**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11, Subchapter V |
| Smart Communications Holding, Inc., | Case No. 8:24-bk-07106 |
| Smart Communications Holding, LLC | Case No. 8:24-bk-07108 |
| **Debtors.** | *Jointly Administered under* 8:24-bk-07106 |

_____/

**CREDITOR JANICE LOGAN'S**
**EMERGENCY MOTION FOR RELIEF FROM AUTOMATIC STAY AND REQUEST**
**FOR COMFORT ORDER AS TO CLAIMS AGAINST NON-DEBTORS**

Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021 ("Janice"), by and through undersigned counsel, hereby respectfully requests that the Court (1) enter an Order granting relief from the automatic stay pursuant to 11 U.S.C. § 362(d), and (2) provide Janice a comfort order as to her right to proceed in state-court on certain claims. In support thereof, Janice states as follows:

**INTRODUCTION**

1.     Bankruptcy is meant for "the honest but unfortunate debtor." *See Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934). Smart Communications Holding, Inc. ("SmartComm") and Smart Communications Holding, LLC ("SmartComm DE") are neither honest nor "legitimate" Debtors, and their bankruptcy filings were in bad faith for at least two reasons.

2.     First, the purported Debtors are parties to a multi-year lawsuit SmartComm initiated in Sarasota County (the "Sarasota Court") that is nearing resolution. *See Jonathan Logan and Smart Commc'n Holding, Inc. v. Janice Logan, et al.* ("*Logan v. Logan*"), Nos. 2023-CA-1002 & 2023-CA-1280 (consolidated into 1002) (Fla. 12th Cir. Ct. Feb. 27, 2023) (the "Sarasota Action");

*see id.*, Janice Logan's Second Am. Compl., *attached as **Exhibit 1***, Jonathan Logan's & SmartComm's First Am. Compl., *attached as **Exhibit 2***, and Janice Logan's Countercl., *attached as **Exhibit 3***.[1] The Sarasota Court entered a November 25, Order setting a two-part trial—one for January 2025 (IP Liability and valuation date) and one for May 2025 (valuation of Janice's shares and purchase order, and all other remaining claims). *See* Order Bifurcating Phase 2 Trial (entered November 25, 2024), *Logan v. Logan*, No. 2023-CA-1002, *attached as **Exhibit 4***.

3.      As explained herein, where bankruptcy petitions are filed on the eve of trial to circumvent pending litigation, the 11th Circuit has found that to be bad faith and abuse of process, and grounds for granting the moving party relief from stay to complete the litigation.

4.      Second, the lawsuit set to be tried in January involves the validity of a purported $90 million debt of the Debtors that is an August 2023 related-party IP transaction ("IP Liability"), executed on behalf of SmartComm DE by Jonathan Logan ("Jon"), the CEO and sole member of SmartComm DE, in the midst of the Sarasota Action, that benefits only Jon via a company he solely owns, HLFIP Holding, LLC ("HLFIP"). Due to a shareholder deadlock—which Jon initiated the Sarasota Action to resolve—Jon currently has exclusive control of SmartComm (as its sole officer and director) and SmartComm DE (a wholly owned subsidiary of SmartComm). This is the very liability the Debtors claim caused their insolvency, and if it were invalidated at the impending trial, the Debtors would not be insolvent, and would have no need for bankruptcy.

---

[1]      This Court can take judicial notice of filings in other courts. *Progressive Mountain Ins. Co. v. Middlebrooks*, 805 F. App'x 731, 733 (11th Cir. 2020) ("We can reasonably take judicial notice of these state court filings as public records."); *see also* Fed. R. Evid. 201. Janice hereby requests that the Court take judicial notice of all exhibits herein that were filed or entered in the Sarasota Action or the Delaware Action. Janice understands that the Court cannot take judicial notice of disputed facts—she does not request that it do so. However, Janice does request that the Court take judicial notice of the fact of filings, the fact of certain allegations within those filings, and the content of Sarasota and Delaware Court Orders and Rulings. To the extent certain exhibits do not appear on a public docket, Janice's Declaration authenticating them is *attached hereto as **Exhibit A***.

5.      Moreover, the impending trial in the Sarasota Action is not an action "against" the Debtors to obtain a judgment or recovery, as would typically be the case when a debtor files bankruptcy to avoid an impending trial. Rather, it is an affirmative action filed by Janice seeking nothing from the estate, and rather seeking only to invalidate the purported $90 million claim against the estate. In other words, the bankruptcy filings are not intended to avoid a state-court ruling unfavorable to the estate. Rather they seek to avoid a ruling unfavorable for Jon and HLFIP, which would significantly benefit the estates, allowing them to remain solvent and avoid bankruptcy. Put simply, the bankruptcy filings are intended to preserve a fraudulent debt.

6.      For these reasons, and as further detailed herein, this Court can and should find that SmartComm and SmartComm DE filed their bankruptcy petition in bad faith, grant Janice's motion for relief from the automatic stay, and issue a comfort order on her right to proceed on all claims in the state-court litigation. *See In re Dixie Broadcasting, Inc.*, 871 F.2d 1023 (11th Cir. 1989).

## FACTUAL BACKGROUND

**A.      Jon's misrepresentations to tribunals to avoid paying Janice the fair value of her shares.**

7.      Contrary to his misrepresentation in SmartComm's List of Security Holders, Jon is not the 100% shareholder of SmartComm. *See* ECF No. 3. Instead, he and Janice are 50% owners. *See* Ex. 4 ("Janice Logan, as Trustee of the James Logan Family Trust—a 50% owner of SmartComm …. Jonathan Logan, who is the other 50% owner of SmartComm and is its incumbent management ….").

8.      SmartComm is a Florida company that provides telecommunications services to prisons and jails throughout the United States. Jon and his late father, James ("Jim") Logan co-

founded SmartComm, and each held a 50% interest in SmartComm's shares prior to Jim's death in October of 2022.

9.      Jon's misrepresentation to this Court that he is 100% owner of SmartComm is just the latest of several attempts to defraud courts. Jon's first misrepresentation was a fraudulent purported shareholders' agreement between Jon and Jim that would have forced Janice to sell her shares on unfavorable terms. The Sarasota Court invalidated that purported agreement at a January 2024 trial ("Phase I Trial").

10.     By way of brief background, before his death, Jim transferred his shares to his family trust. *See* Ex. 1, ¶ 11. Upon his death, Janice became the sole Trustee of his family trust. *See* Ex. 1, ¶ 9; *see also* Ex. 1 to Ex. 1. Between October 16, 2022 and mid-January 2023, Jon negotiated with Janice to purchase her shares, making no mention of any instrument that would control the disposition of the shares, including a prior shareholders' agreement. Janice Logan's Amended Complaint (filed August 24, 2023), *Logan v. Logan*, No. 2023-CA-1002, *attached hereto as **Exhibit 5**, at ¶¶ 58–83. Instead, Jon offered Janice $20 million for her shares, and had an attorney draft a Stock Purchase Agreement in which SmartComm would purchase the shares for that amount. *See* Admitted Phase I Trial Ex. 203, *Logan v. Logan*, No. 2023-CA-1002, *attached hereto as **Exhibit 6***. That draft Stock Purchase Agreement referred to a prior draft shareholders' agreement between Jon and Jim as "unsigned." *See id.* at 203.003, n. 2.

11.     After Janice rejected the $20 million offer because she was aware of UBS and Truist valuations of SmartComm greater than $200 million, Jon purportedly "discovered" a fully executed Shareholders' Agreement in late January 2023 that would have forced Janice to sell her shares on unfavorable terms. *See* Ex. 1, at ¶ 84.

12.     On February 27, 2023, Jon and SmartComm sued Janice for a declaration that the purported shareholders' agreement was valid and enforceable. *See* Jon and SmartComm's Original Compl., *Logan v. Logan*, No. 2023-CA-1002, *attached hereto as **Exhibit 7***.

13.     After almost a year of litigation, the Sarasota Court invalidated that purported shareholders' agreement after a three-day bench trial, which Jon testified under oath had been fully executed. Partial Final Judgment, *Logan v. Logan*, No. 2023-CA-1002, *attached hereto as **Exhibit 8***. In pertinent part, the Court held, "the circumstances in how that document was found are suspicious to the Court" and "I find as fact that the Exhibit 101 [the purported shareholders' agreement] was not signed by Jim Logan. Jim Logan never assented to that document." *Id.* at 20–21 (Tr. pp 723–24).

14.     Following the Sarasota Court's Partial Final Judgment, Janice and Jon (the 50-50 owners of SmartComm) were deadlocked as to the election of a successor director. Janice filed an Amended Complaint in the Sarasota Action seeking judicial dissolution of SmartComm, and bringing various derivative claims against Jon.

15.     In response, SmartComm filed an election to purchase Janice's shares under Fla. Stat. § 607.1436. Election to Purchase Shares, *Logan v. Logan*, No. 2023-CA-1002, *attached as **Exhibit 9***. However, Janice does not lose her status or rights as a shareholder until the court determines the value of her shares and enters a purchase order, which it is set to do in a trial tentatively scheduled for May 2025. *See* Fla. Stat. § 607.1436(6) ("Upon entry of an order under subsection (3) or subsection (5) [the purchase order], the court shall dismiss the petition to dissolve the corporation … and the petitioning shareholder shall no longer have any rights or status as a shareholder of the corporation, except the right to receive the amounts awarded by the order of the court, which shall be enforceable in the same manner as any other judgment."). Neither the

determination of value nor the purchase order have happened yet, and the Sarasota Court otherwise maintains the power to set aside or modify an election to purchase on equitable grounds. *See* Fla. Stat. § 607.1436(1); *see also* Ex. 4.

16.     Jon thus purports to have manipulated the bankruptcy process to reap the benefits of an election to purchase—*i.e.,* sole ownership of the corporation's shares—without satisfying the statutory dissolution process or actually purchasing the shares. This ploy would defy logic and the text and purpose of Chapter 11 and Fla. Stat. §§ 607.1430, *et seq.* Moreover, the financial condition of SmartComm and SmartComm DE show no material changes between the election to purchase on June 20, 2024, and the recent petitions for bankruptcy. *See* Ex. 8; *compare* 2023 Financials produced in September 2024, *attached as **Exhibit 10**, with* ECF No. 6.  The only material change in their condition is that the Sarasota Court refused to delay its decision on the validity of the fraudulent IP Liability.

17.     Jon's second misrepresentation occurred when he tried to evade the Sarasota Action by surreptitiously transferring SmartComm's assets to SmartComm DE and seeking the unwitting imprimatur of the Delaware courts. *See* Ex. 1, at ¶¶ 101–143. First Jon (1) converted a number of SmartComm-related entities from Florida businesses to Delaware businesses, (2) formed SmartComm DE, and (3) transferred all of SmartComm's assets into SmartComm DE. *See* Dec. 6, 2023, Mot. for Contempt and Custodian Hrg. Tr., *Logan v. Logan*, No. 2023-CA-1002, *attached hereto as **Exhibit 11***. Then he filed a lawsuit in Delaware state court without alerting Janice and quickly moved for summary judgment there endorsing his asset-transfer scheme. The Delaware court stayed his action, however, the court criticized Jon's lack of candor: "this Court would have appreciated more transparency from Plaintiff's filings regarding the course of proceedings in the Florida Action." Ex. 1 at Ex. 7, n. 39. The Court further explained, "Given the alarming nature of

the allegations in the Florida Action against Jonathan, the Court is loath to insert itself in a dispute that has involved significant motions practice, evidentiary hearings, and injunctive relief." *Id*. at Ex. 7, p. 10. Having failed in Delaware to oust the Sarasota Court's jurisdiction over SmartComm's assets, Jon now unabashedly seeks to use this Court for the same purpose.

> **B.      SmartComm and SmartComm DE are barred by a stipulated injunction from remittance on the IP Liability; therefore, the only purpose of filing these bankruptcy petitions was to delay and hinder Janice's state court action.**

18.      At the same time in late 2023 when Janice discovered the unilateral asset-transfer scheme underlying Jon's failed effort to evade the Sarasota Court's jurisdiction, she learned that Jon also had executed the transactions that created the IP Liability during the same 96-hours in late August and early September 2023.

19.      On behalf of both SmartComm DE and HLFIP, Jon agreed SmartComm DE would pay HLFIP a 40% of net sales IP royalty. *See* Ex. 1, at Ex. 24, License Agreement. Forty percent just happens to be SmartComm's entire EBITDA margin. *See* Ex. 1, at Ex. 8, slide 12, SmartComm Financial Presentation. Jon thus signed SmartComm's entire revenue margin away to himself (via HLFIP) as IP "royalties" despite the fact that the Federal Circuit affirmed without opinion the invalidation of SmartComm's flagship patent just eleven days earlier. *See HLFIP Holding, Inc. d/b/a Smart Communications IP Holdings v. York Cnty., PA, et al*., 600 F. Supp. 3d 526 (Case No. 1:20-cv-00186, ECF 135) (M.D. Pa. April 25, 2022) *aff'd sub nom. HLFIP Holding, Inc. v. York Cnty., PA*, 2022-1940, 2023 WL 5316529 (Fed. Cir. Aug. 18, 2023).

20.      Undeterred by the complete absence of contemporaneous support for *any* royalty before 2023, let alone one that would beggar SmartComm and thus his own mother, Jon backdated the IP Liability in SmartComm's financial statements to 2015 (plus interest). *See* Ex. 1, at Ex. 19, 2022 Audited Financial Statement (prepared in October 2023). Tellingly, only SmartComm's financial statements *prepared in or after 2023* reflect this liability. *Compare* Ex. 1, at Ex. 19, *with*

Exhibit 1, at Ex. 27, 2021 Audited Financial Statement (prepared in 2022). Even more revealingly, SmartComm's applications for government contracts submitted in 2024 *do not* reflect the liability. *See* Amended Mot. to Determine Value, *Logan v. Logan*, No. 2023-CA-1002, *attached as **Exhibit 12***, at Ex. 9. SmartComm wants it both ways—it wants its potential customers to think it is financially sound, but wants this Court and the Sarasota Court to believe it is under water.

21.    Upon learning SmartComm had sought to transfer all of the assets out of its jurisdiction in the midst of litigation, the Sarasota Court was ready to appoint a temporary custodian or receiver at the hearing on Janice's Motion for Contempt and Custodian. *See* Ex. 11, Tr. at 35–43.[2] To avoid that outcome, Jon, SmartComm, and SmartComm DE represented that no payments had yet been made on the IP Liability and stipulated to an injunction prohibiting SmartComm and SmartComm DE from making payments on the IP Liability. *See* Stipulated Injunction (entered Dec. 15, 2023), *Logan v. Logan*, No. 2023-CA-1002, *attached as **Exhibit 13*** ("Jon, Smart Communications, and Smart Delaware, agree that they will take no action to cause

---

[2]    Key moments from that hearing are excerpted below:

> THE COURT: Okay. You've taken the assets out of an entity that is before me and put it in an entity that's not before me in a different state; is that what has happened?
> MS. KOFF  [SmartComm & SmartComm DE's Counsel]: Yes, Your Honor.
> THE COURT: Why is that not the definition of a corporate waste?
> Look, I will tell you what I'm hearing right now is a situation where unless you can explain it better to me, than "Oh, we just let Delaware law clean this up."
> MS. KOFF: There is a better explanation.
> THE COURT: There better be.
> MS. KOFF: There is, Your Honor, if I could just have one moment. Thank you.
> THE COURT: Please, make it quick. And, Mr. O'Neill, while she's figuring this out, power up your phone and give me the names of the receivers that you're thinking of.
> MR. O'NEILL: I will. Yes, Your Honor.
>                                      ***
> THE COURT: … But, again, it looks bad.
> It smells bad to take an action that appears to be directly designed to undercut the Court's authority over this entity.

Smart Communications or Smart Delaware to pay licensing and/or royalty fees for its use of intellectual property owned by HLFIP, LLC, except as may be permitted by further Court Order on proper motion and notice[.] This includes Jon agreeing not to allow any entity he owns or controls from paying such licensing and/or royalty fees.").

22.    On April 15, 2024, Jon, on behalf of HLFIP, even wrote a demand letter to SmartComm DE (which he controls as sole officer and director) acknowledging SmartComm had made no payment on the IP Liability in compliance with the stipulated injunction. *See* Demand Letter to SmartComm DE, *attached as **Exhibit 14**.*

23.    Considering Jon, SmartComm, and SmartComm DE's representation to the Sarasota Court that SmartComm had not made payments to SmartComm DE, and per the terms of the stipulated injunction, there was no reason SmartComm needed to file for bankruptcy when it did. If SmartComm simply obeyed the terms of the stipulated injunction, it would feel no effects from the $90 million "debt." Indeed, because it was (and still is) in SmartComm's best interest for Janice to prevail on her state court claims invalidating $90 million in fake debt, SmartComm should prefer not to be in bankruptcy until or unless the IP Liability stands.

24.    If SmartComm is currently unable to meet its obligations due to the IP Liability, then that is only because SmartComm has violated the stipulated injunction by transferring funds to HLFIP and is in contempt of the Sarasota Court.

    **C.**    **The very question of whether SmartComm and SmartComm DE owe the $90 million IP Liability is set to be resolved (and still could be resolved) in the Sarasota Action in February.**

25.    Janice challenged the validity of the IP liability via both direct and derivative claims in the state-court proceeding. *See e.g.*, Ex. 1, Count I & Ex. 3, Count I.

26.     In July of this year, the state court set the entire matter for trial at the January 2025 trial setting. *See* Order Setting Trial, *Logan v. Logan*, No. 2023-CA-1002, *attached as **Exhibit 15**.*[3]

27.     Since then, Jon, SmartComm, SmartComm DE, and HLFIP have done nothing but delay and obstruct.

28.     Shortly after the Sarasota Court's initial order setting trial, HLFIP refused to agree to the case management order the Court had ordered the parties to draft because it wanted to delay trial 120-150 days. *See* Opposed Case Management Report, *Logan v. Logan*, No. 2023-CA-1002, *attached as **Exhibit 16***. The Court entered the order anyways. Case Management Order, *Id.*, *attached as **Exhibit 17***.

29.     Despite of their first responses to Janice's document requests being due August 7, 2024, HLFIP failed to make its first production until after the Chapter 11 petitions were filed. *See* Order on Amended Motion to Compel, *Logan v. Logan*, No. 2023-CA-1002, *attached as **Exhibit 18***.

30.     SmartComm and SmartComm DE admittedly altered their accounting practices and 2024 financials in the midst of litigation. *See* Janice Logan's Am. Mot. to Compel, *Logan v. Logan*, No. 2023-CA-1002, *attached as **Exhibit 19.***

31.     Jon, SmartComm, SmartComm DE, and HLFIP all sought again last month to continue trial. *See* Jon, SmartComm, and SmartComm DE's Mot. to Continue Trial (Nov. 15, 2024), *Logan v. Logan*, No. 2023-CA-1002, *attached as **Exhibit 20**; see also* HLFIP's Mot. to Continue Trial (Nov. 19, 2024), *id.*, *attached as **Exhibit 21***.

---

[3]     The court's January trial setting period runs until mid-February. Due to witness availability, the trial will occur in the first half of February.

32.    The Sarasota Court rejected these repeated requests to delay trial, and set a date to decide the validity of the IP Liability, as well as the threshold date-of-valuation issue, at a limited bench trial in January 2025:

> There is a separate core issue framed by the pleadings that could substantially impact value: the viability of the claimed royalty due to HLFIP Holdings, LLC from SmartComm. As HLFIP sees it "the Court must decide (1) whether HLFIP owns some or all the intellectual property that SmartComm uses to provides services to correctional facilities across the country and (2) the royalty that HLFIP is owned for the intellectual property that it owns and licenses to SmartComm." [DIN 821, p. 5]. The Court will shorthand this as the "license/royalty" issue. The HLFIP entity is 100% owned and controlled by Jonathan Logan.
>
> ***
>
> For those reasons, the Court will bifurcate the Phase 2 trial. Part 1 of the Phase 2 trial will focus on: (1) the proper valuation date; and (2) **the "license/royalty" issue**. Part 1 of the Phase 2 trial will occur during the existing three-week trial period that begins on **January 27, 2025**.

*See* Ex. 4 (emphasis added).

33.    Only days after the Sarasota Court issued its trial-setting order above, SmartComm and SmartComm DE filed the Chapter 11 petitions. Then, SmartComm and SmartComm DE wasted no time informing Janice that (1) her claims against them—which if she were successful would *relieve* SmartComm of the IP Liability—could not proceed without violating the automatic stay; and that (2) she no longer had standing to pursue any claim against the "Smart Entities." To be clear, SmartComm has bizarrely taken the position that the Sarasota Court should *not* be allowed to decide whether to invalidate a $90 million liability that would inure to the benefit of the person who signed the bankruptcy petitions on behalf of SmartComm and SmartComm DE. *See* ECF No. 1.[4]

---

[4]    Non-Debtors Jon and HLFIP also contend that the Section 362 automatic stay shields them from having to defend the validity of the purported IP Liability in the Sarasota Action. *See* Debtors' Motion To Enforce The

34.     Nevertheless, SmartComm and SmartComm DE continued offensive litigation even after filing their Chapter 11 petitions. Namely, they filed an Amended Complaint against Janice in the state-court action on December 4, 2024. *See* Second Amended Complaint, *Logan v. Logan*, No. 2023-CA-1002, *attached as **Exhibit 22***. In addition, SmartComm filed an entirely new lawsuit against the City and County of Denver on December 3, 2024. *See* Compl., *Smart Commc'n Holding, Inc. v. City and Cnty. of Denver, et al.*, No. 2024CV33720, *attached as **Exhibit 23***.

35.     The Court should lift the stay to prevent Jon from further delaying what would be in the best interest of SmartComm's bankruptcy estate.

## **LEGAL STANDARD**

Section 362 provides the following procedure and legal standard to grant relief from the automatic stay: "on request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, . . . (1) for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d).

The Bankruptcy Code does not define the term "cause," and so "cause" to lift the stay "must be decided on a case-by-case basis." *In re Murray Industries, Inc*., 121 B.R. 635, 636 (Bankr. M.D. Fla. 1990). Factors that courts generally consider in evaluating motions for relief from the automatic stay include "the prejudice to the Debtor's reorganization efforts, conservation of judicial resources, and prejudice to the movant." *Murray*, 121 B.R. at 637. *See also* S. Rep. 78-989 reprinted in (1978) U.S.C.C.A.N. 5787, 5836 ("[I]t will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from any duties that may be handled elsewhere.").

---

Automatic Stay (ECF No. 19), filed December 6, 2024. Janice will respond separately to the Debtors' Motion To Enforce The Automatic Stay shortly.

In particular, bankruptcy courts have found cause to grant relief from the automatic stay when the debtor filed for bankruptcy in bad faith to avoid an adverse result in ongoing litigation.

In *In re Dixie Broadcasting, Inc.*, the debtors petitioned for bankruptcy to avoid a judgment against it in a civil suit. The debtors had agreed to sell their radio stations to a company, WBHP, but reneged on the sale. *Id.* at 1025. WBHP commenced a state-court suit against the debtor. *Id.* After over two years of litigation, the court informed the parties that it "was ready to rule in WBHP's favor" and ordered them to participate in a settlement meeting. *Id.* During a lunch beak during the settlement meeting, the debtors filed for Chapter 11 bankruptcy. *Id.* WBHP filed a motion for relief from the automatic stay to complete the state-court litigation, and the bankruptcy court granted it because the debtors' petition "amounted to bad faith" and was "for the primary purpose of (1) avoiding the consequences of an anticipated adverse state-court decision; (2) relitigating the same controversy between the two parties in bankruptcy forum; and (3) invoking the automatic stay provision to evade the pending state-court litigation." *Id.* at 1026. The bankruptcy court further observed that the state-court litigation was on "the verge of completion," and that the debtor had filed their Chapter 11 petition "to obtain a last-minute escape chute out of the civil litigation." *Id.*

The Eleventh Circuit affirmed the bankruptcy court's grant of the motion for an automatic stay, and affirmed the finding of bad faith. *Id.* The Eleventh Circuit assessed several factors in assessing whether there was bad faith, such as "an intent to abuse the judicial process and the purposes of the reorganization provisions," "the timing of the filing of the petition," and "whether the petition was filed strictly to circumvent pending litigation." *Id.* at 1027 (internal quotation marks omitted). The Eleventh Circuit identified that, because the debtor had filed for bankruptcy

"in eleventh-hour court ordered settlement negotiations in the state court litigation," and "to get out of its bad deal," that bad faith justified lifting the stay. *Id.* at 1026–27.

In another comparable case, the Eleventh Circuit reached the same result. *See, e.g., In re Phoenix Piccadilly Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988) (affirming bankruptcy court orders granting relief from the automatic stay where the Chapter 11 petition was filed "in bad faith" "the day before a hearing in the state court action" between the debtor and the creditors seeking relief from the stay, and further reasoning that in resolving a motion seeking relief from the automatic stay "courts may consider any factors which evidence an intent to abuse the judicial process and the purposes of the reorganization provisions or, in particular, factors which evidence that the petition was filed to delay or frustrate the legitimate efforts of secured creditors to enforce their rights" (internal quotation marks omitted)); *see also Collier on Bankruptcy* § 362.07 (16th ed. 2012) ("[R]elief [from the automatic stay] also may be granted when necessary to permit litigation to be concluded in another forum, particularly if the nonbankruptcy suit involves multiple parties or is ready for trial.").

## **ARGUMENT**

### A.    **This Case Is Nearly Identical to *Dixie*, and Relief from the Automatic Stay Is Appropriate.**

The facts here are nearly identical to those in *In re Dixie Broadcasting, Inc.*, 871 F.2d 1023 (11th Cir. 1989). Like *In re Dixie Broadcasting, Inc.*, the Debtors filed their Chapter 11 petitions mere *days* after Jon received unfavorable rulings in the state-court proceeding—that is, denials of their motions to dismiss Janice's pleadings, an adverse ruling on Janice's entitlement to costs for Phase I Trial, adverse rulings on motions to compel discovery, and a trial date (only two months away) after repeated attempts to delay the proceeding. *See* Ex. 4; *see also* Orders on 11/22 Mots., *Logan v. Logan*, No. 2023-CA-1002, *attached as **Exhibit 24** (Denial of SmartComm MTD Janice's*

*Second Am. Compl.), 25 (Denial of SmartComm MTD Janice's Countercl.), 26 (Denial of HLFIP's MTD Janice's Second Am. Compl.), 27 (Denial of HLFIP's MTD Janice's Countercl.), 28 (Granting Entitlement to Phase I Costs), 29 (Granting Janice's Mot. to Compel as to HLFIP), 30 (Granting Janice's Second Mot. to Compel as to HLFIP)*.

The Debtors have made incorrect pleas about their status and the state of affairs in order to avoid another unfavorable Sarasota Court ruling. The Debtors are not even up front about SmartComm's security holders. *See* ECF No. 3. SmartComm filed for Chapter 11 without so much as notifying, let alone getting the requisite permissions from, 50% shareholder Janice, and then hope to mislead this Court about Jon owning 100% of SmartComm's shares. The reason for doing so is plain: the state court was about to try the IP Liability and choose a valuation date for valuing Janice's shares. *See* Ex. 4. Once the state court decided those things, SmartComm and SmartComm DE would be locked in to purchasing Janice's shares within a specifically definable value range. And, without the IP Liability, the financials and economic circumstances are only so malleable. Given that, there is a likely, at minimum mid-eight figure floor, to purchase Janice's shares which is unacceptable to Jon.

As to the IP Liability in particular, the state court's comments at the 11/22 hearing (which Jon attended remotely) likely spooked Jon. When pushing HLFIP's counsel about his contention that the IP Liability could not be tried in January, the state court said, "What I was wondering is why can't we resolve whether there's, you know -- whether that transaction actually occurred or whether there was or was not a royalty agreement, and to me that seems like something that could be done probably next week if we absolutely had to." *See* Nov. 22 Hrg. Tr., *Logan v. Logan*, No. 2023-CA-1002, *attached as **Exhibit 31**, at 125–128*. In the same colloquy, the state court further said, "What else is there to do relative to whether or not back in, was it 2015, there was an oral

agreement … maybe some -- some notations in the books and records or the absence of notation

in the books and records?" *Id*. As Janice explained above, and as Jon well knows, there were no

notations of any royalty in SmartComm's financials until 2023. *See* Ex. 1 at ¶¶ 106–137. Indeed,

HLFIP effectively admits as much in its request for admission responses:

> 6. Admit that there are no documents in your custody, possession,
> or control from prior to August 29, 2023, that reference a 40% net
> sales intellectual property royalty license from SmartComm to
> HLFIP.
> Response to RFA No. 6: HLFIP denies this Request because while
> there may be no documents from before August 29, 2023, that use
> the term "royalty" or "royalty fee," in 2015, James Logan, Jon
> Logan, Alexis Logan, Smart Communications US, and Smart
> Communications Holding entered into a written agreement that
> expressly recognized that "Jonathan Logan exclusively owns and
> will retain exclusive ownership" of the intellectual property for
> which Jon was the "inventor." Jon's ownership of the intellectual
> property that Jon invented or developed necessarily entitles him to
> reap the economic benefits of that intellectual property. Therefore,
> that 2015 agreement necessarily implies that SmartComm owed and
> owes royalties to Jon Logan (via what is now his wholly owned
> entity, HLFIP).

HLFIP's Amended Responses and Objections to Janice's First RFAs, *Logan v. Logan*, No. 2023-

CA-1002, *attached as **Exhibit 32***.

Tellingly, even though the purported reason for debtors' Chapter 11 petitions—the

disputed, now-$90 million IP liability allegedly held by SmartComm that plunged it into

insolvency and drove it to seek reorganization under Chapter 11—has, according to SmartComm,

existed since 2015. Despite this purported liability (which would surely impose liquidity

constraints), Jon and SmartComm nevertheless filed an election to purchase Janice's 50% interest

in the company in June of 2024.

Similarly, in request for proposal responses to potential customers, submitted by

SmartComm as recently as 2024, SmartComm did not disclose the $90 million IP liability when

responding to questions about financial status, and produced versions of their financials that did not disclose the IP Liability. *See* Ex. 12, at Ex. 9. The timing of SmartComm's Chapter 11 petition and the fact that SmartComm did not disclose the IP Liability in RFP responses establish that SmartComm, like the debtor in *In re Dixie Broadcasting, Inc.*, filed it in bad faith "for the primary purpose of (1) avoiding the consequences of an anticipated adverse state court decision; (2) relitigating the same controversy between the two parties in bankruptcy forum; and (3) invoking the automatic stay provision to evade the pending state court litigation." *Id.* at 1026. The debtors' bad faith warrants relief from the automatic stay.

Jon cannot have it both ways. Here, against all logic and the plain text of the relevant statutes, Jon *wants* SmartComm and SmartComm DE to be bankrupt because of a purported $90 debt to a third party; Jon *wants* to be the 100% shareholder of SmartComm without paying Janice; and, Jon *wants* the authority to unilateral authority to file bankruptcy as a 50% shareholder while preventing Janice from maintaining derivative claims that would *aid* SmartComm and SmartComm DE. This Court should not abide such gamesmanship, which flouts both Chapter 11 and the Florida Business Corporation Act.

### B.    An Evaluation of Prejudice and Conservation of Judicial Resources Also Favors a Stay

Even leaving aside the bad faith parallels to *In re Dixie Broadcasting, Inc.*, there is ample alternative cause to justify granting Janice's motion for relief from the automatic stay. Relief from the automatic stay would not prejudice SmartComm's or SmartComm DE's reorganization efforts. Quite the opposite—in the state-court proceedings, Janice seeks to *unburden* SmartComm and SmartComm DE from the $90 million IP liability that, according to SmartComm's 2023 Audited Financial Statement, rendered SmartComm insolvent. Without that liability, SmartComm and SmartComm DE would not need to reorganize under Chapter 11 at all. *See* ECF No. 6.

SmartComm's own conduct establishes that proceeding in state-court litigation would not burden its reorganization efforts. Namely, it has continued in, or outright initiated, state-court suits within days after filing its Chapter 11 petition. On December 4, 2024, SmartComm filed an amended complaint in the state-court action against Janice. *See* Ex. 22. Similarly, on December 3, 2024, SmartComm filed a complaint against the City and County of Denver for allegedly improperly withdrawing a contract previously awarded to SmartComm. *See* Ex. 23. These actions leave no doubt that Jon is in really in search of selective breathing room.

Relatedly, relief from the automatic stay would not prejudice SmartComm's reorganization effort because Janice intends to move for dismissal of its Chapter 11 petition. Although Jon, in his capacity as the sole director of SmartComm, filed a certificate of authority to file a Chapter 11 petition, he did not have authority to do so. Fla. Stat. § 607.1202 provides that a corporation may "dispose of all, or substantially all, of its property (with or without good will), otherwise than in the usual and regular course of business" only if "the board of directors proposes and its shareholders approve the proposed transaction." *Id*. § 607.1202(1). Florida courts have held that, because filing for bankruptcy disposes of all of a company's assets by placing in a bankruptcy estate, the requirements of § 607.1202 apply. *See In re Zebranek & Doughten P.A.*, No. 01-04461-6B7, 2001 WL 1825793, at *2 (Bankr. M.D. Fla. July 31, 2001) (§ 607.1202's requirements must be fulfilled for Chapter 7 petition). Far from approving the filing, Janice had no knowledge that SmartComm would file the Chapter 11 petition. Jon therefore had no authority to file the petition and it must be dismissed.

Relief from the automatic stay would conserve judicial resources. Similar to *In re Dixie Broadcasting, Inc.*, the Sarasota Action has been pending since SmartComm filed it almost two years ago. The pleadings were due to be settled on December 6, the parties were in the midst of

discovery, and trial was two months away when SmartComm and SmartComm DE filed their Chapter 11 petitions. Moreover, the validity of the unpaid IP liability that purports to render SmartComm and SmartComm DE insolvent was a key issue, set to be tried in January/February of 2025. To assess that liability in Bankruptcy Court would require the parties to duplicate efforts, and waste judicial and private resources.

On the other hand, enforcement of the automatic stay would severely prejudice Janice. Janice is a 71-year old widow whose SmartComm shares are her husband's only legacy to her and her only significant asset. She has been fighting to access the value of her shares for over two years, and has run out of money to fund this costly litigation against Jon, SmartComm, and the related entities—all of whom are using SmartComm's resources to pay their lengthy roster of big firm lawyers. Meanwhile Jon has abused SmartComm's resources by using SmartComm assets to pay nine different law firms to represent him, SmartComm, SmartComm DE, and HLFIP across the Sarasota, Delaware, and bankruptcy to exhaust Janice and thus deter her recovery of the fair value of her shares. To force Janice to endure further litigation in Bankruptcy Court would bleed her dry. Janice's age and heart condition further weigh in favor of a speedy resolution of her state-court claims against SmartComm and SmartComm DE.

### C.     This Court Also Should Confirm That The Automatic Stay Does Not Apply To Janice's Claims Against The Non-Debtor Defendants (Jon and HLFIP).

The law is clear that the automatic stay pursuant to § 362(a) applies only to the debtor—and not to non-debtor co-defendants. *Teachers. Ins. & Annuity Ass'n v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986) ("It is well-established that stays pursuant to § 362(a) are limited to debtors and do not encompass non-bankrupt co-defendants."); *In re* Melbourne Beach, LLC, 2019 WL 10734362, at *2 (Bkrtcy.M.D.Fla., 2019) ("Because 'unusual circumstances' do not exist in this case, the Court declines to extend the automatic stay to enjoin the state court actions against … a non-debtor

party."). This Court should adopt the same reasoning and confirm that this action does not stay Janice's claims against Jon in his personal capacity, or against HLFIP.

Allowing Janice's claims against Jon in his personal capacity, and against HLFIP, to proceed would not increase the amounts for which debtors might be liable. Quite the opposite: If Janice obtains a favorable judgment against HLFIP with the effect of invalidating the IP liability, that judgment would relieve SmartComm and SmartComm DE from alleged insolvency entirely.

WHEREFORE, Janice respectfully requests that the Court grant this motion for relief from automatic stay and permit her to proceed in all direct and derivative claims in the Sarasota Action, pursuant to 11 U.S.C. § 362, provide a comfort order as to her right to proceed against non-debtors in the Sarasota Court, and order such other and further relief as the Court deems just and equitable. DATED:  December 9, 2024.

*/s/ Edward J. Peterson*
Edward J. Peterson (FBN 014612)
Johnson Pope Bokor Ruppel & Burns, LLP
400 N. Ashley Drive, Suite 3100
Tampa, Florida 33602
Telephone: (813) 225-2500
Email: edwardp@jpfirm.com
Attorneys for Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished on December 9, 2024, by the Court's CM/ECF system to all parties receiving electronic noticing.

*/s/ Edward J. Peterson*
Edward J. Peterson

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**
www.flmb.uscourts.gov

| | |
|---|---|
| **In re:** | **Chapter 11, Subchapter V** |
| Smart Communications Holding, Inc., | Case No. 8:24-bk-07106 |
| Smart Communications Holding, LLC | Case No. 8:24-bk-07108 |
| **Debtors.** | *Jointly Administered under* 8:24-bk-07106 |

_____/

**DECLARATION OF JANICE LOGAN IN SUPPORT OF
EMERGENCY MOTION FOR RELIEF FROM AUTOMATIC STAY**

I, Janice K. Logan, declare as follows:

1. I am a creditor in the bankruptcy proceeding at issue. *See In re: Smart Communications Holding, Inc*., No. 8:24-bk-07106 (Bankr. M.D. Fla. Nov. 30, 2024), ECF 2 at 2. I am also a party in current state-court litigation involving both debtors. *See Jonathan Logan and Smart Commc'n Holding, Inc. v. Janice Logan, et al.* ("*Logan v. Logan*"), Nos. 2023-CA-1002 & 2023-CA-1280 (consolidated into 1002) (Fla. 12th Cir. Ct. Feb. 27, 2023).

2. Because of my involvement in *Logan v. Logan*, I have personal knowledge of the facts stated below and would be competent to testify to them in court.

3. I filed the Second Amended Complaint, attached as Exhibit 1 to my Emergency Motion for Relief from Automatic Stay ("Motion"). Before I filed the Second Amended Complaint (Exh. 1), I earlier filed an Amended Complaint, which is attached to my Motion as Exhibit 5.

4. I also filed the Counterclaims to Jon and Smart Communications Holding, Inc.'s First Amended Complaint, attached as Exhibit 3 to my Motion.

5. I have personal knowledge of the events alleged in the Second Amended Complaint (Exh. 1), Counterclaims (Exh. 3), and Amended Complaint (Exh. 5), because I was present for those events or because they happened to me. Namely, I was present at the deceased Jim Logan's transfer of shares to the Family Trust and Jon's negotiation with me to purchase those shares following Jim's death and my rejection of Jon's offer to purchase for $20 million. Jon's former attorneys also informed me that Jon had located an executed Shareholders' Agreement that would have obligated me to sell the Trust's shares to Jon, and filed a complaint against me for not selling the Trust's shares to him. And my attorneys discovered, and shared with me, documents showing that Jon filed a lawsuit in Delaware

to validate his transfer of disputed assets to Delaware. Because of my personal knowledge and my presence at these events, I would be competent to testify to them in court.

6.  During the proceedings in *Logan v. Logan*, in response to Jon's related-party transactions and unilateral conversion of disputed Florida entities into Delaware entities solely controlled by himself, I filed a Motion for Contempt and Custodian. The Florida court conducted a hearing on that motion on December 6, 2023. Exhibit 11 attached to my Motion is a true and correct transcript of that hearing.

7.  In addition, during the proceedings in *Logan v. Logan*, I served discovery requests directed at debtors. In response to my discovery requests, counsel for Smart Communications Holding, Inc. produced, in September 2024, the 2023 Financials attached to my Motion as Exhibit 10.

8.  Counsel for Smart Communications Holding, Inc. also produced Exhibits 7 (SmartComm Financial Presentation), 19 (2022 Audited Financial Statement, 24 (License Agreement), and 27 (2021 Audited Financial Statement) to the Second Amended Complaint (attached as Exhibit 1 to my Motion) in response to my discovery requests.

9.  Counsel for Smart Communications Holding, Inc. also produced in discovery Exhibit 9 (Clay County Request for Proposal) to my Amended Motion to Determine Value filed in *Logan v. Logan*; the Amended Motion to Determine Value is attached to my Motion as Exhibit 12.

10. Counsel for SmartComm and related-party HLFIP Holding, LLC also produced in discovery Jon's demand letter addressed to Smart Communications Holding, LLC, attached to my Motion as Exhibit 14.

11. Although I served discovery requests for complete financial records directed at debtors and related-party HLFIP Holding, LLC, I did not timely receive responsive documents. Counsel for debtors related that the financial records had not been produced because they were being "corrected"—that is, altered. HLFIP did not produce any responsive documents at all. To seek recourse for these discovery violations, I filed a motion to compel, which is attached to my Motion as Exhibit 19.

12. The Florida court partially granted my motion to compel and set a deadline of December 2 for HLFIP to produce responsive documents. (The court's Order is attached to my Motion as Exhibit 18.) But the December 2 deadline post-dates the date debtors' Chapter 11 petitions were filed, and HLFIP produced nothing until after the petitions had been filed.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 9, 2024

Janice K. Logan

# EXHIBIT 1

**CONFIDENTIAL - UNREDACTED**

**IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA**

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.

Plaintiffs,

v.

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust, dated February 10, 2021;
and ALEXIS LOGAN,

Defendants

_____ /

Case No. 2023-CA-1002-NC

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021,

Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., SMART
COMMUNICATIONS HOLDING, LLC, HLFIP
HOLDING, INC, and HLFIP HOLDING, LLC,

Counterclaim Defendants

_____ /

(CONSOLIDATED)

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021, and
derivatively on behalf of Smart Communications
Holding, Inc.,

Plaintiff,

v.

JONATHAN D. LOGAN,
SMART COMMUNICATIONS HOLDING, INC.,
nominal defendant, SMART COMMUNICATIONS
HOLDING, LLC, HLFIP HOLDING, INC., HLFIP
HOLDING, LLC, LOCO FLORIDA LLC, and
SMART COMMUNICATIONS YACHT
HOLDING, LLC,

Defendants

_____ /

Case No.: 2023-CA-1280-NC

**PLAINTIFF JANICE LOGAN'S
<u>SECOND AMENDED VERIFIED COMPLAINT</u>**

Plaintiff Janice Logan ("Janice"), as Trustee of the James Logan Family Trust, dated February 10, 2021 (the "Trust"), complains as follows against Nominal Defendant Smart Communications Holding, Inc., ("SmartComm" or "the Company"), and Defendants Jonathan D. Logan ("Jon"), Smart Communications Holding, LLC ("SmartComm DE"), HLFIP Holding, Inc./LLC ("HLFIP"), Smart Communications Yacht Holding, LLC ("Yacht"), and Loco Florida LLC ("Loco").

## INTRODUCTION

1.     SmartComm is a valuable business that provides communications-related products and services to correctional facilities. Janice brings this action because her son Jon, using his unilateral control of SmartComm, has repeatedly schemed in breach of both his legal duties and common decency to deprive Janice of the value of her 50% ownership of SmartComm.

2.     Jon first schemed against Janice by proffering a fraudulent shareholders agreement. Jon launched this deception just days after Janice refused to sell the Trust's shares to Jon for a small fraction of their value and she sent him a letter questioning his use of corporate assets.[1] Jon suddenly claimed to have "found" a fully-executed Shareholders' Agreement requiring Janice to relinquish the Trust's shares—but could never explain how he had "lost" that critical document on his own kitchen counter for four months, during which time he had not told a soul of its supposed execution. After a three-day bench trial in January 2024, this Court held that there was no shareholders' agreement in effect between the two 50% shareholders of SmartComm, Jon and Janice. *See* DIN 652, Phase I Declaratory Judgment, *attached hereto* as Exhibit 1.

---

[1]     *See* DIN 271, Amended Verified Complaint, ¶¶ 71–80 (describing the discovery of the purported Shareholders' Agreement and Jon's actions after its discovery).

3.      Jon's second scheme—which continues today—is wielding corporate resources in retaliation against Janice for asserting her rights as a shareholder. Last May, Jon fired his recently widowed mother from her position at SmartComm, cut off her salary and health insurance, began eviction proceedings against her, and filed vexatious lawsuits threatening to repossess her car and charge $35,000/month in rent for her to live in the home she had lived in with her late husband (and SmartComm co-founder), James Logan ("Jim"). That effort was temporarily enjoined in July 2023 after a full-day evidentiary hearing. *See* DIN 169, Order on Janice Logan's Motion for Temporary Injunction, *attached hereto* as Exhibit 2. Nevertheless, Jon recently tried to dun Janice for over $200,000 in expenses incurred to maintain the house from which he sought unsuccessfully to evict her. *See* Exhibit 3, Reimbursement Demand Letter.

4.      Jon launched his third scheme—to move SmartComm assets beyond this Court's jurisdiction by establishing several Delaware corporate entities to hold them—just one month after the Court enjoined his retaliation against Janice and found that based on evidence so-far presented, the purported shareholders' agreement was not in existence during relevant time periods. Jon surreptitiously converted SmartComm-related entities from Florida businesses to Delaware businesses. He unilaterally created a new SmartComm holding entity in Delaware, SmartComm DE, because he could not convert SmartComm without Janice's permission. He then "executed" an Asset Transfer Agreement purporting to transfer all of SmartComm's assets to SmartComm DE. *See* Confidential Exhibit 4, SmartComm DE Asset Transfer Agreement. He also began assigning old SmartComm contracts to SmartComm DE, and entering into new contracts under the guise of SmartComm DE. *See* Exhibit 5, Consent to Assignment; *see also* Confidential Exhibit 6, Eaton County Master Services Agreement.

5.      In furtherance of his Delaware asset-diversion scheme, Jon filed a declaratory judgment action in Delaware. Jon then sought to expedite a Motion for Summary Judgment in that case so that a less-familiar court might declare Jon the sole member of two SmartComm-related entities—Loco Florida LLC (which holds SmartComm's headquarters building), and Smart Communications Yacht Holding, LLC (which holds SmartComm's 100' Italian Riva Corsaro motor yacht). Despite Jon's representation to the Delaware court that he would notify Janice of his declaratory judgment action there, Janice in fact learned of it via a docket alert service. Forced to intervene, Janice filed a Motion to Dismiss or Stay. The Delaware court stayed Jon's suit, criticizing his lack of candor about the extent and progress of the Florida action. *See* Exhibit 7, Order Granting Janice Logan's Motion to Stay.

6.      Jon's fourth scheme is a self-dealing intellectual property ("IP") license agreement that would divert *all* of SmartComm's profit to a company Jon claims to own personally. This scheme rests on a purported August 2023 IP license/long-term note payable between SmartComm and HLFIP[2] (a company Jon asserts he exclusively owns) for a breathtaking 40% of SmartComm's net sales. The purported license agreement's 40% IP royalty rate is no coincidence: SmartComm's internal EBITDA margin is exactly 40%. *See* Confidential Exhibit 8, 2022 Financial Presentation. Moreover, Jon sought to eviscerate SmartComm with this profit-stripping royalty for intellectual property that *has been invalidated* by the Federal Circuit. *See HLFIP Holding, Inc. v. York Cnty., PA*, No. 2022-1940, 2023 WL 5316529 (Fed. Cir. Aug. 18, 2023). And brazenly undeterred by more than a decade-long course of dealing by which SmartComm paid nothing for the now-

---

[2]      Jon converted HLFIP from a Florida corporation to a Delaware limited liability company during the furtive, post-injunction conversions in late August/early September 2023. Thus, Janice names both, and will refer to them commonly as HLFIP.

invalidated IP, Jon *backdated* the 40% royalty from 2023 to 2015 *with interest*, saddling SmartComm with a purported *$80 million liability to himself.*

7.      Janice brought Jon's Delaware asset-transfer and IP liability schemes to the Court's attention on a Motion for Contempt of Temporary Injunction and to Appoint a Temporary Custodian. DIN 401, 468. During the evidentiary hearing on that Motion, prior to evidence being taken, Jon and SmartComm's counsel admitted to the asset transfer and acknowledged the IP liability (while representing that no payments had yet been made on the supposedly 8-year-old liability). To avoid the appointment of a custodian, they stipulated to additional interim injunctive relief, including that: (1) Jon and SmartComm would not enter into any transactions outside the ordinary course of business without Court approval; (2) SmartComm would not make any payments on the fraudulent IP liability; and (3) that SmartComm DE would become a party to the Florida action and Janice would have identical information rights to those she has in SmartComm. *See* DIN 489, Order on Janice Logan's Motion to Appoint a Temporary Custodian and For Contempt, *attached hereto* as Exhibit 9. Nevertheless, Jon continues to claim that the IP transactions are legitimate and should be reflected on SmartComm's books, thereby degrading SmartComm from a profitable, fast-growing company to a deeply-indebted one—thus harming Janice in the midst of their shareholder dispute.

8.      Simply put, Jon's persistent and aggressive scheming against Janice and the Trust is no way to run a Florida corporation. Jon forged a major corporate governance document, retaliated so aggressively against a 50% shareholder for questioning his waste of corporate assets that this Court enjoined him from doing so, surreptitiously sought to move contested assets from this Court's jurisdiction, and has attempted to divert all profit from SmartComm to himself with a self-dealing IP agreement. Janice respectfully asks the Court to put a stop to Jon's reckless

predations by invalidating his self-dealing transactions, appointing a custodian or receiver to manage the SmartComm business and prepare it for sale for the benefit of both shareholders, and hold Jon accountable for his misconduct.

## **THE PARTIES**

9.      Plaintiff Janice Logan is a resident of Sarasota County, Florida, Trustee of the James Logan Family Trust, dated February 10, 2021 and a 50% shareholder of SmartComm.

10.     The Trust is administered in Sarasota County, Florida.

11.     The Trust became a 50% shareholder of SmartComm when Jim transferred his shares via stock power to the Trust on September 16, 2022, shortly before his death on October 16, 2022. *See* Exhibit 10, Stock Power Certificate.

12.     Nominal Defendant SmartComm is a Florida corporation, with its headquarters in Pinellas County, Florida at 10491 72nd Street, Seminole, Florida 33777. It is the sole member of SmartComm DE, making SmartComm DE a SmartComm subsidiary.

13.     Defendant SmartComm DE is a Delaware limited liability company formed on August 29, 2023 in the midst of this Consolidated Action.

14.     SmartComm DE consented to this Court's jurisdiction after a hearing to adjudicate whether a temporary custodian should be appointed for SmartComm, and was thereafter added as a party. *See* Ex. 9, DIN 489, at 2.

15.     Defendant HLFIP is now a Delaware limited liability company. Prior to August 29, 2023 (the date Jon converted it to a Delaware limited liability company in the midst of this Consolidated Action), HLFIP was a Florida corporation with its principal office listed as SmartComm's Pinellas County headquarters. Its principal asset is SmartComm's intellectual property, and Jon (a Florida resident) is the sole member.

16.     Defendants Loco Florida LLC and Smart Communications Yacht Holding, LLC are SmartComm-affiliated entities. Prior to August 29 and September 1, 2023, they were both Florida companies; however, they are now Delaware limited liability companies as a result of Jon's conversions in the midst of litigation.

17.     Prior to Jim's death, the two members of Loco and Yacht were Jim and Jon. When Jim transferred his SmartComm shares to the Trust, he also executed stock powers to transfer his membership interests in Loco and Yacht to the Trust. *See* Exhibits 11 and 12, Loco and Yacht Assignments of Membership Interest.

18.     Loco holds title to SmartComm's headquarters building, which SmartComm purchased.

19.     Yacht holds title to SmartComm's 100 foot, $10 million Italian Riva Corsaro motor yacht, "Convict." SmartComm also paid for the yacht.

20.     Defendant Jon is Janice's son, 50% shareholder of SmartComm, the current sole director and sole officer of SmartComm, the sole member of HLFIP, and the managing member of Loco and Yacht. Jon is a resident of Pinellas County, Florida.

## JURISDICTION AND VENUE

21.     Venue in Sarasota County is proper because Janice is a resident of Sarasota County, the Trust is administered in Sarasota County, and the Trust's injuries as a shareholder accrued pursuant to Florida Statutes Section 47.051 in Sarasota County.

22.     Jon is a resident of Florida; SmartComm is a Florida Corporation; and, SmartComm DE submitted to this Court's jurisdiction and was made a party to the Consolidated Action in DIN 489.

23.     The Amount in Controversy exceeds $50,000.00.

**A.      Jurisdiction Over Entities Converted in the Midst of Litigation**

24.     At the December 6, 2023, hearing on Janice's Motion for Contempt of Temporary Injunction and to Appoint a Custodian, Jon, SmartComm, and Loco's counsel made a number of representations that the Florida to Delaware conversions were not intended to evade this Court's jurisdiction: "Nowhere in that advice was the intention to remove assets from this jurisdiction and we don't believe that they did and, certainly, that's no one's intention." *See* Exhibit 13, December 6, 2023 Hearing Tr. at 39:6–9; *see also id.* at 43:23–25 ("Again, everything we've done has always been completely transparent and not -- nothing done is designed to deprive this Court of jurisdiction.").

25.     Defendants' counsel also explained that she did not think conversions would affect this Court's jurisdiction over the entities:

> And Florida law says very clearly when you convert to a foreign entity -- which is allowed by statute -- when you convert, the effective conversion under 605.1046 is it's the same entity. All the assets remain and all of it remains before Your Honor. So there is literally only a change in form, not substance.

*Id*. at 25:6–12.

**B.      This Court Has Jurisdiction Over Loco Florida LLC and Smart Communications Yacht Holding, LLC**

26.     Prior to September 1, 2023, Loco was a Florida LLC. On September 1, 2023, it was converted to a Delaware LLC in the midst of this Consolidated Action. *See* Exhibit 14, Loco Florida LLC Articles of Conversion.

27.     Loco owns real property in the state of Florida—SmartComm's headquarters building located at 10491 72nd Street, Seminole, Florida 33777.

28.     This Court therefore has personal jurisdiction over Loco, by operation of Fla. Stat. § 48.193(1)(a)(3). Jon's counsel admitted as much during the December 6, 2023, hearing on

Janice's Motion for Contempt and Custodian: "So the only one before you, Your Honor, that's at issue then is Loco Florida. The only asset it holds is located here. It's the building that Smart Communications works from. The asset remains in your jurisdiction. We would not dispute that." *See* Ex. 13, Tr. at 30:16–20.

29.     For the same reasons, Loco has "sufficient minimum contacts" with Florida, such that this Court's jurisdiction over it would satisfy due process. *Schwartzberg v. Knobloch*, 98 So. 3d 173, 177 (Fla. 2d DCA 2012).

30.     Prior to August 29, 2023, Smart Communications Yacht Holding, LLC was a Florida LLC. On August 29, 2023, it was converted to a Delaware LLC in the midst of this Consolidated Action. *See* Exhibit 15, Smart Communications Yacht Holding, LLC Articles of Conversion.

31.     Yacht owns one luxury vessel, which docks in Miami, Florida on the Brickell River.

32.     Upon information and belief, Yacht contracted to insure the vessel; and at the time of contract, it was located (docked) in Florida.

33.     Yacht has substantial contacts with Florida because the only tangible property it holds is physically located in Florida, and upon information and belief, it contracts with Florida parties (*e.g.*, a marina, crew, maintenance, fuel providers) for substantial services to be performed in Florida.

34.      This Court therefore has personal jurisdiction over Yacht by operation of Fla. Stat. § 48.193(1)(a)(4) and § 48.193(2).

35.     For the same reasons, Yacht has "sufficient minimum contacts" with Florida, such that this Court's jurisdiction over it would satisfy due process. *Schwartzberg v. Knobloch*, 98 So. 3d 173, 177 (Fla. 2d DCA 2012).

36.     In addition and in the alternative, Yacht and Loco never had an existence apart from SmartComm and are, in fact, mere instrumentalities of SmartComm.

37.     Both Yacht and Loco are controlled by an insider to SmartComm: Jon.

38.     SmartComm purchased the single asset held by Yacht—the 100' Riva Corsaro.

39.     SmartComm also pays, directly or indirectly, for the maintenance, crew, marina (docking) rental, and insurance for the yacht (even though, upon information and belief, some of these contracts may list Yacht as a party).

40.     Upon information and belief, SmartComm paid, directly or indirectly, the legal bills for the Delaware action concerning Yacht.

41.     SmartComm failed to observe formalities in the use of the Riva Corsaro and did not treat Yacht as a separate entity in its dealings with it.

42.     Upon information and belief, if Yacht has begun to observe any such formalities, they did not begin until after the instant dispute.

43.     Upon information and belief, Yacht was converted into a Delaware entity for an improper purpose—to move its assets outside out of the jurisdiction of this Court in the event that Jon and SmartComm are found liable and to ensure that the Riva Corsaro cannot be accessed by Janice as a judgment-holder.

44.     SmartComm also purchased, or financed, the single asset held by Loco—the SmartComm headquarters building.

45.     SmartComm does not frequently or regularly pay rent to Loco for use of the building.

46.     SmartComm failed to observe formalities in the use of the SmartComm headquarters building and did not treat Loco as a separate entity in its dealings with it.

47.     Upon information and belief, if Loco has begun to observe any such formalities, they did not begin until after the instant dispute.

48.     Upon information and belief, SmartComm paid, directly or indirectly, the legal bills for the Delaware action concerning Loco.

49.     Upon information and belief, Loco was converted into a Delaware entity for an improper purpose—to move its assets outside out of the jurisdiction of this Court during the pendency of litigation concerning Janice's rights in Loco.

50.     For the reasons described in paragraphs 24 through 49, this Court has jurisdiction over Yacht and Loco via the alter-ego theory of long-arm jurisdiction. *See, e.g., Bellairs v. Mohrmann*, 716 So.2d 320, 322 (Fla. 2d DCA 1998).

### C.     This Court Has Jurisdiction Over HLFIP Holding, LLC

51.     On August 29, 2023, Jon converted HLFIP Holding, Inc., a Florida corporation, to HLFIP Holding, LLC, a Delaware limited liability company, in the midst of this Consolidated Action. *See* Exhibit 16, HLFIP Holding, Inc. Articles of Conversion.

52.     HLFIP FL's principal office was SmartComm's headquarters building. *See* Exhibit 17, HLFIP Holding, Inc.'s 2023 Annual Report.

53.     Jon was the sole shareholder of HLFIP FL.

54.     Jon, a Florida resident, is the sole member of HLFIP DE.

55.     On August 29, 2023, HLFIP DE purportedly licensed its main "product" (the IP) to SmartComm (a Florida corporation) for the duration of SmartComm's existing contracts (the Legacy Contracts) and for a Transitory Period ending on March 31, 2024. *See* Confidential Exhibit 18, Termination of Oral License Memorandum.

56.     Upon information and belief, HLFIP DE is still leasing IP to SmartComm (FL) for certain ongoing Legacy Contracts that have not yet terminated or expired.

57.    In the SmartComm Audited 2022 Financial Statement, which was prepared in October 2023, SmartComm recognized for the first time a purported $58 million liability (now increased to $80 million) incurred to HLFIP FL.[3] *See* Confidential Exhibit 19, 2022 Audited Financial Statement.

58.    SmartComm and, later, SmartComm DE (a SmartComm subsidiary) are HLFIP DE's only clients.

59.    HLFIP DE therefore leases intangible personal property to a Florida corporation. *See* Fla. Stat. § 48.181(5).

60.    HLFIP DE is thus "conclusively presumed" to be engaged in "substantial and not isolated activities" within Florida, and "operating, conducting, engaging in, or carrying on a business or business venture" in Florida. *See* Fla. Stat. § 48.181(5).

61.    This Court has general personal jurisdiction over HLFIP DE because, either under the conclusive presumption of § 48.181(5) or not, it engaged in "substantial and not isolated activity" in Florida when it licensed its IP to SmartComm. *See* Fla. Stat. § 48.193(2).

62.    Janice's declaratory judgment, aiding and abetting breach of fiduciary duties, aiding and abetting fraud, and unjust enrichment claims arise from HLFIP DE's business venture in Florida (whether or not the conclusive presumption of § 48.181(5) applies)—that is, the license of its IP to SmartComm from August 29, 2023 onward, and the backdated purported 40% royalty liability for past IP licensing to HLFIP FL.

63.    This Court therefore has specific personal jurisdiction over HLFIP DE. *See* Fla. Stat. § 48.193(1)(a)(1).

---

[3]    This Court automatically has jurisdiction over HLFIP Holding, Inc. (the pre-conversion Florida corporation), and Janice pleads jurisdictional facts sufficient for this Court's jurisdiction against HLFIP Holding, LLC to the extent necessary for this Court to adjudicate and grant a remedy related to the now-$80 million (and growing) liability to HLFIP Holding, Inc.

64.     This Court's exercise of personal jurisdiction over HLFIP DE satisfies federal constitutional due process because, for the reasons described above, HLFIP has "sufficient minimum contacts" with Florida. *See Schwartzberg v. Knobloch*, 98 So. 3d 173, 177 (Fla. 2d DCA 2012).

65.     In addition and in the alternative, HLFIP never had an existence apart from SmartComm and is, in fact, a mere instrumentality of SmartComm.

66.     SmartComm funded in full the development, protection, and enforcement of the intellectual property now held by HLFIP.

67.     SmartComm and SmartComm DE are the only clients of HLFIP and its predecessor.

68.     Prior to this lawsuit, SmartComm failed to observe formalities in the licensing of IP from HLFIP FL, and did not recognize HLFIP FL as an independent entity in its dealings with it. Moreover, the only document recognizing any historical licensing between the two entities is the August 29, 2023, Memorandum Re: Termination of Exclusive Oral License Agreement. *See* Confidential Ex. 18.

69.     HLFIP FL was a mere instrumentality of SmartComm and HLFIP DE is no different.

70.     Further, HLFIP DE was created for the improper purpose of fraudulently diverting assets and revenue from SmartComm and its other 50% shareholder into an entity solely owned by Jon and domiciled in another state—thereby evading this Court's jurisdiction.

71.     For the reasons described in paragraphs 51 through 70, this Court has jurisdiction over HLFIP DE via the alter-ego theory of long-arm jurisdiction. *See, e.g., Bellairs v. Mohrmann*, 716 So. 2d 320, 322 (Fla. 2d DCA 1998).

## FACTUAL BACKGROUND

### I.    The Formation Of SmartComm

72.    SmartComm is a national provider of communications-related products and services to correctional facilities.

73.    As of 2024, SmartComm's main services are (1) the SmartTablet and SmartKiosk, where electronic messages and scanned communications are sent to prisoners from non-incarcerated family, friends, and community members; (2) an inmate telephone service that works over the internet; and, (3) Mailguard, which is offsite screening and scanning of mail to inmates to eliminate contraband and allow prisons to monitor communications.

74.    SmartComm was incorporated on December 29, 2014. *See* Exhibit 20, Smart Communications Holding, Inc.'s Articles of Incorporation.

75.    The Articles of Incorporation provide for 10,000 shares of single-class stock, of which Jon owns 50% and co-founder Jim owned 50%. *See* Ex. 20.

### II.    The Trust's Interest In Jim's Shares

76.    On September 16, 2022, Jim executed an unconditional Stock Power that transferred his shares in SmartComm to the Trust. *See* Ex. 10.

77.    Jim died on October 16, 2022.

78.    Upon Jim's death, as 50% owner, Janice should have been appointed a director of SmartComm with Jon. She made a request consistent with this expectation, which Jon denied.

### III.    Jon's Waste Of Corporate Assets

79.    In abuse of his fiduciary duties, Jon has treated the company's resources as a personal piggy-bank, and grossly wasted corporate assets.

80.     Among other misconduct, SmartComm purchased the following assets for Jon's personal use:

    a.      A $10 million 100' Riva Corsaro yacht named "Convict";

    b.      A $1 million 45' Nor-Tech boat;

    c.      A $250,000 Rolls-Royce;

    d.      A $300,000 Lamborghini with the license plate "Inmate";

    e.      A $350,000 Ferrari;

    f.      A $180,000 Range Rover;

    g.      A $1.5 million condo in Miami; and,

    h.      A $4 million Tierra Verde waterfront house.

81.     Jon uses SmartComm money to pay for the following yacht-related expenses:

    a.      Three full-time staff members, including a captain (with $130k annual salary), and two crew;

    b.      Several thousands of dollars for each fuel tank fill-up; and,

    c.      All maintenance, storage, and transportation costs.

82.     Jon also regularly amasses enormous corporate credit card bills on personal expenses like vacations and luxury meals:

    a.      $9,438 on an Airbnb ski lodge in Breckenridge, Colorado;

    b.      International plane tickets to Colombia for an annual "guys trip";

    c.      $2,848 on a fishing charter; and,

    d.      $1,624 for a sushi dinner.

83.     While Jon touts a low salary, in addition to his personal use of the above luxury assets, he takes hundreds of thousands of dollars in "shareholder loans" every year. In 2023, he caused SmartComm to make over $600,000 in shareholder loans to himself while SmartComm issued no dividends to its shareholders (which would obviously benefit Janice as well).

15

**IV.     Jon's Fraudulent Shareholders' Agreement Scheme**

84.     After Jim's death, from November 2022 to mid-January 2023, Jon negotiated with Janice to purchase the Trust's shares without reference to any documents that would control that sale. Jon offered to buy the Trust's shares from Janice for $20 million, and had his own attorneys at Hill, Ward, Henderson draft a contract to that effect in late December 2022. Janice declined because she was aware of two 2022 valuations of SmartComm from reputable investment banks Truist and UBS that estimated the Company's value as well over $100 million. *See, e.g.*, Exhibit 21, September 18, 2022, Draft Email from Jim to Jon (Sent to Janice). Thereafter, negotiations broke down.

85.     Meanwhile, on January 20, 2023, counsel for Janice and the Trust sent Jon's attorneys a letter detailing Janice's concerns about Jon's waste and mismanagement of SmartComm ("Management Concern Letter"). *See* Exhibit 22, Management Concern Letter.

86.     Shortly afterward, on January 31, 2023, Jon miraculously "found" a copy of a "fully executed" Shareholders' Agreement that (among other things) would have forced Janice to sell the Trust's shares to Jon on terms unfavorable to Janice.

87.     Jon made the purported Shareholders' Agreement the basis of his and SmartComm's surprise complaint against her—2023-CA-1002, filed the first business day after the parties' standstill agreement expired—and attempted in that late-February 2023 lawsuit to force her to sell her shares according to the procedure outlined in the purported Shareholders' Agreement.

88.     The validity of the purported Shareholders' Agreement was the subject of Phase I of the Consolidated Action, culminating in the Phase I Trial (further described below).

**V.      Jon's Retaliation Scheme And The Court's Temporary Injunction**

89.      In the midst of litigation, and in sole control of SmartComm, its books and records, its personnel, and its related entities, Jon attempted to manipulate Janice and this litigation by depriving his recently widowed, then-69-year-old, mother of resources.

90.      On or about May 7, 2023, Jon summarily fired Janice from her consultant role at SmartComm, and stopped issuing her a paycheck. Janice believes she is entitled to a role at SmartComm, including at least being a director of the Company she co-owns.

91.      Janice was willing and able to perform her consultant role at SmartComm or a directorship. Instead, Jon shut her out and made it impossible for her to do so, and then fired her for failing to contribute.

92.      In addition to her role at SmartComm being a source of income, it was a primary source of health insurance. She relied upon the health insurance for access to healthcare related to a heart condition. Without the SmartComm health insurance, Janice would be forced to find new-providers without the benefit of the SmartComm group coverage, which can take a long time in Sarasota because of demand levels.

93.      Jon represented, through counsel, that Janice's firing and the threat of charging rent for Janice's home and car (further alleged below)—or otherwise evicting her and repossessing the cars—is part of an effort to address the corporate waste the Trust alleged is rampant at SmartComm.

94.      Jon has not applied similar standards of waste reduction to SmartComm's spending that benefits him personally. For instance, Jon is not now paying rent for his regular personal use of his Tierra Verde home, Miami Condo, 100' yacht, 45' yacht, and four exotic cars worth more than $180,000 each (2017 Ferrari Spider, 2020 Lamborghini Huracan, 2015 Rolls Royce Wraith, 2022 Range Rover)—all of which are SmartComm assets or were paid for by SmartComm and

then titled to Jon. Far from it, in addition to drawing a regular salary and $619,238.42 in "shareholder loans" in 2023 alone (compared to Janice's $0), Jon is using these corporate assets for free and is paying for expenses related to his use of them out of SmartComm's coffers.

95.    Following a July 2023 Temporary Injunction hearing, this Court enjoined Jon from demanding rent or seeking to evict Janice and seeking to repossess her SmartComm-owned vehicle. This Court further ordered Jon to reinstate Janice to her position at SmartComm. *See* Ex. 2, DIN 169, at 10.

96.    In its order granting Janice's Motion for a Temporary Injunction against Jon's retaliatory conduct, this Court made the factual finding that Jon's complained-of actions were retaliatory. *See* Ex. 2, DIN 169, at 7, 8 ("This factual timeline and the alleged circumstances surrounding the reason for Plaintiff's termination was not refuted by the Defendant when he testified, in fact they appeared to be reinforced by his testimony… In sum, the Defendant did not deny under oath at the hearing that the Plaintiff was terminated from employment, had her health care benefits cut, and denied use of company vehicles and demanded to pay rent as a result of the allegations and actions made by the Plaintiff in bringing these allegations against the Defendant and filing the subsequent lawsuit.").

97.    Although this Court temporarily enjoined Jon from certain retaliatory activities, there is no indication that Jon's campaign of retaliation has ceased. For instance, he recently refused to pay for the propane at Janice's home, which is necessary for hot water and gas; and for other basic maintenance like HOA-required fence washing. By comparison, SmartComm's books and records evidence regular payments for utility and maintenance expenses at Jon's SmartComm-owned home.

98.     He also retaliated via the Delaware conversions and fraudulent IP transactions to strip SmartComm of value for his own benefit. Jon would only be emboldened to worsen the retaliation if the Temporary Injunction were lifted (and indeed, Jon is currently appealing the Temporary Injunction as wrongfully entered). *See Logan v. Logan*, No. 2D23-1798 (Fla. 2d DCA 2023).

99.     Furthermore, upon information and belief SmartComm has funded Jon's significant personal legal bills for the litigation against Janice.

100.    In other words, Janice, as a 50% owner of the company, was the target of Jon's attempt to strip her of her shares via a forced sale, and also funded (and continues to fund) the lawsuit Jon initiated against her.

## VI.    Jon's Delaware Asset-Diversion Scheme

101.    On August 29, 2023—mere weeks after Janice prevailed on her Motion for a Temporary Injunction—Jon executed a series of maneuvers to transfer assets out of SmartComm and out of Florida.

102.    First, he created a parallel SmartComm entity in Delaware—SmartComm DE—with SmartComm as the sole member. *See* Exhibit 23, SmartComm DE Certificate of Formation.

103.    Then, he moved all of SmartComm's assets to the Delaware entity in a unilateral "Asset Transfer Agreement." *See* Confidential Ex. 4.

104.    Next, Jon converted HLFIP Holding, Inc. (a Florida corporation) into HLFIP Holding, LLC (a Delaware entity, with Jon as its sole member). *See* Ex. 16.

105.    Still on the same day, Jon converted Yacht into a Delaware entity. *See* Ex. 15.

A.    **Jon's IP License Scheme**

106.    On August 29, 2023, HLFIP issued an unsigned, unauthored memo (devoid even of letterhead, a watermark, or any kind of law firm version stamp) to SmartComm terminating a purported oral license agreement. *See* Ex. 18.

107.    That same day, Jon (on behalf of SmartComm DE) signed an Executed License Agreement with himself (on behalf of HLFIP DE) in which SmartComm DE would pay a whopping 40% net sales royalty to HLFIP to license its IP. *See* Confidential Exhibit 24, Executed IP License Agreement.

108.    40% is no random number: SmartComm's internal estimated EBITDA as a percentage of revenue was 40% in 2022. *See* Confidential Ex. 8, at 12. Jon knew as much (*see* Exhibit 25, Jon email sending the presentation to Jim), and plainly intended to divert all of SmartComm's profit to himself.

109.    SmartComm's financials do not support a 40% royalty to HLFIP either—the Company's primary revenue does not flow from services related to HLFIP's patents, and the revenue that does is related to the invalidated patents. For instance, in 2023, only 8% of SmartComm's revenue stemmed from a once-patented technology. *See* Confidential Exhibit 26, SmartComm 2023 Profit & Loss Statement. That is hardly appropriate consideration to justify paying 100% of SmartComm's EBITDA margin to HLFIP.

110.    Janice knows of no evidence from 2015 through 2022 that recognizes any expectation of payment from SmartComm to HLFIP for use of the IP (likely because none exists). Rather, there is ample evidence from that time that SmartComm and HLFIP had a royalty-free license, which is ongoing. Royalty-free licenses are common in corporate families where royalty-free use of IP is mutually beneficial to both entities.

1.      **The Books and Records Make Clear the IP Royalty Is a Recent, Fraudulent Invention**

111.    At the end of 2021—before Jim's death and before Janice became a shareholder—SmartComm reported $16 million in shareholders' equity and no IP liability. Confidential Exhibit 27, Audited Financial Statement for 2021.

112.    By October 2023, SmartComm's 2022 Audited Financial Statement (which was prepared in October 2023, two months after the Temporary Injunction) showed SmartComm was supposedly in the red to the tune of $38 million as a result of a new purported $52,848,813 long-term liability to HLFIP (Jon) and $5,592,170 in accrued interest on the backdated liability. *See* Confidential Ex. 19.

113.    Not only did Jon unilaterally enter into a director conflict-of-interest transaction in the midst of shareholder litigation, he unabashedly backdated the transaction to 2015. This backdating was described in three paragraphs tacked onto page 12 of the 2022 Audited Financial Statement. The first two paragraphs of that section attempt to justify the 2022 40% royalty, and the third states,

> The Company **reflected** the prior years' use of the HLFIP IP license for the years 2015-2021 as a long-term liability in the amount of $52,848,813, and accrued interest of $ 5,592,170. Retained earnings has been adjusted to reflect effects of this inclusion for prior year use of the HLFIP license."

*Id*. (emphasis added).

114.    In sum, after litigation had commenced and this Court concluded that Janice had demonstrated a likelihood of success on the merits of her claims in the First Amended Complaint, Jon gutted SmartComm's value by making an agreement with himself that SmartComm (1) suddenly owed HLFIP $58 million (which has since grown to $80 million); and (2) all of SmartComm's forward-looking profit margin for ongoing use of the IP. Jon based SmartComm's

purported liability on 2015-2023 licenses for patents that did not exist until 2019, and had been declared invalid by three federal courts as early as April 2022.

115.    Jon's counsel admitted on the record at the December 6, 2023, Contempt and Custodian Hearing that no payments had yet been made on the purported, then-8-year-old liability, demonstrating the purported license agreement contravened a years-long course of dealing.

116.    The 2015 start for the HLFIP license backdating is particularly questionable because the main patent it holds (Mailguard—the '617 Patent) was not granted until May 2019 after initially being rejected. A U.S. Patent gives the owner the right to prevent others from making, using, offering to sell, or selling the patented invention in the United States "without authority." *See* 35 U.S.C. § 271(a). A patent license grants "authority" to another to use the invention without committing infringement. Thus, it would be nonsensical if SmartComm were paying to license IP that was not yet protected.

117.    SmartComm itself did not begin enforcing the flagship HLFIP Patent until late 2019, and it was invalidated by two district courts in 2022, which was affirmed by Federal Circuit in 2023.

### 2.    The HLFIP IP Is Unpatentable and Worthless

118.    Each of HLFIP's patent claims merely recite obvious approaches to delivering mail to prisoners that humans have performed for years, and suggest that certain of those steps now be performed on a computer. Such purported inventions do not merit patent protection under federal law, and thus saddling SmartComm with any license fee on them, let alone 40% of its entire revenue stream, is unconscionable.

119.    35 U.S.C. § 101 establishes the requirements for patentability, and requires the invention to be "new and useful."

120.    In 2014 the United States Supreme Court in *Alice Corp. v. CLS Bank International*, 573 U.S. 208 (2014), set out a new two-part test for determining whether an invention is invalid for being an abstract idea, and clarified that the "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id*. at 223. Applying this law, two district courts already found HLFIP's '617 Patent invalid as an abstract idea, and the Federal Circuit affirmed one of those decisions in August 2023.

121.    In the Middle District of Pennsylvania, the court analyzed claim 1 of the '617 Patent as "representative" of all of the patent claims asserted in that case, noting that the remaining claim (claim 13) added only "trivial, non-technical limitations." *HLFIP Holding, Inc. v. York County, Pennsylvania*, Civil Case No. 20-cv-186, Doc. 135, Memorandum Opinion, p. 10 (M.D. Pa. April 25, 2022), *attached hereto as* Exhibit 28.

122.    The court then held:

> An examination of the text of the '617 Patent claims reveals a series of steps that describe an abstract idea—namely, identifying characteristics of postal mail (such as the recipient-inmate, the inmate's institution, the sender, etc.), screening it for contraband, scanning the sender and content information, generating a text-readable version of the electronic copy to be stored electronically, and associating a contraband flag that can deny the inmate access.

*Id*. at 17–18. The court noted that SmartComm admitted "there have been manual systems in place to combat this 'longstanding issue' [contraband] for many years." *Id*. The court further explained that the '617 Patent did not add an "inventive concept" by proposing to do this on a computer. *Id*. at 24.

123.    On appeal, the Federal Circuit affirmed this order without a written opinion under Fed. Cir. R. 36, highlighting the lack of any meritorious argument for the validity of the

'617 Patent. *HLFIP Holding, Inc. v. York County, PA*, 22-1940, Doc. 41 (Fed. Cir., Aug. 18, 2023),

*attached hereto as* Exhibit 29.[4]

124.    A final judgment of patent invalidity is like a finding that a contract has been

rescinded: it means the patent never had any legal effect and could not have been infringed.

Nevertheless, despite an August 18, 2023, decision invalidating HLFIP's flagship patent, Jon on

behalf of SmartComm signed the Executed License Agreement for a 40% net sales royalty to

HLFIP (*i.e,* to himself) eleven days later on August 29, 2023. *See* Confidential Ex. 24.

125.    Two tables showing the licensed IP (excluding patent applications, non-registered

trademarks, and non-patented services) as of August 29, 2023 are excerpted below.

SCHEDULE 1: LICENSED INTELLECTUAL PROPERTY

| Assignee | Country | PATENTS Title | Publication No. | Patent No. |
|---|---|---|---|---|
| HLFIP Holding, LLC | USA | CORRECTIONAL POSTAL MAIL CONTRABAND ELIMINATION SYSTEM | 2020/0128014 A1 | 11457013 |
| HLFIP Holding, LLC | USA | CORRECTIONAL POSTAL MAIL CONTRABAND ELIMINATION SYSTEM | 2016/0337360 A1 | 10291617 |
| HLFIP Holding, LLC | USA | CORRECTIONAL INSTITUTION LEGAL POSTAL MAIL PROCESSING SYSTEM AND METHOD | 2020/0280645 A1 | 11637940 |
| HLFIP Holding, LLC | USA | CORRECTIONAL INSTITUTION LEGAL POSTAL MAIL PROCESSING SYSTEM AND METHOD | 2019/0268488 A1 | 10659630 |
| HLFIP Holding, LLC | USA | COMMUNICATION TRACKING SYSTEM FOR CORRECTIONAL FACILITIES | 2019/0386996 A1 | 10862891 |
| HLFIP Holding, LLC | USA | SYSTEMS AND METHODS FOR PROCESSING REQUESTS TO SEND PRIVATE POSTAL MAIL TO AN INMATE | 2020/0396347 A1 | 11201974 |

| Owner | Country | TRADEMARKS Trademark | Reg. No. |
|---|---|---|---|
| HLFIP Holding, LLC | USA | MAILGUARD | 5,135,773 |
| HLFIP Holding, LLC | USA | MAILGUARD POSTAL MAIL ELIMINATION LOGO | 5,135,772 |
| HLFIP Holding, LLC | USA | | |

---

[4]    The Middle District of Tennessee's decision in *HLFIP Holding, Inc. d/b/a Smart Communications IP Holdings v. Rutherford County, Tennessee, et al.* arose from the same posture as the MD PA decision (a patent infringement suit by HLFIP), and Judge Eli Richardson there held the '617 Patent invalid on § 101 grounds applying the same *Alice Corp.* Supreme Court test. Doc. 393, Memorandum Opinion, Civil Case No. 3:19-cv-714 (M.D. Tenn. Oct. 7, 2022), *attached hereto as* Exhibit 30.

126.    The primary IP that SmartComm licenses from HLFIP is for the Mailguard service (also known as the '617 Patent). HLFIP's other patents (the '013, '940, '630, '891, and '974 patents) were all granted after the '617 Patent was granted, and are equally unpatentable for being directed to the computerization of abstract ideas. In fact, the other patents are weaker than the '617 Patent, merely layering ornaments on a dead tree—"building" on the '617 Patent by proposing to do things like mail-tracking, recording sender data, detecting contraband activity, and handling legal mail in a special way; for instance, to date HLFIP has only ever sued to enforce the '617 Patent, and HLFIP has not filed any patent infringement suits since the Federal Circuit decision on its other Patents or IP.

127.    In a December 1, 2023, Federal Circuit filing in HLFIP's appeal of the Middle District of Tennessee's invalidation of the '617 Patent, HLFIP indicated it would not seek rehearing *en banc* or file a *writ of certiorari* and therefore "Dismissal of the consolidated cross-appeals is proper following this Court's ruling in York County finding the '617 Patent ineligible under § 101, and in light of the circumstances noted above. It is not possible for Smart Communications to maintain its patent lawsuit against Rutherford and VendEngine without a valid patent." *See HLFIP Holding, Inc. d/b/a Smart Communications IP Holdings v. Rutherford Cnty, Tennessee, et al.*, Case No. 2023-1380, Dkt. 26, "Appellant's Motion to Dismiss," pp. 8–9 (Fed. Cir. Dec. 1, 2023), *attached hereto as* Exhibit 31.

128.    Nor can HLFIP's pending patent applications justify the royalty. The pending patents are also unpatentable. One of the patent applications listed as "pending" in the Executed License Agreement, Application No. 17/363499, was rejected on Nov. 15, 2023.

### 3.    SmartComm's Royalty-Free Relationship with HLFIP

129.    To the extent any of the IP has any residual value when the related-party, conflict-of-interest, *ultra vires* transactions are set aside, there is a clear, long-running, royalty-free license between SmartComm and HLFIP for the use of HLFIP's IP.

130.    There is abundant evidence of this royalty-free license. For starters, Jon himself signed a 2019 "fictitious name" filing for HLFIP to do business in Florida as "Smart Communications IP Holdings"—*i.e.*, by Jon's own admission HLFIP merely holds SmartComm's IP. Exhibit 32, Fictitious Name Filing.

131.    In fact, in its Federal Circuit briefing, HLFIP referred to itself throughout as "Smart Communications." *See e.g.*, Ex. 31.

132.    The "Termination of Oral License Agreement" memorandum recognizes the existence of an express oral license between the parties. *See* Confidential Ex. 18. That memo additionally recognizes "SmartComm's existing contracts utilizing HLFIP's intellectual property" would be affected by the termination. *Id*. In other words, Jon admits that SmartComm relied on its royalty-free license to enter into certain contracts, and those contracts offer HLFIP's intellectual property at no additional cost to the customer. *E.g.*, Confidential Exhibit 33, at 2 (¶ 18), Crawford County Mailguard Addendum.

133.    Jon's "Executed License Agreement" likewise recognized that HLFIP "previously exclusively licensed the Licensed Intellectual Property to [SmartComm]," and that "under that pre-existing license agreement, the prior licensee executed contracts." Confidential Ex. 24 at 2 (¶ 1.6).

134.    Starting in 2016, after the main '617 Patent application had been submitted, SmartComm entered into all of its contracts in express reliance on the royalty-free license. *See* Confidential Exhibit 34, Draft Pasco County Mailguard Addendum.

135.    In the years between 2016 and fall of 2023, SmartComm made no royalty payments to HLFIP, and HLFIP did not demand any payment or condition any benefit on such a payment. Rather, SmartComm continued to execute on its contracts "under that pre-existing license agreement" with full knowledge of HLFIP without paying any royalty or being requested to do so.

136.    SmartComm's Income Statements, prepared and provided in November 2023, show that SmartComm did not book HLFIP liability until 2022:

| | Jan - Dec 14 | Jan - Dec 15 | Jan - Dec 16 | Jan - Dec 17 | Jan - Dec 18 | Jan - Dec 19 | Jan - Dec 20 | Jan - Dec 21 | Jan - Dec 22 | Jan - Oct 23 |
|---|---|---|---|---|---|---|---|---|---|---|
| Intellectual Property Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 17,874,783.38 | 18,239,257.19 |

*See* Confidential Exhibit 35, SmartComm Collier Income Statement, Row 230. Make no mistake, at least according to Jon's attorneys, no payments have ever been made on that liability, which squarely supports the existence of a royalty-free license. And, Jon and SmartComm could likely not "reflect" the purported 40% liability plus interest back further in their income statements because it was not reported on their taxes for those years (as a result of being a recent invention). SmartComm's 2022 tax return was still subject to manipulation because it was due on extension in October 2023. *See* Confidential Exhibit 36, SmartComm 2022 Tax Return.

137.    HLFIP furnishes no services apart from permission to use its intellectual property.

**VII.    Jon Asks The Delaware Court To Rubber-Stamp His Asset-Diversion Scheme**

138.    On October 23, 2023, Jon filed a declaratory judgment action in Delaware court, asking it to rule that Loco and Yacht were validly converted to Delaware entities, and that he was the sole member of both entities. *See* Exhibit 37, Delaware Complaint.

139.    Jon did not disclose to the Delaware court in his complaint that, at that time, Loco was a party to this Florida suit.

140.    Jon did not disclose the Delaware action to Janice's counsel until after she discovered it independently.

141.    Janice's counsel learned of the lawsuit from its docket alert service, and was forced to intervene, and move to stay the action.

142.    The Delaware court ultimately granted Janice's motion to stay, reasoning that it was "loath to insert itself" in this dispute and specifically identifying the allegations against Jon as "alarming." *See* Ex. 7, at 10.

143.    The Delaware court also stated that it "would have appreciated more transparency from Plaintiff's filings regarding the course of proceedings in the Florida Action." *See* Ex. 7, at 10 n. 37.

## VIII.    Phase I Trial

144.    Following the Phase I trial, this Court concluded that Janice is indeed a full, unencumbered 50% owner of the Company. *See* Ex. 1, DIN 652, at 2.

145.    This Court also made the specific factual findings that "Exhibit 101 [the purported Shareholders' Agreement] was not signed by Jim Logan. Jim Logan never assented to that document" and "the circumstances in how that document was found are suspicious to the Court." *See* Ex. 1, DIN 652, at 20 (Tr. 723:21–23), 21 (Tr. 724:18–20).

## IX.    Janice's Derivative Standing

146.    On January 20, 2023, the Trust sent a Management Concern Letter to Jon and SmartComm, demanding certain actions be taken to remedy SmartComm's corporate waste and Jon's breaches of his fiduciary duties. *See* Ex. 22.

147.    Between January 20, 2023 and February 26, 2023, the Trust and Jon executed a standstill agreement, and attempted to resolve the Trust's concerns outside of court.

148.    On February 27, 2023, the day the standstill agreement expired, Jon (SmartComm's current sole officer and director) and SmartComm sued Janice (before Janice or the Trust had taken any court action) individually and as Trustee of the Trust. *See* DIN 2 (2023-CA-1002).

149.    Further, Jon has been in sole control of SmartComm since Jim died in October 2022, and has used this unfettered power to retaliate against Janice (a 50% shareholder). As detailed above, this Court has already made a specific finding of fact that Jon retaliated against Janice for attempting to vindicate her rights. *See* Ex. 2, DIN 169.

150.    Moreover, any internal investigation of SmartComm's actions by Jon or his current employees would be farcical—he would be "investigating" his own decisions and actions.

151.    Even after this Court had entered a Temporary Injunction, Jon continues to retaliate against a 50% shareholder by converting many of the relevant entities to Delaware entities, transferring all of SmartComm's assets to SmartComm DE, and seeking to siphon SmartComm's value to an entity he claims he exclusively owns. Thus, the Temporary Injunction was expanded by stipulation. *See* Ex. 9, DIN 489.

152.    Still, Jon recently refused to pay Janice's propane utility bill for 1660 Ranch Club Blvd., the SmartComm-owned home where she resides, which is necessary for basic hot water and the gas stove. And, his attorneys sent a letter notifying Janice that they would be shuttering all of SmartComm's utilities accounts for the home, stopping payments for utilities, and demanding over $200,000 in reimbursements from Janice for payments they allege SmartComm has made in the time she has been a shareholder. *See* Ex. 3.

153.    Moreover, Janice demanded a special meeting of the shareholders on March 15, 2024. *See* Exhibit 38, Demand for Special Meeting of the Shareholders. Jon and SmartComm did

not hold the meeting until May 14, 2024. They belatedly issued the notice for the meeting, and at the meeting they refused to let a court reporter in to transcribe the meeting minutes.

154.    At the meeting, Jon and Janice voted on SmartComm's directors, and were deadlocked in that vote. As a result, pursuant to Fla. Stat. § 607.0805 Jon's term as a director has expired and he remains on as a director until a successor director can be elected by the shareholders.

155.    At the meeting, Jon and SmartComm initially refused to hold a vote on an item on the agenda, which called for the shareholders to adopt a resolution that would recommend that the Board unwind the asset-diversion transactions that were *ultra vires*. *See* Exhibit 39, Shareholder Meeting Notice and Agenda. Eventually, Jon and SmartComm agreed to hold the vote and the shareholders were deadlocked on this vote as well with Janice voting for the resolution and Jon voting against.

156.    SmartComm has regularly failed to comply with even its basic Fla. Stat. § 607.1602 obligations to provide books and records:

        a.      Janice's made her first formal demand in June 2023, sent a deficiency letter in August 2023, and did not receive SmartComm's books and records until filing a motion to compel. The Court ordered production in November 2023.

        b.      Janice made a subsequent demand under both her statutory rights and for purposes of mediation, and even after the Court exhorted Jon and SmartComm's attorney to comply, Janice did not receive full books and records, and SmartComm tried to mark basic books and records "For Purposes of Mediation Only," which is not a designation Janice or the Court agreed to and which does not appear in the Confidentiality Stipulation entered in this matter. *See* DIN 362.

**X.    There Is Abundant, Irrefutable Evidence Of The Futility Of A Demand That Jon (As The Current Sole Officer And Director) Would Honestly Investigate Or Pursue A Claim On Behalf Of SmartComm.**

157.    In fact, many of the below derivative claims deal with actions and transactions Jon caused SmartComm to enter into or take.

158.    Moreover, Jon and SmartComm have been commonly represented throughout the litigation, and remain in this posture; and, Jon is unable and unwilling to act impartially towards Janice in this fever-pitched, family dispute.

159.    Thus, pursuant to Fla. Stat. § 607.0742, any further demands would be futile, and any internal investigation or suit by Jon or at Jon's direction on behalf of SmartComm would only provide further opportunities for wrongdoing and retaliation.

### Count I:  Fla. Stat. § 86.011, *et seq.* Declaratory Judgment
**(The Trust, on behalf of SmartComm, against**
**Jon, SmartComm, SmartComm DE and HLFIP)**

I.    **Declaration Concerning The Invalidity Of The Executed License Agreement And Backdated Long-Term Note Payable For 2015-2023 IP Licenses Plus Interest**

160.    Janice incorporates paragraphs 1 through 159 as though fully set forth herein.

161.    The Trust, derivatively on behalf of SmartComm, seeks a declaratory judgment from this Court ruling on the invalidity of two transactions: 1) the Executed License Agreement creating a 40% of net sales royalty from SmartComm in favor of Jon (via HLFIP) from 2023 onward, and 2) the "Long-Term Note Payable" plus interest (which backdates the 40% royalty from Aug. 28, 2023 to 2015) (collectively, the "IP Transactions").

162.    As explained above, SmartComm is the sole member of SmartComm DE, rendering SmartComm DE a wholly-owned subsidiary. As the only director and officer of SmartComm, Jon controlled SmartComm DE's sole member (and therefore SmartComm DE), and then subsequently caused SmartComm DE to enter into the Aug. 29, 2023-future, forward-looking Executed License Agreement portion of the IP Transactions. *See* Ex. 24.

163.    Jon also caused SmartComm to backdate the 40% royalty and create a long-term note payable to HLFIP. The purported long-term note payable has not been produced, and is likely not documented because it did not exist before August 29, 2023.

164.    Upon information and belief, Jon formed SmartComm DE to avoid the jurisdiction of this Court, and to devalue SmartComm.

165.    A complaint for declaratory relief is appropriate for the following reasons.

    a.    The Trust on behalf of SmartComm has a "bona fide, actual, present practical need for the declaration." *Cintron v. Edison Ins. Co*., 339 So. 3d 459, 461 (Fla. 2d DCA 2022). Namely, the validity (or lack thereof) of these transactions has a material effect on the financial value of SmartComm—currently to the tune of a purported $80 million (and growing) liability that would put the Company in nearly $62 million of debt.

    b.    A ruling on the validity (or lack thereof) of these transactions would deal with "ascertained or ascertainable facts": whether a valid contract or obligation exists between SmartComm and HLFIP entitling HLFIP to these payments; and/or whether Jon and/or SmartComm engaged in conflict-of-interest and/or *ultra vires* conduct when entering into these transactions, and/or whether Jon entered into these transactions in breach of his fiduciary duties. *See id*.

    c.    SmartComm's entitlement to the funds affected by the related-party transactions depends on whether those transactions are deemed valid by this Court. *See id*. (Complaining party must show "that some immunity, power, privilege or right of the complaining party is dependent upon the facts or the law applicable to the facts.").

    d.    Jon and HLFIP have an "actual, present, adverse and antagonistic interest in the subject matter" because: Jon is the sole member of HLFIP (and previously, the sole shareholder) and the beneficiary of the disputed transactions; and Jon and HLFIP are liable if the IP Transactions were unlawful. *See id*.

    e.    Jon and HLFIP are before the Court as named defendants. *See id*.

    f.    For the reasons above and the financial effect of these transactions on the value of Janice's shares in SmartComm, the sought-after declaratory judgment is "not merely giving of legal advice by the courts or the answer to questions propounded by curiosity." *Id*.

166.    The IP Transactions are invalid and should be set aside for four independently sufficient reasons, which, to the extent deemed necessary by the Court, are pled in the alternative.

1. **First, the IP Transactions Are Director Conflict-of-Interest Transactions Pursuant to Fla. Stat. 607.0832 Because They Are Between SmartComm and Jon, and SmartComm's Subsidiary and Jon.**

167. Jon is indirectly a party to the Executed License Agreement because he is the sole member of HLFIP. *See* Fla. Stat. 607.0832(1)(d).

168. Jon has an indirect material financial interest in the IP Transactions because HLFIP has a material financial interest in the transaction and is solely controlled by Jon. *See* Fla. Stat. 607.0832(1)(e).

169. The IP Transactions are not fair to SmartComm because they are not beneficial to the corporation and its subsidiary, SmartComm DE, taking into account Jon's role in the transaction and the fact that it created an enormous liability for SmartComm to Jon's solely owned entity with no corresponding benefit to SmartComm or SmartComm DE.

170. The conditions of Fla. Stat. § 607.0832(3)(a) are not met because Jon is the sole director of SmartComm, and in that capacity controls SmartComm DE (*see* (3)(a)(1)) and the IP Transactions were not put to a shareholder vote or otherwise approved by a majority of SmartComm's shareholders (*see* (3)(a)(2)).

171. Therefore, § 607.0832(3)(b) applies, and Jon has the burden of proving the IP Transactions' fairness.

172. Jon cannot do so, and the IP Transactions are therefore voidable, and should be declared void and set aside by this Court.

**2.    Second, the IP Transactions are *Ultra Vires* Actions by Jon and/or SmartComm and Subject to Challenge by the Trust on Behalf of the Corporation and Its Subsidiary, Pursuant to Fla. Stat. § 607.0304.**

173.    SmartComm has the authority to enter into contracts and incur liabilities "which are necessary or convenient to the conduct, promotion, or attainment of the business of the contracting corporation." Fla. Stat. § 607.0302(7).

174.    Janice as Trustee does not concede that the IP Transactions are valid contracts or liabilities within the meaning of Fla. Stat. § 607.0302(7), but assuming *arguendo* that they are, these transactions are not a reasonable method to exercise the corporation's authority to enter into contracts and do business. In short, they are unauthorized acts.

175.    The IP Transactions are not protected by the business judgment rule, because (for the reasons described above) they are also self-dealing transactions on the part of Jon. *See Sonny Boy, L.L.C. v. Asnani*, 879 So. 2d 25, 27 (Fla. 5th DCA 2004); *Yarnall Warehouse & Transfer, Inc. v. Three Ivory Bros. Moving Co*., 226 So. 2d 887, 892 (Fla. 2d DCA 1969) ("the business judgment rule applies to ultra vires claims against the corporation itself").

**3.    Third, the IP Transactions Are Breaches of Jon's Fiduciary Duties as a Director and Officer of SmartComm.**

176.    Jon, as sole officer and sole director of SmartComm, has fiduciary duties to both the shareholders of SmartComm and SmartComm itself to act with care and loyalty in the management of SmartComm.

177.    Jon breached his duties of loyalty and care by forming SmartComm DE in the midst of litigation, thereafter transferring all of SmartComm's assets to SmartComm DE, controlling SmartComm DE as the sole officer and director of SmartComm, and causing SmartComm DE to enter into contracts instead of SmartComm (including the Executed License Agreement).

178. Moreover, the self-dealing nature of the IP Transactions is not consistent with Jon's fiduciary duties of care and loyalty in the management of SmartComm and its subsidiaries.

179. The IP Transactions would cause SmartComm to become significantly indebted in favor of a related-party liability to SmartComm's current sole director and officer, with no corresponding benefit to SmartComm, all at the expense of Janice, the other 50% shareholder of SmartComm.

180. Similarly, the fact that the IP Transactions would strip SmartComm of all of its profit margin, and swing it from positive to negative equity in the span of one year, further indicate that Jon violated his fiduciary duties to SmartComm and its shareholders by entering into the transactions.

181. Finally, Jon caused SmartComm to enter into the IP Transactions eleven days after the Federal Circuit published its per curiam judgment affirming the invalidation of HLFIP's main patent without opinion—the Federal Circuit decision was issued on August 18, 2023, and the IP Transaction paperwork is dated August 29, 2023.

### 4. Fourth, the IP Transactions Are Invalid Contracts and Unenforceable.

182. Under Florida law, a contract exists only if the following elements are established: (1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms. *Moore v. Wagner*, 377 So. 3d 163, 167 (Fla. 2d DCA 2023).

183. The primary IP in the IP License Agreement (that is, the '617 Mailguard Patent) has been deemed worthless by three federal courts, including a per curiam judgment without opinion by the Federal Circuit (*see* Section VI(A)(2) above), which decision was not further appealed. Moreover, prior to August 29, 2023, SmartComm had a royalty-free license to use HLFIP's IP. Thus, the IP Transactions fail for lack of consideration because Jon caused SmartComm to increase its IP licensing from royalty-free to 40% of net sales without providing any additional

consideration—in fact, the HLFIP's IP diminished in value (to virtually worthless) *before* Jon agreed on behalf of SmartComm to pay millions *more* for the services. *Gollobith v. Ferrell*, 84 So. 3d 1095, 1096 (Fla. 2d DCA 2012) ("Providing past services rendered without the expectation of compensation is not adequate consideration to support a contract.").

184.    Similarly, SmartComm's backdated, now-$80 million (and growing) long-term note payable for IP licensing from 2015 through 2023 is invalid and unenforceable because there is no contemporaneous evidence of a contract recognizing that SmartComm owes this sum for IP licensing in that time period.

185.    Upon information and belief, no evidence exists that reflects mutual assent (*e.g.*, offer and acceptance) of *any* payment terms related to SmartComm's licensing of HLFIP IP from 2015 through 2023. And, the only evidence that comes close to recognizing such a liability is a suspiciously backdated financial statement created in October 2023, well after litigation had commenced.

WHEREFORE, Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, requests a speedy hearing of this declaratory judgment Count pursuant to Florida Statutes Section 86.111 and demands judgment in her favor and against Defendants Jon, SmartComm DE, HLFIP, and Nominal Defendant SmartComm declaring:

1.    The IP License Agreement obligating SmartComm via SmartComm DE to pay a 40% licensing fee to HLFIP for licensing IP is invalid, unenforceable, and should be set aside pursuant to Fla. Stat. § 607.0832, Fla. Stat. § 607.0304, and/or this Court's broad equitable powers;

2.    The backdated long-term note payable of $80 million (and growing) to HLFIP for IP licensing from 2015 through 2023 is invalid, unenforceable, and should be set

aside pursuant to Fla. Stat. § 607.0832, Fla. Stat. § 607.0304, and/or this Court's broad equitable powers;

3.    Janice is entitled to attorneys' fees and costs incurred invalidating the IP Transactions under Fla. Stat. § 607.0746, or, in the alternative, as special damages under the Wrongful Act Doctrine because Jon's conflicted, *ultra vires*, breach of fiduciary duties transactions caused Janice to litigate with third person, newly formed entities SmartComm DE, and HLFIP Holding, LLC; and,

4.    Such other and further declarations, relief, and sanctions as this Court deems just and proper.

### Count II:  607.0748 Action To Appoint A Custodian Or Receiver
### (The Trust, on behalf of SmartComm, against Jon and SmartComm)

186.    Plaintiff incorporates paragraphs 1 through 159 as though fully set forth herein.

187.    Pursuant to Florida Statutes Section 607.0748, the Trust asks this Court to appoint a custodian or receiver to oversee SmartComm.

188.    As alleged above, given that Jon is the sole director and officer of SmartComm, the Trust's 50% ownership does not allow meaningful participation in the decisions of SmartComm.

189.    In light of this, the Trust is hamstrung by the decisions of an erratic and vindictive person who has shown a penchant for sabotage, waste, retaliation, and fraud.

190.    In Janice's original complaint, filed March 10, 2023 (1280-DIN 2), she pled that Jon had threatened to "sabotage" the Company and "harm Smart Communications, and therefore the value of the shares, if Janice and the Trust do not comply with his wishes." *See* 1280-DIN 2, ¶¶ 51, 88(f).

191.    That is exactly what he has done as sole director and officer of SmartComm.

192.    First, he proffered a fraudulent purported Shareholders' Agreement to attempt to force Janice to comply with his wishes.

193.    After this Court (per Judge Williams) enjoined Jon's retaliation against Janice based on findings that Janice was likely to prevail on her waste claims and as to the invalidity of the purported Shareholders Agreement, Jon pivoted to the exact sabotage he had earlier threatened—draining SmartComm of value. He did this by creating SmartComm DE, executing the unilateral asset transfer agreement, beginning to execute contracts in SmartComm DE's name instead of SmartComm's, and concocting the IP Transactions. One of the many reasons the IP Transactions are so transparently fraudulent is that they manage to accomplish Jon's sabotage without harming Jon—the transactions devalue SmartComm, at Janice's sole expense because Jon purported to transfer all of the Company's value *to himself*.

194.    In addition to failing to hire separate, impartial counsel for SmartComm, Jon has caused SmartComm to pay for his attorneys' fees in an action by Jon and SmartComm against another 50% shareholder. And, throughout this litigation he and his attorneys have blocked and impeded Janice's statutory rights to books and records via:

     a.    delay (the first books and records production was made five months after Janice's formal demand; the second was delayed one month and only made after Janice threatened a second motion to compel books and records);

     b.    facially defective excuses (like Janice was not entitled to books and records because she was violating the fraudulent Shareholders' Agreement, or Janice was not entitled to SmartComm's subsidiaries' books and records);

     c.    deficient and incomplete productions (the latest books and records production does not include the first quarter of 2024 even though Janice has repeatedly asked for it, nor did it include any SmartComm DE books and records);

     d.    improper confidentiality designations (large portions of the latest books and records production are designated "For Purposes of Mediation Only" which neither Janice nor the Court agreed to, and which contravenes the existing confidentiality stipulation (DIN 362)); and,

e.    ridiculous logistical conditions (prior to the first books and records production, Jon and SmartComm were going to make Janice travel to SmartComm and copy physical versions of the books and records, and were not going to make a copy machine available for Janice to accomplish this).

195.    Moreover, it is clear from the most recent, incomplete books and records production that SmartComm is adjusting the books and reclassifying expenses between iterations of the same documents.

196.    For example, in unaudited profit and loss statements produced one week apart, the employee salary and wage expense dropped by almost $3 million dollars. *See* Confidential Exhibit 40, A Comparison of 2023 Profit & Loss Statements Produced One Week Apart.

197.    And, as alleged above, Jon has continued to retaliate against Janice by refusing to pay for utilities and maintenance at 1660 Ranch Club Blvd., including propane that is necessary for hot water and cooking.

198.    For more than a year, Janice has had to chase Jon and SmartComm, and rectify or stay wrongdoing after it occurred—at great expense to Janice. Much of that expense has stemmed from Jon and SmartComm's improper fusion; Jon has used his sole control of SmartComm to aggressively litigate against Janice without incurring any personal costs.

199.    Upon information and belief, Janice or a custodian would uncover substantial additional wrongdoing if they were to be given complete access to SmartComm's books and records.

200.    At bottom, until a neutral custodian is appointed, Jon will remain in sole control of SmartComm and its information; therefore, SmartComm will remain under threat of irreparable harm at Jon's hand, and Janice will have to continue uncovering wrongdoing after the fact.

WHEREFORE, Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, demands judgment in her favor and against Defendant Jon and Nominal Defendant SmartComm, and the appointment of a custodian or receiver with the power to:

1.    Stabilize and "clean up" the company, including but not limited to investigating and stopping wasteful use of company resources;

2.    Investigate the Delaware conversions, asset transfer, and *ultra vires* adoption of bylaws;

3.    Ensure compliance with Court orders, and investigate the Company's records to ensure compliance with previous injunctions and orders;

4.    Ensure Janice's full access to SmartComm books and records;

5.    Ensure compliance with other discovery obligations and Court orders;

6.    Oversee and be the final arbiter of company expenses and transactions going forward (until the end of litigation);

7.    Appoint independent company counsel;

8.    Award attorneys' fees and costs pursuant to Fla. Stat. § 607.0746; and,

9.    Such other and further declarations, relief, and sanctions as this Court deems just and proper.

### Count III:  607.1430 Action For Judicial Dissolution
**(The Trust, on behalf of SmartComm, against Jon and SmartComm)**

201.    Plaintiff incorporates paragraphs 1 through 159 as though fully set forth herein.

202.    Janice has done everything in her power to find a business resolution short of judicial dissolution. To that end, on March 21, 2024, she sent Jon and SmartComm a business resolution proposal, which suggested a shareholders' agreement that would stabilize the Company

and position it for sale within two years—to maximize value for both 50% shareholders. *See* Exhibit 41, Business Resolution Letter. Jon and SmartComm never responded to this proposal.

203.    SmartComm is owned 50-50, with Janice holding 50% of the shares and Jon holding 50% of the shares.

204.    Janice demanded a special meeting to elect directors and undo the *ultra vires* Delaware actions and IP Transactions on March 15, 2024 pursuant to Fla. Stat. § 607.0702(1)(b).

205.    Since that time, Jon and SmartComm finally scheduled the special meeting for May 14, 2024 via Zoom. *See* Ex. 39.

206.    As mentioned above, they issued a belated meeting notice for the meeting under Fla. Stat. § 607.0705 (requiring at least 10 days), and then refused to let a court reporter into the meeting to take minutes.

207.    At the meeting Jon and Janice were deadlocked in their votes to elect a successor director. Jon nominated himself, Janice nominated herself, and they each voted for themselves and against the other.

208.    The shareholders were thus deadlocked in the election of a successor director.

209.    As a result of the director vote, Jon's current term as a director expired. *See* Fla. Stat. § 607.0805. However, Jon remains on as a director until a successor director is elected.

210.    Then, there were votes on the *ultra vires* transactions Jon caused SmartComm and its subsidiary, SmartComm DE, to enter into. Specifically, Jon and Janice voted on a resolution Janice proposed to find the following transactions *ultra vires* and recommend to the Board that they be unwound:

        a.    The alleged long-term note payable stemming from the Termination of Oral License Agreement and supposed long-running 40% net sales royalty;

b. The Exclusive Intercompany Intellectual Property License Agreement executed between Jon and himself carrying the 40% net sales royalty forward;

c. The purported 5% interest being charged on the novel 40% Oral IP royalty/liability, which was backdated to an effective date of 2015;

d. The purported Transfer Agreement dated August 29, 2023, between SmartComm and SmartComm DE attempting to convey all of the Corporation's assets to SmartComm DE; and,

e. The unilateral adoption of purported Bylaws of the Corporation by Director Consent on August 29, 2023.

211. Janice voted for the adoption of the resolution deeming all of the above transactions *ultra vires* and recommending to the Board that they be undone. Jon voted against the adoption of the resolution. The shareholders were thus deadlocked on this vote as well.

212. As described above, corporate assets are being misapplied or wasted on Jon's frivolous spending, baseless litigation, and improper related-party, conflict-of-interest IP Transactions.

213. In addition, Jon has acted in a manner that is fraudulent, and is reasonably expected to continue to act in a fraudulent manner. To wit,

a. Jon perpetrated a fraud on SmartComm and Janice as a shareholder via the proffering of the purported Shareholders' Agreement; and,

b. Jon is perpetrating additional fraud on SmartComm and Janice as a shareholder via the IP transactions.

214. Janice therefore initiates a judicial dissolution proceeding pursuant to Fla. Stats. §§ 607.1430(1)(b)(2)-(b)(4) & 607.1431.

WHEREFORE, Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, demands judgment in her favor and against Defendant Jon and Nominal Defendant SmartComm, including:

1.     Appointment of a receiver or custodian during the proceeding as provided in Fla. Stat. §§ 607.1431 & 1432, empowered to:

    a.     Oversee and conduct the day to day business of the corporation;

    b.     Investigate, account for, and undo wasteful practices;

    c.     Sell and repossess assets as appropriate;

    d.     Investigate the capitalization, formalities, and balance sheets of SmartComm-related entities and the ownership of underlying related entity assets, including but not limited to investigating Loco, Yacht, and HLFIP;

    e.     Dissolve related entities, assign title of their underlying assets to SmartComm, and/or grant SmartComm constructive trusts over their underlying assets; and,

    f.     Position the Company for sale.

2.     Appointment of provisional directors as provided in Fla. Stat. § 607.1435;

3.     Ordering a purchase of Janice's shares pursuant to Fla. Stat. § 607.1436, and:

    a.     Setting aside the fraudulent IP Transactions in such sale;

    b.     Accounting for profits and value held in SmartComm DE in such sale;

    c.     Accounting for profits and value held in any other SmartComm-related entities properly assignable to SmartComm, including but not limited to Loco, Yacht, and HLFIP; and,

    d.     Including such other qualifications and provisions as the Court deems just and proper.

4.     Making any order or grant any equitable relief other than dissolution as in its discretion it may deem appropriate;

5.     Awarding Janice attorneys' fees and costs pursuant to Fla. Stats. §§ 607.0746 & 607.1430; and/or,

6.     Such other and further relief as this Court deems just and proper.

### Count IV:  607.0831 Liability of Director
### (The Trust, on behalf of SmartComm, against Jon)

215.    Janice incorporates paragraphs 1 through 159 as though fully set forth herein.

216.    Jon has breached or failed to perform his duties as a director and officer of SmartComm. He grossly mismanaged SmartComm assets, caused SmartComm to fail to hold annual meetings for the election of a director, caused SmartComm to pay for the litigation of the fraudulent purported Shareholders' Agreement, caused SmartComm to retaliate against its other 50% shareholder, and engaged in conflict-of-interest, self-dealing transactions that were not in the best interest of SmartComm or its other 50% shareholder but rather to Jon's sole benefit.

217.    The IP Transactions are fraudulent, related-party, conflict-of-interest, *ultra vires* transactions from which Jon derived an improper personal benefit to SmartComm's and the other 50% shareholder's detriment.

218.    And, Jon acted with conscious disregard for the best interests of the corporation, and/or committed willful or intentional misconduct, when he filed and defended suit based on a purported Shareholders' Agreement that he knew was not signed by Jim, which has since been invalidated by this Court.

WHEREFORE, Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, demands judgment in her favor and against Defendant Jon including:

1.    Compensatory damages, including but not limited to repayment by Jon of attorneys' fees and costs paid by SmartComm or its related entities to prosecute or defend fraudulent actions;

2.    Janice's attorneys' fees and costs pursuant to Fla. Stat. § 607.0746; and,

3.    Such other and further relief as this Court deems just and proper.

## Count V:  Breach of Fiduciary Duties
### (The Trust, on behalf of SmartComm, against Jon and SmartComm)

219.    Janice incorporates paragraphs 1 through 159 as though fully set forth herein.

220.    Jon, as sole officer and sole director of SmartComm has duties of loyalty and care

to the Company and its shareholders.

221.    Jon breached his fiduciary duties to SmartComm and its shareholders, by, among

other things:

    a.    Fraudulently claiming the purported Shareholders' Agreement was valid and seeking to enforce it;

    b.    Causing SmartComm to be commonly represented with Jon, and causing SmartComm to aggressively litigate the validity of the purported Shareholders' Agreement against Janice (a 50% shareholder), and causing SmartComm to pay Jon's own legal bills in litigating the invalidity of the purported Shareholders Agreement;

    c.    Entering into multiple transactions that harmed SmartComm and its shareholders, such as: (1) Entering into the IP License Agreement for 40% of SmartComm's net sales eleven days after the Federal Circuit invalidated the Mailguard patent; and (2) Forming SmartComm DE, publishing *ultra vires* bylaws for SmartComm DE that absolved him of all director liability, and transferring all of SmartComm's assets to SmartComm DE;

    d.    Causing SmartComm to enter into a purported long term note payable with HLFIP now worth more than $80 million;

    e.    Causing SmartComm to enter into the IP License Agreement and purported long term note payable for grossly inadequate consideration with full knowledge that SmartComm's revenue does not principally flow from the virtually worthless IP that HLFIP holds, which SmartComm had never paid to use prior to this litigation;

    f.    Usurping corporate opportunities by making contracts with SmartComm DE instead of SmartComm;

    g.    Usurping corporate opportunities by assigning existing SmartComm contracts to SmartComm DE;

    h.    Committing ongoing corporate waste;

    i.    Causing SmartComm to make personal loans solely to himself, instead of declaring and issuing dividends to both shareholders;

      j.     Threatening to harm SmartComm; and,

      k.     Otherwise acting disloyally and not in good faith towards the Company and Janice.

222.    Upon information and belief, additional breaches will become evident upon an accounting of SmartComm's books and records, and the conduct of further discovery.

WHEREFORE, Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, demands judgment in her favor and against Defendant Jon and Nominal Defendant SmartComm, including:

1.    Compensatory damages;

2.    Janice's attorneys' fees and costs pursuant to Florida Statutes Section 607.0746;

3.    Payment of any back-distributions owed to Janice as a result of Jon making unequal distributions to himself from September 16, 2022 to the present;

4.    A full accounting of SmartComm's and its subsidiaries' corporate books and records by a third-party forensic accounting firm;

5.    Appointment of a Custodian or receiver *pendente lite* to rectify Jon's ongoing fraud, mismanagement, and waste, including eventually preparing SmartComm for sale;

6.    Granting SmartComm a constructive trust over revenue obtained by SmartComm DE;

7.    Granting SmartComm a constructive trust over assets in Jon's possession that constitute corporate waste, including but not limited to the $1.4 million Brickell Condo, the 45' Nor-Tech, and Jon's exotic vehicles, or, in the alternative, requiring Jon to provide restitution to SmartComm for the value of those assets and expenses paid related to those assets;

8.      Unwinding of the IP transactions, including the Executed License Agreement and purported long-term note payable, and interest accumulated on either transaction;

9.      Unwinding of the transfer of SmartComm's assets to SmartComm DE and invalidation of the *ultra vires* SmartComm DE bylaws;

10.     Requiring Jon to disgorge the personal attorneys' fees he caused SmartComm to cover related to the proffering of the purported Shareholders' Agreement in the Consolidated Action; and,

11.     Such other and further relief as this Court deems just and proper.

**Count VI:  Aiding and Abetting Breach of Fiduciary Duties**
**(The Trust, on behalf of SmartComm, against SmartComm DE, HLFIP, Loco, and Yacht)**

223.    Janice incorporates paragraphs 1 through 159 as though fully set forth herein.

224.    Jon, as sole officer and sole director of SmartComm has duties of loyalty and care to the Company and its shareholders.

225.    As relevant to this Count, Jon breached his fiduciary duties to SmartComm and its shareholders, by, among other things:

  a.    Entering into multiple transactions that harmed SmartComm and its shareholders, such as: (1) Entering into the IP License Agreement for 40% of SmartComm's net sales eleven days after the Federal Circuit invalidated the Mailguard patent; and (2) Forming SmartComm DE, publishing *ultra vires* bylaws for SmartComm DE that absolved him of all director liability, and transferring all of SmartComm's assets to SmartComm DE;

  b.    Causing SmartComm to enter into a purported long term note payable with HLFIP now worth more than $80 million;

  c.    Causing SmartComm to enter into the IP License Agreement and purported long term note payable for grossly inadequate consideration with full knowledge that SmartComm's revenue does not principally flow from the virtually worthless IP that HLFIP holds, which SmartComm had never paid to use prior to this litigation;

  d.    Usurping corporate opportunities by making contracts with SmartComm DE instead of SmartComm;

47

    e.       Usurping corporate opportunities by assigning existing SmartComm contracts to SmartComm DE;

    f.       Committing ongoing corporate waste;

    g.       Otherwise acting disloyally and not in good faith towards the Company and Janice.

226.    SmartComm DE, HLFIP, Loco, and Yacht had knowledge of the above-listed wrongful acts.

227.    SmartComm DE, HLFIP, Loco, and Yacht provided substantial assistance to Jon and SmartComm in the commission of these above-listed wrongful acts when they:

    a.       Executed the conversion of HLFIP from a Florida corporation to a Delaware LLC;

    b.       Executed the Asset Transfer Agreement which transferred all of SmartComm's assets to SmartComm DE;

    c.       Executed an IP License Agreement wherein SmartComm DE—after being seeded with all of SmartComm's assets—would owe HLFIP 40% of its net sales;

    d.       Entered into the backdated purported long term note payable now worth more than $80 million;

    e.       Executed contract assignments assigning SmartComm FL's existing contracts to SmartComm DE;

    f.       Submitted request for proposal responses in the name of SmartComm DE, and caused customers who would have contracted with SmartComm FL to contract with SmartComm DE;

    g.       Purchased or held for Jon's personal benefit luxury assets unrelated to SmartComm's business;

    h.       Purchased or held business assets titled to Jon that SmartComm paid for; and,

    i.       Caused SmartComm directly or indirectly to expend significant sums to maintain, improve, and use the assets without repaying those expenses.

228.    For these reasons, this Court has an additional source of personal jurisdiction over SmartComm DE, HLFIP, Loco, and Yacht because they committed a tortious act in Florida, *see*

Fla. Stat. § 48.193(1)(a)(2), when they aided and abetted Jon and SmartComm's torts against Janice. *See Concordia Lutheran Ministries v. Wills*, 359 So. 3d 396, 403–04 (Fla. 2d DCA 2023).

WHEREFORE, Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, demands judgment in her favor and against Defendants SmartComm DE, HLFIP, Loco, and Yacht, including:

1.      Compensatory damages;

2.      Disgorgement of benefits conferred on the entities paid for by SmartComm;

3.      A constructive trust for SmartComm over the entities' assets;

4.      Janice's attorneys' fees and costs pursuant to Fla. Stat. § 607.0746, or, in the alternative, as special damages under the Wrongful Act Doctrine because Jon's breaches of fiduciary duties caused Janice to litigate against third person, newly formed entities SmartComm DE and HLFIP, and newly-converted Yacht and Loco; and,

5.      Such other and further relief as this Court deems just and proper.

## Count VII:  Fraud—Saddling SmartComm With Retroactive IP Debt
### (The Trust, on behalf of SmartComm, against Jon)

229.    Janice incorporates paragraphs 1 through 159 as though fully set forth herein.

230.    Jon made to SmartComm a false statement concerning a material fact: that HLFIP's IP was reasonably equivalent in value to 40% of SmartComm's net sales; and that SmartComm and HLFIP had an agreement to pay royalties worth nearly $80 million for use of the IP from 2015 through Aug. 28, 2023.

231.    Jon knew that the HLFIP IP was not worth 40% of SmartComm's net sales.

232.    Jon knew that SmartComm had never paid or owed HLFIP anything at all for the use of the IP from 2015 through Aug. 28, 2023.

233.    There is no documentary evidence of a 40% royalty from prior to Aug. 29, 2023.

234.    Jon intended that SmartComm rely on his false statement above.

235.    SmartComm did rely on his false statements when it, in its internal financial documents, recognized an ongoing liability to HLFIP for 40% of net sales and backdated the financials to "reflect[]" a long-term note payable for use of the IP from 2015 through Aug. 28, 2023.

236.    SmartComm further relied on Jon's false statements when it reported the 40% net sales licensing fee and long-term note payable on its 2022 tax returns, which were prepared and filed in the fall of 2023.

WHEREFORE, Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, demands judgment in her favor and against Defendant Jon and the following remedies:

1.    Compensatory damages, primarily but not limited to SmartComm's attorneys' fees expended on litigation to enforce and validate the fraudulent related-party IP transactions;

2.    Appointment of a receiver *pendente lite* because Jon is committing actual fraud that endangers SmartComm's solvency and existence;

3.    Janice's attorneys' fees and costs pursuant to Fla. Stat. § 607.0746; and,

4.    Such other and further relief as this Court deems just and proper.

## Count VIII:  Aiding and Abetting Fraud—
## Helping Jon Saddle SmartComm with Retroactive IP Debt
### (The Trust, on behalf of SmartComm, against SmartComm DE and HLFIP)

237.    Janice incorporates paragraphs 1 through 159 as though fully set forth herein.

238.    Jon made to SmartComm a false statement concerning a material fact: that HLFIP's IP was reasonably equivalent in value to 40% of SmartComm's net sales; and that SmartComm

50

and HLFIP had an agreement to pay royalties worth nearly $80 million for use of the IP from 2015 through Aug. 28, 2023.

239.    Jon knew that the HLFIP IP was not worth 40% of SmartComm's net sales.

240.    Jon knew that there was no previous agreement for SmartComm to pay HLFIP anything at all for the use of the IP from 2015 through Aug. 28, 2023.

241.    There is no documentary evidence of a 40% royalty from prior to Aug. 29, 2023.

242.    Jon intended that SmartComm rely on his false statement above.

243.    SmartComm did rely on his false statements when it, in its internal financial documents, recognized an ongoing liability to HLFIP for 40% of net sales and backdated the financials to "reflect[]" a long-term note payable for use of the IP from 2015 through Aug. 28, 2023.

244.    SmartComm further relied on Jon's false statements when it reported the 40% net sales licensing fee and long-term note payable on its 2022 tax returns, which were prepared and filed in the fall of 2023.

245.    SmartComm DE and HLFIP had knowledge of Jon's plan to saddle SmartComm with retroactive IP debt to his personal benefit and SmartComm's detriment, as described in the above-listed wrongful acts.

246.    SmartComm DE and HLFIP provided substantial assistance to Jon and SmartComm in the commission of these above-listed wrongful acts when they:

      a.      Executed the conversion of HLFIP from a Florida corporation to a Delaware LLC;

      b.      Executed an IP License Agreement wherein SmartComm DE—after being seeded with all of SmartComm's assets—would owe HLFIP 40% of its net sales with full knowledge that its IP was virtually worthless and had recently been invalidated; and,

      c.     Entered into the backdated purported long term note payable (2015-Aug. 2023) now worth more than $80 million with full knowledge that HLFIP's flagship patent was not granted until 2019 and that HLFIP had never before received compensation from SmartComm for use of its IP.

247.    For these reasons, this Court has an additional source of personal jurisdiction over SmartComm DE and HLFIP because they committed a tortious act in Florida, *see* Fla. Stat. § 48.193(1)(a)(2), when they aided and abetted Jon and SmartComm's torts against Janice. *See Concordia Lutheran Ministries v. Wills*, 359 So. 3d 396, 403–04 (Fla. 2d DCA 2023).

WHEREFORE, Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, demands judgment in her favor and against Defendants SmartComm DE and HLFIP, including:

1.    Compensatory damages;

2.    Janice's attorneys' fees and costs pursuant to Fla. Stat. § 607.0746; and,

3.    Such other and further relief as this Court deems just and proper.

### <u>Count IX:  Unjust Enrichment—IP Debt</u>
### (The Trust, on behalf of SmartComm, against HLFIP and Jon)

248.    Janice incorporates paragraphs 1 through 159 as though fully set forth herein.

249.    Jon improperly caused SmartComm to confer a benefit upon HLFIP: namely, agreeing to a 40% net sales royalty going forward from Aug. 29, 2023, and backdating that liability to begin in 2015.

250.    Jon caused that backdating to be "reflected" in a "long-term note payable" on SmartComm's books and records that is now worth at least $80 million (including the interest Jon is charging SmartComm on the backdated liability).

251.    HLFIP, of which Jon is the sole member, has knowledge of the benefit conferred. He unilaterally executed the IP License Agreement on behalf of both SmartComm and HLFIP.

252. HLFIP voluntarily accepted and retained the benefit of the liability due to it on the IP Transactions.

253. Jon and HLFIP know that it would be inequitable for HLFIP to receive a 40% net sales royalty and payments on the "long-term note payable."

254. It would be inequitable because, among other reasons, the main patent that HLFIP holds was invalidated by the Federal Circuit eleven days before the IP License Agreement was executed; because until Aug. 29, 2023, SmartComm and HLFIP had a royalty-free license for SmartComm's use of HLFIP's IP; and, because Jon and SmartComm are well aware that 40% of net sales is SmartComm's internal EBITDA margin, and recognition of or payment on the liability would sink SmartComm.

WHEREFORE, Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, demands judgment in her favor and against Defendants Jon and HLFIP, and the following remedies:

1. Granting SmartComm a constructive trust over revenue obtained by or liabilities owed to HLFIP; or,

2. Setting aside the IP Transactions; and,

3. Janice's attorneys' fees and costs pursuant to Fla. Stat. § 607.0746, or, in the alternative, as special damages pursuant to the Wrongful Act Doctrine because Jon's self-dealing IP transactions caused Janice to litigate against third-person, newly formed HLFIP Holding, LLC; and,

4. Such other and further relief as this Court deems just and proper.

## Count X:  Unjust Enrichment—Headquarters Building
### (The Trust, on behalf of SmartComm, against Loco)

255. Janice incorporates paragraphs 1 through 159 as though fully set forth herein.

256.    Loco Florida LLC holds SmartComm's headquarters building, which is worth at least $1.3 million.

257.    SmartComm paid for the purchase of its headquarters building at 10491 72nd Street, Seminole, FL 33777.

258.    Thereafter, SmartComm conferred a benefit upon Loco by titling the building to Loco, and paying for its property taxes, significant improvements, and operating costs.

259.    Loco, of which Jon is the managing member, has knowledge of the benefit conferred because he would have signed off on or had knowledge of the benefits as a SmartComm director and officer.

260.    Upon information and belief, at the date of filing there is no formal note or repayment plan.

261.    Upon information and belief, Loco has not made any repayments to SmartComm.

262.    It would be inequitable for Loco to retain title to or the value of the as-improved SmartComm building.

WHEREFORE, Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, demands judgment in her favor and against Defendant Loco, including:

1.    Granting SmartComm a constructive trust over SmartComm's headquarters building at 10491 72nd Street Seminole, FL 33777; or,

2.    Providing restitution to SmartComm for the full value of the building, including but not limited to improvements, property taxes, and maintenance and operating costs; and,

3.    Janice's attorneys' fees and costs pursuant to Fla. Stat. § 607.0746; and,

4.    Such other and further relief as this Court deems just and proper.

## Count XI:  Conversion of Corporate Assets
### (The Trust, on behalf of SmartComm, against Yacht and Jon)

263.    Janice incorporates paragraphs 1 through 159 as though fully set forth herein.

264.    Smart Communications Yacht Holding, LLC holds a 100 foot 2020 Riva Corsaro Yacht, docked in downtown Miami, Florida on the Brickell River.

265.    SmartComm purchased the yacht for $9.6 million. SmartComm paid the $4.8 million down payment on the yacht, and has paid, directly or indirectly, the $40,000/month payment on the note for the yacht plus all or most maintenance, dock fees, and gas costs.

266.    Upon information and belief, SmartComm also pays, indirectly or directly, the yacht crew's salary and benefits.

267.    Jon is the managing member of Yacht, and uses the Riva Corsaro primarily for his personal benefit.

268.    Upon information and belief, Yacht has never made any repayments to SmartComm, nor is there a note payable or repayment plan.

269.    Upon information and belief, no one at SmartComm regularly makes use of the Riva Corsaro, nor does it serve a legitimate business purpose for a correctional communications business.

270.    Therefore, Yacht is wrongfully exercising dominion and control over SmartComm's property.

271.    Similarly, SmartComm purchased a nearly $1 million 45' Nor-Tech, which was titled to Jon.

272.    Upon information and belief, Jon has never made any repayments to SmartComm for the purchase of the Nor-Tech.

273.    Upon information and belief, the Nor-Tech is docked at Jon's Tierra Verde home.

274.    Upon information and belief, Jon causes SmartComm to pay for the maintenance, improvement, and use of the Nor-Tech.

275.    Upon information and belief, no one at SmartComm besides Jon regularly makes use of the Nor-Tech, nor does it serve a legitimate business purpose for a correctional communications company.

276.    Therefore, Jon is improperly exercising dominion and control over SmartComm's property.

WHEREFORE, Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, demands judgment in her favor and against Defendants Yacht and Jon, including:

1.    Granting SmartComm a constructive trust over the Riva Corsaro and Nor-Tech, and empowering a SmartComm custodian or receiver to sell the yachts and distribute the proceeds to SmartComm;

2.    Providing restitution to SmartComm for the full value of the yachts and related expenses, including but not limited to maintenance costs, improvement costs, dock fees, fuel costs, mortgage note payments, and crew salary and benefits; and,

3.    Janice's attorneys' fees and costs pursuant to Fla. Stat. § 607.0746; and,

4.    Such other and further relief as this Court deems just and proper.

### Count XII:  Unjust Enrichment—The Riva Corsaro Yacht
### (The Trust, on behalf of SmartComm, against Yacht)

277.    Janice incorporates paragraphs 1 through 159 as though fully set forth herein.

278.    Smart Communications Yacht Holding, LLC holds a 100 foot 2020 Riva Corsaro Yacht, docked in downtown Miami, Florida on the Brickell River.

279.     SmartComm purchased the yacht for $9.6 million. SmartComm paid the $4.8 million down payment on the yacht, and has paid, directly or indirectly, the $40,000/month payment on the note for the yacht plus all or most maintenance, dock fees, and fuel costs.

280.     Upon information and belief, SmartComm also pays, indirectly or directly, the yacht crew's salary and benefits.

281.     Jon is the managing member of Yacht, and uses the Riva Corsaro primarily for his personal benefit.

282.     Upon information and belief, Yacht has never made any repayments to SmartComm, nor is there a note payable or repayment plan.

283.     Upon information and belief, no one at SmartComm regularly makes use of the Riva Corsaro, nor does it serve a legitimate business purpose for a correctional communications business.

284.     SmartComm alternatively pleads that it has conferred a benefit on Yacht, and Yacht has knowingly retained that benefit. Jon is the managing member of Yacht, and is the only person to regularly make use of the luxury vessel.

285.     It would be inequitable for Yacht to retain the benefit—as a result of the fraud Jon perpetrated on SmartComm, SmartComm is now reporting substantial indebtedness. The Riva Corsaro serves no legitimate purpose to begin with, and retaining it would be inequitable under the circumstances. Even if the Court undoes the fraudulent IP Transactions, it would be inequitable for Yacht to retain a benefit it has not paid for.

WHEREFORE, Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, demands judgment in her favor and against Defendant Yacht, including:

1.      Granting SmartComm a constructive trust over the Riva Corsaro, and empowering a SmartComm custodian or receiver to sell the yacht and distribute the proceeds to SmartComm;

2.      Providing restitution to SmartComm for the full value of the yacht and related expenses, including but not limited to maintenance costs, dock fees, mortgage note payments, and crew salary and benefits; and,

3.      Janice's attorneys' fees and costs pursuant to Fla. Stat. § 607.0746; and,

4.      Such other and further relief as this Court deems just and proper.

## CERTIFICATE OF SERVICE

I CERTIFY that a true and correct copy of the foregoing has been served on all counsel of record through the Florida Court's e-filing portal on May 29, 2024.


Dated:  May 29, 2024                                    Respectfully submitted,

                                                        _/s/  David E. Schoenfeld_____

David E. Schoenfeld (FL PHV # 1047561)                  Anitra R. Clement
Peter F. O'Neill (FL PHV # 1043125)                     Florida Bar No. 100354
Andrew L. Franklin (FL PHV # 1035737)                   **SHOOK, HARDY & BACON L.L.P.**
Kailin Liu (FL PHV # 1051416)                           100 N. Tampa Street, Suite 2900
**SHOOK, HARDY & BACON L.L.P.**                         Tampa, FL 33602
111 S. Wacker Drive, Suite 4700                         Telephone:  (813) 202-7100
Chicago, IL 60606                                       aclement@shb.com
Telephone: (312) 704-7700
dschoenfeld@shb.com
pfoneill@shb.com
afranklin@shb.com
kliu@shb.com


*Counsel for Janice Logan, as Trustee of the*
*James Logan Family Trust, dated February 10, 2021*

## <u>VERIFICATION</u>

Under penalties of perjury, I declare that I have read the foregoing SECOND AMENDED

VERIFIED COMPLAINT and that the facts stated in it are true, or, where indicated, are stated to

the best of my knowledge and belief.

Janice Logan
Trustee of the James Logan Family Trust,
dated February 10, 2021

# EXHIBIT 1

RECORDED IN OFFICIAL RECORDS
INSTRUMENT # 2024016761    26 PG(S)
2/7/2024 4:24 PM
KAREN E. RUSHING
CLERK OF THE CIRCUIT COURT
SARASOTA COUNTY, FLORIDA
CIVIL COURTS        Receipt # 3140431

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.

Plaintiffs,

v.

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust; and ALEXIS LOGAN,

Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021, and directly
and derivatively on behalf of Smart Communications
Holding, Inc., and derivatively on behalf of Loco
Florida, LLC,

Plaintiff,

v.

JONATHAN LOGAN,
SMART COMMUNICATIONS HOLDING, INC.,
nominal defendant, LOCO FLORIDA, LLC,
nominal defendant, and SMART
COMMUNICATIONS HOLDING, LLC,

Defendants.        /

Case No. 2023-CA-1002-NC

(CONSOLIDATED)

Case No.: 2023-CA-1280-NC

**Jury Demanded:**
**Counts II, III, IV, and V**

### PHASE I[1] DECLARATORY JUDGMENT

THIS CAUSE having come before the Court for a three-day bench trial from January 29,

2024, to January 31, 2024, on Count II of Plaintiffs Jonathan D. Logan's ("Jon") and Smart

Communications Holding, Inc.'s ("Smart Communications") Complaint (DIN 2) seeking a

declaration that a certain purported Shareholders' Agreement attached to the Complaint as Exhibit

---

[1] The consolidated action was bifurcated by agreement (DIN 241) of the Parties in order to try the Declaratory
Judgments actions, which are referred to as "Phase I," before the remaining counts of the Parties' respective operative
pleadings.

D was valid and enforceable, and on Count I of the Amended Verified Complaint (DIN 271) of Defendant Janice Logan, individually and as Trustee of the James Logan Family Trust, dated February 10, 2021, ("Janice") seeking a declaration that the purported Shareholders' Agreement is invalid and unenforceable, and having reviewed the file, heard testimony of fact and expert witnesses, and received documentary and physical evidence, and being fully advised in the premises, the Court **ADJUDGES**:

1.      The Court has jurisdiction over the Parties and subject matter of Phase I pursuant to Fla. Stat. § 86.011, *et seq*. Jon is a resident of Pinellas County, Florida, Smart Communications is incorporated in the state of Florida and has its headquarters in Pinellas County, Florida. Janice is a resident of Sarasota County, Florida, and the James Logan Family Trust, dated February 10, 2021, is administered in Sarasota County, Florida.

2.      The Court's January 31, 2024, oral findings of fact and conclusions of law, explained in open court before a court reporter, a transcript of which is attached hereto as **EXHIBIT A**, are incorporated into this judgment and entered.

Based on those findings and conclusions, the Court **DECLARES**:

I.      That the purported September 23, 2022, Shareholders' Agreement attached to Plaintiffs' Complaint as Exhibit D is invalid and unenforceable, and that there is no shareholders' agreement in effect between the two 50% shareholders of Smart Communications Holding, Inc.'s stock, (1) Jonathan D. Logan and (2) Janice Logan, as sole Trustee of the James Logan Family Trust, dated February 10, 2021.

2

**DONE AND ORDERED** in Chambers in Sarasota County, Florida on this _6 k_ day of

February, 2024.

_____

**Hon. Hunter Carroll, Circuit Court Judge**

## Certificate of Service

On February ___, 2024, the Court caused the foregoing document to be served via the Clerk

of Court's case management system, which served the following individuals via email (where

indicated). On the same date, the Court also served a copy of the foregoing document via First

Class U.S. Mail on the individuals who do not have an email address on file with the Clerk of

Court.

CRAIG STEPHEN BARNETT
200 EAST LAS OLAS BLVD
SUITE 2100
FORT LAUDERDALE, FL 33301

MICHAEL J. HARWIN
200 EAST LAS OLAS BLVD
SUITE 2100
FORT LAUDERDALE, FL 33301

CHRISTOPHER R. CLARK
106 EAST COLLEGE AVE
SUITE 700
TALLAHASSEE, FLORIDA 32301

CHARLES FRANKLIN JOHNSON III
802 11TH ST W
BRADENTON, FL 34205

ANITRA RAIFORD CLEMENT
100 N TAMPA ST
SUITE 2900
TAMPA, FL 33602

DAVID E. SCHOENFELD
111 S. WACKER DR
SUITE 4700
CHICAGO, IL 60606

PETER F. O'NEILL
111 S. WACKER DR.
SUITE 4700
CHICAGO, IL 60606

ANDREW L. FRANKLIN
111 S. WACKER DR.
SUITE 4700
CHICAGO, IL 60606

KAILIN LIU
111 S. WACKER DR.
SUITE 4700
CHICAGO, IL 60606

# Exhibit A

1  IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT IN
   AND FOR SARASOTA COUNTY, FLORIDA

2

3  JONATHAN LOGAN and SMART
   COMMUNICATIONS HOLDING, INC.,

4          Plaintiffs,

5  vs.                          Case No.:  2023-CA-1002-NC

6  JANICE LOGAN, individually and
   as Trustee of the James Logan
   Family Trust, and ALEXIS LOGAN,

7  individually,

8  _____Defendants._____/   (CONSOLIDATED)

9  JANICE LOGAN, as Trustee of the
   James Logan Family Trust dated

10 February 10, 2021, and directly
   and derivatively on behalf of

11 Smart Communications Holdings,
   Inc., and derivatively on behalf

12 of Loco Florida, LLC,

13         Plaintiff,

14 vs.                           Case No:   2023-CA-1280-NC

15 JONATHAN LOGAN, SMART
   COMMUNICATIONS HOLDING, INC.,

16 nominal defendant, and LOCO
   FLORIDA, LLC, nominal defendant,

17 _____Defendants._____/

18

19          IN-PERSON TRIAL, PHASE ONE

20      BEFORE THE HONORABLE HUNTER W. CARROLL

21               held at the
       Judge Lynn N. Silvertooth Judicial Center

22     2002 Ringling Boulevard, Courtroom 6C
                 Sarasota, Florida

23  Wednesday, January 31, 2024, 8:47 a.m. to 3:56 p.m.

24       VOLUME III, Pages 569 through 740

25          Stenographically reported by:
       Linda R. Wolfe, RPR, RMR, FCRR, FPR-C

1    following commenced at 3:08 p.m.)

2                    R-U-L-I-N-G

3         THE COURT:  This is Case 2023-CA-1002-NC

4    together with 2023-CA-1280.  We had Phase One of

5    the trial focusing on declaratory judgment actions

6    which was tried January 29th, 30th and 31st.

7         A predecessor judge entered a temporary

8    injunction in this case which, after that judge's

9    disqualification, got expanded ultimately by

10   agreement of parties after some discussions with

11   the Court.

12        But today is -- and the last three days has

13   been focusing in on whether there is a

14   Shareholders' Agreement; and, if so, what is it.

15        And in coming to this ruling, let me first

16   identify who several of the players are.  We have

17   Smart Communications Holding, Inc., I'll call it

18   either "Smart" or "Smart Communications", and it

19   provides telecommunication services for jail and

20   prison inmates.  And although it was not the focus

21   of this Phase One trial, just by the sheer number

22   of lawyers here, it really suggests that the entity

23   is quite successful.

24        We have Jonathan Logan, who is the incumbent

25   president, director, and 50 percent shareholder of

1     Smart Communications.

2          We have Janice Logan, both in her individual

3     capacity and as trustee of the James Logan Family

4     Trust dated February 19th, 2021.  And James Logan,

5     of course, was her late husband.

6          The Trustee currently owns 50 percent of Smart

7     Communications' shares.  So Jon, and Janice as

8     trustee, each are 50 percent.  And I'm using

9     everyone's first name not because I'm trying to be

10    offensive but to help be clear as to who we are

11    talking about.

12         Also a party is Alexis Logan, who is the

13    sister of Jon.  She is the daughter of Janice.  And

14    if I didn't say it, Jon also is the son of Janice.

15         The evidence makes clear that Jon Logan and

16    Alexis Logan do not get along, at all.

17         And Jon's relationship with his mother,

18    Janice, is only slightly better.

19         Alexis and her mom, Janice, get along well.

20         Alexis is an attorney, and I'll comment on it

21    a little bit later.  She also, for a period of

22    time, was the 100 percent shareholder of Smart

23    Communications in a legal title type of situation.

24         There are other folks that we're going to be

25    talking about primarily.  First is James or Jim

1     Logan.

2        Jim is Janice's late husband.  He was the

3     father of Jon and Alexis.

4        And Jim died October 16th, 2022.

5        Attorney Mark Wall, who is an attorney at Hill

6     Ward Henderson, has represented Jon Logan.

7        Tom Sims, who is an attorney at the Johnson

8     Pope firm, has represented Jim and Janice Logan

9     relating to -- and I'm going to say their estate

10    plan.  I know when I say "estate plan," I'm just

11    using that generically, not just referring to wills

12    but the more global planning aspect, trusts and all

13    sorts of various agreements.

14       And I know probate lawyers get upset when I

15    say estate lawyers and I reference trusts.  But I'm

16    using "estate lawyer" here and just "estate

17    planning" in just a very generic sense.

18       We have -- Another person we are going to talk

19    about is Lisa Eddy, who is Smart Communications'

20    Vice President of Operations.  She's been with

21    Smart for approximately five years in various

22    roles, and her current salary is $230,000 a year.

23       We have Scott Holte, who is Smart

24    Communications' Chief Strategy Officer, and he has

25    also been with Smart for approximately five years.

1    And his current salary is $150,000.

2         Gloria Burgess, who is Jon Logan's housekeeper

3    who tends to Jon Logan's house every Tuesday,

4    almost without fail.

5         I did reference earlier that Jon Logan is the

6    incumbent president, director, and 50 percent

7    shareholder of Smart Communications, and he is the

8    person that's been driving the company.  And his

9    dad was with him along for that ride and, over

10   time, providing various different services.  Dad

11   tended to focus on the legal-financial-banking type

12   of services.  Jon Logan was vision and IP type of

13   involvement.

14        The core group of Smart Communications is Jon

15   Logan, Lisa Eddy, and Scott Holte.

16        And that core group can be -- that core group

17   meets at least once a week.  I mean, the evidence

18   indicated that Jon's talking to Lisa, the chief of

19   operations -- sorry, the Vice President of

20   Operations, you know, on a daily basis, but that --

21   those three are the core group that run Smart

22   Communications.  And I don't have it quickly, but I

23   want to say the evidence was there was, like, 14

24   departments and more than 100 employees.  Again,

25   another testament that Smart Communications is a

1   successful business.

2        And I've got -- I think that's basically the

3   players I'm going to talk about.  There are others

4   that I might mention along the way.

5        Now, I'm not going to focus in on how Smart

6   Communications was formed because it's not really

7   relevant.  As with most start-ups, corporate

8   formalities usually come a little bit later after

9   concept and a lot of sweat and tears and time, and

10  sometimes capital.

11       But it became -- from the general beginning,

12  there was a 50/50 split between son and dad.

13       Now, I know that due to various unspecified

14  issues that we didn't explore -- and, again, it

15  doesn't really matter, really -- Alexis held

16  100 percent of stock in her name.  But the reality

17  is, Jim and Jon treated each other as if they were

18  50/50.  Smart Communications' lawyers, accountants

19  treated them as 50/50, although they would include

20  Alexis.  And when we get to it, we'll talk about

21  the 2017, because she was still the legal owner of

22  the stock.

23       But for whatever reason, I never picked up on

24  what Mr. Schoenfeld was trying to explain to me,

25  but I don't think it really matters because I find

1    as fact that, from at least an equitable

2    standpoint, dad and son were 50/50.

3        We heard a lot about dad's alcoholism, and

4    certainly it's a pernicious disease, and I've seen

5    many families -- in this case, unfortunately -- I

6    see a lot of affects of alcoholism.  But be that as

7    it may, Jim would have periods of sobriety and then

8    some periods that were the opposite.

9        And as time has progressed, the waxing and

10    waning, it appears that dad's alcoholism was

11    getting the better of him.

12        And I think as it came through from Jon's

13    testimony, but more particularly in some of the

14    e-mails, Jon was growing frustrated with alcoholic

15    portion of dad.

16        And, Jon, I will just say this:  Nothing I'm

17    going to say changes your love for your dad.  But

18    I'm talking about your business here.  I'm not

19    talking about your love for your dad.  And so,

20    please --

21        JON LOGAN:  Understood, Your Honor.

22        THE COURT:  And I honor that -- and even in

23    some of those difficult e-mails, you know, you

24    acknowledged your love for your dad.  And so I'm

25    not talking about that.

1        But there was some growing resentment about

2    Jim's role and ownership.  And I do agree with what

3    Mr. Johnson was saying, that that concern wasn't

4    necessarily that dad was a 50 percent owner, but it

5    was the longer term:  What does that mean when

6    dad's no longer with us?

7        Now, over the years, there were efforts to

8    agree to a Shareholders' Agreement.  Now, Jon

9    suggests that there always has been one and it's

10   been modified slightly.  With exception of and

11   putting the 2002 (sic) purported Shareholders'

12   Agreement to the side, there are no written

13   agreements that contain signatures.  And we'll talk

14   about 2017, whether that is or is not a written

15   agreement later on.

16       I want to talk for a moment about Exhibit 101.

17   Exhibit 101 is the -- what Jon Logan testified to

18   is the Shareholders' Agreement that's in effect

19   that both he and his dad signed on or about

20   September 23rd, 2022.  It is thirteen single-spaced

21   pages and pretty small font, as you all saw me with

22   the magnifying glass looking.  And that thirteen

23   pages is exclusive of the signature page.

24       The import for our discussion today at

25   Section 4.3, the agreement contains a mandatory

1    buyback-on-death provision of any deceased

2    shareholder's shares.  And Section 5.3(b), as in

3    "bravo," sets the fair market value, but that is

4    determined by a company appraisal to set the

5    purchase price.

6        And the reality is, given that Jon Logan is

7    the incumbent director, if this is the agreement,

8    that puts Jon in basic total control over the

9    valuation process.

10        Now, I'll also pause here.  The Court isn't in

11    a position to determine whether a deal is a good

12    deal or a bad deal from some person's perspective,

13    and it's not the Court's role ever to write or

14    rewrite a contract to make it more fair for one

15    party or the other.

16        I reference the fact of 5.3(b) to help explain

17    the dynamic that brings us here today.

18        Now, there are three questioned signatures.

19    Two are on page 14 of the Shareholders' Agreement

20    from 2022 -- the purported Shareholders' Agreement,

21    and both of those allegedly contain Jim's

22    signature.

23        And then the third disputed signature is on a

24    separate document, but it's also in Exhibit 101,

25    which is entitled the Written Action of the Board

1    of Directors.

2        Janice and Alexis dispute that Jim signed this

3    agreement.  And we certainly have competing

4    experts.

5        The Jim -- sorry.  The Janice and Alexis'

6    expert was of the opinion:  Very highly probable

7    that this was not signed by Jim.

8        And we have the expert for Jon Logan who

9    contained a pretty high -- it was probable that dad

10   did sign.

11       And so I've got two experts that are not

12   exactly polar opposites, but pretty close to being

13   polar opposites of each other.

14       I do want to reference Exhibit 200.

15   Exhibit 200 is an e-mail chain that starts with

16   Attorney Mr. Sims.  And it is to Jon and Jim Logan.

17       And let me just back up.  The Alexis ownership

18   of the stock, her ownership terminated

19   approximately 2018.  I don't have the specific date

20   written down.  I'm sure it's on a document here.  I

21   just didn't go back to write it down.  At that

22   point, the shares went to Jon, individually, and

23   Jim, individually.

24       And prior to Jim's surgery in September, he

25   conveyed the Smart Communications' stock into the

1    Revocable Trust, and that's how Janice, as the

2    trustee, now is the owner of that stock.

3         Okay.  So going back to Exhibit 200.  This is

4    an e-mail.  It originated from Mr. Sims to Jon and

5    copying Jim.  And it, again, is conveying a

6    Shareholders' Agreement.  And the date on this is

7    September 12th, 2022.

8         Now, the text of that e-mail includes

9    statements that this is for Jon's review and

10   comment.  It reminds Jon that his dad's going to be

11   undergoing a medical procedure in the near future.

12   It contemplates that, quote, "once finalized", end

13   quote, it could be signed by son and dad, quote,

14   "in order to put it into place."

15        And I use those quotes to indicate that the

16   sending of the document itself was not a technical

17   offer.  But even if it were, that same day, still

18   in Exhibit 200, Jon rejects the Shareholders'

19   Agreement.

20        He writes, quote, "It's ridiculously too

21   complicated," end quote.

22        Quote, "I don't even understand it," end

23   quote.

24        Quote, "I want it much more simple and

25   direct," end quote.

1          Quote, "All these terms and names that need

2      their own paragraph of definition is ridiculous,"

3      end quote.

4          Now, critically, also in that e-mail, Jon

5      writes to his dad -- or Jon writes to -- yeah -- to

6      his dad, quote, "I do not agree to be a 50/50

7      partner with you," end quote.

8          Now, Jon's explanation is this was written as

9      part of his normal modus operandi to shock his dad

10     back into sobriety.

11         And, you know, I don't really have any

12     statement one way or the other, other than there's

13     not an acceptance of the offer to the extent that

14     you would construe the sending of Exhibit 200 to be

15     an offer, which I do not.

16         But it also is -- it indicates that there's no

17     reference to any existing shareholders.

18         Now, dad has two different types of responses.

19     The first response is at Exhibit 210, which is more

20     on the business side of the response.  And it talks

21     about the share transfer agreement, and that's the

22     share transfer agreement that took Alexis

23     100 percent back to Jon and Jim 50/50.  And so dad

24     is reminding Jon about the 50/50 nature.

25         Then there is Exhibit 211 and 213, and this is

1   a September 18th e-mail, slash, letter, that was

2   sent on October 3rd, 2022.  And I know that there

3   is questions lodged by Jon as far as its proper

4   admissibility.  But it's clear that there's a

5   videotape of Jim signing something, which is this

6   response.  And this is the response on the more

7   personal side.

8           What I highlight at this point is in

9   Exhibit 213, a reply that Jon wrote to his dad on

10  October 3rd, 2022.

11          Quote, "If you want to start a war with me,

12  then we will have a war like you have never seen.

13  I have never made a death threat.  Don't try and

14  put words into my mouth and document that like it

15  is fact.  I am not stupid.  I know what you are

16  attempting to do here.  You are unfit as a business

17  partner, unfit as a father, unfit as a husband, and

18  unfit as an adult.  You can't even dress yourself.

19  You want to make this get nasty.  We can make it

20  get real nasty.  I didn't deserve this.  But I will

21  not let someone, including my own family, take

22  advantage of me anymore," end quote.

23          Now, again, Jon, I go back to I know you

24  testified that this is part of the shock that

25  you're trying to bring dad back into sobriety, but

1    I do note that nowhere in here is there an

2    assertion that there's an existing Shareholders'

3    Agreement.

4        And this was done on October 3rd, and the

5    testimony is that there previously was a signed

6    agreement that Jon left at his own house in

7    Tierra Verde, Pinellas County, Florida, for his dad

8    to come over, dad signed it, left Jon a copy and

9    took the original.

10       Now, the purported original has never been

11   found.  And as we indicated, dad dies on

12   October 16th, 2022.

13       Jon Logan's conduct over the next few months

14   suggests that there was no 2022 signed

15   Shareholders' Agreement.

16       Exhibit 217 -- and I know, again, that there

17   was a dispute over the admissibility of this

18   document -- suggests that Jon was not -- now

19   willing to sign it.

20       But even if I took that 217 away, my finding

21   doesn't change that there was no signed settlement

22   agreement -- I'm sorry -- no signed Shareholders'

23   Agreement in September or at any time in 2022.

24       What, to me, is really telling is the lead-up

25   to the December 8th meeting with Mr. Sims,

1   Mr. Wall, where Mr. Wall seeks from Smart

2   Communications' accountants and attorneys and Jim's

3   attorneys any information or if there is any signed

4   agreements regarding the business.  There's no

5   indication in those communications, "Hey, we know

6   that there is one, we're just trying to track it

7   down."

8         And in the December 8th meeting, while I

9   understand Jon contends that he referenced a signed

10  agreement, the attorneys for the parties don't

11  recall that.

12        There was a statement that Janice made to Jon,

13  "Why didn't you sign it?"  And Jon saying, "I wish

14  I had."

15        Now, I also know that there is an allegation

16  that Janice said something to the effect of that

17  she knows that there is a signed agreement or she

18  had seen a signed agreement, and the Court credits

19  Janice's testimony on that that it was in reference

20  to some prior iteration, not the 2022.

21        I have no doubt that Gloria Burgess found a

22  document, but the circumstances in how that

23  document was found are suspicious to the Court.

24        I also understand that Ms. Eddy and Mr. Holte

25  testified that Jim said something to the effect of

1    "I've signed the stockholders' agreement" or "You

2    don't need to worry about it because That's been

3    taken care of," and those are statements in the

4    fall 2022 time period.

5        I do know that both of them are interested in

6    the outcome of this proceeding from a financial

7    standpoint, and I have difficulty understanding how

8    individuals who talk daily or weekly as part of the

9    core group of Smart Communications would not

10   earlier disclose the existence of that comment or

11   those comments that Jim allegedly made when,

12   indisputably, they knew that one of the prime

13   issues of this lawsuit -- or these lawsuits, I

14   should say, involve whether there is a settlement

15   or -- a Shareholders' Agreement -- why I say

16   settlement agreement, I don't know -- why there's a

17   Shareholders' Agreement.

18       So all of that goes to me saying that I find

19   as fact that the Exhibit 101 was not signed by Jim

20   Logan.   Jim Logan never assented to that document.

21       That there is no 2022 stockholder's agreement.

22       Now, let me also talk, because I said at the

23   beginning that there was references over time that

24   there were various different shareholder

25   agreements.   And without a doubt, there were a lot

1    of evidence of discussions and drafts of various

2    iterations, and I will say they are different in a

3    material respect.  One provision that is different

4    than the 2022 has to do with how the company gets

5    evaluated.

6         And under those other prior agreements, it was

7    more of a -- and depending on which version, but

8    they were more typical that you would see one side

9    picks an appraiser, the other side picks the

10   appraiser, and then if there is a dispute, then

11   they pick a third.

12        I -- I -- I know that most of those

13   Shareholder Agreement requests were being driven by

14   dad and that he was willing to enter into some type

15   of agreement.

16        The 2017 is probably the closest that the

17   evidence supports of a Shareholders' Agreement, but

18   the Court will ultimately find that there was no

19   2017 Shareholders' Agreement.

20        If you look at the discussions contained

21   within the e-mails that were discussing various

22   drafts, there is never a situation where Jon says

23   "I accept" or Jim says "I accept" or using words to

24   that effect.

25        At that time, Alexis was involved and, in

1   fact, some of the e-mails reference that there was

2   either disagreement or a difference of opinion as

3   to what various provisions meant.  And what those

4   e-mails from 2017 -- they talk about a global, Hey,

5   we need to move in this direction type of plan,

6   these are some steps we need to take.  One step is

7   getting the stock out of Alexis' name.  And the

8   next step is to have a Shareholders' Agreement.

9   But the parties never agreed on the business terms.

10          And I understand that parties can agree to

11  business terms but have other terms that are left

12  open that doesn't defeat the existence of an

13  enforceable agreement.

14          Here the parties never came to either an oral

15  or written agreement as to the core business terms

16  for a Shareholders' Agreement.  Certainly, one of

17  the terms that existed or that both sides may have

18  wanted was the existence of a mandatory buyback.

19  But that's not the only term.

20          The various drafts that different lawyers from

21  different firms sent around were much more

22  comprehensive than just a buyback.  And so it's

23  just like a situation where parties are negotiating

24  over ten points; they come to an agreement on

25  three, but not on the other seven.  You don't have

1      an agreement unless the parties then say, "Okay, we

2      agree to those three and they are going to be

3      controlling."  There was not anything like that

4      here.

5            I understand Jon testified that at each of

6      these yearly meetings or whenever a new version of

7      whatever year they were talking about at the time's

8      Shareholders' Agreement, that the parties agreed

9      orally with each other and then decided, since it

10     wasn't a big deal, to physically memorialize it in

11     writing.

12           I find that that -- that Jon Logan failed to

13     meet his burden that there was an existence of

14     either an oral or written Shareholders' Agreement

15     at any time, including the 2017, '18, and I think

16     it was 2020 or the various different iterations.

17           So, ultimately, that means I'm declaring that

18     there is no Shareholders' Agreement that is in

19     effect between the two 50 percent shareholder --

20     50 percent shareholders of Smart Communications'

21     stock.

22           So I'm going to pause there.  Are there any

23     questions or clarifications I need to make?  And

24     I'm going to start with Jon's lawyers first.

25           MR. BARNETT:  No, Your Honor.

1          THE COURT:  Going to Janice's lawyers.

2          MR. SCHOENFELD:  No, Your Honor.

3          THE COURT:  Okay.  Going to Alexis' lawyers.

4          MR. JOHNSON:  No, Your Honor.

5          THE COURT:  Now, who on this side of the room

6    is going to take the first draft of coming up with

7    this partial judgment?

8          MR. SCHOENFELD:  Your Honor, we'd be happy to

9    do so.

10         THE COURT:  I want a specific person.  Is

11   it --

12         MR. SCHOENFELD:  It's not going to be

13   Mr. O'Neill because he is leaving on parental

14   leave, and I've forbidden him to do any more work

15   on this case until it is done.  So it will be

16   Mr. Franklin and myself.

17         THE COURT:  Okay.  Obviously, before anything

18   gets submitted, it needs to go to all the attorneys

19   for their review and approval.

20         What I normally do in these types of

21   situations, if you can get a copy of my ruling, and

22   I'm fine if you want to just electronically staple

23   it and then come up with the partial judgment, just

24   implementing it, that's fine, too.

25         Now, let's talk about -- and that completes my

1   ruling.

2        So I'm now going to shift about what's next.

3   I mean, obviously the lawyers here know, you know,

4   I was a business litigator for many years before I

5   even got on the bench.  I mean, we all know the

6   three primary things that are going to happen.

7   There could be others.

8        Parties are either going to agree on a

9   Shareholders' Agreement governing their relations,

10   there's going to be a buyout, or there's going to

11   be a deadlock.  There could be others, but those

12   are the three typical that I see in these types of

13   situations.

14        I want to be clear that the injunction is

15   still in effect.  And let's not move assets.

16        What is going on next week with the hearing

17   time, and how do we want to proceed?  Do we need to

18   go back to mediation in, let's say, 30 or 60 days?

19        Did you all get the financial information that

20   we talked about when we had the contempt hearings

21   that were ultimately resolved by agreement?

22        MR. O'NEILL:  So, Your Honor -- So to answer

23   Your Honor, I think your first question was, as for

24   next week, what is, I believe, is up on Monday, am

25   I correct?

# EXHIBIT 2

IN THE CIRCUIT COURT OF THE 12TH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA

JANICE LOGAN, AS Trustee of the James Logan
Family Trust, dated February 10, 2021, and
directly and derivatively on behalf of Loco
Florida, LLC.

Plaintiff,

vs.

Case No.: 2023 CA 1280 NC

Case No: 2023 CA 1002 NC

JONATHAN LOGAN, SMART COMMUNICATIONS
HOLDING, INC., nominal defendant, and LOCO
FLORIDA, LLC, nominal defendant

Defendants.
_____/

**ORDER ON JANICE LOGAN'S MOTION FOR TEMPORARY INJUNCTION**

This matter came before the court on a full day evidentiary hearing on **Plaintiff's Motion for Temporary Injunction** on July 20th, 2023.  The court heard from the parties, read the pertinent memorandums of law, received and considered the evidence and testimony, heard argument of counsel, and took this matter under advisement.

It should also be noted that there are other related lawsuits pending related to these parties and issues related to this subject matter.  Two cases have been consolidated by this Court in which this order could apply, depending on the court's ruling, they are;

**Case No.: 2023 CA 1002 NC** a complaint in which the Plaintiff is Jonathan Logan and Smart Communications Holding, Inc., and the Defendant is Janice Logan, individually and as Trustee of the James Logan Family Trust dated February 10, 2021, and Alexis Logan, individually.

and

**Case No.: 2023 CA 1280 NC** Plaintiff Janice Logan's Amended Verified Complaint, a complaint in which Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, has filed against Defendants Jonathan D. Logan (Jon), Smart Communications Holding, Inc., nominal defendant and Loco Florida, LLC, nominal defendant.

1

**The 2023 CA 1280 NC Case**

This Motion for Temporary Injunction originates from a Verified Complaint (DIN #2), since amended (DIN #28).

The body of the complaint contains the allegations which have ultimately led to this motion, including the background information, including the relevant history of the parties' disagreements along with information regarding the related litigation that has resulted. It includes a history of Smart Communications, the formation of Smart Communication Holding, Inc., (Smart Communications, Company)

Both the original and amended complaint sets forth the background (as alleged by the Plaintiff) of the alleged waste of corporate assets, breach of fiduciary duties, and the seeking of a corporate custodian to oversee Smart Communications during the pendency of this litigation. The Amended Verified Complaint sets the table for the primary focus of the Plaintiff's Motion for Temporary Injunction hearing, which is the legality, validity, and authenticity of a purported Shareholder Agreement along with a Stock Purchase Agreement both of which became the primary points of disagreement between the parties and became the primary focus of the subject matter and argument during the evidentiary portion of the Motion for Temporary Injunction hearing.

**Allegations by Janice Logan**

The Plaintiff in this case, Janice Logan, as Trustee of the James Logan Family Trust, dated February 10th, 2021, and directly and derivatively on behalf of Smart Communications Holding, Inc., and derivatively on behalf of Loco Florida, LLC, pursuant to Florida Rule of Civil procedure 1.610, files this Motion for Temporary Injunction against Defendant Jonathan D. Logan, and nominal Defendants Smart Communication Holdings, Inc. and Loco Florida, LLC.,.

The Court may make reference throughout this order at times only to Smart Communications Inc., recognizing that the Plaintiff has claimed an equal (50%) interest also in Loco Florida, LLC.,. The Court notes this for the record only. The Court notes the Defendant has argued that Loco LLC.,. is not a proper party joined for this action, that is also noted for the record. There is no dispute however that the Smart Communications, Inc., is not a properly joined party.

Plaintiff states in her motion that this action is brought to obtain relief from a *"retaliatory and oppressive campaign"* by the Defendant to use unilateral control of Smart Communications and Loco Florida LLC., to deprive Plaintiff of *"her ability to assert her legal right to a fair price for her 50% ownership stake in both entities.".*

The Plaintiff claims that after she filed her Complaint, the Defendant, as sole director and officer, *"used his absolute control of the company to strip Janice of income, health care, the use of her home, a generator needed to power lighting and security at her home, and likely the use of her phone and internet service.".* (DIN #28).

Plaintiff claims that she and her late husband (the father of the Defendant) *"long received these benefits as in-kind distributions on her ownership shares in Smart Communications and Loco."*

2

(DIN #28, Count II)

The Plaintiff claims that the Defendant has, among other things;

1. Sought to enforce a purported fraudulent Shareholders Agreement to pressure her into surrendering 50% ownership interest in Smart Communications and Loco LLC., for less than the fair market value. (DIN #2, Count I)

2. Breached his fiduciary duty by committing "gross corporate waste" and targeting Plaintiff in retaliation for the Plaintiff's position taken during this dispute between allegedly equal shareholders.

3. On May 1st, 2023, the Defendant terminated the Plaintiff from her position as a consultant for Smart Communications, a position she held without any issues since November 1st, 2022, and terminated her only source of income.

4. By terminating the Plaintiff, the Defendant also stripped the Plaintiff of her primary health insurance which she relies upon to treat a heart condition.

5. Stopped construction of a full house generator at the place of residence of the Plaintiff and has commenced eviction proceedings against the Plaintiff for failure to pay rent in the amount of approximately $35,000 per month which was allegedly demanded by Defendant only after commencement of legal proceedings by the Plaintiff.

6. Commenced eviction proceedings against the Plaintiff at her place of primary residence, (1660 Ranch Club Blvd.). Plaintiff claims that if she is evicted she will have no place to live.

The Plaintiff also requests the appointment of a temporary custodian for the well-being of the company. (DIN# 2, Counts II, and III).

Plaintiff alleges that the Defendant regularly makes use of a $10 million, 100-foot Riva Coraso Yacht which is owned by Smart Communications (named the Convict) and also a 48-foot yacht (named Dirty Amy). Upkeep, marina storage and payments to a full-time captain and crew for the Convict, is allegedly paid for by Smart Communications or its sub affiliates-of which the Plaintiff claims she is also a 50% shareholder.

According to the Plaintiff she has never been allowed access or had the ability to use the two boats.

In sum, the Plaintiff alleges that *"Jon has sought to strip his recently widowed 69-year-old mother of income, shelter, and personal security"*. That *"unless this Court grants this motion to restore the **status quo ante** between the parties, Jon may succeed in destroying her financial and emotional ability to effectively vindicate her rights to her severe and irreparable harm."*.

3

**Jonathan Logan and Smart Communication's response**

In response to this motion the Defendant alleges, among other things;

1. The motion has little legal merit.

2. There are procedural and substantive deficiencies with the Plaintiff's motion.

3. The Plaintiff (Janice) has not and cannot establish the elements required for the issuance of a temporary injunction.

4. The Shareholders Agreement at issue was a valid and legally enforceable document.

**The law**

As a procedural matter, the circuit court derives its authority to issue a temporary injunction in a civil action from Article V, section 5(b) of the Florida Constitution. That provision gives circuit courts the power to issue "all writs necessary or proper to the complete exercise of their jurisdiction." The power covers what was once commonly known as "a writ of injunction," which a court may issue "to maintain unchanged, as far as practicable, the *status* or condition of the subject matter of the controversy during the pendency of the suit." *Cohen v. L'Engle,* 24 Fla. 542, 5 So. 235, 237, 238-39 (1888) *see also Jacksonville Elec. Light Co. v. City of Jacksonville,* 36 Fla. 229, 18 So. 677, 679 (1895) (observing that the authority to issue a writ of injunction comes from the constitution and is ancillary to exercise of original jurisdiction). The writ of injunction "is an extraordinary, not an ordinary, everyday writ, and it should never be granted lightly, but cautiously and sparingly." *Godwin v. Phifer,* 51 Fla. 441, 41 So. 597, 602 (1906); *see also Thompson v. Plan. Comm'n of City of Jacksonville,* 464 So.2d 1231, 1236 (Fla. 1st DCA 1985) (recognizing "that the issuance of a preliminary injunction is an extraordinary remedy which should be granted sparingly")

To demonstrate a prima facie case for a temporary injunction, the petitioner must establish four factors:

(1) the likelihood of irreparable harm;

(2) the unavailability of an adequate remedy at law;

(3) a substantial likelihood of success on the merits; and

(4) that a temporary injunction would serve the public interest.

**The motion hearing.**

The motion hearing was scheduled for an all-day in person and hybrid Zoom hearing on July 20, 2023. The hearing commenced at 9:30AM and concluded at approximately 6:30PM with a 45-minute lunch recess along with a few short mid-morning and mid-afternoon breaks of no more than 15 minutes or less.

The court heard from the witnesses and the parties along with reviewing the numerous exhibits and demonstrative presentations. Both sides presented voluminous notebooks of stipulated exhibits and case law supporting their respective positions.

The court notes and incorporates and considers the arguments, briefs, case law, pleadings and exhibits introduced by the parties in its analysis and rationale in coming to its decision. In coming to its written ruling, the court notes it may not specifically cite and reference all of its basis of its ruling within the four corners of this order, however the court notes that its ultimate ruling comes from its analysis and consideration of all of the admissible evidence and testimony presented whether or not it is specifically referenced to or noted specifically in this order.

**Court's findings, analysis, consideration, rationale, and ruling.**

A central issue to both the Plaintiff's and Defendant's position is the purported Shareholders Agreement (Case 1002 DIN#53, Case 1280 DIN#33). The history, relevance, and dispute over the validity of this purported Shareholders Agreement is reflected in the argument, evidence, testimony, the pleadings and the record.

Whether the Shareholders Agreement is valid, forged, or fraudulent is pertinent to the position of both parties. If the Shareholders Agreement is found to be fraudulent, invalid or forged, it would support the position of the Plaintiff Janice Logan's Amended Verified Complaint, specifically **Count I** (Declaration Concerning the Validity of the Purported Shareholder's Agreement).

Also central to the position of the Plaintiff's case relating to **Count II** (607.0831 Liability of Director) is whether the Defendant, retaliated against the Plaintiff as a result of her not abiding by the Purported Shareholder's Agreement as it relates to the Defendant having the authority to buy the shares of Smart Communication Holdings LLC., owned by Plaintiff pursuant to the terms of the purported Shareholders Agreement.

5

The allegations made by the Plaintiff regarding Defendant's behavior, conduct, business dealings and fiscal management are central to **Count III** (Breach of Fiduciary Duties-The Trust against Jonathan Logan and Smart Communications, Inc.), **Count IV** (607 0748 Action to Appoint a Custodian) and **Count V** (Breach of Fiduciary Duties-The Trust against Jonathan Logan and Loco Florida) are also relevant to the Plaintiff's Amended Verified Complaint.

### *The Purported Shareholders Agreement*

Both parties presented testimony supporting their respective positions on the validity of the purported Shareholders Agreement.  The court heard from two experts supporting the parties' respective positions on the validity of the signatures surrounding the Shareholders Agreement, specifically whether there is sufficient evidence to find that the Shareholders Agreement was actually signed by James Logan who was the prior 50% shareholder of Smart Communications, LLC,. whose shares, after his death  ultimately passed to his wife, Janice, the Plaintiff.

Called on behalf of the Plaintiff was Linton A. Mohammed, a handwriting analysist who examined the documents at issue along with other documents to conduct a handwriting analysis and gave an opinion. The Court carefully considered his qualifications, experience and his testimony.

The Court evaluated and considered the final opinion of this witness (Mohammed) and his level of certainty regarding his professional opinion regarding the signature and document at issue.

Called on behalf of the Defendant was John Vastrek, a handwriting analyst and forensic document examiner who did the same and offered his own opinion. The Court likewise carefully considered his qualification, experience and his testimony.

The Court also evaluated and gave consideration of this witness' (Vastrek) level of certainty regarding his professional opinion regarding the signature and document at issue.

The Court also listened and observed the Defendant give testimony and heard his explanation of the circumstances surrounding the history of the purported Shareholders Agreement, including the history and circumstances surrounding the discovery of the lost purported Shareholders Agreement,  and the circumstances surrounding the alleged signing of the purported Shareholders Agreement.

The Court heard sworn testimony from other witnesses regarding the circumstances surrounding the purported Shareholders Agreement, including lawyers who were directly  involved with or had knowledge of the document and the discussions surrounding the purported Shareholders Agreement.

The Court also notes the original Shareholders Agreement was never found and never produced for evaluation by the parties' experts who relied on a copy of the purported Shareholders Agreement in their analysis.

The court heard testimony from experienced attorneys who gave testimony of their recollections of the issues of the Shareholders Agreement, their understanding of the circumstances surrounding the document, including statements they heard related to said document.

The Court notes one of the attorneys called to testify testified that the Defendant in reference to the purported Shareholders Agreement made a statement to the effect that he (the Defendant) *"Wished he had signed it".*

For the witnesses who testified live in court, the court was able to see their testimony and evaluate their testimony including how the witnesses testified along with their demeanor under examination and cross examination and how they responded to questions that were presented to them.

### *Allegations and evidence of retaliation, waste of company assets and breach of fiduciary duties*

The Court heard and evaluated the testimony regarding the Plaintiff's allegations that the Defendant retaliated against her (noting that she is presumptively a 50% shareholder in Smart Communications) by allegedly not abiding by the presumptive Shareholders Agreement and allegedly retaliating against her for her resistance or failure to abide by the purported Shareholders Agreement and the legal challenges she subsequently made against the Defendant.

The court also heard testimony and received evidence regarding allegations of the Defendant's wasting company assets and breach of fiduciary duties.

The Court notes the evidence shows that the Plaintiff was terminated from her employment at Smart Communications Holding, Inc., and her salary (approximately $100,000 per year) and health benefits were cancelled at the direction of the Defendant not long after or contemporaneously with the Plaintiff's lawsuit and allegations made against the Defendant.

This factual timeline and the alleged circumstances surrounding the reasons for Plaintiff's termination was not refuted by the Defendant when he testified, in fact they appeared to be reinforced by his testimony.

The Court notes there are pending lawsuits regarding an eviction from a company owned property where the Plaintiff currently lives and a replevin action regarding a company owned vehicle which prior to these proceedings was being used unfettered by the Plaintiff with knowledge and permission of the Defendant.

The Court notes the Plaintiff was in the process of having a house generator installed in the home she resides in and the contract or services for that installation has been cancelled due to the actions of the Defendant on behalf of the company. This was confirmed by the Defendant during his testimony.

In sum, the Defendant did not deny under oath at the hearing that the Plaintiff was terminated from employment, had her health care benefits cut, and denied use of company vehicles and demanded to pay rent as a result of the allegations and actions made by the Plaintiff in bringing these allegations against the Defendant and filing the subsequent lawsuit.

The Court also heard and testimony and saw evidence of the Defendant's use and exclusive enjoyment of company assets including company credit cards, luxury vehicles, homes and yachts.

The Defendant testified that he employs a full-time boat captain for a company owned and operated luxury yacht, allegedly worth approximately $10 million dollars, that is moored in a marina at a cost of approximately $10,000 per month, in addition, the luxury yacht has a full-time captain salaried at approximately $140,000 per year and a full-time deck hand who is paid approximately $60,000 per year.

According to the Plaintiff the yacht is only used a few times per year.

The Defendant also has use of a home in Tierra Verde, Florida and a condominium in Miami, allegedly worth $1.5 million, acquired in part or owned outright by Smart Communications. The Defendant also has use of a smaller company owned or acquired "sports" boat, allegedly worth approximately $1 million dollars, that he keeps at his Tierra Verde residence.

In particular, but not exclusively, the Court notes the testimony and evidence shows the Defendant under the auspices and/or ownership of Smart Communications Holdings, Inc., has or had use and access to several luxury vehicles including a Ferrari, allegedly worth approximately $350,000, a Lamborghini allegedly worth approximately $300,000, a Range Rover, and a Rolls Royce worth approximately $250,000. These vehicles allegedly are in the exclusive use and possession of the Defendant.

Defendant had or has exclusive use or access to a Smart Communications American Express Business Account/Credit Card in which noted purchases included personal items for the Defendant including plane tickets to international destinations for "guy trips", fishing charters, and ski lodging.

The Court also notes that prior to the initiation of these allegations by the Plaintiff, and the lawsuit, there was no demand by the Defendant for payment for use of the company owned home lived in by the Plaintiff, nor any demand for payment relating to her use of company owned vehicles.

Prior to the initiation of the allegations and the lawsuit by the Plaintiff, there was no expectancy with regard to Plaintiff's role with the company nor was there any issues regarding her salary and health care benefits with the company.

The Court notes the evidence shows that the Plaintiff is approximately 69 years of age, suffers from apparent health-related issues and is concerned with her health, income, shelter, future health care and her personal security.

With regard to the authenticity of the Shareholders Agreement, the Court finds that the testimony of Linton Mohammed, the expert witness on behalf of the Plaintiff was more compelling and persuasive than the testimony of the Defense expert witness, John Vastrek.

8

Based on the testimony of witnesses and the evidence so far presented, the Court cannot find that there was any valid Shareholders Agreement in existence during the relevant time periods.

### *Findings relating to the requirements of a temporary injunction.*

In reviewing and evaluating the witnesses, evidence and testimony the court concludes the following;

1. The Court finds that as to the circumstances surrounding the pending eviction and replevin proceedings along with the cancellation of the health insurance and income of the Plaintiff and based on her age, health history, and her prior dependency on the benefits of being a shareholder of the company show a prima facie case that the Plaintiff would suffer **irreparable harm** if the temporary injunction were not granted.

2. The Court finds that the immediacy of the circumstances surrounding the pending legal actions initiated by the Defendant, especially the eviction proceedings, combined with the age of the Plaintiff and her current health issues, along with other evidence presented in the evidentiary hearing show a prima facie case supporting the argument that there is **no adequate remedy at law**.

3. Based on the evidence that the Court has considered and commented on within this order, the Court finds there is a **substantial likelihood of success on the merits** of the current lawsuit by the Plaintiff.

4. The Court finds that the company employs in excess of 100 employees, the stabilization and maintaining the status quo of the company and its employees until this matter is ultimately resolved indicated the granting of this temporary injunction **would serve the public interest**.

### *Ruling*

**The Plaintiff, Janice Logan has established the requirements under Florida Rule of Civil Procedure 1.160 entitling her to the following temporary injunctive relief to this extent, the Court enters this order;**

1. **Enjoining the Defendant from charging and demanding rent for her occupation and use of her residence (1660 Ranch Club Blvd.) during the pendency of these actions (Case No. 2023 CA 1002 NC and 2023 CA 1280 NC).**

2. Staying any pending or prospective legal eviction or repossession actions related to alleged Smart Communication Inc., and/or Loco Florida, LLC., property or assets that are currently in possession or being used by the Plaintiff, (particularly the Plaintiff's residence at 1660 Ranch Club, Blvd. and personal vehicles) during the pendency of the litigation related to actions in 2023 CA 1002 NC and 2023 CA 1280 NC. This would include pursuing any suits in Sarasota County demanding declaratory judgment, eviction, rents allegedly owed on Smart Communication and or Loco Florida LLC owned property, and related replevin actions of alleged company owned vehicles.

3. Reinstating the Plaintiff's position within the company, her salary and benefits, including health benefits, at the same rate and frequency paid prior to the termination of said salary and benefits by the Defendant.

4. The Defendant shall reinstate or facilitate the completion of the generator project that was begun or contemplated to begin at the 1660 Ranch Club Blvd., property that was ceased at the direction of the Defendant.

5. The Court will retain jurisdiction to impose such other relief as this court deems just and proper.

*Bond*

The Court takes in consideration and incorporates by reference the arguments made by counsel for the Plaintiff and Defendant and after consideration sets a bond in the amount of **$65,000.00** that is to be posted by the Plaintiff as a condition of this order. Said bond shall be subject to review by this Court no earlier than 6 months from the date of this order.

Done and ordered this ___25th___ day of July 2023, in Sarasota, Sarasota Florida.

Charles E. Williams
Circuit Court Judge

cc.

Attorneys of record

10

# EXHIBIT 3

# STEARNS WEAVER MILLER
# WEISSLER ALHADEFF & SITTERSON, P.A.

Craig S. Barnett
200 East Las Olas Boulevard, Suite 2100
Fort Lauderdale, FL 33301
Direct: (954) 462-9553
Email: cbarnett@stearnsweaver.com

May 1, 2024

**By Email**

David E. Schoenfeld, Esq.
Gary Miller, Esq.
Shook Hardy & Bacon
111 South Wacker Drive
Chicago, Illinois 60606

      Re:    Jonathan Logan and Smart Communications v. Janice Logan, et al.

Dear Dave and Gary:

As follow up to David's April 23, 2024 letter, Smart Communications Holding, Inc. ("Smart Comm") is conducting its review of personal expenses submitted by Janice Logan for payment by the company. Given Gary's numerous letters leveling claims of "corporate waste" against Jon, unfounded as they may be, we assume that you both were unaware, as were we, that Janice continues to submit personal bills to Smart Comm for payment and/or reimbursement. We anticipate your full cooperation in bringing Janice's misconduct to an immediate end.

While Smart Comm continues to review its records, and without waiver of any right, including its right to seek further reimbursement from Janice, Alexis or anyone else who may have received cash and/or other benefits from Smart Comm to which they were not entitled, we enclose a spreadsheet identifying thus far $224,148.27 in expenses submitted by Janice since Jim's passing either paid directly by Smart Comm or for which Janice received reimbursement. Review of amounts for which Janice and others may be responsible continues. *This is unacceptable at best.*

Despite Janice's often-repeated claim that the Court intended to protect the *status quo*, no court order can be read to grant Janice a blank check for, among other things: $83,359 for landscaping; $6,451 for pool maintenance; and miscellaneous painting expenses totaling more than $21,000. She has submitted bills for payment for barn repair as well as a chimney and barn doors, presumably, for the horse stable located on Ranch Club Mansion property. To our client's knowledge, Janice does not keep horses on the property and Smart has no investments in horse farming. To the extent Janice does, she alone is responsible for such costs. To the extent that she leases the stables to anyone else, any lease would be the exclusive right of Smart Comm and all resulting funds would belong to the company. If, in fact, the stables are still empty, then we are sure you agree there is no legitimate reason for Janice to be incurring these costs, regardless of

May 1, 2024
Page 2

who pays them. The same can be said for the $6,354 in "reimbursements" paid directly to Janice, including nearly $1,100 for a lanai refrigerator.

Please make immediate arrangements to reimburse Smart Comm in the amount of $224,148.27, without waiver of additional amounts as may be determined to be due and owing from Janice and/or others to Smart Comm.

Going forward, she may not continue to incur costs on behalf of Smart Comm without its prior review and approval. From now on, items necessary to preserve the Ranch Club Mansion as a company asset must be submitted in advance, through counsel and in writing, with a detailed description of the specific expense and its purpose. Smart Comm will review each such request in a timely fashion and reserves the right to deny any request and/or seek alternatives as may be necessary to protect its investment. *Any expenses submitted without prior company approval are subject to rejection.*

Moreover, Smart Comm is not responsible for Janice's utilities, including but not limited to monthly electric, propane and internet or cable bills. Please make arrangements to have Janice open her own accounts with the various utility companies. To prevent any accidental termination of services, please confirm in writing that she has moved these services to her own individual account by no later than May 30, 2024. *Smart Comm will not be responsible for any services on or after June 1, 2024, and after that date, it may terminate such accounts without further notice.*

We appreciate your assistance in making sure that Janice takes no further action that purports to burden Smart Comm with her improper personal expenses. If you have any questions, please advise.

Sincerely,

*/s/ Craig S. Barnett*
CRAIG S. BARNETT
Encl.

cc:     Smart Communications Holding, Inc.
        Mr. Jonathan Logan

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

#12714554 v1

**Sarasota Ranch Costs**
**10/23/2022-4/29/2024**

| Vendor | Reason | Date | Bill Amount | Vendor Amount Paid |
|---|---|---|---|---|
| Accurate Irrigation | Irrigation system repair | 11/18/2022 | $3,043.00 | |
| Accurate Irrigation | Irrigation system repair | 3/10/2023 | $1,678.50 | |
| Accurate Irrigation | Irrigation system repair | 7/28/2023 | $250.00 | |
| Accurate Irrigation | Irrigation system repair | 7/28/2023 | $540.00 | $5,511.50 |
| | | | | |
| Aqua Leak Detection LLC | Irrigation system repair | 3/24/2023 | $592.19 | |
| Aqua Leak Detection LLC | Irrigation system repair | 5/5/2023 | $978.41 | |
| Aqua Leak Detection LLC | Irrigation system repair | 5/27/2023 | $180.23 | $1,750.83 |
| | | | | |
| Cellgate | Gate Repair & Maintenance | 3/1/2023 | $160.47 | |
| Cellgate | Gate Repair & Maintenance | 6/1/2023 | $160.47 | |
| Cellgate | Gate Repair & Maintenance | 9/25/2023 | $160.47 | |
| Cellgate | Gate Repair & Maintenance | 9/25/2023 | $160.47 | |
| Cellgate | Gate Repair & Maintenance | 12/1/2023 | $128.24 | |
| Cellgate | Gate Repair & Maintenance | 3/1/2024 | $128.24 | $898.36 |
| | | | | |
| Custom Air & Plumbing | HVAC and Plumbing Svc | 11/14/2022 | $139.00 | |
| Custom Air & Plumbing | HVAC and Plumbing Svc | 2/17/2023 | $325.00 | |
| Custom Air & Plumbing | HVAC and Plumbing Svc | 3/3/2023 | $552.00 | |
| Custom Air & Plumbing | HVAC and Plumbing Svc | 2/9/2024 | $630.00 | $1,646.00 |
| | | | | |
| Ezzy Cuts Lawncare LLC | Landscaping | 11/17/2022 | $1,680.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 12/9/2022 | $280.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 12/29/2022 | $1,100.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 12/30/2022 | $4,639.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 1/20/2023 | $4,200.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 2/3/2023 | $1,100.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 2/17/2023 | $1,250.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 2/17/2023 | $15,200.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 3/3/2023 | $2,900.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 4/14/2023 | $2,695.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 5/11/2023 | $1,100.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 5/26/2023 | $3,070.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 6/23/2023 | $1,250.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 7/7/2023 | $1,630.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 8/11/2023 | $1,415.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 9/8/2023 | $1,550.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 9/15/2023 | $2,590.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 9/15/2023 | $1,305.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 9/29/2023 | $1,700.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 9/29/2023 | $1,900.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 11/3/2023 | $1,375.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 12/1/2023 | $2,515.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 12/8/2023 | $1,475.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 1/19/2024 | $1,675.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 1/19/2024 | $10,115.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 1/19/2024 | $480.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 1/26/2024 | $2,635.00 | |

| | | | | |
|---|---|---|---|---|
| Ezzy Cuts Lawncare LLC | Landscaping | 2/2/2024 | $1,375.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 2/16/2024 | $1,850.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 3/1/2024 | $1,550.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 4/5/2024 | $1,550.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 4/19/2024 | $4,210.00 | $83,359.00 |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 11/8/2022 | $554.44 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 12/12/2022 | $457.46 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 1/18/2023 | $478.13 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 2/7/2023 | $492.18 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 3/9/2023 | $481.47 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 4/19/2023 | $641.00 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 5/22/2023 | $709.26 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 6/21/2023 | $822.25 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 7/20/2023 | $990.83 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 8/22/2023 | $1,057.75 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 9/20/2023 | $1,035.02 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 10/23/2023 | $926.88 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 11/20/2023 | $711.06 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 12/19/2023 | $689.91 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 1/19/2024 | $664.62 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 2/21/2024 | $649.93 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 3/19/2024 | $616.39 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 4/22/2024 | $705.20 | $12,683.78 |
| Florida Power & Light | Ending 9048-Sarasota Barn | 11/10/2022 | $31.28 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 12/9/2022 | $30.88 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 1/9/2023 | $30.39 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 2/10/2023 | $30.03 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 3/9/2023 | $30.09 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 4/12/2023 | $31.66 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 5/11/2023 | $34.32 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 6/13/2023 | $29.98 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 7/11/2023 | $30.84 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 8/11/2023 | $30.50 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 9/12/2023 | $30.60 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 10/12/2023 | $30.60 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 11/14/2023 | $30.84 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 12/11/2023 | $30.65 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 1/11/2024 | $30.77 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 2/12/2024 | $30.36 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 3/13/2024 | $30.55 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 4/11/2024 | $30.66 | $555.00 |
| Fox Plumbing | Plumbing Repair | 12/13/2022 | $412.00 | |
| Fox Plumbing | Plumbing Repair | 3/1/2023 | $706.00 | |
| Fox Plumbing | Plumbing Repair | 6/9/2024 | $341.00 | $1,459.00 |
| Gate Service Florida | Gate Repair & Maintenance | 10/6/2023 | $3,899.00 | $3,899.00 |
| Glass Menagerie | Sliding Door Repair | 1/24/2023 | $5,564.00 | $5,564.00 |
| Gopher Roofing | Roof Repair | 11/25/2022 | $3,990.00 | $3,990.00 |

| | | | | |
|---|---|---|---|---|
| Heath Pest Control | Pest Service | 12/13/2022 | $722.00 | |
| Heath Pest Control | Pest Service | 12/1/2023 | $722.00 | $1,444.00 |
| | | | | |
| Janice Logan | Vision Electric - Sarasota gate light repair | 12/31/2023 | $484.00 | |
| Janice Logan | Icemaker Repair Reimbursement | 12/31/2023 | $149.00 | |
| Janice Logan | Reimbursement | 7/14/2023 | $110.00 | |
| Janice Logan | Reimbursement-Sliding Door | 8/4/2023 | $100.00 | |
| Janice Logan | Green Cooling Solutions Reimbursement | 10/6/2023 | $258.00 | |
| Janice Logan | Reimburse - Valvoline Instant Oil Change | 11/3/2023 | $150.83 | |
| Janice Logan | Landscaping Costs-Sarasota Property | 11/17/2023 | $93.92 | |
| Janice Logan | Landscaping Costs-Sarasota Property | 11/17/2023 | $176.81 | |
| Janice Logan | Lanai Refrigerator-Sarasota Property | 12/1/2023 | $1,099.00 | |
| Janice Logan | HVAC Unit damaged coil repair-Sarasota Property | 12/1/2023 | $1,125.00 | |
| Janice Logan | Pool Area Lanai Power Wash-Wow PWPainting-Sarasota Property | 12/1/2023 | $700.00 | |
| Janice Logan | Landscape Lighting-Sarasota property | 12/8/2023 | $125.00 | |
| Janice Logan | HVAC Filters | 2/9/2024 | $392.84 | |
| Janice Logan | Landscape Lighting-Sarasota property | 2/9/2024 | $500.00 | |
| Janice Logan | Landscape Lighting-Sarasota property | 2/9/2024 | $550.00 | |
| Janice Logan | Fountain Lighting-Sarasota property | 3/1/2024 | $200.00 | |
| Janice Logan | Garage Door Repair-Sarasota property | 3/8/2024 | $140.00 | $6,354.40 |
| | | | | |
| Janice Logan - Am Ex Credit Card Charges | Details in separate worksheet | Various | $8,432.85 | $8,432.85 |
| | | | | |
| Jeff Schultz Painting, Inc | Painting | 1/6/2023 | $4,500.00 | |
| Jeff Schultz Painting, Inc | Painting | 1/13/2023 | $8,000.00 | |
| Jeff Schultz Painting, Inc | Painting | 1/18/2023 | $2,175.00 | $14,675.00 |
| | | | | |
| Kelly Automatic Gate Service Inc. | Gate Service & Repair | 6/1/2023 | $339.90 | $339.90 |
| | | | | |
| Kinder Safe Pest Solutions | Termite Treatment | 3/14/2024 | $4,000.00 | $4,000.00 |
| | | | | |
| Kurtz Aluminum | Maintenance | 2/17/2023 | $815.00 | $815.00 |
| | | | | |
| Leader Security System | Security System | 11/9/2022 | $276.45 | |
| Leader Security System | Security System | 4/15/2023 | $144.45 | |
| Leader Security System | Security System | 7/15/2023 | $144.45 | |
| Leader Security System | Security System | 10/12/2023 | $144.45 | |
| Leader Security System | Security System | 1/12/2024 | $144.45 | |
| Leader Security System | Security System | 2/27/2024 | $165.85 | |
| Leader Security System | Security System | 4/12/2024 | $144.45 | $1,164.55 |
| | | | | |
| Landscape Lighting by Greenthumb | Outdoor Lighting | 1/9/2023 | $320.00 | |
| Landscape Lighting by Greenthumb | Outdoor Lighting | 1/23/2023 | $400.00 | |
| Landscape Lighting by Greenthumb | Outdoor Lighting | 1/27/2023 | $370.00 | |
| Landscape Lighting by Greenthumb | Outdoor Lighting | 3/15/2024 | $200.00 | $1,290.00 |
| | | | | |
| Leon Bukshbaum | Misc Repair | 11/16/2022 | $524.30 | $524.30 |
| | | | | |
| Lowe's | Janice Logan Purchase | 5/13/2023 | $126.43 | |
| Lowe's | Janice Logan Purchase | 5/14/2023 | $115.24 | |
| Lowe's | Janice Logan Purchase | 6/11/2023 | $43.81 | $285.48 |

| | | | | |
|---|---|---|---|---|
| Matthew Weyler | Barn Repair | 12/9/2022 | $595.00 | $595.00 |
| Mullets Appliances | | 11/22/2022 | $296.86 | $296.86 |
| Myakka Communications | Internet Service | 6/7/2023 | $115.30 | |
| Myakka Communications | Internet Service | 8/1/2023 | $115.30 | |
| Myakka Communications | Internet Service | 8/4/2023 | $115.30 | |
| Myakka Communications | Internet Service | 10/1/2023 | $115.30 | |
| Myakka Communications | Internet Service | 10/6/2023 | $115.30 | |
| Myakka Communications | Internet Service | 12/1/2023 | $115.30 | |
| Myakka Communications | Internet Service | 12/8/2023 | $115.30 | |
| Myakka Communications | Internet Service | 2/1/2024 | $115.30 | $922.40 |
| Perfect Handyman BD LLC | Chimney and Barn Doors | 12/23/2022 | $1,875.00 | $1,875.00 |
| Reno Pros LLC | Miscellaneous Repair | 3/2/2023 | $1,613.22 | $1,613.22 |
| Rick Steakly Painting | Painting Services | 11/29/2022 | $3,000.00 | |
| Rick Steakly Painting | Painting Services | 12/9/2022 | $1,000.00 | |
| Rick Steakly Painting | Painting Services | 12/22/2022 | $3,000.00 | $7,000.00 |
| Sarasota Gate and Access | Gate Repair and Mgmt | 3/10/2023 | $635.00 | |
| Sarasota Gate and Access | Gate Repair and Mgmt | 4/28/2023 | $889.50 | $1,524.50 |
| Sarasota Ranch Club HOA | Homeowners Assn | 1/1/2024 | $2,467.00 | |
| Sarasota Ranch Club HOA | Homeowners Assn | 1/1/2024 | $2,467.00 | $4,934.00 |
| Sherwin Williams | Misc Paint Supplies | 2/12/2023 | $121.96 | |
| Sherwin Williams | Misc Paint Supplies | 3/28/2023 | $36.81 | $158.77 |
| St Pete Choice Supply | Misc Repairs | 11/19/2022 | $281.58 | $281.58 |
| Sunshine Pools | Pool Maintenance and Svc | 11/4/2022 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 11/30/2022 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 1/5/2023 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 2/3/2023 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 3/31/2023 | $75.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 4/7/2023 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 4/7/2023 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 5/5/2023 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 5/5/2023 | $745.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 6/9/2023 | $115.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 6/30/2023 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 7/7/2023 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 8/4/2023 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 9/1/2023 | $332.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 10/6/2023 | $332.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 11/3/2023 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 11/17/2023 | $190.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 12/1/2023 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 1/5/2024 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 2/2/2024 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 3/1/2024 | $290.00 | |

| | | | | |
|---|---|---|---|---|
| Sunshine Pools | Pool Maintenance and Svc | 4/5/2024 | $312.50 | $6,451.50 |
| Supply House | Misc Repair | 3/28/2023 | $60.01 | $60.01 |
| The Home Depot | Misc Repair | 5/5/2023 | $582.17 | $582.17 |
| Tractor Supply | Misc Repair | 1/18/2023 | $77.79 | $77.79 |
| Turner Pest Control | Annual Pest Service | 2/15/2023 | $3,679.40 | |
| Turner Pest Control | Annual Pest Service | 1/23/2024 | $3,376.12 | $7,055.52 |
| Wagler Irrigation Inc. | Exterior Irrigation Svc | 9/15/2023 | $215.50 | |
| Wagler Irrigation Inc. | Exterior Irrigation Svc | 12/15/2023 | $271.30 | $486.80 |
| Wallace Welch & Willingham | Home Insurance | 6/20/2023 | $26,466.20 | $26,466.20 |
| Water Treatment and Filtration | Water Filtration Svc | 11/17/2022 | $154.00 | |
| Water Treatment and Filtration | Water Filtration Svc | 11/24/2022 | $298.00 | |
| Water Treatment and Filtration | Water Filtration Svc | 6/16/2023 | $1,699.00 | |
| Water Treatment and Filtration | Water Filtration Svc | 8/4/2023 | $349.00 | |
| Water Treatment and Filtration | Water Filtration Svc | 8/18/2023 | $99.00 | |
| Water Treatment and Filtration | Water Filtration Svc | 10/13/2023 | $267.00 | |
| Water Treatment and Filtration | Water Filtration Svc | 3/1/2024 | $259.00 | $3,125.00 |
| | Total | | $224,148.27 | $224,148.27 |

| | | | | |
|---|---|---|---|---|
| Credit Card Charge | 10/28/2022 | Amazon | JANICE LOGAN-71871-2UEB2ONXIRH BOOK STORES | $43.37 |
| Credit Card Charge | 10/30/2022 | Mapiposa Nurser | JANICE LOGAN-71871-303IAR461UI9417470499 | $119.06 |
| Credit Card Charge | 11/1/2022 | Mavis | JANICE LOGAN-71871-7102531063 914-984-2500 | $25.00 |
| Credit Card Charge | 11/4/2022 | Mavis | JANICE LOGAN-71871-00001008 941-900-4495 | $1,312.14 |
| Credit Card Charge | 11/5/2022 | Lowe's | JANICE LOGAN-71871-INV # 10645 941-257-2200 | $67.86 |
| Credit Card Charge | 11/6/2022 | Applebee's | JANICE LOGAN-71871-899271 899271 34287 | $51.28 |
| Credit Card Charge | 11/13/2022 | Mr. Tequila Cant | JANICE LOGAN-71871-85133312317 941-312-5110 | $107.40 |
| Check | 11/16/2022 Check 16516 | Janice Logan | Withdrawal with check Jim had at home | $5,000.00 |
| Credit Card Charge | 11/16/2022 | J. E. Skelly Enter | JANICE LOGAN-71871-320IAR6E2BE19742 34202 | $360.00 |
| Credit Card Charge | 12/1/2022 | Cellgate | JANICE LOGAN-71871-NT_MU1VHSKB +19722311999 | $160.47 |
| Credit Card Charge | 12/11/2022 | Floor and Decor | JANICE LOGAN-71871-1014004599 877-675-0002 | $40.53 |
| Credit Card Charge | 12/14/2022 | R & W Sarasota | JANICE LOGAN-71871-07900031 941-377-5735 | $120.05 |
| Credit Card Charge | 12/19/2022 | Speaks Clam Ba | JANICE LOGAN-71871-99999992352 9412327646 | $44.24 |
| Credit Card Charge | 12/25/2022 | Ruth's Chris Stea | JANICE LOGAN-71871-889753 4234 34240 | $529.07 |
| Credit Card Charge | 1/3/2023 | Lowe's | JANICE LOGAN-71871-INV # 19348 941-961-6261 | $73.83 |
| Credit Card Charge | 1/6/2023 | 7-Eleven | JANICE LOGAN-71871-620280106 7 941-807-5498 | $65.80 |
| Credit Card Charge | 1/9/2023 | Wicked Cantina | JANICE LOGAN-71871-21105173009 RESTAURANT | $48.55 |
| Credit Card Charge | 1/24/2023 | Lowe's | JANICE LOGAN-71871-INV # 19514 941-961-6261 | $28.27 |
| Credit Card Charge | 1/30/2023 | Circle K | JANICE LOGAN-71871-CONVENIENCE | $70.00 |
| Credit Card Charge | 1/31/2023 | Pink Tequila | JANICE LOGAN-71871-85349143031 941-888-5332 | $89.12 |
| Credit Card Charge | 2/7/2023 | 7-Eleven | JANICE LOGAN-71871-610100207 7 941-807-5498 | $76.81 |

$8,432.85

# CONFIDENTIAL EXHIBIT 4

TRANSFER AGREEMENT

TRANSFER AGREEMENT (the "Agreement") dated the 29th day of August, 2023, and effective as of such date (the "Effective Date"), between SMART COMMUNICATIONS INC., a Florida corporation (the "Member"), and SMART COMMUNICATIONS HOLDING, LLC, a Delaware limited liability company ("Company").

W I T N E S S E T H :

WHEREAS, Member is the sole member of the Company, and all of the limited liability company interest of the Company are owned by the Member.

WHEREAS, the Member desires to transfer to the Company all of the Member's right, title and interest in and to the Transferred Assets, as defined below (the "Transfer").

NOW THEREFORE, in consideration of the mutual covenants hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Definitions.**

1.1    "control" (including, with correlative meanings, "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such organization (as defined in the Delaware UCC), whether through ownership of Equity Interests, by contract or otherwise.

1.2    "Delaware UCC" means the Uniform Commercial Code as in effect in the State of Delaware on the date hereof.

1.3    "Equity Interests" means all of the Company's securities, shares, units, options, warrants, interests, participations or other equivalents (regardless of how designated) of or in each Subsidiary or other organization (as defined in the Delaware UCC), including but not limited to a corporation, partnership (whether general or limited), limited liability company or similar entity, whether voting or nonvoting, certificated or uncertificated, including general partner partnership interests, limited partner partnership interests, common stock, preferred stock, limited liability company interests, membership interests, partnership interests or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934).

1.4    "Excluded Assets" means: (i) the assets identified on Schedule 1.4 attached hereto; and (ii) any Non-Transferrable Assets (as defined in Section 3 below).

1.5    "Governmental Authority" means any national, state, local, domestic, foreign, or international governmental or judicial, legislative, executive, administrative or regulatory authority, tribunal, agency, body, entity or commission, or other governmental, quasi-governmental, or regulatory authority or agency, domestic, foreign, or international.

CONFIDENTIAL
SMART_B&R 000500

1.6    "Subsidiaries" means Smart Communications Collier, Inc., Smart Communications Desoto, Inc., Smart Communications Lee, Inc., Smart Communications Pasco, Inc. and Smart Communications US, Inc., each Florida corporations, and any other organization (as defined in the Delaware UCC) that is under the Member's control.

1.7    "Transferred Assets" means all of the Member's assets (including the Equity Interests), in any form, whether tangible, intangible, real property or personal, excluding the Excluded Assets.

1.8    "UCC" means the Uniform Commercial Code in effect in the State of Florida on the date of this Agreement or the Delaware UCC, as applicable.

2.    **Transfer of Transferred Assets.**

2.1    *Transfer*. Subject to the terms and conditions of this Agreement, the Member hereby transfers and delivers to the Company, and the Company hereby accepts from the Member all of the Member's rights, title and interest in and to the Transferred Assets (the "Transfer"). Under the Company's limited liability company agreement and the Delaware Limited Liability Company Act, the Transfer shall be a contribution of the Transferred Assets to the Company, whose limited liability company interests are all owned by the Member. The Company shall reflect the Transfer (including the contribution arising therefrom) on the books and records of the Company.

2.2    *Transfer of Equity Interests*.

(a)    For any Equity Interest that is a "certificated security" (as defined in Article 8 of the UCC), as soon as reasonably practicable after the Effective Date, the Member shall deliver to the Company an original duly executed Stock Power in the form attached hereto as Exhibit A.

(b)    For any Equity Interest that is an "uncertificated security" (as defined in Article 8 of the UCC), as soon as reasonably practicable after the Effective Date, the Member shall deliver an "instruction" (as defined in Article 8 of the UCC) to each Subsidiary to register the transfer of all such Equity Interests in the Subsidiary to the Company in the form attached hereto as Exhibit B. In connection therewith, the Member represents and warrants that it is the registered owner of all Equity Interests that are uncertificated securities and otherwise qualifies as an "appropriate person" (as defined in Article 8 of the UCC).

(c)    For any Equity Interest that is not a "security" (as defined in Article 8 of the UCC), as soon as reasonably practicable after the Effective Date, the Member shall deliver a duly executed Interest Transfer and Amendment Agreement in the form attached hereto as Exhibit C.

2.3    *Deliverables*. In addition to any other documents to be delivered under other provisions of this Agreement, on the date hereof, or as soon as reasonably practicable after the Effective Date:

(a)    The Member shall deliver to the Company:

CONFIDENTIAL
SMART_B&R 000501

(1)      an instrument of transfer for all of the Transferred Assets that are tangible personal property, duly executed by the Member, and attached hereto as <u>Exhibit D</u> (the "<u>Instrument of Transfer</u>");

(2)      a transfer and assumption agreement for all of the Transferred Assets that are intangible personal property, duly executed by the Member, and attached hereto as <u>Exhibit E</u> (the "<u>Transfer and Assumption Agreement</u>");

(3)      a copy of each stock power, instruction or Interest Transfer and Amendment Agreement, as applicable, delivered pursuant to <u>Section 2.2</u> above;

(4)      all certificates of title and title transfer documents to all titled motor vehicles and vessels that are Transferred Assets and any other Transferred Assets subject to a certificate of title, registration, recording or similar requirement to evidence ownership of the Transferred Assets under applicable law; and

(5)      such other deeds, assignments, certificates of title, documents and other instruments of transfer as reasonably may be requested by the Company, each in form and substance reasonably satisfactory to the Company, duly executed by the Member.

(b)      The Company shall deliver to the Member:

(1)      the Transfer and Assumption Agreement, duly executed by the Company;

(2)      the Interest Transfer and Amendment Agreement, duly executed by the Company; and

(3)      such other instruments of transfer, assumption, filings, or documents as reasonably may be requested by the Member, each in form and substance reasonably satisfactory to the Member, duly executed by the Company.

2.4      *Government and Third Party Consents, Filings and Notices*. Each of the parties hereto shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, and to assist and cooperate with the other party in doing, all things necessary, proper or advisable under applicable law to consummate the transactions contemplated by this Agreement, including (i) the obtaining of all necessary waivers, consents and approvals from Governmental Authorities and the making of all necessary registrations, filings and notices with Governmental Authorities, if any, and the taking of all other reasonable steps as may be necessary to obtain a waiver, consent or approval from, or to avoid an action or proceeding by, any Governmental Authorities, (ii) the delivery of required notices to, and the obtaining of required consents or waivers from, third parties (as defined below), and (iii) the execution and delivery of any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement.

3.      **Non-Transferrable Assets.**

CONFIDENTIAL
SMART_B&R 000502

3.1     Nothing in this Agreement shall be construed as an attempt or agreement to transfer any asset which by its terms or by law is non-assignable without the consent, authorization, approval, or waiver of any person or entity (including any Governmental Authority) not party to this Agreement (a "third party") (the "Non-Transferrable Assets") unless and until such consent, authorization, approval, or waiver shall have been obtained.

3.2     The Company shall use commercially reasonable efforts, and shall cooperate with the Member, to obtain any required consent, authorization, approval, or waiver, or any release, substitution, or amendment required to transfer any Non-Transferrable Asset to the Member. Once such consent, authorization, approval, waiver, release, substitution, or amendment is obtained, such Non-Transferrable Asset shall automatically, without any further action by the Member, the Company, or any other person or entity, be a Transferred Asset and transferred and delivered to the Company.

3.3     All Non-Transferrable Assets shall be held, as of and from the date hereof, by the Member, in trust for the Company and the covenants and obligations thereunder shall be performed by the Member, on behalf of the Company, and all benefits and obligations existing thereunder shall be for the account of the Company. The Member shall take or cause to be taken such actions in the name of the Member so as to provide the Company with the benefits of the Non-Transferrable Assets and to effect the collection of money or other consideration that becomes due and payable in respect of the Non-Transferrable Assets, and the Member shall pay to the Company all money or other consideration received by it in respect of all Non-Transferrable Assets held by it within ten (10) business days of receipt; provided, however, that the Company shall reimburse the Member for all reasonable out-of-pocket costs incurred by it after the date hereof associated with the retention and maintenance of such Non-Transferrable Assets. As of and from the date hereof, the Member authorizes the Company, to the extent permitted by applicable law and the terms of the Non-Transferrable Assets, to perform all the obligations and receive all the benefits of the Member under the Non-Transferrable Assets and appoints the Company as attorney-in-fact and grants and delegates to the Company the power and authority to act in the name and on behalf of the Member with respect thereto.  The Member shall not amend, modify, or terminate after the date hereof any Non-Transferrable Asset that would otherwise be a Transferred Asset absent the written consent of the Company.  In addition, the parties shall use their respective commercially reasonable efforts to work together in good faith to negotiate, agree to the terms of, and execute, a services agreement pursuant to which Member shall provide Company and Company shall provide Member, as applicable, with certain services relating to such Non-Transferrable Assets following the Effective Date.

3.4     Notwithstanding the foregoing, if, despite the Company's commercially reasonable efforts under Section 3.2 above, the Company is unable to affect the transfer of a Non-Transferrable Asset pursuant to this Section 3 by August 29, 2026 (the "Cut-Off Date"), such Non-Transferrable Asset shall thereafter constitute an Excluded Asset. Accordingly, neither the Member nor the Company shall have any obligation under this Agreement with respect to any such Non-Transferrable Assets after the Cut-Off Date.

4.     **Representations and Warranties of Company.**  Company represents and warrants that:

CONFIDENTIAL
SMART_B&R 000503

4.1     *Authority*.  Company has the power and authority to execute, deliver and carry out the terms of this Agreement and all instruments delivered by Company pursuant to or in connection with this Agreement.  This Agreement constitutes the legal, valid and binding obligation of Company and is enforceable against it in accordance with its terms.

4.2     *Corporate Organization*.  Company is a limited liability company duly formed, validly existing, and in good standing under the laws of the State of Delaware.

5.     **Representations and Warranties of Member.**  The Member represents and warrants that:

5.1     *Authority*.  It has the power and authority to execute, deliver and carry out the terms of this Agreement and all instruments delivered by it pursuant to or in connection with this Agreement.  This Agreement constitutes the legal, valid and binding obligation of the Member and is enforceable against the Member in accordance with its terms.

5.2     *Corporate Organization*.  Member is a corporation duly formed, validly existing, and in good standing under the laws of the State of Florida.

6.     **Miscellaneous**

6.1     *Severability*.  In the event any provision of this Agreement shall be held invalid or unenforceable by a court, such holding shall not invalidate or render unenforceable any other provision of this Agreement and each and every other provision of this Agreement shall continue in full force and effect.

6.2     *Entire Agreement; Binding Effect*.  This Agreement contains the entire agreement of the parties with respect to the subject matter hereto, and shall inure to the benefit of and be binding upon the parties hereto and upon their successors in interest of any kind whatsoever, including, but not limited to, their heirs, executors, administrators, guardians, trustees, attorneys-in-fact and legal and personal representatives.

6.3     *Further Assurances*.  Each of the parties hereto agrees that, without further consideration, it will do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, all such further acts, transfers, powers of attorney and assurances as reasonably may be required to more effectively transfer to and vest in the Company, and to put the Company in possession of, any of the Transferred Assets transferred hereunder and otherwise to carry out the purposes of this Agreement.

6.4     *Non-Recourse*.  This Agreement may only be enforced against, and any claim, action, suit or other legal proceeding based upon, arising out of or related to this Agreement, or the negotiation, execution or performance of this Agreement, may only be brought against the entities that are expressly named as parties hereto and then only with respect to the specific obligations set forth herein with respect to such party.  No past, present or future director, officer, employee, incorporator, manager, member, partner, stockholder, affiliate, agent, attorney or other representative of any party hereto or of any affiliate of any party hereto, or any of their successors or permitted assigns, shall have any liability for any obligations or liabilities of any

CONFIDENTIAL
SMART_B&R 000504

party hereto under this Agreement or for any claim, action, suit or other legal proceeding based on, in respect of or by reason of the transactions contemplated hereby.

6.5    *Notices*.    Except as otherwise provided in this Agreement, all notices, requests, claims, demands, waivers and other communications under this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand, if delivered personally or by courier, one business day if delivered by email, or five business days after being deposited in the mail (registered or certified mail, postage prepaid, return receipt requested) properly addressed to the following address for the Company and Member:

Company Address:

Smart Communications Holding, LLC
10491 72nd St.
Seminole, FL 33777
Attn: President
Email: JON.LOGAN@SMARTCOMMUNICATIONS.US

With a copy to:

legal@smartcommunications.us

Member Address:

Smart Communications Holding, Inc.
10491 72nd St.
Seminole, FL 33777
Attn: President
Email: JON.LOGAN@SMARTCOMMUNICATIONS.US

With a copy to:

legal@smartcommunications.us

6.6    *Amendment*.    Any modification, waiver, amendment or termination of this Agreement or any provision hereof shall be effective only if in writing and signed all parties to this Agreement.

6.7    *Assignment*.    No party shall be permitted to assign any of its rights, interests or obligations hereunder without the express written consent of the other party.

6.8    *Governing Law*.

(a)    The parties hereto hereby declare that it is their intention that this Agreement shall be regarded as made under the laws of the State of Delaware and that the laws of said State shall be applied in interpreting its provisions in all cases where legal interpretation shall be required.  Each of the parties hereto agrees (a) that this Agreement involves

CONFIDENTIAL
SMART_B&R 000505

at least $100,000.00, and (b) that this Agreement has been entered into by the parties hereto in express reliance upon 6 <u>Del. C.</u> § 2708.

(b)      Any dispute, claim, or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be submitted exclusively to and settled by arbitration in Wilmington, Delaware before a panel of three arbitrators. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures.  Judgment on the arbitral award (the "<u>Award</u>") may be entered in any court having jurisdiction.

(c)      Within 15 days after the commencement of arbitration, each party shall select one person to act as arbitrator, who must be a Delaware lawyer with at least 15 years of active litigation experience, and the two so selected shall select a third arbitrator within 30 days of the commencement of the arbitration to serve as the chair (the "<u>Chair</u>").  The Chair must be a Delaware lawyer with at least 20 years of active litigation experience.  If the arbitrators selected by the parties are unable or fail to agree upon the third arbitrator within the allotted time, the third arbitrator shall be appointed by JAMS in accordance with its rules. All arbitrators shall serve as neutral, independent and impartial arbitrators. Each party shall communicate its choice of a party appointed arbitrator only to the JAMS Case Manager in charge of the filing. Neither party is to inform any of the arbitrators as to which of the parties may have appointed them.

(d)      The parties shall maintain the confidential nature of the arbitration proceeding and the Award, including the arbitration hearing, except as may be necessary to prepare for or conduct the arbitration hearing on the merits, or except as may be necessary in connection with a court application for a preliminary remedy, a judicial challenge to an Award or its enforcement, or unless otherwise required by law or judicial decision. The Delaware Uniform Arbitration Act shall apply to the arbitration agreement provided for in this Section 6.8.

6.9      *Counterparts*.   This Agreement may be executed (by hand or electronic means) and delivered (including by electronic means) in one or more counterparts in which event all of said counterparts shall be deemed to be originals of this Agreement.

[Signature Page Follows]

CONFIDENTIAL
SMART_B&R 000506

DocuSign Envelope ID: EB90FECE-344A-42C7-B628-C9837E674B8A

IN WITNESS WHEREOF, the Agreement has been executed by the parties hereto as of the date first written above.

**Member:**

SMART COMMUNICATIONS INC.

By: _____
    Name: Jonathan D. Logan
    Title: President

**Company:**

SMART COMMUNICATIONS HOLDING, LLC

By: _____
    Name: Jonathan D. Logan
    Title: President

RLF1 29491977v.15

CONFIDENTIAL
SMART_B&R 000507

**Schedule 1.4**
**Excluded Assets**

None.

CONFIDENTIAL
SMART_B&R 000508

**Exhibit A**
**Irrevocable Stock Power**

1.     FOR VALUE RECEIVED, the undersigned, on behalf of Smart Communications Inc., a Florida corporation ("Transferor"), hereby transfers, assigns, contributes and delivers unto Smart Communications Holding, LLC, a Delaware limited liability company ("Transferee"), [_____ [shares of the Common Stock][Limited Liability Company Interests][Membership Interests][Partnership Interests][Units], [par value $0.01 per share], of _____, a Florida [corporation (the "Corporation")], represented by Certificate No. _____ standing in the name of Transferor on the books of said [Corporation].

2.     The undersigned, on behalf of Transferor, hereby irrevocably constitute and appoint each of the officers of the [Corporation] as an attorney in fact to transfer said stock on the books of the [Corporation], with full power of substitution in the premises.

Dated: As of _____ __, 2023

By_____
   Name:
   Title:

CONFIDENTIAL
SMART_B&R 000509

**Exhibit B**

**Instruction to Register Transfer of Uncertificated Securities**

_____ __, 2023

_____[*Name and address of Subsidiary*]

Re:    _____[*identify securities being transferred* ] (the "Securities")

To whom it may concern:

In connection with the transfer, assignment, contribution and delivery by Smart Communications Inc., a Florida corporation ("Smart Com FL") to Smart Communications Holding, LLC, a Delaware limited liability company ("Smart Com Holding DE") of the uncertificated Securities under that certain Transfer Agreement dated _____ __, 2023, Smart Com FL, as the registered owner of the Securities, hereby instructs you to register a transfer on your books of the above-referenced uncertificated Securities to Smart Communications Holding, LLC, a Delaware limited liability company ("Smart Com Holding DE"). The address and other contact information of Smart Com Holding DE are as follows: _____[*provide contact information*].

Sincerely,

SMART COMMUNICATIONS INC.

_____ [*signature*]

Name: Jonathan D. Logan

Title: President and Treasurer

CONFIDENTIAL
SMART_B&R 000510

**Exhibit C**

**INTEREST TRANSFER AND AMENDMENT AGREEMENT**

This Interest Transfer and Amendment Agreement, dated and effective as of _____, 2023 (this "Interest Transfer Agreement"), is entered into by and between Smart Communications Inc., a Florida corporation, as transferor (the "Transferor"), and Smart Communications Holding, LLC, a Delaware limited liability company, as an transferee (the "Transferee").

W I T N E S S E T H :

WHEREAS, [NAME OF SUBSIDIARY LLC], a Florida limited liability company (the "Company") has been formed as a limited liability company under the [Florida Revised Limited Liability Company Act] (the "Act") pursuant to the Articles of Organization of the Company, as filed in the office of the Secretary of State of the State of Florida on [Date], and a [Limited Liability Company Agreement] of the Company, dated as of [Date] (the "LLC Agreement");

WHEREAS, the Transferor is a member of the Company and owns a [___%] limited liability company interest in the Company;

WHEREAS, the Transferor desires to transfer its entire [___%] limited liability company interest (the "Interest") to the Transferee, and, immediately following the admission of the Transferee to the Company as a member of the Company with respect to the Interest, the Transferor desires to cease to be a member of the Company;

WHEREAS, the Transferee desires to receive the Interest and to be admitted to the Company as a substitute member of the Company with respect to the Interest; and

WHEREAS, to accomplish the foregoing, the undersigned desire to enter into this Interest Transfer Agreement.

NOW, THEREFORE, the undersigned, in consideration of the premises, covenants and agreements contained herein, do hereby agree as follows:

1.      Transfer.  For value received, the receipt and sufficiency of which are hereby acknowledged, upon the execution of this Interest Transfer Agreement by the parties hereto, the Transferor hereby transfers, assigns, contributes and delivers the Interest to the Transferee (the "Interest Transfer").

2.      Admission. Contemporaneously with the Interest Transfer, the Transferee shall be admitted to the Company as a substitute member of the Company with respect to the Interest and agrees to be bound by all of the terms and conditions of the LLC Agreement.

3.      Cessation.  Immediately following the admission of the Transferee as a substitute member of the Company with respect to the Interest, the Transferor shall and does

CONFIDENTIAL
SMART_B&R 000511

hereby cease to be a member of the Company and shall thereupon cease to have or exercise any right or power as a member of the Company.

4.    <u>Continuation of the Company</u>.  The parties hereto hereby agree that the transfer of the Interest, the admission of the Transferee as a substitute member of the Company with respect to the Interest and the Transferor ceasing to be a member of the Company, shall not dissolve the Company.

5.    <u>Member Redefined</u>.  From and after the date hereof, all references to "Member" contained in the LLC Agreement shall refer to the Transferee.

6.    <u>Future Cooperation</u>.  Each of the parties hereto agrees to cooperate at all times from and after the date hereof with respect to all of the matters described herein, and to execute such further instruments, releases, assumptions, amendments of the LLC Agreement, notifications and other documents as may be reasonably requested for the purpose of giving effect to, or evidencing or giving notice of, the transactions contemplated by this Interest Transfer Agreement.

7.    <u>Binding Effect</u>.  This Interest Transfer Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

8.    <u>Execution in Counterparts</u>.  This Interest Transfer Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

9.    <u>Agreement in Effect</u>.  The LLC Agreement shall remain in full force and effect.

10.    <u>Governing Law</u>.  This Interest Transfer Agreement shall be governed by, and interpreted in accordance with, the laws of the State of Florida, all rights and remedies being governed by such laws.

*[Signature Page Follows]*

CONFIDENTIAL
SMART_B&R 000512

IN WITNESS WHEREOF, the parties hereto have caused this Interest Transfer Agreement to be duly executed as of the day and year first above written.

**TRANSFEROR:**

Smart Communications Inc.

Signature: _____

Name: _____

Title: _____

**TRANSFEREE:**

Smart Communications Holding, LLC

Signature: _____

Name: _____

Title: _____

CONFIDENTIAL
SMART_B&R 000513

**Exhibit D**
**Instrument of Transfer**

THIS INSTRUMENT OF TRANSFER (this "Instrument of Transfer"), dated as of August ___, 2023, is made and entered into between SMART COMMUNICATIONS INC., a Florida corporation ("Transferor"), as transferor, and SMART COMMUNICATIONS HOLDING, LLC, a Delaware limited liability company ("Transferee"), as transferee.

WHEREAS, Transferor and Transferee are parties to that certain Transfer Agreement, dated as of August 29, 2023 (as may be amended, modified or supplemented from time to time, the "Transfer Agreement"), pursuant to which Transferor has agreed to transfer certain assets to Transferee;

WHEREAS, capitalized terms used but not defined herein shall have the meanings for such terms that are set forth in the Transfer Agreement;

WHEREAS, pursuant to this Instrument of Transfer and in accordance with the Transfer Agreement, Transferor desires to evidence the transfer to Transferee of the Transferred Assets; and

NOW THEREFORE, for good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Transferor and Transferee do hereby agree as follows:

1.      Transfer of Transferred Assets.  On the terms and subject to the conditions and exceptions contained in the Transfer Agreement, Transferor hereby transfers, contributes and delivers to Transferee the Transferred Assets, including, but not limited to, the Transferred Assets set forth on Schedule 1 attached hereto, free and clear of any liens, and Transferee hereby accepts from Transferor, all of Transferor's right, title, and interest in, to and under all of the Transferred Assets. The Transferor and Transferee shall update Schedule 1 from time to time after the Effective Date to accurately reflect the Transferred Assets.  The Transferred Assets do not include, and Transferee does not hereby accept or otherwise obtain Transferor's right, title or interest in, to or under any of the Excluded Assets.

2.      Further Actions.  Transferor covenants and agrees to, at the request of Transferee, to execute and deliver further instruments of transfer and take such other action as Transferee may reasonably request to more effectively transfer and deliver to Transferee, and vest in Transferee title to, each of the Transferred Assets.

3.      Terms of the Transfer Agreement.  The terms of the Transfer Agreement are incorporated herein by this reference.  In the event of any conflict or inconsistency between the terms of the Transfer Agreement and the terms hereof, the terms of the Transfer Agreement shall govern.

4.      Governing Law; Submission to Jurisdiction.  This Instrument of Transfer shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law rule.  The terms of Section 6.8 of the Transfer Agreement are incorporated herein by reference and made a part hereof.

RLF1 29491977v.15

CONFIDENTIAL
SMART_B&R 000514

5.      Binding Effect; Amendments and Waivers.  This Instrument of Transfer shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  This Instrument of Transfer can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Instrument of Transfer signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

6.      Invalid Provisions.  If any term or other provision of this Instrument of Transfer is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Instrument of Transfer shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party hereto.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Instrument of Transfer so as to affect the original intent of the parties hereto as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

7.      Counterparts.  This Instrument of Transfer may be executed in one or more counterparts, whether by hand or electronically, each of which will be deemed to be an original copy and all of which, when taken together, will be deemed to constitute one and the same agreement or document, and will be effective when counterparts have been signed by each of the parties hereto and delivered to the other parties.  This Instrument of Transfer may be transmitted and delivered electronically.

[Signature Page Follows]

RLF1 29491977v.15

CONFIDENTIAL
SMART_B&R 000515

IN WITNESS WHEREOF, Transferor and Transferee have duly executed this Instrument of Transfer as of the date first set forth above.

**TRANSFEROR**

SMART COMMUNICATIONS INC.

By: _____
     Name:
     Title:

**TRANSFEREE**

SMART COMMUNICATIONS
HOLDING, LLC

By: _____
     Name:
     Title:

Signature Page to Instrument of Transfer

CONFIDENTIAL
SMART_B&R 000516

**Schedule 1 to Instrument of Transfer**
**Specific Transferred Assets**

CONFIDENTIAL
SMART_B&R 000517

**Exhibit E**
**Transfer and Assumption Agreement**

THIS TRANSFER AND ASSUMPTION AGREEMENT (this "Transfer and Assumption Agreement"), dated as of August __, 2023, is made by and between SMART COMMUNICATIONS INC., a Florida corporation ("Transferor"), and SMART COMMUNICATIONS HOLDING, LLC, a Delaware limited liability company ("Transferee").

WHEREAS, Transferor and Transferee are parties to that certain Transfer Agreement, dated as of August 29, 2023 (as may be amended, modified or supplemented from time to time, the "Transfer Agreement"), pursuant to which Transferee has agreed to transfer certain assets of Transferor and agreed to assume certain obligations of Transferor and this Transfer and Assumption Agreement is being entered into in connection with the Transfer Agreement;

WHEREAS, capitalized terms used but not defined herein shall have the meanings for such terms that are set forth in the Transfer Agreement;

WHEREAS, pursuant to this Transfer and Assumption Agreement, Transferor desires to transfer certain rights and agreements to Transferee and Transferee desires to assume certain obligations of Transferor; and

NOW THEREFORE, for good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Transferor and Transferee do hereby agree as follows:

1.    Transfer and Assumption.  Transferor hereby transfers, contributes, assigns and delivers to Transferee on the date hereof (the "Transfer"), all of Transferor's right, title and interest, legal and equitable, in and to each of any Transferred Assets that are intangible personal property, to the extent transferrable. Subject to Section 3 of the Transfer Agreement, Transferee hereby accepts the Transfer and assumes, and agrees to perform, pay and discharge when due, any liabilities arising out of or relating to such Transferred Assets from and after the date hereof.

2.    Further Actions.  Each party hereto covenants and agrees, at the request of the other party hereto, to execute and deliver further instruments of transfer and take such other action as such party may reasonably request to more effectively consummate the transfers and assumptions contemplated by this Transfer and Assumption Agreement.

3.    Terms of the Transfer Agreement.  The terms of the Transfer and Assumption Agreement are incorporated herein by this reference.  In the event of any conflict or inconsistency between the terms of the Transfer Agreement and the terms hereof, the terms of the Transfer Agreement shall govern.

4.    Governing Law; Submission to Jurisdiction.  This Transfer and Assumption Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law rule.  The terms of Section 6.8 of the Transfer Agreement are incorporated herein by reference and made a part hereof.

RLF1 29491977v.15

CONFIDENTIAL
SMART_B&R 000518

5.      <u>Binding Effect; Amendments and Waivers</u>.  This Transfer and Assumption Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  This Transfer and Assumption Agreement may be amended, supplemented or changed, and any provision hereof may be waived, only by written instrument making specific reference to this Transfer and Assumption Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

6.      <u>Invalid Provisions</u>.  If any term or other provision of this Transfer and Assumption Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Transfer and Assumption Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party hereto.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Transfer and Assumption Agreement so as to affect the original intent of the parties hereto as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

7.      <u>Counterparts</u>.  This Transfer and Assumption Agreement may be executed in one or more counterparts (whether by hand or electronic), each of which will be deemed to be an original copy and all of which, when taken together, will be deemed to constitute one and the same agreement or document, and will be effective when counterparts have been signed by each of the parties hereto and delivered to the other parties.  This Transfer and Assumption Agreement may be delivered via electronic means.

*[Signature Page Follows]*

3

RLF1 29491977v.15

CONFIDENTIAL
SMART_B&R 000519

IN WITNESS WHEREOF, each of Transferor and Transferee has duly executed this Transfer and Assumption Agreement on the date first set above.

**TRANSFEROR:**

SMART COMMUNICATIONS INC.


By: _____
Name:
Title:


**TRANSFEREE:**


SMART COMMUNICATIONS HOLDING, LLC


By: _____
Name:
Title:

CONFIDENTIAL
SMART_B&R 000520

# EXHIBIT 5

# CONSENT TO ASSIGNMENT AND ASSUMPTION OF AGREEMENTS

**THIS CONSENT TO ASSIGNMENT AND ASSUMPTION OF AGREEMENT (this "Consent") is given on the 12th day of October 2023, by Jefferson County, Texas ("Owner").**

Smart Communications Holding, Inc. has entered into a corporate restructuring ("Restructuring Agreement") providing for, among other things, the transfer of substantially all the assets and the business to Smart Communications Holding, LLC.

Effective October 12, 2023, Smart Communications Holding LLC will continue the fulfillment of contract (RFP 22-021/YS) Comprehensive Inmate Technology Services Package for Jefferson County Correctional Facility, Downtown Jail and Minnie Rogers Juvenile Justice Center.

Owner does hereby consent to the assignment of the Agreements by Smart Communications Holding, Inc. to Smart Communications Holding, LLC and the assumption of the Agreements by Smart Communications Holding, LLC. Owner hereby confirms that as of the date hereof, the Agreements are not in default, that all of Smart Communication Holding, Inc.'s obligations thereunder have been duly satisfied.

Owner agrees that copies of any notice to permitted or required under the Agreements shall be sent to:

> Smart Communications Holding, LLC
> 40491 72nd Street
> Seminole, FL 33777

This Consent shall become effective immediately upon approval of Jefferson County and signature of the County Judge.

ATTEST:                                          OWNER:

_____         Jefferson County, Texas
Roxanne Acosta Hellberg,  County Clerk
                                                 By: _____

                                                 Name:  Jeff R. Branick_____

                                                 Title:  _Jefferson County Judge_____

                                                 Date:  _____

**Smart Communications**

*Corrections Simplified...*

*Jonathan D. Logan*
*CEO and President*
*Smart Communications Holding, Inc.*
*Jon.Logan@smartcommunications.us*

RECEIVED   OCT 2 0 2023

October 12, 2023

**VIA CERTIFIED US POSTAL MAIL**

Judge Jeff Branick
Jefferson County
o/b/o Jefferson County Purchasing Department
1149 Pearl Street, 1st Floor
Beaumont, TX 77701

*Re: Notice of Corporate Restructuring and Assignment*

Dear Judge Branick:

We write to inform you that, in connection with an internal corporate restructuring, our existing Service Agreement is being transferred to Smart Communications Holding, LLC. The transfer will have no effect on your agency or our performance of the Service Agreement.

Smart Communications Holding, LLC, a Delaware entity, will maintain the same principal place of business, at 10491 72nd Street, Seminole, Florida 33777.

If you have any questions concerning these matters, please do not hesitate to contact me by email at jon.logan@smartcommunications.us or by phone, at 517-896-1822.

As the industry leader in providing innovative inmate communications solutions, we remain committed to serving our clients' needs with our superior technology, solutions, and dedicated staff. We value your partnership with us and look forward to continuing to serve your agency long into the future.

Very truly yours,

Jonathan D. Logan

# CONFIDENTIAL EXHIBIT 6

CORRECTIONS SIMPLIFIED. 🌐 www.smartcommunications.us 📞 888-253-5178 📍 10491 72ⁿᵈ St. | Seminole, FL 33777

# **Master Services Agreement**

This Master Services Agreement (this "Agreement") is by and between the Eaton County Sheriff's Office, hereinafter referred to as "Customer," and Smart Communications Holding, LLC. and/or its designated subsidiary or assignee, with principal offices located at 10491 72nd Street, Seminole, FL 33777, hereinafter referred to as "Provider."

This Agreement supersedes any and all other agreements made between the Parties, written, oral or otherwise.

Whereas, Customer desires that Provider install an inmate communications system(s) and provide inmate communications and maintenance services according to the terms and conditions in this Agreement, and according to the Schedules, which are incorporated by reference into this Agreement, and;

Whereas, Provider agrees to install the inmate communications system(s) and provide inmate communications and maintenance services according to the terms and conditions in this Agreement, and according to the Schedules, which are incorporated by reference into this Agreement.

Now therefore, in consideration of the mutual covenants and agreements hereinafter set forth, the Parties, intending to be legally bound, agree as follows:

1. <u>Systems.</u> This Agreement specifies the general terms and conditions under which Provider will perform certain inmate related services and systems (the "System(s)") for the Customer. Additional terms and conditions with respect to the Systems will be specified in the Schedules entered into by the Parties and attached (the "Schedules"). The Schedules are incorporated into this Agreement and are subject to the terms and conditions of this Agreement. In the event of any conflict between this Agreement and a Schedule, the terms of the Schedule shall govern.

2. <u>Use of Systems and Exclusivity.</u>  In exchange for Provider installing, providing, and supporting its System and inmate communication services throughout Customer's Facility at no cost to Customer, Customer acknowledges, agrees, and grants to Provider the exclusive right to provide such services in Customer's Facility.  Provider shall have the exclusive right to install, maintain, and derive revenue from and through Provider's inmate communication services and Systems including, without limitation, the related hardware and software, located in the Customer Facility as identified on the Schedules. Customer agrees that it will not resell, grant, or provide access to Provider's services or System, directly or indirectly, to any third party unless agreed to by Provider in a separate written agreement. During and subject to the terms and conditions of this Agreement, and upon the going live of each respective service, Provider shall be the sole and exclusive provider of inmate telephone services (ITS) and all inmate communication services available on or provided by a tablet or kiosk system as set forth in the accompanying Schedule(s), including but not limited to video and data services (e.g., electronic video visitation, electronic messaging and email, texting, photo delivery, and electronic entertainment) and inmate software applications (e.g., electronic delivery of routine postal mail, electronic medical or general requests, electronic grievances, electronic law library, and electronic education).

3. <u>Hardware and Software License.</u> For the term of this Agreement, Provider grants Customer a non-exclusive, non-transferable license to access and use certain proprietary computer software and hardware products and materials in connection with our inmate services and Systems. Provider will provide free of charge all Software upgrades, modifications, and updates. All hardware upgrades, modifications and updates will be done at Provider's sole discretion.

Provider makes no representation or warranty as to the legality of monitoring or archiving such communications and activities.

4. <u>Ownership.</u> Smart Communications is and shall remain the owner of the equipment provided by Smart Communications whether or not physically attached to real estate.

5. <u>License Restrictions:</u> The Software is to be used solely in connection with Provider's Services by Customer and inmates housed at Customer's Facility in connection with Provider's services and Systems. The Hardware is to be

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**



used solely by inmates housed at Customer's Facility to access Provider's services and Systems. Unless and only to the extent that this Agreement expressly permits, Customer must not:

    i. permit any parent, subsidiary, affiliated entity or third party to use the Hardware or Software;

    ii. rent, lease, lend, assign, sublicense, encumber or otherwise transfer or attempt to transfer the Hardware or Software or any portion thereof;

    iii. alter, create derivatives of, or modify the Hardware or Software in any way, or allow a third party to do so;

    iv. connect the Software or Hardware to any third-party products or services that were not approved of in writing by Provider;

    v. distribute or otherwise make the Hardware or Software or any password, key, or other access code for the Software available to any third party;

    vi. reverse engineer, decompile, or disassemble the Hardware or Software, or allow a third party to do so;

    vii. defeat or work around any access restrictions or encryption in the Software, or allow a third party to do so;

    viii. remove, minimize, block, or modify any titles, logos, trademarks, copyright and patent notices, digital watermarks, disclaimers, or other legal notices that are included in the Software, whether or not they are Provider's or a third party's;

6. <u>Title</u>. Provider shall have and retain all rights, title, and interest in the products and services provided to Customer. The Hardware, Software, Systems, networking, and cabling, including all modifications and updates of Software, shall at all times remain the sole and exclusive property of the Provider. Any trade secrets, methodology and processes of our services and Systems constitute proprietary information of Provider, regardless of any part or portion thereof is the subject of a valid copyright or patent. During the term of this agreement and for the time period(s) as stated in the Schedule for Systems, we will provide you access to the records.

7. <u>Term.</u> This Agreement shall commence on the effective date and shall continue for a period of five (5) years from the date of system going live. After the original five (5) year term, this Agreement may be renewed for two (2) additional terms that are two (2) years in length each, upon written notice by Customer or as otherwise agreed by the Parties. The terms and conditions herein shall govern for so long as Provider continues to provide its system and services.

8. <u>Limitation of Liability</u>.  To the maximum extent permitted by applicable law, Provider shall indemnify and hold harmless Customer, his agents, servants and employees from any and all claims, actions, lawsuits, judgments or liabilities of any kind whatsoever deriving from negligent acts or omissions of the Provider, its agents or sub-contractors. Each Party agrees that it shall be solely responsible for the negligent or wrongful acts of its own employees. However, nothing contained herein shall constitute a waiver by Customer of its sovereign immunity or other applicable State Statutes. Notwithstanding anything to the contrary in this Agreement or Schedules, in no event will Provider's liabilities under this agreement, whether under contract law, tort law, warranty, or otherwise, exceed the total amount of revenue received by Provider pursuant to this agreement, during the twelve (12) month period before the date the claim arose.

9. <u>Confidential Information and Non-Disclosure</u>. The parties acknowledge that in their performance of their duties hereunder either party may communicate to the other (or its designees) certain confidential and proprietary information, including without limitation information concerning the party's services and know-how, technology, techniques, or business or marketing plans related thereto (collectively, the "Confidential Information") all of which are confidential and proprietary to, and trade secrets of, the disclosing party (the "Disclosing Party").  As a condition to the receipt of the Confidential Information from the Disclosing Party, the receiving party (the "Receiving Party") shall, at all times during and after the term of this Agreement (i) not disclose in any manner, directly or indirectly, to any third party any portion of the Confidential Information; (ii) not use the Confidential Information in any fashion except to perform its duties hereunder or with the Disclosing Party's express prior written consent; (iii) disclose the Confidential Information, in whole or in part, only to employees and agents who need to have access thereto for the Receiving Party's internal business purposes; (iv) take all necessary steps to ensure that its employees and agents are informed of and comply with the confidentiality restrictions contained in this Agreement; and (v) take all necessary

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**



CORRECTIONS SIMPLIFIED.    www.smartcommunications.us    888-253-5178    10491 72nd St. | Seminole, FL 33777

precautions to protect the confidentiality of the Confidential Information received hereunder and exercise at least the same degree of care in safeguarding the Confidential Information as it would with its own confidential information, and in no event shall apply less than a reasonable standard of care to prevent disclosure. The Receiving Party shall promptly notify the Disclosing Party of any unauthorized disclosure or use of the Confidential Information. The Receiving Party shall cooperate and assist the Disclosing Party in preventing or remedying any such unauthorized use or disclosure. The term "Confidential Information" does not include, and the obligations and undertakings set out in this section do not apply to: (a) Information which now is in the public domain or publicly known at the time of disclosure or hereafter comes into the public domain or generally known through no fault of the Receiving Party, otherwise than by reason of breach of this Agreement; (b) Information the disclosure of which is requested or required by law, regulation, court order or a regulatory agency, provided that, prompt notice of such requested disclosure shall be given to the Disclosing Party, if legally permitted, so that Disclosing Party may seek appropriate remedy to prevent such disclosure or waive compliance with the provisions of this Agreement and the Receiving Party, its directors, officers, employees, agents and advisers shall reasonably co-operate with the Disclosing Party, at the Disclosing Party's sole cost and expense, if the Disclosing Party elects to challenge the validity of such requirement and/or take such steps as the Disclosing Party may reasonably require to avoid or limit such disclosure; (c) Information that was previously known to the Receiving Party free of any obligation of confidentiality; (d) Information that is independently developed by the Receiving Party without reference to or use of the Confidential Information; or (e) Information that is disclosed to the Receiving Party by a third party not under or in violation of, as the case may be, any confidentiality undertaking to the Disclosing Party. Subsections (a) through (e) of this paragraph notwithstanding, the parties agree that the technology behind the Providers Services and Systems is Confidential Information and is a trade secret of Provider.

10. <u>Default and Termination</u>. If either party defaults in the performance of any obligation under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of default and clearly notifying the defaulting party that the written notice is being provided pursuant to this provision. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure. If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party has made good faith attempts to cure the default. Upon termination of this Agreement, Provider shall remove all hardware and software Systems except for the cabling and conduit which shall become the property of the Customer. Provider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement.

11. <u>Insurance</u>. Provider shall maintain General Liability Insurance including but not limited to bodily injury, property damage and personal injury with limits of not less than $1,000,000 combined single limit covering all work performed under this contract. Provider shall maintain automobile insurance including bodily injury and property damage including all vehicles owned, leased, hired and non-owned vehicles with limits of not less than $1,000,000 combined single limit covering all work performed under this contact. Provider shall provide Worker's Compensation Insurance, on behalf of all employees who are to provide a service under this contract, as required by applicable law, and Employers Liability with limits of not less than $100,000 per employee per accident. Customer agrees to furnish to Provider timely written notice of any claim, demand, or cause of action made or brought against Customer or where Provider is listed as a Co-Defendant arising out of or relating to the Systems and Services we provide to you.

12. <u>Employees.</u> Provider represents that it has, or will secure at its own expense, all personnel required in performing its obligations under this Agreement. All of the services required hereunder will be performed by the Provider or under its supervision and all personnel engaged in the work shall be fully qualified to perform such services. Provider and any subcontractors used in the performance of the responsibilities listed herein must maintain a drug-free workplace policy. Customer acknowledges that Provider is an independent contractor and nothing in this Agreement is intended nor shall be construed to create an agency relationship, and employer/employee relationship, a joint venture relationship or any other relationship allowing Customer to exercise control or discretion over the manner by which Provider performs hereunder. Provider expressly agrees that it shall be solely responsible for supervising its employees, that it shall comply with all rules, regulations, orders, standards and interpretations promulgated pursuant to the OSHA Act of 1970, including but not limited to training, recordkeeping, providing personal protective equipment, lock/tag out procedures, material safety data sheets and labeling. Provider certifies that neither it nor any subcontractors used to accomplish its obligations hereunder, shall employ unauthorized aliens. Provider certifies that

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**



CORRECTIONS SIMPLIFIED.    www.smartcommunications.us    888-253-5178    10491 72nd St. | Seminole, FL 33777

in accordance with the provisions of Title VII of the 1968 Civil Rights Act as amended by the Equal Employment Opportunity Act of 1972 and Executive Order 11914, that neither it nor any subcontractors used to accomplish its obligations hereunder discriminate on the basis of race, color, sex, religion, age, national origin or disability in their employment practices.

## Miscellaneous

13. <u>Warranty Against Contingent Fees.</u> Provider warrants that no person or selling agency has been employed or retained to solicit this contract upon an agreement of understanding for commission, percentage, brokerage or contingency, except bona fide employees or selling agents maintained by the Provider for the purpose of securing business.

14. <u>Subcontracts.</u> Provider shall be allowed to use subcontractors for the purpose of completing the provisions of this Agreement.

15. <u>Provider Personnel.</u> All Provider personnel being permitted to work in the Customer Jail Facility will be subject to a security/background check by the Office of the Sheriff.

16. <u>Provider Cooperation.</u> Provider shall, at all times observe and comply with all Federal, State, and local municipal laws, ordinances, rules and regulations in any way affecting the Agreement. The Provider shall maintain regular communications with Customer, or its designees, and shall actively cooperate in all matters pertaining to this Agreement.

17. <u>Public Information.</u> Neither the Provider nor the Customer shall publish any findings based on data obtained from the operation of this agreement without the prior consent of the other party, whose written consent shall not be unreasonably withheld.

18. <u>Permits and Licenses.</u> All permits and licenses required by Federal, State, local laws, rules, and regulations necessary for the implementation of the work undertaken by the Provider pursuant to the Agreement shall be served and paid for by the Provider. It is the responsibility of the Provider to have and maintain the appropriate certificate(s) valid for work to be performed and valid for the jurisdiction in which the work is to be performed for all persons working on the job for whom a certificate is required.

19. <u>Third-party Rights.</u> The rights, obligations and duties contained in this Agreement shall exist exclusively between the Parties. The Parties expressly agree and intend that they alone shall have the exclusive rights to seek legal or equitable enforcement, remedy, injunctive relief or to bring a breach of Agreement action. The Parties do not intend to create, nor shall this Agreement be construed to create in any other individual or entity the status of a third-party beneficiary.

20. <u>Public Entity Crime.</u> Provider confirms its understanding that a "public entity crime" as defined in Paragraph 287.133(1)(g), Florida Statutes, means a violation of any state or federal law by a person with respect to and directly related to the transaction of business with any public entity or with an agency or political subdivision of any other state or of the United States, including but not limited to, any bid or contract for goods or services to be provided to any public entity or an agency or political subdivision of any state or of the United States and involving antitrust, fraud, bribery, collusion, racketeering, conspiracy, or material misrepresentation. Provider hereby certifies that neither its officers, directors, executives, partners, employees, members, nor agents who are active in the management of Contractor have been charged with and convicted of a public entity crime subsequent to July 1, 1989.

21. <u>Waiver of Breach.</u> The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

22. <u>Compliance with Laws.</u> Provider shall comply with all Federal, State and local laws, rules, and regulations applicable to the services or payments for services under this Agreement.

**CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY**



CORRECTIONS SIMPLIFIED.    www.smartcommunications.us    888-253-5178    10491 72nd St. | Seminole, FL 33777

23. <u>Governing Law</u>. The parties mutually consent to the jurisdiction of and agree that any litigation arising hereunder shall be brought in Hillsborough County, Florida and governed by the laws of the state of Florida.

24. <u>Attorney Fees</u>. In the event of litigation concerning this Agreement, the Parties shall each be responsible for their own attorney's fees and costs.

25. <u>Completeness of Agreement</u>. This Agreement, together with any additional or supplementary Schedules or documents incorporated herein by specific reference contain all the terms and conditions agreed upon by the parties hereto, and no other agreements, oral or otherwise, regarding the subject matter of this Agreement or any part thereof shall have any validity or bind any of the Parties hereto. This Agreement may be amended or revised only in writing and signed by all the parties.

26. <u>Force Majeure</u>. Provider will not be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder for any reason beyond its control, including without limitations, strikes, inmate disturbances, failure of Customer to provide proper security services, acts of God, civil or military authority, acts of public enemy, war, terrorism, accidents, fires, explosions, earthquakes, floods, or any similar cause beyond the reasonable control of either Party.

27. <u>Assignment</u>. Provider may assign this Agreement or any interest herein at any time to any parent, successor, or subsidiary with prior written notice to Customer.

28. <u>Severability</u>. In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement which shall remain in full force and effect and enforceable in accordance with its terms.

29. <u>Matters to be Disregarded</u>. The titles of the several sections, subsections and paragraphs set for in this Agreement are inserted for convenience of reference only and shall be disregarded in construing or interpreting any of the provisions of this Agreement.

30. <u>Interpretation</u>. The language in this Agreement is to be construed according to its plain meaning and not strictly for or against either party. The parties have reviewed this Agreement and no ambiguities are known to exist; however, to the extent any ambiguity is later discovered, any rule that such ambiguity is to be resolved for or against either party does not apply.

31. <u>Notices</u>. Any notices, demands, payments or reports required by this Agreement shall be in writing and sufficient if sent by the parties hereto via registered or certified United States mail, postage prepaid, to the notice addresses noted below the Parties signatures on the signature page.

32. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute the same Agreement. Any signature page of any such counterpart, or any telecopy or other electronic facsimile thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart of this Agreement, and any telecopy or other electronic transmission of a signature shall be deemed an original and shall bind the party who made such signature.

33. <u>Authority</u>.  Each Party represents and warrants that it has the authority to enter into this Agreement, and that the individual signing on its behalf likewise has authority to do so.

**THIS PORTION INTENTIONALLY LEFT BLANK**

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**



**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

**Customer: Eaton County Sheriff's Office**

By: _____

Name: __Jim  Mott_____

Title: __Chairperson_____

Date: ___8/31/2023 _____

Email: _chairperson@eatoncounty.org _____

**Notice Address:**
1025 Independence Blvd.
Charlotte, MI 48813

**Provider: Smart Communications Holding, LLC.**

By: _____

Name: Jon Logan

Title: CEO & President

Date: August 31, 2023

Email: jon.logan@smartcommunications.us

**Notice Address:**
10491 72nd St.
Seminole, FL 33777

**CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY**

# EXHIBIT 7

**SUPERIOR COURT**
OF THE
**STATE OF DELAWARE**

VIVIAN L. MEDINILLA
JUDGE

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 10400
WILMINGTON, DE 19801-3733
TELEPHONE (302) 255-0626

March 20, 2024

Richard Rollo, Esquire
Travis S. Hunter, Esquire
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, Delaware 19801

Shaun Michael Kelly, Esquire
Lauren P. DeLuca, Esquire
Connolly Gallagher LLP
1202 North Market Street
Wilmington, DE 19801

**Re:**  ***Jonathan D. Logan v. Loco Florida, LLC et al.,***
**C.A. No. N23C-10-208 VLM CCLD**

Dear Counsel,

This is the Court's ruling on the Intervenor's Motion to Dismiss or Stay.

Having considered the parties' full briefing and for the reasons set forth below, the

Intervenor's Motion to Stay is **GRANTED** in favor of the Florida Action.

## I.    BACKGROUND[1]

---

[1] The facts are drawn from the Complaint, and the documents it incorporates by reference.  The Court also refers to the allegations from public filings in the pending Florida litigation between the parties, *Jonathan D. Logan et al. v. Janice Logan et al.*, 2023-CA-1002-NC (Fl. Cir. Ct.) and *Janice Logan v. Jonathan Logan et al.*, 2023-CA-1280-NC (Fl. Cir. Ct.)   (consolidated into the 1002 Action).   DRE 202(d)(1)(C) permits judicial notice of "the records of the court in which the action is pending and of any other court of this State or federal court sitting in or for this State…." The Court may take judicial notice of court filings "for certain limited purposes, such as to understand the nature and grounds for rulings" made by the court in which the documents were filed."  *In re Rural Metro Corp. S'holders Litig.,* 2013 WL 6634009, at *9 (Del. Ch. Dec. 17, 2013).   It may not, however, take judicial notice of such filings for the truth of their contents.  *Id.*

On October 23, 2023, Plaintiff Jonathan D. Logan initiated this action by filing a Complaint against Defendants Loco Florida, LLC ("Loco") and Smart Communications Yacht Holding, LLC ("Yacht"), seeking declarations that he is the sole member and manager of Loco and Yacht, and that both were validly converted into Delaware entities.[2]

Loco and Yacht were allegedly formed as Florida limited liability companies in 2020 and March 2022, respectively.[3]   Loco owns assets that include a warehouse in Seminole, Florida, which was purchased for approximately $1.1 million.[4]   Yacht owns assets that include a 100' Riva Cosaro, which was purchased for approximately $10 million.[5]

In 2021, Jonathan's father, James Logan, formed the James Logan Family Trust (the "Trust").[6]   He and his wife, Janice Logan, the Intervenor in this action, were the Co-Trustees.[7]   In September 2022, James purportedly transferred his member interests in Loco and Yacht to the Trust.[8]   James died nearly one month later.[9]

---

[2] Complaint for Declaratory Judgment ("Compl.").
[3] *Id*. ¶¶ 1, 2.
[4] *Id*. ¶ 1.
[5] *Id.* ¶ 4.
[6] *Id*.
[7] *Id*.
[8] *Id*. ¶¶ 4, 11. The Court utilizes the parties' first names for ease of reference only.
[9] *Id.*

2

## A. The Florida Action

On February 27, 2023, Jonathan and Smart Communications Holding, Inc. ("SCH") filed a complaint in the Circuit Court of the 12th Judicial Circuit in Sarasota County, Florida Probate Division (Florida Court) against Janice and Janice's daughter, asserting claims for breach of trust and seeking declarations relating to the capacity in which claims may be pursued, and the effect of SCH's purported shareholders' agreement.[10]  Shortly thereafter, Janice filed her original complaint on behalf of the Trust, and directly and derivatively on behalf of SCH and Loco in the Florida Court against Jonathan, SCH, and Loco.[11]  She amended that complaint in August 2023,[12] to include allegations that are particularly alarming.[13]

The amended complaint in Florida consists of five counts.  Count I seeks declarations concerning the validity of the purported shareholders' agreement of

---

[10] *Id*. ¶ 4, n.1; Intervenor's Opening Brief in Support of Her Motion to Dismiss or Stay (the "Motion"), Ex. 4. (*Jonathan D. Logan, et al. v. Janice Logan, et al.*, 2023-CA-1002-NC (Fl. Cir. Ct.)).

[11] *See* Motion, Ex. 10.

[12] *Id.*, Ex. 5A.

[13] *See, e.g.*, *id.* "Jon was convicted of Felony Aggravated Stalking in 2008 for harassing and intimidating a business associate and the associate's wife with whom Jon worked on a car dealership venture" (¶ 17); "Jon held James and Janice at gunpoint, hit his father's face, and demanded that James transfer his shares to Jon.  He also smacked the phone out of his mother's hand when she tried to call 911" (¶ 32); "he vandalized his mother's car" (¶ 33); "On Saturday, August 14, 2021 at 11:24 AM, Jon sent an email to his parents from his Smart Communications email address, threatening to 'Burn your [expletive] house down'" (¶ 34); "He warned his father 'Don't test me'; 'I really hope you fix yourself because you will be dead soon'; and, 'I have zero patience left for you and I am not one to [expletive] with on what I created with sheer willpower and brains. If you, or Janice or Alexis try and take anymore from me, I am prepared to do things the normal human could never fathom'" (¶ 40).

3

SCH; Count II is a claim for director liability; Counts III and V are direct and derivative claims for breach of fiduciary duty; and Count IV seeks to appoint a temporary custodian of SCH.  Count III further relates to Yacht's assets, which Janice alleges Jonathan improperly purchased with SCH's funds.[14]  The Court consolidated these actions (together, the "Florida Action").

On July 20, 2023, the Florida Court considered Janice's motion for a temporary injunction, seeking, in part, an order finding that Janice had a substantial likelihood of success on the merits of her claims.[15]  The Florida Court granted that motion.[16]  After that ruling, Jonathan submitted articles of conversion to the Secretary of State of the State of Florida, converting Yacht and Loco into Delaware entities.[17]  Jonathan then moved to dismiss counts II-V of Janice's amended complaint,[18] which the Florida Court denied.[19]

Because of the conversions and Jonathan's creation of a new Delaware entity (*i.e.*, Smart Communications Holding, LLC ("SCH LLC")), Janice again sought relief from the Florida Court and filed a motion for contempt of the temporary

---

[14] Motion at II.A.   The Motion omitted page numbers, so the Court refers to the section headings.
[15] *Id*., Ex. 10.
[16] *Id*., Ex. 6.
[17] Compl. ¶ 23; *id*., Ex. C.
[18] Motion, Ex. 8.
[19] *Id*. Ex. 9.

4

injunction order and a request to appoint a temporary custodian.[20]    After the

hearing, the parties, including SCH LLC, agreed to additional injunctive relief.[21]

On January 31, 2024, the Florida Court, in Phase 1 of its proceedings,

concluded a three-day trial to resolve Count II, declaring SCH's shareholders'

agreement invalid and unenforceable.[22]   The Florida Court also found that Janice

owned 50% of the shares of SCH.[23]   The Florida Court is expected to address the

remaining counts in Phase II after the parties attend mediation.[24]

## B. This Action

On October 23, 2023, during the pendency of the Florida Action and

approximately one week after the Florida Court denied his Motion to Dismiss

therein, Jonathan filed his Complaint in this Court.    Specifically, he seeks

declarations under 10 *Del. C.* § 6501, and 6 *Del. C.* § 18-110[25] that he is the sole

---

[20]  Motion Section IV; *id.*, Ex. 15.

[21]  Intervenor's Rely Brief in Support of Her Motion to Dismiss or Stay ("Reply"), Ex. 2.

[22]  Reply, Ex. 4 at 2.

[23]  *Id.*

[24]  Reply at 3.

[25]  Jonathan invokes 6 *Del C.* § 18-110, but that statute confers jurisdiction to the Court of Chancery, not this Court.  *See* 6 *Del. C.* § 18-110 ("(a) Upon application of any member or manager, the Court of Chancery may hear and determine the validity of any admission, election, appointment, removal or resignation of a manager of a limited liability company, and the right of any person to become or continue to be a manager of a limited liability company, and, in case the right to serve as a manager is claimed by more than 1 person, may determine the person or persons entitled to serve as managers; and to that end make such order or decree in any such case as may be just and proper, with power to enforce the production of any books, papers and records of the limited liability company relating to the issue.").

member and manager of Loco and Yacht, and that Loco and Yacht were validly converted to Delaware limited liability companies.   The Complaint's only reference to the ongoing Florida litigation described above was confined to a single-sentence footnote.[26]   Jonathan's subsequently filed Motion for Summary Judgment on November 16, 2023, provided few additional details.[27]

In response, Janice filed an unopposed motion to intervene, as well as her Intervenor's Motion to Dismiss or Stay (the "Motion").[28]   The parties submitted competing schedules on whether to first resolve the Motion for Summary Judgment or this Motion.   The Court held a status conference on December 19, 2023, granted the Motion to Intervene, and determined this Motion would be considered first due to the potential forum-related issues presented at first blush.[29]   With full briefing submitted, this matter is ripe for decision.

## II.   DISCUSSION

Under *McWane*'s three-factor test, the Court may dismiss or stay in favor of a previously filed action if there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, and involving the same parties and

---

[26] Compl. ¶ 4, n.1. ("There is pending probate litigation in Florida between Jon and the Trust, but it does not involve the declarations requested here.   Jon will promptly provide the Trust a copy of this complaint.").
[27] Plaintiff Jonathan Logan's Motion for Summary Judgment (D.I. 2).
[28] D.I. 9; D.I. 10.
[29] D.I. 13.

6

the same issues.[30]   "[I]t is preferable to merely stay the later-filed action because it is impossible to predict with certainty the course of earlier-filed litigation in another jurisdiction."[31]   The authority to grant a stay is "incident to the inherent power of a court to exercise its discretion to control the disposition of actions on its docket in order to promote economies of time and effort for the court, litigants, and counsel."[32]

### A.    The Delaware Action is Stayed under *McWane*

Jonathan filed his complaint in the Florida Action in February 2023 and Janice filed her amended complaint in August 2023.   This action commenced in October 2023.   Thus, the Florida Action is the prior-filed action.

The Florida Court has already proven its ability to provide prompt and complete justice.   It has held several evidentiary hearings, entered injunctive relief, and heard predicate Florida-related governance issues that implicate Loco and Yacht, which prior to their conversions, were Florida entities.   It has also considered and added, to a status quo order, the Delaware entity (SCH LLC), which was formed during the Florida litigation.

The Florida Action involves functionally the same parties and issues

---

[30] *LG Electronics, Inc. v. InterDigital Commc'ns, Inc.*, 114 A.3d 1246, 1252 (Del. 2015) (citing *McWane Cast Iron Pipe Corp. v. McDowell–Wellman Eng'g Co.,* 263 A.2d 281, 283 (Del. 1970).
[31] *Schnell v. Porta Sys. Corp.*, 1994 WL 148276, at *6 (Del. Ch. Apr. 12, 1994*); EnVen Energy Corp. v. Dunwoody*, 2020 WL 2770609, at *5 (Del. Ch. May 28, 2020).
[32]  *Joseph v. Shell Oil Co.,* 498 A.2d 1117, 1123 (Del. Ch. 1985).

7

presented before this Court.   "Consistent with the *McWane* doctrine generally, the 'same parties, same issues' analysis focuses on substance over form."[33]   The Court looks for "substantial or functional identity" between the competing action.[34] Whether two cases raise the same issues is based on whether the claims "are closely related and arise out of the same common nucleus of operative facts."[35]

Here, Loco is a party to both actions.   And although Yacht is not a party to the Florida Action, SCH, which is a party, allegedly purchased and maintains Yacht's assets.   Thus, the 100' Riva Cosaro, Yacht's primary asset, may also be subject to relief from the claims of fiduciary duty and waste brought in the Florida Action.   Accordingly, substantial or functional identity exists between the competing actions.   Furthermore, the issues in both proceedings also arise from a common nucleus of operative facts, that is, Jonathan and Janice's rights in SCH and their related entities, including Loco and Yacht, as well as Jonathan's actions with respect to those entities.

Jonathan's opposition is unpersuasive.   He argues that the Delaware Action only seeks narrow declarations regarding membership status in Loco and Yacht, and

---

[33] *Zurich Am. Ins. Co. v. Sterigenics U.S., LLC*, 2024 WL 324094, at *6 (Del. Super. Ct. Jan. 26, 2024) (citation omitted).

[34] *Id.*

[35] *EnVen Energy Corp.*, 2020 WL 2770609, at *5 (citing *EuroCapital Advisors, LLC v. Colburn*, 2008 WL 401352, at *2 (Del. Ch. Feb. 14, 2008) (quoting *Dura Pharms., Inc. v. Scandipharm, Inc.*, 713 A.2d 925, 930 (Del. Ch. 1998))).

8

on that basis, the propriety of their conversions into Delaware entities. But in the Florida Action, Janice has brought derivative claims against Loco, and may only do so if she is a member thereof. The analysis and interpretation of Florida law as to Loco will similarly apply to Yacht. Thus, Janice's claims in the Florida action closely relate to the declarations sought in this action. Lastly, the resolution of the claims regarding the actions taken by Jonathan at SCH may moot the requested declarations as to Yacht.[36]

For these reasons, the Delaware Action is stayed under *McWane*.

### B.    Inherent Discretion to Control Court Docket Weighs in Favor of a Stay

Aside from this Court's consideration of the *McWane* factors, Jonathan's litigation conduct raises a host of jurisdictional concerns. Although Jonathan argues that he merely seeks declarations regarding questions of Delaware internal affairs, any jurisdictional analysis requires consideration of the actions he took after the Florida Action was well underway. Further, Jonathan's contention that his Complaint presents narrow issues of Delaware governance is further belied by the fact that he asks this Court to interpret Florida law. Yet, the only basis that allows him to seek relief here is dependent upon the purported conversion of Florida

---

[36] *See* Reply at 5.

entities, the validity of which may be *void ab initio* if Janice—who has already

shown a substantial likelihood of success—prevails on her claims in the Florida

Action.

Given the alarming nature of the allegations in the Florida Action against

Jonathan, the Court is loath to insert itself in a dispute that has involved significant

motions practice, evidentiary hearings, and injunctive relief.[37]   The parties' more

than year-long dispute in the Florida Court also implicates claims of fiduciary duty

and director liability—issues beyond the subject matter jurisdiction of this Court.

Namely, one claim in the Florida is a derivative claim on behalf of Loco, and others

are direct and derivative breach of fiduciary duty claims against Jonathan regarding

Yacht's assets.[38]   Seeking declaratory relief at this stage is, therefore, premature and

presents the risk of inconsistent rulings between the two actions.[39]   Principles of

comity and judicial efficiency weigh in favor of a stay pending the Florida Action.[40]

---

[37] In seeking summary judgment, this Court would have appreciated more transparency from Plaintiff's filings regarding the course of proceedings in the Florida Action.

[38] Motion at II.

[39] *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.,* 263 A.2d 281, 283 (Del. 1970) (The Court should avoid "the wasteful duplication of time, effort, and expense that occurs when judges, lawyers, parties, and witnesses are simultaneously engaged in the adjudication of the same cause of action in two courts," as well as "the possibility of inconsistent and conflicting rulings and judgments and an unseemly race by each party to trial and judgment in the forum of its choice.").

[40] *Park G.P., Inc. v. CCSB Fin. Corp.,* 2020 WL 7706962, at *2 (Del. Ch. Dec. 29, 2020) (Citation omitted).

### III.    CONCLUSION

For the foregoing reasons, whether under *McWane* or this Court's inherent discretion to control its docket, Intervenor's Motion to Stay is **GRANTED**, and this action is **STAYED** in favor of the Florida Action.

**IT IS SO ORDERED.**

Sincerely,
/s/ Vivian L. Medinilla
Vivian L. Medinilla
Judge

11

# CONFIDENTIAL EXHIBIT 8



*Corrections simplified*

Who is Smart Communications?

## THE MOST INNOVATIVE
## TECHNOLOGY COMPANY
## IN CORRECTIONS

### HISTORICALLY 3-5 YEARS AHEAD OF EVERY OTHER VENDOR IN CORRECTIONS

How have we accomplished this?

# A HISTORY OF INDUSTRY FIRSTS

## Our Timeline of Innovation and Implementation



**2009**
Developed Corrections first electronic request system, SmartRequest™

Introduced corrections' first two-way inmate electronic messaging system

**2010**

**2012**
Established first facility wide law library solution in corrections

Invented and patented the MailGuard Postal Mail Elimination System®

**2015**

**2016**
Deployed the SmartTablet™ Corrections most intelligent tablet system

Instituted and patented MailGuardLegal® legal mail solution

**2017**

**2018**
integrated the first VOIP inmate calling platform in corrections

Deployed next-generation SmartVisit™ video visitation platform

**2019**

**2022**
Several new technologies and Patents to be announced

We are proven innovators in corrections.
Where Smart goes, our competitors follow.

# ABOUT SMART COMMUNICATIONS



## Different Culture - Different Approach - Different Outcome.

- Founded in 2009 with a mission to change the status quo of the Corrections industry with new technology.

- Entered the Corrections industry as a true technology company, not the traditional telecommunications company.





- Created new technologies with new streams of revenue in Corrections.

- Focused on innovation and technologies that benefited families, agencies and the company- true Win-Win solutions for sustainable growth.





Smart Communications Corporate Headquarters, Seminole, FL







CONFIDENTIAL

# HISTORICAL ANNUAL SALES REVENUE AND GROWTH |

| Year | Sales Revenue | Annual Sales Growth % |
|------|---------------|-----------------------|
| 2010 | $4,894.00 | - |
| 2011 | $83,826.00 | - |
| 2012 | $133,098.00 | 58.78% |
| 2013 | $390,921.00 | 193.71% |
| 2014 | $941,635.00 | 140.88% |
| 2015 | $1,418,295.00 | 50.62% |
| 2016 | $3,008,694.00 | 112.13% |
| 2017 | $3,844,365.00 | 27.78% |
| 2018 | $9,379,355.00 | 143.98% |
| 2019 | $15,648,983.00 | 66.84% |
| 2020 | $20,687,943.00 | 32.20% |
| 2021 | $31,061,300.00 | 50.14% |



| Period | Term | Average Sales Growth % |
|--------|------|------------------------|
| 2017 - 2021 | 5 Years | 64.19% |
| 2012 - 2021 | 10 Years | 87.71% |

CONFIDENTIAL

# BUILDING BLOCKS OF REVENUE |

- **2022 Daily Revenue Totals and Projections:**

| Date | Daily Revenue Amount | Total Days | Total Revenue |
|------|------|------|------|
| 1/22/2022 | $100,442.00 | 31 | $3,113,702.00 |
| 2/22/2022 | $113,250.00 | 334 | $37,825,500.00 |

*Total Projected Annual Revenue: $40,939,202.00*

- **Annual Sales Revenue/Growth Projections:**

| Project Sales Revenue/Growth 2022 - 2030 | |
|------|------|
| 2022 | $55,000,000.00 |
| 2023 | $90,303,274.00 |
| 2024 | $148,266,932.00 |
| 2025 | $243,436,170.00 |
| 2026 | $399,692,421.00 |
| 2027 | $600,000,000.00 |
| 2028 | $840,000,000.00 |
| 2029 | $1,092,000,000.00 |
| 2030 | $1,310,400,000.00 |



Project Sales Revenue/Growth 2022 - 2030

CONFIDENTIAL

# NEW CONTRACTS SIGNED IN 2022 | As of 4/15/22

| Agency Name | ADP | Projected Annual Revenue |
|---|---|---|
| Florence County Jail (SC) | 303 | $436,320.00 |
| Ottawa County Jail (MI) | 350 | $504,000.00 |
| Jackson County Jail (MI) | 350 | $504,000.00 |
| Denton County Jail (TX) | 975 | $1,404,000.00 |
| Kitsap County Jail (WA) | 300 | $432,000.00 |
| Licking County Jail (OH) | 300 | $432,000.00 |
| Monroe County Jail (OH) | 130 | $187,200.00 |
| Butler County Jail (PA) | 420 | $604,800.00 |
| Calcasieu Parish Jail (LA) | 840 | $1,209,600.00 |
| Livingston County Jail (IL) | 150 | $72,000.00 |
| Oakland County Jail (MI) | 870 | $1,044,000.00 |
| Washoe County Jail (NV) | 1,100 | $1,584,000.00 |
| Douglas County Correctional Center (NE) | 1,400 | $672,000.00 |

TOTALS:  $9,085,920.00

CONFIDENTIAL

# REVENUE/EBITDA |

- **Project Sales Revenue 2023-2030 = $4,724,098,797.00**
- **$4,724,098,797.00 X 40% (EBITDA) = $1,889,639,520.00**

**Current technology revenue and growth schedule/ Not including new technology introduction to market.**

CONFIDENTIAL

# THE DISTINCTIVE DIFFERENCE |

- Decade of 80% Growth
- Long Term Municipal Contracts Provide "Reoccuring Revenue"
- Near Impossible Market Entry for New Competitors
- Unstoppable Market Penetration
- Revolutionary New Technologies and Services
- Patented Technologies and Services
- Industry Flying Under Radar

# What is the next Revolution of Corrections?

*Mind*

*Body*

*Spirit*

*Smart Communications welcomes you to the future of incarceration*

# The Corrections Industry's First Offender *Smartwatch™*

✓ **Patent Pending**
✓ **100% Open Market**
✓ **Non-Removable**
✓ **Inmate Tracking And Intelligence**
✓ **Communication, Phone, Text, Video**
✓ **Health And Wellness Tracking And Analytics**
✓ **Spy Tools, Voice Biometrics And More.**
✓ **Incarceration Market 2.2 Million ADP**
✓ **Parole/Probation Market 4.5 Million ADP**





**Released To Market 3rd Quarter 2022**

*Take a journey outside of prison walls on the fully interactive and integrated **SmartCycle™***

**SmartCycle™** Patent Pending



Released To Market 1st Quarter 2023

✓ **Transform the incarceration environment from the inside out.**

✓ **Total mind, body and spirit transformation with a fully connected and interactive program specially designed for the incarceration environment.**

✓ **Earn free Communication credits with family and friends.**

✓ **Earn free tablet entertainment time, music, movies, games.**

✓ **Learn positive behavioral traits, such as Effort = Reward.**

*Smart Communications technology leads the way for prison reform and reimaging the incarceration experience. Solving a major pain point of reform and lowering recidivism in this industry.*

# SmartReality™ VR

- Interactive Virtual Reality Reentry Programing To Revolutionize The Way Inmates Reenter Society.

- Real Life Interactive Programing To Prepare Inmates For A Successful Transition Into Society, Dramatically Reducing Recidivism.



Released To Market 1st Quarter 2024

# Accelerated growth factors for the future

- 3 new Industry changing technologies scheduled for market release over the next 3 years.

- 100% untapped market for these new technologies that integrate with existing technologies.

- Untapped market of 4.5 million ADP in Community supervision Probation/Parole with offender SmartWatch™

- Successful pilot for inmate mail processing completed in Federal Bureau of Prisons, scheduled to deploy nationwide coming year with 150k ADP.

- Patent litigation for MailGuard™ new Patent recently issued by US Patent Office – Possible market monopoly for over a decade.



This is the
**FUTURE OF INCARCERATION**
*Smart Communications*

# EXHIBIT 9

THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC,

    Plaintiffs

v                              CASE NO   2023-CA-001002

JANICE LOGAN, individually and as Trustee
of the James Logan Family Trust dated
February 10, 2021 and ALEXIS LOGAN,
individually,

    Defendants

_____/    CONSOLIDATED WITH

JANICE LOGAN, as Trustee of the James
Logan Family Trust, dated February 10, 2021,

    Plaintiff,

v                              CASE NO   2023-CA-001280

JONATHAN D LOGAN and SMART
COMMUNICATIONS HOLDING, INC,
nominal defendant, and LOCO FLORIDA, LLC,
nominal defendant,

    Defendants

_____/

**ORDER ON JANICE LOGAN'S MOTION TO APPOINT A
TEMPORARY CUSTODIAN AND FOR CONTEMPT**

    **THIS MATTER** came before the Court for hearing on December 6, 2023 on the *Motion to*

*Appoint a Temporary Custodian and for Contempt* ("Contempt Motion") filed by JANCE LOGAN,

individually and as Trustee of the James Logan Family Trust dated February 10, 2021 ("Janice"), and

1

the Court, having reviewed the Contempt Motion and the Smart Parties'[1] Response thereto, having

heard the arguments of counsel, and otherwise being advised fully in the premises, it is hereby

**ADJUDGED**

1      Without admission of any liability or wrongdoing whatsoever, Jonathan Logan ("Jon"),

Smart Communications Holding, Inc ("Smart Communications"), and Smart Communications

Holding, LLC, a Delaware limited liability company ("Smart Delaware") hereby stipulate as follows

      a   Jon, Smart Communications, and Smart Delaware, agree that they will take no action

         to cause Smart Communications or Smart Delaware to pay licensing and/or royalty fees

         for its use of intellectual property owned by HLFIP, LLC, except as may be permitted

         by further Court Order on proper motion and notice  This includes Jon agreeing not to

         allow any entity he owns or controls from paying such licensing and/or royalty fees

      b   Jon, Smart Communications, and Smart Delaware agree that they will take no action to

         cause any payment, or any other action that is outside the ordinary course of business,

         by Smart Communication or Smart Delaware, other than those as have been made in

         the usual and ordinary course of business (such as to Yacht), to be made to any entity

         owned or controlled by Jon, except as may be permitted by further Court Order on

         proper motion and notice

      c   Smart Communications Holding LLC, a Delaware limited liability company ("Smart

         Delaware") agrees to submit to the jurisdiction of this Court and shall be made party

         defendant in CASE NO   2023-CA-001280

      d   Janice shall be entitled to access to the books and records of Smart Delaware to the

         same extent to which she would be entitled to access to books and records of Smart

---

[1] Collectively, Jonathan Logan, Smart Communications Holding, Inc  and Loco Florida, LLC

Communications in accordance with, and without limitation to, chapter 607, Florida Statutes  Historical books and records of both Smart Communications and Smart Delaware shall be provided no later than December 24, 2023

2   Except as stated herein, nothing herein shall prejudice any of the rights of the parties to take further action or seek further relief from this Court, including to modify or expire the terms set forth herein or as may otherwise be appropriate

**DONE AND ORDERED** in Chambers, at Sarasota County, Florida, on this _15th_ day of December, 2023

HONORABLE HUNTER W  CARROLL
Circuit Court Judge

Copies furnished to Counsel of Record

#12285772 v2

# EXHIBIT 10

<u>**STOCK POWER**</u>

**FOR VALUE RECEIVED,** the undersigned, JAMES P. LOGAN (the "Transferor"), hereby sells, assigns and transfers unto JAMES LOGAN, as CO-TRUSTEE of the JAMES LOGAN FAMILY TRUST, dated February 10, 2021, five thousand (5,000) shares (the "Shares") of the common capital stock of SMART COMMUNICATIONS HOLDING, INC., a Florida corporation (the "Corporation"), standing in the name of the Transferor on the books of the Corporation, and does hereby irrevocably constitute and appoint Thomas D. Sims, Esq. as attorney to transfer the Shares on the books of the Corporation with full power of substitution in the premises.

A signed copy of this Stock Power, including that executed via DocuSign or other valid electronic or digital signature medium, delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Stock Power.

**DATED TO BE EFFECTIVE AS OF** _____September 16_____ , 2022.

**TRANSFEROR:**

_James Logan (Sep 16, 2022 18:52 EDT)_

JAMES P. LOGAN

6672435v2

# Stock Power - James Logan to Revocable Trust re Smart Communications Holding, Inc. (2022)

Final Audit Report                                                2022-09-16

| | |
|---|---|
| Created: | 2022-09-16 |
| By: | Rachel Chase (rachelc@jpfirm.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAhWDfQnjwoEN_qVWMiErLBCmCNdiW_Ytb |

## "Stock Power - James Logan to Revocable Trust re Smart Communications Holding, Inc. (2022)" History

- Document created by Rachel Chase (rachelc@jpfirm.com)
  2022-09-16 - 8:52:13 PM GMT- IP address: 144.129.14.130

- Document emailed to jim.logan@smartcommunications.us for signature
  2022-09-16 - 9:02:18 PM GMT

- Email viewed by jim.logan@smartcommunications.us
  2022-09-16 - 9:02:20 PM GMT- IP address: 74.125.151.157

- Signer jim.logan@smartcommunications.us entered name at signing as James logan
  2022-09-16 - 10:52:18 PM GMT- IP address: 199.47.254.244

- Document e-signed by James logan (jim.logan@smartcommunications.us)
  Signature Date: 2022-09-16 - 10:52:20 PM GMT - Time Source: server- IP address: 199.47.254.244

- Agreement completed.
  2022-09-16 - 10:52:20 PM GMT

**Adobe Acrobat Sign**

HWH-000118

# EXHIBIT 11

## ASSIGNMENT AND ACCEPTANCE OF MEMBERSHIP INTEREST

**KNOW ALL MEN BY THESE PRESENTS** that JAMES P. LOGAN (the "Assignor"), in exchange for good and valuable consideration paid to him by JAMES LOGAN, as CO-TRUSTEE of the JAMES LOGAN FAMILY TRUST, dated February 10, 2021 (the "Assignee"), the receipt of which is hereby acknowledged, has granted, bargained, sold, assigned, transferred and set over, and by these presents does hereby grant, bargain, sell, assign, transfer and set over unto the Assignee, all of the Assignor's interest as a member of LOCO FLORIDA, LLC, a Florida limited liability company (the "Company"), which interest constitutes a fifty percent (50%) interest in the profits, losses and capital of the Company and is not certificated (the "Membership Interest"), and does hereby irrevocably constitute and appoint Thomas D. Sims, Esq. as attorney to transfer the Membership Interest on the books of the Company with full power of substitution in the premises.

**ASSIGNEE, BY ACCEPTANCE OF THIS ASSIGNMENT AND ACCEPTANCE OF MEMBERSHIP INTEREST (THIS "ASSIGNMENT"),** assumes all of the duties and obligations of the Assignor as to the Membership Interest so assigned, and agrees to perform all of the covenants, conditions and obligations on the Assignor's part to be paid and performed with respect to the Membership Interest.

This Assignment may be executed in multiple counterparts with the same effect as if the signature on each such counterpart were on the same instrument. A signed copy, including that executed via DocuSign or other valid electronic or digital signature medium, of this Assignment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Assignment.

**EXECUTED TO BE EFFECTIVE AS OF** ___September 16___ **, 2022.**

**ASSIGNOR:**                                    **ASSIGNEE:**

James Logan (Sep 16, 2022 18:51 EDT)             James Logan (Sep 16, 2022 18:51 EDT)

JAMES P. LOGAN                                   JAMES LOGAN, AS CO-TRUSTEE OF
                                                 THE JAMES LOGAN FAMILY TRUST,
                                                 DATED FEBRUARY 10, 2021

6672599v2

# Assignment of Membership Interest - James Logan to Revocable Trust re Loco Florida, LLC (2022)

Final Audit Report 2022-09-16

| | |
|---|---|
| Created: | 2022-09-16 |
| By: | Rachel Chase (rachelc@jpfirm.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA5bhdxfYZNnyDwJookfUDMbzJ4I6CqTM_ |

## "Assignment of Membership Interest - James Logan to Revocable Trust re Loco Florida, LLC (2022)" History

- Document created by Rachel Chase (rachelc@jpfirm.com)
  2022-09-16 - 8:50:45 PM GMT- IP address: 144.129.14.130

- Document emailed to jim.logan@ ▮▮▮▮▮▮▮▮▮ for signature
  2022-09-16 - 9:02:03 PM GMT

- Email viewed by jim.logan@ ▮▮▮▮▮▮▮▮
  2022-09-16 - 10:43:04 PM GMT- IP address: 74.125.210.141

- Signer jim.logan@ ▮▮▮▮▮▮▮▮ entered name at signing as James logan
  2022-09-16 - 10:51:28 PM GMT- IP address: 199.47.254.244

- Document e-signed by James logan (jim.logan@ ▮▮▮▮▮▮▮▮ )
  Signature Date: 2022-09-16 - 10:51:30 PM GMT - Time Source: server- IP address: 199.47.254.244

- Agreement completed.
  2022-09-16 - 10:51:30 PM GMT

**Adobe Acrobat Sign**

# EXHIBIT 12

## ASSIGNMENT AND ACCEPTANCE OF MEMBERSHIP INTEREST

**KNOW ALL MEN BY THESE PRESENTS** that JAMES P. LOGAN (the "Assignor"), in exchange for good and valuable consideration paid to him by JAMES LOGAN, as CO-TRUSTEE of the JAMES LOGAN FAMILY TRUST, dated February 10, 2021 (the "Assignee"), the receipt of which is hereby acknowledged, has granted, bargained, sold, assigned, transferred and set over, and by these presents does hereby grant, bargain, sell, assign, transfer and set over unto the Assignee, all of the Assignor's interest as a member of SMART COMMUNICATIONS YACHT HOLDING, LLC, a Florida limited liability company (the "Company"), which interest constitutes a fifty percent (50%) interest in the profits, losses and capital of the Company and is not certificated (the "Membership Interest"), and does hereby irrevocably constitute and appoint Thomas D. Sims, Esq. as attorney to transfer the Membership Interest on the books of the Company with full power of substitution in the premises.

**ASSIGNEE, BY ACCEPTANCE OF THIS ASSIGNMENT AND ACCEPTANCE OF MEMBERSHIP INTEREST (THIS "ASSIGNMENT"),** assumes all of the duties and obligations of the Assignor as to the Membership Interest so assigned, and agrees to perform all of the covenants, conditions and obligations on the Assignor's part to be paid and performed with respect to the Membership Interest.

This Assignment may be executed in multiple counterparts with the same effect as if the signature on each such counterpart were on the same instrument. A signed copy, including that executed via DocuSign or other valid electronic or digital signature medium, of this Assignment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Assignment.

**EXECUTED TO BE EFFECTIVE AS OF** ___September 16___, 2022.

ASSIGNOR:                                ASSIGNEE:

_James Logan (Sep 16, 2022 18:52 EDT)_    _James Logan (Sep 16, 2022 18:52 EDT)_
JAMES P. LOGAN                           JAMES LOGAN, AS CO-TRUSTEE OF
                                         THE JAMES LOGAN FAMILY TRUST,
                                         DATED FEBRUARY 10, 2021

8257501

# Assignment of Membership Interest - James Logan to Revocable Trust re Smart Communications Yacht Holdings, LLC (2022)

Final Audit Report                                        2022-09-16

| | |
|---|---|
| Created: | 2022-09-16 |
| By: | Rachel Chase (rachelc@jpfirm.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA41IVbbBf5AM-yiYmX8oXLjDjvWBKBD5w |

## "Assignment of Membership Interest - James Logan to Revocable Trust re Smart Communications Yacht Holdings, LLC (2022)" History

📄 Document created by Rachel Chase (rachelc@jpfirm.com)
   2022-09-16 - 8:52:54 PM GMT- IP address: 144.129.14.130

📧 Document emailed to jim.logan@█████████████ for signature
   2022-09-16 - 9:02:35 PM GMT

📄 Email viewed by jim.logan@████████████
   2022-09-16 - 10:22:45 PM GMT- IP address: 74.125.210.139

🖊 Signer jim.logan@██████████████ entered name at signing as James logan
   2022-09-16 - 10:52:56 PM GMT- IP address: 199.47.254.244

🖊 Document e-signed by James logan (jim.logan@██████████████)
   Signature Date: 2022-09-16 - 10:52:57 PM GMT - Time Source: server- IP address: 199.47.254.244

✅ Agreement completed.
   2022-09-16 - 10:52:57 PM GMT

 **Adobe Acrobat Sign**

# EXHIBIT 13

```
 1   IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT IN
     AND FOR SARASOTA COUNTY, FLORIDA
 2
     JONATHAN LOGAN and SMART
 3   COMMUNICATIONS HOLDING, INC.,

 4           Plaintiffs,
     vs.                          Case No.:  2023-CA-1002-NC
 5
     JANICE LOGAN, individually and
 6   as Trustee of the James Logan
     Family Trust, and ALEXIS LOGAN,
 7   individually,

 8           Defendants.          /     (CONSOLIDATED)

 9   JANICE LOGAN, as Trustee of the
     James Logan Family Trust dated
10   February 10, 2021, and directly
     and derivatively on behalf of
11   Smart Communications Holdings,
     Inc., and derivatively on behalf
12   of Loco Florida, LLC,

13           Plaintiff,

14   vs.                          Case No:   2023-CA-1280-NC

15   JONATHAN LOGAN, SMART
     COMMUNICATIONS HOLDING, INC.,
16   nominal defendant, and LOCO
     FLORIDA, LLC, nominal defendant,
17
     _____ Defendants.          /
18

19                    LIVE HEARING

20        BEFORE THE HONORABLE HUNTER W. CARROLL

21                    held at the
          Judge Lynn N. Silvertooth Judicial Center
22        2002 Ringling Boulevard, Courtroom 6C
                    Sarasota, Florida
23   on Wednesday, December 6, 2023, 3:00 to 5:00 p.m.

24                Pages 1 through 96

25            Stenographically reported by:
          Linda R. Wolfe, RPR, RMR, FCRR, FPR-C
```



```
 1        Florida Statutes' very clear, by the way.
 2   What they're complaining is that Mr. Logan somehow
 3   caused Loco Florida's assets to be taken away from
 4   Janice Logan and to be taken away from the
 5   jurisdiction of this court.
 6        And Florida law says very clearly when you
 7   convert to a foreign entity -- which is allowed by
 8   statute -- when you convert, the effective
 9   conversion under 605.1046 is it's the same entity.
10   All the assets remain and all of it remains before
11   Your Honor.  So there is literally only a change in
12   form, not substance.  So that is not a fraud or
13   irreparable injury.
14        And, respectfully, Your Honor, there is zero
15   nexus between converting Loco Florida and Yacht
16   Holdings, LLC, which is not a party, by the way,
17   there is no nexus between that action and Smart
18   Communications Holding, Inc., which is a completely
19   different company.
20        Loco Florida merely owns the building that
21   Smart Communications is located in.  That's it.
22        And as a matter of Florida law, there is only
23   four ways to become a member of an LLC.  Ms. Logan
24   doesn't qualify.  There was no consent -- What
25   happened was Jim Logan assigned his shares to his
```



```
 1  effect Your Honor's jurisdiction, and that's what
 2  we're saying as a matter of law:  It's all still
 3  here.  There's been no change in substance; just
 4  form.
 5      THE COURT:  I tend to agree with the statement
 6  that if an entity is not before me, I don't have
 7  jurisdiction over it.  So unless the movant is
 8  saying I somehow have jurisdiction over entities
 9  that haven't been sued or not before me, I don't
10  think we need to address entities that are not
11  before me.
12      MR. O'NEILL:  We are not making that
13  assertion, Your Honor.
14      MS. KOFF:  Well, it's in their papers; that's
15  why I raised it.
16      So the only one before you, Your Honor, that's
17  at issue then is Loco Florida.  The only asset it
18  holds is located here.  It's the building that
19  Smart Communications works from.  The asset remains
20  in your jurisdiction.  We would not dispute that.
21      THE COURT:  Okay.  So, let me just restate
22  what I have heard and then, ultimately, I'm going
23  to ask, and maybe you all can spend three minutes
24  outside discussing this with your clients, what I'm
25  hearing is the entity, Smart Communications
```



```
 1   parties to this litigation, advised Smart

 2   Communications to clean up their corporate

 3   structure across the board to put it into this

 4   Delaware formation to -- for tax purposes and for

 5   all of those items.

 6       Nowhere in that advice was the intention to

 7   remove assets from this jurisdiction and we don't

 8   believe that they did and, certainly, that's no

 9   one's intention.  And perhaps we can draft an order

10   that addresses that.

11       MR. O'NEILL:  Your Honor, may I be heard

12   briefly on just one point that's important and,

13   again, getting overlooked.

14       I think Your Honor has pretty much everything

15   Your Honor needs, but I think the important point

16   here also, in addition to the fact that the

17   subsidiary's assets are not necessarily the

18   parents, because they have been transferred

19   pursuant to an agreement, the operating agreement

20   of the new Delaware LLC gives Jon complete control

21   over disposition of the assets and, essentially,

22   prevents -- absolves him of any breaches of

23   fiduciary duty in connection with the disposition

24   of those assets.  That is the critical fraud among

25   other things that we were going to demonstrate
```

```
 1        It smells bad to take an action that appears
 2    to be directly designed to undercut the Court's
 3    authority over this entity.
 4        MR. BARNETT:  Your Honor, if I may?
 5        THE COURT:  I forgot your name, sir.
 6        MR. BARNETT:  Craig Barnett.
 7        And I don't mean -- this is not -- this is
 8    perhaps to get to where it sounds like you would
 9    like to go.
10        THE COURT:  I don't know where I want to go.
11    I mean, I'm just giving you my thoughts as to what
12    I would be looking for if we proceed with an
13    evidentiary hearing.
14        MR. BARNETT:  Well, we've already addressed
15    the issue -- Ms. Koff did -- of the not paying the
16    license fees absent a court order.
17        Mr. Logan is in front of this Court.  He is
18    subject to this Court's jurisdiction.  He would
19    agree, again, to a limited order that says that he
20    would not cause the assets that were transferred by
21    Inc. to its subsidiary, LLC, without order of the
22    Court.
23        Again, everything we've done has always been
24    completely transparent and not -- nothing done is
25    designed to deprive this Court of jurisdiction.
```

# EXHIBIT 14

L20000130244

---

_____
(Requestor's Name)

_____
(Address)

_____
(Address)

_____
(City/State/Zip/Phone #)

☐ PICK-UP    ☐ WAIT    ☐ MAIL

_____
(Business Entity Name)

_____
(Document Number)

Certified Copies _____    Certificates of Status _____

Special Instructions to Filing Officer:

J DENNIS

SEP - 1 2023

Office Use Only



600414191146

FILED
SECRETARY OF STATE
2023 SEP -1 PM 1:45

RECEIVED
TALLAHASSEE, FLOR.
2023 SEP -1 PM 1:02

DocuSign Envelope ID: DED1C1BF-787E-408A-A718-720DDE229EB0



**Articles of Conversion**
for
**Loco Florida LLC**
(a Florida limited liability company)
into
**Loco Florida LLC**
(a Delaware limited liability company)

The Articles of Conversion are submitted to convert the following Florida Limited Liability Company into an "Other Business Entity" in accordance with § 605.1045, Florida Statutes.

1. The name of the Florida Limited Liability Company converting into the "Other Business Entity" is:

   **Loco Florida LLC**

2. The name of the "Converted or Other Business Entity" is:

   **Loco Florida LLC**

3. The "Converted or Other Business Entity" is a limited liability company formed under the laws of the State of Delaware.

4. The plan of conversion was approved by the converting Florida Limited Liability Company in accordance with Chapter 605, F.S.

5. This conversion shall be effective in Florida on September 1, 2023.

6. Below is the street and mailing address of an office the Florida Department of State may send and for process served on the department pursuant to 605.0117 and Chapter 48:

   Jonathan D. Logan
   10491 72nd St
   Seminole, FL 33777

7. The "Converted or Other Business Entity" has agreed to pay any members having appraisal rights the amount to which such members are entitled under § 605.1006 and 605.1061-605.1072, F.S.

IN WITNESS WHEREOF, the undersigned authorized representative of Loco Florida LLC, has executed these Articles of Conversion as of this 1st day of September, 2023.

Jonathan D. Logan
Authorized Representative

# EXHIBIT 15

L220000096409

_____
(Requestor's Name)

_____
(Address)

_____
(Address)

_____
(City/State/Zip/Phone #)

[ ] PICK-UP      [ ] WAIT      [ ] MAIL

_____
(Business Entity Name)

_____
(Document Number)

Certified Copies _____      Certificates of Status _____

Special Instructions to Filing Officer.

Office Use Only



200411739622



FILED
2023 AUG 29 PM 1: 03
Secretary of State
TALLAHASSEE, FLORIDA

RECEIVED
2023 AUG 29 PM 3: 18
Secretary of State
TALLAHASSEE, FLORIDA

# CT CORP
**(850)656-4724**
**3458 Lakeshore Drive,**
**Tallahassee, FL 32312**

**Date:** _08/29/2023_

Acc#I20160000072

| Name: | Smart Communications Yacht Holding, LLC |
|---|---|
| Document #: | |
| Order #: | 15099736 |

| Certified Copy of Arts & Amend: | ☐ | |
|---|---|---|
| Plain Copy: | ☐ | |
| Certificate of Good Standing: | ☐ | |
| Certified Copy of | ☐ | |
| Apostille/Notarial Certification: | ☐ | Country of Destination: |
| | | Number of Certs: |

| Filing: ☑ | Certified: ☑ | Email Address for Annual Report Notificatio |
|---|---|---|
| | Plain: ☐ | |
| | COGS: ☐ | |

Availability _____

Document _____

Examiner _____

Updater _____

Verifier _____

W.P. Verifier _____

Ref# _____

Amount: $ 55.00

Thank you!

DocuSign Envelope ID: EB90FECE-344A-42C7-B628-C9837E674B8A



**Articles of Conversion**
for
**Smart Communications Yacht Holding, LLC**
(a Florida limited liability company)
into
**Smart Communications Yacht Holding, LLC**
(a Delaware limited liability company)

The Articles of Conversion are submitted to convert the following Florida Limited Liability Company into an "Other Business Entity" in accordance with § 605.1045, Florida Statutes.

1. The name of the Florida Limited Liability Company converting into the "Other Business Entity" is:

**Smart Communications Yacht Holding, LLC**

2. The name of the "Converted or Other Business Entity" is:

**Smart Communications Yacht Holding, LLC**

3. The "Converted or Other Business Entity" is a limited liability company formed under the laws of the State of Delaware.

4. The plan of conversion was approved by the converting Florida Limited Liability Company in accordance with Chapter 605, F.S.

5. This conversion shall be effective in Florida on August 29, 2023.

6. Below is the street and mailing address of an office the Florida Department of State may send and for process served on the department pursuant to 605.0117 and Chapter 48:

> Jonathan D. Logan
> 10491 72nd St
> Seminole, FL 33777

7. The "Converted or Other Business Entity" has agreed to pay any members having appraisal rights the amount to which such members are entitled under § 605.1006 and 605.1061-605.1072, F.S.

IN WITNESS WHEREOF, the undersigned authorized representative of Smart Communications Yacht Holding, LLC, has executed these Articles of Conversion as of this 29th day of August, 2023.

Jonathan D. Logan
Authorized Representative

RLF1 29539693v 1

# EXHIBIT 16

# P15000042874

_____
(Requestor's Name)

_____
(Address)

_____
(Address)

_____
(City/State/Zip/Phone #)

☐ PICK-UP        ☐ WAIT        ☐ MAIL

_____
(Business Entity Name)

_____
(Document Number)

Certified Copies _____     Certificates of Status _____

Special Instructions to Filing Officer:

Office Use Only



600413415166

FILED
2023 AUG 29 PM 12: 45
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

RECEIVED
2023 AUG 29 AM 3: 18
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

# CT CORP

**(850)656-4724**
**3458 Lakeshore Drive,**
**Tallahassee, FL 32312**

**Date:** ___08/29/2023___

Acc#I20160000072

| Name: | HLFIP Holding, Inc. |
|---|---|
| Document #: | |
| Order #: | 15099736 |

| | | |
|---|---|---|
| Certified Copy of Arts & Amend: | ☐ | |
| Plain Copy: | ☐ | |
| Certificate of Good Standing: | ☐ | |
| Certified Copy of | ☐ | |
| Apostille/Notarial Certification: | ☐ | Country of Destination: | |
| | | Number of Certs: | |

| Filing: | ☑ | Certified: | ☑ | Email Address for Annual Report Notificatio |
|---|---|---|---|---|
| | | Plain: | ☐ | |
| | | COGS: | ☐ | |

Availability _____
Document ___
Examiner _____
Updater _____
Verifier _____
W.P. Verifier _____
Ref# _____

Amount: $   43.75

Thank you!

DocuSign Envelope ID: EB90FECE-344A-42C7-B628-C9837E674B8A

**Articles of Conversion**
for
**HLFIP Holding, Inc.**
(a Florida corporation)
into
**HLFIP Holding, LLC**
(a Delaware limited liability company)

FILED

2023 AUG 29 PM 12: 45

TALLAHASSEE, FLORIDA

The Articles of Conversion are submitted to convert the following Florida Profit Corporation into a business entity formed under the laws of another jurisdiction in accordance with § 607.11933, Florida Statutes.

1. The name of the Florida Profit Corporation converting into the (converted) resulting business entity is:

   **HLFIP Holding, Inc.**

2. The name of the resulting business entity is:

   **HLFIP Holding, LLC**

3. The (converted) resulting business entity is a limited liability company formed under the laws of the State of Delaware.

4. The above referenced Florida Profit Corporation has converted into another business entity in compliance with Chapter 607, F.S.

5. The plan of conversion was approved by the converting Florida Profit Corporation in accordance with Chapter 607, F.S.

Pursuant to s. 607.11933(4)(6) F.S. The conversion becomes effective at the later of:
   1. The date and time provided by the organic law of the (converted) resulting entity: or
   2. When the articles of conversion take effect.

IN WITNESS WHEREOF, the undersigned officer of HLFIP Holding, Inc. has caused these Articles of Conversion to be executed on this 29th day of August, 2023.

Jonathan D. Logan
President

# EXHIBIT 17

**2023 FLORIDA PROFIT CORPORATION ANNUAL REPORT**

DOCUMENT# P15000042874

**Entity Name:** HLFIP HOLDING, INC.

**FILED**
**Apr 27, 2023**
**Secretary of State**
**7649719824CC**

**Current Principal Place of Business:**

10491 72ND ST.
SEMINOLE, FL 33777

**Current Mailing Address:**

10491 72ND ST.
SEMINOLE, FL 33777 US

**FEI Number: 82-4804509**                          **Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

TURKEL CUVA BARRIOS, PA
100 N. TAMPA STREET
1900
TAMPA, FL 33602 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:  BRAD BARRIOS                                                04/27/2023

                Electronic Signature of Registered Agent                                Date

**Officer/Director Detail :**

| | | | | |
|---|---|---|---|---|
| Title | P | | Title | VP |
| Name | LOGAN, JONATHAN D. | | Name | LOGAN, JONATHAN D |
| Address | 10491 72ND ST. | | Address | 10491 72ND ST. |
| City-State-Zip: | SEMINOLE FL 33777 | | City-State-Zip: | SEMINOLE FL 33777 |
| | | | | |
| Title | S | | Title | T |
| Name | LOGAN, JONATHAN D. | | Name | LOGAN, JONATHAN D. |
| Address | 10491 72ND ST. | | Address | 10491 72ND ST. |
| City-State-Zip: | SEMINOLE FL 33777 | | City-State-Zip: | SEMINOLE FL 33777 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: JONATHAN D. LOGAN                    PRESIDENT              04/27/2023

            Electronic Signature of Signing Officer/Director Detail                        Date

# CONFIDENTIAL EXHIBIT 18

# MEMORANDUM

**To:**   Smart Communications Holding, Inc.

**From:** HLFIP Holding, LLC (formerly HLFIP Holding, Inc.)

**CC:**   File

**Date:** August 29, 2023

**Re:**   Termination of Exclusive Oral License Agreement Between HLFIP Holding, Inc. and
Smart Communications Holding, Inc.

---

This memorandum shall serve as a memorialization that the exclusive oral license (the "License Agreement") granted to Smart Communications Holding, Inc. ("Smart Comm") by HLFIP Holding, Inc. ("HLFIP") for use of any and all intellectual property owned by HLFIP is terminated effective as of August 29, 2023.

Notwithstanding, any of Smart Comm's existing contracts utilizing HLFIP's intellectual property ("Legacy Contracts") that are affected by this termination of the License Agreement will be permitted to continue to use HLFIP's intellectual property until the Legacy Contracts naturally terminate or expire, or the obligations therein to Smart Comm otherwise cease, but the Legacy Contracts may not be extended, renewed, renegotiated, or otherwise expanded in a manner that goes beyond the scope of the existing terms as of August, 29, 2023.

Additionally, given the current status of outstanding requests for proposals and participation in bidding efforts, Smart Comm may continue to market and offer the licensed intellectual property up to March 31, 2024 (the "Transitory Period"). At the end of the Transitory Period, unless otherwise extended, Smart Comm must cease any and all marketing or offers for sale or use of the licensed intellectual property.

This termination does not release Smart Comm from its obligation to pay any ongoing amounts due pursuant to the License Agreement through the completion and related to the performance of all Legacy Contracts.

Accordingly, any and all rights Smart Comm had to utilize HLFIP's intellectual property covered under the License Agreement is terminated, other than the specific, limited exceptions noted above.

CONFIDENTIAL

SMART_B&R 000531

# CONFIDENTIAL EXHIBIT 19

**Smart Communications Holding, Inc.**

**Consolidated Audited Financial Statements**

**December 31, 2022**

PRIVATE AND CONFIDENTIAL

**Prepared by:**

**M. L. Shreve  CPA, P.C.**
**7781  N. Easy Street**
**Whitehall, Michigan  49461**
**231.894.5559**

**Smart Communications Holding, Inc.**
Table of Contents
December 31, 2022

|  | Page No. |
|---|---|
| **Independent Auditor's Report** | 1 - 2 |
| **Financial Statements** | |
| Consolidated Balance Sheet | 3 |
| Consolidated Income Statement | 4 - 6 |
| Consolidated Statement of Retained Earnings | 7 |
| Consolidated Statement of Cash Flows | 8 |
| Consolidated Notes to Financial Statements | 9 - 13 |

PRIVATE AND CONFIDENTIAL



**MLS**

M.L. Shreve CPA, P.C.
7781 N. Easy Street
Whitehall, Michigan 49461
231.894.5559 (phone)
231.893.2097 (fax)
www.mlshrevecpa.com
mlshrevecpa@frontier.com (email)

October 25, 2023

**Independent Auditor's Report**

To the Board of Directors
Smart Communications Holding, Inc.
Seminole, Florida 33777

*Opinion*

We have audited the consolidated financial statements of Smart Communications Holding, Inc., which comprise the consolidated balance sheet as of December 31, 2022, and the related consolidated statements of income, retained earnings, and cash flows for the year then ended, and the related notes to the consolidated financial statements.

In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the financial position of Smart Communications Holding, Inc. as of December 31, 2022, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

*Basis for Opinion*

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Financial Statements section or our report. We are required to be independent of Smart Communications Holding, Inc. and to meet our other ethical responsibilities, in accordance with the relevant ethical requirements relating to our audit. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

*Responsibilities of Management for the Consolidated Financial Statements*

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the consolidated financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about Smart Communications Holding, Inc.'s ability to continue as a going concern within one year after the date that the consolidated financial statements are available to be issued.

*1*

CONFIDENTIAL
SMART_B&R 000304

*Auditor's Responsibilities for the Audit of the Consolidated Financial Statements*

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with generally accepted auditing standards will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the consolidated financial statements.

In performing an audit in accordance with generally accepted auditing standards, we:

Exercise professional judgment and maintain professional skepticism throughout the audit.

Identify and assess the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements.

Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances but not for the purpose of expressing an opinion on the effectiveness of Smart Communications Holding, Inc.'s internal control. Accordingly, no such opinion is expressed.

Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the consolidated financial statements.

Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about Smart Communications Holding, Inc.'s ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control-related matters that we identified during the audit.

*M. L. Shreve CPA, P.C.*

M. L. Shreve CPA, P.C.
Whitehall, Michigan  49461

2

CONFIDENTIAL
SMART_B&R 000305

**Smart Communications Holding, Inc.**
*Consolidated Balance Sheet*
December 31, 2022

## ASSETS

| | | | |
|---|---|---:|---:|
| **Current Assets** | | | |
| Cash and Cash Equivalents | $ | 865,720 | |
| Accounts Receivable - Trade | | 462,259 | |
| Federal Corporate Income Tax Receivable | | 1,375,000 | |
| Florida Corporate Income Tax Receivable | | 459,114 | |
| Technology Grant Advance | | 37,539 | |
| Prepaid Expenses | | 723,934 | |
| Inventory | | 690,704 | |
| **Total Current Assets** | | $ | 4,614,270 |
| **Fixed Assets** | | | |
| Buildings | | 5,071,155 | |
| Kiosk Computer System | | 2,987,602 | |
| Computer Software | | 2,987,876 | |
| Leasehold Improvements | | 355,751 | |
| Vehicles | | 2,682,697 | |
| Display System & Demo Build | | 43,780 | |
| Equipment | | 599,469 | |
| Furniture | | 163,692 | |
| | | 14,892,022 | |
| Less: Accumulated Depreciation | | (7,158,755) | |
| **Property & Equipment, Net** | | | 7,733,267 |
| **Other Assets** | | | |
| Shareholder Loans | | 2,914,086 | |
| Affiliated Entities Receivable | | | |
| Smart Communications Yacht Holding LLC | | 5,505,639 | |
| Mailguard Federal Inc | | 1,746,369 | |
| Loco Florida LLC | | 1,358,011 | |
| HLFIP | | 169,685 | |
| **Total Other Assets** | | | 11,693,790 |
| **TOTAL ASSETS** | | $ | 24,041,327 |

## LIABILITIES AND EQUITY

| | | | |
|---|---|---:|---:|
| **LIABILITIES** | | | |
| **Current Liabilities** | | | |
| Accounts Payable | $ | 1,277,645 | |
| Accrued Credit Cards | | 182,611 | |
| Accrued Commissions | | 971,993 | |
| Accrued Facility Tech Grant | | 142,998 | |
| Accrued Expenses | | 201,592 | |
| Current Portion - Long Term Debt | | 589,405 | |
| **Total Current Liabilities** | | $ | 3,366,244 |
| **Long Term Liabilities** | | | |
| Lattice Technology License | | 665,000 | |
| Note Payable - HLFIP | | 52,848,813 | |
| Interest Payable - HLFIP | | 5,592,170 | |
| Notes Payable - Vehicles | | 59,714 | |
| Less Current Portion | | (589,405) | |
| **Total Long Term Debt** | | | 58,576,292 |
| **Total Liabilities** | | | 61,942,536 |
| **EQUITY** | | | |
| Common Stock | | 448,988 | |
| Paid In Capital | | 392,151 | |
| Retained Earnings | | (38,742,328) | |
| **Total Equity** | | | (37,901,209) |
| **TOTAL LIABILITIES AND EQUITY** | | $ | 24,041,327 |

*See Notes to Consolidated Financial Statements.*

3

CONFIDENTIAL
SMART_B&R 000306

**Smart Communications Holding, Inc.**
*Consolidated Statement of Income*
**For the year ended December 31, 2022**

| Revenue | | |
|---|---|---|
| Mail Services Income | $ | 4,512,000 |
| Messaging Sales | | 25,801,718 |
| Telephone Call Sales | | 9,982,532 |
| Telephone Service Fees | | 4,388,973 |
| Trust Account Funding Fees | | 37,076 |
| Miscellaneous Income | | 93,375 |
| | | 44,815,675 |
| Less Reurns and Allowances | | (35,341) |
| | | 44,780,334 |
| **Total Cost of Sales** | | (25,540,158) |
| **Gross Profit** | | 19,240,176 |
| | | |
| **Total Operating Expenses** | | (32,041,827) |
| | | |
| **Income /Loss from Operations** | | (12,801,651) |
| | | |
| **Other Income and (Expense)** | | |
| Interest Expense | $ | (461,010) |
| Penalties and Late Fees | | (22,137) |
| | | (483,147) |
| **Net Other Income and (Expense)** | | (483,147) |
| | | |
| **Net Income (Loss) for the Year** | $ | (13,284,798) |

*See Notes to Consolidated Financial Statements*                    *4*

PRIVATE AND CONFIDENTIAL

**Smart Communications Holding, Inc.**
*Consolidated Statement of Income - Cost of Sales*
**For the year ended December 31, 2022**

| Cost of Sales | | | |
|---|---|---|---|
| Beginning Inventory | $ | | $ 1,894,859 |
| Computer and Tablet Purchases | 3,716,300 | | |
| Software Purchases | 171,080 | | |
| Technology Grant & Services - Facilities | 214,397 | | |
| Equipment Design | 70,000 | | |
| Watch | 144,714 | | |
| Voice Over IP | 224,730 | | |
| Freight and Shipping | 548,212 | | |
| Telecommunications Taxes Expense | 629,686 | | |
| Contractor Services | 1,605,422 | | |
| Facilites Commissions Expense | 11,322,286 | | |
| Salesperson Commissions | 164,193 | | |
| Sublicense Royalty Fees Expense | 23,496 | | |
| Data Sorage & Server Hosting | 167,343 | | |
| Labor - Telephone CC Sales | 616,321 | | |
| Labor - Installations | 258,964 | | |
| Labor - Mail Processing | 466,778 | | |
| Labor - Repairs & Maintenance | 601,662 | | |
| Internet Services | 478,554 | | |
| Merchant Card Fees | 1,625,594 | | |
| Travel | 1,204,257 | | |
| Meals | 82,014 | | |
| | | | 24,336,003 |
| | | | 26,230,862 |
| **Less Ending Inventory** | | | (690,704) |
| **Cost of Sales** | | | **25,540,158** |

PRIVATE AND CONFIDENTIAL

CONFIDENTIAL
SMART_B&R 000308

**Smart Communications Holding, Inc.**
*Consolidated Statement of Income - Operating Expenses*
**For the year ended December 31, 2022**

| Description | | Amount |
|---|---|---|
| Advertising and Promotions | $ | 187,879 |
| Bank Service Fees | | 6,804 |
| Depreciation Expense | | 1,636,576 |
| Health Insurance | | 369,967 |
| Workman Compensation Insurance | | 22,601 |
| Business Insurance Expense | | 331,853 |
| Outside Services | | 9,744 |
| Dues and Subscriptions | | 98,821 |
| Computer Expenses | | 162,968 |
| Professional Fees | | 110,937 |
| Regulatory and Registration Fees | | 587,094 |
| Legal Fees | | 2,562,058 |
| IP License Fees | | 17,874,783 |
| Officer Compensation | | 160,385 |
| Wages and Salaries | | 4,814,980 |
| Payroll Taxes Expense | | 568,542 |
| Payroll Service Fees | | 79,354 |
| Property Taxes | | 71,658 |
| Repairs and Maintenance | | 472,332 |
| Rent Expense | | 793,547 |
| Telephone Expense | | 50,197 |
| Contract Labor Expense | | 293,580 |
| Website Design and Maintenance | | 89,318 |
| Client Welfare Expense | | 142,976 |
| Recruitment Fees | | 131,372 |
| Professional Education | | 8,316 |
| Licenses and Permits | | 162 |
| Charitable Contributions | | 19,340 |
| Employee Welfare Expense | | 7,708 |
| Meals and Entertainment | | 144,538 |
| Office Expense | | 160,302 |
| Utilities | | 50,197 |
| Postage and Shipping | | 18,982 |
| Other Expenses | | 1,958 |
| **Total Operating Expenses** | | **32,041,827** |

*See Notes to Consolidated Financial Statements*    6

CONFIDENTIAL
SMART_B&R 000309

**Smart Communications Holding, Inc.**
*Consolidated Statement of Retained Earnings*
**For the year ended December 31, 2022**

| | | |
|---|---|---:|
| Retained Earnings - Beginning of Year | $ | 15,211,356 |
| Effect on Retained Earnings for Prior Years' IP License Fee Liability and Interest | | (40,668,886) |
| Net Income for the Year | | (13,284,798) |
| Retained Earnings - End of Year | $ | (38,742,328) |

*See Notes to Consolidated Financial Statements.*    **7**

CONFIDENTIAL
SMART_B&R 000310

**Smart Communications Holding, Inc.**
**Consolidated Statement of Cash Flows**
**For the year ended December 31, 2022**

| | | |
|---|---|---:|
| **Cash Flows from (Provided to) Operating Activities** | | |
| Net Income (Loss) form Operations | $ | (13,284,798) |
| Adjustments to reconcile increase in net assets | | |
| to net cash provided by (used in) operating activities: | | |
| Depreciation | | 1,636,576 |
| | | (11,648,222) |
| (Increase) Decrease in operating assets: | | |
| Accounts Receivable | | (223,173) |
| Corporate Taxes Receivable | | (1,624,177) |
| Employee Advances Receivable | | 7,149 |
| Other Receivables | | (9,364,949) |
| Prepaid Expenses | | (49,434) |
| Prepaid Corporate Taxes | | (345,697) |
| Inventory | | 1,203,684 |
| Deferred Taxes | | 90,269 |
| Increase (Decrease) in operating liabilities: | | |
| Accounts Payable | | (53,465) |
| Accrued Credit Cards Payable | | 79,693 |
| Accrued Expenses | | 278,863 |
| Accrued Federal Income Taxes | | (20,153) |
| Accrued Payroll and Withholdings | | 72,115 |
| Current Portion of Long Term Debt | | 235,595 |
| **Net Cash Flows from (Provided to) Operating Activities** | | (21,361,902) |
| | | |
| **Cash Flows From ( Provided to) Investing Activities** | | |
| Purchase of Fixed Assets - net | | (1,237,874) |
| **Net Cash Flows From (Provided to) Provided to Investing Activities** | | (1,237,874) |
| **Cash Flows From (Provided to) Financing Activities** | | |
| Note Payable - IP License Fee | | (58,440,984) |
| Payments on Notes Payable | | 18,060,844 |
| **Net Cash Flows from (Provided to) Financing Activities** | | 18,060,844 |
| | | |
| **Net Increase (Decrease) in Cash From Operating Activities** | | (4,538,932) |
| | | |
| Cash and Cash Equivalents at Beginning of Year | | 5,404,652 |
| | | |
| **Cash and Cash Equivalents at End of Year** | $ | 865,720 |

Interest Expense for the year was in the amount of $ 461,010.
Taxes Paid for the year was in the amount of $ 1,813,961.

*See Notes to Consolidated Financial Statements*                                    8

CONFIDENTIAL
SMART_B&R 000311

**Smart Communications Holding, Inc.**
**Notes to Consolidated Financial Statements**
**For the year ended December 31, 2022**
=============================================================================

## Note A – Significant Accounting Policies

*Basis of Consolidation*
The consolidated financial statements include the financial statements of Smart Communications, U.S, Inc.; Smart Communications, Pasco, Inc.; and Smart Communications, Collier, Inc. Smart Communications Holding, Inc, owns 100 % of these companies. All transactions between Smart Communications Holding, Inc. and subsidiaries have been eliminated in the consolidated financial statements.

*Concentration of Credit Risk*
The Company normally maintains sufficient cash to meet its anticipated working capital needs. Cash in deposit accounts may, at times, exceed the Federal Deposit Insurance Corporation (FDIC) insured limit in the amount of $ 250,000. However, The Company has not experienced any losses in such accounts and therefore believes it is not exposed to any significant credit risk in these accounts.

*Cash and Cash Equivalents*
For purposes of the statement of cash flows, the Company considers all highly liquid investments, generally those assets readily convertible to known amounts of cash with a maturity of three months or less, to be cash equivalents.

*Accounts Receivable*
Accounts Receivable are customer obligations due under normal trade conditions that have been received after the year end but attributable to the current year. The Company considers these accounts receivable to be fully collectible; accordingly, no allowance for doubtful accounts is required. If amounts become uncollectible, they are charged to operations when that determination is made.

*Inventory*
Inventory consists of tablets, kiosks, and various computer parts and accessories, and is stated at the lower of cost or market using the first-in, first-out method.

*Property and Equipment*
Property and equipment is stated at cost less accumulated depreciation. Provisions for depreciation of assets are computed using the straight-line at rates which are intended to amortize the cost of such assets over their useful lives which range from 5 to 40 years. Leasehold Improvements are amortized over the service lives of the improvements, generally 40 years.

*Revenue Recognition*
Revenues are generally recognized when realized or realizable, and when earned (generally when goods are transferred or services rendered), no matter when payment is received. The Company recognizes revenue from messaging services at the point of sale, net of sales taxes (if any). Service contract revenue is recognized when the service is performed.

The Company adopted FASB ASC 606, *Revenues from Contracts with Customers*, which amended the existing standards for revenue recognition. The adoption of this new revenue standard does not have a significant impact on the amount and timing of revenue recognized in the Company's financial statements. Based on the Company's evaluation process and review of its contracts with customers, the timing and amount of revenue recognized previously is consistent with how revenue is recognized under the new standard. No changes were required to reported revenues as a result of the adoption of FASB ASC 606.

*9*

CONFIDENTIAL
SMART_B&R 000312

**Smart Communications Holding, Inc.**
**Notes to Consolidated Financial Statements**
**For the year ended December 31, 2022**
================================================================

## Note A – Significant Accounting Policies (continued)

*Use of Estimates*

These financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America. Management is required to make certain estimates and assumptions that affect amounts reported in the financial statements. Actual results may differ from these estimates.

*Advertising Costs*

Advertising costs are charged to operations when incurred. For the year ended December 31, 2022, advertising expense amounted to $ 187,879.

## Note B – Property and Equipment

Property and equipment are stated at cost. All property and equipment and leasehold improvements are depreciated on the straight-line method. Repairs and maintenance of property and equipment are charged to operations, and major improvements are capitalized. Upon retirement, sale or other disposition of assets, the costs and accumulated depreciation are eliminated from the accounts, and any resulting gain or loss is included in operations.

For the year ended December 31, 2022, property and equipment consists of the following:

| Description | Cost | | 2022 Depreciation | | 12.31.2022 Accumulated Depreciation | | Net Book Value |
|---|---|---|---|---|---|---|---|
| Kiosk Computer System | $ 2,987,602 | $ | 313,349 | $ | 2,690,779 | $ | 296,823 |
| Computer Software | 2,987,876 | | 589,406 | | 2,370,375 | | 617,501 |
| Vehicles | 2,682,697 | | 512,738 | | 1,354,744 | | 1,327,953 |
| Display System | 21,280 | | 4,256 | | 17,277 | | 4,003 |
| Demo Build | 22,500 | | 1,400 | | 20,283 | | 2,217 |
| Furniture and Fixtures | 163,692 | | 24,972 | | 114,552 | | 49,140 |
| Buildings | 5,071,155 | | 95,780 | | 244,189 | | 4,826,966 |
| Leasehold Improvements | 355,751 | | 9,037 | | 26,860 | | 328,891 |
| Mail Service Equipment | 414,217 | | 59,174 | | 241,627 | | 172,590 |
| Equipment | 185,252 | | 26,464 | | 78,069 | | 107,183 |
| | $ 14,892,022 | $ | 1,636,576 | $ | 7,158,755 | $ | 7,733,267 |

All property is depreciated using the straight-line method. Furniture and fixtures, computer software, demos, kiosks, and vehicles are depreciated over 5 years. Buildings and leasehold improvements are depreciated over 39 years, and machinery and equipment are depreciated over 7 years. Assets commence depreciation as of the first full month of usage.

*10*

CONFIDENTIAL
SMART_B&R 000313

**Smart Communications Holding, Inc.**
**Notes to Consolidated Financial Statements**
**For the year ended December 31, 2022**
=================================================================

**Note D – Loans To Shareholder**

At December 31, 2022, a 50 % shareholder owed the Company loans in the amount of $ 2,914,086. No interest has been accrued on the loans.

**Note E – Affiliated Entities**

As of December 31, 2022, the Company has accounts receivable from the following affiliated entities:

| Description | | Amount |
|---|---|---|
| Smart Communications Yacht Holding LLC | $ | 5,505,639 |
| Mailguard Federal, Inc. | | 1,746,369 |
| LOCO Florida, LLC | | 1,358,011 |
| HLFIP | | 169,685 |
| | $ | 8,779,704 |

**Note F – Subsequent Events**

Management has evaluated subsequent events through October 25, 2023, the date financial statements were available to be issued. No events occurred or are pending through this date which would have a material effect on the financial statements or require disclosure in the financial statements, except as noted in Footnote Disclosure Note I

**Note G – Long Term Debt**

On May 19, 2020, the Company purchased three Ford Trucks at a total financing cost of $ 93,319.44. Payments on this loan commenced as of July 3, 2020 in the amount of $ 622.02 per truck, including interest at the annual rate of 7.2900%, payable monthly for 60 months for each truck. Final payment on this loan is due on June 3, 2025. As of December 31, 2022, the principal balance on the vehicle loan is in the amount of $ 59,713.92. Interest expense on this loan for the year ended December 31, 2022 is in the amount of $ 2,988.00

As of January 1, 2019, The Company entered into a Technology License Agreement with LATTICE Incorporated. The Agreement is a Licensing Agreement with LATTICE Software wherein Smart Communications Holding, Inc. pays LATTICE a license fee, in the amount of $ 2,850,000.00 payable in monthly installments of $ 47,500.00 for sixty (60) consecutive months beginning on February 1, 2019. Upon payment in full of the License fee, Smart Communications Holding, Inc. shall pay LATTICE an annual royalty payment of $ 100.00 each year (the "Royalty Fee"). The Royalty Fee shall be due on or before December 31, of each year beginning in 2025 and shall continue until the Licensing Agreement is terminated.

As of December 31, 2022, the Company owed the balance due to LATTICE on the Licensing Agreement is in the amount of $ 665,000.

*11*

**Smart Communications Holding, Inc.**
**Notes to Consolidated Financial Statements**
**For the year ended December 31, 2022**
========================================================================

**Note H – Income Taxes**

Income taxes are provided for the tax effects of transactions reported in the financial statements and consist of taxes currently due. The Company is required to recognize, measure, classify and disclose in the consolidated financial statements uncertain tax positions taken or expected to be taken in the Company's tax returns. Management has determined that the Company does not have any uncertain tax positions and associated unrecognized benefits that materially impact the consolidated financial statements or related disclosures. Since tax matters are subject to some degree of uncertainty, there can be no assurance that the Company's tax returns will not be challenged by the taxing authorities and that the Company will not be subject to additional tax, penalties, and interest as a result of such challenge. Penalties and interest assessed by income taxing authorities would be included in operating expenses.

The Company is taxed as a C Corporation under the Internal Revenue Code. For the year ended December 31, 2022, the Company incurred a net operating loss in the amount of $ 12,710,042, a carryover of disallowed business interest expense, and charitable contributions in the amount of $ 19,340.

**NOTE I – Intellectual Property License**

Smart Communications Holding, Inc. provides specialized prison inmate communication technologies. A related entity, HLFIP Holding, Inc. is the owner of proprietary intellectual property, patents, trademarks, and other know how that provides the specialized communications systems (collectively known as "HLFIP IP") which connect prison inmates, correctional facility administration, courts, attorneys, and families. As such, the HLFIP IP improves the lives and safety of the incarcerated inmates, correctional facility staff, and others involved in the delivery of those specialized communications services, as well as the elimination of contraband in postal mail at correctional facilities.

HLFIP Holding, Inc. provides Smart Communications Holding, Inc. an exclusive license of its HLFIP IP for distribution and use at correctional facilities across the United States of America. During and for the year ended December 31, 2022, Smart Communications Holding, Inc. sublicensed the HLFIP IP to Smart Communications Collier, Inc. (a ubsidiary company) for distribution and use at those correctional facilities. HLFIP is the licensor and Smart Communications, Holding, Inc. is the exclusive licensee of HLFIP IP, for which a royalty rate is charged by HLFIP to the Company. The royalty rate of 40 % of net sales was charged for the HLFIP IP. The royalty rate was determined by measurement of and comparison to independent  agreements, using the method known as the Comparable Uncontrolled Transaction ("CUT"), which was selected as the best method under Internal Revenue Code Section 482 and its Treasury Regulations Section 1.482-4(c)(2). Accordingly, Smart Communications Holding, Inc. (via its subsidiary, Smart Communications Collier, Inc.) reported an IP license expense, in the amount of $ 17,874,784 for the year ended December 31, 2022. Additionally, the Company reported interest in the amount of $ 446, 870, calculated at the rate of 5 % for one-half of the year, 2022.

The Company has also reflected the prior years' use of the HLFIP IP license for the years of  2015 – 2021 as a long-term liability in the amount of $ 52,848,813, and accrued interest of $ 5,592,170. Retained earnings has been adjusted to reflect effects of this inclusion for prior year use of the HLFIP license.

*12*

CONFIDENTIAL
SMART_B&R 000315

# EXHIBIT 20

# Electronic Articles of Incorporation For

**P14000102324**
**FILED**
**December 29, 2014**
**Sec. Of State**
cgolden

SMART COMMUNICATIONS HOLDING, INC.

The undersigned incorporator, for the purpose of forming a Florida profit corporation, hereby adopts the following Articles of Incorporation:

## Article I

The name of the corporation is:

SMART COMMUNICATIONS HOLDING, INC.

## Article II

The principal place of business address:

4522 N. B STREET
TAMPA, FL.   33609

The mailing address of the corporation is:

4522 N. B STREET
TAMPA, FL.   33609

## Article III

The purpose for which this corporation is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The number of shares the corporation is authorized to issue is:

10,000

## Article V

The name and Florida street address of the registered agent is:

ALEXIS K LOGAN
515 E. LAS OLAS BLVD.
SUITE 120
FT. LAUDERDALE, FL.   33301

I certify that I am familiar with and accept the responsibilities of registered agent.

Registered Agent Signature:   ALEXIS LOGAN

SMART_B&R 000459

P14000102324
FILED
December 29, 2014
Sec. Of State
cgolden

# Article VI

The name and address of the incorporator is:

ALEXIS LOGAN
515 E. LAS OLAS BLVD.
SUITE 120
FT. LAUDERDALE, FL 33301

Electronic Signature of Incorporator:   ALEXIS LOGAN

I am the incorporator submitting these Articles of Incorporation and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S.  I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of this corporation and every year thereafter to maintain "active" status.

# Article VII

The initial officer(s) and/or director(s) of the corporation is/are:

Title:  P
ALEXIS K LOGAN
4522 N. B STREET
TAMPA, FL.  33609

Title:  VP
JAMES P LOGAN
4522 N. B ST.
TAMPA, FL.  33609

Title:  S
ALEXIS K LOGAN
4522 N. B ST.
TAMPA, FL.  33609

Title:  T
JAMES P LOGAN
4522 N. B ST.
TAMPA, FL.  33609

# Article VIII

The effective date for this corporation shall be:

12/24/2014

SMART_B&R 000460

# EXHIBIT 21

Message

**From**: jim.logan@smartcommunications.us [jim.logan@smartcommunications.us]
**Sent**: 9/18/2022 8:06:08 PM
**To**: Jim Logan [jim.logan@smartcommunications.us]; janice logan [myjesse@hotmail.com]; Alexis Logan [alexis@baytobaylegal.com]; jspeters11@gmail.com
**Subject**: letter to Jon

September 18, 2022

Jon,

In response to your September 12, 2022 Confidential email;

The "Shareholders Agreement" sent to you is the very same as was delivered to you over a year ago.  You have had ample adequate time to review or hire an attorney to modify. It is a mutual agreement (same terms for both of us) sent to you for your protection in the event my surgery goes poorly tomorrow.

In an attempt to respond to your emailed statements and concerns, I will attempt to go line by line.

"You don't agree to be a 50/50 partner."

Your emotional stated does not determine the percentage of ownership.  The Share Transfer Agreement for Smart Communications Holding, Inc. was drafted by Kristen Keene of Carlton Fields as our corporate attorney. You signed this agreement on August 30, 2017 and were issued 50% of the shares and I was issued 50% of the shares. There have never been any agreements or documents amending our 50%/50% ownership agreement.  Our ownership doesn't change based on behavior, be it yours or mine.

No partnerships are equal all the time. At the inception of this corporation and for several years thereafter, you couldn't even use a computer legally and you haven't even visited a jail until the last few years. Perhaps you remember the familiar phone call you would make asking "Is there anything I should be doing?"

When we got out second contract the Corp had no money. I went and established a banking relationship and I secured financing for the next group of contracts by pledging personal and inheritance assets. When your mother and I sold our house, the proceeds of approximately $297,000 went to pay our corporate loan at Englewood Bank. I have never even asked for it back from the company.

There is a lot you either choose to forget or just never paid attention to. Yeah, you are right, sometimes a partnership isn't fair!

You are offering me a $5,000,000 buyout plus I can keep my house in exchange for my 50% share of the company, or, you are OK with keeping me on payroll at $250-$500K if I prefer?? As I read your offer it looks like your offer is one or the other??

Let's look at them separately. Starting with my house. Purchase price of $2,650,000.  What's interesting here is I brought $1,000,000 in profit from the sale of my last house in Mount Dora plus the $200,000 I put down personally and maybe I should get the $297,000 from my last house that the company has had use of for the last decade with 0% interest. Total those and I put in my own equity of $1,500,000 on a $2,650,000 purchase.

Plaintiffs0001178

You are graciously going to let me keep it??!!  In addition to keeping my house you would pay me $5,000,000??

We have had company value estimates from Truists and UBS a few months ago in the $500,000,000 range. You have the documents.

That means you are offering me 1% of value of the company as valued by experts in exchange for my 50% shares. Jon keeps $495,000,000, Jim keeps $5,000,000.

The offer to make me a high-priced consultant is interesting as well, but I get your strategy on the next line where you state     "I don't believe you will be alive much longer."  You back that up a little later where I believe you threaten to kill me if I don't accept your terms. I do want to note the generous consulting fee as to date, I still receive $50,000. per year salary very steady for the past 10 years.

"Past the point in life and the pain and abuse for 40 years."

You are certainly entitled to your opinion.  Some might say you are certainly forgetting you first 25 years.  You are forgetting your life of absolute indulgence. As a child you wanted for nothing,  You were constantly indulged with motorcycles, 4-wheelers, snowmobiles and jet-ski's, including young teen race bikes, a motorhome and a race trailer, personal trainers, personal mechanics and race sponsors. Your mother and I even paid someone to do your school homework so you could race motorcycles.

Young Adult- Your mother and I purchased for you a new construction house in Ocala, you are racing motorcycles for a "living" and supporting a family amazingly without a job. Don't forget the new F-150 for you and even a Lincoln for her! You then later pursue a Pro career traveling around the country. Privateer race team. It is hard to imagine how you accomplished all you did given the outrageous behavior and abuse you have apparently endured.

The next section you describe your pain and how many chances you have given your so-called Father. Your so-called-father objects to your characterizations of you giving chances and ongoing betrayal. Nowhere is it written that you the child is given chances you use like tokens.  You are not my ruler, boss, employer, or even moral compass. You exhibit a total lack of respect for anyone and yet demand it of others.  You exhibit nothing but disdain for your parents and have from an early age. It's interesting but disappointing as we have been your biggest fans.

Now you are offering a "generous buyout" "Get off the back of the guy who started, innovated and has done all the day to day for 13yrs."  If that isn't enough, now you bring the threats.

If I, your mother or your sister try and take anymore from your, "You are preprepared to things the normal human could never Fathom."  Most humans could never fathom a son who says that to his family for any reason, let alone a son sitting atop his $10,000,000 yacht, next to his $2M condo, with a Rolls, a Lamborghini,  and Ferrari parked at his $5,000,000 beach house. Exactly what did your family take from you??

"You are done being taken advantage of" , "Don't test me", "I don't deserve any of this"
" I have been a great son and business partner"

This is not opinion, this is FACT. You have not been a great Son. In fact, you have been anything but.

Plaintiffs0001179

You have been and continue to be both verbally and physically abusive to me and your mother. You have broken into our home and held us at gunpoint demanding that I sign my shares over to you. You have vandalized our cars and belongings. Great Son??

Great news Son! I am as done with you as you are with me.

I don't know how you have talked yourself into this great myth about an abusive family and your heroic rise above it, but it is certainly a myth.  You are the richest young man I know, but instead of enjoying it, you are wallowing in some fairytale about abuse and betrayal.

Want to experience betrayal? Meet my Son!!

Good news, I have lots of opportunities to sell my 50%. Pretty sure it will exceed your 1% offer. If you can find it in yourself to behave like an adult and wish to discuss this, I am ready.

Be aware: I have recorded every death threat to date. I love you but this is over. The next time you threaten anything I will take swift action.

Your loving Father

Plaintiffs0001180

# EXHIBIT 22



January 20, 2023

Gary M. Miller

111 South Wacker Drive
Chicago, Illinois 60606
**t** 312.704.7700
**d** 312.704.7703
**f** 312.558.1195
gmiller@shb.com

<u>**VIA EMAIL**</u>

Mark M. Wall, Esq.
Eric J. Hall, Esq.
**HILL WARD HENDERSON**
101 East Kennedy Boulevard, Suite 3700
Tampa, FL  33602
mark.wall@hwhlaw.com
eric.hall@hwhlaw.com

**RE:     Smart Communications' Management**

Dear Messrs. Wall and Hall:

We represent Janice Logan ("Janice"), trustee of the James Logan Family Trust dated
February 10, 2021 ("the Trust").  It is our understanding that you represent Jonathan
Logan ("Jon").  I write regarding the Trust's 50% ownership stake in Smart
Communications Holding, Inc. and its affiliates ("Smart Communications").  The Trust is
very concerned about Jon's management of Smart Communications, waste of corporate
assets, threats to injure the company, and threats of violence against Janice and her
family.  The Trust has retained Shook, Hardy & Bacon L.L.P. to investigate these
concerns.  All communications with Janice regarding Smart Communications, whether
from your firm or from Jon, should be directed to our attention.  To be clear:  Our client
does not want Jon to communicate directly with her.

On September 16, 2022, James Logan ("Jim") transferred the 5,000 shares of stock in
Smart Communications Holding, Inc. personally owned by him to the Trust.  As a result
of this transfer, and as your client is fully aware, Smart Communications now has two
owners, each with a 50% stake:  Jon and the Trust.

Shortly before Jim transferred his shares to the Trust, your client tried to pressure Jim to
sell his shares for the low-ball sum of $5 million, and a "250k-500k" contract as a
consultant.  *See* Ex. A (Sept. 12, 2022, email from Jon Logan to Jim Logan).  Trying to
scare Jim into this deal, your client threatened:  "I don't believe you will be alive much
longer. . . .  If you, or Janice or Alexis try and take anymore from me, I am prepared to do
things the normal human could never fathom. . . .  Don't test me . . .  Have that attorney
draft a simple strait [sic] forward agreement with the buyout I listed."  *Id.*



January 20, 2023
Page 2

This threat cannot be taken lightly given Jon's history of violence.  Jon has:  (1) broken into his parent's home and held a gun to Jim's head while ordering him to sign his shares over (*see* Ex. B, September 18, 2022, email from Jim to Jon); (2) vandalized Janice's car (*id.*); (3) been convicted and incarcerated for aggravated stalking; and (4) sent an email to Jim and Janice with the subject line "Burn your fucking house down."[1]

As CEO, President, Treasurer, and Secretary of the Smart Communications entities since at least November 5, 2019, and as 50% owner, Jon owes the Trust fiduciary duties, including the duties of care, loyalty, and good faith.  From what we have seen, it appears your client has not been acting in accordance with those duties.  Among other things, Jon has been using corporate funds to purchase personal assets including yachts, houses, luxury cars, and he has incurred enormous sums on the corporate credit card, which we find inexplicable if the expenses were truly all work related.

On top of this waste, Jon stated a willingness to harm the company for his personal gain.  When trying to pressure Janice to sell the Trust's 50% stake to him, Jon stated that he would, essentially, burn the company down if she did not comply.  Jon told Janice that if she did not sell, he would refuse to sign agreements on behalf of the company.  If he were to go through with this threat, in a very short period of time, the company would be unable to meet its obligations to customers, employees, and vendors.  Jon further threatened to invalidate or otherwise impair corporate patent rights.

This situation is untenable and must be resolved promptly.  The Trust demands that Jon take the following steps immediately:

- Preserve all email accounts associated with Jim Logan and Jon Logan, including but not limited to all email accounts on the @smartcommunications.us servers; and the @smartjailmail.com servers;

- Provide complete, direct access to all Smart Communications entities' email accounts, books and records, including Smart Communications' accounting software application;

- Agree in writing that any corporate dividends or distributions, in any form, will be made on a 50/50 basis between the Trust and Jon;

---

[1]  The body of the email read:  "You think you two have a right to just hide from me!!???  You think you can just hang up the phone on me!??  Jim you piece of fucking shit trash pathetic fake as father mother fucker I'm coming for you right now!  I am coming home right now!"  Ex. C (August 14, 2021, email from Jon Logan to Jim Logan and Janice Logan).

ATLANTA | BOSTON | CHICAGO | DENVER | HARTFORD | HOUSTON | KANSAS CITY | LONDON | LOS ANGELES | MIAMI | NEW YORK |
ORANGE COUNTY | PHILADELPHIA | SAN FRANCISCO | SEATTLE | ST. LOUIS | TAMPA | WASHINGTON, D.C.



January 20, 2023
Page 3

- Convene a shareholder meeting to appoint Janice as (1) director of Smart Communications Holding, Inc. and (2) director of all other Smart Communications entities;

- Thereafter, convene a meeting of the board of directors of Smart Communications Holding, Inc. to appoint Janice as Vice President;

- Following such appointment, add Janice as a signatory to all Smart Communications bank accounts, and require signatures of both Jon and Janice for any corporate payments over $50,000.00;

- Sell the yachts (the 100' Riva Corsaro and the 48' center console Nortech), with 50% of the proceeds to be paid to the Trust; and

- Refrain from threatening or abusing (physically, verbally, or emotionally) Janice and her family.

In addition, the Trust demands that Jon pay to the Trust, within 60 days, an amount equal to half of the purchase price of the below assets purchased by the company for Jon's personal use:

- the 100' Riva Corsaro (roughly $10 million at the time of purchase);

- the 48' center console Nortech (roughly $1 million at the time of purchase);

- the Rolls-Royce (roughly $250,000 at the time of purchase);

- the Lamborghini (roughly $300,000 at the time of purchase);

- the Ferrari (roughly $350,000 at the time of purchase); and

- the Brickell Condo (roughly $1.5 million at the time of purchase).

Since these purchases were, in effect, distributions to one shareholder (Jon), the Trust is entitled to 50% of the amounts paid by virtue of its right to 50% of all company distributions. That amount totals $6.7 million, with appropriate adjustments to account for the foregoing.

If your client should refuse any of these demands, or if he accedes to them and later fails to meet them, the Trust is prepared to seek redress in court. If forced to litigate, the Trust will aggressively pursue any or all of the following:



January 20, 2023
Page 4

- A full accounting by a third-party forensic accounting firm;

- Appointment of a custodian to oversee Smart Communications' operations;

- A restraining order to prevent Jon from diverting funds from Smart Communications in excess of market-rate compensation for his services and distributions paid 50/50 to himself and the Trust; and

- Any other forms of relief allowed by law.

Please provide notice of your client's agreement to the above demands by January 25.

Sincerely,

*/s/ Gary M. Miller*

Gary M. Miller

Attachments

cc:    Janice Logan

# EXHIBIT A

This agreement is ridiculously too complicated I don't even understand it. I'm not stupid or bad with contracts and I can't understand this.

I want it much more simple and direct. All these terms and names that need their own paragraphs of definition is ridiculous.

Additionally, I do not agree to be a 50/50 partner with you. In no way has this been an equal partnership in any way. For 10yrs you have been an on again, off again alcoholic offering zero innovation, sporadic at best management or organization. You creat more problems than you solve with your on again off again alcoholism. It's been extremely toxic and harmful to this entire company and employees as well as me personally.

I am offering you a 5 million dollar buyout, plus keep your house. I am ok with keeping you on payroll at 250k-500k as a consultant if you would prefer.

However I don't believe you will be alive much longer and I don't believe my involvement with you is in my best interest or the company's.

Sometimes in life, you pass the point of no return on some things. I believe you are there with me. I have put up with your abusive, outrageous and heartbreaking alcoholism for 40yrs. I've given you ever chance and then some times 10. You only care about yourself and more than anything, your booze.

I am beyond heartbroken and hurt and just flat out done with you and your lying, addict behavior and the constant let down by my so-called father.

Jim, there comes a point where you can't get another chance, you can't get a redo and you can't come back from. I feel you are there. I've been through it so many times over the years and all you do is betrayed me over and over.

I pray to god you change who you are and get your health and life back and be a normal human again. However I can not and this company can not be a victim to your lies, betrayals and guaranteed let down anymore. Neither me or the company deserves this or can afford it anymore.

I am offering you a generous buyout to a company I started, innovated and continue to carry day in day out for 13years now mostly without you.

Do is both a favor and don't make this get nastier than it already is. I have zero patience left for you and I am not one to fuck with on what I created with sheer willpower and brains. If you, or Janice or Alexis try and take anymore from me, I am prepared to do things the normal human could never fathom. I am done being fucked with, fucked over and put in a corner with my hands tied. No more.

5 million, ongoing salary if you want it, involvement not needed. I will never leave you or my mother or even my ungrateful scamming sister out starving or in a bad place. However, you have broken our bond for the final time.

I want a simple contract and a simple buyout and clean separation. We are not partners. You're an addict and terrible alcoholic, the injustice is reached a point I can no longer deal with anymore.

I close with this. I love you forever, but I don't know who you even are anymore. I have lost my dad years ago to alcoholism. I really hope you fix yourself because you will be dead soon. You have wrecked every relationship around you with your alcoholism. There is a point of no return, you are there with me.

I don't want to remember you this way, however you give me no choice.

Don't make this harder, nastier or hurt more than it already does. I don't deserve any of this. I've been a great son and business partner. You have failed me in every way. Don't fight me. I am done being taken advantage of by anyone, especially my own blood. Don't test me.

Have that attorney draft a simple strait forward agreement with the buyout I listed. Let's get this done this week. Time is of the

Thank you

Jon Logan
CEO- Smart Communications

Begin forwarded message:

> **From:** "Thomas D. Sims" <tsims@jpfirm.com>
> **Date:** September 12, 2022 at 5:42:17 PM EDT
> **To:** jon.logan@smartcommunications.us
> **Cc:** jim.logan@smartjailmail.com
> **Subject: Shareholders' Agreement**

Hello Jon,

I spoke with your father last week regarding the Shareholders' Agreement for the Company that I had drafted a while ago (see attached). In light of his upcoming medical procedure, we thought

it would be best for all parties to finalize the existing draft of the purchase agreement. Accordingly, I am attaching the same for your review and comment. Please let me know if there are any questions/concerns regarding the Agreement. Once finalized, you and your father can execute in order to put it into place.

Thanks,

Tom



**Thomas D. Sims**
Attorney at Law
727-551-4652 Direct | 727-800-5981 Fax
490 1st Ave S, Suite 700, St. Petersburg, FL 33701

# JOHNSON POPE
## BOKOR RUPPEL & BURNS LLP
### COUNSELORS AT LAW

**www.jpfirm.com** | **vCard** | **bio** | **email**   

The information contained in this transmission may be attorney/client privileged and therefore confidential. This information is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, printing or copy of the communication is strictly prohibited. If you receive this transmission in error, or if you are not the individual or entity named above, the receipt of this transmission is not intended to and does not waive any privilege, attorney/client or otherwise. If you have received this communication in error, please notify us by telephone or e-mail. Thank you.

# EXHIBIT B

**From:** jim.logan@smartcommunications.us <jim.logan@smartcommunications.us>
**Sent:** Sunday, September 18, 2022 8:06 PM
**To:** Jim Logan <jim.logan@smartcommunications.us>; janice logan <myjesse@hotmail.com>; Alexis Logan
<alexis@baytobaylegal.com>; jspeters11@gmail.com <jspeters11@gmail.com>
**Subject:** letter to Jon

September 18, 2022

Jon,

In response to your September 12, 2022 Confidential email;

The "Shareholders Agreement" sent to you is the very same as was delivered to you over a year ago.  You have had ample adequate time to review or hire an attorney to modify. It is a mutual agreement (same terms for both of us) sent to you for your protection in the event my surgery goes poorly tomorrow.

In an attempt to respond to your emailed statements and concerns, I will attempt to go line by line.

"You don't agree to be a 50/50 partner."

Your emotional stated does not determine the percentage of ownership.  The Share Transfer Agreement for Smart Communications Holding, Inc. was drafted by Kristen Keene of Carlton Fields as our corporate attorney. You signed this agreement on August 30, 2017 and were issued 50% of the shares and I was issued 50% of the shares. There have never been any agreements or documents amending our 50%/50% ownership agreement.  Our ownership doesn't change based on behavior, be it yours or mine.

No partnerships are equal all the time. At the inception of this corporation and for several years thereafter, you couldn't even use a computer legally and you haven't even visited a jail until the last few years. Perhaps you remember the familiar phone call you would make asking "Is there anything I should be doing?"

When we got out second contract the Corp had no money. I went and established a banking relationship and I secured financing for the next group of contracts by pledging personal and inheritance assets. When your mother and I sold our house, the proceeds of approximately $297,000 went to pay our corporate loan at Englewood Bank. I have never even asked for it back from the company.

There is a lot you either choose to forget or just never paid attention to. Yeah, you are right, sometimes a partnership isn't fair!

You are offering me a $5,000,000 buyout plus I can keep my house in exchange for my 50% share of the company, or, you are OK with keeping me on payroll at $250-$500K if I prefer?? As I read your offer it looks like your offer is one or the other??

Let's look at them separately. Starting with my house. Purchase price of $2,650,000.  What's interesting here is I brought $1,000,000 in profit from the sale of my last house in Mount Dora plus the $200,000 I put down personally and maybe I should get the $297,000 from my last house that the company has had use of for the last decade with 0% interest. Total those and I put in my own equity of $1,500,000 on a $2,650,000 purchase.

You are graciously going to let me keep it??!!  In addition to keeping my house you would pay me $5,000,000??

We have had company value estimates from Truists and UBS a few months ago in the $500,000,000 range. You have the documents.

That means you are offering me 1% of value of the company as valued by experts in exchange for my 50% shares. Jon keeps $495,000,000, Jim keeps $5,000,000.

The offer to make me a high-priced consultant is interesting as well, but I get your strategy on the next line where you state     "I don't believe you will be alive much longer."  You back that up a little later where I believe you threaten to kill me if I don't accept your terms. I do want to note the generous consulting fee as to date, I still receive $50,000. per year salary very steady for the past 10 years.

"Past the point in life and the pain and abuse for 40 years."

You are certainly entitled to your opinion.  Some might say you are certainly forgetting you first 25 years.  You are forgetting your life of absolute indulgence. As a child you wanted for nothing,  You were constantly indulged with motorcycles, 4-wheelers, snowmobiles and jet-ski's, including young teen race bikes, a motorhome and a race trailer, personal trainers, personal mechanics and race sponsors. Your mother and I even paid someone to do your school homework so you could race motorcycles.

Young Adult- Your mother and I purchased for you a new construction house in Ocala, you are racing motorcycles for a "living" and supporting a family amazingly without a job. Don't forget the new F-150 for you and even a Lincoln for her! You then later pursue a Pro career traveling around the country. Privateer race team. It is hard to imagine how you accomplished all you did given the outrageous behavior and abuse you have apparently endured.

The next section you describe your pain and how many chances you have given your so-called Father. Your so-called-father objects to your characterizations of you giving chances and ongoing betrayal. Nowhere is it written that you the child is given chances like tokens.  You are not my ruler, boss, employer, or even moral compass. You exhibit a total lack of respect for anyone and yet demand it of others.  You exhibit nothing but disdain for your parents and have from an early age. It's interesting but disappointing as we have been your biggest fans.

Now you are offering a "generous buyout" "Get off the back of the guy who started, innovated and has done all the day to day for 13yrs."  If that isn't enough, now you bring the threats.

If I, your mother or your sister try and take anymore from your, "You are preprepared to things the normal human could never Fathom."  Most humans could never fathom a son who says that to his family for any reason, let alone a son sitting atop his $10,000,000 yacht, next to his $2M condo, with a Rolls, a Lamborghini,  and Ferrari parked at his $5,000,000 beach house. Exactly what did your family take from you??

"You are done being taken advantage of" , "Don't test me", "I don't deserve any of this"
" I have been a great son and business partner"

This is not opinion, this is FACT. You have not been a great Son. In fact, you have been anything but.

You have been and continue to be both verbally and physically abusive to me and your mother. You have broken into our home and held us at gunpoint demanding that I sign my shares over to you. You have vandalized our cars and belongings. Great Son??

Great news Son! I am as done with you as you are with me.

I don't know how you have talked yourself into this great myth about an abusive family and your heroic rise above it, but it is certainly a myth.  You are the richest young man I know, but instead of enjoying it, you are wallowing in some fairytale about abuse and betrayal.

Want to experience betrayal? Meet my Son!!

Good news, I have lots of opportunities to sell my 50%. Pretty sure it will exceed your 1% offer. If you can find it in yourself to behave like an adult and wish to discuss this, I am ready.

Be aware: I have recorded every death threat to date. I love you but this is over. The next time you threaten anything I will take swift action.

Your loving Father

# EXHIBIT C

**From:** Jon <jon.logan@smartcommunications.us>
**Sent:** Saturday, August 14, 2021 11:24 AM
**To:** Jim Logan <jim.logan@smartcommunications.us>; janice logan <myjesse@hotmail.com>
**Subject:** Burn your fucking house down

You think you two have a right to just hide from me!!??? You think you can just hang up the phone on me!?? Jim you piece of fucking shit trash pathetic fake as father mother fucker I'm coming for you right now! I am coming home right now!

Thank you

Jon Logan
CEO- Smart Communications

# EXHIBIT 23

DocuSign Envelope ID: EB90FECE-344A-42C7-B628-C9837E674B8A

## CERTIFICATE OF FORMATION

### OF

### SMART COMMUNICATIONS HOLDING, LLC

This Certificate of Formation of Smart Communications Holding, LLC (the "LLC"), dated as of August 29, 2023, is being duly executed and filed by the undersigned, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del.C. §18-101, et seq.).

FIRST.   The name of the limited liability company is Smart Communications Holding, LLC.

SECOND.   The address of the registered office of the LLC in the State of Delaware is c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

THIRD.   The name and address of the registered agent for service of process on the LLC in the State of Delaware are The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation as of the date first above written.

Name:  Jonathan D. Logan
Title:  Authorized Person

State of Delaware
Secretary of State
Division of Corporations
Delivered  12:42 PM 08/29/2023
FILED  12:42 PM 08/29/2023
SR 20233368539  - File Number  7624778

# CONFIDENTIAL EXHIBIT 24

**CONFIDENTIAL LICENSE AGREEMENT**

# EXCLUSIVE INTERCOMPANY
# INTELLECTUAL PROPERTY LICENSE AGREEMENT

This Exclusive Intercompany Intellectual Property License Agreement ("**Agreement**"), effective as of August 29, 2023 (the "**Effective Date**"), is by and between HLFIP Holding, LLC, a Delaware limited liability company ("**Licensor**") and Smart Communications Holding, LLC, a Delaware limited liability company ("**Licensee**") (collectively, the "**Parties**," or each, individually, a "**Party**").

WHEREAS, Licensor is the sole owner of all right, title, and interest in certain intellectual property, including proprietary technology, patents, patent applications, registered and common law names, trademarks, service marks, logos, federal trademark registrations, and know-how (including those items set forth on **Schedule 1**, which may be supplemented or amended from time to time) aimed at inmate communications technology and services, including to eliminate contraband in postal mail at correctional facilities, improve the safety of inmates and correctional facilities, improve correctional facility and inmate surveillance, and improve communication systems to be used by inmates and their friends and families (collectively, the "**Licensed Intellectual Property**");

WHEREAS, Licensee desires to distribute and sell inmate communication systems and services to correctional facilities in the United States (the "**Business**");

WHEREAS, Licensee specifically acknowledges that Licensor has valuable goodwill associated with its names, trademarks, service marks, and logos used as trademarks in connection with inmate communication systems and services;

WHEREAS, Licensee wishes to license the Licensed Intellectual Property to facilitate Licensee's conduct of the Business;

WHEREAS, Licensor is willing to grant to Licensee an exclusive license to use the Licensed Intellectual Property on the terms set forth herein;

WHEREAS, the parties desire to allocate rights to the intellectual property developed by, or acquired by either of them for inmate communication systems and services developed under this Agreement in accordance with the terms and conditions set forth herein; and

WHEREAS, Licensor and Licensee are commonly controlled.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    License.

    1.1    License Grant. Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee during the Term (as defined below) an exclusive, non-transferable,

## CONFIDENTIAL LICENSE AGREEMENT

non-sublicensable license to make, have made, use, import, export, sell, and offer for sale the Licensed Intellectual Property in connection with the conduct of the Business in the United States and in accordance with standards, specifications, and/or instructions approved by Licensor, from time to time.

   1.2    Ownership. Licensee acknowledges and agrees that Licensor shall retain all right, title, and interest in and to the Licensed Intellectual Property and all rights relating thereto; that the license and rights granted in this Agreement will not be construed to confer any rights upon Licensee by implication, estoppel, or otherwise as to any technology not identified in **Schedule 1;** that all use and goodwill symbolized by and connected with the use of the Licensed Intellectual Property by Licensee shall inure solely to the benefit of Licensor; and that Licensee acquires no ownership right in or to the Licensed Intellectual Property as a result of this Agreement.

   1.3    Prosecution and Maintenance. Licensor has the sole right, in its discretion and at its Licensee's expense, to file, prosecute, and maintain all applications, registrations, and patents relating to the Licensed Intellectual Property. Licensee shall provide, at the request of Licensor and at Licensee's expense, all necessary assistance with such filing, maintenance, and prosecution.

   1.4    Recordation of License. Licensor shall make all necessary filings to record this Agreement in the United States Patent and Trademark Office and in the corresponding offices or agencies where it may be required under applicable law, including as a prerequisite to enforcement of the Licensed Intellectual Property or enforceability of this Agreement in the courts, and any recordation fees and related costs and expenses will be at Licensee's expense.

   1.5    Assignments and Sublicensing. The license hereby granted is and shall be personal to the Licensee, and unless Licensor consents in writing, shall not be assignable by any act of Licensee or by operation of law. Furthermore, the license and rights granted hereunder may not be sublicensed, conveyed, assigned, or otherwise transferred by Licensee to any third party. Any purported sublicense, conveyance, assignment, or transfer will be void and of no force and effect.

   1.6    Prior Exclusive License Agreement. Licensee acknowledges that Licensor previously exclusively licensed the Licensed Intellectual Property to another party, and that under that pre-existing license agreement, the prior licensee executed contracts that extend beyond the Effective Date of this Agreement. Licensee hereby acknowledges that despite Licensor's exclusive license grants to Licensee under this Agreement, Licensor has also agreed to allow the prior licensee to continue to use the Licensed Intellectual Property beyond this Agreement's Effective Date, until the prior contracts naturally expire. Licensee hereby consents to this limited period of overlap of the Licensed Intellectual Property license grants.

   1.7    Reservation of Rights. Licensor hereby reserves all rights not expressly granted to Licensee under this Agreement.

   2.    Use of Licensed Intellectual Property.

2

## CONFIDENTIAL LICENSE AGREEMENT

2.1     <u>Notices</u>. Licensee shall ensure that all use of Licensed Intellectual Property hereunder is accompanied by or marked with the appropriate proprietary rights notices, symbols, and legends as may be reasonably necessary under applicable law to maintain the Licensed Intellectual Property and Licensor's proprietary rights therein and in such order and manner as may be reasonably specified by Licensor. Without limiting the foregoing, Licensee shall comply with the patent marking provisions of 35 U.S.C. § 287(a) by marking all Licensed Products/patented products covered by any Licensed Intellectual Property with the word "patent" or the abbreviation "pat." and either the relevant patent numbers or a web address that is freely accessible to the public and that lists the relevant patent numbers.

2.2     <u>Modifications</u>. As between the Parties, Licensor owns any improvement, enhancement, or other modification of or derivative work based on any of the Licensed Intellectual Property made by or on behalf of Licensee or Licensor (each, a "**Modification**"). Licensee shall immediately notify Licensor of any Modification made by or on behalf of Licensee (each, a "**Licensee Modification**"). Licensee hereby assigns to Licensor all of its right, title, and interest in and to all Licensee Modifications, including all rights to apply for any patents, trademarks, or other intellectual property registrations with respect to such Licensee Modifications and all enforcement rights and remedies for past, present, and future infringement thereof and all rights to collect royalties and damages therefor. All patent applications and trademark applications filed by Licensor with respect to any such Licensee Modification and all patents or trademark registrations issuing therefrom shall automatically be included in the Licensed Intellectual Property and subject to the license granted to Licensee under Section 1.1. At the request of Licensor, Licensee shall promptly execute and deliver such documents as may be necessary or desirable to effect and perfect the foregoing assignment of rights.

2.3     <u>Quality</u>. Licensee acknowledges and is familiar with the high standards and reputation for quality symbolized by the trademarks, service marks, and logos included in the Licensed Intellectual Property as of the Effective Date ("**Licensed Marks**"). Licensee agrees to conduct the Business and use the Licensed Marks in a manner at least consistent with such quality standards and reputation. Licensee shall comply with Licensor's guidelines and specifications regarding the style, appearance, and usage of the Licensed Marks. Licensor may exercise quality control over all uses of the Licensed Marks under this Agreement to maintain the validity of the Licensed Marks and protect the goodwill associated therewith. If Licensor determines that the quality and nature of the goods and services with which the Licensed Marks are used by Licensee do not meet the standards and requirements set forth by Licensor, Licensee agrees to meet or exceed the standards and requirements set forth by Licensor within thirty (30) days of receiving written notification of a failure to meet the standards and requirements for the quality and nature of the goods with which the Licensed Marks are used. Approval of any use by Licensee of the Licensed Marks, once given by Licensor, will continue in effect, without need for future approval, so long as Licensee's use of the Licensed Marks in connection with the goods and services of the Business continues to be substantially consistent with such previously approved use.

3.     <u>Improvements</u>.

3.1     <u>Ownership of Improvements</u>. Each Party shall advise the other of any technical improvements, modifications, or enhancements relating to the Licensed Intellectual Property

3

## CONFIDENTIAL LICENSE AGREEMENT

created from time to time and useful to effectively operate the Licensed Intellectual Property (collectively referred to as "**Improvements**"). Any and all such Improvements shall be the property of Licensor. All Improvements made by Licensor shall be included in the license grant of Section 1.1. All Improvements made by Licensee shall be the property of Licensor and shall be licensed to Licensee for its use. Improvements that are made jointly by the parties shall be owned by Licensor. Each Party agrees to execute any and all documents requested by the other to perfect rights to jointly made Improvements.

4.   Actions by Third Parties.

    4.1   Infringement Actions. Licensee shall promptly notify Licensor in writing of any actual, suspected, or threatened infringement, misappropriation, or other violation of any Licensed Intellectual Property by any third party of which it becomes aware. Licensor has the sole right, in its discretion, and at Licensee's expense, to (a) bring any action or proceeding with respect to any such infringement; (b) defend any declaratory judgment action concerning any Licensed Intellectual Property; and (c) control the conduct of any such action or proceeding (including any settlement thereof). Licensee shall provide Licensor with all assistance that Licensor may reasonably request, at Licensee's expense, in connection with any such action or proceeding. Licensor and Licensee will evenly split any monetary recovery resulting from any such action or proceeding (including any settlement thereof) for each's own account, subject to reimbursement of Licensee's costs, fees or expenses incurred in such action.

    4.2   Other Actions by a Third Party.  Each Party shall promptly notify the other in the event of any legal or administrative action by any third party involving the Licensed Intellectual Property of which it becomes aware, including any opposition, cancellation, or revocation proceeding. Licensor shall have the right, but not the obligation, to defend against any such action involving the Licensed Intellectual Property, and any such defense shall be at Licensee's expense. If Licensor fails to defend against any such action, then Licensee shall have the right to defend such action, in its own name, and any such defense shall be at Licensee's expense.

5.   Payment.

    5.1   Royalty. On or before the last business day of each calendar year during the term of this Agreement, Licensee shall pay to Licensor a royalty of 40 percent (40%) of the Net Sales of products and services sold by Licensee to any third party ("**Royalty Fee**"). "**Net Sales**" means, for any period of determination, the aggregate amount invoiced by Licensee to a third party for Business in the United States, less any credits, refunds, customary and usual trade discounts, rebates, discounts, charge-backs, and sales taxes, excluding net income tax. The amounts of any deductions shall be determined from books and records maintained in accordance with International Financial Reporting Standards, consistently applied.

    5.2   Maintenance of Books and Records; Record Inspection and Audit. Licensee shall keep complete and accurate books and records as reasonably necessary for the calculation the Royalty Fee payable under Section 5.1. Licensee further agrees it shall make these records available for inspection, from time to time, by Licensor, or a third party retained by Licensor, at Licensee's site and at Licensee's cost. Any audit and/or inspection shall be conducted during

4

CONFIDENTIAL
SMART_B&R 000535

### CONFIDENTIAL LICENSE AGREEMENT

regular business hours at Licensee's facilities upon at least seven (7) days prior written notice. Such examination shall be conducted in such a manner as to not unduly interfere with Licensee's business. If the audit reveals an underpayment of Royalty Fee by Licensee under this Agreement, Licensee shall pay to Licensor the full amount of any underpayment revealed by the audit, plus interest at the per annum prime rate in effect at the Chase Manhattan Bank, N.A., New York, New York, on the due date.

6.    Confidentiality. Each Party acknowledges that in connection with this Agreement it will gain access to certain confidential and proprietary information of the other Party (collectively, "**Confidential Information**"). Without limiting the foregoing, for purposes of this Agreement, all trade secrets and confidential information included in the Licensed Intellectual Property, including unpublished patent applications, will be deemed Confidential Information of Licensor. Each Party shall maintain the Confidential Information in strict confidence and not disclose any Confidential Information to any other person, except to its employees who (a) have a need to know such Confidential Information for such Party to exercise its rights or perform its obligations hereunder; and (b) are bound by written nondisclosure agreements. Each Party shall use reasonable care, at least as protective as the efforts it uses with respect to its own confidential information, to safeguard the Confidential Information from use or disclosure other than as permitted hereby.

7.    Indemnification. Licensee shall indemnify, defend, and hold harmless Licensor, its Affiliates, officers, directors, employees, agents and representatives against all losses, liabilities, claims, damages, actions, fines, penalties, expenses or costs (including court costs and reasonable attorneys' fees) arising out of or in connection with any third-party claim, suit, action, or proceeding relating to any breach of this Agreement by Licensee and use by Licensee of any Licensed Intellectual Property under this Agreement.

8.    Term and Termination. This Agreement begins on the Effective Date and will remain in force until terminated ("**Term**"). Licensor may terminate this Agreement at any time without cause, and without incurring any additional obligation, liability, or penalty. Licensee may terminate this Agreement at any time with prior written notice to Licensor.

9.    General Provisions.

9.1    Amendments. No amendment to this Agreement will be effective unless it is in writing and signed by both Parties.

9.2    No Third-Party Beneficiaries. This Agreement solely benefits the Parties and their respective permitted successors and assigns and nothing in this Agreement, express or implied, confers on any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

9.3    Counterparts. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement.

9.4    Severability. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability will not affect

5

CONFIDENTIAL
SMART_B&R 000536

## CONFIDENTIAL LICENSE AGREEMENT

any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

9.5    Governing Law. This Agreement, including all exhibits, schedules, attachments, and appendices attached to this Agreement and thereto, and all matters arising out of or relating to this Agreement, are governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Delaware.

9.6    Waiver. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power, or privilege arising from this Agreement will operate or be construed as a waiver thereof, nor will any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

9.7    Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified):

If to Licensor:

HLFIP Holding, LLC
10491 72nd Street
Seminole, Florida 33777
Email: jon.logan787@gmail.com
Attention: Jon Logan

If to Licensee:

Smart Communications Holding, LLC
10491 72nd Street
Seminole, Florida 33777
Email: legal@smartcommunications.us
Attention: Legal Dept.

9.8    Entire Agreement. This Agreement, including and together with any related exhibits, schedules, attachments, and appendices, constitutes the sole and entire agreement of Licensor and Licensee with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, regarding such subject matter.

[SIGNATURE PAGE FOLLOWS]

6

CONFIDENTIAL
SMART_B&R 000537

### CONFIDENTIAL LICENSE AGREEMENT

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the August 29, 2023, by their respective officers thereunto duly authorized.

HLFIP Holding, LLC

By _____

Name: Jon Logan

Title: President

Smart Communications Holding, LLC

By _____

Name: Jon Logan

Title: CEO

7

CONFIDENTIAL
SMART_B&R 000538

## CONFIDENTIAL LICENSE AGREEMENT

## SCHEDULE 1: LICENSED INTELLECTUAL PROPERTY

| PATENTS | | | | |
|---|---|---|---|---|
| **Assignee** | **Country** | **Title** | **Publication No.** | **Patent No.** |
| HLFIP Holding, LLC | USA | CORRECTIONAL POSTAL MAIL CONTRABAND ELIMINATION SYSTEM | 2020/0128014 A1 | 11457013 |
| HLFIP Holding, LLC | USA | CORRECTIONAL POSTAL MAIL CONTRABAND ELIMINATION SYSTEM | 2016/0337360 A1 | 10291617 |
| HLFIP Holding, LLC | USA | CORRECTIONAL INSTITUTION LEGAL POSTAL MAIL PROCESSING SYSTEM AND METHOD | 2020/0280645 A1 | 11637940 |
| HLFIP Holding, LLC | USA | CORRECTIONAL INSTITUTION LEGAL POSTAL MAIL PROCESSING SYSTEM AND METHOD | 2019/0268488 A1 | 10659630 |
| HLFIP Holding, LLC | USA | COMMUNICATION TRACKING SYSTEM FOR CORRECTIONAL FACILITIES | 2019/0386996 A1 | 10862891 |
| HLFIP Holding, LLC | USA | SYSTEMS AND METHODS FOR PROCESSING REQUESTS TO SEND PRIVATE POSTAL MAIL TO AN INMATE | 2020/0396347 A1 | 11201974 |

8

CONFIDENTIAL LICENSE AGREEMENT

| PATENT APPLICATIONS | | | | | |
|---|---|---|---|---|---|
| Assignee | Country | Title | Application No. | Filing Date | Publication No. |
| HLFIP Holding, LLC | USA | CORRECTIONAL POSTAL MAIL CONTRABAND ELIMINATION SYSTEM | 17/363499 | 06/30/2021 | 2022/0060475 A1 |
| HLFIP Holding, LLC | USA | COMMUNICATION TRACKING SYSTEM FOR CORRECTIONAL FACILITIES | 17/114326 | 12/7/2020 | 2021/0194878 A1 |
| HLFIP Holding, LLC | USA | SYSTEMS AND METHODS FOR PROCESSING REQUESTS TO SEND PRIVATE POSTAL MAIL TO AN INMATE | 17/549349 | 12/13/2021 | 2022/0103701 A1 |
| HLFIP Holding, LLC | USA | SMART WEARABLE DEVICE FOR TRACKING AND MONITORING INDIVIDUALS IN A CORRECTIONAL FACILITY | 17/580462 | 1/20/2022 | 2022/0225947 A1 |
| HLFIP Holding, LLC | USA | STATIONARY EXERCISE BIKE FOR USE IN A CORRECTIONAL FACILITY | 17/194190 | 3/5/2021 | 2021/0275863 A1 |

9

CONFIDENTIAL
SMART_B&R 000540

## CONFIDENTIAL LICENSE AGREEMENT

| TRADEMARKS | | | |
|---|---|---|---|
| Owner | Country | Trademark | Reg. No. |
| HLFIP Holding, LLC | USA | MAILGUARD | 5,135,773 |
| HLFIP Holding, LLC | USA | MAILGUARD POSTAL MAIL ELIMINATION LOGO | 5,135,772 |
| HLFIP Holding, LLC | USA | MAILGUARD CONNECT | |
| HLFIP Holding, LLC | USA | MAILGUARD DIGITAL | |
| HLFIP Holding, LLC | USA | MAILGUARD TRACKER | |
| HLFIP Holding, LLC | USA | MAILGUARDLEGAL | |
| HLFIP Holding, LLC | USA | SMARTECOSYSTEM | |
| HLFIP Holding, LLC | USA | SMARTED | |
| HLFIP Holding, LLC | USA | SMARTENTERTAINMENT | |
| HLFIP Holding, LLC | USA | SMARTLAW | |
| HLFIP Holding, LLC | USA | SMARTLINK | |
| HLFIP Holding, LLC | USA | SMARTREENTRY | |
| HLFIP Holding, LLC | USA | SMARTREQUEST | |
| HLFIP Holding, LLC | USA | SMARTSUMMIT | |
| HLFIP Holding, LLC | USA | SMARTTABLET | |
| HLFIP Holding, LLC | USA | SMARTVISIT | |
| HLFIP Holding, LLC | USA | SMARTWATCH | |

10

CONFIDENTIAL
SMART_B&R 000541

## CONFIDENTIAL LICENSE AGREEMENT

| LICENSED KNOW HOW | |
|---|---|
| Owner | Technology |
| HLFIP Holding, LLC | MAILGUARD |
| HLFIP Holding, LLC | MAILGUARD DIGITAL |
| HLFIP Holding, LLC | MAILGUARD TRACKER |
| HLFIP Holding, LLC | MAILGUARDLEGAL |
| HLFIP Holding, LLC | SMARTECOSYSTEM |
| HLFIP Holding, LLC | SMARTED |
| HLFIP Holding, LLC | SMARTENTERTAINMENT |
| HLFIP Holding, LLC | SMARTLAW |
| HLFIP Holding, LLC | SMARTLINK |
| HLFIP Holding, LLC | SMARTREENTRY |
| HLFIP Holding, LLC | SMARTREQUEST |
| HLFIP Holding, LLC | SMARTTABLET |
| HLFIP Holding, LLC | SMARTVISIT |
| HLFIP Holding, LLC | SMARTWATCH |

11

CONFIDENTIAL
SMART_B&R 000542

# EXHIBIT 25

**To:**       janice logan[myjesse@hotmail.com]
**From:**     jim.logan@smartcommunications.us[jim.logan@smartcommunications.us]
**Sent:**     Thur 4/28/2022 8:31:38 AM (UTC-04:00)
**Subject:**  Fwd: Smart Comm presentation
Smart Comm Finanical Presentation1.pdf

---------- Forwarded message ---------
From: **Jon Logan** <jon.logan@smartcommunications.us>
Date: Tue, Apr 26, 2022, 4:30 PM
Subject: Smart Comm presentation
To: Jim Logan <jim.logan@smartcommunications.us>

# CONFIDENTIAL EXHIBIT 26

## Smart Communications Collier Inc.
# Profit & Loss
### January through December 2023

Accrual Basis

| | Jan - Dec 23 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| Miscellaneous Revenue | 29,000.00 |
| **Sales** | |
| Commissary Transfer Credits | 5,515,544.01 |
| Refunds | -79,075.38 |
| Sales Entertainment | 2,188,122.85 |
| Sales of Mail Services | 4,512,000.00 |
| Sales of Messaging | 14,780,348.18 |
| Sales of Telephone Calls | 18,167,678.37 |
| Sales Photos | 1,572,481.27 |
| Sales Visitation | 3,042,567.09 |
| Service Fees | 5,740,300.69 |
| Trust Account Funding Fees | 122,801.61 |
| **Total Sales** | 55,562,768.69 |
| **Total Income** | 55,591,768.69 |
| **Cost of Goods Sold** | |
| Beginning Inventory Value | 690,704.04 |
| Contractor Services | 2,382,241.33 |
| Data Storage / Server Hosting | 371,469.24 |
| Ending Inventory Value | -3,033,716.53 |
| Facility Commissions Expense | 16,547,913.17 |
| Freight and Shipping Costs | 679,653.92 |
| Internet Service | 644,991.00 |
| Labor - Installation | 511,281.97 |
| Labor - Mail Processing | 456,298.85 |
| Labor - Repairs & Maintenance | 856,848.57 |
| Labor - Telephone CC Sales | 1,019,655.09 |
| Meals Expense | 105,172.70 |
| **Merchant Account Fees** | |
| Charge Backs | 340,215.48 |
| Merchant Account Fees | 1,843,681.94 |
| **Total Merchant Account Fees** | 2,183,897.42 |
| Misc. 3rd Party kiosk software | 456,917.53 |
| Miscellaneous Hardware Install | 0.00 |
| Purchases Hardware | 10,769,348.77 |
| Salesperson Commissions | 263,162.25 |
| Tablet Units | 0.00 |
| Technology Grant | 1,252,922.99 |
| Telecommunications Taxes | 2,566,986.90 |
| **Travel - Installation & Maint.** | |
| Airfare | 353,345.70 |
| Gas | 87,846.52 |
| Lodging | 429,318.15 |
| Mileage | 25,917.35 |
| Misc. Travel Expenses | 7,115.47 |
| Parking & Tolls | 40,594.37 |
| Vehicle Rental | 174,764.08 |
| Travel - Installation & Maint. | 2,033.64 |
| **Total Travel - Installation & Maint.** | 1,120,935.28 |
| Voice Over IP | 362,726.78 |
| Watch | 43,814.00 |
| **Total COGS** | 40,253,225.27 |
| **Gross Profit** | 15,338,543.42 |
| **Expense** | |
| Advertising and Promotion | 274,710.40 |
| Automobile Expense | |

Confidential Draft and Unaudited

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

## Smart Communications Collier Inc.
## Profit & Loss

Accrual Basis          January through December 2023

|  | Jan - Dec 23 |
|---|---|
| **Auto Insurance** | 99,068.00 |
| **Total Automobile Expense** | 99,068.00 |
| **Bank Service Charges** | 8,597.58 |
| **Charitble Contributions** | 18,284.84 |
| **Client Welfare** | 115,478.88 |
| **Computer Expenses** | 92,635.91 |
| **Computer Supplies** | 27,756.19 |
| **Contract Labor Expense** | 266,001.33 |
| **Depreciation Expense** | 1,466,651.95 |
| **Dues and Subscriptions** | 80,513.24 |
| **Education** | 145,876.32 |
| **Employee Welfare** | 6,400.81 |
| **Insurance Expense** | 247,776.47 |
| **Internet Service CORP** | 1,695.21 |
| **Legal Fees** | 3,080,225.81 |
| **Licenses & Permits** | 19,428.93 |
| **Meals and Entertainment** | 140,984.66 |
| **Office Expense** | 79,205.80 |
| **Outside Services** | 1,172.97 |
| **Payroll Expenses** | |
| Employee Salary and Wages | 5,574,493.27 |
| ER FICA & SUTA & FUTA Expense | 729,876.53 |
| ER Health Insurance Premiums | 555,255.28 |
| Officer Compensation | 119,999.88 |
| Other Employee Benefits | 3,500.00 |
| Payroll Service Fees | 110,489.68 |
| Workers' Compensation Insurance | 44,833.18 |
| **Total Payroll Expenses** | 7,138,447.82 |
| **Postage and Delivery** | 19,115.72 |
| **Professional Fees** | |
| Regulatory Registration Agent | 100,006.62 |
| Professional Fees - Other | 126,894.48 |
| **Total Professional Fees** | 226,901.10 |
| **Property Tax** | 79,848.51 |
| **Recruitment Expense** | 63,283.25 |
| **Rent Expense** | |
| Office Rents | 202,021.71 |
| Rent Expense - Other | 1,297,715.00 |
| **Total Rent Expense** | 1,499,736.71 |
| **Repairs and Maintenance** | |
| Equipment Maintenance | 58,898.15 |
| Repairs and Maintenance - Other | 325,557.25 |
| **Total Repairs and Maintenance** | 384,455.40 |
| **Uniforms** | 1,677.20 |
| **Utilities** | |
| Telephone & Internet | 125,236.37 |
| Utilities - Other | 65,600.79 |
| **Total Utilities** | 190,837.16 |
| **Website Design & Maintenance** | 99,712.11 |
| **Total Expense** | 15,876,480.28 |
| **Net Ordinary Income** | -537,936.86 |
| **Other Income/Expense** | |
| **Other Expense** | |
| Intellectual Property Expense | 22,225,725.22 |

**Page 2**

Confidential Draft and Unaudited

## Smart Communications Collier Inc.
## Profit & Loss

Accrual Basis

### January through December 2023

|  | Jan - Dec 23 |
|---|---|
| Interest Expense | 561,207.22 |
| Late Fees / Penalties | 28,267.26 |
| **Total Other Expense** | 22,815,199.70 |
| **Net Other Income** | -22,815,199.70 |
| **Net Income** | **-23,353,136.56** |

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

# CONFIDENTIAL EXHIBIT 27

**Smart Communications Holding, Inc.**

**Consolidated Audited Financial Statements**

**December 31, 2021**

CONFIDENTIAL

Prepared by:

**M. L. Shreve  CPA, P.C.**
**7781  N. Easy Street**
**Whitehall, Michigan  49461**
**231.894.5559**

CONFIDENTIAL

SMART_B&R 000208

**Smart Communications Holding, Inc.**
**Table of Contents**
**December 31, 2021**

| | Page No. |
|---|---|
| **Independent Auditor's Report** | **1 - 2** |
| | |
| **Financial Statements** | |
| Consolidated Balance Sheet | **3** |
| Consolidated Income Statement | **4 - 6** |
| Consolidated Statement of Retained Earnings | **7** |
| Consolidated Statement of Cash Flows | **8** |
| Consolidated Notes to Financial Statements | **9 - 12** |

CONFIDENTIAL



*M L S*

**M.L. Shreve CPA, P.C.**
**7781 N. Easy Street**
**Whitehall, Michigan 49461**
**231.894.5559 (phone)**
**231.893.2097 (fax)**
**www.mlshrevecpa.com**
**mlshrevecpa@frontier.com (email)**

December 21, 2022

**Independent Auditor's Report**

To the Board of Directors
Smart Communications Holding, Inc.
Seminole, Florida 33777

**Report on the Audit of the Consolidated Financial Statements**

*Opinion*

We have audited the consolidated financial statements of Smart Communications Holding, Inc., which comprise the consolidated balance sheet as of December 31, 2021, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for the year then ended, and the related notes to the consolidated financial statements.

In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the financial position of Smart Communications Holding, Inc. as of December 31, 2021, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

*Basis for Opinion*

We conducted our audit in accordance with auditing standards generally accepted in the United States of America (GAAS). Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Financial Statements section or our report. We are required to be independent of Smart Communications Holding, Inc. and to meet our other ethical responsibilities, in accordance with the relevant ethical requirements relating to our audit. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

*Responsibilities of Management for the Consolidated Financial Statements*

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the consolidated financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about Smart Communications Holding, Inc.'s ability to continue as a going concern for year ended December 31, 2023.

*1*

CONFIDENTIAL

SMART_B&R 000210

***Auditor's Responsibilities for the Audit of the Consolidated Financial Statements***

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with GAAS will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the consolidated financial statements.

In performing an audit in accordance with GAAS, we:

> Exercise professional judgment and maintain professional skepticism throughout the audit.

> Identify and assess the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements.

> Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances but not for the purpose of expressing an opinion on the effectiveness of Smart Communications Holding, Inc.'s internal control. Accordingly, no such opinion is expressed.

> Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the consolidated financial statements.

> Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about Smart Communications Holding, Inc.'s ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control-related matters that we identified during the audit.

***Other Matter***

We previously performed a compilation engagement with respect to the 2021 consolidated financial statements, and issued our report thereon, dated October 20, 2022., which stated that the consolidated financial statements were prepared and reported in accordance with the tax basis of accounting, which is a basis of accounting other than accounting principles generally accepted in the United States of America. Our report further stated that we did not audit or review those consolidated financial statements, nor did we express an opinion or any other form of assurance on them.

*M. L. Shreve CPA, P.C.*

**M. L. Shreve CPA, P.C.**
Whitehall, Michigan 49461

*2*

CONFIDENTIAL

SMART_B&R 000211

**Smart Communications Holding, Inc.**
*Consolidated Balance Sheet*
December 31, 2021

**ASSETS**

| | | |
|---|---:|---:|
| **Current Assets** | | |
| Cash and Cash Equivalents | $  5,404,652 | |
| Accounts Receivable - Trade | 239,086 | |
| Accounts Receivable - Employees | 7,149 | |
| Technology Grant Advances | 37,539 | |
| Taxes Receivable - Florida | 109,937 | |
| Prepaid Corporate Taxes - Florida | 100,000 | |
| Prepaid Expenses | 674,500 | |
| Inventory | 1,894,388 | |
| Total Current Assets | | $  8,467,251 |
| **Fixed Assets** | | |
| Buildings | 4,034,661 | |
| Kiosk Computer System | 2,987,602 | |
| Computer Software | 2,987,875 | |
| Leasehold Improvements | 355,710 | |
| Vehicles | 2,514,000 | |
| Display System & Demo Build | 43,780 | |
| Equipment | 599,469 | |
| Furniture | 131,051 | |
| | 13,654,148 | |
| Less: Accumulated Depreciation | (5,525,408) | |
| Property & Equipment, Net | | 8,128,740 |
| **Other Assets** | | |
| Shareholder Loans | 428,855 | |
| Accounts Receivable - Affiliated Entities | 1,899,986 | |
| Deferred Income Taxes - Federal | 536,251 | |
| Deferred Taxes - Florida | 90,269 | |
| Total Other Assets | | 2,955,361 |
| **TOTAL ASSETS** | | $  19,551,352 |

**LIABILITIES AND EQUITY**

| | | |
|---|---:|---:|
| **LIABILITIES** | | |
| **Current Liabilities** | | |
| Accounts Payable | $  1,331,100 | |
| Accrued Credit Cards | 102,916 | |
| Accrued Commissions | 581,378 | |
| Accrued Expenses | 254,750 | |
| Federal Income Tax Payable | 20,153 | |
| Note Payable - ACG Global | 36,694 | |
| Current Portion - Long Term Debt | 825,000 | |
| Total Current Liabilities | | $  3,151,991 |
| **Long Term Liabilities** | | |
| Lattice Technology License | 1,187,500 | |
| Notes Payable - Vehicles | 68,687 | |
| Less Current Portion | (825,000) | |
| Total Long Term Debt | | 431,187 |
| Total Liabilities | | 3,583,178 |
| **EQUITY** | | |
| Common Stock | 364,667 | |
| Paid In Capital | 392,151 | |
| Retained Earnings | 15,211,356 | |
| Total Equity | | 15,968,174 |
| **TOTAL LIABILITIES AND EQUITY** | | $  19,551,352 |

*See Notes to Consolidated Financial Statements.*          3

CONFIDENTIAL

**Smart Communications Holding, Inc.**
*Consolidated Income Statement*
**For the year ended December 31, 2021**

| | | |
|---|---:|---:|
| **Revenue** | | |
| Mail Services Income | $ | 4,512,000 |
| Messaging Sales | | 21,628,106 |
| Telephone Call Sales | | 5,510,925 |
| Telephone Service Fees | | 638,138 |
| Miscellaneous Income | | 30,252 |
| | | 32,319,421 |
| Sales Reporting Errors | | (370,089) |
| Less Reurns and Allowances | | (22,955) |
| | | 31,926,377 |
| **Total Cost of Sales** | | (15,795,401) |
| **Gross Profit** | | 16,130,976 |
| | | |
| **Total Expenses** | | (10,961,790) |
| | | |
| **Income /Loss from Operations** | | 5,169,186 |
| | | |
| **Other Income and (Expense)** | | |
| Gain on Sale of Assets | | 540,589 |
| Interest Expense | $ (125,242) | |
| Penalties and Late Fees | (170,123) | |
| | | (295,365) |
| **Net Other Income and (Expense)** | | 245,224 |
| **Income Before Taxes** | | 5,414,410 |
| **Provision for Income Taxes** | | |
| Florida Income Tax | (119,794) | |
| Federal Income Tax | (783,902) | |
| **Total Provision for Taxes** | | (903,696) |
| | | |
| **Net Income (Loss) for the Year** | $ | 4,510,714 |

.

.

*See Notes to Consolidated Financial Statements.*    **4**

CONFIDENTIAL

**Smart Communications Holding, Inc.**
*Consolidated Income Statement - Cost of Sales*
**For the year ended December 31, 2021**

**Cost of Sales**

| | | | |
|---|---|---|---|
| Beginning Inventory | $ | | $ 1,401,970 |
| Game Revenue Sharing 50/50 | | 13,658 | |
| Computer and Tablet Purchases | | 4,097,633 | |
| Hardware Purchases | | 200,910 | |
| Software Purchases | | 8,876 | |
| Hardware Installation Costs | | 28,554 | |
| Technology Services - Facilities | | 311,913 | |
| Equipment Design | | 43,188 | |
| Vehicle xpenses | | 27,914 | |
| Freight and Shipping | | 374,670 | |
| Repairs and Maintenance | | 808,408 | |
| Telecommunications Taxes Expense | | 474,019 | |
| Labor - Telephone CC Sales | | 237,202 | |
| Touchscreen Kiosk Purchases | | 24,085 | |
| Mobile Mail Carts | | 1,447 | |
| Tablet Purchases | | 152,000 | |
| Contractor Services | | 1,256,386 | |
| Faciliites Commissions Expense | | 5,430,350 | |
| Salesperson Commissions | | 269,485 | |
| Sublicense Royalty Fees Expense | | 100,795 | |
| Data Sorage & Server Hosting | | 68,813 | |
| Internet Services | | 299,578 | |
| Kiosk Software Expense | | 161,378 | |
| Labor - Mail Processing | | 497,451 | |
| Merchant Card Fees | | 1,040,790 | |
| Travel | | 325,488 | |
| Meals | | 32,828 | |
| | | | 16,287,819 |
| | | | 17,689,789 |
| **Less Ending Inventory** | | | (1,894,388) |
| **Cost of Sales** | | | **15,795,401** |

*See Notes to Consolidated Financial Statements.*    **5**

CONFIDENTIAL

**Smart Communications Holding, Inc.**
*Consolidated Income Statement - Expenses*
**For the year ended December 31, 2021**

| Description | Amount |
|---|---|
| Advertising and Promotions | $ 94,873 |
| Bank Service Fees | 2,227 |
| Depreciation Expense | 1,737,201 |
| Postage and Shipping | 4,883 |
| Health Insurance | 336,556 |
| Workman Compensation Insurance | 14,800 |
| Business Insurance Expense | 127,468 |
| Outside Services | 5,495 |
| Dues and Subscriptions | 81,789 |
| Computer Expenses | 38,320 |
| Professional Fees | 110,811 |
| Regulatory and Registration Fees | 50,644 |
| Legal Fees | 3,057,099 |
| Licenses and Permits | 2,656 |
| Charitable Contributions | 10,714 |
| Officer Compensation | 160,945 |
| Wages and Salaries | 3,421,085 |
| Payroll Service Fees | 65,651 |
| Payroll Taxes Expense | 411,561 |
| Property Taxes | 72,676 |
| Vehicle Expenses | 172,289 |
| Meals and Entertainment | 110,879 |
| Office Expense | 83,999 |
| Computer Expenses | 20,135 |
| Contract Labor Expense | 97,916 |
| Rent Expense | 79,825 |
| Telecommunicataions Expense | 80,303 |
| Telephone Expense | 32,947 |
| Website Design and Maintenance | 3,651 |
| Repairs and Maintenance | 203,658 |
| Utilities | 52,574 |
| Client Welfare Expense | 163,073 |
| Recruitment Fees | 20,672 |
| Professional Education | 11,160 |
| Other Expenses | 21,255 |
| **Total Expenses** | $ 10,961,790 |

*See Notes to Consolidated Financial Statements.*    **6**

CONFIDENTIAL

**Smart Communications Holding, Inc.**
*Consolidated Statement of Retained Earnings*
**For the year ended December 31, 2021**

| | | |
|---|---|---|
| Retained Earnings - Beginning of Year | | $ 7,872,214 |
| | | |
| Conversion of Accumulated Depreciation to GAAP | $ 2,480,258 | |
| Prior Period Adjustment - Affiliated Entities | 216,092 | |
| Prior Period Adjustment - Credit Card Liaiblity | 132,078 | |
| | | 2,828,428 |
| Retained Earnings - Beginning of Year Restated | | 10,700,642 |
| | | |
| Net Income for the Year | | 4,510,714 |
| | | |
| Retained Earnings - End of Year | | $ 15,211,356 |

*See Notes to Consolidated Financial Statements.*            *7*

CONFIDENTIAL

SMART_B&R 000216

**Smart Communications Holding, Inc.**
**Statement of Cash Flows**
**For the year ended December 31, 2021**

| | | |
|---|---:|---:|
| **Cash Flows from (Provided to) Operating Activities** | | |
| Net Income (Loss) form Operations | $ | 4,510,714 |
| Adjustments to reconcile increase  in net assets | | |
| to net cash provided by (used in) operating activities: | | |
| Depreciation | | 1,737,201 |
| | | 6,247,915 |
| (Increase) Decrease in operating assets: | | |
| Accounts Receivable | | 560,798 |
| Other Receivables | | (1,375,598) |
| Other Assets | | 117,436 |
| Prepaid Expenses | | (92,860) |
| Inventory | | (492,417) |
| Increase (Decrease) in operating liabilities: | | |
| Accounts Payable | | 889,036 |
| Accrued Credit Cards Payable | | (13,893) |
| Accrued Liabilities | | 313,495 |
| Accrued Payroll and Withholdings | | 109,424 |
| Accrued Corporate Taxes | | (1,368,593) |
| Current Portion of Long Term Debt | | (584,000) |
| | | 4,310,743 |
| Less: Gain on Sale of Asset | | (540,589) |
| **Net Cash Flows from (Provided to) Operating Activities** | | 3,770,154 |
| **Cash Flows From ( Provided to) Investing Activities** | | |
| Proceeds from Sale of Asset | | 1,932,208 |
| Purchase of Fixed Assets | | (1,826,778) |
| **Net Cash Flows From (Provided to) Provided to Investing Activities** | | 105,430 |
| **Cash Flows From (Provided to) Financing Activities** | | |
| Payments on Notes Payable | | (1,045,710) |
| **Net Cash Flows from (Provided to) Financing Activities** | | (1,045,710) |
| | | |
| **Net Increase (Decrease) in Cash From Operating Activities** | | 2,829,874 |
| | | |
| Cash and Cash Equivalents at Beginning of Year | | 2,574,778 |
| | | |
| **Cash and Cash Equivalents at End of Year** | $ | 5,404,652 |

Interest Expense for the year was in the amount of $ 125,242.
Taxes Paid for the year was in the amount of $ 1,907,158.

*See Notes to Consolidated Financial Statements.*                    8

CONFIDENTIAL

**Smart Communications Holding, Inc.**
**Notes to Consolidated Financial Statements**
**For the year ended December 31, 2021**
==========================================================================

### Note A – Significant Accounting Policies

*Basis of Consolidation*
The consolidated financial statements include the financial statements of Smart Communications, U.S, Smart Communications, Pasco, and Smart Communications, Collier. Smart Communications Holding, Inc, owns 100 % of these companies. All transactions between Smart Communications Holding, Inc. and subsidiaries have been eliminated upon consolidation.

*Concentration of Credit Risk*
The Company normally maintains sufficient cash to meet its anticipated working capital needs. Cash in deposit accounts may, at times, exceed the insured amount of $ 250,000 provided by the Federal Deposit Insurance Corporation (FDIC). However, The Company has not experienced any losses in such accounts and believes it is not exposed to any significant credit risk in these accounts.

*Cash and Cash Equivalents*
For purposes of the statement of cash flows, the Company considers all highly liquid investments, generally those assets readily convertible to known amounts of cash with a maturity of three months or less, to be cash equivalents.

*Accounts Receivable*
Accounts Receivable are customer obligations due under normal trade conditions that have been received after the year end but attributable to the current year. The Company considers these accounts receivable to be fully collectible; accordingly, no allowance for doubtful accounts is require. If amounts become uncollectible, they are charged to operations when that determination is made.

*Inventory*
Inventory consists of tablets, kiosks, and various computer parts and accessories, and is stated at the lower of cost or market using the first-in, first-out method.

*Property and Equipment*
Property and equipment is stated at cost less accumulated depreciation. Provisions for depreciation of assets are computed using the straight-line at rates which are intended to amortize the cost of such assets over their useful lives which range from 5 to 40 years. Leasehold Improvements are amortized over the service lives of the improvements, generally 40 years.

*Revenue Recognition*
Revenues are generally recognized when realized or realizable, and when earned (generally when goods are transferred or services rendered), no matter when payment is received. The Company recognizes revenue from messaging services at the point of sale, net of sales taxes (if any). Service contract revenue is recognized when the service is performed.

The Company adopted FASB ASC 606, *Revenues from Contracts with Customers*, which amended the existing standards for revenue recognition. The adoption of this new revenue standard does not have a significant impact on the amount and timing of revenue recognized in the Company's financial statements. Based on the Company's evaluation process and review of its contracts with customers, the timing and amount of revenue recognized previously is consistent with how revenue is recognized under the new standard. No changes were required to reported revenues as a result of the adoption of FASB ASC 606.

*9*

CONFIDENTIAL

**Smart Communications Holding, Inc.**
**Notes to Consolidated Financial Statements**
**For the year ended December 31, 2021**
===============================================================

**Note A – Significant Accounting Policies (continued)**

*Use of Estimates*
These financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America. Management is required to make certain estimates and assumptions that affect amounts reported in the financial statements. Actual results may differ from these estimates.

*Advertising Costs*
Advertising costs are charged to operations when incurred. For the year ended December 31, 2021, advertising expense amounted to $ 94,873.

**Note B – Property and Equipment**

Property and equipment are stated at cost. All property and equipment and leasehold improvements are depreciated on the straight-line method. Repairs and maintenance of property and equipment are charged to operations, and major improvements are capitalized. Upon retirement, sale or other disposition of assets, the costs and accumulated depreciation are eliminated from the accounts, and any resulting gain or loss is included in operations.

For the year ended December 31, 2021, property and equipment consists of the following:

| Description | Cost | 2021 Depreciation | 12.31.2021 Accumulated Depreciation | Net Book Value |
|---|---|---|---|---|
| Kiosk Computer System | $    2,987,602 | $      421,239 | $   2,377,543 | $      610,059 |
| Computer Software | 2,987,875 | 597,009 | 1,780,970 | 1,206,905 |
| Vehicles | 2,514,000 | 486,741 | 842,006 | 1,671,994 |
| Display System | 21,280 | 3,040 | 9,300 | 11,980 |
| Demo Build | 22,500 | 4,500 | 18,883 | 3,617 |
| Furniture and Fixtures | 131,051 | 21,122 | 72,854 | 58,197 |
| Buildings | 4,034,661 | 110,531 | 171,972 | 3,862,689 |
| Leasehold Improvements | 355,710 | 7,381 | 17,822 | 337,888 |
| Mail Service Equipment | 414,217 | 59,174 | 182,453 | 231,764 |
| Equipment | 185,252 | 26,464 | 51,605 | 133,647 |
| | $   13,654,148 | $   1,737,201 | $   5,525,408 | $   8,128,740 |

All property is depreciated using the straight-line method. Furniture and fixtures, computer software, demos, kiosks, and vehicles are depreciated over 5 years. Buildings and leasehold improvements are depreciated over 39 years, and machinery and equipment are depreciated over 7 years. Assets commence depreciation as of the first full month of usage.

*10*

CONFIDENTIAL

SMART_B&R 000219

**Smart Communications Holding, Inc.**
**Notes to Consolidated Financial Statements**
**For the year ended December 31, 2021**
=======================================================================

**Note C – Subsequent Events**

Management has evaluated subsequent events through December 21, 2022, the date financial statements were available to be issued. No events occurred or are pending through this date which would have a material effect on the financial statements or require disclosure in the financial statements.

**Note D – Loans To Shareholder**

At December 31, 2021, a 50 % shareholder owed the Company loans in the amount of $ 428,855. No interest has been accrued on the loans.

**Note E – Accounts Receivable –  Affiliated Entities**

As of December 31, 2021, the Company has accounts receivable from the following affiliated entities:

| Description | Amount |
|---|---|
| Smart Communications U.S., Inc. | $    72,136 |
| LOCO Florida, LLC | 35,830 |
| Mailguard Federal, Inc. | 1,622,935 |
| HLFIP Holding, Inc. | 169,085 |
|  | $   1,899,986 |

**Note F – Long Term Debt**

On May 19, 2020, the Company purchased three Ford Trucks at a total financing cost of $ 93,319.44. Payments on this loan commenced as of July 3, 2020 in the amount of $ 622.02 per truck, including interest at the annual rate of 7.2900%, payable monthly for 60 months for each truck. Final payment on this loan is due on June 3, 2025. As of December 31, 2021, the principal balance on the vehicle loan is in the amount of $ 68,970.81. Interest expense on this loan for the year ended December 31, 2021 is in the amount of $ 5,674.83.

As of January 1, 2019, The Company entered into a Technology License Agreement with LATTICE Incorporated. The Agreement is a Licensing Agreement with LATTICE Software wherein Smart Communications Holding, Inc. pays LATTICE a license fee, in the amount of $ 2,850,000.00 payable in monthly installments of $ 47,500.00 for sixty (60) consecutive months beginning on February 1, 2019. Upon payment in full of the License fee, Smart Communications Holding, Inc. shall pay LATTICE an annual royalty payment of $ 100.00 each year (the "Royalty Fee"). The Royalty Fee shall be due on or before December 31, of each year beginning in 2025 and shall continue until the Licensing Agreement is terminated.

As of December 31, 2021, the balance due to LATTICE on the Licensing Agreement is in the amount of $ 1,187,500.00.

*11*

CONFIDENTIAL

**Smart Communications Holding, Inc.**
**Notes to Consolidated Financial Statements**
**For the year ended December 31, 2021**
================================================================================

### Note G – Income Taxes

Income taxes are provided for the tax affects of transactions reported in the financial statements and consist of taxes currently due plus deferred taxes. Deferred taxes are recognized for differences between the basis of assets and liabilities for financial statement and income tax purposes. The differences relate primarily to depreciation (use of different depreciation methods for financial statement and income tax purposes), and legal expenses not yet recognized on the Company's tax returns. The deferred tax assets and liabilities represent the future tax return consequences of timing differences, which will either be taxable or deductible when the assets and liabilities are recovered or settled.

The Company is required to recognize, measure, classify and disclose in the financial statements uncertain tax positions taken or expected to be taken in the Company's tax returns. Management has determined that the Company does not have any uncertain tax positions and associated unrecognized benefits that materially impact the financial statements or related disclosures. Since tax matters are subject to some degree of uncertainty, there can be no assurance that the Company's tax returns will not be challenged by the taxing authorities and that the Company will not be subject to additional tax, penalties, and interest as a result of such challenge. Penalties and interest assessed by income taxing authorities would be included in operating expenses.

The Company is taxed as a C Corporation under the Internal Revenue Code. For the year ended December 31, 2021, the provision for income taxes consists of the following:

|  |  | 2021 |
|---|---|---|
| **Provision for Income Taxes:** |  |  |
| Current Income Taxes: |  |  |
| Florida Income Tax | $ | 119,794 |
| Federal Income tax |  | 783,902 |
|  | $ | 903,696 |
| **Analysis of Deferred Tax Assets (Liabilities)** |  |  |
| Depreciation | $ | 196,275 |
| Legal and Professional Fees |  | 430,245 |
|  | $ | 626,520 |

*12*

CONFIDENTIAL

SMART_B&R 000221

# EXHIBIT 28

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HLFIP HOLDING, INC. d/b/a SMART COMMUNICATIONS IP HOLDINGS, | : : : | Civil No. 1:20-CV-00186 |
| Plaintiff, | : : | |
| v. | : : | |
| YORK COUNTY, PENNSYLVANIA, *et al.*, | : : : | |
| Defendants. | : : | Judge Jennifer P. Wilson |

## MEMORANDUM

Before the court is Defendants' motion for judgment on the pleadings. (Doc. 46.)  Defendants argue that the patent at issue claims patent-ineligible subject matter pursuant to 35 U.S.C. § 101.  Applying the standard established by the Supreme Court in *Alice Corp. Pty. Ltd. v. CLS Bank International*, this court finds that the claims at issue are directed to an abstract idea and Plaintiff has not adequately alleged an inventive concept sufficient to survive a motion for judgment on the pleadings.  For the reasons that follow, the court will grant Defendants' motion.  (Doc. 31.)

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This action arises from Defendants' alleged infringement of Plaintiff's patented MailGuard technology.  (Doc. 1, ¶ 1.)  Specifically, the complaint alleges that Defendants engaged TextBehind, Inc. to provide services and technology to eliminate the original postal mail addressed to inmates at York County Prison

1

("YCP") by scanning the mail and distributing it electronically to inmates utilizing technology that infringes on Plaintiff's MailGuard technology.  (*Id.* ¶ 17–19.)  On the basis of these facts, Plaintiff filed a two-count complaint on February 3, 2020, alleging patent infringement and deprivation of federal rights.  (Doc. 1.)  Count one of the complaint sets forth a claim for patent infringement under 35 U.S.C. § 271 of Plaintiff's Patent Number: US 10,291,617 ("'617 Patent").  (*Id.*)

The following facts are gleaned from Plaintiff's complaint and the '617 Patent attached thereto for the purpose of ruling on Defendants' motion for judgment on the pleadings.  Plaintiff HLFIP Holding, Inc., doing business as Smart Communications IP ("Smart Communications"), is the record title owner of the '617 Patent.  (Doc. 1, ¶ 10.)  The '617 Patent was filed on May 12, 2016, and issued on May 14, 2019, with the title of "Correctional Postal Mail Contraband Elimination System."  (*Id.*, ¶ 10; Doc. 1-2, p. 2.)[1]  Summarizing the background of the '617 Patent, Smart Communications avers that: "[p]ostal mail is the number-one method for sneaking illegal drugs, contraband, and secret communications into correctional facilities."  (Doc. 1, ¶ 14.)  As a result, "the elimination of postal mail is critical to the safe operation of correctional facilities in that it significantly reduces, and in many cases altogether stops, the infiltration of those undesirable and potentially dangerous items."  (*Id.*)

---

[1] For ease of reference, the court utilized the page numbers in the CM/ECF header.

The abstract of the '617 Patent describes it as follows:

A method and system for eliminating contraband in postal mail at a correctional facility comprising a central processing facility and a network of inmate email kiosks and correctional institution staff review stations. The postal mail utilizes scanning stations to create electronic version of the mail and associates various information about the sender, recipient, mail contents, and institution into a format that is easily reviewable and provides tracking data. The scanned mail may then be made available to the intended inmate and institution staff. Institution staff may also then access the associated information and tracking data.

(Doc. 1-2, p. 2.)

The amended complaint alleges infringement of claims 1 and 13 of the '617 Patent. (See Doc. 1.) Independent Claim 1 provides:

A method for eliminating contraband in postal mail for one or more remote correctional facilities comprising, receiving postal mail at a central facility; identifying mail information comprising recipient inmate and inmate institution; identifying an inmate email account and the associated inmate identifier; identifying content information; associating said sender information and said content information with said inmate identifier; screening said postal mail for contraband; scanning said content information and sender information and generating a scanned electronic copy and a text-readable version of said electronic copy wherein said scanned electronic copy and said text-readable version are stored electronically in a database using the inmate identifier as the primary key; storing an electronic copy of said electronic copy and said text-readable version for electronic transmission to said recipient inmate; associating a contraband flag with said electronic copy and said text-readable version; associating said electronic copy and said text-readable version with an access flag, said access flag denies access to said inmate to said electronic copy and said text-readable version based on content or information contained in said electronic copy and said text-readable version; associating said electronic copy with said inmate email account and the associated inmate identifier; assigning the electronic copy with an unique identifier; presenting said electronic copy for review by institution

3

staff; determining access to said electronic copy by said recipient
inmate wherein access may be granted or denied based upon whether
contraband was discovered in said postal mail; displaying postal mail
to said recipient inmate associated with said inmate identifier on a
remote kiosk capable of receiving and sending electronic mail; and
logging the date of receipt and each access to said electronic copy by
said recipient inmate or said institution staff; wherein the risk of said
recipient inmate receiving contraband in postal mail is essentially
eliminated.

(Doc. 1-2, p. 27.)  Claim 13 is a system claim which mirrors the method claim 1.

Claim 13 provides:

A system for eliminating contraband in postal mail for one or more
correctional facilities comprising: receiving mail at a central facility,
said central facility having a scanning station configured to create an
electronic copy of said postal mail and convert said electronic copy to
a text-readable version of electronic copy, said scanning station with an
input interface adapted to attach recipient inmate information said
electronic copy and said text-readable version of said postal mail and
said electronic copy being assigned an unique identifier; and create
associations between said electronic copy and said text-readable
version and the associated inmate identifier associated with an inmate
email account for an inmate at a correctional situation, said electronic
copy also having an unique identifier assigned to the electronic copy, a
record of the sender of the postal mail, and a log comprising the date
and time the postal mail was scanned and said interface capable of
associating said electronic copy and said text-readable version with an
access flag, said access flag denies access to said inmate to said
electronic copy and said text-readable version based on content or
information contained in said electronic copy; a server in
communication with said scanning station and a network wherein said
scanning station communicates said electronic copy and said log to said
server over said network and said server store said electronic copy and
said log; an inmate kiosk in a remote correctional institution capable of
receiving and sending electronic mail in communication with said
server over a kiosk network wherein said recipient inmate may access
said electronic copy through said kiosk, said kiosk being adapted to
cause said server to log access of said electronic copy by said inmate

4

using their unique inmate identifier; and a viewing station in communication with said server wherein correctional facility personnel may screen said electronic copy prior to allowing access by said inmate.

(*Id.*, p. 28.)

Smart Communications asserts that Defendants are utilizing TextBehind's postal-mail-elimination methods and systems, which infringe on the '617 Patent because it includes at least the steps of:

> (1) [R]eceiving postal mail and associating that mail with an intended inmate recipient; (2) screening the postal mail for contraband; (3) scanning the postal mail; (4) generating a text-readable electronic copy of the scanned postal mail for investigative and inmate-delivery purposes; (5) electronically storing the electronic copy of the scanned postal mail for storage and review by YCP personnel; (6) flagging the electronic copy of the postal mail if it is found to contain contraband or other inappropriate content; (8) electronically delivering approved copies of the scanned postal mail to the intended inmate recipient for viewing on a remote kiosk; and (9) logging details relating to the inmate recipient's access and review of the electronic copy of the scanned postal mail.

(Doc. 1, ¶ 27.) Smart Communications also asserts that the TextBehind system Defendants are using is infringing on the '617 Patent because it contains the following components:

> (1)[A] scanning station capable of creating a text-readable electronic copy of postal mail, and including an input interface capable of (a) attached recipient-inmate information to the electronic copy of the postal mail and associating the electronic copy of the postal mail with an email account belonging to the intended inmate recipient, and (b) associating the electronic copy of the postal mail with an access flag that denies access to the intended inmate recipient if the electronic copy of the postal mail contains contraband or other inappropriate content; (2) a server in communication with the

5

> scanning station and a network, such that the scanning station communicates the electronic copy of the postal mail and its identifying information to the server for storage; (3) a remote kiosk in communication the server that is capable of sending and receiving electronic mail, through which the intended inmate recipient can access the electronic copy of the postal mail; and (4) a viewing station in communication with the server, through which YCP personnel can screen and review the electronic cop of the postal mail prior to delivery to the intended inmate recipient.

(*Id.*, ¶ 28.)

Smart Communications alleges that Defendants have been and are inducing infringement of the '617 Patent by actively and knowingly including others—here, personnel at York County Prison ("YCP")—to use the TextBehind postal-mail-elimination methods and systems. (*Id.*, ¶ 29.) Additionally, Smart Communications alleges that Defendants have done so with knowledge of the '617 Patent since as early as January 7, 2020, when a letter was sent to Warden Doll advising him of the alleged infringement and attaching a copy of the '617 Patent. (*Id.*, ¶¶ 29, 33.)

Defendants filed the instant motion for judgment on the pleadings and a supporting brief on February 10, 2021. (Docs. 46 & 47.) Plaintiff timely filed a brief in opposition. (Doc. 55.) Defendants then filed a reply brief. (Doc. 58.)[2] Thus, the motion is now ripe for resolution.

---

[2] Defendant also submitted a notice of supplemental authority on April 8, 2022. (Doc. 129.) The supplemental authority is a decision from the United States Court of Federal Claims in which the defendant's motion for summary judgment arguing patent ineligibility pursuant to 35 U.S.C. § 101 was granted because the plaintiff's patent claims were directed to the abstract idea of

## JURISDICTION

Because this case raises a federal question of patent infringement under 35

U.S.C. § 271, the court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and

1338(a).  Further, venue is appropriate under 28 U.S.C. §§ 1391 and 1400(b).

## STANDARD OF REVIEW

A motion for judgment on the pleadings is the procedural hybrid of a motion

to dismiss and a motion for summary judgment.  *Westport Ins. Corp. v. Black,*

*Davis, & Shue Agency, Inc.*, 513 F. Supp. 2d 157, 162 (M.D. Pa. 2007).  Federal

Rule of Civil Procedure 12(c) provides: "[a]fter the pleadings are closed–but early

enough not to delay trial–a party may move for judgment on the pleadings."  Fed.

R. Civ. P. 12(c).  Under Rule 12(c), judgment should be granted where:

> the movant clearly establishes that no material issue of fact remains to
> be resolved and that he is entitled to judgment as a matter of law. In
> considering a motion for judgment on the pleadings, the trial court is
> required to view the facts presented in the pleadings and the inferences
> to be drawn therefrom in the light most favorable to the nonmoving
> party.  In this fashion the courts hope to insure that the rights of the
> nonmoving party are decided as fully and fairly on a rule 12(c) motion,
> as if there had been a trial.

*Inst. for Scientific Info., Inc. v. Gordon & Breach Sci. Publishers, Inc.*, 931 F.2d

1002, 1004 (3d Cir. 1991) (citing *Soc'y Hill Civic Ass'n v. Harris*, 632 F.2d 1045,

---

processing undeliverable mail and providing an updated address.  *See Return Mail, Inc. v. United States*, No. 11-130C, 2022 U.S. Claims LEXIS 567 (Fed. Cl. Apr. 6, 2022).

1054 (3d Cir. 1980); 5C Charles A. Wright & Arthur R. Miller, FED. PRACTICE AND PROCEDURE, § 1367, at 205 (3d ed. 2004)).

Thus, judgment on the pleadings will be granted where the movant clearly establishes no material issue of fact and entitlement to judgment as a matter of law. *Id.*; *see also Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290 (3d Cir.1988) (quoting *Soc'y Hill Civic Ass'n*, 632 F.2d at 1054).

A court deciding a motion under Rule 12(c) "must 'view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the non-moving party.'" *Green v. Fund Asset Mgmt., L.P.*, 245 F.3d 214, 220 (3d Cir. 2001) (quoting *Inst. for Scientific Info.*, 931 F.2d at 1004).

## DISCUSSION

In their motion, Defendants argue that the court should dismiss the complaint because the '617 patent claims patent-ineligible subject matter—an abstract idea—under 35 U.S.C. § 101.  (Doc. 46.)

### A. Patent Eligibility Standard

Section 101 provides, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."  35 U.S.C. § 101.  There are three subject matter

8

categories that are patent ineligible: laws of nature, natural phenomena, and abstract ideas. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).

Because patent eligibility under section 101 is a question of law, it can be determined at the motion to dismiss stage. *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015); *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018) (hereinafter "*Aatrix I*"). However, "plausible factual allegations may preclude dismissing a case under § 101 where, for example, nothing on the record . . . refutes those allegations as a matter of law or justifies dismissal under rule 12(b)(6)." *Aatrix I*, 882 F.3d at 1125 (alterations and internal quotations omitted) (quoting *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F. 3d 1089, 1097 (Fed. Cir. 2016)). If there are claim construction disputes at this stage, the court must either adopt the non-moving party's constructions or "resolve the disputes to whatever extent is needed to conduct the § 101 analysis, which may well be less than a full, formal claim construction." *Id.* (citing *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1352 (Fed. Cir. 2016); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1346 (Fed. Cir. 2014); *Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369, 1373 (Fed. Cir. 2016)). As explained below, the court finds that there are no claim construction disputes that need to be resolved before conducting the § 101 analysis here.

9

In determining section 101 eligibility, the court need not "parse each individual claim," rather, analyzing a patent's representative claim is sufficient. *Wolf v. Capstone Photography, Inc.*, No. 2:13-CV-09573, 2014 WL 7639820, at *10 n.3 (C.D. Cal. Oct. 28, 2014) (citations omitted). Here, Defendants assert that Claim 1 may be treated as representative because the dependent claims add trivial, non-technical imitations, and system claim 13 mirrors the limitations of method Claim 1. (Doc. 47, p. 16, n.1.) As Plaintiff does not contest this assertion, the court will treat Claim 1 as representative.

In *Alice*, the Supreme Court reaffirmed the framework set forth in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66 (2012), "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 573 U.S. at 217. The court must first determine "whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* If so, the court must then "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 78–79.)

### 1. *Alice* Step One

"The 'abstract ideas' category embodies 'the longstanding rule that an idea of itself is not patentable.'" *Alice*, 573 U.S. at 218 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)). While the Federal Circuit has not established "a definitive rule to determine what constitutes an abstract idea," it has "held claims ineligible as directed to an abstract idea when they merely collect electronic information, display information, or embody mental processes that could be performed by humans." *Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1346–47 (Fed. Cir. 2017). Courts have found it instructive to "compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Axcess Int'l, Inc. v. Genetec (USA) Inc.*, 375 F. Supp. 3d 533, 537 (D. Del. 2019) (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016)). However, courts "must be careful to avoid oversimplifying the claims because 'at some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'" *Id.* (alterations omitted) (quoting *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016)).

Claim 1 describes a "method for eliminating contraband in postal mail for one or more remote correctional facilities," which includes identifying specific characteristics of the postal mail, screening it for contraband, scanning the sender and content information, generating a text-readable version of the electronic copy

11

to be stored electronically in a database, and associating a contraband flag that can deny the inmate access.  (Doc. 1-2, p. 27.)

Defendants argue that the '617 Patent fails *Alice* step one because it patents an ineligible method of organizing human activity—"receiving, sorting, reviewing, logging, screening, and distributing inmate postal mail—using generic computer components like scanners, terminals, servers, and kiosks and generic computer processes like generating text-searchable documents and tagging electronic files." (Doc. 47, p. 6.)  Defendants note that the specification admits that postal mail is a federal right for inmates in correctional facilities and the facilities have therefore been manually receiving, sorting, reviewing, logging, screening, and distributing inmate mail for years.  (*Id.*, at 17.)  Thus, "the purported invention is simply to computerize a process that, as the specification admits, correctional facilities have carried out manually for years."  (*Id.*, at 6.)  Defendants contend that the claims in the '617 Patent merely recite an automated version of these longstanding human practices and it is therefore not patent-eligible.  (*Id.*, at 17.)

Defendants cite several cases they believe to be analogous to the case at hand, in which the asserted patents at issue were found to be directed to abstract ideas.  Where a claim was "directed to the use of persistent identifiers to implement targeted marketing," the Federal Circuit held that the claim was directed to an abstract idea because targeted marketing "is a fundamental practice

12

that dates back to newspaper advertisements." *Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882, 887 (Fed. Cir. 2019). The Federal Circuit also held that claims directed to "using a marking affixed to the outside of a mail object to communicate information about the mail object, *i.e.*, the sender, recipient, and contents of the mail object" were directed to an abstract idea. *Secured Mail Sols., LLC v. Universal Wilde, Inc.*, 873 F. 3d 905, 911 (Fed. Cir. 2017). Defendants argue that the claims at issue here are likewise fundamental practices.

Additionally, Defendants specifically point to numerous cases in which courts have held that if a patent's claims merely automate manual processes, they are directed to abstract ideas. *See Ericcsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1327 (Fed. Cir. 2020) (holding that processes at issue were "exactly the sort of process that can be performed in the human mind, or by a human using a pen and paper, which we have repeatedly found unpatentable"); *Affinity Labs of Tex., LLC v. Amazon.com, Inc.*, 838 F.3d 1266, 1270 (Fed. Cir. 2016) (holding that in *Alice* step one, "it is often helpful to ask whether the claims are directed to an improvement in the functioning of a computer, or merely adding conventional computer component to well-known business practices," with the latter being abstract) (quoting *Enfish*, 822 F.3d at 1338); *Secured Mail*, 873 F.3d at 910 (where the claims stated various identifiers affixed to a mail object, stored in a database, scanned from the mail object, and retrieved from the database, but "[n]o

13

special rules or details of the computers, databases, printers, or scanners [were] recited," the court held that the claims were directed to an abstract idea); *Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1303, 1335 (Fed. Cir. 2015) (holding that claims employing a computer to "improve the performance of [price] determination" but that did not "improv[e] computer performance" were not patent-eligible); *Ficep Corp. v. Peddinghause Corp.*, 2021 WL 254104, at *2 (D. Del. Jan. 26, 2021) (although the asserted patent was found to be patent-eligible, the court stated that "if a claim simply takes . . . something that humans have done for a long time [] and does nothing more than make use of a generic computer to perform [it] faster or more accurately . . . then the claim is ineligible").

Smart Communications first notes that issued U.S. patents are presumed valid pursuant to 35 U.S.C. § 282(a).  (Doc. 55, p. 5.)  This presumption creates a heightened burden for infringers, who must prove invalidity by clear and convincing evidence.  (*Id.*)  Smart Communications also argues there has not yet been a claim construction hearing and that "[t]he analysis of whether claims recite patent-eligible subject matter requires a complete understanding of what the claims mean."  (*Id.*, at 12–14.)  Smart Communications then asserts that the claims of the '617 Patent are anything but fundamental, and that they describe specific systems and methods for eliminating contraband transmitted through the mail at correctional facilities.  (*Id.*, at 14–21.)

In arguing that the claims at issue here are not fundamental, Smart Communications first cites case law emphasizing that the claims of the asserted patent must be taken as a whole, rather than individually. *Cardionet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1368 (Fed. Cir. 2020). Then, Smart Communications points to several cases in which the claims of the asserted patents focus on a specific means or method that improves longstanding issues, and the asserted patents were found to be patent-eligible. *Cardionet*, 955 F.3d at 1368 (in beginning the *Alice* step one analysis, the court "look[ed] to whether the claims focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is an abstract idea and merely invoke generic processes and machinery") (quoting *McRO, Inc., v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016)). Smart Communications urges the court to deny Defendants' motion because utilizing technology to make improvements to the underlying process remains patentable. (Doc. 55, pp. 21–23.)

In their reply brief, Defendants argue that no deference is owed to the Patent Office examiner's determination regarding the validity of the patent, as that is already captured in the statutory presumption of validity, which is rebuttable. (Doc. 58, p. 18.) In response to the arguments relating to claim construction, Defendants assert that claim construction is not necessary before determining patent invalidity, particularly where Smart Communications has not specified any

15

claim term or phrase that needs to be construed before determining patent eligibility. (*Id.*, at 16–17.)

First, despite Smart Communications' arguments to the contrary, the court notes that claim construction is not necessary prior to determining patent eligibility. *See Elec. Commc'n Techs., LLC v. ShoppersChoice.com, LLC*, 958 F.3d 1178, 1187 (Fed. Cir. 2020). This is particularly so where the patentee does not explain how it might benefit from a particular term's construction under an *Alice* analysis. *Simio, LLC v. Flexsim Software Prods.*, 983 F.3d 1353, 1365 (Fed. Cir. 2020). Because Smart Communications only generally argued that any eligibility analysis should not occur until after claim construction, but has not indicated which term(s) require construction before the court can undertake such analysis, the court finds no reason to defer ruling on patent eligibility until after claim construction.[3]

As to the rebuttable presumption that the patent is valid, it is notable that the patent application was initially rejected, as the Examiner found that the claims "describe[d] an abstract idea of collecting, analyzing, and displaying data/content"

---

[3] While the court's determination here is based on relevant case law from the Federal Circuit, the court also notes that prior to the instant motion being filed, Smart Communications completed claim construction briefing in a case in Tennessee alleging infringement of the same patent and asserted that no term required construction. *See HLFIP Holding, Inc. v. Rutherford Cnty., Tenn.*, No. 3:19-cv-714 (M.D. Tenn) at Doc. 172. Furthermore, after the instant motion was fully briefed, the parties here completed claim construction briefing and Smart Communications likewise asserted that no term required construction. (Doc. 80.) Thus, Smart Communications has failed at several junctures to assert any specific terms that require construction.

and that while the claims "recite[d] some additional elements such as 'associating a contraband flag,' 'presenting electronic copy for staff review,' and 'logging the date of receipt of the electronic copy,'" these elements did not alter the analysis because they were simply "[g]eneric computer components recited as performing generic computer functions." (Doc. 47-2, pp. 3–4.) The claims were amended and limitations were added indicating that a "text-readable" electronic copy would be created, the main may be intended for "one or more remote correctional facilities," and language relating to "access flags" and "identifiers" was added. (Docs. 47-3 & 47-4.) The Examiner allowed these amended claims but there was no analysis or explanation of how the additional claims overcame the abstractness or conventionality issues. (Doc. 47-5.) In this instance, the court cannot defer to the Examiner's rationale because no explanation or rationale was provided. The court recognizes the statutory presumption of validity, but finds that the presumption has been rebutted in this case.

An examination of the text of the '617 Patent claims reveals a series of steps that describe an abstract idea—namely, identifying characteristics of postal mail (such as the recipient-inmate, the inmate's institution, the sender, etc.), screening it for contraband, scanning the sender and content information, generating a text-readable version of the electronic copy to be stored electronically, and associating a contraband flag that can deny the inmate access. These steps are analogous to

17

the steps of "collecting data," "recognizing certain data within the collected data set," and "storing that recognized data in memory" that the Federal Court found to be abstract in *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014).  *See also Return Mail, Inc.*, 2022 U.S. Claims LEXIS 567, at *20.  This is true whether looking at the claim limitations individually or collectively as a whole.

Additionally, contrary to Smart Communications' assertion, the claim does not escape abstractness because it is directed to a specific method that improves a longstanding issue.  Rather, by Smart Communications' own admission, there have been manual systems in place to combat this "longstanding issue" for many years.  Smart Communications has not explained any claim limitations that involve a process not previously being conducted manually.

The '617 Patent is substantially different in this respect from patents that have been found eligible.  In *McRO*, for example, the asserted patent involved a process that improved computer animation by using a process *different* from the prior-art techniques employed manually.  *McRO*, 837 F.3d at 1314 (emphasis added).  Where the asserted patent was an "unconventional technological solution" that achieved an improvement in computer functionality, the court held that the patent was valid.  *Amdocs (Isr.) Ltd. V. Openet Telecom, Inc.*, 841 F.3d 1288,

18

1300–01 (Fed. Cir. 2016). In *CardioNet*, the cardiac-monitoring system used new techniques that doctors were not previously using. *CardioNet*, 955 F.3d at 1370.

Conversely, where the asserted patent involves claims describing the sort of process that could be performed in the human mind or by a human using a pen and paper, they are not patentable. *Ericsson*, 955 F.3d at 1327. In *Affinity Labs*, for example, the asserted patent was ineligible because the claims were adding conventional computer components to well-known business practices rather than an actual improvement. *Affinity Labs*, 838 F.3d at 1270. Courts have repeatedly held that if a claim takes an abstract idea—something that humans have done for a long time–and does nothing more than make use of a generic computer to perform that task faster or more accurately than a human could, then the claim is ineligible. *Ficep Corp.*, 2021 U.S. Dist. LEXIS 15881, at *6; *McRO*, 837 F.3d at 1314.

It is evident that the claim limitations here recite the conventional, historically manual method of processing inmate mail, screening it for contraband, and distributing it to inmates. While the '617 Patent may improve the speed and accuracy of recordkeeping and recognizing trends with inmate mail over time, there is nothing in the record before the court that the '617 Patent does anything more than perform this task faster and more accurately than humans have been doing for years. Accordingly, reviewing the limitations in claim 1 individually and as a whole, the parties' competing characterizations, and comparing claim 1 to

19

claims in previous cases, the court concludes that claim 1 is directed to an abstract idea within the meaning of *Alice* step one.

## 2. *Alice* Step Two

In evaluating *Alice* step two, courts must look for an "inventive concept" by analyzing "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 78–79). The additional features or elements must ensure "that the [claim] is more than a drafting effort designed to monopolize the [abstract idea]." *Id.* at 221 (quoting *Mayo*, 566 U.S. at 72, 79). Furthermore, the patent-eligible application requires "more than simply stat[ing] the [abstract idea] while adding the words 'apply it.'" *Id.* (quoting *Mayo*, 566 U.S. at 72).

However, "patentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6)." *Aatrix I*, 882 F.3d at 1126–27 (citing *BASCOM Glob. Internet Servs., Inc.*, 827 F.3d at 1352). "[P]lausible factual allegations may preclude dismissing a case under § 101 where, for example, nothing in the record . . . refutes those allegations as a matter of law or justifies dismissal under Rule 12(b)(6)." *Id.* (internal quotations and citations omitted) (quoting *FairWarning IP, LLC*, 839 F.3d at 1097). "Whether a claim element or combination of elements would have been well-understood, routine,

and conventional to a skilled artisan in the relevant field at a particular point in time may require weighing evidence, making credibility judgments, and addressing narrow facts that utterly resist generalization." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 890 F.3d 1354, 1355 (Fed. Cir. 2018) (hereinafter "*Aatrix II*") (alterations and quotations omitted) (quoting *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. The Village at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018)). On the other hand, "[i]f the specification admitted that the claim elements are well-understood, routine, and conventional, it would be nearly impossible for a patentee to show a genuine dispute." *Id.* at 1356.

Defendants argue that the claims do not contain an inventive concept, whether considered individually or as an ordered combination, because they simply implement the ineligible concept using generic computer components and techniques. (Doc. 47, pp. 22–24.) They present similar arguments as they presented for step one. (*Id.*)

Smart Communications' response in opposition focuses primarily on a lack of complete preemption. (Doc. 55, pp. 23–27.) Smart Communications asserts that if the court finds at step one that the '617 Patent is directed to an abstract idea, that the court should nonetheless find the remainder of the claim, taken as a whole, limits the claim to a specific implementation of that idea, presenting no danger of broadly pre-empting the distribution of mail to inmates at correctional facilities.

(*Id.*, at 23–24.)  Smart Communications argues that, pursuant to *Alice*, claims presenting no risk of preempting the use of underlying abstract ideas remain eligible for patent protection.  (*Id.*, at 24.)

In their reply brief, Defendants acknowledge that the claims in the '617 Patent are specific in that they do not cover *all* possible methods of processing and distributing inmate mail, but assert that specificity or the absence of complete preemption does not equal eligibility.  (Doc. 58, pp. 14–15.)  Citing Federal Circuit cases, Defendants contend that preemption may signal patent ineligible subject matter, but the absence of complete preemption does not demonstrate patent eligibility.  (*Id.*, at 14) (citing *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015)).  Additionally, Defendants argue that the mere fact that the '617 Patent is directed to solving problems specific to correctional facilities is not sufficient to make the '617 Patent eligible.  (*Id.*, at 14) (citing *Alice*, 573 U.S. at 222).

It is notable that Smart Communications does not make any specific allegation that the '617 Patent contains an inventive concept.  The crux of the *Alice* step two analysis is whether there exists an inventive concept such that the application of the asserted patent is significantly more than the abstract idea the claims are directed to.  Here, however, Defendants have argued that because the claims do nothing more than use generic computers to automate historically

22

manual processes, there is no inventive concept present.  In response, Smart

Communications summarily states that "[t]he limitations, as part of the methods

and systems claimed as a whole, provide an inventive concept that solves identified

problems in the underlying art and, importantly, does not risk pre-empting other

methods and systems of delivering inmate mail."  (Doc. 55, p. 26.)  What is

missing, however, is any explanation of *how* any of the claim limitations represent

a new or useful application.

The limitations of the '617 patent claims were well-known and conventional

at the time of the patent application, including the additional claims Smart

Communications added in order to overcome the initial denial of the patent

application: creating text-readable versions of the scanned mail; utilizing flags and

identifiers; and providing that the mail may be sent to a central facility for

distribution to one or more remote correctional facilities.  It is apparent that

creating a text-readable electronic copy of a document is known and conventional.

*See Context Extraction*, 776 F.3d at 1345 (holding that using a scanner or other

digitizing device to extract data from a document is not inventive).  Likewise,

flagging items and using identifiers are not inventive.  *See Intellectual Ventures I*

*LLC v. Symantec Corp.*, 838 F.3d 1307, 1315 (Fed. Cir. 2016) (holding that using

identifiers and categorizing electronic data is a generic computer function).

Finally, performing the same task at a central location with conventional computer

components is insufficient to state a transformative inventive concept. *See In re Rosenberg*, 813 Fed. App'x 594, 598–99 (Fed. Cir. 2020).

To restate known, conventional steps, but doing so on a computer, is insufficient to transform the claims—otherwise directed to an abstract idea—into an inventive application. *See, e.g., Alice*, 573 U.S. at 225 (holding that claims failed to "do more than simply instruct the practitioner to implement the abstract idea . . . on a generic computer" where "each step of the process [was] purely conventional" individually and as an ordered combination) (internal quotations omitted).

Additionally, Smart Communications' claims that the '617 Patent claims are eligible because they are specific and limited to solving longstanding problems within correctional facilities are unavailing. Limiting the use of an abstract idea to a particular technological environment is not sufficient. *buySafe, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) (citing *Alice*, 573 U.S. at 22–24). Because the claims are directed to the abstract idea of identifying characteristics of postal mail, screening it for contraband, scanning the sender and content information, generating a text-readable version of the electronic copy to be stored electronically, and associating a contraband flag that can deny the inmate access, and because there is no genuine dispute of material fact that those claims fail to

24

offer any kind of new application of that idea, the court holds that the disputed patent is patent-ineligible under 35 U.S.C. § 101.

## CONCLUSION

For the reasons stated herein, the court will grant Defendants' motion for judgment on the pleadings.  Because the court finds that the '617 patent is invalid, count 2 of the complaint and the counterclaims asserted in the second amended answer, Doc. 131, are moot.  An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: April 25, 2022

# EXHIBIT 29

NOTE: This disposition is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

———————————

**HLFIP HOLDING, INC., DBA SMART COMMUNICATIONS IP HOLDINGS,**
*Plaintiff-Appellant*

**v.**

**YORK COUNTY, PA, YORK COUNTY PRISON, ADAM OGLE, IN HIS OFFICIAL CAPACITY AS YORK COUNTY PRISON WARDEN,**
*Defendants-Appellees*

———————————

2022-1940

———————————

Appeal from the United States District Court for the Middle District of Pennsylvania in No. 1:20-cv-00186-JPW, Judge Jennifer P. Wilson.

———————————

**JUDGMENT**

———————————

SCOTT THOMAS WEINGAERTNER, Goodwin Procter LLP, New York, NY, argued for plaintiff-appellant. Also represented by KATRINA M. QUICKER, Quicker Law, LLC, Atlanta, GA.

WILLIAM MILLIKEN, Sterne Kessler Goldstein & Fox, PLLC, Washington, DC, argued for defendants-appellees.

Also represented by RICHARD CRUDO, UMA EVERETT, RYAN
CHARLES RICHARDSON, MICHAEL D. SPECHT.

_____

THIS CAUSE having been heard and considered, it is

ORDERED and ADJUDGED:

    PER CURIAM (LOURIE, PROST, and CUNNINGHAM, *Circuit Judges*).

        **AFFIRMED. See Fed. Cir. R. 36.**


        ENTERED BY ORDER OF THE COURT


| August 18, 2023 | /s/ Jarrett B. Perlow |
|---|---|
| Date | Jarrett B. Perlow |
| | Clerk of Court |

# EXHIBIT 30

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| HLFIP HOLDING, INC. d/b/a SMART COMMUNICATIONS IP HOLDINGS, | ) ) | |
| | ) | NO. 3:19-cv-00714 |
| Plaintiff, | ) ) | |
| | ) | JUDGE RICHARDSON |
| v. | ) ) | |
| RUTHERFORD COUNTY, TENNESSEE; MICHAEL FITZHUGH, *in his official capacity as Rutherford County Sheriff*; KEITH D. LOWERY, *in his official capacity as Deputy Chief of Rutherford County Sheriff's Office*; RUTHERFORD COUNTY ADULT DETENTION CENTER; and CHRISTOPHER FLY, *in his official capacity as Deputy Chief of Rutherford County Adult Detention Center*, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants and Counterclaimants, | ) ) ) | |
| VENDEGINE, INC., | ) ) | |
| Intervenor. | ) ) | |

## **MEMORANDUM OPINION**

Pending before the Court is Defendants Rutherford County et. al.'s and Intervenor VendEngine, Inc.'s Motion for Judgment on the Pleadings (Doc. No. 86, "Motion"), filed along with a supporting memorandum of law (Doc. No. 87). Plaintiff filed a response. (Doc. No. 94). The movants filed a reply. (Doc. No. 105). This motion is ripe for review.

For the reasons discussed herein, the Court will grant Defendants and Intervenor's motion.

## BACKGROUND

A.  Factual Background[1]

Plaintiff, HLFIP Holding, Inc. d/b/a Smart Communications IP Holdings ("Smart Communications"), is a Florida corporation. (Doc. No. 1 at ¶ 2). Defendant Rutherford County is a municipal governmental entity organized under Tennessee law. (*Id.* at ¶ 3). Defendant Michael Fitzhugh is the Sheriff of Rutherford County, and Defendant Keith D. Lowery is the Deputy Chief of the Rutherford County Sheriff's Office. Defendant Rutherford County Adult Detention Center ("RCADC") is an adult correctional facility operated by Rutherford County, and Defendant Christopher Fly is the Deputy Chief of the RCADC. (*Id.* at ¶ 2).

Smart Communications is the owner of the patent-in-suit, namely U.S. Patent 10,291,617 ("'617 patent"), entitled "Correctional Postal Mail Contraband Elimination System" and issued May 14, 2019. (*Id.* at ¶¶ 11–12). The patent is for a kiosk-based electronic system and method[2] for correctional facilities intended to improve the detection of contraband in inmates' mail. (Doc. No. 1-2 at 22). The patented system is meant to be more efficient than manual processing of inmate mail. (Doc. No. 1-2 at 23). The exemplary claim 1 describes "identifying mail information," creating an electronic copy of inmate mail, "screening said postal mail for contraband," "associating a contraband flag with said electronic copy," and "determining access to said electronic copy by said recipient inmate wherein access may be granted or denied based upon whether contraband was discovered in said postal mail." (Doc. No. 1-2 at 27). In essence, the

---

[1] The Court takes these background facts from the Complaint and, as indicated below, accepts them as true for purposes of the Motion.

[2] For the sake of brevity, the Court will use the term "system" or "process," rather than "system and method," to describe the kind of invention the '617 patent covers.

patent describes using a kiosk to scan mail and filter out contraband. Smart Communications uses this patent in its product MailGuard®. (Doc. No. 1 at ¶ 15).

In 2017, RCADC expressed interest in MailGuard® and instructed its commissary vendor, VendEngine, Inc. ("VendEngine") to partner and work with Smart Communications to bring MailGuard® to RCADC. (Doc. No. 1 at ¶ 20). After some preliminary discussions, VendEngine and RCADC abruptly ceased discussions with Smart Communications. (*Id.* at ¶ 21).

In June 2018, RCADC implemented a new application by VendEngine that essentially was Smart Communications' MailGuard®. (*Id.* at ¶ 23). VendEngine's application enables, among other functions, scanning inmate mail, detecting contraband or other inappropriate content, and withholding mail depending on its content. (*Id.* at ¶ 25). RCADC continues to use VendEngine's application. (*Id.* at ¶ 24).

B. Procedural Posture

On August 15, 2019, Smart Communications instituted this action by filing a complaint (Doc. No. 1) against Defendants. In their answer to the complaint, Defendants raised invalidity of the '617 patent under 35 U.S.C. § 101 ("§ 101") as an affirmative defense. (Doc. No. 22 at 9), and also asserted a counterclaim for declaratory judgment of non-infringement of the '617 patent (Doc. No. 22 at 14). Thereafter, VendEngine moved to intervene in the action. (Doc. No. 24). After its motion was granted, (Doc. No. 35), VendEngine filed an answer, wherein it likewise raised invalidity as an affirmative defense and counterclaimed for a declaratory judgment of non-infringement of the '617 patent. (Doc. No. 36 at 9, 14–15). Smart Communications then answered VendEngine's answer and asserted a counterclaim against VendEngine for infringement of the '617 patent. (Doc. No. 54).

On March 30, 2020, Intervenor and Defendants filed the instant Motion, seeking judgment on the pleadings pursuant to Rule 12(c) on the grounds that the '617 patent is invalid under § 101. (Doc. No. 86). Thereafter, Defendants and VendEngine each filed an amended answer and counterclaim, each of which reiterated the affirmative defense of invalidity under § 101 and the counterclaim for a declaratory judgment, (Doc No. 262 at 9, 24–25; Doc. No. 268 at 9, 24–25), and neither of which made any amendments material to the resolution of the instant Motion.

<u>LEGAL STANDARD</u>

The Federal Rules of Civil Procedure provide that after the pleadings are closed, but within such time as not to delay the trial, any party may move for judgment on the pleadings. Fed. R. Civ. P. 12(c).

A motion for judgment on the pleadings under Rule 12(c) is governed by the same standards that govern a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Reilly v. Vadlamudi*, 680 F.3d 617, 622–23 (6th Cir. 2012). "For purposes of a motion for judgment on the pleadings, all well-pleaded allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007). However, the court need not accept as true legal conclusions or unwarranted factual inferences. Id. at 581–82. "A Rule 12(c) motion is appropriately granted 'when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law.'" *Stafford v. Jewelers Mut. Ins. Co.,* 554 F. App'x 360, 370 (6th Cir. 2014) (quoting *Tucker v. Middleburg-Legacy Place, LLC*, 539 F.3d 545, 549 (6th Cir. 2008)).

In this case, a party moving under Rule 12(c) for judgment on the pleadings because of invalidity under § 101 must show that subject-matter ineligibility is clear and convincing based on

pled facts. *Ronald A. Katz Tech. Licensing, L.P. v. Fedex Corp.,* No. 2:15-cv-02329, 2016 WL 1179218, at *3 (W.D. Tenn. Mar. 24, 2016). Claims must be construed in favor of nonmovant. *See Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) (stating that claims must be construed in favor of nonmovant in the context of a 12(b)(6) motion).[3]

DISCUSSION

A.  <u>Invalidity Under 35 U.S.C. § 101</u>

§ 101 prescribes the subject matter eligible for patent protection. Specifically, it provides that "[w]hoever invents or discovers *any new and useful process . . . or any new and useful improvement thereof*, may obtain a patent . . . ." 35 U.S.C. § 101 (emphasis added).

Under *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 221 (2014), a patent is invalid under § 101 if (1) the claims, individually and in combination, are directed to an abstract idea or natural phenomena *and* (2) there is not an "inventive concept" that can transform the abstract idea. *Id. Alice* thus essentially prescribes two requirements (sometimes referred to in terms of "steps") for patent invalidity. As set forth below, because the '617 patent meets both requirements for invalidity, it is invalid under § 101.

---

[3] Contrary to Plaintiff's assertion, the fact that claim construction has not occurred does not preclude a clear and convincing showing that the patent is invalid. (Doc. No. 94. at 6-7). "Although the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter, claim construction is not an inviolable prerequisite to a validity determination under § 101." *Content Extraction and Trans. v. Wells Fargo Bank*, 776 F.3d 1343, 1349 (Fed. Cir. 2014). Claim language itself, even if construed in favor of the non-movant, can be sufficiently clear and convincing to rebut the presumption that the United States Patent and Trademark Office ("PTO") issued a valid patent. To hold otherwise would be to suggest that no motion to dismiss (including a motion based on invalidity and noninfringement) that hinges on claim language can be granted without full claim construction—a suggestion that is unsupported by case law. *See, e.g., Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2016) ("[W]e have repeatedly affirmed § 101 rejections at the motion to dismiss stage, before claim construction or significant discovery has commenced.").

B.  Application of *Alice*'s two requirements for invalidity under § 101

    *1. Alice* Step One

Under Federal Circuit precedent, a patented process that merely uses a computer to perform certain functions is directed to an abstract idea for purposes of *Alice* step one when it does not improve computer functionality at all. "[A] relevant inquiry at step one is 'to ask whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea'" *In re TLI Communications LLC Patent Litigation*, 823 F.3d 607, 612 (Fed. Cir. 2016) (quoting *Enfish, LLC v. Microsoft Corp.,* 822 F.3d. 1327, 1335 (Fed. Cir. 2016)). Step one "relie[s] on the distinction made in *Alice* between, on one hand, computer-functionality improvements and, on the other, uses of existing computers as tools in aid of processes focused on 'abstract ideas'" *Electric Power Group, LLC v. Alstom S.A.* 830 F.3d 1350, 1354 (Fed. Cir. 2016).

The process covered by '617 patent falls into the latter category. The patent covers a process that does not improve any "*existing technological* process," as would be sufficient under *Alice*, 573 U.S. at 223, to support patentability. Instead, the patented process is one of manually sorting postal mail and detecting contraband via a computer. It merely improves the process of mail distribution compared to a manual method. No step "purport[s] to improve the functioning of the computer itself…or effect an improvement in any other technology[.]" *Alice*, 573 U.S. at 225. Manually sorting postal mail is not properly considered an existing *technological* process. None of the claims improve the functioning of computers or any technology itself. Therefore, the '617 patent recites an abstract idea within the meaning of *Alice* step one.

    *2. Alice* Step Two

Even if it is directed to an abstract idea, a patent can meet the requirements of § 101 if it describes an "inventive concept." *Alice*, 573 U.S. at 217–218. But if a patent neither "require[s]

an arguably inventive set of components or methods" nor requires "a new source or type of information, or new techniques for analyzing it," it does not describe an inventive concept as described by *Alice*. *Electric Power Group*, 830 F.3d at 1355.

"If a patent uses generic computer components to implement an invention, it fails to recite an inventive concept under *Alice* step two." *West View Research, LLC v. Audi AG*, 685 Fed. App'x 923, 926 (Fed. Cir. 2017). Plaintiff does not allege usage of even a single non-generic computer component. According to the '617 patent's detailed description of embodiments, the process uses generic scanners, kiosks, and computers. (Doc. No. 1-2 at 24). For example, the '617 patent describes institution staff using terminals to view inmate mail. *Id.* at 27. "Such terminals may be computers, laptops, dumb terminals, virtual machines, kiosks or any other electronic device with a display and the ability to connect to server through a network." *Id.* Inmates may view their mail using "portable tablets, music players, smart phones, or other portable devices used by inmates and capable of communicating with server through a network connection." *Id.* The claims cover only generic methods such as identifying keys and flags. Plaintiff does not allege that anything "in the claims . . . requires anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information." *Electric Power Group,* 830 F.3d at 1355.

Plaintiff also does not allege that there are new techniques used. Scanning mail is not a new technique. Neither is flagging mail that has certain attributes or flagging mail (based on content) to prevent its ultimate distribution to the addressee. Flagging or blocking mail based on content is a basic function of email spam filters, for example. The claims are "essentially result-focused, functional," rather than describing a nonroutine method. *Id.* at 1356. The only novelty presented by the '617 patent is the application of these routine steps in the specific context of

inmate mail. That is distinguishable from, for example, the new technique found patentable in *Bascom*, which was the "installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user." *Bascom*, 827 F.3d at 1350. The patented process at issue in *Bascom* went far beyond merely using basic computer functions to replace a manual process.

Even if, as Plaintiff claims, the '617 patent solves a problem or improves a process in the corrections industry, that alone is not sufficient to meet § 101's requirements. Instead, § 101 requires the patent to cover matter that is both "*new* and useful," not just useful. Plaintiff cites *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.,* 841 F.3d 1288, 1300–1301 (Fed. Cir. 2016), for the proposition that an arrangement of conventional elements does not satisfy *Alice*'s second requirement for invalidity (*i.e.*, step two) if it provides a solution to a recognized problem. (Doc. No. 94 at 13). But *Amdocs* does not actually support that proposition. Rather, *Amdocs* states that the invention must "solve a technology-based problem." *Amdocs*, 841 F.3d at 1300. Again, the invention covered by the '617 patent does not solve a technology-based problem, but rather uses technology to increase efficiency compared to manual processes.

Plaintiff notes that the '617 patent "present[s] no danger of broadly pre-empting the distribution of mail to inmates at correctional facilities." (Doc. No. 94 at 14). Assuming arguendo this is the case, the fact that the claims do not preempt all methods of distribution of mail to inmates does not make the patented system an invention or discovery of a "new" process under § 101 when it otherwise is not.[4] *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir.

---

[4] Plaintiff points out that the analysis under § 101 is distinct from an analysis of novelty and obviousness under 35 U.S.C. § 102 and 35 U.S.C. § 103. (Doc. No. 94 at 14). That said, § 101 nevertheless authorizes the issuance of a patent only for an "invent[ion]" or a "discover[y]" of something "new," such as a "new . . . process" or "new . . . improvement thereof." 35 U.S.C. § 101; *Elan Pharms., Inc. v. Mayo Found. for Med. Educ. & Rsch.*, 304 F.3d 1221, 1227 (Fed. Cir. 2002.) ("To be patented an invention must be new."

2015) ("While preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility.").

Plaintiff cites *Bascom* for the idea that narrowed claims can save a patent under § 101. (Doc. No. 94 at 14). But the Federal Circuit notes in *Bascom* itself that "[its prior] decisions further explained that simply because some of the claims narrowed the scope of protection through additional 'conventional' steps for performing the abstract idea, they did not make those claims any less abstract." *Bascom*, 827 F.3d at 1352. The court in *Bascom* held that the patent-in-suit failed to satisfy *Alice*'s step-two requirement for invalidity because the claims contained an innovative step, not because the claims were narrowed and did not preempt the entire abstract idea. *Bascom*, 827 F.3d at 1350.

Thus, the '617 patent is invalid because it is not directed to patent-eligible subject matter under § 101.

<u>CONCLUSION</u>

For the reasons discussed herein, the Court will grant the Motion and dismiss with prejudice Plaintiff's claims (both as presented against Defendants in the Complaint (Doc. No. 1) and in the counterclaim against VendEngine (Doc. No. 54) with prejudice. And, for reasons to be set forth in the order that will accompany this memorandum opinion, the Court *sua sponte* will dismiss without prejudice Defendants' and VendEngine's respective counterclaims for declaratory judgment of non-infringement (Doc. No. 262 at 14–15; Doc. No. 268 at 14–15).

---

(citing 35 U.S.C. §§ 101, 102(a), (e))), *reh'g en banc granted, opinion vacated on other grounds*, 314 F.3d 1299 (Fed. Cir. 2002), *and on reh'g en banc*, 346 F.3d 1051 (Fed. Cir. 2003). In turn, § 102 and § 103 ask, respectively, whether the invention or discovery is, in addition to being "new," also novel and nonobvious. Notably, the text of § 102 does not use the term "novel" or "novelty"; rather, the term "novelty" is used in the caption of § 102 as a shorthand reference to the particular requirements for patentability set forth in the text, which go beyond merely requiring that the invention be "new." Some of the characteristics that make an invention "new," however, could be relevant to whether the invention is novel in the sense required by § 102 and to whether the invention is nonobvious as required by § 103.

An appropriate accompanying order will be entered.

*Eli Richardson*

ELI  RICHARDSON
UNITED STATES DISTRICT JUDGE

# EXHIBIT 31

Appeal Nos. 2023-1380, 2023-1379

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

———————————

HLFIP HOLDING, INC., D/B/A SMART COMMUNICATIONS IP HOLDINGS,

*Plaintiff-Appellant*,

- v. -

RUTHERFORD COUNTY, TN, RUTHERFORD COUNTY ADULT DETENTION CENTER,

*Defendants-Cross-Appellants*,

VENDENGINE, INC.,

*Defendant-Appellee*,

———————————

Appeal from the United States District Court
for the Middle District of Tennessee in
Case No. 3:19-cv-00714
Judge Eli Jeremy Richardson

———————————

## APPELLANT'S MOTION TO DISMISS

———————————

Scott T. Weingaertner
Stefan Mentzer
Matthew R. Wisnieff
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 459-7067

Katrina M. Quicker
QUICKER LAW, LLC
900 Circle 75 Parkway
Suite 100
Atlanta, Georgia 30339
Telephone: (678) 750-0450

*Counsel for Plaintiff-Appellant*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2023-1380, 2023-1379 |
| **Short Case Caption** | HLFIP Holding, Inc. v. Rutherford County, TN |
| **Filing Party/Entity** | HLFIP Holding, Inc. d/b/a Smart Communications IP Holdings |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/01/2023

Signature:  /s/ Scott T. Weingaertner

Name:  Scott T. Weingaertner

| 1. **Represented Entities.**<br>Fed. Cir. R. 47.4(a)(1). | 2. **Real Party in Interest.**<br>Fed. Cir. R. 47.4(a)(2). | 3. **Parent Corporations and Stockholders.**<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| HLFIP Holding, Inc.d/b/a Smart Communications IP Holdings | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☑   Additional pages attached

| | | |
|---|---|---|
| Kathryn A. Vance Quicker Law, LLC | Jeffrey Lesovitz Baker & Hostetler LLP | Gregory S. Reynolds Riley Warnock & JacobsonPLC |
| Kevin P. Flynn Baker & Hostetler LLP | Mark Einsiedel Baker & Hostetler LLP | John DavidClark Riley Warnock & JacobsonPLC |
| Jason P. Grier Baker & Hostetler LLP | Robert T. Razzano Baker & Hostetler LLP | Keane A. Barger Riley Warnock & Jacobson PLC |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)      ☐   No      ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## ADDITIONAL PAGES TO FORM 9. CERTIFICATE OF INTEREST

**4. Legal Representatives.** The following law firms, partners and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this Court for the entities are listed below, in addition to those on the foregoing Form 9. Certificate of Interest:

1. Jason Jackson – Kutak Rock LLP

2. Peter Jones – Herman Jones LLP

Dated: December 1, 2023

/s/  Scott T. Weingaertner
Scott T. Weingaertner
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 459-7067

*Counsel for Plaintiff-Appellant*
*HLFIP Holding, Inc. d/b/a Smart*
*Communications IP Holdings*

1

Pursuant to Federal Rule of Appellate Procedure 42(b)(2) and Federal

Circuit Rule 27(f), Plaintiff-Appellant HLFIP Holding, Inc. d/b/a Smart

Communications IP Holdings ("Smart Communications") respectfully moves for

entry of an order dismissing, without prejudice, Appeal Nos. 2023-1380 and 2023-

1379.  In support of this motion, Smart Communications states as follows.

## **<u>BACKGROUND</u>**

This appeal arises from an order and judgment of the United States District

Court for the Middle District of Tennessee, ruling that U.S. Patent No. 10,291,617

(the "'617 patent") is ineligible for patent protection under 35 U.S.C. § 101, and

dismissing Smart Communications's patent infringement lawsuit against

Rutherford County, TN and Rutherford County Adult Detention Center (the

"Defendants-Cross-Appellants" or "Rutherford") and VendEngine, Inc. (the

"Defendant-Appellee" or "VendEngine").  *See* Appeal No. 23-1380, Dkt. No. 7.

Before patentee Smart Communications appealed in this action, it previously filed

a separate appeal, *HLFIP Holding, Inc. d/b/a Smart Communications IP Holdings*

*v. York County, PA, et al.*, Case No. 22-1940 ("*York County*").  The *York County*

appeal concerned a district court's ruling that the same patent at issue in this

appeal—the '617 patent—was patent-ineligible under § 101.

Whether the '617 patent is eligible or ineligible § 101 under is the core issue

in this appeal; without a valid patent, there is no patent infringement action against

Defendants-Cross-Appellants or Defendant-Appellee. Indeed, as part of this appeal, the Court granted a motion by Smart Communications to stay briefing deadlines so as to await the outcome of the appeal in *York County*. *See* Appeal No. 23-1380, Dkt. No. 21; Appeal No. 23-1380, Dkt. No. 22.

On the same day Smart Communications filed its notice of appeal, Rutherford filed its own notice of appeal, amounting to a cross-appeal of a prior district court decision ruling that Rutherford was not protected by Eleventh Amendment immunity. *See* Appeal No. 23-1379, Dkt. No. 6 (seeking only "[r]eversal of the district court's denial of Rutherford County, et al.'s motion to dismiss for personal and subject matter jurisdiction holding that Rutherford County is not entitled to Eleventh Amendment immunity"). Importantly, Rutherford did not seek to disturb the appealed judgment concerning § 101 or the dismissal of Smart Communications's patent infringement action against it; rather, it sought the affirmance in full of these rulings. *See* Appeal No. 23-1380, Dkt. No. 4. Smart Communications moved to dismiss the cross-appeal on numerous grounds: (1) for lack of appellate standing (as Rutherford was not adversely affected by the appealed judgment concerning § 101, which it did not seek to have modified); (2) on grounds that protective or conditional cross-appeals (that is, an appeal that would have preserved Rutherford's challenge to the district court's sovereign immunity ruling, in the event that this Court modified the district court's judgment

2

as to § 101) are disallowed; (3) that Rutherford was the prevailing party in the district court; and (4) because an improper cross-appeal would prejudice Smart Communications. *See*, *e.g.*, Appeal No. 23-1379, Dkt. No. 10 at 1-2. On June 28, 2023, the Court deferred Smart Communications's motion to the merits panel assigned to the case, and the motion remains pending. *See* Appeal No. 23-1380, Dkt. No. 19.

During the pendency of this appeal, the Federal Circuit affirmed the district court's ruling in *York County*, ruling that the '617 patent is ineligible under § 101. *See HLFIP Holding, Inc. v. York County PA*, Appeal No. 2022-1940, 2023 U.S. App. LEXIS 21670, *1 (Fed. Cir. Aug. 18, 2023) (affirming judgment *per curiam*). On August 30, 2023, Smart Communications requested a further extension of briefing deadlines to allow it time to consider whether it should proceed with the instant appeal, seek rehearing en banc of the appeal in *York County*, or petition the U.S. Supreme Court for a writ of certiorari. *See* Dkt. No. 24. The Court granted Smart Communications's motion for an extension on September 6, 2023. Dkt. No. 25. Smart Communications ultimately declined to seek rehearing en banc or to petition the U.S. Supreme Court for a writ of certiorari, and the deadlines to do so now have passed.

Now, Smart Communications seeks to resolve the issues before the Court by moving for the voluntary dismissal of its appeal pursuant to Federal Rule of

3

Appellate Procedure 42(b)(2).  Smart Communications contacted counsel for

Rutherford and VendEngine on November 28, 2023, stating that Smart

Communications would seek voluntary dismissal of this appeal and requesting

Defendants-Cross-Appellants' and Defendant-Appellee's position as to dismissal

in accordance with Federal Rule of Appellate Procedure 42(b)(1).  On November

30, 2023, counsel for Rutherford replied but did not indicate their consent or

opposition to a request by Smart Communications for dismissal.  *See* Declaration

of Scott T. Weingaertner ("Weingaertner Decl.") ¶ 4.  Smart Communications's

opening brief is due on December 5, 2023.[1]  *See* Appeal No. 23-1380, Dkt. No. 25.

## ARGUMENT

Dismissal of the consolidated cross-appeals is proper following this Court's

ruling in *York County* finding the '617 patent ineligible under § 101, and in light of

the circumstances noted above.  It is not possible for Smart Communications to

maintain its patent lawsuit against Rutherford and VendEngine without a valid

patent.  This issue moots the other appellate issues raised by Smart

Communications as well as Rutherford.  *See* Appeal No. 23-1380, Dkt. No. 7;

Appeal No. 23-1379, Dkt. No. 6; *see also Praxair, Inc. v. ATMI, Inc.*, 543 F.3d

1306, 1322 (Fed. Cir. 2008) (cross-appeal of district court findings of infringement

---

[1] Without prejudice to this motion to dismiss, Smart Communications intends to
file its opening brief on December 5, 2023 unless this Court grants the motion first.

and validity was improper where district court separately found the patent unenforceable due to inequitable conduct, because "[a] determination of unenforceability bars a finding of infringement . . . and similarly moots any issue of invalidity").

As set forth in Smart Communications's earlier motion to dismiss Rutherford County's cross-appeal, Rutherford has no standing to file a cross-appeal solely to modify a district court order concerning Eleventh Amendment immunity, where the judgment already resulted in dismissal of the action against it due to invalidation of the sole patent in suit. *See* Appeal No. 23-1379, Dkt. No. 10, at 3-8; *see also Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1424 (Fed. Cir. 1984) (a party may only "cross-appeal if adversely affected by the appealed judgment in some particular which it seeks to have modified"); *Aventis Pharma S.A. v. Hospira, Inc.*, 637 F.3d 1341, 1343 (Fed. Cir. 2011) ("Our precedent consistently warns against the improper use of a cross-appeal to reach issues that do not otherwise expand the scope of the judgment.").

The prudential rule against cross-appeals by prevailing parties also neatly covers what Rutherford is seeking to do here—that is, alter an adverse lower court ruling that nevertheless does not alter the judgment. *SkyHawke Techs., LLC v. DECA Int'l Corp.*, 828 F.3d 1373, 1375 (Fed. Cir. 2016) (prevailing patentee

5

cannot appeal PTAB judgment in its favor so as to obtain a more favorable claim

construction decision from the appellate court).

Indeed, this Court routinely dismisses cross-appeals by defendants of

subsidiary issues where the judgment below resulted in invalidity as to all asserted

claims—as the judgment, affirmed by the Court in *York County*, does here. *See*

*Droplets, Inc. v. E\*TRADE Bank*, 887 F.3d 1309, 1322 (Fed. Cir. 2018)

(dismissing cross-appeal where judgment of invalidity entered as to all claims);

*Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1337 (Fed. Cir. 2010)

(dismissing cross-appeal and striking surreply brief of defendant-appellee

concerning non-infringement issues where district court entered judgment of

invalidity as to all asserted claims); *Typeright Keyboard Corp. v. Microsoft Corp.*,

374 F.3d 1151, 1156 (Fed. Cir. 2004) (dismissing cross-appeal by

defendant/accused infringer for lack of jurisdiction after judgment of patent

invalidity).

And to the extent Rutherford believes it needs an opinion on Eleventh

Amendment immunity from this Court to guard against future lawsuits, such an

appeal amounts to an improper request for an advisory opinion. *See United States*

*v. Juvenile Male*, 564 U. S. 932, 937, 131 S. Ct. 2860, 180 L. Ed. 2d 811 (2011)

(*per curiam*) (a judgment's "possible, indirect benefit in a future lawsuit" does not

preserve standing); *see also Allied Mineral Prods. v. OSMI, Inc.*, 870 F.3d 1337,

6

1341 (Fed. Cir. 2017) ("the fear of a future infringement suit is insufficient to confer jurisdiction" under Article III).

Thus, there is no basis for Rutherford to pursue a cross-appeal, and the Court should grant both this motion and Smart Communications's still-pending motion to dismiss.

## **CONCLUSION**

Accordingly, Smart Communications respectfully requests the voluntary dismissal of these consolidated cross-appeals, with each party to bear its own costs.

Dated: December 1, 2023

/s/ Scott T. Weingaertner
Scott T. Weingaertner
Stefan Mentzer
Matthew R. Wisnieff
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 459-7067

*Counsel for Plaintiff-Appellant*
*HLFIP Holding, Inc. d/b/a Smart*
*Communications IP Holdings*

## <u>DECLARATION OF SCOTT T. WEINGAERTNER</u>

I, Scott T. Weingaertner, hereby declare as follows:

1. I am a partner with the law firm of Goodwin Procter LLP and counsel to Plaintiff-Appellant HLFIP Holding, Inc. d/b/a Smart Communications IP Holdings ("Smart Communications") in this matter.  I have personal knowledge of the facts set forth in this declaration.

2. I make this declaration pursuant to Federal Circuit Rule 42(b)(2) under penalty of perjury in support of Smart Communications's Motion for Voluntary Dismissal.

3. Smart Communications's counsel contacted counsel for Defendants-Cross-Appellants Rutherford County, TN and Rutherford County Adult Detention Center, and Defendant-Appellee VendEngine, Inc. by email on November 28, 2023, stating that Smart Communications would seek voluntary dismissal of this appeal and requesting Defendants-Cross-Appellants' and Defendant-Appellee's position as to dismissal in accordance with Federal Rule of Appellate Procedure 42(b)(1).

4. Counsel for Defendants-Cross-Appellants responded by email on November 30, 2023 on behalf of Defendants-Cross-Appellants and Defendant-Appellee, but did not indicate their consent or opposition to a request by Smart Communications for dismissal.

Dated:  December 1, 2023

/s/  Scott T. Weingaertner
Scott T. Weingaertner
GOODWIN PROCTER LLP

*Counsel for Plaintiff-Appellant*
*HLFIP Holding, Inc. d/b/a Smart*
*Communications IP Holdings*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing APPELLANT'S MOTION TO DISMISS

was served on the 1st day of December, 2023, by operation of the Court's

CM/ECF system per Federal Rule of Appellate Procedure 25.


Dated:  December 1, 2023                         /s/  Scott T. Weingaertner
                                                 Scott T. Weingaertner
                                                 GOODWIN PROCTER LLP
                                                 The New York Times Building
                                                 620 Eighth Avenue
                                                 New York, New York 10018
                                                 Telephone: (212) 459-7067

                                                 *Counsel for Plaintiff-Appellant*
                                                 *HLFIP Holding, Inc. d/b/a Smart*
                                                 *Communications IP Holdings*

10

## **CERTIFICATE OF COMPLIANCE**

1.    This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because this motion contains 1,424 words, excluding the parts of the motion exempted by Fed. R. App. P. 27(d)(2), Fed. R. App. P. 27(a)(2)(B), and Fed. R. App. P. 32(f).

2.    This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

 Dated:  December 1, 2023                    /s/  Scott T. Weingaertner
                                             Scott T. Weingaertner
                                             GOODWIN PROCTER LLP
                                             The New York Times Building
                                             620 Eighth Avenue
                                             New York, New York 10018
                                             Telephone: (212) 459-7067

                                             *Counsel for Plaintiff-Appellant*
                                             *HLFIP Holding, Inc. d/b/a Smart*
                                             *Communications IP Holdings*

11

# EXHIBIT 32

# APPLICATION FOR REGISTRATION OF FICTITIOUS NAME

## REGISTRATION# G19000084997

**Fictitious Name to be Registered:**  SMART COMMUNICATIONS IP HOLDINGS

**Mailing Address of Business:**    10491 72ND ST.
SEMINOLE, FL  33777

**Florida County of Principal Place of Business:**  PINELLAS

**FEI Number:**

**Owner(s) of Fictitious Name:**

HLFIP HOLDING, INC.
10491 72ND STR.
SEMINOLE, FL  33777
Florida Document Number: P15000042874
FEI Number: 82-4804509

**FILED**
**Aug 12, 2019**
**Secretary of State**

I the undersigned, being an owner in the above fictitious name, certify that the information indicated on this form is true and accurate. I further certify that the fictitious name to be registered has been advertised at least once in a newspaper as defined in Chapter 50, Florida Statutes, in the county where the principal place of business is located.  I understand that the electronic signature below shall have the same legal effect as if made under oath and I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s. 817.155, Florida Statutes.

JONATHAN D. LOGAN                                                      08/12/2019
　　Electronic Signature(s)                                                      Date

**Certificate of Status Requested ( )          Certified Copy Requested ( )**

# CONFIDENTIAL EXHIBIT 33

## ELECTRONIC MESSAGING AGREEMENT -MAILGUARD ADDENDUM

This Addendum and Extension Agreement is between Crawford County Jail, hereinafter referred to as "you" or "Customer," and Smart Communications Collier, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider."

This Addendum and Extension is part of and governed by the Electronic Messaging Agreement, the "Original Agreement", executed by the Parties on November 3rd, 2016. The terms and conditions of the Original Agreement are incorporated herein by reference.

The Customer's Facility Name and address is: Crawford County Sheriff's Office 4235 Alma Highway, Van Buren, Arkansas 72956

WHEREAS, the Parties entered in an Electronic Messaging System Agreement on November 3rd, 2016, the "Original Agreement".

WHEREAS, the Parties hereby agree to extend the term of the Original Agreement in accordance with the terms provided herein.

In consideration of the mutual covenants contained herein, both of the Parties mutually covenant and agree as follows:

The Original Agreement, original term and extension will end on November 3rd, 2019.

The Parties agree to extend the Original Agreement for three (3) years through November 3rd, 2022 which will begin immediately upon the execution of this document. The contract will then automatically renew for four (4) years. After this four (4) year extension, this Agreement shall automatically renew annually for additional one (1) year terms unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

This Addendum and Extension binds and benefits both Parties and successors or assigns. This document, including the Original Agreement dated November 3rd, 2016, is the entire agreement between the Parties.

The Parties wish to add the following language to the Original Agreement:

Provider shall install and/or provide the following Hardware, Software, Systems and Services:

### Electronic Messaging

1. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the

Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware Kiosks, the software to include the operating systems and application software, and all networking requirements needed for operation of the system.

2. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

3. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

4. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

5. Provider will maintain records for a period of seven (7) years from the date the record is made. During the term of this Agreement and upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

Page 1 of 5

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

6. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

7. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

8. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

9. Electronic Messaging. Each email message is billed at one credit ($0.50).

10. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

#### Customer's Responsibilities.

11. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining the electronic messaging system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

12. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

13. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

14. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability and shall allow inmates access to the Kiosks and systems in keeping with the hours inmates have access to telephones.

15. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those kiosks appropriate to their housing assignment.

16. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

#### MailGuard™ Patent Pending Postal Mail Elimination System

17. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

18. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ or SmartKiosk™ within the
‒ Customer Jail Facility; and

19. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

20. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

Page 2 of 5

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

21. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk™ or SmartKiosk™.

22. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

23. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

24. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system.

25. Provider shall be solely responsible for the cost of maintaining the Mail Box designated by the Customer for incoming routine mail to be sent.

26. Provider will retrieve incoming routine mail from the designated Mail Box and process and transmit that mail in an expeditious manner.

27. Provider will shred all processed mail after 30 days unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

28. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

29. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

30. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

31. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.

### Customer's Responsibilities

32.     Customer shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail.

33.     Customer shall be responsible for informing inmates and inmates friends and family that all routine correspondence must be sent to the designated MailGuard Mail Box. Customer will include information regarding the MailGuard™ system in the Inmate Handbook and in all other areas where information regarding the Inmate Mail Policy and Procedures are located.

34.     Customer will provide information regarding Customer's incoming postal mail policy, the MailGuard™ system and the MailGuard procedure for processing and/or disposing of all incoming mail and pictures in at least one location next to the inmate mailing address on the Customer's website and very clearly state that all incoming routine mail MUST be mailed to the MailGuard designated Mail Box.

35.     Customer will instruct on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system and display information regarding the Customer's incoming postal mail policy, the MailGuard™ system and the MailGuard procedure for processing and/or disposing of all incoming mail and pictures.

Page 3 of 5

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

36.     Should the Customer receive incoming routine mail instead of the designated Mail Box, the Customer will be responsible for the delivery of said mail to MailGuard for processing.

37.     Upon completion of installation and appropriate system testing, Customer will allow the MailGuard™ system to go live within forty-eight (48) hours' notice of system availability.

38.     Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments.

39.     Customer will give prompt notice to MailGuard of any trouble or irregularity in the functioning of the MailGuard™ system.

### Grievances, General and Medical Requests

40.     We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartKiosk.

41.     Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

### Rules, Regulations & Communications

42. The SmartKiosk is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartKiosk for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartKiosk. The SmartKiosk has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Page 4 of 5

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

Customer: Crawford County Sheriff's Office

By: _____

Name: Dennis Gilstrap

Title: County Judge

Date: 10-11-2017

Email: dgilstrap@crawfordcounty.org

Notice Address:
4235 Alma Highway
Van Buren, Arkansas 72956

Provider: Smart Communications Collier, Inc.

By: _____

Name: Jon Logan

Title: CEO

Date: _____

Email: jon.logan@smartjailmail.com

Notice Address:
4522 W. North B Street
Tampa, FL 33609

Customer: Crawford County Sheriff's Office

By: _____

Name: Ron Brown

Title: Sheriff

Date: 10-16-2017

Email: rbrown@crawford-county.org

Notice Address:
4235 Alma Highway
Van Buren, Arkansas 72956

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

# CONFIDENTIAL EXHIBIT 34

### Addendum to Electronic Messaging System Agreement

Smart Communications Pasco, Inc., hereby agrees to provide the Pasco County Sheriff's Office MailGuard™ the patent pending postal mail elimination service. This service converts regular postal mail to an electronic document that is transmitted to the inmate recipient via the SmartKiosk™ already installed in the jail by virtue of the existing contract dated April 8, 2013.

1.  Pasco County Sheriff's Office agrees to make Smart Communications Pasco, Inc. its Agent for the purpose of processing routine postal mail. For purposes of this contract, "routine mail" means all regular correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All Legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

2. Smart Communications Pasco, Inc. and the Pasco County Sheriff's Office shall notify all existing inmates that effective March 1, 2016, they must designate MailGuard™ as their postal agent to receive routine postal mail at the jail. Mail service to the inmates will be enhanced by same day service and six days a week delivery. All new incoming inmates will be given a form for their signature at booking or as the Pasco County Sheriff's Office designates, to make MailGuard™ their postal agent.

3. Smart Communications Pasco, Inc., agrees to provide at no cost to the Pasco County Sheriff's Office additional kiosks and/or tablets to the three (3) medical areas and to the lock down areas as needed by the jail. Should the initial choice by jail administration of either kiosk or tablet be determined at a later date not to meet all the intended goals of the administration, Smart Communications Pasco, Inc., shall replace said hardware with the other optional hardware upon 30 days written notice. All costs associated with installation and hardware will be paid by Smart Communications Pasco, Inc. It is understood and agreed that the software used is the same for either the kiosk or tablet and that maintenance of said equipment shall be the same as in the master agreement.

4. The MailGuard™ service by virtue of this addendum is provided to the Pasco Sheriff's Office at no cost.

5. The term of this addendum shall run concurrently with that of the existing contract dated April 8, 2013.


_____ Date: _____       _____ Date:_____

Sheriff Chris Noco                                      James P. Logan

# CONFIDENTIAL EXHIBIT 35

9:10 AM
11/28/2023
Accrual Basis

**Smart Communications Collier Inc.**
**Profit & Loss**
**January 2014 through October 2023**

| | Jan - Dec 14 | Jan - Dec 15 | Jan - Dec 16 | Jan - Dec 17 | Jan - Dec 18 | Jan - Dec 19 | Jan - Dec 20 | Jan - Dec 21 | Jan - Dec 22 | 10 months Interim-Draft Jan - Oct 23 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | | | | | | |
| **Income** | | | | | | | | | | |
| Lattice Revenue Shares and Miscellaneous Revenue | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 444,839.10 | 284,372.38 | 0.00 | 93,375.09 | 29,000.97 |
| Sales (Gross receipts from sales) | | | | | | | | | | |
| Messaging Fees | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Misc. Reporting Errors (clearing account for sales reporting ε | 0.00 | 0.00 | 0.00 | 0.00 | 790.00 | -35,013.62 | 404,038.16 | -370,089.00 | 0.00 | 0.00 |
| Refunds (client refunds) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -23,004.67 | -35,341.07 | -73,737.42 |
| Sales of Mail Services (mail services - remote and in facilities | 0.00 | 0.00 | 0.00 | 0.00 | 1,880,006.50 | 4,547,013.62 | 4,532,800.00 | 4,512,000.00 | 4,512,000.00 | 3,760,000.00 |
| Sales of Messaging (sales of pre-paid messaging) | 0.00 | 0.00 | 0.00 | 0.00 | 7,710,994.76 | 10,793,692.20 | 15,310,858.88 | 21,628,106.00 | 25,801,717.66 | 23,581,826.48 |
| Sales of Telephone Calls (sales of prepaid telephone calls) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 984,406.67 | 5,510,925.00 | 9,982,532.39 | 11,945,517.97 |
| Telephone Service Fees | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 638,138.00 | 4,388,973.17 | 6,285,507.44 |
| Trust Account Funding Fees (service fees for funding inmate | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 30,252.00 | 37,076.31 | 99,028.50 |
| **Total Sales (Gross receipts from sales)** | 0.00 | 0.00 | 0.00 | 0.00 | 9,591,791.26 | 15,305,692.20 | 21,232,103.71 | 31,926,327.33 | 44,686,958.46 | 45,598,142.97 |
| Sublicense Royalty Fees Income | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 43,500.00 | 1,500.00 | 0.00 | 0.00 | 0.00 |
| **Total Income** | 0.00 | 0.00 | 0.00 | 0.00 | 9,591,791.26 | 15,794,031.30 | 21,517,976.09 | 31,926,327.33 | 44,780,333.55 | 45,627,143.94 |
| **Cost of Goods Sold** | | | | | | | | | | |
| Beginning Inventory Value (use this account only for year-end) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 482,625.00 | 0.00 | 723,965.43 | 1,401,970.44 | 1,894,387.72 | 0.00 |
| Contract Labor Mail Processing (contract labor for mail processing) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 158,959.33 | 183,239.48 | 0.00 | 0.00 | 0.00 |
| Contractor Services (electricians, cabling, general construction contractors, laborers) | | | | | | | | | | |
| Contracted on-site IT services (contracted on-site IT services | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 59,523.67 | 0.00 | 0.00 | 0.00 | 0.00 |
| Contractor - data processing (outsourced off-site data proces | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15,378.68 | 0.00 | 0.00 | 0.00 | 0.00 |
| Contractor Services (electricians, cabling, general constructi | 0.00 | 0.00 | 0.00 | 605.00 | 544,524.68 | 746,431.52 | 0.00 | 1,256,386.00 | 1,605,421.78 | 2,080,627.07 |
| **Total Contractor Services (electricians, cabling, general construction contractors, laborers)** | 0.00 | 0.00 | 0.00 | 605.00 | 544,524.68 | 821,333.87 | 0.00 | 1,256,386.00 | 1,605,421.78 | 2,080,627.07 |
| Cost of Goods Sold (Costs of items purchased and installed) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6,427.70 | -78.00 | 0.00 | 0.00 | 0.00 |
| Damaged Inventory Write Off | 0.00 | 0.00 | 0.00 | -100,498.25 | 2,765.39 | 4,577.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Data Storage / Server Hosting (co-location server hosting services and server software licensing) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33,925.73 | 74,457.40 | 68,813.00 | 167,343.25 | 321,378.99 |
| Ending Inventory Value (use this account only for year end) | 0.00 | 0.00 | 0.00 | 0.00 | -352,041.70 | -723,843.94 | -1,401,970.44 | -1,894,387.72 | -690,704.04 | 0.00 |
| Equipment Design | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 43,187.50 | 70,000.00 | 0.00 |
| Facility Commissions Expense | 0.00 | 0.00 | 685.20 | 24,982.03 | 491,618.88 | 521,685.00 | 1,049,988.45 | 5,430,350.00 | 11,321,922.84 | 13,188,123.52 |
| Freight and Shipping Costs (Freight and shipping costs for inbound inventory) | 0.00 | 0.00 | 0.00 | 0.00 | 141,409.89 | 247,304.15 | 168,277.14 | 374,670.00 | 548,211.82 | 512,398.05 |
| Game Revenue Sharing 50/50 (premium android game revenue sharing with NTN Buzztime) | 0.00 | 0.00 | 0.00 | 0.00 | 1,697.42 | 13,756.57 | 38,653.57 | 13,658.00 | 0.00 | 0.00 |
| Internet Service (internet service by facility) | 0.00 | 0.00 | 0.00 | 1,186.95 | 140,162.26 | 172,342.38 | 223,449.55 | 299,578.00 | 478,733.90 | 592,863.60 |
| Kiosk units | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Labor - Assembly (labor expended during assembly of end products) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Labor - Installation (labor expended during installation of products) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 423,363.31 | 28,554.00 | 258,964.49 | 0.00 |
| Labor - Mail Processing (regular employee labor for mail processing) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 306,990.01 | 456,903.13 | 497,451.00 | 466,777.61 | 0.00 |

| | Jan - Dec 14 | Jan - Dec 15 | Jan - Dec 16 | Jan - Dec 17 | Jan - Dec 18 | Jan - Dec 19 | Jan - Dec 20 | Jan - Dec 21 | Jan - Dec 22 | Jan - Oct 23 |
|---|---|---|---|---|---|---|---|---|---|---|
| Labor - Repairs & Maintenance (labor expended to repair or maintain equipment located in client facilities) | 0.00 | 0.00 | 0.00 | 0.00 | 275.00 | 0.00 | 0.00 | 808,407.95 | 601,662.23 | 0.00 |
| Labor - Telephone CC Sales (labor expended by call center) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -3,490.86 | 220,299.30 | 237,202.00 | 616,321.00 | 0.00 |
| Meals Expense (COGS account dump for CPA) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32,828.00 | 82,014.00 | 84,876.93 |
| Merchant Account Fees (Credit card merchant account discount fees, transaction fees, and related costs) | | | | | | | | | | |
|     Charge Backs (credit card charge backs) | 0.00 | 0.00 | 0.00 | 0.00 | 926.00 | 72,247.75 | 0.00 | 21,600.34 | 282,609.20 | 321,981.53 |
|     Merchant Account Fees (Credit card merchant account disco | 0.00 | 0.00 | 0.00 | 0.00 | 366,043.13 | 447,173.22 | 807,368.15 | 1,019,189.91 | 1,342,985.23 | 1,498,317.11 |
| Total Merchant Account Fees (Credit card merchant account discount fees, transaction fees, and related costs) | 0.00 | 0.00 | 0.00 | 0.00 | 366,969.13 | 519,420.97 | 807,368.15 | 1,040,790.25 | 1,625,594.43 | 1,820,298.64 |
| Misc. 3rd Party kiosk software (Casemaker, video on demand,) | 0.00 | 0.00 | 0.00 | 13,144.26 | 149,047.91 | 88,527.85 | 174,308.50 | 161,377.93 | 170,948.75 | 261,308.94 |
| Miscellaneous Hardware Install | 0.00 | 0.00 | 131.68 | 129,506.13 | -296,025.97 | 0.00 | 200,910.00 | 0.00 | 137,464.56 |
| Mobile Mail Carts | 0.00 | 0.00 | 0.00 | 0.00 | 7.21 | 1,098.59 | 1,050.39 | 1,447.00 | 0.00 | 0.00 |
| Post Office Box Rents (post office boxes for Mailguard) | 0.00 | 0.00 | 0.00 | 0.00 | 2,647.00 | 6,686.36 | 10,218.97 | 0.00 | 0.00 | 0.00 |
| Product Samples Expense (Cost of products used as floor samples or given to customers for trial or demonstration) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Promotional Expenses | 0.00 | 0.00 | 0.00 | 0.00 | 6,873.37 | 108.50 | 560.94 | 0.00 | 0.00 | 0.00 |
| Purchases Hardware | 0.00 | 0.00 | 0.00 | 0.00 | 27,637.62 | 79,550.40 | 1,032,867.63 | 4,097,633.00 | 3,716,771.36 | 7,380,150.22 |
| Repair Pieces for Kiosks (miscellaneous repair pieces used for repairing installed kiosks / keyboards / monitors / ph | 0.00 | 0.00 | 0.00 | 0.00 | 5,000.00 | 0.00 | 3,150.00 | 0.00 | 0.00 | 0.00 |
| Salesperson Commissions | 0.00 | 0.00 | 0.00 | 0.00 | 166,444.37 | 73,993.01 | 43,434.69 | 269,484.62 | 164,193.33 | 63,409.00 |
| Shipping -- UPS / Fedex / USPS | 0.00 | 0.00 | 0.00 | 3.19 | 0.00 | 96,187.73 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sublicense Royalties Fees | 0.00 | 0.00 | 0.00 | 0.00 | 126,675.52 | 127,095.38 | 148,538.78 | 100,794.60 | 23,495.91 | 0.00 |
| Tablet Repair Pieces (replacement glass, specialized tools, misc small pieces) | 0.00 | 0.00 | 0.00 | 0.00 | 19,167.05 | 273.36 | 0.00 | 0.00 | 0.00 | 0.00 |
| Tablet Units | 0.00 | 0.00 | 0.00 | 0.00 | 1,598,648.04 | 2,687,388.42 | 0.00 | 0.00 | 0.00 | 0.00 |
| Tablets Installed with charger (10 tablets installed with one charging station) | 0.00 | 0.00 | 0.00 | 0.00 | 781,763.53 | 618,310.42 | 0.00 | 152,000.00 | 0.00 | 0.00 |
| Technology Grant (technology grant money given to facilities during term of contract) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 154,950.85 | 311,913.00 | 214,396.58 | 1,197,413.26 |
| Telecommunications Taxes (taxes paid in connection with doing business as a telephone provider (local, state, or fe | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 34,844.99 | 474,019.00 | 629,686.57 | 1,892,898.71 |
| Touch screen kiosks (touch screen kiosks for federal prisons) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 7,841.52 | 404.94 | 24,085.00 | 0.00 | 0.00 |
| Travel - Installation & Maint. (travel related cost associated with installation of product or repairs/regular maintenance) | | | | | | | | | | |
|     Airfare | 0.00 | 0.00 | 0.00 | 2,860.20 | 50,084.98 | 47,531.67 | 92,999.15 | 135,754.21 | 380,861.42 | 301,528.92 |
|     Cabs or Rideshare | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4.78 | 0.00 | 0.00 |
|     Covid Travel Expenses (medical screenings required before | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 364.00 | 0.00 | 0.00 | 0.00 |
|     Gas (gas for rental vehicle or POV used for installation and m | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8,511.78 | 27,914.00 | 102,170.93 | 74,067.97 |
|     Lodging | 0.00 | 0.00 | 0.00 | 2,116.66 | 13,608.27 | 24,718.47 | 64,284.79 | 93,647.31 | 340,081.97 | 340,302.50 |
|     Meals | 0.00 | 0.00 | 0.00 | 344.05 | 51,561.35 | 6,509.72 | 23,339.57 | 0.00 | 0.00 | 0.00 |
|     Mileage (mileage) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,559.97 | 6,991.88 | 12,865.19 | 21,052.79 | 19,531.10 |
|     Misc. Travel Expenses | 0.00 | 0.00 | 0.00 | 263.19 | 3,070.41 | 1,952.08 | 346.42 | 605.89 | 16,137.96 | 7,109.47 |
|     Parking & Tolls | 0.00 | 0.00 | 0.00 | 283.00 | 1,303.84 | 1,303.69 | 6,068.62 | 11,161.46 | 27,400.27 | 33,036.07 |
|     Vehicle Rental | 0.00 | 0.00 | 0.00 | 403.85 | 8,098.85 | 18,006.38 | 36,758.78 | 62,221.28 | 169,529.90 | 141,983.48 |
|     Travel - Installation & Maint. (travel related costs associated | 0.00 | 0.00 | 0.00 | 0.00 | 335.03 | 0.00 | 0.00 | 9,227.88 | 147,022.04 | 2,033.64 |
| Total Travel - Installation & Maint. (travel related cost associated with installation of product or repairs/regular mai | 0.00 | 0.00 | 0.00 | 6,270.95 | 128,062.73 | 104,581.98 | 239,664.99 | 353,402.00 | 1,204,257.28 | 919,593.15 |
| Voice Over IP | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8,876.00 | 224,729.67 | 284,208.29 |
| Watch (Watch Tooling and Development) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 144,714.31 | 43,814.00 |
| Web Service | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total COGS** | 0.00 | 0.00 | 685.80 | -54,174.19 | 5,120,445.81 | 5,699,285.61 | 4,628,672.66 | 15,795,400.57 | 25,539,844.79 | 30,780,826.93 |
| **Gross Profit** | 0.00 | 0.00 | -685.80 | 54,174.19 | 4,471,345.45 | 10,094,745.69 | 16,889,303.43 | 16,130,926.76 | 19,240,488.76 | 14,846,317.01 |

| | | Jan - Dec 14 | Jan - Dec 15 | Jan - Dec 16 | Jan - Dec 17 | Jan - Dec 18 | Jan - Dec 19 | Jan - Dec 20 | Jan - Dec 21 | Jan - Dec 22 | Jan - Oct 23 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Expense** | | | | | | | | | | | |
| Advertising and Promotion | | | | | | | | | | | |
| | Conference Demos | 0.00 | 0.00 | 0.00 | 0.00 | 39,376.69 | 60,310.32 | 36,615.80 | 0.00 | 0.00 | 0.00 |
| | Trade Shows | 0.00 | 0.00 | 0.00 | 0.00 | 18,108.72 | 26,499.39 | 15,580.50 | 0.00 | 0.00 | 0.00 |
| | Advertising and Promotion - Other | 0.00 | 0.00 | 0.00 | 0.00 | 7,930.37 | 21,203.60 | 16,455.65 | 94,872.77 | 187,878.83 | 222,257.67 |
| **Total Advertising and Promotion** | | 0.00 | 0.00 | 0.00 | 0.00 | 65,415.78 | 108,013.31 | 68,651.95 | 94,872.77 | 187,878.83 | 222,257.67 |
| Automobile Expense | | | | | | | | | | | |
| | Auto Insurance | 0.00 | 0.00 | 0.00 | 0.00 | 8,084.55 | 15,361.27 | 66,056.76 | 172,289.00 | 160,070.06 | 0.00 |
| | Company Automobile Lease | 0.00 | 0.00 | 0.00 | 0.00 | 14,929.20 | 7,661.14 | 10,574.25 | 0.00 | 0.00 | 0.00 |
| | Fuel | 0.00 | 0.00 | 0.00 | 99.12 | 14,936.63 | 12,858.06 | 22,266.48 | 0.00 | 0.00 | 0.00 |
| | Maintenance | 0.00 | 0.00 | 0.00 | 0.00 | 22,860.33 | 18,717.68 | 61,723.73 | 0.00 | 0.00 | 0.00 |
| | Prepaid Toll Accounts | 0.00 | 0.00 | 0.00 | 0.00 | 504.30 | 557.09 | 1,304.38 | 0.00 | 0.00 | 0.00 |
| | Registration | 0.00 | 0.00 | 0.00 | 0.00 | 1,374.15 | 582.13 | 20,768.80 | 0.00 | 0.00 | 0.00 |
| | Automobile Expense - Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Automobile Expense** | | 0.00 | 0.00 | 0.00 | 99.12 | 62,689.16 | 55,737.37 | 182,694.40 | 172,289.00 | 160,070.06 | 0.00 |
| Bank or Credit Card Misc Fees (annual fees; ATM fees; etc.) | | 0.00 | 0.00 | 0.00 | 0.00 | 200.00 | 1,247.37 | 1,195.00 | 0.00 | 0.00 | 0.00 |
| Bank Service Charges | | 0.00 | 0.00 | 0.00 | 0.00 | 1,555.44 | 681.87 | 677.00 | 2,227.00 | 6,803.71 | 6,763.16 |
| Bid and Proposal Expenses | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Cell Phones & Service | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8,279.78 | 23,758.22 | 0.00 | 0.00 | 0.00 |
| Charitble Contributions | | 0.00 | 0.00 | 0.00 | 0.00 | 2,636.12 | 4,750.00 | 6,160.00 | 10,713.51 | 19,340.25 | 16,822.76 |
| Client Welfare | | 0.00 | 0.00 | 0.00 | 73.60 | 56,545.04 | 62,486.70 | 0.00 | 163,073.00 | 142,975.46 | 172,067.74 |
| Computer Expenses | | 0.00 | 0.00 | 0.00 | 0.00 | 13,273.88 | 0.00 | 19,512.81 | 38,320.00 | 155,749.43 | 68,009.60 |
| Computer Supplies | | 0.00 | 0.00 | 0.00 | 0.00 | 46,804.67 | 0.00 | 3,294.86 | 20,135.00 | 7,218.18 | 23,411.39 |
| Contract Labor Expense | | 0.00 | 0.00 | 0.00 | 0.00 | 3,093.24 | 7,962.64 | 60,974.97 | 97,916.00 | 293,579.59 | 102,582.41 |
| Depreciation Expense (Depreciation on equipment, buildings and improvements) | | 0.00 | 0.00 | 0.00 | 0.00 | 994,890.00 | 1,901,609.00 | 2,690,604.00 | 1,736,067.00 | 1,636,576.09 | 1,172,544.60 |
| Dues and Subscriptions | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33,915.35 | 81,789.00 | 98,821.33 | 22,119.49 |
| Education | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11,159.85 | 8,315.49 | 0.00 |
| Employee Costs | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Employee Welfare | | 0.00 | 0.00 | 0.00 | 4.40 | 23,773.32 | 44,409.78 | 5,950.44 | -1.13 | 7,707.55 | 5,402.20 |
| Facilities Repair & Maintenance | | 0.00 | 0.00 | 0.00 | 561.60 | 4,829.13 | 164,416.57 | 266,140.10 | 0.00 | 0.00 | 0.00 |
| Freight | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,388.98 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance Expense | | 0.00 | 0.00 | 0.00 | 0.00 | 61,030.13 | 81,931.30 | 153,126.35 | 127,467.55 | 171,782.58 | 346,792.47 |
| Internet Service CORP | | 0.00 | 0.00 | 0.00 | 0.00 | 118.13 | -32,533.42 | 8,379.39 | 0.00 | 0.00 | 0.00 |
| Legal Fees | | | | | | | | | | | |
| | Legal Fees - Settlements | 0.00 | 0.00 | 0.00 | 0.00 | 25,000.00 | 3,000.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Legal Fees - Other | 0.00 | 0.00 | 0.00 | 0.00 | 22,500.00 | 536,956.61 | 1,085,563.63 | 3,057,098.80 | 2,562,058.30 | 2,578,901.51 |
| **Total Legal Fees** | | 0.00 | 0.00 | 0.00 | 0.00 | 47,500.00 | 539,956.61 | 1,085,563.63 | 3,057,098.80 | 2,562,058.30 | 2,578,901.51 |
| Licenses & Permits | | 0.00 | 0.00 | 0.00 | 0.00 | 1,258.89 | 2,677.90 | 3,927.35 | 2,655.75 | 162.31 | 19,187.83 |
| Marketing - Summit Expenses | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Marketing Subscriptions | | 0.00 | 0.00 | 0.00 | 29.95 | 4,766.20 | 13,743.65 | 24,430.79 | 0.00 | 0.00 | 0.00 |
| Meals and Entertainment | | 0.00 | 0.00 | 0.00 | 121.84 | 0.00 | 41,291.70 | 55,155.01 | 110,879.00 | 144,537.59 | 116,377.62 |
| Miscellaneous Hardware Purchase | | 0.00 | 0.00 | 0.00 | 5.93 | 12,849.79 | 10,682.37 | 0.00 | 0.00 | 0.00 | 0.00 |

| | | Jan - Dec 14 | Jan - Dec 15 | Jan - Dec 16 | Jan - Dec 17 | Jan - Dec 18 | Jan - Dec 19 | Jan - Dec 20 | Jan - Dec 21 | Jan - Dec 22 | Jan - Oct 23 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Miscellaneous Software Purchase | | 0.00 | 0.00 | 0.00 | 12.50 | 0.00 | 2,983.65 | 0.00 | 0.00 | 130.91 | 0.00 |
| Office Expense | | 0.00 | 0.00 | 0.00 | 0.00 | 2,349.99 | 83.10 | 30,885.72 | 83,999.00 | 160,302.10 | 30,413.83 |
| Office Supplies | | | | | | | | | | | |
| | Computer Supplies | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,239.24 | 3,258.90 | 0.00 | 0.00 | 0.00 |
| | General Office Supplies | 0.00 | 0.00 | 0.00 | 35.77 | 11,198.09 | 28,334.34 | 26,764.66 | 21,256.13 | 0.00 | 51,802.96 |
| | Janitorial Supplies | 0.00 | 0.00 | 0.00 | 0.00 | 9,211.41 | 5,989.11 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Tools | 0.00 | 0.00 | 0.00 | 0.00 | 14,768.29 | 22,859.02 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Office Supplies - Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,799.54 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Office Supplies | | 0.00 | 0.00 | 0.00 | 35.77 | 35,177.79 | 60,221.25 | 30,023.56 | 21,256.13 | 0.00 | 51,802.96 |
| Outside Services | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 14,854.19 | 5,494.50 | 9,743.52 | 950.36 |
| Payroll Expenses | | | | | | | | | | | |
| | AD&D Insurance ER (company paid benefit) | 0.00 | 0.00 | 0.00 | 0.00 | 327.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Covid Sick -- EE (federal government sick leave program for | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,250.00 | 0.00 | 0.00 | 0.00 |
| | Dental Insurance ER (company paid premiums) | 0.00 | 0.00 | 0.00 | 0.00 | 777.32 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Employee Bonus | 0.00 | 0.00 | 0.00 | 0.00 | 2,000.00 | 15,963.10 | 15,900.00 | 0.00 | 0.00 | 0.00 |
| | Employee Overtime Wages (overtime wages paid to hourly or | 0.00 | 0.00 | 0.00 | 0.00 | 11,047.89 | 4,762.82 | 2,517.76 | 0.00 | 0.00 | 0.00 |
| | Employee Salary and Wages (regular W-2 employees) | 0.00 | 0.00 | 0.00 | 0.00 | 787,753.86 | 2,161,320.98 | 2,544,241.16 | 3,421,085.00 | 4,814,980.25 | 6,475,868.51 |
| | ER Federal Unemployment Tax | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,870.12 | 3,571.22 | 0.00 | 0.00 | 0.00 |
| | ER Health Insurance Premiums | 0.00 | 0.00 | 0.00 | 0.00 | 38,212.00 | 194,839.79 | 258,542.31 | 336,556.08 | 369,966.50 | 450,654.05 |
| | ER Medicare & Soc Soc Tax (Combined medicar and social s | 0.00 | 0.00 | 0.00 | 0.00 | 13.38 | 208,106.64 | 280,065.03 | 411,561.00 | 568,541.96 | 567,768.90 |
| | ER Social Security Expense | 0.00 | 0.00 | 0.00 | 0.00 | 57.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | ER State Unemployment Tax | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 26,604.65 | 30,126.66 | 0.00 | 0.00 | 0.00 |
| | Holiday Pay | 0.00 | 0.00 | 0.00 | 0.00 | 33,597.83 | 102,256.59 | 137,514.89 | 0.00 | 0.00 | 0.00 |
| | Medical Waiver ER (payments made to employees who waive | 0.00 | 0.00 | 0.00 | 0.00 | 4,800.00 | 12,200.00 | 6,700.00 | 0.00 | 0.00 | 0.00 |
| | Officer Compensation | 0.00 | 0.00 | 0.00 | 0.00 | 112,419.77 | 148,753.02 | 170,000.10 | 160,945.00 | 160,384.56 | 96,922.98 |
| | Officer Medical Expenses (out of pocket medical expenses, e | 0.00 | 0.00 | 0.00 | 0.00 | 13,451.83 | 10,620.35 | 5,023.36 | 0.00 | 0.00 | 0.00 |
| | Other Employee Benefits | 0.00 | 0.00 | 0.00 | 0.00 | -493.19 | 15,287.36 | 5,950.44 | 0.00 | 0.00 | 0.00 |
| | Other Payroll Taxes (catch-all account for state unemployme | 0.00 | 0.00 | 0.00 | 0.00 | 91,453.87 | 749.31 | 383.47 | 0.00 | 0.00 | 0.00 |
| | Payroll Service Fees | 0.00 | 0.00 | 0.00 | 0.00 | 23,843.10 | 39,304.32 | 53,643.91 | 65,651.00 | 79,353.61 | 87,826.76 |
| | Per Diem (payments to employees for excess travel expenses | 0.00 | 0.00 | 0.00 | 0.00 | 7,162.00 | 1,196.00 | 1,242.00 | 0.00 | 0.00 | 0.00 |
| | PTO (Vacation / Sick) (earned time off with pay) | 0.00 | 0.00 | 0.00 | 0.00 | 17,078.82 | 96,475.77 | 100,893.85 | 0.00 | 0.00 | 0.00 |
| | Vision Insurance ER (employer paid premiums) | 0.00 | 0.00 | 0.00 | 0.00 | 102.90 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Workers' Compensation Insurance | 0.00 | 0.00 | 0.00 | 0.00 | 7,335.47 | 10,058.61 | 11,914.08 | 14,799.73 | 22,600.57 | 34,394.89 |
| | Payroll Expenses - Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Payroll Expenses | | 0.00 | 0.00 | 0.00 | 0.00 | 1,150,941.31 | 3,051,369.43 | 3,630,480.24 | 4,410,597.81 | 6,015,827.45 | 7,713,436.09 |
| Political Contributions | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Postage and Delivery | | 0.00 | 0.00 | 0.00 | 6.38 | 0.00 | 1,998.20 | 24,070.81 | 4,883.00 | 18,982.05 | 10,501.03 |
| Printing & Copying | | 0.00 | 0.00 | 0.00 | 0.00 | 3,505.25 | 6,636.43 | 0.00 | 0.00 | 0.00 | 0.00 |
| Professional Fees | | | | | | | | | | | |
| | Accounting Services | 0.00 | 0.00 | 0.00 | 0.00 | 45,248.50 | 60,941.25 | 39,393.75 | 0.00 | 0.00 | 0.00 |
| | Answering Service (24/7 answering service for IT support des | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 303.16 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Data Storage | 0.00 | 0.00 | 0.00 | 0.99 | 4,728.75 | 4,280.78 | 0.00 | 0.00 | 0.00 | 0.00 |

| | | Jan - Dec 14 | Jan - Dec 15 | Jan - Dec 16 | Jan - Dec 17 | Jan - Dec 18 | Jan - Dec 19 | Jan - Dec 20 | Jan - Dec 21 | Jan - Dec 22 | Jan - Oct 23 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | IT Services | 0.00 | 0.00 | 0.00 | 1,852.50 | 2,699.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Janitorial Service | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,424.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Office Security | 0.00 | 0.00 | 0.00 | 0.00 | 564.84 | 39,114.37 | 4,183.63 | 0.00 | 0.00 | 0.00 |
| | Regulatory Registration Agent (FCC & state regulatory consu | 0.00 | 0.00 | 0.00 | 0.00 | 24,688.32 | 68,569.61 | 50,643.95 | 587,094.48 | 81,901.29 | |
| | Professional Fees - Other | 0.00 | 0.00 | 0.00 | 0.00 | 407,765.75 | 35,295.14 | 17,455.00 | 110,811.00 | 110,937.25 | 119,117.20 |
| **Total Professional Fees** | | 0.00 | 0.00 | 0.00 | 1,853.49 | 461,007.36 | 169,047.02 | 129,601.99 | 161,454.95 | 698,031.73 | 201,018.49 |
| Property Tax (property taxes paid on company owned or leased property) | | 0.00 | 0.00 | 0.00 | 0.00 | 12,000.00 | 69,408.60 | 52,071.86 | 72,675.76 | 71,658.00 | 0.00 |
| Real Estate Closing Fees (doc stamps, title search, lien search, closing fee, survey certs, recording fees) | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15,859.50 | 0.00 | 0.00 | 0.00 |
| Reconciliation Discrepancies (Discrepancies between bank statements and company records) | | 0.00 | 0.00 | 0.00 | 0.00 | -50.57 | -65,156.14 | 1,333.61 | 0.00 | 0.00 | 0.00 |
| Recruitment Expense | | 0.00 | 0.00 | 0.00 | 349.00 | 6,196.50 | 46,527.60 | 12,497.28 | 20,671.61 | 131,371.67 | 43,735.63 |
| Rent Expense | | | | | | | | | | | |
| | Off-site storage | 0.00 | 0.00 | 0.00 | 0.00 | 10,593.00 | 10,766.80 | 22.00 | 0.00 | 0.00 | 0.00 |
| | Office Rents | 0.00 | 0.00 | 0.00 | 0.00 | 189,925.00 | 130,575.00 | 212,000.00 | 79,825.00 | 115,565.25 | 126,191.93 |
| | Rent Expense - Other | 0.00 | 0.00 | 0.00 | 0.00 | 6,500.00 | 0.00 | 0.00 | 0.00 | 677,981.93 | 1,028,613.54 |
| **Total Rent Expense** | | 0.00 | 0.00 | 0.00 | 0.00 | 207,018.00 | 141,341.80 | 212,022.00 | 79,825.00 | 793,547.18 | 1,154,805.47 |
| Repairs and Maintenance | | | | | | | | | | | |
| | Equipment Maintenance (repair of fixed asset machinery and | 0.00 | 0.00 | 0.00 | 0.00 | 20,476.49 | 56,520.95 | 0.00 | 203,658.00 | 54,428.90 | 58,898.15 |
| | Repairs and Maintenance - Other | 0.00 | 0.00 | 0.00 | 0.00 | 2,438.38 | 0.00 | 109,847.68 | 0.00 | 417,902.73 | 270,566.45 |
| **Total Repairs and Maintenance** | | 0.00 | 0.00 | 0.00 | 0.00 | 22,914.87 | 56,520.95 | 109,847.68 | 203,658.00 | 472,331.63 | 329,464.60 |
| Research & Development | | 0.00 | 0.00 | 0.00 | 9,120.00 | 119,244.74 | 81,372.19 | 23,298.72 | 0.00 | 0.00 | 0.00 |
| Royalties Expense | | 0.00 | 0.00 | 0.00 | 62,838.33 | 254,457.61 | 357,352.62 | 131,751.12 | 0.00 | 0.00 | 0.00 |
| Sales Tax Paid | | 0.00 | 0.00 | 0.00 | 7.90 | 111,977.76 | 114,307.16 | 27,604.54 | 0.00 | 0.00 | 0.00 |
| Software Subscriptions | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10,897.97 | 0.00 | 0.00 | 0.00 | 76,888.74 |
| Tech Grant Equipment Purchases | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 111,189.25 | 0.00 | 0.00 | 0.00 |
| Telephone Expense | | 0.00 | 0.00 | 0.00 | 50.00 | 17,072.50 | 10,112.22 | 106.98 | 0.00 | 0.00 | 0.00 |
| Trade Broker Commission Expense (fees paid to agents to secure trade agreements) | | 0.00 | 0.00 | 0.00 | 0.00 | 53,749.98 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Travel Expense | | | | | | | | | | | |
| | Airfare | 0.00 | 0.00 | 0.00 | 1,274.55 | 90,686.19 | 100,642.35 | 80,933.09 | 0.00 | 0.00 | 0.00 |
| | Cabs or RideShare | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Gas (gas for rental and POV) | 0.00 | 0.00 | 0.00 | 0.00 | 7,088.57 | 18,409.52 | 3,525.20 | 0.00 | 0.00 | 0.00 |
| | Lodging | 0.00 | 0.00 | 0.00 | 200.88 | 58,583.64 | 91,532.57 | 79,909.07 | 0.00 | 0.00 | 0.00 |
| | Meals | 0.00 | 0.00 | 0.00 | 156.87 | 0.00 | 24,707.98 | 14,886.13 | 0.00 | 0.00 | 0.00 |
| | Mileage | 0.00 | 0.00 | 0.00 | 449.40 | 1,575.17 | 4,126.02 | 3,204.37 | 0.00 | 0.00 | 0.00 |
| | Misc. Travel Expenditures (laundry service, baggage fees, po | 0.00 | 0.00 | 0.00 | 0.00 | 4,794.13 | 775.53 | 904.92 | 0.00 | 0.00 | 0.00 |
| | Parking & Tolls | 0.00 | 0.00 | 0.00 | 0.00 | 2,790.51 | 5,157.15 | 7,625.13 | 0.00 | 0.00 | 0.00 |
| | Vehicle Rental | 0.00 | 0.00 | 0.00 | -37.71 | 31,632.99 | 33,494.29 | 24,218.88 | 0.00 | 0.00 | 0.00 |
| | Travel Expense - Other | 0.00 | 0.00 | 0.00 | 0.00 | 3,932.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Travel Expense** | | 0.00 | 0.00 | 0.00 | 2,043.99 | 201,083.55 | 278,845.41 | 215,206.79 | 0.00 | 0.00 | 0.00 |
| Uncategorized Expenses | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Uniforms | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Utilities | | | | | | | | | | | |
| | Electric | 0.00 | 0.00 | 0.00 | 0.00 | 9,471.14 | 37,486.14 | 41,389.43 | 0.00 | 0.00 | 0.00 |

| | Jan - Dec 14 | Jan - Dec 15 | Jan - Dec 16 | Jan - Dec 17 | Jan - Dec 18 | Jan - Dec 19 | Jan - Dec 20 | Jan - Dec 21 | Jan - Dec 22 | Jan - Oct 23 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gas | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Telephone & Internet | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 114.63 | 0.00 | 113,250.00 | 50,197.22 | 105,333.74 |
| Waste Services | 0.00 | 0.00 | 0.00 | 0.00 | 671.65 | 2,726.58 | 4,591.84 | 0.00 | 0.00 | 0.00 |
| Water / Sewer | 0.00 | 0.00 | 0.00 | 0.00 | 5,087.66 | 3,650.27 | 2,735.54 | 0.00 | 0.00 | 0.00 |
| Utilities - Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 52,574.00 | 50,197.22 | 54,557.97 |
| Total Utilities | 0.00 | 0.00 | 0.00 | 0.00 | 15,230.45 | 43,977.62 | 48,716.81 | 165,824.00 | 100,394.44 | 159,891.71 |
| Website Design & Maintenance | 0.00 | 0.00 | 0.00 | 60.68 | 15,761.00 | 8,911.62 | 24,457.50 | 3,651.00 | 89,318.30 | 78,372.58 |
| Total Expense | 0.00 | 0.00 | 0.00 | 77,274.48 | 4,092,867.01 | 7,468,592.18 | 9,539,991.77 | 10,960,652.86 | 14,165,215.73 | 14,724,521.94 |
| Net Ordinary Income | 0.00 | 0.00 | -685.80 | -23,100.29 | 378,478.44 | 2,626,153.51 | 7,349,311.66 | 5,170,273.90 | 5,075,273.03 | 121,795.07 |
| Other Income/Expense | | | | | | | | | | |
| Other Income | | | | | | | | | | |
| Gain/Loss on Sale of Asset | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 540,589.00 | 0.00 | 0.00 |
| Miscellaneous Income | 0.00 | 0.00 | 0.00 | 0.00 | 1,906.03 | 7,702.36 | 494,867.00 | 0.00 | 0.00 | 0.00 |
| Total Other Income | 0.00 | 0.00 | 0.00 | 0.00 | 1,906.03 | 7,702.36 | 494,867.00 | 540,589.00 | 0.00 | 0.00 |
| Other Expense | | | | | | | | | | |
| Ask My Accountant (Transactions to be discussed with accountant, consultant, or tax preparer) | 0.00 | 0.00 | 0.00 | 25,423.75 | 0.00 | 20,424.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Corporate Federal Income Tax | 0.00 | 0.00 | 0.00 | 0.00 | 13,531.39 | 397,610.23 | 1,527,789.00 | 783,902.00 | 0.00 | 0.00 |
| Corporate State Income Tax | 0.00 | 0.00 | 0.00 | 0.00 | 41,179.59 | 96,736.00 | 377,109.00 | 119,794.00 | 0.00 | 0.00 |
| Intellectual Property Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 17,874,783.38 | 18,239,257.19 |
| Interest Expense | 0.00 | 0.00 | 0.00 | 0.00 | 98,690.00 | 1,435,201.46 | 219,148.67 | 125,242.00 | 461,010.08 | 461,047.51 |
| Late Fees / Penalties | 0.00 | 0.00 | 0.00 | 0.00 | 6,808.12 | 35,982.00 | 19,424.20 | 170,122.89 | 22,137.16 | 23,390.29 |
| Miscellaneous - Other Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 840,053.71 | 1,958.14 | 0.13 |
| Total Other Expense | 0.00 | 0.00 | 0.00 | 25,423.75 | 160,209.10 | 1,985,953.69 | 2,143,470.87 | 2,039,114.60 | 18,359,888.76 | 18,723,695.12 |
| Net Other Income | 0.00 | 0.00 | 0.00 | -25,423.75 | -158,303.07 | -1,978,251.33 | -1,648,603.87 | -1,498,525.60 | -18,359,888.76 | -18,723,695.12 |
| Net Income | 0.00 | 0.00 | -685.80 | -48,524.04 | 220,175.37 | 647,902.18 | 5,700,707.79 | 3,671,748.30 | -13,284,615.73 | -18,601,900.05 |

# CONFIDENTIAL EXHIBIT 36

Form **1120**

Department of the Treasury
Internal Revenue Service

# U.S. Corporation Income Tax Return

For calendar year 2022 or tax year beginning _____ , 2022, ending _____ , _____

Go to *www.irs.gov/Form1120* for instructions and the latest information.

OMB No. 1545-0123

**2022**

**A** Check if:

1a Consolidated return (attach Form 851) .... [X]
  **TYPE OR PRINT**

b Life/nonlife consolidated return ....... [ ]

2 Personal holding co. (attach Sch. PH) .... [ ]

3 Personal service corp. (see instrs) ..... [ ]

SMART COMMUNICATIONS HOLDING, INC.
10491 72ND STREET
SEMINOLE, FL 33777

**B** Employer identification number
47-2886302

**C** Date incorporated
12/29/2014

**D** Total assets (see instructions)
$ 24,805,714.

**4** Schedule M-3 attached [X]   **E** Check if: **(1)** [ ] Initial return   **(2)** [ ] Final return   **(3)** [ ] Name change   **(4)** [ ] Address change

| | | | |
|---|---|---|---:|
| **I N C O M E** | 1 a Gross receipts or sales ..................... | 1a | 44,815,675. |
| | b Returns and allowances ................... | 1b | 35,341. |
| | c Balance. Subtract line 1b from line 1a ................................... | 1c | 44,780,334. |
| | 2 Cost of goods sold (attach Form 1125-A) .................................... | 2 | 25,540,158. |
| | 3 Gross profit. Subtract line 2 from line 1c ................................. | 3 | 19,240,176. |
| | 4 Dividends and inclusions (Schedule C, line 23) ............................. | 4 | |
| | 5 Interest ................................................................. | 5 | |
| | 6 Gross rents ............................................................. | 6 | |
| | 7 Gross royalties ......................................................... | 7 | |
| | 8 Capital gain net income (attach Schedule D (Form 1120)) .................... | 8 | |
| | 9 Net gain or (loss) from Form 4797, Part II, line 17 (attach Form 4797) ...... | 9 | |
| | 10 Other income (see instructions — attach statement) ........................ | 10 | |
| | 11 **Total income.** Add lines 3 through 10 ................................... | 11 | 19,240,176. |
| **D E D U C T I O N S (SEE INSTRUCTIONS FOR LIMITATIONS ON DEDUCTIONS)** | 12 Compensation of officers (see instructions — attach Form 1125-E) ............ | 12 | 160,385. |
| | 13 Salaries and wages (less employment credits) ............................. | 13 | 4,814,980. |
| | 14 Repairs and maintenance .................................................. | 14 | 472,332. |
| | 15 Bad debts ................................................................ | 15 | |
| | 16 Rents ................................................................... | 16 | 793,547. |
| | 17 Taxes and licenses ...................................................... | 17 | 18,515,145. |
| | 18 Interest (see instructions) ............................................. | 18 | |
| | 19 Charitable contributions ................................................ | 19 | 0. |
| | 20 Depreciation from Form 4562 not claimed on Form 1125-A or elsewhere on return (attach Form 4562). | 20 | 1,636,576. |
| | 21 Depletion .............................................................. | 21 | |
| | 22 Advertising ............................................................ | 22 | 187,879. |
| | 23 Pension, profit-sharing, etc., plans .................................... | 23 | |
| | 24 Employee benefit programs .............................................. | 24 | |
| | 25 Reserved for future use ................................................ | 25 | |
| | 26 Other deductions (attach statement) ..................... See Statement 1 | 26 | 5,369,374. |
| | 27 **Total deductions.** Add lines 12 through 26 ........................... | 27 | 31,950,218. |
| | 28 Taxable income before net operating loss deduction and special deductions. Subtract line 27 from line 11. | 28 | -12,710,042. |
| | 29a Net operating loss deduction (see instructions) .......... 29a | | |
| | b Special deductions (Schedule C, line 24) ................ 29b | | |
| | c Add lines 29a and 29b .................................................. | 29c | |
| **T A X, R E F U N D A B L E, C R E D I T S, A N D P M T S** | 30 **Taxable income.** Subtract line 29c from line 28. See instructions ........ | 30 | -12,710,042. |
| | 31 Total tax (Schedule J, Part I, line 11) ................................. | 31 | 0. |
| | 32 Reserved for future use ................................................ | 32 | |
| | 33 Total payments and credits (Schedule J, Part III, line 23) .............. | 33 | 1,375,000. |
| | 34 Estimated tax penalty. See instructions. Check if Form 2220 is attached ...... [ ] | 34 | |
| | 35 Amount owed. If line 33 is smaller than the total of lines 31 and 34, enter amount owed ... | 35 | |
| | 36 Overpayment. If line 33 is larger than the total of lines 31 and 34, enter amount overpaid ... | 36 | 1,375,000. |
| | 37 Enter amount from line 36 you want: Credited to 2023 estimated tax ..... Refunded | 37 | 1,375,000. |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer _____ Date _____   Title  President

May the IRS discuss this return with the preparer shown below? See instructions.
[X] Yes [ ] No

**Paid Preparer Use Only**

| | | |
|---|---|---|
| Print/Type preparer's name  M. L. SHREVE CPA, P.C. | Preparer's signature  M. L. SHREVE CPA, P.C. | Date  10.25.2 | Check [ ] if self-employed | PTIN  P01417060 |
| Firm's name  M.L. Shreve CPA, P.C. | | Firm's EIN  38-2708740 |
| Firm's address  7781 N. Easy Street  Whitehall, MI 49461 | | Phone no.  231 894-5559 |

**BAA** For Paperwork Reduction Act Notice, see separate instructions.

CPCA0205  10/04/22

Form **1120** (2022)

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form 1120 (2022)   SMART COMMUNICATIONS HOLDING, INC.                47-2886302                     Page **2**

| Schedule C | Dividends, Inclusions, and Special Deductions (see instructions) | (a) Dividends and inclusions | (b) Percentage | (c) Special deductions (a) x (b) |
|---|---|---|---|---|
| 1 | Dividends from less-than-20%-owned domestic corporations (other than debt-financed stock) | | 50 | |
| 2 | Dividends from 20%-or-more-owned domestic corporations (other than debt-financed stock) | | 65 | |
| 3 | Dividends on certain debt-financed stock of domestic and foreign corporations | | See instructions | |
| 4 | Dividends on certain preferred stock of less-than-20%-owned public utilities | | 23.3 | |
| 5 | Dividends on certain preferred stock of 20%-or-more-owned public utilities | | 26.7 | |
| 6 | Dividends from less-than-20%-owned foreign corporations and certain FSCs | | 50 | |
| 7 | Dividends from 20%-or-more-owned foreign corporations and certain FSCs | | 65 | |
| 8 | Dividends from wholly owned foreign subsidiaries | | 100 | |
| 9 | **Subtotal.** Add lines 1 through 8. See instructions for limitations | | See instructions | |
| 10 | Dividends from domestic corporations received by a small business investment company operating under the Small Business Investment Act of 1958 | | 100 | |
| 11 | Dividends from affiliated group members | | 100 | |
| 12 | Dividends from certain FSCs | | 100 | |
| 13 | Foreign-source portion of dividends received from a specified 10%-owned foreign corporation (excluding hybrid dividends) (see instructions) | | 100 | |
| 14 | Dividends from foreign corporations not included on line 3, 6, 7, 8, 11, 12, or 13 (including any hybrid dividends) | | | |
| 15 | Reserved for future use | | | |
| 16a | Subpart F inclusions derived from the sale by a controlled foreign corporation (CFC) of the stock of a lower-tier foreign corporation treated as a dividend (attach Form(s) 5471) (see instructions) | | 100 | |
| b | Subpart F inclusions derived from hybrid dividends of tiered corporations (attach Form(s) 5471) (see instructions) | | | |
| c | Other inclusions from CFCs under subpart F not included on line 16a, 16b, or 17 (attach Form(s) 5471) (see instructions) | | | |
| 17 | Global Intangible Low-Taxed Income (GILTI) (attach Form(s) 5471 and Form 8992) | | | |
| 18 | Gross-up for foreign taxes deemed paid | | | |
| 19 | IC-DISC and former DISC dividends not included on line 1, 2, or 3 | | | |
| 20 | Other dividends | | | |
| 21 | Deduction for dividends paid on certain preferred stock of public utilities | | | |
| 22 | Section 250 deduction (attach Form 8993) | | | |
| 23 | **Total dividends and inclusions.** Add column (a), lines 9 through 20. Enter here and on page 1, line 4 | | | |
| 24 | **Total special deductions.** Add column (c) lines 9 through 22. Enter here and on page 1, line 29b | | | |

Form **1120** (2022)

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form 1120 (2022)   SMART COMMUNICATIONS HOLDING, INC.                47-2886302        Page **3**

| **Schedule J** | **Tax Computation and Payment** (see instructions) | | |
|---|---|---|---|

**Part I — Tax Computation**

| | | | |
|---|---|---|---|
| **1** | Check if the corporation is a member of a controlled group (attach Schedule O (Form 1120)). See instructions ☐ | | |
| **2** | Income tax. See instructions................................................................ | **2** | 0. |
| **3** | Base erosion minimum tax amount (attach Form 8991)................................ | **3** | |
| **4** | Add lines 2 and 3......................................................................... | **4** | 0. |
| **5a** | Foreign tax credit (attach Form 1118)............ **5a** | | |
| **b** | Credit from Form 8834 (see instructions)........ **5b** | | |
| **c** | General business credit (attach Form 3800)...... **5c** | | |
| **d** | Credit for prior year minimum tax (attach Form 8827)....... **5d** | | |
| **e** | Bond credits from Form 8912..................... **5e** | | |
| **6** | **Total credits.** Add lines 5a through 5e............................................. | **6** | |
| **7** | Subtract line 6 from line 4............................................................... | **7** | |
| **8** | Personal holding company tax (attach Schedule PH (Form 1120))................. | **8** | |
| **9a** | Recapture of investment credit (attach Form 4255)............ **9a** | | |
| **b** | Recapture of low-income housing credit (attach Form 8611)..... **9b** | | |
| **c** | Interest due under the look-back method — completed long-term contracts (attach Form 8697).......... **9c** | | |
| **d** | Interest due under the look-back method — income forecast method (attach Form 8866)........ **9d** | | |
| **e** | Alternative tax on qualifying shipping activities (attach Form 8902)..... **9e** | | |
| **f** | Interest/tax due under section 453A(c) and/or section 453(l)........ **9f** | | |
| **g** | Other (see instructions — attach statement)........ **9g** | | |
| **10** | **Total.** Add lines 9a through 9g....................................................... | **10** | |
| **11** | **Total tax.** Add lines 7, 8, and 10. Enter here and on page 1, line 31............. | **11** | 0. |

**Part II — Reserved for Future Use**

| | | | |
|---|---|---|---|
| **12** | Reserved for future use.................................................................. | **12** | |

**Part III — Payments and Refundable Credits**

| | | | |
|---|---|---|---|
| **13** | 2021 overpayment credited to 2022.................................................. | **13** | |
| **14** | 2022 estimated tax payments.......................................................... | **14** | 1,375,000. |
| **15** | 2022 refund applied for on Form 4466................................................ | **15** | ( ) |
| **16** | Combine lines 13, 14, and 15.......................................................... | **16** | 1,375,000. |
| **17** | Tax deposited with Form 7004......................................................... | **17** | |
| **18** | Withholding (see instructions)......................................................... | **18** | |
| **19** | **Total payments.** Add lines 16, 17, and 18........................................... | **19** | 1,375,000. |
| **20** | Refundable credits from: | | |
| **a** | Form 2439....................................... **20a** | | |
| **b** | Form 4136....................................... **20b** | | |
| **c** | Reserved for future use......................... **20c** | | |
| **d** | Other (attach statement — see instructions)....... **20d** | | |
| **21** | **Total credits.** Add lines 20a through 20d......................................... | **21** | |
| **22** | Reserved for future use................................................................ | **22** | |
| **23** | **Total payments and credits.** Add lines 19 and 21. Enter here and on page 1, line 33............. | **23** | 1,375,000. |

Form **1120** (2022)

CPCA0234  10/05/22

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form 1120 (2022)   SMART COMMUNICATIONS HOLDING, INC.              47-2886302                     Page **4**

| **Schedule K** | **Other Information** (see instructions) | | | Yes | No |
|---|---|---|---|---|---|

**1** Check accounting method: **a** ☐ Cash  **b** ☒ Accrual  **c** ☐ Other (specify) _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**2** See the instructions and enter the:

  **a** Business activity code no. 551112 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

  **b** Business activity HOLDING COMPANY _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

  **c** Product or service COMMUNICATIONS _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**3** Is the corporation a subsidiary in an affiliated group or a parent-subsidiary controlled group?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **X**

  If "Yes," enter name and EIN of the parent corporation _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4** At the end of the tax year:

  **a** Did any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, or tax-exempt organization own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote? If "Yes," complete Part I of Schedule G (Form 1120) (attach Schedule G). . . . . . . . . . | | **X**

  **b** Did any individual or estate own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote? If "Yes," complete Part II of Schedule G (Form 1120) (attach Schedule G). . . . . . . | **X** |

**5** At the end of the tax year, did the corporation:

  **a** Own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of stock entitled to vote of any foreign or domestic corporation not included on Form 851, Affiliations Schedule? For rules of constructive ownership, see instructions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **X**

  If "Yes," complete (i) through (iv) below.

| (i) Name of Corporation | (ii) Employer Identification Number (if any) | (iii) Country of Incorporation | (iv) Percentage Owned in Voting Stock |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

  **b** Own directly an interest of 20% or more, or own, directly or indirectly, an interest of 50% or more in any foreign or domestic partnership (including an entity treated as a partnership) or in the beneficial interest of a trust? For rules of constructive ownership, see instructions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **X**

  If "Yes," complete (i) through (iv) below.

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Country of Organization | (iv) Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

**6** During this tax year, did the corporation pay dividends (other than stock dividends and distributions in exchange for stock) in excess of the corporation's current and accumulated earnings and profits? See sections 301 and 316. . . . . . . . . . . . . . . . . . . . | | **X**

  If "Yes," file **Form 5452**, Corporate Report of Nondividend Distributions. See the instructions for Form 5452.

  If this is a consolidated return, answer here for the parent corporation and on Form 851 for each subsidiary.

**7** At any time during the tax year, did one foreign person own, directly or indirectly, at least 25% of the total voting power of all classes of the corporation's stock entitled to vote or at least 25% of the total value of all classes of the corporation's stock? For rules of attribution, see section 318. If "Yes," enter: | | **X**

  **(a)** Percentage owned _ _ _ _ _ _ _  and **(b)** Owner's country _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

  **(c)** The corporation may have to file **Form 5472**, Information Return of a 25% Foreign-Owned U.S. Corporation or a Foreign Corporation Engaged in a U.S. Trade or Business. Enter the number of Forms 5472 attached _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**8** Check this box if the corporation issued publicly offered debt instruments with original issue discount. . . . . . . . . . . . . . . ☐

  If checked, the corporation may have to file **Form 8281**, Information Return for Publicly Offered Original Issue Discount Instruments.

**9** Enter the amount of tax-exempt interest received or accrued during the tax year $ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ None

**10** Enter the number of shareholders at the end of the tax year (if 100 or fewer) 2 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**11** If the corporation has an NOL for the tax year and is electing to forego the carryback period, check here (see instructions). . . . . . . . . . . . . . . . . . . . . ☐

  If the corporation is filing a consolidated return, the statement required by Regulations section 1.1502-21(b)(3) must be attached or the election will not be valid.

**12** Enter the available NOL carryover from prior tax years (do not reduce it by any deduction reported on page 1, line 29a.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _ _ _ _ _ _ _ _ _ _ _ _ _ None

Form **1120** (2022)

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form 1120 (2022)  SMART COMMUNICATIONS HOLDING, INC.  47-2886302  Page **5**

| Schedule K | Other Information *(continued from page 4)* | Yes | No |
|---|---|---|---|
| **13** | Are the corporation's total receipts (page 1, line 1a, plus lines 4 through 10) for the tax year **and** its total assets at the end of the tax year less than $250,000?......................................................................... | | X |
| | If "Yes," the corporation is not required to complete Schedules L, M-1, and M-2. Instead, enter the total amount of cash distributions and the book value of property distributions (other than cash) made during the tax year   $ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | |
| **14** | Is the corporation required to file Schedule UTP (Form 1120), Uncertain Tax Position Statement? See instructions............ | | X |
| | If "Yes," complete and attach Schedule UTP. | | |
| **15a** | Did the corporation make any payments in 2022 that would require it to file Form(s) 1099?............................... | X | |
| **b** | If "Yes," did or will the corporation file required Form(s) 1099?.......................................................... | X | |
| **16** | During this tax year, did the corporation have an 80%-or-more change in ownership, including a change due to redemption of its own stock?............................................................................................................. | | X |
| **17** | During or subsequent to this tax year, but before the filing of this return, did the corporation dispose of more than 65% (by value) of its assets in a taxable, non-taxable, or tax deferred transaction?.................................................. | | X |
| **18** | Did the corporation receive assets in a section 351 transfer in which any of the transferred assets had a fair market basis or fair market value of more than $1 million?..................................................................................... | | X |
| **19** | During the corporation's tax year, did the corporation make any payments that would require it to file Forms 1042 and 1042-S under chapter 3 (sections 1441 through 1464) or chapter 4 (sections 1471 through 1474) of the Code?..................... | | X |
| **20** | Is the corporation operating on a cooperative basis?..................................................................... | | X |
| **21** | During the tax year, did the corporation pay or accrue any interest or royalty for which the deduction is not allowed under section 267A? See instructions .................................................................................... | | X |
| | If "Yes," enter the total amount of the disallowed deductions  $ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | |
| **22** | Does the corporation have gross receipts of at least $500 million in any of the 3 preceding tax years? (See sections 59A(e)(2) and (3))........................................................................................ | | X |
| | If "Yes," complete and attach Form 8991. | | |
| **23** | Did the corporation have an election under section 163(j) for any real property trade or business or any farming business in effect during the tax year? See instructions.................................................................. | | X |
| **24** | Does the corporation satisfy one or more of the following? See instructions............................................. | X | |
| **a** | The corporation owns a pass-through entity with current, or prior year carryover, excess business interest expense. | | |
| **b** | The corporation's aggregate average annual gross receipts (determined under section 448(c)) for the 3 tax years preceding the current tax year are more than $27 million and the corporation has business interest expense. | | |
| **c** | The corporation is a tax shelter and the corporation has business interest expense. | | |
| | If "Yes," complete and attach Form 8990. | | |
| **25** | Is the corporation attaching Form 8996 to certify as a Qualified Opportunity Fund?........................................ | | X |
| | If "Yes," enter amount from Form 8996, line 15............ $ | | |
| **26** | Since December 22, 2017, did a foreign corporation directly or indirectly acquire substantially all of the properties held directly or indirectly by the corporation, and was the ownership percentage (by vote or value) for purposes of section 7874 greater than 50% (for example, the shareholders held more than 50% of the stock of the foreign corporation)? If "Yes," list the ownership percentage by vote and by value. See instructions................................................................... | | X |
| | Percentage: By Vote                                    Percentage: By Value | | |

Form **1120** (2022)

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form 1120 (2022)　　SMART COMMUNICATIONS HOLDING, INC.　　　　　47-2886302　　　　Page **6**

| **Schedule L** | **Balance Sheets per Books** | | Beginning of tax year | | End of tax year | |
|---|---|---|---|---|---|---|
| | **Assets** | | **(a)** | **(b)** | **(c)** | **(d)** |
| 1 | Cash | | | 5,398,481. | | 865,720. |
| 2a | Trade notes and accounts receivable | | 2,244,379. | | 462,259. | |
| b | Less allowance for bad debts | ( | ) | 2,244,379. | ( ) | 462,259. |
| 3 | Inventories | | | 1,894,859. | | 690,704. |
| 4 | U.S. government obligations | | | | | |
| 5 | Tax-exempt securities (see instructions) | | | | | |
| 6 | Other current assets (attach statement) Stmt 2 | | | 1,450,610. | | 12,139,679. |
| 7 | Loans to shareholders | | | 728,855. | | 2,914,086. |
| 8 | Mortgage and real estate loans | | | | | |
| 9 | Other investments (attach statement) | | | | | |
| 10a | Buildings and other depreciable assets | | 13,734,794. | | 14,892,021. | |
| b | Less accumulated depreciation | | 7,205,777.) | 6,529,017. | 7,158,755.) | 7,733,266. |
| 11a | Depletable assets | | | | | |
| b | Less accumulated depletion | ( | ) | ( | ) | |
| 12 | Land (net of any amortization) | | | | | |
| 13a | Intangible assets (amortizable only) | | | | | |
| b | Less accumulated amortization | ( | ) | ( | ) | |
| 14 | Other assets (attach statement) | | | | | |
| 15 | Total assets | | | 18,246,201. | | 24,805,714. |
| | **Liabilities and Shareholders' Equity** | | | | | |
| 16 | Accounts payable | | | 1,502,160. | | 1,277,645. |
| 17 | Mortgages, notes, bonds payable in less than 1 year | | | | | |
| 18 | Other current liabilities (attach stmt) Stmt 3 | | | 1,753,422. | | 3,319,347. |
| 19 | Loans from shareholders | | | | | |
| 20 | Mortgages, notes, bonds payable in 1 year or more | | | 1,284,662. | | 58,576,292. |
| 21 | Other liabilities (attach statement) | | | | | |
| 22 | Capital stock: **a** Preferred stock | | | | | |
| | **b** Common stock | | 364,667. | 364,667. | 364,667. | 364,667. |
| 23 | Additional paid-in capital | | | 760,056. | | 392,151. |
| 24 | Retained earnings — Approp (att stmt) | | | | | |
| 25 | Retained earnings — Unappropriated | | | 12,581,234. | | -39,124,388. |
| 26 | Adjmt to shareholders' equity (att stmt) | | | | | |
| 27 | Less cost of treasury stock | | | ( ) | | ( ) |
| 28 | Total liabilities and shareholders' equity | | | 18,246,201. | | 24,805,714. |

| **Schedule M-1** | **Reconciliation of Income (Loss) per Books With Income per Return** |
|---|---|

**Note:** The corporation may be required to file Schedule M-3. See instructions.

| | | | | | |
|---|---|---|---|---|---|
| 1 | Net income (loss) per books | -14,659,799. | 7 | Income recorded on books this year not included on this return (itemize): | |
| 2 | Federal income tax per books | 1,375,000. | | | |
| 3 | Excess of capital losses over capital gains | | | Tax-exempt interest $ _ _ _ _ _ _ _ _ | |
| 4 | Income subject to tax not recorded on books this year (itemize): _ _ _ _ _ _ _ | | | | |
| | | | 8 | Deductions on this return not charged against book income this year (itemize): | |
| 5 | Expenses recorded on books this year not deducted on this return (itemize): | | | **a** Depreciation $ _ _ _ _ _ _ | |
| | **a** Depreciation $ _ _ _ _ | | | **b** Charitable contribns $ _ _ _ _ | |
| | **b** Charitable contributions $ _ _ _ 19,340. | | | | |
| | **c** Travel & entertainment $ _ _ _ 72,269. | | | | |
| | Statement 4 _ _ _ 483,148. | | 9 | Add lines 7 and 8 | 0. |
| 6 | Add lines 1 through 5 | -12,710,042. | 10 | Income (page 1, line 28) — line 6 less line 9 | -12,710,042. |

Add lines 1 through 5 subtotal (line 5 column): 574,757.

| **Schedule M-2** | **Analysis of Unappropriated Retained Earnings per Books (Schedule L, Line 25)** |
|---|---|

| | | | | | |
|---|---|---|---|---|---|
| 1 | Balance at beginning of year | 12,581,234. | 5 | Distributions: **a** Cash | |
| 2 | Net income (loss) per books | -14,659,799. | | **b** Stock　　**c** Property | |
| 3 | Other increases (itemize): _ _ _ _ _ _ _ | | 6 | Other decreases (itemize): | |
| | _ _ _ _ _ _ _ _ _ _ _ _ | | | Statement 5 | 37,045,823. |
| | _ _ _ _ _ _ _ _ _ _ _ _ | | 7 | Add lines 5 and 6 | 37,045,823. |
| 4 | Add lines 1, 2, and 3 | -2,078,565. | 8 | Balance at end of year (line 4 less line 7) | -39,124,388. |

Form **1120** (2022)

CPCA0234　10/04/22

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

| Form **8050** (November 2016) Department of the Treasury Internal Revenue Service | **Direct Deposit of Corporate Tax Refund** ► Attach to Form 1120 or 1120S. ► Information about Form 8050 and its instructions is at *www.irs.gov/form8050.* | OMB No. 1545-0123 |
|---|---|---|

| Name of corporation (as shown on tax return) | Employer Identification number |
|---|---|
| SMART COMMUNICATIONS HOLDING, INC. | 47-2886302 |
| | Phone number (optional) |

1  **Routing number (must be nine digits).** The first two digits must be between 01 and 12 or 21 through 32.
   263191387

2  **Account number (include hyphens but omit spaces and special symbols):**

3  **Type of account (one box must be checked):**

   [X] Checking    [ ] Savings

**BAA**                                                Form **8050** (11-2016)

CPCZ1501L 08/23/16

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form **1125-A**
(Rev. November 2018)
Department of the Treasury
Internal Revenue Service

**Cost of Goods Sold**

► Attach to Form 1120, 1120-C, 1120-F, 1120S, or 1065.
► Go to *www.irs.gov/Form1125A* for the latest information.

OMB No. 1545-0123

| Name | Employer Identification number |
|---|---|
| SMART COMMUNICATIONS HOLDING, INC. | 47-2886302 |

| | | |
|---|---|---:|
| 1 | Inventory at beginning of year | 1 | 1,894,859. |
| 2 | Purchases | 2 | 4,085,875. |
| 3 | Cost of labor | 3 | 1,943,725. |
| 4 | Additional section 263A costs (attach schedule) | 4 | |
| 5 | Other costs (attach schedule). . . . . . . . . . . . . . . . . . . . . . See Statement 6 | 5 | 18,306,403. |
| 6 | **Total.** Add lines 1 through 5 | 6 | 26,230,862. |
| 7 | Inventory at end of year | 7 | 690,704. |
| 8 | **Cost of goods sold.** Subtract line 7 from line 6. Enter here and on Form 1120, page 1, line 2 or the appropriate line of your tax return. See instructions | 8 | 25,540,158. |

**9 a** Check all methods used for valuing closing inventory:

   (i)  [X] Cost
   (ii) [ ] Lower of cost or market
   (iii)[ ] Other (Specify method used and attach explanation.) ► _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

   **b** Check if there was a writedown of subnormal goods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ► [ ]
   **c** Check if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970). . . . . . . . . . . . . . . . . . ► [ ]
   **d** If the LIFO inventory method was used for this tax year, enter amount of closing inventory computed under LIFO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **9d** |
   **e** If property is produced or acquired for resale, do the rules of section 263A apply to the entity? See instructions . . . . . .  [ ] Yes  [X] No
   **f** Was there any change in determining quantities, cost, or valuations between opening and closing inventory? If "Yes," attach explanation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  [ ] Yes  [X] No

**BAA  For Paperwork Reduction Act Notice, see instructions.**                                    Form **1125-A** (Rev. 11-2018)

CPCZ0401L  09/26/18

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

**SCHEDULE G**
**(Form 1120)**
(Rev December 2011)

Department of the Treasury
Internal Revenue Service

# Information on Certain Persons Owning the Corporation's Voting Stock

► Attach to Form 1120.

► See instructions.

OMB No. 1545-0123

| Name | Employer identification number (EIN) |
|---|---|
| SMART COMMUNICATIONS HOLDING, INC. | 47-2886302 |

**Part I**   **Certain Entities Owning the Corporation's Voting Stock.** (Form 1120, Schedule K, Question 4a). Complete columns (i) through (v) below for any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, or tax-exempt organization that owns directly 20% or more, or owns, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote (see instructions).

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Percentage Owned in Voting Stock |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Part II**   **Certain Individuals and Estates Owning the Corporation's Voting Stock.** (Form 1120, Schedule K, Question 4b). Complete columns (i) through (iv) below for any individual or estate that owns directly 20% or more, or owns, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote (see instructions).

| (i) Name of Individual or Estate | (ii) Identifying Number (if any) | (iii) Country of Citizenship (see instructions) | (iv) Percentage Owned in Voting Stock |
|---|---|---|---|
| JAMES LOGAN | ███████ | United States | 50.00% |
| JONATHAN LOGAN | ███████ | United States | 50.00% |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**BAA**   For Paperwork Reduction Act Notice, see the Instructions for Form 1120.

CPCA1901L 05/02/11

Schedule G (Form 1120) (Rev 12-2011)

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

| SCHEDULE M-3<br>(Form 1120)<br>(Rev. December 2019)<br>Department of the Treasury<br>Internal Revenue Service | **Net Income (Loss) Reconciliation for Corporations**<br>**With Total Assets of $10 Million or More**<br>► Attach to Form 1120 or 1120-C.<br>► Go to *www.irs.gov/Form1120* for instructions and the latest information. | OMB No. 1545-0123 |
|---|---|---|

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| SMART COMMUNICATIONS COLLIER INC. | 46-0554683 |

Check applicable box(es):  (1) ☐ Non-consolidated return   (2) ☒ Consolidated return (Form 1120 only)
(3) ☐ Mixed 1120/L/PC group   (4) ☐ Dormant subsidiaries schedule attached

---

**Part I**   **Financial Information and Net Income (Loss) Reconciliation** (see instructions)

**1 a** Did the corporation file SEC Form 10-K for its income statement period ending with or within this tax year?
   ☐ **Yes.** Skip lines 1b and 1c and complete lines 2a through 11 with respect to that SEC Form 10-K.
   ☒ **No.** Go to line 1b. See instructions if multiple non-tax-basis income statements are prepared.
  **b** Did the corporation prepare a certified audited non-tax-basis income statement for that period?
   ☐ **Yes.** Skip line 1c and complete lines 2a through 11 with respect to that income statement.
   ☒ **No.** Go to line 1c.
  **c** Did the corporation prepare a non-tax-basis income statement for that period?
   ☒ **Yes.** Complete lines 2a through 11 with respect to that income statement.
   ☐ **No.** Skip lines 2a through 3c and enter the corporation's net income (loss) per its books and records on line 4a.
**2 a** Enter the income statement period:   Beginning   1/01/22   Ending   12/31/22
  **b** Has the corporation's income statement been restated for the income statement period on line 2a?
   ☐ **Yes.** (If "Yes," attach an explanation and the amount of each item restated.)
   ☒ **No.**
  **c** Has the corporation's income statement been restated for any of the five income statement periods immediately preceding the period on line 2a?
   ☐ **Yes.** (If "Yes," attach an explanation and the amount of each item restated.)
   ☒ **No.**
**3 a** Is any of the corporation's voting common stock publicly traded?
   ☐ **Yes.**
   ☒ **No.** If "No," go to line 4a.
  **b** Enter the symbol of the corporation's primary U.S. publicly traded voting common stock . . . . . . . . . . . .
  **c** Enter the nine-digit CUSIP number of the corporation's primary publicly traded voting
   common stock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

| | | |
|---|---|---|
| **4 a** Worldwide consolidated net income (loss) from income statement source identified in Part I, line 1 . . . . . . . . . | **4a** | -14,659,799. |
|   **b** Indicate accounting standard used for line 4a (see instructions):<br>  (1) ☒ GAAP  (2) ☐ IFRS  (3) ☐ Statutory  (4) ☐ Tax-basis  (5) ☐ Other (specify) | | |
| **5 a** Net income from nonincludible foreign entities (attach statement) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **5a** | ( ) |
|   **b** Net loss from nonincludible foreign entities (attach statement and enter as a positive amount) . . . . . . . . . . . . | **5b** | |
| **6 a** Net income from nonincludible U.S. entities (attach statement) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **6a** | ( ) |
|   **b** Net loss from nonincludible U.S. entities (attach statement and enter as a positive amount) . . . . . . . . . . . . | **6b** | |
| **7 a** Net income (loss) of other includible foreign disregarded entities (attach statement) . . . . . . . . . . . | **7a** | |
|   **b** Net income (loss) of other includible U.S. disregarded entities (attach statement) . . . . . . . . . . . | **7b** | |
|   **c** Net income (loss) of other includible entities (attach statement) . . . . . . . . . . . . . . . . . . . . . . . | **7c** | |
| **8** Adjustment to eliminations of transactions between includible entities and nonincludible entities (attach statement) . . . . . . . . . . . . | **8** | |
| **9** Adjustment to reconcile income statement period to tax year (attach statement) . . . . . . . . . . . . . . . . . . | **9** | |
| **10 a** Intercompany dividend adjustments to reconcile to line 11 (attach statement) . . . . . . . . . . . . . . . . . . | **10a** | |
|   **b** Other statutory accounting adjustments to reconcile to line 11 (attach statement) . . . . . . . . . . . . . . | **10b** | |
|   **c** Other adjustments to reconcile to amount on line 11 (attach statement) . . . . . . . . . . . . . . . . . . . . | **10c** | |
| **11** **Net income (loss) per income statement of includible corporations.** Combine lines 4 through 10 . . . . . . . . . | **11** | -14,659,799. |

  **Note:** Part I, line 11, must equal Part II, line 30, column (a), or Schedule M-1, line 1 (see instructions).

**12** Enter the total amount (not just the corporation's share) of the assets and liabilities of all entities included or removed on the following lines.

| | Total Assets | Total Liabilities |
|---|---|---|
| **a** Included on Part I, line 4 . . . . . . . . . . . . . . . ► | | |
| **b** Removed on Part I, line 5 . . . . . . . . . . . . . . ► | | |
| **c** Removed on Part I, line 6 . . . . . . . . . . . . . . ► | | |
| **d** Included on Part I, line 7 . . . . . . . . . . . . . . ► | | |

BAA  For Paperwork Reduction Act Notice, see the Instructions for Form 1120.   CPCA1001L  01/09/22   **Schedule M-3 (Form 1120) (Rev. 12-2019)**

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form **851**
(Rev October 2016)

Department of the Treasury
Internal Revenue Service

**Affiliations Schedule**

For tax year ending 12/31 , 2022
► **File with each consolidated income tax return.**
► **Information about Form 851 and its instructions is at www.irs.gov/form851.**

OMB No. 1545-0123

| Name of common parent corporation | Employer identification number |
|---|---|
| SMART COMMUNICATIONS COLLIER, INC | 46-0554683 |

Number, street, and room or suite number. If a P.O. box, see instructions.

10491 72ND STREET

City or town                                    State    ZIP Code

SEMINOLE, FL 33777

### Part I   Overpayment Credits, Estimated Tax Payments, and Tax Deposits (see instructions)

| Corp No. | Name and address of corporation | Employer identification number | Portion of overpayment credits and estimated tax payments | Portion of tax deposited with Form 7004 |
|---|---|---|---|---|
| 1 | Common parent corporation | | 1,375,000. | |
| | Subsidiary corporations: | | | |
| 2 | SMART COMMUNICATIONS PASCO, INC. 10491 72ND STREET, SEMINOLE, FL 33777 | 37-1735923 | | |
| 3 | SMART COMMUNICATIONS US, INC. 10491 72nd STREET, SEMINOLE, FL 33777 | 37-1601615 | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| | **Totals** (Must equal amounts shown on the consolidated tax return) . . . . . . . . . . . . . . . . . ► | | 1,375,000. | |

### Part II   Principal Business Activity, Voting Stock Information, Etc (see instructions)

| Corp No. | Principal business activity (PBA) | PBA Code Number | Did the subsidiary make any nondividend distributions? Yes | No | Number of shares | Percentage of voting power | Percentage of value | Owned by corporation number |
|---|---|---|---|---|---|---|---|---|
| 1 | Common parent corporation HOLDING COMPANY | 551112 | | | | | | |
| | Subsidiary corporations: | | | | | | | |
| 2 | SERVICE | 518210 | | X | | % | % | 1 |
| 3 | SERVICE | 541519 | | X | | % | % | 1 |
| 4 | | | | | | % | % | |
| 5 | | | | | | % | % | |
| 6 | | | | | | % | % | |
| 7 | | | | | | % | % | |
| 8 | | | | | | % | % | |
| 9 | | | | | | % | % | |
| 10 | | | | | | % | % | |

**BAA  For Paperwork Reduction Act Notice, see instructions.**                          Form **851** (Rev 10-2016)

CPCA2312L  08/23/16

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form **851** (Rev 10-2016) SMART COMMUNICATIONS COLLIER, INC              47-2886302   Page **2**

| Part III | Changes in Stock Holdings During the Tax Year | | | | | | |
|---|---|---|---|---|---|---|---|
| Corp No. | Name of corporation | Share-holder of Corpora-tion No. | Date of transaction | **(a) Changes** | | **(b) Shares held after changes described in column (a)** | |
| | | | | Number of shares acquired | Number of shares disposed of | Percentage of voting power | Percentage of value |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |

**(c)** If any transaction listed above caused a transfer of a share of subsidiary stock (defined to include dispositions and deconsolidations), did the share's basis exceed its value at the time of the transfer? See instructions  ☐ Yes  ☒ No

**(d)** Did any share of subsidiary stock become worthless within the meaning of section 165 (taking into account the provisions of Regulations section 1.1502-80(c)) during the taxable year? See instrs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ☐ Yes  ☒ No

**(e)** If the equitable owners of any capital stock shown above were other than the holders of record, provide details of the changes.

_____

_____

_____

_____

_____

_____

_____

**(f)** If additional stock was issued, or if any stock was retired during the year, list the dates and amounts of these transactions.

_____

_____

_____

_____

_____

_____

Form **851** (Rev 10-2016)

CPCA2312L  08/23/16

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form **851** (Rev 10-2016)   SMART COMMUNICATIONS COLLIER, INC                47-2886302 Page **3**

| **Part IV** | **Additional Stock Information** (see instructions) |
|---|---|

**1**  During the tax year, did the corporation have more than one class of stock outstanding?............................... ☐ **Yes**  ☒ **No**
If 'Yes', enter the name of the corporation and list and describe each class of stock.

| Corp No. | Name of corporation | Class of stock |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**2**  During the tax year, was there any member of the consolidated group that reaffiliated within 60 months of disaffiliation? ☐ **Yes**  ☒ **No**
If 'Yes', enter the name of the corporation(s) and explain the circumstances.

| Corp No. | Name of corporation | Explanation |
|---|---|---|
| | | |
| | | |
| | | |

**3**  During the tax year, was there any arrangement in existence by which one or more persons that were not members of the affiliated group could acquire any stock, or acquire any voting power without acquiring stock, in the corporation, other than a de minimis amount, from the corporation or another member of the affiliated group?........................... ☐ **Yes**  ☒ **No**

If 'Yes', enter the name of the corporation and see the instructions for the percentages to enter in columns (a), (b), and (c).

| Corp No. | Name of corporation | (a) Percentage of value | (b) Percentage of outstanding voting stock | (c) Percentage of voting power |
|---|---|---|---|---|
| | | % | % | % |
| | | % | % | % |
| | | % | % | % |
| | | % | % | % |

| Corp No. | **(d)** Provide a description of any arrangement. |
|---|---|
| | |
| | |
| | |
| | |

**BAA**                                                                 Form **851** (Rev 10-2016)

CPCA2303L  08/23/16

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form **1125-E**
(Rev October 2016)
Department of the Treasury
Internal Revenue Service

## Compensation of Officers

► Attach to Form 1120, 1120-C, 1120-F, 1120-REIT, 1120-RIC, or 1120S.
► Information about Form 1125-E and its separate instructions is at *www.irs.gov/form1125e.*

OMB No. 1545-0123

| Name | Employer Identification number |
|---|---|
| SMART COMMUNICATIONS HOLDING, INC. | 47-2886302 |

**Note:** Complete Form 1125-E only if total receipts are $500,000 or more. See instructions for definition of total receipts.

| 1 | (a) Name of officer | (b) Social security number | (c) Percent of time devoted to business | Percent of stock owned | | (f) Amount of compensation |
|---|---|---|---|---|---|---|
| | | | | (d) Common | (e) Preferred | |
| SMART COMMUNICATIONS COLLIER INC. - 46-0554683 | | | % | % | % | |
| JAMES LOGAN | | ▮ | 100 % | 50.00 % | 0.00 % | 40,385. |
| JONATHAN LOGAN | | ▮ | 100 % | 50.00 % | 0.00 % | 120,000. |
| SMART COMMUNICATIONS PASCO, INC. - 37-1735923 | | | % | % | % | |
| JAMES P. LOGAN | | ▮ | 100 % | 50.00 % | 0.00 % | 0. |
| JONATHAN LOGAN | | ▮ | 100 % | 50.00 % | 0.00 % | 0. |
| SMART COMMUNICATIONS US, INC. - 37-1601615 | | | % | % | % | |
| JAMES LOGAN | | ▮ | 100 % | 50.00 % | 0.00 % | 0. |
| JONATHAN LOGAN | | ▮ | 100 % | 50.00 % | 0.00 % | 0. |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |

| | | |
|---|---|---|
| **2** Total compensation of officers.................................................................... | | 160,385. |
| **3** Compensation of officers claimed on Form 1125-A or elsewhere on return.......................................... | | |
| **4** Subtract line 3 from line 2. Enter the result here and on Form 1120, page 1, line 12 or the appropriate line of your tax return........................................................ | | 160,385. |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**                              Form **1125-E** (Rev 10-2016)

CPCA2101L  08/18/16

## CONFIDENTIAL
## FOR PURPOSES OF MEDIATION ONLY

| Form **4562** | **Depreciation and Amortization**<br>**(Including Information on Listed Property)**<br>Attach to your tax return.<br>Go to *www.irs.gov/Form4562* for instructions and the latest information. | OMB No. 1545-0172<br>**2022**<br>Attachment<br>Sequence No. **179** |
|---|---|---|

Department of the Treasury<br>Internal Revenue Service

Name(s) shown on return: **SMART COMMUNICATIONS HOLDING, INC.**  Identifying number: **47-2886302**

Business or activity to which this form relates: **Form 1120**

## Part I — Election To Expense Certain Property Under Section 179

**Note:** If you have any listed property, complete Part V before you complete Part I.

| | | |
|---|---|---|
| 1 | Maximum amount (see instructions) | **1** 1,080,000. |
| 2 | Total cost of section 179 property placed in service (see instructions) | **2** |
| 3 | Threshold cost of section 179 property before reduction in limitation (see instructions) | **3** 2,700,000. |
| 4 | Reduction in limitation. Subtract line 3 from line 2. If zero or less, enter -0- | **4** |
| 5 | Dollar limitation for tax year. Subtract line 4 from line 1. If zero or less, enter -0-. If married filing separately, see instructions | **5** |

| 6 | (a) Description of property | (b) Cost (business use only) | (c) Elected cost |
|---|---|---|---|
| | | | |
| | | | |

| | | |
|---|---|---|
| 7 | Listed property. Enter the amount from line 29 | **7** |
| 8 | Total elected cost of section 179 property. Add amounts in column (c), lines 6 and 7 | **8** |
| 9 | Tentative deduction. Enter the **smaller** of line 5 or line 8 | **9** |
| 10 | Carryover of disallowed deduction from line 13 of your 2021 Form 4562 | **10** |
| 11 | Business income limitation. Enter the smaller of business income (not less than zero) or line 5. See instrs | **11** |
| 12 | Section 179 expense deduction. Add lines 9 and 10, but don't enter more than line 11 | **12** |
| 13 | Carryover of disallowed deduction to 2023. Add lines 9 and 10, less line 12 .... | **13** | |

**Note:** Don't use Part II or Part III below for listed property. Instead, use Part V.

## Part II — Special Depreciation Allowance and Other Depreciation (Don't include listed property. See instructions.)

| | | |
|---|---|---|
| 14 | Special depreciation allowance for qualified property (other than listed property) placed in service during the tax year. See instructions | **14** |
| 15 | Property subject to section 168(f)(1) election | **15** |
| 16 | Other depreciation (including ACRS) | **16** |

## Part III — MACRS Depreciation (Don't include listed property. See instructions.)

### Section A

| | | |
|---|---|---|
| 17 | MACRS deductions for assets placed in service in tax years beginning before 2022 | **17** 1,277,072. |
| 18 | If you are electing to group any assets placed in service during the tax year into one or more general asset accounts, check here | ☐ |

### Section B — Assets Placed in Service During 2022 Tax Year Using the General Depreciation System

| (a) Classification of property | (b) Month and year placed in service | (c) Basis for depreciation (business/investment use only — see instructions) | (d) Recovery period | (e) Convention | (f) Method | (g) Depreciation deduction |
|---|---|---|---|---|---|---|
| 19a 3-year property | | | | | | |
| b 5-year property | | 168,697. | 5 | MQ | S/L | 9,938. |
| c 7-year property | | | | | | |
| d 10-year property | | | | | | |
| e 15-year property | | | | | | |
| f 20-year property | | | | | | |
| g 25-year property | | | 25 yrs | | S/L | |
| h Residential rental property | | | 27.5 yrs | MM | S/L | |
| | | | 27.5 yrs | MM | S/L | |
| i Nonresidential real property | 6/28/22 | 2,680,887. | 39 yrs | MM | S/L | 34,370. |
| | | | | MM | S/L | |

### Section C — Assets Placed in Service During 2022 Tax Year Using the Alternative Depreciation System

| (a) | (b) | (c) | (d) | (e) | (f) | (g) |
|---|---|---|---|---|---|---|
| 20a Class life | | | | | S/L | |
| b 12-year | | | 12 yrs | | S/L | |
| c 30-year | | | 30 yrs | MM | S/L | |
| d 40-year | | | 40 yrs | MM | S/L | |

## Part IV — Summary (See instructions.)

| | | |
|---|---|---|
| 21 | Listed property. Enter amount from line 28 | **21** 315,196. |
| 22 | **Total.** Add amounts from line 12, lines 14 through 17, lines 19 and 20 in column (g), and line 21. Enter here and on the appropriate lines of your return. Partnerships and S corporations — see instructions | **22** 1,636,576. |
| 23 | For assets shown above and placed in service during the current year, enter the portion of the basis attributable to section 263A costs | **23** | |

**BAA** For Paperwork Reduction Act Notice, see separate instructions.  FDIZ0812L 06/28/22  Form **4562** (2022)

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form 4562 (2022)   SMART COMMUNICATIONS HOLDING, INC.                47-2886302        Page **2**

| **Part V** | **Listed Property** (Include automobiles, certain other vehicles, certain aircraft, and property used for entertainment, recreation, or amusement.) |
|---|---|

**Note:** For any vehicle for which you are using the standard mileage rate or deducting lease expense, complete **only** 24a, 24b, columns (a) through (c) of Section A, all of Section B, and Section C if applicable.

**Section A — Depreciation and Other Information (Caution: See the instructions for limits for passenger automobiles.)**

**24a** Do you have evidence to support the business/investment use claimed? . . . . . . . . . [X] Yes [ ] No   **24b** If 'Yes,' is the evidence written? . . . . . . [X] Yes [ ] No

| (a) Type of property (list vehicles first) | (b) Date placed in service | (c) Business/ investment use percentage | (d) Cost or other basis | (e) Basis for depreciation (business/investment use only) | (f) Recovery period | (g) Method/ Convention | (h) Depreciation deduction | (i) Elected section 179 cost |
|---|---|---|---|---|---|---|---|---|
| **25** Special depreciation allowance for qualified listed property placed in service during the tax year and used more than 50% in a qualified business use. See instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | | **25** | | |
| **26** Property used more than 50% in a qualified business use: | | | | | | | | |
| QUAD MERCURY | 5/01/20 | 100.0 | 1,402,694. | 1,402,694. | 5.0 | S/L  HY | 280,539. | |
| 2020 FORD TR | 5/19/20 | 100.0 | 37,491. | 37,491. | 5.0 | S/L  HY | 7,498. | |
| 2020 FORD TR | 5/19/20 | 100.0 | 37,491. | 37,491. | 5.0 | S/L  HY | 7,498. | |
| **27** Property used 50% or less in a qualified business use: | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| **28** Add amounts in column (h), lines 25 through 27. Enter here and on line 21, page 1 . . . . . . . . . . . . . . | | | | | | **28** | 315,196. | |
| **29** Add amounts in column (i), line 26. Enter here and on line 7, page 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | | | **29** | 0. |

**Section B — Information on Use of Vehicles**

Complete this section for vehicles used by a sole proprietor, partner, or other 'more than 5% owner,' or related person. If you provided vehicles to your employees, first answer the questions in Section C to see if you meet an exception to completing this section for those vehicles.

| | | (a) Vehicle 1 | | (b) Vehicle 2 | | (c) Vehicle 3 | | (d) Vehicle 4 | | (e) Vehicle 5 | | (f) Vehicle 6 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **30** | Total business/investment miles driven during the year (**don't** include commuting miles). . . . . . . . . . . . . . . . . . . . | | | | | | | | | | | | | |
| **31** | Total commuting miles driven during the year. . . . . . . | | | | | | | | | | | | | |
| **32** | Total other personal (noncommuting) miles driven . . . . . . . . . . . . . . . . . . . . . . . | | | | | | | | | | | | | |
| **33** | Total miles driven during the year. Add lines 30 through 32 . . . . . . . . . . . . . . . . . . . . | | | | | | | | | | | | | |
| | | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| **34** | Was the vehicle available for personal use during off-duty hours? . . . . . . . . . . . . . . . . . . | | | | | | | | | | | | | |
| **35** | Was the vehicle used primarily by a more than 5% owner or related person? . . . . . . . | | | | | | | | | | | | | |
| **36** | Is another vehicle available for personal use? . . . . . . . . . . . . . . . . . . . . . . . | | | | | | | | | | | | | |

**Section C — Questions for Employers Who Provide Vehicles for Use by Their Employees**

Answer these questions to determine if you meet an exception to completing Section B for vehicles used by employees who **aren't** more than 5% owners or related persons. See instructions.

| | | Yes | No |
|---|---|---|---|
| **37** | Do you maintain a written policy statement that prohibits all personal use of vehicles, including commuting, by your employees? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | |
| **38** | Do you maintain a written policy statement that prohibits personal use of vehicles, except commuting, by your employees? See the instructions for vehicles used by corporate officers, directors, or 1% or more owners . . . . . . . . . . . . . | | |
| **39** | Do you treat all use of vehicles by employees as personal use? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | |
| **40** | Do you provide more than five vehicles to your employees, obtain information from your employees about the use of the vehicles, and retain the information received? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | |
| **41** | Do you meet the requirements concerning qualified automobile demonstration use? See instructions . . . . . . . . . . . . . . . . . . . | | |
| | **Note:** If your answer to 37, 38, 39, 40, or 41 is 'Yes,' don't complete Section B for the covered vehicles. | | |

| **Part VI** | **Amortization** |
|---|---|

| (a) Description of costs | (b) Date amortization begins | (c) Amortizable amount | (d) Code section | (e) Amortization period or percentage | (f) Amortization for this year |
|---|---|---|---|---|---|
| **42** Amortization of costs that begins during your 2022 tax year (see instructions): | | | | | |
| | | | | | |
| | | | | | |
| **43** Amortization of costs that began before your 2022 tax year . . . . . . . . . . . . . . . . . . . . . . . . . | | | | **43** | |
| **44** **Total.** Add amounts in column (f). See the instructions for where to report . . . . . . . . . . . . . . . . . . . . . . | | | | **44** | |

FDIZ0812L 06/28/22                                                            Form **4562** (2022)

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form 4562 (2022)    SMART COMMUNICATIONS HOLDING, INC.    47-2886302    Page **2**

| **Part V** | **Listed Property** (Include automobiles, certain other vehicles, certain aircraft, and property used for entertainment, recreation, or amusement.) |

**Note:** For any vehicle for which you are using the standard mileage rate or deducting lease expense, complete **only** 24a, 24b, columns (a) through (c) of Section A, all of Section B, and Section C if applicable.

**Section A — Depreciation and Other Information (Caution: See the instructions for limits for passenger automobiles.)**

24 a Do you have evidence to support the business/investment use claimed?.......... [ ] Yes [ ] No   24b If 'Yes,' is the evidence written?...... [ ] Yes [ ] No

| (a)<br>Type of property<br>(list vehicles first) | (b)<br>Date placed<br>in service | (c)<br>Business/<br>investment<br>use<br>percentage | (d)<br>Cost or<br>other basis | (e)<br>Basis for depreciation<br>(business/investment<br>use only) | (f)<br>Recovery<br>period | (g)<br>Method/<br>Convention | (h)<br>Depreciation<br>deduction | (i)<br>Elected<br>section 179<br>cost |
|---|---|---|---|---|---|---|---|---|
| 25 Special depreciation allowance for qualified listed property placed in service during the tax year and used more than 50% in a qualified business use. See instructions................... | | | | | | **25** | | |
| 26 Property used more than 50% in a qualified business use: | | | | | | | | |
| 2020 FORD TR | 5/19/20 | 100.0 | 37,491. | 37,491. | 5.0 | S/L  HY | 7,498. | |
| 2018 FORD BU | 4/27/21 | 100.0 | 60,816. | 60,816. | 5.0 | S/L  HY | 12,163. | |
| 27 Property used 50% or less in a qualified business use: | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

28 Add amounts in column (h), lines 25 through 27. Enter here and on line 21, page 1.............. **28**

29 Add amounts in column (i), line 26. Enter here and on line 7, page 1........................................... **29**

**Section B — Information on Use of Vehicles**

Complete this section for vehicles used by a sole proprietor, partner, or other 'more than 5% owner,' or related person. If you provided vehicles to your employees, first answer the questions in Section C to see if you meet an exception to completing this section for those vehicles.

| | (a)<br>Vehicle 1 | | (b)<br>Vehicle 2 | | (c)<br>Vehicle 3 | | (d)<br>Vehicle 4 | | (e)<br>Vehicle 5 | | (f)<br>Vehicle 6 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 Total business/investment miles driven during the year (**don't** include commuting miles)............... | | | | | | | | | | | | |
| 31 Total commuting miles driven during the year....... | | | | | | | | | | | | |
| 32 Total other personal (noncommuting) miles driven.............................. | | | | | | | | | | | | |
| 33 Total miles driven during the year. Add lines 30 through 32...................... | | | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 34 Was the vehicle available for personal use during off-duty hours?.................... | | | | | | | | | | | | |
| 35 Was the vehicle used primarily by a more than 5% owner or related person?........ | | | | | | | | | | | | |
| 36 Is another vehicle available for personal use?........................ | | | | | | | | | | | | |

**Section C — Questions for Employers Who Provide Vehicles for Use by Their Employees**

Answer these questions to determine if you meet an exception to completing Section B for vehicles used by employees who **aren't** more than 5% owners or related persons. See instructions.

| | | Yes | No |
|---|---|---|---|
| 37 | Do you maintain a written policy statement that prohibits all personal use of vehicles, including commuting, by your employees?........................................................... | | |
| 38 | Do you maintain a written policy statement that prohibits personal use of vehicles, except commuting, by your employees? See the instructions for vehicles used by corporate officers, directors, or 1% or more owners............. | | |
| 39 | Do you treat all use of vehicles by employees as personal use?........................................... | | |
| 40 | Do you provide more than five vehicles to your employees, obtain information from your employees about the use of the vehicles, and retain the information received?...................................................... | | |
| 41 | Do you meet the requirements concerning qualified automobile demonstration use? See instructions................... | | |
| | **Note:** If your answer to 37, 38, 39, 40, or 41 is 'Yes,' don't complete Section B for the covered vehicles. | | |

| **Part VI** | **Amortization** |

| (a)<br>Description of costs | (b)<br>Date amortization<br>begins | (c)<br>Amortizable<br>amount | (d)<br>Code<br>section | (e)<br>Amortization<br>period or<br>percentage | (f)<br>Amortization<br>for this year |
|---|---|---|---|---|---|
| 42 Amortization of costs that begins during your 2022 tax year (see instructions): | | | | | |
| | | | | | |
| | | | | | |
| 43 Amortization of costs that began before your 2022 tax year..................... | | | | **43** | |
| 44 **Total.** Add amounts in column (f). See the instructions for where to report.................. | | | | **44** | |

FDIZ0812L 06/28/22    Form **4562** (2022)

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form **8990**
(Rev. December 2022)
Department of the Treasury
Internal Revenue Service

## Limitation on Business Interest Expense Under Section 163(j)
**Attach to your tax return.**
**Go to www.irs.gov/Form8990 for instructions and the latest information.**

OMB No. 1545-0123

| Taxpayer name(s) shown on tax return | Identification number |
|---|---|
| SMART COMMUNICATIONS HOLDING, INC. | 47-2886302 |

**A** If Form 8990 relates to an information return for a foreign entity (for example, Form 5471), enter:

Name of foreign entity _____

Employer identification number, if any _____

Reference ID number _____

**B** Is the foreign entity a CFC group member? See instructions........................... ☐ Yes ☐ No

**C** Is this Form 8990 filed by the specified group parent for an entire CFC group? See instructions...................... ☐ Yes ☐ No

**D** Has a CFC or a CFC group made a safe harbor election? If yes, see instructions for which lines of Form 8990
to complete.................................................................................... ☐ Yes ☐ No

### Part I   Computation of Allowable Business Interest Expense

*Part I is completed by all taxpayers subject to section 163(j). Schedule A and Schedule B need to be completed before Part I when the taxpayer is a partner or shareholder of a pass-through entity subject to section 163(j).*

#### Section I—Business Interest Expense

| | | | | | |
|---|---|---|---|---|---|
| 1 | Current year business interest expense (not including floor plan financing interest expense), before the section 163(j) limitation.......... | 1 | 461,011. | | |
| 2 | Disallowed business interest expense carryforwards from prior years. (Does not apply to a partnership)............................. | 2 | | | |
| 3 | Partner's excess business interest expense treated as paid or accrued in current year (Schedule A, line 44, column (h))................. | 3 | | | |
| 4 | Floor plan financing interest expense. See instructions.................. | 4 | | | |
| 5 | **Total business interest expense.** Add lines 1 through 4.............................................. | | | 5 | 461,011. |

#### Section II—Adjusted Taxable Income

**Tentative Taxable Income**

| | | | | | |
|---|---|---|---|---|---|
| 6 | **Tentative taxable income.** See instructions ...................................................... | | | 6 | -13,171,053. |

**Additions** (adjustments to be made if amounts are taken into account on line 6)

| | | | | | |
|---|---|---|---|---|---|
| 7 | Any item of loss or deduction that is not properly allocable to a trade or business of the taxpayer. See instructions................................ | 7 | | | |
| 8 | Any business interest expense not from a pass-through entity. See instructions...................................................... | 8 | 461,011. | | |
| 9 | Amount of any net operating loss deduction under section 172........... | 9 | | | |
| 10 | Amount of any qualified business income deduction allowed under section 199A.......................................................... | 10 | | | |
| 11 | Reserved for future use........................................................ | 11 | | | |
| 12 | Amount of any loss or deduction items from a pass-through entity. See instructions...................................................... | 12 | | | |
| 13 | Other additions. See instructions.......................................... | 13 | | | |
| 14 | Total current year partner's excess taxable income (Schedule A, line 44, column (f))........................................................ | 14 | | | |
| 15 | Total current year S corporation shareholder's excess taxable income (Schedule B, line 46, column (c))..................................... | 15 | | | |
| 16 | **Total.** Add lines 7 through 15............................................. | | | 16 | 461,011. |

**Reductions** (adjustments to be made if amounts are taken into account on line 6)

| | | | | | |
|---|---|---|---|---|---|
| 17 | Any item of income or gain that is not properly allocable to a trade or business of the taxpayer. See instructions................................ | 17 | ( ) | | |
| 18 | Any business interest income not from a pass-through entity. See instrs.. | 18 | ( ) | | |
| 19 | Amount of any income or gain items from a pass-through entity. See instructions...................................................... | 19 | ( ) | | |
| 20 | Other reductions. See instructions......................................... | 20 | ( ) | | |
| 21 | **Total.** Combine lines 17 through 20........................................... | | | 21 | ( 0.) |
| 22 | **Adjusted taxable income.** Combine lines 6, 16, and 21. See instructions............................ | | | 22 | 0. |

**BAA  For Paperwork Reduction Act Notice, see the instructions.**          CPCA0512L  08/16/22          Form **8990** (Rev. 12-2022)

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form 8990 (Rev. 12-2022)  **SMART COMMUNICATIONS HOLDING, INC.**        47-2886302      Page **2**

## Section III—Business Interest Income

| | | | | | |
|---|---|---|---|---|---|
| 23 | Current year business interest income. See instructions................. | 23 | | | |
| 24 | Excess business interest income from pass-through entities (total of Schedule A, line 44, column (g), and Schedule B, line 46, column (d)).... | 24 | | | |
| 25 | **Total.** Add lines 23 and 24................................................ | | | 25 | 0. |

## Section IV—163(j) Limitation Calculations

### Limitation on Business Interest Expense

| | | | | | |
|---|---|---|---|---|---|
| 26 | Multiply the adjusted taxable income from line 22 by the applicable percentage. See instructions......................................... | 26 | 0. | | |
| 27 | Business interest income (line 25)..................................... | 27 | | | |
| 28 | Floor plan financing interest expense (line 4)........................... | 28 | | | |
| 29 | **Total.** Add lines 26, 27, and 28..................................... | | | 29 | 0. |

### Allowable Business Interest Expense

| | | | |
|---|---|---|---|
| 30 | **Total current year business interest expense deduction.** See instructions........................... | 30 | 0. |

### Carryforward

| | | | |
|---|---|---|---|
| 31 | **Disallowed business interest expense.** Subtract line 29 from line 5. (If zero or less, enter -0-.)........ | 31 | 461,011. |

## Part II   Partnership Pass-Through Items

*Part II is only completed by a partnership that is subject to section 163(j). The partnership items below are allocated to the partners and are not carried forward by the partnership. See the instructions for more information.*

### Excess Business Interest Expense

| | | | |
|---|---|---|---|
| 32 | **Excess business interest expense.** Enter amount from line 31....................................... | 32 | |

### Excess Taxable Income (If you entered an amount on line 32, skip lines 33 through 37.)

| | | | |
|---|---|---|---|
| 33 | Subtract the sum of lines 4 and 25 from line 5. (If zero or less, enter -0-.)............................ | 33 | |
| 34 | Subtract line 33 from line 26. (If zero or less, enter -0-.)........................................... | 34 | |
| 35 | Divide line 34 by line 26. Enter the result as a decimal. (If line 26 is zero, enter -0-.).................. | 35 | |
| 36 | **Excess taxable income.** Multiply line 35 by line 22 ............................................... | 36 | |

### Excess Business Interest Income

| | | | |
|---|---|---|---|
| 37 | **Excess business interest income.** Subtract the sum of lines 1, 2, and 3 from line 25. (If zero or less, enter -0-.)..................................................................................... | 37 | |

## Part III   S Corporation Pass-Through Items

*Part III is only completed by S corporations that are subject to section 163(j). The S corporation items below are allocated to the shareholders. See the instructions for more information.*

### Excess Taxable Income

| | | | |
|---|---|---|---|
| 38 | Subtract the sum of lines 4 and 25 from line 5. (If zero or less, enter -0-.)............................ | 38 | |
| 39 | Subtract line 38 from line 26. (If zero or less, enter -0-.)........................................... | 39 | |
| 40 | Divide line 39 by line 26. Enter the result as a decimal. (If line 26 is zero, enter -0-.).................. | 40 | |
| 41 | **Excess taxable income.** Multiply line 40 by line 22 ............................................... | 41 | |

### Excess Business Interest Income

| | | | |
|---|---|---|---|
| 42 | **Excess business interest income.** Subtract the sum of lines 1, 2, and 3 from line 25. (If zero or less, enter -0-.)..................................................................................... | 42 | |

CPCA0512L  08/16/22                                Form **8990** (Rev. 12-2022)

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form 8990 (Rev. 12-2022)    SMART COMMUNICATIONS HOLDING, INC.                    47-2886302        Page **3**

**SCHEDULE A | Summary of Partner's Section 163(j) Excess Items**

*Any taxpayer that owns an interest in a partnership subject to section 163(j) should complete Schedule A before completing Part I.*

| (a) Name of partnership | (b) EIN | Excess Business Interest Expense | | | (f) Current year excess taxable income | (g) Current year excess business interest income | (h) Excess business interest expense treated as paid or accrued (see instructions) | (i) Current year excess business interest expense carryforward (see instructions) |
|---|---|---|---|---|---|---|---|---|
| | | (c) Current year (see instructions) | (d) Prior year carryforward (see instructions) | (e) Total ((c) plus (d)) | | | | |
| **43** | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| **44** Total............ | | | | | 0. | 0. | 0. | |

**SCHEDULE B | Summary of S Corporation Shareholder's Excess Taxable Income and Excess Business Interest Income**

*Any taxpayer that is required to complete Part I and is a shareholder in an S corporation that has excess taxable income or excess business interest income should complete Schedule B before completing Part I.*

| (a) Name of S corporation | (b) EIN | (c) Current year excess taxable income | (d) Current year excess business interest income |
|---|---|---|---|
| **45** | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **46** Total................................................... | | 0. | 0. |

BAA                                                                Form **8990** (Rev. 12-2022)

CPCA0503L  08/16/22

CONFIDENTIAL FOR PURPOSES OF MEDIATION ONLY

| 12/31/22 | **Consolidated Statement of Income and Deductions** | | | | | | | Page 1 |
|---|---|---|---|---|---|---|---|---|
| | **SMART COMMUNICATIONS HOLDING, INC.** | | | | | | | 47-2886302 |

| | | SMART COMMUNICATIONS COLLIER INC. 46-0554683 | SMART COMMUNICATIONS PASCO, INC. 37-1735923 | SMART COMMUNICATIONS US, INC. 37-1601615 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| | **INCOME** | | | | | | | |
| 1a | Gross receipts or sales | 44,815,675. | | | 44,815,675. | | | 44,815,675. |
| 1b | Less returns and allowances | 35,341. | | | 35,341. | | | 35,341. |
| 1c | Net sales | 44,780,334. | | | 44,780,334. | | | 44,780,334. |
| 2 | Cost of goods sold | 25,540,158. | | | 25,540,158. | | | 25,540,158. |
| 3 | Gross profit | 19,240,176. | | | 19,240,176. | | | 19,240,176. |
| 4 | Dividends | | | | | | | |
| 5 | Interest | | | | | | | |
| 6 | Gross rents | | | | | | | |
| 7 | Gross royalties | | | | | | | |
| 8 | Capital gain net income | | | | | | | |
| 9 | Net gain (loss) from 4797 | | | | | | | |
| 10 | Other income | | | | | | | |
| 11 | **Total income** | 19,240,176. | 0. | 0. | 19,240,176. | | | 19,240,176. |
| | **DEDUCTIONS** | | | | | | | |
| 12 | Compensation of officers | 160,385. | | | 160,385. | | | 160,385. |
| 13 | Salaries and wages | 4,814,980. | | | 4,814,980. | | | 4,814,980. |
| 14 | Repairs and maintenance | 472,332. | | | 472,332. | | | 472,332. |
| 15 | Bad debts | | | | | | | |
| 16 | Rents | 793,547. | | | 793,547. | | | 793,547. |
| 17 | Taxes and licenses | 18,515,145. | | | 18,515,145. | | | 18,515,145. |
| 18 | Interest expense | | | | | | | |
| 19 | Charitable contributions | | | | | | | |
| 20 | Depreciation | 1,636,576. | | | 1,636,576. | | | 1,636,576. |
| 21 | Depletion | | | | | | | |
| 22 | Advertising | 187,879. | | | 187,879. | | | 187,879. |
| 23 | Pension, profit-sharing plans | | | | | | | |
| 24 | Employee benefit programs | | | | | | | |
| 25 | Domestic production activities deduction | | | | | | | |
| 26 | Other deductions | Statement 1 | 5,369,374. | | | 5,369,374. | | | 5,369,374. |
| 27 | **Total deductions** | 31,950,218. | 0. | 0. | 31,950,218. | | | 31,950,218. |
| 28 | TI before NOL/special deductions | -12,710,042. | 0. | 0. | -12,710,042. | | | -12,710,042. |
| 29a | Net operating loss deduction | | | | | | | |
| 29b | Special deductions | | | | | | | |
| 30 | **Taxable income** | -12,710,042. | 0. | 0. | -12,710,042. | | | -12,710,042. |

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

| | | SMART COMMUNICATIONS COLLIER INC. 46-0554683 | SMART COMMUNICATIONS PASCO, INC. 37-1735923 | SMART COMMUNICATIONS US, INC. 37-1601615 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| **12/31/22** | | | | | | | | **Page 1** |

## Consolidated Statement of Cost of Goods Sold

### SMART COMMUNICATIONS HOLDING, INC.

47-2886302

| # | | SMART COMMUNICATIONS COLLIER INC. 46-0554683 | SMART COMMUNICATIONS PASCO, INC. 37-1735923 | SMART COMMUNICATIONS US, INC. 37-1601615 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| 1 | Inventory at beginning of year | 1,894,859. | | | 1,894,859. | | | 1,894,859. |
| 2 | Purchases | 4,085,875. | | | 4,085,875. | | | 4,085,875. |
| 3 | Cost of labor | 1,943,725. | | | 1,943,725. | | | 1,943,725. |
| 4 | Additional section 263A costs | | | | | | | |
| 5 | Other costs　　Statement 6 | 18,306,403. | | | 18,306,403. | | | 18,306,403. |
| 6 | **Total** | 26,230,862. | | | 26,230,862. | | | 26,230,862. |
| 7 | Inventory at end of year | 690,704. | | | 690,704. | | | 690,704. |
| 8 | **Cost of goods sold** | 25,540,158. | 0. | 0. | 25,540,158. | | | 25,540,158. |

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

| 12/31/22 | **Consolidated Beginning Balance Sheet** | | | | | | | Page 1 |
|---|---|---|---|---|---|---|---|---|
| | **SMART COMMUNICATIONS HOLDING, INC.** | | | | | | | 47-2886302 |

| | | | SMART COMMUNICATIONS COLLIER INC. 46-0554683 | SMART COMMUNICATIONS PASCO, INC. 37-1735923 | SMART COMMUNICATIONS US, INC. 37-1601615 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|---|
| | **ASSETS** | | | | | | | | |
| 1 | Cash | | 5,398,481. | | | 5,398,481. | | | 5,398,481. |
| 2a | Trade notes & accounts receivable | | 2,244,379. | | | 2,244,379. | | | 2,244,379. |
| 2b | Less allowance for bad debts | | | | | | | | |
| 3 | Inventories | | 1,894,859. | | | 1,894,859. | | | 1,894,859. |
| 4 | U.S. government obligations | | | | | | | | |
| 5 | Tax-exempt securities | | | | | | | | |
| 6 | Other current assets | Statement 2 | 686,224. | 513,737. | 250,649. | 1,450,610. | | | 1,450,610. |
| 7 | Loans to shareholders | | 370,455. | 58,400. | 300,000. | 728,855. | | | 728,855. |
| 8 | Mortgage and real estate loans | | | | | | | | |
| 9 | Other investments | | | | | | | | |
| 10a | Buildings & other depreciable assets | | 13,424,000. | 158,742. | 152,052. | 13,734,794. | | | 13,734,794. |
| 10b | Less accumulated depreciation | | (6,894,997.) | ( 158,742.) | ( 152,038.) | (7,205,777.) | | | (7,205,777.) |
| 11a | Depletable assets | | | | | | | | |
| 11b | Less accumulated depletion | | | | | | | | |
| 12 | Land (net of amortization) | | | | | | | | |
| 13a | Intangible assets (amortizable) | | | | | | | | |
| 13b | Less accumulated amortization | | | | | | | | |
| 14 | Other assets | | | | | | | | |
| 15 | **Total assets** | | 17,123,401. | 572,137. | 550,663. | 18,246,201. | | | 18,246,201. |
| | **LIABILITIES AND EQUITY** | | | | | | | | |
| 16 | Accounts payable | | 1,502,160. | | | 1,502,160. | | | 1,502,160. |
| 17 | Mortgages, notes, bonds payable in less than one year | | | | | | | | |
| 18 | Other current liabilities | Statement 3 | 1,036,411. | 250,649. | 466,362. | 1,753,422. | | | 1,753,422. |
| 19 | Loans from shareholders | | | | | | | | |
| 20 | Mortgages, notes, bonds payable in more than one year | | 1,284,662. | | | 1,284,662. | | | 1,284,662. |
| 21 | Other liabilities | | | | | | | | |
| 22a | Capital stock - preferred | | | | | | | | |
| 22b | Capital stock - common | | 364,667. | | | 364,667. | | | 364,667. |
| 23 | Additional paid-in capital | | 741,421. | 18,635. | | 760,056. | | | 760,056. |
| 24 | Retained earnings - appropriated | | | | | | | | |
| 25 | Retained earnings - unappropriated | | 12,194,080. | 302,853. | 84,301. | 12,581,234. | | | 12,581,234. |
| 26 | Adjustments to shareholder equity | | | | | | | | |
| 27 | Less cost of treasury stock | | | | | | | | |
| 28 | **Total liabilities and equity** | | 17,123,401. | 572,137. | 550,663. | 18,246,201. | | | 18,246,201. |

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

| 12/31/22 | **Consolidated Ending Balance Sheet** | | | | | | | Page 1 |
|---|---|---|---|---|---|---|---|---|
| | **SMART COMMUNICATIONS HOLDING, INC.** | | | | | | | 47-2886302 |

| | | | SMART COMMUNICATIONS COLLIER INC. 46-0554683 | SMART COMMUNICATIONS PASCO, INC. 37-1735923 | SMART COMMUNICATIONS US, INC. 37-1601615 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|---|
| | **ASSETS** | | | | | | | | |
| 1 | Cash | | 865,720. | | | 865,720. | | | 865,720. |
| 2a | Trade notes & accounts receivable | | 462,259. | | | 462,259. | | | 462,259. |
| 2b | Less allowance for bad debts | | | | | | | | |
| 3 | Inventories | | 690,704. | | | 690,704. | | | 690,704. |
| 4 | U.S. government obligations | | | | | | | | |
| 5 | Tax-exempt securities | | | | | | | | |
| 6 | Other current assets | Statement 2 | 11,375,293. | 513,737. | 250,649. | 12,139,679. | | | 12,139,679. |
| 7 | Loans to shareholders | | 2,555,686. | 58,400. | 300,000. | 2,914,086. | | | 2,914,086. |
| 8 | Mortgage and real estate loans | | | | | | | | |
| 9 | Other investments | | | | | | | | |
| 10a | Buildings & other depreciable assets | | 14,581,127. | 158,842. | 152,052. | 14,892,021. | | | 14,892,021. |
| 10b | Less accumulated depreciation | | (6,847,975.) | ( 158,742.) | ( 152,038.) | (7,158,755.) | | | (7,158,755.) |
| 11a | Depletable assets | | | | | | | | |
| 11b | Less accumulated depletion | | | | | | | | |
| 12 | Land (net of amortization) | | | | | | | | |
| 13a | Intangible assets (amortizable) | | | | | | | | |
| 13b | Less accumulated amortization | | | | | | | | |
| 14 | Other assets | | | | | | | | |
| 15 | **Total assets** | | 23,682,814. | 572,237. | 550,663. | 24,805,714. | | | 24,805,714. |
| | **LIABILITIES AND EQUITY** | | | | | | | | |
| 16 | Accounts payable | | 1,277,645. | | | 1,277,645. | | | 1,277,645. |
| 17 | Mortgages, notes, bonds payable in less than one year | | | | | | | | |
| 18 | Other current liabilities | Statement 3 | 2,602,336. | 250,649. | 466,362. | 3,319,347. | | | 3,319,347. |
| 19 | Loans from shareholders | | | | | | | | |
| 20 | Mortgages, notes, bonds payable in more than one year | | 58,576,292. | | | 58,576,292. | | | 58,576,292. |
| 21 | Other liabilities | | | | | | | | |
| 22a | Capital stock - preferred | | | | | | | | |
| 22b | Capital stock - common | | 364,667. | | | 364,667. | | | 364,667. |
| 23 | Additional paid-in capital | | 373,416. | 18,735. | | 392,151. | | | 392,151. |
| 24 | Retained earnings - appropriated | | | | | | | | |
| 25 | Retained earnings - unappropriated | | -39,511,542. | 302,853. | 84,301. | -39,124,388. | | | -39,124,388. |
| 26 | Adjustments to shareholder equity | | | | | | | | |
| 27 | Less cost of treasury stock | | | | | | | | |
| 28 | **Total liabilities and equity** | | 23,682,814. | 572,237. | 550,663. | 24,805,714. | | | 24,805,714. |

**CONFIDENTIAL FOR PURPOSES OF MEDIATION ONLY**

| 12/31/22 | **Consolidated Schedules M-1 and M-2** | | | | | | | Page 1 |
| | **SMART COMMUNICATIONS HOLDING, INC.** | | | | | | | 47-2886302 |

| | | SMART COMMUNICATIONS COLLIER INC. 46-0554683 | SMART COMMUNICATIONS PASCO, INC. 37-1735923 | SMART COMMUNICATIONS US, INC. 37-1601615 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| | **SCHEDULE M-1** | | | | | | | |
| 1 | Net income per books | -14,659,799. | 0. | 0. | -14,659,799. | | | -14,659,799. |
| 2 | Federal income tax | 1,375,000. | | | 1,375,000. | | | 1,375,000. |
| 3 | Excess of capital losses over capital gains | | | | | | | |
| 4 | Income subject to tax not recorded on books this year | | | | | | | |
| | Expenses recorded on books this year not deducted on this return: | | | | | | | |
| 5a | Depreciation not in return | | | | | | | |
| 5b | Contributions carryover | 19,340. | | | 19,340. | | | 19,340. |
| 5c | Travel and entertainment | 72,269. | | | 72,269. | | | 72,269. |
| | Other items not in return | Statement 4 | 483,148. | | | 483,148. | | 483,148. |
| 6 | Total lines 1 - 5 | -12,710,042. | 0. | 0. | -12,710,042. | | | -12,710,042. |
| | Income recorded on books this year not included on this return: | | | | | | | |
| 7a | Tax-exempt interest | | | | | | | |
| 7b | Other items | | | | | | | |
| | Deductions on this return not charged against book income: | | | | | | | |
| 8a | Depreciation not on books | | | | | | | |
| 8b | Contribution carryover | | | | | | | |
| | Other items not on books | | | | | | | |
| 9 | Total lines 7 and 8 | 0. | 0. | 0. | 0. | | | 0. |
| 10 | Taxable income | -12,710,042. | 0. | 0. | -12,710,042. | | | -12,710,042. |
| | | | | | | | | |
| | **SCHEDULE M-2** | | | | | | | |
| 1 | Beginning retained earnings | 12,194,080. | 302,853. | 84,301. | 12,581,234. | | | 12,581,234. |
| 2 | Net income or loss per books | -14,659,799. | 0. | 0. | -14,659,799. | | | -14,659,799. |
| 3 | Other increases | | | | | | | |
| 4 | Total lines 1 - 3 | -2,465,719. | 302,853. | 84,301. | -2,078,565. | | | -2,078,565. |
| 5 | Distributions: | | | | | | | |
| 5a | Cash | | | | | | | |
| 5b | Stock | | | | | | | |
| 5c | Property | | | | | | | |
| 6 | Other decreases | Statement 5 | 37,045,823. | | | 37,045,823. | | 37,045,823. |
| 7 | Total lines 5 and 6 | 37,045,823. | 0. | 0. | 37,045,823. | | | 37,045,823. |
| 8 | Ending retained earnings | -39,511,542. | 302,853. | 84,301. | -39,124,388. | | | -39,124,388. |

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

| 2022 | Federal Statements | Page 1 |
| --- | --- | --- |

**SMART COMMUNICATIONS HOLDING, INC.**                                                    47-2886302

**Statement 1**
**Form 1120, Line 26**
**Other Deductions**

| | SMART COMMUNICATIONS COLLIER INC. 46-0554683 | SMART COMMUNICATIONS PASCO, INC. 37-1735923 | SMART COMMUNICATIONS US, INC. 37-1681615 | Total | Eliminations | Adjustments | Consolidated |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Bank Charges | 6,804. | | | 6,804. | | | 6,804. |
| CLIENT WELFARE EXPENSE | 142,975. | | | 142,975. | | | 142,975. |
| COMPUTER EXPENSES | 162,968. | | | 162,968. | | | 162,968. |
| CONTRACT LABOR EXPENSE | 293,580. | | | 293,580. | | | 293,580. |
| EMPLOYEE WELFARE EXPENSE | 7,708. | | | 7,708. | | | 7,708. |
| Insurance | 724,420. | | | 724,420. | | | 724,420. |
| Legal and Professional | 3,260,090. | | | 3,260,090. | | | 3,260,090. |
| Meals | 72,269. | | | 72,269. | | | 72,269. |
| Office Expense | 160,302. | | | 160,302. | | | 160,302. |
| OTHER EXPENSES | 1,958. | | | 1,958. | | | 1,958. |
| Outside Services | 9,744. | | | 9,744. | | | 9,744. |
| PAYROLL SERVICE FEES | 79,354. | | | 79,354. | | | 79,354. |
| POSTAGE & SHIPPING | 18,982. | | | 18,982. | | | 18,982. |
| PROFESSIONAL EDUCATION | 8,315. | | | 8,315. | | | 8,315. |
| RECRUITMENT EXPENSE | 131,372. | | | 131,372. | | | 131,372. |
| Subscriptions | 98,821. | | | 98,821. | | | 98,821. |
| Telephone | 50,197. | | | 50,197. | | | 50,197. |
| Utilities | 50,197. | | | 50,197. | | | 50,197. |
| WEBSITE DESIGN & MAINTENANCE | 89,318. | | | 89,318. | | | 89,318. |
| Total | 5,369,374. | 0. | 0. | 5,369,374. | 0. | 0. | 5,369,374. |

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

| 2022 | **Federal Statements** | Page 2 |
|---|---|---|
| | SMART COMMUNICATIONS HOLDING, INC. | 47-2886302 |

**Statement 2**
**Form 1120, Schedule L, Line 6**
**Other Current Assets**

| | SMART COMMUNICATIONS COLLIER INC. 46-0554683 | SMART COMMUNICATIONS PASCO, INC. 37-1735923 | SMART COMMUNICATIONS US, INC. 37-1601615 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|
| **Beginning:** | | | | | | | |
| Accounts Receivable - Collier | | 513,737. | | 513,737. | | | 513,737. |
| Accounts Receivable - HLFIP | 99,507. | | | 99,507. | | | 99,507. |
| Accounts Receivable - Pasco | | | 250,649. | 250,649. | | | 250,649. |
| PREPAID EXPENSES | 170,690. | | | 170,690. | | | 170,690. |
| Prepaid Federal Tax | 35,603. | | | 35,603. | | | 35,603. |
| Prepaid State Tax | 225,449. | | | 225,449. | | | 225,449. |
| TECHNOLOGY GRANT ADVANCE | 154,975. | | | 154,975. | | | 154,975. |
| Total | 686,224. | 513,737. | 250,649. | 1,450,610. | 0. | 0. | 1,450,610. |

| | SMART COMMUNICATIONS COLLIER INC. 46-0554683 | SMART COMMUNICATIONS PASCO, INC. 37-1735923 | SMART COMMUNICATIONS US, INC. 37-1601615 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|
| **Ending:** | | | | | | | |
| ACCOUNTS RECEIVABLE - MAILGUARD FEDERAL | 1,746,370. | | | 1,746,370. | | | 1,746,370. |
| Accounts Receivable - Collier | | 513,737. | | 513,737. | | | 513,737. |
| Accounts Receivable - HLFIP | 169,685. | | | 169,685. | | | 169,685. |
| Accounts Receivable - LOCO | 1,358,011. | | | 1,358,011. | | | 1,358,011. |
| Accounts Receivable - Pasco | | | 250,649. | 250,649. | | | 250,649. |
| ACCOUNTS RECEIVABLE - YACHT LLC | 5,505,639. | | | 5,505,639. | | | 5,505,639. |
| FEDERAL INCOME TAXES RECEIVABLE | 1,834,115. | | | 1,834,115. | | | 1,834,115. |
| PREPAID EXPENSES | 723,934. | | | 723,934. | | | 723,934. |
| TECHNOLOGY GRANT ADVANCE | 37,539. | | | 37,539. | | | 37,539. |
| Total | 11,375,293. | 513,737. | 250,649. | 12,139,679. | 0. | 0. | 12,139,679. |

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

| 2022 | **Federal Statements** | **Page 3** |
|---|---|---|

**SMART COMMUNICATIONS HOLDING, INC.**     47-2886302

**Statement 3**
**Form 1120, Schedule L, Line 18**
**Other Current Liabilities**

| | SMART COMMUNICATIONS COLLIER, INC. 46-0554683 | SMART COMMUNICATIONS PASCO, INC. 37-1735923 | SMART COMMUNICATIONS US, INC. 37-1601615 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|
| **Beginning:** | | | | | | | |
| ACCOUNTS PAYABLE - COLLIER | | | 466,362. | 466,362. | | | 466,362. |
| ACCOUNTS PAYABLE - U S PASCO | 513,737. | | | 513,737. | | | 513,737. |
| ACCRUED CREDIT CREDIT CARDS PAYABLE | 234,028. | | | 234,028. | | | 234,028. |
| ACCRUED FACILITY TECH GRANT | 170,946. | | | 170,946. | | | 170,946. |
| Accrued Taxes on Payroll | 12,227. | | | 12,227. | | | 12,227. |
| ACCRUED WAGES & SALARIES | 105,473. | | | 105,473. | | | 105,473. |
| PAYABLE TO SMART COMM - US | | 250,649. | | 250,649. | | | 250,649. |
| Total | 1,036,411. | 250,649. | 466,362. | 1,753,422. | 0. | 0. | 1,753,422. |

| | SMART COMMUNICATIONS COLLIER, INC. 46-0554683 | SMART COMMUNICATIONS PASCO, INC. 37-1735923 | SMART COMMUNICATIONS US, INC. 37-1601615 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|
| **Ending:** | | | | | | | |
| ACCOUNTS PAYABLE - COLLIER | | | 466,362. | 466,362. | | | 466,362. |
| ACCOUNTS PAYABLE - U S PASCO | 513,737. | | | 513,737. | | | 513,737. |
| ACCRUED CREDIT CREDIT CARDS PAYABLE | 182,611. | | | 182,611. | | | 182,611. |
| ACCRUED FACILITY COMMISSIONS | 971,993. | | | 971,993. | | | 971,993. |
| ACCRUED FACILITY TECH GRANT | 142,998. | | | 142,998. | | | 142,998. |
| ACCRUED LEGAL FEES | 11,777. | | | 11,777. | | | 11,777. |
| Accrued Taxes on Payroll | 13,257. | | | 13,257. | | | 13,257. |
| ACCRUED WAGES & SALARIES | 176,558. | | | 176,558. | | | 176,558. |
| CURRENT PORTION L-T DEBT | 589,405. | | | 589,405. | | | 589,405. |
| PAYABLE TO SMART COMM - US | | 250,649. | | 250,649. | | | 250,649. |
| Total | 2,602,336. | 250,649. | 466,362. | 3,319,347. | 0. | 0. | 3,319,347. |

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

| 2022 | **Federal Statements** | **Page 4** |
|------|------------------------|------------|
| | SMART COMMUNICATIONS HOLDING, INC. | 47-2886302 |

**Statement 4**
**Form 1120, Schedule M-1, Line 5**
**Book Expenses Not Deducted**

| | SMART COMMUNICATIONS COLLIER INC. 46-0554683 | SMART COMMUNICATIONS PASCO, INC. 37-1735923 | SMART COMMUNICATIONS US, INC. 37-1681615 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|
| C/Y Business Interest Exp Disallowed by Sec. 163(j) | 461,011. | | | 461,011. | | | 461,011. |
| Penalties | 22,137. | | | 22,137. | | | 22,137. |
| Total | 483,148. | 0. | 0. | 483,148. | 0. | 0. | 483,148. |

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

| 2022 | Federal Statements | Page 5 |
|------|-------------------|--------|

**SMART COMMUNICATIONS HOLDING, INC.** 47-2886302

**Statement 5**
**Form 1120, Schedule M-2, Line 6**
**Other Decreases**

| | SMART COMMUNICATIONS COLLIER INC. 46-0554683 | SMART COMMUNICATIONS PASCO, INC. 37-1795923 | SMART COMMUNICATIONS US, INC. 37-1601615 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|
| PRIOR YEAR IP FEES | 37,045,823. | | | 37,045,823. | | | 37,045,823. |
| Total | 37,045,823. | 0. | 0. | 37,045,823. | 0. | 0. | 37,045,823. |

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

| 2022 | **Federal Statements** | **Page 6** |

**SMART COMMUNICATIONS HOLDING, INC.**

47-2886302

**Statement 6**
**Form 1125-A, Line 5**
**Other Cost of Goods Sold**

| | SMART COMMUNICATIONS COLLIER INC. 46-0554683 | SMART COMMUNICATIONS PASCO, INC. 37-1735923 | SMART COMMUNICATIONS US, INC. 37-1601615 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|
| CONTRACTOR SEVICES | 1,605,422. | | | 1,605,422. | | | 1,605,422. |
| DATA STORAGE & SERVER HOSTING | 167,343. | | | 167,343. | | | 167,343. |
| EQUIPMENT DESIGN | 70,000. | | | 70,000. | | | 70,000. |
| Facility Commissions Expense | 11,322,286. | | | 11,322,286. | | | 11,322,286. |
| FREIGHT AND SHIPPING COSTS | 548,212. | | | 548,212. | | | 548,212. |
| INTERNET SERVICES | 478,554. | | | 478,554. | | | 478,554. |
| Kiosk Software Expense | 170,949. | | | 170,949. | | | 170,949. |
| Meals | 82,014. | | | 82,014. | | | 82,014. |
| Merchant Credit Card Fees | 1,625,594. | | | 1,625,594. | | | 1,625,594. |
| SALESPERSON COMMISSIONS | 164,193. | | | 164,193. | | | 164,193. |
| Sublicense Royalty Fees | 23,496. | | | 23,496. | | | 23,496. |
| TECHNOLOGY GRANT EXPENSES | 214,397. | | | 214,397. | | | 214,397. |
| TELECOMMUNICATIONS TAX EXPENSE | 629,686. | | | 629,686. | | | 629,686. |
| Travel Expenses | 1,204,257. | | | 1,204,257. | | | 1,204,257. |
| Total | 18,306,403. | 0. | 0. | 18,306,403. | 0. | 0. | 18,306,403. |

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

# EXHIBIT 37

EFiled: Oct 23 2023 05:21PM EDT
Transaction ID 71168234
Case No. N23C-10-208 VLM

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |
|---|---|
| JONATHAN D. LOGAN,<br>       Plaintiff,<br><br>v.<br><br>LOCO FLORIDA, LLC AND<br>SMART COMMUNICATIONS<br>YACHT HOLDING, LLC,<br>       Defendants. | C.A. No. 2023-____-___ [CCLD] |

### COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Jonathan D. Logan ("Jon" or "Plaintiff") seeks declarations that: (a) he is the sole member and manager of Loco Florida LLC ("Loco") and Smart Communications Yacht Holding LLC ("Yacht"); and (b) Loco and Yacht were validly converted to Delaware limited liability companies.

### RELEVANT PARTIES AND NONPARTIES

1.  Loco was formed as a Florida limited liability company in 2020 but was converted to a Delaware limited liability company in September 2023. Loco owns a warehouse in Seminole, Florida, bought for about $1.1 million in 2019. Until recently, Loco did not have a written operating agreement.

2.  Yacht was formed as a Florida limited liability company in 2022 but was converted to a Delaware limited liability company in September 2023. Yacht owns a 100' Riva Cosaro bought for about $10 million in 2022. Until recently, Yacht did not have a written operating agreement.

1

CERTIFIED AS A TRUE COPY
ATTEST: COLLEEN REDMOND
PROTHONOTARY
BY

3.    Jon is a resident of Florida.

4.    James Logan ("James(father)") was Jon's father. Before his death, James(father) formed the James Logan Family Trust ("Trust"), and appointed himself and his wife, Janice Logan, as Co-Trustees.[1]  James(father) died on October 16, 2022.  At that time, Janice Logan became the sole Trustee of the Trust.

## JURISDICTION AND VENUE

5.    This matter should be assigned to the Complex Commercial Litigation Division (CCLD) because the amount in controversy exceeds $1 million.

6.    This Court has non-exclusive jurisdiction to supply declaratory relief under 10 *Del. C.* § 6501.

7.    This Court has non-exclusive jurisdiction to make determinations under 6 *Del. C.* § 18-110. Such actions are *in rem* proceedings, so only the companies at issue are necessary parties.

8.    To the extent that the Trust claims any right to manage Loco or Yacht, it is subject to jurisdiction in Delaware under 6 *Del. C.* § 18-109.

---

[1] There is pending probate litigation in Florida between Jon and the Trust, but it does not involve the declarations requested here. Jon will promptly provide the Trust a copy of this complaint.

2

# BACKGROUND

## *Loco And Yacht Are Formed In Florida*

9.    At all relevant times Jon has been a member and manager of Loco and Yacht.

10.    Before his death, James(father) claimed to be a member and manager of Loco and Yacht.[2]

11.    In September 2022, James(father) purported to transfer his alleged member interests in Loco and Yacht to the Trust. Exhibits A (Loco), B (Yacht). At that time, Loco and Yacht were Florida entities. Those purported transfers did not make the Trust a member or manager of Loco or Yacht.

12.    Under the Florida Revised Limited Liability Company Act ("Florida Act"), there are only four ways to become a member after formation of a Florida limited liability company. Florida Act 605.0401(3). Subsection (a) says: "[a]s provided in the operating agreement" but no such agreement existed at the time. Subsection (b) says: "[a]s the result of a merger, interest exchange, conversion, or domestication" but that did not happen. Subsection (c) says "[w]ith the consent of all the members" but Jon (a member) did not consent. And subsection (d) says: "[a]s

---

[2] Jon is not asking this Court to decide whether James(father) was a member or manager of Loco or Yacht before his death because it does not affect the declarations requested here.

3

provided in s. 605.0701(3)," which relates to dissolution after 90 days if there are no members.

13.   At most, the purported September 2022 transfers transferred any "transferable interest" James(father) had in Loco and Yacht to the Trust.

14.   Under the Florida Act, "a transferable interest means the right, as initially owned by a person in the person's capacity as a member, to receive distributions from a limited liability company in accordance with the operating agreement, whether the person remains a member or continues to own a part of the right. The term applies to any fraction of the interest, by whomever owned." 605.0102(66).

15.   A transferable interest is personal property that can be transferred. Florida Act 605.0501, 605.0502.

16.   But a transferable interest is different from being a member. *See* Florida Act 605.0401(4) ("A person may become a member without acquiring a transferable interest and without making or being obligated to make a contribution to the limited liability company.").

17.   Indeed, receiving a transferable interest "[d]oes not entitle the transferee to: 1. Participate in the management or conduct of the company's

4

activities and affairs; or 2. Except as otherwise provided in subsection (3),[3] have access to records or other information concerning the company's activities and affairs." Florida Act 605.0502(1)(c).

18.   "[I]f a member transfers a transferable interest, the transferor retains the rights of a member other than the transferable interest transferred and retains all the duties and obligations of a member." Florida Act 605.0502(7).

19.   So to the extent James(father) was a member or manager of Loco or Yacht before September 2022, he continued to be despite the purported September 2022 transfers to the Trust.

20.   In October 2022, James(father) died. To the extent that he was a member or manager of Loco or Yacht, under Florida law, James(father) was dissociated as a member and any rights as manager ceased.[4]

21.   Under the Florida Act, a person is dissociated as a member if they die. Florida Act 605.0602(7). If a person is dissociated as a member:

> (a) [t]he person's right to participate as a member in the management and conduct of the company's activities and

---

[3] The referenced subsection (3) says "[i]n a dissolution and winding up of a limited liability company, a transferee is entitled to an account of the company's transactions only from the date of dissolution." 605.0502(3).

[4] To the extent that the purported September 2022 transfers did not transfer any "transferable interest" James(father) had in Loco and Yacht to the Trust, James(father)'s estate became an assignee of those transferable interests.

5

affairs terminates;

(b) [i]f the company is member-managed, the person's duties and obligations under s. 605.04091 as a member end with regard to matters arising and events occurring after the person's dissociation; and

(c) Subject to ss. 605.0504 and 605.1001-605.1072, a transferable interest owned by the person in the person's capacity immediately before dissociation as a member is owned by the person solely as a transferee.

Florida Act 605.0603. The legal representative of a member's estate can act to settle a member's estate for purposes of the transferable interest. Florida Act 605.0504.

22.    Thus, even if James(father) was a member or manager before he died, Jon is now the sole member and manager of Loco and Yacht.

***Loco And Yacht Move To Delaware***

23.    On August 29, 2023, upon the filing of a Certificate of Conversion to Limited Liability Company and a certification of formation with the Secretary of State of the State of Delaware, Yacht was converted from a Florida limited liability company into a Delaware limited liability company. Exhibit C.  Jon—as sole member and manager—validly: (a) authorized that conversion (Exhibit D); and (b) executed an operating agreement for Yacht (Exhibit E).

24.    On September 1, 2023, upon the filing of a Certificate of Conversion to Limited Liability Company and a certification of formation with the Secretary of State of the State of Delaware, Loco was converted from a Florida limited liability

company into a Delaware limited liability company. Exhibit F.  Jon—as sole member and manager—validly: (a) authorized that conversion (Exhibit G); and (b) executed an operating agreement for Loco (Exhibit H).

***The Trust Asserts Member Rights***

25.    The Trust claims the right to inspect books and records as a purported member of Loco and Yacht. If the Trust is not a member, it has no right to inspect. So there is a real controversy.

**WHEREFORE**, Plaintiff asks the Court for:

A.    A declaration that Jon is the sole member and manager of Loco and Yacht;

B.    A declaration that Loco and Yacht were validly converted to Delaware limited liability companies;

C.    Any other relief necessary to enforce those declarations or that the Court considers just and proper.

*/s/ Richard P. Rollo*
Richard P. Rollo (#3994)
Travis S. Hunter (#5350)
Nathalie A. Freeman (#7053)
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801
(302) 651-7700
Dated: October 23, 2023          *Attorneys for Plaintiff*

7

EFiled: Oct 23 2023 05:21PM EDT
Transaction ID 71168234
Case No. N23C-10-208 VLM

# EXHIBIT A

CERTIFIED AS A TRUE COPY
ATTEST: COLLEEN REDMOND
PROTHONOTARY
BY

## ASSIGNMENT AND ACCEPTANCE OF MEMBERSHIP INTEREST

**KNOW ALL MEN BY THESE PRESENTS** that JAMES P. LOGAN (the "Assignor"), in exchange for good and valuable consideration paid to him by JAMES LOGAN, as CO-TRUSTEE of the JAMES LOGAN FAMILY TRUST, dated February 10, 2021 (the "Assignee"), the receipt of which is hereby acknowledged, has granted, bargained, sold, assigned, transferred and set over, and by these presents does hereby grant, bargain, sell, assign, transfer and set over unto the Assignee, all of the Assignor's interest as a member of LOCO FLORIDA, LLC, a Florida limited liability company (the "Company"), which interest constitutes a fifty percent (50%) interest in the profits, losses and capital of the Company and is not certificated (the "Membership Interest"), and does hereby irrevocably constitute and appoint Thomas D. Sims, Esq. as attorney to transfer the Membership Interest on the books of the Company with full power of substitution in the premises.

**ASSIGNEE, BY ACCEPTANCE OF THIS ASSIGNMENT AND ACCEPTANCE OF MEMBERSHIP INTEREST (THIS "ASSIGNMENT"),** assumes all of the duties and obligations of the Assignor as to the Membership Interest so assigned, and agrees to perform all of the covenants, conditions and obligations on the Assignor's part to be paid and performed with respect to the Membership Interest.

This Assignment may be executed in multiple counterparts with the same effect as if the signature on each such counterpart were on the same instrument. A signed copy, including that executed via DocuSign or other valid electronic or digital signature medium, of this Assignment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Assignment.

**EXECUTED TO BE EFFECTIVE AS OF** ___September 16___ **, 2022.**

**ASSIGNOR:**                                    **ASSIGNEE:**


_____             _____
James Logan (Sep 16, 2022 13:51 EDT)          James Logan (Sep 16, 2022 14:51 EDT)
JAMES P. LOGAN                               JAMES LOGAN, AS CO-TRUSTEE OF
                                             THE JAMES LOGAN FAMILY TRUST,
                                             DATED FEBRUARY 10, 2021

6672599v2

# Assignment of Membership Interest - James Logan to Revocable Trust re Loco Florida, LLC (2022)

Final Audit Report                                        2022-09-16

| | |
|---|---|
| Created: | 2022-09-16 |
| By: | Rachel Chase (rachelc@jpfirm.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA5bhdxfYZNnyDwJookfUDMbzJ4I6CqTM |

## "Assignment of Membership Interest - James Logan to Revocable Trust re Loco Florida, LLC (2022)" History

📄 Document created by Rachel Chase (rachelc@jpfirm.com)
2022-09-16 - 8:50:45 PM GMT- IP address: 144.129.14.130

📨 Document emailed to jim.logan@ ▮▮▮▮▮ for signature
2022-09-16 - 9:02:03 PM GMT

📄 Email viewed by jim.logan@ ▮▮▮▮▮
2022-09-16 - 10:43:04 PM GMT- IP address: 74.125.210.141

🖊 Signer jim.logan@ ▮▮▮▮▮ entered name at signing as James logan
2022-09-16 - 10:51:28 PM GMT- IP address: 199.47.254.244

🖊 Document e-signed by James logan (jim.logan@ ▮▮▮▮▮ )
Signature Date: 2022-09-16 - 10:51:30 PM GMT - Time Source: server- IP address: 199.47.254.244

✅ Agreement completed.
2022-09-16 - 10:51:30 PM GMT

📕 **Adobe Acrobat Sign**

# EXHIBIT B

CERTIFIED AS A TRUE COPY
ATTEST: COLLEEN REDMOND
PROTHONOTARY
BY

## ASSIGNMENT AND ACCEPTANCE OF MEMBERSHIP INTEREST

**KNOW ALL MEN BY THESE PRESENTS** that JAMES P. LOGAN (the "Assignor"), in exchange for good and valuable consideration paid to him by JAMES LOGAN, as CO-TRUSTEE of the JAMES LOGAN FAMILY TRUST, dated February 10, 2021 (the "Assignee"), the receipt of which is hereby acknowledged, has granted, bargained, sold, assigned, transferred and set over, and by these presents does hereby grant, bargain, sell, assign, transfer and set over unto the Assignee, all of the Assignor's interest as a member of SMART COMMUNICATIONS YACHT HOLDING, LLC, a Florida limited liability company (the "Company"), which interest constitutes a fifty percent (50%) interest in the profits, losses and capital of the Company and is not certificated (the "Membership Interest"), and does hereby irrevocably constitute and appoint Thomas D. Sims, Esq. as attorney to transfer the Membership Interest on the books of the Company with full power of substitution in the premises.

**ASSIGNEE, BY ACCEPTANCE OF THIS ASSIGNMENT AND ACCEPTANCE OF MEMBERSHIP INTEREST (THIS "ASSIGNMENT"),** assumes all of the duties and obligations of the Assignor as to the Membership Interest so assigned, and agrees to perform all of the covenants, conditions and obligations on the Assignor's part to be paid and performed with respect to the Membership Interest.

This Assignment may be executed in multiple counterparts with the same effect as if the signature on each such counterpart were on the same instrument. A signed copy, including that executed via DocuSign or other valid electronic or digital signature medium, of this Assignment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Assignment.

**EXECUTED TO BE EFFECTIVE AS OF** ___September 16___, **2022.**

**ASSIGNOR:**

Jamie logan (Se_ ,2022 18:5 EDT)

JA              IAN

**ASSIGNEE:**

Jamie logan (Se_ ,2022 18:5 EDT)

JAMES LOGAN, AS CO-TRUSTEE OF THE JAMES LOGAN FAMILY TRUST, DATED FEBRUARY 10, 2021

8257501

# Assignment of Membership Interest - James Logan to Revocable T ust re Sma Communications Yacht Holdings, LLC (2022)

Final Audit Report                                                      2022-09-16

| Created: | 2022-09-16 |
|---|---|
| By: | Rachel Chase (rachelc@jpfirm.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA41IVbbBf5AM-yiYmX8oXLjDjvWBKBD5w |

## "Assignment of Membership Interest - James Logan to Revocable Trust re Smart Communications Yacht Holdings, LLC (2022)" History

- Document created by Rachel Chase (rachelc@jpfirm.com)
  2022-09-16 - 8:52:54 PM GMT- IP address: 144.129.14.130

- Document emailed to jim.logan@█████████████████ for signature
  2022-09-16 - 9:02:35 PM GMT

- Email viewed by jim.logan@██████████████
  2022-09-16 - 10:22:45 PM GMT- IP address: 74.125.210.139

- Signer jim.logan@█████████████████ entered name at signing as James logan
  2022-09-16 - 10:52:56 PM GMT- IP address: 199.47.254.244

- Document e-signed by James logan (jim.logan@███████████████)
  Signature Date: 2022-09-16 - 10:52:57 PM GMT - Time Source: server- IP address: 199.47.254.244

- Agreement completed.
  2022-09-16 - 10:52:57 PM GMT

**Adobe Acrobat Sign**

# EXHIBIT C

CERTIFIED AS A TRUE COPY
ATTEST: COLLEEN REDMOND
PROTHONOTARY
BY



FLORIDA DEPARTMENT OF STATE
Division of Corporations

September 1, 2023

CT CORP

,

Re: Document Number L22000096409

The Articles of Conversion were filed on  August 29, 2023, effective August 29, 2023 converting  SMART COMMUNICATIONS YACHT HOLDING, LLC, a Florida limited liability company, into SMART COMMUNICATIONS YACHT HOLDING, LLC A NON-QUALIFIED DELAWARE LLC.

Enclosed is the requested certification.

Should you have any further questions concerning this matter, please feel free to call (850) 245-6051, the Registration Filing Section.

Neysa Culligan
Regulatory Specialist III
Division of Corporations                    Letter Number: 523A00020250

 Account number: I20160000072            Amount charged: 55.00

www.sunbiz.org

Division of Corporations - P.O. BOX 6327 -Tallahassee, Florida 32314



### Department of State

I certify the attached is a true and correct copy of the Articles of Conversion, filed on    August 29, 2023    effective    August 29, 2023,    converting    SMART COMMUNICATIONS YACHT HOLDING, LLC, a Florida limited liability company, into SMART COMMUNICATIONS YACHT HOLDING, LLC A NON-QUALIFIED DELAWARE LLC, as shown by the records of this office.

Given under my hand and the
Great Seal of the State of Florida
at Tallahassee, the Capital, this the
First day of September, 2023

*Cord Byrd*
*Secretary of State*

CR2E022 (01-11)

DocuSign Envelope ID: EB90FECE-344A-42C7-B628-C9837E674B8A

**Articles of Conversion**
for
**Smart Communications Yacht Holding, LLC**
(a Florida limited liability company)
into
**Smart Communications Yacht Holding, LLC**
(a Delaware limited liability company)

FILED

2023 AUG 29 PM 1:04

SECRETARY OF STATE
TALLAHASSEE, FLORIDA

The Articles of Conversion are submitted to convert the following Florida Limited Liability Company into an "Other Business Entity" in accordance with § 605.1045, Florida Statutes.

1. The name of the Florida Limited Liability Company converting into the "Other Business Entity" is:

   **Smart Communications Yacht Holding, LLC**

2. The name of the "Converted or Other Business Entity" is:

   **Smart Communications Yacht Holding, LLC**

3. The "Converted or Other Business Entity" is a limited liability company formed under the laws of the State of Delaware.

4. The plan of conversion was approved by the converting Florida Limited Liability Company in accordance with Chapter 605, F.S.

5. This conversion shall be effective in Florida on August 29, 2023.

6. Below is the street and mailing address of an office the Florida Department of State may send and for process served on the department pursuant to 605.0117 and Chapter 48:

   Jonathan D. Logan
   10491 72nd St
   Seminole, FL 33777

7. The "Converted or Other Business Entity" has agreed to pay any members having appraisal rights the amount to which such members are entitled under § 605.1006 and 605.1061-605.1072, F.S.

IN WITNESS WHEREOF, the undersigned authorized representative of Smart Communications Yacht Holding, LLC, has executed these Articles of Conversion as of this 29th day of August, 2023.

Jonathan D. Logan
Authorized Representative

RLF1 29539693v.1

State of Delaware
Secretary of State
Division of Corporations
Delivered 01:12 PM 08/29/2023
FILED 01:12 PM 08/29/2023
SR 20233369131 - File Number 7644897

**CERTIFICATE OF CONVERSION
TO LIMITED LIABILITY COMPANY**

**OF**

**SMART COMMUNICATIONS YACHT HOLDING, LLC
(a Florida limited liability company)**

**TO**

**SMART COMMUNICATIONS YACHT HOLDING, LLC
(a Delaware limited liability company)**

This Certificate of Conversion to Limited Liability Company, dated as of August 29, 2023, has been duly executed and is being filed by Smart Communications Yacht Holding, LLC, a Florida limited liability company (the "Other Entity"), to convert the Other Entity to Smart Communications Yacht Holding, LLC, a Delaware limited liability company (the "Company"), under the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.).

FIRST:   The Other Entity was first created, incorporated, formed or otherwise came into being on March 8, 2022.  The jurisdiction of the Other Entity at the time it was first created, incorporated, formed or otherwise came into being, and the jurisdiction of the Other Entity immediately prior to the filing of this Certificate of Conversion to Limited Liability Company was the State of Florida.

SECOND:   The name and type of entity of the Other Entity immediately prior to the filing of this Certificate of Conversion to Limited Liability Company was Smart Communications Yacht Holding, LLC, a Florida limited liability company.

THIRD:   The name of the Company to which the Other Entity shall be converted as set forth in its certificate of formation is Smart Communications Yacht Holding, LLC.

FOURTH:  The conversion of the Other Entity to the Company shall be effective upon the filing of this Certificate of Conversion to Limited Liability Company and a certificate of formation of the Company with the Secretary of State of the State of Delaware.

*Signature page follows.*

DocuSign Envelope ID: EB90FECE-344A-42C7-B628-C9837E674B8A

**IN WITNESS WHEREOF,** the undersigned has executed this Certificate of Conversion to Limited Liability Company as of the date first-above written.

**SMART COMMUNICATIONS YACHT
HOLDING, LLC, a Florida limited liability
company**

By: _____

      Jonathan D. Logan
      President

RLF1 29539831v.2

DocuSign Envelope ID: EB90FECE-344A-42C7-B628-C9837E674B8A

State of Delaware
Secretary of State
Division of Corporations
Delivered 01:12 PM 08/29/2023
FILED 01:12 PM 08/29/2023
SR 20233369131 - File Number 7644897

# CERTIFICATE OF FORMATION

## OF

## SMART COMMUNICATIONS YACHT HOLDING, LLC

This Certificate of Formation of Smart Communications Yacht Holding, LLC (the "LLC"), dated as of August 29, 2023, is being duly executed and filed by the undersigned, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del.C. §18-101, et seq.).

FIRST.   The name of the limited liability company is Smart Communications Yacht Holding, LLC.

SECOND.   The address of the registered office of the LLC in the State of Delaware is c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

THIRD.   The name and address of the registered agent for service of process on the LLC in the State of Delaware are The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation as of the date first above written.

Name:  Jonathan D. Logan
Title:  Authorized Person

# EXHIBIT D

CERTIFIED AS A TRUE COPY
ATTEST: COLLEEN REDMOND
PROTHONOTARY
BY

DocuSign Envelope ID: EB90FECE-344A-42C7-B628-C9837E674B8A

**WRITTEN CONSENT**
**OF THE SOLE MANAGER AND MEMBER**
**OF**
**SMART COMMUNICATIONS YACHT HOLDING, LLC**

The Undersigned, being the sole owner of all of the limited liability company interests and sole member of Smart Communication Yacht Holding, LLC, a Florida limited liability company (the "Company"), does hereby consent to and approve the following actions:

(1) Conversion of the Company. The conversion (the "Conversion") of the Company to Smart Communication Yacht Holding, LLC, a Delaware limited liability company (the "Resulting Entity") and the Plan of Conversion of the Company, in the form attached hereto as Exhibit A, (and the transactions contemplated thereby), including the exhibits attached thereto (including the Certificate of Formation, Certificate of Conversion and LLC Agreement (each as defined therein)) be, and hereby are, authorized, adopted and approved. Jonathan D. Logan, as manager of the Company and authorized representative, is hereby authorized, on behalf of the Company, to execute and file all documents to accomplish the foregoing, including the Articles of Conversion to be filed with the Florida Department of State and the Certificate of Formation, Certificate of Conversion and LLC Agreement. All actions of Jonathan D. Logan taken on behalf of the Company in connection with the Conversion be, and hereby are, adopted, approved, ratified and confirmed.

(2) Conversion of Limited Liability Company Interests. Upon the consummation of the Conversion, all limited liability company interests in the Company, or rights with respect thereto, all of which are owned by Jonathan D. Logan, shall be converted into 100% of the limited liability company interests of the Resulting Entity, and Jonathan D. Logan shall be admitted as and become the sole member of the Resulting Entity, owning 100% of the limited liability company interests thereof.

IN WITNESS WHEREOF, the undersigned, as sole manager of the Company and the sole owner of 100% of the limited liability company interests of the Company and sole member, has executed this consent as of this 29th day of August, 2023.

_____
Jonathan D. Logan

# Exhibit A

**Plan of Conversion**

**By Which**

**Smart Communications Yacht Holding, LLC**
(a Florida limited liability company)

**will be converted to**

**Smart Communications Yacht Holding, LLC**
(a Delaware limited liability company)

This Plan of Conversion relates to the conversion of Smart Communications Yacht Holding, LLC, a Florida limited liability company ("Yacht Florida"), to Smart Communications Yacht Holding, LLC, a Delaware limited liability company (the "Resulting Entity"), pursuant to the Florida Limited Liability Company Act, Fla. Stat. § 608.401 et. seq.

**I**
**Plan of Conversion**

**A.  Adoption of Plan.**  In consideration for the mutual promises, covenants, and agreements herein, Yacht Florida hereby adopts this plan of conversion pursuant to section 608.4401 of the Florida Statutes, as follows:

1. Yacht Florida shall be converted to the Resulting Entity to exist as a limited liability company governed by the laws of the State of Delaware under the name "Smart Communications Yacht Holding, LLC."

2. The Resulting Entity shall be a continuation of the existence of Yacht Florida.

3. The title to all property owned by Yacht Florida shall be vested in the Resulting Entity without revision or impairment and shall be subject to all of the debts and liabilities of Yacht Florida, in the same manner as if the Resulting Entity had itself incurred them.

4. The limited liability company interest in Yacht Florida (or rights with respect thereto), all of which are owned by Jonathan D. Logan, shall be converted into 100% of the limited liability company interests of the Resulting Entity, and Jonathan D. Logan shall be the sole member of the Resulting Entity.

**B.  Effective Date.**  The effective date of the conversion (the "Effective Date") shall be the date of filing of the Articles of Conversion ( the "Florida Certificate") with the Office of the Florida Secretary of State and the date of the filing of the Certificate of Formation of the Resulting Entity and Certificate of Conversion (the "Delaware Certificate") with the Secretary of State of the State of Delaware.  Both the Florida Certificate and the Delaware Certificate shall be filed on the same day.

## II
## Conversion of Interests

Pursuant to the Plan of Conversion described in Article I above, on the Effective Date, the limited liability company interests in Yacht Florida (or rights with respect thereto), all of which are owned by Jonathan D. Logan, shall be converted into 100% of the limited liability company interests of the Resulting Entity, and Jonathan D. Logan shall be admitted as and shall be the sole member of the Resulting Entity, owning 100% of the limited liability company interests thereof.

## III
## Governing Documents

The Certificate of Formation of the Resulting Entity (attached hereto as Exhibit A, the "Certificate of Formation") and the Certificate of Conversion (attached hereto as Exhibit B, the "Certificate of Conversion") shall be filed with the Secretary of State of the State of Delaware on the Effective Date. The limited liability company agreement of the Resulting Entity (attached hereto as Exhibit C, the "LLC Agreement") shall be adopted and become effective as of the Effective Date.

## IV
## Approval of the Conversion

This Plan of Conversion, together with the Certificate of Formation, the Certificate of Conversion and the LLC Agreement, and the transactions contemplated hereby and thereby, including the conversion of Yacht Florida to the Resulting Entity, shall be approved by Jonathan D. Logan, as the owner of 100% of the limited liability company interests of Yacht Florida.

## V
## Miscellaneous

**A. Controlling Law.** The validity, interpretation, and performance of this plan of conversion shall be controlled by and construed under the laws of the State of Florida as existing from time to time.

**B. Amendment.** This Plan of Conversion may be amended at any time before its approval as provided herein.

# EXHIBIT E

CERTIFIED AS A TRUE COPY
ATTEST: COLLEEN REDMOND
PROTHONOTARY
BY

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## SMART COMMUNICATIONS YACHT HOLDING, LLC

This Limited Liability Company Agreement (this "Agreement") of Smart Communications Yacht Holding, LLC, a Delaware limited liability company (the "Company"), dated and effective as of August 29, 2023, is entered into by Jonathan D. Logan, as the sole member of the Company (the "Member").

WHEREAS, Smart Communications Yacht Holding, Inc. ("Yacht Florida") was organized as a Florida limited liability company on March 8, 2022;

WHEREAS, the manager and owner of 100% of the limited liability company interests and member of Yacht Florida has adopted resolutions adopting and approving the conversion of Yacht Florida to a Delaware limited liability company and the adoption of this Agreement;

WHEREAS, Yacht Florida was converted to a Delaware limited liability company pursuant to Section 18-214 of the Delaware Limited Liability Company Act (6 Del. C. § 18 101, et seq.), as amended from time to time (the "Act") and the Florida Limited Liability Company Act by causing the filing of Articles of Conversion with the Secretary of State of the State of Florida and a Certificate of Conversion to Limited Liability Company and a Certificate of Formation with the Secretary of State of the State of Delaware (the "Conversion"); and

WHEREAS, in connection with the Conversion, Jonathan D. Logan, as sole owner of 100% of the limited liability company interests in Yacht Florida and sole member thereof as of immediately prior to the Conversion, was admitted as a member of the Company, owning 100% of the limited liability company interests of the Company.

The Member, by execution of this Agreement, hereby forms a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.), as amended from time to time (the "Act"), and hereby agrees as follows:

1. **Name.** The name of the limited liability company formed hereby is Smart Communications Yacht Holding, LLC.

2. **Certificates.** Jonathan D. Logan is hereby designated as an "authorized person" of the Company within the meaning of the Act, and has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of State of the State of Delaware, which execution, delivery and filing is hereby ratified and approved. Upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware, the Member and

-1-

RLF1 29539807v.2

each Officer (as defined below) thereupon became a designated "authorized person" of the Company and shall continue as a designated "authorized person" of the Company within the meaning of the Act.  The Member or any Officer, as an "authorized person" of the Company within the meaning of the Act, shall execute, deliver and file, or cause the execution, delivery and filing of, all certificates (and any amendments and/or restatements thereof) required or permitted by the Act to be filed with the Secretary of State of the State of Delaware.  The Member or any Officer shall execute, deliver and file, or cause the execution, delivery and filing of any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct business.

      3.    **Purposes.**  The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in any lawful act or activity for which limited liability companies may be formed under the Act and engaging in any and all activities necessary or incidental to the foregoing.

      4.    **Powers.**  The Company, and the Member on behalf of the Company, (i) shall have and exercise all powers necessary, convenient or incidental to accomplish its purposes as set forth in <u>Section 3</u> and (ii) shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.

      5.    **Principal Business Office.**  The principal business office of the Company shall be located at such location as may hereafter be determined by the Member.

      6.    **Registered Office.**  The address of the registered office of the Company in the State of Delaware is c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, New Castle County, Delaware 19801.

      7.    **Registered Agent.**  The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware are The Corporation Trust Company, 1209 Orange Street, City of Wilmington, New Castle County, Delaware 19801.

      8.    **Member.**  The name and the mailing address of the Member are as follows:

| Name | Address |
| --- | --- |
| Jonathan D. Logan | 10491 72nd Street<br>Seminole, FL 33777 |

      9.    **Limited Liability.**  Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member of the Company.

-2-

10.    **Capital Contributions.** The Member is hereby admitted to the Company as a member of the Company upon its execution of this Agreement.  The Member has contributed such capital to the Company, if any, as is set forth in the books and records of the Company.

11.    **Additional Contributions.**  The Member is not required to make any additional capital contribution to the Company.  However, the Member may, at any time and in its sole discretion, make additional capital contributions to the Company.

12.    **Allocation of Profits and Losses.** The Company's profits and losses shall be allocated solely to the Member.

13.    **Distributions.**  Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Member.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to the Member on account of its interest in the Company if such distribution would violate the Act or other applicable law.

14.    **Management.**    In accordance with Section 18-402 of the Act, management of the Company shall be vested in the Member.  The Member shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by members of a limited liability company under the laws of the State of Delaware.  Notwithstanding any other provision of this Agreement, the Member, acting singly, under the title "Member", "Managing Member", or any other title or no title at all, has the authority to bind the Company and is authorized to execute and deliver any document on behalf of the Company without any vote or consent of any other person or entity.

The Member shall have the powers set forth above until the earliest to occur of his death, disability or other inability to act in such capacity, at which time the legal representative of the Member shall appoint a successor to the interest of the Member for the purpose of settling the estate or administering the property of the Member.

15.    **Officers.**  The Member may, from time to time as it deems advisable, select natural persons who are employees or agents of the Company and designate them as officers of the Company (the "Officers") and assign any titles to such persons (including, without limitation, President, Vice President, Secretary, and Treasurer).  Unless the Member decides otherwise, if the title assigned to an Officer is one commonly used for officers of a business corporation formed under the General Corporation Law of the State of Delaware, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office.  The Member may delegate to any Officer or any other person or entity any of the Member's powers under this Agreement, including, without limitation, the power to bind the Company.  Any delegation pursuant to this Section 15 may be revoked at any time by the Member.  An Officer may be removed with or without cause at any time by the Member.  Jonathan D. Logan is hereby appointed as President, Secretary and

-3-

Treasurer and shall continue to hold each such office until such time as he resigns or is removed by the Member.

16.    **Other Business.** Notwithstanding any duty (including any fiduciary duty) otherwise existing at law or in equity, the Member and any Officer may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others, and the Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

17.    **Exculpation and Indemnification; Waiver of Fiduciary Duties.** To the fullest extent permitted by law, no Member or Officer shall be liable to the Company or any other person or entity who is bound by this Agreement for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member or Officer. To the fullest extent permitted by applicable law, the Company shall indemnify the Member against all losses or liabilities incurred by reason of the fact that such person is or was serving as a Member or Officer and shall pay all expenses (including reasonable legal fees) incurred by a Member or Officer in defending any claim, demand, action, suit or proceeding to which such person is made or is threatened to be made a party by reason of the fact that such person is or was a Member or Officer. Notwithstanding any other provision of this Agreement or anything to the contrary existing at law, in equity or otherwise, each of the Member and each Officer shall, to the fullest extent permitted by law, owe no duties (including fiduciary duties) to the Member or the Company or any other person bound by this Agreement; provided, however, that each of the Member and each Officer shall have the duty to act in accordance with the implied contractual covenant of good faith and fair dealing.

18.    **Assignments.** The Member may at any time assign in whole or in part its limited liability company interest in the Company. The transferee of a limited liability company interest in the Company shall be admitted to the Company as a member of the Company upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. If the Member transfers all of its limited liability company interest in the Company pursuant to this Section 18, such admission shall be deemed effective immediately prior to the transfer, and, immediately following such admission, the transferor Member shall cease to be a member of the Company.

19.    **Resignation.** The Member may at any time resign from the Company. If the Member resigns pursuant to this Section 19, a person or entity may be admitted to the Company as an additional member of the Company upon the written consent of the resigning Member and such person's or entity's execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. If a person or entity is admitted to the Company as an additional member of the Company in connection with the resignation of the Member pursuant to this Section 19, such admission shall be deemed effective immediately prior to the resignation, and, immediately following such admission, the resigning Member shall cease to be a member of the Company.

-4-

20. **Admission of Additional Members.** Except as otherwise provided in Section 19, one or more additional members of the Company may be admitted to the Company with the written consent of the Member. A person or entity shall be admitted to the Company as an additional member of the Company upon the written consent of the Member and such person's or entity's execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement.

21. **Dissolution.**

(a) The Company shall dissolve and its affairs shall be wound up upon the first to occur of the following: (i) the written consent of the Member to dissolve the Company, (ii) at any time there are no members of the Company unless the Company is continued without dissolution in accordance with the Act, or (iii) the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

(b) The bankruptcy (as defined at Sections 18-101(1) and 18-304 of the Act) of the Member shall not cause the Member to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.

(c) In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

(d) The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Member in the manner provided for in this Agreement and (ii) the Certificate of Formation of the Company shall have been canceled in the manner required by the Act.

22. **Severability of Provisions.** Each provision of this Agreement shall be considered severable, and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement that are valid, enforceable and legal.

23. **Entire Agreement.** This Agreement constitutes the entire agreement of the Member with respect to the subject matter hereof.

24. **Governing Law.** This Agreement shall be governed by, and construed under, the laws of the State of Delaware (without regard to conflict of laws principles), all rights and remedies being governed by said laws.

RLF1 29539807v.2

25.    **Amendments.**    This Agreement may not be modified, altered, supplemented or amended except pursuant to a written agreement executed and delivered by the Member.

26.    **Sole Benefit of Member.**  Except as expressly provided in Section 17, the provisions of this Agreement (including Section 11) are intended solely to benefit the Member and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any creditor of the Member or any creditor of the Company (and no such creditor shall be a third-party beneficiary of this Agreement), and the Member shall not have any duty or obligation to any creditor of the Company to make any contributions or payments to the Company or to issue any call for capital pursuant to this Agreement.

27.    **Effectiveness.**  Pursuant to Section 18-201(d) of the Act, this Agreement shall be effective as of the time of the filing of the Certificate of Formation of the Company in the office of the Secretary of State of the State of Delaware.


[SIGNATURE PAGE FOLLOWS]

RLF1 29539807v.2

DocuSign Envelope ID: EB90FECE-344A-42C7-B628-C9837E674B8A

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Agreement as of the date first written above.

**MEMBER:**

Jonathan D. Logan

RLF1 29539807v.2

# EXHIBIT F

CERTIFIED AS A TRUE COPY
ATTEST: COLLEEN REDMOND
PROTHONOTARY
BY



FLORIDA DEPARTMENT OF STATE
Division of Corporations

September 5, 2023

CT CORP

Re: Document Number L20000130244

The Articles of Conversion were filed on   September 1, 2023 converting   LOCO
FLORIDA LLC, a Florida limited liability company, into LOCO FLORIDA LLC, a
DELAWARE LIMITED LIABILITY COMPANY.

Should you have any further questions concerning this matter, please feel free to call
(850) 245-6051, the Registration Filing Section.

Jalesa S Dennis
Regulatory Specialist III
Division of Corporations                    Letter Number: 923A00020388

 Account number: I20160000072               Amount charged: 55.00



# State of Florida

## Department of State



Given under my hand and the
Great Seal of the State of Florida
at Tallahassee, the Capital, this the
Fifth day of September, 2023

*Cord Byrd*
*Secretary of State*

CR2E022 (01-11)

DocuSign Envelope ID: DED-1C1BF-787E-408A-A718-720DDE229EB0

**Articles of Conversion**
for
**Loco Florida LLC**
(a Florida limited liability company)
into
**Loco Florida LLC**
(a Delaware limited liability company)

SECRETARY OF STATE
FILED
2023 SEP -1 PM 1:45

The Articles of Conversion are submitted to convert the following Florida Limited Liability Company into an "Other Business Entity" in accordance with § 605.1045, Florida Statutes.

1. The name of the Florida Limited Liability Company converting into the "Other Business Entity" is:

   **Loco Florida LLC**

2. The name of the "Converted or Other Business Entity" is:

   **Loco Florida LLC**

3. The "Converted or Other Business Entity" is a limited liability company formed under the laws of the State of Delaware.

4. The plan of conversion was approved by the converting Florida Limited Liability Company in accordance with Chapter 605, F.S.

5. This conversion shall be effective in Florida on September 1, 2023.

6. Below is the street and mailing address of an office the Florida Department of State may send and for process served on the department pursuant to 605.0117 and Chapter 48:

   > Jonathan D. Logan
   > 10491 72nd St
   > Seminole, FL 33777

7. The "Converted or Other Business Entity" has agreed to pay any members having appraisal rights the amount to which such members are entitled under § 605.1006 and 605.1061-605.1072, F.S.

IN WITNESS WHEREOF, the undersigned authorized representative of Loco Florida LLC, has executed these Articles of Conversion as of this 1st day of September, 2023.

_____
Jonathan D. Logan
Authorized Representative

RLF1 29555205v 1

State of Delaware
Secretary of State
Division of Corporations
Delivered 10:40 AM 09/01/2023
FILED 10:40 AM 09/01/2023
SR 20233401912 - File Number 7652139

**CERTIFICATE OF CONVERSION
TO LIMITED LIABILITY COMPANY**

**OF**

**LOCO FLORIDA LLC
(a Florida limited liability company)**

**TO**

**LOCO FLORIDA LLC
(a Delaware limited liability company)**

This Certificate of Conversion to Limited Liability Company, dated as of September 1, 2023, has been duly executed and is being filed by Loco Florida LLC, a Florida limited liability company (the "Other Entity"), to convert the Other Entity to Loco Florida LLC, a Delaware limited liability company (the "Company"), under the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.).

FIRST:   The Other Entity was first created, incorporated, formed or otherwise came into being on May 13, 2020. The jurisdiction of the Other Entity at the time it was first created, incorporated, formed or otherwise came into being, and the jurisdiction of the Other Entity immediately prior to the filing of this Certificate of Conversion to Limited Liability Company was the State of Florida.

SECOND:   The name and type of entity of the Other Entity immediately prior to the filing of this Certificate of Conversion to Limited Liability Company was Loco Florida LLC, a Florida limited liability company.

THIRD:   The name of the Company to which the Other Entity shall be converted as set forth in its certificate of formation is Loco Florida LLC.

FOURTH:   The conversion of the Other Entity to the Company shall be effective upon the filing of this Certificate of Conversion to Limited Liability Company and a certificate of formation of the Company with the Secretary of State of the State of Delaware.

*Signature page follows.*

DocuSign Envelope ID: DED1C1BF-787E-408A-A718-720DDE229EB0

**IN WITNESS WHEREOF**, the undersigned has executed this Certificate of Conversion to Limited Liability Company as of the date first-above written.

**LOCO FLORIDA LLC, a Florida limited liability company**

By: _____

Jonathan D. Logan
President

DocuSign Envelope ID: DED1C1BF-787E-408A-A718-720DDE229EB0

# CERTIFICATE OF FORMATION

## OF

## LOCO FLORIDA LLC

This Certificate of Formation of Loco Florida LLC (the "LLC"), dated as of September 1, 2023, is being duly executed and filed by the undersigned, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del.C. §18-101, et seq.).

FIRST.  The name of the limited liability company is Loco Florida LLC.

SECOND.  The address of the registered office of the LLC in the State of Delaware is c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

THIRD.  The name and address of the registered agent for service of process on the LLC in the State of Delaware are The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation as of the date first above written.

Name:  Jonathan D. Logan
Title:  Authorized Person

State of Delaware
Secretary of State
Division of Corporations
Delivered  10:40 AM 09/01/2023
FILED  10:40 AM 09/01/2023
SR 20233401912 - File Number  7652139

# EXHIBIT G

CERTIFIED AS A TRUE COPY
ATTEST: COLLEEN REDMOND
PROTHONOTARY
BY

DocuSign Envelope ID: DED1C1BF-787E-408A-A718-720DDE229EB0

**WRITTEN CONSENT**
**OF THE SOLE MANAGER AND MEMBER**
**OF**
**LOCO FLORIDA LLC**

The Undersigned, being the sole owner of all of the limited liability company interests and sole member of Loco Florida LLC, a Florida limited liability company (the "Company"), does hereby consent to and approve the following actions:

(1) <u>Conversion of the Company.</u>  The conversion (the "Conversion") of the Company to Loco Florida LLC, a Delaware limited liability company (the "Resulting Entity") and the Plan of Conversion of the Company, in the form attached hereto as <u>Exhibit A</u>, (and the transactions contemplated thereby), including the exhibits attached thereto (including the Certificate of Formation, Certificate of Conversion and LLC Agreement (each as defined therein)) be, and hereby are, authorized, adopted and approved.  Jonathan D. Logan, as manager of the Company and authorized representative, is hereby authorized, on behalf of the Company, to execute and file all documents to accomplish the foregoing, including the Articles of Conversion to be filed with the Florida Department of State and the Certificate of Formation, Certificate of Conversion and LLC Agreement.  All actions of Jonathan D. Logan taken on behalf of the Company in connection with the Conversion be, and hereby are, adopted, approved, ratified and confirmed.

(2) <u>Conversion of Limited Liability Company Interests.</u>  Upon the consummation of the Conversion, all limited liability company interests in the Company, or rights with respect thereto, all of which are owned by Jonathan D. Logan, shall be converted into 100% of the limited liability company interests of the Resulting Entity, and Jonathan D. Logan shall be admitted as and become the sole member of the Resulting Entity, owning 100% of the limited liability company interests thereof.

IN WITNESS WHEREOF, the undersigned, as sole manager of the Company and the sole owner of 100% of the limited liability company interests of the Company and sole member, has executed this consent as of this 1st day of September, 2023.

_____
Jonathan D. Logan

**Plan of Conversion**

**By Which**

**Loco Florida LLC**
(a Florida limited liability company)

**will be converted to**

**Loco Florida LLC**
(a Delaware limited liability company)

This Plan of Conversion relates to the conversion of Loco Florida LLC, a Florida limited liability company ("Loco"), to Loco Florida LLC, a Delaware limited liability company (the "Resulting Entity"), pursuant to the Florida Limited Liability Company Act, Fla. Stat. § 608.401 et. seq.

**I**
**Plan of Conversion**

**A. Adoption of Plan.** In consideration for the mutual promises, covenants, and agreements herein, Loco hereby adopts this plan of conversion pursuant to section 608.4401 of the Florida Statutes, as follows:

1. Loco shall be converted to the Resulting Entity to exist as a limited liability company governed by the laws of the State of Delaware under the name "Loco Florida LLC."

2. The Resulting Entity shall be a continuation of the existence of Loco.

3. The title to all property owned by Loco shall be vested in the Resulting Entity without revision or impairment and shall be subject to all of the debts and liabilities of Loco, in the same manner as if the Resulting Entity had itself incurred them.

4. The limited liability company interest in Loco (or rights with respect thereto), all of which are owned by Jonathan D. Logan, shall be converted into 100% of the limited liability company interests of the Resulting Entity, and Jonathan D. Logan shall be the sole member of the Resulting Entity.

**B. Effective Date.** The effective date of the conversion (the "Effective Date") shall be the date of filing of the Articles of Conversion (the "Florida Certificate") with the Office of the Florida Secretary of State and the date of the filing of the Certificate of Formation of the Resulting Entity and Certificate of Conversion (the "Delaware Certificate") with the Secretary of State of the State of Delaware. Both the Florida Certificate and the Delaware Certificate shall be filed on the same day.

## II
## Conversion of Interests

Pursuant to the Plan of Conversion described in Article I above, on the Effective Date, the limited liability company interests in Loco (or rights with respect thereto), all of which are owned by Jonathan D. Logan, shall be converted into 100% of the limited liability company interests of the Resulting Entity, and Jonathan D. Logan shall be admitted as and shall be the sole member of the Resulting Entity, owning 100% of the limited liability company interests thereof.

## III
## Governing Documents

The Certificate of Formation of the Resulting Entity (attached hereto as Exhibit A, the "Certificate of Formation") and the Certificate of Conversion (attached hereto as Exhibit B, the "Certificate of Conversion") shall be filed with the Secretary of State of the State of Delaware on the Effective Date. The limited liability company agreement of the Resulting Entity (attached hereto as Exhibit C, the "LLC Agreement") shall be adopted and become effective as of the Effective Date.

## IV
## Approval of the Conversion

This Plan of Conversion, together with the Certificate of Formation, the Certificate of Conversion and the LLC Agreement, and the transactions contemplated hereby and thereby, including the conversion of Loco to the Resulting Entity, shall be approved by Jonathan D. Logan, as the owner of 100% of the limited liability company interests of Loco.

## V
## Miscellaneous

**A. Controlling Law.** The validity, interpretation, and performance of this plan of conversion shall be controlled by and construed under the laws of the State of Florida as existing from time to time.

**B. Amendment.** This Plan of Conversion may be amended at any time before its approval as provided herein.

Exhibit A to Plan of Conversion

## CERTIFICATE OF FORMATION

## OF

## LOCO FLORIDA LLC

This Certificate of Formation of Loco Florida LLC (the "LLC"), dated as of September 1, 2023, is being duly executed and filed by the undersigned, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del.C. §18-101, et seq.).

FIRST.  The name of the limited liability company is Loco Florida LLC.

SECOND.  The address of the registered office of the LLC in the State of Delaware is c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

THIRD.  The name and address of the registered agent for service of process on the LLC in the State of Delaware are The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation as of the date first above written.

Name:  Jonathan D. Logan
Title:  Authorized Person

Exhibit B to Plan of Conversion

**CERTIFICATE OF CONVERSION
TO LIMITED LIABILITY COMPANY**

**OF**

**LOCO FLORIDA LLC
(a Florida limited liability company)**

**TO**

**LOCO FLORIDA LLC
(a Delaware limited liability company)**

This Certificate of Conversion to Limited Liability Company, dated as of September 1, 2023, has been duly executed and is being filed by Loco Florida LLC, a Florida limited liability company (the "Other Entity"), to convert the Other Entity to Loco Florida LLC, a Delaware limited liability company (the "Company"), under the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.).

FIRST:   The Other Entity was first created, incorporated, formed or otherwise came into being on May 13, 2020.  The jurisdiction of the Other Entity at the time it was first created, incorporated, formed or otherwise came into being, and the jurisdiction of the Other Entity immediately prior to the filing of this Certificate of Conversion to Limited Liability Company was the State of Florida.

SECOND:   The name and type of entity of the Other Entity immediately prior to the filing of this Certificate of Conversion to Limited Liability Company was Loco Florida LLC, a Florida limited liability company.

THIRD:   The name of the Company to which the Other Entity shall be converted as set forth in its certificate of formation is Loco Florida LLC.

FOURTH:   The conversion of the Other Entity to the Company shall be effective upon the filing of this Certificate of Conversion to Limited Liability Company and a certificate of formation of the Company with the Secretary of State of the State of Delaware.

*Signature page follows.*

**IN WITNESS WHEREOF**, the undersigned has executed this Certificate of Conversion to Limited Liability Company as of the date first-above written.

**LOCO FLORIDA LLC, a Florida limited liability company**

By: _____
       Jonathan D. Logan
       President

Exhibit C to Plan of Conversion

## LIMITED LIABILITY COMPANY AGREEMENT

## OF

## LOCO FLORIDA LLC

This Limited Liability Company Agreement (this "Agreement") of Loco Florida LLC, a Delaware limited liability company (the "Company"), dated and effective as of September 1, 2023, is entered into by Jonathan D. Logan, as the sole member of the Company (the "Member").

WHEREAS, Loco Florida LLC ("Loco") was organized as a Florida limited liability company on May 13, 2020;

WHEREAS, the manager and owner of 100% of the limited liability company interests and member of Loco has adopted resolutions adopting and approving the conversion of Loco to a Delaware limited liability company and the adoption of this Agreement;

WHEREAS, Loco was converted to a Delaware limited liability company pursuant to Section 18-214 of the Delaware Limited Liability Company Act (6 Del. C. § 18 101, et seq.), as amended from time to time (the "Act") and the Florida Limited Liability Company Act by causing the filing of Articles of Conversion with the Secretary of State of the State of Florida and a Certificate of Conversion to Limited Liability Company and a Certificate of Formation with the Secretary of State of the State of Delaware (the "Conversion"); and

WHEREAS, in connection with the Conversion, Jonathan D. Logan, as sole owner of 100% of the limited liability company interests in Loco and sole member thereof as of immediately prior to the Conversion, was admitted as a member of the Company, owning 100% of the limited liability company interests of the Company.

The Member, by execution of this Agreement, hereby forms a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.), as amended from time to time (the "Act"), and hereby agrees as follows:

1.  **Name.** The name of the limited liability company formed hereby is Loco Florida LLC.

2.  **Certificates.** Jonathan D. Logan is hereby designated as an "authorized person" of the Company within the meaning of the Act, and has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of State of the State of Delaware, which execution, delivery and filing is hereby ratified and approved. Upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware, the Member and each Officer (as defined below) thereupon became a designated "authorized person" of the

-1-

Company and shall continue as a designated "authorized person" of the Company within the meaning of the Act.  The Member or any Officer, as an "authorized person" of the Company within the meaning of the Act, shall execute, deliver and file, or cause the execution, delivery and filing of, all certificates (and any amendments and/or restatements thereof) required or permitted by the Act to be filed with the Secretary of State of the State of Delaware.  The Member or any Officer shall execute, deliver and file, or cause the execution, delivery and filing of any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct business.

3.      **Purposes.**  The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in any lawful act or activity for which limited liability companies may be formed under the Act and engaging in any and all activities necessary or incidental to the foregoing.

4.      **Powers.**  The Company, and the Member on behalf of the Company, (i) shall have and exercise all powers necessary, convenient or incidental to accomplish its purposes as set forth in Section 3 and (ii) shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.

5.      **Principal Business Office.**  The principal business office of the Company shall be located at such location as may hereafter be determined by the Member.

6.      **Registered Office.**  The address of the registered office of the Company in the State of Delaware is c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, New Castle County, Delaware 19801.

7.      **Registered Agent.**  The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware are The Corporation Trust Company, 1209 Orange Street, City of Wilmington, New Castle County, Delaware 19801.

8.      **Member.**  The name and the mailing address of the Member are as follows:

| Name | Address |
| --- | --- |
| Jonathan D. Logan | 10491 72nd Street<br>Seminole, FL 33777 |

9.      **Limited Liability.**  Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member of the Company.

RLF1 29555265v.2

10. **Capital Contributions.** The Member is hereby admitted to the Company as a member of the Company upon its execution of this Agreement. The Member has contributed such capital to the Company, if any, as is set forth in the books and records of the Company.

11. **Additional Contributions.** The Member is not required to make any additional capital contribution to the Company. However, the Member may, at any time and in its sole discretion, make additional capital contributions to the Company.

12. **Allocation of Profits and Losses.** The Company's profits and losses shall be allocated solely to the Member.

13. **Distributions.** Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Member. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to the Member on account of its interest in the Company if such distribution would violate the Act or other applicable law.

14. **Management.** In accordance with Section 18-402 of the Act, management of the Company shall be vested in the Member. The Member shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by members of a limited liability company under the laws of the State of Delaware. Notwithstanding any other provision of this Agreement, the Member, acting singly, under the title "Member", "Managing Member", or any other title or no title at all, has the authority to bind the Company and is authorized to execute and deliver any document on behalf of the Company without any vote or consent of any other person or entity.

The Member shall have the powers set forth above until the earliest to occur of his death, disability or other inability to act in such capacity, at which time the legal representative of the Member shall appoint a successor to the interest of the Member for the purpose of settling the estate or administering the property of the Member.

15. **Officers.** The Member may, from time to time as it deems advisable, select natural persons who are employees or agents of the Company and designate them as officers of the Company (the "Officers") and assign any titles to such persons (including, without limitation, President, Vice President, Secretary, and Treasurer). Unless the Member decides otherwise, if the title assigned to an Officer is one commonly used for officers of a business corporation formed under the General Corporation Law of the State of Delaware, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office. The Member may delegate to any Officer or any other person or entity any of the Member's powers under this Agreement, including, without limitation, the power to bind the Company. Any delegation pursuant to this Section 15 may be revoked at any time by the Member. An Officer may be removed with or without cause at any time by the Member. Jonathan D. Logan is hereby appointed as President, Secretary and

-3-

Treasurer and shall continue to hold each such office until such time as he resigns or is removed by the Member.

16.    **Other Business.**  Notwithstanding any duty (including any fiduciary duty) otherwise existing at law or in equity, the Member and any Officer may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others, and the Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

17.    **Exculpation and Indemnification; Waiver of Fiduciary Duties.**  To the fullest extent permitted by law, no Member or Officer shall be liable to the Company or any other person or entity who is bound by this Agreement for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member or Officer.  To the fullest extent permitted by applicable law, the Company shall indemnify the Member against all losses or liabilities incurred by reason of the fact that such person is or was serving as a Member or Officer and shall pay all expenses (including reasonable legal fees) incurred by a Member or Officer in defending any claim, demand, action, suit or proceeding to which such person is made or is threatened to be made a party by reason of the fact that such person is or was a Member or Officer.  Notwithstanding any other provision of this Agreement or anything to the contrary existing at law, in equity or otherwise, each of the Member and each Officer shall, to the fullest extent permitted by law, owe no duties (including fiduciary duties) to the Member or the Company or any other person bound by this Agreement; provided, however, that each of the Member and each Officer shall have the duty to act in accordance with the implied contractual covenant of good faith and fair dealing.

18.    **Assignments.**  The Member may at any time assign in whole or in part its limited liability company interest in the Company.  The transferee of a limited liability company interest in the Company shall be admitted to the Company as a member of the Company upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement.  If the Member transfers all of its limited liability company interest in the Company pursuant to this Section 18, such admission shall be deemed effective immediately prior to the transfer, and, immediately following such admission, the transferor Member shall cease to be a member of the Company.

19.    **Resignation.**  The Member may at any time resign from the Company.  If the Member resigns pursuant to this Section 19, a person or entity may be admitted to the Company as an additional member of the Company upon the written consent of the resigning Member and such person's or entity's execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement.  If a person or entity is admitted to the Company as an additional member of the Company in connection with the resignation of the Member pursuant to this Section 19, such admission shall be deemed effective immediately prior to the resignation, and, immediately following such admission, the resigning Member shall cease to be a member of the Company.

-4-

20.   **Admission of Additional Members.**  Except as otherwise provided in Section 19, one or more additional members of the Company may be admitted to the Company with the written consent of the Member.  A person or entity shall be admitted to the Company as an additional member of the Company upon the written consent of the Member and such person's or entity's execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement.

21.   **Dissolution.**

(a)   The Company shall dissolve and its affairs shall be wound up upon the first to occur of the following: (i) the written consent of the Member to dissolve the Company, (ii) at any time there are no members of the Company unless the Company is continued without dissolution in accordance with the Act, or (iii) the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

(b)   The bankruptcy (as defined at Sections 18-101(1) and 18-304 of the Act) of the Member shall not cause the Member to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.

(c)   In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

(d)   The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Member in the manner provided for in this Agreement and (ii) the Certificate of Formation of the Company shall have been canceled in the manner required by the Act.

22.   **Severability of Provisions.**  Each provision of this Agreement shall be considered severable, and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement that are valid, enforceable and legal.

23.   **Entire Agreement.**  This Agreement constitutes the entire agreement of the Member with respect to the subject matter hereof.

24.   **Governing Law.**  This Agreement shall be governed by, and construed under, the laws of the State of Delaware (without regard to conflict of laws principles), all rights and remedies being governed by said laws.

-5-

25.     **Amendments.**   This Agreement may not be modified, altered, supplemented or amended except pursuant to a written agreement executed and delivered by the Member.

26.     **Sole Benefit of Member.**   Except as expressly provided in Section 17, the provisions of this Agreement (including Section 11) are intended solely to benefit the Member and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any creditor of the Member or any creditor of the Company (and no such creditor shall be a third-party beneficiary of this Agreement), and the Member shall not have any duty or obligation to any creditor of the Company to make any contributions or payments to the Company or to issue any call for capital pursuant to this Agreement.

27.     **Effectiveness.**   Pursuant to Section 18-201(d) of the Act, this Agreement shall be effective as of the time of the filing of the Certificate of Formation of the Company in the office of the Secretary of State of the State of Delaware.


[SIGNATURE PAGE FOLLOWS]

RLF1 29555265v.2

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Agreement as of the date first written above.

**MEMBER:**

_____
Jonathan D. Logan

# EXHIBIT H



CERTIFIED AS A TRUE COPY
ATTEST: COLLEEN REDMOND
PROTHONOTARY
BY

## LIMITED LIABILITY COMPANY AGREEMENT

## OF

## LOCO FLORIDA LLC

This Limited Liability Company Agreement (this "Agreement") of Loco Florida LLC, a Delaware limited liability company (the "Company"), dated and effective as of September 1, 2023, is entered into by Jonathan D. Logan, as the sole member of the Company (the "Member").

WHEREAS, Loco Florida LLC ("Loco") was organized as a Florida limited liability company on May 13, 2020;

WHEREAS, the manager and owner of 100% of the limited liability company interests and member of Loco has adopted resolutions adopting and approving the conversion of Loco to a Delaware limited liability company and the adoption of this Agreement;

WHEREAS, Loco was converted to a Delaware limited liability company pursuant to Section 18-214 of the Delaware Limited Liability Company Act (6 Del. C. § 18 101, et seq.), as amended from time to time (the "Act") and the Florida Limited Liability Company Act by causing the filing of Articles of Conversion with the Secretary of State of the State of Florida and a Certificate of Conversion to Limited Liability Company and a Certificate of Formation with the Secretary of State of the State of Delaware (the "Conversion"); and

WHEREAS, in connection with the Conversion, Jonathan D. Logan, as sole owner of 100% of the limited liability company interests in Loco and sole member thereof as of immediately prior to the Conversion, was admitted as a member of the Company, owning 100% of the limited liability company interests of the Company.

The Member, by execution of this Agreement, hereby forms a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.), as amended from time to time (the "Act"), and hereby agrees as follows:

1.      **Name.** The name of the limited liability company formed hereby is Loco Florida LLC.

2.      **Certificates.** Jonathan D. Logan is hereby designated as an "authorized person" of the Company within the meaning of the Act, and has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of State of the State of Delaware, which execution, delivery and filing is hereby ratified and approved.  Upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware, the Member and each Officer (as defined below) thereupon became a designated "authorized person" of the Company and shall continue as a designated "authorized person" of the Company within the

-1-

meaning of the Act. The Member or any Officer, as an "authorized person" of the Company within the meaning of the Act, shall execute, deliver and file, or cause the execution, delivery and filing of, all certificates (and any amendments and/or restatements thereof) required or permitted by the Act to be filed with the Secretary of State of the State of Delaware. The Member or any Officer shall execute, deliver and file, or cause the execution, delivery and filing of any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct business.

3. **Purposes.** The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in any lawful act or activity for which limited liability companies may be formed under the Act and engaging in any and all activities necessary or incidental to the foregoing.

4. **Powers.** The Company, and the Member on behalf of the Company, (i) shall have and exercise all powers necessary, convenient or incidental to accomplish its purposes as set forth in <u>Section 3</u> and (ii) shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.

5. **Principal Business Office.** The principal business office of the Company shall be located at such location as may hereafter be determined by the Member.

6. **Registered Office.** The address of the registered office of the Company in the State of Delaware is c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, New Castle County, Delaware 19801.

7. **Registered Agent.** The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware are The Corporation Trust Company, 1209 Orange Street, City of Wilmington, New Castle County, Delaware 19801.

8. **Member.** The name and the mailing address of the Member are as follows:

| Name | Address |
| --- | --- |
| Jonathan D. Logan | 10491 72nd Street<br>Seminole, FL 33777 |

9. **Limited Liability.** Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member of the Company.

10. **Capital Contributions.** The Member is hereby admitted to the Company as a member of the Company upon its execution of this Agreement. The Member has

contributed such capital to the Company, if any, as is set forth in the books and records of the Company.

11. **Additional Contributions.** The Member is not required to make any additional capital contribution to the Company. However, the Member may, at any time and in its sole discretion, make additional capital contributions to the Company.

12. **Allocation of Profits and Losses.** The Company's profits and losses shall be allocated solely to the Member.

13. **Distributions.** Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Member. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to the Member on account of its interest in the Company if such distribution would violate the Act or other applicable law.

14. **Management.** In accordance with Section 18-402 of the Act, management of the Company shall be vested in the Member. The Member shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by members of a limited liability company under the laws of the State of Delaware. Notwithstanding any other provision of this Agreement, the Member, acting singly, under the title "Member", "Managing Member", or any other title or no title at all, has the authority to bind the Company and is authorized to execute and deliver any document on behalf of the Company without any vote or consent of any other person or entity.

The Member shall have the powers set forth above until the earliest to occur of his death, disability or other inability to act in such capacity, at which time the legal representative of the Member shall appoint a successor to the interest of the Member for the purpose of settling the estate or administering the property of the Member.

15. **Officers.** The Member may, from time to time as it deems advisable, select natural persons who are employees or agents of the Company and designate them as officers of the Company (the "Officers") and assign any titles to such persons (including, without limitation, President, Vice President, Secretary, and Treasurer). Unless the Member decides otherwise, if the title assigned to an Officer is one commonly used for officers of a business corporation formed under the General Corporation Law of the State of Delaware, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office. The Member may delegate to any Officer or any other person or entity any of the Member's powers under this Agreement, including, without limitation, the power to bind the Company. Any delegation pursuant to this Section 15 may be revoked at any time by the Member. An Officer may be removed with or without cause at any time by the Member. Jonathan D. Logan is hereby appointed as President, Secretary and Treasurer and shall continue to hold each such office until such time as he resigns or is removed by the Member.

-3-

16. **Other Business.** Notwithstanding any duty (including any fiduciary duty) otherwise existing at law or in equity, the Member and any Officer may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others, and the Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

17. **Exculpation and Indemnification; Waiver of Fiduciary Duties.** To the fullest extent permitted by law, no Member or Officer shall be liable to the Company or any other person or entity who is bound by this Agreement for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member or Officer. To the fullest extent permitted by applicable law, the Company shall indemnify the Member against all losses or liabilities incurred by reason of the fact that such person is or was serving as a Member or Officer and shall pay all expenses (including reasonable legal fees) incurred by a Member or Officer in defending any claim, demand, action, suit or proceeding to which such person is made or is threatened to be made a party by reason of the fact that such person is or was a Member or Officer. Notwithstanding any other provision of this Agreement or anything to the contrary existing at law, in equity or otherwise, each of the Member and each Officer shall, to the fullest extent permitted by law, owe no duties (including fiduciary duties) to the Member or the Company or any other person bound by this Agreement; provided, however, that each of the Member and each Officer shall have the duty to act in accordance with the implied contractual covenant of good faith and fair dealing.

18. **Assignments.** The Member may at any time assign in whole or in part its limited liability company interest in the Company. The transferee of a limited liability company interest in the Company shall be admitted to the Company as a member of the Company upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. If the Member transfers all of its limited liability company interest in the Company pursuant to this Section 18, such admission shall be deemed effective immediately prior to the transfer, and, immediately following such admission, the transferor Member shall cease to be a member of the Company.

19. **Resignation.** The Member may at any time resign from the Company. If the Member resigns pursuant to this Section 19, a person or entity may be admitted to the Company as an additional member of the Company upon the written consent of the resigning Member and such person's or entity's execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. If a person or entity is admitted to the Company as an additional member of the Company in connection with the resignation of the Member pursuant to this Section 19, such admission shall be deemed effective immediately prior to the resignation, and, immediately following such admission, the resigning Member shall cease to be a member of the Company.

20. **Admission of Additional Members.** Except as otherwise provided in Section 19, one or more additional members of the Company may be admitted to the Company with the written consent of the Member. A person or entity shall be admitted to the Company as

-4-

an additional member of the Company upon the written consent of the Member and such person's or entity's execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement.

21. **Dissolution.**

(a)    The Company shall dissolve and its affairs shall be wound up upon the first to occur of the following: (i) the written consent of the Member to dissolve the Company, (ii) at any time there are no members of the Company unless the Company is continued without dissolution in accordance with the Act, or (iii) the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

(b)    The bankruptcy (as defined at Sections 18-101(1) and 18-304 of the Act) of the Member shall not cause the Member to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.

(c)    In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

(d)    The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Member in the manner provided for in this Agreement and (ii) the Certificate of Formation of the Company shall have been canceled in the manner required by the Act.

22. **Severability of Provisions.**  Each provision of this Agreement shall be considered severable, and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement that are valid, enforceable and legal.

23. **Entire Agreement.**  This Agreement constitutes the entire agreement of the Member with respect to the subject matter hereof.

24. **Governing Law.**  This Agreement shall be governed by, and construed under, the laws of the State of Delaware (without regard to conflict of laws principles), all rights and remedies being governed by said laws.

25. **Amendments.**  This Agreement may not be modified, altered, supplemented or amended except pursuant to a written agreement executed and delivered by the Member.

26. **Sole Benefit of Member.**  Except as expressly provided in Section 17, the provisions of this Agreement (including Section 11) are intended solely to benefit the Member

-5-

and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any creditor of the Member or any creditor of the Company (and no such creditor shall be a third-party beneficiary of this Agreement), and the Member shall not have any duty or obligation to any creditor of the Company to make any contributions or payments to the Company or to issue any call for capital pursuant to this Agreement.

27.    **Effectiveness.**  Pursuant to Section 18-201(d) of the Act, this Agreement shall be effective as of the time of the filing of the Certificate of Formation of the Company in the office of the Secretary of State of the State of Delaware.

[SIGNATURE PAGE FOLLOWS]

RLF1 29555265v.2

DocuSign Envelope ID: DED1C1BF-787E-408A-A718-720DDE229EB0

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Agreement as of the date first written above.

**MEMBER:**

_____
Jonathan D. Logan

# EXHIBIT 38

**SMART COMMUNICATIONS HOLDING, INC.**
**DEMAND FOR A SPECIAL MEETING OF THE SHAREHOLDERS OF THE**
**CORPORATION**

March 15, 2024

*Via First Class U.S. Mail*

Smart Communications Holding, Inc.
ATTN: Secretary

In accordance with Section 607.0702(1)(b) of the Florida Business Corporation Act (the "**Act**"), I hereby demand that Smart Communications Holding, Inc. (the "**Corporation**") give notice to all Shareholders of the Corporation that a special meeting of the Shareholders (the "**Shareholders**") of the Corporation will be held on March 27, 2024, at 9:00 a.m., local time, or as soon thereafter as permitted under Section 607.0705 of the Act, at 10491 72nd St, Seminole, FL 33777, for the consideration of the following business to be transacted at the meeting:

1.  The annual election of the director/s of the Corporation.

2.  The adoption of a resolution finding the following transactions (the "**Ultra Vires Transactions**") to be ultra vires and recommending that the Board of Directors of the Corporation take action to unwind, or cause to be unwound, the Ultra Vires Transactions:

    a.  The alleged long-term note payable stemming from a memorandum dated August 29, 2023 purporting to terminate a never-before-evidenced Oral License Agreement (containing a 40% IP licensing royalty rate to a company that Jon Logan asserts he exclusively owns) between HLFIP Holding, Inc. and the Corporation.

    b.  The Exclusive Intercompany Intellectual Property License Agreement purportedly effective as of August 29, 2023 between HLFIP Holding, LLC and Smart Communication Holding, LLC, supposedly carrying forward the same novel 40% IP licensing royalty rate.

    c.  The purported 5% interest being charged on the novel 40% Oral IP royalty/liability, which was backdated to an effective date of 2015.

    d.  The purported Transfer Agreement dated August 29, 2023 between Smart Communications Holding, Inc. and Smart Communications Holding, LLC, attempting to convey all of the Corporation's assets to a newly formed Delaware LLC.

    e.  The unilateral purported adoption of the Bylaws of the Corporation by Director Consent on August 29, 2023.

_Janice Logan_
_____
Janice Logan, Trustee of the James
Logan Family Trust, dated February
10, 2021
Shareholder

# EXHIBIT 39

**SMART COMMUNICATIONS HOLDING, INC.**

**Notice of Special Meeting of Shareholders
To be held on Tuesday, May 14, 2024**

May 8, 2024

Delivery by:       First Class U.S. Mail (with copy by Email)
To:               See attached distribution list

      Please take notice that a Demand for a Special Meeting of the Shareholders of Smart Communications Holding, Inc., a Florida corporation (the "**Corporation**"), was delivered to the Secretary of the Corporation, a copy of which demand is attached hereto as **Exhibit A** (the "**Demand**"). Take further notice that, pursuant to Section 1.2 of the Bylaws of the Corporation, the undersigned hereby calls a Special Meeting of Shareholders of the Corporation, to be held on Tuesday, May 14, 2024, at 11:00 a.m. Eastern Time, by remote communication via Zoom at https://stearnsweaver.zoom.us/j/96508723642?pwd=UHlDN1prZE1WZDJUSXh4eSswdnNiQT09, in accordance with Sections 607.0702 and 607.0709, Florida Statutes. The purpose of the special meeting is to discuss the matters set forth in Sections 1 and 2 of the Demand.

      Please carefully review the contents of this Notice and any exhibits and other attachments hereto. Thank you for your attention to this matter.

      The undersigned confirms that the undersigned has called for a Special Meeting of the Shareholders of the Corporation and has requested the Secretary of the Corporation send this Notice to each Shareholder listed on the attached distribution list.

_____
Jonathan D. Logan
Director, President and Treasurer

Enclosures

## Distribution List

James Logan Family Trust, dated February 10, 2021
Attn:  Janice Logan, Trustee
c/o David E. Schoenfeld
Shook, Hardy & Bacon L.L.P.
111 S Wacker Dr.
Chicago, IL 60606

Jonathan D. Logan
c/o William Gross
Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.
200 East Las Olas Boulevard, Suite 2100 (PH-A)
Fort Lauderdale, FL 33301

<u>Exhibit A</u>

Copy of Demand for a Special Meeting of the Shareholders of the Corporation

[see attached]

**SMART COMMUNICATIONS HOLDING, INC.**
**DEMAND FOR A SPECIAL MEETING OF THE SHAREHOLDERS OF THE**
**CORPORATION**

March 15, 2024

*Via First Class U.S. Mail*

Smart Communications Holding, Inc.
ATTN: Secretary

In accordance with Section 607.0702(1)(b) of the Florida Business Corporation Act (the "**Act**"), I hereby demand that Smart Communications Holding, Inc. (the "**Corporation**") give notice to all Shareholders of the Corporation that a special meeting of the Shareholders (the "**Shareholders**") of the Corporation will be held on March 27, 2024, at 9:00 a.m., local time, or as soon thereafter as permitted under Section 607.0705 of the Act, at 10491 72nd St, Seminole, FL 33777, for the consideration of the following business to be transacted at the meeting:

1.  The annual election of the director/s of the Corporation.

2.  The adoption of a resolution finding the following transactions (the "**Ultra Vires Transactions**") to be ultra vires and recommending that the Board of Directors of the Corporation take action to unwind, or cause to be unwound, the Ultra Vires Transactions:

    a.  The alleged long-term note payable stemming from a memorandum dated August 29, 2023 purporting to terminate a never-before-evidenced Oral License Agreement (containing a 40% IP licensing royalty rate to a company that Jon Logan asserts he exclusively owns) between HLFIP Holding, Inc. and the Corporation.

    b.  The Exclusive Intercompany Intellectual Property License Agreement purportedly effective as of August 29, 2023 between HLFIP Holding, LLC and Smart Communication Holding, LLC, supposedly carrying forward the same novel 40% IP licensing royalty rate.

    c.  The purported 5% interest being charged on the novel 40% Oral IP royalty/liability, which was backdated to an effective date of 2015.

    d.  The purported Transfer Agreement dated August 29, 2023 between Smart Communications Holding, Inc. and Smart Communications Holding, LLC, attempting to convey all of the Corporation's assets to a newly formed Delaware LLC.

    e.  The unilateral purported adoption of the Bylaws of the Corporation by Director Consent on August 29, 2023.

Janice Logan, Trustee of the James
Logan Family Trust, dated February
10, 2021
Shareholder

# CONFIDENTIAL EXHIBIT 40

**Comparison of Smart Comm. Income Statement**
**2024.03.28 Version vs. 2024.04.01 Version**

|  | 2024.03.28 Version | 2024.04.01 Version | Difference |
|---|---|---|---|
|  | **[A]** | **[B]** | **[A] - [B]** |
| **Cost of Goods Sold** |  |  |  |
| Labor - Installation |  | 511,281.97 | -511,281.97 |
| Labor - Mail Processing |  | 456,298.85 | -456,298.85 |
| Labor - Repairs & Maintenance |  | 856,848.57 | -856,848.57 |
| Labor - Telephone CC Sales |  | 1,019,655.09 | -1,019,655.09 |
| **Gross Profit - Expenses** |  |  |  |
| Advertising and Promotion | 268,410.40 | 274,710.40 | -6,300.00 |
| Charitble Contributions | 17,234.84 | 18,284.84 | -1,050.00 |
| Client Welfare | 110,554.31 | 115,478.88 | -4,924.57 |
| Dues and Subscriptions | 80,521.49 | 80,513.24 | 8.25 |
| Employee Welfare | 6,196.51 | 6,400.81 | -204.30 |
| Internet Service CORP |  | 1,695.21 | -1,695.21 |
| Legal Fees | 2,982,568.28 | 3,080,225.81 | -97,657.53 |
| Meals and Entertainment | 136,374.95 | 140,984.66 | -4,609.71 |
| Office Expense | 78,835.21 | 79,205.80 | -370.59 |
| Employee Salary and Wages | 8,418,577.75 | 5,574,493.27 | 2,844,084.48 |
| Repairs and Maintenance - Other | 325,396.78 | 325,557.25 | -160.47 |
| Uniforms |  | 1,677.20 | -1,677.20 |
|  |  | **Total Difference** | **-118,641.33** |

# EXHIBIT 41



March 21, 2024

David E. Schoenfeld
111 South Wacker Drive
Chicago, Illinois 60606
t 312.704.7700
d 312.704.7723
f 312.558.1195
dschoenfeld@shb.com

**VIA ELECTRONIC MAIL**
(**cbarnett@stearnsweaver.com**)

Craig Barnett, Esq.
**Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.**
200 East Las Olas Boulevard, Suite 2100
Fort Lauderdale, Florida 33301

Re:    **Business Resolution Proposal**
       ***Jonathan Logan and Smart Communications v. Janice Logan, et al.***

Dear Craig:

Janice is sincerely interested in resolving this matter short of judicial disposition of the Company (*i.e.*, Smart Communications Holding, Inc./LLC, its related entities, and assets used or held for use in those businesses (collectively, "SmartComm" or "the Company")). The Company is most valuable as a going concern, and it is in both Jon's and Janice's best interests to control the outcome of this dispute by resolving it through a mutually agreeable business arrangement rather than subjecting the Company's fate to the blunt instruments of deadlock litigation.

To that end, we propose that Jon and the Trust enter into a shareholders' agreement containing the following provisions:

1. The agreement will establish a new Board of Directors consisting of five members: Jon, Janice (or her designee), and three outside directors (collectively, the "New Board").

2. Jon and Janice each select one of the outside directors, who in turn choose the third outside director. Each of the three new directors must meet the following qualifications:

   a. No ties (financial or personal) to Jon, Janice, SmartComm, or any of SmartComm's employees;

   b. An advanced business degree (*e.g.*, MBA or master in finance), a relevant professional license (*e.g.*, law or CPA), or at least five years of experience as

CEO or CFO of a company with at least $15 million revenue during each of the last five years of their service; and,

    c.  Not employed by or affiliated with companies in the corrections industry—to protect the Company's image and reputation.

3.  The New Board and Company management acting at its direction will be charged with positioning the Company and/or substantially all of its assets for sale in a manner and at a time intended to maximize shareholder value, but in no event more than two years after the New Board is appointed.

    a.  The New Board will retain an independent investment bank (with no financial or personal ties to Jon, Janice, SmartComm, or SmartComm employees) to manage the sale process.

    b.  The New Board will be required to accept the best offer as determined in the good faith judgment of the investment bank.

    c.  The New Board will retain independent counsel (with no financial or personal ties to Jon, Janice, SmartComm, or SmartComm employees) experienced in mergers and acquisitions transactions to counsel the Company on putting itself and/or its assets up for sale.

    d.  The New Board, the investment bank, and the independent counsel will have unrestricted access to the Company's books and records for the purpose of maximizing the sale value of the Company.

    e.  Janice understands that Jon feels strongly that certain assets should not be included in the valuation of the Company. Janice asks Jon to understand that Janice feels just as strongly that those assets should be included in the valuation and sale of the Company, and that transactions involving those assets were unlawful. Because this difference of opinion, if unresolved, would defeat Janice's goal of finding a business resolution that would maximize the value of the Company for both Jon and Janice, if they cannot reach agreement on this issue within 60 days following agreement on this proposal, then they will submit those issues to Judge Carroll for decision, and will ask the Court to expedite discovery and trial regarding these issues.

4.  If and when a sale of the Company as contemplated by Paragraph 3 above closes, Jon will receive 50% of the net proceeds of the sale and Janice will receive 50%.

5.  Janice's pending corporate claims (Counts II-V of her Amended Verified Complaint) and claims for attorneys' fees related to the Phase I final judgment will be subject to binding arbitration to occur while the New Board and management prepare the Company for sale, with any arbitration judgments, awards, or compromises being paid as an adjustment to the division of sale proceeds.

    a.  Janice would retain all rights vis-à-vis any judgment, award, or compromise, including enforcement, if a sale of the Company does not occur within two years.

6.  While the New Board and SmartComm's management work to position SmartComm for sale, Jon and Janice will receive equal distributions in addition to their current salaries of $120,000/yr. and $100,000/yr., respectively. Distributions will be made quarterly and distributions to each shareholder will total not less than 5% of net revenue (as determined by the New Board after any disagreements over related-party transactions and asset transfers are resolved by agreement or adjudicated by the Court)—and, to the fullest extent permitted by applicable law, in no event less than $1,000,000/year.

If the parties reach an agreement on a business resolution process, and for so long as Jon and SmartComm participate in good faith in that process, Janice will forbear from the following litigation steps: petitioning the Court to exercise its Fla. Stat. § 607.1430 *et seq.* "Judicial Dissolution" powers to appoint a custodian/receiver and/or provisional directors and enter such other equitable relief as it deems appropriate; pursuing pending corporate claims and claims for attorneys' fees related to the Phase I final judgment (which would be resolved by arbitration); and pursuing all other currently pled or available claims, including but not limited to claims regarding the related-party intellectual property transactions, Delaware conversions, and Delaware asset transfers.

To effectuate that forbearance, the parties would agree to stay the litigation and toll all currently pled or available claims while the business-resolution agreement remains in effect, except for claims to be arbitrated under Paragraph 5 and any dispute over related-party intellectual property transactions, Delaware conversions, Delaware asset transfers submitted to the Court pursuant to Paragraph 3e. In turn, Jon's pending appeals and appellate motion(s) would be stayed as well.

The Court and Judge Carroll would retain jurisdiction over the matter during the agreed stay, and the parties would consent to the Court's jurisdiction over any disputed asset questions submitted to the Court pursuant to Paragraph 3e.

*** 

We hope that you and your client will consider this proposal seriously, and we welcome any questions or comments you may have. While we recognize that further discussion and drafting



March 21, 2024
Page 4

will be necessary if the parties elect to pursue this proposal, we ask that you advise us on or before March 28, 2024 whether or not Jon wishes to pursue further discussion of this proposal.

Best Regards,

*/s/ David E. Schoenfeld*

David E. Schoenfeld

cc:    Michael J. Harwin
       Charles F. Johnson III
       Andrew L. Franklin

# EXHIBIT 2

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,

                       Plaintiffs,

v.

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust, dated February 10, 2021,
the ESTATE OF JAMES LOGAN, JUSTIN
PETERSON, ALEXIS LOGAN, and UNNAMED
CURATOR

                       Defendants.

_____

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021,

                       Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., SMART
COMMUNICATIONS HOLDING, LLC, HLFIP
HOLDING, INC, AND HLFIP HOLDING, LLC,

                       Counterclaim Defendants.

_____

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021, and
derivatively on behalf of Smart Communications
Holding, Inc.,

                       Plaintiff,

      v.

JONATHAN D. LOGAN,
SMART COMMUNICATIONS HOLDING, INC.,
nominal defendant, SMART COMMUNICATIONS
HOLDING, LLC, HLFIP HOLDING, INC., HLFIP
HOLDING, LLC, LOCO FLORIDA LLC, and
SMART COMMUNICATIONS YACHT
HOLDING, LLC,

                       Defendants.

_____/

Case No. 2023-CA-1002-NC

(CONSOLIDATED)

Case No.: 2023-CA-1280-NC

## FIRST AMENDED COMPLAINT

Plaintiffs, Jonathan D. Logan and Smart Communications Holding, Inc., by and through their respective undersigned counsel, hereby sue Defendants, Janice Logan, individually and as Trustee of the James Logan Family Trust dated February 10, 2021, the Estate of James Logan, Justin Peterson, Alexis Logan, and Unnamed Curator, and states in support:

### The Parties

1.      Plaintiff, Jonathan D. Logan ("Jon"), is a resident of Pinellas County, Florida. He is the natural son of James Logan and Janice Logan.

2.      Plaintiff, Smart Communications Holding, Inc. ("Smart Communications") is a Florida profit corporation with its principal place of business in Pinellas County, Florida. Smart Communications is a national provider of inmate communication services and it provides those services under contracts with various correctional facilities.

3.      James Logan was a resident of and domiciled in Sarasota County, Florida at the time of his death on October 16, 2022. He was married to Janice at the time of his death. James Logan shall hereinafter be referred to as the "Decedent," or "The Estate."

4.      Defendant, Janice Logan ("Janice") is a resident of Sarasota County, Florida. Janice is the current Trustee of the James Logan Family Trust, dated February 10, 2021 ("Trust"). As Trustee, Janice is responsible for the debts of the Estate pursuant to Section 733.707(3), Florida Statutes. Janice is also named as the personal representative in Decedent's Will, though she has failed to fulfill her duty to open the estate.

5.      Defendant, Alexis Logan ("Alexis") is a resident of Sarasota County, Florida. She is the natural daughter of James Logan and Janice Logan, and Jon's sister.

6.      Defendant, Justin Peterson ("Peterson") is a resident of Sarasota County, Florida.

He is married to Alexis Logan.

7.      Plaintiffs, as creditors of the Estate, have filed a statement of claim against, and petitioned to open, the Estate. A copy of the petition to appoint curator and statement of claim is attached hereto as **Exhibit "A."** Plaintiffs have also moved to appoint a curator in that action because Janice has failed to fulfill her duty to open the Estate as the personal representative identified in the Will. Janice deposited the Will in Case No. 2022 WL 001853 NC (12th Jud. Cir., Sarasota County) over a year and a half ago, but has not taken any steps to open the estate to allow creditors (including Plaintiffs) to file a statement of claim. The Unnamed Curator is the curator to be assigned in that pending case.

## Decedent's Estate Plan

8.      Decedent executed what purports to be a Last Will and Testament (the "Will") on February 10, 2021, a copy of which is attached hereto as **Exhibit "B."** On the same date, Decedent executed what purports to be the James Logan Family Trust (the "Trust"), a copy of which is attached hereto as **Exhibit "C."**

9.      The Will is a pour-over will, devising all of Decedent's assets (except for some tangible personal property) to the Trust, after all expenses and debts of Decedent's Estate have been paid.

10.     The Will nominates Janice as Personal Representative of the Decedent's Estate. The Trust designates Janice and the Decedent as Co-Trustees during the Decedent's life and provides that Janice becomes the sole Trustee upon Decedent's death.

11.     The Decedent was the beneficiary of the Trust during his life. The Trust provides that upon Decedent's death, the beneficiaries are Janice, Jon, and Alexis, although the Trust provides that the Trust estate shall be held for the primary benefit of Janice.

**Venue and Standing for Probate and Trust Administration Purposes**

12.     Venue in this action is proper because any probate estate of the Decedent would be opened in Sarasota County, Florida pursuant to Section 733.101, Florida Statutes, and because Janice is a resident of Sarasota County, Florida.

13.     Additionally, the principal place of administration of the Trust is Sarasota County, Florida, pursuant to Section 736.0108, Florida Statutes. Venue therefore lies in Sarasota County pursuant to Section 736.0204, Florida Statutes.

14.     Venue in Sarasota County is also proper pursuant to Section 736.0202, Florida Statutes, because Janice, Jon, and Alexis are beneficiaries of the Trust.

15.     Jon is expressly identified as a beneficiary of the Trust. *See*, *e.g.*, Trust, ¶¶ 5.3(b)2.B-C (identifying circumstances for specific allocations from the Trust to Jon). Janice has admitted under penalty of perjury that Jon has a beneficial interest in the Trust. Janice further admitted that she has taken steps to eliminate Jon's interest in the Trust (allegedly by exercising the power of appointment under subparagraph 5.3(b)1 in favor of substrusts created under a revocable trust agreement for the benefit of Alexis and her descendants), presumably for the purpose of attempting to deprive Jon of standing. However, the conditions precedent for Janice's limited power of appointment to be effective have not yet occurred; *i.e.*, Janice has not yet died. More importantly, Janice's purported appointment is ***revocable***. Accordingly, until Janice's death, a possibility remains that Janice's "limited power of appointment [will not be] validly exercised in whole or in part," in which case any remaining trust res "shall be distributed" in a manner that expressly benefits Jon. *See*, *e.g.*, Trust, ¶¶ 5.3(b)2.B-C. Jon therefore qualifies as a beneficiary of any probate estate to be opened for the Decedent given the interrelationship between the Will and the Trust. Jon therefore has standing to bring claims related to his father's

estate and Jon will be entitled to notice of probate administration.

16.     To the extent that Janice's will does not devise all of the Trust's assets upon her death, the Trust provides that the "Trustee shall allocate any interest which may be held by or come into the trust estate in LOCO FLORIDA, LLC, a Florida limited liability company, to a separate trust for the primary benefit of JON LOGAN." *See* Trust, ¶ 5.3(b)2.B. Moreover, after certain such allocations are made from the Trust, the "Trustee shall divide the remaining trust estate . . . into shares of equal value, creating one such share for each child of the Settlor . . . .," which would include a share for Jon as a child of the Settlor. *See* Trust, ¶ 5.3(b)2.C. As a result, Jon is a qualified beneficiary of the Trust under Florida Statutes because he would be a permissible distributee under the Trust if Janice's interest under the Trust terminates. *See* § 736.0103(19)(b), Florida Statutes.

17.     In addition to being a qualified beneficiary of the Trust and a beneficiary of the to-be-opened probate estate, Jon is an "interested person" with standing and rights under the Probate Code (Chapter 733) and the Trust Code (Chapter 736). In particular, Section 731.201(23), Florida Statutes, defines an interested person as "any person who may reasonably be expected to be affected by the outcome of the particular proceeding involved."

18.     Jon will be "affected by the outcome" of the probate and Trust administration of the Decedent in various ways because he is a beneficiary of any probate estate, he is a beneficiary under the Trust, and he is the only other owner of Smart Communications.

19.     Smart Communications also qualifies as an "interested person" because it is reasonably expected to be affected by the outcome of this proceeding. Further, Smart Communications is a creditor of the Estate and has a pending statement of claim.

**Jon's and the Decedent's Co-Ownership of the Corporations**

20.     Jon and his father, the Decedent, were each 50% shareholders in the Plaintiff, Smart Communications, before Decedent purportedly transferred his ownership interest in Smart Communications to the Trust. Jon and the Decedent were the only directors of Smart Communications. Jon was and remains the sole director and sole operating officer (holding all registered officer positions) of Smart Communications and he conducts its day-to-day operations, although the Decedent largely handled the financial aspects of Smart Communications when he was alive. Indeed, Jon did not learn of a massive tax bill created by Decedent until after Decedent's death.

21.     Shortly before Decedent's death, Decedent purportedly transferred his ownership interest in Smart Communications to the Trust pursuant to the Stock Power dated September 16, 2022, a copy of which is attached hereto as **Exhibit "D."**

22.     Janice has attempted to leverage the Trust's negotiating position. Janice believes that if the Trust can retain a passive 50% ownership interest in Smart Communications, the company or Jon or both will have to pay her half of what she claims Smart Communications is worth, even if a legitimate valuation does not bear out that value. Janice has used the Trust's 50% stake in Smart Communications to cause the Trust to assert several outrageous demands. Her apparent goal is to leverage those demands until the company or Jon relents and pays the Trust an unwarranted premium for its interest in Smart Communications. But this strategy makes no sense. Janice's tactics are detrimental to Smart Communications and thus deprive the Trust of the capital and liquidity it needs (and which the Decedent wanted the Trust to have) to financially backstop the Decedent's probate estate and pay his creditors.

23.     On information and belief, the Decedent has creditors that cannot be paid without

6

the Trust selling its interest in Smart Communications. Decedent was, for instance, named a party defendant to a pending lawsuit. Presumably, the full extent of the Decedent's debts and the identity of his creditors will be revealed when a probate estate is eventually opened.

24.    It does not appear, however, as if Janice has opened any probate estate for the Decedent, despite being the presumptive Personal Representative. Jon has not been provided with any Notice of Administration. Jon has been unable to find such a Notice after a search of public records in Sarasota County.

25.    As creditors of the Estate, Plaintiffs have filed a statement of claim against the Estate, and a petition to appoint a curator, which are pending. *See* **Exhibit A**.

### Jon's Creation of Smart Communications

26.    Jon first conceived of the idea for Smart Communications in 2008. Smart Communications provides innovative communication technologies and services to correctional facilities, in part through its exclusive license with HLFIP Holding, LLC ("HLFIP"), including electronic messaging, electronic requests and grievances, electronic delivery of routine postal mail and legal mail, and phone and video visitation services. Jon first conceived of the idea for Smart Communications in 2008 and created the world's first inmate email system. However, Smart Communications' business model and technology offering began to change in 2015 from a simple inmate email system, to what Smart Communications offers now – innovative communication technologies and services to correctional facilities.  Smart Communications' services are provided through its exclusive license with HLFIP Holding, LLC ("HLFIP"), under which license Smart Communications has the right to use HLFIP's intellectual property ("IP") and other intangibles as they relate to the communications technologies offered including e-mail, electronic requests, and grievances, SMS short text messaging to mobile phones, electronic delivery of routine postal mail and legal mail, and phone calls, video visitation services,

education and reentry services, streaming entertainment services and inmate wearable devices, interactive inmate fitness equipment, as well as numerous new investigative technologies.

27.     Smart Communications' technologies and services are designed to enhance the efficiency of correctional facilities and to ensure the safety of staff and the inmate population.

28.     Jon conceived of all the ideas for intangibles and IP that made Smart Communications into the company it is today.

29.     Jon designed all the proprietary hardware, software, and technology offerings, while also directing the marketing, branding, and human resources (including the hiring and management of over one hundred (120) employees in twenty-six (26) states).

30.     Although Jon had already started working on his idea for Smart Communications alone, Jon invited his father, Decedent, to join him as 50/50 partners in Smart Communications. Jon is President and CEO, and Jim was CFO and principally responsible for the accounting and corporate structure of Smart Communications until his passing in October 2022.

31.     Janice (Jon's mother) and co-defendant, Alexis (Jon's sister) played no part in the company's creation or operations.

32.     Despite having no involvement with the company whatsoever, after Jim's passing, Janice and Alexis besieged Jon and Smart Communications with increasing demands backed by threats against the company's business and Jon personally that would potentially destroy the good standing and reputation of both Smart Communications and Jon.

33.     These threats culminated in Janice's demand that her son pay her one hundred million dollars ($100,000,000) as ransom for the Trust's shares of the company Jon created and ran for more than fifteen (15) years.

**Jon's Creation of the IP and HLFIP, and Smart's License to Use the IP**

8

34. Cognizant of his familial strife and mistrust, Jon sought to protect himself from the simmering greed within his family. Jon created HLFIP in 2015—long before the current lawsuit or the Decedent's passing—to achieve this goal and solely own the IP he created.

35. Jon created HLFIP in part because of Alexis's intransigence regarding the Smart Communications stock ownership. While Jon and the Decedent were 50/50 partners in Smart Communications, Alexis originally held both Decedent and Jon's shares in Smart Communications for them in trust with the agreement that she would transfer the stock to Jon and Jim. When Jon and Jim asked Alexis to transfer the shares back to them, she refused.

36. Because of Alexis' refusal to transfer the shares and Jon's continued desire to continue his innovations in the corrections industry, Jon prepared a written contract for Decedent and Alexis to sign in 2015. They signed that agreement; it is attached hereto as **Exhibit "E."** In that contract, Decedent and Alexis agreed that Jon individually (and *not* Smart Communications) would exclusively own and control any new IP (*created from that day forward*).

37. Although Jon, the Decedent, and Alexis agreed Alexis would return the respective shares she held in trust, she refused to honor that agreement for years.

38. Ultimately, Alexis relented in 2018 and returned the shares of Smart Communications to Jon as promised.

39. Jon, Jim, and Alexis understood that the 2015 agreement protected Jon's exclusive interest in the IP, which Jon assigned to his IP holding company, HLFIP.

40. Smart Communications used the IP owned by HLFIP under a well-documented oral license with HLFIP referenced in over 100 of its government contracts and in the depositions of both Jon and Decedent.

41. The oral license between Smart Communications and HLFIP worked when Jon

and Decedent were collaborating to grow Smart Communications' business. After Decedent passed and Janice started trying to extract a disproportionate share of that business (which was never supposed to happen based on the long-standing agreements between Jon and Jim to force the immediate sale of any shares of the surviving partner that may have passed to their respective heirs), Smart Communications and HLFIP needed to formalize the economics of their business deal.

42.     This need also raised a tax issue for both Smart Communications and HLFIP. Under section 482 of the Internal Revenue Code ("IRC") and Treas. Reg. § 1.482-1(b)(1), taxpayers under common control must price their transactions under the arm's-length standard: "A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances."

43.     To assess the economics of the license between Smart Communications and HLFIP and to ensure both entities comply with their tax obligations (and were protected from the penalties that can apply to taxpayers with controlled transactions that do not meet the arm's-length standard), HLFIP obtained a transfer pricing documentation study by Marcum, LLP ("Marcum"), an independent accounting firm.

44.     Marcum determined, based on comparable license agreements between uncontrolled taxpayers, that the arm's-length price for the royalty that Smart Communications owed to HLFIP for its exclusive IP license was 40% of Smart Communications' net sales.

**Decedent and Jon's Financial Arrangement for Operating Smart Communications**

45.     Jon and the Decedent were the sole officers, directors and shareholders of Smart Communications. Nevertheless, both were substantially underpaid for their work as officers and

directors of Smart Communications. In fact, Jon did not receive a salary for eight years (and a severely reduced salary thereafter) based on direction from, and a verbal agreement with, Decedent.

46.     Occasionally, the Decedent agreed that Jon would receive some assets for his work as an officer and employee of Smart Communications.

**Decedent, Janice, Alexis, and Peterson Raid Smart Communications to Enrich Themselves**

47.     After Decedent passed away, Jon learned that Decedent withdrew hundreds of thousands of dollars in cash from Smart Communications for his own benefit, for the benefit of Janice, and for the benefit of Alexis and her husband, Peterson. These substantial cash withdrawals had nothing to do with Smart Communications' business, or any purported services provided to Smart Communications, and occurred without Jon's knowledge or consent.

48.     Similarly, Decedent, Janice, Alexis and her husband, Peterson, caused Smart Communications to pay for numerous personal expenses and extravagant purchases, none of which had anything to do with Smart Communications' business, nor were paid in return for any services provided to Smart Communications, and occurred without Jon's knowledge or consent.

49.     Specifically, approximately $23,639 of Smart Communications' corporate funds was used to purchase a 2015 BMW for Janice, without Jon's knowledge or consent.

50.     In late 2019/early 2020, Alexis married her husband Peterson. Upon information and belief, and without Jon's knowledge or consent, Decedent used Smart Communications' funds, resources, and premises to host and pay for this wedding.

51.     Further, in 2021, Smart Communications maintained several accounts with a financial institution formerly known as Englewood Bank. Jon had no access to those accounts.

52.     In an email dated July 19, 2021, Smart Communications' CPA stated that the Englewood Smart Communications' credit card balance comprised "mostly personal expenses

belonging to Alexis" and that another credit card account was "almost all Alexis personal expenses." Jon had no access to those accounts and had no knowledge that Alexis was using Smart Communications' corporate funds for her own personal benefit, again, while providing no services to Smart Communications as an employee or otherwise.

53.    Decedent also bought extravagant jewelry for the benefit of Janice using Smart Communications' funds. On January 3, 2022, Janice forwarded Decedent an email with information related to a Cartier 6.08 carat Diamond Platinum Engagement ring from Wilson's Jewelry, "to make it easier for you." According to the email, the ring was priced at $148,500.

54.    Decedent thereafter withdrew about $150,000 from Smart Communications and, upon information and belief, purchased the diamond platinum engagement ring for Janice without Jon's knowledge or consent.

55.    On June 29, 2022, Alexis emailed Decedent a link to, and specifications for, a 2019 BMW 750i sedan with VIN WBA7F0C52KGM25571 (the "2019 BMW"). The following day, Alexis sent Decedent wiring instructions for the 2019 BMW in an amount of $109,070. Decedent wired Smart Communications' corporate funds to purchase the 2019 BMW without Jon's knowledge or consent. The 2019 BMW was registered in Peterson's name.

56.    In July 2022, Decedent, Janice and Alexis signed a Buy-Sell Agreement for a $1,205,000 vacation home on Lake Michigan and upon information and belief it was either paid for, or intended to be paid for, using Smart Communications' corporate funds without Jon's knowledge or consent.

57.    On July 22, 2020, Alexis forwarded to Decedent an email from the Bank of England related to a loan for approximately $555,000. On information and belief, Alexis was requesting Decedent use Smart Communications' corporate funds to pay a portion (or the full

amount) of her loan without Jon's knowledge or consent.

58.     Furthermore, without Jon's knowledge or consent, Decedent expropriated Smart Communications' corporate funds via cash withdrawal, check, and credit card charges. Decedent himself took more than $739,290 ($681,310 of that amount via cash withdrawals). And Janice received more than $242,089 ($119,500 in cash withdrawals).

59.     Also without Jon's knowledge, Decedent titled in his personal name a 2020 Chevrolet Corvette for approximately $94,836, using Smart Communications' corporate funds, which was intended to be titled in Smart Communications' name.

60.     Upon information and belief, Decedent also purchased an additional Stingray Corvette using Smart Communications' corporate funds (collectively "the Corvettes") for himself. Upon information and belief, Janice sold the Corvettes immediately after Decedent's death and pocketed the cash from the sales and did not return the corporate funds used to make the purchases back to Smart Communications or remit the sale proceeds to the Estate for the payment of creditors.

### Janice's Attempts to Remove Jon as a Beneficiary of the Trust

61.     Janice executed a Last Will and Testament on January 20, 2023 ("Janice's Will").

62.     Janice claims that Janice's Will exercised the testamentary power of appointment allegedly granted by subparagraph 5.3(b)1. of the Trust such that, upon her death, all remaining Trust res will be transferred to separate sub-trusts. The sub-trusts are trusts within the Trust created solely for the benefit of Alexis and her descendants. Put simply, Janice's Will attempts to disinherit Jon upon her death.

63.     However, the sub-trusts were created pursuant to a ***revocable*** trust agreement. Accordingly, until Janice's death, the trust agreement creating the sub-trusts can be revoked. A

possibility therefore also remains that Janice's "limited power of appointment" will not be "validly exercised in whole or in part," in which case any remaining trust res "shall be distributed" in accordance with subparagraph 5.3(b)2. of the Trust, which includes allocations expressly benefitting Jon. *See*, *e.g.*, Trust, ¶¶ 5.3(b)2.B-C.

64.     Decedent established the Trust with an expressed desire to benefit Jon, Janice maliciously defied that intent by leaving the entirety of the Trust res to her daughter for the sole purpose of preventing Jon from receiving any allocation that Decedent intended from the Trust and attempting to deprive Jon of standing in relation to the Trust and/or Estate.

65.     Upon information and belief, the trust agreement creating the sub-trusts for Alexis's benefit are revocable because Janice executed that agreement for the sole purpose of attempting to deprive Jon of access to the Trust res and to gain an advantage in litigation while retaining the power to undo the sub-trusts after the litigation ceases.

**After Decedent's Death, Janice Continued to Cause Smart Communications
to Pay for Her Personal Expenses**

66.     Notwithstanding the fact that Janice never provided any services for Smart Communications, Janice has continued living in a ten (10) acre gated mansion owned by Smart Communications ("Ranch Club Mansion") rent free after Decedent passed away in October 2022.

67.     Since then, and without Jon's knowledge (until recently) Janice has caused Smart Communications to pay for multiple extravagant personal expenditures related to the Ranch Club Mansion, in excess of $224,000, none of those expenses has anything to do with the Smart Communications' business. Janice either caused Smart Communications' accountant to pay third parties directly or received reimbursement from Smart Communications for those expenses.

68.     Those expenses include (but are not limited to): $83,359 for landscaping; $6,451

for pool maintenance; and miscellaneous painting expenses totaling more than $21,000.

69.     Specifically, Janice has submitted bills for payment for barn repair as well as a chimney and barn doors, presumably for a horse stable located on Ranch Club Mansion property. Upon information and belief, Janice does not keep horses on the property. In any event, Smart Communications has no investments in horse farming and horses are wholly unrelated to its business. Through an internal misunderstanding or oversight, Smart Communications paid for all of those expenses, notwithstanding the fact that those expenses were not for the benefit of Smart Communications.

70.     All conditions precedent have occurred or have otherwise been waived.

<u>**COUNT 1**</u>
**UNJUST ENRICHMENT – THE ESTATE**
**(Smart Communications Against The Estate)**

71.     Plaintiff, Smart Communications, realleges the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

72.     Decedent withdrew funds from Smart Communications during his life, which were not for the benefit of Smart Communications.

73.     Thereafter, Decedent used the money he withdrew from Smart Communications and made extravagant purchases for his own benefit. For example, Decedent used Smart Communications' corporate funds to purchase for himself the Corvettes.

74.     Thus, Smart Communications conferred a benefit on Decedent.

75.     Decedent had knowledge of the benefits conferred as the recipient of those funds and extravagant purchases.

76.     It would be inequitable for the Estate to retain those funds and extravagant purchases or the value of those extravagant purchases.

77.    There is no adequate remedy at law in the absence of this claim against the Estate.

WHEREFORE, Plaintiff Smart Communications demands judgment in its favor and against the Estate, including:

a.  Granting a constructive trust over the proceeds from any sale of the Corvettes. Or providing restitution to Smart Communications for, or otherwise disgorging the Estate of, the full value of the funds used to purchase the Corvettes;

b.  Providing restitution for funds taken by the Decedent from Smart Communications that were not used for the benefit of Smart Communications;

c.  Awarding Smart Communications the return of its corporate funds, or the value of the services rendered or assets purchased with its corporate funds; or

d.  Providing restitution to Smart Communications for, or otherwise disgorging the Estate of, the full value of the funds withdrawn and the items and services purchased; and

e.  Smart Communications' attorneys' fees and costs pursuant to Fla. Stat. § 607.0746; and,

f.  Such other and further relief as this Court seems just and proper.

## COUNT 2
## UNJUST ENRICHMENT – JANICE
### (Smart Communications Against Janice Personally)

78.    Plaintiff, Smart Communications, realleges the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

79.    Decedent withdrew funds from Smart Communications during his life that were not for the benefit of Smart Communications.

80.    Thereafter, Decedent used the money he withdrew from Smart Communications

and made extravagant purchases for the benefit of Janice, individually. For example, on January 3, 2022, Janice emailed Decedent a link to a Cartier 6.08 carat Diamond Platinum Engagement Ring for $148,500 (the "Ring") with a message that said: "Here you go, to make it easier for you!" Decedent then made a cash withdrawal of approximately $150,000 from Smart Communications' corporate funds. Janice and Decedent knew that the Ring was paid for using Smart Communications' funds.

81.     Additionally, approximately $23,639 of Smart Communications' corporate funds were used to purchase the 2015 BMW for Janice. Janice and Decedent knew that the 2015 BMW was paid for using Smart Communications' funds.

82.     Janice also has custody of a 2020 Cadillac SUV purchased using approximately $90,000 of Smart Communications' corporate funds. Decedent previously drove it as a corporate vehicle while providing services to Smart Communications, but Janice (who provides no services to Smart Communications) refuses to relinquish custody of the vehicle.

83.     Moreover, Janice sold assets that Decedent purchased with Smart Communications' corporate funds and kept the cash gained from the sale.

84.     Janice also personally used Smart Communications funds (comprising approximately $119,500 in cash withdrawals and another $122,588.85 in credit card charges and/or checks) that were not for the benefit of Smart Communications.

85.     Smart Communications therefore conferred a benefit on Janice.

86.     Janice has knowledge of the benefits conferred as the recipient of those funds and extravagant purchases.

87.     It would be inequitable for Janice to retain those extravagant purchases or the value of those extravagant purchases.

88.     There is no adequate remedy at law in the absence of this claim against Janice.

WHEREFORE, Plaintiff Smart Communications demands judgment in its favor and against Janice Logan, individually, including:

a.   Granting Smart Communications a constructive trust over the Ring and the 2015 BMW, and/or,

b.   Providing restitution to Smart Communications for the full value, or otherwise disgorging Janice of the Ring and the 2015 BMW,

c.   Providing restitution to Smart Communications for the full value of the Cadillac SUV and reasonable rental value during the period of Janice's unlawful retainer of possession;[1]

d.   Providing restitution to Smart Communications for the value of the assets sold by Janice,

e.   Providing restitution to Smart Communications for the full value of the funds withdrawn or utilized by Janice,

f.   Smart Communications' attorneys' fees and costs pursuant to Fla. Stat. § 607.0746; and,

g.   Such other and further relief as this Court seems just and proper.

### COUNT 3
### UNJUST ENRICHMENT - TRUSTEE
### (Smart Communications Against Janice as Trustee)

89.     Plaintiff, Smart Communications, realleges the allegations in paragraphs 1

---

[1] Smart Communications recognizes that the injunction currently in place, albeit subject to a pending appeal, prohibits "any suits in Sarasota County demanding … rents apparently owed on Smart Communications … owned property, and related replevin actions of alleged company owned vehicles," (DIN# 169), and will stay any pursuit, or attempted enforcement, of this requested relief while the injunction is still in place. Nevertheless, Smart Communications asserts this requested relief in an abundance of caution to avoid the potential of being later foreclosed for statute of limitations, laches, or other alleged deficiencies.

through 70 above as if fully incorporated herein.

90.     After Decedent passed away, Janice continued to reside at the Ranch Club Mansion owned by Smart Communications. After numerous requests to relinquish the Ranch Club Mansion to allow Smart Communication to liquidate the residence for much-needed operating capital, Janice refused, ostensibly as Trustee of the Trust. Janice has never paid one dime of rent or other compensation in exchange for living there for nearly two years after Decedent passed, notwithstanding that Smart Communications has no death benefit provision for surviving spouses of its officers and directors, documented or otherwise.

91.     Janice has caused Smart Communications to pay for multiple unnecessary extravagant expenditures related to the Ranch Club Mansion, and other personal expenses, in excess of $224,000.00, including $83,359 for landscaping; $15,000 for driveway cleaning, $6,451 for pool maintenance; and miscellaneous painting expenses totaling more than $21,000. Janice either caused Smart Communications to pay third parties directly or received reimbursement from Smart Communications for those expenses.

92.     Janice has also caused Smart Communications to pay bills for barn repair as well as a chimney and barn doors, presumably for a horse stable located on Ranch Club Mansion property.

93.     The services rendered at the Ranch Club Mansion were not performed, nor were the payments thereof made, for the benefit of Smart Communications. Rather, such services and payment solely benefited Janice and the Trust.

94.     Smart Communications therefore conferred a benefit on Janice individually and as Trustee.

95.     Janice has knowledge of the benefits conferred as the recipient of those funds and

services.

96.     It would be inequitable for Janice to retain the value of the payment for those services.

97.     There is no adequate remedy at law in the absence of this claim against Janice.

WHEREFORE, Plaintiff Smart Communications demands judgment in its favor and against Janice Logan, as the Trustee of the Trust, including:

a.  Providing restitution to Smart Communications for the full value of the funds withdrawn or taken by Janice,

b.  Awarding a reasonable value for back rent for the Ranch Club Mansion,[2]

c.  Smart Communications' attorneys' fees and costs pursuant to Fla. Stat. § 607.0746; and,

d.  Such other and further relief as this Court seems just and proper.

## COUNT 4
## UNJUST ENRICHMENT - ALEXIS
### (Smart Communications Against Alexis)

98.     Plaintiff, Smart Communications, realleges the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

99.     Smart Communications' corporate funds were repeatedly used to benefit Alexis without any knowledge or authorization from Jon.

100.    For example, Alexis used a Smart Communications' credit card account for personal expenses. Jon had no access to those accounts and was not aware Alexis was spending

---

[2] As previously explained (*see* fn. 1), Smart Communications recognizes that the injunction currently in place, albeit subject to a pending appeal, prohibits "any suits in Sarasota County demanding … rents apparently owed on Smart Communications … owned property, and related replevin actions of alleged company owned vehicles," (DIN# 169), and will stay any pursuit, or attempted enforcement, of this requested relief while the injunction is still in place. Nevertheless, Smart Communications asserts this requested relief in an abundance of caution to avoid the potential of being later foreclosed for statute of limitations, laches, or other alleged deficiencies.

corporate funds.

101.    In July 2022, Decedent, Janice and Alexis signed a Buy Sell Agreement for a $1,205,000 vacation home on Lake Michigan. On information and belief, this was purchased, or intended to be purchased with Smart Communications' funds.

102.    Thus, Smart Communications repeatedly conferred a benefit on Alexis.

103.    Alexis has knowledge of the benefits conferred as the recipient of those items purchased using Smart Communications' funds.

104.    It would be inequitable for Alexis to retain those purchases or the value of those purchases.

105.    There is no adequate remedy at law in the absence of this claim against Alexis.

WHEREFORE, Plaintiff Smart Communications demands judgment in its favor and against Alexis Logan, including:

a.  Providing restitution to Smart Communications for the expenses paid for the benefit of Alexis;

b.  Smart Communications' attorneys' fees and costs pursuant to Fla. Stat. § 607.0746; and,

c.  Such other and further relief as this Court seems just and proper.

### COUNT 5
### UNJUST ENRICHMENT - PETERSON
#### (Smart Communications Against Peterson)

106.    Plaintiff, Smart Communications, realleges the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

107.    During his life, Decedent used Smart Communications' corporate funds to make purchases that were not for the benefit of Smart Communications and which were without Smart

Communications or Jon's knowledge or consent.

108.    For example, on or about June 23, 2022, approximately $109,070 of Smart Communications' corporate funds were used to purchase the 2019 BMW, which 2019 BMW was then registered in Peterson's name.

109.    Thus, Smart Communications conferred a benefit on Peterson.

110.    Peterson has knowledge of the benefits conferred as the recipient of those extravagant purchases.

111.    It would be inequitable for Peterson to retain those extravagant purchases or the value of those extravagant purchases.

112.    There is no adequate remedy at law in the absence of this claim against Peterson.

WHEREFORE, Plaintiff Smart Communications demands judgment in its favor and against Peterson, including:

a.  Granting Smart Communications a constructive trust over the 2019 BMW and any other items purchased with Smart Communications' corporate funds; or,

b.  Providing restitution to Smart Communications for the full value, or otherwise disgorging Peterson, of the 2019 BMW and any other items purchased with Smart Communications' corporate funds; and

c.  Smart Communications' attorneys' fees and costs pursuant to Fla. Stat. § 607.0746; and,

d.  Such other and further relief as this Court seems just and proper.

## COUNT 6
## CONSTRUCTIVE FRAUD
### (Jon Against Decedent's Estate)

113.    Plaintiff, Jon Logan, realleges the allegations in paragraphs 1 through 70 above as

if fully incorporated herein.

114.    Jon, raised from birth by Decedent, shared a confidential and/or fiduciary relationship with his father.

115.    Jon is solely responsible for creating the concept, business plan, and IP that has made Smart Communications so successful. Jon invited Decedent to become involved with Smart Communications based on his belief that he could trust his father to protect Jon and to act in Jon's best interest. Decedent accepted the trust and confidence Jon placed in Decedent by accepting that invitation.

116.    Decedent betrayed Jon's trust and confidence by making massive withdrawals from, and purchasing expensive items with, Smart Communications' corporate funds. Jon suffered damages as a result because, by depleting Smart Communications' corporate funds, Decedent significantly reduced the value of Jon's share.

117.    Decedent further betrayed Jon's trust and confidence by failing to take steps to ensure that Jon was appropriately compensated for Jon's services for the use of Jon's IP. Failure to properly compensate Jon disproportionately benefitted Decedent (because it meant that the amounts that should have been paid to Jon individually were instead split equally with Decedent). Jon was damaged because: (a) he received no compensation for his services for approximately eight years, and was severely underpaid thereafter; and (b) Jon's wholly owned entity, HLFIP, has not received any royalties from Smart Communications.

118.    This betrayal has also imposed litigation costs on Jon. If Jim had committed to writing his earlier agreement with Jon about the Smart license with HLFIP (namely that Smart owed material royalties to HLFIP for the IP that everyone agreed was owned by Jon and HLFIP), Jon would not be facing the baseless and uneconomic arguments Janice now raises about a

purported royalty-free license. Decedent's actions were taken in his individual capacity and in furtherance of his own personal financial gain.

WHEREFORE, Plaintiff Jon Logan demands judgment in its favor and against Decedent's Estate, including:

a. Disgorging the Estate of, or otherwise awarding Jon, the value of the benefit derived by Decedent's betrayal; and

b. Such other and further relief as this Court seems just and proper.

### COUNT 7
### CONVERSION
### (Plaintiffs Against the Estate)

119.    Plaintiffs reallege the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

120.    Decedent made numerous withdrawals from Smart Communications' corporate funds.

121.    Decedent used those corporate funds to make purchases, including jewelry, cars, houses, cosmetic and medical procedures, and wedding incidentals.

122.    For example, Decedent withdrew the specific amount needed to purchase the Ring. Separately, Decedent wired the specific amount needed to purchase the 2019 BMW and the vacation home on Lake Michigan.

123.    Decedent was not authorized to allow Janice, Alexis, or Peterson to take custody of those corporate assets.

124.    Plaintiffs have demanded return of the corporate funds and assets or such demand would be futile.

125.    Plaintiffs have been deprived of access to the corporate funds and assets.

126.    As co-owner of Smart Communications, Jon was entitled to 50% of the corporate funds and the assets purchased with such funds.

WHEREFORE, Plaintiffs demand judgment in their favor and against Decedent's Estate, including:

a.  Granting Plaintiffs return of the funds; or

b.  Granting Plaintiffs access to the assets; or

c.  Awarding Jon 50% of the reasonable value of the assets plus interest; and

d.  Such other and further relief as this Court seems just and proper.

### COUNT 8
### Conspiracy to Commit Conversion
### (Jon Against the Estate, Janice, Alexis and Peterson)

127.    Plaintiff, Jon Logan, realleges the allegations in paragraphs 1 through 70 and 119 through 126 above as if fully incorporated herein.

128.    As co-owner of Smart Communications, Jon was entitled to 50% of the corporate funds and the assets purchased with such funds.

129.    Decedent withdrew Smart Communications' corporate funds.

130.    Decedent used those corporate funds to purchase corporate assets, including jewelry, cars, houses, cosmetic and medical procedures, and wedding incidentals.

131.    Decedent was not authorized to allow Janice, Alexis or Peterson to take custody of those corporate assets.

132.    Decedent conspired with Janice, Alexis and Peterson to deprive Jon of access to the corporate funds seized to pay for those assets and/or the assets themselves.

133.    Jon has demanded return of the corporate funds and assets or such demand would be futile.

134.    By placing the corporate assets in Defendants' custody, Jon has been deprived of access to those assets despite his 50% ownership of those assets.

WHEREFORE, Plaintiff Jon Logan demands judgment in its favor and against the Estate, Janice, Alexis and Peterson, including:

a.  Granting Jon return of his portion of the funds; or

b.  Granting Jon access to the assets; or

c.  Awarding Jon 50% of the reasonable value of the assets plus interest; and

d.  Such other and further relief as this Court seems just and proper.

## COUNT 9
## BREACH OF STATUTORY FIDUCIARY DUTY
### (Plaintiffs Against the Estate)

135.    Plaintiffs reallege the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

136.    Section 607.0841, Florida Statutes, provides: "Each officer has the authority and shall perform the duties set forth in the bylaws or, to the extent consistent with the bylaws, the duties prescribed by the board of directors or by direction of any officer authorized by the bylaws or the board of directors to prescribe the duties of other officers." Decedent failed to perform his duties as an officer of Smart Communications.

137.    Moreover, Decedent failed to comply with the general standard for officers and directors. Both Section 607.8411(1) and Section 607.0830, Florida Statutes, required Decedent to act in "good faith" and in a manner he "reasonably believe[d] to be in the best interests" of Smart Communications.

138.    Decedent acted in clear violation of his duties, including self-dealing, taking excessive compensation, making unauthorized and unequal distributions, committing corporate

waste, purchasing extravagant items for personal use, taking unfair advantage, and not acting in the best interest of Plaintiffs.

139. Plaintiffs were injured by Decedent's breach of his fiduciary duties.

140. Pursuant to Section 607.0750(1), Florida Statutes, "a shareholder may maintain a direct action against another shareholder, an officer, a director, or the company, to enforce the shareholder's rights and otherwise protect the shareholder's interests . . . ."

141. Jon, as a shareholder, was injured directly by the Decedent's actions, for which no benefit flowed to, nor was shared by, Jon; such as unequal distributions.

142. As required by Section 607.0750(2), Florida Statutes, Jon suffered an actual or threatened injury that is not solely the result of an injury suffered or threatened to be suffered by Smart Communications; alternatively, Jon suffered an actual or threatened injury resulting from a violation of a separate statutory or contractual duty owed by Decedent to Jon, even if the injury is in whole or in part the same as the injury suffered or threatened to be suffered by Smart Communications

WHEREFORE, Plaintiffs demand judgment in their favor and against the Estate, including:

a. Granting return of the funds withdrawn without authorization; or

b. Granting return of the assets purchased without authorization; or

c. Awarding the reasonable value of the assets plus interest; and

d. Attorneys' fees and costs pursuant to Fla. Stat. § 607.0746; and

e. Such other and further relief as this Court seems just and proper.

## COUNT 10
## BREACH OF COMMON LAW FIDUCIARY DUTY – UNAUTHORIZED WITHDRAWALS AND PURCHASES
### (Plaintiffs Against the Estate)

143.    Plaintiffs reallege the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

144.    As an officer of Smart Communications, Decedent owed a fiduciary duty to Smart Communications and its shareholders (*i.e.*, Jon).

145.    Decedent breached his fiduciary duties to Plaintiffs, including self-dealing, taking excessive compensation, making unauthorized and unequal distributions, committing corporate waste, purchasing extravagant items for personal use, taking unfair advantage, and not acting in the best interest of Plaintiffs.

146.    Decedent's misconduct was intentional because he acted with actual knowledge of the wrongfulness of his breaches and the high probability that damage to Plaintiffs would result. Despite such knowledge, Decedent engaged in conduct that breached his fiduciary duties, resulting in damage to Plaintiffs.

147.    Alternatively, Decedent acted with gross negligence because his conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to Plaintiffs' rights.

148.    Plaintiffs suffered damages as a result of Decedent's breach.

WHEREFORE, Plaintiffs Jon and Smart Communications demand judgment in their favor and against Decedent's Estate, including:

a.   Awarding compensatory damages and/or back-distribution; or

b.   Awarding punitive damages under Section 768.72, Florida Statutes; or

c.   Awarding Smart Communications the reasonable value of the assets plus interest; and

d.   Such other and further relief as this Court seems just and proper.

## COUNT 11
## CONSPIRACY TO COMMIT UNJUST ENRICHMENT
### (Smart Communications Against Defendants)

149.    Plaintiff, Smart Communications, realleges the allegations in paragraphs 1 through 1112 above as if fully incorporated herein.

150.    During his life, Decedent used Smart Communications' corporate funds to make withdrawals and purchases that were not for the benefit of Smart Communications.

151.    Defendants conspired with Decedent to obtain a benefit from Decedent's improper use of Smart Communications' corporate funds.

152.    Defendants committed an overt act in pursuance of the conspiracy, namely coercing Decedent to make the withdrawals and purchases and thereafter taking possession of same.

153.    As the ultimate recipient of Decedent's withdrawals and purchases, Defendants have knowledge of the benefits conferred.

154.    It would be inequitable for Defendants to retain that benefit.

155.    There is no adequate remedy at law in the absence of this claim against Defendants.

156.    Smart Communications was damaged as a result of Defendants' conspiracy.

WHEREFORE, Plaintiff Smart Communications demands judgment in its favor and against Defendants, including:

a.   Granting Smart Communications a constructive trust over the withdrawals and assets; or,

b.   Providing restitution to Smart Communications for the full value, or otherwise disgorging Defendants, of the withdrawals and assets; and

c. Smart Communications' attorneys' fees and costs pursuant to Fla. Stat. § 607.0746; and,

d. Such other and further relief as this Court seems just and proper.

## COUNT 12
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Plaintiffs Against Defendants)

157. Plaintiffs reallege the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

158. As an officer of Smart Communications, Decedent owed a fiduciary duty to Smart Communications and its shareholders (*i.e.*, Jon).

159. Defendants encouraged and/or coerced Decedent into breaching his fiduciary duties, including self-dealing, taking excessive compensation, making unauthorized and unequal distributions, committing corporate waste, purchasing extravagant items for personal use, taking unfair advantage, and not acting in the best interest of Plaintiffs.

160. Defendants were aware of the breach, and procured the breach, in order to receive custody of extravagant items purchased with Smart Communications' corporate funds.

161. Decedent's misconduct was intentional because he acted with actual knowledge of the wrongfulness of his breaches and the high probability that damage to Plaintiffs would result. Despite such knowledge, Decedent engaged in conduct that breached his fiduciary duties, resulting in damage to Plaintiffs.

162. Alternatively, Defendants encouraged Decedent to act with gross negligence because his conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to Plaintiffs' rights.

163. Plaintiffs suffered damages as a result.

WHEREFORE, Plaintiffs Jon and Smart Communications demand judgment in their favor and against Defendants, including:

a.  Awarding compensatory damages and/or back-distribution; or

b.  Awarding punitive damages under Section 768.72, Florida Statutes; or

c.  Awarding Smart Communications the reasonable value of the assets plus interest; and

d.  Such other and further relief as this Court seems just and proper.

**COUNT 13**
**NEGLIGENCE**
**(Plaintiffs Against the Estate)**

164.  Plaintiffs reallege the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

165.  Decedent owed a duty or obligation to Plaintiffs pursuant to Sections 607.0841, 607.8411(1), and 607.0830, Florida Statutes, to conform to a certain standard of conduct for the protection of Plaintiffs against unreasonable risks.

166.  Decedent failed to conform to those standards by making unauthorized withdrawals and purchases.

167.  Decedent's failure proximately caused actual loss to Jon, as a shareholder, because no benefit flowed to, nor was shared by, Jon.

168.  Decedent's breach also proximately caused actual loss to Smart Communications.

WHEREFORE, Plaintiffs demand judgment in their favor and against the Estate, including:

a.  Granting return of the funds withdrawn without authorization; or

b.  Granting return of the assets purchased without authorization; or

31

c.  Awarding the reasonable value of the assets plus interest; and

d.  Attorneys' fees and costs pursuant to Fla. Stat. § 607.0746; and

e.  Such other and further relief as this Court seems just and proper.

**COUNT 14**
**BREACH OF COMMON LAW FIDUCIARY DUTY – TAX LIABILITIES**
**(Plaintiffs Against the Estate)**

169.   Plaintiffs reallege the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

170.   As an officer of Smart Communications, Decedent was responsible for Smart Communications' finances and ensuring compliance with all applicable laws and regulations related to taxes.

171.   Decedent assumed the duty to advise, counsel, and protect Plaintiffs by agreeing to handle tax issues on behalf, and for the benefit, of Smart Communications and its shareholders (*i.e.*, Jon).

172.   Decedent breached his fiduciary duties to Plaintiffs by creating tax liabilities for which Plaintiffs are responsible.

173.   Decedent's misconduct was intentional because he acted with actual knowledge of the wrongfulness of his breaches and the high probability that damage to Plaintiffs would result. Despite such knowledge, Decedent engaged in conduct that breached his fiduciary duties, resulting in damage to Plaintiffs.

174.   Alternatively, Decedent acted with gross negligence because his conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to Plaintiffs' rights.

175.   Specifically, during Decedent's tenure, Decedent should have directed Smart

Communications to pay royalties to HFLIP for use of the IP.

176.    Decedent's failure and refusal to remit royalty payments to HFLIP resulted in the accrual of unfunded tax liabilities which Plaintiffs were required to belatedly account for and pay.

177.    Plaintiffs suffered damages as a result of Decedent's breach as Plaintiffs owed monies to the Internal Revenue Service, and incurred legal and accounting expenses related to same, that they would not have had to pay but for Decedent's breach.

178.    Further, Jon suffered damages because HLFIP was not paid royalties for the use of the IP at the time (which has since been reconciled), thus Jon is now obligated to pay the IRS for tax liabilities on income he did not receive.

WHEREFORE, Plaintiffs Jon and Smart Communications demand judgment in their favor and against Decedent's Estate, including:

     a.   Awarding damages; and

     b.   Such other and further relief as this Court seems just and proper.

**COUNT 15**
**BREACH OF COMMON LAW FIDUCIARY DUTY - COMPENSATION**
**(Jon Against the Estate)**

179.    Plaintiff, Jon Logan, realleges the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

180.    Jon relied upon his father to protect him and act in his best interest.

181.    Jon is solely responsible for creating the concept, business plan, and IP that has made Smart Communications so successful. Jon invited Decedent to become involved with Smart Communications based on his belief that he could trust his father to protect Jon and to act in Jon's best interest. Decedent accepted the trust and confidence Jon placed in Decedent by

accepting the invitation to become involved with Smart Communications.

182.    Decedent misrepresented to Jon that Jon's compensation would be paid in the form of assets instead of a salary.

183.    Decedent further misrepresented to Jon that Jon would be compensated for use of his IP.

184.    Decedent's misrepresentations were made in his individual capacity and in furtherance of his own personal financial gain.

185.    Decedent breached his fiduciary duty to Jon by titling the assets in the name of Smart Communications instead of Jon and/or recording them as a debt owed by Jon (*i.e.*, a loan), such that Jon received no compensation for eight years of services (and a significantly reduced salary thereafter, totaling fifteen (15) years of no payment or being grossly underpaid); and by failing to ensure Jon was compensated for use of Jon's IP. In contrast, Decedent paid himself a salary and made cash withdrawals. Upon information and belief, Decedent titled Jon's assets in the name of Smart Communications, or recorded them as debt, so that Decedent could assert a 50% interest in the assets paid as compensation to Jon.

186.    Decedent's misconduct was intentional because he acted with actual knowledge of the wrongfulness of his breaches and the high probability that damage to Jon would result. Despite such knowledge, Decedent engaged in conduct that breached his fiduciary duties, resulting in damage to Jon.

187.    Alternatively, Decedent acted with gross negligence because his conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to Jon's rights.

188.    Jon suffered damages as a result of Decedent's breach. Specifically, Jon received

no compensation for at least eight years' worth of services rendered as Director and CEO of a national company (and a significantly reduced salary thereafter); and received no compensation for the exclusive use of his IP.

WHEREFORE, Plaintiff Jon Logan demands judgment in his favor and against Decedent's Estate, including:

a.  Awarding damages; and

b.  Such other and further relief as this Court seems just and proper.

**COUNT 16**
**ESTOPPEL – MISREPRESENTATIONS RELATED TO IP**
**(Jon Against the Estate)**

189.    Plaintiff, Jon Logan, realleges the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

190.    Jon conceived of all of the ideas and created all of the IP upon which Smart Communications' business is founded.

191.    Indeed, an independent valuation study determined that Smart Communications owed HLFIP a royalty of 40% of Smart Communications' net sales for the use of the IP owned by HLFIP under their license.

192.    Decedent misrepresented to Jon that Jon would be compensated for Smart Communications' exclusive use of the IP.

193.    Decedent's misrepresentations were made in his individual capacity and in furtherance of his own personal financial gain.

194.    Jon relied to his detriment on Decedent's misrepresentation—Jon did not demand that Decedent formalize the license agreement in writing nor demand immediate and ongoing compensation to HLFIP for an exclusive license to use the IP.

195.    Jon has been damaged by Decedent's misrepresentations because Jon has not been compensated for use of his IP.

196.    Decedent's Estate benefitted from the misrepresentations by increasing the value of its shares higher than if Jon had not relied upon Decedent's misrepresentations (*i.e.*, if Jon had been compensated, then Smart Communications' corporate funds would have been reduced by the amount of that compensation, thereby reducing the value of Decedent's 50% interest in Smart Communications).

WHEREFORE, Plaintiff Jon Logan demands judgment in his favor and against Decedent's Estate, including:

a.    Awarding damages; and

b.    Such other and further relief as this Court seems just and proper.

## COUNT 17
## FRAUDULENT INDUCEMENT - SALARY
### (Jon Against the Estate)

197.    Plaintiff, Jon Logan, realleges the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

198.    Decedent falsely stated that Jon could receive assets in lieu of a fair salary for his services.

199.    Decedent's misrepresentations were made in his individual capacity and in furtherance of his own personal financial gain.

200.    In contrast to Jon, Decedent paid himself a salary and made cash withdrawals.

201.    Upon information and belief, Decedent titled Jon's assets in the name of Smart Communications so that Decedent could assert a 50% interest in the assets purchased for Jon.

202.    Decedent knew or should have known that his representations to Jon were false

because Decedent titled the assets in the name of Smart Communications instead of Jon.

203.    Decedent intended for his misrepresentation to induce Jon not to demand to be paid a fair salary.

204.    Jon was damaged by relying upon Decedent's representation because Jon was not compensated for eight years' worth of services rendered (and received just a fraction of a fair salary thereafter).

WHEREFORE, Plaintiff Jon Logan demands judgment in his favor and against Decedent's Estate, including:

a.   Awarding damages; and

b.   Such other and further relief as this Court seems just and proper.

## COUNT 18
## FRAUDULENT INDUCEMENT - IP
### (Jon Against the Estate)

205.    Plaintiff, Jon Logan, realleges the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

206.    Decedent falsely stated that Jon would be compensated for use of his IP. In fact, this representation was an express condition precedent to Jon's sharing or allowing any further use of his "new IP" starting in 2015.  *See* **Exhibit E**.

207.    Decedent's misrepresentations were made in his individual capacity and in furtherance of his own personal financial gain.

208.    Decedent knew or should have known that his representation to Jon was false because Decedent never intended to compensate Jon.

209.    Decedent intended for his misrepresentation to induce Jon not to demand payment or a written licensing agreement during his lifetime.

37

210.    Jon relied upon Decedent's representation and was damaged thereby because Jon has not been compensated for the exclusive use of his IP, and without the written licensing agreement dictating royalties and other terms from 2015 going forward, Jon is exposed to rapacious and capricious claims over the IP that is undeniably his (by Decedent and Alexis's agreement).

WHEREFORE, Plaintiff Jon Logan demands judgment in his favor and against Decedent's Estate, including:

    a.  Awarding damages; and

    b.  Such other and further relief as this Court seems just and proper.

## COUNT 19
## INDEMNIFICATION
### (Smart Communications Against the Estate)

211.    Plaintiff, Smart Communications, realleges the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

212.    Decedent solely entered into an exclusive broker agreement related to a yacht purportedly on Smart Communications' behalf. However, Decedent acted outside of his authority to act on Smart Communications' behalf.

213.    By procuring a different financing arrangement for the yacht, Decedent is alleged to have breached the broker agreement he procured alone.

214.    Decedent's alleged breach caused Smart Communications to be sued in relation to the commission allegedly owed under the broker agreement.

215.    Smart Communications has incurred legal expenses related to that litigation and is alleged to be liable for damages amounting to approximately $1.2 million.

216.    Smart Communications is without fault as it neither agreed to, nor breached, the

broker agreement.

217.    Smart Communications discharged a duty that Decedent should have discharged.

218.    Smart Communications suffered damages as a result.

WHEREFORE, Plaintiff Smart Communications demands judgment in its favor and against Decedent's Estate, including:

a.    Awarding damages; and

b.    Such other and further relief as this Court seems just and proper.

**COUNT 20**
**BREACH OF FIDUCIARY DUTY – BROKER AGREEMENT**
**(Smart Communications Against the Estate)**

219.    Plaintiff, Smart Communications, reallege the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

220.    As an officer of Smart Communications, Decedent owed Smart Communications a duty to advise, counsel, and protect Smart Communications' interests.

221.    Decedent breached his fiduciary duty by entering into an exclusive broker agreement related to a yacht purportedly on Smart Communications' behalf, but without Smart Communications' knowledge.

222.    By procuring a different financing arrangement for the yacht, Decedent allegedly breached the broker agreement he procured alone, which would have further breached his fiduciary duty to Smart Communications.

223.    Decedent's alleged breach caused Smart Communications to be sued in relation to the commission allegedly owed under the broker agreement.

224.    Smart Communications has incurred legal expenses related to that litigation and is alleged to be liable for an approximately $1.2 million in damages.

225.    Decedent's misconduct was intentional because he acted with actual knowledge of the wrongfulness of his alleged breaches and the high probability that damage to Smart Communications would result. Despite such knowledge, Decedent engaged in conduct that breached his fiduciary duties, resulting in damage to Smart Communications.

226.    Alternatively, Decedent acted with gross negligence because his conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to Smart Communications' rights.

227.    Smart Communications suffered damages as a result of Decedent's breach.

WHEREFORE, Plaintiff Smart Communications demands judgment in its favor and against Decedent's Estate, including:

    a.    Awarding damages; and

    b.    Such other and further relief as this Court seems just and proper.

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
200 East Las Olas Boulevard, Suite 2100
Fort Lauderdale, Florida 33301
Telephone: (954) 462-9500
Primary e-mail: mharwin@stearnsweaver.com
Secondary e-mail: mhernandez@stearnsweaver.com


By: */s/ Michael J. Harwin*
Michael J. Harwin
Florida Bar No.: 1018578

*Attorney for Jonathan Logan, Smart Communications Holding, Inc. and Loco Florida, LLC*

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that, pursuant to Fla. R. Jud. Adm. 2.516(b), a true and correct copy of the foregoing has been electronically filed with the Clerk of Court through the Florida statewide E-Portal system and served by the Clerk maintained website via e-Service to all counsel of record, this 20th day of August, 2024.

*/s/Michael J. Harwin*
Michael J. Harwin

#12372734 v19

# EXHIBIT A

IN THE CIRCUIT COURT FOR ST. SARASOTA COUNTY,
FLORIDA                                    PROBATE DIVISION

IN RE:  ESTATE OF

      JAMES LOGAN,

        Deceased.

        File No.: _____

## PETITION TO APPOINT CURATOR AND ADMIT WILL

Petitioners, Jonathan Logan and Smart Communications Holding, Inc., allege:

1. Petitioners have an interest in the above estate as creditors filing a statement of claim.  Petitioners' address is 10491 72nd St, Seminole, FL 33777, and the name and office address of petitioner's attorney are set forth at the end of this petition.

2. Decedent, JAMES LOGAN , whose last known address was 1660 Ranch Club Boulevard, Sarasota, Florida 34240, and whose age was 69 and the last four digits of whose social security number are 3655, died on October 16, 2022, at Tierra Verde, Pinellas County.  On the date of death, decedent was domiciled in Sarasota County, Florida.

3. So far as is known, the names of the persons entitled to letters of administration, the beneficiaries of this estate and of the decedent's surviving spouse, if any, their addresses and relationships to decedent, and the years of birth of any who are minors, are:

| NAME | ADDRESS | RELATIONSHIP | YEAR OF BIRTH (if Minor) |
|---|---|---|---|
| JANICE LOGAN | 1600 Ranch Club Boulevard, Sarasota, Florida 34240 | Surviving Spouse/ Entitled to Letters of Administration | |
| JAMES LOGAN FAMILY TRUST | 1600 Ranch Club Boulevard, Sarasota, Florida 34240 | Trust | N/A |

4. Venue of this proceeding is in this county because the decedent was domiciled in Sarasota County at the time of his death.

5. The nature and approximate value of the assets in this estate are:

| NATURE OF ASSETS | APPROXIMATE VALUE |
|---|---|
| Tangible Personal Property | $ To be determined |
| Property Insurance Policies | $ To be determined |

6. Petitioners seek appointment of a curator because the personal representative identified in decedent's will has only deposited the will; she has not taken action to admit the will and the deadline for creditors to file a claim against the estate is October 16, 2024.

7. Petitioners propose that MATTHEW WEIDNER whose address is 250 Mirror Lake Drive N, St. Petersburg, Florida 33701 and who is qualified under the laws of the State of Florida to serve as personal representative of the decedent's estate, be appointed as curator of the estate.

8. The court should admit the will and appoint a curator to reduce the risk of loss or waste of estate assets.

Wherefore, PETITIONERS, request that:

a. Mr. Weidner be appointed curator of the estate of the decedent.

b. The court waive any requirement that he file a bond or other surety to act as curator based on: (1) Mr. Weidner being an attorney licensed and eligible to practice law in Florida (Florida Bar #185957); (2) Mr. Weidner's prior experience serving as a professional fiduciary; and (3) Mr. Weidner's lack of a personal interest in, or benefit from, the estate.

Under penalties of perjury, I declare that I have read the foregoing, and the facts alleged are true, to the best of my knowledge and belief.

Signed on this ___7th___ day of _____August_____, 2024.

_____

JONATHAN LOGAN in his individual capacity, and in his official capacity for SMART COMMUNICATIONS HOLDING, INC.
Petitioner

**STEARNS WEAVER MILLER WEISSLER**
**ALHADEFF & SITTERSON, P.A.**

/s/*Michael J. Harwin*
_____
**Michael J. Harwin**
Florida Bar No.: 1018578
**Kelly A. O'Keefe, Esq.**
Florida Bar No.: 12718
200 East Las Olas Boulevard, Suite 2100
Fort Lauderdale, Florida 33301
Telephone: (954) 462-9500
Primary e-mail:  mharwin@stearnsweaver.com
                 kokeefe@stearnsweaver.com
Secondary e-mail: mhernandez@stearnsweaver.com
                 bbreeden@stearnsweaver.com

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA
PROBATE DIVISION

JONATHAN LOGAN and
SMART COMMUNICATIONS HOLDING, INC.,

      Plaintiffs,

v.

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust dated February 10, 2021
and ALEXIS LOGAN, individually,

      Defendants.

_____/

Case No: 2023-CA-10020NC

(CONSOLIDATED)

Case No.: 2023-CA-1280-NC

**EXHIBIT "B"**

**TO**

**<u>COMPLAINT</u>**

# LAST WILL AND TESTAMENT

## OF

## JAMES LOGAN

I, JAMES LOGAN, a resident of Sarasota County, Florida, declare that this is my Last Will and Testament, and I revoke all wills and codicils I have previously made; except the Trust referred to in Article V hereof, if the same be determined to be testamentary.

## I

### FAMILY

1.1    Spouse. I am married to JANICE LOGAN (referred to herein as "my wife" or "my spouse").

1.2    Children. We have 2 children: ALEXIS LOGAN and JON LOGAN.

## II

### APPOINTMENT OF FIDUCIARIES

2.1    Personal Representative. I appoint my wife, JANICE LOGAN, as personal representative of this, my Last Will and Testament. If JANICE LOGAN shall fail to qualify or otherwise serve as personal representative, I appoint my daughter, ALEXIS LOGAN, as personal representative of my estate. If ALEXIS LOGAN shall fail to qualify or otherwise serve as personal representative, I appoint my son, JON LOGAN, as personal representative of my estate.

2.2    No Bond. I request that my personal representative not be required to furnish bond or sureties.

## III

### PAYMENT OF DEBTS AND TAXES

3.1    Debts. I direct that my legal debts and the expenses of any last illness, funeral, and the administration of my estate, be paid as soon as practicable after my death.



3.2    <u>Taxes.</u>  I direct that my personal representative pay out of that portion of my Residuary Estate which is not included in the gift qualifying for the marital deduction, without apportionment except as herein provided, all estate taxes in respect of all property required to be included in my gross estate for estate tax purposes, whether the property passes under this will or otherwise, except:

(a)    that any generation-skipping tax imposed by Chapter 13 of the Internal Revenue Code of 1986, as amended, caused by a disclaimer or by a direct skip from a trust not established hereunder, shall be paid by the person holding or receiving that property; and

(b)    that any such taxes which are attributable to any qualified terminable interest property over which I had a life income interest shall be paid by the person holding or receiving such property, in an amount equal to the difference between the estate tax computed with and without the inclusion of such property in the calculation; and

(c)    that any such taxes which are attributable to proceeds of life insurance policies that are payable to a person or persons other than my spouse and are includable in my estate for federal estate tax purposes shall be paid by the beneficiary or beneficiaries, collectively, receiving such life insurance proceeds, in an amount equal to the difference between the estate tax computed with and without the inclusion of such property in the calculation; and

(d)    that any such taxes which are attributable to any property over which I may have a power of appointment shall be paid by the person holding or receiving such property, in an amount equal to the difference between the estate tax computed with and without the inclusion of such property in the calculation.

If more than one subparagraph of this paragraph 3.2 applies as a result of my death to apportion estate tax to beneficiaries or recipients of property, then each such beneficiary or recipient shall pay a pro rata share of the difference between the estate tax computed with and without the inclusion in the calculation of the total of the property to which the subparagraphs of this paragraph 3.2 have apportioned estate tax to the beneficiaries or recipients.

3.3    <u>Funds From Trust.</u>  However, should there be in existence at the time of my death that trust referred to in this will and known as the "JAMES LOGAN FAMILY TRUST" and should it appear to my personal representative to be in the best interests of the beneficiaries of the trust and my estate, nothing in this provision shall be interpreted as prohibiting the personal representative of my estate from selling estate assets to that trust, or from borrowing funds, secured or unsecured, or accepting funds from that trust to meet the liquidity requirements of my estate which have become necessary to meet the debts, costs of administration and settlement, and taxes and other charges that have been imposed against my estate.

3.4    <u>Mortgage.</u>  In the event any property or interest in property passing under this will or by operation of law or otherwise by reason of my death shall be encumbered by a mortgage or a lien or shall be pledged to secure any obligation (whether the property or interest in property so encumbered or pledged shall be owned by me jointly or individually), it is my intention that such

Page 2



indebtedness shall not be charged to or paid by my estate but that the devisee, legatee, joint owner taking by survivorship or beneficiary shall take such property or interest in property subject to all encumbrances existing at the time of my death.

IV

SPECIFIC BEQUESTS

4.1     Tangible Personal Property.  I give and bequeath, in fee, all tangible personal property except cash on hand owned by me at the time of my death, including, but not limited to, lapsed bequests of tangible personal property, if any, furniture, furnishings, rugs, pictures, books, silverplate, linen, china, glassware, objects of art, wearing apparel, jewelry and automobiles, as follows:

(a)     First, in accordance with that certain separate writing that I have executed or may execute listing certain items of personal property which I bequeath to certain individuals as specified in said list, as said list is altered from time to time.  If the list referred to herein is not found and properly identified by my personal representative within 30 days after his qualification, it shall be presumed that there is no such list and any subsequently discovered list shall be ignored.

(b)     All other tangible personal property not specifically bequeathed by such separate writing and all such property, in the absence of any list, to my wife, JANICE LOGAN, if she survives me, but if not, then to those of my children who survive me, to be divided among them by my personal representative in its absolute discretion, in as nearly equal portions as may be practicable, having due regard for the preferences of such children.

(c)     In the event none of these persons survive me, this bequest shall lapse and shall pass as part of my Residuary Estate.

4.2     Property Insurance Policies.  All of my insurance policies which provide indemnity for the loss of any of my personal or real property by fire, windstorm, or other casualty (including any claim for such loss of any such property which I might have at the time of my death against any insurance company) I give and bequeath respectively to those persons or corporations, as the case may be, who shall become owners of such properties by reason of my death; whether such ownership be acquired under the provisions of this will, by survivorship or by other means.

4.3     Delivery Costs.  If, to effect delivery of my tangible personal property or insurance policies above bequeathed to a beneficiary who resides in a city or a location other than where the tangible property or insurance policies are located at the time delivery is to be made, it becomes necessary to incur expenses of shipment to complete the delivery, my personal representative on behalf of my estate shall arrange for and pay the costs of shipment incurred in making such delivery.

V

RESIDUARY ESTATE

5.1    Defined.  I define "my Residuary Estate" as all of my property not otherwise effectively bequeathed or devised, after the payment of debts and taxes under Article III above; including real and personal property whenever acquired by me, life insurance or for the benefit of my estate, and property as to which I have an option to purchase or a reversionary interest; but excluding property as to which I have no interest other than a power of appointment and any assets which are payable to a designated beneficiary other than me or my estate.

5.2    To My Trust.  I give, devise and bequeath my Residuary Estate to the Trustees under a certain Trust Agreement heretofore entered into between me, JAMES LOGAN, as Settlor, JAMES LOGAN and JANICE LOGAN, as Co-Trustees, and any Successor Trustees thereto, dated February 10, 2021, entitled the "JAMES LOGAN FAMILY TRUST" as the same now exists or is hereafter amended from time to time.

(a)    Said property shall be added to the corpus of the trust fund therein established as an integral part thereof, to be held, administered and distributed by the Trustee in accordance with all the terms and provisions of the said Trust Agreement.

(b)    The receipt of said Trustee under said Trust Agreement shall be a full acquittance and discharge to my personal representative for the property so distributed.  Upon distribution to the Trustee, the administration of my estate shall cease with respect to the assets passing to the Trustee, and the Trustee shall not be subject to the control of the court in which my will is probated.

5.3    Trust Savings Clause.  If for any reason the trust set out above in this Article V shall not be in existence at the time of my death, or if for any reason a court of competent jurisdiction shall declare this testamentary transfer to the Trustee of said trust to be invalid, then I direct that my Residuary Estate shall be held, managed, invested and reinvested in exactly the same manner described in said trust, giving, if the court shall allow, effect to all then existing amendments of said trust, and managed by the same Trustee or the successor or successors therein named and defined; thus, for those purposes I do hereby incorporate that same instrument of revocable trust, by reference, into this, my Last Will and Testament.  If the court shall not allow that trust to be incorporated into this will with its amendments, it shall be incorporated in its original form without regard to said amendments, if any such amendments have been made.

VI

POWERS OF PERSONAL REPRESENTATIVE

6.1    General Powers Of Personal Representative.  I hereby give to my personal representative and any ancillary personal representative full power and authority, at any time or times, to sell, mortgage, pledge, exchange or otherwise deal with or dispose of the property



comprising my estate, upon such terms as shall be deemed best and without any order of the court; to settle and compromise any and all claims in favor of or against my estate as shall be deemed advisable and for any of the foregoing purposes to make, execute and deliver all deeds, contracts, mortgages, bills of sale or other instruments necessary or desirable therefor.  My personal representative is also authorized to retain any assets or property owned by me at the time of my death and, therefore, no sale thereof shall need to be made solely to diversify investments.  My personal representative is expressly authorized to postpone final distribution of my estate, pending final determination of tax liabilities in connection therewith.

6.2     Power Over Digital Assets. I give to my personal representative and any ancillary personal representative full power and authority, at any time or times, (i) to access, use, and control my digital devices, including but not limited to, desktops, laptops, tablets, peripherals, storage devices, mobile telephones, smart phones, and any similar devices, which currently exist or may exist as technology develops for the purposes of accessing, modifying, deleting, controlling, or transferring my digital assets (as defined below), (ii) to access, modify, delete, control, and transfer my digital assets, and (iii) to obtain, access, modify, delete, and control my passwords and other electronic credentials associated with my digital devices (as described above) and digital assets. For purposes of this Last Will and Testament, "digital assets" shall include, but not be limited to, emails received, email accounts, digital music, digital photographs, digital videos, software licenses, social network accounts, file sharing accounts, web hosting accounts, tax preparation services accounts, online stores, affiliate programs, other online accounts, and similar digital items which currently exist or may exist as technology develops.

6.3     Ancillary Administration.  In the event ancillary administration is required to dispose of any property which I may own at the time of my death with a situs outside of the State of Florida, I hereby nominate and appoint my personal representative hereinabove named as such ancillary personal representative; however, if my personal representative is not qualified to act as ancillary personal representative under the laws of the state of the situs of such property, then I authorize my personal representative to designate an individual or corporate ancillary personal representative to administer such property.

6.4     Joint Tax Returns.     I specifically authorize and empower my personal representative to execute and file a joint income tax return with my wife for the year in which my death occurs and for any years prior thereto.  I also authorize and empower my personal representative to execute and file joint gift tax returns with my wife if any gift tax return is required of either of us for the year in which my death occurs or for any year prior thereto.  My personal representative shall incur no personal liability for any action taken in good faith in accordance with either of the foregoing authorizations.

6.5     Choice Of Deductions.  I am cognizant of the fact that the provisions of the Federal Internal Revenue Code (and other applicable laws) in force at the time of my death and applicable to my estate may permit my personal representative to elect to claim certain administration and other expenses as deductions, either in the income tax returns of my estate or in the estate tax return.



(a)     It is my desire that my personal representative elect to claim from time to time such expenses as deductions on the particular tax returns which, in the personal representative's opinion, should result in the smallest combined taxes being paid, irrespective of whether such expenses shall be payable from income or corpus; and my personal representative is directed not to make adjustments between income or principal or between property interests passing to beneficiaries under my will which may be substantially affected as a result of any election under this Article.

(b)     It is my wish that such property interests as may be determined as a result of my personal representative's election under this provision shall be the interest such beneficiary shall receive.

(c)     I exonerate my personal representative from all liability for any such election and direct that no beneficiary shall have any claim against it or my estate by reason of the exercise of my personal representative's judgment in this respect.

6.6     Elections.  Except as elsewhere provided herein, my personal representative shall have the absolute discretion, right and authority to make all elections, decisions, payments and distributions hereunder in regard to sale, distribution and allocation of property so as to allocate the impact of estate and income taxes upon the various assets of my estate, including, but not limited to:

(a)     election to have a specific portion or all of certain life interests for my surviving spouse qualify for the marital deduction as qualified terminable interest property;

(b)     allocation of my generation-skipping exemption as my personal representative shall deem advisable, except the exemption shall be allocated (i) first to property given by me rather than by another or appointed by me and (ii) to a direct skip caused by a disclaimer only if no other allocation is possible;

(c)     sale or disposition of assets among beneficiaries and trusts to minimize potential income tax on sale or disposition of assets by my estate.  In this regard, I request (but do not direct) that my personal representative do so in a manner which will result in the property to be sold to satisfy obligations of my estate, or any trust, having an aggregate income tax basis as close as possible to its aggregate fair market value and, to the extent consistent with the foregoing objective, in a manner which will result in maximizing the increase in basis of assets of my estate on account of federal and state death taxes attributable to appreciation of such assets;

(d)     allocations of assets among beneficiaries and trusts upon the basis of present value without regard to the income tax basis of such assets in the hands of such beneficiaries and trusts unless such allocation is contrary to my express intentions as otherwise reflected herein.

6.7     Principal And Income.  In matters of allocation and accounting of principal, income, expenses, receipts and disbursements, my personal representative shall be governed by Florida Statutes 738, "Principal and Income", or its successor statute, as the same may from time

to time exist, except as otherwise provided in this will; provided, however, my personal representative shall have the option of charging all or any portion of the expenses incurred in connection with the settlement of my estate against either income or principal of my estate.

## VII

### MISCELLANEOUS PROVISIONS AND DEFINITIONS

7.1     Estate Taxes.  The term "estate taxes" shall mean all estate, inheritance, succession, generation-skipping tax on direct skips and other taxes (together with any interest or penalty thereon), assessed by reason of my death imposed by the government of the United States, or any state or territory thereof, or by any foreign government or political subdivision thereof.

7.2     Construction.  The paragraph headings used are for convenience only and shall not be resorted to for interpretation of this will.  Wherever the context so requires, the masculine shall include the feminine and neuter and the singular shall include the plural.  If any portion of this will is held to be void or unenforceable, the balance of the will shall nevertheless be carried into effect. References herein to "gross estate", "marital deduction" or other similar or related words or phrases shall have the same meaning as such words or phrases have in the Internal Revenue Code of 1986, as amended.

7.3     Unused Exclusion.   If (i) my spouse survives me, and (ii) my personal representative determines that my estate does not need to use all of my federal estate tax exclusion to prevent federal estate taxes upon my estate and that such unused federal estate tax exclusion can be used by my spouse's estate if a federal estate tax return is filed for my estate, and (iii) my spouse (or her legal representative, whether a guardian, agent under a power of attorney, or personal representative of her estate) requests that my personal representative file a federal estate tax return that includes an irrevocable election, pursuant to Section 2010(c) of the Internal Revenue Code, to allow my spouse's estate to use my unused federal estate tax exclusion (the so-called Deceased Spousal Unused Exclusion Amount), then I direct my personal representative to timely file such federal estate tax return, whether a return is otherwise required or not, and make such election.

7.4     Survival.  With respect to the distribution of my tangible personal property, the term "survive me" is to be construed to mean that the person referred to must survive me by 30 days.  If such person dies within 30 days of my death, the reference to such person shall be construed as if such person failed to survive me with respect to the distribution of my tangible personal property.  With respect to the JAMES LOGAN FAMILY TRUST, said trust agreement provides its own survivorship provisions.

IN WITNESS WHEREOF, I have set my hand and seal to this, my Last Will and Testament, this _10_ day of February, 2021.

_____ (SEAL)
JAMES LOGAN

We, the undersigned, hereby certify that the foregoing instrument was, on the date hereof, signed, sealed, published and declared by the said JAMES LOGAN, the Testator, as and for his last Will and Testament, in the presence of us, who in his presence and in the presence of each other, have, at his request, hereunto subscribed our names as witnesses to the execution hereof, this 10th day of February, 2021, and we certify that at the time of the execution hereof we believe said Testator to be of sound and disposing mind and memory.

_____ residing at _____ ST. PETERSBURG, FL _____

_____ residing at _____ LARGO, FL _____

STATE OF FLORIDA
COUNTY OF PINELLAS

I, JAMES LOGAN, the Testator, declare to the undersigned officer taking my acknowledgment of this instrument, and to the subscribing witnesses, that I signed this instrument as my Will.

_____
Testator

We ___NICHOLAS A. MITCHELL___ and ___ALMA DEBRUYNE___, the witnesses whose names are signed to the foregoing instrument, have been sworn by the officer signing below, and declare to that officer on our oaths that the Testator declared this instrument to be the Testator's Will and signed it in our presence and that we each signed this instrument as a witness in the presence of the Testator and in the presence of each other.

_____
Witness

_____
Witness

STATE OF FLORIDA
COUNTY OF PINELLAS

I HEREBY CERTIFY that the foregoing instrument was (i) acknowledge and subscribed before me by means of ☑ physical presence or ☐ online notarization, this 10th day of

Page 8

February, 2021, by the Testator, JAMES LOGAN, who is ☐ personally known to me, or who has ☑ produced **FLORIDA DRIVER LICENSE** as identification; (ii) sworn to and subscribed before me by the witnesses, **NICHOLAS A. MITCHELL** and **ALMA DEBRUYNE**, who are personally known to me and each of whom appeared before me by means of ☑ physical presence or ☐ online notarization, this 10th day of February, 2021; and (iii) subscribed by me in the presence of the Testator and the subscribing witnesses, all on this 10th day of February, 2021.

_Jennifer A. Studer_
NOTARY PUBLIC

6078419

> JENNIFER A. STUDER
> MY COMMISSION # GG 934679
> EXPIRES: March 24, 2024
> Bonded Thru Notary Public Underwriters

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA
PROBATE DIVISION

JONATHAN LOGAN and
SMART COMMUNICATIONS HOLDING, INC.,

      Plaintiffs,

v.

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust dated February 10, 2021
and ALEXIS LOGAN, individually,

      Defendants.

_____/

Case No: 2023-CA-10020NC

(CONSOLIDATED)

Case No.: 2023-CA-1280-NC

**EXHIBIT**

**"C" TO**

**<u>COMPLAINT</u>**

"JAMES LOGAN FAMILY TRUST"

dated

February 10, 2021

JAMES LOGAN, Settlor

JAMES LOGAN and JANICE LOGAN, Co-Trustees

TABLE OF CONTENTS

I.      NAME OF TRUST, FAMILY MEMBERS, SURVIVORSHIP

        1.1     Name of Trust
        1.2     Family Members
        1.3     Common Disaster

II.     RESIGNATION OF TRUSTEE AND SUCCESSOR TRUSTEE

        2.1     Appointment of Successor Trustee
        2.2     Settlor's Intent

III.    DUTIES AND RIGHTS DURING THE LIFETIME OF THE SETTLOR

        3.1     Right to Revoke and Amend the Trust
        3.2     Disposition of Trust Income and Principal During Lifetime of Settlor

IV.     DUTIES AFTER SETTLOR'S DEATH BUT PRIOR TO DISTRIBUTION

        4.1     Summary Description of Duties
        4.2     Assemble the Trust Estate
        4.3     Payment of Expenses and Costs of Settling Settlor's Estate

V.      DISTRIBUTION FOLLOWING THE DEATH OF THE SETTLOR

        5.1     Division of Trust Estate
        5.2     Marital Trust for Settlor's Spouse
        5.3     Residuary Trust
        5.4     Final Takers
        5.5     S Corporation Stock

VI.     LIMITATIONS ON BENEFITS AND ALLOCATIONS OF ASSETS

        6.1     Gifts During Lifetime

VII.    INVESTMENT AND ADMINISTRATIVE POWERS

        7.1     Rights Reserved to Settlor
        7.2     Investment Powers
        7.3     Digital Assets
        7.4     Generation Skipping Tax Provisions
        7.5     Allocation of Principal and Income

7.6    Exoneration
7.7    Business Provisions

# VIII. GENERAL PROVISIONS AND DEFINITIONS

8.1    Additions to Corpus
8.2    Laws Governing
8.3    Interpretation and Construction
8.4    Disability
8.5    Small Trust Termination
8.6    Donee's Will
8.7    Spendthrift Provision
8.8    Establishment of Separate Trusts
8.9    Compensation and Accounting
8.10   Merger or Combination of Trusts
8.11   Construction
8.12   Preservation of Marital Deduction
8.13   Definitions

## REVOCABLE TRUST AGREEMENT

THIS AGREEMENT is made and entered into the _10th_ day of February, 2021, at St. Petersburg, Florida, between JAMES LOGAN, Settlor, of Sarasota County, Florida (hereinafter called the "Settlor"), and JAMES LOGAN and JANICE LOGAN, Co-Trustees (hereinafter collectively called the "Trustee").

### W I T N E S S E T H:

WHEREAS, Settlor desires to create a trust to receive cash or other assets, including $10.00 cash which the Trustee acknowledges receipt of, together with such other assets as the Trustee may now or hereafter at any time hold or acquire hereunder (all such assets, being hereinafter referred to collectively as the "trust estate");

NOW, THEREFORE, this Trust is created and assets conveyed and the Trustee agrees to hold the trust estate, IN TRUST, for the following uses and purposes and subject to the terms and conditions hereinafter set forth:

### ARTICLE I

### NAME OF TRUST, FAMILY MEMBERS AND SURVIVORSHIP

1.1    NAME OF TRUST. This trust shall, for convenience, be known as the "JAMES LOGAN FAMILY TRUST" and it shall be sufficient that it be referred to as such in any deed, assignment, bequest or devise.

1.2    FAMILY MEMBERS. At the time of the execution of this Trust Agreement, Settlor's immediate family group consists of his "wife" (hereinafter sometimes referred to as "spouse" or "wife"), JANICE LOGAN, and Settlor's two children, ALEXIS LOGAN and JON LOGAN.

1.3    COMMON DISASTER.

(a)    If Settlor's spouse shall die simultaneously with Settlor or in such circumstances as to render it impossible to determine who predeceased the other, then it shall be presumed that Settlor's spouse survived the Settlor for purposes of this trust and the provisions of this trust shall be construed upon that assumption and basis, notwithstanding the provisions of any law establishing a different presumption of order of death or providing for survivorship for a fixed period as a condition of inheritance of property.

(b)    With respect to persons other than Settlor's spouse, a beneficiary who dies within 30 days of Settlor's death shall be deemed to have predeceased the Settlor.

(c)    Except as provided in the preceding paragraphs, if any beneficiary shall die simultaneously with another beneficiary or in such circumstances as to render it impossible to determine who predeceased the other and if the rights of one of them depend upon his or her having survived the other, the beneficiary whose rights depend upon such survivorship shall be deemed to have predeceased the other beneficiary and the provisions hereof shall be construed upon that assumption.

## ARTICLE II

## RESIGNATION OF TRUSTEE AND SUCCESSOR TRUSTEE

### 2.1    APPOINTMENT OF SUCCESSOR TRUSTEE.

(a)    Upon the death, incapacity, resignation or discharge of either one of the Settlor or JANICE LOGAN as Co-Trustee, then the remaining one of them shall be the sole Trustee of all trusts hereunder. If JANICE LOGAN becomes the sole Trustee after the death, incapacity, resignation or discharge of Settlor as Trustee, then the following provisions shall apply:

1.    If JANICE LOGAN becomes the sole Trustee, she shall have the power at any time to appoint a Co-Trustee, to appoint a sole Trustee, to remove such Co-Trustee or sole Trustee, and to appoint or not re-appoint another Co-Trustee or sole Trustee in the event such Co-Trustee or sole Trustee appointed by JANICE LOGAN should die, become incapacitated, resign or be removed.

2.    Notwithstanding the foregoing, if JANICE LOGAN signs a statement waiving the right to remove a particular Co-Trustee or sole Trustee, then (i) JANICE LOGAN shall not have the power to remove that Co-Trustee unless such Co-Trustee is replaced with a Corporate Trustee, and (ii) that Co-Trustee appointed by JANICE LOGAN shall have exclusive authority over distributions to or for JANICE LOGAN.  For this purpose, a Corporate Trustee shall be a bank or trust company qualified to act as such. However, if that Co-Trustee should die, become incapacitated, resign or be discharged by a court, then Settlor's spouse shall have the power to appoint (or not appoint) any other Co-Trustee in its place.

(b)    Upon the death, incapacity, resignation or discharge of both of the Settlor and the Settlor's spouse, JANICE LOGAN, as Trustees, then SABAL TRUST COMPANY shall be Successor Trustee of all trusts created hereunder, except as provided in subparagraphs 2.1(c) and 2.1(d) below.

(c)    Notwithstanding anything contained herein to the contrary, with respect to a separate trust for the primary benefit of a child of the Settlor or a descendant of a deceased child of the Settlor administered pursuant to subparagraph 5.3(c) of Article V, such child (immediately and without age restriction) and such descendant upon such descendant attaining age 30 years (such child and such descendant shall be collectively hereinafter (for purposes of the remainder of this subparagraph 2.1(c)) referred to as "descendant"), shall have the power to remove any Trustee and appoint any Successor Trustee, subject to the following:

1.    Such removal and/or appointment shall be in writing, and the appointed Successor Trustee(s) may be any person (including Settlor's descendant himself or herself) or a Corporate Trustee.

2.      Such descendant shall have the power to appoint either one Trustee or Co-Trustees.

3.      Such descendant may prospectively appoint one or more Successor Trustees to serve after the death, incapacity, resignation, or discharge of any one or more prior Trustees.

4.      If such descendant appoints Co-Trustees, then upon the death, incapacity, resignation, or discharge of a Co-Trustee, the other Co-Trustee shall become the sole Trustee unless and until another Co-Trustee is appointed (or unless a different result is specified as part of the appointment), except as provided in subparagraph 2.1(c)5. below.

5.      If such descendant signs a statement waiving the right to remove a particular Trustee or Co-Trustee, then such descendant shall not have the power to remove that Trustee or Co-Trustee unless such Trustee or Co-Trustee is replaced with a Corporate Trustee. However, if that Trustee or Co-Trustee should die, become incapacitated, resign, or be discharged by a court, then such descendant shall again have the power to appoint (or not appoint) any other Trustee or Co-Trustee in its place.

6.      If upon the death, incapacity, resignation, or discharge of any Trustee and if no other Successor Trustee has been appointed by such descendant and if such descendant is deceased or incapacitated, then the Trustee provisions of subparagraph 2.1(b) above shall apply.

(d)      Subject to subparagraph 2.1(c) above, with respect to a separate trust for the primary benefit of a descendant of a deceased child of the Settlor administered pursuant to subparagraph 5.3(c) herein, the parent of such descendant who is also a descendant of the Settlor shall have the power, at any time and from time to time, to prospectively appoint any Successor Trustee(s) of such trust for the primary benefit of his or her descendants. If no Successor Trustee(s) has been appointed, then the Trustee provisions of subparagraph 2.1(b) above shall apply.

(e)      Any Trustee or Successor Trustee may resign at any time by giving written notice to that effect to the next named Successor Trustee and to the current income beneficiary (or beneficiaries) of the trust.

(f)      Any Successor Trustee shall have all the rights, powers, duties, and discretions conferred or imposed on the original Trustee. No Successor Trustee shall be obliged to examine the accounts and actions of any previous Trustee. No Trustee shall be liable for any act or omission unless the same be due to such Trustee's own default.

(g)      Any Successor Trustee shall become responsible for the trust estate only when, as and if the same shall be received by it and, in determining such estate, such Trustee shall

only be responsible to make a reasonable inquiry from the records of the prior Trustee which are available.

(h)    No Trustee or Successor Trustee shall be obliged to examine the accounts and actions of the personal representative of the Settlor's estate. No Trustee or Successor Trustee shall be liable for any act or omission of the personal representative of the Settlor's estate.

(i)    If SABAL TRUST COMPANY or any Successor Corporate Trustee appointed under this subparagraph 2.1(i) resigns or is discharged or fails to serve as Trustee of any of the designated trusts herein created and no other Successor Trustee has been otherwise appointed under this trust agreement, then a majority of the then current income beneficiary or beneficiaries who are of legal age and the guardians of any incompetent or minor then current income beneficiary or beneficiaries shall appoint a Successor Corporate Trustee of that trust. In the event there are no current income beneficiary or beneficiaries of the trust estate, then Settlor's spouse shall be deemed to be the sole current income beneficiary for purposes of this subparagraph 2.1(i), but if she is not living or is incapacitated, then Settlor's descendants for whom a separate trust shall be funded under Article V shall be deemed to be the current income beneficiary(ies) of such trust estate. In the event the current income beneficiary or beneficiaries shall fail to designate promptly a Successor Corporate Trustee, the then acting Trustee shall apply to a court for such an appointment and for settlement of account.

(j)    The persons who have the power to appoint a Successor Corporate Trustee pursuant to subparagraph 2.1(i) above shall also have the power to remove any Corporate Trustee then serving, provided that a removed Corporate Trustee is replaced with a Successor Corporate Trustee as provided in subparagraph 2.1(i) above.

ARTICLE III

DUTIES AND RIGHTS DURING THE LIFETIME OF THE SETTLOR

3.1    RIGHT TO REVOKE AND AMEND THE TRUST. The Settlor expressly reserves the right, at any time and from time to time, during Settlor's lifetime, by instrument in writing delivered to the Trustee to alter, amend, or revoke this Agreement, either in whole or in part, provided, however, that if altered or amended, the duties, powers, and responsibilities of the Trustee shall not be substantially changed without the Trustee's consent. In case of revocation, the insurance policies, securities, and property held in trust hereunder, or that part thereof as to which the Agreement may be revoked, shall be delivered by the Trustee to the Settlor or in accordance with the Settlor's written directions.

3.2    DISPOSITION OF TRUST INCOME AND PRINCIPAL DURING LIFETIME OF SETTLOR.

(a)    During the Settlor's lifetime, the Trustee shall pay to or for the benefit of the Settlor and to or for the benefit of any other person as much of the net income and/or principal as the Settlor may direct from time to time.

(b)    In the absence of direction to the contrary by the Settlor, during the lifetime of the Settlor, the Trustee is hereby authorized at any time or from time to time:

1.    To pay to or for the Settlor for Settlor's health, support and maintenance so much of the net income and/or principal of the trust estate as the Trustee determines is proper, taking into account the standard of living to which the Settlor has been accustomed.

2.    To pay to or for Settlor's spouse for her health, support, maintenance and education so much of the remaining net income and/or principal of the trust estate as the Trustee determines is proper, taking into account the standard of living to which Settlor's spouse has been accustomed and taking into consideration all other income or property available to Settlor's spouse for such purposes from all sources known to the Trustee.

3.    To pay to or on behalf of the Settlor the amount of any and all taxes caused by the sale or possession of any of the assets comprising the trust estate.

4.    To make gifts each calendar year in amounts up to the annual gift tax exclusion to or for the benefit of each of Settlor's descendants.

5.    To pay premiums on life insurance policies insuring the life of the Settlor, regardless of who or how those life insurance policies are owned.

(c)    During the Settlor's lifetime, the Settlor shall have the right to occupy as Settlor's homestead any real property which is a part of the trust estate and he shall have the exclusive and continuous present right to full use, occupancy and possession of such residence for life.  It is Settlor's intention that such Settlor's interest in such property shall constitute a "beneficial interest for life" and "equitable title to real estate" as contemplated by Florida Statutes Section 196.041(2). No provision of this trust agreement shall be construed to convert this right into intangible personal property. The Trustee shall have the power and authority to protect, conserve, sell, lease, encumber, or  otherwise manage or dispose of Settlor's homestead or any rights or interests in Settlor's homestead (including on behalf of this Trust and the Settlor individually), which power shall not be affected by the incapacity or disability of the Settlor.

# ARTICLE IV

## DUTIES AFTER SETTLOR'S DEATH, BUT PRIOR TO DISTRIBUTION

Upon the death of the Settlor, this trust shall become irrevocable and the Trustee shall have the following duties and shall dispose of the trust estate in the following manner:

4.1     SUMMARY DESCRIPTION OF DUTIES.  Upon the death of the Settlor, the Trustee's general duties, along with all other duties and responsibilities enumerated hereunder, are:

(a)     First, assemble the trust estate as provided in paragraph 4.2 of this Article IV.

(b)     Second, pay any part or all of the funeral expenses, legal debts, and costs of administration of the Settlor's estate, as provided in paragraph 4.3 of this Article IV.

(c)     Third, establish separate and distinct trusts as provided in Article V.

(d)     Fourth, pay any part or all of any estate, inheritance, succession, and other death taxes (including penalties thereon), which may be imposed by reason of Settlor's death and due upon Settlor's death, but only, as provided in paragraph 4.3 of this Article IV, from the portion of the trust estate that does not qualify for any marital and/or charitable deduction described in Article V.

It is Settlor's intent to provide guidance as to the order in which various duties of the Trustee shall be accomplished; however, the foregoing shall in no way limit the responsibilities and duties of the Trustee hereunder.

4.2     ASSEMBLE THE TRUST ESTATE.

(a)     The Trustee shall collect the proceeds of any life insurance policies, shall collect the proceeds of any retirement plans payable to the trust, shall receive any proceeds from the Settlor's estate and shall hold the same together with other property heretofore or hereafter added to the trust. Such proceeds and property shall constitute the trust estate.

(b)     The Trustee shall have full authority to take any action in regard to the collection of the proceeds of insurance policies that it deems best and to pay the expense thereof out of the trust estate; but the Trustee shall not be required to enter into or maintain any litigation to enforce payment of such policies until it shall have been financially protected or indemnified to its satisfaction against all expenses and liabilities to which it might in its judgment be subjected by any such action on its part.  The Trustee shall have full authority to make any compromise or settlement with respect to such policies, or any of them, that it may deem expedient, and to give to the insurance companies, and each of them, all the necessary and proper releases and acquittances and full discharge of all their liabilities under such policies.

(c)     No insurance company whose policy or policies shall be deposited hereunder and who shall make payments of the proceeds thereof to the Trustee shall be required

to inquire into or take notice of any of the provisions of this Agreement or to see to the application or disposition of the proceeds of such policies, and the receipt of the Trustee to any such insurance company shall be effectual to release and discharge it for any payment so made and shall be binding upon the beneficiary of the trusts hereby created.

4.3    PAYMENT OF EXPENSES AND COSTS OF SETTLING SETTLOR'S ESTATE.

(a)    The Trustee, in its sole and absolute discretion, may:

1.    Pay from the trust estate, all or any part of the Settlor's legal debts, funeral expenses, and the costs of administration of Settlor's estate;

2.    Pay from the portion of the trust estate which does not qualify for the marital deduction for federal estate tax purposes (because Settlor's executor in the exercise of its discretion does not elect to have such part or all of such property treated as qualified terminable interest property or because Settlor's spouse did not survive the Settlor) all or any part of the estate, inheritance, succession and other death taxes (including penalties thereon, if any), imposed by reason of Settlor's death.  This subparagraph 4.3(a)2. shall be applicable to all such taxes payable by reason of the Settlor's death in respect to all property comprising the Settlor's gross estate for death tax purposes whether or not such property passes under this Agreement, under the Settlor's will or otherwise, except as limited in Settlor's will or hereunder.

Provided, however, no proceeds from, or interests in, any of the following shall be used for the foregoing purposes:  individual retirement account, qualified pension plan, profit sharing plan, or other qualified plan, trust, contract, account, annuity, or bond, as those plans are defined in Subchapter D of Chapter 1 of Subtitle A of the Internal Revenue Code (each of which is hereinafter referred to as a "Retirement Account").

(b)    The Trustee is further authorized to:

1.    Lend from the trust estate to the estate of the Settlor sufficient funds upon such terms as to security, rate and maturity and in other respects as the Trustee shall deem advisable to pay all or a portion of the above claims and debts (such loan need not be secured if in the Trustee's opinion it is in the best interests of the beneficiaries of this trust not to obtain security in light of the overall objectives and requirements of the beneficiaries, the Settlor and Settlor's estate); or, in the alternative;

2.    Acquire in the trust estate by purchase, exchange or otherwise, sufficient assets from the estate of the Settlor to provide the estate of the Settlor with sufficient cash to pay the above claims and debts, even though such property may not be of the character prescribed by law or by the terms of the trust instrument for the investment of other trust funds, and although acquisition of such property may result in a large percentage of the trust estate being invested in one class of property, and without liability for loss or depreciation, except for willful or gross neglect, to retain such property so acquired so long as the Trustee shall deem it advisable.

(c)    In no event shall any payments of federal estate taxes and other inheritance, succession, or death taxes (including penalties thereon, if any) be made from property which qualifies for the marital deduction.

## ARTICLE V

### DISTRIBUTION FOLLOWING THE DEATH OF THE SETTLOR

The Trustee shall hold the trust estate after the Settlor's death for the following uses and purposes:

5.1    DIVISION OF TRUST ESTATE.

(a)    If Settlor's spouse survives.  If Settlor's spouse survives the Settlor, the Trustee shall hold the entire remaining trust estate for the primary benefit of Settlor's spouse and distribute the same as provided in paragraph 5.2 herein, except as follows:

1.    Any portion of the trust estate which does not qualify for the marital deduction for federal estate tax purposes, because Settlor's executor in the exercise of its discretion does not elect to have such part or all of such property treated as qualified terminable interest property, shall be held for the primary benefit of Settlor's spouse and distributed as provided in paragraph 5.3 herein.  In such event:

A.    All values shall be those which are finally determined for federal estate tax purposes.  Elections made by Settlor's fiduciaries with respect to an alternate valuation date and with respect to taking certain deductions for income tax purposes shall apply in determining any of such values.

B.    To the extent the election to have part of such property treated as qualified terminable interest property is made by a fractional share or dollar amount, the Trustee in its sole discretion may select the assets used to fund each of the two shares.  For the purpose of division of the trust estate and funding the separate shares, the assets shall be valued at their fair market value on the date or dates of division and funding.

2.    The purpose of subparagraph 5.1(a)1. above is to allow Settlor's executor to make the decision of whether to use part or all of Settlor's remaining estate tax exclusion (applicable exclusion amount) upon Settlor's death for the purpose of keeping that portion of the trust and any appreciation of it out of Settlor's spouse's estate upon her later death, or to not use part or all of Settlor's remaining estate tax exclusion (applicable exclusion amount) upon Settlor's death for the purpose of including such part of the trust estate in Settlor's spouse's estate upon her later death and such assets possibly receiving a step-up in basis. The Trustee herein shall incur no liability for the election or non-election of treatment of property as qualified terminable interest property.

3.    If there is no federal estate tax in effect at the time of Settlor's death, then the entire trust estate shall be held for the primary benefit of Settlor's spouse as provided in paragraph 5.3 herein.

(b)     <u>If Settlor's spouse does not survive</u>.  If Settlor's spouse does not survive the Settlor, the entire remaining trust estate shall be divided and distributed as provided in subparagraph 5.3(b) herein.

5.2     <u>MARITAL TRUST FOR SETTLOR'S SPOUSE</u>.  The trust for the primary benefit of Settlor's spouse to be held under this paragraph 5.2 shall be distributed as follows:

(a)     <u>Income</u>.  The Trustee shall pay the entire net income to Settlor's spouse annually in quarterly or more frequent installments during Settlor's spouse's lifetime and from the date of Settlor's death.  The word "income" for the purposes of this subparagraph shall have the same meaning as the word "income" as used in the marital deduction estate tax provisions of the Internal Revenue Code.

(b)     <u>Principal</u>.  In addition, the Trustee may also pay or apply so much of the principal, to or for the benefit of Settlor's spouse as in the sole discretion of the Trustee shall be necessary or advisable from time to time for the health, maintenance and support in reasonable comfort of said spouse.

(c)     <u>Residence</u>.  If any residence is or becomes an asset of this trust, Settlor's spouse shall have the right to occupy such residence rent-free and she shall have the exclusive and continuous present right to full use, occupancy and possession of such residence for life.  It is Settlor's intention that Settlor's spouse's interest in such property shall constitute a "beneficial interest for life" and "equitable title to real estate" as contemplated by Florida Statutes Section 196.041(2).  The Trustee shall pay for all taxes, insurance, mortgage installments, ordinary maintenance and repair of such residence while Settlor's spouse uses it as a residence.  Settlor's spouse shall pay for utilities and other living expenses while using it as a residence (but the Trustee in its discretion may pay for any of such expenses pursuant to other provisions of this paragraph 5.2).  Upon the written direction of Settlor's spouse to sell such residence, the Trustee shall do so upon such terms as the Trustee deems reasonable and add the proceeds to the principal of the trust estate.  Upon the written direction of Settlor's spouse, the Trustee shall purchase a replacement residence to be held upon the same terms as the original residence which was a part of the trust estate.

(d)     <u>Make productive</u>.  Settlor's spouse shall at all times and in all events be permitted to require the Trustee either to make the property in this trust productive or to convert it, within a reasonable time, to productive property.

(e)     <u>Primary beneficiary</u>.  The Trustee's primary concern shall be Settlor's spouse, not Settlor's descendants or any remainder beneficiaries of this trust, even if such distributions may deplete the trust estate.  It is also the Settlor's intent that Settlor's spouse shall serve as sole Trustee and make such distributions for her own benefit.

(f)    <u>No judgment creditors</u>.  Notwithstanding the foregoing, (i) in no event shall the terms "maintenance" or "support", used together or separately, ever include or be interpreted to include payments to a judgment creditor or to satisfy a judgment creditor, and (ii) in no event shall  distributions of principal be made to a judgment creditor of JANICE LOGAN or used in any way, directly or indirectly, to satisfy a judgment creditor of JANICE LOGAN.

(g)    <u>Distribution on spouse's death</u>.  Upon the death of Settlor's spouse, all income accrued or undistributed at the death of Settlor's spouse shall be added to principal. Further, the Trustee shall, unless Settlor's spouse directs otherwise in said spouse's last will and testament, pay from the principal, directly or to Settlor's spouse's personal representative, as the Trustee deems advisable, the amount by which the estate and inheritance tax as assessed by reason of the death of Settlor's spouse shall be increased as a result of the inclusion of the this trust estate in said spouse's estate for such tax purposes.  Following such payments, if any, the Trustee shall divide and distribute the remaining trust fund as provided in subparagraph 5.3(b) herein.

5.3    <u>RESIDUARY TRUST</u>.  The trust for the benefit of Settlor's spouse to be held under this paragraph 5.3 or for the benefit of Settlor's descendants shall be distributed as follows:

(a)    <u>Payments during spouse's lifetime</u>.  During the lifetime of Settlor's spouse, the trust estate shall be held and distributed as follows for the primary benefit of Settlor's spouse:

1.    The Trustee is authorized to accumulate the net income or to pay or apply so much of the net income, and/or to pay or apply so much of the principal, to or for the benefit of Settlor's spouse during her lifetime as in the sole discretion of the Trustee shall be necessary or advisable from time to time for Settlor's spouse's health, maintenance and support in reasonable comfort.  However, payments shall be made hereunder from principal to or for Settlor's spouse only after the trust estate held pursuant to paragraph 5.2 herein has been exhausted.

2.    If any residence is or becomes an asset of this trust, Settlor's spouse shall have the right to occupy such residence rent-free and she shall have the exclusive and continuous present right to full use, occupancy and possession of such residence for life.  It is Settlor's intention that Settlor's spouse's interest in such property shall constitute a "beneficial interest for life" and "equitable title to real estate" as contemplated by Florida Statutes Section 196.041(2).  The Trustee shall pay for all taxes, insurance, mortgage installments, ordinary maintenance and repair of such residence while Settlor's spouse uses it as a residence.  Settlor's spouse shall pay for utilities and other living expenses while using it as a residence (but the Trustee in its discretion may pay for any of such expenses pursuant to other provisions of this subparagraph 5.3(a)).  Upon the written direction of Settlor's spouse to sell such residence, the Trustee shall do so upon such terms as the Trustee deems reasonable and add the proceeds to the principal of the trust estate.  Upon the written direction of Settlor's spouse, the Trustee shall purchase a replacement residence to be held upon the same terms as the original residence which was a part of the trust estate.

3.    After providing for Settlor's spouse, the Trustee may also in its sole discretion distribute as much of any remaining net income and/or principal during the lifetime of Settlor's spouse to or for the benefit of Settlor's descendants for their health, maintenance and support as determined by the Trustee in its sole discretion.

A.    However, no such distribution shall be made for the purpose of or which would have the effect of discharging any legal obligation which the Trustee may have outside of its capacity as Trustee, including the obligation of support, or which the person who has the power to remove and appoint the Trustee may have.

B.    Settlor's descendants shall have no right to any distributions under this subparagraph 5.3(a)3. and may not demand or require any distributions. Furthermore, Settlor's spouse may veto any such distribution.

4.    The Trustee's primary concern shall be Settlor's spouse, not Settlor's descendants or any remainder beneficiaries of this trust, even if such distributions may deplete the trust estate. It is also the Settlor's intent that Settlor's spouse shall serve as the Trustee and make such distributions for her own benefit.

5.    Notwithstanding the foregoing, (i) in no event shall the terms "maintenance" or "support", used together or separately, ever include or be interpreted to include payments to a judgment creditor or to satisfy a judgment creditor, and (ii) in no event shall distributions of principal be made to a judgment creditor of JANICE LOGAN or Settlor's descendants or used in any way, directly or indirectly, to satisfy a judgment creditor of JANICE LOGAN or Settlor's descendants.

(b)    <u>Division and distribution at spouse's death</u>. Upon the death of Settlor's spouse, or upon Settlor's death if Settlor's spouse should predecease the Settlor, the Trustee shall divide and distribute the remaining trust estate (including undistributed income, if any, and including any amounts added hereto from the trust for Settlor's spouse administered pursuant to paragraph 5.2 herein) as follows (after the payment of any estate taxes and costs of administration):

1.    The Trustee shall distribute the trust estate to or for the benefit of any one or more persons (including individuals and entities), in such amounts or portions and in such lawful interests or estates, whether absolute or in trust, as Settlor's spouse may appoint by specific reference to this power in said spouse's last will and testament, except not to Settlor's spouse, not to her estate, not to her creditors, and not to the creditors of her estate.

2.    If the foregoing limited power of appointment is for any reason not validly exercised in whole or in part by Settlor's spouse, the remaining trust estate, to the extent not validly appointed, shall be distributed as follows:

A.    The Trustee shall allocate an amount equal to ten percent (10%) of the net consideration (including cash and other forms of consideration) received by the Settlor or this trust from the liquidation or the sale of shares of stock of Smart Communications Holding, Inc., a Florida corporation (or its successor) (the "Corporation"), held by the Settlor or this trust (whether such liquidation or sale occurs during the lifetime of Settlor or after his death), to a separate trust for the primary benefit of ALEXIS LOGAN, if she survives the Settlor, to be administered as provided in subparagraph 5.3(c) of this Article V. The term "net consideration" as provided for in this subparagraph 5.3(b)2.A. shall **not** be net of taxes (income or otherwise), but shall be net of debt, expenses of sale, and other expenses properly charged against such proceeds and is meant to provide for an amount equal to ten percent (10%) of the amount received by Settlor or this trust pursuant to the liquidation or sale of his/its stock of the Corporation. In the event ALEXIS LOGAN does not survive the Settlor, then such gift shall lapse, to be distributed as provided under the remaining provisions of this Article V. No estate taxes or expenses of administration shall be paid from or charged to such gift under this subparagraph 5.3(b)2.A.

B.    The Trustee shall allocate any interest which may be held by or come into the trust estate in LOCO FLORIDA, LLC, a Florida limited liability company, to a separate trust for the primary benefit of JON LOGAN, if he survives the Settlor, to be administered as provided in subparagraph 5.3(c) of this Article V.  In the event JON LOGAN does not survive the Settlor, then such gift shall lapse, to be distributed as provided under the remaining provisions of this Article V.  No estate taxes or expenses of administration shall be paid from or charged to such gift under this subparagraph 5.3(b)2.B.

C.    The Trustee shall divide the remaining trust estate (after the gifts provided for under subparagraph 5.3(b)2.A. and 5.3(b)2.B. above (if any)) into shares of equal value, creating one such share for each child of the Settlor who is then living, and creating one such share for the descendants, collectively, of each deceased child of the Settlor who leaves one or more descendants living at the time of division.

(i)    A share created for a child of the Settlor shall be held as a separate trust for the primary benefit of such child of the Settlor for distribution as provided in subparagraph 5.3(c) of this Article V.

(ii)    A share created for the descendants, collectively, of a deceased child of the Settlor shall be divided into shares for such descendants on a per stirpes basis. Any such share for a descendant of a deceased child of the Settlor shall be held as a separate trust for the primary benefit of such descendant for distribution as provided in subparagraph 5.3(c) of this Article V.

(c)    <u>Trust provisions for descendants</u>.  Upon the creation of a separate trust for the primary benefit of a descendant of the Settlor (any one of whom shall be referred to in this subparagraph 5.3(c) as the "Primary Beneficiary") such trust estate, including his or her beneficial interest in a Retirement Account, shall be distributed as follows:

1.    Notwithstanding anything to the contrary in this subparagraph 5.3(c), upon the creation of a separate trust for the primary benefit of the Primary Beneficiary, if any Retirement Account or portion of a Retirement Account becomes payable to this separate trust for such Primary Beneficiary, the following shall apply:

A.    If such Primary Beneficiary is an "eligible designated beneficiary" within the meaning of Section 401(a)(9)(E)(ii) of the Internal Revenue Code (such that distributions from such Retirement Account to such Primary Beneficiary can be made over the remaining life expectancy of such Primary Beneficiary), then for as long as such Primary Beneficiary remains an "eligible designated beneficiary," the Trustee shall elect to receive or shall withdraw from such Retirement Account the following: (i) the minimum required distribution as is necessary in order to satisfy the requirements of Section 401(a)(9) of the Internal Revenue Code and Regulations issued thereunder, and (ii) such additional amount or amounts as the Trustee determines, in its sole discretion, that it needs to satisfy the remaining distribution provisions of this subparagraph 5.3(c). The Trustee shall pay to or for the benefit of such Primary Beneficiary the entire amount withdrawn by the Trustee each year from Retirement Accounts payable to this separate trust.  These payments may be made annually or periodically during the year.

B.    If such Primary Beneficiary is not (or no longer qualifies as) an "eligible designated beneficiary" within the meaning of Section 401(a)(9)(E)(ii) of the Internal Revenue Code, then the Trustee shall elect to receive or shall withdraw from such Retirement Account only such amount or amounts as the Trustee determines, in its sole discretion, that it needs either to satisfy the remaining distribution provisions of this subparagraph 5.3(c) or that it deems advisable to withdraw for tax planning and other purposes; provided, however, that each such Retirement Account payable to this separate trust for such Primary Beneficiary who is not (or no longer qualifies as) an "eligible designated beneficiary" shall, in all cases, be fully distributed to the Trustee within the time period required by Section 401(a)(9) of the Internal Revenue Code and Regulations issued thereunder. Upon the Trustee's receipt of a distribution from a Retirement Account pursuant to this subparagraph 5.3(c)1.B., the Trustee is authorized either (i) to pay or apply such distribution to or for the benefit of such Primary Beneficiary or (ii) to retain such distribution as part of such Primary Beneficiary's trust estate for potential future distribution.

2.    During the lifetime of such Primary Beneficiary, the Trustee may pay or apply so much of the net income and/or principal, in excess of the minimum required distribution from a Retirement Account as provided in subparagraph 5.3(c)1. above, to or for the benefit of such Primary Beneficiary as in the sole discretion of the Trustee shall be appropriate or advisable from time to time for the health, education, maintenance and support in reasonable comfort of such Primary Beneficiary.

3.    In addition, the Trustee may distribute any remaining net income and/or principal (other than distributions from a Retirement Account) to or for the benefit of the Primary Beneficiary's descendants for their health, education, maintenance and support.

A.    Provided that no such distribution shall be made if objected to by the Primary Beneficiary.

B.    No such distributions shall be made for the purpose of or which would have the effect of discharging any legal obligation, including the obligation of support, which the Trustee may have outside of its capacity as Trustee or which the person who has the power to remove and appoint the Trustee may have.

4.    If any residence is or becomes an asset of the trust estate, such Primary Beneficiary of the Settlor shall have the right to occupy such residence rent-free and he or she shall have the exclusive and continuous present right to full use, occupancy and possession of such residence for life. It is Settlor's intention that such Primary Beneficiary's interest in such property shall constitute a "beneficial interest for life" and "equitable title to real estate" as contemplated by Florida Statutes Section 196.041(2). The Trustee shall pay for all taxes, insurance, mortgage installments, ordinary maintenance and repair of such residence while such Primary Beneficiary uses it as a residence. Such Primary Beneficiary shall pay for utilities and other living expenses while using it as a residence (but the Trustee in its discretion may pay for any of such expenses pursuant to other provisions of this subparagraph 5.3(c)). Upon the written direction of such Primary Beneficiary to sell such residence, the Trustee shall do so upon such terms as the Trustee deems reasonable and add the proceeds to the principal of the trust estate. Upon the written direction of such Primary Beneficiary, the Trustee shall purchase a replacement residence to be held upon the same terms as the original residence which was a part of the trust estate.

5.    To help in making its determination for any discretionary distributions (whether to the Primary Beneficiary or the Primary Beneficiary's descendants), the Trustee may consider such circumstances and factors the Trustee believes are relevant, including but not limited to the other income and assets known to the Trustee to be available to such beneficiary for such purposes (including any distributions from a Retirement Account pursuant to subparagraph 5.3(c)1. above) and the advisability of supplementing such other income or assets, the tax consequences of any such distribution, the character and habits of such beneficiary, the diligence, progress and aptitude of such beneficiary in acquiring an education, the ability of such beneficiary to handle money usefully and prudently and to assume the responsibilities of adult life and self-support.

6.    The Trustee's primary concern shall be the Primary Beneficiary, not the Primary Beneficiary's children or any residual beneficiaries of this trust, even if such distributions may deplete the trust estate. It is also the Settlor's intent that the Primary Beneficiary shall be able to serve as the sole Trustee immediately in the event the Primary Beneficiary is a child of the Settlor, or after attaining age 30 years if the Primary Beneficiary is a descendant of a deceased child of the Settlor, and as such be able to make such distributions for his or her own benefit.

7.     Notwithstanding the foregoing, (i) in no event shall the terms "maintenance" or "support", used together or separately, ever include or be interpreted to include payments to a judgment creditor or to satisfy a judgment creditor, and (ii) in no event shall any distributions be made to satisfy a judgment creditor of the Primary Beneficiary or any members of his or her family.

8.     Upon the death of the Primary Beneficiary, the Trustee shall divide and distribute the Primary Beneficiary's remaining trust fund as follows:

A.     The Trustee shall distribute any portion of such trust fund that would be subject to the generation skipping tax (if not for this subparagraph 5.3(c)8.A.) as a result of the death of such Primary Beneficiary, in such proportions and in such a manner, outright or in trust or otherwise, to or for the benefit of any one or more of such Primary Beneficiary's creditors or the creditors of such Primary Beneficiary's estate, as such Primary Beneficiary may appoint by specific reference to this general power of appointment in his or her Will admitted to probate.

B.     If such Primary Beneficiary dies after attaining age 30 years, then any portion of such trust fund over which such Primary Beneficiary does not either have or effectively exercise the foregoing general power of appointment shall be distributed in such proportions and in such a manner, outright or in trust or otherwise, to or for the benefit of such one or more persons (including individuals and entities) as such Primary Beneficiary may appoint by specific reference to this limited power of appointment in his or her Will admitted to probate, except not to the Primary Beneficiary himself or herself, not to his or her estate, not to his or her creditors, and not to the creditors of his or her estate.

C.     If such Primary Beneficiary dies prior to attaining age 30 years, then any portion of such trust fund over which such Primary Beneficiary does not either have or effectively exercise the foregoing general power of appointment shall be distributed in such proportions and in such a manner, outright or in trust or otherwise, to or for the benefit of any one or more of such Primary Beneficiary's descendants as such Primary Beneficiary may appoint by specific reference to this limited power of appointment in his or her Will admitted to probate, except not to the Primary Beneficiary himself or herself, not to his or her estate, not to his or her creditors, and not to the creditors of his or her estate.

D.     Any portion of such Primary Beneficiary's trust fund over which he or she does not effectively exercise the foregoing general or limited powers of appointment, shall be divided on a per stirpes basis among his or her descendants and each such share shall be held as a separate trust and distributed as provided in this subparagraph 5.3(c), but if the Primary Beneficiary has no living descendants, then it shall be divided on a per stirpes basis among the descendants of the Primary Beneficiary's nearest ancestor who is a descendant of the Settlor and who has living descendants and each such share shall be held as a separate trust and

distributed as provided in this subparagraph 5.3(c), and if no such beneficiaries exist, then it shall be divided and distributed as provided in subparagraph 5.3(b)2.B. of this Article V.

9.    Notwithstanding any other provision herein, each and every separate trust created herein shall terminate one day prior to end of the statutory time period, set forth in the applicable rule against perpetuities, after the death of the Settlor, and the remainder of each such trust fund shall be distributed to the Primary Beneficiary who is eligible to receive distributions at such time from such trust fund. It is Settlor's intent that no trust or trust share herein created, or attempted to be created, shall fail, in whole or in part, by reason of the rule against perpetuities. Therefore:

A.    Each and every power granted herein is severable one from the other; each and every trust or trust share is severable from the other; and all powers granted to each trust or trust share are severable powers granted as to any other trust.

B.    If any provision or power herein would cause a violation of the rule against perpetuities, the Trustee shall terminate or modify such provision or power, at the latest day possible, so as to avoid a violation of the rule against perpetuities.

5.4    FINAL TAKERS. In the event that none of Settlor's descendants survive to the time the trust estate is to vest, then at the death of the last of them and Settlor's spouse and the Settlor, but subject to any powers of appointment granted herein, the then remaining trust estate shall be distributed 50% to Settlor's heirs at law and 50% to Settlor's spouse's heirs at law, determined under the laws of the state of Florida as if both the Settlor and Settlor's spouse died at such time. Provided that if any such beneficiary has not attained age 21 years at the time such distribution is to be made, then the Trustee shall make such distribution to a custodian (chosen by the Trustee in its sole discretion) for such beneficiary under a Uniform Transfers to Minors Act to be held until such beneficiary attains age 25 years, if possible

5.5    S CORPORATION STOCK.

(a)    Notwithstanding any other provision in this Article V to the contrary,

(i)    if this Trust holds S corporation stock one (1) day less than two (2) years after such stock is distributed to this Trust by the Settlor's estate;

(ii)    if this Trust held S corporation stock at the time of the Settlor's death and still holds such stock one (1) day less than two (2) years after the Settlor's death;

(iii)    if this Trust receives or acquires S corporation stock from any other source; or

(iv)    if this Trust holds stock of a corporation and the shareholders of such corporation and the Trustee desire to elect S corporation status,

then at such time, the Trustee may elect treatment as an "Electing Small Business Trust" under Section 1361 of the Internal Revenue Code or may allocate such S corporation stock to one or more separate and distinct Qualified Subchapter S Trusts (each hereinafter referred to as a "QSST") to be held, managed and distributed as follows:

(b)    Each QSST shall comply with all of the following requirements:

1.    As to any trust created for more than one current income beneficiary, the Trustee shall allocate the S corporation stock equally to separate and distinct trusts, one trust for each such current income beneficiary.

2.    The Trustee shall pay the entire net income of such separate trust, at least quarter-annually, to such current income beneficiary and any distributions of principal shall be made only to such current income beneficiary of each such trust to the exclusion of all others. The Trustee shall also distribute to such current income beneficiary an amount of principal equal to (A) any and all taxes which such current income beneficiary may be subject to as a result of being a beneficiary of such trust, in excess of (B) the income of such trust distributed to such current income beneficiary.

3.    If any such trust should terminate for any reason during the lifetime of the current income beneficiary, the Trustee shall distribute all of the assets of such separate trust to such beneficiary.

4.    Upon the death of a beneficiary of a QSST and if the QSST holds S corporation stock at such time, the descent and distribution of the assets of such trust shall be pursuant to the provisions of this Trust other than this paragraph 5.5, and if such stock is to be held in trust, then such stock shall be held in one or more QSSTs pursuant to the terms of this paragraph 5.5.

5.    Upon the death of a current income beneficiary of a QSST and if the QSST no longer holds S corporation stock at such time, this paragraph 5.5 shall no longer apply to such trust; instead, the remaining provisions of this Trust shall apply to such trust.

(c)    Except as hereinabove modified, the terms of the separate trust other than this paragraph 5.5 shall apply to each QSST.

(d)    The term "S corporation" shall mean a corporation which is an electing small business corporation within the meaning of Section 1361 of the Internal Revenue Code.

ARTICLE VI

LIMITATIONS ON BENEFITS AND ALLOCATIONS OF ASSETS

6.1    GIFTS DURING LIFETIME.    Any gifts of real or personal property, tangible or intangible, which the Settlor may make during Settlor's lifetime, if any, before or after the execution of this Trust Agreement, to any person or persons, shall not be deemed to be an advancement or a satisfaction to be applied to any share of any beneficiary of this trust, and shall not be taken into account in connection with this trust.

ARTICLE VII

INVESTMENT AND ADMINISTRATIVE POWERS

7.1    RIGHTS RESERVED TO SETTLOR.

(a)    During the lifetime of the Settlor, the Settlor reserves the right to elect, at any time and from time to time, to advise the Trustee and to direct the Trustee as to any investments the Settlor deems advisable for the Trustee to purchase or sell.  Should the Settlor elect to exercise Settlor's right to advise or direct the Trustee to purchase or to sell any investment, Settlor shall do so in writing; or, if that is not practical, Settlor shall, as soon thereafter as is practical, approve of such purchase or sale in writing, as requested or required by the Trustee.  The Trustee is hereby specifically relieved of all liability for loss which may be occasioned by the purchase or sale of any asset of the trust estate when it has been directed or advised to make such purchase or sale by the Settlor, except for willful default or gross neglect.

(b)    During Settlor's lifetime, the Co-Trustees, or either of them acting alone, shall have all rights and powers granted Trustees under the laws of Florida, and the Settlor shall not be governed by fiduciary standards in the investment, management or operation of the trust estate.  Further, the Co-Trustees, or either of them acting alone, may borrow funds and pledge, sell and/or mortgage trust assets (including real property) for whatever purpose.

(c)    During Settlor's lifetime, the Co-Trustees, or either of them acting alone, shall not be limited to the type and character of investments in which it may invest funds of this trust and such investments may include, but not be limited to, margin accounts, options and commodity accounts.

(d)    Anything contained in this Agreement to the contrary notwithstanding, during Settlor's lifetime, the Co-Trustees, or either of them acting alone, shall have (i) signature authority over a bank account, money market account, brokerage account, mutual fund, or other account at a financial institution, with the right to add to such account, withdraw from such account and/or to manage the investments of such account including to buy or sell securities within such account, and (ii) the power to sign as Trustee any deeds, partnership documents, notes, checks, negotiable instruments, and any other documents required to buy, sell, transfer or convey trust assets and any other commercial paper for or on account of the Trust created by this Agreement. Any individual or other entity is hereby relieved of any and all liability for accepting the signature of either one of the Co-Trustees serving hereunder.

(e)    The Settlor in the capacity as Trustee may borrow funds, guarantee any debt (including debt of the Settlor and/or debt of third parties that the Settlor wants to guarantee for any reason) and pledge, encumber, mortgage and/or sell trust assets (including real property) for any purpose, including, but not limited to securing debt and guaranteeing debt of the Settlor and/or

7-1

third parties. Any such debt or guarantee entered into by the Settlor as Trustee shall continue to be an obligation of this trust even after the Settlor is no longer serving as Trustee.

(f)    The Settlor as Trustee may appoint one or more other persons who are not trustees to have signature authority over a bank account, money market account, brokerage account, mutual fund, or other account at a financial institution, with the right to add to such account, withdraw from such account and/or to manage the investments of such account including to buy or sell securities within such account.

7.2    INVESTMENT POWERS. Except as otherwise provided in this Agreement, and except as would disqualify any marital deduction, the Trustee shall have the following general powers, in addition to and not by way of limitation of the powers provided by law, said powers to be exercised in the Trustee's discretion, provided that the Trustee other than the Settlor uses reasonable prudence and judgment in the exercise of such discretion:

(a)    To make distribution of the trust estate or of the principal of any trust created hereunder in kind and to cause any share to be composed of cash, property or undivided fractional shares in property different in kind from any other share.

(b)    To invest any part or all of the principal of the trust estate in any mutual fund or funds (including proprietary mutual funds), any of which mutual funds may be established and operated by and under the control of the Trustee (or its affiliates, if not prohibited by law).

(c)    For convenience of administration or investment, the Trustee may hold separate trusts created hereunder as a common fund, dividing the income proportionately among such trusts, assigning undivided interests to such trusts and making joint investments of the funds belonging in such trusts. The Trustee may consolidate any separate trust with any other trust with similar provisions for the same beneficiary or beneficiaries, which consolidation would not result in any alteration of the time for vesting of such interests in such beneficiary or beneficiaries due to the operation of the rule against perpetuities.

(d)    The Trustee shall have the right and authority to make all elections, decisions, payments and distributions hereunder consistent with minimizing the impact of estate and income taxes upon Settlor's estate or this trust.

(e)    In making all such elections, decisions, payments and distributions hereunder, the Trustee is directed not to make adjustments between income or principal or between property interests passing to beneficiaries hereunder which may be substantially affected as a result of any elections under this Article unless such adjustments are necessary to prevent a loss of, or decrease in, the marital or charitable deduction, if any, otherwise allowable in determining Settlor's federal estate tax. The Trustee shall be exonerated from all liability for any such election(s) and

no beneficiary shall have any claim against the Trustee by reason of the exercise of the Trustee's judgment in this respect.

(f)    The Trustee may borrow funds from any source (including the Trustee in its non-fiduciary capacity), guarantee any debt (including debt of the Settlor and/or debt of any entity in which Settlor had a direct or indirect ownership interest) and pledge, encumber, mortgage and/or sell trust assets (including real property) for any purpose the Trustee deems advisable, including, but not limited to securing debt and guaranteeing debt of the Settlor and/or any entity in which Settlor had a direct or indirect ownership interest.

7.3    <u>DIGITAL ASSETS</u>.  The Trustee shall have full power and authority, at any time or times, (i) to access, use, and control Settlor's digital devices, including but not limited to, desktops, laptops, tablets, peripherals, storage devices, mobile telephones, smart phones, and any similar devices, which currently exist or may exist as technology develops, for the purposes of accessing, modifying, deleting, controlling, or transferring Settlor's digital assets (as defined below), (ii) to access, modify, delete, control, and transfer Settlor's digital assets, and (iii) to obtain, access, modify, delete, and control Settlor's passwords and other electronic credentials associated with Settlor's digital devices (as described above) and digital assets. "Digital assets" shall include, but not be limited to, emails received, email accounts, digital music, digital photographs, digital videos, software licenses, social network accounts, file sharing accounts, web hosting accounts, tax preparation services accounts, online stores, affiliate programs, other online accounts, and similar digital items which currently exist or may exist as technology develops.

7.4    <u>GENERATION SKIPPING TAX PROVISIONS</u>.

(a)    If a trust hereunder would be partially exempt from generation-skipping tax by reason of an allocation of generation-skipping tax exemption to it, before the allocation, the Trustee, in its discretion, may divide the trust into two separate trusts of equal or unequal value, to permit allocation of the exemption solely to one trust which will be entirely exempt from generation-skipping tax.  Such division shall be done in such a manner as required under federal tax law so that each separate trust is recognized for generation skipping tax purposes.

(b)    If a trust hereunder is partially exempt from generation-skipping tax, the Trustee, in its discretion, may divide the trust into two separate trusts of equal or unequal value, so that one such trust is entirely exempt from generation-skipping tax and the other such trust is entirely subject to generation-skipping tax.  Such division shall be done in such a manner as required under federal tax law so that each separate trust is recognized for generation skipping tax purposes.

(c)    In addition, if a trust hereunder is entirely exempt or nonexempt from generation-skipping tax and adding property to the trust would partially subject it to generation-skipping tax, or if a trust hereunder is entirely non-exempt from generation-skipping tax and

7-3

adding property to the trust would partially exempt it from generation-skipping tax, the Trustee, in its discretion, may hold that property as a separate trust in lieu of making the addition.

(d)　　Except as otherwise provided in this Trust Agreement, such two trusts (whether divided as provided in subparagraphs (a) or (b) above or additions held as a separate trust as provided in subparagraph (c) above) shall have the same terms and conditions, but the Trustee shall not make discretionary distributions from the income or principal of the exempt trust to beneficiaries who are nonskip persons so long as readily marketable  assets remain in the nonexempt trust.

(e)　　If there are two or more trusts known to the Trustee for the same beneficiary who is a skip person, whether or not such trusts are all created under this trust agreement, and if one or more of such trusts has an inclusion ratio of zero and if one or more of such trusts has an inclusion ratio of greater than zero, then to the extent possible, distributions to skip persons shall be first made from the trust or trusts with an inclusion ratio of zero and distributions to nonskip persons shall be first made from the trust or trusts with an inclusion ratio of greater than zero.

(f)　　Upon division or distribution of an exempt trust and a nonexempt trust held hereunder, the Trustee, in its discretion may allocate property from the exempt trust first to a share from which a generation-skipping transfer is more likely to occur.

(g)　　The terms "skip person", "nonskip person", "generation-skipping tax exemption" shall have the same meaning as such words or phrases have in Chapter 26 of the Internal Revenue Code.

7.5　　ALLOCATION OF PRINCIPAL AND INCOME.  In matters of allocation and accounting of principal, income, expenses, receipts and disbursements, the Trustee other than the Settlor shall be governed by Florida Statutes 738, "Principal and Income", or its successor statute, as the same may from time to time exist, except as otherwise provided in this Agreement, provided, however:

(a)　　The Trustee shall have the option of charging all or any portion of the expenses incurred in connection with the settlement of Settlor's estate against either income or principal of the trust estate;

(b)　　The Trustee may allocate within the meaning of Treas. Reg. §1.643(a)-3(b) to income or to principal, or partly to income and partly to principal, all or part of the realized gains from the sale or exchange of trust assets; provided, however, that, if income is defined under an applicable state statute as a unitrust amount and the trust is being administered pursuant to such statute, the allocation of gains to income must be exercised consistently and the amount so allocated may not be greater than the excess of the unitrust amount over the amount of distributable net income determined without regard to Treas. Reg. §1.643(a)-3(b);

7-4

(c)    The Trustee, in its discretion, may exercise the power to adjust between principal and income, notwithstanding the fact that the trust assets may not be a prudent investment, but otherwise shall exercise such power in accordance with Florida Statutes 738.104;

(d)    In no event shall any allocation or accounting decision made by the Trustee in regard to the Marital Trust be contrary to the provisions of the Marital Trust or be contrary to the definition of "income" contained therein or be made in such a manner as to at any time disqualify for federal income tax purposes any trust established herein which qualifies for the marital deduction; and

(e)    (i) In the event the Settlor's estate is not required to file a Federal Estate Tax Return (Form 706), or (ii) in the event a Federal Estate Tax Return (Form 706) is filed for Settlor's estate, but no estate tax is due pursuant to such return (without taking into account the benefit of the charitable deduction for Federal income tax purposes), then any gift(s) made under the terms of this Agreement to a qualified charitable organization described in Section 2055(a) and Section 170(c) of the Internal Revenue Code, which is exempt from taxation under Section 501(a) of the Code, shall first be made by the Trustee (to the extent possible) from the income of the trust estate, and then (after exhausting all such income) any remaining such gift(s) shall be made from the principal of the trust estate.

7.6    <u>EXONERATION</u>.  No individual (as distinguished from a bank or trust company) acting as a Trustee hereunder shall, whether or not named herein, be held liable for any error of judgment or mistake of fact or law, or for any loss resulting by reason of the purchase or retention in good faith of any property as part of the trust estate, or for any loss resulting from any act done or omitted to be done in good faith, or for any act or neglect on the part of any agent or attorney employed by him or her, or for anything other than his or her own fraud or wrongful misconduct.

7.7    <u>BUSINESS PROVISIONS</u>.  Except as otherwise provided in this Agreement, and subject to such standards of reasonableness and prudence as are appropriate at the time, if any ownership interests in any non-public corporations, limited liability companies, partnerships, joint ventures, proprietorships, or business interests (herein called "business") are or become a part of the trust estate, the Successor Trustee shall have the following powers and authority, without limitation by reason of specification, and in addition to powers conferred by law, all of which may be exercised with respect to every such business, whether a corporation, a limited liability company, a partnership, a joint venture, or a sole proprietorship:

(a)    To retain and continue to operate the business for such period as the Trustee may deem advisable.

(b)    To control, direct, and manage the business. In this connection, the Trustee, in its sole discretion, shall determine the manner and extent of its active participation in the

operation of the business, and the Trustee may delegate all or any part of its power to supervise and operate the business to such person or persons as it may select, including any associate, partner, officer, or employee of the business.

(c)     To hire and discharge directors, officers, and employees and to fix their compensation and define their duties; and, similarly, to employ, compensate, and discharge agents, attorneys, consultants, accountants, and such other representatives as the Trustee may deem appropriate.

(d)     To organize a corporation, limited liability company, or other entity under the laws of this or any other state or country and to transfer thereto all or any part of the business or other property held in the trust estate, and to receive in exchange therefor such stocks, bonds, and other securities as the Trustee may deem advisable.

(e)     To take any action required to convert any corporation into a limited liability company, partnership, or sole proprietorship.

(f)     To treat the business as an entity, separate from the trust estate.  In its accountings to the court and to any beneficiaries, as elsewhere provided herein, the Trustee shall only be required to report the earnings and conditions of the business in accordance with standard corporate accounting practice.

(g)     To sell or liquidate all or any part of any business at such time and price and upon such terms and conditions (including credit) as the Trustee may determine.

(h)     To exercise any of the rights and powers herein conferred in conjunction with another or others.

(i)     To diminish, enlarge, or change the scope or nature of any business.

(j)     To guarantee debt(s) of such business.

ARTICLE VIII

GENERAL PROVISIONS AND DEFINITIONS

8.1    ADDITIONS TO CORPUS.  The Settlor or any other person with the consent of the Trustee may add to the principal of the trust created herein by deed or will or otherwise.  Such additions shall be covered by the provisions hereof, the same as if originally included herein.

8.2    LAWS GOVERNING.  This Agreement shall be construed and regulated in all respects by the laws of the State of Florida, subject to the following:

(a)    The Settlor recognizes that the place or jurisdiction of the administration of any trust hereunder may be changed if a Trustee outside of the state of Florida is appointed as the Trustee.  In addition, the Trustee is granted the authority to move the administration of any trust hereunder to any jurisdiction in the world.

(b)    If the administration of any trust hereunder is moved to another jurisdiction, then the Trustee shall also have the authority to change, by written declaration, the law applicable to such trust hereunder to be that of the jurisdiction to which the administration of such trust has been changed, and in such event, this Agreement and the rights of all persons affected by such trust  shall be construed and regulated in all respects exclusively by the laws of such jurisdiction and the courts in such jurisdiction.

(c)    In conjunction with the Trustee's authority to change the jurisdiction of the administration of any trust hereunder and the laws regulating such trust, the Trustee shall also have the authority to modify or amend this Agreement as shall be necessary or desirable to ensure the continued validity and effect of any trust hereunder pursuant to the law of such other jurisdiction, but any such modification or amendment shall not change the basic provisions hereunder or intent of the Settlor.

8.3    INTERPRETATION AND CONSTRUCTION.    All duties, rights, powers and discretions, whether or not absolute, granted any Trustee other than the Settlor hereunder shall be exercised by the Trustee other than the Settlor in its fiduciary capacity and the Trustee other than the Settlor shall be governed by fiduciary standards.

8.4    DISABILITY.  In case the income or any discretionary payment of principal from the Residuary Trust, as created hereunder, or any share thereof, becomes payable to a minor, or to a person under legal disability, or to a person not adjudicated incompetent, but who, by reason of illness or mental or physical disability, is, in the opinion of the Trustee, unable to administer properly such amount, then, such amounts shall be paid out by the Trustee in such of the following ways as it deems best:  (i) directly to such beneficiary; (ii) to the legally appointed guardian or conservator of such beneficiary; (iii) to a custodian (chosen by the Trustee in its sole discretion) under a Uniform Transfers to Minors Act to be held until age 25 years, if possible; (iv) to some

relative or friend for the care and support, and education of such beneficiary; (v) by the Trustee, using such amounts directly for such beneficiary's care, support and education.

8.5    SMALL TRUST TERMINATION.  In the event a separate and distinct trust created hereunder for the benefit of a child of the Settlor or a descendant of a deceased child of the Settlor shall at any time be comprised of assets which, in the aggregate, are valued at less than $200,000.00 (increased by the relative increase in the Consumer Price Index for Urban Consumers from January 2021 to January of the year in which such value is being determined), then, the Trustee may, in its sole discretion, terminate such trust and distribute the trust property to the beneficiary of such trust, if such beneficiary has attained age 21 years, or to a custodian under the Florida Uniform Transfers to Minors Act (chosen by the Trustee in its sole discretion) if such beneficiary has not attained age 21 years to last until such beneficiary attains age 25 years, if possible.

8.6    DONEE'S WILL.  In disposing of any trust property subject to a power of appointment by will, the Trustee may rely upon an instrument admitted to probate in any jurisdiction as the last will of the donee of such power of appointment, but if it has no written notice of the existence of such will within a period of three (3) months after his or her death, it may be presumed that the donee of such power of appointment died intestate and the Trustee shall be protected in acting in accordance with such presumption.

8.7    SPENDTHRIFT PROVISION.  No beneficial interest herein or in any separate trust or any separate shares created herein, including beneficial interests in income and/or principal, shall be (i) subject to anticipation, assignment, charge, disposition, encumbrance, pledge, sale, transfer in any manner, or (ii) liable for or subject to any contracts, debts, liabilities or obligations of any beneficiary.  Any attempted anticipation, assignment, charge, disposition, encumbrance, pledge, sale, transfer in any manner of either the income or principal of this trust or any separate trust or any separate shares created herein, by any beneficiary hereunder, shall be void and not have any validity or legal effect or be in any way recognized by the Trustee.  No beneficial interest and no income or principal receivable by any beneficiary or payable on any beneficiary's behalf shall be subject to any legal process for the payment of any beneficiary's debts or in anyway be liable to any claim of any creditor of any beneficiary.

8.8    ESTABLISHMENT OF SEPARATE TRUSTS.  Despite the delay in determining the exact nature and amounts of the assets allocable to any separate trust created hereunder upon the death of any person (including, but not limited to the Settlor and Settlor's spouse) or any other event, each such trust shall be fully effective as of the moment of such person's death or such other event.  Each separate trust created hereunder shall share, on a pro rata basis, income earned by the trust from which the allocation of assets is to be made from the moment of the event creating such separate trust until the funding of such separate trust.

8.9    <u>COMPENSATION AND ACCOUNTING.</u>

(a)    The Trustee shall be entitled to receive a fair and just compensation for its services hereunder and shall also be reimbursed for all reasonable expenses incurred in the management and protection of the trust estate. In no event shall a Trustee charge a termination fee or distribution fee in excess of its reasonable costs.

(b)    The Trustee shall render to the beneficiary or beneficiaries then entitled to the income from the trust (and any other beneficiaries entitled to an accounting under applicable law from time to time) statements of account of its receipts and disbursements as Trustee hereunder at least annually. Provided, however, during the lifetime of the Settlor and while the Settlor is not incapacitated, the Trustee shall not disclose any information concerning this trust, or its terms, operation or assets to any beneficiary other than the Settlor unless the Settlor consents thereto in writing.

8.10    <u>MERGER OR COMBINATION OF TRUSTS</u>. The Trustee shall have the power to merge or combine any separate trust created herein with any other separate trust created herein or with any other trust created by the Settlor or any other person, if the terms of the trusts are substantially the same and the trustees are the same, except that such combination or merger shall not be made if the result would change the inclusion ratio of either trust with respect to the generation-skipping tax.

8.11    <u>CONSTRUCTION</u>. The paragraph headings used are for convenience only and shall not be resorted to for interpretation of this Agreement. Wherever the context so requires, the masculine shall include the feminine and neuter and the singular shall include the plural. If any portion of this Agreement is held to be void or unenforceable, the balance of the Agreement shall nevertheless be carried into effect.

8.12    <u>PRESERVATION OF MARITAL DEDUCTION</u>. Notwithstanding anything herein contained to the contrary, any power, duty or discretionary authority granted to the Trustee under any provision of this trust shall be absolutely void to the extent that either the right to exercise or the exercise thereof shall in any way affect, jeopardize or cause Settlor's estate and this trust to lose all or any part of the tax benefit afforded by the marital deduction under either federal or state laws. It is recognized that the Trustee has no obligation with respect to any election to have property treated as qualified terminable interest property and therefore, the Trustee shall neither be required to oppose nor to consent to such election or non-election as such right is reserved solely to Settlor's personal representative. Further, the Trustee shall incur no liability for the election or non-election of treatment of property as qualified terminable interest property.

8.13    <u>DEFINITIONS.</u>

(a)    Adopted children or descendants of any person shall be treated as such person's children or descendants only if they are legally adopted prior to attaining age 18 years.

(b)    The terms "child", "children" or "descendants" of a person shall include any person hereafter born or adopted (subject to being adopted prior to attaining age 18 years).

(c)    The term "Corporate Trustee" shall mean a trust company or bank qualified to act as such, possessing trust powers.

(d)    The term "education" shall include all forms of education, including but not limited to, public or private schools, primary or secondary, college, advanced college or post college, commercial, technical, business or art education, or otherwise.

(e)    The term "executor" for purposes of making an election to have property (or part or all of the trust estate) treated as qualified terminable interest property shall mean the personal representative of Settlor's estate appointed by a probate court, but if no such personal representative is appointed by a probate court, then the Trustee hereunder.

(f)    References herein to "gross estate", "marital deduction", "charitable deduction" or other similar or related words or phrases shall have the same meaning as such words or phrases have in the Internal Revenue Code.

(g)    Any person (including a Settlor, a Trustee, or a beneficiary) shall be deemed incapacitated if: (i) he or she has been determined incapacitated or incompetent by a court of competent jurisdiction; (ii) a guardian of the person or of the property has been appointed by a court of competent jurisdiction for such person; or (iii) in the written opinion of two licensed physicians, such person is incapable either physically or mentally of handling his or her financial affairs.

(h)    The term "Internal Revenue Code" shall mean the Internal Revenue Code of 1986, as amended.

IN WITNESS WHEREOF, JAMES LOGAN, as Settlor, and JAMES LOGAN and JANICE LOGAN, as Co-Trustees, have signed this Agreement, as of the day and year first written above.


JAMES LOGAN

SETTLOR and CO-TRUSTEE


JANICE LOGAN

CO-TRUSTEE

On this 10th day of February, 2021, the Settlor signed the foregoing trust agreement in our presence (the undersigned witnesses), and we have signed as witnesses in the presence of the Settlor and in the presence of each other.

_____
(witness signature)

_____
(witness signature)

_____
NICHOLAS A. MITCHELL
(witness printed name)

_____
ALMA DEBRUYNE
(witness printed name)

STATE OF FLORIDA
COUNTY OF PINELLAS

I HEREBY CERTIFY that the foregoing instrument was acknowledged before me by means of ☑ physical presence or ☐ online notarization, this 10th day of February, 2021, by the Settlor and Co-Trustees, JAMES LOGAN and JANICE LOGAN, each of whom is ☐ personally known to me or who has ☑ produced a ___FLORIDA DRIVER LICENSE___ as identification, and both of whom have acknowledged before me that they executed the same as their free act and deed and for the uses and purposes therein stated.

6078387v2

_____
NOTARY PUBLIC

JENNIFER A. STUDER
MY COMMISSION # GG 934679
EXPIRES: March 24, 2024
Bonded Thru Notary Public Underwriters

8-5

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA
PROBATE DIVISION

JONATHAN LOGAN and
SMART COMMUNICATIONS HOLDING, INC.,

      Plaintiffs,

v.                                   Case No: 2023-CA-10020NC

JANICE LOGAN, individually and as Trustee of the    (CONSOLIDATED)
James Logan Family Trust dated February 10, 2021
and ALEXIS LOGAN, individually,             Case No.: 2023-CA-1280-NC

      Defendants.

_____/

**EXHIBIT "D"**

**TO**

**<u>COMPLAINT</u>**

## STOCK POWER

**FOR VALUE RECEIVED,** the undersigned, JAMES P. LOGAN (the "Transferor"), hereby sells, assigns and transfers unto JAMES LOGAN, as CO-TRUSTEE of the JAMES LOGAN FAMILY TRUST, dated February 10, 2021, five thousand (5,000) shares (the "Shares") of the common capital stock of SMART COMMUNICATIONS HOLDING, INC., a Florida corporation (the "Corporation"), standing in the name of the Transferor on the books of the Corporation, and does hereby irrevocably constitute and appoint Thomas D. Sims, Esq. as attorney to transfer the Shares on the books of the Corporation with full power of substitution in the premises.

A signed copy of this Stock Power, including that executed via DocuSign or other valid electronic or digital signature medium, delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Stock Power.

**DATED TO BE EFFECTIVE AS OF** _____September 16_____ **, 2022.**

TRANSFEROR:

James Logan (Sep 16, 2022 18:52 EDT)

JAMES P. LOGAN

6672435v2

# Stock Power - James Logan to Revocable Trust re Smart Communications Holding, Inc. (2022)

Final Audit Report                                                  2022-09-16

| | |
|---|---|
| Created: | 2022-09-16 |
| By: | Rachel Chase (rachelc@jpfirm.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAhWDfQnjwoEN_qVWMiErLBCmCNdIW_Ytb |

## "Stock Power - James Logan to Revocable Trust re Smart Communications Holding, Inc. (2022)" History

📄 Document created by Rachel Chase (rachelc@jpfirm.com)
2022-09-16 - 8:52:13 PM GMT- IP address: 144.129.14.130

✉ Document emailed to jim.logan@smartcommunications.us for signature
2022-09-16 - 9:02:18 PM GMT

📄 Email viewed by jim.logan@smartcommunications.us
2022-09-16 - 9:02:20 PM GMT- IP address: 74.125.151.157

✍ Signer jim.logan@smartcommunications.us entered name at signing as James logan
2022-09-16 - 10:52:18 PM GMT- IP address: 199.47.254.244

✍ Document e-signed by James logan (jim.logan@smartcommunications.us)
Signature Date: 2022-09-16 - 10:52:20 PM GMT - Time Source: server- IP address: 199.47.254.244

✅ Agreement completed.
2022-09-16 - 10:52:20 PM GMT

**Adobe Acrobat Sign**

# EXHIBIT E

---------- Forwarded message ----------
From: **Jon** <jon.logan@smartjailmail.com>
Date: Thu, Apr 30, 2015 at 3:26 PM
Subject: Contract
To: Jim Logan <jim.logan@smartjailmail.com>

Agreement between Jim Logan - president of smart communications us, and smart communications holding, between Jon Logan creator and owner of intellectual property known as (postal mail contraband elimination system).

This contract confirms Jonathan D Logan is the creator and owner of intellectual property and system business model soon to be patented for postal mail elimination system. This intellectual property is solely created and owned by Jonathan Logan (inventor) and this contract acknowledges that Jonathan Logan exclusively owns and will retain exclusive ownership of this service invention to correctional facilities and smart communications us and smart communications holding and Jim Logan, Alexis logan, or any employee, share holder or agent of smart communications us or of Jim Logan and Alexis Logan acknowledges they do not own this service invention and they can not use this postal mail contraband elimination service or system model, unless direct written permission is given by the owner of this intellectual property (Jonathan d Logan) to use this service, model, business plan, or technology.

This agreement encompasses a non disclosure agreement and the technology and system disclosed by Jonathan Logan to Jim Logan, Alexis Logan and smart communications us and smart communications holding can not be used or disclosed in any way shape or form unless written permission is given by Jonathan Logan.

Date and sign.  Alexis sign and Janice as a witness to you.

Thank you!

Jon,
Smartjailmail.com

X Alexis Logan, Dated May 18, 2015

✱ Jon new technology/Patent/ new IP only

-Alexis Logan

jim.logar

Mail

COMPOSE

**Inbox (1,524)**
Starred
Important
Sent Mail
Drafts (78)
Follow up
Misc
Priority
More

Contract    Inbox    x

More

1 of 3,891

J

SN

**Jon**
to me

3:26 PM (18 minutes ago)

Agreement between Jim Logan - president of smart communications us, and smart communications holding, between Jon
Logan creator and owner of intellectual property known as (postal mail contraband elimination system).

This contract confirms Jonathan D Logan is the creator and owner of intellectual property and system business model soon to
be patented for postal mail elimination system. This intellectual property is solely created and owned by Jonathan Logan
(inventor) and this contract acknowledges that Jonathan Logan exclusively owns and will retain exclusive ownership of this
service invention to correctional facilities and smart communications us and smart communications holding and Jim Logan,
Alexis logan, or any employee, share holder or agent of smart communications us or of Jim Logan and Alexis Logan
acknowledges they do not own this service invention and they can not use this postal mail contraband elimination service or
system model, unless direct written permission is given by the owner of this intellectual property (Jonathan d Logan) to use this
service, model, business plan, or technology.

This agreement encompasses a non disclosure agreement and the technology and system disclosed by Jonathan Logan to
Jim Logan, Alexis Logan and smart communications us and smart communications holding can not be used or disclosed in any
way shape or form unless written permission is given by Jonathan Logan.

Date and sign.  Alexis sign and Janice as a witness to you.

Thank you!

**Jim Logan** <jim.logan@smartjailmail.com>
to Alexis

3:42 PM (2 minutes ago)

# EXHIBIT 3

# IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.

                    Plaintiffs,

v.

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust, dated February 10, 2021;
and ALEXIS LOGAN,

                    Defendants.                /

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021,

                Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., SMART
COMMUNICATIONS HOLDING, LLC, and
HLFIP HOLDING, LLC,

                Counterclaim Defendants.        /

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021, and
derivatively on behalf of Smart Communications
Holding, Inc.,

                    Plaintiff,

       v.

JONATHAN D. LOGAN,
SMART COMMUNICATIONS HOLDING, INC.,
nominal defendant, SMART COMMUNICATIONS
HOLDING, LLC, HLFIP HOLDING, LLC,
LOCO FLORIDA LLC, and SMART
COMMUNICATIONS YACHT HOLDING, LLC,

                  Defendants.                /

Case No. 2023-CA-1002-NC

(CONSOLIDATED)

Case No.: 2023-CA-1280-NC

## DEFENDANT JANICE LOGAN'S
## SECOND AMENDED ANSWER WITH COUNTERCLAIMS

Defendant Janice Logan ("Janice"), individually and as Trustee of the James Logan Family Trust dated February 10, 2021 ("Defendant"), incorporates her Amended Answer and Affirmative Defenses, as contained in DIN 281, as though fully set forth herein. Janice further notes that Count II of the Complaint, DIN 2, is subject to a partial final judgment, pursuant to DIN 652.

## COUNTERCLAIMS[1]

Counterclaim-Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021 ("Janice"), claims as follows against Counterclaim-Defendants Jonathan D. Logan ("Jon"), Smart Communications Holding, Inc. ("SmartComm" or the "Company"), Smart Communications Holding, LLC ("SmartComm DE"), and HLFIP Holding, Inc./LLC ("HLFIP").

## INTRODUCTION

1.      SmartComm is a valuable business that provides communications-related products and services to correctional facilities. Janice brings this action because her son Jon, using his unilateral control of SmartComm, has repeatedly schemed in breach of both his legal duties and common decency to deprive Janice of the value of her 50% ownership of SmartComm.

2.      Jon first schemed against Janice by proffering a fraudulent shareholders agreement. Jon launched this deception just days after Janice refused to sell the Trust's shares to Jon for a small fraction of their value and she sent him a letter questioning his use of corporate assets.[2] Jon

---

[1]      The factual background sections for the proposed Second Amended Verified Complaint (DIN 675, Exhibit 1) and these Counterclaims in the proposed Second Amended Answer are similar. Janice, out of an abundance of caution, separated her direct and derivative claims into two separate pleadings pursuant to Jon and SmartComm's Second Motion to Dismiss (DIN 451) and Fla. R. Civ. P. 1.110(g). Janice maintains, as she pointed out in her Motion to Strike the Second Motion to Dismiss (DIN 460) that the Second Motion to Dismiss is an improper second bite at the apple and that Jon and SmartComm waived their procedural objection to the direct and derivative claims being brought together because they failed to object in their first Motion to Dismiss (DIN 286). Moreover, there are scores of facts common to the direct and derivative claims, and so it is expedient to try them together. However, in the interests of avoiding the procedural objection and getting to the substance of her claims, Janice brings her direct claims separately here. Because the facts surrounding her direct and derivative claims are nearly identical, she repeats those facts in her two pleadings.

[2]      *See* DIN 271, Amended Verified Complaint, ¶¶ 71-80 (describing the discovery of the purported Shareholders' Agreement and Jon's actions after its discovery).

suddenly claimed to have "found" a fully-executed Shareholders' Agreement requiring Janice to relinquish the Trust's shares—but could never explain how he had "lost" that critical document on his own kitchen counter for four months, during which time he had not told a soul of its supposed execution. After a three-day bench trial in January 2024, this Court held that there was no shareholders' agreement in effect between the two 50% shareholders of SmartComm, Jon and Janice. *See* DIN 652, Phase I Declaratory Judgment, *attached hereto* as Exhibit 1.

3.      Jon's second scheme—which continues today—is wielding corporate resources in retaliation against Janice for asserting her rights as a shareholder. Last May, Jon fired his recently widowed mother from her position at SmartComm, cut off her salary and health insurance, began eviction proceedings against her, and filed vexatious lawsuits threatening to repossess her car and charge $35,000/month in rent for her to live in the home she had lived in with her late husband (and SmartComm co-founder), James Logan ("Jim"). That effort was temporarily enjoined in July 2023 after a full-day evidentiary hearing. *See* DIN 169, Order on Janice Logan's Motion for Temporary Injunction, *attached hereto* as Exhibit 2. Nevertheless, Jon recently tried to dun Janice for over $200,000 in expenses incurred to maintain the house from which he sought unsuccessfully to evict her. *See* Exhibit 3, Reimbursement Demand Letter.

4.      Jon launched his third scheme—to move SmartComm assets beyond this Court's jurisdiction by establishing several Delaware corporate entities to hold them—just one month after the Court enjoined his retaliation against Janice and found that based on evidence so-far presented, the purported shareholders' agreement was not in existence during relevant time periods. Jon surreptitiously converted SmartComm-related entities from Florida businesses to Delaware businesses. He unilaterally created a new SmartComm holding entity in Delaware, SmartComm DE, because he could not convert SmartComm without Janice's permission. He then "executed"

3

an Asset Transfer Agreement purporting to transfer all of SmartComm's assets to SmartComm DE. *See* Confidential Exhibit 4, SmartComm DE Asset Transfer Agreement. He also began assigning old SmartComm contracts to SmartComm DE, and entering into new contracts under the guise of SmartComm DE. *See* Exhibit 5, Consent to Assignment; *see also* Confidential Exhibit 6, Eaton County Master Services Agreement.

5.     In furtherance of his Delaware asset-diversion scheme, Jon filed a declaratory judgment action in Delaware. Jon then sought to expedite a Motion for Summary Judgment in that case so that a less-familiar court might declare Jon the sole member of two SmartComm-related entities—Loco Florida LLC (which holds SmartComm's headquarters building), and Smart Communications Yacht Holding, LLC (which holds SmartComm's 100' Italian Riva Corsaro motor yacht). Despite Jon's representation to the Delaware court that he would notify Janice of his declaratory judgment action there, Janice in fact learned of it via a docket alert service. Forced to intervene, Janice filed a Motion to Dismiss or Stay. The Delaware court stayed Jon's suit, criticizing his lack of candor about the extent and progress of the Florida action. *See* Exhibit 7, Order Granting Janice Logan's Motion to Stay.

6.     Jon's fourth scheme is a self-dealing intellectual property ("IP") license agreement that would divert *all* of SmartComm's profit to a company Jon claims to own personally. This scheme rests on a purported August 2023 IP license/long-term note payable between SmartComm and HLFIP[3] (a company Jon asserts he exclusively owns) for a breathtaking 40% of SmartComm's net sales. The purported license agreement's 40% IP royalty rate is no coincidence: SmartComm's internal EBITDA margin figure is exactly 40%. *See* Confidential Exhibit 8, 2022 Financial

---

[3]     Jon converted HLFIP from a Florida corporation to a Delaware limited liability company during the furtive, post-injunction conversions in late August/early September 2023. Thus, Janice names both, and will refer to them commonly as HLFIP.

Presentation. Moreover, Jon sought to eviscerate SmartComm with this profit-stripping royalty for intellectual property that *has been invalidated* by the Federal Circuit. *See HLFIP Holding, Inc. v. York Cnty., PA*, No. 2022-1940, 2023 WL 5316529 (Fed. Cir. Aug. 18, 2023). And brazenly undeterred by more than a decade-long course of dealing by which SmartComm paid nothing for the now-invalidated IP, Jon *backdated* the 40% royalty from 2023 to 2015 *with interest*, saddling SmartComm with a purported *$80 million liability to himself*.

7.      Janice brought Jon's Delaware asset-transfer and IP liability schemes to the Court's attention on a Motion for Contempt of Temporary Injunction and to Appoint a Temporary Custodian. DIN 401, 468. During the evidentiary hearing on that Motion, prior to evidence being taken, Jon and SmartComm's counsel admitted to the asset transfer and acknowledged the IP liability (while representing that no payments had yet been made on the supposedly 8-year-old liability). To avoid the appointment of a custodian, they stipulated to additional interim injunctive relief, including that: (1) Jon and SmartComm would not enter into any transactions outside the ordinary course of business without Court approval; (2) SmartComm would not make any payments on the fraudulent IP liability; and (3) that SmartComm DE would become a party to the Florida action and Janice would have identical information rights to those she has in SmartComm. *See* DIN 489, Order on Janice Logan's Motion to Appoint a Temporary Custodian and For Contempt, *attached hereto* as Exhibit 9. Nevertheless, Jon continues to claim that the IP transactions are legitimate and should be reflected on SmartComm's books, thereby degrading SmartComm from a profitable, fast-growing company to a deeply-indebted one—thus harming Janice in the midst of their shareholder dispute.

8.      Simply put, Jon's persistent and aggressive scheming against Janice and the Trust is no way to run a Florida corporation. Jon forged a major corporate governance document,

retaliated so aggressively against a 50% shareholder for questioning his waste of corporate assets that this Court enjoined him from doing so, surreptitiously sought to move contested assets from this Court's jurisdiction, and has attempted to divert all profit from SmartComm to himself with a self-dealing IP agreement. Janice respectfully asks the Court to put a stop to Jon's reckless predations by invalidating his self-dealing transactions, appointing a custodian or receiver to manage the SmartComm business and prepare it for sale for the benefit of both shareholders, and hold Jon accountable for his misconduct.

## **THE PARTIES**

9.      Counterclaim-Plaintiff Janice Logan is a resident of Sarasota County, Florida, Trustee of the James Logan Family Trust, dated February 10, 2021 and a 50% shareholder of SmartComm.

10.      The Trust is administered in Sarasota County, Florida.

11.      The Trust became a 50% shareholder of SmartComm when Jim transferred his shares via stock power to the Trust on September 16, 2022, shortly before his death on October 16, 2022. *See* Exhibit 10, Stock Power Certificate.

12.      Counterclaim-Defendant SmartComm is a Florida corporation, with its headquarters in Pinellas County, Florida at 10491 72nd Street, Seminole, Florida 33777. It is the sole member of SmartComm DE, making SmartComm DE a SmartComm subsidiary.

13.      Counterclaim-Defendant SmartComm DE is a Delaware limited liability company formed on August 29, 2023 in the midst of this Consolidated Action.

14.      SmartComm DE consented to this Court's jurisdiction after a hearing to adjudicate whether a temporary custodian should be appointed for SmartComm, and was thereafter added as a party. *See* Ex. 9, DIN 489, at 2.

15.    Counterclaim-Defendant HLFIP is now a Delaware limited liability company. Prior to August 29, 2023 (the date Jon converted it to a Delaware limited liability company in the midst of this Consolidated Action), HLFIP was a Florida corporation with its principal office listed as SmartComm's Pinellas County headquarters. Its principal asset is SmartComm's intellectual property, and Jon (a Florida resident) is the sole member.

16.    Loco Florida LLC ("Loco") and Smart Communications Yacht Holding, LLC ("Yacht") are SmartComm-affiliated entities. Prior to August 29 and September 1, 2023, they were both Florida companies; however, they are now Delaware limited liability companies as a result of Jon's conversions in the midst of litigation.

17.    Prior to Jim's death, the two members of Loco and Yacht were Jim and Jon. When Jim transferred his SmartComm shares to the Trust, he also executed stock powers to transfer his membership interests in Loco and Yacht to the Trust. *See* Exhibits 11 and 12, Loco and Yacht Assignments of Membership Interest.

18.    Loco holds title to SmartComm's headquarters building, which SmartComm purchased.

19.    Yacht holds title to SmartComm's 100 foot, $10 million Italian Riva Corsaro motor yacht, "Convict." SmartComm also paid for the yacht.

20.    Counterclaim-Defendant Jon is Janice's son, 50% shareholder of SmartComm, the current sole director and sole officer of SmartComm, the sole member of HLFIP, and the managing member of Loco and Yacht. Jon is a resident of Pinellas County, Florida.

## JURISDICTION AND VENUE

21.    Venue in Sarasota County is proper because Janice is a resident of Sarasota County, the Trust is administered in Sarasota County, and the Trust's injuries as a shareholder accrued pursuant to Florida Statutes Section 47.051 in Sarasota County.

22.     Jon is a resident of Florida; SmartComm is a Florida Corporation; and, SmartComm DE submitted to this Court's jurisdiction and was made a party to the Consolidated Action in DIN 489.

23.     The Amount in Controversy exceeds $50,000.00.

**A.     Jurisdiction over Entities Converted in the Midst of Litigation**

24.     At the December 6, 2023, hearing on Janice's Motion for Contempt of Temporary Injunction and to Appoint a Custodian, Jon, SmartComm, and Loco's counsel made a number of representations that the Florida to Delaware conversions were not intended to evade this Court's jurisdiction: "Nowhere in that advice was the intention to remove assets from this jurisdiction and we don't believe that they did and, certainly, that's no one's intention." *See* Exhibit 13, December 6, 2023 Hearing Tr. at 39:6-9; *see also id.* at 43:23-25 ("Again, everything we've done has always been completely transparent and not -- nothing done is designed to deprive this Court of jurisdiction.").

25.     Counterclaim-Defendants' counsel also explained that she did not think conversions would affect this Court's jurisdiction over the entities:

> And Florida law says very clearly when you convert to a foreign entity -- which is allowed by statute -- when you convert, the effective conversion under 605.1046 is it's the same entity. All the assets remain and all of it remains before Your Honor. So there is literally only a change in form, not substance.

*Id.* at 25:6–12.

**B.     This Court Has Jurisdiction over HLFIP Holding, LLC**

26.     On August 29, 2023, Jon converted HLFIP Holding, Inc., a Florida corporation, to HLFIP Holding, LLC, a Delaware limited liability company, in the midst of this Consolidated Action. *See* Exhibit 14, HLFIP Holding, Inc. Articles of Conversion.

27.    HLFIP FL's principal office was SmartComm's headquarters building. *See* Exhibit 15, HLFIP Holding, Inc.'s 2023 Annual Report.

28.    Jon was the sole shareholder of HLFIP FL.

29.    Jon, a Florida resident, is the sole member of HLFIP DE.

30.    On August 29, 2023, HLFIP DE purportedly licensed its main "product" (the IP) to SmartComm (a Florida corporation) for the duration of SmartComm's existing contracts (the Legacy Contracts) and for a Transitory Period ending on March 31, 2024. *See* Confidential Exhibit 16, Termination of Oral License Memorandum.

31.    Upon information and belief, HLFIP DE is still leasing IP to SmartComm (FL) for certain ongoing Legacy Contracts that have not yet terminated or expired.

32.    In the SmartComm Audited 2022 Financial Statement, which was prepared in October 2023, SmartComm recognized for the first time a purported $58 million liability (now increased to $80 million) incurred to HLFIP FL.[4] *See* Confidential Exhibit 17, 2022 Audited Financial Statement.

33.    SmartComm and, later, SmartComm DE (a SmartComm subsidiary) are HLFIP DE's only clients.

34.    HLFIP DE therefore leases intangible personal property to a Florida corporation. *See* Fla. Stat. § 48.181(5).

35.    HLFIP DE is thus "conclusively presumed" to be engaged in "substantial and not isolated activities" within Florida, and "operating, conducting, engaging in, or carrying on a business or business venture" in Florida. *See* Fla. Stat. § 48.181(5).

---

[4]    This Court automatically has jurisdiction over HLFIP Holding, Inc. (the pre-conversion Florida corporation), and Janice pleads jurisdictional facts sufficient for this Court's jurisdiction against HLFIP Holding, LLC to the extent necessary for this Court to adjudicate and grant a remedy related to the now-$80 million (and growing) liability to HLFIP Holding, Inc.

36.     This Court has general personal jurisdiction over HLFIP DE because, either under the conclusive presumption of § 48.181(5) or not, it engaged in "substantial and not isolated activity" in Florida when it licensed its IP to SmartComm. *See* Fla. Stat. § 48.193(2).

37.     Janice's fraudulent transfer claim arises from HLFIP DE's business venture in Florida (whether or not the conclusive presumption of § 48.181(5) applies)—that is, the license of its IP to SmartComm from August 29, 2023 onward, and the backdated purported 40% royalty liability for past IP licensing to HLFIP FL.

38.     This Court therefore has specific personal jurisdiction over HLFIP DE. *See* Fla. Stat. § 48.193(1)(a)(1).

39.     This Court's exercise of personal jurisdiction over HLFIP DE satisfies federal constitutional due process because, for the reasons described above, HLFIP has "sufficient minimum contacts" with Florida. *See Schwartzberg v. Knobloch*, 98 So. 3d 173, 177 (Fla. 2d DCA 2012).

40.     In addition and in the alternative, HLFIP never had an existence apart from SmartComm and is, in fact, a mere instrumentality of SmartComm.

41.     SmartComm funded in full the development, protection, and enforcement of the intellectual property now held by HLFIP.

42.     SmartComm and SmartComm DE are the only clients of HLFIP and its predecessor.

43.     Prior to this lawsuit, SmartComm failed to observe formalities in the licensing of IP from HLFIP FL, and did not recognize HLFIP FL as an independent entity in its dealings with it. Moreover, the only document recognizing any historical licensing between the two entities is

the August 29, 2023, Memorandum Re: Termination of Exclusive Oral License Agreement. *See* Confidential Ex. 16.

44.     HLFIP FL was a mere instrumentality of SmartComm, and HLFIP DE is no different.

45.     Further, HLFIP DE was created for the improper purpose of fraudulently diverting assets and revenue from SmartComm and its other 50% shareholder into an entity solely owned by Jon and domiciled in another state—thereby evading this Court's jurisdiction.

46.     For the reasons described in paragraphs 24 through 45, this Court has jurisdiction over HLFIP DE via the alter-ego theory of long-arm jurisdiction. *See, e.g., Bellairs v. Mohrmann*, 716 So.2d 320, 322 (Fla. 2d DCA 1998).

## FACTUAL BACKGROUND

### I.     The Formation Of SmartComm

47.     SmartComm is a national provider of communications-related products and services to correctional facilities.

48.     As of 2024, SmartComm's main services are (1) the SmartTablet and SmartKiosk, where electronic messages and scanned communications are sent to prisoners from non-incarcerated family, friends, and community members; (2) an inmate telephone service that works over the internet; and, (3) Mailguard, which is offsite screening and scanning of mail to inmates to eliminate contraband and allow prisons to monitor communications.

49.     SmartComm was incorporated on December 29, 2014. *See* Exhibit 18, Smart Communications Holding, Inc.'s Articles of Incorporation.

50.     The Articles of Incorporation provide for 10,000 shares of single-class stock, of which Jon owns 50% and co-founder Jim owned 50%. *See* Ex. 18.

## II.     The Trust's Interest In Jim's Shares

51.     On September 16, 2022, Jim executed an unconditional Stock Power that transferred his shares in SmartComm to the Trust. *See* Ex. 10.

52.     Jim died on October 16, 2022.

53.     Upon Jim's death, as 50% owner, Janice should have been appointed a director of SmartComm with Jon. She made a request consistent with this expectation, which Jon denied.

## III.    Jon's Waste Of Corporate Assets

54.     In abuse of his fiduciary duties, Jon has treated the company's resources as a personal piggy-bank, and grossly wasted corporate assets.

55.     Among other misconduct, SmartComm purchased the following assets for Jon's personal use:

    a.     A $10 million 100' Riva Corsaro yacht named "Convict";

    b.     A $1 million 45' Nor-Tech boat;

    c.     A $250,000 Rolls-Royce;

    d.     A $300,000 Lamborghini with the license plate "Inmate";

    e.     A $350,000 Ferrari;

    f.     A $180,000 Range Rover;

    g.     A $1.5 million condo in Miami; and,

    h.     A $4 million Tierra Verde waterfront house.

56.     Jon uses SmartComm money to pay for the following yacht-related expenses:

    a.     Three full-time staff members, including a captain (with $130k annual salary), and two crew;

    b.     Several thousands of dollars for each fuel tank fill-up; and,

    c.     All maintenance, storage, and transportation costs.

57.    Jon also regularly amasses enormous corporate credit card bills on personal expenses like vacations and luxury meals:

    a.    $9,438 on an Airbnb ski lodge in Breckenridge, Colorado;

    b.    International plane tickets to Colombia for an annual "guys trip";

    c.    $2,848 on a fishing charter; and,

    d.    $1,624 for a sushi dinner.

58.    While Jon touts a low salary, in addition to his personal use of the above luxury assets, he takes hundreds of thousands of dollars in "shareholder loans" every year. In 2023, he caused SmartComm to make over $600,000 in shareholder loans to himself while SmartComm issued no dividends to its shareholders (which would obviously benefit Janice as well).

## IV.    Jon's Fraudulent Shareholders' Agreement Scheme

59.    After Jim's death, from November 2022 to mid-January 2023, Jon negotiated with Janice to purchase the Trust's shares without reference to any documents that would control that sale. Jon offered to buy the Trust's shares from Janice for $20 million, and had his own attorneys at Hill, Ward, Henderson draft a contract to that effect in late December 2022. Janice declined because she was aware of two 2022 valuations of SmartComm from reputable investment banks Truist and UBS that estimated the Company's value as well over $100 million. *See* Exhibit 19, September 18, 2022, Draft Email from Jim to Jon (Sent to Janice). Thereafter, negotiations broke down.

60.    Meanwhile, on January 20, 2023, counsel for Janice and the Trust sent Jon's attorneys a letter detailing Janice's concerns about Jon's waste and mismanagement of SmartComm ("Management Concern Letter"). *See* Exhibit 20, Management Concern Letter.

13

61.     Shortly afterward, on January 31, 2023, Jon miraculously "found" a copy of a "fully executed" Shareholders' Agreement that (among other things) would have forced Janice to sell the Trust's shares to Jon on terms unfavorable to Janice.

62.     Jon made the purported Shareholders' Agreement the basis of his and SmartComm's surprise complaint against her—2023-CA-1002, filed the first business day after the parties' standstill agreement expired—and attempted in that late-February 2023 lawsuit to force her to sell her shares according to the procedure outlined in the purported Shareholders' Agreement.

63.     The validity of the purported Shareholders' Agreement was the subject of Phase I of the Consolidated Action, culminating in the Phase I Trial (further described below).

**V.    Jon's Retaliation Scheme And The Court's Temporary Injunction**

64.     In the midst of litigation, and in sole control of SmartComm, its books and records, its personnel, and its related entities, Jon attempted to manipulate Janice and this litigation by depriving his recently widowed, then-69 year-old, mother of resources.

65.     On or about May 7, 2023, Jon summarily fired Janice from her consultant role at SmartComm, and stopped issuing her a paycheck. Janice believes she is entitled to a role at SmartComm, including at least being a director of the Company she co-owns.

66.     Janice was willing and able to perform her consultant role at SmartComm or a directorship. Instead, Jon shut her out and made it impossible for her to do so, and then fired her for failing to contribute.

67.     In addition to her role at SmartComm being a source of income, it was a primary source of health insurance. She relied upon the health insurance for access to healthcare related to a heart condition. Without the SmartComm health insurance, Janice would be forced to find new-

providers without the benefit of the SmartComm group coverage, which can take a long time in Sarasota because of demand levels.

68.     Jon represented, through counsel, that Janice's firing and the threat of charging rent for Janice's home and car (further alleged below)—or otherwise evicting her and repossessing the car—is part of an effort to address the corporate waste the Trust alleged is rampant at SmartComm.

69.     Jon has not applied similar standards of waste reduction to SmartComm's spending that benefits him personally. For instance, Jon is not now paying rent for his regular personal use of his Tierra Verde home, Miami Condo, 100' yacht, 45' yacht, and four exotic cars worth more than $180,000 each (2017 Ferrari Spider, 2020 Lamborghini Huracan, 2015 Rolls Royce Wraith, 2022 Range Rover)—all of which are SmartComm assets or were paid for by SmartComm and then titled to Jon. Far from it, in addition to drawing a regular salary and $619,238.42 in "shareholder loans" in 2023 alone (compared to Janice's $0), Jon is using these corporate assets for free and is paying for expenses related to his use of them out of SmartComm's coffers.

70.     Following a July 2023 Temporary Injunction hearing, this Court enjoined Jon from demanding rent or seeking to evict Janice and seeking to repossess her SmartComm-owned vehicle. This Court further ordered Jon to reinstate Janice to her position at SmartComm. *See* Ex. 2, DIN 169, at 10.

71.     In its order granting Janice's Motion for a Temporary Injunction against Jon's retaliatory conduct, this Court made the factual finding that Jon's complained-of actions were retaliatory. *See* Ex. 2, DIN 169, at 7, 8 ("This factual timeline and the alleged circumstances surrounding the reason for Plaintiff's termination was not refuted by the Defendant when he testified, in fact they appeared to be reinforced by his testimony… In sum, the Defendant did not deny under oath at the hearing that the Plaintiff was terminated from employment, had her health

care benefits cut, and denied use of company vehicles and demanded to pay rent as a result of the allegations and actions made by the Plaintiff in bringing these allegations against the Defendant and filing the subsequent lawsuit.").

72.     Although this Court temporarily enjoined Jon from certain retaliatory activities, there is no indication that Jon's campaign of retaliation has ceased. For instance, he recently refused to pay for the propane at Janice's home, which is necessary for hot water and gas; and for other basic maintenance like HOA-required fence washing. By comparison, SmartComm's books and records evidence regular payments for utility and maintenance expenses at Jon's SmartComm-owned home.

73.     He also retaliated via the Delaware conversions and fraudulent IP transactions to strip SmartComm of value for his own benefit. Jon would only be emboldened to worsen the retaliation if the Temporary Injunction were lifted (and indeed, Jon is currently appealing the Temporary Injunction as wrongfully entered). *See Logan v. Logan*, No. 2D23-1798 (Fla. 2d DCA 2023).

74.     Furthermore, upon information and belief SmartComm has funded Jon's significant personal legal bills for the litigation against Janice.

75.     In other words, Janice, as a 50% owner of the company, was the target of Jon's attempt to strip her of her shares via a forced sale, and also funded (and continues to fund) the lawsuit Jon initiated against her.

## VI.     Jon's Delaware Asset-Diversion Scheme

76.     On August 29, 2023—mere weeks after Janice prevailed on her Motion for a Temporary Injunction—Jon executed a series of maneuvers to transfer assets out of SmartComm and out of Florida.

16

77.     First, he created a parallel SmartComm entity in Delaware—SmartComm DE—with SmartComm as the sole member. *See* Exhibit 21, SmartComm DE Certificate of Formation.

78.     Then, he moved all of SmartComm's assets to the Delaware entity in a unilateral "Asset Transfer Agreement." *See* Confidential Ex. 4.

79.     Next, Jon converted HLFIP Holding, Inc. (a Florida corporation) into HLFIP Holding, LLC (a Delaware entity, with Jon as its sole member). *See* Ex. 14.

80.     Still on the same day, Jon converted Yacht into a Delaware entity.

**A.      Jon's IP License Scheme**

81.     On August 29, 2023, HLFIP issued an unsigned, unauthored memo (devoid even of letterhead, a watermark, or any kind of law firm version stamp) to SmartComm terminating a purported oral license agreement. *See* Ex.16.

82.     That same day, Jon (on behalf of SmartComm DE) signed an Executed License Agreement with himself (on behalf of HLFIP DE) in which SmartComm DE would pay a whopping 40% net sales royalty to HLFIP to license its IP. *See* Confidential Ex. 22, Executed IP License Agreement.

83.     40% is no random number: SmartComm's internal estimated EBITDA as a percentage of revenue was 40% in 2022. *See* Confidential Ex. 8. Jon knew as much (*see* Exhibit 23 (Jon email sending the presentation to Jim)), and plainly intended to divert all of SmartComm's profit to himself.

84.     SmartComm's financials do not support a 40% royalty to HLFIP either—the Company's primary revenue does not flow from services related to HLFIP's patents, and the revenue that does is related to the invalidated patents. For instance, in 2023, only 8% of SmartComm's revenue stemmed from a once-patented technology. *See* Confidential Exhibit 24,

2023 Profit & Loss Statement. That is hardly appropriate consideration to justify paying 100% of SmartComm's EBITDA margin to HLFIP.

85.     Janice knows of no evidence from 2015 through 2022 that recognizes any expectation of payment from SmartComm to HLFIP for use of the IP (likely because none exists). Rather, there is ample evidence from that time that SmartComm and HLFIP had a royalty-free license, which is ongoing. Royalty-free licenses are common in corporate families where royalty-free use of IP is mutually beneficial to both entities.

### 1.     The Books and Records Make Clear the IP Royalty Is a Recent, Fraudulent Invention

86.     At the end of 2021—before Jim's death and before Janice became a shareholder—SmartComm reported $16 million in shareholders' equity and no IP liability. Confidential Exhibit 25, Audited Financial Statement for 2021.

87.     By October 2023, SmartComm's 2022 Audited Financial Statement (which was prepared in October 2023, two months after the Temporary Injunction) showed SmartComm was supposedly in the red to the tune of $38 million as a result of a new purported $52,848,813 long-term liability to HLFIP (Jon) and $5,592,170 in accrued interest on the backdated liability. *See* Confidential Ex.17.

88.     Not only did Jon unilaterally enter into a director conflict-of-interest transaction in the midst of shareholder litigation, he unabashedly backdated the transaction to 2015. This backdating was described in three paragraphs tacked onto page 12 of the 2022 Audited Financial Statement. The first two paragraphs of that section attempt to justify the 2022 40% royalty, and the third states,

> The Company **reflected** the prior years' use of the HLFIP IP license for the years 2015-2021 as a long-term liability in the amount of $52,848,813, and accrued interest of $ 5,592,170. Retained earnings

> has been adjusted to reflect effects of this inclusion for prior year
> use of the HLFIP license."

*Id*. (emphasis added).

89.     In sum, after litigation had commenced and this Court concluded that Janice had demonstrated a likelihood of success on the merits of her claims in the First Amended Complaint, Jon gutted SmartComm's value by making an agreement with himself that SmartComm: (1) suddenly owed HLFIP $58 million (which has since grown to $80 million); and (2) all of SmartComm's forward-looking profit margin for ongoing use of the IP. Jon based SmartComm's purported liability on 2015-2023 licenses for patents that did not exist until 2019, and had been declared invalid by three federal courts as early as April 2022.

90.     Jon's counsel admitted on the record at the December 6, 2023, Contempt and Custodian Hearing that no payments had yet been made on the purported, then-8-year-old liability, demonstrating the purported license agreement contravened a years-long course of dealing.

91.     The 2015 start for the HLFIP license backdating is particularly questionable because the main patent it holds (Mailguard—the '617 Patent) was not granted until May 2019 after initially being rejected. A U.S. Patent gives the owner the right to prevent others from making, using, offering to sell, or selling the patented invention in the United States "without authority." *See* 35 U.S.C. § 271(a). A patent license grants "authority" to another to use the invention without committing infringement. Thus, it would be nonsensical if SmartComm were paying to license IP that was not yet protected.

92.     SmartComm itself did not begin enforcing the flagship HLFIP Patent until late 2019, and it was invalidated by two district courts in 2022, which was affirmed by the Federal Circuit in 2023.

## 2.     The HLFIP IP Is Unpatentable and Worthless

93.     Each of HLFIP's patent claims merely recite obvious approaches to delivering mail to prisoners that humans have performed for years, and suggest that certain of those steps now be performed on a computer. Such purported inventions do not merit patent protection under federal law, and thus saddling SmartComm with any license fee on them, let alone 40% of its entire revenue stream, is unconscionable.

94.     35 U.S.C. § 101 establishes the requirements for patentability, and requires the invention to be "new and useful."

95.     In 2014 the United States Supreme Court in *Alice Corp. v. CLS Bank International*, 573 U.S. 208 (2014), set out a new two-part test for determining whether an invention is invalid for being an abstract idea, and clarified that the "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id*. at 223. Applying this law, two district courts already found HLFIP's '617 Patent invalid as an abstract idea, and the Federal Circuit affirmed one of those decisions in August 2023.

96.     In the Middle District of Pennsylvania, the court analyzed claim 1 of the '617 patent as "representative" of all of the patent claims asserted in that case, noting that the remaining claim (claim 13) added only "trivial, non-technical limitations." *HLFIP Holding, Inc. v. York County, Pennsylvania*, Civil Case No. 20-cv-186, Doc. 135, Memorandum Opinion, p. 10 (M.D. Pa. April 25, 2022), *attached hereto as* Exhibit 26.

97.     The court then held:

> An examination of the text of the '617 Patent claims reveals a series of steps that describe an abstract idea—namely, identifying characteristics of postal mail (such as the recipient-inmate, the inmate's institution, the sender, etc.), screening it for contraband, scanning the sender and content information, generating a text-readable version of the electronic copy to be stored electronically, and associating a contraband flag that can deny the inmate access.

*Id*. at 17–18. The court noted that SmartComm admitted "there have been manual systems in place to combat this 'longstanding issue' [contraband] for many years." *Id*. The court further explained that the '617 Patent did not add an "inventive concept" by proposing to do this on a computer. *Id*. at 24.

98.    On appeal, the Federal Circuit affirmed this order without a written opinion under Fed. Cir. R. 36, highlighting the lack of any meritorious argument for the validity of the '617 patent. *HLFIP Holding, Inc. v. York County, PA*, 22-1940, Doc. 41 (Fed. Cir., Aug. 18, 2023), *attached hereto as* Exhibit 27.[5]

99.    A final judgment of patent invalidity is like a finding that a contract has been rescinded: it means the patent never had any legal effect and could not have been infringed. Nevertheless, despite an August 18, 2023, decision invalidating HLFIP's flagship patent, Jon on behalf of SmartComm signed the Executed License Agreement for a 40% net sales royalty to HLFIP (*i.e,* to himself) eleven days later on August 29, 2023. *See* Confidential Ex. 22.

---

[5]    The Middle District of Tennessee's decision in *HLFIP Holding, Inc. d/b/a Smart Communications IP Holdings v. Rutherford County, Tennessee, et al.* arose from the same posture as the MD PA decision (a patent infringement suit by HLFIP), and Judge Eli Richardson there held the '617 Patent invalid on § 101 grounds applying the same *Alice Corp.* Supreme Court test. Doc. 393, Memorandum Opinion, Civil Case No. 3:19-cv-714 (M.D. Tenn. Oct. 7, 2022), *attached hereto as* Exhibit 28.

100.    Two tables showing the licensed IP (excluding patent applications, non-registered trademarks, and non-patented services) as of August 29, 2023 are excerpted below.

**SCHEDULE 1: LICENSED INTELLECTUAL PROPERTY**

| | | PATENTS | | |
| Assignee | Country | Title | Publication No. | Patent No. |
| --- | --- | --- | --- | --- |
| HLFIP Holding, LLC | USA | CORRECTIONAL POSTAL MAIL CONTRABAND ELIMINATION SYSTEM | 2020/0128014 A1 | 11457013 |
| HLFIP Holding, LLC | USA | CORRECTIONAL POSTAL MAIL CONTRABAND ELIMINATION SYSTEM | 2016/0337360 A1 | 10291617 |
| HLFIP Holding, LLC | USA | CORRECTIONAL INSTITUTION LEGAL POSTAL MAIL PROCESSING SYSTEM AND METHOD | 2020/0280645 A1 | 11637940 |
| HLFIP Holding, LLC | USA | CORRECTIONAL INSTITUTION LEGAL POSTAL MAIL PROCESSING SYSTEM AND METHOD | 2019/0268488 A1 | 10659630 |
| HLFIP Holding, LLC | USA | COMMUNICATION TRACKING SYSTEM FOR CORRECTIONAL FACILITIES | 2019/0386996 A1 | 10862891 |
| HLFIP Holding, LLC | USA | SYSTEMS AND METHODS FOR PROCESSING REQUESTS TO SEND PRIVATE POSTAL MAIL TO AN INMATE | 2020/0396347 A1 | 11201974 |

| | TRADEMARKS | | |
| Owner | Country | Trademark | Reg. No. |
| --- | --- | --- | --- |
| HLFIP Holding, LLC | USA | MAILGUARD | 5,135,773 |
| HLFIP Holding, LLC | USA | MAILGUARD POSTAL MAIL ELIMINATION LOGO | 5,135,772 |
| HLFIP Holding, LLC | USA | | |

101.    The primary IP that SmartComm licenses from HLFIP is for the Mailguard service (also known as the '617 patent). HLFIP's other patents (the '013, '940, '630, '891, and '974 patents) were all granted after the '617 Patent was granted, and are equally unpatentable for being directed to the computerization of abstract ideas. In fact, the other patents are weaker than the '617 Patent, merely layering ornaments on a dead tree—"building" on the '617 Patent by proposing to do things like mail-tracking, recording sender data, detecting contraband activity, and handling legal mail in a special way; for instance, to date HLFIP has only ever sued to enforce the '617 Patent, and HLFIP has not filed any patent infringement suits on its other Patents or IP since the Federal Circuit decision.

102.    In a December 1, 2023, Federal Circuit filing in HLFIP's appeal of the Middle District of Tennessee's invalidation of the '617 Patent, HLFIP indicated it would not seek rehearing *en banc* or file a *writ of certiorari* and therefore "Dismissal of the consolidated cross-appeals is proper following this Court's ruling in York County finding the '617 patent ineligible under § 101, and in light of the circumstances noted above. It is not possible for Smart Communications to maintain its patent lawsuit against Rutherford and VendEngine without a valid patent." *See HLFIP Holding, Inc. d/b/a Smart Communications IP Holdings v. Rutherford Cnty, Tennessee, et al.*, Case No. 2023-1380, Dkt. 26, "Appellant's Motion to Dismiss," pp. 8–9 (Fed. Cir. Dec. 1, 2023), *attached hereto as* Exhibit 29.

103.    Nor can HLFIP's pending patent applications justify the royalty. The pending patents are also unpatentable. One of the patent applications listed as "pending" in the Executed License Agreement, Application No. 17/363499, was rejected on Nov. 15, 2023.

### 3.    SmartComm's Royalty-Free Relationship with HLFIP

104.    To the extent any of the IP has any residual value when the related-party, conflict-of-interest, *ultra vires* transactions are set aside, there is a clear, long-running, royalty-free license between SmartComm and HLFIP for the use of HLFIP's IP.

105.    There is abundant evidence of this royalty-free license. For starters, Jon himself signed a 2019 "fictitious name" filing for HLFIP to do business in Florida as "Smart Communications IP Holdings"—*i.e.*, by Jon's own admission HLFIP merely holds SmartComm's IP. Exhibit 30, Fictitious Name Filing.

106.    In fact, in its Federal Circuit briefing, HLFIP referred to itself throughout as "Smart Communications." *See e.g.*, Ex. 29.

107.    The "Termination of Oral License Agreement" memorandum recognizes the existence of an express oral license between the parties. *See* Confidential Ex. 16. That memo

additionally recognizes "SmartComm's existing contracts utilizing HLFIP's intellectual property" would be affected by the termination. *Id.* In other words, Jon admits that SmartComm relied on its royalty-free license to enter into certain contracts, and those contracts offer HLFIP's intellectual property at no additional cost to the customer. *E.g.*, Confidential Exhibit 31, at 2 (¶ 18), Crawford County Mailguard Addendum.

108.    Jon's "Executed License Agreement" likewise recognized that HLFIP "previously exclusively licensed the Licensed Intellectual Property to [SmartComm]," and that "under that pre-existing license agreement, the prior licensee executed contracts." Confidential Ex. 22, at 2 (¶ 1.6).

109.    Starting in 2016, after the main '617 Patent application had been submitted, SmartComm entered into all of its contracts in express reliance on the royalty-free license. *See* Exhibit 32, Draft Pasco County Mailguard Addendum.

110.    In the years between 2016 and fall of 2023, SmartComm made no royalty payments to HLFIP, and HLFIP did not demand any payment or condition any benefit on such a payment. Rather, SmartComm continued to execute on its contracts "under that pre-existing license agreement" with full knowledge of HLFIP without paying any royalty or being requested to do so.

111.    SmartComm's Income Statements, prepared and provided in November 2023, show that SmartComm did not book HLFIP liability until 2022:

| | Jan - Dec 14 | Jan - Dec 15 | Jan - Dec 16 | Jan - Dec 17 | Jan - Dec 18 | Jan - Dec 19 | Jan - Dec 20 | Jan - Dec 21 | Jan - Dec 22 | Jan - Oct 23 |
|---|---|---|---|---|---|---|---|---|---|---|
| Intellectual Property Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 17,874,783.38 | 18,239,257.19 |

*See* Confidential Exhibit 33, SmartComm Collier Income Statement, Row 230. Make no mistake, at least according to Jon's attorneys, no payments have ever been made on that liability, which squarely supports the existence of a royalty-free license. And, Jon and SmartComm could likely not "reflect" the purported 40% liability plus interest back further in their income statements

because it was not reported on their taxes for those years (as a result of being a recent invention). SmartComm's 2022 tax return was still subject to manipulation because it was due on extension in October 2023. *See* Confidential Exhibit 34, SmartComm 2022 Tax Return.

112.    HLFIP furnishes no services apart from permission to use its intellectual property.

## VII.    Jon Asks The Delaware Court To Rubber-Stamp His Asset-Diversion Scheme

113.    On October 23, 2023, Jon filed a declaratory judgment action in Delaware court, asking it to rule that Loco and Yacht were validly converted to Delaware entities, and that he was the sole member of both entities. *See* Exhibit 35, Delaware Complaint.

114.    Jon did not disclose to the Delaware court in his complaint that, at that time, Loco was a party to this Florida suit.

115.    Jon did not disclose the Delaware action to Janice's counsel until after she discovered it independently.

116.    Janice's counsel learned of the lawsuit from its docket alert service, and was forced to intervene, and move to stay the action.

117.    The Delaware court ultimately granted Janice's motion to stay, reasoning that it was "loath to insert itself" in this dispute and specifically identifying the allegations against Jon as "alarming." *See* Ex. 7, at 10.

118.    The Delaware court also stated that it "would have appreciated more transparency from Plaintiff's filings regarding the course of proceedings in the Florida Action." *See* Ex. 7, at 10 n. 37.

## VIII.    Phase I Trial

119.    Following the Phase I trial, this Court concluded that Janice is indeed a full, unencumbered 50% owner of the Company. *See* Ex. 1, DIN 652, at 2.

120.    This Court also made the specific factual findings that "Exhibit 101 [the purported Shareholders' Agreement] was not signed by Jim Logan. Jim Logan never assented to that document" and "the circumstances in how that document was found are suspicious to the Court." *See* Ex, 1, DIN 652, at 20 (Tr. 723:21–23), 21 (Tr. 724:18–20).

### Count I:  Malicious Prosecution and Abuse of Process
**(Janice as Trustee Against Counterclaim-Defendants Jon and SmartComm)**

121.    Janice incorporates paragraphs 1 through 120 as though fully set forth herein.

122.    This Court concluded that the purported signature of Jim Logan on the purported Shareholders' Agreement was not Jim Logan's true signature. *See* Ex. 1, DIN 652, at 21 (Tr. 724:18–21) ("So all of that goes to me saying that I find as fact that the Exhibit 101 [the Purported Shareholders' Agreement] was not signed by Jim Logan. Jim Logan never assented to that document. That there is no 2022 stockholder's agreement.").

123.    Janice prevailed in the declaratory judgment action to determine whether the Trust owned 50% of SmartComm's shares unencumbered.

124.    Janice, as Trustee, nevertheless had to pay attorneys' fees for defending against the declaratory judgment action initiated by Jon and SmartComm.

125.    Jon is the only officer and director of SmartComm, and SmartComm entrusted him with sole authority on whether or not to litigate against Janice based on the purported Shareholders' Agreement: therefore, his knowledge that the purported Shareholders' Agreement was a fraud is imputed to SmartComm.

126.    Jon and SmartComm knew when filing his declaratory judgment suit against Janice that the purported signature of Jim Logan on the purported Shareholders' Agreement was not Jim Logan's true signature.

127.    Jon and SmartComm therefore had no probable cause to believe that Jim Logan had executed the purported Shareholders' Agreement.

128.    Nevertheless, Jon and SmartComm intentionally and with legal malice filed their declaratory judgment suit to deprive the Trust of its ownership.

129.    Janice was injured by Jon and SmartComm's declaratory judgment suit because as Trustee she had to pay attorneys' fees for the purpose of defending a suit that Jon knew had no basis in fact.

130.    Janice was similarly injured by Jon's Delaware declaratory judgment action, which, upon information and belief, Jon knew was improper to bring before the resolution of the Florida suit and nevertheless filed for the ulterior motive of circumventing this Court's jurisdiction over the disputed assets in Loco Florida LLC and related entity Smart Communications Yacht Holding, LLC.

131.    Janice was similarly injured when Jon and SmartComm engaged in vexatious litigation tactics in this suit, including but not limited to: multiple motions to strike Janice's pleadings, for the improper purpose of bleeding Janice of funds by extending litigation; withholding books and records for the purpose of hiding fraudulent related-party transactions and forcing Janice to spend more money to compel production; and continued retaliation against Janice in spite of a Temporary Injunction Order (DIN 169, Ex. 2) being in place.

WHEREFORE, Counterclaim-Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, demands judgment in her favor and against Counterclaim-Defendants Jon and SmartComm, including compensatory damages—namely, attorneys' fees to defend against the malicious suit and damages for mental anguish and suffering therefrom—and such other and further relief as this Court deems just and proper.

### Count II:  Uniform Fraudulent Transfer Act – Actual Fraud
### (Fla. Stat. § 726.105(1)(a)) and Constructive Fraud ((Fla. Stat. § 726.105(1)(b))
### (Janice as Trustee against Jon, SmartComm, SmartComm DE, and HLFIP)

132.    Janice incorporates paragraphs 1 through 120 as though fully set forth herein.

**I.    Additional Allegations Specific To Count II**

133.    The IP License Agreement and retroactive long-term note payable for IP licensing are invalid and should be set aside because they are fraudulent transfers.

134.    Janice, as Trustee, has standing to pursue fraudulent transfer claims against Jon and SmartComm, as a creditor to both, because of her tort claims against Jon and SmartComm, which include breach of fiduciary duties (*inter alia*, proffering and aggressively litigating the fraudulent purported Shareholders' Agreement against the Trust, retaliating against Janice in the midst of litigation, and acting disloyally and not in good faith toward a 50% shareholder) and malicious-prosecution and abuse-of-process. *See Cook v. Pompano Shopper, Inc*., 582 So. 2d 37, 40 (Fla. 4th DCA 1991) ("A tort claimant or contingent claimant is as fully protected under the Uniform Fraudulent Transfer Act as a holder of an absolute claim."). Even assuming *arguendo* that her tort claims did not arise until she prevailed at the Phase I trial, Fla. Stat. § 726.105(1) provides that transfers can be fraudulent "whether the creditor's claim arose before or after the transfer was made or the obligation was incurred."

135.    The transfer of SmartComm's assets to SmartComm DE in August 2023 was fraudulent as to the Trust because the transfer was made with the actual intent to hinder, delay, or defraud it.

136.    The obligation incurred by SmartComm DE to pay a 40% net sales licensing fee to HLFIP from August 2023 onward—in combination with the transfer of all of SmartComm's assets to SmartComm DE—was fraudulent as to the Trust because the transfer was made with the actual intent to hinder, delay, or defraud it.

137.    The obligation incurred by SmartComm for $80 million (and growing) in backdated IP licensing fees plus interest was fraudulent as to the Trust because the transfer was made with the actual intent to hinder, delay, or defraud it.

138.    The obligations incurred by SmartComm DE to pay a 40% net sales licensing fee to HLFIP from August 2023 onward; for SmartComm to pay $80 million in backdated IP licensing fees; and the transfer of SmartComm's assets to SmartComm DE in August 2023 all contain numerous badges of fraud.

139.    All transfers and obligations were made to the benefit of an insider—Jon, the sole director of SmartComm who exercises control over SmartComm, the sole member of HLFIP Holding, LLC, and the President of SmartComm DE.

140.    The recording of $80 million in purportedly owed licensing fees, the execution of the IP License Agreement, and the transfer of assets to SmartComm DE all occurred after the parties anticipated litigation related to the fraudulent Shareholders' Agreement and after the Temporary Injunction Order was entered as a result of Jon and SmartComm's unlawful retaliation, which are also the bases for some of the Trust's tort claims against Jon and SmartComm.

141.    The obligations and transfer were concealed. Janice as Trustee requested to inspect SmartComm's books and records in June of 2023. Jon and SmartComm denied this request until late November 2023. Only upon receiving the books and records did Janice discover the Asset Transfer Agreement, the Executed IP License Agreement, and the backdated $80 million in licensing fees owed to HLFIP. Further, Jon and SmartComm also failed to disclose the formation of SmartComm DE, assignment(s) of SmartComm contracts to SmartComm DE, contract(s) entered into in SmartComm DE's name that would have been entered into in SmartComm's name previously, and the registrations of SmartComm DE to do business in at least a dozen states.

29

142.    The transfer from SmartComm to SmartComm DE was for substantially all of SmartComm's assets.

143.    The recorded liability from SmartComm to HLFIP exceeds SmartComm's assets and plunged SmartComm into debt of $62 million dollars, plus accrued interest that has purportedly increased SmartComm's debt to more than $80 million.

144.    Because the Mailguard patent is invalid and none of the patents existed until 2019 or later, the $80 million obligation incurred by SmartComm for past IP licensing is not reasonably equivalent value to the licensed IP.

145.    In fact, the value of the IP licenses provided by HLFIP is orders of magnitude less (it is virtually worthless) than the $80 million liability on SmartComm's financial statements.

146.    For the same reason, when SmartComm DE entered into the IP Licensing Agreement with HLFIP for 40% of net sales, it did so without receiving reasonably equivalent value in exchange for the obligation because the IP was virtually worthless.

147.    When Jon and SmartComm DE entered into the IP Licensing Agreement for 40% of net sales, they intended to incur (or believed and reasonably should have believed that it would incur) obligations and liabilities to the Trust beyond SmartComm DE's ability to pay as they became due.

148.    Thus, the only purpose of the IP Licensing Agreement is to use SmartComm DE as a middleman (or a lienor, under the construction of Fla. Stat. § 726.105(k)) to shift assets and revenue away from the Trust and to Jon.

149.    When Jon and SmartComm recognized the $80 million obligation for past licensing fees on SmartComm's books and records and 2022 tax returns, which were prepared and/or filed

in late 2023, they intended to incur (or believed and reasonably should have believed that it would incur) obligations and liabilities beyond its ability to pay as they became due.

150.    When, in August 2023, Jon and SmartComm transferred all of SmartComm's assets to SmartComm DE, they did so without receiving reasonably equivalent value in exchange for the transfer.

151.    When, in August 2023, Jon and SmartComm transferred all of SmartComm's assets to SmartComm DE, they intended to incur (or believed and reasonably should have believed that it would incur) obligations and liabilities beyond its ability to pay as they became due.

WHEREFORE, Counterclaim-Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, demands judgment in her favor and against Counterclaim-Defendants Jon, SmartComm, SmartComm DE, and HLFIP, including:

1.    Avoidance of the fraudulent obligations and transfers described in Count II;

2.    An injunction against further fraudulent obligations or transfers pursuant to Fla. Stat. § 726.108(c)(1);

3.    Appointment of a custodian pursuant to Fla. Stat. § 726.108(c)(2);

4.    Compensatory damages;

5.    Janice's attorneys' fees and costs as special damages under the Wrongful Act Doctrine because Jon's fraudulent transfer with SmartComm DE and HLFIP caused Janice as Trustee to litigate against third person, newly formed entities SmartComm DE and HLFIP; and,

6.    Such other and further relief as this Court deems just and proper.

### Count III:  607.0831 Liability of Director
### (Janice as Trustee against Jon)

152.    Janice incorporates paragraphs 1 through 120 as though fully set forth herein.

153. As outlined above, Jon has attempted to manipulate this proceeding and the related action by depriving Janice of income, health insurance, a generator, and threatening to take her home and car. That retaliation stemmed from Janice's possession (via the Trust) of 50% of SmartComm's shares.

154. And, it continues to this day. Almost a year after this Court enjoined Jon from tampering with Janice's occupation and use of her home, Jon proceeded to demand over $200,000 in reimbursement for Janice's household-maintenance expenses (such as propane and power) and threatened to terminate utilities accounts for her home.

155. Jon is taking no such measures in regards to his own income and use of SmartComm assets.

156. Jon wields unchecked and unaccountable power as sole officer and director of Smart Communications, and is using this power to target Janice to obtain a litigation result that is favorable to him personally, including but not limited to engaging in fraudulent self-dealing transactions that benefit him and him alone.

157. He is doing so in the midst of a shareholder suit that alleges breaches of fiduciary duties and corporate waste.

158. Thus, he is in clear violation of his duties of loyalty and good faith, and is demonstrating conscious disregard for the best interest of the corporation, and participating in willful or intentional misconduct in the midst of a proceeding by or in the right of a shareholder.

WHEREFORE, Counterclaim-Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, demands judgment in her favor and against Counterclaim-Defendant Jon including:

1. Compensatory damages for income lost as a result of Jon's actions;

2.      Attorneys' fees and costs; and,

3.      Such other and further relief as this Court deems just and proper.

### Count IV:  Breach of Fiduciary Duties
### (Janice as Trustee against Jon and SmartComm)

159.     Janice incorporates paragraphs 1 through 120 as though fully set forth herein.

160.     Janice, as Trustee, brings the below claims against Jon and SmartComm directly, as a 50% shareholder of SmartComm.

161.     The Trust has been injured directly pursuant to Florida Statutes Section 607.0750 to the extent that Jon has fraudulently attempted to subject it to the purported Shareholders' Agreement, to the extent Jon has used the Company, its employees, and its resources as instruments of retaliation against Janice, and to the extent Janice has been forced to endure Jon's vexatious litigation tactics, which were funded with SmartComm assets. Jon has not suffered the same injuries, and continues to make liberal personal use of SmartComm's assets for his own personal gain.

162.     Janice has been injured to the extent that Jon has made distributions to himself in which the Trust did not share, including but not limited to the $600,000+ in "shareholder loans" Jon distributed to himself but not to Janice in 2023. *See* Confidential Exhibit 36, 2023 Collier General Ledger, Lines 7159–7256.

163.     Janice has been further injured by Jon's retaliation against her as Trustee, including but not limited to firing her from her position at SmartComm, tampering with her occupation and use of her home, and now, in spite of the Temporary Injunction, demanding more than $200,000 in reimbursements for expenses Jon does not pay for. Jon's misconduct in this regard is intended to impair Janice's ability to protect the value of the Trust's shares in SmartComm.

164.    Finally, the Trust was injured as a creditor within the meaning of the Florida Uniform Fraudulent Transfer Act when Jon made multiple fraudulent related-party transactions.

165.    Jon, as sole officer and sole director of SmartComm, has fiduciary duties to the Trust as a shareholder to act with care and loyalty in the management of SmartComm.

166.    Jon breached those fiduciary duties by, among other things:

a.    Fraudulently claiming the purported Shareholders' Agreement is a valid agreement in order to force the Trust to sell to him and to gain favorable sale and appraisal terms;

b.    Failing to make distributions or issue dividends to Janice as Trustee;

c.    Firing Janice, stripping her of health insurance, and attempting to evict her legally and constructively, and using his unchecked control of SmartComm and its related entities to attempt to manipulate this litigation;

d.    In the midst of litigation with Janice, forming subsidiary SmartComm DE to prevent the Trust from accessing SmartComm FL assets and revenue;

e.    In the midst of litigation with Janice, causing SmartComm FL's contracts to be assigned to SmartComm DE, and causing SmartComm to contract in the name of SmartComm DE rather than SmartComm FL to prevent the Trust from accessing SmartComm FL assets and revenue;

f.    Engaging in self-dealing transactions with HLFIP that were not in the best interest of SmartComm, for the purpose of depriving the Trust of value;

g.    Use of SmartComm funds, employees, and information to litigate against Janice; and,

h.    Acting disloyally and not in good faith towards a 50% shareholder of the company.

167.    Upon information and belief, additional breaches will become evident upon an accounting of SmartComm's books and records, and the conduct of further discovery.

168.    As a direct and proximate result of Jon's breaches as sole officer and sole director of SmartComm, the Trust has not received distributions due it; by comparison, Jon has received significant distributions in the form of both shareholder loans and additional corporate waste for his personal benefit. And, Janice has been the target of efforts to specifically devalue the Trust's

Case 8:24-bk-07106-RCT    Doc 26    Filed 12/09/24    Page 615 of 699

shares by calling their ownership into question. Additionally, Janice has had to take personal protective precautions as a result of Jon's background and threats.

WHEREFORE, Counterclaim-Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, demands judgment in her favor and against Counterclaim-Defendants Jon and SmartComm, including:

1.    Compensatory damages, including but not limited to damages for Janice's mental anguish and suffering incurred by Jon and SmartComm's lawsuit to enforce the fraudulent Shareholders' Agreement;

2.    Punitive damages pursuant to Florida Statutes Section 768.72 because Counterclaim-Plaintiff has pled a reasonable basis for the inference of intentional misconduct or gross negligence by Jon and SmartComm;[6]

3.    A full accounting of SmartComm's and its subsidiaries' corporate books and records by a third-party forensic accounting firm;

4.    Thereafter, payment of any back-distributions owed to Janice as a result of Jon making unequal distributions to himself from September 16, 2022 to the present;

5.    Appointment of a custodian or receiver *pendente lite* to rectify Jon's mismanagement, fraud, and waste;

6.    Imposition of a constructive trust over SmartComm DE wherein SmartComm retains revenue generated by SmartComm DE for the pendency of this litigation;

---

[6] This Court has already allowed Janice to seek punitive damages in this Count. *See* DIN 341 ("The Court finds pursuant to Fla. Stat. Sec. 768.72 and Fla. R.Civ.Pro. 1.100(b) the Plaintiff/Respondent Janice Logan has made a reasonable showing by evidence in the record and/or proffered by the Plaintiff/Respondent which would provide a reasonable basis for recovery of punitive damages."). The Court then denied a Motion for Reconsideration of this ruling. *See* DIN 383. Those decisions are subject to a pending interlocutory appeal. *See* Case No. 2D23-2430 in the 2nd DCA.

7.      Janice's attorneys' fees and costs; and,

8.      Such other and further relief as this Court deems just and proper.

### Count V:  Civil Conspiracy
**(Janice as Trustee against Jon, SmartComm, SmartComm DE, and HLFIP)**

169.    Janice incorporates paragraphs 1 through 120 as if fully set forth herein.

170.    Jon and SmartComm conspired and agreed with SmartComm DE and HLFIP to prevent Janice from recovering the full and fair value of the Trust's 50% shares in SmartComm by doing multiple unlawful acts and/or doing lawful acts by unlawful means.

171.    As discussed above, Jon is the sole director and officer of SmartComm; SmartComm is the sole member of SmartComm DE and Jon is the President of SmartComm DE (therefore, Jon currently controls SmartComm DE); and, Jon is the sole member of HLFIP.

172.    Specifically:

a.      Jon, as the sole officer and sole director of SmartComm, breached his fiduciary duties to the Trust by creating and/or converting SmartComm and SmartComm-related Delaware entities to evade the jurisdiction of this Court, and make Janice's recovery of the fair value of the Trust's SmartComm shares and SmartComm-related interests more difficult;

b.      Jon, as the sole officer and sole director of SmartComm, breached his fiduciary duties to the Trust by engaging in improper, conflicted, related-party, *ultra vires* transactions with HLFIP;

c.      Jon, as the sole officer and sole director of SmartComm, breached his fiduciary duties to the Trust by transferring all of SmartComm's assets to SmartComm DE;

d.      Jon, as the sole officer and sole director of SmartComm, wastefully and fraudulently transferred assets to HLFIP and SmartComm DE, as described in Count II;

e.      Jon converted the Trust's portion of SmartComm assets by taking control of it in his capacity as sole officer and sole director of SmartComm and transferring it to SmartComm DE, and/or making it subject to a fraudulent liability owed to HLFIP.

173. Jon, SmartComm, SmartComm DE, and HLFIP executed the following overt acts in support of the conspiracies, namely:

a. Jon and SmartComm executed the Asset Transfer Agreement (*see* Confidential Ex. 4) which transferred all of SmartComm's assets to SmartComm DE;

b. SmartComm began to recognize in its financial records a backdated long-term liability to HLFIP (*see, e.g.*, Confidential Ex. 33);

c. After SmartComm DE was seeded with SmartComm's assets as a result of unilateral, fraudulent asset transfer, Jon caused HLFIP and SmartComm DE to enter into the Executed IP License Agreement (*see* Confidential Ex. 22), wherein SmartComm DE would owe HLFIP 40% of its net sales.

174. The Trust was injured by the conspiracy and the acts in support of them because Janice cannot access the Trust's rightful portion of SmartComm assets and must also pay attorneys' fees for their rightful return.

175. In addition to the Jurisdictional Facts pled above in paragraphs 24 through 46, this Court has jurisdiction over SmartComm DE and HLFIP because they committed a tortious act in Florida, *see* Fla. Stat. § 48.193(1)(a)(2), when they participated in a civil conspiracy against Florida residents and with Florida co-conspirators. *See, e.g., Phelan v. Lawhon*, 229 So. 3d 853, 858 (Fla. 3d DCA 2017).

WHEREFORE, Counterclaim-Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, demands judgment in her favor and against Counterclaim-Defendants Jon, SmartComm, SmartComm DE, and HLFIP, including:

1. Compensatory damages;

2. Janice's attorneys' fees and costs as special damages under the Wrongful Act Doctrine because Jon's wrongful conspiracy with SmartComm DE and HLFIP

caused Janice as Trustee to litigate against third person, newly formed entities SmartComm DE and HLFIP; and,

3.      Such other and further relief as this Court deems just and proper.

### Count VI:  Aiding and Abetting Breach of Fiduciary Duties
**(Janice as Trustee against Jon, SmartComm, SmartComm DE, and HLFIP)**

176.    Counterclaim-Plaintiff incorporates paragraphs 1 through 120 as if set forth herein.

177.    Jon, as sole officer and sole director of SmartComm, has fiduciary duties to the Trust as a shareholder to act with care and loyalty in the management of SmartComm.

178.    Jon breached those fiduciary duties by, among other things:

a.      Engaging in related-party, self-dealing transactions with HLFIP that were not in the best interest of SmartComm for the purpose of depriving the Trust of the value of its shares;

b.      In the midst of litigation with the Trust, forming SmartComm DE to prevent Janice as Trustee from accessing SmartComm FL assets and revenue;

c.      In the midst of litigation with the Trust, causing SmartComm FL's contracts to be assigned to SmartComm DE, and causing SmartComm to contract in the name of SmartComm DE rather than SmartComm FL to prevent Janice as Trustee from accessing SmartComm FL assets and revenue; and,

d.      Acting disloyally and not in good faith towards a 50% shareholder of the company.

179.    SmartComm DE and HLFIP had knowledge of the above-listed wrongful acts.

180.    SmartComm DE and HLFIP provided substantial assistance to Jon and SmartComm in the commission of these above-listed wrongful acts when they:

a.      Executed the conversion of HLFIP from a Florida corporation to a Delaware LLC;

b.      Executed the Asset Transfer Agreement which transferred all of SmartComm's assets to SmartComm DE;

c.      Executed an IP License Agreement wherein SmartComm DE—after being seeded with all of SmartComm's assets—would owe HLFIP 40% of its net sales;

      d.     Executed contract assignments assigning SmartComm FL's existing contracts to SmartComm DE; and,

      e.     Submitted request for proposal responses in the name of SmartComm DE, and caused customers who would have contracted with SmartComm FL to contract with SmartComm DE.

181.    For these reasons, this Court has an additional source of personal jurisdiction over SmartComm DE and HLFIP because they committed a tortious act in Florida, *see* Fla. Stat. § 48.193(1)(a)(2), when they aided and abetted Jon and SmartComm's torts against Janice. *See Concordia Lutheran Ministries v. Wills*, 359 So. 3d 396, 403–04 (Fla. 2d DCA 2023).

WHEREFORE, Counterclaim-Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, demands judgment in her favor and against Counterclaim-Defendants Jon, SmartComm, SmartComm DE, and HLFIP, including:

1.    Compensatory damages;

2.    Janice's attorneys' fees and costs as special damages under the Wrongful Act Doctrine because Jon's and SmartComm's breaches of fiduciary duties caused Janice as Trustee to litigate against third person, newly formed entities SmartComm DE and HLFIP; and,

3.    Such other and further relief as this Court deems just and proper.

## CERTIFICATE OF SERVICE

I CERTIFY that a true and correct copy of the foregoing has been served on all counsel of record through the Florida Court's e-filing portal on October 2, 2024.

Dated:  October 2, 2024

Respectfully submitted,

  /s/   *David E. Schoenfeld*
Anitra R. Clement
Florida Bar No. 100354
**SHOOK, HARDY & BACON L.L.P.**
100 N. Tampa Street, Suite 2900
Tampa, FL 33602
Telephone:  (813) 202-7100
aclement@shb.com

David E. Schoenfeld (FL PHV # 1047561)
Peter F. O'Neill (FL PHV # 1043125)
Andrew L. Franklin (FL PHV # 1035737)
Kailin Liu (FL PHV # 1051416)
**SHOOK, HARDY & BACON L.L.P.**
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Telephone:  (312) 704-7700
dschoenfeld@shb.com
pfoneill@shb.com
afranklin@shb.com
kliu@shb.com

***Counsel for Janice Logan, individually and as Trustee of the James Logan Family Trust, dated February 10, 2021***

# EXHIBIT 1

RECORDED IN OFFICIAL RECORDS
INSTRUMENT # 2024036761  26 PG(S)
2/7/2024 4:24 PM
KAREN E. RUSHING
CLERK OF THE CIRCUIT COURT
SARASOTA COUNTY, FLORIDA
CIVIL COURTS        Receipt # 3140431

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.

                    Plaintiffs,

v.                                                  Case No. 2023-CA-1002-NC

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust; and ALEXIS LOGAN,

                    Defendants.
_____/              (CONSOLIDATED)

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021, and directly
and derivatively on behalf of Smart Communications
Holding, Inc., and derivatively on behalf of Loco
Florida, LLC,                                       Case No.: 2023-CA-1280-NC

                    Plaintiff,

                                                    **Jury Demanded:**
v.                                                  **Counts II, III, IV, and V**

JONATHAN LOGAN,
SMART COMMUNICATIONS HOLDING, INC.,
nominal defendant, LOCO FLORIDA, LLC,
nominal defendant, and SMART
COMMUNICATIONS HOLDING, LLC,

                    Defendants.           /
_____

### PHASE I[1] DECLARATORY JUDGMENT

THIS CAUSE having come before the Court for a three-day bench trial from January 29,

2024, to January 31, 2024, on Count II of Plaintiffs Jonathan D. Logan's ("Jon") and Smart

Communications Holding, Inc.'s ("Smart Communications") Complaint (DIN 2) seeking a

declaration that a certain purported Shareholders' Agreement attached to the Complaint as Exhibit

_____

[1] The consolidated action was bifurcated by agreement (DIN 241) of the Parties in order to try the Declaratory
Judgments actions, which are referred to as "Phase I," before the remaining counts of the Parties' respective operative
pleadings.

D was valid and enforceable, and on Count I of the Amended Verified Complaint (DIN 271) of Defendant Janice Logan, individually and as Trustee of the James Logan Family Trust, dated February 10, 2021, ("Janice") seeking a declaration that the purported Shareholders' Agreement is invalid and unenforceable, and having reviewed the file, heard testimony of fact and expert witnesses, and received documentary and physical evidence, and being fully advised in the premises, the Court **ADJUDGES**:

1.     The Court has jurisdiction over the Parties and subject matter of Phase I pursuant to Fla. Stat. § 86.011, *et seq.* Jon is a resident of Pinellas County, Florida, Smart Communications is incorporated in the state of Florida and has its headquarters in Pinellas County, Florida. Janice is a resident of Sarasota County, Florida, and the James Logan Family Trust, dated February 10, 2021, is administered in Sarasota County, Florida.

2.     The Court's January 31, 2024, oral findings of fact and conclusions of law, explained in open court before a court reporter, a transcript of which is attached hereto as **EXHIBIT A**, are incorporated into this judgment and entered.

Based on those findings and conclusions, the Court **DECLARES**:

I.     That the purported September 23, 2022, Shareholders' Agreement attached to Plaintiffs' Complaint as Exhibit D is invalid and unenforceable, and that there is no shareholders' agreement in effect between the two 50% shareholders of Smart Communications Holding, Inc.'s stock, (1) Jonathan D. Logan and (2) Janice Logan, as sole Trustee of the James Logan Family Trust, dated February 10, 2021.

**DONE AND ORDERED** in Chambers in Sarasota County, Florida on this _6_ day of

February, 2024.

_____

**Hon. Hunter Carroll, Circuit Court Judge**

### Certificate of Service

On February ___, 2024, the Court caused the foregoing document to be served via the Clerk

of Court's case management system, which served the following individuals via email (where

indicated). On the same date, the Court also served a copy of the foregoing document via First

Class U.S. Mail on the individuals who do not have an email address on file with the Clerk of

Court.

CRAIG STEPHEN BARNETT
200 EAST LAS OLAS BLVD
SUITE 2100
FORT LAUDERDALE, FL 33301

MICHAEL J. HARWIN
200 EAST LAS OLAS BLVD
SUITE 2100
FORT LAUDERDALE, FL 33301

CHRISTOPHER R. CLARK
106 EAST COLLEGE AVE
SUITE 700
TALLAHASSEE, FLORIDA 32301

CHARLES FRANKLIN JOHNSON III
802 11TH ST W
BRADENTON, FL 34205

ANITRA RAIFORD CLEMENT
100 N TAMPA ST
SUITE 2900
TAMPA, FL 33602

DAVID E. SCHOENFELD
111 S. WACKER DR
SUITE 4700
CHICAGO, IL 60606

PETER F. O'NEILL
111 S. WACKER DR.
SUITE 4700
CHICAGO, IL 60606

ANDREW L. FRANKLIN
111 S. WACKER DR.
SUITE 4700
CHICAGO, IL 60606

KAILIN LIU
111 S. WACKER DR.
SUITE 4700
CHICAGO, IL 60606

# Exhibit A

1  IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT IN
   AND FOR SARASOTA COUNTY, FLORIDA
2
   JONATHAN LOGAN and SMART
3  COMMUNICATIONS HOLDING, INC.,

4           Plaintiffs,
   vs.                         Case No.:  2023-CA-1002-NC
5
   JANICE LOGAN, individually and
6  as Trustee of the James Logan
   Family Trust, and ALEXIS LOGAN,
7  individually,

8  _____Defendants._____/    (CONSOLIDATED)

9  JANICE LOGAN, as Trustee of the
   James Logan Family Trust dated
10 February 10, 2021, and directly
   and derivatively on behalf of
11 Smart Communications Holdings,
   Inc., and derivatively on behalf
12 of Loco Florida, LLC,

13          Plaintiff,

14 vs.                          Case No:   2023-CA-1280-NC

15 JONATHAN LOGAN, SMART
   COMMUNICATIONS HOLDING, INC.,
16 nominal defendant, and LOCO
   FLORIDA, LLC, nominal defendant,
17
   _____Defendants._____/
18

19            IN-PERSON TRIAL, PHASE ONE

20       BEFORE THE HONORABLE HUNTER W. CARROLL

21              held at the
      Judge Lynn N. Silvertooth Judicial Center
22      2002 Ringling Boulevard, Courtroom 6C
                Sarasota, Florida
23  Wednesday, January 31, 2024, 8:47 a.m. to 3:56 p.m.

24       VOLUME III, Pages 569 through 740

25         Stenographically reported by:
         Linda R. Wolfe, RPR, RMR, FCRR, FPR-C

1    following commenced at 3:08 p.m.)

2                    R-U-L-I-N-G

3        THE COURT:  This is Case 2023-CA-1002-NC

4    together with 2023-CA-1280.  We had Phase One of

5    the trial focusing on declaratory judgment actions

6    which was tried January 29th, 30th and 31st.

7        A predecessor judge entered a temporary

8    injunction in this case which, after that judge's

9    disqualification, got expanded ultimately by

10   agreement of parties after some discussions with

11   the Court.

12       But today is -- and the last three days has

13   been focusing in on whether there is a

14   Shareholders' Agreement; and, if so, what is it.

15       And in coming to this ruling, let me first

16   identify who several of the players are.  We have

17   Smart Communications Holding, Inc., I'll call it

18   either "Smart" or "Smart Communications", and it

19   provides telecommunication services for jail and

20   prison inmates.  And although it was not the focus

21   of this Phase One trial, just by the sheer number

22   of lawyers here, it really suggests that the entity

23   is quite successful.

24       We have Jonathan Logan, who is the incumbent

25   president, director, and 50 percent shareholder of

1    Smart Communications.

2         We have Janice Logan, both in her individual

3    capacity and as trustee of the James Logan Family

4    Trust dated February 19th, 2021.  And James Logan,

5    of course, was her late husband.

6         The Trustee currently owns 50 percent of Smart

7    Communications' shares.  So Jon, and Janice as

8    trustee, each are 50 percent.  And I'm using

9    everyone's first name not because I'm trying to be

10   offensive but to help be clear as to who we are

11   talking about.

12        Also a party is Alexis Logan, who is the

13   sister of Jon.  She is the daughter of Janice.  And

14   if I didn't say it, Jon also is the son of Janice.

15        The evidence makes clear that Jon Logan and

16   Alexis Logan do not get along, at all.

17        And Jon's relationship with his mother,

18   Janice, is only slightly better.

19        Alexis and her mom, Janice, get along well.

20        Alexis is an attorney, and I'll comment on it

21   a little bit later.  She also, for a period of

22   time, was the 100 percent shareholder of Smart

23   Communications in a legal title type of situation.

24        There are other folks that we're going to be

25   talking about primarily.  First is James or Jim

1   Logan.

2        Jim is Janice's late husband.  He was the

3   father of Jon and Alexis.

4        And Jim died October 16th, 2022.

5        Attorney Mark Wall, who is an attorney at Hill

6   Ward Henderson, has represented Jon Logan.

7        Tom Sims, who is an attorney at the Johnson

8   Pope firm, has represented Jim and Janice Logan

9   relating to -- and I'm going to say their estate

10   plan.  I know when I say "estate plan," I'm just

11   using that generically, not just referring to wills

12   but the more global planning aspect, trusts and all

13   sorts of various agreements.

14        And I know probate lawyers get upset when I

15   say estate lawyers and I reference trusts.  But I'm

16   using "estate lawyer" here and just "estate

17   planning" in just a very generic sense.

18        We have -- Another person we are going to talk

19   about is Lisa Eddy, who is Smart Communications'

20   Vice President of Operations.  She's been with

21   Smart for approximately five years in various

22   roles, and her current salary is $230,000 a year.

23        We have Scott Holte, who is Smart

24   Communications' Chief Strategy Officer, and he has

25   also been with Smart for approximately five years.

1    And his current salary is $150,000.

2         Gloria Burgess, who is Jon Logan's housekeeper

3    who tends to Jon Logan's house every Tuesday,

4    almost without fail.

5         I did reference earlier that Jon Logan is the

6    incumbent president, director, and 50 percent

7    shareholder of Smart Communications, and he is the

8    person that's been driving the company.  And his

9    dad was with him along for that ride and, over

10   time, providing various different services.  Dad

11   tended to focus on the legal-financial-banking type

12   of services.  Jon Logan was vision and IP type of

13   involvement.

14        The core group of Smart Communications is Jon

15   Logan, Lisa Eddy, and Scott Holte.

16        And that core group can be -- that core group

17   meets at least once a week.  I mean, the evidence

18   indicated that Jon's talking to Lisa, the chief of

19   operations -- sorry, the Vice President of

20   Operations, you know, on a daily basis, but that --

21   those three are the core group that run Smart

22   Communications.  And I don't have it quickly, but I

23   want to say the evidence was there was, like, 14

24   departments and more than 100 employees.  Again,

25   another testament that Smart Communications is a

1    successful business.

2         And I've got -- I think that's basically the

3    players I'm going to talk about.  There are others

4    that I might mention along the way.

5         Now, I'm not going to focus in on how Smart

6    Communications was formed because it's not really

7    relevant.  As with most start-ups, corporate

8    formalities usually come a little bit later after

9    concept and a lot of sweat and tears and time, and

10   sometimes capital.

11        But it became -- from the general beginning,

12   there was a 50/50 split between son and dad.

13        Now, I know that due to various unspecified

14   issues that we didn't explore -- and, again, it

15   doesn't really matter, really -- Alexis held

16   100 percent of stock in her name.  But the reality

17   is, Jim and Jon treated each other as if they were

18   50/50.  Smart Communications' lawyers, accountants

19   treated them as 50/50, although they would include

20   Alexis.  And when we get to it, we'll talk about

21   the 2017, because she was still the legal owner of

22   the stock.

23        But for whatever reason, I never picked up on

24   what Mr. Schoenfeld was trying to explain to me,

25   but I don't think it really matters because I find

1    as fact that, from at least an equitable

2    standpoint, dad and son were 50/50.

3           We heard a lot about dad's alcoholism, and

4    certainly it's a pernicious disease, and I've seen

5    many families -- in this case, unfortunately -- I

6    see a lot of affects of alcoholism.  But be that as

7    it may, Jim would have periods of sobriety and then

8    some periods that were the opposite.

9           And as time has progressed, the waxing and

10   waning, it appears that dad's alcoholism was

11   getting the better of him.

12          And I think as it came through from Jon's

13   testimony, but more particularly in some of the

14   e-mails, Jon was growing frustrated with alcoholic

15   portion of dad.

16          And, Jon, I will just say this:  Nothing I'm

17   going to say changes your love for your dad.  But

18   I'm talking about your business here.  I'm not

19   talking about your love for your dad.  And so,

20   please --

21          JON LOGAN:  Understood, Your Honor.

22          THE COURT:  And I honor that -- and even in

23   some of those difficult e-mails, you know, you

24   acknowledged your love for your dad.  And so I'm

25   not talking about that.

1      But there was some growing resentment about

2   Jim's role and ownership.  And I do agree with what

3   Mr. Johnson was saying, that that concern wasn't

4   necessarily that dad was a 50 percent owner, but it

5   was the longer term:  What does that mean when

6   dad's no longer with us?

7      Now, over the years, there were efforts to

8   agree to a Shareholders' Agreement.  Now, Jon

9   suggests that there always has been one and it's

10   been modified slightly.  With exception of and

11   putting the 2002 (sic) purported Shareholders'

12   Agreement to the side, there are no written

13   agreements that contain signatures.  And we'll talk

14   about 2017, whether that is or is not a written

15   agreement later on.

16      I want to talk for a moment about Exhibit 101.

17   Exhibit 101 is the -- what Jon Logan testified to

18   is the Shareholders' Agreement that's in effect

19   that both he and his dad signed on or about

20   September 23rd, 2022.  It is thirteen single-spaced

21   pages and pretty small font, as you all saw me with

22   the magnifying glass looking.  And that thirteen

23   pages is exclusive of the signature page.

24      The import for our discussion today at

25   Section 4.3, the agreement contains a mandatory

1 buyback-on-death provision of any deceased

2 shareholder's shares.  And Section 5.3(b), as in

3 "bravo," sets the fair market value, but that is

4 determined by a company appraisal to set the

5 purchase price.

6   And the reality is, given that Jon Logan is

7 the incumbent director, if this is the agreement,

8 that puts Jon in basic total control over the

9 valuation process.

10   Now, I'll also pause here.  The Court isn't in

11 a position to determine whether a deal is a good

12 deal or a bad deal from some person's perspective,

13 and it's not the Court's role ever to write or

14 rewrite a contract to make it more fair for one

15 party or the other.

16   I reference the fact of 5.3(b) to help explain

17 the dynamic that brings us here today.

18   Now, there are three questioned signatures.

19 Two are on page 14 of the Shareholders' Agreement

20 from 2022 -- the purported Shareholders' Agreement,

21 and both of those allegedly contain Jim's

22 signature.

23   And then the third disputed signature is on a

24 separate document, but it's also in Exhibit 101,

25 which is entitled the Written Action of the Board

1      of Directors.

2           Janice and Alexis dispute that Jim signed this

3      agreement.  And we certainly have competing

4      experts.

5           The Jim -- sorry.  The Janice and Alexis'

6      expert was of the opinion:  Very highly probable

7      that this was not signed by Jim.

8           And we have the expert for Jon Logan who

9      contained a pretty high -- it was probable that dad

10     did sign.

11          And so I've got two experts that are not

12     exactly polar opposites, but pretty close to being

13     polar opposites of each other.

14          I do want to reference Exhibit 200.

15     Exhibit 200 is an e-mail chain that starts with

16     Attorney Mr. Sims.  And it is to Jon and Jim Logan.

17          And let me just back up.  The Alexis ownership

18     of the stock, her ownership terminated

19     approximately 2018.  I don't have the specific date

20     written down.  I'm sure it's on a document here.  I

21     just didn't go back to write it down.  At that

22     point, the shares went to Jon, individually, and

23     Jim, individually.

24          And prior to Jim's surgery in September, he

25     conveyed the Smart Communications' stock into the

1   Revocable Trust, and that's how Janice, as the

2   trustee, now is the owner of that stock.

3         Okay.  So going back to Exhibit 200.  This is

4   an e-mail.  It originated from Mr. Sims to Jon and

5   copying Jim.  And it, again, is conveying a

6   Shareholders' Agreement.  And the date on this is

7   September 12th, 2022.

8         Now, the text of that e-mail includes

9   statements that this is for Jon's review and

10  comment.  It reminds Jon that his dad's going to be

11  undergoing a medical procedure in the near future.

12  It contemplates that, quote, "once finalized", end

13  quote, it could be signed by son and dad, quote,

14  "in order to put it into place."

15        And I use those quotes to indicate that the

16  sending of the document itself was not a technical

17  offer.  But even if it were, that same day, still

18  in Exhibit 200, Jon rejects the Shareholders'

19  Agreement.

20        He writes, quote, "It's ridiculously too

21  complicated," end quote.

22        Quote, "I don't even understand it," end

23  quote.

24        Quote, "I want it much more simple and

25  direct," end quote.

1        Quote, "All these terms and names that need

2       their own paragraph of definition is ridiculous,"

3       end quote.

4        Now, critically, also in that e-mail, Jon

5       writes to his dad -- or Jon writes to -- yeah -- to

6       his dad, quote, "I do not agree to be a 50/50

7       partner with you," end quote.

8        Now, Jon's explanation is this was written as

9       part of his normal modus operandi to shock his dad

10      back into sobriety.

11        And, you know, I don't really have any

12      statement one way or the other, other than there's

13      not an acceptance of the offer to the extent that

14      you would construe the sending of Exhibit 200 to be

15      an offer, which I do not.

16        But it also is -- it indicates that there's no

17      reference to any existing shareholders.

18        Now, dad has two different types of responses.

19      The first response is at Exhibit 210, which is more

20      on the business side of the response.  And it talks

21      about the share transfer agreement, and that's the

22      share transfer agreement that took Alexis

23      100 percent back to Jon and Jim 50/50.  And so dad

24      is reminding Jon about the 50/50 nature.

25        Then there is Exhibit 211 and 213, and this is

1   a September 18th e-mail, slash, letter, that was

2   sent on October 3rd, 2022.  And I know that there

3   is questions lodged by Jon as far as its proper

4   admissibility.  But it's clear that there's a

5   videotape of Jim signing something, which is this

6   response.  And this is the response on the more

7   personal side.

8        What I highlight at this point is in

9   Exhibit 213, a reply that Jon wrote to his dad on

10  October 3rd, 2022.

11       Quote, "If you want to start a war with me,

12  then we will have a war like you have never seen.

13  I have never made a death threat.  Don't try and

14  put words into my mouth and document that like it

15  is fact.  I am not stupid.  I know what you are

16  attempting to do here.  You are unfit as a business

17  partner, unfit as a father, unfit as a husband, and

18  unfit as an adult.  You can't even dress yourself.

19  You want to make this get nasty.  We can make it

20  get real nasty.  I didn't deserve this.  But I will

21  not let someone, including my own family, take

22  advantage of me anymore," end quote.

23       Now, again, Jon, I go back to I know you

24  testified that this is part of the shock that

25  you're trying to bring dad back into sobriety, but

1    I do note that nowhere in here is there an

2    assertion that there's an existing Shareholders'

3    Agreement.

4        And this was done on October 3rd, and the

5    testimony is that there previously was a signed

6    agreement that Jon left at his own house in

7    Tierra Verde, Pinellas County, Florida, for his dad

8    to come over, dad signed it, left Jon a copy and

9    took the original.

10       Now, the purported original has never been

11   found.  And as we indicated, dad dies on

12   October 16th, 2022.

13       Jon Logan's conduct over the next few months

14   suggests that there was no 2022 signed

15   Shareholders' Agreement.

16       Exhibit 217 -- and I know, again, that there

17   was a dispute over the admissibility of this

18   document -- suggests that Jon was not -- now

19   willing to sign it.

20       But even if I took that 217 away, my finding

21   doesn't change that there was no signed settlement

22   agreement -- I'm sorry -- no signed Shareholders'

23   Agreement in September or at any time in 2022.

24       What, to me, is really telling is the lead-up

25   to the December 8th meeting with Mr. Sims,

1  Mr. Wall, where Mr. Wall seeks from Smart

2  Communications' accountants and attorneys and Jim's

3  attorneys any information or if there is any signed

4  agreements regarding the business.  There's no

5  indication in those communications, "Hey, we know

6  that there is one, we're just trying to track it

7  down."

8       And in the December 8th meeting, while I

9  understand Jon contends that he referenced a signed

10  agreement, the attorneys for the parties don't

11  recall that.

12      There was a statement that Janice made to Jon,

13  "Why didn't you sign it?"  And Jon saying, "I wish

14  I had."

15      Now, I also know that there is an allegation

16  that Janice said something to the effect of that

17  she knows that there is a signed agreement or she

18  had seen a signed agreement, and the Court credits

19  Janice's testimony on that that it was in reference

20  to some prior iteration, not the 2022.

21      I have no doubt that Gloria Burgess found a

22  document, but the circumstances in how that

23  document was found are suspicious to the Court.

24      I also understand that Ms. Eddy and Mr. Holte

25  testified that Jim said something to the effect of

1    "I've signed the stockholders' agreement" or "You

2    don't need to worry about it because That's been

3    taken care of," and those are statements in the

4    fall 2022 time period.

5        I do know that both of them are interested in

6    the outcome of this proceeding from a financial

7    standpoint, and I have difficulty understanding how

8    individuals who talk daily or weekly as part of the

9    core group of Smart Communications would not

10    earlier disclose the existence of that comment or

11    those comments that Jim allegedly made when,

12    indisputably, they knew that one of the prime

13    issues of this lawsuit -- or these lawsuits, I

14    should say, involve whether there is a settlement

15    or -- a Shareholders' Agreement -- why I say

16    settlement agreement, I don't know -- why there's a

17    Shareholders' Agreement.

18        So all of that goes to me saying that I find

19    as fact that the Exhibit 101 was not signed by Jim

20    Logan.  Jim Logan never assented to that document.

21        That there is no 2022 stockholder's agreement.

22        Now, let me also talk, because I said at the

23    beginning that there was references over time that

24    there were various different shareholder

25    agreements.  And without a doubt, there were a lot

1    of evidence of discussions and drafts of various

2    iterations, and I will say they are different in a

3    material respect.  One provision that is different

4    than the 2022 has to do with how the company gets

5    evaluated.

6         And under those other prior agreements, it was

7    more of a -- and depending on which version, but

8    they were more typical that you would see one side

9    picks an appraiser, the other side picks the

10   appraiser, and then if there is a dispute, then

11   they pick a third.

12        I -- I -- I know that most of those

13   Shareholder Agreement requests were being driven by

14   dad and that he was willing to enter into some type

15   of agreement.

16        The 2017 is probably the closest that the

17   evidence supports of a Shareholders' Agreement, but

18   the Court will ultimately find that there was no

19   2017 Shareholders' Agreement.

20        If you look at the discussions contained

21   within the e-mails that were discussing various

22   drafts, there is never a situation where Jon says

23   "I accept" or Jim says "I accept" or using words to

24   that effect.

25        At that time, Alexis was involved and, in

1  fact, some of the e-mails reference that there was

2  either disagreement or a difference of opinion as

3  to what various provisions meant.  And what those

4  e-mails from 2017 -- they talk about a global, Hey,

5  we need to move in this direction type of plan,

6  these are some steps we need to take.  One step is

7  getting the stock out of Alexis' name.  And the

8  next step is to have a Shareholders' Agreement.

9  But the parties never agreed on the business terms.

10      And I understand that parties can agree to

11  business terms but have other terms that are left

12  open that doesn't defeat the existence of an

13  enforceable agreement.

14      Here the parties never came to either an oral

15  or written agreement as to the core business terms

16  for a Shareholders' Agreement.  Certainly, one of

17  the terms that existed or that both sides may have

18  wanted was the existence of a mandatory buyback.

19  But that's not the only term.

20      The various drafts that different lawyers from

21  different firms sent around were much more

22  comprehensive than just a buyback.  And so it's

23  just like a situation where parties are negotiating

24  over ten points; they come to an agreement on

25  three, but not on the other seven.  You don't have

1     an agreement unless the parties then say, "Okay, we

2     agree to those three and they are going to be

3     controlling."  There was not anything like that

4     here.

5          I understand Jon testified that at each of

6     these yearly meetings or whenever a new version of

7     whatever year they were talking about at the time's

8     Shareholders' Agreement, that the parties agreed

9     orally with each other and then decided, since it

10    wasn't a big deal, to physically memorialize it in

11    writing.

12         I find that that -- that Jon Logan failed to

13    meet his burden that there was an existence of

14    either an oral or written Shareholders' Agreement

15    at any time, including the 2017, '18, and I think

16    it was 2020 or the various different iterations.

17         So, ultimately, that means I'm declaring that

18    there is no Shareholders' Agreement that is in

19    effect between the two 50 percent shareholder --

20    50 percent shareholders of Smart Communications'

21    stock.

22         So I'm going to pause there.  Are there any

23    questions or clarifications I need to make?  And

24    I'm going to start with Jon's lawyers first.

25         MR. BARNETT:  No, Your Honor.

1        THE COURT:  Going to Janice's lawyers.

2        MR. SCHOENFELD:  No, Your Honor.

3        THE COURT:  Okay.  Going to Alexis' lawyers.

4        MR. JOHNSON:  No, Your Honor.

5        THE COURT:  Now, who on this side of the room

6    is going to take the first draft of coming up with

7    this partial judgment?

8        MR. SCHOENFELD:  Your Honor, we'd be happy to

9    do so.

10       THE COURT:  I want a specific person.  Is

11   it --

12       MR. SCHOENFELD:  It's not going to be

13   Mr. O'Neill because he is leaving on parental

14   leave, and I've forbidden him to do any more work

15   on this case until it is done.  So it will be

16   Mr. Franklin and myself.

17       THE COURT:  Okay.  Obviously, before anything

18   gets submitted, it needs to go to all the attorneys

19   for their review and approval.

20       What I normally do in these types of

21   situations, if you can get a copy of my ruling, and

22   I'm fine if you want to just electronically staple

23   it and then come up with the partial judgment, just

24   implementing it, that's fine, too.

25       Now, let's talk about -- and that completes my

1    ruling.

2         So I'm now going to shift about what's next.

3    I mean, obviously the lawyers here know, you know,

4    I was a business litigator for many years before I

5    even got on the bench.  I mean, we all know the

6    three primary things that are going to happen.

7    There could be others.

8         Parties are either going to agree on a

9    Shareholders' Agreement governing their relations,

10   there's going to be a buyout, or there's going to

11   be a deadlock.  There could be others, but those

12   are the three typical that I see in these types of

13   situations.

14        I want to be clear that the injunction is

15   still in effect.  And let's not move assets.

16        What is going on next week with the hearing

17   time, and how do we want to proceed?  Do we need to

18   go back to mediation in, let's say, 30 or 60 days?

19        Did you all get the financial information that

20   we talked about when we had the contempt hearings

21   that were ultimately resolved by agreement?

22        MR. O'NEILL:  So, Your Honor -- So to answer

23   Your Honor, I think your first question was, as for

24   next week, what is, I believe, is up on Monday, am

25   I correct?

# EXHIBIT 2

IN THE CIRCUIT COURT OF THE 12TH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA

JANICE LOGAN, AS Trustee of the James Logan
Family Trust, dated February 10, 2021, and
directly and derivatively on behalf of Loco
Florida, LLC.

                 Plaintiff,

vs.
                                         Case No.: 2023 CA 1280 NC

JONATHAN LOGAN, SMART COMMUNICATIONS
                                         Case No: 2023 CA 1002 NC
HOLDING, INC., nominal defendant, and LOCO
FLORIDA, LLC, nominal defendant

                 Defendants.
_____/

## ORDER ON JANICE LOGAN'S MOTION FOR TEMPORARY INJUNCTION

This matter came before the court on a full day evidentiary hearing on **Plaintiff's Motion for Temporary Injunction** on July 20th, 2023. The court heard from the parties, read the pertinent memorandums of law, received and considered the evidence and testimony, heard argument of counsel, and took this matter under advisement.

It should also be noted that there are other related lawsuits pending related to these parties and issues related to this subject matter. Two cases have been consolidated by this Court in which this order could apply, depending on the court's ruling, they are;

**Case No.: 2023 CA 1002 NC** a complaint in which the Plaintiff is Jonathan Logan and Smart Communications Holding, Inc., and the Defendant is Janice Logan, individually and as Trustee of the James Logan Family Trust dated February 10, 2021, and Alexis Logan, individually.

and

**Case No.: 2023 CA 1280 NC** Plaintiff Janice Logan's Amended Verified Complaint, a complaint in which Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, has filed against Defendants Jonathan D. Logan (Jon), Smart Communications Holding, Inc., nominal defendant and Loco Florida, LLC, nominal defendant.

1

### The 2023 CA 1280 NC Case

This Motion for Temporary Injunction originates from a Verified Complaint (DIN #2), since amended (DIN #28).

The body of the complaint contains the allegations which have ultimately led to this motion, including the background information, including the relevant history of the parties' disagreements along with information regarding the related litigation that has resulted. It includes a history of Smart Communications, the formation of Smart Communication Holding, Inc., (Smart Communications, Company)

Both the original and amended complaint sets forth the background (as alleged by the Plaintiff) of the alleged waste of corporate assets, breach of fiduciary duties, and the seeking of a corporate custodian to oversee Smart Communications during the pendency of this litigation. The Amended Verified Complaint sets the table for the primary focus of the Plaintiff's Motion for Temporary Injunction hearing, which is the legality, validity, and authenticity of a purported Shareholder Agreement along with a Stock Purchase Agreement both of which became the primary points of disagreement between the parties and became the primary focus of the subject matter and argument during the evidentiary portion of the Motion for Temporary Injunction hearing.

### Allegations by Janice Logan

The Plaintiff in this case, Janice Logan, as Trustee of the James Logan Family Trust, dated February 10th, 2021, and directly and derivatively on behalf of Smart Communications Holding, Inc., and derivatively on behalf of Loco Florida, LLC, pursuant to Florida Rule of Civil procedure 1.610, files this Motion for Temporary Injunction against Defendant Jonathan D. Logan, and nominal Defendants Smart Communication Holdings, Inc. and Loco Florida, LLC.,.

The Court may make reference throughout this order at times only to Smart Communications Inc., recognizing that the Plaintiff has claimed an equal (50%) interest also in Loco Florida, LLC.,. The Court notes this for the record only. The Court notes the Defendant has argued that Loco LLC., is not a proper party joined for this action, that is also noted for the record. There is no dispute however that the Smart Communications, Inc., is not a properly joined party.

Plaintiff states in her motion that this action is brought to obtain relief from a *"retaliatory and oppressive campaign"* by the Defendant to use unilateral control of Smart Communications and Loco Florida LLC., to deprive Plaintiff of *"her ability to assert her legal right to a fair price for her 50% ownership stake in both entities."*.

The Plaintiff claims that after she filed her Complaint, the Defendant, as sole director and officer, *"used his absolute control of the company to strip Janice of income, health care, the use of her home, a generator needed to power lighting and security at her home, and likely the use of her phone and internet service."*. (DIN #28).

Plaintiff claims that she and her late husband (the father of the Defendant) *"long received these benefits as in-kind distributions on her ownership shares in Smart Communications and Loco."*

2

(DIN #28, Count II)

The Plaintiff claims that the Defendant has, among other things;

1. Sought to enforce a purported fraudulent Shareholders Agreement to pressure her into surrendering 50% ownership interest in Smart Communications and Loco LLC., for less than the fair market value. (DIN #2, Count I)

2. Breached his fiduciary duty by committing "gross corporate waste" and targeting Plaintiff in retaliation for the Plaintiff's position taken during this dispute between allegedly equal shareholders.

3. On May 1st, 2023, the Defendant terminated the Plaintiff from her position as a consultant for Smart Communications, a position she held without any issues since November 1st, 2022, and terminated her only source of income.

4. By terminating the Plaintiff, the Defendant also stripped the Plaintiff of her primary health insurance which she relies upon to treat a heart condition.

5. Stopped construction of a full house generator at the place of residence of the Plaintiff and has commenced eviction proceedings against the Plaintiff for failure to pay rent in the amount of approximately $35,000 per month which was allegedly demanded by Defendant only after commencement of legal proceedings by the Plaintiff.

6. Commenced eviction proceedings against the Plaintiff at her place of primary residence, (1660 Ranch Club Blvd.). Plaintiff claims that if she is evicted she will have no place to live.

The Plaintiff also requests the appointment of a temporary custodian for the well-being of the company. (DIN# 2, Counts II, and III).

Plaintiff alleges that the Defendant regularly makes use of a $10 million, 100-foot Riva Coraso Yacht which is owned by Smart Communications (named the Convict) and also a 48-foot yacht (named Dirty Amy). Upkeep, marina storage and payments to a full-time captain and crew for the Convict, is allegedly paid for by Smart Communications or its sub affiliates-of which the Plaintiff claims she is also a 50% shareholder.

According to the Plaintiff she has never been allowed access or had the ability to use the two boats.

In sum, the Plaintiff alleges that *"Jon has sought to strip his recently widowed 69-year-old mother of income, shelter, and personal security"*. That *"unless this Court grants this motion to restore the **status quo ante** between the parties, Jon may succeed in destroying her financial and emotional ability to effectively vindicate her rights to her severe and irreparable harm."*.

3

### Jonathan Logan and Smart Communication's response

In response to this motion the Defendant alleges, among other things;

1. The motion has little legal merit.

2. There are procedural and substantive deficiencies with the Plaintiff's motion.

3. The Plaintiff (Janice) has not and cannot establish the elements required for the issuance of a temporary injunction.

4. The Shareholders Agreement at issue was a valid and legally enforceable document.

### The law

As a procedural matter, the circuit court derives its authority to issue a temporary injunction in a civil action from Article V, section 5(b) of the Florida Constitution. That provision gives circuit courts the power to issue "all writs necessary or proper to the complete exercise of their jurisdiction." The power covers what was once commonly known as "a writ of injunction," which a court may issue "to maintain unchanged, as far as practicable, the *status* or condition of the subject matter of the controversy during the pendency of the suit." *Cohen v. L'Engle,* 24 Fla. 542, 5 So. 235, 237, 238-39 (1888) *see also Jacksonville Elec. Light Co. v. City of Jacksonville,* 36 Fla. 229, 18 So. 677, 679 (1895) (observing that the authority to issue a writ of injunction comes from the constitution and is ancillary to exercise of original jurisdiction). The writ of injunction "is an extraordinary, not an ordinary, everyday writ, and it should never be granted lightly, but cautiously and sparingly." *Godwin v. Phifer,* 51 Fla. 441, 41 So. 597, 602 (1906); *see also Thompson v. Plan. Comm'n of City of Jacksonville,* 464 So.2d 1231, 1236 (Fla. 1st DCA 1985) (recognizing "that the issuance of a preliminary injunction is an extraordinary remedy which should be granted sparingly")

To demonstrate a prima facie case for a temporary injunction, the petitioner must establish four factors:

(1) the likelihood of irreparable harm;

(2) the unavailability of an adequate remedy at law;

(3) a substantial likelihood of success on the merits; and

(4) that a temporary injunction would serve the public interest.

4

**The motion hearing.**

The motion hearing was scheduled for an all-day in person and hybrid Zoom hearing on July 20, 2023. The hearing commenced at 9:30AM and concluded at approximately 6:30PM with a 45-minute lunch recess along with a few short mid-morning and mid-afternoon breaks of no more than 15 minutes or less.

The court heard from the witnesses and the parties along with reviewing the numerous exhibits and demonstrative presentations. Both sides presented voluminous notebooks of stipulated exhibits and case law supporting their respective positions.

The court notes and incorporates and considers the arguments, briefs, case law, pleadings and exhibits introduced by the parties in its analysis and rationale in coming to its decision. In coming to its written ruling, the court notes it may not specifically cite and reference all of its basis of its ruling within the four corners of this order, however the court notes that its ultimate ruling comes from its analysis and consideration of all of the admissible evidence and testimony presented whether or not it is specifically referenced to or noted specifically in this order.

**Court's findings, analysis, consideration, rationale, and ruling.**

A central issue to both the Plaintiff's and Defendant's position is the purported Shareholders Agreement (Case 1002 DIN#53, Case 1280 DIN#33). The history, relevance, and dispute over the validity of this purported Shareholders Agreement is reflected in the argument, evidence, testimony, the pleadings and the record.

Whether the Shareholders Agreement is valid, forged, or fraudulent is pertinent to the position of both parties. If the Shareholders Agreement is found to be fraudulent, invalid or forged, it would support the position of the Plaintiff Janice Logan's Amended Verified Complaint, specifically **Count I** (Declaration Concerning the Validity of the Purported Shareholder's Agreement).

Also central to the position of the Plaintiff's case relating to **Count II** (607.0831 Liability of Director) is whether the Defendant, retaliated against the Plaintiff as a result of her not abiding by the Purported Shareholder's Agreement as it relates to the Defendant having the authority to buy the shares of Smart Communication Holdings LLC., owned by Plaintiff pursuant to the terms of the purported Shareholders Agreement.

5

The allegations made by the Plaintiff regarding Defendant's behavior, conduct, business dealings and fiscal management are central to **Count III** (Breach of Fiduciary Duties-The Trust against Jonathan Logan and Smart Communications, Inc.), **Count IV** (607 0748 Action to Appoint a Custodian) and **Count V** (Breach of Fiduciary Duties-The Trust against Jonathan Logan and Loco Florida) are also relevant to the Plaintiff's Amended Verified Complaint.

### *The Purported Shareholders Agreement*

Both parties presented testimony supporting their respective positions on the validity of the purported Shareholders Agreement.  The court heard from two experts supporting the parties' respective positions on the validity of the signatures surrounding the Shareholders Agreement, specifically whether there is sufficient evidence to find that the Shareholders Agreement was actually signed by James Logan who was the prior 50% shareholder of Smart Communications, LLC,. whose shares, after his death  ultimately passed to his wife, Janice, the Plaintiff.

Called on behalf of the Plaintiff was Linton A. Mohammed, a handwriting analysist who examined the documents at issue along with other documents to conduct a handwriting analysis and gave an opinion. The Court carefully considered his qualifications, experience and his testimony.

The Court evaluated and considered the final opinion of this witness (Mohammed) and his level of certainty regarding his professional opinion regarding the signature and document at issue.

Called on behalf of the Defendant was John Vastrek, a handwriting analyst and forensic document examiner who did the same and offered his own opinion. The Court likewise carefully considered his qualification, experience and his testimony.

The Court also evaluated and gave consideration of this witness' (Vastrek) level of certainty regarding his professional opinion regarding the signature and document at issue.

The Court also listened and observed the Defendant give testimony and heard his explanation of the circumstances surrounding the history of the purported Shareholders Agreement, including the history and circumstances surrounding the discovery of the lost purported Shareholders Agreement,  and the circumstances surrounding the alleged signing of the purported Shareholders Agreement.

The Court heard sworn testimony from other witnesses regarding the circumstances surrounding the purported Shareholders Agreement, including lawyers who were directly involved with or had knowledge of the document and the discussions surrounding the purported Shareholders Agreement.

The Court also notes the original Shareholders Agreement was never found and never produced for evaluation by the parties' experts who relied on a copy of the purported Shareholders Agreement in their analysis.

6

The court heard testimony from experienced attorneys who gave testimony of their recollections of the issues of the Shareholders Agreement, their understanding of the circumstances surrounding the document, including statements they heard related to said document.

The Court notes one of the attorneys called to testify testified that the Defendant in reference to the purported Shareholders Agreement made a statement to the effect that he (the Defendant) *"Wished he had signed it"*.

For the witnesses who testified live in court, the court was able to see their testimony and evaluate their testimony including how the witnesses testified along with their demeanor under examination and cross examination and how they responded to questions that were presented to them.

### *Allegations and evidence of retaliation, waste of company assets and breach of fiduciary duties*

The Court heard and evaluated the testimony regarding the Plaintiff's allegations that the Defendant retaliated against her (noting that she is presumptively a 50% shareholder in Smart Communications) by allegedly not abiding by the presumptive Shareholders Agreement and allegedly retaliating against her for her resistance or failure to abide by the purported Shareholders Agreement and the legal challenges she subsequently made against the Defendant.

The court also heard testimony and received evidence regarding allegations of the Defendant's wasting company assets and breach of fiduciary duties.

The Court notes the evidence shows that the Plaintiff was terminated from her employment at Smart Communications Holding, Inc., and her salary (approximately $100,000 per year) and health benefits were cancelled at the direction of the Defendant not long after or contemporaneously with the Plaintiff's lawsuit and allegations made against the Defendant.

This factual timeline and the alleged circumstances surrounding the reasons for Plaintiff's termination was not refuted by the Defendant when he testified, in fact they appeared to be reinforced by his testimony.

The Court notes there are pending lawsuits regarding an eviction from a company owned property where the Plaintiff currently lives and a replevin action regarding a company owned vehicle which prior to these proceedings was being used unfettered by the Plaintiff with knowledge and permission of the Defendant.

The Court notes the Plaintiff was in the process of having a house generator installed in the home she resides in and the contract or services for that installation has been cancelled due to the actions of the Defendant on behalf of the company. This was confirmed by the Defendant during his testimony.

7

In sum, the Defendant did not deny under oath at the hearing that the Plaintiff was terminated from employment, had her health care benefits cut, and denied use of company vehicles and demanded to pay rent as a result of the allegations and actions made by the Plaintiff in bringing these allegations against the Defendant and filing the subsequent lawsuit.

The Court also heard and testimony and saw evidence of the Defendant's use and exclusive enjoyment of company assets including company credit cards, luxury vehicles, homes and yachts.

The Defendant testified that he employs a full-time boat captain for a company owned and operated luxury yacht, allegedly worth approximately $10 million dollars, that is moored in a marina at a cost of approximately $10,000 per month, in addition, the luxury yacht has a full-time captain salaried at approximately $140,000 per year and a full-time deck hand who is paid approximately $60,000 per year.

According to the Plaintiff the yacht is only used a few times per year.

The Defendant also has use of a home in Tierra Verde, Florida and a condominium in Miami, allegedly worth $1.5 million, acquired in part or owned outright by Smart Communications. The Defendant also has use of a smaller company owned or acquired "sports" boat, allegedly worth approximately $1 million dollars, that he keeps at his Tierra Verde residence.

In particular, but not exclusively, the Court notes the testimony and evidence shows the Defendant under the auspices and/or ownership of Smart Communications Holdings, Inc., has or had use and access to several luxury vehicles including a Ferrari, allegedly worth approximately $350,000, a Lamborghini allegedly worth approximately $300,000, a Range Rover, and a Rolls Royce worth approximately $250,000. These vehicles allegedly are in the exclusive use and possession of the Defendant.

Defendant had or has exclusive use or access to a Smart Communications American Express Business Account/Credit Card in which noted purchases included personal items for the Defendant including plane tickets to international destinations for "guy trips", fishing charters, and ski lodging.

The Court also notes that prior to the initiation of these allegations by the Plaintiff, and the lawsuit, there was no demand by the Defendant for payment for use of the company owned home lived in by the Plaintiff, nor any demand for payment relating to her use of company owned vehicles.

Prior to the initiation of the allegations and the lawsuit by the Plaintiff, there was no expectancy with regard to Plaintiff's role with the company nor was there any issues regarding her salary and health care benefits with the company.

The Court notes the evidence shows that the Plaintiff is approximately 69 years of age, suffers from apparent health-related issues and is concerned with her health, income, shelter, future health care and her personal security.

With regard to the authenticity of the Shareholders Agreement, the Court finds that the testimony of Linton Mohammed, the expert witness on behalf of the Plaintiff was more compelling and persuasive than the testimony of the Defense expert witness, John Vastrek.

8

Based on the testimony of witnesses and the evidence so far presented, the Court cannot find that there was any valid Shareholders Agreement in existence during the relevant time periods.

### *Findings relating to the requirements of a temporary injunction.*

In reviewing and evaluating the witnesses, evidence and testimony the court concludes the following;

1. The Court finds that as to the circumstances surrounding the pending eviction and replevin proceedings along with the cancellation of the health insurance and income of the Plaintiff and based on her age, health history, and her prior dependency on the benefits of being a shareholder of the company show a prima facie case that the Plaintiff would suffer **irreparable harm** if the temporary injunction were not granted.

2. The Court finds that the immediacy of the circumstances surrounding the pending legal actions initiated by the Defendant, especially the eviction proceedings, combined with the age of the Plaintiff and her current health issues, along with other evidence presented in the evidentiary hearing show a prima facie case supporting the argument that there is **no adequate remedy at law**.

3. Based on the evidence that the Court has considered and commented on within this order, the Court finds there is a **substantial likelihood of success on the merits** of the current lawsuit by the Plaintiff.

4. The Court finds that the company employs in excess of 100 employees, the stabilization and maintaining the status quo of the company and its employees until this matter is ultimately resolved indicated the granting of this temporary injunction **would serve the public interest**.

### *Ruling*

The Plaintiff, Janice Logan has established the requirements under Florida Rule of Civil Procedure 1.160 entitling her to the following temporary injunctive relief to this extent, the Court enters this order;

1. **Enjoining the Defendant from charging and demanding rent for her occupation and use of her residence (1660 Ranch Club Blvd.) during the pendency of these actions (Case No. 2023 CA 1002 NC and 2023 CA 1280 NC).**

2. Staying any pending or prospective legal eviction or repossession actions related to alleged Smart Communication Inc., and/or Loco Florida, LLC., property or assets that are currently in possession or being used by the Plaintiff, (particularly the Plaintiff's residence at 1660 Ranch Club, Blvd. and personal vehicles) during the pendency of the litigation related to actions in 2023 CA 1002 NC and 2023 CA 1280 NC. This would include pursuing any suits in Sarasota County demanding declaratory judgment, eviction, rents allegedly owed on Smart Communication and or Loco Florida LLC owned property, and related replevin actions of alleged company owned vehicles.

3. Reinstating the Plaintiff's position within the company, her salary and benefits, including health benefits, at the same rate and frequency paid prior to the termination of said salary and benefits by the Defendant.

4. The Defendant shall reinstate or facilitate the completion of the generator project that was begun or contemplated to begin at the 1660 Ranch Club Blvd., property that was ceased at the direction of the Defendant.

5. The Court will retain jurisdiction to impose such other relief as this court deems just and proper.

### *Bond*

The Court takes in consideration and incorporates by reference the arguments made by counsel for the Plaintiff and Defendant and after consideration sets a bond in the amount of **$65,000.00** that is to be posted by the Plaintiff as a condition of this order. Said bond shall be subject to review by this Court no earlier than 6 months from the date of this order.

Done and ordered this ___25th___ day of July 2023, in Sarasota, Sarasota Florida.

Charles E. Williams
Circuit Court Judge

cc.

Attorneys of record

10

# EXHIBIT 3

STEARNS WEAVER MILLER
WEISSLER ALHADEFF & SITTERSON, P.A.

Craig S. Barnett
200 East Las Olas Boulevard, Suite 2100
Fort Lauderdale, FL 33301
Direct: (954) 462-9553
Email: cbarnett@stearnsweaver.com

May 1, 2024

**By Email**

David E. Schoenfeld, Esq.
Gary Miller, Esq.
Shook Hardy & Bacon
111 South Wacker Drive
Chicago, Illinois 60606

Re:    Jonathan Logan and Smart Communications v. Janice Logan, et al.

Dear Dave and Gary:

As follow up to David's April 23, 2024 letter, Smart Communications Holding, Inc. ("Smart Comm") is conducting its review of personal expenses submitted by Janice Logan for payment by the company. Given Gary's numerous letters leveling claims of "corporate waste" against Jon, unfounded as they may be, we assume that you both were unaware, as were we, that Janice continues to submit personal bills to Smart Comm for payment and/or reimbursement. We anticipate your full cooperation in bringing Janice's misconduct to an immediate end.

While Smart Comm continues to review its records, and without waiver of any right, including its right to seek further reimbursement from Janice, Alexis or anyone else who may have received cash and/or other benefits from Smart Comm to which they were not entitled, we enclose a spreadsheet identifying thus far $224,148.27 in expenses submitted by Janice since Jim's passing either paid directly by Smart Comm or for which Janice received reimbursement. Review of amounts for which Janice and others may be responsible continues. *This is unacceptable at best.*

Despite Janice's often-repeated claim that the Court intended to protect the *status quo*, no court order can be read to grant Janice a blank check for, among other things: $83,359 for landscaping; $6,451 for pool maintenance; and miscellaneous painting expenses totaling more than $21,000. She has submitted bills for payment for barn repair as well as a chimney and barn doors, presumably, for the horse stable located on Ranch Club Mansion property. To our client's knowledge, Janice does not keep horses on the property and Smart has no investments in horse farming. To the extent Janice does, she alone is responsible for such costs. To the extent that she leases the stables to anyone else, any lease would be the exclusive right of Smart Comm and all resulting funds would belong to the company. If, in fact, the stables are still empty, then we are sure you agree there is no legitimate reason for Janice to be incurring these costs, regardless of

May 1, 2024
Page 2

who pays them. The same can be said for the $6,354 in "reimbursements" paid directly to Janice, including nearly $1,100 for a lanai refrigerator.

Please make immediate arrangements to reimburse Smart Comm in the amount of $224,148.27, without waiver of additional amounts as may be determined to be due and owing from Janice and/others to Smart Comm.

Going forward, she may not continue to incur costs on behalf of Smart Comm without its prior review and approval. From now on, items necessary to preserve the Ranch Club Mansion as a company asset must be submitted in advance, through counsel and in writing, with a detailed description of the specific expense and its purpose. Smart Comm will review each such request in a timely fashion and reserves the right to deny any request and/or seek alternatives as may be necessary to protect its investment. *Any expenses submitted without prior company approval are subject to rejection.*

Moreover, Smart Comm is not responsible for Janice's utilities, including but not limited to monthly electric, propane and internet or cable bills. Please make arrangements to have Janice open her own accounts with the various utility companies. To prevent any accidental termination of services, please confirm in writing that she has moved these services to her own individual account by no later than May 30, 2024. *Smart Comm will not be responsible for any services on or after June 1, 2024, and after that date, it may terminate such accounts without further notice.*

We appreciate your assistance in making sure that Janice takes no further action that purports to burden Smart Comm with her improper personal expenses. If you have any questions, please advise.

Sincerely,

*/s/ Craig S. Barnett*
CRAIG S. BARNETT
Encl.

cc:     Smart Communications Holding, Inc.
        Mr. Jonathan Logan

#12714554 v1

**Sarasota Ranch Costs**
**10/23/2022-4/29/2024**

| Vendor | Reason | Date | Bill Amount | Vendor Amount Paid |
|---|---|---|---|---|
| Accurate Irrigation | Irrigation system repair | 11/18/2022 | $3,043.00 | |
| Accurate Irrigation | Irrigation system repair | 3/10/2023 | $1,678.50 | |
| Accurate Irrigation | Irrigation system repair | 7/28/2023 | $250.00 | |
| Accurate Irrigation | Irrigation system repair | 7/28/2023 | $540.00 | $5,511.50 |
| | | | | |
| Aqua Leak Detection LLC | Irrigation system repair | 3/24/2023 | $592.19 | |
| Aqua Leak Detection LLC | Irrigation system repair | 5/5/2023 | $978.41 | |
| Aqua Leak Detection LLC | Irrigation system repair | 5/27/2023 | $180.23 | $1,750.83 |
| | | | | |
| Cellgate | Gate Repair & Maintenance | 3/1/2023 | $160.47 | |
| Cellgate | Gate Repair & Maintenance | 6/1/2023 | $160.47 | |
| Cellgate | Gate Repair & Maintenance | 9/25/2023 | $160.47 | |
| Cellgate | Gate Repair & Maintenance | 9/25/2023 | $160.47 | |
| Cellgate | Gate Repair & Maintenance | 12/1/2023 | $128.24 | |
| Cellgate | Gate Repair & Maintenance | 3/1/2024 | $128.24 | $898.36 |
| | | | | |
| Custom Air & Plumbing | HVAC and Plumbing Svc | 11/14/2022 | $139.00 | |
| Custom Air & Plumbing | HVAC and Plumbing Svc | 2/17/2023 | $325.00 | |
| Custom Air & Plumbing | HVAC and Plumbing Svc | 3/3/2023 | $552.00 | |
| Custom Air & Plumbing | HVAC and Plumbing Svc | 2/9/2024 | $630.00 | $1,646.00 |
| | | | | |
| Ezzy Cuts Lawncare LLC | Landscaping | 11/17/2022 | $1,680.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 12/9/2022 | $280.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 12/29/2022 | $1,100.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 12/30/2022 | $4,639.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 1/20/2023 | $4,200.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 2/3/2023 | $1,100.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 2/17/2023 | $1,250.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 2/17/2023 | $15,200.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 3/3/2023 | $2,900.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 4/14/2023 | $2,695.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 5/11/2023 | $1,100.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 5/26/2023 | $3,070.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 6/23/2023 | $1,250.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 7/7/2023 | $1,630.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 8/11/2023 | $1,415.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 9/8/2023 | $1,550.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 9/15/2023 | $2,590.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 9/15/2023 | $1,305.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 9/29/2023 | $1,700.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 9/29/2023 | $1,900.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 11/3/2023 | $1,375.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 12/1/2023 | $2,515.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 12/8/2023 | $1,475.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 1/19/2024 | $1,675.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 1/19/2024 | $10,115.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 1/19/2024 | $480.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 1/26/2024 | $2,635.00 | |

| | | | | |
|---|---|---|---|---|
| Ezzy Cuts Lawncare LLC | Landscaping | 2/2/2024 | $1,375.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 2/16/2024 | $1,850.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 3/1/2024 | $1,550.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 4/5/2024 | $1,550.00 | |
| Ezzy Cuts Lawncare LLC | Landscaping | 4/19/2024 | $4,210.00 | $83,359.00 |
| | | | | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 11/8/2022 | $554.44 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 12/12/2022 | $457.46 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 1/18/2023 | $478.13 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 2/7/2023 | $492.18 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 3/9/2023 | $481.47 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 4/19/2023 | $641.00 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 5/22/2023 | $709.26 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 6/21/2023 | $822.25 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 7/20/2023 | $990.83 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 8/22/2023 | $1,057.75 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 9/20/2023 | $1,035.02 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 10/23/2023 | $926.88 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 11/20/2023 | $711.06 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 12/19/2023 | $689.91 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 1/19/2024 | $664.62 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 2/21/2024 | $649.93 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 3/19/2024 | $616.39 | |
| Florida Power & Light | 12880-54586- Sarasota Ranch | 4/22/2024 | $705.20 | $12,683.78 |
| | | | | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 11/10/2022 | $31.28 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 12/9/2022 | $30.88 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 1/9/2023 | $30.39 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 2/10/2023 | $30.03 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 3/9/2023 | $30.09 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 4/12/2023 | $31.66 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 5/11/2023 | $34.32 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 6/13/2023 | $29.98 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 7/11/2023 | $30.84 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 8/11/2023 | $30.50 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 9/12/2023 | $30.60 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 10/12/2023 | $30.60 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 11/14/2023 | $30.84 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 12/11/2023 | $30.65 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 1/11/2024 | $30.77 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 2/12/2024 | $30.36 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 3/13/2024 | $30.55 | |
| Florida Power & Light | Ending 9048-Sarasota Barn | 4/11/2024 | $30.66 | $555.00 |
| | | | | |
| Fox Plumbing | Plumbing Repair | 12/13/2022 | $412.00 | |
| Fox Plumbing | Plumbing Repair | 3/1/2023 | $706.00 | |
| Fox Plumbing | Plumbing Repair | 6/9/2023 | $341.00 | $1,459.00 |
| | | | | |
| Gate Service Florida | Gate Repair & Maintenance | 10/6/2023 | $3,899.00 | $3,899.00 |
| | | | | |
| Glass Menagerie | Sliding Door Repair | 1/24/2023 | $5,564.00 | $5,564.00 |
| | | | | |
| Gopher Roofing | Roof Repair | 11/25/2022 | $3,990.00 | $3,990.00 |

| | | | | |
|---|---|---|---|---|
| Heath Pest Control | Pest Service | 12/13/2022 | $722.00 | |
| Heath Pest Control | Pest Service | 12/1/2023 | $722.00 | $1,444.00 |
| | | | | |
| Janice Logan | Vision Electric - Sarasota gate light repair | 12/31/2023 | $484.00 | |
| Janice Logan | Icemaker Repair Reimbursement | 12/31/2023 | $149.00 | |
| Janice Logan | Reimbursement | 7/14/2023 | $110.00 | |
| Janice Logan | Reimbursement-Sliding Door | 8/4/2023 | $100.00 | |
| Janice Logan | Green Cooling Solutions Reimbursement | 10/6/2023 | $258.00 | |
| Janice Logan | Reimburse - Valvoline Instant Oil Change | 11/3/2023 | $150.83 | |
| Janice Logan | Landscaping Costs-Sarasota Property | 11/17/2023 | $93.92 | |
| Janice Logan | Landscaping Costs-Sarasota Property | 11/17/2023 | $176.81 | |
| Janice Logan | Lanai Refrigerator-Sarasota Property | 12/1/2023 | $1,099.00 | |
| Janice Logan | HVAC Unit damaged coil repair-Sarasota Property | 12/1/2023 | $1,125.00 | |
| Janice Logan | Pool Area Lanai Power Wash-Wow PWPainting-Sarasota Property | 12/1/2023 | $700.00 | |
| Janice Logan | Landscape Lighting-Sarasota property | 12/8/2023 | $125.00 | |
| Janice Logan | HVAC Filters | 2/9/2024 | $392.84 | |
| Janice Logan | Landscape Lighting-Sarasota property | 2/9/2024 | $500.00 | |
| Janice Logan | Landscape Lighting-Sarasota property | 2/9/2024 | $550.00 | |
| Janice Logan | Fountain Lighting-Sarasota property | 3/1/2024 | $200.00 | |
| Janice Logan | Garage Door Repair-Sarasota property | 3/8/2024 | $140.00 | $6,354.40 |
| | | | | |
| Janice Logan - Am Ex Credit Card Charges | Details in separate worksheet | Various | $8,432.85 | $8,432.85 |
| | | | | |
| Jeff Schultz Painting, Inc | Painting | 1/6/2023 | $4,500.00 | |
| Jeff Schultz Painting, Inc | Painting | 1/13/2023 | $8,000.00 | |
| Jeff Schultz Painting, Inc | Painting | 1/18/2023 | $2,175.00 | $14,675.00 |
| | | | | |
| Kelly Automatic Gate Service Inc. | Gate Service & Repair | 6/1/2023 | $339.90 | $339.90 |
| | | | | |
| Kinder Safe Pest Solutions | Termite Treatment | 3/14/2024 | $4,000.00 | $4,000.00 |
| | | | | |
| Kurtz Aluminum | Maintenance | 2/17/2023 | $815.00 | $815.00 |
| | | | | |
| Leader Security System | Security System | 11/9/2022 | $276.45 | |
| Leader Security System | Security System | 4/15/2023 | $144.45 | |
| Leader Security System | Security System | 7/15/2023 | $144.45 | |
| Leader Security System | Security System | 10/12/2023 | $144.45 | |
| Leader Security System | Security System | 1/12/2024 | $144.45 | |
| Leader Security System | Security System | 2/27/2024 | $165.85 | |
| Leader Security System | Security System | 4/12/2024 | $144.45 | $1,164.55 |
| | | | | |
| Landscape Lighting by Greenthumb | Outdoor Lighting | 1/9/2023 | $320.00 | |
| Landscape Lighting by Greenthumb | Outdoor Lighting | 1/23/2023 | $400.00 | |
| Landscape Lighting by Greenthumb | Outdoor Lighting | 1/27/2023 | $370.00 | |
| Landscape Lighting by Greenthumb | Outdoor Lighting | 3/15/2024 | $200.00 | $1,290.00 |
| | | | | |
| Leon Bukshbaum | Misc Repair | 11/16/2022 | $524.30 | $524.30 |
| | | | | |
| Lowe's | Janice Logan Purchase | 5/13/2023 | $126.43 | |
| Lowe's | Janice Logan Purchase | 5/14/2023 | $115.24 | |
| Lowe's | Janice Logan Purchase | 6/11/2023 | $43.81 | $285.48 |

| Vendor | Description | Date | Amount | Total |
|---|---|---|---|---|
| Matthew Weyler | Barn Repair | 12/9/2022 | $595.00 | $595.00 |
| Mullets Appliances | | 11/22/2022 | $296.86 | $296.86 |
| Myakka Communications | Internet Service | 6/7/2023 | $115.30 | |
| Myakka Communications | Internet Service | 8/1/2023 | $115.30 | |
| Myakka Communications | Internet Service | 8/4/2023 | $115.30 | |
| Myakka Communications | Internet Service | 10/1/2023 | $115.30 | |
| Myakka Communications | Internet Service | 10/6/2023 | $115.30 | |
| Myakka Communications | Internet Service | 12/1/2023 | $115.30 | |
| Myakka Communications | Internet Service | 12/8/2023 | $115.30 | |
| Myakka Communications | Internet Service | 2/1/2024 | $115.30 | $922.40 |
| Perfect Handyman BD LLC | Chimney and Barn Doors | 12/23/2022 | $1,875.00 | $1,875.00 |
| Reno Pros LLC | Miscellaneous Repair | 3/2/2023 | $1,613.22 | $1,613.22 |
| Rick Steakly Painting | Painting Services | 11/29/2022 | $3,000.00 | |
| Rick Steakly Painting | Painting Services | 12/9/2022 | $1,000.00 | |
| Rick Steakly Painting | Painting Services | 12/22/2022 | $3,000.00 | $7,000.00 |
| Sarasota Gate and Access | Gate Repair and Mgmt | 3/10/2023 | $635.00 | |
| Sarasota Gate and Access | Gate Repair and Mgmt | 4/28/2023 | $889.50 | $1,524.50 |
| Sarasota Ranch Club HOA | Homeowners Assn | 1/1/2024 | $2,467.00 | |
| Sarasota Ranch Club HOA | Homeowners Assn | 1/1/2024 | $2,467.00 | $4,934.00 |
| Sherwin Williams | Misc Paint Supplies | 2/12/2023 | $121.96 | |
| Sherwin Williams | Misc Paint Supplies | 3/28/2023 | $36.81 | $158.77 |
| St Pete Choice Supply | Misc Repairs | 11/19/2022 | $281.58 | $281.58 |
| Sunshine Pools | Pool Maintenance and Svc | 11/4/2022 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 11/30/2022 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 1/5/2023 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 2/3/2023 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 3/31/2023 | $75.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 4/7/2023 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 4/7/2023 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 5/5/2023 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 5/5/2023 | $745.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 6/9/2023 | $115.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 6/30/2023 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 7/7/2023 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 8/4/2023 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 9/1/2023 | $332.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 10/6/2023 | $332.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 11/3/2023 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 11/17/2023 | $190.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 12/1/2023 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 1/5/2024 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 2/2/2024 | $290.00 | |
| Sunshine Pools | Pool Maintenance and Svc | 3/1/2024 | $290.00 | |

| | | | | |
|---|---|---|---|---|
| Sunshine Pools | Pool Maintenance and Svc | 4/5/2024 | $312.50 | $6,451.50 |
| Supply House | Misc Repair | 3/28/2023 | $60.01 | $60.01 |
| The Home Depot | Misc Repair | 5/5/2023 | $582.17 | $582.17 |
| Tractor Supply | Misc Repair | 1/18/2023 | $77.79 | $77.79 |
| Turner Pest Control | Annual Pest Service | 2/15/2023 | $3,679.40 | |
| Turner Pest Control | Annual Pest Service | 1/23/2024 | $3,376.12 | $7,055.52 |
| Wagler Irrigation Inc. | Exterior Irrigation Svc | 9/15/2023 | $215.50 | |
| Wagler Irrigation Inc. | Exterior Irrigation Svc | 12/15/2023 | $271.30 | $486.80 |
| Wallace Welch & Willingham | Home Insurance | 6/20/2023 | $26,466.20 | $26,466.20 |
| Water Treatment and Filtration | Water Filtration Svc | 11/17/2022 | $154.00 | |
| Water Treatment and Filtration | Water Filtration Svc | 11/24/2022 | $298.00 | |
| Water Treatment and Filtration | Water Filtration Svc | 6/16/2023 | $1,699.00 | |
| Water Treatment and Filtration | Water Filtration Svc | 8/4/2023 | $349.00 | |
| Water Treatment and Filtration | Water Filtration Svc | 8/18/2023 | $99.00 | |
| Water Treatment and Filtration | Water Filtration Svc | 10/13/2023 | $267.00 | |
| Water Treatment and Filtration | Water Filtration Svc | 3/1/2024 | $259.00 | $3,125.00 |
| | Total | | $224,148.27 | $224,148.27 |

| | | | | |
|---|---|---|---|---|
| Credit Card Charge | 10/28/2022 | Amazon | JANICE LOGAN-71871-2UEB2ONXIRH BOOK STORES | $43.37 |
| Credit Card Charge | 10/30/2022 | Mapiposa Nurser | JANICE LOGAN-71871-303IAR461UI9417470499 | $119.06 |
| Credit Card Charge | 11/1/2022 | Mavis | JANICE LOGAN-71871-7102531063 914-984-2500 | $25.00 |
| Credit Card Charge | 11/4/2022 | Mavis | JANICE LOGAN-71871-00001008 941-900-4495 | $1,312.14 |
| Credit Card Charge | 11/5/2022 | Lowe's | JANICE LOGAN-71871-INV # 10645 941-257-2200 | $67.86 |
| Credit Card Charge | 11/6/2022 | Applebee's | JANICE LOGAN-71871-899271 899271 34287 | $51.28 |
| Credit Card Charge | 11/13/2022 | Mr. Tequila Cant | JANICE LOGAN-71871-85133312317 941-312-5110 | $107.40 |
| Check | 11/16/2022 Check 16516 | Janice Logan | Withdrawal with check Jim had at home | $5,000.00 |
| Credit Card Charge | 11/16/2022 | J. E. Skelly Enter | JANICE LOGAN-71871-320IAR6E2BE19742 34202 | $360.00 |
| Credit Card Charge | 12/1/2022 | Cellgate | JANICE LOGAN-71871-NT_MU1VHSKB +19722311999 | $160.47 |
| Credit Card Charge | 12/11/2022 | Floor and Decor | JANICE LOGAN-71871-1014004599 877-675-0002 | $40.53 |
| Credit Card Charge | 12/14/2022 | R & W Sarasota | JANICE LOGAN-71871-07900031 941-377-5735 | $120.05 |
| Credit Card Charge | 12/19/2022 | Speaks Clam Ba | JANICE LOGAN-71871-99999992352 9412327646 | $44.24 |
| Credit Card Charge | 12/25/2022 | Ruth's Chris Stea | JANICE LOGAN-71871-889753 4234 34240 | $529.07 |
| Credit Card Charge | 1/3/2023 | Lowe's | JANICE LOGAN-71871-INV # 19348 941-961-6261 | $73.83 |
| Credit Card Charge | 1/6/2023 | 7-Eleven | JANICE LOGAN-71871-620280106 7 941-807-5498 | $65.80 |
| Credit Card Charge | 1/9/2023 | Wicked Cantina | JANICE LOGAN-71871-21105173009 RESTAURANT | $48.55 |
| Credit Card Charge | 1/24/2023 | Lowe's | JANICE LOGAN-71871-INV # 19514 941-961-6261 | $28.27 |
| Credit Card Charge | 1/30/2023 | Circle K | JANICE LOGAN-71871-CONVENIENCE | $70.00 |
| Credit Card Charge | 1/31/2023 | Pink Tequila | JANICE LOGAN-71871-85349143031 941-888-5332 | $89.12 |
| Credit Card Charge | 2/7/2023 | 7-Eleven | JANICE LOGAN-71871-610100207 7 941-807-5498 | $76.81 |

$8,432.85

# EXHIBIT 4

TRANSFER AGREEMENT

TRANSFER AGREEMENT (the "Agreement") dated the 29th day of August, 2023, and effective as of such date (the "Effective Date"), between SMART COMMUNICATIONS INC., a Florida corporation (the "Member"), and SMART COMMUNICATIONS HOLDING, LLC, a Delaware limited liability company ("Company").

W I T N E S S E T H :

WHEREAS, Member is the sole member of the Company, and all of the limited liability company interest of the Company are owned by the Member.

WHEREAS, the Member desires to transfer to the Company all of the Member's right, title and interest in and to the Transferred Assets, as defined below (the "Transfer").

NOW THEREFORE, in consideration of the mutual covenants hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Definitions.**

1.1    "control" (including, with correlative meanings, "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such organization (as defined in the Delaware UCC), whether through ownership of Equity Interests, by contract or otherwise.

1.2    "Delaware UCC" means the Uniform Commercial Code as in effect in the State of Delaware on the date hereof.

1.3    "Equity Interests" means all of the Company's securities, shares, units, options, warrants, interests, participations or other equivalents (regardless of how designated) of or in each Subsidiary or other organization (as defined in the Delaware UCC), including but not limited to a corporation, partnership (whether general or limited), limited liability company or similar entity, whether voting or nonvoting, certificated or uncertificated, including general partner partnership interests, limited partner partnership interests, common stock, preferred stock, limited liability company interests, membership interests, partnership interests or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934).

1.4    "Excluded Assets" means: (i) the assets identified on Schedule 1.4 attached hereto; and (ii) any Non-Transferrable Assets (as defined in Section 3 below).

1.5    "Governmental Authority" means any national, state, local, domestic, foreign, or international governmental or judicial, legislative, executive, administrative or regulatory authority, tribunal, agency, body, entity or commission, or other governmental, quasi-governmental, or regulatory authority or agency, domestic, foreign, or international.

CONFIDENTIAL
SMART_B&R 000500

1.6     "Subsidiaries" means Smart Communications Collier, Inc., Smart Communications Desoto, Inc., Smart Communications Lee, Inc., Smart Communications Pasco, Inc. and Smart Communications US, Inc., each Florida corporations, and any other organization (as defined in the Delaware UCC) that is under the Member's control.

1.7     "Transferred Assets" means all of the Member's assets (including the Equity Interests), in any form, whether tangible, intangible, real property or personal, excluding the Excluded Assets.

1.8     "UCC" means the Uniform Commercial Code in effect in the State of Florida on the date of this Agreement or the Delaware UCC, as applicable.

2.     **Transfer of Transferred Assets.**

2.1     *Transfer*. Subject to the terms and conditions of this Agreement, the Member hereby transfers and delivers to the Company, and the Company hereby accepts from the Member all of the Member's rights, title and interest in and to the Transferred Assets (the "Transfer").  Under the Company's limited liability company agreement and the Delaware Limited Liability Company Act, the Transfer shall be a contribution of the Transferred Assets to the Company, whose limited liability company interests are all owned by the Member.   The Company shall reflect the Transfer (including the contribution arising therefrom) on the books and records of the Company.

2.2     *Transfer of Equity Interests*.

(a)     For any Equity Interest that is a "certificated security" (as defined in Article 8 of the UCC), as soon as reasonably practicable after the Effective Date, the Member shall deliver to the Company an original duly executed Stock Power in the form attached hereto as Exhibit A.

(b)     For any Equity Interest that is an "uncertificated security" (as defined in Article 8 of the UCC), as soon as reasonably practicable after the Effective Date, the Member shall deliver an "instruction" (as defined in Article 8 of the UCC) to each Subsidiary to register the transfer of all such Equity Interests in the Subsidiary to the Company in the form attached hereto as Exhibit B.  In connection therewith, the Member represents and warrants that it is the registered owner of all Equity Interests that are uncertificated securities and otherwise qualifies as an "appropriate person" (as defined in Article 8 of the UCC).

(c)     For any Equity Interest that is not a "security" (as defined in Article 8 of the UCC), as soon as reasonably practicable after the Effective Date, the Member shall deliver a duly executed Interest Transfer and Amendment Agreement in the form attached hereto as Exhibit C.

2.3     *Deliverables*. In addition to any other documents to be delivered under other provisions of this Agreement, on the date hereof, or as soon as reasonably practicable after the Effective Date:

(a)     The Member shall deliver to the Company:

CONFIDENTIAL
SMART_B&R 000501

(1)     an instrument of transfer for all of the Transferred Assets that are tangible personal property, duly executed by the Member, and attached hereto as <u>Exhibit D</u> (the "<u>Instrument of Transfer</u>");

(2)     a transfer and assumption agreement for all of the Transferred Assets that are intangible personal property, duly executed by the Member, and attached hereto as <u>Exhibit E</u> (the "<u>Transfer and Assumption Agreement</u>");

(3)     a copy of each stock power, instruction or Interest Transfer and Amendment Agreement, as applicable, delivered pursuant to <u>Section 2.2</u> above;

(4)     all certificates of title and title transfer documents to all titled motor vehicles and vessels that are Transferred Assets and any other Transferred Assets subject to a certificate of title, registration, recording or similar requirement to evidence ownership of the Transferred Assets under applicable law; and

(5)     such other deeds, assignments, certificates of title, documents and other instruments of transfer as reasonably may be requested by the Company, each in form and substance reasonably satisfactory to the Company, duly executed by the Member.

(b)     The Company shall deliver to the Member:

(1)     the Transfer and Assumption Agreement, duly executed by the Company;

(2)     the Interest Transfer and Amendment Agreement, duly executed by the Company; and

(3)     such other instruments of transfer, assumption, filings, or documents as reasonably may be requested by the Member, each in form and substance reasonably satisfactory to the Member, duly executed by the Company.

2.4     *Government and Third Party Consents, Filings and Notices.* Each of the parties hereto shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, and to assist and cooperate with the other party in doing, all things necessary, proper or advisable under applicable law to consummate the transactions contemplated by this Agreement, including (i) the obtaining of all necessary waivers, consents and approvals from Governmental Authorities and the making of all necessary registrations, filings and notices with Governmental Authorities, if any, and the taking of all other reasonable steps as may be necessary to obtain a waiver, consent or approval from, or to avoid an action or proceeding by, any Governmental Authorities, (ii) the delivery of required notices to, and the obtaining of required consents or waivers from, third parties (as defined below), and (iii) the execution and delivery of any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement.

3.     **Non-Transferrable Assets.**

CONFIDENTIAL
SMART_B&R 000502

3.1     Nothing in this Agreement shall be construed as an attempt or agreement to transfer any asset which by its terms or by law is non-assignable without the consent, authorization, approval, or waiver of any person or entity (including any Governmental Authority) not party to this Agreement (a "third party") (the "Non-Transferrable Assets") unless and until such consent, authorization, approval, or waiver shall have been obtained.

3.2     The Company shall use commercially reasonable efforts, and shall cooperate with the Member, to obtain any required consent, authorization, approval, or waiver, or any release, substitution, or amendment required to transfer any Non-Transferrable Asset to the Member. Once such consent, authorization, approval, waiver, release, substitution, or amendment is obtained, such Non-Transferrable Asset shall automatically, without any further action by the Member, the Company, or any other person or entity, be a Transferred Asset and transferred and delivered to the Company.

3.3     All Non-Transferrable Assets shall be held, as of and from the date hereof, by the Member, in trust for the Company and the covenants and obligations thereunder shall be performed by the Member, on behalf of the Company, and all benefits and obligations existing thereunder shall be for the account of the Company. The Member shall take or cause to be taken such actions in the name of the Member so as to provide the Company with the benefits of the Non-Transferrable Assets and to effect the collection of money or other consideration that becomes due and payable in respect of the Non-Transferrable Assets, and the Member shall pay to the Company all money or other consideration received by it in respect of all Non-Transferrable Assets held by it within ten (10) business days of receipt; provided, however, that the Company shall reimburse the Member for all reasonable out-of-pocket costs incurred by it after the date hereof associated with the retention and maintenance of such Non-Transferrable Assets. As of and from the date hereof, the Member authorizes the Company, to the extent permitted by applicable law and the terms of the Non-Transferrable Assets, to perform all the obligations and receive all the benefits of the Member under the Non-Transferrable Assets and appoints the Company as attorney-in-fact and grants and delegates to the Company the power and authority to act in the name and on behalf of the Member with respect thereto.  The Member shall not amend, modify, or terminate after the date hereof any Non-Transferrable Asset that would otherwise be a Transferred Asset absent the written consent of the Company.  In addition, the parties shall use their respective commercially reasonable efforts to work together in good faith to negotiate, agree to the terms of, and execute, a services agreement pursuant to which Member shall provide Company and Company shall provide Member, as applicable, with certain services relating to such Non-Transferrable Assets following the Effective Date.

3.4     Notwithstanding the foregoing, if, despite the Company's commercially reasonable efforts under Section 3.2 above, the Company is unable to affect the transfer of a Non-Transferrable Asset pursuant to this Section 3 by August 29, 2026 (the "Cut-Off Date"), such Non-Transferrable Asset shall thereafter constitute an Excluded Asset. Accordingly, neither the Member nor the Company shall have any obligation under this Agreement with respect to any such Non-Transferrable Assets after the Cut-Off Date.

4.      **Representations and Warranties of Company.**  Company represents and warrants that:

CONFIDENTIAL
SMART_B&R 000503

4.1     *Authority*.  Company has the power and authority to execute, deliver and carry out the terms of this Agreement and all instruments delivered by Company pursuant to or in connection with this Agreement.  This Agreement constitutes the legal, valid and binding obligation of Company and is enforceable against it in accordance with its terms.

4.2     *Corporate Organization*.  Company is a limited liability company duly formed, validly existing, and in good standing under the laws of the State of Delaware.

5.     **Representations and Warranties of Member.**  The Member represents and warrants that:

5.1     *Authority*.  It has the power and authority to execute, deliver and carry out the terms of this Agreement and all instruments delivered by it pursuant to or in connection with this Agreement.  This Agreement constitutes the legal, valid and binding obligation of the Member and is enforceable against the Member in accordance with its terms.

5.2     *Corporate Organization*.  Member is a corporation duly formed, validly existing, and in good standing under the laws of the State of Florida.

6.     **Miscellaneous**

6.1     *Severability*.  In the event any provision of this Agreement shall be held invalid or unenforceable by a court, such holding shall not invalidate or render unenforceable any other provision of this Agreement and each and every other provision of this Agreement shall continue in full force and effect.

6.2     *Entire Agreement; Binding Effect*.  This Agreement contains the entire agreement of the parties with respect to the subject matter hereto, and shall inure to the benefit of and be binding upon the parties hereto and upon their successors in interest of any kind whatsoever, including, but not limited to, their heirs, executors, administrators, guardians, trustees, attorneys-in-fact and legal and personal representatives.

6.3     *Further Assurances*.  Each of the parties hereto agrees that, without further consideration, it will do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, all such further acts, transfers, powers of attorney and assurances as reasonably may be required to more effectively transfer to and vest in the Company, and to put the Company in possession of, any of the Transferred Assets transferred hereunder and otherwise to carry out the purposes of this Agreement.

6.4     *Non-Recourse*.  This Agreement may only be enforced against, and any claim, action, suit or other legal proceeding based upon, arising out of or related to this Agreement, or the negotiation, execution or performance of this Agreement, may only be brought against the entities that are expressly named as parties hereto and then only with respect to the specific obligations set forth herein with respect to such party.  No past, present or future director, officer, employee, incorporator, manager, member, partner, stockholder, affiliate, agent, attorney or other representative of any party hereto or of any affiliate of any party hereto, or any of their successors or permitted assigns, shall have any liability for any obligations or liabilities of any

CONFIDENTIAL
SMART_B&R 000504

party hereto under this Agreement or for any claim, action, suit or other legal proceeding based on, in respect of or by reason of the transactions contemplated hereby.

6.5     *Notices*.   Except as otherwise provided in this Agreement, all notices, requests, claims, demands, waivers and other communications under this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand, if delivered personally or by courier, one business day if delivered by email, or five business days after being deposited in the mail (registered or certified mail, postage prepaid, return receipt requested) properly addressed to the following address for the Company and Member:

Company Address:

Smart Communications Holding, LLC
10491 72nd St.
Seminole, FL 33777
Attn: President
Email: JON.LOGAN@SMARTCOMMUNICATIONS.US

With a copy to:

legal@smartcommunications.us

Member Address:

Smart Communications Holding, Inc.
10491 72nd St.
Seminole, FL 33777
Attn: President
Email: JON.LOGAN@SMARTCOMMUNICATIONS.US

With a copy to:

legal@smartcommunications.us

6.6     *Amendment*.   Any modification, waiver, amendment or termination of this Agreement or any provision hereof shall be effective only if in writing and signed all parties to this Agreement.

6.7     *Assignment*.   No party shall be permitted to assign any of its rights, interests or obligations hereunder without the express written consent of the other party.

6.8     *Governing Law*.

(a)     The parties hereto hereby declare that it is their intention that this Agreement shall be regarded as made under the laws of the State of Delaware and that the laws of said State shall be applied in interpreting its provisions in all cases where legal interpretation shall be required.  Each of the parties hereto agrees (a) that this Agreement involves

CONFIDENTIAL
SMART_B&R 000505

at least $100,000.00, and (b) that this Agreement has been entered into by the parties hereto in express reliance upon 6 Del. C. § 2708.

(b)       Any dispute, claim, or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be submitted exclusively to and settled by arbitration in Wilmington, Delaware before a panel of three arbitrators. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures.  Judgment on the arbitral award (the "Award") may be entered in any court having jurisdiction.

(c)       Within 15 days after the commencement of arbitration, each party shall select one person to act as arbitrator, who must be a Delaware lawyer with at least 15 years of active litigation experience, and the two so selected shall select a third arbitrator within 30 days of the commencement of the arbitration to serve as the chair (the "Chair").  The Chair must be a Delaware lawyer with at least 20 years of active litigation experience.  If the arbitrators selected by the parties are unable or fail to agree upon the third arbitrator within the allotted time, the third arbitrator shall be appointed by JAMS in accordance with its rules. All arbitrators shall serve as neutral, independent and impartial arbitrators. Each party shall communicate its choice of a party appointed arbitrator only to the JAMS Case Manager in charge of the filing. Neither party is to inform any of the arbitrators as to which of the parties may have appointed them.

(d)       The parties shall maintain the confidential nature of the arbitration proceeding and the Award, including the arbitration hearing, except as may be necessary to prepare for or conduct the arbitration hearing on the merits, or except as may be necessary in connection with a court application for a preliminary remedy, a judicial challenge to an Award or its enforcement, or unless otherwise required by law or judicial decision. The Delaware Uniform Arbitration Act shall apply to the arbitration agreement provided for in this Section 6.8.

6.9    *Counterparts*.  This Agreement may be executed (by hand or electronic means) and delivered (including by electronic means) in one or more counterparts in which event all of said counterparts shall be deemed to be originals of this Agreement.

[Signature Page Follows]

CONFIDENTIAL
SMART_B&R 000506

DocuSign Envelope ID: EB90FECE-344A-42C7-B628-C9837E674B8A

IN WITNESS WHEREOF, the Agreement has been executed by the parties hereto as of the date first written above.

**Member:**

SMART COMMUNICATIONS INC.

By: _____
    Name: Jonathan D. Logan
    Title: President

**Company:**

SMART COMMUNICATIONS HOLDING, LLC

By: _____
    Name: Jonathan D. Logan
    Title: President

CONFIDENTIAL
SMART_B&R 000507

**Schedule 1.4**
**Excluded Assets**

None.

CONFIDENTIAL
SMART_B&R 000508

**Exhibit A**
**Irrevocable Stock Power**

1.     FOR VALUE RECEIVED, the undersigned, on behalf of Smart Communications Inc., a Florida corporation ("Transferor"), hereby transfers, assigns, contributes and delivers unto Smart Communications Holding, LLC, a Delaware limited liability company ("Transferee"), [_____ [shares of the Common Stock][Limited Liability Company Interests][Membership Interests][Partnership Interests][Units], [par value $0.01 per share], of _____, a Florida [corporation (the "Corporation")], represented by Certificate No. _____ standing in the name of Transferor on the books of said [Corporation].

2.     The undersigned, on behalf of Transferor, hereby irrevocably constitute and appoint each of the officers of the [Corporation] as an attorney in fact to transfer said stock on the books of the [Corporation], with full power of substitution in the premises.

Dated: As of _____ __, 2023

By_____
       Name:
       Title:

CONFIDENTIAL
SMART_B&R 000509

**Exhibit B**

**Instruction to Register Transfer of Uncertificated Securities**

_____ \_\_, 2023

_____[*Name and address of Subsidiary*]

Re: _____[*identify securities being transferred* ] (the "Securities")

To whom it may concern:

In connection with the transfer, assignment, contribution and delivery by Smart Communications Inc., a Florida corporation ("Smart Com FL") to Smart Communications Holding, LLC, a Delaware limited liability company ("Smart Com Holding DE") of the uncertificated Securities under that certain Transfer Agreement dated _____ \_\_, 2023, Smart Com FL, as the registered owner of the Securities, hereby instructs you to register a transfer on your books of the above-referenced uncertificated Securities to Smart Communications Holding, LLC, a Delaware limited liability company ("Smart Com Holding DE"). The address and other contact information of Smart Com Holding DE are as follows: _____[*provide contact information*].

Sincerely,

SMART COMMUNICATIONS INC.

_____ [*signature*]

Name: Jonathan D. Logan

Title: President and Treasurer

CONFIDENTIAL
SMART_B&R 000510

**Exhibit C**

**INTEREST TRANSFER AND AMENDMENT AGREEMENT**

This Interest Transfer and Amendment Agreement, dated and effective as of _____, 2023 (this "Interest Transfer Agreement"), is entered into by and between Smart Communications Inc., a Florida corporation, as transferor (the "Transferor"), and Smart Communications Holding, LLC, a Delaware limited liability company, as an transferee (the "Transferee").

W I T N E S S E T H :

WHEREAS, [NAME OF SUBSIDIARY LLC], a Florida limited liability company (the "Company") has been formed as a limited liability company under the [Florida Revised Limited Liability Company Act] (the "Act") pursuant to the Articles of Organization of the Company, as filed in the office of the Secretary of State of the State of Florida on [Date], and a [Limited Liability Company Agreement] of the Company, dated as of [Date] (the "LLC Agreement");

WHEREAS, the Transferor is a member of the Company and owns a [___%] limited liability company interest in the Company;

WHEREAS, the Transferor desires to transfer its entire [___%] limited liability company interest (the "Interest") to the Transferee, and, immediately following the admission of the Transferee to the Company as a member of the Company with respect to the Interest, the Transferor desires to cease to be a member of the Company;

WHEREAS, the Transferee desires to receive the Interest and to be admitted to the Company as a substitute member of the Company with respect to the Interest; and

WHEREAS, to accomplish the foregoing, the undersigned desire to enter into this Interest Transfer Agreement.

NOW, THEREFORE, the undersigned, in consideration of the premises, covenants and agreements contained herein, do hereby agree as follows:

1.     Transfer.  For value received, the receipt and sufficiency of which are hereby acknowledged, upon the execution of this Interest Transfer Agreement by the parties hereto, the Transferor hereby transfers, assigns, contributes and delivers the Interest to the Transferee (the "Interest Transfer").

2.     Admission. Contemporaneously with the Interest Transfer, the Transferee shall be admitted to the Company as a substitute member of the Company with respect to the Interest and agrees to be bound by all of the terms and conditions of the LLC Agreement.

3.     Cessation.  Immediately following the admission of the Transferee as a substitute member of the Company with respect to the Interest, the Transferor shall and does

CONFIDENTIAL
SMART_B&R 000511

hereby cease to be a member of the Company and shall thereupon cease to have or exercise any right or power as a member of the Company.

4.    <u>Continuation of the Company</u>.    The parties hereto hereby agree that the transfer of the Interest, the admission of the Transferee as a substitute member of the Company with respect to the Interest and the Transferor ceasing to be a member of the Company, shall not dissolve the Company.

5.    <u>Member Redefined</u>.    From and after the date hereof, all references to "Member" contained in the LLC Agreement shall refer to the Transferee.

6.    <u>Future Cooperation</u>.    Each of the parties hereto agrees to cooperate at all times from and after the date hereof with respect to all of the matters described herein, and to execute such further instruments, releases, assumptions, amendments of the LLC Agreement, notifications and other documents as may be reasonably requested for the purpose of giving effect to, or evidencing or giving notice of, the transactions contemplated by this Interest Transfer Agreement.

7.    <u>Binding Effect</u>.    This Interest Transfer Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

8.    <u>Execution in Counterparts</u>.    This Interest Transfer Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

9.    <u>Agreement in Effect</u>.    The LLC Agreement shall remain in full force and effect.

10.    <u>Governing Law</u>.    This Interest Transfer Agreement shall be governed by, and interpreted in accordance with, the laws of the State of Florida, all rights and remedies being governed by such laws.

*[Signature Page Follows]*

CONFIDENTIAL

SMART_B&R 000512

IN WITNESS WHEREOF, the parties hereto have caused this Interest Transfer Agreement to be duly executed as of the day and year first above written.

**TRANSFEROR:**

Smart Communications Inc.

Signature: _____

Name: _____

Title: _____

**TRANSFEREE:**

Smart Communications Holding, LLC

Signature: _____

Name: _____

Title: _____

CONFIDENTIAL
SMART_B&R 000513

**Exhibit D**
**Instrument of Transfer**

THIS INSTRUMENT OF TRANSFER (this "Instrument of Transfer"), dated as of August ___, 2023, is made and entered into between SMART COMMUNICATIONS INC., a Florida corporation ("Transferor"), as transferor, and SMART COMMUNICATIONS HOLDING, LLC, a Delaware limited liability company ("Transferee"), as transferee.

WHEREAS, Transferor and Transferee are parties to that certain Transfer Agreement, dated as of August 29, 2023 (as may be amended, modified or supplemented from time to time, the "Transfer Agreement"), pursuant to which Transferor has agreed to transfer certain assets to Transferee;

WHEREAS, capitalized terms used but not defined herein shall have the meanings for such terms that are set forth in the Transfer Agreement;

WHEREAS, pursuant to this Instrument of Transfer and in accordance with the Transfer Agreement, Transferor desires to evidence the transfer to Transferee of the Transferred Assets; and

NOW THEREFORE, for good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Transferor and Transferee do hereby agree as follows:

1.    Transfer of Transferred Assets.  On the terms and subject to the conditions and exceptions contained in the Transfer Agreement, Transferor hereby transfers, contributes and delivers to Transferee the Transferred Assets, including, but not limited to, the Transferred Assets set forth on Schedule 1 attached hereto, free and clear of any liens, and Transferee hereby accepts from Transferor, all of Transferor's right, title, and interest in, to and under all of the Transferred Assets. The Transferor and Transferee shall update Schedule 1 from time to time after the Effective Date to accurately reflect the Transferred Assets.  The Transferred Assets do not include, and Transferee does not hereby accept or otherwise obtain Transferor's right, title or interest in, to or under any of the Excluded Assets.

2.    Further Actions.  Transferor covenants and agrees to, at the request of Transferee, to execute and deliver further instruments of transfer and take such other action as Transferee may reasonably request to more effectively transfer and deliver to Transferee, and vest in Transferee title to, each of the Transferred Assets.

3.    Terms of the Transfer Agreement.  The terms of the Transfer Agreement are incorporated herein by this reference.  In the event of any conflict or inconsistency between the terms of the Transfer Agreement and the terms hereof, the terms of the Transfer Agreement shall govern.

4.    Governing Law; Submission to Jurisdiction.  This Instrument of Transfer shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law rule.  The terms of Section 6.8 of the Transfer Agreement are incorporated herein by reference and made a part hereof.

RLF1 29491977v.15

CONFIDENTIAL
SMART_B&R 000514

5.      Binding Effect; Amendments and Waivers.  This Instrument of Transfer shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  This Instrument of Transfer can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Instrument of Transfer signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

6.      Invalid Provisions.  If any term or other provision of this Instrument of Transfer is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Instrument of Transfer shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party hereto.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Instrument of Transfer so as to affect the original intent of the parties hereto as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

7.      Counterparts.  This Instrument of Transfer may be executed in one or more counterparts, whether by hand or electronically, each of which will be deemed to be an original copy and all of which, when taken together, will be deemed to constitute one and the same agreement or document, and will be effective when counterparts have been signed by each of the parties hereto and delivered to the other parties.  This Instrument of Transfer may be transmitted and delivered electronically.

[Signature Page Follows]

RLF1 29491977v.15

CONFIDENTIAL
SMART_B&R 000515

IN WITNESS WHEREOF, Transferor and Transferee have duly executed this Instrument of Transfer as of the date first set forth above.

**TRANSFEROR**

SMART COMMUNICATIONS INC.

By: _____
    Name:
    Title:

**TRANSFEREE**

SMART COMMUNICATIONS
HOLDING, LLC

By: _____
    Name:
    Title:

RLF1 29491977v.15

CONFIDENTIAL
SMART_B&R 000516

**Schedule 1 to Instrument of Transfer**
**Specific Transferred Assets**

RLF1 29491977v.15

CONFIDENTIAL
SMART_B&R 000517

**Exhibit E**
**Transfer and Assumption Agreement**

THIS TRANSFER AND ASSUMPTION AGREEMENT (this "Transfer and Assumption Agreement"), dated as of August __, 2023, is made by and between SMART COMMUNICATIONS INC., a Florida corporation ("Transferor"), and SMART COMMUNICATIONS HOLDING, LLC, a Delaware limited liability company ("Transferee").

WHEREAS, Transferor and Transferee are parties to that certain Transfer Agreement, dated as of August 29, 2023 (as may be amended, modified or supplemented from time to time, the "Transfer Agreement"), pursuant to which Transferee has agreed to transfer certain assets of Transferor and agreed to assume certain obligations of Transferor and this Transfer and Assumption Agreement is being entered into in connection with the Transfer Agreement;

WHEREAS, capitalized terms used but not defined herein shall have the meanings for such terms that are set forth in the Transfer Agreement;

WHEREAS, pursuant to this Transfer and Assumption Agreement, Transferor desires to transfer certain rights and agreements to Transferee and Transferee desires to assume certain obligations of Transferor; and

NOW THEREFORE, for good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Transferor and Transferee do hereby agree as follows:

1.  Transfer and Assumption.  Transferor hereby transfers, contributes, assigns and delivers to Transferee on the date hereof (the "Transfer"), all of Transferor's right, title and interest, legal and equitable, in and to each of any Transferred Assets that are intangible personal property, to the extent transferrable. Subject to Section 3 of the Transfer Agreement, Transferee hereby accepts the Transfer and assumes, and agrees to perform, pay and discharge when due, any liabilities arising out of or relating to such Transferred Assets from and after the date hereof.

2.  Further Actions.  Each party hereto covenants and agrees, at the request of the other party hereto, to execute and deliver further instruments of transfer and take such other action as such party may reasonably request to more effectively consummate the transfers and assumptions contemplated by this Transfer and Assumption Agreement.

3.  Terms of the Transfer Agreement.  The terms of the Transfer and Assumption Agreement are incorporated herein by this reference.  In the event of any conflict or inconsistency between the terms of the Transfer Agreement and the terms hereof, the terms of the Transfer Agreement shall govern.

4.  Governing Law; Submission to Jurisdiction.  This Transfer and Assumption Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law rule.  The terms of Section 6.8 of the Transfer Agreement are incorporated herein by reference and made a part hereof.

2

CONFIDENTIAL
SMART_B&R 000518

5.      <u>Binding Effect; Amendments and Waivers</u>.    This Transfer and Assumption Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  This Transfer and Assumption Agreement may be amended, supplemented or changed, and any provision hereof may be waived, only by written instrument making specific reference to this Transfer and Assumption Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

6.      <u>Invalid Provisions</u>.  If any term or other provision of this Transfer and Assumption Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Transfer and Assumption Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party hereto.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Transfer and Assumption Agreement so as to affect the original intent of the parties hereto as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

7.      <u>Counterparts</u>.  This Transfer and Assumption Agreement may be executed in one or more counterparts (whether by hand or electronic), each of which will be deemed to be an original copy and all of which, when taken together, will be deemed to constitute one and the same agreement or document, and will be effective when counterparts have been signed by each of the parties hereto and delivered to the other parties.  This Transfer and Assumption Agreement may be delivered via electronic means.

*[Signature Page Follows]*

3

**CONFIDENTIAL**
SMART_B&R 000519

IN WITNESS WHEREOF, each of Transferor and Transferee has duly executed this Transfer and Assumption Agreement on the date first set above.

**TRANSFEROR:**

SMART COMMUNICATIONS INC.


By: _____
Name:
Title:


**TRANSFEREE:**


SMART COMMUNICATIONS HOLDING, LLC


By: _____
Name:
Title:

CONFIDENTIAL
SMART_B&R 000520

# EXHIBIT 5

# CONSENT TO ASSIGNMENT AND ASSUMPTION OF AGREEMENTS

**THIS CONSENT TO ASSIGNMENT AND ASSUMPTION OF AGREEMENT (this "Consent") is given on the 12th day of October 2023, by Jefferson County, Texas ("Owner").**

Smart Communications Holding, Inc. has entered into a corporate restructuring ("Restructuring Agreement") providing for, among other things, the transfer of substantially all the assets and the business to Smart Communications Holding, LLC.

Effective October 12, 2023, Smart Communications Holding LLC will continue the fulfillment of contract (RFP 22-021/YS) Comprehensive Inmate Technology Services Package for Jefferson County Correctional Facility, Downtown Jail and Minnie Rogers Juvenile Justice Center.

Owner does hereby consent to the assignment of the Agreements by Smart Communications Holding, Inc. to Smart Communications Holding, LLC and the assumption of the Agreements by Smart Communications Holding, LLC. Owner hereby confirms that as of the date hereof, the Agreements are not in default, that all of Smart Communication Holding, Inc.'s obligations thereunder have been duly satisfied.

Owner agrees that copies of any notice to permitted or required under the Agreements shall be sent to:

> Smart Communications Holding, LLC
> 40491 72nd Street
> Seminole, FL 33777

This Consent shall become effective immediately upon approval of Jefferson County and signature of the County Judge.

ATTEST:                                           OWNER:

                                                  Jefferson County, Texas
_____
Roxanne Acosta Hellberg,  County Clerk            By: _____

                                                  Name: _Jeff R. Branick_____

                                                  Title:   _Jefferson County Judge_____

                                                  Date: _____

**Smart** Communications
*Corrections Simplified...*

*Jonathan D. Logan*
*CEO and President*
*Smart Communications Holding, Inc.*
*Jon.Logan@smartcommunications.us*

RECEIVED   OCT 2 0 2023

October 12, 2023

**VIA CERTIFIED US POSTAL MAIL**

Judge Jeff Branick
Jefferson County
o/b/o Jefferson County Purchasing Department
1149 Pearl Street, 1st Floor
Beaumont, TX 77701

*Re: Notice of Corporate Restructuring and Assignment*

Dear Judge Branick:

We write to inform you that, in connection with an internal corporate restructuring, our existing Service Agreement is being transferred to Smart Communications Holding, LLC.   The transfer will have no effect on your agency or our performance of the Service Agreement.

Smart Communications Holding, LLC, a Delaware entity, will maintain the same principal place of business, at 10491 72nd Street, Seminole, Florida 33777.

If you have any questions concerning these matters, please do not hesitate to contact me by email at jon.logan@smartcommunications.us or by phone, at 517-896-1822.

As the industry leader in providing innovative inmate communications solutions, we remain committed to serving our clients' needs with our superior technology, solutions, and dedicated staff.  We value your partnership with us and look forward to continuing to serve your agency long into the future.

Very truly yours,

Jonathan D. Logan

# EXHIBIT 6

CORRECTIONS SIMPLIFIED. | 🌐 www.smartcommunications.us | 📞 888-253-5178 | 📍 10491 72ⁿᵈ St. | Seminole, FL 33777

# **Master Services Agreement**

This Master Services Agreement (this "Agreement") is by and between the Eaton County Sheriff's Office, hereinafter referred to as "Customer," and Smart Communications Holding, LLC. and/or its designated subsidiary or assignee, with principal offices located at 10491 72nd Street, Seminole, FL 33777, hereinafter referred to as "Provider."

This Agreement supersedes any and all other agreements made between the Parties, written, oral or otherwise.

Whereas, Customer desires that Provider install an inmate communications system(s) and provide inmate communications and maintenance services according to the terms and conditions in this Agreement, and according to the Schedules, which are incorporated by reference into this Agreement, and;

Whereas, Provider agrees to install the inmate communications system(s) and provide inmate communications and maintenance services according to the terms and conditions in this Agreement, and according to the Schedules, which are incorporated by reference into this Agreement.

Now therefore, in consideration of the mutual covenants and agreements hereinafter set forth, the Parties, intending to be legally bound, agree as follows:

1. <u>Systems.</u> This Agreement specifies the general terms and conditions under which Provider will perform certain inmate related services and systems (the "System(s)") for the Customer. Additional terms and conditions with respect to the Systems will be specified in the Schedules entered into by the Parties and attached (the "Schedules"). The Schedules are incorporated into this Agreement and are subject to the terms and conditions of this Agreement. In the event of any conflict between this Agreement and a Schedule, the terms of the Schedule shall govern.

2. <u>Use of Systems and Exclusivity.</u>  In exchange for Provider installing, providing, and supporting its System and inmate communication services throughout Customer's Facility at no cost to Customer, Customer acknowledges, agrees, and grants to Provider the exclusive right to provide such services in Customer's Facility.  Provider shall have the exclusive right to install, maintain, and derive revenue from and through Provider's inmate communication services and Systems including, without limitation, the related hardware and software, located in the Customer Facility as identified on the Schedules. Customer agrees that it will not resell, grant, or provide access to Provider's services or System, directly or indirectly, to any third party unless agreed to by Provider in a separate written agreement. During and subject to the terms and conditions of this Agreement, and upon the going live of each respective service, Provider shall be the sole and exclusive provider of inmate telephone services (ITS) and all inmate communication services available on or provided by a tablet or kiosk system as set forth in the accompanying Schedule(s), including but not limited to video and data services (e.g., electronic video visitation, electronic messaging and email, texting, photo delivery, and electronic entertainment) and inmate software applications (e.g., electronic delivery of routine postal mail, electronic medical or general requests, electronic grievances, electronic law library, and electronic education).

3. <u>Hardware and Software License.</u> For the term of this Agreement, Provider grants Customer a non-exclusive, non-transferable license to access and use certain proprietary computer software and hardware products and materials in connection with our inmate services and Systems. Provider will provide free of charge all Software upgrades, modifications, and updates. All hardware upgrades, modifications and updates will be done at Provider's sole discretion.

Provider makes no representation or warranty as to the legality of monitoring or archiving such communications and activities.

4. <u>Ownership.</u> Smart Communications is and shall remain the owner of the equipment provided by Smart Communications whether or not physically attached to real estate.

5. <u>License Restrictions:</u> The Software is to be used solely in connection with Provider's Services by Customer and inmates housed at Customer's Facility in connection with Provider's services and Systems. The Hardware is to be

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**



used solely by inmates housed at Customer's Facility to access Provider's services and Systems. Unless and only to the extent that this Agreement expressly permits, Customer must not:

    i. permit any parent, subsidiary, affiliated entity or third party to use the Hardware or Software;

    ii. rent, lease, lend, assign, sublicense, encumber or otherwise transfer or attempt to transfer the Hardware or Software or any portion thereof;

    iii. alter, create derivatives of, or modify the Hardware or Software in any way, or allow a third party to do so;

    iv. connect the Software or Hardware to any third-party products or services that were not approved of in writing by Provider;

    v. distribute or otherwise make the Hardware or Software or any password, key, or other access code for the Software available to any third party;

    vi. reverse engineer, decompile, or disassemble the Hardware or Software, or allow a third party to do so;

    vii. defeat or work around any access restrictions or encryption in the Software, or allow a third party to do so;

    viii. remove, minimize, block, or modify any titles, logos, trademarks, copyright and patent notices, digital watermarks, disclaimers, or other legal notices that are included in the Software, whether or not they are Provider's or a third party's;

6. <u>Title</u>. Provider shall have and retain all rights, title, and interest in the products and services provided to Customer. The Hardware, Software, Systems, networking, and cabling, including all modifications and updates of Software, shall at all times remain the sole and exclusive property of the Provider. Any trade secrets, methodology and processes of our services and Systems constitute proprietary information of Provider, regardless of any part or portion thereof is the subject of a valid copyright or patent. During the term of this agreement and for the time period(s) as stated in the Schedule for Systems, we will provide you access to the records.

7. <u>Term.</u> This Agreement shall commence on the effective date and shall continue for a period of five (5) years from the date of system going live. After the original five (5) year term, this Agreement may be renewed for two (2) additional terms that are two (2) years in length each, upon written notice by Customer or as otherwise agreed by the Parties. The terms and conditions herein shall govern for so long as Provider continues to provide its system and services.

8. <u>Limitation of Liability</u>.  To the maximum extent permitted by applicable law, Provider shall indemnify and hold harmless Customer, his agents, servants and employees from any and all claims, actions, lawsuits, judgments or liabilities of any kind whatsoever deriving from negligent acts or omissions of the Provider, its agents or sub-contractors. Each Party agrees that it shall be solely responsible for the negligent or wrongful acts of its own employees. However, nothing contained herein shall constitute a waiver by Customer of its sovereign immunity or other applicable State Statutes. Notwithstanding anything to the contrary in this Agreement or Schedules, in no event will Provider's liabilities under this agreement, whether under contract law, tort law, warranty, or otherwise, exceed the total amount of revenue received by Provider pursuant to this agreement, during the twelve (12) month period before the date the claim arose.

9. <u>Confidential Information and Non-Disclosure</u>. The parties acknowledge that in their performance of their duties hereunder either party may communicate to the other (or its designees) certain confidential and proprietary information, including without limitation information concerning the party's services and know-how, technology, techniques, or business or marketing plans related thereto (collectively, the "Confidential Information") all of which are confidential and proprietary to, and trade secrets of, the disclosing party (the "Disclosing Party").  As a condition to the receipt of the Confidential Information from the Disclosing Party, the receiving party (the "Receiving Party") shall, at all times during and after the term of this Agreement (i) not disclose in any manner, directly or indirectly, to any third party any portion of the Confidential Information; (ii) not use the Confidential Information in any fashion except to perform its duties hereunder or with the Disclosing Party's express prior written consent; (iii) disclose the Confidential Information, in whole or in part, only to employees and agents who need to have access thereto for the Receiving Party's internal business purposes; (iv) take all necessary steps to ensure that its employees and agents are informed of and comply with the confidentiality restrictions contained in this Agreement; and (v) take all necessary

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**



CORRECTIONS SIMPLIFIED.    www.smartcommunications.us    888-253-5178    10491 72nd St. | Seminole, FL 33777

precautions to protect the confidentiality of the Confidential Information received hereunder and exercise at least the same degree of care in safeguarding the Confidential Information as it would with its own confidential information, and in no event shall apply less than a reasonable standard of care to prevent disclosure. The Receiving Party shall promptly notify the Disclosing Party of any unauthorized disclosure or use of the Confidential Information. The Receiving Party shall cooperate and assist the Disclosing Party in preventing or remedying any such unauthorized use or disclosure. The term "Confidential Information" does not include, and the obligations and undertakings set out in this section do not apply to: (a) Information which now is in the public domain or publicly known at the time of disclosure or hereafter comes into the public domain or generally known through no fault of the Receiving Party, otherwise than by reason of breach of this Agreement; (b) Information the disclosure of which is requested or required by law, regulation, court order or a regulatory agency, provided that, prompt notice of such requested disclosure shall be given to the Disclosing Party, if legally permitted, so that Disclosing Party may seek appropriate remedy to prevent such disclosure or waive compliance with the provisions of this Agreement and the Receiving Party, its directors, officers, employees, agents and advisers shall reasonably co-operate with the Disclosing Party, at the Disclosing Party's sole cost and expense, if the Disclosing Party elects to challenge the validity of such requirement and/or take such steps as the Disclosing Party may reasonably require to avoid or limit such disclosure; (c) Information that was previously known to the Receiving Party free of any obligation of confidentiality; (d) Information that is independently developed by the Receiving Party without reference to or use of the Confidential Information; or (e) Information that is disclosed to the Receiving Party by a third party not under or in violation of, as the case may be, any confidentiality undertaking to the Disclosing Party. Subsections (a) through (e) of this paragraph notwithstanding, the parties agree that the technology behind the Providers Services and Systems is Confidential Information and is a trade secret of Provider.

10. <u>Default and Termination</u>. If either party defaults in the performance of any obligation under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of default and clearly notifying the defaulting party that the written notice is being provided pursuant to this provision. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure. If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party has made good faith attempts to cure the default. Upon termination of this Agreement, Provider shall remove all hardware and software Systems except for the cabling and conduit which shall become the property of the Customer. Provider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement.

11. <u>Insurance</u>. Provider shall maintain General Liability Insurance including but not limited to bodily injury, property damage and personal injury with limits of not less than $1,000,000 combined single limit covering all work performed under this contract. Provider shall maintain automobile insurance including bodily injury and property damage including all vehicles owned, leased, hired and non-owned vehicles with limits of not less than $1,000,000 combined single limit covering all work performed under this contact. Provider shall provide Worker's Compensation Insurance, on behalf of all employees who are to provide a service under this contract, as required by applicable law, and Employers Liability with limits of not less than $100,000 per employee per accident. Customer agrees to furnish to Provider timely written notice of any claim, demand, or cause of action made or brought against Customer or where Provider is listed as a Co-Defendant arising out of or relating to the Systems and Services we provide to you.

12. <u>Employees.</u> Provider represents that it has, or will secure at its own expense, all personnel required in performing its obligations under this Agreement. All of the services required hereunder will be performed by the Provider or under its supervision and all personnel engaged in the work shall be fully qualified to perform such services. Provider and any subcontractors used in the performance of the responsibilities listed herein must maintain a drug-free workplace policy. Customer acknowledges that Provider is an independent contractor and nothing in this Agreement is intended nor shall be construed to create an agency relationship, and employer/employee relationship, a joint venture relationship or any other relationship allowing Customer to exercise control or discretion over the manner by which Provider performs hereunder. Provider expressly agrees that it shall be solely responsible for supervising its employees, that it shall comply with all rules, regulations, orders, standards and interpretations promulgated pursuant to the OSHA Act of 1970, including but not limited to training, recordkeeping, providing personal protective equipment, lock/tag out procedures, material safety data sheets and labeling. Provider certifies that neither it nor any subcontractors used to accomplish its obligations hereunder, shall employ unauthorized aliens. Provider certifies that

**CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY**



CORRECTIONS SIMPLIFIED. · www.smartcommunications.us · 888-253-5178 · 10491 72ⁿᵈ St. | Seminole, FL 33777

in accordance with the provisions of Title VII of the 1968 Civil Rights Act as amended by the Equal Employment Opportunity Act of 1972 and Executive Order 11914, that neither it nor any subcontractors used to accomplish its obligations hereunder discriminate on the basis of race, color, sex, religion, age, national origin or disability in their employment practices.

### Miscellaneous

13. <u>Warranty Against Contingent Fees.</u> Provider warrants that no person or selling agency has been employed or retained to solicit this contract upon an agreement of understanding for commission, percentage, brokerage or contingency, except bona fide employees or selling agents maintained by the Provider for the purpose of securing business.

14. <u>Subcontracts.</u> Provider shall be allowed to use subcontractors for the purpose of completing the provisions of this Agreement.

15. <u>Provider Personnel.</u> All Provider personnel being permitted to work in the Customer Jail Facility will be subject to a security/background check by the Office of the Sheriff.

16. <u>Provider Cooperation.</u> Provider shall, at all times observe and comply with all Federal, State, and local municipal laws, ordinances, rules and regulations in any way affecting the Agreement. The Provider shall maintain regular communications with Customer, or its designees, and shall actively cooperate in all matters pertaining to this Agreement.

17. <u>Public Information.</u> Neither the Provider nor the Customer shall publish any findings based on data obtained from the operation of this agreement without the prior consent of the other party, whose written consent shall not be unreasonably withheld.

18. <u>Permits and Licenses.</u> All permits and licenses required by Federal, State, local laws, rules, and regulations necessary for the implementation of the work undertaken by the Provider pursuant to the Agreement shall be served and paid for by the Provider. It is the responsibility of the Provider to have and maintain the appropriate certificate(s) valid for work to be performed and valid for the jurisdiction in which the work is to be performed for all persons working on the job for whom a certificate is required.

19. <u>Third-party Rights.</u> The rights, obligations and duties contained in this Agreement shall exist exclusively between the Parties. The Parties expressly agree and intend that they alone shall have the exclusive rights to seek legal or equitable enforcement, remedy, injunctive relief or to bring a breach of Agreement action. The Parties do not intend to create, nor shall this Agreement be construed to create in any other individual or entity the status of a third-party beneficiary.

20. <u>Public Entity Crime</u>. Provider confirms its understanding that a "public entity crime" as defined in Paragraph 287.133(1)(g), Florida Statutes, means a violation of any state or federal law by a person with respect to and directly related to the transaction of business with any public entity or with an agency or political subdivision of any other state or of the United States, including but not limited to, any bid or contract for goods or services to be provided to any public entity or an agency or political subdivision of any state or of the United States and involving antitrust, fraud, bribery, collusion, racketeering, conspiracy, or material misrepresentation. Provider hereby certifies that neither its officers, directors, executives, partners, employees, members, nor agents who are active in the management of Contractor have been charged with and convicted of a public entity crime subsequent to July 1, 1989.

21. <u>Waiver of Breach</u>. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

22. <u>Compliance with Laws</u>. Provider shall comply with all Federal, State and local laws, rules, and regulations applicable to the services or payments for services under this Agreement.

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY



23. <u>Governing Law</u>. The parties mutually consent to the jurisdiction of and agree that any litigation arising hereunder shall be brought in Hillsborough County, Florida and governed by the laws of the state of Florida.

24. <u>Attorney Fees</u>. In the event of litigation concerning this Agreement, the Parties shall each be responsible for their own attorney's fees and costs.

25. <u>Completeness of Agreement</u>. This Agreement, together with any additional or supplementary Schedules or documents incorporated herein by specific reference contain all the terms and conditions agreed upon by the parties hereto, and no other agreements, oral or otherwise, regarding the subject matter of this Agreement or any part thereof shall have any validity or bind any of the Parties hereto. This Agreement may be amended or revised only in writing and signed by all the parties.

26. <u>Force Majeure</u>. Provider will not be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder for any reason beyond its control, including without limitations, strikes, inmate disturbances, failure of Customer to provide proper security services, acts of God, civil or military authority, acts of public enemy, war, terrorism, accidents, fires, explosions, earthquakes, floods, or any similar cause beyond the reasonable control of either Party.

27. <u>Assignment</u>. Provider may assign this Agreement or any interest herein at any time to any parent, successor, or subsidiary with prior written notice to Customer.

28. <u>Severability</u>. In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement which shall remain in full force and effect and enforceable in accordance with its terms.

29. <u>Matters to be Disregarded</u>. The titles of the several sections, subsections and paragraphs set for in this Agreement are inserted for convenience of reference only and shall be disregarded in construing or interpreting any of the provisions of this Agreement.

30. <u>Interpretation</u>. The language in this Agreement is to be construed according to its plain meaning and not strictly for or against either party. The parties have reviewed this Agreement and no ambiguities are known to exist; however, to the extent any ambiguity is later discovered, any rule that such ambiguity is to be resolved for or against either party does not apply.

31. <u>Notices</u>. Any notices, demands, payments or reports required by this Agreement shall be in writing and sufficient if sent by the parties hereto via registered or certified United States mail, postage prepaid, to the notice addresses noted below the Parties signatures on the signature page.

32. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute the same Agreement. Any signature page of any such counterpart, or any telecopy or other electronic facsimile thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart of this Agreement, and any telecopy or other electronic transmission of a signature shall be deemed an original and shall bind the party who made such signature.

33. <u>Authority</u>. Each Party represents and warrants that it has the authority to enter into this Agreement, and that the individual signing on its behalf likewise has authority to do so.


**THIS PORTION INTENTIONALLY LEFT BLANK**

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**



**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

| **Customer: Eaton County Sheriff's Office** | **Provider: Smart Communications Holding, LLC.** |
|---|---|
| By: _____ | By: _____ |
| Name: ___Jim  Mott_____ | Name: __Jon Logan_____ |
| Title: ___Chairperson_____ | Title: __CEO & President_____ |
| Date: ___8/31/2023_____ | Date: __August 31, 2023_____ |
| Email: _chairperson@eatoncounty.org_ | Email: _jon.logan@smartcommunications.us_ |
| **Notice Address:** | **Notice Address:** |
| 1025 Independence Blvd. | 10491 72nd St. |
| Charlotte, MI 48813 | Seminole, FL 33777 |

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**