# EXHIBIT 7

**SUPERIOR COURT**
OF THE
**STATE OF DELAWARE**

VIVIAN L. MEDINILLA
JUDGE

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 10400
WILMINGTON, DE 19801-3733
TELEPHONE (302) 255-0626

March 20, 2024

Richard Rollo, Esquire
Travis S. Hunter, Esquire
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, Delaware 19801

Shaun Michael Kelly, Esquire
Lauren P. DeLuca, Esquire
Connolly Gallagher LLP
1202 North Market Street
Wilmington, DE 19801

**Re:** *Jonathan D. Logan v. Loco Florida, LLC et al.,*
<u>**C.A. No. N23C-10-208 VLM CCLD**</u>

Dear Counsel,

This is the Court's ruling on the Intervenor's Motion to Dismiss or Stay.

Having considered the parties' full briefing and for the reasons set forth below, the

Intervenor's Motion to Stay is **GRANTED** in favor of the Florida Action.

## I.    BACKGROUND[1]

---

[1] The facts are drawn from the Complaint, and the documents it incorporates by reference.   The Court also refers to the allegations from public filings in the pending Florida litigation between the parties, *Jonathan D. Logan et al. v. Janice Logan et al.*, 2023-CA-1002-NC (Fl. Cir. Ct.) and *Janice Logan v. Jonathan Logan et al.*, 2023-CA-1280-NC (Fl. Cir. Ct.)   (consolidated into the 1002 Action).   DRE 202(d)(1)(C) permits judicial notice of "the records of the court in which the action is pending and of any other court of this State or federal court sitting in or for this State…." The Court may take judicial notice of court filings "for certain limited purposes, such as to understand the nature and grounds for rulings" made by the court in which the documents were filed." *In re Rural Metro Corp. S'holders Litig.*, 2013 WL 6634009, at *9 (Del. Ch. Dec. 17, 2013).   It may not, however, take judicial notice of such filings for the truth of their contents. *Id.*

On October 23, 2023, Plaintiff Jonathan D. Logan initiated this action by filing a Complaint against Defendants Loco Florida, LLC ("Loco") and Smart Communications Yacht Holding, LLC ("Yacht"), seeking declarations that he is the sole member and manager of Loco and Yacht, and that both were validly converted into Delaware entities.[2]

Loco and Yacht were allegedly formed as Florida limited liability companies in 2020 and March 2022, respectively.[3]   Loco owns assets that include a warehouse in Seminole, Florida, which was purchased for approximately $1.1 million.[4]   Yacht owns assets that include a 100' Riva Cosaro, which was purchased for approximately $10 million.[5]

In 2021, Jonathan's father, James Logan, formed the James Logan Family Trust (the "Trust").[6]   He and his wife, Janice Logan, the Intervenor in this action, were the Co-Trustees.[7]   In September 2022, James purportedly transferred his member interests in Loco and Yacht to the Trust.[8]   James died nearly one month later.[9]

---

[2] Complaint for Declaratory Judgment ("Compl.").
[3] *Id*. ¶¶ 1, 2.
[4] *Id*. ¶ 1.
[5] *Id.* ¶ 4.
[6] *Id*.
[7] *Id*.
[8] *Id*. ¶¶ 4, 11. The Court utilizes the parties' first names for ease of reference only.
[9] *Id.*

### A. The Florida Action

On February 27, 2023, Jonathan and Smart Communications Holding, Inc. ("SCH") filed a complaint in the Circuit Court of the 12th Judicial Circuit in Sarasota County, Florida Probate Division (Florida Court) against Janice and Janice's daughter, asserting claims for breach of trust and seeking declarations relating to the capacity in which claims may be pursued, and the effect of SCH's purported shareholders' agreement.[10]   Shortly thereafter, Janice filed her original complaint on behalf of the Trust, and directly and derivatively on behalf of SCH and Loco in the Florida Court against Jonathan, SCH, and Loco.[11]   She amended that complaint in August 2023,[12] to include allegations that are particularly alarming.[13]

The amended complaint in Florida consists of five counts.   Count I seeks declarations concerning the validity of the purported shareholders' agreement of

---

[10] *Id*. ¶ 4, n.1; Intervenor's Opening Brief in Support of Her Motion to Dismiss or Stay (the "Motion"), Ex. 4. (*Jonathan D. Logan, et al. v. Janice Logan, et al.*, 2023-CA-1002-NC (Fl. Cir. Ct.)).

[11] *See* Motion, Ex. 10.

[12] *Id*., Ex. 5A.

[13] *See, e.g.*, *id.* "Jon was convicted of Felony Aggravated Stalking in 2008 for harassing and intimidating a business associate and the associate's wife with whom Jon worked on a car dealership venture" (¶ 17); "Jon held James and Janice at gunpoint, hit his father's face, and demanded that James transfer his shares to Jon.   He also smacked the phone out of his mother's hand when she tried to call 911" (¶ 32); "he vandalized his mother's car" (¶ 33); "On Saturday, August 14, 2021 at 11:24 AM, Jon sent an email to his parents from his Smart Communications email address, threatening to 'Burn your [expletive] house down'" (¶ 34); "He warned his father 'Don't test me'; 'I really hope you fix yourself because you will be dead soon'; and, 'I have zero patience left for you and I am not one to [expletive] with on what I created with sheer willpower and brains. If you, or Janice or Alexis try and take anymore from me, I am prepared to do things the normal human could never fathom'" (¶ 40).

SCH; Count II is a claim for director liability; Counts III and V are direct and derivative claims for breach of fiduciary duty; and Count IV seeks to appoint a temporary custodian of SCH.   Count III further relates to Yacht's assets, which Janice alleges Jonathan improperly purchased with SCH's funds.[14]   The Court consolidated these actions (together, the "Florida Action").

On July 20, 2023, the Florida Court considered Janice's motion for a temporary injunction, seeking, in part, an order finding that Janice had a substantial likelihood of success on the merits of her claims.[15]   The Florida Court granted that motion.[16]   After that ruling, Jonathan submitted articles of conversion to the Secretary of State of the State of Florida, converting Yacht and Loco into Delaware entities.[17]   Jonathan then moved to dismiss counts II-V of Janice's amended complaint,[18] which the Florida Court denied.[19]

Because of the conversions and Jonathan's creation of a new Delaware entity (*i.e.*, Smart Communications Holding, LLC ("SCH LLC")), Janice again sought relief from the Florida Court and filed a motion for contempt of the temporary

---

[14] Motion at II.A.   The Motion omitted page numbers, so the Court refers to the section headings.
[15] *Id*., Ex. 10.
[16] *Id*., Ex. 6.
[17] Compl. ¶ 23; *id*., Ex. C.
[18] Motion, Ex. 8.
[19] *Id*. Ex. 9.

injunction order and a request to appoint a temporary custodian.[20]    After the
hearing, the parties, including SCH LLC, agreed to additional injunctive relief.[21]

On January 31, 2024, the Florida Court, in Phase 1 of its proceedings,
concluded a three-day trial to resolve Count II, declaring SCH's shareholders'
agreement invalid and unenforceable.[22]    The Florida Court also found that Janice
owned 50% of the shares of SCH.[23]    The Florida Court is expected to address the
remaining counts in Phase II after the parties attend mediation.[24]

### B. This Action

On October 23, 2023, during the pendency of the Florida Action and
approximately one week after the Florida Court denied his Motion to Dismiss
therein, Jonathan filed his Complaint in this Court.    Specifically, he seeks
declarations under 10 *Del. C.* § 6501, and 6 *Del. C.* § 18-110[25] that he is the sole

---

[20] Motion Section IV; *id.*, Ex. 15.

[21] Intervenor's Rely Brief in Support of Her Motion to Dismiss or Stay ("Reply"), Ex. 2.

[22] Reply, Ex. 4 at 2.

[23] *Id.*

[24] Reply at 3.

[25] Jonathan invokes 6 *Del C.* § 18-110, but that statute confers jurisdiction to the Court of Chancery, not this Court.  *See* 6 *Del. C.* § 18-110 ("(a) Upon application of any member or manager, the Court of Chancery may hear and determine the validity of any admission, election, appointment, removal or resignation of a manager of a limited liability company, and the right of any person to become or continue to be a manager of a limited liability company, and, in case the right to serve as a manager is claimed by more than 1 person, may determine the person or persons entitled to serve as managers; and to that end make such order or decree in any such case as may be just and proper, with power to enforce the production of any books, papers and records of the limited liability company relating to the issue.").

5

member and manager of Loco and Yacht, and that Loco and Yacht were validly converted to Delaware limited liability companies.   The Complaint's only reference to the ongoing Florida litigation described above was confined to a single-sentence footnote. [26]   Jonathan's subsequently filed Motion for Summary Judgment on November 16, 2023, provided few additional details.[27]

In response, Janice filed an unopposed motion to intervene, as well as her Intervenor's Motion to Dismiss or Stay (the "Motion").[28]   The parties submitted competing schedules on whether to first resolve the Motion for Summary Judgment or this Motion.   The Court held a status conference on December 19, 2023, granted the Motion to Intervene, and determined this Motion would be considered first due to the potential forum-related issues presented at first blush.[29]   With full briefing submitted, this matter is ripe for decision.

## II.   DISCUSSION

Under *McWane*'s three-factor test, the Court may dismiss or stay in favor of a previously filed action if there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, and involving the same parties and

---

[26] Compl. ¶ 4, n.1. ("There is pending probate litigation in Florida between Jon and the Trust, but it does not involve the declarations requested here.   Jon will promptly provide the Trust a copy of this complaint.").
[27] Plaintiff Jonathan Logan's Motion for Summary Judgment (D.I. 2).
[28] D.I. 9; D.I. 10.
[29] D.I. 13.

the same issues.[30]   "[I]t is preferable to merely stay the later-filed action because it is impossible to predict with certainty the course of earlier-filed litigation in another jurisdiction."[31]   The authority to grant a stay is "incident to the inherent power of a court to exercise its discretion to control the disposition of actions on its docket in order to promote economies of time and effort for the court, litigants, and counsel."[32]

### A.    The Delaware Action is Stayed under *McWane*

Jonathan filed his complaint in the Florida Action in February 2023 and Janice filed her amended complaint in August 2023.   This action commenced in October 2023.   Thus, the Florida Action is the prior-filed action.

The Florida Court has already proven its ability to provide prompt and complete justice.   It has held several evidentiary hearings, entered injunctive relief, and heard predicate Florida-related governance issues that implicate Loco and Yacht, which prior to their conversions, were Florida entities.   It has also considered and added, to a status quo order, the Delaware entity (SCH LLC), which was formed during the Florida litigation.

The Florida Action involves functionally the same parties and issues

---

[30] *LG Electronics, Inc. v. InterDigital Commc'ns, Inc.*, 114 A.3d 1246, 1252 (Del. 2015) (citing *McWane Cast Iron Pipe Corp. v. McDowell–Wellman Eng'g Co.,* 263 A.2d 281, 283 (Del. 1970).
[31] *Schnell v. Porta Sys. Corp.*, 1994 WL 148276, at *6 (Del. Ch. Apr. 12, 1994*); EnVen Energy Corp. v. Dunwoody*, 2020 WL 2770609, at *5 (Del. Ch. May 28, 2020).
[32] *Joseph v. Shell Oil Co.,* 498 A.2d 1117, 1123 (Del. Ch. 1985).

7

presented before this Court.    "Consistent with the *McWane* doctrine generally, the 'same parties, same issues' analysis focuses on substance over form."[33]    The Court looks  for  "substantial  or functional identity"  between  the  competing  action.[34] Whether two cases raise the same issues is based on whether the claims "are closely related and arise out of the same common nucleus of operative facts."[35]

Here, Loco is a party to both actions.    And although Yacht is not a party to the Florida Action, SCH, which is a party, allegedly purchased and maintains Yacht's assets.    Thus, the 100' Riva Cosaro, Yacht's primary asset, may also be subject to relief from the claims of fiduciary duty and waste brought in the Florida Action.    Accordingly, substantial or functional identity exists between the competing actions.    Furthermore, the issues in both proceedings also arise from a common nucleus of operative facts, that is, Jonathan and Janice's rights in SCH and their related entities, including Loco and Yacht, as well as Jonathan's actions with respect to those entities.

Jonathan's opposition is unpersuasive.    He argues that the Delaware Action only seeks narrow declarations regarding membership status in Loco and Yacht, and

---

[33] *Zurich Am. Ins. Co. v. Sterigenics U.S., LLC*, 2024 WL 324094, at *6 (Del. Super. Ct. Jan. 26, 2024) (citation omitted).

[34] *Id.*

[35] *EnVen Energy Corp.*, 2020 WL 2770609, at *5 (citing *EuroCapital Advisors, LLC v. Colburn*, 2008 WL 401352, at *2 (Del. Ch. Feb. 14, 2008) (quoting *Dura Pharms., Inc. v. Scandipharm, Inc.*, 713 A.2d 925, 930 (Del. Ch. 1998))).

on that basis, the propriety of their conversions into Delaware entities.   But in the Florida Action, Janice has brought derivative claims against Loco, and may only do so if she is a member thereof.   The analysis and interpretation of Florida law as to Loco will similarly apply to Yacht.   Thus, Janice's claims in the Florida action closely relate to the declarations sought in this action.   Lastly, the resolution of the claims regarding the actions taken by Jonathan at SCH may moot the requested declarations as to Yacht.[36]

For these reasons, the Delaware Action is stayed under *McWane*.

### B.   Inherent Discretion to Control Court Docket Weighs in Favor of a Stay

Aside from this Court's consideration of the *McWane* factors, Jonathan's litigation conduct raises a host of jurisdictional concerns.   Although Jonathan argues that he merely seeks declarations regarding questions of Delaware internal affairs, any jurisdictional analysis requires consideration of the actions he took after the Florida Action was well underway.   Further, Jonathan's contention that his Complaint presents narrow issues of Delaware governance is further belied by the fact that he asks this Court to interpret Florida law.   Yet, the only basis that allows him to seek relief here is dependent upon the purported conversion of Florida

---

[36] *See* Reply at 5.

9

entities, the validity of which may be *void ab initio* if Janice—who has already shown a substantial likelihood of success—prevails on her claims in the Florida Action.

Given the alarming nature of the allegations in the Florida Action against Jonathan, the Court is loath to insert itself in a dispute that has involved significant motions practice, evidentiary hearings, and injunctive relief.[37]  The parties' more than year-long dispute in the Florida Court also implicates claims of fiduciary duty and director liability—issues beyond the subject matter jurisdiction of this Court. Namely, one claim in the Florida is a derivative claim on behalf of Loco, and others are direct and derivative breach of fiduciary duty claims against Jonathan regarding Yacht's assets.[38]  Seeking declaratory relief at this stage is, therefore, premature and presents the risk of inconsistent rulings between the two actions.[39]  Principles of comity and judicial efficiency weigh in favor of a stay pending the Florida Action.[40]

---

[37] In seeking summary judgment, this Court would have appreciated more transparency from Plaintiff's filings regarding the course of proceedings in the Florida Action.

[38] Motion at II.

[39] *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.,* 263 A.2d 281, 283 (Del. 1970) (The Court should avoid "the wasteful duplication of time, effort, and expense that occurs when judges, lawyers, parties, and witnesses are simultaneously engaged in the adjudication of the same cause of action in two courts," as well as "the possibility of inconsistent and conflicting rulings and judgments and an unseemly race by each party to trial and judgment in the forum of its choice.").

[40] *Park G.P., Inc. v. CCSB Fin. Corp.,* 2020 WL 7706962, at *2 (Del. Ch. Dec. 29, 2020) (Citation omitted).

## III.    CONCLUSION

For the foregoing reasons, whether under *McWane* or this Court's inherent discretion to control its docket, Intervenor's Motion to Stay is **GRANTED**, and this action is **STAYED** in favor of the Florida Action.

**IT IS SO ORDERED.**

Sincerely,
/s/ Vivian L. Medinilla
Vivian L. Medinilla
Judge

11

# EXHIBIT 8



Who is Smart Communications?

THE MOST INNOVATIVE
**TECHNOLOGY COMPANY**
IN CORRECTIONS

HISTORICALLY 3-5 YEARS AHEAD OF EVERY OTHER
VENDOR IN CORRECTIONS

How have we accomplished this?

# A HISTORY OF INDUSTRY FIRSTS

Our Timeline of Innovation and Implementation

**2009** — Introduced corrections' first two-way inmate electronic messaging system

**2010** — Developed Corrections first electronic request system, SmartRequest™

**2012** — Established first facility wide law library solution in corrections

**2015** — Invented and patented the MailGuard Postal Mail Elimination System®

**2016** — Deployed the SmartTablet™ Corrections most intelligent tablet system

**2017** — Instituted and patented MailGuardLegal® legal mail solution

**2018** — integrated the first VOIP inmate calling platform in corrections

**2019** — Deployed next-generation SmartVisit™ video visitation platform

**2022** — Several new technologies and Patents to be announced

We are proven innovators in corrections.
Where Smart goes, our competitors follow.










# ABOUT SMART COMMUNICATIONS

## Different Culture - Different Approach - Different Outcome.

- Founded in 2009 with a mission to change the status quo of the Corrections industry with new technology.

- Entered the Corrections industry as a true technology company, not the traditional telecommunications company.

- Created new technologies with new streams of revenue in Corrections.

- Focused on innovation and technologies that benefited families, agencies and the company- true Win-Win solutions for sustainable growth.



Smart Communications Corporate Headquarters, Seminole, FL







CONFIDENTIAL

# HISTORICAL ANNUAL SALES REVENUE AND GROWTH |



Smart Communications
Sales Revenue - Actual 10 yr.
2012 -2021

| Year | Sales Revenue | Annual Sales Growth % |
|------|---------------|-----------------------|
| 2010 | $4,894.00 | - |
| 2011 | $83,826.00 | - |
| 2012 | $133,098.00 | 58.78% |
| 2013 | $390,921.00 | 193.71% |
| 2014 | $941,635.00 | 140.88% |
| 2015 | $1,418,295.00 | 50.62% |
| 2016 | $3,008,694.00 | 112.13% |
| 2017 | $3,844,365.00 | 27.78% |
| 2018 | $9,379,355.00 | 143.98% |
| 2019 | $15,648,983.00 | 66.84% |
| 2020 | $20,687,943.00 | 32.20% |
| 2021 | $31,061,300.00 | 50.14% |

| Period | Term | Average Sales Growth % |
|--------|------|------------------------|
| 2017 - 2021 | 5 Years | 64.19% |
| 2012 - 2021 | 10 Years | 87.71% |

CONFIDENTIAL

# BUILDING BLOCKS OF REVENUE |

- **2022 Daily Revenue Totals and Projections:**

| Date | Daily Revenue Amount | Total Days | Total Revenue |
|---|---|---|---|
| 1/22/2022 | $100,442.00 | 31 | $3,113,702.00 |
| 2/22/2022 | $113,250.00 | 334 | $37,825,500.00 |

*Total Projected Annual Revenue: $40,939,202.00*

- **Annual Sales Revenue/Growth Projections:**

| Project Sales Revenue/Growth 2022 - 2030 | |
|---|---|
| 2022 | $55,000,000.00 |
| 2023 | $90,303,274.00 |
| 2024 | $148,266,932.00 |
| 2025 | $243,436,170.00 |
| 2026 | $399,692,421.00 |
| 2027 | $600,000,000.00 |
| 2028 | $840,000,000.00 |
| 2029 | $1,092,000,000.00 |
| 2030 | $1,310,400,000.00 |



Project Sales Revenue/Growth 2022 - 2030

CONFIDENTIAL

# NEW CONTRACTS SIGNED IN 2022 |

## As of 4/15/22

| Agency Name | ADP | Projected Annual Revenue |
|---|---|---|
| Florence County Jail (SC) | 303 | $436,320.00 |
| Ottawa County Jail (MI) | 350 | $504,000.00 |
| Jackson County Jail (MI) | 350 | $504,000.00 |
| Denton County Jail (TX) | 975 | $1,404,000.00 |
| Kitsap County Jail (WA) | 300 | $432,000.00 |
| Licking County Jail (OH) | 300 | $432,000.00 |
| Monroe County Jail (OH) | 130 | $187,200.00 |
| Butler County Jail (PA) | 420 | $604,800.00 |
| Calcasieu Parish Jail (LA) | 840 | $1,209,600.00 |
| Livingston County Jail (IL) | 150 | $72,000.00 |
| Oakland County Jail (MI) | 870 | $1,044,000.00 |
| Washoe County Jail (NV) | 1,100 | $1,584,000.00 |
| Douglas County Correctional Center (NE) | 1,400 | $672,000.00 |

TOTALS:  $9,085,920.00

CONFIDENTIAL

# REVENUE/EBITDA |

- Project Sales Revenue 2023-2030 = $4,724,098,797.00
- $4,724,098,797.00 X 40% (EBITDA) = $1,889,639,520.00

Current technology revenue and growth schedule/ Not including new technology introduction to market.



CONFIDENTIAL

# THE DISTINCTIVE DIFFERENCE |

- Decade of 80% Growth
- Long Term Municipal Contracts Provide "Reoccuring Revenue"
- Near Impossible Market Entry for New Competitors
- Unstoppable Market Penetration
- Revolutionary New Technologies and Services
- Patented Technologies and Services
- Industry Flying Under Radar

# What is the next Revolution of Corrections?

*Mind*

*Body*

*Spirit*

*Smart Communications welcomes you to the future of incarceration*

# The Corrections Industry's
# First Offender *Smartwatch™*



√ Patent Pending
√ 100% Open Market
√ Non-Removable
√ Inmate Tracking And Intelligence
√ Communication, Phone, Text, Video
√ Health And Wellness Tracking And Analytics
√ Spy Tools, Voice Biometrics And More.
√ Incarceration Market 2.2 Million ADP
√ Parole/Probation Market 4.5 Million ADP



Released To Market 3rd Quarter 2022

*Take a journey outside of prison walls on the fully interactive and integrated SmartCycle™*

✓ Transform the incarceration environment from the inside out.

✓ Total mind, body and spirit transformation with a fully connected and interactive program specially designed for the incarceration environment.

✓ Earn free Communication credits with family and friends.

✓ Earn free tablet entertainment time, music, movies, games.

✓ Learn positive behavioral traits, such as Effort = Reward.

*Smart Communications technology leads the way for prison reform and reimaging the incarceration experience. Solving a major pain point of reform and lowering recidivism in this industry.*

**SmartCycle™** Patent Pending



SmartCycle™

Released To Market 1st Quarter 2023



- **Interactive Virtual Reality Reentry Programing To Revolutionize The Way Inmates Reenter Society.**

- **Real Life Interactive Programing To Prepare Inmates For A Successful Transition Into Society, Dramatically Reducing Recidivism.**

**SmartReality™ VR**

**Released To Market 1st Quarter 2024**

# Accelerated growth factors for the future

- 3 new Industry changing technologies scheduled for market release over the next 3 years.

- 100% untapped market for these new technologies that integrate with existing technologies.

- Untapped market of 4.5 million ADP in Community supervision Probation/Parole with offender SmartWatch™

- Successful pilot for inmate mail processing completed in Federal Bureau of Prisons, scheduled to deploy nationwide coming year with 150k ADP.

- Patent litigation for MailGuard™ new Patent recently issued by US Patent Office – Possible market monopoly for over a decade.



*This is the*
**FUTURE OF INCARCERATION**
*Smart Communications*



# EXHIBIT 9

THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC ,

      Plaintiffs

v                                  CASE NO   2023-CA-001002

JANICE LOGAN, individually and as Trustee
of the James Logan Family Trust dated
February 10, 2021 and ALEXIS LOGAN,
individually,

      Defendants
_____/     CONSOLIDATED WITH

JANICE LOGAN, as Trustee of the James
Logan Family Trust, dated February 10, 2021,

      Plaintiff,

v                                  CASE NO   2023-CA-001280

JONATHAN D  LOGAN and SMART
COMMUNICATIONS HOLDING, INC ,
nominal defendant, and LOCO FLORIDA, LLC,
nominal defendant,

      Defendants
_____/

### ORDER ON JANICE LOGAN'S MOTION TO APPOINT A
### TEMPORARY CUSTODIAN AND FOR CONTEMPT

**THIS MATTER** came before the Court for hearing on December 6, 2023 on the *Motion to*

*Appoint a Temporary Custodian and for Contempt* ("Contempt Motion") filed by JANCE LOGAN,

individually and as Trustee of the James Logan Family Trust dated February 10, 2021 ("Janice"), and

1

the Court, having reviewed the Contempt Motion and the Smart Parties'[1] Response thereto, having heard the arguments of counsel, and otherwise being advised fully in the premises, it is hereby

**ADJUDGED**

1        Without admission of any liability or wrongdoing whatsoever, Jonathan Logan ("Jon"), Smart Communications Holding, Inc ("Smart Communications"), and Smart Communications Holding, LLC, a Delaware limited liability company ("Smart Delaware") hereby stipulate as follows

   a   Jon, Smart Communications, and Smart Delaware, agree that they will take no action to cause Smart Communications or Smart Delaware to pay licensing and/or royalty fees for its use of intellectual property owned by HLFIP, LLC, except as may be permitted by further Court Order on proper motion and notice  This includes Jon agreeing not to allow any entity he owns or controls from paying such licensing and/or royalty fees

   b   Jon, Smart Communications, and Smart Delaware agree that they will take no action to cause any payment, or any other action that is outside the ordinary course of business, by Smart Communication or Smart Delaware, other than those as have been made in the usual and ordinary course of business (such as to Yacht), to be made to any entity owned or controlled by Jon, except as may be permitted by further Court Order on proper motion and notice

   c   Smart Communications Holding LLC, a Delaware limited liability company ("Smart Delaware") agrees to submit to the jurisdiction of this Court and shall be made party defendant in CASE NO   2023-CA-001280

   d   Janice shall be entitled to access to the books and records of Smart Delaware to the same extent to which she would be entitled to access to books and records of Smart

---

[1] Collectively, Jonathan Logan, Smart Communications Holding, Inc  and Loco Florida, LLC

Communications in accordance with, and without limitation to, chapter 607, Florida Statutes Historical books and records of both Smart Communications and Smart Delaware shall be provided no later than December 24, 2023

2    Except as stated herein, nothing herein shall prejudice any of the rights of the parties to take further action or seek further relief from this Court, including to modify or expire the terms set forth herein or as may otherwise be appropriate

**DONE AND ORDERED** in Chambers, at Sarasota County, Florida, on this __15th__ day of December, 2023

HONORABLE HUNTER W CARROLL
Circuit Court Judge

Copies furnished to Counsel of Record

# EXHIBIT 10

## STOCK POWER

**FOR VALUE RECEIVED,** the undersigned, JAMES P. LOGAN (the "Transferor"), hereby sells, assigns and transfers unto JAMES LOGAN, as CO-TRUSTEE of the JAMES LOGAN FAMILY TRUST, dated February 10, 2021, five thousand (5,000) shares (the "Shares") of the common capital stock of SMART COMMUNICATIONS HOLDING, INC., a Florida corporation (the "Corporation"), standing in the name of the Transferor on the books of the Corporation, and does hereby irrevocably constitute and appoint Thomas D. Sims, Esq. as attorney to transfer the Shares on the books of the Corporation with full power of substitution in the premises.

A signed copy of this Stock Power, including that executed via DocuSign or other valid electronic or digital signature medium, delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Stock Power.

**DATED TO BE EFFECTIVE AS OF** _____September 16_____, 2022.

**TRANSFEROR:**

_____
JAMES P. LOGAN

6672435v2



# Stock Power - James Logan to Revocable Trust re Smart Communications Holding, Inc. (2022)

Final Audit Report 2022-09-16

| | |
|---|---|
| Created: | 2022-09-16 |
| By: | Rachel Chase (rachelc@jpfirm.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAhWDfQnjwoEN_qVWMiErLBCmCNdIW_Ytb |

## "Stock Power - James Logan to Revocable Trust re Smart Communications Holding, Inc. (2022)" History

🔴 Document created by Rachel Chase (rachelc@jpfirm.com)
2022-09-16 - 8:52:13 PM GMT- IP address: 144.129.14.130

✉️ Document emailed to jim.logan@smartcommunications.us for signature
2022-09-16 - 9:02:18 PM GMT

🔴 Email viewed by jim.logan@smartcommunications.us
2022-09-16 - 9:02:20 PM GMT- IP address: 74.125.151.157

✍️ Signer jim.logan@smartcommunications.us entered name at signing as James logan
2022-09-16 - 10:52:18 PM GMT- IP address: 199.47.254.244

✍️ Document e-signed by James logan (jim.logan@smartcommunications.us)
Signature Date: 2022-09-16 - 10:52:20 PM GMT - Time Source: server- IP address: 199.47.254.244

✅ Agreement completed.
2022-09-16 - 10:52:20 PM GMT

**Adobe Acrobat Sign**

# EXHIBIT 11

## ASSIGNMENT AND ACCEPTANCE OF MEMBERSHIP INTEREST

**KNOW ALL MEN BY THESE PRESENTS** that JAMES P. LOGAN (the "Assignor"), in exchange for good and valuable consideration paid to him by JAMES LOGAN, as CO-TRUSTEE of the JAMES LOGAN FAMILY TRUST, dated February 10, 2021 (the "Assignee"), the receipt of which is hereby acknowledged, has granted, bargained, sold, assigned, transferred and set over, and by these presents does hereby grant, bargain, sell, assign, transfer and set over unto the Assignee, all of the Assignor's interest as a member of LOCO FLORIDA, LLC, a Florida limited liability company (the "Company"), which interest constitutes a fifty percent (50%) interest in the profits, losses and capital of the Company and is not certificated (the "Membership Interest"), and does hereby irrevocably constitute and appoint Thomas D. Sims, Esq. as attorney to transfer the Membership Interest on the books of the Company with full power of substitution in the premises.

**ASSIGNEE, BY ACCEPTANCE OF THIS ASSIGNMENT AND ACCEPTANCE OF MEMBERSHIP INTEREST (THIS "ASSIGNMENT"),** assumes all of the duties and obligations of the Assignor as to the Membership Interest so assigned, and agrees to perform all of the covenants, conditions and obligations on the Assignor's part to be paid and performed with respect to the Membership Interest.

This Assignment may be executed in multiple counterparts with the same effect as if the signature on each such counterpart were on the same instrument. A signed copy, including that executed via DocuSign or other valid electronic or digital signature medium, of this Assignment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Assignment.

**EXECUTED TO BE EFFECTIVE AS OF** ___September 16___, 2022.

**ASSIGNOR:**                                            **ASSIGNEE:**


James Logan (Sep 16, 2022 18:51 EDT)          James Logan (Sep 16, 2022 18:51 EDT)
_____          _____
JAMES P. LOGAN                                          JAMES LOGAN, AS CO-TRUSTEE OF
                                                        THE JAMES LOGAN FAMILY TRUST,
                                                        DATED FEBRUARY 10, 2021

6672599v2

# Assignment of Membership Interest - James Logan to Revocable Trust re Loco Florida, LLC (2022)

Final Audit Report                                                                 2022-09-16

| | |
|---|---|
| Created: | 2022-09-16 |
| By: | Rachel Chase (rachelc@jpfirm.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA5bhdxfYZNnyDwJookfUDMbzJ4I6CqTM_ |

## "Assignment of Membership Interest - James Logan to Revocabl e Trust re Loco Florida, LLC (2022)" History

🗋 Document created by Rachel Chase (rachelc@jpfirm.com)
2022-09-16 - 8:50:45 PM GMT- IP address: 144.129.14.130

🖂 Document emailed to jim.logan@ ████████████ for signature
2022-09-16 - 9:02:03 PM GMT

🗋 Email viewed by jim.logan@ ████████████
2022-09-16 - 10:43:04 PM GMT- IP address: 74.125.210.141

✒ Signer jim.logan@ ████████████ entered name at signing as James logan
2022-09-16 - 10:51:28 PM GMT- IP address: 199.47.254.244

✒ Document e-signed by James logan (jim.logan@ ████████████ )
Signature Date: 2022-09-16 - 10:51:30 PM GMT - Time Source: server- IP address: 199.47.254.244

✅ Agreement completed.
2022-09-16 - 10:51:30 PM GMT

📄 **Adobe Acrobat Sign**

# EXHIBIT 12

## ASSIGNMENT AND ACCEPTANCE OF MEMBERSHIP INTEREST

  **KNOW ALL MEN BY THESE PRESENTS** that JAMES P. LOGAN (the "Assignor"), in exchange for good and valuable consideration paid to him by JAMES LOGAN, as CO-TRUSTEE of the JAMES LOGAN FAMILY TRUST, dated February 10, 2021 (the "Assignee"), the receipt of which is hereby acknowledged, has granted, bargained, sold, assigned, transferred and set over, and by these presents does hereby grant, bargain, sell, assign, transfer and set over unto the Assignee, all of the Assignor's interest as a member of SMART COMMUNICATIONS YACHT HOLDING, LLC, a Florida limited liability company (the "Company"), which interest constitutes a fifty percent (50%) interest in the profits, losses and capital of the Company and is not certificated (the "Membership Interest"), and does hereby irrevocably constitute and appoint Thomas D. Sims, Esq. as attorney to transfer the Membership Interest on the books of the Company with full power of substitution in the premises.

  **ASSIGNEE, BY ACCEPTANCE OF THIS ASSIGNMENT AND ACCEPTANCE OF MEMBERSHIP INTEREST (THIS "ASSIGNMENT"),** assumes all of the duties and obligations of the Assignor as to the Membership Interest so assigned, and agrees to perform all of the covenants, conditions and obligations on the Assignor's part to be paid and performed with respect to the Membership Interest.

  This Assignment may be executed in multiple counterparts with the same effect as if the signature on each such counterpart were on the same instrument. A signed copy, including that executed via DocuSign or other valid electronic or digital signature medium, of this Assignment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Assignment.

  **EXECUTED TO BE EFFECTIVE AS OF**  September 16 , 2022.

**ASSIGNOR:**        **ASSIGNEE:**

James logan (Sep 16, 2022 18:52 EDT)      James logan (Sep 16, 2022 18:52 EDT)

JAMES P. LOGAN        JAMES LOGAN, AS CO-TRUSTEE OF
                  THE JAMES LOGAN FAMILY TRUST,
                  DATED FEBRUARY 10, 2021

8257501

# Assignment of Membership Interest - James Logan to Revocable Trust re Smart Communications Yacht Holdings, LLC (2022)

Final Audit Report                                                    2022-09-16

| | |
|---|---|
| Created: | 2022-09-16 |
| By: | Rachel Chase (rachelc@jpfirm.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA41IVbbBf5AM-yiYmX8oXLjDjvWBKBD5w |

## "Assignment of Membership Interest - James Logan to Revocable Trust re Smart Communications Yacht Holdings, LLC (2022)" History

Document created by Rachel Chase (rachelc@jpfirm.com)
2022-09-16 - 8:52:54 PM GMT- IP address: 144.129.14.130

Document emailed to jim.logan@█████████████ for signature
2022-09-16 - 9:02:35 PM GMT

Email viewed by jim.logan@████████████
2022-09-16 - 10:22:45 PM GMT- IP address: 74.125.210.139

Signer jim.logan@████████████ entered name at signing as James logan
2022-09-16 - 10:52:56 PM GMT- IP address: 199.47.254.244

Document e-signed by James logan (jim.logan@███████████)
Signature Date: 2022-09-16 - 10:52:57 PM GMT - Time Source: server- IP address: 199.47.254.244

Agreement completed.
2022-09-16 - 10:52:57 PM GMT

# EXHIBIT 13

1

2

3

4        Plaintiff

5

6

7

8                    /

9

10

11

12

13        Plaintiff

14

15

16

17                    /

18

19

20

21

22

23

24

25



Jonathan Logan v Janice Logan                    Hearing  .                    12/06/2023

1     Florida State they clearly know y.

2  While you complaining situation go on how

3  called Florida's and states anyway of m

4  Janice ye and collect as anyway of m he

5  jurisdiction to

6     Florida  laws a year dearly know yo

7  to a entity who is a liability

8  state by up to the

9  one This is the a mobility.

0  All the terms an and all of item anis6

1  Well                          Sha is lie all y dry  a be gin

2  of my class                          Sha it is so a fact b

3  jeparade injy.

4     Ab ll y Whole is so

5  doing Florida  and Yes bo

6  he big Who is to a party by them y,

7  be is collect ratio a 5 m at

8  Communicating light who is a complely

9  call company.

0     of Florida  m and y web to to light at

1  Sm at Communication is based in.                          This it

2     Let as a matter Florida l ay the is o dy

3  of any scheme a member of a C                          Mr Logan

4  to qualify.                    To for and as What

5  he pleas of m logan and his is and this



Jonathan Logan v Janice Logan                    Hearing  .                    12/06/2023



Jonathan Logan v Janice Logan                    Hearing  .                    12/06/2023



# EXHIBIT 14

P1500042874

_____
(Requestor's Name)

_____
(Address)

_____
(Address)

_____
(City/State/Zip/Phone #)

☐ PICK-UP    ☐ WAIT    ☐ MAIL

_____
(Business Entity Name)

_____
(Document Number)

Certified Copies _____    Certificates of Status _____

Special Instructions to Filing Officer:

Office Use Only



600413415166

FILED
2023 AUG 29 PH 12: 45
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

RECEIVED
2023 AUG 29 AM 3: 18
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

# CT CORP

**(850)656-4724**
**3458 Lakeshore Drive,**
**Tallahassee, FL 32312**

**Date:** _08/29/2023_

Acc#I20160000072

| Name: | HLFIP Holding, Inc. |
|---|---|
| Document #: | |
| Order #: | 15099736 |

| | | |
|---|---|---|
| Certified Copy of Arts & Amend: | ☐ | |
| Plain Copy: | ☐ | |
| Certificate of Good Standing: | ☐ | |
| Certified Copy of | ☐ | |
| Apostille/Notarial Certification: | ☐ | Country of Destination: |
| | | Number of Certs: |

| Filing: ☑ | Certified: ☑ | Email Address for Annual Report Notificatio |
|---|---|---|
| | Plain: ☐ | |
| | COGS: ☐ | |

Availability _____
Document ___
Examiner _____
Updater _____
Verifier _____
W.P. Verifier _____
Ref# _____

Amount: $  43.75

Thank you!

DocuSign Envelope ID: EB90FECE-344A-42C7-B628-C9837E674B8A

**Articles of Conversion**
for
**HLFIP Holding, Inc.**
(a Florida corporation)
into
**HLFIP Holding, LLC**
(a Delaware limited liability company)

FILED

2023 AUG 29 PM 12: 45

TALLAHASSEE, FLORIDA

The Articles of Conversion are submitted to convert the following Florida Profit Corporation into a business entity formed under the laws of another jurisdiction in accordance with § 607.11933, Florida Statutes.

1. The name of the Florida Profit Corporation converting into the (converted) resulting business entity is:

   **HLFIP Holding, Inc.**

2. The name of the resulting business entity is:

   **HLFIP Holding, LLC**

3. The (converted) resulting business entity is a limited liability company formed under the laws of the State of Delaware.

4. The above referenced Florida Profit Corporation has converted into another business entity in compliance with Chapter 607, F.S.

5. The plan of conversion was approved by the converting Florida Profit Corporation in accordance with Chapter 607, F.S.

Pursuant to s. 607.11933(4)(6) F.S. The conversion becomes effective at the later of:
   1. The date and time provided by the organic law of the (converted) resulting entity; or
   2. When the articles of conversion take effect.

IN WITNESS WHEREOF, the undersigned officer of HLFIP Holding, Inc. has caused these Articles of Conversion to be executed on this 29th day of August, 2023.

Jonathan D. Logan
President

RLF1 29499311v 2

# EXHIBIT 15

# 2023  FLORIDA PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# P15000042874

**FILED**
**Apr 27, 2023**
**Secretary of State**
**7649719824CC**

**Entity Name:** HLFIP HOLDING, INC.

**Current Principal  Place of Business:**

10491 72ND ST.
SEMINOLE, FL  33777

**Current Mailing Address:**

10491 72ND ST.
SEMINOLE, FL  33777  US

**FEI Number: 82-4804509**                                    **Certificate of Status Desired:**  No

**Name and Address of Current Registered Agent:**

TURKEL CUVA BARRIOS, PA
100 N. TAMPA STREET
 1900
TAMPA, FL  33602  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:   BRAD BARRIOS                                                            04/27/2023

                     Electronic Signature of Registered Agent                                          Date

## Officer/Director Detail :

| | | | | |
|---|---|---|---|---|
| Title | P | | Title | VP |
| Name | LOGAN, JONATHAN D. | | Name | LOGAN, JONATHAN D |
| Address | 10491 72ND ST. | | Address | 10491 72ND ST. |
| City-State-Zip: | SEMINOLE FL 33777 | | City-State-Zip: | SEMINOLE FL 33777 |
| Title | S | | Title | T |
| Name | LOGAN, JONATHAN D. | | Name | LOGAN, JONATHAN D. |
| Address | 10491 72ND ST. | | Address | 10491 72ND ST. |
| City-State-Zip: | SEMINOLE FL 33777 | | City-State-Zip: | SEMINOLE FL 33777 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: JONATHAN D. LOGAN                              PRESIDENT                    04/27/2023

                     Electronic Signature of Signing Officer/Director Detail                                    Date

# EXHIBIT 16

# MEMORANDUM

**To:**   Smart Communications Holding, Inc.

**From:** HLFIP Holding, LLC (formerly HLFIP Holding, Inc.)

**CC:**   File

**Date:** August 29, 2023

**Re:**   Termination of Exclusive Oral License Agreement Between HLFIP Holding, Inc. and Smart Communications Holding, Inc.

---

This memorandum shall serve as a memorialization that the exclusive oral license (the "License Agreement") granted to Smart Communications Holding, Inc. ("Smart Comm") by HLFIP Holding, Inc. ("HLFIP") for use of any and all intellectual property owned by HLFIP is terminated effective as of August 29, 2023.

Notwithstanding, any of Smart Comm's existing contracts utilizing HLFIP's intellectual property ("Legacy Contracts") that are affected by this termination of the License Agreement will be permitted to continue to use HLFIP's intellectual property until the Legacy Contracts naturally terminate or expire, or the obligations therein to Smart Comm otherwise cease, but the Legacy Contracts may not be extended, renewed, renegotiated, or otherwise expanded in a manner that goes beyond the scope of the existing terms as of August, 29, 2023.

Additionally, given the current status of outstanding requests for proposals and participation in bidding efforts, Smart Comm may continue to market and offer the licensed intellectual property up to March 31, 2024 (the "Transitory Period"). At the end of the Transitory Period, unless otherwise extended, Smart Comm must cease any and all marketing or offers for sale or use of the licensed intellectual property.

This termination does not release Smart Comm from its obligation to pay any ongoing amounts due pursuant to the License Agreement through the completion and related to the performance of all Legacy Contracts.

Accordingly, any and all rights Smart Comm had to utilize HLFIP's intellectual property covered under the License Agreement is terminated, other than the specific, limited exceptions noted above.

CONFIDENTIAL

SMART_B&R 000531

# EXHIBIT 17

**Smart Communications Holding, Inc.**

**Consolidated Audited Financial Statements**

**December 31, 2022**

PRIVATE AND CONFIDENTIAL

**Prepared by:**

**M. L. Shreve  CPA, P.C.**
**7781  N. Easy Street**
**Whitehall, Michigan  49461**
**231.894.5559**

**Smart Communications Holding, Inc.**
Table of Contents
December 31, 2022

| | Page No. |
|---|---|
| **Independent Auditor's Report** | 1 - 2 |
| | |
| **Financial Statements** | |
| Consolidated Balance Sheet | 3 |
| Consolidated Income Statement | 4 - 6 |
| Consolidated Statement of Retained Earnings | 7 |
| Consolidated Statement of Cash Flows | 8 |
| Consolidated Notes to Financial Statements | 9 - 13 |

PRIVATE AND CONFIDENTIAL



**MLS**

M.L. Shreve CPA, P.C.
7781 N. Easy Street
Whitehall, Michigan 49461
231.894.5559 (phone)
231.893.2097 (fax)
www.mlshrevecpa.com
mlshrevecpa@frontier.com (email)

October 25, 2023

**Independent Auditor's Report**

To the Board of Directors
Smart Communications Holding, Inc.
Seminole, Florida 33777

*Opinion*

We have audited the consolidated financial statements of Smart Communications Holding, Inc., which comprise the consolidated balance sheet as of December 31, 2022, and the related consolidated statements of income, retained earnings, and cash flows for the year then ended, and the related notes to the consolidated financial statements.

In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the financial position of Smart Communications Holding, Inc. as of December 31, 2022, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

*Basis for Opinion*

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Financial Statements section or our report. We are required to be independent of Smart Communications Holding, Inc. and to meet our other ethical responsibilities, in accordance with the relevant ethical requirements relating to our audit. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

*Responsibilities of Management for the Consolidated Financial Statements*

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the consolidated financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about Smart Communications Holding, Inc.'s ability to continue as a going concern within one year after the date that the consolidated financial statements are available to be issued.

1

***Auditor's Responsibilities for the Audit of the Consolidated Financial Statements***

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with generally accepted auditing standards will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the consolidated financial statements.

In performing an audit in accordance with generally accepted auditing standards, we:

Exercise professional judgment and maintain professional skepticism throughout the audit.

Identify and assess the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements.

Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances but not for the purpose of expressing an opinion on the effectiveness of Smart Communications Holding, Inc.'s internal control. Accordingly, no such opinion is expressed.

Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the consolidated financial statements.

Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about Smart Communications Holding, Inc.'s ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control-related matters that we identified during the audit.

*M. L. Shreve CPA, P.C.*
Whitehall, Michigan  49461

2

CONFIDENTIAL
SMART_B&R 000305

**Smart Communications Holding, Inc.**
*Consolidated Balance Sheet*
December 31, 2022

### ASSETS

| | | | |
|---|---|---:|---:|
| **Current Assets** | | | |
| Cash and Cash Equivalents | $ | 865,720 | |
| Accounts Receivable - Trade | | 462,259 | |
| Federal Corporate Income Tax Receivable | | 1,375,000 | |
| Florida Corporate Income Tax Receivable | | 459,114 | |
| Technology Grant Advance | | 37,539 | |
| Prepaid Expenses | | 723,934 | |
| Inventory | | 690,704 | |
| **Total Current Assets** | | $ | 4,614,270 |
| **Fixed Assets** | | | |
| Buildings | | 5,071,155 | |
| Kiosk Computer System | | 2,987,602 | |
| Computer Software | | 2,987,876 | |
| Leasehold Improvements | | 355,751 | |
| Vehicles | | 2,682,697 | |
| Display System & Demo Build | | 43,780 | |
| Equipment | | 599,469 | |
| Furniture | | 163,692 | |
| | | 14,892,022 | |
| Less: Accumulated Depreciation | | (7,158,755) | |
| **Property & Equipment, Net** | | | 7,733,267 |
| **Other Assets** | | | |
| Shareholder Loans | | 2,914,086 | |
| Affiliated Entities Receivable | | | |
| Smart Communications Yacht Holding LLC | | 5,505,639 | |
| Mailguard Federal Inc | | 1,746,369 | |
| Loco Florida LLC | | 1,358,011 | |
| HLFIP | | 169,685 | |
| **Total Other Assets** | | | 11,693,790 |
| **TOTAL ASSETS** | | $ | 24,041,327 |

### LIABILITIES AND EQUITY

| | | | |
|---|---|---:|---:|
| **LIABILITIES** | | | |
| **Current Liabilities** | | | |
| Accounts Payable | $ | 1,277,645 | |
| Accrued Credit Cards | | 182,611 | |
| Accrued Commissions | | 971,993 | |
| Accrued Facility Tech Grant | | 142,998 | |
| Accrued Expenses | | 201,592 | |
| Current Portion - Long Term Debt | | 589,405 | |
| **Total Current Liabilities** | | $ | 3,366,244 |
| **Long Term Liabilities** | | | |
| Lattice Technology License | | 665,000 | |
| Note Payable - HLFIP | | 52,848,813 | |
| Interest Payable - HLFIP | | 5,592,170 | |
| Notes Payable - Vehicles | | 59,714 | |
| Less Current Portion | | (589,405) | |
| **Total Long Term Debt** | | | 58,576,292 |
| **Total Liabilities** | | | 61,942,536 |
| **EQUITY** | | | |
| Common Stock | | 448,988 | |
| Paid In Capital | | 392,151 | |
| Retained Earnings | | (38,742,328) | |
| **Total Equity** | | | (37,901,209) |
| **TOTAL LIABILITIES AND EQUITY** | | $ | 24,041,327 |

*See Notes to Consolidated Financial Statements.*

3

CONFIDENTIAL
SMART_B&R 000306

**Smart Communications Holding, Inc.**
*Consolidated Statement of Income*
**For the year ended December 31, 2022**

| | | |
|---|---:|---:|
| **Revenue** | | |
| Mail Services Income | $ | 4,512,000 |
| Messaging Sales | | 25,801,718 |
| Telephone Call Sales | | 9,982,532 |
| Telephone Service Fees | | 4,388,973 |
| Trust Account Funding Fees | | 37,076 |
| Miscellaneous Income | | 93,375 |
| | | 44,815,675 |
| Less Reurns and Allowances | | (35,341) |
| | | 44,780,334 |
| **Total Cost of Sales** | | (25,540,158) |
| **Gross Profit** | | 19,240,176 |
| | | |
| **Total Operating Expenses** | | (32,041,827) |
| | | |
| **Income /Loss from Operations** | | (12,801,651) |
| | | |
| **Other Income and (Expense)** | | |
| Interest Expense | $ (461,010) | |
| Penalties and Late Fees | (22,137) | |
| | | (483,147) |
| **Net Other Income and (Expense)** | | (483,147) |
| | | |
| **Net Income (Loss) for the Year** | $ | (13,284,798) |

*See Notes to Consolidated Financial Statements*     *4*

CONFIDENTIAL
SMART_B&R 000307

**Smart Communications Holding, Inc.**
*Consolidated Statement of Income - Cost of Sales*
**For the year ended December 31, 2022**

**Cost of Sales**

| | | | |
|---|---|---|---|
| Beginning Inventory | $ | | $ 1,894,859 |
| Computer and Tablet Purchases | 3,716,300 | | |
| Software Purchases | 171,080 | | |
| Technology Grant & Services - Facilities | 214,397 | | |
| Equipment Design | 70,000 | | |
| Watch | 144,714 | | |
| Voice Over IP | 224,730 | | |
| Freight and Shipping | 548,212 | | |
| Telecommunications Taxes Expense | 629,686 | | |
| Contractor Services | 1,605,422 | | |
| Facililtes Commissions Expense | 11,322,286 | | |
| Salesperson Commissions | 164,193 | | |
| Sublicense Royalty Fees Expense | 23,496 | | |
| Data Sorage & Server Hosting | 167,343 | | |
| Labor - Telephone CC Sales | 616,321 | | |
| Labor - Installations | 258,964 | | |
| Labor - Mail Processing | 466,778 | | |
| Labor - Repairs & Maintenance | 601,662 | | |
| Internet Services | 478,554 | | |
| Merchant Card Fees | 1,625,594 | | |
| Travel | 1,204,257 | | |
| Meals | 82,014 | | |
| | | | 24,336,003 |
| | | | 26,230,862 |
| **Less Ending Inventory** | | | (690,704) |
| **Cost of Sales** | | | **25,540,158** |

*See Notes to Consolidated Financial Statements*                    5

CONFIDENTIAL
SMART_B&R 000308

**Smart Communications Holding, Inc.**
*Consolidated Statement of Income - Operating Expenses*
**For the year ended December 31, 2022**

| Description | | Amount |
|---|---|---|
| Advertising and Promotions | $ | 187,879 |
| Bank Service Fees | | 6,804 |
| Depreciation Expense | | 1,636,576 |
| Health Insurance | | 369,967 |
| Workman Compensation Insurance | | 22,601 |
| Business Insurance Expense | | 331,853 |
| Outside Services | | 9,744 |
| Dues and Subscriptions | | 98,821 |
| Computer Expenses | | 162,968 |
| Professional Fees | | 110,937 |
| Regulatory and Registration Fees | | 587,094 |
| Legal Fees | | 2,562,058 |
| IP License Fees | | 17,874,783 |
| Officer Compensation | | 160,385 |
| Wages and Salaries | | 4,814,980 |
| Payroll Taxes Expense | | 568,542 |
| Payroll Service Fees | | 79,354 |
| Property Taxes | | 71,668 |
| Repairs and Maintenance | | 472,332 |
| Rent Expense | | 793,547 |
| Telephone Expense | | 50,197 |
| Contract Labor Expense | | 293,580 |
| Website Design and Maintenance | | 89,318 |
| Client Welfare Expense | | 142,976 |
| Recruitment Fees | | 131,372 |
| Professional Education | | 8,316 |
| Licenses and Permits | | 162 |
| Charitable Contributions | | 19,340 |
| Employee Welfare Expense | | 7,708 |
| Meals and Entertainment | | 144,538 |
| Office Expense | | 160,302 |
| Utilities | | 50,197 |
| Postage and Shipping | | 18,982 |
| Other Expenses | | 1,958 |
| **Total Operating Expenses** | | **32,041,827** |

*See Notes to Consolidated Financial Statements*                6

CONFIDENTIAL
SMART_B&R 000309

**Smart Communications Holding, Inc.**
*Consolidated Statement of Retained Earnings*
**For the year ended December 31, 2022**

| | | |
|---|---|---:|
| Retained Earnings - Beginning of Year | $ | 15,211,356 |
| Effect on Retained Earnings for Prior Years' IP License Fee Liability and Interest | | (40,668,886) |
| Net Income for the Year | | (13,284,798) |
| Retained Earnings - End of Year | $ | (38,742,328) |

*See Notes to Consolidated Financial Statements.*　　　　*7*

PRIVATE AND CONFIDENTIAL

CONFIDENTIAL
SMART_B&R 000310

**Smart Communications Holding, Inc.**
**Consolidated Statement of Cash Flows**
**For the year ended December 31, 2022**

| | | |
|---|---|---:|
| **Cash Flows from (Provided to) Operating Activities** | | |
| Net Income (Loss) form Operations | $ | (13,284,798) |
| Adjustments to reconcile increase in net assets | | |
| to net cash provided by (used in) operating activities: | | |
| Depreciation | | 1,636,576 |
| | | (11,648,222) |
| (Increase) Decrease in operating assets: | | |
| Accounts Receivable | | (223,173) |
| Corporate Taxes Receivable | | (1,624,177) |
| Employee Advances Receivable | | 7,149 |
| Other Receivables | | (9,364,949) |
| Prepaid Expenses | | (49,434) |
| Prepaid Corporate Taxes | | (345,697) |
| Inventory | | 1,203,684 |
| Deferred Taxes | | 90,269 |
| Increase (Decrease) in operating liabilities: | | |
| Accounts Payable | | (53,465) |
| Accrued Credit Cards Payable | | 79,693 |
| Accrued Expenses | | 278,863 |
| Accrued Federal Income Taxes | | (20,153) |
| Accrued Payroll and Withholdings | | 72,115 |
| Current Portion of Long Term Debt | | 235,595 |
| **Net Cash Flows from (Provided to) Operating Activities** | | (21,361,902) |
| | | |
| **Cash Flows From ( Provided to) Investing Activities** | | |
| Purchase of Fixed Assets - net | | (1,237,874) |
| **Net Cash Flows From (Provided to) Provided to Investing Activities** | | (1,237,874) |
| **Cash Flows From (Provided to) Financing Activities** | | |
| Note Payable - IP License Fee | | (58,440,984) |
| Payments on Notes Payable | | 18,060,844 |
| **Net Cash Flows from (Provided to) Financing Activities** | | 18,060,844 |
| | | |
| **Net Increase (Decrease) in Cash From Operating Activities** | | (4,538,932) |
| | | |
| Cash and Cash Equivalents at Beginning of Year | | 5,404,652 |
| | | |
| **Cash and Cash Equivalents at End of Year** | $ | 865,720 |

Interest Expense for the year was in the amount of $ 461,010.
Taxes Paid for the year was in the amount of $ 1,813,961.

*See Notes to Consolidated Financial Statements*                                   8

CONFIDENTIAL
SMART_B&R 000311

**Smart Communications Holding, Inc.**
**Notes to Consolidated Financial Statements**
**For the year ended December 31, 2022**
================================================================

**Note A – Significant Accounting Policies**

*Basis of Consolidation*
The consolidated financial statements include the financial statements of Smart Communications, U.S, Inc.; Smart Communications, Pasco, Inc.; and Smart Communications, Collier, Inc. Smart Communications Holding, Inc, owns 100 % of these companies. All transactions between Smart Communications Holding, Inc. and subsidiaries have been eliminated in the consolidated financial statements.

*Concentration of Credit Risk*
The Company normally maintains sufficient cash to meet its anticipated working capital needs. Cash in deposit accounts may, at times, exceed the Federal Deposit Insurance Corporation (FDIC) insured limit in the amount of $ 250,000. However, The Company has not experienced any losses in such accounts and therefore believes it is not exposed to any significant credit risk in these accounts.

*Cash and Cash Equivalents*
For purposes of the statement of cash flows, the Company considers all highly liquid investments, generally those assets readily convertible to known amounts of cash with a maturity of three months or less, to be cash equivalents.

*Accounts Receivable*
Accounts Receivable are customer obligations due under normal trade conditions that have been received after the year end but attributable to the current year. The Company considers these accounts receivable to be fully collectible; accordingly, no allowance for doubtful accounts is required. If amounts become uncollectible, they are charged to operations when that determination is made.

*Inventory*
Inventory consists of tablets, kiosks, and various computer parts and accessories, and is stated at the lower of cost or market using the first-in, first-out method.

*Property and Equipment*
Property and equipment is stated at cost less accumulated depreciation. Provisions for depreciation of assets are computed using the straight-line at rates which are intended to amortize the cost of such assets over their useful lives which range from 5 to 40 years. Leasehold Improvements are amortized over the service lives of the improvements, generally 40 years.

*Revenue Recognition*
Revenues are generally recognized when realized or realizable, and when earned (generally when goods are transferred or services rendered), no matter when payment is received. The Company recognizes revenue from messaging services at the point of sale, net of sales taxes (if any). Service contract revenue is recognized when the service is performed.

The Company adopted FASB ASC 606, *Revenues from Contracts with Customers*, which amended the existing standards for revenue recognition. The adoption of this new revenue standard does not have a significant impact on the amount and timing of revenue recognized in the Company's financial statements. Based on the Company's evaluation process and review of its contracts with customers, the timing and amount of revenue recognized previously is consistent with how revenue is recognized under the new standard. No changes were required to reported revenues as a result of the adoption of FASB ASC 606.

*9*

CONFIDENTIAL
SMART_B&R 000312

**Smart Communications Holding, Inc.**
**Notes to Consolidated Financial Statements**
**For the year ended December 31, 2022**
========================================================================

## Note A – Significant Accounting Policies (continued)

*Use of Estimates*

These financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America. Management is required to make certain estimates and assumptions that affect amounts reported in the financial statements. Actual results may differ from these estimates.

*Advertising Costs*

Advertising costs are charged to operations when incurred. For the year ended December 31, 2022, advertising expense amounted to $ 187,879.

## Note B – Property and Equipment

Property and equipment are stated at cost. All property and equipment and leasehold improvements are depreciated on the straight-line method. Repairs and maintenance of property and equipment are charged to operations, and major improvements are capitalized. Upon retirement, sale or other disposition of assets, the costs and accumulated depreciation are eliminated from the accounts, and any resulting gain or loss is included in operations.

For the year ended December 31, 2022, property and equipment consists of the following:

| Description | Cost | 2022 Depreciation | 12.31.2022 Accumulated Depreciation | Net Book Value |
|---|---|---|---|---|
| Kiosk Computer System | $ 2,987,602 | $ 313,349 | $ 2,690,779 | $ 296,823 |
| Computer Software | 2,987,876 | 589,406 | 2,370,375 | 617,501 |
| Vehicles | 2,682,697 | 512,738 | 1,354,744 | 1,327,953 |
| Display System | 21,280 | 4,256 | 17,277 | 4,003 |
| Demo Build | 22,500 | 1,400 | 20,283 | 2,217 |
| Furniture and Fixtures | 163,692 | 24,972 | 114,552 | 49,140 |
| Buildings | 5,071,155 | 95,780 | 244,189 | 4,826,966 |
| Leasehold Improvements | 355,751 | 9,037 | 26,860 | 328,891 |
| Mail Service Equipment | 414,217 | 59,174 | 241,627 | 172,590 |
| Equipment | 185,252 | 26,464 | 78,069 | 107,183 |
| | $ 14,892,022 | $ 1,636,576 | $ 7,158,755 | $ 7,733,267 |

All property is depreciated using the straight-line method. Furniture and fixtures, computer software, demos, kiosks, and vehicles are depreciated over 5 years. Buildings and leasehold improvements are depreciated over 39 years, and machinery and equipment are depreciated over 7 years. Assets commence depreciation as of the first full month of usage.

*10*

CONFIDENTIAL
SMART_B&R 000313

**Smart Communications Holding, Inc.**
**Notes to Consolidated Financial Statements**
**For the year ended December 31, 2022**

=================================================================================

### Note D – Loans To Shareholder

At December 31, 2022, a 50 % shareholder owed the Company loans in the amount of $ 2,914,086. No interest has been accrued on the loans.

### Note E – Affiliated Entities

As of December 31, 2022, the Company has accounts receivable from the following affiliated entities:

| Description | | Amount |
|---|---|---|
| Smart Communications Yacht Holding LLC | $ | 5,505,639 |
| Mailguard Federal, Inc. | | 1,746,369 |
| LOCO Florida, LLC | | 1,358,011 |
| HLFIP | | 169,685 |
| | $ | 8,779,704 |

### Note F – Subsequent Events

Management has evaluated subsequent events through October 25, 2023, the date financial statements were available to be issued. No events occurred or are pending through this date which would have a material effect on the financial statements or require disclosure in the financial statements, except as noted in Footnote Disclosure Note I

### Note G – Long Term Debt

On May 19, 2020, the Company purchased three Ford Trucks at a total financing cost of $ 93,319.44. Payments on this loan commenced as of July 3, 2020 in the amount of $ 622.02 per truck, including interest at the annual rate of 7.2900%, payable monthly for 60 months for each truck. Final payment on this loan is due on June 3, 2025. As of December 31, 2022, the principal balance on the vehicle loan is in the amount of $ 59,713.92. Interest expense on this loan for the year ended December 31, 2022 is in the amount of $ 2,988.00

As of January 1, 2019, The Company entered into a Technology License Agreement with LATTICE Incorporated. The Agreement is a Licensing Agreement with LATTICE Software wherein Smart Communications Holding, Inc. pays LATTICE a license fee, in the amount of $ 2,850,000.00 payable in monthly installments of $ 47,500.00 for sixty (60) consecutive months beginning on February 1, 2019. Upon payment in full of the License fee, Smart Communications Holding, Inc. shall pay LATTICE an annual royalty payment of $ 100.00 each year (the "Royalty Fee"). The Royalty Fee shall be due on or before December 31, of each year beginning in 2025 and shall continue until the Licensing Agreement is terminated.

As of December 31, 2022, the Company owed the balance due to LATTICE on the Licensing Agreement is in the amount of $ 665,000.

*11*

CONFIDENTIAL
SMART_B&R 000314

**Smart Communications Holding, Inc.**
**Notes to Consolidated Financial Statements**
**For the year ended December 31, 2022**
================================================================================

**Note H – Income Taxes**

Income taxes are provided for the tax effects of transactions reported in the financial statements and consist of taxes currently due. The Company is required to recognize, measure, classify and disclose in the consolidated financial statements uncertain tax positions taken or expected to be taken in the Company's tax returns. Management has determined that the Company does not have any uncertain tax positions and associated unrecognized benefits that materially impact the consolidated financial statements or related disclosures. Since tax matters are subject to some degree of uncertainty, there can be no assurance that the Company's tax returns will not be challenged by the taxing authorities and that the Company will not be subject to additional tax, penalties, and interest as a result of such challenge. Penalties and interest assessed by income taxing authorities would be included in operating expenses.

The Company is taxed as a C Corporation under the Internal Revenue Code. For the year ended December 31, 2022, the Company incurred a net operating loss in the amount of $ 12,710,042, a carryover of disallowed business interest expense, and charitable contributions in the amount of $ 19,340.

**NOTE I – Intellectual Property License**

Smart Communications Holding, Inc. provides specialized prison inmate communication technologies. A related entity, HLFIP Holding, Inc. is the owner of proprietary intellectual property, patents, trademarks, and other know how that provides the specialized communications systems (collectively known as "HLFIP IP") which connect prison inmates, correctional facility administration, courts, attorneys, and families. As such, the HLFIP IP improves the lives and safety of the incarcerated inmates, correctional facility staff, and others involved in the delivery of those specialized communications services, as well as the elimination of contraband in postal mail at correctional facilities.

HLFIP Holding, Inc. provides Smart Communications Holding, Inc. an exclusive license of its HLFIP IP for distribution and use at correctional facilities across the United States of America. During and for the year ended December 31, 2022, Smart Communications Holding, Inc. sublicensed the HLFIP IP to Smart Communications Collier, Inc. (a ubsidiary company) for distribution and use at those correctional facilities. HLFIP is the licensor and Smart Communications, Holding, Inc. is the exclusive licensee of HLFIP IP, for which a royalty rate is charged by HLFIP to the Company. The royalty rate of 40 % of net sales was charged for the HLFIP IP. The royalty rate was determined by measurement of and comparison to independent agreements, using the method known as the Comparable Uncontrolled Transaction ("CUT"), which was selected as the best method under Internal Revenue Code Section 482 and its Treasury Regulations Section 1.482-4(c)(2). Accordingly, Smart Communications Holding, Inc. (via its subsidiary, Smart Communications Collier, Inc.) reported an IP license expense, in the amount of $ 17,874,784 for the year ended December 31, 2022. Additionally, the Company reported interest in the amount of $ 446, 870, calculated at the rate of 5 % for one-half of the year, 2022.

The Company has also reflected the prior years' use of the HLFIP IP license for the years of 2015 – 2021 as a long-term liability in the amount of $ 52,848,813, and accrued interest of $ 5,592,170. Retained earnings has been adjusted to reflect effects of this inclusion for prior year use of the HLFIP license.

*12*

CONFIDENTIAL
SMART_B&R 000315

# EXHIBIT 18

# Electronic Articles of Incorporation For

P14000102324
FILED
**December 29, 2014**
Sec. Of State
cgolden

SMART COMMUNICATIONS HOLDING, INC.

The undersigned incorporator, for the purpose of forming a Florida profit corporation, hereby adopts the following Articles of Incorporation:

## Article I
The name of the corporation is:

SMART COMMUNICATIONS HOLDING, INC.

## Article II
The principal place of business address:

4522 N. B STREET
TAMPA, FL.   33609

The mailing address of the corporation is:

4522 N. B STREET
TAMPA, FL.   33609

## Article III
The purpose for which this corporation is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV
The number of shares the corporation is authorized to issue is:

10,000

## Article V
The name and Florida street address of the registered agent is:

ALEXIS K LOGAN
515 E. LAS OLAS BLVD.
SUITE 120
FT. LAUDERDALE, FL.   33301

I certify that I am familiar with and accept the responsibilities of registered agent.

Registered Agent Signature:   ALEXIS LOGAN

SMART_B&R 000459

P14000102324
FILED
December 29, 2014
Sec. Of State
cgolden

# Article VI

The name and address of the incorporator is:

> ALEXIS LOGAN
> 515 E. LAS OLAS BLVD.
> SUITE 120
> FT. LAUDERDALE, FL 33301

Electronic Signature of Incorporator:    ALEXIS LOGAN

I am the incorporator submitting these Articles of Incorporation and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S.  I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of this corporation and every year thereafter to maintain "active" status.

# Article VII

The initial officer(s) and/or director(s) of the corporation is/are:

> Title:   P
> ALEXIS K LOGAN
> 4522 N. B STREET
> TAMPA, FL.  33609

> Title:   VP
> JAMES P LOGAN
> 4522 N. B ST.
> TAMPA, FL.  33609

> Title:   S
> ALEXIS K LOGAN
> 4522 N. B ST.
> TAMPA, FL.  33609

> Title:   T
> JAMES P LOGAN
> 4522 N. B ST.
> TAMPA, FL.  33609

# Article VIII

The effective date for this corporation shall be:

> 12/24/2014

SMART_B&R 000460

# EXHIBIT 19

Message
_____

**From**:     jim.logan@smartcommunications.us [jim.logan@smartcommunications.us]
**Sent**:     9/18/2022 8:06:08 PM
**To**:       Jim Logan [jim.logan@smartcommunications.us]; janice logan [myjesse@hotmail.com]; Alexis Logan
            [alexis@baytobaylegal.com]; jspeters11@gmail.com
**Subject**:  letter to Jon

September 18, 2022

Jon,

In response to your September 12, 2022 Confidential email;

The "Shareholders Agreement" sent to you is the very same as was delivered to you over a year ago.  You have had ample adequate time to review or hire an attorney to modify. It is a mutual agreement (same terms for both of us) sent to you for your protection in the event my surgery goes poorly tomorrow.

In an attempt to respond to your emailed statements and concerns, I will attempt to go line by line.

"You don't agree to be a 50/50 partner."

Your emotional stated does not determine the percentage of ownership.  The Share Transfer Agreement for Smart Communications Holding, Inc. was drafted by Kristen Keene of Carlton Fields as our corporate attorney. You signed this agreement on August 30, 2017 and were issued 50% of the shares and I was issued 50% of the shares. There have never been any agreements or documents amending our 50%/50% ownership agreement.  Our ownership doesn't change based on behavior, be it yours or mine.

No partnerships are equal all the time. At the inception of this corporation and for several years thereafter, you couldn't even use a computer legally and you haven't even visited a jail until the last few years. Perhaps you remember the familiar phone call you would make asking "Is there anything I should be doing?"

When we got out second contract the Corp had no money. I went and established a banking relationship and I secured financing for the next group of contracts by pledging personal and inheritance assets. When your mother and I sold our house, the proceeds of approximately $297,000 went to pay our corporate loan at Englewood Bank. I have never even asked for it back from the company.

There is a lot you either choose to forget or just never paid attention to. Yeah, you are right, sometimes a partnership isn't fair!

You are offering me a $5,000,000 buyout plus I can keep my house in exchange for my 50% share of the company, or, you are OK with keeping me on payroll at $250-$500K if I prefer?? As I read your offer it looks like your offer is one or the other??

Let's look at them separately. Starting with my house. Purchase price of $2,650,000.  What's interesting here is I brought $1,000,000 in profit from the sale of my last house in Mount Dora plus the $200,000 I put down personally and maybe I should get the $297,000 from my last house that the company has had use of for the last decade with 0% interest. Total those and I put in my own equity of $1,500,000 on a $2,650,000 purchase.

Plaintiffs0001178

You are graciously going to let me keep it??!!  In addition to keeping my house you would pay me $5,000,000??

We have had company value estimates from Truists and UBS a few months ago in the $500,000,000 range. You have the documents.

That means you are offering me 1% of value of the company as valued by experts in exchange for my 50% shares. Jon keeps $495,000,000, Jim keeps $5,000,000.

The offer to make me a high-priced consultant is interesting as well, but I get your strategy on the next line where you state      "I don't believe you will be alive much longer."  You back that up a little later where I believe you threaten to kill me if I don't accept your terms. I do want to note the generous consulting fee as to date, I still receive $50,000. per year salary very steady for the past 10 years.

"Past the point in life and the pain and abuse for 40 years."

You are certainly entitled to your opinion.  Some might say you are certainly forgetting you first 25 years.  You are forgetting your life of absolute indulgence. As a child you wanted for nothing,  You were constantly indulged with motorcycles, 4-wheelers, snowmobiles and jet-ski's, including young teen race bikes, a motorhome and a race trailer, personal trainers, personal mechanics and race sponsors. Your mother and I even paid someone to do your school homework so you could race motorcycles.

Young Adult- Your mother and I purchased for you a new construction house in Ocala, you are racing motorcycles for a "living" and supporting a family amazingly without a job. Don't forget the new F-150 for you and even a Lincoln for her! You then later pursue a Pro career traveling around the country. Privateer race team. It is hard to imagine how you accomplished all you did given the outrageous behavior and abuse you have apparently endured.

The next section you describe your pain and how many chances you have given your so-called Father. Your so-called-father objects to your characterizations of you giving chances and ongoing betrayal. Nowhere is it written that you the child is given chances you use like tokens.  You are not my ruler, boss, employer, or even moral compass. You exhibit a total lack of respect for anyone and yet demand it of others.  You exhibit nothing but disdain for your parents and have from an early age. It's interesting but disappointing as we have been your biggest fans.

Now you are offering a "generous buyout" "Get off the back of the guy who started, innovated and has done all the day to day for 13yrs."  If that isn't enough, now you bring the threats.

If I, your mother or your sister try and take anymore from your, "You are preprepared to things the normal human could never Fathom."  Most humans could never fathom a son who says that to his family for any reason, let alone a son sitting atop his $10,000,000 yacht, next to his $2M condo, with a Rolls, a Lamborghini,  and Ferrari parked at his $5,000,000 beach house. Exactly what did your family take from you??

"You are done being taken advantage of" , "Don't test me", "I don't deserve any of this"
" I have been a great son and business partner"

This is not opinion, this is FACT. You have not been a great Son. In fact, you have been anything but.

Plaintiffs0001179

You have been and continue to be both verbally and physically abusive to me and your mother. You have broken into our home and held us at gunpoint demanding that I sign my shares over to you. You have vandalized our cars and belongings. Great Son??

Great news Son! I am as done with you as you are with me.

I don't know how you have talked yourself into this great myth about an abusive family and your heroic rise above it, but it is certainly a myth.  You are the richest young man I know, but instead of enjoying it, you are wallowing in some fairytale about abuse and betrayal.

Want to experience betrayal? Meet my Son!!

Good news, I have lots of opportunities to sell my 50%. Pretty sure it will exceed your 1% offer. If you can find it in yourself to behave like an adult and wish to discuss this, I am ready.

Be aware: I have recorded every death threat to date. I love you but this is over. The next time you threaten anything I will take swift action.

Your loving Father

# EXHIBIT 20



January 20, 2023

Gary M. Miller

111 South Wacker Drive
Chicago, Illinois 60606
**t** 312.704.7700
**d** 312.704.7703
**f** 312.558.1195
gmiller@shb.com

<u>**VIA EMAIL**</u>

Mark M. Wall, Esq.
Eric J. Hall, Esq.
**HILL WARD HENDERSON**
101 East Kennedy Boulevard, Suite 3700
Tampa, FL  33602
mark.wall@hwhlaw.com
eric.hall@hwhlaw.com

**RE:    Smart Communications' Management**

Dear Messrs. Wall and Hall:

We represent Janice Logan ("Janice"), trustee of the James Logan Family Trust dated February 10, 2021 ("the Trust").  It is our understanding that you represent Jonathan Logan ("Jon").  I write regarding the Trust's 50% ownership stake in Smart Communications Holding, Inc. and its affiliates ("Smart Communications").  The Trust is very concerned about Jon's management of Smart Communications, waste of corporate assets, threats to injure the company, and threats of violence against Janice and her family.  The Trust has retained Shook, Hardy & Bacon L.L.P. to investigate these concerns.  All communications with Janice regarding Smart Communications, whether from your firm or from Jon, should be directed to our attention.  To be clear:  Our client does not want Jon to communicate directly with her.

On September 16, 2022, James Logan ("Jim") transferred the 5,000 shares of stock in Smart Communications Holding, Inc. personally owned by him to the Trust.  As a result of this transfer, and as your client is fully aware, Smart Communications now has two owners, each with a 50% stake:  Jon and the Trust.

Shortly before Jim transferred his shares to the Trust, your client tried to pressure Jim to sell his shares for the low-ball sum of $5 million, and a "250k-500k" contract as a consultant.  *See* Ex. A (Sept. 12, 2022, email from Jon Logan to Jim Logan).  Trying to scare Jim into this deal, your client threatened:  "I don't believe you will be alive much longer. . . .  If you, or Janice or Alexis try and take anymore from me, I am prepared to do things the normal human could never fathom. . . .  Don't test me . . .  Have that attorney draft a simple strait [sic] forward agreement with the buyout I listed."  *Id.*



This threat cannot be taken lightly given Jon's history of violence.  Jon has:  (1) broken into his parent's home and held a gun to Jim's head while ordering him to sign his shares over (*see* Ex. B, September 18, 2022, email from Jim to Jon); (2) vandalized Janice's car (*id.*); (3) been convicted and incarcerated for aggravated stalking; and (4) sent an email to Jim and Janice with the subject line "Burn your fucking house down."[1]

As CEO, President, Treasurer, and Secretary of the Smart Communications entities since at least November 5, 2019, and as 50% owner, Jon owes the Trust fiduciary duties, including the duties of care, loyalty, and good faith.  From what we have seen, it appears your client has not been acting in accordance with those duties.  Among other things, Jon has been using corporate funds to purchase personal assets including yachts, houses, luxury cars, and he has incurred enormous sums on the corporate credit card, which we find inexplicable if the expenses were truly all work related.

On top of this waste, Jon stated a willingness to harm the company for his personal gain.  When trying to pressure Janice to sell the Trust's 50% stake to him, Jon stated that he would, essentially, burn the company down if she did not comply.  Jon told Janice that if she did not sell, he would refuse to sign agreements on behalf of the company.  If he were to go through with this threat, in a very short period of time, the company would be unable to meet its obligations to customers, employees, and vendors.  Jon further threatened to invalidate or otherwise impair corporate patent rights.

This situation is untenable and must be resolved promptly.  The Trust demands that Jon take the following steps immediately:

- Preserve all email accounts associated with Jim Logan and Jon Logan, including but not limited to all email accounts on the @smartcommunications.us servers; and the @smartjailmail.com servers;

- Provide complete, direct access to all Smart Communications entities' email accounts, books and records, including Smart Communications' accounting software application;

- Agree in writing that any corporate dividends or distributions, in any form, will be made on a 50/50 basis between the Trust and Jon;

---

[1] The body of the email read:  "You think you two have a right to just hide from me!!???  You think you can just hang up the phone on me!??  Jim you piece of fucking shit trash pathetic fake as father mother fucker I'm coming for you right now!  I am coming home right now!"  Ex. C (August 14, 2021, email from Jon Logan to Jim Logan and Janice Logan).

ATLANTA | BOSTON | CHICAGO | DENVER | HARTFORD | HOUSTON | KANSAS CITY | LONDON | LOS ANGELES | MIAMI | NEW YORK |
ORANGE COUNTY | PHILADELPHIA | SAN FRANCISCO | SEATTLE | ST. LOUIS | TAMPA | WASHINGTON, D.C.



January 20, 2023
Page 3

- Convene a shareholder meeting to appoint Janice as (1) director of Smart Communications Holding, Inc. and (2) director of all other Smart Communications entities;

- Thereafter, convene a meeting of the board of directors of Smart Communications Holding, Inc. to appoint Janice as Vice President;

- Following such appointment, add Janice as a signatory to all Smart Communications bank accounts, and require signatures of both Jon and Janice for any corporate payments over $50,000.00;

- Sell the yachts (the 100' Riva Corsaro and the 48' center console Nortech), with 50% of the proceeds to be paid to the Trust; and

- Refrain from threatening or abusing (physically, verbally, or emotionally) Janice and her family.

In addition, the Trust demands that Jon pay to the Trust, within 60 days, an amount equal to half of the purchase price of the below assets purchased by the company for Jon's personal use:

- the 100' Riva Corsaro (roughly $10 million at the time of purchase);

- the 48' center console Nortech (roughly $1 million at the time of purchase);

- the Rolls-Royce (roughly $250,000 at the time of purchase);

- the Lamborghini (roughly $300,000 at the time of purchase);

- the Ferrari (roughly $350,000 at the time of purchase); and

- the Brickell Condo (roughly $1.5 million at the time of purchase).

Since these purchases were, in effect, distributions to one shareholder (Jon), the Trust is entitled to 50% of the amounts paid by virtue of its right to 50% of all company distributions. That amount totals $6.7 million, with appropriate adjustments to account for the foregoing.

If your client should refuse any of these demands, or if he accedes to them and later fails to meet them, the Trust is prepared to seek redress in court. If forced to litigate, the Trust will aggressively pursue any or all of the following:



January 20, 2023
Page 4

- A full accounting by a third-party forensic accounting firm;

- Appointment of a custodian to oversee Smart Communications' operations;

- A restraining order to prevent Jon from diverting funds from Smart Communications in excess of market-rate compensation for his services and distributions paid 50/50 to himself and the Trust; and

- Any other forms of relief allowed by law.

Please provide notice of your client's agreement to the above demands by January 25.

Sincerely,

*/s/ Gary M. Miller*

Gary M. Miller

Attachments

cc:    Janice Logan

# EXHIBIT A

This agreement is ridiculously too complicated I don't even understand it. I'm not stupid or bad with contracts and I can't understand this.

I want it much more simple and direct. All these terms and names that need their own paragraphs of definition is ridiculous.

Additionally, I do not agree to be a 50/50 partner with you. In no way has this been an equal partnership in any way. For 10yrs you have been an on again, off again alcoholic offering zero innovation, sporadic at best management or organization. You creat more problems than you solve with your on again off again alcoholism. It's been extremely toxic and harmful to this entire company and employees as well as me personally.

I am offering you a 5 million dollar buyout, plus keep your house. I am ok with keeping you on payroll at 250k-500k as a consultant if you would prefer.

However I don't believe you will be alive much longer and I don't believe my involvement with you is in my best interest or the company's.

Sometimes in life, you pass the point of no return on some things. I believe you are there with me. I have put up with your abusive, outrageous and heartbreaking alcoholism for 40yrs. I've given you ever chance and then some times 10. You only care about yourself and more than anything, your booze.

I am beyond heartbroken and hurt and just flat out done with you and your lying, addict behavior and the constant let down by my so-called father.

Jim, there comes a point where you can't get another chance, you can't get a redo and you can't come back from. I feel you are there. I've been through it so many times over the years and all you do is betrayed me over and over.

I pray to god you change who you are and get your health and life back and be a normal human again. However I can not and this company can not be a victim to your lies, betrayals and guaranteed let down anymore. Neither me or the company deserves this or can afford it anymore.

I am offering you a generous buyout to a company I started, innovated and continue to carry day in day out for 13years now mostly without you.

Do is both a favor and don't make this get nastier than it already is. I have zero patience left for you and I am not one to fuck with on what I created with sheer willpower and brains. If you, or Janice or Alexis try and take anymore from me, I am prepared to do things the normal human could never fathom. I am done being fucked with, fucked over and put in a corner with my hands tied. No more.

5 million, ongoing salary if you want it, involvement not needed. I will never leave you or my mother or even my ungrateful scamming sister out starving or in a bad place. However, you have broken our bond for the final time.

I want a simple contract and a simple buyout and clean separation. We are not partners. You're an addict and terrible alcoholic, the injustice is reached a point I can no longer deal with anymore.

I close with this. I love you forever, but I don't know who you even are anymore. I have lost my dad years ago to alcoholism. I really hope you fix yourself because you will be dead soon. You have wrecked every relationship around you with your alcoholism. There is a point of no return, you are there with me.

I don't want to remember you this way, however you give me no choice.

Don't make this harder, nastier or hurt more than it already does. I don't deserve any of this. I've been a great son and business partner. You have failed me in every way. Don't fight me. I am done being taken advantage of by anyone, especially my own blood. Don't test me.

Have that attorney draft a simple strait forward agreement with the buyout I listed. Let's get this done this week. Time is of the


Thank you

Jon Logan
CEO- Smart Communications

Begin forwarded message:

> **From:** "Thomas D. Sims" <tsims@jpfirm.com>
> **Date:** September 12, 2022 at 5:42:17 PM EDT
> **To:** jon.logan@smartcommunications.us
> **Cc:** jim.logan@smartjailmail.com
> **Subject: Shareholders' Agreement**


Hello Jon,


I spoke with your father last week regarding the Shareholders' Agreement for the Company that I had drafted a while ago (see attached). In light of his upcoming medical procedure, we thought

it would be best for all parties to finalize the existing draft of the purchase agreement. Accordingly, I am attaching the same for your review and comment. Please let me know if there are any questions/concerns regarding the Agreement. Once finalized, you and your father can execute in order to put it into place.

Thanks,

Tom



Thomas D. Sims
Attorney at Law
727-551-4652 Direct | 727-800-5981 Fax
490 1st Ave S, Suite 700, St. Petersburg, FL 33701

## JOHNSON POPE
BOKOR RUPPEL & BURNS LLP
COUNSELORS AT LAW

**www.jpfirm.com** | **vCard** | **bio** | **email**

The information contained in this transmission may be attorney/client privileged and therefore confidential. This information is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, printing or copy of the communication is strictly prohibited. If you receive this transmission in error, or if you are not the individual or entity named above, the receipt of this transmission is not intended to and does not waive any privilege, attorney/client or otherwise. If you have received this communication in error, please notify us by telephone or e-mail. Thank you.

# EXHIBIT B

**From:** jim.logan@smartcommunications.us <jim.logan@smartcommunications.us>
**Sent:** Sunday, September 18, 2022 8:06 PM
**To:** Jim Logan <jim.logan@smartcommunications.us>; janice logan <myjesse@hotmail.com>; Alexis Logan <alexis@baytobaylegal.com>; jspeters11@gmail.com <jspeters11@gmail.com>
**Subject:** letter to Jon

September 18, 2022

Jon,

In response to your September 12, 2022 Confidential email;

The "Shareholders Agreement" sent to you is the very same as was delivered to you over a year ago. You have had ample adequate time to review or hire an attorney to modify. It is a mutual agreement (same terms for both of us) sent to you for your protection in the event my surgery goes poorly tomorrow.

In an attempt to respond to your emailed statements and concerns, I will attempt to go line by line.

"You don't agree to be a 50/50 partner."

Your emotional stated does not determine the percentage of ownership. The Share Transfer Agreement for Smart Communications Holding, Inc. was drafted by Kristen Keene of Carlton Fields as our corporate attorney. You signed this agreement on August 30, 2017 and were issued 50% of the shares and I was issued 50% of the shares. There have never been any agreements or documents amending our 50%/50% ownership agreement. Our ownership doesn't change based on behavior, be it yours or mine.

No partnerships are equal all the time. At the inception of this corporation and for several years thereafter, you couldn't even use a computer legally and you haven't even visited a jail until the last few years. Perhaps you remember the familiar phone call you would make asking "Is there anything I should be doing?"

When we got out second contract the Corp had no money. I went and established a banking relationship and I secured financing for the next group of contracts by pledging personal and inheritance assets. When your mother and I sold our house, the proceeds of approximately $297,000 went to pay our corporate loan at Englewood Bank. I have never even asked for it back from the company.

There is a lot you either choose to forget or just never paid attention to. Yeah, you are right, sometimes a partnership isn't fair!

You are offering me a $5,000,000 buyout plus I can keep my house in exchange for my 50% share of the company, or, you are OK with keeping me on payroll at $250-$500K if I prefer?? As I read your offer it looks like your offer is one or the other??

Let's look at them separately. Starting with my house. Purchase price of $2,650,000.  What's interesting here is I brought $1,000,000 in profit from the sale of my last house in Mount Dora plus the $200,000 I put down personally and maybe I should get the $297,000 from my last house that the company has had use of for the last decade with 0% interest. Total those and I put in my own equity of $1,500,000 on a $2,650,000 purchase.

You are graciously going to let me keep it??!!  In addition to keeping my house you would pay me $5,000,000??

We have had company value estimates from Truists and UBS a few months ago in the $500,000,000 range. You have the documents.

That means you are offering me 1% of value of the company as valued by experts in exchange for my 50% shares. Jon keeps $495,000,000, Jim keeps $5,000,000.

The offer to make me a high-priced consultant is interesting as well, but I get your strategy on the next line where you state     "I don't believe you will be alive much longer."  You back that up a little later where I believe you threaten to kill me if I don't accept your terms. I do want to note the generous consulting fee as to date, I still receive $50,000. per year salary very steady for the past 10 years.

"Past the point in life and the pain and abuse for 40 years."

You are certainly entitled to your opinion.  Some might say you are certainly forgetting you first 25 years.  You are forgetting your life of absolute indulgence. As a child you wanted for nothing,  You were constantly indulged with motorcycles, 4-wheelers, snowmobiles and jet-ski's, including young teen race bikes, a motorhome and a race trailer, personal trainers, personal mechanics and race sponsors. Your mother and I even paid someone to do your school homework so you could race motorcycles.

Young Adult- Your mother and I purchased for you a new construction house in Ocala, you are racing motorcycles for a "living" and supporting a family amazingly without a job. Don't forget the new F-150 for you and even a Lincoln for her! You then later pursue a Pro career traveling around the country. Privateer race team. It is hard to imagine how you accomplished all you did given the outrageous behavior and abuse you have apparently endured.

The next section you describe your pain and how many chances you have given your so-called Father. Your so-called-father objects to your characterizations of you giving chances and ongoing betrayal. Nowhere is it written that you the child is given chances you use like tokens.  You are not my ruler, boss, employer, or even moral compass. You exhibit a total lack of respect for anyone and yet demand it of others.  You exhibit nothing but disdain for your parents and have from an early age. It's interesting but disappointing as we have been your biggest fans.

Now you are offering a "generous buyout" "Get off the back of the guy who started, innovated and has done all the day to day for 13yrs."  If that isn't enough, now you bring the threats.

If I, your mother or your sister try and take anymore from your, "You are preprepared to things the normal human could never Fathom." Most humans could never fathom a son who says that to his family for any reason, let alone a son sitting atop his $10,000,000 yacht, next to his $2M condo, with a Rolls, a Lamborghini, and Ferrari parked at his $5,000,000 beach house. Exactly what did your family take from you??

"You are done being taken advantage of" , "Don't test me", "I don't deserve any of this"
" I have been a great son and business partner"

This is not opinion, this is FACT. You have not been a great Son. In fact, you have been anything but.

You have been and continue to be both verbally and physically abusive to me and your mother. You have broken into our home and held us at gunpoint demanding that I sign my shares over to you. You have vandalized our cars and belongings. Great Son??

Great news Son! I am as done with you as you are with me.

I don't know how you have talked yourself into this great myth about an abusive family and your heroic rise above it, but it is certainly a myth.  You are the richest young man I know, but instead of enjoying it, you are wallowing in some fairytale about abuse and betrayal.

Want to experience betrayal? Meet my Son!!

Good news, I have lots of opportunities to sell my 50%. Pretty sure it will exceed your 1% offer. If you can find it in yourself to behave like an adult and wish to discuss this, I am ready.

Be aware: I have recorded every death threat to date. I love you but this is over. The next time you threaten anything I will take swift action.

Your loving Father

# EXHIBIT C

**From:** Jon <jon.logan@smartcommunications.us>
**Sent:** Saturday, August 14, 2021 11:24 AM
**To:** Jim Logan <jim.logan@smartcommunications.us>; janice logan <myjesse@hotmail.com>
**Subject:** Burn your fucking house down

You think you two have a right to just hide from me!!??? You think you can just hang up the phone on me!?? Jim you piece of fucking shit trash pathetic fake as father mother fucker I'm coming for you right now! I am coming home right now!

Thank you

Jon Logan
CEO- Smart Communications

# EXHIBIT 21

DocuSign Envelope ID: EB90FECE-344A-42C7-B628-C9837E674B8A

# CERTIFICATE OF FORMATION

## OF

## SMART COMMUNICATIONS HOLDING, LLC

This Certificate of Formation of Smart Communications Holding, LLC (the "LLC"), dated as of August 29, 2023, is being duly executed and filed by the undersigned, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del.C. §18-101, et seq.).

FIRST.    The name of the limited liability company is Smart Communications Holding, LLC.

SECOND.  The address of the registered office of the LLC in the State of Delaware is c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

THIRD.   The name and address of the registered agent for service of process on the LLC in the State of Delaware are The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation as of the date first above written.

Name:  Jonathan D. Logan
Title:  Authorized Person

State of Delaware
Secretary of State
Division of Corporations
Delivered  12:42 PM 08/29/2023
FILED  12:42 PM 08/29/2023
SR 20233368539 - File Number  7624778

# EXHIBIT 22

CONFIDENTIAL LICENSE AGREEMENT

# EXCLUSIVE INTERCOMPANY
# INTELLECTUAL PROPERTY LICENSE AGREEMENT

This Exclusive Intercompany Intellectual Property License Agreement ("**Agreement**"), effective as of August 29, 2023 (the "**Effective Date**"), is by and between HLFIP Holding, LLC, a Delaware limited liability company ("**Licensor**") and Smart Communications Holding, LLC, a Delaware limited liability company ("**Licensee**") (collectively, the "**Parties**," or each, individually, a "**Party**").

WHEREAS, Licensor is the sole owner of all right, title, and interest in certain intellectual property, including proprietary technology, patents, patent applications, registered and common law names, trademarks, service marks, logos, federal trademark registrations, and know-how (including those items set forth on **Schedule 1**, which may be supplemented or amended from time to time) aimed at inmate communications technology and services, including to eliminate contraband in postal mail at correctional facilities, improve the safety of inmates and correctional facilities, improve correctional facility and inmate surveillance, and improve communication systems to be used by inmates and their friends and families (collectively, the "**Licensed Intellectual Property**");

WHEREAS, Licensee desires to distribute and sell inmate communication systems and services to correctional facilities in the United States (the "**Business**");

WHEREAS, Licensee specifically acknowledges that Licensor has valuable goodwill associated with its names, trademarks, service marks, and logos used as trademarks in connection with inmate communication systems and services;

WHEREAS, Licensee wishes to license the Licensed Intellectual Property to facilitate Licensee's conduct of the Business;

WHEREAS, Licensor is willing to grant to Licensee an exclusive license to use the Licensed Intellectual Property on the terms set forth herein;

WHEREAS, the parties desire to allocate rights to the intellectual property developed by, or acquired by either of them for inmate communication systems and services developed under this Agreement in accordance with the terms and conditions set forth herein; and

WHEREAS, Licensor and Licensee are commonly controlled.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.  License.

    1.1    License Grant. Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee during the Term (as defined below) an exclusive, non-transferable,

# CONFIDENTIAL LICENSE AGREEMENT

non-sublicensable license to make, have made, use, import, export, sell, and offer for sale the Licensed Intellectual Property in connection with the conduct of the Business in the United States and in accordance with standards, specifications, and/or instructions approved by Licensor, from time to time.

1.2    Ownership. Licensee acknowledges and agrees that Licensor shall retain all right, title, and interest in and to the Licensed Intellectual Property and all rights relating thereto; that the license and rights granted in this Agreement will not be construed to confer any rights upon Licensee by implication, estoppel, or otherwise as to any technology not identified in **Schedule 1**; that all use and goodwill symbolized by and connected with the use of the Licensed Intellectual Property by Licensee shall inure solely to the benefit of Licensor; and that Licensee acquires no ownership right in or to the Licensed Intellectual Property as a result of this Agreement.

1.3    Prosecution and Maintenance. Licensor has the sole right, in its discretion and at its Licensee's expense, to file, prosecute, and maintain all applications, registrations, and patents relating to the Licensed Intellectual Property. Licensee shall provide, at the request of Licensor and at Licensee's expense, all necessary assistance with such filing, maintenance, and prosecution.

1.4    Recordation of License. Licensor shall make all necessary filings to record this Agreement in the United States Patent and Trademark Office and in the corresponding offices or agencies where it may be required under applicable law, including as a prerequisite to enforcement of the Licensed Intellectual Property or enforceability of this Agreement in the courts, and any recordation fees and related costs and expenses will be at Licensee's expense.

1.5    Assignments and Sublicensing. The license hereby granted is and shall be personal to the Licensee, and unless Licensor consents in writing, shall not be assignable by any act of Licensee or by operation of law. Furthermore, the license and rights granted hereunder may not be sublicensed, conveyed, assigned, or otherwise transferred by Licensee to any third party. Any purported sublicense, conveyance, assignment, or transfer will be void and of no force and effect.

1.6    Prior Exclusive License Agreement. Licensee acknowledges that Licensor previously exclusively licensed the Licensed Intellectual Property to another party, and that under that pre-existing license agreement, the prior licensee executed contracts that extend beyond the Effective Date of this Agreement. Licensee hereby acknowledges that despite Licensor's exclusive license grants to Licensee under this Agreement, Licensor has also agreed to allow the prior licensee to continue to use the Licensed Intellectual Property beyond this Agreement's Effective Date, until the prior contracts naturally expire. Licensee hereby consents to this limited period of overlap of the Licensed Intellectual Property license grants.

1.7    Reservation of Rights. Licensor hereby reserves all rights not expressly granted to Licensee under this Agreement.

2.    Use of Licensed Intellectual Property.

2

CONFIDENTIAL
SMART_B&R 000533

## CONFIDENTIAL LICENSE AGREEMENT

2.1     <u>Notices</u>. Licensee shall ensure that all use of Licensed Intellectual Property hereunder is accompanied by or marked with the appropriate proprietary rights notices, symbols, and legends as may be reasonably necessary under applicable law to maintain the Licensed Intellectual Property and Licensor's proprietary rights therein and in such order and manner as may be reasonably specified by Licensor. Without limiting the foregoing, Licensee shall comply with the patent marking provisions of 35 U.S.C. § 287(a) by marking all Licensed Products/patented products covered by any Licensed Intellectual Property with the word "patent" or the abbreviation "pat." and either the relevant patent numbers or a web address that is freely accessible to the public and that lists the relevant patent numbers.

2.2     <u>Modifications</u>. As between the Parties, Licensor owns any improvement, enhancement, or other modification of or derivative work based on any of the Licensed Intellectual Property made by or on behalf of Licensee or Licensor (each, a **"Modification"**). Licensee shall immediately notify Licensor of any Modification made by or on behalf of Licensee (each, a **"Licensee Modification"**). Licensee hereby assigns to Licensor all of its right, title, and interest in and to all Licensee Modifications, including all rights to apply for any patents, trademarks, or other intellectual property registrations with respect to such Licensee Modifications and all enforcement rights and remedies for past, present, and future infringement thereof and all rights to collect royalties and damages therefor. All patent applications and trademark applications filed by Licensor with respect to any such Licensee Modification and all patents or trademark registrations issuing therefrom shall automatically be included in the Licensed Intellectual Property and subject to the license granted to Licensee under Section 1.1. At the request of Licensor, Licensee shall promptly execute and deliver such documents as may be necessary or desirable to effect and perfect the foregoing assignment of rights.

2.3     <u>Quality</u>. Licensee acknowledges and is familiar with the high standards and reputation for quality symbolized by the trademarks, service marks, and logos included in the Licensed Intellectual Property as of the Effective Date (**"Licensed Marks"**). Licensee agrees to conduct the Business and use the Licensed Marks in a manner at least consistent with such quality standards and reputation. Licensee shall comply with Licensor's guidelines and specifications regarding the style, appearance, and usage of the Licensed Marks. Licensor may exercise quality control over all uses of the Licensed Marks under this Agreement to maintain the validity of the Licensed Marks and protect the goodwill associated therewith. If Licensor determines that the quality and nature of the goods and services with which the Licensed Marks are used by Licensee do not meet the standards and requirements set forth by Licensor, Licensee agrees to meet or exceed the standards and requirements set forth by Licensor within thirty (30) days of receiving written notification of a failure to meet the standards and requirements for the quality and nature of the goods with which the Licensed Marks are used. Approval of any use by Licensee of the Licensed Marks, once given by Licensor, will continue in effect, without need for future approval, so long as Licensee's use of the Licensed Marks in connection with the goods and services of the Business continues to be substantially consistent with such previously approved use.

3.     <u>Improvements</u>.

3.1     <u>Ownership of Improvements</u>. Each Party shall advise the other of any technical improvements, modifications, or enhancements relating to the Licensed Intellectual Property

3

## CONFIDENTIAL LICENSE AGREEMENT

created from time to time and useful to effectively operate the Licensed Intellectual Property (collectively referred to as "**Improvements**"). Any and all such Improvements shall be the property of Licensor. All Improvements made by Licensor shall be included in the license grant of Section 1.1. All Improvements made by Licensee shall be the property of Licensor and shall be licensed to Licensee for its use. Improvements that are made jointly by the parties shall be owned by Licensor. Each Party agrees to execute any and all documents requested by the other to perfect rights to jointly made Improvements.

4.    Actions by Third Parties.

    4.1    Infringement Actions. Licensee shall promptly notify Licensor in writing of any actual, suspected, or threatened infringement, misappropriation, or other violation of any Licensed Intellectual Property by any third party of which it becomes aware. Licensor has the sole right, in its discretion, and at Licensee's expense, to (a) bring any action or proceeding with respect to any such infringement; (b) defend any declaratory judgment action concerning any Licensed Intellectual Property; and (c) control the conduct of any such action or proceeding (including any settlement thereof). Licensee shall provide Licensor with all assistance that Licensor may reasonably request, at Licensee's expense, in connection with any such action or proceeding. Licensor and Licensee will evenly split any monetary recovery resulting from any such action or proceeding (including any settlement thereof) for each's own account, subject to reimbursement of Licensee's costs, fees or expenses incurred in such action.

    4.2    Other Actions by a Third Party.  Each Party shall promptly notify the other in the event of any legal or administrative action by any third party involving the Licensed Intellectual Property of which it becomes aware, including any opposition, cancellation, or revocation proceeding. Licensor shall have the right, but not the obligation, to defend against any such action involving the Licensed Intellectual Property, and any such defense shall be at Licensee's expense. If Licensor fails to defend against any such action, then Licensee shall have the right to defend such action, in its own name, and any such defense shall be at Licensee's expense.

5.    Payment.

    5.1    Royalty. On or before the last business day of each calendar year during the term of this Agreement, Licensee shall pay to Licensor a royalty of 40 percent (40%) of the Net Sales of products and services sold by Licensee to any third party ("**Royalty Fee**"). "**Net Sales**" means, for any period of determination, the aggregate amount invoiced by Licensee to a third party for Business in the United States, less any credits, refunds, customary and usual trade discounts, rebates, discounts, charge-backs, and sales taxes, excluding net income tax. The amounts of any deductions shall be determined from books and records maintained in accordance with International Financial Reporting Standards, consistently applied.

    5.2    Maintenance of Books and Records; Record Inspection and Audit. Licensee shall keep complete and accurate books and records as reasonably necessary for the calculation the Royalty Fee payable under Section 5.1. Licensee further agrees it shall make these records available for inspection, from time to time, by Licensor, or a third party retained by Licensor, at Licensee's site and at Licensee's cost. Any audit and/or inspection shall be conducted during

4

CONFIDENTIAL
SMART_B&R 000535

## CONFIDENTIAL LICENSE AGREEMENT

regular business hours at Licensee's facilities upon at least seven (7) days prior written notice. Such examination shall be conducted in such a manner as to not unduly interfere with Licensee's business. If the audit reveals an underpayment of Royalty Fee by Licensee under this Agreement, Licensee shall pay to Licensor the full amount of any underpayment revealed by the audit, plus interest at the per annum prime rate in effect at the Chase Manhattan Bank, N.A., New York, New York, on the due date.

6.    Confidentiality. Each Party acknowledges that in connection with this Agreement it will gain access to certain confidential and proprietary information of the other Party (collectively, **"Confidential Information"**). Without limiting the foregoing, for purposes of this Agreement, all trade secrets and confidential information included in the Licensed Intellectual Property, including unpublished patent applications, will be deemed Confidential Information of Licensor. Each Party shall maintain the Confidential Information in strict confidence and not disclose any Confidential Information to any other person, except to its employees who (a) have a need to know such Confidential Information for such Party to exercise its rights or perform its obligations hereunder; and (b) are bound by written nondisclosure agreements. Each Party shall use reasonable care, at least as protective as the efforts it uses with respect to its own confidential information, to safeguard the Confidential Information from use or disclosure other than as permitted hereby.

7.    Indemnification. Licensee shall indemnify, defend, and hold harmless Licensor, its Affiliates, officers, directors, employees, agents and representatives against all losses, liabilities, claims, damages, actions, fines, penalties, expenses or costs (including court costs and reasonable attorneys' fees) arising out of or in connection with any third-party claim, suit, action, or proceeding relating to any breach of this Agreement by Licensee and use by Licensee of any Licensed Intellectual Property under this Agreement.

8.    Term and Termination. This Agreement begins on the Effective Date and will remain in force until terminated (**"Term"**). Licensor may terminate this Agreement at any time without cause, and without incurring any additional obligation, liability, or penalty. Licensee may terminate this Agreement at any time with prior written notice to Licensor.

9.    General Provisions.

9.1    Amendments. No amendment to this Agreement will be effective unless it is in writing and signed by both Parties.

9.2    No Third-Party Beneficiaries. This Agreement solely benefits the Parties and their respective permitted successors and assigns and nothing in this Agreement, express or implied, confers on any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

9.3    Counterparts. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement.

9.4    Severability. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability will not affect

5

CONFIDENTIAL
SMART_B&R 000536

## CONFIDENTIAL LICENSE AGREEMENT

any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

     9.5    Governing Law. This Agreement, including all exhibits, schedules, attachments, and appendices attached to this Agreement and thereto, and all matters arising out of or relating to this Agreement, are governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Delaware.

     9.6    Waiver. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power, or privilege arising from this Agreement will operate or be construed as a waiver thereof, nor will any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

     9.7    Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified):

If to Licensor:          HLFIP Holding, LLC
                         10491 72nd Street
                         Seminole, Florida 33777
                         Email: jon.logan787@gmail.com
                         Attention: Jon Logan

If to Licensee:          Smart Communications Holding, LLC
                         10491 72nd Street
                         Seminole, Florida 33777
                         Email: legal@smartcommunications.us
                         Attention: Legal Dept.

     9.8    Entire Agreement. This Agreement, including and together with any related exhibits, schedules, attachments, and appendices, constitutes the sole and entire agreement of Licensor and Licensee with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, regarding such subject matter.

[SIGNATURE PAGE FOLLOWS]

6

CONFIDENTIAL
SMART_B&R 000537

CONFIDENTIAL LICENSE AGREEMENT

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the August 29, 2023, by their respective officers thereunto duly authorized.

HLFIP Holding, LLC

By_____

Name: Jon Logan

Title: President

Smart Communications Holding, LLC

By_____

Name: Jon Logan

Title: CEO

CONFIDENTIAL
SMART_B&R 000538

## CONFIDENTIAL LICENSE AGREEMENT

## SCHEDULE 1: LICENSED INTELLECTUAL PROPERTY

| PATENTS | | | | |
|---|---|---|---|---|
| Assignee | Country | Title | Publication No. | Patent No. |
| HLFIP Holding, LLC | USA | CORRECTIONAL POSTAL MAIL CONTRABAND ELIMINATION SYSTEM | 2020/0128014 A1 | 11457013 |
| HLFIP Holding, LLC | USA | CORRECTIONAL POSTAL MAIL CONTRABAND ELIMINATION SYSTEM | 2016/0337360 A1 | 10291617 |
| HLFIP Holding, LLC | USA | CORRECTIONAL INSTITUTION LEGAL POSTAL MAIL PROCESSING SYSTEM AND METHOD | 2020/0280645 A1 | 11637940 |
| HLFIP Holding, LLC | USA | CORRECTIONAL INSTITUTION LEGAL POSTAL MAIL PROCESSING SYSTEM AND METHOD | 2019/0268488 A1 | 10659630 |
| HLFIP Holding, LLC | USA | COMMUNICATION TRACKING SYSTEM FOR CORRECTIONAL FACILITIES | 2019/0386996 A1 | 10862891 |
| HLFIP Holding, LLC | USA | SYSTEMS AND METHODS FOR PROCESSING REQUESTS TO SEND PRIVATE POSTAL MAIL TO AN INMATE | 2020/0396347 A1 | 11201974 |

8

CONFIDENTIAL
SMART_B&R 000539

**CONFIDENTIAL LICENSE AGREEMENT**

| PATENT APPLICATIONS | | | | | |
|---|---|---|---|---|---|
| Assignee | Country | Title | Application No. | Filing Date | Publication No. |
| HLFIP Holding, LLC | USA | CORRECTIONAL POSTAL MAIL CONTRABAND ELIMINATION SYSTEM | 17/363499 | 06/30/2021 | 2022/0060475 A1 |
| HLFIP Holding, LLC | USA | COMMUNICATION TRACKING SYSTEM FOR CORRECTIONAL FACILITIES | 17/114326 | 12/7/2020 | 2021/0194878 A1 |
| HLFIP Holding, LLC | USA | SYSTEMS AND METHODS FOR PROCESSING REQUESTS TO SEND PRIVATE POSTAL MAIL TO AN INMATE | 17/549349 | 12/13/2021 | 2022/0103701 A1 |
| HLFIP Holding, LLC | USA | SMART WEARABLE DEVICE FOR TRACKING AND MONITORING INDIVIDUALS IN A CORRECTIONAL FACILITY | 17/580462 | 1/20/2022 | 2022/0225947 A1 |
| HLFIP Holding, LLC | USA | STATIONARY EXERCISE BIKE FOR USE IN A CORRECTIONAL FACILITY | 17/194190 | 3/5/2021 | 2021/0275863 A1 |

CONFIDENTIAL
SMART_B&R 000540

## CONFIDENTIAL LICENSE AGREEMENT

| TRADEMARKS | | | |
|---|---|---|---|
| **Owner** | **Country** | **Trademark** | **Reg. No.** |
| HLFIP Holding, LLC | USA | MAILGUARD | 5,135,773 |
| HLFIP Holding, LLC | USA | MAILGUARD POSTAL MAIL ELIMINATION LOGO | 5,135,772 |
| HLFIP Holding, LLC | USA | MAILGUARD CONNECT | |
| HLFIP Holding, LLC | USA | MAILGUARD DIGITAL | |
| HLFIP Holding, LLC | USA | MAILGUARD TRACKER | |
| HLFIP Holding, LLC | USA | MAILGUARDLEGAL | |
| HLFIP Holding, LLC | USA | SMARTECOSYSTEM | |
| HLFIP Holding, LLC | USA | SMARTED | |
| HLFIP Holding, LLC | USA | SMARTENTERTAINMENT | |
| HLFIP Holding, LLC | USA | SMARTLAW | |
| HLFIP Holding, LLC | USA | SMARTLINK | |
| HLFIP Holding, LLC | USA | SMARTREENTRY | |
| HLFIP Holding, LLC | USA | SMARTREQUEST | |
| HLFIP Holding, LLC | USA | SMARTSUMMIT | |
| HLFIP Holding, LLC | USA | SMARTTABLET | |
| HLFIP Holding, LLC | USA | SMARTVISIT | |
| HLFIP Holding, LLC | USA | SMARTWATCH | |

10

CONFIDENTIAL
SMART_B&R 000541

## CONFIDENTIAL LICENSE AGREEMENT

| LICENSED KNOW HOW | |
|---|---|
| Owner | Technology |
| HLFIP Holding, LLC | MAILGUARD |
| HLFIP Holding, LLC | MAILGUARD DIGITAL |
| HLFIP Holding, LLC | MAILGUARD TRACKER |
| HLFIP Holding, LLC | MAILGUARDLEGAL |
| HLFIP Holding, LLC | SMARTECOSYSTEM |
| HLFIP Holding, LLC | SMARTED |
| HLFIP Holding, LLC | SMARTENTERTAINMENT |
| HLFIP Holding, LLC | SMARTLAW |
| HLFIP Holding, LLC | SMARTLINK |
| HLFIP Holding, LLC | SMARTREENTRY |
| HLFIP Holding, LLC | SMARTREQUEST |
| HLFIP Holding, LLC | SMARTTABLET |
| HLFIP Holding, LLC | SMARTVISIT |
| HLFIP Holding, LLC | SMARTWATCH |

11

CONFIDENTIAL
SMART_B&R 000542

# EXHIBIT 23

**To:**       janice logan[myjesse@hotmail.com]
**From:**     jim.logan@smartcommunications.us[jim.logan@smartcommunications.us]
**Sent:**     Thur 4/28/2022 8:31:38 AM (UTC-04:00)
**Subject:**  Fwd: Smart Comm presentation
Smart Comm Finanical Presentation1.pdf

---------- Forwarded message ---------
 From: **Jon Logan** <jon.logan@smartcommunications.us>
 Date: Tue, Apr 26, 2022, 4:30 PM
 Subject: Smart Comm presentation
 To: Jim Logan <jim.logan@smartcommunications.us>

# EXHIBIT 24

## Smart Communications Collier Inc.
## Profit & Loss

Accrual Basis

### January through December 2023

|  | Jan - Dec 23 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| Miscellaneous Revenue | 29,000.00 |
| **Sales** | |
| Commissary Transfer Credits | 5,515,544.01 |
| Refunds | -79,075.38 |
| Sales Entertainment | 2,188,122.85 |
| Sales of Mail Services | 4,512,000.00 |
| Sales of Messaging | 14,780,348.18 |
| Sales of Telephone Calls | 18,167,678.37 |
| Sales Photos | 1,572,481.27 |
| Sales Visitation | 3,042,567.09 |
| Service Fees | 5,740,300.69 |
| Trust Account Funding Fees | 122,801.61 |
| **Total Sales** | 55,562,768.69 |
| **Total Income** | 55,591,768.69 |
| **Cost of Goods Sold** | |
| Beginning Inventory Value | 690,704.04 |
| Contractor Services | 2,382,241.33 |
| Data Storage / Server Hosting | 371,469.24 |
| Ending Inventory Value | -3,033,716.53 |
| Facility Commissions Expense | 16,547,913.17 |
| Freight and Shipping Costs | 679,653.92 |
| Internet Service | 644,991.00 |
| Labor - Installation | 511,281.97 |
| Labor - Mail Processing | 456,298.85 |
| Labor - Repairs & Maintenance | 856,848.57 |
| Labor - Telephone CC Sales | 1,019,655.09 |
| Meals Expense | 105,172.70 |
| **Merchant Account Fees** | |
| Charge Backs | 340,215.48 |
| Merchant Account Fees | 1,843,681.94 |
| **Total Merchant Account Fees** | 2,183,897.42 |
| Misc. 3rd Party kiosk software | 456,917.53 |
| Miscellaneous Hardware Install | 0.00 |
| Purchases Hardware | 10,769,348.77 |
| Salesperson Commissions | 263,162.25 |
| Tablet Units | 0.00 |
| Technology Grant | 1,252,922.99 |
| Telecommunications Taxes | 2,566,986.90 |
| **Travel - Installation & Maint.** | |
| Airfare | 353,345.70 |
| Gas | 87,846.52 |
| Lodging | 429,318.15 |
| Mileage | 25,917.35 |
| Misc. Travel Expenses | 7,115.47 |
| Parking & Tolls | 40,594.37 |
| Vehicle Rental | 174,764.08 |
| Travel - Installation & Maint. | 2,033.64 |
| **Total Travel - Installation & Maint.** | 1,120,935.28 |
| Voice Over IP | 362,726.78 |
| Watch | 43,814.00 |
| **Total COGS** | 40,253,225.27 |
| **Gross Profit** | 15,338,543.42 |
| **Expense** | |
| Advertising and Promotion | 274,710.40 |
| Automobile Expense | |

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

# Smart Communications Collier Inc.
## Profit & Loss
Accrual Basis
### January through December 2023

| | Jan - Dec 23 |
|---|---|
| **Auto Insurance** | 99,068.00 |
| **Total Automobile Expense** | 99,068.00 |
| | |
| **Bank Service Charges** | 8,597.58 |
| **Charitble Contributions** | 18,284.84 |
| **Client Welfare** | 115,478.88 |
| **Computer Expenses** | 92,635.91 |
| **Computer Supplies** | 27,756.19 |
| **Contract Labor Expense** | 266,001.33 |
| **Depreciation Expense** | 1,466,651.95 |
| **Dues and Subscriptions** | 80,513.24 |
| **Education** | 145,876.32 |
| **Employee Welfare** | 6,400.81 |
| **Insurance Expense** | 247,776.47 |
| **Internet Service CORP** | 1,695.21 |
| **Legal Fees** | 3,080,225.81 |
| | |
| **Licenses & Permits** | 19,428.93 |
| **Meals and Entertainment** | 140,984.66 |
| **Office Expense** | 79,205.80 |
| **Outside Services** | 1,172.97 |
| **Payroll Expenses** | |
|     Employee Salary and Wages | 5,574,493.27 |
|     ER FICA & SUTA & FUTA Expense | 729,876.53 |
|     ER Health Insurance Premiums | 555,255.28 |
|     Officer Compensation | 119,999.88 |
|     Other Employee Benefits | 3,500.00 |
|     Payroll Service Fees | 110,489.68 |
|     Workers' Compensation Insurance | 44,833.18 |
| | |
| **Total Payroll Expenses** | 7,138,447.82 |
| | |
| **Postage and Delivery** | 19,115.72 |
| **Professional Fees** | |
|     Regulatory Registration Agent | 100,006.62 |
|     Professional Fees - Other | 126,894.48 |
| | |
| **Total Professional Fees** | 226,901.10 |
| | |
| **Property Tax** | 79,848.51 |
| **Recruitment Expense** | 63,283.25 |
| **Rent Expense** | |
|     Office Rents | 202,021.71 |
|     Rent Expense - Other | 1,297,715.00 |
| | |
| **Total Rent Expense** | 1,499,736.71 |
| | |
| **Repairs and Maintenance** | |
|     Equipment Maintenance | 58,898.15 |
|     Repairs and Maintenance - Other | 325,557.25 |
| | |
| **Total Repairs and Maintenance** | 384,455.40 |
| | |
| **Uniforms** | 1,677.20 |
| **Utilities** | |
|     Telephone & Internet | 125,236.37 |
|     Utilities - Other | 65,600.79 |
| | |
| **Total Utilities** | 190,837.16 |
| | |
| **Website Design & Maintenance** | 99,712.11 |
| | |
| **Total Expense** | 15,876,480.28 |
| | |
| **Net Ordinary Income** | -537,936.86 |
| | |
| **Other Income/Expense** | |
|   **Other Expense** | |
|     Intellectual Property Expense | 22,225,725.22 |

**Page 2**

## Smart Communications Collier Inc.
## Profit & Loss
### January through December 2023

Accrual Basis

|  | Jan - Dec 23 |
|---|---:|
| **Interest Expense** | 561,207.22 |
| **Late Fees / Penalties** | 28,267.26 |
| **Total Other Expense** | 22,815,199.70 |
| **Net Other Income** | -22,815,199.70 |
| **Net Income** | **-23,353,136.56** |

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

# EXHIBIT 25

Smart Communications Holding, Inc.

Consolidated Audited Financial Statements

December 31, 2021

Prepared by:

M. L. Shreve  CPA, P.C.
7781  N. Easy Street
Whitehall, Michigan  49461
231.894.5559

CONFIDENTIAL

SMART_B&R 000208

**Smart Communications Holding, Inc.**
Table of Contents
December 31, 2021

| | Page No. |
|---|---|
| **Independent Auditor's Report** | 1 - 2 |
| | |
| **Financial Statements** | |
| Consolidated Balance Sheet | 3 |
| Consolidated Income Statement | 4 - 6 |
| Consolidated Statement of Retained Earnings | 7 |
| Consolidated Statement of Cash Flows | 8 |
| Consolidated Notes to Financial Statements | 9 - 12 |

CONFIDENTIAL

CONFIDENTIAL

SMART_B&R 000209



**M L S**

M.L. Shreve CPA, P.C.
7781 N. Easy Street
Whitehall, Michigan 49461
231.894.5559 (phone)
231.893.2097 (fax)
www.mlshrevecpa.com
mlshrevecpa@frontier.com (email)

December 21, 2022

**Independent Auditor's Report**

To the Board of Directors
Smart Communications Holding, Inc.
Seminole, Florida 33777

**Report on the Audit of the Consolidated Financial Statements**

*Opinion*

We have audited the consolidated financial statements of Smart Communications Holding, Inc., which comprise the consolidated balance sheet as of December 31, 2021, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for the year then ended, and the related notes to the consolidated financial statements.

In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the financial position of Smart Communications Holding, Inc. as of December 31, 2021, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

*Basis for Opinion*

We conducted our audit in accordance with auditing standards generally accepted in the United States of America (GAAS). Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Financial Statements section or our report. We are required to be independent of Smart Communications Holding, Inc. and to meet our other ethical responsibilities, in accordance with the relevant ethical requirements relating to our audit. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

*Responsibilities of Management for the Consolidated Financial Statements*

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the consolidated financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about Smart Communications Holding, Inc.'s ability to continue as a going concern for year ended December 31, 2023.

*1*

CONFIDENTIAL

SMART_B&R 000210

*Auditor's Responsibilities for the Audit of the Consolidated Financial Statements*

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with GAAS will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the consolidated financial statements.

In performing an audit in accordance with GAAS, we:

> Exercise professional judgment and maintain professional skepticism throughout the audit.

> Identify and assess the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements.

> Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances but not for the purpose of expressing an opinion on the effectiveness of Smart Communications Holding, Inc.'s internal control. Accordingly, no such opinion is expressed.

> Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the consolidated financial statements.

> Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about Smart Communications Holding, Inc.'s ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control-related matters that we identified during the audit.

**Other Matter**

We previously performed a compilation engagement with respect to the 2021 consolidated financial statements, and issued our report thereon, dated October 20, 2022., which stated that the consolidated financial statements were prepared and reported in accordance with the tax basis of accounting, which is a basis of accounting other than accounting principles generally accepted in the United States of America. Our report further stated that we did not audit or review those consolidated financial statements, nor did we express an opinion or any other form of assurance on them.

*M.L. Shreve CPA, P.C.*

**M. L. Shreve CPA, P.C.**
Whitehall, Michigan  49461

2

CONFIDENTIAL

SMART_B&R 000211

**Smart Communications Holding, Inc.**
*Consolidated Balance Sheet*
December 31, 2021

## ASSETS

| | | |
|---|---:|---:|
| **Current Assets** | | |
| Cash and Cash Equivalents | $ 5,404,652 | |
| Accounts Receivable - Trade | 239,086 | |
| Accounts Receivable - Employees | 7,149 | |
| Technology Grant Advances | 37,539 | |
| Taxes Receivable – Florida | 109,937 | |
| Prepaid Corporate Taxes - Florida | 100,000 | |
| Prepaid Expenses | 674,500 | |
| Inventory | 1,694,388 | |
| **Total Current Assets** | | $ 8,467,251 |
| **Fixed Assets** | | |
| Buildings | 4,034,661 | |
| Kiosk Computer System | 2,987,602 | |
| Computer Software | 2,987,875 | |
| Leasehold Improvements | 355,710 | |
| Vehicles | 2,514,000 | |
| Display System & Demo Build | 43,780 | |
| Equipment | 599,469 | |
| Furniture | 131,051 | |
| | 13,654,148 | |
| Less: Accumulated Depreciation | (5,525,408) | |
| Property & Equipment, Net | | 8,128,740 |
| **Other Assets** | | |
| Shareholder Loans | 428,855 | |
| Accounts Receivable - Affiliated Entities | 1,899,986 | |
| Deferred Income Taxes - Federal | 536,251 | |
| Deferred Taxes – Florida | 90,269 | |
| **Total Other Assets** | | 2,955,361 |
| **TOTAL ASSETS** | | $ 19,551,352 |

## LIABILITIES AND EQUITY

**LIABILITIES**

| | | |
|---|---:|---:|
| **Current Liabilities** | | |
| Accounts Payable | $ 1,331,100 | |
| Accrued Credit Cards | 102,916 | |
| Accrued Commissions | 581,378 | |
| Accrued Expenses | 254,750 | |
| Federal Income Tax Payable | 20,153 | |
| Note Payable - ACG Global | 36,694 | |
| Current Portion - Long Term Debt | 825,000 | |
| **Total Current Liabilities** | | $ 3,151,991 |
| **Long Term Liabilities** | | |
| Lattice Technology License | 1,187,500 | |
| Notes Payable - Vehicles | 68,687 | |
| Less Current Portion | (825,000) | |
| **Total Long Term Debt** | | 431,187 |
| **Total Liabilities** | | 3,583,178 |
| **EQUITY** | | |
| Common Stock | 364,667 | |
| Paid In Capital | 392,151 | |
| Retained Earnings | 15,211,356 | |
| **Total Equity** | | 15,968,174 |
| **TOTAL LIABILITIES AND EQUITY** | | $ 19,551,352 |

*See Notes to Consolidated Financial Statements.*

3

CONFIDENTIAL

CONFIDENTIAL

**Smart Communications Holding, Inc.**
*Consolidated Income Statement*
**For the year ended December 31, 2021**

| | | |
|---|---:|---:|
| **Revenue** | | |
| Mail Services Income | $ | 4,512,000 |
| Messaging Sales | | 21,628,106 |
| Telephone Call Sales | | 5,510,925 |
| Telephone Service Fees | | 638,138 |
| Miscellaneous Income | | 30,252 |
| | | 32,319,421 |
| Sales Reporting Errors | | (370,089) |
| Less Reurns and Allowances | | (22,955) |
| | | 31,926,377 |
| **Total Cost of Sales** | | (15,795,401) |
| **Gross Profit** | | 16,130,976 |
| | | |
| **Total Expenses** | | (10,961,790) |
| | | |
| **Income /Loss from Operations** | | 5,169,186 |
| | | |
| **Other Income and (Expense)** | | |
| Gain on Sale of Assets | | 540,589 |
| Interest Expense | $ (125,242) | |
| Penalties and Late Fees | (170,123) | |
| | | (295,365) |
| **Net Other Income and (Expense)** | | 245,224 |
| **Income Before Taxes** | | 5,414,410 |
| **Provision for Income Taxes** | | |
| Florida Income Tax | (119,794) | |
| Federal Income Tax | (783,902) | |
| **Total Provision for Taxes** | | (903,696) |
| | | |
| **Net Income (Loss) for the Year** | $ | 4,510,714 |

*See Notes to Consolidated Financial Statements.*

4

CONFIDENTIAL

SMART_B&R 000213

**Smart Communications Holding, Inc.**
*Consolidated Income Statement - Cost of Sales*
For the year ended December 31, 2021

| Cost of Sales | | |
|---|---|---|
| Beginning Inventory | $ | $ 1,401,970 |
| Game Revenue Sharing 50/50 | 13,658 | |
| Computer and Tablet Purchases | 4,097,633 | |
| Hardware Purchases | 200,910 | |
| Software Purchases | 8,876 | |
| Hardware Installation Costs | 28,554 | |
| Technology Services - Facilities | 311,913 | |
| Equipment Design | 43,188 | |
| Vehicle xpenses | 27,914 | |
| Freight and Shipping | 374,670 | |
| Repairs and Maintenance | 808,408 | |
| Telecommunications Taxes Expense | 474,019 | |
| Labor - Telephone CC Sales | 237,202 | |
| Touchscreen Kiosk Purchases | 24,085 | |
| Mobile Mail Carts | 1,447 | |
| Tablet Purchases | 152,000 | |
| Contractor Services | 1,256,386 | |
| Faciliites Commissions Expense | 5,430,350 | |
| Salesperson Commissions | 269,485 | |
| Sublicense Royalty Fees Expense | 100,795 | |
| Data Sorage & Server Hosting | 68,813 | |
| Internet Services | 299,578 | |
| Kiosk Software Expense | 161,378 | |
| Labor - Mail Processing | 497,451 | |
| Merchant Card Fees | 1,040,790 | |
| Travel | 325,488 | |
| Meals | 32,828 | |
| | | 16,287,819 |
| | | 17,689,789 |
| **Less Ending Inventory** | | (1,894,388) |
| **Cost of Sales** | | **15,795,401** |

*See Notes to Consolidated Financial Statements.*

5

CONFIDENTIAL

SMART_B&R 000214

Smart Communications Holding, Inc.
*Consolidated Income Statement - Expenses*
For the year ended December 31, 2021

| Description | Amount |
|---|---|
| Advertising and Promotions | $ 94,873 |
| Bank Service Fees | 2,227 |
| Depreciation Expense | 1,737,201 |
| Postage and Shipping | 4,883 |
| Health Insurance | 336,556 |
| Workman Compensation Insurance | 14,800 |
| Business Insurance Expense | 127,468 |
| Outside Services | 5,495 |
| Dues and Subscriptions | 81,789 |
| Computer Expenses | 38,320 |
| Professional Fees | 110,811 |
| Regulatory and Registration Fees | 50,644 |
| Legal Fees | 3,057,099 |
| Licenses and Permits | 2,656 |
| Charitable Contributions | 10,714 |
| Officer Compensation | 160,945 |
| Wages and Salaries | 3,421,085 |
| Payroll Service Fees | 65,651 |
| Payroll Taxes Expense | 411,561 |
| Property Taxes | 72,676 |
| Vehicle Expenses | 172,289 |
| Meals and Entertainment | 110,879 |
| Office Expense | 83,999 |
| Computer Expenses | 20,135 |
| Contract Labor Expense | 97,916 |
| Rent Expense | 79,825 |
| Telecommunicataions Expense | 80,303 |
| Telephone Expense | 32,947 |
| Website Design and Maintenance | 3,651 |
| Repairs and Maintenance | 203,658 |
| Utilities | 52,574 |
| Client Welfare Expense | 163,073 |
| Recruitment Fees | 20,672 |
| Professional Education | 11,160 |
| Other Expenses | 21,255 |
| **Total Expenses** | **$ 10,961,790** |

*See Notes to Consolidated Financial Statements.*

6

CONFIDENTIAL

SMART_B&R 000215

**Smart Communications Holding, Inc.**
*Consolidated Statement of Retained Earnings*
**For the year ended December 31, 2021**

| | | |
|---|---:|---:|
| Retained Earnings - Beginning of Year | | $ 7,872,214 |
| | | |
| Conversion of Accumulated Depreciation to GAAP | $ 2,480,258 | |
| Prior Period Adjustment - Affiliated Entities | 216,092 | |
| Prior Period Adjustment - Credit Card Liaiblity | 132,078 | |
| | | 2,828,428 |
| Retained Earnings - Beginning of Year Restated | | 10,700,642 |
| | | |
| Net Income for the Year | | 4,510,714 |
| | | |
| Retained Earnings - End of Year | | $ 15,211,356 |

*See Notes to Consolidated Financial Statements.*          7

CONFIDENTIAL

SMART_B&R 000216

**Smart Communications Holding, Inc.**
**Statement of Cash Flows**
**For the year ended December 31, 2021**

| | | |
|---|---|---:|
| **Cash Flows from (Provided to) Operating Activities** | | |
| Net Income (Loss) form Operations | $ | 4,510,714 |
| Adjustments to reconcile increase  in net assets | | |
| to net cash provided by (used in) operating activities: | | |
| Depreciation | | 1,737,201 |
| | | 6,247,915 |
| (Increase) Decrease in operating assets: | | |
| Accounts Receivable | | 560,798 |
| Other Receivables | | (1,375,598) |
| Other Assets | | 117,436 |
| Prepaid Expenses | | (92,860) |
| Inventory | | (492,417) |
| Increase (Decrease) in operating liabilities: | | |
| Accounts Payable | | 889,036 |
| Accrued Credit Cards Payable | | (13,893) |
| Accrued Liabilities | | 313,495 |
| Accrued Payroll and Withholdings | | 109,424 |
| Accrued Corporate Taxes | | (1,368,593) |
| Current Portion of Long Term Debt | | (584,000) |
| | | 4,310,743 |
| Less: Gain on Sale of Asset | | (540,589) |
| **Net Cash Flows from (Provided to) Operating Activities** | | 3,770,154 |
| **Cash Flows From ( Provided to) Investing Activities** | | |
| Proceeds from Sale of Asset | | 1,932,208 |
| Purchase of Fixed Assets | | (1,826,778) |
| **Net Cash Flows From (Provided to) Provided to Investing Activities** | | 105,430 |
| **Cash Flows From (Provided to) Financing Activities** | | |
| Payments on Notes Payable | | (1,045,710) |
| **Net Cash Flows from (Provided to) Financing Activities** | | (1,045,710) |
| **Net Increase (Decrease) in Cash From Operating Activities** | | 2,829,874 |
| Cash and Cash Equivalents at Beginning of Year | | 2,574,778 |
| **Cash and Cash Equivalents at End of Year** | $ | 5,404,652 |

Interest Expense for the year was in the amount of $ 125,242.
Taxes Paid for the year was in the amount of $ 1,907,158.

*See Notes to Consolidated Financial Statements.*

8

CONFIDENTIAL

SMART_B&R 000217

Smart Communications Holding, Inc.
Notes to Consolidated Financial Statements
For the year ended December 31, 2021

## Note A – Significant Accounting Policies

*Basis of Consolidation*
The consolidated financial statements include the financial statements of Smart Communications, U.S, Smart Communications, Pasco, and Smart Communications, Collier. Smart Communications Holding, Inc, owns 100 % of these companies. All transactions between Smart Communications Holding, Inc. and subsidiaries have been eliminated upon consolidation.

*Concentration of Credit Risk*
The Company normally maintains sufficient cash to meet its anticipated working capital needs. Cash in deposit accounts may, at times, exceed the insured amount of $ 250,000 provided by the Federal Deposit Insurance Corporation (FDIC). However, The Company has not experienced any losses in such accounts and believes it is not exposed to any significant credit risk in these accounts.

*Cash and Cash Equivalents*
For purposes of the statement of cash flows, the Company considers all highly liquid investments, generally those assets readily convertible to known amounts of cash with a maturity of three months or less, to be cash equivalents.

*Accounts Receivable*
Accounts Receivable are customer obligations due under normal trade conditions that have been received after the year end but attributable to the current year. The Company considers these accounts receivable to be fully collectible; accordingly, no allowance for doubtful accounts is require. If amounts become uncollectible, they are charged to operations when that determination is made.

*Inventory*
Inventory consists of tablets, kiosks, and various computer parts and accessories, and is stated at the lower of cost or market using the first-in, first-out method.

*Property and Equipment*
Property and equipment is stated at cost less accumulated depreciation. Provisions for depreciation of assets are computed using the straight-line at rates which are intended to amortize the cost of such assets over their useful lives which range from 5 to 40 years. Leasehold Improvements are amortized over the service lives of the improvements, generally 40 years.

*Revenue Recognition*
Revenues are generally recognized when realized or realizable, and when earned (generally when goods are transferred or services rendered), no matter when payment is received. The Company recognizes revenue from messaging services at the point of sale, net of sales taxes (if any). Service contract revenue is recognized when the service is performed.

The Company adopted FASB ASC 606, *Revenues from Contracts with Customers*, which amended the existing standards for revenue recognition. The adoption of this new revenue standard does not have a significant impact on the amount and timing of revenue recognized in the Company's financial statements. Based on the Company's evaluation process and review of its contracts with customers, the timing and amount of revenue recognized previously is consistent with how revenue is recognized under the new standard. No changes were required to reported revenues as a result of the adoption of FASB ASC 606.

*9*

CONFIDENTIAL

SMART_B&R 000218

**Smart Communications Holding, Inc.**
**Notes to Consolidated Financial Statements**
**For the year ended December 31, 2021**

====================================================================

### Note A – Significant Accounting Policies (continued)

*Use of Estimates*
These financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America. Management is required to make certain estimates and assumptions that affect amounts reported in the financial statements. Actual results may differ from these estimates.

*Advertising Costs*
Advertising costs are charged to operations when incurred. For the year ended December 31, 2021, advertising expense amounted to $ 94,873.

### Note B – Property and Equipment

Property and equipment are stated at cost. All property and equipment and leasehold improvements are depreciated on the straight-line method. Repairs and maintenance of property and equipment are charged to operations, and major improvements are capitalized. Upon retirement, sale or other disposition of assets, the costs and accumulated depreciation are eliminated from the accounts, and any resulting gain or loss is included in operations.

For the year ended December 31, 2021, property and equipment consists of the following:

| Description | | Cost | | 2021 Depreciation | | 12.31.2021 Accumulated Depreciation | | Net Book Value |
|---|---|---|---|---|---|---|---|---|
| Kiosk Computer System | $ | 2,987,602 | $ | 421,239 | $ | 2,377,543 | $ | 610,059 |
| Computer Software | | 2,987,875 | | 597,009 | | 1,780,970 | | 1,206,905 |
| Vehicles | | 2,514,000 | | 486,741 | | 842,006 | | 1,671,994 |
| Display System | | 21,280 | | 3,040 | | 9,300 | | 11,980 |
| Demo Build | | 22,500 | | 4,500 | | 18,883 | | 3,617 |
| Furniture and Fixtures | | 131,051 | | 21,122 | | 72,854 | | 58,197 |
| Buildings | | 4,034,661 | | 110,531 | | 171,972 | | 3,862,689 |
| Leasehold Improvements | | 355,710 | | 7,381 | | 17,822 | | 337,888 |
| Mail Service Equipment | | 414,217 | | 59,174 | | 182,453 | | 231,764 |
| Equipment | | 185,252 | | 26,464 | | 51,605 | | 133,647 |
| | $ | 13,654,148 | $ | 1,737,201 | $ | 5,525,408 | $ | 8,128,740 |

All property is depreciated using the straight-line method. Furniture and fixtures, computer software, demos, kiosks, and vehicles are depreciated over 5 years. Buildings and leasehold improvements are depreciated over 39 years, and machinery and equipment are depreciated over 7 years. Assets commence depreciation as of the first full month of usage.

10

CONFIDENTIAL

SMART_B&R 000219

**Smart Communications Holding, Inc.**
**Notes to Consolidated Financial Statements**
**For the year ended December 31, 2021**

### Note C – Subsequent Events

Management has evaluated subsequent events through December 21, 2022, the date financial statements were available to be issued. No events occurred or are pending through this date which would have a material effect on the financial statements or require disclosure in the financial statements.

### Note D – Loans To Shareholder

At December 31, 2021, a 50 % shareholder owed the Company loans in the amount of $ 428,855. No interest has been accrued on the loans.

### Note E – Accounts Receivable – Affiliated Entities

As of December 31, 2021, the Company has accounts receivable from the following affiliated entities:

| Description | | Amount |
|---|---|---|
| Smart Communications U.S., Inc. | $ | 72,136 |
| LOCO Florida, LLC | | 35,830 |
| Mailguard Federal, Inc. | | 1,622,935 |
| HLFIP Holding, Inc. | | 169,085 |
| | $ | 1,899,986 |

### Note F – Long Term Debt

On May 19, 2020, the Company purchased three Ford Trucks at a total financing cost of $ 93,319.44. Payments on this loan commenced as of July 3, 2020 in the amount of $ 622.02 per truck, including interest at the annual rate of 7.2900%, payable monthly for 60 months for each truck. Final payment on this loan is due on June 3, 2025. As of December 31, 2021, the principal balance on the vehicle loan is in the amount of $ 68,970.81. Interest expense on this loan for the year ended December 31, 2021 is in the amount of $ 5,674.83.

As of January 1, 2019, The Company entered into a Technology License Agreement with LATTICE Incorporated. The Agreement is a Licensing Agreement with LATTICE Software wherein Smart Communications Holding, Inc. pays LATTICE a license fee, in the amount of $ 2,850,000.00 payable in monthly installments of $ 47,500.00 for sixty (60) consecutive months beginning on February 1, 2019. Upon payment in full of the License fee, Smart Communications Holding, Inc. shall pay LATTICE an annual royalty payment of $ 100.00 each year (the "Royalty Fee"). The Royalty Fee shall be due on or before December 31, of each year beginning in 2025 and shall continue until the Licensing Agreement is terminated.

As of December 31, 2021, the balance due to LATTICE on the Licensing Agreement is in the amount of $ 1,187,500.00.

*11*

CONFIDENTIAL

**Smart Communications Holding, Inc.**
**Notes to Consolidated Financial Statements**
**For the year ended December 31, 2021**

## Note G – Income Taxes

Income taxes are provided for the tax affects of transactions reported in the financial statements and consist of taxes currently due plus deferred taxes. Deferred taxes are recognized for differences between the basis of assets and liabilities for financial statement and income tax purposes. The differences relate primarily to depreciation (use of different depreciation methods for financial statement and income tax purposes), and legal expenses not yet recognized on the Company's tax returns. The deferred tax assets and liabilities represent the future tax return consequences of timing differences, which will either be taxable or deductible when the assets and liabilities are recovered or settled.

The Company is required to recognize, measure, classify and disclose in the financial statements uncertain tax positions taken or expected to be taken in the Company's tax returns. Management has determined that the Company does not have any uncertain tax positions and associated unrecognized benefits that materially impact the financial statements or related disclosures. Since tax matters are subject to some degree of uncertainty, there can be no assurance that the Company's tax returns will not be challenged by the taxing authorities and that the Company will not be subject to additional tax, penalties, and interest as a result of such challenge. Penalties and interest assessed by income taxing authorities would be included in operating expenses.

The Company is taxed as a C Corporation under the Internal Revenue Code. For the year ended December 31, 2021, the provision for income taxes consists of the following:

|  |  | 2021 |
| --- | --- | --- |
| Provision for Income Taxes: |  |  |
| Current Income Taxes: |  |  |
| Florida Income Tax | $ | 119,794 |
| Federal Income tax |  | 783,902 |
|  | $ | 903,696 |
| Analysis of Deferred Tax Assets (Liabilities) |  |  |
| Depreciation | $ | 196,275 |
| Legal and Professional Fees |  | 430,245 |
|  | $ | 626,520 |

*12*

CONFIDENTIAL

SMART_B&R 000221

# EXHIBIT 26

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HLFIP HOLDING, INC. d/b/a SMART COMMUNICATIONS IP HOLDINGS, | : : : | Civil No. 1:20-CV-00186 |
| Plaintiff, | : : | |
| v. | : : | |
| YORK COUNTY, PENNSYLVANIA, *et al.*, | : : : | |
| Defendants. | : : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Before the court is Defendants' motion for judgment on the pleadings. (Doc. 46.)  Defendants argue that the patent at issue claims patent-ineligible subject matter pursuant to 35 U.S.C. § 101.  Applying the standard established by the Supreme Court in *Alice Corp. Pty. Ltd. v. CLS Bank International*, this court finds that the claims at issue are directed to an abstract idea and Plaintiff has not adequately alleged an inventive concept sufficient to survive a motion for judgment on the pleadings.  For the reasons that follow, the court will grant Defendants' motion.  (Doc. 31.)

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This action arises from Defendants' alleged infringement of Plaintiff's patented MailGuard technology.  (Doc. 1, ¶ 1.)  Specifically, the complaint alleges that Defendants engaged TextBehind, Inc. to provide services and technology to eliminate the original postal mail addressed to inmates at York County Prison

1

("YCP") by scanning the mail and distributing it electronically to inmates utilizing technology that infringes on Plaintiff's MailGuard technology. (*Id.* ¶ 17–19.) On the basis of these facts, Plaintiff filed a two-count complaint on February 3, 2020, alleging patent infringement and deprivation of federal rights. (Doc. 1.) Count one of the complaint sets forth a claim for patent infringement under 35 U.S.C. § 271 of Plaintiff's Patent Number: US 10,291,617 ("'617 Patent"). (*Id.*)

The following facts are gleaned from Plaintiff's complaint and the '617 Patent attached thereto for the purpose of ruling on Defendants' motion for judgment on the pleadings. Plaintiff HLFIP Holding, Inc., doing business as Smart Communications IP ("Smart Communications"), is the record title owner of the '617 Patent. (Doc. 1, ¶ 10.) The '617 Patent was filed on May 12, 2016, and issued on May 14, 2019, with the title of "Correctional Postal Mail Contraband Elimination System." (*Id.*, ¶ 10; Doc. 1-2, p. 2.)[1] Summarizing the background of the '617 Patent, Smart Communications avers that: "[p]ostal mail is the number-one method for sneaking illegal drugs, contraband, and secret communications into correctional facilities." (Doc. 1, ¶ 14.) As a result, "the elimination of postal mail is critical to the safe operation of correctional facilities in that it significantly reduces, and in many cases altogether stops, the infiltration of those undesirable and potentially dangerous items." (*Id.*)

---

[1] For ease of reference, the court utilized the page numbers in the CM/ECF header.

The abstract of the '617 Patent describes it as follows:

A method and system for eliminating contraband in postal mail at a correctional facility comprising a central processing facility and a network of inmate email kiosks and correctional institution staff review stations.  The postal mail utilizes scanning stations to create electronic version of the mail and associates various information about the sender, recipient, mail contents, and institution into a format that is easily reviewable and provides tracking data.  The scanned mail may then be made available to the intended inmate and institution staff.  Institution staff may also then access the associated information and tracking data.

(Doc. 1-2, p. 2.)

The amended complaint alleges infringement of claims 1 and 13 of the '617

Patent.  (See Doc. 1.)  Independent Claim 1 provides:

A method for eliminating contraband in postal mail for one or more remote correctional facilities comprising, receiving postal mail at a central facility; identifying mail information comprising recipient inmate and inmate institution; identifying an inmate email account and the associated inmate identifier; identifying content information; associating said sender information and said content information with said inmate identifier; screening said postal mail for contraband; scanning said content information and sender information and generating a scanned electronic copy and a text-readable version of said electronic copy wherein said scanned electronic copy and said text-readable version are stored electronically in a database using the inmate identifier as the primary key; storing an electronic copy of said electronic copy and said text-readable version for electronic transmission to said recipient inmate; associating a contraband flag with said electronic copy and said text-readable version; associating said electronic copy and said text-readable version with an access flag, said access flag denies access to said inmate to said electronic copy and said text-readable version based on content or information contained in said electronic copy and said text-readable version; associating said electronic copy with said inmate email account and the associated inmate identifier; assigning the electronic copy with an unique identifier; presenting said electronic copy for review by institution

staff; determining access to said electronic copy by said recipient inmate wherein access may be granted or denied based upon whether contraband was discovered in said postal mail; displaying postal mail to said recipient inmate associated with said inmate identifier on a remote kiosk capable of receiving and sending electronic mail; and logging the date of receipt and each access to said electronic copy by said recipient inmate or said institution staff; wherein the risk of said recipient inmate receiving contraband in postal mail is essentially eliminated.

(Doc. 1-2, p. 27.) Claim 13 is a system claim which mirrors the method claim 1.

Claim 13 provides:

A system for eliminating contraband in postal mail for one or more correctional facilities comprising: receiving mail at a central facility, said central facility having a scanning station configured to create an electronic copy of said postal mail and convert said electronic copy to a text-readable version of electronic copy, said scanning station with an input interface adapted to attach recipient inmate information said electronic copy and said text-readable version of said postal mail and said electronic copy being assigned an unique identifier; and create associations between said electronic copy and said text-readable version and the associated inmate identifier associated with an inmate email account for an inmate at a correctional situation, said electronic copy also having an unique identifier assigned to the electronic copy, a record of the sender of the postal mail, and a log comprising the date and time the postal mail was scanned and said interface capable of associating said electronic copy and said text-readable version with an access flag, said access flag denies access to said inmate to said electronic copy and said text-readable version based on content or information contained in said electronic copy; a server in communication with said scanning station and a network wherein said scanning station communicates said electronic copy and said log to said server over said network and said server store said electronic copy and said log; an inmate kiosk in a remote correctional institution capable of receiving and sending electronic mail in communication with said server over a kiosk network wherein said recipient inmate may access said electronic copy through said kiosk, said kiosk being adapted to cause said server to log access of said electronic copy by said inmate

4

using their unique inmate identifier; and a viewing station in communication with said server wherein correctional facility personnel may screen said electronic copy prior to allowing access by said inmate.

(*Id.*, p. 28.)

Smart Communications asserts that Defendants are utilizing TextBehind's postal-mail-elimination methods and systems, which infringe on the '617 Patent because it includes at least the steps of:

(1) [R]eceiving postal mail and associating that mail with an intended inmate recipient; (2) screening the postal mail for contraband; (3) scanning the postal mail; (4) generating a text-readable electronic copy of the scanned postal mail for investigative and inmate-delivery purposes; (5) electronically storing the electronic copy of the scanned postal mail for storage and review by YCP personnel; (6) flagging the electronic copy of the postal mail if it is found to contain contraband or other inappropriate content; (8) electronically delivering approved copies of the scanned postal mail to the intended inmate recipient for viewing on a remote kiosk; and (9) logging details relating to the inmate recipient's access and review of the electronic copy of the scanned postal mail.

(Doc. 1, ¶ 27.) Smart Communications also asserts that the TextBehind system Defendants are using is infringing on the '617 Patent because it contains the following components:

(1) [A] scanning station capable of creating a text-readable electronic copy of postal mail, and including an input interface capable of (a) attached recipient-inmate information to the electronic copy of the postal mail and associating the electronic copy of the postal mail with an email account belonging to the intended inmate recipient, and (b) associating the electronic copy of the postal mail with an access flag that denies access to the intended inmate recipient if the electronic copy of the postal mail contains contraband or other inappropriate content; (2) a server in communication with the

scanning station and a network, such that the scanning station
communicates the electronic copy of the postal mail and its
identifying information to the server for storage; (3) a remote kiosk
in communication the server that is capable of sending and receiving
electronic mail, through which the intended inmate recipient can
access the electronic copy of the postal mail; and (4) a viewing
station in communication with the server, through which YCP
personnel can screen and review the electronic cop of the postal mail
prior to delivery to the intended inmate recipient.

(*Id.*, ¶ 28.)

Smart Communications alleges that Defendants have been and are inducing
infringement of the '617 Patent by actively and knowingly including others—here,
personnel at York County Prison ("YCP")—to use the TextBehind postal-mail-
elimination methods and systems.  (*Id.*, ¶ 29.)  Additionally, Smart
Communications alleges that Defendants have done so with knowledge of the '617
Patent since as early as January 7, 2020, when a letter was sent to Warden Doll
advising him of the alleged infringement and attaching a copy of the '617 Patent.
(*Id.*, ¶¶ 29, 33.)

Defendants filed the instant motion for judgment on the pleadings and a
supporting brief on February 10, 2021.  (Docs. 46 & 47.)  Plaintiff timely filed a
brief in opposition.  (Doc. 55.)  Defendants then filed a reply brief.  (Doc. 58.)[2]
Thus, the motion is now ripe for resolution.

---

[2] Defendant also submitted a notice of supplemental authority on April 8, 2022.  (Doc. 129.)  The
supplemental authority is a decision from the United States Court of Federal Claims in which the
defendant's motion for summary judgment arguing patent ineligibility pursuant to 35 U.S.C. §
101 was granted because the plaintiff's patent claims were directed to the abstract idea of

## JURISDICTION

Because this case raises a federal question of patent infringement under 35 U.S.C. § 271, the court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).  Further, venue is appropriate under 28 U.S.C. §§ 1391 and 1400(b).

## STANDARD OF REVIEW

A motion for judgment on the pleadings is the procedural hybrid of a motion to dismiss and a motion for summary judgment.  *Westport Ins. Corp. v. Black, Davis, & Shue Agency, Inc.*, 513 F. Supp. 2d 157, 162 (M.D. Pa. 2007).  Federal Rule of Civil Procedure 12(c) provides: "[a]fter the pleadings are closed–but early enough not to delay trial–a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  Under Rule 12(c), judgment should be granted where:

> the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law.  In considering a motion for judgment on the pleadings, the trial court is required to view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party.  In this fashion the courts hope to insure that the rights of the nonmoving party are decided as fully and fairly on a rule 12(c) motion, as if there had been a trial.

*Inst. for Scientific Info., Inc. v. Gordon & Breach Sci. Publishers, Inc.*, 931 F.2d 1002, 1004 (3d Cir. 1991) (citing *Soc'y Hill Civic Ass'n v. Harris*, 632 F.2d 1045,

---

processing undeliverable mail and providing an updated address.  *See Return Mail, Inc. v. United States*, No. 11-130C, 2022 U.S. Claims LEXIS 567 (Fed. Cl. Apr. 6, 2022).

1054 (3d Cir. 1980); 5C Charles A. Wright & Arthur R. Miller, FED. PRACTICE

AND PROCEDURE, § 1367, at 205 (3d ed. 2004)).

Thus, judgment on the pleadings will be granted where the movant clearly

establishes no material issue of fact and entitlement to judgment as a matter of law.

*Id.*; *see also Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290 (3d

Cir.1988) (quoting *Soc'y Hill Civic Ass'n*, 632 F.2d at 1054).

A court deciding a motion under Rule 12(c) "must 'view the facts presented

in the pleadings and the inferences to be drawn therefrom in the light most

favorable to the non-moving party.'"  *Green v. Fund Asset Mgmt., L.P.*, 245 F.3d

214, 220 (3d Cir. 2001) (quoting *Inst. for Scientific Info.*, 931 F.2d at 1004).

## DISCUSSION

In their motion, Defendants argue that the court should dismiss the

complaint because the '617 patent claims patent-ineligible subject matter—an

abstract idea—under 35 U.S.C. § 101.  (Doc. 46.)

### A. Patent Eligibility Standard

Section 101 provides, "[w]hoever invents or discovers any new and useful

process, machine, manufacture, or composition of matter, or any new and useful

improvement thereof, may obtain a patent therefor, subject to the conditions and

requirements of this title."  35 U.S.C. § 101.  There are three subject matter

8

categories that are patent ineligible: laws of nature, natural phenomena, and abstract ideas. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).

Because patent eligibility under section 101 is a question of law, it can be determined at the motion to dismiss stage. *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015); *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018) (hereinafter "*Aatrix I*"). However, "plausible factual allegations may preclude dismissing a case under § 101 where, for example, nothing on the record . . . refutes those allegations as a matter of law or justifies dismissal under rule 12(b)(6)." *Aatrix I*, 882 F.3d at 1125 (alterations and internal quotations omitted) (quoting *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F. 3d 1089, 1097 (Fed. Cir. 2016)). If there are claim construction disputes at this stage, the court must either adopt the non-moving party's constructions or "resolve the disputes to whatever extent is needed to conduct the § 101 analysis, which may well be less than a full, formal claim construction." *Id.* (citing *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1352 (Fed. Cir. 2016); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1346 (Fed. Cir. 2014); *Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369, 1373 (Fed. Cir. 2016)). As explained below, the court finds that there are no claim construction disputes that need to be resolved before conducting the § 101 analysis here.

In determining section 101 eligibility, the court need not "parse each individual claim," rather, analyzing a patent's representative claim is sufficient. *Wolf v. Capstone Photography, Inc.*, No. 2:13-CV-09573, 2014 WL 7639820, at *10 n.3 (C.D. Cal. Oct. 28, 2014) (citations omitted). Here, Defendants assert that Claim 1 may be treated as representative because the dependent claims add trivial, non-technical imitations, and system claim 13 mirrors the limitations of method Claim 1. (Doc. 47, p. 16, n.1.) As Plaintiff does not contest this assertion, the court will treat Claim 1 as representative.

In *Alice*, the Supreme Court reaffirmed the framework set forth in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66 (2012), "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 573 U.S. at 217. The court must first determine "whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* If so, the court must then "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 78–79.)

10

### 1. *Alice* Step One

"The 'abstract ideas' category embodies 'the longstanding rule that an idea of itself is not patentable.'" *Alice*, 573 U.S. at 218 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)). While the Federal Circuit has not established "a definitive rule to determine what constitutes an abstract idea," it has "held claims ineligible as directed to an abstract idea when they merely collect electronic information, display information, or embody mental processes that could be performed by humans." *Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1346–47 (Fed. Cir. 2017). Courts have found it instructive to "compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Axcess Int'l, Inc. v. Genetec (USA) Inc.*, 375 F. Supp. 3d 533, 537 (D. Del. 2019) (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016)). However, courts "must be careful to avoid oversimplifying the claims because 'at some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'" *Id.* (alterations omitted) (quoting *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016)).

Claim 1 describes a "method for eliminating contraband in postal mail for one or more remote correctional facilities," which includes identifying specific characteristics of the postal mail, screening it for contraband, scanning the sender and content information, generating a text-readable version of the electronic copy

11

to be stored electronically in a database, and associating a contraband flag that can deny the inmate access.  (Doc. 1-2, p. 27.)

Defendants argue that the '617 Patent fails *Alice* step one because it patents an ineligible method of organizing human activity—"receiving, sorting, reviewing, logging, screening, and distributing inmate postal mail—using generic computer components like scanners, terminals, servers, and kiosks and generic computer processes like generating text-searchable documents and tagging electronic files." (Doc. 47, p. 6.)  Defendants note that the specification admits that postal mail is a federal right for inmates in correctional facilities and the facilities have therefore been manually receiving, sorting, reviewing, logging, screening, and distributing inmate mail for years.  (*Id.*, at 17.)  Thus, "the purported invention is simply to computerize a process that, as the specification admits, correctional facilities have carried out manually for years."  (*Id.*, at 6.)  Defendants contend that the claims in the '617 Patent merely recite an automated version of these longstanding human practices and it is therefore not patent-eligible.  (*Id.*, at 17.)

Defendants cite several cases they believe to be analogous to the case at hand, in which the asserted patents at issue were found to be directed to abstract ideas.  Where a claim was "directed to the use of persistent identifiers to implement targeted marketing," the Federal Circuit held that the claim was directed to an abstract idea because targeted marketing "is a fundamental practice

that dates back to newspaper advertisements." *Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882, 887 (Fed. Cir. 2019).  The Federal Circuit also held that claims directed to "using a marking affixed to the outside of a mail object to communicate information about the mail object, *i.e.*, the sender, recipient, and contents of the mail object" were directed to an abstract idea.  *Secured Mail Sols., LLC v. Universal Wilde, Inc.*, 873 F. 3d 905, 911 (Fed. Cir. 2017).  Defendants argue that the claims at issue here are likewise fundamental practices.

Additionally, Defendants specifically point to numerous cases in which courts have held that if a patent's claims merely automate manual processes, they are directed to abstract ideas.  *See Ericcsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1327 (Fed. Cir. 2020) (holding that processes at issue were "exactly the sort of process that can be performed in the human mind, or by a human using a pen and paper, which we have repeatedly found unpatentable"); *Affinity Labs of Tex., LLC v. Amazon.com, Inc.*, 838 F.3d 1266, 1270 (Fed. Cir. 2016) (holding that in *Alice* step one, "it is often helpful to ask whether the claims are directed to an improvement in the functioning of a computer, or merely adding conventional computer component to well-known business practices," with the latter being abstract) (quoting *Enfish*, 822 F.3d at 1338); *Secured Mail*, 873 F.3d at 910 (where the claims stated various identifiers affixed to a mail object, stored in a database, scanned from the mail object, and retrieved from the database, but "[n]o

13

special rules or details of the computers, databases, printers, or scanners [were] recited," the court held that the claims were directed to an abstract idea); *Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1303, 1335 (Fed. Cir. 2015) (holding that claims employing a computer to "improve the performance of [price] determination" but that did not "improv[e] computer performance" were not patent-eligible); *Ficep Corp. v. Peddinghause Corp.*, 2021 WL 254104, at *2 (D. Del. Jan. 26, 2021) (although the asserted patent was found to be patent-eligible, the court stated that "if a claim simply takes . . . something that humans have done for a long time [] and does nothing more than make use of a generic computer to perform [it] faster or more accurately . . . then the claim is ineligible").

Smart Communications first notes that issued U.S. patents are presumed valid pursuant to 35 U.S.C. § 282(a). (Doc. 55, p. 5.) This presumption creates a heightened burden for infringers, who must prove invalidity by clear and convincing evidence. (*Id.*) Smart Communications also argues there has not yet been a claim construction hearing and that "[t]he analysis of whether claims recite patent-eligible subject matter requires a complete understanding of what the claims mean." (*Id.*, at 12–14.) Smart Communications then asserts that the claims of the '617 Patent are anything but fundamental, and that they describe specific systems and methods for eliminating contraband transmitted through the mail at correctional facilities. (*Id.*, at 14–21.)

In arguing that the claims at issue here are not fundamental, Smart Communications first cites case law emphasizing that the claims of the asserted patent must be taken as a whole, rather than individually. *Cardionet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1368 (Fed. Cir. 2020). Then, Smart Communications points to several cases in which the claims of the asserted patents focus on a specific means or method that improves longstanding issues, and the asserted patents were found to be patent-eligible. *Cardionet*, 955 F.3d at 1368 (in beginning the *Alice* step one analysis, the court "look[ed] to whether the claims focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is an abstract idea and merely invoke generic processes and machinery") (quoting *McRO, Inc., v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016)). Smart Communications urges the court to deny Defendants' motion because utilizing technology to make improvements to the underlying process remains patentable. (Doc. 55, pp. 21–23.)

In their reply brief, Defendants argue that no deference is owed to the Patent Office examiner's determination regarding the validity of the patent, as that is already captured in the statutory presumption of validity, which is rebuttable. (Doc. 58, p. 18.) In response to the arguments relating to claim construction, Defendants assert that claim construction is not necessary before determining patent invalidity, particularly where Smart Communications has not specified any

claim term or phrase that needs to be construed before determining patent eligibility.  (*Id.*, at 16–17.)

First, despite Smart Communications' arguments to the contrary, the court notes that claim construction is not necessary prior to determining patent eligibility.  *See Elec. Commc'n Techs., LLC v. ShoppersChoice.com, LLC*, 958 F.3d 1178, 1187 (Fed. Cir. 2020).  This is particularly so where the patentee does not explain how it might benefit from a particular term's construction under an *Alice* analysis.  *Simio, LLC v. Flexsim Software Prods.*, 983 F.3d 1353, 1365 (Fed. Cir. 2020).  Because Smart Communications only generally argued that any eligibility analysis should not occur until after claim construction, but has not indicated which term(s) require construction before the court can undertake such analysis, the court finds no reason to defer ruling on patent eligibility until after claim construction.[3]

As to the rebuttable presumption that the patent is valid, it is notable that the patent application was initially rejected, as the Examiner found that the claims "describe[d] an abstract idea of collecting, analyzing, and displaying data/content"

---

[3] While the court's determination here is based on relevant case law from the Federal Circuit, the court also notes that prior to the instant motion being filed, Smart Communications completed claim construction briefing in a case in Tennessee alleging infringement of the same patent and asserted that no term required construction.  *See HLFIP Holding, Inc. v. Rutherford Cnty., Tenn.*, No. 3:19-cv-714 (M.D. Tenn) at Doc. 172.  Furthermore, after the instant motion was fully briefed, the parties here completed claim construction briefing and Smart Communications likewise asserted that no term required construction.  (Doc. 80.)  Thus, Smart Communications has failed at several junctures to assert any specific terms that require construction.

and that while the claims "recite[d] some additional elements such as 'associating a contraband flag,' 'presenting electronic copy for staff review,' and 'logging the date of receipt of the electronic copy,'" these elements did not alter the analysis because they were simply "[g]eneric computer components recited as performing generic computer functions." (Doc. 47-2, pp. 3–4.) The claims were amended and limitations were added indicating that a "text-readable" electronic copy would be created, the main may be intended for "one or more remote correctional facilities," and language relating to "access flags" and "identifiers" was added. (Docs. 47-3 & 47-4.) The Examiner allowed these amended claims but there was no analysis or explanation of how the additional claims overcame the abstractness or conventionality issues. (Doc. 47-5.) In this instance, the court cannot defer to the Examiner's rationale because no explanation or rationale was provided. The court recognizes the statutory presumption of validity, but finds that the presumption has been rebutted in this case.

An examination of the text of the '617 Patent claims reveals a series of steps that describe an abstract idea—namely, identifying characteristics of postal mail (such as the recipient-inmate, the inmate's institution, the sender, etc.), screening it for contraband, scanning the sender and content information, generating a text-readable version of the electronic copy to be stored electronically, and associating a contraband flag that can deny the inmate access. These steps are analogous to

the steps of "collecting data," "recognizing certain data within the collected data set," and "storing that recognized data in memory" that the Federal Court found to be abstract in *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014).  *See also Return Mail, Inc.*, 2022 U.S. Claims LEXIS 567, at *20.  This is true whether looking at the claim limitations individually or collectively as a whole.

Additionally, contrary to Smart Communications' assertion, the claim does not escape abstractness because it is directed to a specific method that improves a longstanding issue.  Rather, by Smart Communications' own admission, there have been manual systems in place to combat this "longstanding issue" for many years.  Smart Communications has not explained any claim limitations that involve a process not previously being conducted manually.

The '617 Patent is substantially different in this respect from patents that have been found eligible.  In *McRO*, for example, the asserted patent involved a process that improved computer animation by using a process *different* from the prior-art techniques employed manually.  *McRO*, 837 F.3d at 1314 (emphasis added).  Where the asserted patent was an "unconventional technological solution" that achieved an improvement in computer functionality, the court held that the patent was valid.  *Amdocs (Isr.) Ltd. V. Openet Telecom, Inc.*, 841 F.3d 1288,

1300–01 (Fed. Cir. 2016).  In *CardioNet*, the cardiac-monitoring system used new techniques that doctors were not previously using.  *CardioNet*, 955 F.3d at 1370.

Conversely, where the asserted patent involves claims describing the sort of process that could be performed in the human mind or by a human using a pen and paper, they are not patentable.  *Ericsson*, 955 F.3d at 1327.  In *Affinity Labs*, for example, the asserted patent was ineligible because the claims were adding conventional computer components to well-known business practices rather than an actual improvement.  *Affinity Labs*, 838 F.3d at 1270.  Courts have repeatedly held that if a claim takes an abstract idea—something that humans have done for a long time–and does nothing more than make use of a generic computer to perform that task faster or more accurately than a human could, then the claim is ineligible. *Ficep Corp.*, 2021 U.S. Dist. LEXIS 15881, at *6; *McRO*, 837 F.3d at 1314.

It is evident that the claim limitations here recite the conventional, historically manual method of processing inmate mail, screening it for contraband, and distributing it to inmates.  While the '617 Patent may improve the speed and accuracy of recordkeeping and recognizing trends with inmate mail over time, there is nothing in the record before the court that the '617 Patent does anything more than perform this task faster and more accurately than humans have been doing for years.  Accordingly, reviewing the limitations in claim 1 individually and as a whole, the parties' competing characterizations, and comparing claim 1 to

19

claims in previous cases, the court concludes that claim 1 is directed to an abstract idea within the meaning of *Alice* step one.

## 2. *Alice* Step Two

In evaluating *Alice* step two, courts must look for an "inventive concept" by analyzing "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 78–79). The additional features or elements must ensure "that the [claim] is more than a drafting effort designed to monopolize the [abstract idea]." *Id.* at 221 (quoting *Mayo*, 566 U.S. at 72, 79). Furthermore, the patent-eligible application requires "more than simply stat[ing] the [abstract idea] while adding the words 'apply it.'" *Id.* (quoting *Mayo*, 566 U.S. at 72).

However, "patentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6)." *Aatrix I*, 882 F.3d at 1126–27 (citing *BASCOM Glob. Internet Servs., Inc.*, 827 F.3d at 1352). "[P]lausible factual allegations may preclude dismissing a case under § 101 where, for example, nothing in the record . . . refutes those allegations as a matter of law or justifies dismissal under Rule 12(b)(6)." *Id.* (internal quotations and citations omitted) (quoting *FairWarning IP, LLC*, 839 F.3d at 1097). "Whether a claim element or combination of elements would have been well-understood, routine,

and conventional to a skilled artisan in the relevant field at a particular point in time may require weighing evidence, making credibility judgments, and addressing narrow facts that utterly resist generalization." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 890 F.3d 1354, 1355 (Fed. Cir. 2018) (hereinafter "*Aatrix II*") (alterations and quotations omitted) (quoting *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. The Village at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018)).  On the other hand, "[i]f the specification admitted that the claim elements are well-understood, routine, and conventional, it would be nearly impossible for a patentee to show a genuine dispute." *Id.* at 1356.

Defendants argue that the claims do not contain an inventive concept, whether considered individually or as an ordered combination, because they simply implement the ineligible concept using generic computer components and techniques.  (Doc. 47, pp. 22–24.)  They present similar arguments as they presented for step one.  (*Id.*)

Smart Communications' response in opposition focuses primarily on a lack of complete preemption.  (Doc. 55, pp. 23–27.)  Smart Communications asserts that if the court finds at step one that the '617 Patent is directed to an abstract idea, that the court should nonetheless find the remainder of the claim, taken as a whole, limits the claim to a specific implementation of that idea, presenting no danger of broadly pre-empting the distribution of mail to inmates at correctional facilities.

21

(*Id.*, at 23–24.)  Smart Communications argues that, pursuant to *Alice*, claims presenting no risk of preempting the use of underlying abstract ideas remain eligible for patent protection.  (*Id.*, at 24.)

In their reply brief, Defendants acknowledge that the claims in the '617 Patent are specific in that they do not cover *all* possible methods of processing and distributing inmate mail, but assert that specificity or the absence of complete preemption does not equal eligibility.  (Doc. 58, pp. 14–15.)  Citing Federal Circuit cases, Defendants contend that preemption may signal patent ineligible subject matter, but the absence of complete preemption does not demonstrate patent eligibility.  (*Id.*, at 14) (citing *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015)).  Additionally, Defendants argue that the mere fact that the '617 Patent is directed to solving problems specific to correctional facilities is not sufficient to make the '617 Patent eligible.  (*Id.*, at 14) (citing *Alice*, 573 U.S. at 222).

It is notable that Smart Communications does not make any specific allegation that the '617 Patent contains an inventive concept.  The crux of the *Alice* step two analysis is whether there exists an inventive concept such that the application of the asserted patent is significantly more than the abstract idea the claims are directed to.  Here, however, Defendants have argued that because the claims do nothing more than use generic computers to automate historically

22

manual processes, there is no inventive concept present.  In response, Smart Communications summarily states that "[t]he limitations, as part of the methods and systems claimed as a whole, provide an inventive concept that solves identified problems in the underlying art and, importantly, does not risk pre-empting other methods and systems of delivering inmate mail."  (Doc. 55, p. 26.)  What is missing, however, is any explanation of *how* any of the claim limitations represent a new or useful application.

The limitations of the '617 patent claims were well-known and conventional at the time of the patent application, including the additional claims Smart Communications added in order to overcome the initial denial of the patent application: creating text-readable versions of the scanned mail; utilizing flags and identifiers; and providing that the mail may be sent to a central facility for distribution to one or more remote correctional facilities.  It is apparent that creating a text-readable electronic copy of a document is known and conventional.  *See Context Extraction*, 776 F.3d at 1345 (holding that using a scanner or other digitizing device to extract data from a document is not inventive).  Likewise, flagging items and using identifiers are not inventive.  *See Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1315 (Fed. Cir. 2016) (holding that using identifiers and categorizing electronic data is a generic computer function).  Finally, performing the same task at a central location with conventional computer

components is insufficient to state a transformative inventive concept.  *See In re Rosenberg*, 813 Fed. App'x 594, 598–99 (Fed. Cir. 2020).

To restate known, conventional steps, but doing so on a computer, is insufficient to transform the claims—otherwise directed to an abstract idea—into an inventive application.  *See, e.g., Alice*, 573 U.S. at 225 (holding that claims failed to "do more than simply instruct the practitioner to implement the abstract idea . . . on a generic computer" where "each step of the process [was] purely conventional" individually and as an ordered combination) (internal quotations omitted).

Additionally, Smart Communications' claims that the '617 Patent claims are eligible because they are specific and limited to solving longstanding problems within correctional facilities are unavailing.  Limiting the use of an abstract idea to a particular technological environment is not sufficient.  *buySafe, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) (citing *Alice*, 573 U.S. at 22–24).  Because the claims are directed to the abstract idea of identifying characteristics of postal mail, screening it for contraband, scanning the sender and content information, generating a text-readable version of the electronic copy to be stored electronically, and associating a contraband flag that can deny the inmate access, and because there is no genuine dispute of material fact that those claims fail to

24

offer any kind of new application of that idea, the court holds that the disputed patent is patent-ineligible under 35 U.S.C. § 101.

**CONCLUSION**

For the reasons stated herein, the court will grant Defendants' motion for judgment on the pleadings.  Because the court finds that the '617 patent is invalid, count 2 of the complaint and the counterclaims asserted in the second amended answer, Doc. 131, are moot.  An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: April 25, 2022

# EXHIBIT 27

NOTE: This disposition is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

———————————

## HLFIP HOLDING, INC., DBA SMART COMMUNICATIONS IP HOLDINGS,
*Plaintiff-Appellant*

**v.**

## YORK COUNTY, PA, YORK COUNTY PRISON, ADAM OGLE, IN HIS OFFICIAL CAPACITY AS YORK COUNTY PRISON WARDEN,
*Defendants-Appellees*

———————————

2022-1940

———————————

Appeal from the United States District Court for the Middle District of Pennsylvania in No. 1:20-cv-00186-JPW, Judge Jennifer P. Wilson.

———————————

## JUDGMENT

———————————

SCOTT THOMAS WEINGAERTNER, Goodwin Procter LLP, New York, NY, argued for plaintiff-appellant. Also represented by KATRINA M. QUICKER, Quicker Law, LLC, Atlanta, GA.

WILLIAM MILLIKEN, Sterne Kessler Goldstein & Fox, PLLC, Washington, DC, argued for defendants-appellees.

Also represented by Richard Crudo, Uma Everett, Ryan Charles Richardson, Michael D. Specht.

---

This Cause having been heard and considered, it is

Ordered and Adjudged:

Per Curiam (Lourie, Prost, and Cunningham, *Circuit Judges*).

**AFFIRMED. See Fed. Cir. R. 36.**

Entered by Order of the Court

August 18, 2023          /s/ Jarrett B. Perlow
Date                     Jarrett B. Perlow
                         Clerk of Court

# EXHIBIT 28

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| HLFIP HOLDING, INC. d/b/a SMART COMMUNICATIONS IP HOLDINGS, | ) ) ) | NO. 3:19-cv-00714 |
| Plaintiff, | ) ) | JUDGE RICHARDSON |
| v. | ) ) | |
| RUTHERFORD COUNTY, TENNESSEE; MICHAEL FITZHUGH, *in his official capacity as Rutherford County Sheriff*; KEITH D. LOWERY, *in his official capacity as Deputy Chief of Rutherford County Sheriff's Office*; RUTHERFORD COUNTY ADULT DETENTION CENTER; and CHRISTOPHER FLY, *in his official capacity as Deputy Chief of Rutherford County Adult Detention Center*, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants and Counterclaimants, | ) ) ) | |
| VENDEGINE, INC., | ) ) ) | |
| Intervenor. | ) | |

**MEMORANDUM OPINION**

Pending before the Court is Defendants Rutherford County et. al.'s and Intervenor VendEngine, Inc.'s Motion for Judgment on the Pleadings (Doc. No. 86, "Motion"), filed along with a supporting memorandum of law (Doc. No. 87). Plaintiff filed a response. (Doc. No. 94). The movants filed a reply. (Doc. No. 105). This motion is ripe for review.

For the reasons discussed herein, the Court will grant Defendants and Intervenor's motion.

<u>BACKGROUND</u>

A. <u>Factual Background</u>[1]

Plaintiff, HLFIP Holding, Inc. d/b/a Smart Communications IP Holdings ("Smart Communications"), is a Florida corporation. (Doc. No. 1 at ¶ 2). Defendant Rutherford County is a municipal governmental entity organized under Tennessee law. (*Id.* at ¶ 3). Defendant Michael Fitzhugh is the Sheriff of Rutherford County, and Defendant Keith D. Lowery is the Deputy Chief of the Rutherford County Sheriff's Office. Defendant Rutherford County Adult Detention Center ("RCADC") is an adult correctional facility operated by Rutherford County, and Defendant Christopher Fly is the Deputy Chief of the RCADC. (*Id.* at ¶ 2).

Smart Communications is the owner of the patent-in-suit, namely U.S. Patent 10,291,617 ("'617 patent"), entitled "Correctional Postal Mail Contraband Elimination System" and issued May 14, 2019. (*Id.* at ¶¶ 11–12). The patent is for a kiosk-based electronic system and method[2] for correctional facilities intended to improve the detection of contraband in inmates' mail. (Doc. No. 1-2 at 22). The patented system is meant to be more efficient than manual processing of inmate mail. (Doc. No. 1-2 at 23). The exemplary claim 1 describes "identifying mail information," creating an electronic copy of inmate mail, "screening said postal mail for contraband," "associating a contraband flag with said electronic copy," and "determining access to said electronic copy by said recipient inmate wherein access may be granted or denied based upon whether contraband was discovered in said postal mail." (Doc. No. 1-2 at 27). In essence, the

---

[1] The Court takes these background facts from the Complaint and, as indicated below, accepts them as true for purposes of the Motion.

[2] For the sake of brevity, the Court will use the term "system" or "process," rather than "system and method," to describe the kind of invention the '617 patent covers.

patent describes using a kiosk to scan mail and filter out contraband. Smart Communications uses this patent in its product MailGuard®. (Doc. No. 1 at ¶ 15).

In 2017, RCADC expressed interest in MailGuard® and instructed its commissary vendor, VendEngine, Inc. ("VendEngine") to partner and work with Smart Communications to bring MailGuard® to RCADC. (Doc. No. 1 at ¶ 20). After some preliminary discussions, VendEngine and RCADC abruptly ceased discussions with Smart Communications. (*Id.* at ¶ 21).

In June 2018, RCADC implemented a new application by VendEngine that essentially was Smart Communications' MailGuard®. (*Id.* at ¶ 23). VendEngine's application enables, among other functions, scanning inmate mail, detecting contraband or other inappropriate content, and withholding mail depending on its content. (*Id.* at ¶ 25). RCADC continues to use VendEngine's application. (*Id.* at ¶ 24).

B.  Procedural Posture

On August 15, 2019, Smart Communications instituted this action by filing a complaint (Doc. No. 1) against Defendants. In their answer to the complaint, Defendants raised invalidity of the '617 patent under 35 U.S.C. § 101 ("§ 101") as an affirmative defense. (Doc. No. 22 at 9), and also asserted a counterclaim for declaratory judgment of non-infringement of the '617 patent (Doc. No. 22 at 14). Thereafter, VendEngine moved to intervene in the action. (Doc. No. 24). After its motion was granted, (Doc. No. 35), VendEngine filed an answer, wherein it likewise raised invalidity as an affirmative defense and counterclaimed for a declaratory judgment of non-infringement of the '617 patent. (Doc. No. 36 at 9, 14–15). Smart Communications then answered VendEngine's answer and asserted a counterclaim against VendEngine for infringement of the '617 patent. (Doc. No. 54).

On March 30, 2020, Intervenor and Defendants filed the instant Motion, seeking judgment on the pleadings pursuant to Rule 12(c) on the grounds that the '617 patent is invalid under § 101. (Doc. No. 86). Thereafter, Defendants and VendEngine each filed an amended answer and counterclaim, each of which reiterated the affirmative defense of invalidity under § 101 and the counterclaim for a declaratory judgment, (Doc No. 262 at 9, 24–25; Doc. No. 268 at 9, 24–25), and neither of which made any amendments material to the resolution of the instant Motion.

<u>LEGAL STANDARD</u>

The Federal Rules of Civil Procedure provide that after the pleadings are closed, but within such time as not to delay the trial, any party may move for judgment on the pleadings. Fed. R. Civ. P. 12(c).

A motion for judgment on the pleadings under Rule 12(c) is governed by the same standards that govern a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Reilly v. Vadlamudi*, 680 F.3d 617, 622–23 (6th Cir. 2012). "For purposes of a motion for judgment on the pleadings, all well-pleaded allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007). However, the court need not accept as true legal conclusions or unwarranted factual inferences. Id. at 581–82. "A Rule 12(c) motion is appropriately granted 'when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law.'" *Stafford v. Jewelers Mut. Ins. Co.,* 554 F. App'x 360, 370 (6th Cir. 2014) (quoting *Tucker v. Middleburg-Legacy Place, LLC*, 539 F.3d 545, 549 (6th Cir. 2008)).

In this case, a party moving under Rule 12(c) for judgment on the pleadings because of invalidity under § 101 must show that subject-matter ineligibility is clear and convincing based on

pled facts.  *Ronald A. Katz Tech. Licensing, L.P. v. Fedex Corp.,* No. 2:15-cv-02329, 2016 WL 1179218, at *3 (W.D. Tenn. Mar. 24, 2016). Claims must be construed in favor of nonmovant. *See Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) (stating that claims must be construed in favor of nonmovant in the context of a 12(b)(6) motion).[3]

DISCUSSION

A.  Invalidity Under 35 U.S.C. § 101

§ 101 prescribes the subject matter eligible for patent protection. Specifically, it provides that "[w]hoever invents or discovers *any new and useful process* . . . *or any new and useful improvement thereof*, may obtain a patent . . . ." 35 U.S.C. § 101 (emphasis added).

Under *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 221 (2014), a patent is invalid under § 101 if (1) the claims, individually and in combination, are directed to an abstract idea or natural phenomena *and* (2) there is not an "inventive concept" that can transform the abstract idea. *Id. Alice* thus essentially prescribes two requirements (sometimes referred to in terms of "steps") for patent invalidity. As set forth below, because the '617 patent meets both requirements for invalidity, it is invalid under § 101.

---

[3] Contrary to Plaintiff's assertion, the fact that claim construction has not occurred does not preclude a clear and convincing showing that the patent is invalid. (Doc. No. 94. at 6-7). "Although the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter, claim construction is not an inviolable prerequisite to a validity determination under § 101." *Content Extraction and Trans. v. Wells Fargo Bank*, 776 F.3d 1343, 1349 (Fed. Cir. 2014). Claim language itself, even if construed in favor of the non-movant, can be sufficiently clear and convincing to rebut the presumption that the United States Patent and Trademark Office ("PTO") issued a valid patent. To hold otherwise would be to suggest that no motion to dismiss (including a motion based on invalidity and noninfringement) that hinges on claim language can be granted without full claim construction—a suggestion that is unsupported by case law. *See, e.g., Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2016) ("[W]e have repeatedly affirmed § 101 rejections at the motion to dismiss stage, before claim construction or significant discovery has commenced.").

B. Application of *Alice*'s two requirements for invalidity under § 101

*1. Alice* Step One

Under Federal Circuit precedent, a patented process that merely uses a computer to perform certain functions is directed to an abstract idea for purposes of *Alice* step one when it does not improve computer functionality at all. "[A] relevant inquiry at step one is 'to ask whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea'" *In re TLI Communications LLC Patent Litigation*, 823 F.3d 607, 612 (Fed. Cir. 2016) (quoting *Enfish, LLC v. Microsoft Corp.,* 822 F.3d. 1327, 1335 (Fed. Cir. 2016)). Step one "relie[s] on the distinction made in *Alice* between, on one hand, computer-functionality improvements and, on the other, uses of existing computers as tools in aid of processes focused on 'abstract ideas'" *Electric Power Group, LLC v. Alstom S.A.* 830 F.3d 1350, 1354 (Fed. Cir. 2016).

The process covered by '617 patent falls into the latter category. The patent covers a process that does not improve any "*existing technological* process," as would be sufficient under *Alice*, 573 U.S. at 223, to support patentability. Instead, the patented process is one of manually sorting postal mail and detecting contraband via a computer. It merely improves the process of mail distribution compared to a manual method. No step "purport[s] to improve the functioning of the computer itself…or effect an improvement in any other technology[.]" *Alice*, 573 U.S. at 225. Manually sorting postal mail is not properly considered an existing *technological* process. None of the claims improve the functioning of computers or any technology itself. Therefore, the '617 patent recites an abstract idea within the meaning of *Alice* step one.

*2. Alice* Step Two

Even if it is directed to an abstract idea, a patent can meet the requirements of § 101 if it describes an "inventive concept." *Alice*, 573 U.S. at 217–218. But if a patent neither "require[s]

an arguably inventive set of components or methods" nor requires "a new source or type of information, or new techniques for analyzing it," it does not describe an inventive concept as described by *Alice*. *Electric Power Group*, 830 F.3d at 1355.

"If a patent uses generic computer components to implement an invention, it fails to recite an inventive concept under *Alice* step two." *West View Research, LLC v. Audi AG*, 685 Fed. App'x 923, 926 (Fed. Cir. 2017). Plaintiff does not allege usage of even a single non-generic computer component. According to the '617 patent's detailed description of embodiments, the process uses generic scanners, kiosks, and computers. (Doc. No. 1-2 at 24). For example, the '617 patent describes institution staff using terminals to view inmate mail. *Id.* at 27. "Such terminals may be computers, laptops, dumb terminals, virtual machines, kiosks or any other electronic device with a display and the ability to connect to server through a network." *Id.* Inmates may view their mail using "portable tablets, music players, smart phones, or other portable devices used by inmates and capable of communicating with server through a network connection." *Id.* The claims cover only generic methods such as identifying keys and flags. Plaintiff does not allege that anything "in the claims . . .  requires anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information." *Electric Power Group,* 830 F.3d at 1355.

Plaintiff also does not allege that there are new techniques used. Scanning mail is not a new technique. Neither is flagging mail that has certain attributes or flagging mail (based on content) to prevent its ultimate distribution to the addressee. Flagging or blocking mail based on content is a basic function of email spam filters, for example. The claims are "essentially result-focused, functional," rather than describing a nonroutine method. *Id.* at 1356. The only novelty presented by the '617 patent is the application of these routine steps in the specific context of

inmate mail. That is distinguishable from, for example, the new technique found patentable in *Bascom*, which was the "installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user." *Bascom*, 827 F.3d at 1350. The patented process at issue in *Bascom* went far beyond merely using basic computer functions to replace a manual process.

Even if, as Plaintiff claims, the '617 patent solves a problem or improves a process in the corrections industry, that alone is not sufficient to meet § 101's requirements. Instead, § 101 requires the patent to cover matter that is both "*new* and useful," not just useful. Plaintiff cites *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.,* 841 F.3d 1288, 1300–1301 (Fed. Cir. 2016), for the proposition that an arrangement of conventional elements does not satisfy *Alice*'s second requirement for invalidity (*i.e.*, step two) if it provides a solution to a recognized problem. (Doc. No. 94 at 13). But *Amdocs* does not actually support that proposition. Rather, *Amdocs* states that the invention must "solve a technology-based problem." *Amdocs*, 841 F.3d at 1300. Again, the invention covered by the '617 patent does not solve a technology-based problem, but rather uses technology to increase efficiency compared to manual processes.

Plaintiff notes that the '617 patent "present[s] no danger of broadly pre-empting the distribution of mail to inmates at correctional facilities." (Doc. No. 94 at 14). Assuming arguendo this is the case, the fact that the claims do not preempt all methods of distribution of mail to inmates does not make the patented system an invention or discovery of a "new" process under § 101 when it otherwise is not.[4] *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir.

---

[4] Plaintiff points out that the analysis under § 101 is distinct from an analysis of novelty and obviousness under 35 U.S.C. § 102 and 35 U.S.C. § 103. (Doc. No. 94 at 14). That said, § 101 nevertheless authorizes the issuance of a patent only for an "invent[ion]" or a "discover[y]" of something "new," such as a "new . . . process" or "new . . . improvement thereof." 35 U.S.C. § 101; *Elan Pharms., Inc. v. Mayo Found. for Med. Educ. & Rsch.*, 304 F.3d 1221, 1227 (Fed. Cir. 2002.) ("To be patented an invention must be new."

2015) ("While preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility.").

Plaintiff cites *Bascom* for the idea that narrowed claims can save a patent under § 101. (Doc. No. 94 at 14). But the Federal Circuit notes in *Bascom* itself that "[its prior] decisions further explained that simply because some of the claims narrowed the scope of protection through additional 'conventional' steps for performing the abstract idea, they did not make those claims any less abstract." *Bascom*, 827 F.3d at 1352. The court in *Bascom* held that the patent-in-suit failed to satisfy *Alice*'s step-two requirement for invalidity because the claims contained an innovative step, not because the claims were narrowed and did not preempt the entire abstract idea. *Bascom*, 827 F.3d at 1350.

Thus, the '617 patent is invalid because it is not directed to patent-eligible subject matter under § 101.

<u>CONCLUSION</u>

For the reasons discussed herein, the Court will grant the Motion and dismiss with prejudice Plaintiff's claims (both as presented against Defendants in the Complaint (Doc. No. 1) and in the counterclaim against VendEngine (Doc. No. 54) with prejudice. And, for reasons to be set forth in the order that will accompany this memorandum opinion, the Court *sua sponte* will dismiss without prejudice Defendants' and VendEngine's respective counterclaims for declaratory judgment of non-infringement (Doc. No. 262 at 14–15; Doc. No. 268 at 14–15).

---

(citing 35 U.S.C. §§ 101, 102(a), (e))), *reh'g en banc granted, opinion vacated on other grounds*, 314 F.3d 1299 (Fed. Cir. 2002), *and on reh'g en banc*, 346 F.3d 1051 (Fed. Cir. 2003). In turn, § 102 and § 103 ask, respectively, whether the invention or discovery is, in addition to being "new," also novel and nonobvious. Notably, the text of § 102 does not use the term "novel" or "novelty"; rather, the term "novelty" is used in the caption of § 102 as a shorthand reference to the particular requirements for patentability set forth in the text, which go beyond merely requiring that the invention be "new." Some of the characteristics that make an invention "new," however, could be relevant to whether the invention is novel in the sense required by § 102 and to whether the invention is nonobvious as required by § 103.

An appropriate accompanying order will be entered.

_Eli Richardson_
ELI  RICHARDSON
UNITED STATES DISTRICT JUDGE

# EXHIBIT 29

Appeal Nos. 2023-1380, 2023-1379

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
# 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔠𝔦𝔯𝔠𝔲𝔦𝔱

———————

HLFIP HOLDING, INC., D/B/A SMART COMMUNICATIONS IP HOLDINGS,

*Plaintiff-Appellant*,

- v. -

RUTHERFORD COUNTY, TN, RUTHERFORD COUNTY ADULT DETENTION CENTER,

*Defendants-Cross-Appellants*,

VENDENGINE, INC.,

*Defendant-Appellee*,

———————

Appeal from the United States District Court
for the Middle District of Tennessee in
Case No. 3:19-cv-00714
Judge Eli Jeremy Richardson

———————

## APPELLANT'S MOTION TO DISMISS

———————

Scott T. Weingaertner
Stefan Mentzer
Matthew R. Wisnieff
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 459-7067

Katrina M. Quicker
QUICKER LAW, LLC
900 Circle 75 Parkway
Suite 100
Atlanta, Georgia 30339
Telephone: (678) 750-0450

*Counsel for Plaintiff-Appellant*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2023-1380, 2023-1379 |
| **Short Case Caption** | HLFIP Holding, Inc. v. Rutherford County, TN |
| **Filing Party/Entity** | HLFIP Holding, Inc. d/b/a Smart Communications IP Holdings |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/01/2023

Signature: /s/ Scott T. Weingaertner

Name: Scott T. Weingaertner

| 1. Represented Entities.<br>Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest.<br>Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders.<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| HLFIP Holding, Inc.d/b/a Smart Communications IP Holdings | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable          ☑ Additional pages attached

| | | |
|---|---|---|
| Kathryn A. Vance Quicker Law, LLC | Jeffrey Lesovitz Baker & Hostetler LLP | Gregory S. Reynolds Riley Warnock & JacobsonPLC |
| Kevin P. Flynn Baker & Hostetler LLP | Mark Einsiedel Baker & Hostetler LLP | John DavidClark Riley Warnock & JacobsonPLC |
| Jason P. Grier Baker & Hostetler LLP | Robert T. Razzano Baker & Hostetler LLP | Keane A. Barger Riley Warnock & Jacobson PLC |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below)   ☐ No   ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## <u>ADDITIONAL PAGES TO FORM 9. CERTIFICATE OF INTEREST</u>

**4. Legal Representatives.** The following law firms, partners and associates

that (a) appeared for the entities in the originating court or agency or (b) are

expected to appear in this Court for the entities are listed below, in addition to

those on the foregoing Form 9. Certificate of Interest:

1. Jason Jackson – Kutak Rock LLP

2. Peter Jones – Herman Jones LLP


Dated:  December 1, 2023

/s/  Scott T. Weingaertner
Scott T. Weingaertner
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 459-7067

*Counsel for Plaintiff-Appellant*
*HLFIP Holding, Inc. d/b/a Smart*
*Communications IP Holdings*

1

Pursuant to Federal Rule of Appellate Procedure 42(b)(2) and Federal

Circuit Rule 27(f), Plaintiff-Appellant HLFIP Holding, Inc. d/b/a Smart

Communications IP Holdings ("Smart Communications") respectfully moves for

entry of an order dismissing, without prejudice, Appeal Nos. 2023-1380 and 2023-

1379.  In support of this motion, Smart Communications states as follows.

## **BACKGROUND**

This appeal arises from an order and judgment of the United States District

Court for the Middle District of Tennessee, ruling that U.S. Patent No. 10,291,617

(the "'617 patent") is ineligible for patent protection under 35 U.S.C. § 101, and

dismissing Smart Communications's patent infringement lawsuit against

Rutherford County, TN and Rutherford County Adult Detention Center (the

"Defendants-Cross-Appellants" or "Rutherford") and VendEngine, Inc. (the

"Defendant-Appellee" or "VendEngine").  *See* Appeal No. 23-1380, Dkt. No. 7.

Before patentee Smart Communications appealed in this action, it previously filed

a separate appeal, *HLFIP Holding, Inc. d/b/a Smart Communications IP Holdings*

*v. York County, PA, et al.*, Case No. 22-1940 ("*York County*").  The *York County*

appeal concerned a district court's ruling that the same patent at issue in this

appeal—the '617 patent—was patent-ineligible under § 101.

Whether the '617 patent is eligible or ineligible § 101 under is the core issue

in this appeal; without a valid patent, there is no patent infringement action against

1

Defendants-Cross-Appellants or Defendant-Appellee.  Indeed, as part of this appeal, the Court granted a motion by Smart Communications to stay briefing deadlines so as to await the outcome of the appeal in *York County*.  *See* Appeal No. 23-1380, Dkt. No. 21; Appeal No. 23-1380, Dkt. No. 22.

On the same day Smart Communications filed its notice of appeal, Rutherford filed its own notice of appeal, amounting to a cross-appeal of a prior district court decision ruling that Rutherford was not protected by Eleventh Amendment immunity.  *See* Appeal No. 23-1379, Dkt. No. 6 (seeking only "[r]eversal of the district court's denial of Rutherford County, et al.'s motion to dismiss for personal and subject matter jurisdiction holding that Rutherford County is not entitled to Eleventh Amendment immunity").  Importantly, Rutherford did not seek to disturb the appealed judgment concerning § 101 or the dismissal of Smart Communications's patent infringement action against it; rather, it sought the affirmance in full of these rulings.  *See* Appeal No. 23-1380, Dkt. No. 4.  Smart Communications moved to dismiss the cross-appeal on numerous grounds:  (1) for lack of appellate standing (as Rutherford was not adversely affected by the appealed judgment concerning § 101, which it did not seek to have modified); (2) on grounds that protective or conditional cross-appeals (that is, an appeal that would have preserved Rutherford's challenge to the district court's sovereign immunity ruling, in the event that this Court modified the district court's judgment

2

as to § 101) are disallowed; (3) that Rutherford was the prevailing party in the district court; and (4) because an improper cross-appeal would prejudice Smart Communications. *See*, *e.g.*, Appeal No. 23-1379, Dkt. No. 10 at 1-2. On June 28, 2023, the Court deferred Smart Communications's motion to the merits panel assigned to the case, and the motion remains pending. *See* Appeal No. 23-1380, Dkt. No. 19.

During the pendency of this appeal, the Federal Circuit affirmed the district court's ruling in *York County*, ruling that the '617 patent is ineligible under § 101. *See HLFIP Holding, Inc. v. York County PA*, Appeal No. 2022-1940, 2023 U.S. App. LEXIS 21670, *1 (Fed. Cir. Aug. 18, 2023) (affirming judgment *per curiam*). On August 30, 2023, Smart Communications requested a further extension of briefing deadlines to allow it time to consider whether it should proceed with the instant appeal, seek rehearing en banc of the appeal in *York County*, or petition the U.S. Supreme Court for a writ of certiorari. *See* Dkt. No. 24. The Court granted Smart Communications's motion for an extension on September 6, 2023. Dkt. No. 25. Smart Communications ultimately declined to seek rehearing en banc or to petition the U.S. Supreme Court for a writ of certiorari, and the deadlines to do so now have passed.

Now, Smart Communications seeks to resolve the issues before the Court by moving for the voluntary dismissal of its appeal pursuant to Federal Rule of

3

Appellate Procedure 42(b)(2). Smart Communications contacted counsel for
Rutherford and VendEngine on November 28, 2023, stating that Smart
Communications would seek voluntary dismissal of this appeal and requesting
Defendants-Cross-Appellants' and Defendant-Appellee's position as to dismissal
in accordance with Federal Rule of Appellate Procedure 42(b)(1). On November
30, 2023, counsel for Rutherford replied but did not indicate their consent or
opposition to a request by Smart Communications for dismissal. *See* Declaration
of Scott T. Weingaertner ("Weingaertner Decl.") ¶ 4. Smart Communications's
opening brief is due on December 5, 2023.[1] *See* Appeal No. 23-1380, Dkt. No. 25.

## ARGUMENT

Dismissal of the consolidated cross-appeals is proper following this Court's
ruling in *York County* finding the '617 patent ineligible under § 101, and in light of
the circumstances noted above. It is not possible for Smart Communications to
maintain its patent lawsuit against Rutherford and VendEngine without a valid
patent. This issue moots the other appellate issues raised by Smart
Communications as well as Rutherford. *See* Appeal No. 23-1380, Dkt. No. 7;
Appeal No. 23-1379, Dkt. No. 6; *see also Praxair, Inc. v. ATMI, Inc.*, 543 F.3d
1306, 1322 (Fed. Cir. 2008) (cross-appeal of district court findings of infringement

---

[1] Without prejudice to this motion to dismiss, Smart Communications intends to
file its opening brief on December 5, 2023 unless this Court grants the motion first.

4

and validity was improper where district court separately found the patent

unenforceable due to inequitable conduct, because "[a] determination of

unenforceability bars a finding of infringement . . . and similarly moots any issue

of invalidity").

As set forth in Smart Communications's earlier motion to dismiss

Rutherford County's cross-appeal, Rutherford has no standing to file a cross-

appeal solely to modify a district court order concerning Eleventh Amendment

immunity, where the judgment already resulted in dismissal of the action against it

due to invalidation of the sole patent in suit. *See* Appeal No. 23-1379, Dkt. No. 10,

at 3-8; *see also Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1424 (Fed. Cir. 1984) (a

party may only "cross-appeal if adversely affected by the appealed judgment in

some particular which it seeks to have modified"); *Aventis Pharma S.A. v.

Hospira, Inc.*, 637 F.3d 1341, 1343 (Fed. Cir. 2011) ("Our precedent consistently

warns against the improper use of a cross-appeal to reach issues that do not

otherwise expand the scope of the judgment.").

The prudential rule against cross-appeals by prevailing parties also neatly

covers what Rutherford is seeking to do here—that is, alter an adverse lower court

ruling that nevertheless does not alter the judgment. *SkyHawke Techs., LLC v.

DECA Int'l Corp.*, 828 F.3d 1373, 1375 (Fed. Cir. 2016) (prevailing patentee

cannot appeal PTAB judgment in its favor so as to obtain a more favorable claim

construction decision from the appellate court).

Indeed, this Court routinely dismisses cross-appeals by defendants of

subsidiary issues where the judgment below resulted in invalidity as to all asserted

claims—as the judgment, affirmed by the Court in *York County*, does here. *See*

*Droplets, Inc. v. E*TRADE Bank*, 887 F.3d 1309, 1322 (Fed. Cir. 2018)

(dismissing cross-appeal where judgment of invalidity entered as to all claims);

*Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1337 (Fed. Cir. 2010)

(dismissing cross-appeal and striking surreply brief of defendant-appellee

concerning non-infringement issues where district court entered judgment of

invalidity as to all asserted claims); *Typeright Keyboard Corp. v. Microsoft Corp.*,

374 F.3d 1151, 1156 (Fed. Cir. 2004) (dismissing cross-appeal by

defendant/accused infringer for lack of jurisdiction after judgment of patent

invalidity).

And to the extent Rutherford believes it needs an opinion on Eleventh

Amendment immunity from this Court to guard against future lawsuits, such an

appeal amounts to an improper request for an advisory opinion. *See United States*

*v. Juvenile Male*, 564 U. S. 932, 937, 131 S. Ct. 2860, 180 L. Ed. 2d 811 (2011)

(*per curiam*) (a judgment's "possible, indirect benefit in a future lawsuit" does not

preserve standing); *see also Allied Mineral Prods. v. OSMI, Inc.*, 870 F.3d 1337,

1341 (Fed. Cir. 2017) ("the fear of a future infringement suit is insufficient to confer jurisdiction" under Article III).

Thus, there is no basis for Rutherford to pursue a cross-appeal, and the Court should grant both this motion and Smart Communications's still-pending motion to dismiss.

## CONCLUSION

Accordingly, Smart Communications respectfully requests the voluntary dismissal of these consolidated cross-appeals, with each party to bear its own costs.

Dated:  December 1, 2023

/s/  Scott T. Weingaertner
Scott T. Weingaertner
Stefan Mentzer
Matthew R. Wisnieff
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 459-7067

*Counsel for Plaintiff-Appellant*
*HLFIP Holding, Inc. d/b/a Smart*
*Communications IP Holdings*

## DECLARATION OF SCOTT T. WEINGAERTNER

I, Scott T. Weingaertner, hereby declare as follows:

1.       I am a partner with the law firm of Goodwin Procter LLP and counsel to Plaintiff-Appellant HLFIP Holding, Inc. d/b/a Smart Communications IP Holdings ("Smart Communications") in this matter.  I have personal knowledge of the facts set forth in this declaration.

2.       I make this declaration pursuant to Federal Circuit Rule 42(b)(2) under penalty of perjury in support of Smart Communications's Motion for Voluntary Dismissal.

3.       Smart Communications's counsel contacted counsel for Defendants-Cross-Appellants Rutherford County, TN and Rutherford County Adult Detention Center, and Defendant-Appellee VendEngine, Inc. by email on November 28, 2023, stating that Smart Communications would seek voluntary dismissal of this appeal and requesting Defendants-Cross-Appellants' and Defendant-Appellee's position as to dismissal in accordance with Federal Rule of Appellate Procedure 42(b)(1).

4.       Counsel for Defendants-Cross-Appellants responded by email on November 30, 2023 on behalf of Defendants-Cross-Appellants and Defendant-Appellee, but did not indicate their consent or opposition to a request by Smart Communications for dismissal.

Dated:  December 1, 2023                    /s/  Scott T. Weingaertner
                                            Scott T. Weingaertner
                                            GOODWIN PROCTER LLP

                                            *Counsel for Plaintiff-Appellant
                                            HLFIP Holding, Inc. d/b/a Smart
                                            Communications IP Holdings*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing APPELLANT'S MOTION TO DISMISS

was served on the 1st day of December, 2023, by operation of the Court's

CM/ECF system per Federal Rule of Appellate Procedure 25.

Dated:  December 1, 2023

/s/  Scott T. Weingaertner
Scott T. Weingaertner
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 459-7067

*Counsel for Plaintiff-Appellant
HLFIP Holding, Inc. d/b/a Smart
Communications IP Holdings*

# CERTIFICATE OF COMPLIANCE

1.    This motion complies with the type-volume limitation of Fed. R. App.

P. 27(d)(2)(A) because this motion contains 1,424 words, excluding the parts of the

motion exempted by Fed. R. App. P. 27(d)(2), Fed. R. App. P. 27(a)(2)(B), and

Fed. R. App. P. 32(f).

2.    This motion complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it

has been prepared in a proportionally spaced typeface using Microsoft Word in

Times New Roman 14-point font.


 Dated:  December 1, 2023                    /s/  Scott T. Weingaertner
                                             Scott T. Weingaertner
                                             GOODWIN PROCTER LLP
                                             The New York Times Building
                                             620 Eighth Avenue
                                             New York, New York 10018
                                             Telephone: (212) 459-7067

                                             *Counsel for Plaintiff-Appellant*
                                             *HLFIP Holding, Inc. d/b/a Smart*
                                             *Communications IP Holdings*

# EXHIBIT 30

# APPLICATION FOR REGISTRATION OF FICTITIOUS NAME

## REGISTRATION# G19000084997

**Fictitious Name to be Registered:**  SMART COMMUNICATIONS IP HOLDINGS

**Mailing Address of Business:**       10491 72ND ST.
                                       SEMINOLE, FL  33777

**Florida County of Principal Place of Business:**  PINELLAS

**FEI Number:**

**Owner(s) of Fictitious Name:**

HLFIP HOLDING, INC.
10491 72ND STR.
SEMINOLE, FL  33777
Florida Document Number: P15000042874
FEI Number: 82-4804509

**FILED
Aug 12, 2019
Secretary of State**

I the undersigned, being an owner in the above fictitious name, certify that the information indicated on this form is true and accurate. I further certify that the fictitious name to be registered has been advertised at least once in a newspaper as defined in Chapter 50, Florida Statutes, in the county where the principal place of business is located.  I understand that the electronic signature below shall have the same legal effect as if made under oath and I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s. 817.155, Florida Statutes.

JONATHAN D. LOGAN                                      08/12/2019
   Electronic Signature(s)                                Date

**Certificate of Status Requested ( )        Certified Copy Requested ( )**

# EXHIBIT 31

## ELECTRONIC MESSAGING AGREEMENT -MAILGUARD ADDENDUM

This Addendum and Extension Agreement is between Crawford County Jail, hereinafter referred to as "you" or "Customer," and Smart Communications Collier, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider."

This Addendum and Extension is part of and governed by the Electronic Messaging Agreement, the "Original Agreement", executed by the Parties on November 3rd, 2016. The terms and conditions of the Original Agreement are incorporated herein by reference.

The Customer's Facility Name and address is: Crawford County Sheriff's Office 4235 Alma Highway, Van Buren, Arkansas 72956

WHEREAS, the Parties entered in an Electronic Messaging System Agreement on November 3rd, 2016, the "Original Agreement".

WHEREAS, the Parties hereby agree to extend the term of the Original Agreement in accordance with the terms provided herein.

In consideration of the mutual covenants contained herein, both of the Parties mutually covenant and agree as follows:

The Original Agreement, original term and extension will end on November 3rd, 2019.

The Parties agree to extend the Original Agreement for three (3) years through November 3rd, 2022 which will begin immediately upon the execution of this document. The contract will then automatically renew for four (4) years. After this four (4) year extension, this Agreement shall automatically renew annually for additional one (1) year terms unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

This Addendum and Extension binds and benefits both Parties and successors or assigns. This document, including the Original Agreement dated November 3rd, 2016, is the entire agreement between the Parties.

The Parties wish to add the following language to the Original Agreement:

Provider shall install and/or provide the following Hardware, Software, Systems and Services:

### Electronic Messaging

1.  We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the

Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware Kiosks, the software to include the operating systems and application software, and all networking requirements needed for operation of the system.

2.  We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

3.  We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

4.  Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

5.  Provider will maintain records for a period of seven (7) years from the date the record is made. During the term of this Agreement and upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

6. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

7. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

8. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

9. Electronic Messaging. Each email message is billed at one credit ($0.50).

10. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

#### Customer's Responsibilities.

11. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining the electronic messaging system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

12. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

13. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

14. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability and shall allow inmates access to the Kiosks and systems in keeping with the hours inmates have access to telephones.

15. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those kiosks appropriate to their housing assignment.

16. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

#### MailGuard™ Patent Pending Postal Mail Elimination System

17. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

18. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ or SmartKiosk™ within the
   - Customer Jail Facility; and

19. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

20. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

Page 2 of 5

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

21. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk™ or SmartKiosk™.

22. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

23. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

24. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system.

25. Provider shall be solely responsible for the cost of maintaining the Mail Box designated by the Customer for incoming routine mail to be sent.

26. Provider will retrieve incoming routine mail from the designated Mail Box and process and transmit that mail in an expeditious manner.

27. Provider will shred all processed mail after 30 days unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

28. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

29. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

30. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

31. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.

### Customer's Responsibilities

32.    Customer shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail.

33.    Customer shall be responsible for informing inmates and inmates friends and family that all routine correspondence must be sent to the designated MailGuard Mail Box. Customer will include information regarding the MailGuard™ system in the Inmate Handbook and in all other areas where information regarding the Inmate Mail Policy and Procedures are located.

34.    Customer will provide information regarding Customer's incoming postal mail policy, the MailGuard™ system and the MailGuard procedure for processing and/or disposing of all incoming mail and pictures in at least one location next to the inmate mailing address on the Customer's website and very clearly state that all incoming routine mail MUST be mailed to the MailGuard designated Mail Box.

35.    Customer will instruct on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system and display information regarding the Customer's incoming postal mail policy, the MailGuard™ system and the MailGuard procedure for processing and/or disposing of all incoming mail and pictures.

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

36.    Should the Customer receive incoming routine mail instead of the designated Mail Box, the Customer will be responsible for the delivery of said mail to MailGuard for processing.

37.    Upon completion of installation and appropriate system testing, Customer will allow the MailGuard™ system to go live within forty-eight (48) hours' notice of system availability.

38.    Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments.

39.    Customer will give prompt notice to MailGuard of any trouble or irregularity in the functioning of the MailGuard™ system.

### Grievances, General and Medical Requests

40.    We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartKiosk.

41.    Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

### Rules, Regulations & Communications

42. The SmartKiosk is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartKiosk for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartKiosk. The SmartKiosk has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Page 4 of 5

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

Customer: Crawford County Sheriff's Office

By: _____

Name: Dennis Gilstrap

Title: County Judge

Date: _10- 11- 2017_

Email: _dgilstrap@crawfordcounty.org_

Notice Address:
4235 Alma Highway
Van Buren, Arkansas 72956

Provider: Smart Communications Collier, Inc.

By: _____

Name: Jon Logan

Title: CEO

Date: _____

Email: jon.logan@smartjailmail.com

Notice Address:
4522 W. North B Street
Tampa, FL 33609

Customer: Crawford County Sheriff's Office

By: _____

Name: Ron Brown

Title: Sheriff

Date: _10- 16- 2017_

Email: _rbrown@crawford-county.org_

Notice Address:
4235 Alma Highway
Van Buren, Arkansas 72956

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

# EXHIBIT 32

### Addendum to Electronic Messaging System Agreement

Smart Communications Pasco, Inc., hereby agrees to provide the Pasco County Sheriff's Office MailGuard™ the patent pending postal mail elimination service. This service converts regular postal mail to an electronic document that is transmitted to the inmate recipient via the SmartKiosk™ already installed in the jail by virtue of the existing contract dated April 8, 2013.

1.  Pasco County Sheriff's Office agrees to make Smart Communications Pasco, Inc. its Agent for the purpose of processing routine postal mail. For purposes of this contract, "routine mail" means all regular correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All Legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

2.  Smart Communications Pasco, Inc. and the Pasco County Sheriff's Office shall notify all existing inmates that effective March 1, 2016, they must designate MailGuard™ as their postal agent to receive routine postal mail at the jail. Mail service to the inmates will be enhanced by same day service and six days a week delivery. All new incoming inmates will be given a form for their signature at booking or as the Pasco County Sheriff's Office designates, to make MailGuard™ their postal agent.

3.  Smart Communications Pasco, Inc., agrees to provide at no cost to the Pasco County Sheriff's Office additional kiosks and/or tablets to the three (3) medical areas and to the lock down areas as needed by the jail. Should the initial choice by jail administration of either kiosk or tablet be determined at a later date not to meet all the intended goals of the administration, Smart Communications Pasco, Inc., shall replace said hardware with the other optional hardware upon 30 days written notice. All costs associated with installation and hardware will be paid by Smart Communications Pasco, Inc. It is understood and agreed that the software used is the same for either the kiosk or tablet and that maintenance of said equipment shall be the same as in the master agreement.

4.  The MailGuard™ service by virtue of this addendum is provided to the Pasco Sheriff's Office at no cost.

5.  The term of this addendum shall run concurrently with that of the existing contract dated April 8, 2013.


_____ Date: _____          _____ Date:_____

Sheriff Chris Noco                          James P. Logan

# EXHIBIT 33

9:10 AM
11/28/2023
Accrual Basis

**Smart Communications Collier Inc.**
**Profit & Loss**
**January 2014 through October 2023**

| | | Jan - Dec 14 | Jan - Dec 15 | Jan - Dec 16 | Jan - Dec 17 | Jan - Dec 18 | Jan - Dec 19 | Jan - Dec 20 | Jan - Dec 21 | Jan - Dec 22 | 10 months Interim-Draft Jan - Oct 23 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | | | | | | | |
| **Income** | | | | | | | | | | | |
| Lattice Revenue Shares and Miscellaneous Revenue | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 444,839.10 | 284,372.38 | 0.00 | 93,375.09 | 29,000.97 |
| Sales (Gross receipts from sales) | | | | | | | | | | | |
| | Messaging Fees | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Misc. Reporting Errors (clearing account for sales reporting ) | 0.00 | 0.00 | 0.00 | 0.00 | 790.00 | -35,013.62 | 404,038.16 | -370,089.00 | 0.00 | 0.00 |
| | Refunds (client refunds) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -23,004.67 | -35,341.07 | -73,737.42 |
| | Sales of Mail Services (mail services - remote and in facilities | 0.00 | 0.00 | 0.00 | 0.00 | 1,880,006.50 | 4,547,013.62 | 4,532,800.00 | 4,512,000.00 | 4,512,000.00 | 3,760,000.00 |
| | Sales of Messaging (sales of pre-paid messaging) | 0.00 | 0.00 | 0.00 | 0.00 | 7,710,994.76 | 10,793,692.20 | 15,310,858.88 | 21,628,106.00 | 25,801,717.66 | 23,581,826.48 |
| | Sales of Telephone Service Calls (sales of prepaid telephone calls) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 984,406.67 | 5,510,925.00 | 9,982,532.39 | 11,945,517.97 |
| | Telephone Service Fees | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 638,138.00 | 4,388,973.17 | 6,285,507.44 |
| | Trust Account Funding Fees (service fees for funding inmate | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 30,252.00 | 37,076.31 | 99,028.50 |
| Total Sales (Gross receipts from sales) | | 0.00 | 0.00 | 0.00 | 0.00 | 9,591,791.26 | 15,305,692.20 | 21,232,103.71 | 31,926,327.33 | 44,686,958.46 | 45,598,142.97 |
| Sublicense Royalty Fees Income | | 0.00 | 0.00 | 0.00 | 0.00 | 43,500.00 | 1,500.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Income** | | 0.00 | 0.00 | 0.00 | 0.00 | 9,591,791.26 | 15,794,031.30 | 21,517,976.09 | 31,926,327.33 | 44,780,333.55 | 45,627,143.94 |
| **Cost of Goods Sold** | | | | | | | | | | | |
| Beginning Inventory Value (use this account only for year-end) | | 0.00 | 0.00 | 0.00 | 0.00 | 482,625.00 | 0.00 | 723,965.43 | 1,401,970.44 | 1,894,387.72 | 0.00 |
| Contract Labor Mail Processing (contract labor for mail processing) | | 0.00 | 0.00 | 0.00 | 0.00 | 158,959.33 | 183,239.48 | 0.00 | 0.00 | 0.00 | 0.00 |
| Contractor Services (electricians, cabling, general construction contractors, laborers) | | | | | | | | | | | |
| | Contracted on-site IT services (contracted on-site IT services | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 59,523.67 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Contractor - data processing (outsourced off-site data proces | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15,378.68 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Contractor Services (electricians, cabling, general constructi | 0.00 | 0.00 | 0.00 | 605.00 | 544,524.68 | 746,431.52 | 0.00 | 1,256,386.00 | 1,605,421.78 | 2,080,627.07 |
| Total Contractor Services (electricians, cabling, general construction contractors, laborers) | | 0.00 | 0.00 | 0.00 | 605.00 | 544,524.68 | 821,333.87 | 0.00 | 1,256,386.00 | 1,605,421.78 | 2,080,627.07 |
| Cost of Goods Sold (Costs of items purchased and installed) | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6,427.70 | -78.00 | 0.00 | 0.00 | 0.00 |
| Damaged Inventory Write Off | | 0.00 | 0.00 | 0.00 | -100,498.25 | 2,765.39 | 4,577.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Data Storage / Server Hosting (co-location server hosting services and server software licensing) | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33,925.73 | 74,457.40 | 68,813.00 | 167,343.25 | 321,378.99 |
| Ending Inventory Value (use this account only for year end) | | 0.00 | 0.00 | 0.00 | 0.00 | -352,041.70 | -723,843.94 | -1,401,970.44 | -1,894,387.72 | -690,704.04 | 0.00 |
| Equipment Design | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 43,187.50 | 70,000.00 | 0.00 |
| Facility Commissions Expense | | 0.00 | 0.00 | 685.30 | 24,982.03 | 491,618.88 | 521,685.00 | 1,049,988.45 | 5,430,350.00 | 11,321,922.84 | 13,188,123.52 |
| Freight and Shipping Costs (Freight and shipping costs for inbound inventory) | | 0.00 | 0.00 | 0.00 | 0.00 | 141,409.89 | 247,304.15 | 168,277.14 | 374,670.00 | 548,211.82 | 512,398.05 |
| Game Revenue Sharing 50/50 (premium android game revenue sharing with NTN Buzztime) | | 0.00 | 0.00 | 0.00 | 0.00 | 1,697.42 | 13,756.57 | 38,653.57 | 13,658.00 | 0.00 | 0.00 |
| Internet Service (internet service by facility) | | 0.00 | 0.00 | 0.00 | 1,186.95 | 140,162.26 | 172,342.38 | 223,449.55 | 299,578.00 | 478,733.90 | 592,863.60 |
| Kiosk units | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Labor - Assembly (labor expended during assembly of end products) | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Labor - Installation (labor expended during installation of products) | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 423,363.31 | 28,554.00 | 258,964.49 | 0.00 | 0.00 |
| Labor - Mail Processing (regular employee labor for mail processing) | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 306,990.01 | 456,903.13 | 497,451.00 | 466,777.61 | 0.00 |

| | Jan - Dec 14 | Jan - Dec 15 | Jan - Dec 16 | Jan - Dec 17 | Jan - Dec 18 | Jan - Dec 19 | Jan - Dec 20 | Jan - Dec 21 | Jan - Dec 22 | Jan - Oct 23 |
|---|---|---|---|---|---|---|---|---|---|---|
| Labor - Repairs & Maintenance (labor expended to repair or maintain equipment located in client facilities) | 0.00 | 0.00 | 0.00 | 0.00 | 275.00 | 0.00 | 0.00 | 808,407.95 | 601,662.23 | 0.00 |
| Labor - Telephone CC Sales (labor expended by call center) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -3,490.36 | 220,299.30 | 237,202.00 | 616,321.00 | 0.00 |
| Meals Expense (COGS account dump for CPA) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32,828.00 | 82,014.00 | 84,876.93 |
| Merchant Account Fees (Credit card merchant account discount fees, transaction fees, and related costs) | | | | | | | | | | |
| Charge Backs (credit card charge backs) | 0.00 | 0.00 | 0.00 | 0.00 | 926.00 | 72,247.75 | 0.00 | 21,600.34 | 282,609.20 | 321,961.53 |
| Merchant Account Fees (Credit card merchant account disco | 0.00 | 0.00 | 0.00 | 0.00 | 366,043.13 | 447,173.22 | 807,368.15 | 1,019,189.91 | 1,342,985.23 | 1,498,317.11 |
| Total Merchant Account Fees (Credit card merchant account discount fees, transaction fees, and related costs) | 0.00 | 0.00 | 0.00 | 0.00 | 366,969.13 | 519,420.97 | 807,368.15 | 1,040,790.25 | 1,625,594.43 | 1,820,298.64 |
| Misc. 3rd Party kiosk software (Casemaker, video on demand,) | 0.00 | 0.00 | 0.00 | 13,144.26 | 149,047.91 | 88,527.85 | 174,308.50 | 161,377.93 | 170,948.75 | 261,308.94 |
| Miscellaneous Hardware Install | 0.00 | 0.00 | 0.00 | 131.68 | 129,506.13 | -296,025.97 | 0.00 | 200,910.00 | 0.00 | 137,464.56 |
| Mobile Mail Carts | 0.00 | 0.00 | 0.00 | 0.00 | 7.21 | 1,098.59 | 1,050.39 | 1,447.00 | 0.00 | 0.00 |
| Post Office Box Rents (post office boxes for Mailguard) | 0.00 | 0.00 | 0.00 | 0.00 | 2,647.00 | 6,686.36 | 10,218.97 | 0.00 | 0.00 | 0.00 |
| Product Samples Expense (Cost of products used as floor samples or given to customers for trial or demonstration) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Promotional Expenses | 0.00 | 0.00 | 0.00 | 0.00 | 6,873.37 | 108.50 | 560.94 | 0.00 | 0.00 | 0.00 |
| Purchases Hardware | 0.00 | 0.00 | 0.00 | 0.00 | 27,637.62 | 79,550.40 | 1,032,867.63 | 4,097,633.00 | 3,716,771.36 | 7,380,150.22 |
| Repair Pieces for Kiosks (miscellaneous repair pieces used for repairing installed kiosks / keyboards / monitors / pho | 0.00 | 0.00 | 0.00 | 0.00 | 5,000.00 | 0.00 | 3,150.00 | 0.00 | 0.00 | 0.00 |
| Salesperson Commissions | 0.00 | 0.00 | 0.00 | 0.00 | 166,444.37 | 73,993.01 | 43,434.69 | 269,484.62 | 164,193.33 | 63,409.00 |
| Shipping -- UPS / Fedex / USPS | 0.00 | 0.00 | 0.00 | 3.19 | 0.00 | 96,187.73 | 0.00 | 0.00 | 0.00 | 0.00 |
| Sublicense Royalties Fees | 0.00 | 0.00 | 0.00 | 0.00 | 126,675.57 | 127,095.38 | 148,538.78 | 100,794.60 | 23,495.91 | 0.00 |
| Tablet Repair Pieces (replacement glass, specialized tools, misc small pieces) | 0.00 | 0.00 | 0.00 | 0.00 | 19,167.05 | 273.36 | 0.00 | 0.00 | 0.00 | 0.00 |
| Tablet Units | 0.00 | 0.00 | 0.00 | 0.00 | 1,598,664.04 | 2,687,388.42 | 0.00 | 0.00 | 0.00 | 0.00 |
| Tablets Installed with charger (10 tablets installed with one charging station) | 0.00 | 0.00 | 0.00 | 0.00 | 781,763.53 | 618,310.42 | 0.00 | 152,000.00 | 0.00 | 0.00 |
| Technology Grant (technology grant money given to facilities during term of contract) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 154,950.85 | 311,913.00 | 214,396.58 | 1,197,413.26 |
| Telecommunications Taxes (taxes paid in connection with doing business as a telephone provider (local, state, or fed | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 34,844.99 | 474,019.00 | 629,686.57 | 1,892,898.71 |
| Touch screen kiosks (touch screen kiosks for federal prisons) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 7,841.52 | 404.94 | 24,085.00 | 0.00 | 0.00 |
| Travel - Installation & Maint. (travel related costs asscociated with installation of product or repairs/regular maintenance) | | | | | | | | | | |
| Airfare | 0.00 | 0.00 | 0.00 | 2,860.20 | 50,084.98 | 47,531.67 | 92,999.15 | 135,754.21 | 380,861.42 | 301,528.92 |
| Cabs or Rideshare | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4.78 | 0.00 | 0.00 |
| Covid Travel Expenses (medical screenings required before t | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 364.00 | 0.00 | 0.00 | 0.00 |
| Gas (gas for rental vehicle or POV used for installation and m | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8,511.78 | 27,914.00 | 102,170.93 | 74,067.97 |
| Lodging | 0.00 | 0.00 | 0.00 | 2,116.66 | 13,608.27 | 24,718.47 | 64,284.79 | 93,647.31 | 340,081.97 | 340,302.50 |
| Meals | 0.00 | 0.00 | 0.00 | 344.05 | 51,561.35 | 6,509.72 | 23,339.57 | 0.00 | 0.00 | 0.00 |
| Mileage (mileage) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,559.97 | 6,991.88 | 12,865.19 | 21,052.79 | 19,531.10 |
| Misc. Travel Expenses | 0.00 | 0.00 | 0.00 | 263.19 | 3,070.41 | 1,952.08 | 346.42 | 605.89 | 16,137.96 | 7,109.47 |
| Parking & Tolls | 0.00 | 0.00 | 0.00 | 283.00 | 1,303.84 | 1,303.69 | 6,068.62 | 11,161.46 | 27,400.27 | 33,036.07 |
| Vehicle Rental | 0.00 | 0.00 | 0.00 | 403.85 | 8,098.85 | 18,006.38 | 36,758.78 | 62,221.28 | 169,529.90 | 141,983.48 |
| Travel - Installation & Maint. (travel related costs asscociated | 0.00 | 0.00 | 0.00 | 0.00 | 335.03 | 0.00 | 0.00 | 9,227.88 | 147,022.04 | 2,033.64 |
| Total Travel - Installation & Maint. (travel related costs asscociated with installation of product or repairs/regular main | 0.00 | 0.00 | 0.00 | 6,270.95 | 128,062.73 | 104,581.98 | 239,664.99 | 353,402.00 | 1,204,257.28 | 919,593.15 |
| Voice Over IP | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8,876.00 | 224,729.67 | 284,208.29 |
| Watch (Watch Tooling and Development) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 144,714.31 | 43,814.00 |
| Web Service | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total COGS** | 0.00 | 0.00 | 685.80 | -54,174.19 | 5,120,445.81 | 5,699,285.61 | 4,628,672.66 | 15,795,400.57 | 25,539,844.79 | 30,780,826.93 |
| **Gross Profit** | 0.00 | 0.00 | -685.80 | 54,174.19 | 4,471,345.45 | 10,094,745.69 | 16,889,303.43 | 16,130,926.76 | 19,240,488.76 | 14,846,317.01 |

| | | Jan - Dec 14 | Jan - Dec 15 | Jan - Dec 16 | Jan - Dec 17 | Jan - Dec 18 | Jan - Dec 19 | Jan - Dec 20 | Jan - Dec 21 | Jan - Dec 22 | Jan - Oct 23 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Expense** | | | | | | | | | | | |
| Advertising and Promotion | | | | | | | | | | | |
| | Conference Demos | 0.00 | 0.00 | 0.00 | 0.00 | 39,376.69 | 60,310.32 | 36,615.80 | 0.00 | 0.00 | 0.00 |
| | Trade Shows | 0.00 | 0.00 | 0.00 | 0.00 | 18,108.72 | 26,499.39 | 15,580.50 | 0.00 | 0.00 | 0.00 |
| | Advertising and Promotion - Other | 0.00 | 0.00 | 0.00 | 0.00 | 7,930.37 | 21,203.60 | 16,455.65 | 94,872.77 | 187,878.83 | 222,257.67 |
| **Total Advertising and Promotion** | | 0.00 | 0.00 | 0.00 | 0.00 | 65,415.78 | 108,013.31 | 68,651.95 | 94,872.77 | 187,878.83 | 222,257.67 |
| Automobile Expense | | | | | | | | | | | |
| | Auto Insurance | 0.00 | 0.00 | 0.00 | 0.00 | 8,084.55 | 15,361.27 | 66,056.76 | 172,289.00 | 160,070.06 | 0.00 |
| | Company Automobile Lease | 0.00 | 0.00 | 0.00 | 0.00 | 14,929.20 | 7,661.14 | 10,574.25 | 0.00 | 0.00 | 0.00 |
| | Fuel | 0.00 | 0.00 | 0.00 | 99.12 | 14,936.63 | 12,858.06 | 22,266.48 | 0.00 | 0.00 | 0.00 |
| | Maintenance | 0.00 | 0.00 | 0.00 | 0.00 | 22,860.33 | 18,717.68 | 61,723.73 | 0.00 | 0.00 | 0.00 |
| | Prepaid Toll Accounts | 0.00 | 0.00 | 0.00 | 0.00 | 504.30 | 557.09 | 1,304.38 | 0.00 | 0.00 | 0.00 |
| | Registration | 0.00 | 0.00 | 0.00 | 0.00 | 1,374.15 | 582.13 | 20,768.80 | 0.00 | 0.00 | 0.00 |
| | Automobile Expense - Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Automobile Expense** | | 0.00 | 0.00 | 0.00 | 99.12 | 62,689.16 | 55,737.37 | 182,694.40 | 172,289.00 | 160,070.06 | 0.00 |
| Bank or Credit Card Misc Fees (annual fees; ATM fees; etc.) | | 0.00 | 0.00 | 0.00 | 0.00 | 200.00 | 1,247.37 | 1,195.00 | 0.00 | 0.00 | 0.00 |
| Bank Service Charges | | 0.00 | 0.00 | 0.00 | 0.00 | 1,555.44 | 681.87 | 677.00 | 2,227.00 | 6,803.71 | 6,763.16 |
| Bid and Proposal Expenses | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Cell Phones & Service | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8,279.78 | 23,758.22 | 0.00 | 0.00 | 0.00 |
| Charitble Contributions | | 0.00 | 0.00 | 0.00 | 0.00 | 2,636.12 | 4,750.00 | 6,160.00 | 10,713.51 | 19,340.25 | 16,822.76 |
| Client Welfare | | 0.00 | 0.00 | 0.00 | 73.60 | 56,545.04 | 62,486.70 | 0.00 | 163,073.00 | 142,975.46 | 172,067.74 |
| Computer Expenses | | 0.00 | 0.00 | 0.00 | 0.00 | 13,273.88 | 0.00 | 19,512.81 | 38,320.00 | 155,749.43 | 68,009.60 |
| Computer Supplies | | 0.00 | 0.00 | 0.00 | 0.00 | 46,804.67 | 0.00 | 3,294.86 | 20,135.00 | 7,218.18 | 23,411.39 |
| Contract Labor Expense | | 0.00 | 0.00 | 0.00 | 0.00 | 3,093.24 | 7,962.64 | 60,974.97 | 97,916.00 | 293,579.59 | 102,582.41 |
| Depreciation Expense (Depreciation on equipment, buildings and improvements) | | 0.00 | 0.00 | 0.00 | 0.00 | 994,890.00 | 1,901,609.00 | 2,690,604.00 | 1,736,067.00 | 1,636,576.09 | 1,172,544.60 |
| Dues and Subscriptions | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33,915.35 | 81,789.00 | 98,821.33 | 22,119.49 |
| Education | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11,159.85 | 8,315.49 | 0.00 |
| Employee Costs | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Employee Welfare | | 0.00 | 0.00 | 0.00 | 4.40 | 23,773.32 | 44,409.78 | 5,950.44 | -1.13 | 7,707.55 | 5,402.20 |
| Facilities Repair & Maintenance | | 0.00 | 0.00 | 0.00 | 561.60 | 4,829.13 | 164,416.57 | 266,140.10 | 0.00 | 0.00 | 0.00 |
| Freight | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,388.98 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance Expense | | 0.00 | 0.00 | 0.00 | 0.00 | 61,030.13 | 81,931.30 | 153,126.35 | 127,467.55 | 171,782.58 | 346,792.47 |
| Internet Service CORP | | 0.00 | 0.00 | 0.00 | 0.00 | 118.13 | -32,533.42 | 8,379.39 | 0.00 | 0.00 | 0.00 |
| Legal Fees | | | | | | | | | | | |
| | Legal Fees - Settlements | 0.00 | 0.00 | 0.00 | 0.00 | 25,000.00 | 3,000.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Legal Fees - Other | 0.00 | 0.00 | 0.00 | 0.00 | 22,500.00 | 536,956.61 | 1,085,563.63 | 3,057,098.80 | 2,562,058.30 | 2,578,901.51 |
| **Total Legal Fees** | | 0.00 | 0.00 | 0.00 | 0.00 | 47,500.00 | 539,956.61 | 1,085,563.63 | 3,057,098.80 | 2,562,058.30 | 2,578,901.51 |
| Licenses & Permits | | 0.00 | 0.00 | 0.00 | 0.00 | 1,258.89 | 2,677.90 | 3,927.35 | 2,655.75 | 162.31 | 19,187.83 |
| Marketing - Summit Expenses | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Marketing Subscriptions | | 0.00 | 0.00 | 0.00 | 29.95 | 4,766.20 | 13,743.65 | 24,430.79 | 0.00 | 0.00 | 0.00 |
| Meals and Entertainment | | 0.00 | 0.00 | 0.00 | 121.84 | 0.00 | 41,291.70 | 55,155.01 | 110,879.00 | 144,537.59 | 116,377.62 |
| Miscellaneous Hardware Purchase | | 0.00 | 0.00 | 0.00 | 5.93 | 12,849.79 | 10,682.37 | 0.00 | 0.00 | 0.00 | 0.00 |

| | | Jan - Dec 14 | Jan - Dec 15 | Jan - Dec 16 | Jan - Dec 17 | Jan - Dec 18 | Jan - Dec 19 | Jan - Dec 20 | Jan - Dec 21 | Jan - Dec 22 | Jan - Oct 23 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Miscellaneous Software Purchase | | 0.00 | 0.00 | 0.00 | 12.50 | 0.00 | 2,983.65 | 0.00 | 0.00 | 130.91 | 0.00 |
| Office Expense | | 0.00 | 0.00 | 0.00 | 0.00 | 2,349.99 | 83.10 | 30,885.72 | 83,999.00 | 160,302.10 | 30,413.83 |
| Office Supplies | | | | | | | | | | | |
| | Computer Supplies | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,239.24 | 3,258.90 | 0.00 | 0.00 | 0.00 |
| | General Office Supplies | 0.00 | 0.00 | 0.00 | 35.77 | 11,198.09 | 28,334.34 | 26,764.66 | 21,256.13 | 0.00 | 51,802.96 |
| | Janitorial Supplies | 0.00 | 0.00 | 0.00 | 0.00 | 9,211.41 | 5,989.11 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Tools | 0.00 | 0.00 | 0.00 | 0.00 | 14,768.29 | 22,859.02 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Office Supplies - Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,799.54 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Office Supplies | | 0.00 | 0.00 | 0.00 | 35.77 | 35,177.79 | 60,221.25 | 30,023.56 | 21,256.13 | 0.00 | 51,802.96 |
| Outside Services | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 14,854.19 | 5,494.50 | 9,743.52 | 950.36 |
| Payroll Expenses | | | | | | | | | | | |
| | AD&D Insurance ER (company paid benefit) | 0.00 | 0.00 | 0.00 | 0.00 | 327.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Covid Sick -- EE (federal government sick leave program for ( | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,250.00 | 0.00 | 0.00 | 0.00 |
| | Dental Insurance ER (company paid premiums) | 0.00 | 0.00 | 0.00 | 0.00 | 777.32 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Employee Bonus | 0.00 | 0.00 | 0.00 | 0.00 | 2,000.00 | 15,963.10 | 15,900.00 | 0.00 | 0.00 | 0.00 |
| | Employee Overtime Wages (overtime wages paid to hourly or | 0.00 | 0.00 | 0.00 | 0.00 | 11,047.89 | 4,762.82 | 2,517.76 | 0.00 | 0.00 | 0.00 |
| | Employee Salary and Wages (regular W-2 employees) | 0.00 | 0.00 | 0.00 | 0.00 | 787,753.86 | 2,161,320.98 | 2,544,241.16 | 3,421,085.00 | 4,814,980.25 | 6,475,868.51 |
| | ER Federal Unemployment Tax | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,870.12 | 3,571.22 | 0.00 | 0.00 | 0.00 |
| | ER Health Insurance Premiums | 0.00 | 0.00 | 0.00 | 0.00 | 38,212.00 | 194,839.79 | 258,542.31 | 336,556.08 | 369,966.50 | 450,654.05 |
| | ER Medicare & Soc Soc Tax (Combined medicar and social s | 0.00 | 0.00 | 0.00 | 0.00 | 13.38 | 208,106.64 | 280,065.03 | 411,561.00 | 568,541.96 | 567,768.90 |
| | ER Social Security Expense | 0.00 | 0.00 | 0.00 | 0.00 | 57.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | ER State Unemployment Tax | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 26,604.65 | 30,126.66 | 0.00 | 0.00 | 0.00 |
| | Holiday Pay | 0.00 | 0.00 | 0.00 | 0.00 | 33,597.83 | 102,256.59 | 137,514.89 | 0.00 | 0.00 | 0.00 |
| | Medical Waiver ER (payments made to employees who waive | 0.00 | 0.00 | 0.00 | 0.00 | 4,800.00 | 12,200.00 | 6,700.00 | 0.00 | 0.00 | 0.00 |
| | Officer Compensation | 0.00 | 0.00 | 0.00 | 0.00 | 112,419.77 | 148,753.02 | 170,000.10 | 160,945.00 | 160,384.56 | 96,922.98 |
| | Officer Medical Expenses (out of pocket medical expenses, e | 0.00 | 0.00 | 0.00 | 0.00 | 13,451.83 | 10,620.35 | 5,023.36 | 0.00 | 0.00 | 0.00 |
| | Other Employee Benefits | 0.00 | 0.00 | 0.00 | 0.00 | -493.19 | 15,287.36 | 5,950.44 | 0.00 | 0.00 | 0.00 |
| | Other Payroll Taxes (catch-all account for state unemployme | 0.00 | 0.00 | 0.00 | 0.00 | 91,453.87 | 749.31 | 383.47 | 0.00 | 0.00 | 0.00 |
| | Payroll Service Fees | 0.00 | 0.00 | 0.00 | 0.00 | 23,843.10 | 39,304.32 | 53,643.91 | 65,651.00 | 79,353.61 | 87,826.76 |
| | Per Diem (payments to employees for excess travel expense | 0.00 | 0.00 | 0.00 | 0.00 | 7,162.00 | 1,196.00 | 1,242.00 | 0.00 | 0.00 | 0.00 |
| | PTO (Vacation / Sick) (earned time off with pay) | 0.00 | 0.00 | 0.00 | 0.00 | 17,078.82 | 96,475.77 | 100,893.85 | 0.00 | 0.00 | 0.00 |
| | Vision Insurance ER (employer paid premiums) | 0.00 | 0.00 | 0.00 | 0.00 | 102.90 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Workers' Compensation Insurance | 0.00 | 0.00 | 0.00 | 0.00 | 7,335.47 | 10,058.61 | 11,914.08 | 14,799.73 | 22,600.57 | 34,394.89 |
| | Payroll Expenses - Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Payroll Expenses | | 0.00 | 0.00 | 0.00 | 0.00 | 1,150,941.31 | 3,051,369.43 | 3,630,480.24 | 4,410,597.81 | 6,015,827.45 | 7,713,436.09 |
| Political Contributions | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Postage and Delivery | | 0.00 | 0.00 | 0.00 | 6.38 | 0.00 | 1,998.20 | 24,070.81 | 4,883.00 | 18,982.05 | 10,501.03 |
| Printing & Copying | | 0.00 | 0.00 | 0.00 | 0.00 | 3,505.25 | 6,636.43 | 0.00 | 0.00 | 0.00 | 0.00 |
| Professional Fees | | | | | | | | | | | |
| | Accounting Services | 0.00 | 0.00 | 0.00 | 0.00 | 45,248.50 | 60,941.25 | 39,393.75 | 0.00 | 0.00 | 0.00 |
| | Answering Service (24/7 answering service for IT support des | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 303.16 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Data Storage | 0.00 | 0.00 | 0.00 | 0.99 | 4,728.75 | 4,280.78 | 0.00 | 0.00 | 0.00 | 0.00 |

| | | Jan - Dec 14 | Jan - Dec 15 | Jan - Dec 16 | Jan - Dec 17 | Jan - Dec 18 | Jan - Dec 19 | Jan - Dec 20 | Jan - Dec 21 | Jan - Dec 22 | Jan - Oct 23 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | IT Services | 0.00 | 0.00 | 0.00 | 1,852.50 | 2,699.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Janitorial Service | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,424.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Office Security | 0.00 | 0.00 | 0.00 | 0.00 | 564.84 | 39,114.37 | 4,183.63 | 0.00 | 0.00 | 0.00 |
| | Regulatory Registration Agent (FCC & state regulatory consu | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 24,688.32 | 68,569.61 | 50,643.95 | 587,094.48 | 81,901.29 |
| | Professional Fees - Other | 0.00 | 0.00 | 0.00 | 0.00 | 407,765.75 | 35,295.14 | 17,455.00 | 110,811.00 | 110,937.25 | 119,117.20 |
| Total Professional Fees | | 0.00 | 0.00 | 0.00 | 1,853.49 | 461,007.36 | 169,047.02 | 129,601.99 | 161,454.95 | 698,031.73 | 201,018.49 |
| Property Tax (property taxes paid on company owned or leased property) | | 0.00 | 0.00 | 0.00 | 0.00 | 12,000.00 | 69,408.60 | 52,071.86 | 72,675.76 | 71,658.00 | 0.00 |
| Real Estate Closing Fees (doc stamps, title search, lien search, closing fee, survey certs, recording fees) | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15,859.50 | 0.00 | 0.00 | 0.00 |
| Reconciliation Discrepancies (Discrepancies between bank statements and company records) | | 0.00 | 0.00 | 0.00 | 0.00 | -50.57 | -65,156.14 | 1,333.61 | 0.00 | 0.00 | 0.00 |
| Recruitment Expense | | 0.00 | 0.00 | 0.00 | 349.00 | 6,196.50 | 46,527.60 | 12,497.28 | 20,671.61 | 131,371.67 | 43,735.63 |
| Rent Expense | | | | | | | | | | | |
| | Off-site storage | 0.00 | 0.00 | 0.00 | 0.00 | 10,593.00 | 10,766.80 | 22.00 | 0.00 | 0.00 | 0.00 |
| | Office Rents | 0.00 | 0.00 | 0.00 | 0.00 | 189,925.00 | 130,575.00 | 212,000.00 | 79,825.00 | 115,565.25 | 126,191.93 |
| | Rent Expense - Other | 0.00 | 0.00 | 0.00 | 0.00 | 6,500.00 | 0.00 | 0.00 | 0.00 | 677,981.93 | 1,028,613.54 |
| Total Rent Expense | | 0.00 | 0.00 | 0.00 | 0.00 | 207,018.00 | 141,341.80 | 212,022.00 | 79,825.00 | 793,547.18 | 1,154,805.47 |
| Repairs and Maintenance | | | | | | | | | | | |
| | Equipment Maintenance (repair of fixed asset machinery and | 0.00 | 0.00 | 0.00 | 0.00 | 20,476.49 | 56,520.95 | 0.00 | 203,658.00 | 54,428.90 | 58,898.15 |
| | Repairs and Maintenance - Other | 0.00 | 0.00 | 0.00 | 0.00 | 2,438.38 | 0.00 | 109,847.68 | 0.00 | 417,902.73 | 270,566.45 |
| Total Repairs and Maintenance | | 0.00 | 0.00 | 0.00 | 0.00 | 22,914.87 | 56,520.95 | 109,847.68 | 203,658.00 | 472,331.63 | 329,464.60 |
| Research & Development | | 0.00 | 0.00 | 0.00 | 9,120.00 | 119,244.74 | 81,372.19 | 23,298.72 | 0.00 | 0.00 | 0.00 |
| Royalties Expense | | 0.00 | 0.00 | 0.00 | 62,838.33 | 254,457.61 | 357,352.62 | 131,751.12 | 0.00 | 0.00 | 0.00 |
| Sales Tax Paid | | 0.00 | 0.00 | 0.00 | 7.90 | 111,977.76 | 114,307.16 | 27,604.54 | 0.00 | 0.00 | 0.00 |
| Software Subscriptions | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10,897.97 | 0.00 | 0.00 | 0.00 | 76,888.74 |
| Tech Grant Equipment Purchases | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 111,189.25 | 0.00 | 0.00 | 0.00 |
| Telephone Expense | | 0.00 | 0.00 | 0.00 | 50.00 | 17,072.50 | 10,112.22 | 106.98 | 0.00 | 0.00 | 0.00 |
| Trade Broker Commission Expense (fees paid to agents to secure trade agreements) | | 0.00 | 0.00 | 0.00 | 0.00 | 53,749.98 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Travel Expense | | | | | | | | | | | |
| | Airfare | 0.00 | 0.00 | 0.00 | 1,274.55 | 90,686.19 | 100,642.35 | 80,933.09 | 0.00 | 0.00 | 0.00 |
| | Cabs or RideShare | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Gas (gas for rental and POV) | 0.00 | 0.00 | 0.00 | 0.00 | 7,088.57 | 18,409.52 | 3,525.20 | 0.00 | 0.00 | 0.00 |
| | Lodging | 0.00 | 0.00 | 0.00 | 200.88 | 58,583.64 | 91,532.57 | 79,909.07 | 0.00 | 0.00 | 0.00 |
| | Meals | 0.00 | 0.00 | 0.00 | 156.87 | 0.00 | 24,707.98 | 14,886.13 | 0.00 | 0.00 | 0.00 |
| | Mileage | 0.00 | 0.00 | 0.00 | 449.40 | 1,575.17 | 4,126.02 | 3,204.37 | 0.00 | 0.00 | 0.00 |
| | Misc. Travel Expenditures (laundry service, baggage fees, po | 0.00 | 0.00 | 0.00 | 0.00 | 4,794.13 | 775.53 | 904.92 | 0.00 | 0.00 | 0.00 |
| | Parking & Tolls | 0.00 | 0.00 | 0.00 | 0.00 | 2,790.51 | 5,157.15 | 7,625.13 | 0.00 | 0.00 | 0.00 |
| | Vehicle Rental | 0.00 | 0.00 | 0.00 | -37.71 | 31,632.99 | 33,494.29 | 24,218.88 | 0.00 | 0.00 | 0.00 |
| | Travel Expense - Other | 0.00 | 0.00 | 0.00 | 0.00 | 3,932.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Travel Expense | | 0.00 | 0.00 | 0.00 | 2,043.99 | 201,083.55 | 278,845.41 | 215,206.79 | 0.00 | 0.00 | 0.00 |
| Uncategorized Expenses | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Uniforms | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Utilities | | | | | | | | | | | |
| | Electric | 0.00 | 0.00 | 0.00 | 0.00 | 9,471.14 | 37,486.14 | 41,389.43 | 0.00 | 0.00 | 0.00 |

| | Jan - Dec 14 | Jan - Dec 15 | Jan - Dec 16 | Jan - Dec 17 | Jan - Dec 18 | Jan - Dec 19 | Jan - Dec 20 | Jan - Dec 21 | Jan - Dec 22 | Jan - Oct 23 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gas | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Telephone & Internet | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 114.63 | 0.00 | 113,250.00 | 50,197.22 | 105,333.74 |
| Waste Services | 0.00 | 0.00 | 0.00 | 0.00 | 671.65 | 2,726.58 | 4,591.84 | 0.00 | 0.00 | 0.00 |
| Water / Sewer | 0.00 | 0.00 | 0.00 | 0.00 | 5,087.66 | 3,650.27 | 2,735.54 | 0.00 | 0.00 | 0.00 |
| Utilities - Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 52,574.00 | 50,197.22 | 54,557.97 |
| **Total Utilities** | 0.00 | 0.00 | 0.00 | 0.00 | 15,230.45 | 43,977.62 | 48,716.81 | 165,824.00 | 100,394.44 | 159,891.71 |
| **Website Design & Maintenance** | 0.00 | 0.00 | 0.00 | 60.08 | 15,761.06 | 8,911.62 | 24,457.50 | 3,651.00 | 89,318.30 | 78,372.58 |
| **Total Expense** | 0.00 | 0.00 | 0.00 | 77,274.48 | 4,092,867.01 | 7,468,592.18 | 9,539,991.77 | 10,960,652.86 | 14,165,215.73 | 14,724,521.94 |
| **Net Ordinary Income** | 0.00 | 0.00 | -685.80 | -23,100.29 | 378,478.44 | 2,626,153.51 | 7,349,311.66 | 5,170,273.90 | 5,075,273.03 | 121,795.07 |
| **Other Income/Expense** | | | | | | | | | | |
| **Other Income** | | | | | | | | | | |
| Gain/Loss on Sale of Asset | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 540,589.00 | 0.00 | 0.00 |
| Miscellaneous Income | 0.00 | 0.00 | 0.00 | 0.00 | 1,906.03 | 7,702.36 | 494,867.00 | 0.00 | 0.00 | 0.00 |
| **Total Other Income** | 0.00 | 0.00 | 0.00 | 0.00 | 1,906.03 | 7,702.36 | 494,867.00 | 540,589.00 | 0.00 | 0.00 |
| **Other Expense** | | | | | | | | | | |
| Ask My Accountant (Transactions to be discussed with accountant, consultant, or tax preparer) | 0.00 | 0.00 | 0.00 | 25,423.75 | 0.00 | 20,424.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Corporate Federal Income Tax | 0.00 | 0.00 | 0.00 | 0.00 | 13,531.39 | 397,610.23 | 1,527,789.00 | 783,902.00 | 0.00 | 0.00 |
| Corporate State Income Tax | 0.00 | 0.00 | 0.00 | 0.00 | 41,179.59 | 96,736.00 | 377,109.00 | 119,794.00 | 0.00 | 0.00 |
| Intellectual Property Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 17,874,783.38 | 18,239,257.19 |
| Interest Expense | 0.00 | 0.00 | 0.00 | 0.00 | 98,690.00 | 1,435,201.46 | 219,148.67 | 125,242.00 | 461,010.08 | 461,047.51 |
| Late Fees / Penalties | 0.00 | 0.00 | 0.00 | 0.00 | 6,808.12 | 35,982.00 | 19,424.20 | 170,122.89 | 22,137.16 | 23,390.29 |
| Miscellaneous - Other Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 840,053.71 | 1,958.14 | 0.13 |
| **Total Other Expense** | 0.00 | 0.00 | 0.00 | 25,423.75 | 160,209.10 | 1,985,953.69 | 2,143,470.87 | 2,039,114.60 | 18,359,888.76 | 18,723,695.12 |
| **Net Other Income** | 0.00 | 0.00 | 0.00 | -25,423.75 | -158,303.07 | -1,978,251.33 | -1,648,603.87 | -1,498,525.60 | -18,359,888.76 | -18,723,695.12 |
| **Net Income** | **0.00** | **0.00** | **-685.80** | **-48,524.04** | **220,175.37** | **647,902.18** | **5,700,707.79** | **3,671,748.30** | **-13,284,615.73** | **-18,601,900.05** |

# EXHIBIT 34

Form **1120**

Department of the Treasury
Internal Revenue Service

## U.S. Corporation Income Tax Return

For calendar year 2022 or tax year beginning _____ , 2022, ending _____ , _____

Go to *www.irs.gov/Form1120* for instructions and the latest information.

OMB No. 1545-0123

**2022**

**A Check if:**

1a Consolidated return (attach Form 851) .... [X]
b Life/nonlife consolidated return. ....... [ ]
2 Personal holding co. (attach Sch. PH) ..... [ ]
3 Personal service corp. (see instrs) ...... [ ]

**TYPE OR PRINT**

SMART COMMUNICATIONS HOLDING, INC.
10491 72ND STREET
SEMINOLE, FL 33777

**B Employer identification number**

**C Date incorporated**
12/29/2014

**D Total assets (see instructions)**
$ 24,805,714.

4 Schedule M-3 attached [X]   **E** Check if: (1) [ ] Initial return  (2) [ ] Final return  (3) [ ] Name change  (4) [ ] Address change

| | | | | |
|---|---|---|---:|---:|
| **I N C O M E** | 1 a Gross receipts or sales ....................................... | 1a | 44,815,675. | |
| | b Returns and allowances ..................................... | 1b | 35,341. | |
| | c Balance. Subtract line 1b from line 1a .................................. | | 1c | 44,780,334. |
| | 2 Cost of goods sold (attach Form 1125-A) ............................. | | 2 | 25,540,158. |
| | 3 Gross profit. Subtract line 2 from line 1c ............................. | | 3 | 19,240,176. |
| | 4 Dividends and inclusions (Schedule C, line 23) ........................ | | 4 | |
| | 5 Interest ............................................... | | 5 | |
| | 6 Gross rents ............................................ | | 6 | |
| | 7 Gross royalties ......................................... | | 7 | |
| | 8 Capital gain net income (attach Schedule D (Form 1120)) ................ | | 8 | |
| | 9 Net gain or (loss) from Form 4797, Part II, line 17 (attach Form 4797) ....... | | 9 | |
| | 10 Other income (see instructions — attach statement) .................... | | 10 | |
| | 11 **Total income.** Add lines 3 through 10 .............................. | | 11 | 19,240,176. |
| **D E D U C T I O N S** (See instructions for limitations on deductions) | 12 Compensation of officers (see instructions — attach Form 1125-E) ......... | | 12 | 160,385. |
| | 13 Salaries and wages (less employment credits) ........................ | | 13 | 4,814,980. |
| | 14 Repairs and maintenance .................................. | | 14 | 472,332. |
| | 15 Bad debts ............................................ | | 15 | |
| | 16 Rents ............................................... | | 16 | 793,547. |
| | 17 Taxes and licenses ...................................... | | 17 | 18,515,145. |
| | 18 Interest (see instructions) ................................. | | 18 | |
| | 19 Charitable contributions ................................... | | 19 | 0. |
| | 20 Depreciation from Form 4562 not claimed on Form 1125-A or elsewhere on return (attach Form 4562) | | 20 | 1,636,576. |
| | 21 Depletion ............................................ | | 21 | |
| | 22 Advertising ........................................... | | 22 | 187,879. |
| | 23 Pension, profit-sharing, etc., plans ............................. | | 23 | |
| | 24 Employee benefit programs ................................. | | 24 | |
| | 25 Reserved for future use. ................................... | | 25 | |
| | 26 Other deductions (attach statement) .............. See Statement 1 | | 26 | 5,369,374. |
| | 27 **Total deductions.** Add lines 12 through 26 ......................... | | 27 | 31,950,218. |
| | 28 Taxable income before net operating loss deduction and special deductions. Subtract line 27 from line 11 | | 28 | -12,710,042. |
| | 29a Net operating loss deduction (see instructions) ......... | 29a | | |
| | b Special deductions (Schedule C, line 24) ............. | 29b | | |
| | c Add lines 29a and 29b ................................... | | 29c | |
| **T A X, R E F U N D A B L E C R E D I T S, A N D P A Y M E N T S** | 30 **Taxable income.** Subtract line 29c from line 28. See instructions ......... | | 30 | -12,710,042. |
| | 31 Total tax (Schedule J, Part I, line 11) ............................ | | 31 | 0. |
| | 32 Reserved for future use. ................................... | | 32 | |
| | 33 Total payments and credits (Schedule J, Part III, line 23) ................ | | 33 | 1,375,000. |
| | 34 Estimated tax penalty. See instructions. Check if Form 2220 is attached ....... [ ] | | 34 | |
| | 35 Amount owed. If line 33 is smaller than the total of lines 31 and 34, enter amount owed .. | | 35 | |
| | 36 Overpayment. If line 33 is larger than the total of lines 31 and 34, enter amount overpaid .. | | 36 | 1,375,000. |
| | 37 Enter amount from line 36 you want: Credited to 2023 estimated tax ..... Refunded | | 37 | 1,375,000. |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer                  Date         President
                                                   Title

May the IRS discuss this return with the preparer shown below? See instructions.
[X] Yes [ ] No

**Paid Preparer Use Only**

| | | | |
|---|---|---|---|
| Print/Type preparer's name | Preparer's signature | Date | Check [ ] if self-employed   PTIN |
| M. L. SHREVE CPA, P.C. | M. L. SHREVE CPA, P.C. | 10.25.2 | |
| Firm's name ▶ M.L. Shreve CPA, P.C. | | Firm's EIN ▶ | |
| Firm's address ▶ 7781 N. Easy Street | | | |
| Whitehall, MI 49461 | | Phone no. 231 894-5559 | |

**BAA** For Paperwork Reduction Act Notice, see separate instructions.

CPCA0205  10/04/22

Form **1120** (2022)

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form 1120 (2022)    SMART COMMUNICATIONS HOLDING, INC. ▮▮▮▮▮▮▮    Page **2**

| Schedule C | Dividends, Inclusions, and Special Deductions (see instructions) | (a) Dividends and inclusions | (b) Percentage | (c) Special deductions (a) x (b) |
|---|---|---|---|---|
| 1 | Dividends from less-than-20%-owned domestic corporations (other than debt-financed stock) | | 50 | |
| 2 | Dividends from 20%-or-more-owned domestic corporations (other than debt-financed stock) | | 65 | |
| 3 | Dividends on certain debt-financed stock of domestic and foreign corporations | | See instructions | |
| 4 | Dividends on certain preferred stock of less-than-20%-owned public utilities | | 23.3 | |
| 5 | Dividends on certain preferred stock of 20%-or-more-owned public utilities | | 26.7 | |
| 6 | Dividends from less-than-20%-owned foreign corporations and certain FSCs | | 50 | |
| 7 | Dividends from 20%-or-more-owned foreign corporations and certain FSCs | | 65 | |
| 8 | Dividends from wholly owned foreign subsidiaries | | 100 | |
| 9 | **Subtotal.** Add lines 1 through 8. See instructions for limitations | | See instructions | |
| 10 | Dividends from domestic corporations received by a small business investment company operating under the Small Business Investment Act of 1958 | | 100 | |
| 11 | Dividends from affiliated group members | | 100 | |
| 12 | Dividends from certain FSCs | | 100 | |
| 13 | Foreign-source portion of dividends received from a specified 10%-owned foreign corporation (excluding hybrid dividends) (see instructions) | | 100 | |
| 14 | Dividends from foreign corporations not included on line 3, 6, 7, 8, 11, 12, or 13 (including any hybrid dividends) | | | |
| 15 | Reserved for future use | | | |
| 16a | Subpart F inclusions derived from the sale by a controlled foreign corporation (CFC) of the stock of a lower-tier foreign corporation treated as a dividend (attach Form(s) 5471) (see instructions) | | 100 | |
| b | Subpart F inclusions derived from hybrid dividends of tiered corporations (attach Form(s) 5471) (see instructions) | | | |
| c | Other inclusions from CFCs under subpart F not included on line 16a, 16b, or 17 (attach Form(s) 5471) (see instructions) | | | |
| 17 | Global Intangible Low-Taxed Income (GILTI) (attach Form(s) 5471 and Form 8992) | | | |
| 18 | Gross-up for foreign taxes deemed paid | | | |
| 19 | IC-DISC and former DISC dividends not included on line 1, 2, or 3 | | | |
| 20 | Other dividends | | | |
| 21 | Deduction for dividends paid on certain preferred stock of public utilities | | | |
| 22 | Section 250 deduction (attach Form 8993) | | | |
| 23 | **Total dividends and inclusions.** Add column (a), lines 9 through 20. Enter here and on page 1, line 4 | | | |
| 24 | **Total special deductions.** Add column (c) lines 9 through 22. Enter here and on page 1, line 29b | | | |

Form **1120** (2022)

CPCA0212  10/04/22

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form 1120 (2022)    SMART COMMUNICATIONS HOLDING, INC.    ▮▮▮▮▮    Page **3**

| Schedule J | Tax Computation and Payment (see instructions) | | | |
|---|---|---|---|---|
| **Part I — Tax Computation** | | | | |
| 1 | Check if the corporation is a member of a controlled group (attach Schedule O (Form 1120)). See instructions ☐ | | | |
| 2 | Income tax. See instructions | | 2 | 0. |
| 3 | Base erosion minimum tax amount (attach Form 8991) | | 3 | |
| 4 | Add lines 2 and 3 | | 4 | 0. |
| 5a | Foreign tax credit (attach Form 1118) | 5a | | |
| b | Credit from Form 8834 (see instructions) | 5b | | |
| c | General business credit (attach Form 3800) | 5c | | |
| d | Credit for prior year minimum tax (attach Form 8827) | 5d | | |
| e | Bond credits from Form 8912 | 5e | | |
| 6 | **Total credits.** Add lines 5a through 5e | | 6 | |
| 7 | Subtract line 6 from line 4 | | 7 | |
| 8 | Personal holding company tax (attach Schedule PH (Form 1120)) | | 8 | |
| 9a | Recapture of investment credit (attach Form 4255) | 9a | | |
| b | Recapture of low-income housing credit (attach Form 8611) | 9b | | |
| c | Interest due under the look-back method — completed long-term contracts (attach Form 8697) | 9c | | |
| d | Interest due under the look-back method — income forecast method (attach Form 8866) | 9d | | |
| e | Alternative tax on qualifying shipping activities (attach Form 8902) | 9e | | |
| f | Interest/tax due under section 453A(c) and/or section 453(l) | 9f | | |
| g | Other (see instructions — attach statement) | 9g | | |
| 10 | **Total.** Add lines 9a through 9g | | 10 | |
| 11 | **Total tax.** Add lines 7, 8, and 10. Enter here and on page 1, line 31 | | 11 | 0. |
| **Part II — Reserved for Future Use** | | | | |
| 12 | Reserved for future use | | 12 | |
| **Part III — Payments and Refundable Credits** | | | | |
| 13 | 2021 overpayment credited to 2022 | | 13 | |
| 14 | 2022 estimated tax payments | | 14 | 1,375,000. |
| 15 | 2022 refund applied for on Form 4466 | | 15 | ( ) |
| 16 | Combine lines 13, 14, and 15 | | 16 | 1,375,000. |
| 17 | Tax deposited with Form 7004 | | 17 | |
| 18 | Withholding (see instructions) | | 18 | |
| 19 | **Total payments.** Add lines 16, 17, and 18 | | 19 | 1,375,000. |
| 20 | Refundable credits from: | | | |
| a | Form 2439 | 20a | | |
| b | Form 4136 | 20b | | |
| c | Reserved for future use | 20c | | |
| d | Other (attach statement — see instructions) | 20d | | |
| 21 | **Total credits.** Add lines 20a through 20d | | 21 | |
| 22 | Reserved for future use | | 22 | |
| 23 | **Total payments and credits.** Add lines 19 and 21. Enter here and on page 1, line 33 | | 23 | 1,375,000. |

Form **1120** (2022)

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form 1120 (2022)    SMART COMMUNICATIONS HOLDING, INC.    ███████████    Page **4**

| **Schedule K** | **Other Information** (see instructions) | | **Yes** | **No** |
|---|---|---|---|---|

**1** Check accounting method: **a** ☐ Cash  **b** ☒ Accrual  **c** ☐ Other (specify) _____

**2** See the instructions and enter the:

**a** Business activity code no. 551112 _____

**b** Business activity HOLDING COMPANY _____

**c** Product or service COMMUNICATIONS _____

**3** Is the corporation a subsidiary in an affiliated group or a parent-subsidiary controlled group?............................... | | | | X

If "Yes," enter name and EIN of the parent corporation _____

**4** At the end of the tax year:

**a** Did any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, or tax-exempt organization own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote? If "Yes," complete Part I of Schedule G (Form 1120) (attach Schedule G)............. | | | | X

**b** Did any individual or estate own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote? If "Yes," complete Part II of Schedule G (Form 1120) (attach Schedule G)........ | | | X |

**5** At the end of the tax year, did the corporation:

**a** Own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of stock entitled to vote of any foreign or domestic corporation not included on **Form 851**, Affiliations Schedule? For rules of constructive ownership, see instructions............................................................................................................ | | | | X

If "Yes," complete (i) through (iv) below.

| **(i)** Name of Corporation | **(ii)** Employer Identification Number (if any) | **(iii)** Country of Incorporation | **(iv)** Percentage Owned in Voting Stock |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

**b** Own directly an interest of 20% or more, or own, directly or indirectly, an interest of 50% or more in any foreign or domestic partnership (including an entity treated as a partnership) or in the beneficial interest of a trust? For rules of constructive ownership, see instructions............................................................................................................ | | | | X

If "Yes," complete (i) through (iv) below.

| **(i)** Name of Entity | **(ii)** Employer Identification Number (if any) | **(iii)** Country of Organization | **(iv)** Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

**6** During this tax year, did the corporation pay dividends (other than stock dividends and distributions in exchange for stock) in excess of the corporation's current and accumulated earnings and profits? See sections 301 and 316........................ | | | | X

If "Yes," file **Form 5452**, Corporate Report of Nondividend Distributions. See the instructions for Form 5452.

If this is a consolidated return, answer here for the parent corporation and on Form 851 for each subsidiary.

**7** At any time during the tax year, did one foreign person own, directly or indirectly, at least 25% of the total voting power of all classes of the corporation's stock entitled to vote or at least 25% of the total value of all classes of the corporation's stock? For rules of attribution, see section 318. If "Yes," enter: | | | | X

**(a)** Percentage owned _____ and **(b)** Owner's country _____

**(c)** The corporation may have to file **Form 5472**, Information Return of a 25% Foreign-Owned U.S. Corporation or a Foreign Corporation Engaged in a U.S. Trade or Business. Enter the number of Forms 5472 attached _____

**8** Check this box if the corporation issued publicly offered debt instruments with original issue discount.................. ☐

If checked, the corporation may have to file **Form 8281**, Information Return for Publicly Offered Original Issue Discount Instruments.

**9** Enter the amount of tax-exempt interest received or accrued during the tax year $ _____ None

**10** Enter the number of shareholders at the end of the tax year (if 100 or fewer) 2 _____

**11** If the corporation has an NOL for the tax year and is electing to forego the carryback period, check here (see instructions)........................ ☐

If the corporation is filing a consolidated return, the statement required by Regulations section 1.1502-21(b)(3) must be attached or the election will not be valid.

**12** Enter the available NOL carryover from prior tax years (do not reduce it by any deduction reported on page 1, line 29a.)................................................. $ _____ None

Form **1120** (2022)

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form 1120 (2022)    SMART COMMUNICATIONS HOLDING, INC.    ▊▊▊▊▊▊▊▊    Page **5**

| Schedule K | Other Information *(continued from page 4)* | Yes | No |
|---|---|---|---|

| | | Yes | No |
|---|---|---|---|
| **13** | Are the corporation's total receipts (page 1, line 1a, plus lines 4 through 10) for the tax year **and** its total assets at the end of the tax year less than $250,000?............................................................................ | | X |
| | If "Yes," the corporation is not required to complete Schedules L, M-1, and M-2. Instead, enter the total amount of cash distributions and the book value of property distributions (other than cash) made during the tax year    $ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | |
| **14** | Is the corporation required to file Schedule UTP (Form 1120), Uncertain Tax Position Statement? See instructions........... | | X |
| | If "Yes," complete and attach Schedule UTP. | | |
| **15a** | Did the corporation make any payments in 2022 that would require it to file Form(s) 1099?................................. | X | |
| **b** | If "Yes," did or will the corporation file required Form(s) 1099?.................................................... | X | |
| **16** | During this tax year, did the corporation have an 80%-or-more change in ownership, including a change due to redemption of its own stock?........................................................................................ | | X |
| **17** | During or subsequent to this tax year, but before the filing of this return, did the corporation dispose of more than 65% (by value) of its assets in a taxable, non-taxable, or tax deferred transaction?......................................... | | X |
| **18** | Did the corporation receive assets in a section 351 transfer in which any of the transferred assets had a fair market basis or fair market value of more than $1 million?........................................................................ | | X |
| **19** | During the corporation's tax year, did the corporation make any payments that would require it to file Forms 1042 and 1042-S under chapter 3 (sections 1441 through 1464) or chapter 4 (sections 1471 through 1474) of the Code?....................... | | X |
| **20** | Is the corporation operating on a cooperative basis?.............................................................. | | X |
| **21** | During the tax year, did the corporation pay or accrue any interest or royalty for which the deduction is not allowed under section 267A? See instructions ...................................................................... | | X |
| | If "Yes," enter the total amount of the disallowed deductions   $ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | |
| **22** | Does the corporation have gross receipts of at least $500 million in any of the 3 preceding tax years? (See sections 59A(e)(2) and (3))...................................................................... | | X |
| | If "Yes," complete and attach Form 8991. | | |
| **23** | Did the corporation have an election under section 163(j) for any real property trade or business or any farming business in effect during the tax year? See instructions ..................................................... | | X |
| **24** | Does the corporation satisfy one or more of the following? See instructions......................................... | X | |
| **a** | The corporation owns a pass-through entity with current, or prior year carryover, excess business interest expense. | | |
| **b** | The corporation's aggregate average annual gross receipts (determined under section 448(c)) for the 3 tax years preceding the current tax year are more than $27 million and the corporation has business interest expense. | | |
| **c** | The corporation is a tax shelter and the corporation has business interest expense. | | |
| | If "Yes," complete and attach Form 8990. | | |
| **25** | Is the corporation attaching Form 8996 to certify as a Qualified Opportunity Fund?..................................... | | X |
| | If "Yes," enter amount from Form 8996, line 15............ $ | | |
| **26** | Since December 22, 2017, did a foreign corporation directly or indirectly acquire substantially all of the properties held directly or indirectly by the corporation, and was the ownership percentage (by vote or value) for purposes of section 7874 greater than 50% (for example, the shareholders held more than 50% of the stock of the foreign corporation)? If "Yes," list the ownership percentage by vote and by value. See instructions................................................. | | X |
| | Percentage: By Vote                          Percentage: By Value | | |

Form **1120** (2022)

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form 1120 (2022)    SMART COMMUNICATIONS HOLDING, INC.    ▮▮▮▮▮▮    Page 6

## Schedule L — Balance Sheets per Books

| Assets | Beginning of tax year (a) | (b) | End of tax year (c) | (d) |
|---|---|---|---|---|
| 1  Cash | | 5,398,481. | | 865,720. |
| 2a  Trade notes and accounts receivable | 2,244,379. | | 462,259. | |
| b  Less allowance for bad debts | ( ) | 2,244,379. | ( ) | 462,259. |
| 3  Inventories | | 1,894,859. | | 690,704. |
| 4  U.S. government obligations | | | | |
| 5  Tax-exempt securities (see instructions) | | | | |
| 6  Other current assets (attach statement) Stmt. 2 | | 1,450,610. | | 12,139,679. |
| 7  Loans to shareholders | | 728,855. | | 2,914,086. |
| 8  Mortgage and real estate loans | | | | |
| 9  Other investments (attach statement) | | | | |
| 10a  Buildings and other depreciable assets | 13,734,794. | | 14,892,021. | |
| b  Less accumulated depreciation | ( 7,205,777.) | 6,529,017. | ( 7,158,755.) | 7,733,266. |
| 11a  Depletable assets | | | | |
| b  Less accumulated depletion | ( ) | | ( ) | |
| 12  Land (net of any amortization) | | | | |
| 13a  Intangible assets (amortizable only) | | | | |
| b  Less accumulated amortization | ( ) | | ( ) | |
| 14  Other assets (attach statement) | | | | |
| 15  Total assets | | 18,246,201. | | 24,805,714. |
| **Liabilities and Shareholders' Equity** | | | | |
| 16  Accounts payable | | 1,502,160. | | 1,277,645. |
| 17  Mortgages, notes, bonds payable in less than 1 year | | | | |
| 18  Other current liabilities (attach stmt) Stmt. 3 | | 1,753,422. | | 3,319,347. |
| 19  Loans from shareholders | | | | |
| 20  Mortgages, notes, bonds payable in 1 year or more | | 1,284,662. | | 58,576,292. |
| 21  Other liabilities (attach statement) | | | | |
| 22  Capital stock:  a Preferred stock | | | | |
| b Common stock | 364,667. | 364,667. | 364,667. | 364,667. |
| 23  Additional paid-in capital | | 760,056. | | 392,151. |
| 24  Retained earnings — Approp (att stmt) | | | | |
| 25  Retained earnings — Unappropriated | | 12,581,234. | | -39,124,388. |
| 26  Adjmt to shareholders' equity (att stmt) | | | | |
| 27  Less cost of treasury stock | | ( ) | | ( ) |
| 28  Total liabilities and shareholders' equity | | 18,246,201. | | 24,805,714. |

## Schedule M-1 — Reconciliation of Income (Loss) per Books With Income per Return
Note: The corporation may be required to file Schedule M-3. See instructions.

| | | | | |
|---|---|---|---|---|
| 1  Net income (loss) per books | -14,659,799. | 7  Income recorded on books this year not included on this return (itemize): | | |
| 2  Federal income tax per books | 1,375,000. | Tax-exempt interest $ _ _ _ _ _ _ _ _ | | |
| 3  Excess of capital losses over capital gains | | | | |
| 4  Income subject to tax not recorded on books this year (itemize): _ _ _ _ _ _ _ _ | | | | |
| | | 8  Deductions on this return not charged against book income this year (itemize): | | |
| 5  Expenses recorded on books this year not deducted on this return (itemize): | | a Depreciation . . $ _ _ _ _ _ _ _ _ | | |
| a Depreciation . . . . . . . $ _ _ _ _ _ | | b Charitable contribs $ _ _ _ _ _ _ _ | | |
| b Charitable contributions . . $ _ _ _ _ 19,340. | | | | |
| c Travel & entertainment . . $ _ _ _ _ 72,269. | | | | |
| Statement 4 _ _ _ _ 483,148. | | | | |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | 574,757. | 9  Add lines 7 and 8 | | 0. |
| 6  Add lines 1 through 5 | -12,710,042. | 10  Income (page 1, line 28) — line 6 less line 9 | | -12,710,042. |

## Schedule M-2 — Analysis of Unappropriated Retained Earnings per Books (Schedule L, Line 25)

| | | | | |
|---|---|---|---|---|
| 1  Balance at beginning of year | 12,581,234. | 5  Distributions . . . . . . . . a Cash | | |
| 2  Net income (loss) per books | -14,659,799. | b Stock    c Property | | |
| 3  Other increases (itemize): _ _ _ _ _ _ _ _ | | 6  Other decreases (itemize): | | |
| | | Statement 5 | | 37,045,823. |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | 7  Add lines 5 and 6 | | 37,045,823. |
| 4  Add lines 1, 2, and 3 | -2,078,565. | 8  Balance at end of year (line 4 less line 7) | | -39,124,388. |

CPCA0234  10/04/22

Form **1120** (2022)

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form **8050**
(November 2016)

Department of the Treasury
Internal Revenue Service

## Direct Deposit of Corporate Tax Refund

► Attach to Form 1120 or 1120S.
► Information about Form 8050 and its instructions is at *www.Irs.gov/form8050.*

OMB No. 1545-0128

| Name of corporation (as shown on tax return) | Employer Identification number |
|---|---|
| SMART COMMUNICATIONS HOLDING, INC. | ▓▓▓▓▓▓▓▓ |
| | Phone number (optional) |

**1**   **Routing number (must be nine digits).** The first two digits must be between 01 and 12 or 21 through 32.

▓▓▓▓▓▓

**2**   **Account number** (include hyphens but omit spaces and special symbols):   ▓▓▓▓▓▓▓▓

**3**   Type of account (one box must be checked):

[X] Checking     [ ] Savings

**BAA**

Form **8050**  (11-2016)

CPCZ1501L 08/23/16

**CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY**

| Form **1125-A** | | **Cost of Goods Sold** | | OMB No. 1545-0123 |
|---|---|---|---|---|
| (Rev. November 2018) | | ► Attach to Form 1120, 1120-C, 1120-F, 1120S, or 1065. | | |
| Department of the Treasury Internal Revenue Service | | ► Go to *www.irs.gov/Form1125A* for the latest information. | | |

| Name | Employer Identification number |
|---|---|
| SMART COMMUNICATIONS HOLDING, INC. | |

| | | | |
|---|---|---|---:|
| 1 | Inventory at beginning of year | 1 | 1,894,859. |
| 2 | Purchases | 2 | 4,085,875. |
| 3 | Cost of labor | 3 | 1,943,725. |
| 4 | Additional section 263A costs (attach schedule) | 4 | |
| 5 | Other costs (attach schedule) . . . . . . . . . . . . . . . . . . . See Statement 6 | 5 | 18,306,403. |
| 6 | **Total.** Add lines 1 through 5 | 6 | 26,230,862. |
| 7 | Inventory at end of year | 7 | 690,704. |
| 8 | **Cost of goods sold.** Subtract line 7 from line 6. Enter here and on Form 1120, page 1, line 2 or the appropriate line of your tax return. See instructions | 8 | 25,540,158. |

**9a** Check all methods used for valuing closing inventory:

   *(i)*  [X] Cost

   *(ii)*  [ ] Lower of cost or market

   *(iii)*  [ ] Other (Specify method used and attach explanation.) ► _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

  **b** Check if there was a writedown of subnormal goods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ► [ ]

  **c** Check if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) . . . . . . . . . . . . . . . ► [ ]

  **d** If the LIFO inventory method was used for this tax year, enter amount of closing inventory computed under LIFO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **9d** | |

  **e** If property is produced or acquired for resale, do the rules of section 263A apply to the entity? See instructions . . . . . . [ ] Yes [X] No

  **f** Was there any change in determining quantities, cost, or valuations between opening and closing inventory? If "Yes," attach explanation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [ ] Yes [X] No

**BAA  For Paperwork Reduction Act Notice, see instructions.**          Form **1125-A** (Rev. 11-2018)

CPCZ0401L  09/26/18

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

**SCHEDULE G**
**(Form 1120)**
(Rev December 2011)
Department of the Treasury
Internal Revenue Service

# Information on Certain Persons Owning the Corporation's Voting Stock
► Attach to Form 1120.
► See instructions.

OMB No. 1545-0123

Name
SMART COMMUNICATIONS HOLDING, INC.

Employer Identification number (EIN)
█████████

**Part I** | **Certain Entities Owning the Corporation's Voting Stock.** (Form 1120, Schedule K, Question 4a).
Complete columns (i) through (v) below for any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, or tax-exempt organization that owns directly 20% or more, or owns, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote (see instructions).

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Percentage Owned in Voting Stock |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Part II** | **Certain Individuals and Estates Owning the Corporation's Voting Stock.** (Form 1120, Schedule K, Question 4b).
Complete columns (i) through (iv) below for any individual or estate that owns directly 20% or more, or owns, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote (see instructions).

| (i) Name of Individual or Estate | (ii) Identifying Number (if any) | (iii) Country of Citizenship (see instructions) | (iv) Percentage Owned in Voting Stock |
|---|---|---|---|
| JAMES LOGAN | ███████ | United States | 50.00% |
| JONATHAN LOGAN | ███████ | United States | 50.00% |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**BAA** For Paperwork Reduction Act Notice, see the Instructions for Form 1120.

CPCA1901L  06/02/11

Schedule G (Form 1120) (Rev 12-2011)

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

| SCHEDULE M-3 (Form 1120) | Net Income (Loss) Reconciliation for Corporations With Total Assets of $10 Million or More | OMB No. 1545-0123 |
|---|---|---|
| (Rev. December 2019) Department of the Treasury Internal Revenue Service | ► Attach to Form 1120 or 1120-C. ► Go to *www.irs.gov/Form1120* for instructions and the latest information. | |

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| SMART COMMUNICATIONS COLLIER INC. | ███████ |

Check applicable box(es):
(1) ☐ Non-consolidated return   (2) ☒ Consolidated return (Form 1120 only)
(3) ☐ Mixed 1120/L/PC group   (4) ☐ Dormant subsidiaries schedule attached

**Part I  Financial Information and Net Income (Loss) Reconciliation** (see instructions)

**1a** Did the corporation file SEC Form 10-K for its income statement period ending with or within this tax year?
☐ **Yes.** Skip lines 1b and 1c and complete lines 2a through 11 with respect to that SEC Form 10-K.
☒ **No.** Go to line 1b. See instructions if multiple non-tax-basis income statements are prepared.
**b** Did the corporation prepare a certified audited non-tax-basis income statement for that period?
☐ **Yes.** Skip line 1c and complete lines 2a through 11 with respect to that income statement.
☒ **No.** Go to line 1c.
**c** Did the corporation prepare a non-tax-basis income statement for that period?
☒ **Yes.** Complete lines 2a through 11 with respect to that income statement.
☐ **No.** Skip lines 2a through 3c and enter the corporation's net income (loss) per its books and records on line 4a.

**2a** Enter the income statement period:   Beginning   1/01/22   Ending   12/31/22
**b** Has the corporation's income statement been restated for the income statement period on line 2a?
☐ **Yes.** (If "Yes," attach an explanation and the amount of each item restated.)
☒ **No.**
**c** Has the corporation's income statement been restated for any of the five income statement periods immediately preceding the period on line 2a?
☐ **Yes.** (If "Yes," attach an explanation and the amount of each item restated.)
☒ **No.**

**3a** Is any of the corporation's voting common stock publicly traded?
☐ **Yes.**
☒ **No.** If "No," go to line 4a.
**b** Enter the symbol of the corporation's primary U.S. publicly traded voting common stock . . . . . . . . . . . . [          ]
**c** Enter the nine-digit CUSIP number of the corporation's primary publicly traded voting common stock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [          ]

| | | |
|---|---|---:|
| **4a** Worldwide consolidated net income (loss) from income statement source identified in Part I, line 1 . . . . . . . . . | **4a** | -14,659,799. |
| **b** Indicate accounting standard used for line 4a (see instructions): (1) ☒ GAAP  (2) ☐ IFRS  (3) ☐ Statutory  (4) ☐ Tax-basis  (5) ☐ Other (specify) | | |
| **5a** Net income from nonincludible foreign entities (attach statement) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **5a** | (                    ) |
| **b** Net loss from nonincludible foreign entities (attach statement and enter as a positive amount) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **5b** | |
| **6a** Net income from nonincludible U.S. entities (attach statement) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **6a** | (                    ) |
| **b** Net loss from nonincludible U.S. entities (attach statement and enter as a positive amount) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **6b** | |
| **7a** Net income (loss) of other includible foreign disregarded entities (attach statement) . . . . . . . . . . . . | **7a** | |
| **b** Net income (loss) of other includible U.S. disregarded entities (attach statement) . . . . . . . . . . . . . . | **7b** | |
| **c** Net income (loss) of other includible entities (attach statement) . . . . . . . . . . . . . . . . . . . . . . . . . | **7c** | |
| **8** Adjustment to eliminations of transactions between includible entities and nonincludible entities (attach statement) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **8** | |
| **9** Adjustment to reconcile income statement period to tax year (attach statement) . . . . . . . . . . . . . . . | **9** | |
| **10a** Intercompany dividend adjustments to reconcile to line 11 (attach statement) . . . . . . . . . . . . . . . . . | **10a** | |
| **b** Other statutory accounting adjustments to reconcile to line 11 (attach statement) . . . . . . . . . . . . . . | **10b** | |
| **c** Other adjustments to reconcile to amount on line 11 (attach statement) . . . . . . . . . . . . . . . . . . . . | **10c** | |
| **11** **Net income (loss) per income statement of includible corporations.** Combine lines 4 through 10 . . . . . . . . . . | **11** | -14,659,799. |
| **Note:** Part I, line 11, must equal Part II, line 30, column (a), or Schedule M-1, line 1 (see instructions). | | |

**12** Enter the total amount (not just the corporation's share) of the assets and liabilities of all entities included or removed on the following lines.

| | Total Assets | Total Liabilities |
|---|---|---|
| **a** Included on Part I, line 4 . . . . . . . . . . . . . . . ► | | |
| **b** Removed on Part I, line 5 . . . . . . . . . . . . . . . ► | | |
| **c** Removed on Part I, line 6 . . . . . . . . . . . . . . . ► | | |
| **d** Included on Part I, line 7 . . . . . . . . . . . . . . . ► | | |

BAA  **For Paperwork Reduction Act Notice, see the Instructions for Form 1120.**   CPCA1001L  01/09/22   **Schedule M-3 (Form 1120) (Rev. 12-2019)**

**CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY**

**Form 851**
(Rev October 2016)

Department of the Treasury
Internal Revenue Service

## Affiliations Schedule

**For tax year ending** 12/31 , 2022
► File with each consolidated income tax return.
► Information about Form 851 and its instructions is at *www.irs.gov/form851.*

OMB No. 1545-0123

Name of common parent corporation
SMART COMMUNICATIONS COLLIER, INC

Employer identification number
████████

Number, street, and room or suite number. If a P.O. box, see instructions.
10491 72ND STREET

City or town
SEMINOLE, FL 33777     State     ZIP Code

### Part I  Overpayment Credits, Estimated Tax Payments, and Tax Deposits (see instructions)

| Corp No. | Name and address of corporation | Employer identification number | Portion of overpayment credits and estimated tax payments | Portion of tax deposited with Form 7004 |
|---|---|---|---|---|
| 1 | Common parent corporation | | 1,375,000. | |
|  | Subsidiary corporations: | | | |
| 2 | SMART COMMUNICATIONS PASCO, INC.<br>10491 72ND STREET, SEMINOLE, FL 33777 | ████████ | | |
| 3 | SMART COMMUNICATIONS US, INC.<br>10491 72nd STREET, SEMINOLE, FL 33777 | ████████ | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| | **Totals** (Must equal amounts shown on the consolidated tax return) . . . . . . . . . . . . . . . ► | | 1,375,000. | |

### Part II  Principal Business Activity, Voting Stock Information, Etc (see instructions)

| Corp No. | Principal business activity (PBA) | PBA Code Number | Did the subsidiary make any nondividend distributions? Yes | No | Stock holdings at beginning of year Number of shares | Percentage of voting power | Percentage of value | Owned by corporation number |
|---|---|---|---|---|---|---|---|---|
| 1 | Common parent corporation<br>HOLDING COMPANY | 551112 | | | | | | |
|  | Subsidiary corporations: | | | | | | | |
| 2 | SERVICE | 518210 | | X | | % | % | 1 |
| 3 | SERVICE | 541519 | | X | | % | % | 1 |
| 4 | | | | | | % | % | |
| 5 | | | | | | % | % | |
| 6 | | | | | | % | % | |
| 7 | | | | | | % | % | |
| 8 | | | | | | % | % | |
| 9 | | | | | | % | % | |
| 10 | | | | | | % | % | |

**BAA For Paperwork Reduction Act Notice, see instructions.**                                    Form **851** (Rev 10-2016)

CPCA2312L  08/23/16

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form **851** (Rev 10-2016) SMART COMMUNICATIONS COLLIER, INC ▓▓▓▓ Page **2**

## Part III | Changes in Stock Holdings During the Tax Year

| Corp No. | Name of corporation | Share-holder of Corpora-tion No. | Date of transaction | (a) Changes | | (b) Shares held after changes described in column (a) | |
|---|---|---|---|---|---|---|---|
| | | | | Number of shares acquired | Number of shares disposed of | Percentage of voting power | Percentage of value |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |

**(c)** If any transaction listed above caused a transfer of a share of subsidiary stock (defined to include dispositions and deconsolidations), did the share's basis exceed its value at the time of the transfer? See instructions ☐ Yes ☒ No

**(d)** Did any share of subsidiary stock become worthless within the meaning of section 165 (taking into account the provisions of Regulations section 1.1502-80(c)) during the taxable year? See instrs................................ ☐ Yes ☒ No

**(e)** If the equitable owners of any capital stock shown above were other than the holders of record, provide details of the changes.

_____

_____

_____

_____

_____

_____

_____

**(f)** If additional stock was issued, or if any stock was retired during the year, list the dates and amounts of these transactions.

_____

_____

_____

_____

_____

_____

Form **851** (Rev 10-2016)

CPCA2312L 08/23/16

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form 851 (Rev 10-2016)    SMART COMMUNICATIONS COLLIER, INC    Page 3

| **Part IV**    **Additional Stock Information** (see instructions) |
| --- |

**1**  During the tax year, did the corporation have more than one class of stock outstanding?............................ ☐ **Yes** ☒ **No**
If 'Yes', enter the name of the corporation and list and describe each class of stock.

| Corp No. | Name of corporation | Class of stock |
| --- | --- | --- |
| | | |
| | | |
| | | |
| | | |

**2**  During the tax year, was there any member of the consolidated group that reaffiliated within 60 months of disaffiliation? ☐ **Yes** ☒ **No**
If 'Yes', enter the name of the corporation(s) and explain the circumstances.

| Corp No. | Name of corporation | Explanation |
| --- | --- | --- |
| | | |
| | | |
| | | |

**3**  During the tax year, was there any arrangement in existence by which one or more persons that were not members of the affiliated group could acquire any stock, or acquire any voting power without acquiring stock, in the corporation, other than a de minimis amount, from the corporation or another member of the affiliated group?............................ ☐ **Yes** ☒ **No**

If 'Yes', enter the name of the corporation and see the instructions for the percentages to enter in columns (a), (b), and (c).

| Corp No. | Name of corporation | (a) Percentage of value | (b) Percentage of outstanding voting stock | (c) Percentage of voting power |
| --- | --- | --- | --- | --- |
| | | % | % | % |
| | | % | % | % |
| | | % | % | % |
| | | % | % | % |

| Corp No. | **(d)** Provide a description of any arrangement. |
| --- | --- |
| | |
| | |
| | |
| | |

BAA    Form 851 (Rev 10-2016)

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form **1125-E**
(Rev October 2016)
Department of the Treasury
Internal Revenue Service

**Compensation of Officers**

► Attach to Form 1120, 1120-C, 1120-F, 1120-REIT, 1120-RIC, or 1120S.
► Information about Form 1125-E and its separate instructions is at *www.irs.gov/form1125e.*

OMB No. 1545-0123

Name

SMART COMMUNICATIONS HOLDING, INC.

Employer Identification number

**Note:** Complete Form 1125-E only if total receipts are $500,000 or more. See instructions for definition of total receipts.

| 1 | (a) Name of officer | (b) Social security number | (c) Percent of time devoted to business | Percent of stock owned | | (f) Amount of compensation |
|---|---|---|---|---|---|---|
| | | | | (d) Common | (e) Preferred | |
| | SMART COMMUNICATIONS COLLIER INC. – | | % | % | % | |
| | JAMES LOGAN | | 100 % | 50.00 % | 0.00 % | 40,385. |
| | JONATHAN LOGAN | | 100 % | 50.00 % | 0.00 % | 120,000. |
| | SMART COMMUNICATIONS PASCO, INC. – | | % | % | % | |
| | JAMES P. LOGAN | | 100 % | 50.00 % | 0.00 % | 0. |
| | JONATHAN LOGAN | | 100 % | 50.00 % | 0.00 % | 0. |
| | SMART COMMUNICATIONS US, INC. – | | % | % | % | |
| | JAMES LOGAN | | 100 % | 50.00 % | 0.00 % | 0. |
| | JONATHAN LOGAN | | 100 % | 50.00 % | 0.00 % | 0. |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |

| 2 | Total compensation of officers | 160,385. |
|---|---|---|
| 3 | Compensation of officers claimed on Form 1125-A or elsewhere on return | |
| 4 | Subtract line 3 from line 2. Enter the result here and on Form 1120, page 1, line 12 or the appropriate line of your tax return | 160,385. |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**

Form **1125-E** (Rev 10-2016)

CPCA2101L  08/18/16

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form **4562**

Department of the Treasury
Internal Revenue Service

## Depreciation and Amortization
### (Including Information on Listed Property)
Attach to your tax return.
Go to *www.irs.gov/Form4562* for instructions and the latest information.

OMB No. 1545-0172

**2022**

Attachment
Sequence No. **179**

Name(s) shown on return
SMART COMMUNICATIONS HOLDING, INC.

Identifying number ▇▇▇▇▇▇

Business or activity to which this form relates
Form 1120

### Part I — Election To Expense Certain Property Under Section 179
**Note:** If you have any listed property, complete Part V before you complete Part I.

| | | |
|---|---|---|
| 1 | Maximum amount (see instructions) | **1** | 1,080,000. |
| 2 | Total cost of section 179 property placed in service (see instructions) | **2** | |
| 3 | Threshold cost of section 179 property before reduction in limitation (see instructions) | **3** | 2,700,000. |
| 4 | Reduction in limitation. Subtract line 3 from line 2. If zero or less, enter -0-. | **4** | |
| 5 | Dollar limitation for tax year. Subtract line 4 from line 1. If zero or less, enter -0-. If married filing separately, see instructions | **5** | |

| 6 | (a) Description of property | (b) Cost (business use only) | (c) Elected cost |
|---|---|---|---|
| | | | |
| | | | |

| | | |
|---|---|---|
| 7 | Listed property. Enter the amount from line 29 | **7** | |
| 8 | Total elected cost of section 179 property. Add amounts in column (c), lines 6 and 7 | **8** | |
| 9 | Tentative deduction. Enter the **smaller** of line 5 or line 8 | **9** | |
| 10 | Carryover of disallowed deduction from line 13 of your 2021 Form 4562 | **10** | |
| 11 | Business income limitation. Enter the smaller of business income (not less than zero) or line 5. See instrs | **11** | |
| 12 | Section 179 expense deduction. Add lines 9 and 10, but don't enter more than line 11 | **12** | |
| 13 | Carryover of disallowed deduction to 2023. Add lines 9 and 10, less line 12 | **13** | | |

**Note:** Don't use Part II or Part III below for listed property. Instead, use Part V.

### Part II — Special Depreciation Allowance and Other Depreciation (Don't include listed property. See instructions.)

| | | |
|---|---|---|
| 14 | Special depreciation allowance for qualified property (other than listed property) placed in service during the tax year. See instructions | **14** | |
| 15 | Property subject to section 168(f)(1) election | **15** | |
| 16 | Other depreciation (including ACRS) | **16** | |

### Part III — MACRS Depreciation (Don't include listed property. See instructions.)

**Section A**

| | | |
|---|---|---|
| 17 | MACRS deductions for assets placed in service in tax years beginning before 2022 | **17** | 1,277,072. |
| 18 | If you are electing to group any assets placed in service during the tax year into one or more general asset accounts, check here ☐ | | |

**Section B — Assets Placed in Service During 2022 Tax Year Using the General Depreciation System**

| (a) Classification of property | (b) Month and year placed in service | (c) Basis for depreciation (business/investment use only — see instructions) | (d) Recovery period | (e) Convention | (f) Method | (g) Depreciation deduction |
|---|---|---|---|---|---|---|
| 19a 3-year property | | | | | | |
| b 5-year property | | 168,697. | 5 | MQ | S/L | 9,938. |
| c 7-year property | | | | | | |
| d 10-year property | | | | | | |
| e 15-year property | | | | | | |
| f 20-year property | | | | | | |
| g 25-year property | | | 25 yrs | | S/L | |
| h Residential rental property | | | 27.5 yrs | MM | S/L | |
| | | | 27.5 yrs | MM | S/L | |
| i Nonresidential real property | 6/28/22 | 2,680,887. | 39 yrs | MM | S/L | 34,370. |
| | | | | MM | S/L | |

**Section C — Assets Placed in Service During 2022 Tax Year Using the Alternative Depreciation System**

| | | | | | | |
|---|---|---|---|---|---|---|
| 20a Class life | | | | | S/L | |
| b 12-year | | | 12 yrs | | S/L | |
| c 30-year | | | 30 yrs | MM | S/L | |
| d 40-year | | | 40 yrs | MM | S/L | |

### Part IV — Summary (See instructions.)

| | | |
|---|---|---|
| 21 | Listed property. Enter amount from line 28 | **21** | 315,196. |
| 22 | **Total.** Add amounts from line 12, lines 14 through 17, lines 19 and 20 in column (g), and line 21. Enter here and on the appropriate lines of your return. Partnerships and S corporations — see instructions | **22** | 1,636,576. |
| 23 | For assets shown above and placed in service during the current year, enter the portion of the basis attributable to section 263A costs | **23** | | |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**    FDIZ0812L 06/28/22    Form **4562** (2022)

**CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY**

Form 4562 (2022)  SMART COMMUNICATIONS HOLDING, INC.  ███  Page **2**

**Part V** | **Listed Property** (Include automobiles, certain other vehicles, certain aircraft, and property used for entertainment, recreation, or amusement.)
**Note:** For any vehicle for which you are using the standard mileage rate or deducting lease expense, complete **only** 24a, 24b, columns (a) through (c) of Section A, all of Section B, and Section C if applicable.

**Section A — Depreciation and Other Information (Caution: See the instructions for limits for passenger automobiles.)**

24 a Do you have evidence to support the business/investment use claimed?......... [X] Yes [ ] No  24b If 'Yes,' is the evidence written?...... [X] Yes [ ] No

| (a) Type of property (list vehicles first) | (b) Date placed in service | (c) Business/investment use percentage | (d) Cost or other basis | (e) Basis for depreciation (business/investment use only) | (f) Recovery period | (g) Method/Convention | (h) Depreciation deduction | (i) Elected section 179 cost |
|---|---|---|---|---|---|---|---|---|
| 25 Special depreciation allowance for qualified listed property placed in service during the tax year and used more than 50% in a qualified business use. See instructions..... | | | | | | | **25** | |
| 26 Property used more than 50% in a qualified business use: | | | | | | | | |
| QUAD MERCURY | 5/01/20 | 100.0 | 1,402,694. | 1,402,694. | 5.0 | S/L HY | 280,539. | |
| 2020 FORD TR | 5/19/20 | 100.0 | 37,491. | 37,491. | 5.0 | S/L HY | 7,498. | |
| 2020 FORD TR | 5/19/20 | 100.0 | 37,491. | 37,491. | 5.0 | S/L HY | 7,498. | |
| 27 Property used 50% or less in a qualified business use: | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| 28 Add amounts in column (h), lines 25 through 27. Enter here and on line 21, page 1.............. **28** | | | | | | | 315,196. | |
| 29 Add amounts in column (i), line 26. Enter here and on line 7, page 1................................. | | | | | | | **29** | 0. |

**Section B — Information on Use of Vehicles**

Complete this section for vehicles used by a sole proprietor, partner, or other 'more than 5% owner,' or related person. If you provided vehicles to your employees, first answer the questions in Section C to see if you meet an exception to completing this section for those vehicles.

| | | (a) Vehicle 1 | | (b) Vehicle 2 | | (c) Vehicle 3 | | (d) Vehicle 4 | | (e) Vehicle 5 | | (f) Vehicle 6 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 | Total business/investment miles driven during the year (**don't** include commuting miles)....................... | | | | | | | | | | | | |
| 31 | Total commuting miles driven during the year...... | | | | | | | | | | | | |
| 32 | Total other personal (noncommuting) miles driven................................. | | | | | | | | | | | | |
| 33 | Total miles driven during the year. Add lines 30 through 32..................... | | | | | | | | | | | | |
| | | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 34 | Was the vehicle available for personal use during off-duty hours?................... | | | | | | | | | | | | |
| 35 | Was the vehicle used primarily by a more than 5% owner or related person?........ | | | | | | | | | | | | |
| 36 | Is another vehicle available for personal use?................................... | | | | | | | | | | | | |

**Section C — Questions for Employers Who Provide Vehicles for Use by Their Employees**

Answer these questions to determine if you meet an exception to completing Section B for vehicles used by employees who **aren't** more than 5% owners or related persons. See instructions.

| | | Yes | No |
|---|---|---|---|
| 37 | Do you maintain a written policy statement that prohibits all personal use of vehicles, including commuting, by your employees?................................................................. | | |
| 38 | Do you maintain a written policy statement that prohibits personal use of vehicles, except commuting, by your employees? See the instructions for vehicles used by corporate officers, directors, or 1% or more owners.............. | | |
| 39 | Do you treat all use of vehicles by employees as personal use?................................................ | | |
| 40 | Do you provide more than five vehicles to your employees, obtain information from your employees about the use of the vehicles, and retain the information received?............................................................ | | |
| 41 | Do you meet the requirements concerning qualified automobile demonstration use? See instructions.................... **Note:** If your answer to 37, 38, 39, 40, or 41 is 'Yes,' don't complete Section B for the covered vehicles. | | |

**Part VI** | **Amortization**

| (a) Description of costs | (b) Date amortization begins | (c) Amortizable amount | (d) Code section | (e) Amortization period or percentage | (f) Amortization for this year |
|---|---|---|---|---|---|
| 42 Amortization of costs that begins during your 2022 tax year (see instructions): | | | | | |
| | | | | | |
| | | | | | |
| 43 Amortization of costs that began before your 2022 tax year......................................... **43** | | | | | |
| 44 **Total.** Add amounts in column (f). See the instructions for where to report............................ **44** | | | | | |

FDIZ0812L 06/28/22                                                                 Form **4562** (2022)

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form 4562 (2022)   SMART COMMUNICATIONS HOLDING, INC.   ▮▮▮▮▮▮   Page **2**

**Part V** **Listed Property** (Include automobiles, certain other vehicles, certain aircraft, and property used for entertainment, recreation, or amusement.)

**Note:** For any vehicle for which you are using the standard mileage rate or deducting lease expense, complete **only** 24a, 24b, columns (a) through (c) of Section A, all of Section B, and Section C if applicable.

**Section A — Depreciation and Other Information (Caution: See the instructions for limits for passenger automobiles.)**

24a Do you have evidence to support the business/investment use claimed?......... ☐ Yes ☐ No   24b If 'Yes,' is the evidence written?...... ☐ Yes ☐ No

| (a) Type of property (list vehicles first) | (b) Date placed in service | (c) Business/ investment use percentage | (d) Cost or other basis | (e) Basis for depreciation (business/investment use only) | (f) Recovery period | (g) Method/ Convention | (h) Depreciation deduction | (i) Elected section 179 cost |
|---|---|---|---|---|---|---|---|---|
| 25 Special depreciation allowance for qualified listed property placed in service during the tax year and used more than 50% in a qualified business use. See instructions....................  **25** | | | | | | | | |
| 26 Property used more than 50% in a qualified business use: | | | | | | | | |
| 2020 FORD TR | 5/19/20 | 100.0 | 37,491. | 37,491. | 5.0 | S/L HY | 7,498. | |
| 2018 FORD BU | 4/27/21 | 100.0 | 60,816. | 60,816. | 5.0 | S/L HY | 12,163. | |
| 27 Property used 50% or less in a qualified business use: | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

28 Add amounts in column (h), lines 25 through 27. Enter here and on line 21, page 1............... **28**

29 Add amounts in column (i), line 26. Enter here and on line 7, page 1................................................. **29**

**Section B — Information on Use of Vehicles**

Complete this section for vehicles used by a sole proprietor, partner, or other 'more than 5% owner,' or related person. If you provided vehicles to your employees, first answer the questions in Section C to see if you meet an exception to completing this section for those vehicles.

| | (a) Vehicle 1 | | (b) Vehicle 2 | | (c) Vehicle 3 | | (d) Vehicle 4 | | (e) Vehicle 5 | | (f) Vehicle 6 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 Total business/investment miles driven during the year (**don't** include commuting miles)...................... | | | | | | | | | | | | |
| 31 Total commuting miles driven during the year....... | | | | | | | | | | | | |
| 32 Total other personal (noncommuting) miles driven.......................... | | | | | | | | | | | | |
| 33 Total miles driven during the year. Add lines 30 through 32 .................... | | | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 34 Was the vehicle available for personal use during off-duty hours?.................. | | | | | | | | | | | | |
| 35 Was the vehicle used primarily by a more than 5% owner or related person?........ | | | | | | | | | | | | |
| 36 Is another vehicle available for personal use?................... | | | | | | | | | | | | |

**Section C — Questions for Employers Who Provide Vehicles for Use by Their Employees**

Answer these questions to determine if you meet an exception to completing Section B for vehicles used by employees who **aren't** more than 5% owners or related persons. See instructions.

| | Yes | No |
|---|---|---|
| 37 Do you maintain a written policy statement that prohibits all personal use of vehicles, including commuting, by your employees?...................................................................... | | |
| 38 Do you maintain a written policy statement that prohibits personal use of vehicles, except commuting, by your employees? See the instructions for vehicles used by corporate officers, directors, or 1% or more owners.............. | | |
| 39 Do you treat all use of vehicles by employees as personal use?......................................................... | | |
| 40 Do you provide more than five vehicles to your employees, obtain information from your employees about the use of the vehicles, and retain the information received?........................................................... | | |
| 41 Do you meet the requirements concerning qualified automobile demonstration use? See instructions.................. | | |

**Note:** If your answer to 37, 38, 39, 40, or 41 is 'Yes,' don't complete Section B for the covered vehicles.

**Part VI** **Amortization**

| (a) Description of costs | (b) Date amortization begins | (c) Amortizable amount | (d) Code section | (e) Amortization period or percentage | (f) Amortization for this year |
|---|---|---|---|---|---|
| 42 Amortization of costs that begins during your 2022 tax year (see instructions): | | | | | |
| | | | | | |
| | | | | | |
| 43 Amortization of costs that began before your 2022 tax year .............................................. **43** | | | | | |
| 44 **Total.** Add amounts in column (f). See the instructions for where to report.............................. **44** | | | | | |

FDIZ0812L 06/28/22                                                           Form **4562** (2022)

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form **8990**
(Rev. December 2022)
Department of the Treasury
Internal Revenue Service

## Limitation on Business Interest Expense Under Section 163(j)
**Attach to your tax return.**
**Go to www.irs.gov/Form8990 for instructions and the latest information.**

OMB No. 1545-0123

| Taxpayer name(s) shown on tax return | Identification number |
|---|---|
| SMART COMMUNICATIONS HOLDING, INC. | ▮▮▮▮▮▮ |

**A** If Form 8990 relates to an information return for a foreign entity (for example, Form 5471), enter:
Name of foreign entity _____
Employer identification number, if any _____
Reference ID number _____

**B** Is the foreign entity a CFC group member? See instructions.................................... ☐ Yes ☐ No

**C** Is this Form 8990 filed by the specified group parent for an entire CFC group? See instructions...................... ☐ Yes ☐ No

**D** Has a CFC or a CFC group made a safe harbor election? If yes, see instructions for which lines of Form 8990
to complete.................................................. ☐ Yes ☐ No

### Part I    Computation of Allowable Business Interest Expense

*Part I is completed by all taxpayers subject to section 163(j). Schedule A and Schedule B need to be completed before Part I when the taxpayer is a partner or shareholder of a pass-through entity subject to section 163(j).*

#### Section I—Business Interest Expense

| | | | | | |
|---|---|---|---|---|---|
| 1 | Current year business interest expense (not including floor plan financing interest expense), before the section 163(j) limitation.......... | **1** | 461,011. | | |
| 2 | Disallowed business interest expense carryforwards from prior years. (Does not apply to a partnership)................................. | **2** | | | |
| 3 | Partner's excess business interest expense treated as paid or accrued in current year (Schedule A, line 44, column (h)).................... | **3** | | | |
| 4 | Floor plan financing interest expense. See instructions.................. | **4** | | | |
| 5 | **Total business interest expense.** Add lines 1 through 4............................................. | | | **5** | 461,011. |

#### Section II—Adjusted Taxable Income

| Tentative Taxable Income | | | | | |
|---|---|---|---|---|---|
| 6 | **Tentative taxable income.** See instructions ........................................................ | | | **6** | -13,171,053. |

| Additions (adjustments to be made if amounts are taken into account on line 6) | | | | | |
|---|---|---|---|---|---|
| 7 | Any item of loss or deduction that is not properly allocable to a trade or business of the taxpayer. See instructions.............................. | **7** | | | |
| 8 | Any business interest expense not from a pass-through entity. See instructions................................. | **8** | 461,011. | | |
| 9 | Amount of any net operating loss deduction under section 172.......... | **9** | | | |
| 10 | Amount of any qualified business income deduction allowed under section 199A............................................ | **10** | | | |
| 11 | Reserved for future use............................................ | **11** | | | |
| 12 | Amount of any loss or deduction items from a pass-through entity. See instructions............................................ | **12** | | | |
| 13 | Other additions. See instructions...................................... | **13** | | | |
| 14 | Total current year partner's excess taxable income (Schedule A, line 44, column (f))................................. | **14** | | | |
| 15 | Total current year S corporation shareholder's excess taxable income (Schedule B, line 46, column (c)).................................... | **15** | | | |
| 16 | **Total.** Add lines 7 through 15................................................................... | | | **16** | 461,011. |

| Reductions (adjustments to be made if amounts are taken into account on line 6) | | | | | |
|---|---|---|---|---|---|
| 17 | Any item of income or gain that is not properly allocable to a trade or business of the taxpayer. See instructions............................. | **17** | ( ) | | |
| 18 | Any business interest income not from a pass-through entity. See instrs.. | **18** | ( ) | | |
| 19 | Amount of any income or gain items from a pass-through entity. See instructions................................. | **19** | ( ) | | |
| 20 | Other reductions. See instructions..................................... | **20** | ( ) | | |
| 21 | **Total.** Combine lines 17 through 20................................................................ | | | **21** | ( 0.) |
| 22 | **Adjusted taxable income.** Combine lines 6, 16, and 21. See instructions............................... | | | **22** | 0. |

**BAA For Paperwork Reduction Act Notice, see the instructions.**          CPCA0512L  08/16/22          Form **8990** (Rev. 12-2022)

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

Form 8990 (Rev. 12-2022)   SMART COMMUNICATIONS HOLDING, INC.       ▮▮▮▮▮     Page **2**

## Section III—Business Interest Income

| | | | |
|---|---|---|---|
| 23 | Current year business interest income. See instructions . . . . . . . . . . . . . . . . | **23** | |
| 24 | Excess business interest income from pass-through entities (total of Schedule A, line 44, column (g), and Schedule B, line 46, column (d)) . . . . | **24** | |
| 25 | **Total.** Add lines 23 and 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **25** | 0. |

## Section IV—163(j) Limitation Calculations

### Limitation on Business Interest Expense

| | | | |
|---|---|---|---|
| 26 | Multiply the adjusted taxable income from line 22 by the applicable percentage. See instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **26**     0. | |
| 27 | Business interest income (line 25) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **27** | |
| 28 | Floor plan financing interest expense (line 4) . . . . . . . . . . . . . . . . . . . . . . | **28** | |
| 29 | **Total.** Add lines 26, 27, and 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **29** | 0. |

### Allowable Business Interest Expense

| | | | |
|---|---|---|---|
| 30 | **Total current year business interest expense deduction.** See instructions . . . . . . . . . . . . . . . . . . . . . . . . . . | **30** | 0. |

### Carryforward

| | | | |
|---|---|---|---|
| 31 | **Disallowed business interest expense.** Subtract line 29 from line 5. (If zero or less, enter -0-.) . . . . . . . . . | **31** | 461,011. |

## Part II   Partnership Pass-Through Items

*Part II is only completed by a partnership that is subject to section 163(j). The partnership items below are allocated to the partners and are not carried forward by the partnership. See the instructions for more information.*

### Excess Business Interest Expense

| | | | |
|---|---|---|---|
| 32 | **Excess business interest expense.** Enter amount from line 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **32** | |

### Excess Taxable Income (If you entered an amount on line 32, skip lines 33 through 37.)

| | | | |
|---|---|---|---|
| 33 | Subtract the sum of lines 4 and 25 from line 5. (If zero or less, enter -0-.) . . . . . . . . . . . . . . . . . . . . . . . . . | **33** | |
| 34 | Subtract line 33 from line 26. (If zero or less, enter -0-.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **34** | |
| 35 | Divide line 34 by line 26. Enter the result as a decimal. (If line 26 is zero, enter -0-.) . . . . . . . . . . . . . . . . . | **35** | |
| 36 | **Excess taxable income.** Multiply line 35 by line 22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **36** | |

### Excess Business Interest Income

| | | | |
|---|---|---|---|
| 37 | **Excess business interest income.** Subtract the sum of lines 1, 2, and 3 from line 25. (If zero or less, enter -0-.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **37** | |

## Part III   S Corporation Pass-Through Items

*Part III is only completed by S corporations that are subject to section 163(j). The S corporation items below are allocated to the shareholders. See the instructions for more information.*

### Excess Taxable Income

| | | | |
|---|---|---|---|
| 38 | Subtract the sum of lines 4 and 25 from line 5. (If zero or less, enter -0-.) . . . . . . . . . . . . . . . . . . . . . . . . . | **38** | |
| 39 | Subtract line 38 from line 26. (If zero or less, enter -0-.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **39** | |
| 40 | Divide line 39 by line 26. Enter the result as a decimal. (If line 26 is zero, enter -0-.) . . . . . . . . . . . . . . . . . | **40** | |
| 41 | **Excess taxable income.** Multiply line 40 by line 22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **41** | |

### Excess Business Interest Income

| | | | |
|---|---|---|---|
| 42 | **Excess business interest income.** Subtract the sum of lines 1, 2, and 3 from line 25. (If zero or less, enter -0-.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **42** | |

**CONFIDENTIAL**
**FOR PURPOSES OF MEDIATION ONLY**

Form 8990 (Rev. 12-2022)   SMART COMMUNICATIONS HOLDING, INC.   ████████   Page **3**

## SCHEDULE A | Summary of Partner's Section 163(j) Excess Items

*Any taxpayer that owns an interest in a partnership subject to section 163(j) should complete Schedule A before completing Part I.*

| (a) Name of partnership | (b) EIN | Excess Business Interest Expense | | | (f) Current year excess taxable income | (g) Current year excess business interest income | (h) Excess business interest expense treated as paid or accrued (see instructions) | (i) Current year excess business interest expense carryforward (see instructions) |
|---|---|---|---|---|---|---|---|---|
| | | (c) Current year (see instructions) | (d) Prior year carryforward (see instructions) | (e) Total ((c) plus (d)) | | | | |
| **43** | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| **44**  Total............ | | | | | 0. | 0. | 0. | |

## SCHEDULE B | Summary of S Corporation Shareholder's Excess Taxable Income and Excess Business Interest Income

*Any taxpayer that is required to complete Part I and is a shareholder in an S corporation that has excess taxable income or excess business interest income should complete Schedule B before completing Part I.*

| (a) Name of S corporation | (b) EIN | (c) Current year excess taxable income | (d) Current year excess business interest income |
|---|---|---|---|
| **45** | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **46**  Total.................................................... | | 0. | 0. |

BAA   Form **8990** (Rev. 12-2022)

CPCA0503L  08/16/22

CONFIDENTIAL FOR PURPOSES OF MEDIATION ONLY

**12/31/22**     **Consolidated Statement of Income and Deductions**     **Page 1**

### SMART COMMUNICATIONS HOLDING, INC.

| | | SMART COMMUNICATIONS COLLIER INC. | SMART COMMUNICATIONS PASCO, INC. | SMART COMMUNICATIONS US, INC. | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| | **INCOME** | | | | | | | |
| 1a | Gross receipts or sales | 44,815,675. | | | 44,815,675. | | | 44,815,675. |
| 1b | Less returns and allowances | 35,341. | | | 35,341. | | | 35,341. |
| 1c | Net sales | 44,780,334. | | | 44,780,334. | | | 44,780,334. |
| 2 | Cost of goods sold | 25,540,158. | | | 25,540,158. | | | 25,540,158. |
| 3 | Gross profit | 19,240,176. | | | 19,240,176. | | | 19,240,176. |
| 4 | Dividends | | | | | | | |
| 5 | Interest | | | | | | | |
| 6 | Gross rents | | | | | | | |
| 7 | Gross royalties | | | | | | | |
| 8 | Capital gain net income | | | | | | | |
| 9 | Net gain (loss) from 4797 | | | | | | | |
| 10 | Other income | | | | | | | |
| 11 | **Total income** | 19,240,176. | 0. | 0. | 19,240,176. | | | 19,240,176. |
| | | | | | | | | |
| | **DEDUCTIONS** | | | | | | | |
| 12 | Compensation of officers | 160,385. | | | 160,385. | | | 160,385. |
| 13 | Salaries and wages | 4,814,980. | | | 4,814,980. | | | 4,814,980. |
| 14 | Repairs and maintenance | 472,332. | | | 472,332. | | | 472,332. |
| 15 | Bad debts | | | | | | | |
| 16 | Rents | 793,547. | | | 793,547. | | | 793,547. |
| 17 | Taxes and licenses | 18,515,145. | | | 18,515,145. | | | 18,515,145. |
| 18 | Interest expense | | | | | | | |
| 19 | Charitable contributions | | | | | | | |
| 20 | Depreciation | 1,636,576. | | | 1,636,576. | | | 1,636,576. |
| 21 | Depletion | | | | | | | |
| 22 | Advertising | 187,879. | | | 187,879. | | | 187,879. |
| 23 | Pension, profit-sharing plans | | | | | | | |
| 24 | Employee benefit programs | | | | | | | |
| 25 | Domestic production activities deduction | | | | | | | |
| 26 | Other deductions | Statement 1 | 5,369,374. | | | 5,369,374. | | | 5,369,374. |
| 27 | **Total deductions** | 31,950,218. | 0. | 0. | 31,950,218. | | | 31,950,218. |
| | | | | | | | | |
| 28 | TI before NOL/special deductions | -12,710,042. | 0. | 0. | -12,710,042. | | | -12,710,042. |
| 29a | Net operating loss deduction | | | | | | | |
| 29b | Special deductions | | | | | | | |
| | | | | | | | | |
| 30 | **Taxable income** | -12,710,042. | 0. | 0. | -12,710,042. | | | -12,710,042. |

**CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY**

| 12/31/22 | | Consolidated Statement of Cost of Goods Sold | | | | | | | Page 1 |
|----------|--|------------|--------|--------|--------|--------|--------|--------|--------|

**SMART COMMUNICATIONS HOLDING, INC.**

| | | | SMART COMMUNICATIONS COLLIER INC. | SMART COMMUNICATIONS PASCO, INC. | SMART COMMUNICATIONS US, INC. | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Inventory at beginning of year | | 1,894,859. | | | 1,894,859. | | . | 1,894,859. |
| 2 | Purchases | | 4,085,875. | | | 4,085,875. | | | 4,085,875. |
| 3 | Cost of labor | | 1,943,725. | | | 1,943,725. | | | 1,943,725. |
| 4 | Additional section 263A costs | | | | | | | | |
| 5 | Other costs | Statement 6 | 18,306,403. | | | 18,306,403. | | | 18,306,403. |
| 6 | **Total** | | 26,230,862. | | | 26,230,862. | | . | 26,230,862. |
| 7 | Inventory at end of year | | 690,704. | | | 690,704. | | . | 690,704. |
| 8 | **Cost of goods sold** | | 25,540,158. | 0. | 0. | 25,540,158. | | . | 25,540,158. |

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

| 12/31/22 | Consolidated Beginning Balance Sheet | | | | | | Page 1 |

**SMART COMMUNICATIONS HOLDING, INC.**

| | | SMART COMMUNICATIONS COLLIER INC. | SMART COMMUNICATIONS PASCO, INC. | SMART COMMUNICATIONS US, INC. | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| | **ASSETS** | | | | | | | |
| 1 | Cash | 5,398,481. | | | 5,398,481. | | | 5,398,481. |
| 2a | Trade notes & accounts receivable | 2,244,379. | | | 2,244,379. | | | 2,244,379. |
| 2b | Less allowance for bad debts | | | | | | | |
| 3 | Inventories | 1,894,859. | | | 1,894,859. | | | 1,894,859. |
| 4 | U.S. government obligations | | | | | | | |
| 5 | Tax-exempt securities | | | | | | | |
| 6 | Other current assets | Statement 2 | 686,224. | 513,737. | 250,649. | 1,450,610. | | | 1,450,610. |
| 7 | Loans to shareholders | 370,455. | 58,400. | 300,000. | 728,855. | | | 728,855. |
| 8 | Mortgage and real estate loans | | | | | | | |
| 9 | Other investments | | | | | | | |
| 10a | Buildings & other depreciable assets | 13,424,000. | 158,742. | 152,052. | 13,734,794. | | | 13,734,794. |
| 10b | Less accumulated depreciation | (6,894,997.) | ( 158,742.) | ( 152,038.) | (7,205,777.) | | | (7,205,777.) |
| 11a | Depletable assets | | | | | | | |
| 11b | Less accumulated depletion | | | | | | | |
| 12 | Land (net of amortization) | | | | | | | |
| 13a | Intangible assets (amortizable) | | | | | | | |
| 13b | Less accumulated amortization | | | | | | | |
| 14 | Other assets | | | | | | | |
| 15 | **Total assets** | 17,123,401. | 572,137. | 550,663. | 18,246,201. | | | 18,246,201. |
| | **LIABILITIES AND EQUITY** | | | | | | | |
| 16 | Accounts payable | 1,502,160. | | | 1,502,160. | | | 1,502,160. |
| 17 | Mortgages, notes, bonds payable in less than one year | | | | | | | |
| 18 | Other current liabilities | Statement 3 | 1,036,411. | 250,649. | 466,362. | 1,753,422. | | | 1,753,422. |
| 19 | Loans from shareholders | | | | | | | |
| 20 | Mortgages, notes, bonds payable in more than one year | 1,284,662. | | | 1,284,662. | | | 1,284,662. |
| 21 | Other liabilities | | | | | | | |
| 22a | Capital stock - preferred | | | | | | | |
| 22b | Capital stock - common | 364,667. | | | 364,667. | | | 364,667. |
| 23 | Additional paid-in capital | 741,421. | 18,635. | | 760,056. | | | 760,056. |
| 24 | Retained earnings - appropriated | | | | | | | |
| 25 | Retained earnings - unappropriated | 12,194,080. | 302,853. | 84,301. | 12,581,234. | | | 12,581,234. |
| 26 | Adjustments to shareholder equity | | | | | | | |
| 27 | Less cost of treasury stock | | | | | | | |
| 28 | **Total liabilities and equity** | 17,123,401. | 572,137. | 550,663. | 18,246,201. | | | 18,246,201. |

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

| 12/31/22 | **Consolidated Ending Balance Sheet** | | | | | | | Page 1 |
|---|---|---|---|---|---|---|---|---|
| | **SMART COMMUNICATIONS HOLDING, INC.** | | | | | | | |

| | | | SMART COMMUNICATIONS COLLIER INC. | SMART COMMUNICATIONS PASCO, INC. | SMART COMMUNICATIONS US, INC. | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|---|
| | **ASSETS** | | | | | | | | |
| 1 | Cash | | 865,720. | | | 865,720. | | | 865,720. |
| 2a | Trade notes & accounts receivable | | 462,259. | | | 462,259. | | | 462,259. |
| 2b | Less allowance for bad debts | | | | | | | | |
| 3 | Inventories | | 690,704. | | | 690,704. | | | 690,704. |
| 4 | U.S. government obligations | | | | | | | | |
| 5 | Tax-exempt securities | | | | | | | | |
| 6 | Other current assets | Statement 2 | 11,375,293. | 513,737. | 250,649. | 12,139,679. | | | 12,139,679. |
| 7 | Loans to shareholders | | 2,555,686. | 58,400. | 300,000. | 2,914,086. | | | 2,914,086. |
| 8 | Mortgage and real estate loans | | | | | | | | |
| 9 | Other investments | | | | | | | | |
| 10a | Buildings & other depreciable assets | | 14,581,127. | 158,842. | 152,052. | 14,892,021. | | | 14,892,021. |
| 10b | Less accumulated depreciation | | (6,847,975.) | ( 158,742.) | ( 152,038.) | (7,158,755.) | | | (7,158,755.) |
| 11a | Depletable assets | | | | | | | | |
| 11b | Less accumulated depletion | | | | | | | | |
| 12 | Land (net of amortization) | | | | | | | | |
| 13a | Intangible assets (amortizable) | | | | | | | | |
| 13b | Less accumulated amortization | | | | | | | | |
| 14 | Other assets | | | | | | | | |
| 15 | **Total assets** | | 23,682,814. | 572,237. | 550,663. | 24,805,714. | | | 24,805,714. |
| | **LIABILITIES AND EQUITY** | | | | | | | | |
| 16 | Accounts payable | | 1,277,645. | | | 1,277,645. | | | 1,277,645. |
| 17 | Mortgages, notes, bonds payable in less than one year | | | | | | | | |
| 18 | Other current liabilities | Statement 3 | 2,602,336. | 250,649. | 466,362. | 3,319,347. | | | 3,319,347. |
| 19 | Loans from shareholders | | | | | | | | |
| 20 | Mortgages, notes, bonds payable in more than one year | | 58,576,292. | | | 58,576,292. | | | 58,576,292. |
| 21 | Other liabilities | | | | | | | | |
| 22a | Capital stock - preferred | | | | | | | | |
| 22b | Capital stock - common | | 364,667. | | | 364,667. | | | 364,667. |
| 23 | Additional paid-in capital | | 373,416. | 18,735. | | 392,151. | | | 392,151. |
| 24 | Retained earnings - appropriated | | | | | | | | |
| 25 | Retained earnings - unappropriated | | -39,511,542. | 302,853. | 84,301. | -39,124,388. | | | -39,124,388. |
| 26 | Adjustments to shareholder equity | | | | | | | | |
| 27 | Less cost of treasury stock | | | | | | | | |
| 28 | **Total liabilities and equity** | | 23,682,814. | 572,237. | 550,663. | 24,805,714. | | | 24,805,714. |

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

| 12/31/22 | Consolidated Schedules M-1 and M-2 | | | | | Page 1 |

**SMART COMMUNICATIONS HOLDING, INC.**

| | | SMART COMMUNICATIONS COLLIER INC. | SMART COMMUNICATIONS PASCO, INC. | SMART COMMUNICATIONS US, INC. | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| | **SCHEDULE M-1** | | | | | | | |
| 1 | Net income per books | -14,659,799. | 0. | 0. | -14,659,799. | | | -14,659,799. |
| 2 | Federal income tax | 1,375,000. | | | 1,375,000. | | | 1,375,000. |
| 3 | Excess of capital losses over capital gains | | | | | | | |
| 4 | Income subject to tax not recorded on books this year | | | | | | | |
| | **Expenses recorded on books this year not deducted on this return:** | | | | | | | |
| 5a | Depreciation not in return | | | | | | | |
| 5b | Contributions carryover | 19,340. | | | 19,340. | | | 19,340. |
| 5c | Travel and entertainment | 72,269. | | | 72,269. | | | 72,269. |
| | Other items not in return | Statement 4 | 483,148. | | | 483,148. | | | 483,148. |
| 6 | Total lines 1 - 5 | -12,710,042. | 0. | 0. | -12,710,042. | | | -12,710,042. |
| | **Income recorded on books this year not included on this return:** | | | | | | | |
| 7a | Tax-exempt interest | | | | | | | |
| 7b | Other items | | | | | | | |
| | **Deductions on this return not charged against book income:** | | | | | | | |
| 8a | Depreciation not on books | | | | | | | |
| 8b | Contribution carryover | | | | | | | |
| | Other items not on books | 0. | 0. | 0. | 0. | | | 0. |
| 9 | Total lines 7 and 8 | 0. | 0. | 0. | 0. | | | 0. |
| 10 | Taxable income | -12,710,042. | 0. | 0. | -12,710,042. | | | -12,710,042. |
| | | | | | | | | |
| | **SCHEDULE M-2** | | | | | | | |
| 1 | Beginning retained earnings | 12,194,080. | 302,853. | 84,301. | 12,581,234. | | | 12,581,234. |
| 2 | Net income or loss per books | -14,659,799. | 0. | 0. | -14,659,799. | | | -14,659,799. |
| 3 | Other increases | | | | | | | |
| 4 | Total lines 1 - 3 | -2,465,719. | 302,853. | 84,301. | -2,078,565. | | | -2,078,565. |
| 5 | Distributions: | | | | | | | |
| 5a | Cash | | | | | | | |
| 5b | Stock | | | | | | | |
| 5c | Property | | | | | | | |
| 6 | Other decreases | Statement 5 | 37,045,823. | | | 37,045,823. | | | 37,045,823. |
| 7 | Total lines 5 and 6 | 37,045,823. | 0. | 0. | 37,045,823. | | | 37,045,823. |
| 8 | Ending retained earnings | -39,511,542. | 302,853. | 84,301. | -39,124,388. | | | -39,124,388. |

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

**2022**        **Federal Statements**        **Page 1**

### SMART COMMUNICATIONS HOLDING, INC.

**Statement 1**
**Form 1120, Line 26**
**Other Deductions**

| | SMART COMMUNICATIONS COLLIER INC. | SMART COMMUNICATIONS PASCO, INC. | SMART COMMUNICATIONS US, INC. | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|
| Bank Charges | 6,804. | | | 6,804. | | | 6,804. |
| CLIENT WELFARE EXPENSE | 142,975. | | | 142,975. | | | 142,975. |
| COMPUTER EXPENSES | 162,968. | | | 162,968. | | | 162,968. |
| CONTRACT LABOR EXPENSE | 293,580. | | | 293,580. | | | 293,580. |
| EMPLOYEE WELFARE EXPENSE | 7,708. | | | 7,708. | | | 7,708. |
| Insurance | 724,420. | | | 724,420. | | | 724,420. |
| Legal and Professional | 3,260,090. | | | 3,260,090. | | | 3,260,090. |
| Meals | 72,269. | | | 72,269. | | | 72,269. |
| Office Expense | 160,302. | | | 160,302. | | | 160,302. |
| OTHER EXPENSES | 1,958. | | | 1,958. | | | 1,958. |
| Outside Services | 9,744. | | | 9,744. | | | 9,744. |
| PAYROLL SERVICE FEES | 79,354. | | | 79,354. | | | 79,354. |
| POSTAGE & SHIPPING | 18,982. | | | 18,982. | | | 18,982. |
| PROFESSIONAL EDUCATION | 8,315. | | | 8,315. | | | 8,315. |
| RECRUITMENT EXPENSE | 131,372. | | | 131,372. | | | 131,372. |
| Subscriptions | 98,821. | | | 98,821. | | | 98,821. |
| Telephone | 50,197. | | | 50,197. | | | 50,197. |
| Utilities | 50,197. | | | 50,197. | | | 50,197. |
| WEBSITE DESIGN & MAINTENANCE | 89,318. | | | 89,318. | | | 89,318. |
| Total | 5,369,374. | 0. | 0. | 5,369,374. | 0. | 0. | 5,369,374. |

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

| 2022 | **Federal Statements** | Page 2 |
|---|---|---|

**SMART COMMUNICATIONS HOLDING, INC.**

**Statement 2**
**Form 1120, Schedule L, Line 6**
**Other Current Assets**

| | SMART COMMUNICATIONS COLLIER INC. | SMART COMMUNICATIONS PASCO, INC. | SMART COMMUNICATIONS US, INC. | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|
| **Beginning:** | | | | | | | |
| Accounts Receivable - Collier | | 513,737. | | 513,737. | | | 513,737. |
| Accounts Receivable - HLFIP | 99,507. | | | 99,507. | | | 99,507. |
| Accounts Receivable - Pasco | | | 250,649. | 250,649. | | | 250,649. |
| PREPAID EXPENSES | 170,690. | | | 170,690. | | | 170,690. |
| Prepaid Federal Tax | 35,603. | | | 35,603. | | | 35,603. |
| Prepaid State Tax | 225,449. | | | 225,449. | | | 225,449. |
| TECHNOLOGY GRANT ADVANCE | 154,975. | | | 154,975. | | | 154,975. |
| Total | 686,224. | 513,737. | 250,649. | 1,450,610. | 0. | 0. | 1,450,610. |

| | SMART COMMUNICATIONS COLLIER INC. | SMART COMMUNICATIONS PASCO, INC. | SMART COMMUNICATIONS US, INC. | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|
| **Ending:** | | | | | | | |
| ACCOUNTS RECEIVABLE - MAILGUARD FEDERAL | 1,746,370. | | | 1,746,370. | | | 1,746,370. |
| Accounts Receivable - Collier | | 513,737. | | 513,737. | | | 513,737. |
| Accounts Receivable - HLFIP | 169,685. | | | 169,685. | | | 169,685. |
| Accounts Receivable - LOCO | 1,358,011. | | | 1,358,011. | | | 1,358,011. |
| Accounts Receivable - Pasco | | | 250,649. | 250,649. | | | 250,649. |
| ACCOUNTS RECEIVABLE - YACHT LLC | 5,505,639. | | | 5,505,639. | | | 5,505,639. |
| FEDERAL INCOME TAXES RECEIVABLE | 1,834,115. | | | 1,834,115. | | | 1,834,115. |
| PREPAID EXPENSES | 723,934. | | | 723,934. | | | 723,934. |
| TECHNOLOGY GRANT ADVANCE | 37,539. | | | 37,539. | | | 37,539. |
| Total | 11,375,293. | 513,737. | 250,649. | 12,139,679. | 0. | 0. | 12,139,679. |

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

| 2022 | **Federal Statements** | Page 3 |
|------|------------------------|--------|

**SMART COMMUNICATIONS HOLDING, INC.**

**Statement 3**
**Form 1120, Schedule L, Line 18**
**Other Current Liabilities**

| | SMART COMMUNICATIONS COLLIER INC. | SMART COMMUNICATIONS PASCO, INC. | SMART COMMUNICATIONS US, INC. | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|
| **Beginning:** | | | | | | | |
| ACCOUNTS PAYABLE - COLLIER | | | 466,362. | 466,362. | | | 466,362. |
| ACCOUNTS PAYABLE - U S PASCO | 513,737. | | | 513,737. | | | 513,737. |
| ACCRUED CREDIT CREDIT CARDS PAYABLE | 234,028. | | | 234,028. | | | 234,028. |
| ACCRUED FACILITY TECH GRANT | 170,946. | | | 170,946. | | | 170,946. |
| Accrued Taxes on Payroll | 12,227. | | | 12,227. | | | 12,227. |
| ACCRUED WAGES & SALARIES | 105,473. | | | 105,473. | | | 105,473. |
| PAYABLE TO SMART COMM - US | | 250,649. | | 250,649. | | | 250,649. |
| Total | 1,036,411. | 250,649. | 466,362. | 1,753,422. | 0. | 0. | 1,753,422. |

| | SMART COMMUNICATIONS COLLIER INC. | SMART COMMUNICATIONS PASCO, INC. | SMART COMMUNICATIONS US, INC. | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|
| **Ending:** | | | | | | | |
| ACCOUNTS PAYABLE - COLLIER | | | 466,362. | 466,362. | | | 466,362. |
| ACCOUNTS PAYABLE - U S PASCO | 513,737. | | | 513,737. | | | 513,737. |
| ACCRUED CREDIT CREDIT CARDS PAYABLE | 182,611. | | | 182,611. | | | 182,611. |
| ACCRUED FACILITY COMMISSIONS | 971,993. | | | 971,993. | | | 971,993. |
| ACCRUED FACILITY TECH GRANT | 142,998. | | | 142,998. | | | 142,998. |
| ACCRUED LEGAL FEES | 11,777. | | | 11,777. | | | 11,777. |
| Accrued Taxes on Payroll | 13,257. | | | 13,257. | | | 13,257. |
| ACCRUED WAGES & SALARIES | 176,558. | | | 176,558. | | | 176,558. |
| CURRENT PORTION L-T DEBT | 589,405. | | | 589,405. | | | 589,405. |
| PAYABLE TO SMART COMM - US | | 250,649. | | 250,649. | | | 250,649. |
| Total | 2,602,336. | 250,649. | 466,362. | 3,319,347. | 0. | 0. | 3,319,347. |

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

| 2022 | Federal Statements | Page 4 |
|------|:------------------:|-------:|

**SMART COMMUNICATIONS HOLDING, INC.**

**Statement 4**
**Form 1120, Schedule M-1, Line 5**
**Book Expenses Not Deducted**

| | SMART COMMUNICATIONS COLLIER INC. | SMART COMMUNICATIONS PASCO, INC. | SMART COMMUNICATIONS US, INC. | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|
| C/Y Business Interest Exp Disallowed by Sec. 163(j) | 461,011. | | | 461,011. | | | 461,011. |
| Penalties | 22,137. | | | 22,137. | | | 22,137. |
| Total | 483,148. | 0. | 0. | 483,148. | 0. | 0. | 483,148. |

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

| 2022 | Federal Statements | Page 5 |

**SMART COMMUNICATIONS HOLDING, INC.**

**Statement 5**
**Form 1120, Schedule M-2, Line 6**
**Other Decreases**

| | SMART COMMUNICATIONS COLLIER INC. | SMART COMMUNICATIONS PASCO, INC. | SMART COMMUNICATIONS US, INC. | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|
| PRIOR YEAR IP FEES | 37,045,823. | | | 37,045,823. | | | 37,045,823. |
| Total | 37,045,823. | 0. | 0. | 37,045,823. | 0. | 0. | 37,045,823. |

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

| 2022 | **Federal Statements** | **Page 6** |
|---|---|---|

**SMART COMMUNICATIONS HOLDING, INC.**

**Statement 6**
**Form 1125-A, Line 5**
**Other Cost of Goods Sold**

| | SMART COMMUNICATIONS COLLIER INC. | SMART COMMUNICATIONS PASCO, INC. | SMART COMMUNICATIONS US, INC. | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|
| CONTRACTOR SEVICES | 1,605,422. | | | 1,605,422. | | | 1,605,422. |
| DATA STORAGE & SERVER HOSTING | 167,343. | | | 167,343. | | | 167,343. |
| EQUIPMENT DESIGN | 70,000. | | | 70,000. | | | 70,000. |
| Facility Commissions Expense | 11,322,286. | | | 11,322,286. | | | 11,322,286. |
| FREIGHT AND SHIPPING COSTS | 548,212. | | | 548,212. | | | 548,212. |
| INTERNET SERVICES | 478,554. | | | 478,554. | | | 478,554. |
| Kiosk Software Expense | 170,949. | | | 170,949. | | | 170,949. |
| Meals | 82,014. | | | 82,014. | | | 82,014. |
| Merchant Credit Card Fees | 1,625,594. | | | 1,625,594. | | | 1,625,594. |
| SALESPERSON COMMISSIONS | 164,193. | | | 164,193. | | | 164,193. |
| Sublicense Royalty Fees | 23,496. | | | 23,496. | | | 23,496. |
| TECHNOLOGY GRANT EXPENSES | 214,397. | | | 214,397. | | | 214,397. |
| TELECOMMUNICATIONS TAX EXPENSE | 629,686. | | | 629,686. | | | 629,686. |
| Travel Expenses | 1,204,257. | | | 1,204,257. | | | 1,204,257. |
| Total | 18,306,403. | 0. | 0. | 18,306,403. | 0. | 0. | 18,306,403. |

CONFIDENTIAL
FOR PURPOSES OF MEDIATION ONLY

# EXHIBIT 35

EFiled: Oct 23 2023 05:21PM EDT
Transaction ID 71168234
Case No. N23C-10-208 VLM

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |
|---|---|
| JONATHAN D. LOGAN,<br>　　　　Plaintiff,<br><br>v.<br><br>LOCO FLORIDA, LLC AND<br>SMART COMMUNICATIONS<br>YACHT HOLDING, LLC,<br>　　　　Defendants. | C.A. No. 2023-____-___ [CCLD] |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Jonathan D. Logan ("Jon" or "Plaintiff") seeks declarations that: (a) he is the sole member and manager of Loco Florida LLC ("Loco") and Smart Communications Yacht Holding LLC ("Yacht"); and (b) Loco and Yacht were validly converted to Delaware limited liability companies.

### RELEVANT PARTIES AND NONPARTIES

1.　　Loco was formed as a Florida limited liability company in 2020 but was converted to a Delaware limited liability company in September 2023. Loco owns a warehouse in Seminole, Florida, bought for about $1.1 million in 2019. Until recently, Loco did not have a written operating agreement.

2.　　Yacht was formed as a Florida limited liability company in 2022 but was converted to a Delaware limited liability company in September 2023. Yacht owns a 100' Riva Cosaro bought for about $10 million in 2022. Until recently, Yacht did not have a written operating agreement.

1

CERTIFIED AS A TRUE COPY
ATTEST: COLLEEN REDMOND
PROTHONOTARY
BY _____

3.    Jon is a resident of Florida.

4.    James Logan ("James(father)") was Jon's father. Before his death, James(father) formed the James Logan Family Trust ("Trust"), and appointed himself and his wife, Janice Logan, as Co-Trustees.[1] James(father) died on October 16, 2022. At that time, Janice Logan became the sole Trustee of the Trust.

## JURISDICTION AND VENUE

5.    This matter should be assigned to the Complex Commercial Litigation Division (CCLD) because the amount in controversy exceeds $1 million.

6.    This Court has non-exclusive jurisdiction to supply declaratory relief under 10 *Del. C.* § 6501.

7.    This Court has non-exclusive jurisdiction to make determinations under 6 *Del. C.* § 18-110. Such actions are *in rem* proceedings, so only the companies at issue are necessary parties.

8.    To the extent that the Trust claims any right to manage Loco or Yacht, it is subject to jurisdiction in Delaware under 6 *Del. C.* § 18-109.

---

[1] There is pending probate litigation in Florida between Jon and the Trust, but it does not involve the declarations requested here. Jon will promptly provide the Trust a copy of this complaint.

## BACKGROUND

*Loco And Yacht Are Formed In Florida*

9.     At all relevant times Jon has been a member and manager of Loco and

Yacht.

10.     Before his death, James(father) claimed to be a member and manager

of Loco and Yacht.[2]

11.     In September 2022, James(father) purported to transfer his alleged

member interests in Loco and Yacht to the Trust. Exhibits A (Loco), B (Yacht). At

that time, Loco and Yacht were Florida entities. Those purported transfers did not

make the Trust a member or manager of Loco or Yacht.

12.     Under the Florida Revised Limited Liability Company Act ("Florida

Act"), there are only four ways to become a member after formation of a Florida

limited liability company. Florida Act 605.0401(3). Subsection (a) says: "[a]s

provided in the operating agreement" but no such agreement existed at the time.

Subsection (b) says: "[a]s the result of a merger, interest exchange, conversion, or

domestication" but that did not happen. Subsection (c) says "[w]ith the consent of

all the members" but Jon (a member) did not consent. And subsection (d) says: "[a]s

_____

[2] Jon is not asking this Court to decide whether James(father) was a member
or manager of Loco or Yacht before his death because it does not affect the
declarations requested here.

3

provided in s. 605.0701(3)," which relates to dissolution after 90 days if there are no members.

13.    At most, the purported September 2022 transfers transferred any "transferable interest" James(father) had in Loco and Yacht to the Trust.

14.    Under the Florida Act, "a transferable interest means the right, as initially owned by a person in the person's capacity as a member, to receive distributions from a limited liability company in accordance with the operating agreement, whether the person remains a member or continues to own a part of the right. The term applies to any fraction of the interest, by whomever owned." 605.0102(66).

15.    A transferable interest is personal property that can be transferred. Florida Act 605.0501, 605.0502.

16.    But a transferable interest is different from being a member. *See* Florida Act 605.0401(4) ("A person may become a member without acquiring a transferable interest and without making or being obligated to make a contribution to the limited liability company.").

17.    Indeed, receiving a transferable interest "[d]oes not entitle the transferee to: 1. Participate in the management or conduct of the company's

4

activities and affairs; or 2. Except as otherwise provided in subsection (3),[3] have access to records or other information concerning the company's activities and affairs." Florida Act 605.0502(1)(c).

18.    "[I]f a member transfers a transferable interest, the transferor retains the rights of a member other than the transferable interest transferred and retains all the duties and obligations of a member." Florida Act 605.0502(7).

19.    So to the extent James(father) was a member or manager of Loco or Yacht before September 2022, he continued to be despite the purported September 2022 transfers to the Trust.

20.    In October 2022, James(father) died. To the extent that he was a member or manager of Loco or Yacht, under Florida law, James(father) was dissociated as a member and any rights as manager ceased.[4]

21.    Under the Florida Act, a person is dissociated as a member if they die. Florida Act 605.0602(7). If a person is dissociated as a member:

> (a) [t]he person's right to participate as a member in the management and conduct of the company's activities and

---

[3] The referenced subsection (3) says "[i]n a dissolution and winding up of a limited liability company, a transferee is entitled to an account of the company's transactions only from the date of dissolution." 605.0502(3).

[4] To the extent that the purported September 2022 transfers did not transfer any "transferable interest" James(father) had in Loco and Yacht to the Trust, James(father)'s estate became an assignee of those transferable interests.

affairs terminates;

(b) [i]f the company is member-managed, the person's duties and obligations under s. 605.04091 as a member end with regard to matters arising and events occurring after the person's dissociation; and

(c) Subject to ss. 605.0504 and 605.1001-605.1072, a transferable interest owned by the person in the person's capacity immediately before dissociation as a member is owned by the person solely as a transferee.

Florida Act 605.0603. The legal representative of a member's estate can act to settle a member's estate for purposes of the transferable interest. Florida Act 605.0504.

22.    Thus, even if James(father) was a member or manager before he died, Jon is now the sole member and manager of Loco and Yacht.

### *Loco And Yacht Move To Delaware*

23.    On August 29, 2023, upon the filing of a Certificate of Conversion to Limited Liability Company and a certification of formation with the Secretary of State of the State of Delaware, Yacht was converted from a Florida limited liability company into a Delaware limited liability company. Exhibit C.   Jon—as sole member and manager—validly: (a) authorized that conversion (Exhibit D); and (b) executed an operating agreement for Yacht (Exhibit E).

24.    On September 1, 2023, upon the filing of a Certificate of Conversion to Limited Liability Company and a certification of formation with the Secretary of State of the State of Delaware, Loco was converted from a Florida limited liability

6

company into a Delaware limited liability company. Exhibit F.   Jon—as sole member and manager—validly: (a) authorized that conversion (Exhibit G); and (b) executed an operating agreement for Loco (Exhibit H).

**The Trust Asserts Member Rights**

25.    The Trust claims the right to inspect books and records as a purported member of Loco and Yacht. If the Trust is not a member, it has no right to inspect. So there is a real controversy.

**WHEREFORE**, Plaintiff asks the Court for:

A.    A declaration that Jon is the sole member and manager of Loco and Yacht;

B.    A declaration that Loco and Yacht were validly converted to Delaware limited liability companies;

C.    Any other relief necessary to enforce those declarations or that the Court considers just and proper.

/s/ Richard P. Rollo
Richard P. Rollo (#3994)
Travis S. Hunter (#5350)
Nathalie A. Freeman (#7053)
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801
(302) 651-7700
Dated: October 23, 2023        *Attorneys for Plaintiff*

7



EFiled:  Oct 23 2023 05:21PM EDT
Transaction ID 71168234
Case No. N23C-10-208 VLM

# EXHIBIT A



CERTIFIED AS A TRUE COPY
ATTEST: COLLEEN REDMOND
PROTHONOTARY
BY

## ASSIGNMENT AND ACCEPTANCE OF MEMBERSHIP INTEREST

**KNOW ALL MEN BY THESE PRESENTS** that JAMES P. LOGAN (the "Assignor"), in exchange for good and valuable consideration paid to him by JAMES LOGAN, as CO-TRUSTEE of the JAMES LOGAN FAMILY TRUST, dated February 10, 2021 (the "Assignee"), the receipt of which is hereby acknowledged, has granted, bargained, sold, assigned, transferred and set over, and by these presents does hereby grant, bargain, sell, assign, transfer and set over unto the Assignee, all of the Assignor's interest as a member of LOCO FLORIDA, LLC, a Florida limited liability company (the "Company"), which interest constitutes a fifty percent (50%) interest in the profits, losses and capital of the Company and is not certificated (the "Membership Interest"), and does hereby irrevocably constitute and appoint Thomas D. Sims, Esq. as attorney to transfer the Membership Interest on the books of the Company with full power of substitution in the premises.

**ASSIGNEE, BY ACCEPTANCE OF THIS ASSIGNMENT AND ACCEPTANCE OF MEMBERSHIP INTEREST (THIS "ASSIGNMENT"),** assumes all of the duties and obligations of the Assignor as to the Membership Interest so assigned, and agrees to perform all of the covenants, conditions and obligations on the Assignor's part to be paid and performed with respect to the Membership Interest.

This Assignment may be executed in multiple counterparts with the same effect as if the signature on each such counterpart were on the same instrument. A signed copy, including that executed via DocuSign or other valid electronic or digital signature medium, of this Assignment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Assignment.

**EXECUTED TO BE EFFECTIVE AS OF** ___September 16___ **, 2022.**

**ASSIGNOR:**                                    **ASSIGNEE:**

James Logan (Sep 16, 2022 18.51 EDT)            James Logan (Sep 16, 2022 18.51 EDT)

JAMES P. LOGAN                                   JAMES LOGAN, AS CO-TRUSTEE OF
                                                 THE JAMES LOGAN FAMILY TRUST,
                                                 DATED FEBRUARY 10, 2021

6672599v2

# Assignment of Membership Interest - James Logan to Revocable Trust re Loco Florida, LLC (2022)

Final Audit Report

| | |
|---|---|
| Created: | 2022-09-16 |
| By: | Rachel Chase (rachelc@jpfirm.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA5bhdxfYZNnyDwJookfUDMbzJ4I6CqTM_ |

## "Assignment of Membership Interest - James Logan to Revocabl e Trust re Loco Florida, LLC (2022)" History

🕒 Document created by Rachel Chase (rachelc@jpfirm.com)
2022-09-16 - 8:50:45 PM GMT- IP address: 144.129.14.130

✉ Document emailed to jim.logan@ ▮▮▮▮▮▮▮▮▮ for signature
2022-09-16 - 9:02:03 PM GMT

🕒 Email viewed by jim.logan@ ▮▮▮▮▮▮▮▮
2022-09-16 - 10:43:04 PM GMT- IP address: 74.125.210.141

✍ Signer jim.logan@ ▮▮▮▮▮▮▮▮ entered name at signing as James logan
2022-09-16 - 10:51:28 PM GMT- IP address: 199.47.254.244

✍ Document e-signed by James logan (jim.logan@ ▮▮▮▮▮▮▮▮ )
Signature Date: 2022-09-16 - 10:51:30 PM GMT - Time Source: server- IP address: 199.47.254.244

✅ Agreement completed.
2022-09-16 - 10:51:30 PM GMT

# EXHIBIT B

CERTIFIED AS A TRUE COPY
ATTEST: COLLEEN REDMOND
PROTHONOTARY
BY _____

## ASSIGNMENT AND ACCEPTANCE OF MEMBERSHIP INTEREST

**KNOW ALL MEN BY THESE PRESENTS** that JAMES P. LOGAN (the "Assignor"), in exchange for good and valuable consideration paid to him by JAMES LOGAN, as CO-TRUSTEE of the JAMES LOGAN FAMILY TRUST, dated February 10, 2021 (the "Assignee"), the receipt of which is hereby acknowledged, has granted, bargained, sold, assigned, transferred and set over, and by these presents does hereby grant, bargain, sell, assign, transfer and set over unto the Assignee, all of the Assignor's interest as a member of SMART COMMUNICATIONS YACHT HOLDING, LLC, a Florida limited liability company (the "Company"), which interest constitutes a fifty percent (50%) interest in the profits, losses and capital of the Company and is not certificated (the "Membership Interest"), and does hereby irrevocably constitute and appoint Thomas D. Sims, Esq. as attorney to transfer the Membership Interest on the books of the Company with full power of substitution in the premises.

**ASSIGNEE, BY ACCEPTANCE OF THIS ASSIGNMENT AND ACCEPTANCE OF MEMBERSHIP INTEREST (THIS "ASSIGNMENT"),** assumes all of the duties and obligations of the Assignor as to the Membership Interest so assigned, and agrees to perform all of the covenants, conditions and obligations on the Assignor's part to be paid and performed with respect to the Membership Interest.

This Assignment may be executed in multiple counterparts with the same effect as if the signature on each such counterpart were on the same instrument. A signed copy, including that executed via DocuSign or other valid electronic or digital signature medium, of this Assignment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Assignment.

**EXECUTED TO BE EFFECTIVE AS OF** September 16 **, 2022.**

**ASSIGNOR:**                                    **ASSIGNEE:**

Jame logan (Se   , 2022 18:5  EDT)              Jame logan (Se   , 2022 18:5  EDT)

JA            ;AN                                JAMES LOGAN, AS CO-TRUSTEE OF
                                                THE JAMES LOGAN FAMILY TRUST,
                                                DATED FEBRUARY 10, 2021

8257501

# Assignment of Membership Interest - James Logan to Revocable T ust re Sma Communications Yacht Holdings, LLC (2022)

Final Audit Report                                    2022-09-16

| | |
|---|---|
| Created: | 2022-09-16 |
| By: | Rachel Chase (rachelc@jpfirm.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA41IVbbBf5AM-yiYmX8oXLjDjvWBKBD5w |

## "Assignment of Membership Interest - James Logan to Revocable Trust re Smart Communications Yacht Holdings, LLC (2022)" History

📄 Document created by Rachel Chase (rachelc@jpfirm.com)
2022-09-16 - 8:52:54 PM GMT- IP address: 144.129.14.130

📧 Document emailed to jim.logan@▓▓▓▓▓▓▓▓ for signature
2022-09-16 - 9:02:35 PM GMT

📄 Email viewed by jim.logan@▓▓▓▓▓▓▓▓
2022-09-16 - 10:22:45 PM GMT- IP address: 74.125.210.139

✍ Signer jim.logan@▓▓▓▓▓▓▓▓ entered name at signing as James logan
2022-09-16 - 10:52:56 PM GMT- IP address: 199.47.254.244

✍ Document e-signed by James logan (jim.logan@▓▓▓▓▓▓▓▓)
Signature Date: 2022-09-16 - 10:52:57 PM GMT - Time Source: server- IP address: 199.47.254.244

✅ Agreement completed.
2022-09-16 - 10:52:57 PM GMT

# EXHIBIT C

CERTIFIED AS A TRUE COPY
ATTEST: COLLEEN REDMOND
PROTHONOTARY
BY

FLORIDA DEPARTMENT OF STATE
Division of Corporations

September 1, 2023

CT CORP

,

Re: Document Number L22000096409

The Articles of Conversion were filed on August 29, 2023, effective August 29, 2023 converting SMART COMMUNICATIONS YACHT HOLDING, LLC, a Florida limited liability company, into SMART COMMUNICATIONS YACHT HOLDING, LLC A NON-QUALIFIED DELAWARE LLC.

Enclosed is the requested certification.

Should you have any further questions concerning this matter, please feel free to call (850) 245-6051, the Registration Filing Section.

Neysa Culligan
Regulatory Specialist III
Division of Corporations

Letter Number: 523A00020250

Account number: I20160000072

Amount charged: 55.00



# State of Florida

## Department of State

I certify the attached is a true and correct copy of the Articles of Conversion, filed on August 29, 2023 effective August 29, 2023, converting SMART COMMUNICATIONS YACHT HOLDING, LLC, a Florida limited liability company, into SMART COMMUNICATIONS YACHT HOLDING, LLC A NON-QUALIFIED DELAWARE LLC, as shown by the records of this office.

Given under my hand and the Great Seal of the State of Florida at Tallahassee, the Capital, this the First day of September, 2023



*Cord Byrd*
Secretary of State

CR2E022 (01-11)

DocuSign Envelope ID: EB90FECE-344A-42C7-B628-C9837E674B8A

**Articles of Conversion**
for
**Smart Communications Yacht Holding, LLC**
(a Florida limited liability company)
into
**Smart Communications Yacht Holding, LLC**
(a Delaware limited liability company)

FILED

2023 AUG 29 PM 1: 04

_____ OF STATE
TALLAHASSEE, FLORIDA

The Articles of Conversion are submitted to convert the following Florida Limited Liability Company into an "Other Business Entity" in accordance with § 605.1045, Florida Statutes.

1. The name of the Florida Limited Liability Company converting into the "Other Business Entity" is:

   **Smart Communications Yacht Holding, LLC**

2. The name of the "Converted or Other Business Entity" is:

   **Smart Communications Yacht Holding, LLC**

3. The "Converted or Other Business Entity" is a limited liability company formed under the laws of the State of Delaware.

4. The plan of conversion was approved by the converting Florida Limited Liability Company in accordance with Chapter 605, F.S.

5. This conversion shall be effective in Florida on August 29, 2023.

6. Below is the street and mailing address of an office the Florida Department of State may send and for process served on the department pursuant to 605.0117 and Chapter 48:

   Jonathan D. Logan
   10491 72nd St
   Seminole, FL 33777

7. The "Converted or Other Business Entity" has agreed to pay any members having appraisal rights the amount to which such members are entitled under § 605.1006 and 605.1061-605.1072, F.S.

IN WITNESS WHEREOF, the undersigned authorized representative of Smart Communications Yacht Holding, LLC, has executed these Articles of Conversion as of this 29th day of August, 2023.

Jonathan D. Logan
Authorized Representative

RLF1 29539693v.1

State of Delaware
Secretary of State
Division of Corporations
Delivered 01:12 PM 08/29/2023
FILED 01:12 PM 08/29/2023
SR 20233369131 - File Number 7644897

# CERTIFICATE OF CONVERSION
# TO LIMITED LIABILITY COMPANY

## OF

## SMART COMMUNICATIONS YACHT HOLDING, LLC
### (a Florida limited liability company)

## TO

## SMART COMMUNICATIONS YACHT HOLDING, LLC
### (a Delaware limited liability company)

This Certificate of Conversion to Limited Liability Company, dated as of August 29, 2023, has been duly executed and is being filed by Smart Communications Yacht Holding, LLC, a Florida limited liability company (the "Other Entity"), to convert the Other Entity to Smart Communications Yacht Holding, LLC, a Delaware limited liability company (the "Company"), under the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.).

FIRST: The Other Entity was first created, incorporated, formed or otherwise came into being on March 8, 2022. The jurisdiction of the Other Entity at the time it was first created, incorporated, formed or otherwise came into being, and the jurisdiction of the Other Entity immediately prior to the filing of this Certificate of Conversion to Limited Liability Company was the State of Florida.

SECOND: The name and type of entity of the Other Entity immediately prior to the filing of this Certificate of Conversion to Limited Liability Company was Smart Communications Yacht Holding, LLC, a Florida limited liability company.

THIRD: The name of the Company to which the Other Entity shall be converted as set forth in its certificate of formation is Smart Communications Yacht Holding, LLC.

FOURTH: The conversion of the Other Entity to the Company shall be effective upon the filing of this Certificate of Conversion to Limited Liability Company and a certificate of formation of the Company with the Secretary of State of the State of Delaware.

*Signature page follows.*

DocuSign Envelope ID: EB90FECE-344A-42C7-B628-C9837E674B8A

**IN WITNESS WHEREOF**, the undersigned has executed this Certificate of Conversion to Limited Liability Company as of the date first-above written.

**SMART COMMUNICATIONS YACHT HOLDING, LLC, a Florida limited liability company**

By: _____
    Jonathan D. Logan
    President

State of Delaware
Secretary of State
Division of Corporations
Delivered 01:12 PM 08/29/2023
FILED 01:12 PM 08/29/2023
SR 20233369131 - File Number 7644897

## CERTIFICATE OF FORMATION

### OF

### SMART COMMUNICATIONS YACHT HOLDING, LLC

This Certificate of Formation of Smart Communications Yacht Holding, LLC (the "LLC"), dated as of August 29, 2023, is being duly executed and filed by the undersigned, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del.C. §18-101, et seq.).

FIRST.    The name of the limited liability company is Smart Communications Yacht Holding, LLC.

SECOND.    The address of the registered office of the LLC in the State of Delaware is c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

THIRD.    The name and address of the registered agent for service of process on the LLC in the State of Delaware are The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation as of the date first above written.

Name: Jonathan D. Logan
Title: Authorized Person

# EXHIBIT D

CERTIFIED AS A TRUE COPY
ATTEST: COLLEEN REDMOND
PROTHONOTARY
BY

DocuSign Envelope ID: EB90FECE-344A-42C7-B628-C9837E674B8A

**WRITTEN CONSENT**
**OF THE SOLE MANAGER AND MEMBER**
**OF**
**SMART COMMUNICATIONS YACHT HOLDING, LLC**

The Undersigned, being the sole owner of all of the limited liability company interests and sole member of Smart Communication Yacht Holding, LLC, a Florida limited liability company (the "Company"), does hereby consent to and approve the following actions:

(1) <u>Conversion of the Company.</u> The conversion (the "Conversion") of the Company to Smart Communication Yacht Holding, LLC, a Delaware limited liability company (the "Resulting Entity") and the Plan of Conversion of the Company, in the form attached hereto as <u>Exhibit A,</u> (and the transactions contemplated thereby), including the exhibits attached thereto (including the Certificate of Formation, Certificate of Conversion and LLC Agreement (each as defined therein)) be, and hereby are, authorized, adopted and approved. Jonathan D. Logan, as manager of the Company and authorized representative, is hereby authorized, on behalf of the Company, to execute and file all documents to accomplish the foregoing, including the Articles of Conversion to be filed with the Florida Department of State and the Certificate of Formation, Certificate of Conversion and LLC Agreement. All actions of Jonathan D. Logan taken on behalf of the Company in connection with the Conversion be, and hereby are, adopted, approved, ratified and confirmed.

(2) <u>Conversion of Limited Liability Company Interests.</u> Upon the consummation of the Conversion, all limited liability company interests in the Company, or rights with respect thereto, all of which are owned by Jonathan D. Logan, shall be converted into 100% of the limited liability company interests of the Resulting Entity, and Jonathan D. Logan shall be admitted as and become the sole member of the Resulting Entity, owning 100% of the limited liability company interests thereof.

IN WITNESS WHEREOF, the undersigned, as sole manager of the Company and the sole owner of 100% of the limited liability company interests of the Company and sole member, has executed this consent as of this 29th day of August, 2023.

_____
Jonathan D. Logan

# Exhibit A

**Plan of Conversion**

**By Which**

**Smart Communications Yacht Holding, LLC**
(a Florida limited liability company)

**will be converted to**

**Smart Communications Yacht Holding, LLC**
(a Delaware limited liability company)

This Plan of Conversion relates to the conversion of Smart Communications Yacht Holding, LLC, a Florida limited liability company ("Yacht Florida"), to Smart Communications Yacht Holding, LLC, a Delaware limited liability company (the "Resulting Entity"), pursuant to the Florida Limited Liability Company Act, Fla. Stat. § 608.401 et. seq.

**I**

**Plan of Conversion**

**A. Adoption of Plan.** In consideration for the mutual promises, covenants, and agreements herein, Yacht Florida hereby adopts this plan of conversion pursuant to section 608.4401 of the Florida Statutes, as follows:

1. Yacht Florida shall be converted to the Resulting Entity to exist as a limited liability company governed by the laws of the State of Delaware under the name "Smart Communications Yacht Holding, LLC."

2. The Resulting Entity shall be a continuation of the existence of Yacht Florida.

3. The title to all property owned by Yacht Florida shall be vested in the Resulting Entity without revision or impairment and shall be subject to all of the debts and liabilities of Yacht Florida, in the same manner as if the Resulting Entity had itself incurred them.

4. The limited liability company interest in Yacht Florida (or rights with respect thereto), all of which are owned by Jonathan D. Logan, shall be converted into 100% of the limited liability company interests of the Resulting Entity, and Jonathan D. Logan shall be the sole member of the Resulting Entity.

**B. Effective Date.** The effective date of the conversion (the "Effective Date") shall be the date of filing of the Articles of Conversion ( the "Florida Certificate") with the Office of the Florida Secretary of State and the date of the filing of the Certificate of Formation of the Resulting Entity and Certificate of Conversion (the "Delaware Certificate") with the Secretary of State of the State of Delaware. Both the Florida Certificate and the Delaware Certificate shall be filed on the same day.

## II
## Conversion of Interests

Pursuant to the Plan of Conversion described in Article I above, on the Effective Date, the limited liability company interests in Yacht Florida (or rights with respect thereto), all of which are owned by Jonathan D. Logan, shall be converted into 100% of the limited liability company interests of the Resulting Entity, and Jonathan D. Logan shall be admitted as and shall be the sole member of the Resulting Entity, owning 100% of the limited liability company interests thereof.

## III
## Governing Documents

The Certificate of Formation of the Resulting Entity (attached hereto as <u>Exhibit A</u>, the "Certificate of Formation") and the Certificate of Conversion (attached hereto as <u>Exhibit B</u>, the "Certificate of Conversion") shall be filed with the Secretary of State of the State of Delaware on the Effective Date. The limited liability company agreement of the Resulting Entity (attached hereto as <u>Exhibit C</u>, the "LLC Agreement") shall be adopted and become effective as of the Effective Date.

## IV
## Approval of the Conversion

This Plan of Conversion, together with the Certificate of Formation, the Certificate of Conversion and the LLC Agreement, and the transactions contemplated hereby and thereby, including the conversion of Yacht Florida to the Resulting Entity, shall be approved by Jonathan D. Logan, as the owner of 100% of the limited liability company interests of Yacht Florida.

## V
## Miscellaneous

**A. Controlling Law.** The validity, interpretation, and performance of this plan of conversion shall be controlled by and construed under the laws of the State of Florida as existing from time to time.

**B. Amendment.** This Plan of Conversion may be amended at any time before its approval as provided herein.

# EXHIBIT E

CERTIFIED AS A TRUE COPY
ATTEST: COLLEEN REDMOND
PROTHONOTARY
BY

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## SMART COMMUNICATIONS YACHT HOLDING, LLC

This Limited Liability Company Agreement (this "Agreement") of Smart Communications Yacht Holding, LLC, a Delaware limited liability company (the "Company"), dated and effective as of August 29, 2023, is entered into by Jonathan D. Logan, as the sole member of the Company (the "Member").

WHEREAS, Smart Communications Yacht Holding, Inc. ("Yacht Florida") was organized as a Florida limited liability company on March 8, 2022;

WHEREAS, the manager and owner of 100% of the limited liability company interests and member of Yacht Florida has adopted resolutions adopting and approving the conversion of Yacht Florida to a Delaware limited liability company and the adoption of this Agreement;

WHEREAS, Yacht Florida was converted to a Delaware limited liability company pursuant to Section 18-214 of the Delaware Limited Liability Company Act (6 Del. C. § 18 101, et seq.), as amended from time to time (the "Act") and the Florida Limited Liability Company Act by causing the filing of Articles of Conversion with the Secretary of State of the State of Florida and a Certificate of Conversion to Limited Liability Company and a Certificate of Formation with the Secretary of State of the State of Delaware (the "Conversion"); and

WHEREAS, in connection with the Conversion, Jonathan D. Logan, as sole owner of 100% of the limited liability company interests in Yacht Florida and sole member thereof as of immediately prior to the Conversion, was admitted as a member of the Company, owning 100% of the limited liability company interests of the Company.

The Member, by execution of this Agreement, hereby forms a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.), as amended from time to time (the "Act"), and hereby agrees as follows:

1.    **Name.** The name of the limited liability company formed hereby is Smart Communications Yacht Holding, LLC.

2.    **Certificates.** Jonathan D. Logan is hereby designated as an "authorized person" of the Company within the meaning of the Act, and has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of State of the State of Delaware, which execution, delivery and filing is hereby ratified and approved. Upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware, the Member and

RLF1 29539807v.2

each Officer (as defined below) thereupon became a designated "authorized person" of the Company and shall continue as a designated "authorized person" of the Company within the meaning of the Act. The Member or any Officer, as an "authorized person" of the Company within the meaning of the Act, shall execute, deliver and file, or cause the execution, delivery and filing of, all certificates (and any amendments and/or restatements thereof) required or permitted by the Act to be filed with the Secretary of State of the State of Delaware. The Member or any Officer shall execute, deliver and file, or cause the execution, delivery and filing of any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct business.

3. **Purposes.** The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in any lawful act or activity for which limited liability companies may be formed under the Act and engaging in any and all activities necessary or incidental to the foregoing.

4. **Powers.** The Company, and the Member on behalf of the Company, (i) shall have and exercise all powers necessary, convenient or incidental to accomplish its purposes as set forth in Section 3 and (ii) shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.

5. **Principal Business Office.** The principal business office of the Company shall be located at such location as may hereafter be determined by the Member.

6. **Registered Office.** The address of the registered office of the Company in the State of Delaware is c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, New Castle County, Delaware 19801.

7. **Registered Agent.** The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware are The Corporation Trust Company, 1209 Orange Street, City of Wilmington, New Castle County, Delaware 19801.

8. **Member.** The name and the mailing address of the Member are as follows:

| Name | Address |
| --- | --- |
| Jonathan D. Logan | 10491 72nd Street Seminole, FL 33777 |

9. **Limited Liability.** Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member of the Company.

RLF1 29539807v.2

10. **Capital Contributions.** The Member is hereby admitted to the Company as a member of the Company upon its execution of this Agreement. The Member has contributed such capital to the Company, if any, as is set forth in the books and records of the Company.

11. **Additional Contributions.** The Member is not required to make any additional capital contribution to the Company. However, the Member may, at any time and in its sole discretion, make additional capital contributions to the Company.

12. **Allocation of Profits and Losses.** The Company's profits and losses shall be allocated solely to the Member.

13. **Distributions.** Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Member. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to the Member on account of its interest in the Company if such distribution would violate the Act or other applicable law.

14. **Management.** In accordance with Section 18-402 of the Act, management of the Company shall be vested in the Member. The Member shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by members of a limited liability company under the laws of the State of Delaware. Notwithstanding any other provision of this Agreement, the Member, acting singly, under the title "Member", "Managing Member", or any other title or no title at all, has the authority to bind the Company and is authorized to execute and deliver any document on behalf of the Company without any vote or consent of any other person or entity.

The Member shall have the powers set forth above until the earliest to occur of his death, disability or other inability to act in such capacity, at which time the legal representative of the Member shall appoint a successor to the interest of the Member for the purpose of settling the estate or administering the property of the Member.

15. **Officers.** The Member may, from time to time as it deems advisable, select natural persons who are employees or agents of the Company and designate them as officers of the Company (the "Officers") and assign any titles to such persons (including, without limitation, President, Vice President, Secretary, and Treasurer). Unless the Member decides otherwise, if the title assigned to an Officer is one commonly used for officers of a business corporation formed under the General Corporation Law of the State of Delaware, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office. The Member may delegate to any Officer or any other person or entity any of the Member's powers under this Agreement, including, without limitation, the power to bind the Company. Any delegation pursuant to this Section 15 may be revoked at any time by the Member. An Officer may be removed with or without cause at any time by the Member. Jonathan D. Logan is hereby appointed as President, Secretary and

Treasurer and shall continue to hold each such office until such time as he resigns or is removed by the Member.

16. **Other Business.** Notwithstanding any duty (including any fiduciary duty) otherwise existing at law or in equity, the Member and any Officer may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others, and the Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

17. **Exculpation and Indemnification; Waiver of Fiduciary Duties.** To the fullest extent permitted by law, no Member or Officer shall be liable to the Company or any other person or entity who is bound by this Agreement for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member or Officer. To the fullest extent permitted by applicable law, the Company shall indemnify the Member against all losses or liabilities incurred by reason of the fact that such person is or was serving as a Member or Officer and shall pay all expenses (including reasonable legal fees) incurred by a Member or Officer in defending any claim, demand, action, suit or proceeding to which such person is made or is threatened to be made a party by reason of the fact that such person is or was a Member or Officer. Notwithstanding any other provision of this Agreement or anything to the contrary existing at law, in equity or otherwise, each of the Member and each Officer shall, to the fullest extent permitted by law, owe no duties (including fiduciary duties) to the Member or the Company or any other person bound by this Agreement; provided, however, that each of the Member and each Officer shall have the duty to act in accordance with the implied contractual covenant of good faith and fair dealing.

18. **Assignments.** The Member may at any time assign in whole or in part its limited liability company interest in the Company. The transferee of a limited liability company interest in the Company shall be admitted to the Company as a member of the Company upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. If the Member transfers all of its limited liability company interest in the Company pursuant to this Section 18, such admission shall be deemed effective immediately prior to the transfer, and, immediately following such admission, the transferor Member shall cease to be a member of the Company.

19. **Resignation.** The Member may at any time resign from the Company. If the Member resigns pursuant to this Section 19, a person or entity may be admitted to the Company as an additional member of the Company upon the written consent of the resigning Member and such person's or entity's execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. If a person or entity is admitted to the Company as an additional member of the Company in connection with the resignation of the Member pursuant to this Section 19, such admission shall be deemed effective immediately prior to the resignation, and, immediately following such admission, the resigning Member shall cease to be a member of the Company.

-4-

20.     **Admission of Additional Members.** Except as otherwise provided in Section 19, one or more additional members of the Company may be admitted to the Company with the written consent of the Member. A person or entity shall be admitted to the Company as an additional member of the Company upon the written consent of the Member and such person's or entity's execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement.

21.     **Dissolution.**

(a)     The Company shall dissolve and its affairs shall be wound up upon the first to occur of the following: (i) the written consent of the Member to dissolve the Company, (ii) at any time there are no members of the Company unless the Company is continued without dissolution in accordance with the Act, or (iii) the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

(b)     The bankruptcy (as defined at Sections 18-101(1) and 18-304 of the Act) of the Member shall not cause the Member to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.

(c)     In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

(d)     The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Member in the manner provided for in this Agreement and (ii) the Certificate of Formation of the Company shall have been canceled in the manner required by the Act.

22.     **Severability of Provisions.** Each provision of this Agreement shall be considered severable, and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement that are valid, enforceable and legal.

23.     **Entire Agreement.** This Agreement constitutes the entire agreement of the Member with respect to the subject matter hereof.

24.     **Governing Law.** This Agreement shall be governed by, and construed under, the laws of the State of Delaware (without regard to conflict of laws principles), all rights and remedies being governed by said laws.

RLF1 29539807v.2

25. **Amendments.** This Agreement may not be modified, altered, supplemented or amended except pursuant to a written agreement executed and delivered by the Member.

26. **Sole Benefit of Member.** Except as expressly provided in Section 17, the provisions of this Agreement (including Section 11) are intended solely to benefit the Member and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any creditor of the Member or any creditor of the Company (and no such creditor shall be a third-party beneficiary of this Agreement), and the Member shall not have any duty or obligation to any creditor of the Company to make any contributions or payments to the Company or to issue any call for capital pursuant to this Agreement.

27. **Effectiveness.** Pursuant to Section 18-201(d) of the Act, this Agreement shall be effective as of the time of the filing of the Certificate of Formation of the Company in the office of the Secretary of State of the State of Delaware.

[SIGNATURE PAGE FOLLOWS]

RLF1 29539807v.2

DocuSign Envelope ID: EB90FECE-344A-42C7-B628-C9837E674B8A

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Agreement as of the date first written above.

**MEMBER:**

Jonathan D. Logan

# EXHIBIT F

CERTIFIED AS A TRUE COPY
ATTEST: COLLEEN REDMOND
PROTHONOTARY
BY

**FLORIDA DEPARTMENT OF STATE**
Division of Corporations

September 5, 2023

CT CORP

,

Re: Document Number L20000130244

The Articles of Conversion were filed on   September 1, 2023 converting   LOCO FLORIDA LLC, a Florida limited liability company, into LOCO FLORIDA LLC, a DELAWARE LIMITED LIABILITY COMPANY.

Should you have any further questions concerning this matter, please feel free to call (850) 245-6051, the Registration Filing Section.

Jalesa S Dennis
Regulatory Specialist III
Division of Corporations                    Letter Number: 923A00020388

  Account number: I20160000072           Amount charged: 55.00



# State of Florida

## Department of State



Given under my hand and the
Great Seal of the State of Florida
at Tallahassee, the Capital, this the
Fifth day of September, 2023



*Cord Byrd*

*Secretary of State*

CR2E022 (01-11)

DocuSign Envelope ID: DED1C1BF-787E-408A-A718-720DDE229EB0

**Articles of Conversion**
for
**Loco Florida LLC**
(a Florida limited liability company)
into
**Loco Florida LLC**
(a Delaware limited liability company)

FILED
SECRETARY OF STATE
2023 SEP -1 PM 1:45

The Articles of Conversion are submitted to convert the following Florida Limited Liability Company into an "Other Business Entity" in accordance with § 605.1045, Florida Statutes.

1. The name of the Florida Limited Liability Company converting into the "Other Business Entity" is:

   **Loco Florida LLC**

2. The name of the "Converted or Other Business Entity" is:

   **Loco Florida LLC**

3. The "Converted or Other Business Entity" is a limited liability company formed under the laws of the State of Delaware.

4. The plan of conversion was approved by the converting Florida Limited Liability Company in accordance with Chapter 605, F.S.

5. This conversion shall be effective in Florida on September 1, 2023.

6. Below is the street and mailing address of an office the Florida Department of State may send and for process served on the department pursuant to 605.0117 and Chapter 48:

   Jonathan D. Logan
   10491 72nd St
   Seminole, FL 33777

7. The "Converted or Other Business Entity" has agreed to pay any members having appraisal rights the amount to which such members are entitled under § 605.1006 and 605.1061-605.1072, F.S.

IN WITNESS WHEREOF, the undersigned authorized representative of Loco Florida LLC, has executed these Articles of Conversion as of this 1st day of September, 2023.

Jonathan D. Logan
Authorized Representative

RLF1 29555205v.1

State of Delaware
Secretary of State
Division of Corporations
Delivered 10:40 AM 09/01/2023
FILED 10:40 AM 09/01/2023
SR 20233401912 - File Number 7652139

# CERTIFICATE OF CONVERSION
# TO LIMITED LIABILITY COMPANY

## OF

## LOCO FLORIDA LLC
### (a Florida limited liability company)

## TO

## LOCO FLORIDA LLC
### (a Delaware limited liability company)

This Certificate of Conversion to Limited Liability Company, dated as of September 1, 2023, has been duly executed and is being filed by Loco Florida LLC, a Florida limited liability company (the "Other Entity"), to convert the Other Entity to Loco Florida LLC, a Delaware limited liability company (the "Company"), under the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.).

FIRST: The Other Entity was first created, incorporated, formed or otherwise came into being on May 13, 2020. The jurisdiction of the Other Entity at the time it was first created, incorporated, formed or otherwise came into being, and the jurisdiction of the Other Entity immediately prior to the filing of this Certificate of Conversion to Limited Liability Company was the State of Florida.

SECOND: The name and type of entity of the Other Entity immediately prior to the filing of this Certificate of Conversion to Limited Liability Company was Loco Florida LLC, a Florida limited liability company.

THIRD: The name of the Company to which the Other Entity shall be converted as set forth in its certificate of formation is Loco Florida LLC.

FOURTH: The conversion of the Other Entity to the Company shall be effective upon the filing of this Certificate of Conversion to Limited Liability Company and a certificate of formation of the Company with the Secretary of State of the State of Delaware.

*Signature page follows.*

DocuSign Envelope ID: DED1C1BF-787E-408A-A718-720DDE229EB0

**IN WITNESS WHEREOF**, the undersigned has executed this Certificate of Conversion to Limited Liability Company as of the date first-above written.

**LOCO FLORIDA LLC, a Florida limited liability company**

By: _____
      Jonathan D. Logan
      President

# CERTIFICATE OF FORMATION

## OF

## LOCO FLORIDA LLC

This Certificate of Formation of Loco Florida LLC (the "LLC"), dated as of September 1, 2023, is being duly executed and filed by the undersigned, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del.C. §18-101, et seq.).

FIRST. The name of the limited liability company is Loco Florida LLC.

SECOND. The address of the registered office of the LLC in the State of Delaware is c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

THIRD. The name and address of the registered agent for service of process on the LLC in the State of Delaware are The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation as of the date first above written.

Name: Jonathan D. Logan
Title: Authorized Person

State of Delaware
Secretary of State
Division of Corporations
Delivered 10:40 AM 09/01/2023
FILED 10:40 AM 09/01/2023
SR 20233401912 - File Number 7652139

# EXHIBIT G

CERTIFIED AS A TRUE COPY
ATTEST: COLLEEN REDMOND
PROTHONOTARY
BY

# WRITTEN CONSENT
## OF THE SOLE MANAGER AND MEMBER
### OF
## LOCO FLORIDA LLC

The Undersigned, being the sole owner of all of the limited liability company interests and sole member of Loco Florida LLC, a Florida limited liability company (the "Company"), does hereby consent to and approve the following actions:

(1) <u>Conversion of the Company.</u> The conversion (the "Conversion") of the Company to Loco Florida LLC, a Delaware limited liability company (the "Resulting Entity") and the Plan of Conversion of the Company, in the form attached hereto as <u>Exhibit A,</u> (and the transactions contemplated thereby), including the exhibits attached thereto (including the Certificate of Formation, Certificate of Conversion and LLC Agreement (each as defined therein)) be, and hereby are, authorized, adopted and approved. Jonathan D. Logan, as manager of the Company and authorized representative, is hereby authorized, on behalf of the Company, to execute and file all documents to accomplish the foregoing, including the Articles of Conversion to be filed with the Florida Department of State and the Certificate of Formation, Certificate of Conversion and LLC Agreement. All actions of Jonathan D. Logan taken on behalf of the Company in connection with the Conversion be, and hereby are, adopted, approved, ratified and confirmed.

(2) <u>Conversion of Limited Liability Company Interests.</u> Upon the consummation of the Conversion, all limited liability company interests in the Company, or rights with respect thereto, all of which are owned by Jonathan D. Logan, shall be converted into 100% of the limited liability company interests of the Resulting Entity, and Jonathan D. Logan shall be admitted as and become the sole member of the Resulting Entity, owning 100% of the limited liability company interests thereof.

IN WITNESS WHEREOF, the undersigned, as sole manager of the Company and the sole owner of 100% of the limited liability company interests of the Company and sole member, has executed this consent as of this 1st day of September, 2023.

_____
Jonathan D. Logan

**Plan of Conversion**

**By Which**

**Loco Florida LLC**
(a Florida limited liability company)

**will be converted to**

**Loco Florida LLC**
(a Delaware limited liability company)

This Plan of Conversion relates to the conversion of Loco Florida LLC, a Florida limited liability company ("Loco"), to Loco Florida LLC, a Delaware limited liability company (the "Resulting Entity"), pursuant to the Florida Limited Liability Company Act, Fla. Stat. § 608.401 et. seq.

**I**
**Plan of Conversion**

**A. Adoption of Plan.** In consideration for the mutual promises, covenants, and agreements herein, Loco hereby adopts this plan of conversion pursuant to section 608.4401 of the Florida Statutes, as follows:

1. Loco shall be converted to the Resulting Entity to exist as a limited liability company governed by the laws of the State of Delaware under the name "Loco Florida LLC."

2. The Resulting Entity shall be a continuation of the existence of Loco.

3. The title to all property owned by Loco shall be vested in the Resulting Entity without revision or impairment and shall be subject to all of the debts and liabilities of Loco, in the same manner as if the Resulting Entity had itself incurred them.

4. The limited liability company interest in Loco (or rights with respect thereto), all of which are owned by Jonathan D. Logan, shall be converted into 100% of the limited liability company interests of the Resulting Entity, and Jonathan D. Logan shall be the sole member of the Resulting Entity.

**B. Effective Date.** The effective date of the conversion (the "Effective Date") shall be the date of filing of the Articles of Conversion (the "Florida Certificate") with the Office of the Florida Secretary of State and the date of the filing of the Certificate of Formation of the Resulting Entity and Certificate of Conversion (the "Delaware Certificate") with the Secretary of State of the State of Delaware. Both the Florida Certificate and the Delaware Certificate shall be filed on the same day.

## II
## Conversion of Interests

Pursuant to the Plan of Conversion described in Article I above, on the Effective Date, the limited liability company interests in Loco (or rights with respect thereto), all of which are owned by Jonathan D. Logan, shall be converted into 100% of the limited liability company interests of the Resulting Entity, and Jonathan D. Logan shall be admitted as and shall be the sole member of the Resulting Entity, owning 100% of the limited liability company interests thereof.

## III
## Governing Documents

The Certificate of Formation of the Resulting Entity (attached hereto as <u>Exhibit A</u>, the "Certificate of Formation") and the Certificate of Conversion (attached hereto as <u>Exhibit B</u>, the "Certificate of Conversion") shall be filed with the Secretary of State of the State of Delaware on the Effective Date. The limited liability company agreement of the Resulting Entity (attached hereto as <u>Exhibit C</u>, the "LLC Agreement") shall be adopted and become effective as of the Effective Date.

## IV
## Approval of the Conversion

This Plan of Conversion, together with the Certificate of Formation, the Certificate of Conversion and the LLC Agreement, and the transactions contemplated hereby and thereby, including the conversion of Loco to the Resulting Entity, shall be approved by Jonathan D. Logan, as the owner of 100% of the limited liability company interests of Loco.

## V
## Miscellaneous

**A. Controlling Law.** The validity, interpretation, and performance of this plan of conversion shall be controlled by and construed under the laws of the State of Florida as existing from time to time.

**B. Amendment.** This Plan of Conversion may be amended at any time before its approval as provided herein.

# CERTIFICATE OF FORMATION

## OF

## LOCO FLORIDA LLC

This Certificate of Formation of Loco Florida LLC (the "LLC"), dated as of September 1, 2023, is being duly executed and filed by the undersigned, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del.C. §18-101, et seq.).

FIRST.  The name of the limited liability company is Loco Florida LLC.

SECOND.  The address of the registered office of the LLC in the State of Delaware is c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

THIRD.  The name and address of the registered agent for service of process on the LLC in the State of Delaware are The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation as of the date first above written.

Name:  Jonathan D. Logan
Title:  Authorized Person

**CERTIFICATE OF CONVERSION
TO LIMITED LIABILITY COMPANY**

**OF**

**LOCO FLORIDA LLC
(a Florida limited liability company)**

**TO**

**LOCO FLORIDA LLC
(a Delaware limited liability company)**


This Certificate of Conversion to Limited Liability Company, dated as of September 1, 2023, has been duly executed and is being filed by Loco Florida LLC, a Florida limited liability company (the "Other Entity"), to convert the Other Entity to Loco Florida LLC, a Delaware limited liability company (the "Company"), under the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.).

FIRST:   The Other Entity was first created, incorporated, formed or otherwise came into being on May 13, 2020.  The jurisdiction of the Other Entity at the time it was first created, incorporated, formed or otherwise came into being, and the jurisdiction of the Other Entity immediately prior to the filing of this Certificate of Conversion to Limited Liability Company was the State of Florida.

SECOND:   The name and type of entity of the Other Entity immediately prior to the filing of this Certificate of Conversion to Limited Liability Company was Loco Florida LLC, a Florida limited liability company.

THIRD:   The name of the Company to which the Other Entity shall be converted as set forth in its certificate of formation is Loco Florida LLC.

FOURTH:   The conversion of the Other Entity to the Company shall be effective upon the filing of this Certificate of Conversion to Limited Liability Company and a certificate of formation of the Company with the Secretary of State of the State of Delaware.

*Signature page follows.*

**IN WITNESS WHEREOF**, the undersigned has executed this Certificate of Conversion to Limited Liability Company as of the date first-above written.

**LOCO FLORIDA LLC, a Florida limited liability company**

By: _____
        Jonathan D. Logan
        President

Exhibit C to Plan of Conversion

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## LOCO FLORIDA LLC

This Limited Liability Company Agreement (this "Agreement") of Loco Florida LLC, a Delaware limited liability company (the "Company"), dated and effective as of September 1, 2023, is entered into by Jonathan D. Logan, as the sole member of the Company (the "Member").

WHEREAS, Loco Florida LLC ("Loco") was organized as a Florida limited liability company on May 13, 2020;

WHEREAS, the manager and owner of 100% of the limited liability company interests and member of Loco has adopted resolutions adopting and approving the conversion of Loco to a Delaware limited liability company and the adoption of this Agreement;

WHEREAS, Loco was converted to a Delaware limited liability company pursuant to Section 18-214 of the Delaware Limited Liability Company Act (6 Del. C. § 18 101, et seq.), as amended from time to time (the "Act") and the Florida Limited Liability Company Act by causing the filing of Articles of Conversion with the Secretary of State of the State of Florida and a Certificate of Conversion to Limited Liability Company and a Certificate of Formation with the Secretary of State of the State of Delaware (the "Conversion"); and

WHEREAS, in connection with the Conversion, Jonathan D. Logan, as sole owner of 100% of the limited liability company interests in Loco and sole member thereof as of immediately prior to the Conversion, was admitted as a member of the Company, owning 100% of the limited liability company interests of the Company.

The Member, by execution of this Agreement, hereby forms a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.), as amended from time to time (the "Act"), and hereby agrees as follows:

  1.  **Name.** The name of the limited liability company formed hereby is Loco Florida LLC.

  2.  **Certificates.** Jonathan D. Logan is hereby designated as an "authorized person" of the Company within the meaning of the Act, and has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of State of the State of Delaware, which execution, delivery and filing is hereby ratified and approved. Upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware, the Member and each Officer (as defined below) thereupon became a designated "authorized person" of the

Company and shall continue as a designated "authorized person" of the Company within the meaning of the Act. The Member or any Officer, as an "authorized person" of the Company within the meaning of the Act, shall execute, deliver and file, or cause the execution, delivery and filing of, all certificates (and any amendments and/or restatements thereof) required or permitted by the Act to be filed with the Secretary of State of the State of Delaware. The Member or any Officer shall execute, deliver and file, or cause the execution, delivery and filing of any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct business.

3. **Purposes.** The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in any lawful act or activity for which limited liability companies may be formed under the Act and engaging in any and all activities necessary or incidental to the foregoing.

4. **Powers.** The Company, and the Member on behalf of the Company, (i) shall have and exercise all powers necessary, convenient or incidental to accomplish its purposes as set forth in Section 3 and (ii) shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.

5. **Principal Business Office.** The principal business office of the Company shall be located at such location as may hereafter be determined by the Member.

6. **Registered Office.** The address of the registered office of the Company in the State of Delaware is c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, New Castle County, Delaware 19801.

7. **Registered Agent.** The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware are The Corporation Trust Company, 1209 Orange Street, City of Wilmington, New Castle County, Delaware 19801.

8. **Member.** The name and the mailing address of the Member are as follows:

| Name | Address |
| --- | --- |
| Jonathan D. Logan | 10491 72nd Street |
|  | Seminole, FL 33777 |

9. **Limited Liability.** Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member of the Company.

RLF1 29555265v.2

10. **Capital Contributions.** The Member is hereby admitted to the Company as a member of the Company upon its execution of this Agreement. The Member has contributed such capital to the Company, if any, as is set forth in the books and records of the Company.

11. **Additional Contributions.** The Member is not required to make any additional capital contribution to the Company. However, the Member may, at any time and in its sole discretion, make additional capital contributions to the Company.

12. **Allocation of Profits and Losses.** The Company's profits and losses shall be allocated solely to the Member.

13. **Distributions.** Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Member. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to the Member on account of its interest in the Company if such distribution would violate the Act or other applicable law.

14. **Management.** In accordance with Section 18-402 of the Act, management of the Company shall be vested in the Member. The Member shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by members of a limited liability company under the laws of the State of Delaware. Notwithstanding any other provision of this Agreement, the Member, acting singly, under the title "Member", "Managing Member", or any other title or no title at all, has the authority to bind the Company and is authorized to execute and deliver any document on behalf of the Company without any vote or consent of any other person or entity.

The Member shall have the powers set forth above until the earliest to occur of his death, disability or other inability to act in such capacity, at which time the legal representative of the Member shall appoint a successor to the interest of the Member for the purpose of settling the estate or administering the property of the Member.

15. **Officers.** The Member may, from time to time as it deems advisable, select natural persons who are employees or agents of the Company and designate them as officers of the Company (the "Officers") and assign any titles to such persons (including, without limitation, President, Vice President, Secretary, and Treasurer). Unless the Member decides otherwise, if the title assigned to an Officer is one commonly used for officers of a business corporation formed under the General Corporation Law of the State of Delaware, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office. The Member may delegate to any Officer or any other person or entity any of the Member's powers under this Agreement, including, without limitation, the power to bind the Company. Any delegation pursuant to this Section 15 may be revoked at any time by the Member. An Officer may be removed with or without cause at any time by the Member. Jonathan D. Logan is hereby appointed as President, Secretary and

RLF1 29555265v.2

Treasurer and shall continue to hold each such office until such time as he resigns or is removed by the Member.

16. **Other Business.** Notwithstanding any duty (including any fiduciary duty) otherwise existing at law or in equity, the Member and any Officer may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others, and the Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

17. **Exculpation and Indemnification; Waiver of Fiduciary Duties.** To the fullest extent permitted by law, no Member or Officer shall be liable to the Company or any other person or entity who is bound by this Agreement for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member or Officer. To the fullest extent permitted by applicable law, the Company shall indemnify the Member against all losses or liabilities incurred by reason of the fact that such person is or was serving as a Member or Officer and shall pay all expenses (including reasonable legal fees) incurred by a Member or Officer in defending any claim, demand, action, suit or proceeding to which such person is made or is threatened to be made a party by reason of the fact that such person is or was a Member or Officer. Notwithstanding any other provision of this Agreement or anything to the contrary existing at law, in equity or otherwise, each of the Member and each Officer shall, to the fullest extent permitted by law, owe no duties (including fiduciary duties) to the Member or the Company or any other person bound by this Agreement; provided, however, that each of the Member and each Officer shall have the duty to act in accordance with the implied contractual covenant of good faith and fair dealing.

18. **Assignments.** The Member may at any time assign in whole or in part its limited liability company interest in the Company. The transferee of a limited liability company interest in the Company shall be admitted to the Company as a member of the Company upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. If the Member transfers all of its limited liability company interest in the Company pursuant to this Section 18, such admission shall be deemed effective immediately prior to the transfer, and, immediately following such admission, the transferor Member shall cease to be a member of the Company.

19. **Resignation.** The Member may at any time resign from the Company. If the Member resigns pursuant to this Section 19, a person or entity may be admitted to the Company as an additional member of the Company upon the written consent of the resigning Member and such person's or entity's execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. If a person or entity is admitted to the Company as an additional member of the Company in connection with the resignation of the Member pursuant to this Section 19, such admission shall be deemed effective immediately prior to the resignation, and, immediately following such admission, the resigning Member shall cease to be a member of the Company.

RLF1 29555265v.2

20.    **Admission of Additional Members.**  Except as otherwise provided in Section 19, one or more additional members of the Company may be admitted to the Company with the written consent of the Member.  A person or entity shall be admitted to the Company as an additional member of the Company upon the written consent of the Member and such person's or entity's execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement.

21.    **Dissolution.**

(a)    The Company shall dissolve and its affairs shall be wound up upon the first to occur of the following: (i) the written consent of the Member to dissolve the Company, (ii) at any time there are no members of the Company unless the Company is continued without dissolution in accordance with the Act, or (iii) the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

(b)    The bankruptcy (as defined at Sections 18-101(1) and 18-304 of the Act) of the Member shall not cause the Member to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.

(c)    In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

(d)    The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Member in the manner provided for in this Agreement and (ii) the Certificate of Formation of the Company shall have been canceled in the manner required by the Act.

22.    **Severability of Provisions.**  Each provision of this Agreement shall be considered severable, and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement that are valid, enforceable and legal.

23.    **Entire Agreement.**  This Agreement constitutes the entire agreement of the Member with respect to the subject matter hereof.

24.    **Governing Law.**  This Agreement shall be governed by, and construed under, the laws of the State of Delaware (without regard to conflict of laws principles), all rights and remedies being governed by said laws.

RLF1 29555265v.2

25. **Amendments.** This Agreement may not be modified, altered, supplemented or amended except pursuant to a written agreement executed and delivered by the Member.

26. **Sole Benefit of Member.** Except as expressly provided in Section 17, the provisions of this Agreement (including Section 11) are intended solely to benefit the Member and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any creditor of the Member or any creditor of the Company (and no such creditor shall be a third-party beneficiary of this Agreement), and the Member shall not have any duty or obligation to any creditor of the Company to make any contributions or payments to the Company or to issue any call for capital pursuant to this Agreement.

27. **Effectiveness.** Pursuant to Section 18-201(d) of the Act, this Agreement shall be effective as of the time of the filing of the Certificate of Formation of the Company in the office of the Secretary of State of the State of Delaware.

[SIGNATURE PAGE FOLLOWS]

RLF1 29555265v.2

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Agreement as of the date first written above.

**<u>MEMBER</u>:**

_____
Jonathan D. Logan

# EXHIBIT H

CERTIFIED AS A TRUE COPY
ATTEST: COLLEEN REDMOND
PROTHONOTARY
BY

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## LOCO FLORIDA LLC

This Limited Liability Company Agreement (this "Agreement") of Loco Florida LLC, a Delaware limited liability company (the "Company"), dated and effective as of September 1, 2023, is entered into by Jonathan D. Logan, as the sole member of the Company (the "Member").

WHEREAS, Loco Florida LLC ("Loco") was organized as a Florida limited liability company on May 13, 2020;

WHEREAS, the manager and owner of 100% of the limited liability company interests and member of Loco has adopted resolutions adopting and approving the conversion of Loco to a Delaware limited liability company and the adoption of this Agreement;

WHEREAS, Loco was converted to a Delaware limited liability company pursuant to Section 18-214 of the Delaware Limited Liability Company Act (6 Del. C. § 18 101, et seq.), as amended from time to time (the "Act") and the Florida Limited Liability Company Act by causing the filing of Articles of Conversion with the Secretary of State of the State of Florida and a Certificate of Conversion to Limited Liability Company and a Certificate of Formation with the Secretary of State of the State of Delaware (the "Conversion"); and

WHEREAS, in connection with the Conversion, Jonathan D. Logan, as sole owner of 100% of the limited liability company interests in Loco and sole member thereof as of immediately prior to the Conversion, was admitted as a member of the Company, owning 100% of the limited liability company interests of the Company.

The Member, by execution of this Agreement, hereby forms a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.), as amended from time to time (the "Act"), and hereby agrees as follows:

1.      **Name.** The name of the limited liability company formed hereby is Loco Florida LLC.

2.      **Certificates.** Jonathan D. Logan is hereby designated as an "authorized person" of the Company within the meaning of the Act, and has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of State of the State of Delaware, which execution, delivery and filing is hereby ratified and approved. Upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware, the Member and each Officer (as defined below) thereupon became a designated "authorized person" of the Company and shall continue as a designated "authorized person" of the Company within the

RLF1 29555265v.2

meaning of the Act.  The Member or any Officer, as an "authorized person" of the Company within the meaning of the Act, shall execute, deliver and file, or cause the execution, delivery and filing of, all certificates (and any amendments and/or restatements thereof) required or permitted by the Act to be filed with the Secretary of State of the State of Delaware.  The Member or any Officer shall execute, deliver and file, or cause the execution, delivery and filing of any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct business.

3.      **Purposes.**  The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in any lawful act or activity for which limited liability companies may be formed under the Act and engaging in any and all activities necessary or incidental to the foregoing.

4.      **Powers.**  The Company, and the Member on behalf of the Company, (i) shall have and exercise all powers necessary, convenient or incidental to accomplish its purposes as set forth in Section 3 and (ii) shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.

5.      **Principal Business Office.**  The principal business office of the Company shall be located at such location as may hereafter be determined by the Member.

6.      **Registered Office.**  The address of the registered office of the Company in the State of Delaware is c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, New Castle County, Delaware 19801.

7.      **Registered Agent.**  The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware are The Corporation Trust Company, 1209 Orange Street, City of Wilmington, New Castle County, Delaware 19801.

8.      **Member.**  The name and the mailing address of the Member are as follows:

| Name | Address |
| --- | --- |
| Jonathan D. Logan | 10491 72nd Street<br>Seminole, FL 33777 |

9.      **Limited Liability.**  Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member of the Company.

10.     **Capital Contributions.**  The Member is hereby admitted to the Company as a member of the Company upon its execution of this Agreement.  The Member has

RLF1 29555265v.2

contributed such capital to the Company, if any, as is set forth in the books and records of the Company.

11. **Additional Contributions.** The Member is not required to make any additional capital contribution to the Company. However, the Member may, at any time and in its sole discretion, make additional capital contributions to the Company.

12. **Allocation of Profits and Losses.** The Company's profits and losses shall be allocated solely to the Member.

13. **Distributions.** Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Member. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to the Member on account of its interest in the Company if such distribution would violate the Act or other applicable law.

14. **Management.** In accordance with Section 18-402 of the Act, management of the Company shall be vested in the Member. The Member shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by members of a limited liability company under the laws of the State of Delaware. Notwithstanding any other provision of this Agreement, the Member, acting singly, under the title "Member", "Managing Member", or any other title or no title at all, has the authority to bind the Company and is authorized to execute and deliver any document on behalf of the Company without any vote or consent of any other person or entity.

The Member shall have the powers set forth above until the earliest to occur of his death, disability or other inability to act in such capacity, at which time the legal representative of the Member shall appoint a successor to the interest of the Member for the purpose of settling the estate or administering the property of the Member.

15. **Officers.** The Member may, from time to time as it deems advisable, select natural persons who are employees or agents of the Company and designate them as officers of the Company (the "Officers") and assign any titles to such persons (including, without limitation, President, Vice President, Secretary, and Treasurer). Unless the Member decides otherwise, if the title assigned to an Officer is one commonly used for officers of a business corporation formed under the General Corporation Law of the State of Delaware, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office. The Member may delegate to any Officer or any other person or entity any of the Member's powers under this Agreement, including, without limitation, the power to bind the Company. Any delegation pursuant to this Section 15 may be revoked at any time by the Member. An Officer may be removed with or without cause at any time by the Member. Jonathan D. Logan is hereby appointed as President, Secretary and Treasurer and shall continue to hold each such office until such time as he resigns or is removed by the Member.

RLF1 29555265v.2

16.     **Other Business.** Notwithstanding any duty (including any fiduciary duty) otherwise existing at law or in equity, the Member and any Officer may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others, and the Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

17.     **Exculpation and Indemnification; Waiver of Fiduciary Duties.** To the fullest extent permitted by law, no Member or Officer shall be liable to the Company or any other person or entity who is bound by this Agreement for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member or Officer. To the fullest extent permitted by applicable law, the Company shall indemnify the Member against all losses or liabilities incurred by reason of the fact that such person is or was serving as a Member or Officer and shall pay all expenses (including reasonable legal fees) incurred by a Member or Officer in defending any claim, demand, action, suit or proceeding to which such person is made or is threatened to be made a party by reason of the fact that such person is or was a Member or Officer. Notwithstanding any other provision of this Agreement or anything to the contrary existing at law, in equity or otherwise, each of the Member and each Officer shall, to the fullest extent permitted by law, owe no duties (including fiduciary duties) to the Member or the Company or any other person bound by this Agreement; provided, however, that each of the Member and each Officer shall have the duty to act in accordance with the implied contractual covenant of good faith and fair dealing.

18.     **Assignments.** The Member may at any time assign in whole or in part its limited liability company interest in the Company. The transferee of a limited liability company interest in the Company shall be admitted to the Company as a member of the Company upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. If the Member transfers all of its limited liability company interest in the Company pursuant to this Section 18, such admission shall be deemed effective immediately prior to the transfer, and, immediately following such admission, the transferor Member shall cease to be a member of the Company.

19.     **Resignation.** The Member may at any time resign from the Company. If the Member resigns pursuant to this Section 19, a person or entity may be admitted to the Company as an additional member of the Company upon the written consent of the resigning Member and such person's or entity's execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. If a person or entity is admitted to the Company as an additional member of the Company in connection with the resignation of the Member pursuant to this Section 19, such admission shall be deemed effective immediately prior to the resignation, and, immediately following such admission, the resigning Member shall cease to be a member of the Company.

20.     **Admission of Additional Members.** Except as otherwise provided in Section 19, one or more additional members of the Company may be admitted to the Company with the written consent of the Member. A person or entity shall be admitted to the Company as

-4-

an additional member of the Company upon the written consent of the Member and such person's or entity's execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement.

21.   **Dissolution.**

(a)   The Company shall dissolve and its affairs shall be wound up upon the first to occur of the following: (i) the written consent of the Member to dissolve the Company, (ii) at any time there are no members of the Company unless the Company is continued without dissolution in accordance with the Act, or (iii) the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

(b)   The bankruptcy (as defined at Sections 18-101(1) and 18-304 of the Act) of the Member shall not cause the Member to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.

(c)   In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

(d)   The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Member in the manner provided for in this Agreement and (ii) the Certificate of Formation of the Company shall have been canceled in the manner required by the Act.

22.   **Severability of Provisions.**   Each provision of this Agreement shall be considered severable, and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement that are valid, enforceable and legal.

23.   **Entire Agreement.**   This Agreement constitutes the entire agreement of the Member with respect to the subject matter hereof.

24.   **Governing Law.**   This Agreement shall be governed by, and construed under, the laws of the State of Delaware (without regard to conflict of laws principles), all rights and remedies being governed by said laws.

25.   **Amendments.**   This Agreement may not be modified, altered, supplemented or amended except pursuant to a written agreement executed and delivered by the Member.

26.   **Sole Benefit of Member.**   Except as expressly provided in Section 17, the provisions of this Agreement (including Section 11) are intended solely to benefit the Member

RLF1 29555265v.2

and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any creditor of the Member or any creditor of the Company (and no such creditor shall be a third-party beneficiary of this Agreement), and the Member shall not have any duty or obligation to any creditor of the Company to make any contributions or payments to the Company or to issue any call for capital pursuant to this Agreement.

27.    **Effectiveness.** Pursuant to Section 18-201(d) of the Act, this Agreement shall be effective as of the time of the filing of the Certificate of Formation of the Company in the office of the Secretary of State of the State of Delaware.

[SIGNATURE PAGE FOLLOWS]

RLF1 29555265v.2

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Agreement as of the date first written above.

**MEMBER:**

Jonathan D. Logan