# EXHIBIT 36

| Type | Date | Num / Name | Memo / Description | Account | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|
| Bill | 06/27/2023 5414379756 | CCH Incorporated | Months 2-15 $3640.80 per month to Software Subscriptions (July 2023-August 2024) | Accounts Payable (Unpaid or unapplied vendor bills or credits) | 50,971.20 | | 50,996.50 |
| General Journal | 06/30/2023 943 | | Reclass Mark Foster personal meals expense | Meals Expense (COGS account dump for CPA) | 22.70 | | 51,019.20 |
| Credit | 07/01/2023 897 | | CCH - Wolters Kluwer Prepaid Payment 2 July 2023 | Dues and Subscriptions | | 3,640.80 | 47,378.40 |
| Credit | 07/05/2023 487104100D5 | James Lockinghill | Meals (Employee Travelling) Not Business STEAK N SHAKE 1702 | Accounts Payable (Unpaid or unapplied vendor bills or credits) | | 29.91 | 47,348.49 |
| Credit Card Charge | 07/18/2023 E4CA2A8B324 | BP | Non Reimbursable/Personal Expense Mobile River BP#9902022GO-MART #126 | Trust Corporate Card | 16.74 | | 47,365.23 |
| Credit Card Charge | 07/26/2023 155FA8485DE | Taco Bell | Meals (Employee Travelling) Install TACO BELL 029564 | Trust Corporate Card | 15.43 | | 47,380.66 |
| Bill | 07/28/2023 personal | James Lockinghill | Personal Expense paid back through payroll | Accounts Payable (Unpaid or unapplied vendor bills or credits) | 29.91 | | 47,410.57 |
| General Journal | 08/01/2023 898 | | CCH - Wolters Kluwer Prepaid Payment 3 August 2023 | Dues and Subscriptions | | 3,640.80 | 43,769.77 |
| Credit | 08/02/2023 E4CA2A8B324 | James Lockinghill | Non Reimbursable/Personal Expense Mobile River BP#9902022GO-MART #126 | Accounts Payable (Unpaid or unapplied vendor bills or credits) | | 16.74 | 43,753.03 |
| Credit Card Charge | 08/02/2023 155FA8485DE | KFC | Meals (Employee Travelling) Install KFC J970046 | Trust Corporate Card | 12.09 | | 43,765.12 |
| Credit | 08/07/2023 55EA84C0273 | Christian Howe | Car Rental Travel Avis | Accounts Payable (Unpaid or unapplied vendor bills or credits) | | 11.45 | 43,753.67 |
| Credit | 08/07/2023 55EA84C0273 | Christian Howe | Car Rental Travel Avis | Accounts Payable (Unpaid or unapplied vendor bills or credits) | | 128.12 | 43,625.50 |
| Credit Card Charge | 08/21/2023 A7ED5F815C5 | McDonald's | Meals (Employee Travelling) Meals MCDONALD'S F30326 | Trust Corporate Card | 9.42 | | 43,634.97 |
| Credit Card Charge | 08/22/2023 A7ED5F815C5 | Gordon Biersch | Meals (Employee Travelling) Meals GORDON BIERSCH 4624 | Trust Corporate Card | 50.05 | | 43,685.02 |
| Credit | 08/24/2023 155FA8485DE | Mark Foster | Meals (Employee Travelling) Install TACO BELL 029564 | Accounts Payable (Unpaid or unapplied vendor bills or credits) | | 15.43 | 43,669.59 |
| Credit | 08/24/2023 155FA8485DE | Mark Foster | Meals (Employee Travelling) Install KFC J970046 | Accounts Payable (Unpaid or unapplied vendor bills or credits) | | 12.09 | 43,657.50 |
| Credit | 08/24/2023 155FA8485DE | Mark Foster | Meals (Employee Travelling) Install TST* Hartlands Bar | Accounts Payable (Unpaid or unapplied vendor bills or credits) | | 0.33 | 43,657.17 |
| Bill | 08/25/2023 55EA84C0273 | Christian Howe | Car Rental Travel Avis | Accounts Payable (Unpaid or unapplied vendor bills or credits) | 11.45 | | 43,668.62 |
| Bill | 08/25/2023 55EA84C0273 | Christian Howe | Car Rental Travel Avis | Accounts Payable (Unpaid or unapplied vendor bills or credits) | 128.12 | | 43,796.74 |
| Bill | 08/25/2023 E4CA2A8B324 | James Lockinghill | Non Reimbursable/Personal Expense Mobile River BP#9902022GO-MART #126 | Accounts Payable (Unpaid or unapplied vendor bills or credits) | 16.74 | | 43,813.48 |
| General Journal | 09/01/2023 899 | | CCH - Wolters Kluwer Prepaid Payment 4 September 2023 | Dues and Subscriptions | | 3,640.80 | 40,172.68 |
| Credit Card Charge | 09/17/2023 A7ED5F815C5 | Jesse Venkvin | Meals (Employee Travelling) Meals MCDONALD'S F30326 | Trust Corporate Card | 9.42 | | 40,163.26 |
| Credit | 09/17/2023 A7ED5F815C5 | Jesse Venkvin | Meals (Employee Travelling) Meals GORDON BIERSCH 4624 | Accounts Payable (Unpaid or unapplied vendor bills or credits) | | 50.05 | 40,113.21 |
| General Journal | 10/01/2023 900 | | CCH - Wolters Kluwer Prepaid Payment 5 October 2023 | Dues and Subscriptions | | 3,640.80 | 36,472.41 |
| Credit Card Charge | 10/09/2023 F41D12EB2B4 | Avis | Car Rental Travel Avis | Trust Corporate Card | 18.81 | | 36,491.22 |
| Credit Card Charge | 10/13/2023 A7ED5F815C5 | Jesse Venkvin | Meals (Employee Travelling) Meals MCDONALD'S F30326 | Accounts Payable (Unpaid or unapplied vendor bills or credits) | 9.42 | | 36,500.64 |
| Bill | 10/13/2023 A7ED5F815C5 | Jesse Venkvin | Meals (Employee Travelling) Meals GORDON BIERSCH 4624 | Accounts Payable (Unpaid or unapplied vendor bills or credits) | 50.05 | | 36,550.69 |
| Credit Card Charge | 10/20/2023 008DCAA6AA4 | Buc-ee's | Gas for Rental Vehicles Fuel BUC-EE'S 847 | Trust Corporate Card | 39.23 | | 36,589.92 |
| Check | 10/31/2023 24731 | | Miscellaneous | Fraudulent Check that was refunded 11/1/23 | Truist BB&T 7701 Checking (Main Operating Checking) | 5,829.00 | | 42,418.92 |
| General Journal | 11/01/2023 901 | | CCH - Wolters Kluwer Prepaid Payment 6 November 2023 | Dues and Subscriptions | | 3,640.80 | 38,778.12 |
| General Journal | 11/01/2023 1133 | | Fraudulent check refund by Truist Bank | Truist BB&T 7701 Checking (Main Operating Checking) | | 5,829.00 | 32,949.12 |
| Credit Card Charge | 11/03/2023 D751AB9B534 | Marriott | Meals (Employee Travelling) Smart Communications Marriott Hotels | Trust Corporate Card | 153.37 | | 33,102.49 |
| Credit Card Charge | 11/29/2023 B6064D0C9E4 | Amazon | Employee Welfare Install AMZN Mktp US*8H0DC1Y93 | Trust Corporate Card | 34.43 | | 33,136.92 |
| General Journal | 12/01/2023 902 | | CCH - Wolters Kluwer Prepaid Payment 7 December 2023 | Dues and Subscriptions | | 3,640.80 | 29,496.12 |
| Credit Card Charge | 12/05/2023 67F434ACAAE | Galleria Bar and Grill | Non Reimbursable/Personal Expense Installation GALLERIA BAR AND GRILLE | Trust Corporate Card | 0.03 | | 29,496.15 |
| Credit Card Charge | 12/05/2023 67F434ACAAE | York SC County Detention Ctr | Non Reimbursable/Personal Expense Installation SOUTHERN GRILL | Trust Corporate Card | 10.43 | | 29,506.58 |
| Credit Card Charge | 12/07/2023 67F434ACAAE | York SC County Detention Ctr | Non Reimbursable/Personal Expense Installation GALLERIA BAR AND GRILLE | Trust Corporate Card | 1.07 | | 29,507.65 |
| Credit Card Charge | 12/06/2023 67F434ACAAE | Galleria Bar and Grill | Non Reimbursable/Personal Expense Installation GALLERIA BAR AND GRILLE | Trust Corporate Card | 0.84 | | 29,508.49 |
| Credit Card Charge | 12/12/2023 67F434ACAAE | Galleria Bar and Grill | Non Reimbursable/Personal Expense Installation GALLERIA BAR AND GRILLE | Trust Corporate Card | 5.43 | | 29,513.92 |
| Credit Card Charge | 12/13/2023 67F434ACAAE | Galleria Bar and Grill | Non Reimbursable/Personal Expense Installation GALLERIA BAR AND GRILLE | Trust Corporate Card | 3.71 | | 29,517.63 |
| Credit Card Charge | 12/14/2023 67F434ACAAE | Galleria Bar and Grill | Non Reimbursable/Personal Expense Installation GALLERIA BAR AND GRILLE | Trust Corporate Card | 3.62 | | 29,521.25 |
| Credit Card Charge | 12/15/2023 67F434ACAAE | Galleria Bar and Grill | Non Reimbursable/Personal Expense Installation GALLERIA BAR AND GRILLE | Trust Corporate Card | 3.43 | | 29,524.68 |
| Credit | 12/18/2023 B8064D0C9E4 | Jesse Venkvin | Employee Welfare Install AMZN Mktp US*8H0DC1Y93 | Accounts Payable (Unpaid or unapplied vendor bills or credits) | | 34.43 | 29,490.25 |
| Credit Card Charge | 12/19/2023 67F434ACAAE | Galleria Bar and Grill | Non Reimbursable/Personal Expense Installation GALLERIA BAR AND GRILLE | Trust Corporate Card | 4.47 | | 29,494.72 |
| Credit Card Charge | 12/21/2023 67F434ACAAE | Galleria Bar and Grill | Non Reimbursable/Personal Expense Installation GALLERIA BAR AND GRILLE | Trust Corporate Card | 0.71 | | 29,495.43 |
| Credit Card Charge | 12/27/2023 ACBA7CD5AC9 | LYFT | Non Reimbursable/Personal Expense hotel LYFT   SCOOTER RIDE | Trust Corporate Card | 14.15 | | 29,509.58 |
| **Total Prepaid Expenses** | | | | | 58,387.93 | 28,878.35 | 29,509.58 |
| **Prepaid Facility Commissions** | | | | | | | 459,333.33 |
| General Journal | 01/01/2023 863 | | Facility Commission Prepaid Amortization | Facility Commissions Expense | | 66,666.67 | 391,666.65 |
| General Journal | 02/01/2023 864 | | Facility Commission Prepaid Amortization | Facility Commissions Expense | | 66,666.67 | 324,999.98 |
| General Journal | 03/01/2023 865 | | Facility Commission Prepaid Amortization | Facility Commissions Expense | | 66,666.67 | 258,333.31 |
| General Journal | 04/01/2023 866 | | Facility Commission Prepaid Amortization | Facility Commissions Expense | | 66,666.67 | 191,666.64 |
| General Journal | 05/01/2023 867 | | Facility Commission Prepaid Amortization | Facility Commissions Expense | | 66,666.67 | 124,999.97 |
| General Journal | 06/01/2023 868 | | Facility Commission Prepaid Amortization | Facility Commissions Expense | | 41,666.67 | 83,333.30 |
| General Journal | 07/01/2023 869 | | Facility Commission Prepaid Amortization | Facility Commissions Expense | | 41,666.67 | 41,666.63 |
| General Journal | 08/01/2023 870 | | Facility Commission Prepaid Amortization | Facility Commissions Expense | | 41,666.63 | 0.00 |
| Check | 09/26/2023 18742 | Highlands County Sheriff's Office | Prepaid Facility Commission Expense - amortize for 12 months | Truist BB&T 7701 Checking (Main Operating Checking) | 500,000.00 | | 500,000.00 |
| General Journal | 10/01/2023 1213 | | Facility Commission Prepaid Amortization | Facility Commissions Expense | | 41,666.67 | 458,333.33 |
| General Journal | 11/01/2023 1214 | | Facility Commission Prepaid Amortization | Facility Commissions Expense | | 41,666.67 | 416,666.66 |
| General Journal | 12/01/2023 1215 | | Facility Commission Prepaid Amortization | Facility Commissions Expense | | 41,666.67 | 374,999.99 |
| **Total Prepaid Facility Commissions** | | | | | 500,000.00 | 583,333.33 | 374,999.99 |
| **Prepaid Federal Income Taxes** | | | | | | | 380,069.00 |
| Check | 03/29/2023 EFTPS | Internal Revenue Service | Q1 2023 - Estimated Payment | Truist BB&T 7701 Checking (Main Operating Checking) | 375,000.00 | | 755,069.00 |
| Check | 06/21/2023 EFTPS | Internal Revenue Service | Q2 2023 - Estimated Payment | Truist BB&T 7701 Checking (Main Operating Checking) | 375,000.00 | | 1,130,069.00 |
| General Journal | 11/14/2023 1141 | | IRS Tax Refund | Truist BB&T 7701 Checking (Main Operating Checking) | | 380,069.00 | 750,000.00 |
| **Total Prepaid Federal Income Taxes** | | | | | 750,000.00 | 380,069.00 | 750,000.00 |
| **Prepaid State Income Taxes** | | | | | | | 65,631.00 |
| Check | 03/29/2023 EFTPS | FL Department of Revenue | F-1120 Q1 2023 Estimated Payment | Truist BB&T 7701 Checking (Main Operating Checking) | 75,000.00 | | 140,631.00 |
| Check | 04/18/2023 EFTPS | FL Department of Revenue | F-1120 Q4 2022 Estimated Payment | Truist BB&T 7701 Checking (Main Operating Checking) | 50,000.00 | | 190,631.00 |
| Check | 04/18/2023 EFTPS | FL Department of Revenue | F-1120 Q2 2022 Estimated Payment | Truist BB&T 7701 Checking (Main Operating Checking) | 50,000.00 | | 240,631.00 |
| **Total Prepaid State Income Taxes** | | | | | 175,000.00 | 0.00 | 240,631.00 |
| **Security Deposit** | | | | | | | 255,600.00 |
| Bill | 02/15/2023 Security Deposit | Mt. View Business Plaza LLC | Vancouver WA office security deposit | Accounts Payable (Unpaid or unapplied vendor bills or credits) | 4,600.00 | | 270,200.00 |
| Deposit | 05/16/2023 207113 | Homebridge Financial Services Inc. | HOmebridge Refund | Truist BB&T 7701 Checking (Main Operating Checking) | | 7,500.00 | 262,700.00 |
| Bill | 11/09/2023 Call Center Lease | Watson Realty Corporation | Call Center Lease in Jacksonville FL-January 27th - last month's rent | Accounts Payable (Unpaid or unapplied vendor bills or credits) | 4,186.49 | | 266,887.12 |
| Bill | 11/14/2023 Call Center Lease | GA Call Center | Call Center Lease in Jacksonville FL-January 27th - last month's rent | Accounts Payable (Unpaid or unapplied vendor bills or credits) | 254.49 | | 267,141.61 |
| **Total Security Deposit** | | | | | 9,040.98 | 7,500.00 | 267,141.61 |
| **Shareholder Loan** | | | | | | | 2,559,686.16 |
| Credit Card Charge | 01/02/2023 | Anytime Fitness | JONATHAN D LOGAN 73026-7109447300 I 888-827-9262 | AMEX 74006-1 | 42.00 | | 2,555,728.16 |
| Credit Card Charge | 01/03/2023 | Lowe's | JANICE LOGAN-71871-INV # 19348 941-961-4261 | AMEX 74006-1 | 73.83 | | 2,555,801.99 |
| Credit Card Charge | 01/04/2023 | CVS Pharmacy | JONATHAN D LOGAN-74024-10172238 800745728T | AMEX 74006-1 | 18.19 | | 2,555,820.18 |
| Credit Card Charge | 01/06/2023 | 7-Eleven | JANICE LOGAN-71871-62026-08-7 941-807-5498 | AMEX 74006-1 | 65.80 | | 2,555,885.98 |
| Credit Card Charge | 01/08/2023 | Publix Supermarkets | JONATHAN D LOGAN-74024-1041110 8636881188 | AMEX 74006-1 | 31.85 | | 2,555,917.83 |
| Credit Card Charge | 01/08/2023 | Wicked Cantina | JANICE LOGAN-71871-21100173009 RESTAURANT | AMEX 74006-1 | 48.55 | | 2,555,966.38 |
| Credit Card Charge | 01/11/2023 | CVS Pharmacy | JONATHAN D LOGAN-74024-10029873 800745728T | AMEX 74006-1 | 82.58 | | 2,556,028.96 |
| Credit Card Charge | 01/14/2023 | CVS Pharmacy | JONATHAN D LOGAN-74024-10176106 800745728T | AMEX 74006-1 | 23.72 | | 2,556,052.68 |
| Credit Card Charge | 01/20/2023 | Publix Supermarkets | JONATHAN D LOGAN-74024-1541104 8636881188 | AMEX 74006-1 | 86.02 | | 2,556,118.70 |
| Credit Card Charge | 01/21/2023 | Alpine Sports Park | JONATHAN D LOGAN-74024-73011003026L597561 5 90424 | AMEX 74006-1 | 281.98 | | 2,556,400.68 |
| Credit Card Charge | 01/22/2023 | Snow.com | JONATHAN D LOGAN-74024-7743 375 888-636-0486 | AMEX 74006-1 | 965.58 | | 2,557,366.26 |
| Credit Card Charge | 01/22/2023 | Grand Hacienda Mexican | JANICE LOGAN-71871-73011003022000031443 33701 | AMEX 74006-1 | 91.21 | | 2,557,457.47 |
| Credit Card Charge | 01/24/2023 | Lowe's | JANICE LOGAN-71871-INV # 16519 941-961-4261 | AMEX 74006-1 | 26.37 | | 2,557,483.74 |
| Credit Card Charge | 01/25/2023 | Anytime Fitness | JONATHAN D LOGAN-73026-7109447302S 888-827-9262 | AMEX 74006-1 | 42.79 | | 2,557,526.53 |
| Credit Card Charge | 01/25/2023 | Anytime Fitness | JONATHAN D LOGAN-73026-7109447302S 888-827-9262 | AMEX 74006-1 | 42.79 | | 2,557,571.32 |
| Credit Card Charge | 01/26/2023 | Publix Supermarkets | JONATHAN D LOGAN-74024-1541103 8636881188 | AMEX 74006-1 | 115.17 | | 2,557,686.49 |
| Credit Card Charge | 01/30/2023 | Circle K | JANICE LOGAN-71871-CONVENIENCE | AMEX 74006-1 | 70.00 | | 2,557,756.49 |
| Credit Card Charge | 01/31/2023 | CVS Pharmacy | JONATHAN D LOGAN-74024-10087618 800745728T | AMEX 74006-1 | 12.11 | | 2,557,768.60 |
| Credit Card Charge | 01/31/2023 | Pink Tequila | JANICE LOGAN-71871-6534014302I 941-888-5332 | AMEX 74006-1 | 89.12 | | 2,557,857.72 |

| Type | Date | Name | Memo | Account | Amount | Balance |
|---|---|---|---|---|---|---|
| Credit Card Charge | 02/03/2023 | CVS Pharmacy | JONATHAN D LOGAN-74024-10095694 8007467287 | AMEX 74008-1 | 3.63 | 2,557,861.35 |
| Credit Card Charge | 02/04/2023 | CVS Pharmacy | JONATHAN D LOGAN-74024-10174264 8007467287 | AMEX 74008-1 | 38.93 | 2,557,900.28 |
| Credit Card Charge | 02/05/2023 | Total Wine | JONATHAN D LOGAN-74024-NT_NIMFIZT +18882467622 | AMEX 74008-1 | 558.57 | 2,558,458.85 |
| Credit Card Charge | 02/05/2023 | CVS Pharmacy | JONATHAN D LOGAN-74024-10184756 8007467287 | AMEX 74008-1 | 19.99 | 2,558,478.84 |
| Credit Card Charge | 02/07/2023 | Instacart | JONATHAN D LOGAN-74024-NT_NJVWUJ1R +18882467622 | AMEX 74008-1 | 209.19 | 2,558,688.03 |
| Credit Card Charge | 02/07/2023 | T-Eleven | JANICE LOGAN-71871-61010G207 7.841-807-5498 | AMEX 74008-1 | 76.81 | 2,558,764.84 |
| Credit Card Charge | 02/07/2023 | CVS Pharmacy | JONATHAN D LOGAN-74024-10094918 8007467287 | AMEX 74008-1 | 76.47 | 2,558,841.31 |
| Credit Card Charge | 02/08/2023 | CVS Pharmacy | JONATHAN D LOGAN-74024-10095224 8007467287 | AMEX 74008-1 | 14.51 | 2,558,855.82 |
| Check | 02/09/2023 ACH320625 | Silverspot Cinema Miami | Jon Logan | Truist BB&T 7701 Checking (Main Operating Checking) | 36.16 | 2,558,893.98 |
| Bill | 02/13/2023 2018 Late Fee | Internal Revenue Service | Jon Logan Form 1040 - 2018 Late Fee and Interest | Accounts Payable (Unpaid or unapplied vendor bills or credits) | 13,726.57 | 2,572,620.55 |
| Bill | 02/13/2023 2018 Late Fee | Internal Revenue Service | Jon Logan Form 1040 - 2018 Late Fee and Interest | Accounts Payable (Unpaid or unapplied vendor bills or credits) | 517.53 | 2,573,138.08 |
| Credit Card Charge | 02/15/2023 | CVS Pharmacy | JONATHAN D LOGAN-74024-10097580 8007467287 | AMEX 74008-1 | 18.15 | 2,573,156.23 |
| Check | 02/23/2023 ACH0222 | Olympic Brewer | Jon Logan | Truist BB&T 7701 Checking (Main Operating Checking) | 3,298.00 | 2,576,454.23 |
| Credit Card Charge | 02/25/2023 | CVS Pharmacy | JONATHAN D LOGAN-74024-10027429 8007467287 | AMEX 74008-1 | 26.30 | 2,576,480.53 |
| Credit Card Charge | 02/26/2023 | Anytime Fitness | JONATHAN D LOGAN-73026-7109447308 888-827-9262 | AMEX 74008-1 | 42.79 | 2,576,523.32 |
| Credit Card Charge | 02/26/2023 | Anytime Fitness | JONATHAN D LOGAN-73026-7109447309 888-827-9262 | AMEX 74008-1 | 42.79 | 2,576,566.11 |
| Check | 02/28/2023 ACH0227 | CVS Pharmacy | Jon Logan Purchase | Truist BB&T 7701 Checking (Main Operating Checking) | 17.99 | 2,576,584.10 |
| Credit Card Charge | 02/28/2023 | Instacart | JONATHAN D LOGAN-74024-NT_NRB6NQ2G +18882467622 | AMEX 74008-1 | 98.00 | 2,576,683.10 |
| Check | 03/01/2023 ACH030123 | Publix Supermarkets | Jon Logan Purchase | Truist BB&T 7701 Checking (Main Operating Checking) | 299.56 | 2,576,982.66 |
| Credit Card Charge | 03/12/2023 | CVS Pharmacy | JONATHAN D LOGAN-74024-10096093 8007467287 | AMEX 74008-1 | 68.68 | 2,577,051.34 |
| Credit Card Charge | 03/12/2023 | Instacart | JONATHAN D LOGAN-74024-NT_NVZEGHPB +18882467622 | AMEX 74008-1 | 722.47 | 2,577,773.81 |
| Bill | 03/22/2023 | Fit Life Foods | Jon Logan | Accounts Payable (Unpaid or unapplied vendor bills or credits) | 105.66 | 2,577,879.47 |
| Credit Card Charge | 03/26/2023 | Anytime Fitness | JONATHAN D LOGAN-73026-7109447308 888-827-9262 | Am Ex 74008-new | 42.79 | 2,577,922.26 |
| Credit Card Charge | 03/26/2023 | Anytime Fitness | JONATHAN D LOGAN-73026-7109447308 888-827-9262 | Am Ex 74008-new | 42.79 | 2,577,965.05 |
| Credit Card Charge | 03/29/2023 | Instacart | JONATHAN D LOGAN-74024-NT_NCLJSCGM +18882467622 IC* INSTACART*159 SAN FRANCISCO CA | Am Ex 74008-new | 198.95 | 2,578,164.00 |
| Check | 03/30/2023 Debit | CVS Pharmacy | Jon Logan Purchase | Truist BB&T 7701 Checking (Main Operating Checking) | 72.95 | 2,578,236.95 |
| Check | 03/30/2023 Debit | CVS Pharmacy | Jon Logan Purchase | Truist BB&T 7701 Checking (Main Operating Checking) | 25.14 | 2,578,262.09 |
| Check | 03/30/2023 Debit | CVS Pharmacy | Jon Logan Purchase | Truist BB&T 7701 Checking (Main Operating Checking) | 15.49 | 2,578,277.58 |
| Credit Card Charge | 04/04/2023 | Instacart | JONATHAN D LOGAN-74024-NT_NEWIIQ2X +18882467622 IC* INSTACART*159 SAN FRANCISCO CA | Am Ex 74008-new | 993.79 | 2,579,271.37 |
| Credit Card Charge | 04/05/2023 | CVS Pharmacy | JONATHAN D LOGAN-74024-10094522 8007467287 CVS/PHARMACY #00402 00000402 MIAMI FL | Am Ex 74008-new | 39.91 | 2,579,311.28 |
| Credit Card Charge | 04/09/2023 | CVS Pharmacy | JONATHAN D LOGAN-74024-10028753 8007467287 CVS PHARMACY SAINT PETERSBURG FL | Am Ex 74008-new | 32.95 | 2,579,344.23 |
| Credit Card Charge | 04/15/2023 | CVS Pharmacy | JONATHAN D LOGAN-74024-10191735 8007467287 CVS/PHARMACY #00402 00000402 MIAMI FL | Am Ex 74008-new | 14.51 | 2,579,358.74 |
| Credit Card Charge | 04/16/2023 | CVS Pharmacy | JONATHAN D LOGAN-74024-10191962 8007467287 CVS/PHARMACY #00402 00000402 MIAMI FL | Am Ex 74008-new | 28.32 | 2,579,387.06 |
| Check | 04/17/2023 Debit | CVS Pharmacy | Jon Logan Purchase | Truist BB&T 7701 Checking (Main Operating Checking) | 37.42 | 2,579,424.48 |
| Credit Card Charge | 04/18/2023 | Instacart | JONATHAN D LOGAN-74024-BRVK5NX6  8882467622 IC* INSTACART*159 SAN FRANCISCO CA | Am Ex 74008-new | 215.59 | 2,579,640.07 |
| Credit Card Charge | 04/22/2023 | CVS Pharmacy | JONATHAN D LOGAN-74024-10183622  8007467287 CVS/PHARMACY #00402 00000402 MIAMI FL | Am Ex 74008-new | 18.14 | 2,579,658.21 |
| Credit Card Charge | 04/22/2023 | Instacart | JONATHAN D LOGAN-74024-NT_NLKL1QGF +18882467622 IC* INSTACART*159 SAN FRANCISCO CA | Am Ex 74008-new | 345.59 | 2,580,003.80 |
| Credit Card Charge | 04/23/2023 | Instacart | JONATHAN D LOGAN-74024-NT_NLDTLUZL +18882467622 IC* INSTACART*159 SAN FRANCISCO CA | Am Ex 74008-new | 252.26 | 2,580,256.06 |
| Credit Card Charge | 04/24/2023 ACH | Jonathan Logan | Loan Pay Back from 2021 | Truist BB&T 7701 Checking (Main Operating Checking) | 300,000.00 | 2,880,256.06 |
| Credit Card Charge | 04/25/2023 | Anytime Fitness | JONATHAN D LOGAN-73064473115 888-827-9262 ABC*ANYTIME FITNESS ST PETERSBURG FL | Am Ex 74008-new | 46.13 | 2,880,304.19 |
| Credit Card Charge | 04/25/2023 | Anytime Fitness | JONATHAN D LOGAN-73064473115 888-827-9262 ABC*ANYTIME FITNESS ST PETERSBURG FL | Am Ex 74008-new | 46.13 | 2,880,352.32 |
| Check | 04/26/2023 Debit | CVS Pharmacy | Jon Logan Purchase | Truist BB&T 7701 Checking (Main Operating Checking) | 43.43 | 2,880,395.75 |
| Check | 04/30/2023 Debit | CVS Pharmacy | Jon Logan Purchase | Truist BB&T 7701 Checking (Main Operating Checking) | 14.51 | 2,880,410.26 |
| Credit Card Charge | 05/06/2023 | Instacart | JONATHAN D LOGAN-74024-NT_NQRK5NDB +18882467622 IC* INSTACART*159 SAN FRANCISCO CA | Am Ex 74008-new | 286.00 | 2,880,698.32 |
| Credit Card Charge | 05/11/2023 | CVS Pharmacy | JONATHAN D LOGAN-74024-10186200  8007467287 ApPay CVS/PHARMACY #00402 00000402 MIAMI FL | Am Ex 74008-new | 3.63 | 2,880,701.95 |
| Credit Card Charge | 05/14/2023 | Instacart | JONATHAN D LOGAN-74024-DXG38Y7A  8882467622 IC* INSTACART*159 SAN FRANCISCO CA | Am Ex 74008-new | 18.48 | 2,880,720.43 |
| Credit Card Charge | 05/15/2023 | Spa Benitae | Jonathan Logan | Am Ex 74008-new | 24.96 | 2,880,745.39 |
| Credit Card Charge | 05/16/2023 | Instacart | JONATHAN D LOGAN-74024-6QGHNMZ0  8882467622 IC* INSTACART*159 SAN FRANCISCO CA | Am Ex 74008-new | 61.08 | 2,880,806.47 |
| Credit Card Charge | 05/25/2023 | Anytime Fitness | Logan, Jonathan | Am Ex 74008-new | 48.13 | 2,880,854.60 |
| Credit Card Charge | 05/29/2023 | Anytime Fitness | Logan, Jonathan | Am Ex 74008-new | 48.13 | 2,880,902.73 |
| Credit Card Charge | 06/07/2023 | Publix Supermarkets | Logan,Jonathan | Truist Corporate Card | 130.53 | 2,881,063.26 |
| Credit Card Charge | 06/08/2023 | CVS Pharmacy | Logan,Jonathan | Truist Corporate Card | 4.80 | 2,881,068.06 |
| Credit Card Charge | 06/16/2023 | QuickGifts | Logan,Jonathan | Truist Corporate Card | 400.00 | 2,881,468.06 |
| Credit Card Charge | 07/09/2023 | Express | Logan,Jon | Truist Corporate Card | 90.26 | 2,881,558.34 |
| Credit Card Charge | 07/18/2023 | Fantastic Sams | Logan,Jon | Truist Corporate Card | 26.00 | 2,881,584.34 |
| Credit Card Charge | 07/22/2023 | CVS Pharmacy | Logan,Jon | Truist Corporate Card | 14.94 | 2,881,599.28 |
| Credit Card Charge | 07/25/2023 | Publix Supermarkets | Logan,Jon | Truist Corporate Card | 128.94 | 2,881,728.22 |
| Bill | 09/01/2023 7420216143 | Frontline Insurance | Policy # 7420216143-Miami Condo | Accounts Payable (Unpaid or unapplied vendor bills or credits) | 3,638.57 | 2,885,366.79 |
| Credit Card Charge | 10/08/2023 | CVS Pharmacy | Logan,Jonathan | Truist Corporate Card | 107.93 | 2,885,474.52 |
| Credit Card Charge | 10/08/2023 | Uber Eats | Logan,Jonathan | Truist Corporate Card | 205.42 | 2,885,679.94 |
| Credit Card Charge | 10/09/2023 | CVS Pharmacy | Logan,Jonathan | Truist Corporate Card | 3.74 | 2,885,683.68 |
| Bill | 10/29/2023 | Miami-Dade Office of the Tax Collector | Folio Number 01-4138-147-0370 | Accounts Payable (Unpaid or unapplied vendor bills or credits) | 24,594.61 | 2,910,278.49 |
| Bill | 10/29/2023 | Miami-Dade Office of the Tax Collector | Service Fee | Accounts Payable (Unpaid or unapplied vendor bills or credits) | 1,171.00 | 2,911,449.49 |
| Bill | 10/29/2023 | Miami-Dade Office of the Tax Collector | Folio Number 01-4138-147-0370 | Accounts Payable (Unpaid or unapplied vendor bills or credits) | 28,391.46 | 2,939,840.97 |
| Credit Card Charge | 10/30/2023 | CVS Pharmacy | Logan,Jonathan | Truist Corporate Card | 3.74 | 2,939,844.71 |
| Bill | 11/02/2023 | Miami-Dade Office of the Tax Collector | Folio Number 01-4138-147-0370 | Accounts Payable (Unpaid or unapplied vendor bills or credits) | 26,665.33 | 2,966,510.04 |
| Credit Card Charge | 11/20/2023 | Publix Supermarkets | Logan,Jonathan | Truist Corporate Card | 44.96 | 2,966,555.00 |
| Credit Card Charge | 11/24/2023 | CVS Pharmacy | Logan,Jonathan | Truist Corporate Card | 72.63 | 2,966,627.63 |
| Credit Card Charge | 11/26/2023 | CVS Pharmacy | Logan,Jonathan | Truist Corporate Card | 29.40 | 2,966,657.08 |
| Credit Card Charge | 12/03/2023 | CVS Pharmacy | Logan,Jonathan | Truist Corporate Card | 3.74 | 2,966,660.82 |
| Credit Card Charge | 12/04/2023 | CVS Pharmacy | Logan,Jonathan | Truist Corporate Card | 45.81 | 2,966,706.63 |
| Credit Card Charge | 12/11/2023 | Publix Supermarkets | Logan,Jonathan | Truist Corporate Card | 209.77 | 2,966,916.40 |
| Credit Card Charge | 12/17/2023 | Publix Supermarkets | Logan,Jonathan | Truist Corporate Card | 70.95 | 2,966,992.35 |
| Bill | 12/28/2023 2015 Late Payment | Internal Revenue Service | Form 1040 Tax Year 2015-TIN Ending 9764 | Accounts Payable (Unpaid or unapplied vendor bills or credits) | 89,445.07 | 3,056,437.42 |
| Credit Card Charge | 12/31/2023 | Walgreens | Logan,Jonathan | Truist Corporate Card | 12.10 | 3,056,449.58 |
| General Journal | 12/31/2023 1241 | | Reclass BMW in James Logan's name to Shareholder Loan | -SPLIT- | 23,639.00 | 3,080,088.58 |
| General Journal | 12/31/2023 1241 | | Reclass Corvette in James Logan's name to Shareholder Loan | Shareholder Loan | 94,836.00 | 3,174,924.58 |

| | | | | | | 994,934.00 |
|---|---|---|---|---|---|---|
| **Total Shareholder Loan** | | | | | 619,238.42 | **3,174,924.58** |
| **Taxes Receivable- Federal** | | | | | | **994,934.00** |

| Type | Date | Name | Memo | Account | Amount | Balance |
|---|---|---|---|---|---|---|
| General Journal | 11/14/2023 1141 | | IRS Tax Refund | Truist BB&T 7701 Checking (Main Operating Checking) | | 994,934.00 | 0.00 |

| | | | | | | 994,934.00 | 0.00 |
|---|---|---|---|---|---|---|---|
| **Total Taxes Receivable- Federal** | | | | | 0.00 | 994,934.00 | **0.00** |
| **Taxes Receivable - State** | | | | | | | **393,483.61** |
| **Total Taxes Receivable - State** | | | | | | | **393,483.61** |
| **Technology Grant Advance** | | | | | | | **37,539.14** |

| Type | Date | Name | Memo | Account | Amount | Balance |
|---|---|---|---|---|---|---|
| General Journal | 12/31/2023 1267 | | Adjust Balance for Tech Grant incorrectly booked | -SPLIT- | | 37,539.14 | 0.00 |

| | | | | | | 37,539.14 | 0.00 |
|---|---|---|---|---|---|---|---|
| **Total Technology Grant Advance** | | | | | 0.00 | 37,539.14 | **0.00** |
| **Undeposited Funds** | | | | | | | **0.00** |
| Payment | 07/15/2023 1880 | Crook OR County Sheriff's Office | | Accounts Receivable Trade | 1,354.27 | | 1,354.27 |
| Payment | 07/15/2023 6820 | Gibson TN | | Accounts Receivable Trade | 9,164.67 | | 10,518.94 |
| Payment | 07/15/2023 89104 | Bell Tx County Government | | Accounts Receivable Trade | 16,957.00 | | 27,475.94 |
| Payment | 07/10/2023 3998 | Colleton SC Sheriff's Office | | Accounts Receivable Trade | 3,524.16 | | 31,000.10 |
| Payment | 07/15/2023 8990 | Levy County FL | | Accounts Receivable Trade | 522.00 | | 31,522.10 |
| Payment | 07/15/2023 27739.57 | DeSoto County MS Sheriff's Office | | Accounts Receivable Trade | 27,739.57 | | 59,260.77 |
| Deposit | 07/24/2023 1880 | Crook OR County Sheriff's Office | Deposit | Truist BB&T 7701 Checking (Main Operating Checking) | | 1,354.27 | 57,906.50 |
| Deposit | 07/24/2023 6820 | Gibson TN | Deposit | Truist BB&T 7701 Checking (Main Operating Checking) | | 9,164.67 | 48,741.83 |
| Deposit | 07/24/2023 89104 | Bell TX County Government | Deposit | Truist BB&T 7701 Checking (Main Operating Checking) | | 16,957.00 | 31,784.83 |
| Deposit | 07/24/2023 8990 | Levy County FL | Deposit | Truist BB&T 7701 Checking (Main Operating Checking) | | 522.00 | 31,262.83 |

# EXHIBIT 4

IN THE TWELFTH JUDICIAL CIRCUIT COURT
IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
JANICE LOGAN,
      Plaintiff,

v.

CASE NO.  2023 CA 001002 NC
DIVISION C CIRCUIT

JANICE LOGAN,
JANICE LOGAN AS TRUSTEE OF
THE JAMES LOGAN FAMILY
TRUST DATED FEBRUARY 19 2021,
ALEXIS LOGAN,
JONATHAN D LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
LOCO FLORIDA LLC,
SMART COMMUNICATIONS
HOLDING INC,
HLFIP HOLDING LLC,
      Defendant.

_____

**<u>ORDER BIFURCATING PHASE 2 TRIAL</u>**

Previously, the Court severed the counts associated with the validity of the purported Shareholders Agreement for Smart Communications Holding, Inc. ("SmartComm") from the other aspects of the lawsuit. The Court conducted a 3-day nonjury trial, colloquially described as the Phase 1 trial.

In a nutshell, the Court found in Phase 1 that the purported Shareholders Agreement dated September 23, 2022, was invalid and unenforceable. The Court further found there was no Shareholders Agreement between the two 50% shareholders of SmartComm's stock: (1) Jonathan D. Logan; and (2) Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021. The Court entered final judgment following the Phase 1 trial [DIN 652].

The Court previously set Phase 2 trial to address all remaining matters for the trial period beginning January 27, 2025. There has been substantial change to the nature of this lawsuit since Phase 1 trial.

Critically, Janice Logan, as Trustee of the James Logan Family Trust—a 50% owner of SmartComm—filed a Second Amended Complaint that contained a count seeking judicial

Page 1 of 7

**Filed 11/25/2024 08:14 AM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL**

dissolution of SmartComm. Then SmartComm filed its election pursuant to section 607.1436, Florida Statutes, to purchase the shares at fair value that are owned by Janice Logan, as Trustee of the James Logan Family Trust.

The statutory time frame for negotiating has elapsed. This leaves the Court with the obligation to determine the fair value of the shares. Section 607.1436(4) directs the valuation date to be "the day before the date on which [the judicial dissolution petition] was filed or such other date as the court deems appropriate under the circumstances." Unless the Court identifies "such other date," the valuation date would be May 28, 2024.

Trustee Janice Logan filed an amended motion seeking two basic items [DIN 827]. *First*, she seeks for the Court to set the "such other date" for valuation to be February 27, 2023, the date Jonathan Logan and SmartComm filed their original lawsuit. *Second*, she seeks to have all matters in all operative pleadings resolved during the existing trial period beginning on January 27, 2025.

Jonathan Logan, who is the other 50% owner of SmartComm and is its incumbent management, opposes those requests. Jonathan Logan and SmartComm strongly contend the specific date identified in statute should be the valuation date. Alternatively, they contend that if the Court were to depart from the statutorily prescribed date and select "such other date," they would then contend a separate, yet unspecified date that corresponds to federal action regulating the field in which SmartComm operates, should be the "such other date." Specifically, they identify that President Biden in January 2023 signed the Martha Wright-Reed Just and Reasonable Communications Act of 2022 into law that directed the FCC to ensure charges for audio or video communications services used by inmates be reasonable. The FCC has been in rule-making mode since then, which according to SmartComm may adversely affect its revenues. Further, Jonathan Logan and his other entities involved in this case seek to cancel the existing trial date [DIN 843, 852].

While Janice Logan argued the Court can determine the valuation date now, the Court believes it better for there to be an evidentiary hearing on the issue of the correct valuation date. The Court understands that it conducted the Phase 1 trial; however, that trial did not focus on the proper valuation date. The Court believes it prudent under these circumstances to address the valuation date directly and allow the parties an opportunity to present evidence to that issue.

There is a separate core issue framed by the pleadings that could substantially impact value: the viability of the claimed royalty due to HLFIP Holdings, LLC from SmartComm. As HLFIP sees it "the Court must decide (1) whether HLFIP owns some or all the intellectual property that SmartComm uses to provides services to correctional facilities across the country and (2) the royalty that HLFIP is owned for the intellectual property that it owns and licenses to SmartComm." [DIN 821, p. 5]. The Court will shorthand this as the "license/royalty" issue. The HLFIP entity is 100% owned and controlled by Jonathan Logan.

While the Court could direct the parties' experts to prepare multiple valuations for multiple valuation dates, the existence of the "license/royalty" issue would further require additional valuation assumptions that could substantially impact the analysis.

Filed 11/25/2024 08:14 AM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL

For those reasons, the Court will bifurcate the Phase 2 trial. Part 1 of the Phase 2 trial will focus on: (1) the proper valuation date; and (2) the "license/royalty" issue. Part 1 of the Phase 2 trial will occur during the existing three-week trial period that begins on January 27, 2025.

The Court described this in open Court on November 22, 2024. In thinking about this matter further over the weekend, the Court would also be willing to consider adding a third issue: any issue all parties agree to. It may be that the parties believe another issue should be addressed in Part 1 of Phase 2. However, before the Court will consider it, *all parties to this litigation* must agree. Please let the Court know if there is an agreement between the parties to add another issue to Part 1 of Phase 2.

Finally, the Court currently anticipates that Part 2 of the Phase 2 trial will occur during the three-week trial period beginning on May 5, 2025. Part 2 of Phase 2 will address the remaining issues. The Court explained some of the contingencies for that trial period, which the Court need not detail here. However, the parties should keep that trial period available. The Court hopes within the next couple of weeks the Court will have clarity on those contingencies.

IT IS ORDERED:

1.    Janice Logan's amended motion to determine fair value and advance entire case to trial [DIN 827] is granted only to the extent identified in this order.

2.    The Smart Parties' motion to amend the trial order and continue trial; and HLFIP's motion to amend the trial order and continue trial [DIN 843, 852, respectively] are granted only to the extent identified in this order.

3.    The Court bifurcates the Phase 2 trial.

4.    Part 1 of the Phase 2 trial will remain in the existing three-week trial period beginning on January 27, 2025. Part 1 will be limited to three issues: (1) the proper valuation date; (2) the license/royalty issue; and (3) any issue (if any) all parties agree to be heard during Part 1.

5.    Part 2 of the Phase 2 trial is being tentatively scheduled for the three-week trial period beginning on May 5, 2025.

6.    The parties are directed to meet and confer to address the creation of a case management plan to address this trial schedule.

DONE AND ORDERED in Sarasota, Sarasota County, Florida, on November 25, 2024.

11/25/2024 8:14 AM 2023 CA 001002 NC

e-Signed 11/25/2024 8:14 AM 2023 CA 001002 NC

**HUNTER W CARROLL**
Circuit Judge

<u>**SERVICE CERTIFICATE**</u>

On November 25, 2024, the Court caused the foregoing document to be served via the Clerk of Court's case management system, which served the following individuals via email (where indicated). On the same date, the Court also served a copy of the foregoing document via First Class U.S. Mail on the individuals who do not have an email address on file with the Clerk of Court.

CRAIG STEPHEN BARNETT
200 EAST LAS OLAS BLVD
SUITE 2100
FORT LAUDERDALE, FL  33301

CRAIG STEPHEN BARNETT
GREENBERG TRAURIG ET AL
515 E LAS OLAS BLVDSUITE 2000
FORT LAUDERDALE, FL  33301

BRETT ALAN GEER
PO BOX 47212
SAINT PETERSBURG, FL  33743

M MARIE WILSON ESQ
2357 S TAMIAMI TRAIL #3 PMB #122
VENICE, FL  34293

MARK MATTHEW WALL
101 EAST KENNEDY BLVD
SUITE 3700
TAMPA, FL  33602

CHARLES FRANKLIN JOHNSON III
802 11TH ST W
BRADENTON, FL  34205

ANITRA F RAIFORD
2555 GRAND BLVD
KANSAS CITY, MO  64108

CHELSEA KOFF
200 EAST LAS OLAS BLVD

SUITE 2100
FORT LAUDERDALE, FL  33301

JOSEPH H III VARNER
777 S. HARBOUR ISLAND PLACE, #800
TAMPA, FL  33602

JASON SAMUEL OLETSKY
401 E JACKSON ST STE 1700
TAMPA, FL  33602

JONATHAN T TORTORICI
4301 WEST BOY SCOUT BLVD STE 300
TAMPA, FL  33607

JAROD A BRAZEL
101 E. KENNEDY BLVD., SUITE 3700
TAMPA, FL  33602

JULIE NEGOVAN
6750 N ANDREWS AVE STE 200
FORT LAUDERDALE, FL  33309

REGINALD KEITH PETERSEN
6750 N ANDREWS AVE STE 200
FORT LAUDERDALE, FL  33309

SARAH O'ROURKE
100 N TAMPA STREET STE 2900
SUITE 2900
TAMPA, FL  33602

ANDREW L FRANKLIN
111 S. WACKER DR.
STE. 4700
CHICAGO, IL  60606

DAVID E SCHOENFELD
111 SOUTH WACKER DRIVE
SUITE 4700
CHICAGO, IL  60606

JESSICA LEONA MAZZEO
6750 N ANDREWS AVE
STE. 200

FORT LAUDERDALE, FL  33309

PETER F O'NEILL
2555 GRAND BOULEVARD
KANSAS CITY, MO  64108

MICHAEL J HARWIN
200 EAST LAS OLAS BOULEVARD
SUITE 2100
FORT LAUDERDALE, FL  33301

CHRISTOPHER ROY CLARK
106 EAST COLLEGE AVENUE
SUITE 700
TALLAHASSEE, FL  32301

GLENN T BURHANS JR
106 EAST COLLEGE AVENUE
SUITE 700
TALLAHASSEE, FL  32301

DUSTIN BRYAN HILLSLEY
AKERMAN LLP
201 EAST LAST OLAS BOULEVARD, SUITE 1800
FORT LAUDERDALE, FL  33301

CHRISTOPHER GEORGE OPRISON
DLA PIPER LLP (US)
200 SOUTH BISCAYNE BOULEVARD - SUITE 2500
MIAMI, FL  33131

BRIDGET K SMITHA
106 EAST COLLEGE AVENUE
SUITE 700
TALLAHASSEE, FL  32301

MAX CORY RUDOLF
350 EAST LAS OLAS BLVD.
SUITE 1600
FT. LAUDERDALE, FL  33301

Filed 11/25/2024 08:14 AM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL

Filed 11/25/2024 08:14 AM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL

# EXHIBIT 5

**IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA
PROBATE DIVISION**

| | | |
|---|---|---|
| JONATHAN LOGAN and SMART COMMUNICATIONS HOLDING, INC. | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 2023-CA-1002-NC |
| JANICE LOGAN, individually and as Trustee of the James Logan Family Trust; and ALEXIS LOGAN, | ) ) ) | |
| Defendants. | ) | (CONSOLIDATED) |
| JANICE LOGAN, as Trustee of the James Logan Family Trust, dated February 10, 2021, and directly and derivatively on behalf of Smart Communications Holding, Inc., and derivatively on behalf of Loco Florida, LLC, | ) ) ) ) ) ) | Case No.: 2023-CA-1280-NC |
| Plaintiff, | ) ) | **Jury Demanded: Counts II, III, IV, and V** |
| v. | ) ) | |
| JONATHAN LOGAN, SMART COMMUNICATIONS HOLDING, INC., nominal defendant, and LOCO FLORIDA, LLC, nominal defendant, | ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFF JANICE LOGAN'S AMENDED VERIFIED COMPLAINT**

Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021 ("Janice"), complains as follows against Defendants Jonathan D. Logan ("Jon"), Smart Communications Holding, Inc., nominal defendant ("Smart Communications" or "the company"), and Loco Florida, LLC, nominal defendant ("Loco Florida").

## INTRODUCTION

1.      Janice brings this action to obtain relief from a campaign of fraud and retaliation launched against her by her son Jon, seeking to pressure her into surrendering her 50% ownership interest in Smart Communications for far less than its fair value. The shares representing that ownership interest belonged to Jon's father, James, before James' death in October 2022, and now are held by his Trust. Jon seeks to wrest those shares from Janice by proffering a fraudulent Shareholders' Agreement and by stripping her of income, shelter, and personal security.

2.      Smart Communications is a valuable enterprise that provides communications-related products and services to correctional facilities. Jon conceived of the idea while he was himself incarcerated on a felony conviction. Lacking the financial and strategic wherewithal to execute that idea—indeed, prohibited by the terms of his probation even to use a computer—Jon turned to his father to build the company. James did help build the company, and father and son agreed to own and run that company together on a 50/50 basis.

3.      As Smart Communications grew, so did Jon's remorse about its ownership structure. Jon complained that his father did not deserve a 50% stake in the company. He wrote to James on September 12, 2022, a month before his father's death, claiming, "[i]n no way has this been an equal partnership in any way." Indeed, Jon came to hold and assert the baseless view that he *is* the company. Consequently, Jon sought to buy out his father's interest in September 2022 for pennies on the dollar. James refused that offer.

4.      Since James' death in October 2022, Janice has controlled his 50% stake in Smart Communications through James' Trust. Jon renewed his pursuit of a low-ball purchase with Janice in December of 2022, including by proposing a Stock Purchase Agreement. At no point in those negotiations did Jon raise or invoke the existence of an executed September 2022 Shareholders' Agreement that might control the situation.

5.    Janice rejected the offer. She also expressed concern about the manner in which Jon was running the company and draining its resources for his personal benefit—including owning and operating two large, multi-million dollar yachts, two luxury homes, and three exotic automobiles.

6.    Only thereafter in February 2023 did Jon suddenly "find" a Shareholders' Agreement—purportedly fully-executed by Jon and James on September 23, 2022—that he now claims entitles him to purchase Janice's shares on terms favorable to him. This document and Jon's tale of its provenance are a transparent fraud.

7.    Indeed, in the draft Stock Purchase Agreement he proposed in December 2022, Jon *three times* expressly described the Shareholders' Agreement as "unsigned"—three months after Jon and Jim supposedly signed it. (Tellingly, Jon again ratified this admission by retaining the same lawyers who included it in the draft Stock Purchase Agreement on his behalf to represent him individually in this lawsuit.).

8.    Jon invokes the fraudulent purported Shareholders' Agreement to freeze Janice out of the company, force her to sell on unfavorable terms, and tie Janice up in costly litigation. And, he is artificially devaluing the company he helms in the process. Further, in retaliation for—and to undermine—Janice's assertion of her right to a fair price for her ownership stake, Jon terminated her position with Smart Communications. As a result, he is depriving her of income, health benefits and personal security, and threatening to charge rent for her home and automobile to boot.

9.    Janice, on behalf of the Trust (defined below), asks this Court to declare Jon's purported Shareholders' Agreement invalid, issue an order preserving the *status quo ante* to shield her from Jon's retaliatory abuse, and to prevent Jon from further wasting company assets for his personal benefit.

## THE PARTIES

10.     Plaintiff Janice Logan is a resident of Sarasota County, Florida, Trustee of the James Logan Family Trust, dated February 10, 2021 ("the Trust"), 50% shareholder of Smart Communications, and 50% member of Loco Florida.

11.     The Trust is administered in Sarasota County, Florida.

12.     Defendant and nominal defendant Smart Communications is a Florida corporation, with its principal office in Pinellas County, Florida at 10491 72nd Street, Seminole, Florida 33777.

13.     Defendant and nominal defendant Loco Florida is a Florida limited liability company, with its principal office in Pinellas County, Florida at 10491 72nd Street, Seminole, Florida 33777. Its principal asset is the Smart Communications headquarters building at 10491 72nd Street, Seminole, Florida 33777.

14.     Defendant Jonathan D. Logan is Janice's son, 50% shareholder of Smart Communications, the current sole Director and sole Operating Officer of Smart Communications, managing 50% member of Loco Florida, and is a resident of Pinellas County, Florida.

## JURISDICTION AND VENUE

15.     Venue in Sarasota County is proper because Janice is a resident of Sarasota County, the Trust is administered in Sarasota County, and the Trust's injuries as a shareholder and directly accrued pursuant to Florida Statutes Section 47.051 in Sarasota County.

16.     The Amount in Controversy exceeds $50,000.00.

## FACTUAL BACKGROUND

### I.     The Genesis of Smart Communications

17.     Jon was convicted of Felony Aggravated Stalking in 2008 for harassing and intimidating a business associate and the associate's wife with whom Jon worked on a car dealership venture.

18.     While he was imprisoned, Jon conceived of the technology underlying Smart Communications. Though his initial idea, Jon's father, James Logan ("James"), and sister, Alexis Logan ("Alexis"), were instrumental in the development of Smart Communications. James was a serial entrepreneur, and Alexis is a criminal defense attorney and former public defender with knowledge of the communications needs of corrections inmates. Together, they helped launch Smart Communications given Jon's probation limitations; he was forbidden from using a computer for five years after release.

19.     In fact, Jon and Smart Communications acknowledge as much in the about section of the Smart Communications website, which calls Smart Communications a "family-owned business."

20.     James was a 50% owner of Smart Communications, and contributed significantly to its growth and success—both financially and strategically.

## II.    The Formation of Smart Communications Holding, Inc.

21.     Smart Communications is a national provider of communications-related products and services to correctional facilities.

22.     Smart Communications Holding, Inc. was incorporated on December 29, 2014. *See* Ex. 1, Smart Communications Holding, Inc.'s Articles of Incorporation.

23.     The Articles of Incorporation provide for 10,000 shares of single-class stock, of which Jon owns 50% and James owned 50%. *See* Ex. 1.

24.     There are no other Smart Communications shareholders.

## III.    Jon's Waste of Corporate Assets

25.     Smart Communications has come to control a substantial market-share in the prison technology and communications space.

26.     In abuse of his fiduciary duties, Jon has treated the company's resources as a personal piggy-bank, and grossly wasted corporate assets.

27.     Among other misconduct, Jon purchased the following assets with Smart Communications funds for his personal use:

    a.      A $10 million 100' Riva Corsaro yacht named "Convict";

    b.      A $1 million 45' Nor-Tech boat named "Dirty Amy";

    c.      A $250,000 Rolls-Royce;

    d.      A $300,000 Lamborghini with the license plate "Inmate";

    e.      A $350,000 Ferrari;

    f.      A $1.5 million condo in Miami; and,

    g.      A $4 million Tierra Verde waterfront house.

28.     Jon uses Smart Communications money to pay for the following yacht-related expenses:

    a.      Three full-time staff members, including a captain, and two crew;

    b.      Several thousands of dollars for each fuel tank fill-up; and,

    c.      All maintenance, storage, and transportation costs.

29.     Jon also regularly amasses enormous corporate credit card bills on personal expenses like vacations and luxury meals:

    a.      $9,438 on an Airbnb ski lodge in Breckenridge, Colorado;

    b.      International plane tickets to Colombia for an annual "guys trip";

    c.      $2,848 on a fishing charter; and,

    d.      $1,624 for a sushi dinner.

**IV.    Jon Threatens His Parents and Tries to Steal Their Shares**

30.    Jon has asserted that his father was not a 50% contributor to the company, and that Jon is entitled to his father's shares.

31.    Jon has exhibited rash and threatening behavior towards his family in attempting to gain control of Smart Communications' shares since well before his father's death.

32.    For example, Jon held James and Janice at gunpoint, hit his father's face, and demanded that James transfer his shares to Jon. He also smacked the phone out of his mother's hand when she tried to call 911. *See* Ex. 2, email dated Sept. 18, 2022, James' Response to Jon's Email.

33.    He vandalized his mother's car. *See* Ex. 2.

34.    On Saturday, August 14, 2021 at 11:24 AM, Jon sent an email to his parents from his Smart Communications email address, threatening to "Burn your [expletive] house down." *See* Ex. 3, Aug. 14, 2021 email from Jon Logan to James Logan and Janice Logan.

**V.    Shareholders' Agreement Negotiations—Jon Rejects the Shareholders' Agreement**

35.    For years, James had been trying to persuade Jon to sign a Shareholders' Agreement that would govern the disposition of their Smart Communications shares.

36.    Jon consistently refused to sign, as demonstrated by the ample documentary evidence referenced below.

37.    On September 12, 2022, Thomas Sims, Janice and James' trust and estate attorney, emailed a draft Shareholders' Agreement to Jon. In this email, he mentioned that he had drafted it a while ago, and that it was James' wish that prior to his upcoming medical procedure Jon execute it. *See* Ex. 4, Sept. 12, 2022, email from Jon Logan to James Logan (Sims email at bottom).

38.    Jon forwarded the email to James an hour later, and said: "This agreement is ridiculously too complicated I don't even understand it. I'm not stupid or bad with contracts and I

can't understand this. I want it more simple and direct. All these terms and names that need their own paragraphs of definition is ridiculous." *See* Ex. 4.

39.     He also disputed his father's role and the material terms of the Agreement: "I do not agree to be a 50/50 partner with you. In no way has this been an equal partnership in any way." *See* Ex. 4.

40.     He warned his father "Don't test me"; "I really hope you fix yourself because you will be dead soon"; and, "I have zero patience left for you and I am not one to [expletive] with on what I created with sheer willpower and brains. If you, or Janice or Alexis try and take anymore from me, I am prepared to do things the normal human could never fathom." *See* Ex. 4.

41.     Jon also sought to buy his father out of his 50% of the company for $5 million. *See* Ex. 4.

42.     Jon ended the email by saying, "Have that attorney draft a simple strait [sic] forward agreement with the buyout I listed." *See* Ex. 4.

43.     James responded to Jon's email in an email dated September 18, 2022. *See* Ex. 2.

44.     James explained that "The 'Shareholders Agreement' sent to you is the very same as was delivered to you over a year ago. You have had ample time to review or hire an attorney to modify. It is a mutual agreement (same terms for both of us) sent to you for your protection in the event my surgery goes poorly tomorrow." *See* Ex. 2.

45.     Jon never did validly execute the draft shareholders agreement.

**VI.     The Trust Receives His Shares and then James Dies**

46.     James Logan executed a Last Will and Testament and a Revocable Trust on February 10, 2021. *See* Ex. 5, James Logan Last Will and Testament; *see* Ex. 6, James Logan Family Trust, dated Feb. 10, 2021.

47.     The Trust names Janice as Trustee and primary beneficiary of the Trust with full power of appointment over the assets of the Trust at her death. *See* Ex. 6.

48.     On September 12, 2022, Jon rejected the Purported Shareholders' Agreement. *See* Ex. 4.

49.     On September 16, 2022, James executed an unconditional Stock Power that transferred his shares in Smart Communications to the Trust. *See* Ex. 7, Stock Power Certificate.

50.     Even in Jon's telling, which Janice disputes, the Purported Shareholders' Agreement was not "executed" until at least September 23, 2022. It therefore did not govern Jim's transfer of shares to the Trust.

51.     On September 16, 2022, James also assigned his membership interests (50% ownership) in Loco Florida, LLC, and Smart Communications Yacht Holdings, LLC to the Trust. *See* Ex. 8, Assignment of Member Interest Loco Florida; Ex. 9, Assignment of Membership Interest Yacht Holdings.

52.     Loco Florida, LLC owns Smart Communications' $2.1 million building headquarters, to which Smart Communications owes rent.

53.     James died on October 16, 2022.

54.     Upon James' death, Janice should have been made co-director of Smart Communications Holding, Inc. with Jon. She made a request consistent with this right and was denied.

55.     In her individual capacity as a beneficiary of the Trust, and as a direct result of Jon's behavior, including threats towards Janice to get Janice to sell her shares, Janice executed her most recent Last Will and Testament on January 20, 2023, which exercises the testamentary power of appointment granted her by James under the terms of the Trust (subparagraph 5.3(b)1.)

in favor of separate subtrusts created under a newly-executed revocable trust agreement solely for the benefit of Alexis or her descendants. Such exercise eliminates Jon's beneficial interest in the Trust.

56.     The Trust owns half of Smart Communications' issued shares with full and unencumbered rights therein.

**<u>Count I:  Declaratory Judgment</u>**
**(Declaration Concerning the Validity of the Purported Shareholders' Agreement)**

57.     Plaintiff incorporates the foregoing paragraphs of this complaint as though fully set forth herein.

**I.      Facts Specific to this Count:**

**A.      In December 2022, Jon Worked with His Lawyer to Draft a Stock Purchase Agreement**

58.     After his father's death, Jon gained exclusive control of Smart Communications, acting as the sole Director and sole Operating Officer.

59.     Jon decided he again wanted to try to purchase the outstanding shares, now held by the Trust. Thus, he directed his personal attorneys, Hill, Ward, Henderson—the law firm representing Jon in this case—to draft a Stock Purchase Agreement.

60.     Separately, he threatened Janice that if she did not sell the Trust's shares he would sabotage the company by refusing to sign agreements and contracts on the company's behalf.

61.     On December 22, 2022, clearly believing that Jon had never executed the Shareholders' Agreement, Mark M. Wall of Hill, Ward, Henderson, "On behalf of Jon," emailed a draft Stock Purchase Agreement to Thomas Sims. *See* Ex. 10, Dec. 22, 2022, email from Mark M. Wall to Thomas D. Sims.

62.     A Stock Purchase Agreement would have been redundant had a Shareholders' Agreement been executed and in effect as of December 2022.

10

63.     And, if a Shareholders' Agreement had been in effect, the Stock Purchase Agreement would have referenced it, and explained (at the very least) what, if anything, the Stock Purchase Agreement changed about the Shareholders' Agreement.

64.     Yet, "On behalf of Jon," Hill, Ward, Henderson drafted a meticulous, 12-page single spaced Stock Purchase Agreement.

65.     The draft Stock Purchase Agreement has the watermark "HWH DRAFT 12/22/2022 *For discussion purposes only*." *See* Ex. 11, Draft Stock Purchase Agreement.

66.     The draft Stock Purchase Agreement contains a "Note to Draft" Footnote, which three times describes the Shareholders' Agreement—that Jon now says was fully executed on September 23, 2022—as the "unsigned Shareholders' Agreement." *See* Ex. 11, p. 2 n.2.

67.     Jon and his own lawyer, Mark M. Wall, who is representing him individually in this suit, thus admitted as of December 22, 2022, that the Shareholders' Agreement was unsigned.

68.     At a December 2022 meeting between Jon, Mark Wall, Thomas Sims, and Janice, Jon was repeatedly asked whether he regretted not signing the Shareholders' Agreement and he admitted that he wished he had signed it.

**B.      Janice Sends the Management Concern Letter to Jon**

69.     On January 20, 2023, counsel for Janice and the Trust sent Jon's attorneys a letter detailing Janice's concerns about Jon's management of Smart Communications ("Management Concern Letter") and demanding, among other things, (a) a full accounting of Jon's use of corporate assets and (b) that Janice be involved in company management going forward. *See* Ex. 12, Management Concern Letter.

70.     The Trust and Jon entered into a Standstill and Document Exchange Agreement in an attempt (at least by the Trust) to resolve this dispute short of litigation.

**1.      Jon "Discovers" a Copy of a Fully Executed Shareholders' Agreement**

71.      While discussions regarding the Trust's concerns of corporate mismanagement were ongoing, Jon miraculously "discovered" a copy of a fully-executed Shareholders' Agreement. He claimed that on February 2, 2023, his housekeeper found a copy of the executed Shareholders' Agreement, dated September 23, 2022, in the kitchen counter mail rack.

72.      Specifically, according to Jon, on the weekend of September 23, Jon signed the Purported Shareholders' Agreement and left it on his kitchen counter for James to sign.

73.      Jon further alleges that when he returned, a copy of the fully executed agreement had been left by James.

74.      Jon has represented that the Shareholders' Agreement his housekeeper found is a "copy," and that he is not aware of the location or existence of the original.

75.      Thus, Jon cannot produce the original fully-executed Shareholders' Agreement.

76.      In fact, Jon does not even claim to have ever seen an original fully-executed Shareholders' Agreement, and proffers no evidence that one ever existed.

77.      The Purported Shareholders' Agreement would require that Shareholders sell their shares back to the corporation upon death. *See* Ex. 13, Purported Shareholders' Agreement.

78.      The Purported Shareholders' Agreement also has a more favorable appraisal term for Jon than the draft Stock Purchase Agreement did. Under the Purported Shareholders' Agreement, Smart Communications would choose a single appraiser to value the shares, whose decision would be binding. The Stock Purchase Agreement, on the other hand, provided for each party to designate a Qualified Appraiser, and for further challenge if there were a value discrepancy after both appraisals. *Cf.* Ex. 11, (C)(2)-(3); *and* Ex. 13, §§ 4.3, 5.3(b).

79.      On February 24, 2023, Jon's counsel attempted to invoke the unilateral valuation provided for in the Purported Shareholders' Agreement, and name an appraiser.

80. The Trust objected on February 25, 2023.

81. Jon and Smart Communications then, without standing in the Probate Division of this Court, filed the related action alleging breach of contract of the Purported Shareholders' Agreement and asking the Probate Division to use its equitable powers to force the Trust to sell to Smart Communications under the guise of breach of trust and trust administration.

82. Jon, however, is not a qualified beneficiary of the Trust and thus has no standing to bring the trust/probate claims he asserted.

83. His suit also seeks specific performance of the Purported Shareholders' Agreement, which is properly brought in the Civil Division, not probate court.

## II.    Allegations

84. Pursuant to Florida Statutes Chapter 86, Plaintiff seeks declaratory relief construing the validity of the Purported Shareholders' Agreement.

85. Plaintiff contends that Jon rejected the Shareholders Agreement in his September 12, 2022, email, and issued a counter-offer with significantly different terms. *See* Ex. 4.

86. Upon James' death, and to the extent it had not already been nullified by Jon's September 12, 2023, email rejecting it, the Shareholders' Agreement was no longer a valid offer. It is axiomatic that contract formation requires a meeting of the minds, and that an offeror's death terminates an offer because the minds can no longer meet.

87. Jon cannot bind the Trust to an offer of agreement he repeatedly rejected, especially one that terminated upon his father's death.

88. Plaintiff contends that Defendant Jon fraudulently and with intent to deceive executed the Purported Shareholders' Agreement well after September 23, 2022, in order to force Janice's sale of the Trust's shares back to Jon and Smart Communications, and to obtain the benefits of a unilateral appraisal of Smart Communications' share price.

89. There is a bona fide, actual, present need to determine the validity of the Purported Shareholders' Agreement—namely, to determine whether the Trust must sell its shares to Jon and Smart Communications.

90. The validity of the Purported Shareholders' Agreement is an ascertainable fact or set of facts.

91. Janice and the Trust's control over her right to and property in the 5,000 Smart Communications shares is dependent upon the validity *vel non* of the Purported Shareholders' Agreement.

92. Jon has an adverse and antagonistic interest to the Trust with respect to the relief sought because he asserts the Purported Shareholders' Agreement is valid and enforceable.

93. Jon is properly served and in front of this Court for adjudication of this question.

WHEREFORE, Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, requests a speedy hearing of this declaratory judgment Count pursuant to Florida Statutes Section 86.111 and demands judgment in her favor and against Defendants Jonathan D. Logan and Smart Communications Holding, Inc. declaring:

1. The Purported Shareholders' Agreement is invalid and unenforceable.

2. Therefore, the disposition of the Trust's Smart Communications shares is unconstrained by the Purported Shareholders' Agreement.

3. Janice is entitled to attorneys' fees and costs as a result of Jon's fraudulent execution of the Shareholders' Agreement, and use of company resources to freeze Janice out and prosecute his claims.

4. Such other and further declarations as this Court deems just and proper.

## Count II:  607.0831 Liability of Director
### (The Trust against Jonathan Logan)

94.    Plaintiff incorporates the foregoing paragraphs of this complaint as though fully set forth herein.

**I.    Facts Specific to this Count:**

**A.    Jon Retaliates Against Janice**

95.    In the midst of litigation, and in sole control of Smart Communications, its books and records, its personnel, and its related entities, Jon has attempted to manipulate this litigation by depriving his widowed 69 year-old mother of resources.

96.    On or about May 7, 2023, Jon summarily fired Janice from Smart Communications, and stopped issuing her a paycheck. Janice believes she is entitled to a role at Smart Communications, including being a co-director—she would currently be a co-director but for the fraudulent Shareholders' Agreement.

97.    Janice is willing and able to perform the role to which she is entitled at Smart Communications. Instead, Jon has shut her out and made it impossible for her to do so, and then fired her for failing to contribute.

98.    In addition to her role at Smart Communications being a source of income, it was a primary source of health insurance. She relies upon the health insurance for access to healthcare related to a heart condition. Janice will be forced to be find new providers without this health insurance policy, which can take a long time in Sarasota because of demand levels.

99.    Jon represented, through counsel, that Janice's firing and the threat of charging rent for Janice's home and car (further alleged below)—or otherwise evicting her and repossessing the cars—is part of an effort to address the corporate waste the Trust has alleged is rampant at Smart Communications.

100.    Upon information and belief, Jon has not applied similar standards of waste reduction to Smart Communications' spending that benefits him personally. For instance, Jon is not now paying rent for his regular personal use of his Tierra Verde home, Miami Condo, 100' yacht, 48' yacht, and three cars worth more than $250,000 each—all of which are Smart Communications assets. Far from it, in addition to drawing a regular salary and unknown, unequal distributions, Jon is using these corporate assets for free and is paying for expenses related to his use of them out of Smart Communications' coffers.

101.    In addition to the company's baseless and retaliatory firing of Janice, Smart Communications stopped work on a generator for her home on May 23, 2023. The improvement had been previously approved by Smart Communications. As things stand, the home is without a generator, and Florida is in hurricane season. As a 69-year old widow who lives alone, Janice relies on electricity to power, among other things, her security system, refrigeration, and air conditioning. Given Jon's prior threatening behavior towards James and Janice, the security system is particularly important. Additionally, prolonged exposure to Florida's summer heat without air conditioning could exacerbate the heart condition she has lost her primary health insurance coverage for.

102.    Upon information and belief, Jon is also funding the related action and this litigation using Smart Communications' resources.

103.    Thus, Janice, as a 50% owner of the company, is essentially funding a lawsuit Jon initiated against her. Meanwhile, Jon has deprived her of an income and threatened to deprive her of a roof over head, electricity, and a means of transportation. This is a patent attempt to manipulate this litigation, and force Janice into a result that is counter to her interests.

## II.    Allegations

104.    Plaintiff incorporates the foregoing paragraphs of this complaint as though fully set forth herein.

105.    As outlined above, Jon has attempted to manipulate this proceeding and the related action by depriving Janice of income, health insurance, a generator, and threatening to take her home and cars.

106.    Upon information and belief, Jon is taking no such measures in regards to his own income and use of Smart Communications' assets.

107.    Jon wields unchecked and unaccountable power as sole officer and director of Smart Communications, and is using this power to target Janice to obtain a result that is favorable to him.

108.    He is doing so in the midst of a direct and derivative shareholder suit that alleges breaches of fiduciary duties and corporate waste.

109.    Thus, he is in clear violation of his duties of loyalty and good faith, and is demonstrating conscious disregard for the best interest of the corporation, and participating in willful or intentional misconduct in the midst of a proceeding by or in the right of a shareholder.

WHEREFORE, Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, demands judgment in her favor and against Defendant Jonathan D. Logan including:

1.    Restoration of Janice to her position at Smart Communications, including salary and health insurance benefits;

2.    Completing the generator project at her home;

3.    Maintenance of the *status quo ante* for Janice of use of Smart Communications' assets during the pendency of the litigation rent-free;

17

4.    Compensatory damages for income lost as a result of Jon's actions; and,

5.    Attorney's fees and costs.

**COUNTS III, IV, AND V**

110.    Plaintiff incorporates the foregoing paragraphs of this complaint as though fully set forth herein.

**I.    Additional Facts Specific to Counts III, IV, and V:**

**A.    The Trust's Direct and Derivative Standing**

111.    The Trust brings the below claims against Jon and Smart Communications both directly and derivatively, as a 50% shareholder of Smart Communications.

112.    The Trust has been injured directly pursuant to Florida Statutes Section 607.0750 to the extent that Jon has fraudulently attempted to subject it to the Purported Shareholders' Agreement, and to the extent that Jon has made distributions to himself in which the Trust did not share.

113.    The Trust has been injured derivatively pursuant to Florida Statutes Section 607.0742 to the extent Jon's breaches of fiduciary duty, corporate waste, and mismanagement have impaired the value of Smart Communications' shares.

114.    The Trust sent the Management Concern Letter to Jon's counsel demanding certain actions be taken on January 20, 2023. *See* Ex. 12.

115.    Between January 20, 2023, and February 26, 2023, the Trust and Jon executed a standstill agreement, and attempted to resolve the Trust's concerns outside of court.

116.    On February 27, 2023, the day the standstill agreement expired, Jon and Smart Communications filed the related action against the Trust for the enforcement of the Purported Shareholders' Agreement.

117. Further, Jon is the sole Director of the Board, sole Operating Officer of Smart Communications, and only other Smart Communications shareholder. Given Jon's and Smart Communications' aggressive action in preemptively initiating this suit and the personal and acrimonious nature of the dispute, the Trust concludes that its demands will not be met; and, there is the potential for irreparable injury to the corporation and continuing corporate waste in the interim. For example, the January 20, 2023, Management Concern Letter contained a demand to examine Smart Communications' books and records pursuant to 607.1602. Smart Communications has never offered to arrange for that inspection to take place.

118. Meanwhile, Jon continues to regularly expend thousands of dollars of Smart Communications' money on yacht trips, maintenance, and gas. Jon is also in exclusive control of the information and resources at Smart Communications. He can unilaterally and without check do anything he likes. There is no other authority at Smart Communications for Janice to appeal to besides Jon, and Jon's aggressive behavior and background require legal intervention to avoid erratic or destructive action, and to ensure the preservation of Smart Communications.

119. There is no other arbiter or venue in which or from which the Trust can properly seek relief.

120. Further, the Trust has been injured derivatively, pursuant to Florida Statutes Section 605.0802, as a 50% member of Loco Florida.

121. On April 17, 2023, Janice sent a demand for rent letter to Jon in his dual capacities as manager of Loco Florida, LLC and sole officer and director of Smart Communications, indicating that she is a 50% member of Loco Florida and believes Loco Florida should be collecting rent from Smart Communications and distributing such profits to members of Loco

Florida, as has occurred in the past. Janice suggested that both she and Jon would benefit as members of Loco from establishing a lease with Smart Communications.

122.    Janice additionally demanded to examine the books and records of Loco Florida.

123.    In response to this letter, on April 28, 2023, Jon indicated that he did not believe he had a duty to collect rent or distribute rent to Janice, and then threatened to begin charging Janice $35,000/month rent on her home and demanded Janice return her vehicles to Smart Communications' headquarters no later than May 5, 2023.

124.    In response to a cordial demand, Jon threatened to charge his widowed mother rent for her house while he occupies and makes personal use of yachts, condos, houses, and exotic cars paid for by Smart Communications. Additionally, he failed to respond at all to the records request in the letter. Pursuant to Fl. Stat. § 605.0802(2), given Jon's belligerence thus far, and insofar as Jon's letter was not a flat-out rejection of Janice's demand, a demand would be futile.

125.    Jon's father, James, who was an officer and co-director of Smart Communications and who contributed significantly—financially and strategically—to the founding and growth of Smart Communications was provided the house as a result of his role.

126.    Janice is now a beneficial 50% owner of Smart Communications, and has been wrongly denied a co-director role.

127.    Jon would be in breach of his fiduciary duties to Smart Communications if he charged Janice rent for property she uses/occupies and failed to hold himself to the same standard.

128.    Because of the personal nature of this family-owned business dispute—Jon and Janice are the only Smart Communications shareholders, and only Loco Florida members—and because Jon currently has exclusive control of all of these entities, typical business processes have not and will not suffice in the resolution of Janice's concerns as a shareholder/member.

## Count III:  Breach of Fiduciary Duties
### (The Trust against Jonathan Logan and Smart Communications)

129.     Plaintiff incorporates the foregoing paragraphs of this complaint as though fully set forth herein.

130.     Jon, as CEO and sole Director of Smart Communications, has fiduciary duties to both the shareholders and Smart Communications to act with care and loyalty in the management of Smart Communications.

131.     Jon breached those fiduciary duties by, among other things:

    a.     Fraudulently claiming the Purported Shareholders' Agreement is a valid agreement in order to force Janice to sell to him and to gain favorable sale and appraisal terms;

    b.     Perpetrating corporate waste via luxury asset purchases for Jon's personal use;

    c.     Abusing the corporate credit card for personal expenses;

    d.     Failing to make 50/50 distributions to shareholders;

    e.     Compensating himself excessively;

    f.     Threatening to harm Smart Communications, and therefore the value of the shares, if Janice and the Trust do not comply with his wishes;

    g.     Firing Janice, and using his unchecked power to attempt to manipulate this litigation; and,

    h.     Acting disloyally and not in good faith towards a 50% shareholder of the company.

132.     Upon information and belief, additional breaches will become evident upon an accounting of Smart Communications' books and records, and the conduct of further discovery.

133.    As a direct and proximate result of Jon's breaches as CEO, sole Director, President, Vice President, Secretary, and Treasurer of Smart Communications, the Trust has not received distributions due it, and the Trust's shares have lost value or have been the subject of efforts to devalue them. Additionally, the Trust has had to take personal protective precautions as a result of Jon's background and threats.

WHEREFORE, Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, demands judgment in her favor and against Defendants Jonathan D. Logan and Smart Communications Holding, Inc., including:

1.    Compensatory damages;

2.    Punitive damages pursuant to Florida Statutes Section 768.72 because Plaintiff has pled a reasonable basis for the inference of intentional misconduct or gross negligence by Jon and Smart Communications;

3.    A full accounting of Smart Communications' and its subsidiaries' corporate books and records by a third-party forensic accounting firm;

4.    Thereafter, payment of any back-distributions owed to Janice as a result of Jon making unequal distributions to himself from September 16, 2022 to the present;

5.    Appointment of Janice, as trustee of the Trust, as a board member, in addition to the appointment of a third, neutral director such that the board will not be susceptible to deadlock;

6.    Attorneys' fees and expenses pursuant to Florida Statutes Section 607.0746; and,

7.    Such other and further relief as this Court deems just and proper.

**Count IV:  607.0748 Action to Appoint a Custodian**
**(The Trust against Jonathan Logan and Smart Communications)**

134.    Plaintiff incorporates the foregoing paragraphs of this complaint as though fully set forth herein.

135.    Pursuant to Florida Statutes Section 607.0748, the Trust asks this Court to appoint a temporary custodian to oversee Smart Communications during the pendency of this litigation.

136.    As alleged above, given that Jon is the sole Director and Officer of Smart Communications, the Trust's 50% ownership does not allow meaningful participation in the decisions of Smart Communications since James Logan's death.

137.    In light of this, the Trust is hamstrung by the decisions of an erratic and vindictive person who has shown a penchant for waste, violence, harassment, and intimidation.

138.    To preserve Smart Communications from continuing waste and mismanagement, and prevent retribution via share devaluation and major corporate expenditures for Jon's personal benefit, the Trust believes a temporary custodianship is in order.

139.    An impartial custodian will be able to exercise oversight and control to ensure that Smart Communications' value is maintained, and that there is an accountability mechanism for Jon's decisions.

WHEREFORE, Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, demands judgment in her favor and against Defendants Jonathan D. Logan and Smart Communications Holding, Inc., including:

1.    Appointment of a temporary custodian during the pendency of this litigation to oversee Smart Communications operations; and,

2.    Such other and further relief as this Court deems just and proper.

### Count V:  Breach of Fiduciary Duties
### (The Trust against Jonathan Logan and Loco Florida)

140.    Plaintiff incorporates the foregoing paragraphs of this complaint as though fully set forth herein.

141.    Jon, as managing member of Loco Florida, has fiduciary duties to the company and its members. *See* Fl. Stat. § 605.4091.

142.    The principal asset of Loco Florida is the real property at 10491 72nd Street, Seminole, Florida 33777, which is Smart Communications' multi-million dollar, 13,091 square foot headquarters building.

143.    Smart Communications has occupied the building since 2020 without consistently paying rent to Loco Florida.

144.    As managing-member of Loco Florida, Jon has certain fiduciary duties to Loco Florida and its members, including the duties of loyalty, good faith, and fair dealing.

145.    Jon has breached his fiduciary duties to Loco Florida and its members by:

a.    Failing to execute a formal lease with Smart Communications;

b.    Failing to consistently collect rent from Smart Communications;

c.    Failing to distribute such payments in accordance with the membership interests in Loco Florida; and,

d.    Failing to diligently and transparently manage Loco Florida, and communicate regarding its profits, losses, and activities.

WHEREFORE, Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, demands judgment in her favor and against Defendants Jonathan D. Logan and Loco Florida, LLC, nominal defendant, including:

1.       Compensatory damages;

2.       Establishment of a lease and rent schedule between Loco Florida and Smart Communications;

3.       A full accounting of Loco Florida's books and records by a third-party forensic accounting firm;

4.       Appointment of Janice, as trustee of the Trust, as a manager, in addition to the appointment of a third, neutral manager such that the company will not be susceptible to deadlock;

5.       Attorney's fees and expenses pursuant to Florida Statutes Section 605.0805; and,

6.       Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff Janice Logan demands trial by jury pursuant to Florida Rule of Civil Procedure 1.430(c) on all legal relief sought by Counts II, III, IV, and V.

## CERTIFICATE OF SERVICE

I CERTIFY that a true and correct copy of the foregoing has been served on all counsel of record through the Florida Court's e-filing portal on August 24, 2023.

Dated:  August 24, 2023

Respectfully submitted,

  /s/   *Anitra R. Clement*

Anitra R. Clement
Florida Bar No. 100354
**SHOOK, HARDY & BACON L.L.P.**
100 N. Tampa Street, Suite 2900
Tampa, FL 33602
Telephone:  (813) 202-7100
aclement@shb.com

David E. Schoenfeld (*pro hac vice*)
Peter F. O'Neill (*pro hac vice*)
Andrew L. Franklin (*pro hac vice*)
**SHOOK, HARDY & BACON L.L.P.**
111 South Wacker Dr., Suite 4700
Chicago, IL 60606
Telephone:  (312) 704-7700
dschoenfeld@shb.com
pfoneill@shb.com
afranklin@shb.com

***Counsel for Janice Logan, individually and as Trustee of the James Logan Family Trust, dated February 10, 2021***

## **VERIFICATION**

Under penalties of perjury, I declare that I have read the foregoing AMENDED VERIFIED

COMPLAINT and that the facts stated in it are true, or, where indicated, are stated to the best of

my knowledge and belief.

Dated: August 23, 2023

Janice Logan
Trustee of the James Logan Family Trust,
dated February 10, 2021

# EXHIBIT 1

# Electronic Articles of Incorporation For

**P14000102324**
**FILED**
**December 29, 2014**
**Sec. Of State**
**cgolden**

SMART COMMUNICATIONS HOLDING, INC.

The undersigned incorporator, for the purpose of forming a Florida profit corporation, hereby adopts the following Articles of Incorporation:

## Article I

The name of the corporation is:

SMART COMMUNICATIONS HOLDING, INC.

## Article II

The principal place of business address:

4522 N. B STREET
TAMPA, FL.   33609

The mailing address of the corporation is:

4522 N. B STREET
TAMPA, FL.   33609

## Article III

The purpose for which this corporation is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The number of shares the corporation is authorized to issue is:

10,000

## Article V

The name and Florida street address of the registered agent is:

ALEXIS K LOGAN
515 E. LAS OLAS BLVD.
SUITE 120
FT. LAUDERDALE, FL.   33301

I certify that I am familiar with and accept the responsibilities of registered agent.

Registered Agent Signature:   ALEXIS LOGAN

P14000102324
FILED
December 29, 2014
Sec. Of State
cgolden

## Article VI

The name and address of the incorporator is:

ALEXIS LOGAN
515 E. LAS OLAS BLVD.
SUITE 120
FT. LAUDERDALE, FL 33301

Electronic Signature of Incorporator:   ALEXIS LOGAN

I am the incorporator submitting these Articles of Incorporation and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S.  I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of this corporation and every year thereafter to maintain "active" status.

## Article VII

The initial officer(s) and/or director(s) of the corporation is/are:

Title:  P
ALEXIS K LOGAN
4522 N. B STREET
TAMPA, FL.  33609

Title:  VP
JAMES P LOGAN
4522 N. B ST.
TAMPA, FL.  33609

Title:  S
ALEXIS K LOGAN
4522 N. B ST.
TAMPA, FL.  33609

Title:  T
JAMES P LOGAN
4522 N. B ST.
TAMPA, FL.  33609

## Article VIII

The effective date for this corporation shall be:

12/24/2014

# EXHIBIT 2

**From:** jim.logan@ ████████████ <jim.logan@ ████████████ >
**Sent:** Sunday, September 18, 2022 8:06 PM
**To:** Jim Logan <jim.logan@ ██████████████ >; janice logan < ██████████████ >; Alexis Logan
< ██████████████ >; jspeters11@gmail.com <jspeters11@gmail.com>
**Subject:** letter to Jon

September 18, 2022

Jon,

In response to your September 12, 2022 Confidential email;

The "Shareholders Agreement" sent to you is the very same as was delivered to you over a year ago.  You have
had ample adequate time to review or hire an attorney to modify. It is a mutual agreement (same terms for
both of us) sent to you for your protection in the event my surgery goes poorly tomorrow.

In an attempt to respond to your emailed statements and concerns, I will attempt to go line by line.

"You don't agree to be a 50/50 partner."

Your emotional stated does not determine the percentage of ownership.  The Share Transfer Agreement for
Smart Communications Holding, Inc. was drafted by Kristen Keene of Carlton Fields as our corporate attorney.
You signed this agreement on August 30, 2017 and were issued 50% of the shares and I was issued 50% of the
shares. There have never been any agreements or documents amending our 50%/50%
ownership agreement.  Our ownership doesn't change based on behavior, be it yours or mine.

No partnerships are equal all the time. At the inception of this corporation and for several years thereafter,
you couldn't even use a computer legally and you haven't even visited a jail until the last few years. Perhaps
you remember the familiar phone call you would make asking "Is there anything I should be doing?"

When we got out second contract the Corp had no money. I went and established a banking relationship and I
secured financing for the next group of contracts by pledging personal and inheritance assets. When your
mother and I sold our house, the proceeds of approximately $297,000 went to pay our corporate loan at
Englewood Bank. I have never even asked for it back from the company.

There is a lot you either choose to forget or just never paid attention to. Yeah, you are right, sometimes a
partnership isn't fair!

You are offering me a $5,000,000 buyout plus I can keep my house in exchange for my 50% share of the company, or, you are OK with keeping me on payroll at $250-$500K if I prefer?? As I read your offer it looks like your offer is one or the other??

Let's look at them separately. Starting with my house. Purchase price of $2,650,000.  What's interesting here is I brought $1,000,000 in profit from the sale of my last house in Mount Dora plus the $200,000 I put down personally and maybe I should get the $297,000 from my last house that the company has had use of for the last decade with 0% interest. Total those and I put in my own equity of $1,500,000 on a $2,650,000 purchase.

You are graciously going to let me keep it??!!  In addition to keeping my house you would pay me $5,000,000??

We have had company value estimates from Truists and UBS a few months ago in the $500,000,000 range. You have the documents.

That means you are offering me 1% of value of the company as valued by experts in exchange for my 50% shares. Jon keeps $495,000,000, Jim keeps $5,000,000.

The offer to make me a high-priced consultant is interesting as well, but I get your strategy on the next line where you state     "I don't believe you will be alive much longer."  You back that up a little later where I believe you threaten to kill me if I don't accept your terms. I do want to note the generous consulting fee as to date, I still receive $50,000. per year salary very steady for the past 10 years.

"Past the point in life and the pain and abuse for 40 years."

You are certainly entitled to your opinion.  Some might say you are certainly forgetting you first 25 years.  You are forgetting your life of absolute indulgence. As a child you wanted for nothing,  You were constantly indulged with motorcycles, 4-wheelers, snowmobiles and jet-ski's, including young teen race bikes, a motorhome and a race trailer, personal trainers, personal mechanics and race sponsors. Your mother and I even paid someone to do your school homework so you could race motorcycles.

Young Adult- Your mother and I purchased for you a new construction house in Ocala, you are racing motorcycles for a "living" and supporting a family amazingly without a job. Don't forget the new F-150 for you and even a Lincoln for her! You then later pursue a Pro career traveling around the country. Privateer race team. It is hard to imagine how you accomplished all you did given the outrageous behavior and abuse you have apparently endured.

The next section you describe your pain and how many chances you have given your so-called Father. Your so-called-father objects to your characterizations of you giving chances and ongoing betrayal. Nowhere is it written that you the child is given chances you use like tokens.  You are not my ruler, boss, employer, or even moral compass. You exhibit a total lack of respect for anyone and yet demand it of others.  You exhibit nothing but disdain for your parents and have from an early age. It's interesting but disappointing as we have been your biggest fans.

Now you are offering a "generous buyout" "Get off the back of the guy who started, innovated and has done all the day to day for 13yrs."  If that isn't enough, now you bring the threats.

If I, your mother or your sister try and take anymore from your, "You are preprepared to things the normal human could never Fathom."  Most humans could never fathom a son who says that to his family for any reason, let alone a son sitting atop his $10,000,000 yacht, next to his $2M condo, with a Rolls, a Lamborghini,  and Ferrari parked at his $5,000,000 beach house. Exactly what did your family take from you??

"You are done being taken advantage of" , "Don't test me", "I don't deserve any of this"
" I have been a great son and business partner"

This is not opinion, this is FACT. You have not been a great Son. In fact, you have been anything but.

You have been and continue to be both verbally and physically abusive to me and your mother. You have broken into our home and held us at gunpoint demanding that I sign my shares over to you. You have vandalized our cars and belongings. Great Son??

Great news Son! I am as done with you as you are with me.

I don't know how you have talked yourself into this great myth about an abusive family and your heroic rise above it, but it is certainly a myth.  You are the richest young man I know, but instead of enjoying it, you are wallowing in some fairytale about abuse and betrayal.

Want to experience betrayal? Meet my Son!!

Good news, I have lots of opportunities to sell my 50%. Pretty sure it will exceed your 1% offer. If you can find it in yourself to behave like an adult and wish to discuss this, I am ready.

Be aware: I have recorded every death threat to date. I love you but this is over. The next time you threaten anything I will take swift action.

Your loving Father

# EXHIBIT 3

**From:** Jon <jon.logan@███████████████████>
**Sent:** Saturday, August 14, 2021 11:24 AM
**To:** Jim Logan <jim.logan@████████████████>; janice logan <██████████████████>
**Subject:** Burn your fucking house down

You think you two have a right to just hide from me!!??? You think you can just hang up the phone on me!??
Jim you piece of fucking shit trash pathetic fake as father mother fucker I'm coming for you right now!
I am coming home right now!

Thank you

Jon Logan
CEO- Smart Communications

# EXHIBIT 4

---------- Forwarded message ---------
From: **Jon** <jon.logan@████████████>
Date: Mon, Sep 12, 2022, 6:44 PM
Subject: Confidential not for company disclosure
To: Jim Logan <jim.logan@████████████>


This agreement is ridiculously too complicated I don't even understand it. I'm not stupid or bad with contracts and I can't understand this.

I want it much more simple and direct. All these terms and names that need their own paragraphs of definition is ridiculous.

Additionally, I do not agree to be a 50/50 partner with you. In no way has this been an equal partnership in any way. For 10yrs you have been an on again, off again alcoholic offering zero innovation, sporadic at best management or organization. You creat more problems than you solve with your on again off again alcoholism. It's been extremely toxic and harmful to this entire company and employees as well as me personally.

I am offering you a 5 million dollar buyout, plus keep your house. I am ok with keeping you on payroll at 250k-500k as a consultant if you would prefer.

However I don't believe you will be alive much longer and I don't believe my involvement with you is in my best interest or the company's.

Sometimes in life, you pass the point of no return on some things. I believe you are there with me. I have put up with your abusive, outrageous and heartbreaking alcoholism for 40yrs. I've given you ever chance and then some times 10. You only care about yourself and more than anything, your booze.

I am beyond heartbroken and hurt and just flat out done with you and your lying, addict behavior and the constant let down by my so-called father.

Jim, there comes a point where you can't get another chance, you can't get a redo and you can't come back from. I feel you are there. I've been through it so many times over the years and all you do is betrayed me over and over.

I pray to god you change who you are and get your health and life back and be a normal human again. However I can not and this company can not be a victim to your lies, betrayals and guaranteed let down anymore. Neither me or the company deserves this or can afford it anymore.

I am offering you a generous buyout to a company I started, innovated and continue to carry day in day out for 13years now mostly without you.

Do is both a favor and don't make this get nastier than it already is. I have zero patience left for you and I am not one to fuck with on what I created with sheer willpower and brains. If you, or Janice or Alexis try and take anymore from me, I am prepared to do things the normal human could never fathom. I am done being fucked with, fucked over and put in a corner with my hands tied. No more.

5 million, ongoing salary if you want it, involvement not needed. I will never leave you or my mother or even my ungrateful scamming sister out starving or in a bad place. However, you have broken our bond for the final time.

I want a simple contract and a simple buyout and clean separation. We are not partners. You're an addict and terrible alcoholic, the injustice is reached a point I can no longer deal with anymore.

I close with this. I love you forever, but I don't know who you even are anymore. I have lost my dad years ago to alcoholism. I really hope you fix yourself because you will be dead soon. You have wrecked every relationship around you with your alcoholism. There is a point of no return, you are there with me.

I don't want to remember you this way, however you give me no choice.

Don't make this harder, nastier or hurt more than it already does. I don't deserve any of this. I've been a great son and business partner. You have failed me in every way. Don't fight me. I am done being taken advantage of by anyone, especially my own blood. Don't test me.

Have that attorney draft a simple strait forward agreement with the buyout I listed. Let's get this done this week. Time is of the


Thank you

Jon Logan
CEO- Smart Communications

Begin forwarded message:

> **From:** "Thomas D. Sims" <tsims@jpfirm.com>
> **Date:** September 12, 2022 at 5:42:17 PM EDT
> **To:** jon.logan@█████████████
> **Cc:** jim.logan@███████████
> **Subject: Shareholders' Agreement**


Hello Jon,


I spoke with your father last week regarding the Shareholders' Agreement for the Company that I had drafted a while ago (see attached). In light of his upcoming medical procedure, we thought

it would be best for all parties to finalize the existing draft of the purchase agreement. Accordingly, I am attaching the same for your review and comment. Please let me know if there are any questions/concerns regarding the Agreement. Once finalized, you and your father can execute in order to put it into place.

Thanks,

Tom



**Thomas D. Sims**
Attorney at Law
727-551-4652 Direct | 727-800-5981 Fax
490 1st Ave S, Suite 700, St. Petersburg, FL 33701



**www.jpfirm.com** | **vCard** | **bio** | **email**

The information contained in this transmission may be attorney/client privileged and therefore confidential. This information is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, printing or copying of the communication is strictly prohibited. If you receive this transmission in error, or if you are not the individual or entity named above, the receipt of this transmission is not intended to and does not waive any privilege, attorney/client or otherwise. If you have received this communication in error, please notify us by telephone or e-mail. Thank you.

# EXHIBIT 5

# LAST WILL AND TESTAMENT

## OF

## JAMES LOGAN

I, JAMES LOGAN, a resident of Sarasota County, Florida, declare that this is my Last Will and Testament, and I revoke all wills and codicils I have previously made; except the Trust referred to in Article V hereof, if the same be determined to be testamentary.

## I

## FAMILY

1.1   <u>Spouse.</u>  I am married to JANICE LOGAN (referred to herein as "my wife" or "my spouse").

1.2   <u>Children.</u>  We have 2 children: ALEXIS LOGAN and JON LOGAN.

## II

## APPOINTMENT OF FIDUCIARIES

2.1   <u>Personal Representative.</u>  I appoint my wife, JANICE LOGAN, as personal representative of this, my Last Will and Testament. If JANICE LOGAN shall fail to qualify or otherwise serve as personal representative, I appoint my daughter, ALEXIS LOGAN, as personal representative of my estate. If ALEXIS LOGAN shall fail to qualify or otherwise serve as personal representative, I appoint my son, JON LOGAN, as personal representative of my estate.

2.2   <u>No Bond.</u>  I request that my personal representative not be required to furnish bond or sureties.

## III

## PAYMENT OF DEBTS AND TAXES

3.1   <u>Debts.</u>  I direct that my legal debts and the expenses of any last illness, funeral, and the administration of my estate, be paid as soon as practicable after my death.



3.2    <u>Taxes.</u>  I direct that my personal representative pay out of that portion of my Residuary Estate which is not included in the gift qualifying for the marital deduction, without apportionment except as herein provided, all estate taxes in respect of all property required to be included in my gross estate for estate tax purposes, whether the property passes under this will or otherwise, except:

(a)    that any generation-skipping tax imposed by Chapter 13 of the Internal Revenue Code of 1986, as amended, caused by a disclaimer or by a direct skip from a trust not established hereunder, shall be paid by the person holding or receiving that property; and

(b)    that any such taxes which are attributable to any qualified terminable interest property over which I had a life income interest shall be paid by the person holding or receiving such property, in an amount equal to the difference between the estate tax computed with and without the inclusion of such property in the calculation; and

(c)    that any such taxes which are attributable to proceeds of life insurance policies that are payable to a person or persons other than my spouse and are includable in my estate for federal estate tax purposes shall be paid by the beneficiary or beneficiaries, collectively, receiving such life insurance proceeds, in an amount equal to the difference between the estate tax computed with and without the inclusion of such property in the calculation; and

(d)    that any such taxes which are attributable to any property over which I may have a power of appointment shall be paid by the person holding or receiving such property, in an amount equal to the difference between the estate tax computed with and without the inclusion of such property in the calculation.

If more than one subparagraph of this paragraph 3.2 applies as a result of my death to apportion estate tax to beneficiaries or recipients of property, then each such beneficiary or recipient shall pay a pro rata share of the difference between the estate tax computed with and without the inclusion in the calculation of the total of the property to which the subparagraphs of this paragraph 3.2 have apportioned estate tax to the beneficiaries or recipients.

3.3    <u>Funds From Trust.</u>  However, should there be in existence at the time of my death that trust referred to in this will and known as the "JAMES LOGAN FAMILY TRUST" and should it appear to my personal representative to be in the best interests of the beneficiaries of the trust and my estate, nothing in this provision shall be interpreted as prohibiting the personal representative of my estate from selling estate assets to that trust, or from borrowing funds, secured or unsecured, or accepting funds from that trust to meet the liquidity requirements of my estate which have become necessary to meet the debts, costs of administration and settlement, and taxes and other charges that have been imposed against my estate.

3.4    <u>Mortgage.</u>  In the event any property or interest in property passing under this will or by operation of law or otherwise by reason of my death shall be encumbered by a mortgage or a lien or shall be pledged to secure any obligation (whether the property or interest in property so encumbered or pledged shall be owned by me jointly or individually), it is my intention that such

Page 2



indebtedness shall not be charged to or paid by my estate but that the devisee, legatee, joint owner taking by survivorship or beneficiary shall take such property or interest in property subject to all encumbrances existing at the time of my death.

IV

SPECIFIC BEQUESTS

4.1    Tangible Personal Property.    I give and bequeath, in fee, all tangible personal property except cash on hand owned by me at the time of my death, including, but not limited to, lapsed bequests of tangible personal property, if any, furniture, furnishings, rugs, pictures, books, silverplate, linen, china, glassware, objects of art, wearing apparel, jewelry and automobiles, as follows:

(a)    First, in accordance with that certain separate writing that I have executed or may execute listing certain items of personal property which I bequeath to certain individuals as specified in said list, as said list is altered from time to time.  If the list referred to herein is not found and properly identified by my personal representative within 30 days after his qualification, it shall be presumed that there is no such list and any subsequently discovered list shall be ignored.

(b)    All other tangible personal property not specifically bequeathed by such separate writing and all such property, in the absence of any list, to my wife, JANICE LOGAN, if she survives me, but if not, then to those of my children who survive me, to be divided among them by my personal representative in its absolute discretion, in as nearly equal portions as may be practicable, having due regard for the preferences of such children.

(c)    In the event none of these persons survive me, this bequest shall lapse and shall pass as part of my Residuary Estate.

4.2    Property Insurance Policies.  All of my insurance policies which provide indemnity for the loss of any of my personal or real property by fire, windstorm, or other casualty (including any claim for such loss of any such property which I might have at the time of my death against any insurance company) I give and bequeath respectively to those persons or corporations, as the case may be, who shall become owners of such properties by reason of my death; whether such ownership be acquired under the provisions of this will, by survivorship or by other means.

4.3    Delivery Costs.  If, to effect delivery of my tangible personal property or insurance policies above bequeathed to a beneficiary who resides in a city or a location other than where the tangible property or insurance policies are located at the time delivery is to be made, it becomes necessary to incur expenses of shipment to complete the delivery, my personal representative on behalf of my estate shall arrange for and pay the costs of shipment incurred in making such delivery.

V

RESIDUARY ESTATE

5.1    Defined.  I define "my Residuary Estate" as all of my property not otherwise effectively bequeathed or devised, after the payment of debts and taxes under Article III above; including real and personal property whenever acquired by me, life insurance or for the benefit of my estate, and property as to which I have an option to purchase or a reversionary interest; but excluding property as to which I have no interest other than a power of appointment and any assets which are payable to a designated beneficiary other than me or my estate.

5.2    To My Trust.  I give, devise and bequeath my Residuary Estate to the Trustees under a certain Trust Agreement heretofore entered into between me, JAMES LOGAN, as Settlor, JAMES LOGAN and JANICE LOGAN, as Co-Trustees, and any Successor Trustees thereto, dated February 10, 2021, entitled the "JAMES LOGAN FAMILY TRUST" as the same now exists or is hereafter amended from time to time.

(a)    Said property shall be added to the corpus of the trust fund therein established as an integral part thereof, to be held, administered and distributed by the Trustee in accordance with all the terms and provisions of the said Trust Agreement.

(b)    The receipt of said Trustee under said Trust Agreement shall be a full acquittance and discharge to my personal representative for the property so distributed.  Upon distribution to the Trustee, the administration of my estate shall cease with respect to the assets passing to the Trustee, and the Trustee shall not be subject to the control of the court in which my will is probated.

5.3    Trust Savings Clause.  If for any reason the trust set out above in this Article V shall not be in existence at the time of my death, or if for any reason a court of competent jurisdiction shall declare this testamentary transfer to the Trustee of said trust to be invalid, then I direct that my Residuary Estate shall be held, managed, invested and reinvested in exactly the same manner described in said trust, giving, if the court shall allow, effect to all then existing amendments of said trust, and managed by the same Trustee or the successor or successors therein named and defined; thus, for those purposes I do hereby incorporate that same instrument of revocable trust, by reference, into this, my Last Will and Testament.  If the court shall not allow that trust to be incorporated into this will with its amendments, it shall be incorporated in its original form without regard to said amendments, if any such amendments have been made.

VI

POWERS OF PERSONAL REPRESENTATIVE

6.1    General Powers Of Personal Representative.  I hereby give to my personal representative and any ancillary personal representative full power and authority, at any time or times, to sell, mortgage, pledge, exchange or otherwise deal with or dispose of the property

Page 4



comprising my estate, upon such terms as shall be deemed best and without any order of the court; to settle and compromise any and all claims in favor of or against my estate as shall be deemed advisable and for any of the foregoing purposes to make, execute and deliver all deeds, contracts, mortgages, bills of sale or other instruments necessary or desirable therefor. My personal representative is also authorized to retain any assets or property owned by me at the time of my death and, therefore, no sale thereof shall need to be made solely to diversify investments. My personal representative is expressly authorized to postpone final distribution of my estate, pending final determination of tax liabilities in connection therewith.

6.2     Power Over Digital Assets. I give to my personal representative and any ancillary personal representative full power and authority, at any time or times, (i) to access, use, and control my digital devices, including but not limited to, desktops, laptops, tablets, peripherals, storage devices, mobile telephones, smart phones, and any similar devices, which currently exist or may exist as technology develops for the purposes of accessing, modifying, deleting, controlling, or transferring my digital assets (as defined below), (ii) to access, modify, delete, control, and transfer my digital assets, and (iii) to obtain, access, modify, delete, and control my passwords and other electronic credentials associated with my digital devices (as described above) and digital assets. For purposes of this Last Will and Testament, "digital assets" shall include, but not be limited to, emails received, email accounts, digital music, digital photographs, digital videos, software licenses, social network accounts, file sharing accounts, web hosting accounts, tax preparation services accounts, online stores, affiliate programs, other online accounts, and similar digital items which currently exist or may exist as technology develops.

6.3     Ancillary Administration. In the event ancillary administration is required to dispose of any property which I may own at the time of my death with a situs outside of the State of Florida, I hereby nominate and appoint my personal representative hereinabove named as such ancillary personal representative; however, if my personal representative is not qualified to act as ancillary personal representative under the laws of the state of the situs of such property, then I authorize my personal representative to designate an individual or corporate ancillary personal representative to administer such property.

6.4     Joint Tax Returns. I specifically authorize and empower my personal representative to execute and file a joint income tax return with my wife for the year in which my death occurs and for any years prior thereto. I also authorize and empower my personal representative to execute and file joint gift tax returns with my wife if any gift tax return is required of either of us for the year in which my death occurs or for any year prior thereto. My personal representative shall incur no personal liability for any action taken in good faith in accordance with either of the foregoing authorizations.

6.5     Choice Of Deductions. I am cognizant of the fact that the provisions of the Federal Internal Revenue Code (and other applicable laws) in force at the time of my death and applicable to my estate may permit my personal representative to elect to claim certain administration and other expenses as deductions, either in the income tax returns of my estate or in the estate tax return.



(a)    It is my desire that my personal representative elect to claim from time to time such expenses as deductions on the particular tax returns which, in the personal representative's opinion, should result in the smallest combined taxes being paid, irrespective of whether such expenses shall be payable from income or corpus; and my personal representative is directed not to make adjustments between income or principal or between property interests passing to beneficiaries under my will which may be substantially affected as a result of any election under this Article.

(b)    It is my wish that such property interests as may be determined as a result of my personal representative's election under this provision shall be the interest such beneficiary shall receive.

(c)    I exonerate my personal representative from all liability for any such election and direct that no beneficiary shall have any claim against it or my estate by reason of the exercise of my personal representative's judgment in this respect.

6.6    Elections.  Except as elsewhere provided herein, my personal representative shall have the absolute discretion, right and authority to make all elections, decisions, payments and distributions hereunder in regard to sale, distribution and allocation of property so as to allocate the impact of estate and income taxes upon the various assets of my estate, including, but not limited to:

(a)    election to have a specific portion or all of certain life interests for my surviving spouse qualify for the marital deduction as qualified terminable interest property;

(b)    allocation of my generation-skipping exemption as my personal representative shall deem advisable, except the exemption shall be allocated (i) first to property given by me rather than by another or appointed by me and (ii) to a direct skip caused by a disclaimer only if no other allocation is possible;

(c)    sale or disposition of assets among beneficiaries and trusts to minimize potential income tax on sale or disposition of assets by my estate.  In this regard, I request (but do not direct) that my personal representative do so in a manner which will result in the property to be sold to satisfy obligations of my estate, or any trust, having an aggregate income tax basis as close as possible to its aggregate fair market value and, to the extent consistent with the foregoing objective, in a manner which will result in maximizing the increase in basis of assets of my estate on account of federal and state death taxes attributable to appreciation of such assets;

(d)    allocations of assets among beneficiaries and trusts upon the basis of present value without regard to the income tax basis of such assets in the hands of such beneficiaries and trusts unless such allocation is contrary to my express intentions as otherwise reflected herein.

6.7    Principal And Income.  In matters of allocation and accounting of principal, income, expenses, receipts and disbursements, my personal representative shall be governed by Florida Statutes 738, "Principal and Income", or its successor statute, as the same may from time

to time exist, except as otherwise provided in this will; provided, however, my personal representative shall have the option of charging all or any portion of the expenses incurred in connection with the settlement of my estate against either income or principal of my estate.

VII

## MISCELLANEOUS PROVISIONS AND DEFINITIONS

7.1     Estate Taxes.  The term "estate taxes" shall mean all estate, inheritance, succession, generation-skipping tax on direct skips and other taxes (together with any interest or penalty thereon), assessed by reason of my death imposed by the government of the United States, or any state or territory thereof, or by any foreign government or political subdivision thereof.

7.2     Construction.  The paragraph headings used are for convenience only and shall not be resorted to for interpretation of this will.  Wherever the context so requires, the masculine shall include the feminine and neuter and the singular shall include the plural.  If any portion of this will is held to be void or unenforceable, the balance of the will shall nevertheless be carried into effect. References herein to "gross estate", "marital deduction" or other similar or related words or phrases shall have the same meaning as such words or phrases have in the Internal Revenue Code of 1986, as amended.

7.3     Unused Exclusion.   If (i) my spouse survives me, and (ii) my personal representative determines that my estate does not need to use all of my federal estate tax exclusion to prevent federal estate taxes upon my estate and that such unused federal estate tax exclusion can be used by my spouse's estate if a federal estate tax return is filed for my estate, and (iii) my spouse (or her legal representative, whether a guardian, agent under a power of attorney, or personal representative of her estate) requests that my personal representative file a federal estate tax return that includes an irrevocable election, pursuant to Section 2010(c) of the Internal Revenue Code, to allow my spouse's estate to use my unused federal estate tax exclusion (the so-called Deceased Spousal Unused Exclusion Amount), then I direct my personal representative to timely file such federal estate tax return, whether a return is otherwise required or not, and make such election.

7.4     Survival.  With respect to the distribution of my tangible personal property, the term "survive me" is to be construed to mean that the person referred to must survive me by 30 days.  If such person dies within 30 days of my death, the reference to such person shall be construed as if such person failed to survive me with respect to the distribution of my tangible personal property.  With respect to the JAMES LOGAN FAMILY TRUST, said trust agreement provides its own survivorship provisions.

IN WITNESS WHEREOF, I have set my hand and seal to this, my Last Will and Testament, this _10_ day of February, 2021.

_____ (SEAL)
JAMES LOGAN

We, the undersigned, hereby certify that the foregoing instrument was, on the date hereof, signed, sealed, published and declared by the said JAMES LOGAN, the Testator, as and for his last Will and Testament, in the presence of us, who in his presence and in the presence of each other, have, at his request, hereunto subscribed our names as witnesses to the execution hereof, this 10th day of February, 2021, and we certify that at the time of the execution hereof we believe said Testator to be of sound and disposing mind and memory.

_____ residing at _____ ST. PETERSBURG, FL _____

_____ residing at _____ LARGO, FL _____

STATE OF FLORIDA
COUNTY OF PINELLAS

I, JAMES LOGAN, the Testator, declare to the undersigned officer taking my acknowledgment of this instrument, and to the subscribing witnesses, that I signed this instrument as my Will.

_____
Testator

We ___NICHOLAS A. MITCHELL___ and ___ALMA DEBRUYNE___, the witnesses whose names are signed to the foregoing instrument, have been sworn by the officer signing below, and declare to that officer on our oaths that the Testator declared this instrument to be the Testator's Will and signed it in our presence and that we each signed this instrument as a witness in the presence of the Testator and in the presence of each other.

_____
Witness

_____
Witness

STATE OF FLORIDA
COUNTY OF PINELLAS

I HEREBY CERTIFY that the foregoing instrument was (i) acknowledge and subscribed before me by means of ☑ physical presence or ☐ online notarization, this 10th day of

February, 2021, by the Testator, JAMES LOGAN, who is ☐ personally known to me, or who has ☑ produced **FLORIDA DRIVER LICENSE** as identification; (ii) sworn to and subscribed before me by the witnesses, **NICHOLAS A. MITCHELL** and **ALMA DEBRUYNE**, who are personally known to me and each of whom appeared before me by means of ☑ physical presence or ☐ online notarization, this 10th day of February, 2021; and (iii) subscribed by me in the presence of the Testator and the subscribing witnesses, all on this 10th day of February, 2021.

*Jennifer A. Studer*

NOTARY PUBLIC

6078419

JENNIFER A. STUDER
MY COMMISSION # GG 934679
EXPIRES: March 24, 2024
Bonded Thru Notary Public Underwriters

Page 9

# EXHIBIT 6

"JAMES LOGAN FAMILY TRUST"

dated

February 10, 2021

JAMES LOGAN, Settlor

JAMES LOGAN and JANICE LOGAN, Co-Trustees

TABLE OF CONTENTS

I.    NAME OF TRUST, FAMILY MEMBERS, SURVIVORSHIP

      1.1    Name of Trust
      1.2    Family Members
      1.3    Common Disaster

II.   RESIGNATION OF TRUSTEE AND SUCCESSOR TRUSTEE

      2.1    Appointment of Successor Trustee
      2.2    Settlor's Intent

III.  DUTIES AND RIGHTS DURING THE LIFETIME OF THE SETTLOR

      3.1    Right to Revoke and Amend the Trust
      3.2    Disposition of Trust Income and Principal During Lifetime of Settlor

IV.   DUTIES AFTER SETTLOR'S DEATH BUT PRIOR TO DISTRIBUTION

      4.1    Summary Description of Duties
      4.2    Assemble the Trust Estate
      4.3    Payment of Expenses and Costs of Settling Settlor's Estate

V.    DISTRIBUTION FOLLOWING THE DEATH OF THE SETTLOR

      5.1    Division of Trust Estate
      5.2    Marital Trust for Settlor's Spouse
      5.3    Residuary Trust
      5.4    Final Takers
      5.5    S Corporation Stock

VI.   LIMITATIONS ON BENEFITS AND ALLOCATIONS OF ASSETS

      6.1    Gifts During Lifetime

VII.  INVESTMENT AND ADMINISTRATIVE POWERS

      7.1    Rights Reserved to Settlor
      7.2    Investment Powers
      7.3    Digital Assets
      7.4    Generation Skipping Tax Provisions
      7.5    Allocation of Principal and Income

7.6     Exoneration
7.7     Business Provisions

## VIII. GENERAL PROVISIONS AND DEFINITIONS

8.1     Additions to Corpus
8.2     Laws Governing
8.3     Interpretation and Construction
8.4     Disability
8.5     Small Trust Termination
8.6     Donee's Will
8.7     Spendthrift Provision
8.8     Establishment of Separate Trusts
8.9     Compensation and Accounting
8.10    Merger or Combination of Trusts
8.11    Construction
8.12    Preservation of Marital Deduction
8.13    Definitions

# REVOCABLE TRUST AGREEMENT

THIS AGREEMENT is made and entered into the _10th_ day of February, 2021, at St. Petersburg, Florida, between JAMES LOGAN, Settlor, of Sarasota County, Florida (hereinafter called the "Settlor"), and JAMES LOGAN and JANICE LOGAN, Co-Trustees (hereinafter collectively called the "Trustee").

## W I T N E S S E T H:

WHEREAS, Settlor desires to create a trust to receive cash or other assets, including $10.00 cash which the Trustee acknowledges receipt of, together with such other assets as the Trustee may now or hereafter at any time hold or acquire hereunder (all such assets, being hereinafter referred to collectively as the "trust estate");

NOW, THEREFORE, this Trust is created and assets conveyed and the Trustee agrees to hold the trust estate, IN TRUST, for the following uses and purposes and subject to the terms and conditions hereinafter set forth:

## ARTICLE I

## NAME OF TRUST, FAMILY MEMBERS AND SURVIVORSHIP

1.1     NAME OF TRUST.  This trust shall, for convenience, be known as the "JAMES LOGAN FAMILY TRUST" and it shall be sufficient that it be referred to as such in any deed, assignment, bequest or devise.

1.2     FAMILY MEMBERS.  At the time of the execution of this Trust Agreement, Settlor's immediate family group consists of his "wife" (hereinafter sometimes referred to as "spouse" or "wife"), JANICE LOGAN, and Settlor's two children, ALEXIS LOGAN and JON LOGAN.

1.3     COMMON DISASTER.

(a)     If Settlor's spouse shall die simultaneously with Settlor or in such circumstances as to render it impossible to determine who predeceased the other, then it shall be presumed that Settlor's spouse survived the Settlor for purposes of this trust and the provisions of this trust shall be construed upon that assumption and basis, notwithstanding the provisions of any law establishing a different presumption of order of death or providing for survivorship for a fixed period as a condition of inheritance of property.

(b)    With respect to persons other than Settlor's spouse, a beneficiary who dies within 30 days of Settlor's death shall be deemed to have predeceased the Settlor.

(c)    Except as provided in the preceding paragraphs, if any beneficiary shall die simultaneously with another beneficiary or in such circumstances as to render it impossible to determine who predeceased the other and if the rights of one of them depend upon his or her having survived the other, the beneficiary whose rights depend upon such survivorship shall be deemed to have predeceased the other beneficiary and the provisions hereof shall be construed upon that assumption.

## ARTICLE II

## RESIGNATION OF TRUSTEE AND SUCCESSOR TRUSTEE

2.1     APPOINTMENT OF SUCCESSOR TRUSTEE.

(a)     Upon the death, incapacity, resignation or discharge of either one of the Settlor or JANICE LOGAN as Co-Trustee, then the remaining one of them shall be the sole Trustee of all trusts hereunder. If JANICE LOGAN becomes the sole Trustee after the death, incapacity, resignation or discharge of Settlor as Trustee, then the following provisions shall apply:

1.     If JANICE LOGAN becomes the sole Trustee, she shall have the power at any time to appoint a Co-Trustee, to appoint a sole Trustee, to remove such Co-Trustee or sole Trustee, and to appoint or not re-appoint another Co-Trustee or sole Trustee in the event such Co-Trustee or sole Trustee appointed by JANICE LOGAN should die, become incapacitated, resign or be removed.

2.     Notwithstanding the foregoing, if JANICE LOGAN signs a statement waiving the right to remove a particular Co-Trustee or sole Trustee, then (i) JANICE LOGAN shall not have the power to remove that Co-Trustee unless such Co-Trustee is replaced with a Corporate Trustee, and (ii) that Co-Trustee appointed by JANICE LOGAN shall have exclusive authority over distributions to or for JANICE LOGAN.  For this purpose, a Corporate Trustee shall be a bank or trust company qualified to act as such. However, if that Co-Trustee should die, become incapacitated, resign or be discharged by a court, then Settlor's spouse shall have the power to appoint (or not appoint) any other Co-Trustee in its place.

(b)     Upon the death, incapacity, resignation or discharge of both of the Settlor and the Settlor's spouse, JANICE LOGAN, as Trustees, then SABAL TRUST COMPANY shall be Successor Trustee of all trusts created hereunder, except as provided in subparagraphs 2.1(c) and 2.1(d) below.

(c)     Notwithstanding anything contained herein to the contrary, with respect to a separate trust for the primary benefit of a child of the Settlor or a descendant of a deceased child of the Settlor administered pursuant to subparagraph 5.3(c) of Article V, such child (immediately and without age restriction) and such descendant upon such descendant attaining age 30 years (such child and such descendant shall be collectively hereinafter (for purposes of the remainder of this subparagraph 2.1(c)) referred to as "descendant"), shall have the power to remove any Trustee and appoint any Successor Trustee, subject to the following:

1.     Such removal and/or appointment shall be in writing, and the appointed Successor Trustee(s) may be any person (including Settlor's descendant himself or herself) or a Corporate Trustee.

2.      Such descendant shall have the power to appoint either one Trustee or Co-Trustees.

3.      Such descendant may prospectively appoint one or more Successor Trustees to serve after the death, incapacity, resignation, or discharge of any one or more prior Trustees.

4.      If such descendant appoints Co-Trustees, then upon the death, incapacity, resignation, or discharge of a Co-Trustee, the other Co-Trustee shall become the sole Trustee unless and until another Co-Trustee is appointed (or unless a different result is specified as part of the appointment), except as provided in subparagraph 2.1(c)5. below.

5.      If such descendant signs a statement waiving the right to remove a particular Trustee or Co-Trustee, then such descendant shall not have the power to remove that Trustee or Co-Trustee unless such Trustee or Co-Trustee is replaced with a Corporate Trustee. However, if that Trustee or Co-Trustee should die, become incapacitated, resign, or be discharged by a court, then such descendant shall again have the power to appoint (or not appoint) any other Trustee or Co-Trustee in its place.

6.      If upon the death, incapacity, resignation, or discharge of any Trustee and if no other Successor Trustee has been appointed by such descendant and if such descendant is deceased or incapacitated, then the Trustee provisions of subparagraph 2.1(b) above shall apply.

(d)      Subject to subparagraph 2.1(c) above, with respect to a separate trust for the primary benefit of a descendant of a deceased child of the Settlor administered pursuant to subparagraph 5.3(c) herein, the parent of such descendant who is also a descendant of the Settlor shall have the power, at any time and from time to time, to prospectively appoint any Successor Trustee(s) of such trust for the primary benefit of his or her descendants. If no Successor Trustee(s) has been appointed, then the Trustee provisions of subparagraph 2.1(b) above shall apply.

(e)      Any Trustee or Successor Trustee may resign at any time by giving written notice to that effect to the next named Successor Trustee and to the current income beneficiary (or beneficiaries) of the trust.

(f)      Any Successor Trustee shall have all the rights, powers, duties, and discretions conferred or imposed on the original Trustee. No Successor Trustee shall be obliged to examine the accounts and actions of any previous Trustee. No Trustee shall be liable for any act or omission unless the same be due to such Trustee's own default.

(g)      Any Successor Trustee shall become responsible for the trust estate only when, as and if the same shall be received by it and, in determining such estate, such Trustee shall

only be responsible to make a reasonable inquiry from the records of the prior Trustee which are available.

(h)    No Trustee or Successor Trustee shall be obliged to examine the accounts and actions of the personal representative of the Settlor's estate.  No Trustee or Successor Trustee shall be liable for any act or omission of the personal representative of the Settlor's estate.

(i)    If SABAL TRUST COMPANY or any Successor Corporate Trustee appointed under this subparagraph 2.1(i) resigns or is discharged or fails to serve as Trustee of any of the designated trusts herein created and no other Successor Trustee has been otherwise appointed under this trust agreement, then a majority of the then current income beneficiary or beneficiaries who are of legal age and the guardians of any incompetent or minor then current income beneficiary or beneficiaries shall appoint a Successor Corporate Trustee of that trust. In the event there are no current income beneficiary or beneficiaries of the trust estate, then Settlor's spouse shall be deemed to be the sole current income beneficiary for purposes of this subparagraph 2.1(i), but if she is not living or is incapacitated, then Settlor's descendants for whom a separate trust shall be funded under Article V shall be deemed to be the current income beneficiary(ies) of such trust estate. In the event the current income beneficiary or beneficiaries shall fail to designate promptly a Successor Corporate Trustee, the then acting Trustee shall apply to a court for such an appointment and for settlement of account.

(j)    The persons who have the power to appoint a Successor Corporate Trustee pursuant to subparagraph 2.1(i) above shall also have the power to remove any Corporate Trustee then serving, provided that a removed Corporate Trustee is replaced with a Successor Corporate Trustee as provided in subparagraph 2.1(i) above.

ARTICLE III

DUTIES AND RIGHTS DURING THE LIFETIME OF THE SETTLOR

3.1    RIGHT TO REVOKE AND AMEND THE TRUST.  The Settlor expressly reserves the right, at any time and from time to time, during Settlor's lifetime, by instrument in writing delivered to the Trustee to alter, amend, or revoke this Agreement, either in whole or in part, provided, however, that if altered or amended, the duties, powers, and responsibilities of the Trustee shall not be substantially changed without the Trustee's consent. In case of revocation, the insurance policies, securities, and property held in trust hereunder, or that part thereof as to which the Agreement may be revoked, shall be delivered by the Trustee to the Settlor or in accordance with the Settlor's written directions.

3.2    DISPOSITION OF TRUST INCOME AND PRINCIPAL DURING LIFETIME OF SETTLOR.

(a)    During the Settlor's lifetime, the Trustee shall pay to or for the benefit of the Settlor and to or for the benefit of any other person as much of the net income and/or principal as the Settlor may direct from time to time.

(b)    In the absence of direction to the contrary by the Settlor, during the lifetime of the Settlor, the Trustee is hereby authorized at any time or from time to time:

1.    To pay to or for the Settlor for Settlor's health, support and maintenance so much of the net income and/or principal of the trust estate as the Trustee determines is proper, taking into account the standard of living to which the Settlor has been accustomed.

2.    To pay to or for Settlor's spouse for her health, support, maintenance and education so much of the remaining net income and/or principal of the trust estate as the Trustee determines is proper, taking into account the standard of living to which Settlor's spouse has been accustomed and taking into consideration all other income or property available to Settlor's spouse for such purposes from all sources known to the Trustee.

3.    To pay to or on behalf of the Settlor the amount of any and all taxes caused by the sale or possession of any of the assets comprising the trust estate.

4.    To make gifts each calendar year in amounts up to the annual gift tax exclusion to or for the benefit of each of Settlor's descendants.

5.    To pay premiums on life insurance policies insuring the life of the Settlor, regardless of who or how those life insurance policies are owned.

(c)    During the Settlor's lifetime, the Settlor shall have the right to occupy as Settlor's homestead any real property which is a part of the trust estate and he shall have the exclusive and continuous present right to full use, occupancy and possession of such residence for life.    It is Settlor's intention that such Settlor's interest in such property shall constitute a "beneficial interest for life" and "equitable title to real estate" as contemplated by Florida Statutes Section 196.041(2). No provision of this trust agreement shall be construed to convert this right into intangible personal property. The Trustee shall have the power and authority to protect, conserve, sell, lease, encumber, or  otherwise manage or dispose of Settlor's homestead or any rights or interests in Settlor's homestead (including on behalf of this Trust and the Settlor individually), which power shall not be affected by the incapacity or disability of the Settlor.

ARTICLE IV

DUTIES AFTER SETTLOR'S DEATH, BUT PRIOR TO DISTRIBUTION

Upon the death of the Settlor, this trust shall become irrevocable and the Trustee shall have the following duties and shall dispose of the trust estate in the following manner:

4.1    SUMMARY DESCRIPTION OF DUTIES.  Upon the death of the Settlor, the Trustee's general duties, along with all other duties and responsibilities enumerated hereunder, are:

(a)    First, assemble the trust estate as provided in paragraph 4.2 of this Article IV.

(b)    Second, pay any part or all of the funeral expenses, legal debts, and costs of administration of the Settlor's estate, as provided in paragraph 4.3 of this Article IV.

(c)    Third, establish separate and distinct trusts as provided in Article V.

(d)    Fourth, pay any part or all of any estate, inheritance, succession, and other death taxes (including penalties thereon), which may be imposed by reason of Settlor's death and due upon Settlor's death, but only, as provided in paragraph 4.3 of this Article IV, from the portion of the trust estate that does not qualify for any marital and/or charitable deduction described in Article V.

It is Settlor's intent to provide guidance as to the order in which various duties of the Trustee shall be accomplished; however, the foregoing shall in no way limit the responsibilities and duties of the Trustee hereunder.

4.2    ASSEMBLE THE TRUST ESTATE.

(a)    The Trustee shall collect the proceeds of any life insurance policies, shall collect the proceeds of any retirement plans payable to the trust, shall receive any proceeds from the Settlor's estate and shall hold the same together with other property heretofore or hereafter added to the trust. Such proceeds and property shall constitute the trust estate.

(b)    The Trustee shall have full authority to take any action in regard to the collection of the proceeds of insurance policies that it deems best and to pay the expense thereof out of the trust estate; but the Trustee shall not be required to enter into or maintain any litigation to enforce payment of such policies until it shall have been financially protected or indemnified to its satisfaction against all expenses and liabilities to which it might in its judgment be subjected by any such action on its part. The Trustee shall have full authority to make any compromise or settlement with respect to such policies, or any of them, that it may deem expedient, and to give to the insurance companies, and each of them, all the necessary and proper releases and acquittances and full discharge of all their liabilities under such policies.

(c)    No insurance company whose policy or policies shall be deposited hereunder and who shall make payments of the proceeds thereof to the Trustee shall be required

to inquire into or take notice of any of the provisions of this Agreement or to see to the application or disposition of the proceeds of such policies, and the receipt of the Trustee to any such insurance company shall be effectual to release and discharge it for any payment so made and shall be binding upon the beneficiary of the trusts hereby created.

### 4.3    PAYMENT OF EXPENSES AND COSTS OF SETTLING SETTLOR'S ESTATE.

(a)    The Trustee, in its sole and absolute discretion, may:

1.    Pay from the trust estate, all or any part of the Settlor's legal debts, funeral expenses, and the costs of administration of Settlor's estate;

2.    Pay from the portion of the trust estate which does not qualify for the marital deduction for federal estate tax purposes (because Settlor's executor in the exercise of its discretion does not elect to have such part or all of such property treated as qualified terminable interest property or because Settlor's spouse did not survive the Settlor) all or any part of the estate, inheritance, succession and other death taxes (including penalties thereon, if any), imposed by reason of Settlor's death.  This subparagraph 4.3(a)2. shall be applicable to all such taxes payable by reason of the Settlor's death in respect to all property comprising the Settlor's gross estate for death tax purposes whether or not such property passes under this Agreement, under the Settlor's will or otherwise, except as limited in Settlor's will or hereunder.

Provided, however, no proceeds from, or interests in, any of the following shall be used for the foregoing purposes:  individual retirement account, qualified pension plan, profit sharing plan, or other qualified plan, trust, contract, account, annuity, or bond, as those plans are defined in Subchapter D of Chapter 1 of Subtitle A of the Internal Revenue Code (each of which is hereinafter referred to as a "Retirement Account").

(b)    The Trustee is further authorized to:

1.    Lend from the trust estate to the estate of the Settlor sufficient funds upon such terms as to security, rate and maturity and in other respects as the Trustee shall deem advisable to pay all or a portion of the above claims and debts (such loan need not be secured if in the Trustee's opinion it is in the best interests of the beneficiaries of this trust not to obtain security in light of the overall objectives and requirements of the beneficiaries, the Settlor and Settlor's estate); or, in the alternative;

2.    Acquire in the trust estate by purchase, exchange or otherwise, sufficient assets from the estate of the Settlor to provide the estate of the Settlor with sufficient cash to pay the above claims and debts, even though such property may not be of the character prescribed by law or by the terms of the trust instrument for the investment of other trust funds, and although acquisition of such property may result in a large percentage of the trust estate being invested in one class of property, and without liability for loss or depreciation, except for willful or gross neglect, to retain such property so acquired so long as the Trustee shall deem it advisable.

(c)    In no event shall any payments of federal estate taxes and other inheritance, succession, or death taxes (including penalties thereon, if any) be made from property which qualifies for the marital deduction.

## ARTICLE V

## DISTRIBUTION FOLLOWING THE DEATH OF THE SETTLOR

The Trustee shall hold the trust estate after the Settlor's death for the following uses and purposes:

5.1    DIVISION OF TRUST ESTATE.

(a)    If Settlor's spouse survives.  If Settlor's spouse survives the Settlor, the Trustee shall hold the entire remaining trust estate for the primary benefit of Settlor's spouse and distribute the same as provided in paragraph 5.2 herein, except as follows:

1.  Any portion of the trust estate which does not qualify for the marital deduction for federal estate tax purposes, because Settlor's executor in the exercise of its discretion does not elect to have such part or all of such property treated as qualified terminable interest property, shall be held for the primary benefit of Settlor's spouse and distributed as provided in paragraph 5.3 herein.  In such event:

A.    All values shall be those which are finally determined for federal estate tax purposes.  Elections made by Settlor's fiduciaries with respect to an alternate valuation date and with respect to taking certain deductions for income tax purposes shall apply in determining any of such values.

B.    To the extent the election to have part of such property treated as qualified terminable interest property is made by a fractional share or dollar amount, the Trustee in its sole discretion may select the assets used to fund each of the two shares.  For the purpose of division of the trust estate and funding the separate shares, the assets shall be valued at their fair market value on the date or dates of division and funding.

2.    The purpose of subparagraph 5.1(a)1. above is to allow Settlor's executor to make the decision of whether to use part or all of Settlor's remaining estate tax exclusion (applicable exclusion amount) upon Settlor's death for the purpose of keeping that portion of the trust and any appreciation of it out of Settlor's spouse's estate upon her later death, or to not use part or all of Settlor's remaining estate tax exclusion (applicable exclusion amount) upon Settlor's death for the purpose of including such part of the trust estate in Settlor's spouse's estate upon her later death and such assets possibly receiving a step-up in basis. The Trustee herein shall incur no liability for the election or non-election of treatment of property as qualified terminable interest property.

3.    If there is no federal estate tax in effect at the time of Settlor's death, then the entire trust estate shall be held for the primary benefit of Settlor's spouse as provided in paragraph 5.3 herein.

     (b)   <u>If Settlor's spouse does not survive</u>.  If Settlor's spouse does not survive the Settlor, the entire remaining trust estate shall be divided and distributed as provided in subparagraph 5.3(b) herein.

    5.2   <u>MARITAL TRUST FOR SETTLOR'S SPOUSE</u>.  The trust for the primary benefit of Settlor's spouse to be held under this paragraph 5.2 shall be distributed as follows:

     (a)   <u>Income</u>.  The Trustee shall pay the entire net income to Settlor's spouse annually in quarterly or more frequent installments during Settlor's spouse's lifetime and from the date of Settlor's death.  The word "income" for the purposes of this subparagraph shall have the same meaning as the word "income" as used in the marital deduction estate tax provisions of the Internal Revenue Code.

     (b)   <u>Principal</u>.  In addition, the Trustee may also pay or apply so much of the principal, to or for the benefit of Settlor's spouse as in the sole discretion of the Trustee shall be necessary or advisable from time to time for the health, maintenance and support in reasonable comfort of said spouse.

     (c)   <u>Residence</u>.  If any residence is or becomes an asset of this trust, Settlor's spouse shall have the right to occupy such residence rent-free and she shall have the exclusive and continuous present right to full use, occupancy and possession of such residence for life.  It is Settlor's intention that Settlor's spouse's interest in such property shall constitute a "beneficial interest for life" and "equitable title to real estate" as contemplated by Florida Statutes Section 196.041(2).  The Trustee shall pay for all taxes, insurance, mortgage installments, ordinary maintenance and repair of such residence while Settlor's spouse uses it as a residence.  Settlor's spouse shall pay for utilities and other living expenses while using it as a residence (but the Trustee in its discretion may pay for any of such expenses pursuant to other provisions of this paragraph 5.2).  Upon the written direction of Settlor's spouse to sell such residence, the Trustee shall do so upon such terms as the Trustee deems reasonable and add the proceeds to the principal of the trust estate.  Upon the written direction of Settlor's spouse, the Trustee shall purchase a replacement residence to be held upon the same terms as the original residence which was a part of the trust estate.

     (d)   <u>Make productive</u>.  Settlor's spouse shall at all times and in all events be permitted to require the Trustee either to make the property in this trust productive or to convert it, within a reasonable time, to productive property.

     (e)   <u>Primary beneficiary</u>.  The Trustee's primary concern shall be Settlor's spouse, not Settlor's descendants or any remainder beneficiaries of this trust, even if such distributions may deplete the trust estate.  It is also the Settlor's intent that Settlor's spouse shall serve as sole Trustee and make such distributions for her own benefit.

(f)    No judgment creditors. Notwithstanding the foregoing, (i) in no event shall the terms "maintenance" or "support", used together or separately, ever include or be interpreted to include payments to a judgment creditor or to satisfy a judgment creditor, and (ii) in no event shall distributions of principal be made to a judgment creditor of JANICE LOGAN or used in any way, directly or indirectly, to satisfy a judgment creditor of JANICE LOGAN.

(g)    Distribution on spouse's death. Upon the death of Settlor's spouse, all income accrued or undistributed at the death of Settlor's spouse shall be added to principal. Further, the Trustee shall, unless Settlor's spouse directs otherwise in said spouse's last will and testament, pay from the principal, directly or to Settlor's spouse's personal representative, as the Trustee deems advisable, the amount by which the estate and inheritance tax as assessed by reason of the death of Settlor's spouse shall be increased as a result of the inclusion of the this trust estate in said spouse's estate for such tax purposes. Following such payments, if any, the Trustee shall divide and distribute the remaining trust fund as provided in subparagraph 5.3(b) herein.

5.3    RESIDUARY TRUST. The trust for the benefit of Settlor's spouse to be held under this paragraph 5.3 or for the benefit of Settlor's descendants shall be distributed as follows:

(a)    Payments during spouse's lifetime. During the lifetime of Settlor's spouse, the trust estate shall be held and distributed as follows for the primary benefit of Settlor's spouse:

1.    The Trustee is authorized to accumulate the net income or to pay or apply so much of the net income, and/or to pay or apply so much of the principal, to or for the benefit of Settlor's spouse during her lifetime as in the sole discretion of the Trustee shall be necessary or advisable from time to time for Settlor's spouse's health, maintenance and support in reasonable comfort. However, payments shall be made hereunder from principal to or for Settlor's spouse only after the trust estate held pursuant to paragraph 5.2 herein has been exhausted.

2.    If any residence is or becomes an asset of this trust, Settlor's spouse shall have the right to occupy such residence rent-free and she shall have the exclusive and continuous present right to full use, occupancy and possession of such residence for life. It is Settlor's intention that Settlor's spouse's interest in such property shall constitute a "beneficial interest for life" and "equitable title to real estate" as contemplated by Florida Statutes Section 196.041(2). The Trustee shall pay for all taxes, insurance, mortgage installments, ordinary maintenance and repair of such residence while Settlor's spouse uses it as a residence. Settlor's spouse shall pay for utilities and other living expenses while using it as a residence (but the Trustee in its discretion may pay for any of such expenses pursuant to other provisions of this subparagraph 5.3(a)). Upon the written direction of Settlor's spouse to sell such residence, the Trustee shall do so upon such terms as the Trustee deems reasonable and add the proceeds to the principal of the trust estate. Upon the written direction of Settlor's spouse, the Trustee shall purchase a replacement residence to be held upon the same terms as the original residence which was a part of the trust estate.

5-3

3.      After providing for Settlor's spouse, the Trustee may also in its sole discretion distribute as much of any remaining net income and/or principal during the lifetime of Settlor's spouse to or for the benefit of Settlor's descendants for their health, maintenance and support as determined by the Trustee in its sole discretion.

A.      However, no such distribution shall be made for the purpose of or which would have the effect of discharging any legal obligation which the Trustee may have outside of its capacity as Trustee, including the obligation of support, or which the person who has the power to remove and appoint the Trustee may have.

B.      Settlor's descendants shall have no right to any distributions under this subparagraph 5.3(a)3. and may not demand or require any distributions. Furthermore, Settlor's spouse may veto any such distribution.

4.      The Trustee's primary concern shall be Settlor's spouse, not Settlor's descendants or any remainder beneficiaries of this trust, even if such distributions may deplete the trust estate. It is also the Settlor's intent that Settlor's spouse shall serve as the Trustee and make such distributions for her own benefit.

5.      Notwithstanding the foregoing, (i) in no event shall the terms "maintenance" or "support", used together or separately, ever include or be interpreted to include payments to a judgment creditor or to satisfy a judgment creditor, and (ii) in no event shall distributions of principal be made to a judgment creditor of JANICE LOGAN or Settlor's descendants or used in any way, directly or indirectly, to satisfy a judgment creditor of JANICE LOGAN or Settlor's descendants.

(b)      <u>Division and distribution at spouse's death</u>. Upon the death of Settlor's spouse, or upon Settlor's death if Settlor's spouse should predecease the Settlor, the Trustee shall divide and distribute the remaining trust estate (including undistributed income, if any, and including any amounts added hereto from the trust for Settlor's spouse administered pursuant to paragraph 5.2 herein) as follows (after the payment of any estate taxes and costs of administration):

1.      The Trustee shall distribute the trust estate to or for the benefit of any one or more persons (including individuals and entities), in such amounts or portions and in such lawful interests or estates, whether absolute or in trust, as Settlor's spouse may appoint by specific reference to this power in said spouse's last will and testament, except not to Settlor's spouse, not to her estate, not to her creditors, and not to the creditors of her estate.

2.      If the foregoing limited power of appointment is for any reason not validly exercised in whole or in part by Settlor's spouse, the remaining trust estate, to the extent not validly appointed, shall be distributed as follows:

A.    The Trustee shall allocate an amount equal to ten percent (10%) of the net consideration (including cash and other forms of consideration) received by the Settlor or this trust from the liquidation or the sale of shares of stock of Smart Communications Holding, Inc., a Florida corporation (or its successor) (the "Corporation"), held by the Settlor or this trust (whether such liquidation or sale occurs during the lifetime of Settlor or after his death), to a separate trust for the primary benefit of ALEXIS LOGAN, if she survives the Settlor, to be administered as provided in subparagraph 5.3(c) of this Article V. The term "net consideration" as provided for in this subparagraph 5.3(b)2.A. shall **not** be net of taxes (income or otherwise), but shall be net of debt, expenses of sale, and other expenses properly charged against such proceeds and is meant to provide for an amount equal to ten percent (10%) of the amount received by Settlor or this trust pursuant to the liquidation or sale of his/its stock of the Corporation. In the event ALEXIS LOGAN does not survive the Settlor, then such gift shall lapse, to be distributed as provided under the remaining provisions of this Article V. No estate taxes or expenses of administration shall be paid from or charged to such gift under this subparagraph 5.3(b)2.A.

B.    The Trustee shall allocate any interest which may be held by or come into the trust estate in LOCO FLORIDA, LLC, a Florida limited liability company, to a separate trust for the primary benefit of JON LOGAN, if he survives the Settlor, to be administered as provided in subparagraph 5.3(c) of this Article V.  In the event JON LOGAN does not survive the Settlor, then such gift shall lapse, to be distributed as provided under the remaining provisions of this Article V.  No estate taxes or expenses of administration shall be paid from or charged to such gift under this subparagraph 5.3(b)2.B.

C.    The Trustee shall divide the remaining trust estate (after the gifts provided for under subparagraph 5.3(b)2.A. and 5.3(b)2.B. above (if any)) into shares of equal value, creating one such share for each child of the Settlor who is then living, and creating one such share for the descendants, collectively, of each deceased child of the Settlor who leaves one or more descendants living at the time of division.

(i)    A share created for a child of the Settlor shall be held as a separate trust for the primary benefit of such child of the Settlor for distribution as provided in subparagraph 5.3(c) of this Article V.

(ii)    A share created for the descendants, collectively, of a deceased child of the Settlor shall be divided into shares for such descendants on a per stirpes basis. Any such share for a descendant of a deceased child of the Settlor shall be held as a separate trust for the primary benefit of such descendant for distribution as provided in subparagraph 5.3(c) of this Article V.

(c)    <u>Trust provisions for descendants</u>.  Upon the creation of a separate trust for the primary benefit of a descendant of the Settlor (any one of whom shall be referred to in this subparagraph 5.3(c) as the "Primary Beneficiary") such trust estate, including his or her beneficial interest in a Retirement Account, shall be distributed as follows:

1.    Notwithstanding anything to the contrary in this subparagraph 5.3(c), upon the creation of a separate trust for the primary benefit of the Primary Beneficiary, if any Retirement Account or portion of a Retirement Account becomes payable to this separate trust for such Primary Beneficiary, the following shall apply:

A.    If such Primary Beneficiary is an "eligible designated beneficiary" within the meaning of Section 401(a)(9)(E)(ii) of the Internal Revenue Code (such that distributions from such Retirement Account to such Primary Beneficiary can be made over the remaining life expectancy of such Primary Beneficiary), then for as long as such Primary Beneficiary remains an "eligible designated beneficiary," the Trustee shall elect to receive or shall withdraw from such Retirement Account the following: (i) the minimum required distribution as is necessary in order to satisfy the requirements of Section 401(a)(9) of the Internal Revenue Code and Regulations issued thereunder, and (ii) such additional amount or amounts as the Trustee determines, in its sole discretion, that it needs to satisfy the remaining distribution provisions of this subparagraph 5.3(c). The Trustee shall pay to or for the benefit of such Primary Beneficiary the entire amount withdrawn by the Trustee each year from Retirement Accounts payable to this separate trust.  These payments may be made annually or periodically during the year.

B.    If such Primary Beneficiary is not (or no longer qualifies as) an "eligible designated beneficiary" within the meaning of Section 401(a)(9)(E)(ii) of the Internal Revenue Code, then the Trustee shall elect to receive or shall withdraw from such Retirement Account only such amount or amounts as the Trustee determines, in its sole discretion, that it needs either to satisfy the remaining distribution provisions of this subparagraph 5.3(c) or that it deems advisable to withdraw for tax planning and other purposes; provided, however, that each such Retirement Account payable to this separate trust for such Primary Beneficiary who is not (or no longer qualifies as) an "eligible designated beneficiary" shall, in all cases, be fully distributed to the Trustee within the time period required by Section 401(a)(9) of the Internal Revenue Code and Regulations issued thereunder. Upon the Trustee's receipt of a distribution from a Retirement Account pursuant to this subparagraph 5.3(c)1.B., the Trustee is authorized either (i) to pay or apply such distribution to or for the benefit of such Primary Beneficiary or (ii) to retain such distribution as part of such Primary Beneficiary's trust estate for potential future distribution.

2.    During the lifetime of such Primary Beneficiary, the Trustee may pay or apply so much of the net income and/or principal, in excess of the minimum required distribution from a Retirement Account as provided in subparagraph 5.3(c)1. above, to or for the benefit of such Primary Beneficiary as in the sole discretion of the Trustee shall be appropriate or advisable from time to time for the health, education, maintenance and support in reasonable comfort of such Primary Beneficiary.

3.    In addition, the Trustee may distribute any remaining net income and/or principal (other than distributions from a Retirement Account) to or for the benefit of the Primary Beneficiary's descendants for their health, education, maintenance and support.

A. Provided that no such distribution shall be made if objected to by the Primary Beneficiary.

B. No such distributions shall be made for the purpose of or which would have the effect of discharging any legal obligation, including the obligation of support, which the Trustee may have outside of its capacity as Trustee or which the person who has the power to remove and appoint the Trustee may have.

4. If any residence is or becomes an asset of the trust estate, such Primary Beneficiary of the Settlor shall have the right to occupy such residence rent-free and he or she shall have the exclusive and continuous present right to full use, occupancy and possession of such residence for life. It is Settlor's intention that such Primary Beneficiary's interest in such property shall constitute a "beneficial interest for life" and "equitable title to real estate" as contemplated by Florida Statutes Section 196.041(2). The Trustee shall pay for all taxes, insurance, mortgage installments, ordinary maintenance and repair of such residence while such Primary Beneficiary uses it as a residence. Such Primary Beneficiary shall pay for utilities and other living expenses while using it as a residence (but the Trustee in its discretion may pay for any of such expenses pursuant to other provisions of this subparagraph 5.3(c)). Upon the written direction of such Primary Beneficiary to sell such residence, the Trustee shall do so upon such terms as the Trustee deems reasonable and add the proceeds to the principal of the trust estate. Upon the written direction of such Primary Beneficiary, the Trustee shall purchase a replacement residence to be held upon the same terms as the original residence which was a part of the trust estate.

5. To help in making its determination for any discretionary distributions (whether to the Primary Beneficiary or the Primary Beneficiary's descendants), the Trustee may consider such circumstances and factors the Trustee believes are relevant, including but not limited to the other income and assets known to the Trustee to be available to such beneficiary for such purposes (including any distributions from a Retirement Account pursuant to subparagraph 5.3(c)1. above) and the advisability of supplementing such other income or assets, the tax consequences of any such distribution, the character and habits of such beneficiary, the diligence, progress and aptitude of such beneficiary in acquiring an education, the ability of such beneficiary to handle money usefully and prudently and to assume the responsibilities of adult life and self-support.

6. The Trustee's primary concern shall be the Primary Beneficiary, not the Primary Beneficiary's children or any residual beneficiaries of this trust, even if such distributions may deplete the trust estate. It is also the Settlor's intent that the Primary Beneficiary shall be able to serve as the sole Trustee immediately in the event the Primary Beneficiary is a child of the Settlor, or after attaining age 30 years if the Primary Beneficiary is a descendant of a deceased child of the Settlor, and as such be able to make such distributions for his or her own benefit.

7.     Notwithstanding the foregoing, (i) in no event shall the terms "maintenance" or "support", used together or separately, ever include or be interpreted to include payments to a judgment creditor or to satisfy a judgment creditor, and (ii) in no event shall any distributions be made to satisfy a judgment creditor of the Primary Beneficiary or any members of his or her family.

8.     Upon the death of the Primary Beneficiary, the Trustee shall divide and distribute the Primary Beneficiary's remaining trust fund as follows:

A.     The Trustee shall distribute any portion of such trust fund that would be subject to the generation skipping tax (if not for this subparagraph 5.3(c)8.A.) as a result of the death of such Primary Beneficiary, in such proportions and in such a manner, outright or in trust or otherwise, to or for the benefit of any one or more of such Primary Beneficiary's creditors or the creditors of such Primary Beneficiary's estate, as such Primary Beneficiary may appoint by specific reference to this general power of appointment in his or her Will admitted to probate.

B.     If such Primary Beneficiary dies after attaining age 30 years, then any portion of such trust fund over which such Primary Beneficiary does not either have or effectively exercise the foregoing general power of appointment shall be distributed in such proportions and in such a manner, outright or in trust or otherwise, to or for the benefit of such one or more persons (including individuals and entities) as such Primary Beneficiary may appoint by specific reference to this limited power of appointment in his or her Will admitted to probate, except not to the Primary Beneficiary himself or herself, not to his or her estate, not to his or her creditors, and not to the creditors of his or her estate.

C.     If such Primary Beneficiary dies prior to attaining age 30 years, then any portion of such trust fund over which such Primary Beneficiary does not either have or effectively exercise the foregoing general power of appointment shall be distributed in such proportions and in such a manner, outright or in trust or otherwise, to or for the benefit of any one or more of such Primary Beneficiary's descendants as such Primary Beneficiary may appoint by specific reference to this limited power of appointment in his or her Will admitted to probate, except not to the Primary Beneficiary himself or herself, not to his or her estate, not to his or her creditors, and not to the creditors of his or her estate.

D.     Any portion of such Primary Beneficiary's trust fund over which he or she does not effectively exercise the foregoing general or limited powers of appointment, shall be divided on a per stirpes basis among his or her descendants and each such share shall be held as a separate trust and distributed as provided in this subparagraph 5.3(c), but if the Primary Beneficiary has no living descendants, then it shall be divided on a per stirpes basis among the descendants of the Primary Beneficiary's nearest ancestor who is a descendant of the Settlor and who has living descendants and each such share shall be held as a separate trust and

distributed as provided in this subparagraph 5.3(c), and if no such beneficiaries exist, then it shall be divided and distributed as provided in subparagraph 5.3(b)2.B. of this Article V.

9.    Notwithstanding any other provision herein, each and every separate trust created herein shall terminate one day prior to end of the statutory time period, set forth in the applicable rule against perpetuities, after the death of the Settlor, and the remainder of each such trust fund shall be distributed to the Primary Beneficiary who is eligible to receive distributions at such time from such trust fund.  It is Settlor's intent that no trust or trust share herein created, or attempted to be created, shall fail, in whole or in part, by reason of the rule against perpetuities.  Therefore:

A.    Each and every power granted herein is severable one from the other; each and every trust or trust share is severable from the other; and all powers granted to each trust or trust share are severable powers granted as to any other trust.

B.    If any provision or power herein would cause a violation of the rule against perpetuities, the Trustee shall terminate or modify such provision or power, at the latest day possible, so as to avoid a violation of the rule against perpetuities.

5.4    <u>FINAL TAKERS</u>.  In the event that none of Settlor's descendants survive to the time the trust estate is to vest, then at the death of the last of them and Settlor's spouse and the Settlor, but subject to any powers of appointment granted herein, the then remaining trust estate shall be distributed 50% to Settlor's heirs at law and 50% to Settlor's spouse's heirs at law, determined under the laws of the state of Florida as if both the Settlor and Settlor's spouse died at such time. Provided that if any such beneficiary has not attained age 21 years at the time such distribution is to be made, then the Trustee shall make such distribution to a custodian (chosen by the Trustee in its sole discretion) for such beneficiary under a Uniform Transfers to Minors Act to be held until such beneficiary attains age 25 years, if possible

5.5    <u>S CORPORATION STOCK</u>.

(a)    Notwithstanding any other provision in this Article V to the contrary,

(i)    if this Trust holds S corporation stock one (1) day less than two (2) years after such stock is distributed to this Trust by the Settlor's estate;

(ii)    if this Trust held S corporation stock at the time of the Settlor's death and still holds such stock one (1) day less than two (2) years after the Settlor's death;

(iii)    if this Trust receives or acquires S corporation stock from any other source; or

(iv)    if this Trust holds stock of a corporation and the shareholders of such corporation and the Trustee desire to elect S corporation status,

then at such time, the Trustee may elect treatment as an "Electing Small Business Trust" under Section 1361 of the Internal Revenue Code or may allocate such S corporation stock to one or more separate and distinct Qualified Subchapter S Trusts (each hereinafter referred to as a "QSST") to be held, managed and distributed as follows:

(b)    Each QSST shall comply with all of the following requirements:

1.    As to any trust created for more than one current income beneficiary, the Trustee shall allocate the S corporation stock equally to separate and distinct trusts, one trust for each such current income beneficiary.

2.    The Trustee shall pay the entire net income of such separate trust, at least quarter-annually, to such current income beneficiary and any distributions of principal shall be made only to such current income beneficiary of each such trust to the exclusion of all others. The Trustee shall also distribute to such current income beneficiary an amount of principal equal to (A) any and all taxes which such current income beneficiary may be subject to as a result of being a beneficiary of such trust, in excess of (B) the income of such trust distributed to such current income beneficiary.

3.    If any such trust should terminate for any reason during the lifetime of the current income beneficiary, the Trustee shall distribute all of the assets of such separate trust to such beneficiary.

4.    Upon the death of a beneficiary of a QSST and if the QSST holds S corporation stock at such time, the descent and distribution of the assets of such trust shall be pursuant to the provisions of this Trust other than this paragraph 5.5, and if such stock is to be held in trust, then such stock shall be held in one or more QSSTs pursuant to the terms of this paragraph 5.5.

5.    Upon the death of a current income beneficiary of a QSST and if the QSST no longer holds S corporation stock at such time, this paragraph 5.5 shall no longer apply to such trust; instead, the remaining provisions of this Trust shall apply to such trust.

(c)    Except as hereinabove modified, the terms of the separate trust other than this paragraph 5.5 shall apply to each QSST.

(d)    The term "S corporation" shall mean a corporation which is an electing small business corporation within the meaning of Section 1361 of the Internal Revenue Code.

## ARTICLE VI

### LIMITATIONS ON BENEFITS AND ALLOCATIONS OF ASSETS

6.1    <u>GIFTS DURING LIFETIME</u>.  Any gifts of real or personal property, tangible or intangible, which the Settlor may make during Settlor's lifetime, if any, before or after the execution of this Trust Agreement, to any person or persons, shall not be deemed to be an advancement or a satisfaction to be applied to any share of any beneficiary of this trust, and shall not be taken into account in connection with this trust.

ARTICLE VII

INVESTMENT AND ADMINISTRATIVE POWERS

7.1   RIGHTS RESERVED TO SETTLOR.

(a)   During the lifetime of the Settlor, the Settlor reserves the right to elect, at any time and from time to time, to advise the Trustee and to direct the Trustee as to any investments the Settlor deems advisable for the Trustee to purchase or sell.  Should the Settlor elect to exercise Settlor's right to advise or direct the Trustee to purchase or to sell any investment, Settlor shall do so in writing; or, if that is not practical, Settlor shall, as soon thereafter as is practical, approve of such purchase or sale in writing, as requested or required by the Trustee.  The Trustee is hereby specifically relieved of all liability for loss which may be occasioned by the purchase or sale of any asset of the trust estate when it has been directed or advised to make such purchase or sale by the Settlor, except for willful default or gross neglect.

(b)   During Settlor's lifetime, the Co-Trustees, or either of them acting alone, shall have all rights and powers granted Trustees under the laws of Florida, and the Settlor shall not be governed by fiduciary standards in the investment, management or operation of the trust estate.  Further, the Co-Trustees, or either of them acting alone, may borrow funds and pledge, sell and/or mortgage trust assets (including real property) for whatever purpose.

(c)   During Settlor's lifetime, the Co-Trustees, or either of them acting alone, shall not be limited to the type and character of investments in which it may invest funds of this trust and such investments may include, but not be limited to, margin accounts, options and commodity accounts.

(d)   Anything contained in this Agreement to the contrary notwithstanding, during Settlor's lifetime, the Co-Trustees, or either of them acting alone, shall have (i) signature authority over a bank account, money market account, brokerage account, mutual fund, or other account at a financial institution, with the right to add to such account, withdraw from such account and/or to manage the investments of such account including to buy or sell securities within such account, and (ii) the power to sign as Trustee any deeds, partnership documents, notes, checks, negotiable instruments, and any other documents required to buy, sell, transfer or convey trust assets and any other commercial paper for or on account of the Trust created by this Agreement.  Any individual or other entity is hereby relieved of any and all liability for accepting the signature of either one of the Co-Trustees serving hereunder.

(e)   The Settlor in the capacity as Trustee may borrow funds, guarantee any debt (including debt of the Settlor and/or debt of third parties that the Settlor wants to guarantee for any reason) and pledge, encumber, mortgage and/or sell trust assets (including real property) for any purpose, including, but not limited to securing debt and guaranteeing debt of the Settlor and/or

third parties. Any such debt or guarantee entered into by the Settlor as Trustee shall continue to be an obligation of this trust even after the Settlor is no longer serving as Trustee.

(f)    The Settlor as Trustee may appoint one or more other persons who are not trustees to have signature authority over a bank account, money market account, brokerage account, mutual fund, or other account at a financial institution, with the right to add to such account, withdraw from such account and/or to manage the investments of such account including to buy or sell securities within such account.

7.2    INVESTMENT POWERS. Except as otherwise provided in this Agreement, and except as would disqualify any marital deduction, the Trustee shall have the following general powers, in addition to and not by way of limitation of the powers provided by law, said powers to be exercised in the Trustee's discretion, provided that the Trustee other than the Settlor uses reasonable prudence and judgment in the exercise of such discretion:

(a)    To make distribution of the trust estate or of the principal of any trust created hereunder in kind and to cause any share to be composed of cash, property or undivided fractional shares in property different in kind from any other share.

(b)    To invest any part or all of the principal of the trust estate in any mutual fund or funds (including proprietary mutual funds), any of which mutual funds may be established and operated by and under the control of the Trustee (or its affiliates, if not prohibited by law).

(c)    For convenience of administration or investment, the Trustee may hold separate trusts created hereunder as a common fund, dividing the income proportionately among such trusts, assigning undivided interests to such trusts and making joint investments of the funds belonging in such trusts. The Trustee may consolidate any separate trust with any other trust with similar provisions for the same beneficiary or beneficiaries, which consolidation would not result in any alteration of the time for vesting of such interests in such beneficiary or beneficiaries due to the operation of the rule against perpetuities.

(d)    The Trustee shall have the right and authority to make all elections, decisions, payments and distributions hereunder consistent with minimizing the impact of estate and income taxes upon Settlor's estate or this trust.

(e)    In making all such elections, decisions, payments and distributions hereunder, the Trustee is directed not to make adjustments between income or principal or between property interests passing to beneficiaries hereunder which may be substantially affected as a result of any elections under this Article unless such adjustments are necessary to prevent a loss of, or decrease in, the marital or charitable deduction, if any, otherwise allowable in determining Settlor's federal estate tax. The Trustee shall be exonerated from all liability for any such election(s) and

7-2

no beneficiary shall have any claim against the Trustee by reason of the exercise of the Trustee's judgment in this respect.

(f)   The Trustee may borrow funds from any source (including the Trustee in its non-fiduciary capacity), guarantee any debt (including debt of the Settlor and/or debt of any entity in which Settlor had a direct or indirect ownership interest) and pledge, encumber, mortgage and/or sell trust assets (including real property) for any purpose the Trustee deems advisable, including, but not limited to securing debt and guaranteeing debt of the Settlor and/or any entity in which Settlor had a direct or indirect ownership interest.

7.3   <u>DIGITAL ASSETS</u>.   The Trustee shall have full power and authority, at any time or times, (i) to access, use, and control Settlor's digital devices, including but not limited to, desktops, laptops, tablets, peripherals, storage devices, mobile telephones, smart phones, and any similar devices, which currently exist or may exist as technology develops, for the purposes of accessing, modifying, deleting, controlling, or transferring Settlor's digital assets (as defined below), (ii) to access, modify, delete, control, and transfer Settlor's digital assets, and (iii) to obtain, access, modify, delete, and control Settlor's passwords and other electronic credentials associated with Settlor's digital devices (as described above) and digital assets. "Digital assets" shall include, but not be limited to, emails received, email accounts, digital music, digital photographs, digital videos, software licenses, social network accounts, file sharing accounts, web hosting accounts, tax preparation services accounts, online stores, affiliate programs, other online accounts, and similar digital items which currently exist or may exist as technology develops.

7.4   <u>GENERATION SKIPPING TAX PROVISIONS</u>.

(a)   If a trust hereunder would be partially exempt from generation-skipping tax by reason of an allocation of generation-skipping tax exemption to it, before the allocation, the Trustee, in its discretion, may divide the trust into two separate trusts of equal or unequal value, to permit allocation of the exemption solely to one trust which will be entirely exempt from generation-skipping tax. Such division shall be done in such a manner as required under federal tax law so that each separate trust is recognized for generation skipping tax purposes.

(b)   If a trust hereunder is partially exempt from generation-skipping tax, the Trustee, in its discretion, may divide the trust into two separate trusts of equal or unequal value, so that one such trust is entirely exempt from generation-skipping tax and the other such trust is entirely subject to generation-skipping tax. Such division shall be done in such a manner as required under federal tax law so that each separate trust is recognized for generation skipping tax purposes.

(c)   In addition, if a trust hereunder is entirely exempt or nonexempt from generation-skipping tax and adding property to the trust would partially subject it to generation-skipping tax, or if a trust hereunder is entirely non-exempt from generation-skipping tax and

adding property to the trust would partially exempt it from generation-skipping tax, the Trustee, in its discretion, may hold that property as a separate trust in lieu of making the addition.

      (d)    Except as otherwise provided in this Trust Agreement, such two trusts (whether divided as provided in subparagraphs (a) or (b) above or additions held as a separate trust as provided in subparagraph (c) above) shall have the same terms and conditions, but the Trustee shall not make discretionary distributions from the income or principal of the exempt trust to beneficiaries who are nonskip persons so long as readily marketable  assets remain in the nonexempt trust.

      (e)    If there are two or more trusts known to the Trustee for the same beneficiary who is a skip person, whether or not such trusts are all created under this trust agreement, and if one or more of such trusts has an inclusion ratio of zero and if one or more of such trusts has an inclusion ratio of greater than zero, then to the extent possible, distributions to skip persons shall be first made from the trust or trusts with an inclusion ratio of zero and distributions to nonskip persons shall be first made from the trust or trusts with an inclusion ratio of greater than zero.

      (f)    Upon division or distribution of an exempt trust and a nonexempt trust held hereunder, the Trustee, in its discretion may allocate property from the exempt trust first to a share from which a generation-skipping transfer is more likely to occur.

      (g)    The terms "skip person", "nonskip person", "generation-skipping tax exemption" shall have the same meaning as such words or phrases have in Chapter 26 of the Internal Revenue Code.

    7.5    <u>ALLOCATION OF PRINCIPAL AND INCOME</u>.  In matters of allocation and accounting of principal, income, expenses, receipts and disbursements, the Trustee other than the Settlor shall be governed by Florida Statutes 738, "Principal and Income", or its successor statute, as the same may from time to time exist, except as otherwise provided in this Agreement, provided, however:

      (a)    The Trustee shall have the option of charging all or any portion of the expenses incurred in connection with the settlement of Settlor's estate against either income or principal of the trust estate;

      (b)    The Trustee may allocate within the meaning of Treas. Reg. $\S1.643(a)$-3(b) to income or to principal, or partly to income and partly to principal, all or part of the realized gains from the sale or exchange of trust assets; provided, however, that, if income is defined under an applicable state statute as a unitrust amount and the trust is being administered pursuant to such statute, the allocation of gains to income must be exercised consistently and the amount so allocated may not be greater than the excess of the unitrust amount over the amount of distributable net income determined without regard to Treas. Reg. $\S1.643(a)$-3(b);

(c)     The Trustee, in its discretion, may exercise the power to adjust between principal and income, notwithstanding the fact that the trust assets may not be a prudent investment, but otherwise shall exercise such power in accordance with Florida Statutes 738.104;

(d)     In no event shall any allocation or accounting decision made by the Trustee in regard to the Marital Trust be contrary to the provisions of the Marital Trust or be contrary to the definition of "income" contained therein or be made in such a manner as to at any time disqualify for federal income tax purposes any trust established herein which qualifies for the marital deduction; and

(e)     (i) In the event the Settlor's estate is not required to file a Federal Estate Tax Return (Form 706), or (ii) in the event a Federal Estate Tax Return (Form 706) is filed for Settlor's estate, but no estate tax is due pursuant to such return (without taking into account the benefit of the charitable deduction for Federal income tax purposes), then any gift(s) made under the terms of this Agreement to a qualified charitable organization described in Section 2055(a) and Section 170(c) of the Internal Revenue Code, which is exempt from taxation under Section 501(a) of the Code, shall first be made by the Trustee (to the extent possible) from the income of the trust estate, and then (after exhausting all such income) any remaining such gift(s) shall be made from the principal of the trust estate.

7.6     <u>EXONERATION</u>.  No individual (as distinguished from a bank or trust company) acting as a Trustee hereunder shall, whether or not named herein, be held liable for any error of judgment or mistake of fact or law, or for any loss resulting by reason of the purchase or retention in good faith of any property as part of the trust estate, or for any loss resulting from any act done or omitted to be done in good faith, or for any act or neglect on the part of any agent or attorney employed by him or her, or for anything other than his or her own fraud or wrongful misconduct.

7.7     <u>BUSINESS PROVISIONS</u>.  Except as otherwise provided in this Agreement, and subject to such standards of reasonableness and prudence as are appropriate at the time, if any ownership interests in any non-public corporations, limited liability companies, partnerships, joint ventures, proprietorships, or business interests (herein called "business") are or become a part of the trust estate, the Successor Trustee shall have the following powers and authority, without limitation by reason of specification, and in addition to powers conferred by law, all of which may be exercised with respect to every such business, whether a corporation, a limited liability company, a partnership, a joint venture, or a sole proprietorship:

(a)     To retain and continue to operate the business for such period as the Trustee may deem advisable.

(b)     To control, direct, and manage the business. In this connection, the Trustee, in its sole discretion, shall determine the manner and extent of its active participation in the

operation of the business, and the Trustee may delegate all or any part of its power to supervise and operate the business to such person or persons as it may select, including any associate, partner, officer, or employee of the business.

(c)    To hire and discharge directors, officers, and employees and to fix their compensation and define their duties; and, similarly, to employ, compensate, and discharge agents, attorneys, consultants, accountants, and such other representatives as the Trustee may deem appropriate.

(d)    To organize a corporation, limited liability company, or other entity under the laws of this or any other state or country and to transfer thereto all or any part of the business or other property held in the trust estate, and to receive in exchange therefor such stocks, bonds, and other securities as the Trustee may deem advisable.

(e)    To take any action required to convert any corporation into a limited liability company, partnership, or sole proprietorship.

(f)    To treat the business as an entity, separate from the trust estate.  In its accountings to the court and to any beneficiaries, as elsewhere provided herein, the Trustee shall only be required to report the earnings and conditions of the business in accordance with standard corporate accounting practice.

(g)    To sell or liquidate all or any part of any business at such time and price and upon such terms and conditions (including credit) as the Trustee may determine.

(h)    To exercise any of the rights and powers herein conferred in conjunction with another or others.

(i)    To diminish, enlarge, or change the scope or nature of any business.

(j)    To guarantee debt(s) of such business.

ARTICLE VIII

GENERAL PROVISIONS AND DEFINITIONS

8.1     ADDITIONS TO CORPUS.  The Settlor or any other person with the consent of the Trustee may add to the principal of the trust created herein by deed or will or otherwise.  Such additions shall be covered by the provisions hereof, the same as if originally included herein.

8.2     LAWS GOVERNING.  This Agreement shall be construed and regulated in all respects by the laws of the State of Florida, subject to the following:

        (a)     The Settlor recognizes that the place or jurisdiction of the administration of any trust hereunder may be changed if a Trustee outside of the state of Florida is appointed as the Trustee.  In addition, the Trustee is granted the authority to move the administration of any trust hereunder to any jurisdiction in the world.

        (b)     If the administration of any trust hereunder is moved to another jurisdiction, then the Trustee shall also have the authority to change, by written declaration, the law applicable to such trust hereunder to be that of the jurisdiction to which the administration of such trust has been changed, and in such event, this Agreement and the rights of all persons affected by such trust  shall be construed and regulated in all respects exclusively by the laws of such jurisdiction and the courts in such jurisdiction.

        (c)     In conjunction with the Trustee's authority to change the jurisdiction of the administration of any trust hereunder and the laws regulating such trust, the Trustee shall also have the authority to modify or amend this Agreement as shall be necessary or desirable to ensure the continued validity and effect of any trust hereunder pursuant to the law of such other jurisdiction, but any such modification or amendment shall not change the basic provisions hereunder or intent of the Settlor.

8.3     INTERPRETATION AND CONSTRUCTION.     All duties, rights, powers and discretions, whether or not absolute, granted any Trustee other than the Settlor hereunder shall be exercised by the Trustee other than the Settlor in its fiduciary capacity and the Trustee other than the Settlor shall be governed by fiduciary standards.

8.4     DISABILITY.  In case the income or any discretionary payment of principal from the Residuary Trust, as created hereunder, or any share thereof, becomes payable to a minor, or to a person under legal disability, or to a person not adjudicated incompetent, but who, by reason of illness or mental or physical disability, is, in the opinion of the Trustee, unable to administer properly such amount, then, such amounts shall be paid out by the Trustee in such of the following ways as it deems best:  (i) directly to such beneficiary; (ii) to the legally appointed guardian or conservator of such beneficiary; (iii) to a custodian (chosen by the Trustee in its sole discretion) under a Uniform Transfers to Minors Act to be held until age 25 years, if possible; (iv) to some

relative or friend for the care and support, and education of such beneficiary; (v) by the Trustee, using such amounts directly for such beneficiary's care, support and education.

8.5    SMALL TRUST TERMINATION.  In the event a separate and distinct trust created hereunder for the benefit of a child of the Settlor or a descendant of a deceased child of the Settlor shall at any time be comprised of assets which, in the aggregate, are valued at less than $200,000.00 (increased by the relative increase in the Consumer Price Index for Urban Consumers from January 2021 to January of the year in which such value is being determined), then, the Trustee may, in its sole discretion, terminate such trust and distribute the trust property to the beneficiary of such trust, if such beneficiary has attained age 21 years, or to a custodian under the Florida Uniform Transfers to Minors Act (chosen by the Trustee in its sole discretion) if such beneficiary has not attained age 21 years to last until such beneficiary attains age 25 years, if possible.

8.6    DONEE'S WILL.  In disposing of any trust property subject to a power of appointment by will, the Trustee may rely upon an instrument admitted to probate in any jurisdiction as the last will of the donee of such power of appointment, but if it has no written notice of the existence of such will within a period of three (3) months after his or her death, it may be presumed that the donee of such power of appointment died intestate and the Trustee shall be protected in acting in accordance with such presumption.

8.7    SPENDTHRIFT PROVISION.  No beneficial interest herein or in any separate trust or any separate shares created herein, including beneficial interests in income and/or principal, shall be (i) subject to anticipation, assignment, charge, disposition, encumbrance, pledge, sale, transfer in any manner, or (ii) liable for or subject to any contracts, debts, liabilities or obligations of any beneficiary.  Any attempted anticipation, assignment, charge, disposition, encumbrance, pledge, sale, transfer in any manner of either the income or principal of this trust or any separate trust or any separate shares created herein, by any beneficiary hereunder, shall be void and not have any validity or legal effect or be in any way recognized by the Trustee.  No beneficial interest and no income or principal receivable by any beneficiary or payable on any beneficiary's behalf shall be subject to any legal process for the payment of any beneficiary's debts or in anyway be liable to any claim of any creditor of any beneficiary.

8.8    ESTABLISHMENT OF SEPARATE TRUSTS.  Despite the delay in determining the exact nature and amounts of the assets allocable to any separate trust created hereunder upon the death of any person (including, but not limited to the Settlor and Settlor's spouse) or any other event, each such trust shall be fully effective as of the moment of such person's death or such other event.  Each separate trust created hereunder shall share, on a pro rata basis, income earned by the trust from which the allocation of assets is to be made from the moment of the event creating such separate trust until the funding of such separate trust.

8.9    <u>COMPENSATION AND ACCOUNTING</u>.

(a)    The Trustee shall be entitled to receive a fair and just compensation for its services hereunder and shall also be reimbursed for all reasonable expenses incurred in the management and protection of the trust estate.  In no event shall a Trustee charge a termination fee or distribution fee in excess of its reasonable costs.

(b)    The Trustee shall render to the beneficiary or beneficiaries then entitled to the income from the trust (and any other beneficiaries entitled to an accounting under applicable law from time to time) statements of account of its receipts and disbursements as Trustee hereunder at least annually.  Provided, however, during the lifetime of the Settlor and while the Settlor is not incapacitated, the Trustee shall not disclose any information concerning this trust, or its terms, operation or assets to any beneficiary other than the Settlor unless the Settlor consents thereto in writing.

8.10    <u>MERGER OR COMBINATION OF TRUSTS</u>.  The Trustee shall have the power to merge or combine any separate trust created herein with any other separate trust created herein or with any other trust created by the Settlor or any other person, if the terms of the trusts are substantially the same and the trustees are the same, except that such combination or merger shall not be made if the result would change the inclusion ratio of either trust with respect to the generation-skipping tax.

8.11    <u>CONSTRUCTION</u>.  The paragraph headings used are for convenience only and shall not be resorted to for interpretation of this Agreement.  Wherever the context so requires, the masculine shall include the feminine and neuter and the singular shall include the plural.  If any portion of this Agreement is held to be void or unenforceable, the balance of the Agreement shall nevertheless be carried into effect.

8.12    <u>PRESERVATION OF MARITAL DEDUCTION</u>.    Notwithstanding anything herein contained to the contrary, any power, duty or discretionary authority granted to the Trustee under any provision of this trust shall be absolutely void to the extent that either the right to exercise or the exercise thereof shall in any way affect, jeopardize or cause Settlor's estate and this trust to lose all or any part of the tax benefit afforded by the marital deduction under either federal or state laws.  It is recognized that the Trustee has no obligation with respect to any election to have property treated as qualified terminable interest property and therefore, the Trustee shall neither be required to oppose nor to consent to such election or non-election as such right is reserved solely to Settlor's personal representative.  Further, the Trustee shall incur no liability for the election or non-election of treatment of property as qualified terminable interest property.

8.13    <u>DEFINITIONS</u>.

(a)    Adopted children or descendants of any person shall be treated as such person's children or descendants only if they are legally adopted prior to attaining age 18 years.

(b)      The terms "child", "children" or "descendants" of a person shall include any person hereafter born or adopted (subject to being adopted prior to attaining age 18 years).

(c)      The term "Corporate Trustee" shall mean a trust company or bank qualified to act as such, possessing trust powers.

(d)      The term "education" shall include all forms of education, including but not limited to, public or private schools, primary or secondary, college, advanced college or post college, commercial, technical, business or art education, or otherwise.

(e)      The term "executor" for purposes of making an election to have property (or part or all of the trust estate) treated as qualified terminable interest property shall mean the personal representative of Settlor's estate appointed by a probate court, but if no such personal representative is appointed by a probate court, then the Trustee hereunder.

(f)      References herein to "gross estate", "marital deduction", "charitable deduction" or other similar or related words or phrases shall have the same meaning as such words or phrases have in the Internal Revenue Code.

(g)      Any person (including a Settlor, a Trustee, or a beneficiary) shall be deemed incapacitated if: (i) he or she has been determined incapacitated or incompetent by a court of competent jurisdiction; (ii) a guardian of the person or of the property has been appointed by a court of competent jurisdiction for such person; or (iii) in the written opinion of two licensed physicians, such person is incapable either physically or mentally of handling his or her financial affairs.

(h)      The term "Internal Revenue Code" shall mean the Internal Revenue Code of 1986, as amended.

IN WITNESS WHEREOF, JAMES LOGAN, as Settlor, and JAMES LOGAN and JANICE LOGAN, as Co-Trustees, have signed this Agreement, as of the day and year first written above.

JAMES LOGAN

SETTLOR and CO-TRUSTEE

JANICE LOGAN

CO-TRUSTEE

On this 10th day of February, 2021, the Settlor signed the foregoing trust agreement in our presence (the undersigned witnesses), and we have signed as witnesses in the presence of the Settlor and in the presence of each other.

_____
(witness signature)

_____
(witness signature)

NICHOLAS A. MITCHELL
_____
(witness printed name)

ALMA DEBRUYNE
_____
(witness printed name)

STATE OF FLORIDA
COUNTY OF PINELLAS

I HEREBY CERTIFY that the foregoing instrument was acknowledged before me by means of ☑ physical presence or ☐ online notarization, this 10th day of February, 2021, by the Settlor and Co-Trustees, JAMES LOGAN and JANICE LOGAN, each of whom is ☐ personally known to me or who has ☑ produced a _____FLORIDA DRIVER LICENSE_____ as identification, and both of whom have acknowledged before me that they executed the same as their free act and deed and for the uses and purposes therein stated.

6078387v2

_____
NOTARY PUBLIC

JENNIFER A. STUDER
MY COMMISSION # GG 934679
EXPIRES: March 24, 2024
Bonded Thru Notary Public Underwriters

8-5

# EXHIBIT 7

## STOCK POWER

**FOR VALUE RECEIVED,** the undersigned, JAMES P. LOGAN (the "Transferor"), hereby sells, assigns and transfers unto JAMES LOGAN, as CO-TRUSTEE of the JAMES LOGAN FAMILY TRUST, dated February 10, 2021, five thousand (5,000) shares (the "Shares") of the common capital stock of SMART COMMUNICATIONS HOLDING, INC., a Florida corporation (the "Corporation"), standing in the name of the Transferor on the books of the Corporation, and does hereby irrevocably constitute and appoint Thomas D. Sims, Esq. as attorney to transfer the Shares on the books of the Corporation with full power of substitution in the premises.

A signed copy of this Stock Power, including that executed via DocuSign or other valid electronic or digital signature medium, delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Stock Power.

**DATED TO BE EFFECTIVE AS OF**   September 16   , **2022.**

**TRANSFEROR:**

James Logan (Sep 16, 2022 18:52 EDT)
_____

JAMES P. LOGAN

6672435v2

# Stock Power - James Logan to Revocable Trust re Smart Communications Holding, Inc. (2022)

Final Audit Report                                                2022-09-16

| | |
|---|---|
| Created: | 2022-09-16 |
| By: | Rachel Chase (rachelc@jpfirm.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAhWDfQnjwoEN_qVWMiErl.BCmCNdlW_Ytb |

## "Stock Power - James Logan to Revocable Trust re Smart Communications Holding, Inc. (2022)" History

Document created by Rachel Chase (rachelc@jpfirm.com)
2022-09-16 - 8:52:13 PM GMT- IP address: 144.129.14.130

Document emailed to jim.logan@█████████████ for signature
2022-09-16 - 9:02:18 PM GMT

Email viewed by jim.logan@███████████
2022-09-16 - 9:02:20 PM GMT- IP address: 74.125.151.157

Signer jim.logan@████████████ entered name at signing as James logan
2022-09-16 - 10:52:18 PM GMT- IP address: 199.47.254.244

Document e-signed by James logan (jim.logan@█████████████)
Signature Date: 2022-09-16 - 10:52:20 PM GMT - Time Source: server- IP address: 199.47.254.244

Agreement completed.
2022-09-16 - 10:52:20 PM GMT

**Adobe Acrobat Sign**

# EXHIBIT 8

## ASSIGNMENT AND ACCEPTANCE OF MEMBERSHIP INTEREST

**KNOW ALL MEN BY THESE PRESENTS** that JAMES P. LOGAN (the "Assignor"), in exchange for good and valuable consideration paid to him by JAMES LOGAN, as CO-TRUSTEE of the JAMES LOGAN FAMILY TRUST, dated February 10, 2021 (the "Assignee"), the receipt of which is hereby acknowledged, has granted, bargained, sold, assigned, transferred and set over, and by these presents does hereby grant, bargain, sell, assign, transfer and set over unto the Assignee, all of the Assignor's interest as a member of LOCO FLORIDA, LLC, a Florida limited liability company (the "Company"), which interest constitutes a fifty percent (50%) interest in the profits, losses and capital of the Company and is not certificated (the "Membership Interest"), and does hereby irrevocably constitute and appoint Thomas D. Sims, Esq. as attorney to transfer the Membership Interest on the books of the Company with full power of substitution in the premises.

**ASSIGNEE, BY ACCEPTANCE OF THIS ASSIGNMENT AND ACCEPTANCE OF MEMBERSHIP INTEREST (THIS "ASSIGNMENT"),** assumes all of the duties and obligations of the Assignor as to the Membership Interest so assigned, and agrees to perform all of the covenants, conditions and obligations on the Assignor's part to be paid and performed with respect to the Membership Interest.

This Assignment may be executed in multiple counterparts with the same effect as if the signature on each such counterpart were on the same instrument. A signed copy, including that executed via DocuSign or other valid electronic or digital signature medium, of this Assignment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Assignment.

**EXECUTED TO BE EFFECTIVE AS OF** ___September 16___ **, 2022.**

**ASSIGNOR:**                                    **ASSIGNEE:**

_James Logan (Sep 16, 2022 18:51 EDT)_           _James Logan (Sep 16, 2022 18:51 EDT)_

JAMES P. LOGAN                                   JAMES LOGAN, AS CO-TRUSTEE OF
                                                 THE JAMES LOGAN FAMILY TRUST,
                                                 DATED FEBRUARY 10, 2021

6672599v2

# Assignment of Membership Interest - James Logan to Revocable Trust re Loco Florida, LLC (2022)

Final Audit Report                                      2022-09-16

| | |
|---|---|
| Created: | 2022-09-16 |
| By: | Rachel Chase (rachelc@jpfirm.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA5bhdxfYZNnyDwJookfUDMbzJ4I6CqTM_ |

## "Assignment of Membership Interest - James Logan to Revocable Trust re Loco Florida, LLC (2022)" History

🗎 Document created by Rachel Chase (rachelc@jpfirm.com)
2022-09-16 - 8:50:45 PM GMT- IP address: 144.129.14.130

✉ Document emailed to jim.logan@ ██████████████ for signature
2022-09-16 - 9:02:03 PM GMT

🗎 Email viewed by jim.logan@ ██████████████
2022-09-16 - 10:43:04 PM GMT- IP address: 74.125.210.141

✒ Signer jim.logan@ ██████████████ entered name at signing as James logan
2022-09-16 - 10:51:28 PM GMT- IP address: 199.47.254.244

✒ Document e-signed by James logan (jim.logan@ ██████████████ )
Signature Date: 2022-09-16 - 10:51:30 PM GMT - Time Source: server- IP address: 199.47.254.244

✔ Agreement completed.
2022-09-16 - 10:51:30 PM GMT

📥 Adobe Acrobat Sign

# EXHIBIT 9

## ASSIGNMENT AND ACCEPTANCE OF MEMBERSHIP INTEREST

      **KNOW ALL MEN BY THESE PRESENTS** that JAMES P. LOGAN (the "Assignor"), in exchange for good and valuable consideration paid to him by JAMES LOGAN, as CO-TRUSTEE of the JAMES LOGAN FAMILY TRUST, dated February 10, 2021 (the "Assignee"), the receipt of which is hereby acknowledged, has granted, bargained, sold, assigned, transferred and set over, and by these presents does hereby grant, bargain, sell, assign, transfer and set over unto the Assignee, all of the Assignor's interest as a member of SMART COMMUNICATIONS YACHT HOLDING, LLC, a Florida limited liability company (the "Company"), which interest constitutes a fifty percent (50%) interest in the profits, losses and capital of the Company and is not certificated (the "Membership Interest"), and does hereby irrevocably constitute and appoint Thomas D. Sims, Esq. as attorney to transfer the Membership Interest on the books of the Company with full power of substitution in the premises.

      **ASSIGNEE, BY ACCEPTANCE OF THIS ASSIGNMENT AND ACCEPTANCE OF MEMBERSHIP INTEREST (THIS "ASSIGNMENT"),** assumes all of the duties and obligations of the Assignor as to the Membership Interest so assigned, and agrees to perform all of the covenants, conditions and obligations on the Assignor's part to be paid and performed with respect to the Membership Interest.

      This Assignment may be executed in multiple counterparts with the same effect as if the signature on each such counterpart were on the same instrument. A signed copy, including that executed via DocuSign or other valid electronic or digital signature medium, of this Assignment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Assignment.

      **EXECUTED TO BE EFFECTIVE AS OF**   September 16  , 2022.

ASSIGNOR:                 ASSIGNEE:

James Logan (Sep 16, 2022 18:52 EDT)        James Logan (Sep 16, 2022 18:52 EDT)

JAMES P. LOGAN             JAMES LOGAN, AS CO-TRUSTEE OF
THE JAMES LOGAN FAMILY TRUST,
DATED FEBRUARY 10, 2021

8257501

# Assignment of Membership Interest - James Logan to Revocable Trust re Smart Communications Yacht Holdings, LLC (2022)

Final Audit Report                                    2022-09-16

| | |
|---|---|
| Created: | 2022-09-16 |
| By: | Rachel Chase (rachelc@jpfirm.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA41IVbbBf5AM-yiYmX8oXLjDjvWBKBD5w |

## "Assignment of Membership Interest - James Logan to Revocable Trust re Smart Communications Yacht Holdings, LLC (2022)" History

📄 Document created by Rachel Chase (rachelc@jpfirm.com)
   2022-09-16 - 8:52:54 PM GMT- IP address: 144.129.14.130

✉️ Document emailed to jim.logan@█████████ for signature
   2022-09-16 - 9:02:35 PM GMT

📄 Email viewed by jim.logan@█████████
   2022-09-16 - 10:22:45 PM GMT- IP address: 74.125.210.139

✍️ Signer jim.logan@█████████ entered name at signing as James logan
   2022-09-16 - 10:52:56 PM GMT- IP address: 199.47.254.244

✍️ Document e-signed by James logan (jim.logan@█████████)
   Signature Date: 2022-09-16 - 10:52:57 PM GMT - Time Source: server- IP address: 199.47.254.244

✅ Agreement completed.
   2022-09-16 - 10:52:57 PM GMT

Adobe Acrobat Sign

# EXHIBIT 10

| | |
|---|---|
| **From:** | Mark M. Wall <mark.wall@hwhlaw.com> |
| **Sent:** | Thursday, December 22, 2022 3:24 PM |
| **To:** | Thomas D. Sims |
| **Cc:** | Eric J. Hall; Kevin Sutton; Michelle A. Ebrada |
| **Subject:** | Fwd: Logan - Stock Purchase Agreement (Smart Communications Holding) [IWOV-FirmLive.FID1854183] |
| **Attachments:** | Stock Purchase Agreement (Smart Communications Holding).DOC |

**This message originated from outside Johnson, Pope, Bokor, Ruppel, & Burns, LLP**

Tom-

Hope you are having a nice holiday season.

On behalf of Jon and per my email of December 16th, attached is the draft Stock Purchase Agreement for your review and comment.  Please note that it remains subject to the review and comment of Jon and the Company.

We look forward to hearing from you.

Mark

Sent from my iPad

Begin forwarded message:


**Mark M. Wall**
Shareholder
**Board Certified by The Florida Bar in Business Litigation**

o: 813.221.3900 | d: 813.227.8413 | mark.wall@hwhlaw.com | hwhlaw.com
101 E. Kennedy Blvd, Suite 3700, Tampa, FL 33602



vcard bio


**From:** "Eric J. Hall" <eric.hall@hwhlaw.com>
**Date:** December 22, 2022 at 4:13:06 PM EST
**To:** "Mark M. Wall" <mark.wall@hwhlaw.com>
**Subject: Logan - Stock Purchase Agreement (Smart Communications Holding) [IWOV-FirmLive.FID1854183]**


**Eric J. Hall**
Shareholder

d: 813.227.8408

**CONFIDENTIALITY NOTE:** The contents of this email and its attachments are confidential and may be privileged. If you are not the intended recipient, please immediately notify the sender (by return e-mail or telephone), destroy the original and all copies of this message along with any attachments, and do not disclose, copy, distribute, or use the contents.

**Please consider the environment before printing this e-mail.**

# EXHIBIT 11

**HWH DRAFT 12/22/2022**
*For discussion purposes only*

## STOCK PURCHASE AGREEMENT[1]

THIS STOCK PURCHASE AGREEMENT (this "Agreement") is entered into as of this __ day of _____, 2022 (the "Effective Date"), between SMART COMMUNICATIONS HOLDING, INC. a Florida corporation (the "Company," and sometimes referred to in this Agreement as the "Buyer"), and JANICE LOGAN, AS TRUSTEE OF THE JAMES LOGAN FAMILY TRUST DATED FEBRUARY 10, 2021 (the "Seller"). The Seller and the Buyer are sometimes referred to in this Agreement individually as a "Party" and, collectively, the "Parties".

## BACKGROUND

The Seller owns five thousand (5,000) shares of common stock of the Company (the "Purchased Shares"), that were assigned to the Seller pursuant to the Stock Power, dated September 16, 2022, executed and delivered by James P. Logan in favor of the Seller.

The Seller desires to sell, transfer and assign, and the Buyer desires to purchase and receive, the Purchased Shares pursuant to the terms and conditions of this Agreement and the other instruments, agreements, certificates and documents expressly referenced in this Agreement to be delivered in connection with the transaction set forth in this Agreement.

## OPERATIVE TERMS

The Parties agree as follows:

## SECTION I
## STOCK PURCHASE AND SALE; CLOSING

A.      Sale and Purchase of Purchased Shares.  At the Closing (as defined below), the Seller shall sell, transfer and assign to the Buyer all of the Seller's rights, title and interest in and to the Purchased Shares, free and clear of any and all Encumbrances, and the Buyer shall purchase and receive from the Seller the Purchased Shares.

B.      Consideration for Purchased Shares. The aggregate consideration for the Purchased Shares shall be the Purchase Price as determined in accordance with Section I.C. below.

C.      Determination of Purchase Price. The "Purchase Price" shall mean the amount of the aggregate consideration for the Purchased Shares finally determined pursuant to the terms of this Section I.C.:

1.      The Parties will use reasonable efforts to negotiate and mutually determine the Purchase Price within ten (10) days after the Effective Date.

2.      If the Parties are unable or unwilling to mutually determine the Purchase Price within such ten (10) day period, each Party shall designate its own Qualified Appraiser within thirty

---

[1] **NOTE TO DRAFT**: This draft needs to be reviewed by the Company's legal counsel and tax advisors.

(30) days after the Effective Date to prepare a Qualified Appraisal of the Purchased Shares. Each Qualified Appraiser will be engaged by the Company, and the Company shall instruct each Qualified Appraiser to complete its Qualified Appraisal within thirty (30) days after such Qualified Appraiser's engagement by the Company. The reasonable fees and costs of each Qualified Appraiser for such engagement will be paid by the Company. Once a Qualified Appraisal has been completed, the Company shall share with the Parties a copy of such Qualified Appraisal. The Parties shall average the values determined under each Qualified Appraisal for the Purchased Shares, and such average shall be the Purchase Price for the Purchased Shares and final and binding on the Parties, unless there is a Valuation Discrepancy (as defined below).

        3.      In the event there is a Valuation Discrepancy, the Company shall designate and engage a third (3rd) Qualified Appraiser (the "Third Qualified Appraiser") to prepare a Qualified Appraisal (the "Third Qualified Appraisal") for the Purchased Shares and the reasonable fees and costs of the Third Qualified Appraiser for such engagement will be paid by the Company. The Company shall instruct the Third Qualified Appraiser to complete the Third Qualified Appraisal within thirty (30) days after the Third Qualified Appraiser's engagement by the Company. The Company shall share with the Parties a copy of the Third Qualified Appraisal once it has been completed. The Parties shall average the value determined under the Third Qualified Appraisal with the other Qualified Appraisal that is closest in absolute dollar value to the Third Qualified Appraisal, and such average shall be the Purchase Price for the Purchased Shares and final and binding on the Parties.

    D.    <u>Payment of the Purchase Price</u>.  The Purchase Price determined pursuant to <u>Section I.C.</u> above shall be paid by the Buyer to the Seller as follows:

        1.      Two Million Dollars ($2,000,000) shall paid by wire transfer of immediately available funds at the time of the Closing (and Seller shall specify in writing the account to receive such payment at least one (1) business day prior to the Closing) (the "<u>Closing Payment</u>"); and

        2.      The balance of the Purchase Price shall be paid by the issuance of a Promissory Note by the Buyer, as the maker, in favor of the Seller, as the holder, substantially in the form attached hereto as <u>Exhibit A</u> (the "<u>Promissory Note</u>").[2]

    E.    <u>Closing</u>.  The closing for the sale and purchase of the Purchased Shares (the "<u>Closing</u>") occur electronically via the remote exchange of documents and signatures on the date (the "<u>Closing Date</u>") that is three (3) business days after the date on which all conditions set forth in <u>Section I.F.3</u> below shall have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions). The Closing shall be deemed effective as of the close of business on the Closing Date. All actions to

---

[2] **NOTE TO DRAFT**: The Promissory Note would include the following terms: (1) annual $1M principal payments with accrued interest each anniversary of the Closing Date with a balloon payment of all remaining principal and interest on the 5th anniversary of the Closing Date, (2) the Promissory Note would be non-negotiable, (3) the interest rate would be the greater of (A) 4% per annum and (B) the applicable federal rate for federal income tax purposes to avoid the imputation of interest, (4) the Buyer would have the right to prepay the Promissory Note without penalty, (5) the Seller would be obligated to subordinate to any subsequent financing obtained by the Company, and (6) there would be a set-off right in favor of the Buyer consistent with the terms set forth in the unsigned Shareholders' Agreement. The payment terms are different than those included in the unsigned Shareholders' Agreement, but the unsigned Shareholders' Agreement contemplated there would be life insurance proceeds payable to support the payment of the purchase price.

be taken and all documents to be executed and delivered by the Parties at the Closing shall be deemed to have been taken and executed and delivered simultaneously, and no actions shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered (unless any such actions or deliveries have been validly waived or as otherwise specified in this Agreement).

F.    Closing Deliverables; Conditions to Closing.

1.    Deliveries by the Seller. At or before the Closing, the Seller shall deliver to the Buyer:

(i)    an Assignment Separate from Certificate, duly signed by the Seller, in the form attached hereto as Exhibit B;

(ii)    a Certificate of Authority, duly signed by the Trustee of the Seller, certifying that the Trustee is authorized to cause the Seller to enter into this Agreement and execute and deliver the other agreements and documents contemplated in this Agreement and cause the Seller to close on the transaction contemplated in this Agreement, in a form reasonably satisfactory to the Buyer;

(iii)    an IRS Form W-9 (or equivalent form for a trust, if a Form W-9 is not applicable) fully completed and signed by the Seller;

(iv)    the Promissory Note, duly countersigned by the Seller;

(v)    a Stock Pledge Agreement, duly signed by the Seller, in the form attached hereto as Exhibit C (the "Stock Pledge Agreement")[3];

(vi)    a Closing Certificate, duly signed by the Seller, that each of the conditions of the Buyer's obligation to close set forth in Section I.F.3. below have been satisfied; and

(vii)    any and all certificates evidencing the Purchased Shares.

2.    Deliveries by the Buyer. At or before the Closing, the Buyer shall deliver to the Seller:

(i)    the Closing Payment;

(ii)    the Promissory Note, duly signed by the Buyer;

(iii)    the Stock Pledge Agreement, duly signed by the Buyer; and

---

[3] **NOTE TO DRAFT**: The Buyer would pledge the Purchased Shares as collateral security for the payment of the outstanding principal balance under the Promissory Note. Unless there is a final determination of a payment default under the Promissory Note, the Buyer would continue to hold all rights with respect to the Pledged Shares.

(iv)     a Closing Certificate, duly signed by the Buyer, that each of the conditions of the Seller's obligation to close set forth in <u>Section I.F.3.</u> below have been satisfied.

3.     <u>Conditions to Closing</u>. Each respective Party's obligation to close on the transaction contemplated in this Agreement is expressly conditioned upon satisfaction or waiver of each condition described below applicable to such Party:

(i)     <u>Conditions to the Buyer's Obligation to Close.</u>

(a)     delivery by the Seller at or before the Closing of all of the deliverables set forth in <u>Section I.F.1</u> above;

(b)     the representations and warranties of the Seller set forth in <u>Section II</u> below being true and correct in all material respects as of the Closing Date;

(c)     the Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement to be performed or complied with by the Seller on or before the Closing Date;

(d)     since the Effective Date, there shall not have been a Material Adverse Effect;

(e)     no Governmental Authority shall have enacted, issued, promulgated, enforced or entered any order against the Buyer which is in effect and has the effect of making the transaction contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transaction or causing the transaction contemplated under this Agreement to be rescinded following completion thereof; and

(f)     the Parties shall have determined the Purchase Price pursuant to <u>Section I.C.</u> above.

(ii)     <u>Conditions to the Seller's Obligation to Close.</u>

(a)     delivery by the Buyer at or before the Closing of all of the deliverables set forth in <u>Section I.F.2</u> above;

(b)     the representations and warranties of the Seller set forth in <u>Section III</u> below being true and correct in all material respects as of the Closing Date;

(c)     the Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement to be performed or complied with by the Buyer on or before the Closing Date; and

4

(d)    the Parties shall have determined the Purchase Price pursuant to <u>Section I.C.</u> above.

G.    <u>Termination</u>. This Agreement may be terminated and the transaction contemplated under this Agreement may be abandoned at any time prior to the Closing:

1.    by the mutual written agreement of the Parties;

2.    by the Buyer, if the Buyer is not then in material breach of any provision of this Agreement and the Seller has materially breached any representation, warranty, covenant or agreement contained in this Agreement that would give rise to the failure of any condition specified in <u>Section I.F.3.(i)</u> above and the Seller has not cured such breach within thirty (30) days after receipt of written notice identifying in reasonable detail such breach; or

3.    by the Seller, if the Seller is not then in material breach of any provision of this Agreement and the Buyer has materially breached any representation, warranty, covenant or agreement contained in this Agreement that would give rise to the failure of any condition specified in <u>Section I.F.3.(ii)</u> above and the Buyer has not cured such breach within thirty (30) days after receipt of written notice identifying in reasonable detail such breach.

In the event of termination of this Agreement by a Party pursuant to this <u>Section I.G.</u>, written notice thereof shall be given by the terminating Party to the other Party specifying the provision hereof pursuant to which termination is made, and this Agreement shall terminate and become void and have no effect, except that this <u>Section I.G.</u> and <u>Section VI</u> (Miscellaneous) shall survive the termination of this Agreement; provided, however, that any such termination shall not relieve any Party of any liability for any willful breach of this Agreement prior to such termination.

**SECTION II**
**REPRESENTATIONS AND WARRANTIES OF THE SELLER**

A.    The Seller represents and warrants to the Buyer that each of the statements contained in this <u>Section II</u> are true, correct and complete as of the Effective Date and the Closing Date:

1.    The Seller is the legal and beneficial owner of all of the Purchased Shares, free and clear of all Encumbrances. The Seller owns no other shares of capital stock of the Company other than the Purchased Shares. The Seller has the absolute right to transfer and deliver the Purchased Shares to the Buyer in accordance with the provisions of this Agreement. Immediately upon the Closing, the Buyer will hold good and valid title to the Purchased Shares and will be the exclusive legal and beneficial owner of the Purchased Shares.

2.    The Seller has not pledged all or any portion of the Purchased Shares as collateral for any loan, or entered into any agreements or arrangements which would restrict its right to sell the Purchased Shares to the Buyer in accordance with the provisions of this Agreement.

3.    There are no actions or proceedings pending or threatened, involving the Seller that might reasonably be expected to adversely affect the validity of this Agreement.

4.    This Agreement, and each other agreement, certificate, instrument and document to be delivered by the Seller at the Closing, has been duly executed and delivered by the

5

Seller and, assuming due execution and delivery by the Buyer, constitutes a legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its respective terms.

5.      The execution and delivery of this Agreement, and each other agreement, certificate, instrument and document to be delivered by the Seller at the Closing, and the consummation of the transaction provided for in this Agreement, and the fulfillment of the terms of this Agreement by the Seller do not and will not, with or without the giving of notice, the lapse of time, or both, result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, any agreement or other contract or instrument by which the Seller is bound, any judgment, decree, order, or award of any court, governmental body, or arbitrator, or any applicable law, rule or regulation.

6.      Except for the representations made by the Buyer in <u>Section III</u> below and expressly set forth in this Agreement, no person or entity has made any statement or representation to the Seller regarding any fact relied upon by the Seller in entering into this Agreement, and the Seller specifically does not rely upon any statement, representation, or promise of any other person or entity in executing this Agreement.

7.      The Seller has made such investigation of the facts, and has been given all information requested by the Seller and its advisors, pertaining to this Agreement, the Purchased Shares, the Company, and its assets, liabilities, operations and prospects, in each case as the Seller and its advisors deem necessary. The Seller and its advisors have had the opportunity and/or has received independent tax and legal advice from attorneys, accountants and/or other professional advisors of its choice with respect to this Agreement and the transaction contemplated in this Agreement.

8.      The Seller has not dealt with any broker, finder, or similar agent with respect to the transaction contemplated by this Agreement, and the Seller is under no obligation to pay any broker's fee, finder's fee, or commission in connection with the consummation of the transactions contemplated by this Agreement as a result of any agreement of the Seller.

B.      <u>Survival</u>. All representations, warranties and agreements made herein shall survive the execution, delivery and performance of this Agreement until expiration of the applicable statutes of limitation, including any extensions thereof by agreement or waiver.

**SECTION III**
**REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

A.      The Buyer represents and warrants to the Seller that each of the statements contained in this <u>Section III</u> are true, correct and complete as of the Effective Date and the Closing Date:

1.      The Company is a corporation, duly incorporated, and its status is active, under the laws of Florida.

2.      The Company has the requisite power and authority to execute and deliver this Agreement, to perform its obligations under this Agreement and to consummate the transactions contemplated by this Agreement.  The execution, delivery and performance by the Company of this Agreement and the consummation by the Company of the transaction contemplated by this Agreement have been duly and validly authorized by all necessary action. This Agreement has been

6

duly executed and delivered by the Company and, assuming due execution and delivery by the Seller, this Agreement constitutes the legal, valid and binding obligations of the Company, enforceable against the Company in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law).

3.       The execution and delivery of this Agreement, the consummation of the transactions provided for in this Agreement, and the fulfillment of the terms of this Agreement by the Company do not and will not, with or without the giving of notice, the lapse of time, or both, result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, any agreement or other instrument by which the Company is bound, any judgment, decree, order, or award of any court, governmental body, or arbitrator, or any applicable law, rule or regulation.

5.       The Company has not dealt with any broker, finder, or similar agent with respect to the transaction contemplated by this Agreement, and the Company is under no obligation to pay any broker's fee, finder's fee, or commission in connection with the consummation of the transactions contemplated by this Agreement as a result of any agreement of the Company.

B.       <u>Survival</u>. All representations, warranties and agreements made herein shall survive the execution, delivery and performance of this Agreement until expiration of the applicable statutes of limitation, including any extensions thereof by agreement or waiver.

**SECTION IV**
**COVENANTS**

A.       <u>Further Assurances</u>. At any time and from time-to-time after the Closing Date, at the Buyer's reasonable request, the Seller will promptly execute and deliver all such further instruments or documents in order to fully consummate the transaction contemplated in this Agreement and in order to vest, transfer, confirm, protect, and defend the right, title, and interest of the Buyer in and to the Purchased Shares.

B.       <u>Grant of Proxy</u>. Upon the Effective Date, the Seller hereby appoints Jonathan D. Logan, and any designee of such Person, as the Seller's proxy and attorney-in-fact pursuant to the provisions of Fla. Stat. Sec. 607.0722 to vote and otherwise act, at any meeting of the shareholders of the Company, and in any action by written consent of the shareholders of the Company, for the shareholder with respect to all of the Purchased Shares, including, without limitation, any vote or action by written consent of the shareholders of the Company: (1) in favor of the approval or ratification of the Agreement and the transaction contemplated by this Agreement; (2) against any action, agreement or transaction (other than this Agreement and the transaction contemplated in this Agreement) or proposal that could result in a breach of any agreement, covenant, representation or warranty or any other obligation under this Agreement or that could result in any of the conditions to closing not being fulfilled; and (3) in favor of any other matter necessary to the consummation of the closing of the transaction contemplated by this Agreement and considered and voted upon by the shareholders of the Company. The Seller agrees to execute any such documents or certificates evidencing such proxy as the Buyer may reasonably request. THIS PROXY IS IRREVOCABLE AND IS COUPLED WITH AN INTEREST.

C.      Exclusivity. From and after the Effective Date, the Seller shall not sell, assign, transfer, convey or otherwise dispose of any interest in or with respect to, or otherwise grant any right to, any of the Purchased Shares, except to the Buyer in accordance with the terms of this Agreement. Any attempt to effect such a sale, assignment, transfer, conveyance or disposal in contravention of this Agreement shall be void ab initio and without force or effect.

## SECTION V
## RELEASE

A.      Release. As a material inducement to the Buyer to enter into this Agreement, effective as of the Closing, the Seller, on its own behalf and its trustees, beneficiaries, successors and assigns (collectively, the "Releasors") agrees not to sue or take any other action and fully releases and discharges the Company, and its officers, directors, employees, shareholders, attorneys, agents and representatives (collectively, the "Releasees"), with respect to and from any and all losses, damages, claims, charges, encumbrances, liabilities, covenants or actions, of whatever kind or nature in law, equity or otherwise, whether now known or unknown, all of which such Releasor now owns or holds or has at any time at or prior to the Closing owned or held against the Releasees. It is the intention of the Seller that such release shall be effective as a bar to each and every claim, demand, cause of action or other action hereinabove specified. In furtherance of this intention the Seller hereby expressly waives, effective as of the Closing, any and all rights and benefits conferred upon it, by the provisions of law and expressly consents that this release will be given full force and effect according to each and all of its express terms and provisions, including those related to unknown and unsuspected claims, demands and causes of action, if any, as those relating to any other claims, demands and causes of action hereinabove specified, but only to the extent such section is applicable to releases such as this. Each of the Releasees is an intended third-party beneficiary of this Section V.A.

B.      Exception. Excepted from the foregoing release are any claims that arise out of any breach of the Buyer's obligations under the terms of this Agreement.

## SECTION VI
## MISCELLANEOUS

A.      Notices.  All notices, claims, demands, and other communications under this Agreement shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email of a PDF document if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient, or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  The addresses for such communications shall be:

       If to the Buyer:       Smart Communications Holding, Inc.
                                     10491 72nd St.
                                     Seminole, FL 33777
                                     Attn: Jonathan D. Logan, President
                                     Email: jon.logan787@gmail.com

                                     With courtesy copy to (which shall not constitute notice):

8

> Hill, Ward & Henderson, P.A.
> Bank of America Plaza
> 101 East Kennedy Boulevard
> Suite 3700
> Tampa, Florida 33602
> Attention: Mark M. Wall
> Email: Mark.Wall@hwhlaw.com

If to the Seller:    _____
                     _____
                     _____

With courtesy copy to (which shall not constitute notice):

_____
_____
_____

Each party shall provide notice to the other party of any change in address.

B.    Confidentiality.  Each Party hereby covenants to the other Party that it shall keep confidential and shall not disclose or divulge any aspect of this Agreement, except to the extent that such disclosing Party can demonstrate that such information: (a) is generally available to and known by the public through no fault of the disclosing Party; (b) is lawfully acquired by the disclosing Party from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual, or fiduciary obligation; or (c) is required by applicable law to be disclosed or as necessary or appropriate to enforce legal rights under this Agreement.

C.    Governing Law; Jurisdiction and Venue; Waiver of Jury Trial.  This Agreement and all actions and disputes arising from or related to the transactions contemplated therein (whether in contract, tort or statute) shall be governed by and construed in accordance with the internal laws of the State of Florida without giving effect to any choice or conflict of law provision or rule (whether of the State of Florida or any other jurisdiction).  If any mediation, action or proceeding is brought by any of the Parties to enforce any right or remedy under this Agreement or relating to or arising out of the transactions contemplated hereby, each of the Parties hereto consents to, and agrees to submit to, the exclusive jurisdiction of any state or federal court sitting in Pinellas County, Florida, and waives any claim of improper venue or forum non conveniens as to any such action or proceeding. EACH PARTY, TO THE EXTENT PERMITTED BY APPLICABLE LAW, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED IN THIS AGREEMENT. THIS WAIVER APPLIES TO ANY PROCEEDING, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

D.    Binding Effect.  This Agreement will be binding upon the Parties, their personal and legal representatives, guardians, successors and assigns.  This Agreement will inure to the benefit of the Parties, their personal and legal representatives, guardians, successors and assigns.

E.      Entire Agreement; Amendments.  This Agreement constitutes the entire agreement between the Parties hereto pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, documents, negotiations and discussions, whether oral or written, of the Parties. This Agreement may not be amended except by a written instrument duly executed by both Parties.

F.      Further Documents.  Each Party will take whatever action or actions as are deemed by their respective legal counsel to be reasonably necessary or desirable from time to time to effectuate the provisions or intent of this Agreement, and, to that end, the Parties agree that they will execute, acknowledge, seal and deliver any further instruments or documents that may be requested by their respective legal counsel to give force and effect to this Agreement or any of its provisions, or to carry out the intent of this Agreement or any of its provisions.

G.      Signatures.  This Agreement may be executed in any number of counterparts and by the Parties in separate counterparts, each of which when so executed and delivered shall be deemed an original and all of which counterparts taken together shall constitute one and the same instrument. Signatures received by facsimile, PDF file or other electronic format (including RightSignature) shall be deemed to be original signatures.

H.      Legal Representation. Each of the Company and the Seller acknowledge and agree that Hill, Ward & Henderson, P.A. ("HWH") represents the interests of Jonathan D. Logan, who is the other shareholder of the Company and an intended third party beneficiary of this Agreement, in connection with this Agreement, the other agreements, certificates, instruments and documents contemplated in this Agreement, and the transaction contemplated in this Agreement. Each of the Company and the Seller has been represented by its own legal and tax counsel (which is not HWH) in connection with the negotiation of the transaction contemplated by this Agreement and the drafting and negotiation of this Agreement and the other agreements, certificates, instruments and documents contemplated in this Agreement. Each of the Company and the Seller and their respective legal counsel have had an opportunity to review and suggest revisions to the language of this Agreement and the other agreements, certificates, instruments and documents contemplated in this Agreement. Accordingly, no provision of this Agreement shall be construed for or against or interpreted to the benefit or disadvantage of any Person by reason of any Person having or being deemed to have structured or drafted such provision.

I.      Third Party Beneficiary. Jonathan D. Logan is an intended third-party beneficiary of this Agreement and is entitled to enforce any and all of the rights and benefits under this Agreement and the other agreements, certificates, instruments and documents and may enforce any of the provisions of this Agreement and the other agreements, certificates, instruments and documents contemplated in this Agreement, in each case as if he were the Buyer under this Agreement.

J.      Assignment. Neither this Agreement nor any right, interest or obligation under this Agreement may be assigned, pledged or otherwise transferred by any Party, whether by operation of law or otherwise, without the prior written consent of the other Party; provided, that the Company (a) shall have the right to assign any or all of its rights and obligations under this Agreement to Jonathan D. Logan or any Affiliate of Jonathan D. Logan, and (b) may collaterally assign its rights under this Agreement to any lender or any acquiror of a material part of the assets of the Company, in each case without the prior written consent of the Seller.

 K. <u>Definitions</u>. As used in this Agreement, the following terms have the meanings set forth below:

  1. "<u>Affiliate</u>" means, for any Person, any other Person who controls, is controlled by or is under common control with such Person, and "control" means, with respect to any Person, the direct or indirect ability to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

  2. "<u>Encumbrance</u>" means any lien, encumbrance, security interest, pledge, mortgage, charge, restriction, claim, or similar encumbrance of any kind, whether absolute or contingent.

  3. "<u>Governmental Authority</u>" means any United States federal, state or local governmental, regulatory or administrative authority, agency or commission or any judicial or arbitral body.

  4. "<u>Material Adverse Effect</u>" means any change, effect, development or event, or related series thereof, that has resulted in or would reasonably be expected to result in a material adverse effect on the business, operations, assets, liabilities, prospects, results of operations, conditions (financial or otherwise) or capitalization of the Company.

  5. "<u>Person</u>" means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

  6. "<u>Qualified Appraisal</u>" means a valuation of the Purchased Shares that is based on the following requirements: (i) treating the Company as a going concern and not using a liquidation method of valuation and without regard for discounts applied for minority interests or lack of marketability; (ii) accruing as a liability all federal, state and local taxes, including, but not limited to, sales, payroll, unemployment insurance, excise, franchise and income taxes; (iii) contributions to any qualified pension, profit sharing or other qualified retirement plan for the fiscal year of the Company in which the purchase and sale would occur shall be accrued as a liability and shall be prorated for such fiscal year in accordance with the prior accounting practices of the Company; (iv) accruing an estimated loss as a liability of the Company (to the extent such accrual is required under generally accepted accounting principles) any pending or known claims for negligence or other liability which are not fully covered by the Company's insurance; and (v) any marketable securities held by the Company shall be valued at fair market value based upon the latest quotations available. For the avoidance of doubt, a Qualified Appraisal will not ascribe any value attributable to any assets or rights held by any shareholder of the Company, Affiliate of the Company or any of its shareholders.

  7. "<u>Qualified Appraiser</u>" means a qualified appraiser who regularly performs business appraisals in the United States and is a member of the American Society of Appraisers, the Institute of Business Appraisers, the National Association of Certified Valuation Analysts, or the American Institute of Certified Public Accounts – ABV Accredited.

  8. "<u>Valuation Discrepancy</u>" means there is a difference in the values determined in the Qualified Appraisals performed by the Qualified Appraisers designated by the Seller and the

11

Buyer and engaged by the Company that exceeds in absolute dollar value more than ten percent (10%). For illustration purposes only, if one Qualified Appraiser determined a value in a Qualified Appraisal of $10,000,000, and the second Qualified Appraiser determined a value in a Qualified Appraisal of $15,000,000, then the two Qualified Appraisals would have a difference of fifty percent (50%) and there would be a Valuation Discrepancy.

[SIGNATURE PAGE FOLLOWS ON THE NEXT PAGE]

IN WITNESS WHEREOF, this Stock Purchase Agreement has been executed as of the Effective Date and the Parties by placing their signatures hereto agree to and adopt the terms hereof.

COMPANY:

SMART COMMUNICATIONS HOLDING, INC.


By: _____
        Name: Jonathan D. Logan
        Title: President


SELLER:

JANICE LOGAN, AS TRUSTEE OF THE JAMES LOGAN FAMILY TRUST DATED FEBRUARY 10, 2021


By: _____
        Name: Janice Logan
        Title: Trustee

# EXHIBIT A

## PROMISSORY NOTE

[To be attached]

# **EXHIBIT B**

## **ASSIGNMENT SEPARATE FROM CERTIFICATE**

[To be attached]

**<u>EXHIBIT C</u>**

**STOCK PLEDGE AGREEMENT**

[To be attached]

# EXHIBIT 12



January 20, 2023

Gary M. Miller

111 South Wacker Drive
Chicago, Illinois 60606
**t** 312.704.7700
**d** 312.704.7703
**f** 312.558.1195
gmiller@shb.com

**VIA EMAIL**

Mark M. Wall, Esq.
Eric J. Hall, Esq.
**HILL WARD HENDERSON**
101 East Kennedy Boulevard, Suite 3700
Tampa, FL 33602
mark.wall@hwhlaw.com
eric.hall@hwhlaw.com

**RE:    Smart Communications' Management**

Dear Messrs. Wall and Hall:

We represent Janice Logan ("Janice"), trustee of the James Logan Family Trust dated February 10, 2021 ("the Trust"). It is our understanding that you represent Jonathan Logan ("Jon"). I write regarding the Trust's 50% ownership stake in Smart Communications Holding, Inc. and its affiliates ("Smart Communications"). The Trust is very concerned about Jon's management of Smart Communications, waste of corporate assets, threats to injure the company, and threats of violence against Janice and her family. The Trust has retained Shook, Hardy & Bacon L.L.P. to investigate these concerns. All communications with Janice regarding Smart Communications, whether from your firm or from Jon, should be directed to our attention. To be clear: Our client does not want Jon to communicate directly with her.

On September 16, 2022, James Logan ("Jim") transferred the 5,000 shares of stock in Smart Communications Holding, Inc. personally owned by him to the Trust. As a result of this transfer, and as your client is fully aware, Smart Communications now has two owners, each with a 50% stake: Jon and the Trust.

Shortly before Jim transferred his shares to the Trust, your client tried to pressure Jim to sell his shares for the low-ball sum of $5 million, and a "250k-500k" contract as a consultant. *See* Ex. A (Sept. 12, 2022, email from Jon Logan to Jim Logan). Trying to scare Jim into this deal, your client threatened: "I don't believe you will be alive much longer. . . . If you, or Janice or Alexis try and take anymore from me, I am prepared to do things the normal human could never fathom. . . . Don't test me . . . Have that attorney draft a simple strait [sic] forward agreement with the buyout I listed." *Id.*



This threat cannot be taken lightly given Jon's history of violence.  Jon has:  (1) broken into his parent's home and held a gun to Jim's head while ordering him to sign his shares over (*see* Ex. B, September 18, 2022, email from Jim to Jon); (2) vandalized Janice's car (*id.*); (3) been convicted and incarcerated for aggravated stalking; and (4) sent an email to Jim and Janice with the subject line "Burn your fucking house down."[1]

As CEO, President, Treasurer, and Secretary of the Smart Communications entities since at least November 5, 2019, and as 50% owner, Jon owes the Trust fiduciary duties, including the duties of care, loyalty, and good faith.  From what we have seen, it appears your client has not been acting in accordance with those duties.  Among other things, Jon has been using corporate funds to purchase personal assets including yachts, houses, luxury cars, and he has incurred enormous sums on the corporate credit card, which we find inexplicable if the expenses were truly all work related.

On top of this waste, Jon stated a willingness to harm the company for his personal gain.  When trying to pressure Janice to sell the Trust's 50% stake to him, Jon stated that he would, essentially, burn the company down if she did not comply.  Jon told Janice that if she did not sell, he would refuse to sign agreements on behalf of the company.  If he were to go through with this threat, in a very short period of time, the company would be unable to meet its obligations to customers, employees, and vendors.  Jon further threatened to invalidate or otherwise impair corporate patent rights.

This situation is untenable and must be resolved promptly.  The Trust demands that Jon take the following steps immediately:

- Preserve all email accounts associated with Jim Logan and Jon Logan, including but not limited to all email accounts on the @smartcommunications.us servers; and the @smartjailmail.com servers;

- Provide complete, direct access to all Smart Communications entities' email accounts, books and records, including Smart Communications' accounting software application;

- Agree in writing that any corporate dividends or distributions, in any form, will be made on a 50/50 basis between the Trust and Jon;

---

[1]  The body of the email read:  "You think you two have a right to just hide from me!!???  You think you can just hang up the phone on me!??  Jim you piece of fucking shit trash pathetic fake as father mother fucker I'm coming for you right now!  I am coming home right now!"  Ex. C (August 14, 2021, email from Jon Logan to Jim Logan and Janice Logan).

ATLANTA | BOSTON | CHICAGO | DENVER | HARTFORD | HOUSTON | KANSAS CITY | LONDON | LOS ANGELES | MIAMI | NEW YORK |
ORANGE COUNTY | PHILADELPHIA | SAN FRANCISCO | SEATTLE | ST. LOUIS | TAMPA | WASHINGTON, D.C.



January 20, 2023
Page 3

- Convene a shareholder meeting to appoint Janice as (1) director of Smart Communications Holding, Inc. and (2) director of all other Smart Communications entities;

- Thereafter, convene a meeting of the board of directors of Smart Communications Holding, Inc. to appoint Janice as Vice President;

- Following such appointment, add Janice as a signatory to all Smart Communications bank accounts, and require signatures of both Jon and Janice for any corporate payments over $50,000.00;

- Sell the yachts (the 100' Riva Corsaro and the 48' center console Nortech), with 50% of the proceeds to be paid to the Trust; and

- Refrain from threatening or abusing (physically, verbally, or emotionally) Janice and her family.

In addition, the Trust demands that Jon pay to the Trust, within 60 days, an amount equal to half of the purchase price of the below assets purchased by the company for Jon's personal use:

- the 100' Riva Corsaro (roughly $10 million at the time of purchase);

- the 48' center console Nortech (roughly $1 million at the time of purchase);

- the Rolls-Royce (roughly $250,000 at the time of purchase);

- the Lamborghini (roughly $300,000 at the time of purchase);

- the Ferrari (roughly $350,000 at the time of purchase); and

- the Brickell Condo (roughly $1.5 million at the time of purchase).

Since these purchases were, in effect, distributions to one shareholder (Jon), the Trust is entitled to 50% of the amounts paid by virtue of its right to 50% of all company distributions. That amount totals $6.7 million, with appropriate adjustments to account for the foregoing.

If your client should refuse any of these demands, or if he accedes to them and later fails to meet them, the Trust is prepared to seek redress in court. If forced to litigate, the Trust will aggressively pursue any or all of the following:



January 20, 2023
Page 4

- A full accounting by a third-party forensic accounting firm;

- Appointment of a custodian to oversee Smart Communications' operations;

- A restraining order to prevent Jon from diverting funds from Smart Communications in excess of market-rate compensation for his services and distributions paid 50/50 to himself and the Trust; and

- Any other forms of relief allowed by law.

Please provide notice of your client's agreement to the above demands by January 25.

Sincerely,

*/s/ Gary M. Miller*

Gary M. Miller

Attachments

cc:    Janice Logan

# EXHIBIT 13

## SHAREHOLDERS' AGREEMENT
## SMART COMMUNICATIONS HOLDING, INC.

THIS SHAREHOLDERS' AGREEMENT (the "Agreement") is made and entered into as of the *23* day of September, 2022 ("Effective Date"), by and among James Logan, as Co-Trustee of the James Logan Family Trust, dated February 10, 2021 (the "James Trust") and Jon Logan (each, and any future shareholders may be separately referred to as "Shareholder" and collectively as the "Shareholders"); and SMART COMMUNICATIONS HOLDING, INC., a Florida corporation (the "Corporation").

### RECITALS:

A.     The Shareholders together own one hundred percent (100%) of the issued and outstanding shares of capital stock of the Corporation as of the Effective Date, as follows:

| Name of Shareholder | Number of Shares | Percentage Interest |
|---|---|---|
| James Trust | 5,000 | 50% |
| Jon Logan | 5,000 | 50% |

B.     The parties believe that it is in their best interests to make provision for the future disposition of a Shareholder's stock in the Corporation pursuant to this Agreement.

C.     The parties have agreed that their execution of this Agreement would be in their best interests and would promote harmonious relationships among the Shareholders with respect to the conduct of the affairs of the Corporation.

IT IS THEREFORE AGREED, in consideration of the promises and mutual covenants contained herein and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, as follows:

### ARTICLE ONE - INTRODUCTION

1.1.    Recitals.  The parties agree that the recitals are true and correct and the recitals are hereby incorporated into this Agreement.

1.2.    Exhibits.  Any exhibits referred to in this Agreement are hereby incorporated into this Agreement.

1.3.    Definitions.

(a)     The definitions set forth in the preamble and recitals shall be used in the Agreement.

1

(b)     The term "closing" shall refer to any purchase made by the Corporation or any Shareholder pursuant to this Agreement.

(c)     The term "Key Designee" shall mean James Logan, with respect to the James Trust. In addition, the term "Key Designee" shall include the principal party identified by the transferor upon the purchase or transfer of Stock, with respect to any Shareholder. Upon the death of a current Key Designee, if no successor Key Designee is identified, each heir or primary beneficiary receiving Stock shall be a Key Designee.

(d)     The term "Stock" shall mean all of the shares of capital stock of the Corporation now or hereafter owned by a Shareholder, together with all rights, options, warrants, or otherwise to acquire shares of capital stock of the Corporation, now or hereafter possessed by a Shareholder, his or her personal representatives upon his or her death, or any other successor in interest of any kind whatsoever.

1.4     Shareholder Vote.  Unless otherwise expressly provided, all references to a vote, consent to action, approval, or other authorization to act or refrain from action by a Shareholder or the Shareholders shall refer to the vote, consent to action, approval, or other authorization to act or refrain from action by the Shareholders holding voting shares only.  In no event shall a Shareholder holding non-voting shares have any rights to vote or consent.

## ARTICLE TWO - RESTRICTIONS

2.1.    Restriction on Transfer.  No Shareholder shall sell, assign, give, pledge, encumber, or otherwise transfer all or any part of his or her Stock, except as provided in this Agreement.  Any such attempted transfer shall be void and of no force and effect.  In the event any such prohibited transfer is forced or upheld by any court of law, such transferee shall have an economic interest only, and shall not be entitled to vote.

2.2.    Endorsement on Certificates.   Each certificate representing shares of capital stock of the Corporation now or hereafter held by the Shareholders shall be stamped with a legend in substantially the following form:

"The Stock represented by this Certificate has not been registered under the Securities Act of 1933, as amended, the Florida Securities and Investor Protection Act, or any other similar securities statute. This certificate may only be transferred upon registration of the shares under the foregoing statutes and applicable regulations adopted thereunder or upon the delivery to the Corporation of advice of counsel satisfactory to the Corporation that such registration is not required. This stock certificate and the shares of stock represented by it are held subject to a Shareholders' Agreement, dated as of September 22, 2022, as amended from time to time, a copy of which is recorded in the minute book of the Corporation, placing restrictions upon the alienation of said stock. A copy of said Agreement will be furnished to any shareholder upon request and without charge."

2

2.3.    Permitted Transfers.

(a)    Subject to the further terms of this Section 2.3, including the requirement that transferee sign the Joinder Agreement (as noted hereinbelow), any Shareholder may transfer all, or any portion, of his or her shares to i) any person approved by written consent of a majority of the Shareholders (provided that the Stock of the transferor shall not be entitled to vote with respect to such transfer), ii) any other Shareholder, or iii) with respect to a Shareholder, a trust for the benefit of such Shareholder or Key Designee, such Shareholder's or Key Designee's spouse, or such Shareholder's or Key Designee's descendants, solely for estate planning or asset protection purposes (any such transferee pursuant to this Section is referred to as a "Permitted Transferee").

(b)    Notwithstanding anything contained in the Agreement to the contrary, Permitted Transferees pursuant to Section 2.3(a)(iii) above, shall only be Permitted Transferees so long as i) the Shareholder remains the sole and exclusive agent or proxy to vote the Stock being transferred, ii) the Permitted Transferee executes and delivers to the non-transferring Shareholders a counterpart of this Agreement agreeing to be bound by the terms hereof, iii) the Corporation receives advice of Corporation's counsel to the effect that such transfer does not contravene does not otherwise conflict with the terms or conditions of the Agreement, and iv) if the Transfer is to a trust, the trustee and all current beneficiaries thereof agree in writing that no amendment of such trust instrument and no assignment of beneficial interest in such trust will be made without an advance written opinion of Corporation's counsel to the effect that such amendment or assignment does not contravene, and is not otherwise in conflict with, the terms or conditions of the Agreement.    A change of Key Designee shall constitute a transfer which shall be again subject to the restrictions provided herein.

(c)    Any Stock transferred pursuant to this Section shall remain subject to this Agreement, and upon receipt of delivery of shares representing the transferred Stock the transferee shall be so bound.    The transferee shall acknowledge in writing that the Stock transferred remains subject to this Agreement by executing a Joinder Agreement, substantially in the form attached hereto as Exhibit A.

(d)    The making of any transfer permitted by this Section shall not relieve or alter the transferor Shareholder's obligations under this Agreement, and the parties to this Agreement may enforce such obligations directly against the transferor Shareholder as if such transfer had not occurred.

(e)    Any attempted transfer to a Permitted Transferee without satisfying all of the applicable requirements of this Section 2.3, including but not limited to, obtaining the required approval shall be void *ab initio* and of no force and effect.

2.4.    Encumbrance of Stock.

(a)    No Shareholder shall have the right to encumber all or any part of his or her Stock during his or her lifetime without the unanimous written consent of the Shareholders. Any attempted encumbrance without the required approval shall be void and of no

3

force and effect. In the event of an attempted prohibited encumbrance that is held to be enforceable by a court of competent jurisdiction, the pledgee shall accept such stock subject to the terms and conditions of this Agreement, and upon request of the Corporation, the pledgee shall acknowledge in writing that the pledged stock remains subject to this Agreement.

(b)     In the event any validly pledged stock is purchased in accordance with this Agreement, the proceeds shall be paid to the pledgor and pledgee as their interests appear, and the pledged shares shall be released to the purchaser. In the event of any dispute or ambiguity regarding the respective rights of the pledgor or pledgee, the purchaser shall be entitled to disburse all proceeds to the party in possession of the certificate representing the pledged shares.

(c)     In the event the pledgee of encumbered stock or a judgment lien holder shall exercise any right or remedy under any security or stock pledge agreement or in accordance with any applicable laws, or attempt to cause a public or private sale of such stock, the pledgee or lien holder shall notify the Corporation and the other Shareholder(s) and such notice shall be deemed to be an offer made under Article Three of this Agreement to sell such stock at a price determined in accordance with Article Five. In the event such Stock so pledged is purchased pursuant to this Agreement, the purchaser may remit to such pledgee or secured party all or that portion of the proceeds otherwise due the Shareholder, to the extent necessary to release such security interest.

## ARTICLE THREE - RIGHT OF FIRST REFUSAL

3.1.     Proposed Transfer. Except to a Permitted Transferee, no Shareholder shall sell, transfer, assign or otherwise dispose of all or any part of his Stock now or hereafter owned during his lifetime to any person, firm, or corporation, unless the Shareholder desiring to make such transfer or other disposition (hereinafter referred to as the transferor) shall have first made an offer to sell such stock to the other Shareholder(s) in the manner hereinafter described and such offer shall not have been accepted. The Shareholders may, upon unanimous agreement of the non-transferring Shareholders, assign the rights of first refusal under this Article Three to the Corporation, in their sole discretion.

3.2.     Offer. The offer shall be given by the transferor to the other Shareholders simultaneously, pro-rata in accordance with their ownership at the time of such offer. The offer shall be a written offer to sell all the Stock owned by the transferor which is to be transferred, to which shall be attached a statement of intention to transfer, the name and address of the prospective transferee, the number of shares of capital stock involved in the proposed transfer, and the terms of such transfer.

3.3.     Acceptance by Shareholders. Within thirty (30) days after the receipt of such offer, the other Shareholder(s), at their option, may elect to purchase all, but not less than all, the Stock of the Corporation owned by the transferor which is to be transferred. Should the other Shareholders elect to purchase all of the Stock subject to the offer, they shall be entitled to purchase, and transferring Shareholder shall sell, such Stock for the price set forth in the offer, and the purchase shall be effected in accordance with the other terms and provisions set forth in

4

such offer. Such purchase shall be on a pro-rata basis, based upon the shares of Stock then held by the other Shareholder(s). If any Shareholder declines to purchase, and the remaining Shareholder(s) desire to purchase all, but not less than all, of the Stock which is to be transferred, they may, in that event, elect to do so. Such purchase shall be pro-rata, based upon Stock then held by the Shareholder(s) who have elected to purchase such additional amounts. The other Shareholder(s) shall exercise their election to purchase by giving notice thereof to the transferor and to the Corporation. The notice shall specify a date for the closing of the purchase which shall be not more than thirty (30) days after the date of the giving of such notice. If no election is made by the other Shareholder(s) to purchase all of the Stock of transferor after thirty (30) days, the Shareholder(s) shall be deemed to have elected not to accept such offer.

       3.4.    Release from Restriction. If the offer to sell is not accepted by any of the other Shareholder(s) (or the Corporation if assigned pursuant to Section 3.1), the transferor may make a bona fide transfer to the prospective transferee named in the statement attached to the offer, provided such transfer shall be made only in strict accordance with the terms therein stated. However, if the transferor shall fail to make such transfer within thirty (30) days following the election by the other Shareholder(s) not to accept such offer, such Stock shall again become subject to all the restrictions of this Agreement. Provided, further, however, that nothing contained herein shall be construed as releasing any Stock from any restrictions or requirements of law concerning transfer of such Stock.

## ARTICLE FOUR – OPTION TO PURCHASE/MANDATORY PURCHASE

       4.1.    Option.

       (a)    Upon an Involuntary Transfer (as defined in Section 4.2, the Involuntary Transfer shall be referred to herein as a "Triggering Event," and in each case either the transferor Shareholder or the terminated Shareholder is referred to herein as "Transferring Shareholder") the Corporation shall have the privilege and first option to purchase all, or any part, of the Transferring Shareholder's Stock, at the price determined in accordance with the provisions of Article Five and in accordance with the terms of Article Six.

       (b)    The Corporation shall exercise its option by delivery of a written notice to the Transferring Shareholder within ninety (90) days after the Triggering Event (or discovery of Triggering Event by the Corporation, if later). The closing shall take place at a date selected by Corporation upon not less than five (5) days' notice to the Transferring Shareholder, which date shall be not more than two hundred seventy (270) days after the date of the Triggering Event.

       (c)    In the event the Corporation does not exercise its option to purchase, or elects to purchase less than all of, the Transferring Shareholder's Stock, the remaining Shareholders shall have the privilege and second option to purchase the remaining unpurchased, all, or any part, of the Transferring Shareholder's Stock, pro-rata in accordance with their ownership on the date of determination and at the price determined in accordance with the provisions of Article Five and in accordance with the terms of Article Six.

5

(d)     The remaining Shareholder(s) shall exercise their option by delivery of a written notice to the Transferring Shareholder within one hundred twenty (120) days after the Triggering Event (or discovery of Triggering Event by the Corporation, if later). The closing shall take place at a date selected by Corporation upon not less than five (5) days' notice to the Transferring Shareholder, which date shall be not more than two hundred seventy (270) days after the date of the Triggering Event.  If any Shareholder declines to purchase and the remaining Shareholders desire to purchase the Stock which is to be transferred, they may, in that event, elect to do so.  Such purchase shall be pro-rata, based upon Stock then held by the Shareholder(s) who have elected to purchase such additional amounts.

4.2     Involuntary Transfer.  For the purposes of this Agreement, "Involuntary Transfer" shall mean any transfer in the event a Shareholder (i) files a voluntary petition under any bankruptcy or insolvency law or petition for the appointment of a receiver or makes an assignment for the benefit of creditors, (ii) is subjected involuntarily to such a petition or assignment or to an attachment with respect to his/her shares in the Corporation and such involuntarily petition, assignment or attachment is not discharged within thirty (30) days after its effective date, or (iii) is subjected to any other involuntary transfer of his/her/its shares in the Corporation by legal process, including without limitation, an assignment or transfer pursuant to a divorce decree of a Shareholder or, in the case of a Shareholder that is a trust, a divorce decree of a Shareholder.

4.3     Mandatory Purchase upon Death of a Shareholder.   Upon the death of a Shareholder or, in the case of a Shareholder that is a trust, the death of the Key Designee (in each case referred to herein, along with the personal representative of a deceased individual Shareholder as the "Decedent Shareholder"), the Corporation shall purchase and the Decedent Shareholder shall sell, all of the Decedent Shareholder's Stock, at the price determined in accordance with the provisions of Article Five and in accordance with the terms of Article Six. The parties acknowledge and agree that the Corporation intends to obtain one or more policies insuring the life of each Shareholder or, in the case of a Shareholder that is a trust, insuring the life of the Key Designee, and for coverage amounts to be determined by approval of the Shareholders.  The parties hereby further acknowledge and agree that such mandatory purchase obligation shall be assignable by the Corporation in its sole and absolute discretion on a pro-rata basis (based on Stock ownership) to the Shareholders other than the Decedent Shareholder.

The Corporation shall be the sole owner of any life insurance policies issued to it and at its option may apply any dividends on those policies toward the payment of premiums on those policies.  Should any Shareholder sell his or her Stock pursuant to this Agreement at a time when the Corporation owns a life insurance policy on such Shareholder's life, or, in the case of a Shareholder that is a trust, on the life of the Key Designee, the Shareholder shall have the right and option to purchase such policies from the Corporation at a price equal to the then cash surrender value of the policy or policies.  The Shareholder shall exercise this option by delivery of written notice to the Corporation at least twenty (20) days prior to the closing of the Stock sale.  At the closing the Corporation shall deliver the policy or policies to the Shareholder and shall execute any instruments necessary to transfer the policies and to change the designated beneficiary. The Shareholder shall deliver the purchase price for such policies in cash at closing.

6

## ARTICLE FIVE - PURCHASE PRICE

5.1.    Date of Determination.  The date of determination of the purchase price of any Stock transferred pursuant to this Agreement shall be as of the last day of the calendar month immediately preceding the date of the Triggering Event or any other event which creates any purchase of any Stock pursuant to this Agreement.

5.2    Established Purchase Price.  Notwithstanding anything contained herein to the contrary, the parties hereto, as of any given date, may set a price for each share of stock, and that price shall apply during the period for which such specified price is made applicable, provided there is endorsed as an Addendum hereto in the form set forth below, signed by all of the parties; provided, further that the payment terms shall be in accordance with Section 6.3, subject to Section 6.2 with respect to available life insurance proceeds:

### ADDENDUM TO SHAREHOLDERS' AGREEMENT

The price of each share of stock subject to the Shareholders' Agreement between the undersigned shall be $_____ per share.  This price shall be effective from the date hereof until _____, 20___.

The parties, in addition to the foregoing, hereby elect to amend Section 6.3 of Article Six as follows:

The purchase price set forth above, shall be paid, subject to Section 6.2 with respect to available life insurance proceeds, in cash, or, at the election of the purchaser, in not more than _____ equal monthly installments.  The interest rate shall be _____ percent (__%) but in no event less than the lowest "applicable Federal rate."

Date: _____, 20___.

_____

_____
SHAREHOLDERS

_____
CORPORATION

5.3    Purchase Price.

(a)    The parties hereto agree that the Stock shall be valued at fair market value.  Except as specifically otherwise provided in Section 5.2 regarding an agreed upon purchase price for the Stock, the fair market value of the Stock shall be determined by mutual agreement of the purchaser and the seller of the shares being valued, if possible.

7

(b)    If such seller and purchaser shall not agree on such value within a ten (10) day period and there is no then applicable agreed upon purchase price as provided in Section 5.2, the Corporation (at its expense) shall promptly and within thirty (30) days designate a qualified appraiser who regularly performs business appraisals in the United States of America and must be a member of the American Society of Appraisers, the Institute of Business Appraisers, the National Association of Certified Valuation Analysts, or the American Institute of Certified Public Accounts – ABV Accredited, and the decision of such appraiser shall be final and binding on the parties. In the event the Corporation is unable or unwilling to appoint such an appraiser, then such appraiser shall (instead) be appointed by the Corporation's regularly used accountant. In the event the Corporation owns real property at the time of such appraisal, the appraiser shall be, or engage, a qualified real estate appraiser who is either a MAI or SRA and has performed at least three appraisals of commercial real estate properties within the period two years prior to being selected.  Notwithstanding any other provision contained in this Agreement to the contrary, if such valuation shall be submitted for appraisal, the date of any closing of the purchase specified herein shall take place within sixty (60) days after the determination of such value by appraisal if such determination by appraisal shall not be made before the closing date otherwise provided for herein.  The Stock shall be valued treating the Corporation as a going concern and not using a liquidation method of valuation and there shall be no discounts applied for minority interests, lack of marketability, or similar circumstances.    The following adjustments shall be observed by the appraisers in determining the value of such shares:

(1)    All Federal, state and local taxes including, but not limited to, sales, payroll, unemployment insurance, excise, franchise and income taxes shall be accrued as a liability.  If appraised values of any tangible assets required to be valued at other than book value under this Agreement would, if sold by the Corporation, produce a taxable gain or loss to the Corporation, appropriate adjustments for tax effect shall be made by the appraisers.

(2)    Proceeds payable under a corporate owned disability buyout insurance policy insuring the Shareholder whose stock is being valued for purchase hereunder shall be excluded from the computation of such adjusted book value to the extent such proceeds exceed the cash value of the policy, if any, as of the date to which premiums have been paid.

(3)    Contributions to any qualified pension, profit sharing or other qualified retirement plan for the fiscal year of the Corporation in which the date of determination falls shall be accrued as a liability and shall be prorated for such fiscal year in accordance with the prior accounting procedures of the Corporation.

(4)    In the event of any pending or known claims for negligence or other liability which are not fully covered by insurance, the appraisers shall accrue any estimated loss therefrom as a liability of the Corporation to the extent such accrual shall be required under generally accepted accounting principles.  Each party agrees to submit in connection with such determination a certificate as to their knowledge of any pendency or probable pendency or possible pendency of such claims.  The accountants shall be authorized to take such action or actions as shall be required for said accountants to make such determination.

(5)    Marketable securities shall be valued at fair market value based upon the latest quotations available.

## ARTICLE SIX - PAYMENT

6.1.    Closing.  The closing of any purchase under this Agreement shall take place at the principal office of the Corporation or effectuated by mail or electronic means as may be agreed by the parties, in any case all within the appropriate time period set forth in this Agreement.

6.2.    Payment of Purchase Price.  If the purchaser is paying the asking price stated in the notice described in Article Three, then the purchaser shall pay the purchase price according to the terms and conditions stated in the notice.  If the purchaser is paying an established purchase price pursuant to Section 5.2 and the terms of the payment of the established purchase price are set forth in the applicable Addendum to Shareholders' Agreement, the payment terms set forth therein shall apply.  If the purchaser is paying the purchase price determined in accordance with the provisions of Article Five hereof, other than an established purchase price pursuant to Section 5.2 for which payment terms are designated, then twenty percent (20%) of the purchase price shall be paid, in cash at closing, and the remaining eighty (80%) of the purchase price may be paid, in cash at closing, or in accordance with Section 6.3, at the option of the purchaser. Notwithstanding the foregoing, if the Corporation owns one or more policies insuring the life of the Decedent Shareholder and either the Corporation or the other Shareholders (other than the Decedent Shareholder) are purchasing the Decedent Shareholder's Stock pursuant to Section 4.3, then an amount equal to the greater of (i) the proceeds of such policies received by the Corporation, but not in excess of the purchase price, or (ii) twenty percent (20%) of the purchase price shall be paid in cash at closing to the seller and the remaining balance of the purchase price may be paid, in cash at closing, or in accordance with Section 6.3, at the option of the Corporation.

6.3.    Installment Payments.

(a)    Except as otherwise provided in a then applicable Addendum to Shareholders' Agreement pursuant to Section 5.2, if the purchaser elects payment in installments, the purchase price shall be paid in not more than sixty (60) equal monthly installments, the first such installment being payable upon the one month anniversary of the closing, and the remaining installments, if any, successively thereafter.  Such remaining installments shall be represented by a promissory note of the buyer delivered to the seller, bearing interest at the rate equal to the greater of: i) four percent (4%) per annum, or ii) the lowest "applicable Federal rate" available for the closing date, as that rate is defined in Section 1274(d) of the Internal Revenue Code of 1986, as amended, taking into consideration the term of the note.  It is the intention of the parties that the interest rate so determined shall be sufficient to avoid re-characterization of amounts due under the note as unstated interest or original issue discount.  The note shall provide that the maker shall have the privilege of prepaying all or any part thereof at any time, and that a default in any payment of principal and/or interest, as fixed in such note, shall cause the remaining unpaid balance to become due and payable forthwith.  The

9

note shall further provide for the payment of costs and attorney fees related to collection and shall be in non-negotiable form.

6.4.    Pledge of Purchased Stock.

(a)    Unless the entire purchase price has been paid in cash, whenever any party purchases shares of Stock under this Agreement, such purchaser shall, following the delivery of the purchased Stock, deliver the Stock to the seller as collateral security for the payment of the unpaid purchase price.

(b)    The pledged Stock shall be so held until the entire purchase price is paid in full. So long as the purchaser is not in default, the purchaser shall be entitled to exercise all voting rights with respect to any such Stock held as collateral security. Dividends paid and amounts distributed shall be paid to the purchaser.

(c)    The pledgor hereby appoints pledgee his attorney-in-fact to arrange for the transfer of the pledged shares of Stock on the books of the Corporation to the name of the pledgee in the event of a purchaser default. The pledgee of such shares shall have all rights and remedies available under the Uniform Commercial Code in the event the purchaser defaults under his obligation to pay for such shares.

6.5    Release of Guarantee.    In the event of a purchase pursuant to this Agreement, the Corporation shall pay off all debt owed to the selling Shareholder, and all debt guaranteed by the selling Shareholder shall be paid off or the guarantee shall be released.

6.6    Setoff. In the event of a purchase pursuant to this Agreement, it is hereby agreed that the Corporation and/or a purchasing Shareholder, as applicable, may set-off and apply against the purchase price any amounts, including, but not limited to, accrued interest, owed from such selling Shareholder to the Corporation and/or a purchasing Shareholder, as applicable.

6.7    Shares Still Subject to Agreement. The shares transferred to Shareholders or others in accordance with this Agreement shall, however, to the extent permitted by law, continue to be subject to the terms hereof and the transferee shall be a party hereto and, upon delivery of such shares, shall be bound hereby. The transferee shall acknowledge in writing that the Stock transferred remains subject to this Agreement by executing a Joinder Agreement, substantially in the form attached hereto as Exhibit A.

ARTICLE SEVEN - GENERAL PROVISIONS

7.1.    Notices.   Any and all notices, designations, consents, offers, acceptances, or any other communication provided for herein shall be given in writing and shall be deemed given a) upon delivery, if delivered in person, b) upon response, if by email to the email address known to be associated with such notice recipient and which email is confirmed or responded to by receiving party, or c) three days following deposit with the United States Postal Service by registered or certified mail, with proper postage, which shall be addressed to such Shareholder's

address or on the stock books of the Corporation, or to the Corporation at its then principal office as registered with the Florida Secretary of State.

7.2.    **Specific Performance.**  The parties hereby declare that it is impossible to measure in money the damages which will accrue to a party hereto or to the personal representatives of a decedent by reason of a failure to perform any of the obligations under this Agreement. Therefore, in addition to any other remedies provided by law or in equity any party hereto or the personal representatives of a decedent shall have the right to enforce specific performance of this Agreement and any person (including the Corporation) against whom such action or proceeding is brought hereby waives the claim or defense therein that such party or such personal representatives has or have an adequate remedy at law, and such person shall not urge in any such action or proceeding the claim or defense that such remedy at law exists.

7.3.    **Survival.**  The representation and warranties and provisions of this Agreement shall survive any closing hereunder.

7.4.    **Modification.**  No change or modification of this Agreement shall be valid unless the same be in writing and signed by all the parties hereto.

7.5.    **Prior Agreements.**  This Agreement supersedes any prior agreement of the parties related to the Stock.

7.6.    **Termination.**

(a)    This Agreement and all restrictions on Stock transfer created hereby shall terminate on the occurrence of any of the following events:

(1)    The bankruptcy or dissolution and liquidation of the Corporation;

(2)    A single Shareholder becoming the owner of all of the Stock subject to this Agreement;

(3)    The execution of a written instrument by the Corporation and the Shareholders terminating this Agreement; or

(4)    The death of all of the Shareholders (or, in the case of a Shareholder that is a trust, the death of the Key Designee) within ninety (90) days of each other.

(b)    The termination of this Agreement for any reason shall not affect any right or remedy existing hereunder prior to the effective date of termination hereof except that in the event subparagraph (a)(4) of this Section 7.6 applies, any obligation under this Agreement of the Corporation and/or any Shareholder to purchase the stock of a Shareholder hereunder shall be null and void.

11

7.7.    Incompetency.  If a Shareholder is legally declared incompetent, his or her guardian shall have all of the rights of and be subject to all of the obligations under this Agreement.

7.8.    Construction.  Wherever the context so requires, the masculine shall include the feminine and neuter and vice versa, and the singular shall include the plural and vice versa.

7.9.    Counterparts.  This Agreement may be executed in several counterparts with the same effect as if the signature on each such counterpart were on the same instrument. A signed copy, including by DocuSign or other electronic signature, of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

7.10.    Severability.  In case any one or more provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein.

7.11.    Attorneys' Fees.  In the event that any party is required to engage the services of legal counsel to enforce its rights under this Agreement against any other party, regardless of whether such action results in litigation, each party shall bear the cost of his, her, or its own attorneys' fees and costs.

7.12.    Shareholders' Inspection Rights.  As long as they own Stock, each Shareholder shall have the right to examine, in person or by agent or attorney, at any reasonable time or times, for any proper purpose, the relevant books and records of accounts, minutes and records of Shareholders and other shareholders of the Corporation and to make copies or extracts therefrom.

7.13.    Attorney's Representations.  The parties each acknowledge that the Corporation's counsel, Johnson, Pope, Bokor, Ruppel & Burns, LLP, prepared this Agreement on behalf of and in the course of its representation of the Corporation, and that:

(a)    The Shareholders have been advised that a conflict exists among their individual interests;

(b)    The Shareholders have been advised to seek the advice of independent counsel, and the Shareholders have had the opportunity to seek the advice of counsel;

(c)    The Shareholders have received no representations regarding the tax consequences of this Agreement; and

12

(e)    The Shareholders have been advised that this Agreement may have tax consequences and have had an opportunity to seek the advice of independent tax counsel.

7.14.    Amendment of Bylaws. The Shareholders hereby agree that the terms of this Agreement shall supersede any provision of the Bylaws of the Corporation that might be in conflict with this Agreement, and to the extent required by Florida law, this Agreement shall be considered a written action taken by the Shareholders of the Corporation and shall be deemed an amendment of the Corporation's Bylaws.

7.15.    Board of Directors. The Shareholders agree to vote or act with respect to their Stock and the Corporation agrees to take all actions necessary, so as to fix the number of directors constituting the board of directors of the Corporation at two (2), during such time that James Logan and Jon Logan both are alive.  Following the death of either of them, the Shareholders agree to vote or act with respect to their Stock and the Corporation agrees to take all actions necessary, so as to fix the number of directors constituting the board of directors of the Corporation at one (1).  Following the death of both of James Logan and Jon Logan, or in the event both directors named herein resign, the provisions of this Section 7.15 shall terminate and the Board of Directors shall be elected in accordance with the Bylaws of the Corporation.  The Shareholders agree that each Shareholder shall take all other necessary action within his, her, or its control (in his capacity as a stockholder and including without limitation, attendance at meetings in person or by proxy for purposes of obtaining a quorum and execution of written consents or resolutions in lieu of meetings), and the Corporation shall take all necessary actions within its control (including, without limitation, calling special board and stockholders' meetings) so that: i) while the number of directors is fixed at two (2) hereunder, one (1) member of the Board is James Logan and one (1) member of the Board is Jon Logan, and ii) while the number of directors is fixed at one (1) hereunder, such director is the survivor of James Logan and Jon Logan.

[signatures appear on following page]

13

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of September 23, 2022.

SMART COMMUNICATIONS HOLDING, INC.

By:_____
    James Logan, President

SHAREHOLDERS:

_____
James Logan, as Co-Trustee of the
James Logan Family Trust, dated
February 10, 2021

Address:   _____

               _____

_____
Jon Logan

Address:   _____

               _____

14

# WRITTEN ACTION OF THE BOARD OF DIRECTORS
## SMART COMMUNICATIONS HOLDING, INC.

The Board of Directors of SMART COMMUNICATIONS HOLDING, INC. (the "Corporation") by unanimous written action adopt the following resolution:

Upon motion duly made, seconded and carried, it is

RESOLVED, that the Shareholders' Agreement between the Corporation and its shareholders is hereby approved and ratified and the President of the Corporation is directed to enter into the agreement on behalf of the Corporation as of ___9-23___, 2022, all prior agreements with respect to the subject matter are hereby revoked and terminated, and the Secretary of the Corporation is hereby instructed to place a copy of the agreement in the minute book of the Corporation.

In accordance with the bylaws and articles of the Corporation, effective as of ___9-23___, 2022.

DIRECTORS:

_____
James Logan

_____
Jon Logan

# EXHIBIT 6

# EXHIBIT 11

Logan v. Logan
**TRIAL EXHIBIT**
**203**

**Ex. 203.001**

**HWH DRAFT 12/22/2022**
*For discussion purposes only*

## STOCK PURCHASE AGREEMENT[1]

THIS STOCK PURCHASE AGREEMENT (this "Agreement") is entered into as of this __ day of _____, 2022 (the "Effective Date"), between SMART COMMUNICATIONS HOLDING, INC. a Florida corporation (the "Company," and sometimes referred to in this Agreement as the "Buyer"), and JANICE LOGAN, AS TRUSTEE OF THE JAMES LOGAN FAMILY TRUST DATED FEBRUARY 10, 2021 (the "Seller"). The Seller and the Buyer are sometimes referred to in this Agreement individually as a "Party" and, collectively, the "Parties".

## BACKGROUND

The Seller owns five thousand (5,000) shares of common stock of the Company (the "Purchased Shares"), that were assigned to the Seller pursuant to the Stock Power, dated September 16, 2022, executed and delivered by James P. Logan in favor of the Seller.

The Seller desires to sell, transfer and assign, and the Buyer desires to purchase and receive, the Purchased Shares pursuant to the terms and conditions of this Agreement and the other instruments, agreements, certificates and documents expressly referenced in this Agreement to be delivered in connection with the transaction set forth in this Agreement.

## OPERATIVE TERMS

The Parties agree as follows:

## SECTION I
## STOCK PURCHASE AND SALE; CLOSING

A.    Sale and Purchase of Purchased Shares.  At the Closing (as defined below), the Seller shall sell, transfer and assign to the Buyer all of the Seller's rights, title and interest in and to the Purchased Shares, free and clear of any and all Encumbrances, and the Buyer shall purchase and receive from the Seller the Purchased Shares.

B.    Consideration for Purchased Shares. The aggregate consideration for the Purchased Shares shall be the Purchase Price as determined in accordance with Section I.C. below.

C.    Determination of Purchase Price. The "Purchase Price" shall mean the amount of the aggregate consideration for the Purchased Shares finally determined pursuant to the terms of this Section I.C.:

1.    The Parties will use reasonable efforts to negotiate and mutually determine the Purchase Price within ten (10) days after the Effective Date.

2.    If the Parties are unable or unwilling to mutally determine the Purchase Price within such ten (10) day period, each Party shall designate its own Qualified Appraiser within thirty

---

[1] **NOTE TO DRAFT**: This draft needs to be reviewed by the Company's legal counsel and tax advisors.

1

**Ex. 203.002**

(30) days after the Effective Date to prepare a Qualified Appraisal of the Purchased Shares. Each Qualified Appraiser will be engaged by the Company, and the Company shall instruct each Qualified Appraiser to complete its Qualified Appraisal within thirty (30) days after such Qualified Appraiser's engagement by the Company. The reasonable fees and costs of each Qualified Appraiser for such engagement will be paid by the Company. Once a Qualified Appraisal has been completed, the Company shall share with the Parties a copy of such Qualified Appraisal. The Parties shall average the values determined under each Qualified Appraisal for the Purchased Shares, and such average shall be the Purchase Price for the Purchased Shares and final and binding on the Parties, unless there is a Valuation Discrepancy (as defined below).

        3.     In the event there is a Valuation Discrepancy, the Company shall designate and engage a third (3rd) Qualified Appraiser (the "Third Qualified Appraiser") to prepare a Qualified Appraisal (the "Third Qualified Appraisal") for the Purchased Shares and the reasonable fees and costs of the Third Qualified Appraiser for such engagement will be paid by the Company. The Company shall instruct the Third Qualified Appraiser to complete the Third Qualified Appraisal within thirty (30) days after the Third Qualified Appraiser's engagement by the Company. The Company shall share with the Parties a copy of the Third Qualified Appraisal once it has been been completed. The Parties shall average the value determined under the Third Qualified Appraisal with the other Qualified Appraisal that is closest in absolute dollar value to the Third Qualified Appraisal, and such average shall be the Purchase Price for the Purchased Shares and final and binding on the Parties.

    D.    <u>Payment of the Purchase Price</u>.  The Purchase Price determined pursuant to <u>Section I.C.</u> above shall be paid by the Buyer to the Seller as follows:

        1.     Two Million Dollars ($2,000,000) shall paid by wire transfer of immediately available funds at the time of the Closing (and Seller shall specify in writing the account to receive such payment at least one (1) business day prior to the Closing) (the "Closing Payment"); and

        2.     The balance of the Purchase Price shall be paid by the issuance of a Promissory Note by the Buyer, as the maker, in favor of the Seller, as the holder, substantially in the form attached hereto as <u>Exhibit A</u> (the "Promissory Note").[2]

    E.    <u>Closing</u>.  The closing for the sale and purchase of the Purchased Shares (the "Closing") occur electronically via the remote exchange of documents and signatures on the date (the "Closing Date") that is three (3) business days after the date on which all conditions set forth in <u>Section I.F.3</u> below shall have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions). The Closing shall be deemed effective as of the close of business on the Closing Date. All actions to

---

[2] **NOTE TO DRAFT**: The Promissory Note would include the following terms: (1) annual $1M principal payments with accrued interest each anniversary of the Closing Date with a balloon payment of all remaining principal and interest on the 5th anniversary of the Closing Date, (2) the Promissory Note would be non-negotiable, (3) the interest rate would be the greater of (A) 4% per annum and (B) the applicable federal rate for federal income tax purposes to avoid the imputation of interest, (4) the Buyer would have the right to prepay the Promissory Note without penalty, (5) the Seller would be obligated to subordinate to any subsequent financing obtained by the Company, and (6) there would be a set-off right in favor of the Buyer consistent with the terms set forth in the unsigned Shareholders' Agreement. The payment terms are different than those included in the unsigned Shareholders' Agreement, but the unsigned Shareholders' Agreement contemplated there would be life insurance proceeds payable to support the payment of the purchase price.

Ex. 203.003

be taken and all documents to be executed and delivered by the Parties at the Closing shall be deemed to have been taken and executed and delivered simultaneously, and no actions shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered (unless any such actions or deliveries have been validly waived or as otherwise specified in this Agreement).

      F.    <u>Closing Deliverables; Conditions to Closing</u>.

      1.    <u>Deliveries by the Seller</u>. At or before the Closing, the Seller shall deliver to the Buyer:

    (i)    an Assignment Separate from Certificate, duly signed by the Seller, in the form attached hereto as <u>Exhibit B</u>;

    (ii)    a Certificate of Authority, duly signed by the Trustee of the Seller, certifying that the Trustee is authorized to cause the Seller to enter into this Agreement and execute and deliver the other agreements and documents contemplated in this Agreement and cause the Seller to close on the transaction contemplated in this Agreement, in a form reasonably satisfactory to the Buyer;

    (iii)    an IRS Form W-9 (or equivalent form for a trust, if a Form W-9 is not applicable) fully completed and signed by the Seller;

    (iv)    the Promissory Note, duly countersigned by the Seller;

    (v)    a Stock Pledge Agreement, duly signed by the Seller, in the form attached hereto as <u>Exhibit C</u> (the "<u>Stock Pledge Agreement</u>")[3];

    (vi)    a Closing Certificate, duly signed by the Seller, that each of the conditions of the Buyer's obligation to close set forth in <u>Section I.F.3.</u> below have been satisfied; and

    (vii)    any and all certificates evidencing the Purchased Shares.

      2.    <u>Deliveries by the Buyer</u>. At or before the Closing, the Buyer shall deliver to the Seller:

    (i)    the Closing Payment;

    (ii)    the Promissory Note, duly signed by the Buyer;

    (iii)    the Stock Pledge Agreement, duly signed by the Buyer; and

---

[3] **NOTE TO DRAFT**: The Buyer would pledge the Purchased Shares as collateral security for the payment of the outstanding principal balance under the Promissory Note. Unless there is a final determination of a payment default under the Promissory Note, the Buyer would continue to hold all rights with respect to the Pledged Shares.

**Ex. 203.004**

(iv)    a Closing Certificate, duly signed by the Buyer, that each of the conditions of the Seller's obligation to close set forth in <u>Section I.F.3.</u> below have been satisfied.

3.    <u>Conditions to Closing</u>. Each respective Party's obligation to close on the transaction contemplated in this Agreement is expressly conditioned upon satisfaction or waiver of each condition described below applicable to such Party:

(i)    <u>Conditions to the Buyer's Obligation to Close</u>.

(a)    delivery by the Seller at or before the Closing of all of the deliverables set forth in <u>Section I.F.1</u> above;

(b)    the representations and warranties of the Seller set forth in <u>Section II</u> below being true and correct in all material respects as of the Closing Date;

(c)    the Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement to be performed or complied with by the Seller on or before the Closing Date;

(d)    since the Effective Date, there shall not have been a Material Adverse Effect;

(e)    no Governmental Authority shall have enacted, issued, promulgated, enforced or entered any order against the Buyer which is in effect and has the effect of making the transaction contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transaction or causing the transaction contemplated under this Agreement to be rescinded following completion thereof; and

(f)    the Parties shall have determined the Purchase Price pursuant to <u>Section I.C.</u> above.

(ii)    <u>Conditions to the Seller's Obligation to Close</u>.

(a)    delivery by the Buyer at or before the Closing of all of the deliverables set forth in <u>Section I.F.2</u> above;

(b)    the representations and warranties of the Seller set forth in <u>Section III</u> below being true and correct in all material respects as of the Closing Date;

(c)    the Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement to be performed or complied with by the Buyer on or before the Closing Date; and

4

(d)      the Parties shall have determined the Purchase Price pursuant to Section I.C. above.

G.      Termination. This Agreement may be terminated and the transaction contemplated under this Agreement may be abandoned at any time prior to the Closing:

1.      by the mutual written agreement of the Parties;

2.      by the Buyer, if the Buyer is not then in material breach of any provision of this Agreement and the Seller has materially breached any representation, warranty, covenant or agreement contained in this Agreement that would give rise to the failure of any condition specified in Section I.F.3.(i) above and the Seller has not cured such breach within thirty (30) days after receipt of written notice identifying in reasonable detail such breach; or

3.      by the Seller, if the Seller is not then in material breach of any provision of this Agreement and the Buyer has materially breached any representation, warranty, covenant or agreement contained in this Agreement that would give rise to the failure of any condition specified in Section I.F.3.(ii) above and the Buyer has not cured such breach within thirty (30) days after receipt of written notice identifying in reasonable detail such breach.

In the event of termination of this Agreement by a Party pursuant to this Section I.G., written notice thereof shall be given by the terminating Party to the other Party specifying the provision hereof pursuant to which termination is made, and this Agreement shall terminate and become void and have no effect, except that this Section I.G. and Section VI (Miscellaneous) shall survive the termination of this Agreement; provided, however, that any such termination shall not relieve any Party of any liability for any willful breach of this Agreement prior to such termination.

## SECTION II
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

A.      The Seller represents and warrants to the Buyer that each of the statements contained in this Section II are true, correct and complete as of the Effective Date and the Closing Date:

1.      The Seller is the legal and beneficial owner of all of the Purchased Shares, free and clear of all Encumbrances. The Seller owns no other shares of capital stock of the Company other than the Purchased Shares. The Seller has the absolute right to transfer and deliver the Purchased Shares to the Buyer in accordance with the provisions of this Agreement. Immediately upon the Closing, the Buyer will hold good and valid title to the Purchased Shares and will be the exclusive legal and beneficial owner of the Purchased Shares.

2.      The Seller has not pledged all or any portion of the Purchased Shares as collateral for any loan, or entered into any agreements or arrangements which would restrict its right to sell the Purchased Shares to the Buyer in accordance with the provisions of this Agreement.

3.      There are no actions or proceedings pending or threatened, involving the Seller that might reasonably be expected to adversely affect the validity of this Agreement.

4.      This Agreement, and each other agreement, certificate, instrument and document to be delivered by the Seller at the Closing, has been duly executed and delivered by the

5

Seller and, assuming due execution and delivery by the Buyer, constitutes a legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its respective terms.

5.       The execution and delivery of this Agreement, and each other agreement, certificate, instrument and document to be delivered by the Seller at the Closing, and the consummation of the transaction provided for in this Agreement, and the fulfillment of the terms of this Agreement by the Seller do not and will not, with or without the giving of notice, the lapse of time, or both, result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, any agreement or other contract or instrument by which the Seller is bound, any judgment, decree, order, or award of any court, governmental body, or arbitrator, or any applicable law, rule or regulation.

6.       Except for the representations made by the Buyer in <u>Section III</u> below and expressly set forth in this Agreement, no person or entity has made any statement or representation to the Seller regarding any fact relied upon by the Seller in entering into this Agreement, and the Seller specifically does not rely upon any statement, representation, or promise of any other person or entity in executing this Agreement.

7.       The Seller has made such investigation of the facts, and has been given all information requested by the Seller and its advisors, pertaining to this Agreement, the Purchased Shares, the Company, and its assets, liabilities, operations and prospects, in each case as the Seller and its advisors deem necessary. The Seller and its advisors have had the opportunity and/or has received independent tax and legal advice from attorneys, accountants and/or other professional advisors of its choice with respect to this Agreement and the transaction contemplated in this Agreement.

8.       The Seller has not dealt with any broker, finder, or similar agent with respect to the transaction contemplated by this Agreement, and the Seller is under no obligation to pay any broker's fee, finder's fee, or commission in connection with the consummation of the transactions contemplated by this Agreement as a result of any agreement of the Seller.

B.       <u>Survival</u>. All representations, warranties and agreements made herein shall survive the execution, delivery and performance of this Agreement until expiration of the applicable statutes of limitation, including any extensions thereof by agreement or waiver.

**SECTION III**
**REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

A.       The Buyer represents and warrants to the Seller that each of the statements contained in this <u>Section III</u> are true, correct and complete as of the Effective Date and the Closing Date:

1.       The Company is a corporation, duly incorporated, and its status is active, under the laws of Florida.

2.       The Company has the requisite power and authority to execute and deliver this Agreement, to perform its obligations under this Agreement and to consummate the transactions contemplated by this Agreement.  The execution, delivery and performance by the Company of this Agreement and the consummation by the Company of the transaction contemplated by this Agreement have been duly and validly authorized by all necessary action. This Agreement has been

**Ex. 203.007**

duly executed and delivered by the Company and, assuming due execution and delivery by the Seller, this Agreement constitutes the legal, valid and binding obligations of the Company, enforceable against the Company in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law).

3.      The execution and delivery of this Agreement, the consummation of the transactions provided for in this Agreement, and the fulfillment of the terms of this Agreement by the Company do not and will not, with or without the giving of notice, the lapse of time, or both, result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, any agreement or other instrument by which the Company is bound, any judgment, decree, order, or award of any court, governmental body, or arbitrator, or any applicable law, rule or regulation.

5.      The Company has not dealt with any broker, finder, or similar agent with respect to the transaction contemplated by this Agreement, and the Company is under no obligation to pay any broker's fee, finder's fee, or commission in connection with the consummation of the transactions contemplated by this Agreement as a result of any agreement of the Company.

B.    <u>Survival</u>. All representations, warranties and agreements made herein shall survive the execution, delivery and performance of this Agreement until expiration of the applicable statutes of limitation, including any extensions thereof by agreement or waiver.

## SECTION IV
## COVENANTS

A.    <u>Further Assurances</u>. At any time and from time-to-time after the Closing Date, at the Buyer's reasonable request, the Seller will promptly execute and deliver all such further instruments or documents in order to fully consummate the transaction contemplated in this Agreement and in order to vest, transfer, confirm, protect, and defend the right, title, and interest of the Buyer in and to the Purchased Shares.

B.    <u>Grant of Proxy</u>. Upon the Effective Date, the Seller hereby appoints Jonathan D. Logan, and any designee of such Person, as the Seller's proxy and attorney-in-fact pursuant to the provisions of Fla. Stat. Sec. 607.0722 to vote and otherwise act, at any meeting of the shareholders of the Company, and in any action by written consent of the shareholders of the Company, for the shareholder with respect to all of the Purchased Shares, including, without limitation, any vote or action by written consent of the shareholders of the Company: (1) in favor of the approval or ratification of the Agreement and the transaction contemplated by this Agreement; (2) against any action, agreement or transaction (other than this Agreement and the transaction contemplated in this Agreement) or proposal that could result in a breach of any agreement, covenant, representation or warranty or any other obligation under this Agreement or that could result in any of the conditions to closing not being fulfilled; and (3) in favor of any other matter necessary to the consummation of the closing of the transaction contemplated by this Agreement and considered and voted upon by the shareholders of the Company. The Seller agrees to execute any such documents or certificates evidencing such proxy as the Buyer may reasonably request. THIS PROXY IS IRREVOCABLE AND IS COUPLED WITH AN INTEREST.

C.    <u>Exclusivity</u>. From and after the Effective Date, the Seller shall not sell, assign, transfer, convey or otherwise dispose of any interest in or with respect to, or otherwise grant any right to, any of the Purchased Shares, except to the Buyer in accordance with the terms of this Agreement. Any attempt to effect such a sale, assignment, transfer, conveyance or disposal in contravention of this Agreement shall be void ab initio and without force or effect.

**SECTION V**
**RELEASE**

A.    <u>Release</u>. As a material inducement to the Buyer to enter into this Agreement, effective as of the Closing, the Seller, on its own behalf and its trustees, beneficiaries, successors and assigns (collectively, the "<u>Releasors</u>") agrees not to sue or take any other action and fully releases and discharges the Company, and its officers, directors, employees, shareholders, attorneys, agents and representatives (collectively, the "<u>Releasees</u>"), with respect to and from any and all losses, damages, claims, charges, encumbrances, liabilities, covenants or actions, of whatever kind or nature in law, equity or otherwise, whether now known or unknown, all of which such Releasor now owns or holds or has at any time at or prior to the Closing owned or held against the Releasees. It is the intention of the Seller that such release shall be effective as a bar to each and every claim, demand, cause of action or other action hereinabove specified. In furtherance of this intention the Seller hereby expressly waives, effective as of the Closing, any and all rights and benefits conferred upon it, by the provisions of law and expressly consents that this release will be given full force and effect according to each and all of its express terms and provisions, including those related to unknown and unsuspected claims, demands and causes of action, if any, as those relating to any other claims, demands and causes of action hereinabove specified, but only to the extent such section is applicable to releases such as this. Each of the Releasees is an intended third-party beneficiary of this <u>Section V.A.</u>

B.    <u>Exception</u>. Excepted from the foregoing release are any claims that arise out of any breach of the Buyer's obligations under the terms of this Agreement.

**SECTION VI**
**MISCELLANEOUS**

A.    <u>Notices</u>.  All notices, claims, demands, and other communications under this Agreement shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email of a PDF document if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient, or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  The addresses for such communications shall be:

<u>If to the Buyer</u>:        Smart Communications Holding, Inc.
10491 72nd St.
Seminole, FL 33777
Attn: Jonathan D. Logan, President
Email: jon.logan787@gmail.com

With courtesy copy to (which shall not constitute notice):

8

**Ex. 203.009**

Hill, Ward & Henderson, P.A.
Bank of America Plaza
101 East Kennedy Boulevard
Suite 3700
Tampa, Florida 33602
Attention: Mark M. Wall
Email: Mark.Wall@hwhlaw.com

If to the Seller:    _____
                     _____
                     _____

With courtesy copy to (which shall not constitute notice):

                     _____
                     _____
                     _____

Each party shall provide notice to the other party of any change in address.

B.    Confidentiality.  Each Party hereby covenants to the other Party that it shall keep confidential and shall not disclose or divulge any aspect of this Agreement, except to the extent that such disclosing Party can demonstrate that such information: (a) is generally available to and known by the public through no fault of the disclosing Party; (b) is lawfully acquired by the disclosing Party from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual, or fiduciary obligation; or (c) is required by applicable law to be disclosed or as necessary or appropriate to enforce legal rights under this Agreement.

C.    Governing Law; Jurisdiction and Venue; Waiver of Jury Trial.  This Agreement and all actions and disputes arising from or related to the transactions contemplated therein (whether in contract, tort or statute) shall be governed by and construed in accordance with the internal laws of the State of Florida without giving effect to any choice or conflict of law provision or rule (whether of the State of Florida or any other jurisdiction).  If any mediation, action or proceeding is brought by any of the Parties to enforce any right or remedy under this Agreement or relating to or arising out of the transactions contemplated hereby, each of the Parties hereto consents to, and agrees to submit to, the exclusive jurisdiction of any state or federal court sitting in Pinellas County, Florida, and waives any claim of improper venue or forum non conveniens as to any such action or proceeding. EACH PARTY, TO THE EXTENT PERMITTED BY APPLICABLE LAW, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED IN THIS AGREEMENT. THIS WAIVER APPLIES TO ANY PROCEEDING, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

D.    Binding Effect.  This Agreement will be binding upon the Parties, their personal and legal representatives, guardians, successors and assigns.  This Agreement will inure to the benefit of the Parties, their personal and legal representatives, guardians, successors and assigns.

9

E.      Entire Agreement; Amendments.  This Agreement constitutes the entire agreement between the Parties hereto pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, documents, negotiations and discussions, whether oral or written, of the Parties. This Agreement may not be amended except by a written instrument duly executed by both Parties.

F.      Further Documents.  Each Party will take whatever action or actions as are deemed by their respective legal counsel to be reasonably necessary or desirable from time to time to effectuate the provisions or intent of this Agreement, and, to that end, the Parties agree that they will execute, acknowledge, seal and deliver any further instruments or documents that may be requested by their respective legal counsel to give force and effect to this Agreement or any of its provisions, or to carry out the intent of this Agreement or any of its provisions.

G.      Signatures.  This Agreement may be executed in any number of counterparts and by the Parties in separate counterparts, each of which when so executed and delivered shall be deemed an original and all of which counterparts taken together shall constitute one and the same instrument. Signatures received by facsimile, PDF file or other electronic format (including RightSignature) shall be deemed to be original signatures.

H.      Legal Representation. Each of the Company and the Seller acknowledge and agree that Hill, Ward & Henderson, P.A. ("HWH") represents the interests of Jonathan D. Logan, who is the other shareholder of the Company and an intended third party beneficiary of this Agreement, in connection with this Agreement, the other agreements, certificates, instruments and documents contemplated in this Agreement, and the transaction contemplated in this Agreement. Each of the Company and the Seller has been represented by its own legal and tax counsel (which is not HWH) in connection with the negotiation of the transaction contemplated by this Agreement and the drafting and negotiation of this Agreement and the other agreements, certificates, instruments and documents contemplated in this Agreement. Each of the Company and the Seller and their respective legal counsel have had an opportunity to review and suggest revisions to the language of this Agreement and the other agreements, certificates, instruments and documents contemplated in this Agreement. Accordingly, no provision of this Agreement shall be construed for or against or interpreted to the benefit or disadvantage of any Person by reason of any Person having or being deemed to have structured or drafted such provision.

I.      Third Party Beneficiary. Jonathan D. Logan is an intended third-party beneficiary of this Agreement and is entitled to enforce any and all of the rights and benefits under this Agreement and the other agreements, certificates, instruments and documents and may enforce any of the provisions of this Agreement and the other agreements, certificates, instruments and documents contemplated in this Agreement, in each case as if he were the Buyer under this Agreement.

J.      Assignment. Neither this Agreement nor any right, interest or obligation under this Agreement may be assigned, pledged or otherwise transferred by any Party, whether by operation of law or otherwise, without the prior written consent of the other Party; provided, that the Company (a) shall have the right to assign any or all of its rights and obligations under this Agreement to Jonathan D. Logan or any Affiliate of Jonathan D. Logan, and (b) may collaterally assign its rights under this Agreement to any lender or any acquiror of a material part of the assets of the Company, in each case without the prior written consent of the Seller.

Ex. 203.011

K.    <u>Definitions</u>. As used in this Agreement, the following terms have the meanings set forth below:

1.    "<u>Affiliate</u>" means, for any Person, any other Person who controls, is controlled by or is under common control with such Person, and "control" means, with respect to any Person, the direct or indirect ability to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

2.    "<u>Encumbrance</u>" means any lien, encumbrance, security interest, pledge, mortgage, charge, restriction, claim, or similar encumbrance of any kind, whether absolute or contingent.

3.    "<u>Governmental Authority</u>" means any United States federal, state or local governmental, regulatory or administrative authority, agency or commission or any judicial or arbitral body.

4.    "<u>Material Adverse Effect</u>" means any change, effect, development or event, or related series thereof, that has resulted in or would reasonably be expected to result in a material adverse effect on the business, operations, assets, liabilities, prospects, results of operations, conditions (financial or otherwise) or capitalization of the Company.

5.    "<u>Person</u>" means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

6.    "<u>Qualified Appraisal</u>" means a valuation of the Purchased Shares that is based on the following requirements: (i) treating the Company as a going concern and not using a liquidation method of valuation and without regard for discounts applied for minority interests or lack of marketability; (ii) accruing as a liability all federal, state and local taxes, including, but not limited to, sales, payroll, unemployment insurance, excise, franchise and income taxes; (iii) contributions to any qualified pension, profit sharing or other qualified retirement plan for the fiscal year of the Company in which the purchase and sale would occur shall be accrued as a liability and shall be prorated for such fiscal year in accordance with the prior accounting practices of the Company; (iv) accruing an estimated loss as a liability of the Company (to the extent such accrual is required under generally accepted accounting principles) any pending or known claims for negligence or other liability which are not fully covered by the Company's insurance; and (v) any marketable securities held by the Company shall be valued at fair market value based upon the latest quotations available. For the avoidance of doubt, a Qualified Appraisal will not ascribe any value attributable to any assets or rights held by any shareholder of the Company, Affiliate of the Company or any of its shareholders.

7.    "<u>Qualified Appraiser</u>" means a qualified appraiser who regularly performs business appraisals in the United States and is a member of the American Society of Appraisers, the Institute of Business Appraisers, the National Association of Certified Valuation Analysts, or the American Institute of Certified Public Accounts – ABV Accredited.

8.    "<u>Valuation Discrepancy</u>" means there is a difference in the values determined in the Qualified Appraisals performed by the Qualified Appraisers designated by the Seller and the

11

Ex. 203.012

Buyer and engaged by the Company that exceeds in absolute dollar value more than ten percent (10%). For illustration purposes only, if one Qualified Appraiser determined a value in a Qualified Appraisal of $10,000,000, and the second Qualified Appraiser determined a value in a Qualified Appraisal of $15,000,000, then the two Qualified Appraisals would have a difference of fifty percent (50%) and there would be a Valuation Discrepancy.

[SIGNATURE PAGE FOLLOWS ON THE NEXT PAGE]

Ex. 203.013

IN WITNESS WHEREOF, this Stock Purchase Agreement has been executed as of the Effective Date and the Parties by placing their signatures hereto agree to and adopt the terms hereof.

COMPANY:

SMART COMMUNICATIONS HOLDING, INC.

By: _____
     Name: Jonathan D. Logan
     Title: President

SELLER:

JANICE LOGAN, AS TRUSTEE OF THE JAMES LOGAN FAMILY TRUST DATED FEBRUARY 10, 2021

By: _____
     Name: Janice Logan
     Title: Trustee

**<u>EXHIBIT A</u>**

**PROMISSORY NOTE**

[To be attached]

**<u>EXHIBIT B</u>**

**ASSIGNMENT SEPARATE FROM CERTIFICATE**

[To be attached]

**EXHIBIT C**

**STOCK PLEDGE AGREEMENT**

[To be attached]

# EXHIBIT 7

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA
PROBATE DIVISION

JONATHAN LOGAN and
SMART COMMUNICATIONS HOLDING, INC.,

       Plaintiffs,

v.                                            Case No:

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust dated February 10, 2021
and ALEXIS LOGAN, individually,

       Defendants.

_____/

## **COMPLAINT**

Plaintiffs, Jonathan Logan and Smart Communications Holding, Inc., by and through their

respective undersigned counsel, hereby sue Defendants, Janice Logan, individually and as Trustee

of the James Logan Family Trust dated February 10, 2021 and Alexis Logan, individually, and in

support thereof state as follows:

### **The Parties**

1.     Plaintiff, Jonathan Logan ("Jonathan"), is a resident of Pinellas County, Florida.

He is the natural son of James Logan and Janice Logan.

2.     Plaintiff, Smart Communications Holding, LLC ("Smart Communications") is a

Florida limited liability company with its principal place of business in Pinellas County, Florida.

Smart Communications is a national provider of inmate communication services and contracts

with various correctional facilities.

3.     Defendant, Janice Logan ("Janice") is a resident of Sarasota County, Florida.

4.     Defendant, Alexis Logan ("Alexis") is a resident of Sarasota County, Florida. She

is the natural daughter of James Logan and Janice Logan, and the sister of Jonathan Logan.

5.    James Logan was a resident of and domiciled in Sarasota County, Florida at the time of his death on October 16, 2022. He was married to Janice at the time of his death. James Logan shall hereinafter be referred to as the "Decedent."

## Decedent's Estate Plan

6.    Decedent executed what purports to be a Last Will and Testament (the "Will") on February 10, 2021, a copy of which is attached hereto as **Exhibit "A."**  On the same date, Decedent executed what purports to be the James Logan Family Trust (the "Trust"), a copy of which is attached hereto as **Exhibit "B."**

7.    The Will is a pour-over will, devising all of Decedent's assets (with the exception of some tangible personal property) to the Trust, after all expenses and debts of Decedent's estate have been paid.

8.    The Will nominates Janice as Personal Representative of the Decedent's estate, and the Trust designates Janice and the Decedent as Co-Trustees during the Decedent's life, and provides that Janice becomes the sole Trustee upon Decedent's death.

9.    The Decedent was the beneficiary of the Trust during his life. The Trust provides that upon Decedent's death, the beneficiaries are Janice, Jonathan, and Alexis, although the Trust provides that the Trust estate shall be held for the primary benefit of Janice.

## Venue and Standing for Probate and Trust Administration Purposes

10.    Venue in this action is proper because any probate estate of the Decedent would be opened in Sarasota County, Florida pursuant to Florida Statutes Section 733.101 and because Janice and Alexis are residents of Sarasota County, Florida.

11.     Additionally, the principal place of administration of the Trust is Sarasota County, Florida pursuant to Florida Statutes Section 736.0108. As such, venue is proper in Sarasota County pursuant to Florida Statutes Section 736.0204.

12.     Venue in Sarasota County is also proper pursuant to Florida Statutes Section 736.0202 because Janice, Jonathan and Alexis are beneficiaries of the Trust.

13.     Jonathan qualifies as a beneficiary of any probate estate to be opened for the Decedent given the interrelationship between the Will and the Trust. As such, Jonathan has standing to bring claims related to his father's estate and he will be entitled to notice of probate administration.

14.     The Trust provides that, to the extent Janice does not devise all of the Trust assets in her Will, the remaining assets, upon her death, will be devised equally among trusts for Alexis and Jonathan. As a result, Jonathan is a qualified beneficiary of the Trust under Florida Statutes because he would be a permissible distributee under the Trust if Janice's interest under the Trust terminates. *See* Florida Statutes Section 736.0103(19)(b).

15.     In addition to being a qualified beneficiary of the Trust and a beneficiary of the to-be-opened probate estate, Jonathan is an "interested person" with standing and rights under the Probate Code (Chapter 733) and the Trust Code (Chapter 736).  In particular, Florida Statutes Section 731.201(23) defines an interested person as "any person who may reasonably be expected to be affected by the outcome of the particular proceeding involved."

16.     Jonathan will be "affected by the outcome" of the probate and Trust administration of the Decedent in various ways given his status as a beneficiary of any probate estate and his status as a beneficiary under the Trust, and the fact that he is the only other owner of Smart Communications.

3

17.    Smart Communications also qualifies as an "interested person" because it is reasonably expected to be affected by the outcome of this proceeding insofar as the position taken by Janice as Trustee is depriving Smart Communications of its purchase rights under the Shareholders' Agreement, referenced below.

### Jonathan's and the Decedent's Co-Ownership of the Corporations

18.    Prior to execution of the Trust, Decedent and Jonathan were each 50% shareholders in the following Florida corporations and limited liability companies:

    i.      Smart Communications Holdings, Inc. (a Plaintiff in this action)

    ii.     Smart Communications Lee, Inc.

    iii.    Smart Communications Desoto, Inc.

    iv.     Mailguard, Inc.

    v.      Mailguard Federal, Inc.

    vi.     Smart Communications Yacht Holdings, LLC

    viii.   Loco Florida, LLC

19.    Decedent was the sole shareholder of a Florida entity known as Inmate Information Services, Inc.

20.    Plaintiff, Smart Communications, owns 100% of the shares of Smart Communications US, Inc., Smart Communications Pasco, Inc. and Smart Communications Collier, Inc.

21.    According to the 2021 Audited Financial Statements of Smart Communications, the shareholder equity was approximately $15 million as of December 31, 2021.

22.    Smart Communications Yacht Holdings, LLC owns assets consisting of a 100' Riva Cosaro purchased for approximately $10 million in 2022 and a 48' center console Nortech purchased for approximately $1 million.

23.     Loco Florida, Inc. has assets consisting of a warehouse space located in Seminole, Florida purchased for approximately $1.1 million in 2019.

**The Smart Communications Shareholder Agreement**

24.     Jonathan and his father, the Decedent, were each 50% shareholders in the Plaintiff, Smart Communications, prior to Decedent's purported transfer of his ownership interest in Smart Communications to the Trust. Jonathan and the Decedent were the only directors of the company. Jonathan was and remains the sole operating officer of Smart Communications and he conducts its day-to-day operations, although the Decedent largely handled the financial aspects of Smart Communications when he was alive.

25.     Shortly before the Decedent's death, Decedent transferred his ownership interest in Smart Communications to the Trust pursuant to the Stock Power dated September 16, 2022, a copy of which is attached hereto as **Exhibit "C."[1]**

26.     As of September 23, 2022, Decedent and Jonathan executed a Shareholder Agreement for Smart Communications (the "Shareholders' Agreement"), a copy of which is attached hereto as **Exhibit "D."** Given the Decedent's transfer of his interest in Smart Communications to the Trust pursuant to the September 16, 2022 Stock Power, as of Decedent's date of death, the parties to the Shareholders' Agreement are Jonathan and the Trust, with each designated as having a 50% ownership interest.

27.     Section 4.3 of the Shareholders' Agreement provides for "Mandatory Purchase upon Death of a Shareholder."  It states, in relevant part:

> Upon the death of a Shareholder or, in the case of a Shareholder that is a Trust, the death of the Key Designee (in each case referred to herein, along with the personal representative of a deceased

---

[1] The Decedent also transferred his interests in various other companies to the Trust on September 16, 2022, such as for Smart Communications Yacht Holding, LLC, and Loco Florida, LLC. presumably as part of his end-of-life planning.

individual Shareholder as the "Decedent Shareholder"), the
Corporation shall purchase and the Decedent Shareholder shall sell,
all of the Decedent Shareholder's Stock, at the price determined in
accordance with the provisions of Article Five and in accordance
with the terms of Article Six.[2]

**<u>Janice's Repudiation of the Shareholders' Agreement</u>**

28.     The Decedent's intentions with respect to his estate plan and the funding of the

Trust with the ownership interest in Smart Communications are clear: he intended to provide

liquidity for Janice (and the other beneficiaries) through the mandatory sale and purchase

requirement in Section 4.3 of the Shareholders' Agreement. This would allow the Trust to receive

the fair market value of the ownership interest in Smart Communications, a potentially significant

amount.

29.     Decedent intended for Jonathan to then become the sole shareholder of Smart

Communications.  This is important because he would not have to account to Janice as Trustee of

the Trust, because Janice had no knowledge of or prior dealings with respect to the company.

30.     Simply put, the Decedent's estate plan, of which the Shareholder's Agreement is a

part, would financially provide for his surviving spouse and ensure that his son would become the

sole shareholder in Smart Communications.

31.     Unfortunately, Janice is attempting to thwart the structure of the estate plan and the

clear requirements of Section 4.3 of the Shareholders' Agreement out of her own perceived self-

interest and self-aggrandizement.

32.     Janice is refusing to recognize the Shareholders' Agreement as valid and she is

thereby refusing to adhere to the buy/sell requirement in Section 4.3 thereof. As a result, the

---

[2] Section 1.3(c) defines "Key Designee" as the Decedent, with respect to the Trust.

valuation process set forth in Article Five of the Shareholders' Agreement is being frustrated and cannot occur because of her refusal to abide by the Shareholders' Agreement.

33.    On information and belief, Janice believes that she will leverage the negotiating position of the Trust if the Trust is not contractually obligated to sell its interest for fair market value. Janice believes that if the Trust can continue to hold onto and remain a passive 50% ownership of Smart Communications, the company and/or Jonathan will be forced to pay her a sum of money well in excess of what a valuation process under the Shareholders' Agreement would garner for the Trust. It is believed that Janice would intend to have the Trust assert various demands as a 50% owner of Smart Communications until such time as the company or Jonathan would relent and pay the Trust a premium for its interest. Meanwhile, the Trust's interest in Smart Communications is far and away its most valuable asset and Janice's position and strategy actually serve to deprive the Trust of the necessary capital and liquidity (that the Decedent wanted the Trust to have) and that are necessary to financially backstop the Decedent's probate estate and pay his creditors.

34.    On information and belief, the Decedent has creditors that cannot be paid without the Trust selling its interest in Smart Communications pursuant to the terms of the Shareholders' Agreement. It does not appear as if Janice has opened any probate estate for the Decedent, despite her being nominated as the Personal Representative. Certainly, Jonathan has not been provided with any Notice of Administration, and it does not appear as if any estate has been opened for the Decedent by a search of public records in Sarasota County. Nevertheless, just to name an example of the Decedent's debts, he was individually named as a party defendant to a pending lawsuit. It is anticipated that the extent of the Decedent's creditors will be made known when a probate estate is eventually opened.

**Janice as Trustee does not Possess "Permitted Transferee" Status
Under the Shareholders' Agreement**

35.     Section 1.3(c) of the Shareholders' Agreement defines "Key Designee" as "James Logan," with respect to the Trust.

36.     Section 2.3(b) of the Shareholders' Agreement states that a change of Key Designee shall constitute a transfer, which is subject to the restrictions of the Shareholders' Agreement.

37.     Section 2.3 (b) of the Shareholder Agreement only allows "Permitted Transfers" of the stock to "Permitted Transferees," who must (i) execute and deliver to the non-transferring Shareholders a counterpart of the Shareholder Agreement agreeing to be bound by its terms and (ii) receive advice of Corporation's counsel to the effect that such transfer does not contravene or otherwise conflict with terms and conditions of the Agreement and (iii) if the Transfer is to a trust, the Trustee and all current beneficiaries thereof agree in writing to no amendment of such trust instrument and no assignment of beneficial interest in such trust will be made with an advance written opinion of Corporation's counsel to the effect that such amendment or assignment does not contravene and is not otherwise in conflict with the terms or conditions of the Agreement.

38.     Defendant, Janice, as Trustee, has failed to comply with any of these requirements. As such, she has not become a Permitted Transferee.  Section 2.3(e) specifically states, "Any attempted transfer to a Permitted Transferee without satisfying all of the applicable requirements of this Section 2.3, including but not limited to, obtaining the required approval shall be void *ab initio* and of no force and effect."

39.     Since Janice, as Trustee, has not complied with the requirements of Section 2.3, she is not a Permitted Transferee and therefore, is not authorized to control the Stock.

**Janice's Misguided Demands for Millions of Dollars to be Paid to the Trust
Without Regard to the Creditors of a Probate Estate**

40.    On January 20, 2023, Janice made a demand on Jonathan through counsel that she retained in Chicago in her capacity as Trustee of the Trust. Janice had no participation in Smart Communications or understanding as to how the company was operated or any agreements between Jonathan and the Decedent. Nevertheless, she had her attorney demand that Jonathan pay up to $6.7 million to the Trust within 60 days on the rationale that various watercraft, automobiles, and real estate that were being *used* by Jonathan were in effect distributions to him worth $6.7 million, and that the Decedent should have received equal distributions from Smart Communications and the operative companies. Janice is fundamentally mistaken about the nature of the assets insofar as they continued to be titled in the name of the companies and she was not privy to the express arrangement between Jonathan and the Decedent.[3] Nevertheless, Janice has either fundamentally confused the fiduciary capacities in which she has been designated, or she has attempted to make a multi-million-dollar money grab at the level of the Trust to benefit her as beneficiary and at the expense of creditors of the necessary probate estate.

41.    Any distributions owed to the Decedent prior to September 16, 2022, as are addressed in the January 20, 2023 demand, were claims or assets personal to the Decedent and would belong exclusively to the Decedent's probate estate. Janice has no standing or capacity to make such demands as Trustee of the Trust. Even if the demand for the $6.7 million had merit, only the Personal Representative of the Decedent's probate estate would have standing to pursue

---

[3] To further illustrate the point, Janice is herself a beneficiary of corporate-owned assets that she lives in and uses. For example, the Decedent and Janice lived in a home in Sarasota County that is titled in the name of Smart Communications. Janice continues to reside there. Janice's personal automobile is also owned by one of the companies. The Decedent (and Janice) also took hundreds of thousands of cash distributions from Smart Communications prior to the Decedent's passing, for which Jonathan did not receive "equal distributions."

the claims. Sections 5.1 and 5.2 of the Will provide that the Decedent's residuary estate is devised to the Trust "<u>after</u> the payment of debts and taxes" of the estate (emphasis supplied).

42.     In other words, even if Janice's demand for the $6.7 million had merit, she has demanded it in the wrong capacity as any such claims would belong to the to-be-opened probate estate, and not to the Trust. Any "equivalent distributions" owed to the Decedent would have been personal to him <u>prior</u> to his funding the Trust with his ownership interest in Smart Communications. Additionally, Janice's demand for the $6.7 million be paid to the Trust is wrongful as to the probate estate and creditors of the Decedent, demonstrating that Janice is not understanding her fiduciary roles, despite her nomination in the Will as Personal Representative.

43.     All conditions precedent have occurred or have otherwise been waived.

## <u>COUNT I</u>
### (Declaration over Capacity in which Claims may be Pursued)

44.     This is an action for declaratory and supplemental relief by Plaintiffs, Jonathan and Smart Communications, against Defendants, Janice, individually and as Trustee of the Trust, and Alexis, as beneficiary of the Trust, pursuant to Florida Statutes Section 736.0201 and Florida Statutes Chapter 86.

45.     Plaintiffs reallege the allegations in paragraphs 1 through 43 above as if fully incorporated herein.

46.     Plaintiffs contend that the claims represented by the demand for $6.7 million by Janice, as Trustee, through her attorney's letter of January 20, 2023, can <u>only</u> be brought by a duly appointed Personal Representative of the Decedent's estate because they represent claims personal to the Decedent and pre-date the Decedent's September 16, 2022 Stock Power to the Trust, to the extent the claims have any merit (which is denied). Plaintiffs contend that Janice, as Trustee, has

no standing to pursue those claims, and she would only have standing to do so if and when she is appointed as Personal Representative.

47.    Defendants are believed to contend that the demand for $6.7 million was properly brought by Janice as Trustee, and that she has standing to pursue those claims.

48.    Pursuant to Florida Statutes Section 736.0201(2), a court "may intervene in the administration of a trust to the extent a court's jurisdiction is invoked by an interested person as is provided by law." Section 736.0201(8) allows the Court to "instruct trustees" and Section 736.0201(f) authorizes the Court to provide a declaration of rights.

49.    As a result of the foregoing, there exists a bona fide, actual, present practical need for a declaration by the Court as to whether claims relating to the $6.7 million demanded in Janice's January 20, 2023 letter belong to the Decedent's to-be-opened estate or to the Trust.

50.    The requested declaration deals with a present, ascertained, or ascertainable state of facts or present controversy as to a state of facts. As alleged herein, there is a present controversy between Plaintiffs and Janice.

51.    The rights of the parties are dependent upon the facts alleged herein and the law applicable to these facts.

52.    Plaintiffs and Janice have an actual, present, adverse, and antagonistic interest in the subject matter as alleged herein, in both fact and law.

53.    The antagonistic and adverse interests alleged herein are all before the Court by proper process and the relief sought is not merely the giving of legal advice by the courts or the answer to questions propounded from curiosity. The parties are presently in need of the declaration described above.

54.     Defendant, Alexis, is named as a proper and necessary party to this proceeding by virtue of her interest as beneficiary under the Will and the Trust.

WHEREFORE, Plaintiffs, Jonathan Logan and Smart Communications Holding, Inc., demand judgment in their favor and against Defendants, Janice Logan, individually and as the Trustee of the Trust and Alexis Logan as beneficiary of the Trust, declaring:

1.     Any claims of allegedly improper distributions to Jonathan occurring proper to September 16, 2022 are claims of the to-be-opened estate of the Decedent;

2.     Janice has no standing to pursue the claims of the Decedent's estate because she has not been appointed as Personal Representative of the estate;

3.     No improper distributions were made to Jonathan prior to September 16, 2022; and

4.     Such other and further declarations as this Court deems just and proper.

## COUNT II
### (Declaration Concerning Effect of Shareholders' Agreement)

55.     This is an action for declaratory and supplemental relief by Plaintiffs, Jonathan and Smart Communications, against Defendants, Janice, individually and as Trustee of the Trust, and Alexis, as beneficiary of the Trust, pursuant to Florida Statutes Section 736.0201 and Florida Statutes Chapter 86.

56.     Plaintiffs reallege the allegations in paragraphs 1 through 43 above as if fully incorporated herein.

57.     Plaintiffs contend that the Shareholders' Agreement is in effect and that the Trust is obligated to sell its ownership interest in Smart Communications to the company pursuant to Section 4.3 of the Shareholders' Agreement.

58.     Plaintiffs also contend that Janice, as Trustee, has failed to comply with the "Permitted Transferee" provisions in Section 2.3(b) of the Shareholders' Agreement such that the

Trust cannot exercise any control over the ownership interests in Smart Communications and only has the right to receive payment of fair market value for its interest pursuant to Articles Five and Six.

59.     Defendants contend that the Shareholders' Agreement is not valid and that there is no obligation for the Trust to sell its interest to the company therein.

60.     Defendants are also believed to contend that Janice, as Trustee, enjoys "Permitted Transferee" status under the Shareholders' Agreement and can exercise ownership rights in Smart Communications in the event that the Shareholders' Agreement is effective.''

61.     Janice has not complied with the requirements of Section 2.3(b) of the Shareholder Agreement.

62.     Janice is not a "Permitted Transferee" under the Shareholder Agreement.

63.     Janice had refused to recognize the Shareholder Agreement as valid and enforceable.

64.     Janice has refused to participate in the mandatory sale provisions of the Shareholder Agreement.

65.     Pursuant to Florida Statutes Section 736.0201(2), a court "may intervene in the administration of a trust to the extent a court's jurisdiction is invoked by an interested person as is provided by law." Section 736.0201(8) allows the Court to "instruct trustees" and Section 736.0201(f) authorizes the Court to provide a declaration of rights.

66.     As a result of the foregoing, there exists a bona fide, actual, present practical need for a declaration by the Court as to whether the Shareholders' Agreement is in effect and the Trust must sell its interest in Smart Communications to the company and whether the Trust enjoys "Permitted Transferee" status under the Shareholders' Agreement.

67.     The requested declaration deals with a present, ascertained, or ascertainable state of facts or present controversy as to a state of facts. As alleged herein, there is a present controversy between Plaintiffs and Defendants.

68.     The rights of the parties are dependent upon the facts alleged herein and the law applicable to these facts.

69.     Plaintiffs and Defendants have an actual, present, adverse, and antagonistic interest in the subject matter as alleged herein, in both fact and law.

70.     The antagonistic and adverse interests alleged herein are all before the Court by proper process and the relief sought is not merely the giving of legal advice by the courts or the answer to questions propounded from curiosity. The parties are presently in need of the declaration described above.

71.     Defendant, Alexis, is named as a proper and necessary party to this proceeding by virtue of her interest as beneficiary under the Will and the Trust.

72.     Jonathan and Smart Communications have retained the services of the undersigned counsel and are obligated to pay them a reasonable fee for their professional services. They are entitled to recover their attorneys' fees from the Trust pursuant to Florida Statutes Sections 736.1005.

WHEREFORE, Plaintiffs, Jonathan Logan and Smart Communications Holding, Inc., demand judgment in their favor and against Defendants, Janice Logan, individually and as the Trustee of the Trust and Alexis Logan as beneficiary of the Trust, declaring:

1.     The Shareholders' Agreement is valid and enforceable against the Trust;

2.     Janice, as Trustee of the Trust, is required to comply with the "Permitted Transferee" provisions of Section 2.3 of the Shareholders' Agreement;

3.      The Trust is required to comply with the mandatory sale provisions of the Shareholders' Agreement, and instructing her to do so;

4.      This Court retains jurisdiction over these matters to implement transfer of the Stock to Smart Communications Holding, Inc. in the event of further dispute;

5.      Plaintiffs are entitled to their attorneys' fees, and awarding such fees to Plaintiffs; and

6.      Such other and further declarations as this Court deems just and proper.

## COUNT III
### (Breach of Trust)

73.     This is an action by Plaintiff, Jonathan, against Defendant, Janice, individually and as Trustee of the Trust, for breach of trust involving an amount in controversy in excess of $50,000, exclusive of interest, costs and attorneys' fees.

74.     Plaintiff realleges his allegations in paragraphs 1 through 43 above as if fully set forth herein.

75.     Defendant, Janice, as Trustee, has committed a breach of trust by refusing to honor the Shareholders' Agreement to sell the Trust's interest in Smart Communications to the company for fair market value and thereby fund the Trust for the benefit of all beneficiaries.

76.     As a result of the foregoing, Janice has committed a serious breach of trust. Plaintiff, Jonathan, demands the following remedies under Florida Statutes, Section 736.1001:

a.   Compelling Janice to perform her duties and to convey the Trust's ownership interest in Smart Communications pursuant to Section 4.3 of the Shareholders' Agreement;

b.   Ordering Janice to account to Jonathan; and

c.   Reducing or denying compensation to Janice, as Trustee.

15

77.     Jonathan has retained the services of the undersigned counsel and is obligated to pay them a reasonable fee for their professional services. Jonathan is entitled to recover his attorneys' fees from the Trust pursuant to Florida Statutes Sections 736.1004 and 736.1005.

WHEREFORE, Plaintiff, Jonathan Logan, demands judgment against Defendant, Janice Logan, as Trustee of the Trust, in accordance with the foregoing, to include an award of Jonathan's reasonable attorneys' fees and costs incurred in this action, in addition to such other relief as the Court considers just.

*/s/ Mark M. Wall*
Mark M. Wall
Florida Bar Certified, Business Litigation
Florida Bar No. 58483
mark.wall@hwhlaw.com
ashley.jecevicus@hwhlaw.com
RELitMMW@hwhlaw.com
Jarod A. Brazel
Florida Bar No. 1017722
jarod.brazel@hwhlaw.com
Hill, Ward & Henderson, P.A.
101 East Kennedy Blvd., Suite 3700
Tampa, Florida 33602
Telephone: (813) 221-3900
Fax: (813) 221-2900
*Attorneys for Plaintiff, Jonathan Logan*

*/s/ Julie Negovan*
Julie Negovan
Florida Bar No. 121450
jnegovan@griesinglaw.com
Griesing Mazzeo Law, LLC
6750 N. Andrews Ave., Ste. 200
Fort Lauderdale, FL 33309
Telephone (215) 431-9295
*Attorneys for Jonathan*
*Logan and Smart Communications*
*Holding, Inc.*

16

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA
PROBATE DIVISION

JONATHAN LOGAN and
SMART COMMUNICATIONS HOLDING, INC.,

      Plaintiffs,

v.                                                         Case No:

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust dated February 10, 2021
and ALEXIS LOGAN, individually,

      Defendants.

_____/

**EXHIBIT "A"**

**TO**

**<u>COMPLAINT</u>**

# LAST WILL AND TESTAMENT

## OF

## JAMES LOGAN

I, JAMES LOGAN, a resident of Sarasota County, Florida, declare that this is my Last Will and Testament, and I revoke all wills and codicils I have previously made; except the Trust referred to in Article V hereof, if the same be determined to be testamentary.

## I

### FAMILY

1.1     Spouse. I am married to JANICE LOGAN (referred to herein as "my wife" or "my spouse").

1.2     Children. We have 2 children:  ALEXIS LOGAN and JON LOGAN.

## II

### APPOINTMENT OF FIDUCIARIES

2.1     Personal Representative. I appoint my wife, JANICE LOGAN, as personal representative of this, my Last Will and Testament.  If JANICE LOGAN shall fail to qualify or otherwise serve as personal representative, I appoint my daughter, ALEXIS LOGAN, as personal representative of my estate.  If ALEXIS LOGAN shall fail to qualify or otherwise serve as personal representative, I appoint my son, JON LOGAN, as personal representative of my estate.

2.2     No Bond. I request that my personal representative not be required to furnish bond or sureties.

## III

### PAYMENT OF DEBTS AND TAXES

3.1     Debts. I direct that my legal debts and the expenses of any last illness, funeral, and the administration of my estate, be paid as soon as practicable after my death.



3.2    <u>Taxes.</u>   I direct that my personal representative pay out of that portion of my Residuary Estate which is not included in the gift qualifying for the marital deduction, without apportionment except as herein provided, all estate taxes in respect of all property required to be included in my gross estate for estate tax purposes, whether the property passes under this will or otherwise, except:

(a)    that any generation-skipping tax imposed by Chapter 13 of the Internal Revenue Code of 1986, as amended, caused by a disclaimer or by a direct skip from a trust not established hereunder, shall be paid by the person holding or receiving that property; and

(b)    that any such taxes which are attributable to any qualified terminable interest property over which I had a life income interest shall be paid by the person holding or receiving such property, in an amount equal to the difference between the estate tax computed with and without the inclusion of such property in the calculation; and

(c)    that any such taxes which are attributable to proceeds of life insurance policies that are payable to a person or persons other than my spouse and are includable in my estate for federal estate tax purposes shall be paid by the beneficiary or beneficiaries, collectively, receiving such life insurance proceeds, in an amount equal to the difference between the estate tax computed with and without the inclusion of such property in the calculation; and

(d)    that any such taxes which are attributable to any property over which I may have a power of appointment shall be paid by the person holding or receiving such property, in an amount equal to the difference between the estate tax computed with and without the inclusion of such property in the calculation.

If more than one subparagraph of this paragraph 3.2 applies as a result of my death to apportion estate tax to beneficiaries or recipients of property, then each such beneficiary or recipient shall pay a pro rata share of the difference between the estate tax computed with and without the inclusion in the calculation of the total of the property to which the subparagraphs of this paragraph 3.2 have apportioned estate tax to the beneficiaries or recipients.

3.3    <u>Funds From Trust.</u>   However, should there be in existence at the time of my death that trust referred to in this will and known as the "JAMES LOGAN FAMILY TRUST" and should it appear to my personal representative to be in the best interests of the beneficiaries of the trust and my estate, nothing in this provision shall be interpreted as prohibiting the personal representative of my estate from selling estate assets to that trust, or from borrowing funds, secured or unsecured, or accepting funds from that trust to meet the liquidity requirements of my estate which have become necessary to meet the debts, costs of administration and settlement, and taxes and other charges that have been imposed against my estate.

3.4    <u>Mortgage.</u>   In the event any property or interest in property passing under this will or by operation of law or otherwise by reason of my death shall be encumbered by a mortgage or a lien or shall be pledged to secure any obligation (whether the property or interest in property so encumbered or pledged shall be owned by me jointly or individually), it is my intention that such

Page 2



indebtedness shall not be charged to or paid by my estate but that the devisee, legatee, joint owner taking by survivorship or beneficiary shall take such property or interest in property subject to all encumbrances existing at the time of my death.

## IV

## SPECIFIC BEQUESTS

4.1    Tangible Personal Property.    I give and bequeath, in fee, all tangible personal property except cash on hand owned by me at the time of my death, including, but not limited to, lapsed bequests of tangible personal property, if any, furniture, furnishings, rugs, pictures, books, silverplate, linen, china, glassware, objects of art, wearing apparel, jewelry and automobiles, as follows:

(a)    First, in accordance with that certain separate writing that I have executed or may execute listing certain items of personal property which I bequeath to certain individuals as specified in said list, as said list is altered from time to time.  If the list referred to herein is not found and properly identified by my personal representative within 30 days after his qualification, it shall be presumed that there is no such list and any subsequently discovered list shall be ignored.

(b)    All other tangible personal property not specifically bequeathed by such separate writing and all such property, in the absence of any list, to my wife, JANICE LOGAN, if she survives me, but if not, then to those of my children who survive me, to be divided among them by my personal representative in its absolute discretion, in as nearly equal portions as may be practicable, having due regard for the preferences of such children.

(c)    In the event none of these persons survive me, this bequest shall lapse and shall pass as part of my Residuary Estate.

4.2    Property Insurance Policies.    All of my insurance policies which provide indemnity for the loss of any of my personal or real property by fire, windstorm, or other casualty (including any claim for such loss of any such property which I might have at the time of my death against any insurance company) I give and bequeath respectively to those persons or corporations, as the case may be, who shall become owners of such properties by reason of my death; whether such ownership be acquired under the provisions of this will, by survivorship or by other means.

4.3    Delivery Costs.    If, to effect delivery of my tangible personal property or insurance policies above bequeathed to a beneficiary who resides in a city or a location other than where the tangible property or insurance policies are located at the time delivery is to be made, it becomes necessary to incur expenses of shipment to complete the delivery, my personal representative on behalf of my estate shall arrange for and pay the costs of shipment incurred in making such delivery.

V

## RESIDUARY ESTATE

5.1    <u>Defined.</u>  I define "my Residuary Estate" as all of my property not otherwise effectively bequeathed or devised, after the payment of debts and taxes under Article III above; including real and personal property whenever acquired by me, life insurance or for the benefit of my estate, and property as to which I have an option to purchase or a reversionary interest; but excluding property as to which I have no interest other than a power of appointment and any assets which are payable to a designated beneficiary other than me or my estate.

5.2    <u>To My Trust.</u>  I give, devise and bequeath my Residuary Estate to the Trustees under a certain Trust Agreement heretofore entered into between me, JAMES LOGAN, as Settlor, JAMES LOGAN and JANICE LOGAN, as Co-Trustees, and any Successor Trustees thereto, dated February 10, 2021, entitled the "JAMES LOGAN FAMILY TRUST" as the same now exists or is hereafter amended from time to time.

(a)    Said property shall be added to the corpus of the trust fund therein established as an integral part thereof, to be held, administered and distributed by the Trustee in accordance with all the terms and provisions of the said Trust Agreement.

(b)    The receipt of said Trustee under said Trust Agreement shall be a full acquittance and discharge to my personal representative for the property so distributed.  Upon distribution to the Trustee, the administration of my estate shall cease with respect to the assets passing to the Trustee, and the Trustee shall not be subject to the control of the court in which my will is probated.

5.3    <u>Trust Savings Clause.</u>  If for any reason the trust set out above in this Article V shall not be in existence at the time of my death, or if for any reason a court of competent jurisdiction shall declare this testamentary transfer to the Trustee of said trust to be invalid, then I direct that my Residuary Estate shall be held, managed, invested and reinvested in exactly the same manner described in said trust, giving, if the court shall allow, effect to all then existing amendments of said trust, and managed by the same Trustee or the successor or successors therein named and defined; thus, for those purposes I do hereby incorporate that same instrument of revocable trust, by reference, into this, my Last Will and Testament.  If the court shall not allow that trust to be incorporated into this will with its amendments, it shall be incorporated in its original form without regard to said amendments, if any such amendments have been made.

VI

## POWERS OF PERSONAL REPRESENTATIVE

6.1    <u>General Powers Of Personal Representative.</u>  I hereby give to my personal representative and any ancillary personal representative full power and authority, at any time or times, to sell, mortgage, pledge, exchange or otherwise deal with or dispose of the property



comprising my estate, upon such terms as shall be deemed best and without any order of the court; to settle and compromise any and all claims in favor of or against my estate as shall be deemed advisable and for any of the foregoing purposes to make, execute and deliver all deeds, contracts, mortgages, bills of sale or other instruments necessary or desirable therefor. My personal representative is also authorized to retain any assets or property owned by me at the time of my death and, therefore, no sale thereof shall need to be made solely to diversify investments. My personal representative is expressly authorized to postpone final distribution of my estate, pending final determination of tax liabilities in connection therewith.

6.2     <u>Power Over Digital Assets.</u> I give to my personal representative and any ancillary personal representative full power and authority, at any time or times, (i) to access, use, and control my digital devices, including but not limited to, desktops, laptops, tablets, peripherals, storage devices, mobile telephones, smart phones, and any similar devices, which currently exist or may exist as technology develops for the purposes of accessing, modifying, deleting, controlling, or transferring my digital assets (as defined below), (ii) to access, modify, delete, control, and transfer my digital assets, and (iii) to obtain, access, modify, delete, and control my passwords and other electronic credentials associated with my digital devices (as described above) and digital assets. For purposes of this Last Will and Testament, "digital assets" shall include, but not be limited to, emails received, email accounts, digital music, digital photographs, digital videos, software licenses, social network accounts, file sharing accounts, web hosting accounts, tax preparation services accounts, online stores, affiliate programs, other online accounts, and similar digital items which currently exist or may exist as technology develops.

6.3     <u>Ancillary Administration.</u> In the event ancillary administration is required to dispose of any property which I may own at the time of my death with a situs outside of the State of Florida, I hereby nominate and appoint my personal representative hereinabove named as such ancillary personal representative; however, if my personal representative is not qualified to act as ancillary personal representative under the laws of the state of the situs of such property, then I authorize my personal representative to designate an individual or corporate ancillary personal representative to administer such property.

6.4     <u>Joint Tax Returns.</u> I specifically authorize and empower my personal representative to execute and file a joint income tax return with my wife for the year in which my death occurs and for any years prior thereto. I also authorize and empower my personal representative to execute and file joint gift tax returns with my wife if any gift tax return is required of either of us for the year in which my death occurs or for any year prior thereto. My personal representative shall incur no personal liability for any action taken in good faith in accordance with either of the foregoing authorizations.

6.5     <u>Choice Of Deductions.</u> I am cognizant of the fact that the provisions of the Federal Internal Revenue Code (and other applicable laws) in force at the time of my death and applicable to my estate may permit my personal representative to elect to claim certain administration and other expenses as deductions, either in the income tax returns of my estate or in the estate tax return.

Page 5



(a)    It is my desire that my personal representative elect to claim from time to time such expenses as deductions on the particular tax returns which, in the personal representative's opinion, should result in the smallest combined taxes being paid, irrespective of whether such expenses shall be payable from income or corpus; and my personal representative is directed not to make adjustments between income or principal or between property interests passing to beneficiaries under my will which may be substantially affected as a result of any election under this Article.

(b)    It is my wish that such property interests as may be determined as a result of my personal representative's election under this provision shall be the interest such beneficiary shall receive.

(c)    I exonerate my personal representative from all liability for any such election and direct that no beneficiary shall have any claim against it or my estate by reason of the exercise of my personal representative's judgment in this respect.

6.6    Elections.  Except as elsewhere provided herein, my personal representative shall have the absolute discretion, right and authority to make all elections, decisions, payments and distributions hereunder in regard to sale, distribution and allocation of property so as to allocate the impact of estate and income taxes upon the various assets of my estate, including, but not limited to:

(a)    election to have a specific portion or all of certain life interests for my surviving spouse qualify for the marital deduction as qualified terminable interest property;

(b)    allocation of my generation-skipping exemption as my personal representative shall deem advisable, except the exemption shall be allocated (i) first to property given by me rather than by another or appointed by me and (ii) to a direct skip caused by a disclaimer only if no other allocation is possible;

(c)    sale or disposition of assets among beneficiaries and trusts to minimize potential income tax on sale or disposition of assets by my estate.  In this regard, I request (but do not direct) that my personal representative do so in a manner which will result in the property to be sold to satisfy obligations of my estate, or any trust, having an aggregate income tax basis as close as possible to its aggregate fair market value and, to the extent consistent with the foregoing objective, in a manner which will result in maximizing the increase in basis of assets of my estate on account of federal and state death taxes attributable to appreciation of such assets;

(d)    allocations of assets among beneficiaries and trusts upon the basis of present value without regard to the income tax basis of such assets in the hands of such beneficiaries and trusts unless such allocation is contrary to my express intentions as otherwise reflected herein.

6.7    Principal And Income.  In matters of allocation and accounting of principal, income, expenses, receipts and disbursements, my personal representative shall be governed by Florida Statutes 738, "Principal and Income", or its successor statute, as the same may from time

to time exist, except as otherwise provided in this will; provided, however, my personal representative shall have the option of charging all or any portion of the expenses incurred in connection with the settlement of my estate against either income or principal of my estate.

VII

MISCELLANEOUS PROVISIONS AND DEFINITIONS

7.1    Estate Taxes.  The term "estate taxes" shall mean all estate, inheritance, succession, generation-skipping tax on direct skips and other taxes (together with any interest or penalty thereon), assessed by reason of my death imposed by the government of the United States, or any state or territory thereof, or by any foreign government or political subdivision thereof.

7.2    Construction.  The paragraph headings used are for convenience only and shall not be resorted to for interpretation of this will.  Wherever the context so requires, the masculine shall include the feminine and neuter and the singular shall include the plural.  If any portion of this will is held to be void or unenforceable, the balance of the will shall nevertheless be carried into effect. References herein to "gross estate", "marital deduction" or other similar or related words or phrases shall have the same meaning as such words or phrases have in the Internal Revenue Code of 1986, as amended.

7.3    Unused Exclusion.  If (i) my spouse survives me, and (ii) my personal representative determines that my estate does not need to use all of my federal estate tax exclusion to prevent federal estate taxes upon my estate and that such unused federal estate tax exclusion can be used by my spouse's estate if a federal estate tax return is filed for my estate, and (iii) my spouse (or her legal representative, whether a guardian, agent under a power of attorney, or personal representative of her estate) requests that my personal representative file a federal estate tax return that includes an irrevocable election, pursuant to Section 2010(c) of the Internal Revenue Code, to allow my spouse's estate to use my unused federal estate tax exclusion (the so-called Deceased Spousal Unused Exclusion Amount), then I direct my personal representative to timely file such federal estate tax return, whether a return is otherwise required or not, and make such election.

7.4    Survival.  With respect to the distribution of my tangible personal property, the term "survive me" is to be construed to mean that the person referred to must survive me by 30 days.  If such person dies within 30 days of my death, the reference to such person shall be construed as if such person failed to survive me with respect to the distribution of my tangible personal property.  With respect to the JAMES LOGAN FAMILY TRUST, said trust agreement provides its own survivorship provisions.

IN WITNESS WHEREOF, I have set my hand and seal to this, my Last Will and Testament, this ___ day of February, 2021.

_____(SEAL)
JAMES LOGAN

Page 7

We, the undersigned, hereby certify that the foregoing instrument was, on the date hereof, signed, sealed, published and declared by the said JAMES LOGAN, the Testator, as and for his last Will and Testament, in the presence of us, who in his presence and in the presence of each other, have, at his request, hereunto subscribed our names as witnesses to the execution hereof, this 10th day of February, 2021, and we certify that at the time of the execution hereof we believe said Testator to be of sound and disposing mind and memory.

_____ residing at _____ ST. PETERSBURG, FL _____

_____ residing at _____ LARGO, FL _____

STATE OF FLORIDA
COUNTY OF PINELLAS

I, JAMES LOGAN, the Testator, declare to the undersigned officer taking my acknowledgment of this instrument, and to the subscribing witnesses, that I signed this instrument as my Will.

_____
Testator

We __NICHOLAS A. MITCHELL__ and __ALMA DEBRUYNE__, the witnesses whose names are signed to the foregoing instrument, have been sworn by the officer signing below, and declare to that officer on our oaths that the Testator declared this instrument to be the Testator's Will and signed it in our presence and that we each signed this instrument as a witness in the presence of the Testator and in the presence of each other.

_____
Witness

_____
Witness

STATE OF FLORIDA
COUNTY OF PINELLAS

I HEREBY CERTIFY that the foregoing instrument was (i) acknowledge and subscribed before me by means of ☑ physical presence or ☐ online notarization, this 10th day of

February, 2021, by the Testator, JAMES LOGAN, who is ☐ personally known to me, or who has ☑ produced **FLORIDA DRIVER LICENSE** as identification; (ii) sworn to and subscribed before me by the witnesses, **NICHOLAS A. MITCHELL** and **ALMA DEBRUYNE**, who are personally known to me and each of whom appeared before me by means of ☑ physical presence or ☐ online notarization, this 10th day of February, 2021; and (iii) subscribed by me in the presence of the Testator and the subscribing witnesses, all on this 10th day of February, 2021.


_Jennifer A. Studer_
NOTARY PUBLIC

6078419

JENNIFER A. STUDER
MY COMMISSION # GG 934679
EXPIRES: March 24, 2024
Bonded Thru Notary Public Underwriters

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA
PROBATE DIVISION

JONATHAN LOGAN and
SMART COMMUNICATIONS HOLDING, INC.,

      Plaintiffs,

v.                                                                                       Case No:

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust dated February 10, 2021
and ALEXIS LOGAN, individually,

      Defendants.

_____/

**EXHIBIT "B"**

**TO**

**<u>COMPLAINT</u>**

"JAMES LOGAN FAMILY TRUST"

dated

February 10, 2021

JAMES LOGAN, Settlor

JAMES LOGAN and JANICE LOGAN, Co-Trustees

TABLE OF CONTENTS

I.   NAME OF TRUST, FAMILY MEMBERS, SURVIVORSHIP

    1.1   Name of Trust
    1.2   Family Members
    1.3   Common Disaster

II.   RESIGNATION OF TRUSTEE AND SUCCESSOR TRUSTEE

    2.1   Appointment of Successor Trustee
    2.2   Settlor's Intent

III.   DUTIES AND RIGHTS DURING THE LIFETIME OF THE SETTLOR

    3.1   Right to Revoke and Amend the Trust
    3.2   Disposition of Trust Income and Principal During Lifetime of Settlor

IV.   DUTIES AFTER SETTLOR'S DEATH BUT PRIOR TO DISTRIBUTION

    4.1   Summary Description of Duties
    4.2   Assemble the Trust Estate
    4.3   Payment of Expenses and Costs of Settling Settlor's Estate

V.   DISTRIBUTION FOLLOWING THE DEATH OF THE SETTLOR

    5.1   Division of Trust Estate
    5.2   Marital Trust for Settlor's Spouse
    5.3   Residuary Trust
    5.4   Final Takers
    5.5   S Corporation Stock

VI.   LIMITATIONS ON BENEFITS AND ALLOCATIONS OF ASSETS

    6.1   Gifts During Lifetime

VII.   INVESTMENT AND ADMINISTRATIVE POWERS

    7.1   Rights Reserved to Settlor
    7.2   Investment Powers
    7.3   Digital Assets
    7.4   Generation Skipping Tax Provisions
    7.5   Allocation of Principal and Income

7.6     Exoneration
7.7     Business Provisions

## VIII. GENERAL PROVISIONS AND DEFINITIONS

8.1     Additions to Corpus
8.2     Laws Governing
8.3     Interpretation and Construction
8.4     Disability
8.5     Small Trust Termination
8.6     Donee's Will
8.7     Spendthrift Provision
8.8     Establishment of Separate Trusts
8.9     Compensation and Accounting
8.10    Merger or Combination of Trusts
8.11    Construction
8.12    Preservation of Marital Deduction
8.13    Definitions

## REVOCABLE TRUST AGREEMENT

THIS AGREEMENT is made and entered into the _10th_ day of February, 2021, at St. Petersburg, Florida, between JAMES LOGAN, Settlor, of Sarasota County, Florida (hereinafter called the "Settlor"), and JAMES LOGAN and JANICE LOGAN, Co-Trustees (hereinafter collectively called the "Trustee").

## W I T N E S S E T H:

WHEREAS, Settlor desires to create a trust to receive cash or other assets, including $10.00 cash which the Trustee acknowledges receipt of, together with such other assets as the Trustee may now or hereafter at any time hold or acquire hereunder (all such assets, being hereinafter referred to collectively as the "trust estate");

NOW, THEREFORE, this Trust is created and assets conveyed and the Trustee agrees to hold the trust estate, IN TRUST, for the following uses and purposes and subject to the terms and conditions hereinafter set forth:

### ARTICLE I

### NAME OF TRUST, FAMILY MEMBERS AND SURVIVORSHIP

1.1     NAME OF TRUST.  This trust shall, for convenience, be known as the "JAMES LOGAN FAMILY TRUST" and it shall be sufficient that it be referred to as such in any deed, assignment, bequest or devise.

1.2     FAMILY MEMBERS.  At the time of the execution of this Trust Agreement, Settlor's immediate family group consists of his "wife" (hereinafter sometimes referred to as "spouse" or "wife"), JANICE LOGAN, and Settlor's two children, ALEXIS LOGAN and JON LOGAN.

1.3     COMMON DISASTER.

(a)     If Settlor's spouse shall die simultaneously with Settlor or in such circumstances as to render it impossible to determine who predeceased the other, then it shall be presumed that Settlor's spouse survived the Settlor for purposes of this trust and the provisions of this trust shall be construed upon that assumption and basis, notwithstanding the provisions of any law establishing a different presumption of order of death or providing for survivorship for a fixed period as a condition of inheritance of property.

(b)    With respect to persons other than Settlor's spouse, a beneficiary who dies within 30 days of Settlor's death shall be deemed to have predeceased the Settlor.

(c)    Except as provided in the preceding paragraphs, if any beneficiary shall die simultaneously with another beneficiary or in such circumstances as to render it impossible to determine who predeceased the other and if the rights of one of them depend upon his or her having survived the other, the beneficiary whose rights depend upon such survivorship shall be deemed to have predeceased the other beneficiary and the provisions hereof shall be construed upon that assumption.

## ARTICLE II

## RESIGNATION OF TRUSTEE AND SUCCESSOR TRUSTEE

2.1    APPOINTMENT OF SUCCESSOR TRUSTEE.

(a)    Upon the death, incapacity, resignation or discharge of either one of the Settlor or JANICE LOGAN as Co-Trustee, then the remaining one of them shall be the sole Trustee of all trusts hereunder. If JANICE LOGAN becomes the sole Trustee after the death, incapacity, resignation or discharge of Settlor as Trustee, then the following provisions shall apply:

1.    If JANICE LOGAN becomes the sole Trustee, she shall have the power at any time to appoint a Co-Trustee, to appoint a sole Trustee, to remove such Co-Trustee or sole Trustee, and to appoint or not re-appoint another Co-Trustee or sole Trustee in the event such Co-Trustee or sole Trustee appointed by JANICE LOGAN should die, become incapacitated, resign or be removed.

2.    Notwithstanding the foregoing, if JANICE LOGAN signs a statement waiving the right to remove a particular Co-Trustee or sole Trustee, then (i) JANICE LOGAN shall not have the power to remove that Co-Trustee unless such Co-Trustee is replaced with a Corporate Trustee, and (ii) that Co-Trustee appointed by JANICE LOGAN shall have exclusive authority over distributions to or for JANICE LOGAN.  For this purpose, a Corporate Trustee shall be a bank or trust company qualified to act as such. However, if that Co-Trustee should die, become incapacitated, resign or be discharged by a court, then Settlor's spouse shall have the power to appoint (or not appoint) any other Co-Trustee in its place.

(b)    Upon the death, incapacity, resignation or discharge of both of the Settlor and the Settlor's spouse, JANICE LOGAN, as Trustees, then SABAL TRUST COMPANY shall be Successor Trustee of all trusts created hereunder, except as provided in subparagraphs 2.1(c) and 2.1(d) below.

(c)    Notwithstanding anything contained herein to the contrary, with respect to a separate trust for the primary benefit of a child of the Settlor or a descendant of a deceased child of the Settlor administered pursuant to subparagraph 5.3(c) of Article V, such child (immediately and without age restriction) and such descendant upon such descendant attaining age 30 years (such child and such descendant shall be collectively hereinafter (for purposes of the remainder of this subparagraph 2.1(c)) referred to as "descendant"), shall have the power to remove any Trustee and appoint any Successor Trustee, subject to the following:

1.    Such removal and/or appointment shall be in writing, and the appointed Successor Trustee(s) may be any person (including Settlor's descendant himself or herself) or a Corporate Trustee.

2.      Such descendant shall have the power to appoint either one Trustee or Co-Trustees.

3.      Such descendant may prospectively appoint one or more Successor Trustees to serve after the death, incapacity, resignation, or discharge of any one or more prior Trustees.

4.      If such descendant appoints Co-Trustees, then upon the death, incapacity, resignation, or discharge of a Co-Trustee, the other Co-Trustee shall become the sole Trustee unless and until another Co-Trustee is appointed (or unless a different result is specified as part of the appointment), except as provided in subparagraph 2.1(c)5. below.

5.      If such descendant signs a statement waiving the right to remove a particular Trustee or Co-Trustee, then such descendant shall not have the power to remove that Trustee or Co-Trustee unless such Trustee or Co-Trustee is replaced with a Corporate Trustee. However, if that Trustee or Co-Trustee should die, become incapacitated, resign, or be discharged by a court, then such descendant shall again have the power to appoint (or not appoint) any other Trustee or Co-Trustee in its place.

6.      If upon the death, incapacity, resignation, or discharge of any Trustee and if no other Successor Trustee has been appointed by such descendant and if such descendant is deceased or incapacitated, then the Trustee provisions of subparagraph 2.1(b) above shall apply.

(d)      Subject to subparagraph 2.1(c) above, with respect to a separate trust for the primary benefit of a descendant of a deceased child of the Settlor administered pursuant to subparagraph 5.3(c) herein, the parent of such descendant who is also a descendant of the Settlor shall have the power, at any time and from time to time, to prospectively appoint any Successor Trustee(s) of such trust for the primary benefit of his or her descendants. If no Successor Trustee(s) has been appointed, then the Trustee provisions of subparagraph 2.1(b) above shall apply.

(e)      Any Trustee or Successor Trustee may resign at any time by giving written notice to that effect to the next named Successor Trustee and to the current income beneficiary (or beneficiaries) of the trust.

(f)      Any Successor Trustee shall have all the rights, powers, duties, and discretions conferred or imposed on the original Trustee. No Successor Trustee shall be obliged to examine the accounts and actions of any previous Trustee. No Trustee shall be liable for any act or omission unless the same be due to such Trustee's own default.

(g)      Any Successor Trustee shall become responsible for the trust estate only when, as and if the same shall be received by it and, in determining such estate, such Trustee shall

only be responsible to make a reasonable inquiry from the records of the prior Trustee which are available.

(h)    No Trustee or Successor Trustee shall be obliged to examine the accounts and actions of the personal representative of the Settlor's estate.  No Trustee or Successor Trustee shall be liable for any act or omission of the personal representative of the Settlor's estate.

(i)    If SABAL TRUST COMPANY or any Successor Corporate Trustee appointed under this subparagraph 2.1(i) resigns or is discharged or fails to serve as Trustee of any of the designated trusts herein created and no other Successor Trustee has been otherwise appointed under this trust agreement, then a majority of the then current income beneficiary or beneficiaries who are of legal age and the guardians of any incompetent or minor then current income beneficiary or beneficiaries shall appoint a Successor Corporate Trustee of that trust. In the event there are no current income beneficiary or beneficiaries of the trust estate, then Settlor's spouse shall be deemed to be the sole current income beneficiary for purposes of this subparagraph 2.1(i), but if she is not living or is incapacitated, then Settlor's descendants for whom a separate trust shall be funded under Article V shall be deemed to be the current income beneficiary(ies) of such trust estate. In the event the current income beneficiary or beneficiaries shall fail to designate promptly a Successor Corporate Trustee, the then acting Trustee shall apply to a court for such an appointment and for settlement of account.

(j)    The persons who have the power to appoint a Successor Corporate Trustee pursuant to subparagraph 2.1(i) above shall also have the power to remove any Corporate Trustee then serving, provided that a removed Corporate Trustee is replaced with a Successor Corporate Trustee as provided in subparagraph 2.1(i) above.

ARTICLE III

DUTIES AND RIGHTS DURING THE LIFETIME OF THE SETTLOR

3.1    RIGHT TO REVOKE AND AMEND THE TRUST.  The Settlor expressly reserves the right, at any time and from time to time, during Settlor's lifetime, by instrument in writing delivered to the Trustee to alter, amend, or revoke this Agreement, either in whole or in part, provided, however, that if altered or amended, the duties, powers, and responsibilities of the Trustee shall not be substantially changed without the Trustee's consent. In case of revocation, the insurance policies, securities, and property held in trust hereunder, or that part thereof as to which the Agreement may be revoked, shall be delivered by the Trustee to the Settlor or in accordance with the Settlor's written directions.

3.2    DISPOSITION OF TRUST INCOME AND PRINCIPAL DURING LIFETIME OF SETTLOR.

(a)      During the Settlor's lifetime, the Trustee shall pay to or for the benefit of the Settlor and to or for the benefit of any other person as much of the net income and/or principal as the Settlor may direct from time to time.

(b)      In the absence of direction to the contrary by the Settlor, during the lifetime of the Settlor, the Trustee is hereby authorized at any time or from time to time:

1.      To pay to or for the Settlor for Settlor's health, support and maintenance so much of the net income and/or principal of the trust estate as the Trustee determines is proper, taking into account the standard of living to which the Settlor has been accustomed.

2.      To pay to or for Settlor's spouse for her health, support, maintenance and education so much of the remaining net income and/or principal of the trust estate as the Trustee determines is proper, taking into account the standard of living to which Settlor's spouse has been accustomed and taking into consideration all other income or property available to Settlor's spouse for such purposes from all sources known to the Trustee.

3.      To pay to or on behalf of the Settlor the amount of any and all taxes caused by the sale or possession of any of the assets comprising the trust estate.

4.      To make gifts each calendar year in amounts up to the annual gift tax exclusion to or for the benefit of each of Settlor's descendants.

5.      To pay premiums on life insurance policies insuring the life of the Settlor, regardless of who or how those life insurance policies are owned.

(c)      During the Settlor's lifetime, the Settlor shall have the right to occupy as Settlor's homestead any real property which is a part of the trust estate and he shall have the exclusive and continuous present right to full use, occupancy and possession of such residence for life.  It is Settlor's intention that such Settlor's interest in such property shall constitute a "beneficial interest for life" and "equitable title to real estate" as contemplated by Florida Statutes Section 196.041(2). No provision of this trust agreement shall be construed to convert this right into intangible personal property. The Trustee shall have the power and authority to protect, conserve, sell, lease, encumber, or  otherwise manage or dispose of Settlor's homestead or any rights or interests in Settlor's homestead (including on behalf of this Trust and the Settlor individually), which power shall not be affected by the incapacity or disability of the Settlor.

## ARTICLE IV

### DUTIES AFTER SETTLOR'S DEATH, BUT PRIOR TO DISTRIBUTION

Upon the death of the Settlor, this trust shall become irrevocable and the Trustee shall have the following duties and shall dispose of the trust estate in the following manner:

4.1    SUMMARY DESCRIPTION OF DUTIES.    Upon the death of the Settlor, the Trustee's general duties, along with all other duties and responsibilities enumerated hereunder, are:

(a)    First, assemble the trust estate as provided in paragraph 4.2 of this Article IV.

(b)    Second, pay any part or all of the funeral expenses, legal debts, and costs of administration of the Settlor's estate, as provided in paragraph 4.3 of this Article IV.

(c)    Third, establish separate and distinct trusts as provided in Article V.

(d)    Fourth, pay any part or all of any estate, inheritance, succession, and other death taxes (including penalties thereon), which may be imposed by reason of Settlor's death and due upon Settlor's death, but only, as provided in paragraph 4.3 of this Article IV, from the portion of the trust estate that does not qualify for any marital and/or charitable deduction described in Article V.

It is Settlor's intent to provide guidance as to the order in which various duties of the Trustee shall be accomplished; however, the foregoing shall in no way limit the responsibilities and duties of the Trustee hereunder.

4.2    ASSEMBLE THE TRUST ESTATE.

(a)    The Trustee shall collect the proceeds of any life insurance policies, shall collect the proceeds of any retirement plans payable to the trust, shall receive any proceeds from the Settlor's estate and shall hold the same together with other property heretofore or hereafter added to the trust. Such proceeds and property shall constitute the trust estate.

(b)    The Trustee shall have full authority to take any action in regard to the collection of the proceeds of insurance policies that it deems best and to pay the expense thereof out of the trust estate; but the Trustee shall not be required to enter into or maintain any litigation to enforce payment of such policies until it shall have been financially protected or indemnified to its satisfaction against all expenses and liabilities to which it might in its judgment be subjected by any such action on its part. The Trustee shall have full authority to make any compromise or settlement with respect to such policies, or any of them, that it may deem expedient, and to give to the insurance companies, and each of them, all the necessary and proper releases and acquittances and full discharge of all their liabilities under such policies.

(c)    No insurance company whose policy or policies shall be deposited hereunder and who shall make payments of the proceeds thereof to the Trustee shall be required

to inquire into or take notice of any of the provisions of this Agreement or to see to the application or disposition of the proceeds of such policies, and the receipt of the Trustee to any such insurance company shall be effectual to release and discharge it for any payment so made and shall be binding upon the beneficiary of the trusts hereby created.

### 4.3  PAYMENT OF EXPENSES AND COSTS OF SETTLING SETTLOR'S ESTATE.

    (a)    The Trustee, in its sole and absolute discretion, may:

        1.    Pay from the trust estate, all or any part of the Settlor's legal debts, funeral expenses, and the costs of administration of Settlor's estate;

        2.    Pay from the portion of the trust estate which does not qualify for the marital deduction for federal estate tax purposes (because Settlor's executor in the exercise of its discretion does not elect to have such part or all of such property treated as qualified terminable interest property or because Settlor's spouse did not survive the Settlor) all or any part of the estate, inheritance, succession and other death taxes (including penalties thereon, if any), imposed by reason of Settlor's death.  This subparagraph 4.3(a)2. shall be applicable to all such taxes payable by reason of the Settlor's death in respect to all property comprising the Settlor's gross estate for death tax purposes whether or not such property passes under this Agreement, under the Settlor's will or otherwise, except as limited in Settlor's will or hereunder.

Provided, however, no proceeds from, or interests in, any of the following shall be used for the foregoing purposes:  individual retirement account, qualified pension plan, profit sharing plan, or other qualified plan, trust, contract, account, annuity, or bond, as those plans are defined in Subchapter D of Chapter 1 of Subtitle A of the Internal Revenue Code (each of which is hereinafter referred to as a "Retirement Account").

    (b)    The Trustee is further authorized to:

        1.    Lend from the trust estate to the estate of the Settlor sufficient funds upon such terms as to security, rate and maturity and in other respects as the Trustee shall deem advisable to pay all or a portion of the above claims and debts (such loan need not be secured if in the Trustee's opinion it is in the best interests of the beneficiaries of this trust not to obtain security in light of the overall objectives and requirements of the beneficiaries, the Settlor and Settlor's estate); or, in the alternative;

        2.    Acquire in the trust estate by purchase, exchange or otherwise, sufficient assets from the estate of the Settlor to provide the estate of the Settlor with sufficient cash to pay the above claims and debts, even though such property may not be of the character prescribed by law or by the terms of the trust instrument for the investment of other trust funds, and although acquisition of such property may result in a large percentage of the trust estate being invested in one class of property, and without liability for loss or depreciation, except for willful or gross neglect, to retain such property so acquired so long as the Trustee shall deem it advisable.

    (c)    In no event shall any payments of federal estate taxes and other inheritance, succession, or death taxes (including penalties thereon, if any) be made from property which qualifies for the marital deduction.

ARTICLE V

DISTRIBUTION FOLLOWING THE DEATH OF THE SETTLOR

The Trustee shall hold the trust estate after the Settlor's death for the following uses and purposes:

5.1    DIVISION OF TRUST ESTATE.

(a)    If Settlor's spouse survives.  If Settlor's spouse survives the Settlor, the Trustee shall hold the entire remaining trust estate for the primary benefit of Settlor's spouse and distribute the same as provided in paragraph 5.2 herein, except as follows:

1.  Any portion of the trust estate which does not qualify for the marital deduction for federal estate tax purposes, because Settlor's executor in the exercise of its discretion does not elect to have such part or all of such property treated as qualified terminable interest property, shall be held for the primary benefit of Settlor's spouse and distributed as provided in paragraph 5.3 herein.  In such event:

A.    All values shall be those which are finally determined for federal estate tax purposes.  Elections made by Settlor's fiduciaries with respect to an alternate valuation date and with respect to taking certain deductions for income tax purposes shall apply in determining any of such values.

B.    To the extent the election to have part of such property treated as qualified terminable interest property is made by a fractional share or dollar amount, the Trustee in its sole discretion may select the assets used to fund each of the two shares.  For the purpose of division of the trust estate and funding the separate shares, the assets shall be valued at their fair market value on the date or dates of division and funding.

2.    The purpose of subparagraph 5.1(a)1. above is to allow Settlor's executor to make the decision of whether to use part or all of Settlor's remaining estate tax exclusion (applicable exclusion amount) upon Settlor's death for the purpose of keeping that portion of the trust and any appreciation of it out of Settlor's spouse's estate upon her later death, or to not use part or all of Settlor's remaining estate tax exclusion (applicable exclusion amount) upon Settlor's death for the purpose of including such part of the trust estate in Settlor's spouse's estate upon her later death and such assets possibly receiving a step-up in basis. The Trustee herein shall incur no liability for the election or non-election of treatment of property as qualified terminable interest property.

3.    If there is no federal estate tax in effect at the time of Settlor's death, then the entire trust estate shall be held for the primary benefit of Settlor's spouse as provided in paragraph 5.3 herein.

(b)  <u>If Settlor's spouse does not survive</u>.  If Settlor's spouse does not survive the Settlor, the entire remaining trust estate shall be divided and distributed as provided in subparagraph 5.3(b) herein.

5.2  <u>MARITAL TRUST FOR SETTLOR'S SPOUSE</u>.  The trust for the primary benefit of Settlor's spouse to be held under this paragraph 5.2 shall be distributed as follows:

(a)  <u>Income</u>.  The Trustee shall pay the entire net income to Settlor's spouse annually in quarterly or more frequent installments during Settlor's spouse's lifetime and from the date of Settlor's death.  The word "income" for the purposes of this subparagraph shall have the same meaning as the word "income" as used in the marital deduction estate tax provisions of the Internal Revenue Code.

(b)  <u>Principal</u>.  In addition, the Trustee may also pay or apply so much of the principal, to or for the benefit of Settlor's spouse as in the sole discretion of the Trustee shall be necessary or advisable from time to time for the health, maintenance and support in reasonable comfort of said spouse.

(c)  <u>Residence</u>.  If any residence is or becomes an asset of this trust, Settlor's spouse shall have the right to occupy such residence rent-free and she shall have the exclusive and continuous present right to full use, occupancy and possession of such residence for life.  It is Settlor's intention that Settlor's spouse's interest in such property shall constitute a "beneficial interest for life" and "equitable title to real estate" as contemplated by Florida Statutes Section 196.041(2).  The Trustee shall pay for all taxes, insurance, mortgage installments, ordinary maintenance and repair of such residence while Settlor's spouse uses it as a residence.  Settlor's spouse shall pay for utilities and other living expenses while using it as a residence (but the Trustee in its discretion may pay for any of such expenses pursuant to other provisions of this paragraph 5.2).  Upon the written direction of Settlor's spouse to sell such residence, the Trustee shall do so upon such terms as the Trustee deems reasonable and add the proceeds to the principal of the trust estate.  Upon the written direction of Settlor's spouse, the Trustee shall purchase a replacement residence to be held upon the same terms as the original residence which was a part of the trust estate.

(d)  <u>Make productive</u>.  Settlor's spouse shall at all times and in all events be permitted to require the Trustee either to make the property in this trust productive or to convert it, within a reasonable time, to productive property.

(e)  <u>Primary beneficiary</u>.  The Trustee's primary concern shall be Settlor's spouse, not Settlor's descendants or any remainder beneficiaries of this trust, even if such distributions may deplete the trust estate.  It is also the Settlor's intent that Settlor's spouse shall serve as sole Trustee and make such distributions for her own benefit.

   (f) <u>No judgment creditors</u>.  Notwithstanding the foregoing, (i) in no event shall the terms "maintenance" or "support", used together or separately, ever include or be interpreted to include payments to a judgment creditor or to satisfy a judgment creditor, and (ii) in no event shall distributions of principal be made to a judgment creditor of JANICE LOGAN or used in any way, directly or indirectly, to satisfy a judgment creditor of JANICE LOGAN.

   (g) <u>Distribution on spouse's death</u>.  Upon the death of Settlor's spouse, all income accrued or undistributed at the death of Settlor's spouse shall be added to principal. Further, the Trustee shall, unless Settlor's spouse directs otherwise in said spouse's last will and testament, pay from the principal, directly or to Settlor's spouse's personal representative, as the Trustee deems advisable, the amount by which the estate and inheritance tax as assessed by reason of the death of Settlor's spouse shall be increased as a result of the inclusion of the this trust estate in said spouse's estate for such tax purposes.  Following such payments, if any, the Trustee shall divide and distribute the remaining trust fund as provided in subparagraph 5.3(b) herein.

  5.3 <u>RESIDUARY TRUST</u>.  The trust for the benefit of Settlor's spouse to be held under this paragraph 5.3 or for the benefit of Settlor's descendants shall be distributed as follows:

   (a) <u>Payments during spouse's lifetime</u>.  During the lifetime of Settlor's spouse, the trust estate shall be held and distributed as follows for the primary benefit of Settlor's spouse:

    1. The Trustee is authorized to accumulate the net income or to pay or apply so much of the net income, and/or to pay or apply so much of the principal, to or for the benefit of Settlor's spouse during her lifetime as in the sole discretion of the Trustee shall be necessary or advisable from time to time for Settlor's spouse's health, maintenance and support in reasonable comfort.  However, payments shall be made hereunder from principal to or for Settlor's spouse only after the trust estate held pursuant to paragraph 5.2 herein has been exhausted.

    2. If any residence is or becomes an asset of this trust, Settlor's spouse shall have the right to occupy such residence rent-free and she shall have the exclusive and continuous present right to full use, occupancy and possession of such residence for life.  It is Settlor's intention that Settlor's spouse's interest in such property shall constitute a "beneficial interest for life" and "equitable title to real estate" as contemplated by Florida Statutes Section 196.041(2).  The Trustee shall pay for all taxes, insurance, mortgage installments, ordinary maintenance and repair of such residence while Settlor's spouse uses it as a residence.  Settlor's spouse shall pay for utilities and other living expenses while using it as a residence (but the Trustee in its discretion may pay for any of such expenses pursuant to other provisions of this subparagraph 5.3(a)).  Upon the written direction of Settlor's spouse to sell such residence, the Trustee shall do so upon such terms as the Trustee deems reasonable and add the proceeds to the principal of the trust estate.  Upon the written direction of Settlor's spouse, the Trustee shall purchase a replacement residence to be held upon the same terms as the original residence which was a part of the trust estate.

3.      After providing for Settlor's spouse, the Trustee may also in its sole discretion distribute as much of any remaining net income and/or principal during the lifetime of Settlor's spouse to or for the benefit of Settlor's descendants for their health, maintenance and support as determined by the Trustee in its sole discretion.

A.      However, no such distribution shall be made for the purpose of or which would have the effect of discharging any legal obligation which the Trustee may have outside of its capacity as Trustee, including the obligation of support, or which the person who has the power to remove and appoint the Trustee may have.

B.      Settlor's descendants shall have no right to any distributions under this subparagraph 5.3(a)3. and may not demand or require any distributions. Furthermore, Settlor's spouse may veto any such distribution.

4.      The Trustee's primary concern shall be Settlor's spouse, not Settlor's descendants or any remainder beneficiaries of this trust, even if such distributions may deplete the trust estate. It is also the Settlor's intent that Settlor's spouse shall serve as the Trustee and make such distributions for her own benefit.

5.      Notwithstanding the foregoing, (i) in no event shall the terms "maintenance" or "support", used together or separately, ever include or be interpreted to include payments to a judgment creditor or to satisfy a judgment creditor, and (ii) in no event shall distributions of principal be made to a judgment creditor of JANICE LOGAN or Settlor's descendants or used in any way, directly or indirectly, to satisfy a judgment creditor of JANICE LOGAN or Settlor's descendants.

(b)      <u>Division and distribution at spouse's death</u>. Upon the death of Settlor's spouse, or upon Settlor's death if Settlor's spouse should predecease the Settlor, the Trustee shall divide and distribute the remaining trust estate (including undistributed income, if any, and including any amounts added hereto from the trust for Settlor's spouse administered pursuant to paragraph 5.2 herein) as follows (after the payment of any estate taxes and costs of administration):

1.      The Trustee shall distribute the trust estate to or for the benefit of any one or more persons (including individuals and entities), in such amounts or portions and in such lawful interests or estates, whether absolute or in trust, as Settlor's spouse may appoint by specific reference to this power in said spouse's last will and testament, except not to Settlor's spouse, not to her estate, not to her creditors, and not to the creditors of her estate.

2.      If the foregoing limited power of appointment is for any reason not validly exercised in whole or in part by Settlor's spouse, the remaining trust estate, to the extent not validly appointed, shall be distributed as follows:

A.      The Trustee shall allocate an amount equal to ten percent (10%) of the net consideration (including cash and other forms of consideration) received by the Settlor or this trust from the liquidation or the sale of shares of stock of Smart Communications Holding, Inc., a Florida corporation (or its successor) (the "Corporation"), held by the Settlor or this trust (whether such liquidation or sale occurs during the lifetime of Settlor or after his death), to a separate trust for the primary benefit of ALEXIS LOGAN, if she survives the Settlor, to be administered as provided in subparagraph 5.3(c) of this Article V. The term "net consideration" as provided for in this subparagraph 5.3(b)2.A. shall **not** be net of taxes (income or otherwise), but shall be net of debt, expenses of sale, and other expenses properly charged against such proceeds and is meant to provide for an amount equal to ten percent (10%) of the amount received by Settlor or this trust pursuant to the liquidation or sale of his/its stock of the Corporation. In the event ALEXIS LOGAN does not survive the Settlor, then such gift shall lapse, to be distributed as provided under the remaining provisions of this Article V. No estate taxes or expenses of administration shall be paid from or charged to such gift under this subparagraph 5.3(b)2.A.

B.      The Trustee shall allocate any interest which may be held by or come into the trust estate in LOCO FLORIDA, LLC, a Florida limited liability company, to a separate trust for the primary benefit of JON LOGAN, if he survives the Settlor, to be administered as provided in subparagraph 5.3(c) of this Article V.  In the event JON LOGAN does not survive the Settlor, then such gift shall lapse, to be distributed as provided under the remaining provisions of this Article V.  No estate taxes or expenses of administration shall be paid from or charged to such gift under this subparagraph 5.3(b)2.B.

C.      The Trustee shall divide the remaining trust estate (after the gifts provided for under subparagraph 5.3(b)2.A. and 5.3(b)2.B. above (if any)) into shares of equal value, creating one such share for each child of the Settlor who is then living, and creating one such share for the descendants, collectively, of each deceased child of the Settlor who leaves one or more descendants living at the time of division.

(i)      A share created for a child of the Settlor shall be held as a separate trust for the primary benefit of such child of the Settlor for distribution as provided in subparagraph 5.3(c) of this Article V.

(ii)      A share created for the descendants, collectively, of a deceased child of the Settlor shall be divided into shares for such descendants on a per stirpes basis. Any such share for a descendant of a deceased child of the Settlor shall be held as a separate trust for the primary benefit of such descendant for distribution as provided in subparagraph 5.3(c) of this Article V.

(c)      <u>Trust provisions for descendants</u>.  Upon the creation of a separate trust for the primary benefit of a descendant of the Settlor (any one of whom shall be referred to in this subparagraph 5.3(c) as the "Primary Beneficiary") such trust estate, including his or her beneficial interest in a Retirement Account, shall be distributed as follows:

1.      Notwithstanding anything to the contrary in this subparagraph 5.3(c), upon the creation of a separate trust for the primary benefit of the Primary Beneficiary, if any Retirement Account or portion of a Retirement Account becomes payable to this separate trust for such Primary Beneficiary, the following shall apply:

A.      If such Primary Beneficiary is an "eligible designated beneficiary" within the meaning of Section 401(a)(9)(E)(ii) of the Internal Revenue Code (such that distributions from such Retirement Account to such Primary Beneficiary can be made over the remaining life expectancy of such Primary Beneficiary), then for as long as such Primary Beneficiary remains an "eligible designated beneficiary," the Trustee shall elect to receive or shall withdraw from such Retirement Account the following: (i) the minimum required distribution as is necessary in order to satisfy the requirements of Section 401(a)(9) of the Internal Revenue Code and Regulations issued thereunder, and (ii) such additional amount or amounts as the Trustee determines, in its sole discretion, that it needs to satisfy the remaining distribution provisions of this subparagraph 5.3(c). The Trustee shall pay to or for the benefit of such Primary Beneficiary the entire amount withdrawn by the Trustee each year from Retirement Accounts payable to this separate trust.  These payments may be made annually or periodically during the year.

B.      If such Primary Beneficiary is not (or no longer qualifies as) an "eligible designated beneficiary" within the meaning of Section 401(a)(9)(E)(ii) of the Internal Revenue Code, then the Trustee shall elect to receive or shall withdraw from such Retirement Account only such amount or amounts as the Trustee determines, in its sole discretion, that it needs either to satisfy the remaining distribution provisions of this subparagraph 5.3(c) or that it deems advisable to withdraw for tax planning and other purposes; provided, however, that each such Retirement Account payable to this separate trust for such Primary Beneficiary who is not (or no longer qualifies as) an "eligible designated beneficiary" shall, in all cases, be fully distributed to the Trustee within the time period required by Section 401(a)(9) of the Internal Revenue Code and Regulations issued thereunder. Upon the Trustee's receipt of a distribution from a Retirement Account pursuant to this subparagraph 5.3(c)1.B., the Trustee is authorized either (i) to pay or apply such distribution to or for the benefit of such Primary Beneficiary or (ii) to retain such distribution as part of such Primary Beneficiary's trust estate for potential future distribution.

2.      During the lifetime of such Primary Beneficiary, the Trustee may pay or apply so much of the net income and/or principal, in excess of the minimum required distribution from a Retirement Account as provided in subparagraph 5.3(c)1. above, to or for the benefit of such Primary Beneficiary as in the sole discretion of the Trustee shall be appropriate or advisable from time to time for the health, education, maintenance and support in reasonable comfort of such Primary Beneficiary.

3.      In addition, the Trustee may distribute any remaining net income and/or principal (other than distributions from a Retirement Account) to or for the benefit of the Primary Beneficiary's descendants for their health, education, maintenance and support.

A.      Provided that no such distribution shall be made if objected to by the Primary Beneficiary.

B.      No such distributions shall be made for the purpose of or which would have the effect of discharging any legal obligation, including the obligation of support, which the Trustee may have outside of its capacity as Trustee or which the person who has the power to remove and appoint the Trustee may have.

4.      If any residence is or becomes an asset of the trust estate, such Primary Beneficiary of the Settlor shall have the right to occupy such residence rent-free and he or she shall have the exclusive and continuous present right to full use, occupancy and possession of such residence for life. It is Settlor's intention that such Primary Beneficiary's interest in such property shall constitute a "beneficial interest for life" and "equitable title to real estate" as contemplated by Florida Statutes Section 196.041(2). The Trustee shall pay for all taxes, insurance, mortgage installments, ordinary maintenance and repair of such residence while such Primary Beneficiary uses it as a residence. Such Primary Beneficiary shall pay for utilities and other living expenses while using it as a residence (but the Trustee in its discretion may pay for any of such expenses pursuant to other provisions of this subparagraph 5.3(c)). Upon the written direction of such Primary Beneficiary to sell such residence, the Trustee shall do so upon such terms as the Trustee deems reasonable and add the proceeds to the principal of the trust estate. Upon the written direction of such Primary Beneficiary, the Trustee shall purchase a replacement residence to be held upon the same terms as the original residence which was a part of the trust estate.

5.      To help in making its determination for any discretionary distributions (whether to the Primary Beneficiary or the Primary Beneficiary's descendants), the Trustee may consider such circumstances and factors the Trustee believes are relevant, including but not limited to the other income and assets known to the Trustee to be available to such beneficiary for such purposes (including any distributions from a Retirement Account pursuant to subparagraph 5.3(c)1. above) and the advisability of supplementing such other income or assets, the tax consequences of any such distribution, the character and habits of such beneficiary, the diligence, progress and aptitude of such beneficiary in acquiring an education, the ability of such beneficiary to handle money usefully and prudently and to assume the responsibilities of adult life and self-support.

6.      The Trustee's primary concern shall be the Primary Beneficiary, not the Primary Beneficiary's children or any residual beneficiaries of this trust, even if such distributions may deplete the trust estate. It is also the Settlor's intent that the Primary Beneficiary shall be able to serve as the sole Trustee immediately in the event the Primary Beneficiary is a child of the Settlor, or after attaining age 30 years if the Primary Beneficiary is a descendant of a deceased child of the Settlor, and as such be able to make such distributions for his or her own benefit.

7.      Notwithstanding the foregoing, (i) in no event shall the terms "maintenance" or "support", used together or separately, ever include or be interpreted to include payments to a judgment creditor or to satisfy a judgment creditor, and (ii) in no event shall any distributions be made to satisfy a judgment creditor of the Primary Beneficiary or any members of his or her family.

8.      Upon the death of the Primary Beneficiary, the Trustee shall divide and distribute the Primary Beneficiary's remaining trust fund as follows:

A.      The Trustee shall distribute any portion of such trust fund that would be subject to the generation skipping tax (if not for this subparagraph 5.3(c)8.A.) as a result of the death of such Primary Beneficiary, in such proportions and in such a manner, outright or in trust or otherwise, to or for the benefit of any one or more of such Primary Beneficiary's creditors or the creditors of such Primary Beneficiary's estate, as such Primary Beneficiary may appoint by specific reference to this general power of appointment in his or her Will admitted to probate.

B.      If such Primary Beneficiary dies after attaining age 30 years, then any portion of such trust fund over which such Primary Beneficiary does not either have or effectively exercise the foregoing general power of appointment shall be distributed in such proportions and in such a manner, outright or in trust or otherwise, to or for the benefit of such one or more persons (including individuals and entities) as such Primary Beneficiary may appoint by specific reference to this limited power of appointment in his or her Will admitted to probate, except not to the Primary Beneficiary himself or herself, not to his or her estate, not to his or her creditors, and not to the creditors of his or her estate.

C.      If such Primary Beneficiary dies prior to attaining age 30 years, then any portion of such trust fund over which such Primary Beneficiary does not either have or effectively exercise the foregoing general power of appointment shall be distributed in such proportions and in such a manner, outright or in trust or otherwise, to or for the benefit of any one or more of such Primary Beneficiary's descendants as such Primary Beneficiary may appoint by specific reference to this limited power of appointment in his or her Will admitted to probate, except not to the Primary Beneficiary himself or herself, not to his or her estate, not to his or her creditors, and not to the creditors of his or her estate.

D.      Any portion of such Primary Beneficiary's trust fund over which he or she does not effectively exercise the foregoing general or limited powers of appointment, shall be divided on a per stirpes basis among his or her descendants and each such share shall be held as a separate trust and distributed as provided in this subparagraph 5.3(c), but if the Primary Beneficiary has no living descendants, then it shall be divided on a per stirpes basis among the descendants of the Primary Beneficiary's nearest ancestor who is a descendant of the Settlor and who has living descendants and each such share shall be held as a separate trust and

distributed as provided in this subparagraph 5.3(c), and if no such beneficiaries exist, then it shall be divided and distributed as provided in subparagraph 5.3(b)2.B. of this Article V.

9.     Notwithstanding any other provision herein, each and every separate trust created herein shall terminate one day prior to end of the statutory time period, set forth in the applicable rule against perpetuities, after the death of the Settlor, and the remainder of each such trust fund shall be distributed to the Primary Beneficiary who is eligible to receive distributions at such time from such trust fund.  It is Settlor's intent that no trust or trust share herein created, or attempted to be created, shall fail, in whole or in part, by reason of the rule against perpetuities.  Therefore:

A.     Each and every power granted herein is severable one from the other; each and every trust or trust share is severable from the other; and all powers granted to each trust or trust share are severable powers granted as to any other trust.

B.     If any provision or power herein would cause a violation of the rule against perpetuities, the Trustee shall terminate or modify such provision or power, at the latest day possible, so as to avoid a violation of the rule against perpetuities.

5.4     FINAL TAKERS.  In the event that none of Settlor's descendants survive to the time the trust estate is to vest, then at the death of the last of them and Settlor's spouse and the Settlor, but subject to any powers of appointment granted herein, the then remaining trust estate shall be distributed 50% to Settlor's heirs at law and 50% to Settlor's spouse's heirs at law, determined under the laws of the state of Florida as if both the Settlor and Settlor's spouse died at such time.  Provided that if any such beneficiary has not attained age 21 years at the time such distribution is to be made, then the Trustee shall make such distribution to a custodian (chosen by the Trustee in its sole discretion) for such beneficiary under a Uniform Transfers to Minors Act to be held until such beneficiary attains age 25 years, if possible

5.5     S CORPORATION STOCK.

(a)     Notwithstanding any other provision in this Article V to the contrary,

(i)     if this Trust holds S corporation stock one (1) day less than two (2) years after such stock is distributed to this Trust by the Settlor's estate;

(ii)     if this Trust held S corporation stock at the time of the Settlor's death and still holds such stock one (1) day less than two (2) years after the Settlor's death;

(iii)     if this Trust receives or acquires S corporation stock from any other source; or

       (iv) if this Trust holds stock of a corporation and the shareholders of such corporation and the Trustee desire to elect S corporation status,

then at such time, the Trustee may elect treatment as an "Electing Small Business Trust" under Section 1361 of the Internal Revenue Code or may allocate such S corporation stock to one or more separate and distinct Qualified Subchapter S Trusts (each hereinafter referred to as a "QSST") to be held, managed and distributed as follows:

   (b) Each QSST shall comply with all of the following requirements:

      1. As to any trust created for more than one current income beneficiary, the Trustee shall allocate the S corporation stock equally to separate and distinct trusts, one trust for each such current income beneficiary.

      2. The Trustee shall pay the entire net income of such separate trust, at least quarter-annually, to such current income beneficiary and any distributions of principal shall be made only to such current income beneficiary of each such trust to the exclusion of all others. The Trustee shall also distribute to such current income beneficiary an amount of principal equal to (A) any and all taxes which such current income beneficiary may be subject to as a result of being a beneficiary of such trust, in excess of (B) the income of such trust distributed to such current income beneficiary.

      3. If any such trust should terminate for any reason during the lifetime of the current income beneficiary, the Trustee shall distribute all of the assets of such separate trust to such beneficiary.

      4. Upon the death of a beneficiary of a QSST and if the QSST holds S corporation stock at such time, the descent and distribution of the assets of such trust shall be pursuant to the provisions of this Trust other than this paragraph 5.5, and if such stock is to be held in trust, then such stock shall be held in one or more QSSTs pursuant to the terms of this paragraph 5.5.

      5. Upon the death of a current income beneficiary of a QSST and if the QSST no longer holds S corporation stock at such time, this paragraph 5.5 shall no longer apply to such trust; instead, the remaining provisions of this Trust shall apply to such trust.

   (c) Except as hereinabove modified, the terms of the separate trust other than this paragraph 5.5 shall apply to each QSST.

   (d) The term "S corporation" shall mean a corporation which is an electing small business corporation within the meaning of Section 1361 of the Internal Revenue Code.

ARTICLE VI

<u>LIMITATIONS ON BENEFITS AND ALLOCATIONS OF ASSETS</u>

 6.1 <u>GIFTS DURING LIFETIME</u>.  Any gifts of real or personal property, tangible or intangible, which the Settlor may make during Settlor's lifetime, if any, before or after the execution of this Trust Agreement, to any person or persons, shall not be deemed to be an advancement or a satisfaction to be applied to any share of any beneficiary of this trust, and shall not be taken into account in connection with this trust.

ARTICLE VII

INVESTMENT AND ADMINISTRATIVE POWERS

7.1    RIGHTS RESERVED TO SETTLOR.

(a)    During the lifetime of the Settlor, the Settlor reserves the right to elect, at any time and from time to time, to advise the Trustee and to direct the Trustee as to any investments the Settlor deems advisable for the Trustee to purchase or sell.  Should the Settlor elect to exercise Settlor's right to advise or direct the Trustee to purchase or to sell any investment, Settlor shall do so in writing; or, if that is not practical, Settlor shall, as soon thereafter as is practical, approve of such purchase or sale in writing, as requested or required by the Trustee.  The Trustee is hereby specifically relieved of all liability for loss which may be occasioned by the purchase or sale of any asset of the trust estate when it has been directed or advised to make such purchase or sale by the Settlor, except for willful default or gross neglect.

(b)    During Settlor's lifetime, the Co-Trustees, or either of them acting alone, shall have all rights and powers granted Trustees under the laws of Florida, and the Settlor shall not be governed by fiduciary standards in the investment, management or operation of the trust estate.  Further, the Co-Trustees, or either of them acting alone, may borrow funds and pledge, sell and/or mortgage trust assets (including real property) for whatever purpose.

(c)    During Settlor's lifetime, the Co-Trustees, or either of them acting alone, shall not be limited to the type and character of investments in which it may invest funds of this trust and such investments may include, but not be limited to, margin accounts, options and commodity accounts.

(d)    Anything contained in this Agreement to the contrary notwithstanding, during Settlor's lifetime, the Co-Trustees, or either of them acting alone, shall have (i) signature authority over a bank account, money market account, brokerage account, mutual fund, or other account at a financial institution, with the right to add to such account, withdraw from such account and/or to manage the investments of such account including to buy or sell securities within such account, and (ii) the power to sign as Trustee any deeds, partnership documents, notes, checks, negotiable instruments, and any other documents required to buy, sell, transfer or convey trust assets and any other commercial paper for or on account of the Trust created by this Agreement. Any individual or other entity is hereby relieved of any and all liability for accepting the signature of either one of the Co-Trustees serving hereunder.

(e)    The Settlor in the capacity as Trustee may borrow funds, guarantee any debt (including debt of the Settlor and/or debt of third parties that the Settlor wants to guarantee for any reason) and pledge, encumber, mortgage and/or sell trust assets (including real property) for any purpose, including, but not limited to securing debt and guaranteeing debt of the Settlor and/or

7-1

third parties. Any such debt or guarantee entered into by the Settlor as Trustee shall continue to be an obligation of this trust even after the Settlor is no longer serving as Trustee.

(f)    The Settlor as Trustee may appoint one or more other persons who are not trustees to have signature authority over a bank account, money market account, brokerage account, mutual fund, or other account at a financial institution, with the right to add to such account, withdraw from such account and/or to manage the investments of such account including to buy or sell securities within such account.

7.2    INVESTMENT POWERS. Except as otherwise provided in this Agreement, and except as would disqualify any marital deduction, the Trustee shall have the following general powers, in addition to and not by way of limitation of the powers provided by law, said powers to be exercised in the Trustee's discretion, provided that the Trustee other than the Settlor uses reasonable prudence and judgment in the exercise of such discretion:

(a)    To make distribution of the trust estate or of the principal of any trust created hereunder in kind and to cause any share to be composed of cash, property or undivided fractional shares in property different in kind from any other share.

(b)    To invest any part or all of the principal of the trust estate in any mutual fund or funds (including proprietary mutual funds), any of which mutual funds may be established and operated by and under the control of the Trustee (or its affiliates, if not prohibited by law).

(c)    For convenience of administration or investment, the Trustee may hold separate trusts created hereunder as a common fund, dividing the income proportionately among such trusts, assigning undivided interests to such trusts and making joint investments of the funds belonging in such trusts. The Trustee may consolidate any separate trust with any other trust with similar provisions for the same beneficiary or beneficiaries, which consolidation would not result in any alteration of the time for vesting of such interests in such beneficiary or beneficiaries due to the operation of the rule against perpetuities.

(d)    The Trustee shall have the right and authority to make all elections, decisions, payments and distributions hereunder consistent with minimizing the impact of estate and income taxes upon Settlor's estate or this trust.

(e)    In making all such elections, decisions, payments and distributions hereunder, the Trustee is directed not to make adjustments between income or principal or between property interests passing to beneficiaries hereunder which may be substantially affected as a result of any elections under this Article unless such adjustments are necessary to prevent a loss of, or decrease in, the marital or charitable deduction, if any, otherwise allowable in determining Settlor's federal estate tax. The Trustee shall be exonerated from all liability for any such election(s) and

7-2

no beneficiary shall have any claim against the Trustee by reason of the exercise of the Trustee's judgment in this respect.

(f)     The Trustee may borrow funds from any source (including the Trustee in its non-fiduciary capacity), guarantee any debt (including debt of the Settlor and/or debt of any entity in which Settlor had a direct or indirect ownership interest) and pledge, encumber, mortgage and/or sell trust assets (including real property) for any purpose the Trustee deems advisable, including, but not limited to securing debt and guaranteeing debt of the Settlor and/or any entity in which Settlor had a direct or indirect ownership interest.

7.3     DIGITAL ASSETS.  The Trustee shall have full power and authority, at any time or times, (i) to access, use, and control Settlor's digital devices, including but not limited to, desktops, laptops, tablets, peripherals, storage devices, mobile telephones, smart phones, and any similar devices, which currently exist or may exist as technology develops, for the purposes of accessing, modifying, deleting, controlling, or transferring Settlor's digital assets (as defined below), (ii) to access, modify, delete, control, and transfer Settlor's digital assets, and (iii) to obtain, access, modify, delete, and control Settlor's passwords and other electronic credentials associated with Settlor's digital devices (as described above) and digital assets.  "Digital assets" shall include, but not be limited to, emails received, email accounts, digital music, digital photographs, digital videos, software licenses, social network accounts, file sharing accounts, web hosting accounts, tax preparation services accounts, online stores, affiliate programs, other online accounts, and similar digital items which currently exist or may exist as technology develops.

7.4     GENERATION SKIPPING TAX PROVISIONS.

(a)     If a trust hereunder would be partially exempt from generation-skipping tax by reason of an allocation of generation-skipping tax exemption to it, before the allocation, the Trustee, in its discretion, may divide the trust into two separate trusts of equal or unequal value, to permit allocation of the exemption solely to one trust which will be entirely exempt from generation-skipping tax.  Such division shall be done in such a manner as required under federal tax law so that each separate trust is recognized for generation skipping tax purposes.

(b)     If a trust hereunder is partially exempt from generation-skipping tax, the Trustee, in its discretion, may divide the trust into two separate trusts of equal or unequal value, so that one such trust is entirely exempt from generation-skipping tax and the other such trust is entirely subject to generation-skipping tax.  Such division shall be done in such a manner as required under federal tax law so that each separate trust is recognized for generation skipping tax purposes.

(c)     In addition, if a trust hereunder is entirely exempt or nonexempt from generation-skipping tax and adding property to the trust would partially subject it to generation-skipping tax, or if a trust hereunder is entirely non-exempt from generation-skipping tax and

7-3

adding property to the trust would partially exempt it from generation-skipping tax, the Trustee, in its discretion, may hold that property as a separate trust in lieu of making the addition.

(d)    Except as otherwise provided in this Trust Agreement, such two trusts (whether divided as provided in subparagraphs (a) or (b) above or additions held as a separate trust as provided in subparagraph (c) above) shall have the same terms and conditions, but the Trustee shall not make discretionary distributions from the income or principal of the exempt trust to beneficiaries who are nonskip persons so long as readily marketable  assets remain in the nonexempt trust.

(e)    If there are two or more trusts known to the Trustee for the same beneficiary who is a skip person, whether or not such trusts are all created under this trust agreement, and if one or more of such trusts has an inclusion ratio of zero and if one or more of such trusts has an inclusion ratio of greater than zero, then to the extent possible, distributions to skip persons shall be first made from the trust or trusts with an inclusion ratio of zero and distributions to nonskip persons shall be first made from the trust or trusts with an inclusion ratio of greater than zero.

(f)    Upon division or distribution of an exempt trust and a nonexempt trust held hereunder, the Trustee, in its discretion may allocate property from the exempt trust first to a share from which a generation-skipping transfer is more likely to occur.

(g)    The terms "skip person", "nonskip person", "generation-skipping tax exemption" shall have the same meaning as such words or phrases have in Chapter 26 of the Internal Revenue Code.

7.5    ALLOCATION OF PRINCIPAL AND INCOME.  In matters of allocation and accounting of principal, income, expenses, receipts and disbursements, the Trustee other than the Settlor shall be governed by Florida Statutes 738, "Principal and Income", or its successor statute, as the same may from time to time exist, except as otherwise provided in this Agreement, provided, however:

(a)    The Trustee shall have the option of charging all or any portion of the expenses incurred in connection with the settlement of Settlor's estate against either income or principal of the trust estate;

(b)    The Trustee may allocate within the meaning of Treas. Reg. §1.643(a)-3(b) to income or to principal, or partly to income and partly to principal, all or part of the realized gains from the sale or exchange of trust assets; provided, however, that, if income is defined under an applicable state statute as a unitrust amount and the trust is being administered pursuant to such statute, the allocation of gains to income must be exercised consistently and the amount so allocated may not be greater than the excess of the unitrust amount over the amount of distributable net income determined without regard to Treas. Reg. §1.643(a)-3(b);

7-4

(c)     The Trustee, in its discretion, may exercise the power to adjust between principal and income, notwithstanding the fact that the trust assets may not be a prudent investment, but otherwise shall exercise such power in accordance with Florida Statutes 738.104;

(d)     In no event shall any allocation or accounting decision made by the Trustee in regard to the Marital Trust be contrary to the provisions of the Marital Trust or be contrary to the definition of "income" contained therein or be made in such a manner as to at any time disqualify for federal income tax purposes any trust established herein which qualifies for the marital deduction; and

(e)     (i) In the event the Settlor's estate is not required to file a Federal Estate Tax Return (Form 706), or (ii) in the event a Federal Estate Tax Return (Form 706) is filed for Settlor's estate, but no estate tax is due pursuant to such return (without taking into account the benefit of the charitable deduction for Federal income tax purposes), then any gift(s) made under the terms of this Agreement to a qualified charitable organization described in Section 2055(a) and Section 170(c) of the Internal Revenue Code, which is exempt from taxation under Section 501(a) of the Code, shall first be made by the Trustee (to the extent possible) from the income of the trust estate, and then (after exhausting all such income) any remaining such gift(s) shall be made from the principal of the trust estate.

7.6     EXONERATION.  No individual (as distinguished from a bank or trust company) acting as a Trustee hereunder shall, whether or not named herein, be held liable for any error of judgment or mistake of fact or law, or for any loss resulting by reason of the purchase or retention in good faith of any property as part of the trust estate, or for any loss resulting from any act done or omitted to be done in good faith, or for any act or neglect on the part of any agent or attorney employed by him or her, or for anything other than his or her own fraud or wrongful misconduct.

7.7     BUSINESS PROVISIONS.  Except as otherwise provided in this Agreement, and subject to such standards of reasonableness and prudence as are appropriate at the time, if any ownership interests in any non-public corporations, limited liability companies, partnerships, joint ventures, proprietorships, or business interests (herein called "business") are or become a part of the trust estate, the Successor Trustee shall have the following powers and authority, without limitation by reason of specification, and in addition to powers conferred by law, all of which may be exercised with respect to every such business, whether a corporation, a limited liability company, a partnership, a joint venture, or a sole proprietorship:

(a)     To retain and continue to operate the business for such period as the Trustee may deem advisable.

(b)     To control, direct, and manage the business. In this connection, the Trustee, in its sole discretion, shall determine the manner and extent of its active participation in the

operation of the business, and the Trustee may delegate all or any part of its power to supervise and operate the business to such person or persons as it may select, including any associate, partner, officer, or employee of the business.

(c)     To hire and discharge directors, officers, and employees and to fix their compensation and define their duties; and, similarly, to employ, compensate, and discharge agents, attorneys, consultants, accountants, and such other representatives as the Trustee may deem appropriate.

(d)     To organize a corporation, limited liability company, or other entity under the laws of this or any other state or country and to transfer thereto all or any part of the business or other property held in the trust estate, and to receive in exchange therefor such stocks, bonds, and other securities as the Trustee may deem advisable.

(e)     To take any action required to convert any corporation into a limited liability company, partnership, or sole proprietorship.

(f)     To treat the business as an entity, separate from the trust estate.  In its accountings to the court and to any beneficiaries, as elsewhere provided herein, the Trustee shall only be required to report the earnings and conditions of the business in accordance with standard corporate accounting practice.

(g)     To sell or liquidate all or any part of any business at such time and price and upon such terms and conditions (including credit) as the Trustee may determine.

(h)     To exercise any of the rights and powers herein conferred in conjunction with another or others.

(i)     To diminish, enlarge, or change the scope or nature of any business.

(j)     To guarantee debt(s) of such business.

ARTICLE VIII

GENERAL PROVISIONS AND DEFINITIONS

8.1    ADDITIONS TO CORPUS.  The Settlor or any other person with the consent of the Trustee may add to the principal of the trust created herein by deed or will or otherwise.  Such additions shall be covered by the provisions hereof, the same as if originally included herein.

8.2    LAWS GOVERNING.  This Agreement shall be construed and regulated in all respects by the laws of the State of Florida, subject to the following:

(a)    The Settlor recognizes that the place or jurisdiction of the administration of any trust hereunder may be changed if a Trustee outside of the state of Florida is appointed as the Trustee.  In addition, the Trustee is granted the authority to move the administration of any trust hereunder to any jurisdiction in the world.

(b)    If the administration of any trust hereunder is moved to another jurisdiction, then the Trustee shall also have the authority to change, by written declaration, the law applicable to such trust hereunder to be that of the jurisdiction to which the administration of such trust has been changed, and in such event, this Agreement and the rights of all persons affected by such trust  shall be construed and regulated in all respects exclusively by the laws of such jurisdiction and the courts in such jurisdiction.

(c)    In conjunction with the Trustee's authority to change the jurisdiction of the administration of any trust hereunder and the laws regulating such trust, the Trustee shall also have the authority to modify or amend this Agreement as shall be necessary or desirable to ensure the continued validity and effect of any trust hereunder pursuant to the law of such other jurisdiction, but any such modification or amendment shall not change the basic provisions hereunder or intent of the Settlor.

8.3    INTERPRETATION AND CONSTRUCTION.     All duties, rights, powers and discretions, whether or not absolute, granted any Trustee other than the Settlor hereunder shall be exercised by the Trustee other than the Settlor in its fiduciary capacity and the Trustee other than the Settlor shall be governed by fiduciary standards.

8.4    DISABILITY.  In case the income or any discretionary payment of principal from the Residuary Trust, as created hereunder, or any share thereof, becomes payable to a minor, or to a person under legal disability, or to a person not adjudicated incompetent, but who, by reason of illness or mental or physical disability, is, in the opinion of the Trustee, unable to administer properly such amount, then, such amounts shall be paid out by the Trustee in such of the following ways as it deems best:  (i) directly to such beneficiary; (ii) to the legally appointed guardian or conservator of such beneficiary; (iii) to a custodian (chosen by the Trustee in its sole discretion) under a Uniform Transfers to Minors Act to be held until age 25 years, if possible; (iv) to some

relative or friend for the care and support, and education of such beneficiary; (v) by the Trustee, using such amounts directly for such beneficiary's care, support and education.

8.5     SMALL TRUST TERMINATION.  In the event a separate and distinct trust created hereunder for the benefit of a child of the Settlor or a descendant of a deceased child of the Settlor shall at any time be comprised of assets which, in the aggregate, are valued at less than $200,000.00 (increased by the relative increase in the Consumer Price Index for Urban Consumers from January 2021 to January of the year in which such value is being determined), then, the Trustee may, in its sole discretion, terminate such trust and distribute the trust property to the beneficiary of such trust, if such beneficiary has attained age 21 years, or to a custodian under the Florida Uniform Transfers to Minors Act (chosen by the Trustee in its sole discretion) if such beneficiary has not attained age 21 years to last until such beneficiary attains age 25 years, if possible.

8.6     DONEE'S WILL.  In disposing of any trust property subject to a power of appointment by will, the Trustee may rely upon an instrument admitted to probate in any jurisdiction as the last will of the donee of such power of appointment, but if it has no written notice of the existence of such will within a period of three (3) months after his or her death, it may be presumed that the donee of such power of appointment died intestate and the Trustee shall be protected in acting in accordance with such presumption.

8.7     SPENDTHRIFT PROVISION. No beneficial interest herein or in any separate trust or any separate shares created herein, including beneficial interests in income and/or principal, shall be (i) subject to anticipation, assignment, charge, disposition, encumbrance, pledge, sale, transfer in any manner, or (ii) liable for or subject to any contracts, debts, liabilities or obligations of any beneficiary.  Any attempted anticipation, assignment, charge, disposition, encumbrance, pledge, sale, transfer in any manner of either the income or principal of this trust or any separate trust or any separate shares created herein, by any beneficiary hereunder, shall be void and not have any validity or legal effect or be in any way recognized by the Trustee. No beneficial interest and no income or principal receivable by any beneficiary or payable on any beneficiary's behalf shall be subject to any legal process for the payment of any beneficiary's debts or in anyway be liable to any claim of any creditor of any beneficiary.

8.8     ESTABLISHMENT OF SEPARATE TRUSTS.  Despite the delay in determining the exact nature and amounts of the assets allocable to any separate trust created hereunder upon the death of any person (including, but not limited to the Settlor and Settlor's spouse) or any other event, each such trust shall be fully effective as of the moment of such person's death or such other event. Each separate trust created hereunder shall share, on a pro rata basis, income earned by the trust from which the allocation of assets is to be made from the moment of the event creating such separate trust until the funding of such separate trust.

8.9    <u>COMPENSATION AND ACCOUNTING</u>.

(a)    The Trustee shall be entitled to receive a fair and just compensation for its services hereunder and shall also be reimbursed for all reasonable expenses incurred in the management and protection of the trust estate.  In no event shall a Trustee charge a termination fee or distribution fee in excess of its reasonable costs.

(b)    The Trustee shall render to the beneficiary or beneficiaries then entitled to the income from the trust (and any other beneficiaries entitled to an accounting under applicable law from time to time) statements of account of its receipts and disbursements as Trustee hereunder at least annually.  Provided, however, during the lifetime of the Settlor and while the Settlor is not incapacitated, the Trustee shall not disclose any information concerning this trust, or its terms, operation or assets to any beneficiary other than the Settlor unless the Settlor consents thereto in writing.

8.10   <u>MERGER OR COMBINATION OF TRUSTS</u>.  The Trustee shall have the power to merge or combine any separate trust created herein with any other separate trust created herein or with any other trust created by the Settlor or any other person, if the terms of the trusts are substantially the same and the trustees are the same, except that such combination or merger shall not be made if the result would change the inclusion ratio of either trust with respect to the generation-skipping tax.

8.11   <u>CONSTRUCTION</u>.  The paragraph headings used are for convenience only and shall not be resorted to for interpretation of this Agreement.  Wherever the context so requires, the masculine shall include the feminine and neuter and the singular shall include the plural.  If any portion of this Agreement is held to be void or unenforceable, the balance of the Agreement shall nevertheless be carried into effect.

8.12   <u>PRESERVATION OF MARITAL DEDUCTION</u>.   Notwithstanding anything herein contained to the contrary, any power, duty or discretionary authority granted to the Trustee under any provision of this trust shall be absolutely void to the extent that either the right to exercise or the exercise thereof shall in any way affect, jeopardize or cause Settlor's estate and this trust to lose all or any part of the tax benefit afforded by the marital deduction under either federal or state laws.  It is recognized that the Trustee has no obligation with respect to any election to have property treated as qualified terminable interest property and therefore, the Trustee shall neither be required to oppose nor to consent to such election or non-election as such right is reserved solely to Settlor's personal representative.  Further, the Trustee shall incur no liability for the election or non-election of treatment of property as qualified terminable interest property.

8.13   <u>DEFINITIONS</u>.

(a)    Adopted children or descendants of any person shall be treated as such person's children or descendants only if they are legally adopted prior to attaining age 18 years.

(b)    The terms "child", "children" or "descendants" of a person shall include any person hereafter born or adopted (subject to being adopted prior to attaining age 18 years).

(c)    The term "Corporate Trustee" shall mean a trust company or bank qualified to act as such, possessing trust powers.

(d)    The term "education" shall include all forms of education, including but not limited to, public or private schools, primary or secondary, college, advanced college or post college, commercial, technical, business or art education, or otherwise.

(e)    The term "executor" for purposes of making an election to have property (or part or all of the trust estate) treated as qualified terminable interest property shall mean the personal representative of Settlor's estate appointed by a probate court, but if no such personal representative is appointed by a probate court, then the Trustee hereunder.

(f)    References herein to "gross estate", "marital deduction", "charitable deduction" or other similar or related words or phrases shall have the same meaning as such words or phrases have in the Internal Revenue Code.

(g)    Any person (including a Settlor, a Trustee, or a beneficiary) shall be deemed incapacitated if: (i) he or she has been determined incapacitated or incompetent by a court of competent jurisdiction; (ii) a guardian of the person or of the property has been appointed by a court of competent jurisdiction for such person; or (iii) in the written opinion of two licensed physicians, such person is incapable either physically or mentally of handling his or her financial affairs.

(h)    The term "Internal Revenue Code" shall mean the Internal Revenue Code of 1986, as amended.

IN WITNESS WHEREOF, JAMES LOGAN, as Settlor, and JAMES LOGAN and JANICE LOGAN, as Co-Trustees, have signed this Agreement, as of the day and year first written above.

JAMES LOGAN

SETTLOR and CO-TRUSTEE

JANICE LOGAN

CO-TRUSTEE

On this 10th day of February, 2021, the Settlor signed the foregoing trust agreement in our presence (the undersigned witnesses), and we have signed as witnesses in the presence of the Settlor and in the presence of each other.

_____
(witness signature)

_____
(witness signature)

NICHOLAS A. MITCHELL
_____
(witness printed name)

ALMA DEBRUYNE
_____
(witness printed name)

STATE OF FLORIDA
COUNTY OF PINELLAS

I HEREBY CERTIFY that the foregoing instrument was acknowledged before me by means of ☑ physical presence or ☐ online notarization, this 10th day of February, 2021, by the Settlor and Co-Trustees, JAMES LOGAN and JANICE LOGAN, each of whom is ☐ personally known to me or who has ☑ produced a ___FLORIDA DRIVER LICENSE___ as identification, and both of whom have acknowledged before me that they executed the same as their free act and deed and for the uses and purposes therein stated.

6078387v2

_____
NOTARY PUBLIC

JENNIFER A. STUDER
MY COMMISSION # GG 934679
EXPIRES: March 24, 2024
Bonded Thru Notary Public Underwriters

8-5

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA
PROBATE DIVISION

JONATHAN LOGAN and
SMART COMMUNICATIONS HOLDING, INC.,

      Plaintiffs,

v.                                                Case No:

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust dated February 10, 2021
and ALEXIS LOGAN, individually,

      Defendants.

_____/

**EXHIBIT "C"**

**TO**

**COMPLAINT**

## STOCK POWER

**FOR VALUE RECEIVED,** the undersigned, JAMES P. LOGAN (the "Transferor"), hereby sells, assigns and transfers unto JAMES LOGAN, as CO-TRUSTEE of the JAMES LOGAN FAMILY TRUST, dated February 10, 2021, five thousand (5,000) shares (the "Shares") of the common capital stock of SMART COMMUNICATIONS HOLDING, INC., a Florida corporation (the "Corporation"), standing in the name of the Transferor on the books of the Corporation, and does hereby irrevocably constitute and appoint Thomas D. Sims, Esq. as attorney to transfer the Shares on the books of the Corporation with full power of substitution in the premises.

A signed copy of this Stock Power, including that executed via DocuSign or other valid electronic or digital signature medium, delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Stock Power.

**DATED TO BE EFFECTIVE AS OF** _____September 16_____, **2022.**

TRANSFEROR:

_James Logan (Sep 16, 2022 18:52 EDT)_

JAMES P. LOGAN

6672435v2

# Stock Power - James Logan to Revocable Trust re Smart Communications Holding, Inc. (2022)

Final Audit Report                                                                                          2022-09-16

| | |
|---|---|
| Created: | 2022-09-16 |
| By: | Rachel Chase (rachelc@jpfirm.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAhWDfQnjwoEN_qVWMiErLBCmCNdIW_Ytb |

## "Stock Power - James Logan to Revocable Trust re Smart Communications Holding, Inc. (2022)" History

📄 Document created by Rachel Chase (rachelc@jpfirm.com)
2022-09-16 - 8:52:13 PM GMT- IP address: 144.129.14.130

✉ Document emailed to jim.logan@smartcommunications.us for signature
2022-09-16 - 9:02:18 PM GMT

📄 Email viewed by jim.logan@smartcommunications.us
2022-09-16 - 9:02:20 PM GMT- IP address: 74.125.151.157

✍ Signer jim.logan@smartcommunications.us entered name at signing as James logan
2022-09-16 - 10:52:18 PM GMT- IP address: 199.47.254.244

✍ Document e-signed by James logan (jim.logan@smartcommunications.us)
Signature Date: 2022-09-16 - 10:52:20 PM GMT - Time Source: server- IP address: 199.47.254.244

✅ Agreement completed.
2022-09-16 - 10:52:20 PM GMT

**Adobe Acrobat Sign**

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA
PROBATE DIVISION

JONATHAN LOGAN and
SMART COMMUNICATIONS HOLDING, INC.,

      Plaintiffs,

v.                                                Case No:

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust dated February 10, 2021
and ALEXIS LOGAN, individually,

      Defendants.

_____/

**EXHIBIT "D"**

**TO**

**COMPLAINT**

# SHAREHOLDERS' AGREEMENT
# SMART COMMUNICATIONS HOLDING, INC.

THIS SHAREHOLDERS' AGREEMENT (the "Agreement") is made and entered into as of the 23 day of September, 2022 ("Effective Date"), by and among James Logan, as Co-Trustee of the James Logan Family Trust, dated February 10, 2021 (the "James Trust") and Jon Logan (each, and any future shareholders may be separately referred to as "Shareholder" and collectively as the "Shareholders"); and SMART COMMUNICATIONS HOLDING, INC., a Florida corporation (the "Corporation").

## RECITALS:

A.    The Shareholders together own one hundred percent (100%) of the issued and outstanding shares of capital stock of the Corporation as of the Effective Date, as follows:

| Name of Shareholder | Number of Shares | Percentage Interest |
|---|---|---|
| James Trust | 5,000 | 50% |
| Jon Logan | 5,000 | 50% |

B.    The parties believe that it is in their best interests to make provision for the future disposition of a Shareholder's stock in the Corporation pursuant to this Agreement.

C.    The parties have agreed that their execution of this Agreement would be in their best interests and would promote harmonious relationships among the Shareholders with respect to the conduct of the affairs of the Corporation.

IT IS THEREFORE AGREED, in consideration of the promises and mutual covenants contained herein and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, as follows:

## ARTICLE ONE - INTRODUCTION

1.1.    Recitals.  The parties agree that the recitals are true and correct and the recitals are hereby incorporated into this Agreement.

1.2.    Exhibits.  Any exhibits referred to in this Agreement are hereby incorporated into this Agreement.

1.3.    Definitions.

(a)    The definitions set forth in the preamble and recitals shall be used in the Agreement.

1

6069705v3

(b)   The term "closing" shall refer to any purchase made by the Corporation or any Shareholder pursuant to this Agreement.

(c)   The term "Key Designee" shall mean James Logan, with respect to the James Trust. In addition, the term "Key Designee" shall include the principal party identified by the transferor upon the purchase or transfer of Stock, with respect to any Shareholder. Upon the death of a current Key Designee, if no successor Key Designee is identified, each heir or primary beneficiary receiving Stock shall be a Key Designee.

(d)   The term "Stock" shall mean all of the shares of capital stock of the Corporation now or hereafter owned by a Shareholder, together with all rights, options, warrants, or otherwise to acquire shares of capital stock of the Corporation, now or hereafter possessed by a Shareholder, his or her personal representatives upon his or her death, or any other successor in interest of any kind whatsoever.

1.4   Shareholder Vote. Unless otherwise expressly provided, all references to a vote, consent to action, approval, or other authorization to act or refrain from action by a Shareholder or the Shareholders shall refer to the vote, consent to action, approval, or other authorization to act or refrain from action by the Shareholders holding voting shares only. In no event shall a Shareholder holding non-voting shares have any rights to vote or consent.

## ARTICLE TWO - RESTRICTIONS

2.1.   Restriction on Transfer. No Shareholder shall sell, assign, give, pledge, encumber, or otherwise transfer all or any part of his or her Stock, except as provided in this Agreement. Any such attempted transfer shall be void and of no force and effect. In the event any such prohibited transfer is forced or upheld by any court of law, such transferee shall have an economic interest only, and shall not be entitled to vote.

2.2.   Endorsement on Certificates. Each certificate representing shares of capital stock of the Corporation now or hereafter held by the Shareholders shall be stamped with a legend in substantially the following form:

"The Stock represented by this Certificate has not been registered under the Securities Act of 1933, as amended, the Florida Securities and Investor Protection Act, or any other similar securities statute. This certificate may only be transferred upon registration of the shares under the foregoing statutes and applicable regulations adopted thereunder or upon the delivery to the Corporation of advice of counsel satisfactory to the Corporation that such registration is not required. This stock certificate and the shares of stock represented by it are held subject to a Shareholders' Agreement, dated as of September 2̃2̃, 2022, as amended from time to time, a copy of which is recorded in the minute book of the Corporation, placing restrictions upon the alienation of said stock. A copy of said Agreement will be furnished to any shareholder upon request and without charge."

2

2.3.    Permitted Transfers.

(a)    Subject to the further terms of this Section 2.3, including the requirement that transferee sign the Joinder Agreement (as noted hereinbelow), any Shareholder may transfer all, or any portion, of his or her shares to i) any person approved by written consent of a majority of the Shareholders (provided that the Stock of the transferor shall not be entitled to vote with respect to such transfer), ii) any other Shareholder, or iii) with respect to a Shareholder, a trust for the benefit of such Shareholder or Key Designee, such Shareholder's or Key Designee's spouse, or such Shareholder's or Key Designee's descendants, solely for estate planning or asset protection purposes (any such transferee pursuant to this Section is referred to as a "Permitted Transferee").

(b)    Notwithstanding anything contained in the Agreement to the contrary, Permitted Transferees pursuant to Section 2.3(a)(iii) above, shall only be Permitted Transferees so long as i) the Shareholder remains the sole and exclusive agent or proxy to vote the Stock being transferred, ii) the Permitted Transferee executes and delivers to the non-transferring Shareholders a counterpart of this Agreement agreeing to be bound by the terms hereof, iii) the Corporation receives advice of Corporation's counsel to the effect that such transfer does not contravene does not otherwise conflict with the terms or conditions of the Agreement, and iv) if the Transfer is to a trust, the trustee and all current beneficiaries thereof agree in writing that no amendment of such trust instrument and no assignment of beneficial interest in such trust will be made without an advance written opinion of Corporation's counsel to the effect that such amendment or assignment does not contravene, and is not otherwise in conflict with, the terms or conditions of the Agreement.  A change of Key Designee shall constitute a transfer which shall be again subject to the restrictions provided herein.

(c)    Any Stock transferred pursuant to this Section shall remain subject to this Agreement, and upon receipt of delivery of shares representing the transferred Stock the transferee shall be so bound.   The transferee shall acknowledge in writing that the Stock transferred remains subject to this Agreement by executing a Joinder Agreement, substantially in the form attached hereto as Exhibit A.

(d)    The making of any transfer permitted by this Section shall not relieve or alter the transferor Shareholder's obligations under this Agreement, and the parties to this Agreement may enforce such obligations directly against the transferor Shareholder as if such transfer had not occurred.

(e)    Any attempted transfer to a Permitted Transferee without satisfying all of the applicable requirements of this Section 2.3, including but not limited to, obtaining the required approval shall be void *ab initio* and of no force and effect.

2.4.    Encumbrance of Stock.

(a)    No Shareholder shall have the right to encumber all or any part of his or her Stock during his or her lifetime without the unanimous written consent of the Shareholders.  Any attempted encumbrance without the required approval shall be void and of no

force and effect. In the event of an attempted prohibited encumbrance that is held to be enforceable by a court of competent jurisdiction, the pledgee shall accept such stock subject to the terms and conditions of this Agreement, and upon request of the Corporation, the pledgee shall acknowledge in writing that the pledged stock remains subject to this Agreement.

(b)    In the event any validly pledged stock is purchased in accordance with this Agreement, the proceeds shall be paid to the pledgor and pledgee as their interests appear, and the pledged shares shall be released to the purchaser. In the event of any dispute or ambiguity regarding the respective rights of the pledgor or pledgee, the purchaser shall be entitled to disburse all proceeds to the party in possession of the certificate representing the pledged shares.

(c)    In the event the pledgee of encumbered stock or a judgment lien holder shall exercise any right or remedy under any security or stock pledge agreement or in accordance with any applicable laws, or attempt to cause a public or private sale of such stock, the pledgee or lien holder shall notify the Corporation and the other Shareholder(s) and such notice shall be deemed to be an offer made under Article Three of this Agreement to sell such stock at a price determined in accordance with Article Five. In the event such Stock so pledged is purchased pursuant to this Agreement, the purchaser may remit to such pledgee or secured party all or that portion of the proceeds otherwise due the Shareholder, to the extent necessary to release such security interest.

## ARTICLE THREE - RIGHT OF FIRST REFUSAL

3.1.    Proposed Transfer. Except to a Permitted Transferee, no Shareholder shall sell, transfer, assign or otherwise dispose of all or any part of his Stock now or hereafter owned during his lifetime to any person, firm, or corporation, unless the Shareholder desiring to make such transfer or other disposition (hereinafter referred to as the transferor) shall have first made an offer to sell such stock to the other Shareholder(s) in the manner hereinafter described and such offer shall not have been accepted. The Shareholders may, upon unanimous agreement of the non-transferring Shareholders, assign the rights of first refusal under this Article Three to the Corporation, in their sole discretion.

3.2.    Offer. The offer shall be given by the transferor to the other Shareholders simultaneously, pro-rata in accordance with their ownership at the time of such offer. The offer shall be a written offer to sell all the Stock owned by the transferor which is to be transferred, to which shall be attached a statement of intention to transfer, the name and address of the prospective transferee, the number of shares of capital stock involved in the proposed transfer, and the terms of such transfer.

3.3.    Acceptance by Shareholders. Within thirty (30) days after the receipt of such offer, the other Shareholder(s), at their option, may elect to purchase all, but not less than all, the Stock of the Corporation owned by the transferor which is to be transferred. Should the other Shareholders elect to purchase all of the Stock subject to the offer, they shall be entitled to purchase, and transferring Shareholder shall sell, such Stock for the price set forth in the offer, and the purchase shall be effected in accordance with the other terms and provisions set forth in

4

such offer. Such purchase shall be on a pro-rata basis, based upon the shares of Stock then held by the other Shareholder(s). If any Shareholder declines to purchase, and the remaining Shareholder(s) desire to purchase all, but not less than all, of the Stock which is to be transferred, they may, in that event, elect to do so. Such purchase shall be pro-rata, based upon Stock then held by the Shareholder(s) who have elected to purchase such additional amounts. The other Shareholder(s) shall exercise their election to purchase by giving notice thereof to the transferor and to the Corporation. The notice shall specify a date for the closing of the purchase which shall be not more than thirty (30) days after the date of the giving of such notice. If no election is made by the other Shareholder(s) to purchase all of the Stock of transferor after thirty (30) days, the Shareholder(s) shall be deemed to have elected not to accept such offer.

      3.4.    Release from Restriction. If the offer to sell is not accepted by any of the other Shareholder(s) (or the Corporation if assigned pursuant to Section 3.1), the transferor may make a bona fide transfer to the prospective transferee named in the statement attached to the offer, provided such transfer shall be made only in strict accordance with the terms therein stated. However, if the transferor shall fail to make such transfer within thirty (30) days following the election by the other Shareholder(s) not to accept such offer, such Stock shall again become subject to all the restrictions of this Agreement. Provided, further, however, that nothing contained herein shall be construed as releasing any Stock from any restrictions or requirements of law concerning transfer of such Stock.

## ARTICLE FOUR – OPTION TO PURCHASE/MANDATORY PURCHASE

    4.1.    Option.

        (a)    Upon an Involuntary Transfer (as defined in Section 4.2, the Involuntary Transfer shall be referred to herein as a "Triggering Event," and in each case either the transferor Shareholder or the terminated Shareholder is referred to herein as "Transferring Shareholder") the Corporation shall have the privilege and first option to purchase all, or any part, of the Transferring Shareholder's Stock, at the price determined in accordance with the provisions of Article Five and in accordance with the terms of Article Six.

        (b)    The Corporation shall exercise its option by delivery of a written notice to the Transferring Shareholder within ninety (90) days after the Triggering Event (or discovery of Triggering Event by the Corporation, if later). The closing shall take place at a date selected by Corporation upon not less than five (5) days' notice to the Transferring Shareholder, which date shall be not more than two hundred seventy (270) days after the date of the Triggering Event.

        (c)    In the event the Corporation does not exercise its option to purchase, or elects to purchase less than all of, the Transferring Shareholder's Stock, the remaining Shareholders shall have the privilege and second option to purchase the remaining unpurchased, all, or any part, of the Transferring Shareholder's Stock, pro-rata in accordance with their ownership on the date of determination and at the price determined in accordance with the provisions of Article Five and in accordance with the terms of Article Six.

5

(d)     The remaining Shareholder(s) shall exercise their option by delivery of a written notice to the Transferring Shareholder within one hundred twenty (120) days after the Triggering Event (or discovery of Triggering Event by the Corporation, if later). The closing shall take place at a date selected by Corporation upon not less than five (5) days' notice to the Transferring Shareholder, which date shall be not more than two hundred seventy (270) days after the date of the Triggering Event.  If any Shareholder declines to purchase and the remaining Shareholders desire to purchase the Stock which is to be transferred, they may, in that event, elect to do so.  Such purchase shall be pro-rata, based upon Stock then held by the Shareholder(s) who have elected to purchase such additional amounts.

4.2     Involuntary Transfer.  For the purposes of this Agreement, "Involuntary Transfer" shall mean any transfer in the event a Shareholder (i) files a voluntary petition under any bankruptcy or insolvency law or petition for the appointment of a receiver or makes an assignment for the benefit of creditors, (ii) is subjected involuntarily to such a petition or assignment or to an attachment with respect to his/her shares in the Corporation and such involuntarily petition, assignment or attachment is not discharged within thirty (30) days after its effective date, or (iii) is subjected to any other involuntary transfer of his/her/its shares in the Corporation by legal process, including without limitation, an assignment or transfer pursuant to a divorce decree of a Shareholder or, in the case of a Shareholder that is a trust, a divorce decree of a Shareholder.

4.3     Mandatory Purchase upon Death of a Shareholder.  Upon the death of a Shareholder or, in the case of a Shareholder that is a trust, the death of the Key Designee (in each case referred to herein, along with the personal representative of a deceased individual Shareholder as the "Decedent Shareholder"), the Corporation shall purchase and the Decedent Shareholder shall sell, all of the Decedent Shareholder's Stock, at the price determined in accordance with the provisions of Article Five and in accordance with the terms of Article Six. The parties acknowledge and agree that the Corporation intends to obtain one or more policies insuring the life of each Shareholder or, in the case of a Shareholder that is a trust, insuring the life of the Key Designee, and for coverage amounts to be determined by approval of the Shareholders.  The parties hereby further acknowledge and agree that such mandatory purchase obligation shall be assignable by the Corporation in its sole and absolute discretion on a pro-rata basis (based on Stock ownership) to the Shareholders other than the Decedent Shareholder.

The Corporation shall be the sole owner of any life insurance policies issued to it and at its option may apply any dividends on those policies toward the payment of premiums on those policies.  Should any Shareholder sell his or her Stock pursuant to this Agreement at a time when the Corporation owns a life insurance policy on such Shareholder's life, or, in the case of a Shareholder that is a trust, on the life of the Key Designee, the Shareholder shall have the right and option to purchase such policies from the Corporation at a price equal to the then cash surrender value of the policy or policies.  The Shareholder shall exercise this option by delivery of written notice to the Corporation at least twenty (20) days prior to the closing of the Stock sale.  At the closing the Corporation shall deliver the policy or policies to the Shareholder and shall execute any instruments necessary to transfer the policies and to change the designated beneficiary.  The Shareholder shall deliver the purchase price for such policies in cash at closing.

## ARTICLE FIVE - PURCHASE PRICE

5.1.    Date of Determination.  The date of determination of the purchase price of any Stock transferred pursuant to this Agreement shall be as of the last day of the calendar month immediately preceding the date of the Triggering Event or any other event which creates any purchase of any Stock pursuant to this Agreement.

5.2    Established Purchase Price.  Notwithstanding anything contained herein to the contrary, the parties hereto, as of any given date, may set a price for each share of stock, and that price shall apply during the period for which such specified price is made applicable, provided there is endorsed as an Addendum hereto in the form set forth below, signed by all of the parties; provided, further that the payment terms shall be in accordance with Section 6.3, subject to Section 6.2 with respect to available life insurance proceeds:

## ADDENDUM TO SHAREHOLDERS' AGREEMENT

The price of each share of stock subject to the Shareholders' Agreement between the undersigned shall be $_____ per share.  This price shall be effective from the date hereof until _____, 20__.

The parties, in addition to the foregoing, hereby elect to amend Section 6.3 of Article Six as follows:

The purchase price set forth above, shall be paid, subject to Section 6.2 with respect to available life insurance proceeds, in cash, or, at the election of the purchaser, in not more than _____ equal monthly installments.  The interest rate shall be _____ percent (__%) but in no event less than the lowest "applicable Federal rate."

Date: _____, 20__.

_____

_____
SHAREHOLDERS

_____
CORPORATION

5.3    Purchase Price.

(a)    The parties hereto agree that the Stock shall be valued at fair market value.  Except as specifically otherwise provided in Section 5.2 regarding an agreed upon purchase price for the Stock, the fair market value of the Stock shall be determined by mutual agreement of the purchaser and the seller of the shares being valued, if possible.

(b)      If such seller and purchaser shall not agree on such value within a ten (10) day period and there is no then applicable agreed upon purchase price as provided in Section 5.2, the Corporation (at its expense) shall promptly and within thirty (30) days designate a qualified appraiser who regularly performs business appraisals in the United States of America and must be a member of the American Society of Appraisers, the Institute of Business Appraisers, the National Association of Certified Valuation Analysts, or the American Institute of Certified Public Accounts – ABV Accredited, and the decision of such appraiser shall be final and binding on the parties. In the event the Corporation is unable or unwilling to appoint such an appraiser, then such appraiser shall (instead) be appointed by the Corporation's regularly used accountant. In the event the Corporation owns real property at the time of such appraisal, the appraiser shall be, or engage, a qualified real estate appraiser who is either a MAI or SRA and has performed at least three appraisals of commercial real estate properties within the period two years prior to being selected. Notwithstanding any other provision contained in this Agreement to the contrary, if such valuation shall be submitted for appraisal, the date of any closing of the purchase specified herein shall take place within sixty (60) days after the determination of such value by appraisal if such determination by appraisal shall not be made before the closing date otherwise provided for herein. The Stock shall be valued treating the Corporation as a going concern and not using a liquidation method of valuation and there shall be no discounts applied for minority interests, lack of marketability, or similar circumstances. The following adjustments shall be observed by the appraisers in determining the value of such shares:

(1)      All Federal, state and local taxes including, but not limited to, sales, payroll, unemployment insurance, excise, franchise and income taxes shall be accrued as a liability. If appraised values of any tangible assets required to be valued at other than book value under this Agreement would, if sold by the Corporation, produce a taxable gain or loss to the Corporation, appropriate adjustments for tax effect shall be made by the appraisers.

(2)      Proceeds payable under a corporate owned disability buyout insurance policy insuring the Shareholder whose stock is being valued for purchase hereunder shall be excluded from the computation of such adjusted book value to the extent such proceeds exceed the cash value of the policy, if any, as of the date to which premiums have been paid.

(3)      Contributions to any qualified pension, profit sharing or other qualified retirement plan for the fiscal year of the Corporation in which the date of determination falls shall be accrued as a liability and shall be prorated for such fiscal year in accordance with the prior accounting procedures of the Corporation.

(4)      In the event of any pending or known claims for negligence or other liability which are not fully covered by insurance, the appraisers shall accrue any estimated loss therefrom as a liability of the Corporation to the extent such accrual shall be required under generally accepted accounting principles. Each party agrees to submit in connection with such determination a certificate as to their knowledge of any pendency or probable pendency or possible pendency of such claims. The accountants shall be authorized to take such action or actions as shall be required for said accountants to make such determination.

8

(5)    Marketable securities shall be valued at fair market value based upon the latest quotations available.

## ARTICLE SIX - PAYMENT

6.1.    Closing.    The closing of any purchase under this Agreement shall take place at the principal office of the Corporation or effectuated by mail or electronic means as may be agreed by the parties, in any case all within the appropriate time period set forth in this Agreement.

6.2.    Payment of Purchase Price.    If the purchaser is paying the asking price stated in the notice described in Article Three, then the purchaser shall pay the purchase price according to the terms and conditions stated in the notice.    If the purchaser is paying an established purchase price pursuant to Section 5.2 and the terms of the payment of the established purchase price are set forth in the applicable Addendum to Shareholders' Agreement, the payment terms set forth therein shall apply.    If the purchaser is paying the purchase price determined in accordance with the provisions of Article Five hereof, other than an established purchase price pursuant to Section 5.2 for which payment terms are designated, then twenty percent (20%) of the purchase price shall be paid, in cash at closing, and the remaining eighty (80%) of the purchase price may be paid, in cash at closing, or in accordance with Section 6.3, at the option of the purchaser. Notwithstanding the foregoing, if the Corporation owns one or more policies insuring the life of the Decedent Shareholder and either the Corporation or the other Shareholders (other than the Decedent Shareholder) are purchasing the Decedent Shareholder's Stock pursuant to Section 4.3, then an amount equal to the greater of (i) the proceeds of such policies received by the Corporation, but not in excess of the purchase price, or (ii) twenty percent (20%) of the purchase price shall be paid in cash at closing to the seller and the remaining balance of the purchase price may be paid, in cash at closing, or in accordance with Section 6.3, at the option of the Corporation.

6.3.    Installment Payments.

(a)    Except as otherwise provided in a then applicable Addendum to Shareholders' Agreement pursuant to Section 5.2, if the purchaser elects payment in installments, the purchase price shall be paid in not more than sixty (60) equal monthly installments, the first such installment being payable upon the one month anniversary of the closing, and the remaining installments, if any, successively thereafter.    Such remaining installments shall be represented by a promissory note of the buyer delivered to the seller, bearing interest at the rate equal to the greater of: i) four percent (4%) per annum, or ii) the lowest "applicable Federal rate" available for the closing date, as that rate is defined in Section 1274(d) of the Internal Revenue Code of 1986, as amended, taking into consideration the term of the note. It is the intention of the parties that the interest rate so determined shall be sufficient to avoid re-characterization of amounts due under the note as unstated interest or original issue discount. The note shall provide that the maker shall have the privilege of prepaying all or any part thereof at any time, and that a default in any payment of principal and/or interest, as fixed in such note, shall cause the remaining unpaid balance to become due and payable forthwith. The

9

note shall further provide for the payment of costs and attorney fees related to collection and shall be in non-negotiable form.

6.4.    Pledge of Purchased Stock.

(a)    Unless the entire purchase price has been paid in cash, whenever any party purchases shares of Stock under this Agreement, such purchaser shall, following the delivery of the purchased Stock, deliver the Stock to the seller as collateral security for the payment of the unpaid purchase price.

(b)    The pledged Stock shall be so held until the entire purchase price is paid in full. So long as the purchaser is not in default, the purchaser shall be entitled to exercise all voting rights with respect to any such Stock held as collateral security. Dividends paid and amounts distributed shall be paid to the purchaser.

(c)    The pledgor hereby appoints pledgee his attorney-in-fact to arrange for the transfer of the pledged shares of Stock on the books of the Corporation to the name of the pledgee in the event of a purchaser default. The pledgee of such shares shall have all rights and remedies available under the Uniform Commercial Code in the event the purchaser defaults under his obligation to pay for such shares.

6.5    Release of Guarantee.    In the event of a purchase pursuant to this Agreement, the Corporation shall pay off all debt owed to the selling Shareholder, and all debt guaranteed by the selling Shareholder shall be paid off or the guarantee shall be released.

6.6    Setoff.  In the event of a purchase pursuant to this Agreement, it is hereby agreed that the Corporation and/or a purchasing Shareholder, as applicable, may set-off and apply against the purchase price any amounts, including, but not limited to, accrued interest, owed from such selling Shareholder to the Corporation and/or a purchasing Shareholder, as applicable.

6.7    Shares Still Subject to Agreement.  The shares transferred to Shareholders or others in accordance with this Agreement shall, however, to the extent permitted by law, continue to be subject to the terms hereof and the transferee shall be a party hereto and, upon delivery of such shares, shall be bound hereby. The transferee shall acknowledge in writing that the Stock transferred remains subject to this Agreement by executing a Joinder Agreement, substantially in the form attached hereto as Exhibit A.

## ARTICLE SEVEN - GENERAL PROVISIONS

7.1.    Notices.  Any and all notices, designations, consents, offers, acceptances, or any other communication provided for herein shall be given in writing and shall be deemed given a) upon delivery, if delivered in person, b) upon response, if by email to the email address known to be associated with such notice recipient and which email is confirmed or responded to by receiving party, or c) three days following deposit with the United States Postal Service by registered or certified mail, with proper postage, which shall be addressed to such Shareholder's

10

address or on the stock books of the Corporation, or to the Corporation at its then principal office as registered with the Florida Secretary of State.

7.2.    Specific Performance.  The parties hereby declare that it is impossible to measure in money the damages which will accrue to a party hereto or to the personal representatives of a decedent by reason of a failure to perform any of the obligations under this Agreement. Therefore, in addition to any other remedies provided by law or in equity any party hereto or the personal representatives of a decedent shall have the right to enforce specific performance of this Agreement and any person (including the Corporation) against whom such action or proceeding is brought hereby waives the claim or defense therein that such party or such personal representatives has or have an adequate remedy at law, and such person shall not urge in any such action or proceeding the claim or defense that such remedy at law exists.

7.3.    Survival.    The representation and warranties and provisions of this Agreement shall survive any closing hereunder.

7.4.    Modification.  No change or modification of this Agreement shall be valid unless the same be in writing and signed by all the parties hereto.

7.5.    Prior Agreements.  This Agreement supersedes any prior agreement of the parties related to the Stock.

7.6.    Termination.

(a)    This Agreement and all restrictions on Stock transfer created hereby shall terminate on the occurrence of any of the following events:

(1)    The bankruptcy or dissolution and liquidation of the Corporation;

(2)    A single Shareholder becoming the owner of all of the Stock subject to this Agreement;

(3)    The execution of a written instrument by the Corporation and the Shareholders terminating this Agreement; or

(4)    The death of all of the Shareholders (or, in the case of a Shareholder that is a trust, the death of the Key Designee) within ninety (90) days of each other.

(b)    The termination of this Agreement for any reason shall not affect any right or remedy existing hereunder prior to the effective date of termination hereof except that in the event subparagraph (a)(4) of this Section 7.6 applies, any obligation under this Agreement of the Corporation and/or any Shareholder to purchase the stock of a Shareholder hereunder shall be null and void.

11

7.7.    Incompetency.  If a Shareholder is legally declared incompetent, his or her guardian shall have all of the rights of and be subject to all of the obligations under this Agreement.

7.8.    Construction.   Wherever the context so requires, the masculine shall include the feminine and neuter and vice versa, and the singular shall include the plural and vice versa.

7.9.    Counterparts.  This Agreement may be executed in several counterparts with the same effect as if the signature on each such counterpart were on the same instrument. A signed copy, including by DocuSign or other electronic signature, of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

7.10.    Severability.   In case any one or more provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein.

7.11.    Attorneys' Fees.   In the event that any party is required to engage the services of legal counsel to enforce its rights under this Agreement against any other party, regardless of whether such action results in litigation, each party shall bear the cost of his, her, or its own attorneys' fees and costs.

7.12.    Shareholders' Inspection Rights.   As long as they own Stock, each Shareholder shall have the right to examine, in person or by agent or attorney, at any reasonable time or times, for any proper purpose, the relevant books and records of accounts, minutes and records of Shareholders and other shareholders of the Corporation and to make copies or extracts therefrom.

7.13.    Attorney's Representations.   The parties each acknowledge that the Corporation's counsel, Johnson, Pope, Bokor, Ruppel & Burns, LLP, prepared this Agreement on behalf of and in the course of its representation of the Corporation, and that:

(a)    The Shareholders have been advised that a conflict exists among their individual interests;

(b)    The Shareholders have been advised to seek the advice of independent counsel, and the Shareholders have had the opportunity to seek the advice of counsel;

(c)    The Shareholders have received no representations regarding the tax consequences of this Agreement; and

12

(e)    The Shareholders have been advised that this Agreement may have tax consequences and have had an opportunity to seek the advice of independent tax counsel.

7.14.    Amendment of Bylaws.  The Shareholders hereby agree that the terms of this Agreement shall supersede any provision of the Bylaws of the Corporation that might be in conflict with this Agreement, and to the extent required by Florida law, this Agreement shall be considered a written action taken by the Shareholders of the Corporation and shall be deemed an amendment of the Corporation's Bylaws.

7.15.    Board of Directors. The Shareholders agree to vote or act with respect to their Stock and the Corporation agrees to take all actions necessary, so as to fix the number of directors constituting the board of directors of the Corporation at two (2), during such time that James Logan and Jon Logan both are alive.  Following the death of either of them, the Shareholders agree to vote or act with respect to their Stock and the Corporation agrees to take all actions necessary, so as to fix the number of directors constituting the board of directors of the Corporation at one (1).  Following the death of both of James Logan and Jon Logan, or in the event both directors named herein resign, the provisions of this Section 7.15 shall terminate and the Board of Directors shall be elected in accordance with the Bylaws of the Corporation.  The Shareholders agree that each Shareholder shall take all other necessary action within his, her, or its control (in his capacity as a stockholder and including without limitation, attendance at meetings in person or by proxy for purposes of obtaining a quorum and execution of written consents or resolutions in lieu of meetings), and the Corporation shall take all necessary actions within its control (including, without limitation, calling special board and stockholders' meetings) so that: i) while the number of directors is fixed at two (2) hereunder, one (1) member of the Board is James Logan and one (1) member of the Board is Jon Logan, and ii) while the number of directors is fixed at one (1) hereunder, such director is the survivor of James Logan and Jon Logan.

[signatures appear on following page]

13

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of September 23, 2022.

SMART COMMUNICATIONS HOLDING, INC.

By: _____
        James Logan, President

SHAREHOLDERS:

_____          _____
James Logan, as Co-Trustee of the              Jon Logan
James Logan Family Trust, dated
February 10, 2021

Address: _____          Address: _____

_____                              _____

6069705v3

14

WRITTEN ACTION OF THE BOARD OF DIRECTORS
SMART COMMUNICATIONS HOLDING, INC.

The Board of Directors of SMART COMMUNICATIONS HOLDING, INC. (the "Corporation") by unanimous written action adopt the following resolution:

Upon motion duly made, seconded and carried, it is

RESOLVED, that the Shareholders' Agreement between the Corporation and its shareholders is hereby approved and ratified and the President of the Corporation is directed to enter into the agreement on behalf of the Corporation as of ___9-23___, 2022, all prior agreements with respect to the subject matter are hereby revoked and terminated, and the Secretary of the Corporation is hereby instructed to place a copy of the agreement in the minute book of the Corporation.

___9-23___ In accordance with the bylaws and articles of the Corporation, effective as of _____, 2022.

DIRECTORS:

_____
James Logan

_____
Jon Logan