# EXHIBIT 8

RECORDED IN OFFICIAL RECORDS
INSTRUMENT # 2024036761    26  PG(S)
2/7/2024 4:24 PM
KAREN E. RUSHING
CLERK OF THE CIRCUIT COURT
SARASOTA COUNTY, FLORIDA
CIVIL COURTS        Receipt # 3140431

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.

                Plaintiffs,

v.

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust; and ALEXIS LOGAN,

                Defendants.
                           /

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021, and directly
and derivatively on behalf of Smart Communications
Holding, Inc., and derivatively on behalf of Loco
Florida, LLC,

                Plaintiff,

v.

JONATHAN LOGAN,
SMART COMMUNICATIONS HOLDING, INC.,
nominal defendant, LOCO FLORIDA, LLC,
nominal defendant, and SMART
COMMUNICATIONS HOLDING, LLC,

                Defendants.
                           /

Case No. 2023-CA-1002-NC

(CONSOLIDATED)

Case No.: 2023-CA-1280-NC

**Jury Demanded:**
**Counts II, III, IV, and V**

## PHASE I[1] DECLARATORY JUDGMENT

THIS CAUSE having come before the Court for a three-day bench trial from January 29,

2024, to January 31, 2024, on Count II of Plaintiffs Jonathan D. Logan's ("Jon") and Smart

Communications Holding, Inc.'s ("Smart Communications") Complaint (DIN 2) seeking a

declaration that a certain purported Shareholders' Agreement attached to the Complaint as Exhibit

---

[1] The consolidated action was bifurcated by agreement (DIN 241) of the Parties in order to try the Declaratory
Judgments actions, which are referred to as "Phase I," before the remaining counts of the Parties' respective operative
pleadings.

D was valid and enforceable, and on Count I of the Amended Verified Complaint (DIN 271) of Defendant Janice Logan, individually and as Trustee of the James Logan Family Trust, dated February 10, 2021, ("Janice") seeking a declaration that the purported Shareholders' Agreement is invalid and unenforceable, and having reviewed the file, heard testimony of fact and expert witnesses, and received documentary and physical evidence, and being fully advised in the premises, the Court **ADJUDGES**:

1.      The Court has jurisdiction over the Parties and subject matter of Phase I pursuant to Fla. Stat. § 86.011, *et seq.* Jon is a resident of Pinellas County, Florida, Smart Communications is incorporated in the state of Florida and has its headquarters in Pinellas County, Florida. Janice is a resident of Sarasota County, Florida, and the James Logan Family Trust, dated February 10, 2021, is administered in Sarasota County, Florida.

2.      The Court's January 31, 2024, oral findings of fact and conclusions of law, explained in open court before a court reporter, a transcript of which is attached hereto as **EXHIBIT A**, are incorporated into this judgment and entered.

Based on those findings and conclusions, the Court **DECLARES**:

I.      That the purported September 23, 2022, Shareholders' Agreement attached to Plaintiffs' Complaint as Exhibit D is invalid and unenforceable, and that there is no shareholders' agreement in effect between the two 50% shareholders of Smart Communications Holding, Inc.'s stock, (1) Jonathan D. Logan and (2) Janice Logan, as sole Trustee of the James Logan Family Trust, dated February 10, 2021.

**DONE AND ORDERED** in Chambers in Sarasota County, Florida on this _6_ day of

February, 2024.

_____

**Hon. Hunter Carroll, Circuit Court Judge**

## Certificate of Service

On February ___, 2024, the Court caused the foregoing document to be served via the Clerk

of Court's case management system, which served the following individuals via email (where

indicated). On the same date, the Court also served a copy of the foregoing document via First

Class U.S. Mail on the individuals who do not have an email address on file with the Clerk of

Court.

CRAIG STEPHEN BARNETT
200 EAST LAS OLAS BLVD
SUITE 2100
FORT LAUDERDALE, FL 33301

MICHAEL J. HARWIN
200 EAST LAS OLAS BLVD
SUITE 2100
FORT LAUDERDALE, FL 33301

CHRISTOPHER R. CLARK
106 EAST COLLEGE AVE
SUITE 700
TALLAHASSEE, FLORIDA 32301

CHARLES FRANKLIN JOHNSON III
802 11TH ST W
BRADENTON, FL 34205

ANITRA RAIFORD CLEMENT
100 N TAMPA ST
SUITE 2900
TAMPA, FL 33602

DAVID E. SCHOENFELD
111 S. WACKER DR
SUITE 4700
CHICAGO, IL 60606

PETER F. O'NEILL
111 S. WACKER DR.
SUITE 4700
CHICAGO, IL 60606

ANDREW L. FRANKLIN
111 S. WACKER DR.
SUITE 4700
CHICAGO, IL 60606

KAILIN LIU
111 S. WACKER DR.
SUITE 4700
CHICAGO, IL 60606

# Exhibit A

1   IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT IN
    AND FOR SARASOTA COUNTY, FLORIDA
2
    JONATHAN LOGAN and SMART
3   COMMUNICATIONS HOLDING, INC.,

4          Plaintiffs,
    vs.                        Case No.:  2023-CA-1002-NC
5
    JANICE LOGAN, individually and
6   as Trustee of the James Logan
    Family Trust, and ALEXIS LOGAN,
7   individually,

8   _____Defendants._____/    (CONSOLIDATED)

9   JANICE LOGAN, as Trustee of the
    James Logan Family Trust dated
10  February 10, 2021, and directly
    and derivatively on behalf of
11  Smart Communications Holdings,
    Inc., and derivatively on behalf
12  of Loco Florida, LLC,

13         Plaintiff,

14  vs.                        Case No:   2023-CA-1280-NC

15  JONATHAN LOGAN, SMART
    COMMUNICATIONS HOLDING, INC.,
16  nominal defendant, and LOCO
    FLORIDA, LLC, nominal defendant,
17
    _____Defendants._____/
18

19             IN-PERSON TRIAL, PHASE ONE

20        BEFORE THE HONORABLE HUNTER W. CARROLL

21               held at the
         Judge Lynn N. Silvertooth Judicial Center
22        2002 Ringling Boulevard, Courtroom 6C
                  Sarasota, Florida
23   Wednesday, January 31, 2024, 8:47 a.m. to 3:56 p.m.

24        VOLUME III, Pages 569 through 740

25          Stenographically reported by:
         Linda R. Wolfe, RPR, RMR, FCRR, FPR-C

1    following commenced at 3:08 p.m.)

2                    R-U-L-I-N-G

3        THE COURT:  This is Case 2023-CA-1002-NC

4    together with 2023-CA-1280.  We had Phase One of

5    the trial focusing on declaratory judgment actions

6    which was tried January 29th, 30th and 31st.

7        A predecessor judge entered a temporary

8    injunction in this case which, after that judge's

9    disqualification, got expanded ultimately by

10   agreement of parties after some discussions with

11   the Court.

12       But today is -- and the last three days has

13   been focusing in on whether there is a

14   Shareholders' Agreement; and, if so, what is it.

15       And in coming to this ruling, let me first

16   identify who several of the players are.  We have

17   Smart Communications Holding, Inc., I'll call it

18   either "Smart" or "Smart Communications", and it

19   provides telecommunication services for jail and

20   prison inmates.  And although it was not the focus

21   of this Phase One trial, just by the sheer number

22   of lawyers here, it really suggests that the entity

23   is quite successful.

24       We have Jonathan Logan, who is the incumbent

25   president, director, and 50 percent shareholder of

1   Smart Communications.

2        We have Janice Logan, both in her individual

3   capacity and as trustee of the James Logan Family

4   Trust dated February 19th, 2021.  And James Logan,

5   of course, was her late husband.

6        The Trustee currently owns 50 percent of Smart

7   Communications' shares.  So Jon, and Janice as

8   trustee, each are 50 percent.  And I'm using

9   everyone's first name not because I'm trying to be

10   offensive but to help be clear as to who we are

11   talking about.

12        Also a party is Alexis Logan, who is the

13   sister of Jon.  She is the daughter of Janice.  And

14   if I didn't say it, Jon also is the son of Janice.

15        The evidence makes clear that Jon Logan and

16   Alexis Logan do not get along, at all.

17        And Jon's relationship with his mother,

18   Janice, is only slightly better.

19        Alexis and her mom, Janice, get along well.

20        Alexis is an attorney, and I'll comment on it

21   a little bit later.  She also, for a period of

22   time, was the 100 percent shareholder of Smart

23   Communications in a legal title type of situation.

24        There are other folks that we're going to be

25   talking about primarily.  First is James or Jim

1   Logan.

2   Jim is Janice's late husband.  He was the

3   father of Jon and Alexis.

4   And Jim died October 16th, 2022.

5   Attorney Mark Wall, who is an attorney at Hill

6   Ward Henderson, has represented Jon Logan.

7   Tom Sims, who is an attorney at the Johnson

8   Pope firm, has represented Jim and Janice Logan

9   relating to -- and I'm going to say their estate

10   plan.  I know when I say "estate plan," I'm just

11   using that generically, not just referring to wills

12   but the more global planning aspect, trusts and all

13   sorts of various agreements.

14   And I know probate lawyers get upset when I

15   say estate lawyers and I reference trusts.  But I'm

16   using "estate lawyer" here and just "estate

17   planning" in just a very generic sense.

18   We have -- Another person we are going to talk

19   about is Lisa Eddy, who is Smart Communications'

20   Vice President of Operations.  She's been with

21   Smart for approximately five years in various

22   roles, and her current salary is $230,000 a year.

23   We have Scott Holte, who is Smart

24   Communications' Chief Strategy Officer, and he has

25   also been with Smart for approximately five years.

1    And his current salary is $150,000.

2        Gloria Burgess, who is Jon Logan's housekeeper

3    who tends to Jon Logan's house every Tuesday,

4    almost without fail.

5        I did reference earlier that Jon Logan is the

6    incumbent president, director, and 50 percent

7    shareholder of Smart Communications, and he is the

8    person that's been driving the company.  And his

9    dad was with him along for that ride and, over

10   time, providing various different services.  Dad

11   tended to focus on the legal-financial-banking type

12   of services.  Jon Logan was vision and IP type of

13   involvement.

14       The core group of Smart Communications is Jon

15   Logan, Lisa Eddy, and Scott Holte.

16       And that core group can be -- that core group

17   meets at least once a week.  I mean, the evidence

18   indicated that Jon's talking to Lisa, the chief of

19   operations -- sorry, the Vice President of

20   Operations, you know, on a daily basis, but that --

21   those three are the core group that run Smart

22   Communications.  And I don't have it quickly, but I

23   want to say the evidence was there was, like, 14

24   departments and more than 100 employees.  Again,

25   another testament that Smart Communications is a

1   successful business.

2          And I've got -- I think that's basically the

3   players I'm going to talk about.  There are others

4   that I might mention along the way.

5          Now, I'm not going to focus in on how Smart

6   Communications was formed because it's not really

7   relevant.  As with most start-ups, corporate

8   formalities usually come a little bit later after

9   concept and a lot of sweat and tears and time, and

10  sometimes capital.

11         But it became -- from the general beginning,

12  there was a 50/50 split between son and dad.

13         Now, I know that due to various unspecified

14  issues that we didn't explore -- and, again, it

15  doesn't really matter, really -- Alexis held

16  100 percent of stock in her name.  But the reality

17  is, Jim and Jon treated each other as if they were

18  50/50.  Smart Communications' lawyers, accountants

19  treated them as 50/50, although they would include

20  Alexis.  And when we get to it, we'll talk about

21  the 2017, because she was still the legal owner of

22  the stock.

23         But for whatever reason, I never picked up on

24  what Mr. Schoenfeld was trying to explain to me,

25  but I don't think it really matters because I find

1    as fact that, from at least an equitable

2    standpoint, dad and son were 50/50.

3        We heard a lot about dad's alcoholism, and

4    certainly it's a pernicious disease, and I've seen

5    many families -- in this case, unfortunately -- I

6    see a lot of affects of alcoholism.  But be that as

7    it may, Jim would have periods of sobriety and then

8    some periods that were the opposite.

9        And as time has progressed, the waxing and

10   waning, it appears that dad's alcoholism was

11   getting the better of him.

12       And I think as it came through from Jon's

13   testimony, but more particularly in some of the

14   e-mails, Jon was growing frustrated with alcoholic

15   portion of dad.

16       And, Jon, I will just say this:  Nothing I'm

17   going to say changes your love for your dad.  But

18   I'm talking about your business here.  I'm not

19   talking about your love for your dad.  And so,

20   please --

21       JON LOGAN:  Understood, Your Honor.

22       THE COURT:  And I honor that -- and even in

23   some of those difficult e-mails, you know, you

24   acknowledged your love for your dad.  And so I'm

25   not talking about that.

1          But there was some growing resentment about

2     Jim's role and ownership.  And I do agree with what

3     Mr. Johnson was saying, that that concern wasn't

4     necessarily that dad was a 50 percent owner, but it

5     was the longer term:  What does that mean when

6     dad's no longer with us?

7          Now, over the years, there were efforts to

8     agree to a Shareholders' Agreement.  Now, Jon

9     suggests that there always has been one and it's

10    been modified slightly.  With exception of and

11    putting the 2002 (sic) purported Shareholders'

12    Agreement to the side, there are no written

13    agreements that contain signatures.  And we'll talk

14    about 2017, whether that is or is not a written

15    agreement later on.

16         I want to talk for a moment about Exhibit 101.

17    Exhibit 101 is the -- what Jon Logan testified to

18    is the Shareholders' Agreement that's in effect

19    that both he and his dad signed on or about

20    September 23rd, 2022.  It is thirteen single-spaced

21    pages and pretty small font, as you all saw me with

22    the magnifying glass looking.  And that thirteen

23    pages is exclusive of the signature page.

24         The import for our discussion today at

25    Section 4.3, the agreement contains a mandatory

1    buyback-on-death provision of any deceased

2    shareholder's shares.  And Section 5.3(b), as in

3    "bravo," sets the fair market value, but that is

4    determined by a company appraisal to set the

5    purchase price.

6         And the reality is, given that Jon Logan is

7    the incumbent director, if this is the agreement,

8    that puts Jon in basic total control over the

9    valuation process.

10        Now, I'll also pause here.  The Court isn't in

11   a position to determine whether a deal is a good

12   deal or a bad deal from some person's perspective,

13   and it's not the Court's role ever to write or

14   rewrite a contract to make it more fair for one

15   party or the other.

16        I reference the fact of 5.3(b) to help explain

17   the dynamic that brings us here today.

18        Now, there are three questioned signatures.

19   Two are on page 14 of the Shareholders' Agreement

20   from 2022 -- the purported Shareholders' Agreement,

21   and both of those allegedly contain Jim's

22   signature.

23        And then the third disputed signature is on a

24   separate document, but it's also in Exhibit 101,

25   which is entitled the Written Action of the Board

1    of Directors.

2        Janice and Alexis dispute that Jim signed this

3    agreement. And we certainly have competing

4    experts.

5        The Jim -- sorry. The Janice and Alexis'

6    expert was of the opinion: Very highly probable

7    that this was not signed by Jim.

8        And we have the expert for Jon Logan who

9    contained a pretty high -- it was probable that dad

10    did sign.

11        And so I've got two experts that are not

12    exactly polar opposites, but pretty close to being

13    polar opposites of each other.

14        I do want to reference Exhibit 200.

15    Exhibit 200 is an e-mail chain that starts with

16    Attorney Mr. Sims. And it is to Jon and Jim Logan.

17        And let me just back up. The Alexis ownership

18    of the stock, her ownership terminated

19    approximately 2018. I don't have the specific date

20    written down. I'm sure it's on a document here. I

21    just didn't go back to write it down. At that

22    point, the shares went to Jon, individually, and

23    Jim, individually.

24        And prior to Jim's surgery in September, he

25    conveyed the Smart Communications' stock into the

1    Revocable Trust, and that's how Janice, as the

2    trustee, now is the owner of that stock.

3         Okay.  So going back to Exhibit 200.  This is

4    an e-mail.  It originated from Mr. Sims to Jon and

5    copying Jim.  And it, again, is conveying a

6    Shareholders' Agreement.  And the date on this is

7    September 12th, 2022.

8         Now, the text of that e-mail includes

9    statements that this is for Jon's review and

10   comment.  It reminds Jon that his dad's going to be

11   undergoing a medical procedure in the near future.

12   It contemplates that, quote, "once finalized", end

13   quote, it could be signed by son and dad, quote,

14   "in order to put it into place."

15        And I use those quotes to indicate that the

16   sending of the document itself was not a technical

17   offer.  But even if it were, that same day, still

18   in Exhibit 200, Jon rejects the Shareholders'

19   Agreement.

20        He writes, quote, "It's ridiculously too

21   complicated," end quote.

22        Quote, "I don't even understand it," end

23   quote.

24        Quote, "I want it much more simple and

25   direct," end quote.

1        Quote, "All these terms and names that need

2    their own paragraph of definition is ridiculous,"

3    end quote.

4        Now, critically, also in that e-mail, Jon

5    writes to his dad -- or Jon writes to -- yeah -- to

6    his dad, quote, "I do not agree to be a 50/50

7    partner with you," end quote.

8        Now, Jon's explanation is this was written as

9    part of his normal modus operandi to shock his dad

10   back into sobriety.

11       And, you know, I don't really have any

12   statement one way or the other, other than there's

13   not an acceptance of the offer to the extent that

14   you would construe the sending of Exhibit 200 to be

15   an offer, which I do not.

16       But it also is -- it indicates that there's no

17   reference to any existing shareholders.

18       Now, dad has two different types of responses.

19   The first response is at Exhibit 210, which is more

20   on the business side of the response.  And it talks

21   about the share transfer agreement, and that's the

22   share transfer agreement that took Alexis

23   100 percent back to Jon and Jim 50/50.  And so dad

24   is reminding Jon about the 50/50 nature.

25       Then there is Exhibit 211 and 213, and this is

1    a September 18th e-mail, slash, letter, that was

2    sent on October 3rd, 2022.  And I know that there

3    is questions lodged by Jon as far as its proper

4    admissibility.  But it's clear that there's a

5    videotape of Jim signing something, which is this

6    response.  And this is the response on the more

7    personal side.

8          What I highlight at this point is in

9    Exhibit 213, a reply that Jon wrote to his dad on

10   October 3rd, 2022.

11         Quote, "If you want to start a war with me,

12   then we will have a war like you have never seen.

13   I have never made a death threat.  Don't try and

14   put words into my mouth and document that like it

15   is fact.  I am not stupid.  I know what you are

16   attempting to do here.  You are unfit as a business

17   partner, unfit as a father, unfit as a husband, and

18   unfit as an adult.  You can't even dress yourself.

19   You want to make this get nasty.  We can make it

20   get real nasty.  I didn't deserve this.  But I will

21   not let someone, including my own family, take

22   advantage of me anymore," end quote.

23         Now, again, Jon, I go back to I know you

24   testified that this is part of the shock that

25   you're trying to bring dad back into sobriety, but

1    I do note that nowhere in here is there an

2    assertion that there's an existing Shareholders'

3    Agreement.

4         And this was done on October 3rd, and the

5    testimony is that there previously was a signed

6    agreement that Jon left at his own house in

7    Tierra Verde, Pinellas County, Florida, for his dad

8    to come over, dad signed it, left Jon a copy and

9    took the original.

10        Now, the purported original has never been

11   found.  And as we indicated, dad dies on

12   October 16th, 2022.

13        Jon Logan's conduct over the next few months

14   suggests that there was no 2022 signed

15   Shareholders' Agreement.

16        Exhibit 217 -- and I know, again, that there

17   was a dispute over the admissibility of this

18   document -- suggests that Jon was not -- now

19   willing to sign it.

20        But even if I took that 217 away, my finding

21   doesn't change that there was no signed settlement

22   agreement -- I'm sorry -- no signed Shareholders'

23   Agreement in September or at any time in 2022.

24        What, to me, is really telling is the lead-up

25   to the December 8th meeting with Mr. Sims,

1    Mr. Wall, where Mr. Wall seeks from Smart

2    Communications' accountants and attorneys and Jim's

3    attorneys any information or if there is any signed

4    agreements regarding the business.  There's no

5    indication in those communications, "Hey, we know

6    that there is one, we're just trying to track it

7    down."

8         And in the December 8th meeting, while I

9    understand Jon contends that he referenced a signed

10   agreement, the attorneys for the parties don't

11   recall that.

12        There was a statement that Janice made to Jon,

13   "Why didn't you sign it?"  And Jon saying, "I wish

14   I had."

15        Now, I also know that there is an allegation

16   that Janice said something to the effect of that

17   she knows that there is a signed agreement or she

18   had seen a signed agreement, and the Court credits

19   Janice's testimony on that that it was in reference

20   to some prior iteration, not the 2022.

21        I have no doubt that Gloria Burgess found a

22   document, but the circumstances in how that

23   document was found are suspicious to the Court.

24        I also understand that Ms. Eddy and Mr. Holte

25   testified that Jim said something to the effect of

1     "I've signed the stockholders' agreement" or "You

2     don't need to worry about it because That's been

3     taken care of," and those are statements in the

4     fall 2022 time period.

5          I do know that both of them are interested in

6     the outcome of this proceeding from a financial

7     standpoint, and I have difficulty understanding how

8     individuals who talk daily or weekly as part of the

9     core group of Smart Communications would not

10    earlier disclose the existence of that comment or

11    those comments that Jim allegedly made when,

12    indisputably, they knew that one of the prime

13    issues of this lawsuit -- or these lawsuits, I

14    should say, involve whether there is a settlement

15    or -- a Shareholders' Agreement -- why I say

16    settlement agreement, I don't know -- why there's a

17    Shareholders' Agreement.

18         So all of that goes to me saying that I find

19    as fact that the Exhibit 101 was not signed by Jim

20    Logan.   Jim Logan never assented to that document.

21         That there is no 2022 stockholder's agreement.

22         Now, let me also talk, because I said at the

23    beginning that there was references over time that

24    there were various different shareholder

25    agreements.   And without a doubt, there were a lot

1    of evidence of discussions and drafts of various

2    iterations, and I will say they are different in a

3    material respect.  One provision that is different

4    than the 2022 has to do with how the company gets

5    evaluated.

6         And under those other prior agreements, it was

7    more of a -- and depending on which version, but

8    they were more typical that you would see one side

9    picks an appraiser, the other side picks the

10   appraiser, and then if there is a dispute, then

11   they pick a third.

12        I -- I -- I know that most of those

13   Shareholder Agreement requests were being driven by

14   dad and that he was willing to enter into some type

15   of agreement.

16        The 2017 is probably the closest that the

17   evidence supports of a Shareholders' Agreement, but

18   the Court will ultimately find that there was no

19   2017 Shareholders' Agreement.

20        If you look at the discussions contained

21   within the e-mails that were discussing various

22   drafts, there is never a situation where Jon says

23   "I accept" or Jim says "I accept" or using words to

24   that effect.

25        At that time, Alexis was involved and, in

1   fact, some of the e-mails reference that there was

2   either disagreement or a difference of opinion as

3   to what various provisions meant.  And what those

4   e-mails from 2017 -- they talk about a global, Hey,

5   we need to move in this direction type of plan,

6   these are some steps we need to take.  One step is

7   getting the stock out of Alexis' name.  And the

8   next step is to have a Shareholders' Agreement.

9   But the parties never agreed on the business terms.

10        And I understand that parties can agree to

11   business terms but have other terms that are left

12   open that doesn't defeat the existence of an

13   enforceable agreement.

14        Here the parties never came to either an oral

15   or written agreement as to the core business terms

16   for a Shareholders' Agreement.  Certainly, one of

17   the terms that existed or that both sides may have

18   wanted was the existence of a mandatory buyback.

19   But that's not the only term.

20        The various drafts that different lawyers from

21   different firms sent around were much more

22   comprehensive than just a buyback.  And so it's

23   just like a situation where parties are negotiating

24   over ten points; they come to an agreement on

25   three, but not on the other seven.  You don't have

1   an agreement unless the parties then say, "Okay, we

2   agree to those three and they are going to be

3   controlling."  There was not anything like that

4   here.

5         I understand Jon testified that at each of

6   these yearly meetings or whenever a new version of

7   whatever year they were talking about at the time's

8   Shareholders' Agreement, that the parties agreed

9   orally with each other and then decided, since it

10  wasn't a big deal, to physically memorialize it in

11  writing.

12        I find that that -- that Jon Logan failed to

13  meet his burden that there was an existence of

14  either an oral or written Shareholders' Agreement

15  at any time, including the 2017, '18, and I think

16  it was 2020 or the various different iterations.

17        So, ultimately, that means I'm declaring that

18  there is no Shareholders' Agreement that is in

19  effect between the two 50 percent shareholder --

20  50 percent shareholders of Smart Communications'

21  stock.

22        So I'm going to pause there.  Are there any

23  questions or clarifications I need to make?  And

24  I'm going to start with Jon's lawyers first.

25        MR. BARNETT:  No, Your Honor.

1       THE COURT:  Going to Janice's lawyers.

2       MR. SCHOENFELD:  No, Your Honor.

3       THE COURT:  Okay.  Going to Alexis' lawyers.

4       MR. JOHNSON:  No, Your Honor.

5       THE COURT:  Now, who on this side of the room

6   is going to take the first draft of coming up with

7   this partial judgment?

8       MR. SCHOENFELD:  Your Honor, we'd be happy to

9   do so.

10      THE COURT:  I want a specific person.  Is

11  it --

12      MR. SCHOENFELD:  It's not going to be

13  Mr. O'Neill because he is leaving on parental

14  leave, and I've forbidden him to do any more work

15  on this case until it is done.  So it will be

16  Mr. Franklin and myself.

17      THE COURT:  Okay.  Obviously, before anything

18  gets submitted, it needs to go to all the attorneys

19  for their review and approval.

20      What I normally do in these types of

21  situations, if you can get a copy of my ruling, and

22  I'm fine if you want to just electronically staple

23  it and then come up with the partial judgment, just

24  implementing it, that's fine, too.

25      Now, let's talk about -- and that completes my

1    ruling.

2        So I'm now going to shift about what's next.

3    I mean, obviously the lawyers here know, you know,

4    I was a business litigator for many years before I

5    even got on the bench.  I mean, we all know the

6    three primary things that are going to happen.

7    There could be others.

8        Parties are either going to agree on a

9    Shareholders' Agreement governing their relations,

10   there's going to be a buyout, or there's going to

11   be a deadlock.  There could be others, but those

12   are the three typical that I see in these types of

13   situations.

14       I want to be clear that the injunction is

15   still in effect.  And let's not move assets.

16       What is going on next week with the hearing

17   time, and how do we want to proceed?  Do we need to

18   go back to mediation in, let's say, 30 or 60 days?

19       Did you all get the financial information that

20   we talked about when we had the contempt hearings

21   that were ultimately resolved by agreement?

22       MR. O'NEILL:  So, Your Honor -- So to answer

23   Your Honor, I think your first question was, as for

24   next week, what is, I believe, is up on Monday, am

25   I correct?

# EXHIBIT 9

# IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,

        Plaintiffs,

v.

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust, dated February 10, 2021;
and ALEXIS LOGAN,

        Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan          Case No.: 2023-CA-1002-NC
Family Trust, dated February 10, 2021,

        Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., SMART
COMMUNICATIONS HOLDING, LLC, HLFIP
HOLDING, INC., and HLFIP HOLDING, LLC,

        Counterclaim Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan Family        (CONSOLIDATED)
Trust, dated February 10, 2021, and derivatively on
Behalf of Smart Communications Holding, Inc.,

        Plaintiff,                    Case No.: 2023-CA-1280-NC

v.

JONATHAN D. LOGAN,
SMART COMMUNICATIONS HOLDING, INC.,
nominal defendant, SMART COMMUNICATIONS
HOLDING, LLC, HLFIP HOLDING, INC., HLFIP
HOLDING, LLC, LOCO FLORIDA LLC, and
SMART COMMUNICATIONS YACHT
HOLDING, LLC,

        Defendants

_____/

## SMART COMMUNICATIONS HOLDING, INC.'S ELECTION TO PURCHASE
## PURSUANT TO FLORIDA STATUTE § 607.1436

Smart Communications Holding, Inc. ("Smart Communications" or the "Company"), pursuant to § 607.1436, Fla. Stat., elects to purchase all shares of the Company owned by the James Logan Family Trust, dated February 10, 2021, at fair value.

Smart Communications reserves all rights available to it under § 607.1436, or otherwise, including its right to deny, contest and/or object to the allegations raised in the Second Amended Complaint dated May 29, 2024.

Dated:  June 20, 2024

**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
Highpoint Center
106 East College Avenue - Suite 700
Tallahassee, FL 32301
Telephone: (850) 580-7200
gburhans@stearnsweaver.com

By: *s/ Glenn Burhans, Jr.*
Glenn Burhans, Jr.
Florida Bar No. 605867

-and-

**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
200 East Las Olas Boulevard, Suite 2100
Fort Lauderdale, Florida 33301
Telephone:  (954) 462-9500
mharwin@stearnsweaver.com
mhernandez@stearnsweaver.com

By: *s/Michael J. Harwin*
Michael J. Harwin
Florida Bar No.: 1018578

**AKERMAN LLP**
401 E. Jackson Street, Suite 1700
Tampa, FL 33602-5250
Office: (813) 23-7333
Fax: (813)218-5495
mark.bernet@akerman.com
caren.deruiter@akerman.com

By:*/s/ Mark J. Bernet*
Mark J. Bernet, Esq.
Florida Bar No. 606359

-and-

**AKERMAN LLP**
201 East Las Olas Boulevard
Suite 1800
Fort Lauderdale, FL 33301
Telephone: (954) 463-2700
Fax: (954) 463-2224

Jason S. Oletsky, Esq.
Florida Bar No. 9301
jason.oletskey@akerman.com
jill.parnes@akerman.com
Dustin B. Hillsley, Esq.
Florida Bar No. 1018589
dustin.hillsley@akerman.com
deborah.karlson@akerman.com
Max C. Rudolf, Esq.
Florida Bar No. 98766
max.rudolf@akerman.com
deborah.karlson@akerman.com

*Counsel for Smart Communications Holding, Inc.*

76886216;1

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on June 20,

2024, via electronic mail through the Florida Court's E-Portal to:


Anitra R. Clement
Florida Bar No. 100354
**SHOOK, HARDY & BACON L.L.P.**
100 N. Tampa Street, Suite 2900
Tampa, FL 33602
Telephone: (813) 202-7100
aclement@shb.com

David E. Schoenfeld (FL PHV # 1047561)
Peter F. O'Neill (FL PHV # 1043125)
Andrew L. Franklin (FL PHV # 1035737)
Kailin Liu (FL PHV # 1051416)
**SHOOK, HARDY & BACON L.L.P.**
111 S. Wacker Drive, Suite 4700
Chicago, IL 60606
Telephone: (312) 704-7700
dschoenfeld@shb.com
pfoneill@shb.com
afranklin@shb.com
kliu@shb.com

/s/<u>*Mark Bernet*</u>
Mark Bernet, Esq.

76886216;1

# EXHIBIT 10

## Smart Communications Holding, Inc.
## Balance Sheet
### As of December 31, 2023

Accrual Basis

|  | December 31, 2023 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| Bank of America Checking 9057 | 3,112.17 |
| BOA Savings 2783 - FAC ESCROW | 144.95 |
| Savings 2833 | 82.81 |
| Truist BB&T 1704 Inmate Info | 600.46 |
| Truist BB&T 7701 Checking | 129,583.11 |
| Truist BB&T 7728 Holding | 1,262.52 |
| Truist CD Account 1358 | 25,000.00 |
| **Total Checking/Savings** | 159,786.02 |
| **Accounts Receivable** | |
| Accounts Receivable -- HLFIP (non IP related) Accounts | 178,416.63 |
| Receivable -- MGF | 1,622,935.32 |
| Accounts Receivable - Smart US (inter company eliminated) | 0.00 |
| Accounts Receivable Trade | 735,767.15 |
| **Total Accounts Receivable** | 2,537,119.10 |
| **Other Current Assets** | |
| Due From Loco Florida LLC | 1,375,100.72 |
| Due From Mailguard Federal | 123,134.19 |
| Due from Mailguard Inc. | 630.00 |
| Due From SCYH | 5,711,296.13 |
| Inventory | 3,033,716.53 |
| Prepaid Expenses | 29,509.58 |
| Prepaid Facility Commissions | 374,999.99 |
| Prepaid Federal Income Taxes | 750,000.00 |
| Prepaid State Income Taxes | 240,631.00 |
| Security Deposit | 19,641.61 |
| Shareholder Loan | 3,533,324.58 |
| Taxes Receivable - State | 393,483.61 |
| **Total Other Current Assets** | 15,585,467.94 |
| **Total Current Assets** | 18,282,373.06 |
| **Fixed Assets** | |
| **Accumulated Depreciation** | |
| Accumulated Depr-Furniture | -137,565.62 |
| Accumulated Depreciation-Kiosk | -2,877,734.41 |
| Accumulated Depreciatn-Building | -374,339.40 |
| Accumulated Depreciatn-Displays | -42,896.03 |
| Accumulated Depreciatn-Equipmen | -414,938.23 |
| Accumulated Depreciatn-L/H Impr | -35,898.07 |
| Accumulated Depreciatn-Software | -2,940,375.97 |
| Accumulated Depreciatn-Vehicles | -1,801,659.05 |
| **Total Accumulated Depreciation** | -8,625,406.78 |
| Building | 5,071,155.20 |
| Computer Software | 2,987,875.50 |
| Demo Build (Collier Co.) | 22,500.00 |
| Display System | 21,280.00 |
| Equipment & Mail Process Equipment | 683,905.07 |
| Furniture | 163,692.34 |
| Kiosks - Installed | 2,987,601.52 |
| Leasehold Improvements | 355,750.95 |
| Vehicles | 2,564,222.16 |
| **Total Fixed Assets** | 6,232,575.96 |
| **TOTAL ASSETS** | **24,514,949.02** |

Preliminary and Confidential

## Smart Communications Holding, Inc.
## Balance Sheet
### As of December 31, 2023

**Accrual Basis**

| | December 31, 2023 |
|---|---|
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| **Accounts Payable** | |
| Accounts Payable Pasco (inter company eliminated) | 0.00 |
| Accounts Payable - Trade | 3,278,633.14 |
| **Total Accounts Payable** | 3,278,633.14 |
| **Total Accounts Payable** | 3,278,633.14 |
| **Credit Cards** | |
| Truist Corporate Card | 1,303.64 |
| Truist Credit Card - Purchasing | 143.91 |
| **Total Credit Cards** | 1,447.55 |
| **Other Current Liabilities** | |
| Accrued Credit Cards | 3,161.93 |
| Accrued Facility Commissions | 1,138,659.52 |
| Accrued Facility Tech Grant | 38,055.82 |
| Accrued Legal Fees | 11,777.10 |
| Accrued Payroll-Wages | 240,358.21 |
| Accrued Payroll Taxes | 30,926.92 |
| Current Portion Long Term Debt | 105,069.76 |
| IP License Fee Interest-Current | 561,099.23 |
| IP Licensing Fee-Current | 22,443,968.93 |
| **Total Other Current Liabilities** | 24,573,077.42 |
| **Total Current Liabilities** | 27,853,158.11 |
| **Long Term Liabilities** | |
| Interest Payable-Licensing Fee | 5,592,170.04 |
| IP Licensing Fee | 51,782,755.98 |
| Lattice Technology License | 228,140.00 |
| Note Payable - Vehicles | 24,880.80 |
| **Total Long Term Liabilities** | 57,627,946.82 |
| **Total Liabilities** | 85,481,104.93 |
| **Equity** | |
| Common Stock | 364,667.42 |
| Paid In Capital | 392,151.30 |
| Retained Earnings | -38,696,876.56 |
| Net Income | -23,026,098.07 |
| **Total Equity** | -60,966,155.91 |
| **TOTAL LIABILITIES & EQUITY** | 24,514,949.02 |

CONFIDENTIAL

SMART-0025454

Preliminary and Confidential

## Smart Communications Holding, Inc.
## Profit & Loss

**Accrual Basis**         January through December 2023

| | Jan 1, 2023 To Dec 31, 2023 |
|---|---:|
| **Ordinary Income/Expense** | |
| **Income** | |
| Miscellaneous Revenue | 29,000.00 |
| **Sales** | |
| Commissary Transfer Credits | 5,517,534.01 |
| Refunds | -79,075.38 |
| Sales Entertainment | 2,188,122.85 |
| Sales of Mail Services | 4,512,000.00 |
| Sales of Messaging | 15,325,510.68 |
| Sales of Telephone Calls | 18,167,678.37 |
| Sales Photos | 1,572,481.27 |
| Sales Visitation | 3,042,567.09 |
| Service Fees | 5,740,300.69 |
| Trust Account Funding Fees | 122,802.74 |
| **Total Sales** | 56,109,922.32 |
| **Total Income** | 56,138,922.32 |
| **Cost of Goods Sold** | |
| Beginning Inventory Value | 690,704.04 |
| Contractor Services | 2,382,241.33 |
| Data Storage / Server Hosting | 371,469.24 |
| Ending Inventory Value | -3,033,716.53 |
| Facility Commissions Expense | 16,541,354.14 |
| Facility Rates Tables | 14,054.00 |
| Freight and Shipping Costs | 680,457.92 |
| Internet Service | 645,484.44 |
| Labor - Installation | 511,281.97 |
| Labor - Mail Processing | 456,298.85 |
| Labor - Repairs & Maintenance | 856,848.57 |
| Labor - Telephone CC Sales | 1,019,655.09 |
| Meals Expense | 105,322.42 |
| **Merchant Account Fees** | |
| Charge Backs | 340,215.48 |
| Merchant Account Fees | 1,845,145.24 |
| **Total Merchant Account Fees** | 2,185,360.72 |
| Misc. 3rd Party kiosk software | 454,692.53 |
| Miscellaneous Hardware Install | 0.00 |
| Purchases Hardware | 10,765,788.77 |
| Tablet Units | 0.00 |
| Salesperson Commissions | 263,162.25 |
| Technology Grant | 1,252,922.99 |
| Telecommunications Taxes | 2,566,986.90 |
| **Travel - Installation & Maint.** | |
| Airfare | 353,345.70 |
| Gas | 87,846.52 |
| Lodging | 429,318.15 |
| Mileage | 25,917.35 |
| Misc. Travel Expenses | 7,115.47 |
| Parking & Tolls | 40,594.37 |
| Vehicle Rental | 174,823.37 |
| Travel - Installation & Maint. | 2,033.64 |
| **Total Travel - Installation & Maint.** | 1,120,994.57 |
| Voice Over IP | 362,726.78 |
| Watch | 43,814.00 |
| **Total COGS** | 40,257,904.99 |
| **Gross Profit** | 15,881,017.33 |
| **Expense** | |
| Advertising and Promotion | 274,651.11 |

Page 1

CONFIDENTIAL

## Smart Communications Holding, Inc.
# Profit & Loss
### January through December 2023

**Accrual Basis**

|  | Jan 1, 2023 To Dec 31, 2023 |
|---|---|
| **Automobile Expense** | |
| Auto Insurance | 99,068.00 |
| **Total Automobile Expense** | 99,068.00 |
| **Bank Service Charges** | 8,597.58 |
| **Charitble Contributions** | 18,284.84 |
| **Client Welfare** | 107,076.88 |
| **Computer Expenses** | 120,392.10 |
| **Computer Supplies** | 0.00 |
| **Contract Labor Expense** | 266,001.33 |
| **Depreciation Expense** | 1,556,296.13 |
| **Dues and Subscriptions** | 80,513.24 |
| **Education** | 145,876.32 |
| **Employee Welfare** | 6,260.45 |
| **Insurance Expense** | 247,776.47 |
| **Legal Fees** | 3,080,225.81 |
| **Licenses & Permits** | 19,428.93 |
| **Meals and Entertainment** | 141,108.30 |
| **Office Expense** | 79,205.80 |
| **Outside Services** | 1,172.97 |
| **Payroll Expenses** | |
| Employee Salary and Wages | 5,574,493.27 |
| ER FICA & SUTA & FUTA Expense | 729,876.53 |
| ER Health Insurance Premiums | 555,255.28 |
| Officer Compensation | 119,999.88 |
| Other Employee Benefits | 3,500.00 |
| Payroll Service Fees | 110,489.68 |
| Workers' Compensation Insurance | 44,833.18 |
| **Total Payroll Expenses** | 7,138,447.82 |
| **Postage and Delivery** | 18,312.85 |
| **Professional Fees** | |
| Regulatory Registration Agent | 100,006.62 |
| Professional Fees - Other | 126,894.48 |
| **Total Professional Fees** | 226,901.10 |
| **Property Tax** | 79,848.51 |
| **Recruitment Expense** | 63,283.25 |
| **Rent Expense** | |
| Office Rents | 202,021.71 |
| Rent Expense - Other | 1,297,715.00 |
| **Total Rent Expense** | 1,499,736.71 |
| **Repairs and Maintenance** | |
| Equipment Maintenance | 58,898.15 |
| Repairs and Maintenance - Other | 326,573.75 |
| **Total Repairs and Maintenance** | 385,471.90 |
| **Uniforms** | 1,677.20 |
| **Utilities** | |
| Telephone & Internet | 126,931.58 |
| Utilities - Other | 65,600.79 |
| **Total Utilities** | 192,532.37 |
| **Website Design & Maintenance** | 99,712.11 |
| **Total Expense** | 15,957,860.08 |
| **Net Ordinary Income** | -76,842.75 |

Page 2

**Smart Communications Holding, Inc.**
## Profit & Loss
**January through December 2023**

Accrual Basis

| | Jan 1, 2023 To Dec 31, 2023 |
|---|---:|
| **Other Income/Expense** | |
| **Other Income** | |
| **Miscellaneous Income** | 89,644.18 |
| **Total Other Income** | 89,644.18 |
| **Other Expense** | |
| **Intellectual Property Expense** | 22,443,968.93 |
| **Interest Expense** | 566,663.31 |
| **Late Fees / Penalties** | 28,267.26 |
| **Total Other Expense** | 23,038,899.50 |
| **Net Other Income** | -22,949,255.32 |
| **Net Income** | **-23,026,098.07** |

CONFIDENTIAL

SMART-0025461

# EXHIBIT 11

**In the Matter Of:**

Jonathan Logan v Janice Logan

**Hearing  .**

*December 06, 2023*

1  IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT IN
   AND FOR SARASOTA COUNTY, FLORIDA

2
   JONATHAN LOGAN and SMART
3  COMMUNICATIONS HOLDING, INC.,

4          Plaintiffs,
   vs.                    Case No.:  2023-CA-1002-NC
5
   JANICE LOGAN, individually and
6  as Trustee of the James Logan
   Family Trust, and ALEXIS LOGAN,
7  individually,

8          Defendants.       /   (CONSOLIDATED)

9  JANICE LOGAN, as Trustee of the
   James Logan Family Trust dated
10 February 10, 2021, and directly
   and derivatively on behalf of
11 Smart Communications Holdings,
   Inc., and derivatively on behalf
12 of Loco Florida, LLC,

13          Plaintiff,

14 vs.                    Case No:  2023-CA-1280-NC

15 JONATHAN LOGAN, SMART
   COMMUNICATIONS HOLDING, INC.,
16 nominal defendant, and LOCO
   FLORIDA, LLC, nominal defendant,
17
   _____ Defendants.        /
18

19              LIVE HEARING

20       BEFORE THE HONORABLE HUNTER W. CARROLL

21              held at the
         Judge Lynn N. Silvertooth Judicial Center
22        2002 Ringling Boulevard, Courtroom 6C
                Sarasota, Florida
23 on Wednesday, December 6, 2023, 3:00 to 5:00 p.m.

24          Pages 1 through 96

25       Stenographically reported by:
         Linda R. Wolfe, RPR, RMR, FCRR, FPR-C

Jonathan Logan v Janice Logan                Hearing  .                        12/06/2023

1  APPEARANCES:

2  On behalf of Jonathan Logan, Smart Communications
   Holding, Inc. and Loco Florida, LLC:
3
        CRAIG S. BARNETT, Attorney at Law
4        CHELSEA KOFF, Attorney at Law
        STEARNS WEAVER MILLER WEISSLER ALHADEFF &
5         SITTERSON, P.A.
        200 East Las Olas Boulevard
6         Suite 2100
        Fort Lauderdale, FL  33301-2299
7         (954)462-9500
        cbarnett@stearnsweaver.com
8         ckoff@stearnsweaver.com

9
   On behalf of Janice Logan, individually and as Trustee
10  of the James Logan Family Trust, dated 2/10/21:

11        PETER F. O'NEILL, Attorney at Law
        ANDREW L. FRANKLIN, Attorney at Law
12         SHOOK, HARDY & BACON L.L.P.
        111 S. Wacker Dr., Ste. 4700
13         Chicago, IL  60606
        (312)704-7710
14         pfoneill@shb.com
        afranklin@shb.com
15
        ANITA R. CLEMENT, Attorney at Law
16         SHOOK, HARDY & BACON L.L.P.
        100 North Tampa Street, Ste. 2900
17         Tampa, FL  33602
        (813)202-7100
18         aclement@shb.com

19  On behalf of Alexis Logan:

20        CHARLES F. JOHNSON, III, Attorney at Law
        BLALOCK WALTERS, P.A.
21         802 11th Street West
        Bradenton, FL  34205-7734
22         (941)748-0100
        cjohnson@blalockwalters.com
23

24  ALSO PRESENT:  Alexis Logan
        Janice Logan
25         Jonathan Logan

1      (Proceedings commenced with all parties

2   attending live on Wednesday, December 6, 2023

3   at 3:00 p.m.)

4           P R O C E E D I N G S

5      THE COURT:  These are cases 2023-CA-1002 as

6   well as 2023-CA-1280.

7      Let's go ahead and take appearances, please.

8      MS. KOFF:  Chelsea Koff from Stearns Weaver

9   here on behalf of Jonathan Logan and Smart

10   Communications Holding, Inc. as well as Loco

11   Florida, LLC.  With me at the table is my partner

12   Craig Barnett as well as Jonathan Logan.

13      MR. O'NEILL:  Good afternoon, Your Honor.

14   Peter O'Neill from Shook Hardy & Bacon on behalf of

15   Janice Logan along with my colleagues Anitra

16   Clement, Andrew Franklin, and my client Janice

17   Logan back here as well.

18      MR. JOHNSON:  Charles Johnson on behalf of the

19   Defendant, Alexis Logan.  Ms. Logan is in the first

20   row wearing the black suit.  Seated to her right is

21   her husband, Justin Peterson.  Mr. Peterson is

22   neither a party nor counsel in the proceeding.

23      THE COURT:  And before we start, do I need

24   Zoom or are we --

25      MR. O'NEILL:  Not from our side, Your Honor.

1    THE COURT:  So I can go ahead and turn it off?

2    MR. O'NEILL:  That's fine.

3    THE COURT:  My understanding is we are still

4  here on the Motion for Contempt and to Appoint a

5  Temporary Custodian; is that correct?

6    MR. O'NEILL:  That's correct, Your Honor.

7    THE COURT:  Any other preliminary issues we

8  need to address before we dig right in?

9    MR. O'NEILL:  A couple of preliminary issues,

10  Your Honor.

11    First is I believe Ms. Gunning.  Noreen

12  Gunning is a fact witness who will be testifying

13  today.  We would ask that she be sequestered until

14  she's called to testify.

15    THE COURT:  So you're invoking the rule of

16  sequestration?

17    MR. O'NEILL:  Yes, Your Honor.

18    THE COURT:  Are there any other folks that are

19  witnesses here that are not parties?

20    MS. KOFF:  Not from our side.

21    THE COURT:  Ma'am, you need to wait outside.

22  Do not have any discussions about this case except

23  with the attorneys.

24    MR. O'NEILL:  The other preliminary matter I

25  want to discuss with Your Honor is today we will be

1  discussing with certain witnesses documents and

2  testimony about those documents that have been

3  marked "Confidential" pursuant to the Protective

4  Order that's been entered in this case.

5      Do you remember the number?  362, I believe,

6  is the DIN number.

7      I didn't know Your Honor's practice in terms

8  of designating the portion confidential.  Right

9  before we go into those documents and testimony,

10  should we just state that for the record or how

11  would Your Honor prefer to handle that?

12      THE COURT:  I would prefer that you would have

13  told me that you were seeking to deal with

14  confidential information so we could be prepared

15  for it.

16      MR. O'NEILL:  Understood.

17      THE COURT:  Because now you're talking about

18  discussing issues publicly in a public courtroom.

19      MR. O'NEILL:  So my --

20      THE COURT:  Are you seeking to close the

21  courtroom?

22      MR. O'NEILL:  Not seeking to close the

23  courtroom.

24      I'm seeking to -- I'm seeking leave from the

25  Court to throughout today's questioning designate

1  certain portions of the testimony and the documents

2  confidential.  It may be to alleviate Your Honor's

3  concern -- and I do apologize for not bringing this

4  to Your Honor's attention beforehand.

5      Maybe we could do something where Your Honor

6  could preliminarily allow the confidentiality

7  designation and then we would later address that

8  issue with Your Honor.  And for Your Honor's --

9  just for the record, I'm thinking it's at most five

10  to seven documents, and I do believe there are -- I

11  think our case can be put on in certainly less than

12  an hour.  That's our intent.  We don't think it's

13  going to be voluminous.

14      THE COURT:  Well, receiving confidential

15  documents is one thing.  That's pretty easy to

16  address.

17      The issue about the transcript, though,

18  becomes more difficult --

19      MR. O'NEILL:  Understood.

20      THE COURT:  -- because we're dealing with a

21  public courtroom.

22      MR. O'NEILL:  Understood.  I guess my

23  suggestion would be, Your Honor, maybe we allow for

24  the testimony to go forward today and then we can

25  file timely, you know, maybe by when -- I guess

1  whenever we receive the transcript, we would

2  promptly thereafter file a motion to seal portions

3  of the transcript as confidential.  I imagine the

4  other side would be in the same sort of predicament

5  that we are.

6      MS. KOFF:  Your Honor, respectfully, we would

7  defer to Your Honor how Your Honor would like to

8  handle those documents.  However, I can address

9  this in Opening or now, but this might all be moot.

10      I don't see the need for any evidence to be

11  put on today, and I'm happy to explain that to Your

12  Honor right now.

13      THE COURT:  Well, let's deal, first, with the

14  question of confidentiality.

15      I have the ability to tell the Clerk that

16  documents that we receive or are marked can be

17  designated as confidential.  So that's not the

18  problem.

19      Conceptually, I don't have any problem with

20  you filing a Notice of Confidential Information

21  using the procedure under Rule 2.420 with respect

22  to a transcript or a portion of the transcript that

23  may contain confidential trade secret or whatever

24  the sensitive, but I'm not sure how I ultimately

25  would rule on it, and I don't want to -- I don't

1  want to lull you into a sense of, "Yeah, we'll do

2  that."  I will tell you I am not a big fan of

3  sealing anything.

4      I mean, like, if it's a trade secret, if there

5  is a formula for Coca-Cola, I mean, there's --

6      MR. O'NEILL:  Sure.

7      THE COURT:  -- things that, obviously --

8      MR. O'NEILL:  Sure.

9      THE COURT:  -- we have got to do.  But,

10  generally speaking, most people try to seal things

11  that are not truly sealable, and I don't just sign

12  off on these things blatantly.

13      MR. O'NEILL:  Understood.  May I suggest then

14  that we proceed in that fashion?  In other words,

15  we go through today the testimony with the

16  witnesses and the documents, and then we would

17  shortly after this hearing file a motion and,

18  obviously, we would make sure that we have merit to

19  the motion, we'd make sure that we are only seeking

20  to make confidential the exhibits and testimony we

21  believe truly are confidential and that would be

22  supported by case law.  Would that be acceptable?

23      THE COURT:  I think that's a procedure you can

24  follow.  I just don't know how I'm ultimately going

25  to rule on that.

1      MR. O'NEILL:  I understand that, Your Honor.

2    Understood.

3      THE COURT:  Mr. Johnson, you were trying --

4      MR. JOHNSON:  I was going to say, I agree,

5    Your Honor, I think under Rule 2.420(e)(1), we file

6    a motion to determine confidentiality of the

7    records.  We understand the Court is not

8    guaranteeing that you're going to make them

9    confidential.  We'll take that into account during

10   the proceedings today.  But I'm harkening back to

11   the Court's admonition that you want to spend as

12   little time on preliminary matters and as much time

13   as you could on evidence.  That I was listening so

14   I'm trying to streamline.  I think we can deal with

15   it during the course of the proceedings.  Rather

16   than having an academic discussion now, we can talk

17   about a substantive discussion as the issue arises.

18     THE COURT:  Understood.

19     Now, any other preliminary matters before we

20   go through Ms. Koff's explanation why none of this

21   is even going to matter?

22     MR. O'NEILL:  Nothing from us, Your Honor.

23     THE COURT:  Ms. Koff?

24     MS. KOFF:  Yes, Your Honor.  Can I?

25     THE COURT:  Sure.  Is it Koff; am I saying it

1  properly?

2     MS. KOFF:  Yes.  Yes.  I respond to a lot of

3  things, so that's fine.

4     Okay.  As you're aware, Your Honor, we are

5  here for contempt and to appoint a custodian under

6  a very specific statute over an ongoing private

7  corporation, two very extreme forms of relief.

8     As it relates to the contempt order or the

9  Motion for Contempt, rather, while normally you

10  would need evidence in order to make that

11  determination, they fail on the papers and they

12  fail as a matter of law.

13     They admit that the temporary injunction has

14  only four specific items that are prevented by it.

15  And I'm going to put them up here so we can very

16  quickly --

17     THE COURT:  When you say "very quickly" what

18  are we talking about because --

19     MS. KOFF:  Two minutes, Your Honor.

20     Because the contempt is -- the only things

21  that Mr. Logan and Smart Communications were

22  enjoined from doing was taking Janice causing rent,

23  taking her car, the generator project which is

24  finished, and keeping her salary.  She has not

25  alleged in her papers that any of that is not going

1  on.  Instead, she alleges a spirit violation that

2  Jon somehow violated the spirit of the injunction

3  relying on this language at the bottom, number

4  five, the very vague and general I retain

5  jurisdiction.

6      Case law is very clear that you cannot be held

7  in contempt of an order, of an injunction order,

8  unless it is specifically spelled out in that

9  injunction what the behavior that you were enjoined

10  from doing.

11      So we don't need evidence on this.  As a

12  matter of law on her papers, she admits that

13  neither of Jon Logan or Smart Communications

14  violated 1, 2, 3 or 4, and, instead, she's trying

15  to expand the order by claiming some sort of spirit

16  of this temporary injunction, which the case law

17  flatly does not allow.  So we do not need any

18  evidence on that point.  That's the first issue,

19  Your Honor.

20      The second regarding the Delaware, and I won't

21  walk through it until Your Honor is ready, but all

22  of the allegations relating to the Delaware

23  conversion, that's all done on publicly-filed

24  documents.  We have no objection to Your Honor

25  taking judicial notice of those.  We do not need

1   testimony or evidence.

2      Florida Statute applies directly and let's the

3   Court know why it does not amount to fraud under

4   the statute that Ms. Logan is moving under for a

5   custodian and irreparable injury.  So no evidence

6   is needed, but I will walk through that later in

7   the interest of time.

8      But here is the biggest one, Your Honor.  They

9   filed a reply late at night on Monday raising brand

10  new issues for the first time that are not in the

11  motion and are not in the response.  And in doing

12  so, not only do they reveal confidential settlement

13  discussions, which is highly improper and should be

14  stricken from the record, they also state in that

15  reply that they are still figuring out what these

16  documents mean, but they just assume that something

17  nefarious is going on.

18     In any event, Your Honor, it's in regards to

19  the IP.  And the IP has two parts:  Ownership and

20  licensing.

21     THE COURT:  You have gone more than two

22  minutes.

23     MS. KOFF:  I'm sorry, Your Honor, but I'm

24  going to get really fast to it.

25     There is no dispute over who owns the IP.

1   What they are raising is the licensing.  And I have

2   a proposal for Your Honor that would moot any

3   custodian.

4        We are willing to enter into an agreed order

5   that Smart Communications will not cause it to make

6   any payments on the licensing fee without a motion

7   to Your Honor first, and I believe that that moots

8   everything that they are raising here.  You won't

9   need evidence.

10       We are not trying to hide anything.  We are

11   not trying to do anything untoward.  The license --

12   You will hear all about it at the appropriate time.

13       But their complaint is that Mr. Logan may

14   cause Smart Communications to pay on this licensing

15   fee.  And what I'm willing to say is in an agreed

16   order, Smart Communications will not pay on that

17   licensing fee without the appropriate motion to

18   Your Honor first.

19       MR. O'NEILL:  I'm going to try to keep this to

20   less than a minute, Your Honor.

21       First of all, none of this has been brought to

22   our attention until just now and, respectfully,

23   with respect to the late reply brief, we received

24   the documents last Tuesday and we were trying to do

25   our best.

1      The TI motion, if Your Honor looks at the

2   finding, I believe it's on page 9, paragraph 4,

3   Judge Williams specifically said:  The Court finds

4   the company employs in excess of 100 employees.

5   The stabilization in maintaining the status quo of

6   the company and its employees until this matter is

7   ultimately resolved indicated the granting of this

8   temporary injunction would serve the public

9   interest.

10     So maintaining the status quo of the company

11  was a specific finding that Judge Williams did

12  enter.

13     On the Delaware filings, I'm not going to

14  address that in the interest of time.

15     I would just also note that on the agreed

16  order piece, respectfully, Your Honor, I believe

17  that there are other issues that stem from the

18  entire licensing agreement itself that go beyond

19  just the payments.

20     THE COURT:  All right.  Are you willing to

21  agree to the order that Ms. Koff is suggesting or

22  not?

23     MR. O'NEILL:  I'm not.

24     THE COURT:  Okay.  Then we need to proceed

25  today with the hearing.

1    MR. O'NEILL:  Your Honor, with Your Honor's

2  permission, I would like to give a five-minute

3  opening statement, but I'm happy to -- we can defer

4  that if Your Honor would like.

5    THE COURT:  Five minutes is fine.

6    MR. O'NEILL:  Understood.

7    Your Honor, Janice's Motion to Appoint a

8  Temporary Custodian and to hold Jon and Smart

9  Communications in contempt seeks to prevent the

10  complete destruction of Janice's 50 percent

11  ownership interest in Smart Communications and its

12  related entities while this case is pending.

13    As Your Honor knows, Judge Williams entered a

14  temporary injunction in July of this year and the

15  purpose of that was, as we just read, to preserve

16  the status quo.

17    Shortly after that Order, Jon and Smart

18  Communications restructured the company -- what you

19  will hear today -- and began the process of moving

20  assets out of the company without disclosing any of

21  that to Janice.

22    Your Honor, I do hate to admit this but we

23  literally are powerless without Your Honor's

24  intervention.  Janice has been completely frozen

25  out of the business since her late husband, Jim,

1  passed away.  She has no role.  There's been no

2  formal director meetings.  She's not a director.

3  She's not an officer.  She hasn't been allowed to

4  participate in any meaningful way in the business

5  whatsoever.

6      And as Your Honor knows, we have recently only

7  received books and records despite requesting those

8  back in January of this year.  Now we know why

9  based on the records that they produced so far,

10  that that was the case.  And it was so Janice could

11  not uncover that Jon is currently, while this case

12  is going on, attempting to move assets out of

13  companies that Janice owns and to companies that

14  Jon owns or at least purports to own and control

15  himself.  So, in other words, Your Honor, it is

16  classic textbook self-dealing.

17      I will quickly walk through just the key

18  pieces of evidence, and we are going to make our

19  presentation very short today to really focus and

20  drill down on the key pieces of evidence, but I

21  just want to preview them with Your Honor and then

22  I want to briefly discuss the relief we're seeking.

23      First and most significantly, the books and

24  records reveal that the company incurred a

25  liability of nearly $53 million in calendar year

1  2022.  That is on the books as a long-term note

2  payable.

3      In essence, that liability appears to stem

4  from the alleged overdue royalties for the products

5  that Smart Communications used and sold since 2015

6  that contained intellectual property which is owned

7  and held by a company called HLFIP.  That's an

8  entity that Jon purports to solely own and control.

9  So a $53 million liability owed to a company that

10  Jon solely owns and controls.

11      That long-term note payable first appears in

12  the company's audited financial statements in 2022,

13  which is the year Jim Logan died.

14      In addition to the long-term note payable,

15  though, the company is also incurring an additional

16  going forward liability that requires Smart

17  Communications to pay HLFIP 40 percent of all net

18  sales of products and services using the

19  intellectual property.

20      For Your Honor's reference, that's 1.5 just on

21  the books for this year, that is between $1.5- and

22  $2.2 million going out to HLFIP every month.

23  That's in addition to the $53 million note payable.

24      These transactions have not only eviscerated

25  the company's profit, but they took shareholder

1  equity from a positive 16 million at the end of

2  2021 to a negative 38 million by the end of the

3  2022.

4      And Jon never disclosed any of this note

5  payable, the royalty, the license agreement that

6  Your Honor will hear a lot about.  Jon never

7  disclosed any of that to Janice despite the fact

8  that he is, alone, the beneficiary of all of those

9  payments.

10      Now, second, Your Honor is going to hear a lot

11  about new entities, conversion of entities, whether

12  those were disclosed to Janice or not.  I promise

13  we're going to try to move through that relatively

14  quickly because there is not a huge dollars and

15  cents kind of movement there, but they are, we

16  believe, decisions that should have been disclosed

17  to Janice and Janice should have been a participant

18  in those discussions.

19      So in summary, Your Honor, we need you to step

20  in.  We are here asking for you to step in.

21  Pleading for you to step in.  Because, otherwise,

22  it's clear that Jon Logan will do whatever he can

23  to devalue Janice's ownership interest.

24      And that brings me to the relief we're

25  requesting.  The preferred relief will be for this

1   court to order a temporary custodian to restore the

2   parties and the company to the status --

3       THE COURT REPORTER:  Could you just slow down?

4       MR. O'NEILL:  I'm sorry about that.  I'm

5   trying to be judicious with my time.

6       THE COURT REPORTER:  Yeah.  I know that.

7       MR. O'NEILL:  -- to restore the parties in the

8   company to the status quo ante and prevent

9   self-dealing while this case is pending.

10       The law gives Your Honor broad discretion to

11   define the contours of the custodian's powers and

12   we would designate a proposed custodian by close of

13   business Friday with a proposed order.

14       I would just note here we are not asking --

15       THE COURT:  You are not prepared to tell me

16   who you're proposing?

17       MR. O'NEILL:  We have -- I have two candidates

18   in my in-box I could propose for Your Honor today.

19   We have interviewed them.  They have cleared

20   conflicts.  They do this exact kind of work; their

21   firm does this kind of work.  So we have done that

22   and I'm happy to propose this.  I would just need

23   to turn my phone back on and propose those names to

24   Your Honor and I can do that at some point today.

25       I would just note here also we are not asking

1  for Jon to be removed from his day-to-day job of

2  sales and marketing.  We just need his power to

3  make decisions on behalf of the company subject to

4  oversight by a custodian.

5       An alternative form of relief would be for the

6  Court to modify the prior injunction and order that

7  there can be no further self-dealing or devaluing

8  of Janice's interest while this case is pending.

9       Briefly, I know we need to discuss the issue

10  of a bond.  Our position is that the bond amount

11  sufficient would be an amount sufficient to cover

12  fees that they would incur appealing any ruling of

13  Your Honor.

14      At 75 -- We talked to our appellate counsel in

15  Miami, at 75 hours is what he recommended would be

16  a potential budget for this kind of case.  He said

17  that's probably overdoing it since they've already

18  briefed this issue in the appellate court.

19      But 75 hours at a $500 hourly rate would be

20  about 37 point $5,000 and that's the bond that we

21  would suggest that Your Honor require if Your Honor

22  enters the order that we are asking Your Honor to

23  do.

24      And just to explain that just one piece.  The

25  reason for that is because there's no harm to the

1  company if Your Honor enters the orders that we're

2  asking.

3      The company keeps its money, retains the money

4  in the accounts, and works to claw back.  We would

5  ask that Your Honor work with the custodian or the

6  custodian to work to claw back any amounts that

7  have already been paid under these licensing

8  agreements and, potentially, if there are any other

9  agreements that we're currently unaware of.

10     I'm going to stop there, Your Honor.  We need

11  your help and that's why we're here today.  Thank

12  you for your time.

13     MS. KOFF:  Your Honor, respectfully pleading

14  "we need your help" is not the standard.  The

15  standard that they have chosen to travel under here

16  today is Statute 607.0748.  And that is a very

17  specific statute.

18     It says:  You can only appoint a custodian

19  over a going corporation if there is -- excuse

20  me -- if there is fraud or irreparable injury.  And

21  there is neither here.  And that is why I say, Your

22  Honor, we don't need an evidentiary hearing.

23     THE COURT:  Is corporate waste an irreparable

24  injury?

25     MS. KOFF:  No, Your Honor, because the waste

1  they're discussing can be fixed monetarily and it

2  will all come out in the wash during the

3  evaluation, and that is why I offered to not cause

4  Smart to make any payments on that licensing fee

5  that they are complaining about without coming to

6  the Court on an appropriate motion first.

7      I would point out, Your Honor, that they have

8  not cited a single case in Florida, nor is there

9  any, or a single case from the 35 states that have

10  adopted this Model Corporations Act in support of

11  their motion.  Instead, they rely on the judicial

12  dissolution statute, which talks about the Court's

13  inherit authority.  Well, when you are in a

14  dissolved company, all you're doing is winding up

15  the affairs.  It's a completely different and lower

16  standard than when you have an ongoing corporation

17  like this.

18      I would also note that today, Mr. O'Neill

19  requesting his relief is different than the five

20  different types of relief that they request in

21  their motion and then again in their reply filed

22  Monday.

23      As it relates to their reply, it's -- it's

24  brand new issues that have never come before this

25  Court today, or are not properly before this Court.

1        The licensing agreement, Your Honor, the fee

2   that they're complaining about, that was put

3   together by outside experts Marcum, attorneys.  It

4   has a host of documents and witnesses that are

5   required to fully discuss that with Your Honor and

6   that's not before the Court.  None of that is

7   listed.  None of that's been shared in discovery

8   yet because we are still in Phase One talking only

9   about only the Shareholder Agreement.  It's

10  completely premature.

11       And that's why, Your Honor, the only thing

12  that they're complaining about here is that Smart

13  might make payments on that IP licensing agreement.

14  And that's why I offered to enter an order saying

15  that Smart would not make those payments without

16  coming to the Court first.

17       The other things that they complain about,

18  Your Honor, they have no standing to complain

19  about.  They're not asking you to appoint a

20  custodian over Smart because Mr. Logan caused Smart

21  to convert into Delaware entities.

22       They are asking you to appoint a custodian

23  over Smart Communications Holding, Inc., a

24  completely separate entity, because Loco Florida,

25  LLC and Smart Communications Yacht, LLC for which

1   Ms. Logan is not a member as a matter of Florida

2   law.  She holds only a transferable interest.  That

3   is what happened.

4       And as the holder of the transferable

5   interest, she is not entitled to engage in the

6   affairs of the entity.  It's built into the

7   statute, Your Honor.  She was not entitled to

8   notice about that conversion, nor say.  And it's

9   irrelevant because she was provided notice.  It's

10  pending in the Delaware court.  Her attorneys have

11  filed an unopposed motion to intervene in that --

12  in that location.  And that's what's happening,

13  Your Honor.

14      And that's why I say, we don't need any

15  evidence here, because they have to allege and

16  prove fraud and irreparable injury, and their fraud

17  that they're claiming here respectfully was not

18  corporate waste.

19      What they are claiming here is Mr. Logan

20  violated the spirit of the temporary injunction

21  order by doing these Delaware conversions and in

22  doing that, we need a custodian over Smart

23  Communications Holding.  That makes zero sense,

24  Your Honor, and that is not even close to fraud at

25  Smart Communications or irreparable injury.

1      Florida Statutes' very clear, by the way.

2   What they're complaining is that Mr. Logan somehow

3   caused Loco Florida's assets to be taken away from

4   Janice Logan and to be taken away from the

5   jurisdiction of this court.

6      And Florida law says very clearly when you

7   convert to a foreign entity -- which is allowed by

8   statute -- when you convert, the effective

9   conversion under 605.1046 is it's the same entity.

10  All the assets remain and all of it remains before

11  Your Honor.  So there is literally only a change in

12  form, not substance.  So that is not a fraud or

13  irreparable injury.

14      And, respectfully, Your Honor, there is zero

15  nexus between converting Loco Florida and Yacht

16  Holdings, LLC, which is not a party, by the way,

17  there is no nexus between that action and Smart

18  Communications Holding, Inc., which is a completely

19  different company.

20      Loco Florida merely owns the building that

21  Smart Communications is located in.  That's it.

22      And as a matter of Florida law, there is only

23  four ways to become a member of an LLC.  Ms. Logan

24  doesn't qualify.  There was no consent -- What

25  happened was Jim Logan assigned his shares to his

1  Trust and what the Florida Statutes say about that

2  is that when Mr. Logan passed away, 605.0602 sub 7

3  sub A --

4      THE COURT REPORTER:  Sorry.  Say that number

5  again.

6      MS. KOFF:  Sorry.

7      -- 605.0602, sub 7, sub A as in apple, Mr. Jim

8  Logan became a disassociated member at that time.

9      And what happens as a disassociated member,

10  his right to participate in the company terminates

11  and only his transferable interests remains.  These

12  are direct quotes from the statute.  I just put

13  them all on this demonstrative so that they are in

14  the same place.

15      Ms. Janice Logan is solely the holder of the

16  transferable interest of those LLCs.  And by law,

17  as a holder of that transferable interest, she

18  has -- and I quote -- no right to participate in

19  management or conduct of the company's activities

20  and affairs and no right to the books and records.

21      And that's what she's complaining about here.

22  She's complaining that in those two LLCs where she

23  holds solely a transferable interest, that Jon

24  Logan somehow committed a fraud by not telling her

25  that he was moving them to Delaware when he has no

1  obligation to tell her, and, oh, by the way, she

2  was informed and she's intervening in that lawsuit.

3      But that, again, not only is it not fraud,

4  it's not a fraud as it relates to Smart

5  Communications and it certainly does not move Loco,

6  Yachts or Smart Communications Holding, Inc.'s

7  assets away from this Court and that's what she's

8  complaining about.

9      THE COURT:  I'm assuming at some point you're

10  going to explain why we're changing corporate

11  structure?

12      MS. KOFF:  Your Honor, it's very simple and we

13  will explain that here if Your Honor wants to take

14  evidence, but it's a very fair question because

15  when you first hear it, I get it:  Alarm bells go

16  off.  What's happening?  But that's not the case at

17  all.

18      Lawyers have been involved every step of the

19  way.  What happened, unfortunately, was Jim Logan,

20  he was the finances and corporate structure; and

21  Jon Logan was the sales, the face of the company,

22  development of technology.

23      And when Jim Logan passed away, and the

24  lawyers and the CPAs and everyone's got in there

25  and said, "What's the state of affairs?" it just

1  became very clear that the state of affairs was

2  messy.  And that happens in family-run companies

3  and that happens in closely-held corporations.

4  It's not surprising, but this is no longer a

5  family-run company.

6      THE COURT:  Is there any problem until this

7  lawsuit's resolved that we don't proceed on

8  changing corporate structures?

9      I mean, I'm just -- as a -- what's the problem

10  of we just pause until this lawsuit's over?

11     MS. KOFF:  Can I have a moment?

12     THE COURT:  Sure.

13     MS. KOFF:  Your Honor, I think I can address

14  this and make this something that everybody can

15  live with, which is the corporate structure needed

16  to be done because Delaware law is, as we all know,

17  the home of corporations and it allows you to clean

18  up a structure that did not exist before.

19     But we're happy to enter any order, agree here

20  in open court, no assets are going to be moved.  No

21  assets have been moved.  There's been no changes to

22  the day to day.  The bank accounts are the same.

23  All the assets are in the same exact location.  And

24  that's really the concern here.

25     THE COURT:  Would it impact this Court's

1  power?

2     MS. KOFF:  Absolutely not.  And that is what

3  the case law says.  Delaware statutes are exactly

4  the same as Florida.  The effect on conversion,

5  Your Honor, is very clear.

6     THE COURT:  Would I lose the ability to issue

7  a receiver or a custodian for a Delaware entity?

8     MS. KOFF:  No, Your Honor.  The converted

9  entity is the same entity.  It says it right here.

10  Subsection -- paragraph 2, it's the same entity

11  without interruption.

12     All of the property of the converting entity

13  continues to be vested in it without transfer,

14  reversion or impairment.

15     It remains in front of Your Honor's

16  jurisdiction.  I retain that there is no need for a

17  custodian or receiver and that's a host of other

18  issues.

19     THE COURT:  I understand.

20     MS. KOFF:  It would not affect Your Honor's --

21  for the entities that are before Your Honor.  So I

22  want to be clear:  Some of these entities are not

23  parties and we do not believe Your Honor has any

24  power over them.

25     However, the Delaware conversion would not

1  effect Your Honor's jurisdiction, and that's what

2  we're saying as a matter of law:  It's all still

3  here.  There's been no change in substance; just

4  form.

5      THE COURT:  I tend to agree with the statement

6  that if an entity is not before me, I don't have

7  jurisdiction over it.  So unless the movant is

8  saying I somehow have jurisdiction over entities

9  that haven't been sued or not before me, I don't

10  think we need to address entities that are not

11  before me.

12      MR. O'NEILL:  We are not making that

13  assertion, Your Honor.

14      MS. KOFF:  Well, it's in their papers; that's

15  why I raised it.

16      So the only one before you, Your Honor, that's

17  at issue then is Loco Florida.  The only asset it

18  holds is located here.  It's the building that

19  Smart Communications works from.  The asset remains

20  in your jurisdiction.  We would not dispute that.

21      THE COURT:  Okay.  So, let me just restate

22  what I have heard and then, ultimately, I'm going

23  to ask, and maybe you all can spend three minutes

24  outside discussing this with your clients, what I'm

25  hearing is the entity, Smart Communications

1  Holdings Inc., is it Loco Florida, LLC -- or what

2  is it?

3      MS. KOFF:  Yes, Your Honor.  Loco Florida,

4  LLC.

5      THE COURT:  -- agree that even if they

6  continue with the conversion, that this Court would

7  retain full jurisdiction over all of the assets.  I

8  still would have the ability to issue, if it ever

9  become necessary, a receiver or custodian; that

10  the -- those entities would not make payments on

11  the --

12      MS. KOFF:  Licensing fee.

13      THE COURT:  And that's the --

14      MS. KOFF:  Smart Communications.

15      THE COURT:  -- 1.5 million to 2.2 million

16  monthly that --

17      MS. KOFF:  I don't know what the monthly is,

18  but, yes, and it's to HLFIP which is an entity that

19  holds the IP that Smart leases on top of it.

20      THE COURT:  And then there would be no new

21  incursion of obligations that are outside the

22  ordinary course?

23      MS. KOFF:  Without a proper motion to Your

24  Honor first.

25      THE COURT:  Without approval of the Court or

1   agreement of the other side.

2       So is that what I'm hearing from your side?

3       MS. KOFF:  Yes, Your Honor.

4       THE COURT:  Now, that it's been fleshed out

5   more, do you want to take a moment and see if that

6   is agreeable to your side?

7       MR. O'NEILL:  I can assure you, it's not

8   agreeable, and the reason in part lies in some of

9   the fine details that have been overlooked by the

10  presentation.

11      THE COURT:  Such as?

12      MR. O'NEILL:  There's an Asset Transfer

13  Agreement between Smart Communications Holding,

14  Incorporated and one of the new entities that they

15  just created in Delaware.

16      That Asset Transfer Agreement purports to

17  transfer all of the assets of Smart Communications

18  Holding, Inc. to a new Delaware entity and,

19  importantly, the operating agreement of the new

20  Delaware entity, just like the operating agreements

21  of Loco, Yacht Holding, et cetera, those operating

22  agreements allow Jon Logan to be the managing --

23  full discretion over the disposition of assets in

24  those entities' control, and, importantly, absolves

25  him of all breaches of fiduciary duties and

1   requires indemnity for that.  So there is a lot

2   more there.

3       THE COURT:  So, Ms. Koff, are we going to hear

4   during testimony that there has been an Asset

5   Purchase Agreement with --

6       MS. KOFF:  That's not accurate.

7       THE COURT:  -- your client?

8       MS. KOFF:  This is -- That is what it has

9   been.  Smart -- which is not this issue.  The LLCs

10  are a different issue.

11      Smart Communications Holding, Inc., the

12  Florida corporation, of course, cannot be converted

13  without agreement.  That's in our papers.  We know

14  that.  This was all done with lawyers, by the way.

15      Smart Communications Holding, LLC has been

16  opened in Delaware.  Smart Communications Holding,

17  Inc. has been placed as its fully-owned subsidiary.

18  The assets have not changed.  The ownership has not

19  changed.  Both parties in this room still own the

20  same exact amount of shares.  They still have the

21  same exact access.  The only difference being

22  allowing Delaware law to clean up the corporate

23  structure.

24      THE COURT:  Well --

25      MS. KOFF:  The assets remain for anyone.

1      THE COURT:  -- I don't understand what you

2   mean by Delaware law cleaning up the corporation.

3      And, ultimately, are you saying that no assets

4   are going to be transferred --

5      MS. KOFF:  The assets are being held by the

6   Delaware LLC.

7      THE COURT:  The Florida entities' assets are

8   no longer held by the Florida entity?

9      MS. KOFF:  The Florida --

10      THE COURT:  Is that what I'm hearing?

11      MR. O'NEILL:  That's correct.

12      MS. KOFF:  The Florida entity itself --

13      THE COURT:  I need a "yes" or "no".

14      MS. KOFF:  Yes.

15      The Florida entity itself is now being held by

16   the Delaware entity, but the assets remain in front

17   of Your Honor.  The ownership remains the same.

18      THE COURT:  No, no, no.  I'm asking a direct

19   question.

20      The entity that's in front of me, the Florida

21   entity, are its assets transferred at all?

22      MS. KOFF:  It --

23      THE COURT:  I'm seeing a nod from your

24   co-counsel.

25      MS. KOFF:  Yeah.  The --

1     THE COURT:  Okay.  So what you're telling me

2  is the assets, the entity that's in front of me has

3  been transferred?

4     MS. KOFF:  It has been transferred into the

5  LLC in Delaware, but Your Honor's jurisdiction over

6  them has not changed and no one's ownership over

7  them has changed.

8     The -- The assets --

9     THE COURT:  Okay.  You've taken the assets out

10  of an entity that is before me and put it in an

11  entity that's not before me in a different state;

12  is that what has happened?

13     MS. KOFF:  Yes, Your Honor.

14     THE COURT:  Why is that not the definition of

15  a corporate waste?

16     Look, I will tell you what I'm hearing right

17  now is a situation where unless you can explain it

18  better to me, than "Oh, we just let Delaware law

19  clean this up."

20     MS. KOFF:  There is a better explanation.

21     THE COURT:  There better be.

22     MS. KOFF:  There is, Your Honor, if I could

23  just have one moment.  Thank you.

24     THE COURT:  Please, make it quick.

25     And, Mr. O'Neill, while she's figuring this

1  out, power up your phone and give me the names of

2  the receivers that you're thinking of.

3      MR. O'NEILL:  I will.  Yes, Your Honor.

4      MS. KOFF:  Your Honor, I'm trying to answer

5  your question as directly as possible.  I don't

6  think it's as simple as that.

7      This is what happened.  Smart Communications

8  Delaware, LLC, Smart Communications Holding, Inc.,

9  which is the party here has transferred its assets

10  as a wholly-owned subsidiary of the Delaware LLC.

11  The Delaware L--

12      THE COURT:  Give me that to me one more time.

13      MS. KOFF:  Sure.

14      THE COURT:  The Florida entity, tell me the

15  specific name.

16      MS. KOFF:  The Florida entity is the party

17  here, which is Smart Communications Holding, Inc.

18  And the Delaware entity is Smart Communications

19  Holding, LLC.

20      Smart Communications Holding, Inc. is the sole

21  member of Smart Communications, LLC.

22      And that's why, Your Honor, although

23  technically assets were transferred there, the

24  ownership has remained the same, the assets

25  remained in front of Your Honor, and there has been

1    no other change.  The day-to-day has not changed.

2    The bank accounts have not changed.

3        The only change is that Smart Communications

4    Holding, Inc. is owned by Smart Communications

5    Holding, LLC.

6        THE COURT:  And is Smart Communications -- Who

7    owns Smart Communications --

8        MS. KOFF:  I'm sorry.  I apologize.

9        THE COURT:  -- Holdings (sic), LLC?  It's

10    100 percent --

11        MS. KOFF:  Owned by Smart Communications

12    Holding, Inc., which is the party we are talking

13    about here, which is owned 50/50 at this point by

14    --

15        THE COURT:  So the LLC, itself, is the

16    subsidiary to the Florida entity?

17        MS. KOFF:  I'm sorry.  It's the other way

18    around.  The --

19        THE COURT:  So -- so --

20        MS. KOFF:  The "Inc." is a subsidiary to the

21    LLC.  The Inc. is the sole member of the LLC.

22        THE COURT:  Holdings?

23        MS. KOFF:  So the party here --

24        THE COURT:  Time out.

25        The LLC, the new LLC in Delaware --

1      MS. KOFF:  Is owned by the party here:  Smart

2  Communications Holding, Inc.

3      THE COURT:  So the Delaware entity is a

4  100 percent wholly-owned subsidiary of Smart

5  Communications Inc., a Florida entity?

6      MS. KOFF:  Correct.

7      And that's why, Your Honor, the ownership of

8  Smart Communications Holding, Inc. has not changed

9  nor has the assets, nor are they outside of Your

10  Honor's jurisdiction.  That was never the

11  intention.

12      THE COURT:  Well, but, unfortunately, Florida

13  law says that assets of a subsidiary are not the

14  assets of the parent.

15      And what I'm hearing is you took all of the

16  assets of the parent and put it in a subsidiary.

17      MS. KOFF:  Yes, Your Honor.

18      THE COURT:  That's what I'm hearing.

19      MS. KOFF:  Yes, Your Honor.

20      THE COURT:  And what is the explanation, the

21  specific explanation as to why that was needed to

22  be done in the middle of this lawsuit?

23      MS. KOFF:  The explanation, Your Honor, and

24  this -- the explanation is that Delaware counsel

25  and corporate counsel was not the counsel that is

1  parties to this litigation, advised Smart

2  Communications to clean up their corporate

3  structure across the board to put it into this

4  Delaware formation to -- for tax purposes and for

5  all of those items.

6      Nowhere in that advice was the intention to

7  remove assets from this jurisdiction and we don't

8  believe that they did and, certainly, that's no

9  one's intention.  And perhaps we can draft an order

10  that addresses that.

11      MR. O'NEILL:  Your Honor, may I be heard

12  briefly on just one point that's important and,

13  again, getting overlooked.

14      I think Your Honor has pretty much everything

15  Your Honor needs, but I think the important point

16  here also, in addition to the fact that the

17  subsidiary's assets are not necessarily the

18  parents, because they have been transferred

19  pursuant to an agreement, the operating agreement

20  of the new Delaware LLC gives Jon complete control

21  over disposition of the assets and, essentially,

22  prevents -- absolves him of any breaches of

23  fiduciary duty in connection with the disposition

24  of those assets.  That is the critical fraud among

25  other things that we were going to demonstrate

1  today.

2     And for Your Honor's reference, by the way, --

3     THE COURT:  Didn't he have the ability as the

4  --

5     MS. KOFF:  President and CEO.

6     THE COURT:  -- president and CEO to dispose of

7  the assets of the Florida entity?

8     MR. O'NEILL:  Yes, Your Honor, but there was

9  no agreement that absolved him of breaches of

10  fiduciary duty, which is why we are actually able

11  to at least assert claims in this case.

12     So we believe that there is an extra layer of,

13  you know, sort of an issue insofar as we have to

14  come into court.  I'm not even sure -- This entity

15  is not before Your Honor as Your Honor's

16  recognized, so we would have to go to Delaware and

17  then we would have to make a claim that that entire

18  structure was fraud in order to get those

19  exculpatory provisions invalidated.

20     THE COURT:  Okay.  Look, I've gotten some

21  statements of fact.  I haven't taken evidence.

22     MR. O'NEILL:  Understood.

23     THE COURT:  We can do a couple things.

24     I can give the parties some preliminary

25  thoughts based on what I have heard; I can shut up

1  and take evidence and we will go from there; or the

2  parties can come to some sort of agreement in the

3  next couple minutes.  So why don't you take two --

4    MS. KOFF:  We would like your preliminary

5  thoughts.

6    THE COURT:  I'm sorry?

7    MS. KOFF:  We would like your preliminary

8  thoughts.

9    MR. O'NEILL:  Realistically, Your Honor, as

10  long as Jon Logan is in charge of this company, we

11  have serious doubts.

12    THE COURT:  Do you want preliminary thoughts?

13    MR. O'NEILL:  Preliminary thoughts.

14  Preliminary thoughts.

15    THE COURT:  Okay.  It looks bad.  I'm not

16  saying it is bad.

17    It looks bad that the Florida entity conveyed

18  all of its assets to an entity that's not before

19  me.

20    Yes, I understand the Delaware entity to be a

21  subsidiary of the Florida entity, but Florida law

22  doesn't -- or recognizes a difference in corporate

23  formalities.

24    There might very well be a legitimate business

25  purpose to do this and there might be a need to do

1  it sooner as opposed to later.

2       I can also see at the same time a fundamental

3  attempt to circumvent this Court's jurisdiction, to

4  undermine the claims of folks on that side of the

5  room, and if, ultimately, I think that is the case,

6  I probably would be in a situation of appointing

7  either a custodian or a receiver to investigate and

8  see what we can do to unwind the actions and to

9  file lawsuits against those who perpetrated the

10  taking of the assets out of my jurisdiction.

11       Again, though, there could be a very business

12  necessity to do this.  So I won't know the answer

13  to that until we focus in on it.

14       Whether we do it under the guise of a

15  temporary injunction or under the guise of a

16  607.0748 action, it's probably easier to do it

17  under the 0748 action because we've got that, I

18  think, T'd up here today.

19       I don't want to be running a company.  And so

20  if, ultimately, I were to appoint a receiver slash

21  custodian, whatever it would ultimately be, it

22  would be for a limited time to try to get us over

23  the hump of this lawsuit and come to some sort of

24  resolution between the parties.

25       But, again, it looks bad.

1     It smells bad to take an action that appears

2   to be directly designed to undercut the Court's

3   authority over this entity.

4     MR. BARNETT:  Your Honor, if I may?

5     THE COURT:  I forgot your name, sir.

6     MR. BARNETT:  Craig Barnett.

7     And I don't mean -- this is not -- this is

8   perhaps to get to where it sounds like you would

9   like to go.

10    THE COURT:  I don't know where I want to go.

11  I mean, I'm just giving you my thoughts as to what

12  I would be looking for if we proceed with an

13  evidentiary hearing.

14    MR. BARNETT:  Well, we've already addressed

15  the issue -- Ms. Koff did -- of the not paying the

16  license fees absent a court order.

17    Mr. Logan is in front of this Court.  He is

18  subject to this Court's jurisdiction.  He would

19  agree, again, to a limited order that says that he

20  would not cause the assets that were transferred by

21  Inc. to its subsidiary, LLC, without order of the

22  Court.

23    Again, everything we've done has always been

24  completely transparent and not -- nothing done is

25  designed to deprive this Court of jurisdiction.

1    That would cover both your issues.

2        The issue of waste that they claim which is we

3    have this liability that we have to pay for on

4    these license fees, we've said we will come to you

5    before that's done.

6        Mr. Logan now has somebody who is a party

7    before this Court.  Has willingly made the

8    representation he will not cause any of the assets

9    that have been transferred from Inc. to LLC to be

10    transferred without order of the Court.

11        THE COURT:  Why can't we put the assets that

12    were put into the Delaware entity back into the

13    parent which is before me and let you all finish

14    this case before you all change whatever structures

15    as necessary?

16        MR. BARNETT:  Candidly, Your Honor, that, I

17    was not -- neither one of us was involved in the

18    Delaware -- the assignment from Inc. to its

19    subsidiary.  I don't know if they can just be put

20    back.  That I would candidly ask if we could do

21    some sort of further briefing on its feasibility.

22        Obviously, we have gone way outside of what

23    was raised in their motion.  And I just simply

24    don't want to represent to the Court something like

25    'Oh, sure, let's just move it back' if there's

1   something more complicated.

2       THE COURT:  I know Mr. Logan has got his hand

3   up, and what I'm ultimately going to do, Mr. Logan,

4   is give you all a couple minutes to talk so that

5   you're not saying something that might hurt your

6   case; that you run it by your lawyer.  That's the

7   reason why I'm not calling on you right now.

8       So, ultimately, if I were to find -- and this

9   is -- I qualify it with the "if" because, I don't

10  know, like I said, there might be a good business

11  reason to do what was done.  But my ultimate goal

12  at the end of -- if there wasn't, would be to

13  unwind and to return us to where you all were, if I

14  needed to temporarily run the company through a

15  receiver or custodian, until your'alls disagreement

16  can be adjudicated or resolved.

17      You know, at the end of the day, my goal is

18  not to be a running of a company long-term.  I

19  don't care what your business is or what it is so

20  long as it's legal, you know.  That's not my place.

21      What is my place is I have got a claim that

22  might be frustrated and a corporation that might,

23  otherwise, that might be found responsible not able

24  to pay or somehow no longer be able to operate like

25  it was because of the actions taken to do what was

1  done.

2      So at the end of the day, I'm looking for

3  status quo.  And when I say "status quo" I'm not

4  meaning status quo in Delaware; I'm meaning status

5  quo in Florida prior to.

6      So why don't we take five minutes?  I'll come

7  back in five minutes.  Each side talk to your

8  parties as to what you want to do and maybe the

9  lawyers can briefly talk to see if there's some

10  sort of agreement that can be reached today.

11      MS. KOFF:  Thank you.

12      THE COURT:  Otherwise, we'll need to start

13  calling witnesses and evidence.

14      MR. O'NEILL:  Thank you, Your Honor.  Would

15  we, by chance, be able to use the witness rooms?

16      THE COURT:  Yeah, if they're open.  I don't

17  know if they're locked or unlocked.

18      MR. O'NEILL:  Okay.  Sounds good.  Thank you,

19  Your Honor.

20      THE COURT:  I'll be back in five minutes.

21      THE BAILIFF:  All rise.  Court is in recess.

22      (A break was taken at 3:52 p.m. and the

23  following commenced at 4:02 p.m.)

24      THE BAILIFF:  All rise.

25      THE COURT:  Please be seated.

1      Have you all had a chance to talk with your

2   clients and figure out how you want to proceed?

3      MR. BARNETT:  Your Honor, if I may, to address

4   the issue that you raised --

5      THE COURT REPORTER:  Could you come up to the

6   podium?

7      MR. BARNETT:  I sure can.  I apologize.

8      THE COURT REPORTER:  Thank you.

9      MR. BARNETT:  I think this is the solution.

10  You have got a wholly-owned subsidiary that was --

11  that is in Delaware.  The assets that had been

12  formally in Inc., that were then transferred to the

13  LLC.  The reason for that was to clean up the

14  various buckets in which these assets were.

15      It was -- The problem is none of the

16  documentation when Mr. -- when Jim Logan was the

17  CFO was in proper order.

18      So what they did is they said, okay, we're

19  going -- from this point forward, we're going to

20  clean it up and we're going to have the assets in

21  this LLC, so that the book -- so that its records

22  are clear from the inception.  There's no effect

23  because the entity Inc. is before this court.

24      This court certainly has the power.  And this

25  would be sort of the three-part suggestion that we

1  have is part one is that Smart Communications as

2  100 percent owner of the LLC, which Smart Inc.

3  being subject to the Court's jurisdiction shall

4  take no action to permit its subsidiary to move any

5  transferred assets without further court order.

6      Mr. Logan, who is the only officer of Smart

7  Inc. and the officer of the LLC who is also, again,

8  subject to this Court's jurisdiction is willing to

9  agree not to transfer any of the assets that had

10  been transferred to LLC, again, without a court

11  order.  And then that on the issue they raised of

12  the licensing fee that Smart Inc., again, before

13  this court, won't pay any of the fees on the

14  license absent court order.  That allows us,

15  candidly, to have this issue put before the court

16  properly.

17      Because if we start from the motion that was

18  filed to what we have been talking about today, if

19  we confine what we are going to do only to the

20  motion, none of this was part of it.  This is all

21  brand new.

22      Some of it was raised in various forms in the

23  replies served only two days ago.  The reason --

24  and it's why we're very careful not to say, Oh,

25  we're going to do something that can't be done

1  because we haven't had an opportunity.

2      You posed the question:  Can you put these

3  back?  And the answer is:  We don't know if they

4  can be put back.

5      But what we can do and what should give then

6  the comfort they need and, certainly, the Court the

7  comfort, is that the entity Inc. which wholly owns

8  the LLC will not take any action, and that

9  Mr. Logan also before this court won't take any

10  action.

11      THE COURT:  Well, let me -- let me say a

12  couple things.

13      I mean, my understanding, I don't know if this

14  is true, but that the folks on that side of the

15  room are not getting any sort of books and records

16  of the entity that was in front of me for a long

17  time and that just occurred over the last week or

18  so.

19      And so, I would imagine if they had just

20  gotten books and records and they are starting to

21  learn about some of these things, that, yeah, their

22  position's going to change because they have been

23  not in the sunshine, if you will, relative to

24  what's been going on with the company.

25      Now, what if the Delaware entity is made a

1  party here, made part of an order slash injunction

2  slash whatever you want to call it, that basically

3  what you just said, make the Delaware entity the

4  subsidiary party here and subject to the Court's

5  order and then let that side of the room have

6  whatever access to the books and records that they

7  otherwise would have from the Florida entity.

8      I'm not saying that they would have a greater

9  books-and-records-access, but whatever

10  books-and-records access they would have in

11  Florida, that they would have a mirror image of the

12  books and records of the Delaware entity, so that

13  the effect of this change is not so pronounced

14  until we can figure out what's going on with the

15  lawsuit.

16      MR. BARNETT:  Your Honor, I think, in fact,

17  just to be clear on this, that there's been a

18  shortcut of a bunch of things because we've talked

19  about all these assets being in Inc.

20      The reality is there are already subsidiaries.

21  There's one called Collier.  I forget what the

22  other one is.

23      MS. KOFF:  Pasco.

24      MR. BARNETT:  Pasco.  So there are.  And, in

25  fact, when we made the books and records

1  production -- and I'll be very clear, we're almost

2  as new to this dance as you are.  So -- And we

3  appreciated your comments at the last hearing that

4  we're moving forward, the books and records have

5  been turned over.  In fact, we turned over the

6  books and records of the subsidiary entity --

7  subsidiary entities:  Collier, Pasco and the other

8  one, as part of it.

9      So we would not have a problem saying that --

10  that the LLC -- that Smart Communications Holding,

11  LLC, agrees to be subject to this Court's

12  jurisdiction.

13      THE COURT:  You would or would not?

14      MR. BARNETT:  Would not.

15      THE COURT:  Would not agree?

16      MS. KOFF:  We agree to it.

17      MR. BARNETT:  We would not object to that.

18      THE COURT:  Okay.

19      MR. BARNETT:  We agree to it.

20      THE COURT:  Let me ask this:  Is the ultimate

21  trajectory of this case some sort of valuation so

22  that we -- the parties can separate and go about

23  their merry ways?

24      MR. BARNETT:  Exactly.

25      And, Your Honor, and here's -- this is the

1  part as to why this was more, as Ms. Koff said,

2  more form than substance, because the asset -- the

3  assets here -- and just so that it's clear, the

4  assets are a bunch of contracts.  Contracts with

5  various --

6      MS. KOFF:  Government agencies, correctional

7  facilities.

8      MR. BARNETT:  -- correctional facilities to

9  provide various services.

10      So it's not like there are a lot of physical

11  assets.  There are these contract rights.

12      All of those still exist and they all roll up

13  into the same value.  So the valuation on Inc.

14  includes what its -- a split of the value of its

15  wholly-owned subsidiary.  So there hasn't been

16  something put outside of the Court.

17      And what we're suggesting is we've agreed not

18  to put any of the assets that were moved into LLC

19  out; we would agree to have LLC subject to the

20  Court's jurisdiction for purposes of further

21  orders, if need be; and that -- that that covers

22  both Smart Inc. being bound, Mr. Logan being bound,

23  and LLC being bound.

24      Nothing's been moved.

25      And as you point out, if the ultimate

1  valuation is -- if an asset, if it's A and its subs

2  are B, C and D, if something moves from A to B, the

3  total value hasn't changed.  It's still on the --

4  in the same spot.

5      THE COURT:  Mr. O'Neill.

6      MR. O'NEILL:  So, okay.  So there is a lot

7  here, Your Honor, and I'll try to be quick.

8      First of all -- Let me move up to the podium.

9      -- Mr. Barnett began his presentation saying

10  that from this point forward -- the lawyers got

11  involved and from this point forward they're going

12  to clean up the books.  Why was this point August

13  and September of this year?  Okay?  As a factual

14  point, it raises serious doubt about the motive for

15  the restructuring.

16      THE COURT:  And that's something you can

17  figure out and discover.

18      MR. O'NEILL:  Absolutely.  Understood.

19      I have to clean up something I said earlier,

20  which was that Jon had -- I think I said Jon had

21  the power to move all the assets out of Inc. into

22  the LLC.  We actually don't believe that that's

23  accurate under Florida law.  So I don't know that

24  that is an accurate statement of Florida law given

25  Janice's position.  So I just have to clean that up

1   for the record.

2        THE COURT:  Be that as it may, it goes to

3   the -- what I'm hearing from this side of the room

4   now is they're agreeing to bring in the entity that

5   received the assets, put it to the Court's

6   jurisdiction, and -- my words, not Mr. Barnett's

7   and Ms. Koff's words -- that basically the status

8   quo is going to prevail, that there's not going to

9   be any sort of extraordinary actions that's going

10  to be subject to a court order or preventing that.

11  And so that would seem to, at least in my mind,

12  address what you're seeking to give us time for you

13  all to figure out whether it's valuation or breach

14  of fiduciary duty, whatever your claims ultimately

15  are.

16       MR. O'NEILL:  Sure.

17       THE COURT:  That it gives everybody breathing

18  space and it keeps the entities moving forward in

19  their normal business.

20       MR. O'NEILL:  Your Honor, respectfully -- and

21  I don't mean to bring up factual issues -- but we

22  thought we had breathing space after the July

23  temporary injunction hearing and then all this

24  happened.  And, I mean, that with all due respect,

25  Your Honor.  I'm not trying to play cute with

1  things, but we are in a position now where

2  breathing space is dangerous to our client.  It has

3  been proven to be dangerous to our client.  We were

4  here today to offer proof that it has devalued her

5  interest.

6      Again, the point I brought up, 16 million

7  positive equity down to negative 38 million.  I

8  don't mean to be an alarmist, but this is a serious

9  situation of siphoning of corporate assets.  And I

10  would love to work out something with the other

11  side, but nothing short of having an adult in the

12  room to oversee decisions is going to suffice.

13      And let me just raise one point:  Janice has

14  to file Jim Logan's estate tax return.  She already

15  got an extension.  She can't get it extended

16  anymore.  They knew this.  This is why we, in part,

17  requested the books and records.

18      She has to file the estate tax return now

19  based on books and records that have these massive

20  transactions that were never disclosed to her, that

21  we believe are wrongful, unlawful, et cetera.  So

22  we need an unwinding of the -- preserving the

23  status quo as it exists today is not sufficient.

24  Preserving the status quo ante before this lawsuit

25  began would be sufficient and that requires an

1  unwinding of all of this.  And I apologize for the

2  complexity of this, but it's not our fault.

3      THE COURT:  I understand that.  But at the end

4  of the day, let's say we go to an evidentiary

5  hearing and you're right and I appoint a receiver

6  slash custodian, I'm still going to have to ask the

7  receiver slash custodian to evaluate whether to do

8  the unwinding because there might be tax

9  implications that harm the ultimate value to all of

10  the shareholders if the action is unwound.

11      That's why I'm just wondering if -- and I know

12  you don't have faith given what you thought you had

13  with Judge Williams' order, and I know you feel

14  like you're stung on it, but if the entity to which

15  the asset was transferred into becomes part of my

16  jurisdiction, and you have access to the books and

17  records just the same as you would have with the

18  entity that's currently in front of me, isn't that

19  about as best as you're going to be able to get as

20  part of this other than just the actual receiver

21  appointed?

22      MR. O'NEILL:  So a couple points.  One is

23  HLFIP, they have not offered to have HLFIP come

24  before Your Honor.  That entity would need to be

25  included --

1      THE COURT:  But I heard at this moment that

2   they are not going to make payments to the entity

3   on a going forward basis and you still have a

4   possible fraudulent transfer claim if, in fact,

5   that is wrongful transfers.

6      MR. O'NEILL:  Sure, Your Honor.  These are

7   exactly the kinds of issues that Your Honor is

8   bringing up.  Exactly the kinds of issues that we

9   need a custodian to figure out so that Your Honor

10  is not managing the business, Jon Logan is not

11  managing the business and, frankly, we're not

12  managing the business.

13      It should be an independent party to come in,

14  and as Your Honor said, file lawsuits to the extent

15  necessary to claw back assets if they have been

16  transferred.

17      File lawsuits to invalidate agreements that

18  were -- that were entered into and --

19      THE COURT:  Well, let me ask this, because at

20  the end of the day -- I don't know if by asking

21  this you're going to have to disclose and if you

22  have to disclose your client's position, then

23  don't.

24      MR. O'NEILL:  Sure.

25      THE COURT:  But if the ultimate goal here is

1  to get a valuation and a payment of money for the

2  shares that your clients have instead of they

3  taking over and running the business, why would I

4  need the custodian if you ultimately are going to

5  get the access to all the financial information?

6      You know, the last few of these shareholder

7  divorces that have occurred and the hearings that I

8  have had, the reality is all these claims against

9  the individuals, they get priced out in the

10  valuation proceeding, and, ultimately, get valued

11  and then they get paid out as far as the, Okay,

12  this is what you are going to pay for shares, LLC,

13  interest, whatever it happens to be.

14    MR. O'NEILL:  So my first answer would be that

15  the valuation of the company is directly impacted

16  by the transactions.  That they're not agreeing to

17  unwind; they're just essentially agreeing to stay

18  and then provide us access to financials and then

19  make themselves a party to the case.  That's very

20  different.

21     Agreeing to stay performance of these

22  agreements and obligations created thereunder,

23  which, by the way, are now legal obligations the

24  company has to adhere to; right?  He entered into

25  the transactions on behalf of the other -- you

1  know, self-dealing transaction, I'm not going to go

2  into it.

3      THE COURT:  Let me ask this, because I

4  think -- don't quote me if I'm -- I think on the

5  valuation date, there is a provision of the statute

6  that says I can choose a valuation date if it's --

7  you know, there's a date of valuation that the

8  statute provides or some other date selected by the

9  Court.

10      So why couldn't we just select the date before

11  the movement of the Asset Purchase Agreement and

12  wouldn't that resolve the issue?

13      MR. O'NEILL:  I don't believe it would

14  because, again, he's created legally-binding

15  obligations on behalf of the company that need to

16  be unwound, Your Honor.

17      THE COURT:  But if we valuated the day before

18  those obligations were incurred.  So let's --

19      MR. O'NEILL:  Yeah, go ahead.

20      THE COURT:  Let's say October 1st was the date

21  which the Asset Purchase Agreement was signed;

22  okay?  So assume it's October 1st.

23      MR. O'NEILL:  Okay.

24      THE COURT:  What if we valued it

25  September 30th?

1    MR. O'NEILL:  So we could do that.  I suppose

2   that's one option.

3    I just don't know that I'm ready to commit to

4   the idea that, like, the whole purpose of this is

5   just to get a valuation and then go home.

6    There has been significant wrongdoing, Your

7   Honor, in my client's view and I believe we have

8   irrefutable evidence to put that case on, and I

9   don't know that a valuation walk-home is exactly

10  what my client wants to do if she believes that

11  it's not in her best interest.

12    And I also -- and, candidly, Your Honor, I'm

13  just trying to be respectful of Your Honor, I have

14  not done the legal research necessary to know if

15  what Your Honor is proposing to me is something I

16  can agree to on behalf of my client today.  I

17  apologize for that, but I was not prepared for it.

18    THE COURT:  Because what I'm hearing is,

19  essentially, this side of the room is pretty much

20  agreeing to everything that would be an injunction

21  with exception of the appointment of a receiver

22  slash custodian.  And in my mind, one, that's a

23  pretty good deal, especially if it buys us a little

24  bit of time, gives you a chance to look through the

25  records, gives you a chance to start doing the

1  analysis.  It doesn't preclude you from having a

2  more principled formal argument later with a motion

3  that is directed to the specific thing that you

4  think is deficient in whatever this agreement is.

5      Because, I mean, why am I going to have this

6  hearing if basically they are agreeing to

7  everything except for the appointment of the

8  receiver, the custodian, and it sounds at least to

9  me right this second that you're getting protection

10  in the short-term to give us some breathing space?

11      MR. O'NEILL:  But we're not getting a

12  restoration of the status quo.

13      What we are getting is assets have been moved

14  to entities, agreements have been made, I get that;

15  right?  But we are not getting the reversal of

16  those and I think that negatively impacts the value

17  of the company.  It negatively impacts our client's

18  interests.  And, respectfully, Your Honor, the

19  purpose of the custodian would be to come in and

20  restore the status quo ante.

21      This is -- Unfortunately, what has happened is

22  that they moved the status quo now to a point

23  where -- it's hard to go into that without showing

24  Your Honor the financials.

25      THE COURT:  Assume I appoint a receiver slash

1  custodian.

2      MR. O'NEILL:  Yes.

3      THE COURT:  My instruction to the receiver

4  slash custodian is not to be 'immediately go unwind

5  this transaction'.  It's going to be analyze --

6      MR. O'NEILL:  Sure.

7      THE COURT:  -- whether it's in the entity's

8  best interest to unwind --

9      MR. O'NEILL:  Yep.

10      THE COURT:  -- the transaction.

11      MR. O'NEILL:  Yep.  Absolutely.

12      THE COURT:  That's going to take a little bit

13  of time --

14      MR. O'NEILL:  And we understand.

15      THE COURT:  -- to review books and records.

16      It seems to me that the same books and records

17  that you are now going to have access to that you

18  and your experts are going to be able to evaluate

19  as far as your progression of this case, and if in

20  your evaluation, you come to the conclusion that

21  there is so much more harm that is being done even

22  with the status quo as it exists today, if you

23  will --

24      MR. O'NEILL:  Yeah.

25      THE COURT:  -- I don't see why that would

1  preclude us from having another hearing where you

2  can try to make that argument.

3     Because the best you are going to get today is

4  an appointment of a receiver with me telling the

5  receiver to analyze it and then come and report

6  back to me.

7     MR. O'NEILL:  That is preferable than the

8  scenario that they are proposing to our side.  And

9  the reason for that, Your Honor, is because,

10  fundamentally, we do not trust Jon Logan to run the

11  company and, frankly, even provide the information.

12     THE COURT:  And the benefit of doing it this

13  way as opposed to the way you're wanting to do it

14  is I'm not running into the case law that tells me

15  that I shouldn't be running companies for an

16  indefinite period of time.  And so this way, I

17  mean -- I think maybe what we should do is come to

18  this agreement with the understanding and agreement

19  that it's not going to preclude Mr. O'Neill from

20  once he's had a chance to look at the books and

21  records, had a chance to analyze the overarching

22  consideration to filing a fresh motion with

23  specifics that we can then have a principled

24  evidentiary hearing on it.

25     MR. BARNETT:  Absolutely, Your Honor.  And I

1  don't mean to cut you off.

2      And we would agree and we think that that

3  actually cuts both ways because it should be to the

4  extent that there is a later need to have somebody

5  come in to look at issues of, quote, corporate

6  waste.

7      They made a lot of allegations none of which

8  are substantiated, actually none of which are true,

9  but what we do know is true is that Ms. Logan gets

10  a salary for doing nothing.  She gets a house, use

11  of a house for which she pays no rent.

12      THE COURT:  Well, that's something Judge

13  Williams has already said; right?

14      MR. BARNETT:  Well, that -- and we're not --

15  we're not disturbing that injunction.

16      What we're saying is we would have the same

17  right in that instance to bring the issue properly

18  before the Court.  We're not -- We won't -- We're

19  not kicking her out of her house.  We are not

20  cutting off her salary that she gets for doing

21  nothing.

22      But if it was to be raised just as the Court

23  could revisit -- even if it wasn't Judge Williams,

24  the Court can always revisit the temporary

25  injunction.  So that doesn't change anything.

1      And it would give -- what we're suggesting is

2   the confines that we've proposed give this Court

3   comfort that nothing is going to happen to change

4   what is on the value of the Smart Communications'

5   family of entities without your permission and

6   that, I think, is appropriate.

7      The further issue that we have to be concerned

8   about, and it is something, a factor to look at in

9   terms of receivership, is the fact that of a

10  receivership, these are government contracts.  One

11  of the events of default under these various

12  government contracts -- and they'll correct me if

13  I'm wrong -- one of the events of default is if a

14  receiver is appointed for the entity.  So what we

15  --

16     MR. O'NEILL:  That's in one contract that they

17  produced.

18     THE COURT:  Well --

19     MR. BARNETT:  Okay.  So his comment is, yes,

20  it will only kill one contract.  We believe it will

21  kill others, but it will only kill one.  He

22  acknowledges --

23     THE COURT:  Time out.

24     The existence of the contract is what gives

25  value to whatever entity holds the contract; right?

1      MR. BARNETT:  Yes.

2      MR. O'NEILL:  Yes, Your Honor.

3      MR. BARNETT:  Continued perpetuation of the

4   contract.

5      MR. O'NEILL:  The company also had value

6   before.  50-some million in liabilities was put on

7   its books.  1.5, 2 million is being siphoned out

8   every month.  These are serious --

9      And I was going to actually ask, can we defer

10  to Mr. Johnson?

11     THE COURT:  I want to defer to Mr. Johnson as

12  to how he thinks we should proceed because I know

13  he has a lot of experience in these cases.

14     MR. JOHNSON:  May I have just a moment to

15  confer?

16     THE COURT:  Yes.

17     MR. BARNETT:  And just to clarify --

18     THE COURT:  They're chatting.  So why don't

19  you hold on one second.

20     MR. O'NEILL:  Your Honor, may we have a moment

21  to confer with my client just to make sure -- we

22  obviously haven't had a chance to confer with her

23  about what specifically we might be addressing with

24  Mr. Johnson?  It would take us three minutes.

25     THE COURT:  Yes.  Yeah.  That's fine.

1     Just as FYI, my Judicial Assistant is going to

2   be leaving soon and if I need to find quick hearing

3   time, I want to make sure I have that ability.  So

4   that's the time issue I have.

5     MR. JOHNSON:  I think we can talk in the back

6   of the courtroom without a full recess.

7     THE COURT:  That's fine.

8     (Pause.)

9     THE COURT:  Mr. Johnson.

10    MR. JOHNSON:  Is it okay if Mr. O'Neill joins

11  me?

12    THE COURT:  Sure.

13    MR. O'NEILL:  I promise I won't interrupt.

14    MR. JOHNSON:  Your Honor, I was trying to make

15  a list following on the comments by Your Honor and

16  both of the counsel, and for discussion purposes, I

17  will propose the following:

18    Number one, that Jonathan Logan -- and I

19  apologize for not using a surname but it's getting

20  confusing with Jon Logan and Jim Logan, so I won't

21  call him Mr. Logan.

22    THE COURT:  That's fine.

23    MR. JOHNSON:  That Jon Logan disclose all

24  actions, agreements or transactions associated with

25  the, quote, clean-up, quote, that was described

1   here today.  That's number one.

2      Number two:  That Jon Logan disclose all

3   transactions outside the ordinary course of

4   business since the filing of this lawsuit, meaning,

5   specifically, the lower case number.

6      Number three:  That Jon Logan identify and

7   describe any consequences associated with unwinding

8   the clean-up transactions or any other

9   transactions; in other words, if there is a tax

10   consequence -- the reason I wrote this down is Your

11   Honor's comment -- the reason why he can't do it or

12   why he shouldn't do it, Jon Logan should describe

13   that so we understand where it is.

14      Number four:  And I'm going to state this

15   delicately, I would request that the Court very

16   carefully make a record to confirm that the LLC is

17   a party to this lawsuit and that the Clerk be

18   directed to add the LLC.

19      So if Mr. -- And excuse me.  Thank you.

20      So the LLC, meaning I believe it's Smart

21   Communications Holding, LLC, and also HLFIP, LLC,

22   be made parties.  And that Mr. Barnett -- either

23   the Court can ask Mr. Logan if it's okay -- again,

24   it's your courtroom, you make the rules, I don't,

25   but I want to make sure that somebody doesn't come

1  back and say Mr. Barnett didn't have the authority

2  while standing at this podium to subject a

3  non-party to the jurisdiction of this court.

4      THE COURT:  Let me ask some clarifications of

5  your -- because it's my understanding that that H-L

6  whatever is not an entity that your and Mr.

7  O'Neill's clients have any interest in.

8      MR. O'NEILL:  We dispute that.  It's an IP

9  ownership issue.

10      THE COURT:  I'm sorry?

11      MR. O'NEILL:  It's an IP ownership issue.

12      Let me be clear, actually, they do not own the

13  entity; they own the assets the entity owns.

14      THE COURT:  They do not have any ownership

15  interest in the actual entity, but they may be

16  claiming an asset that is within the possession of

17  that entity.  Is that asset something that has been

18  transferred out of the Florida Smart entity?

19      MR. O'NEILL:  No.  So it was HLFIP, Inc. was a

20  Florida entity that owned the intellectual property

21  that Smart Communications uses.  That entity was

22  converted to a Delaware LLC.

23      So HLFIP is now a Delaware LLC that holds the

24  intellectual property.

25      THE COURT:  I'm not sure at this moment about

1  that H-L entity.

2     I agree that the Smart Delaware entity would

3  have to be a party, and the reason why I'm saying

4  the H-L is because that might -- that seems to be

5  more than what I could probably do in an injunction

6  today.

7     MR. O'NEILL:  Mr. Logan -- If they're

8  agreeing, Mr. Logan is the sole shareholder of

9  HLFIP, Inc. and I believe he is the sole member of

10  HLFIP, LLC.  So he could consent to be within the

11  Court's jurisdiction on behalf of both those

12  entities today.

13     THE COURT:  The next issue was the description

14  of all the out of the ordinary -- it would have to

15  be, I think, tailored so that it dealt with the

16  Smart entity in Florida or any entity to which

17  assets flowed into that isn't in front of me.

18  Because I'm just unsure about this other H --

19     MR. O'NEILL:  HLFIP.  That's the licensor, if

20  you will, pursuant to the license agreement.  So

21  that's where you have a 50-something million dollar

22  note payable plus the --

23     THE COURT:  Right.  But my understanding of

24  what the agreement was is that the Smart entities

25  were not going to be paying on a going-forward

1  basis that amount and you all are going to have to

2  fight over whether it's a valid liability or not,

3  but to me that's something that we can during the

4  course -- during the normal course of the lawsuit

5  can address.

6     MR. O'NEILL:  I think that --

7     THE COURT:  It would seem like the Smart

8  entity if that was a fraudulent transfer --

9     MR. O'NEILL:  Uh-huh.

10     THE COURT:  -- would still have a fraudulent

11  transfer action and if I ultimately had to appoint

12  a receiver to pursue a fraudulent transfer action

13  against the HLFIP, we can do that in the future but

14  I don't think I heard anything here today that

15  would necessitate us doing that today if Smart's

16  not going to be paying them any more money and if

17  you are going to be able to challenge the liability

18  accrual on a going-forward basis as well as the

19  historic liability.

20     MR. O'NEILL:  I think it would be helpful to

21  know how much of the 50-something million plus the

22  ongoing monthly 1.5 to 2.2 has been paid to HLFIP

23  because at this point, if Your Honor doesn't

24  exercise jurisdiction of that entity, he controls

25  it.  And that's the issue.

1    THE COURT:  Mr. Barnhardt (sic), that seems

2   like a pretty fair request.

3    MS. KOFF:  Zero payments -- Pardon, Your

4   Honor.

5    Zero payments have been made to date.  There

6   are a host of issues that are -- I'm not going to

7   raise.  It's not as simple as that.  But zero

8   payments have been made so far.  That's what we

9   represented earlier today, we are representing

10  again, and we are representing once again that we

11  will agree not to make any payments without order

12  of the Court.

13   THE COURT:  And I know you're just starting to

14  get documents and just starting getting them and

15  I'll suspect you're getting more in the future, but

16  it sounds to me like that issue is temporarily okay

17  for the next week or two what it sounds like.

18   MR. O'NEILL:  It sounds like it, but I'm

19  getting some whispers back here, so I'm going to

20  let Mr. Johnson continue with a couple other things

21  he has on his list real quick.

22   MR. JOHNSON:  Your Honor, again, it's your

23  courtroom, you make the rules, but it does seem

24  like there's going to need to be a follow-up if

25  we're going to lose your JA --

1      THE COURT:  My suggestion -- and if we have an

2   agreement that it will be an oral order of the

3   court that Mr. -- is it Jonathan Logan?

4      JONATHAN LOGAN:  Yes, sir.

5      THE COURT:  -- doesn't take any of the actions

6   that he said he is not going to take.  That we

7   could come back next Friday at let's say three

8   o'clock because I have got first appearances.

9      MR. O'NEILL:  Next Friday.

10      THE COURT:  And if you need to appear by Zoom,

11   that's fine.

12      If you all have not hammered out the order

13   that I need to sign by then, we can finish

14   hammering out the language, but, you know, I just

15   talked to Sarah and I could do next Friday at three

16   o'clock for the rest of the day.

17      And Ms. Koff is shaking her head no.

18      MS. KOFF:  I'm sorry.  I have a conflict next

19   Friday.

20      But also respectfully, Your Honor, I believe

21   there is a lot of discovery that needs to be taken.

22   We're happy to participate in on this IP issue.  It

23   just would be premature for Your Honor to hear the

24   same argument today without that evidence.

25      THE COURT:  Well, I'm trying to get to a

1  written order that I can enter.

2     And my concern is after we all leave here

3  today, the progress won't be as fantastic as there

4  has been while I'm sitting here.  I realize that.

5  So that's why I want to be able to say I've got the

6  ability to sit down with you all to finish this in

7  a very short time frame.

8     MR. BARNETT:  Can I make a suggestion --

9     THE COURT:  Yeah.

10     MR. BARNETT:  -- Your Honor?

11     Why don't we agree that the parties will

12  exchange proposed orders -- or we're happy to take

13  the draftsmanship since it was our suggestion, send

14  it over to them, we can mark it up, we can talk,

15  and then it would be submitted to the Court in some

16  sort of red line our version/their version, and

17  then we can convene via Zoom -- I know these folks

18  are coming from Chicago -- on Friday at your time

19  and you'll have our proposed order, in a perfect

20  world an agreed order or at least agreed to the

21  language, that you can say everybody agree?  We say

22  yes.  You sign it.

23     If there is a dispute as to what should be in

24  there, you can hear argument as to why we think --

25  for example, I understand Mr. Johnson's point.  A

1   lot of those disclose these things.  That's why we

2   have discovery.  Discovery addresses that.  And

3   it's not -- typically courts don't order discovery.

4   The parties serve discovery.  There will be

5   objections and response.  I can see --

6      THE COURT:  I like your idea.  I'm just

7   concerned about Ms. Koff saying that she might have

8   a conflict.

9      MS. KOFF:  I apologize.  I can do via Zoom.  I

10  can't in person.  I'm very sorry.

11     THE COURT:  No.  You can come by Zoom.

12     MR. BARNETT:  I know these folks have some

13  young kids.  They live in Chicago.  We can do it

14  via Zoom.  It wouldn't be an evidentiary hearing.

15     I don't see there being a problem to have

16  everybody convene with proposed orders in front of

17  you by, let's say, end of business on Wednesday if

18  there's no agreement in advance for you to hammer

19  them out and decide what you want in your order on

20  Friday.

21     THE COURT:  Provided, though, that your client

22  understands that the oral pronouncement today is

23  you can't transfer anything including with respect

24  to the Florida -- sorry -- with the Delaware Smart

25  entity that is becoming a party to this lawsuit.

1     MR. BARNETT:  We have no -- no problem with

2   that.  It was our suggestion.

3       We can certainly say that he is bound subject

4   to the Court's -- and it's obviously reflected in

5   the record and made in open court, that it's

6   subject to the Court's later reduced-to-writing

7   written order.

8       We would -- We envision it being something

9   along the lines, perhaps not as colorful as the

10  prior injunction, but a supplement.  And it's very

11  simple.  These are the four points in terms of not

12  moving assets and things like that.

13      THE COURT:  Your'alls thoughts about putting

14  pen to paper and then if there is a disagreement,

15  we hammer it out next Friday at three o'clock via

16  Zoom.

17      MR. O'NEILL:  That's acceptable to Janice and

18  I believe --

19      MR. JOHNSON:  Also acceptable to Alexis, Your

20  Honor.

21      Could we -- For purposes of the record, can we

22  get -- I am requesting, as a matter of the record,

23  that we either have Mr. Barnett speak with his

24  client and confirm that the Delaware entity is

25  going to be subject to jurisdiction of the Court

1  today.  That's not subject to the order.  It's not

2  subject to further agreement.  I want that to

3  happen today in a binding way.  Or I request that

4  the Court inquire of Mr. Logan directly that he is

5  subject in that entity to the jurisdiction of this

6  courtroom today.

7      THE COURT:  Mr. Barnhardt (sic), you have had

8  that conversation with Mr. Logan, your client?

9      MR. BARNETT:  I made that representation to

10  the Court now several times in open court.  I'm not

11  sure what further assurances --

12      THE COURT:  So what we can do, I will now make

13  the Delaware entity -- What's the formal name of

14  the entity?

15      MS. KOFF:  Smart Communications Holding, LLC.

16      THE COURT:  So the Clerk minutes, the Court

17  has made Smart --

18      MS. KOFF:  -- Communications Holding, LLC, a

19  Delaware limited liability.

20      THE COURT:  Yeah.

21      -- a Delaware LLC, party defendant to these

22  two cases.

23      Mr. Johnson, can you follow that with an order

24  tomorrow directing the Clerk to -- or making that

25  entity a party defendant and directing the Clerk to

1  update the case maintenance system to include that

2  entity as a party?

3      MR. JOHNSON:  Since the Court always is very

4  careful with case numbers, that would be in case

5  number 2023-CA-1280, which is the case where Janice

6  Logan is the Plaintiff.  The entity that was named

7  that I won't try to say the name again will be

8  added as a party defendant as part of the

9  consolidated action involving case number

10  2023-CA-1002.

11      THE COURT:  Correct.

12      MR. O'NEILL:  That would also include

13  2023-CA-1280 as well; correct?

14      MR. JOHNSON:  Correct.  Yes, Your Honor.

15      MR. O'NEILL:  It would just be a party

16  defendant in that second action, but they would

17  all -- yeah.  Sorry.

18      THE COURT:  Yes.

19      MR. JOHNSON:  And, Your Honor, I'm going to

20  put just --

21      THE COURT:  Go for it.

22      MR. JOHNSON:  I see your facial reaction to a

23  couple other things that I've written down.

24      That there be no payments to HLFIP or any

25  other entity owned or controlled by Jon Logan

1  without either the approval of this Court or the

2  consent of Janice and Alexis Logan.

3      THE COURT:  I think they have already agreed

4  to that and so, yes, that would be included.

5      MR. JOHNSON:  Then in good faith, that Mr. Jon

6  Logan will provide corporate records for the LLC

7  that just became a party, within 14 days, within 20

8  days, but some direction by the Court within a

9  reasonable degree of time, and we can talk about

10  it, but I don't want to have to serve a request

11  they have 20 days, and then we argue about it.

12      They offered -- Let me know what we need,

13  Judge.

14      THE COURT:  My thought on that would be the

15  same scope of what the -- you could get for the

16  books and the records under that Florida entity,

17  you get that same scope with the Delaware entity.

18  Now, if you need something beyond that, I think you

19  need to do a normal discovery.

20      But my thought is since the asset was formally

21  in the Florida entity, you would have had the

22  ability to get the books and the records under the

23  Florida Statute, and I want to replicate that for

24  whatever the books and records are of the Delaware

25  entity that is now a party.

1    MR. JOHNSON:  I'll take a look at what was

2    requested.

3       The only challenge I potentially see is at the

4    time the original records request was made, we

5    didn't know about the existence of the Delaware

6    entity.  So I don't know how they're crafted.  I

7    will look at it and make sure they are cleaned up

8    before next Friday.

9       Going forward that there be no transactions

10   outside the ordinary course of business without the

11   approval of this Court.

12      THE COURT:  Hang on one second.

13      MR. JOHNSON:  Yes, Your Honor.

14      THE COURT:  (Speaking to assistant.)  Go ahead

15   and book the three o'clock next Friday.

16      Sorry.  My assistant was providing me --

17      MR. JOHNSON:  What I was saying, Your Honor,

18   is going forward, from today forward that there be

19   no transactions outside the ordinary course of

20   business by any of the Jon Logan entities subject

21   to the Court's jurisdiction without the approval of

22   this court or the consent of Alexis Logan and

23   Janice Logan.

24      And, last, that this order that's being

25   entered be without prejudice to Janice and/or

1  Alexis Logan to have further proceedings in the

2  nature of a custodian.

3      THE COURT:  And without prejudice to Jon Logan

4  to have further proceedings with respect to the

5  injunction.

6      MR. O'NEILL:  Sure.  Sure.

7      THE COURT:  So --

8      MS. KOFF:  I want to make sure:  We did not

9  fully agree to all of those things.

10      Alexis Logan is not a shareholder of Smart

11  Communications, only the Trust is, for which Janice

12  Logan is the beneficiary and trustee.  So I don't

13  know why Alexis Logan would need to sign off as

14  well.

15      THE COURT:  Does it matter?

16      MR. JOHNSON:  I'll work through that, Your

17  Honor.  Functionally, I don't think it changes

18  things.  But I hear Ms. Koff's concern and we will

19  take that into account in the drafting.  I don't

20  want to get into the minutiae with the Court.

21      MS. KOFF:  And I just want to make sure of the

22  prospective payments.  There are payments that come

23  out of the company that have always come out of the

24  company to other LLCs for ongoing assets and things

25  like that.  So just not -- and, certainly, we are

1  not agreeing to stop those.  That's not a subject

2  of this.

3     THE COURT:  Well, it's part of the status quo.

4  So if that was part of the ordinary course now --

5  and I'm making up numbers.  So if the payment

6  was -- and I know it's not a hundred dollars, but

7  assuming it was $100 and then all of a sudden we

8  see a $4,000 payment --

9     MS. KOFF:  Completely understood and that was

10  my clarification so we don't have this issue later.

11  That's all.

12     THE COURT:  And I made up those numbers --

13     MR. O'NEILL:  Understood.

14     THE COURT:  -- because I don't think $100 --

15     MR. O'NEILL:  Covers it.

16     THE COURT:  -- you know, gets you gas for a

17  dinghy.

18     MR. O'NEILL:  Yeah.

19     THE COURT:  Okay.  So I agree and I think

20  Mr. Barnhardt and Ms. Koff --

21     MR. BARNETT:  Barnett.

22     THE COURT:  Barnett.

23     MR. BARNETT:  Barnhart.  I know Greg Barnhart.

24  He is a PI guy.  He is a lot smarter than me and

25  taller.

1    THE COURT:  Mr. Barnett.  I apologize, Mr.

2  Barnett.  It's like the former bank.

3    MR. BARNETT:  That's exactly it.  I'm the

4  black sheep of the family.

5    MR. O'NEILL:  And, Your Honor, to confirm for

6  next week, would it be okay to appear by Zoom then

7  if that's okay with Your Honor?

8    THE COURT:  Yes.

9    MR. O'NEILL:  Okay.  Thank you very much.

10    THE COURT:  And just use my ordinary Zoom.  I

11  just -- Yes.

12    MR. BARNETT:  We just need to know the time.

13    THE COURT:  3:00 p.m. Eastern Standard Time.

14    MR. BARNETT:  We will be there.

15    THE COURT:  Eastern Standard Time, not

16  Central, Eastern.

17    MR. BARNETT:  I think it's Eastern Daylight

18  Savings Time, Your Honor.

19    THE COURT:  Sorry?

20    MR. BARNETT:  Eastern Daylight Savings Time.

21  We're into Daylight Savings Time.

22    MR. O'NEILL:  It's an EDT, EST distinction.  I

23  was called out on it by a partner at one point.  I

24  ignored the piece of advice.

25    THE COURT:  I don't understand what that is.

1     MR. BARNETT:  We are not in Standard Time.

2  Standard Time is when we move the clocks.  Right

3  now we are in Daylight Savings Time.

4     MR. O'NEILL:  So if you would put Eastern Time

5  right now, the proper way would be to five o'clock

6  EDT and then when the clocks change back in the

7  spring, it goes back to EST.

8     MR. BARNETT:  Yes.

9     THE COURT REPORTER:  Is this one?

10     MR. O'NEILL:  Yeah, let's keep it on,

11  actually.

12     THE COURT:  My entire world was just rocked.

13  Are you suggesting that Daylight Savings Time is

14  Standard Time?

15     MR. BARNETT:  No.  We're suggesting that

16  Daylight Savings Time is Daylight Savings Time and

17  Standard Time is Standard Time.  But we are not on

18  Standard Time right now.

19     THE COURT:  Why not?  I thought we were on

20  Standard Time.

21     MR. BARNETT:  We are not.  We are on Daylight

22  Savings Time.  That's why it gets dark at five

23  o'clock.

24     MR. O'NEILL:  We can stipulate to that.

25     MR. BARNETT:  The good thing, Your Honor, is

1  you are actually seeing agreement between the

2  parties.

3      THE COURT:  Yes.  Exactly.

4      MR. BARNETT:  So it should be a kernel of hope

5  that we can move this through.

6      THE COURT:  Anything else?

7      MS. KOFF:  Yes, Your Honor.

8      THE COURT:  If you're going to tell us we're

9  going to go to Atlantic Standard Time, I'm going to

10  walk out.

11      MS. KOFF:  I can't keep track of that.  I'm

12  just agreeing.

13      While we are looking at the calendar, I don't

14  know if it's possible, we did file a Motion to

15  Dismiss Janice's Complaint.  If we could get a

16  hearing on that or we should take that up on

17  Friday?

18      THE COURT:  What I would suggest is in the

19  ordinary course on something like that, contact Ms.

20  Scibak and she'll get that scheduled in the

21  ordinary course.

22      MS. KOFF:  Okay.

23      MR. O'NEILL:  Yeah.

24      THE COURT:  Right now I'm just trying to deal

25  with things that are outside the ordinary course.

1    MR. O'NEILL:  Sure.  We have -- Yeah, there's

2   a motion relating to that motion that we filed.

3   It's a Motion to Strike be admitted and we'll

4   address it with your JA.

5    THE COURT:  Yes.  That sounds like an ordinary

6   course type of --

7    MR. O'NEILL:  Sure.

8    THE COURT:  -- discussion.

9    MR. O'NEILL:  It is.

10    MS. KOFF:  The only other thing -- I'm

11   sorry -- scheduling-wise was you had told us that

12   we would address the January timing trial today.  I

13   don't know if you still wanted to do that.

14    THE COURT:  Well, I mean, if you got a Motion

15   to Dismiss, it sounds like you're not at issue

16   technically.

17    MS. KOFF:  Agree.

18    THE COURT:  So what are the parties' thoughts

19   about trial and when it actually makes sense?  I

20   did look.  I have 40 trials left for the January

21   trial period:  4-0.

22    MS. KOFF:  Your Honor, we are not at issue in

23   regards to Ms. Logan's Complaint.

24    However, the January bench trial is actually

25   on the claims brought by Jonathan Logan on the

1   declaratory judgment on the Shareholders'

2   Agreement, which Ms. Logan brought as well

3   completing claims, simply to determine whether the

4   shareholder agreement is valid and binding which

5   changes the course of everything because it has

6   buyout provisions, sets a date, sets a calculation.

7   So we do believe that that part is at issue with

8   the prior judge and prior counsel.  They broke this

9   into phase litigation.

10      That is the only aspect that has had discovery

11   so far, which is why we have these valuation issues

12   coming up prematurely.  So we do think the faster

13   we get to that trial on Your Honor's docket,

14   whatever it is, the faster we get to the merits of

15   this case.

16      MR. O'NEILL:  Generally speaking, we agree.

17      We would prefer that the trial date remain

18   around that, if it works with Your Honor's

19   calendar, and it is, to reiterate, it's just a

20   single-issue trial on the validity of the

21   Shareholder Agreement.

22      So Your Honor, in other words, won't be

23   hearing a lot about corporate waste, breaches of

24   fiduciary duty, et cetera.  It's going to be

25   limited to that issue.

1    THE COURT:  This is in the 1002 portion?

2    MR. O'NEILL:  That is -- The 1002 portion, Jon

3  Logan brought a declaratory judgment claim and are

4  claims that relate to the Shareholder Agreement.

5  We countered with our own Complaint in the 1280

6  action that I believe has the declaratory judgment

7  claims regarding the validity, but we also have

8  defenses to their claims.  So, in other words, the

9  shareholder validity issue, the Shareholder

10  Agreement validity issue is in both cases at this

11  point.

12    THE COURT:  So are all parties agreeing that

13  the Court should hold trial on the -- and how are

14  we going to call it the --

15    MS. KOFF:  The declaratory judgment as to the

16  validity of the Shareholders' Agreement; is that

17  fair?

18    MR. O'NEILL:  Correct.

19    THE COURT:  On the validity of the

20  Shareholders' Agreement, which is the declaratory

21  judgment count?

22    MS. KOFF:  Yes, Your Honor.

23    THE COURT:  Are there any affirmative defenses

24  that we're trying as part of that?

25    MR. O'NEILL:  Yes, I believe there are.  I

1  don't know them off the top of my head.  I would

2  have to go back and look at the pleadings.

3      MS. KOFF:  I will say, because we did move to

4  dismiss Ms. Logan's Complaint, we have not yet

5  asserted affirmative defenses to her competing

6  exact declaratory judgment request, but I don't

7  know that that's necessary because we brought the

8  claim as well.

9      THE COURT:  Okay.  So --

10      MR. O'NEILL:  Your Honor, can I just quickly?

11  I think we need an answer to our claim before we

12  try that case.

13      THE COURT:  An answer to your declaratory --

14      MR. O'NEILL:  We need to know their

15  affirmative defenses, for example.  We need to know

16  how they're going to respond to our claim.

17      THE COURT:  To the declaratory judgment --

18      MR. O'NEILL:  Claim.

19      THE COURT:  -- portion of your --

20      MR. O'NEILL:  Yes.

21      THE COURT:  -- counterclaim?

22      MR. O'NEILL:  Yeah, regarding the validity of

23  the Shareholder Agreement.

24      And, Your Honor --

25      THE COURT:  That makes sense to me.

1    MS. KOFF:  Yes, Your Honor, it does make

2  sense.

3      Preview.  We moved to dismiss in part because

4  they bring direct and derivative claims together

5  and then they violated the contemporaneous doc

6  ownership rule.  But as it relates to that one

7  count, other than the problem of being direct and

8  derivative at the same time, we are not moving to

9  dismiss it.  Without prejudice to our Motion to

10  Dismiss, we can certainly file an answer to that

11  singular count while the rest of the Motion to

12  Dismiss pends against the other claims, if that

13  works.  So we are at issue in that one count.

14     THE COURT:  So would that be a response that,

15  an answer that Jon Logan and Smart Communications

16  has to answer?

17     MS. KOFF:  Correct.

18     THE COURT:  As well as is there another entity

19  that has --

20     MS. KOFF:  I believe Loco -- I don't know part

21  of that claim.  But we represent all three.

22  Directed as that claim against by Janice Logan, we

23  could file an answer in affirmative defenses as to

24  that one count while not affecting the Motion to

25  Dismiss the remainder of the Complaint.

1      THE COURT:  An answer in affirmative -- how

2   long do you need to do that?

3      MS. KOFF:  Could we have one week?

4      THE COURT:  Sure.  You want 10 days?

5      MS. KOFF:  Sure.  Thank you, Your Honor.

6      THE COURT:  Okay.  So what I'm going to do --

7   and just let me recap here and make sure we're all

8   on the same page -- I have a two-week trial period

9   that starts on January 22nd.  My docket sounding is

10   January 16.

11      What I try to do at docket sounding or that

12   night is I create a more date certain for everybody

13   when I know out of those 40 cases that I have

14   remaining -- and now 41 -- I figure out how to

15   dodge and leave so I can try as many as I can.

16      So I won't be able today to give you a

17   definitive this is the date you're going to go.  It

18   would be in that two-week period.  I would try to

19   have a definitive answer by the 16th or the 17th.

20      We are going to try the validity of the

21   Shareholders' Agreement which is the declaratory

22   judgment action.

23      And the Jonathan Logan, Smart Communications

24   Holding, Inc. and Loco will need to file an answer

25   in affirmative defenses within 10 days.

1      And all the parties agree to this.  Am I

2   correct so far?

3      MS. KOFF:  Yes, Your Honor, without prejudice

4   to our Motion to Dismiss on the other claims.

5      THE COURT:  I'm not dealing with the other

6   claims.

7      MS. KOFF:  Yes.

8      THE COURT:  How many days for the declaratory

9   judgment action are we actually --

10      MS. KOFF:  It was originally set for three.

11      MR. O'NEILL:  Three seems like too many.

12      MS. KOFF:  Yeah.

13      MR. O'NEILL:  Two is probably enough.

14      MS. KOFF:  I would say --

15      MR. O'NEILL:  We've already tread a lot of

16   this ground on the temporary injunction hearing and

17   I understand new counsel, they might have a

18   different strategy, et cetera.  So maybe we keep it

19   for three, but --

20      (Overlapping.)

21      MS. KOFF:  I always like to go more just in

22   case.

23      MR. O'NEILL:  -- I would need two.

24      THE COURT REPORTER:  Wait.  I really need one

25   at a time.

1      MR. O'NEILL:  We would suggest two to three at

2   most.

3      THE COURT REPORTER:  And what did you say?

4      MS. KOFF:  No.  I just suggest more than less

5   so that we don't get into a position where we need

6   more time and we don't have it.

7      THE COURT:  Well, I will tell you it will be

8   easier for me to make sure it's tried the smaller

9   your trial window is.  I -- Just the way it is.

10      So I will put three days, but if you can get

11   it down to one to two days, that makes it easier to

12   land it.

13      MR. O'NEILL:  Your Honor, one other point that

14   we have to raise is I believe under Florida rules

15   the pleadings have to be closed within a certain

16   period of days before trial and that that issue is,

17   itself, appealable.

18      We could ask the other side to confirm the

19   fact that they filed a Motion to Dismiss is not,

20   itself, going to be a basis for later --

21      THE COURT:  I thought the Motion to Dismiss

22   was on your other counts and not on the declaratory

23   judgment count, and I already put in here that all

24   the parties agree to the setting of the trial.

25      MR. O'NEILL:  Okay.

1    THE COURT:  And we allow -- I allow people to

2  waive the at-issue issue.  And, hopefully, the

3  Florida Supreme Court will eliminate that

4  relatively soon and you won't have to do this dance

5  anymore.

6    MR. O'NEILL:  Understood.

7    MR. JOHNSON:  Your Honor, will you take care

8  of issuing the order or is that going to be the

9  obligation --

10    THE COURT:  I'm going to do the trial order.

11  It will go out tomorrow morning.

12    MR. JOHNSON:  Terrific.

13    THE COURT:  I was drafting it as we spoke.  I

14  was typing it as I was making sure I was saying

15  correct things.

16    Okay.  I will issue the trial order.

17    You all will work on the order from today.

18  And to the extent that it remains unagreed, we will

19  have that discussion on Friday at three o'clock,

20  and perhaps we should also make that a Case

21  Management Conference as well.  So I'll also notice

22  that as a Case Management Conference.

23    MR. O'NEILL:  Sounds good.  Thank you, Your

24  Honor.

25    THE COURT:  Okay?  Anything else?  I know it's

1  five o'clock now.

2      MR. O'NEILL:  Appreciate you making the time

3  and for everything.

4      THE COURT:  I have to comment:  You all worked

5  well with each other today.  My hope is -- I know

6  that there's a -- this is a complex and there's a

7  lot of family dynamics and perhaps some bad blood,

8  but my hope is you can take the professionalism

9  that you all have shown here today and continue on

10  that -- I mean, obviously, you're going to have

11  disagreements as far as the legal position and

12  that's fine.  That's why I'm here.  But this job is

13  too difficult to make it worse, unnecessarily.

14      So I compliment both sides on how you all are

15  working today.  So thank you very much.

16      MR. O'NEILL:  Thank you, Your Honor.

17      THE COURT:  With that we will be in recess.

18      (Proceedings concluded at 5:00 p.m.)

19

20

21

22

23

24

25

1        HEARING CERTIFICATE

2   STATE OF FLORIDA  )

3   COUNTY OF SARASOTA)

4       I, Linda R. Wolfe, AAS, FCRR, RMR, RPR, FPR-C,

5   Certified Stenographic Court Reporter, certify that

6   I was authorized to and did stenographically report

7   the foregoing hearing; and that the transcript is a

8   true record of the proceedings.

9       I further certify that I am not a relative,

10   employee, attorney, or counsel of any of the

11   parties, nor am I a relative or employee of any of

12   the parties' attorney or counsel connected with the

13   action, nor am I financially interested in the

14   action.

15       Dated this 11th day of December, 2023.

16

17

18   _____

     LINDA R. WOLFE, AAS, FCRR, RMR, RPR, FPR-C
19    Certified Stenographic Court Reporter

20

21

22

23

24

25

Jonathan Logan v Janice Logan                Hearing  .                          12/06/2023
                                                                    Index: $1.5-..agreement

**$**

**$1.5-**  17:21

**$100**  82:7,14

**$2.2**  17:22

**$4,000**  82:8

**$5,000**  20:20

**$500**  20:19

**$53**  16:25 17:9,23

**0**

**0748**  42:17

**1**

**1**  11:14

**1.5**  17:20 31:15 66:7
71:22

**10**  91:4,25

**100**  14:4 37:10 38:4
48:2

**1002**  88:1,2

**1280**  88:5

**14**  79:7

**16**  18:1 55:6 91:10

**16th**  91:19

**17th**  91:19

**1st**  59:20,22

**2**

**2**  11:14 29:10 66:7

**2.2**  31:15 71:22

**2.420**  7:21

**2.420(e)(1)**  9:5

**20**  79:7,11

**2015**  17:5

**2021**  18:2

**2022**  17:1,12 18:3

**2023**  3:2

**2023-CA-1002**  3:5
78:10

**2023-CA-1280**  3:6
78:5,13

**22nd**  91:9

**3**

**3**  11:14

**30th**  59:25

**35**  22:9

**362**  5:5

**37**  20:20

**38**  18:2 55:7

**3:00**  3:3 83:13

**3:52**  46:22

**4**

**4**  11:14 14:2

**4-0**  86:21

**40**  17:17 86:20 91:13

**41**  91:14

**4:02**  46:23

**5**

**50**  15:10

**50-some**  66:6

**50-something**  70:21
71:21

**50/50**  37:13

**5:00**  95:18

**6**

**6**  3:2

**605.0602**  26:2,7

**605.1046**  25:9

**607.0748**  21:16 42:16

**7**

**7**  26:2,7

**75**  20:14,15,19

**9**

**9**  14:2

**A**

**ability**  7:15 29:6 31:8
40:3 67:3 74:6 79:22

**absent**  43:16 48:14

**Absolutely**  29:2 53:18
62:11 63:25

**absolved**  40:9

**absolves**  32:24 39:22

**academic**  9:16

**acceptable**  8:22 76:17,
19

**access**  33:21 50:6,10
56:16 58:5,18 62:17

**account**  9:9 81:19

**accounts**  21:4 28:22
37:2

**accrual**  71:18

**accurate**  33:6 53:23,24

**acknowledges**  65:22

**Act**  22:10

**action**  25:17 42:16,17
43:1 48:4 49:8,10 56:10
71:11,12 78:9,16 88:6
91:22 92:9

**actions**  42:8 45:25
54:9 67:24 73:5

**activities**  26:19

**actual**  56:20 69:15

**add**  68:18

**added**  78:8

**addition**  17:14,23
39:16

**additional**  17:15

**address**  4:8 6:7,16 7:8
14:14 28:13 30:10 47:3
54:12 71:5 86:4,12

**addressed**  43:14

**addresses**  39:10 75:2

**addressing**  66:23

**adhere**  58:24

**adjudicated**  45:16

**admit**  10:13 15:22

**admits**  11:12

**admitted**  86:3

**admonition**  9:11

**adopted**  22:10

**adult**  55:11

**advance**  75:18

**advice**  39:6 83:24

**advised**  39:1

**affairs**  22:15 24:6
26:20 27:25 28:1

**affect**  29:20

**affecting**  90:24

**affirmative**  88:23 89:5,
15 90:23 91:1,25

**afternoon**  3:13

**agencies**  52:6

**agree**  9:4 14:21 28:19
30:5 31:5 43:19 48:9
51:15,16,19 52:19
60:16 64:2 70:2 72:11
74:11,21 81:9 82:19
86:17 87:16 92:1 93:24

**agreeable**  32:6,8

**agreed**  13:4,15 14:15
52:17 74:20 79:3

**agreeing**  54:4 58:16,
17,21 60:20 61:6 70:8
82:1 85:12 88:12

**agreement**  14:18 18:5
23:1,9,13 32:1,13,16,19
33:5,13 39:19 40:9 41:2
46:10 59:11,21 61:4

63:18 70:20,24 73:2
75:18 77:2 85:1 87:2,4,
21 88:4,10,16,20 89:23
91:21

**agreements** 21:8,9
32:20,22 57:17 58:22
61:14 67:24

**agrees** 51:11

**ahead** 3:7 4:1 59:19
80:14

**Alarm** 27:15

**alarmist** 55:8

**Alexis** 3:19 76:19 79:2
80:22 81:1,10,13

**allegations** 11:22 64:7

**allege** 24:15

**alleged** 10:25 17:4

**alleges** 11:1

**alleviate** 6:2

**allowed** 16:3 25:7

**allowing** 33:22

**alternative** 20:5

**amount** 12:3 20:10,11
33:20 71:1

**amounts** 21:6

**analysis** 61:1

**analyze** 62:5 63:5,21

**and/or** 80:25

**Andrew** 3:16

**Anitra** 3:15

**ante** 19:8 55:24 61:20

**anymore** 55:16 94:5

**apologize** 6:3 37:8
47:7 56:1 60:17 67:19
75:9 83:1

**appealable** 93:17

**appealing** 20:12

**appearances** 3:7 73:8

**appears** 17:3,11 43:1

**appellate** 20:14,18

**apple** 26:7

**applies** 12:2

**appoint** 4:4 10:5 15:7
21:18 23:19,22 42:20
56:5 61:25 71:11

**appointed** 56:21 65:14

**appointing** 42:6

**appointment** 60:21
61:7 63:4

**appreciated** 51:3

**approval** 31:25 79:1
80:11,21

**argue** 79:11

**argument** 61:2 63:2
73:24 74:24

**arises** 9:17

**aspect** 87:10

**assert** 40:11

**asserted** 89:5

**assertion** 30:13

**asset** 30:17,19 32:12,
16 33:4 52:2 53:1 56:15
59:11,21 69:16,17
79:20

**assets** 15:20 16:12
25:3,10 27:7 28:20,21,
23 31:7 32:17,23 33:18,
25 34:3,5,7,16,21 35:2,
8,9 36:9,23,24 38:9,13,
14,16 39:7,17,21,24
40:7 41:18 42:10 43:20
44:8,11 47:11,14,20
48:5,9 50:19 52:3,4,11,
18 53:21 54:5 55:9
57:15 61:13 69:13
70:17 76:12 81:24

**assigned** 25:25

**assignment** 44:18

**assistant** 67:1 80:14,
16

**assume** 12:16 59:22
61:25

**assuming** 27:9 82:7

**assurances** 77:11

**assure** 32:7

**at-issue** 94:2

**Atlantic** 85:9

**attempt** 42:3

**attempting** 16:12

**attending** 3:2

**attention** 6:4 13:22

**attorneys** 4:23 23:3
24:10

**audited** 17:12

**August** 53:12

**authority** 22:13 43:3
69:1

**aware** 10:4

**B**

**back** 3:17 9:10 16:8
19:23 21:4,6 44:12,20,
25 46:7,20 49:3,4 57:15
63:6 67:5 69:1 72:19
73:7 84:6,7 89:2

**Bacon** 3:14

**bad** 41:15,16,17 42:25
43:1 95:7

**BAILIFF** 46:21,24

**bank** 28:22 37:2 83:2

**Barnett** 3:12 43:4,6,14
44:16 47:3,7,9 50:16,24
51:14,17,19,24 52:8
53:9 63:25 64:14 65:19
66:1,3,17 68:22 69:1
74:8,10 75:12 76:1,23
77:9 82:21,22,23 83:1,
2,3,12,14,17,20 84:1,8,
15,21,25 85:4

**Barnett's** 54:6

**Barnhardt** 72:1 77:7
82:20

**Barnhart** 82:23

**based** 16:9 40:25 55:19

**basically** 50:2 54:7
61:6

**basis** 57:3 71:1,18
93:20

**began** 15:19 53:9 55:25

**behalf** 3:9,14,18 20:3
58:25 59:15 60:16
70:11

**behavior** 11:9

**believes** 60:10

**bells** 27:15

**bench** 86:24

**beneficiary** 18:8 81:12

**benefit** 63:12

**big** 8:2

**biggest** 12:8

**binding** 77:3 87:4

**bit** 60:24 62:12

**black** 3:20 83:4

**blatantly** 8:12

**blood** 95:7

**board** 39:3

**bond** 20:10,20

**book** 47:21 80:15

**books** 16:7,23 17:1,21
26:20 49:15,20 50:6,12,
25 51:4,6 53:12 55:17,
19 56:16 62:15,16
63:20 66:7 79:16,22,24

**books-and-records**
50:10

**books-and-records-
access** 50:9

**bottom** 11:3

**bound** 52:22,23 76:3

**brand** 12:9 22:24 48:21

**breach** 54:13

**breaches** 32:25 39:22
40:9 87:23

**break** 46:22

**breathing** 54:17,22
55:2 61:10

**briefed** 20:18

**briefing** 44:21

**briefly** 16:22 20:9 39:12 46:9

**bring** 54:4,21 64:17 90:4

**bringing** 6:3 57:8

**brings** 18:24

**broad** 19:10

**broke** 87:8

**brought** 13:21 55:6 86:25 87:2 88:3 89:7

**buckets** 47:14

**budget** 20:16

**building** 25:20 30:18

**built** 24:6

**bunch** 50:18 52:4

**business** 15:25 16:4 19:13 41:24 42:11 45:10,19 54:19 57:10, 11,12 58:3 68:4 75:17 80:10,20

**buyout** 87:6

**buys** 60:23

**C**

**calculation** 87:6

**calendar** 16:25 85:13 87:19

**call** 50:2 67:21 88:14

**called** 4:14 17:7 50:21 83:23

**calling** 45:7 46:13

**candidates** 19:17

**candidly** 44:16,20 48:15 60:12

**car** 10:23

**care** 45:19 94:7

**careful** 48:24 78:4

**carefully** 68:16

**case** 4:22 5:4 6:11 8:22 11:6,16 15:12 16:10,11 19:9 20:8,16 22:8,9 27:16 29:3 40:11 42:5 44:14 45:6 51:21 58:19 60:8 62:19 63:14 68:5 78:1,4,5,9 87:15 89:12 92:22 94:20,22

**cases** 3:5 66:13 77:22 88:10 91:13

**caused** 23:20 25:3

**causing** 10:22

**Central** 83:16

**cents** 18:15

**CEO** 40:5,6

**cetera** 32:21 55:21 87:24 92:18

**CFO** 47:17

**challenge** 71:17 80:3

**chance** 46:15 47:1 60:24,25 63:20,21 66:22

**change** 25:11 30:3 37:1,3 44:14 49:22 50:13 64:25 65:3 84:6

**changed** 33:18,19 35:6,7 37:1,2 38:8 53:3

**changing** 27:10 28:8

**charge** 41:10

**Charles** 3:18

**chatting** 66:18

**Chelsea** 3:8

**Chicago** 74:18 75:13

**choose** 59:6

**chosen** 21:15

**circumvent** 42:3

**cited** 22:8

**claim** 40:17 44:2 45:21 57:4 88:3 89:8,11,16,18 90:21,22

**claiming** 11:15 24:17, 19 69:16

**claims** 40:11 42:4 54:14 58:8 86:25 87:3 88:4,7,8 90:4,12 92:4,6

**clarification** 82:10

**clarifications** 69:4

**clarify** 66:17

**classic** 16:16

**claw** 21:4,6 57:15

**clean** 28:17 33:22 35:19 39:2 47:13,20 53:12,19,25

**clean-up** 67:25 68:8

**cleaned** 80:7

**cleaning** 34:2

**clear** 11:6 18:22 25:1 28:1 29:5,22 47:22 50:17 51:1 52:3 69:12

**cleared** 19:19

**Clement** 3:16

**Clerk** 7:15 68:17 77:16, 24,25

**client** 3:16 33:7 55:2,3 60:10,16 66:21 75:21 76:24 77:8

**client's** 57:22 60:7 61:17

**clients** 30:24 47:2 58:2 69:7

**clocks** 84:2,6

**close** 5:20,22 19:12 24:24

**closed** 93:15

**closely-held** 28:3

**co-counsel** 34:24

**Coca-cola** 8:5

**colleagues** 3:15

**Collier** 50:21 51:7

**colorful** 76:9

**comfort** 49:6,7 65:3

**commenced** 3:1 46:23

**comment** 65:19 68:11

95:4

**comments** 51:3 67:15

**commit** 60:3

**committed** 26:24

**Communications** 3:10 10:21 11:13 13:5, 14,16 15:9,11,18 17:5, 17 23:23,25 24:23,25 25:18,21 27:5,6 30:19, 25 31:14 32:13,17 33:11,15,16 36:7,8,17, 18,20,21 37:3,4,6,7,11 38:2,5,8 39:2 48:1 51:10 68:21 69:21 77:15,18 81:11 90:15 91:23

**Communications'** 65:4

**companies** 16:13 28:2 63:15

**company** 14:4,6,10 15:18,20 16:24 17:7,9, 15 19:2,8 20:3 21:1,3 22:14 25:19 26:10 27:21 28:5 41:10 42:19 45:14,18 49:24 58:15, 24 59:15 61:17 63:11 66:5 81:23,24

**company's** 17:12,25 26:19

**competing** 89:5

**complain** 23:17,18

**complaining** 22:5 23:2,12 25:2 26:21,22 27:8

**complaint** 13:13 85:15 86:23 88:5 89:4 90:25

**complete** 15:10 39:20

**completely** 15:24 22:15 23:10,24 25:18 43:24 82:9

**completing** 87:3

**complex** 95:6

**complexity** 56:2

**complicated** 45:1

**compliment** 95:14

Conceptually 7:19

concern 6:3 28:24 74:2 81:18

concerned 65:7 75:7

concluded 95:18

conclusion 62:20

conduct 26:19

confer 66:15,21,22

Conference 94:21,22

confidential 5:3,8,14 6:2,14 7:3,17,20,23 8:20,21 9:9 12:12

confidentiality 6:6 7:14 9:6

confine 48:19

confines 65:2

confirm 68:16 76:24 83:5 93:18

conflict 73:18 75:8

conflicts 19:20

confusing 67:20

connection 39:23

consent 25:24 70:10 79:2 80:22

consequence 68:10

consequences 68:7

consideration 63:22

consolidated 78:9

contact 85:19

contained 17:6

contemporaneous 90:5

contempt 4:4 10:5,8,9, 20 11:7 15:9

continue 31:6 72:20 95:9

Continued 66:3

continues 29:13

contours 19:11

contract 52:11 65:16,

20,24,25 66:4

contracts 52:4 65:10, 12

control 16:14 17:8 32:24 39:20

controlled 78:25

controls 17:10 71:24

convene 74:17 75:16

conversation 77:8

conversion 11:23 18:11 24:8 25:9 29:4,25 31:6

conversions 24:21

convert 23:21 25:7,8

converted 29:8 33:12 69:22

converting 25:15 29:12

conveyed 41:17

corporate 21:23 24:18 27:10,20 28:8,15 33:22 35:15 38:25 39:2 41:22 55:9 64:5 79:6 87:23

corporation 10:7 21:19 22:16 33:12 34:2 45:22

corporations 22:10 28:3,17

correct 4:5,6 34:11 38:6 65:12 78:11,13,14 88:18 90:17 92:2 94:15

correctional 52:6,8

counsel 3:22 20:14 38:24,25 67:16 87:8 92:17

count 88:21 90:7,11,13, 24 93:23

counterclaim 89:21

countered 88:5

counts 93:22

couple 4:9 40:23 41:3 45:4 49:12 56:22 72:20 78:23

court 3:5,23 4:1,3,7,15, 18,21 5:12,17,20,25 6:14,20 7:13 8:7,9,23 9:3,7,18,23,25 10:17 12:3,21 14:3,20,24 15:5 19:1,3,6,15 20:6,18 21:23 22:6,25 23:6,16 24:10 25:5 26:4 27:7,9 28:6,12,20,25 29:6,19 30:5,21 31:5,6,13,15, 20,25 32:4,11 33:3,7,24 34:1,7,10,13,18,23 35:1,9,14,21,24 36:12, 14 37:6,9,15,19,22,24 38:3,12,18,20 40:3,6, 14,20,23 41:6,12,15 43:5,10,16,17,22,25 44:7,10,11,24 45:2 46:12,16,20,21,25 47:5, 8,23,24 48:5,10,13,14, 15 49:6,9,11 51:13,15, 18,20 52:16 53:5,16 54:2,10,17 56:3 57:1, 19,25 59:3,9,17,20,24 60:18 61:25 62:3,7,10, 12,15,25 63:12 64:12, 18,22,24 65:2,18,23 66:11,16,18,25 67:7,9, 12,22 68:15,23 69:3,4, 10,14,25 70:13,23 71:7, 10 72:1,12,13 73:1,3,5, 10,25 74:9,15 75:6,11, 21 76:5,13,25 77:4,7, 10,12,16,20 78:3,11,18, 21 79:1,3,8,14 80:11, 12,14,22 81:3,7,15,20 82:3,12,14,16,19,22 83:1,8,10,13,15,19,25 84:9,12,19 85:3,6,8,18, 24 86:5,8,14,18 88:1, 12,13,19,23 89:9,13,17, 19,21,25 90:14,18 91:1, 4,6 92:5,8,24 93:3,7,21 94:1,3,10,13,25 95:4,17

Court's 9:11 22:12 28:25 42:3 43:2,18 48:3,8 50:4 51:11 52:20 54:5 70:11 76:4,6 80:21

courtroom 5:18,21,23 6:21 67:6 68:24 72:23 77:6

courts 75:3

cover 20:11 44:1

covers 52:21 82:15

CPAS 27:24

crafted 80:6

Craig 3:12 43:6

create 91:12

created 32:15 58:22 59:14

critical 39:24

custodian 4:5 10:5 12:5 13:3 15:8 19:1,12 20:4 21:5,6,18 23:20,22 24:22 29:7,17 31:9 42:7,21 45:15 56:6,7 57:9 58:4 60:22 61:8,19 62:1,4 81:2

custodian's 19:11

cut 64:1

cute 54:25

cuts 64:3

cutting 64:20

D

dance 51:2 94:4

dangerous 55:2,3

dark 84:22

date 59:5,6,7,8,10,20 72:5 87:6,17 91:12,17

day 28:22 45:17 46:2 56:4 57:20 59:17 73:16

day-to-day 20:1 37:1

Daylight 83:17,20,21 84:3,13,16,21

days 48:23 79:7,8,11 91:4,25 92:8 93:10,11, 16

deal 5:13 7:13 9:14 60:23 85:24

dealing 6:20 92:5

dealt 70:15

December 3:2

decide 75:19

**decisions** 18:16 20:3
55:12

**declaratory** 87:1 88:3,
6,15,20 89:6,13,17
91:21 92:8 93:22

**default** 65:11,13

**defendant** 3:19 77:21,
25 78:8,16

**defenses** 88:8,23 89:5,
15 90:23 91:25

**defer** 7:7 15:3 66:9,11

**deficient** 61:4

**define** 19:11

**definition** 35:14

**definitive** 91:17,19

**degree** 79:9

**Delaware** 11:20,22
14:13 23:21 24:10,21
26:25 28:16 29:3,7,25
32:15,18,20 33:16,22
34:2,6,16 35:5,18 36:8,
10,11,18 37:25 38:3,24
39:4,20 40:16 41:20
44:12,18 46:4 47:11
49:25 50:3,12 69:22,23
70:2 75:24 76:24 77:13,
19,21 79:17,24 80:5

**delicately** 68:15

**demonstrate** 39:25

**demonstrative** 26:13

**deprive** 43:25

**derivative** 90:4,8

**describe** 68:7,12

**description** 70:13

**designate** 5:25 19:12

**designated** 7:17

**designating** 5:8

**designation** 6:7

**designed** 43:2,25

**destruction** 15:10

**details** 32:9

**determination** 10:11

**determine** 9:6 87:3

**devalue** 18:23

**devalued** 55:4

**devaluing** 20:7

**development** 27:22

**died** 17:13

**difference** 33:21 41:22

**difficult** 6:18 95:13

**dig** 4:8

**DIN** 5:6

**dinghy** 82:17

**direct** 26:12 34:18 90:4,
7

**directed** 61:3 68:18
90:22

**directing** 77:24,25

**direction** 79:8

**directly** 12:2 36:5 43:2
58:15 77:4

**director** 16:2

**disagreement** 45:15
76:14

**disagreements** 95:11

**disassociated** 26:8,9

**disclose** 57:21,22
67:23 68:2 75:1

**disclosed** 18:4,7,12,16
55:20

**disclosing** 15:20

**discover** 53:17

**discovery** 23:7 73:21
75:2,3,4 79:19 87:10

**discretion** 19:10 32:23

**discuss** 4:25 16:22
20:9 23:5

**discussing** 5:1,18 22:1
30:24

**discussion** 9:16,17
67:16 86:8 94:19

**discussions** 4:22
12:13 18:18

**dismiss** 85:15 86:15
89:4 90:3,9,10,12,25
92:4 93:19,21

**dispose** 40:6

**disposition** 32:23
39:21,23

**dispute** 12:25 30:20
69:8 74:23

**dissolution** 22:12

**dissolved** 22:14

**distinction** 83:22

**disturbing** 64:15

**divorces** 58:7

**doc** 90:5

**docket** 87:13 91:9,11

**documentation** 47:16

**documents** 5:1,2,9
6:1,10,15 7:8,16 8:16
11:24 12:16 13:24 23:4
72:14

**dodge** 91:15

**dollar** 70:21

**dollars** 18:14 82:6

**doubt** 53:14

**doubts** 41:11

**draft** 39:9

**drafting** 81:19 94:13

**draftsmanship** 74:13

**drill** 16:20

**due** 54:24

**duties** 32:25

**duty** 39:23 40:10 54:14
87:24

**dynamics** 95:7

**E**

**earlier** 53:19 72:9

**easier** 42:16 93:8,11

**Eastern** 83:13,15,16,
17,20 84:4

**easy** 6:15

**EDT** 83:22 84:6

**effect** 29:4 30:1 47:22
50:13

**effective** 25:8

**eliminate** 94:3

**employees** 14:4,6

**employs** 14:4

**end** 18:1,2 45:12,17
46:2 56:3 57:20 75:17

**engage** 24:5

**enjoined** 10:22 11:9

**enter** 13:4 14:12 23:14
28:19 74:1

**entered** 5:4 15:13
57:18 58:24 80:25

**enters** 20:22 21:1

**entire** 14:18 40:17
84:12

**entities** 15:12 18:11
23:21 29:21,22 30:8,10
31:10 32:14 51:7 54:18
61:14 65:5 70:12,24
80:20

**entities'** 32:24 34:7

**entitled** 24:5,7

**entity** 17:8 23:24 24:6
25:7,9 29:7,9,10,12
30:6,25 31:18 32:18,20
34:8,12,15,16,20,21
35:2,10,11 36:14,16,18
37:16 38:3,5 40:7,14
41:17,18,20,21 43:3
44:12 47:23 49:7,16,25
50:3,7,12 51:6 54:4
56:14,18,24 57:2 65:14,
25 69:6,13,15,17,18,20,
21 70:1,2,16 71:8,24
75:25 76:24 77:5,13,14,
25 78:2,6,25 79:16,17,
21,25 80:6 90:18

**entity's** 62:7

**envision** 76:8

**equity** 18:1 55:7

**essence** 17:3

essentially 39:21 58:17 60:19

EST 83:22 84:7

estate 55:14,18

evaluate 56:7 62:18

evaluation 22:3 62:20

event 12:18

events 65:11,13

everyone's 27:24

evidence 7:10 9:13 10:10 11:11,18 12:1,5 13:9 16:18,20 24:15 27:14 40:21 41:1 46:13 60:8 73:24

evidentiary 21:22 43:13 56:4 63:24 75:14

eviscerated 17:24

exact 19:20 28:23 33:20,21 89:6

exception 60:21

excess 14:4

exchange 74:12

exculpatory 40:19

excuse 21:19 68:19

exercise 71:24

exhibits 8:20

exist 28:18 52:12

existence 65:24 80:5

exists 55:23 62:22

expand 11:15

experience 66:13

experts 23:3 62:18

explain 7:11 20:24 27:10,13 35:17

explanation 9:20 35:20 38:20,21,23,24

extended 55:15

extension 55:15

extent 57:14 64:4 94:18

extra 40:12

extraordinary 54:9

extreme 10:7

**F**

face 27:21

facial 78:22

facilities 52:7,8

fact 4:12 18:7 39:16 40:21 50:16,25 51:5 57:4 65:9 93:19

factor 65:8

factual 53:13 54:21

fail 10:11,12

fair 27:14 72:2 88:17

faith 56:12 79:5

family 65:5 83:4 95:7

family-run 28:2,5

fan 8:2

fantastic 74:3

fashion 8:14

fast 12:24

faster 87:12,14

fault 56:2

feasibility 44:21

fee 13:6,15,17 22:4 23:1 31:12 48:12

feel 56:13

fees 20:12 43:16 44:4 48:13

fiduciary 32:25 39:23 40:10 54:14 87:24

fight 71:2

figure 47:2 50:14 53:17 54:13 57:9 91:14

figuring 12:15 35:25

file 6:25 7:2 8:17 9:5 42:9 55:14,18 57:14,17 85:14 90:10,23 91:24

filed 12:9 22:21 24:11 48:18 86:2 93:19

filing 7:20 63:22 68:4

filings 14:13

finances 27:20

financial 17:12 58:5

financials 58:18 61:24

find 45:8 67:2

finding 14:2,11

finds 14:3

fine 4:2 10:3 15:5 32:9 66:25 67:7,22 73:11 95:12

finish 44:13 73:13 74:6

finished 10:24

firm 19:21

five-minute 15:2

fixed 22:1

flatly 11:17

fleshed 32:4

Florida 3:11 12:2 22:8 23:24 24:1 25:1,6,15, 20,22 26:1 29:4 30:17 31:1,3 33:12 34:7,8,9, 12,15,20 36:14,16 37:16 38:5,12 40:7 41:17,21 46:5 50:7,11 53:23,24 69:18,20 70:16 75:24 79:16,21, 23 93:14 94:3

Florida's 25:3

flowed 70:17

focus 16:19 42:13

folks 4:18 42:4 49:14 74:17 75:12

follow 8:24 77:23

follow-up 72:24

foreign 25:7

forget 50:21

forgot 43:5

form 20:5 25:12 30:4 52:2

formal 16:2 61:2 77:13

formalities 41:23

formally 47:12 79:20

formation 39:4

forms 10:7 48:22

formula 8:5

forward 6:24 17:16 47:19 51:4 53:10,11 54:18 57:3 80:9,18

found 45:23

frame 74:7

Franklin 3:16

frankly 57:11 63:11

fraud 12:3 21:20 24:16, 24 25:12 26:24 27:3,4 39:24 40:18

fraudulent 57:4 71:8, 10,12

fresh 63:22

Friday 19:13 73:7,9,15, 19 74:18 75:20 76:15 80:8,15 85:17 94:19

front 29:15 34:16,20 35:2 36:25 43:17 49:16 56:18 70:17 75:16

frozen 15:24

frustrated 45:22

full 31:7 32:23 67:6

fully 23:5 81:9

fully-owned 33:17

Functionally 81:17

fundamental 42:2

fundamentally 63:10

future 71:13 72:15

FYI 67:1

**G**

gas 82:16

general 11:4

generally 8:10 87:16

generator 10:23

Jonathan Logan v Janice Logan                        Hearing  .

12/06/2023
Index: give..intellectual

**give** 15:2 36:1,12 40:24
45:4 49:5 54:12 61:10
65:1,2 91:16

**giving** 43:11

**goal** 45:11,17 57:25

**going-forward** 70:25
71:18

**good** 3:13 45:10 46:18
60:23 79:5 84:25 94:23

**government** 52:6
65:10,12

**granting** 14:7

**greater** 50:8

**Greg** 82:23

**ground** 92:16

**guaranteeing** 9:8

**guess** 6:22,25

**guise** 42:14,15

**Gunning** 4:11,12

**guy** 82:24

**H**

**H-L** 69:5 70:1,4

**hammer** 75:18 76:15

**hammered** 73:12

**hammering** 73:14

**hand** 45:2

**handle** 5:11 7:8

**Hang** 80:12

**happen** 65:3 77:3

**happened** 24:3 25:25
27:19 35:12 36:7 54:24
61:21

**happening** 24:12
27:16

**happy** 7:11 15:3 19:22
28:19 73:22 74:12

**hard** 61:23

**Hardy** 3:14

**harkening** 9:10

**harm** 20:25 56:9 62:21

**hate** 15:22

**head** 73:17 89:1

**hear** 13:12 15:19 18:6,
10 27:15 33:3 73:23
74:24 81:18

**heard** 30:22 39:11
40:25 57:1 71:14

**hearing** 8:17 14:25
21:22 30:25 32:2 34:10
35:16 38:15,18 43:13
51:3 54:3,23 56:5 60:18
61:6 63:1,24 67:2 75:14
85:16 87:23 92:16

**hearings** 58:7

**held** 11:6 17:7 34:5,8,
15

**helpful** 71:20

**hide** 13:10

**highly** 12:13

**historic** 71:19

**HLFIP** 17:7,17,22 31:18
56:23 68:21 69:19,23
70:9,10,19 71:13,22
78:24

**hold** 15:8 66:19 88:13

**holder** 24:4 26:15,17

**Holding** 3:10 23:23
24:23 25:18 27:6 32:13,
18,21 33:11,15,16 36:8,
17,19,20 37:4,5,12
38:2,8 51:10 68:21
77:15,18 91:24

**Holdings** 25:16 31:1
37:9,22

**holds** 24:2 26:23 30:18
31:19 65:25 69:23

**home** 28:17 60:5

**Honor** 3:13,25 4:6,10,
17,25 5:11 6:5,8,23 7:6,
7,12 9:1,5,22,24 10:4,
19 11:19,21,24 12:8,18,
23 13:2,7,18,20 14:1,16
15:1,4,7,13,22 16:6,15,
21 18:6,10,19 19:10,18,
24 20:13,21,22 21:1,5,

10,13,22,25 22:7 23:1,
5,11,18 24:7,13,24
25:11,14 27:12,13
28:13 29:5,8,21,23
30:13,16 31:3,24 32:3
34:17 35:13,22 36:3,4,
22,25 38:7,17,19,23
39:11,14,15 40:8,15
41:9 43:4 44:16 46:14,
19 47:3 50:16 51:25
53:7 54:20,25 56:24
57:6,7,9,14 59:16 60:7,
12,13,15 61:18,24 63:9,
25 66:2,20 67:14,15
71:23 72:4,22 73:20,23
74:10 76:20 78:14,19
80:13,17 81:17 83:5,7,
18 84:25 85:7 86:22
87:22 88:22 89:10,24
90:1 91:5 92:3 93:13
94:7,24 95:16

**Honor's** 5:7 6:2,4,8
15:1,23 17:20 29:15,20
30:1 35:5 38:10 40:2,15
68:11 87:13,18

**hope** 85:4 95:5,8

**host** 23:4 29:17 72:6

**hour** 6:12

**hourly** 20:19

**hours** 20:15,19

**house** 64:10,11,19

**huge** 18:14

**hump** 42:23

**hundred** 82:6

**hurt** 45:5

**husband** 3:21 15:25

**I**

**idea** 60:4 75:6

**identify** 68:6

**image** 50:11

**imagine** 7:3 49:19

**immediately** 62:4

**impact** 28:25

**impacted** 58:15

**impacts** 61:16,17

**impairment** 29:14

**implications** 56:9

**important** 39:12,15

**importantly** 32:19,24

**improper** 12:13

**in-box** 19:18

**Inc.'s** 27:6

**inception** 47:22

**include** 78:1,12

**included** 56:25 79:4

**includes** 52:14

**including** 75:23

**Incorporated** 32:14

**incur** 20:12

**incurred** 16:24 59:18

**incurring** 17:15

**incursion** 31:21

**indefinite** 63:16

**indemnity** 33:1

**independent** 57:13

**individuals** 58:9

**information** 5:14 7:20
58:5 63:11

**informed** 27:2

**inherit** 22:13

**injunction** 10:13 11:2,
7,9,16 14:8 15:14 20:6
24:20 42:15 50:1 54:23
60:20 64:15,25 70:5
76:10 81:5 92:16

**injury** 12:5 21:20,24
24:16,25 25:13

**inquire** 77:4

**instance** 64:17

**instruction** 62:3

**intellectual** 17:6,19
69:20,24

Jonathan Logan v Janice Logan                    Hearing   .                                   12/06/2023
                                                                                   Index: intent..litigation

**intent** 6:12

**intention** 38:11 39:6,9

**interest** 12:7 14:9,14 15:11 18:23 20:8 24:2,5 26:16,17,23 55:5 58:13 60:11 62:8 69:7,15

**interests** 26:11 61:18

**interrupt** 67:13

**interruption** 29:11

**intervene** 24:11

**intervening** 27:2

**intervention** 15:24

**interviewed** 19:19

**invalidate** 57:17

**invalidated** 40:19

**investigate** 42:7

**invoking** 4:15

**involved** 27:18 44:17 53:11

**involving** 78:9

**IP** 12:19,25 23:13 31:19 69:8,11 73:22

**irrefutable** 60:8

**irrelevant** 24:9

**irreparable** 12:5 21:20, 23 24:16,25 25:13

**issue** 6:8,17 9:17 11:18 20:9,18 29:6 30:17 31:8 33:9,10 40:13 43:15 44:2 47:4 48:11,15 59:12 64:17 65:7 67:4 69:9,11 70:13 71:25 72:16 73:22 82:10 86:15,22 87:7,25 88:9, 10 90:13 93:16 94:2,16

**issues** 4:7,9 5:18 12:10 14:17 22:24 29:18 44:1 54:21 57:7,8 64:5 72:6 87:11

**issuing** 94:8

**items** 10:14 39:5

---
**J**

**JA** 72:25 86:4

**Janice** 3:15,16 10:22 15:21,24 16:10,13 18:7, 12,17 25:4 26:15 55:13 76:17 78:5 79:2 80:23, 25 81:11 90:22

**Janice's** 15:7,10 18:23 20:8 53:25 85:15

**January** 16:8 86:12,20, 24 91:9,10

**Jim** 15:25 17:13 25:25 26:7 27:19,23 47:16 55:14 67:20

**job** 20:1 95:12

**Johnson** 3:18 9:3,4 66:10,11,14,24 67:5,9, 10,14,23 72:20,22 76:19 77:23 78:3,14,19, 22 79:5 80:1,13,17 81:16 94:7,12

**Johnson's** 74:25

**joins** 67:10

**Jon** 11:2,13 15:8,17 16:11,14 17:8,10 18:4, 6,22 20:1 26:23 27:21 32:22 39:20 41:10 53:20 57:10 63:10 67:20,23 68:2,6,12 78:25 79:5 80:20 81:3 88:2 90:15

**Jonathan** 3:9,12 67:18 73:3,4 86:25 91:23

**judge** 14:3,11 15:13 56:13 64:12,23 79:13 87:8

**judgment** 87:1 88:3,6, 15,21 89:6,17 91:22 92:9 93:23

**judicial** 11:25 22:11 67:1

**judicious** 19:5

**July** 15:14 54:22

**jurisdiction** 11:5 25:5 29:16 30:1,7,8,20 31:7

---
35:5 38:10 39:7 42:3,10 43:18,25 48:3,8 51:12 52:20 54:6 56:16 69:3 70:11 71:24 76:25 77:5 80:21

**Justin** 3:21

---
**K**

**keeping** 10:24

**kernel** 85:4

**key** 16:17,20

**kicking** 64:19

**kids** 75:13

**kill** 65:20,21

**kind** 18:15 19:20,21 20:16

**kinds** 57:7,8

**knew** 55:16

**Koff** 3:8 4:20 7:6 9:23, 24,25 10:2,19 12:23 14:21 21:13,25 26:6 27:12 28:11,13 29:2,8, 20 30:14 31:3,12,14,17, 23 32:3 33:3,6,8,25 34:5,9,12,14,22,25 35:4,13,20,22 36:4,13, 16 37:8,11,17,20,23 38:1,6,17,19,23 40:5 41:4,7 43:15 46:11 50:23 51:16 52:1,6 72:3 73:17,18 75:7,9 77:15, 18 81:8,21 82:9,20 85:7,11,22 86:10,17,22 88:15,22 89:3 90:1,17, 20 91:3,5 92:3,7,10,12, 14,21 93:4

**Koff's** 9:20 54:7 81:18

---
**L**

**L--** 36:11

**land** 93:12

**language** 11:3 73:14 74:21

**late** 12:9 13:23 15:25

---
**law** 8:22 10:12 11:6,12, 16 19:10 24:2 25:6,22 26:16 28:16 29:3 30:2 33:22 34:2 35:18 38:13 41:21 53:23,24 63:14

**lawsuit** 27:2 38:22 42:23 50:15 55:24 68:4, 17 71:4 75:25

**lawsuit's** 28:7,10

**lawsuits** 42:9 57:14,17

**lawyer** 45:6

**lawyers** 27:18,24 33:14 46:9 53:10

**layer** 40:12

**learn** 49:21

**leases** 31:19

**leave** 5:24 74:2 91:15

**leaving** 67:2

**left** 86:20

**legal** 45:20 58:23 60:14 95:11

**legally-binding** 59:14

**legitimate** 41:24

**liabilities** 66:6

**liability** 16:25 17:3,9,16 44:3 71:2,17,19 77:19

**license** 13:11 18:5 43:16 44:4 48:14 70:20

**licensing** 12:20 13:1,6, 14,17 14:18 21:7 22:4 23:1,13 31:12 48:12

**licensor** 70:19

**lies** 32:8

**limited** 42:22 43:19 77:19 87:25

**lines** 76:9

**list** 67:15 72:21

**listed** 23:7

**listening** 9:13

**literally** 15:23 25:11

**litigation** 39:1 87:9

**live**  3:2 28:15 75:13

**LLC**  3:11 23:25 25:16, 23 31:1,4 33:15 34:6 35:5 36:8,10,19,21 37:5,9,15,21,25 39:20 43:21 44:9 47:13,21 48:2,7,10 49:8 51:10,11 52:18,19,23 53:22 58:12 68:16,18,20,21 69:22,23 70:10 77:15, 18,21 79:6

**LLCS**  26:16,22 33:9 81:24

**located**  25:21 30:18

**location**  24:12 28:23

**locked**  46:17

**Loco**  3:10 23:24 25:3, 15,20 27:5 30:17 31:1,3 32:21 90:20 91:24

**Logan**  3:9,12,15,17,19 10:21 11:13 12:4 13:13 17:13 18:22 23:20 24:1, 19 25:2,4,23,25 26:2,8, 15,24 27:19,21,23 32:22 41:10 43:17 44:6 45:2,3 47:16 48:6 49:9 52:22 57:10 63:10 64:9 67:18,20,21,23 68:2,6, 12,23 70:7,8 73:3,4 77:4,8 78:6,25 79:2,6 80:20,22,23 81:1,3,10, 12,13 86:25 87:2 88:3 90:15,22 91:23

**Logan's**  55:14 86:23 89:4

**long**  41:10 45:20 49:16 91:2

**long-term**  17:1,11,14 45:18

**longer**  28:4 34:8 45:24

**lose**  29:6 72:25

**lot**  10:2 18:6,10 33:1 52:10 53:6 64:7 66:13 73:21 75:1 82:24 87:23 92:15 95:7

**love**  55:10

**lower**  22:15 68:5

**lull**  8:1

---

**M**

---

**made**  44:7 49:25 50:1, 25 61:14 64:7 68:22 72:5,8 76:5 77:9,17 80:4 82:12

**maintaining**  14:5,10

**maintenance**  78:1

**make**  8:18,19,20 9:8 10:10 13:5 16:18 20:3 22:4 23:13,15 28:14 31:10 35:24 40:17 50:3 57:2 58:19 63:2 66:21 67:3,14 68:16,24,25 72:11,23 74:8 77:12 80:7 81:8,21 90:1 91:7 93:8 94:20 95:13

**makes**  24:23 86:19 89:25 93:11

**making**  30:12 77:24 82:5 94:14 95:2

**management**  26:19 94:21,22

**managing**  32:22 57:10, 11,12

**Marcum**  23:3

**mark**  74:14

**marked**  5:3 7:16

**marketing**  20:2

**massive**  55:19

**matter**  4:24 9:21 10:12 11:12 14:6 24:1 25:22 30:2 76:22 81:15

**matters**  9:12,19

**meaning**  46:4 68:4,20

**meaningful**  16:4

**meetings**  16:2

**member**  24:1 25:23 26:8,9 36:21 37:21 70:9

**merit**  8:18

**merits**  87:14

**merry**  51:23

**messy**  28:2

**Miami**  20:15

**middle**  38:22

**million**  16:25 17:9,22, 23 18:1,2 31:15 55:6,7 66:6,7 70:21 71:21

**mind**  54:11 60:22

**minute**  13:20

**minutes**  10:19 12:22 15:5 30:23 41:3 45:4 46:6,7,20 66:24 77:16

**minutiae**  81:20

**mirror**  50:11

**Model**  22:10

**modify**  20:6

**moment**  28:11 32:5 35:23 57:1 66:14,20 69:25

**Monday**  12:9 22:22

**monetarily**  22:1

**money**  21:3 58:1 71:16

**month**  17:22 66:8

**monthly**  31:16,17 71:22

**moot**  7:9 13:2

**moots**  13:7

**morning**  94:11

**motion**  4:4 7:2 8:17,19 9:6 10:9 12:11 13:6,17 14:1 15:7 22:6,11,21 24:11 31:23 44:23 48:17,20 61:2 63:22 85:14 86:2,3,14 90:9, 11,24 92:4 93:19,21

**motive**  53:14

**movant**  30:7

**move**  16:12 18:13 27:5 44:25 48:4 53:8,21 84:2 85:5 89:3

**moved**  28:20,21 52:18, 24 61:13,22 90:3

**movement**  18:15 59:11

**moves**  53:2

**moving**  12:4 15:19 26:25 51:4 54:18 76:12 90:8

---

**N**

---

**named**  78:6

**names**  19:23 36:1

**nature**  81:2

**necessarily**  39:17

**necessitate**  71:15

**necessity**  42:12

**needed**  12:6 28:15 38:21 45:14

**nefarious**  12:17

**negative**  18:2 55:7

**negatively**  61:16,17

**net**  17:17

**nexus**  25:15,17

**night**  12:9 91:12

**nod**  34:23

**non-party**  69:3

**Noreen**  4:11

**normal**  54:19 71:4 79:19

**note**  14:15 17:1,11,14, 23 18:4 19:14,25 22:18 70:22

**Nothing's**  52:24

**notice**  7:20 11:25 24:8, 9 94:21

**number**  5:5,6 11:3 26:4 67:18 68:1,2,5,6,14 78:5,9

**numbers**  78:4 82:5,12

---

**O**

---

**O'NEILL**  3:13,14,25 4:2,6,9,17,24 5:16,19, 22 6:19,22 8:6,8,13 9:1, 22 13:19 14:23 15:1,6

Jonathan Logan v Janice Logan                Hearing .

19:4,7,17 22:18 30:12
32:7,12 34:11 35:25
36:3 39:11 40:8,22
41:9,13 46:14,18 53:5,
6,18 54:16,20 56:22
57:6,24 58:14 59:13,19,
23 60:1 61:11 62:2,6,9,
11,14,24 63:7,19 65:16
66:2,5,20 67:10,13
69:8,11,19 70:7,19
71:6,9,20 72:18 73:9
76:17 78:12,15 81:6
82:13,15,18 83:5,9,22
84:4,10,24 85:23 86:1,
7,9 87:16 88:2,18,25
89:10,14,18,20,22
92:11,13,15,23 93:1,13,
25 94:6,23 95:2,16

**O'Neill's** 69:7

**object** 51:17

**objection** 11:24

**objections** 75:5

**obligation** 27:1 94:9

**obligations** 31:21
58:22,23 59:15,18

**occurred** 49:17 58:7

**October** 59:20,22

**offer** 55:4

**offered** 22:3 23:14
56:23 79:12

**officer** 16:3 48:6,7

**one's** 35:6 39:9

**ongoing** 10:6 22:16
71:22 81:24

**open** 28:20 46:16 76:5
77:10

**opened** 33:16

**opening** 7:9 15:3

**operate** 45:24

**operating** 32:19,20,21
39:19

**opportunity** 49:1

**opposed** 42:1 63:13

**option** 60:2

**oral** 73:2 75:22

**order** 5:4 10:8,10 11:7,
15 13:4,16 14:16,21
15:17 19:1,13 20:6,22
23:14 24:21 28:19 39:9
40:18 43:16,19,21
44:10 47:17 48:5,11,14
50:1,5 54:10 56:13
72:11 73:2,12 74:1,19,
20 75:3,19 76:7 77:1,23
80:24 94:8,10,16,17

**orders** 21:1 52:21
74:12 75:16

**ordinary** 31:22 68:3
70:14 80:10,19 82:4
83:10 85:19,21,25 86:5

**original** 80:4

**originally** 92:10

**overarching** 63:21

**overdoing** 20:17

**overdue** 17:4

**Overlapping** 92:20

**overlooked** 32:9 39:13

**oversee** 55:12

**oversight** 20:4

**owed** 17:9

**owned** 17:6 37:4,11,13
38:1 69:20 78:25

**owner** 48:2

**ownership** 12:19
15:11 18:23 33:18
34:17 35:6 36:24 38:7
69:9,11,14 90:6

**owns** 12:25 16:13,14
17:10 25:20 37:7 49:7
69:13

---

**P**

**p.m.** 3:3 46:22,23 83:13
95:18

**paid** 21:7 58:11 71:22

**paper** 76:14

**papers** 10:11,25 11:12
30:14 33:13

**paragraph** 14:2 29:10

**Pardon** 72:3

**parent** 38:14,16 44:13

**parents** 39:18

**part** 32:8 48:1,20 50:1
51:8 52:1 55:16 56:15,
20 78:8 82:3,4 87:7
88:24 90:3,20

**participant** 18:17

**participate** 16:4 26:10,
18 73:22

**parties** 3:1 4:19 19:2,7
29:23 33:19 39:1 40:24
41:2 42:24 46:8 51:22
68:22 74:11 75:4 85:2
88:12 92:1 93:24

**parties'** 86:18

**partner** 3:11 83:23

**parts** 12:19

**party** 3:22 25:16 36:9,
16 37:12,23 38:1 44:6
50:1,4 57:13 58:19
68:17 70:3 75:25 77:21,
25 78:2,8,15 79:7,25

**Pasco** 50:23,24 51:7

**passed** 16:1 26:2 27:23

**pause** 28:10 67:8

**pay** 13:14,16 17:17 44:3
45:24 48:13 58:12

**payable** 17:2,11,14,23
18:5 70:22

**paying** 43:15 70:25
71:16

**payment** 58:1 82:5,8

**payments** 13:6 14:19
18:9 22:4 23:13,15
31:10 57:2 72:3,5,8,11
78:24 81:22

**pays** 64:11

**pen** 76:14

**pending** 15:12 19:9
20:8 24:10

**pends** 90:12

**people** 8:10 94:1

**percent** 15:10 17:17
37:10 38:4 48:2

**perfect** 74:19

**performance** 58:21

**period** 63:16 86:21
91:8,18 93:16

**permission** 15:2 65:5

**permit** 48:4

**perpetrated** 42:9

**perpetuation** 66:3

**person** 75:10

**Peter** 3:14

**Peterson** 3:21

**phase** 23:8 87:9

**phone** 19:23 36:1

**physical** 52:10

**PI** 82:24

**piece** 14:16 20:24
83:24

**pieces** 16:18,20

**place** 26:14 45:20,21

**Plaintiff** 78:6

**play** 54:25

**pleading** 18:21 21:13

**pleadings** 89:2 93:15

**podium** 47:6 53:8 69:2

**point** 11:18 19:24 20:20
22:7 27:9 37:13 39:12,
15 47:19 52:25 53:10,
11,12,14 55:6,13 61:22
71:23 74:25 83:23
88:11 93:13

**points** 56:22 76:11

**portion** 5:8 7:22 88:1,2
89:19

**portions** 6:1 7:2

**posed** 49:2

**position** 20:10 53:25
55:1 57:22 93:5 95:11

**position's** 49:22

**positive** 18:1 55:7

**possession** 69:16

**potential** 20:16

**potentially** 21:8 80:3

**power** 20:2 29:1,24 36:1 47:24 53:21

**powerless** 15:23

**powers** 19:11

**practice** 5:7

**preclude** 61:1 63:1,19

**predicament** 7:4

**prefer** 5:11,12 87:17

**preferable** 63:7

**preferred** 18:25

**prejudice** 80:25 81:3 90:9 92:3

**preliminarily** 6:6

**preliminary** 4:7,9,24 9:12,19 40:24 41:4,7, 12,13,14

**premature** 23:10 73:23

**prematurely** 87:12

**prepared** 5:14 19:15 60:17

**presentation** 16:19 32:10 53:9

**preserve** 15:15

**preserving** 55:22,24

**president** 40:5,6

**pretty** 6:15 39:14 60:19,23 72:2

**prevail** 54:8

**prevent** 15:9 19:8

**prevented** 10:14

**preventing** 54:10

**prevents** 39:22

**preview** 16:21 90:3

**priced** 58:9

**principled** 61:2 63:23

**prior** 20:6 46:5 76:10 87:8

**private** 10:6

**problem** 7:18,19 28:6,9 47:15 51:9 75:15 76:1 90:7

**procedure** 7:21 8:23

**proceed** 8:14 14:24 28:7 43:12 47:2 66:12

**proceeding** 3:22 58:10

**proceedings** 3:1 9:10, 15 81:1,4 95:18

**process** 15:19

**produced** 16:9 65:17

**production** 51:1

**products** 17:4,18

**professionalism** 95:8

**profit** 17:25

**progress** 74:3

**progression** 62:19

**project** 10:23

**promise** 18:12 67:13

**promptly** 7:2

**pronounced** 50:13

**pronouncement** 75:22

**proof** 55:4

**proper** 31:23 47:17 84:5

**properly** 10:1 22:25 48:16 64:17

**property** 17:6,19 29:12 69:20,24

**proposal** 13:2

**propose** 19:18,22,23 67:17

**proposed** 19:12,13 65:2 74:12,19 75:16

**proposing** 19:16 60:15 63:8

**prospective** 81:22

**protection** 61:9

**Protective** 5:3

**prove** 24:16

**proven** 55:3

**provide** 52:9 58:18 63:11 79:6

**provided** 24:9 75:21

**providing** 80:16

**provision** 59:5

**provisions** 40:19 87:6

**public** 5:18 6:21 14:8

**publicly** 5:18

**publicly-filed** 11:23

**Purchase** 33:5 59:11, 21

**purports** 16:14 17:8 32:16

**purpose** 15:15 41:25 60:4 61:19

**purposes** 39:4 52:20 67:16 76:21

**pursuant** 5:3 39:19 70:20

**pursue** 71:12

**put** 6:11 7:11 10:15 23:2 26:12 35:10 38:16 39:3 44:11,12,19 48:15 49:2,4 52:16,18 54:5 60:8 66:6 78:20 84:4 93:10,23

**putting** 76:13

**Q**

**qualify** 25:24 45:9

**question** 7:14 27:14 34:19 36:5 49:2

**questioning** 5:25

**quick** 35:24 53:7 67:2 72:21

**quickly** 10:16,17 16:17 18:14 89:10

**quo** 14:5,10 15:16 19:8 46:3,4,5 54:8 55:23,24 61:12,20,22 62:22 82:3

**quote** 26:18 59:4 64:5 67:25

**quotes** 26:12

**R**

**raise** 55:13 72:7 93:14

**raised** 30:15 44:23 47:4 48:11,22 64:22

**raises** 53:14

**raising** 12:9 13:1,8

**rate** 20:19

**reached** 46:10

**reaction** 78:22

**read** 15:15

**ready** 11:21 60:3

**real** 72:21

**Realistically** 41:9

**reality** 50:20 58:8

**realize** 74:4

**reason** 20:25 32:8 45:7,11 47:13 48:23 63:9 68:10,11 70:3

**reasonable** 79:9

**recap** 91:7

**receive** 7:1,16

**received** 13:23 16:7 54:5

**receiver** 29:7,17 31:9 42:7,20 45:15 56:5,7,20 60:21 61:8,25 62:3 63:4,5 65:14 71:12

**receivers** 36:2

**receivership** 65:9,10

**receiving** 6:14

**recently** 16:6

**recess** 46:21 67:6 95:17

**recognized** 40:16

**recognizes** 41:22

**recommended** 20:15

**record** 5:10 6:9 12:14 54:1 68:16 76:5,21,22

**records** 9:7 16:7,9,24 26:20 47:21 49:15,20 50:6,12,25 51:4,6 55:17,19 56:17 60:25 62:15,16 63:21 79:6,16, 22,24 80:4

**red** 74:16

**reduced-to-writing** 76:6

**reference** 17:20 40:2

**reflected** 76:4

**reiterate** 87:19

**relate** 88:4

**related** 15:12

**relates** 10:8 22:23 27:4 90:6

**relating** 11:22 86:2

**relative** 49:23

**relief** 10:7 16:22 18:24, 25 20:5 22:19,20

**rely** 22:11

**relying** 11:3

**remain** 25:10 33:25 34:16 87:17

**remainder** 90:25

**remained** 36:24,25

**remaining** 91:14

**remains** 25:10 26:11 29:15 30:19 34:17 94:18

**remember** 5:5

**remove** 39:7

**removed** 20:1

**rent** 10:22 64:11

**replicate** 79:23

**replies** 48:23

**reply** 12:9,15 13:23 22:21,23

**report** 63:5

**REPORTER** 19:3,6 26:4 47:5,8 84:9 92:24 93:3

**represent** 44:24 90:21

**representation** 44:8 77:9

**represented** 72:9

**representing** 72:9,10

**request** 22:20 68:15 72:2 77:3 79:10 80:4 89:6

**requested** 55:17 80:2

**requesting** 16:7 18:25 22:19 76:22

**require** 20:21

**required** 23:5

**requires** 17:16 33:1 55:25

**research** 60:14

**resolution** 42:24

**resolve** 59:12

**resolved** 14:7 28:7 45:16

**respect** 7:21 13:23 54:24 75:23 81:4

**respectful** 60:13

**respectfully** 7:6 13:22 14:16 21:13 24:17 25:14 54:20 61:18 73:20

**respond** 10:2 89:16

**response** 12:11 75:5 90:14

**responsible** 45:23

**rest** 73:16 90:11

**restate** 30:21

**restoration** 61:12

**restore** 19:1,7 61:20

**restructured** 15:18

**restructuring** 53:15

**retain** 11:4 29:16 31:7

**retains** 21:3

**return** 45:13 55:14,18

**reveal** 12:12 16:24

**reversal** 61:15

**reversion** 29:14

**review** 62:15

**revisit** 64:23,24

**rights** 52:11

**rise** 46:21,24

**rocked** 84:12

**role** 16:1

**roll** 52:12

**room** 33:19 42:5 49:15 50:5 54:3 55:12 60:19

**rooms** 46:15

**row** 3:20

**royalties** 17:4

**royalty** 18:5

**rule** 4:15 7:21,25 8:25 9:5 90:6

**rules** 68:24 72:23 93:14

**ruling** 20:12

**run** 45:6,14 63:10

**running** 42:19 45:18 58:3 63:14,15

---

**S**

**salary** 10:24 64:10,20

**sales** 17:18 20:2 27:21

**Sarah** 73:15

**Savings** 83:18,20,21 84:3,13,16,22

**scenario** 63:8

**scheduled** 85:20

**scheduling-wise** 86:11

**Scibak** 85:20

**scope** 79:15,17

**seal** 7:2 8:10

**sealable** 8:11

**sealing** 8:3

**seated** 3:20 46:25

**secret** 7:23 8:4

**seeking** 5:13,20,22,24 8:19 16:22 54:12

**seeks** 15:9

**select** 59:10

**selected** 59:8

**self-dealing** 16:16 19:9 20:7 59:1

**send** 74:13

**sense** 8:1 24:23 86:19 89:25 90:2

**sensitive** 7:24

**separate** 23:24 51:22

**September** 53:13 59:25

**sequestered** 4:13

**sequestration** 4:16

**serve** 14:8 75:4 79:10

**served** 48:23

**services** 17:18 52:9

**set** 92:10

**sets** 87:6

**setting** 93:24

**settlement** 12:12

**shaking** 73:17

**shared** 23:7

**shareholder** 17:25 23:9 58:6 70:8 81:10 87:4,21 88:4,9 89:23

**shareholders** 56:10

**Shareholders'** 87:1 88:16,20 91:21

**shares** 25:25 33:20 58:2,12

she'll 85:20

sheep 83:4

Shook 3:14

short 16:19 55:11 74:7

short-term 61:10

shortcut 50:18

shortly 8:17 15:17

showing 61:23

shown 95:9

shut 40:25

sic 37:9 72:1 77:7

side 3:25 4:20 7:4 32:1,
2,6 42:4 46:7 49:14
50:5 54:3 55:11 60:19
63:8 93:18

sides 95:14

sign 8:11 73:13 74:22
81:13

signed 59:21

significant 60:6

significantly 16:23

simple 27:12 36:6 72:7
76:11

simply 44:23 87:3

single 22:8,9

single-issue 87:20

singular 90:11

siphoned 66:7

siphoning 55:9

sir 43:5 73:4

sit 74:6

sitting 74:4

situation 35:17 42:6
55:9

slash 42:20 50:1,2
56:6,7 60:22 61:25 62:4

slow 19:3

smaller 93:8

Smart 3:9 10:21 11:13
13:5,14,16 15:8,11,17

17:5,16 22:4 23:12,15,
20,23,25 24:22,25
25:17,21 27:4,6 30:19,
25 31:14,19 32:13,17
33:9,11,15,16 36:7,8,
17,18,20,21 37:3,4,6,7,
11 38:1,4,8 39:1 48:1,2,
6,12 51:10 52:22 65:4
68:20 69:18,21 70:2,16,
24 71:7 75:24 77:15,17
81:10 90:15 91:23

Smart's 71:15

smarter 82:24

smells 43:1

sold 17:5

sole 36:20 37:21 70:8,9

solely 17:8,10 26:15,23

solution 47:9

sooner 42:1

sort 7:4 11:15 40:13
41:2 42:23 44:21 46:10
47:25 49:15 51:21 54:9
74:16

sounding 91:9,11

sounds 43:8 46:18
61:8 72:16,17,18 86:5,
15 94:23

space 54:18,22 55:2
61:10

speak 76:23

speaking 8:10 80:14
87:16

specific 10:6,14 14:11
21:17 36:15 38:21 61:3

specifically 11:8 14:3
66:23 68:5

specifics 63:23

spelled 11:8

spend 9:11 30:23

spirit 11:1,2,15 24:20

split 52:14

spoke 94:13

spot 53:4

spring 84:7

stabilization 14:5

standard 21:14,15
22:16 83:13,15 84:1,2,
14,17,18,20 85:9

standing 23:18 69:2

start 3:23 46:12 48:17
60:25

starting 49:20 72:13,14

starts 91:9

state 5:10 12:14 27:25
28:1 35:11 68:14

statement 15:3 30:5
53:24

statements 17:12
40:21

states 22:9

status 14:5,10 15:16
19:2,8 46:3,4 54:7
55:23,24 61:12,20,22
62:22 82:3

statute 10:6 12:2,4
21:16,17 22:12 24:7
25:8 26:12 59:5,8 79:23

statutes 26:1 29:3

Statutes' 25:1

stay 58:17,21

Stearns 3:8

stem 14:17 17:3

step 18:19,20,21 27:18

stipulate 84:24

stop 21:10 82:1

strategy 92:18

streamline 9:14

stricken 12:14

Strike 86:3

structure 27:11,20
28:15,18 33:23 39:3
40:18

structures 28:8 44:14

stung 56:14

subject 20:3 43:18
48:3,8 50:4 51:11 52:19
54:10 69:2 76:3,6,25
77:1,2,5 80:20 82:1

submitted 74:15

subs 53:1

Subsection 29:10

subsidiaries 50:20

subsidiary 33:17
36:10 37:16,20 38:4,13,
16 41:21 43:21 44:19
47:10 48:4 50:4 51:6,7
52:15

subsidiary's 39:17

substance 25:12 30:3
52:2

substantiated 64:8

substantive 9:17

sudden 82:7

sued 30:9

suffice 55:12

sufficient 20:11 55:23,
25

suggest 8:13 20:21
85:18 93:1,4

suggesting 14:21
52:17 65:1 84:13,15

suggestion 6:23 47:25
73:1 74:8,13 76:2

suit 3:20

summary 18:19

sunshine 49:23

supplement 76:10

support 22:10

supported 8:22

suppose 60:1

Supreme 94:3

surname 67:19

surprising 28:4

suspect 72:15

system 78:1

Jonathan Logan v Janice Logan                    Hearing  .

**T**

**T'D** 42:18

**table** 3:11

**tailored** 70:15

**taking** 10:22,23 11:25
42:10 58:3

**talk** 9:16 45:4 46:7,9
47:1 67:5 74:14 79:9

**talked** 20:14 50:18
73:15

**talking** 5:17 10:18 23:8
37:12 48:18

**talks** 22:12

**taller** 82:25

**tax** 39:4 55:14,18 56:8
68:9

**technically** 36:23
86:16

**technology** 27:22

**telling** 26:24 35:1 63:4

**tells** 63:14

**temporarily** 45:14
72:16

**temporary** 4:5 10:13
11:16 14:8 15:8,14 19:1
24:20 42:15 54:23
64:24 92:16

**tend** 30:5

**terminates** 26:10

**terms** 5:7 65:9 76:11

**Terrific** 94:12

**testify** 4:14

**testifying** 4:12

**testimony** 5:2,9 6:1,24
8:15,20 12:1 33:4

**textbook** 16:16

**thereunder** 58:22

**thing** 6:15 23:11 61:3
84:25 86:10

**things** 8:7,10,12 10:3,

20 23:17 39:25 40:23
49:12,21 50:18 55:1
72:20 75:1 76:12 78:23
81:9,18,24 85:25 94:15

**thinking** 6:9 36:2

**thinks** 66:12

**thought** 54:22 56:12
79:14,20 84:19 93:21

**thoughts** 40:25 41:5,8,
12,13,14 43:11 76:13
86:18

**three-part** 47:25

**TI** 14:1

**time** 9:12 12:7,10 13:12
14:14 19:5 21:12 26:8
36:12 37:24 42:2,22
49:17 54:12 60:24
62:13 63:16 65:23 67:3,
4 74:7,18 79:9 80:4
83:12,13,15,18,20,21
84:1,2,3,4,13,14,16,17,
18,20,22 85:9 90:8
92:25 93:6 95:2

**timely** 6:25

**times** 77:10

**timing** 86:12

**today** 4:13,25 6:24 7:11
8:15 9:10 14:25 15:19
16:19 19:18,24 21:11,
16 22:18,25 40:1 42:18
46:10 48:18 55:4,23
60:16 62:22 63:3 68:1
70:6,12 71:14,15 72:9
73:24 74:3 75:22 77:1,
3,6 80:18 86:12 91:16
94:17 95:5,9,15

**today's** 5:25

**told** 5:13 86:11

**tomorrow** 77:24 94:11

**top** 31:19 89:1

**total** 53:3

**track** 85:11

**trade** 7:23 8:4

**trajectory** 51:21

**transaction** 59:1 62:10

**transaction'** 62:5

**transactions** 17:24
55:20 58:16,25 67:24
68:3,8,9 80:9,19

**transcript** 6:17 7:1,3,
22

**transfer** 29:13 32:12,
16,17 48:9 57:4 71:8,
11,12 75:23

**transferable** 24:2,4
26:11,16,17,23

**transferred** 34:4,21
35:3,4 36:9,23 39:18
43:20 44:9,10 47:12
48:5,10 56:15 57:16
69:18

**transfers** 57:5

**transparent** 43:24

**travel** 21:15

**tread** 92:15

**trial** 86:12,19,21,24
87:13,17,20 88:13 91:8
93:9,16,24 94:10,16

**trials** 86:20

**true** 49:14 64:8,9

**trust** 26:1 63:10 81:11

**trustee** 81:12

**Tuesday** 13:24

**turn** 4:1 19:23

**turned** 51:5

**two-week** 91:8,18

**type** 86:6

**types** 22:20

**typically** 75:3

**typing** 94:14

**U**

**Uh-huh** 71:9

**ultimate** 45:11 51:20
52:25 56:9 57:25

**ultimately** 7:24 8:24
14:7 30:22 34:3 42:5,

20,21 45:3,8 54:14
58:4,10 71:11

**unagreed** 94:18

**unaware** 21:9

**uncover** 16:11

**undercut** 43:2

**undermine** 42:4

**understand** 9:1,7
29:19 34:1 41:20 56:3
62:14 68:13 74:25
83:25 92:17

**understanding** 4:3
49:13 63:18 69:5 70:23

**understands** 75:22

**understood** 5:16 6:19,
22 8:13 9:2,18 15:6
40:22 53:18 82:9,13
94:6

**unlawful** 55:21

**unlocked** 46:17

**unnecessarily** 95:13

**unopposed** 24:11

**unsure** 70:18

**untoward** 13:11

**unwind** 42:8 45:13
58:17 62:4,8

**unwinding** 55:22 56:1,
8 68:7

**unwound** 56:10 59:16

**update** 78:1

**V**

**vague** 11:4

**valid** 71:2 87:4

**validity** 87:20 88:7,9,
10,16,19 89:22 91:20

**valuated** 59:17

**valuation** 51:21 52:13
53:1 54:13 58:1,10,15
59:5,6,7 60:5,9 87:11

**valued** 58:10 59:24

**version** 74:16

**version/their** 74:16

**vested** 29:13

**view** 60:7

**violated** 11:2,14 24:20
  90:5

**violation** 11:1

**voluminous** 6:13

---

**W**

**wait** 4:21 92:24

**waive** 94:2

**walk** 11:21 12:6 16:17
  85:10

**walk-home** 60:9

**wanted** 86:13

**wanting** 63:13

**wash** 22:2

**waste** 21:23,25 24:18
  35:15 44:2 64:6 87:23

**ways** 25:23 51:23 64:3

**wearing** 3:20

**Weaver** 3:8

**Wednesday** 3:2 75:17

**week** 49:17 72:17 83:6
  91:3

**whatsoever** 16:5

**whispers** 72:19

**wholly** 49:7

**wholly-owned** 36:10
  38:4 47:10 52:15

**Williams** 14:3,11 15:13
  64:13,23

**Williams'** 56:13

**willingly** 44:7

**winding** 22:14

**window** 93:9

**witnesses** 4:19 5:1
  8:16 23:4 46:13

**wondering** 56:11

**words** 8:14 16:15 54:6,
  7 68:9 87:22 88:8

**work** 19:20,21 21:5,6
  55:10 81:16 94:17

**worked** 95:4

**working** 95:15

**works** 21:4 30:19 87:18
  90:13

**world** 74:20 84:12

**worse** 95:13

**written** 74:1 76:7 78:23

**wrong** 65:13

**wrongdoing** 60:6

**wrongful** 55:21 57:5

**wrote** 68:10

---

**Y**

**Yacht** 23:25 25:15
  32:21

**Yachts** 27:6

**year** 15:14 16:8,25
  17:13,21 53:13

**young** 75:13

**your'alls** 45:15 76:13

---

**Z**

**Zoom** 3:24 73:10 74:17
  75:9,11,14 76:16 83:6,
  10

# EXHIBIT 12

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,

                Plaintiffs,

v.

JANICE LOGAN, individually, as Trustee of
the James Logan Family Trust, dated
February 10, 2021, and as Personal
Representative of the ESTATE OF
JAMES LOGAN, JUSTIN PETERSON, and
ALEXIS LOGAN,

                Defendants.
_____/

JANICE LOGAN, as Trustee of the James
Logan Family Trust, dated February 10,
2021,

                Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., SMART
COMMUNICATIONS HOLDING, LLC, and
HLFIP HOLDING, LLC,

                Counterclaim Defendants.
_____/

JANICE LOGAN, as Trustee of the James
Logan Family Trust, dated February 10,
2021, and derivatively on behalf of Smart
Communications Holding, Inc.,

                Plaintiff,

      v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., nominal
defendant, SMART COMMUNICATIONS
HOLDING, LLC, HLFIP HOLDING, LLC,
LOCO FLORIDA LLC, and SMART
COMMUNICATIONS YACHT HOLDING, LLC,

                Defendants.
_____/

Case No. 2023-CA-1002-NC

(CONSOLIDATED)

Case No.: 2023-CA-1280-NC

## JANICE LOGAN'S AMENDED MOTION TO DETERMINE FAIR VALUE
## AND ADVANCE ENTIRE CASE TO TRIAL

Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021 ("Janice") hereby moves pursuant to Fla. Stat. § 607.1436(4) for a determination of the fair value of her 50% shares in Smart Communications Holding, Inc. ("SmartComm" or the "Company"), and for this Court to select the date of February 27, 2023—the date Jonathan Logan and Smart Communications Holding, Inc. filed their original Complaint against her—as the date of valuation.[1] In addition, because of her age, Janice respectfully requests that this case remain in its current trial setting of January-February 2025 (DIN 711). In support thereof, she states as follows:

## **INTRODUCTION**

Prior to his death, James Logan, a SmartComm director and co-founder, owned 50% of SmartComm. Now, Janice—the sole Trustee of her late husband's trust—owns 50% of SmartComm. These shares were Jim's most valuable asset and were meant to provide for Janice upon his death. As this Court concluded at the end of the Phase I Trial, Janice has an unencumbered 50% stake in SmartComm. That means she is entitled to 50% of SmartComm's value.

Despite the legal reality that Janice owns 50% of SmartComm (and has owned this share since Jim's death), Jon has undermined Janice's efforts to receive the fair value of her ownership interest. First, he invented a fraudulent Shareholders' Agreement that would have forced Janice to sell her shares on

---

[1] Janice filed her original Motion to Determine Value on August 20, 2024. DIN 729. In Argument Section I of this amended motion, Janice expressly requests that this Court select a valuation date of February 27, 2023, before trial. Janice also adds several facts relevant to the choice of valuation date to her Introduction and makes stylistic changes to comply with this Court's directive to the parties to write in a more concise manner. Otherwise, the remainder of this Amended Motion is substantially the same as the original.

unfavorable terms and sought to enforce it by filing his initial Complaint on February 27, 2023. DIN 2. This Court found that document to be invalid in the Phase I Trial. DIN 652. Next, Jon launched a campaign of oppression against Janice that Judge Williams enjoined in July 2023. DIN 169. Then Jon undertook a series of entity conversions, asset transfers, and intellectual property "transactions"—all executed within 96 hours of each other in August 2023. These transactions, if upheld, would essentially transfer all of SmartComm's assets to a Delaware company in the midst of litigation, and indebt SmartComm by its entire 40% EBITDA margin to a company Jon exclusively owns.

When Janice raised her concerns about these self-dealing transactions in a Motion for Contempt and to Appoint a Temporary Custodian in December 2023, this Court noted,

> I think on the valuation date, there is a provision of the statute that says I can choose a valuation date if it's -- you know, there's a date of valuation that the statute provides or some other date selected by the Court.
>
> So why couldn't we just select the date before the movement of the Asset Purchase Agreement and wouldn't that resolve the issue?

Exhibit 1, Tr. of Dec. 6, 2023 Hrg. 59:4–12.

Following Phase I Judgment and the ripening of Jon and Janice's 50-50 deadlock on the election of a director to succeed Jon, Janice filed a petition for judicial dissolution on May 29, 2024. DIN 680. On June 20, SmartComm filed its Election to Purchase shares. DIN 696. The filing of the Election triggered a 60-day negotiation window. Fla. Stat. § 607.1436(3). During that window,

SmartComm made no offer to purchase Janice's shares. SmartComm also produced no documents until 48 days into the negotiation window, and the documents it produced then were largely documents previously produced for mediation.

Janice did not receive 2024 financials until August 14, 2024 (55 days into the negotiation period), despite requests seeking them that were served in February 2024. And, HLFIP—the entity with which Jon entered into related-party transactions to divert $87 million in SmartComm's funds to himself—has now stated that SmartComm's 2024 financials are being "corrected" and "created" anew, purportedly to reflect more appropriate accounting principles. Exhibit 2, August 14, 2024 Correspondence from D. Hillsley. SmartComm previewed as much at the July 24, 2024, Case Management Conference, stating: "Again, part of the issue is looking now at some of the allegations and looking at financials and having to deal with that.  So these are – to some extent, financials have to be created, and that's what we're working on." *See* Exhibit 3, 7/24 CMC Tr. at 26:4–8.[2]

For the reasons set forth below, Janice asks that the Court determine the value of her shares based on a valuation date that reflects the reality of her ouster from the company and moots the need to evaluate "corrected" financial data. Janice, who is currently 71 years old, further requests that the Court

---

[2]  The correction and creation of new financials is concerning, because it appears to be litigation-driven. SmartComm has had an outside accountant for the last decade, and an in-house accountant, who presumably supports the outside accountant, since at least 2022. It is unclear whether prior years are being "corrected" as well.

maintain its earlier decision to advance the entire case to trial during its January-February 2025 trial setting consistent with its Order Setting Trial and Fla. Stat. § 415.1115. DIN 711 ("This includes the consolidated case as well (23-CA-1280). Unless otherwise ordered, this will be on all remaining issues.").

## LEGAL STANDARD

> (3) If, within 60 days after the filing of the first election, the parties reach agreement as to the fair value and terms of the purchase of the petitioner's shares, the court shall enter an order directing the purchase of the petitioner's shares upon the terms and conditions agreed to by the parties.
>
> (4) If the parties are unable to reach an agreement as provided for in subsection (3), the court, upon application of any party, may stay the proceeding to dissolve under s. 607.1430(1)(b) and shall, whether or not the proceeding is stayed, determine the fair value of the petitioner's shares as of the day before the date on which the petition under s. 607.1430 was filed or as of such other date as the court deems appropriate under the circumstances.

§ 607.1436, Fla. Stat.

> In a civil action in which a person over the age of 65 is a party, such party may move the court to advance the trial on the docket. The presiding judge, after consideration of the age and health of the party, may advance the trial on the docket. The motion may be filed and served with the initial complaint or at any time thereafter.

§ 415.1115, Fla. Stat.

**ARGUMENT**

I.     **Selecting an Alternative Valuation Date Is an Appropriate Use of This Court's Discretion**

Florida Statute § 607.1436(4) provides that this Court will decide the "fair value" of Janice's shares. There is no question that this Court has the authority to select a valuation date other than the statutory default if it finds that it is "appropriate under the circumstances." *Id.* Janice respectfully requests that (1) the Court now select an alternative valuation date; and (2) the Court select February 27, 2023—the date Jon and SmartComm filed their original complaint against Janice seeking to deprive her of her shareholder status—as the valuation date, on the ground that February 27, 2023 is the date when she was ousted from the Company.

A.     **Whether to select an alternative date, and when to do so, is within this Court's discretion**

The language of § 607.1436(4) grants this Court the discretion to select an alternative valuation date if it is "appropriate under the circumstances." Appellate courts in Florida have not had occasion to review the selection of an alternative valuation date pursuant to § 607.1436(4). But in other contexts, appellate review of whether a trial court's action is "appropriate under the circumstances" indicates that is a decision reviewed on appeal for an abuse of discretion. *See, e.g., Lang v. Lang*, 459 So. 2d 402, 404 (Fla. 4th DCA 1984) ("We recognize that the trial court has the discretion to determine whether or not permanent alimony is appropriate under the circumstances of each case. It is our responsibility, however, to determine whether the trial court abused its

discretion in making this determination."); *Taylor v. Mazda Motor of Am., Inc.*, 934 So. 2d 518, 521 (Fla. 3d DCA 2005) (sanction was not "appropriate under the circumstances" and was reviewed for abuse of direction); *Spanakos v. Hawk Sys.*, 362 So. 3d 226, 241 (Fla. 4th DCA 2023) ("Here, the trial court did not abuse it discretion in finding that, due to the nature and complexity of this high-stakes litigation, the billing entries objected to as duplicative 'were appropriate under the circumstances.'").

Moreover, because selecting an alternative valuation date is a discretionary decision and not a finding of fact, this Court can do so on the record now before it. *See Giat v. SCI Funeral Servs. of Fla., LLC*, 308 So. 3d 642, 647 (Fla. 4th DCA 2020) (evidentiary hearings are required only when there is a disputed question of fact).

### B. Selecting the date of ouster for valuation is well within this Court's discretion

The abuse-of-discretion standard requires that the trial judge's ruling be affirmed unless it is "arbitrary, fanciful, or unreasonable, [and] no reasonable man would take the view adopted by the trial court." *Canakaris v. Canakaris*, 382 So. 2d 1197, 1203 (Fla. 1980). Because there is ample support in other jurisdictions and in academic literature on using date of ouster for valuation, doing so here would not be "arbitrary, fanciful, or unreasonable." *Id.*

When other courts applying provisions analogous to Fla. Stat. § 607.1436(4) have used the "date of ouster" as the valuation date, their rationale is based on whether the ousted or oppressed shareholder is able to influence the company. Because the ousted shareholder has *no* influence, she therefore

should not be held responsible for drops in the company's value that occur after she lost any control of the company. *See* Douglas K. Moll, Shareholder Oppression and Fair Value: Of Discounts, Dates, and Dastardly Deeds in the Close Corporation, 54 DUKE L.J. 293, 375 ("This date-of-oppression argument is premised on the notion that the minority should not be held responsible for changes in the company's value after the minority's role in management has unjustifiably ended."); *see also Kaplan v. First Hartford Corp.*, 522 F. Supp. 2d 275, 279 n.4 (D. Me. 2007) (relying on Moll analysis); *Hendley v. Lee*, 676 F. Supp. 1317, 1327 (D.S.C. 1987) (conducting valuation as of "date of ouster" in forced buyout); *Pooley v. Mankato Iron & Metal, Inc.*, 513 N.W.2d 834, 836 (Minn. Ct. App. 1994) (conducting valuation as of date that shareholder was voted out as an officer and removed as director).

## C.   Record evidence demonstrates that February 27, 2023 is when ouster occurred

There is no genuine question that, as of February 27, 2023, Jon's campaign to oust Janice from SmartComm had culminated in the filing of a lawsuit to deprive her of her shares. A timeline of undisputed facts is below: [3]

- October 16, 2022: Jim Logan dies. DIN 596 (Trial Ex. 132).
- December 22, 2022 – January 12, 2023: Janice and Jon discuss Jon's possible purchase of her shares, via text message. DINs 610 (Trial Ex. 202), 645 (Trial Ex. 203), Ex. 4, Day 1 Trial Tr. 254:2–257:3.

---

[3]  It is well-established that a Florida court will take judicial notice of its own records. *Tower Credit Corp. v. State*, 183 So.2d 255, 256 (Fla. 4th DCA 1966). Nevertheless, out of an abundance of caution, Janice has concurrently filed a motion for this Court to take judicial notice of evidence admitted during the Phase 1 trial and the Temporary Injunction hearing, and the filing date of Jon's and SmartComm's original complaint.

- January 12, 2023: Janice and Jon cannot come to an agreement of a fair value for her shares. Day 1 Trial Tr. 254:2–257:3.

- January 20, 2023: Janice sends Jon a management concern letter. DIN 630 (Trial Ex. 260).

- February 10, 2023 – Friday, February 24, 2023: Jon and Janice agree on a standstill period in an attempt to resolve their dispute short of litigation. DIN 271, ¶¶ 70, 115, 116. Ex. 5, Standstill Agreement.

- February 24, 2023: Jon's counsel informs Janice that Jon has found a Purported Shareholder's Agreement and attempts to force Janice to sell her shares to Jon according to the terms of that document. DIN 632 (Trial Ex. 220).

- Monday, February 27, 2023: The first court day after the standstill agreement expired, Jon and SmartComm file a declaratory-judgment action, seeking a ruling that Janice was required to sell her shares to Jon according to the terms of the Purported Shareholder's Agreement. DIN 2, Count II.

After February 27, 2023, Jon and SmartComm pulled every lever to keep Janice out of the company and to give her no visibility into the company's activities. Such actions include:

- Janice has been denied a seat on the board. Ex. 4, Day 1 Trial Tr. 199:19–200:8; Ex. 6, Day 2 Trial Tr. 329:4–15; DIN 734 (Jon & SmartComm's First Amended Complaint), ¶¶ 31–33.

- Janice has been fired from the Company. Ex. 7, July 20, Temporary Injunction Evidentiary Hrg. Tr. 267:4–19 (Jon testifying about terminating his mother's employment and benefits following Janice's lawsuit); *see also* DIN 169.

- Janice has been subject to numerous vexatious and harassing lawsuits from Jon and the Company. *See* DINs 169, 489.

- Jon created a Delaware holding company, of which SmartComm was listed as the only member, without Janice's knowledge or consent. Ex. 1, Dec. 6 Custodian Hrg. Tr. 11:20–12:1 (Jon & SmartComm's Attorney: "The second regarding the Delaware, and I won't walk through it until Your Honor is ready, but all of the allegations relating to the Delaware conversion, that's all done on publicly-filed documents. We have no objection to Your Honor taking judicial notice of those. We do not need testimony or evidence"); *id.* 33:15–17 (Jon & SmartComm's Attorney: "Smart Communications

9

Holding, LLC has been opened in Delaware. Smart Communications Holding, Inc. has been placed as its fully-owned subsidiary.").

- Jon transferred all of SmartComm's assets to a Delaware entity, without Janice's knowledge or consent. Ex. 1, Dec. 6 Custodian Hrg. 35:9–13 ("THE COURT: Okay. You've taken the assets out of an entity that is before me and put it in an entity that's not before me in a different state; is that what has happened? MS. KOFF [Jon & SmartComm's Attorney]: Yes, Your Honor.").

- As a result of those admissions, Jon and SmartComm stipulated to further injunctive relief, including joining SmartComm DE as a party to this Consolidated Action, not making payments on the purported intellectual property transactions, and not doing anything outside of the ordinary course of business. *See* DIN 489.

- Janice has repeatedly been denied timely access to SmartComm's books and records, including when SmartComm refused timely production of 2024 financial information in discovery. DIN 436 (This Court compelling SmartComm's First Books and Records Production six months on November 20, 2023); *see also* Ex. 3, 7/24 CMC Tr. at 9:1–8 (The Court: "Because when I came into this, one of the big issues was dockets -- documents were not being turned over. And I'm now hearing documents are not being turned over, and I feel like we've addressed that and so I'm wondering: Is this a new request, or is this documents that they have been asking for for a year?").

- Later, during an August 2024 Meet & Confer, the related-party beneficiary of the purported $87 million liability, HLFIP, confirmed that the reason for delay is because 2024 financial information is being created (or, rather, retroactively adjusted to conform with "different" accounting principles) in real time. SmartComm confirmed the same at a hearing and in writing. *See* Exs. 2 & 3, *supra.*

Thus, Janice indisputably has had no control of SmartComm's affairs since February 27, 2023. That alone would suffice to justify valuing SmartComm as of that date.

Moreover, the conduct of Jon and SmartComm since her ouster had additional effects that make February 27, 2023 an appropriate valuation date. First, Jon's contention that the purported Shareholder Agreement required

Janice to sell her shares to SmartComm precluded any sale to a third party. In addition, Jon's efforts to transfer assets and divert revenue from SmartComm commencing in August 2023, and the ongoing "correction" of existing financials and creation of new ones, further undermine this Court's ability to fulfil its statutory responsibility to determine the fair value of the company as of any date since February 27, 2023.

Thus the rationale of the ouster/oppression cases applies here. Janice should not be prejudiced by any decline in SmartComm's value since Jon and SmartComm ousted her from participation in the Company's affairs and launched their campaign of oppression and devaluation.

## II. The Impending Trial Is the Appropriate Legal Vehicle for Deciding the Intellectual Property Issue

The largest contested issue in the parties' valuation dispute is whether Jon's purported intellectual property transactions are relevant to the appropriate valuation of Janice's shares and, if so, whether those transactions are valid. To the extent those transactions are relevant, their validity can and should be determined in the scheduled trial.

The appropriate legal vehicle for deciding the relevance and validity of Jon's purported intellectual property transactions is Janice's derivative Count I Declaratory Judgment Action. That Count is pending and is not subject to a Motion to Dismiss from Jon and SmartComm thus far; it is subject only to a pending Motion to Dismiss from HLFIP (DIN 730), which as of filing is under the Court's advisement. Jon is the sole owner and managing member of HLFIP, the purported beneficiary of an $87 million liability from SmartComm, and

simultaneously the sole officer and director of SmartComm during the period relevant to the IP dispute. Because the purported intellectual property transactions were related-party transactions by the sole director of SmartComm (Jon), the Florida legislature instructs that the transactions should be scrutinized as director conflict of interest transactions under Fla. Stat. § 607.0832.

Neither Jon nor any SmartComm-related entity has produced any documentary evidence of the purported 40% intellectual property royalty license from prior to August 29, 2023. SmartComm's *first* mention of a 40% royalty appears in audited financial statement for 2022 (created in October 2023): "The Company has also reflected the prior years' use of the HLFIP IP license for the years of 2015—2021 as a long-term liability in the amount of $52,848,813, and accrued interest of $5,592,170." *See* Exhibit 8, 2022 Consolidated Audited Financial Statement, at 12. As recently as February 2024, however, Jon was sending prospective SmartComm customers 2022 financials that *did not* reflect the massive purported intellectual property liability. *See* Exhibit 9, Clay County RFP, at 123–128. This tacit admission that the purported royalty exists solely for litigation purposes and does not reflect SmartComm's economic reality is unsurprising; what customer would sign a contract with a vendor rendered insolvent by a high-eight figure liability? Thus, the 40% net sales royalty was an agreement between Jon and himself made solely to benefit him at his mother's expense, and it should be adjudged as a director conflict of interest transaction

at the January 2025 Trial with all parties' remaining counts. *See e.g.*, DIN 722, Ex. A at ¶¶ 41–44; *see also* DIN 705 at pp. 8–9.

The Court need not decide the intellectual property question in choosing Janice's proposed valuation date of February 27, 2023 now. In Jon and SmartComm's First Amended Complaint, they describe the August 29, 2023 Exclusive Intercompany Intellectual Property License Agreement as a formalization of a long-running understanding. *See* DIN 734, ¶ 41. Regardless of the valuation date the Court chooses, Jon and SmartComm will need to prove the existence of the purported oral intellectual property license from 2015 to August 29, 2023, and will have the opportunity to do so at the impending trial.

Deferring the resolution of this issue beyond the valuation trial, however, would result in severe prejudice to Janice, as we explain next.

## III.    Janice Would Be Prejudiced Irreparably if Any Part of the Case Were Stayed, and Judicial Economy and Efficiency Favor Advancing the Entire Case

Fla. Stat. § 607.1436(6) provides,

> Upon entry of an order under subsection (3) or subsection (5) [Court valuation Order], the court shall dismiss the petition to dissolve the corporation under s. 607.1430(1)(b) and the petitioning shareholder ***shall no longer have any rights or status as a shareholder of the corporation***, except the right to receive the amounts awarded by the order of the court, which shall be enforceable in the same manner as any other judgment.

§ 607.1436, Fla. Stat. (emphasis added). The official comment to the Model Business Corporation Act, upon which Florida's Business Corporation Act is based, explains, "the [valuation] order terminates all claims that the petitioner

13

may have had in his or her capacity as a shareholder, and the value of such claims must either be asserted as part of the 'fair value' of the petitioner's shares or forever lost."[4] Janice has had pending derivative claims since March 10, 2023. 1280-DIN 2. Because Janice's right to challenge the purported IP transactions and to prosecute her significant breach of fiduciary duty claims against Jon and SmartComm would effectively merge into the Court's valuation order, it is essential that she have the opportunity to assert those rights in the January-February valuation trial.

Given Janice's age (71), the age of the Consolidated Action (1 year and 8 months), and Jon's litigation tactics thus far (which have resulted in two temporary injunctions, DINs 169, 489), efficiency, judicial economy, and finality all militate towards January 2025 Trial deciding **all** remaining issues. The text of the Election to Purchase statute only provides for a permissive stay of the *dissolution* action, and does not instruct as to other pending claims. *See* Fla. Stat. § 607.1436(4) ("... the court, upon application of any party, may stay the proceeding to dissolve under s. 607.1430(1)(b) and shall, whether or not the proceeding is stayed...."). In fact, the legislature decided to shift the stay of the dissolution action from mandatory to permissive in 2019 amendments that became effective in 2020—the prior language of section 4 was "the court, upon application of any party, shall stay the s. 607.1430 proceedings and determine

---

[4]   Model Business Corporation Act (with Official Comments), American Bar Association (Updated through April 28, 2023), https://www.americanbar.org/content/dam/aba/administrative/business_law/corplaws/mbca-202304.pdf.

the fair value...." FLORIDA BUSINESS CORPORATION ACT, 2019 Fla. Sess. Law Serv. Ch. 2019-90 (C.S.C.S.H.B. 1009) (WEST).

Finally, pursuant to Fla. Stat. § 415.1115, Janice's age should be considered in advancing the full case to January-February 2025 Trial. She is 71 years old, and has been forced to expend significant time and money litigating just to realize the fair value of the shares her husband left her in October 2022. If the matter were further partitioned, Jon and SmartComm would continue to find ways to extend the litigation and prevent Janice's collection of the fair value of her shares.

WHEREFORE Janice Logan respectfully requests that the Court decide that the valuation date that will be used at the Trial is February 27, 2023; that this Court retain this Case in the January-February 2025 trial setting; that this Court (using the February 27, 2023 valuation date) determine the value of her 50% shares in Smart Communications Holding, Inc. at the Trial in January 2025 (DIN 711); and grant such other and further relief as the Court deems just and proper.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been electronically filed and served on all counsel of record via the Florida Court's e-filing portal, on November 8, 2024.

Dated:  November 8, 2024

Respectfully submitted,

/s/   *David E. Schoenfeld*
Anitra R. Clement
Florida Bar No. 100354
**SHOOK, HARDY & BACON L.L.P.**
100 N. Tampa St., Ste. 2900
Tampa, FL 33602
Telephone: (813) 202-7100
aclement@shb.com

David E. Schoenfeld (FL PHV # 1047561)
Peter F. O'Neill (FL PHV # 1043125)
Andrew L. Franklin (FL PHV # 1035737)
Kailin Liu (FL PHV # 1051416)
**SHOOK, HARDY & BACON L.L.P.**
111 S. Wacker Dr., Ste. 4700
Chicago, IL 60606
Telephone: (312) 704-7700
dschoenfeld@shb.com
pfoneill@shb.com
afranklin@shb.com
kliu@shb.com

John D. Garretson (FL PHV #1057004)
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, MO 64108
Telephone:  (816) 474-6550
jgarretson@shb.com

***Counsel for Janice Logan, as Trustee***
***of the James Logan Family Trust,***
***dated February 10, 2021***

# EXHIBIT 1

```
 1   IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT IN
     AND FOR SARASOTA COUNTY, FLORIDA
 2
     JONATHAN LOGAN and SMART
 3   COMMUNICATIONS HOLDING, INC.,

 4            Plaintiffs,
     vs.                         Case No.:  2023-CA-1002-NC
 5
     JANICE LOGAN, individually and
 6   as Trustee of the James Logan
     Family Trust, and ALEXIS LOGAN,
 7   individually,

 8            Defendants.            /    (CONSOLIDATED)

 9   JANICE LOGAN, as Trustee of the
     James Logan Family Trust dated
10   February 10, 2021, and directly
     and derivatively on behalf of
11   Smart Communications Holdings,
     Inc., and derivatively on behalf
12   of Loco Florida, LLC,

13            Plaintiff,

14   vs.                         Case No:   2023-CA-1280-NC

15   JONATHAN LOGAN, SMART
     COMMUNICATIONS HOLDING, INC.,
16   nominal defendant, and LOCO
     FLORIDA, LLC, nominal defendant,
17
     _____ Defendants.           /
18

19                  LIVE HEARING

20        BEFORE THE HONORABLE HUNTER W. CARROLL

21                 held at the
           Judge Lynn N. Silvertooth Judicial Center
22          2002 Ringling Boulevard, Courtroom 6C
                   Sarasota, Florida
23      on Wednesday, December 6, 2023, 3:00 to 5:00 p.m.

24               Pages 1 through 96

25             Stenographically reported by:
           Linda R. Wolfe, RPR, RMR, FCRR, FPR-C
```



```
 1    on.  Instead, she alleges a spirit violation that
 2    Jon somehow violated the spirit of the injunction
 3    relying on this language at the bottom, number
 4    five, the very vague and general I retain
 5    jurisdiction.
 6        Case law is very clear that you cannot be held
 7    in contempt of an order, of an injunction order,
 8    unless it is specifically spelled out in that
 9    injunction what the behavior that you were enjoined
10    from doing.
11        So we don't need evidence on this.  As a
12    matter of law on her papers, she admits that
13    neither of Jon Logan or Smart Communications
14    violated 1, 2, 3 or 4, and, instead, she's trying
15    to expand the order by claiming some sort of spirit
16    of this temporary injunction, which the case law
17    flatly does not allow.  So we do not need any
18    evidence on that point.  That's the first issue,
19    Your Honor.
20        The second regarding the Delaware, and I won't
21    walk through it until Your Honor is ready, but all
22    of the allegations relating to the Delaware
23    conversion, that's all done on publicly-filed
24    documents.  We have no objection to Your Honor
25    taking judicial notice of those.  We do not need
```



 1   testimony or evidence.

 2       Florida Statute applies directly and let's the

 3   Court know why it does not amount to fraud under

 4   the statute that Ms. Logan is moving under for a

 5   custodian and irreparable injury.  So no evidence

 6   is needed, but I will walk through that later in

 7   the interest of time.

 8       But here is the biggest one, Your Honor.  They

 9   filed a reply late at night on Monday raising brand

10   new issues for the first time that are not in the

11   motion and are not in the response.  And in doing

12   so, not only do they reveal confidential settlement

13   discussions, which is highly improper and should be

14   stricken from the record, they also state in that

15   reply that they are still figuring out what these

16   documents mean, but they just assume that something

17   nefarious is going on.

18       In any event, Your Honor, it's in regards to

19   the IP.  And the IP has two parts:  Ownership and

20   licensing.

21       THE COURT:  You have gone more than two

22   minutes.

23       MS. KOFF:  I'm sorry, Your Honor, but I'm

24   going to get really fast to it.

25       There is no dispute over who owns the IP.



```
 1   requires indemnity for that.  So there is a lot
 2   more there.
 3         THE COURT:  So, Ms. Koff, are we going to hear
 4   during testimony that there has been an Asset
 5   Purchase Agreement with --
 6         MS. KOFF:  That's not accurate.
 7         THE COURT:  -- your client?
 8         MS. KOFF:  This is -- That is what it has
 9   been.  Smart -- which is not this issue.  The LLCs
10   are a different issue.
11         Smart Communications Holding, Inc., the
12   Florida corporation, of course, cannot be converted
13   without agreement.  That's in our papers.  We know
14   that.  This was all done with lawyers, by the way.
15         Smart Communications Holding, LLC has been
16   opened in Delaware.  Smart Communications Holding,
17   Inc. has been placed as its fully-owned subsidiary.
18   The assets have not changed.  The ownership has not
19   changed.  Both parties in this room still own the
20   same exact amount of shares.  They still have the
21   same exact access.  The only difference being
22   allowing Delaware law to clean up the corporate
23   structure.
24         THE COURT:  Well --
25         MS. KOFF:  The assets remain for anyone.
```

```
 1        THE COURT:  Okay.  So what you're telling me
 2   is the assets, the entity that's in front of me has
 3   been transferred?
 4        MS. KOFF:  It has been transferred into the
 5   LLC in Delaware, but Your Honor's jurisdiction over
 6   them has not changed and no one's ownership over
 7   them has changed.
 8        The -- The assets --
 9        THE COURT:  Okay.  You've taken the assets out
10   of an entity that is before me and put it in an
11   entity that's not before me in a different state;
12   is that what has happened?
13        MS. KOFF:  Yes, Your Honor.
14        THE COURT:  Why is that not the definition of
15   a corporate waste?
16        Look, I will tell you what I'm hearing right
17   now is a situation where unless you can explain it
18   better to me, than "Oh, we just let Delaware law
19   clean this up."
20        MS. KOFF:  There is a better explanation.
21        THE COURT:  There better be.
22        MS. KOFF:  There is, Your Honor, if I could
23   just have one moment.  Thank you.
24        THE COURT:  Please, make it quick.
25        And, Mr. O'Neill, while she's figuring this
```

```
 1   know, self-dealing transaction, I'm not going to go
 2   into it.
 3        THE COURT:  Let me ask this, because I
 4   think -- don't quote me if I'm -- I think on the
 5   valuation date, there is a provision of the statute
 6   that says I can choose a valuation date if it's --
 7   you know, there's a date of valuation that the
 8   statute provides or some other date selected by the
 9   Court.
10        So why couldn't we just select the date before
11   the movement of the Asset Purchase Agreement and
12   wouldn't that resolve the issue?
13        MR. O'NEILL:  I don't believe it would
14   because, again, he's created legally-binding
15   obligations on behalf of the company that need to
16   be unwound, Your Honor.
17        THE COURT:  But if we valuated the day before
18   those obligations were incurred.  So let's --
19        MR. O'NEILL:  Yeah, go ahead.
20        THE COURT:  Let's say October 1st was the date
21   which the Asset Purchase Agreement was signed;
22   okay?  So assume it's October 1st.
23        MR. O'NEILL:  Okay.
24        THE COURT:  What if we valued it
25   September 30th?
```



# EXHIBIT 2



Dustin B. Hillsley

Akerman LLP
201 East Las Olas Boulevard
Suite 1800
Fort Lauderdale, FL  33301

T: 954 463 2700
F: 954 463 2224

August 14, 2024

**VIA EMAIL**

David E. Schoenfeld
Shook Hardy & Bacon
111 South Wacker Drive
Chicago, Illinois 60606

Re:    **Meet and Confer Letter;** *Jonathan D. Logan, et al. v. Janice Logan, et al.*, **Case Nos. 2023-CA-1002-NC / 2023-CA-1280-NC (Consolidated into 1002)**

Dear David:

This firm represents Jonathan Logan and Smart Communications Holding, Inc. ("Smart") in the above referenced matter. We write in response to your letter dated August 9, 2024, which letter primarily addressed Smart's responses and objections (the "Responses") to your July 8, 2024, Requests for Production (the "Requests"), as well as Smart's document production on August 7, 2024 (the "Production").

In your letter, you allege three deficiencies: (1) you assert that Smart has not produced its financial documents through May 28, 2024; (2) you assert that Smart has not produced its 2023 and 2024 as-submitted Requests for Proposal ("RFPs"); and (3) you note that HLFIP, a new party to the case for which claims are not even at issue yet, has not produced its documents. We address each issue in turn.

**First**, in Response to your Request No. 4 to Smart, which broadly sought "All historical financials," Smart did *not* refuse to produce its documents. Instead, it referred your client to its previous production of nearly one thousand pages of financial records (Bates Range SMART_B&R 00005-67, 000071-139, 000208-400, 000525-530, 000543-1044; LOCO_B&R 00001-000099; YACHT_B&R 00001-00003; and Plaintiffs---1532-0001577). In addition, Smart produced another 789 pages of financial documents that had only been shared with your client in the context of confidential mediation (Bates Range SMART-0000001-0000145, 0002359-0003003).

Furthermore, Smart indicated it would supplement its productions with updated 2024 financials as they become available. That is consistent with Smart's representation to the Court at the parties' status conference that it would produce documents on a rolling basis as they become available/are prepared. To that end, Smart will now make a limited supplemental production of financial records. There are more financial records (for the 2024 period) that will be produced. We will make those productions as soon as those documents have been prepared.

David E. Schoenfeld
August 14, 2024
Page 2

Your letter appears to take issue with that approach, stating it is "deeply concerning" that we have not produced all of Smart's 2024 financial documents "that are kept in the ordinary course of business," and that it "would be inappropriate and unusual" to correct the company's financials. We disagree.

The cause for the delay is easy to identify: we discovered that Smart's former CFO, James Logan, did not record Smart's books in ways that comported with "the ordinary course of business." For that matter, what is "inappropriate and unusual" is the way in which James Logan kept Smart's books and records. As CFO, James owed fiduciary duties to Smart and its other shareholder to keep books and records that accurately reflected the assets and liabilities of Smart. He did not.

By way of example, James Logan routinely recorded the amounts that he used to purchase assets (for himself, Jon, Janice, and others) and disbursed as cash (to himself and apparently to Janice and Alexis) as "shareholder loans." He did not, however, evidence those loans with formal loan documentation or even informal loan agreements (which is what should have been done "in the ordinary course of business"). When James purchased assets that were for Jon's use, James did not lend funds to Jon, nor did he advance cash to Jon to make the purchases. Without memorializing anything in writing, James simply used Smart's funds to purchase those assets, titled the assets in Jon's name, and then recorded amounts receivable from Jon. He did not inform Jon that he made entries on Smart's books reflecting a purported debt that Jon owed to Smart; indeed, that was the opposite of what he told Jon.

Moreover, James Logan also used Smart funds to purchase the building for Loco and the vessel for Yacht. Again, James had Smart pay some or all of the purchase price for each asset, titled the assets in the name of those entities, and then recorded receivables from those entities on Smart's books. But James did not evidence those purported receivables with loan agreements or document any transactions with Loco or Yacht. Because Smart has already produced its pre-2024 financial records, you know (or should know) all of this.

In fact, upon review, none of these purported accounts receivable or shareholder loans appear to be bona fide assets in Smart's hands. They were not documented or memorialized as loans or accounts receivable. Indeed, your client's position is that Jon does not owe amounts to Smart, and if that were not the case (*i.e.*, Jon borrowed from Smart to purchase assets), then your unjust enrichment/fiduciary duty claims against Jon would be moot/invalid. Clearly, many of the financial entries that James Logan made as Smart's CFO do not accurately reflect Smart assets.

Before preparing 2024 financial documents, Smart had to go through the process of untangling the mess created by James Logan. That process is nearly complete, but it took time. Smart will supplement its production on a rolling basis as soon as possible.

**<u>Second</u>**, you seek (in Request No. 15) Smart's marketing and sales materials and specifically its 2023 and 2024 as-submitted Requests for Proposal or RFPs. As you know, we objected to that Request (the basis for which is obtaining the financial data attached to the RFP responses) because the financial data attached to the RFP responses is unreasonably cumulative and duplicative of the company's other financial data, which has already been produced. You maintain these documents are relevant to the valuation analysis because they include "representations of its [Smart's] value and liquidity". We have reviewed a sampling of RFP responses and that is not accurate.

David E. Schoenfeld
August 14, 2024
Page 3

However, as a compromise and in order to avoid unnecessary motion practice, Smart is willing to produce documents responsive to Request No. 15, even though Smart disagrees as to the relevance and probative value of those documents. To that end, Smart is including in its next supplemental production a sampling of as-submitted RFP responses. As part of the parties' good faith meet and confer process, we ask that you review these RFP responses and then advise on your position as to whether you still contend that the production of any additional RFP responses are warranted and proportional to the needs of this case.

**Third**, you complain that HLFIP has not yet produced documents. Though this purported deficiency is not directed at Smart, we note that HLFIP is a new party to this litigation, its answer is not even due yet, and as a result your complaint appears to be premature. In any event, and for the sake of completeness, we further note that counsel for HLFIP indicated to you that they would begin producing responsive documents during the week of August 19, 2024.

We look forward to our forthcoming meet-and-confer.

Respectfully,

Dustin B. Hillsley

cc:    Counsel of Record

77637181;1