# EXHIBIT 3

```
 1  IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT IN
    AND FOR SARASOTA COUNTY, FLORIDA
 2           JULY 24, 2024 CASE MANAGEMENT HEARING
    JONATHAN LOGAN and SMART
 3  COMMUNICATIONS HOLDING, INC.,

 4           Plaintiffs,
    vs.                          Case No.:  2023-CA-1002-NC
 5
    JANICE LOGAN, individually and
 6  as Trustee of the James Logan
    Family Trust, dated February 10,
 7  2021; and ALEXIS LOGAN,

 8           Defendants.         /     (CONSOLIDATED)
    JANICE LOGAN, as Trustee of the
 9  James Logan Family Trust dated
    February 10, 2021,
10
             Counterclaim Plaintiff,
11  vs.                          Case No.:  2023-CA-1280-NC

12  JONATHAN D. LOGAN, SMART
    COMMUNICATIONS HOLDING, INC.,
13  SMART COMMUNICATIONS HOLDING,
    LLC, HLFIP HOLDING, INC., and
14  HLFIP HOLDING, LLC,

15  _____ Counterclaim Defendants./
    JANICE LOGAN, as Trustee of the
16  James Logan Family Trust dated
    February 10, 2021, and
17  derivatively on behalf of
    Smart Communications Holdings,
18  Inc.,

19           Plaintiff,

20  vs.

21  JONATHAN D. LOGAN, SMART
    COMMUNICATIONS HOLDING, INC.,
22  nominal defendant, SMART
    COMMUNICATIONS HOLDING, LLC,
23  HLFIP HOLDING, LLC,
    LOCO FLORIDA LLC and SMART
24  COMMUNICATIONS YACHT HOLDING, LLC,

25           Defendants.
    _____/
```



```
 1        THE COURT:  Because when I came into this, one
 2   of the big issues was dockets -- documents were not
 3   being turned over.
 4        And I'm now hearing documents are not being
 5   turned over, and I feel like we've addressed that
 6   and so I'm wondering:  Is this a new request, or is
 7   this documents that they have been asking for for a
 8   year?
 9        MR. BERNET:  No, sir.
10        So under the valuation proceeding, the
11   relevant date is going to be May 28, which is the
12   day before the Notice of Election was filed.
13        Now, to value the company as of that date,
14   company financials will need to be made available.
15        The company is in the process of having those
16   financials put together.  Some have been produced.
17   Others are -- I don't want to speak for
18   Mr. Hillsley, but I think -- well, I -- we're on
19   the same side, we're the same law firm, but he
20   actually has some that just need attorney review
21   that are going to be then produced, and there's
22   others that are in the process of being prepared.
23        We think that those documents are all going to
24   be available very soon.  Within three weeks,
25   certainly by the end of August is our target to get
```

```
 1      MR. BERNET:  Message is received.  And we
 2  understand and we are working towards getting
 3  everything accomplished.
 4      Again, part of the issue is looking now at
 5  some of the allegations and looking at financials
 6  and having to deal with that.  So these are -- to
 7  some extent, financials have to be created, and
 8  that's what we're working on.
 9      MR. SCHOENFELD:  Your Honor, I don't doubt the
10  good faith of any of the counsel who are on this
11  call.  That's not my concern.
12      I think -- frankly, I think you could arm them
13  with a lever to get some progress with a crisp,
14  definitive order.
15      THE COURT:  My concern, Mr. Schoenfeld, is --
16  how should I put it -- it looks like you're asking
17  for, with the formal request, a pretty big amount
18  and what I can do right now is reduce the time to
19  allow it, but I don't think that's appropriate.
20      What I think I will say is if you start
21  rounding Day 30 and you don't have a healthy
22  production by that date, that's something I'm going
23  to want to know and we would set a Motion to Compel
24  in very short order, like within a matter of days,
25  to address it.
```

# EXHIBIT 4

1  IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT IN
   AND FOR SARASOTA COUNTY, FLORIDA
2
   JONATHAN LOGAN and SMART
3  COMMUNICATIONS HOLDING, INC.,

4           Plaintiffs,
   vs.                            Case No.:  2023-CA-1002-NC
5
   JANICE LOGAN, individually and
6  as Trustee of the James Logan
   Family Trust, and ALEXIS LOGAN,
7  individually,

8  _____ Defendants. _____ /    (CONSOLIDATED)

9  JANICE LOGAN, as Trustee of the
   James Logan Family Trust dated
10 February 10, 2021, and directly
   and derivatively on behalf of
11 Smart Communications Holdings,
   Inc., and derivatively on behalf
12 of Loco Florida, LLC,

13          Plaintiff,

14 vs.                            Case No:   2023-CA-1280-NC

15 JONATHAN LOGAN, SMART
   COMMUNICATIONS HOLDING, INC.,
16 nominal defendant, and LOCO
   FLORIDA, LLC, nominal defendant,
17
   _____ Defendants. _____ /
18

19            IN-PERSON TRIAL, PHASE ONE

20       BEFORE THE HONORABLE HUNTER W. CARROLL

21                  held at the
        Judge Lynn N. Silvertooth Judicial Center
22        2002 Ringling Boulevard, Courtroom 6C
                   Sarasota, Florida
23    Monday, January 29, 2024, 8:37 a.m. to 4:56 p.m.

24             Pages 1 through 263

25           Stenographically reported by:
         Linda R. Wolfe, RPR, RMR, FCRR, FPR-C

 1  said, "No.  I can be."  He said, "Well, you might want

 2  to be.  Then check your e-mail."  I was on the phone

 3  with him, and this is what I received from them.

 4      Q.    Showing you what's been marked as

 5  Plaintiffs' 136 and has been introduced into evidence.

 6  Is this the letter that you were referring to?

 7      A.    136.  Yes, it is.

 8      Q.    And just so the record's clear, this is a

 9  letter from Shook Hardy & Bacon.  That's your mother's

10  law firm?

11      A.    Yes, it is.

12      Q.    Who is Gary Miller?

13      A.    I have no idea who Gary Miller is.

14      Q.    What did you understand your mom, through

15  these lawyers, to be asking for?

16      A.    This was almost impossible to comprehend, but,

17  to me -- are you asking me what I think?

18      Q.    What did you understand -- Strike that.

19           Let's take a look at some of the things.  One

20  of the things that she asked -- I'm looking at page 3 of

21  the letter, if you would -- is to convene a shareholder

22  meeting to appoint Janice as, 1, director of Smart

23  Communications Holding, Inc., and 2, director of other

24  Smart Communications entities.  Was that ever part of

25  your understanding with Jim?

1      A.   No.  That was one hundred percent against my

2  understanding with Jim.

3      Q.   And the next was to convene a meeting of the

4  Board of Directors of Smart Communications Holding, Inc.

5  to appoint Janice as vice president.  Was that part of

6  your understanding?

7      A.   No.  That was never -- in fact, that was

8  expressly contemplated to never happen.

9      Q.   There's a demand here to sell the yachts and

10  there's a reference to 100-foot Riva Corsaro and 48-foot

11  center console Nor-Tech, do you see that?

12      A.   I do see that.

13      Q.   Did Smart own a 100-foot Riva Corsaro?

14      A.   Smart Communications Holding does not own any

15  of that, no.

16      Q.   Do you know when the -- this 100-foot Riva

17  Corsaro was acquired or the one that she's referencing?

18      A.   Yes.  My dad purchased that in March of '22,

19  six months before he died.

20      Q.   Just to be clear, that was a purchase made by

21  Jim?

22      A.   He made all of those purchases.

23      Q.   When you say "all of those purchases," let's

24  just be clear:  Who purchased the 48-foot center console

25  Nor-Tech?

1  agreed to them.

2      Q.   You continued to negotiate with Janice over

3  the purchase of her shares at the end of January,

4  correct?

5      A.   I guess I don't understand the question.  You

6  said they continued --

7      Q.   I'm sorry.  I misspoke, if I did.  You

8  continued to negotiate with Janice for the purchase of

9  her shares into January of 2023, correct?

10     A.   We had, I would say, somewhat regular

11  communication through the holidays.  She invited me to

12  her house for Christmas.  On New Year's, I went to the

13  Bahamas.  I was sending her pictures of my dog and the

14  ocean.  We stayed in contact.

15          And then she scheduled -- as I testified

16  earlier, she scheduled a discussion about the Stock

17  Purchase Agreement sometime, I believe, in the beginning

18  of January.  And that's really about the end of our

19  communication.

20     Q.   It's fair to say there were no communications

21  with your mother about the purchase of the shares after

22  December -- or January 17th, correct?

23     A.   The last communication I got from her was she

24  sent me -- I think.  I would have to go back and check.

25  But I think the last communication I got from her was

1  when she sent me the picture of the contract for a

2  hundred million dollars from my dad and her's marriage

3  renewal, and she has never reached out to me since, and

4  then I got the Shook Hardy demand letter.

5      Q.   And that marriage contract text was

6  January 7th?

7      A.   I don't recall.

8          MR. SCHOENFELD:  Could you display

9      Exhibit 216, please.

10         Go to page 44, please.  Can you enlarge that?

11 BY MR. SCHOENFELD:

12     Q.   Sir, is this the marriage contract to which

13 you just referred?

14     A.   I believe it is.  You said 244?

15     Q.   216.

16     A.   Okay.

17     Q.   Page 44.

18     A.   My pages aren't really numbered like that.

19     Q.   If you look down at the bottom, it says

20 Exhibit 216.044.  I'm sorry, I should have explained

21 that.

22     A.   Mine just says 07, 09, 011.  It goes all the

23 way back to 44?  Sorry.  Okay.

24         Okay.  Following.  Sorry about that.

25     Q.   Is that the text you just referred to?

1        A.    Yes.

2        Q.    And that text is dated, if we scroll up a bit,

3    January 7, 2023?

4        A.    That sounds about right.

5        Q.    Does that refresh your recollection as to when

6    your last communications with Janice over the

7    settlement -- or the purchase of her shares took place?

8        A.    I guess that's not accurate, because if you

9    turn to the next pages, it appears there was more

10   communication, and it looks like there's more

11   communication about the purchase of the shares.

12       Q.    If that refreshes your recollection, please

13   take a look and tell me when you think the last

14   communication you had with your mother about the

15   purchase of her shares took place.

16       A.    Let me look back through the texts.  I know

17   that was the last phone conversation was on the 7th.

18   She hung up on me when she didn't like the number I

19   offered.  And the rest has been through text.  And as

20   you will see, I guess the last text from her was, "What

21   e-mail do you get?  Because I think someone hacked your

22   e-mail, and they were sending spam e-mails to me."

23            And then on January 12, she said, "I will have

24   to look it at tomorrow, just block me so it won't

25   continue," was, I guess, the last text, it looks like

 1  from her.

 2          And then the next communication I got was from

 3  you guys on the 20th.

 4      Q.   So let's look at Exhibit 260.

 5      A.   You said 269?

 6      Q.   260?

 7      A.   260.

 8      Q.   Is this the letter you just referred to?

 9      A.   Let me get on track with you, I'm sorry.

10          Yes, this is the letter.

11          THE CLERK:  Your Honor, are they admitting

12      Exhibit 216?

13          THE COURT:  I don't know.

14          THE CLERK:  Are we admitting Exhibit 216?

15          MR. SCHOENFELD:  I am not, no.

16          THE COURT:  I think it was -- Mr. Clerk, I

17      think it was being used to refresh his recollection

18      as opposed to being marked, if that's where you are

19      going with your question.

20  BY MR. SCHOENFELD:

21      Q.   Sir, if you turn to the second page of this

22  exhibit, in the second paragraph, the letter alleges

23  that you had been using corporate funds to purchase

24  personal assets, including yachts, houses, luxury cars,

25  and incurred enormous sums on the corporate credit card.

# EXHIBIT 5

dotloop signature verification: dtlp.us/brvw-mm7Z-z9eT
DocuSign Envelope ID: ACECE2C0-8B89-4E6B-8039-5C1147BB4DD2

## DOCUMENT EXCHANGE AND STANDSTILL AGREEMENT

On January 20, 2023, Janice Logan, trustee of the James Logan Family Trust dated February 10, 2021 ("the Trust"), notified Jon Logan of various issues concerning Mr. Logan's management of Smart Communications Holding, Inc. ("the Company") and its affiliated entities. The Trust and Mr. Logan each is a "party" to this Document Exchange and Standstill Agreement ("agreement") and, collectively, they are "the parties."

On January 27, 2023, counsel for the Trust and Mr. Logan discussed a process by which the parties would exchange information in an attempt to avoid litigation.

Thus, the parties agree as follows:

1. This agreement shall remain in effect until February 24, 2023, unless the parties agree in writing to an extension.
2. The parties agree to exchange documents relating to the (a) issues raised in the Trust's January 20, 2023, letter and (b) statements related to an alleged shareholders' agreement in an email sent by counsel for Mr. Logan on February 2, 2023, as follows: Each party may serve the other with up to five document requests by February 10, 2023.  The requested documents will be produced on a rolling basis, with production to be completed by February 20, 2023.  Documents produced in accordance with this agreement in the context of resolution of the dispute will be used solely for that purpose and for no other purpose, including litigation, provided however that nothing in this agreement precludes any party for seeking production of such documents in litigation or other legal proceedings.  A party's production of information in accordance with this agreement is not a waiver of any objection as to relevance, admissibility or responsiveness.  Nothing under this agreement constitutes a waiver of any claim of privilege or work product protection.
3. The parties agree to not initiate any legal proceedings against each other related to the issues addressed in the Trust's January 20, 2023, letter while this agreement is in effect. However, the parties reserve the right to involve law enforcement and/or seek a civil restraining order if, in their judgment, that is necessary to prevent physical violence or property damage. Further, the parties agree not to contact each other while this agreement is in effect, except through counsel.
4. Janice Logan and Jon Logan shall remain in their current roles with the Company, and they shall continue to receive the salary, benefits and other compensation for services from the Company as they have received historically, including the use of Company property in their possession. During the term of this agreement, neither Janice Logan, nor anyone acting on her behalf, will communicate with Company employees, agents, customers, vendors or consultants directly.
5. There will be no distributions from the Company to shareholders (other than the salary, benefits and other compensation for services referenced above), aside from those distributions approved by both the Trust and Jon Logan.
6. Jon Logan may continue to live in and have exclusive use of the home purchased by the Company and located at 788 Columbus Dr., Tierre Verde, FL 33715 while this agreement is in effect, with the Company paying maintenance expenses as it has historically done.
7. Janice Logan may continue to live in and have exclusive use of the home purchased by the Company and located at 1660 Ranch Club Blvd., Sarasota, FL 34240 while this

dotloop signature verification: dtlp.us/brvw-mm7Z-z9eT

agreement is in effect, with the Company paying maintenance expenses as it has historically done.

8. Janice and Jon Logan can continue to use the vehicles purchased for them by the Company, while this agreement is in effect.

AGREED TO AS OF FEBRUARY 10, 2023 BY:

Jon Logan

Janice Logan, as Trustee of the Trust

# EXHIBIT 6

```
 1   IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT IN
     AND FOR SARASOTA COUNTY, FLORIDA
 2
     JONATHAN LOGAN and SMART
 3   COMMUNICATIONS HOLDING, INC.,

 4              Plaintiffs,
     vs.                         Case No.:  2023-CA-1002-NC
 5
     JANICE LOGAN, individually and
 6   as Trustee of the James Logan
     Family Trust, and ALEXIS LOGAN,
 7   individually,

 8              Defendants.          /     (CONSOLIDATED)

 9   JANICE LOGAN, as Trustee of the
     James Logan Family Trust dated
10   February 10, 2021, and directly
     and derivatively on behalf of
11   Smart Communications Holdings,
     Inc., and derivatively on behalf
12   of Loco Florida, LLC,

13              Plaintiff,

14   vs.                         Case No:   2023-CA-1280-NC

15   JONATHAN LOGAN, SMART
     COMMUNICATIONS HOLDING, INC.,
16   nominal defendant, and LOCO
     FLORIDA, LLC, nominal defendant,
17
     _____ Defendants.          /
18

19              IN-PERSON TRIAL, PHASE ONE

20         BEFORE THE HONORABLE HUNTER W. CARROLL

21                      held at the
           Judge Lynn N. Silvertooth Judicial Center
22          2002 Ringling Boulevard, Courtroom 6C
                      Sarasota, Florida
23     Tuesday, January 30, 2024, 8:33 a.m. to 5:24 p.m.

24         VOLUME II, Pages 264 through 568

25           Stenographically reported by:
          Linda R. Wolfe, RPR, RMR, FCRR, FPR-C
```



 1  just know that I had, at some point, discussed with her,

 2  and she was looking in my office and in my dad's

 3  cubicle.

 4       Q.    Circling back to Smart Communications, who are

 5  the company leaders of Smart Communications, or if you

 6  want to take it back to prior to your father's passing,

 7  who were the leaders of Smart Communications?

 8       A.    Well --

 9       Q.    Not being funny.  I haven't seen an org chart

10  or anything like that, Mr. Logan.

11       A.    Fair enough.  I have well over 100 employees.

12  I have 13 different departments.  And they all funnel

13  back to me.

14       Q.    Is there a Board of Directors?

15       A.    Yes.  I am the Board of Directors.

16       Q.    Besides you -- and I think your father's

17  expression, to you, if I -- I'll try to quote it.  Maybe

18  I'll get it wrong -- was he recommended that you work on

19  the business, not in the business?

20       A.    That was a saying would he say to me all the

21  time because I had a tendency to get into the details.

22       Q.    So since you were supposed to work on the

23  business, not in the business, who was running the

24  business day to day?  I understand you were, but someone

25  had to help you if you were going to focus on the big



# EXHIBIT 7

```
1   IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT IN
    AND FOR SARASOTA COUNTY, FLORIDA          PROBATE DIVISION
2
    JONATHAN LOGAN and SMART
3   COMMUNICATIONS HOLDING, INC.,

4           Plaintiffs,        Case No.:  2023-CA-1002-NC
    vs.                        Case No:   2023-CA-1280-NC
5
    JANICE LOGAN, individually and as
6   Trustee of the James Logan Family
    Trust, dated February 10, 2021,
7   and ALEXIS LOGAN, individually,

8           Defendants.
                                        /
9


10


11                  LIVE HEARING


12        BEFORE THE HONORABLE CHARLES E. WILLIAMS


13                  held at the


14      Judge Lynn N. Silvertooth Judicial Center,
            2002 Ringling Boulevard, Courtroom 6A
15                Sarasota, Florida


16              Pages 1 through 390


17            Thursday, July 20, 2023


18            9:30 a.m. to 6:43 p.m.


19


20


21        Stenographically reported by:


22        Linda R. Wolfe, RPR, RMR, FCRR


23


24


25
```



1  security; right?

2      A.    That could be one representation of financial

3  security, I suppose.

4      **Q.    Now, after your mother raised the issue of**

5  **whether you were wasting money with the company, you**

6  **terminated her salary and health benefits in May of this**

7  **year; correct?**

8      A.    When she started suing me and claiming I am

9  wasting company money on a breach of my fiduciary duty,

10  I thought, well, there's only one area where we actually

11  have made any changes to the way the company spends

12  money and structures its money, and it was to pay

13  someone who is not an employee of the company that does

14  nothing for the company and the only person that was was

15  actually my mother.

16          So that was an easy decision.  Let's stop

17  that, let's clean up, and let's operate this like a real

18  business that it is because we're being accused of not

19  operating like a real business.

20      **Q.    And the only change you made to the use of**

21  **company assets in response to your mother's allegations**

22  **of corporate waste was to terminate her salary; correct?**

23      A.    That is the only corporate waste that we have

24  done.

25      **Q.    And you were aware when you terminated her**



# EXHIBIT 8

**Smart Communications Holding, Inc.**

**Consolidated Audited Financial Statements**

**December 31, 2022**

PRIVATE AND CONFIDENTIAL

**Prepared by:**

**M. L. Shreve  CPA, P.C.**
**7781  N. Easy Street**
**Whitehall, Michigan  49461**
**231.894.5559**

**Smart Communications Holding, Inc.**
Table of Contents
December 31, 2022

|  | Page No. |
|---|---|
| **Independent Auditor's Report** | **1 - 2** |
|  |  |
| **Financial Statements** |  |
| Consolidated Balance Sheet | **3** |
| Consolidated Income Statement | **4 - 6** |
| Consolidated Statement of Retained Earnings | **7** |
| Consolidated Statement of Cash Flows | **8** |
| Consolidated Notes to Financial Statements | **9 - 13** |

PRIVATE AND CONFIDENTIAL



### 𝕸 𝕷 𝕾

**M.L. Shreve CPA, P.C.**
7781 N. Easy Street
Whitehall, Michigan 49461
231.894.5559 (phone)
231.893.2097 (fax)
www.mlshrevecpa.com
mlshrevecpa@frontier.com (email)

---

October 25, 2023

**Independent Auditor's Report**

To the Board of Directors
Smart Communications Holding, Inc.
Seminole, Florida 33777

*Opinion*

We have audited the consolidated financial statements of Smart Communications Holding, Inc., which comprise the consolidated balance sheet as of December 31, 2022, and the related consolidated statements of income, retained earnings, and cash flows for the year then ended, and the related notes to the consolidated financial statements.

In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the financial position of Smart Communications Holding, Inc. as of December 31, 2022, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

*Basis for Opinion*

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Financial Statements section or our report. We are required to be independent of Smart Communications Holding, Inc. and to meet our other ethical responsibilities, in accordance with the relevant ethical requirements relating to our audit. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

*Responsibilities of Management for the Consolidated Financial Statements*

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the consolidated financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about Smart Communications Holding, Inc.'s ability to continue as a going concern within one year after the date that the consolidated financial statements are available to be issued.

1

CONFIDENTIAL
SMART_B&R 000304

***Auditor's Responsibilities for the Audit of the Consolidated Financial Statements***

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with generally accepted auditing standards will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the consolidated financial statements.

In performing an audit in accordance with generally accepted auditing standards, we:

Exercise professional judgment and maintain professional skepticism throughout the audit.

Identify and assess the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements.

Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances but not for the purpose of expressing an opinion on the effectiveness of Smart Communications Holding, Inc.'s internal control. Accordingly, no such opinion is expressed.

Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the consolidated financial statements.

Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about Smart Communications Holding, Inc.'s ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control-related matters that we identified during the audit.

*M. L. Shreve CPA, P.C.*

**M. L. Shreve CPA, P.C.**
Whitehall, Michigan 49461

2

CONFIDENTIAL
SMART_B&R 000305

**Smart Communications Holding, Inc.**
*Consolidated Balance Sheet*
December 31, 2022

### ASSETS

| | | |
|---|---:|---:|
| **Current Assets** | | |
| Cash and Cash Equivalents | $ 865,720 | |
| Accounts Receivable - Trade | 462,259 | |
| Federal Corporate Income Tax Receivable | 1,375,000 | |
| Florida Corporate Income Tax Receivable | 459,114 | |
| Technology Grant Advance | 37,539 | |
| Prepaid Expenses | 723,934 | |
| Inventory | 690,704 | |
| Total Current Assets | | $ 4,614,270 |
| **Fixed Assets** | | |
| Buildings | 5,071,155 | |
| Kiosk Computer System | 2,987,602 | |
| Computer Software | 2,987,876 | |
| Leasehold Improvements | 355,751 | |
| Vehicles | 2,682,697 | |
| Display System & Demo Build | 43,780 | |
| Equipment | 599,469 | |
| Furniture | 163,692 | |
| | 14,892,022 | |
| Less: Accumulated Depreciation | (7,158,755) | |
| Property & Equipment, Net | | 7,733,267 |
| **Other Assets** | | |
| Shareholder Loans | 2,914,086 | |
| Affiliated Entities Receivable | | |
| Smart Communications Yacht Holding LLC | 5,505,639 | |
| Mailguard Federal Inc | 1,746,369 | |
| Loco Florida LLC | 1,358,011 | |
| HLFIP | 169,685 | |
| Total Other Assets | | 11,693,790 |
| **TOTAL ASSETS** | | $ 24,041,327 |

### LIABILITIES AND EQUITY

| | | |
|---|---:|---:|
| **LIABILITIES** | | |
| **Current Liabilities** | | |
| Accounts Payable | $ 1,277,645 | |
| Accrued Credit Cards | 182,611 | |
| Accrued Commissions | 971,993 | |
| Accrued Facility Tech Grant | 142,998 | |
| Accrued Expenses | 201,592 | |
| Current Portion - Long Term Debt | 589,405 | |
| Total Current Liabilities | | $ 3,366,244 |
| **Long Term Liabilities** | | |
| Lattice Technology License | 665,000 | |
| Note Payable - HLFIP | 52,848,813 | |
| Interest Payable - HLFIP | 5,592,170 | |
| Notes Payable - Vehicles | 59,714 | |
| Less Current Portion | (589,405) | |
| Total Long Term Debt | | 58,576,292 |
| Total Liabilities | | 61,942,536 |
| **EQUITY** | | |
| Common Stock | 448,988 | |
| Paid In Capital | 392,151 | |
| Retained Earnings | (38,742,328) | |
| Total Equity | | (37,901,209) |
| **TOTAL LIABILITIES AND EQUITY** | | $ 24,041,327 |

*See Notes to Consolidated Financial Statements.*

3

CONFIDENTIAL
SMART_B&R 000306

**Smart Communications Holding, Inc.**
*Consolidated Statement of Income*
**For the year ended December 31, 2022**

| | | |
|---|---:|---:|
| **Revenue** | | |
| Mail Services Income | $ | 4,512,000 |
| Messaging Sales | | 25,801,718 |
| Telephone Call Sales | | 9,982,532 |
| Telephone Service Fees | | 4,388,973 |
| Trust Account Funding Fees | | 37,076 |
| Miscellaneous Income | | 93,375 |
| | | 44,815,675 |
| Less Reurns and Allowances | | (35,341) |
| | | 44,780,334 |
| **Total Cost of Sales** | | (25,540,158) |
| **Gross Profit** | | 19,240,176 |
| | | |
| **Total Operating Expenses** | | (32,041,827) |
| | | |
| **Income /Loss from Operations** | | (12,801,651) |
| | | |
| **Other Income and (Expense)** | | |
| Interest Expense | $ (461,010) | |
| Penalties and Late Fees | (22,137) | |
| | | (483,147) |
| **Net Other Income and (Expense)** | | (483,147) |
| | | |
| **Net Income (Loss) for the Year** | $ | (13,284,798) |

*See Notes to Consolidated Financial Statements*                    *4*

PRIVATE AND CONFIDENTIAL

CONFIDENTIAL
SMART_B&R 000307

**Smart Communications Holding, Inc.**
*Consolidated Statement of Income - Cost of Sales*
**For the year ended December 31, 2022**

| | | | |
|---|---:|---:|---:|
| **Cost of Sales** | | | |
| Beginning Inventory | $ | $ | 1,894,859 |
| Computer and Tablet Purchases | 3,716,300 | | |
| Software Purchases | 171,080 | | |
| Technology Grant & Services - Facilities | 214,397 | | |
| Equipment Design | 70,000 | | |
| Watch | 144,714 | | |
| Voice Over IP | 224,730 | | |
| Freight and Shipping | 548,212 | | |
| Telecommunications Taxes Expense | 629,686 | | |
| Contractor Services | 1,605,422 | | |
| Facilites Commissions Expense | 11,322,286 | | |
| Salesperson Commissions | 164,193 | | |
| Sublicense Royalty Fees Expense | 23,496 | | |
| Data Sorage & Server Hosting | 167,343 | | |
| Labor - Telephone CC Sales | 616,321 | | |
| Labor - Installations | 258,964 | | |
| Labor - Mail Processing | 466,778 | | |
| Labor - Repairs & Maintenance | 601,662 | | |
| Internet Services | 478,554 | | |
| Merchant Card Fees | 1,625,594 | | |
| Travel | 1,204,257 | | |
| Meals | 82,014 | | |
| | | 24,336,003 | |
| | | 26,230,862 | |
| **Less Ending Inventory** | | (690,704) | |
| **Cost of Sales** | | **25,540,158** | |

*See Notes to Consolidated Financial Statements*            5

PRIVATE AND CONFIDENTIAL

**Smart Communications Holding, Inc.**
*Consolidated Statement of Income  - Operating Expenses*
**For the year ended December 31, 2022**

| Description | | Amount |
|---|---|---|
| Advertising and Promotions | $ | 187,879 |
| Bank Service Fees | | 6,804 |
| Depreciation Expense | | 1,636,576 |
| Health Insurance | | 369,967 |
| Workman Compensation Insurance | | 22,601 |
| Business Insurance Expense | | 331,853 |
| Outside Services | | 9,744 |
| Dues and Subscriptions | | 98,821 |
| Computer Expenses | | 162,968 |
| Professional Fees | | 110,937 |
| Regulatory and Registration Fees | | 587,094 |
| Legal Fees | | 2,562,058 |
| IP License Fees | | 17,874,783 |
| Officer Compensation | | 160,385 |
| Wages and Salaries | | 4,814,980 |
| Payroll Taxes Expense | | 568,542 |
| Payroll Service Fees | | 79,354 |
| Property Taxes | | 71,668 |
| Repairs and Maintenance | | 472,332 |
| Rent Expense | | 793,547 |
| Telephone Expense | | 50,197 |
| Contract Labor Expense | | 293,580 |
| Website Design and Maintenance | | 89,318 |
| Client Welfare Expense | | 142,976 |
| Recruitment Fees | | 131,372 |
| Professional Education | | 8,316 |
| Licenses and Permits | | 162 |
| Charitable Contributions | | 19,340 |
| Employee Welfare Expense | | 7,708 |
| Meals and Entertainment | | 144,538 |
| Office Expense | | 160,302 |
| Utilities | | 50,197 |
| Postage and Shipping | | 18,982 |
| Other Expenses | | 1,958 |
| **Total Operating Expenses** | | **32,041,827** |

*See Notes to Consolidated Financial Statements*                    6

CONFIDENTIAL
SMART_B&R 000309

**Smart Communications Holding, Inc.**
*Consolidated Statement of Retained Earnings*
**For the year ended December 31, 2022**

| | | |
|---|---|---:|
| Retained Earnings - Beginning of Year | $ | 15,211,356 |
| Effect on Retained Earnings for Prior Years' IP License Fee Liability and Interest | | (40,668,886) |
| Net Income for the Year | | (13,284,798) |
| Retained Earnings - End of Year | $ | (38,742,328) |

*See Notes to Consolidated Financial Statements.*          **7**

PRIVATE AND CONFIDENTIAL

**Smart Communications Holding, Inc.**
**Consolidated Statement of Cash Flows**
**For the year ended December 31, 2022**

| | | |
|---|---|---|
| **Cash Flows from (Provided to) Operating Activities** | | |
| Net Income (Loss) form Operations | $ | (13,284,798) |
| Adjustments to reconcile increase  in net assets | | |
| to net cash provided by (used in) operating activities: | | |
| Depreciation | | 1,636,576 |
| | | (11,648,222) |
| (Increase) Decrease in operating assets: | | |
| Accounts Receivable | | (223,173) |
| Corporate Taxes Receivable | | (1,624,177) |
| Employee Advances Receivable | | 7,149 |
| Other Receivables | | (9,364,949) |
| Prepaid Expenses | | (49,434) |
| Prepaid Corporate Taxes | | (345,697) |
| Inventory | | 1,203,684 |
| Deferred Taxes | | 90,269 |
| Increase (Decrease) in operating liabilities: | | |
| Accounts Payable | | (53,465) |
| Accrued Credit Cards Payable | | 79,693 |
| Accrued Expenses | | 278,863 |
| Accrued Federal Income Taxes | | (20,153) |
| Accrued Payroll and Withholdings | | 72,115 |
| Current Portion of Long Term Debt | | 235,595 |
| **Net Cash Flows from (Provided to) Operating Activities** | | (21,361,902) |
| | | |
| **Cash Flows From ( Provided to) Investing Activities** | | |
| Purchase of Fixed Assets - net | | (1,237,874) |
| **Net Cash Flows From (Provided to) Provided to Investing Activities** | | (1,237,874) |
| **Cash Flows From (Provided to) Financing Activities** | | |
| Note Payable - IP License Fee | | (58,440,984) |
| Payments on Notes Payable | | 18,060,844 |
| **Net Cash Flows from (Provided to) Financing Activities** | | 18,060,844 |
| | | |
| **Net Increase (Decrease) in Cash From Operating Activities** | | (4,538,932) |
| | | |
| Cash and Cash Equivalents at Beginning of Year | | 5,404,652 |
| | | |
| **Cash and Cash Equivalents at End of Year** | $ | 865,720 |

Interest Expense for the year was in the amount of $ 461,010.
Taxes Paid for the year was in the amount of $ 1,813,961.

*See Notes to Consolidated Financial Statements*                    8

CONFIDENTIAL
SMART_B&R 000311

**Smart Communications Holding, Inc.**
**Notes to Consolidated Financial Statements**
**For the year ended December 31, 2022**
================================================================

## Note A – Significant Accounting Policies

*Basis of Consolidation*

The consolidated financial statements include the financial statements of Smart Communications, U.S, Inc.; Smart Communications, Pasco, Inc.; and Smart Communications, Collier, Inc. Smart Communications Holding, Inc, owns 100 % of these companies. All transactions between Smart Communications Holding, Inc. and subsidiaries have been eliminated in the consolidated financial statements.

*Concentration of Credit Risk*

The Company normally maintains sufficient cash to meet its anticipated working capital needs. Cash in deposit accounts may, at times, exceed the Federal Deposit Insurance Corporation (FDIC) insured limit in the amount of $ 250,000. However, The Company has not experienced any losses in such accounts and therefore believes it is not exposed to any significant credit risk in these accounts.

*Cash and Cash Equivalents*

For purposes of the statement of cash flows, the Company considers all highly liquid investments, generally those assets readily convertible to known amounts of cash with a maturity of three months or less, to be cash equivalents.

*Accounts Receivable*

Accounts Receivable are customer obligations due under normal trade conditions that have been received after the year end but attributable to the current year. The Company considers these accounts receivable to be fully collectible; accordingly, no allowance for doubtful accounts is required. If amounts become uncollectible, they are charged to operations when that determination is made.

*Inventory*

Inventory consists of tablets, kiosks, and various computer parts and accessories, and is stated at the lower of cost or market using the first-in, first-out method.

*Property and Equipment*

Property and equipment is stated at cost less accumulated depreciation. Provisions for depreciation of assets are computed using the straight-line at rates which are intended to amortize the cost of such assets over their useful lives which range from 5 to 40 years. Leasehold Improvements are amortized over the service lives of the improvements, generally 40 years.

*Revenue Recognition*

Revenues are generally recognized when realized or realizable, and when earned (generally when goods are transferred or services rendered), no matter when payment is received. The Company recognizes revenue from messaging services at the point of sale, net of sales taxes (if any). Service contract revenue is recognized when the service is performed.

The Company adopted FASB ASC 606, *Revenues from Contracts with Customers*, which amended the existing standards for revenue recognition. The adoption of this new revenue standard does not have a significant impact on the amount and timing of revenue recognized in the Company's financial statements. Based on the Company's evaluation process and review of its contracts with customers, the timing and amount of revenue recognized previously is consistent with how revenue is recognized under the new standard. No changes were required to reported revenues as a result of the adoption of FASB ASC 606.

*9*

CONFIDENTIAL
SMART_B&R 000312

**Smart Communications Holding, Inc.**
**Notes to Consolidated Financial Statements**
**For the year ended December 31, 2022**
==================================================================

**Note A – Significant Accounting Policies (continued)**

*Use of Estimates*
These financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America. Management is required to make certain estimates and assumptions that affect amounts reported in the financial statements. Actual results may differ from these estimates.

*Advertising Costs*
Advertising costs are charged to operations when incurred. For the year ended December 31, 2022, advertising expense amounted to $ 187,879.

**Note B – Property and Equipment**

Property and equipment are stated at cost. All property and equipment and leasehold improvements are depreciated on the straight-line method. Repairs and maintenance of property and equipment are charged to operations, and major improvements are capitalized. Upon retirement, sale or other disposition of assets, the costs and accumulated depreciation are eliminated from the accounts, and any resulting gain or loss is included in operations.

For the year ended December 31, 2022, property and equipment consists of the following:

| Description | Cost | | 2022 Depreciation | | 12.31.2022 Accumulated Depreciation | | Net Book Value |
|---|---|---|---|---|---|---|---|
| Kiosk Computer System | $ | 2,987,602 | $ | 313,349 | $ | 2,690,779 | $ | 296,823 |
| Computer Software | | 2,987,876 | | 589,406 | | 2,370,375 | | 617,501 |
| Vehicles | | 2,682,697 | | 512,738 | | 1,354,744 | | 1,327,953 |
| Display System | | 21,280 | | 4,256 | | 17,277 | | 4,003 |
| Demo Build | | 22,500 | | 1,400 | | 20,283 | | 2,217 |
| Furniture and Fixtures | | 163,692 | | 24,972 | | 114,552 | | 49,140 |
| Buildings | | 5,071,155 | | 95,780 | | 244,189 | | 4,826,966 |
| Leasehold Improvements | | 355,751 | | 9,037 | | 26,860 | | 328,891 |
| Mail Service Equipment | | 414,217 | | 59,174 | | 241,627 | | 172,590 |
| Equipment | | 185,252 | | 26,464 | | 78,069 | | 107,183 |
| | $ | 14,892,022 | $ | 1,636,576 | $ | 7,158,755 | $ | 7,733,267 |

All property is depreciated using the straight-line method. Furniture and fixtures, computer software, demos, kiosks, and vehicles are depreciated over 5 years. Buildings and leasehold improvements are depreciated over 39 years, and machinery and equipment are depreciated over 7 years. Assets commence depreciation as of the first full month of usage.

*10*

CONFIDENTIAL
SMART_B&R 000313

**Smart Communications Holding, Inc.**
**Notes to Consolidated Financial Statements**
**For the year ended December 31, 2022**
=============================================================================

## Note D – Loans To Shareholder

At December 31, 2022, a 50 % shareholder owed the Company loans in the amount of $ 2,914,086. No interest has been accrued on the loans.

## Note E – Affiliated Entities

As of December 31, 2022, the Company has accounts receivable from the following affiliated entities:

| Description | Amount |
|---|---|
| Smart Communications Yacht Holding LLC | $    5,505,639 |
| Mailguard Federal, Inc. | 1,746,369 |
| LOCO Florida, LLC | 1,358,011 |
| HLFIP | 169,685 |
|  | $    8,779,704 |

## Note F – Subsequent Events

Management has evaluated subsequent events through October 25, 2023, the date financial statements were available to be issued. No events occurred or are pending through this date which would have a material effect on the financial statements or require disclosure in the financial statements, except as noted in Footnote Disclosure Note I

## Note G – Long Term Debt

On May 19, 2020, the Company purchased three Ford Trucks at a total financing cost of $ 93,319.44. Payments on this loan commenced as of July 3, 2020 in the amount of $ 622.02 per truck, including interest at the annual rate of 7.2900%, payable monthly for 60 months for each truck. Final payment on this loan is due on June 3, 2025. As of December 31, 2022, the principal balance on the vehicle loan is in the amount of $ 59,713.92. Interest expense on this loan for the year ended December 31, 2022 is in the amount of $ 2,988.00

As of January 1, 2019, The Company entered into a Technology License Agreement with LATTICE Incorporated. The Agreement is a Licensing Agreement with LATTICE Software wherein Smart Communications Holding, Inc. pays LATTICE a license fee, in the amount of $ 2,850,000.00 payable in monthly installments of $ 47,500.00 for sixty (60) consecutive months beginning on February 1, 2019. Upon payment in full of the License fee, Smart Communications Holding, Inc. shall pay LATTICE an annual royalty payment of $ 100.00 each year (the "Royalty Fee"). The Royalty Fee shall be due on or before December 31, of each year beginning in 2025 and shall continue until the Licensing Agreement is terminated.

As of December 31, 2022, the Company owed the balance due to LATTICE on the Licensing Agreement is in the amount of $ 665,000.

*11*

CONFIDENTIAL
SMART_B&R 000314

**Smart Communications Holding, Inc.**
**Notes to Consolidated Financial Statements**
**For the year ended December 31, 2022**
=======================================================================

**Note H – Income Taxes**

Income taxes are provided for the tax effects of transactions reported in the financial statements and consist of taxes currently due. The Company is required to recognize, measure, classify and disclose in the consolidated financial statements uncertain tax positions taken or expected to be taken in the Company's tax returns. Management has determined that the Company does not have any uncertain tax positions and associated unrecognized benefits that materially impact the consolidated financial statements or related disclosures. Since tax matters are subject to some degree of uncertainty, there can be no assurance that the Company's tax returns will not be challenged by the taxing authorities and that the Company will not be subject to additional tax, penalties, and interest as a result of such challenge. Penalties and interest assessed by income taxing authorities would be included in operating expenses.

The Company is taxed as a C Corporation under the Internal Revenue Code. For the year ended December 31, 2022, the Company incurred a net operating loss in the amount of $ 12,710,042, a carryover of disallowed business interest expense, and charitable contributions in the amount of $ 19,340.

**NOTE I – Intellectual Property License**

Smart Communications Holding, Inc. provides specialized prison inmate communication technologies. A related entity, HLFIP Holding, Inc. is the owner of proprietary intellectual property, patents, trademarks, and other know how that provides the specialized communications systems (collectively known as "HLFIP IP") which connect prison inmates, correctional facility administration, courts, attorneys, and families. As such, the HLFIP IP improves the lives and safety of the incarcerated inmates, correctional facility staff, and others involved in the delivery of those specialized communications services, as well as the elimination of contraband in postal mail at correctional facilities.

HLFIP Holding, Inc. provides Smart Communications Holding, Inc. an exclusive license of its HLFIP IP for distribution and use at correctional facilities across the United States of America. During and for the year ended December 31, 2022, Smart Communications Holding, Inc. sublicensed the HLFIP IP to Smart Communications Collier, Inc. (a ubsidiary company) for distribution and use at those correctional facilities. HLFIP is the licensor and Smart Communications, Holding, Inc. is the exclusive licensee of HLFIP IP, for which a royalty rate is charged by HLFIP to the Company. The royalty rate of 40 % of net sales was charged for the HLFIP IP. The royalty rate was determined by measurement of and comparison to independent   agreements, using the method known as the Comparable Uncontrolled Transaction ("CUT"), which was selected as the best method under Internal Revenue Code Section 482 and its Treasury Regulations Section 1.482-4(c)(2). Accordingly, Smart Communications Holding, Inc. (via its subsidiary, Smart Communications Collier, Inc.) reported an IP license expense, in the amount of $ 17,874,784 for the year ended December 31, 2022. Additionally, the Company reported interest in the amount of $ 446, 870, calculated at the rate of 5 % for one-half of the year, 2022.

The Company has also reflected the prior years' use of the HLFIP IP license for the years of 2015 – 2021 as a long-term liability in the amount of $ 52,848,813, and accrued interest of $ 5,592,170. Retained earnings has been adjusted to reflect effects of this inclusion for prior year use of the HLFIP license.

*12*

CONFIDENTIAL
SMART_B&R 000315

# EXHIBIT 9

# Clay County Sheriff's Office

RFP #23-0002
Inmate Communication Services
Proposal

**COPY**



Different Culture.
Different Approach.
Different Outcome.

*Communication, Automation, Intelligence*

©2024 Smart Communications

# CLAY COUNTY SHERIFF'S OFFICE
RESPONSE TO RFP #23-0002
INMATE COMMUNICATION SERVICES



February 14, 2024

Mr. John Householder, Contracts Analyst
Clay County Sheriff's Office
901 North Orange Ave.
Green Cove Springs, FL  32043

Dear Mr. Householder:

Smart Communications is pleased to submit our proposal in response Clay County Sheriff's Office RFP #23-002 for the provisioning of Inmate Communication Services for the Clay County Jail.

Our firm is corrections' most innovative company. For more than a decade, we have been driven by our passion for innovation, resulting in the development of multiple new technologies and services that have truly transformed the inmate communications landscape for the better. In fact, many of the technologies and services that are now commonplace in corrections, such as inmate messaging/email, digital requests and grievances, and electronic postal mail delivery, were first designed and implemented by Smart Communications.

To both meet and exceed the County's requirements and expectations, we are proposing a comprehensive inmate communications technology and service package composed of our turnkey SmartEvo™ ITS, SmartVisit™ VVS, SmartInmate™ Electronic Messaging System and SmartEntertainment™ Streaming Media Platform, along with multiple value-added technologies, services and benefits at *no cost*.

The greatest evidence of a company's ability to provide successful integration, timely service delivery and a true partnership is best demonstrated by current utilization, client references and testimonials. Smart Communications' client footprint has grown organically for 15 years, from one account to more than 150 facilities throughout 26 states. Our client partners in the state of Florida currently include:

- Brevard County Sheriff's Office
- Collier County Sheriff's Office
- Flagler County Sheriff's Office
- Hernando County Sheriff's Office
- Indian River County Sheriff's Office
- Levy County Sheriff's Office
- Osceola County Sheriff's Office
- Putnam County Sheriff's Office
- Charlotte County Sheriff's Office
- Columbia County Sheriff's Office
- Florida Civil Commitment Center
- Highlands County Sheriff's Office
- Lee County Sheriff's Office
- Orange County Sheriff's Office
- Polk County Sheriff's Office

Please refer to "***Exhibit A: Confidential Client Partner List and Testimonials***," which provides point of contact information for all our client partners. We invite you to reach out to any of our clients as this will provide direct feedback on how their partnership with Smart Communications has benefited their facility staff, inmates and the communities they serve.

We welcome the opportunity to demonstrate our proposed technologies and services to the County as a part of the RFP evaluation process. This demonstration will provide an invaluable firsthand look at all potential solutions, allowing for a more informed and strategic approach to selecting the service provider that best aligns with your specific needs and goals. Moreover, it will provide the County with a chance to learn more about our latest innovation, the SmartWatch™ Offender Wearable. The SmartWatch™ is the most advanced technology

# CLAY COUNTY SHERIFF'S OFFICE

RESPONSE TO RFP #23-0002
INMATE COMMUNICATION SERVICES



ever introduced to the corrections environment and offers a whole new universe of control, communication, intelligence and possibilities.

We are excited to collaborate with the County and contribute to the improvement of inmate communication, safety and efficiency at your facility. Our team is committed to delivering a solution that is tailored to your specific needs and requirements, and we welcome any customization requests or further discussions to ensure the success of this project. Moreover, our experience ensures a smooth and successful roll-out of all technologies and services proposed, and as fellow Floridians, headquartered in Pinellas County, we are uniquely positioned to provide rapid, direct on-site support should the need ever arise.

Thank you for your consideration. If you have any questions, need additional information or would like to schedule a demonstration, please do not hesitate to contact me directly by phone 888-253-5178 or email jon.logan@smartcommunications.us.

Respectfully,

Jon Logan
CEO, Smart Communications

Cc: Guy Mosteller (Account Manager), Jerome Anderson (VP of Sales)

CONFIDENTIAL                                                                                    SMART-0004998

# CLAY COUNTY SHERIFF'S OFFICE
RESPONSE TO RFP #23-0002
INMATE COMMUNICATION SERVICES



# Table of Contents

Executive Summary ........................................................................................................................... 5

SECTION TWO SCOPE OF WORK ....................................................................................................... 8

    2.1 Purpose ..................................................................................................................................... 8

    2.2 Statistical Information ............................................................................................................... 8

    2.3 Vendor Requirements ............................................................................................................... 9

    2.4 Inmate Telephone System (ITS) Features and Functionality .................................................. 18

    2.5 Telephone/Kiosk Equipment Requirements ........................................................................... 23

    2.6 American with Disabilities Act (ADA) ...................................................................................... 26

    2.7 Call Protocols ......................................................................................................................... 26

    2.8 Monitoring and Recording Requirements .............................................................................. 28

    2.9 Video Visitation System (VVS) ................................................................................................ 40

    2.10 Inmate Postal Mail System (IPMS) ...................................................................................... 47

    2.11 Inmate Email and Text Messaging ....................................................................................... 51

    2.12 Inmate Tablets and Applications .......................................................................................... 57

    2.13 Vendor Maintenance ........................................................................................................... 62

    2.14 Inmate Funds Accounts (IFA) .............................................................................................. 63

    2.15 Payment and Commission Accountability ............................................................................ 64

Appendix A: Required Forms .............................................................................................................. 65

    VENDOR REGISTRATION FORM ...................................................................................................... 65

    PROPOSER W-9 FORM .................................................................................................................... 66

    PROPOSAL AUTHORIZED SIGNATURE FORM .................................................................................. 67

    PROPOSAL SUBMITTAL FORM ........................................................................................................ 68

    QUALIFICATIONS STATEMENT FORM .............................................................................................. 69

    NON-COLLUSIVE AFFIDAVIT ........................................................................................................... 71

    PUBLIC ENTITY CRIMES STATEMENT FORM .................................................................................... 72

    DRUG FREE WORKPLACE FORM ...................................................................................................... 73

    INDEMNIFICATION/HOLD HARMLESS FORM .................................................................................. 74

    PRIOR EXPERIENCE NARRATIVE ..................................................................................................... 75

    REFERENCE LIST FORM ................................................................................................................... 76

    VENDOR QUESTIONNAIRE .............................................................................................................. 77

    COST/FEE SCHEDULE ...................................................................................................................... 78

        Cost Proposal/Financial Offer Overview ........................................................................... 86

# Clay County Sheriff's Office

Response to RFP #23-0002
Inmate Communication Services



LIST OF SUBCONTRACTORS ................................................................................................ 101

Exhibit A: Confidential Client Partner List and Testimonials ....................................... 102

Exhibit B: Business Registrations, Certifications and Licenses ................................... 115

Exhibit C: Confidential Financial Statements............................................................... 123

Exhibit D: Confidential Litigation Matters .................................................................... 129

Exhibit E: Service Escalation Matrix and Maintenance Plan ....................................... 130

Exhibit F: Methodology and Management Plan............................................................ 134

Exhibit G: Proposal Acknowledgement Form and Addendum .................................... 140

Exhibit H: Confidential Information Notice .................................................................. 159

## CLAY COUNTY SHERIFF'S OFFICE

RESPONSE TO RFP #23-0002
INMATE COMMUNICATION SERVICES



# Exhibit C: Confidential Financial Statements

### 2022 Consolidated Financial Statements – Independent Accountant's Review Report|



ℳ 𝓛 𝓢

**M.L. Shreve CPA, P.C.**
7781 N. Easy Street
Whitehall, Michigan 49461
231.894.5559 (phone)
231.893.2097 (fax)
www.mlshrevecpa.com
mlshrevecpa@frontier.com (email)

---

### INDEPENDENT ACCOUNTANT'S REVIEW REPORT

To Management
Smart Communications Holding, Inc.
Seminole, Florida 33777

We have reviewed the accompanying consolidated financial statements of Smart Communications Holding, Inc. (a corporation), which comprise the consolidated balance sheet as of December 31, 2022, and the related consolidated statements of income and retained earnings and cash flows for the year then ended, and the related notes to the consolidated financial statements. A review includes primarily applying analytical procedures to management's financial data and making inquiries of company management. A review is substantially less in scope than an audit, the objective of which is the expression of an opinion regarding the consolidated financial statements as a whole. Accordingly, we do not express such an opinion.

#### *Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of the consolidated financial statements that are free from material misstatement whether due to fraud or error.

#### *Accountant's Responsibility*

Our responsibility is to conduct the review engagement in accordance with Statements on Standards for Accounting and Review Services promulgated by the Accounting and Review Services Committee of the AICPA. Those standards require us to perform procedures to obtain limited assurance as a basis for reporting whether we are aware of any material modifications that should be made to the consolidated financial statements for them to be in accordance with accounting principles generally accepted in the United States of America. We believe that the results of our procedures provide a reasonable basis for our conclusion.

We are required to be independent of Smart Communications Holding, Inc. and to meet our other ethical responsibilities in accordance with the relevant ethical requirements related to our review.

#### *Accountant's Conclusion*

Based on our review, we are not aware of any material modifications that should be made to the accompanying consolidated financial statements in order for them to be in accordance with accounting principles generally accepted in the United States of America.

*M. L. Shreve CPA, P.C.*
Whitehall, Michigan
July 26, 2023

CONFIDENTIAL                    SMART-0005119

# CLAY COUNTY SHERIFF'S OFFICE

RESPONSE TO RFP #23-0002
INMATE COMMUNICATION SERVICES



## 2022 Consolidated Balance Sheet|

**Smart Communications Holding, Inc.**
*Consolidated Balance Sheet*
**December 31, 2022**

### ASSETS

| | | |
|---|---:|---:|
| **Current Assets** | | |
| Cash and Cash Equivalents | $ 852,272 | |
| Accounts Receivable - Trade | 617,034 | |
| Technology Grant Advances | 37,539 | |
| Taxes Receivable - Federal | 355,700 | |
| Prepaid Corporate Taxes - Florida | 65,828 | |
| Prepaid Facility Commissions | 458,333 | |
| Prepaid Expenses | 265,601 | |
| Inventory | 690,704 | |
| **Total Current Assets** | | $ 3,343,011 |
| **Fixed Assets** | | |
| Buildings | 6,715,548 | |
| Kiosk Computer System | 2,937,602 | |
| Computer Software | 2,997,876 | |
| Leasehold Improvements | 356,751 | |
| Vehicles | 2,832,697 | |
| Display System & Demo Build | 43,780 | |
| Equipment | 599,469 | |
| Furniture | 131,051 | |
| | 16,503,774 | |
| Less: Accumulated Depreciation | (7,196,441) | |
| Property & Equipment, Net | | 9,307,333 |
| **Other Assets** | | |
| Shareholder Loans | 1,453,103 | |
| Accounts Receivable - Affiliated Entities | 7,496,203 | |
| Deferred Income Taxes - Federal | 536,261 | |
| Deferred Taxes - Florida | 90,269 | |
| **Total Other Assets** | | 9,575,916 |
| **TOTAL ASSETS** | | $ 22,226,260 |

### LIABILITIES AND EQUITY

| | | |
|---|---:|---:|
| **LIABILITIES** | | |
| **Current Liabilities** | | |
| Accounts Payable | $ 1,290,422 | |
| Accrued Credit Cards | 264,120 | |
| Accrued Commissions | 971,993 | |
| Accrued Expenses | 332,813 | |
| Current Portion - Long Term Debt | 589,405 | |
| **Total Current Liabilities** | | $ 3,447,753 |
| **Long Term Liabilities** | | |
| Lattice Technology License | 666,000 | |
| Notes Payable - Vehicles | 59,714 | |
| Less Current Portion | (589,405) | |
| **Total Long Term Debt** | | 136,309 |
| **Total Liabilities** | | 3,586,062 |
| **EQUITY** | | |
| Common Stock | 384,667 | |
| Paid In Capital | 392,151 | |
| Retained Earnings | 17,863,380 | |
| **Total Equity** | | 18,640,198 |
| **TOTAL LIABILITIES AND EQUITY** | | $ 22,226,260 |

*See Accountant's Review Report and Notes*

2

CONFIDENTIAL

CONFIDENTIAL          SMART-0005120

# CLAY COUNTY SHERIFF'S OFFICE

RESPONSE TO RFP #23-0002
INMATE COMMUNICATION SERVICES



## 2022 Consolidated Income Statement |

**Smart Communications Holding, Inc.**
*Consolidated Income Statement*
For the year ended December 31, 2022

| | | |
|---|---|---|
| **Revenue** | | |
| Revenue from Contracts with Customers - Mail Services | | |
| Mail Services Income | $ | 4,512,000 |
| Revenue from Contracts with Customers - Messaging | | |
| Messaging Sales | | 25,932,773 |
| Telephone Call Sales | | 9,982,533 |
| Telephone Service Fees | | 4,388,973 |
| Trust Account Funding Fees | | 37,076 |
| | | 40,341,355 |
| Returns and Allowances | | (35,341) |
| Net Messaging Sales | | 40,306,014 |
| Total Net Revenue witrh Customers | | 44,818,014 |
| Miscellaneous Income | | 81,183 |
| **Total Net Revenue** | | 44,899,197 |
| **Total Cost of Sales** | | (24,076,834) |
| **Gross Profit** | | 20,822,363 |
| **Total Expenses** | | (15,762,740) |
| **Income /Loss from Operations** | | 5,059,623 |
| | | |
| **Other Income and (Expense)** | | |
| Interest Expense | $ (14,140) | |
| Penalties and Late Fees | (22,137) | |
| | | (36,277) |
| **Net Other Income and (Expense)** | | (36,277) |
| **Income Before Taxes** | | 5,023,346 |
| **Provision for Income Taxes** | | |
| State Income Tax Expense | (110,987) | |
| Florida Corporate Tax Expense | (282,300) | |
| Federal Income Tax | (1,019,300) | |
| **Total Provision for Taxes** | | (1,412,587) |
| | | |
| Net Income (Loss) for the Year | $ | 3,610,759 |

*See Accountant's Review Report and Notes*    **3**

CONFIDENTIAL    SMART-0005121

# CLAY COUNTY SHERIFF'S OFFICE

RESPONSE TO RFP #23-0002
INMATE COMMUNICATION SERVICES



## 2021 Consolidated Financial Statements – Independent Auditor's Report|



$\mathcal{M L S}$

M.L. Shreve CPA, P.C.
7781 N. Easy Street
Whitehall, Michigan 49461
231.894.5559 (phone)
231.893.2097 (fax)
www.mlshrevecpa.com
mlshrevecpa@frontier.com (email)

December 21, 2022

**Independent Auditor's Report**

To the Board of Directors
Smart Communications Holding, Inc.
Seminole, Florida 33777

**Report on the Audit of the Consolidated Financial Statements**

*Opinion*

We have audited the consolidated financial statements of Smart Communications Holding, Inc., which comprise the consolidated balance sheet as of December 31, 2021, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for the year then ended, and the related notes to the consolidated financial statements.

In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the financial position of Smart Communications Holding, Inc. as of December 31, 2021, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

*Basis for Opinion*

We conducted our audit in accordance with auditing standards generally accepted in the United States of America (GAAS). Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Financial Statements section or our report. We are required to be independent of Smart Communications Holding, Inc. and to meet our other ethical responsibilities, in accordance with the relevant ethical requirements relating to our audit. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

*Responsibilities of Management for the Consolidated Financial Statements*

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the consolidated financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about Smart Communications Holding, Inc.'s ability to continue as a going concern for year ended December 31, 2023.

*1*

CONFIDENTIAL                    SMART-0005122

# CLAY COUNTY SHERIFF'S OFFICE

RESPONSE TO RFP #23-0002
INMATE COMMUNICATION SERVICES



## 2021 Consolidated Balance Sheet (Audited)|

**Smart Communications Holding, Inc.**
*Consolidated Balance Sheet*
**December 31, 2021**

| ASSETS | | |
|---|---:|---:|
| **Current Assets** | | |
| Cash and Cash Equivalents | $ 5,404,652 | |
| Accounts Receivable - Trade | 239,086 | |
| Accounts Receivable - Employees | 7,149 | |
| Technology Grant Advances | 37,539 | |
| Taxes Receivable - Florida | 109,937 | |
| Prepaid Corporate Taxes - Florida | 100,000 | |
| Prepaid Expenses | 674,500 | |
| Inventory | 1,894,388 | |
| **Total Current Assets** | | $ 8,467,251 |
| **Fixed Assets** | | |
| Buildings | 4,034,661 | |
| Kiosk Computer System | 2,987,602 | |
| Computer Software | 2,987,875 | |
| Leasehold Improvements | 355,710 | |
| Vehicles | 2,514,000 | |
| Display System & Demo Build | 43,780 | |
| Equipment | 599,469 | |
| Furniture | 131,051 | |
| | 13,654,148 | |
| Less: Accumulated Depreciation | (5,525,408) | |
| Property & Equipment, Net | | 8,128,740 |
| **Other Assets** | | |
| Shareholder Loans | 428,855 | |
| Accounts Receivable - Affiliated Entities | 1,899,986 | |
| Deferred Income Taxes - Federal | 536,251 | |
| Deferred Taxes - Florida | 90,269 | |
| **Total Other Assets** | | 2,955,361 |
| **TOTAL ASSETS** | | $ 19,551,352 |

| LIABILITIES AND EQUITY | | |
|---|---:|---:|
| **LIABILITIES** | | |
| **Current Liabilities** | | |
| Accounts Payable | $ 1,331,100 | |
| Accrued Credit Cards | 102,916 | |
| Accrued Commissions | 581,378 | |
| Accrued Expenses | 254,750 | |
| Federal Income Tax Payable | 20,153 | |
| Note Payable - ACG Global | 36,694 | |
| Current Portion - Long Term Debt | 825,000 | |
| **Total Current Liabilities** | | $ 3,151,991 |
| **Long Term Liabilities** | | |
| Lattice Technology License | 1,187,500 | |
| Notes Payable - Vehicles | 68,687 | |
| Less Current Portion | (825,000) | |
| **Total Long Term Debt** | | 431,187 |
| **Total Liabilities** | | 3,583,178 |
| **EQUITY** | | |
| Common Stock | 364,667 | |
| Paid In Capital | 392,151 | |
| Retained Earnings | 15,211,356 | |
| **Total Equity** | | 15,968,174 |
| **TOTAL LIABILITIES AND EQUITY** | | $ 19,551,352 |

*See Notes to Consolidated Financial Statements.*     3

CONFIDENTIAL    SMART-0005123

# CLAY COUNTY SHERIFF'S OFFICE

RESPONSE TO RFP #23-0002
INMATE COMMUNICATION SERVICES



## 2021 Consolidated Income Statement (Audited)

**Smart Communications Holding, Inc.**
*Consolidated Income Statement*
**For the year ended December 31, 2021**

| | | | |
|---|---|---:|---:|
| **Revenue** | | | |
| Mail Services Income | | $ | 4,512,000 |
| Messaging Sales | | | 21,628,106 |
| Telephone Call Sales | | | 5,510,925 |
| Telephone Service Fees | | | 638,138 |
| Miscellaneous Income | | | 30,252 |
| | | | 32,319,421 |
| Sales Reporting Errors | | | (370,089) |
| Less Reurns and Allowances | | | (22,955) |
| | | | 31,926,377 |
| **Total Cost of Sales** | | | (15,795,401) |
| **Gross Profit** | | | 16,130,976 |
| | | | |
| **Total Expenses** | | | (10,961,790) |
| | | | |
| **Income /Loss from Operations** | | | 5,169,186 |
| | | | |
| **Other Income and (Expense)** | | | |
| Gain on Sale of Assets | | | 540,589 |
| Interest Expense | $ | (125,242) | |
| Penalties and Late Fees | | (170,123) | |
| | | | (295,365) |
| **Net Other Income and (Expense)** | | | 245,224 |
| **Income Before Taxes** | | | 5,414,410 |
| **Provision for Income Taxes** | | | |
| Florida Income Tax | | (119,794) | |
| Federal Income Tax | | (783,902) | |
| **Total Provision for Taxes** | | | (903,696) |
| | | | |
| **Net Income (Loss) for the Year** | | $ | 4,510,714 |

*See Notes to Consolidated Financial Statements.*                    *4*

CONFIDENTIAL          SMART-0005124

# EXHIBIT 13

THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC ,

    Plaintiffs

v                                                    CASE NO    2023-CA-001002

JANICE LOGAN, individually and as Trustee
of the James Logan Family Trust dated
February 10, 2021 and ALEXIS LOGAN,
individually,

    Defendants
_____/    CONSOLIDATED WITH

JANICE LOGAN, as Trustee of the James
Logan Family Trust, dated February 10, 2021,

    Plaintiff,

v                                                    CASE NO    2023-CA-001280

JONATHAN D  LOGAN and SMART
COMMUNICATIONS HOLDING, INC ,
nominal defendant, and LOCO FLORIDA, LLC,
nominal defendant,

    Defendants
_____/

### ORDER ON JANICE LOGAN'S MOTION TO APPOINT A
### TEMPORARY CUSTODIAN AND FOR CONTEMPT

**THIS MATTER** came before the Court for hearing on December 6, 2023 on the *Motion to*

*Appoint a Temporary Custodian and for Contempt* ("Contempt Motion") filed by JANCE LOGAN,

individually and as Trustee of the James Logan Family Trust dated February 10, 2021 ("Janice"), and

1

the Court, having reviewed the Contempt Motion and the Smart Parties'[1] Response thereto, having heard the arguments of counsel, and otherwise being advised fully in the premises, it is hereby

**ADJUDGED**

1.      Without admission of any liability or wrongdoing whatsoever, Jonathan Logan ("Jon"), Smart Communications Holding, Inc ("Smart Communications"), and Smart Communications Holding, LLC, a Delaware limited liability company ("Smart Delaware") hereby stipulate as follows

> a    Jon, Smart Communications, and Smart Delaware, agree that they will take no action to cause Smart Communications or Smart Delaware to pay licensing and/or royalty fees for its use of intellectual property owned by HLFIP, LLC, except as may be permitted by further Court Order on proper motion and notice  This includes Jon agreeing not to allow any entity he owns or controls from paying such licensing and/or royalty fees

> b    Jon, Smart Communications, and Smart Delaware agree that they will take no action to cause any payment, or any other action that is outside the ordinary course of business, by Smart Communication or Smart Delaware, other than those as have been made in the usual and ordinary course of business (such as to Yacht), to be made to any entity owned or controlled by Jon, except as may be permitted by further Court Order on proper motion and notice

> c    Smart Communications Holding LLC, a Delaware limited liability company ("Smart Delaware") agrees to submit to the jurisdiction of this Court and shall be made party defendant in CASE NO   2023-CA-001280

> d    Janice shall be entitled to access to the books and records of Smart Delaware to the same extent to which she would be entitled to access to books and records of Smart

---

[1] Collectively, Jonathan Logan, Smart Communications Holding, Inc  and Loco Florida, LLC

Communications in accordance with, and without limitation to, chapter 607, Florida Statutes Historical books and records of both Smart Communications and Smart Delaware shall be provided no later than December 24, 2023

2   Except as stated herein, nothing herein shall prejudice any of the rights of the parties to take further action or seek further relief from this Court, including to modify or expire the terms set forth herein or as may otherwise be appropriate

**DONE AND ORDERED** in Chambers, at Sarasota County, Florida, on this $\underline{15^{th}}$ day of December, 2023

HONORABLE HUNTER W CARROLL
Circuit Court Judge

Copies furnished to Counsel of Record

#12285772 v2

# EXHIBIT 14

Jonathan D. Logan
Managing Member
HLFIP Holding, LLC
10491 72nd Street
Seminole, Florida 33777

April 15, 2024

Smart Communications Holding, LLC
Attention:     Accounts Payable, ap@smartcommunications.us
               Operations Department, lisa.eddy@smartcommunications.us
               Legal Department, legal@smartcommunications.us
10491 72nd Street
Seminole, Florida 33777

        Re: Notice of Breach of License Agreement and Intent to Terminate

To whom it may concern,

I write to you in my capacity as the Managing Member of HLFIP Holding, LLC ("HLFIP"),
pursuant to the Exclusive Intercompany Intellectual Property License Agreement dated August
29, 2023 ("Agreement") with Smart Communications Holding, LLC ("Smart"). As you may
know, pursuant to the Agreement, Smart was granted the right to use HLFIP's intangible assets,
including proprietary technology, patents, patent applications, registered and common law
names, trademarks, service marks, logos, federal trademark registrations, and know-how related
to at least the following HLFIP technologies, systems, products, software, methods, processes,
and services (collectively, "Licensed Intellectual Property"):

- MailGuard
- MailGuardLegal
- MailGuard Connect
- MailGuard Digital
- MailGuard Tracker
- SmartWatch
- SmartBike
- SmartEcosystem
- SmartEd
- SmartEntertainment
- SmartLaw
- SmartLink
- SmartReentry
- SmartRequest
- SmartTablet
- SmartVisit

SMART-0004115

The Licensed Intellectual Property undoubtedly covers numerous technologies and services Smart offers to provide and provides to various correctional facilities across the United States.

Notwithstanding Smart's ongoing reliance on and use of HLFIP's Licensed Intellectual Property pursuant to the Agreement, to date, Smart has not complied with its payment obligations as required by the Agreement. Smart's failure to make timely payment violates at least Sections 1 and 5 of the Agreement, as well as the entire purpose of the Agreement.

As per the explicit provisions of the Agreement, specifically Section 5 entitled "Payment," Smart was obligated to remit a royalty payment of 40 percent of Smart's net sales ("Royalty Fee") by December 29, 2023. Because the Royalty Fee still has not been received, Smart is in default of the Agreement.

Please arrange to have the payment of all past-due amounts delivered to HLFIP no later than December 31, 2024, along with any applicable late fees as outlined in Section 5.2 of the Agreement.

Please be advised that timely and full payment under the terms of the Agreement is essential for the continuation of the license granted therein. If the overdue Royalty Fee is not paid in full by December 31, 2024, HLFIP will have no choice but to terminate Smart's license and all rights granted thereunder. Termination of the license will result in the immediate cessation of Smart's use of the Licensed Intellectual Property and may subject Smart to further legal action to enforce the Agreement and to recover any damages suffered by HLFIP as a result of Smart's breach.

Additionally, please also be informed that a material term of the Agreement was the ongoing exclusive control and direction of Smart by Jonathan Logan. Therefore, should any change in the control of Smart occur, including but not limited to a change in the officers or directorship of Smart, or the appointment of a custodian or the initiation of receivership, such action will constitute a material breach and will result in the immediate termination of the Agreement. Again, termination would result in the immediate cessation of Smart's right to use the Licensed Intellectual Property, including all technologies and software, as well as any other rights granted under the Agreement.

My goal is to maintain the integrity and mutual respect that formed the basis of our contractual and business relationship. I look forward to receiving the required ongoing payments promptly, and all outstanding amounts no later than December 31, 2024.

Sincerely,


Jonathan D. Logan
Managing Member, HLFIP Holding, LLC

SMART-0004116

# EXHIBIT 15

IN THE TWELFTH JUDICIAL CIRCUIT COURT
IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
JANICE LOGAN,
        Plaintiff,

                                  CASE NO.  2023 CA 001002 NC

v.                                      DIVISION C CIRCUIT

JANICE LOGAN,
JANICE LOGAN AS TRUSTEE OF
THE JAMES LOGAN FAMILY
TRUST DATED FEBRUARY 19 2021,
ALEXIS LOGAN,
JONATHAN D LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
LOCO FLORIDA LLC,
        Defendant.
_____

## ORDER SETTING CASE FOR NONJURY TRIAL

    IT IS ORDERED that this case is set for nonjury trial as follows:

**Docket Sounding:**              01/17/2025 at 8:45 a.m.

**Nonjury Trial Term Begins:**    01/27/2025 at 9:00 a.m.

**Number of Weeks in Trial Term:**  3 weeks

**Estimated Trial Length:**       7 day(s)

**Courthouse Location:**       Lynn N. Silvertooth Judicial Center - 2002 Ringling
                                Blvd. - Sarasota - FL 34237

**Courtroom:**                    6-C

**[ X ]    If checked, the parties within 10 days must complete a revised Case
        Management Report (form found on the Court's website) that corresponds to
        this new trial period, and the parties must file it in the Court file
        immediately.**

**Special instructions for this case (none if blank):** This includes the consolidated case as well (23-CA-1280). Unless otherwise ordered, this will be on all remaining issues.

IT IS FURTHER ORDERED that:

All trials are conducted in-person in the Courthouse unless the presiding judge provides otherwise.

Attorneys and parties appearing for Docket Sounding must appear as follows. (The parties and attorneys do not need to advise the Court how they will appear if the Court is permitting either in person or Zoom appearance.)

**Docket Sounding:**          Either in person or via Zoom at discretion of party/attorney

If the Court authorized remote appearance by Zoom at Docket Sounding, the assigned judge's Zoom credentials are:

**Zoom Credentials:**   https://www.zoom.us/ Click "Join A Meeting"
                        **Meeting ID:**  353 234 4884
                        **Password:**    756433
                        **Audio:**       1.253.215.8782 - only if no video access

IT IS FURTHER ORDERED that:

1.      Attorneys must comply with the circuit's Local Rules and the Standard of Professionalism of the Twelfth Judicial Circuit.

2.      The parties must adhere to the most recent discovery and case management deadlines contained in the Court's most recent Case Management Order. All deadlines and requirements for discovery, motion practice, and mediation are controlled by the Case Management Order. Nothing in this Order obviates any provision of the Case Management Order.

3.      Each party is limited to one expert per specialty.

4.      Lead counsel for each party must attend the mandatory Docket Sounding in person to address all matters relating to the trial. The lead counsel shall have full authority to make stipulations at Docket Sounding. Motions will not be heard at Docket Sounding unless leave is granted by the Court. Unless stricken through below, the attorneys and unrepresented parties shall confer and prepare a complete, single set of documents to be provided to the Court in electronic format; at Docket Sounding:

- operative pleadings;
- any stipulated facts;
- an indexed list of each party's trial exhibits together with notations as to stipulations on authenticity and admissibility of each exhibit; and
- all substantive rulings in the case (e.g., partial summary judgment orders).

5.      A party may, but is not required to, submit a trial memorandum. If a party is to submit a trial memorandum, it must be submitted no later than . If no date is listed, it must be submitted by Docket Sounding.

6.      Failure to attend the mandatory Docket Sounding could result in the Court dismissing the action, striking the pleadings, limiting proof or witnesses, or taking other appropriate action. See Fla. R. Civ. P. 1.200(c).

7.      All exhibits must be marked with the Clerk prior to starting the trial. Please contact the Clerk for the Clerk's naming convention (i.e., plaintiff's exhibits are numbered 1, 2, 3, etc. and defendant's exhibits are lettered A, B, C, etc.).

8.      Once a trial date is set, the Court discourages continuance motions. All continuance motions must be in writing, contain the reasons for the continuance, and be signed by the client/party. The party filing the motion must submit a courtesy copy to the presiding judge's chambers when the motion is filed. A stipulation to continue a trial does not automatically continue the trial. A trial may only be continued by Court Order. The Court assumes any attorney appearing on behalf of a party can try this case. Where a party has multiple counsel appearing, the Court likely will not accept last minute complaints about known conflicts. Any attorney filing a notice of conflict involving the trial date set in this case with any other trial is under an affirmative obligation to set a status conference expeditiously to resolve the conflict. Failure to do so constitutes a waiver of the claimed conflict.

[ ]      IT IS FURTHER ORDERED that  shall serve a copy of this Order on all parties; execute a certificate of service identifying all persons served with service information; and file the certificate of service in the Court file.

### Expectations for All Participants Attending Zoom Hearings

Please see the expectations for all participants on the Twelfth Judicial Court Website: https://www.jud12.flcourts.org/Public-Information/Public-Court-Hearings.

### Court Reporters

The Court does not provide a court reporter. If a party wishes to have a court reporter present, that party must arrange for the court reporter's attendance and must notify all other parties before the hearing.

### No Recording Proceedings

Filed 07/24/2024 02:16 PM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL

By court rule and court order, you are not authorized to make your own audio or visual recording of a court proceeding. No one may take "screenshots" or other audio or visual depictions of a court proceeding. Recording a court proceeding is strictly prohibited unless approved by the Judge. If you violate these rules, you may be held in contempt of court. Members of the media must comply with rule 2.450 and administrative order 2020-23.2 regarding media coverage. Please contact the Court's Public Information Officer for further information.

### Late entry or Technical Difficulties

If you are not logged in when the hearing begins, the judge may not interrupt the proceedings to admit you to the hearing. If you have trouble logging in, and you wish to participate in the hearing, contact the Court's judicial assistant immediately at (941) 861-7946.

### ADA Notice

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Sarasota County Jury Office, P.O. Box 3079, Sarasota, Florida 34230-3079, (941) 861-8000, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711.

DONE AND ORDERED in Sarasota, Sarasota County, Florida, on July 24, 2024.

e-Signed 7/24/2024 2:16 PM 2023 CA 001002 NC

**HUNTER W CARROLL**
Circuit Judge

### <u>SERVICE CERTIFICATE</u>

On July 24, 2024, the Court caused the foregoing document to be served via the Clerk of Court's case management system, which served the following individuals via email (where indicated). On the same date, the Court also served a copy of the foregoing document via First Class U.S. Mail on the individuals who do not have an email address on file with the Clerk of Court.

CRAIG STEPHEN BARNETT
200 EAST LAS OLAS BLVD
SUITE 2100
FORT LAUDERDALE, FL  33301

CHARLES FRANKLIN JOHNSON III
802 11TH ST W
BRADENTON, FL  34205

BRETT ALAN GEER
PO BOX 47212
SAINT PETERSBURG, FL  33743

JOSEPH H III VARNER
777 S. HARBOUR ISLAND PLACE, #800
TAMPA, FL  33602
JASON SAMUEL OLETSKY
401 E JACKSON ST STE 1700
TAMPA, FL  33602

M MARIE WILSON
2357 S TAMIAMI TRAIL #3 PMB #122
VENICE, FL  34293

MARK JAMES BERNET
AKERMAN SENTERFITT PA
401 EAST JACKSON STREETSUITE 1700
TAMPA, FL  33602

MARK MATTHEW WALL
101 EAST KENNEDY BLVD
SUITE 3700
TAMPA, FL  33602

ANITRA F RAIFORD
100 N TAMPA ST STE 2900

JONATHAN T TORTORICI
802 11TH STREET WEST
BRADENTON, FL  34205
JAROD A BRAZEL
101 E. KENNEDY BLVD., SUITE 3700
TAMPA, FL  33602

JULIE NEGOVAN
6750 N ANDREWS AVE STE 200
FORT LAUDERDALE, FL  33309

REGINALD KEITH PETERSEN
6750 N ANDREWS AVE STE 200
FORT LAUDERDALE, FL  33309

SARAH O'ROURKE
100 N TAMPA STREET STE 2900
SUITE 2900
TAMPA, FL  33602

ANDREW L FRANKLIN
111 S. WACKER DR.
STE. 4700
CHICAGO, IL  60606

DAVID E SCHOENFELD
111 SOUTH WACKER DRIVE
SUITE 4700
CHICAGO, IL  60606

REGINALD KEITH PETERSEN
6750 N ANDREWS AVE STE 200
FORT LAUDERDALE, FL  33309

JESSICA LEONA MAZZEO
1880 JFK BLVD. SUITE 1800
PHILADELPHIA, PA  19103

PETER F O'NEILL
2555 GRAND BOULEVARD
KANSAS CITY, MO  64108
CHELSEA KOFF
200 EAST LAS OLAS BLVD
SUITE 2100
FORT LAUDERDALE, FL  33301

CHRISTOPHER ROY CLARK
106 EAST COLLEGE AVENUE
SUITE 700
TALLAHASSEE, FL  32301

GLENN T BURHANS JR
106 EAST COLLEGE AVENUE
SUITE 700
TALLAHASSEE, FL  32301

CHRISTOPHER ROY CLARK
106 EAST COLLEGE AVENUE
SUITE 700
TALLAHASSEE, FL  32301

Filed 07/24/2024 02:16 PM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL

DUSTIN BRYAN HILLSLEY
AKERMAN LLP
201 EAST LAST OLAS BOULEVARD, SUITE 1800
FORT LAUDERDALE, FL  33301

CHRISTOPHER GEORGE OPRISON
DLA PIPER LLP (US)
200 SOUTH BISCAYNE BOULEVARD - SUITE 2500
MIAMI, FL  33131

Filed 07/24/2024 02:16 PM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL

# EXHIBIT 16

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR DESOTO, MANATEE, AND SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and
SMART COMMUNICATIONS HOLDING, INC.

        Plaintiff(s) / Petitioner(s),

v.                                 Case No.: 2023-CA-1002 & 2023-CA-1280
                                    Division: C (Sarasota)
JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021;
and ALEXIS LOGAN

        Defendant(s) / Respondent(s).

_____

**<u>NOT AGREED</u>**
**<u>CASE MANAGEMENT REPORT</u>**
**(for use in General Cases – Circuit & County Civil)**

**Did all parties meet and confer as required?**
    ☑ Yes
    ☐ No. (Must attend Initial Case Management Conference unless the Court excuses you.)

**This Case Management Report is submitted on behalf of:**
    ☐ All parties named in this lawsuit, each of whom agrees to this Report.
    ☑ Only on behalf of the following party or parties: Janice Logan and Alexis Logan.

**The parties in this lawsuit request a:**
    ☐ Jury trial (to begin within 18 months of the date of filing of the lawsuit).
    ***Proposed trial date:*** Trial Date. PTC PTC Date DS DS Date.
    ☑ Nonjury trial (to begin within 12 months of the date of filing of the lawsuit).
    ***Proposed*** *trial date:* 1/27/2025 Docket Sounding 1/17/2025
    ☐ An extended trial date; may require appearance at Initial Case Management
    Conference. Briefly describe the reason for the request and include proposed month and
    year of trial: Month & Year.

**Do you believe the trial will last more than 5 days (inclusive of jury selection)?**
    ☑ Yes.    ***Estimated*** *Days*: 7
    ☐ No.    ***Estimated*** *Days*: # Days

**Setting the case for trial:**
    ☑ The parties waive the "at issue" requirement and request the Court to enter an order
        setting the case for trial for the date agreed to above.

☐ The parties do not waive the "at issue" requirement, and the Plaintiff must send the Court a proposed order setting the case for the date agreed to above within 15 days of the case being at issue. The Court will set a firm trial date when at issue.

☐ The parties do not agree to a proposed trial date and will attend Initial Case Management Conference and will discuss with the Court setting the case for trial.

**Trial calendars are posted on the Civil Division Page under "DeSoto," "Manatee," "Sarasota," and "South County (Venice)" tabs.**

The Court in establishing Case Management deadlines will give due regard to the parties' proposed deadlines. As required by various administrative orders, Case Management deadlines established in the case management order will be strictly enforced. A party must demonstrate good cause for a date to be changed.

| DEADLINE, EVENT, OR QUESTION | RESPONSE |
|---|---|
| **Do all parties agree to this Case Management Report?** (If no, you must attend the Initial Case Management Conference unless excused by the Court.) | ☐ Yes  ☑ No |
| **Date this lawsuit was filed.** | 2/27/2023 |
| **Have all Defendants been served?** | ☑ Yes  ☐ No |
| **If all Defendants have not been served, what deadline do you propose by when the last Defendant will be served?** | N/A |
| **Do the parties believe a counterclaim, crossclaim, or third-party complaint may be filed?** | ☑ Yes  ☐ No |
| **Have all counterclaims, third-party claims, and crossclaims been served on the relevant defendant party?** | ☐ Yes  ☑ No<br>☐ Not Applicable |
| **Deadline to file a Motion to Add Party or Amend Pleadings.** (If the movant has not scheduled the motion for hearing within 15 calendar days of filing the motion, the Court may deny the motion as being in violation of the case management order. The motion does not need to be heard within 15 days; it simply must be set for hearing.) | 8/30/2024 |
| **Deadline for all motions to dismiss directed to the pleadings or objections to the pleadings to be resolved, including motions to strike.** (If greater than 60 days, parties must appear at the Initial Case Management Conference, unless excused by the Court.) | 9/30/2024 |

| DEADLINE, EVENT, OR QUESTION | RESPONSE |
|---|---|
| **Do the parties believe discovery will include substantial Electronically Stored Information or significant Court time to address Electronically Stored Information?** | ☐ Yes ☑ No |
| **Do the parties agree to exchange initial witness and exhibit lists?  If so, by what date?** (The Court recommends 30 days after filing of this report.) | ☑ Yes ☐ No 10/18/2024 |
| **Do the parties anticipate having one or more expert witnesses?** (The Court limits each party to one expert per specialty.) | ☑ Yes ☐ No ☐ Unknown |
| **Deadline to file expert witness lists for experts used to support affirmative claims.** (The Court recommends 90 days before the Pre-Trial Conference date in jury cases and 90 days before the Trial Period in nonjury cases.) | 10/1/2024 |
| **Deadline to file expert witness lists for experts used to oppose affirmative claims.** (The Court recommends 60 days before the Pre-Trial Conference date in jury cases and 60 days before the Trial Period in nonjury cases.) | 10/1/2024 |
| **Do the parties agree to have the experts author written reports?** | ☐ Yes ☑ No |
| **If the parties agree to have the experts author written reports, the deadline for experts used to support affirmative claims to submit their written reports.** (The Court recommends 60 days before the Pre-Trial Conference.) | 11/15/2024 |
| **If the parties agree to have the experts to author written reports, the deadline for experts used to oppose affirmative claims to submit their written reports.** (The Court recommends 30 days before the Pre-Trial Conference.) | 11/15/2024 |
| **Deadline to file a motion seeking to add a nonparty to the verdict form (i.e., _Fabre_ defendant).** (The Court recommends 45 days before the Pre-Trial Conference.) | 12/13/2024 |
| **Deadline to file final witness and exhibit lists, which list includes designation of those witnesses and exhibits a party reasonably believes the party will call or use in trial.** (The Court recommends 45 days before the Pre-Trial Conference date in jury cases and 45 days before the Trial Period in nonjury cases.) | 11/15/2024 |

| DEADLINE, EVENT, OR QUESTION | RESPONSE |
|---|---|
| **Discovery deadline. No discovery may occur after this date without Court permission or, only if permitted by the Court, agreement of all parties.** (The Court recommends the Pre-Trial Conference Date for jury cases and 30 days before the first day of the Trial Period for nonjury cases.) | 12/20/2024 |
| **Dispositive motion (i.e., summary judgment) and <u>Daubert</u> motion deadline to be filed.** (The Court recommends no later than 90 days before the first day of the Trial Period.) | 12/20/2024 |
| **Dispositive motion (i.e., summary judgment) and <u>Daubert</u> motion deadline to be heard.** (These motions may not be heard within 30 days before the first day of the Trial Period without Court permission. Any pending motion not heard by the Court by this deadline will be denied.) | 1/24/2025 |
| **Deadline for all other motions to be heard.** (The Court will not permit motions to be heard after Docket Sounding without Court permission. Any pending motion after this date will be denied.) | 1/17/2025 |
| **Mediation deadline** (The Court recommends no later than the Pre-Trial Conference date.) | N/A |

### Magistrate Referral

The Court refers certain matters to a general magistrate as permitted by Florida Rule of Civil Procedure 1.490(a). The Court will refer all motions directed to the pleadings and all discovery motions. The parties may agree to additional matters to be referred.

### Attorney Appearance

Each attorney that appears on behalf of a party must file a separate notice of appearance and designation of email address. (Multiple attorneys within the same firm must each file a separate notice of appearance and designation of email address.) This is an on-going requirement for any new attorney that appears during the litigation. Each attorney that appears is fully responsible for the case.

Please identify all known attorneys currently appearing for each party for each status that parties holds, such as Plaintiff or Defendant. Some parties may have more than one status, such as Defendant and Counterclaim Plaintiff, and will have multiple entries in the table below. If a party does not have an attorney, simply complete the Party Name and Status of the table below. Please remember that each corporate entity must have an attorney represent it. Additionally, an individual sued in a representative capacity, such as Trustee, must have an attorney represent the person in the person's representative capacity.

| Party Name | Status | Attorney Name | FL Bar # |
|---|---|---|---|
| Janice Logan | Plaintiff/Defendant/Counter-Plaintiff | Anitra Raiford Clement | 100354 |
| Janice Logan | See above | David E. Schoenfeld | PHV 1047561 |
| Janice Logan | See above | John D. Garretson | PHV 1057004 |
| Janice Logan | See above | Peter F. O'Neill | PHV 1043125 |
| Janice Logan | See above | Andrew L. Franklin | PHV 1035737 |
| Janice Logan | See above | Kailin Liu | PHV 1051416 |
| Alexis Logan | Defendant | Charles F. Johnson | 898937 |
| Jonathan D. Logan, Smart Communications Holding, Inc., Loco Florida, LLC, Smart Communications Holding, LLC, Smart Communications Yacht Holding, LLC | Plaintiff/Defendant/Counter-Defendant | Michael J. Harwin | 1018578 |
| Jonathan D. Logan, Smart Communications Holding, Inc., Loco Florida, LLC, Smart Communications Holding, LLC, Smart Communications Yacht Holding, LLC | Plaintiff/Defendant/Counter-Defendant | Glenn Burhans, Jr. | 605867 |
| Jonathan D. Logan, Smart Communications Holding, Inc., Loco Florida, LLC, Smart Communications Holding, LLC, Smart Communications Yacht Holding, LLC | Plaintiff/Defendant/Counter-Defendant | Christopher R. Clark | 1002388 |
| Jonathan D. Logan, Smart Communications Holding, Inc., Smart Communications Holding, LLC, Loco Florida, LLC | Plaintiff/Defendant/Counter-Defendant | Mark Bernet | 606359 |
| Jonathan D. Logan, Smart Communications Holding, Inc., Smart Communications Holding, LLC, Loco Florida, LLC | Plaintiff/Defendant/Counter-Defendant | Jason S. Oletsky | 9301 |

| Party Name | Status | Attorney Name | FL Bar # |
|---|---|---|---|
| Jonathan D. Logan, Smart Communications Holding, Inc., Smart Communications Holding, LLC, Loco Florida, LLC | Plaintiff/Defendant/Counter-Defendant | Dustin B. Hillsley | 1018589 |
| Jonathan D. Logan, Smart Communications Holding, Inc., Smart Communications Holding, LLC, LocoFlorida, LLC | Plaintiff/Defendant/Counter-Defendant | Max C. Rudolf | 98766 |
| HLFIP Holding, LLC | Defendant/Counter-Defendant | Christopher G. Oprison | 122080 |

The parties do not agree to this Case Management Report in Case Numbers: 2023-CA-1002-NC and 2023-CA-1280-NC (consolidated into the 1002 matter)

ADDITIONAL INFORMATION:

Since the Court instructed the Parties to use the Court's form for the Case Management Report on August 8, Janice Logan and Alexis Logan circulated the completed form on Monday August 12 to the opposing counsel group for approval, and followed up with counsel for those parties three times without gaining final approval--Mr. Harwin did note that he was deferring SmartComm's other counsel. On August 16, HLFIP suggested moving trial back 120-150 days, which Janice opposes. It is Janice's position that the Court already heard argument on the trial date at the Case Management Conference, and then set a date it deemed appropriate. Mindful that it has been nearly a month since the Case Management Conference, Janice and Alexis submit this form as Not Agreed even though they believe it is substantially similar to the prior, agreed non-standard form that was submitted to the Court.

CASE CAPTION - The above case caption is not the operative case caption for the Consolidated Action, 2023-CA-1002 and 2023-CA-1280 (consolidated into the 1002 matter). Additional parties include Smart Communications Holding, LLC, Loco Florida LLC, Smart Communications Yacht Holding, LLC, and HLFIP Holding, LLC.

EXPERT WITNESSES - The Parties will supplement their expert witness disclosures and produce expert reports, files, materials, and related documents, on or before November 15, 2024. The Parties may but are not required to produce expert reports. If they do, nothing herein should be read to define the acceptable format and content of an expert's work product (i.e. "report"). The supplemental disclosure shall include not fewer than three dates when their expert witness is available for deposition on or before December 20, 2024.

EXHIBIT LIST FINAL DEADLINE - To clarify the final witness and exhibit list deadline, the final witness list deadline is the November 15, 2024 date selected above. The deadline for final exhibit lists will be January 9, 2025. The Parties shall designate any agreed exhibits on or before January 16, 2025. On or before January 23, 2025, the Parties shall provide all other parties copies of the exhibits on their Final Exhibit List, either electronically or in hard copy form. It is not sufficient to say that the documents have been previously produced.

INTERROGATORIES - Janice Logan and Smart Communications Holding, Inc. may propound 25 interrogatories on or after the date of the Order Setting Trial (DIN 711). If any party wishes to serve additional interrogatories (other than those permitted by the Court's rules), they may file a motion or seek a stipulation.

DEPOSITIONS TO READ - If any Party intends to read portions of a deposition at the Trial, they shall provide a page/line summary of the testimony to be introduced on or before January 16, 2025. Objections to the page/line summary shall be made prior to the pretrial conference and will be heard at or before the pretrial conference. The Court will allow additional deposition testimony to be read at trial for impeachment purposes only. This paragraph is intended to discourage surprise and increase efficiency, but not to otherwise preclude evidence—it should not be read to prevent witness testimony at Trial via deposition testimony to the extent agreed or allowed by court order.

TRIAL BRIEFS - Any Party may submit a trial brief on or before January 24, 2025.


Name:        David E. Schoenfeld
Bar Number:  PHV 1047561
Firm:        Shook, Hardy & Bacon L.L.P.
Email:       dschoenfeld@shb.com
Address 1:   111 South Wacker Drive
Address 2:   Suite 4700
Address 3:   Chicago, IL 60606
Attorney for: Janice Logan, individually and as Trustee of the James Logan Family Trust, dated February 10, 2021
Date:        8/16/2024

/s/  David E. Schoenfeld
_____
Signature

**Certificate of Service**

On 8/16/2024, I certify (1) that I sent a copy of the Case Management Report directly to the Manatee County Case Manager  or Sarasota County Case Manager AND (2) I either (check one box):

☒        electronically filed the foregoing Case Management Report with the Clerk of Court by using the Florida Court, which will send a copy to:

     **or**

☐        served a copy of the foregoing Case Management Report by First Class U.S. Mail to:

Name:        Michael J. Harwin
Bar Number:  1018578
Firm:        Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.
Email:       mharwin@stearnsweaver.com
Address 1:   200 East Las Olas Boulevard
Address 2:   Suite 2100
Address 3:   Fort Lauderdale, FL 33301
Attorney for: Jonathan D. Logan; Smart Communications Holding, Inc.; Smart Communications Holding, LLC; Loco Florida, LLC; Smart Communications Yacht Holding, LLC

Name:        Glenn Burhans, Jr.
Bar Number:  605867
Firm:        Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.
Email:       gburhans@stearnsweaver.com
Address 1:   106 East College Avenue
Address 2:   Suite 700
Address 3:   Tallahassee, FL 32301
Attorney for: Jonathan D. Logan; Smart Communications Holding, Inc.; Smart Communications Holding, LLC; Loco Florida, LLC; Smart Communications Yacht Holding, LLC

Name:        Christopher R. Clark
Bar Number:  1002388
Firm:        Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.
Email:       crclark@stearnsweaver.com
Address 1:   106 East College Avenue
Address 2:   Suite 700
Address 3:   Tallahassee, FL 32301
Attorney for: Jonathan D. Logan; Smart Communications Holding, Inc.; Smart Communications Holding, LLC; Loco Florida, LLC; Smart Communications Yacht Holding, LLC

Name:        Mark Bernet
Bar Number:  606359
Firm:        Akerman LLP
Email:       mark.bernet@akerman.com
Address 1:   401 E. Jackson Street
Address 2:   Suite 1700
Address 3:   Tampa, FL 33602-5250
Attorney for: Jonathan D. Logan; Smart Communications Holding, Inc.; Smart
Communications Holding, LLC; Loco Florida, LLC

Name:        Jason S. Oletsky
Bar Number:  9301
Firm:        Akerman LLP
Email:       jason.oletsky@akerman.com
Address 1:   201 East Las Olas Boulevard
Address 2:   Suite 1800
Address 3:   Fort Lauderdale, FL 33301
Attorney for: Jonathan D. Logan; Smart Communications Holding, Inc.; Smart
Communications Holding, LLC; Loco Florida, LLC

Name:        Dustin B. Hillsley
Bar Number:  1018589
Firm:        Akerman LLP
Email:       dustin.hillsley@akerman.com
Address 1:   201 East Las Olas Boulevard
Address 2:   Suite 1800
Address 3:   Fort Lauderdale, FL 33301
Attorney for: Jonathan D. Logan; Smart Communications Holding, Inc.; Smart
Communications Holding, LLC; Loco Florida, LLC

Name:        Max C. Rudolf
Bar Number:  98766
Firm:        Akerman LLP
Email:       max.rudolf@akerman.com
Address 1:   201 East Las Olas Boulevard
Address 2:   Suite 1800
Address 3:   Fort Lauderdale, FL 33301
Attorney for: Jonathan D. Logan; Smart Communications Holding, Inc.; Smart
Communications Holding, LLC; Loco Florida, LLC

Name:        Christopher G. Oprison
Bar Number:  122080
Firm:        DLA Piper LLP (US)
Email:       chris.oprison@dlapiper.com
Address 1:   200 South Biscayne Boulevard
Address 2:   Suite 2500

Address 3:      Miami, FL 33131-5341
Attorney for:   HLFIP Holding, LLC


/s/  David E. Schoenfeld

_____

Signature

# EXHIBIT 17

IN THE TWELFTH JUDICIAL CIRCUIT COURT
IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
JANICE LOGAN,
       Plaintiff,

v.

CASE NO.  2023 CA 001002 NC
       DIVISION C CIRCUIT

JANICE LOGAN,
JANICE LOGAN AS TRUSTEE OF
THE JAMES LOGAN FAMILY
TRUST DATED FEBRUARY 19 2021,
ALEXIS LOGAN,
JONATHAN D LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
LOCO FLORIDA LLC,
       Defendant.

_____

## <u>CASE MANAGEMENT ORDER</u>
### (for use in General Circuit Civil Cases)

**IT IS ORDERED:**

This Case Management Order supersedes any existing Case Management Orders in this case. The Court references the Case Management Report filed on the progress docket on August 16, 2024 at DIN 724. The Court imposes all deadlines identified in that Case Management Report as Court-imposed deadlines. The Court entered a separate trial order [see DIN 711].

**Experts required to provide written reports:**    No

**IT IS FURTHER ORDERED:**

1. **Attendance at the Initial Case Management Conference (select one):**
   [X]   The parties are excused from attending the Initial Case Management Conference.

   [ ]   The Clerk is directed to cancel the Initial Case Management Conference within the case management system that was set for     .

   [ ]   The parties must attend the Initial Case Management Conference as ordered.

Page 1 of 3

2. **Ability of parties to modify discovery dates without Court permission (select one):**

[ ]  The parties by agreement may modify discovery deadlines without Court Order, except the parties may not extend discovery beyond the Pre-Trial Conference.

[X]  The parties by agreement may modify discovery deadlines without Court Order, except the parties may not extend discovery beyond Docket Sounding.

3. **Other Court instructions (none if blank):**

### IMPORTANT NOTICE

The Court will strictly enforce the deadlines set by this Case Management Order. Failure to abide by these deadlines may result in sanctions, including and without limitation to, the exclusion of witnesses and evidence, the striking of pleadings, or the dismissal of the case. No deadline may be modified without Court permission unless otherwise stated in paragraph 2 or 3.

DONE AND ORDERED in Sarasota, Sarasota County, Florida, on August 19, 2024.

e-Signed 8/19/2024 4:10 PM 2023 CA 001002 NC

**HUNTER W CARROLL**
Circuit Judge

### SERVICE CERTIFICATE

On August 19, 2024, the Court caused the foregoing document to be served via the Clerk of Court's case management system, which served the following individuals via email (where indicated). On the same date, the Court also served a copy of the foregoing document via First Class U.S. Mail on the individuals who do not have an email address on file with the Clerk of Court.

DAVID E. SCHOENFELD, ESQ.
schoenfeld@shb.com

MICHAEL J. HARWIN, ESQ.
mharwin@stearnsweaver.com

GLENN BURHANS, JR., ESQ.
gburhans@stearnsweaver.com

Filed 08/19/2024 04:10 PM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL

CHRISTOPHER R. CLARK, ESQ.
crclark@stearnsweaver.com


MARK BERNET, ESQ.
mark.bernet@akerman.com


JASON S. OLETSKY, ESQ.
jason.oletsky@akerman.com


DUSTIN B. HILLSLEY, ESQ.
dustin.hillsley@akerman.com


MAX C. RUDOLF, ESQ.
max.rudolf@akerman.com


CHRISTOPHER G. OPRISON, ESQ.
chris.oprison@dlapiper.com


JOHN D. GARRETSON, pro hac vice
jgarretson@shb.com

**Filed 08/19/2024 04:10 PM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL**

# EXHIBIT 18

# IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,

Plaintiffs,

v.                                                          Case No. 2023-CA-1002-NC

JANICE LOGAN, individually, as Trustee of the James
Logan Family Trust, dated February 10, 2021, and as
Personal Representative of the ESTATE OF JAMES
LOGAN, JUSTIN PETERSON, and ALEXIS LOGAN,

Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021,

Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., SMART
COMMUNICATIONS HOLDING, LLC, and HLFIP
HOLDING, LLC,

Counterclaim Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan          (CONSOLIDATED)
Family Trust, dated February 10, 2021, and derivatively
on behalf of Smart Communications Holding, Inc.,

Plaintiff,                    Case No.: 2023-CA-1280-NC

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., nominal
defendant, SMART COMMUNICATIONS HOLDING,
LLC, HLFIP HOLDING, LLC,
LOCO FLORIDA LLC, and SMART
COMMUNICATIONS YACHT HOLDING, LLC,

Defendants.

_____/

**ORDER ON JANICE LOGAN'S AMENDED MOTION TO COMPEL DISCOVERY FROM SMART COMMUNICATIONS HOLDING, INC./LLC AND HLFIP HOLDING, LLC**

This cause came before the Court on Janice Logan's ("Janice") Amended Motion to Compel Discovery from Smart Communications Holding, Inc./LLC ("SmartComm") and HLFIP Holding, LLC ("HLFIP"), DIN 832 (the "Motion"), SmartComm's Response in Opposition (DIN 853), and HLFIP's Response in Opposition (DIN 851), and the Court having heard argument of counsel, having reviewed the court file and being otherwise fully advised it is Ordered and Adjudged as follows:

1.     The Court defers ruling on Janice's Amended Motion to Compel as to SmartComm (specifically as to certain 2024 financials) unless and until the issue becomes ripe following the Court's Phase II decision regarding valuation date.

2.     The Court grants the Motion to Compel as to HLFIP.

a.   HLFIP is made a party to the Confidentiality Order entered in this case at DIN 362, and the Confidentiality Order's provisions shall apply to all discovery responses and documents produced by HLFIP.

b.   HLFIP is ordered to produce documents responsive to Janice's First Requests for Production to HLFIP by December 2, 2024.

DONE AND ORDERED in Sarasota County, Florida.

e-Signed 12/2/2024 7:24 AM 2023 CA 001002 NC

_____
Honorable Hunter W. Carroll
Circuit Judge

# EXHIBIT 19

# IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
# IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,

    Plaintiffs,

v.               Case No. 2023-CA-1002-NC

JANICE LOGAN, individually, as Trustee of
the James Logan Family Trust, dated
February 10, 2021, and as Personal
Representative of the ESTATE OF
JAMES LOGAN, JUSTIN PETERSON, and
ALEXIS LOGAN,

    Defendants.
            /

JANICE LOGAN, as Trustee of the James
Logan Family Trust, dated February 10,
2021,

    Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC.,
SMART COMMUNICATIONS HOLDING, LLC,
and HLFIP HOLDING, LLC,

    Counterclaim Defendants.
            /

JANICE LOGAN, as Trustee of the James  (CONSOLIDATED)
Logan Family Trust, dated February 10,
2021, and derivatively on behalf of Smart
Communications Holding, Inc.,

    Plaintiff,      Case No.: 2023-CA-1280-NC

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., nominal
defendant, SMART COMMUNICATIONS
HOLDING, LLC, HLFIP HOLDING, LLC,
LOCO FLORIDA LLC, and SMART
COMMUNICATIONS YACHT HOLDING, LLC,

    Defendants.   /

**JANICE LOGAN'S AMENDED[1] MOTION TO COMPEL DISCOVERY
FROM SMART COMMUNICATIONS HOLDING, INC./LLC AND
HLFIP HOLDING, LLC, AND FOR ATTORNEYS' FEES**

Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021 ("Janice"), hereby moves pursuant to Florida Rule of Civil Procedure 1.380 to compel discovery from Smart Communications Holding, Inc./LLC ("SmartComm") and HLFIP Holding, LLC ("HLFIP"). Janice respectfully requests an order compelling SmartComm and HLFIP to comply fully with Janice's outstanding Requests for Production of Documents on or before December 6, 2024.

**BACKGROUND**

SmartComm issued its Election to Purchase the 50% ownership share of SmartComm held by the James Logan Family Trust, of which Janice is Trustee, on June 20, 2024. SmartComm has made no offer since then to purchase the Trust's shares. Consequently, this case is scheduled for trial during the Court's January 27, 2025 trial setting period on judicial valuation pursuant to Fla. Stat. § 607.1436(4) and on all other pending claims (DIN 711).

Janice served her Fourth Requests for Production of Documents to Smart Communications Holding, Inc. and its new wholly owned Delaware subsidiary Smart Communications Holding, LLC and First Requests for Production of Documents to HLFIP Holding, LLC/Inc. on July 8, 2024 ("Janice's Requests" or

---

[1] Janice originally filed her Motion to Compel as to SmartComm and HLFIP on August 20, 2024 (DIN 731). This Motion is amended to limit the requested relief as to SmartComm in light of subsequent productions, and to ask the Court to compel HLFIP to produce documents under the existing Confidentiality Order in this matter (DIN 362) for the reasons outlined at the end of the Discussion section. The Motion additionally contains stylistic changes to comply with the Court's directive to the parties to be more concise.

"Requests"). *See* DIN 703; Requests attached as Exhibit 1. Janice's Requests seek financial records and other documents essential to the proper valuation of SmartComm. In a letter serving her Requests, Janice requested that documents be produced prior to the Rule 1.350 deadline to allow Janice's experts reasonable time to work on the valuation. *See* Exhibit 2.

In a Meet and Confer on July 9, 2024, SmartComm indicated that it believed Janice's request for documents ahead of the Rule 1.350 deadline was reasonable and it would start producing documents within a couple of weeks. Neither SmartComm nor HLFIP did so.

SmartComm and HLFIP filed their written objections and responses, and SmartComm served a production on the August 7, 2024 deadline. *See* DINs 718, 719. As relevant to this Motion, SmartComm objected and responded as follows:

> 4. All historical financials (i.e., income statements, balance sheets, and any other internal financials) through the most recently available date—including complete 2024 data up to and including the present day.

> **Smart objects to the time frame of this Request to the extent it seeks information related to matters after May 28, 2024, the day before Janice's petition under Fla. Stat. § 607.1430 was filed. See Fla. Stat. § 607.1436(4). Subject to the foregoing objection, Smart responds as follows:**

> **Smart refers Janice to its previous production (Bates range SMART_B&R 000005-67, 000071-139, 000208-400, 000525-530, 000543-1044; LOCO_B&R 000001-000099; and YACHT_B&R 000001-000003) in response to a books-and-records request by Janice, which production includes information potentially responsive to this Request. Smart also refers Janice to its previous productions made for purposes of mediation, which it is reproducing here with Bates range SMART-0000001-0000145, 0002359-0003003, and its documents previously produced on November 29, 2023 (Bates**

**range Plaintiffs0001532-0001577).  Those productions include information potentially responsive to this Request.**

**Smart further responds that it will supplement its productions with updated financials through year-end 2023, and with interim, non-audited financials through May 2024.**

To date, SmartComm has produced current versions of its financial records. SmartComm has acknowledged both in open court and in a letter to Janice, however, that the reason for its original delay in the production of financials was that it was altering the financials. Janice has sought production of prior versions of those records and the raw data they reflect in order to understand SmartComm's alterations, but SmartComm has not produced that material.

Meanwhile, HLFIP has produced nothing. HLFIP indicated in mid-August that it would begin rolling productions the week of August 19, but then backtracked and has produced no documents to date because they have demanded a new, more stringent Confidentiality Order be entered even though a Confidentiality Order has already been entered in this Consolidated Action (DIN 362). Janice conveyed a proposed compromise to HLFIP, but as of this writing HLFIP has not responded substantively. Janice therefore asks for relief from the Court in this Amended Motion.

## DISCUSSION

### I.    SmartComm's Failure to Reveal How It Altered Its Financials.

Janice has yet to receive complete 2024 financial records because Jon and SmartComm continue mid-litigation antics in the face of two injunctions. Janice has been asking for 2024 financials since February 2024, prior to mediation of

this matter following Phase I Trial, including pursuant to multiple books and records requests. *See* Exhibit 3 (including Req. No. 2 therein for updated books and records); *see also* Exhibit 4 (deficiency letter regarding same); *see also* Exhibit 5 (SmartComm's response to Janice's deficiency letter alleging she had not stated a proper purpose for her books and records request). SmartComm even previewed at the July 24, 2024 Case Management Conference that the reason for delay was that they were altering and creating the financials, "Again, part of the issue is looking now at some of the allegations and looking at financials and having to deal with that.  So these are – to some extent, financials have to be created, and that's what we're working on." *See* Exhibit 6, 7/24 CMC Tr. at 26:4–8. SmartComm's counsel confirmed that they were adjusting the books in a response to Janice's deficiency letter. *See* Exhibits 7 (deficiency letter) and 8 (SmartComm response letter). Then, during a Meet and Confer on August 14, 2024, counsel for HLFIP—not SmartComm—explained that SmartComm's 2024 financials are being "corrected." HLFIP blamed the purported need to "correct" SmartComm's financials on decedent Jim Logan's alleged accounting practices as CFO (which justification happens to align with the allegations in Jon and SmartComm's First Amended Complaint (*see* DIN 734)). Janice finally received substantial production of the altered 2024 financials on September 13, 2024.

However, Janice has not received the un-altered financials, the raw data undergirding them, or any precise explanation of what changes SmartComm made in spite of requesting "complete 2024 data up to and including the present

day." *See* Exhibit 1, RFP No. 4 (quoted above). And, at this late stage prior to January 2025 trial of this Consolidated Action, Janice and her experts will have to expend time and resources uncovering the extent of the alterations and how they affect SmartComm's EBITDA margin and value if the Court is to use the statutory default date of May 28, 2024. Making matters worse, Janice will likely have to contend with invocation of the attorney-client privilege, accountant-client privilege, and attorney work product doctrine in doing so. *See* Exhibit 9, D. Hillsley to P. O'Neill (Responding to a request for a Corp. Representative deposition on the topic of versions of the financials and alterations thereof, "Before we can confirm date/time, location, and designee, we need further information from you. Specifically, the topics as described appear to concern exclusively accountant-client, attorney client, and/or work product privileged information."). The altered financials almost certainly inure to Jon's benefit in this litigation by reducing SmartComm's margins and increasing expenses, and Jon/SmartComm clearly intend to use the altered records as a sword while shielding the alterations from discovery.

There is, in fact, no other reason to alter SmartComm's financials. SmartComm's prior-year income statements and general ledgers appear to be kept in the ordinary course of business and are exportable as .xlsx (Excel) documents. As for any accounting errors Jim Logan may have made, he died in October 2022, obviously having had no direct role in SmartComm's 2024 financials. Moreover, SmartComm's longtime outside CPA audited SmartComm's financials as recently as October 2023 (and has issued annual unqualified

opinions thereof for years), presumably obviating any effect of prior-year errors on 2024 financials. *See e.g.*, Exhibit 10, SmartComm's 2021 Audited Financial Statement Cover Letter. When Janice's counsel pressed HLFIP's counsel on whether he was also "correcting" those audited financial statements prepared by an independent third party, he refused to answer.

Further, it is unclear why HLFIP—a purportedly separate legal entity—is "correcting" SmartComm's financials at all. One of Jon Logan's principal valuation arguments is that he effectively stripped SmartComm of all, or nearly all, of its net income by diverting that income to HLFIP. Jon contends an intellectual property licensing agreement he made in August 2023, using his control of both SmartComm and HLFIP, saddled SmartComm with an obligation to pay 40% of its net sales to HLFIP. *See* DIN 722, Exhibit A at ¶¶ 41–44. (Indeed, Jon admits he did so in response to Janice's refusal to take short money for her interest in SmartComm as he contends she was required to do by the purported shareholders' agreement this Court rejected in the Phase I trial. *Id.* at ¶ 41). HLFIP claims SmartComm owes HLFIP over $80 million in past royalties, and essentially all of its future profits. SmartComm's accounting practices should be no concern of HLFIP ever, but especially not before this Court decides the validity of the purported intellectual property transaction.

All of this has occurred in spite of the Court's repeated admonitions that Janice is entitled to books and records. *See e.g.* Exhibit 6, 7/24 CMC Tr. at 9:1–8 (The Court: "Because when I came into this, one of the big issues was dockets - - documents were not being turned over. And I'm now hearing

documents are not being turned over, and I feel like we've addressed that and so I'm wondering: Is this a new request, or is this documents that they have been asking for for a year?"); *see also* DIN 436. Indeed, Jon and SmartComm continue to show no compunction about mid-litigation manipulation of the state of affairs in this Consolidated Action. The purported justification for altering the financials sounds a lot like the "clean up" of the Company that Jon orchestrated via Delaware conversions and asset transfers, which led to a stipulated injunction. *See* DIN 489.

Manipulation of the Company's books violates that very injunction. This Court ordered (with Jon and SmartComm's agreement): "that [Jon and SmartComm] will take no action to cause . . . any other action that is outside the ordinary course of business, by Smart Communication or Smart Delaware, . . . to be made to any entity owned or controlled by Jon, except as may be permitted by further Court Order on proper motion and notice." DIN 489, ¶ (1)(b). Unilaterally manipulating the Company's financial records and accounting practices would be an action outside the ordinary course of business, particularly in the midst of a judicially supervised valuation proceeding, and with the intent to harm one of the shareholders involved in the proceeding and deprive her of accurate information needed for the trial. In order to protect against such misconduct, the Court should order strict compliance with SmartComm's and HLFIP's obligations to produce every iteration of every responsive document or record, and all metadata associated with every such document or record. Otherwise, such alterations may lead to spoliation of evidence critical to the

upcoming valuation proceeding. *See Shamrock-Shamrock, Inc. v. Remark*, 271 So. 3d 1200, 1203 (5th DCA 2019).

## II.    HLFIP's Complete Failure to Produce Documents, and Recent Demand for an All New Confidentiality Order.

Rather than complete and timely productions, HLFIP has made only unfulfilled promises. HLFIP responded to an August 9, 2024 Meet and Confer Letter that it "will begin rolling productions next week." *See* Exhibit 11, Email Correspondence from HLFIP's Counsel. HLFIP has yet to produce a single document. Instead, HLFIP has repeatedly attempted to back out of the Court's trial setting, proposing a 120-150 day delay even though the Court heard argument on an appropriate trial date at the Case Management Conference (including from HLFIP's counsel) and then selected a date it deemed appropriate. *See* Exhibit 12.

HLFIP did not mention their demand for a new confidentiality order until a Meet and Confer on September 16 (nearly a month after rolling productions were supposed to have begun). Since that time, Janice has repeatedly offered to stipulate that HLFIP's production is protected by the existing Confidentiality Order. Janice has also explained why the proposed terms in HLFIP's new Confidentiality Order are inappropriate in this lawsuit. *See* Exhibit 13 (A. Franklin Email to C. Oprison); *see* Exhibit 14 (C. Oprison Response Email); *see also* Exhibit 15 (D. Schoenfeld Letter to C. Oprison Offering Compromise). Janice's primary concern is that an unnecessarily restrictive Confidentiality Order, in addition to contravening Fla. R. Jud. Admin 2.420 and Florida courts' general posture of transparency in litigation, will unnecessarily complicate

filings, hearings, and trial. More specifically, HLFIP has thus far insisted on an Attorneys' Eyes Only designation (precluding Janice and Alexis from viewing documents with this designation). That designation is not appropriate in this circumstance where neither Janice nor Alexis are colorably competitors of HLFIP or SmartComm, and both have knowledge of the Company and its practices that would assist counsel in understanding the documents HLFIP produced. Thus, Janice offered a Highly Confidential designation as a compromise, and would like to make sure that designation is clearly defined to avoid over-designation— she has offered twice to discuss with HLFIP specific categories of documents it is looking to protect in a more restricted category. *See* Exhibits 13, 15.

Moreover, HLFIP seeks to delay trial and to excuse discovery failures because of its newness to the case. However, HLFIP has been involved in the case for five months now—HLFIP's counsel volunteered to waive service of Janice's Second Amended Complaint on June 17, 2024, and returned the waiver of service on June 20, 2024. Exhibit 16, June 20, 2024 Email Correspondence from HLFIP; *see also* DIN 697. And, HLFIP was essentially a dormant shell entity prior to August 2023 (and Jon Logan is its sole member and managing member)—as a result, HLFIP indicated it was not in possession of responsive documents to 9 of Janice's first 16 requests for production (and objected that another two requests were not directed to HLFIP) (*see* DIN 718). Finally, HLFIP is represented by one of the largest law firms in the world (the firm touts 1,800 lawyers in the United States alone).

With trial of this case (including valuation) set for January/February 2025, Janice will be prejudiced in the extreme if she cannot obtain complete, accurate and uncorrupted financials in a timely manner and assist her counsel to prepare her case. Accordingly, Janice respectfully requests that the Court order SmartComm and HLFIP to make full and complete productions of all documents, books and records responsive to Janice's Requests, including the raw financial data underlying income statements and general ledgers, and metadata or other documents that specify version history, substance of alteration, and dates of alteration for all responsive records, on or before December 6, 2024, as detailed in the Proposed Order (attached hereto as Exhibit A). *See Computer Sols., Inc. v. Gnaizda*, 633 So. 2d 1100, 1102 (Fla. 3d DCA 1994) ("Where, as here, the financial statements are unaudited, the shareholder is entitled to reasonable access to the underlying financial data."). Janice also requests that her valuation expert be given credentials to access SmartComm's QuickBooks or other accounting software account and that the Court order SmartComm to refrain from altering metadata in such software which could obscure any history of alterations.

Janice further requests that HLFIP be required to produce documents under the existing Confidentiality Order (DIN 362) or that the Court work with the parties at the November 22 hearing to complete a Confidentiality Order and subsequently require HLFIP to make productions by December 6.

**WHEREFORE,** Janice Logan respectfully requests that the Court compel Smart Communications Holding, Inc., Smart Communications Holding, LLC,

and HLFIP Holding, LLC to produce the requested documents in the form and manner and by the deadline described above, for attorneys' fees for her repeated efforts to obtain plainly responsive documents, and grant such other and further relief as this Court deems appropriate and just.

## CERTIFICATION OF GOOD FAITH CONFERRAL

I, David E. Schoenfeld, certify pursuant to Rule 1.380 that I conferred with counsel for SmartComm and HLFIP to obtain the discovery sought in good faith prior to filing this Motion, and that my efforts were unavailing.

   /s/   *David E. Schoenfeld*
David E. Schoenfeld (FL PHV # 1047561)
SHOOK, HARDY & BACON L.L.P.
111 S. Wacker Dr., Ste. 4700
Chicago, IL 60606
Telephone: (312) 704-7700
dschoenfeld@shb.com

***Counsel for Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been electronically filed and served on all counsel of record via the Florida Court's e-filing portal, on November 13, 2024.

Dated:  November 13, 2024

Respectfully submitted,

/s/   David E. Schoenfeld
Anitra R. Clement
Florida Bar No. 100354
**SHOOK, HARDY & BACON L.L.P.**
100 N. Tampa St., Ste. 2900
Tampa, FL 33602
Telephone: (813) 202-7100
aclement@shb.com

David E. Schoenfeld (FL PHV # 1047561)
Peter F. O'Neill (FL PHV # 1043125)
Andrew L. Franklin (FL PHV # 1035737)
Kailin Liu (FL PHV # 1051416)
**SHOOK, HARDY & BACON L.L.P.**
111 S. Wacker Dr., Ste. 4700
Chicago, IL 60606
Telephone: (312) 704-7700
dschoenfeld@shb.com
pfoneill@shb.com
afranklin@shb.com
kliu@shb.com

John D. Garretson (FL PHV #1057004)
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, MO 64108
Telephone:  (816) 474-6550
jgarretson@shb.com

***Counsel for Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021***

13

# EXHIBIT A

**IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA**

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,

                Plaintiffs,

v.                                       Case No. 2023-CA-1002-NC

JANICE LOGAN, individually, as Trustee of
the James Logan Family Trust, dated
February 10, 2021, and as Personal
Representative of the ESTATE OF
JAMES LOGAN, JUSTIN PETERSON, and
ALEXIS LOGAN,

                Defendants.       /
_____

JANICE LOGAN, as Trustee of the James
Logan Family Trust, dated February 10,
2021,

                Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC.,
SMART COMMUNICATIONS HOLDING, LLC,
and HLFIP HOLDING, LLC,

                Counterclaim Defendants.
_____       (CONSOLIDATED)

JANICE LOGAN, as Trustee of the James
Logan Family Trust, dated February 10,
2021, and derivatively on behalf of Smart
Communications Holding, Inc.,                Case No.: 2023-CA-1280-NC

                Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., nominal
defendant, SMART COMMUNICATIONS
HOLDING, LLC, HLFIP HOLDING, LLC,
LOCO FLORIDA LLC, and SMART
COMMUNICATIONS YACHT HOLDING, LLC,

                Defendants.
_____/

**PROPOSED ORDER ON JANICE LOGAN'S AMENDED MOTION TO COMPEL**

Upon consideration of Janice Logan's Amended Motion to Compel Discovery ("Motion") pursuant to Fla. R. Civ. P. 1.380, having considered the Motion, and the argument of Smart Communications Holding, Inc., Smart Communications Holding, LLC, and HLFIP Holding, LLC, and otherwise being fully advised in the premises, this Court ORDERS:

1.      Janice Logan's Amended Motion to Compel Discovery is GRANTED.

2.      Smart Communications Holding, Inc. and Smart Communications Holding, LLC are ordered to produce all documents of any kind in their possession, custody or control responsive to Janice Logan's Fourth Set of Requests for Production to Smart Communications Holding, Inc. and Smart Communications Holding, LLC and First Set of Requests for Production to HLFIP Holding, Inc. and HLFIP Holding, LLC ("Janice's Requests") on or before December 6, 2024, including the following:

    a.      Responsive to Janice's Request No. 4 to SmartComm:

        i.      All 2024 financial data up to the present day, including but not limited to General Ledgers, Income Statements, and Profit and Loss Statements, and including every iteration of every responsive document and all raw data and metadata relating to alterations thereof and dates of alterations thereof;

        ii.      Every iteration of their General Ledgers, Income Statements, and Profit and Loss Statements from January 1, 2022 to the present day, including raw data

and metadata relating to alterations thereof and dates of alterations thereof; and

    iii.    Janice Logan's valuation expert is to be provided credentials to log into and view, without limitation, all information in SmartComm's Quickbooks or other accounting software by December 2, 2024, and SmartComm shall not alter any metadata contained in its accounting software.

3.    HLFIP Holding, LLC, is ordered to make a complete production of all documents of any kind in its possession, custody or control responsive to Janice's Requests, including every iteration of every responsive document and all raw data and metadata relating to alterations thereof and dates of alterations thereof, on or before December 6, 2024.

4.    HLFIP Holding, LLC is ordered to make this production under the existing Confidentiality Order in this Consolidated Action (DIN 362), and shall be covered by its protections and the protections of Fla. R. Jud. Admin. 2.420.

5.    Smart Communications Holding, Inc., Smart Communications Holding, LLC, and HLFIP Holding, LLC are to pay Janice Logan expenses and attorneys' fees pursuant to Fla. R. Civ. P. 1.380(4) for the time and expense of preparing and advancing the Amended Motion to Compel.

DONE AND ORDERED in Chambers, Sarasota County, Florida.

_____

Hon. Hunter W. Carroll
Circuit Court Judge

Copies to:  All Counsel of Record

# EXHIBIT 1

# IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
# IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.

     Plaintiffs,

v.             Case No. 2023-CA-1002-NC

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust, dated February 10, 2021;
and ALEXIS LOGAN,

     Defendants.    /

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021,

     Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., SMART
COMMUNICATIONS HOLDING, LLC, HLFIP
HOLDING, INC, and HLFIP HOLDING, LLC,

     Counterclaim Defendants. /

JANICE LOGAN, as Trustee of the James Logan  (CONSOLIDATED)
Family Trust, dated February 10, 2021, and
derivatively on behalf of Smart Communications
Holding, Inc.,

            Case No.: 2023-CA-1280-NC

     Plaintiff,

   v.

JONATHAN D. LOGAN,
SMART COMMUNICATIONS HOLDING, INC.,
nominal defendant, SMART COMMUNICATIONS
HOLDING, LLC, HLFIP HOLDING, INC., HLFIP
HOLDING, LLC, LOCO FLORIDA LLC, and
SMART COMMUNICATIONS YACHT
HOLDING, LLC,

     Defendants.    /

## JANICE LOGAN'S FOURTH SET OF REQUESTS FOR PRODUCTION TO SMART COMMUNICATIONS HOLDING, INC. AND SMART COMMUNICATIONS HOLDING, LLC AND FIRST SET OF REQUESTS FOR PRODUCTION TO HLFIP HOLDING, INC. AND HLFIP HOLDING, LLC

Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, pursuant to Florida Rule of Civil Procedure 1.350, serves this Fourth Set of Requests for Production on Smart Communications Holding, Inc./LLC, and First Set of Requests for Production on HLFIP Holding, Inc./LLC, to produce and permit the inspection and copying of the following described items at the offices of Shook, Hardy & Bacon L.L.P., 100 N. Tampa St., Suite 2900, Tampa, Florida 33602.

## **<u>DEFINITIONS</u>**

1.     "All" means any and all.

2.     "And" shall be construed both disjunctively and conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed outside of its scope.

3.     "Or" shall be construed both disjunctively and conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed outside of its scope.

4.     "You," or "your" or "SmartComm" refers to Defendants Smart Communications Holding, Inc., Smart Communications Holdings, LLC, and any of their subsidiaries and affiliates, and all of their respective agents, directors, officers, employees, and all other persons acting or purporting to act on their behalf. This definition should not be interpreted to call for attorney-client communications.

5.     "You," or "your" or "HLFIP" refers to Defendants HLFIP Holding, Inc. and HLFIP Holding, LLC, and any of their subsidiaries and affiliates, and all of their respective agents, directors, officers, employees, and all other persons acting or purporting to act on their behalf. This definition should not be interpreted to call for attorney-client communications.

6.      "Document" should be construed as broadly as permissible under the Florida Rules of Civil Procedure and Florida Rules of Evidence. "Document" encompasses all of the following: any medium by which information is recorded, stored, communicated, or utilized, including but not limited to any and all documentary, written, printed, computer printed or generated, typewritten or graphic material of any kind or character. The term includes, without limitation, audio tapes, video tapes, still or moving pictures, computer disks, CD-ROMS, microfilm, microfiche, x rays, notes, letters, memoranda, contracts, invoices, receipts, checks, estimates, statements, bills, photographs, or any other piece of paper whatsoever. The term "document" should be deemed to include a request for any document which relates to the principal document or the subject matter of the principal document, *e.g.* (a) any material which was used or referred to in the preparation of the principal document; (b) all attachments to the document; (c) any document referred to in the principal document; and (d) all additions, deletions, substitutions, amendments, or modifications to the original of the principal document. All requests for documents should be interpreted to include requests for any metadata associated with such documents.

7.      "Communication" means the transmittal of information by any means (including through electronic means—including, but not limited to, text messages, emails, messenger applications (such as WhatsApp or via social media messaging), and fax). All requests for communications should be interpreted to include requests for any metadata associated with such communications.

8.      "Valuation" is defined to mean any third-party's assessment of an entity's value (including but not limited to past, present, potential, or projected future value) of any kind and for any purpose.

9.      Any words or phrases not defined should be given their ordinary usage. If the ordinary usage is unclear, please refer to the definition for the word or phrase in the Merriam-Webster online dictionary.

10.     Business terms should be accorded their typical business usage. If you have any questions about business terms herein, please promptly seek to clarify them with the propounding party.

## **INSTRUCTIONS**

1.      As set forth above, to the extent a request seeks documents and/or communications, it also includes a request for any metadata associated with such documents and/or communications.

2.      Each Request seeks information for the time period spanning January 1, 2018 through the present, unless otherwise specified.

3.      If you object to any Request, in whole or in part, on the grounds of privilege or work-product immunity, provide all information required by Florida Rule of Civil Procedure 1.280(b)(6).

4.      If you contend the documents requested are too voluminous to be produced, please make them available to counsel for inspection, labeling and review, in order to facilitate a means by which they can be economically copied by a commercial copy service.

5.      These Requests are continuing, and you are requested to individually and separately provide, by way of supplementary answers thereto, such additional information as you or any other persons acting on your behalf may hereafter obtain, which will supplement or otherwise modify your answers to these Requests. Such supplemental responses are to be served upon Plaintiff within 10 days after receipt of such information.

6.      These Requests pertain to the § 607.1436 Election to Purchase filed by Smart Communications Holding, Inc. and are without prejudice to and in addition to discovery on the remaining claims in Janice's Second Amended Verified Complaint.

## REQUESTS FOR PRODUCTION

1.      All previous or outstanding offers (formal or informal) from outside parties to acquire SmartComm or HLFIP or any part or assets thereof.

2.      All valuations of SmartComm or HLFIP conducted subsequent to the Truist valuations in March 2022 and January 2023, and the UBS valuation conducted in August 2022.

3.      All valuations of SmartComm or HLFIP from 2022 to the present not yet produced in discovery.

4.      All historical financials (*i.e.*, income statements, balance sheets, and any other internal financials) through the most recently available date—including complete 2024 data up to and including the present day.

5.      All internal financial projections (*i.e.*, revenue projections, expense projections, *etc*.) created in the ordinary course of business by SmartComm or HLFIP.

6.      All financial projections (*i.e.*, revenue projections, expense projections, *etc*.) created by third parties on behalf of SmartComm or HLFIP.

7.      All data or documents describing any outstanding debt obligations at SmartComm or HLFIP. Additionally, any data or documents received by SmartComm or HLFIP from banks during the loan application process (*e.g.*, documents assessing the creditworthiness of SmartComm or HLFIP).

8.      All industry research reports received in the ordinary course of business by SmartComm or HLFIP.

9.      All contracts that SmartComm (SmartComm FL and SmartComm DE) has signed in 2023 and 2024, including but not limited to assignments of SmartComm FL contracts to SmartComm DE, and contracts that have been signed but not implemented, and

      a.      Documents sufficient to describe all ongoing negotiations between SmartComm and prisons for contracts that have not yet been signed, including but not limited to the potential value of each such contract.

10.     Data or documents sufficient to describe in reasonable detail what was done to develop intellectual property at SmartComm versus HLFIP, including but not limited to patent applications, fees to patent attorneys, and the amounts and sources of all research and development spending.

11.     Documents sufficient to describe in reasonable detail the 2019 intellectual property dispute identified on SmartComm's website,[1] including but not limited to all transcripts, expert reports, and briefs associated with this legal dispute SmartComm may have in its possession.

12.     Data or documents supporting the 2022 UBS valuation's revenue growth rate of 50%, an EBITDA margin of 40%+, and a Free Cash Flow margin of 20%+ (*see* Slides 11 and 20).[2]

13.     Data or documents supporting the 40% EBITDA margin in the SmartComm Financial Presentation (*see* Slide 12).

14.     Internal documents sufficient to identify and describe any direct competitors to SmartComm or HLFIP.

15.     All materials used to market and sell SmartComm products and services, including 2023 and 2024 as-submitted Request for Proposal (RFP) request responses and unredacted financial data therein.

---

[1]      "News," Smart Communications, available at https://www.smartcommunications.us/news.cfm.

[2]      If SmartComm or its attorneys are for some reason not in possession of documents referenced herein, Janice can furnish the copies in her possession upon request.

16.     Data or documents sufficient to identify each separate product offered by SmartComm and HLFIP that earns revenue and annual data sufficient to show the revenue SmartComm and HLFIP earns from each of its product offerings (*e.g.*, calling services vs. video services).

17.     Internal financial data sufficient to quantify all SmartComm revenues and expenses for each prison system with which Smart Communications does business.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been served on all counsel listed below via email on July 8, 2024.

Michael J. Harwin, Esq.
**Stearns Weaver Miller Weissler**
      **Alhadeff & Sitterson, P.A.**
200 East Las Olas Boulevard, Suite 2100
Fort Lauderdale, FL 33301
Tel: (954) 462-9500
mharwin@stearnsweaver.com
mhernandez@stearnsweaver.com (secondary)

Glenn Burhans, Jr., Esq.
Christopher R. Clark
**Stearns Weaver Miller Weissler**
      **Alhadeff & Sitterson, P.A.**
106 East College Avenue, Suite 700
Tallahassee, FL 32301
Tel: (850) 580-7200
gburhans@stearnsweaver.com
crclark@stearnsweaver.com
lrussell@stearnsweaver.com (secondary)

*Counsel for Jonathan D. Logan;*
*Smart Communications Holding, Inc.;*
*Smart Communications Holding LLC;*
*Loco Florida LLC, Smart Communications*
*Yacht Holding, LLC*

Mark Bernet
**Akerman LLP**
401 E. Jackson Street, Suite 1700
Tampa, FL 33602-5250
Tel:  (813) 223-7333
Mark.bernet@akerman.com
Caren.deruiter@akerman.com (secondary)

Jason S. Oletsky
Dustin B. Hillsley
Max C. Rudolf
**Akerman LLP**
201 East Las Olas Boulevard, Suite 1800
Fort Lauderdale, FL 33301
Tel:  (954) 463-2700
Jason.oletsky@akerman.com
Jill.parnes@akerman.com (secondary)
Dustin.hillsley@akerman.com
Max.rudolf@akerman.com
Deborah.karlson@akerman.com
(hillsley/rudolf secondary)

*Counsel for Jonathan D. Logan;*
*Smart Communications Holding, Inc.;*
*Smart Communications Holding, LLC;*
*Loco Florida LLC*

Christopher G. Oprison
Tal Aburos
Jody A. Stafford
**DLA Piper LLP (US)**
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131-5341
Tel:  (305) 423-8522
chris.oprison@us.dlapiper.com
tal.aburos@us.dlapiper.com
jody.stafford@us.dlapiper.com
chris.baker2@us.dlapiper.com
Sheila.hall@us.dlapiper.com

Steve Dixon
**DLA Piper LLP (US)**
500 Eighth Street, NW
Washington, DC 20004
Tel:  (202) 799-4000
steve.dixon@us.dlapiper.com

*Counsel for HLFIP Holding, LLC*

Charles F. Johnson, Esq.
**Blalock Walters, P.A.**
802 11th St. West
Bradenton, FL 34205
Tel: (941) 748-0100
cjohnson@blalockwalters.com
eservice@blalockwalters.com

*Counsel for Alexis Logan*

Dated:  July 8, 2024

Respectfully submitted,

  /s/   *David E. Schoenfeld*

David E. Schoenfeld (FL PHV # 1047561)
Peter F. O'Neill (FL PHV # 1043125)
Andrew L. Franklin (FL PHV # 1035737)
Kailin Liu (FL PHV # 1051416)
**SHOOK, HARDY & BACON L.L.P.**
111 S. Wacker Dr., Ste. 4700
Chicago, IL 60606
Telephone: (312) 704-7700
dschoenfeld@shb.com
pfoneill@shb.com
afranklin@shb.com
kliu@shb.com

Anitra R. Clement
Florida Bar No. 100354
**SHOOK, HARDY & BACON L.L.P.**
100 N. Tampa St., Ste. 2900
Tampa, FL 33602
Telephone: (813) 202-7100
aclement@shb.com

*Counsel for Janice Logan, individually and as Trustee of the*
*James Logan Family Trust, dated February 10, 2021*

# EXHIBIT 2



David E. Schoenfeld

July 8, 2024

111 South Wacker Drive
Chicago, Illinois 60606
**t** 312.704.7700
**dd** 312.704.7723
**f** 312.558.1195
dschoenfeld@shb.com

**<u>Via Email</u>**

Dustin B. Hillsley
**Akerman LLP**
201 East Las Olas Boulevard
Suite 1800
Fort Lauderdale, FL 33301

Christopher G. Oprison
**DLA Piper LLP (US)**
200 South Biscayne Boulevard
Suite 2500
Miami, FL 33131-5341

**Re:    *Jonathan D. Logan, et al. v. Janice Logan, et al.*
        Case Nos. 2023-CA-1002-NC / 2023-CA-1280-NC
        (Consolidated into 1002)**

Counsel:

We enclose document requests to SmartComm and HLFIP, which we
prepared in consultation with our valuation expert and are necessary to
assess any purchase proposals SmartComm may make during the statutory
§607.1436 negotiation window. Therefore, we request production of the
requested documents at the earliest feasible date, notwithstanding Rule 1.350
deadlines. We submit these requests in Rule 1.350 form now in order to
assure full production of responsive documents if judicial valuation and
related declaratory relief are needed absent an agreed purchase valuation.

We will be prepared to discuss discovery related to the election to purchase
shares when we the meet and confer tomorrow.

As we state in the RFPs themselves, these requests are specific to the election
to purchase, and are without prejudice, and in addition, to discovery sought
on Janice's remaining claims in her Second Amended Verified Complaint.



We look forward to speaking tomorrow afternoon and hope this process will be productive.

Sincerely,

*/s/  David E. Schoenfeld*

David E. Schoenfeld

Enclosure
cc:      All Counsel of Record

# EXHIBIT 3



February 22, 2024

David E. Schoenfeld
111 South Wacker Drive
Chicago, Illinois 60606
**t** 312.704.7700
**d** 312.704.7723
**f** 312.558.1195
dschoenfeld@shb.com

**VIA ELECTRONIC MAIL**
(**cbarnett@stearnsweaver.com**)

Craig Barnett, Esq.
**Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.**
200 East Las Olas Boulevard
Suite 2100
Fort Lauderdale, Florida 33301

**Re:     Mediation Document Requests**

Craig:

Our client, Janice Logan, individually and as Trustee of the James Logan Family Trust, dated February 10, 2021 ("Janice"), looks forward to the good faith mediation of this matter. In preparation, Janice requests the documents described below, which we and Janice's appraiser believe will facilitate a productive mediation.

1.     Any and all documents and information provided to UBS and Truist to do their valuations.

2.     Updated Smart Communications Holding, Inc. ("SmartComm") general ledgers and income statements (up to the present day, or at least through the end of 2023).

3.     SmartComm's as-filed 2022 Tax Return.

4.     General ledgers and income statements for Smart Communications Holding, LLC ("SmartComm DE"). [1]

5.     Audited financial statements and tax returns of SmartComm DE, if any.

---

[1]     SmartComm DE is to be construed throughout the requests to include all Smart Communications Holding, LLC DBAs. Janice is aware that SmartComm DE has registered to do business throughout the country in various state iterations—e.g., Smart Communications Holding Arizona, LLC.

SHOOK
HARDY & BACON

February 22, 2024
Page 2

6.      Any and all other valuations of SmartComm, SmartComm DE, or
        SmartComm-related entities (or valuations of any of their assets)
        besides the 2022 Truist and UBS valuations.

7.      The master list of current SmartComm and SmartComm DE
        contracts, describing (*inter alia*) the customer, contract term,
        expiration date, and renewal terms.

8.      Pending SmartComm or SmartComm DE contracts "in the pipeline"
        that are not ramped up yet, but from which SmartComm or
        SmartComm DE will receive income in the future.

9.      Any and all recent (late 2022-present) marketing or request for
        proposal ("RFP") pitches, brochures, pdfs, slide decks, or Excel
        files.

10.     Any and all damages analysis from HLFIP, Inc.'s IP infringement
        suits.

11.     Any and all documents and information regarding new or
        forthcoming SmartComm and SmartComm DE's products and
        services (*e.g.*, Smart Watch, Smart Bike, VR, etc.), including
        research and development into new technologies and sales
        projections for new products and services.

As you know, Janice is a full and unencumbered shareholder of SmartComm, as well as its
subsidiaries. This status gives her statutory rights to access certain SmartComm records. *See* Fla.
Stat. 607.1602, *et seq.* Moreover, as a result of the Court's December 15, 2023, Order on Janice's
Motion for Contempt and to Appoint a Temporary Custodian, Janice has the same statutory rights
to information regarding SmartComm DE as in SmartComm. *See* DIN 489.

Finally, the Court indicated in its recent Case Management Order setting a mediation deadline that
it "anticipates the parties will need to exchange documents on valuation prior to mediation to make
mediation productive." *See* DIN 609.

I mention the above rights, obligations, and expectations to underscore Janice's entitlement to
obtain the requested documents and information on an abbreviated timeline. In fact, books and
records must typically be provided within a matter of days.

SHOOK
HARDY & BACON

February 22, 2024
Page 3

For mediation to be meaningful—*i.e.*, to ensure Janice's appraiser can conduct their analysis in time for mediation—we request that the above documents be provided on or before March 8, 2024.

Sincerely,

David E. Schoenfeld

cc:     Michael J. Harwin
        Charles F. Johnson
        Gary M. Miller
        Anitra R. Clement
        Peter F. O'Neill
        Andrew L. Franklin
        Kailin Liu

# EXHIBIT 4



April 16, 2024

David E. Schoenfeld
111 South Wacker Drive
Chicago, Illinois 60606
**t** 312.704.7700
**d** 312.704.7703
**f** 312.558.1195
dschoenfeld@shb.com

**<u>VIA ELECTRONIC MAIL</u>**
**(cbarnett@stearnsweaver.com;**
 **mharwin@stearnsweaver.com)**

Craig Barnett, Esq.
Michael Harwin, Esq.
**Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.**
200 East Las Olas Boulevard
Suite 2100
Fort Lauderdale, Florida 33301

      **Re:    Books and Records Deficiency**

Craig and Michael:

Our client, Janice Logan, individually and as Trustee of the James Logan Family Trust, dated February 10, 2021 ("Janice"), requested certain documents in a February 22, 2024 "Mediation Document Requests" letter to you. In that letter, I made clear that my client's requests were pursuant to both the Court's anticipation of Janice's need for documents for mediation, **and** pursuant to her statutory rights to books and records. Further, I'm sure your partner Michael conveyed to you that, at the March 21, 2024 hearing on your Motion to Modify, the Court was quite clear that we have a right to SmartComm's books and records regardless of mediation. You also know that the Court's December 15, 2023 Order (DIN 489) provided Janice the same statutory rights to Smart Communications Holding, LLC ("SmartComm DE")[1] books and records as to Smart Communications Holding, Inc.'s ("SmartComm") books and records. Finally, the Court's Case Management Order that you sought to modify at the March 21 hearing made clear that documents should be exchanged under the existing confidentiality stipulation. *See* DIN 609.

Your recent productions of books and records are deficient for two reasons. *First*, they are improperly marked "Confidential For Purposes of Mediation Only." This label is printed on books and records that we undisputedly have a right to use beyond mediation—like financial statements, tax returns, and accounting records, which Michael did not and could not dispute are squarely within our Fla. Stat. 607.1602 rights. Moreover, Fla. Stat. § 44.405(5) prohibits exactly this type

---

[1]      SmartComm DE is to be construed throughout the requests to include all Smart Communications Holding, LLC DBAs. Janice is aware that SmartComm DE has registered to do business throughout the country in various state iterations—e.g., Smart Communications Holding Arizona, LLC.

of evidentiary gamesmanship.[2] Thus, we will treat these documents as marked "Confidential" under the Confidentiality Stipulation under which they should have been produced, and will continue to comply with the dictates of that protective order. However, you cannot unilaterally proscribe our use of them by creating a confidentiality designation the parties and the Court did not agree to.

*Second*, your recent productions are missing documents we know or expect are kept in SmartComm's ordinary course of business.

1.   We asked for, but did not receive, books and records up to the present day—including but not limited to SmartComm's General Ledgers and Income Statement Excel sheets. You only produced a General Ledger as of year-end 2023. We are now through the first quarter of 2024 and are entitled to inspect and copy SmartComm's General Ledger and Income Statement Excel sheets up to the present day. Please make those available immediately.

2.   We asked for, but not did not receive, any SmartComm DE financial statements or financial records. The Court's comments on December 6, 2023 at the Contempt and Custodian hearing and subsequent December 15, 2023 Order were clear that we are fully entitled to SmartComm DE books and records. Michael recently represented that you did not withhold SmartComm DE books and records; however, we expect that the Company keeps SmartComm DE financial records in the ordinary course of business, and that they exist. Please conduct a reasonable search and produce the resulting documents immediately, including but not limited to a SmartComm DE General Ledger, Income Statement, tax returns, and any other financial statements or accounting records, or confirm that those things do not exist.

3.   Any and all other valuations of SmartComm, SmartComm DE, or SmartComm-related entities (or valuations of any of their assets)

---

[2]      § 405(5) provides that "Information that is otherwise admissible or subject to discovery does not become inadmissible or protected from discovery by reason of its disclosure or use in mediation." *See Rayonier Performance Fibers, LLC v. Amerisure Ins. Co.*, 2021 WL 5416185, at *4 (M.D. Fla. Nov. 19, 2021) ("This provision acknowledges the importance of the availability of relevant evidence to the truth-seeking function of courts and administrative agencies, and makes clear that relevant evidence may not be shielded from discovery or admission at trial merely because it is communicated in a mediation. For purposes of the mediation privilege, it is the communication that is made in a mediation that is protected by the privilege, ***not the underlying evidence giving rise to the communication***. Evidence that is communicated in a mediation is subject to discovery, just as it would be if the mediation had not taken place.") (emphasis added).

SHOOK
HARDY & BACON

April 16, 2024
Page 3

besides the 2022 Truist and UBS valuations. Please produce additional valuations that have been performed, or confirm in writing that no other valuations have been done.

4.      Pending SmartComm or SmartComm DE contracts "in the pipeline" that are executed but not ramped up yet, but from which SmartComm or SmartComm DE will receive income in the future. *See* Fla. Stat. §§§ 607.1602(2)(b), (c), & (e). We appreciate that you produced 113 SmartComm/SmartComm DE contracts; however, we have no contracts after Aug. 31, 2023. Please either produce all contracts executed between Aug. 31, 2023 and the present, or confirm that neither SmartComm nor SmartComm DE have entered into any contracts since then. We would remind you that contracts with municipal entities are public records subject to FOIA and state record request laws.

5.      Any and all recent (late 2022-present) marketing or request for proposal ("RFP") pitches, brochures, pdfs, slide decks, or Excel files.

Finally, to the extent withheld from us previously, please provide any and all SmartComm or SmartComm DE records of corporate action, minutes of meetings, written consents of the board, or other such documents outlined in Fla. Stat. § 607.1602(2)(a).

These documents were requested for the proper purpose of valuing our client's shares. Up to date financials and contracts are essential to this purpose because transactions, transfers, revenue, and losses since 2023 could affect our client's shares. Unfortunately, Jon's prior transfers, conversions, purported transactions, and willingness to withhold books and records in spite of the Court's clear orders leave no room for trust. For instance, the backdating of the IP license to incur a $58 million liability (now $80 million) happened over the course of only a few days. That purported liability changed the equity of the company from $16 million to -$32 million (now -$61 million).

Further, we are in possession of at least one contract executed in the name of SmartComm DE instead of SmartComm. We are also aware that Jon has registered SmartComm DE to do business in more than a dozen states. It is therefore highly unlikely that no SmartComm DE financials exist, and that SmartComm DE has not entered into more contracts than the Eaton County, Michigan contract.

SHOOK
HARDY & BACON

April 16, 2024
Page 4

We are entitled to these documents—please make them available for inspection and copying by next Tuesday, April 23, 2024.

Sincerely,

David E. Schoenfeld

cc:    Charles F. Johnson
       Gary M. Miller
       Anitra R. Clement
       Peter F. O'Neill
       Andrew L. Franklin
       Kailin Liu

# EXHIBIT 5

STEARNS WEAVER MILLER
WEISSLER ALHADEFF & SITTERSON, P.A.

Michael J. Harwin
200 East Las Olas Boulevard, Suite 2100
Fort Lauderdale, FL 33301
Direct: (954) 462-9512
Fax: (954) 462-9567
Email: mharwin@stearnsweaver.com

April 23, 2024

**BY EMAIL – DSCHOENFELD@SHB.COM**

David E. Schoenfeld, Esq.
Shook, Hardy & Bacon
111 South Wacker Drive
Chicago, IL 60606

    Re:   *Jonathan Logan and Smart Communications Holding, Inc. v. Janice Logan, et al.*
          Case No. 2023-CA-001002

Dear David:

    We write to address your April 16, 2024 letter.  To be clear, the Smart Parties (Jon, Smart Communications Holding, Inc., Loco Florida, LLC, and Smart Communications Holding, LLC) dispute any claim of "deficiencies" in the production of documents ordered to be produced for mediation or which otherwise would be part a proper request for books and records.

## Mediation Designation

    The Smart Parties' mediation production was properly designated as "Confidential For Purposes of Mediation Only."  The Smart Parties continue to insist that the materials be treated as confidential and under the protections afforded to communications in mediation.

    It is difficult to understand the basis for any claim that these documents were not requested or produced in connection with mediation. Indeed, you stated expressly in your February 22, 2024 letter, the documents were needed to "***to facilitate a productive mediation***." As you referenced, the Court stated clearly that the reason for the exchange of documents was expressly for the purposes of a productive mediation.  *See* February 5, 2024 Order [DIN 609], at ¶ 2 ("The Court anticipates that the parties will need to exchange documents on valuation prior to mediation ***to make mediation productive***.  These documents may be produced under the existing confidentiality order.") (Emphasis added).

    Despite Janice's and Alexis's refusal to ***exchange*** documents regarding valuation in direct violation of the Court's order, for which all rights remain reserved, the Smart Parties produced hundreds of documents in the hope that mediation might be productive, including documents far in excess of what a shareholder would otherwise be entitled to receive.  The Smart Parties' mediation production supplemented the financial records produced previously and

MIAMI ▪ TAMPA ▪ FORT LAUDERDALE ▪ TALLAHASSEE ▪ CORAL GABLES

David E. Schoenfeld, Esq.
April 23, 2024
Page 2

included, without limitation, the general ledgers of the Smart companies detailing nearly every Smart transaction from 2016 through October 2023, including at least 200,000 financial entries. By contrast, your client and her daughter continue to stonewall all attempts to ascertain a legitimate foundation for her demands.

Nevertheless, although the Smart Parties were more than willing to provide documents necessary to facilitate a productive mediation, that mediation has concluded and there is no longer any such need or obligation.  Moreover, the Smart Parties' prior willingness should not be mistaken or misconstrued as an independent basis for ongoing discovery that purports to allow Janice to end run the books and records statute or the Florida Rules of Civil Procedure.  The Smart Parties designated their production consistent with Janice's express purposes, the Court's Order, and applicable Florida law. The mere fact that mediation was unsuccessful does not waive mediation privilege or otherwise permit a party to use documents produced for mediation more broadly in litigation or for any other use.

## The Smart Parties' Books and Records Production Was Not Deficient

Similarly, Janice cannot overcome the mediation privilege by claiming after the fact that Smart's production may be redefined as a books and records production under Chapter 607, Florida Statutes. A shareholder does not hold an unfettered right to each and every piece of paper or electronic file in the company. Under Florida law, a shareholder may inspect certain corporate books and records (not every single corporate document) "*only if*" (1) "[t]he shareholder's demand is made in good faith and for a proper purpose"; (2) "[t]he shareholder's demand describes with reasonable particularity the shareholder's purpose and the records the shareholder desires to inspect"; and (3) "[t]he records are directly connected with the shareholder's purpose." Fla. Stat. § 607.1602.  To the extent that your April 16, 2024 letter was intended to meet the requirements of a books and records production request, your client fails to meet any of these three required criteria.

In your April 16, 2024 letter, you state clearly that the "documents were requested for the proper purpose of valuing [the Trust's] shares," ostensibly for mediation consistent with Judge Carroll's order. But Janice's claimed need to value her shares for mediation is no longer applicable. Your letter does not set forth any basis for valuation following the conclusion of mediation.  Nor is there any pending claim in the current litigation that bears on the value of the Trust's shares.  Assuming that your letter can be construed as a books and records request under Chapter 607, Janice fails to identify how it "is made in good faith and for a proper purpose," much less with the "reasonable particularity" required, nor how the "records are directly connected with" this unstated purpose.

Even if your letter could be read as a proper books and records request, Janice is *__still__* not entitled to all the documents that she demands.  *Jewelers Int'l Showcase, Inc. v. Mandell*, 529 So. 2d 1211 (Fla. 3d DCA 1988) (holding that where a stockholder's primary purpose is to determine value of stock, generally only tax returns, general ledger of corporation, profit and loss statements, and corporate stockbooks are the sole relevant records which the corporation must produce for inspection); *D. Stephenson Const., Inc. v. Mendiguren*, 958 So. 2d 527, 529 (Fla. 4th

David E. Schoenfeld, Esq.
April 23, 2024
Page 3

DCA 2007) (citing *Jewelers Int'l* with approval and denying request for records to allegedly assess a $500 tax liability when "the letter requesting the records [and] the complaint for inspection of the records [did not] contain[] any explanation as to why the records are necessary for the stated purpose of stock valuation"). Nevertheless, to put the matter to rest and without waiver of any rights under Florida law and/or the applicable rules of civil procedure, including the Smart Parties' rights to seek fees and costs, we provide the following:

- As previously explained, the Smart Parties have not withheld any Smart Comm DE financial documents or financial records. Florida law is clear that a party need not produce books and records that do not exist. *Nu Med Home Health Care, Inc. v. Hospital Staffing Services, Inc.*, 664 So. 2d 353 (Fla. 4th DCA 1995) (corporation is not obligated to produce a corporate record that it does not have at the time the request is made).

- Janice's demand does nothing to identify or define what "contracts" are "in the pipeline," nor how any of the categories of documents that could conceivably fall within such description might relate to valuation. Not every negotiation results in a written contract or a signed contract, much less a contract that is ultimately implemented. Janice's request cannot be reasonably intended to include a request for putative contracts (which are not contracts at all).

- Janice's demand for "valuations" "besides the 2022 Truist and UBS valuations" begs the question of what is meant by the term "valuation" in this context. The materials generated by UBS and Truist cannot be considered valuations in any sense of the word that has any meaning here. At best, UBS and Truist compiled marketing materials to promote their ability to assist in a theoretical sale of Smart Comm based on a multitude of assumptions and factual predicates that do not exist. Inasmuch as we have located a 2017 "valuation," a copy will be provided via our Sharefile. Other than the 2017 valuation, Smart Comm does not possess ***any*** valuation documents because no other valuation of Smart Comm or any of its subsidiaries has ever been conducted.

- The balance of requested documents bear no relationship to valuation whatsoever, even assuming that there was a pending, legitimate basis for valuing her one-half interest. For example, Janice has not even *tried to explain* how her demand for marketing materials, for proposal pitches, or similar documents, has any relation to valuation. Janice's demand for marketing materials appears, at best, to be a thinly-veiled attempt to obtain documents that she would not otherwise be entitled to receive because they are not related to the claims and defenses in the current lawsuit.

The Smart Parties have gone well beyond their obligation to produce books and records. Florida's books and records statute was never intended to provide a basis for a shareholder to demand any and all corporate documents without that shareholder providing a legitimate purpose for that demand. The Smart Parties reserve all rights, including the recovery of fees and costs, to

David E. Schoenfeld, Esq.
April 23, 2024
Page 4

the extent Janice's actions on behalf of the Trust have created and continue to create unnecessary expenses for the Smart Parties.

### Outstanding Requests to Confer

Since the conclusion of mediation, we have reached out to you numerous times by both phone and email to attempt to discuss various housekeeping matters, including Janice's demand for a shareholder meeting. To date, you have ignored all of our efforts. As a result and until we hear otherwise, we will construe your lack of response to mean that the requested shareholder meeting has been called off or at least postponed indefinitely. Please let us know immediately if that is not the case.

Sincerely,

*/s/ Michael J. Harwin*
MICHAEL J. HARWIN

# EXHIBIT 6

```
 1   IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT IN
     AND FOR SARASOTA COUNTY, FLORIDA
 2             JULY 24, 2024 CASE MANAGEMENT HEARING
     JONATHAN LOGAN and SMART
 3   COMMUNICATIONS HOLDING, INC.,

 4            Plaintiffs,
     vs.                        Case No.:  2023-CA-1002-NC
 5
     JANICE LOGAN, individually and
 6   as Trustee of the James Logan
     Family Trust, dated February 10,
 7   2021; and ALEXIS LOGAN,

 8            Defendants.        /     (CONSOLIDATED)
     JANICE LOGAN, as Trustee of the
 9   James Logan Family Trust dated
     February 10, 2021,
10
              Counterclaim Plaintiff,
11   vs.                        Case No.:  2023-CA-1280-NC

12   JONATHAN D. LOGAN, SMART
     COMMUNICATIONS HOLDING, INC.,
13   SMART COMMUNICATIONS HOLDING,
     LLC, HLFIP HOLDING, INC., and
14   HLFIP HOLDING, LLC,

15   _____ Counterclaim Defendants./
     JANICE LOGAN, as Trustee of the
16   James Logan Family Trust dated
     February 10, 2021, and
17   derivatively on behalf of
     Smart Communications Holdings,
18   Inc.,

19            Plaintiff,

20   vs.

21   JONATHAN D. LOGAN, SMART
     COMMUNICATIONS HOLDING, INC.,
22   nominal defendant, SMART
     COMMUNICATIONS HOLDING, LLC,
23   HLFIP HOLDING, LLC,
     LOCO FLORIDA LLC and SMART
24   COMMUNICATIONS YACHT HOLDING, LLC,

25            Defendants.
     _____/
```



1

2

3

4          CASE MANAGEMENT HEARING

5   BEFORE THE HONORABLE HUNTER W. CARROLL

6               held at the
    Judge Lynn N. Silvertooth Judicial Center
7       2002 Ringling Boulevard, 6-C
           Sarasota, Florida
8
         Wednesday, July 24, 2024
9
        1:15 p.m. to 1:55 p.m.
10
         Pages 1 through 33
11

12

13

14

15

16

17  Stenographically reported via Zoom by:

18         Linda R. Wolfe
     Registered Professional Reporter
19      Registered Merit Reporter
   Federal Certified Realtime Reporter
20  Florida Professional Reporter-Certified

21

22

23

24

25



```
 1        THE COURT:  Because when I came into this, one
 2   of the big issues was dockets -- documents were not
 3   being turned over.
 4        And I'm now hearing documents are not being
 5   turned over, and I feel like we've addressed that
 6   and so I'm wondering:  Is this a new request, or is
 7   this documents that they have been asking for for a
 8   year?
 9        MR. BERNET:  No, sir.
10        So under the valuation proceeding, the
11   relevant date is going to be May 28, which is the
12   day before the Notice of Election was filed.
13        Now, to value the company as of that date,
14   company financials will need to be made available.
15        The company is in the process of having those
16   financials put together.  Some have been produced.
17   Others are -- I don't want to speak for
18   Mr. Hillsley, but I think -- well, I -- we're on
19   the same side, we're the same law firm, but he
20   actually has some that just need attorney review
21   that are going to be then produced, and there's
22   others that are in the process of being prepared.
23        We think that those documents are all going to
24   be available very soon.  Within three weeks,
25   certainly by the end of August is our target to get
```



```
 1      MR. BERNET:  Message is received.  And we
 2  understand and we are working towards getting
 3  everything accomplished.
 4      Again, part of the issue is looking now at
 5  some of the allegations and looking at financials
 6  and having to deal with that.  So these are -- to
 7  some extent, financials have to be created, and
 8  that's what we're working on.
 9      MR. SCHOENFELD:  Your Honor, I don't doubt the
10  good faith of any of the counsel who are on this
11  call.  That's not my concern.
12      I think -- frankly, I think you could arm them
13  with a lever to get some progress with a crisp,
14  definitive order.
15      THE COURT:  My concern, Mr. Schoenfeld, is --
16  how should I put it -- it looks like you're asking
17  for, with the formal request, a pretty big amount
18  and what I can do right now is reduce the time to
19  allow it, but I don't think that's appropriate.
20      What I think I will say is if you start
21  rounding Day 30 and you don't have a healthy
22  production by that date, that's something I'm going
23  to want to know and we would set a Motion to Compel
24  in very short order, like within a matter of days,
25  to address it.
```



# EXHIBIT 7



David E. Schoenfeld

111 South Wacker Drive
Chicago, Illinois 60606
**t** 312.704.7700
**dd** 312.704.7723
**f** 312.558.1195
dschoenfeld@shb.com

August 9, 2024

**Via Email**

Dustin B. Hillsley
Mark Bernet
**Akerman LLP**
201 East Las Olas Boulevard
Suite 1800
Fort Lauderdale, FL 33301

Christopher G. Oprison
**DLA Piper LLP (US)**
200 South Biscayne Boulevard
Suite 2500
Miami, FL 33131-5341

Michael J. Harwin
**Stearns Weaver Miller Weissler
  Alhadeff & Sitterson, P.A.**
200 East Las Olas Boulevard
Suite 2100
Fort Lauderdale, FL 33301

Re:    **Meet and Confer Letter**
       ***Jonathan D. Logan, et al. v. Janice Logan, et al.***
       **Case Nos. 2023-CA-1002-NC / 2023-CA-1280-NC**
       **(Consolidated into 1002)**

Counsel:

We write to meet and confer about various deficiencies in your August 7, 2024 responses, objections, and productions in response to our Requests for Production of Documents on July 8, 2024.

Most notably, you have failed to produce SmartComm (Smart Communications Holding, Inc. and Smart Communications Holding, LLC) financials from 2024 even though we have been requesting them since March 2024. Yet, you reproduced 280 documents you previously produced. Surely you do not intend to point the Court to documents you are ***reproducing*** as evidence of good faith efforts to comply with our requests.

It is deeply concerning to us that SmartComm is unable to produce financial documents like 2024 income statements and general ledgers that are kept in SmartComm's ordinary course of business. Our concern was further



amplified when Mr. Bernet represented at the July 24, 2024 Case Management Conference that SmartComm was still drafting and amending 2024 financials "consistent with some of the allegations in the complaint."

It, of course, would be inappropriate and unusual for a company to adjust books kept in the ordinary course of business in response to litigation allegations.

Please produce 2024 SmartComm financials, including SmartComm's general ledger and income statement, immediately.

We do appreciate that some of the additional 119 documents you produced were new, responsive, and relevant to valuation—setting aside the dozen or so third-party news articles. However, there is no reason for continued delay on the 2024 income statement and general ledger. Please produce them immediately.

In addition to this general and glaring deficiency, we address some specific deficiencies below.

## SMARTCOMM (FL & DE)

> ***RFP 15: All materials used to market and sell SmartComm products and services, including 2023 and 2024 as-submitted Request for Proposal (RFP) request responses and unredacted financial data therein.***

These documents are directly relevant to Janice's valuation of SmartComm because they represent SmartComm's representations of its value and liquidity to third-party potential customers. Assessments given to third parties are probative and directly relevant to the actual value of the company.

## HLFIP

While we did receive a handful of HLFIP-related documents from SmartComm's counsel, we received no separate document production from HLFIP. Please advise when you intend to produce documents you indicated you would search for and produce.



Please provide your availability for a brief Meet and Confer on Monday,
August 12.

August 9, 2024
Page 3

Sincerely,

/s/  *David E. Schoenfeld*

David E. Schoenfeld

Enclosure
cc:       All Counsel of Record

# EXHIBIT 8

# akerman

Dustin B. Hillsley

Akerman LLP
201 East Las Olas Boulevard
Suite 1800
Fort Lauderdale, FL  33301

T: 954 463 2700
F: 954 463 2224

August 14, 2024

**VIA EMAIL**

David E. Schoenfeld
Shook Hardy & Bacon
111 South Wacker Drive
Chicago, Illinois 60606

Re:    **Meet and Confer Letter;** *Jonathan D. Logan, et al. v. Janice Logan, et al.*, **Case Nos. 2023-CA-1002-NC / 2023-CA-1280-NC (Consolidated into 1002)**

Dear David:

This firm represents Jonathan Logan and Smart Communications Holding, Inc. ("Smart") in the above referenced matter. We write in response to your letter dated August 9, 2024, which letter primarily addressed Smart's responses and objections (the "Responses") to your July 8, 2024, Requests for Production (the "Requests"), as well as Smart's document production on August 7, 2024 (the "Production").

In your letter, you allege three deficiencies: (1) you assert that Smart has not produced its financial documents through May 28, 2024; (2) you assert that Smart has not produced its 2023 and 2024 as-submitted Requests for Proposal ("RFPs"); and (3) you note that HLFIP, a new party to the case for which claims are not even at issue yet, has not produced its documents. We address each issue in turn.

**First**, in Response to your Request No. 4 to Smart, which broadly sought "All historical financials," Smart did *not* refuse to produce its documents. Instead, it referred your client to its previous production of nearly one thousand pages of financial records (Bates Range SMART_B&R 00005-67, 000071-139, 000208-400, 000525-530, 000543-1044; LOCO_B&R 00001-000099; YACHT_B&R 00001-00003; and Plaintiffs---1532-0001577). In addition, Smart produced another 789 pages of financial documents that had only been shared with your client in the context of confidential mediation (Bates Range SMART-0000001-0000145, 0002359-0003003).

Furthermore, Smart indicated it would supplement its productions with updated 2024 financials as they become available. That is consistent with Smart's representation to the Court at the parties' status conference that it would produce documents on a rolling basis as they become available/are prepared. To that end, Smart will now make a limited supplemental production of financial records. There are more financial records (for the 2024 period) that will be produced. We will make those productions as soon as those documents have been prepared.

David E. Schoenfeld
August 14, 2024
Page 2

Your letter appears to take issue with that approach, stating it is "deeply concerning" that we have not produced all of Smart's 2024 financial documents "that are kept in the ordinary course of business," and that it "would be inappropriate and unusual" to correct the company's financials. We disagree.

The cause for the delay is easy to identify: we discovered that Smart's former CFO, James Logan, did not record Smart's books in ways that comported with "the ordinary course of business." For that matter, what is "inappropriate and unusual" is the way in which James Logan kept Smart's books and records. As CFO, James owed fiduciary duties to Smart and its other shareholder to keep books and records that accurately reflected the assets and liabilities of Smart. He did not.

By way of example, James Logan routinely recorded the amounts that he used to purchase assets (for himself, Jon, Janice, and others) and disbursed as cash (to himself and apparently to Janice and Alexis) as "shareholder loans." He did not, however, evidence those loans with formal loan documentation or even informal loan agreements (which is what should have been done "in the ordinary course of business"). When James purchased assets that were for Jon's use, James did not lend funds to Jon, nor did he advance cash to Jon to make the purchases. Without memorializing anything in writing, James simply used Smart's funds to purchase those assets, titled the assets in Jon's name, and then recorded amounts receivable from Jon. He did not inform Jon that he made entries on Smart's books reflecting a purported debt that Jon owed to Smart; indeed, that was the opposite of what he told Jon.

Moreover, James Logan also used Smart funds to purchase the building for Loco and the vessel for Yacht. Again, James had Smart pay some or all of the purchase price for each asset, titled the assets in the name of those entities, and then recorded receivables from those entities on Smart's books. But James did not evidence those purported receivables with loan agreements or document any transactions with Loco or Yacht. Because Smart has already produced its pre-2024 financial records, you know (or should know) all of this.

In fact, upon review, none of these purported accounts receivable or shareholder loans appear to be bona fide assets in Smart's hands. They were not documented or memorialized as loans or accounts receivable. Indeed, your client's position is that Jon does not owe amounts to Smart, and if that were not the case (*i.e.*, Jon borrowed from Smart to purchase assets), then your unjust enrichment/fiduciary duty claims against Jon would be moot/invalid. Clearly, many of the financial entries that James Logan made as Smart's CFO do not accurately reflect Smart assets.

Before preparing 2024 financial documents, Smart had to go through the process of untangling the mess created by James Logan. That process is nearly complete, but it took time. Smart will supplement its production on a rolling basis as soon as possible.

**Second**, you seek (in Request No. 15) Smart's marketing and sales materials and specifically its 2023 and 2024 as-submitted Requests for Proposal or RFPs. As you know, we objected to that Request (the basis for which is obtaining the financial data attached to the RFP responses) because the financial data attached to the RFP responses is unreasonably cumulative and duplicative of the company's other financial data, which has already been produced. You maintain these documents are relevant to the valuation analysis because they include "representations of its [Smart's] value and liquidity". We have reviewed a sampling of RFP responses and that is not accurate.

David E. Schoenfeld
August 14, 2024
Page 3

However, as a compromise and in order to avoid unnecessary motion practice, Smart is willing to produce documents responsive to Request No. 15, even though Smart disagrees as to the relevance and probative value of those documents. To that end, Smart is including in its next supplemental production a sampling of as-submitted RFP responses. As part of the parties' good faith meet and confer process, we ask that you review these RFP responses and then advise on your position as to whether you still contend that the production of any additional RFP responses are warranted and proportional to the needs of this case.

**Third**, you complain that HLFIP has not yet produced documents. Though this purported deficiency is not directed at Smart, we note that HLFIP is a new party to this litigation, its answer is not even due yet, and as a result your complaint appears to be premature. In any event, and for the sake of completeness, we further note that counsel for HLFIP indicated to you that they would begin producing responsive documents during the week of August 19, 2024.

We look forward to our forthcoming meet-and-confer.

Respectfully,

Dustin B. Hillsley

cc:    Counsel of Record

# EXHIBIT 9

| | |
|---|---|
| **From:** | dustin.hillsley@akerman.com |
| **To:** | O'Neill, Peter F. (SHB); Franklin, Andrew L. (SHB); chris.oprison@us.dlapiper.com |
| **Cc:** | mharwin@stearnsweaver.com; gburhans@stearnsweaver.com; crclark@stearnsweaver.com; MHernandez@stearnsweaver.com; lrussell@stearnsweaver.com; jason.oletsky@akerman.com; max.rudolf@akerman.com; mark.bernet@akerman.com; jody.stafford@dlapiper.com; tal.aburos@dlapiper.com; cjohnson@blalockwalters.com; Schoenfeld, David E. (SHB); Garretson, John D. (SHB); Clement, Anitra (SHB); Liu, Kailin (SHB); jill.parnes@akerman.com; deborah.karlson@akerman.com; caren.deruiter@akerman.com; Brehmer, Deana (SHB) |
| **Subject:** | RE: Logan: 9/16/24 Meet & Confer Recap & Follow-Ups |
| **Date:** | Friday, October 4, 2024 2:35:30 PM |
| **Attachments:** | image001.jpg image004.jpg image005.jpg image006.jpg |

**EXTERNAL**

Peter,

See below regarding the requested depositions.

- Jon Logan (in-person)
  - He'll appear in his individual capacity, except to the extent an entity elects to designate him in connection with a corporate rep deposition (that will not happen until we see a specific topic list). In addition, and for the avoidance of doubt, you do not get to specify who will appear as a corporate designee.
  - We will produce Jon (or any other witness) one time only.
  - As you know, nearly all of these witnesses have already sat for at least one deposition in this case. In connection with an upcoming deposition, we will not produce Jon (or any other witness) for more than one 7-hour day (at most), unless otherwise ordered by the court.
  - Jon is available for an in-person deposition hosted at Akerman's Tampa office on December 16 or 17.
- Noreen Gunning (in-person)
  - Noreen is available for an in-person deposition hosted at Akerman's Tampa office on December 4 or 5.
- Justin Scott (Zoom)
  - Justin is available for a Zoom deposition on December 11 or 12.
- Lisa Eddy (Zoom)
  - Lisa is available for a Zoom deposition on November 20 or 21.
- Corporate Rep Deposition of Smart (unknown)
  - Before we can confirm date/time, location, and designee, we need further information from you. Specifically, the topics as described appear to concern exclusively accountant-client, attorney client, and/or work product privileged information. Can you articulate a non-privilege subject matter/ topic for the deposition?
- Mike Shreve (in-person)
  - We understand Mike will be represented by his own counsel.
  - We'll coordinate a call between counsel once that happens.
- Janice Logan/Alexis Logan/Justin Peterson

Please provide availability for December dates.

**Dustin B. Hillsley**
Partner
Akerman LLP | 201 East Las Olas Boulevard, Suite 1800 | Ft. Lauderdale, FL 33301
D: 954 331 4129 | C: 303 916 4564
dustin.hillsley@akerman.com

---

**From:** Hillsley, Dustin (Ptnr-Ftl)
**Sent:** Wednesday, October 2, 2024 11:18 AM
**To:** 'O'Neill, Peter F. (SHB)' <PFONEILL@shb.com>; Franklin, Andrew L. (SHB) <afranklin@shb.com>; chris.oprison@us.dlapiper.com
**Cc:** mharwin@stearnsweaver.com; gburhans@stearnsweaver.com; crclark@stearnsweaver.com; MHernandez@stearnsweaver.com; lrussell@stearnsweaver.com; Oletsky, Jason (Ptnr-Ftl) <jason.oletsky@akerman.com>; Rudolf, Max (Assoc-Ftl) <max.rudolf@akerman.com>; Bernet, Mark (Ptnr-Tpa) <mark.bernet@akerman.com>; jody.stafford@dlapiper.com; tal.aburos@dlapiper.com; cjohnson@blalockwalters.com; Schoenfeld, David E. (SHB) <DSCHOENFELD@shb.com>; Garretson, John D. (SHB) <JGARRETSON@shb.com>; Clement, Anitra (SHB) <ACLEMENT@shb.com>; Liu, Kailin (SHB) <kliu@shb.com>; Parnes, Jill (LAA-Ftl) <jill.parnes@akerman.com>; Karlson, Deborah (LAA-Ftl) <deborah.karlson@akerman.com>; DeRuiter, Caren (LAA-Tpa) <caren.deruiter@akerman.com>; Brehmer, Deana (SHB) <DBREHMER@shb.com>
**Subject:** RE: Logan: 9/16/24 Meet & Confer Recap & Follow-Ups

Peter, with all due respect, the below message is inaccurate. The ball has been in your court. I inquired, nearly ten days ago, about whether you are requesting that the depositions be via Zoom or in-person and did not receive a response, even though I indicated that your response (of course) impacts witness availability.

Now that we have your response, we will discuss with our clients and get back to you promptly on availability. In the interim, please provide dates that work for Janice Logan, Alexis Logan and Justin Peterson.

Thank you.

**Dustin B. Hillsley**
Partner
Akerman LLP | 201 East Las Olas Boulevard, Suite 1800 | Ft. Lauderdale, FL 33301
D: 954 331 4129 | C: 303 916 4564
dustin.hillsley@akerman.com

---

**From:** O'Neill, Peter F. (SHB) <PFONEILL@shb.com>
**Sent:** Wednesday, October 2, 2024 10:52 AM
**To:** Hillsley, Dustin (Ptnr-Ftl) <dustin.hillsley@akerman.com>; Franklin, Andrew L. (SHB) <afranklin@shb.com>; chris.oprison@us.dlapiper.com
**Cc:** mharwin@stearnsweaver.com; gburhans@stearnsweaver.com; crclark@stearnsweaver.com; MHernandez@stearnsweaver.com; lrussell@stearnsweaver.com; Oletsky, Jason (Ptnr-Ftl) <jason.oletsky@akerman.com>; Rudolf, Max (Assoc-Ftl) <max.rudolf@akerman.com>; Bernet, Mark

(Ptnr-Tpa) <mark.bernet@akerman.com>; jody.stafford@dlapiper.com; tal.aburos@dlapiper.com; cjohnson@blalockwalters.com; Schoenfeld, David E. (SHB) <DSCHOENFELD@shb.com>; Garretson, John D. (SHB) <JGARRETSON@shb.com>; Clement, Anitra (SHB) <ACLEMENT@shb.com>; Liu, Kailin (SHB) <kliu@shb.com>; Parnes, Jill (LAA-Ftl) <jill.parnes@akerman.com>; Karlson, Deborah (LAA-Ftl) <deborah.karlson@akerman.com>; DeRuiter, Caren (LAA-Tpa) <caren.deruiter@akerman.com>; Brehmer, Deana (SHB) <DBREHMER@shb.com>
**Subject:** RE: Logan: 9/16/24 Meet & Confer Recap & Follow-Ups

<mark>**[External to Akerman]**</mark>

All – it has been nearly two weeks since we requested everyone's availability for depositions, and we do not yet have any answers from Smart Comm or HLFIP.  Please provide dates by close of business Friday, or we will be forced to notice the depositions in the date ranges provided.  To the extent counsel or witnesses have been impacted by Helene, we will of course be flexible and understanding.  But we need communication, not silence.

Dustin, with respect to your comments and questions:

1. The recordkeeping deposition (like Jon's representative-capacity depositions) is meant to be a Rule 1.310(b)(6) deposition, and we will of course put together an appropriate notice.  As a preview, however, the notice will essentially concern Smart Comms' knowledge, retention, and production of the various iterations of the company's books and records and financial statements, including the admitted changes to SmartComm's books and records, the reasons for them, the extent of the changes, and everything that has been created, altered, otherwise modified, or deleted, since this lawsuit was filed.  We trust that this gives you sufficient particularity to select a witness.  If it does not, please let me know immediately.  With trial on the horizon, we can no longer entertain delays on issues like deposition scheduling.
2. We would like to do in-person depositions for everyone except Justin Scott and Lisa Eddy.

Thanks,
Peter

**Peter F. O'Neill**
*Associate*
Shook, Hardy & Bacon L.L.P.

312-704-7710 | pfoneill@shb.com



---

**From:** dustin.hillsley@akerman.com <dustin.hillsley@akerman.com>
**Sent:** Monday, September 23, 2024 1:04 PM
**To:** O'Neill, Peter F. (SHB) <PFONEILL@shb.com>; Franklin, Andrew L. (SHB) <afranklin@shb.com>; chris.oprison@us.dlapiper.com
**Cc:** mharwin@stearnsweaver.com; gburhans@stearnsweaver.com; crclark@stearnsweaver.com;

MHernandez@stearnsweaver.com; lrussell@stearnsweaver.com; jason.oletsky@akerman.com; max.rudolf@akerman.com; mark.bernet@akerman.com; jody.stafford@dlapiper.com; tal.aburos@dlapiper.com; cjohnson@blalockwalters.com; Schoenfeld, David E. (SHB) <DSCHOENFELD@shb.com>; Garretson, John D. (SHB) <JGARRETSON@shb.com>; Clement, Anitra (SHB) <ACLEMENT@shb.com>; Liu, Kailin (SHB) <kliu@shb.com>; jill.parnes@akerman.com; deborah.karlson@akerman.com; caren.deruiter@akerman.com; Brehmer, Deana (SHB) <DBREHMER@shb.com>

**Subject:** RE: Logan: 9/16/24 Meet & Confer Recap & Follow-Ups

## EXTERNAL

Good afternoon,

We are still determining availability and coverage. Please do not unilaterally set these depositions.

For clarification: is the record keeper deposition meant to be a Rule 1.310(b)(6) deposition? If yes, can you let us know, with reasonable particularity, the matters on which examination is requested, so we can determine the availability of the appropriate person?

Also, please let us know your position on in-person vs. Zoom depositions as it impacts availability.

Thanks,

**Dustin B. Hillsley**
Partner
Akerman LLP | 201 East Las Olas Boulevard, Suite 1800 | Ft. Lauderdale, FL 33301
D: 954 331 4129 | C: 303 916 4564
dustin.hillsley@akerman.com

vCard | Profile



CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

**From:** O'Neill, Peter F. (SHB) <PFONEILL@shb.com>
**Sent:** Monday, September 23, 2024 1:16 PM
**To:** Franklin, Andrew L. (SHB) <afranklin@shb.com>; Hillsley, Dustin (Ptnr-Ftl) <dustin.hillsley@akerman.com>; Oprison, Chris <chris.oprison@us.dlapiper.com>

**Cc:** Michael Harwin <mharwin@stearnsweaver.com>; gburhans@stearnsweaver.com; Christopher Clark <crclark@stearnsweaver.com>; Madeleine Hernandez <MHernandez@stearnsweaver.com>; lrussell@stearnsweaver.com; Oletsky, Jason (Ptnr-Ftl) <jason.oletsky@akerman.com>; Rudolf, Max (Assoc-Ftl) <max.rudolf@akerman.com>; Bernet, Mark (Ptnr-Tpa) <mark.bernet@akerman.com>; jody.stafford@dlapiper.com; tal.aburos@dlapiper.com; cjohnson@blalockwalters.com; Schoenfeld, David E. (SHB) <DSCHOENFELD@shb.com>; Garretson, John D. (SHB) <JGARRETSON@shb.com>; Clement, Anitra (SHB) <ACLEMENT@shb.com>; Liu, Kailin (SHB) <kliu@shb.com>; Parnes, Jill (LAA-Ftl) <jill.parnes@akerman.com>; Karlson, Deborah (LAA-Ftl) <deborah.karlson@akerman.com>; DeRuiter, Caren (LAA-Tpa) <caren.deruiter@akerman.com>; Brehmer, Deana (SHB) <DBREHMER@shb.com>
**Subject:** RE: Logan: 9/16/24 Meet & Confer Recap & Follow-Ups

**[External to Akerman]**

Counsel,

Please let us know by COB tomorrow on the dates requested below.  If we don't hear back, we'll go ahead and finalize and serve the notices for dates within the ranges below.

Thanks,
Peter

**Peter F. O'Neill**
*Associate*
Shook, Hardy & Bacon L.L.P.

312-704-7710 | pfoneill@shb.com



**From:** O'Neill, Peter F. (SHB)
**Sent:** Thursday, September 19, 2024 8:55 AM
**To:** Franklin, Andrew L. (SHB) <afranklin@shb.com>; dustin.hillsley@akerman.com; Oprison, Chris <chris.oprison@us.dlapiper.com>
**Cc:** Michael Harwin <mharwin@stearnsweaver.com>; gburhans@stearnsweaver.com; Christopher Clark <crclark@stearnsweaver.com>; Madeleine Hernandez <MHernandez@stearnsweaver.com>; lrussell@stearnsweaver.com; jason.oletsky@akerman.com; max.rudolf@akerman.com; mark.bernet@akerman.com; jody.stafford@dlapiper.com; tal.aburos@dlapiper.com; cjohnson@blalockwalters.com; Schoenfeld, David E. (SHB) <DSCHOENFELD@shb.com>; Garretson, John D. (SHB) <JGARRETSON@shb.com>; Clement, Anitra (SHB) <ACLEMENT@shb.com>; Liu, Kailin (SHB) <kliu@shb.com>; jill.parnes@akerman.com; deborah.karlson@akerman.com; caren.deruiter@akerman.com; Brehmer, Deana (SHB) <DBREHMER@shb.com>
**Subject:** RE: Logan: 9/16/24 Meet & Confer Recap & Follow-Ups

Counsel,

Following up on Andrew's email below, and as discussed during Monday's meet and confer, we would like to get depositions scheduled.  To that end, see our proposals below for a non-exhaustive list of deponents (expert and Marcum depositions, for example, will also need to be scheduled, and there will likely be others).

1. Jon Logan (individual and representative capacities for both Smart Comm and HLFIP)
    a. Expected Length: 2 days (possibly 3)
    b. Proposed Dates: November 11-13, or November 19-27
2. Noreen Gunning
    a. Expected Length: 1 day
    b. Proposed Dates: November 18-22, or December 2-6
3. Justin Scott
    a. Expected Length: 1 day
    a. Proposed Dates: any date in late October
4. Smart Comms Recordkeeper
    a. Expected Length: 1 day
    b. Proposed Dates: any date in mid- to late-October
5. Lisa Eddy
    a. Expected Length: 1 day
    b. Proposed Dates: October 21-24, November 4-8, November 11-15 or November 17-22
6. Mike Shreve
    a. Expected Length: 1 day
    b. Proposed Dates: We propose talking to Mike jointly about scheduling.  Let us know your availability for that call.

Once we have dates we will finalize the notices and get them to you.

Thanks,
Peter

**Peter F. O'Neill**
*Associate*
Shook, Hardy & Bacon L.L.P.

312-704-7710 | pfoneill@shb.com



---

**From:** Franklin, Andrew L. (SHB) <afranklin@shb.com>
**Sent:** Wednesday, September 18, 2024 11:38 AM
**To:** dustin.hillsley@akerman.com; Oprison, Chris <chris.oprison@us.dlapiper.com>
**Cc:** Michael Harwin <mharwin@stearnsweaver.com>; gburhans@stearnsweaver.com; Christopher Clark <crclark@stearnsweaver.com>; Madeleine Hernandez <MHernandez@stearnsweaver.com>; lrussell@stearnsweaver.com; jason.oletsky@akerman.com; max.rudolf@akerman.com; mark.bernet@akerman.com; jody.stafford@dlapiper.com; tal.aburos@dlapiper.com;

cjohnson@blalockwalters.com; Schoenfeld, David E. (SHB) <DSCHOENFELD@shb.com>; Garretson, John D. (SHB) <JGARRETSON@shb.com>; Clement, Anitra (SHB) <ACLEMENT@shb.com>; O'Neill, Peter F. (SHB) <PFONEILL@shb.com>; Liu, Kailin (SHB) <kliu@shb.com>; jill.parnes@akerman.com; deborah.karlson@akerman.com; caren.deruiter@akerman.com; Brehmer, Deana (SHB) <DBREHMER@shb.com>

**Subject:** Logan: 9/16/24 Meet & Confer Recap & Follow-Ups

Hi Dustin and Chris,

Thanks for your time Monday. I wanted to record my understanding of the results of the Meet and Confer. If you disagree with any of the below, please let me know as soon as possible to avoid unnecessary motion practice. Where HLFIP indicated it would stand on its objections, Janice understands that to mean we are at an impasse requiring Court intervention. If Janice has not heard from HLFIP on the below by COB Friday, she will assume your positions remain the same.

Janice did not receive any response letters from SmartComm or HLFIP in advance of the 9/16 Meet & Confer.

**SmartComm**
- SmartComm understands Janice's objection to its general objection regarding the relevance and production of financials and other documents post-dating May 28, 2024. SmartComm further generally agrees that it must timely produce to Janice materials that were provided to SmartComm's own experts, and that belated production of documents and financials it is now objecting to providing would be prejudicial to Janice and her experts.
- SmartComm represented there were no communications responsive to RFP No. 5.

**HLFIP**
- HLFIP is in accord with SmartComm as to the general objection regarding the relevance and production of financials or other documents post-dating May 28, 2024.
- HLFIP understands it needs to verify its interrogatory responses, and will do so both with its original responses and supplemental answers.
  - HLFIP will be supplementing its responses to Rogs 13 and 14.
  - HLFIP was also going to take another look at Rog 8.
- HLFIP indicated that it would make its first production "within 30 days" but would not commit to a date certain. Further said that its productions would be "rolling."
  - Janice indicated she was not agreeing that production timeline is reasonable given that HLFIP's First RFP responses were due Aug. 7.
- HLFIP indicated that it was going to stand on its objections to Rogs 5, 7, and 9 regarding "funded" being vague and ambiguous because "cash is fungible."
- HLFIP indicated that it was going to stand on its objections to Rog 6 on the basis of relevance and sensitivity.
- HLFIP indicated that it was going to stand on its objections to Rog 15 because it believes Jon's reasons for conversion were the result of conversations with counsel.
- HLFIP indicated that it was going to stand on its denial of RFA 3 because even though the Federal Circuit affirmed the middle district of PA invalidation of the '617 patent and HLFIP has

in other filings related to the '617 patent said it is "without a valid patent," a patent is presumed valid and the validity of a patent is a legal conclusion.

- Chris, I would note here that there is clear guidance from the USPTO that a final federal court holding of invalidity is binding on the PTO (*see* 37 CFR 1.565), which means there is no route to reexamination of validity of '617. And, HLFIP's IP counsel has previously admitted HLFIP was "without a valid patent" in its Motion to Voluntarily Dismiss (attached) the parallel Rutherford Cnty, Tennessee Fed. Cir. Appeal after the York County, PA Fed. Cir. opinion. In that same filing, HLFIP indicated it would not seek rehearing en banc or cert to the Supreme Court. In other words, the presumption of validity has given way to a clear and final legal conclusion of invalidity.
- In addition to the authority cited in our letter, I'm sure you're aware that Florida courts may require a responding party to pay the requesting party's attorneys' fees and expenses incurred in establishing as true a fact that a party denied in response to an RFA (Fla. R. Civ. P. 1.380(c); *R.J. Reynolds Tobacco Co. v. Ward*, 238 So. 3d 408, 409-10 (Fla. 1st DCA 2018); *Haas Automation, Inc. v. Fox*, 243 So. 3d 1017, 1027-28 (Fla. 3d DCA 2018)).

- HLFIP indicated that it was going to stand on its objections to RFAs 5 and 6 that "reference" is "vague and ambiguous" and that it was going to stand on its resulting denials.

Additionally, HLFIP indicated it would send a draft protective order for Janice's consideration. Janice awaits that draft order.

Thanks,

Andrew

**Andrew L. Franklin**
*Associate*
Shook, Hardy & Bacon L.L.P.

**O:** 312-368-3707 | [afranklin@shb.com](mailto:afranklin@shb.com)
**M:** 443-745-7488



CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any, is intended for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

# EXHIBIT 10



𝕸 𝖑 𝖘

M.L. Shreve CPA, P.C.
7781 N. Easy Street
Whitehall, Michigan 49461
231.894.5559 (phone)
231.893.2097 (fax)
www.mlshrevecpa.com
mlshrevecpa@frontier.com (email)

December 21, 2022

## Independent Auditor's Report

To the Board of Directors
Smart Communications Holding, Inc.
Seminole, Florida 33777

**Report on the Audit of the Consolidated Financial Statements**

### Opinion

We have audited the consolidated financial statements of Smart Communications Holding, Inc., which comprise the consolidated balance sheet as of December 31, 2021, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for the year then ended, and the related notes to the consolidated financial statements.

In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the financial position of Smart Communications Holding, Inc. as of December 31, 2021, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

### Basis for Opinion

We conducted our audit in accordance with auditing standards generally accepted in the United States of America (GAAS). Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Financial Statements section or our report. We are required to be independent of Smart Communications Holding, Inc. and to meet our other ethical responsibilities, in accordance with the relevant ethical requirements relating to our audit. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### Responsibilities of Management for the Consolidated Financial Statements

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the consolidated financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about Smart Communications Holding, Inc.'s ability to continue as a going concern for year ended December 31, 2023.

*1*

*Auditor's Responsibilities for the Audit of the Consolidated Financial Statements*

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with GAAS will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the consolidated financial statements.

In performing an audit in accordance with GAAS, we:

Exercise professional judgment and maintain professional skepticism throughout the audit.

Identify and assess the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements.

Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances but not for the purpose of expressing an opinion on the effectiveness of Smart Communications Holding, Inc.'s internal control. Accordingly, no such opinion is expressed.

Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the consolidated financial statements.

Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about Smart Communications Holding, Inc.'s ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control-related matters that we identified during the audit.

**Other Matter**

We previously performed a compilation engagement with respect to the 2021 consolidated financial statements, and issued our report thereon, dated October 20, 2022., which stated that the consolidated financial statements were prepared and reported in accordance with the tax basis of accounting, which is a basis of accounting other than accounting principles generally accepted in the United States of America. Our report further stated that we did not audit or review those consolidated financial statements, nor did we express an opinion or any other form of assurance on them.

*M. L. Shreve CPA, P.C.*

M. L. Shreve CPA, P.C.
Whitehall, Michigan  49461

2

Plaintiffs0000709

# EXHIBIT 11

| | |
|---|---|
| **From:** | Stafford, Jody A. <Jody.Stafford@us.dlapiper.com> |
| **Sent:** | Tuesday, August 13, 2024 2:54 PM |
| **To:** | Franklin, Andrew L. (SHB); dustin.hillsley@akerman.com; Schoenfeld, David E. (SHB); mark.bernet@akerman.com; Oprison, Chris; mharwin@stearnsweaver.com |
| **Cc:** | gburhans@stearnsweaver.com; crclark@stearnsweaver.com; jason.oletsky@akerman.com; max.rudolf@akerman.com; Aburos, Tal; steve.dixon@dlapiper.com; cjohnson@blalockwalters.com; Clement, Anitra (SHB); O'Neill, Peter F. (SHB); Liu, Kailin (SHB); Garretson, John D. (SHB) |
| **Subject:** | RE: Jonathan Logan, et al. v. Janice Logan, et al., Nos. 2023-CA-1002-NC/2023-CA-1280-NC (Consolidated):  Meet and Confer Letter |

**EXTERNAL**

Andrew,

HLFIP will begin its rolling production of responsive documents next week.

Best,

## Jody A. Stafford
Associate

T   +1 305 702 8890
F   +1 305 675 5590
jody.stafford@us.dlapiper.com

**DLA Piper LLP (US)**
200 South Biscayne Boulevard
Suite 2500
Miami, FL  33131-5341



dlapiper.com

---

**From:** Franklin, Andrew L. (SHB) <afranklin@shb.com>
**Sent:** Monday, August 12, 2024 4:50 PM
**To:** dustin.hillsley@akerman.com; Schoenfeld, David E. (SHB) <DSCHOENFELD@shb.com>; mark.bernet@akerman.com; Oprison, Chris <chris.oprison@us.dlapiper.com>; mharwin@stearnsweaver.com
**Cc:** gburhans@stearnsweaver.com; crclark@stearnsweaver.com; jason.oletsky@akerman.com; max.rudolf@akerman.com; Aburos, Tal <Tal.Aburos@us.dlapiper.com>; Stafford, Jody A. <Jody.Stafford@us.dlapiper.com>; steve.dixon@dlapiper.com; cjohnson@blalockwalters.com; Clement, Anitra (SHB) <ACLEMENT@shb.com>; O'Neill, Peter F. (SHB) <PFONEILL@shb.com>; Liu, Kailin (SHB) <kliu@shb.com>; Garretson, John D. (SHB) <JGARRETSON@shb.com>
**Subject:** RE: Jonathan Logan, et al. v. Janice Logan, et al., Nos. 2023-CA-1002-NC/2023-CA-1280-NC (Consolidated): Meet and Confer Letter

⚠ EXTERNAL MESSAGE

Dustin, we are free at 2pm ET on Wednesday.

Chris, if you are unable to attend please let us know by Wednesday when in the coming days we should expect HLFIP's production of all responsive documents it indicated it would search for and produce.

Thanks,

Andrew

**Andrew L. Franklin**
*Associate*
Shook, Hardy & Bacon L.L.P.

**O:** 312-368-3707 | afranklin@shb.com
**M:** 443-745-7488



---

**From:** dustin.hillsley@akerman.com <dustin.hillsley@akerman.com>
**Sent:** Monday, August 12, 2024 2:14 PM
**To:** Schoenfeld, David E. (SHB) <DSCHOENFELD@shb.com>; mark.bernet@akerman.com; chris.oprison@dlapiper.com; mharwin@stearnsweaver.com
**Cc:** gburhans@stearnsweaver.com; crclark@stearnsweaver.com; jason.oletsky@akerman.com; max.rudolf@akerman.com; tal.aburos@dlapiper.com; jody.stafford@dlapiper.com; steve.dixon@dlapiper.com; cjohnson@blalockwalters.com; Clement, Anitra (SHB) <ACLEMENT@shb.com>; O'Neill, Peter F. (SHB) <PFONEILL@shb.com>; Franklin, Andrew L. (SHB) <afranklin@shb.com>; Liu, Kailin (SHB) <kliu@shb.com>; Garretson, John D. (SHB) <JGARRETSON@shb.com>
**Subject:** RE: Jonathan Logan, et al. v. Janice Logan, et al., Nos. 2023-CA-1002-NC/2023-CA-1280-NC (Consolidated): Meet and Confer Letter

**EXTERNAL**

We are in receipt of David's letter. The Akerman folks are tied up today and tomorrow. Do you have any availability for a call on this on Wednesday? I'm flexible after 11 am ET.

**Dustin B. Hillsley**
Partner
Akerman LLP | 201 East Las Olas Boulevard, Suite 1800 | Ft. Lauderdale, FL 33301
D: 954 331 4129 | C: 303 916 4564
dustin.hillsley@akerman.com

vCard | Profile

# akerman

700+ Lawyers
25 Offices
akerman.com

CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this

communication in error and then delete it. Thank you.

---

**From:** Brehmer, Deana (SHB) <DBREHMER@shb.com> **On Behalf Of** Schoenfeld, David E. (SHB)
**Sent:** Friday, August 9, 2024 2:00 PM
**To:** Hillsley, Dustin (Ptnr-Ftl) <dustin.hillsley@akerman.com>; Bernet, Mark (Ptnr-Tpa) <mark.bernet@akerman.com>;
chris.oprison@dlapiper.com; Michael Harwin <mharwin@stearnsweaver.com>
**Cc:** gburhans@stearnsweaver.com; Christopher Clark <crclark@stearnsweaver.com>; Oletsky, Jason (Ptnr-Ftl)
<jason.oletsky@akerman.com>; Rudolf, Max (Assoc-Ftl) <max.rudolf@akerman.com>; tal.aburos@dlapiper.com;
jody.stafford@dlapiper.com; steve.dixon@dlapiper.com; 'cjohnson@blalockwalters.com'
<cjohnson@blalockwalters.com>; Schoenfeld, David E. (SHB) <DSCHOENFELD@shb.com>; Clement, Anitra (SHB)
<ACLEMENT@shb.com>; O'Neill, Peter F. (SHB) <PFONEILL@shb.com>; Franklin, Andrew L. (SHB) <afranklin@shb.com>;
Liu, Kailin (SHB) <kliu@shb.com>; Garretson, John D. (SHB) <JGARRETSON@shb.com>
**Subject:** Jonathan Logan, et al. v. Janice Logan, et al., Nos. 2023-CA-1002-NC/2023-CA-1280-NC (Consolidated): Meet
and Confer Letter

**[External to Akerman]**

Please see attached correspondence from David Schoenfeld.

Thank you,

**Deana D. Brehmer**
*Legal Administrative Assistant III to David E. Schoenfeld*
Shook, Hardy & Bacon L.L.P.

312-580-4935 | dbrehmer@shb.com



CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any, is intended for the person or entity to
which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure
or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy
all copies of the original message. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended
recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure,
dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this
communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to
postmaster@dlapiper.com. Thank you.

# EXHIBIT 12

| | |
|---|---|
| **From:** | Oprison, Chris <chris.oprison@us.dlapiper.com> |
| **Sent:** | Friday, August 16, 2024 2:11 PM |
| **To:** | Franklin, Andrew L. (SHB); 'dustin.hillsley@akerman.com'; mark.bernet@akerman.com; Michael Harwin; Dixon, Steve; Stafford, Jody A.; max.rudolf@akerman.com; Charles Johnson |
| **Cc:** | Schoenfeld, David E. (SHB); Brehmer, Deana (SHB) |
| **Subject:** | Re: Logan, et al. v Logan et al.; Consolidated Cases 2023 CA 1002 NC and 2023 CA 1280 NC proposed Agreed Case Management Order |

**EXTERNAL**

Andrew - understand your position but what we are asking is not that unreasonable considering the circumstances. We have literally been on this case for a matter of a few weeks since the amended complaint was filed. There is quite a bit of work to do which given the number of parties and counsel will be a challenge to align. Expert discovery has to be completed in less than 3 months and trial is in 5 months which is aggressive under any circumstances but particularly for a party that was only recently brought in by your client. If you want to dismiss HLFIP from the case, then we will obviously not have an issue but if you wish to proceed against HLFIP, we will submit our own order and ask for reconsideration given these circumstances. Thanks Andrew.

CHRIS

Christopher Oprison
DLA Piper LLP (US)
(305) 423-8522 (office)
(202) 664-6543 (cell)

---

**From:** Franklin, Andrew L. (SHB) <afranklin@shb.com>
**Sent:** Friday, August 16, 2024 2:40:41 PM
**To:** Oprison, Chris <chris.oprison@us.dlapiper.com>; 'dustin.hillsley@akerman.com' <dustin.hillsley@akerman.com>; mark.bernet@akerman.com <mark.bernet@akerman.com>; Michael Harwin <mharwin@stearnsweaver.com>; Dixon, Steve <Steve.Dixon@us.dlapiper.com>; Stafford, Jody A. <Jody.Stafford@us.dlapiper.com>; max.rudolf@akerman.com <max.rudolf@akerman.com>; Charles Johnson <cjohnson@blalockwalters.com>
**Cc:** Schoenfeld, David E. (SHB) <DSCHOENFELD@shb.com>; Brehmer, Deana (SHB) <DBREHMER@shb.com>
**Subject:** RE: Logan, et al. v Logan et al.; Consolidated Cases 2023 CA 1002 NC and 2023 CA 1280 NC proposed Agreed Case Management Order

⚠ EXTERNAL MESSAGE

Chris,

Respectfully, we are not willing to consider moving the trial date back. You presented this argument as to the trial date to the Court at the CMC (as did Akerman), and the Court set a trial date after hearing your perspective. In the Order Setting Trial, the Court instructed us to submit a case management report, which the parties had agreed on before the Court asked for it in a standard format.

The dates in the revised case management report are substantially similar to the dates in the non-standard report you agreed to two weeks ago. If you are changing your position as to the report, we'll submit it as Not Agreed.

If we don't get your and Akerman's approval by 4:30 PM EDT, we're going to file the report as Not Agreed at the close of business today.

Thanks,

Andrew

**Andrew L. Franklin**
*Associate*
Shook, Hardy & Bacon L.L.P.

**O:** 312-368-3707 | afranklin@shb.com
**M:** 443-745-7488



---

**From:** Oprison, Chris <chris.oprison@us.dlapiper.com>
**Sent:** Friday, August 16, 2024 2:01 PM
**To:** Franklin, Andrew L. (SHB) <afranklin@shb.com>; 'dustin.hillsley@akerman.com' <dustin.hillsley@akerman.com>; mark.bernet@akerman.com; Michael Harwin <mharwin@stearnsweaver.com>; Dixon, Steve <Steve.Dixon@us.dlapiper.com>; Stafford, Jody A. <Jody.Stafford@us.dlapiper.com>; max.rudolf@akerman.com; Charles Johnson <cjohnson@blalockwalters.com>
**Cc:** Schoenfeld, David E. (SHB) <DSCHOENFELD@shb.com>; Brehmer, Deana (SHB) <DBREHMER@shb.com>
**Subject:** Re: Logan, et al. v Logan et al.; Consolidated Cases 2023 CA 1002 NC and 2023 CA 1280 NC proposed Agreed Case Management Order

**EXTERNAL**

Andrew - as you may recall, HLFIP was of the view that trial dates and all intervening milestones should be pushed out to accommodate the amount of work to be accomplished particularly in light of HLFIP only recently coming into the case. We had asked for that at the last status conference. Would your client consider revising the trial schedule and seeking a trial date 120-150 days later than what we currently have?  I just don't want to have unworkable deadlines that may just need to be adjusted later and think if we make the ask now the judge will not have a problem with it. What do you think?

Dustin?

CHRIS

Christopher Oprison
DLA Piper LLP (US)
(305) 423-8522 (office)
(202) 664-6543 (cell)

---

**From:** Franklin, Andrew L. (SHB) <afranklin@shb.com>
**Sent:** Friday, August 16, 2024 9:57:35 AM
**To:** Oprison, Chris <chris.oprison@us.dlapiper.com>; 'dustin.hillsley@akerman.com' <dustin.hillsley@akerman.com>;

mark.bernet@akerman.com <mark.bernet@akerman.com>; Michael Harwin <mharwin@stearnsweaver.com>; Dixon, Steve <Steve.Dixon@us.dlapiper.com>; Stafford, Jody A. <Jody.Stafford@us.dlapiper.com>; max.rudolf@akerman.com <max.rudolf@akerman.com>; Charles Johnson <cjohnson@blalockwalters.com>
**Cc:** Schoenfeld, David E. (SHB) <DSCHOENFELD@shb.com>; Brehmer, Deana (SHB) <DBREHMER@shb.com>
**Subject:** RE: Logan, et al. v Logan et al.; Consolidated Cases 2023 CA 1002 NC and 2023 CA 1280 NC proposed Agreed Case Management Order

⚠ EXTERNAL MESSAGE

Thanks, Chris. Any word?

Stearns and Akerman?

Thanks,

Andrew

**Andrew L. Franklin**
*Associate*
Shook, Hardy & Bacon L.L.P.

**O:** 312-368-3707 | afranklin@shb.com
**M:** 443-745-7488



**From:** Oprison, Chris <chris.oprison@us.dlapiper.com>
**Sent:** Thursday, August 15, 2024 8:23 AM
**To:** Franklin, Andrew L. (SHB) <afranklin@shb.com>; 'dustin.hillsley@akerman.com' <dustin.hillsley@akerman.com>; mark.bernet@akerman.com; Michael Harwin <mharwin@stearnsweaver.com>; Dixon, Steve <Steve.Dixon@us.dlapiper.com>; Stafford, Jody A. <Jody.Stafford@us.dlapiper.com>; max.rudolf@akerman.com; Charles Johnson <cjohnson@blalockwalters.com>
**Cc:** Schoenfeld, David E. (SHB) <DSCHOENFELD@shb.com>; Brehmer, Deana (SHB) <DBREHMER@shb.com>
**Subject:** Re: Logan, et al. v Logan et al.; Consolidated Cases 2023 CA 1002 NC and 2023 CA 1280 NC proposed Agreed Case Management Order

**EXTERNAL**

Andrew - apologies.  Have been traveling. I need to check in with my client. Let me do that when I land today and revert

CHRIS

Christopher Oprison
DLA Piper LLP (US)
(305) 423-8522 (office)
(202) 664-6543 (cell)

**From:** Franklin, Andrew L. (SHB) <afranklin@shb.com>
**Sent:** Wednesday, August 14, 2024 5:58:28 PM
**To:** 'dustin.hillsley@akerman.com' <dustin.hillsley@akerman.com>; mark.bernet@akerman.com <mark.bernet@akerman.com>; Michael Harwin <mharwin@stearnsweaver.com>; Dixon, Steve <Steve.Dixon@us.dlapiper.com>; Stafford, Jody A. <Jody.Stafford@us.dlapiper.com>; Oprison, Chris <chris.oprison@us.dlapiper.com>; max.rudolf@akerman.com <max.rudolf@akerman.com>; Charles Johnson <cjohnson@blalockwalters.com>
**Cc:** Schoenfeld, David E. (SHB) <DSCHOENFELD@shb.com>; Brehmer, Deana (SHB) <DBREHMER@shb.com>
**Subject:** Fwd: Logan, et al. v Logan et al.; Consolidated Cases 2023 CA 1002 NC and 2023 CA 1280 NC proposed Agreed Case Management Order

---

⚠️ EXTERNAL MESSAGE

Hi All,

Following up on this. We should get this on file soon. It's been three weeks since the CMC.

Thanks,

Andrew

**Andrew L. Franklin**
*Associate*
Shook, Hardy & Bacon L.L.P.

**O:** 312-368-3707 | afranklin@shb.com
**M:** 443-745-7488

---

**From:** Franklin, Andrew L. (SHB) <afranklin@shb.com>
**Sent:** Monday, August 12, 2024 1:33 PM
**To:** dustin.hillsley@akerman.com <dustin.hillsley@akerman.com>; mark.bernet@akerman.com <mark.bernet@akerman.com>; jason.oletsky@akerman.com <jason.oletsky@akerman.com>; mharwin@stearnsweaver.com <mharwin@stearnsweaver.com>; Oprison, Chris <chris.oprison@us.dlapiper.com>; Jody.Stafford@us.dlapiper.com <Jody.Stafford@us.dlapiper.com>; Charles Johnson <cjohnson@blalockwalters.com>
**Cc:** Schoenfeld, David E. (SHB) <DSCHOENFELD@shb.com>; Garretson, John D. (SHB) <JGARRETSON@shb.com>; Clement, Anitra (SHB) <ACLEMENT@shb.com>; O'Neill, Peter F. (SHB) <PFONEILL@shb.com>; Liu, Kailin (SHB) <kliu@shb.com>; Brehmer, Deana (SHB) <DBREHMER@shb.com>
**Subject:** FW: Logan, et al. v Logan et al.; Consolidated Cases 2023 CA 1002 NC and 2023 CA 1280 NC proposed Agreed Case Management Order

Dustin, Chris, and Michael,

Attached is a revised case management report in the Court's form, with some of the additional material we had already agreed on added at the end.

Please let us know if this looks good for filing.

Thanks,

Andrew

**Andrew L. Franklin**
*Associate*
Shook, Hardy & Bacon L.L.P.

**O:** 312-368-3707 | afranklin@shb.com
**M:** 443-745-7488



---

**From:** Sarah E. Scibak <SScibak@jud12.flcourts.org>
**Sent:** Thursday, August 8, 2024 1:10 PM
**To:** Margie Woodham <mwoodham@blalockwalters.com>
**Cc:** Charles Johnson <cjohnson@blalockwalters.com>; Clement, Anitra (SHB) <aclement@shb.com>; O'Neill, Peter F. (SHB) <pfoneill@shb.com>; Schoenfeld, David E. (SHB) <DSCHOENFELD@shb.com>; Franklin, Andrew L. (SHB) <afranklin@shb.com>; Liu, Kailin (SHB) <kliu@shb.com>; Garretson, John D. (SHB) <jgarretson@shb.com>; mharwin@sternsweaver.com; mhernandez@sternsweaver.com; gburhans@sternsweaver.com; crclark@stearnsweaver.com; lrussell@stearnsweaver.com; mark.bernet@akerman.com; caren.deruiter@akerman.com; jason.oletsky@akerman.com; jill.parnes@akerman.com; dustin.hillsley@akerman.com; max.rudolf@akerman.com; deborah.karlson@akerma.com; chris.oprison@dlapiper.com; tal.aburos@dlapiper.com; jody.stafford@dlapiper.com; chris.baker2@dlapiper.com; Sheila.hall@dlapiper.com; steve.dixon@dlapiper.com
**Subject:** RE: Logan, et al. v Logan et al.; Consolidated Cases 2023 CA 1002 NC and 2023 CA 1280 NC proposed Agreed Case Management Order

**EXTERNAL**

Good afternoon,

Judge Carroll asks that the parties use the Court's form which is located on the 12th Judaical Website and add any additional information to the bottom. Once completed, please file in the Court file (not as a proposed order).

Thank you,

Sarah Scibak
Judicial Assistant to the Honorable Hunter W. Carroll
Silvertooth Judicial Center
2002 Ringling Blvd
Sarasota, FL 34237
Phone: 941 861 7946

**\*\*Please review the [Civil Division](#) website for the most up to date information including Calendars, Form Orders, Zoom information and Judge Carroll's [Requirements & Information (flcourts.org)](#).  Most questions can be answered after review.**

---

**From:** Margie Woodham <[mwoodham@blalockwalters.com](mailto:mwoodham@blalockwalters.com)>
**Sent:** Thursday, August 8, 2024 12:52 PM
**To:** Sarah E. Scibak <[SScibak@jud12.flcourts.org](mailto:SScibak@jud12.flcourts.org)>
**Cc:** Charles Johnson <[cjohnson@blalockwalters.com](mailto:cjohnson@blalockwalters.com)>; Margie Woodham <[mwoodham@blalockwalters.com](mailto:mwoodham@blalockwalters.com)>; [aclement@shb.com](mailto:aclement@shb.com); [pfoneill@shb.com](mailto:pfoneill@shb.com); [dschoenfeld@shb.com](mailto:dschoenfeld@shb.com); Franklin, Andrew L. (SHB) <[afranklin@shb.com](mailto:afranklin@shb.com)>; [kliu@shb.com](mailto:kliu@shb.com); [jgarretson@shb.com](mailto:jgarretson@shb.com); [mharwin@sternsweaver.com](mailto:mharwin@sternsweaver.com); [mhernandez@sternsweaver.com](mailto:mhernandez@sternsweaver.com); [gburhans@sternsweaver.com](mailto:gburhans@sternsweaver.com); [crclark@stearnsweaver.com](mailto:crclark@stearnsweaver.com); [lrussell@stearnsweaver.com](mailto:lrussell@stearnsweaver.com); [mark.bernet@akerman.com](mailto:mark.bernet@akerman.com); [caren.deruiter@akerman.com](mailto:caren.deruiter@akerman.com); [jason.oletsky@akerman.com](mailto:jason.oletsky@akerman.com); [jill.parnes@akerman.com](mailto:jill.parnes@akerman.com); [dustin.hillsley@akerman.com](mailto:dustin.hillsley@akerman.com); [max.rudolf@akerman.com](mailto:max.rudolf@akerman.com); [deborah.karlson@akerma.com](mailto:deborah.karlson@akerma.com); [chris.oprison@dlapiper.com](mailto:chris.oprison@dlapiper.com); [tal.aburos@dlapiper.com](mailto:tal.aburos@dlapiper.com); [jody.stafford@dlapiper.com](mailto:jody.stafford@dlapiper.com); [chris.baker2@dlapiper.com](mailto:chris.baker2@dlapiper.com); [Sheila.hall@dlapiper.com](mailto:Sheila.hall@dlapiper.com); [steve.dixon@dlapiper.com](mailto:steve.dixon@dlapiper.com)
**Subject:** Logan, et al. v Logan et al.; Consolidated Cases 2023 CA 1002 NC and 2023 CA 1280 NC proposed Agreed Case Management Order

 CAUTION: This email contains one or more attachments that may be malicious. Please click responsibly and be cautious if asked to provide sensitive information. [What's this?](#) 

Good afternoon, Sarah:

Per your instructions during our call yesterday afternoon regarding the proposed Agreed Case Management Order in the above matter, attached herewith for Judge Carroll's review and consideration are the following:

      Letter to Judge Carroll of this date;

      Proposed Agreed Case Management Order in PDF format; and

      Proposed Agreed Case Management Order in Word format.

Please advise if you have any problems opening any of the attachments., or, if there is anything further you require at this time.

Thank you very much for your assistance in this regard.

Best regards,

Margie M. Woodham, FRP | Florida Registered Paralegal



802 11th Street West | Bradenton, FL 34205
2 North Tamiami Trail, #402 | Sarasota, FL 34236

Office 941.748.0100 | Facsimile 941.745.2093
mwoodham@blalockwalters.com

To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.

Confidentiality Notice - This message is being sent by or on behalf of an attorney. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of this message.

CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any, is intended for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

# EXHIBIT 13

**From:** Franklin, Andrew L. (SHB) <afranklin@shb.com>
**Sent:** Friday, October 11, 2024 5:16 PM
**To:** Oprison, Chris <chris.oprison@us.dlapiper.com>; Stafford, Jody A.
<Jody.Stafford@us.dlapiper.com>
**Cc:** Michael Harwin <mharwin@stearnsweaver.com>; gburhans@stearnsweaver.com; Bridget
Smitha <bsmitha@stearnsweaver.com>; Christopher Clark <crclark@stearnsweaver.com>;
Madeleine Hernandez <MHernandez@stearnsweaver.com>; lrussell@stearnsweaver.com;
jason.oletsky@akerman.com; max.rudolf@akerman.com; mark.bernet@akerman.com; Dixon, Steve
<Steve.Dixon@us.dlapiper.com>; cjohnson@blalockwalters.com; Schoenfeld, David E. (SHB)
<DSCHOENFELD@shb.com>; Garretson, John D. (SHB) <JGARRETSON@shb.com>; Clement, Anitra
(SHB) <ACLEMENT@shb.com>; O'Neill, Peter F. (SHB) <PFONEILL@shb.com>; Liu, Kailin (SHB)
<kliu@shb.com>; jill.parnes@akerman.com; deborah.karlson@akerman.com;
caren.deruiter@akerman.com; Brehmer, Deana (SHB) <DBREHMER@shb.com>;
eservice@blalockwalters.com; dustin.hillsley@akerman.com
**Subject:** RE: Logan: 9/16/24 Meet & Confer Recap & Follow-Ups

⚠ EXTERNAL MESSAGE

Counsel,

The version you sent is not acceptable to Janice Logan.

As an initial matter, you do not appear to have addressed your overbroad definitions of Confidential
Information, Highly Confidential Information, and the section regarding filing procedures not
comporting with Fla. R. Jud. Admin. 2.420. Judge Carroll has already told the parties to this case that
Confidentiality Orders that contravene 2.420 are in effect null. This is presumably why SmartComm
has publicly filed documents that SmartComm itself marked as confidential on the public docket
since the July 24 Case Management Conference when Judge Carroll offered that clarification.

Moreover, SmartComm is a public-facing business as a result of its contracting with municipalities.
As a result, much of the information provided by SmartComm or to be provided by HLFIP is either
already publicly available or subject to FOIA. And, SmartComm did not insist on any kind of sealing of
exhibits in Phase I trial, which means a number of exhibits, including exhibits that describe
SmartComm's value and financials are already in the public record.

If there are specific categories of documents HLFIP is worried about protecting, we are happy to talk
about those, but we cannot agree to the definitions you provided.

Second, the AEO category needs to be cut or significantly limited. This case does not involve a
dispute between competitors, and there is no legitimate reason to prevent parties to the

Consolidated Action from viewing any documents produced. The managing member of your client HLFIP, Jon, initiated what has become the Consolidated Action by suing Janice and Alexis. And he added Justin Peterson to the suit in his First Amended Complaint. Janice is a 50% shareholder of SmartComm, and Alexis and Justin are not colorably competitors of SmartComm or HLFIP. Thus, there is no good reason to preclude them from viewing AEO material—which we frankly doubt exists in any event. Patents and trademarks are publicly available, and HLFIP has not contended it holds any copyrights to things like software code.

Over-capacious confidentiality designations and AEO categories will only unnecessarily delay discovery and filings in this matter, which is set for trial in January.

Attached is a revised version of the clean draft you sent, which keeps portions of your revisions insofar as they are warranted. We will consider any authority for your positions and/or meet and confer regarding this order before next week's hearing. But it has now been two months since your first RFP written responses were due (Aug. 7), and we have yet to receive a single document from HLFIP. If HLFIP cannot agree to an acceptable new protective order by next Friday, we will ask the Court to order a complete production under the existing protective order (DIN 362).

Thanks,

Andrew

**Andrew L. Franklin**
*Associate*
Shook, Hardy & Bacon L.L.P.

**O:** 312-368-3707 | afranklin@shb.com
**M:** 443-745-7488

# EXHIBIT 14

| | |
|---|---|
| **From:** | Oprison, Chris |
| **To:** | Franklin, Andrew L. (SHB); Stafford, Jody A. |
| **Cc:** | Michael Harwin; gburhans@stearnsweaver.com; Bridget Smitha; Christopher Clark; Madeleine Hernandez; lrussell@stearnsweaver.com; jason.oletsky@akerman.com; max.rudolf@akerman.com; mark.bernet@akerman.com; Dixon, Steve; cjohnson@blalockwalters.com; Schoenfeld, David E. (SHB); Garretson, John D. (SHB); Clement, Anitra (SHB); O"Neill, Peter F. (SHB); Liu, Kailin (SHB); jill.parnes@akerman.com; deborah.karlson@akerman.com; caren.deruiter@akerman.com; Brehmer, Deana (SHB); eservice@blalockwalters.com; dustin.hillsley@akerman.com |
| **Subject:** | RE: Logan: 9/16/24 Meet & Confer Recap & Follow-Ups |
| **Date:** | Thursday, October 17, 2024 12:03:25 PM |
| **Attachments:** | image001.jpg image002.jpg image003.jpg image004.png image005.jpg image006.png |

**EXTERNAL**

Andrew

Pardon my delayed response, but I have been traveling all week and needed to find some time to digest your email.  It has quite a few misstatements and unsupported assumptions.  Our addressing the points below should not be construed as us conceding the accuracy or truth of any other statements in your email.  We reject all.

As an initial matter, I will just say that your edits to the protective order are not acceptable. My client is under no obligation to agree with you or accept as true your position.  Nor will my client capitulate to unreasonable demands on scope and timing.  If you want to take matters up with Judge Carroll, by all means do so.  I am happy to explain why we believe you and your team are unreasonable in your demands and show how my client (and my firm) have attempted to catch up after less than three months with all other parties who have been litigating this case for years.

As for your first point, we have not addressed what you deem to be "overbroad" definitions of "Confidential" or "Highly Confidential" because we do not agree with your unilateral assertion that they are, in fact, overbroad.  As you know, Fla. R. Jud. Admin. 2.420 does not require a definition of "confidential" or "highly confidential" to be used in a stipulated protective order. Parties may agree to whatever definition of confidential they deem appropriate, as this Court has acknowledged. *See, e.g.*, *Trump Media & Technology Corp. v. ARC Global Investments II, et al*, Case No. 2024-CA-001061, DIN 87 at 2 (Sarasota County July 24, 2024) (Carroll, J.) ("As used in this Order, "Confidential Information" means information designated as "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" by the Producing Party, including, whether contained in documents, testimony, or otherwise, that constitutes trade secrets, proprietary business information, competitively sensitive information, personal or business financial information, or other information the disclosure of which would, in the good faith judgment of the Party designating the Discovery Material as Confidential Information, be detrimental to the conduct of that Party's business or the business of any of that Party's customers or clients…."); *see also* Rule 2.420(b)(4) ("Confidential information includes information that is confidential under this rule **or under a court order entered under this rule**.") (emphasis added).  If you think differently, then point us to authority stating that a stipulated protective order must include a specific, predetermined definition of "highly confidential" or "confidential" or that limits what parties

can agree to designate as confidential pursuant to a stipulated protective order. If not, then we will have our position, and you can have yours (however misguided) and take it up with Judge Carroll. But, we will not produce documents unless and until you either agree to language protecting OUR information from YOUR clients' misuse or threatened misuse and dissemination, or Judge Carroll orders otherwise.

Moreover, your concerns regarding language in the stipulated order contravening Rule 2.420 (even if true, which it is not) can be remedied by the addition of language along the lines of the following:

> "Nothing in this Order alters any requirements or burdens established in Florida Rule of General Practice and Judicial Administration 2.420. To the extent there is a conflict between this Order and Rule 2.420, the Rule will prevail over this Order."

We did this in my other case with Judge Carroll, s*ee, e.g.*, *Trump Media & Technology Corp. v. ARC Global Investments II, et al*, Case No. 2024-CA-001061, DIN 87 at 2 (Sarasota County July 24, 2024) (Carroll, J.), and can do it here as well. Simple fix.

Regarding your contention that SmartComm is a public-facing business and, thus, Smart's or HLFIP's information is already publicly available or subject to FOIA, that is not only not true as a blanket assertion, but demonstrates a fundamental misunderstanding of the parties and the nature of the protected intellectual property owned by HLFIP. Even if true as to some information, that certainly does not cover the field. Your blanket assertion that because some information of HLFIP may be publicly available (which we do not concede) means we cannot protect other information that is not publicly available is absurd. HLFIP has a right to protect from public disclosure its non-public, proprietary, sensitive information. And it has a right to protect such information from getting into the hands of Janice or Alexis who have demonstrated time and again that they care nothing about protecting the company or its IP and are out to benefit only themselves. More on that to come but suffice to say, your position here is untenable. If you think some information may be subject to FOIA, then go to a municipality and make a FOIA request and see what you receive. But, as you may or may not know, conceptually, just because contracting material may have been submitted to a municipality, and that municipality has a FOIA-like sunshine law does not mean that information necessarily will be produced in response to a FOIA request nor does it mean, for our purposes here, that it loses protection in litigation. If you think otherwise, then take it up with Judge Carroll.

It also is inconsequential what Smart may or may not have insisted on in prior trials or litigation. I don't speak for Smart. I represent HLFIP which owns the IP and merely licenses it to Smart for a royalty payment. My client is entitled to protect its IP, financial and other sensitive information from disclosure to the public or to parties that are intent on misusing it for personal gain. HLFIP is not "worried" about protecting certain categories of documents, as you say. It has every right to protect sensitive information and will do so consistent with the rules applicable here.

As for the "Highly Confidential/AEO" category, which you contend "needs to be cut or significantly limited" because the "case does not involve a dispute between competitors," we obviously disagree. HLFIP, as the holder of proprietary and valuable intellectual property, has bona fide concerns regarding access to its highly confidential information. We welcome you to point us to authority stating that AEO provisions are reserved for disputes

between competitors.  Moreover, there is every reason to preclude your clients from viewing certain sensitive information.  What is odd to us is that you have no idea what that material might be, yet you have categorically rejected the designation which is all the indicia we need to stand our ground and demand that it be included in our protective order.  This is particularly true given that your clients have done nothing to suggest they are interested in protecting the IP or the company.  On the contrary, their intent to destroy the company and undermine the value of the IP is quite apparent.  That is why we have insisted and will continue to insist on the "Highly Confidential/AEO" designation.  If you disagree, take it up with Judge Carroll.

As to your contention that we are delaying discovery with our objections and designations, that is also untrue.  You and your clients are the ones who waited until less than three months ago to serve our client in a case that has been pending for years.  You will not agree to reasonable language in a protective order so that we can properly designate documents and protect our property and our rights, which we are entitled to despite your protestations.  If you want to have an orderly discovery process, then agree to our proposed protective order.  If not, then take it up with Judge Carroll. But, HLFIP is entitled to protect its interests, including in confidential and highly confidential information, prior to producing discovery. HLFIP is also entitled to engage in an orderly (and not rushed or hasty) discovery process.  This is the parties' second round of edits to the stipulated protective order.  If you disagree, then point us to authority stating that a party must produce documents pursuant to a preexisting protective order negotiated by other parties to the case before my client was ever named, to which it was not a party, and which does not adequately protect its property interests. For that matter, we are aware of not authority mandating a complete production within 3 months of a party being added to a case that has been pending for years.  I seriously doubt that you will find any such authority supporting that position.

Finally, as you know, the hearing on Friday October 18 is reserved for the parties' Motions to Dismiss.  I sent you a separate email making clear our position that we do not agree to substitute the motions noticed for that hearing with your first (or second) motion to compel. We believe our motion to dismiss has merit, will be granted, and will substantially narrow the issues if not eliminate one or more parties, including HLFIP.  Even if not, it merits being given priority in the motion pecking order. We do not agree to insert discovery motions into that one-hour time slot just because your clients have a preference to prioritize the discovery matters over dispositive motions.  That frankly seems backwards and counterintuitive to us.  We are happy to discuss rescheduling the hearing on your motion to compel for a later date, but do not agree to have it taken up on Friday.

Let me know if you wish to discuss.

Chris

Christopher George Oprison
Partner

---

T   +1 305 423 8522
F   +1 305 657 6366
M  +1 202 664 6543
chris.oprison@us.dlapiper.com

**DLA Piper LLP (US)**
200 South Biscayne Boulevard
Suite 2500
Miami, FL  33131-5341

# EXHIBIT 15



November 1, 2024

David E. Schoenfeld

111 South Wacker Drive
Chicago, Illinois 60606
**t** 312.704.7700
**dd** 312.704.7723
**f** 312.558.1195
dschoenfeld@shb.com

**Via Email**

Christopher G. Oprison
**DLA Piper LLP (US)**
200 South Biscayne Boulevard
Suite 2500
Miami, FL 33131-5341

**Re:    Meet and Confer Letter**
        ***Jonathan D. Logan, et al. v. Janice Logan, et al.***
        **Case Nos. 2023-CA-1002-NC / 2023-CA-1280-NC**
        **(Consolidated into 1002)**

Counsel:

We write concerning your failure to produce documents since your first RFP responses became due on August 7, 2024—nearly three months ago. This, in spite of your representation in mid-August that rolling productions would begin the week of August 19. We have yet to receive a single document from your client, HLFIP Holding, LLC, despite the fact that expert reports are due on November 15, 2024 (DIN 726), and trial in this matter is set for January 27, 2025 (DIN 711). We also respond herein to the points raised in your email of October 17, 2024.

HLFIP Holding, LLC's latest excuse that it cannot produce documents until an entirely new protective order is entered is clearly a delay tactic. There is an existing Protective Order in this case, *see* DIN 362, and we have repeatedly offered to stipulate to HLFIP being covered by its protections. Instead, you insist on a number of conditions that are not warranted by Rule 2.420 or the facts of this case.

As an initial matter, we want to be clear about the effect of your delay: HLFIP's delay in producing documents prejudices Janice's intellectual property expert's ability to opine on the matters at issue in this case and prepare his report due November 15, 2024 under the Case Management Order (DIN 726). As a result, Janice's expert's opinions and materials will be subject to the caveat that he will reserve the right to revise and amend those opinions and materials to account for documents you produce after the November 15 expert disclosure deadline. We also reject your repeated contention that Janice has any interest in hurting your client or



SmartComm—she is a 50% owner of SmartComm who has been trying to obtain the fair value of her shares for almost two years now.

Regardless, Janice believes that this issue can be resolved short of motion practice, and would propose the following. *First*, in our email of October 11, we invited discussion of "specific categories of documents HLFIP is worried about protecting." Your email of October 17 does not appear to have responded to that invitation, but it is still open. You are right that we do not know what documents HLFIP possesses, which was precisely the reason for that invitation. If you were to work with us, we might be able to appropriately tailor a Highly Confidential designation.

Indeed, we are willing to agree to appropriately limited Confidential and Highly Confidential designations. However, we will not agree to a Highly Confidential - AEO designation that precludes party review. We did not suggest that AEOs were exclusively the remit of cases between competitors; we suggested that is a common reason for AEOs. *See Classic Soft Trim, Inc. v. Albert*, No. 618CV1237ORL78GJK, 2020 WL 13593864, at *3 (M.D. Fla. Jan. 15, 2020) ("The AEO designation is recognized as an appropriate method of protecting information, but it is usually employed in very limited situations such as cases involving trade secrets. Courts have also upheld AEO designations when confidential business information is to be provided to a competitor. However, the AEO designation is considered a drastic remedy given its impact on the party entitled to the information as it limits the ability of the receiving party to view the relevant evidence, fully discuss it with counsel, and make intelligent litigation decisions. The designation can also limit the ability of a party to provide needed assistance to counsel.") (internal citations and quotations omitted).

Further, Florida R. Jud. Admin. 2.420 and Florida courts make clear that disclosure and transparency are the appropriate starting point, not non-disclosure and protection. *See Carnegie v. Tedder*, 698 So. 2d 1310, 1312 (2nd DCA 1997) ("Historically, litigants have had no reasonable expectation of privacy with regard to trial proceedings and court files.").

We will agree to shield certain categories of highly confidential documents from public view, and to ensure the appropriate protections around the use of those documents in court. The larger point, which you did not refute, is that there is no credible argument that my client (a now-71 year old) could or will use the Highly Confidential documents she views to compete with HLFIP. She and Alexis, however, have been and continue to be essential resources for us given the family nature of the businesses at issue, and must have access to evidence produced in the case to perform that function.



November 1, 2024
Page 3

In sum, we would agree to a Confidentiality designation along the lines of what was used in TMTG with a more tailored Highly Confidential designation set forth below:

### *Confidential:*

Confidential Information is information that is maintained in confidence and of value to the Party from the fact that it is not commonly or publicly known. Information designated as CONFIDENTIAL may also include information that falls within one or more of the following categories:  (a) information prohibited from disclosure by statute, or any foreign law or regulation; (b) information that reveals trade secrets; (c) research, technical, commercial, or financial information that the Party has maintained as confidential; (d) medical information concerning any individual; (e) personal identity information, including PII; (f) income tax returns (including attached schedules and forms), W-2 forms and 1099 forms; or (g) personnel or employment records of a person who is not a Party to the case. Information or documents that are available to the public may not be designated as Confidential Information.

### *Highly Confidential:*

Highly Confidential Information is information that is maintained in strict confidence and of high value to the Party from the fact that it is not commonly or publicly known. Information designated as HIGHLY CONFIDENTIAL may also include information that falls within one or more of the following categories:  (a) information that reveals trade secrets, (b) information that reveals non-public intellectual property, (c) information that reveals the development of intellectual property or trade secrets, or (d) non-public software documents or source code. Information or documents that are available to the public may not be designated as Highly Confidential Information.

We believe that we can resolve this short of motion practice and that the above is reasonable. Please provide a response by Monday, 11/4 to allow us time to prepare and notice a motion on this point for the 11/22 hearing if we cannot resolve this matter.

Sincerely,

/s/  David E. Schoenfeld

David E. Schoenfeld

cc:    All Counsel of Record

# EXHIBIT 16

| | |
|---|---|
| **From:** | Oprison, Chris <chris.oprison@us.dlapiper.com> |
| **Sent:** | Thursday, June 20, 2024 11:37 PM |
| **To:** | Franklin, Andrew L. (SHB); Schoenfeld, David E. (SHB); Clement, Anitra (SHB) |
| **Cc:** | Michael Harwin; jason.oletsky@akerman.com; 'dustin.hillsley@akerman.com'; Dixon, Steve; Aburos, Tal; Baker, Chris; Hall, Sheila; Stafford, Jody A.; Brehmer, Deana (SHB) |
| **Subject:** | RE: SERVICE OF COURT DOCUMENT CASE NUMBER 582023CA001002XXXANC LOGAN, JONATHAN vs. LOGAN, JANICE |
| **Attachments:** | Waiver of Service of Process (HLFIP Redline Edits - June 20, 2024).docx; Waiver of Service of Process (HLFIP - June 20, 2024).PDF |

**EXTERNAL**

Andrew – thank you. Attached is a redline of edits we made to the waiver form to clarify the language and a pdf final with my electronic signature.

Chris

## Christopher George Oprison

Partner

---

T  +1 305 423 8522
F  +1 305 657 6366
M  +1 202 664 6543
chris.oprison@us.dlapiper.com

**DLA Piper LLP (US)**
200 South Biscayne Boulevard
Suite 2500
Miami, FL  33131-5341



[dlapiper.com](dlapiper.com)

---

**From:** Franklin, Andrew L. (SHB) <afranklin@shb.com>
**Sent:** Tuesday, June 18, 2024 4:37 PM
**To:** Oprison, Chris <chris.oprison@us.dlapiper.com>; Schoenfeld, David E. (SHB) <DSCHOENFELD@shb.com>; Clement, Anitra (SHB) <ACLEMENT@shb.com>
**Cc:** Michael Harwin <mharwin@stearnsweaver.com>; jason.oletsky@akerman.com; 'dustin.hillsley@akerman.com' <dustin.hillsley@akerman.com>; Dixon, Steve <Steve.Dixon@us.dlapiper.com>; Aburos, Tal <Tal.Aburos@us.dlapiper.com>; Baker, Chris <Chris.Baker2@us.dlapiper.com>; Hall, Sheila <Sheila.Hall@us.dlapiper.com>; Stafford, Jody A. <Jody.Stafford@us.dlapiper.com>; Brehmer, Deana (SHB) <DBREHMER@shb.com>
**Subject:** RE: SERVICE OF COURT DOCUMENT CASE NUMBER 582023CA001002XXXANC LOGAN, JONATHAN vs. LOGAN, JANICE

⚠ **EXTERNAL MESSAGE**

Hi Chris,

Nice to meet you. Please find a draft waiver for HLFIP attached.

Thanks,

Andrew

**Andrew L. Franklin**
*Associate*
Shook, Hardy & Bacon L.L.P.

**O:** 312-368-3707 | afranklin@shb.com
**M:** 443-745-7488



---

**From:** Oprison, Chris <chris.oprison@us.dlapiper.com>
**Sent:** Monday, June 17, 2024 1:10 PM
**To:** Schoenfeld, David E. (SHB) <dschoenfeld@shb.com>; Franklin, Andrew L. (SHB) <afranklin@shb.com>; Clement, Anitra (SHB) <aclement@shb.com>
**Cc:** Michael Harwin <mharwin@stearnsweaver.com>; jason.oletsky@akerman.com; 'dustin.hillsley@akerman.com' <dustin.hillsley@akerman.com>; Dixon, Steve <Steve.Dixon@us.dlapiper.com>; Aburos, Tal <Tal.Aburos@us.dlapiper.com>; Baker, Chris <Chris.Baker2@us.dlapiper.com>; Hall, Sheila <Sheila.Hall@us.dlapiper.com>; Stafford, Jody A. <Jody.Stafford@us.dlapiper.com>
**Subject:** FW: SERVICE OF COURT DOCUMENT CASE NUMBER 582023CA001002XXXANC LOGAN, JONATHAN vs. LOGAN, JANICE
**Importance:** High

**EXTERNAL**

Counsel

I write to notify you that my firm will substitute in as counsel for **HLFIP Holding, LLC** ("HLFIP") in the above referenced matter pending in the Twelfth Judicial Circuit in and for Sarasota County, Florida, Case No. 2023-CA-1280-NC (consolidated into Case No. 2023-CA-1002-ANC).  HLFIP will waive formal service pursuant to Fla. R. Civ. P. 1.070.  Please send an appropriate waiver form that I may execute on behalf of my client.  Should you have any questions, please do not hesitate to contact me.  My contact information is below.

Thanks very much.

Chris Oprison

# Christopher George Oprison
Partner

---

T  +1 305 423 8522
F  +1 305 657 6366
M +1 202 664 6543
chris.oprison@us.dlapiper.com

**DLA Piper LLP (US)**
200 South Biscayne Boulevard
Suite 2500
Miami, FL  33131-5341



dlapiper.com

**From:** eservice@myflcourtaccess.com <eservice@myflcourtaccess.com>
**Sent:** Monday, June 17, 2024 10:29 AM
**Subject:** SERVICE OF COURT DOCUMENT CASE NUMBER 582023CA001002XXXANC LOGAN, JONATHAN vs. LOGAN, JANICE

<mark>[External to Akerman]</mark>

## Notice of Service of Court Documents

## Filing Information

| | |
|---|---|
| Filing #: | 200668811 |
| Filing Time: | 06/17/2024 10:28:28 AM ET |
| Filer: | David E Schoenfeld 312-704-7700 |
| Court: | Twelfth Judicial Circuit in and for Sarasota County, Florida |
| Case #: | 582023CA001002XXXANC |
| Court Case #: | 2023 CA 001002 NC |
| Case Style: | LOGAN, JONATHAN vs. LOGAN, JANICE |
| **Documents** | **Click on the file name below to download or print your document NOW. The link expires** |

## Documents

| Title | File |
|---|---|
| Summons To Be Issued By Clerk | Summons to be issued to HLFIP Holding Inc.pdf |
| Summons To Be Issued By Clerk | Summons to be issued to HLFIP Holding LLC.pd |

## E-service recipients selected for service:

| Name | Email Address |
|---|---|
| Andrew L Franklin | afranklin@shb.com |
| | jvail@shb.com |
| | jvail@shb.com |
| Anitra Raiford Clement | aclement@shb.com |
| | mclick@shb.com |
| | anitra-raiford-3177@ecf.pacerpro.com |
| Charles Franklin Johnson | cjohnson@blalockwalters.com |
| | eservice@blalockwalters.com |

| Name | Email Address |
|------|---------------|
| Christopher Roy Clark | crclark@stearnsweaver.com |
| | lrussell@stearnsweaver.com |
| David E Schoenfeld | dschoenfeld@shb.com |
| | dbrehmer@shb.com |
| Dustin Bryan Hillsley | dustin.hillsley@akerman.com |
| | deborah.karlson@akerman.com |
| Jason S. Oletsky | jason.oletsky@akerman.com |
| | jill.parnes@akerman.com |
| Max C. Rudolf | max.rudolf@akerman.com |
| | deborah.karlson@akerman.com |
| Glenn T Burhans Jr | gburhans@stearnsweaver.com |
| | cacosta@stearnsweaver.com |
| | abrantley@stearnsweaver.com |
| Mark J. Bernet | mark.bernet@akerman.com |
| | caren.deruiter@akerman.com |
| Michael J. Harwin | MHarwin@stearnsweaver.com |
| | MHernandez@stearnsweaver.com |
| Peter F. O'Neill | pfoneill@shb.com |
| | dbrehmer@shb.com |

## E-service recipients not selected for service:

| Name | Email Address |
|------|---------------|
| Charles F. Johnson | cjohnson@blablockwalters.com |
| Peter F. O'Neill | PFONEILL@shb.com |
| | mclick@shb.com |
| Anitra Raiford Clement | aclement@shb.com |
| | mclick@shb.com |
| | lmaranto@shb.com |
| David E. Schoenfeld | dschoenfeld@shb.com |

| Name | Email Address |
| --- | --- |
| Brett Alan Geer | brettgeer@geerlawfirm.com |
| | info@geerlawfirm.com |
| David A Wallace | dwallace@bgk.law |
| | eserve@bgk.law |
| Andrew L Franklin | afranklin@shb.com |
| | jvail@shb.com |
| | jvail@shb.com |
| Mark Bernet | mark.bernet@akerman.com |
| | caren.deruiter@akerman.com |
| Jarod Brazel | jarod.brazel@hwhlaw.com |
| | sheri.williams@hwhlaw.com |
| | michelle.farris@hwhlaw.com |
| Jessica Leona Mazzeo | Jmazzeo@griesingmazzeo.com |
| Jule Negovan | julie.negovan@outlook.com |
| | jnegovan@griesingmazzeo.com |
| Mark M Wall | mark.wall@hwhlaw.com |
| | sheri.williams@hwhlaw.com |
| | RELitMMW@hwhlaw.com |
| Jarod A. Brazel | jarod.brazel@hwhlaw.com |
| | ashley.jecevicus@hwhlaw.com |
| Julie Negovan | jnegovan@griesinglaw.com |
| Michael Barfield | michael@denovolawfl.com |
| | mbar62@gmail.com |
| Reginald Keith Petersen | kpetersen@griesinglaw.com |
| | kpetersen@griesinglaw.com |
| | kpetersen@griesinglaw.com |

This is an automatic email message generated by the Florida Courts E-Filing Portal. This email address does not receive email.

**Document Access Link(s) will be active for 14 days (excluding weekends) after the Clerk accepts the submission or it is abandoned. In addition to access to the link for 14 days (excluding weekends), the documents will also be available, after acceptance by the Clerk, to counsel of record in the portal on the My Cases page, by clicking on the case number and then the document name, or by accessing the Clerk's website.**

If you are not associated with this case and wish to be removed, please click here to request to be removed from the E-service list.

Thank you,
The Florida Courts E-Filing Portal

  request_id#:200668811;Audit#:687234484;UCN#:582023CA001002XXXANC;

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.
CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any, is intended for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.


The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

# EXHIBIT 20

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.

                Plaintiffs,

v.

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust, dated February 10, 2021;
JUSTIN PETERSON, ALEXIS LOGAN, and
UNNAMED CURATOR of the Estate of Jim Logan,

                Defendants     /

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021,

                Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., SMART
COMMUNICATIONS HOLDING, LLC, HLFIP
HOLDING, INC, AND HLFIP HOLDING, LLC,

                Counterclaim Defendants   /

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021, and
derivatively on behalf of Smart Communications
Holding, Inc.,

                Plaintiff,

      v.

JONATHAN D. LOGAN,
SMART COMMUNICATIONS HOLDING, INC.,
nominal defendant, SMART COMMUNICATIONS
HOLDING, LLC, HLFIP HOLDING, INC., HLFIP
HOLDING, LLC, LOCO FLORIDA LLC, and
SMART COMMUNICATIONS YACHT HOLDING,
LLC,

                Defendants

                /

Case No. 2023-CA-1002-NC

(CONSOLIDATED)

Case No.: 2023-CA-1280-NC

## THE SMART PARTIES' MOTION TO AMEND THE TRIAL ORDER AND CONTINUE THE TRIAL

JONATHAN LOGAN ("Jon"), SMART COMMUNICATIONS HOLDING, INC., and SMART COMMUNICATIONS HOLDING, LLC, LOCO FLORIDA, LLC, and SMART COMMUNICATIONS YACHT HOLDING, LLC (referred to as the "Smart Parties"), pursuant to Fla. R. Civ. P. 1.460, move to amend the Trial Order entered on July 24, 2024 [DIN 711] and continue the trial currently set on this Court's docket commencing on January 27, 2025, and in support thereof state:

## **INTRODUCTION**

Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021 ("Janice"), recently filed an Amended Motion to Determine Fair Value and Advance Entire Case to Trial ("Janice's Amended Motion"), [DIN 827], in which she argues, in part, that this case should barrel towards its current January-February 2025 trial date despite the fact that numerous pending issues, discovery, and motion practice remain outstanding.[1] This position ignores the practical realities of this case, its current posture, and what still needs to be done to ready the case for trial. Indeed, it will be ***impossible*** for the parties to sufficiently prepare for trial, especially in light of Janice's position that the trial address all outstanding claims between the parties, including the claims asserted, for the first time, in her Counterclaim filed less than two months ago.

To be clear, the Smart Parties agree that the Court should decide nearly all, if not all, remaining issues at trial; in fact, many of the claims between the parties necessarily implicate the valuation analysis as well as any possible award in connection with the purchase of the Trust's shares.[2] With this approach, however, it is simply infeasible and untenable to push forward with

---

[1]    Janice's Amended Motion also argues that this Court should select February 27, 2023, as the date of valuation. The Smart Parties will file a separate response to Janice's Amended Motion concerning the appropriate valuation date prior to the hearing on November 22, 2024, in line with this Court's procedures.

[2]    For the avoidance of doubt, the trial must address ***all*** remaining claims, including the claims asserted against Janice, Alexis Logan ("Alexis"), Justin Peterson ("Peterson"), and the

2

the January-February 2025 trial date due to the number of pending issues needing resolution, and the truncated deadlines created in Janice's rush to trial, which create a substantial risk of prejudicing the Smart Parties and their effort to resolve the matter completely (as the Court presumably prefers). Therefore, the Smart Parties believe it is in the parties' and the Court's best interest to continue the trial until the Court's July 2025 trial docket, for the reasons explained below.

## **ARGUMENT**

### I.     **The Court Should Continue the Trial Until Its July 2025 Trial Period, and Order the Parties to Submit Amended Scheduling Deadlines in Light of the New Trial Period.**

Good cause exists for the continuance of the trial currently set on this Court's January-February 2025 trial docket. Pursuant to Rule 1.460 of the Florida Rules of Civil Procedure, as well as this Court's Trial Order, the Smart Parties respectfully request that the Court continue the trial until July 2025, for good cause shown, and instruct the parties to submit an amended Case Management Report with new deadlines in light of the new trial date.[3] Since the time the Court entered its Trial Order, several additional claims have been asserted between the parties, fact and expert discovery remains ongoing, expert reports are pending, and the Smart Parties are entitled to file dispositive motions, *Daubert* motions, and motions *in limine* before trial. While the parties have worked diligently to prepare this case for trial, there is simply not enough time between now and January 27, 2025, for the parties to accomplish everything necessary to prepare for trial.

---

Estate of James "Jim" Logan (the "Estate"), not only Janice's affirmative claims as she seems to suggest in her Amended Motion.

[3]     While the Smart Parties contend that good cause for the continuance has been shown, which obviates the need for the party's signature on the motion under Rule 1.460, Jonathan Logan has signed this motion seeking a continuance in an abundance of caution and in compliance with this Court's Trial Order and divisional procedures.

### a. Pertinent Factual and Procedural Background

SmartComm initially filed a complaint in this action on February 27, 2023. [DIN 177]. Pursuant to this Court's Order dated June 29, 2023, the issues were bifurcated into phases and matters beyond the merits of the shareholders' agreement were stayed. [DIN 241]. After Phase I and the lifting of the stay on January 31, 2024, the parties participated in court-ordered mediation, which had the effect of extending the stay. [DIN 609, 666]. Mediation was held on April 11, 2024, and resulted in an impasse. [DIN 669]. Janice subsequently requested a Special Meeting of the Shareholders of SmartComm, which had the effect of further stalling progress in this litigation. That meeting was held on May 14, 2024.

Then, on May 29, 2024, Janice filed her Second Amended Complaint, which included (for the first time) a petition for judicial dissolution pursuant to Florida Statutes Section 607.1430. [DIN 680]. In response, Smart Communications exercised its statutory right by filing its Election to Purchase the Trust's shares on June 20, 2024, [DIN 696], which triggered a 60-day negotiation window through and including August 19, 2024. *See* § 607.1436(3), Fla. Stat. (2020).

On July 24, 2024, the Court entered its Order Setting Case for Nonjury Trial (the "Trial Order"). [DIN 711]. Pursuant to the Trial Order, the valuation required by Section 607.1436(4) was to occur during the three-week trial term to begin January 27, 2025, with Docket Sounding set for January 17, 2025. *Id*. During the hearing addressing the trial schedule, HLFIP voiced its opposition to the current trial date because of the outstanding issues still needing resolution , as well as the need for additional discovery including depositions. At the time of the hearing, the case was not at issue with numerous motions to dismiss pending (and still pending today), various claims had only recently been filed, and additional claims were anticipated and soon to be filed.

### b.  The Case And Its Posture Has Significantly Evolved Since The Trial Order.

#### i.  *New Claims and Pending Motions.*

Shortly after the Trial Order was entered, Jon and SmartComm filed their First Amended Complaint. [DIN 734].[4] The First Amended Complaint asserts 20 new causes of action against Defendants Janice and Alexis, as well as two new defendants: Justin Peterson and the Estate of James Logan (the "Estate").[5]

Janice, Alexis, and Peterson were served with Jon and SmartComm's First Amended Complaint, and all three filed motions to dismiss, motions to strike and/or motions for more definite statements. [DIN 763, 765]. Those motions were set for hearing on October 18, 2024. [DIN 766]. However, during the October 18th hearing, the Court only heard arguments on the Smart Parties' Motions to Dismiss Janice's Second Amended Complaint, and the parties did not reach the motions filed by Janice, Alexis, and Justin Peterson.

Moreover, on October 2, 2024, Janice filed her Second Amended Answer and asserted six new Counterclaims. By agreement and Court order, [DIN 767], Smart Communications and Jon filed their Motion to Dismiss Janice's Second Amended Counterclaims on November 1, 2024. [DIN 820]. HLFIP also filed its own Motion to Dismiss Janice's Second Amended Counterclaims on November 1, 2024. [DIN 821].

The Court has now set a full-day hearing on November 22, 2024, in order to address all outstanding motions, which include:

---

[4]    At the time the Trial Order was entered, Janice agreed to Plaintiffs, Jon and SmartComm, seeking leave to amend their complaint. Jon and SmartComm sought such leave on August 9, 2024, and the parties thereafter submitted an agreed order granting the motion for leave and extending the time for Defendants to respond. The Court entered the agreed order on August 20, 2024. [DIN 733]

[5]    The Order Setting Case for Nonjury Trial states: "Unless otherwise ordered, this will be on all remaining issues." [DIN 711]. However, at that time, the "remaining issues" did not include the 20 new tort claims as the Smart Parties had not yet filed their First Amended Complaint.

- Jonathan Logan & Smart Communications' Motion to Dismiss Janice Logan's Verified Second Amended Complaint, filed July 15, 2024 [DIN 705];

- Smart Communications Yacht Holding's Motion to Dismiss Janice Logan's Verified Second Amended Complaint, filed July 30, 2024 [DIN 716];

- Defendant HLFIP Holding, LLC's Motion to Dismiss Plaintiff Janice Logan's Second Amended Verified Complaint, filed August 20, 2024 [DIN 730];

- Janice Logan's Motion to Dismiss Jonathan Logan and SmartComm's First Amended Complaint [DIN 765];

- Janice Logan's Motion to Strike Punitive Damages Claims [DIN 761];

- Alexis Logan & Justin Peterson's Motion to Dismiss and for More Definite Statement [DIN 763];

- Alexis Logan & Justin Peterson's Motion to Strike Punitive Damages Claim [DIN 764];

- Jonathan Logan & SmartComm's Motion to Dismiss Janice Logan's Second Amended Counterclaims, filed on November 1, 2024 [DIN 820];

- HLFIP's Motion to Dismiss Janice Logan's Second Amended Counterclaims, filed on November 1, 2024 [DIN 821];

- Janice Logan's Amended Motion to Determine Fair Value and Advance Entire Case to Trial, filed on November 8, 2024 [Original DIN 729, Amended DIN 827];

- The Smart Parties' Motion to Amend the Trial Order and Continue the Trial (the instant Motion);

- Janice Logan's Amended Motion to Compel Discovery From SmartComm and HLFIP, and for Attorneys' Fees, filed on November 13, 2024 [DIN 832];

- Janice Logan's Motion for Phase I Costs and Phase II Indemnification [DIN 834];

- SmartComm's Motion to Compel Janice Logan's Complete Response to Discovery, filed on November 15, 2024 [DIN Forthcoming];

- SmartComm's Motion to Compel Alexis Logan's Complete Responses to Discovery, filed on November 15, 2024 [DIN Forthcoming];

- Janice Logan's forthcoming Motion to Appoint Commissioner and Authorize Out of State Deposition of Mike Shreve [DIN Forthcoming].

Even if the Court resolves all of the pending motions at the hearing on November 22, 2024—and assuming no parties must replead some or all of their claims—there is still not enough

time between November 22, 2024 and January 2025 for the parties to properly prepare for trial. The parties are still exchanging written discovery responses and objections, fact depositions have not started, expert reports are pending, expert depositions are not scheduled, and dispositive motions, *Daubert* motions, and motions *in limine* cannot be filed until the close of fact and expert discovery sometime well into the new year. *See infra* Section I(c). As demonstrated above, this case is not yet at issue.

ii. *Janice's Refusal to Open the Estate and Attempts to Avoid Service of Process.*

The First Amended Complaint asserts 15 new causes of action against the Estate. However, the Estate itself lacks legal capacity to participate in litigation and must instead act through the representative of the Estate. *Spradley v. Spradley*, 213 So. 3d 1042, 1045 (Fla. 2d DCA 2017) ("it is well-settled that an 'Estate' is not an entity that can be a party to litigation.") (citing 31 Am. Jur. 2d Executors and Administrators § 1141 (2016) ("Since estates are not natural or artificial persons, and they lack legal capacity to sue or be sued, an action against an estate must be brought against an administrator or executor as the representative of the estate.")). Though Janice was named as the personal representative in Jim's will, Janice refused to take the steps necessary to open his estate, thereby precluding the Smart Parties from filing claims against the Estate.

Because Janice never opened the Estate, and letters of administration were not issued, no representative existed through which Jon and SmartComm could serve the Estate with the First Amended Complaint and discovery on their claims. Jon and SmartComm had no choice but to file a Petition to Appoint Curator and Admit Will, and a Statement of Claim, to initiate *In Re: Estate*

*of James Logan*, No. 2024-CP-004071 (Fla. 12th Cir. Ct. 2024, the "Estate Case"),[6] and name the Estate's to-be-appointed curator as a defendant in this action. The hearing on Jon and SmartComm's Petition to Appoint a Curator (in part to effectuate service), was heard by this Court[7] on October 15, 2024, and was denied without prejudice. Therefore, Janice will tentatively proceed as the personal representative of the Estate, and the Smart Parties are only recently able to serve and obtain discovery from the Estate.

However, Janice's dilatory tactics in refusing to open the Estate or apply for letters of administration—which SmartComm had to do on behalf of Janice—have unduly delayed SmartComm's ability to obtain necessary discovery from the Estate to support its claims. Although Decedent passed away on October 16, 2022, and creditors only had two years to file a claim against the Estate, Janice failed to take any action to open the Estate as of the filing of Plaintiffs' First Amended Complaint (i.e., August 20, 2024). Because Plaintiffs could not serve the Estate until it was opened, Plaintiffs had to file the documents necessary to open the Estate (*i.e.*, a petition to appoint a curator and admit the will), which were filed on August 9, 2024. By objecting to that appointment on September 3, 2024, Janice prolonged the process as a hearing could not be set until October 15, 2024. At that hearing, counsel for Smart Communications noted that it could neither serve discovery on the Estate, nor serve the Estate with a copy of the pleadings, until the letters of administration issued. Nonetheless, nine days later, Janice still had not submitted letters of administration to the Court, requiring Plaintiffs to again step in and take those steps for her. Due

---

[6]    The Smart Parties initially filed the Estate Case in this court's Probate Division, and thereafter filed a Notice of Civil Action and Motion to Reassign requesting that the probate action be transferred to this Court (*i.e.*, the Honorable Hunter W. Carroll), which has since occurred.

[7]    The Estate Case was originally assigned to Probate Judge Williams, who was the presiding judge of this matter before he disqualified himself in November 2023. [DIN 427]. Thus, the Estate Case needed to be reassigned (for the same conflict reasons), and was reassigned by agreement and stipulated Order in September 2024.

to Janice's delay, Plaintiffs could not serve the Estate with discovery, nor the First Amended Complaint, until October 25, 2024. Though Plaintiffs proceeded as expeditiously as possible, the Estate's first round of discovery responses are not due until November 25, 2024. These facts alone support a continuance of the trial until a later trial docket.

<em>iii.  <u>Need to Increase Trial Period.</u></em>

Additionally, at the time of the Trial Order and based on the claims and posture then existing, the parties only anticipated needing seven (7) days for trial. *See* Case Mgmt. Report at 1. Since then, however, twenty new counts, six new counterclaims (bringing the total number of causes of action to 39), and three new defendants were added in amended pleadings, which will substantially increase the length of the trial, and itself necessitate a new trial period. A more realistic estimate would be between 10 and 15 days for the trial.

**c.  Although the Smart Parties Have Diligently Pursued Discovery, Too Much Discovery Remains Outstanding and the Smart Parties Require More Time to Prepare for Trial.**

While the parties have diligently pursued discovery since the Court entered its Trial Order, the parties are still in the midst of discovery, as reflected by the flurry of recent discovery requests served by all parties. By way of example, at least the following discovery requests are still outstanding:

- Janice Logan's Fifth Set of Interrogatories to SmartComm, served October 17, 2024, with responses due on Monday, November 18, 2024;

- Janice Logan's Sixth Set of Requests for Production to SmartComm, served October 17, 2024, with responses due on Monday, November 18, 2024;

- Janice Logan's Second Set of Interrogatories to HLFIP, served October 17, 2024, with responses due on Monday, November 18, 2024;

- Janice Logan's Third Set of Requests for Production to HLFIP, served October 17, 2024, with responses due on Monday, November 18, 2024;

- Janice Logan's Third Set of Interrogatories to HLFIP, served November 1, 2024, with responses due on Monday, December 2, 2024;

9

- Janice Logan's Fifth Set of Requests for Production to Jonathan Logan, served November 8, 2024, with responses due Monday, December 9, 2024;

- Janice Logan's First Set of Requests for Production to Smart Communications Yacht Holding, LLC and Loco Florida, LLC, served November 8, 2024, with responses due Monday, December 9, 2024;

- Janice Logan's Third Set of Interrogatories to HLFIP, served November 14, 2024, with responses due Monday, December 16, 2024;

- Janice Logan's Sixth Set of Interrogatories to SmartComm, served November 14, 2024, with responses due Monday, December 16, 2024;

- Janice Logan's Seventh Set of Requests for Production to SmartComm, served November 14, 2024, with responses due Monday, December 16, 2024;

- SmartComm's First Set of Interrogatories to the Estate of Jim Logan, served October 25, 2024, with responses due Monday, November 25, 2024;

- Jonathan Logan and SmartComm's First Set of Requests for Production to the Estate of Jim Logan, served October 25, 2024, with responses due Monday, November 25, 2024;

- SmartComm's Fourth Set of Interrogatories to Janice Logan, served October 31, 2024, with responses due Monday, December 2, 2024;

- Jonathan Logan and SmartComm's Fifth Set of Requests for Production to Janice Logan, served October 31, 2024, with responses due Monday, December 2, 2024;

- SmartComm's Second Set of Interrogatories to Alexis Logan, served October 31, 2024, with responses due Monday, December 2, 2024;

- Jonathan Logan and SmartComm's Third Set of Requests for Production to Alexis Logan, served October 31, 2024, with responses due Monday, December 2, 2024.

Janice has forty-one (41) separate outstanding Requests for Production directed to the Smart Parties alone, not to mention the numerous requests directed to HLFIP, Janice, Alexis and the Estate. And these are only the outstanding discovery requests. The foregoing list does not include the recently responded to discovery requests by the parties, and the rolling productions of documents that remain ongoing. For example, on November 13, 2024, Alexis and Peterson produced additional documents related to their discovery responses dated October 17, 2024, nearly a month after the production was due.

10

Moreover, the Smart Parties served discovery requests upon Janice, Alexis, and Peterson on September 10, 2024. Though Defendants provided written responses on October 17, 2024, they were riddled with meritless boilerplate objections and other deficiencies necessitating more than ten meet & confer exchanges. *See* Exhibits to Motions to Compel filed simultaneously herewith. Accordingly, responsive documents were not produced by either party until November 8 for Janice and November 13 for Alexis and Peterson—two months after they were requested.[8] And the productions for Janice and Alexis are not yet complete with both indicating that more responsive documents will be produced at an indeterminate point in the future. Using this same timeline, the Smart Parties anticipate that it will be well into next year before they receive fulsome responses to the discovery propounded upon Defendants on October 31, 2024.

Further, the first deposition is set for December 5, 2024, with seven (7) depositions scheduled through at least the third week in December, and with at least two more fact witnesses yet to be scheduled.[9] Much of this deposition testimony will be relevant to the valuation experts' opinions, especially in light of Janice's request that the trial address *all outstanding claims* between the parties.[10] These depositions do not include the expert depositions, which still need to be scheduled. On November 8, 2024, in light of the ongoing discovery and the currently scheduled fact witness depositions, the parties filed an agreed stipulation extending the deadlines for filing

---

[8]     Alexis and Peterson's production was also made in an incorrect format and without Bates stamps. Counsel for the Smart Parties have requested that they properly Bates stamp their documents and reproduce them and are awaiting a response.

[9]     *See* Janice Logan's Notice of Taking Videotaped Deposition of Non-Party Marcum LLP with Subpoena *Duces Tecum*, filed on November 14, 2024 [DIN 835, 836]; and Janice Logan's forthcoming Motion to Appoint Commissioner and Authorize Out of State Deposition of Mike Shreve [DIN Forthcoming].

[10]     The Smart Parties will be filing a Declaration of Robert S. Sly, Jr., the Smart Parties' valuation expert, in support of their response to Janice's Amended Motion to Determine Value and Advance Entire Case to Trial. The Smart Parties incorporate herein by reference the forthcoming Sly Declaration.

fact witness lists and for the parties to supplement their expert witness disclosures and produce

expert reports, files, materials, and related documents from November 15, 2024, until January 3,

2025. [DIN 825]. This means that the earliest the parties' experts will be deposed is the second or

third weeks in January 2025, which will necessitate an extension of the current December 20, 2024

discovery deadline.

Additionally, Janice's request for an earlier valuation date has created uncertainty

regarding which valuation date is to be used—February 27, 2023 or May 28, 2024—and has

hindered the Smart Parties' expert's ability to perform and complete his analysis. The valuation

date is one of the, if not the, most important variables for the valuation experts—it is a threshold

matter that must be determined in order to provide the foundation for the expert's analysis. Even

assuming the valuation date is determined at the hearing on November 22, 2024, there is simply

not enough time for the experts to complete their analyses, especially in light of the ongoing and

incomplete discovery.

Furthermore, the Trial Order provides for dispositive motions, *Daubert* motions, and

motions *in limine* before trial. The parties are therefore entitled to file such motions should they

decide to do so. However, without completing the aforementioned discovery, neither party can

even begin to prepare these significant motions.

### d.  Neither Section 415.1115 nor Any Other Considerations Warrant Maintaining the January-February 2025 Trial Date.

Janice failed to cite any case law in support of her Amended Motion requesting that the

Court maintain this case on its current trial setting pursuant to Section 415.1115, because none

exists.  The only Florida case to substantively address this statute stated:

> A party's request to advance the trial under the statute is akin to a defendant's
> demand for a speedy trial under Florida Rule of Criminal Procedure 3.191, where
> a defendant is deemed to have represented that he "**has diligently investigated the**
> **case**" and is "**timely prepared for trial**." Fla. R. Crim. P. 3.191(g). Where a party
> seeks to take advantage of section 415.1115, she should be **largely finished with**

**the disclosure obligations of civil discovery**. A party may not use section 415.1115 as a shield from the consequences of late discovery disclosure and a **sword to cut off the opposition's ability to prepare for trial**.[11]

*Intramed, Inc. v. Guider*, 93 So. 3d 503, 506 (Fla. 4th DCA 2012) (holding "[T]he trial court **abused its discretion in failing**, at the very least, to **grant a continuance** to allow the defendant to secure a rebuttal expert and to arrange for a rule 1.360 examination of [the plaintiff]."). Here, the parties have not "largely finished" with their discovery obligations. Rather, the January-February 2025 trial period was agreed to when the only matters before the court involved valuation. Since that time, the Smart Parties filed an Amended Complaint on August 9, 2024, asserting 20 new causes of action related to tortious conduct that implicate an entirely new set of facts and legal theories and Janice likewise filed six new counterclaims bringing into this action matters related to action taken, and litigation pursued, in Delaware. In total, there are now 39 causes of action pending between the parties. Janice should not be permitted to use Section 415.1115 as a "sword to cut off [the Smart Parties'] ability to prepare for trial." Discovery on these new issues has only recently begun, much less been sufficiently investigated. Janice has therefore failed to meet the threshold for demanding a speedy trial as to the tort claims.

Even if she had, a request made pursuant to Section 415.1115 does "[*not*] *require* the Court to expedite a case upon a unilateral request, and one party's desire for a 'speedy' disposition cannot override the Court's obligation to ensure that both parties get a 'just' disposition of the case." *Flournoy v. Dowd*, 3:21CV1032-TKW-EMT, 2021 WL 12181320, at *1 (N.D. Fla. Nov. 9, 2021) (emphasis added) (citing *Intramed, Inc., supra*, and **denying** plaintiff's motion to advance the trial on the docket where the scheduling order took into consideration that the plaintiff was ***81 years***

---

[11]    All emphasis herein is added.

*old*,[12] but recognized "other considerations also weighed into the establishment of those deadlines, including Defendants' right to have adequate time for sufficient and orderly discovery" and "the intervening holiday season"[13] (emphasis added)). Moreover, similar to the plaintiff in *Flournoy*, the valuation for the purchase of Janice's shares has taken as long as it has solely because Janice herself prevented the sale by fighting against it for more than a year, wasting this Court's and the parties' time and resources. She cannot now complain that she has been delayed in "realiz[ing] the fair value of the shares her husband left her in October 2022," (Motion at 15), when she is wholly, or at least substantially, to blame for the delay.

Moreover, section 415.1115 is purely discretionary. *Goldberg v. Goldberg*, 643 So. 2d 656, 658 (Fla. 4th DCA 1994). "Section 415.1115 states that ["after consideration of the age and health of the party"] a trial court 'may' advance the plaintiff's trial on the docket." *Styner v. Compass Health Brands Corp.*, No. 9:18-CV-81744, 2019 WL 7841784, at *2 (S.D. Fla. Jan. 28, 2019) (denying motion to expedite trial, even though removal of the action delayed the trial from the May 2019 date set in state court to the January 2020 date set in federal court; in addition to needing time for discovery, "the parties **need adequate time** for the **preparation and briefing of dispositive motions and pretrial motions**, and the Court needs adequate time to **rule on such motions** prior to the parties' final trial preparations" (emphasis added)). Janice has not suggested that she is in poor health or otherwise in such a need for speed that the just disposition of this case should be overridden.

---

[12]    The plaintiff's age is identified at paragraph 2 of Plaintiffs' Motion to Advance Trial on Docket.  *See* Flournoy v. Dowd, 3:21CV1032, Document #14 (filed 11/08/21).  **Despite being 10 years older than Janice, the district court denied the motion to expedite trial.**

[13]    Here, the trial is currently set for the trial period immediately following the same "holiday season."

**e. The Smart Parties' Valuation Expert, Robert S. Sly, Jr., Has a Conflict the Week of January 27, 2025, Further Weighing in Favor of Continuing the Trial Date.**

The Smart Parties also recently learned that their valuation expert, Robert Sly, is set to testify as an expert witness in a trial scheduled for January 28-30, 2025, in Savannah, Georgia.[14] The Smart Parties have a right to have their expert witness attend this trial and hear the testimony of witnesses, and would be unfairly prejudiced if this trial was set for the first week of this Court's January-February 2025 Trial Docket. This means that, barring any other conflicts, this case would at least have to be set for trial during the weeks of February 3-14, 2025, providing this Court and the other parties with less flexibility in scheduling the trial. To be clear—and for all the reasons outlined herein—such a trial date is infeasible. Accordingly, this trial must be continued to a later date.

**f. The Court Should Continue the Trial Until Its July 2025 Trial Docket.**

As detailed above, the Smart Parties have demonstrated good cause for why a continuance is warranted, and the Court should continue the trial until its July 2025 trial docket. A January 2025 trial date does not leave enough time for the parties to fully and adequately prepare to try the valuation issue as well as the other 39 causes of action between them, many of which are directly relevant to or subsumed by the valuation process. Even if the Court bifurcated the proceedings and only tried the valuation portion at the upcoming trial, a continuance would still be necessary for the reasons outlined above. There are far too many pending issues and discovery that are directly relevant to this Court's—as well as the parties'—valuation analysis for the trial to move forward on the January-February 2025 trial docket.

---

[14]    *See* the forthcoming Declaration of Robert S. Sly, Jr., which is incorporated herein by reference.

## CONCLUSION

For the foregoing reasons, the Smart Parties respectfully request this Court grant its motion for a continuance, continue the trial in these consolidated actions until its July 2025 trial docket, and order the parties to submit an amended and revised Case Management Report with new deadlines that take into consideration the new trial date and provide the parties with sufficient time to prepare for trial.

Dated: November 15, 2024

Respectfully submitted,

 /s/ Jonathan D. Logan
Jonathan D. Logan, as Authorized
Representative for the Smart Parties

 s/ Michael Harwin
GLENN BURHANS, JR.
Florida Bar No. 605867
BRIDGET K. SMITHA
Florida Bar No. 709581
CHRISTOPHER CLARK
Florida Bar. No. 1002388
**STEARNS WEAVER MILLER
WEISSLER
ALHADEFF & SITTERSON PA**
106 East College Ave., Suite 700
Tallahassee, FL 32301
Telephone (850) 580-7200
Facsimile (850) 329-4844
gburhans@stearnsweaver.com
bsmitha@stearnsweaver.com
cacosta@stearnsweaver.com
cclark@stearnsweaver.com

MICHAEL J. HARWIN
Florida Bar No. 1018578
**STEARNS WEAVER MILLER
WEISSLER
ALHADEFF & SITTERSON PA**

**AKERMAN LLP**
401 E. Jackson Street, Suite 1700
Tampa, FL 33602-5250
Office: (813) 23-7333
Fax: (813)218-5495
mark.bernet@akerman.com
caren.deruiter@akerman.com

By:/s/ Mark J. Bernet
Mark J. Bernet, Esq.
Florida Bar No. 606359

-and-

**AKERMAN LLP**
201 East Las Olas Boulevard
Suite 1800
Fort Lauderdale, FL 33301
Telephone: (954) 463-2700
Fax: (954) 463-2224

Jason S. Oletsky, Esq.
Florida Bar No. 9301
jason.oletskey@akerman.com

200 East Las Olas Blvd., Suite 2100
Ft. Lauderdale, FL 33301
Telephone (954) 462-9500
mharwin@stearnsweaver.com
mhernandez@stearnsweaver.com

*Counsel for Jonathan Logan, Smart
Communications Holding, Inc. Smart
Communications Yacht Holding, LLC, Loco
Florida, LLC, and Smart Communications
Holding, LLC*

jill.parnes@akerman.com
Dustin B. Hillsley, Esq.
Florida Bar No. 1018589
dustin.hillsley@akerman.com
deborah.karlson@akerman.com
Max C. Rudolf, Esq.
Florida Bar No. 98766
max.rudolf@akerman.com
deborah.karlson@akerman.com

*Counselors for Jonathan D. Logan, Smart
Communications Holding, Inc., and Smart
Communications Holding, LLC*

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that, pursuant to Fla. R. Jud. Adm. 2.516(b), a true and correct copy of the foregoing has been electronically filed with the Clerk of Court through the Florida statewide E-Portal system and served by the Clerk maintained website via e-Service to all counsel of record, this 15th day of November, 2024.

*/s/  Mark J. Bernet*
Mark J. Bernet

# EXHIBIT 21

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,
                  Plaintiffs,

v.

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust, dated February 10, 2021;
and ALEXIS LOGAN,
                  Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan        Case No.: 2023-CA-1002-NC
Family Trust, dated February 10, 2021,
                  Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., SMART
COMMUNICATIONS HOLDING, LLC, HLFIP
HOLDING, INC., and HLFIP HOLDING, LLC,
                  Counterclaim Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan Family    (CONSOLIDATED)
Trust, dated February 10, 2021, and derivatively on
Behalf of Smart Communications Holding, Inc.,
                  Plaintiff,              Case No.: 2023-CA-1280-NC

v.

JONATHAN D. LOGAN,
SMART COMMUNICATIONS HOLDING, INC.,
nominal defendant, SMART COMMUNICATIONS
HOLDING, LLC, HLFIP HOLDING, LLC, LOCO
FLORIDA LLC, and SMART COMMUNICATIONS
YACHT HOLDING, LLC,
                  Defendants.

_____/

## HLFIP'S MOTION TO AMEND THE TRIAL ORDER AND CONTINUE THE TRIAL

Defendant HLFIP Holdings, LLC ("HLFIP"), by and through undersigned counsel, hereby moves to amend the Trial Order (DIN 711) and continue the trial currently set on this Court's docket commencing on January 27, 2025, and in support thereof states as follows:

## I.     The Court Should Continue the Trial Until Its July 2025 Trial Period and Order the Parties to Submit Amended Scheduling Deadlines Accordingly

As detailed below, there is good cause for the Court to continue the trial currently set on this Court's January-February 2025 trial docket. Pursuant to Florida Rule of Civil Procedure 1.460, as well as this Court's Trial Order, HLFIP respectfully requests that the Court continue the trial until its July 2025 trial docket, for good cause shown, and instruct the parties to submit an amended Case Management Report with new deadlines that reflect the new trial date.[1]

HLFIP is a late entrant to this dispute; HLFIP was not served with the Second Amended Complaint until on or about June 24, 2024. (DIN 698.) With its initial case analysis, HLFIP determined that the underlying valuation issues required far more care and attention than the schedule for which Janice advocated could possibly allow. HLFIP made its opposition to the current Trial Order clear and known to all parties. HLFIP did not agree to the unrealistically accelerated trial schedule. (DIN 724.)

Since the time the Court entered its Trial Order on July 24, 2024, Janice has asserted additional claims against HLFIP. While HLFIP has worked diligently to prepare this case for trial and make up for its late start in the case, there is simply not enough time between now and January for the parties to accomplish everything necessary to prepare for trial, should the claims against HLFIP even survive the pending motions to dismiss. Discovery remains ongoing, and HLFIP

---

[1] While HLFIP contends that good cause for the continuance has been shown, which obviates the need for the party's signature on the motion under Rule 1.460, Jonathan Logan has signed this motion seeking a continuance in an abundance of caution and in compliance with this Court's Trial Order requiring that any motion for continuance "be signed by the client/party." DIN 711 at 3.

requires additional time to complete discovery and enable its expert to complete his analysis of the royalty due to HLFIP for the intellectual property that HLFIP exclusively licenses to Smart Communications.

### A. Pertinent Factual and Procedural Background

Janice's attempt to add HLFIP as a Defendant did not come until well over a year after this case was filed in February 2023. (DIN 679.) HLFIP was served with the Second Amended Complaint on or about June 24, 2024. (DIN 698.)

Just one month later (on July 24, 2024), the Court entered its Order Setting Case for Nonjury Trial (the "Trial Order"). (DIN 711). Pursuant to the Trial Order, the valuation required by section 607.1436(4), Fla. Stat., was to occur during the three-week trial term to begin January 27, 2025, with Docket Sounding set for January 17, 2025. (*Id.*) At that time, however, the parties were aware of the statutory valuation date—now, however, the parties no longer know the valuation date because of Janice's motion to change the valuation date. (DIN 827.)

During the hearing addressing the trial schedule, HLFIP opposed such an early trial date because of the myriad outstanding issues and the need for additional discovery, including depositions (especially expert depositions). At the time of that hearing, the case was not at issue— there were (and still are) numerous motions to dismiss pending, various claims had only recently been filed, and additional claims were anticipated and soon to be filed.

### B. The Case Is Not Yet at Issue and Several Motions Remain Outstanding

Janice has asserted baseless claims against HLFIP that the Court should dismiss. HLFIP moved to dismiss Janice's Second Amended Complaint. That motion (on which the Court heard argument on October 18, 2024) remains pending. (DIN 730.) On October 2, 2024, Janice filed her Second Amended Answer with Counterclaims against HLFIP. (DIN 775.) HLFIP timely moved to dismiss those Counterclaims on November 1, 2024. (DIN 821; DIN 767.) That motion remains

pending. It is impractical and inefficient to require HLFIP to prepare for a January trial when HLFIP does not know whether it is even a party to this litigation (and indeed has sound arguments that Janice's claims against HLFIP should be dismissed).

The Court has now set a full-day hearing on November 22, 2024, to address all outstanding motions. For HLFIP, those motions include:

- Defendant HLFIP Holding, LLC's Motion to Dismiss Plaintiff Janice Logan's Second Amended Verified Complaint, filed August 20, 2024 (DIN 730);

- HLFIP's Motion to Dismiss Janice Logan's Second Amended Counterclaims, filed on November 1, 2024 (DIN 821), and Janice's Omnibus Response in Opposition to Motions to Dismiss Her Counterclaims, filed November 19, 2024;

- Janice Logan's Amended Motion to Compel Discovery From SmartComm and HLFIP, and for Attorneys' Fees, filed on November 13, 2024 (DIN 832); and

- Janice Logan's Motion to Compel or Deem Admitted from HLFIP Holding, LLC (DIN 780).

As demonstrated above, this case is not yet at issue with numerous pending motions to dismiss and other motions directed to the operative pleadings. Even if the Court were to resolve all pending motions at the hearing on November 22, 2024—and assuming no parties must replead some or all their claims thereafter—there is not enough time between now and January 2025 for the parties to properly prepare for trial.

### C.  Discovery Remains Outstanding and Additional Discovery Time Is Needed

While the parties have diligently pursued discovery since the Court entered its Trial Order, the parties are still in fact discovery (with new discovery requests served as recently as November 14, 2024). As far as HLFIP is concerned, the following discovery requests are still outstanding:

- Janice Logan's Second Set of Interrogatories to HLFIP, served October 17, 2024, with responses due on Monday, November 18, 2024;

- Janice Logan's Third Set of Requests for Production to HLFIP, served October 17, 2024, with responses due on Monday, November 18, 2024;

- Janice Logan's Third Set of Interrogatories to HLFIP, served November 1, 2024, with responses due on Monday, December 2, 2024;

- Janice Logan's Fourth Set of Interrogatories to HLFIP, served November 14, 2024, with responses due on Monday, December 16, 2024.

The first deposition in this case is set for December 5, 2024, with eight (8) depositions currently through at least the third week in December. And on November 14, 2024, Janice filed (1) a Notice of Taking Deposition of HLFIP Holding, LLC Pursuant to Rule 1.310(b)(6) with Rule 1.310(b)(5) Requests for Production; and (2) a Notice of Taking Deposition of Smart Communications Pursuant to Rule 1.310(b)(6). (DIN 835; DIN 836.) The dates for these corporate representative depositions have not been set. (For that matter, whether those depositions proceed at all hinges on whether Janice's claims against HLFIP survive its motions to dismiss.) If these depositions proceed, some of that testimony may be relevant to HLFIP's expert's opinions.

Moreover, these depositions do not include the expert depositions, which still need to be scheduled. For its part, if it is indeed a party to the case (*i.e.*, the Court does not dismiss the claims against HLFIP), then HLFIP intends to present valuation evidence defending the royalty rate reflected in its license agreement. That will entail the testimony of HLFIP's expert, who should have the time to review the discovery and explore the relative contributions that HLFIP's intellectual property and the operations of Smart Communications make to their collective revenue production. It will also entail depositions of Janice's apparent valuation experts—HLFIP is entitled to discover Janice's position about the proper rate that Smart Communications owes to HLFIP for Smart's use of HLFIP's intellectual property. For that matter, it would benefit the Court if the parties exchanged both expert *and* rebuttal reports and had the opportunity to depose the other side's experts—this should narrow the issues in dispute at trial.

On November 8, 2024, because of the ongoing discovery and the currently scheduled fact witness depositions, the parties filed an agreed stipulation extending the deadlines for filing fact

witness lists and for the parties to supplement their expert witness disclosures and produce expert

reports, files, materials, and related documents from November 15, 2024, until January 3, 2025.

(DIN 825). This means that the earliest the parties' experts will be deposed is the second or third

weeks in January 2025, which will also necessitate an extension of the current December 20, 2024

discovery deadline.

### D. Neither Section 415.1115 Nor Any Other Considerations Warrant Moving Forward with the January-February 2025 Trial

Janice failed to cite any law in support of her Motion requesting that the Court maintain

this case on its current trial setting pursuant to Section 415.1115, presumably because none exists.

The only Florida case to substantively address this statute stated:

> A party's request to advance the trial under the statute is akin to a defendant's
> demand for a speedy trial under Florida Rule of Criminal Procedure 3.191, where
> a defendant is deemed to have represented that he "**has diligently investigated the
> case**" and is "**timely prepared for trial**." Fla. R. Crim. P. 3.191(g). Where a party
> seeks to take advantage of section 415.1115, she should be **largely finished with
> the disclosure obligations of civil discovery**. A party may not use section
> 415.1115 as a shield from the consequences of late discovery disclosure and a
> **sword to cut off the opposition's ability to prepare for trial**.

*Intramed, Inc. v. Guider*, 93 So. 3d 503, 506 (Fla. 4th DCA 2012) (emphasis added) (holding that

"the trial court **abused its discretion in failing**, at the very least, to **grant a continuance** to allow

the defendant to secure a rebuttal expert and to arrange for a Rule 1.360 examination of [the

plaintiff].").

Here, the parties have not "largely finished" with their discovery obligations. For that

matter, HLFIP was not served with a complaint until June 2024 (thereafter it was served with brand

new claims on October 7, 2024, *see* DIN 777) and has made clear its position that the current trial

schedule is unworkable. Janice should not be permitted to use Section 415.1115 as a "sword to cut

off [HLFIP's] ability to prepare for trial." *Intramed*, 93 So. 3d at 506. Janice has not yet defended

her claims and Counterclaims from HLFIP's motions to dismiss; she has not met the threshold for demanding a speedy trial for her claims.

Even if she had, a request made pursuant to Section 415.1115 does "[**not**] **require** the Court to expedite a case upon request, and one party's desire for a 'speedy' disposition cannot override the Court's obligation to ensure that both parties get a 'just' disposition of the case." *Flournoy v. Dowd*, 3:21CV1032-TKW-EMT, 2021 WL 12181320, at *1 (N.D. Fla. Nov. 9, 2021) (emphasis added) (citing *Intramed* 93 So. 3d at 506). In *Flournoy*, the court **denied** plaintiff's motion to advance the trial where the scheduling order took into consideration that the plaintiff was **81 years old**,[2] but recognized "other considerations also weighed into the establishment of those deadlines, including Defendants' right to have adequate time for sufficient and orderly discovery" and "the intervening holiday season."[3] Janice cannot now demand a speedy trial against HLFIP when it took her more than a year from the time this case was filed in February 2023 to serve her complaint against HLFIP. (DIN 679.).

Moreover, section 415.1115 is purely "discretionary." *Goldberg v. Goldberg*, 643 So. 2d 656, 658 (Fla. 4th DCA 1994). Section 415.1115 states that "after consideration of the age *and health* of the party," a trial court "*may* advance the trial on the docket."  Fla. Stat. § 415.1115 (emphasis added); *Styner v. Compass Health Brands Corp*., 9:18-CV-81744, 2019 WL 7841784, at *2 (S.D. Fla. Jan. 28, 2019) (denying plaintiff's motion to expedite trial and motion to remand, even though removal of the action delayed the trial from the May 2019 date set in state court to the January 2020 date set in federal court; in addition to needing time for discovery, "the parties

---

[2] The plaintiff's age is identified at paragraph 2 of Plaintiffs' Motion to Advance Trial on Docket. *See Flournoy v. Dowd*, 3:21CV1032, Document #14 (filed 11/08/21). The district court denied the motion to expedite trial even though the plaintiff in that case was 10 years *older* than Janice.

[3] Here, the trial is currently set for the trial period immediately following the same "holiday season."

**need adequate time** for the **preparation and briefing of dispositive motions and pretrial motions**, and the Court needs adequate time to **rule on such motions** prior to the parties' final trial preparations" (emphasis added)). Janice has not suggested that she is in poor health or otherwise in such a need for speed that the just disposition of this case should be overridden.

### E.  The Court Should Continue the Trial Until Its July 2025 Trial Docket

HLFIP has demonstrated good cause for why a continuance is warranted, and the Court should continue the trial until its July 2025 trial docket. A January 2025 trial date does not leave enough time for the parties to fully and adequately prepare to try the valuation issue and the other causes of action between them, many of which are directly relevant to and subsumed by the valuation process. Even if the Court were to bifurcate the proceedings and try only the valuation and royalty rate issues at the upcoming trial, a continuance would still be necessary for the reasons outlined above. There are too many pending issues and discovery that are directly relevant to this Court's—as well as the parties'—valuation and royalty rate analyses for the trial to move forward on the January-February 2025 trial docket.

For the foregoing reasons, HLFIP respectfully requests this Court grant its motion for a continuance, continue the trial in these consolidated actions until its July 2025 trial docket, and order the parties to submit an amended and revised Case Management Report with new deadlines that take into consideration the new trial date and provide the parties with sufficient time to prepare for trial.

Date: November 19, 2024

Respectfully submitted,

*/s/ Christopher G. Oprison*

Christopher G. Oprison (FBN 122080)
Email:  chris.oprison@dlapiper.com
**DLA PIPER LLP (US)**
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131
Telephone:  (305) 423-8522
Facsimile:  (305) 657-6366

*Attorney for Defendant HLFIP*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 19, 2024, a true and correct copy of the foregoing document was served via the Court's electronic portal to all entitled parties and counsel of record appearing on the Court's service list at the time of service.

*/s/ Christopher G. Oprison*

Christopher G. Oprison

# EXHIBIT 22

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,

                Plaintiffs,

v.

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust, dated February 10, 2021,
the ESTATE OF JAMES LOGAN, JUSTIN
PETERSON, ALEXIS LOGAN, and UNNAMED
CURATOR

                Defendants.

_____

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021,

                Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., SMART
COMMUNICATIONS HOLDING, LLC, HLFIP
HOLDING, INC, AND HLFIP HOLDING, LLC,

                Counterclaim Defendants.

_____

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021, and
derivatively on behalf of Smart Communications
Holding, Inc.,

                Plaintiff,

       v.

JONATHAN D. LOGAN,
SMART COMMUNICATIONS HOLDING, INC.,
nominal defendant, SMART COMMUNICATIONS
HOLDING, LLC, HLFIP HOLDING, INC., HLFIP
HOLDING, LLC, LOCO FLORIDA LLC, and
SMART COMMUNICATIONS YACHT
HOLDING, LLC,

                Defendants.

_____/

Case No. 2023-CA-1002-NC

(CONSOLIDATED)

Case No.: 2023-CA-1280-NC

## SECOND AMENDED COMPLAINT[1]

Plaintiffs, Jonathan D. Logan and Smart Communications Holding, Inc., by and through their respective undersigned counsel, hereby sue Defendants, Janice Logan, individually and as Trustee of the James Logan Family Trust dated February 10, 2021, the Estate of James Logan, Justin Peterson, Alexis Logan, and Unnamed Curator, and states in support:

### The Parties

1.      Plaintiff, Jonathan D. Logan ("Jon"), is a resident of Pinellas County, Florida. He is the natural son of James Logan and Janice Logan.

2.      Plaintiff, Smart Communications Holding, Inc. ("Smart Communications") is a Florida profit corporation with its principal place of business in Pinellas County, Florida. Smart Communications is a national provider of inmate communication services and it provides those services under contracts with various correctional facilities.

3.      James Logan was a resident of and domiciled in Sarasota County, Florida at the time of his death on October 16, 2022. He was married to Janice at the time of his death. James Logan shall hereinafter be referred to as the "Decedent," or "The Estate."

4.      Defendant, Janice Logan ("Janice") is a resident of Sarasota County, Florida. Janice is the current Trustee of the James Logan Family Trust, dated February 10, 2021

---

[1] Pursuant to the Court's oral ruling at the hearing on November 22, 2024, this pleading is amended only for the purpose of providing a more definite statement as to paragraphs 100 and 107 by amending paragraphs 52, 100, 107, 108, 110, and 111. By filing this amended pleading, neither Jon nor Smart Communications waive any rights or benefits under title 11 of the United States Code and the Federal Rules of Bankruptcy Procedure triggered from Smart Communications commencement of a bankruptcy case, including, but not limited to: (i) the enforcement of the automatic stay; (ii) tolling and extension of any deadlines pursuant to the time limitations proscribed in 11 U.S.C. Sections 108; or (iii) bankruptcy court's exclusive jurisdiction to adjudicate any core matters related to the Smart Communications bankruptcy estate. Jon and Smart Communications explicitly reserve all rights to challenge any objection to the same. This filing is made out of an abundance of caution solely to comply with the Court's orders.

("Trust"). As Trustee, Janice is responsible for the debts of the Estate pursuant to Section 733.707(3), Florida Statutes. Janice is also named as the personal representative in Decedent's Will, though she has failed to fulfill her duty to open the estate.

5.      Defendant, Alexis Logan ("Alexis") is a resident of Sarasota County, Florida. She is the natural daughter of James Logan and Janice Logan, and Jon's sister.

6.      Defendant, Justin Peterson ("Peterson") is a resident of Sarasota County, Florida. He is married to Alexis Logan.

7.      Plaintiffs, as creditors of the Estate, have filed a statement of claim against, and petitioned to open, the Estate. A copy of the petition to appoint curator and statement of claim is attached hereto as **Exhibit "A."** Plaintiffs have also moved to appoint a curator in that action because Janice has failed to fulfill her duty to open the Estate as the personal representative identified in the Will. Janice deposited the Will in Case No. 2022 WL 001853 NC (12th Jud. Cir., Sarasota County) over a year and a half ago, but has not taken any steps to open the estate to allow creditors (including Plaintiffs) to file a statement of claim. The Unnamed Curator is the curator to be assigned in that pending case.

**Decedent's Estate Plan**

8.      Decedent executed what purports to be a Last Will and Testament (the "Will") on February 10, 2021, a copy of which is attached hereto as **Exhibit "B."** On the same date, Decedent executed what purports to be the James Logan Family Trust (the "Trust"), a copy of which is attached hereto as **Exhibit "C."**

9.      The Will is a pour-over will, devising all of Decedent's assets (except for some tangible personal property) to the Trust, after all expenses and debts of Decedent's Estate have been paid.

3

10.     The Will nominates Janice as Personal Representative of the Decedent's Estate. The Trust designates Janice and the Decedent as Co-Trustees during the Decedent's life and provides that Janice becomes the sole Trustee upon Decedent's death.

11.     The Decedent was the beneficiary of the Trust during his life. The Trust provides that upon Decedent's death, the beneficiaries are Janice, Jon, and Alexis, although the Trust provides that the Trust estate shall be held for the primary benefit of Janice.

**Venue and Standing for Probate and Trust Administration Purposes**

12.     Venue in this action is proper because any probate estate of the Decedent would be opened in Sarasota County, Florida pursuant to Section 733.101, Florida Statutes, and because Janice is a resident of Sarasota County, Florida.

13.     Additionally, the principal place of administration of the Trust is Sarasota County, Florida, pursuant to Section 736.0108, Florida Statutes. Venue therefore lies in Sarasota County pursuant to Section 736.0204, Florida Statutes.

14.     Venue in Sarasota County is also proper pursuant to Section 736.0202, Florida Statutes, because Janice, Jon, and Alexis are beneficiaries of the Trust.

15.     Jon is expressly identified as a beneficiary of the Trust. *See*, *e.g.*, Trust, ¶¶ 5.3(b)2.B-C (identifying circumstances for specific allocations from the Trust to Jon). Janice has admitted under penalty of perjury that Jon has a beneficial interest in the Trust. Janice further admitted that she has taken steps to eliminate Jon's interest in the Trust (allegedly by exercising the power of appointment under subparagraph 5.3(b)1 in favor of substrusts created under a revocable trust agreement for the benefit of Alexis and her descendants), presumably for the purpose of attempting to deprive Jon of standing. However, the conditions precedent for Janice's limited power of appointment to be effective have not yet occurred; *i.e.*, Janice has not yet died.

4

More importantly, Janice's purported appointment is ***revocable***. Accordingly, until Janice's death, a possibility remains that Janice's "limited power of appointment [will not be] validly exercised in whole or in part," in which case any remaining trust res "shall be distributed" in a manner that expressly benefits Jon. *See*, *e.g.*, Trust, ¶¶ 5.3(b)2.B-C. Jon therefore qualifies as a beneficiary of any probate estate to be opened for the Decedent given the interrelationship between the Will and the Trust. Jon therefore has standing to bring claims related to his father's estate and Jon will be entitled to notice of probate administration.

16. To the extent that Janice's will does not devise all of the Trust's assets upon her death, the Trust provides that the "Trustee shall allocate any interest which may be held by or come into the trust estate in LOCO FLORIDA, LLC, a Florida limited liability company, to a separate trust for the primary benefit of JON LOGAN." *See* Trust, ¶ 5.3(b)2.B. Moreover, after certain such allocations are made from the Trust, the "Trustee shall divide the remaining trust estate . . . into shares of equal value, creating one such share for each child of the Settlor . . . .," which would include a share for Jon as a child of the Settlor. *See* Trust, ¶ 5.3(b)2.C. As a result, Jon is a qualified beneficiary of the Trust under Florida Statutes because he would be a permissible distributee under the Trust if Janice's interest under the Trust terminates. *See* § 736.0103(19)(b), Florida Statutes.

17. In addition to being a qualified beneficiary of the Trust and a beneficiary of the to-be-opened probate estate, Jon is an "interested person" with standing and rights under the Probate Code (Chapter 733) and the Trust Code (Chapter 736). In particular, Section 731.201(23), Florida Statutes, defines an interested person as "any person who may reasonably be expected to be affected by the outcome of the particular proceeding involved."

18. Jon will be "affected by the outcome" of the probate and Trust administration of

the Decedent in various ways because he is a beneficiary of any probate estate, he is a beneficiary under the Trust, and he is the only other owner of Smart Communications.

19.     Smart Communications also qualifies as an "interested person" because it is reasonably expected to be affected by the outcome of this proceeding. Further, Smart Communications is a creditor of the Estate and has a pending statement of claim.

### Jon's and the Decedent's Co-Ownership of the Corporations

20.     Jon and his father, the Decedent, were each 50% shareholders in the Plaintiff, Smart Communications, before Decedent purportedly transferred his ownership interest in Smart Communications to the Trust. Jon and the Decedent were the only directors of Smart Communications. Jon was and remains the sole director and sole operating officer (holding all registered officer positions) of Smart Communications and he conducts its day-to-day operations, although the Decedent largely handled the financial aspects of Smart Communications when he was alive. Indeed, Jon did not learn of a massive tax bill created by Decedent until after Decedent's death.

21.     Shortly before Decedent's death, Decedent purportedly transferred his ownership interest in Smart Communications to the Trust pursuant to the Stock Power dated September 16, 2022, a copy of which is attached hereto as **Exhibit "D."**

22.     Janice has attempted to leverage the Trust's negotiating position. Janice believes that if the Trust can retain a passive 50% ownership interest in Smart Communications, the company or Jon or both will have to pay her half of what she claims Smart Communications is worth, even if a legitimate valuation does not bear out that value. Janice has used the Trust's 50% stake in Smart Communications to cause the Trust to assert several outrageous demands. Her apparent goal is to leverage those demands until the company or Jon relents and pays the

Trust an unwarranted premium for its interest in Smart Communications. But this strategy makes no sense. Janice's tactics are detrimental to Smart Communications and thus deprive the Trust of the capital and liquidity it needs (and which the Decedent wanted the Trust to have) to financially backstop the Decedent's probate estate and pay his creditors.

23.     On information and belief, the Decedent has creditors that cannot be paid without the Trust selling its interest in Smart Communications. Decedent was, for instance, named a party defendant to a pending lawsuit. Presumably, the full extent of the Decedent's debts and the identity of his creditors will be revealed when a probate estate is eventually opened.

24.     It does not appear, however, as if Janice has opened any probate estate for the Decedent, despite being the presumptive Personal Representative. Jon has not been provided with any Notice of Administration. Jon has been unable to find such a Notice after a search of public records in Sarasota County.

25.     As creditors of the Estate, Plaintiffs have filed a statement of claim against the Estate, and a petition to appoint a curator, which are pending. *See* **Exhibit A**.

<u>**Jon's Creation of Smart Communications**</u>

26.     Jon first conceived of the idea for Smart Communications in 2008. Smart Communications provides innovative communication technologies and services to correctional facilities, in part through its exclusive license with HLFIP Holding, LLC ("HLFIP"), including electronic messaging, electronic requests and grievances, electronic delivery of routine postal mail and legal mail, and phone and video visitation services. Jon first conceived of the idea for Smart Communications in 2008 and created the world's first inmate email system. However, Smart Communications' business model and technology offering began to change in 2015 from a simple inmate email system, to what Smart Communications offers now – innovative communication technologies and services to correctional facilities.  Smart Communications'

services are provided through its exclusive license with HLFIP Holding, LLC ("HLFIP"), under which license Smart Communications has the right to use HLFIP's intellectual property ("IP") and other intangibles as they relate to the communications technologies offered including e-mail, electronic requests, and grievances, SMS short text messaging to mobile phones, electronic delivery of routine postal mail and legal mail, and phone calls, video visitation services, education and reentry services, streaming entertainment services and inmate wearable devices, interactive inmate fitness equipment, as well as numerous new investigative technologies.

27.     Smart Communications' technologies and services are designed to enhance the efficiency of correctional facilities and to ensure the safety of staff and the inmate population.

28.     Jon conceived of all the ideas for intangibles and IP that made Smart Communications into the company it is today.

29.     Jon designed all the proprietary hardware, software, and technology offerings, while also directing the marketing, branding, and human resources (including the hiring and management of over one hundred (120) employees in twenty-six (26) states).

30.     Although Jon had already started working on his idea for Smart Communications alone, Jon invited his father, Decedent, to join him as 50/50 partners in Smart Communications. Jon is President and CEO, and Jim was CFO and principally responsible for the accounting and corporate structure of Smart Communications until his passing in October 2022.

31.     Janice (Jon's mother) and co-defendant, Alexis (Jon's sister) played no part in the company's creation or operations.

32.     Despite having no involvement with the company whatsoever, after Jim's passing, Janice and Alexis besieged Jon and Smart Communications with increasing demands backed by threats against the company's business and Jon personally that would potentially destroy the

good standing and reputation of both Smart Communications and Jon.

33.    These threats culminated in Janice's demand that her son pay her one hundred million dollars ($100,000,000) as ransom for the Trust's shares of the company Jon created and ran for more than fifteen (15) years.

**Jon's Creation of the IP and HLFIP, and Smart's License to Use the IP**

34.    Cognizant of his familial strife and mistrust, Jon sought to protect himself from the simmering greed within his family. Jon created HLFIP in 2015—long before the current lawsuit or the Decedent's passing—to achieve this goal and solely own the IP he created.

35.    Jon created HLFIP in part because of Alexis's intransigence regarding the Smart Communications stock ownership. While Jon and the Decedent were 50/50 partners in Smart Communications, Alexis originally held both Decedent and Jon's shares in Smart Communications for them in trust with the agreement that she would transfer the stock to Jon and Jim. When Jon and Jim asked Alexis to transfer the shares back to them, she refused.

36.    Because of Alexis' refusal to transfer the shares and Jon's continued desire to continue his innovations in the corrections industry, Jon prepared a written contract for Decedent and Alexis to sign in 2015. They signed that agreement; it is attached hereto as **Exhibit "E."** In that contract, Decedent and Alexis agreed that Jon individually (and *not* Smart Communications) would exclusively own and control any new IP (*created from that day forward*).

37.    Although Jon, the Decedent, and Alexis agreed Alexis would return the respective shares she held in trust, she refused to honor that agreement for years.

38.    Ultimately, Alexis relented in 2018 and returned the shares of Smart Communications to Jon as promised.

39.    Jon, Jim, and Alexis understood that the 2015 agreement protected Jon's

exclusive interest in the IP, which Jon assigned to his IP holding company, HLFIP.

40.    Smart Communications used the IP owned by HLFIP under a well-documented oral license with HLFIP referenced in over 100 of its government contracts and in the depositions of both Jon and Decedent.

41.    The oral license between Smart Communications and HLFIP worked when Jon and Decedent were collaborating to grow Smart Communications' business. After Decedent passed and Janice started trying to extract a disproportionate share of that business (which was never supposed to happen based on the long-standing agreements between Jon and Jim to force the immediate sale of any shares of the surviving partner that may have passed to their respective heirs), Smart Communications and HLFIP needed to formalize the economics of their business deal.

42.    This need also raised a tax issue for both Smart Communications and HLFIP. Under section 482 of the Internal Revenue Code ("IRC") and Treas. Reg. § 1.482-1(b)(1), taxpayers under common control must price their transactions under the arm's-length standard: "A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances."

43.    To assess the economics of the license between Smart Communications and HLFIP and to ensure both entities comply with their tax obligations (and were protected from the penalties that can apply to taxpayers with controlled transactions that do not meet the arm's-length standard), HLFIP obtained a transfer pricing documentation study by Marcum, LLP ("Marcum"), an independent accounting firm.

44.    Marcum determined, based on comparable license agreements between

uncontrolled taxpayers, that the arm's-length price for the royalty that Smart Communications owed to HLFIP for its exclusive IP license was 40% of Smart Communications' net sales.

### Decedent and Jon's Financial Arrangement for Operating Smart Communications

45.    Jon and the Decedent were the sole officers, directors and shareholders of Smart Communications. Nevertheless, both were substantially underpaid for their work as officers and directors of Smart Communications. In fact, Jon did not receive a salary for eight years (and a severely reduced salary thereafter) based on direction from, and a verbal agreement with, Decedent.

46.    Occasionally, the Decedent agreed that Jon would receive some assets for his work as an officer and employee of Smart Communications.

### Decedent, Janice, Alexis, and Peterson Raid Smart Communications to Enrich Themselves

47.    After Decedent passed away, Jon learned that Decedent withdrew hundreds of thousands of dollars in cash from Smart Communications for his own benefit, for the benefit of Janice, and for the benefit of Alexis and her husband, Peterson. These substantial cash withdrawals had nothing to do with Smart Communications' business, or any purported services provided to Smart Communications, and occurred without Jon's knowledge or consent.

48.    Similarly, Decedent, Janice, Alexis and her husband, Peterson, caused Smart Communications to pay for numerous personal expenses and extravagant purchases, none of which had anything to do with Smart Communications' business, nor were paid in return for any services provided to Smart Communications, and occurred without Jon's knowledge or consent.

49.    Specifically, approximately $23,639 of Smart Communications' corporate funds was used to purchase a 2015 BMW for Janice, without Jon's knowledge or consent.

50.    In late 2019/early 2020, Alexis married her husband Peterson. Upon information and belief, and without Jon's knowledge or consent, Decedent used Smart Communications'

11

funds, resources, and premises to host and pay for this wedding.

51.    Further, in 2021, Smart Communications maintained several accounts with a financial institution formerly known as Englewood Bank. Jon had no access to those accounts.

52.    In an email dated July 19, 2021, Smart Communications' CPA stated that the Englewood Smart Communications' credit card balance comprised "mostly personal expenses belonging to Alexis" and that another credit card account was "almost all Alexis personal expenses." Transaction details for the personal expenses that Alexis improperly charged to Smart Communications' credit cards, including the transaction date and a description of the nature of the transaction, are attached as **Exhibit F** (Alexis Logan Production 5000-6657, and 06889-10458). Jon had no access to those accounts and had no knowledge that Alexis was using Smart Communications' corporate funds for her own personal benefit, again, while providing no services to Smart Communications as an employee or otherwise.

53.    Decedent also bought extravagant jewelry for the benefit of Janice using Smart Communications' funds. On January 3, 2022, Janice forwarded Decedent an email with information related to a Cartier 6.08 carat Diamond Platinum Engagement ring from Wilson's Jewelry, "to make it easier for you." According to the email, the ring was priced at $148,500.

54.    Decedent thereafter withdrew about $150,000 from Smart Communications and, upon information and belief, purchased the diamond platinum engagement ring for Janice without Jon's knowledge or consent.

55.    On June 29, 2022, Alexis emailed Decedent a link to, and specifications for, a 2019 BMW 750i sedan with VIN WBA7F0C52KGM25571 (the "2019 BMW"). The following day, Alexis sent Decedent wiring instructions for the 2019 BMW in an amount of $109,070. Decedent wired Smart Communications' corporate funds to purchase the 2019 BMW without

Jon's knowledge or consent. The 2019 BMW was registered in Peterson's name.

56.     In July 2022, Decedent, Janice and Alexis signed a Buy-Sell Agreement for a $1,205,000 vacation home on Lake Michigan and upon information and belief it was either paid for, or intended to be paid for, using Smart Communications' corporate funds without Jon's knowledge or consent.

57.     On July 22, 2020, Alexis forwarded to Decedent an email from the Bank of England related to a loan for approximately $555,000. On information and belief, Alexis was requesting Decedent use Smart Communications' corporate funds to pay a portion (or the full amount) of her loan without Jon's knowledge or consent.

58.     Furthermore, without Jon's knowledge or consent, Decedent expropriated Smart Communications' corporate funds via cash withdrawal, check, and credit card charges. Decedent himself took more than $739,290 ($681,310 of that amount via cash withdrawals). And Janice received more than $242,089 ($119,500 in cash withdrawals).

59.     Also without Jon's knowledge, Decedent titled in his personal name a 2020 Chevrolet Corvette for approximately $94,836, using Smart Communications' corporate funds, which was intended to be titled in Smart Communications' name.

60.     Upon information and belief, Decedent also purchased an additional Stingray Corvette using Smart Communications' corporate funds (collectively "the Corvettes") for himself. Upon information and belief, Janice sold the Corvettes immediately after Decedent's death and pocketed the cash from the sales and did not return the corporate funds used to make the purchases back to Smart Communications or remit the sale proceeds to the Estate for the payment of creditors.

### Janice's Attempts to Remove Jon as a Beneficiary of the Trust

61.     Janice executed a Last Will and Testament on January 20, 2023 ("Janice's Will").

62.     Janice claims that Janice's Will exercised the testamentary power of appointment allegedly granted by subparagraph 5.3(b)1. of the Trust such that, upon her death, all remaining Trust res will be transferred to separate sub-trusts. The sub-trusts are trusts within the Trust created solely for the benefit of Alexis and her descendants. Put simply, Janice's Will attempts to disinherit Jon upon her death.

63.     However, the sub-trusts were created pursuant to a ***revocable*** trust agreement. Accordingly, until Janice's death, the trust agreement creating the sub-trusts can be revoked. A possibility therefore also remains that Janice's "limited power of appointment" will not be "validly exercised in whole or in part," in which case any remaining trust res "shall be distributed" in accordance with subparagraph 5.3(b)2. of the Trust, which includes allocations expressly benefitting Jon. *See*, *e.g.*, Trust, ¶¶ 5.3(b)2.B-C.

64.     Decedent established the Trust with an expressed desire to benefit Jon, Janice maliciously defied that intent by leaving the entirety of the Trust res to her daughter for the sole purpose of preventing Jon from receiving any allocation that Decedent intended from the Trust and attempting to deprive Jon of standing in relation to the Trust and/or Estate.

65.     Upon information and belief, the trust agreement creating the sub-trusts for Alexis's benefit are revocable because Janice executed that agreement for the sole purpose of attempting to deprive Jon of access to the Trust res and to gain an advantage in litigation while retaining the power to undo the sub-trusts after the litigation ceases.

### After Decedent's Death, Janice Continued to Cause Smart Communications to Pay for Her Personal Expenses

66.     Notwithstanding the fact that Janice never provided any services for Smart Communications, Janice has continued living in a ten (10) acre gated mansion owned by Smart

Communications ("Ranch Club Mansion") rent free after Decedent passed away in October 2022.

67.     Since then, and without Jon's knowledge (until recently) Janice has caused Smart Communications to pay for multiple extravagant personal expenditures related to the Ranch Club Mansion, in excess of $224,000, none of those expenses has anything to do with the Smart Communications' business. Janice either caused Smart Communications' accountant to pay third parties directly or received reimbursement from Smart Communications for those expenses.

68.     Those expenses include (but are not limited to): $83,359 for landscaping; $6,451 for pool maintenance; and miscellaneous painting expenses totaling more than $21,000.

69.     Specifically, Janice has submitted bills for payment for barn repair as well as a chimney and barn doors, presumably for a horse stable located on Ranch Club Mansion property. Upon information and belief, Janice does not keep horses on the property. In any event, Smart Communications has no investments in horse farming and horses are wholly unrelated to its business. Through an internal misunderstanding or oversight, Smart Communications paid for all of those expenses, notwithstanding the fact that those expenses were not for the benefit of Smart Communications.

70.     All conditions precedent have occurred or have otherwise been waived.

## COUNT 1
## UNJUST ENRICHMENT – THE ESTATE
### (Smart Communications Against The Estate)

71.     Plaintiff, Smart Communications, realleges the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

72.     Decedent withdrew funds from Smart Communications during his life, which were not for the benefit of Smart Communications.

73.     Thereafter, Decedent used the money he withdrew from Smart Communications and made extravagant purchases for his own benefit. For example, Decedent used Smart Communications' corporate funds to purchase for himself the Corvettes.

74.     Thus, Smart Communications conferred a benefit on Decedent.

75.     Decedent had knowledge of the benefits conferred as the recipient of those funds and extravagant purchases.

76.     It would be inequitable for the Estate to retain those funds and extravagant purchases or the value of those extravagant purchases.

77.     There is no adequate remedy at law in the absence of this claim against the Estate.

WHEREFORE, Plaintiff Smart Communications demands judgment in its favor and against the Estate, including:

a. Granting a constructive trust over the proceeds from any sale of the Corvettes. Or providing restitution to Smart Communications for, or otherwise disgorging the Estate of, the full value of the funds used to purchase the Corvettes;

b. Providing restitution for funds taken by the Decedent from Smart Communications that were not used for the benefit of Smart Communications;

c. Awarding Smart Communications the return of its corporate funds, or the value of the services rendered or assets purchased with its corporate funds; or

d. Providing restitution to Smart Communications for, or otherwise disgorging the Estate of, the full value of the funds withdrawn and the items and services purchased; and

e. Smart Communications' attorneys' fees and costs pursuant to Fla. Stat. § 607.0746; and,

f.    Such other and further relief as this Court seems just and proper.

## COUNT 2
### UNJUST ENRICHMENT – JANICE
### (Smart Communications Against Janice Personally)

78.    Plaintiff, Smart Communications, realleges the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

79.    Decedent withdrew funds from Smart Communications during his life that were not for the benefit of Smart Communications.

80.    Thereafter, Decedent used the money he withdrew from Smart Communications and made extravagant purchases for the benefit of Janice, individually. For example, on January 3, 2022, Janice emailed Decedent a link to a Cartier 6.08 carat Diamond Platinum Engagement Ring for $148,500 (the "Ring") with a message that said: "Here you go, to make it easier for you!" Decedent then made a cash withdrawal of approximately $150,000 from Smart Communications' corporate funds. Janice and Decedent knew that the Ring was paid for using Smart Communications' funds.

81.    Additionally, approximately $23,639 of Smart Communications' corporate funds were used to purchase the 2015 BMW for Janice. Janice and Decedent knew that the 2015 BMW was paid for using Smart Communications' funds.

82.    Janice also has custody of a 2020 Cadillac SUV purchased using approximately $90,000 of Smart Communications' corporate funds. Decedent previously drove it as a corporate vehicle while providing services to Smart Communications, but Janice (who provides no services to Smart Communications) refuses to relinquish custody of the vehicle.

83.    Moreover, Janice sold assets that Decedent purchased with Smart Communications' corporate funds and kept the cash gained from the sale.

17

84. Janice also personally used Smart Communications funds (comprising approximately $119,500 in cash withdrawals and another $122,588.85 in credit card charges and/or checks) that were not for the benefit of Smart Communications.

85. Smart Communications therefore conferred a benefit on Janice.

86. Janice has knowledge of the benefits conferred as the recipient of those funds and extravagant purchases.

87. It would be inequitable for Janice to retain those extravagant purchases or the value of those extravagant purchases.

88. There is no adequate remedy at law in the absence of this claim against Janice.

WHEREFORE, Plaintiff Smart Communications demands judgment in its favor and against Janice Logan, individually, including:

a. Granting Smart Communications a constructive trust over the Ring and the 2015 BMW, and/or,

b. Providing restitution to Smart Communications for the full value, or otherwise disgorging Janice of the Ring and the 2015 BMW,

c. Providing restitution to Smart Communications for the full value of the Cadillac SUV and reasonable rental value during the period of Janice's unlawful retainer of possession;[2]

d. Providing restitution to Smart Communications for the value of the assets sold by

---

[2] Smart Communications recognizes that the injunction currently in place, albeit subject to a pending appeal, prohibits "any suits in Sarasota County demanding … rents apparently owed on Smart Communications … owned property, and related replevin actions of alleged company owned vehicles," (DIN# 169), and will stay any pursuit, or attempted enforcement, of this requested relief while the injunction is still in place. Nevertheless, Smart Communications asserts this requested relief in an abundance of caution to avoid the potential of being later foreclosed for statute of limitations, laches, or other alleged deficiencies.

Janice,

e.  Providing restitution to Smart Communications for the full value of the funds withdrawn or utilized by Janice,

f.  Smart Communications' attorneys' fees and costs pursuant to Fla. Stat. § 607.0746; and,

g.  Such other and further relief as this Court seems just and proper.

### COUNT 3
### UNJUST ENRICHMENT - TRUSTEE
### (Smart Communications Against Janice as Trustee)

89.     Plaintiff, Smart Communications, realleges the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

90.     After Decedent passed away, Janice continued to reside at the Ranch Club Mansion owned by Smart Communications. After numerous requests to relinquish the Ranch Club Mansion to allow Smart Communication to liquidate the residence for much-needed operating capital, Janice refused, ostensibly as Trustee of the Trust. Janice has never paid one dime of rent or other compensation in exchange for living there for nearly two years after Decedent passed, notwithstanding that Smart Communications has no death benefit provision for surviving spouses of its officers and directors, documented or otherwise.

91.     Janice has caused Smart Communications to pay for multiple unnecessary extravagant expenditures related to the Ranch Club Mansion, and other personal expenses, in excess of $224,000.00, including $83,359 for landscaping; $15,000 for driveway cleaning, $6,451 for pool maintenance; and miscellaneous painting expenses totaling more than $21,000. Janice either caused Smart Communications to pay third parties directly or received reimbursement from Smart Communications for those expenses.

92.    Janice has also caused Smart Communications to pay bills for barn repair as well as a chimney and barn doors, presumably for a horse stable located on Ranch Club Mansion property.

93.    The services rendered at the Ranch Club Mansion were not performed, nor were the payments thereof made, for the benefit of Smart Communications. Rather, such services and payment solely benefited Janice and the Trust.

94.    Smart Communications therefore conferred a benefit on Janice individually and as Trustee.

95.    Janice has knowledge of the benefits conferred as the recipient of those funds and services.

96.    It would be inequitable for Janice to retain the value of the payment for those services.

97.    There is no adequate remedy at law in the absence of this claim against Janice.

WHEREFORE, Plaintiff Smart Communications demands judgment in its favor and against Janice Logan, as the Trustee of the Trust, including:

a.    Providing restitution to Smart Communications for the full value of the funds withdrawn or taken by Janice,

b.    Awarding a reasonable value for back rent for the Ranch Club Mansion,[3]

c.    Smart Communications' attorneys' fees and costs pursuant to Fla. Stat. § 607.0746;

---

[3] As previously explained (*see* fn. 1), Smart Communications recognizes that the injunction currently in place, albeit subject to a pending appeal, prohibits "any suits in Sarasota County demanding … rents apparently owed on Smart Communications … owned property, and related replevin actions of alleged company owned vehicles," (DIN# 169), and will stay any pursuit, or attempted enforcement, of this requested relief while the injunction is still in place. Nevertheless, Smart Communications asserts this requested relief in an abundance of caution to avoid the potential of being later foreclosed for statute of limitations, laches, or other alleged deficiencies.

and,

    d.   Such other and further relief as this Court seems just and proper.

## <u>COUNT 4</u>
## UNJUST ENRICHMENT - ALEXIS
### (Smart Communications Against Alexis)

98.    Plaintiff, Smart Communications, realleges the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

99.    Smart Communications' corporate funds were repeatedly used to benefit Alexis without any knowledge or authorization from Jon.

100.    Specifically, Alexis used a Smart Communications' credit card account for personal expenses. A description of each transaction at issue, including the date of the transaction and a description of the nature of the transaction, is attached as **Exhibit F** (Alexis Logan Production 5000-6657, and 06889-10458). Jon had no access to those accounts and was not aware Alexis was spending corporate funds.

101.    In July 2022, Decedent, Janice and Alexis signed a Buy Sell Agreement for a $1,205,000 vacation home on Lake Michigan. On information and belief, this was purchased, or intended to be purchased with Smart Communications' funds.

102.    Thus, Smart Communications repeatedly conferred a benefit on Alexis.

103.    Alexis has knowledge of the benefits conferred as the recipient of those items purchased using Smart Communications' funds.

104.    It would be inequitable for Alexis to retain those purchases or the value of those purchases.

105.    There is no adequate remedy at law in the absence of this claim against Alexis.

WHEREFORE, Plaintiff Smart Communications demands judgment in its favor and

against Alexis Logan, including:

    a. Providing restitution to Smart Communications for the expenses paid for the benefit of Alexis;

    b. Smart Communications' attorneys' fees and costs pursuant to Fla. Stat. § 607.0746; and,

    c. Such other and further relief as this Court seems just and proper.

## COUNT 5
### UNJUST ENRICHMENT - PETERSON
### (Smart Communications Against Peterson)

106. Plaintiff, Smart Communications, realleges the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

107. During his life, Decedent used Smart Communications' corporate funds to make a purchase that was not for the benefit of Smart Communications and which was without Smart Communications' or Jon's knowledge or consent.

108. Specifically, on or about June 23, 2022, approximately $109,070 of Smart Communications' corporate funds were used to purchase the 2019 BMW, which 2019 BMW was then registered in Peterson's name.

109. Thus, Smart Communications conferred a benefit on Peterson.

110. Peterson has knowledge of the benefit conferred as the recipient of that extravagant purchase.

111. It would be inequitable for Peterson to retain that extravagant purchase or the value of that extravagant purchase.

112. There is no adequate remedy at law in the absence of this claim against Peterson.

WHEREFORE, Plaintiff Smart Communications demands judgment in its favor and

against Peterson, including:

    a.  Granting Smart Communications a constructive trust over the 2019 BMW and any other items purchased with Smart Communications' corporate funds; or,

    b.  Providing restitution to Smart Communications for the full value, or otherwise disgorging Peterson, of the 2019 BMW and any other items purchased with Smart Communications' corporate funds; and

    c.  Smart Communications' attorneys' fees and costs pursuant to Fla. Stat. § 607.0746; and,

    d.  Such other and further relief as this Court seems just and proper.

### COUNT 6
### CONSTRUCTIVE FRAUD
### (Jon Against Decedent's Estate)

113.    Plaintiff, Jon Logan, realleges the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

114.    Jon, raised from birth by Decedent, shared a confidential and/or fiduciary relationship with his father.

115.    Jon is solely responsible for creating the concept, business plan, and IP that has made Smart Communications so successful. Jon invited Decedent to become involved with Smart Communications based on his belief that he could trust his father to protect Jon and to act in Jon's best interest. Decedent accepted the trust and confidence Jon placed in Decedent by accepting that invitation.

116.    Decedent betrayed Jon's trust and confidence by making massive withdrawals from, and purchasing expensive items with, Smart Communications' corporate funds. Jon suffered damages as a result because, by depleting Smart Communications' corporate funds,

Decedent significantly reduced the value of Jon's share.

117.    Decedent further betrayed Jon's trust and confidence by failing to take steps to ensure that Jon was appropriately compensated for Jon's services for the use of Jon's IP. Failure to properly compensate Jon disproportionately benefitted Decedent (because it meant that the amounts that should have been paid to Jon individually were instead split equally with Decedent). Jon was damaged because: (a) he received no compensation for his services for approximately eight years, and was severely underpaid thereafter; and (b) Jon's wholly owned entity, HLFIP, has not received any royalties from Smart Communications.

118.    This betrayal has also imposed litigation costs on Jon. If Jim had committed to writing his earlier agreement with Jon about the Smart license with HLFIP (namely that Smart owed material royalties to HLFIP for the IP that everyone agreed was owned by Jon and HLFIP), Jon would not be facing the baseless and uneconomic arguments Janice now raises about a purported royalty-free license. Decedent's actions were taken in his individual capacity and in furtherance of his own personal financial gain.

WHEREFORE, Plaintiff Jon Logan demands judgment in its favor and against Decedent's Estate, including:

a.  Disgorging the Estate of, or otherwise awarding Jon, the value of the benefit derived by Decedent's betrayal; and

b.  Such other and further relief as this Court seems just and proper.

### COUNT 7
### CONVERSION
### (Plaintiffs Against the Estate)

119.    Plaintiffs reallege the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

120.     Decedent made numerous withdrawals from Smart Communications' corporate funds.

121.     Decedent used those corporate funds to make purchases, including jewelry, cars, houses, cosmetic and medical procedures, and wedding incidentals.

122.     For example, Decedent withdrew the specific amount needed to purchase the Ring. Separately, Decedent wired the specific amount needed to purchase the 2019 BMW and the vacation home on Lake Michigan.

123.     Decedent was not authorized to allow Janice, Alexis, or Peterson to take custody of those corporate assets.

124.     Plaintiffs have demanded return of the corporate funds and assets or such demand would be futile.

125.     Plaintiffs have been deprived of access to the corporate funds and assets.

126.     As co-owner of Smart Communications, Jon was entitled to 50% of the corporate funds and the assets purchased with such funds.

WHEREFORE, Plaintiffs demand judgment in their favor and against Decedent's Estate, including:

a.   Granting Plaintiffs return of the funds; or

b.   Granting Plaintiffs access to the assets; or

c.   Awarding Jon 50% of the reasonable value of the assets plus interest; and

d.   Such other and further relief as this Court seems just and proper.

### COUNT 8
**Conspiracy to Commit Conversion**
**(Jon Against the Estate, Janice, Alexis and Peterson)**

127.     Plaintiff, Jon Logan, realleges the allegations in paragraphs 1 through 70 and 119

through 126 above as if fully incorporated herein.

128.    As co-owner of Smart Communications, Jon was entitled to 50% of the corporate funds and the assets purchased with such funds.

129.    Decedent withdrew Smart Communications' corporate funds.

130.    Decedent used those corporate funds to purchase corporate assets, including jewelry, cars, houses, cosmetic and medical procedures, and wedding incidentals.

131.    Decedent was not authorized to allow Janice, Alexis or Peterson to take custody of those corporate assets.

132.    Decedent conspired with Janice, Alexis and Peterson to deprive Jon of access to the corporate funds seized to pay for those assets and/or the assets themselves.

133.    Jon has demanded return of the corporate funds and assets or such demand would be futile.

134.    By placing the corporate assets in Defendants' custody, Jon has been deprived of access to those assets despite his 50% ownership of those assets.

WHEREFORE, Plaintiff Jon Logan demands judgment in its favor and against the Estate, Janice, Alexis and Peterson, including:

a.  Granting Jon return of his portion of the funds; or

b.  Granting Jon access to the assets; or

c.  Awarding Jon 50% of the reasonable value of the assets plus interest; and

d.  Such other and further relief as this Court seems just and proper.

## COUNT 9
## BREACH OF STATUTORY FIDUCIARY DUTY
### (Plaintiffs Against the Estate)

135.    Plaintiffs reallege the allegations in paragraphs 1 through 70 above as if fully

incorporated herein.

136. Section 607.0841, Florida Statutes, provides: "Each officer has the authority and shall perform the duties set forth in the bylaws or, to the extent consistent with the bylaws, the duties prescribed by the board of directors or by direction of any officer authorized by the bylaws or the board of directors to prescribe the duties of other officers." Decedent failed to perform his duties as an officer of Smart Communications.

137. Moreover, Decedent failed to comply with the general standard for officers and directors. Both Section 607.8411(1) and Section 607.0830, Florida Statutes, required Decedent to act in "good faith" and in a manner he "reasonably believe[d] to be in the best interests" of Smart Communications.

138. Decedent acted in clear violation of his duties, including self-dealing, taking excessive compensation, making unauthorized and unequal distributions, committing corporate waste, purchasing extravagant items for personal use, taking unfair advantage, and not acting in the best interest of Plaintiffs.

139. Plaintiffs were injured by Decedent's breach of his fiduciary duties.

140. Pursuant to Section 607.0750(1), Florida Statutes, "a shareholder may maintain a direct action against another shareholder, an officer, a director, or the company, to enforce the shareholder's rights and otherwise protect the shareholder's interests . . . ."

141. Jon, as a shareholder, was injured directly by the Decedent's actions, for which no benefit flowed to, nor was shared by, Jon; such as unequal distributions.

142. As required by Section 607.0750(2), Florida Statutes, Jon suffered an actual or threatened injury that is not solely the result of an injury suffered or threatened to be suffered by Smart Communications; alternatively, Jon suffered an actual or threatened injury resulting from

a violation of a separate statutory or contractual duty owed by Decedent to Jon, even if the injury is in whole or in part the same as the injury suffered or threatened to be suffered by Smart Communications

WHEREFORE, Plaintiffs demand judgment in their favor and against the Estate, including:

a.  Granting return of the funds withdrawn without authorization; or

b.  Granting return of the assets purchased without authorization; or

c.  Awarding the reasonable value of the assets plus interest; and

d.  Attorneys' fees and costs pursuant to Fla. Stat. § 607.0746; and

e.  Such other and further relief as this Court seems just and proper.

<u>**COUNT 10**</u>
**BREACH OF COMMON LAW FIDUCIARY DUTY – UNAUTHORIZED
WITHDRAWALS AND PURCHASES
(Plaintiffs Against the Estate)**

143.    Plaintiffs reallege the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

144.    As an officer of Smart Communications, Decedent owed a fiduciary duty to Smart Communications and its shareholders (*i.e.*, Jon).

145.    Decedent breached his fiduciary duties to Plaintiffs, including self-dealing, taking excessive compensation, making unauthorized and unequal distributions, committing corporate waste, purchasing extravagant items for personal use, taking unfair advantage, and not acting in the best interest of Plaintiffs.

146.    Decedent's misconduct was intentional because he acted with actual knowledge of the wrongfulness of his breaches and the high probability that damage to Plaintiffs would result. Despite such knowledge, Decedent engaged in conduct that breached his fiduciary duties,

resulting in damage to Plaintiffs.

147.    Alternatively, Decedent acted with gross negligence because his conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to Plaintiffs' rights.

148.    Plaintiffs suffered damages as a result of Decedent's breach.

WHEREFORE, Plaintiffs Jon and Smart Communications demand judgment in their favor and against Decedent's Estate, including:

    a.  Awarding compensatory damages and/or back-distribution; or

    b.  Awarding punitive damages under Section 768.72, Florida Statutes; or

    c.  Awarding Smart Communications the reasonable value of the assets plus interest; and

    d.  Such other and further relief as this Court seems just and proper.

### COUNT 11
### CONSPIRACY TO COMMIT UNJUST ENRICHMENT
#### (Smart Communications Against Defendants)

149.    Plaintiff, Smart Communications, realleges the allegations in paragraphs 1 through 1112 above as if fully incorporated herein.

150.    During his life, Decedent used Smart Communications' corporate funds to make withdrawals and purchases that were not for the benefit of Smart Communications.

151.    Defendants conspired with Decedent to obtain a benefit from Decedent's improper use of Smart Communications' corporate funds.

152.    Defendants committed an overt act in pursuance of the conspiracy, namely coercing Decedent to make the withdrawals and purchases and thereafter taking possession of same.

153.    As the ultimate recipient of Decedent's withdrawals and purchases, Defendants have knowledge of the benefits conferred.

154.    It would be inequitable for Defendants to retain that benefit.

155.    There is no adequate remedy at law in the absence of this claim against Defendants.

156.    Smart Communications was damaged as a result of Defendants' conspiracy.

WHEREFORE, Plaintiff Smart Communications demands judgment in its favor and against Defendants, including:

a.  Granting Smart Communications a constructive trust over the withdrawals and assets; or,

b.  Providing restitution to Smart Communications for the full value, or otherwise disgorging Defendants, of the withdrawals and assets; and

c.  Smart Communications' attorneys' fees and costs pursuant to Fla. Stat. § 607.0746; and,

d.  Such other and further relief as this Court seems just and proper.

## COUNT 12
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Plaintiffs Against Defendants)

157.    Plaintiffs reallege the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

158.    As an officer of Smart Communications, Decedent owed a fiduciary duty to Smart Communications and its shareholders (*i.e.*, Jon).

159.    Defendants encouraged and/or coerced Decedent into breaching his fiduciary duties, including self-dealing, taking excessive compensation, making unauthorized and unequal

distributions, committing corporate waste, purchasing extravagant items for personal use, taking unfair advantage, and not acting in the best interest of Plaintiffs.

160.    Defendants were aware of the breach, and procured the breach, in order to receive custody of extravagant items purchased with Smart Communications' corporate funds.

161.    Decedent's misconduct was intentional because he acted with actual knowledge of the wrongfulness of his breaches and the high probability that damage to Plaintiffs would result. Despite such knowledge, Decedent engaged in conduct that breached his fiduciary duties, resulting in damage to Plaintiffs.

162.    Alternatively, Defendants encouraged Decedent to act with gross negligence because his conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to Plaintiffs' rights.

163.    Plaintiffs suffered damages as a result.

WHEREFORE, Plaintiffs Jon and Smart Communications demand judgment in their favor and against Defendants, including:

 a.  Awarding compensatory damages and/or back-distribution; or

 b.  Awarding punitive damages under Section 768.72, Florida Statutes; or

 c.  Awarding Smart Communications the reasonable value of the assets plus interest; and

 d.  Such other and further relief as this Court seems just and proper.

## COUNT 13
### NEGLIGENCE
**(Plaintiffs Against the Estate)**

164.    Plaintiffs reallege the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

165.    Decedent owed a duty or obligation to Plaintiffs pursuant to Sections 607.0841, 607.8411(1), and 607.0830, Florida Statutes, to conform to a certain standard of conduct for the protection of Plaintiffs against unreasonable risks.

166.    Decedent failed to conform to those standards by making unauthorized withdrawals and purchases.

167.    Decedent's failure proximately caused actual loss to Jon, as a shareholder, because no benefit flowed to, nor was shared by, Jon.

168.    Decedent's breach also proximately caused actual loss to Smart Communications.

WHEREFORE, Plaintiffs demand judgment in their favor and against the Estate, including:

a.  Granting return of the funds withdrawn without authorization; or

b.  Granting return of the assets purchased without authorization; or

c.  Awarding the reasonable value of the assets plus interest; and

d.  Attorneys' fees and costs pursuant to Fla. Stat. § 607.0746; and

e.  Such other and further relief as this Court seems just and proper.

## COUNT 14
## BREACH OF COMMON LAW FIDUCIARY DUTY – TAX LIABILITIES
### (Plaintiffs Against the Estate)

169.    Plaintiffs reallege the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

170.    As an officer of Smart Communications, Decedent was responsible for Smart Communications' finances and ensuring compliance with all applicable laws and regulations related to taxes.

171.    Decedent assumed the duty to advise, counsel, and protect Plaintiffs by agreeing

to handle tax issues on behalf, and for the benefit, of Smart Communications and its shareholders (*i.e.*, Jon).

172.    Decedent breached his fiduciary duties to Plaintiffs by creating tax liabilities for which Plaintiffs are responsible.

173.    Decedent's misconduct was intentional because he acted with actual knowledge of the wrongfulness of his breaches and the high probability that damage to Plaintiffs would result. Despite such knowledge, Decedent engaged in conduct that breached his fiduciary duties, resulting in damage to Plaintiffs.

174.    Alternatively, Decedent acted with gross negligence because his conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to Plaintiffs' rights.

175.    Specifically, during Decedent's tenure, Decedent should have directed Smart Communications to pay royalties to HFLIP for use of the IP.

176.    Decedent's failure and refusal to remit royalty payments to HFLIP resulted in the accrual of unfunded tax liabilities which Plaintiffs were required to belatedly account for and pay.

177.    Plaintiffs suffered damages as a result of Decedent's breach as Plaintiffs owed monies to the Internal Revenue Service, and incurred legal and accounting expenses related to same, that they would not have had to pay but for Decedent's breach.

178.    Further, Jon suffered damages because HLFIP was not paid royalties for the use of the IP at the time (which has since been reconciled), thus Jon is now obligated to pay the IRS for tax liabilities on income he did not receive.

WHEREFORE, Plaintiffs Jon and Smart Communications demand judgment in their

favor and against Decedent's Estate, including:

    a.   Awarding damages; and

    b.   Such other and further relief as this Court seems just and proper.

## COUNT 15
## BREACH OF COMMON LAW FIDUCIARY DUTY - COMPENSATION
### (Jon Against the Estate)

179.    Plaintiff, Jon Logan, realleges the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

180.    Jon relied upon his father to protect him and act in his best interest.

181.    Jon is solely responsible for creating the concept, business plan, and IP that has made Smart Communications so successful. Jon invited Decedent to become involved with Smart Communications based on his belief that he could trust his father to protect Jon and to act in Jon's best interest. Decedent accepted the trust and confidence Jon placed in Decedent by accepting the invitation to become involved with Smart Communications.

182.    Decedent misrepresented to Jon that Jon's compensation would be paid in the form of assets instead of a salary.

183.    Decedent further misrepresented to Jon that Jon would be compensated for use of his IP.

184.    Decedent's misrepresentations were made in his individual capacity and in furtherance of his own personal financial gain.

185.    Decedent breached his fiduciary duty to Jon by titling the assets in the name of Smart Communications instead of Jon and/or recording them as a debt owed by Jon (*i.e.*, a loan), such that Jon received no compensation for eight years of services (and a significantly reduced salary thereafter, totaling fifteen (15) years of no payment or being grossly underpaid); and by

failing to ensure Jon was compensated for use of Jon's IP. In contrast, Decedent paid himself a salary and made cash withdrawals. Upon information and belief, Decedent titled Jon's assets in the name of Smart Communications, or recorded them as debt, so that Decedent could assert a 50% interest in the assets paid as compensation to Jon.

186.    Decedent's misconduct was intentional because he acted with actual knowledge of the wrongfulness of his breaches and the high probability that damage to Jon would result. Despite such knowledge, Decedent engaged in conduct that breached his fiduciary duties, resulting in damage to Jon.

187.    Alternatively, Decedent acted with gross negligence because his conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to Jon's rights.

188.    Jon suffered damages as a result of Decedent's breach. Specifically, Jon received no compensation for at least eight years' worth of services rendered as Director and CEO of a national company (and a significantly reduced salary thereafter); and received no compensation for the exclusive use of his IP.

WHEREFORE, Plaintiff Jon Logan demands judgment in his favor and against Decedent's Estate, including:

    a.  Awarding damages; and

    b.  Such other and further relief as this Court seems just and proper.

### COUNT 16
### ESTOPPEL – MISREPRESENTATIONS RELATED TO IP
### (Jon Against the Estate)

189.    Plaintiff, Jon Logan, realleges the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

190.    Jon conceived of all of the ideas and created all of the IP upon which Smart Communications' business is founded.

191.    Indeed, an independent valuation study determined that Smart Communications owed HLFIP a royalty of 40% of Smart Communications' net sales for the use of the IP owned by HLFIP under their license.

192.    Decedent misrepresented to Jon that Jon would be compensated for Smart Communications' exclusive use of the IP.

193.    Decedent's misrepresentations were made in his individual capacity and in furtherance of his own personal financial gain.

194.    Jon relied to his detriment on Decedent's misrepresentation—Jon did not demand that Decedent formalize the license agreement in writing nor demand immediate and ongoing compensation to HLFIP for an exclusive license to use the IP.

195.    Jon has been damaged by Decedent's misrepresentations because Jon has not been compensated for use of his IP.

196.    Decedent's Estate benefitted from the misrepresentations by increasing the value of its shares higher than if Jon had not relied upon Decedent's misrepresentations (*i.e.*, if Jon had been compensated, then Smart Communications' corporate funds would have been reduced by the amount of that compensation, thereby reducing the value of Decedent's 50% interest in Smart Communications).

WHEREFORE, Plaintiff Jon Logan demands judgment in his favor and against Decedent's Estate, including:

    a.  Awarding damages; and

    b.  Such other and further relief as this Court seems just and proper.

## <u>COUNT 17</u>
## FRAUDULENT INDUCEMENT - SALARY
### (Jon Against the Estate)

197.     Plaintiff, Jon Logan, realleges the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

198.     Decedent falsely stated that Jon could receive assets in lieu of a fair salary for his services.

199.     Decedent's misrepresentations were made in his individual capacity and in furtherance of his own personal financial gain.

200.     In contrast to Jon, Decedent paid himself a salary and made cash withdrawals.

201.     Upon information and belief, Decedent titled Jon's assets in the name of Smart Communications so that Decedent could assert a 50% interest in the assets purchased for Jon.

202.     Decedent knew or should have known that his representations to Jon were false because Decedent titled the assets in the name of Smart Communications instead of Jon.

203.     Decedent intended for his misrepresentation to induce Jon not to demand to be paid a fair salary.

204.     Jon was damaged by relying upon Decedent's representation because Jon was not compensated for eight years' worth of services rendered (and received just a fraction of a fair salary thereafter).

WHEREFORE, Plaintiff Jon Logan demands judgment in his favor and against Decedent's Estate, including:

   a.   Awarding damages; and

   b.   Such other and further relief as this Court seems just and proper.

## COUNT 18
## FRAUDULENT INDUCEMENT - IP
### (Jon Against the Estate)

205.     Plaintiff, Jon Logan, realleges the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

206.     Decedent falsely stated that Jon would be compensated for use of his IP. In fact, this representation was an express condition precedent to Jon's sharing or allowing any further use of his "new IP" starting in 2015.  *See* **Exhibit E**.

207.     Decedent's misrepresentations were made in his individual capacity and in furtherance of his own personal financial gain.

208.     Decedent knew or should have known that his representation to Jon was false because Decedent never intended to compensate Jon.

209.     Decedent intended for his misrepresentation to induce Jon not to demand payment or a written licensing agreement during his lifetime.

210.     Jon relied upon Decedent's representation and was damaged thereby because Jon has not been compensated for the exclusive use of his IP, and without the written licensing agreement dictating royalties and other terms from 2015 going forward, Jon is exposed to rapacious and capricious claims over the IP that is undeniably his (by Decedent and Alexis's agreement).

WHEREFORE, Plaintiff Jon Logan demands judgment in his favor and against Decedent's Estate, including:

      a.   Awarding damages; and

      b.   Such other and further relief as this Court seems just and proper.

## COUNT 19
## INDEMNIFICATION
### (Smart Communications Against the Estate)

211.    Plaintiff, Smart Communications, realleges the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

212.    Decedent solely entered into an exclusive broker agreement related to a yacht purportedly on Smart Communications' behalf. However, Decedent acted outside of his authority to act on Smart Communications' behalf.

213.    By procuring a different financing arrangement for the yacht, Decedent is alleged to have breached the broker agreement he procured alone.

214.    Decedent's alleged breach caused Smart Communications to be sued in relation to the commission allegedly owed under the broker agreement.

215.    Smart Communications has incurred legal expenses related to that litigation and is alleged to be liable for damages amounting to approximately $1.2 million.

216.    Smart Communications is without fault as it neither agreed to, nor breached, the broker agreement.

217.    Smart Communications discharged a duty that Decedent should have discharged.

218.    Smart Communications suffered damages as a result.

WHEREFORE, Plaintiff Smart Communications demands judgment in its favor and against Decedent's Estate, including:

a.    Awarding damages; and

b.    Such other and further relief as this Court seems just and proper.

## COUNT 20
## BREACH OF FIDUCIARY DUTY – BROKER AGREEMENT
### (Smart Communications Against the Estate)

219.    Plaintiff, Smart Communications, reallege the allegations in paragraphs 1 through 70 above as if fully incorporated herein.

220.    As an officer of Smart Communications, Decedent owed Smart Communications a duty to advise, counsel, and protect Smart Communications' interests.

221.    Decedent breached his fiduciary duty by entering into an exclusive broker agreement related to a yacht purportedly on Smart Communications' behalf, but without Smart Communications' knowledge.

222.    By procuring a different financing arrangement for the yacht, Decedent allegedly breached the broker agreement he procured alone, which would have further breached his fiduciary duty to Smart Communications.

223.    Decedent's alleged breach caused Smart Communications to be sued in relation to the commission allegedly owed under the broker agreement.

224.    Smart Communications has incurred legal expenses related to that litigation and is alleged to be liable for an approximately $1.2 million in damages.

225.    Decedent's misconduct was intentional because he acted with actual knowledge of the wrongfulness of his alleged breaches and the high probability that damage to Smart Communications would result. Despite such knowledge, Decedent engaged in conduct that breached his fiduciary duties, resulting in damage to Smart Communications.

226.    Alternatively, Decedent acted with gross negligence because his conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to Smart Communications' rights.

227.    Smart Communications suffered damages as a result of Decedent's breach.

WHEREFORE, Plaintiff Smart Communications demands judgment in its favor and

against Decedent's Estate, including:

    a.  Awarding damages; and

    b.  Such other and further relief as this Court seems just and proper.

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
200 East Las Olas Boulevard, Suite 2100
Fort Lauderdale, Florida 33301
Telephone: (954) 462-9650
Primary e-mail: mharwin@stearnsweaver.com
Secondary e-mail: mhernandez@stearnsweaver.com


By: */s/ Michael J. Harwin*
Michael J. Harwin
Florida Bar No.: 1018578

*Attorney for Jonathan Logan, Smart Communications Holding, Inc. and Loco Florida, LLC*


## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that, pursuant to Fla. R. Jud. Adm. 2.516(b), a true and correct copy of the foregoing has been electronically filed with the Clerk of Court through the Florida statewide E-Portal system and served by the Clerk maintained website via e-Service to all counsel of record, this 4th day of December, 2024.


*/s/Michael J. Harwin*
Michael J. Harwin

# EXHIBIT A

IN THE CIRCUIT COURT FOR ST. SARASOTA COUNTY, FLORIDA                           PROBATE DIVISION

IN RE:  ESTATE OF

     JAMES LOGAN,

       Deceased.

       File No.: _____

## PETITION TO APPOINT CURATOR AND ADMIT WILL

Petitioners, Jonathan Logan and Smart Communications Holding, Inc., allege:

1. Petitioners have an interest in the above estate as creditors filing a statement of claim. Petitioners' address is 10491 72nd St, Seminole, FL 33777, and the name and office address of petitioner's attorney are set forth at the end of this petition.

2. Decedent, JAMES LOGAN , whose last known address was 1660 Ranch Club Boulevard, Sarasota, Florida 34240, and whose age was 69 and the last four digits of whose social security number are 3655, died on October 16, 2022, at Tierra Verde, Pinellas County.  On the date of death, decedent was domiciled in Sarasota County, Florida.

3. So far as is known, the names of the persons entitled to letters of administration, the beneficiaries of this estate and of the decedent's surviving spouse, if any, their addresses and relationships to decedent, and the years of birth of any who are minors, are:

| NAME | ADDRESS | RELATIONSHIP | YEAR OF BIRTH (if Minor) |
|---|---|---|---|
| JANICE LOGAN | 1600 Ranch Club Boulevard, Sarasota, Florida 34240 | Surviving Spouse/ Entitled to Letters of Administration | |
| JAMES LOGAN FAMILY TRUST | 1600 Ranch Club Boulevard, Sarasota, Florida 34240 | Trust | N/A |

4. Venue of this proceeding is in this county because the decedent was domiciled in Sarasota County at the time of his death.

5. The nature and approximate value of the assets in this estate are:

| NATURE OF ASSETS | APPROXIMATE VALUE |
|---|---|
| Tangible Personal Property | $ To be determined |
| Property Insurance Policies | $ To be determined |

6. Petitioners seek appointment of a curator because the personal representative identified in decedent's will has only deposited the will; she has not taken action to admit the will and the deadline for creditors to file a claim against the estate is October 16, 2024.

7. Petitioners propose that MATTHEW WEIDNER whose address is 250 Mirror Lake Drive N, St. Petersburg, Florida 33701 and who is qualified under the laws of the State of Florida to serve as personal representative of the decedent's estate, be appointed as curator of the estate.

8. The court should admit the will and appoint a curator to reduce the risk of loss or waste of estate assets.

Wherefore, PETITIONERS, request that:

a. Mr. Weidner be appointed curator of the estate of the decedent.

b. The court waive any requirement that he file a bond or other surety to act as curator based on: (1) Mr. Weidner being an attorney licensed and eligible to practice law in Florida (Florida Bar #185957); (2) Mr. Weidner's prior experience serving as a professional fiduciary; and (3) Mr. Weidner's lack of a personal interest in, or benefit from, the estate.

Under penalties of perjury, I declare that I have read the foregoing, and the facts alleged are true, to the best of my knowledge and belief.

Signed on this __7th__ day of ____August____, 2024.

_____
JONATHAN LOGAN in his individual capacity, and in his
official capacity for SMART COMMUNICATIONS HOLDING, INC.
Petitioner

**STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.**

*/s/Michael J. Harwin*
_____
**Michael J. Harwin**
Florida Bar No.: 1018578
**Kelly A. O'Keefe, Esq.**
Florida Bar No.: 12718
200 East Las Olas Boulevard, Suite 2100
Fort Lauderdale, Florida 33301
Telephone: (954) 462-9500
Primary e-mail:  mharwin@stearnsweaver.com
                kokeefe@stearnsweaver.com
Secondary e-mail: mhernandez@stearnsweaver.com
                bbreeden@stearnsweaver.com

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA
PROBATE DIVISION

JONATHAN LOGAN and
SMART COMMUNICATIONS HOLDING, INC.,

      Plaintiffs,

v.                                                                                  Case No: 2023-CA-10020NC

JANICE LOGAN, individually and as Trustee of the                 (CONSOLIDATED)
James Logan Family Trust dated February 10, 2021
and ALEXIS LOGAN, individually,                                         Case No.: 2023-CA-1280-NC

      Defendants.

_____/

**EXHIBIT "B"**

**TO**

**COMPLAINT**

# LAST WILL AND TESTAMENT

## OF

## JAMES LOGAN

I, JAMES LOGAN, a resident of Sarasota County, Florida, declare that this is my Last Will and Testament, and I revoke all wills and codicils I have previously made; except the Trust referred to in Article V hereof, if the same be determined to be testamentary.

## I

### FAMILY

1.1     Spouse. I am married to JANICE LOGAN (referred to herein as "my wife" or "my spouse").

1.2     Children. We have 2 children: ALEXIS LOGAN and JON LOGAN.

## II

### APPOINTMENT OF FIDUCIARIES

2.1     Personal Representative. I appoint my wife, JANICE LOGAN, as personal representative of this, my Last Will and Testament. If JANICE LOGAN shall fail to qualify or otherwise serve as personal representative, I appoint my daughter, ALEXIS LOGAN, as personal representative of my estate. If ALEXIS LOGAN shall fail to qualify or otherwise serve as personal representative, I appoint my son, JON LOGAN, as personal representative of my estate.

2.2     No Bond. I request that my personal representative not be required to furnish bond or sureties.

## III

### PAYMENT OF DEBTS AND TAXES

3.1     Debts. I direct that my legal debts and the expenses of any last illness, funeral, and the administration of my estate, be paid as soon as practicable after my death.



3.2    <u>Taxes.</u>  I direct that my personal representative pay out of that portion of my Residuary Estate which is not included in the gift qualifying for the marital deduction, without apportionment except as herein provided, all estate taxes in respect of all property required to be included in my gross estate for estate tax purposes, whether the property passes under this will or otherwise, except:

(a)    that any generation-skipping tax imposed by Chapter 13 of the Internal Revenue Code of 1986, as amended, caused by a disclaimer or by a direct skip from a trust not established hereunder, shall be paid by the person holding or receiving that property; and

(b)    that any such taxes which are attributable to any qualified terminable interest property over which I had a life income interest shall be paid by the person holding or receiving such property, in an amount equal to the difference between the estate tax computed with and without the inclusion of such property in the calculation; and

(c)    that any such taxes which are attributable to proceeds of life insurance policies that are payable to a person or persons other than my spouse and are includable in my estate for federal estate tax purposes shall be paid by the beneficiary or beneficiaries, collectively, receiving such life insurance proceeds, in an amount equal to the difference between the estate tax computed with and without the inclusion of such property in the calculation; and

(d)    that any such taxes which are attributable to any property over which I may have a power of appointment shall be paid by the person holding or receiving such property, in an amount equal to the difference between the estate tax computed with and without the inclusion of such property in the calculation.

If more than one subparagraph of this paragraph 3.2 applies as a result of my death to apportion estate tax to beneficiaries or recipients of property, then each such beneficiary or recipient shall pay a pro rata share of the difference between the estate tax computed with and without the inclusion in the calculation of the total of the property to which the subparagraphs of this paragraph 3.2 have apportioned estate tax to the beneficiaries or recipients.

3.3    <u>Funds From Trust.</u>  However, should there be in existence at the time of my death that trust referred to in this will and known as the "JAMES LOGAN FAMILY TRUST" and should it appear to my personal representative to be in the best interests of the beneficiaries of the trust and my estate, nothing in this provision shall be interpreted as prohibiting the personal representative of my estate from selling estate assets to that trust, or from borrowing funds, secured or unsecured, or accepting funds from that trust to meet the liquidity requirements of my estate which have become necessary to meet the debts, costs of administration and settlement, and taxes and other charges that have been imposed against my estate.

3.4    <u>Mortgage.</u>  In the event any property or interest in property passing under this will or by operation of law or otherwise by reason of my death shall be encumbered by a mortgage or a lien or shall be pledged to secure any obligation (whether the property or interest in property so encumbered or pledged shall be owned by me jointly or individually), it is my intention that such



indebtedness shall not be charged to or paid by my estate but that the devisee, legatee, joint owner taking by survivorship or beneficiary shall take such property or interest in property subject to all encumbrances existing at the time of my death.

IV

SPECIFIC BEQUESTS

    4.1    <u>Tangible Personal Property.</u>  I give and bequeath, in fee, all tangible personal property except cash on hand owned by me at the time of my death, including, but not limited to, lapsed bequests of tangible personal property, if any, furniture, furnishings, rugs, pictures, books, silverplate, linen, china, glassware, objects of art, wearing apparel, jewelry and automobiles, as follows:

        (a)    First, in accordance with that certain separate writing that I have executed or may execute listing certain items of personal property which I bequeath to certain individuals as specified in said list, as said list is altered from time to time. If the list referred to herein is not found and properly identified by my personal representative within 30 days after his qualification, it shall be presumed that there is no such list and any subsequently discovered list shall be ignored.

        (b)    All other tangible personal property not specifically bequeathed by such separate writing and all such property, in the absence of any list, to my wife, JANICE LOGAN, if she survives me, but if not, then to those of my children who survive me, to be divided among them by my personal representative in its absolute discretion, in as nearly equal portions as may be practicable, having due regard for the preferences of such children.

        (c)    In the event none of these persons survive me, this bequest shall lapse and shall pass as part of my Residuary Estate.

    4.2    <u>Property Insurance Policies.</u> All of my insurance policies which provide indemnity for the loss of any of my personal or real property by fire, windstorm, or other casualty (including any claim for such loss of any such property which I might have at the time of my death against any insurance company) I give and bequeath respectively to those persons or corporations, as the case may be, who shall become owners of such properties by reason of my death; whether such ownership be acquired under the provisions of this will, by survivorship or by other means.

    4.3    <u>Delivery Costs.</u> If, to effect delivery of my tangible personal property or insurance policies above bequeathed to a beneficiary who resides in a city or a location other than where the tangible property or insurance policies are located at the time delivery is to be made, it becomes necessary to incur expenses of shipment to complete the delivery, my personal representative on behalf of my estate shall arrange for and pay the costs of shipment incurred in making such delivery.

Page 3

V

## RESIDUARY ESTATE

5.1     <u>Defined.</u>  I define "my Residuary Estate" as all of my property not otherwise effectively bequeathed or devised, after the payment of debts and taxes under Article III above; including real and personal property whenever acquired by me, life insurance or for the benefit of my estate, and property as to which I have an option to purchase or a reversionary interest; but excluding property as to which I have no interest other than a power of appointment and any assets which are payable to a designated beneficiary other than me or my estate.

5.2     <u>To My Trust.</u>  I give, devise and bequeath my Residuary Estate to the Trustees under a certain Trust Agreement heretofore entered into between me, JAMES LOGAN, as Settlor, JAMES LOGAN and JANICE LOGAN, as Co-Trustees, and any Successor Trustees thereto, dated February 10, 2021, entitled the "JAMES LOGAN FAMILY TRUST" as the same now exists or is hereafter amended from time to time.

(a)     Said property shall be added to the corpus of the trust fund therein established as an integral part thereof, to be held, administered and distributed by the Trustee in accordance with all the terms and provisions of the said Trust Agreement.

(b)     The receipt of said Trustee under said Trust Agreement shall be a full acquittance and discharge to my personal representative for the property so distributed.  Upon distribution to the Trustee, the administration of my estate shall cease with respect to the assets passing to the Trustee, and the Trustee shall not be subject to the control of the court in which my will is probated.

5.3     <u>Trust Savings Clause.</u>  If for any reason the trust set out above in this Article V shall not be in existence at the time of my death, or if for any reason a court of competent jurisdiction shall declare this testamentary transfer to the Trustee of said trust to be invalid, then I direct that my Residuary Estate shall be held, managed, invested and reinvested in exactly the same manner described in said trust, giving, if the court shall allow, effect to all then existing amendments of said trust, and managed by the same Trustee or the successor or successors therein named and defined; thus, for those purposes I do hereby incorporate that same instrument of revocable trust, by reference, into this, my Last Will and Testament.  If the court shall not allow that trust to be incorporated into this will with its amendments, it shall be incorporated in its original form without regard to said amendments, if any such amendments have been made.

VI

## POWERS OF PERSONAL REPRESENTATIVE

6.1     <u>General Powers Of Personal Representative.</u>  I hereby give to my personal representative and any ancillary personal representative full power and authority, at any time or times, to sell, mortgage, pledge, exchange or otherwise deal with or dispose of the property



comprising my estate, upon such terms as shall be deemed best and without any order of the court; to settle and compromise any and all claims in favor of or against my estate as shall be deemed advisable and for any of the foregoing purposes to make, execute and deliver all deeds, contracts, mortgages, bills of sale or other instruments necessary or desirable therefor. My personal representative is also authorized to retain any assets or property owned by me at the time of my death and, therefore, no sale thereof shall need to be made solely to diversify investments. My personal representative is expressly authorized to postpone final distribution of my estate, pending final determination of tax liabilities in connection therewith.

6.2 <u>Power Over Digital Assets.</u> I give to my personal representative and any ancillary personal representative full power and authority, at any time or times, (i) to access, use, and control my digital devices, including but not limited to, desktops, laptops, tablets, peripherals, storage devices, mobile telephones, smart phones, and any similar devices, which currently exist or may exist as technology develops for the purposes of accessing, modifying, deleting, controlling, or transferring my digital assets (as defined below), (ii) to access, modify, delete, control, and transfer my digital assets, and (iii) to obtain, access, modify, delete, and control my passwords and other electronic credentials associated with my digital devices (as described above) and digital assets. For purposes of this Last Will and Testament, "digital assets" shall include, but not be limited to, emails received, email accounts, digital music, digital photographs, digital videos, software licenses, social network accounts, file sharing accounts, web hosting accounts, tax preparation services accounts, online stores, affiliate programs, other online accounts, and similar digital items which currently exist or may exist as technology develops.

6.3 <u>Ancillary Administration.</u> In the event ancillary administration is required to dispose of any property which I may own at the time of my death with a situs outside of the State of Florida, I hereby nominate and appoint my personal representative hereinabove named as such ancillary personal representative; however, if my personal representative is not qualified to act as ancillary personal representative under the laws of the state of the situs of such property, then I authorize my personal representative to designate an individual or corporate ancillary personal representative to administer such property.

6.4 <u>Joint Tax Returns.</u> I specifically authorize and empower my personal representative to execute and file a joint income tax return with my wife for the year in which my death occurs and for any years prior thereto. I also authorize and empower my personal representative to execute and file joint gift tax returns with my wife if any gift tax return is required of either of us for the year in which my death occurs or for any year prior thereto. My personal representative shall incur no personal liability for any action taken in good faith in accordance with either of the foregoing authorizations.

6.5 <u>Choice Of Deductions.</u> I am cognizant of the fact that the provisions of the Federal Internal Revenue Code (and other applicable laws) in force at the time of my death and applicable to my estate may permit my personal representative to elect to claim certain administration and other expenses as deductions, either in the income tax returns of my estate or in the estate tax return.



(a)    It is my desire that my personal representative elect to claim from time to time such expenses as deductions on the particular tax returns which, in the personal representative's opinion, should result in the smallest combined taxes being paid, irrespective of whether such expenses shall be payable from income or corpus; and my personal representative is directed not to make adjustments between income or principal or between property interests passing to beneficiaries under my will which may be substantially affected as a result of any election under this Article.

(b)    It is my wish that such property interests as may be determined as a result of my personal representative's election under this provision shall be the interest such beneficiary shall receive.

(c)    I exonerate my personal representative from all liability for any such election and direct that no beneficiary shall have any claim against it or my estate by reason of the exercise of my personal representative's judgment in this respect.

6.6    Elections.  Except as elsewhere provided herein, my personal representative shall have the absolute discretion, right and authority to make all elections, decisions, payments and distributions hereunder in regard to sale, distribution and allocation of property so as to allocate the impact of estate and income taxes upon the various assets of my estate, including, but not limited to:

(a)    election to have a specific portion or all of certain life interests for my surviving spouse qualify for the marital deduction as qualified terminable interest property;

(b)    allocation of my generation-skipping exemption as my personal representative shall deem advisable, except the exemption shall be allocated (i) first to property given by me rather than by another or appointed by me and (ii) to a direct skip caused by a disclaimer only if no other allocation is possible;

(c)    sale or disposition of assets among beneficiaries and trusts to minimize potential income tax on sale or disposition of assets by my estate.  In this regard, I request (but do not direct) that my personal representative do so in a manner which will result in the property to be sold to satisfy obligations of my estate, or any trust, having an aggregate income tax basis as close as possible to its aggregate fair market value and, to the extent consistent with the foregoing objective, in a manner which will result in maximizing the increase in basis of assets of my estate on account of federal and state death taxes attributable to appreciation of such assets;

(d)    allocations of assets among beneficiaries and trusts upon the basis of present value without regard to the income tax basis of such assets in the hands of such beneficiaries and trusts unless such allocation is contrary to my express intentions as otherwise reflected herein.

6.7    Principal And Income.  In matters of allocation and accounting of principal, income, expenses, receipts and disbursements, my personal representative shall be governed by Florida Statutes 738, "Principal and Income", or its successor statute, as the same may from time

to time exist, except as otherwise provided in this will; provided, however, my personal representative shall have the option of charging all or any portion of the expenses incurred in connection with the settlement of my estate against either income or principal of my estate.

VII

MISCELLANEOUS PROVISIONS AND DEFINITIONS

7.1     Estate Taxes.  The term "estate taxes" shall mean all estate, inheritance, succession, generation-skipping tax on direct skips and other taxes (together with any interest or penalty thereon), assessed by reason of my death imposed by the government of the United States, or any state or territory thereof, or by any foreign government or political subdivision thereof.

7.2     Construction.  The paragraph headings used are for convenience only and shall not be resorted to for interpretation of this will.  Wherever the context so requires, the masculine shall include the feminine and neuter and the singular shall include the plural.  If any portion of this will is held to be void or unenforceable, the balance of the will shall nevertheless be carried into effect.  References herein to "gross estate", "marital deduction" or other similar or related words or phrases shall have the same meaning as such words or phrases have in the Internal Revenue Code of 1986, as amended.

7.3     Unused Exclusion.  If (i) my spouse survives me, and (ii) my personal representative determines that my estate does not need to use all of my federal estate tax exclusion to prevent federal estate taxes upon my estate and that such unused federal estate tax exclusion can be used by my spouse's estate if a federal estate tax return is filed for my estate, and (iii) my spouse (or her legal representative, whether a guardian, agent under a power of attorney, or personal representative of her estate) requests that my personal representative file a federal estate tax return that includes an irrevocable election, pursuant to Section 2010(c) of the Internal Revenue Code, to allow my spouse's estate to use my unused federal estate tax exclusion (the so-called Deceased Spousal Unused Exclusion Amount), then I direct my personal representative to timely file such federal estate tax return, whether a return is otherwise required or not, and make such election.

7.4     Survival.  With respect to the distribution of my tangible personal property, the term "survive me" is to be construed to mean that the person referred to must survive me by 30 days.  If such person dies within 30 days of my death, the reference to such person shall be construed as if such person failed to survive me with respect to the distribution of my tangible personal property.  With respect to the JAMES LOGAN FAMILY TRUST, said trust agreement provides its own survivorship provisions.

IN WITNESS WHEREOF, I have set my hand and seal to this, my Last Will and Testament, this _10_ day of February, 2021.

_____ (SEAL)
JAMES LOGAN

Page 7

We, the undersigned, hereby certify that the foregoing instrument was, on the date hereof, signed, sealed, published and declared by the said JAMES LOGAN, the Testator, as and for his last Will and Testament, in the presence of us, who in his presence and in the presence of each other, have, at his request, hereunto subscribed our names as witnesses to the execution hereof, this 10th day of February, 2021, and we certify that at the time of the execution hereof we believe said Testator to be of sound and disposing mind and memory.

_____ residing at _____ ST. PETERSBURG, FL _____

_____ residing at _____ LARGO, FL _____

STATE OF FLORIDA
COUNTY OF PINELLAS

I, JAMES LOGAN, the Testator, declare to the undersigned officer taking my acknowledgment of this instrument, and to the subscribing witnesses, that I signed this instrument as my Will.

_____
Testator

We ___NICHOLAS A. MITCHELL___ and ___ALMA DEBRUYNE_____, the witnesses whose names are signed to the foregoing instrument, have been sworn by the officer signing below, and declare to that officer on our oaths that the Testator declared this instrument to be the Testator's Will and signed it in our presence and that we each signed this instrument as a witness in the presence of the Testator and in the presence of each other.

_____
Witness

_____
Witness

STATE OF FLORIDA
COUNTY OF PINELLAS

I HEREBY CERTIFY that the foregoing instrument was (i) acknowledge and subscribed before me by means of ☑ physical presence or ☐ online notarization, this 10th day of

Page 8

February, 2021, by the Testator, JAMES LOGAN, who is ☐ personally known to me, or who has ☑ produced **FLORIDA DRIVER LICENSE** as identification; (ii) sworn to and subscribed before me by the witnesses, **NICHOLAS A. MITCHELL** and **ALMA DEBRUYNE** , who are personally known to me and each of whom appeared before me by means of ☑ physical presence or ☐ online notarization, this 10th day of February, 2021; and (iii) subscribed by me in the presence of the Testator and the subscribing witnesses, all on this 10th day of February, 2021.

_Jennifer A. Studer_
NOTARY PUBLIC

6078419

JENNIFER A. STUDER
MY COMMISSION # GG 934679
EXPIRES: March 24, 2024
Bonded Thru Notary Public Underwriters

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA
PROBATE DIVISION

JONATHAN LOGAN and
SMART COMMUNICATIONS HOLDING, INC.,

      Plaintiffs,

v.                                                                      Case No: 2023-CA-10020NC

JANICE LOGAN, individually and as Trustee of the        (CONSOLIDATED)
James Logan Family Trust dated February 10, 2021
and ALEXIS LOGAN, individually,                              Case No.: 2023-CA-1280-NC

      Defendants.

_____/

**EXHIBIT**

**"C" TO**

**<u>COMPLAINT</u>**

"JAMES LOGAN FAMILY TRUST"

dated

February 10, 2021

JAMES LOGAN, Settlor

JAMES LOGAN and JANICE LOGAN, Co-Trustees

TABLE OF CONTENTS

I.    NAME OF TRUST, FAMILY MEMBERS, SURVIVORSHIP

      1.1    Name of Trust
      1.2    Family Members
      1.3    Common Disaster

II.   RESIGNATION OF TRUSTEE AND SUCCESSOR TRUSTEE

      2.1    Appointment of Successor Trustee
      2.2    Settlor's Intent

III.  DUTIES AND RIGHTS DURING THE LIFETIME OF THE SETTLOR

      3.1    Right to Revoke and Amend the Trust
      3.2    Disposition of Trust Income and Principal During Lifetime of Settlor

IV.   DUTIES AFTER SETTLOR'S DEATH BUT PRIOR TO DISTRIBUTION

      4.1    Summary Description of Duties
      4.2    Assemble the Trust Estate
      4.3    Payment of Expenses and Costs of Settling Settlor's Estate

V.    DISTRIBUTION FOLLOWING THE DEATH OF THE SETTLOR

      5.1    Division of Trust Estate
      5.2    Marital Trust for Settlor's Spouse
      5.3    Residuary Trust
      5.4    Final Takers
      5.5    S Corporation Stock

VI.   LIMITATIONS ON BENEFITS AND ALLOCATIONS OF ASSETS

      6.1    Gifts During Lifetime

VII.  INVESTMENT AND ADMINISTRATIVE POWERS

      7.1    Rights Reserved to Settlor
      7.2    Investment Powers
      7.3    Digital Assets
      7.4    Generation Skipping Tax Provisions
      7.5    Allocation of Principal and Income

7.6     Exoneration
7.7     Business Provisions

# VIII. GENERAL PROVISIONS AND DEFINITIONS

8.1     Additions to Corpus
8.2     Laws Governing
8.3     Interpretation and Construction
8.4     Disability
8.5     Small Trust Termination
8.6     Donee's Will
8.7     Spendthrift Provision
8.8     Establishment of Separate Trusts
8.9     Compensation and Accounting
8.10    Merger or Combination of Trusts
8.11    Construction
8.12    Preservation of Marital Deduction
8.13    Definitions

# REVOCABLE TRUST AGREEMENT

THIS AGREEMENT is made and entered into the _10th_ day of February, 2021, at St. Petersburg, Florida, between JAMES LOGAN, Settlor, of Sarasota County, Florida (hereinafter called the "Settlor"), and JAMES LOGAN and JANICE LOGAN, Co-Trustees (hereinafter collectively called the "Trustee").

## W I T N E S S E T H:

WHEREAS, Settlor desires to create a trust to receive cash or other assets, including $10.00 cash which the Trustee acknowledges receipt of, together with such other assets as the Trustee may now or hereafter at any time hold or acquire hereunder (all such assets, being hereinafter referred to collectively as the "trust estate");

NOW, THEREFORE, this Trust is created and assets conveyed and the Trustee agrees to hold the trust estate, IN TRUST, for the following uses and purposes and subject to the terms and conditions hereinafter set forth:

## ARTICLE I

## NAME OF TRUST, FAMILY MEMBERS AND SURVIVORSHIP

1.1     NAME OF TRUST.  This trust shall, for convenience, be known as the "JAMES LOGAN FAMILY TRUST" and it shall be sufficient that it be referred to as such in any deed, assignment, bequest or devise.

1.2     FAMILY MEMBERS.  At the time of the execution of this Trust Agreement, Settlor's immediate family group consists of his "wife" (hereinafter sometimes referred to as "spouse" or "wife"), JANICE LOGAN, and Settlor's two children, ALEXIS LOGAN and JON LOGAN.

1.3     COMMON DISASTER.

(a)     If Settlor's spouse shall die simultaneously with Settlor or in such circumstances as to render it impossible to determine who predeceased the other, then it shall be presumed that Settlor's spouse survived the Settlor for purposes of this trust and the provisions of this trust shall be construed upon that assumption and basis, notwithstanding the provisions of any law establishing a different presumption of order of death or providing for survivorship for a fixed period as a condition of inheritance of property.

(b)    With respect to persons other than Settlor's spouse, a beneficiary who dies within 30 days of Settlor's death shall be deemed to have predeceased the Settlor.

(c)    Except as provided in the preceding paragraphs, if any beneficiary shall die simultaneously with another beneficiary or in such circumstances as to render it impossible to determine who predeceased the other and if the rights of one of them depend upon his or her having survived the other, the beneficiary whose rights depend upon such survivorship shall be deemed to have predeceased the other beneficiary and the provisions hereof shall be construed upon that assumption.

## ARTICLE II

## RESIGNATION OF TRUSTEE AND SUCCESSOR TRUSTEE

2.1     APPOINTMENT OF SUCCESSOR TRUSTEE.

(a)     Upon the death, incapacity, resignation or discharge of either one of the Settlor or JANICE LOGAN as Co-Trustee, then the remaining one of them shall be the sole Trustee of all trusts hereunder. If JANICE LOGAN becomes the sole Trustee after the death, incapacity, resignation or discharge of Settlor as Trustee, then the following provisions shall apply:

1.     If JANICE LOGAN becomes the sole Trustee, she shall have the power at any time to appoint a Co-Trustee, to appoint a sole Trustee, to remove such Co-Trustee or sole Trustee, and to appoint or not re-appoint another Co-Trustee or sole Trustee in the event such Co-Trustee or sole Trustee appointed by JANICE LOGAN should die, become incapacitated, resign or be removed.

2.     Notwithstanding the foregoing, if JANICE LOGAN signs a statement waiving the right to remove a particular Co-Trustee or sole Trustee, then (i) JANICE LOGAN shall not have the power to remove that Co-Trustee unless such Co-Trustee is replaced with a Corporate Trustee, and (ii) that Co-Trustee appointed by JANICE LOGAN shall have exclusive authority over distributions to or for JANICE LOGAN.  For this purpose, a Corporate Trustee shall be a bank or trust company qualified to act as such. However, if that Co-Trustee should die, become incapacitated, resign or be discharged by a court, then Settlor's spouse shall have the power to appoint (or not appoint) any other Co-Trustee in its place.

(b)     Upon the death, incapacity, resignation or discharge of both of the Settlor and the Settlor's spouse, JANICE LOGAN, as Trustees, then SABAL TRUST COMPANY shall be Successor Trustee of all trusts created hereunder, except as provided in subparagraphs 2.1(c) and 2.1(d) below.

(c)     Notwithstanding anything contained herein to the contrary, with respect to a separate trust for the primary benefit of a child of the Settlor or a descendant of a deceased child of the Settlor administered pursuant to subparagraph 5.3(c) of Article V, such child (immediately and without age restriction) and such descendant upon such descendant attaining age 30 years (such child and such descendant shall be collectively hereinafter (for purposes of the remainder of this subparagraph 2.1(c)) referred to as "descendant"), shall have the power to remove any Trustee and appoint any Successor Trustee, subject to the following:

1.     Such removal and/or appointment shall be in writing, and the appointed Successor Trustee(s) may be any person (including Settlor's descendant himself or herself) or a Corporate Trustee.

2.     Such descendant shall have the power to appoint either one Trustee or Co-Trustees.

3.     Such descendant may prospectively appoint one or more Successor Trustees to serve after the death, incapacity, resignation, or discharge of any one or more prior Trustees.

4.     If such descendant appoints Co-Trustees, then upon the death, incapacity, resignation, or discharge of a Co-Trustee, the other Co-Trustee shall become the sole Trustee unless and until another Co-Trustee is appointed (or unless a different result is specified as part of the appointment), except as provided in subparagraph 2.1(c)5. below.

5.     If such descendant signs a statement waiving the right to remove a particular Trustee or Co-Trustee, then such descendant shall not have the power to remove that Trustee or Co-Trustee unless such Trustee or Co-Trustee is replaced with a Corporate Trustee. However, if that Trustee or Co-Trustee should die, become incapacitated, resign, or be discharged by a court, then such descendant shall again have the power to appoint (or not appoint) any other Trustee or Co-Trustee in its place.

6.     If upon the death, incapacity, resignation, or discharge of any Trustee and if no other Successor Trustee has been appointed by such descendant and if such descendant is deceased or incapacitated, then the Trustee provisions of subparagraph 2.1(b) above shall apply.

(d)     Subject to subparagraph 2.1(c) above, with respect to a separate trust for the primary benefit of a descendant of a deceased child of the Settlor administered pursuant to subparagraph 5.3(c) herein, the parent of such descendant who is also a descendant of the Settlor shall have the power, at any time and from time to time, to prospectively appoint any Successor Trustee(s) of such trust for the primary benefit of his or her descendants. If no Successor Trustee(s) has been appointed, then the Trustee provisions of subparagraph 2.1(b) above shall apply.

(e)     Any Trustee or Successor Trustee may resign at any time by giving written notice to that effect to the next named Successor Trustee and to the current income beneficiary (or beneficiaries) of the trust.

(f)     Any Successor Trustee shall have all the rights, powers, duties, and discretions conferred or imposed on the original Trustee. No Successor Trustee shall be obliged to examine the accounts and actions of any previous Trustee. No Trustee shall be liable for any act or omission unless the same be due to such Trustee's own default.

(g)     Any Successor Trustee shall become responsible for the trust estate only when, as and if the same shall be received by it and, in determining such estate, such Trustee shall

only be responsible to make a reasonable inquiry from the records of the prior Trustee which are available.

(h)    No Trustee or Successor Trustee shall be obliged to examine the accounts and actions of the personal representative of the Settlor's estate.  No Trustee or Successor Trustee shall be liable for any act or omission of the personal representative of the Settlor's estate.

(i)    If SABAL TRUST COMPANY or any Successor Corporate Trustee appointed under this subparagraph 2.1(i) resigns or is discharged or fails to serve as Trustee of any of the designated trusts herein created and no other Successor Trustee has been otherwise appointed under this trust agreement, then a majority of the then current income beneficiary or beneficiaries who are of legal age and the guardians of any incompetent or minor then current income beneficiary or beneficiaries shall appoint a Successor Corporate Trustee of that trust. In the event there are no current income beneficiary or beneficiaries of the trust estate, then Settlor's spouse shall be deemed to be the sole current income beneficiary for purposes of this subparagraph 2.1(i), but if she is not living or is incapacitated, then Settlor's descendants for whom a separate trust shall be funded under Article V shall be deemed to be the current income beneficiary(ies) of such trust estate. In the event the current income beneficiary or beneficiaries shall fail to designate promptly a Successor Corporate Trustee, the then acting Trustee shall apply to a court for such an appointment and for settlement of account.

(j)    The persons who have the power to appoint a Successor Corporate Trustee pursuant to subparagraph 2.1(i) above shall also have the power to remove any Corporate Trustee then serving, provided that a removed Corporate Trustee is replaced with a Successor Corporate Trustee as provided in subparagraph 2.1(i) above.

## ARTICLE III

## DUTIES AND RIGHTS DURING THE LIFETIME OF THE SETTLOR

3.1    RIGHT TO REVOKE AND AMEND THE TRUST.  The Settlor expressly reserves the right, at any time and from time to time, during Settlor's lifetime, by instrument in writing delivered to the Trustee to alter, amend, or revoke this Agreement, either in whole or in part, provided, however, that if altered or amended, the duties, powers, and responsibilities of the Trustee shall not be substantially changed without the Trustee's consent. In case of revocation, the insurance policies, securities, and property held in trust hereunder, or that part thereof as to which the Agreement may be revoked, shall be delivered by the Trustee to the Settlor or in accordance with the Settlor's written directions.

3.2    DISPOSITION OF TRUST INCOME AND PRINCIPAL DURING LIFETIME OF SETTLOR.

(a)    During the Settlor's lifetime, the Trustee shall pay to or for the benefit of the Settlor and to or for the benefit of any other person as much of the net income and/or principal as the Settlor may direct from time to time.

(b)    In the absence of direction to the contrary by the Settlor, during the lifetime of the Settlor, the Trustee is hereby authorized at any time or from time to time:

1.    To pay to or for the Settlor for Settlor's health, support and maintenance so much of the net income and/or principal of the trust estate as the Trustee determines is proper, taking into account the standard of living to which the Settlor has been accustomed.

2.    To pay to or for Settlor's spouse for her health, support, maintenance and education so much of the remaining net income and/or principal of the trust estate as the Trustee determines is proper, taking into account the standard of living to which Settlor's spouse has been accustomed and taking into consideration all other income or property available to Settlor's spouse for such purposes from all sources known to the Trustee.

3.    To pay to or on behalf of the Settlor the amount of any and all taxes caused by the sale or possession of any of the assets comprising the trust estate.

4.    To make gifts each calendar year in amounts up to the annual gift tax exclusion to or for the benefit of each of Settlor's descendants.

5.    To pay premiums on life insurance policies insuring the life of the Settlor, regardless of who or how those life insurance policies are owned.

(c)    During the Settlor's lifetime, the Settlor shall have the right to occupy as Settlor's homestead any real property which is a part of the trust estate and he shall have the exclusive and continuous present right to full use, occupancy and possession of such residence for life.  It is Settlor's intention that such Settlor's interest in such property shall constitute a "beneficial interest for life" and "equitable title to real estate" as contemplated by Florida Statutes Section 196.041(2). No provision of this trust agreement shall be construed to convert this right into intangible personal property. The Trustee shall have the power and authority to protect, conserve, sell, lease, encumber, or  otherwise manage or dispose of Settlor's homestead or any rights or interests in Settlor's homestead (including on behalf of this Trust and the Settlor individually), which power shall not be affected by the incapacity or disability of the Settlor.

ARTICLE IV

DUTIES AFTER SETTLOR'S DEATH, BUT PRIOR TO DISTRIBUTION

Upon the death of the Settlor, this trust shall become irrevocable and the Trustee shall have the following duties and shall dispose of the trust estate in the following manner:

4.1     SUMMARY DESCRIPTION OF DUTIES.  Upon the death of the Settlor, the Trustee's general duties, along with all other duties and responsibilities enumerated hereunder, are:

(a)     First, assemble the trust estate as provided in paragraph 4.2 of this Article IV.

(b)     Second, pay any part or all of the funeral expenses, legal debts, and costs of administration of the Settlor's estate, as provided in paragraph 4.3 of this Article IV.

(c)     Third, establish separate and distinct trusts as provided in Article V.

(d)     Fourth, pay any part or all of any estate, inheritance, succession, and other death taxes (including penalties thereon), which may be imposed by reason of Settlor's death and due upon Settlor's death, but only, as provided in paragraph 4.3 of this Article IV, from the portion of the trust estate that does not qualify for any marital and/or charitable deduction described in Article V.

It is Settlor's intent to provide guidance as to the order in which various duties of the Trustee shall be accomplished; however, the foregoing shall in no way limit the responsibilities and duties of the Trustee hereunder.

4.2     ASSEMBLE THE TRUST ESTATE.

(a)     The Trustee shall collect the proceeds of any life insurance policies, shall collect the proceeds of any retirement plans payable to the trust, shall receive any proceeds from the Settlor's estate and shall hold the same together with other property heretofore or hereafter added to the trust. Such proceeds and property shall constitute the trust estate.

(b)     The Trustee shall have full authority to take any action in regard to the collection of the proceeds of insurance policies that it deems best and to pay the expense thereof out of the trust estate; but the Trustee shall not be required to enter into or maintain any litigation to enforce payment of such policies until it shall have been financially protected or indemnified to its satisfaction against all expenses and liabilities to which it might in its judgment be subjected by any such action on its part. The Trustee shall have full authority to make any compromise or settlement with respect to such policies, or any of them, that it may deem expedient, and to give to the insurance companies, and each of them, all the necessary and proper releases and acquittances and full discharge of all their liabilities under such policies.

(c)     No insurance company whose policy or policies shall be deposited hereunder and who shall make payments of the proceeds thereof to the Trustee shall be required

to inquire into or take notice of any of the provisions of this Agreement or to see to the application or disposition of the proceeds of such policies, and the receipt of the Trustee to any such insurance company shall be effectual to release and discharge it for any payment so made and shall be binding upon the beneficiary of the trusts hereby created.

### 4.3    PAYMENT OF EXPENSES AND COSTS OF SETTLING SETTLOR'S ESTATE.

(a)    The Trustee, in its sole and absolute discretion, may:

1.    Pay from the trust estate, all or any part of the Settlor's legal debts, funeral expenses, and the costs of administration of Settlor's estate;

2.    Pay from the portion of the trust estate which does not qualify for the marital deduction for federal estate tax purposes (because Settlor's executor in the exercise of its discretion does not elect to have such part or all of such property treated as qualified terminable interest property or because Settlor's spouse did not survive the Settlor) all or any part of the estate, inheritance, succession and other death taxes (including penalties thereon, if any), imposed by reason of Settlor's death.  This subparagraph 4.3(a)2. shall be applicable to all such taxes payable by reason of the Settlor's death in respect to all property comprising the Settlor's gross estate for death tax purposes whether or not such property passes under this Agreement, under the Settlor's will or otherwise, except as limited in Settlor's will or hereunder.

Provided, however, no proceeds from, or interests in, any of the following shall be used for the foregoing purposes:  individual retirement account, qualified pension plan, profit sharing plan, or other qualified plan, trust, contract, account, annuity, or bond, as those plans are defined in Subchapter D of Chapter 1 of Subtitle A of the Internal Revenue Code (each of which is hereinafter referred to as a "Retirement Account").

(b)    The Trustee is further authorized to:

1.    Lend from the trust estate to the estate of the Settlor sufficient funds upon such terms as to security, rate and maturity and in other respects as the Trustee shall deem advisable to pay all or a portion of the above claims and debts (such loan need not be secured if in the Trustee's opinion it is in the best interests of the beneficiaries of this trust not to obtain security in light of the overall objectives and requirements of the beneficiaries, the Settlor and Settlor's estate); or, in the alternative;

2.    Acquire in the trust estate by purchase, exchange or otherwise, sufficient assets from the estate of the Settlor to provide the estate of the Settlor with sufficient cash to pay the above claims and debts, even though such property may not be of the character prescribed by law or by the terms of the trust instrument for the investment of other trust funds, and although acquisition of such property may result in a large percentage of the trust estate being invested in one class of property, and without liability for loss or depreciation, except for willful or gross neglect, to retain such property so acquired so long as the Trustee shall deem it advisable.

(c)    In no event shall any payments of federal estate taxes and other inheritance, succession, or death taxes (including penalties thereon, if any) be made from property which qualifies for the marital deduction.

## ARTICLE V

## DISTRIBUTION FOLLOWING THE DEATH OF THE SETTLOR

The Trustee shall hold the trust estate after the Settlor's death for the following uses and purposes:

5.1    DIVISION OF TRUST ESTATE.

(a)    If Settlor's spouse survives.  If Settlor's spouse survives the Settlor, the Trustee shall hold the entire remaining trust estate for the primary benefit of Settlor's spouse and distribute the same as provided in paragraph 5.2 herein, except as follows:

1.    Any portion of the trust estate which does not qualify for the marital deduction for federal estate tax purposes, because Settlor's executor in the exercise of its discretion does not elect to have such part or all of such property treated as qualified terminable interest property, shall be held for the primary benefit of Settlor's spouse and distributed as provided in paragraph 5.3 herein.  In such event:

A.    All values shall be those which are finally determined for federal estate tax purposes.  Elections made by Settlor's fiduciaries with respect to an alternate valuation date and with respect to taking certain deductions for income tax purposes shall apply in determining any of such values.

B.    To the extent the election to have part of such property treated as qualified terminable interest property is made by a fractional share or dollar amount, the Trustee in its sole discretion may select the assets used to fund each of the two shares.  For the purpose of division of the trust estate and funding the separate shares, the assets shall be valued at their fair market value on the date or dates of division and funding.

2.    The purpose of subparagraph 5.1(a)1. above is to allow Settlor's executor to make the decision of whether to use part or all of Settlor's remaining estate tax exclusion (applicable exclusion amount) upon Settlor's death for the purpose of keeping that portion of the trust and any appreciation of it out of Settlor's spouse's estate upon her later death, or to not use part or all of Settlor's remaining estate tax exclusion (applicable exclusion amount) upon Settlor's death for the purpose of including such part of the trust estate in Settlor's spouse's estate upon her later death and such assets possibly receiving a step-up in basis. The Trustee herein shall incur no liability for the election or non-election of treatment of property as qualified terminable interest property.

3.    If there is no federal estate tax in effect at the time of Settlor's death, then the entire trust estate shall be held for the primary benefit of Settlor's spouse as provided in paragraph 5.3 herein.

(b)    <u>If Settlor's spouse does not survive</u>. If Settlor's spouse does not survive the Settlor, the entire remaining trust estate shall be divided and distributed as provided in subparagraph 5.3(b) herein.

5.2    <u>MARITAL TRUST FOR SETTLOR'S SPOUSE</u>. The trust for the primary benefit of Settlor's spouse to be held under this paragraph 5.2 shall be distributed as follows:

(a)    <u>Income</u>. The Trustee shall pay the entire net income to Settlor's spouse annually in quarterly or more frequent installments during Settlor's spouse's lifetime and from the date of Settlor's death. The word "income" for the purposes of this subparagraph shall have the same meaning as the word "income" as used in the marital deduction estate tax provisions of the Internal Revenue Code.

(b)    <u>Principal</u>. In addition, the Trustee may also pay or apply so much of the principal, to or for the benefit of Settlor's spouse as in the sole discretion of the Trustee shall be necessary or advisable from time to time for the health, maintenance and support in reasonable comfort of said spouse.

(c)    <u>Residence</u>. If any residence is or becomes an asset of this trust, Settlor's spouse shall have the right to occupy such residence rent-free and she shall have the exclusive and continuous present right to full use, occupancy and possession of such residence for life. It is Settlor's intention that Settlor's spouse's interest in such property shall constitute a "beneficial interest for life" and "equitable title to real estate" as contemplated by Florida Statutes Section 196.041(2). The Trustee shall pay for all taxes, insurance, mortgage installments, ordinary maintenance and repair of such residence while Settlor's spouse uses it as a residence. Settlor's spouse shall pay for utilities and other living expenses while using it as a residence (but the Trustee in its discretion may pay for any of such expenses pursuant to other provisions of this paragraph 5.2). Upon the written direction of Settlor's spouse to sell such residence, the Trustee shall do so upon such terms as the Trustee deems reasonable and add the proceeds to the principal of the trust estate. Upon the written direction of Settlor's spouse, the Trustee shall purchase a replacement residence to be held upon the same terms as the original residence which was a part of the trust estate.

(d)    <u>Make productive</u>. Settlor's spouse shall at all times and in all events be permitted to require the Trustee either to make the property in this trust productive or to convert it, within a reasonable time, to productive property.

(e)    <u>Primary beneficiary</u>. The Trustee's primary concern shall be Settlor's spouse, not Settlor's descendants or any remainder beneficiaries of this trust, even if such distributions may deplete the trust estate. It is also the Settlor's intent that Settlor's spouse shall serve as sole Trustee and make such distributions for her own benefit.

(f)    No judgment creditors. Notwithstanding the foregoing, (i) in no event shall the terms "maintenance" or "support", used together or separately, ever include or be interpreted to include payments to a judgment creditor or to satisfy a judgment creditor, and (ii) in no event shall distributions of principal be made to a judgment creditor of JANICE LOGAN or used in any way, directly or indirectly, to satisfy a judgment creditor of JANICE LOGAN.

(g)    Distribution on spouse's death. Upon the death of Settlor's spouse, all income accrued or undistributed at the death of Settlor's spouse shall be added to principal. Further, the Trustee shall, unless Settlor's spouse directs otherwise in said spouse's last will and testament, pay from the principal, directly or to Settlor's spouse's personal representative, as the Trustee deems advisable, the amount by which the estate and inheritance tax as assessed by reason of the death of Settlor's spouse shall be increased as a result of the inclusion of the this trust estate in said spouse's estate for such tax purposes. Following such payments, if any, the Trustee shall divide and distribute the remaining trust fund as provided in subparagraph 5.3(b) herein.

5.3    RESIDUARY TRUST. The trust for the benefit of Settlor's spouse to be held under this paragraph 5.3 or for the benefit of Settlor's descendants shall be distributed as follows:

(a)    Payments during spouse's lifetime. During the lifetime of Settlor's spouse, the trust estate shall be held and distributed as follows for the primary benefit of Settlor's spouse:

1.    The Trustee is authorized to accumulate the net income or to pay or apply so much of the net income, and/or to pay or apply so much of the principal, to or for the benefit of Settlor's spouse during her lifetime as in the sole discretion of the Trustee shall be necessary or advisable from time to time for Settlor's spouse's health, maintenance and support in reasonable comfort. However, payments shall be made hereunder from principal to or for Settlor's spouse only after the trust estate held pursuant to paragraph 5.2 herein has been exhausted.

2.    If any residence is or becomes an asset of this trust, Settlor's spouse shall have the right to occupy such residence rent-free and she shall have the exclusive and continuous present right to full use, occupancy and possession of such residence for life. It is Settlor's intention that Settlor's spouse's interest in such property shall constitute a "beneficial interest for life" and "equitable title to real estate" as contemplated by Florida Statutes Section 196.041(2). The Trustee shall pay for all taxes, insurance, mortgage installments, ordinary maintenance and repair of such residence while Settlor's spouse uses it as a residence. Settlor's spouse shall pay for utilities and other living expenses while using it as a residence (but the Trustee in its discretion may pay for any of such expenses pursuant to other provisions of this subparagraph 5.3(a)). Upon the written direction of Settlor's spouse to sell such residence, the Trustee shall do so upon such terms as the Trustee deems reasonable and add the proceeds to the principal of the trust estate. Upon the written direction of Settlor's spouse, the Trustee shall purchase a replacement residence to be held upon the same terms as the original residence which was a part of the trust estate.

3.     After providing for Settlor's spouse, the Trustee may also in its sole discretion distribute as much of any remaining net income and/or principal during the lifetime of Settlor's spouse to or for the benefit of Settlor's descendants for their health, maintenance and support as determined by the Trustee in its sole discretion.

A.     However, no such distribution shall be made for the purpose of or which would have the effect of discharging any legal obligation which the Trustee may have outside of its capacity as Trustee, including the obligation of support, or which the person who has the power to remove and appoint the Trustee may have.

B.     Settlor's descendants shall have no right to any distributions under this subparagraph 5.3(a)3. and may not demand or require any distributions. Furthermore, Settlor's spouse may veto any such distribution.

4.     The Trustee's primary concern shall be Settlor's spouse, not Settlor's descendants or any remainder beneficiaries of this trust, even if such distributions may deplete the trust estate. It is also the Settlor's intent that Settlor's spouse shall serve as the Trustee and make such distributions for her own benefit.

5.     Notwithstanding the foregoing, (i) in no event shall the terms "maintenance" or "support", used together or separately, ever include or be interpreted to include payments to a judgment creditor or to satisfy a judgment creditor, and (ii) in no event shall distributions of principal be made to a judgment creditor of JANICE LOGAN or Settlor's descendants or used in any way, directly or indirectly, to satisfy a judgment creditor of JANICE LOGAN or Settlor's descendants.

(b)     Division and distribution at spouse's death. Upon the death of Settlor's spouse, or upon Settlor's death if Settlor's spouse should predecease the Settlor, the Trustee shall divide and distribute the remaining trust estate (including undistributed income, if any, and including any amounts added hereto from the trust for Settlor's spouse administered pursuant to paragraph 5.2 herein) as follows (after the payment of any estate taxes and costs of administration):

1.     The Trustee shall distribute the trust estate to or for the benefit of any one or more persons (including individuals and entities), in such amounts or portions and in such lawful interests or estates, whether absolute or in trust, as Settlor's spouse may appoint by specific reference to this power in said spouse's last will and testament, except not to Settlor's spouse, not to her estate, not to her creditors, and not to the creditors of her estate.

2.     If the foregoing limited power of appointment is for any reason not validly exercised in whole or in part by Settlor's spouse, the remaining trust estate, to the extent not validly appointed, shall be distributed as follows:

A.      The Trustee shall allocate an amount equal to ten percent (10%) of the net consideration (including cash and other forms of consideration) received by the Settlor or this trust from the liquidation or the sale of shares of stock of Smart Communications Holding, Inc., a Florida corporation (or its successor) (the "Corporation"), held by the Settlor or this trust (whether such liquidation or sale occurs during the lifetime of Settlor or after his death), to a separate trust for the primary benefit of ALEXIS LOGAN, if she survives the Settlor, to be administered as provided in subparagraph 5.3(c) of this Article V. The term "net consideration" as provided for in this subparagraph 5.3(b)2.A. shall **not** be net of taxes (income or otherwise), but shall be net of debt, expenses of sale, and other expenses properly charged against such proceeds and is meant to provide for an amount equal to ten percent (10%) of the amount received by Settlor or this trust pursuant to the liquidation or sale of his/its stock of the Corporation. In the event ALEXIS LOGAN does not survive the Settlor, then such gift shall lapse, to be distributed as provided under the remaining provisions of this Article V. No estate taxes or expenses of administration shall be paid from or charged to such gift under this subparagraph 5.3(b)2.A.

B.      The Trustee shall allocate any interest which may be held by or come into the trust estate in LOCO FLORIDA, LLC, a Florida limited liability company, to a separate trust for the primary benefit of JON LOGAN, if he survives the Settlor, to be administered as provided in subparagraph 5.3(c) of this Article V.  In the event JON LOGAN does not survive the Settlor, then such gift shall lapse, to be distributed as provided under the remaining provisions of this Article V.  No estate taxes or expenses of administration shall be paid from or charged to such gift under this subparagraph 5.3(b)2.B.

C.      The Trustee shall divide the remaining trust estate (after the gifts provided for under subparagraph 5.3(b)2.A. and 5.3(b)2.B. above (if any)) into shares of equal value, creating one such share for each child of the Settlor who is then living, and creating one such share for the descendants, collectively, of each deceased child of the Settlor who leaves one or more descendants living at the time of division.

(i)      A share created for a child of the Settlor shall be held as a separate trust for the primary benefit of such child of the Settlor for distribution as provided in subparagraph 5.3(c) of this Article V.

(ii)      A share created for the descendants, collectively, of a deceased child of the Settlor shall be divided into shares for such descendants on a per stirpes basis. Any such share for a descendant of a deceased child of the Settlor shall be held as a separate trust for the primary benefit of such descendant for distribution as provided in subparagraph 5.3(c) of this Article V.

(c)      <u>Trust provisions for descendants</u>. Upon the creation of a separate trust for the primary benefit of a descendant of the Settlor (any one of whom shall be referred to in this subparagraph 5.3(c) as the "Primary Beneficiary") such trust estate, including his or her beneficial interest in a Retirement Account, shall be distributed as follows:

1.      Notwithstanding anything to the contrary in this subparagraph 5.3(c), upon the creation of a separate trust for the primary benefit of the Primary Beneficiary, if any Retirement Account or portion of a Retirement Account becomes payable to this separate trust for such Primary Beneficiary, the following shall apply:

A.      If such Primary Beneficiary is an "eligible designated beneficiary" within the meaning of Section 401(a)(9)(E)(ii) of the Internal Revenue Code (such that distributions from such Retirement Account to such Primary Beneficiary can be made over the remaining life expectancy of such Primary Beneficiary), then for as long as such Primary Beneficiary remains an "eligible designated beneficiary," the Trustee shall elect to receive or shall withdraw from such Retirement Account the following: (i) the minimum required distribution as is necessary in order to satisfy the requirements of Section 401(a)(9) of the Internal Revenue Code and Regulations issued thereunder, and (ii) such additional amount or amounts as the Trustee determines, in its sole discretion, that it needs to satisfy the remaining distribution provisions of this subparagraph 5.3(c). The Trustee shall pay to or for the benefit of such Primary Beneficiary the entire amount withdrawn by the Trustee each year from Retirement Accounts payable to this separate trust. These payments may be made annually or periodically during the year.

B.      If such Primary Beneficiary is not (or no longer qualifies as) an "eligible designated beneficiary" within the meaning of Section 401(a)(9)(E)(ii) of the Internal Revenue Code, then the Trustee shall elect to receive or shall withdraw from such Retirement Account only such amount or amounts as the Trustee determines, in its sole discretion, that it needs either to satisfy the remaining distribution provisions of this subparagraph 5.3(c) or that it deems advisable to withdraw for tax planning and other purposes; provided, however, that each such Retirement Account payable to this separate trust for such Primary Beneficiary who is not (or no longer qualifies as) an "eligible designated beneficiary" shall, in all cases, be fully distributed to the Trustee within the time period required by Section 401(a)(9) of the Internal Revenue Code and Regulations issued thereunder. Upon the Trustee's receipt of a distribution from a Retirement Account pursuant to this subparagraph 5.3(c)1.B., the Trustee is authorized either (i) to pay or apply such distribution to or for the benefit of such Primary Beneficiary or (ii) to retain such distribution as part of such Primary Beneficiary's trust estate for potential future distribution.

2.      During the lifetime of such Primary Beneficiary, the Trustee may pay or apply so much of the net income and/or principal, in excess of the minimum required distribution from a Retirement Account as provided in subparagraph 5.3(c)1. above, to or for the benefit of such Primary Beneficiary as in the sole discretion of the Trustee shall be appropriate or advisable from time to time for the health, education, maintenance and support in reasonable comfort of such Primary Beneficiary.

3.      In addition, the Trustee may distribute any remaining net income and/or principal (other than distributions from a Retirement Account) to or for the benefit of the Primary Beneficiary's descendants for their health, education, maintenance and support.

A.    Provided that no such distribution shall be made if objected to by the Primary Beneficiary.

B.    No such distributions shall be made for the purpose of or which would have the effect of discharging any legal obligation, including the obligation of support, which the Trustee may have outside of its capacity as Trustee or which the person who has the power to remove and appoint the Trustee may have.

4.    If any residence is or becomes an asset of the trust estate, such Primary Beneficiary of the Settlor shall have the right to occupy such residence rent-free and he or she shall have the exclusive and continuous present right to full use, occupancy and possession of such residence for life. It is Settlor's intention that such Primary Beneficiary's interest in such property shall constitute a "beneficial interest for life" and "equitable title to real estate" as contemplated by Florida Statutes Section 196.041(2). The Trustee shall pay for all taxes, insurance, mortgage installments, ordinary maintenance and repair of such residence while such Primary Beneficiary uses it as a residence. Such Primary Beneficiary shall pay for utilities and other living expenses while using it as a residence (but the Trustee in its discretion may pay for any of such expenses pursuant to other provisions of this subparagraph 5.3(c)). Upon the written direction of such Primary Beneficiary to sell such residence, the Trustee shall do so upon such terms as the Trustee deems reasonable and add the proceeds to the principal of the trust estate. Upon the written direction of such Primary Beneficiary, the Trustee shall purchase a replacement residence to be held upon the same terms as the original residence which was a part of the trust estate.

5.    To help in making its determination for any discretionary distributions (whether to the Primary Beneficiary or the Primary Beneficiary's descendants), the Trustee may consider such circumstances and factors the Trustee believes are relevant, including but not limited to the other income and assets known to the Trustee to be available to such beneficiary for such purposes (including any distributions from a Retirement Account pursuant to subparagraph 5.3(c)1. above) and the advisability of supplementing such other income or assets, the tax consequences of any such distribution, the character and habits of such beneficiary, the diligence, progress and aptitude of such beneficiary in acquiring an education, the ability of such beneficiary to handle money usefully and prudently and to assume the responsibilities of adult life and self-support.

6.    The Trustee's primary concern shall be the Primary Beneficiary, not the Primary Beneficiary's children or any residual beneficiaries of this trust, even if such distributions may deplete the trust estate. It is also the Settlor's intent that the Primary Beneficiary shall be able to serve as the sole Trustee immediately in the event the Primary Beneficiary is a child of the Settlor, or after attaining age 30 years if the Primary Beneficiary is a descendant of a deceased child of the Settlor, and as such be able to make such distributions for his or her own benefit.

7.      Notwithstanding the foregoing, (i) in no event shall the terms "maintenance" or "support", used together or separately, ever include or be interpreted to include payments to a judgment creditor or to satisfy a judgment creditor, and (ii) in no event shall any distributions be made to satisfy a judgment creditor of the Primary Beneficiary or any members of his or her family.

8.      Upon the death of the Primary Beneficiary, the Trustee shall divide and distribute the Primary Beneficiary's remaining trust fund as follows:

A.      The Trustee shall distribute any portion of such trust fund that would be subject to the generation skipping tax (if not for this subparagraph 5.3(c)8.A.) as a result of the death of such Primary Beneficiary, in such proportions and in such a manner, outright or in trust or otherwise, to or for the benefit of any one or more of such Primary Beneficiary's creditors or the creditors of such Primary Beneficiary's estate, as such Primary Beneficiary may appoint by specific reference to this general power of appointment in his or her Will admitted to probate.

B.      If such Primary Beneficiary dies after attaining age 30 years, then any portion of such trust fund over which such Primary Beneficiary does not either have or effectively exercise the foregoing general power of appointment shall be distributed in such proportions and in such a manner, outright or in trust or otherwise, to or for the benefit of such one or more persons (including individuals and entities) as such Primary Beneficiary may appoint by specific reference to this limited power of appointment in his or her Will admitted to probate, except not to the Primary Beneficiary himself or herself, not to his or her estate, not to his or her creditors, and not to the creditors of his or her estate.

C.      If such Primary Beneficiary dies prior to attaining age 30 years, then any portion of such trust fund over which such Primary Beneficiary does not either have or effectively exercise the foregoing general power of appointment shall be distributed in such proportions and in such a manner, outright or in trust or otherwise, to or for the benefit of any one or more of such Primary Beneficiary's descendants as such Primary Beneficiary may appoint by specific reference to this limited power of appointment in his or her Will admitted to probate, except not to the Primary Beneficiary himself or herself, not to his or her estate, not to his or her creditors, and not to the creditors of his or her estate.

D.      Any portion of such Primary Beneficiary's trust fund over which he or she does not effectively exercise the foregoing general or limited powers of appointment, shall be divided on a per stirpes basis among his or her descendants and each such share shall be held as a separate trust and distributed as provided in this subparagraph 5.3(c), but if the Primary Beneficiary has no living descendants, then it shall be divided on a per stirpes basis among the descendants of the Primary Beneficiary's nearest ancestor who is a descendant of the Settlor and who has living descendants and each such share shall be held as a separate trust and

distributed as provided in this subparagraph 5.3(c), and if no such beneficiaries exist, then it shall be divided and distributed as provided in subparagraph 5.3(b)2.B. of this Article V.

9.    Notwithstanding any other provision herein, each and every separate trust created herein shall terminate one day prior to end of the statutory time period, set forth in the applicable rule against perpetuities, after the death of the Settlor, and the remainder of each such trust fund shall be distributed to the Primary Beneficiary who is eligible to receive distributions at such time from such trust fund.  It is Settlor's intent that no trust or trust share herein created, or attempted to be created, shall fail, in whole or in part, by reason of the rule against perpetuities.  Therefore:

A.    Each and every power granted herein is severable one from the other; each and every trust or trust share is severable from the other; and all powers granted to each trust or trust share are severable powers granted as to any other trust.

B.    If any provision or power herein would cause a violation of the rule against perpetuities, the Trustee shall terminate or modify such provision or power, at the latest day possible, so as to avoid a violation of the rule against perpetuities.

5.4    FINAL TAKERS.  In the event that none of Settlor's descendants survive to the time the trust estate is to vest, then at the death of the last of them and Settlor's spouse and the Settlor, but subject to any powers of appointment granted herein, the then remaining trust estate shall be distributed 50% to Settlor's heirs at law and 50% to Settlor's spouse's heirs at law, determined under the laws of the state of Florida as if both the Settlor and Settlor's spouse died at such time. Provided that if any such beneficiary has not attained age 21 years at the time such distribution is to be made, then the Trustee shall make such distribution to a custodian (chosen by the Trustee in its sole discretion) for such beneficiary under a Uniform Transfers to Minors Act to be held until such beneficiary attains age 25 years, if possible

5.5    S CORPORATION STOCK.

(a)    Notwithstanding any other provision in this Article V to the contrary,

(i)    if this Trust holds S corporation stock one (1) day less than two (2) years after such stock is distributed to this Trust by the Settlor's estate;

(ii)    if this Trust held S corporation stock at the time of the Settlor's death and still holds such stock one (1) day less than two (2) years after the Settlor's death;

(iii)    if this Trust receives or acquires S corporation stock from any other source; or

(iv)    if this Trust holds stock of a corporation and the shareholders of such corporation and the Trustee desire to elect S corporation status,

then at such time, the Trustee may elect treatment as an "Electing Small Business Trust" under Section 1361 of the Internal Revenue Code or may allocate such S corporation stock to one or more separate and distinct Qualified Subchapter S Trusts (each hereinafter referred to as a "QSST") to be held, managed and distributed as follows:

(b)    Each QSST shall comply with all of the following requirements:

1.    As to any trust created for more than one current income beneficiary, the Trustee shall allocate the S corporation stock equally to separate and distinct trusts, one trust for each such current income beneficiary.

2.    The Trustee shall pay the entire net income of such separate trust, at least quarter-annually, to such current income beneficiary and any distributions of principal shall be made only to such current income beneficiary of each such trust to the exclusion of all others. The Trustee shall also distribute to such current income beneficiary an amount of principal equal to (A) any and all taxes which such current income beneficiary may be subject to as a result of being a beneficiary of such trust, in excess of (B) the income of such trust distributed to such current income beneficiary.

3.    If any such trust should terminate for any reason during the lifetime of the current income beneficiary, the Trustee shall distribute all of the assets of such separate trust to such beneficiary.

4.    Upon the death of a beneficiary of a QSST and if the QSST holds S corporation stock at such time, the descent and distribution of the assets of such trust shall be pursuant to the provisions of this Trust other than this paragraph 5.5, and if such stock is to be held in trust, then such stock shall be held in one or more QSSTs pursuant to the terms of this paragraph 5.5.

5.    Upon the death of a current income beneficiary of a QSST and if the QSST no longer holds S corporation stock at such time, this paragraph 5.5 shall no longer apply to such trust; instead, the remaining provisions of this Trust shall apply to such trust.

(c)    Except as hereinabove modified, the terms of the separate trust other than this paragraph 5.5 shall apply to each QSST.

(d)    The term "S corporation" shall mean a corporation which is an electing small business corporation within the meaning of Section 1361 of the Internal Revenue Code.

ARTICLE VI

## LIMITATIONS ON BENEFITS AND ALLOCATIONS OF ASSETS

6.1     GIFTS DURING LIFETIME.  Any gifts of real or personal property, tangible or intangible, which the Settlor may make during Settlor's lifetime, if any, before or after the execution of this Trust Agreement, to any person or persons, shall not be deemed to be an advancement or a satisfaction to be applied to any share of any beneficiary of this trust, and shall not be taken into account in connection with this trust.

## ARTICLE VII

## INVESTMENT AND ADMINISTRATIVE POWERS

7.1     RIGHTS RESERVED TO SETTLOR.

(a)     During the lifetime of the Settlor, the Settlor reserves the right to elect, at any time and from time to time, to advise the Trustee and to direct the Trustee as to any investments the Settlor deems advisable for the Trustee to purchase or sell.  Should the Settlor elect to exercise Settlor's right to advise or direct the Trustee to purchase or to sell any investment, Settlor shall do so in writing; or, if that is not practical, Settlor shall, as soon thereafter as is practical, approve of such purchase or sale in writing, as requested or required by the Trustee.  The Trustee is hereby specifically relieved of all liability for loss which may be occasioned by the purchase or sale of any asset of the trust estate when it has been directed or advised to make such purchase or sale by the Settlor, except for willful default or gross neglect.

(b)     During Settlor's lifetime, the Co-Trustees, or either of them acting alone, shall have all rights and powers granted Trustees under the laws of Florida, and the Settlor shall not be governed by fiduciary standards in the investment, management or operation of the trust estate.  Further, the Co-Trustees, or either of them acting alone, may borrow funds and pledge, sell and/or mortgage trust assets (including real property) for whatever purpose.

(c)     During Settlor's lifetime, the Co-Trustees, or either of them acting alone, shall not be limited to the type and character of investments in which it may invest funds of this trust and such investments may include, but not be limited to, margin accounts, options and commodity accounts.

(d)     Anything contained in this Agreement to the contrary notwithstanding, during Settlor's lifetime, the Co-Trustees, or either of them acting alone, shall have (i) signature authority over a bank account, money market account, brokerage account, mutual fund, or other account at a financial institution, with the right to add to such account, withdraw from such account and/or to manage the investments of such account including to buy or sell securities within such account, and (ii) the power to sign as Trustee any deeds, partnership documents, notes, checks, negotiable instruments, and any other documents required to buy, sell, transfer or convey trust assets and any other commercial paper for or on account of the Trust created by this Agreement. Any individual or other entity is hereby relieved of any and all liability for accepting the signature of either one of the Co-Trustees serving hereunder.

(e)     The Settlor in the capacity as Trustee may borrow funds, guarantee any debt (including debt of the Settlor and/or debt of third parties that the Settlor wants to guarantee for any reason) and pledge, encumber, mortgage and/or sell trust assets (including real property) for any purpose, including, but not limited to securing debt and guaranteeing debt of the Settlor and/or

7-1

third parties. Any such debt or guarantee entered into by the Settlor as Trustee shall continue to be an obligation of this trust even after the Settlor is no longer serving as Trustee.

(f)     The Settlor as Trustee may appoint one or more other persons who are not trustees to have signature authority over a bank account, money market account, brokerage account, mutual fund, or other account at a financial institution, with the right to add to such account, withdraw from such account and/or to manage the investments of such account including to buy or sell securities within such account.

7.2     INVESTMENT POWERS. Except as otherwise provided in this Agreement, and except as would disqualify any marital deduction, the Trustee shall have the following general powers, in addition to and not by way of limitation of the powers provided by law, said powers to be exercised in the Trustee's discretion, provided that the Trustee other than the Settlor uses reasonable prudence and judgment in the exercise of such discretion:

(a)     To make distribution of the trust estate or of the principal of any trust created hereunder in kind and to cause any share to be composed of cash, property or undivided fractional shares in property different in kind from any other share.

(b)     To invest any part or all of the principal of the trust estate in any mutual fund or funds (including proprietary mutual funds), any of which mutual funds may be established and operated by and under the control of the Trustee (or its affiliates, if not prohibited by law).

(c)     For convenience of administration or investment, the Trustee may hold separate trusts created hereunder as a common fund, dividing the income proportionately among such trusts, assigning undivided interests to such trusts and making joint investments of the funds belonging in such trusts. The Trustee may consolidate any separate trust with any other trust with similar provisions for the same beneficiary or beneficiaries, which consolidation would not result in any alteration of the time for vesting of such interests in such beneficiary or beneficiaries due to the operation of the rule against perpetuities.

(d)     The Trustee shall have the right and authority to make all elections, decisions, payments and distributions hereunder consistent with minimizing the impact of estate and income taxes upon Settlor's estate or this trust.

(e)     In making all such elections, decisions, payments and distributions hereunder, the Trustee is directed not to make adjustments between income or principal or between property interests passing to beneficiaries hereunder which may be substantially affected as a result of any elections under this Article unless such adjustments are necessary to prevent a loss of, or decrease in, the marital or charitable deduction, if any, otherwise allowable in determining Settlor's federal estate tax. The Trustee shall be exonerated from all liability for any such election(s) and

no beneficiary shall have any claim against the Trustee by reason of the exercise of the Trustee's judgment in this respect.

(f)    The Trustee may borrow funds from any source (including the Trustee in its non-fiduciary capacity), guarantee any debt (including debt of the Settlor and/or debt of any entity in which Settlor had a direct or indirect ownership interest) and pledge, encumber, mortgage and/or sell trust assets (including real property) for any purpose the Trustee deems advisable, including, but not limited to securing debt and guaranteeing debt of the Settlor and/or any entity in which Settlor had a direct or indirect ownership interest.

7.3    <u>DIGITAL ASSETS</u>.  The Trustee shall have full power and authority, at any time or times, (i) to access, use, and control Settlor's digital devices, including but not limited to, desktops, laptops, tablets, peripherals, storage devices, mobile telephones, smart phones, and any similar devices, which currently exist or may exist as technology develops, for the purposes of accessing, modifying, deleting, controlling, or transferring Settlor's digital assets (as defined below), (ii) to access, modify, delete, control, and transfer Settlor's digital assets, and (iii) to obtain, access, modify, delete, and control Settlor's passwords and other electronic credentials associated with Settlor's digital devices (as described above) and digital assets. "Digital assets" shall include, but not be limited to, emails received, email accounts, digital music, digital photographs, digital videos, software licenses, social network accounts, file sharing accounts, web hosting accounts, tax preparation services accounts, online stores, affiliate programs, other online accounts, and similar digital items which currently exist or may exist as technology develops.

7.4    <u>GENERATION SKIPPING TAX PROVISIONS</u>.

(a)    If a trust hereunder would be partially exempt from generation-skipping tax by reason of an allocation of generation-skipping tax exemption to it, before the allocation, the Trustee, in its discretion, may divide the trust into two separate trusts of equal or unequal value, to permit allocation of the exemption solely to one trust which will be entirely exempt from generation-skipping tax.  Such division shall be done in such a manner as required under federal tax law so that each separate trust is recognized for generation skipping tax purposes.

(b)    If a trust hereunder is partially exempt from generation-skipping tax, the Trustee, in its discretion, may divide the trust into two separate trusts of equal or unequal value, so that one such trust is entirely exempt from generation-skipping tax and the other such trust is entirely subject to generation-skipping tax.  Such division shall be done in such a manner as required under federal tax law so that each separate trust is recognized for generation skipping tax purposes.

(c)    In addition, if a trust hereunder is entirely exempt or nonexempt from generation-skipping tax and adding property to the trust would partially subject it to generation-skipping tax, or if a trust hereunder is entirely non-exempt from generation-skipping tax and

adding property to the trust would partially exempt it from generation-skipping tax, the Trustee, in its discretion, may hold that property as a separate trust in lieu of making the addition.

(d)    Except as otherwise provided in this Trust Agreement, such two trusts (whether divided as provided in subparagraphs (a) or (b) above or additions held as a separate trust as provided in subparagraph (c) above) shall have the same terms and conditions, but the Trustee shall not make discretionary distributions from the income or principal of the exempt trust to beneficiaries who are nonskip persons so long as readily marketable  assets remain in the nonexempt trust.

(e)    If there are two or more trusts known to the Trustee for the same beneficiary who is a skip person, whether or not such trusts are all created under this trust agreement, and if one or more of such trusts has an inclusion ratio of zero and if one or more of such trusts has an inclusion ratio of greater than zero, then to the extent possible, distributions to skip persons shall be first made from the trust or trusts with an inclusion ratio of zero and distributions to nonskip persons shall be first made from the trust or trusts with an inclusion ratio of greater than zero.

(f)    Upon division or distribution of an exempt trust and a nonexempt trust held hereunder, the Trustee, in its discretion may allocate property from the exempt trust first to a share from which a generation-skipping transfer is more likely to occur.

(g)    The terms "skip person", "nonskip person", "generation-skipping tax exemption" shall have the same meaning as such words or phrases have in Chapter 26 of the Internal Revenue Code.

7.5    <u>ALLOCATION OF PRINCIPAL AND INCOME</u>.  In matters of allocation and accounting of principal, income, expenses, receipts and disbursements, the Trustee other than the Settlor shall be governed by Florida Statutes 738, "Principal and Income", or its successor statute, as the same may from time to time exist, except as otherwise provided in this Agreement, provided, however:

(a)    The Trustee shall have the option of charging all or any portion of the expenses incurred in connection with the settlement of Settlor's estate against either income or principal of the trust estate;

(b)    The Trustee may allocate within the meaning of Treas. Reg. §1.643(a)-3(b) to income or to principal, or partly to income and partly to principal, all or part of the realized gains from the sale or exchange of trust assets; provided, however, that, if income is defined under an applicable state statute as a unitrust amount and the trust is being administered pursuant to such statute, the allocation of gains to income must be exercised consistently and the amount so allocated may not be greater than the excess of the unitrust amount over the amount of distributable net income determined without regard to Treas. Reg. §1.643(a)-3(b);

7-4

      (c)     The Trustee, in its discretion, may exercise the power to adjust between principal and income, notwithstanding the fact that the trust assets may not be a prudent investment, but otherwise shall exercise such power in accordance with Florida Statutes 738.104;

      (d)     In no event shall any allocation or accounting decision made by the Trustee in regard to the Marital Trust be contrary to the provisions of the Marital Trust or be contrary to the definition of "income" contained therein or be made in such a manner as to at any time disqualify for federal income tax purposes any trust established herein which qualifies for the marital deduction; and

      (e)     (i) In the event the Settlor's estate is not required to file a Federal Estate Tax Return (Form 706), or (ii) in the event a Federal Estate Tax Return (Form 706) is filed for Settlor's estate, but no estate tax is due pursuant to such return (without taking into account the benefit of the charitable deduction for Federal income tax purposes), then any gift(s) made under the terms of this Agreement to a qualified charitable organization described in Section 2055(a) and Section 170(c) of the Internal Revenue Code, which is exempt from taxation under Section 501(a) of the Code, shall first be made by the Trustee (to the extent possible) from the income of the trust estate, and then (after exhausting all such income) any remaining such gift(s) shall be made from the principal of the trust estate.

     7.6    <u>EXONERATION</u>. No individual (as distinguished from a bank or trust company) acting as a Trustee hereunder shall, whether or not named herein, be held liable for any error of judgment or mistake of fact or law, or for any loss resulting by reason of the purchase or retention in good faith of any property as part of the trust estate, or for any loss resulting from any act done or omitted to be done in good faith, or for any act or neglect on the part of any agent or attorney employed by him or her, or for anything other than his or her own fraud or wrongful misconduct.

     7.7    <u>BUSINESS PROVISIONS</u>. Except as otherwise provided in this Agreement, and subject to such standards of reasonableness and prudence as are appropriate at the time, if any ownership interests in any non-public corporations, limited liability companies, partnerships, joint ventures, proprietorships, or business interests (herein called "business") are or become a part of the trust estate, the Successor Trustee shall have the following powers and authority, without limitation by reason of specification, and in addition to powers conferred by law, all of which may be exercised with respect to every such business, whether a corporation, a limited liability company, a partnership, a joint venture, or a sole proprietorship:

      (a)     To retain and continue to operate the business for such period as the Trustee may deem advisable.

      (b)     To control, direct, and manage the business. In this connection, the Trustee, in its sole discretion, shall determine the manner and extent of its active participation in the

7-5

operation of the business, and the Trustee may delegate all or any part of its power to supervise and operate the business to such person or persons as it may select, including any associate, partner, officer, or employee of the business.

(c)     To hire and discharge directors, officers, and employees and to fix their compensation and define their duties; and, similarly, to employ, compensate, and discharge agents, attorneys, consultants, accountants, and such other representatives as the Trustee may deem appropriate.

(d)     To organize a corporation, limited liability company, or other entity under the laws of this or any other state or country and to transfer thereto all or any part of the business or other property held in the trust estate, and to receive in exchange therefor such stocks, bonds, and other securities as the Trustee may deem advisable.

(e)     To take any action required to convert any corporation into a limited liability company, partnership, or sole proprietorship.

(f)     To treat the business as an entity, separate from the trust estate.  In its accountings to the court and to any beneficiaries, as elsewhere provided herein, the Trustee shall only be required to report the earnings and conditions of the business in accordance with standard corporate accounting practice.

(g)     To sell or liquidate all or any part of any business at such time and price and upon such terms and conditions (including credit) as the Trustee may determine.

(h)     To exercise any of the rights and powers herein conferred in conjunction with another or others.

(i)     To diminish, enlarge, or change the scope or nature of any business.

(j)     To guarantee debt(s) of such business.

# ARTICLE VIII

## GENERAL PROVISIONS AND DEFINITIONS

8.1    ADDITIONS TO CORPUS.  The Settlor or any other person with the consent of the Trustee may add to the principal of the trust created herein by deed or will or otherwise.  Such additions shall be covered by the provisions hereof, the same as if originally included herein.

8.2    LAWS GOVERNING.  This Agreement shall be construed and regulated in all respects by the laws of the State of Florida, subject to the following:

(a)    The Settlor recognizes that the place or jurisdiction of the administration of any trust hereunder may be changed if a Trustee outside of the state of Florida is appointed as the Trustee.  In addition, the Trustee is granted the authority to move the administration of any trust hereunder to any jurisdiction in the world.

(b)    If the administration of any trust hereunder is moved to another jurisdiction, then the Trustee shall also have the authority to change, by written declaration, the law applicable to such trust hereunder to be that of the jurisdiction to which the administration of such trust has been changed, and in such event, this Agreement and the rights of all persons affected by such trust  shall be construed and regulated in all respects exclusively by the laws of such jurisdiction and the courts in such jurisdiction.

(c)    In conjunction with the Trustee's authority to change the jurisdiction of the administration of any trust hereunder and the laws regulating such trust, the Trustee shall also have the authority to modify or amend this Agreement as shall be necessary or desirable to ensure the continued validity and effect of any trust hereunder pursuant to the law of such other jurisdiction, but any such modification or amendment shall not change the basic provisions hereunder or intent of the Settlor.

8.3    INTERPRETATION AND CONSTRUCTION.    All duties, rights, powers and discretions, whether or not absolute, granted any Trustee other than the Settlor hereunder shall be exercised by the Trustee other than the Settlor in its fiduciary capacity and the Trustee other than the Settlor shall be governed by fiduciary standards.

8.4    DISABILITY.  In case the income or any discretionary payment of principal from the Residuary Trust, as created hereunder, or any share thereof, becomes payable to a minor, or to a person under legal disability, or to a person not adjudicated incompetent, but who, by reason of illness or mental or physical disability, is, in the opinion of the Trustee, unable to administer properly such amount, then, such amounts shall be paid out by the Trustee in such of the following ways as it deems best:  (i) directly to such beneficiary; (ii) to the legally appointed guardian or conservator of such beneficiary; (iii) to a custodian (chosen by the Trustee in its sole discretion) under a Uniform Transfers to Minors Act to be held until age 25 years, if possible; (iv) to some

relative or friend for the care and support, and education of such beneficiary; (v) by the Trustee, using such amounts directly for such beneficiary's care, support and education.

8.5    SMALL TRUST TERMINATION.  In the event a separate and distinct trust created hereunder for the benefit of a child of the Settlor or a descendant of a deceased child of the Settlor shall at any time be comprised of assets which, in the aggregate, are valued at less than $200,000.00 (increased by the relative increase in the Consumer Price Index for Urban Consumers from January 2021 to January of the year in which such value is being determined), then, the Trustee may, in its sole discretion, terminate such trust and distribute the trust property to the beneficiary of such trust, if such beneficiary has attained age 21 years, or to a custodian under the Florida Uniform Transfers to Minors Act (chosen by the Trustee in its sole discretion) if such beneficiary has not attained age 21 years to last until such beneficiary attains age 25 years, if possible.

8.6    DONEE'S WILL.  In disposing of any trust property subject to a power of appointment by will, the Trustee may rely upon an instrument admitted to probate in any jurisdiction as the last will of the donee of such power of appointment, but if it has no written notice of the existence of such will within a period of three (3) months after his or her death, it may be presumed that the donee of such power of appointment died intestate and the Trustee shall be protected in acting in accordance with such presumption.

8.7    SPENDTHRIFT PROVISION. No beneficial interest herein or in any separate trust or any separate shares created herein, including beneficial interests in income and/or principal, shall be (i) subject to anticipation, assignment, charge, disposition, encumbrance, pledge, sale, transfer in any manner, or (ii) liable for or subject to any contracts, debts, liabilities or obligations of any beneficiary.  Any attempted anticipation, assignment, charge, disposition, encumbrance, pledge, sale, transfer in any manner of either the income or principal of this trust or any separate trust or any separate shares created herein, by any beneficiary hereunder, shall be void and not have any validity or legal effect or be in any way recognized by the Trustee. No beneficial interest and no income or principal receivable by any beneficiary or payable on any beneficiary's behalf shall be subject to any legal process for the payment of any beneficiary's debts or in anyway be liable to any claim of any creditor of any beneficiary.

8.8    ESTABLISHMENT OF SEPARATE TRUSTS.  Despite the delay in determining the exact nature and amounts of the assets allocable to any separate trust created hereunder upon the death of any person (including, but not limited to the Settlor and Settlor's spouse) or any other event, each such trust shall be fully effective as of the moment of such person's death or such other event.  Each separate trust created hereunder shall share, on a pro rata basis, income earned by the trust from which the allocation of assets is to be made from the moment of the event creating such separate trust until the funding of such separate trust.

8.9    <u>COMPENSATION AND ACCOUNTING.</u>

(a)    The Trustee shall be entitled to receive a fair and just compensation for its services hereunder and shall also be reimbursed for all reasonable expenses incurred in the management and protection of the trust estate.  In no event shall a Trustee charge a termination fee or distribution fee in excess of its reasonable costs.

(b)    The Trustee shall render to the beneficiary or beneficiaries then entitled to the income from the trust (and any other beneficiaries entitled to an accounting under applicable law from time to time) statements of account of its receipts and disbursements as Trustee hereunder at least annually.  Provided, however, during the lifetime of the Settlor and while the Settlor is not incapacitated, the Trustee shall not disclose any information concerning this trust, or its terms, operation or assets to any beneficiary other than the Settlor unless the Settlor consents thereto in writing.

8.10    <u>MERGER OR COMBINATION OF TRUSTS</u>.  The Trustee shall have the power to merge or combine any separate trust created herein with any other separate trust created herein or with any other trust created by the Settlor or any other person, if the terms of the trusts are substantially the same and the trustees are the same, except that such combination or merger shall not be made if the result would change the inclusion ratio of either trust with respect to the generation-skipping tax.

8.11    <u>CONSTRUCTION</u>.  The paragraph headings used are for convenience only and shall not be resorted to for interpretation of this Agreement.  Wherever the context so requires, the masculine shall include the feminine and neuter and the singular shall include the plural.  If any portion of this Agreement is held to be void or unenforceable, the balance of the Agreement shall nevertheless be carried into effect.

8.12    <u>PRESERVATION OF MARITAL DEDUCTION</u>.    Notwithstanding anything herein contained to the contrary, any power, duty or discretionary authority granted to the Trustee under any provision of this trust shall be absolutely void to the extent that either the right to exercise or the exercise thereof shall in any way affect, jeopardize or cause Settlor's estate and this trust to lose all or any part of the tax benefit afforded by the marital deduction under either federal or state laws.  It is recognized that the Trustee has no obligation with respect to any election to have property treated as qualified terminable interest property and therefore, the Trustee shall neither be required to oppose nor to consent to such election or non-election as such right is reserved solely to Settlor's personal representative.  Further, the Trustee shall incur no liability for the election or non-election of treatment of property as qualified terminable interest property.

8.13    <u>DEFINITIONS.</u>

(a)    Adopted children or descendants of any person shall be treated as such person's children or descendants only if they are legally adopted prior to attaining age 18 years.

(b)  The terms "child", "children" or "descendants" of a person shall include any person hereafter born or adopted (subject to being adopted prior to attaining age 18 years).

(c)  The term "Corporate Trustee" shall mean a trust company or bank qualified to act as such, possessing trust powers.

(d)  The term "education" shall include all forms of education, including but not limited to, public or private schools, primary or secondary, college, advanced college or post college, commercial, technical, business or art education, or otherwise.

(e)  The term "executor" for purposes of making an election to have property (or part or all of the trust estate) treated as qualified terminable interest property shall mean the personal representative of Settlor's estate appointed by a probate court, but if no such personal representative is appointed by a probate court, then the Trustee hereunder.

(f)  References herein to "gross estate", "marital deduction", "charitable deduction" or other similar or related words or phrases shall have the same meaning as such words or phrases have in the Internal Revenue Code.

(g)  Any person (including a Settlor, a Trustee, or a beneficiary) shall be deemed incapacitated if: (i) he or she has been determined incapacitated or incompetent by a court of competent jurisdiction; (ii) a guardian of the person or of the property has been appointed by a court of competent jurisdiction for such person; or (iii) in the written opinion of two licensed physicians, such person is incapable either physically or mentally of handling his or her financial affairs.

(h)  The term "Internal Revenue Code" shall mean the Internal Revenue Code of 1986, as amended.

IN WITNESS WHEREOF, JAMES LOGAN, as Settlor, and JAMES LOGAN and JANICE LOGAN, as Co-Trustees, have signed this Agreement, as of the day and year first written above.


_____          _____
JAMES LOGAN                                              JANICE LOGAN

SETTLOR and CO-TRUSTEE                          CO-TRUSTEE

On this 10th day of February, 2021, the Settlor signed the foregoing trust agreement in our presence (the undersigned witnesses), and we have signed as witnesses in the presence of the Settlor and in the presence of each other.

_____
(witness signature)

_____
(witness signature)

NICHOLAS A. MITCHELL
_____
(witness printed name)

ALMA DEBRUYNE
_____
(witness printed name)

STATE OF FLORIDA
COUNTY OF PINELLAS

I HEREBY CERTIFY that the foregoing instrument was acknowledged before me by means of ☑ physical presence or ☐ online notarization, this 10th day of February, 2021, by the Settlor and Co-Trustees, JAMES LOGAN and JANICE LOGAN, each of whom is ☐ personally known to me or who has ☑ produced a _____FLORIDA DRIVER LICENSE_____ as identification, and both of whom have acknowledged before me that they executed the same as their free act and deed and for the uses and purposes therein stated.

6078387v2

_____
NOTARY PUBLIC

JENNIFER A. STUDER
MY COMMISSION # GG 934679
EXPIRES: March 24, 2024
Bonded Thru Notary Public Underwriters

8-5

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA
PROBATE DIVISION

JONATHAN LOGAN and
SMART COMMUNICATIONS HOLDING, INC.,

      Plaintiffs,

v.

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust dated February 10, 2021
and ALEXIS LOGAN, individually,

      Defendants.

_____/

Case No: 2023-CA-10020NC

(CONSOLIDATED)

Case No.: 2023-CA-1280-NC

**EXHIBIT "D"**

**TO**

**COMPLAINT**

## STOCK POWER

**FOR VALUE RECEIVED,** the undersigned, JAMES P. LOGAN (the "Transferor"), hereby sells, assigns and transfers unto JAMES LOGAN, as CO-TRUSTEE of the JAMES LOGAN FAMILY TRUST, dated February 10, 2021, five thousand (5,000) shares (the "Shares") of the common capital stock of SMART COMMUNICATIONS HOLDING, INC., a Florida corporation (the "Corporation"), standing in the name of the Transferor on the books of the Corporation, and does hereby irrevocably constitute and appoint Thomas D. Sims, Esq. as attorney to transfer the Shares on the books of the Corporation with full power of substitution in the premises.

A signed copy of this Stock Power, including that executed via DocuSign or other valid electronic or digital signature medium, delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Stock Power.

**DATED TO BE EFFECTIVE AS OF** _____September 16_____, **2022.**

**TRANSFEROR:**

James Logan (Sep 16, 2022 18:52 EDT)
_____

JAMES P. LOGAN

**6672435v2**

# Stock Power - James Logan to Revocable Trust re Smart Communications Holding, Inc. (2022)

Final Audit Report                                          2022-09-16

| | |
|---|---|
| Created: | 2022-09-16 |
| By: | Rachel Chase (rachelc@jpfirm.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAhWDfQnjwoEN_qVWMiErLBCmCNdIW_Ytb |

## "Stock Power - James Logan to Revocable Trust re Smart Communications Holding, Inc. (2022)" History

📄 Document created by Rachel Chase (rachelc@jpfirm.com)
2022-09-16 - 8:52:13 PM GMT- IP address: 144.129.14.130

✉️ Document emailed to jim.logan@smartcommunications.us for signature
2022-09-16 - 9:02:18 PM GMT

📄 Email viewed by jim.logan@smartcommunications.us
2022-09-16 - 9:02:20 PM GMT- IP address: 74.125.151.157

✍️ Signer jim.logan@smartcommunications.us entered name at signing as James logan
2022-09-16 - 10:52:18 PM GMT- IP address: 199.47.254.244

✍️ Document e-signed by James logan (jim.logan@smartcommunications.us)
Signature Date: 2022-09-16 - 10:52:20 PM GMT - Time Source: server- IP address: 199.47.254.244

✅ Agreement completed.
2022-09-16 - 10:52:20 PM GMT

![Adobe Acrobat Sign] **Adobe Acrobat Sign**

# EXHIBIT E

---------- Forwarded message ----------
From: **Jon** <jon.logan@smartjailmail.com>
Date: Thu, Apr 30, 2015 at 3:26 PM
Subject: Contract
To: Jim Logan <jim.logan@smartjailmail.com>

Agreement between Jim Logan - president of smart communications us, and smart communications holding, between Jon Logan creator and owner of intellectual property known as (postal mail contraband elimination system).

This contract confirms Jonathan D Logan is the creator and owner of intellectual property and system business model soon to be patented for postal mail elimination system. This intellectual property is solely created and owned by Jonathan Logan (inventor) and this contract acknowledges that Jonathan Logan exclusively owns and will retain exclusive ownership of this service invention to correctional facilities and smart communications us and smart communications holding and Jim Logan, Alexis logan, or any employee, share holder or agent of smart communications us or of Jim Logan and Alexis Logan acknowledges they do not own this service invention and they can not use this postal mail contraband elimination service or system model, unless direct written permission is given by the owner of this intellectual property (Jonathan d Logan) to use this service, model, business plan, or technology.

This agreement encompasses a non disclosure agreement and the technology and system disclosed by Jonathan Logan to Jim Logan, Alexis Logan and smart communications us and smart communications holding can not be used or disclosed in any way shape or form unless written permission is given by Jonathan Logan.

Date and sign.  Alexis sign and Janice as a witness to you.

Thank you!

Jon,
Smartjailmail.com

X Alexis Logan, Dated May 18, 2015

*Jon new technology/Patent/ new IP only

-Alexis Logan

jim.logar

Mail

More

1 of 3,891

J

SP

COMPOSE

**Inbox (1,524)**
Starred
Important
Sent Mail
Drafts (78)
Follow up
Misc
Priority
More

Contract      Inbox   x

**Jon**
to me

3:26 PM (18 minutes ago)

Agreement between Jim Logan - president of smart communications us, and smart communications holding, between Jon Logan creator and owner of intellectual property known as (postal mail contraband elimination system).

This contract confirms Jonathan D Logan is the creator and owner of intellectual property and system business model soon to be patented for postal mail elimination system. This intellectual property is solely created and owned by Jonathan Logan (inventor) and this contract acknowledges that Jonathan Logan exclusively owns and will retain exclusive ownership of this service invention to correctional facilities and smart communications us and smart communications holding and Jim Logan, Alexis logan, or any employee, share holder or agent of smart communications us or of Jim Logan and Alexis Logan acknowledges they do not own this service invention and they can not use this postal mail contraband elimination service or system model, unless direct written permission is given by the owner of this intellectual property (Jonathan d Logan) to use this service, model, business plan, or technology.

This agreement encompasses a non disclosure agreement and the technology and system disclosed by Jonathan Logan to Jim Logan, Alexis Logan and smart communications us and smart communications holding can not be used or disclosed in any way shape or form unless written permission is given by Jonathan Logan.

Date and sign.  Alexis sign and Janice as a witness to you.

Thank you!

**Jim Logan** <jim.logan@smartjailmail.com>
to Alexis

3:42 PM (2 minutes ago)

# EXHIBIT F

# EXHIBIT F[1]

### Alexis Logan Production 5002

| 07/20/16 | ALEXIS K LOGAN | ANNUAL MEMBERSHIP FEE | $450.00 |
|---|---|---|---|

### Alexis Logan Production 5007

**Detail**

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | Amount |
|---|---|---|
| 07/26/16 | SHELL OIL 57543665202 | $64.76 |
| | HOLLYWOOD        FL | |
| | AUTO FUEL DISPENSER | |
| 07/29/16 | RACETRAC 95 000000000901217 | $48.31 |
| | PRT CHARLOTE    FL | |
| | 9412553069 | |
| 08/07/16 | SHELL OIL 57543665004 | $39.82 |
| | FORT LAUDERDALE    FL | |
| | AUTO FUEL DISPENSER | |
| 08/17/16 | EXXONMOBIL 9926 | $58.96 |
| | FORT LAUDERDA    FL | |
| | 954-523-9055 | |
| | Description | |
| | GAS/SERVICES | |

### Alexis Logan Production 5014

**Detail**

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | Amount |
|---|---|---|
| 07/25/16 | TOTAL WINE AND MORE 904 TOTAL WINE AND | $221.46 |
| | FORT LAUDERDALE    FL | |
| | 855-328-9463 | |
| 07/27/16 | WALGREENS | $27.76 |
| | ENGLEWOOD        FL | |
| | 8002892273 | |
| | Description | |
| | REFER TO RECEIPT | |
| 07/31/16 | THE FLORIDA BAR THE FLORIDA BAR | $265.00 |
| | TALLAHASSEE    FL | |
| | 850-561-5691 | |
| 07/31/16 | FLORIDA DEPT OF STATE DI 0000000008753 | $550.00 |
| | TALLAHASSEE    FL | |
| | 8502456939 | |
| 07/31/16 | FLORIDA DEPT OF STATE DI 0000000008753 | $550.00 |
| | TALLAHASSEE    FL | |
| | 8502456939 | |
| 08/02/16 | DADA OF DELRAY BEACH 0080 | $50.40 |
| | DELRAY BEACH    FL | |
| | 561-330-3232 | |
| | Description | |
| | FOOD/BEVERAGE | |
| 08/03/16 | OFFICE DEPOT 003324 | $89.03 |
| | FT LAUDERDALE    FL | |
| | RETAIL 33304 | |

---

[1] Equitable Tolling may delay the running of the statue of limitations. *Major League Baseball v. Morsani*, 790 So. 2d 1071, 1076, n. 11 (Fla. 2001).

Alexis Logan Production 5014

### Detail Continued

| | | Amount |
|---|---|---|
| 08/04/16 | HIALEAH CITY HALL 00-08029523183<br>HIALEAH       FL<br>GOVERNMENT SERVICE | $2.00 |
| 08/06/16 | CVS PHARMACY<br>FORT LAUDERDALE    FL<br>8007467287<br>PHARMACIES | $73.21 |
| 08/08/16 | WISE HEALTH SOLUTIONS<br>Fort Lauderdale    FL<br>squareup.com/receipts | $200.00 |

Alexis Logan Production 5019

### Detail

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | Amount |
|---|---|---|
| 08/24/16 | FEDERAL MARATHON 00000149872<br>FORT LAUDERDALE    FL<br>954-527-9035<br>Description          Price<br>GAS/MSC96 94089872      $43.22 | $43.22 |
| 09/14/16 | CVS PHARMACY<br>FORT LAUDERDALE    FL<br>8007467287<br>PHARMACIES | $113.09 |
| 09/16/16 | EXXONMOBIL 9926<br>FORT LAUDERDA      FL<br>954-523-9055<br>Description<br>GAS/SERVICES | $64.60 |

Alexis Logan Production 5026

| Detail | |
|---|---|

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | Amount |
|---|---|---|
| 08/19/16 | OCEAN CADILLAC 0000<br>BAY HARBOUR I    FL<br><br>786-220-2297<br>Description<br>AUTO SLS/SVC/RPR | $1,095.00 |
| 08/24/16 | FEDEX OFFICE<br>FORT LAUDERDALE    FL<br><br>1-888-889-7121<br>BW 1S ON 24# WHT | $3.34 |
| 08/24/16 | USPS 113061025201128 41835201128<br>FORT LAUDERDA    FL<br><br>800-2758777 | $12.90 |
| 08/26/16 | HARTMANS' PRINT CENTER 0331<br>ENGLEWOOD    FL<br><br>941-475-2220<br>Description<br>PUBLISHING & PRINTI | $107.00 |
| 08/29/16 | FLORIDA DEPT OF STATE DI 0000000008753<br>TALLAHASSEE    FL<br><br>8502456939 | $550.00 |
| 08/29/16 | FLORIDA DEPT OF STATE DI 0000000008753<br>TALLAHASSEE    FL<br><br>8502456939 | $550.00 |
| 08/30/16 | FLORIDA DEPT OF STATE DI 0000000008753<br>TALLAHASSEE    FL<br><br>8502456939 | $538.75 |

Alexis Logan Production 5027

### Detail Continued

| | | Amount |
|---|---|---|
| 08/30/16 | FLORIDA DEPT OF STATE DI 0000000008753<br>TALLAHASSEE     FL<br>8502456939 | $550.00 |
| 08/31/16 | 32742 - 350 LAS OLAS CENTREL<br>FORT LAUDERDALE    FL<br>3122742000<br>Description                Price<br>PARKING FEES            $4.00 | $4.00 |
| 09/01/16 | IL MULINO 2 0003<br>FORT LAUDERDA     FL<br>954-524-1800<br>Description<br>FOOD/BEVERAGE | $16.70 |
| 09/01/16 | CITY OF FL PARKING SVCS CITY OF FL PAR<br>FORT LAUDERDALE    FL<br>954-828-3700 | $1.10 |
| 09/02/16 | 1-800-FLOWERS.COM<br>(800)468-1141     NY<br>FLORAL PROD | $114.44 |
| 09/08/16 | FEDEX OFFICE<br>FORT LAUDERDALE    FL<br>0000 333160<br>COMPUTER RENTAL | $1.91 |
| 09/08/16 | OFFICE DEPOT 002383<br>FT. LAUDERDALE    FL<br>RETAIL 33316 | $78.96 |
| 09/16/16 | FEDEX OFFICE<br>FORT LAUDERDALE    FL<br>1-888-889-7121<br>BW 1S ON 24# WHT | $9.22 |
| 09/16/16 | WALGREENS<br>FORT LAUDERDALE    FL<br>8002892273<br>Description<br>REFER TO RECEIPT | $59.97 |
| 09/16/16 | IL MULINO 2 0003<br>FORT LAUDERDA     FL<br>954-524-1800<br>Description<br>FOOD/BEVERAGE | $14.59 |
| 09/16/16 | USPS 113041024201383 41835201383<br>FORT LAUDERDA     FL<br>800-2758777 | $15.50 |

Alexis Logan Production 5034

| Detail | |
|--------|--|

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | Amount |
|--------|--|--------|
| 10/04/16 | SHELL OIL 57543663900<br>FORT LAUDERDALE    FL<br>AUTO FUEL DISPENSER | $43.29 |
| 10/14/16 | SHELL OIL 57543663900<br>FORT LAUDERDALE    FL<br>AUTO FUEL DISPENSER | $56.71 |

Alexis Logan Production 5043

| Detail | |
|--------|--|

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | Amount |
|--------|--|--|--------|
| 09/21/16 | IL MULINO 2 0003<br>FORT LAUDERDA    FL<br>954-524-1800<br>Description<br>FOOD/BEVERAGE | | $46.80 |
| 09/22/16 | MONTY´S RAW BAR<br>COCONUT GROVE    FL<br>305-858-9895 | | $114.31 |
| 10/03/16 | CAFE EUROPA<br>FORT LAUDERDALE    FL<br>RESTAURANT | | $74.28 |
| 10/04/16 | WALGREENS<br>FORT LAUDERDALE    FL<br>8002892273<br>Description<br>REFER TO RECEIPT | | $18.00 |
| 10/11/16 | CVS PHARMACY<br>FORT LAUDERDALE    FL<br>8007467287<br>Description<br>PHARMACIES | Price<br>$139.34 | $139.34 |

Alexis Logan Production 5044

| Detail Continued | |
|------------------|--|

| | | Amount |
|--------|--|--------|
| 10/15/16 | EMPIRE SUSHI<br>PLANTATION    FL<br>USFC33317 | $72.53 |

5

Alexis Logan Production 5055

**Detail**

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 10/21/16 | BRYAN PETROLEUM 104 00000171819<br>954-476-7703<br>Description         Price<br>GAS/MSC96 10311819    $36.75 | DAVIE | FL | $36.75 |
| 11/12/16 | EXXONMOBIL 4806<br>954-415-8335<br>Description<br>GAS/SERVICES | FORT LAUDERDA | FL | $45.99 |
| 11/13/16 | CHEESECAKE FT LAUDERDALE 0000<br>818-871-3281<br>Description<br>FOOD/BEVERAGE | FT LAUDERDALE | FL | $173.56 |
| 11/16/16 | HOMEDEPOT.COM<br>800-430-3376 | 800-430-3376 | GA | $63.60 |

Alexis Logan Production 5062

**Detail**

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | | Amount |
|---|---|---|---|---|
| 10/22/16 | ENGLEWOOD MARATHON 00000148734<br>941-475-0293<br>Description         Price<br>GAS/MSC96 19128734    $57.87 | ENGLEWOOD | FL | $57.87 |
| 10/24/16 | MCAFEE INTELSECURITY<br>SECURITY SVS | 866-622-3911 | TX | $29.99 |
| 11/02/16 | 7-ELEVEN 29367 00072936742<br>954-563-4019<br>Description         Price<br>GAS/MSC96 75196742    $12.24 | FORT LAUDERDALE | FL | $12.24 |
| 11/05/16 | BOB HEILMANS BEACHCOMBER 0888<br>727-442-4144<br>Description<br>FOOD/BEVERAGE | CLEARWATER | FL | $73.96 |
| 11/09/16 | 32742 - 350 LAS OLAS CENTREL<br>3122742000<br>Description         Price<br>PARKING FEES       $3.00 | FORT LAUDERDALE | FL | $3.00 |
| 11/10/16 | CVS PHARMACY<br>8007467287<br>Description         Price<br>PHARMACIES        $113.73 | FORT LAUDERDALE | FL | $113.73 |
| 11/11/16 | TOP NOTCH MOVERS INC 201001004424040<br>888-668-3812 | LAUDERHILL | FL | $51.50 |
| 11/11/16 | LEMON GRASS FT LAUDERDALE<br>954-564-4422 | FORT LAUDERDALE | FL | $147.49 |
| 11/12/16 | THE HOME DEPOT<br>800-654-0688 | FORT LAUDERDALE | FL | $12.64 |

6

Alexis Logan Production 5063

## Detail Continued

| | | | | Amount |
|---|---|---|---|---|
| 11/12/16 | EXXONMOBIL 4806<br>954-415-8335<br>Description<br>GAS/SERVICES | FORT LAUDERDA | FL | $62.36 |
| 11/15/16 | USPS PO 1130410245 001352822<br>8002758777<br>Description          Price<br>POST SVCS GO       $8.59 | FORT LAUDERDA | FL | $8.59 |
| 11/15/16 | J AND J DENTAL INC 000000001<br>9544637262<br>Description<br>REFER TO RECEIPT | FORT LAUDERDA | FL | $670.00 |
| 11/17/16 | THE HOME DEPOT<br>800-654-0688 | FORT LAUDERDALE | FL | $120.91 |
| 11/17/16 | J AND J DENTAL INC 000000001<br>9544637262<br>Description<br>REFER TO RECEIPT | FORT LAUDERDA | FL | $220.00 |

Alexis Logan Production 5073

## Detail

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 11/18/16 | USPS PO 1175540030 001377693<br>8002758777<br>Description          Price<br>POST SVCS GO       $102.89 | PLACIDA | FL | $102.89 |
| 11/18/16 | ACE HDWE 0000<br>941-697-1669<br>Description<br>HARDWARE/TOOLS | CAPE HAZE | FL | $59.65 |
| 11/19/16 | LOWE'S<br>941-421-1041 | PORT CHARLOTTE | FL | $63.98 |
| 11/27/16 | RACETRAC 95  000950 97400000950<br>GAS STATION | PRT CHARLOTE | FL | $33.36 |
| 11/29/16 | IL MULINO 2 0003<br>954-524-1800<br>Description<br>FOOD/BEVERAGE | FORT LAUDERDA | FL | $85.34 |
| 12/01/16 | EXXONMOBIL 9746<br>941-698-0067<br>Description<br>GAS/SERVICES | PLACIDA | FL | $65.66 |
| 12/03/16 | UHAUL RENTAL/PURCHASE 18125<br>(800)528-0463 | ENGLEWOOD | FL | $210.97 |
| 12/04/16 | UHAUL RENTAL/PURCHASE 78642<br>(800)528-0463 | TAMPA | FL | $98.52 |
| 12/06/16 | UHAUL RENTAL/PURCHASE 78642<br>(800)528-0463 | TAMPA | FL | $41.72 |

Alexis Logan Production 5080

## Detail

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | | | | Amount |
|---|---|---|---|---|---|---|
| 11/20/16 | HYATT PIER 66 FOOD & LODGING | | | FORT LAUDERDALE | FL | $76.86 |
| 11/21/16 | PODS 9/100 650000002063801 8887767637 | | | CLEARWATER | FL | $912.79 |
| | Description | Price | | | | |
| | PODS 9/100 | $912.79 | | | | |
| 11/21/16 | THE FRESH MARKET 9547631250 | | | FORT LAUDERDALE | FL | $34.71 |
| | Description | Price | | | | |
| | GROCERY STORES, SUP | $34.71 | | | | |
| 11/22/16 | HOLY CROSS HOSPITAL 954-245-3961 | | | FORT LAUDERDALE | FL | $158.00 |
| | Description | | | | | |
| | MEDICAL SERVICES | | | | | |

Alexis Logan Production 5081

## Detail Continued

| | | | | Amount |
|---|---|---|---|---|
| 11/22/16 | QUEST DIAGNOSTICS<br>4138613124 19403 | (800)488-8890 | PA | $81.52 |
| 11/23/16 | PUBLIX #697 000000697<br>9416981699<br>Description<br>REFER TO RECEIPT | CAPE HAZE | FL | $287.18 |
| 11/27/16 | RACETRAC 95  00095097400000950<br>GAS STATION | PRT CHARLOTE | FL | $44.06 |
| 11/27/16 | THE HOME DEPOT<br>800-654-0688 | PORT CHARLOTTE | FL | $53.92 |
| 11/28/16 | FEDEX OFFICE<br>1-888-889-7121<br>BW 1S ON 24# WHT | FORT LAUDERDALE | FL | $1.27 |
| 11/29/16 | TOP NOTCH MOVERS INC 201001004424040<br>888-668-3812 | LAUDERHILL | FL | $757.05 |
| 11/29/16 | PODS 9/100 650000002063801<br>8887767637<br>Description    Price<br>PODS 9/100    $2,291.19 | CLEARWATER | FL | $2,291.19 |
| 11/30/16 | PODS 9/100 650000002063801<br>8887767637<br>Description    Price<br>PODS 9/100    $414.07 | CLEARWATER | FL | $414.07 |
| 12/01/16 | 32742 - 350 LAS OLAS CENTREL<br>3122742000<br>Description    Price<br>PARKING FEES    $5.00 | FORT LAUDERDALE | FL | $5.00 |
| 12/01/16 | 32742 - 350 LAS OLAS CENTREL<br>3122742000<br>Description    Price<br>PARKING FEES    $5.00 | FORT LAUDERDALE | FL | $5.00 |
| 12/02/16 | CREEKWOOD CROSSING M 00000169219<br>941-756-2458<br>Description    Price<br>GAS/MSC96 87369219    $59.52 | BRADENTON | FL | $59.52 |
| 12/03/16 | ABC FINE WINE & SPIRITS<br>4078510000<br>Description    Price<br>PACKAGE STORES    $43.83 | LARGO | FL | $43.83 |
| 12/04/16 | THE HOME DEPOT<br>800-654-0688 | TAMPA | FL | $82.34 |
| 12/06/16 | LOWE'S<br>813-313-5040 | TAMPA | FL | $72.72 |
| 12/08/16 | TWO MEN AND A TRUCK 0026 0026<br>813-988-7388<br>Description<br>AMEX DATA | THONOTOSASSA | FL | $645.00 |
| 12/10/16 | ENGLEWOOD MARATHON 00000148734<br>941-475-0293<br>Description    Price<br>GAS/MSC96 49088734    $59.85 | ENGLEWOOD | FL | $59.85 |
| 12/11/16 | SAKS FIFTH AVENUE #633 000000633<br>8775517257<br>Description    Price<br>DEPT. STORES    $1,819.00 | SARASOTA | FL | $1,819.00 |
| 12/11/16 | JOHNSTON & MURPHY<br>SHOE STORE<br>Description<br>SPORTS/RIDING APPAR | SARASOTA | FL | $399.34 |
| 12/15/16 | BAR TACO HYDE PARK<br>813-258-8226 | TAMPA | FL | $23.53 |

Alexis Logan Production 5082

### Detail Continued

| | | | | | | Amount |
|---|---|---|---|---|---|---|
| 12/15/16 | TIMPANO RESTAURANT FOOD/BEVERAGE TIP | | $28.36 $6.00 | TAMPA | FL | $34.36 |
| 12/17/16 | ON SWANN 650000009071377 8132510110 TIP | | $7.00 | TAMPA | FL | $44.45 |
| 12/18/16 | ADOBE *ACROPRO SUBS Adobe Systems 800-833-6687 | | | SAN JOSE | CA | $14.99 |
| 12/19/16 | Neiman Marcus DEPARTMENT STORE | | | N Tampa | | $561.75 |

Alexis Logan Production 5091

### Detail

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 12/29/16 | MURPHY7328ATWALMART 0927 800-843-4298 Description GAS/SERVICES | NORTH PORT | FL | $82.54 |

Alexis Logan Production 5099

### Detail

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | | | Amount |
|---|---|---|---|---|---|
| 12/23/16 | 7-ELEVEN 37149 00073714901 813-837-9509 Description          Price GAS/MSC96 52164901      $60.06 | | TAMPA | FL | $60.06 |
| 12/23/16 | WHT HS BLK MKT #3624 000003624 8888554968 Description Womens Apparel | | SARASOTA | FL | $970.19 |
| 12/27/16 | WHITE HOUSE BLACK MARKET 8888554968 Description Womens Apparel | | ELLENTON | FL | $66.45 |
| 12/29/16 | SUNPASS*ACC22455430 888-865-5352 Description RETAIL | | 888-865-5352 | FL | $10.00 |
| 12/30/16 | PMT*HILLSBOROUGH CNTY FEE 000010002 8778184323 Description          Price GVMNT SCVS        $2.95 | | TAMPA | FL | $2.95 |

Alexis Logan Production 5100

## Detail Continued

| | | | | | | Amount |
|---|---|---|---|---|---|---|
| 12/30/16 | VEHICLE TAG RENEW HILLSB<br>8778184323<br>Description     Price<br>GVMNT SCVS     $73.60 | | TAMPA | | FL | $73.60 |
| 12/30/16 | SUNPASS*ACC22455430<br>888-865-5352<br>Description<br>RETAIL | | 888-865-5352 | | FL | $10.00 |
| 01/01/17 | SW AIR<br>SOUTHWEST AIRLINES (MASTE<br>From:     To:<br>TAMPA INTERNATIONA  DALLAS/FORT WORTH<br>     LUBBOCK MUNICIPAL<br>     AUSTIN ROBERT MUEL<br>     TAMPA INTERNATIONA<br>Ticket Number: 5262474990084<br>Passenger Name: SCOTT/JUSTIN<br>Document Type: PASSENGER TICKET | | DALLAS<br><br>Carrier:  Class:<br>WN    K<br>WN    K<br>WN    K<br>WN    K<br>Date of Departure: 01/03 | | TX | $1,137.10 |
| 01/01/17 | SW AIR<br>SOUTHWEST AIRLINES (MASTE<br>From:     To:<br>TAMPA INTERNATIONA  DALLAS/FORT WORTH<br>     LUBBOCK MUNICIPAL<br>     AUSTIN ROBERT MUEL<br>     TAMPA INTERNATIONA<br>Ticket Number: 5262474990083<br>Passenger Name: LOGAN/JAMES PATRICK<br>Document Type: PASSENGER TICKET | | DALLAS<br><br>Carrier:  Class:<br>WN    K<br>WN    K<br>WN    K<br>WN    K<br>Date of Departure: 01/03 | | TX | $1,137.10 |
| 01/11/17 | FLORIDA DEPT OF STATE DI 0000000008753<br>8502456939 | | TALLAHASSEE | | FL | $900.00 |
| 01/12/17 | CAFE EUROPA<br>RESTAURANT | | FORT LAUDERDALE | | FL | $121.76 |
| 01/13/17 | EXXONMOBIL 4806<br>954-415-8335<br>Description<br>GAS/SERVICES | | FORT LAUDERDA | | FL | $10.93 |
| 01/14/17 | EXXONMOBIL 9926<br>954-523-9055<br>Description<br>GAS/SERVICES | | FORT LAUDERDA | | FL | $66.54 |
| 01/17/17 | 220 EAST 542929806161063<br>8132591220<br>TIP     $4.00 | | TAMPA | | FL | $20.05 |
| 01/18/17 | ADOBE *ACROPRO SUBS Adobe Systems<br>800-833-6687 | | SAN JOSE | | CA | $14.99 |

Alexis Logan Production 5113

| Detail | | | | | |
|---|---|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | | Amount |
|---|---|---|---|---|---|
| 01/20/17 | RACETRAC 682 006825 97400006825 000-0000000 | | NORTH PORT | FL | $40.22 |
| 01/29/17 | ENGLEWOOD MARATHON 00000148734 941-475-0293 Description GAS/MSC96 07348734 | Price $74.92 | ENGLEWOOD | FL | $74.92 |
| 02/01/17 | USPS PO 1175540030 001377693 8002758777 Description POST SVCS GO | Price $56.50 | PLACIDA | FL | $56.50 |
| 02/10/17 | ENGLEWOOD MARATHON 00000148734 941-475-0293 Description GAS/MSC98 23328734 | Price $72.31 | ENGLEWOOD | FL | $72.31 |

Alexis Logan Production 5122

| Credits | | | Amount |
|---|---|---|---|
| 01/23/17* | ALEXIS K LOGAN | AMEX Airline Fee Reimbursement TRANSACTION PROCESSED BY AMERICAN EXPRESS | -$25.00 |
| 01/23/17* | ALEXIS K LOGAN | AMEX Airline Fee Reimbursement TRANSACTION PROCESSED BY AMERICAN EXPRESS | -$25.00 |
| 01/23/17* | ALEXIS K LOGAN | AMEX Airline Fee Reimbursement TRANSACTION PROCESSED BY AMERICAN EXPRESS | -$150.00 |

| Detail | | | | | |
|---|---|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | | | Amount |
|---|---|---|---|---|---|
| 01/20/17 | EXXONMOBIL 9740 813-837-8088 Description GAS/SERVICES | | TAMPA | FL | $25.10 |
| 01/21/17 | TIMPANO RESTAURANT FOOD/BEVERAGE TIP | $138.55 $40.00 | TAMPA | FL | $178.55 |

Alexis Logan Production 5123

### Detail Continued

| | | | | Amount |
|---|---|---|---|---|
| 01/26/17 | STAPLES 00201<br>00201000155360 33607<br>PPM INK JOY 100RT BP ASST 20PK<br>HP902XL HYBLK/902 CMY INK 4PK<br>HP OFFICEJET PRO 6978 AIO<br>VENDOR FUNDED COUPON | TAMPA | FL | $185.09 |
| 01/29/17 | EXXONMOBIL 9740<br>813-837-8088<br>Description<br>GAS/SERVICES | TAMPA | FL | $65.75 |
| 01/29/17 | SUNPASS*ACC22455430<br>888-865-5352<br>Description<br>RETAIL | 888-865-5352 | FL | $10.00 |
| 01/31/17 | WALGREENS<br>8002892273<br>Description<br>REFER TO RECEIPT | TAMPA | FL | $112.29 |
| 02/09/17 | SUNPASS*ACC22455430<br>888-865-5352<br>Description<br>RETAIL | 888-865-5352 | FL | $10.00 |
| 02/10/17 | ENGLEWOOD MARATHON 00000148734<br>941-475-0293<br>Description    Price<br>GAS/MSC96 24028734   $43.97 | ENGLEWOOD | FL | $43.97 |
| 02/10/17 | FL LICENSE/TAG/ASMT 000010003<br>8778184323<br>Description    Price<br>GVMNT SCVS   $226.20 | TAMPA | FL | $226.20 |
| 02/10/17 | PMT*HILLSBOROUGH CNTY FEE 000010002<br>8778184323<br>Description    Price<br>GVMNT SCVS   $5.32 | TAMPA | FL | $5.32 |
| 02/10/17 | USPS PO 1189440600 001438877<br>8002758777<br>Description    Price<br>POST SVCS GO   $6.65 | TAMPA | FL | $6.65 |
| 02/12/17 | WALGREENS<br>8002892273<br>Description<br>REFER TO RECEIPT | TAMPA | FL | $113.28 |
| 02/16/17 | THE UPS STORE<br>OFFICE SUPPLY STORE | TAMPA | FL | $19.24 |

Alexis Logan Production 5135

### Detail

 **ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 02/23/17 | NORRIS FURNITURE & INTE 10300100382431<br>941-556-0501 | SARASOTA | FL | $1,951.84 |
| 02/25/17 | BELLACOR.COM<br>8777235522 | (877)723-5522 | MN | $316.80 |

Alexis Logan Production 5142

| Credits | | | Amount |
|---|---|---|---|
| 03/16/17* | **ALEXIS** K LOGAN | AMEX TRAVEL PURCHASE WITH MR POINTS CREDIT | -$341.00 |

**Detail**

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | | | Amount |
|---|---|---|---|---|---|
| 02/17/17 | OCEAN PRIME | | TAMPA | FL | $70.59 |
| | 803-490-5288 | | | | |
| 02/18/17 | THE HYDE OUT 542929805905981 | | TAMPA | FL | $69.39 |
| | 8132501595 | | | | |
| | TIP | $10.00 | | | |
| 02/18/17 | ADOBE *ACROPRO SUBS Adobe Systems | | SAN JOSE | CA | $14.99 |
| | 800-833-6687 | | | | |

| 02/21/17 | PRICELINE.COM | | NORWALK | | CT | | $606.40 |
|---|---|---|---|---|---|---|---|
| | DELTA AIR LINES INC. | | | | | | |
| | From: | To: | Carrier: | Class: | | | |
| | TAMPA INTERNATIONA | ATLANTA HARTSFIELD | DL | Q | | | |
| | | TAMPA INTERNATIONA | DL | Q | | | |
| | | N/A | YY | 00 | | | |
| | | N/A | YY | 00 | | | |
| | Ticket Number: 00679758050086 | | Date of Departure: 02/23 | | | | |
| | Passenger Name: LOGAN/JAMES.PATRICK | | | | | | |
| | Document Type: PASSENGER TICKET | | | | | | |

| 02/21/17 | PRICELINE.COM | | NORWALK | | CT | | $606.40 |
|---|---|---|---|---|---|---|---|
| | DELTA AIR LINES INC. | | | | | | |
| | From: | To: | Carrier: | Class: | | | |
| | TAMPA INTERNATIONA | ATLANTA HARTSFIELD | DL | Q | | | |
| | | TAMPA INTERNATIONA | DL | Q | | | |
| | | N/A | YY | 00 | | | |
| | | N/A | YY | 00 | | | |
| | Ticket Number: 00679758050090 | | Date of Departure: 02/23 | | | | |
| | Passenger Name: PIETRANTONE/JACK | | | | | | |
| | Document Type: PASSENGER TICKET | | | | | | |

Alexis Logan Production 5143

## Detail Continued

| | | | | | Amount |
|---|---|---|---|---|---|
| 02/21/17 | PUBLIX #1506 000001506<br>8636881188<br>Description<br>REFER TO RECEIPT | | TAMPA | FL | $27.87 |
| 02/23/17 | BARNES & NOBLE<br>8662387323<br>Description<br>REFER TO RECEIPT | | TAMPA | FL | $23.10 |
| 02/26/17 | SUNOCO 0671121200 0671121200<br>AUTO FUEL DISPENSER | | TAMPA | FL | $60.62 |
| 02/27/17 | THOMAS J BOLAND MD DMD 0000<br>727-525-0155<br>Description<br>DENTAL SERVICES | | SAINT PETERSB | FL | $100.00 |
| 02/28/17 | WILLIAM C. DUDNEY III MD<br>squareup.com/receipts | | Tampa | FL | $50.00 |
| 03/01/17 | BAR TACO HYDE PARK<br>813-258-8226 | | TAMPA | FL | $42.85 |
| 03/09/17 | LOWE'S<br>813-313-5040 | | TAMPA | FL | $105.04 |
| 03/09/17 | WALGREENS<br>8002892273<br>Description<br>REFER TO RECEIPT | | TAMPA | FL | $158.28 |
| 03/10/17 | ULELE 0601 000000001<br>8132483000<br>Description<br>REFER TO RECEIPT | | TAMPA | FL | $38.52 |
| 03/10/17 | ULELE 0601 000000001<br>8132483000<br>Description<br>REFER TO RECEIPT | | TAMPA | FL | $51.38 |
| 03/10/17 | ULELE 0601 000000001<br>8132483000<br>Description<br>REFER TO RECEIPT | | TAMPA | FL | $144.84 |
| 03/10/17 | THE UPS STORE<br>OFFICE SUPPLY STORE | | TAMPA | FL | $13.32 |
| 03/11/17 | FRENCHYS ROCKAWAY GRILL<br>RESTAURANT<br>FOOD/BEVERAGE $110.96<br>TIP $25.00 | | CLEARWATER | FL | $135.96 |
| 03/12/17 | CARMEL KITCHEN SOUTH TAMP 650000008936<br>8139646889<br>TIP $8.00 | | TAMPA | FL | $47.53 |
| 03/12/17 | WALGREENS<br>8002892273<br>Description<br>REFER TO RECEIPT | | TAMPA | FL | $82.03 |
| 03/14/17 | SUNOCO 0671121200 0671121200<br>GAS STATION | | TAMPA | FL | $62.37 |
| 03/14/17 | MISTER CAR WASH #223 223<br>813-837-9333<br>Description<br>CAR WASH | | TAMPA | FL | $53.49 |

Alexis Logan Production 5144

## Detail Continued

| | | | | | | Amount |
|---|---|---|---|---|---|---|
| 03/15/17 | AMERICAN EXPRESS TVL SVC<br>DELTA AIR LINES INC. | | PHOENIX | | AZ | $341.00 |
| | From: | To: | Carrier: | Class: | | |
| | TAMPA INTERNATIONA | ATLANTA HARTSFIELD | DL | V | | |
| | | SAVANNAH INTERNATI | YY | 00 | | |
| | | ATLANTA HARTSFIELD | DL | K | | |
| | | TAMPA INTERNATIONA | DL | K | | |
| | Ticket Number: 00679558715986 | | Date of Departure: 05/11 | | | |
| | Passenger Name: LOGAN/ALEXIS KAY | | | | | |
| | Document Type: PASSENGER TICKET | | | | | |
| 03/15/17 | AMEX TLS MERCHLOCID<br>TRAVEL AGENCY | | PHOENIX | | AZ | $39.00 |
| 03/18/17 | ADOBE *ACROPRO SUBS Adobe Systems<br>800-833-6687 | | SAN JOSE | | CA | $14.99 |

Alexis Logan Production 5157

## Credits

| | | | Amount |
|---|---|---|---|
| 04/02/17* | ALEXIS K LOGAN | AMEX TRAVEL PURCHASE WITH MR POINTS CREDIT | -$964.10 |
| 04/02/17* | ALEXIS K LOGAN | AMEX TRAVEL PURCHASE WITH MR POINTS CREDIT | -$964.10 |

## Detail

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | | | Amount |
|---|---|---|---|---|---|
| 03/22/17 | USPS PO 1189210614 001366989<br>8002758777 | | TAMPA | FL | $162.00 |
| | Description | Price | | | |
| | POST SVCS GO | $162.00 | | | |
| 03/24/17 | SUNOCO 0671121200 0671121200<br>GAS STATION | | TAMPA | FL | $55.55 |
| 03/24/17 | Neiman Marcus<br>DEPARTMENT STORE | | N Tampa | | $128.40 |

Alexis Logan Production 5158

## Detail Continued

| | | | | | Amount |
|---|---|---|---|---|---|
| 03/25/17 | CHICK-FIL-A #01125 000000000471942<br>3867748625 | | ORANGE CITY | FL | $19.72 |
| 03/26/17 | PEACH VALLEY CAFE<br>1185 W. GRANADA BLVD ORM<br>FOOD/BEVERAGE $39.75<br>TIP $8.00 | | ORMOND BEACH | FL | $47.75 |
| 03/30/17 | DOC B'S FRESH KITC 542929806325627<br>8728061416<br>TIP $6.00 | | TAMPA | FL | $35.96 |
| 04/01/17 | AMERICAN EXPRESS TVL SVC<br>DELTA AIR LINES INC. | | PHOENIX | AZ | $964.10 |
| | From: | To: | Carrier: Class: | | |
| | TAMPA INTERNATIONA | ATLANTA HARTSFIELD<br>MOBILE MUNICIPAL A<br>ATLANTA HARTSFIELD<br>TAMPA INTERNATIONA | DL K<br>DL K<br>DL K<br>DL K | | |
| | Ticket Number: 00679610431220<br>Passenger Name: PIETRANTONE/JACK<br>Document Type: PASSENGER TICKET | | Date of Departure: 04/03 | | |
| 04/01/17 | AMERICAN EXPRESS TVL SVC<br>DELTA AIR LINES INC. | | PHOENIX | AZ | $964.10 |
| | From: | To: | Carrier: Class: | | |
| | TAMPA INTERNATIONA | ATLANTA HARTSFIELD<br>MOBILE MUNICIPAL A<br>ATLANTA HARTSFIELD<br>TAMPA INTERNATIONA | DL K<br>DL K<br>DL K<br>DL K | | |
| | Ticket Number: 00679610431356<br>Passenger Name: LOGAN/JAMES<br>Document Type: PASSENGER TICKET | | Date of Departure: 04/03 | | |
| 04/01/17 | AMEX TLS MERCHLOCID<br>TRAVEL AGENCY | | PHOENIX | AZ | $39.00 |
| 04/01/17 | AMEX TLS MERCHLOCID<br>TRAVEL AGENCY | | PHOENIX | AZ | $39.00 |
| 04/02/17 | SAKANA 650000008089636<br>8138378744<br>TIP $8.00 | | TAMPA | FL | $49.90 |
| 04/03/17 | SEI 37680 00000202630<br>813-253-6511<br>Description Price<br>GAS/MSC96 68342630 $57.94 | | TAMPA | FL | $57.94 |
| 04/03/17 | SUNPASS*ACC22455430<br>888-865-5352<br>Description<br>RETAIL | | 888-865-5352 | FL | $10.00 |
| 04/04/17 | SHELL OIL 57543665004<br>AUTO FUEL DISPENSER | | FORT LAUDERDALE | FL | $52.54 |
| 04/04/17 | J MARKS RESTAURANT<br>954-390-0770 | | FORT LAUDERDALE | FL | $107.00 |
| 04/06/17 | SHOOTERS WATERFRONT 1 SHOOTERS WATERF<br>3033 NE 32ND AVENUE FT LA<br>FOOD/BEVERAGE $34.98<br>TIP $6.00 | | FT LAUDERDALE | FL | $40.98 |
| 04/07/17 | THE FOUNDRY 542929806361085<br>7543073241<br>TIP $7.00 | | POMPANO BEACH | FL | $41.72 |
| 04/08/17 | TOP HAT 000000001<br>9545252421<br>Description<br>REFER TO RECEIPT | | FORT LAUDERDA | FL | $42.51 |

Alexis Logan Production 5159

## Detail Continued

| | | | | | Amount |
|---|---|---|---|---|---|
| 04/08/17 | PAY*HOMEAWAY 170635471<br>8662895977<br>Description<br>REFER TO RECEIPT | | AUSTIN | TX | $91.00 |
| 04/08/17 | LUCKY SAVANNAH VACATION R 00-080297254<br>912-2574050 | | SAVANNAH | GA | $466.68 |
| 04/09/17 | CHANSON<br>RESTAURANT<br>FOOD/BEVERAGE<br>TIP | $61.48<br>$10.00 | DEERFIELD BEACH | FL | $71.48 |
| 04/10/17 | PAYPAL *REDEFININGR<br>402-935-7733<br>Description<br>OTHER | | 4029357733 | CA | $258.24 |
| 04/11/17 | ENGLEWOOD MARATHON 00000148734<br>941-475-0293<br>Description          Price<br>GAS/MSC96 35248734      $43.97 | | ENGLEWOOD | FL | $43.97 |
| 04/13/17 | SUNOCO 0671121200 0671121200<br>GAS STATION | | TAMPA | FL | $20.11 |
| 04/13/17 | SUNPASS*ACC16171736<br>888-865-5352<br>Description<br>RETAIL | | 888-865-5352 | FL | $50.00 |
| 04/14/17 | MISTER CAR WASH #223 223<br>813-837-9333<br>Description<br>CAR WASH | | TAMPA | FL | $53.49 |
| 04/14/17 | Asurion Wireless Insurance 866-667-253<br>9qZGjjoQOWMeUWXwVscg | | Nashville | | $149.00 |
| 04/17/17 | SHELL OIL 50981450039<br>AUTO FUEL DISPENSER | | SAINT AUGUSTI | FL | $34.05 |
| 04/18/17 | BESITO TAMPA 650000009481758<br>8132874800<br>TIP | $10.78 | TAMPA | FL | $60.91 |
| 04/18/17 | ADOBE *ACROPRO SUBS Adobe Systems<br>800-833-6687 | | SAN JOSE | CA | $14.99 |

Alexis Logan Production 5170

## Detail

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | | Amount |
|---|---|---|---|---|---|
| 04/19/17 | MIKES FOOD & FUEL INC 00034666070<br>813-374-8989<br>Description          Price<br>GAS/MSC96 22226070      $50.74 | | TAMPA | FL | $50.74 |
| 04/27/17 | SHELL OIL 57542489208<br>AUTO FUEL DISPENSER | | VENICE | FL | $81.47 |
| 05/05/17 | EXXONMOBIL 9746<br>941-698-0067<br>Description<br>GAS/SERVICES | | PLACIDA | FL | $80.39 |
| 05/15/17 | COSTCO CHECKS & FORMS 000000061<br>8775343769<br>Description<br>REFER TO RECEIPT | | SAN ANTONIO | TX | $49.53 |

18

Alexis Logan Production 5177

| Detail | | | | | |
|---|---|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | | | Amount |
|---|---|---|---|---|---|
| 04/20/17 | DOC B'S FRESH KITC 542929806325627 | | TAMPA | FL | $51.80 |
| | 8728061416 | | | | |
| | TIP | $9.00 | | | |
| 04/20/17 | MICROSOFT - 78 INTERNATI 0000 | | TAMPA | FL | $1,746.35 |
| | 855-825-7575 | | | | |
| | Description | | | | |
| | COMPUTER HRDWR/SFTW | | | | |
| 04/22/17 | LUEKENS LIQUORS - TAMP 000000001 | | TAMPA | FL | $72.73 |
| | 7276882114 | | | | |
| | Description | | | | |
| | REFER TO RECEIPT | | | | |
| 04/23/17 | SUNOCO 0671121200 0671121200 | | TAMPA | FL | $71.80 |
| | GAS STATION | | | | |
| 04/23/17 | VINO E PASTA INC 0456 | | TAMPA | FL | $24.36 |
| | 813-454-8943 | | | | |
| | Description | | | | |
| | FOOD/BEVERAGE | | | | |

Alexis Logan Production 5178

## Detail Continued

| | | | | | | Amount |
|---|---|---|---|---|---|---|
| 04/25/17 | FLORIDA DEPT OF STATE DI 0000000008753<br>8502456939 | | TALLAHASSEE | | FL | $138.75 |
| 04/25/17 | FLORIDA DEPT OF STATE DI 0000000008753<br>8502456939 | | TALLAHASSEE | | FL | $150.00 |
| 04/25/17 | FLORIDA DEPT OF STATE DI 0000000008753<br>8502456939 | | TALLAHASSEE | | FL | $150.00 |
| 04/25/17 | FLORIDA DEPT OF STATE DI 0000000008753<br>8502456939 | | TALLAHASSEE | | FL | $150.00 |
| 04/25/17 | FLORIDA DEPT OF STATE DI 0000000008753<br>8502456939 | | TALLAHASSEE | | FL | $150.00 |
| 04/25/17 | FLORIDA DEPT OF STATE DI 0000000008753<br>8502456939 | | TALLAHASSEE | | FL | $150.00 |

| 04/27/17 | DELTA AIR LINES | | ATLANTA | | | $687.60 |
|---|---|---|---|---|---|---|
| | DELTA AIR LINES | | | | | |
| | From: | To: | Carrier: | Class: | | |
| | TAMPA INTERNATIONA | ATLANTA HARTSFIELD | DL | K | | |
| | | BATON ROUGE RYAN A | DL | K | | |
| | | ATLANTA HARTSFIELD | DL | K | | |
| | | TAMPA INTERNATIONA | DL | K | | |
| | Ticket Number: 0062381001313 1 | | Date of Departure: 05/02 | | | |
| | Passenger Name: PINZON/JAVIER | | | | | |
| | Document Type: PASSENGER TICKET | | | | | |

| 04/27/17 | DELTA AIR LINES | | ATLANTA | | | $687.60 |
|---|---|---|---|---|---|---|
| | DELTA AIR LINES | | | | | |
| | From: | To: | Carrier: | Class: | | |
| | TAMPA INTERNATIONA | ATLANTA HARTSFIELD | DL | K | | |
| | | BATON ROUGE RYAN A | DL | K | | |
| | | ATLANTA HARTSFIELD | DL | K | | |
| | | TAMPA INTERNATIONA | DL | K | | |
| | Ticket Number: 0062381001312 0 | | Date of Departure: 05/02 | | | |
| | Passenger Name: LOGAN/JAMES PATRICK | | | | | |
| | Document Type: PASSENGER TICKET | | | | | |

| 04/28/17 | DELTA AIR LINES | | ATLANTA | | | $129.00 |
|---|---|---|---|---|---|---|
| | DELTA AIR LINES | | | | | |
| | From: | To: | Carrier: | Class: | | |
| | N/A | N/A | YY | 00 | | |
| | | N/A | YY | 00 | | |
| | | N/A | YY | 00 | | |
| | | N/A | YY | 00 | | |
| | Ticket Number: 0062381001312 | | | | | |
| | Passenger Name: LOGAN/JAMES PATRICK | | | | | |
| | Document Type: ADDITIONAL COLLECTION | | | | | |

| 04/28/17 | DELTA AIR LINES | | ATLANTA | | | $129.00 |
|---|---|---|---|---|---|---|
| | DELTA AIR LINES | | | | | |
| | From: | To: | Carrier: | Class: | | |
| | N/A | N/A | YY | 00 | | |
| | | N/A | YY | 00 | | |
| | | N/A | YY | 00 | | |
| | | N/A | YY | 00 | | |
| | Ticket Number: 0062381001313 | | | | | |
| | Passenger Name: PINZON/JAVIER | | | | | |
| | Document Type: ADDITIONAL COLLECTION | | | | | |

| 04/29/17 | TIMPANO<br>RESTAURANT | | TAMPA | | FL | $126.44 |
|---|---|---|---|---|---|---|
| | FOOD/BEVERAGE | $106.44 | | | | |
| | TIP | $20.00 | | | | |

| 04/30/17 | LAWDEPOT.COM 877-509<br>8552318425 | | EDMONTON | | | $33.00 |
|---|---|---|---|---|---|---|

Alexis Logan Production 5179

## Detail Continued

| | | | | | | Amount |
|---|---|---|---|---|---|---|
| 05/03/17 | AMERICAN AIRLINES 45107392 | | 800-433-7300 | | TX | $564.61 |
| | AMERICAN AIRLINES | | | | | |
| | From: | To: | Carrier: | Class: | | |
| | SARASOTA/BRADENTON | CHARLOTTE | AA | G | | |
| | | CHARLESTON | AA | G | | |
| | | CHARLOTTE | AA | N | | |
| | | SARASOTA/BRADENTON | AA | N | | |
| | Ticket Number: 0012127013823 | | Date of Departure: 05/08 | | | |
| | Passenger Name: LOGAN/JAMES | | | | | |
| | Document Type: PASSENGER TICKET | | | | | |
| 05/03/17 | AMERICAN AIRLINES 45107392 | | 800-433-7300 | | TX | $32.56 |
| | AMERICAN AIRLINES | | | | | |
| | From: | To: | Carrier: | Class: | | |
| | N/A | N/A | YY | Y | | |
| | | N/A | YY | 00 | | |
| | | N/A | YY | 00 | | |
| | | N/A | YY | 00 | | |
| | Ticket Number: 0010649917928 | | Date of Departure: 05/03 | | | |
| | Passenger Name: LOGAN/JAMES | | | | | |
| | Document Type: ADDITIONAL COLLECTION | | | | | |
| 05/06/17 | BAR TACO HYDE PARK | | TAMPA | | FL | $22.53 |
| | 813-258-8226 | | | | | |
| 05/09/17 | SHELL OIL 57542494406 | | TAMPA | | FL | $65.42 |
| | AUTO FUEL DISPENSER | | | | | |
| 05/11/17 | The Lawrence | | Atlanta | | GA | $30.73 |
| | 404-961-7177 | | | | | |
| 05/12/17 | SIX PENCE PUB 650000000917792 | | SAVANNAH | | GA | $19.40 |
| | 9122018697 | | | | | |
| | TIP | $4.00 | | | | |
| 05/12/17 | ALAMO CAR RENTAL | | COLLEGE PARK | | GA | $197.84 |
| | Location | | Date | | | |
| | Rental: COLLEGE PARK GA | | 17/05/11 | | | |
| | Return: SAVANNAH GA | | 17/05/12 | | | |
| | Agreement Number: 746434098 | | | | | |
| | Renter Name: LOGAN ALEXIS K | | | | | |
| 05/13/17 | TREYLOR PARK HITCH LLC 0000 | | SAVANNAH | | GA | $35.96 |
| | 310-463-1621 | | | | | |
| | FOOD | $35.96 | | | | |
| 05/13/17 | LOCAL 11 TEN 650000005270064 | | SAVANNAH | | GA | $81.34 |
| | 9127909000 | | | | | |
| | TIP | $15.00 | | | | |
| 05/14/17 | MISTER CAR WASH #223 223 | | TAMPA | | FL | $53.49 |
| | 813-837-9333 | | | | | |
| | Description | | | | | |
| | CAR WASH | | | | | |
| 05/17/17 | TST* O COCINA AND FLIGHTS 000001532 | | TAMPA | | FL | $52.10 |
| | 8139664338 | | | | | |
| | Description | Price | | | | |
| | RESTAURANTS | $52.10 | | | | |
| 05/18/17 | ADOBE *ACROPRO SUBS Adobe Systems | | SAN JOSE | | CA | $14.99 |
| | 800-833-6687 | | | | | |

Alexis Logan Production 5196

**Detail**

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 05/20/17 | SHELL OIL 57542513601<br>AUTO FUEL DISPENSER | PT CHARLOTTE | FL | $77.07 |
| 05/25/17 | ENGLEWOOD MARATHON 00000148734<br>941-475-0293<br>Description          Price<br>GAS/MSC96 53298734     $42.23 | ENGLEWOOD | FL | $42.23 |
| 05/26/17 | CHEVRON 0205019/CHEVRON<br>SERVICE STN<br>Description<br>CHEVRON<br>TAX | TAMPA | FL | $18.93 |
| 05/28/17 | SHELL OIL 57542494406<br>AUTO FUEL DISPENSER | TAMPA | FL | $36.83 |
| 05/30/17 | SELMON MARATHON 00000180422<br>813-248-2721<br>Description          Price<br>GAS/MSC96 28060422     $22.38 | TAMPA | FL | $22.38 |
| 06/10/17 | ENGLEWOOD MARATHON 00000148734<br>941-475-0293<br>Description          Price<br>GAS/MSC96 80068734     $75.00 | ENGLEWOOD | FL | $75.00 |
| 06/12/17 | SUPERDAY CITGO #3 00030742023<br>941-697-1556<br>Description          Price<br>GAS/MSC98 18222023     $46.26 | PORT CHARLOTTE | FL | $46.26 |

Alexis Logan Production 5211

**Detail**

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | | Amount |
|---|---|---|---|---|
| 05/24/17 | FLORIDA DEPT OF STATE DI 0000000008753<br>8502456939 | TALLAHASSEE | FL | $70.00 |
| 05/25/17 | BESITO TAMPA 650000009481758<br>8132874800<br>TIP                      $10.00 | TAMPA | FL | $66.60 |
| 05/25/17 | MISTER CAR WASH #223 223<br>813-837-9333<br>Description<br>CAR WASH | TAMPA | FL | $22.46 |
| 05/30/17 | SHELL OIL 50981450039<br>AUTO FUEL DISPENSER | SAINT AUGUSTI | FL | $28.03 |
| 05/30/17 | LAWDEPOT.COM 877-509<br>8552318425 | EDMONTON | | $33.00 |

Alexis Logan Production 5212

## Detail Continued

| | | | | | Amount |
|---|---|---|---|---|---|
| 06/06/17 | SUNPASS*ACC22455430<br>888-865-5352<br>Description<br>RETAIL | | 888-865-5352 | FL | $10.00 |
| 06/13/17 | GODADDY.COM<br>(480)505-8855 | | 480-505-8855 | AZ | $21.16 |
| 06/14/17 | MISTER CAR WASH #223 223<br>813-837-9333<br>Description<br>CAR WASH | | TAMPA | FL | $53.49 |
| 06/15/17 | RACETRAC 2442 024422 97400024422<br>770-4317600<br>Description<br>FUEL | Price<br>$46.52 | ENGLEWOOD | FL | $46.52 |
| 06/15/17 | USPS PO 1175150270 001377577<br>8002758777<br>Description<br>POST SVCS GO | Price<br>$198.00 | PINELLAS PARK | FL | $198.00 |
| 06/18/17 | ADOBE *ACROPRO SUBS Adobe Systems<br>800-833-6687 | | SAN JOSE | CA | $14.99 |

Alexis Logan Production 5236

## Detail

 **ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | | Amount |
|---|---|---|---|---|---|
| 06/26/17 | DERMSTORE.COM<br>800-213-3376 | | 800-213-3376 | CA | $40.66 |
| 07/04/17 | ENGLEWOOD MARATHON 00000148734<br>941-475-0293<br>Description<br>GAS/MSC96 71358734 | Price<br>$55.88 | ENGLEWOOD | FL | $55.88 |

## Fees

| | | | Amount |
|---|---|---|---|
| 07/20/17 | ALEXIS K LOGAN | ANNUAL MEMBERSHIP FEE | $175.00 |

Alexis Logan Production 5245

## Credits

| | | | Amount |
|---|---|---|---|
| 07/05/17* | ALEXIS K LOGAN | AMEX TRAVEL PURCHASE WITH MR POINTS CREDIT | -$816.80 |
| 07/19/17* | ALEXIS K LOGAN | AMEX TRAVEL PURCHASE WITH MR POINTS CREDIT | -$1,468.58 |

## Detail

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | | | Amount |
|---|---|---|---|---|---|
| 06/19/17 | SHELL OIL 50981450039<br>AUTO FUEL DISPENSER | | SAINT AUGUSTI | FL | $41.55 |
| 06/25/17 | SHELL OIL 57542492905<br>AUTO FUEL DISPENSER | | TAMPA | FL | $61.45 |

Alexis Logan Production 5246

## Detail Continued

| | | | | | | Amount |
|---|---|---|---|---|---|---|
| 06/28/17 | GATE 1421    Q/GATE PTRO<br>SPC FOOD STR<br>Description<br>GATE PTRO<br>TAX | | JACKSONVILLE | | FL | $61.01 |
| 06/30/17 | LAWDEPOT.COM 877-509<br>8552318425 | | EDMONTON | | | $33.00 |
| 07/01/17 | SPIRITLINE CRUISES<br>8000000000<br>Description<br>General Merchandise | | CHARLESTON | | SC | $48.00 |
| 07/04/17 | AMERICAN EXPRESS TRAVEL<br>UNITED AIRLINES<br>From:<br>JACKSONVILLE INTER<br><br><br>Ticket Number: 01686352806703<br>Passenger Name: LOGAN/ALEXIS K<br>Document Type: PASSENGER TICKET | To:<br>CHICAGO O'HARE INT<br>JACKSONVILLE INTER<br>N/A<br>N/A | CHICAGO<br><br>Carrier:<br>UA<br>UA<br>YY<br>YY<br>Date of Departure: 07/28 | Class:<br>W<br>W<br>00<br>00 | IL | $408.40 |
| 07/04/17 | AMERICAN EXPRESS TRAVEL<br>UNITED AIRLINES<br>From:<br>JACKSONVILLE INTER<br><br><br>Ticket Number: 01686352806714<br>Passenger Name: DEPAIVA/HELDER<br>Document Type: PASSENGER TICKET | To:<br>CHICAGO O'HARE INT<br>JACKSONVILLE INTER<br>N/A<br>N/A | CHICAGO<br><br>Carrier:<br>UA<br>UA<br>YY<br>YY<br>Date of Departure: 07/28 | Class:<br>W<br>W<br>00<br>00 | IL | $408.40 |
| 07/07/17 | AMAZON.COM<br>MERCHANDISE | | AMZN.COM/BILL | | WA | $1,454.99 |
| 07/07/17 | 7-ELEVEN 37149 00073714901<br>813-837-9509<br>Description<br>GAS/MSC96 62304901 | Price<br>$20.10 | TAMPA | | FL | $20.10 |
| 07/07/17 | TLF BENEVA FLOWERS<br>941-308-5131 | | SARASOTA | | FL | $221.93 |
| 07/08/17 | ENGLEWOOD MARATHON 00000148734<br>941-475-0293<br>Description<br>GAS/MSC96 05308734 | Price<br>$49.13 | ENGLEWOOD | | FL | $49.13 |
| 07/10/17 | AMAZON.COM<br>MERCHANDISE | | AMZN.COM/BILL | | WA | $10.16 |
| 07/14/17 | MISTER CAR WASH #223 223<br>813-837-9333<br>Description<br>CAR WASH | | TAMPA | | FL | $53.49 |
| 07/14/17 | SUNPASS*ACC22455430<br>888-865-5352<br>Description<br>RETAIL | | 888-865-5352 | | FL | $10.00 |
| 07/17/17 | RACETRAC PETROLEUM<br>000-0000000<br>Description<br>FUEL | Price<br>$40.20 | SAINT AUGUSTINE | | FL | $40.20 |

Alexis Logan Production 5247

## Detail Continued

| | | | | | | Amount |
|---|---|---|---|---|---|---|
| 07/18/17 | AMERICAN EXPRESS TRAVEL AMERICAN AIRLINES INC | | CHICAGO | | IL | $734.29 |
| | From: | To: | Carrier: | Class: | | |
| | SARASOTA/BRADENTON | CHARLOTTE | AA | M | | |
| | | SARASOTA/BRADENTON | AA | L | | |
| | | N/A | YY | 00 | | |
| | | N/A | YY | 00 | | |
| | Ticket Number: 00186389659492 | | Date of Departure: 07/24 | | | |
| | Passenger Name: LOGAN/JAMES P | | | | | |
| | Document Type: PASSENGER TICKET | | | | | |
| 07/18/17 | AMERICAN EXPRESS TRAVEL AMERICAN AIRLINES INC | | CHICAGO | | IL | $734.29 |
| | From: | To: | Carrier: | Class: | | |
| | SARASOTA/BRADENTON | CHARLOTTE | AA | M | | |
| | | SARASOTA/BRADENTON | AA | L | | |
| | | N/A | YY | 00 | | |
| | | N/A | YY | 00 | | |
| | Ticket Number: 00186389659503 | | Date of Departure: 07/24 | | | |
| | Passenger Name: VALDERRAMA/JOSEPH | | | | | |
| | Document Type: PASSENGER TICKET | | | | | |
| 07/18/17 | ADOBE *ACROPRO SUBS Adobe Systems 800-833-6687 | | SAN JOSE | | CA | $14.99 |
| 07/18/17 | AMAZON MKTPLACE PMTS BOOK STORES | | AMZN.COM/BILL | | WA | $209.95 |
| 07/19/17 | AMAZON.COM MERCHANDISE | | AMZN.COM/BILL | | WA | $4,569.05 |
| 07/19/17 | CORPORATE FILINGS LLC 00-08029641761 888-7898466 | | SHERIDAN | | WY | $49.00 |
| 07/19/17 | AMAZON.COM MERCHANDISE | | AMZN.COM/BILL | | WA | $725.40 |
| 07/19/17 | AMAZON.COM MERCHANDISE | | AMZN.COM/BILL | | WA | $1,656.36 |
| 07/20/17 | FEDEX# 787233120404 787233120404 FedEx #1-800-622-1147 TO: Office of the Clerk State VA FROM: Alexis Logan 33947 001 Standard 1LB AWB787233120404 FedEx #1-800-622-1147 | | MEMPHIS | | TN | $34.50 |

Alexis Logan Production 5259

## Fees

| | | | Amount |
|---|---|---|---|
| 07/20/17 | ALEXIS K LOGAN | ANNUAL MEMBERSHIP FEE | $450.00 |

Alexis Logan Production 5264

**Detail**

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 07/20/17 | SHELL OIL 57542513601<br>AUTO FUEL DISPENSER | PT CHARLOTTE | FL | $77.94 |
| 08/09/17 | EXXONMOBIL 9746<br>941-698-0067<br>Description<br>GAS/SERVICES | PLACIDA | FL | $80.60 |
| 08/15/17 | ENGLEWOOD MARATHON 00000148734<br>941-475-0293<br>Description          Price<br>GAS/MSC96 12198734     $48.00 | ENGLEWOOD | FL | $48.00 |
| 08/16/17 | LUIGIS KITCHEN INC 0000<br>518-381-0339<br>Description<br>FOOD/BEVERAGE | TAMPA | FL | $42.37 |

Alexis Logan Production 5271

**Detail**

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | | Amount |
|---|---|---|---|---|
| 07/20/17 | COMPSOURCE INC 084890020522597<br>2165667767 | 216-5667767 | OH | $1,096.96 |

Alexis Logan Production 5272

## Detail Continued

| | | | | | Amount |
|---|---|---|---|---|---|
| 07/21/17 | EHOUNDS DATA RECOVE<br>7277268985<br>Description<br>GENERAL | | 7277268985 | FL | $225.00 |
| 07/23/17 | SHELL OIL 57542494406<br>AUTO FUEL DISPENSER | | TAMPA | FL | $57.67 |
| 07/24/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | | AMZN.COM/BILL | WA | $14.99 |
| 07/26/17 | AMAZON.COM<br>MERCHANDISE | | AMZN.COM/BILL | WA | $1,763.00 |
| 07/27/17 | FCC 10 00000148163<br>352-748-5644<br>Description        Price<br>GAS/MSC96 48218163  $30.36 | | ST. AUGUSTINE | FL | $30.36 |
| 07/28/17 | UNITED AIRLINES<br>UNITED AIRLINES<br>From:             To:<br>JACKSONVILLE INTER  CHICAGO O'HARE INT<br>                  N/A<br>                  N/A<br>                  N/A<br>Ticket Number: 01626014724541<br>Passenger Name: DEPAIVA /FIRST CHECKED<br>Document Type: EXCESS BAGGAGE | | HOUSTON<br><br>Carrier:    Class:<br>UA         00<br>YY         00<br>YY         00<br>YY         00<br>Date of Departure: 07/28 | TX | $50.00 |
| 07/28/17 | RPM STEAK<br>RESTAURANT<br>FOOD/BEVERAGE    $120.43<br>TIP              $24.00 | | CHICAGO | IL | $144.43 |
| 07/31/17 | AMAZON.COM<br>MERCHANDISE | | AMZN.COM/BILL | WA | $244.78 |
| 07/31/17 | LAWDEPOT.COM 877-509<br>8552318425 | | EDMONTON | | $33.00 |
| 07/31/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | | AMZN.COM/BILL | WA | $158.13 |
| 08/01/17 | AMAZON.COM<br>MERCHANDISE | | AMZN.COM/BILL | WA | $65.84 |
| 08/01/17 | FEDEX OFFICE<br>1-888-889-7121<br>BW 1S ON 24# WHT | | CHICAGO | IL | $4.35 |
| 08/01/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | | AMZN.COM/BILL | WA | $135.99 |
| 08/01/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | | AMZN.COM/BILL | WA | $323.14 |
| 08/03/17 | UNITED AIRLINES<br>UNITED AIRLINES<br>From:             To:<br>CHICAGO O'HARE INT  JACKSONVILLE INTER<br>                  N/A<br>                  N/A<br>                  N/A<br>Ticket Number: 01626019403864<br>Passenger Name: DEPAIVA /FIRST CHECKED<br>Document Type: EXCESS BAGGAGE | | HOUSTON<br><br>Carrier:    Class:<br>UA         00<br>YY         00<br>YY         00<br>YY         00<br>Date of Departure: 08/03 | TX | $50.00 |
| 08/04/17 | PC CONNECTION PC Connection<br>ORDER #:52918257 33634<br>PC CONNECTION | | MERRIMACK | NH | $21,972.18 |
| 08/04/17 | SYNACCESS NETWORKS<br>760-930-0473 | | GILBERT | AZ | $7,044.81 |
| 08/04/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | | AMZN.COM/BILL | WA | $39.78 |

Alexis Logan Production 5273

## Detail Continued

|  |  |  |  | Amount |
|---|---|---|---|---|
| 08/04/17 | GTEL PAYPHONECOM<br>2815505592<br>Description<br>GENERAL ELECTRONIC | 2815505592 | TX | $2,217.58 |
| 08/05/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | $119.75 |
| 08/05/17 | PC CONNECTION PC Connection<br>ORDER #:52918257 33634<br>PC CONNECTION | MERRIMACK | NH | $5,015.80 |
| 08/07/17 | SUNOCO 0890327000 0890327000<br>GAS STATION | ST AUGUSTINE | FL | $30.15 |
| 08/10/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | $6.07 |
| 08/10/17 | AMAZON.COM<br>MERCHANDISE | AMZN.COM/BILL | WA | $11.61 |
| 08/11/17 | PC CONNECTION PC Connection<br>ORDER #:52918257 33634<br>PC CONNECTION | MERRIMACK | NH | $470.64 |
| 08/12/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | $6.25 |
| 08/14/17 | MISTER CAR WASH #223 223<br>813-837-9333<br>Description<br>CAR WASH | TAMPA | FL | $53.49 |
| 08/14/17 | MITXPC INC<br>5102266883<br>Description<br>DESKTOPS, LAPTOPS, | 5102266883 | CA | $1,985.12 |
| 08/15/17 | WWWTHINLABSCOM<br>215-315-3858 | FAIRLESS HLS | PA | $683.99 |
| 08/15/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | $844.49 |
| 08/15/17 | MSFT * E07004C8XM 0000<br>800-642-7676<br>Description<br>COMPUTER DATA PROCE | MSBILL.INFO | WA | $12.50 |
| 08/16/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | $626.74 |
| 08/16/17 | FAST TRACK URGENT 3301 039300981593634<br>DOCTOR & PHYSICIAN | TAMPA | FL | $75.00 |
| 08/17/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | $138.53 |
| 08/18/17 | BESITO TAMPA 650000009481758<br>8132874800<br>TIP                                    $10.00 | TAMPA | FL | $58.10 |
| 08/18/17 | ADOBE *ACROPRO SUBS Adobe Systems<br>800-833-6687 | SAN JOSE | CA | $14.99 |
| 08/18/17 | MITXPC INC<br>5102266883<br>Description<br>DESKTOPS, LAPTOPS, | 5102266883 | CA | $43.17 |
| 08/18/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | $75.87 |
| 08/19/17 | SUNPASS*ACC22455430<br>888-865-5352<br>Description<br>RETAIL | 888-865-5352 | FL | $10.00 |

Alexis Logan Production 5294

| Detail | | | | |
|--------|--|--|--|--|

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|--|--|--|--|-------:|
| 08/25/17 | CVS/PHARMACY<br>8007467287<br>PHARMACIES | ENGLEWOOD | FL | $164.44 |
| 08/28/17 | EXXONMOBIL 9746<br>941-698-0067<br>Description<br>GAS/SERVICES | PLACIDA | FL | $46.70 |

Alexis Logan Production 5301

| Detail | | | | |
|--------|--|--|--|--|

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | | Amount |
|--|--|--|--|-------:|
| 08/21/17 | CREST CADILLAC 0160<br>941-497-5800<br>Description<br>AUTO SLS/SVC/RPR | VENICE | FL | $164.26 |
| 08/21/17 | THE UPS STORE<br>BUSINESS SERVICE | PLACIDA | FL | $71.61 |

Alexis Logan Production 5302

## Detail Continued

| | | | | | Amount |
|---|---|---|---|---|---|
| 08/22/17 | DELTA AIR LINES | | ATLANTA | | $913.60 |
| | DELTA AIR LINES | | | | |
| | From: | To: | Carrier: | Class: | |
| | PORTLAND | ATLANTA HARTSFIELD | DL | H | |
| | | SARASOTA/BRADENTON | DL | H | |
| | | ATLANTA HARTSFIELD | DL | Q | |
| | | PORTLAND | DL | Q | |
| | Ticket Number: 00623948325792 | | Date of Departure: 08/23 | | |
| | Passenger Name: SCOTT/JUSTIN | | | | |
| | Document Type: PASSENGER TICKET | | | | |
| 08/23/17 | HERTZ CAR RENTAL | | 800-654-4173 | OK | $272.81 |
| | Location | | Date | | |
| | Rental: HERTZ PPAY OK | | 17/08/21 | | |
| | Return: HERTZ PPAY OK | | 17/08/23 | | |
| | Agreement Number: 006529773 | | | | |
| | Renter Name: SCOTT JUSTIN | | | | |
| 08/23/17 | BRIO UNIVERSITY TOWN CENTER | | SARASOTA | FL | $55.70 |
| | RESTAURANT | | | | |
| | FOOD/BEVERAGE | $45.70 | | | |
| | TIP | $10.00 | | | |
| 08/23/17 | AMAZON.COM | | AMZN.COM/BILL | WA | $600.27 |
| | MERCHANDISE | | | | |
| 08/23/17 | AMAZON MKTPLACE PMTS | | AMZN.COM/BILL | WA | $35.98 |
| | BOOK STORES | | | | |
| 08/26/17 | RACETRAC 2442 024422 97400024422 | | ENGLEWOOD | FL | $45.49 |
| | 770-4317600 | | | | |
| | Description | Price | | | |
| | FUEL | $45.49 | | | |
| 08/26/17 | BESITO TAMPA 650000009481758 | | TAMPA | FL | $79.29 |
| | 8132874800 | | | | |
| | TIP | $13.00 | | | |
| 08/27/17 | BELLA'S ITALIAN CAFE 461682000204545 | | TAMPA | FL | $5.42 |
| | MWALTER@SQ1BB.COM | | | | |
| 08/29/17 | HOTEL BAR | | TAMPA | FL | $96.50 |
| | 813-533-2650 | | | | |
| | FOOD | $76.50 | | | |
| | TIP | $20.00 | | | |
| 08/29/17 | PC CONNECTION PC Connection | | MERRIMACK | NH | $545.88 |
| | ORDER #:21836305 33777 | | | | |
| | PC CONNECTION | | | | |
| 08/29/17 | PC CONNECTION PC Connection | | MERRIMACK | NH | $252.99 |
| | ORDER #:21836305 33777 | | | | |
| | PC CONNECTION | | | | |
| 08/29/17 | PC CONNECTION PC Connection | | MERRIMACK | NH | $1,273.22 |
| | ORDER #:21836305 33777 | | | | |
| | PC CONNECTION | | | | |
| 08/29/17 | PC CONNECTION PC Connection | | MERRIMACK | NH | $545.88 |
| | ORDER #:21836305 33777 | | | | |
| | PC CONNECTION | | | | |
| 08/29/17 | PC CONNECTION PC Connection | | MERRIMACK | NH | $1,073.84 |
| | ORDER #:21836305 33777 | | | | |
| | PC CONNECTION | | | | |
| 08/29/17 | SYNACCESS NETWORKS | | GILBERT | AZ | $7,045.02 |
| | 760-930-0473 | | | | |
| 08/29/17 | SYNACCESS NETWORKS | | GILBERT | AZ | $7,045.02 |
| | 760-930-0473 | | | | |
| 08/30/17 | HERTZ CAR RENTAL | | 800-654-4173 | FL | $365.32 |
| | Location | | Date | | |
| | Rental: SARASOTA FL | | 17/08/23 | | |
| | Return: SARASOTA FL | | 17/08/30 | | |
| | Agreement Number: 595461252 | | | | |
| | Renter Name: SCOTT /JUSTIN | | | | |

Alexis Logan Production 5303

| Detail Continued | | | | |
|---|---|---|---|---|
| | | | | **Amount** |
| 08/30/17 | PC CONNECTION PC Connection<br>ORDER #:53041130 33777<br>PC CONNECTION | MERRIMACK | NH | $143.72 |
| 08/30/17 | PC CONNECTION PC Connection<br>ORDER #:53041130 33777<br>PC CONNECTION | MERRIMACK | NH | $27,405.42 |
| 08/31/17 | AMAZON.COM<br>MERCHANDISE | AMZN.COM/BILL | WA | $18.09 |
| 08/31/17 | PC CONNECTION PC Connection<br>ORDER #:53041130 33777<br>PC CONNECTION | MERRIMACK | NH | $24,486.54 |
| 08/31/17 | FLORIDA DEPT OF STATE DI 0000000008753<br>8502456939 | TALLAHASSEE | FL | $550.00 |
| 08/31/17 | PC CONNECTION PC Connection<br>ORDER #:53041130 33777<br>PC CONNECTION | MERRIMACK | NH | $944.03 |
| 08/31/17 | LAWDEPOT.COM 877-509<br>8552318425 | EDMONTON | | $33.00 |
| 08/31/17 | AMAZON.COM<br>MERCHANDISE | AMZN.COM/BILL | WA | $192.40 |
| 09/01/17 | COMPSOURCE INC 084890020522597<br>2165667767 | 216-5667767 | OH | $4,558.36 |
| 09/01/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | $248.90 |
| 09/01/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | $413.26 |
| 09/01/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | $264.02 |
| 09/01/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | $279.05 |
| 09/01/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | $146.25 |
| 09/01/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | $37.44 |
| 09/01/17 | PC CONNECTION PC Connection<br>ORDER #:53041130 33777<br>PC CONNECTION | MERRIMACK | NH | $119.50 |
| 09/02/17 | AMAZON.COM<br>MERCHANDISE | AMZN.COM/BILL | WA | $323.77 |
| 09/02/17 | GTEL PAYPHONECOM<br>2815505592<br>Description<br>GENERAL ELECTRONIC | 2815505592 | TX | $173.43 |
| 09/05/17 | SUNPASS*ACC22455430<br>888-865-5352<br>Description<br>RETAIL | 888-865-5352 | FL | $10.00 |
| 09/07/17 | EACCU-TECH<br>TELECOMMUNIC | ALPHARETTA | GA | $139.01 |
| 09/11/17 | HERTZ TOLL CHARGE-ATS American Traffi<br>877-411-4300 | MESA | AZ | $34.63 |
| 09/14/17 | MISTER CAR WASH #223 223<br>813-837-9333<br>Description<br>CAR WASH | TAMPA | FL | $53.49 |
| 09/14/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | $17.98 |

Alexis Logan Production 5304

## Detail Continued

| | | | | Amount |
|---|---|---|---|---|
| 09/16/17 | MSFT * E07004I3QE 0000<br>800-642-7676<br>Description<br>COMPUTER DATA PROCE | MSBILL.INFO | WA | $12.50 |
| 09/18/17 | ADOBE *ACROPRO SUBS Adobe Systems<br>800-833-6687 | SAN JOSE | CA | $14.99 |

Alexis Logan Production 5330

| Detail |
| --- |

**ALEXIS K LOGAN**
Card Ending 7-71004

|  |  |  |  | Amount |
| --- | --- | --- | --- | --- |
| 09/22/17 | AMAZON.COM<br>MERCHANDISE | AMZN.COM/BILL | WA | $444.00 |
| 09/24/17 | McAfee Anti-Virus<br>10001258 ONLINE SOFTWR<br>Description<br>CA, ONLINE SFTWARE | 888-847-8766 | CA | $89.99 |
| 09/26/17 | GTEL PAYPHONECOM<br>2815505592<br>Description<br>GENERAL ELECTRONIC | 2815505592 | TX | $239.68 |
| 09/27/17 | PC CONNECTION PC Connection<br>ORDER #:53179762 33777<br>PC CONNECTION | MERRIMACK | NH | $283.93 |
| 09/27/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | $555.39 |
| 09/27/17 | COMPSOURCE INC 084890020522597<br>2165667767 | 216-5667767 | OH | $373.32 |
| 09/27/17 | WWW.NEWEGG.COM<br>237701209 33777- | 800-390-1119 | CA | $823.90 |
| 09/27/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | $462.14 |
| 09/27/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | $170.04 |
| 09/27/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | $79.98 |
| 09/29/17 | CHEVRON 0205019/CHEVRON<br>SERVICE STN<br>Description<br>CHEVRON<br>TAX | TAMPA | FL | $75.30 |
| 09/30/17 | LAWDEPOT.COM 877-509<br>8552318425 | EDMONTON |  | $33.00 |
| 10/03/17 | PAYPAL *MITXPC INC<br>402-935-7733<br>Description<br>DESKTOPS, LAPTOPS, | 5102266883 | CA | $877.77 |
| 10/04/17 | COMPSOURCE INC 021770020522597<br>2165667767 | 216-5667767 | OH | $3,333.64 |
| 10/05/17 | 220 EAST RESTAURANT 00-08031405478<br>RESTAURANT | TAMPA | FL | $26.40 |
| 10/06/17 | PC CONNECTION PC Connection<br>ORDER #:53236632 33777<br>PC CONNECTION | MERRIMACK | NH | $37,067.35 |
| 10/06/17 | SYNACCESS NETWORKS<br>760-930-0473 | GILBERT | AZ | $7,039.21 |
| 10/06/17 | SUNPASS*ACC16171736<br>888-865-5352<br>Description<br>RETAIL | 888-865-5352 | FL | $20.00 |

Alexis Logan Production 5331

## Detail Continued

| | | | | Amount |
|---|---|---|---|---|
| 10/06/17 | SYNACCESS NETWORKS<br>760-930-0473 | GILBERT | AZ | $7,039.21 |
| 10/06/17 | GTEL PAYPHONECOM<br>2815505592<br>Description<br>GENERAL ELECTRONIC | 2815505592 | TX | $5,950.14 |
| 10/07/17 | MADISON SOCIAL 0053<br>850-894-6276<br>Description<br>FOOD/BEVERAGE | TALLAHASSEE | FL | $42.10 |
| 10/07/17 | MADISON SOCIAL 0053<br>850-894-6276<br>Description<br>FOOD/BEVERAGE | TALLAHASSEE | FL | $20.20 |
| 10/07/17 | PC CONNECTION PC Connection<br>ORDER #:53236632 33777<br>PC CONNECTION | MERRIMACK | NH | $1,053.07 |
| 10/08/17 | MCKNZE MKTS APPALACH 00000184069<br>850-656-4939<br>Description          Price<br>GAS/MSC96 03224069     $48.71 | TALLAHASSEE | FL | $48.71 |
| 10/08/17 | SUNPASS*ACC22455430<br>888-865-5352<br>Description<br>RETAIL | 888-865-5352 | FL | $10.00 |
| 10/09/17 | PC CONNECTION PC Connection<br>ORDER #:53236632 33777<br>PC CONNECTION | MERRIMACK | NH | $10,635.48 |
| 10/11/17 | AMAZON.COM<br>MERCHANDISE | AMZN.COM/BILL | WA | $1,335.30 |
| 10/11/17 | MITXPC INC<br>5102266883<br>Description<br>DESKTOPS, LAPTOPS, | 5102266883 | CA | $3,877.84 |
| 10/11/17 | GTEL PAYPHONECOM<br>2815505592<br>Description<br>GENERAL ELECTRONIC | 2815505592 | TX | $174.39 |
| 10/11/17 | GTEL PAYPHONECOM<br>2815505592<br>Description<br>GENERAL ELECTRONIC | 2815505592 | TX | $299.66 |
| 10/11/17 | GTEL PAYPHONECOM<br>2815505592<br>Description<br>GENERAL ELECTRONIC | 2815505592 | TX | $230.54 |
| 10/11/17 | GTEL PAYPHONECOM<br>2815505592<br>Description<br>GENERAL ELECTRONIC | 2815505592 | TX | $93.20 |
| 10/14/17 | RACETRAC 2442 024422 97400024422<br>770-4317600<br>Description          Price<br>FUEL               $61.19 | ENGLEWOOD | FL | $61.19 |
| 10/14/17 | MISTER CAR WASH #223 223<br>813-837-9333<br>Description<br>CAR WASH | TAMPA | FL | $53.49 |
| 10/14/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | $77.50 |

Alexis Logan Production 5332

## Detail Continued

| | | | | | Amount |
|---|---|---|---|---|---|
| 10/16/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | | $54.18 |
| 10/16/17 | MSFT * E07004NWYB 0000<br>800-642-7676<br>Description<br>COMPUTER DATA PROCE | MSBILL.INFO | WA | | $12.50 |
| 10/16/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | | $120.86 |
| 10/16/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | | $46.50 |
| 10/17/17 | SUNPASS*ACC22455430<br>888-865-5352<br>Description<br>RETAIL | 888-865-5352 | FL | | $10.00 |
| 10/17/17 | GTEL PAYPHONECOM<br>2815505592<br>Description<br>GENERAL ELECTRONIC | 2815505592 | TX | | $321.66 |
| 10/18/17 | PC CONNECTION PC Connection<br>ORDER #:53284086 33777<br>PC CONNECTION | MERRIMACK | NH | | $413.69 |
| 10/18/17 | ADOBE *ACROPRO SUBS Adobe Systems<br>800-833-6687 | SAN JOSE | CA | | $14.99 |
| 10/19/17 | PC CONNECTION PC Connection<br>ORDER #:53296821 33777<br>PC CONNECTION | MERRIMACK | NH | | $1,263.99 |
| 10/19/17 | EACCU-TECH<br>TELECOMMUNIC | ALPHARETTA | GA | | $1,919.64 |
| 10/20/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | | $11.62 |

Alexis Logan Production 5356

## Detail

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | | Amount |
|---|---|---|---|---|---|
| 10/25/17 | SHELL OIL 57542513601<br>AUTO FUEL DISPENSER | PT CHARLOTTE | FL | | $77.24 |
| 11/01/17 | SUNOCO 0892568701 0892<br>813-254-3969<br>Description<br>Super Unleaded (92 | TAMPA | FL | | $74.59 |
| 11/13/17 | EXXONMOBIL 9746<br>00840908 33946<br>Unleaded Super<br>Car Wash | PLACIDA | FL | | $68.43 |
| 11/17/17 | LONGHORN STEAK055301 39700055301<br>941-7646463<br>FOOD/BEVERAGE $89.05<br>TIP $20.00 | PORT CHARLOTT | FL | | $109.05 |

Alexis Logan Production 5361

## Detail

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | | Amount |
|---|---|---|---|---|---|
| 11/23/17 | CAPITAL GRILLE080564 58400080564 | | SARASOTA | FL | $455.59 |
| | 941-2563647 | | | | |
| | FOOD/BEVERAGE | $379.59 | | | |
| | TIP | $76.00 | | | |
| 12/01/17 | SFS HALE GROVES | | 800-990-8884 | FL | $174.96 |
| | CITRUS GIFTS | | | | |
| 12/02/17 | RODS WESTERN PALACE 0830 | | COLUMBUS | OH | $234.90 |
| | 866-326-1975 | | | | |
| | Description | | | | |
| | SPORTS/RIDING APPAR | | | | |

Alexis Logan Production 5366

## Detail

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | | | | Amount |
|---|---|---|---|---|---|---|
| 11/18/17 | ALASKA AIRLINES | | AlaskaAir.COM | | WA | $39.00 |
| | ALASKA AIRLINES INC. | | | | | |
| | From: | To: | Carrier: | Class: | | |
| | PORTLAND | SAN DIEGO LINDBERG | AS | 00 | | |
| | | N/A | YY | 00 | | |
| | | N/A | YY | 00 | | |
| | | N/A | YY | 00 | | |
| | Ticket Number: 02782019753763 | | | | | |
| | Passenger Name: SCOTT, JUSTIN | | | | | |
| | Document Type: PASSENGER TICKET | | | | | |
| 11/18/17 | ALASKA AIRLINES | | AlaskaAir.COM | | WA | $396.39 |
| | ALASKA AIRLINES INC. | | | | | |
| | From: | To: | Carrier: | Class: | | |
| | PORTLAND | SAN DIEGO LINDBERG | AS | H | | |
| | | PORTLAND | AS | K | | |
| | | N/A | YY | 00 | | |
| | | N/A | YY | 00 | | |
| | Ticket Number: 02721566292255 | | | | | |
| | Passenger Name: SCOTT, JUSTIN | | | | | |
| | Document Type: PASSENGER TICKET | | | | | |
| 11/20/17 | DTCOM | | DALLAS | | TX | $391.96 |
| | SOUTHWEST AIRLINES (MASTE | | | | | |
| | From: | To: | Carrier: | Class: | | |
| | TAMPA INTERNATIONA | RALEIGH/DURHAM | WN | R | | |
| | | TAMPA INTERNATIONA | WN | R | | |
| | | N/A | YY | 00 | | |
| | | N/A | YY | 00 | | |
| | Ticket Number: 5268786483179 | | Date of Departure: 11/28 | | | |
| | Passenger Name: LONGENBERGER/JUSTIN | | | | | |
| | Document Type: PASSENGER TICKET | | | | | |
| 11/20/17 | DTCOM | | DALLAS | | TX | $391.96 |
| | SOUTHWEST AIRLINES (MASTE | | | | | |
| | From: | To: | Carrier: | Class: | | |
| | TAMPA INTERNATIONA | RALEIGH/DURHAM | WN | R | | |
| | | TAMPA INTERNATIONA | WN | R | | |
| | | N/A | YY | 00 | | |
| | | N/A | YY | 00 | | |
| | Ticket Number: 5268786483180 | | Date of Departure: 11/28 | | | |
| | Passenger Name: VALDERRAMA/JOSEPH | | | | | |
| | Document Type: PASSENGER TICKET | | | | | |

| 11/26/17 | DROPBOX*7H7NDQHFXDYB DROPBOX*7H7NDQH 4159867057 | SAN FRANCISCO | CA | $99.00 |
| 11/27/17 | PC CONNECTION PC Connection ORDER #:53459172 33777 PC CONNECTION | MERRIMACK | NH | $606.26 |
| 11/27/17 | MITXPC INC 5102266883 Description DESKTOPS, LAPTOPS, | 5102266883 | CA | $2,781.26 |
| 11/29/17 | AMAZON MKTPLACE PMTS BOOK STORES | AMZN.COM/BILL | WA | $46.82 |
| 11/29/17 | AMAZON MKTPLACE PMTS BOOK STORES | AMZN.COM/BILL | WA | $209.08 |

## Alexis Logan Production 5368

### Detail Continued

| | | | | Amount |
|---|---|---|---|---|
| 12/01/17 | PAYPAL *MEMPHISCOMP 402-935-7733 Description DESKTOPS, LAPTOPS, | 4029357733 | TN | $210.00 |
| 12/01/17 | SUNPASS*ACC22455430 888-865-5352 Description RETAIL | 888-865-5352 | FL | $10.00 |
| 12/06/17 | COMCAST CABLE SVC | 800-266-2278 | GA | $488.70 |
| 12/12/17 | AMAZON MKTPLACE PMTS BOOK STORES | AMZN.COM/BILL | WA | $756.90 |
| 12/13/17 | AMAZON.COM MERCHANDISE | AMZN.COM/BILL | WA | $27.42 |
| 12/14/17 | MISTER CAR WASH #223 223 813-837-9333 Description CAR WASH | TAMPA | FL | $53.49 |
| 12/15/17 | AMAZON.COM MERCHANDISE | AMZN.COM/BILL | WA | $273.36 |
| 12/15/17 | CHARTER COMM CABLE TV | 888-438-2427 | SC | $311.47 |
| 12/15/17 | AMAZON MKTPLACE PMTS BOOK STORES | AMZN.COM/BILL | WA | $24.50 |
| 12/18/17 | ADOBE *ACROPRO SUBS Adobe Systems 800-833-6687 | SAN JOSE | CA | $14.99 |
| 12/18/17 | SUNPASS*ACC16171736 888-865-5352 Description RETAIL | 888-865-5352 | FL | $20.00 |

## Alexis Logan Production 5400

| 12/22/17 | MSFT * E07004ZTNT 0000 800-642-7676 Description COMPUTER DATA PROCE | MSBILL.INFO | WA | $12.50 |
| 12/22/17 | GODADDY.COM (480)505-8855 | 480-505-8855 | AZ | $30.34 |
| 12/22/17 | GODADDY.COM (480)505-8855 | 480-505-8855 | AZ | $30.34 |

## Alexis Logan Production 5401

| | | | | |
|---|---|---|---|---|
| 12/24/17 | AMAZON.COM<br>MERCHANDISE | AMZN.COM/BILL | WA | $5.93 |
| 12/30/17 | TEBELLA TEA COMPANY 000000001<br>8132541212<br>Description<br>REFER TO RECEIPT | TAMPA | FL | $5.02 |
| 12/31/17 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | $13.98 |
| 01/01/18 | UBER  *TRIP AWN6Q<br>HELP.UBER.COM | HELP.UBER.COM | CA | $5.00 |
| 01/01/18 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | $801.66 |
| 01/02/18 | EXXONMOBIL 4824<br>813-949-0788<br>Description<br>GAS/SERVICES | TAMPA | FL | $49.71 |
| 01/04/18 | PC CONNECTION PC Connection<br>ORDER #:53610299 98683<br>PC CONNECTION | MERRIMACK | NH | $281.66 |
| 01/04/18 | AMAZON.COM<br>MERCHANDISE | AMZN.COM/BILL | WA | $44.81 |
| 01/06/18 | WAL-MART SUPERCENTER 4681 4681<br>DISCOUNT STORE | TAMPA | FL | $42.00 |
| 01/07/18 | UBER  *TRIP JIIOE<br>HELP.UBER.COM | HELP.UBER.COM | CA | $16.69 |
| 01/07/18 | UBER  *TRIP OBLXH<br>HELP.UBER.COM | HELP.UBER.COM | CA | $9.81 |
| 01/07/18 | UBER  *TRIP 7GWMX<br>HELP.UBER.COM | HELP.UBER.COM | CA | $6.82 |
| 01/08/18 | PC CONNECTION PC Connection<br>ORDER #:53624620 33777<br>PC CONNECTION | MERRIMACK | NH | $1,043.03 |
| 01/08/18 | SYNACCESS NETWORKS<br>760-930-0473 | GILBERT | AZ | $4,499.64 |
| 01/09/18 | CARLTON FIELDS. PA<br>813-223-7000 | 813-223-7000 | FL | $10,000.00 |
| 01/09/18 | ZENDESK, INC.<br>INV02865468 33947 | SAN FRANCISCO | CA | $100.00 |
| 01/10/18 | AMAZON MKTPLACE PMTS<br>BOOK STORES | AMZN.COM/BILL | WA | $36.85 |
| 01/10/18 | CREATELY CREATELY<br>0425753926 | MENTONE | AU | $5.00 |
| 01/10/18 | WWW.NEWEGG.COM<br>414396871 98683- | 800-390-1119 | CA | $15.95 |
| 01/10/18 | VZWRLSS MY VZ VB P<br>BILL PAYMENT | 800-922-0204 | FL | $1,186.95 |
| 01/10/18 | AMAZON.COM<br>MERCHANDISE | AMZN.COM/BILL | WA | $1,086.19 |

## Alexis Logan Production 5402

### Detail Continued

| | | | | Amount |
|---|---|---|---|---|
| 01/10/18 | USPS PO 1189350609 001377149<br>8002758777<br>Description          Price<br>POST SVCS GO          $22.00 | TAMPA | FL | $22.00 |

| Date | Description | Location | State | Amount |
|------|-------------|----------|-------|--------|
| 01/12/18 | UBER *TRIP 2Y75Y<br>HELP.UBER.COM | HELP.UBER.COM | CA | $8.51 |
| 01/12/18 | UBER *TRIP QER6T<br>HELP.UBER.COM | HELP.UBER.COM | CA | $8.74 |
| 01/14/18 | UBER *TRIP TG224<br>HELP.UBER.COM | HELP.UBER.COM | CA | $14.03 |
| 01/14/18 | MISTER CAR WASH #223 223<br>813-837-9333<br>Description<br>CAR WASH | TAMPA | FL | $53.49 |
| 01/14/18 | EXXONMOBIL 4824<br>813-949-0788<br>Description<br>GAS/SERVICES | TAMPA | FL | $50.85 |
| 01/16/18 | RED5 PRO SUBSCRIPTION<br>6174424151 | JAMAICA PLAIN | MA | $495.00 |
| 01/16/18 | RED5 PRO SUBSCRIPTION<br>6174424151 | JAMAICA PLAIN | MA | $55.00 |
| 01/16/18 | Atlassian<br>COMPUTERS & EQUIPMENT<br>Description<br>AT-48635260 | San Francisco | | $20.00 |
| 01/16/18 | DIGITAL RIVER<br>WWW.DIGITALRIVER.COM | 952-908-4084 | MN | $468.00 |
| 01/17/18 | MSFT * E070056010 0000<br>800-642-7676<br>Description<br>COMPUTER DATA PROCE | MSBILL.INFO | WA | $12.50 |
| 01/17/18 | SUNPASS*ACC16171736<br>888-865-5352<br>Description<br>RETAIL | 888-865-5352 | FL | $20.00 |
| 01/17/18 | ZENDESK, INC.<br>INV02899347 33947 | SAN FRANCISCO | CA | $83.36 |
| 01/18/18 | ADOBE *ACROPRO SUBS Adobe Systems<br>800-833-6687 | SAN JOSE | CA | $14.99 |
| 01/19/18 | LOGMEIN GOTOMEETING<br>SERVICES/SW | 855-837-1750 | CA | $39.20 |

## Alexis Logan Production 5419

**Detail**

 **ALEXIS K LOGAN**
Card Ending 7-11004

| Date | Description | Location | State | Amount |
|------|-------------|----------|-------|--------|
| 02/13/18 | FCC 10 00000148163<br>352-748-5644 | ST. AUGUSTINE | FL | $74.59 |

Alexis Logan Production 5427

## Detail

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | | Amount |
|---|---|---|---|---|
| 01/19/18 | DIGI-KEY 61058164 56701 | (800)344-4539 | MN | $584.86 |
| 01/19/18 | AT&T *PAYMENT AT&T PH PMT | 800-288-2020 | TX | $176.50 |
| 01/19/18 | TAG-CONNECT 8772444156 4153766629 | 8772444156 | CA | $243.67 |
| 01/20/18 | UBER *TRIP 74K3O HELP.UBER.COM | HELP.UBER.COM | CA | $13.55 |
| 01/25/18 | SUNPASS*ACC16171736 888-865-5352 | 888-865-5352 | FL | $20.00 |
| 01/27/18 | UBER *3QJDW HELP.UBER.COM | HELP.UBER.COM | CA | $12.44 |
| 01/27/18 | UBER *EXVZU HELP.UBER.COM | HELP.UBER.COM | CA | $7.13 |
| 01/27/18 | UBER *B6K2B HELP.UBER.COM | HELP.UBER.COM | CA | $14.30 |
| 01/27/18 | UBER *TRIP 6YVJF HELP.UBER.COM | HELP.UBER.COM | CA | $31.73 |
| 01/31/18 | MSFT * E080058WIV 0000 800-642-7676 | MSFT AZURE | WA | $5.82 |
| 02/03/18 | UBER *AKHA5 HELP.UBER.COM | HELP.UBER.COM | CA | $13.78 |
| 02/03/18 | UBER *TRIP LI52H HELP.UBER.COM | HELP.UBER.COM | CA | $5.00 |
| 02/03/18 | UBER *H2ZC3 HELP.UBER.COM | HELP.UBER.COM | CA | $12.74 |
| 02/07/18 | 7-ELEVEN 37149 00073714901 813-837-9509 | TAMPA | FL | $74.92 |
| 02/09/18 | CREATELY CREATELY 0425753926 | MENTONE | AU | $5.00 |
| 02/10/18 | UBER *TRIP OKT56 HELP.UBER.COM | HELP.UBER.COM | CA | $12.98 |

Alexis Logan Production 5428

## Detail Continued

| | | | | Amount |
|---|---|---|---|---|
| 02/11/18 | UBER *TRIP PJVBF HELP.UBER.COM | HELP.UBER.COM | CA | $17.96 |
| 02/11/18 | UBER *HN6AD HELP.UBER.COM | HELP.UBER.COM | CA | $15.91 |
| 02/11/18 | RED5 PRO SUBSCRIPTION 6174424151 | JAMAICA PLAIN | MA | $550.00 |
| 02/12/18 | RED5 PRO SUBSCRIPTION 6174424151 | JAMAICA PLAIN | MA | $55.00 |
| 02/13/18 | RED5 PRO SUBSCRIPTION 6174424151 | JAMAICA PLAIN | MA | $440.00 |
| 02/14/18 | MISTER CAR WASH #223 223 813-837-9333 | TAMPA | FL | $53.49 |
| 02/15/18 | Atlassian COMPUTERS & EQUIPMENT | San Francisco | | $20.00 |

Alexis Logan Production 5453

| Detail | | | | |
|---|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 03/17/18 | HARLAND CLARKE CHECK PRIN 000000061 8775343769 | SAN ANTONIO | TX | $49.89 |

Alexis Logan Production 5461

| Detail | | | | |
|---|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | | Amount |
|---|---|---|---|---|
| 02/16/18 | SUNPASS*ACC22455430 888-865-5352 | 888-865-5352 | FL | $10.00 |
| 02/16/18 | MSFT * E07005CAD2 0000 800-642-7676 | MSBILL.INFO | WA | $12.50 |
| 02/17/18 | UBER *TRIP B6A5D HELP.UBER.COM | HELP.UBER.COM | CA | $5.00 |
| 02/17/18 | UBER *TRIP WOWQR HELP.UBER.COM | HELP.UBER.COM | CA | $18.85 |
| 02/17/18 | UBER *TRIP RXNNM HELP.UBER.COM | HELP.UBER.COM | CA | $8.30 |
| 02/17/18 | UBER *TRIP MSIB6 HELP.UBER.COM | HELP.UBER.COM | CA | $8.04 |
| 02/17/18 | LOGMEIN GOTOMEETING SERVICES/SW | 855-837-1750 | CA | $39.20 |
| 02/17/18 | SUNPASS*ACC16171736 888-865-5352 | 888-865-5352 | FL | $20.00 |
| 02/18/18 | UBER *TRIP VRWC5 HELP.UBER.COM | HELP.UBER.COM | CA | $14.62 |
| 02/18/18 | ADOBE *ACROPRO SUBS Adobe Systems 800-833-6687 | SAN JOSE | CA | $14.99 |
| 02/24/18 | UBER *TRIP BGIUX HELP.UBER.COM | HELP.UBER.COM | CA | $8.95 |
| 02/27/18 | FEDEX OFFICE 1-888-889-7121 | TAMPA | FL | $17.41 |

Alexis Logan Production 5462

## Detail Continued

| | | | | Amount |
|---|---|---|---|---|
| 03/01/18 | GODADDY.COM (480)505-8855 | 480-505-8855 | AZ | $699.98 |
| 03/02/18 | MSFT * E08005F5LI0000 800-642-7676 | MSFT AZURE | WA | $5.25 |
| 03/02/18 | SUNPASS*ACC22455430 888-865-5352 | 888-865-5352 | FL | $10.00 |
| 03/03/18 | UBER *TRIP 4LT3L HELP.UBER.COM | HELP.UBER.COM | CA | $5.00 |
| 03/03/18 | UBER *NPNFU HELP.UBER.COM | HELP.UBER.COM | CA | $14.20 |
| 03/03/18 | UBER *722K5 HELP.UBER.COM | HELP.UBER.COM | CA | $22.86 |
| 03/03/18 | UBER *TRIP HE7HN HELP.UBER.COM | HELP.UBER.COM | CA | $9.00 |
| 03/05/18 | TAMPA PRINTER 0606 813-280-5413 | TAMPA | FL | $67.63 |
| 03/05/18 | 220 EAST RESTAURANT 00-08031405478 RESTAURANT | TAMPA | FL | $37.12 |
| 03/06/18 | 7THANNUALBUBBLESANDB 8882172220 | TAMPA | FL | $216.12 |
| 03/08/18 | CARMEL KITCHEN SOUTH TAMP 650000008936 8139646889 | TAMPA | FL | $45.41 |
| 03/09/18 | CREATELY CREATELY 0425753926 | MENTONE | AU | $5.00 |
| 03/10/18 | UBER *O6AVD HELP.UBER.COM | HELP.UBER.COM | CA | $12.50 |
| 03/10/18 | UBER *TRIP KB2VD HELP.UBER.COM | HELP.UBER.COM | CA | $7.62 |
| 03/10/18 | UBER *TRIP YY5P4 HELP.UBER.COM | HELP.UBER.COM | CA | $14.01 |
| 03/11/18 | UBER *BYBZD HELP.UBER.COM | HELP.UBER.COM | CA | $55.92 |
| 03/11/18 | UBER *DMB4O HELP.UBER.COM | HELP.UBER.COM | CA | $12.87 |
| 03/14/18 | MISTER CAR WASH #223 223 813-837-9333 | TAMPA | FL | $53.49 |
| 03/15/18 | Atlassian COMPUTERS & EQUIPMENT | San Francisco | | $20.00 |
| 03/15/18 | ANISE GLOBAL GASTROBAR 628107004676391 813-225-4272 | TAMPA | FL | $75.65 |

Alexis Logan Production 5463

### Detail Continued

| | | | | Amount |
|---|---|---|---|---|
| 03/16/18 | MSFT * E07005J0CQ 0000<br>800-642-7676 | MSBILL.INFO | WA | $12.50 |
| 03/17/18 | UBER  *TRIP BDIP6<br>HELP.UBER.COM | HELP.UBER.COM | CA | $12.41 |
| 03/17/18 | UBER  *TRIP H3MZK<br>HELP.UBER.COM | HELP.UBER.COM | CA | $7.62 |
| 03/17/18 | LOGMEIN GOTOMEETING<br>SERVICES/SW | 855-837-1750 | CA | $39.20 |
| 03/17/18 | UBER  *TRIP T2DXR<br>HELP.UBER.COM | HELP.UBER.COM | CA | $14.15 |
| 03/19/18 | ADOBE *ACROPRO SUBS Adobe Systems<br>800-833-6687 | SAN JOSE | CA | $14.99 |
| 03/20/18 | FEDEX INV 376200987 I376200987<br>1-800-622-1147 | MEMPHIS | TN | $35.10 |

Alexis Logan Production 5489

### Detail

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 03/31/18 | ANTHONY'S COAL FIRED PIZZA<br>954-462-5555 | FORT LAUDERDALE | FL | $87.99 |
| 04/01/18 | RENDEZVOUS WATERFRONT 0032<br>754-214-5633 | FORT LAUDERDA | FL | $57.97 |
| 04/02/18 | 32742 - 350 LAS OLAS CENTREL<br>3122742000 | FORT LAUDERDALE | FL | $4.00 |
| 04/02/18 | UBREAKIFIX 0000<br>954-916-7525 | FORT LAUDERDA | FL | $111.27 |
| 04/02/18 | Asurion Wireless Insurance 866-667-253<br>5IQ9IV6wP5U7i24hw3js | Nashville | | $29.00 |
| 04/03/18 | SHELL OIL 57543664205<br>AUTO FUEL DISPENSER | FORT LAUDERDALE | FL | $29.85 |
| 04/05/18 | BAR ASIA<br>703-568-4070 | TAMPA | FL | $24.42 |
| 04/11/18 | PARCHMENT TRANSCRIPT<br>TRANSMISSION | SCOTTSDALE | AZ | $8.25 |
| 04/12/18 | 7-ELEVEN 37149 00073714901<br>813-837-9509 | TAMPA | FL | $39.53 |
| 04/12/18 | 7-ELEVEN 37149 00073714901<br>813-837-9509 | TAMPA | FL | $82.05 |

Alexis Logan Production 5495

| Detail | | | | |
|---|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | | Amount |
|---|---|---|---|---|
| 03/20/18 | SUNPASS*ACC16171736<br>888-865-5352 | 888-865-5352 | FL | $20.00 |
| 03/21/18 | OCEAN PRIME<br>803-490-5288 | TAMPA | FL | $27.47 |
| 03/21/18 | MITXPC INC<br>5102266883 | 5102266883 | CA | $2,812.10 |
| 03/22/18 | EXXONMOBIL 4824<br>813-949-0788 | TAMPA | FL | $69.18 |

Alexis Logan Production 5496

| 03/25/18 | DOC B'S FRESH KITC 542929806325627<br>3124873301 | TAMPA | FL | $104.40 |
|---|---|---|---|---|
| 03/30/18 | UBER *TRIP N5WSM<br>HELP.UBER.COM | HELP.UBER.COM | CA | $20.32 |
| 03/31/18 | UBER *TRIP U5NQ2<br>HELP.UBER.COM | HELP.UBER.COM | CA | $7.52 |
| 03/31/18 | UBER *TRIP J7L7W<br>HELP.UBER.COM | HELP.UBER.COM | CA | $12.72 |
| 04/01/18 | MSFT * E08005LWCV 0000<br>800-642-7676 | MSFT AZURE | WA | $6.38 |
| 04/08/18 | UBER *TRIP 4ANUH<br>HELP.UBER.COM | HELP.UBER.COM | CA | $14.33 |
| 04/08/18 | UBER *TRIP BGVBK<br>HELP.UBER.COM | HELP.UBER.COM | CA | $13.79 |
| 04/10/18 | CREATELY CREATELY<br>0425753926 | MENTONE | AU | $5.00 |
| 04/12/18 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |
| 04/13/18 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |
| 04/14/18 | MISTER CAR WASH #223 223<br>813-837-9333 | TAMPA | FL | $53.49 |
| 04/15/18 | Atlassian<br>COMPUTERS & EQUIPMENT | San Francisco | | $20.00 |
| 04/16/18 | FEDEX INV 378984682 I378984682<br>1-800-622-1147<br>SCOTT, JUSTIN WA<br>DIRECT BILLING TRANSACTION<br>FEDEX INV# 000378984682<br>FedEx #1-800-622-1147 | MEMPHIS | TN | $46.06 |
| 04/16/18 | MSFT * E07005PCCW 0000<br>800-642-7676 | MSBILL.INFO | WA | $12.50 |

Alexis Logan Production 5497

## Detail Continued

| | | | | | | Amount |
|---|---|---|---|---|---|---|
| 04/17/18 | PRICELINE.COM | | NORWALK | | CT | $361.39 |
| | UNITED AIRLINES | | | | | |
| | From: | To: | Carrier: | Class: | | |
| | TAMPA INTERNATIONA | DENVER INTL APT | UA | W | | |
| | | TAMPA INTERNATIONAL | UA | K | | |
| | Ticket Number: 01671043398080 | | Date of Departure: 04/23 | | | |
| | Passenger Name: LOGAN/ALEXIS | | | | | |
| | Document Type: PASSENGER TICKET | | | | | |
| 04/17/18 | LogMeInInc.com | | 855-837-1750 | | CA | $39.20 |
| | SERVICES/SW | | | | | |
| 04/17/18 | PRICELINE*RENTAL CAR | | 800-774-2354 | | CT | $68.55 |
| | CAR RENTALS | | | | | |
| | INVOICE NUMBER | | | | | |
| | NO REFUNDS | | | | | |
| 04/18/18 | ADOBE *ACROPRO SUBS Adobe Systems | | SAN JOSE | | CA | $14.99 |
| | 800-833-6687 | | | | | |

Alexis Logan Production 5521

## Detail

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 04/30/18 | LETS GET MOVING INC LETS GET MOVING | SAINT PETERSB | FL | $1,564.00 |
| | FREIGHT & MOVING | | | |
| 04/30/18 | USPS.COM MOVER'S GUIDE 670178000 | MEMPHIS | TN | $1.00 |
| | 8002383150 | | | |
| 05/01/18 | LOWE'S | TAMPA | FL | $61.71 |
| | 813-313-5040 | | | |
| 05/02/18 | SAKANA SUSHI RESTAURANT. 0001 | TAMPA | FL | $21.24 |
| | 646-468-8878 | | | |
| 05/10/18 | SPROUTS FARMERS MARKET # 0000000003663 | S TAMPA | FL | $147.99 |
| | 9999999999 | | | |
| 05/16/18 | 72848 - RIVERGATE TOWER SPRK728481 SPR | TAMPA | FL | $8.00 |
| | 3122742000 | | | |
| 05/18/18 | CICCIO WATER CICCIO WATER | TAMPA | FL | $65.64 |
| | 1015 S HOWARD AVE TAMPA, | | | |
| 05/19/18 | PUBLIX | TAMPA | FL | $64.30 |
| | 8139881980 | | | |
| 05/19/18 | PUBLIX | TAMPA | FL | $20.40 |
| | 8139881980 | | | |

Alexis Logan Production 5527

## Detail

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | | | Amount |
|---|---|---|---|---|---|
| 04/19/18 | EXXONMOBIL 4824<br>813-949-0788 | TAMPA | | FL | $72.67 |
| 04/20/18 | MICROSOFT *STORE 0000<br>Z20NOUKINA0E 33947<br>UKINA0E Z20NOUKINA0 | MSBILL.INFO | | WA | $99.99 |
| 04/20/18 | USPS PO 1189230611 001367971<br>8002758777 | TAMPA | | FL | $26.80 |
| 04/21/18 | LOWE'S<br>813-313-5040 | TAMPA | | FL | $23.04 |
| 04/23/18 | UBER *TRIP EFHJM<br>HELP.UBER.COM | HELP.UBER.COM | | CA | $14.55 |
| 04/23/18 | HOONG'S PALACE<br>3037925528 | ENGLEWOOD | | CO | $30.50 |
| 04/24/18 | UNITED AIRLINES<br>UNITED AIRLINES<br>From: To:<br>DENVER INTL APT TAMPA INTERNATIONA<br>Ticket Number: 01629292723284<br>Passenger Name: ALEXIS /INFLIGHT A LA<br>Document Type: INFLIGHT CHARGES | HOUSTON<br><br>Carrier: Class:<br>UA 00<br>Date of Departure: 04/24 | | TX | $3.99 |
| 04/24/18 | UNITED AIRLINES<br>UNITED AIRLINES<br>From: To:<br>DENVER INTL APT TAMPA INTERNATIONA<br>Ticket Number: 01629292723295<br>Passenger Name: ALEXIS /INFLIGHT LIQUO<br>Document Type: INFLIGHT CHARGES | HOUSTON<br><br>Carrier: Class:<br>UA 00<br>Date of Departure: 04/24 | | TX | $15.98 |
| 04/24/18 | ELWAYS 0007<br>303-342-9000 | GREENWOOD VIL | | CO | $15.42 |
| 04/24/18 | HAMPTON INN DENVER TECH<br>Arrival Date Departure Date<br>04/24/18 04/24/18<br>00000000<br>LODGING | CENTENNIAL | | CO | $169.74 |
| 04/24/18 | AVIS RENT A CAR<br>Location<br>Rental: DENVER CO<br>Return: DENVER CO<br>Agreement Number: 781668344<br>Renter Name: LOGAN,ALEXIS | DENVER<br>Date<br>18/04/23<br>18/04/24 | | CO | $71.73 |
| 04/27/18 | SAKANA SUSHI RESTAURANT. 0001<br>646-468-8878 | TAMPA | | FL | $97.25 |
| 04/29/18 | CVS PHARMACY<br>8007467287<br>PHARMACIES | TAMPA | | FL | $12.18 |
| 05/02/18 | AVIS RENT A CAR TOLLS<br>WWW.HTALLC.COM | 800-482-0159 | | NY | $16.75 |

## Alexis Logan Production 5528

| Date | Description | Location | State | Amount |
|---|---|---|---|---|
| 05/05/18 | MSFT * E08005SIAY 0000<br>800-642-7676 | MSFT AZURE | WA | $8.49 |
| 05/06/18 | UBER *TRIP V4MYI<br>HELP.UBER.COM | HELP.UBER.COM | CA | $8.54 |
| 05/09/18 | CREATELY CREATELY<br>0425753926 | MENTONE | AU | $5.00 |
| 05/10/18 | LOWE'S<br>813-313-5040 | TAMPA | FL | $13.89 |
| 05/10/18 | LOWE'S<br>813-313-5040 | TAMPA | FL | $21.38 |
| 05/10/18 | PANE RUSTICA 000000001<br>8139028828 | TAMPA | FL | $55.30 |
| 05/13/18 | UBER *TRIP IWVC6<br>HELP.UBER.COM | HELP.UBER.COM | CA | $10.32 |
| 05/14/18 | MISTER CAR WASH #223 223<br>813-837-9333 | TAMPA | FL | $53.49 |
| 05/15/18 | Atlassian<br>COMPUTERS & EQUIPMENT | San Francisco | | $20.00 |
| 05/16/18 | MSFT * E07005W0ND 0000<br>800-642-7676 | MSBILL.INFO | WA | $12.50 |
| 05/17/18 | LogMeInInc.com<br>SERVICES/SW | 855-837-1750 | CA | $39.20 |
| 05/18/18 | ADOBE *ACROPRO SUBS Adobe Systems<br>800-833-6687 | SAN JOSE | CA | $14.99 |
| 05/19/18 | UBER *TRIP YCGUV<br>HELP.UBER.COM | HELP.UBER.COM | CA | $25.67 |
| 05/19/18 | UBER *TRIP NHAAG<br>HELP.UBER.COM | HELP.UBER.COM | CA | $30.19 |
| 05/19/18 | UBER *TRIP 54KVK<br>HELP.UBER.COM | HELP.UBER.COM | CA | $8.94 |
| 05/20/18 | UBER *TRIP B4OYF<br>HELP.UBER.COM | HELP.UBER.COM | CA | $17.44 |

Alexis Logan Production 5553

| Detail | | | | |
|---|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 05/20/18 | SAKANA SUSHI RESTAURANT. 0001<br>646-468-8878 | TAMPA | FL | $41.68 |
| 05/21/18 | CORPORATE FILINGS LLC 00-08029641761<br>888-7898466 | SHERIDAN | WY | $49.00 |
| 05/23/18 | THE HOME DEPOT<br>800-654-0688 | TAMPA | FL | $106.97 |
| 05/23/18 | THE HOME DEPOT<br>800-654-0688 | TAMPA | FL | $75.97 |
| 05/23/18 | CICCIO WATER CICCIO WATER<br>1015 S HOWARD AVE TAMPA, | TAMPA | FL | $39.10 |
| 05/25/18 | ABC FINE WINE & SPIRITS<br>4078510000 | TAMPA | FL | $94.12 |
| 05/27/18 | TARGET GANDY 1051<br>DISCOUNT STORE | TAMPA | FL | $106.61 |
| 05/27/18 | THE HOME DEPOT<br>800-654-0688 | TAMPA | FL | $133.67 |
| 05/27/18 | LILLY PULITZER<br>888-725-4559 | SARASOTA | FL | $222.05 |
| 05/29/18 | MAGGIANOS TAMPA 0039<br>800-983-4637 | TAMPA | FL | $153.82 |
| 05/29/18 | PUBLIX #1506 000001506<br>8636881188 | TAMPA | FL | $139.41 |

Alexis Logan Production 5554

| Detail Continued | | | | |
|---|---|---|---|---|

| | | | | Amount |
|---|---|---|---|---|
| 05/29/18 | CHEESE PLEASE 542929806960654<br>8137660060 | TAMPA | FL | $40.00 |
| 05/31/18 | SHELL OIL 57542494406<br>AUTO FUEL DISPENSER | TAMPA | FL | $32.94 |
| 05/31/18 | DILLARDS INTERNATION<br>DEPARTMENT STORE | TAMPA | FL | $84.53 |
| 06/01/18 | DSW TYRONE SQUARE 000029416<br>8663797463 | ST. PETERSBUR | FL | $117.69 |

Alexis Logan Production 5567

| 05/25/18 | EPICUREAN FOOD AND BEVERA 650000009460 8139998700 | TAMPA | FL | $57.08 |
|---|---|---|---|---|
| 05/31/18 | MSFT * E08005YUP4 0000 800-642-7676 | MSFT AZURE | WA | $9.32 |
| 06/01/18 | WAL-MART SUPERCENTER 4681 4681 DISCOUNT STORE | TAMPA | FL | $41.70 |
| 06/02/18 | UBER TRIP O2AMQ HELP.UBER.COM | HELP.UBER.COM | CA | $15.80 |
| 06/03/18 | APPLEBEE'S 770-6234775 | TAMPA | FL | $58.09 |
| 06/09/18 | CREATELY CREATELY 0425753926 | MENTONE | AU | $5.00 |
| 06/09/18 | UBER TRIP TQC7E HELP.UBER.COM | HELP.UBER.COM | CA | $9.23 |
| 06/09/18 | ON SWANN 650000009071377 8132510110 | TAMPA | FL | $88.40 |
| 06/09/18 | SHELL OIL 57542492905 AUTO FUEL DISPENSER | TAMPA | FL | $58.47 |
| 06/09/18 | UBER TRIP VKTX5 HELP.UBER.COM | HELP.UBER.COM | CA | $11.89 |
| 06/09/18 | UBER TRIP PGCPP HELP.UBER.COM | HELP.UBER.COM | CA | $8.45 |
| 06/10/18 | AMERICAN SOCIAL TAMPA 8136053333 | TAMPA | FL | $28.19 |
| 06/10/18 | AMERICAN SOCIAL TAMPA 8136053333 | TAMPA | FL | $78.85 |
| 06/10/18 | UBER TRIP JMWLF HELP.UBER.COM | HELP.UBER.COM | CA | $9.78 |
| 06/12/18 | MSFT * E070061N7Q 0000 800-642-7676 | MSBILL.INFO | WA | $12.00 |
| 06/13/18 | ON SWANN 650000009071377 8132510110 | TAMPA | FL | $101.89 |
| 06/14/18 | MISTER CAR WASH #223 223 813-837-9333 | TAMPA | FL | $53.49 |

Alexis Logan Production 5568

**Detail Continued**

| | | | | Amount |
|---|---|---|---|---|
| 06/14/18 | GODADDY.COM (480)505-8855 | 480-505-8855 | AZ | $25.16 |
| 06/15/18 | Atlassian COMPUTERS & EQUIPMENT | San Francisco | | $20.00 |
| 06/17/18 | LOGMEIN GOTOMEETING SERVICES/SW | 855-837-1750 | CA | $39.20 |
| 06/18/18 | SAKANA SUSHI RESTAURANT. 0001 646-468-8878 | TAMPA | FL | $27.24 |
| 06/18/18 | ADOBE *ACROPRO SUBS Adobe Systems 800-833-6687 | SAN JOSE | CA | $14.99 |

Alexis Logan Production 5601

**Detail**

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 06/21/18 | RACETRAC 95  000950 97400000950<br>GAS STATION | PRT CHARLOTE | FL | $59.14 |
| 06/21/18 | 32742 - 350 LAS OLAS CENTREL<br>3122742000 | FORT LAUDERDALE | FL | $5.00 |
| 06/21/18 | EXXONMOBIL 9955<br>813-681-4279 | RIVERVIEW | FL | $52.27 |
| 06/26/18 | 7-ELEVEN 38090 00073809001<br>813-571-2119 | BRANDON | FL | $66.14 |
| 07/08/18 | THE HOME DEPOT<br>800-654-0688 | TAMPA | FL | $33.17 |
| 07/08/18 | 7-ELEVEN 22724 00072272441<br>813-837-4430 | TAMPA | FL | $71.03 |
| 07/12/18 | MISTER CAR WASH #223 223<br>813-837-9333 | TAMPA | FL | $120.00 |
| 07/13/18 | USPS PO 1189230611 001367971<br>8002758777 | TAMPA | FL | $20.20 |
| 07/16/18 | TOSTI'S SPIRITS & FINE WINE<br>LIQUOR STORE | ST PETERSBURG | FL | $66.29 |
| 07/20/18 | CFX - VES SERVICE CTR<br>407-690-5200 | ORLANDO | FL | $5.80 |

Alexis Logan Production 5601

**Fees**

| | | | Amount |
|---|---|---|---|
| 07/20/18 | ALEXIS K LOGAN | ANNUAL MEMBERSHIP FEE | $175.00 |
| 07/20/18 | JAMES D LOGAN | ANNUAL MEMBERSHIP FEE | |

Alexis Logan Production 5606

| | | | Spend | Amount |
|---|---|---|---|---|
| 06/23/18 | UBER TRIP 6YX4S HELP.UBER.COM | HELP.UBER.COM | CA | $9.17 |
| 06/27/18 | UBER TRIP IEMIS HELP.UBER.COM | HELP.UBER.COM | CA | $8.44 |
| 06/29/18 | UBER TRIP DTCQL HELP.UBER.COM | HELP.UBER.COM | CA | $10.04 |
| 06/30/18 | UBER TRIP RL24H HELP.UBER.COM | HELP.UBER.COM | CA | $9.71 |
| 07/01/18 | UBER TRIP MC7HA HELP.UBER.COM | HELP.UBER.COM | CA | $8.43 |
| 07/01/18 | UBER TRIP R6KEW HELP.UBER.COM | HELP.UBER.COM | CA | $8.26 |
| 07/02/18 | MSFT * E080065OSO 0000 800-642-7676 | MSFT AZURE | WA | $7.75 |
| 07/04/18 | UBER TRIP HHDGF HELP.UBER.COM | HELP.UBER.COM | CA | $12.77 |
| 07/08/18 | UBER TRIP TMQNN HELP.UBER.COM | HELP.UBER.COM | CA | $8.36 |
| 07/08/18 | UBER TRIP CIHLY HELP.UBER.COM | HELP.UBER.COM | CA | $8.76 |
| 07/09/18 | CREATELY CREATELY 0425753926 | MENTONE | AU | $5.00 |
| 07/11/18 | UBER TRIP TVB3P HELP.UBER.COM | HELP.UBER.COM | CA | $18.45 |
| 07/12/18 | UBER TRIP RT3SB HELP.UBER.COM | HELP.UBER.COM | CA | $7.62 |
| 07/12/18 | UBER TRIP GLOQU HELP.UBER.COM | HELP.UBER.COM | CA | $7.62 |
| 07/13/18 | UBER TRIP KTFYF HELP.UBER.COM | HELP.UBER.COM | CA | $15.32 |
| 07/14/18 | UBER TRIP 365CH HELP.UBER.COM | HELP.UBER.COM | CA | $23.24 |

Alexis Logan Production 5629

**Fees**

| | | | Amount |
|---|---|---|---|
| 07/20/18 | ALEXIS K LOGAN | ANNUAL MEMBERSHIP FEE | $450.00 |

Alexis Logan Production 5632

| Detail |
|---|


**ALEXIS K LOGAN**
Card Ending 7-11004

|  |  |  |  | Amount |
|---|---|---|---|---|
| 07/23/18 | 7-ELEVEN 35005 00073500501 813-872-9561 | TAMPA | FL | $57.53 |
| 07/27/18 | SHELL OIL 57543665004 AUTO FUEL DISPENSER | FORT LAUDERDALE | FL | $57.77 |
| 08/03/18 | SHELL OIL 57542492905 AUTO FUEL DISPENSER | TAMPA | FL | $65.25 |
| 08/03/18 | USPS PO 1189440600 001438877 8002758777 | TAMPA | FL | $26.20 |
| 08/07/18 | OSAKA SUSHI & GRILL 0001 813-968-8877 | TAMPA | FL | $22.19 |
| 08/12/18 | SAKANA SUSHI RESTAURANT. 0001 646-468-8878 | TAMPA | FL | $34.87 |

Alexis Logan Production 5636

| Detail |
|---|


**ALEXIS K LOGAN**
Card Ending 7-71004

|  |  |  |  | Amount |
|---|---|---|---|---|
| 07/22/18 | SUNPASS*ACC22455430 888-865-5352 | 888-865-5352 | FL | $10.00 |
| 07/27/18 | OFFICE DEPOT #201 000000201 8004633768 | TAMPA | FL | $162.60 |
| 07/27/18 | UBER EATS VNIX7 HELP.UBER.COM | HELP.UBER.COM | CA | $33.88 |
| 07/29/18 | OPC*VIRGINIA SCC 444043833 8043712123 | SAN RAMON | CA | $130.00 |
| 07/29/18 | SUNPASS*ACC16171736 888-865-5352 | 888-865-5352 | FL | $20.00 |
| 08/01/18 | MSFT * E08006CBJP 0000 800-642-7676 | MSFT AZURE | WA | $7.77 |
| 08/09/18 | CREATELY CREATELY 0425753926 | MENTONE | AU | $5.00 |
| 08/09/18 | SUNPASS*ACC22455430 888-865-5352 | 888-865-5352 | FL | $10.00 |
| 08/14/18 | MISTER CAR WASH #223 223 813-837-9333 | TAMPA | FL | $53.49 |
| 08/15/18 | Atlassian COMPUTERS & EQUIPMENT | San Francisco |  | $20.00 |
| 08/16/18 | MSFT * E07006GAM5 0000 800-642-7676 | MSBILL.INFO | WA | $12.00 |

Alexis Logan Production 5637

### Detail Continued

| | | | | Amount |
|---|---|---|---|---|
| 08/17/18 | LOGMEIN GOTOMEETING SERVICES/SW | LOGMEIN.COM | CA | $39.20 |
| 08/17/18 | UBER TRIP QM2M6 HELP.UBER.COM | HELP.UBER.COM | CA | $8.35 |
| 08/18/18 | UBER TRIP HFR7V HELP.UBER.COM | HELP.UBER.COM | CA | $1.00 |
| 08/18/18 | UBER TRIP HFR7V HELP.UBER.COM | HELP.UBER.COM | CA | $10.06 |
| 08/18/18 | UBER TRIP YRJUP HELP.UBER.COM | HELP.UBER.COM | CA | $17.82 |
| 08/18/18 | UBER TRIP PUP6K HELP.UBER.COM | HELP.UBER.COM | CA | $8.08 |
| 08/18/18 | UBER TRIP SMD6W HELP.UBER.COM | HELP.UBER.COM | CA | $11.97 |
| 08/18/18 | ADOBE *ACROPRO SUBS Adobe Systems 800-833-6687 | SAN JOSE | CA | $14.99 |
| 08/19/18 | AMERICAN SOCIAL TAMPA 8136053333 | TAMPA | FL | $150.19 |

Alexis Logan Production 5661

### Detail

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 08/23/18 | DISCOUNT BEVERAGE DEPOT 0000 941-268-1072 | ENGLEWOOD | FL | $64.17 |
| 08/23/18 | CHICANOS 021770016868317 9414975249 | VENICE | FL | $50.19 |
| 08/29/18 | USPS PO 1189350609 001377149 8002758777 | TAMPA | FL | $6.70 |
| 08/31/18 | 7-ELEVEN 22724 00072272441 813-837-4430 | TAMPA | FL | $62.22 |
| 09/07/18 | KUMO JAPANESE SUSHI AND G 00-080274918 RESTAURANT | NORTH PORT | FL | $113.46 |
| 09/08/18 | FIRST WATCH 158 FIRST WATCH 158 1617 US 41 BYPASS SOUTH | VENICE | FL | $35.28 |
| 09/10/18 | AAA POC MEMBERSHIP 0082 800-222-1134 | TAMPA | FL | $126.00 |
| 09/11/18 | TEXACO 0376941/CHEVRON CONVENIENCE | TAMPA | FL | $29.87 |
| 09/11/18 | FIRST WATCH FIRST WATCH 2726 E FOWLER AVE TAMPA, | TAMPA | FL | $32.72 |

Alexis Logan Production 5662

## Detail Continued

| | | | | | | Amount |
|---|---|---|---|---|---|---|
| 09/12/18 | Southwest Airlines | | DALLAS | | TX | $1,197.96 |
| | SOUTHWEST AIRLINES (MASTE | | | | | |
| | From: | To: | Carrier: | Class: | | |
| | TAMPA INTERNATIONA | DENVER INTL APT | WN | K | | |
| | | TAMPA INTERNATIONA | WN | K | | |
| | Ticket Number: 5261487768673 | | Date of Departure: 09/18 | | | |
| | Passenger Name: LOGAN/ALEXIS KAY | | | | | |
| | Document Type: PASSENGER TICKET | | | | | |
| 09/12/18 | Southwest Airlines | | DALLAS | | TX | $465.96 |
| | SOUTHWEST AIRLINES (MASTE | | | | | |
| | From: | To: | Carrier: | Class: | | |
| | TAMPA INTERNATIONA | DENVER INTL APT | WN | R | | |
| | | TAMPA INTERNATIONA | WN | R | | |
| | Ticket Number: 5261487778261 | | Date of Departure: 09/22 | | | |
| | Passenger Name: LOGAN/JANICE KAY | | | | | |
| | Document Type: PASSENGER TICKET | | | | | |
| 09/12/18 | OXFORD EXCHANGE RESTAURAN | | TAMPA | | FL | $29.35 |
| | 8132530222 | | | | | |
| 09/14/18 | SHELL OIL 57542492905 | | TAMPA | | FL | $63.57 |
| | AUTO FUEL DISPENSER | | | | | |
| 09/17/18 | WALGREENS | | TAMPA | | FL | $85.07 |
| | NONE 33609 | | | | | |
| | PHARMACIES | | | | | |

Alexis Logan Production 5666

## Detail

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | | | Amount |
|---|---|---|---|---|---|
| 08/20/18 | SUNPASS*ACC22455430 | 888-865-5352 | FL | | $10.00 |
| | 888-865-5352 | | | | |
| 08/21/18 | 7-ELEVEN 22724 00072272441 | TAMPA | FL | | $62.48 |
| | 813-837-4430 | | | | |
| 08/25/18 | UBER TRIP BSLTP | HELP.UBER.COM | CA | | $3.80 |
| | HELP.UBER.COM | | | | |
| 08/25/18 | UBER TRIP RIHKT | HELP.UBER.COM | CA | | $4.18 |
| | HELP.UBER.COM | | | | |
| 08/27/18 | USPS PO 1189230611 001367971 | TAMPA | FL | | $24.70 |
| | 8002758777 | | | | |
| 08/30/18 | FLORIDA DEPT OF STATE DI 0000000008753 | TALLAHASSEE | FL | | $550.00 |
| | 8502456939 | | | | |
| 09/01/18 | UBR* PENDING.UBER.COM | HELP.UBER.COM | CA | | $11.88 |
| | HELP.UBER.COM | | | | |
| 09/01/18 | MSFT * E08006IZ25 0000 | MSFT AZURE | WA | | $8.59 |
| | 800-642-7676 | | | | |
| 09/06/18 | LOGMEIN GOTOMEETING | LOGMEIN.COM | CA | | $34.13 |
| | SERVICES/SW | | | | |
| 09/09/18 | CREATELY CREATELY | MENTONE | AU | | $5.00 |
| | 0425753926 | | | | |
| 09/13/18 | SUNPASS*ACC22455430 | 888-865-5352 | FL | | $10.00 |
| | 888-865-5352 | | | | |
| 09/14/18 | MISTER CAR WASH #223 223 | TAMPA | FL | | $53.49 |
| | 813-837-9333 | | | | |
| 09/15/18 | Atlassian | San Francisco | | | $20.00 |
| | COMPUTERS & EQUIPMENT | | | | |

## Alexis Logan Production 5667

| | | | | | |
|---|---|---|---|---|---|
| 09/17/18 | A1010BUSD01<br>BUSINESS SERVICE | REDMOND | | | $98.71 |
| 09/17/18 | SUNPASS*ACC16171736<br>888-865-5352 | 888-865-5352 | FL | | $20.00 |
| 09/18/18 | ADOBE *ACROPRO SUBS Adobe Systems<br>800-833-6687 | SAN JOSE | CA | | $14.99 |

## Alexis Logan Production 5691

**Detail**


**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | | Amount |
|---|---|---|---|---|---|
| 09/19/18 | Southwest Airlines<br>SOUTHWEST AIRLINES (MASTE<br>From:              To:<br>DENVER INTL APT          TAMPA INTERNATIONA<br>Ticket Number: 5261490149233<br>Passenger Name: LOGAN/ALEXIS KAY<br>Document Type: PASSENGER TICKET | DALLAS<br><br>Carrier:        Class:<br>WN            Y<br>Date of Departure: 09/20 | TX | | | $337.99 |
| 09/19/18 | LOS ARCOS 0000<br>303-858-8860 | LONE TREE | CO | | $47.47 |
| 09/20/18 | TIMBERLINE STEAKS & GRILL<br>3033426671 | DENVER | CO | | $44.72 |
| 09/20/18 | LONE TREE 56192<br>(303)790-0202 | LITTLETON | CO | | $326.70 |
| 09/20/18 | UNITED PACIFIC 6544 09439613<br>UNITED PACIFIC 6544 | LONE TREE | CO | | $8.32 |
| 09/22/18 | LOWE'S<br>813-313-5040 | TAMPA | FL | | $99.08 |
| 09/26/18 | USPS PO 1189230611 001367971<br>8002758777 | TAMPA | FL | | $6.70 |
| 10/01/18 | TARGET GANDY 1051<br>DISCOUNT STORE | TAMPA | FL | | $78.63 |
| 10/01/18 | FIRST WATCH<br>3712 HENDERSON BLVD TAMP | TAMPA | FL | | $32.03 |
| 10/02/18 | 7-ELEVEN 22724 00072272441<br>813-837-4430 | TAMPA | FL | | $33.69 |
| 10/03/18 | 32742 - 350 LAS OLAS CENTREL<br>3122742000 | FORT LAUDERDALE | FL | | $5.00 |
| 10/03/18 | EXXONMOBIL 9740<br>813-805-0883 | TAMPA | FL | | $36.01 |

## Alexis Logan Production 5692

**Detail Continued**

| | | | | | Amount |
|---|---|---|---|---|---|
| 10/03/18 | ADVANCE AUTO PARTS #9508 9508<br>950802725201 33950<br>AUTO PARTS/ACCESSORIES | PUNTA GORDA | FL | | $10.69 |
| 10/04/18 | RACETRAC441  004416 97400004416<br>000-0000000 | ST PETERSBUR | FL | | $19.45 |
| 10/08/18 | 1966 FOODS 00000062778<br>813-354-7902 | TAMPA | FL | | $65.45 |
| 10/11/18 | CINEBISTRO AT HYDEPARK<br>RESTAURANT | TAMPA | FL | | $105.11 |
| 10/12/18 | CVS PHARMACY<br>8007467287 | TAMPA | FL | | $42.22 |

Alexis Logan Production 5699

| Detail | | | | |
|---|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | | Amount |
|---|---|---|---|---|
| 09/20/18 | PAYL RENT A CAR<br>Location<br>Rental:   DENVER CO<br>Return:   DENVER CO<br>Agreement Number: 308625354<br>Renter Name: LOGAN,ALEXIS | DENVER<br>Date<br>18/09/18<br>18/09/20 | CO | $318.66 |
| 09/20/18 | MCAFEE INC<br>10855193ONLINE SOFTWR | SANTA CLARA | CA | $99.99 |
| 09/21/18 | UBER TRIP VFHIP<br>HELP.UBER.COM | HELP.UBER.COM | CA | $5.00 |
| 09/21/18 | UBR* PENDING.UBER.COM<br>HELP.UBER.COM | HELP.UBER.COM | CA | $18.04 |
| 09/22/18 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |
| 09/28/18 | CAR RENTAL TOLLS<br>WWW.HTALLC.COM | 800-482-0159 | NY | $30.30 |
| 10/01/18 | A1010BUSD01<br>BUSINESS SERVICE | REDMOND | | $8.51 |
| 10/07/18 | LOGMEIN GOTOMEETING<br>SERVICES/SW | LOGMEIN.COM | CA | $47.20 |

Alexis Logan Production 5700

| Detail Continued | | | | |
|---|---|---|---|---|

| | | | | Amount |
|---|---|---|---|---|
| 10/09/18 | CREATELY CREATELY<br>0425753926 | MENTONE | AU | $5.00 |
| 10/13/18 | UBER TRIP NCZZ7<br>HELP.UBER.COM | HELP.UBER.COM | CA | $1.00 |
| 10/13/18 | UBR* PENDING.UBER.COM<br>HELP.UBER.COM | HELP.UBER.COM | CA | $11.10 |
| 10/13/18 | UBR* PENDING.UBER.COM<br>HELP.UBER.COM | HELP.UBER.COM | CA | $7.62 |
| 10/13/18 | UBER TRIP S2OOO<br>HELP.UBER.COM | HELP.UBER.COM | CA | $9.49 |
| 10/14/18 | UBER TRIP LIAMO<br>HELP.UBER.COM | HELP.UBER.COM | CA | $10.51 |
| 10/14/18 | MISTER CAR WASH #223 223<br>813-837-9333 | TAMPA | FL | $53.49 |
| 10/15/18 | Atlassian<br>COMPUTERS & EQUIPMENT | San Francisco | | $20.00 |
| 10/16/18 | MSFT * E07006U59M 0000<br>800-642-7676 | MSBILL.INFO | WA | $60.00 |
| 10/18/18 | ADOBE *ACROPRO SUBS Adobe Systems<br>800-833-6687 | SAN JOSE | CA | $14.99 |

Alexis Logan Production 5727

**Detail**

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | | Amount |
|---|---|---|---|---|---|
| 10/20/18 | SHELL OIL 57543957906<br>AUTO FUEL DISPENSER | MIAMI | FL | | $75.71 |
| 10/20/18 | WASABI JAPANESE STEAKHOUS 650000009707<br>2393379555 | ESTERO | FL | | $89.90 |
| 10/21/18 | MISTER CAR WASH<br>727-392-0357 | SEMINOLE | FL | | $38.00 |
| 10/22/18 | SAKANA SUSHI RESTAURANT. 0001<br>646-468-8878 | TAMPA | FL | | $52.28 |
| 10/25/18 | HAVEN WINE BAR 000000000000000<br>RESTAURANT | TAMPA | FL | | $58.93 |
| 10/27/18 | BEDBATH&BEYOND#0178 178<br>MISC HOME FURNISHINGS | ST. | FL | | $53.49 |
| 10/27/18 | WALGREENS<br>8002892273 | TAMPA | FL | | $2.49 |
| 10/27/18 | PUBLIX<br>8139881980 | TAMPA | FL | | $82.66 |
| 10/28/18 | WAL-MART SUPERCENTER 4681 4681<br>DISCOUNT STORE | TAMPA | FL | | $89.31 |
| 10/30/18 | PUBLIX<br>8139881980 | TAMPA | FL | | $49.06 |
| 10/30/18 | EXXONMOBIL 9740<br>813-805-0883 | TAMPA | FL | | $41.63 |
| 10/31/18 | THE HOME DEPOT<br>800-654-0688 | TAMPA | FL | | $72.20 |
| 10/31/18 | SUNOCO 0091134700 0091<br>813-875-1225 | TAMPA | FL | | $60.62 |
| 11/05/18 | WRIGHT'S GOURMET HOUSE<br>4031965 33629<br>RESTAURANTS | TAMPA | FL | | $15.02 |
| 11/05/18 | WALMART.COM<br>RETAIL | 800-966-6546 | AR | | $40.48 |

Alexis Logan Production 5728

**Detail Continued**

| | | | | | Amount |
|---|---|---|---|---|---|
| 11/07/18 | EPICUREAN FOOD AND BEVERA 650000009460<br>8139998700 | TAMPA | FL | | $41.89 |
| 11/08/18 | CVS PHARMACY<br>8007467287<br>PHARMACIES | TAMPA | FL | | $17.76 |
| 11/09/18 | EXXONMOBIL 9740<br>813-805-0883 | TAMPA | FL | | $41.42 |
| 11/10/18 | RED LOBSTER 0479 479<br>941-625-7745 | PT CHARLOTTE | FL | | $85.91 |
| 11/11/18 | PUBLIX<br>8139881980 | TAMPA | FL | | $96.69 |
| 11/13/18 | FIRST CHOICE SURVEYI<br>LAND SURVEYS | 407-951-3425 | FL | | $2,000.00 |
| 11/14/18 | FIRST CHOICE SURVEYI<br>LAND SURVEYS | 407-951-3425 | FL | | $200.00 |
| 11/14/18 | SAKANA SUSHI RESTAURANT. 0001<br>646-468-8878 | TAMPA | FL | | $43.07 |
| 11/18/18 | 7 ELEVEN 37671 00000146084<br>813-348-2386 | TAMPA | FL | | $45.42 |

Alexis Logan Production 5755

| **Detail** | | | | |
|---|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | **Amount** |
|---|---|---|---|---|
| 11/21/18 | 7-ELEVEN 22724 00072272441<br>813-837-4430 | TAMPA | FL | $45.87 |
| 11/26/18 | Southwest Airlines<br>SOUTHWEST AIRLINES (MASTE<br>From:                          To:<br>ORLANDO INTERNATIO          DENVER INTL APT<br>Ticket Number: 5262412204027<br>Passenger Name: LOGAN/ALEXIS KAY<br>Document Type: PASSENGER TICKET | DALLAS<br><br>Carrier:          Class:<br>WN                 K<br>Date of Departure: 11/29 | TX | $598.98 |
| 11/26/18 | EXXONMOBIL 9740<br>813-805-0883 | TAMPA | FL | $39.45 |
| 11/26/18 | USPS PO 1175540030 001377693<br>8002758777 | PLACIDA | FL | $6.70 |
| 11/28/18 | 7-ELEVEN 22724 00072272441<br>813-837-4430 | TAMPA | FL | $40.92 |
| 11/28/18 | LAMPU STEAK HOUSE & SU 0001<br>352-383-6119 | MOUNT DORA | FL | $57.99 |
| 11/30/18 | LOWE'S OF MT. DORA, FL 2577<br>352-385-3600 | MT. DORA | FL | $37.33 |
| 11/30/18 | CHILI'S GRILL & BAR<br>800-983-4637 | MOUNT DORA | FL | $46.28 |
| 11/30/18 | LOWE'S OF MT. DORA, FL 2577<br>352-385-3600 | MT. DORA | FL | $35.21 |
| 11/30/18 | EXXONMOBIL 9755<br>352-383-1544 | MOUNT DORA | FL | $48.49 |

58

Alexis Logan Production 5756

## Detail Continued

| | | | | | | Amount |
|---|---|---|---|---|---|---|
| 11/30/18 | MOUNT DORA ACE 0000<br>352-383-2101 | | MOUNT DORA | | FL | $16.02 |
| 12/03/18 | CRITTERFENCE.COM<br>8559217900 | | 8559217900 | | SC | $2,292.46 |
| 12/03/18 | LAMPU STEAK HOUSE & SU 0001<br>352-383-6119 | | MOUNT DORA | | FL | $50.99 |
| 12/04/18 | ADT-PROTECT YOUR HOME<br>3178104720 | | 800-6899554 | | IN | $105.93 |
| 12/05/18 | ONE STEPP FOOD STORE 00000203067<br>813-252-8840 | | TAMPA | | FL | $53.70 |
| 12/06/18 | Southwest Airlines<br>SOUTHWEST AIRLINES (MASTE<br>From:                          To:<br>ORLANDO INTERNATIO        DENVER INTL APT<br>                                 ORLANDO INTERNATIO<br>Ticket Number: 5262415688751<br>Passenger Name: LOGAN/ALEXIS KAY<br>Document Type: PASSENGER TICKET | | DALLAS<br><br>Carrier:        Class:<br>WN              K<br>WN              K<br>Date of Departure: 12/08 | | TX | $1,197.96 |
| 12/06/18 | ADTSECURITY MYADT.CO<br>13556724 32757- | | 800-238-2727 | | FL | $105.84 |
| 12/09/18 | TOWNEPLACE SUITES9P4<br>Arrival Date           Departure Date<br>12/08/18                12/09/18<br>00000000 | | Lone Tree | | CO | $101.51 |
| 12/11/18 | JOHN HOLLY'S ASIAN BISTRO<br>3037689088 | | LONE TREE | | CO | $36.12 |
| 12/12/18 | PLAZA GUADALAJARA 461682001142694<br>CARLOSJAIME8021@GMAIL.COM | | MOUNT DORA | | FL | $36.22 |
| 12/12/18 | LONE TREE 56192<br>(303)790-0202 | | LITTLETON | | CO | $342.04 |
| 12/13/18 | MAN CRATES STORE<br>8669027260 | | SAN MATEO | | CA | $123.70 |
| 12/13/18 | AMZN MKTP US*M279Y04I0<br>BOOK STORES | | AMZN.COM/BILL | | WA | $733.22 |
| 12/13/18 | ADT-PROTECT YOUR HOME<br>3178104720 | | 800-6899554 | | IN | $73.83 |
| 12/14/18 | ABC FINE WINE/SPIRITS<br>4078510000 | | MOUNT DORA | | FL | $201.23 |
| 12/14/18 | PUBLIX<br>8636881188 | | MOUNT DORA | | FL | $127.87 |
| 12/18/18 | THE HOME DEPOT<br>800-654-0688 | | LEESBURG | | FL | $8.48 |
| 12/18/18 | USPS PO 1161350567 001373982<br>8002758777 | | MOUNT DORA | | FL | $24.70 |
| 12/19/18 | THE HOME DEPOT<br>800-654-0688 | | LEESBURG | | FL | $52.35 |
| 12/19/18 | SUNOCO 0050638600 0050<br>352-508-5525 | | TAVARES | | FL | $42.92 |

Alexis Logan Production 5761

## Detail

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | Foreign Spend | Amount |
|---|---|---|---|---|
| 11/21/18 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |
| 11/25/18 | DROPBOX*3SV3Y4VZYX2W<br>4159867057 | SAN FRANCISCO | CA | $99.00 |

Alexis Logan Production 5762

## Detail Continued

| | | | | Foreign Spend | Amount |
|---|---|---|---|---|---|
| 11/28/18 | Southwest Airlines<br>SOUTHWEST AIRLINES (MASTE<br>From:             To:<br>TAMPA INTERNATIONA   DENVER INTL APT<br>Ticket Number: 5262413441297<br>Passenger Name: LOGAN/ALEXIS KAY<br>Document Type: PASSENGER TICKET | DALLAS<br><br>Carrier:        Class:<br>WN              K<br>Date of Departure: 12/02 | TX | | $5.00 |
| 11/28/18 | SUNPASS*ACC16171736<br>888-865-5352 | 888-865-5352 | FL | | $20.00 |
| 12/01/18 | MSFT * E080074030 0000<br>800-642-7676 | MSFT AZURE | WA | | $8.85 |
| 12/07/18 | LOGMEIN GOTOMEETING<br>SERVICES/SW | LOGMEIN.COM | CA | | $47.20 |
| 12/07/18 | AVIS.COM PREPAY RESERV 0000<br>           Location<br>Rental:    VIRGINIA BEAC VA<br>Return:    VIRGINIA BEAC VA<br>Agreement Number: 40619321<br>Renter Name: Not Provided | VIRGINIA BEAC<br>Date<br>18/12/07<br>18/12/07 | VA | | $281.84 |
| 12/09/18 | CREATELY<br>0425753926 | MENTONE | AU | | $5.00 |
| 12/09/18 | UBER  *EATS-M5BYM<br>HELP.UBER.COM | HELP.UBER.COM | CA | | $23.40 |
| 12/11/18 | UBER  *TRIP-2U4MU<br>HELP.UBER.COM | HELP.UBER.COM | CA | | $4.81 |
| 12/11/18 | UBER  *EATS-Z7AA5<br>HELP.UBER.COM | HELP.UBER.COM | CA | | $28.29 |
| 12/12/18 | TIMBERLINE STEAKS & GRILL<br>3033426671 | DENVER | CO | | $37.32 |
| 12/12/18 | UBER  *TRIP-X5AQJ<br>HELP.UBER.COM | HELP.UBER.COM | CA | | $64.09 |
| 12/12/18 | AVIS RENT A CAR<br>           Location<br>Rental:    DENVER CO<br>Return:    DENVER CO<br>Agreement Number: 367924723<br>Renter Name: LOGAN,ALEXIS | DENVER<br>Date<br>18/12/08<br>18/12/12 | CO | | $59.61 |
| 12/14/18 | MISTER CAR WASH #223 223<br>813-837-9333 | TAMPA | FL | | $53.49 |

Alexis Logan Production 5763

**Detail Continued**

| | | | Foreign Spend | Amount |
|---|---|---|---|---|
| 12/15/18 | Atlassian<br>COMPUTERS & EQUIPMENT | San Francisco | | $20.00 |
| 12/16/18 | MSFT * E070078H54 0000<br>800-642-7676 | MSBILL.INFO | WA | $60.00 |
| 12/19/18 | ADOBE *ACROPRO SUBS Adobe Systems<br>800-833-6687 | SAN JOSE | CA | $14.99 |

Alexis Logan Production 5795

**Detail**

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | | Amount |
|---|---|---|---|---|
| 12/22/18 | UBER TRIP VRBNL<br>HELP.UBER.COM | HELP.UBER.COM | CA | $14.22 |
| 12/28/18 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |
| 12/28/18 | SUNPASS*ACC16171736<br>888-865-5352 | 888-865-5352 | FL | $20.00 |
| 12/30/18 | AMAZON MKTPLACE PMTS<br>DIRECT MKTG MISC | SEATTLE | WA | $23.27 |
| 12/30/18 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |
| 01/01/19 | MSFT * E08007BLQ9 0000<br>800-642-7676 | MSFT AZURE | WA | $8.53 |
| 01/02/19 | UBER EATS<br>HELP.UBER.COM | HELP.UBER.COM | CA | $28.05 |
| 01/07/19 | LOGMEIN GOTOMEETING<br>SERVICES/SW | LOGMEIN.COM | CA | $47.20 |
| 01/09/19 | CREATELY<br>0425753926 | MENTONE | AU | $5.00 |

Alexis Logan Production 5796

**Detail Continued**

| | | | | Amount |
|---|---|---|---|---|
| 01/14/19 | MISTER CAR WASH #223 223<br>813-837-9333 | TAMPA | FL | $53.49 |
| 01/15/19 | Atlassian<br>COMPUTERS & EQUIPMENT | San Francisco | | $20.00 |
| 01/16/19 | MSFT * E07007GAE2 0000<br>800-642-7676 | MSBILL.INFO | WA | $60.00 |
| 01/16/19 | DIGITAL RIVER<br>WWW.DIGITALRIVER.COM | 952-908-4084 | MN | $468.00 |
| 01/18/19 | AVIS RENT A CAR TOLLS<br>WWW.HTALLC.COM | 800-482-0159 | NY | $28.60 |
| 01/18/19 | ADOBE *ACROPRO SUBS Adobe Systems<br>800-833-6687 | SAN JOSE | CA | $14.99 |

Alexis Logan Production 5817

| Detail |
| --- |

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
| --- | --- | --- | --- | --- |
| 12/20/18 | AMZN MKTP US*M20LH5PY2<br>BOOK STORES | AMZN.COM/BILL | WA | $159.99 |
| 12/21/18 | FRONTIER ONLINEPAY<br>TELECOM | 800-921-8101 | CT | $257.01 |
| 12/21/18 | FRONTIER ONLINEPAY<br>TELECOM | 800-921-8101 | CT | $257.01 |
| 12/21/18 | GODIVA CHOCOLATIER<br>800-946-3482 | TAMPA | FL | $51.84 |
| 12/21/18 | KELP SUSHI JOINT 000000001<br>8138312222 | TAMPA | FL | $27.36 |
| 12/21/18 | MICROSOFT - 78 INTERNATI 0000<br>855-825-7575 | TAMPA | FL | $1,014.36 |
| 12/21/18 | BATH AND BODY WORKS 4738 4738<br>COSMETIC STORE | TAMPA | FL | $25.00 |
| 12/21/18 | Z GALLERIE 63 0899<br>800-421-3372 | TAMPA | FL | $36.36 |
| 12/21/18 | Z GALLERIE 63 0899<br>800-421-3372 | TAMPA | FL | $18.18 |
| 12/21/18 | SAKANA SUSHI RESTAURANT. 0001<br>646-468-8878 | TAMPA | FL | $91.99 |
| 12/22/18 | ABC FINE WINE & SPIRITS<br>4078510000 | TAMPA | FL | $140.12 |
| 12/23/18 | 7-ELEVEN 22724 00072272441<br>813-837-4430 | TAMPA | FL | $28.81 |
| 12/26/18 | WALMART.COM<br>800-966-6546 | BENTONVILLE | AR | $22.95 |

Alexis Logan Production 5818

## Detail Continued

| | | | | Amount |
|---|---|---|---|---|
| 12/27/18 | BBQGUYS.COM<br>N25613591 708154<br>HOUSEWARES/APPAREL | BATON ROUGE | LA | $2,056.73 |
| 12/30/18 | SHELL OIL 51001880056<br>AUTO FUEL DISPENSER | ALPHARETTA | GA | $40.45 |
| 12/31/18 | QT<br>8002473452 | SUWANEE | GA | $28.61 |
| 12/31/18 | ARBY'S<br>8005992729 | SUWANEE | GA | $27.00 |
| 12/31/18 | ABC FINE WINE/SPIRITS 035 000000035<br>4078510000 | ST PETERSBURG | FL | $151.32 |
| 12/31/18 | CHOPSTICK EXPRESS INC 0197<br>727-526-8999 | TAMPA | FL | $52.20 |
| 12/31/18 | PILOT_04561 04561<br>AUTO FUEL DISPENSER | VALDOSTA | GA | $39.90 |
| 01/05/19 | ADTSECURITY MYADT.CO<br>13556724 32757- | 800-238-2727 | FL | $56.70 |
| 01/07/19 | AMZN MKTP US*M26A76WZ2<br>BOOK STORES | AMZN.COM/BILL | WA | $312.60 |
| 01/08/19 | AMAZON MKTPLACE PMTS<br>DIRECT MKTG MISC | SEATTLE | WA | $6.40 |
| 01/09/19 | RACETRAC441  004416 97400004416<br>000-0000000 | ST PETERSBUR | FL | $54.90 |
| 01/10/19 | FABIAN ENTERPRISES,<br>COMMERICAL EQUIPMENT | TAMPA | FL | $327.57 |
| 01/10/19 | TARGET GANDY 1051<br>DISCOUNT STORE | TAMPA | FL | $86.21 |

Alexis Logan Production 5822

| | | | | |
|---|---|---|---|---|
| 01/31/19 | MSFT * E08007IPYA 0000<br>800-642-7676 | MSFT AZURE | WA | $12.66 |
| 02/05/19 | GODADDY.COM<br>(480)505-8855 | 480-505-8855 | AZ | $109.36 |
| 02/07/19 | LOGMEIN GOTOMEETING<br>SERVICES/SW | LOGMEIN.COM | CA | $47.20 |
| 02/09/19 | CREATELY<br>0425753926 | MENTONE | AU | $5.00 |
| 02/14/19 | ULELE 0601 000000001<br>8132483000 | TAMPA | FL | $64.03 |
| 02/14/19 | MISTER CAR WASH #223 223<br>813-837-9333 | TAMPA | FL | $53.49 |
| 02/14/19 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |
| 02/15/19 | Atlassian<br>COMPUTERS & EQUIPMENT | San Francisco | | $20.00 |
| 02/16/19 | MSFT * E07007NLPA 0000<br>800-642-7676 | MSBILL.INFO | WA | $60.00 |

Alexis Logan Production 5849

| Detail |
| --- |

**ALEXIS K LOGAN**
Card Ending 7-11004

|  |  |  |  | **Amount** |
| --- | --- | --- | --- | --- |
| 01/20/19 | 7-ELEVEN 22724 00072272441<br>813-837-4430 | TAMPA | FL | $51.20 |
| 01/21/19 | LEMON GRASS THAI<br>RESTAURANT | TAMPA | FL | $25.65 |
| 01/24/19 | PLAZA GUADALAJARA 461682001142694<br>CARLOSJAIME8021@GMAIL.COM | MOUNT DORA | FL | $53.14 |
| 01/31/19 | PILOT_00624 00624<br>AUTO FUEL DISPENSER | SAN ANTONIO | FL | $63.43 |
| 02/02/19 | WALGREENS<br>NONE 33611<br>PHARMACIES | TAMPA | FL | $60.92 |
| 02/05/19 | ADTSECURITY MYADT.CO<br>13556724 32757- | 800-238-2727 | FL | $56.70 |
| 02/06/19 | FLORIDA DEPT OF STATE<br>GOVERNMENT SERVICE | TALLAHASSEE | FL | $70.00 |
| 02/08/19 | FRESH MKT-071 STAM 542929800025710<br>8138757400 | TAMPA | FL | $92.03 |
| 02/09/19 | CITY OF TAMPA<br>813-274-8252 | TAMPA | FL | $58.24 |
| 02/09/19 | 7-ELEVEN 22724 00072272441<br>813-837-4430 | TAMPA | FL | $58.27 |
| 02/09/19 | ABC FINE WINE & SPIRITS<br>4078510000 | TAMPA | FL | $93.48 |
| 02/11/19 | PUBLIX<br>8139881980 | TAMPA | FL | $16.16 |
| 02/11/19 | PUBLIX<br>8139881980 | TAMPA | FL | $127.70 |
| 02/13/19 | CRU CELLARS, LLC<br>8138311117 | TAMPA | FL | $73.84 |
| 02/13/19 | WAL-MART SUPERCENTER 4681 4681<br>DISCOUNT STORE | TAMPA | FL | $14.26 |
| 02/14/19 | PUBLIX #1506 000001506<br>8636881188 | TAMPA | FL | $33.11 |
| 02/15/19 | THE FRESH MARKET<br>7278224913 | SAINT PETERSBURG | FL | $29.50 |
| 02/16/19 | 7-ELEVEN 22724 00072272441<br>813-837-4430 | TAMPA | FL | $48.81 |
| 02/16/19 | WALGREENS<br>NONE 34224<br>PHARMACIES | ENGLEWOOD | FL | $34.60 |

64

Alexis Logan Production 5856

| Detail |
|---|

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | | Amount |
|---|---|---|---|---|
| 02/18/19 | ADOBE *ACROPRO SUBS Adobe Systems<br>800-833-6687 | SAN JOSE | CA | $14.99 |
| 03/03/19 | UBER TRIP<br>HELP.UBER.COM | HELP.UBER.COM | CA | $12.72 |
| 03/03/19 | UBER TRIP QXHFV<br>HELP.UBER.COM | HELP.UBER.COM | CA | $5.00 |
| 03/03/19 | MSFT * E08007QCU8 0000<br>800-642-7676 | MSFT AZURE | WA | $12.35 |
| 03/04/19 | UBER TRIP UPKO4<br>HELP.UBER.COM | HELP.UBER.COM | CA | $10.00 |

Alexis Logan Production 5857

| Detail Continued |
|---|

| | | | | Amount |
|---|---|---|---|---|
| 03/04/19 | UBER TRIP<br>HELP.UBER.COM | HELP.UBER.COM | CA | $14.93 |
| 03/07/19 | LOGMEIN GOTOMEETING<br>SERVICES/SW | LOGMEIN.COM | CA | $47.20 |
| 03/09/19 | UBER TRIP VIK7N<br>HELP.UBER.COM | HELP.UBER.COM | CA | $1.00 |
| 03/09/19 | UBER TRIP 2DD2Y<br>HELP.UBER.COM | HELP.UBER.COM | CA | $5.75 |
| 03/09/19 | UBER TRIP<br>HELP.UBER.COM | HELP.UBER.COM | CA | $5.45 |
| 03/09/19 | UBER TRIP<br>HELP.UBER.COM | HELP.UBER.COM | CA | $5.44 |
| 03/10/19 | CREATELY<br>0425753926 | MENTONE | AU | $5.00 |
| 03/14/19 | MISTER CAR WASH #223 223<br>813-837-9333 | TAMPA | FL | $53.49 |
| 03/15/19 | Atlassian<br>COMPUTERS & EQUIPMENT | San Francisco | | $20.00 |
| 03/18/19 | ADOBE *ACROPRO SUBS Adobe Systems<br>800-833-6687 | SAN JOSE | CA | $14.99 |

Alexis Logan Production 5883

## Detail

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | | Amount |
|---|---|---|---|---|---|
| 02/17/19 | ACE HDWE 0000<br>941-697-1669 | CAPE HAZE | | FL | $27.31 |
| 02/17/19 | SAKANA SUSHI RESTAURANT. 0001<br>646-468-8878 | TAMPA | | FL | $26.01 |
| 02/18/19 | SHELL OIL 10051395001<br>GAS STATION | TAMPA | | FL | $30.00 |
| 03/01/19 | Southwest Airlines<br>SOUTHWEST AIRLINES (MASTE<br>From:          To:<br>DENVER INTL APT          ATLANTA HARTSFIELD<br>                              TAMPA INTERNATIONA<br>Ticket Number: 5262446022897<br>Passenger Name: LOGAN/ALEXIS KAY<br>Document Type: PASSENGER TICKET | DALLAS<br>Carrier:     Class:<br>WN          U<br>WN          U<br>Date of Departure: 03/04 | | TX | $28.02 |
| 03/05/19 | ADTSECURITY MYADT.CO<br>13556724 32757- | 800-238-2727 | | FL | $56.70 |

Alexis Logan Production 5887

## Detail

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | | Amount |
|---|---|---|---|---|
| 03/21/19 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |
| 03/22/19 | MSFT * E07007VI72 0000<br>800-642-7676 | MSBILL.INFO | WA | $14.57 |
| 03/28/19 | SUNPASS*ACC16171736<br>888-865-5352 | 888-865-5352 | FL | $20.00 |
| 04/03/19 | A1010BUSD01*MSFT*<E08007Y1ZT><br>BUSINESS SERVICE | REDMOND | | $16.64 |
| 04/05/19 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |
| 04/05/19 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |

Alexis Logan Production 5888

| | | | | Amount |
|---|---|---|---|---|
| 04/07/19 | LOGMEIN GOTOMEETING<br>SERVICES/SW | LOGMEIN.COM | CA | $47.20 |
| 04/09/19 | CREATELY<br>0425753926 | MENTONE | AU | $5.00 |
| 04/14/19 | MISTER CAR WASH #223 223<br>813-837-9333 | TAMPA | FL | $53.49 |
| 04/15/19 | Atlassian<br>COMPUTER STORE | San Francisco | | $20.00 |
| 04/17/19 | MSFT * E070082SBA 0000<br>800-642-7676 | MSBILL.INFO | WA | $36.00 |
| 04/18/19 | ADOBE *ACROPRO SUBS Adobe Systems<br>800-833-6687 | SAN JOSE | CA | $14.99 |

## Alexis Logan Production 5924

| | | | | |
|---|---|---|---|---|
| 04/21/19 | MICROSOFT*MICROSOFT *OFFICE 365<br>DIGITAL GOODS: GAMES | REDMOND | | $99.99 |
| | PLUG.COM | SAN FRANCISCO | CA | |

## Alexis Logan Production 5925

| | | | | |
|---|---|---|---|---|
| 04/26/19 | UBER TRIP<br>HELP.UBER.COM | HELP.UBER.COM | CA | $18.74 |
| 04/27/19 | UBER TRIP<br>HELP.UBER.COM | HELP.UBER.COM | CA | $3.00 |
| 04/27/19 | UBER TRIP<br>HELP.UBER.COM | HELP.UBER.COM | CA | $23.83 |
| 05/01/19 | MSFT * E080085RLT 0000<br>800-642-7676 | MSFT AZURE | WA | $15.68 |
| 05/02/19 | SUNPASS*ACC16171736<br>888-865-5352 | 888-865-5352 | FL | $20.00 |
| 05/02/19 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |
| 05/03/19 | UBER TRIP<br>HELP.UBER.COM | HELP.UBER.COM | CA | $6.26 |
| 05/03/19 | UBER TRIP<br>HELP.UBER.COM | HELP.UBER.COM | CA | $2.00 |
| 05/05/19 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |
| 05/07/19 | LOGMEIN GOTOMEETING<br>SERVICES/SW | LOGMEIN.COM | CA | $47.20 |
| 05/08/19 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |
| 05/09/19 | CREATELY<br>0425753926 | MENTONE | AU | $5.00 |
| 05/11/19 | UBER TRIP<br>HELP.UBER.COM | HELP.UBER.COM | CA | $15.90 |
| 05/13/19 | UBER TRIP<br>HELP.UBER.COM | HELP.UBER.COM | CA | $8.89 |

## Alexis Logan Production 5926

**Detail Continued**

| | | | | Amount |
|---|---|---|---|---|
| 05/15/19 | Atlassian<br>COMPUTER STORE | San Francisco | | $20.00 |
| 05/16/19 | UBER TRIP<br>HELP.UBER.COM | HELP.UBER.COM | CA | $18.39 |
| 05/16/19 | UBER TRIP<br>HELP.UBER.COM | HELP.UBER.COM | CA | $5.00 |
| 05/18/19 | ADOBE *ACROPRO SUBS Adobe Systems<br>800-833-6687 | SAN JOSE | CA | $14.99 |

## Alexis Logan Production 5963

| | | | | |
|---|---|---|---|---|
| 05/23/19 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |
| 05/27/19 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |

## Alexis Logan Production 5964

| 05/29/19 | TAMPAPRINTER 0606<br>813-280-5413 | TAMPA | FL | $71.50 |
| 05/29/19 | TAMPAPRINTER 0606<br>813-280-5413 | TAMPA | FL | $1.22 |
| 05/30/19 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |
| 06/02/19 | MSFT * E08008DI64 0000<br>800-642-7676 | MSFT AZURE | WA | $12.58 |
| 06/07/19 | LOGMEIN GOTOMEETING<br>SERVICES/SW | LOGMEIN.COM | CA | $47.20 |
| 06/09/19 | CREATELY<br>0425753926 | MENTONE | AU | $5.00 |
| 06/15/19 | Atlassian<br>COMPUTER STORE | San Francisco | | $20.00 |
| 06/18/19 | ADOBE *ACROPRO SUBS Adobe Systems<br>800-833-6687 | SAN JOSE | CA | $14.99 |

## Alexis Logan Production 6016

**Detail**

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | **Amount** |
|---|---|---|---|---|
| 05/27/19 | EXXONMOBIL 9943<br>352-735-1118 | MOUNT DORA | FL | $14.71 |
| 05/27/19 | U-HAUL 833032<br>U-HAUL 1-800-789-3638 | EUSTIS | FL | $82.07 |
| 06/05/19 | ADTSECURITY MYADT.CO<br>13556724 32757- | 800-238-2727 | FL | $56.70 |
| 06/07/19 | MARATHON PETRO149559 00000149559<br>813-876-8563 | TAMPA | FL | $70.74 |

## Alexis Logan Production 6029

| 06/20/19 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |
| 07/01/19 | A1010BUSD01*MSFT*<E08008LDQ2><br>COMPUTERS & EQUIPMENT | REDMOND | | $13.27 |
| 07/07/19 | LOGMEIN GOTOMEETING<br>SERVICES/SW | LOGMEIN.COM | CA | $47.20 |
| 07/09/19 | CREATELY<br>0425753926 | MENTONE | AU | $5.00 |

## Alexis Logan Production 6030

**Detail Continued**

| | | | | **Amount** |
|---|---|---|---|---|
| 07/09/19 | SUNPASS*ACC16171736<br>888-865-5352 | 888-865-5352 | FL | $20.00 |
| 07/15/19 | Atlassian<br>COMPUTER STORE | San Francisco | | $20.00 |
| 07/18/19 | ADOBE *ACROPRO SUBS Adobe Systems<br>800-833-6687 | SAN JOSE | CA | $14.99 |

Alexis Logan Production 6056

### Fees

| | | | Amount |
|---|---|---|---|
| 07/19/19 | ALEXIS K LOGAN | ANNUAL MEMBERSHIP FEE | $595.00 |

Alexis Logan Production 6059

### Detail

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 07/02/19 | FRONTIER TELEPHONE TELECOM | 8009218101 | NY | $249.90 |
| 07/05/19 | ADTSECURITY MYADT.CO 13556724 32757- | 800-238-2727 | FL | $56.70 |

Alexis Logan Production 6064

### Detail

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | Foreign Spend | Amount |
|---|---|---|---|---|
| 07/19/19 | SUNPASS*ACC22455430 888-865-5352 | 888-865-5352 | FL | $10.00 |
| 07/20/19 | SUNPASS*ACC22455430 888-865-5352 | 888-865-5352 | FL | $10.00 |
| 07/22/19 | SUNPASS*ACC22455430 888-865-5352 | 888-865-5352 | FL | $10.00 |
| 07/31/19 | MSFT * E08008TASN 0000 800-642-7676 | MSFT AZURE | WA | $13.48 |
| 08/02/19 | SUNPASS*ACC22455430 888-865-5352 | 888-865-5352 | FL | $10.00 |
| 08/07/19 | LOGMEIN GOTOMEETING SERVICES/SW | LOGMEIN.COM | CA | $47.20 |
| 08/09/19 | CREATELY 0425753926 | MENTONE | AU | $5.00 |
| 08/13/19 | SUNPASS*ACC22455430 888-865-5352 | 888-865-5352 | FL | $10.00 |
| 08/15/19 | Atlassian COMPUTER STORE | San Francisco | | $20.00 |
| 08/15/19 | SUNPASS*ACC16171736 888-865-5352 | 888-865-5352 | FL | $20.00 |
| 08/18/19 | ADOBE *ACROPRO SUBS Adobe Systems 8008336687 | SAN JOSE | CA | $14.99 |

Alexis Logan Production 6105

### Detail

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 08/05/19 | ADTSECURITY MYADT.CO 13556724 32757- | 800-238-2727 | FL | $56.70 |

Alexis Logan Production 6110

| Detail |
|--------|

 **ALEXIS K LOGAN**
Card Ending 7-71004

| | | | | Amount |
|---|---|---|---|---|
| 08/23/19 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |
| 08/26/19 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |
| 09/01/19 | A1010BUSD01*MSFT*<E080091CA8><br>COMPUTERS & EQUIPMENT | REDMOND | | $15.28 |
| 09/05/19 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |
| 09/07/19 | LOGMEIN GOTOMEETING<br>SERVICES/SW | LOGMEIN.COM | CA | $47.20 |
| 09/09/19 | CREATELY<br>0425753926 | MENTONE | AU | $5.00 |
| 09/15/19 | Atlassian<br>COMPUTER STORE | San Francisco | | $20.00 |
| 09/18/19 | ADOBE *ACROPRO SUBS Adobe Systems<br>8008336687 | SAN JOSE | CA | $14.99 |

Alexis Logan Production 6150

| Detail |
|--------|

 **ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 09/05/19 | ADTSECURITY MYADT.CO<br>13556724 32757- | 800-238-2727 | FL | $56.70 |

Alexis Logan Production 6158

| **Detail** | | | | | |

**ALEXIS K LOGAN**
Card Ending 7-71004

| | | | | Foreign Spend | Amount |
|---|---|---|---|---|---|
| 09/11/19 | MCAFEE INC<br>22564622ONLINE SOFTWR | SANTA CLARA | CA | | $109.99 |
| 09/21/19 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | | $10.00 |
| 10/01/19 | MSFT * E080099HGR 0000<br>800-642-7676 | MSFT AZURE | WA | | $87.53 |
| 10/07/19 | LOGMEIN GOTOMEETING<br>SERVICES/SW | LOGMEIN.COM | CA | | $47.20 |
| 10/11/19 | CREATELY<br>0425753926 | MENTONE | AU | | $5.00 |
| 10/15/19 | Atlassian<br>COMPUTER STORE | San Francisco | | | $20.00 |
| 10/18/19 | ADOBE ACROPRO SUBS Adobe Systems<br>8008336687 | SAN JOSE | CA | | $14.99 |

Alexis Logan Production 6205

| **Detail** | | | | |

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 10/05/19 | ADTSECURITY MYADT.CO<br>13556724 32757- | 800-238-2727 | FL | $56.70 |

Alexis Logan Production 6215

| | | | | |
|---|---|---|---|---|
| 10/24/19 | SUNPASS*ACC16171736<br>888-865-5352 | 888-865-5352 | FL | $20.00 |
| 10/28/19 | UBER TRIP<br>HELP.UBER.COM | HELP.UBER.COM | CA | $9.05 |
| 10/28/19 | UBER TRIP<br>HELP.UBER.COM | HELP.UBER.COM | CA | $6.05 |
| 10/31/19 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |
| 11/01/19 | MSFT *<E08009HRVA><br>COMPUTERS & EQUIPMENT | REDMOND | | $1,524.41 |

## Alexis Logan Production 6216

| 11/07/19 | LOGMEIN*GOTOMEETING ONLINE SVCS | LOGMEIN.COM | MA | $47.20 |
|---|---|---|---|---|
| 11/11/19 | CREATELY 0425753926 | MENTONE | AU | $5.00 |
| 11/11/19 | SUNPASS*ACC22455430 888-865-5352 | 888-865-5352 | FL | $10.00 |
| 11/15/19 | Atlassian COMPUTER STORE | San Francisco | | $20.00 |
| 11/15/19 | SUNPASS*ACC22455430 888-865-5352 | 888-865-5352 | FL | $10.00 |
| 11/18/19 | ADOBE ACROPRO SUBS Adobe Systems 8008336687 | SAN JOSE | CA | $14.99 |

## Alexis Logan Production 6261

| Detail | | | | |
|---|---|---|---|---|
| **ALEXIS K LOGAN** Card Ending 7-11004 | | | | **Amount** |
| 11/05/19 | ADTSECURITY MYADT.CO 13556724 32757- | 800-238-2727 | FL | $56.70 |

## Alexis Logan Production 6271

| 11/24/19 | DROPBOX*DHYJDR6QY1G4 4159867057 | SAN FRANCISCO | CA | $119.88 |
|---|---|---|---|---|
| 11/26/19 | SUNPASS*ACC16171736 888-865-5352 | 888-865-5352 | FL | $20.00 |
| 12/01/19 | MSFT * E08009Q6GW 0000 800-642-7676 | MSFT AZURE | WA | $14.11 |
| 12/03/19 | Amazon Web Services WEB SERVICES | AWS.Amazon.com | WA | $722.05 |
| 12/07/19 | LOGMEIN*GOTOMEETING ONLINE SVCS | LOGMEIN.COM | MA | $47.20 |
| 12/10/19 | CREATELY 0425753926 | MENTONE | AU | $5.00 |

## Alexis Logan Production 6272

| 12/15/19 | Atlassian COMPUTER STORE | San Francisco | | $20.00 |
|---|---|---|---|---|
| 12/18/19 | ADOBE ACROPRO SUBS Adobe Systems 8008336687 | SAN JOSE | CA | $14.99 |

## Alexis Logan Production 6312

| 12/31/19 | MSFT * E08009YLTG 0000 800-642-7676 | MSFT AZURE | WA | $11.53 |
|---|---|---|---|---|
| 01/07/20 | LOGMEIN*GOTOMEETING ONLINE SVCS | LOGMEIN.COM | MA | $47.20 |
| 01/09/20 | SUNPASS*ACC22455430 888-865-5352 | 888-865-5352 | FL | $10.00 |
| 01/10/20 | CREATELY 0425753926 | MENTONE | AU | $5.00 |
| 01/15/20 | Atlassian COMPUTER STORE | San Francisco | | $20.00 |
| 01/16/20 | DIGITAL RIVER WWW.DIGITALRIVER.COM | 952-908-4084 | MN | $468.00 |

## Alexis Logan Production 6313

| 01/18/20 | ADOBE ACROPRO SUBS Adobe Systems 8008336687 | SAN JOSE | CA | $14.99 |
|---|---|---|---|---|

## Alexis Logan Production 6347

| **Detail** |
|---|

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | **Amount** |
|---|---|---|---|---|
| 01/05/20 | ADTSECURITY MYADT.CO 13556724 32757- | 800-238-2727 | FL | $56.70 |

## Alexis Logan Production 6356

| 01/31/20 | SUNPASS*ACC16171736 888-865-5352 | 888-865-5352 | FL | $20.00 |
|---|---|---|---|---|
| 01/31/20 | MSFT * E0800A70O3 0000 800-642-7676 | MSFT AZURE | WA | $13.50 |
| 02/06/20 | GODADDY.COM (480)505-8855 | 480-505-8855 | AZ | $18.17 |

## Alexis Logan Production 6357

| 02/09/20 | SUNPASS*ACC22455430 888-865-5352 | 888-865-5352 | FL | $10.00 |
|---|---|---|---|---|
| 02/10/20 | CREATELY 0425753926 | MENTONE | AU | $5.00 |
| 02/14/20 | SUNPASS*ACC22455430 888-865-5352 | 888-865-5352 | FL | $10.00 |

Alexis Logan Production 6403

| Detail | | | | |
|---|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 02/05/20 | ADTSECURITY MYADT.CO<br>13556724 32757- | 800-238-2727 | FL | $56.70 |

Alexis Logan Production 6415

| Detail | | | | |
|---|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 02/18/20 | ADOBE ACROPRO SUBS Adobe Systems<br>8008336687 | SAN JOSE | CA | $14.99 |
| 02/23/20 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |
| 03/03/20 | MSFT * E0800AFSBP 0000<br>Z310UYBUI46C 33947<br>YBUI46C Z310UYBUI46 | MSFT AZURE | WA | $15.93 |

Alexis Logan Production 6416

| | | | | |
|---|---|---|---|---|
| 03/08/20 | UBER TRIP<br>HELP.UBER.COM | HELP.UBER.COM | CA | $10.44 |
| 03/08/20 | UBER TRIP<br>HELP.UBER.COM | HELP.UBER.COM | CA | $18.10 |
| 03/10/20 | CREATELY<br>0425753926 | MENTONE | AU | $5.00 |
| 03/13/20 | SUNPASS*ACC16171736<br>888-865-5352 | 888-865-5352 | FL | $20.00 |
| 03/18/20 | ADOBE ACROPRO SUBS Adobe Systems<br>ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |

Alexis Logan Production 6469

| Detail | | | | |
|---|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 03/05/20 | ADTSECURITY MYADT.CO<br>13556724 32757- | 800-238-2727 | FL | $56.70 |
| 03/05/20 | MARATHON PETRO149419 00000149419<br>813-287-1791 | TAMPA | FL | $59.54 |
| 03/12/20 | SHELL OIL 57546429408<br>AUTO FUEL DISPENSER | ST PETERSBURG | FL | $54.51 |

## Alexis Logan Production 6481

| | | | | |
|---|---|---|---|---|
| 03/21/20 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |
| 03/31/20 | MSFT * E0800AOL2N 0000<br>Z313WPVX48E3 33947<br>PVX48E3 Z313WPVX48E | MSFT AZURE | WA | $13.61 |
| 04/17/20 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |
| 04/18/20 | ADOBE ACROPRO SUBS Adobe Systems<br>ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |

## Alexis Logan Production 6502

**Detail**

 **ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 04/05/20 | ADTSECURITY MYADT.CO<br>13556724 32757- | 800-238-2727 | FL | $56.70 |

## Alexis Logan Production 6510

| | | | | |
|---|---|---|---|---|
| 04/20/20 | MICROSOFT*OFFICE 365 HOME<br>DIGITAL GOODS: GAMES | REDMOND | | $99.99 |
| 04/20/20 | SUNPASS*ACC16171736<br>888-865-5352 | 888-865-5352 | FL | $20.00 |
| 04/28/20 | SUNPASS*ACC22455430<br>888-865-5352 | 888-865-5352 | FL | $10.00 |
| 05/01/20 | MSFT *<E0800AXNYH><br>Z312YKG8P2A6 98052 | REDMOND | | $11.39 |

## Alexis Logan Production 6511

| | | | | |
|---|---|---|---|---|
| 05/18/20 | ADOBE ACROPRO SUBS Adobe Systems<br>ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |

## Alexis Logan Production 6547

**Detail**

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 04/25/20 | SHELL OIL 57546429408<br>AUTO FUEL DISPENSER | ST PETERSBURG | FL | $47.26 |
| 05/05/20 | ADTSECURITY MYADT.CO<br>13556724 32757- | 800-238-2727 | FL | $56.70 |

Alexis Logan Production 6554

| 05/31/20 | MSFT * E0800B6UF1 0000 Z4110H5C1XJ8 33947 H5C1XJ8 Z4110H5C1XJ | MSFT AZURE | WA | $13.79 |
| 06/18/20 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |

Alexis Logan Production 6612

| 06/30/20 | MSFT * E0800BGG5K 0000 Z4162BUX98HU 33947 BUX98HU Z4162BUX98H | MSFT AZURE | WA | $14.57 |
| 07/18/20 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |
| | OLUD COM | SAN FRANCISCO | CA | |

Alexis Logan Production 6649

| Fees | | | |
|---|---|---|---|
| | | | **Amount** |
| 07/20/20 | ALEXIS K LOGAN | ANNUAL MEMBERSHIP FEE | $595.00 |

Alexis Logan Production 6654

| Fees | | | |
|---|---|---|---|
| | | | **Amount** |
| 07/20/20 | ALEXIS K LOGAN | ANNUAL MEMBERSHIP FEE | $175.00 |

Alexis Logan Production 06891

| Detail | | | |
|---|---|---|---|
| **ALEXIS K LOGAN** Card Ending 7-11004 | | | |
| | | | **Amount** |
| 04/25/20 | SHELL OIL 57546429408 AUTO FUEL DISPENSER | ST PETERSBURG | FL | $47.26 |
| 05/05/20 | ADTSECURITY MYADT.CO 13556724 32757- | 800-238-2727 | FL | $56.70 |

## Alexis Logan Production 06898

| | | | | |
|---|---|---|---|---|
| 05/31/20 | MSFT * E0800B6UF1 0000<br>Z4110H5C1XJ8 33947<br>H5C1XJ8 Z4110H5C1XJ | MSFT AZURE | WA | $13.79 |
| 06/18/20 | ADOBE ACROPRO SUBS Adobe Systems<br>ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |

## Alexis Logan Production 06947

**Detail**

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 06/05/20 | ADTSECURITY MYADT.CO<br>13556724 32757- | 800-238-2727 | FL | $56.70 |
| 06/16/20 | USPS PO 1182540704 001362797<br>8002758777 | SAINT PETERSB | FL | $7.50 |
| 06/18/20 | SHELL OIL 57546429408<br>AUTO FUEL DISPENSER | ST PETERSBURG | FL | $45.79 |

## Alexis Logan Production 06954

| Credits | | | Amount |
|---|---|---|---|
| 07/03/20* | ALEXIS K LOGAN | AMEX Shipping Credit<br>TRANSACTION PROCESSED BY AMERICAN EXPRESS | -$20.00 |
| 07/08/20* | ALEXIS K LOGAN | AMEX Wireless Phone Service Credit<br>TRANSACTION PROCESSED BY AMERICAN EXPRESS | -$20.00 |

## Alexis Logan Production 06956

| | | | | |
|---|---|---|---|---|
| 06/30/20 | MSFT * E0800BGG5K 0000<br>Z4162BUX98HU 33947<br>BUX98HU Z4162BUX98H | MSFT AZURE | WA | $14.57 |

## Alexis Logan Production 07004

| Credits | | | Amount |
|---|---|---|---|
| 07/31/20* | ALEXIS K LOGAN | Appreciation Credit<br>TRANSACTION PROCESSED BY AMERICAN EXPRESS | -$200.00 |
| 08/04/20* | ALEXIS K LOGAN | AMEX Shipping Credit<br>TRANSACTION PROCESSED BY AMERICAN EXPRESS | -$20.00 |
| 08/08/20* | ALEXIS K LOGAN | AMEX Wireless Phone Service Credit<br>TRANSACTION PROCESSED BY AMERICAN EXPRESS | -$20.00 |

## Alexis Logan Production 07006

| | | | |
|---|---|---|---|
| 08/01/20 | MSFT *<E0800BQ4RO><br>Z41648RABJQL 98052 | REDMOND | $13.67 |

## Alexis Logan Production 07052

**Detail**

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 07/30/20 | SHELL OIL 57546429408<br>AUTO FUEL DISPENSER | ST PETERSBURG | FL | $57.02 |
| 08/05/20 | ADTSECURITY MYADT.CO<br>13556724 32757- | 800-238-2727 | FL | $60.76 |

## Alexis Logan Production 07062

| Credits | | | Amount |
|---|---|---|---|
| 09/04/20* | **ALEXIS** K LOGAN | AMEX Shipping Credit | -$4.73 |
| | | TRANSACTION PROCESSED BY AMERICAN EXPRESS | |
| 09/05/20* | **ALEXIS** K LOGAN | AMEX Shipping Credit | -$15.27 |
| | | TRANSACTION PROCESSED BY AMERICAN EXPRESS | |
| 09/10/20* | **ALEXIS** K LOGAN | AMEX Wireless Phone Service Credit | -$20.00 |
| | | TRANSACTION PROCESSED BY AMERICAN EXPRESS | |

## Alexis Logan Production 07064

| 09/01/20 | MSFT *<E0800C04UB> | REDMOND | $15.69 |
|---|---|---|---|
| | Z41665XSO579 98052 | | |

## Alexis Logan Production 07107

| **Detail** |
|---|

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 09/01/20 | CHEVRON 0205019/CHEVRON | TAMPA | FL | $67.83 |
| | SERVICE STN | | | |
| 09/05/20 | ADTSECURITY MYADT.CO | 800-238-2727 | FL | $60.76 |
| | 13556724 32757- | | | |

## Alexis Logan Production 07116

| Credits | | | Amount |
|---|---|---|---|
| 10/04/20* | **ALEXIS** K LOGAN | AMEX Shipping Credit | -$20.00 |
| | | TRANSACTION PROCESSED BY AMERICAN EXPRESS | |
| 10/09/20* | **ALEXIS** K LOGAN | AMEX Wireless Phone Service Credit | -$20.00 |
| | | TRANSACTION PROCESSED BY AMERICAN EXPRESS | |

## Alexis Logan Production 07118

| 09/18/20 | ADOBE ACROPRO SUBS Adobe Systems | SAN JOSE | CA | $14.99 |
|---|---|---|---|---|
| | ADOBE.LY/ENUS | | | |
| 09/24/20 | MCAFEE LLC | SANTA CLARA | CA | $119.99 |
| | 35812450ONLINE SOFTWR | | | |
| 10/01/20 | MSFT *<E0800CA3GC> | REDMOND | | $19.18 |
| | Z41580N1MWQE 98052 | | | |

## Alexis Logan Production 07119

| 10/18/20 | ADOBE ACROPRO SUBS Adobe Systems | SAN JOSE | CA | $14.99 |
|---|---|---|---|---|
| | ADOBE.LY/ENUS | | | |

## Alexis Logan Production 07173

### Detail

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 09/28/20 | 7-ELEVEN 25564 00072556441<br>727-821-1953 | SAINT PETERSBURG | FL | $48.62 |
| 10/05/20 | ADTSECURITY MYADT.CO<br>13556724 32757- | 800-238-2727 | FL | $60.76 |
| 10/05/20 | 7-ELEVEN 23035 00072303542<br>941-755-6230 | BRADENTON | FL | $29.94 |

## Alexis Logan Production 07182

| Credits | | | Amount |
|---|---|---|---|
| 11/04/20* | ALEXIS K LOGAN | AMEX Shipping Credit<br>TRANSACTION PROCESSED BY AMERICAN EXPRESS | -$20.00 |
| 11/10/20* | ALEXIS K LOGAN | AMEX Wireless Phone Service Credit<br>TRANSACTION PROCESSED BY AMERICAN EXPRESS | -$20.00 |

## Alexis Logan Production 07185

| | | | | |
|---|---|---|---|---|
| 11/01/20 | MSFT *<E0800CK93K><br>Z4199XGERUCB 98052 | REDMOND | | $21.94 |

## Alexis Logan Production 07186

| | | | | |
|---|---|---|---|---|
| 11/18/20 | ADOBE ACROPRO SUBS Adobe Systems<br>ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |

## Alexis Logan Production 07256

### Detail

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 10/21/20 | TST* GROVE - LAKEWOOD RAN 300516475<br>9418934321 | LAKEWOOD RANC | FL | $54.94 |
| 10/27/20 | SHELL OIL 57546429408<br>AUTO FUEL DISPENSER | ST PETERSBURG | FL | $50.75 |
| 10/28/20 | SPEEDWAY<br>7273192320 | 1-800-643-1949 | OH | $40.90 |
| 11/05/20 | ADTSECURITY MYADT.CO<br>13556724 32757- | 800-238-2727 | FL | $60.76 |
| 11/06/20 | THE UPS STORE<br>BUSINESS SERVICE | SAINT PETERSBURG | FL | $5.89 |
| 11/17/20 | SUNPASS OPERATIONS<br>888-865-5352 | BOCA RATON | FL | $21.50 |

## Alexis Logan Production 07262

| Credits | | | Amount |
|---|---|---|---|
| 12/03/20* | ALEXIS K LOGAN | AMEX Shipping Credit<br>TRANSACTION PROCESSED BY AMERICAN EXPRESS | -$20.00 |

## Alexis Logan Production 07263

| Detail Continued | *Indicates posting date | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|
| | | | **Amount** |
| 12/09/20* | ALEXIS K LOGAN | AMEX Wireless Phone Service Credit<br>TRANSACTION PROCESSED BY AMERICAN EXPRESS | -$20.00 |

## Alexis Logan Production 07265

| 11/24/20 | DROPBOX*KFMY1BDTQ2HY<br>4159867057 | SAN FRANCISCO | CA | $119.88 ♦ |
|---|---|---|---|---|
| 12/02/20 | MSFT *<E0800CUFOU><br>Z41CBUTNRDCG 98052 | REDMOND | | $22.00 |

## Alexis Logan Production 07266

| 12/18/20 | ADOBE ACROPRO SUBS Adobe Systems<br>ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |
|---|---|---|---|---|

## Alexis Logan Production 07324

| Detail | *Indicates posting date | | |
|---|---|---|---|
| **Credits** | | | **Amount** |
| 11/24/20* | ALEXIS K LOGAN | AMAZON SHOP WITH POINTS CREDIT | -$42.98 |
| 11/24/20* | ALEXIS K LOGAN | AMAZON SHOP WITH POINTS CREDIT | -$128.39 |
| 11/24/20* | ALEXIS K LOGAN | AMAZON SHOP WITH POINTS CREDIT | -$25.03 |
| 11/24/20* | ALEXIS K LOGAN | AMAZON SHOP WITH POINTS CREDIT | -$91.38 |

## Alexis Logan Production 07325

| Detail | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|

ALEXIS K LOGAN
Card Ending 7-11004

| | | | | **Amount** |
|---|---|---|---|---|
| 11/23/20 | AMAZON MKTPLACE PMTS<br>GENERAL MERCHANDISE | SEATTLE | WA | $25.03 |
| 11/23/20 | AMAZON MKTPLACE PMTS<br>GENERAL MERCHANDISE | SEATTLE | WA | $91.38 |
| 11/23/20 | AMAZON.COM<br>GENERAL MERCHANDISE | SEATTLE | WA | $128.39 ♦ |
| 11/23/20 | AMAZON MKTPLACE PMTS<br>GENERAL MERCHANDISE | SEATTLE | WA | $42.98 |
| 11/25/20 | 7-ELEVEN 30053 00073005341<br>727-865-2962 | SAINT PETERSBURG | FL | $42.60 |
| 11/30/20 | USPS PO 1182540704 001362797<br>8002758777 | SAINT PETERSB | FL | $11.75 |
| 12/02/20 | TEXACO 0376869/CHEVRON<br>CONVENIENCE | LAKE PANASOFFKEE | FL | $29.25 |
| 12/04/20 | CHEVRON 0382484/CHEVRON<br>CONVENIENCE STORE | SARASOTA | FL | $32.08 |
| 12/05/20 | ADTSECURITY MYADT.CO<br>13556724 32757- | 800-238-2727 | FL | $60.76 |
| 12/18/20 | CRYSTALLI INC<br>squareup.com/receipts | Auburn | WA | $224.95 ♦ |
| 12/19/20 | SHELL OIL 57546429408<br>AUTO FUEL DISPENSER | ST PETERSBURG | FL | $27.95 |

## Alexis Logan Production 07333

| Credits | | | Amount |
|---|---|---|---|
| 01/03/21* | ALEXIS K LOGAN | AMEX Airline Fee Reimbursement<br>TRANSACTION PROCESSED BY AMERICAN EXPRESS | -$170.00 ♦ |
| 01/06/21* | ALEXIS K LOGAN | AMEX Airline Fee Reimbursement<br>TRANSACTION PROCESSED BY AMERICAN EXPRESS | -$30.00 |

## Alexis Logan Production 07335

| | | | | |
|---|---|---|---|---|
| 01/01/21 | MSFT * E0800D53US 0000<br>Z414DOJP4FI6 33947<br>OJP4FI6 Z414DOJP4FI | MSFT AZURE | WA | $16.56 |

Alexis Logan Production 07387

## Detail
♦ - denotes Pay Over Time activity

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 12/18/20 | AMZN MKTP US*B13MU3C53<br>BOOK STORES | AMZN.COM/BILL | WA | $25.03 |
| 12/21/20 | CRYSTALLI INC<br>squareup.com/receipts | Auburn | WA | $17.00 |
| 12/21/20 | SPANX INC<br>6785001326 | 678-5001326 | GA | $403.35 ♦ |
| 12/23/20 | AMAZON MKTPLACE PMTS<br>GENERAL MERCHANDISE | SEATTLE | WA | $67.72 |
| 12/29/20 | BP#2761898GIANT #110 2761<br>727-289-4084 | SAINT PETERSB | FL | $59.85 |
| 01/05/21 | ADTSECURITY MYADT.CO<br>13556724 32757- | 800-238-2727 | FL | $60.76 |

Alexis Logan Production 07388

## Detail Continued
♦ - denotes Pay Over Time activity

| | | | | Amount |
|---|---|---|---|---|
| 01/20/21 | AMZN MKTP US*8714W5JO3<br>BOOK STORES | AMZN.COM/BILL | WA | $25.03 |
| 01/20/21 | AMAZON MKTPLACE PMTS<br>GENERAL MERCHANDISE | SEATTLE | WA | $85.93 |

Alexis Logan Production 07395

## Credits
| | | | | Amount |
|---|---|---|---|---|
| 02/02/21 | ALEXIS K LOGAN | UBER EATS<br>SAN FRANCISCO   CA<br>FOAB76M4 94103 | | -$5.77 |

Alexis Logan Production 07397

| | | | | |
|---|---|---|---|---|
| 02/01/21 | MSFT * E0800DFJB7 0000<br>Z41CFKZVH5YZ 33947<br>KZVH5YZ Z41CFKZVH5Y | MSFT AZURE | WA | $18.90 |
| 02/01/21 | UBER EATS<br>FOAB76M4 94103 | SAN FRANCISCO | CA | $62.77 |
| 02/01/21 | UBER EATS<br>FOAB76M4 94103 | SAN FRANCISCO | CA | $12.55 |
| 02/06/21 | GODADDY.COM<br>(480)505-8855 | 480-505-8855 | AZ | $84.48 |
| | OLIVO COM | WALNUT | CA | |

## Alexis Logan Production 07444

**Detail**

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 01/22/21 | SHELL OIL 57546429408<br>AUTO FUEL DISPENSER | ST PETERSBURG | FL | $37.57 |
| 02/01/21 | SHELL OIL 57546429408<br>AUTO FUEL DISPENSER | ST PETERSBURG | FL | $49.49 |
| 02/05/21 | NORTON NP1334479199<br>NORTON.COM/NS | MOUNTAIN VIEW | CA | $29.98 |
| 02/05/21 | ADTSECURITY MYADT.CO<br>13556724 32757- | 800-238-2727 | FL | $60.76 |
| 02/10/21 | AMAZON MKTPLACE PMTS<br>GENERAL MERCHANDISE | SEATTLE | WA | $16.36 |
| 02/13/21 | SHELL OIL 57546429408<br>AUTO FUEL DISPENSER | ST PETERSBURG | FL | $65.41 |

## Alexis Logan Production 07516

| Credits | | | Amount |
|---|---|---|---|
| 02/23/21* | ALEXIS K LOGAN | AMAZON SHOP WITH POINTS CREDIT | -$27.99 |
| 02/23/21* | ALEXIS K LOGAN | AMAZON SHOP WITH POINTS CREDIT | -$107.13 |
| 02/23/21* | ALEXIS K LOGAN | AMAZON SHOP WITH POINTS CREDIT | -$156.47 |
| 03/14/21* | ALEXIS K LOGAN | AMAZON SHOP WITH POINTS CREDIT | -$63.11 |
| 03/14/21* | ALEXIS K LOGAN | AMAZON SHOP WITH POINTS CREDIT | -$47.98 |
| 03/14/21* | ALEXIS K LOGAN | AMAZON SHOP WITH POINTS CREDIT | -$83.04 |

## Alexis Logan Production 07516

**Detail**                                         ♦ - denotes Pay Over Time activity

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 02/18/21 | AMZN MKTP US*AX88U5SU3<br>BOOK STORES | AMZN.COM/BILL | WA | $25.03 |
| 02/22/21 | AMAZON MKTPLACE PMTS<br>GENERAL MERCHANDISE | SEATTLE | WA | $107.13 ♦ |
| 02/22/21 | AMAZON.COM<br>GENERAL MERCHANDISE | SEATTLE | WA | $156.47 ♦ |
| 02/22/21 | AMAZON MKTPLACE PMTS<br>GENERAL MERCHANDISE | SEATTLE | WA | $27.99 |

## Alexis Logan Production 07531

| | | | | |
|---|---|---|---|---|
| 04/01/21 | MSFT *<E0800E1FSZ><br>Z419J7UBZNOO 98052 | MSFT AZURE | | $14.97 |

## Alexis Logan Production 07532

| | | | | |
|---|---|---|---|---|
| 04/18/21 | ADOBE ACROPRO SUBS Adobe Systems<br>ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |
| | DIIVO.COM | WALNUT | CA | |

## Alexis Logan Production 07590

| Credits | | | Amount |
|---|---|---|---|
| 03/30/21* | ALEXIS K LOGAN | AMAZON SHOP WITH POINTS CREDIT | -$46.36 |
| 04/15/21* | ALEXIS K LOGAN | AMAZON SHOP WITH POINTS CREDIT | -$156.25 |

## Alexis Logan Production 07590

| Detail | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | Amount |
|---|---|---|---|---|
| 03/19/21 | AMZN MKTP US*ZA36S3N63 BOOK STORES | AMZN.COM/BILL | WA | $25.03 |
| 03/29/21 | AMAZON MKTPLACE PMTS GENERAL MERCHANDISE | SEATTLE | WA | $46.36 |
| 04/05/21 | ADTSECURITY MYADT.COM SECURITY | 800-238-2727 | FL | $60.76 |
| 04/12/21 | 7-ELEVEN 37149 00073714901 813-837-9509 | TAMPA | FL | $62.36 |
| 04/14/21 | AMAZON MKTPLACE PMTS GENERAL MERCHANDISE | SEATTLE | WA | $156.25 ♦ |
| 04/18/21 | AMZN MKTP US*RN0LO9IA3 BOOK STORES | AMZN.COM/BILL | WA | $25.03 |

## Alexis Logan Production 07599

| | | | | |
|---|---|---|---|---|
| 04/20/21 | MICROSOFT*MICROSOFT 365 F Z41FKDWI0EJQ 98052 | MSBILL.INFO | | $99.99 |

## Alexis Logan Production 07600

| | | | | |
|---|---|---|---|---|
| 05/02/21 | MSFT *<E0800ED0YU> Z418L53D5NWN 98052 | MSFT AZURE | | $13.67 |
| 05/18/21 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |

## Alexis Logan Production 07664

| Detail | *indicates posting date | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|

| Credits | | | Amount |
|---|---|---|---|
| 05/05/21* | ALEXIS K LOGAN | AMAZON SHOP WITH POINTS CREDIT | -$21.99 |
| 05/05/21* | ALEXIS K LOGAN | AMAZON SHOP WITH POINTS CREDIT | -$219.33 |
| 05/11/21* | ALEXIS K LOGAN | AMAZON SHOP WITH POINTS CREDIT | -$17.99 |
| 04/21/21 | JAMES P LOGAN | DILLARDS 201 INTERNA TAMPA          FL DEPARTMENT STORE | -$148.73 ♦ |

Alexis Logan Production 07664

| Detail | | | | ♦ - denotes Pay Over Time activity |
|--------|--|--|--|-----|

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | **Amount** |
|--------|--------------------------------|-------------|----|-----------|
| 04/21/21 | SUNPASS OPERATIONS 888-865-5352 | BOCA RATON | FL | $14.96 |
| 04/21/21 | SUNPASS OPERATIONS 888-865-5352 | BOCA RATON | FL | $25.05 |
| 04/21/21 | SUNPASS OPERATIONS 888-865-5352 | BOCA RATON | FL | $5.72 |

Alexis Logan Production 07665

| Detail Continued | | | | ♦ - denotes Pay Over Time activity |
|--------|--|--|--|-----|

| | | | | **Amount** |
|--------|--------------------------------------------|-------------|----|-----------|
| 04/21/21 | SUNPASS OPERATIONS 888-865-5352 | BOCA RATON | FL | $28.68 |
| 04/21/21 | THEA Collect 8772585205 43684555748206 TOLL & BRIDGE FEE | TAMPA | FL | $126.96 ♦ |
| 05/04/21 | SUNPASS OPERATIONS 888-865-5352 | BOCA RATON | FL | $10.00 |
| 05/05/21 | AMAZON MKTPLACE PMTS GENERAL MERCHANDISE | SEATTLE | WA | $219.33 ♦ |
| 05/05/21 | AMAZON MKTPLACE PMTS GENERAL MERCHANDISE | SEATTLE | WA | $21.99 |
| 05/05/21 | ADTSECURITY MYADT.COM SECURITY | 800-238-2727 | FL | $60.76 |
| 05/09/21 | SHELL OIL 57546380403 AUTO FUEL DISPENSER | BRADENTON | FL | $67.83 |
| 05/10/21 | AMAZON MKTPLACE PMTS GENERAL MERCHANDISE | SEATTLE | WA | $17.99 |
| 05/10/21 | SUNPASS OPERATIONS 888-865-5352 | BOCA RATON | FL | $10.00 |
| 05/11/21 | SUNPASS OPERATIONS 888-865-5352 | BOCA RATON | FL | $10.00 |
| 05/19/21 | SUNPASS OPERATIONS 888-865-5352 | BOCA RATON | FL | $10.00 |

Alexis Logan Production 07737

| Detail | | | | ♦ - denotes Pay Over Time activity |
|--------|--|--|--|-----|

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | **Amount** |
|--------|------------------------------------------|---------------|----|-----------|
| 05/20/21 | SHELL OIL 57546429408 AUTO FUEL DISPENSER | ST PETERSBURG | FL | $65.42 |
| 05/23/21 | SUNPASS OPERATIONS 888-865-5352 | BOCA RATON | FL | $10.00 |
| 05/23/21 | AMZN MKTP US*2R6UE8E50 BOOK STORES | AMZN.COM/BILL | WA | $25.03 |
| 05/27/21 | AMAZON MKTPLACE PMTS GENERAL MERCHANDISE | SEATTLE | WA | $86.08 |
| 05/28/21 | SUNPASS OPERATIONS 888-865-5352 | BOCA RATON | FL | $10.00 |

Alexis Logan Production 07738

| **Detail Continued** | | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|---|
| | | | | **Amount** |
| 06/02/21 | SUNPASS OPERATIONS<br>888-865-5352 | BOCA RATON | FL | $10.00 |
| 06/04/21 | SUNPASS OPERATIONS<br>888-865-5352 | BOCA RATON | FL | $10.00 |
| 06/05/21 | ADTSECURITY MYADT.COM<br>SECURITY | 800-238-2727 | FL | $60.75 |
| 06/05/21 | SUNPASS OPERATIONS<br>888-865-5352 | BOCA RATON | FL | $10.00 |
| 06/09/21 | SUNPASS OPERATIONS<br>888-865-5352 | BOCA RATON | FL | $10.00 |
| 06/10/21 | EXXONMOBIL 9726<br>727-823-4833 | SAINT PETERSB | FL | $67.07 |
| 06/11/21 | SUNPASS OPERATIONS<br>888-865-5352 | BOCA RATON | FL | $10.00 |
| 06/15/21 | SUNPASS OPERATIONS<br>888-865-5352 | BOCA RATON | FL | $10.00 |

Alexis Logan Production 07748

| 06/18/21 | ADOBE ACROPRO SUBS Adobe Systems<br>ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |
|---|---|---|---|---|
| 06/23/21 | UBER TRIP<br>NRCBCRUE 94105 | SAN FRANCISCO | CA | $15.02 |
| 06/25/21 | UBER TRIP<br>O5DABRX4 94105 | SAN FRANCISCO | CA | $27.94 |

Alexis Logan Production 07749

| 07/07/21 | UBER TRIP<br>HQ6YVB2Y 94105 | SAN FRANCISCO | CA | $8.97 |
|---|---|---|---|---|
| 07/08/21 | UBER TRIP<br>HQ6YVB2Y 94105 | SAN FRANCISCO | CA | $5.00 |

Alexis Logan Production 07750

| 07/18/21 | ADOBE ACROPRO SUBS Adobe Systems<br>ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |
|---|---|---|---|---|
| 07/19/21 | MICROSOFT#G004948342<br>Z419PXMV3TJA 98052 | MSBILL.INFO | IR | $15.57 |

Alexis Logan Production 07817

| **Detail** | | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-11004

| | | | | **Amount** |
|---|---|---|---|---|
| 06/20/21 | SUNPASS OPERATIONS<br>888-865-5352 | BOCA RATON | FL | $10.00 |
| 06/23/21 | AMZN MKTP US*215NL6QN0<br>BOOK STORES | AMZN.COM/BILL | WA | $25.03 |
| 06/24/21 | SUNPASS OPERATIONS<br>888-865-5352 | BOCA RATON | FL | $10.00 |
| 06/30/21 | SUNPASS OPERATIONS<br>888-865-5352 | BOCA RATON | FL | $10.00 |
| 07/05/21 | ADTSECURITY MYADT.COM<br>SECURITY | 800-238-2727 | FL | $60.75 |

86

### Alexis Logan Production 07829

| 08/18/21 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |
|---|---|---|---|---|
| | | | | |
| 08/19/21 | MICROSOFT#G005226430 Z41GRTX9D3L5 98052 | MSBILL.INFO | IR | $17.49 |

### Alexis Logan Production 07901

| Detail | | | ♦ – denotes Pay Over Time activity |
|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-12002

| | | | | Amount |
|---|---|---|---|---|
| 08/05/21 | ADTSECURITY MYADT.COM SECURITY | 800-238-2727 | FL | $65.45 |
| 08/13/21 | SHELL OIL 57546429408 AUTO FUEL DISPENSER | ST PETERSBURG | FL | $53.67 |

### Alexis Logan Production 07915

| 09/18/21 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |
|---|---|---|---|---|
| 09/18/21 | MICROSOFT#G005431301 0000 Z41BTQRDCSJK 33947 QRDCSJK Z41BTQRDCSJ | MSBILL.INFO | WA | $17.76 |
| | | | | |
| 09/19/21 | AMAZON MKTPLACE PMTS GENERAL MERCHANDISE | SEATTLE | WA | $89.65 |

### Alexis Logan Production 07968

| Detail |
|---|

**ALEXIS K LOGAN**
Card Ending 7-12002

| | | | | Amount |
|---|---|---|---|---|
| 08/23/21 | EXXONMOBIL 4824 813-805-6476 | TAMPA | FL | $65.60 |
| 09/05/21 | ADTSECURITY MYADT.COM SECURITY | 800-238-2727 | FL | $65.45 |
| 09/06/21 | SHELL OIL 57546380403 AUTO FUEL DISPENSER | BRADENTON | FL | $66.96 |

### Alexis Logan Production 07977

| Credits | | | Amount |
|---|---|---|---|
| 09/20/21* | ALEXIS K LOGAN | AMAZON SHOP WITH POINTS CREDIT | -$89.65 |
| 10/09/21* | ALEXIS K LOGAN | AMAZON SHOP WITH POINTS CREDIT | -$57.75 |
| | | | |

## Alexis Logan Production 07979

| 09/24/21 | MCAFEE RENEWAL 495747350NLINE SOFTWR | SANTA CLARA | CA | $119.99 |
|---|---|---|---|---|
| 10/08/21 | AMAZON MKTPLACE PMTS GENERAL MERCHANDISE | SEATTLE | WA | $57.75 |

## Alexis Logan Production 07980

| 10/18/21 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |
|---|---|---|---|---|
| 10/19/21 | MICROSOFT#G006050655 0000 Z41JVLY3MY13 33947 LY3MY13 Z41JVLY3MY1 | MSBILL.INFO | WA | $19.49 |

## Alexis Logan Production 08037

| **Detail** | | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-12002

| | | | | **Amount** |
|---|---|---|---|---|
| 09/26/21 | SHELL OIL 57546380403 AUTO FUEL DISPENSER | BRADENTON | FL | $75.89 |
| 10/05/21 | ADTSECURITY MYADT.COM SECURITY | 800-238-2727 | FL | $65.45 |
| 10/08/21 | SHELL OIL 57546429408 AUTO FUEL DISPENSER | ST PETERSBURG | FL | $63.37 |

## Alexis Logan Production 08047

| **Credits** | | | **Amount** |
|---|---|---|---|
| 10/22/21* | ALEXIS K LOGAN | AMAZON SHOP WITH POINTS CREDIT | -$401.86 |
| 10/22/21* | ALEXIS K LOGAN | AMAZON SHOP WITH POINTS CREDIT | -$89.74 |
| 11/10/21* | ALEXIS K LOGAN | Credit for AMEX Error | -$0.32 ♦ |

## Alexis Logan Production 08049

| 10/21/21 | AMAZON MKTPLACE PMTS GENERAL MERCHANDISE | SEATTLE | WA | $401.86 |
|---|---|---|---|---|
| 10/21/21 | AMAZON MKTPLACE PMTS GENERAL MERCHANDISE | SEATTLE | WA | $89.74 |

## Alexis Logan Production 08050

| 11/18/21 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |
|---|---|---|---|---|
| 11/18/21 | MICROSOFT#G006314150 0000 Z41RXIGX5C3S 33947 IGX5C3S Z41RXIGX5C3 | MSBILL.INFO | WA | $18.87 |

## Alexis Logan Production 08113

### Detail
♦ - denotes Pay Over Time activity

**ALEXIS K LOGAN**
Card Ending 7-12002

| | | | | Amount |
|---|---|---|---|---|
| 10/26/21 | WAWA FUEL/CONVENIENCE 7278228168 | ST. PETERSBURG | FL | $26.41 |
| 11/05/21 | ADTSECURITY MYADT.COM SECURITY | 800-238-2727 | FL | $65.45 ♦ |

## Alexis Logan Production 08122

### Detail
♦ - denotes Pay Over Time activity

**ALEXIS K LOGAN**
Card Ending 7-72002

| | | | Foreign Spend | Amount |
|---|---|---|---|---|
| 12/03/21 | Amazon Web Services WEB SERVICES | AWS.Amazon.com | WA | $1,940.21 |
| 12/18/21 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |
| 12/19/21 | MICROSOFT#G006779933 Z41KZD4480IV 98052 | MSBILL.INFO | | $17.00 |

## Alexis Logan Production 08187

### Detail
♦ - denotes Pay Over Time activity

**ALEXIS K LOGAN**
Card Ending 7-12002

| | | | | Amount |
|---|---|---|---|---|
| 12/05/21 | ADTSECURITY MYADT.COM SECURITY | 800-238-2727 | FL | $65.45 ♦ |

## Alexis Logan Production 08192

| Credits | | | Amount |
|---|---|---|---|
| 01/07/22* | ALEXIS K LOGAN | AMAZON SHOP WITH POINTS CREDIT | -$991.62 |
| 01/19/22* | ALEXIS K LOGAN | AMEX Airline Fee Reimbursement TRANSACTION PROCESSED BY AMERICAN EXPRESS | -$30.00 ♦ |

## Alexis Logan Production 08195

| | | | | Amount |
|---|---|---|---|---|
| 01/06/22 | AMAZON MKTPLACE PMTS GENERAL MERCHANDISE | SEATTLE | WA | $991.62 |
| 01/18/22 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |
| 01/19/22 | MICROSOFT#G007846704 Z51Q19XRL8V9 98052 | MSBILL.INFO | | $13.86 |

## Alexis Logan Production 08253

### Detail
♦ - denotes Pay Over Time activity

| Credits | | | Amount |
|---|---|---|---|
| 12/28/21 | ALEXIS K LOGAN | WHT HS BLK MKT #3624 000003624 SARASOTA    FL 8888554968 | -$368.35 ♦ |

Alexis Logan Production 08253

| Detail | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-12002

| | | | | Amount |
|---|---|---|---|---|
| 12/22/21 | WHITE HUSE BLCKMRKT 8888554968 | TAMPA | FL | $579.73 ♦ |
| 12/22/21 | LILLY PULITZER INTERNATIONAL PLAZA 888-725-4559 | TAMPA | FL | $1,240.55 |
| 12/22/21 | MICHAEL KORS 866-709-5677 | TAMPA | FL | $133.30 ♦ |
| 12/22/21 | Z GALLERIE 0573 800-358-8288 | TAMPA | FL | $88.94 ♦ |
| 01/05/22 | ADTSECURITY MYADT.COM SECURITY | 800-238-2727 | FL | $65.45 ♦ |

Alexis Logan Production 08260

| Credits | | | Amount |
|---|---|---|---|
| 01/22/22* | ALEXIS K LOGAN | AMEX Airline Fee Reimbursement TRANSACTION PROCESSED BY AMERICAN EXPRESS | -$47.29 ♦ |
| 01/28/22* | ALEXIS K LOGAN | AMEX Airline Fee Reimbursement TRANSACTION PROCESSED BY AMERICAN EXPRESS | -$122.71 ♦ |
| 02/12/22 | ALEXIS K LOGAN | AMAZON MKTPLACE PMTS SEATTLE        WA GENERAL MERCHANDISE | -$55.27 ♦ |
| 02/12/22 | ALEXIS K LOGAN | AMAZON MKTPLACE PMTS SEATTLE        WA GENERAL MERCHANDISE | -$331.62 ♦ |
| 02/12/22 | ALEXIS K LOGAN | AMAZON MKTPLACE PMTS SEATTLE        WA GENERAL MERCHANDISE | -$160.47 ♦ |
| 02/13/22 | ALEXIS K LOGAN | AMAZON MKTPLACE PMTS SEATTLE        WA GENERAL MERCHANDISE | -$53.49 ♦ |
| 02/13/22 | ALEXIS K LOGAN | AMAZON MKTPLACE PMTS SEATTLE        WA GENERAL MERCHANDISE | -$53.49 ♦ |

Alexis Logan Production 08261

| Detail Continued | *Indicates posting date | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|

| | | | Amount |
|---|---|---|---|
| 02/13/22 | ALEXIS K LOGAN | AMAZON MKTPLACE PMTS SEATTLE        WA GENERAL MERCHANDISE | -$283.79 ♦ |

Alexis Logan Production 08262

| Detail | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-72002

| | | | | Amount |
|---|---|---|---|---|
| 02/02/22 | Amazon Web Services WEB SERVICES | AWS.Amazon.com | WA | $2,286.98 |

## Alexis Logan Production 08339

| Detail | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-12002

| | | | | Amount |
|---|---|---|---|---|
| 01/24/22 | 2131 4TH ST N 57546429408 7278232420 | SAINT PETERSBURG | FL | $64.02 ♦ |
| 02/03/22 | 7-ELEVEN 25359 00072535942 954-467-3856 | FORT LAUDERDALE | FL | $69.12 ♦ |
| 02/14/22 | 14315 EAST SR 70 57546380403 9417751455 | BRADENTON | FL | $77.79 |

## Alexis Logan Production 08344

| Credits | | | Amount |
|---|---|---|---|
| 03/05/22* | ALEXIS K LOGAN | AMAZON SHOP WITH POINTS CREDIT | -$453.68 |
| 03/05/22* | ALEXIS K LOGAN | AMAZON SHOP WITH POINTS CREDIT | -$33.05 |

## Alexis Logan Production 08346

| Detail | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-73000

| | | | | Amount |
|---|---|---|---|---|
| 02/18/22 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |
| 02/19/22 | MICROSOFT#G008504722 Z51N371WAWAS 98052 | MSBILL.INFO | | $29.71 |
| 03/04/22 | AMAZON MKTPLACE PMTS GENERAL MERCHANDISE | SEATTLE | WA | $453.68 |
| 03/05/22 | AMAZON MKTPLACE PMTS GOODS/SERVICES | SEATTLE | WA | $33.05 |
| 03/18/22 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 ♦ |
| 03/19/22 | MICROSOFT#G009210120 0000 Z51M4X9EZ46I 33947 X9EZ46I Z51M4X9EZ46 | MSBILL.INFO | WA | $19.94 |

## Alexis Logan Production 08425

| Detail | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-12002

| | | | | Amount |
|---|---|---|---|---|
| 02/23/22 | TPA - RAC CURBSIDE CONCIERGE squareup.com/receipts | Tampa | FL | $6.00 ♦ |

## Alexis Logan Production 08436

| 04/09/22 | PRIME VIDEO*1H3GA3IO0 DIGITAL | 888-802-3080 | WA | $6.81 |
|---|---|---|---|---|
| 04/18/22 | MICROSOFT#G010032103 MSBILL.INFO | MSBILL.INFO | WA | $24.82 |
| 04/18/22 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |

## Alexis Logan Production 08519
**Credits**

| | | | | |
|---|---|---|---|---|
| ALEXIS K LOGAN 7-12002 | | $0.00 | -$38.51 | -$38.51 |

## Alexis Logan Production 08519
**Credits** | **Amount**

| | | | | |
|---|---|---|---|---|
| 04/05/22 | ALEXIS K LOGAN | AMZN MKTP US AMZN.COM/BILL BOOK STORES | WA | -$38.51 ♦ |

## Alexis Logan Production 08519

| **Detail** | ♦ - denotes Pay Over Time activity |
|---|---|



**ALEXIS K LOGAN**
Card Ending 7-12002

| | | | | **Amount** |
|---|---|---|---|---|
| 03/21/22 | 2131 4TH ST N 57546429408 7278232420 | SAINT PETERSBURG | FL | $103.18 ♦ |
| 03/22/22 | THE TICKET CLINIC - VA 800-248-2846 | VALDOSTA | GA | $299.95 ♦ |
| 03/28/22 | RACETRAC696 006965 97400006965 000-0000000 | ST PETERSBUR | FL | $90.17 ♦ |
| 03/31/22 | AMZN MKTP US*163EF8M72 BOOK STORES | AMZN.COM/BILL | WA | $38.51 ♦ |
| 03/31/22 | AMZN MKTP US*169FW4UE0 BOOK STORES | AMZN.COM/BILL | WA | $22.41 ♦ |

## Alexis Logan Production 08528
**Credits** | **Amount**

| | | | |
|---|---|---|---|
| 05/06/22 | ALEXIS K LOGAN | CLEAR NEW YORK Plat CLEAR Credit | -$179.00 ♦ |

## Alexis Logan Production 08531

| **Detail** | ♦ - denotes Pay Over Time activity |
|---|---|

**ALEXIS K LOGAN**
Card Ending 7-73000

| | | | | **Amount** |
|---|---|---|---|---|
| 04/20/22 | MICROSOFT*MICROSOFT 365 F Z51Q6W202QDX 98052 | MSBILL.INFO | | $99.99 ♦ |
| 05/09/22 | AMAZON.COM*1350L9D60 MERCHANDISE | AMZN.COM/BILL | WA | $283.49 |
| 05/18/22 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |
| 05/19/22 | MICROSOFT*G010378659 751Q8Q1A7MKF 98052 | MSBILL.INFO | | $24.44 |

Alexis Logan Production 08635

| Detail | | | ♦ – denotes Pay Over Time activity |
|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-12002

| | | | | Amount |
|---|---|---|---|---|
| 05/02/22 | 2131 4TH ST N 57546429408<br>7278232420 | SAINT PETERSBURG | FL | $92.13 ♦ |
| 05/10/22 | 7-ELEVEN 22724 00072272441<br>813-837-4430 | TAMPA | FL | $90.44 |

Alexis Logan Production 08645

| 06/18/22 | ADOBE ACROPRO SUBS Adobe Systems<br>ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |
|---|---|---|---|---|
| 06/19/22 | MICROSOFT#G011624790<br>Z51NAKYSW42V 98052 | MSBILL.INFO | | $22.39 ♦ |

Alexis Logan Production 08729

| Detail | | | ♦ – denotes Pay Over Time activity |
|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-12002

| | | | | Amount |
|---|---|---|---|---|
| 05/25/22 | 2131 4TH ST N 57546429408<br>7278232420 | SAINT PETERSBURG | FL | $103.82 ♦ |

Alexis Logan Production 08740

| 07/18/22 | ADOBE ACROPRO SUBS Adobe Systems<br>ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |
|---|---|---|---|---|
| 07/20/22 | MICROSOFT#G012141456<br>Z51RCH2SRFF3 98052 | MSBILL.INFO | | $24.95 |

Alexis Logan Production 08829

| Detail | | | ♦ – denotes Pay Over Time activity |
|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-12002

| | | | | Amount |
|---|---|---|---|---|
| 07/02/22 | 2131 4TH ST N 57546429408<br>7278232420 | SAINT PETERSBURG | FL | $93.14 ♦ |

Alexis Logan Production 08830

| Detail Continued | | | ♦ – denotes Pay Over Time activity |
|---|---|---|---|

| | | | | Amount |
|---|---|---|---|---|
| 07/12/22 | EXXONMOBIL 4563<br>727-822-0596 | SAINT PETERSB | FL | $91.13 |
| 07/14/22 | THE LITTLE FLOWER 0375<br>301-447-2700 | EMMITSBURG | MD | $94.45 |

Alexis Logan Production 08839

| Detail | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-73000

| | | | | Amount |
|---|---|---|---|---|
| 07/20/22 | AMZN MKTP US*2O5JD2PF3 BOOK STORES | AMZN.COM/BILL | WA | $181.41 |
| 07/20/22 | AMZN MKTP US*QO77M61O3 BOOK STORES | AMZN.COM/BILL | WA | $37.43 |
| 08/18/22 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |
| 08/19/22 | MICROSOFT#G013370623 Z51RECLSG7J7 98052 | MSBILL.INFO | | $29.21 |

Alexis Logan Production 08931

| Detail | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-12002

| | | | | Amount |
|---|---|---|---|---|
| 08/10/22 | EXXONMOBIL 4563 727-822-0596 | SAINT PETERSB | FL | $52.35 ♦ |

Alexis Logan Production 08943

| | | | | |
|---|---|---|---|---|
| 09/03/22 | AMZN MKTP US*1F4VS8CR1 BOOK STORES | AMZN.COM/BILL | WA | $96.30 |
| 09/18/22 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |
| 09/18/22 | MICROSOFT#G014198041 MSBILL.INFO | MSBILL.INFO | WA | $25.78 |

Alexis Logan Production 09030

| Detail | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-12002

| | | | | Amount |
|---|---|---|---|---|
| 08/24/22 | 2131 4TH ST N 57546429408 7278232420 | SAINT PETERSBURG | FL | $79.65 ♦ |
| 09/14/22 | WAWA FUEL/CONVENIENCE 8138742760 | TAMPA | FL | $76.00 ♦ |

Alexis Logan Production 09039

| Detail | | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-74008

| | | | | Amount |
|---|---|---|---|---|
| 09/24/22 | MCAFEE RENEWAL 62943741ONLINE SOFTWR | SANTA CLARA | CA | $129.99 |
| 10/01/22 | AMZN MKTP US*1462N25P0 BOOK STORES | AMZN.COM/BILL | WA | $13.99 |
| 10/01/22 | AMZN MKTP US*140XK25D0 BOOK STORES | AMZN.COM/BILL | WA | $13.95 ♦ |
| 10/10/22 | AMZN MKTP US*1K2UK2YB0 BOOK STORES | AMZN.COM/BILL | WA | $28.88 |
| 10/10/22 | AMZN MKTP US*1K6IM8KO1 BOOK STORES | AMZN.COM/BILL | WA | $12.83 |
| 10/10/22 | AMAZON.COM*1K1ZF51S2 MERCHANDISE | AMZN.COM/BILL | WA | $127.88 |
| 10/10/22 | AMZN MKTP US*1K4QN2SF1 BOOK STORES | AMZN.COM/BILL | WA | $64.17 |
| 10/10/22 | AMZN MKTP US*1K07U3BB2 BOOK STORES | AMZN.COM/BILL | WA | $60.95 |
| 10/11/22 | AMZN MKTP US*1K8M52YA0 BOOK STORES | AMZN.COM/BILL | WA | $16.03 |
| 10/13/22 | AMZN MKTP US*1K3TD7682 BOOK STORES | AMZN.COM/BILL | WA | $49.12 |
| 10/13/22 | AMZN MKTP US*HT7FX6TM1 BOOK STORES | AMZN.COM/BILL | WA | $8.55 |

Alexis Logan Production 09040

| Detail Continued | | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|---|

| | | | | Amount |
|---|---|---|---|---|
| 10/18/22 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |
| 10/19/22 | MICROSOFT#G015694409 Z521I44V7ZVP 98052 | MSBILL.INFO | | $26.50 |

Alexis Logan Production 09120

| Detail | | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-12002

| | | | | Amount |
|---|---|---|---|---|
| 09/21/22 | 2131 4TH ST N 57546429408 7278232420 | SAINT PETERSBURG | FL | $74.66 ♦ |

Alexis Logan Production 09227

| Detail | | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-74008

| | | | | Amount |
|---|---|---|---|---|
| 11/18/22 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $14.99 |
| 11/19/22 | MICROSOFT#G016226728 Z524K0BHGBOF 98052 | MSBILL.INFO | | $26.26 |

Alexis Logan Production 09228

| 12/11/22 | MICROSOFT#G017538557 Z524LECXJ5A8 98052 | MSBILL.INFO | | $25.60 |
|---|---|---|---|---|
| 12/18/22 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 |

Alexis Logan Production 09304

| Credits | | | Amount |
|---|---|---|---|
| 01/07/23* | ALEXIS K LOGAN | AMEX Airline Fee Reimbursement TRANSACTION PROCESSED BY AMERICAN EXPRESS | -$119.99 ♦ |
| 01/14/23* | ALEXIS K LOGAN | AMEX Airline Fee Reimbursement TRANSACTION PROCESSED BY AMERICAN EXPRESS | -$29.99 ♦ |

Alexis Logan Production 09307

| 01/05/23 | AMAZON MARKETPLACE NA PA BOOK STORES | AMZN.COM/BILL | WA | $89.55 |
|---|---|---|---|---|
| 01/05/23 | AMAZON MARKETPLACE NA PA BOOK STORES | AMZN.COM/BILL | WA | $17.12 |
| 01/11/23 | MICROSOFT#G018548536 Z527NAMBUZTD 98052 | MSBILL.INFO | | $28.45 |
| 01/11/23 | AMAZON.COM MERCHANDISE | AMZN.COM/BILL | WA | $29.43 |
| 01/18/23 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 ♦ |

Alexis Logan Production 09377

| Credits | | | Amount |
|---|---|---|---|
| 01/07/23* | ALEXIS K LOGAN | AMEX Airline Fee Reimbursement TRANSACTION PROCESSED BY AMERICAN EXPRESS | -$119.99 ♦ |
| 01/14/23* | ALEXIS K LOGAN | AMEX Airline Fee Reimbursement TRANSACTION PROCESSED BY AMERICAN EXPRESS | -$29.99 ♦ |

Alexis Logan Production 09380

| 01/05/23 | AMAZON MARKETPLACE NA PA BOOK STORES | AMZN.COM/BILL | WA | $89.55 |
|---|---|---|---|---|
| 01/05/23 | AMAZON MARKETPLACE NA PA BOOK STORES | AMZN.COM/BILL | WA | $17.12 |
| 01/11/23 | MICROSOFT#G018548536 Z527NAMBUZTD 98052 | MSBILL.INFO | | $28.45 |
| 01/11/23 | AMAZON.COM MERCHANDISE | AMZN.COM/BILL | WA | $29.43 |
| 01/18/23 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 ♦ |

## Alexis Logan Production 09450

| Credits | | | Amount |
|---|---|---|---|
| 02/08/23* | ALEXIS K LOGAN | AMEX Airline Fee Reimbursement | -$50.02 ♦ |
| | | TRANSACTION PROCESSED BY AMERICAN EXPRESS | |

## Alexis Logan Production 09453

| 02/11/23 | MICROSOFT#G019070613 | MSBILL.INFO | $25.83 |
|---|---|---|---|
| | Z523P6YXBMEI 98052 | | |

## Alexis Logan Production 09529

| Credits | | | Amount |
|---|---|---|---|
| 02/08/23* | ALEXIS K LOGAN | AMEX Airline Fee Reimbursement | -$50.02 ♦ |
| | | TRANSACTION PROCESSED BY AMERICAN EXPRESS | |

## Alexis Logan Production 09532

| 02/11/23 | MICROSOFT#G019070613 | MSBILL.INFO | $25.83 |
|---|---|---|---|
| | Z523P6YXBMEI 98052 | | |

## Alexis Logan Production 09610

| Detail | | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-74008

| | | | Foreign Spend | Amount |
|---|---|---|---|---|
| 02/18/23 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 |
| 03/11/23 | MICROSOFT#G020462687 Z523QX82YM9F 98052 | MSBILL.INFO | .... | $26.50 |
| 03/18/23 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 ♦ |

## Alexis Logan Production 09685

| Detail | | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-74008

| | | | Foreign Spend | Amount |
|---|---|---|---|---|
| 02/18/23 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 |
| 03/11/23 | MICROSOFT#G020462687 Z523QX82YM9F 98052 | MSBILL.INFO | | $26.50 |
| 03/18/23 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 ♦ |

## Alexis Logan Production 09758

| Credits | | | Amount |
|---|---|---|---|
| 03/25/23 | ALEXIS K LOGAN | CLEAR<br>NEW YORK<br>Plat CLEAR Credit | -$189.00 ♦ |

## Alexis Logan Production 09761

| | | | | |
|---|---|---|---|---|
| 04/10/23 | AMAZON MARKETPLACE NA PA<br>BOOK STORES | AMZN.COM/BILL | WA | $82.40 ♦ |
| 04/11/23 | MICROSOFT#G021335323<br>Z51YSTS956ER 98052 | MSBILL.INFO | | $29.42 ♦ |
| 04/18/23 | ADOBE ACROPRO SUBS Adobe Systems<br>ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 |

## Alexis Logan Production 09838

| Credits | | | Amount |
|---|---|---|---|
| 03/25/23 | ALEXIS K LOGAN | CLEAR<br>NEW YORK<br>Plat CLEAR Credit | -$189.00 ♦ |
| 03/29/23 | JUSTIN SCOTT | THE HOME DEPOT<br>VANCOUVER    WA<br>800-654-0688 | -$76.29 ♦ |

## Alexis Logan Production 09841

| | | | | |
|---|---|---|---|---|
| 04/10/23 | AMAZON MARKETPLACE NA PA<br>BOOK STORES | AMZN.COM/BILL | WA | $82.40 ♦ |
| 04/11/23 | MICROSOFT#G021335323<br>Z51YSTS956ER 98052 | MSBILL.INFO | | $29.42 ♦ |
| 04/18/23 | ADOBE ACROPRO SUBS Adobe Systems<br>ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 |

## Alexis Logan Production 09921

| Detail | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-74008

| | | | | Amount |
|---|---|---|---|---|
| 04/20/23 | MICROSOFT*MICROSOFT 365 F<br>Z51YTEPZ5KB6 98052 | MSBILL.INFO | | $99.99 |
| 05/01/23 | PRIME VIDEO *HM01F5A22<br>DIGITAL | 888-802-3080 | WA | $4.53 |
| 05/09/23 | AMAZON MARKETPLACE NA PA<br>BOOK STORES | AMZN.COM/BILL | WA | $18.95 |
| 05/11/23 | MICROSOFT#G022710711<br>Z520UP0OIPVJ 98052 | MSBILL.INFO | | $28.65 |
| 05/18/23 | ADOBE ACROPRO SUBS Adobe Systems<br>ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 |

Alexis Logan Production 010013

| Detail | | | ♦ - denotes Pay Over Time activity |
|--------|--|--|--------------------------------------|

**ALEXIS K LOGAN**
Card Ending 7-74008

| | | | | Amount |
|----------|------------------------------------------|--------------|----|--------|
| 04/20/23 | MICROSOFT*MICROSOFT 365 F Z51YTEPZ5KB6 98052 | MSBILL.INFO | | $99.99 |
| 05/01/23 | PRIME VIDEO *HM01F5A22 DIGITAL | 888-802-3080 | WA | $4.53 |
| 05/09/23 | AMAZON MARKETPLACE NA PA BOOK STORES | AMZN.COM/BILL | WA | $18.95 |
| 05/11/23 | MICROSOFT#G022710711 Z520UPOOIPVJ 98052 | MSBILL.INFO | | $28.65 |
| 05/18/23 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 |

Alexis Logan Production 10104

| 06/11/23 | MICROSOFT#G024450533 Z521WM2355SB 98052 | MSBILL.INFO | | $31.72 |
|----------|------------------------------------------|-------------|----|--------|
| 06/18/23 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 ♦ |

Alexis Logan Production 10153

| 06/11/23 | MICROSOFT#G024450533 Z521WM2355SB 98052 | MSBILL.INFO | | $31.72 |
|----------|------------------------------------------|-------------|----|--------|
| 06/18/23 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 ♦ |

Alexis Logan Production 10200

| Credits | | | Amount |
|----------|----------------|-------------------------------|-----------|
| 07/03/23 | ALEXIS K LOGAN | DISPUTE CREDIT - COMFORT INN | -$325.80 ♦ |
| 07/20/23* | ALEXIS K LOGAN | CREDIT ADJUSTMENT | -$355.89 |
| | | | |

Alexis Logan Production 10201

| Detail | *Indicates posting date | | | ♦ - denotes Pay Over Time activity |
|--------|-------------------------|--|--|--------------------------------------|

**ALEXIS K LOGAN**
Card Ending 7-74008

| | | | | Amount |
|-----------|------------------------------------------|--------------|----|--------|
| 07/03/23 | AMAZON.COM MERCHANDISE | AMZN.COM/BILL | WA | $10.42 ♦ |
| 07/10/23 | AMAZON.COM MERCHANDISE | AMZN.COM/BILL | WA | $42.80 ♦ |
| 07/11/23 | MICROSOFT#G025864260 Z523YFPUPVMZ 98052 | MSBILL.INFO | | $30.53 ♦ |
| 07/18/23 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 ♦ |
| 07/20/23* | DEBIT ADJUSTMENT | | | $355.89 ♦ |

Alexis Logan Production 10209

| Credits | | | Amount |
|---------|---|---|--------|
| 07/03/23 | ALEXIS K LOGAN | DISPUTE CREDIT - COMFORT INN | -$325.80 ♦ |
| 07/20/23* | ALEXIS K LOGAN | CREDIT ADJUSTMENT | -$355.89 |

Alexis Logan Production 10210

| **Detail** | *Indicates posting date | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-74008

| | | | | Amount |
|---|---|---|---|---|
| 07/03/23 | AMAZON.COM MERCHANDISE | AMZN.COM/BILL | WA | $10.42 ♦ |
| 07/10/23 | AMAZON.COM MERCHANDISE | AMZN.COM/BILL | WA | $42.80 ♦ |
| 07/11/23 | MICROSOFT#G025864260 Z523YFPUPVMZ 98052 | MSBILL.INFO | | $30.53 ♦ |
| 07/18/23 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 ♦ |
| 07/20/23* | DEBIT ADJUSTMENT | | | $355.89 ♦ |

Alexis Logan Production 10218

| **Detail** | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-74008

| | | | | Amount |
|---|---|---|---|---|
| 08/09/23 | MICROSOFT#G027323102 Z625094X3O5Q 98052 | MSBILL.INFO | | $29.29 ♦ |
| 08/18/23 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 ♦ |

Alexis Logan Production 10226

| **Detail** | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-74008

| | | | | Amount |
|---|---|---|---|---|
| 08/09/23 | MICROSOFT#G027323102 Z625094X3O5Q 98052 | MSBILL.INFO | | $29.29 ♦ |
| 08/18/23 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 ♦ |

## Alexis Logan Production 10234

| Detail | *Indicates posting date | | | ♦ – denotes Pay Over Time activity |
|---|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-74008

| | | | | Amount |
|---|---|---|---|---|
| 09/09/23 | MICROSOFT#G028332760 Z61W24PCU7MQ 98052 | MSBILL.INFO | | $35.83 ♦ |
| 09/18/23 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 ♦ |
| 09/19/23* | DEBIT ADJUSTMENT | | | $55.82 |

## Alexis Logan Production 10243

| Detail | *Indicates posting date | | | ♦ – denotes Pay Over Time activity |
|---|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-74008

| | | | | Amount |
|---|---|---|---|---|
| 09/09/23 | MICROSOFT#G028332760 Z61W24PCU7MQ 98052 | MSBILL.INFO | | $35.83 ♦ |
| 09/18/23 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 ♦ |
| 09/19/23* | DEBIT ADJUSTMENT | | | $55.82 |

## Alexis Logan Production 10252

| Detail | *Indicates posting date | | | ♦ – denotes Pay Over Time activity |
|---|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-74008

| | | | | Amount |
|---|---|---|---|---|
| 09/24/23 | MCAFEE RENEWAL 75898024mcafee.com/aut | SANTA CLARA | CA | $149.99 ♦ |
| 10/09/23 | MICROSOFT#G030139969 Z62R3ZJU11N9 98052 | MSBILL.INFO | | $226.38 ♦ |
| 10/18/23 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 ♦ |
| 10/20/23* | DEBIT ADJUSTMENT | | | $263.30 |

## Alexis Logan Production 10262

| Detail | *Indicates posting date | | | ♦ – denotes Pay Over Time activity |
|---|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-74008

| | | | | Amount |
|---|---|---|---|---|
| 09/24/23 | MCAFEE RENEWAL 75898024mcafee.com/aut | SANTA CLARA | CA | $149.99 ♦ |
| 10/09/23 | MICROSOFT#G030139969 Z62R3ZJU11N9 98052 | MSBILL.INFO | | $226.38 ♦ |
| 10/18/23 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 ♦ |
| 10/20/23* | DEBIT ADJUSTMENT | | | $263.30 |

Alexis Logan Production 10272

| **Detail** | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-74008

| | | | | Amount |
|---|---|---|---|---|
| 11/04/23 | AMAZON MARKETPLACE NA PA MERCHANDISE | AMZN.COM/BILL | WA | $40.66 ♦ |
| 11/09/23 | MICROSOFT#G032701143 Z62N5XFQAZQG 98052 | MSBILL.INFO | | $148.50 ♦ |
| 11/18/23 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 ♦ |

Alexis Logan Production 10277

| **Detail** | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-74008

| | | | | Amount |
|---|---|---|---|---|
| 11/04/23 | AMAZON MARKETPLACE NA PA MERCHANDISE | AMZN.COM/BILL | WA | $40.66 ♦ |
| 11/09/23 | MICROSOFT#G032701143 Z62N5XFQAZQG 98052 | MSBILL.INFO | | $148.50 ♦ |
| 11/18/23 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 ♦ |

Alexis Logan Production 10282

| **Detail** | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-74008

| | | | | Amount |
|---|---|---|---|---|
| 12/09/23 | MICROSOFT#G034603683 Z62J7RFPVA1T 98052 | MSBILL.INFO | | $177.50 ♦ |
| 12/18/23 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 ♦ |

Alexis Logan Production 10289

| **Detail** | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-74008

| | | | | Amount |
|---|---|---|---|---|
| 12/09/23 | MICROSOFT#G034603683 Z62J7RFPVA1T 98052 | MSBILL.INFO | | $177.50 ♦ |
| 12/18/23 | ADOBE ACROPRO SUBS Adobe Systems ADOBE.LY/ENUS | SAN JOSE | CA | $19.99 ♦ |

Alexis Logan Production 10305

| **Detail** | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-74008

| | | | | Amount |
|---|---|---|---|---|
| 02/18/24 | ADOBE SYSTEMS Adobe Systems www.adobe.com | SAN JOSE | CA | $19.99 ♦ |

Alexis Logan Production 10333

| **Detail** | | | ♦ - denotes Pay Over Time activity |
|---|---|---|---|

**ALEXIS K LOGAN**
Card Ending 7-74008

| | | | | Amount |
|---|---|---|---|---|
| 04/20/24 | MICROSOFT*MICROSOFT 365 F 0000 Z62QFZD73FWY 33947 COMPUTER HRDWR/SFTWR | MSBILL.INFO | WA | $99.99 ♦ |

# EXHIBIT 23

| | |
|---|---|
| DISTRICT COURT, DENVER COUNTY, COLORADO<br>Court Address: 1437 Bannock Street<br>              Denver, Colorado 80202 | |
| **Plaintiff**: SMART COMMUNICATIONS HOLDING, INC.,<br><br>v.<br><br>**Defendant:** CITY AND COUNTY OF DENVER, DEPARTMENT OF GENERAL SERVICES, PURCHASING DIVISION. | DATE FILED<br>December 3, 2024 4:34 PM<br>FILING ID: 6A6061FE33E2D<br>CASE NUMBER: 2024CV33720<br><br><br><br>▲ **COURT USE ONLY** ▲ |
| *Attorney for Plaintiff*<br><br>Name:         Shaun C. Kennedy, No. 46548<br>               Shannon N. Calhoun, No. 58175<br>Address:    HOLLAND & HART LLP<br>               555 17th Street, Suite 3200<br>               Denver, Colorado 80202-3921<br>Phone No.:  (303) 295-8000<br>Fax No:     (303) 295-8261<br>E-Mail:     SCKennedy@hollandhart.com<br>               SNCalhoun@hollandhart.com | Case No.<br><br>Div: |
| **COMPLAINT** | |

For its Complaint, Plaintiff Smart Communications Holding, Inc. ("Smart"), by and through undersigned counsel of Holland & Hart LLP, hereby alleges as follows:

## NATURE OF THE ACTION

1.      This is a Colorado Rule of Civil Procedure ("C.R.C.P.") 106(a)(4) appeal action against the Defendant, City and County of Denver, acting through the Department of General Services, Purchasing Division (the "City" or "Denver").

2.      This appeal action challenges the City's arbitrary and capricious decision to withdraw a Notice of Award, issued "in the best interest of the City and County of Denver" under full and open procurement, without a rational basis.

3.      The City's withdrawal decision cites a purported failure to reach a mutual agreement on the terms of a contract. However, the City altogether failed to conduct meaningful, good faith negotiations with Smart  And when pressed, the City admitted there was actually no term Smart did not agree to.  Rather, the withdrawal decision appears to have been solution in search of a problem.  The City entered negotiations with a separate vendor under the terms of the

1

Solicitation (defined below), despite selecting Smart as the apparent awardee and acknowledging its offer was in the best interest of the City.

4.      The City's irrational decision not only violates the terms of its own Solicitation, but also the basic tenant in public procurements to treat prospective offerors fairly.  In addition, the City's failure to conduct reasonable negotiations after selecting Smart as the apparent awardee was irrational.

5.      For these reasons, Smart seeks an order from the Court overturning the City's unlawful actions pursuant to C.R.C.P. 106(a)(4), and respectfully asks that the Court grant Smart the declaratory and injunctive relief sought in this Complaint.

## PARTIES

6.      Plaintiff Smart Communications Holding, Inc., a leading provider of telecommunications services and technologies in the corrections space, is a Florida corporation with its principal place of business located at 10491 72nd Street, Seminole, Florida 33777.

7.      Defendant City and County of Denver, acting through the Department of General Services, Purchasing Division, is a governmental entity established by the Charter of the City and County of Denver, with a principal place of business located at 201 W. Colfax Avenue, Denver, Colorado 80202.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Colo. Const. art. VI, § 9(1), C.R.C.P. 106(a)(4), the Colorado Declaratory Judgment Act, §§ 13-51-101, *et seq*.; and C.R.C.P. 57;

9.      This Court has personal jurisdiction over Defendant, who resides and has its principal place of business located in the City and County of Denver.

10.      Venue is proper in this Court pursuant to C.R.C.P. 98 because Defendant resides in this judicial district.

## GENERAL FACTUAL ALLEGATIONS

**A.    The Solicitation**

11.      On or about October 12, 2023, the City published Request for Proposal No. 29440, entitled "Telecommunication, Video, and Programmatic Services for Persons Experiencing Incarceration with the Denver Sheriff's Department" (the "Solicitation").  The Solicitation refers to the "Denver Sheriff's Department" as "DSD."  A true and correct copy of the Solicitation is appended hereto as Exhibit A.

12.      The Solicitation included a "Scope of Work" describing the services to be acquired by Denver.  It states the purpose of the procurement is to obtain "multi-purpose" telephone and video visitation solutions for DSD operated Correctional Facilities.

2

13.     These services include: (a) hardware including telephones, kiosks, tablets, servers, switches, all necessary WiFi infrastructure, and the external service provider that will provide internet connection; (b) video and telephone visitation software; (c) educational materials and career services; (d) voice biometrics; (e) investigative platform; (f) fraud management; (g) digital mail solutions; (h) Jail Management System (JMS) and commissary system integrations; (i) reporting and business intelligence capability; (j) access and security configurability; and (k) compliance, technology, and compatibility standards.

14.     The Solicitation required the selected vendor to provide an end-to-end solution, including installation of all hardware and software, as well as ongoing maintenance and support.

15.     The Solicitation stated that "the effective period of the contract resulting from this [Solicitation] shall be from the date of City signature for five consecutive years."

16.     The City announced its intent to utilize a comparative evaluation criteria to select an awardee.  It states that "[o]ne award will be made on an 'all or none' basis."

17.     The evaluation criteria set forth in the Solicitation required the City to consider the following factors: (a) pricing; (b) response to "Vendor Questions and Requirements"; (c) the vendor's responses to the "Required Traceability Matrix" and the "Integration Requirement Matrix"; (d) other required submittals; (e) whether the vendor is qualified, responsible and responsive; and (f) the vendor's response to the City's proposed Sample Contract provisions.  It further advised that "[n]o weighting or relative importance of criteria is intended or implied" by the above-referenced evaluation factors.

## B.    Smart Proposal Submission and Notice of Award

18.     On January 2, 2024, Smart tendered its proposal to the City.  The proposal complied in all material aspects with the requirements of the Solicitation.

19.     Smart's proposal leveraged its long-standing expertise and experience providing telephone and video services in correctional facilities for other governmental customers across the country.  Smart also proposed competitively advantageous pricing as required by Section C.4 of the Solicitation.

20.     Recognizing the technical and pricing advantages of Smart's proposal, on April 8, 2024, Denver transmitted a "Notice of Apparent Successful Proposer" letter to Smart (the "Award Letter").  A true and correct copy of the Award Letter is appended hereto as Exhibit B.

21.     The Notice of Award stated that Smart's proposal was "fair, equitable, and in the best interest of the City and County of Denver, Colorado."  It further advised that the "proposal is hereby declared to be acceptable at the bid price contained therein, **SUBJECT TO** the approval of the agreement in accordance with the Charter of the City and County of Denver."

22.     The Notice of Award further requested that Smart submit to the City certain "Certificates of Insurance."  Smart complied with this request by transmitting the requested certificates to the City.

C.   **Post-Award Exchanges Between the City and Smart**

23.     During the period of July through August 2024, Smart and the City engaged in a review of the Scope of Work for the contract.  The City provided Smart with a final version of the Scope of Work on August 1, 2024, and submitted the same to the City Council for approval.  Upon information and belief, the City Council rejected the Scope of Work proposed by the City.

24.     In September 2024, Smart participated in several transition activities with the City and DSD in anticipation of commencing the contract awarded under the Solicitation.  To be clear, Smart participated in the transition activities prior to the City's ratification of the contract, at the City's request, to accelerate the timing for its readiness to assume the contractual activities.

25.     For example, Smart flew its technical staff to Denver to participate in an on-site in a walk-through of the relevant DSD-operated Detention Center facilities.  In addition, Smart engaged in further communications (both by email and over the telephone) with Denver regarding the services it described in its proposal.

26.     Over the course of the following months, through October 2024, the parties continued to review and revise the Scope of Work.  Notably, the City revised the Scope of Work to largely adopt the method of performance set forth in Smart's proposal.  At no time did the City express that Smart's suggested input for the Scope of Work was unacceptable.

D.   **The City's Decision to Pursue Negotiations With Another Vendor**

27.     While Smart pursued negotiations in good faith with the City to finalize the Scope of Work and a resulting Contract, the City began surreptitiously pursuing other opportunities.

28.     As an example, in October 2014, Smart and the City engaged in discussions regarding the potential impact of regulations recently adopted by the Federal Communications Commission ("FCC").

29.     Specifically, on July 18, 2024, the FCC adopted regulations pursuant to the Martha Wright-Reed Fair and Just Compensation Act.  The regulations established new maximum charges for telephone and video calling services in prisons and jails applicable to the services being acquired by the City under the Solicitation.  The FCC notably adopted these regulations *after* Smart submitted its proposal in response to the Solicitation.

30.     On October 22, 2024, a representatives from DSD—not the City's purchasing division—requested information from Smart regarding whether the FCC regulations would impact the company's proposed pricing model.  Smart responded indicating that the FCC regulations would impact the pricing structure, but would importantly result in a "*cost reduction*" under the resulting contract.  Put differently, Smart specifically assured DSD that any change resulting from FCC's regulations would not result in a cost increase.  A true and correct copy of the email exchange between Smart and DSD is appended hereto as Exhibit C.

31.     Nevertheless, on or about October 23, 2024, the City abruptly decided to pursue a new contract with the second-ranked vendor, Securus Technologies ("Securus").  To conceal

their plan, a City supervisor made clear that DSD begin preparations for awarding a contract to Securus "*without contacting Securus*."

32.     The City made this decision while purportedly continuing to engage in negotiations with Smart.  Smart was unaware the City was planning to withdraw the Award Letter and continued to engage in good faith negotiations and discussions with the City.

33.     Nearly a week passed before DSD sent a letter to the City's Chief Procurement Officer requesting that the City "discontinue negotiations with Smart Communications" (the "Withdrawal Letter").  A true and correct copy of the Withdrawal Letter is appended hereto as Exhibit D.

34.     In the Withdrawal Letter, DSD erroneously claimed that "after months of negotiations, . . . Smart asked for a different arrangement to be enacted which included *increased costs* to the people in their custody and their families."  This claim is plainly contradicted by Smart's prior assurance by email that compliance with the FCC regulations would result in a "cost reduction" from its initially proposed pricing structure.  *See* Exh. C.

35.     The Withdrawal Letter also unfairly criticized Smart for apparently not foreseeing the passage of the FCC regulations *after* it submitted its proposal in response to the Solicitation.  It claimed that the FCC regulations "have been in the works for nearly a decade" and that "Smart officials knew when they submitted their pricing proposals that these regulations were potentially forthcoming."

36.     Finally, the Withdrawal Letter speciously concludes that Smart's compliance with new FCC regulations presented a "change" and was a "disservice to operating in good faith and . . . an indicator of behavior to come from Smart."

37.     DSD requested approval to begin negotiations with Securus.  The Withdrawal Letter explains that Securus is DSD's "current contractor," and that the parties should be able to "come to a fair and reasonable cost model while also having the benefit of no disruption to [DSD's] current service."

38.     In summary, DSD used new federal regulations imposed by FCC as a pretext to circumvent the competitive bidding process and award a contract under the Solicitation to its preferred vendor, whose proposal did not receive the highest evaluated score, the incumbent Securus.

**E.     The City's Revocation Decision**

39.     Unexpectedly, and without warning, on November 6, 2024, the City transmitted a "Revocation of Intent to Award" letter to Smart (the "Award Revocation").  A true and correct copy of the Award Revocation is appended hereto as Exhibit E.

40.     The City transmitted the Award Revocation nearly *two weeks* after it already made the decision to begin negotiating a new contract with Securus.

41.     The Award Revocation states, in pertinent part:

The City and County of Denver (City) would like to thank Smart Communications for participating in the process for the above reference [*sic*] solicitation.  On April 8, 2024, the City sent Smart Communications an Intent to Award letter and contract negotiations were initiated.

However, the City and Smart Communications have not been able to come to mutually agreeable terms during these negotiations.  At this time, the City is revoking its Intent to Award to Smart Communications.  We appreciate the time and effort put forth by your company during this time.  All communications for this contract negotiation will stop and will be held confidential.

42.     Notably, however, the City never actually engaged Smart in meaningful negotiations regarding a contract under the Solicitation.  Quite to the contrary, Smart diligently worked with the City to transition activities at its own cost to assist the City in promptly commencing contract performance.  This included providing assistance in revising the Scope of Work to ensure it described the services acquired by the City pursuant to the Solicitation.  Furthermore, Smart sought to comply with the newly passed FCC regulations and assured the City that it would result in a "cost decrease."

43.     There were no material issues for which the City and Smart disagreed or that justified the City's issuance of the Award Revocation.

44.     At no time did Smart affirmatively, by implication, or otherwise, state that it intended to withdraw any aspect of its proposal submitted to the City, or make any material adjustment to the manner in which it proposed to perform the contract.

## <u>COUNT I</u>
### (For Judicial Review Pursuant to C.R.C.P. 106(a)(4))

45.     Plaintiff incorporates the previous paragraphs as if fully set forth herein.

46.     Defendant is a governmental body that exercised judicial or quasi-judicial functions in issuing the Award Revocation.  Defendant conducted a public procurement for goods and services in accordance with State and municipal law, which included decision-making authority that adversely affected the protected interest of Plaintiff.

47.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered damages and has no plain, speedy, or adequate remedy otherwise provided by law.

48.     Defendant exceeded its jurisdiction and abused its discretion.  By issuing the Award Revocation without engaging Plaintiff in good faith negotiations to finalize a contract pursuant to the Solicitation, Defendant's actions were arbitrary and capricious.

49.     Plaintiff respectfully requests that the Court sustain this appeal brought pursuant to C.R.C.P. 106(a)(4).

## COUNT II
### (Declaratory Judgment Pursuant to the Colorado Declaratory Judgment Act, §§ 13-51-101, *et seq*. and C.R.C.P. 56)

50.    Plaintiff incorporates the previous paragraphs as if fully set forth herein.

51.    Plaintiff is an entity whose rights, status, or other legal relations were affected by Defendant's abuse of discretion in issuing the Award Revocation.

52.    A declaratory judgment or decree would terminate the uncertainty or controversy giving rise to these proceedings.

53.    Plaintiff respectfully requests a declaratory judgment that Defendant wrongly issued the Award Revocation without a rational basis.

54.    Plaintiff respectfully requests a declaratory judgment that Defendant wrongly issued the Award Revocation in contravention of the terms of the Solicitation.

55.    Plaintiff respectfully requests a declaratory judgment that Defendant wrongly issued the Award Revocation in violation of Colorado law.

## COUNT III
### (Permanent Injunction of Defendant's *Ultra Vires* Actions)

56.    Plaintiff incorporates the previous paragraphs as if fully set forth herein.

57.    As an administrative body under the City and County of Denver, Defendant is authorized to solicit, procure, and award contracts to third-parties in accordance with State and municipal law.

58.    For the reasons set forth herein, Defendant's issuance of the Award Revocation exceeded its authority under State and municipal procurement law.  Therefore, Defendant's actions were *ultra vires* and unlawful.

59.    Defendant's unlawful action of issuing the Award Revocation threatens to cause Plaintiff irreparable harm for which there is no adequate remedy of law.  Defendant will not be harmed by a permanent injunction enjoining their *ultra vires* application of State and municipal procurement law.

60.    Plaintiff respectfully requests that this Court enter judgment and permanently enjoin Defendant from their *ultra vires* application of State and municipal procurement law when it issued the Award Revocation.

## **PRAYER FOR RELIEF**

WHEREFORE, Smart requests that this Court enter judgment in its favor and award the following relief:

1.      Judgment in Plaintiff's favor against Defendant.

2.      Preliminary and permanent injunctive relief in favor of Plaintiff and against Defendant.

3.      An order vacating the Award Revocation and remanding the matter to Defendant with the direction to commence good faith negotiations of a contract resulting from the Solicitation.

4.      An award of all attorney fees and cost.

5.      Any and all other relief that this Court deems just and proper.

Dated: December 3, 2024              **HOLLAND & HART LLP**

                                     _/s/  Shaun C. Kennedy_
                                     Shaun C. Kennedy
                                     Shannon N. Calhoun

                                     **Attorneys for Plaintiff, Smart Communications Holding, Inc.**

Plaintiff's Address:
10491 72nd Street
Seminole, Florida 33777

8

# EXHIBIT 24

IN THE TWELFTH JUDICIAL CIRCUIT COURT
IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
JANICE LOGAN,
      Plaintiff,

v.

JANICE LOGAN,
JANICE LOGAN AS TRUSTEE OF
THE JAMES LOGAN FAMILY
TRUST DATED FEBRUARY 19 2021,
ALEXIS LOGAN,
JONATHAN D LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
LOCO FLORIDA LLC,
SMART COMMUNICATIONS
HOLDING INC,
HLFIP HOLDING LLC,
      Defendant.

CASE NO.  2023 CA 001002 NC
DIVISION C CIRCUIT

---

**ORDER**
**JON LOGAN, SMART COMMUNICATIONS HOLDING, INC.,**
**SMART COMMUNICATIONS HOLDING, LLC, AND**
**LOCO FLORIDA, LLC'S MOTION TO DISMISS**
**JANICE LOGAN'S VERIFIED SECOND AMENDED COMPLAINT**

BEFORE THE COURT is Jonathan Logan, Smart Communications Holding, Inc., Smart Communications Holdings, LLC, and Loco Florida, LLC's motion to dismiss Counterclaim Plaintiff Janice Logan's Verified Second Amended Complaint [DIN 705]. Janice Logan filed a response in opposition [DIN 790]. The operative complaint is at DIN 680. The Court conducted oral argument.

As a reminder, on a motion to dismiss, the Court is constrained to the well-pled allegations within the four-corners of the complaint as well as all attachments.

The Court has considered Jon Logan's issues and denies them. Most of these arguments are more appropriate for summary judgment, not a motion to dismiss. This specifically includes those claims and arguments based on the contemporaneous stock ownership rule.

Page 1 of 5

IT IS THEREFORE ORDERED:

1.     The motion is denied.

2.     The affected parties must answer on or before 4 p.m. on Friday, December 6, 2024.


DONE AND ORDERED in Sarasota, Sarasota County, Florida, on November 21, 2024.

e-Signed 11/21/2024 9:49 AM 2023 CA 001002 NC

**HUNTER W CARROLL**
Circuit Judge

## SERVICE CERTIFICATE

On November 21, 2024, the Court caused the foregoing document to be served via the Clerk of Court's case management system, which served the following individuals via email (where indicated). On the same date, the Court also served a copy of the foregoing document via First Class U.S. Mail on the individuals who do not have an email address on file with the Clerk of Court.

CRAIG STEPHEN BARNETT
200 EAST LAS OLAS BLVD
SUITE 2100
FORT LAUDERDALE, FL  33301

MARK A SCHWARTZ
200 S ORANGE AVE
SARASOTA, FL  34236

BRETT ALAN GEER
PO BOX 47212
SAINT PETERSBURG, FL  33743


M MARIE WILSON ESQ
2357 S TAMIAMI TRAIL #3 PMB #122
VENICE, FL  34293

MARK MATTHEW WALL
101 EAST KENNEDY BLVD
SUITE 3700
TAMPA, FL  33602

CHARLES FRANKLIN JOHNSON III
802 11TH ST W
BRADENTON, FL  34205

ANITRA F RAIFORD
2555 GRAND BLVD
KANSAS CITY, MO  64108

CHELSEA KOFF
200 EAST LAS OLAS BLVD
SUITE 2100
FORT LAUDERDALE, FL  33301

JOSEPH H III VARNER
777 S. HARBOUR ISLAND PLACE, #800
TAMPA, FL  33602

MARK JAMES BERNET
AKERMAN SENTERFITT PA
401 EAST JACKSON STREETSUITE 1700
TAMPA, FL  33602

JASON SAMUEL OLETSKY
401 E JACKSON ST STE 1700
TAMPA, FL  33602

JONATHAN T TORTORICI
4301 WEST BOY SCOUT BLVD STE 300
TAMPA, FL  33607

JAROD A BRAZEL
101 E. KENNEDY BLVD., SUITE 3700
TAMPA, FL  33602

JULIE NEGOVAN
6750 N ANDREWS AVE STE 200
FORT LAUDERDALE, FL  33309

REGINALD KEITH PETERSEN
6750 N ANDREWS AVE STE 200
FORT LAUDERDALE, FL  33309

SARAH O'ROURKE
100 N TAMPA STREET STE 2900
SUITE 2900
TAMPA, FL  33602

ANDREW L FRANKLIN
111 S. WACKER DR.
STE. 4700
CHICAGO, IL  60606

DAVID E SCHOENFELD
111 SOUTH WACKER DRIVE
SUITE 4700
CHICAGO, IL  60606

JESSICA LEONA MAZZEO
6750 N ANDREWS AVE
STE. 200
FORT LAUDERDALE, FL  33309

PETER F O'NEILL
2555 GRAND BOULEVARD
KANSAS CITY, MO  64108

MICHAEL J HARWIN
200 EAST LAS OLAS BOULEVARD
SUITE 2100
FORT LAUDERDALE, FL  33301

CHRISTOPHER ROY CLARK
106 EAST COLLEGE AVENUE
SUITE 700
TALLAHASSEE, FL  32301

GLENN T BURHANS JR
106 EAST COLLEGE AVENUE
SUITE 700
TALLAHASSEE, FL  32301

DUSTIN BRYAN HILLSLEY
AKERMAN LLP
201 EAST LAST OLAS BOULEVARD, SUITE 1800
FORT LAUDERDALE, FL  33301

**Filed 11/21/2024 09:49 AM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL**

CHRISTOPHER GEORGE OPRISON
DLA PIPER LLP (US)
200 SOUTH BISCAYNE BOULEVARD - SUITE 2500
MIAMI, FL  33131

BRIDGET K SMITHA
106 EAST COLLEGE AVENUE
SUITE 700
TALLAHASSEE, FL  32301

MAX CORY RUDOLF
350 EAST LAS OLAS BLVD.
SUITE 1600
FT. LAUDERDALE, FL  33301

DAVID E SCHOENFELD
111 SOUTH WACKER DRIVE
SUITE 4700
CHICAGO, IL  60606

# EXHIBIT 25

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,

                Plaintiffs,

v.                                                              Case No. 2023-CA-1002-NC

JANICE LOGAN, individually, as Trustee of the James
Logan Family Trust, dated February 10, 2021, and as
Personal Representative of the ESTATE OF
JAMES LOGAN, JUSTIN PETERSON, and
ALEXIS LOGAN,

                Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021,

                Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC.,
SMART COMMUNICATIONS HOLDING, LLC, and
HLFIP HOLDING, LLC,

                Counterclaim Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan          (CONSOLIDATED)
Family Trust, dated February 10, 2021, and derivatively
on behalf of Smart Communications Holding, Inc.,

                Plaintiff,                          Case No.: 2023-CA-1280-NC

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., nominal
defendant, SMART COMMUNICATIONS HOLDING,
LLC, HLFIP HOLDING, LLC,
LOCO FLORIDA LLC, and SMART
COMMUNICATIONS YACHT HOLDING, LLC,

                Defendants.

_____/

**ORDER DENYING COUNTERCLAIM DEFENDANTS
JONATHAN LOGAN, SMART COMMUNICATIONS HOLDING, INC.,
AND SMART COMMUNICATIONS HOLDING, LLC'S
<u>MOTION TO DISMISS COUNTERCLAIMS</u>**

BEFORE THE COURT are Counterclaim Defendants Jonathan Logan, Smart Communications Holding, Inc., and Smart Communications Holding, LLC's Motion to Dismiss Counterclaim (DIN 820), and Janice Logan's Omnibus Response in Opposition to the Motions to Dismiss Her Counterclaims (DIN 850). The Court conducted oral argument.

IT IS ORDERED:

The Court denies the motion.

1.      The motion is denied.

2.      Counterclaim Defendants Jonathan Logan, Smart Communications Holding, Inc., and Smart Communications Holding, LLC, must answer Janice Logan's Counterclaims on or before 4:00 pm on Friday, December 6, 2024.

DONE AND ORDERED in Sarasota, Sarasota County, Florida.

e-Signed 12/2/2024 7:24 AM 2023 CA 001002 NC

Honorable Hunter W. Carroll
Circuit Court Judge

Copies to:  All Counsel of Record

2

# EXHIBIT 26

IN THE TWELFTH JUDICIAL CIRCUIT COURT
IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
JANICE LOGAN,
      Plaintiff,

v.

                                 CASE NO.  2023 CA 001002 NC
                                      DIVISION C CIRCUIT

JANICE LOGAN,
JANICE LOGAN AS TRUSTEE OF
THE JAMES LOGAN FAMILY
TRUST DATED FEBRUARY 19 2021,
ALEXIS LOGAN,
JONATHAN D LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
LOCO FLORIDA LLC,
SMART COMMUNICATIONS
HOLDING INC,
HLFIP HOLDING LLC,
      Defendant.

_____

**ORDER DENYING
HLFIP'S MOTION TO DISMISS**

      BEFORE THE COURT is Defendant HLFIP Holdings, LLC's motion to dismiss Janice
Logan's second amended verified complaint [DIN 730]. The Court conducted oral argument, and
the Court has reviewed the transcript from the hearing [DIN 866].

      IT IS ORDERED

      The Court denies the motion.

    1.      The motion is denied.

    2.      Defendant HLFIP Holding, LLC must answer on or before 4 p.m. on Friday,
          December 6, 2024.

      DONE AND ORDERED in Sarasota, Sarasota County, Florida, on November 25, 2024.

**Filed 11/25/2024 08:13 AM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL**



e-Signed 11/25/2024 8:13 AM 2023 CA 001002 NC

**HUNTER W CARROLL**
Circuit Judge

## SERVICE CERTIFICATE

On November 25, 2024, the Court caused the foregoing document to be served via the Clerk of Court's case management system, which served the following individuals via email (where indicated). On the same date, the Court also served a copy of the foregoing document via First Class U.S. Mail on the individuals who do not have an email address on file with the Clerk of Court.

CRAIG STEPHEN BARNETT
200 EAST LAS OLAS BLVD
SUITE 2100
FORT LAUDERDALE, FL  33301

BRETT ALAN GEER
PO BOX 47212
SAINT PETERSBURG, FL  33743

M MARIE WILSON ESQ
2357 S TAMIAMI TRAIL #3 PMB #122
VENICE, FL  34293

MARK MATTHEW WALL
101 EAST KENNEDY BLVD
SUITE 3700
TAMPA, FL  33602

CHARLES FRANKLIN JOHNSON III
802 11TH ST W
BRADENTON, FL  34205

ANITRA F RAIFORD
2555 GRAND BLVD
KANSAS CITY, MO  64108

GEORGE PARPAS
50 CENTRAL AVENUE
EIGHTH FLOOR

SARASOTA, FL  34236

CHELSEA KOFF
200 EAST LAS OLAS BLVD
SUITE 2100
FORT LAUDERDALE, FL  33301

JOSEPH H III VARNER
777 S. HARBOUR ISLAND PLACE, #800
TAMPA, FL  33602

JASON SAMUEL OLETSKY
401 E JACKSON ST STE 1700
TAMPA, FL  33602

JONATHAN T TORTORICI
4301 WEST BOY SCOUT BLVD STE 300
TAMPA, FL  33607

JAROD A BRAZEL
101 E. KENNEDY BLVD., SUITE 3700
TAMPA, FL  33602

JULIE NEGOVAN
6750 N ANDREWS AVE STE 200
FORT LAUDERDALE, FL  33309

REGINALD KEITH PETERSEN
6750 N ANDREWS AVE STE 200
FORT LAUDERDALE, FL  33309

SARAH O'ROURKE
100 N TAMPA STREET STE 2900
SUITE 2900
TAMPA, FL  33602

ANDREW L FRANKLIN
111 S. WACKER DR.
STE. 4700
CHICAGO, IL  60606

JESSICA LEONA MAZZEO
1880 JFK BLVD. SUITE 1800
PHILADELPHIA, PA  19103

Page 3 of 5

PETER F O'NEILL
2555 GRAND BOULEVARD
KANSAS CITY, MO  64108

MICHAEL J HARWIN
200 EAST LAS OLAS BOULEVARD
SUITE 2100
FORT LAUDERDALE, FL  33301

CHRISTOPHER ROY CLARK
106 EAST COLLEGE AVENUE
SUITE 700
TALLAHASSEE, FL  32301

GLENN T BURHANS JR
106 EAST COLLEGE AVENUE
SUITE 700
TALLAHASSEE, FL  32301

DUSTIN BRYAN HILLSLEY
AKERMAN LLP
201 EAST LAST OLAS BOULEVARD, SUITE 1800
FORT LAUDERDALE, FL  33301

CHRISTOPHER GEORGE OPRISON
DLA PIPER LLP (US)
200 SOUTH BISCAYNE BOULEVARD - SUITE 2500
MIAMI, FL  33131

BRIDGET K SMITHA
106 EAST COLLEGE AVENUE
SUITE 700
TALLAHASSEE, FL  32301

MAX CORY RUDOLF
350 EAST LAS OLAS BLVD.
SUITE 1600
FT. LAUDERDALE, FL  33301

**Filed 11/25/2024 08:13 AM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL**

# EXHIBIT 27

IN THE TWELFTH JUDICIAL CIRCUIT COURT
IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
JANICE LOGAN,
      Plaintiff,

v.

JANICE LOGAN,
JANICE LOGAN AS TRUSTEE OF
THE JAMES LOGAN FAMILY
TRUST DATED FEBRUARY 19 2021,
ALEXIS LOGAN,
JONATHAN D LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
LOCO FLORIDA LLC,
SMART COMMUNICATIONS
HOLDING INC,
HLFIP HOLDING LLC,
      Defendant.

CASE NO.  2023 CA 001002 NC
DIVISION C CIRCUIT

_____

**ORDER DENYING
COUNTERCLAIM DEFENDANT HLFIP'S
MOTION TO DISMISS COUNTERCLAIMS**

      BEFORE THE COURT is Counterclaim Defendant HLFIP Holding, LLC's motion to dismiss Janice Logan's counterclaims [DIN 821] and the response in opposition [DIN 857]. The Court conducted oral argument.

      IT IS ORDERED

      The Court denies the motion.

1.      The motion is denied.

2.      Counterclaim Defendant HLFIP Holding, LLC must answer on or before 4 p.m. on Friday, December 6, 2024.

      DONE AND ORDERED in Sarasota, Sarasota County, Florida, on November 25, 2024.

Page 1 of 5

e-Signed 11/25/2024 8:13 AM 2023 CA 001002 NC

**HUNTER W CARROLL**
Circuit Judge

## SERVICE CERTIFICATE

On November 25, 2024, the Court caused the foregoing document to be served via the Clerk of Court's case management system, which served the following individuals via email (where indicated). On the same date, the Court also served a copy of the foregoing document via First Class U.S. Mail on the individuals who do not have an email address on file with the Clerk of Court.

CRAIG STEPHEN BARNETT
GREENBERG TRAURIG ET AL
515 E LAS OLAS BLVDSUITE 2000
FORT LAUDERDALE, FL  33301

BRETT ALAN GEER
PO BOX 47212
SAINT PETERSBURG, FL  33743

M MARIE WILSON ESQ
2357 S TAMIAMI TRAIL #3 PMB #122
VENICE, FL  34293

MARK MATTHEW WALL
101 EAST KENNEDY BLVD
SUITE 3700
TAMPA, FL  33602

CHARLES FRANKLIN JOHNSON III
802 11TH ST W
BRADENTON, FL  34205

CHELSEA KOFF
200 EAST LAS OLAS BLVD
SUITE 2100
FORT LAUDERDALE, FL  33301

JOSEPH H III VARNER
777 S. HARBOUR ISLAND PLACE, #800
TAMPA, FL  33602

MARK JAMES BERNET
AKERMAN SENTERFITT PA
401 EAST JACKSON STREETSUITE 1700
TAMPA, FL  33602

JASON SAMUEL OLETSKY
401 E JACKSON ST STE 1700
TAMPA, FL  33602

JONATHAN T TORTORICI
4301 WEST BOY SCOUT BLVD STE 300
TAMPA, FL  33607

JAROD A BRAZEL
101 E. KENNEDY BLVD., SUITE 3700
TAMPA, FL  33602

JULIE NEGOVAN
6750 N ANDREWS AVE STE 200
FORT LAUDERDALE, FL  33309

REGINALD KEITH PETERSEN
6750 N ANDREWS AVE STE 200
FORT LAUDERDALE, FL  33309

SARAH O'ROURKE
100 N TAMPA STREET STE 2900
SUITE 2900
TAMPA, FL  33602

ANDREW L FRANKLIN
111 S. WACKER DR.
STE. 4700
CHICAGO, IL  60606

DAVID E SCHOENFELD
111 SOUTH WACKER DRIVE
SUITE 4700
CHICAGO, IL  60606

JESSICA LEONA MAZZEO
6750 N ANDREWS AVE

Filed 11/25/2024 08:13 AM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL

STE. 200
FORT LAUDERDALE, FL  33309

PETER F O'NEILL
2555 GRAND BOULEVARD
KANSAS CITY, MO  64108

MICHAEL J HARWIN
200 EAST LAS OLAS BOULEVARD
SUITE 2100
FORT LAUDERDALE, FL  33301

CHRISTOPHER ROY CLARK
106 EAST COLLEGE AVENUE
SUITE 700
TALLAHASSEE, FL  32301

GLENN T BURHANS JR
106 EAST COLLEGE AVENUE
SUITE 700
TALLAHASSEE, FL  32301

DUSTIN BRYAN HILLSLEY
AKERMAN LLP
201 EAST LAST OLAS BOULEVARD, SUITE 1800
FORT LAUDERDALE, FL  33301

CHRISTOPHER GEORGE OPRISON
DLA PIPER LLP (US)
200 SOUTH BISCAYNE BOULEVARD - SUITE 2500
MIAMI, FL  33131

BRIDGET K SMITHA
106 EAST COLLEGE AVENUE
SUITE 700
TALLAHASSEE, FL  32301

MAX CORY RUDOLF
350 EAST LAS OLAS BLVD.
SUITE 1600
FT. LAUDERDALE, FL  33301

Filed 11/25/2024 08:13 AM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL

# EXHIBIT 28

# IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,

                Plaintiffs,

v.

JANICE LOGAN, individually, as Trustee of the James
Logan Family Trust, dated February 10, 2021, and as
Personal Representative of the ESTATE OF JAMES
LOGAN, JUSTIN PETERSON, and ALEXIS LOGAN,

                Defendants.

Case No. 2023-CA-1002-NC

_____/

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021,

                Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., SMART
COMMUNICATIONS HOLDING, LLC, and HLFIP
HOLDING, LLC,

                Counterclaim Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021, and derivatively
on behalf of Smart Communications Holding, Inc.,

                Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., nominal
defendant, SMART COMMUNICATIONS HOLDING,
LLC, HLFIP HOLDING, LLC,
LOCO FLORIDA LLC, and SMART
COMMUNICATIONS YACHT HOLDING, LLC,

                Defendants.

(CONSOLIDATED)

Case No.: 2023-CA-1280-NC

_____/

**ORDER GRANTING THAT PORTION OF**

**JANICE'S MOTION FOR PHASE I COSTS**

This cause came before the Court on a motion for Phase I costs and Phase II indemnification and advancement, DIN 834 (the "Motion"), of the James Logan Family Trust, dated February 10, 2021, for which Janice Logan is the Trustee (the "Trust") and the Estate of James Logan, for which Janice Logan is the Personal Representative (the "Estate"), and DIN 854 (the "Response in Opposition") of Jonathan Logan and Smart Communications Holding, Inc. The Court having heard argument of counsel, having reviewed the court file and being otherwise fully advised it is Ordered and Adjudged as follows:

1.      The Trust is entitled to Phase I costs. The parties are instructed to confer regarding the reasonableness of the Trust's Phase I costs. In the event the parties do not reach agreement on the precise amount of taxable costs, the amount shall be determined at an evidentiary hearing.

2.      With respect to Phase II indemnification and advancement for the Estate, the Court takes the motion under advisement.

DONE AND ORDERED in Sarasota County, Florida.

e-Signed 12/2/2024 7:24 AM 2023 CA 001002 NC
Honorable Hunter W. Carroll
Circuit Judge

# EXHIBIT 29

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,

                Plaintiffs,

v.

JANICE LOGAN, individually, as Trustee of the James
Logan Family Trust, dated February 10, 2021, and as
Personal Representative of the ESTATE OF JAMES
LOGAN, JUSTIN PETERSON, and ALEXIS LOGAN,

                Defendants.

Case No. 2023-CA-1002-NC

_____/

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021,

                Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., SMART
COMMUNICATIONS HOLDING, LLC, and HLFIP
HOLDING, LLC,

                Counterclaim Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021, and derivatively
on behalf of Smart Communications Holding, Inc.,

                Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., nominal
defendant, SMART COMMUNICATIONS HOLDING,
LLC, HLFIP HOLDING, LLC,
LOCO FLORIDA LLC, and SMART
COMMUNICATIONS YACHT HOLDING, LLC,

                Defendants.

(CONSOLIDATED)

Case No.: 2023-CA-1280-NC

_____/

**ORDER ON JANICE LOGAN'S AMENDED MOTION TO COMPEL DISCOVERY FROM SMART COMMUNICATIONS HOLDING, INC./LLC AND HLFIP HOLDING, LLC**

This cause came before the Court on Janice Logan's ("Janice") Amended Motion to Compel Discovery from Smart Communications Holding, Inc./LLC ("SmartComm") and HLFIP Holding, LLC ("HLFIP"), DIN 832 (the "Motion"), SmartComm's Response in Opposition (DIN 853), and HLFIP's Response in Opposition (DIN 851), and the Court having heard argument of counsel, having reviewed the court file and being otherwise fully advised it is Ordered and Adjudged as follows:

1. The Court defers ruling on Janice's Amended Motion to Compel as to SmartComm (specifically as to certain 2024 financials) unless and until the issue becomes ripe following the Court's Phase II decision regarding valuation date.

2. The Court grants the Motion to Compel as to HLFIP.

   a. HLFIP is made a party to the Confidentiality Order entered in this case at DIN 362, and the Confidentiality Order's provisions shall apply to all discovery responses and documents produced by HLFIP.

   b. HLFIP is ordered to produce documents responsive to Janice's First Requests for Production to HLFIP by December 2, 2024.

DONE AND ORDERED in Sarasota County, Florida.

e-Signed 12/2/2024 7:24 AM 2023 CA 001002 NC

_____
Honorable Hunter W. Carroll
Circuit Judge

# EXHIBIT 30

# IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
# IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,

                Plaintiffs,

v.

                Case No. 2023-CA-1002-NC

JANICE LOGAN, individually, as Trustee of the James
Logan Family Trust, dated February 10, 2021, and as
Personal Representative of the ESTATE OF JAMES
LOGAN, JUSTIN PETERSON, and ALEXIS LOGAN,

                Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021,

                Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., SMART
COMMUNICATIONS HOLDING, LLC, and HLFIP
HOLDING, LLC,

                Counterclaim Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021, and derivatively
on behalf of Smart Communications Holding, Inc.,

                Plaintiff,

      v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., nominal
defendant, SMART COMMUNICATIONS HOLDING,
LLC, HLFIP HOLDING, LLC,
LOCO FLORIDA LLC, and SMART
COMMUNICATIONS YACHT HOLDING, LLC,

                Defendants.

_____/

(CONSOLIDATED)

Case No.: 2023-CA-1280-NC

## ORDER ON JANICE LOGAN'S

**MOTION TO COMPEL OR DEEM ADMITTED FROM HLFIP HOLDING, LLC**

This cause came before the Court on Janice Logan's ("Janice") Motion to Compel Discovery or Deem Admitted as to HLFIP Holding, LLC ("HLFIP"), DIN 780 (the "Motion"), HLFIP's Response in Opposition (DIN 851), and the Court having heard argument of counsel, having reviewed the court file and being otherwise fully advised it is Ordered and Adjudged as follows:

1. The Court overrules HLFIP's objections to Janice's First Set of Interrogatories to HLFIP (served July 24, 2024) and First Set of Requests for Admission to HLFIP (served July 24, 2024) as follows:

  a. **Interrogatory No. 6:** HLFIP's relevance and overly broad and unduly burdensome objections are overruled;

  b. **Interrogatory Nos. 5, 7, and 9:** HLFIP's vague and ambiguous objection as to "funded" is overruled;

  c. **Requests for Admission Nos. 5 and 6:** HLFIP's vague and ambiguous objection as to "reference" is overruled.

2. HLFIP is ordered to remove the conditional objections in its responses to the discovery requests identified in paragraph 1.

3. HLFIP is ordered to serve Amended Discovery responses by December 2, 2024.

DONE AND ORDERED in Sarasota County, Florida.

e-Signed 12/2/2024 7:24 AM 2023 CA 001002 NC

Honorable Hunter W. Carroll
Circuit Judge

# EXHIBIT 31

1    IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT IN
     AND FOR SARASOTA COUNTY, FLORIDA
2         GROUP 1, 2, 3, & 4 MOTIONS ON NOVEMBER 22, 2024
     JONATHAN LOGAN and SMART
3    COMMUNICATIONS HOLDING, INC.,

4               Plaintiffs,
     vs.                          Case No.:  2023-CA-1002-NC
5
     JANICE LOGAN, individually and
6    as Trustee of the James Logan
     Family Trust, dated February 10,
7    2021; and ALEXIS LOGAN,

8    _____Defendants._____/    (CONSOLIDATED)
     JANICE LOGAN, as Trustee of the
9    James Logan Family Trust dated
     February 10, 2021,
10
               Counterclaim Plaintiff,
11   vs.                          Case No.:  2023-CA-1280-NC

12   JONATHAN D. LOGAN, SMART
     COMMUNICATIONS HOLDING, INC.,
13   SMART COMMUNICATIONS HOLDING,
     LLC, HLFIP HOLDING, INC., and
14   HLFIP HOLDING, LLC,

15   _____Counterclaim Defendants./
     JANICE LOGAN, as Trustee of the
16   James Logan Family Trust dated
     February 10, 2021, and
17   derivatively on behalf of
     Smart Communications Holdings,
18   Inc.,

19             Plaintiff,

20   vs.

21   JONATHAN D. LOGAN, SMART
     COMMUNICATIONS HOLDING, INC.,
22   nominal defendant, SMART
     COMMUNICATIONS HOLDING, LLC,
23   HLFIP HOLDING, LLC, HLFIP HOLDING
     LLC, LOCO FLORIDA LLC and SMART
24   COMMUNICATIONS YACHT HOLDING, LLC,
               Defendants.
25

1

2

3                   TRANSCRIPT OF PROCEEDINGS

4           BEFORE THE HONORABLE HUNTER W. CARROLL

5                         held at the
              Judge Lynn N. Silvertooth Judicial Center
6                 2002 Ringling Boulevard, 2-A
                     Sarasota, Florida  34237
7
                    Friday, November 22, 2024
8
                     8:30 a.m. to 3:40 p.m.
9
                       Pages 1 through 232
10

11

12

13

14

15

16           Stenographically reported live by:

17                     Linda R. Wolfe
               Registered Professional Reporter
18                 Registered Merit Reporter
              Federal Certified Realtime Reporter
19           Florida Professional Reporter-Certified

20

21

22

23

24

25

```
 1   APPEARANCES:

 2   On behalf of Jonathan D. Logan; Smart Communications
     Holding, Inc.; Smart Communications Holding LLC; Loco
 3   Florida, LLC; and Smart Communications Yacht Holding,
     LLC:
 4
             BRIDGET KELLOGG SMITHA, Attorney at Law (Live)
 5           STEARNS WEAVER MILLER WEISSLER ALHADEFF &
               SITTERSON, P.A.
 6           106 East College Avenue
             Suite 720
 7           Tallahassee, FL  32301
             (850)329-4852
 8           bsmitha@stearnsweaver.com

 9           MICHAEL J. HARWIN, Attorney at Law (Zoom)
             STEARNS WEAVER MILLER WEISSLER ALHADEFF &
10             SITTERSON, P.A.
             200 East Las Olas Boulevard
11           Suite 2100
             Fort Lauderdale, FL  33301-2299
12           (954)462-9500
             mharwin@stearnsweaver.com
13

14   On behalf of HLFIP Holding, LLC:

15           CHRISTOPHER G. OPRISON, Attorney at Law (Live)
             DLA PIPER, LLP (US)
16           200 S. Biscayne Blvd., Suite 2500
             Miami, FL  33131-5340
17           (305)423-8522
             chris.oprison@dlapiper.com
18

19           STEVE DIXON, Attorney at Law (Zoom)
             DLA PIPER, LLP (US)
20           500 Eighth Street, NW
             Washington, DC  20004
21           (202)799-4000
             steve.dixon@dlapiper.com
22

23

24

25
```

1 On behalf of Jonathan D. Logan; Smart Communications
  Holding, Inc.; Smart Communications Holding LLC; and
2 Loco Florida, LLC:

3    DUSTIN B. HILLSLEY, Attorney at Law (Live)
     MAX C. RUDOLF, Attorney at Law (Live)
4    AKERMAN, LLP
     201 E. Las Olas Blvd., Suite 1800
5    Ft. Lauderdale, FL  33301-4442
     (954)331-4129
6    dustin.hillsley@akerman.com
     max.rudolf@akerman.com

7

8 On behalf of Janice Logan:

9    DAVID SCHOENFELD, Attorney at Law (Live)
     PETER F. O'NEILL, Attorney at Law (Zoom)
10    ANDREW L. FRANKLIN, Attorney at Law (Zoom)
     KAILIN LIU, Attorney at Law (Zoom)
11    SHOOK, HARDY & BACON L.L.P.
     111 S. Wacker Dr., Ste. 4700
12    Chicago, IL  60606
     (312)704-7700
13    dschoenfeld@shb.com
     pfoneill@shb.com
14    afranklin@shb.com
     kliu@shb.com
15
     ANITRA R. CLEMENT, Attorney at Law (Zoom)
16    SHOOK, HARDY & BACON L.L.P.
     100 N. Tampa Street, Suite 2900
17    Tampa, FL  33602-5810
     (813)202-7100
18    aclement@shb.com

19

20

21

22

23

24

25

1   On behalf of Alexis Logan:

2              CHARLES F. JOHNSON, III (Live)
                Attorney at Law
3              BLALOCK WALTERS, P.A.
                802 11th Street West
4              Bradenton, FL  34205-7734
                (941)748-0100
5              cjohnson@blalockwalters.com

6   ALSO PRESENT VIA LIVE:  Janice Logan
                                Alexis Logan
7                               Justin Peterson

8
    ALSO PRESENT VIA ZOOM:  Jonathan Logan
9                               David Gann, Smart Communications
                                 In-House Counsel
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P-R-O-C-E-E-D-I-N-G-S

2          THE COURT:  Is there anyone that is having

3     difficulty hearing me on Zoom?  I don't see anybody

4     formally telling me to speak loud or anything like

5     that.

6          This is consolidated cases 23-CA-1002,

7     23-CA-1280.

8          Starting in the courtroom, and I'm just going

9     to go from my left to right.  So, Mr. Johnson, why

10    don't you start introducing yourself and the folks

11    with you.

12         MR. JOHNSON:  Charles Johnson on behalf of

13    Alexis Logan and Justin Peterson, both whom are

14    seated at counsel table.

15         THE COURT:  And before we go forward, folks on

16    Zoom, were you able to hear Mr. Johnson where he

17    was speaking from?  I'm getting thumbs up.

18         MR. SCHOENFELD:  Good morning, Your Honor.

19    David Schoenfeld for Janice Logan in all her

20    capacities.  Actually, Ms. Logan is with me in the

21    courtroom today.  Peter O'Neill, Andrew Franklin,

22    Anitra Clement and Kailin Liu are with me on Zoom.

23         MS. SMITHA:  Your Honor, Bridget Smitha with

24    Stearns Weaver on behalf of the Smart parties.  I

25    have with me here Justin Hillsley and Max Rudolf

1        with Akerman, and Mr. Oprison from DLA Piper on

2        behalf of HLFIP.

3                THE COURT:  And, I'm sorry, I got -- I had

4        closed that line for a reason.  Can you go back and

5        close that?

6                And I'm sorry.  Can you redo it?

7                MS. SMITHA:  I apologize, Your Honor.

8                Bridget Smitha with Stearns Weaver on behalf

9        of the Smart parties.  I have Dustin Hillsley and

10       Max Rudolf also on behalf of --

11               THE COURT:  Hemsley?

12               MS. SMITHA:  Hillsley.  H-I-L-L-S-L-E-Y.

13               THE COURT:  Hillsley.

14               MS. SMITHA:  Yes, Your Honor.  And Max Rudolf.

15               THE COURT:  Rudolf.

16               MS. SMITHA:  Also from Akerman, also on behalf

17       of the Smart Parties.

18               THE COURT:  I know Mr. Oprison over here.

19               Okay.  Was there anyone on Zoom that was not

20       introduced by the folks here in the courtroom?

21               MR. HARWIN:  I don't know if I heard, but

22       Michael Harwin, Your Honor, for Jon and Smart, from

23       Stearns Weaver, on the Smart group over there.

24               THE COURT:  Thank you.

25               For those that are in the courtroom, let's try

1        to be via microphone.  There is a microphone on the

2        counsel table and the lectern here.  It just helps

3        the folks that are on the Zoom to be able to hear

4        as well.

5            I know we have all day set aside.  I did

6        receive at least a proposal at the end of the day

7        yesterday in the order.  I'm fine with that order

8        that was sent around last night.  So unless there's

9        any objection to proceeding that way, why don't we

10       just proceed that way.

11           MR. SCHOENFELD:  Your Honor, our only concern

12       with the order is we want to be sure we get to

13       everything and in particular --

14           THE COURT:  I feel like we're going to have

15       plenty of time to get everything in, especially

16       since when we get to some of these motions, I'm

17       going to give you some thoughts ahead of time which

18       might speed things up as well.

19           MR. SCHOENFELD:  That would be terrific.  Your

20       Honor, if I may, and the Court may already be aware

21       of this, but we did advise counsel for the Jon

22       parties and the Court staff that we are prepared to

23       present two of our motions, actually, we're

24       prepared to present one of our motions, and

25       Mr. Johnson is prepared to submit one of his

1    motions, on papers without further argument if the

2    Court's amenable to that and reserving rights to

3    respond.

4        THE COURT:  I feel like we're going to have

5    enough time, so I'm going to let people make

6    presentations, not hour-long presentations, but

7    everyone can make a presentation.

8        MR. SCHOENFELD:  Very well.

9        THE COURT:  Let's start off -- and then when

10   I'm referring to "DIN" today, which is D-I-N,

11   Docket Identification Number, so I'll just be

12   short-handing DIN and then the number.

13       First up is the Alexis Logan and Justin

14   Peterson Motion to Dismiss and for More Definite

15   Statement, that's at DIN 763, and there's a

16   response at DIN 788.

17       MR. JOHNSON:  I think that was mine, Your

18   Honor.

19       THE COURT:  It is.

20       MR. JOHNSON:  We had offered to do this on

21   paper.  I will keep mine brief, Your Honor.

22       THE COURT:  Yes.

23       MR. JOHNSON:  Just to give the Court a frame

24   of reference, initially, Alexis Logan was only in

25   this case as beneficiary of a Trust.

1          After the first trial that the Court had, the

2      other side filed an Amended Claim against Alexis

3      and also joined her husband.  The big picture

4      theory of that new claim is that James Logan, the

5      father, received moneys from Smart Communication

6      that were not supposed to have been distributed to

7      him.  You may recall they were rather loose in

8      their methodologies for handling the distributions.

9          And then those moneys came to Jim Logan, the

10     father, and then there were some -- some of those

11     moneys were spent for the benefit of Alexis Logan

12     and/or Justin Peterson.  So it's a rather

13     attenuated claim.

14         And what is articulated in the amended

15     pleading is that unspecified funds at an

16     unspecified time were used for unspecified reasons

17     to benefit Ms. Logan -- excuse me -- Alexis Logan

18     and Justin Peterson.

19         To be fair, Your Honor, with respect to Mr.

20     Peterson, there is one reference to a car that was

21     purchased with some money from Jim Logan and some

22     money from Alexis Logan and Justin Peterson, but

23     otherwise, I'm not left to understand whether the

24     transactions were in 2008 when the company started

25     or whether they were in 2021, so I'm simply unable

1    to frame a response for it as a fact pleading

2    jurisdiction.

3        And I would also point out that Smart -- that

4    the Plaintiff, Smart Communications, is in

5    possession of the records.  In other words, if

6    money has left Smart Communications for the benefit

7    of Alexis Logan or Justin Peterson, they know which

8    ones they are.  So we'd like to be told what they

9    are.

10       And -- Well, I'll save the rest for the Motion

11   to Compel, Your Honor.

12       Case should be dismissed.

13       We also have adopted the argument of

14   Mr. Schoenfeld as to Counts 8, 10 and 11, and I'll

15   let him make that argument.

16       MS. SMITHA:  Your Honor, yesterday, issued an

17   order denying our Motion to Dismiss on the basis

18   that the claims were more appropriately heard at a

19   summary judgment stage and we respectfully submit

20   that Alexis and Peterson's Motion to Dismiss should

21   be denied for that same basis.

22       THE COURT:  And I'm inclined to deny, but I'm

23   more in the field of 'Should I have a more definite

24   statement here?'  That's kind of where, just to let

25   you know, where my head is right this second.

1          MS. SMITHA:  Yes, Your Honor, and I can speak

2     to that.

3          And, actually, if you look at paragraphs 50

4     through 52, 56 through 57, and 99 through 100 --

5          THE COURT:  Those were the ones you referenced

6     in your response, if I remember correctly.

7          MS. SMITHA:  That's correct.

8          In those paragraphs, we expressly alleged that

9     they were unjustly enriched and we explained how

10    they were.  For example, we say that Alexis used

11    Smart Communications' credit card as well as

12    received money and used it for personal expenses

13    and so that's set forth in the Complaint.

14         We also had discovery to that point, which we

15    can't get into right now in the Motion to Dismiss.

16         And Rule 1.140(e) only requires a more

17    definite statement when the allegations are so

18    vague that you can't even submit a general denial.

19    And when you read those cases, generally it comes

20    down to there's an excessive use of "and slash or"

21    so that there's contingent factual allegations and

22    you are literally not able to deny them.

23         Here, I don't think that there is any

24    statement that neither Alexis nor Peterson can

25    generally deny that they were unjustly enriched.

1          Where, when, and how they were unjustly

2     enriched is a matter for discovery.  It's a matter

3     for a Motion for Summary Judgment, and it's not

4     proper on a Motion to Dismiss or for a Motion for

5     More Definite Statement.

6          We specifically allege that Mr. Peterson

7     received a BMW.  We identified the date.  We

8     identified the amount.  And so we feel like with

9     regard to a "short and plain statement" as required

10    by the rule, we have provided that.  It's a

11    200-count Complaint already.

12         If we get into the specifics every single

13    transaction, we're going to get into a very

14    unwieldly Complaint and we're already, if Your

15    Honor keeps the trial date, a matter of weeks,

16    really, from trial.

17         THE COURT:  Anything on the response relative

18    to more definite statement, in particular?

19         MR. JOHNSON:  Yes, Your Honor.

20         First, I'll say that the presence of the trial

21    date in January makes it that much more imperative

22    that I have an understanding of what I'm being sued

23    for, and I would point out that I can't frame a

24    response; in other words, I don't know if the

25    statute of limitation applies.  I don't know even

1      what year these transactions are alleged to have

2      occurred.

3           I can't articulate -- I mean, the affirmative

4      defenses do have to be specific.

5           THE COURT:  Can you identify for me, like, a

6      couple of examples of what you are specifically

7      talking about?  Because I have got the Complaint

8      open and there is a level of detail here that would

9      seem to suggest you could answer.

10          MR. JOHNSON:  Paragraph 100, Judge, and 107,

11     both of those paragraphs simply open the door to

12     make some claim regarding some credit card at some

13     time and paragraph with respect to Mr. Peterson

14     says:  Smart Communications' funds were -- decedent

15     used Smart Communications' funds to make purchases

16     that were for the benefit of Justin.

17          They're so amorphous.

18          Now, to be fair, as I said, there's one

19     specific claim regarding the car, but then it says,

20     And there's other -- I'm trying to remember the

21     Court's admonition at the last hearing:  No

22     hyperbole, unnecessary adjectives.  I assume it

23     applies at the podium as well as in written

24     statements.

25          THE COURT:  It does.

1              MR. JOHNSON:  So it is nonspecific to the

2       point that I'm unable to respond to 100 and 107.

3              THE COURT:  As it relates to those -- is it

4       Smitha?

5              MS. SMITHA:  Smitha.

6              THE COURT:  I'm sorry?

7              MS. SMITHA:  It's Smitha, Your Honor.

8              THE COURT:  Smitha.

9              MS. SMITHA:  Yeah.

10             THE COURT:  Ms. Smitha, with respect to those

11      paragraphs that Mr. Johnson was referring to, the

12      open-ended paragraphs, what are those paragraphs

13      talking about?

14             MS. SMITHA:  So in those paragraphs, we're

15      alleging that Alexis had credit cards from Smart

16      Communications that were issued to Smart

17      Communications, and on those credit cards she

18      charged personal expenses.  She knows what those

19      personal expenses are.  She just sent us all the

20      credit card bills.  She's the one that put them on

21      the credit card.  So how she doesn't know what

22      those charges are, I don't know.

23             And so we're supposed to go into the Complaint

24      and say, "On February 1st you bought this on this

25      credit card based on the documents you produced to

1    us?"

2        THE COURT:  What timeframe are you talking

3    about?

4        MS. SMITHA:  I don't have those documents

5    before me, Your Honor, but the position that we're

6    taking would be that it would be documents all

7    within this statute of limitations based on delayed

8    discovery.

9        MR. JOHNSON:  So if I may speak, forever.

10   Because it's not a four-year lookback.  They're

11   saying, "Oh, no, that doesn't apply because of

12   delayed discovery."  So it's sometime between the

13   formation of the company and --

14       MS. SMITHA:  Your Honor, if I may respond.

15       Our position is that they are charges that she

16   put onto a Smart Communications credit card.  So

17   the fact that she doesn't know what those are is a

18   little bit laughable because she is the one who put

19   them on the credit card.

20       We're saying anything that you charged to the

21   Smart Communications credit card is an unjust

22   enrichment to you; therefore, anything that is in

23   your records that is on a Smart Communications

24   credit card is what we are saying is an unjust

25   enrichment.

1          THE COURT:  This is what we're going to do.

2     I'm going to deny the motion in its entirety except

3     for Paragraphs 100 and 107 in which I'm going to

4     direct a more definite statement to identify the

5     claimed transactions including date of transaction.

6          And let's talk about --

7          MR. JOHNSON:  Can that include the amount as

8     well, Your Honor?

9          THE COURT:  I don't think so.  We've got the

10    identity and the date.  I'm assuming we're going to

11    be looking at the credit card statements.

12         MR. JOHNSON:  Mr. Peterson is not related to

13    the credit card statements.  107 is not related to

14    the credit cards.  Just, generically, Jim Logan

15    spent some money that benefited Justin Peterson.

16         THE COURT:  I think if we go with the date of

17    the transaction, the nature of the transactions,

18    that is going to be sufficient for a more definite

19    statement.

20         So let's talk, for a moment, about the timing

21    of more definite statement and the answer deadline

22    on this one.

23         MS. SMITHA:  And, Your Honor, can I get a

24    point of clarification on that?

25         We received documents from Alexis that are,

1      like, I think, hundreds of pages of transactions.

2      Can we just refer back to those Bates numbers of

3      what she produced to us, because I'm having a

4      difficult time understanding how you can get

5      hundreds of pages or however many pages of

6      transactions into a Complaint?

7            THE COURT:  Here's what, ultimately, I'm going

8      to want.  I'm going to want some sort of list that

9      I'm going to be able to -- whether it's at trial or

10     at summary judgment or whatever it turns out to be,

11     I want to have a list of what's being claimed and

12     knowing and I can have some sort of list I can work

13     off of.

14           I don't know how you want to code it or frame

15     it so long as we know that the transaction and when

16     the transaction allegedly occurred.  I don't know

17     if you want to create a table.

18           I don't want to like tell you specifically,

19     but I need those, that information, and this is how

20     I'm going to be using it on a going-forward basis.

21           MS. SMITHA:  Thank you for that clarification.

22           So timing, I think I had asked in the Order

23     yesterday that the answer -- was it December 6th?

24           MR. HILLSLEY:  Yes, Your Honor.

25           THE COURT:  Is that the date by which the more

1        definite statement can be done?

2              MS. SMITHA:  Your Honor --

3              THE COURT REPORTER:  You need to talk in the

4        mic so they can hear you on Zoom.

5              MS. SMITHA:  -- we're also preparing for

6        depositions that are coming up this week or we

7        have, Your Honor, Thanksgiving next week.  So it's

8        a shortened week already.  And then immediately

9        after that we're going into depositions.  We can

10       try our best, but December 2nd is Ms. Logan's

11       deposition already scheduled.

12             THE COURT:  Did I say December 6 or

13       December 2nd?

14             MS. SMITHA:  You said December 6, but we also

15       have Alexis' deposition on December 9th as well,

16       Your Honor, that we will be preparing for.

17             THE COURT:  Well, it would seem to me that we

18       need to know prior to her deposition the

19       transactions that you're claiming.  So, I mean, out

20       of a matter of fairness, it would seem that.

21             So when is Alexis' Logan's deposition?

22             MS. SMITHA:  The 9th.

23             THE COURT:  And when I'm using people's first

24       names, I'm not trying to be offensive.  I'm just

25       trying to -- instead of saying "Mr. Logan" or

1    "Ms. Logan", I'm trying to be specific.  So I -- my

2    use of people's first name is just to try to be

3    clear, clarity, and I'm fine with you doing the

4    same thing this way.

5         Mr. Johnson.

6         MR. JOHNSON:  I agree with Your Honor.  We

7    should have a reasonable period of time before Ms.

8    Logan's deposition so she can reasonably prepare

9    and I would note the 6th is a Friday.  So the --

10   that's not a lot of lead time for a deposition on a

11   Monday.

12        THE COURT:  Well, now --

13        MR. JOHNSON:  So --

14        THE COURT:  Go ahead.

15        MR. JOHNSON:  The deposition of Mr. Peterson

16   is scheduled, I believe, for the 16th.  15th?

17        MS. ALEXIS LOGAN:  13th.

18        MR. JOHNSON:  13th.

19        Does Ms. Smitha think we can do both of them

20   that day and so she produced the records by the

21   6th, and then we took both the deposition of Ms.

22   Alexis Logan and Justin Peterson on the 13th, that

23   would solve the --

24        MS. SMITHA:  I don't know that we can change

25   dates of the depositions now because I'm not taking

1        the depositions, so I don't know what the schedules

2        are.  You said the 13th?

3              MR. JOHNSON:  The 13th is currently scheduled

4        for Mr. Peterson.

5              MS. SMITHA:  All right.

6              MR. JOHNSON:  So I assume he already has that

7        blocked off.

8              MS. SMITHA:  Okay.

9              MR. JOHNSON:  So I was suggesting given the

10       nature of it, I think we can probably get it --

11             THE COURT:  Who is taking Alexis Logan --

12       what's Ms. Alexis' last name now?

13             MS. ALEXIS LOGAN:  Logan.

14             THE COURT:  Logan.  Okay.  What is Alexis

15       Logan's -- who is the person taking that

16       deposition?  Is it somebody --

17             MR. HARWIN:  Your Honor, I'm taking those

18       depositions.

19             THE COURT:  So did you hear Mr. Johnson's

20       suggestion, and does that --

21             MR. HARWIN:  Yeah.  I'm not necessarily

22       opposed to that.

23             The only issue is, you know, whether we can

24       get Alexis Logan and Justin Peterson in one day,

25       that I'm not sure.  If we can maybe start -- do one

 1        of them on the Thursday and then the one on Friday

 2        thereafter, that would be -- that is the 12th and

 3        13th, that would work if that works for everybody

 4        else.

 5            MS. SMITHA:  Your Honor, instead of changing

 6        those dates around, I'll just make this a priority.

 7        I can work over Thanksgiving.  It's not a problem

 8        to amend the Complaint.

 9            MR. JOHNSON:  I'm not sure I understand the

10        proposal, Your Honor.

11            MS. SMITHA:  Originally, Your Honor

12        recommended --

13            THE COURT:  Well -- Well -- Miss -- Miss -- If

14        we're having the deposition on the 9th, I think

15        they would need that by Wednesday the 4th, so.

16            MS. SMITHA:  We can make that happen.

17            THE COURT:  Okay.  So it sounds like the

18        depositions are going to remain the more definite

19        statement by December 4th.

20            Who is doing the order on this one?

21            MR. JOHNSON:  I'll work -- I'll draft the

22        order and work with Ms. Smitha, Your Honor.

23            And then --

24            THE COURT:  So Mr. Johnson is to do the order.

25        So it's a denial.  More definite statement by the

1    4th.

2         Now, when are we going to have the answer and

3    the affirmative defenses?

4         MR. JOHNSON:  Your Honor, 10 days after we

5    receive the information from Mr. Peterson, which, I

6    think, is the last issue we have to address.  In

7    other words, is December 4th the information on

8    Alexis and Justin?

9         THE COURT:  Yes.

10        MR. JOHNSON:  In that case, the 14th, if

11   that's not a holiday, a weekend out; if it is --

12        THE COURT:  Do you really need -- because, I

13   mean, you can frame everything except for two

14   paragraphs right now.  So do you really need --

15        MR. JOHNSON:  The 11th?  We're getting the

16   information by the 4th.  By the 11th.  So seven

17   days.  You want it by Friday, the 6th?  Whatever

18   you want, Judge.

19        THE COURT:  If the answer is on the 11th,

20   that's one week after the 4th, does that work

21   for --

22        MS. SMITHA:  Your Honor, it would put

23   receiving her answer after her deposition.

24        THE COURT:  Oh.  What date was her deposition

25   then?

1          MS. SMITHA:  The 9th.

2          And, again, Your Honor, there is not going to

3     be any surprises.  We're going to be quoting back

4     to her the documents that she's produced to us.  So

5     I don't understand what the surprises will be.

6          THE COURT:  Okay.  Mr. Johnson, are you going

7     to be able to do it by the 6th?  I mean, my only

8     concern is the items that are on the more definite

9     statement.  I think everything else you would be

10    able to --

11         MR. JOHNSON:  I'll do my best, Your Honor.

12         THE COURT:  Okay.  So answer and affirmative

13    defenses by close of business on December 6th.

14         Anything else with respect to this motion?

15         MR. JOHNSON:  No, Your Honor.

16         THE COURT:  Just give me a second.  As you

17    know, this is not my normal courtroom and let me

18    see if I can turn off that chime or it's going to

19    drive us all insane here.

20         (Pause; off record.)

21         THE COURT:  Everybody ready for the next

22    issue?

23         Next is Jon Logan, Smart Communications

24    Holdings/Loco, Smart Communications Yacht Motion to

25    Dismiss at DIN 820 with a Response at DIN 857.

1          And it's Mr. Hillsby?

2          MR. HILLSLEY:  Mr. Hillsley, Your Honor.

3          THE COURT:  Hillsley.  Hillsley.

4          MR. HILLSLEY:  Yes.

5          THE COURT:  Thank you.

6          MR. HILLSLEY:  So Dustin Hillsley from the

7    Akerman firm on behalf of Jon and the Smart

8    parties.  I'm addressing DIN 820 and the Response,

9    DIN 857.

10         Janice and the Trust assert six counts against

11   Jon Logan and the Smart entities, which I will

12   refer to as the "Smart parties."  The Smart parties

13   move to dismiss all six counts.  I am, of course,

14   sensitive to the Court's already articulated view

15   that most of these types of arguments are best made

16   for summary judgment.

17         We have submitted papers outlining our

18   positions, which we're happy to rely on for the

19   most part; however, there are a couple of key

20   points on each count I want to draw to the Court's

21   attention.

22         I would like to start, just to keep it simple,

23   with Count I, which is the malicious prosecution

24   and abuse of process counts.

25         The counterclaim asserts a malicious

1    prosecution and abuse of process claim based on two

2    judicial proceedings.  This proceeding which is

3    ongoing and the declaratory judgment action in

4    Delaware.

5         I'd like to tackle this proceeding first,

6    which is the malicious prosecution claim.

7         As a matter of law, Ms. Logan -- sorry --

8    Janice Logan cannot assert malicious prosecution

9    based on this action.  Not only is this case not

10   over but it's already effectively the law of the

11   case that Jon had probable cause for commencing the

12   DJ as stated by this Court in its order denying

13   Janice's Section 57.105 motion.  That's DIN 467.

14        The declaratory judgment action was not close

15   to being a frivolous action.  It's seeking a DJ was

16   not sufficient to warrant sanctions under that

17   section.  It certainly fails to be a basis for a

18   malicious prosecution claim.  And on that basis and

19   given the law of the case, we would argue that this

20   claim should be dismissed.  This is nothing more

21   than a second bite of the apple.

22        THE COURT:  Here is the thing.  I have -- I

23   perhaps strongly believe a court should be able to

24   look at its court file on a Motion to Dismiss.

25        The Second District has told me no, I can't do

1      that unless all the parties agree.  And so, you

2      know, they have been very clear with me that that's

3      not something I can do.

4          So my question is how can I start looking

5      outside the four corners unless everyone agrees

6      that I can do that?

7          MR. HILLSLEY:  Your Honor, obviously we didn't

8      cite the Second DCA court case that you're

9      referencing.

10         We cited two opinions from the Fourth and the

11     Fifth, both of which state expressly that the Court

12     is permitted to look at its own court file and take

13     judicial notice, particularly to dispose of claims

14     like this, in a situation --

15         THE COURT:  I've got to have everybody to

16     agree.  I mean, that's what the Second says.

17     Unless everyone agrees, I can't do it.

18         MR. HILLSLEY:  Your Honor, I don't think there

19     was an objection in the opposition in reference to

20     the sanctions motion in Your Honor's order, but I

21     won't speak for counsel.  They can make a

22     representation.

23         THE COURT:  I'm just saying that that is --

24     the Second has specifically told me I can't do

25     that.  I have to follow what the Second says.

1          MR. HILLSLEY:  Your Honor, that makes sense.

2          My response is that in opposition, Janice

3     Logan's counsel has now taken the position, and I

4     believe it's Janice's position, that it is not

5     improper for Your Honor to look at this issue.  If

6     I'm misstating their position, they can correct me.

7          MR. SCHOENFELD:  Your Honor, there is no

8     agreement from us on this point on this motion.

9          THE COURT:  And that's the Brown versus -- I

10    don't know if it's Nationstar.  It was a

11    foreclosure case, where I took judicial notice of

12    the court file.

13         MR. HILLSLEY:  Thank you, Your Honor.

14         THE COURT:  Actually, another judge had taken

15    judicial notice of the court file and I just

16    followed, and you can't do that.

17         MR. HILLSLEY:  Understood.  I will move on to

18    the next issue.  I can read the tea leaves.

19         So the next one is the Delaware action which

20    is an abuse of process claim.  To state a claim for

21    abuse of process, Plaintiff must allege three

22    elements:  That the Defendant made an illegal,

23    improper, perverted abuse of process; the Defendant

24    had ulterior motives for purpose in doing that; and

25    as a result of such action on the part of the

1      Defendant, the Plaintiff suffered damages.

2           This claim fails as a matter of law as it is

3      based only on the wrongful filing, i.e., the filing

4      of the Delaware action.  And abuse of process claim

5      requires an act constituting the misuse of process

6      after it issues.

7           Now, here there has been no alleged abuse of

8      process.  What there has been, motion practice and

9      the like, is all protected by the litigation

10     privilege under Florida law.  So for this reason,

11     this claim, too, should be dismissed, although I

12     recognize Your Honor is not dismissing the other

13     portion of it, the malicious prosecution claim for

14     Count I.

15          So moving on to Count II, which is the FUFTA

16     claim.  It's the Florida Uniform Fraudulent

17     Transfer Act claim.  The claim asserts purported

18     fraudulent transfers in connection with the

19     transfer of assets from Smart Florida to Smart

20     Delaware.  That claim is uniquely suited for

21     dismissal at the pleading stage.

22          The Trust claim is that Smart moved its assets

23     from Smart Florida, the parent company, to Smart

24     Delaware, the wholly-owned subsidiary.

25          As a matter of law, this conversion is not a

1          transfer under FUFTA because Smart Florida still

2          indirectly owns the assets.  And I can point Your

3          Honor to the specific statutes.

4              In Section 726.102(14), Florida Statutes, the

5          court -- the Legislature defined "'transfer' as a

6          'direct or indirect, absolute or conditional,

7          voluntary or involuntary' disposal of or parting

8          with 'an asset or an interest in an asset.'"

9              Under a similar statute, a court in Delaware

10         ruled, quote, "Courts recognize that a transfer to

11         a solvent, wholly-owned subsidiary does not amount

12         to a fraudulent transfer," end quote.  That's the

13         HH Liquidation case we cited.

14             But probably most important, Florida Statutes

15         specifically authorized such a transfer.  This is

16         an authorized transfer under the statutes, and this

17         is Section 607.1201(3).

18             Quote, Unless the Articles of Incorporation

19         otherwise provide -- and nobody stated that they

20         have -- "no approval by shareholders is required to

21         transfer any or all of the corporation's assets to

22         one or more domestic or foreign corporations or

23         other entities" -- and this is the important part

24         -- "all of the shares or interests of which are

25         owned by the corporation," which is the case here.

1          It's a wholly-owned sub.

2               THE COURT:  It's a what?

3               MR. HILLSLEY:  A wholly-owned sub.

4               THE COURT:  Subsidiary.

5               THE COURT REPORTER:  Thank you.

6               MR. HILLSLEY:  Notably, the Trust makes no

7          argument on this issue in their opposition brief.

8          This is a purely legal issue and dismissal of this

9          claim would be appropriate to narrow the issues for

10         trial.

11              Moving on to Count III, Your Honor, this

12         one's, I think, even simpler.  This is the

13         liability of directors claim.  The Trust purports

14         to assert a cause of action under Florida Statute

15         607.0831 as noted by the Second DCA in the Connolly

16         case we cited.

17              Quote, "By its terms that statute merely

18         shields directors from personal liability and

19         specifies circumstances in which that protection

20         may be lost.  The statute itself neither imposes

21         any duties on corporate directors nor creates any

22         causes of action against them."

23              The cases cited by Plaintiffs in response are

24         not to the contrary.  They deal with improper

25         pleadings of a prayer or an improper statement of a

1    legal theory; not the assertion of the cause of

2    action that doesn't exist.

3        THE COURT:  But isn't that statute more of

4    a -- and I'm probably using the wrong terms, but it

5    gives directors a certain level of immunity and --

6    not that it necessarily creates a cause of action,

7    but it just says those cause of actions that can't

8    proceed; isn't that how I'm supposed to read that

9    statute?

10       MR. HILLSLEY:  It's defining rights and

11   protections, but it doesn't create a cause of

12   action.  It doesn't authorize one.  And the courts

13   have ruled accordingly.

14       So -- And, fortunately, this doesn't leave the

15   Trust or Janice without relief because they can

16   assert a breach of fiduciary duty claim, which is a

17   proper way to bring a claim for misuse of authority

18   as a director.  That's the vehicle for this sort of

19   claim.  But this isn't.  And so the claim should be

20   dismissed on legal grounds.

21       THE COURT:  And I know we're not talking about

22   it right now, but is this one of the claims that

23   potentially gets wrapped up in the valuation?  I

24   know there is some question as to when the

25   valuation is going to occur, but isn't this one of

1          those claims that really is going to get wrapped up

2          in the valuation?

3                   MR. HILLSLEY:  For sure, Your Honor.

4                   So as, I think, all parties have noted,

5          including the proceedings before Your Honor, the

6          Trust loses its status as a shareholder following

7          the conclusion of the valuation proceeding because

8          the outcome of that is an order to purchase shares.

9          And so breach of fiduciary duty claims and the like

10         would all be accounted for in terms of Your Honor's

11         valuation, ultimately, the assets, and they don't

12         survive the conclusion of that process because

13         she's no longer a shareholder.

14                  (Brief interruption due to audience member in

15         wrong courtroom.)

16                  MR. HILLSLEY:  Your Honor, may I proceed?

17                  THE COURT:  Yes, sir.

18                  MR. HILLSLEY:  Okay.  So, at this point, I

19         would like to turn to the breach of fiduciary duty

20         claim.  That's Count IV.

21                  There are a lot of arguments with respect to a

22         lot of different claims there.  I only want to

23         focus Your Honor on three.

24                  So, first, is the corporate waste claim.

25         Florida Statutes 607.0750 provides the direct

1      claims -- which is what these are -- requiring

2      injury that is suffered by a singular shareholder

3      and is not suffered by the entire corporation as a

4      whole.  The difference between a direct claim and

5      derivative claim.

6          The Trust purports to assert a direct claim

7      for corporate waste.  Such claims are inherently

8      derivative.  And this was addressed in the Orlinsky

9      case in the Third DCA back in 2007 stating that

10     such claims are derivative only.  So for that

11     reason, this claim can be dismissed.

12         There are similar claims anyway that have

13     already been alleged derivatively and Your Honor

14     has denied a Motion to Dismiss those claims.

15         The next one is transfer of assets from Smart

16     Florida to Smart Delaware, which I have touched on

17     already in connection with the FUFTA claim.  The

18     Trust alleges that Smart Florida's transfer of

19     assets to Smart Delaware is a breach of fiduciary

20     duty.

21         As I stated earlier, that is a transfer that

22     is expressly authorized by Florida Statute.  So

23     this is a legal issue only.  The claim should be

24     dismissed.  It's permitted under Florida Statute.

25         The third issue that I want to focus the Court

1    on is the termination of Ms. Logan's employment.

2    This is paragraph 166(c) of the counterclaim.

3         There is no question that if Ms. Logan were a

4    shareholder, she could attempt to assert a direct

5    claim on this basis, but she is not; the Trust is.

6    And the Trust has no interests separate and apart

7    from the other shareholders in Ms. Logan's ongoing

8    employment.

9         This is a case of Ms. Logan conflating her

10   individual capacity with her capacity as the

11   trustee of the Trust.  Individually, Ms. Logan does

12   not have standing to assert a breach of fiduciary

13   duty claim because she isn't a shareholder, and the

14   Trust has no interest in her employment and

15   Ms. Logan alleges none.  So it does not have a

16   direct claim here.

17        Finally, Your Honor, so I can wrap this

18   portion up, Counts V and VI address the conspiracy

19   and aiding and abetting claims.

20        Ms. Logan alleges that -- sorry -- Janice

21   alleges that Jon, Smart Florida, Smart Delaware and

22   HLFIP conspired with each other.  The case law is

23   clear that regardless of how many companies are

24   involved in such a claim, a conspiracy requires

25   more than one natural-born person because a person

1    cannot conspire with himself.  The courts refers to

2    this as the Intracorporate Conspiracy Doctrine.

3    Here, the only person in this claim is Jon Logan.

4    Janice cites case law that proves this point.

5         The Microsoft and Copperweld cases both stand

6    for the proposition that a parent -- here Smart

7    Florida -- cannot conspire with its wholly-owned

8    sub -- here Smart Delaware.  I can quote the case,

9    but this is uncontrovertible.

10         Similarly, there can be no conspiracy with

11    HLFIP.  This is the WBDH-BC Holdings case, which we

12    cite in our papers.  And that's instructive.  The

13    defendant in that case principally owned and

14    controlled three companies, one of which was a

15    50 percent member of another LLC.  None of the

16    companies in that case were wholly-owned subs.  The

17    District Court recognized that each of the entities

18    were separate corporate structures and,

19    nonetheless, applied the Intracorporate Conspiracy

20    Doctrine because it was clear that the members and

21    owners were the same.  And so you only have one

22    person.

23         So Janice doesn't appear to dispute this in

24    her papers.  Instead, she argues the personal stake

25    exception applies.  And, specifically, that's in

1      paragraph 166 of the counterclaim.

2           And she argues that Jon had a personal stake

3      in preventing Janice from accessing the value of

4      her shares.  This is a rarely referenced and

5      narrowly applied exception to the Intracorporate

6      Conspiracy Doctrine, and it only applies in the

7      rare instance where a corporation and its alleged

8      agent have competing interests, they have different

9      separate and distinct purposes and, yet, conspired

10     together.  That is hard to even wrap your head

11     around.  And, yet, there are no allegations about

12     that whatsoever.

13          And, just for the record, the case I'm

14     referencing here that deals with this is Mancinelli

15     v. Davis, 217 So.3rd 1034, and the pin cite is

16     1037.  This is a Florida Fourth DCA case out of

17     2017.

18          So for that reason, too, the conspiracy in

19     aiding and abetting claims should be dismissed.

20     And for all the reasons I identified in the papers.

21          And so we believe dismissal is appropriate and

22     we think this will narrow the issues for discovery

23     and, ultimately, for trial.

24          Thank you, Your Honor.

25          THE COURT:  Who's going to --

1          MR. SCHOENFELD:  Mr. O'Neill will.

2          THE COURT:  I'm sorry?

3          MR. SCHOENFELD:  Mr. O'Neill.

4          MR. O'NEILL:  I want to first start by asking

5     Your Honor if Your Honor has any particular

6     questions that I can address at the outset.  I do

7     have a few discreet points I want to raise, but I

8     wanted to see if Your Honor had any questions

9     before I begin.

10          THE COURT:  Let me go back to -- is it Count

11     III or IV?

12          I had some question about the proper nature

13     and, you know, it's something I have been

14     struggling with now for a couple of days.  It's the

15     607.0831 director liability and the nature of that

16     statute.  That is, I think, the only thing that if

17     you can talk specifically about versus whatever you

18     wanted to say in general.

19          MR. O'NEILL:  Sure, Your Honor.

20          So we do believe that with respect to that

21     statute, it describes several circumstances in

22     which the director loses their shield against

23     personal liability and they include, but are not

24     limited to, willful or intentional misconduct or

25     recklessness or an act or omission which was

1      committed in bad faith or with malicious purpose,

2      and we believe that those -- the language in that

3      statute clearly provides a mechanism by which you

4      would hold a director liable in those kinds of

5      circumstances where you have conduct that rises to

6      that level as described in that statute.

7          Again, here, Your Honor, I'm not going to go

8      through all the factual allegations that we've

9      asserted in our counterclaims.  But in terms of

10     outlining that Jon used his position as a director

11     and officer of these entities and controlling these

12     entities, used his position to retaliate against

13     Janice for her asserting her rights as a

14     shareholder in this action, and that's the story

15     that we have told inn our counterclaims.  And so we

16     do believe that it meets the carve-outs that are

17     there in the statute that we believe do rise to a

18     liability of director cause of action.

19         So that would be my response on that point,

20     Your Honor.

21         THE COURT:  Thank you.

22         And you can continue with whatever other

23     general response you can have, and then I'll come

24     back to you, Mr. Hillsley.

25         MR. O'NEILL:  Are we still on this count in

1      particular, Your Honor?

2           THE COURT:  No.  Just in general in response

3      to Mr. Hillsley's argument to the extent you would

4      like to.  I don't need a ton, though, Mr. O'Neill.

5           MR. O'NEILL:  Understood.  Understood, Your

6      Honor.  Then let me just flip through, because he

7      raised key points.  So I'm going to rest on our

8      papers for the most part.  I do want to address

9      some key points.

10          I think it's obvious -- Your Honor, obviously

11     stated with respect to malicious prosecution, that

12     we do disagree that the Court should consider the

13     file and we do not believe, in any sense, that Your

14     Honor's prior position on the sanctions order, even

15     if it could be considered, amounts to a finding of

16     probable cause.  So I just want to make that clear

17     on the record.

18          With respect to the Delaware action, I think

19     it's important to point out that that action was

20     filed, and they told the Judge that they were going

21     to, you know, tell Janice about the filing of that

22     case.  And this, again, that case was related to

23     Loco and Yacht and Jon trying to seek to establish

24     ownership over assets that were currently being

25     disputed in this case.

1            And they said in their Complaint that they

2       were going to notify Janice.  They did not notify

3       Janice.  Janice -- We were tracking filings and

4       Janice was notified that way.

5            And then not only did they do that, but then

6       they sought to advance -- so it's not just the

7       filing of that lawsuit that occurred, they tried to

8       advance a summary judgment procedure in front of a

9       judge who had no idea what was going on down here,

10      and in those filings, they didn't tell that judge

11      the nature of these proceedings.  They withheld

12      from that judge the vast majority of what had

13      happened in this case.

14           And so we do believe there is an adequate

15      ground for an abuse of process claim in light of

16      what they did and the Court's order, which we

17      again, quote and attached to our Complaint where

18      the Court referenced that it had wished Jon had

19      been more candid about what had happened in this

20      proceeding.  So we do believe that does state an

21      adequate claim for abuse of process.

22           Moving to Count II.

23           Let me just kind of get my notes together

24      here.

25           I think the primary argument, if I'm not

1      mistaken, was regarding this -- they didn't talk

2      about the intellectual property transaction.  So

3      I'm going to focus on the Smart Delaware asset

4      transfer.

5          Understanding their point about the

6      wholly-owned subsidiary issue, I think it's

7      important for Your Honor to understand, you know,

8      what happened here, which is that Jon could not

9      convert Smart Comm Florida to a Delaware entity

10     because Janice would not have allowed it.

11         So what he did was he set up an entirely new

12     entity, called it Smart Comm Delaware and then

13     purported to transfer all the assets out of Smart

14     Comm Florida to Smart Comm Delaware; again, without

15     Janice's permission; didn't tell Janice about it;

16     didn't notify her until the asset transfer had

17     already gone through.  And this was -- obviously,

18     Your Honor was here for the, I believe, it was the

19     motion for a temporary custodian when this was

20     first brought to our and Your Honor's attention.

21         I think it's also important to note -- so,

22     again, concealed from Janice, sets up an entity

23     without her permission, et cetera, and then

24     transfers all the assets out of an entity that

25     she's 50 percent owner of.

1          Then on top of that, they built in certain --

2     without going into too much detail, the assets are

3     now in this entity and while it is, you know, the

4     sole member of that entity is Smart Communications

5     Florida, all the bylaws, et cetera, everything that

6     that Delaware entity provides by way of Jon

7     controlling it allows them to dispose of assets in

8     ways that don't necessarily need to consider

9     Janice's 50 percent interest in Smart Comm Florida,

10    and the problem is she can't, by virtue of just

11    being a 50 percent owner of Smart Comm Florida, she

12    can't force Smart Comm Florida to do anything to

13    recover those assets, to take actions to get them

14    back, things of that nature.

15         So the fact that the assets went from the

16    Florida company to the Delaware company and the

17    Delaware company has one member, which is the

18    Florida company, that doesn't mean that Janice

19    doesn't control and is able to benefit from those

20    assets in the same way that she otherwise would as

21    a 50 percent shareholder as Smart Communications

22    Florida.

23         So for that reason and for all the reasons

24    discussed more in our papers, we do believe that

25    the asset transfer between Smart Communications

1      Florida and Smart Communications Delaware does

2      constitute a fraudulent transfer under the act.

3          We talked about Count III.

4          With respect to Count IV, again, they brought

5      up the transfer of assets to Delaware.  Obviously,

6      Jon sat on both sides of that transaction, did not

7      disclose to Janice that he was doing that

8      transaction, and the transaction was meant, and as

9      we allege, both -- we allege, certainly, a number

10     of facts that would give rise to the inference that

11     the purpose of the asset transfer was not for any

12     valid legal purpose, but to harm Janice, and to

13     move money and assets from an entity that she had,

14     at least partial control over, to an entity that

15     she really didn't have any control over.

16         So we believe that that certainly has to be a

17     breach of fiduciary duty, particularly because of

18     the royalty and conflict issues that were never

19     disclosed to Janice with respect, again, to assets

20     that she, at one point, had at least some control

21     over.

22         With respect to the termination of the

23     employment and the corporate waste, I would just

24     note that those allegations are also directed

25     toward Jon engaging in corporate waste and

1        terminating her employment in retaliation for

2        Janice exercising her rights in this case, and we

3        certainly believe it's a breach of the duty of care

4        to have -- to take those actions for the sole

5        purpose of harming the shareholder to the fiduciary

6        duties, and I understand the point that, 'Well,

7        okay, she's an employee and she's receiving her

8        salary as an employee.'  Yeah, but the reason they

9        terminated her, took her salary, took her

10       insurance, tried to evict her, tried to take her

11       car was because she was enforcing her rights as a

12       shareholder in this lawsuit.

13            And, again, this is the pleading stage.  We

14       believe that our factual allegations must be taken

15       as true, and we believe we've alleged a number of

16       them that give rise to an inference that there has

17       been a breach of fiduciary duty with respect to all

18       of the alleged actions that Mr. Hillsley has

19       discussed.

20            With respect to Counts V and VI, I would just

21       last note -- let me get to my notes here -- we do

22       believe that Jon is a separate actor for purposes

23       of the conspiracy.  Jon does have a personal stake

24       in assuring that these transactions go through

25       because he's the one who benefits from them at the

1       end of the day.  He, solely.  And Janice is the one

2       who, obviously, suffers a detriment.

3           And we don't believe there's any dispute that

4       HLFIP is a separate entity.  So, really, the only

5       dispute is whether Smart Comm's Delaware, you know,

6       is a separate entity under this analysis.

7           And there's no way that the Delaware entity

8       has a complete unity of interest because,

9       basically, Janice, as 50 percent shareholder of the

10      Florida company, objected to the entire asset

11      transfer and has objected and has made it very

12      clear that she objects to that asset transfer.

13          In addition, that Delaware entity is now

14      taking contracts that would have otherwise been

15      Smart Communications' Florida contracts.  So there

16      is no complete unity of interest.

17          And so we believe for all of those reasons,

18      we've adequately stated claims, and we ask that the

19      motion be denied.

20          THE COURT:  Mr. Hillsley, any brief response?

21          MR. HILLSLEY:  Very briefly, Your Honor.

22          So, first, on Counts III and IV, you just

23      heard from counsel for --

24          (Microphone audio interference.)

25          I'll try again.

1          THE COURT:  No, I'm turning the microphones

2      down since you're speaking.  That's what was

3      causing the feedback.

4          MR. HILLSLEY:  Okay.  So you just heard from

5      counsel for Janice and the Trust that Jon and Smart

6      retaliated against Janice.  That's the fundamental

7      point; right?

8          The claim is that the retaliation was against

9      Janice, not the Trust.  Janice has no standing to

10      bring breach of fiduciary duty, claims directly or

11      derivatively.  She is not a shareholder.  And so

12      all of those claims have to fail as a matter of

13      law.  She has no standing.

14          As to the FUFTA claim, Count II -- and this

15      really bears on the breach of fiduciary duty claims

16      as well -- you just heard from counsel, they

17      repeatedly stated that Janice didn't authorize this

18      transfer.

19          Counsel's very good at making claims, but

20      ignoring the law; right?  And I quoted this to Your

21      Honor in my presentation.  Section 607.1201(3)

22      states expressly that unless otherwise indicated in

23      the Articles of Incorporation, a transfer from a

24      parent to a wholly-owned sub does not require

25      approval of shareholders.  It does not.  And so

1      Jon's action was absolutely permitted under express

2      Florida law.

3            And for what it's worth, there is no

4      diminution of assets or value because Smart still

5      owns Smart Delaware.  And so all those contracts

6      are still owned by Smart Florida indirectly through

7      that Delaware entity.

8            That's it, Your Honor.  Thank you.

9            THE COURT:  Court has before it the Motion to

10     Dismiss at DIN 820.  I'm going to go ahead and deny

11     the motion.

12           And can we make the answer here December 6th?

13     Does that impact anyone's depositions' timing or

14     sequence?

15           MR. O'NEILL:  We do have -- and I say "we".  I

16     am the one who is going to be involved in the

17     depositions on the 4th and 5th of December, which

18     is Noreen Gunning and then Janice Logan.

19           And so the 6th might make it -- You know what?

20     We'll make the 6th work.  We'll make the 6th work.

21           THE COURT:  I appreciate that.

22           So answer by December 6.  Mr. O'Neill, you can

23     do the order.

24           MR. O'NEILL:  Understood.  Thank you, Your

25     Honor.

 1          THE COURT:  And in a moment, we'll move on to

 2     the next one.  I haven't had a chance to read it.

 3     But it looks like the Second DCA reversed Judge

 4     Williams injunction.  So, obviously, that doesn't

 5     impact the motions to dismiss.  But as an FYI, I

 6     haven't had a chance to read it to see what they

 7     said about it.

 8          Okay.  Let's move on to DIN 821, which is

 9     HLFIP Holdings Motion to Dismiss the Counterclaims.

10          Mr. Oprison, come on down, sir.

11          MR. OPRISON:  Good morning, Your Honor.

12          THE COURT:  Good morning.

13          MR. OPRISON:  Your Honor, everything that we

14     needed to say is in our brief.

15          I do want to just highlight a few of the

16     issues here.  Obviously, we adopt Smart's arguments

17     in their Motion to Dismiss as well.

18          This is a motion to dismiss a counterclaim,

19     and I just want to point out the fact that we

20     didn't bring the Complaint.  Procedurally, this

21     makes no sense to us because they brought a

22     Complaint -- and I'm not trying to say that their

23     motion shouldn't have been granted, but I defer to

24     Your Honor on that -- but we're differently

25     positioned here.

1          There is a Complaint, a Second Amended

2     Complaint that we argued our Motion to Dismiss just

3     a month ago on October 18th.  HLFIP does not have a

4     ruling on that yet.  We're hopeful.  But we move to

5     dismiss that Second Amended -- their third attempt

6     to plead a case and we've moved to dismiss that --

7          THE COURT:  I'm sorry.  Am I owing another

8     Motion to Dismiss?  I don't have it on my list.

9          MR. OPRISON:  HLFIP Motion to Dismiss the

10     Second Amended Complaint, Your Honor, that was

11     argued last month.

12          THE COURT:  Can you, at some point today, get

13     me a DIN on that?

14          MR. OPRISON:  I can tell you right now, Your

15     Honor.

16          THE COURT:  I probably didn't write it down,

17     and so I apologize on that.

18          MR. OPRISON:  That is DIN 730.

19          THE COURT:  Yeah, I'll have to go back and

20     review that.  Okay.

21          MR. OPRISON:  So, in any event, Your Honor,

22     that was their third attempt to plead.  The first

23     time my client had been brought into the case and

24     now they have a -- they have counterclaims that

25     they brought against my client who has not brought

1      a complaint against them and --

2           THE COURT:  But does it really matter whether

3      it's called a complaint, a counterclaim, a

4      cross-claim?  It's an affirmative action.

5           MR. OPRISON:  Well, it is and it isn't, Your

6      Honor, because they're taking an opportunity to

7      bring claims in now against my client that they

8      should have brought in in the Second Amended

9      Complaint.  They didn't do that.  They could have.

10     I don't think they should fair any better.  But the

11     point is that they brought them now.  They're

12     trying to smuggle claims in against our client.  I

13     just -- procedurally, it doesn't make much sense.

14     But I think we have other arguments here in terms

15     of where HLFIP falls into this fray in terms of

16     what we have.

17          And I think when you look at our brief you'll

18     understand, Your Honor, that -- and I'm sure you

19     have read it because you're obviously quite

20     familiar with the briefing.  But in order to have

21     a -- and these are counts -- this is Count II, the

22     fraudulent transfer act claim against us as well as

23     Smart.  You have to show certain things.

24          They're the masters of their Complaint.  So

25     they have to show not only was there a transfer but

1    that my client is a debtor.  That's required under

2    the statute.  So they can't show either.

3        There is no -- the only thing that they try to

4    pin on HLFIP in terms of a transfer is this

5    obligation for the royalty payment.  The money

6    hasn't been paid.  There might be an obligation.

7    Certainly an obligation.  But that hasn't been --

8    that doesn't constitute or crystalize a transfer.

9        But the bigger issue is we're not a debtor and

10   in order to have a violation of the transfer, the

11   fraudulent transfer, you have to have a debtor.

12   We're a creditor.  We're the ones that are saying

13   we are owed this $80 million in past accrued

14   royalties and we're owed going forward royalties at

15   40 percent.

16       So, again, they framed the Complaint they

17   brought against our client but they can't satisfy

18   the elements, and I think as this imagination, I

19   think, as a matter of law, they cannot show under

20   the statute that our client is -- can be liable

21   under the fraudulent transfer, at least not on the

22   facts that they pleaded in their counterclaims.

23       And for the reasons Mr. Hillsley discussed on

24   the civil conspiracy and the aiding and abetting,

25   if you look at their Complaint, it's a little bit

1          inconsistent, but the Complaint says a couple of

2          things.

3               It says, one, HLFIP is merely a sham

4          corporation.  It's a setup by Jon.  Jon is -- but

5          they do allege at other places that it is a

6          freestanding of a separate, legal entity, but it is

7          owned by Jon.  So is Smart.  Now, Jon is the

8          managing member of Smart.  Jon is the managing

9          member and the sole owner, sole member of HLFIP.

10              So for the reasons Mr. Hillsley discussed,

11         this Intracorporate Conspiracy Doctrine bars them

12         both from the conspiracy and the aiding and

13         abetting.  Forget about the fact that they have no

14         underlying cause of action that they can pin to

15         because they can't show a breach of contract -- or

16         a breach of fiduciary duty as to Miss -- as to

17         Janice, because for the reasons we discussed last

18         month she's not a fiduciary or, you know, there is

19         not a fiduciary duty owed to her because she has no

20         interest, she has no standing.

21              So there is no underlying -- there is no

22         underlying fiduciary breach, at least as the way

23         they pleaded it, and, therefore, there isn't a --

24         there can't be an aiding and abetting claim.

25              But further to that is you can't have aiding

1    and abetting yourself.  You can't conspire with

2    yourself.  And the way they pleaded this, which is

3    correct that Mr. Logan, Jon Logan, is the sole

4    owner of HLFIP.  He set it up as we discussed last

5    month for the specific purpose of protecting and

6    holding his IP, not just the one patent but many of

7    the IP, to show -- the show-how/know-how all of the

8    other -- all the other technology.  And he also is

9    the sole member of Smart, and he is an individual

10   that is also in this case.

11        So they're saying Jon conspired with himself

12   through Smart and through HLFIP and himself,

13   individually.  You just can't do that under the

14   Florida Statute or the Florida doctrine.  You can't

15   enter a corporate conspiracy.

16        So, Your Honor, for those reasons alone, we

17   believe that the Motion to Dismiss should be

18   granted as to the counterclaims.

19        THE COURT:  Is this still you, Mr. O'Neill?

20        MR. O'NEILL:  It is, Your Honor.

21        THE COURT:  Hold on a second.  Let me turn up

22   the volume again.

23        Try that.  Go for it.

24        MR. O'NEILL:  Your Honor, I do believe our

25   papers address pretty much everything Mr. Oprison

1    said.  I want to focus, though, on whether HLFIP is

2    a proper defendant to Janice's claim.

3        On a conceptual level, it really would defeat

4    the purpose of the statute if Plaintiffs could not

5    recover fraudulently transferred moneys from

6    knowing transfer recipients.

7        Again, Jon was on all sides of this

8    transaction.  He is the one who had knowledge of

9    the impropriety of the transaction, yet executed it

10   anyways without disclosing it to Janice.

11       As a result of the fraudulent IP transactions

12   in particular, HLFIP is a recipient of a 40 percent

13   royalty and a, roughly, $80 million obligation to

14   which it's not entitled and for which it did not

15   provide reasonably equivalent value.

16       We know it didn't provide reasonably

17   equivalent value because 11 days before the IP

18   licensing that the agreement was entered into, the

19   federal circuit invalidated the key crux of the

20   intellectual property that served as the basis for

21   the 40 percent royalty.  And focus specifically

22   provides transferees of proper defendants.  When

23   the first transferee of the asset or the person for

24   whom benefit the transfer was made or be any

25   subsequent transferee other than a good faith

1    transferee who took core value in any subsequent

2    transferee, we do not believe HLFIP is a good faith

3    transferee in this scenario and so we do believe

4    that HLFIP is a proper defendant to that claim.

5    And that's the only point that I want to address,

6    Your Honor, for everything else we would rest on

7    our papers.

8         THE COURT:  Mr. Oprison, anything further?

9         MR. OPRISON:  Just, Your Honor, we didn't

10   write the statute.  The statute's written the way

11   it is.  So unless you satisfy those elements -- and

12   maybe there's other claims.  I'm not suggesting and

13   inviting them to bring them.  But if it's a

14   Fraudulent Transfer Act claim, they can't bring it

15   against my client.

16        Thank you, Your Honor.

17        THE COURT:  I'm going to take this one under

18   advisement.

19        I'll also go back and look at DIN 730.

20        Are there any other motions that you're still

21   expecting a ruling from a prior hearing?  And I

22   apologize if I -- looks like I missed one.

23        MR. FRANKLIN:  Your Honor, I'm not sure we

24   got -- Was Yacht included in the Order yesterday,

25   because that was a separate motion?

1          THE COURT:  If it was a separate DIN number,

2      it was not included.

3          So do you happen to have the DIN number for

4      the Yacht motion?

5          MR. FRANKLIN:  Mr. Harwin can correct me if

6      I'm wrong, but I believe it was 716.

7          THE COURT:  Okay.  I apologize.  I'll go back

8      and look at those as well.

9          That takes us -- I'm going to do the Order on

10      DIN 821 from today.

11          Now, let's go to Janice Logan's Motion to

12      Dismiss Jon Logan and Smart Communications, et al.,

13      plus the Joinders.  That's at DIN 765 and 823, and

14      the Response at 787.

15          And Mr. Schoenfeld.

16          MR. SCHOENFELD:  Thank you, Your Honor.

17          Your Honor, this motion seeks to dismiss a

18      20-count Complaint brought against Janice,

19      personally and as trustee, against Jim's estate,

20      against Alexis, against Justin Peterson; and of

21      those 20 counts, 16 sound against the estate and

22      five sound against Janice, and I'll be addressing

23      those specific counts.

24          In sum, the Complaint seeks $100 million from

25      Jim's estate as damages allegedly because Jim did

1   not document prior to his death in 2020 an

2   agreement that Jon made with himself, essentially,

3   in 2023 with respect to the -- posing a royalty

4   payment on Smart Communications for IP that it

5   used -- allegedly used in its business.

6       We move to dismiss all of these counts on two

7   grounds:  In pari delicto and equitable estoppel.

8   And the reason for those defenses is that -- or the

9   ground for those defenses is that Jon had full

10  knowledge of all of the conduct he alleges in all

11  of the actions that he bases these claims on

12  through his capacity as the sole executive officer

13  of Smart Communications, its director, its C.E.O.,

14  as he alleges it, the person in charge of all of

15  the day-to-day operations of that company.

16      And he also participated in the very asset,

17  the utilization of company assets for personal

18  purposes, to a greater extent than Jim ever did.

19  And, therefore, given that he was participating in

20  the same, exact conduct on which he bases these

21  claims, he's equitably estopped from complaining

22  now after many, many years of knowledge and

23  participation as to those claims.

24      Now, it is often the case that these defenses

25  raise fact questions that preclude a dismissal.

1       But that's not the case here, because the statutes

2       in Florida and the case law, impose specific

3       obligations on Jon to be aware, to oversee the

4       actions of the activities of the company, and to be

5       aware of what it's doing.

6           And as I mentioned a moment ago, Jon expressly

7       alleges in his Complaint that he had that capacity,

8       that that was, in fact, his responsibility.

9           And so this is not a case where Jon's

10      responsibility to oversee these activities, to be

11      aware of the very things he alleges now support

12      these claims, were unknown to him or that there's

13      any dispute about it.  He alleges it in his own

14      Complaint, and the statute imposes obligations in

15      the case law, imposes obligations on Jon as well.

16          He alleges in paragraphs 20, 26 and 30, that

17      he is the sole operating officer of Smart

18      Communications.  That he conducts Smart

19      Communications day-to-day obligations.  So he had

20      the responsibility to be aware of what was going

21      on.  And in point of fact, as he alleges, he was

22      aware of these things.

23          And to whatever extent he was not aware or

24      claims to not have been aware of these things, he

25      had an obligation under the statutes given his role

1        in the company to be aware of them.

2            There is no allegation of fraudulent

3        concealment, of concealment of any of these

4        activities by Jim or anyone else during the course

5        of the activities.  If Jon was unaware of these

6        things, it's because he didn't look, not because

7        they were concealed from him or because he had no

8        access to them.

9            So as a consequence, we argue, we submit that

10       all of these claims are barred by both the in pari

11       delicto defense and equitable estoppel, and should

12       be dismissed.

13           So unless the Court has questions on that

14       subject, I will turn to several of the specific

15       counts.

16           Count 6 alleges constructive fraud; 15 alleges

17       breach of common law fiduciary duties; and 14

18       alleges breach of duty arising from HLFIP's alleged

19       tax liabilities for that same IP royalty agreement

20       that I mentioned earlier, which was never

21       documented.  It appears nowhere in any documents

22       until 2023 when Jon created an agreement between

23       HLFIP and Smart Communications to impose a

24       40 percent -- a royalty of 40 percent of the

25       profit -- well, basically, all of the profit for

1    the entire 40 percent profit of the company as an

2    IP royalty, and, hence, shift in his telling all of

3    the value of the company from Smart Communications

4    to HLFIP and, hence, effectively to Jon, himself,

5    and away from Janice.

6         Those claims all failed because Jim owed Jon

7    no duties giving rise to or supporting those

8    claims.  Jim had -- all of those claims require

9    either a confidential relationship, a fiduciary

10    relationship or position of trust and confidence

11    between Jim and Jon.  And none of that is present

12    here as between those two.  Jon is a grown man in a

13    superior corporate role to Jim for the entire time

14    that these events took place.

15         Jim had no particular expertise in the subject

16    of these transactions, in the tax rules applicable

17    to IP transfers.  He didn't hold himself out as an

18    expert in any way.

19         There is simply no support in Florida case law

20    for the proposition that a simple arms-length

21    business relationship would give rise to a

22    relationship of trust and confidence or a fiduciary

23    relationship.  And that's the entire basis on which

24    these claims stand.

25         Count 15 is particularly flawed in this

1    respect in that that alleges that Jim, as an

2    officer of Smart Communications, owed Jon a

3    fiduciary duty when negotiating Jon's payment to

4    Jon by Smart Communications for IP rights.

5        This would have been not a fiduciary duty on

6    Jim's part; it would have been a clear conflict of

7    interest on his part to negotiate on Jon's behalf

8    of a company that he represented in the

9    negotiations.

10       Jon relies on Steigman vs. Danese for the

11   proposition that a family relationship could give

12   rise to a confidential relationship.  But in that

13   case, the defendant had much more than just a mere

14   family relationship.

15       The plaintiffs allege that they had become

16   dependent -- it was a dispute among siblings --

17   dependent on the brother as, quote, the dominant

18   family figure, closed quote.  And that he, quote,

19   exerted control over them.

20       Well, here Jon alleges not Jim but rather Jon

21   was the, quote, sole founder, president, C.E.O. and

22   day-to-day operator, closed quote of Smart

23   Communications.

24       So he alleges he held the dominant position in

25   this relationship, and in his telling, he, quote,

1    invited, end quote, Jim to become involved in the

2    company at Jon's behest.

3        They also cite a case -- cite several

4    shareholder cases, but those cases involve theft

5    of -- theft from the business by shareholders or

6    others.  There is no allegations of that here.

7    There is no allegation that Jim stole from the

8    business.  It's that he didn't protect Jon in

9    various ways.

10       So these three counts, 6, 14, and 15, should

11   be dismissed because Jim did not owe Jon the

12   required confidential or fiduciary duties.

13       Count 11 alleges conspiracy to commit unjust

14   enrichment and that fails because the elements of

15   unjust enrichment do not include the requisite

16   wrongful act to support an underlying claim.

17       Unjust enrichment only requires -- I'm sorry.

18       Under Florida law, civil conspiracy requires a

19   wrong or a tort, but unjust enrichment doesn't

20   require that level of culpability on the part of

21   the defendant such that it would rise to the level

22   or a wrong or a tort.  So you can't have a -- you

23   can't enhance that claim sufficiently to represent

24   a conspiracy to commit unjust enrichment.

25       And there is no supporting -- we point out in

1          our briefs, there is no Florida law supporting this

2          claim, the existence of this claim in any context,

3          and, therefore, absent any supporting Florida law,

4          Count 11 should be dismissed.

5               Now, counts 14, 15, 16 and 18 all allege

6          claims arising from failure to pay IP royalties to

7          HLFIP since 2015.  These claims, obviously, are all

8          subject to an applicable -- the applicable

9          four-year statute of limitations.  There are

10         different statutes applying to several of these

11         claims but they're all four years.

12              Now, the Defendants argue that the statute of

13         limitations didn't begin running in 2015 when the

14         purported royalties began to accrue, but, rather,

15         in 2023 when Jon agreed with himself for the first

16         time to enter into a written royalty agreement.

17              Jon meets himself coming around the corner on

18         this one.  Either there was an oral agreement of

19         some kind beginning -- requiring payment in 2015

20         arising from -- and claims arising from the

21         nonpayment of which Jon would have been well aware

22         because he was running both companies, the statute

23         of limitations would apply.

24              Or there was only an agreement made in 2015 to

25         begin paying in 2013 an oral agreement, but that

1        would be barred by the statute of frauds.

2             So in either event, however you want to look

3        at this allegation that there was a long-running

4        oral contract going back to 2015, it was only

5        documented for the first time in 2023, it's barred

6        by either the statute of limitations or the statute

7        of frauds.

8             Counts 17 and 18 allege fraudulent inducement

9        but lack the requisite particularity required by

10       Rule 1.120(b), including the time frame of the

11       statements made and the context in which they were

12       made.

13            Now, the Complaint really doesn't allege any

14       specific misstatement.  It alleges only that Jim

15       promised Jon that he would be compensated for the

16       IP.

17            Jon was compensated for the IP throughout his

18       entire -- throughout the entire 2015 to 2023 period

19       at issue because Smart Communications, to whatever

20       extent it profited from the use of that IP, Jon

21       received 50 percent of that value as a shareholder.

22       And there is no allegation here that Jim promised

23       Jon anything else.  So even if there was a general

24       statement that Jon would be compensated, there is

25       no allegation that that didn't happen.

1              Jon's opposition relies on the 2015 e-mail.

2       This is Exhibit E to their Complaint.  But that

3       e-mail says -- it describes itself as an

4       "agreement."  It's not an agreement because it's

5       basically Jim and Alexis acknowledging that Jon

6       created certain IP assets.

7              There is no agreement because there is no

8       consideration on Jon's part for this.

9              And even as a statement, an acknowledgment, it

10      doesn't promise -- it doesn't say anything at all

11      about a license, and it certainly doesn't say

12      anything about a royalty payment, not a word on

13      either subject.  So that can't be the basis of

14      fraudulent misrepresentation, fraudulent

15      inducement.

16             It also doesn't establish a time frame for

17      when any of these obligations or inducements might

18      have occurred.

19             And it says nothing at all about the time

20      frame of any representation that was made because

21      there is no -- in that document, there is no

22      representation, and there is no documentary

23      evidence prior to the creation of this agreement by

24      Jon in August of 2023, that there was ever any

25      agreement, any representation, any obligation

1 stated in any way that Jon would be compensated

2 with a royalty payment prior to that date, and

3 there is no allegation of that.

4  In their brief, they try to provide some

5 extraneous context.  None of that is -- none of

6 that is alleged and it all relies on conclusory

7 allegations about Jim's alleged motives and not on

8 any specific time frame or specific representation

9 or even context in which the alleged

10 representations were made.

11  So for these reasons, we ask the Court to

12 dismiss the entire First Amended Complaint as to

13 Janice, personally and as a trustee, and as to the

14 estate on in pari delicto grounds and equitable

15 estoppel.

16  And in the alternative, we ask the Court to

17 dismiss Counts 6, 11, 14, 15, 16, 17, and 18 for

18 the individual reasons stated.

19  Thank you.

20  THE COURT:  Thank you.  Ms. Smitha.

21  MS. SMITHA:  Yes, Your Honor.

22  THE COURT:  And I don't need that much.

23  MS. SMITHA:  Okay.  Yes, Your Honor.

24  THE COURT:  So just want to hit the

25 highlights.

1          MS. SMITHA:  Sure.

2          So for highlights, as a general matter, as we

3     stated with regard to the prior Motion to Dismiss

4     earlier this morning, this is more appropriately

5     dealt with on a summary judgment as opposed to

6     motion to dismiss.

7          Prime example, in pari delicto.  That is a

8     fact-intensive inquiry and it's very difficult to

9     deal with on a motion to dismiss.  I see that

10    you're agreeing.  So I'll move on.

11         THE COURT:  Yeah.  I didn't even need you to

12    start.  I'm denying the Motion to Dismiss.

13         MS. SMITHA:  Okay.

14         THE COURT:  Let's talk about the timing on the

15    answer.  Can we -- Is December 6 going to interfere

16    with any required deposition before or is that

17    timing working for everybody knowing that you all

18    are going to have to work hard over the next couple

19    weeks?

20         MR. SCHOENFELD:  I do not believe it would

21    interfere with any scheduled depositions.  I'll

22    give my colleagues a moment to weigh in if they

23    think it would.  Hearing none, I would say no, Your

24    Honor.

25         THE COURT:  And who is drafting this order?

1          MS. SMITHA:  I'll take the liberty, Your

2     Honor.

3          THE COURT:  And it's Ms. Smitha?

4          MS. SMITHA:  Yes, Your Honor.

5          THE COURT:  Now, we are going to deal with the

6     motions to strike and then we'll take our break.

7          We have got two motions to strike.  Janice's

8     Motion to Strike is at DIN 761, and Alexis and

9     Justin's Motion to Strike is at DIN 764.  The

10    response is at 789.

11         Now, let me ask everybody this:  Given what I

12    think I read in the response, my understanding is

13    the parties that filed the First Amended Complaint

14    are not claiming currently any claim for punitive

15    damages; instead, they were just putting the

16    Defendants of the First Amended Complaint on notice

17    that they may seek to file permission to seek

18    punitive damages in the future.

19         Am I correct in my understanding?

20         MS. SMITHA:  That's correct, Your Honor.

21    There's only two counts that reference it and it

22    references the statute and it uses the conjunctive

23    "or" in the wherefore clause.

24         THE COURT:  So in that there does not, based

25    on the writing and the concession here in open

1     court, it doesn't seem like there is actually a

2     claim for punitive damages.  So why don't I just

3     enter an order denying the motions as moot because

4     there is no claim for punitive damages referencing

5     the paper and the statement here in open court.

6     Does that work for everybody?

7          MR. SCHOENFELD:  That works for us, Your

8     Honor.

9          MR. JOHNSON:  Yes, Your Honor.

10         THE COURT:  Okay.  So let me just make a note

11    of that.

12         Why don't we take ten minutes, fifteen

13    minutes?  How much time do you all want?

14         MR. SCHOENFELD:  Ten minutes would work for

15    us.

16         MR. JOHNSON:  Ten is fine, Your Honor.

17         MR. HILLSLEY:  And for us, Your Honor.

18         THE COURT:  Why don't we take a ten-minute

19    break and we'll be back at that time.

20         (A break was taken at 10:00 a.m. and the

21    following commenced at 10:10 a.m.)

22         THE COURT:  Who was trying to get my attention

23    on Zoom before we --

24         MS. CLEMENT:  Anitra Clement, but I was hoping

25    to talk to you off the record.

1          THE COURT:  I don't like doing things off the

2     record unless everyone agrees to it.

3          MS. CLEMENT:  Okay.  That's fine.  It can be

4     on the record.  But the last motion was the only

5     motion I was going to argue and I know you have a

6     rule on your website that we need to attend on

7     video.  I was hoping I could just go off video and

8     listen in since that was the last motion for me.

9          THE COURT:  Okay.  That's fine.  Thank you.

10         Let's move on to the Group 2 or what you all

11    were calling the Group 2 motions.  And we've got

12    Janice Logan's Amended Motion to Determine Value

13    and Advance Entire Case to Trial, which the Amended

14    Motion is at DIN 827.  There's a request for

15    judicial notice at DIN 828, a response at 858.

16         There's the Jon Logan and Smart Communications

17    and Yacht and those folks' motion to basically

18    Continue the Trial.  And then we have the HLFIP --

19    or, actually, Jon Logan's is at DIN 843.  The

20    response is at 856.

21         Then we have the HLFIP Holdings' Motion to

22    Amend the Trial Order and Continue the Trial.  And

23    then that's at DIN 852 and the response at 856.

24         I think what we probably need to do is just to

25    kind of have a discussion first about the progress

1    of the case, what's being tried, and because of the

2    judicial dissolution and the buyout, what actually

3    would go away, if you will, once there is a

4    determination on value.

5         And these are just preliminary thoughts.  I

6    certainly am -- these are not rulings.  I'm just

7    conceptually telling you where I am in my mind

8    right this second to help you understand and make

9    your arguments a little bit more clear.

10        With respect to the issue of the valuation

11   date, obviously the statute sets fourth a specific

12   date and I know that this side of the room is

13   seeking an earlier valuation date.

14        I am -- I know I've got that authority.  I

15   just don't know how I can do that without having an

16   evidentiary basis to do it.  Meaning, I either do

17   it in a trial or maybe even a pretrial issue where

18   we determine the date.

19        It seems like if we -- there's now two dates

20   in play:  The statutory date, and the date that

21   this side of the room is suggesting.

22        So, in my mind, I'm wondering if the valuation

23   folks can just give us two, you know, two

24   valuations and we would try the issue of "what day"

25   at the same time as the "what's the valuation".

1        Now, I think the difficulty is, as we were

2    just talking about at the motions to dismiss, is

3    what to do with the IP portion of the valuation,

4    because if there is an IP agreement, if you will,

5    from, was it 2015, then I suspect that's going to

6    impact the valuation analysis.  I'm assuming it

7    would.

8        And so I don't know if the folks that are

9    doing the valuation -- and I'm assuming, but don't

10   know this to be true yet because we haven't seen

11   the pleadings, but I think the IP thing is going to

12   be a binary choice.  It's either there was the

13   agreement or there wasn't; right?  The license.

14   There was.  But maybe not.  There could possibly be

15   some sort of gradation.

16       So my thought process is is there a way that

17   we can try the valuation on both dates with a

18   discussion and addressing what to do with the IP

19   case?  I mean, to me, that's the core of what has

20   to happen.

21       I think a good number of the claims are going

22   to go away.  I think there's going to be some other

23   claims that are going to remain, probably the

24   Alexis and Justin claims, because I don't think

25   that those are wrapped up in the valuation.  Maybe

1       I'm wrong on that.

2            So I would like your thoughts on to what is it

3       we're going to try?  And I know I've got

4       Mr. Johnson's motion -- I'm sorry --

5       Mr. Schoenfeld's motion to try everything in

6       advance on the docket and things like that.

7            One other thought process, and one of the

8       reasons why I was checking the Second DCA is in my

9       mind I've been mentally preparing for a four-week

10      trial in the July trial period in a Manatee case

11      that I have been specially assigned to that has

12      several cases up at the Second DCA that I'm waiting

13      for them to respond so I can say "go" and as of

14      this morning, they haven't said "go" to me yet.  So

15      I don't know, ultimately, if that July is going to

16      work.  But in my mind, that's where I put that

17      four-week trial.  The parties don't know it but

18      that's where I put it.  And it's a 2016 case that I

19      have recently been specially assigned to.  It

20      has -- that case is going to take priority over

21      pretty much everything else in my other case

22      repertoire right this second.

23           So those are my thoughts.  So who wants to

24      just start talking about issues?  And if you just

25      get to the lectern, it's probably a little bit

1        easier for the folks on Zoom to hear.

2            MR. SCHOENFELD:  Thank you, Your Honor.  We

3        appreciate the Court's sharing its preliminary

4        thoughts, and we have thought about all of these

5        issues.

6            In fact, when we first proposed a 7-day trial

7        to be held at the end of January and into February,

8        we expressly contemplated that these issues might

9        be such that the Court would want to hear evidence

10        on the valuation date.  And we -- so our experts

11        are preparing on both dates.

12            We brought this motion now and, you know, put

13        it on the calendar for this hearing really to give

14        the other side fair notice of what we contend

15        should be the valuation date.

16            And we understand the Court's view that it may

17        be best to do this in an evidentiary hearing.  And

18        we're prepared to do that.  And we're prepared to

19        do that in January into February on the current

20        schedule.

21            And the dissolution of the temporary

22        injunction really makes it much more urgent to

23        Janice, in particular, to get that hearing, you

24        know, to have that trial held as scheduled.  That

25        was in our contemplation that it might involve

1    these questions.  We think that it can be

2    addressed.

3         The Court is absolutely right.  The valuation

4    experts can look at both dates.  They can look at

5    how the valuation would be affected by the validity

6    or invalidity of the IP transaction and any others

7    that might affect it.  Those are all well within

8    their capability and it's things that, frankly, our

9    experts are already thinking about and working on.

10   So we are -- we would be good with that.

11        And to answer the Court's question about

12   how -- you know, what would -- you know, what would

13   happen to the trial, we were going to suggest the

14   same thing Your Honor did and that is that there

15   are claims here that do not have to be tried with

16   the valuation claims.

17        Our view of this is that all of the claims,

18   the valuation claims, the valuation issue, and the

19   claims by and against Janice and the Trust, those

20   claims have to be tried together because, as was

21   discussed earlier, they would essentially merge

22   into the valuation judgment, and so they do have to

23   be tried at the same time.

24        The claims against Jim's estate don't have to

25   be tried now.  The claims against Janice -- or I'm

1    sorry -- Alexis and Justin Peterson certainly do

2    not have to be tried then.

3         THE COURT:  Well, what I don't know -- and

4    this is going to sound pretty crude and it's not

5    meant to be, but with the numbers for the valuation

6    that have been thrown out on both sides, I don't

7    yet have a handle if your-alls claims against them

8    is more in the de minimis standpoint, right?  I

9    just don't know.

10        Are we talking millions and millions, or are

11   we just talking hundreds of thousands?  In other

12   words, is it going to have any material impact on

13   the company valuation regardless of the date?  And,

14   see, that's what I don't have a handle on.

15        Because if it materially impacts the valuation

16   of the company, then we might have to deal with

17   that issue within the valuation.  But if we're in

18   the realm of rounding errors, maybe we don't have

19   to.  And I just don't have an appreciation yet as

20   to what those claims are.

21        MR. SCHOENFELD:  I would defer to Mr. Johnson

22   on this, but I cannot conceive -- and I suppose to

23   the other side -- I cannot conceive of any way that

24   the claims against Alexis and Justin could affect

25   the valuation.  They're completely independent,

1      unless I'm just completely missing something.

2          The claims against the estate don't affect

3      valuation, per se.  The value will be what it is

4      based on the Court's findings as to the value of --

5      the fair value of Janice's shares, perhaps affected

6      by the claims that she's brought and the claims

7      that have been brought against her.  And those do

8      have to be decided and will merge into the

9      valuation judgment.  That's what has to be decided

10     in the valuation motion.

11         The claims against Jim's estate, frankly,

12     they're an offset is how they're -- that's their

13     function in the case and I'm speaking for the other

14     side based on how I see it.

15         They would argue, I presume, that those claims

16     against the estate would offset the value of the

17     company.  But it doesn't -- or the value of the

18     shares.  It doesn't effect the value of the shares.

19     It would be a claim against the value that the

20     Court awards to Janice as the fair value of her

21     shares adjusted by the outcome of these claims.

22     But it's a separate -- it's a separate claim.  It's

23     not the valuation.  It would be, as I say, they

24     would argue an offset.  We dispute that.  But I

25     think that's what it would be.

1          THE COURT:  Well, let me ask this:  Because on

2     the valuation that's in front of the Court, are

3     there any of these other claims that there's a jury

4     component to that we're going to have to address?

5          MR. SCHOENFELD:  To my knowledge, there is no

6     claim here that would be under the current

7     pleadings tied to a jury.

8          THE COURT:  Okay.  Well, let me hear from the

9     other side of the room for a few moments about how

10     you are envisioning this.

11          MR. HILLSLEY:  Thank you, Your Honor.

12     Mr. Hillsley on behalf of Jon and Smart entities.

13          So as an initial matter, for the valuation

14     date issue, I think there are -- Your Honor

15     correctly encapsulated what the choices are.

16          We can either decide, presumably today, that

17     the presumptive valuation date is the valuation

18     date, and we stick with that.  And, Your Honor, I

19     have a host of arguments for why you should do

20     that.

21          But the alternative, the only other option

22     effectively --

23          THE COURT:  Well, the statute says what the

24     date is and then I have to go out and would find --

25     I have to find certain things to change the

1    valuation date.  But I don't see how I can do that

2    without evidence or you all just agreeing this is

3    the proffer of what it's all going to be.

4         I mean, I suspect I know some of it already.

5         MR. HILLSLEY:  Your Honor, I agree.  Sorry.  I

6    didn't mean to interrupt.  I agree.

7         I think the choice before the Court is we

8    either stick with the presumptive valuation date or

9    there needs to be an evidentiary hearing where you

10   can hear, you know, sort of the facts, including

11   what the experts will do with it, with the

12   alternative date, and what the impact will be and

13   why you should consider an alternative date in

14   order to make findings of fact fundamental for that

15   determination and that is either a separate

16   evidentiary hearing or it's done at trial.  Those

17   are really the only ways.  It's too monumental.

18   The impact on valuation is huge.  And, frankly,

19   none of us here are the right people to tell you

20   what that is.  It's our experts.

21        And so that analysis needs to be done.  I hear

22   from counsel that they've already started working

23   on that analysis.  Your Honor, we haven't, and not

24   as a matter of being dilatory.  But because we were

25   already working on the concept of moving forward on

1        the statutory date, and we do not think it is

2        appropriate to move to February 2023.

3              Having said that, Your Honor, if you direct --

4        and I think this is a reasonable choice, but I

5        don't think it's the one you should make.  I think

6        you should stick with the statutory date, and,

7        again, I'm happy to speak on that.  But if you

8        decide to put that to an evidentiary hearing, then

9        we need to -- we need to direct our expert to

10       analyze that issue, the impact, and be prepared to

11       speak on that.  And we can't do that today.

12             THE COURT:  I think the part of the allure of

13       what the -- the Janice side, if you will, and using

14       that first filing date is it avoids all of the

15       post-lawsuit filing transactions that were told to

16       me were tax-related, you know, back when I was

17       first assigned to this.

18             So I understand why they're coming from where

19       they're coming from, but all I, basically, have

20       right now are assertions of fact from counsel and I

21       just don't think I could make that decision today

22       because I don't think I have the evidentiary basis.

23             I mean, obviously the statute is we start

24       with, you know, the day before the election, but

25       the statute contemplates a different date could be

1    used.

2         MR. HILLSLEY:  Your Honor, I'm happy to speak

3    because I view counsel's presentation and the

4    reasons for departing from the statutory valuation

5    date as a strawman, and I'm happy to walk through

6    for the Court why that is and why you can make that

7    determination today.  If you would like me to do

8    that, I will do that, because I think that is worth

9    the Court's time.

10        But, fundamentally, I do agree that if Your

11   Honor is at all inclined to depart from the

12   statutory valuation date, there's no way you could

13   do that today.  You need an evidentiary hearing and

14   a factual basis to make that determination.

15        THE COURT:  I guess I'm not inclined or not

16   inclined; it's I don't think I can.

17        And so -- but right now I'm only hearing --

18   it's either going to be one date or the other date.

19   I'm not hearing that there's any other possible

20   date on the spectrum that we need to be

21   considering.  So because it sounds like it's an

22   either/or at this point, then that might make it

23   easier for the experts.  I don't know.  I'm just

24   recalling here.

25        MR. HILLSLEY:  So maybe -- Your Honor, now I'm

1    thinking that I really should explain why we are

2    opposing this motion and present it to Your Honor.

3    Really there is -- there are other options and --

4    and it isn't a binary choice, necessarily, and I

5    feel like Your Honor needs at least that context

6    before you decide how you direct the parties to

7    proceed.

8        THE COURT:  Well, what are the other possible

9    alternatives that your side is actually advocating

10   for?

11       MR. HILLSLEY:  Well, sir, our position is --

12       THE COURT:  Statutory date, I know.

13       MR. HILLSLEY:  Yeah.  Yeah.  Okay.

14       THE COURT:  And then you want to be on the

15   statutory date.  Gotcha.

16       And -- but if -- if we depart, where are the

17   other landing spots?

18       MR. HILLSLEY:  So, Your Honor, if you

19   departed, it would be on the basis of exceptional

20   circumstances.  And one of the issues that I think

21   is fundamental here is that they've represented

22   that there are exceptional circumstances because of

23   the, quote/unquote, ouster of Janice from Smart.

24   That is fundamentally false and demonstrably so,

25   and I can establish it here right now.

1          But the real reason they've requested the

2     February 2023 valuation date is that they

3     believe -- and I expect that they've discussed this

4     with their expert -- they believe that generates a

5     higher valuation for Smart; not because of any kind

6     of misconduct by Smart, all of which even if they

7     could prove it, could be addressed in the

8     normalization process that both experts will engage

9     in to take this enterprise, which is a closely-held

10    company, and make it and its books reflect what

11    complete, independent running of the company looks

12    like.  That's the process they engage in so that

13    Your Honor can look at it and go, 'Okay, I

14    understand.  If there weren't any transfers to Jon,

15    if there wasn't any payments to Janice, if there

16    wasn't -- and none of that happened, this is what

17    the value of the company would be,' that's the

18    process.  That can be addressed without changing

19    the valuation date.

20         Now, Your Honor asked me a very specific

21    question.  What would be the exceptional

22    circumstance that we would view as warranting

23    departure?  Right?  Well, the exceptional

24    circumstance, the reason why their side takes the

25    position that a more recent valuation date is

1    harmful for them is because there have been

2    significant industry trends in this business that

3    have harmed Smart and all of its peers.

4         The Martha Reed Act, which was passed by

5    Congress and went into effect in January 2023,

6    permitted the FCC to engage significant rule-making

7    and regulations that capped prices for this

8    business for fundamentally all of their -- all of

9    their products.  So revenues go way down and

10   forecasts are massively impacted by that because

11   they're capped.  They're going to be able to charge

12   a fraction of what they've been charging

13   historically.

14        They want to stay away from that.  They don't

15   want the experts talking about that.  They know

16   that that has a massive impact on the value of

17   Smart.  And, again, that has nothing to do with the

18   conduct of any of the parties.  They can dodge that

19   if they get Your Honor to agree to an earlier date.

20        So a more appropriate date -- and there's case

21   law on this.  Like, for example, when courts have

22   addressed around COVID, this came up a ton, where

23   the court says, "Look, I get that you filed the

24   action in 2020, but does that really reflect the

25   value of the company?"  I mean, this is unique

1      circumstances, like a hotel.  Am I really going to

2      value the company on the fact that during COVID

3      there was no business?  Of course not.  Right?  So

4      the court departs outside of COVID and looks at the

5      value accordingly.

6           So here, if the Court was going to depart from

7      the statutory date, it would be to go forward to

8      address the fact that the FCC has capped the

9      revenue for this company, for our company and for

10     the other companies and, frankly, will have a

11     massive impact on this value going forward, putting

12     aside all the other issues.

13          So, Your Honor, we submit to you that you can

14     stick with the statutory date, and I'm happy to go

15     through why the ouster argument makes no sense

16     here, but if you don't, 100 percent agree,

17     100 percent agree that an evidentiary hearing is

18     warranted here.

19          THE COURT:  Mr. Johnson, did you want to chime

20     in?

21          MR. JOHNSON:  I would only weigh in on the

22     notion that handling the claims against Alexis and

23     Justin, if that was done separately, I don't think

24     that's an impediment.  I mean, I don't know the

25     magnitude of the claims because I haven't received

1    a more definite statement the Court instructed, but

2    I think in your vernacular, it's likely a rounding

3    error relative to the issues we're talking about

4    here.

5         I do want to be clear --

6         THE COURT REPORTER:  You need to talk into the

7    mic because they can't hear you.

8         MR. JOHNSON:  Yes, ma'am.

9         I'm trying to listen carefully to the

10   statements from Mr. Schoenfeld and Mr. Hillsley.  I

11   do think we need to come away from this hearing

12   with an understanding of what the different options

13   are and what the different valuation dates are.  I

14   certainly don't want to get to trial and --

15        Right now I understood the Court to be it's

16   either the statutory date or the date proposed by

17   Mr. Schoenfeld.  Everybody show up prepared to try

18   those two dates.  If it's something other than

19   that, I'd want to have a clear understanding, Your

20   Honor.

21        THE COURT:  Well, that's why I'm having this

22   discussion so I can synthesize.  I mean, you all

23   are living this.  You all know this case a lot more

24   than me.  You all are smarter about this than me.

25        I'm trying to just make sense and let everyone

1          know what is being tried and when it's being tried

2          so everybody is on the same sheet of music, because

3          I don't want there to be any surprises for anybody.

4                    MR. JOHNSON:  Yes, Your Honor.

5                    THE COURT:  And I guess going to -- I'm sorry

6          Mr. Johnson.

7                    Going back to Mr. Hillsley, is -- are you in a

8          position right now to say whether the claims

9          involving Alexis and Justin are going to have any

10         material impact on the valuation of the company

11         because I kind of need to know that information as

12         to how we're going to structure going forward.

13                   I mean, I'm not trying to suggest that a, you

14         know, hundred thousand or hundreds of thousand

15         dollar claim isn't an important claim; I'm just

16         trying to get the sense of whether we've got to

17         address that claim on the critical path of

18         valuation or if that's just can be addressed at any

19         time.

20                   MR. HILLSLEY:  So let me briefly speak to

21         that.

22                   So, first of all, I'm not prepared today to

23         make a representation about the total value of the

24         claim and then, accordingly, it's materiality.

25         Frankly, I would defer to my expert on that and

1      would want to get an analysis of that once

2      discovery is complete and we can sense whether

3      that's the case.

4           Having said that, Your Honor, fundamental to

5      your question, in my view, is that you're wondering

6      if bifurcation would allow this case to proceed in

7      the January/February trial docket and my

8      representation to you, Your Honor, is that it

9      doesn't; right?  That doesn't change.  There are a

10     host of reasons that I'm happy to walk through for

11     why that -- that can't happen.

12          THE COURT:  I mean, I understand you don't

13     want the trial, but it would seem like you would

14     know -- have some idea this is, you know, a

15     $100,000 claim, this is a $1,000,000 claim, this is

16     a $5,000,000 claim, and, you know, if we're dealing

17     with, you know, a six-figure claim, it probably is

18     not going to be material at all.

19          So do you have -- is this a six-figure claim?

20     Is this a seven-figure claim that you're making?

21     And that's really what I need to tease out of you

22     today.

23          And maybe what we do is we'll go to lunch

24     early, let you all have a chance to talk about it,

25     and then come back.

1          I have, right now, another judge doing first

2     appearances for me, so I don't have that issue that

3     I have to deal with today.

4          But I really need -- as we walk out of here

5     today, I need to have an understanding of what the

6     value of your claim is, and I think you probably

7     have some idea.

8          MR. HILLSLEY:  Specifically as to Justin

9     Peterson and Alexis Logan; correct?

10          THE COURT:  Correct.

11          MR. HILLSLEY:  So, Your Honor, I'll confer

12     with counsel and we'll see if we can ballpark that

13     in some form or fashion so Your Honor is equipped

14     with that information.

15          I would request, however, that we have the

16     opportunity to speak specifically on the Motion to

17     Amend the Trial Order and set the schedule because

18     there are some critical points that we have not

19     discussed today that I think animate that decision

20     for Your Honor besides the bifurcation issue.

21          THE COURT:  Okay.  Well, before we go to

22     lunch, I'll let you do that and maybe what we'll do

23     is do that now, and then go to lunch and then come

24     back and keep talking on this, and then we can do

25     the discovery in the afternoon.

1              Are there other issues that we have to address

2         other than the ones that are on the list that was

3         circulated last night?

4              MR. SCHOENFELD:  No, Your Honor.

5              I just want to make one real quick point.  I

6         have thoughts in response to Mr. Hillsley.

7              THE COURT:  Sure.  Come on down to the

8         lectern.

9              MR. SCHOENFELD:  I have thoughts in response

10         to Mr. Hillsley's argument that the Court can

11         decide on the statutory date today, that those may

12         be extraneous, I'm happy to share them with the

13         Court, or hold them for the time being.

14              THE COURT:  Well, I am -- unless you can

15         convince me that I can do this without evidence,

16         without an evidentiary hearing, I don't see how I

17         can rule on the valuation date today.

18              MR. SCHOENFELD:  And that's not what I'm

19         arguing.  That's what Mr. Hillsley is arguing.  And

20         that is that he -- his argument is that, as I

21         understand it, you could decide to use a statutory

22         date today.  I disagree with that.

23              THE COURT:  I don't think I can make that

24         decision today.

25              MR. SCHOENFELD:  Understood.

1          THE COURT:  I really think I need to have

2     evidence.  And unless someone tells me, 'Judge

3     Carroll, you can do this without evidence and

4     here's the case that says that,' we're going to

5     have to have evidence.

6          MR. SCHOENFELD:  Then I'll hold my comments

7     unless the Court asks for them later.

8          THE COURT:  Okay.  So I guess the ball's back

9     in your court, Mr. Hillsley, about the other issues

10    that you feel we need to address and the timing of

11    trial.

12         MR. HILLSLEY:  Thank you, Your Honor.

13         So this is DIN 858.  That's the Smart Parties

14    Motion to Amend the Trial Order and Continue the

15    Trial.

16         Your Honor, I'll briefly describe the ask, but

17    I think you've characterized it already.  We've

18    requested that the Court continue the trial from

19    the January/February trial period to Your Honor's

20    July trial period or the next available thereafter,

21    which I recognize that may be the case if that

22    other case goes forward.

23         In addition, when the trial date was set

24    during the summer, the parties were contemplating,

25    as we've been discussing, a valuation trial only.

1          And even if we carve out the Justin Peterson and

2          the estate of Jim Logan's claims, we presently have

3          39 total claims in the case.  And a realistic

4          estimate at this point would be that we need at

5          least two weeks.

6               I think that there is -- there is no sense in

7          rushing off to a trial than having to continue it

8          for another trial period months' out, or however

9          Your Honor chooses to deal with it.

10              Currently, there is no way to move forward

11         with seven days only.

12              Now, I have to -- I have to start with the

13         point that this is our -- this is, literally, our

14         first motion for continuance and there is more than

15         ample good cause to grant it.

16              I don't think I probably need to engage in a

17         discussion of the histrionics and the opposition,

18         but I will briefly, which is to say that this is

19         not a case where the parties or counsel are being

20         dilatory.  We've all been doing this a long time

21         and we know what dilatory conduct looks like in a

22         case, and this isn't it.

23              These cases are being aggressively litigated.

24         Your Honor may see the docket alerts.  We're filing

25         motions and discovery and whatnot almost every

1      single day.

2           The parties have -- since the Case Management

3      Conference engaged in significant discovery, my

4      clients, themselves, have produced literally tens

5      of thousands of documents since the Case Management

6      Conference.  And I guess I won't say anything more

7      about that part of it unless Your Honor thinks you

8      need more information.  I will move forward to the

9      main reasons why we need a continuance.

10          The issue is that the parties are entitled to

11     an opportunity to fully present their cases and

12     that cannot happen starting in January and

13     February.

14          Twenty-six of the 39 claims are new, and some

15     of them are still not even at issue.  They won't be

16     at issue until a couple of weeks in December.

17          In addition, while discovery has been

18     proceeding at pace, Ms. Logan's side has served

19     over half a dozen new sets of discovery totaling

20     well over a hundred new requests in the last month

21     alone.

22          THE COURT:  The valuation can't -- I know

23     there is a request to try everything from Janice,

24     but can't we just focus on the valuation and once

25     we deal with the valuation, most of those other

1      claims are just going to go away because they're

2      being folded into the valuation and --

3          MR. HILLSLEY:  So, Your Honor, I believe you

4      answered your own question.

5          THE COURT:  -- it just doesn't seem -- it just

6      seems like our path is a lot shorter than it

7      ordinarily would be.

8          MR. HILLSLEY:  So this is -- I'll cut through;

9      right?

10         The point is that the experts need to take the

11     various inputs from fact discovery:  It's the

12     documents, it's the depositions, and so on and so

13     forth.  And use them to do their analysis.  Those

14     are the inputs.

15         They also, obviously, need the direction from

16     Your Honor, presumably from today, on what they're

17     analyzing.  Are they analyzing February 2023,

18     May 2024, both, another date?  And so they need

19     that information to create their reports.

20         We don't have -- the fact discovery is not

21     done.  Depositions aren't done.

22         All of those issues that you're talking about,

23     Your Honor, they all -- I think I could safely say

24     they almost all impact valuation.

25         So you heard from counsel for the Trust side

1    that one -- one way in which it could impact Your

2    Honor's order following the Phase Two trial is a

3    potential offset.  That's not the only way.

4        The other way is that certain of these

5    transactions that have been alleged, they need to

6    be clawed back as part of the normalization

7    process.  And I don't literally mean pulling the

8    money back in Smart.  I mean, Your Honor looks at

9    the claim, goes:  Okay, I think that's valid;

10   that's unjust enrichment.

11       And based on that ruling, you decide, okay,

12   the experts' portion of their report where they

13   say, I am excluding or including this asset or

14   liability, that is -- I'm checkmarking that and

15   that will then have a material effect, certainly in

16   the aggregate, on the value of Smart, and we can't

17   do this process, divorced from doing that analysis.

18   That is the normalization process of the financials

19   that must be done to reach the value.

20       And so while we have quite a bit of fact

21   discovery done, there's still a host of requests

22   that haven't been satisfied.  No depositions yet.

23   We have a bunch in December.

24       But there have been third-party depositions

25   noticed for people out of state.  Those need to be

1          domesticated.  That includes the outside CPA of

2          Smart, Mike Shreve, who I believe is in Michigan.

3          And so that needs to be domesticated.  He needs to

4          be heard.  I don't know.  I mean, we're about to

5          approach the holidays.  I don't know when that

6          deposition's going to be.

7              And so the point is that all of this needs to

8          be done first before the experts can complete their

9          analyses and we're effectively two months from

10         trial.  There's no way to do that.

11             I think that July is ambitious but doable.

12         You know, we put our foot on the pedal and get this

13         done, I think we can do that.  But I just don't see

14         any way.

15             I've asked my expert how long it would take to

16         complete the analysis.  The answer was a month from

17         having all the data.  We're just not there.

18             And following the reports, you've got expert

19         depositions and dispositive motions.  We've talked

20         about summary judgment today.  And there's just not

21         time to do all of that before trial.

22             THE COURT:  Let me throw a hypothetical out at

23         you.  And, obviously, this is not a ruling, but

24         just to kind of, in my mind, I'm trying to wrap my

25         arms around this.

1              Assume for the sake of argument that the

2        valuation date is as Janice suggests.  I suspect

3        because of the temporary injunction and historic

4        practices, there's been payments made to support

5        her for, you know, for that period of time after

6        that date that Janice Logan is wanting the

7        valuation.

8              That would seem to be a known number.  So why

9        is it that if we use that number, why do we even

10       have to worry about, you know, this thing that

11       happened later on versus just taking, Hey, she's

12       got paid $50,000, $500,000, whatever it ends up

13       being since the date of the valuation, and then

14       Smart gets a credit for all those payments made to

15       her or on her behalf, why is that just not the

16       calculation?

17             Why -- why do we have to make this more

18       complex than what I think it really needs to be, I

19       guess is the fundamental question?

20             MR. HILLSLEY:  Your Honor, I don't want to

21       step out of line because that question I would

22       actually ask my expert to answer for you.  But I --

23       my understanding is that we have challenged

24       transactions that go back well before either of the

25       proposed valuation dates, but then we have

1      transactions that allegedly occurred after.

2          And if your question is, okay, isn't it as

3      simple as building in or building out those assets

4      and liabilities in Smart, that may be the primary,

5      the primary task.

6          But I don't know -- as a practical matter, I

7      can't present to the Court how complicated that is

8      in piecing through all the different financials and

9      determining whether it's appropriate to include or

10     exclude various transactions.  I can't make those

11     representations to Your Honor.

12         But I can tell Your Honor that my expert

13     represents that it takes a month, minimum, to get

14     this done once they have all the inputs.  And I

15     just don't see how there is sufficient time between

16     now and the start of the trial date to get that

17     done.

18         And I'd add, Your Honor, that the other part

19     of this -- I think we've -- I know that we have

20     shown good cause for a continuance, but the other

21     portion of it is is there prejudice?  And the

22     answer is there isn't.

23         So put aside that Janice has been -- now it's

24     been reversed, has been paid improperly from --

25     from Smart for now well over a year.

1              Fundamentally, this case is about money;

2      right?  This is about how much money the Trust

3      should be paid for its shares.  And having had this

4      case active for over a year, there's no plausible

5      basis for a claim of prejudice for what effectively

6      is a fairly short extension of time to get

7      everything properly prepared to present to Your

8      Honor.

9              And I would further add that while the

10     temporary injunction was reversed, Your Honor still

11     has an injunction in place from the end of Phase

12     One that prohibits transactions, affiliated

13     transactions outside of the ordinary course.

14     That's in place.  That protects the other side from

15     any -- from any misconduct.

16             And, frankly, Your Honor, you don't have on

17     your desk a motion to address a violation of that

18     injunction.  There isn't one.  There are

19     allegations and characterizations and blanket

20     statements about misconduct, but not one single

21     concrete example of how this business has been

22     rated for value.

23             THE COURT:  And perhaps I probably should have

24     led off with this.  I mean, in my simple mind this

25     is -- it's not a family law case, but this is a

1        business divorce involving family members.  There

2        are lots of moving parts, you know, but I don't

3        think these family members are going to

4        Thanksgiving dinner next week with each other.

5            But the way I think I have to approach it

6        is -- since I've sent you all to mediation and

7        impasse, I'm not asking what happened -- is I just

8        need to keep making rulings and hopefully that

9        narrows whatever the delta is between the two of

10       you and maybe if I keep making rulings, that that

11       delta shrinks to some point where you all can then

12       make a business decision on how to effectuate the

13       departing of mom from son and sister from brother.

14           I mean, is that effectively what I should be

15       doing here or should I be doing something else?

16           MR. HILLSLEY:  So, Your Honor, I will let the

17       other side speak for their view on this, but I will

18       tell you that, fundamentally, in my view, the

19       parties are worlds apart and they're worlds apart

20       for a very simple reason.  Putting aside all the

21       other issues that will effect value, fundamentally

22       the issue is they contest the royalty impacts the

23       value significantly.

24           It's the most material factor; right?  And

25       without a determination from the Court on that

1        issue, the parties are just too far apart.  There's

2        no way to mold that view which no royalty, like,

3        what is the value of Smart with, there is a

4        royalty, what is the value of Smart.

5            THE COURT:  Yeah.

6            MR. HILLSLEY:  You just can't bridge that

7        crap.

8            THE COURT:  And I think that was kind of what

9        I was alluding to earlier when we came back from

10       break.

11           If we tried first the issue of the date and

12       the IP issue, does that then narrow the playing

13       field such that maybe you all can make a business

14       decision on a going-forward basis?

15           I mean, what -- what can I do to most

16       effectively help you all along?  Because I don't

17       think any of you want to be paying the battalions

18       of lawyers that are here both in person and on

19       Zoom.  No offense to the lawyers, but I suspect

20       they'd rather not be paying you.

21           MR. HILLSLEY:  Your Honor, I think you're

22       right.  Addressing those two issues, you know,

23       vastly narrows this case.

24           The problem, and what I submit to Your Honor,

25       is that that can't be done by January/February.

1          THE COURT:  Why not?

2          MR. HILLSLEY:  Because that's where the work

3     is.  And that's what both of those questions

4     require the expert analyses.

5          We need the expert analysis to make the

6     determination on the value of the company and what

7     is the appropriate date.  We need the expert

8     analysis -- both sides have hired experts on IP, so

9     to weigh in on those issues.

10          THE COURT:  Well, but if the question is what

11     is the date, I don't need the experts to tell me

12     the financial value or the financial impact.  It's

13     the extraordinary circumstances as to whether we're

14     sticking with the statutory date or doing something

15     else.

16          I don't need to make factual findings, do I,

17     as to 'If I go with this date, it's going to cost

18     this much money'?  It's just --

19          MR. HILLSLEY:  I misunderstood, Your Honor.

20     Yeah, I agree with you.  I think that can be done

21     before the other pieces.

22          THE COURT:  Right.  So do that.

23          And then the IP is -- was there a license or

24     wasn't there a license?  And that seems to be a lot

25     more targeted and focused.  And if that -- if that

1    helps address the delta between the parties the

2    most, then why don't we look at or can we look at

3    making that the focus of the January trial?

4         MR. HILLSLEY:  So, Your Honor, I think that's

5    actually -- that's a sensible suggestion.  I will

6    let HLFIP weigh in on the IP portion, but I

7    certainly think it's a sensible suggestion that we

8    address the valuation date at an evidentiary

9    hearing at that juncture because I think that needs

10   to move forward.

11        THE COURT:  Well, why don't we do this?  I'll

12   let you all speak.  And then we'll go to lunch.

13   And let you all have further discussion internally,

14   because I don't want you to put yourself into a,

15   'Well, you just said'.

16        MR. HILLSLEY:  Thank you, Your Honor.

17        THE COURT:  I want to give you a chance to

18   have some discussion internally with your battalion

19   of lawyers to come up with an answer.

20        But, Mr. Schoenfeld, I have been letting Mr.

21   Hillsley go for a while.  So why don't I let you go

22   for a little bit here.

23        MR. SCHOENFELD:  Your Honor, it's been very

24   informative to me, too, so no objection.

25        What I will refer to as the "Jon parties" have

1    been seeking through the latest trial as long as

2    we've been discussing the trial date.  They

3    resisted the date that the Court set initially and

4    they're back here again seeking to continue the

5    trial as they did previously.

6        And this Court has reaffirmed the trial date

7    three times, twice in direct response to the

8    pleadings that Mr. Hillsley was just lamenting he

9    hasn't been able to pursue.  Those pleadings could

10    have been filed months or even years ago.

11        The notion that their experts can't do the

12    valuation without discovery, I had to -- I thought

13    maybe I misheard him.  They have all of the

14    records.  They don't need anything from Janice.

15    They go on and on about how Janice has had no role

16    in the management of the company for at least two

17    years.

18        They don't need anything to do the valuation

19    work.  Though the work that Your Honor is

20    discussing, whether it's on the valuation date or

21    the actual value, they don't need anything.

22        And if their experts don't have the material

23    that they need, that's a strategic choice because

24    Smart and HLFIP have everything that their experts

25    need.  We don't.  HLFIP hasn't produced a single

1      document in this case.  And, yet, we're prepared to

2      go.

3           We'll abide by the Court's rulings on the

4      motions to compel.  We will get with the

5      information that we can and we'll go forward.

6           They don't need anything.  And if their

7      experts say -- instead of standing up here and

8      saying their experts can't prepare for a trial

9      that's been scheduled for months on information

10     that's been in their files the entire time, it just

11     makes absolutely no sense.

12          Even the computing valuation dates, as I said

13     when I first stood up here, we brought this up so

14     that they would know what our position was and so

15     that the experts could work to alternative dates.

16     And if that's the issue that we think should be

17     tried in January or February, then we'll be ready

18     for that, they can be ready for it, too.

19          The question here is what are the

20     circumstances that would militate for an

21     alternative date, then we'll be prepared to present

22     evidence on those facts.

23          The same would be true on the validity of the

24     IP, the transaction.  And I don't want to correct

25     the Court, but I would state it this way.  The

1        question is not a license.  The question is a

2        royalty fee.  And that is -- there is no evidence

3        that any royalty fee was ever discussed between the

4        companies prior to August of 2023.  But that will

5        be the issue, and I think that that can be tried in

6        February.  And there's absolutely no reason why the

7        Court -- the parties can't prepare for that trial.

8            To continue the trial, however, past that

9        date -- and we have serious -- I want -- I don't

10       want to -- we want to work with the Court and we

11       will work with the Court, but we've got some

12       concerns that I'm going to have to address in a

13       moment that we need some help with, we think, if

14       we're going to continue the actual valuation beyond

15       February.

16           But to continue the whole case in particular,

17       and even to continue, as the Court's floated with

18       us, would be a severe burden on Janice Logan,

19       particularly in light of the dissolution of the

20       injunction.

21           Jon has been bleeding her of cash for two

22       years now.  She's spent a year fighting off a

23       Shareholders' Agreement that the Court found to be

24       completely invalid.

25           She's pushed this case along and been -- and

1     had to overcome resistance.

2         We're still -- we have to spend money trying

3     to get HLFIP to produce the first document in this

4     case.  They haven't produced anything on a totally

5     spurious ground.  So we're still fighting all these

6     costs.  And this is the strategy is to bleed her of

7     cash so that she cannot continue the pursuit of a

8     fair price, a fair value for her shares.  That's

9     what we're up against.  And I'm just going to plead

10    with the Court, she needs a resolution.

11        We're cognizant of everything the Court said

12    about the need for a record and the time and

13    everything else.  We would ask the Court to give us

14    a shot at trying the value of the case, the

15    valuation case at the end of -- in February.  We

16    think -- as I mentioned when I first stood up here

17    on this issue, we planned for that.  When we said

18    seven days, that's what we were talking about.  We

19    think that can be done.

20        I think all of their complaints about not

21    having rulings on pleadings that they filed

22    belatedly in our mind, their experts not having

23    records that are in their own files, none of that

24    should justify delaying the full trial of this

25    case.  That's our principal ask.

1      But, you know, we will work to whatever

2   outcome, whatever decision the Court thinks is

3   feasible in this trial-setting period.  If that

4   involves any delay of the valuation judgment, we

5   are very, very concerned that we will see the same

6   thing you've seen repeatedly here:  More

7   manipulation of the files; more manipulation of the

8   records; more transactions.

9      We can't even conceive of what they may try

10   next but the pattern is crystal clear.  And because

11   of that, if this case has to go past mid-February,

12   we've cross-moved in response to the motions to

13   continue for the appointment of a custodian to

14   ensure that no more records are doctored, no more

15   are altered.

16      And let me address a point Mr. Hillsley made

17   on that point.  Said we haven't pointed to

18   anything, any changes in the records that resulted

19   from this alteration process.  Not true at all.

20      The 2020 financials issued in, I think it was

21   October 23 of 2023 for 2022, suddenly referred to

22   the IP transaction, whereas no prior financial

23   record had ever acknowledged, ever said anything

24   about royalty obligation.

25      Suddenly, it was at that point a $76 million

1      obligation and it's gone up from there.

2          So they are changing the facts of the case as

3      we speak, and we need a custodian to put an end to

4      that if this case is going to go past mid-February.

5          THE COURT:  A custodian to do what?

6          MR. SCHOENFELD:  To ensure that they stop

7      changing these records, that they don't --

8          THE COURT:  Well, if I rule that -- whether

9      you want to call it a royalty, a license, a

10     contract, an agreement, a figment of Jon Logan's

11     imagination, however, you want to characterize it,

12     if I were in the trial period that this case is

13     set, say, 'That was a valid transaction' or 'That's

14     not a valid transaction', then you got the answer

15     on that and then the experts can value it

16     accordingly.

17         So why is that not the simple and elegant

18     solution?

19         MR. SCHOENFELD:  As to that specific

20     agreement, I would agree.

21         But let's bear in mind, the genesis of that

22     agreement for a year prior to last January, Jon

23     insisted that there was a Shareholders Agreement

24     that required Janice to sell on unfavorable terms.

25     And when this Court ruled against him on that and

1      held it was invalid, that's when we saw the

2      creation of this agreement and the Delaware

3      corporations and the transfer of assets, the

4      beginning of signed contracts.

5          THE COURT:  And I hear your exceptional

6      circumstance argument.  I -- I get you on that.  I

7      understand it.

8          But I guess I came in this with is the

9      valuation date a binary so that, you know, I can --

10     I think that it's probably doable for an expert to

11     come up with two different valuations on two

12     different dates.  But every time that there is

13     another "What if this" and "What if that" when you

14     have a material impact on the valuation of the

15     company, then now are we asking the experts to come

16     up with three, five, six, ten different valuations

17     under ten different scenarios?

18         At what point does it become unworkable for

19     the experts and what you have to present at court?

20         MR. SCHOENFELD:  I disagree with Mr. Hillsley

21     that some of these claims about whether it's

22     Janice's claims against Jon for fiduciary --

23     breaches of fiduciary duty, his claims against

24     Janice, that those are valuation claims.

25         It is true that those claims have to be

1        resolved now because of the merger of those claims

2        into the valuation, but they don't have to -- the

3        experts don't have to do multiple analyses.

4            I think the Court was right on when it asked

5        Mr. Hillsley:  Couldn't we just do -- get the

6        valuation ruling based on the actual fair value and

7        then you have to normalize some things and so

8        forth?  But the experts will do that and present

9        that to the Court and we'll argue about it and the

10       Court can decide that.

11           And then these other claims that have to be

12       addressed because, otherwise, they will be lost,

13       would be at a credit or a debit against that

14       valuation in the judgment.  They don't have to

15       be -- you know, they don't have to produce multiple

16       iterations of a valuation opinion from the experts,

17       and, ultimately, they don't have to effect the

18       Court's fair value judgment.

19           It's simply the ultimate judgment coming out

20       of that because of these other claims would be

21       increased or decreased by the net effect of those

22       claims.  It doesn't have to require that they hold

23       new valuation analysis.

24           THE COURT:  So let me see if I can articulate

25       what you just told me and make sure I understand.

1          You're suggesting we do the valuation and if

2     there is some of these ancillary claims that may

3     impact valuation, we could try those later and,

4     let's say, Oh, that's a breach and that's, you

5     know, a $50,000 claim, the valuation that was

6     previously found by the Court just gets adjusted

7     by, presumably, the 50 percent of the $50,000

8     claim?

9          MR. SCHOENFELD:  I am not advocating for doing

10    it later because of the fact that if the Court

11    enters a judgment on that issue, that then those

12    claims would merge into that judgment and I

13    don't -- I'm not confident standing here telling

14    the Court that could be tried later.

15         They could be tried at the same time.  You

16    don't have the experts; they don't have to be

17    involved in this.  That's simply a question of, you

18    know, the Judge or the Court will make findings and

19    conclusions on those specific claims, and then

20    deduct the credit accordingly from the valuation,

21    from the fair value judgment.

22         THE COURT:  Would I even have to or would that

23    just get wrapped into the value of the company

24    and --

25         MR. SCHOENFELD:  Well, I suppose the Court

1    could look at it that way, but I don't think it

2    requires the experts, I guess, is the bottom line.

3    How exactly the actual judgment is structured, we

4    can, you know, work on that.  But the larger point

5    of this, it doesn't have to affect the experts'

6    work.  So we are not looking at having the experts

7    produce an infinite number of opinions based on how

8    these different claims might come out.

9         THE COURT:  Okay.  Why don't we take lunch.

10   Let you all talk some more, and we'll come back.

11        I feel we're going to be trying some aspect of

12   this case in January.  When I say the "January

13   trial period" it's really at the end of January.

14        And it seems, at a minimum, it would be the

15   valuation date and the issues relative to IP and

16   whether it's including or excluded from within the

17   calculation, I think, at a minimum.  There could be

18   other things, but that's where my head is right

19   this second.

20        I do want to give you all a chance to talk

21   amongst yourselves and get your teams to kind of

22   fine tune.

23        But I also kind of feel like once I get to it,

24   the valuation, that most of these claims are going

25   to be wrapped up into the question of valuation.

1            I think the Alexis and Justin is a side issue

2       that we have to understand the magnitude or lack of

3       magnitude relative to the valuation component.  So

4       if you could effort that over lunch, I think that

5       would be helpful in helping us figure out how we're

6       going to proceed.

7            MR. SCHOENFELD:  Very well.  Thank you.

8            THE COURT:  Anything else that anyone wants to

9       say before we go?

10           Now, because I've kind of laid some homework

11      on you, why don't we take a little bit longer.

12      Come back at, say, 12:45.  Give you an hour and a

13      half.  Does that work for everybody?

14           I'm sorry.  I haven't been looking at the

15      folks on Zoom.  Does that work for you all on Zoom

16      as well?

17           Madam Court Reporter, is that okay?

18           THE COURT REPORTER:  Yes.  Thank you.

19           THE COURT:  We'll be in recess until 12:45.

20      Have a good lunch.

21           (A lunch break was taken at 11:15 a.m. and the

22      following commenced at 12:47 p.m.)

23           THE COURT:  Okay.  Please be seated everybody.

24      Let me get everything started here.

25           We're back from lunch.

1              Mr. Harwin, are you able to hear me okay, sir?

2              MR. HARWIN:  Yes, Your Honor.

3              THE COURT:  Thank you.

4              Well, let's pick back up where we left off now

5       that we have had lunch and had the -- attorneys had

6       a chance to caucus amongst themselves.

7              Who wants to start talking?

8              MR. SCHOENFELD:  I would be happy to.

9              THE COURT:  Mr. Schoenfeld, you stood up

10      first.  So come on down.  You're the next

11      contestant.

12             MR. SCHOENFELD:  Thank you, Your Honor.

13      Appreciate it.

14             We are very appreciative of the Court's

15      creativity and flexibility on this.

16             And we have a suggestion that may enable us to

17      make the best possible use of the current January

18      trial schedule with the Court's approval.

19             And it's driven largely by the concern I

20      raised earlier that this is -- this litigation is

21      draining Janice very badly, bleeding her.  And we

22      are very concerned that if we try the selection of

23      the valuation date and the IP transaction validity

24      only in January and February, I may be wrong here,

25      but I would be willing to bet lunch that we're

1          going to hear that the other side's not available

2          for the next two trial settings.  We're into July.

3          The Court has conflicts there.

4                  THE COURT:  Potential conflicts.

5                  MR. SCHOENFELD:  Potential conflicts.  I

6          appreciate that.

7                  THE COURT:  Have to wait on the second.

8                  MR. SCHOENFELD:  Understood.

9                  But we may be well into August or September by

10         the time we get to the next phase of this hearing.

11                 THE COURT:  Then don't forget Mr. Oprison's

12         October trial in another matter.

13                 MR. SCHOENFELD:  Uh-huh.  Understood.

14                 And so that just heightens our concern about

15         the time this would take.

16                 So our proposal is this, and we think this can

17         get the entire case done, take advantage of

18         scheduling issues that we have been viewing as a

19         problem, and maybe use them as an opportunity to

20         get the entire thing done in January and February.

21                 Now, we're told that Mr. Sly, the Jon party

22         expert, is unavailable the first week of the trial

23         setting.

24                 He is not needed, I think, for the trial that

25         has been delineated in these discussions of the

1        validity of the IP and the, you know, the choice of

2        a valuation date.

3             I think we could try that in the first week of

4        the trial setting without the experts.

5             The experts can work to two alternative

6        scenarios.  The IP is valid; the IP is not.

7             I suppose it could be four:  IP is valid; IP's

8        not; valuation date is 2024; valuation date is

9        2023.

10            Have a week in between to adjust their --

11       their opinions, come back, and try that valuation

12       case the final week of that trial setting.

13            THE COURT:  Just let you know, as we sit here

14       right now, I still have 112 cases set for trial

15       that trial period.

16            MR. SCHOENFELD:  I understand.

17            THE COURT:  Okay.

18            MR. SCHOENFELD:  And we make this suggestion

19       entirely cognizant of that possibility.

20            But that is our proposal.  We're very

21       concerned that -- and this could be obviated.

22            THE COURT:  Well --

23            MR. SCHOENFELD:  I'm sorry.

24            THE COURT:  Go ahead.

25            MR. SCHOENFELD:  This could be obviated if the

1      other side steps up and says, you know, we can try

2      the rest of the case in May.  We still have

3      concerns about the need for a custodian or other

4      issues, but those can be dealt with.

5            If we're talking about going out to August or

6      later, I ask serious consideration about the

7      proposal.

8            THE COURT:  Thank you.  Mr. Hillsley.

9            MR. HILLSLEY:  Thank you, Your Honor.

10           So, first, I owe you a representation about

11     Alexis Logan and Justin Peterson, so I'll start

12     there because it's simple.

13           Without waiver, obviously, and fully reserving

14     our rights.  Based on our current knowledge, I can

15     represent to the Court that we expect those claims

16     to be valued in the six figures.  Obviously, I'm

17     not making a representation about the impact of

18     that on any valuation analysis from the experts,

19     just that the total figure, the total amount for

20     those claims will be in the six figures.  I can

21     make that representation based on our current

22     knowledge.

23           Turning to the more critical issue, before

24     I -- well, I guess maybe I'll start with what you

25     had presented to us, Your Honor, is the question.

1    Smart Comm can agree to an evidentiary hearing

2    during the currently-set trial period on the

3    appropriate date to use for valuation.  We've

4    discussed it.  We think that can be done.

5        As we noted in our papers, our valuation

6    expert did have a conflict during that first week.

7    Specifically, Rob Sly had had a trial reset for

8    January 28th through the 30th.  So if we do proceed

9    with this, our request would be that it would start

10   in the first week of February, if possible.

11   Obviously, the trial period goes through, I think,

12   the second week of February.  So, you know, we

13   would obviously also make ourselves available for

14   that as well.

15       I will defer to counsel for HLFIP on the

16   feasibility on the IP aspect of this which they're

17   handling, and I'll let them speak to that because I

18   know they haven't spoken to the Court at all so far

19   today on this issue.

20       But let me briefly respond to the proposal

21   from Janice's counsel.  I have to take issue with a

22   couple of statements, and I'm going to try and do

23   this without any showmanship or histrionics.

24       But the sort of representation or, I guess,

25   suggestion is that counsel from our side of the

1    table are going to engage in shenanigans to try to

2    keep us out of court.  I almost feel like I don't

3    need to address that, but, Your Honor, I can

4    represent to you that that is not going to happen.

5    If we have legitimate conflicts, we'll disclose

6    those to you, Your Honor.  Otherwise, we will be in

7    court when this case is ready to go and we won't

8    make up any suggestion for a reason not to do that.

9         And I have to point out that the suggestion

10    that our side is trying to delay this, denies

11    reality, which is that Smart Comm has been trying

12    to purchase the Trust shares for years, before this

13    case was even instituted.

14         The reason this case was instituted was

15    because the Trust declined to sell the shares.

16    Sure, I understand the objection about the

17    Shareholder Agreement, but there were other

18    proposals including everybody picking their own

19    valuation experts, coming together and saying if we

20    can agree, then there could be a third party

21    appointed, so on and so forth.  And I don't have to

22    get into all that.

23         But the point is that it is absolutely false

24    that Smart Comm has been trying to avoid this.

25    We're the ones who elected to purchase shares, who

1      initiated this portion of the case.  So that is

2      just not accurate.

3          Similarly, this concept about draining

4      resources.  That is at Janice Logan's own choice.

5      She is the one who has made this into the scorched

6      earth case.  It could have been the straightforward

7      valuation case.  That is not what it is anymore.

8      Her 39 claims in this case, because we have had to

9      go back and forth, there is no innocent party with

10     respect to that.

11         And, further, and I don't want to belabor the

12     point, but Smart has been funding Janice Logan for

13     over a year pursuant to a temporary injunction that

14     has now been removed.  And so the representation --

15         THE COURT:  Well, the Second has ruled that

16     temporary injunction remains until it comes back

17     down.

18         MR. HILLSLEY:  You're right, Your Honor.  It's

19     reversed and remanded.  I apologize.

20         The point is that Smart has been -- it is

21     absolutely not the case, that Smart has caused some

22     drain on Janice Logan's resources.  That just isn't

23     what's happened.

24         And, yes, this litigation is expensive.  And

25     yes we all want it to stop.  But we can't go to

1    trial until everybody's ready because that's the

2    only way to get a fair outcome here.

3         Thank you, Your Honor.

4         THE COURT:  Mr. Oprison?  Come on down, sir.

5         MR. OPRISON:  Thank you, Your Honor.

6         Your Honor, so we've heard a lot over the last

7    hour or so about what can be done between now and

8    January, what can be done in January.

9         I have to go back to our position that we

10   articulated in our motion to continue the trial,

11   and the objections we raised back when we were

12   first at a status conference with Your Honor four

13   months ago.

14        We just brought -- we were just brought into

15   this case.  I'm going to disagree with my friend

16   and co-counsel, Mr. Hillsley.

17        I don't necessarily think that there is no

18   innocent parties.  I know for a fact that HLFIP

19   hasn't been involved in this for years.  We just

20   came in a couple months ago.

21        There's been no discovery.  They're going to

22   say it's because we haven't produced any documents.

23   We're going to say there's an easy way to get over

24   that hump.  Just approve our protective order

25   that's got protections in it for our IP.  That's

1      what we do.

2          No depositions taken.  There's depositions

3      noticed.

4          There's no expert report.  There's experts

5      that have been retained; we're working on that.  So

6      there's no expert depositions.  So if you're going

7      to do anything related to a valuation date or a

8      valuation in January, would seem to be sort of

9      predicate steps.  You would need to probably have

10     those.

11         THE COURT:  What discovery has to happen to

12     determine -- I don't know if you want to

13     characterize it as a license, a royalty, a

14     contract?

15         I mean, what really has to be done?

16         MR. OPRISON:  Well, Your Honor, there's

17     questions -- there's predicate questions about

18     whether or not -- I mean, Ms. Alexis Logan disputes

19     whether or not the contract that we have that

20     they've acknowledged exists is actually valid and

21     actually vests the ownership interest in Jon such

22     that he can collect royalties on that IP.  There is

23     more than just the, you know, a one patent.

24         There is a number of different IP no how/show

25     how technology that's at play here.  So we have

1        to -- we have to have somebody that's going to be

2        able to look at all that and say that it's got

3        value, it's protectable, and that it's in the hands

4        of and subject to a royalty and a license.

5            THE COURT:  I'm not -- I'm not -- and maybe --

6        maybe I was unclear before, and I apologize if I

7        was unclear.

8            I'm not asking for a valuation of the IP in

9        January.  What I was wondering is why can't we

10       resolve whether there's, you know -- whether that

11       transaction actually occurred or whether there was

12       or was not a royalty agreement, and to me that

13       seems like something that could be done probably

14       next week if we absolutely had to.  It doesn't seem

15       like it requires that much discovery to get to that

16       one issue.

17           Help me -- help me understand what specific

18       discovery we have to get to the fundamental

19       question of whether there was an agreement, a

20       royalty agreement, a license agreement, whatever

21       you want to call it.

22           MR. OPRISON:  Well, first of all, there's

23       depositions that need to be taken.  We didn't

24       notice those depositions.  We can certainly cross

25       notice them.

1        But the problem is we're going to have to find

2    other dates because we've got conflicts on the

3    dates that they've noticed them.  So we're going to

4    have to find our own dates to depose these folks or

5    just rely on the transcripts.  And not that we

6    don't have competent counsel, but, I mean, we have

7    discovery to take in that respect.  We have to get

8    documents from the other side which we have not

9    gotten because we haven't propounded our own

10   discovery.  There's motions pending.  So it could

11   very well be --

12       THE COURT:  I guess I'm asking us to sharpen

13   the pencil here.

14       MR. OPRISON:  Right.

15       THE COURT:  And tell me what -- let's start at

16   this:  Is this a written agreement or is this an

17   oral agreement?

18       MR. OPRISON:  Well, it was an oral agreement

19   and then it was a written agreement, Your Honor.

20       THE COURT:  When did the writing occur?

21       MR. OPRISON:  I believe in 20-- 2017, I

22   believe, is the date.

23       2023, Your Honor.  There was an oral agreement

24   and then there was a written agreement later on in

25   2023.

1          THE COURT:  So who are the parties to the oral

2     agreement?

3          MR. OPRISON:  It would have been Jim, Alexis

4     and Jon.

5          THE COURT:  So two people are still alive;

6     one's not with us anymore.  So, okay, you got that.

7     You've got some discovery on the written document.

8          What else is there to do relative to whether

9     or not back in, was it 2015, there was an oral

10     agreement --

11          MR. OPRISON:  An oral license, right.

12          THE COURT:  -- maybe some -- some notations in

13     the books and records or the absence of notation in

14     the books and records?

15          I mean, what is it that we are going to be

16     presenting to the fact finder on this issue?

17          MR. OPRISON:  Well, I think there's -- I mean,

18     in my view, Your Honor, I mean, you can -- you can

19     take a surgical knife to it and say, "This is all

20     that's going to be at issue," but we all know when

21     you go to trial, there's other things that come

22     out.

23          We want to go in and be able to effectively

24     try our case and protect our client's interests.

25     And in order to do that, we're going to have to

1    come in and play catch-up.  We have been playing

2    catch-up.

3        We've been now trying to do what's HLFIP's

4    furthering its interest and trying to get an expert

5    from BVI to look at these and provide a report and

6    an opinion, but that's not -- that's not for weeks

7    out.

8        THE COURT:  And who is the -- and is Jon Logan

9    the 100 percent shareholder of HLFIP?

10       MR. OPRISON:  He is the sole member of that

11   LLC.

12       THE COURT:  Sole member.  Okay.  And so is he

13   the officer and director or whatever?

14       MR. OPRISON:  He is.

15       THE COURT:  Okay.  So, again, I'm just

16   wondering what there actually has to be done in

17   discovery that would make us not be able to try

18   that issue in what I call the January trial period,

19   but it's at the end of January.

20       MR. OPRISON:  Now, just to be clear, are you

21   talking about determining a valuation date?  The

22   dispute between them going back to '23 and us

23   looking at '24, or are you talking about ownership

24   issue?  Those are two separate issues and I think

25   that's going to be much more involved.

1          THE COURT:  The valuation date of the company

2      is one issue.

3          The next issue is whether or not there was an

4      agreement back in, what was it, 2015 that appears

5      to have been documented in 2023 relating to whether

6      or not there was an agreement between HLFIP and the

7      Smart entity for the payment or a license and the

8      terms of the royalty agreement that Jon Logan says

9      exists.  I mean, those are, in my mind, the two big

10     issues that we need to at least resolve.

11         There could be others, but those two issues at

12     a minimum.

13     MR. OPRISON:  Well, if those are the two

14     issues that we need to resolve, then we need to

15     target discovery on that.  We need to try to figure

16     out a way to get through some of the roadblocks

17     we've got here.

18         We've got to start getting discovery from the

19     other side and we certainly want to do some

20     depositions, which, again, we've got a month to get

21     those done before we really have to ramp up for a

22     trial.  And I'm not suggesting it couldn't be done,

23     Your Honor.  I'm just saying that there may be

24     other things that we need to do that are going to

25     come up at trial that I just want to make sure

1        we're not, again, going into a street fight with

2        one hand tied behind our back here.

3            THE COURT:  I'm never a fan of piecemealing

4        things, but it seems like at least those two issues

5        shouldn't take a lot of discovery time and,

6        frankly, probably not a lot of court time to

7        address those two fundamental issues.  I just --

8        I'm having difficulty seeing why this needs to be

9        more complicated than addressing those two issues

10       at a minimum.

11           MR. OPRISON:  Well, I think part of it is we

12       don't -- we at HLFIP don't know what we don't know

13       right now.  And so, yes, we've done a lot of our

14       own internal investigation and inquiries and our

15       own discovery.

16           THE COURT:  When you say we're doing

17       "internal," I mean, how many people are at HLFIP?

18           MR. OPRISON:  Well, there's -- there's Jon,

19       but there's documents and there's -- there's

20       historical information that we need to go through,

21       and we need to make sure -- we also have Jim who's

22       testified and we have to figure out a way to get

23       some of that testimony potentially.  He has

24       actually testified and acknowledged that there is a

25       license agreement out there.

1          He testified as a corporate rep in another --

2      in another case for HLFIP where he acknowledged on

3      the record under oath that there was a license

4      agreement and this was prior to the written.  So

5      there's -- there's evidentiary issues we're going

6      to have to sort of grapple with and I'm sure

7      there's going to be motions practiced on that.

8          I'm not trying to delay for the sake of delay,

9      Your Honor.  I'm just saying that we've been in

10     this case since July and we've got a lot to do.

11     And I think in terms of those crystalized issues, I

12     understand that those could probably be fairly

13     quick.  I don't know how many days that would take.

14         But in terms of getting ready for that and

15     ensuring we're doing the right job and servicing

16     our client the right way, my concern is that we're

17     going to be, maybe not cutting corners, but really

18     trying to circumvent some other things that we

19     would be trying to do to get fully prepared for

20     trial.

21         Now, that being said, if Your Honor orders us

22     to go with those of the issues we'll focus in on,

23     then we're going to want some guardrails on what

24     happens between now and then because we want to

25     focus our efforts pretty succinctly on those issues

1    and discovery on those issues and we may need to

2    bifurcate, trifurcate, however you want to call it,

3    that discovery and how we then revisit these issues

4    depending on how it comes out at the January trial.

5        But I can't see doing us having to do a full

6    assault and a full-on plenary discovery now to get

7    ready for a trial that's on two discreet issues in

8    January.  So perhaps we could find a way to narrow

9    the scope, so that we're only focusing on those

10   issues, and then we have the opportunity to come

11   back after there's a ruling on those issues later

12   on, and then we can then find a more narrow way to

13   target our discovery and our efforts after that.

14   So those are the things I threw out, Your Honor.

15       Our preference, obviously, would be to get

16   some more time here, but if those are the issues,

17   and, frankly, if it's between the two or if we have

18   our option, we'd certainly want to just go with

19   trying to do a valuation date hearing and then give

20   us more time to do ownership maybe at a later date.

21   I think that might be a better way for us to

22   approach it so that we've got a little bit of time

23   to see how the valuation date comes out and then

24   our expert will know exactly what he is dealing

25   with as well.

1          THE COURT:  Anyone else wish to say anything

2     in response to what anyone has said?

3          Mr. Johnson.

4          MR. JOHNSON:  Briefly, Judge.  I'll try to

5     stay in my lane.

6          You earlier today set up a schedule for the

7     disclosure of the more definite statement, the

8     deposition of Ms. Alexis Logan.  Our preference is

9     she only be deposed one more time.

10          In other words, we're going to have the

11     information about the more definite statement as

12     the Court points out.  She's going to have some

13     information potentially related to this IP

14     question.  It's not that involved.  Let's ask it.

15     She's already been deposed once.  Twice is enough.

16          MR. SCHOENFELD:  Very briefly, if I may.

17          THE COURT:  Yes.

18          MR. SCHOENFELD:  Your Honor, with respect to

19     HLFIP's need for discovery, I can't fathom that.

20     This is their agreement.  It's one agreement.  And

21     then there's an e-mail that they say it ties back

22     to.

23          It's all -- everything that they need is in

24     their own records.  Apparently they haven't looked

25     there, but there is no reason to delay that issue

1      because they're not prepared.

2          I'm also -- I want to hearken back to our

3      concern that we're off to August, September,

4      October, November.

5          THE COURT:  I got you on that.

6          MR. SCHOENFELD:  Yeah.  And I -- and -- well,

7      I was hoping we'd get some response, some response

8      as far as availability so that we know how much

9      delay Janice would face as a consequence of

10     dividing this case.  We haven't heard that.  I'm

11     still hoping we could hear it today.

12         But those are the points I wanted to note in

13     response.

14         THE COURT:  I guess my view or my concern is

15     if the insistence is to, quote, try everything, I

16     do have concerns that the existing trial period

17     probably isn't the best trial period to do that

18     because I do think there is a little bit more

19     discovery that has to get done for it to be a fair

20     trial.  I don't think we're talking many months,

21     but I do think that if we're talking about doing

22     everything.

23         I don't like splitting pieces of the case, but

24     I think in this case, it seems to be making more

25     sense, both on the big issues that will then help

1          focus our attention at the valuation hearing and

2          also kind of understanding where I'm at with my

3          other cases and kind of promises that I have been

4          making for those cases and expectations there.

5               I don't have any problem trying in January the

6          issue of what valuation date we should use into I'm

7          calling it the royalty, licensing, breach of

8          contract, whatever you want to call it, not the

9          valuation of that --

10              MR. SCHOENFELD:  Understood.

11              THE COURT:  -- but whether or not there was

12         that agreement back in 2020 -- or 2015-ish I think

13         is where it was or not.

14              MR. SCHOENFELD:  Understood.

15              THE COURT:  Because if there was no agreement

16         that impacts the valuation.  If there was an

17         agreement, that impacts the valuation.

18              So those two -- I don't think there is any

19         problem getting this case to trial on those two

20         issues.  Frankly, we could probably do it in two

21         weeks if we had to.  We've got almost two months.

22         I don't foresee the discovery on those issues being

23         so time consuming that we can't finish it.

24              So I do want to put those two issues -- when I

25         say "put those two issues", I want to narrow the

1      existing trial to those two issues.

2           Now, my March trial period is a two-week trial

3      period.  If my ruling occurs -- let's say you're at

4      the end of that trial period.  I think that's

5      Valentine's Day.  That's March -- sorry, sorry --

6      February 14th, I think your experts are going to

7      need, you know, a month or two.  So I'm concerned

8      that the March trial period is a little too close

9      to when we would be ruling.  So that rolls us to

10     May.

11          Now, Mr. Johnson's not involved in it.

12          I have set a four-week trial in a construction

13     litigation case with, Morgan Bentley is the

14     Plaintiff, but they keep settling various different

15     pieces of it.

16          How many construction litigation cases

17     actually go to trial?

18          So, you know, my thought is that we slot you

19     all in that May trial period.

20          By the time the January trial period comes

21     around, I will have better view of whether the

22     Second DCA has ruled in that Manatee case which

23     will impact whether the July trial period will be

24     effective.

25          So, basically, what I'm saying is let's try

1       those two issues in January and then we will either

2       hit the May or July for the balance is kind of my

3       working outline.

4            As far as discovery that has already

5       occurred -- sorry -- discovery that's already on

6       the books, I think you keep working on that.  Like

7       I said, I don't think the discovery that is going

8       to be necessary for those two core issues in the

9       January trial period is going to be so onerous as

10      to prevent you from continuing on doing the work

11      associated with preparing for later on, you know,

12      the May slash July.

13           MR. SCHOENFELD:  Understood.

14           THE COURT:  I think that's where I'm

15      coalescing.  So before that's the absolute, final

16      ruling, last, last opportunity, Mr. Schoenfeld.

17           MR. SCHOENFELD:  That is a sound way of

18      proceeding, certainly, and we'll work to that.

19           In terms of getting, you know, everybody in

20      place for either of those dates, I do just want to

21      note that we're prepared to go forward in May

22      despite the fact that Mr. Franklin, who, as the

23      Court's observed, is an indispensable part of our

24      team, won't be available then.  We're going to make

25      due, nevertheless.

1          THE COURT:  Remind me why Mr. Franklin is not

2      available in May.

3          MR. SCHOENFELD:  He is getting married.

4          THE COURT:  How dare you!

5          MR. FRANKLIN:  Sorry?

6          THE COURT:  How dare you!

7          MR. FRANKLIN:  I know.

8          MR. SCHOENFELD:  We're going to endeavor to

9      muddle through in his absence and I would just hope

10      that everyone would do the same because I think we

11      have to get this case resolved.

12          THE COURT:  Mr. Hillsley, last opportunity.

13          MR. HILLSLEY:  Your Honor, no objection to

14      your proposal.

15          THE COURT:  Mr. Oprison.

16          MR. OPRISON:  Your Honor, we'll make that

17      work.  We can make that work.

18          THE COURT:  Mr. Johnson.

19          MR. JOHNSON:  No objection, Your Honor.  I

20      will say I have got something I've got to do in

21      May, but it's a two- or three-week docket.

22          THE COURT:  It's a three-week docket.

23          MR. JOHNSON:  That's what I mean.  I'm not

24      going to be gone for three weeks.

25          THE COURT:  Okay.

1          MR. JOHNSON:  I need to be here when Ms.

2     Alexis Logan is involved.  I will move I'm not

3     going to be the one to hold us up, Judge.

4          THE COURT:  Okay.  So I will draft an order

5     kind of laying out the dates.

6          Can I count on the lawyers based on the

7     timeframes that we've discussed here to come back

8     and create your own deadlines or do you need me to

9     help you create deadlines for these two trials?

10          MR. HILLSLEY:  Your Honor, just one point of

11     clarification for the proposal.  Rob Sly is in

12     another trial that first week of January.

13          So my ask would just be that we conduct the

14     first evidentiary hearing in that February portion

15     just 'cause we need him.  That's the whole point is

16     to provide testimony from the experts on this

17     issue.

18          Secondly, certainly more than willing to work

19     with counsel.  I think that the setting of the

20     dates is going to be somewhat complicated because

21     of all the different issues.  And so I think it

22     would be more expeditious to speak with counsel and

23     make sure we're all on the same page, and then

24     present to you a proposed solution to get us to the

25     finish line.

1          THE COURT:  I mean, I will do what I can

2     relative to the timing of the January trial period.

3          I hear you with the expert.  That case might

4     settle.  Might be rolled.  I have no idea what's

5     going on in Georgia and their calendars.

6          Like I said, when I looked, there's 112 cases

7     on my January trial period.  But, you know, I've

8     spent a lot of time on this, and I hate to say it,

9     provided that I'm still a Twelfth Judicial Circuit

10    judge, I'll make it work.

11         MR. HILLSLEY:  Thank you, Your Honor.

12         THE COURT:  Okay?  And, you know, there is a

13    chance I might not be.  I'm on the short list for

14    the Second DCA.

15         MR. HILLSLEY:  I figured that's what that is.

16         THE COURT:  That was the issue.

17         MR. HILLSLEY:  Congratulations.

18         MR. SCHOENFELD:  Very briefly, the Second

19    District's gain would be our loss, certainly.

20         A couple points of clarification.  One is we

21    should be working to the May trial date and setting

22    any subsequent.

23         THE COURT:  The answer is yes, because my hope

24    is that by the January trial period, I will have a

25    much better view.  Because Mr. Bentley in open

1     court said last week that they might be able to go

2     from a four-week trial to a two-week trial based on

3     something that was happening next week from now,

4     like right before Thanksgiving.

5          And maybe you can have a conversation with

6     Mr. Bentley and kind of figure out the timing and

7     you can circulate that to everybody.

8          MR. JOHNSON:  Yes, Your Honor.

9          THE COURT:  It's the Rosalyne Holdings trial.

10         MR. JOHNSON:  Rosalyne?

11         THE COURT:  Rosalyne.

12         MR. JOHNSON:  Oh, Rosalyne.  Got it.

13         THE COURT:  Yeah.  Tell him it's his trial in

14    May; he'll know it.

15         MR. SCHOENFELD:  And the last point of

16    clarification --

17         THE COURT:  Actually, Mr. Oprison is in

18    another case with Mr. Bentley now, so he could also

19    talk with Mr. Bentley so.

20         MR. SCHOENFELD:  Last point of clarification

21    consistent with Mr. Johnson's concern, we should

22    try to -- we have depositions scheduled.  It

23    remains -- and I think I heard the Court suggest we

24    should try to accomplish everything that can be

25    accomplished in the currently-set depositions and

1     not plan to push things.

2          THE COURT:  Right.  I do not intend on

3     changing the deadline on the answers that we've

4     discussed today in my order from yesterday.

5          I want to get the pleadings formally closed.

6     I know that this trial will occur after the new

7     rules take effect, but I still want to get the

8     pleadings technically closed.

9          I want to get the affirmative defenses out

10    there so everybody knows precisely the issues.  I

11    think everybody kind of knows what they are right

12    now, but let's get them on paper formally.

13         Anything else?

14         MR. SCHOENFELD:  That's all I had.  Thank you.

15         THE COURT:  All right.  So I will -- I will

16    draft an order and ask you all to meet and confer

17    on scheduling on a going-forward basis.

18         So I think that takes us through all of the

19    Group 2 motions, and now we're on to discovery.

20         Why don't we take a five-minute, maybe

21    ten-minute comfort break and then come back, do the

22    discovery, and then any last-minute issues and then

23    we'll finish the day.  Does that work for

24    everybody?

25         MR. SCHOENFELD:  Yes.

1          MR. OPRISON:  Yes, sir.

2          MR. HILLSLEY:  Thank you.

3          MR. JOHNSON:  Thank you.

4          (A break was taken at 1:24 p.m. and the

5     following commenced at 1:35 p.m.)

6          THE COURT:  Let's move on to issues involving

7     discovery.

8          So the first one on the list appears to be,

9     the Amended Motion is DIN 832, which is Janice

10     Logan's Amended Motion to Compel Discovery from

11     Smart, et al., and then the response are at DINs

12     851 for HLFIP and 853 for the Smart folks.

13          So let's pull those out and let's get going.

14          MR. SCHOENFELD:  Your Honor, I believe

15     Mr. Franklin has this one.

16          THE COURT:  I thought he was getting married

17     and was not joining us anymore!

18          MR. SCHOENFELD:  He's still working for now.

19          MR. FRANKLIN:  Yes, I've got these, Your

20     Honor.  So Andrew Franklin on behalf of Janice

21     Logan.

22          So this First Amended Motion to Compel is as

23     to Smart and HLFIP, and there's a discreet issue as

24     to both entities.  So, first, as to Smart Comm, and

25     on the topic of ensuring that we keep discovery

1      moving and that the parties and experts are not

2      prejudiced in their preparation for trial, Jon and

3      Smart Comm actually don't dispute that they have

4      altered their 2024 financials, which are the

5      financials that have been produced to Janice Logan.

6          Now, as far as Janice knows, she has not

7      received the unaltered financials or any

8      information to substantiate what Jon and Smart Comm

9      allege they did to alter them.  All we have from

10     Smart Comm is the bare and unsubstantiated

11     justification that the 2024 financials had to be

12     cleaned up in order to account for accounting

13     errors that James Logan made in his role as C.F.O.

14         Now, Janice believes that she is entitled to

15     the raw data to check that assertion and into

16     discovery as to why those things were actually

17     done, especially since those changes happen to

18     align with allegations that Jon and Smart Comm make

19     in their First Amended Complaint.

20         So Janice's Amended Motion as to Smart Comm

21     respectfully requests discovery into the raw 2024

22     financials, production of unaltered financials, and

23     the ability to inquire in discovery about the

24     reasons for the changes.

25         In our motion, we indicated that Smart Comm

1     had previously conveyed that it's going to rely on

2     certain privileges to protect -- or prevent

3     Janice's discovery into the reasons for the

4     changes, namely, the accountant/client privilege

5     and the attorney/client privilege.

6          But it's our contention that if there is a

7     possibility that a 2024 valuation date might be

8     used, then Janice is entitled to discovery into the

9     true 2024 financials for Smart Comm, especially if

10    there's any chance that they have been altered to

11    align with Jon and Smart Comm's allegations in this

12    matter.

13         And so for those reasons, Your Honor, we move

14    to respectfully request raw financial data from

15    Smart Comm and the ability to discover the reasons

16    for the changes.

17         THE COURT:  So let me make sure I understand,

18    you are asking about document request number 4 and

19    15; is that correct?

20         MR. FRANKLIN:  Just -- Just 4.  I believe

21    unless -- and Smart Comm can correct me, but the

22    Amended Motion, I believe, just asks about 4.

23         I believe we have all of the RFP responses

24    that were requested.  Mr. Hillsley or somebody else

25    from Smart Comm can correct me if I'm wrong.

1          THE COURT:  Okay.  So let me just kind of

2     break this down into bite-size pieces.

3          Are you challenging the objection relating to

4     anything after May 28, 2024 after the statutory

5     presumptive?

6          MR. FRANKLIN:  I don't believe so, Your Honor.

7          I mean, as long as there is -- as long as the

8     other side is not going to rely on data after that

9     date, and they've indicated they understand that

10     they couldn't if they didn't produce it, I don't

11     think we're challenging that objection.

12          But our issue is that it's our understanding

13     that the books and records, the 2024 books and

14     records we've received were changed to account for

15     the allegation that James Logan made accounting

16     record -- or accounting errors, and we would

17     respectfully assert that we have the right and

18     would be prejudiced if we did not get discovery

19     into the actual true 2024 financials.

20          THE COURT:  So are you only talking about 2024

21     here or is there anything prior?

22          MR. FRANKLIN:  I don't believe that any of the

23     prior records have been altered.  I'm not aware of

24     that, but Smart Comm could speak to that better

25     than I can.

 1          THE COURT:  And do you have the prior records?

 2          MR. FRANKLIN:  I believe so, Your Honor.

 3          THE COURT:  So let me ask this, if we got to

 4     the position that in the January trial period, the

 5     Court rules we're sticking with the statutory date,

 6     you might need 'em.

 7          If I rule that it's your date or maybe some

 8     date in between, you might not need the 2024

 9     information; is that correct?

10          MR. FRANKLIN:  I believe so, Your Honor.  I

11     mean, I can't speak to our expert's timeline and,

12     you know, the need to start preparing those models

13     now, but I believe that is correct.

14          THE COURT:  I guess my -- and maybe this is

15     more practical than anything else.  If all we're

16     talking about is the 2024, I don't want to use the

17     world altered, but revised information, should we

18     just kind of punt on that one issue until we see

19     what happens at the January trial period?

20          MR. FRANKLIN:  I guess -- so my concern would

21     be we have upcoming depositions scheduled of Noreen

22     Gunning, Smart Comm's inhouse accountant.  That's

23     scheduled for December 5.  And Jon Logan.

24          And I believe that we would want to ask

25     questions about the 2024 financials and alterations

1      thereto in those depositions or have the right to

2      reopen those depositions pending whatever happens

3      in January.

4          THE COURT:  Would that go to any other issue

5      other than valuation or does this only go to

6      valuation?

7          MR. FRANKLIN:  I mean, as to the alterations,

8      I think probably just valuation.

9          THE COURT:  Ms. Smitha.

10          MS. SMITHA:  Your Honor, I just want to

11      clarify that we keep hearing the world alteration,

12      and that suggests that there was a set of 2024

13      financials that were somehow changed and that we

14      only gave them some sort of chicanery, goofied-up

15      financials.  That's not the case.

16          What happened was we had 18 months from now to

17      produce our 2024 financials.  We had no obligations

18      to create them now.  We actually bumped up that

19      deadline specifically for this litigation, and,

20      technically, it's kind of work product.  But we

21      pushed them out prematurely.

22          And what happened is it's a growing document.

23      It's our QuickBooks.  And it's kind of a picture in

24      time.  Every day you're getting a receipt saying

25      you're getting invoices in, you're updating what's

1      in your QuickBooks.  So when we had a clear

2      picture, we produced it to them.

3          It wasn't that we had a clear picture or a

4      document that we printed out and we had copies of

5      and were holding and we can't give it to them.

6      It's that we had this QuickBooks set of software

7      that was constantly, every day being updated with

8      additional information.

9          So we're not -- We don't have responsive

10     documents where we're saying we're refusing to give

11     them to.  My understanding of the way that

12     QuickBooks works is we don't have raw data where we

13     can just press "Print" and say "Here you go; here's

14     our documents."  So that's kind of the problem.

15         The other problem that we're running up

16     against is I think they're citing to a statement

17     that was made in open court at the Case Management

18     hearing where the attorney kind of combined two

19     issues that were going on.

20         One issue was that we were in the process of

21     creating the 2024 financials, and then the other

22     issue was that in the course of this litigation,

23     based on allegations and issues that were raised,

24     all our attorneys went in and specifically looked

25     at Smart's accounting and that's when we discovered

1    that there were things that had been incorrectly

2    classified and that is one of the things that we

3    were addressing.

4        So it's not that we went back and changed

5    something.  It was that there was this growing

6    thing that we did produce once it was in existence.

7        And, Your Honor, we referred to you the case

8    law Nu Med Home, 664 So.2d 353, and it stands for

9    the proposition that we don't have a discovery

10   obligation until a document exists.  We can't

11   produce something to you that doesn't exist.

12       Once it was in existence, we produced it.  We

13   can't go back in time and give you something that

14   didn't exist prior to that.

15       And I also wanted to briefly touch on the

16   audit if you wanted to hear that issue as well.

17       THE COURT:  Sure.

18       MS. SMITHA:  So there is also a suggestion

19   that every single year the accounting records have

20   been audited and that that somehow proves that

21   there wasn't any kind of chicanery going on prior

22   to that.

23       But the audit itself specifically says -- and

24   you can look at Exhibit 10, I believe it is.  It

25   says that the purpose of an audit is just to make

1    sure that Smart Communications is a going concern,

2    and they look at a sampling of what's going on, but

3    it specifically calls out and says that it cannot

4    give you a reasonable assurance at a high level

5    based on things like fraud, and it specifically

6    says that that's because these are things that tend

7    to get hidden.  So we as a third party can't come

8    in and say:  There's the fraud.  Just like Jon

9    couldn't go in and say:  There's the fraud.  It was

10   a matter of getting this information and then being

11   able to go back and look at it and then identify

12   it.

13       So the fact that there were audits in the past

14   doesn't somehow rubber stamp and say that those

15   were correct and that was absolutely 100 percent

16   how it should have been catheterized.

17       When we realized that there was a mistake, we

18   went back and corrected it.  And the corrections

19   are also, Your Honor, in Exhibit 8.  It explains

20   what we did.

21       And, Your Honor, if I may, one more thing.

22   This is all kind of much ado about nothing because

23   it detracts from the basic question of relevance.

24       We produced what the 2024 financials are.  We

25   produced what an accurate representation of those

1       financials are.  So if we were able to go back in

2       time and show prior iterations of that, they

3       wouldn't be correct.  So how would they help

4       understand the valuation of Smart Communications if

5       they weren't up-to-date and they didn't contain all

6       the information?

7           Lastly, we produced, I think, tens of

8       thousands of pages going all the way from 2023 all

9       the way backwards as well as 2,000 pages for 2024,

10      itself.  So if there was some sort of difference,

11      you can compare what was previous to what is going

12      on now.  We're not hiding anything.

13          THE COURT:  Well, it seems like there's a lot

14      of issues going on as to whether there's actually

15      any documents to produce to begin with.

16          But right this second what I'm hearing -- and,

17      Mr. Franklin, correct me if I'm wrong or, Ms.

18      Smitha, correct me if I'm wrong -- this specific

19      document request, which is number 4, only becomes

20      relevant, potentially, if the Court goes with a --

21      like the statutory valuation date --

22          MS. SMITHA:  That's my understanding.

23          THE COURT:  -- as opposed to an earlier.

24          And earlier today, I heard, and maybe I

25      shouldn't have heard, that, you know, the experts

1        will probably need 30 days from receipt of the

2        materials to kind of review.

3             So I'm wondering with respect to this one

4        document request, we revisit it if it becomes

5        necessary based on the Court's ruling from the next

6        phase of the trial.

7             I'm just -- because right this second, I don't

8        know and it sounds like there might not even be

9        anything to produce to date anyway because it

10       doesn't sound like things are not being produced

11       but in a few more weeks the -- is it a calendar

12       year or is it a fiscal year for the company?

13            MS. SMITHA:  Can you speak to that?  I don't

14       have that information at the grasp.

15            THE COURT:  I think Mr. Logan, Jon Logan's on.

16       Maybe he would probably know if he's on a calendar

17       or a fiscal year.

18            MR. HILLSLEY:  Your Honor, we think they're on

19       a calendar year, fiscal year.

20            THE COURT:  So, you know, it almost sounds

21       like this one particular question can wait because

22       it's -- by that time, you know, a month will have

23       passed.  I'm sure the books will be -- for 2024

24       will be closed by then and there would be a

25       complete picture of the raw data at that point.

1          MS. SMITHA:  It will certainly be a clearer

2      picture.

3          I believe I was told they had 18 months to

4      fully-fully close all of the books and finalize

5      everything.  But, certainly, with the close at the

6      year-end, we'll have a clearer picture of January

7      through December.

8          THE COURT:  Anything further, Mr. Franklin, on

9      that issue?

10         MR. FRANKLIN:  I think we're comfortable with

11     that, you know.  Just noting our concern about

12     being able to depose -- to continue depositions as

13     to changes if that becomes ripe.

14         THE COURT:  Well, and I will say to the extent

15     that the Court were to rule a 2024 valuation date,

16     you will then be able to go back and depose.

17         So I'll let you draft the order, but I think

18     when it comes to this one particular issue, I'm

19     going to defer ruling until after next phase of

20     trial.

21         Mr. Franklin, you've got that order.  You can

22     certainly run it by Mr. Smith.

23         MR. FRANKLIN:  Will do, Your Honor.

24         And then there is a separate issue as to HLFIP

25     in this Amended Motion.  So, and what it comes down

1       to is HLFIP has not produced a single document yet

2       in this case, not financials, not tax returns, not

3       even publicly-registered intellectual property.

4           THE COURT:  I'm sorry.  I was only dealing

5       with DIN 832.

6           MR. FRANKLIN:  Yes, Your Honor.  That's

7       twofold.

8           THE COURT:  I thought your motion to HLFIP was

9       a different DIN.

10          MR. FRANKLIN:  There are two.

11          THE COURT:  I'm sorry.  When you say "there

12      are two," there are two different motions or --

13          MR. FRANKLIN:  Yes, Your Honor.  We have the

14      Amended Motion to Compel as to both Smart Comm and

15      HLFIP, which is one DIN, and then there is a

16      separate Motion to Compel at 14 admitted just as to

17      HLFIP which is below at 780.

18          THE COURT:  I'm in your Amended Motion which

19      is 832.  Tell me what page you're on.  Is this

20      question number 2?  I'm sorry.  Question number 4?

21          MR. FRANKLIN:  I'm sorry.  I'm getting to it.

22      Nine.  We're on page 9.

23          THE COURT:  Okay.  There we go.

24          Okay.  So why don't you make your argument

25      relative to HLFIP.

1          MR. FRANKLIN:  Okay.  So, as I was saying,

2     Your Honor, HLFIP has not produced a single

3     document in this matter even though their first RFP

4     responses were due on August 7.  The purported

5     justification for this is the need for an entirely

6     new confidentiality order with an attorneys' eyes

7     only provision even though this Court has already

8     entered a confidentiality order at DIN 362.

9          As a matter of fact, Jon, who as Mr. Oprison

10     mentioned earlier, is the sole member of HLFIP,

11     already acceded to the confidentiality.  He signed

12     the confidentiality order at DIN 362 or his

13     attorneys did on his behalf.  He's already agreed

14     to that confidential order.

15          Janice's also repeatedly offered to stipulate

16     that HLFIP is covered by the protections in that

17     confidentiality order.

18          Janice has also attempted to meet and confer

19     on this point several times.  She invited Mr.

20     Oprison to provide specific categories of highly

21     confidential information that would allow us to

22     tailor a confidentiality order in order to ensure

23     that the parties are efficient in their

24     designations and productions.

25          But Janice's primary issue with the

1    confidentiality, the brand-new confidentiality

2    order that Mr. Oprison is insisting on, is

3    attorneys' eyes only provision.  She doesn't view

4    that as necessary in this case where she is a

5    50 percent shareholder of the purported exclusive

6    licensee of HLFIP.  And she doesn't think there is

7    a credible risk of her using the documents that

8    HLFIP produces outside of this litigation in any

9    way that would harm HLFIP and she has no intention

10   of misusing it within this litigation.

11        Furthermore, I would point out that both

12   Janice and Alexis, as this Court has heard and as

13   this Court heard in Phase One, have knowledge of

14   the company and its practices and are able to

15   assist us as counsel in preparing to represent

16   them, and their viewing of the documents has been

17   instrumental for us and will continue to be.

18        Finally, on this point, I would just say that

19   we offered as a compromise in November, it was a

20   November 1 letter that was attached to the Amended

21   Motion to Compel as Exhibit 15, to agree to a

22   highly-confidential provision that is not AEO and

23   to the extent that HLFIP feels that it's necessary

24   to protect its IP, it's rather unspecified but

25   desperately in need of a protection IP, we feel

1     like that is an appropriate term.

2          But the bottom line is, Your Honor, that HLFIP

3     has not been clear about what specifically needs to

4     be protected or why, and we've repeatedly invited

5     them to explain that to us and attempted to work

6     this out.  So at this point, Your Honor, we would

7     ask that you either order HLFIP to produce

8     documents under the existing confidentiality order

9     which Jon has already agreed to or help us in this

10    moment finalize a new confidentiality order or an

11    amended confidentiality order so that we can get

12    documents from HLFIP flowing.

13         Thank you, Your Honor.

14         THE COURT:  Mr. Oprison.

15         MR. OPRISON:  Your Honor, I just want to set

16    the table a little bit here for you.  I appreciate

17    what Mr. Franklin is saying but it's just not true.

18         So what we've done -- this was before October

19    of 2023.  It was before HLFIP, about seven months,

20    eight months before HLFIP was ever in the case.

21         Just because Jon Logan might have signed a

22    Protective Order on behalf of another entity that

23    does not own the IP, my client owns the IP, means

24    nothing.

25         There was a Protective Order that was in place

1        that was put in place by parties at the time they

2        were agreeing to it and felt those terms were

3        appropriate.

4            HLFIP came in and was served and sued in July

5        of this year.  HLFIP owns the IP.  That's what

6        we're concerned about protecting.  That's why we

7        put an AEO or an attorneys' eyes only provision in

8        there.  We've done it in other protective orders in

9        front of Your Honor in other cases.

10           And the reason we do that, Your Honor, it's

11       not a take or leave.  It's an AEO designation that

12       has processes for them to challenge it if they want

13       to challenge it.

14           But this is not, as Mr. Franklin says,

15       somebody who is -- can be trusted not to mistreat,

16       not to misuse and not to try to undermine the

17       well-being of the company.  If that was the case,

18       we wouldn't be in this case.  They're not

19       competitors.  They say they're not competitors.

20       They may not be competitors, but they are

21       predators.  And when I say they're predators, they

22       have done everything they can --

23           THE COURT:  Are you saying "creditors"?

24           MR. OPRISON:  No.  "Predators" as to the

25       corporate predators because of what they've tried

1    to do is undermine the company's operations,

2    HLFIP's operations and IP.  And they've done

3    everything they can to try to eliminate its own

4    corporate identity.  They've done everything they

5    can to try to undermine the protections of the

6    patents and the other IP.  They've done everything

7    they can to try to argue that there's no value to

8    that IP when, in fact, there is.  And so we're

9    trying to protect our IP.

10        Now, if there is a credible challenge that

11    they can make after we designate these documents --

12    all we said is agree to our provision and then if

13    you want to go challenge it, we're not designating

14    everything AEO.

15        We're going to designate only those things

16    that are highly confidential, highly proprietary,

17    highly sensitive, drawings, know-how/show-how

18    IP-related information, tech specs, that sort of

19    thing that our client has spent a lot of sweat

20    equity and other effort putting in place and

21    developing over the last 10 years.

22        And so what we're trying to do is just find a

23    way to protect them.  We're ready to produce

24    documents, but we can't produce it because we're

25    not subject to the prior Protective Order.

1           We believe that we need this heightened

2       confidential, this AEO designation to protect that

3       patent, those patents and that IP.  And it's not

4       just the patent.  It's all of the other IP that we

5       believe is entitled to heightened protection so

6       that the -- Miss -- Janice and Alexis can't misuse

7       it.  And that's what we're trying to protect here,

8       Your Honor.

9           Again, there is a process.  If they wanted to

10      challenge it, they could challenge it.

11          THE COURT:  Well, can you articulate what is

12      the problem with the existing confidentiality

13      order?  I get that you want a new category for

14      preventing the actual parties from seeing the

15      documents.  I get that.

16          But I haven't really heard a, "Look at this

17      incident.  They did this with the existing

18      confidentiality agreement" or "They have somehow

19      abused the existing confidentiality order" or

20      anything that would give me kind of a better reason

21      to add an attorney eyes only, because right now I'm

22      not seeing it.

23          MR. OPRISON:  Your Honor, it's what they've

24      said and the things that they filed in this case.

25      It's the effort to try to undermine the -- Let me

1       step back.

2           As you know, HLFIP does one thing.  It holds

3       the IP.  It's the possessor, the owner of Jon

4       Logan's IP.

5           We're in this case because they're trying to,

6       among other things, trying to neutralize the value

7       or zero out the value of that IP.  Saying it's

8       worth nothing.  They're saying that we're not

9       entitled to receive royalties on it because, for

10      one reason or another, there is not a licensing

11      agreement that allowed for royalties and, in any

12      event, the IP is worthless.

13          Well, when you're saying the IP is worthless,

14      it means you're telling everybody, the outside

15      world, that you don't believe it's entitled to

16      protection.  That you don't believe it's entitled

17      to -- it has no value, so if you disclose it, if

18      you misuse it, if you try to undermine it, if you

19      try to replicate it, it's not going to do any harm.

20      We're not going to have any damages to my client,

21      and that's what we disagree with.  So it's what

22      they've said in almost every filing in front of

23      this court.

24          THE COURT:  Assume I add an "Attorney Eyes

25      Only" aren't they going to still say the same

1      thing?

2          I mean, what does the Attorney Eyes Only do to

3      change the restrictions on them other than

4      preventing the actual client from seeing it?

5          MR. OPRISON:  Well, that would be it.  It

6      would prevent the clients from seeing it and it

7      would prevent them from being able to use it or

8      misuse it in some way that they could actually --

9      once they have it, they can do anything with it.

10         So what we're saying is it has to be limited

11     to the people that have an absolute need to see it,

12     which would be the attorneys and perhaps the

13     experts that are going to be opining on the value.

14     That's what we're talking about here.

15         And, again, if they disagree with it -- and

16     it's not everything.  But if they disagree with an

17     AEO designation, they can challenge it.  There's a

18     process in here for challenging it.

19         So it's -- it's -- it's not -- it's not a

20     take-or-leave.  It is a -- It is a designation that

21     has an out that they could bring it to, Your Honor.

22     We could show it to, Your Honor.  You're entitled

23     to see it.  Of course, the Court's entitled to see

24     it.  And determine whether or not the drawings, the

25     other specs, the know-how, the other IP

1       technological, you know, drawings and other

2       specifications are entitled to this heightened

3       protection.

4            THE COURT:  I don't see the need for an

5       Attorney Eyes Only provision in this case.  I am

6       fine with the existing Confidentiality Order.

7            Is there a provision in here that would

8       require the return of the documents, the

9       confidential documents?

10           MR. FRANKLIN:  I believe there is a deletion

11      provision at the end, deletion or return.

12           THE COURT:  Is there a deletion with a

13      certification, final disposition?

14           MR. OPRISON:  Final distribution [sic], Your

15      Honor, I believe this is it under 14, Section 14.

16      Actually, you know what?  I'm looking at ours.

17      Sorry.

18           THE COURT:  No.  It's 14 --

19           MR. OPRISON:  14 and both.  Within 60 days --

20           THE COURT:  Yeah.

21           MR. OPRISON:  -- after final disposition, the

22      receiving party, upon written request, must return

23      such documents and restore such material.

24           But, again, our concern is, and I understand

25      Your Honor's ruling, but our concern is that in the

1    interim given what they have alluded to and given

2    the positions that they have taken in their

3    public-facing documents here, there's no protection

4    for the IP because once the -- once the bell is

5    rung on this, once the protection is lost, and

6    however they misuse it, which we believe they will,

7    we're going to lose that protection, Your Honor.

8        THE COURT:  I believe that the existing

9    Confidentiality Order is more than sufficient.  I

10   am going to expressly make HLFIP a part of this.

11       Mr. Franklin, I want you to do an order on

12   that making sure that HLFIP is specifically

13   included in the provisions of that order.

14       Now, Mr. Oprison, now that I have done that,

15   where are we on production, and when can we get

16   documents produced under that?

17       MR. OPRISON:  We have a production ready to go

18   out, Your Honor.  We can get that out.

19       If -- if my colleague associate had not gone

20   into labor at 2:00 in the morning, she would get it

21   out today, but she's not.  So I've got to find

22   somebody else to step in.  We've all got a lot of,

23   like, very cool things going on with families

24   around here.  Very happy for her; it's her first.

25       But I'll get it out early next week, Your

1    Honor.

2         THE COURT:  And please pass along my

3    congratulations.

4         MR. OPRISON:  I will.

5         THE COURT:  I hope it all turns out well.

6         MR. OPRISON:  Will do.  Thank you, Your Honor.

7         THE COURT:  Let me just take my notes and then

8    we'll move on to the next order -- or the next

9    motion.

10        The next one that's on this list looks like

11   it's DIN 780:  Janice Logan's Motion to Compel or

12   Deem Admitted from HLFIP.

13        MR. FRANKLIN:  That's correct, Your Honor.

14        THE COURT:  Is that now wrapped up in that

15   last one?

16        MR. FRANKLIN:  No, Your Honor.  This one's

17   quick, though.

18        THE COURT:  Sorry.  I was just getting

19   confused because Ms. Smitha went to the lectern.

20        MS. SMITHA:  I confused HLFIP.  My bad.

21        THE COURT:  Okay.  So we're on DIN 780 with a

22   response at DIN 851.  And, Mr. Franklin, you said

23   you're on this one?

24        MR. FRANKLIN:  Yes, Your Honor.

25        THE COURT:  Mr. Franklin, you have the floor.

1          MR. FRANKLIN:  Yes, Your Honor.

2          This motion is, I think, quick and pretty

3     straightforward.

4          We're asking the Court to help us in requiring

5     HLFIP to respond to interrogatories and RFAs that

6     are clear on their face and that HLFIP clearly

7     understood.

8          So the first interrogatories at issue are

9     Interrogatories 5, 7 and 9 to HLFIP and Janice's

10    first set.

11         HLFIP refused to answer those because they

12    allege that the word "funded" is unclear and

13    because they allege that their response would be

14    prejudicial to HLFIP.

15         On the first point in the interrogatory

16    itself, Janice said, "Identify the entity or

17    entities that funded, i.e., paid fees and costs

18    related to each of the lawsuits listed in your

19    response to Interrogatory 4."

20         THE COURT:  Let's just -- I'm sorry.  Let's

21    just -- We might have to do this one at a time.

22         MR. FRANKLIN:  Okay.

23         THE COURT:  So I don't know, Mr. Oprison, if

24    you just kind of want to hang at the lectern.

25         So is Interrogatory Number 5 just the lawsuits

1    filed?

2         MR. FRANKLIN:  Interrogatory Number 5 is the

3    entity or entities that funded each of the lawsuits

4    listed in the response to the preceding

5    interrogatory.

6         THE COURT:  Yeah.  Pro tip in the future:  I

7    know you tried to group them and that's fine, but

8    you still need to write out the document request

9    and the response in full.

10        MR. FRANKLIN:  Okay.

11        THE COURT:  Because now I'm trying to figure

12   out the precise wording of the Number 5 and since

13   you didn't write it out, I'm trying to figure it

14   out.  And so tell me again what it says.

15        MR. FRANKLIN:  I believe the Court can read it

16   in exhibit --

17        THE COURT:  Mr. Franklin, I'm not in my normal

18   courtroom.  I have a lot less screens.

19        MR. FRANKLIN:  Okay.

20        THE COURT:  I've got papers everywhere.  I've

21   got lots of things open.

22        It just -- it really would help out if you

23   "This is the document request and this is the

24   response."  That's kind of how we're supposed to do

25   it.

1          MR. OPRISON:  Your Honor, I've got it open if

2     you want me to read it.

3          MR. FRANKLIN:  And I'll be sure to do that.

4          THE COURT:  What is the request for Number 5?

5          MR. OPRISON:  Identify the entity or entities

6     that funded, paren, i.e. paid fees and costs

7     related to, close paren, each of the lawsuits

8     listed in your response to Interrogatory 4.

9          THE COURT:  And there's an objection because

10     of the word "funded" is vague and ambiguous; is

11     that --

12          MR. OPRISON:  Your Honor, it's that and

13     several others, but it's the word "funded" that our

14     client had concerns about given what it does.  We

15     said, We're happy to answer this, but the word

16     "funded" is an attempt to get a buzz word or

17     a --(Audio microphone interference.)

18          So we said cash is fungible.  The entity that

19     wrote checks or wired money is not necessarily the

20     entity that bore the economic burden for those

21     payments.  So "funded" is different than "paid" and

22     that's why we made that point in several

23     communications back to the other side as well as to

24     some of the other requests.  And so we just said,

25     We're clarifying what that means; funded means

1      something different than paid.

2           THE COURT:  Well, I don't think the word

3      "funded" is vague or ambiguous.  So I'm going to

4      overrule vague or ambiguous.

5           Is there other objections?

6           MR. OPRISON:  Well, the -- Your Honor, without

7      the -- the vague and ambiguous to us is we try to

8      define it a different way, and what we'll do is go

9      back and answer it with a supplemental or amended

10     response that identifies the way we define it, not

11     the way they define it.

12          THE COURT:  I am ruling on what I got in front

13     of me.  Right now I have an objection for vague and

14     ambiguous.  It's not vague or ambiguous.  So I'm

15     overruling the objection.  What you do --

16          MR. OPRISON:  Okay.

17          THE COURT:  -- and whether Mr. Franklin takes

18     issue with that, I don't know.

19          MR. OPRISON:  Okay.

20          THE COURT:  But so the word "funded" is not

21     ambiguous.

22          So does that address each of 5, 7 and 9 or are

23     there different language in the questions that

24     would suggest a different outcome.

25          MR. OPRISON:  5, 7 and 9 use the same

1        definition, we believe, of funded.

2              THE COURT:  Okay.  So --

3              MR. OPRISON:  Rephrase the same objection.

4              THE COURT:  I will overrule with respect to

5        Interrogatories 5, 7 and 9, and require an answer.

6              Okay.  So that takes us to Rog 6.

7              MR. FRANKLIN:  Yes, Your Honor.  HLFIP raises

8        a relevance objection to this one.

9              THE COURT:  And this is identify each and

10       every lawsuit you have filed to enforce other

11       non-patent --

12             MR. FRANKLIN:  -- intellectual property held

13       by HLFIP.  Yes, Your Honor.

14             And the point there is intellectual property

15       is only valuable to the extent that it's used to

16       exclude others from practicing it, and so whether

17       or not HLFIP has filed lawsuits to enforce its

18       non-patent intellectual property is directly

19       probative of the potential value of its other IP.

20             And I would point out that HLFIP did respond

21       to this interrogatory as to lawsuits filed to

22       enforce its patent in its response to Interrogatory

23       Number 4.  So its position as to relevance seems to

24       be inconsistent between the two.

25             THE COURT:  Is the only objection, Mr.

1        Oprison, that it is overly broad, unduly

2        burdensome?

3             MR. OPRISON:  It's overly broad, unduly

4        burdensome.

5             THE COURT:  How many lawsuits are we talking

6        about?

7             MR. OPRISON:  Well, they're asking us to

8        identify so they can have a takeaway or an

9        inference from the fact that we didn't file a

10       lawsuit to enforce certain patents or other IP.  So

11       it's not relevant.

12            What we're saying, it's not relevant

13       proportional to the claims and defenses in this

14       case.

15            THE COURT:  Well, now I'm unclear here because

16       it's asking for lawsuits.  So it's not asking for

17       things that where HLFIP didn't engage in a lawsuit.

18       It's just asking for lawsuits; right?

19            MR. OPRISON:  It's asking for us to identify

20       every lawsuit irrespective of whether it relates to

21       the patents and IP that are relevant to this case.

22            THE COURT:  I mean, to me, it is relevant and

23       can lead to the discovery of admissible evidence.

24       So I'm going to overrule that.

25            Now, help me understand how this is

1    burdensome.  Is there, like, an affidavit or

2    something that tells me, Hey, we were involved in

3    150 lawsuits and to identify each one would take

4    this much time, or is there anything like that?

5        MR. OPRISON:  Well, there's nothing like that,

6    Your Honor.  It's a matter of going out and

7    tracking down all the lawsuits that our client's

8    been involved in.

9        THE COURT:  That's why I'm saying.  I mean,

10   how many are we really talking about?

11       MR. OPRISON:  I don't have a number on that,

12   Your Honor.

13       THE COURT:  Is it more than 10?

14       MR. OPRISON:  I would suspect it is, but,

15   again, I don't want to misspeak.

16       But it's the effort of having to go out and

17   track down lawsuits where that our IP has been

18   involved and have either not been, we haven't filed

19   a lawsuit but there's been lawsuits against the

20   company, as well as whether or not we've actually

21   brought lawsuits on behalf of HLFIP.

22       THE COURT:  I mean, without any sort of

23   evidence to suggest that it's unduly burdensome,

24   probably is really not that many, it's information

25   that seems readily available to HLFIP because it

1        will know the lawsuits that it actually filed.

2            MR. OPRISON:  Well, Your Honor, I go back to,

3        and I understand you've ruled on the relevance or

4        likely-to-lead-to, but the understanding we have is

5        that it's really not relevant to this case whether

6        or not our client has gone -- whether or not it

7        protects and believes that these patents and other

8        IP have -- have value simply because they chose to

9        pursue a lawsuit to protect it or not protect it at

10       any given circumstance.

11           THE COURT:  I'm overruling all objections with

12       respect to Interrogatory Number 6.

13           So does that take us to Request for Admissions

14       5 and 6; is that the next one, Mr. Franklin?

15           MR. FRANKLIN:  Yes, Your Honor.

16           And I can -- I can read the full request for

17       Admission Number 5 and the objection is identical

18       for 5 and 6.

19           THE COURT:  So what does 5 say?

20           MR. FRANKLIN:  Five says:  Admit that there

21       are no documents in your custody, possession or

22       control from prior to August 29, 2023 that

23       reference the royalty fee.

24           And "royalty fee" is a defined term.  We use

25       the same definition as HLFIP and Smart Comm used in

1       the exclusive intercompany intellectual property

2       license agreement, and cited to that and the Bates

3       number in defining it.

4            HLFIP objects that "reference" is vague and

5       ambiguous.  They say in the papers that we should

6       have used the word "refer to" instead.  And Janice

7       would respectfully contend that "reference" is not

8       vague and ambiguous, and that that objection should

9       be overruled.

10           THE COURT:  Mr. Oprison.

11           MR. OPRISON:  Your Honor, we answered the

12      request.  We said we deny this request because

13      while there may be no documents from before

14      August 29, 2023, that's the date on which we had --

15      the oral license agreement was memorialized in

16      writing.

17           That use of the term, quote, royalty or, quote

18      royalty fee in 2015, James Logan, Jon Logan, Alexis

19      Logan, Smart Communications U.S. and Smart

20      Communications Holdings, entered into a written

21      agreement that expressly recognized that Jon Logan

22      exclusively owns and will retain exclusive

23      ownership of the intellectual property for which

24      Jon was the inventor.

25           And so what they're asking us to admit is

1    there are no documents in our possession, custody

2    or control from before August 29.  And we're saying

3    we deny that because there was at least an oral

4    agreement where it expressly recognized a

5    royalty -- a royalty under the license agreement.

6        THE COURT:  What I do not allow, and I don't

7    think the case law allows, is asserting an

8    objection and then saying "Subject to but without

9    waiving that objection, here's an answer."  That's

10   not allowed.  So I'm going to overrule the

11   objections and require an answer without an

12   objection.

13       Now, what you answer, if there's a problem

14   with the answer, again, that's in the future.

15       MR. OPRISON:  Got it.

16       THE COURT:  But we cannot have an objection

17   and then some sort of answer.

18       MR. OPRISON:  So the same would apply, I

19   think, for Request for Admission 6, same objection,

20   same issue; I suspect same ruling on that as well.

21       THE COURT:  Just as a matter of course, the

22   idea of an objection and then an answer in the same

23   just doesn't work.

24       MR. OPRISON:  Well, typically -- what we're

25   making an effort not to do is do boilerplate

1        objections here.

2             What we said was subject to and without

3        waiving our objections that we made, here's how

4        we're limiting it, here's why we're defining it and

5        making it more specific or more focused or we're

6        explaining why we're denying it.

7             Your Honor, typically when you have

8        boilerplate, as you know, you do your objections

9        and then you say "no documents exist" or "we deny",

10       but we gave an explanation which is -- helps to

11       explain why we denied it subject to the objections.

12            THE COURT:  And I don't know if they're going

13       to -- if you reassert that without the objection,

14       what their position is going to be, but we can't

15       have an objection and then a response in the same

16       category.  That's not allowed.  That's not a

17       proper.

18            MR. OPRISON:  Okay, Your Honor.

19            MR. FRANKLIN:  Thank you, Your Honor.

20            THE COURT:  That takes us -- is that next one

21       RFA Number 3?

22            MR. FRANKLIN:  Yes, Your Honor.  And Janice is

23       comfortable withdrawing her argument as to -- as to

24       that specific argument.

25            THE COURT:  So that's -- RFA Number 3 is

1        withdrawn.

2             MR. FRANKLIN:  And, I believe, that's it, Your

3        Honor.

4             THE COURT:  So, Mr. Franklin, you are to do

5        the order now.

6             When Mr. Oprison -- are you going to be able

7        to get a response in a week from now?

8             MR. OPRISON:  Amended response, Your Honor.

9             THE COURT:  Amended response.

10            MR. OPRISON:  Yes, sir.

11            THE COURT:  What day did we say for the -- did

12       you say you were going to produce the documents?

13            MR. OPRISON:  Next week.  End of next week.

14            THE COURT:  Because Thursday and Friday are

15       Thanksgiving.  I'm just trying to be clear.

16            Is this by Wednesday or by Friday or what is

17       your --

18            MR. OPRISON:  Actually, I had forgotten next

19       week was Thanks -- forgot where we were in the

20       month, Your Honor.  If we could have till the

21       following Monday, that would be preferable.

22       December 2nd.

23            THE COURT:  And, Mr. Franklin, if the response

24       comes on December 2nd, does that work for you?

25            MR. FRANKLIN:  I believe so, Your Honor.

1          THE COURT:  So December 2nd is the deadline

2      for the Amended Response.

3          Anything else with respect to this one before

4      we move on to the next motion?

5          MR. FRANKLIN:  Nothing from me, Your Honor.

6      Thank you.

7          MR. OPRISON:  Thank you, Your Honor.

8          THE COURT:  Now, Ms. Smitha has gone to the

9      lectern because we are up to Smart Communications

10     Motion to Compel Janice Logan's Complete Response

11     to Discovery, which is at DIN 840 and then the

12     response at DIN 855; is that correct?  Is that what

13     we're doing next?

14         MS. SMITHA:  Yes, Your Honor.

15         THE COURT:  Okay.  Ms. Smitha, you have the

16     floor.

17         MS. SMITHA:  Thank you, Your Honor.

18         After close of business last night, Janice

19     produced supplemental discovery responses, but they

20     don't moot this Motion to Compel, namely because

21     her supplemental responses to the request for

22     production make clear the discovery remains

23     outstanding.  For example, in response to RFP

24     Number 31 she says:  Subject to and without waiving

25     the foregoing objections.

1          THE COURT:  We're not doing that.  We already

2     discussed that.  So that's going to have to be

3     cleaned up.

4          MS. SMITHA:  The important part is that she

5     says that she will search for and produce

6     responsive documents, if any.  So our issue with

7     that is that while she agreed to produce responsive

8     documents, she didn't commit to any date certain to

9     producing those responsive documents and these

10    requests were propounded over two months ago.

11         More importantly, though she states in her

12    response that she doesn't believe that she has many

13    more responsive documents, she didn't commit to a

14    date certain by which she's going to actually even

15    look for those documents.

16         So what we're simply asking this Court for is

17    a deadline that not only she look for those

18    documents but that she produce those documents in

19    sufficient time for her December 4th deposition.

20         THE COURT:  And who is going to speak in

21    response?

22         MR. FRANKLIN:  That's me, Your Honor.

23         THE COURT:  Mr. Franklin, you're going to have

24    to remove the conditional objections and then

25    response is either an objection or a response.

1          MR. FRANKLIN:  Understood, Your Honor.  We

2      will do so.

3          But as to the production of documents, we

4      indicated -- I mean, I don't think we're at issue

5      here.  We indicated that we would produce documents

6      before Janice's deposition and we intend to do so.

7          Janice's deposition is scheduled for

8      December 4.

9          MS. SMITHA:  We respectively requested that it

10      be produced by November 25th.  I'm concerned that

11      because we got it last night right before this

12      deposition [sic], they're going to do it -- I mean,

13      that they're going to send it December 1st on the

14      eve of that.

15          We're asking for November 25th so that we can

16      have sufficient time to review and be prepared for

17      the deposition on December 2nd [sic].

18          THE COURT:  And if I were to look at my

19      calendar, is that Wednesday of Thanksgiving?  Oh,

20      no, that's Monday.

21          And you said the deposition is on the 4th?

22          MS. SMITHA:  It's on the -- That's correct.

23          MR. FRANKLIN:  I believe so, Your Honor.

24          THE COURT:  I'm sorry?

25          MR. FRANKLIN:  I believe so.  I believe it's

1      on the 4th.

2           THE COURT:  So, Mr. Franklin, if you were to

3      by, let's say, noon on Wednesday the 27th, revise

4      the response and produce any remaining documents,

5      is that doable?

6           MR. FRANKLIN:  Your Honor, yes.  We are happy

7      to do so.  I mean, just given the Thanksgiving

8      holiday would rather, as Mr. Oprison did, push to

9      Monday, but if we have to, we'll do that.

10          THE COURT:  Well, my concern is apparently

11     that's going to be a fourth deposition.  I could be

12     persuaded to give you until Friday, the day after

13     Thanksgiving, but I don't think I can wait until

14     Monday.

15          MR. FRANKLIN:  In that case, I would prefer

16     Wednesday just to get it out of the way.

17          THE COURT:  Noon on Wednesday, November 27.

18          And, Ms. Smitha, are you going to be able to

19     do that order?

20          MS. SMITHA:  Yes, Your Honor.

21          THE COURT:  Anything else with respect to that

22     motion?

23          MS. SMITHA:  Yes, Your Honor.

24          THE COURT:  Okay.  What's the next piece?

25          MS. SMITHA:  In her supplemental response to

1      her RFP Number 30, she admits that she's missing

2      six years' worth of tax documents, which we find

3      hard to believe because most tax documents aren't

4      due in paper form, but that's beside the point.

5           THE COURT:  Say that again.

6           MS. SMITHA:  She says that she's missing six

7      years' worth of tax documents, and our position is

8      nobody does taxes in paper format anymore.  So how

9      do you not have six years' worth of tax documents,

10     but that's beside the point.

11          We presented them with case law over two weeks

12     ago that said that your duty to produce documents

13     that are in your possession, custody and control

14     also means that if you control somebody else that

15     you can direct to produce those documents such as

16     the IRS, then that includes your duty to produce.

17     And so we said:  You can go to the IRS and you can

18     ask them for those documents.  We can't do that

19     because they won't talk to us.  We're not the

20     taxpayer.

21          THE COURT:  Are you asking for -- and I forget

22     the terminology.  One is like a quicker, like the

23     tax transcript, and then there is one that you get

24     a copy of the return but that takes a long time.

25     So which one were you --

1          MS. SMITHA:  With the deposition around the

2     corner, we were hoping for the quickest possible.

3     The problem is they sat on this for two weeks.

4     Apparently, they were waiting for some sort of

5     return promise that we were going to obey the same

6     case law that we already told them controlled here.

7     And we never indicated that we were missing any tax

8     documents that we would need to go to the IRS for

9     any tax documents.  So I don't understand why it

10    was an issue for us to even promise that we were

11    going to be subject to that.

12         THE COURT:  Well, I mean, it would seem to me

13    that if, ultimately, you don't get the tax

14    documents prior to the deposition, then that,

15    basically, is going to mean she would have to resit

16    on that issue if the tax documents come later.

17         MS. SMITHA:  Well, Your Honor, I actually

18    believe that there's tax documents that pertain to

19    the decedent and the estate, and I don't know if

20    that's a separate deposition or not.

21         THE COURT:  Well, let's talk about getting the

22    documents first.  So who's going to speak on that?

23         MR. FRANKLIN:  It's still me, Your Honor.

24         And we indicated to Ms. Smitha that we were

25    willing to do this.  We did indicate that we would

1          hope that given that Janice's propounded identical

2          requests to Jon and Smart Comm that they would

3          commit to doing the same if they were not in

4          possession and we never heard back from Ms. Smitha

5          prior to the filing of this motion.

6               THE COURT:  Have you asked the IRS yet for

7          the -- is it "tax transcript"?  Is that the

8          correct --

9               MS. SMITHA:  It would be whatever we're asking

10         that's responsive to our request, which, I believe,

11         was tax documents for twenty-twenty -- going back

12         to two thou -- let me pull it up so I can speak

13         intelligently.

14              THE COURT:  No, no.  What I'm saying is if

15         they don't physically have them --

16              MS. SMITHA:  Uh-huh.

17              THE COURT:  -- which it sounds like that's on

18         the response --

19              MS. SMITHA:  There is a tax form.  I think

20         it's 1190, something like that, you submit to the

21         IRS and ask them to provide it to you.

22              THE COURT:  Right, but what I'm saying is my

23         recollection is there's two different variants.

24         One is you just get the electronic data which comes

25         much faster and then the other is they'll send you

1       a copy of the paper form, that takes forever.

2            MS. SMITHA:  Uh-huh.  We would want quick as

3       possible.

4            THE COURT:  Mr. Franklin, have you started the

5       process with the IRS.

6            MR. FRANKLIN:  Not that I'm aware of, Your

7       Honor.

8            THE COURT:  So you're going to be able to do

9       that early next week.

10           MR. FRANKLIN:  I believe so.

11           THE COURT:  That wasn't a question.

12           MR. FRANKLIN:  Okay.

13           THE COURT:  Because it's just a -- I think

14      it's a one- or two-page form that has to be

15      submitted.  So I think you just need to get your

16      clients to sign the appropriate forms and send it

17      on in.

18           MR. FRANKLIN:  Okay.

19           MS. SMITHA:  And, Your Honor, I don't want to

20      be greedy, but --

21           THE COURT:  Or it might even be an electronic

22      submission.  Something tells me that that might be

23      permissible as well.

24           MS. SMITHA:  May we request both because we

25      have the time sensitivity that we want it as

1           quickly as possible but to the extent that it

2           doesn't have all of the information, we would like

3           the opportunity to have a full and complete

4           response at whatever time it comes back.

5                THE COURT:  I don't think it costs anything.

6           So I don't mind requiring both to be requested, but

7           I'm more interested in getting the fast one here

8           fast.  I don't know if it's appropriate to say "the

9           fast one."  It's the faster one.

10               Okay.  So, Ms. Smitha, are you going to

11          include that in your order?

12               MS. SMITHA:  Yes, Your Honor.

13               THE COURT:  Thank you.  Anything else your

14          motion that we have to address?

15               MS. SMITHA:  Yes, Your Honor.

16               We also received supplemental responses to the

17          interrogatories, and I'll read you the exact

18          request and answer momentarily, but I just wanted

19          to kind of T up the issue for you.

20               And that issue is that in her supplemental

21          response it refers back to documents.  Instead of

22          saying "Here's the information," it says, "Here, go

23          look at these documents and the information is in

24          there."  Those documents contain some of the

25          information that's requested in the interrogatory,

1      but it doesn't include the amount that Janice

2      retained from the sale of the decedent's cars.  And

3      I'll also point out that the interrogatory response

4      also says that it's subject to and without waiving.

5      So to the extent that there was any information

6      that was withheld based on those objections, we

7      would ask that the amended response provide that

8      information as well.

9          THE COURT:  Everyone's heard my position on

10     you cannot have an objection and then a

11     subject-to-and-without-waiving answer.  That is

12     just flatly wrong.  And if it exists, it needs to

13     be redone.

14         MS. SMITHA:  Would Your Honor like me to

15     read --

16         THE COURT:  Please.

17         MS. SMITHA:  -- into the record the

18     interrogatory?

19         Sorry.  Let me go to that page.

20         The request said:  Identify each and every car

21     or thing of value purchased, owned, or used by

22     decedent that has been sold since decedent's death,

23     including the amount that the item was sold for and

24     the amount that you retained from the sale, if any.

25         THE COURT:  I'm sorry.  Is this an

1          interrogatory or is this a request to produce?

2                  MS. SMITHA:  It's an interrogatory.

3                  THE COURT:  Can you read it to me again?

4                  MS. SMITHA:  Sure, Your Honor.

5                  "Identify each and every car or thing of value

6          purchased, owned, or used by decedent that has been

7          sold since decedent's death, including the amount

8          that the item sold for and the amount that you

9          retained from the sale, if any."

10                 THE COURT:  "Car or thing of value"?

11                 MS. SMITHA:  In the meet and confer, we

12         changed it to anything that was a thousand dollars

13         or more.

14                 THE COURT:  And then what is the response?

15                 MS. SMITHA:  The response was 2020 Chevy

16         Corvette, which was a gift from Jon to Jim, and

17         then refers to a slew of Bates documents.

18                 Then Corvette Stingray, again refers to Bates

19         ranges.

20                 And then 2015 BMW, which Janice gifted rather

21         than sold, and then refers to Bates numbers.

22                 And when I went back and reviewed those Bates

23         numbers, again, it was late last night and I was

24         preparing for other things today, but I didn't see

25         anywhere where that could be -- the information

1          could be retained from those documents as to how

2          much of that sale price Janice kept.

3                 THE COURT:  And Mr. Franklin.

4                 MR. FRANKLIN:  Yes, Your Honor.

5                 It was our position that those documents were

6          responsive given that they contained the sales

7          price themselves, and information about the

8          transfer prior to sale.

9                 I -- I -- I would argue that that provides

10         sufficient information, but if need be, we are

11         happy to amend.

12                THE COURT:  So it's just four different

13         responses?

14                MS. SMITHA:  I believe it's three, Your Honor.

15         Three different cars.

16                THE COURT:  Three different things?

17                MS. SMITHA:  Uh-huh.

18                THE COURT:  Doesn't sound like it's going to

19         be too taxing to get a revised.  So what number is

20         this?

21                MS. SMITHA:  Interrogatory Number 1, Your

22         Honor.

23                THE COURT:  Rog 1.  So a revised response by

24         Wednesday at noon.

25                Anything else?

1          MS. SMITHA:  Yes, Your Honor.

2          In response to Interrogatory Number 13, she --

3     the request says:  Identify any costs associated

4     with the Lexus in Peterson's wedding that were paid

5     for by you, decedent, or Smart Communications and

6     where the funds to pay for such costs came from.

7          And then the supplemental answer was:  Subject

8     to and without waiving the foregoing objections,

9     Janice Logan paid for the wedding costs out of her

10    personal bank account.

11         So she says where the funds were paid from,

12    but not identifying any of the costs that were paid

13    for from the funds.  So that was the only issue

14    that we were addressing --

15         THE COURT:  I'm sorry.  She said that she paid

16    for -- I'm sorry.

17         Janice Logan said that she paid for the

18    wedding costs out of her own personal money?

19         MS. SMITHA:  Yes, Your Honor, but without any

20    documents, we don't have any way to do any further

21    discovery.  We just have to take her word for it:

22    "Yeah, I paid for it with my money."  But if she

23    said, "We bought this, we bought that, we bought

24    that."

25         THE COURT:  This is an interrogatory request;

1          it's not a discovery.

2              MS. SMITHA:  Yes, Your Honor.  But we had RFP

3          requests --

4              THE COURT:  Oh.

5              MS. SMITHA:  -- that were tangentially

6          related.

7              THE COURT:  Well, how did they answer that

8          RFP?

9              MS. SMITHA:  Without -- I haven't gone through

10         everything.  So I don't -- to my knowledge, there

11         haven't been any documents that were produced that

12         say what Janice paid for.  I'm not aware of

13         anything that indicates that.

14             I believe there is a fight over --

15             THE COURT:  I mean, obviously, if there was a

16         conditional objection, we need to remove that.  But

17         if she, being Janice Logan, said she paid for it

18         out of her own personal funds, then that's her

19         sworn statement; right?

20             So all I want to do on that one is if there

21         was a conditional objection, that needs to be

22         removed.

23             Okay.  What's the next one?

24             MS. SMITHA:  Janice has failed to identify any

25         documents produced in Phase One that are responsive

1       to Phase Two requests.

2           THE COURT:  I'm sorry.  Are we on a document

3       request now?

4           MS. SMITHA:  Essentially, what happened was

5       there were --

6           THE COURT:  I'm sorry.  I need --

7           MS. SMITHA:  Yes.  It's a --

8           THE COURT:  -- a document request number.

9           MS. SMITHA:  It was -- It was a general group

10      where in response to a request for production, she

11      said:  We already produced stuff in Phase One.  And

12      in the meet and confer, you said -- we said you

13      can't just say:  Go fish through all these

14      documents that were produced in Phase One.  And

15      they said:  Okay, that's fine.  Just like you have

16      referred us back to Bates numbers, we will do the

17      same thing.  We will tell you, here are the Bates

18      ranges in Phase One that are responsive to your

19      Phase Two requests.

20          So they agreed to do that, but, once again, we

21      don't have a date commitment, a firm timeline of

22      when we're going to actually get that.  So we're

23      just asking the Court to say:  Okay, you said you

24      were going to provide it, now you need to provide

25      it by this date certain.

1          THE COURT:  I guess -- Let me say what I heard

2     and then you can correct me where I'm wrong.

3          That there were prior documents that Janice

4     Logan produced in Phase One, and according to some

5     further document request that has occurred in the

6     most recent phase, there was a statement that these

7     documents have been previously produced and Janice

8     Logan has agreed to identify the Bates numbers

9     where the previous documents were produced that are

10    responsive to the second-phase document request.

11    And they just haven't told you when -- by when

12    they're going to do that.

13         MS. SMITHA:  Yes, Your Honor.

14         THE COURT:  Wow.  Okay.  So Mr. Franklin.

15         MR. FRANKLIN:  Yes, Your Honor.

16         THE COURT:  Thoughts on that.

17         MR. FRANKLIN:  I mean, as we indicated in our

18    response, I don't think we're at issue on this

19    either.

20         Janice produced more than 13,000 pages of

21    documents in Phase One, so it's just going to take

22    a little time.  But it's -- we agreed to do it.

23         THE COURT:  All right.  I don't think given

24    that the documents have been previously produced

25    that I need to push this one by next Wednesday.

1          So, Mr. Franklin, when can you legitimately

2     do, I guess, whatever you had agreed to do?

3          MR. FRANKLIN:  Since we're doing answers by

4     December 6, maybe early the following week?

5          THE COURT:  Wednesday, the 11th?

6          MR. FRANKLIN:  I believe that will work, Your

7     Honor.

8          THE COURT:  I mean, if they've produced the

9     documents previously in Phase One, I'm not as

10    concerned about that issue.  So December 11th for

11    those.

12         Anything else?

13         MS. SMITHA:  Yes, Your Honor, one last point.

14    And that is that we served these discovery requests

15    in September; September 10th.  We are over two

16    months later that we're actually getting responses

17    last night, in fact.

18         And our concern is that we had the luxury of

19    time to go back and forth on these multiple meet

20    and confers.  They had boilerplate, meritless

21    objections that took multiple meet and confers to

22    finally break through and finally get some

23    substance.  And we're concerned that the same thing

24    is going to happen with this second set of

25    discovery requests that are due on December 2nd.

1           And so we're just asking the Court to request

2       that there be a good faith production on

3       December 2nd and not just that "We will produce

4       responsive documents."  We need, like, actual

5       responsive documents on December 2nd with the

6       deposition on December 4th.

7           THE COURT:  Well, it seems to me that everyone

8       needs to kind of act with dispatch since we've got

9       our kind of trial schedule out there.  So I'm

10      hopeful my comments about "no conditional

11      objections" will hopefully solve that issue.  And I

12      remain hopeful that people just know they have got

13      to produce documents and they produce them, and

14      that the parties need to -- when the lawyers say

15      "We need these documents or access to these

16      documents," that it is number one priority because

17      everybody needs to get this case behind them.

18          MS. SMITHA:  I agree, Your Honor.

19          We're just concerned we're just going to get a

20      response that says, "We will produce" and then not

21      get anything.

22          THE COURT:  It's tough for me to, without a

23      specific issue, to make a specific ruling.

24          MS. SMITHA:  Yes, Your Honor.

25          THE COURT:  I'm hopeful my comments will help.

1           MS. SMITHA:  I appreciate it.  Thank you.

2           THE COURT:  Okay.  Ms. Smitha, you are to do

3       the order from this motion.

4           MS. SMITHA:  Thank you, Your Honor.  I have

5       one more before I leave.

6           THE COURT:  Oh.  Are we still on the same?

7           MS. SMITHA:  No, Your Honor.  The next motion.

8           THE COURT:  Then let me stay organized here.

9       I'm sorry.

10          This next one is Smart Communications' Motion

11      to Compel Alexis' Complete Responses to Discovery

12      at Docket Identification Number 841?

13          MS. SMITHA:  That's correct, Your Honor.

14          THE COURT:  Okay.  You have the floor.

15          MS. SMITHA:  Thank you, Your Honor.

16          We were able to work through almost all of the

17      issues with Alexis; this is Alexis' counsel.

18          The only remaining issue is that they produced

19      several documents last night, or I should say,

20      several PDFs last night that were hundreds to

21      thousands of pages long.  And they had documents

22      all kind of jumbled together, and we tried our

23      best.  But I sent counsel Excel spreadsheet columns

24      that had about 40 entries where we just had no

25      idea, like, how are these documents connected,

1      because we don't have the metadata to understand

2      the family relatedness between the documents.

3           And so I said, Can you please -- and I

4      actually have made this request multiple times over

5      the past couple of weeks -- Can you please give

6      us -- or past couple days -- Can you please give us

7      the TIFF load files so that we can get the metadata

8      behind these documents, so that we can understand

9      the interrelatedness between the documents.  And so

10     that's really the only issue.

11          All of their prior productions have been

12     TIFF-load files.  It's just this one production

13     that was in PDFs that we haven't been able to get

14     them to agree to provide us that additional

15     information.

16          MR. JOHNSON:  May I?

17          THE COURT:  Yes.

18          MR. JOHNSON:  The book I handed you is -- the

19     Request for Production is under Tab Number 1, and

20     I'm not going to bore you with each one of these

21     letters, but Tabs Number 2 through 9 are my back

22     and forth with Ms. Smitha.

23          Going forward up to my production which

24     occurred on -- just one second.  November 13th was

25     the initial production.

1              Ms. Smitha asked for a -- by the way, the
2       November 13 production was a PDF, just as my
3       production was in this case last year:  All PDFs.
4       I mean, I don't mean to surprise the Court, but I
5       don't have any discovery vendor on this case.  I'm
6       sitting over there dealing with this case about who
7       paid for your wedding and who helped pay for your
8       car.  So I'm trying to proportionally provide
9       discovery in this case.

10             So where I was before I segued myself was
11      November 13th I did my initial production in the
12      course of good faith with Ms. Smitha.  She filed
13      her Motion to Compel on November 15th, two days
14      after my initial production.

15             The Motion to Compel in this case, if you look
16      at the wherefore clause makes no mention at all as
17      to the method for production, TIFF metadata or
18      otherwise.

19             And then the reason I handed you this binder
20      is under Tab Number 10 is Ms. Smitha's e-mail to me
21      from two days ago where the first paragraph, for
22      the very first time, says "Now we want TIFFs."

23             So I'm a minor player in this.  There's
24      nothing about the production from my client that's
25      going to tilt the scales in this case.  In other

1          words, the big scale, the one you're really looking

2          at.  So we would respectfully request it's

3          something that can't be done in a day if we have to

4          go back and reproduce everything in an entirely

5          different format.

6              MS. SMITHA:  I just want to clarify.  We have

7          got a lot going on and they produced thousands of

8          pages.  And so it was only until recently that we

9          were able to get through it and understand that we

10         didn't understand what they produced.

11             And I sent a spreadsheet that says:  These are

12         the 40 documents that we don't understand how

13         they're related.  And I said:  If you can clarify

14         how they're related or provide the TIFF, that's

15         what we're seeking.  And I didn't get a response.

16         Granted, it was last night, but that's because it's

17         when I got the information.

18             THE COURT:  Based on the -- and it's not the

19         final answer, but sounds like the issues relative

20         to Alexis Logan and Justin are in the six figures

21         as opposed to seven, eight or nine figures.

22             I don't -- unless your client's willing to

23         take on the financial obligation of going back and

24         recollecting to put all this into some sort of

25         ESI-type of discovery, I don't think that we need

1    to do anything further on this discovery request.

2         So my ultimate view is right this second, it's

3    a denied unless your client wishes to come in and

4    bear the cost associated with bringing in an

5    electronic vendor.

6         MS. SMITHA:  Can we put if down as denied

7    without prejudice, Your Honor, just in case as we

8    review it it becomes important?

9         THE COURT:  That sounds good.  And you can

10   actually draft the order, Ms. Smitha.

11        MS. SMITHA:  Thank you, Your Honor.

12        THE COURT:  Denied without prejudice.

13        Where'd my sheets go?

14        Anyone need a comfort break?  We only have a

15   couple more to go.

16        Why don't we take a five-minute comfort break.

17   Take five minutes.

18        THE COURT REPORTER:  Thank you, Your Honor.

19        THE COURT:  You're welcome.

20        (A break was taken at 2:50 p.m. and the

21   following commenced at 3:03 p.m.)

22        THE COURT:  Before we do the indemnification,

23   there is the Unopposed Motion to Appoint

24   Commissioner and Authorization of Out-of-State

25   Deposition of Mike Shreve -- is that the correct

1    pronunciation -- at DIN 850.  Is that still

2    unopposed?

3         MR. O'NEILL:  Yes, Your Honor, it is.  And I

4    believe my assistant might have submitted the order

5    this morning, if I'm not mistaken, on that.  We got

6    an agreement last night.

7         THE COURT:  So, Mr. O'Neill, you are to submit

8    it and if you're saying it's already here, then I

9    appreciate that.

10         MR. O'NEILL:  Sounds good.

11         THE COURT:  And that's a grant.

12         That takes us to Janice Logan's Motion for

13    Phase One Costs and Phase Two Indemnification at

14    DIN 834.  Who's --

15         MS. LIU:  That would be me, Your Honor.

16    Kailin Liu for Janice Logan.

17         THE COURT:  Okay.  And then the response is

18    854.

19         Let me turn this up just a little.

20         THE COURT REPORTER:  Thank you.

21         THE COURT:  You're welcome.  I didn't realize

22    when I became a judge, I was also going to be a

23    sound engineer and a TV director.

24         Ms. Liu, you have the floor.

25         MS. LIU:  Thank you, Your Honor.

1          I'm going to begin with the motion for Phase

2     One costs and I want to cover four things:  One,

3     why it's proper to move for costs now; two, the

4     relevant statutory authority and legal standard;

5     three, addressing Smart Comm's point about the

6     evidentiary hearing; and, four, why the other costs

7     should be awarded.

8          So I'll start with why now.  Two reasons.  The

9     first is that it's permitted under Rule 1.525

10    because, as we all know, Phase One was about the

11    validity of the purported Shareholders' Agreement

12    and the Phase One judgment disposed of all claims

13    against Janice and the original 1002 Complaint.

14    All of those counts had to do with the

15    Shareholders' Agreement.  There was a ruling on

16    that.  Those counts went away.

17         It is true that Jon and Smart Comm did amend

18    the 1002 Complaint, but the amendment stems from

19    entirely different facts than in the original 1002

20    Complaint.

21         And, as a practical matter, we didn't move for

22    costs right away after the Phase One judgment

23    because we thought it would be more efficient to do

24    everything at the end of Phase Two.

25         Phase Two unfolded very differently than we

1      thought it would.  For one, it's a lot more

2      expensive and, quite candidly, we'll get into this

3      later with the indemnification, Janice needs money

4      to continue the litigation.

5          Moving on.  With the statutory and legal

6      authority for the taxation of costs, we agree that

7      86.081 applies to the taxation of costs for

8      declaratory judgment actions and the standard in

9      that statute is what is equitable.

10         There is not a ton of authority out there on

11     what is equitable in this context.  And the only

12     authority that I'm aware of that gives guidance to

13     this Court's discretion on taxation of costs is the

14     uniform guidelines -- the uniformed guidelines and

15     the taxation of costs.  And that's what Janice

16     has -- that's what we referred to in our motion.

17         As an aside, Smart Comm's response seems to be

18     saying that taxing Phase One costs against them

19     would only be equitable if there had been some sort

20     of factual finding or legal conclusion of fraud or

21     other sort of malfeasance.

22         They did not cite a case to support that and I

23     don't agree that that's the standard.  Moreover, it

24     is true that at the end of the Phase One trial,

25     this Court did not draw a legal conclusion that

1    fraud or wrongdoing had occurred.

2         But this Court did conclude or did make the

3    factual finding that the circumstances surrounding

4    the discovery of the purported Shareholders'

5    Agreement was suspicious and this Court did not

6    credit Jon's sworn testimony that Jim did sign that

7    document, and prosecuting a lawsuit based on a

8    suspicious document would cross the line into fraud

9    or malfeasance.

10        Third, a quick procedural point on the

11   evidentiary hearing.  I do agree that under Second

12   DCA precedent, if Smart Comm specifically objected

13   to the reasonableness and necessity of specific

14   costs, then the correct next step is an evidentiary

15   hearing on the reasonableness and necessity of

16   those specific costs.  And I understood that they

17   made that objection when contesting the bundled

18   costs and travel expenses for the handwriting

19   expert, Dr. Mohammed, and the $19,000 transaction

20   for equipment rental to assist the reporter -- or

21   excuse me -- the court reporter at trial.  So I

22   agree that those two things should be addressed at

23   an evidentiary hearing.

24        But because they did not specifically object

25   the reasonableness and the necessity of everything

1          else in her motion for Phase One costs, those other

2          costs can be awarded without an evidentiary

3          hearing.

4               So that brings us to my last point on the rest

5          of those costs and why those should be taxable.

6          The burden as stated in the Uniform Guidelines on

7          recovering those costs are whether they are

8          reasonably necessary, either to defend or prosecute

9          the case, at the time the activity precipitating

10         the cost was undertaken.  And I'm just quoting the

11         language and guidelines there.

12              We've met that burden.  We met that burden

13         when we attached invoices and a spreadsheet for

14         those other costs.

15              THE COURT:  Let me just stop you for a second

16         and let me back up.

17              On the table that you have in your Phase One

18         costs, is there anything that is agreed to?

19              MS. LIU:  Agreed to between us and the Smart

20         parties?

21              THE COURT:  Correct.

22              MS. LIU:  Not that I'm aware of.  But they did

23         not specifically object to reasonableness and

24         necessity, and that is what is required in the

25         standard.

1          THE COURT:  Well, let's go back to the -- let

2     me think for a second.

3          There is no agreement between the parties on

4     the costs.  Is there -- Let me remind myself of

5     your position.

6          Let me rephrase.

7          I know there's the legal issue as to whether I

8     can enter it now.  But putting that issue aside, is

9     there any alternative agreement that, Hey, if Judge

10    Carroll says it can be, we agree to costs A, B, C,

11    D, G, you know, anything like that, or --

12          MS. LIU:  No, Your Honor.

13          THE COURT:  I think I only had one hearing

14    where there was contested costs.

15          Okay.  You can continue, Ms. Liu.

16          MS. LIU:  Thank you.

17          Janice met the burden of showing

18    reasonableness and necessity via the attached

19    invoices and the attached spreadsheet.  And in

20    their opposition, Smart Comm has not actually

21    disputed reasonableness or necessity for the

22    spreadsheet costs and the invoices, minus the

23    equipment rental and minus the bundled cost for

24    Dr. Mohammed.

25          They did say that the spreadsheet was not easy

1        to read.  But, respectfully, Your Honor, the

2        spreadsheet is very easy to read if you zoom in.

3        It has dates, vendor names, amounts, and

4        descriptions for the individual costs and that's

5        enough to assess reasonableness and necessity.

6        And, again, these are for very normal, quotidian

7        things like filing fees and deposition transcripts.

8            So it's our view that Janice has met her

9        burden for taxation of those costs.  Nevertheless,

10       if Your Honor wants more documentation on the costs

11       and the spreadsheet, we can certainly submit that.

12           And, finally, there is a whole category of

13       costs that Smart Comm did not dispute as

14       unsupported or unreasonable or unnecessary, and

15       that did have invoices, and because of the absence

16       of dispute, those should be awarded; specifically,

17       the mediator fees, the ESI fees, the fees to depose

18       Mr. Vastrick; and Dr. Mohammed's non-bundled fees

19       for making the expert report and preparing for

20       testimony.  And that wholly undisputed category is

21       just shy of $28,000.

22           So we respectfully request that even if this

23       Court wants more documentation on the spreadsheet

24       costs and pending an evidentiary hearing, that the

25       $28,000 be awarded to Janice now.  There is no

1    reason to delay that.

2         THE COURT:  Well, let me hear on the

3    overarching issues and then we'll dig into the

4    individual claims, if we need to.

5         MS. LIU:  Are you asking me to speak, Your

6    Honor?

7         THE COURT:  No.  I'm asking Mr. Hillsley.

8         And I entered a judgment; right?

9         MR. HILLSLEY:  You did, Your Honor.

10        THE COURT:  And so the Motion's timely because

11   of the Order on the extension; right?

12        MR. HILLSLEY:  So the order on the extension

13   is timely.  The request is timely in the sense that

14   it has not expired, but it has not expired because

15   the deadline doesn't accrue until the end of the

16   case.  And, frankly, Ms. Logan, Janice, took that

17   position in the request for the extension.

18        So Rule 1.525 is pretty clear that you need a

19   final judgment or notice concluding the case, which

20   is not what happened.  We don't have a concluded

21   case.  And so for that reason, the motion should be

22   denied without prejudice until the conclusion of --

23        THE COURT:  So when the order says, This order

24   does not limit Janice Logan's right to submit the

25   Rule 1.525 Motion for Fees and Costs relating to

1    Phase One earlier?

2    MR. HILLSLEY:  Your Honor, the motion, the

3    unopposed motion that requested that order that

4    resulted in that order, that's DIN 656 that was

5    filed on February 21st, 2024 shortly after the

6    trial, Janice took the position, she said, quote,

7    While the declaratory judgment for Phase One issues

8    did not conclude the action as to Janice, to the

9    extent anyone might contend that it did -- and

10   mind, Your Honor, nobody took that position -- any

11   motion for costs and attorney's fees under Rule

12   1.525 would be due on March 8, 2024 -- again, no

13   one took that position -- three weeks before

14   mediation must be concluded, end quote.  She then

15   sought a, quote, extension out of an abundance of

16   caution.

17   So Janice's position was that costs weren't

18   appropriate to be awarded until the end of Phase

19   Two.

20   She's changed her position because if we take

21   the representation from counsel, they want more

22   money to fund this litigation.  That is not a basis

23   to prematurely award costs.

24   For what it's worth, Your Honor, Smart also

25   has a pending Motion to Award Costs that we have

1    been sitting on for, I believe, over a year.  This

2    is DIN 531.  And that we're sitting on until the

3    end of Phase Two because that's the appropriate

4    time to award costs.

5        Now, if the Court decides to take up the issue

6    before the end of Phase Two or before the end of

7    the case, Florida law is clear that an evidentiary

8    hearing is required specifically to address these

9    types of issues.  And we cited the Bateman, Parker,

10   Minkoff and Arango cases in our papers.  Those are

11   just examples.  There would be a host of others

12   that make clear that this is the rule in Florida.

13       Even Janice acknowledged in her Amended Motion

14   to Determine Fair Value that evidentiary hearings

15   are required when there are disputed questions of

16   fact, and she cites the Giat case for that

17   proposition.

18       Now, you've heard from counsel that we didn't

19   take issue with the costs.  That's not true.  What

20   the motion says -- or what the opposition says is

21   that we take issue with this.  This is both

22   premature and not appropriate to handle absent an

23   evidentiary hearing and gave examples of why.  But

24   those weren't meant to be exhaustive.  It was meant

25   to illustrate the need for an evidentiary hearing

1     to address this.

2          So, again, our position isn't at this time the

3     motion should be denied.  It's that it should be

4     denied without prejudice, either to be addressed

5     after Phase Two or if Your Honor believes that Rule

6     1.525 is more flexible than I believe it is, then

7     in connection with an evidentiary hearing.

8          THE COURT:  As it relates to entitlement to

9     costs related to Phase One, the Court will note

10    that it did enter a judgment.  The parties agreed

11    to sever, and Janice Logan was the prevailing party

12    as to that litigation.  The motion is timely.  And

13    so I'm going to find an entitlement for costs.

14         Now, Mr. Hillsley's correct that if you all

15    can't work it out, we'll have to have an

16    evidentiary hearing on any sort of disagreement.  I

17    think in the nine years, I think I've had one cost

18    hearing.

19         MR. HILLSLEY:  We'll try to work it out, Your

20    Honor.

21         THE COURT:  Thank you.

22         And so, Ms. Liu, as to Phase One, cost, you're

23    to do the order.  It's just finding an entitlement.

24    Okay?  The amount will be reserved on because you

25    will have to either agree to the amount or we'll

1          have to have an evidentiary hearing.

2                  So let's move on to indemnity.

3                  And you're muted, Ms. Liu.  There you go.

4                  MS. LIU:  Thank you, Your Honor.

5                  To start off for some background on the

6          indemnity piece, right now there is a clear

7          disparity on what's going on in this lawsuit.  Jon

8          is being indemnified by the company for the claims

9          against him.  Janice, on the other hand is

10         self-funded.  But the claims in both pleadings, at

11         least a subset of them, are extremely analogous, so

12         that disparity should not exist.

13                 So four things I'm going to hit on:  For one,

14         I'm going to clarify the relief requested; two, I'm

15         going to explain why it's proper for Janice to be

16         asking for that relief; three, why the claims

17         against Jim stem from his position and not from his

18         conduct; and, finally, why indemnification and

19         advancement are fair and reasonable.

20                 I'll start with the relief requested.  Janice

21         is only seeking an indemnification related to

22         claims brought against Jim's estate.  So if I'm

23         reading the Smart parties' response correctly,

24         we're actually aligned on that point.

25                 Point two:  Why it's correct for Janice to be

1      asking for that relief?  The claims in Jon and

2      Smart Comm's First Amended Complaint are pled

3      against Jim's estate, so the estate gets to defend

4      and the person who is responsible for that defense

5      is Janice.

6          Point three:  Jim's estate is a party because

7      of his position and not because of his conduct, and

8      so moving for indemnification under 607.0854 is

9      proper.  And to understand why that is, we have to

10     take a somewhat close look at the claims in the

11     First Amended Complaint.  That pleading has ten

12     counts against Jim and about half of them expressly

13     hinge on his duty as an officer and director of the

14     company.  For example, Counts 9, 10, and 12 allege

15     breach of fiduciary duty.

16         So to say it another way, without that

17     position as an officer and director, there is no

18     duty.  Without a duty, there's no basis for those

19     claims.

20         Now, there are other counts.  Those other

21     counts are based on overlapping factual allegations

22     and they relate to a course of dealing in a

23     long-standing corporate practice where the two

24     shareholders and officers took in-kind

25     distributions.  Long-standing corporate practice is

1       a very different thing than individual conduct.

2            Final point:  Why an indemnification and

3       advancement are fair and reasonable.  And, here,

4       I'll borrow from some of the language in the Smart

5       parties' response about peculiar facts and what

6       they are.

7            First peculiar fact:  Janice cannot afford the

8       defense otherwise.  Smart Comm did raise a concern

9       that if they advance her money and she doesn't

10      have -- she doesn't have any money of her own,

11      they're going to be hosed because she can't pay it

12      back.  But let's not forget that at the end of the

13      Phase Two trial, there is going to be an order

14      where Smart Comm is going to pay her for her shares

15      and at that time, if she needs to pay anything

16      back, she'll have money.

17           Second peculiar fact, a very peculiar one:

18      Smart Comm is indemnifying Jon, even though the

19      allegations against him have a lot of parallels to

20      the claims again Jim insofar as both are alleged to

21      have taken company money for improper, personal

22      use.

23           A couple points on this -- this idea of Smart

24      Comm indemnifying Jon.  We know that he's

25      indemnified from the financial records.  Smart Comm

1          doesn't dispute that.  And we also know that Smart

2          Comm Delaware's LLC agreement has a provision that

3          indemnifies Jon as well.

4              Further, in Supplemental Exhibit 5A, which was

5          in the binder that we submitted to everybody on

6          Tuesday night, Supplemental Exhibit 5A shows that

7          in August of 2017, Jim and Jon executed a mutual

8          general release which has a provision on

9          indemnification that's pretty broad, I won't read

10         it, but it basically covers all claims against

11         either of them arising through their conduct and

12         services with respect to the ownership, management,

13         and operation of Smart Comm.

14             So Supplemental Exhibit 5A is in the hearing

15         binder.  The first part of that is a Share Title

16         Transfer Agreement, which was executed in September

17         of 2017, and Exhibit 8 of that agreement is the

18         mutual general release.  In Section 3 of the mutual

19         general release is a provision on defense and

20         indemnification.

21             So we have that agreement from several years

22         ago and assuming that the presence of that

23         agreement doesn't entirely resolve the question, it

24         certainly weighs in favor of indemnification being

25         fair and reasonable because Jon is enjoying the

1         fruits of that provision.  Jim's estate is not.

2              Final point:  When considering what's fair and

3         reasonable, the First DCA in the Turkey Creek case

4         has ruled that it is not appropriate to rely solely

5         on the allegations in the pleadings.  So what that

6         means is it is not proper to look only at Jon and

7         Smart Comm's pleadings and conclude that Jim did

8         all this bad stuff and so, therefore, his estate is

9         not entitled to indemnification.  Similarly, it is

10        not proper to look solely at their pleadings and

11        conclude that Janice has all this money from the

12        company that she's not supposed to have and so she

13        shouldn't get indemnification or advancement.

14             Rather, consideration of those allegations

15        should be wrapped up in light of other information

16        in the lawsuit.  Such as the fact that Jon is being

17        indemnified for parallel claims.  Previous

18        testimony that use of company assets is a

19        shareholder distribution, and there is no doubt

20        that Janice is a shareholder.  And, finally, the

21        sharp, factual dispute which we've covered at

22        length today on whether Jim breached his duties at

23        all, especially with related to any IP-related

24        agreements.

25             Thank you, Your Honor.

1          THE COURT:  Mr. Hillsley.

2          MR. HILLSLEY:  Thank you, Your Honor.

3          Janice requests indemnification and

4    advancement of fees and costs in connection with

5    the claims against James Logan's estate only.

6    That's confirmed.

7          Ms. Logan is not an officer or director of

8    Smart and she's not seeking advancement or

9    indemnification in connection with claims alleged

10   against her nor would she be entitled that under

11   the statute given that she's not a shareholder --

12   oops, sorry -- given that she's not an officer or

13   director.

14         What we have here is a company that did not

15   provide for mandatory indemnification or

16   advancement in its governance documents, and in

17   this situation, the Florida Statutes permit the

18   Court to award indemnification and/or advancement

19   but only where there are three things:  One, an

20   officer or director is a party to the proceeding;

21   two, the claims concern actions taken in that

22   capacity; and, three, where it's fair and

23   reasonable under the circumstances.

24         Here, Jim Logan is not a party to this

25   proceeding.  The statute does not provide for

1    indemnification or advancement in favor of his

2    estate.  And Ms. Logan cites no case law that

3    suggests the Court should or even could depart from

4    this requirement in the statute.

5         The Court can stop there as there is no right

6    to indemnification or advancement under the statute

7    and there is no provision for it in the operating

8    agreements.

9         If the Court needs further reasons, the

10   statute makes clear that a determination on

11   indemnification is premature until the proceeding

12   is concluded.

13        If Your Honor has done indemnification awards

14   before, that's a familiar concept.  In fact, if the

15   officer or director is adjudged liable, which is

16   when indemnification kicks in, indemnification

17   under the statute is limited to expenses incurred

18   in connection with the proceeding per

19   607.0854(1)(c), and this is consistent with the

20   Turkey Creek case that counsel just referenced.

21   That's 766 So.2d 1245 noting that pleadings are not

22   sufficient for an award of indemnification.  What

23   the court's actually saying there is that you need

24   a conclusion of the case to determine whether

25   there's claims that aren't barred and can be

1    indemnified for.

2         This means that indemnification is not on the

3    table at this time.  It would only be advancement

4    that is up for the judge to consider.

5         There are a host of reasons why the Court

6    should not authorize advancement here.  The first,

7    of course, is the corporation has not authorized

8    advancement.  So this would be the Court overriding

9    that decision by the company and imposing an

10   additional financial burden on the company it

11   hasn't elected for itself.  The Court obviously can

12   do that, but as noted in the comment to Section 854

13   of the model rules, that's only appropriate where

14   there are peculiar facts that weren't doing so and

15   it appears there is no disagreement on the law in

16   that regard.

17        Here, there are allegations of bad faith and

18   other misconduct that if proven would bar

19   indemnification and that tends to show advancement

20   is not appropriate.

21        Second, this is a first-party claim; right?

22   So there is no third-party claim.  And the company,

23   itself, is suing the estate, which, again, while

24   permitted in Florida for indemnification of

25   first-party claims, it calls for even more care in

1      determining whether to advance fees because it

2      essentially means the company is paying for both

3      sides of the litigation.

4           Ms. Logan has indicated the estate cannot

5      afford to pay or to repay counsel she has selected.

6      That's -- That's her choice.  Which means that if

7      the company is stuck advancing funds and,

8      ultimately, proves indemnification is not

9      permitted, then it won't -- the estate won't be

10     able to recover -- sorry -- the company won't be

11     able to recover those moneys from the estate,

12     which, again, as noted in the Windmill Point case

13     weighs heavily against advancement.

14          Now -- And I want to talk about that, but

15     counsel said they will pay money to reimburse out

16     of any award.  But this assumes the conclusion;

17     right?  It assumes, depending on how the valuation

18     goes, that she will have a pot of money to pay.

19     And we cannot make that assumption.

20          And, in fact, the Windmill Point case says,

21     quote, movants have described themselves as

22     destitute and unable to pay the fees and costs of

23     counsel.  Because movants would be obligated to

24     repay any advancement if they are unable to

25     successfully defend against trustee's pending

1          allegations of fraud and self-dealing, the movant's

2          stated inability to finance litigation undermines

3          their request.

4               Now, there's other case law cited, Ransom

5          Group, et cetera, that support the same conclusion.

6               That is why nearly all advancement provisions

7          and operating agreements include an undertaking

8          provision.

9               Fourth, and as a matter of equity -- and,

10         again, counsel referenced this -- Ms. Logan, for

11         over a year, has received an unreasonable number of

12         benefits from the company without providing any

13         services in return.  The company paid her a salary

14         for no services rendered, paid for her house and

15         for her living expenses, and that has now been

16         reversed as Your Honor corrected me earlier today.

17         Let's not go down that road a second time.

18               Smart does not provide for mandatory

19         indemnification and advancement.  The statute does

20         not provide for indemnification or advancement to

21         the estate, only to officers and directors in an

22         action.  And that's the end of the analysis.

23               But even if it were not, it's premature to

24         award indemnification, and there are a host of

25         reasons to not award advancement in this case.

1          Motion should be denied on the indemnification

2     and advancement.

3          Thank you, Your Honor.

4          THE COURT:  Ms. Liu, any sort of reply?

5          MS. LIU:  Yes, Your Honor.

6          So onto the specific point that only Jim would

7     get to ask for indemnification and advancement, I

8     addressed that a little bit earlier when I stated

9     that the claims against Jim are actually pled

10    against his estate, and Janice holds the mantel to

11    defend.

12         And, similarly, Florida Statute 46.021 tells

13    us that Jim's claims and his rights for

14    indemnification didn't disappear when he died.

15    Rather, that claim or that right can be pursued by

16    the person prescribed by law, and that person is

17    Janice.

18         As to the allegations of bad faith and that

19    Janice has gotten a bunch of money from the company

20    that was wrongful or improper, I would refer back

21    to this idea that when evaluating a claim -- or a

22    request for a court-ordered indemnification and

23    advancement, the universal facts and circumstances

24    is all relevant facts and circumstances were not

25    just limited to the pleadings.

1              And that's all.  Thank you.

2              THE COURT:  Okay.  I'm going to take this one

3        under advisement.  So, Ms. Liu, when you do the

4        order on the Phase One cost, make sure it's clear

5        that it is not addressing the second component of

6        the motion and that that would be by separate

7        order.

8              Are there other motions that we need to

9        address today?

10             MR. JOHNSON:  No, Your Honor.

11             MR. SCHOENFELD:  Your Honor, I have one item.

12       It's not a motion.  It has to do with depositions.

13             THE COURT:  Is this for the good of the order?

14             MR. SCHOENFELD:  For the good of the orders.

15             THE COURT:  Before we get to the good of the

16       order, any other motions that are out there that I

17       haven't addressed?  Okay.

18             Mr. Schoenfeld, let's go ahead and do your

19       good of the order and then I'll go around the room.

20             MR. SCHOENFELD:  Thank you, Your Honor.

21             Jon Logan's deposition is scheduled for

22       December 17th.  We've noticed it to continue from

23       day-to-day until concluded.  We've had a

24       communication back from his counsel saying that

25       they would not permit a second day or any

1      subsequent days of deposition absent a court order.

2      I don't think that's the right way to proceed.

3      They should seek a motion for protective order, but

4      since we're here, I thought I would raise it and

5      see if we could avoid that necessity.

6           Mr. Logan is the most knowledgeable person in

7      the case on all of the issues related to the next

8      phase of this trial.  We will, as we always have

9      done, do everything we can to avoid and we will

10     avoid any duplicative questioning.  We've done this

11     before.  But it is quite likely that his deposition

12     will require more than a single day and I'd just

13     like to clarify that he will sit until the

14     deposition is concluded.

15          THE COURT:  Who wants to speak on this issue?

16     Now, are we talking about in what capacity?  I

17     mean, is this his personal capacity?

18          MR. SCHOENFELD:  Personal, yes.

19          THE COURT:  And are there any (b)(6)

20     depositions out there?

21          MR. SCHOENFELD:  There may be (b)(6), but his

22     is an individual deposition.  I believe that's

23     right.  I'll let my colleague correct me if I'm

24     wrong about that.

25          THE COURT:  I'm just wondering if there's any

1     (b)(6)'s out there where --

2          MR. O'NEILL:  There are, Your Honor.  And I

3     apologize for interrupting, Your Honor.

4          There are (b)(6)'s out to both Smart Comm and

5     HLFIP.

6          THE COURT:  And have either of those entities

7     designated their corporate rep or reps and, if so,

8     is Jon Logan a designated testifier for the

9     entities?

10         MR. O'NEILL:  They have not designated

11    anybody.  We assume that he would be the person,

12    but they have not let us know one way or the other.

13         THE COURT:  They get to kind of choose who

14    they want.

15         Mr. Hillsley?

16         MR. HILLSLEY:  Thank you, Your Honor.

17         First of all, you know, I don't have to say

18    it, but this wasn't a motion noticed for this

19    hearing, and I don't appreciate being, you know,

20    sort of surprised with a new matter that wasn't

21    brought before the Court and noticed in advance.

22         But having said that, Jon Logan has been

23    deposed twice already.  This would be the third

24    one.  And the response that --

25         THE COURT:  He has been deposed in this phase?

1            MR. HILLSLEY:  No, Your Honor.

2            Our response to counsel was that we would

3       provide Jon Logan for a single day, the same as

4       everyone else, the same as counsel has requested

5       for their clients, and there's no special treatment

6       of Jon that he gets to be further burdened here

7       except in one circumstance which is where more

8       evidence is brought forward that wasn't available

9       at the time of his deposition and it should have

10      been and then he should be brought forth again for

11      another deposition.

12           Your Honor has already discussed that in the

13      context of other aspects of this case today and,

14      obviously, if that comes up, that is a perfectly

15      valid reason to recall Jon, particularly given that

16      we're going to do this in a couple of steps.  And

17      so I am not taking the position, and Jon is not

18      taking the position that that can't happen.

19           But what we are requesting is that he be

20      afforded the same treatment which was afforded to

21      everybody else in the case, which is that he sits

22      for a seven-hour deposition, same as everybody

23      else, and if -- if -- and they need to -- to manage

24      their time and get it done in the day that

25      everybody else -- every other witness in this case

1    is scheduled for just one day.  And so we're asking

2    for the same treatment, especially given that this

3    is his third in this case, and, again, if more

4    evidence comes up, we'll deal with it then.

5         Thank you, Your Honor.

6         THE COURT:  Mr. Oprison, did you want to

7    comment?  I know he has not been designated as the

8    corporate rep for his company yet, but I didn't

9    know if you had anything.

10        MR. OPRISON:  Nothing to add at this time,

11   Your Honor.

12        THE COURT:  Okay.  Thank you.

13        MR. SCHOENFELD:  Your Honor, just to be clear,

14   what we were told was he would not appear for more

15   than one day without a court order, so that's the

16   reason we're raising this.

17        We have completed both his prior depositions

18   in a single day and we hope to do so again, but

19   this is a more involved circumstance.  The facts

20   he's aware of are much broader.

21        We can't be certain we can complete this in a

22   single day.  We don't want to have a fight over

23   whether he comes back that day or not.  We would

24   like to just make it clear that he will continue

25   from day-to-day and if they, you know, think we're

1          wasting time or trying to abuse him, they could

2          raise that at the time.  But that's not been --

3          that's never been raised in connection with his or

4          any other depositions in this case.  We're not

5          trying to oppress anybody.  We just need to get the

6          facts.

7                THE COURT:  Well, here are my thoughts.

8          Obviously, this was not brought in a motion, but

9          my -- I do not recall entering a time limit for a

10          deposition in this case.

11                Obviously, if there's not a court order on a

12          time limit and if the deposition is not complete

13          because there's still ground to cover, then I don't

14          think it's appropriate to just unilaterally say,

15          we're not going to show up for a second day.

16                I think the appropriate thing there is a

17          Motion for Protective Order that we can hash it out

18          a little bit better.

19                Having said that, I am one that -- if you need

20          more than a day and someone brings me a transcript

21          and I see a lot of fluff and wasted time, then I

22          probably would grant the Motion for Protective

23          Order.  In federal court, you get seven hours

24          without leave.

25                In this case, Mr. Logan is, you know, markedly

1       different than, let's say, an Alexis or Justin

2       deposition because Jon Logan is going to have

3       substantially more information than those others.

4       So I don't think you can compare those deponents to

5       Jon Logan.

6            So that's a long-winded way of saying I'm not

7       going to answer it, but if you haven't finished the

8       deposition and unless there is a court order on a

9       protective order, then the deposition isn't

10      completed and I would expect the deposition to

11      continue.

12           Now, does it have to be the very next day?  I

13      mean, we need to deal and be respectful of

14      everyone's schedules, but those are my comments on

15      that.

16           MR. SCHOENFELD:  Thank you, Judge.

17           THE COURT:  What's the next for the good of

18      the order, if anything?

19           MR. SCHOENFELD:  Nothing else here.

20           THE COURT:  How about from Mr. Jon Logan's

21      side?

22           MR. HILLSLEY:  No, Your Honor.  Thank you.

23      Appreciate your time today.

24           THE COURT:  How about from H-L -- and I'm

25      going to get those letters --

1           MR. OPRISON:  "Happy Logan Family IP."  Just

2       remember that acronym.  That's what it stands for.

3           Nothing from us, Your Honor.

4           THE COURT:  Thank you.

5           And coming around the horn to Mr. Johnson.

6           MR. JOHNSON:  Nothing, Your Honor.

7           THE COURT:  Okay.  I appreciate everyone's

8       time and diligence today.

9           I will get orders out as soon as I can on the

10      reserved items.

11          Everyone have happy holidays.  Thank you.

12          We're in recess.

13          (Hearing concluded is 3:40 p.m.)

1                      HEARING CERTIFICATE

2        STATE OF FLORIDA   )

3        COUNTY OF SARASOTA)

4             I, Linda R. Wolfe, AAS, RPR, RMR, FCRR, FPR-C,

5        Certified Stenographic Court Reporter, certify that

6        I was authorized to and did stenographically report

7        live the foregoing hearing; and that the transcript

8        is a true record of the proceedings.

9             I further certify that I am not a relative,

10       employee, attorney, or counsel of any of the

11       parties, nor am I a relative or employee of any of

12       the parties' attorney or counsel connected with the

13       action, nor am I financially interested in the

14       action.

15            Dated this 30th day of November, 2024.

16

17

18       _____

19       LINDA R. WOLFE, AAS, RPR, RMR, FCRR, FPR-C
         Certified Stenographic Court Reporter
20       Registered Professional Reporter
         Registered Merit Reporter
21       Federal Certified Realtime Reporter
         Florida Professional Reporter
22

23

24

25

**MR. FRANKLIN: [55]**
56/23 57/5 138/5
138/7 143/19 145/20
146/6 146/22 147/2
147/10 147/20 148/7
154/10 154/23 155/6
155/10 155/13
155/21 156/1 164/10
166/13 166/16
166/24 167/1 167/22
168/2 168/10 168/15
168/19 169/3 171/7
171/12 174/15
174/20 177/19
177/22 178/2 178/25
179/5 180/22 181/1
181/23 181/25 182/6
182/15 184/23 186/6
186/10 186/12
186/18 190/4 194/15
194/17 195/3 195/6
**MR. HARWIN: [4]** 7/21
21/17 21/21 116/2
**MR. HILLSLEY: [56]**
18/24 25/2 25/4 25/6
27/7 27/18 28/1
28/13 28/17 31/3
31/6 32/10 33/3
33/16 33/18 46/21
47/4 70/17 79/11
80/5 82/2 82/25
83/11 83/13 83/18
88/20 90/8 90/11
92/12 95/3 95/8
98/20 101/16 102/6
102/21 103/2 103/19
104/4 104/16 119/9
122/18 138/13
139/10 140/11
140/15 140/17 143/2
153/18 209/9 209/12
210/2 212/19 218/2
226/16 227/1 230/22
**MR. JOHNSON: [41]**
6/12 9/17 9/20 9/23
13/19 14/10 15/1
16/9 17/7 17/12 20/6
20/13 20/15 20/18
21/3 21/6 21/9 22/9
22/21 23/4 23/10
23/15 24/11 24/15
70/9 70/16 86/21
87/8 88/4 133/4
138/19 138/23 139/1
141/8 141/10 141/12
143/3 198/16 198/18
224/10 231/6
**MR. O'NEILL: [12]**
38/4 38/19 39/25
40/5 48/15 48/24
54/20 54/24 202/3
202/10 226/2 226/10
**MR. OPRISON: [62]**
49/11 49/13 50/9
50/14 50/18 50/21
51/5 56/9 123/5
124/16 125/22
126/14 126/18

126/21 127/3 127/11
127/17 128/10
128/14 128/20
129/13 130/11
130/18 138/16 143/1
158/15 159/24
161/23 163/5 164/14
164/19 164/21
165/17 166/4 166/6
169/1 169/5 169/12
170/6 170/16 170/19
170/25 171/3 172/3
172/7 172/19 173/5
173/11 173/14 174/2
175/11 176/15
176/18 176/24
177/18 178/8 178/10
178/13 178/18 179/7
228/10 231/1
**MR. SCHOENFELD:**
**[59]** 6/18 8/11 8/19
9/8 28/7 38/1 38/3
57/16 68/20 70/7
70/14 75/2 77/21
79/5 91/4 91/9 91/18
91/25 92/6 104/23
110/6 110/19 111/20
113/9 113/25 115/7
116/8 116/12 117/5
117/8 117/13 118/16
118/18 118/23
118/25 133/16
133/18 134/6 135/10
135/14 137/13
137/17 138/3 138/8
140/18 141/15
141/20 142/14
142/25 143/14
143/18 224/11
224/14 224/20
225/18 225/21
228/13 230/16
230/19
**MS. ALEXIS LOGAN:**
**[2]** 20/17 21/13
**MS. CLEMENT: [2]**
70/24 71/3
**MS. LIU: [9]** 202/15
202/25 206/19
206/22 207/12
207/16 209/5 213/4
223/5
**MS. SMITHA: [90]**
6/23 7/7 7/12 7/14
7/16 11/16 12/1 12/7
15/5 15/7 15/9 15/14
16/4 16/14 17/23
18/21 19/2 19/5
19/14 19/22 20/24
21/5 21/8 22/5 22/11
22/16 23/22 24/1
67/21 67/23 68/1
68/13 69/1 69/4
69/20 148/10 150/18
152/22 153/13 154/1
166/20 179/14
179/17 180/4 181/9
181/22 182/20
182/23 182/25 183/6

184/1 184/17 185/9
185/16 185/19 186/2
186/19 186/24
187/12 187/15
188/14 188/17 189/2
189/4 189/11 189/15
190/14 190/17
190/21 191/1 191/19
192/2 192/5 192/9
192/24 193/4 193/7
193/9 194/13 195/13
196/18 196/24 197/1
197/4 197/7 197/13
197/15 200/6 201/6
201/11
**THE COURT**
**REPORTER: [6]** 19/3
31/5 87/6 115/18
201/18 202/20
**THE COURT: [360]**

**$**
**$1,000,000 [1]** 89/15
**$100 [1]** 57/24
**$100 million [1]**
57/24
**$100,000 [1]** 89/15
**$19,000 [1]** 205/19
**$28,000 [2]** 208/21
208/25
**$5,000,000 [1]** 89/16
**$50,000 [3]** 98/12
113/5 113/7
**$500,000 [1]** 98/12
**$76 [1]** 109/25
**$76 million [1]** 109/25
**$80 [2]** 52/13 55/13
**$80 million [2]** 52/13
55/13

**'**
**'23 [1]** 128/22
**'24 [1]** 128/23
**'an [1]** 30/8
**'cause [1]** 139/15
**'direct [1]** 30/6
**'em [1]** 147/6
**'If [1]** 103/17
**'Judge [1]** 92/2
**'Okay [1]** 84/13
**'s [2]** 226/1 226/4
**'Should [1]** 11/23
**'That [1]** 110/13
**'That's [1]** 110/13
**'transfer' [1]** 30/5
**'Well [2]** 45/6 104/15

**0**
**0100 [1]** 5/4

**1**
**1.120 [1]** 65/10
**1.140 [1]** 12/16
**1.525 [5]** 203/9
209/18 209/25
210/12 212/6
**10 [10]** 1/6 1/9 1/16
11/14 23/4 150/24
160/21 173/13

199/20 214/14
**100 [5]** 4/16 12/4
14/10 15/2 17/3
**100 percent [4]** 86/16
86/17 128/9 151/15
**1002 [4]** 6/6 203/13
203/18 203/19
**1034 [1]** 37/15
**1037 [1]** 37/16
**106 [1]** 3/6
**107 [4]** 14/10 15/2
17/3 17/13
**10:00 a.m [1]** 70/20
**10:10 a.m [1]** 70/21
**10th [1]** 195/15
**11 [5]** 11/14 55/17
63/13 64/4 67/17
**111 [1]** 4/11
**112 [2]** 118/14 140/6
**1190 [1]** 185/20
**11:15 a.m [1]** 115/21
**11th [6]** 5/3 23/15
23/16 23/19 195/5
195/10
**12 [1]** 214/14
**1245 [1]** 219/21
**1280 [1]** 6/7
**12:45 [2]** 115/12
115/19
**12:47 [1]** 115/22
**12th [1]** 22/2
**13 [2]** 191/2 199/2
**13,000 [1]** 194/20
**13th [8]** 20/17 20/18
20/22 21/2 21/3 22/3
198/24 199/11
**14 [10]** 30/4 60/17
63/10 64/5 67/17
155/16 164/15
164/15 164/18
164/19
**14th [2]** 23/10 136/6
**15 [7]** 60/16 61/25
63/10 64/5 67/17
145/19 157/21
**150 [1]** 173/3
**15th [2]** 20/16 199/13
**16 [3]** 57/21 64/5
67/17
**166 [2]** 35/2 37/1
**16th [1]** 20/16
**17 [2]** 65/8 67/17
**17th [1]** 224/22
**18 [5]** 64/5 65/8
67/17 148/16 154/3
**1800 [1]** 4/4
**18th [1]** 50/3
**1:24 p.m [1]** 143/4
**1:35 [1]** 143/5
**1st [2]** 15/24 181/13

**2**
**2,000 [1]** 152/9
**2-A [1]** 2/6
**20 [3]** 57/21 59/16
126/21
**20-count [1]** 57/18
**200 [2]** 3/10 3/16
**200-count [1]** 13/11

**20004 [1]** 3/20
**2002 [1]** 2/6
**2007 [1]** 34/9
**2008 [1]** 10/24
**201 [1]** 4/4
**2013 [1]** 64/25
**2015 [12]** 64/7 64/13
64/19 64/24 65/4
65/18 66/1 73/5
127/9 129/4 175/18
189/20
**2015-ish [1]** 135/12
**2016 [1]** 74/18
**2017 [4]** 37/17
126/21 216/7 216/17
**202 [1]** 3/21
**202-7100 [1]** 4/17
**2020 [5]** 58/1 85/24
109/20 135/12
189/15
**2021 [4]** 1/7 1/9 1/16
10/25
**2022 [1]** 109/21
**2023 [20]** 58/3 60/22
64/15 65/5 65/18
66/24 81/2 84/2 85/5
95/17 107/4 109/21
118/9 126/23 126/25
129/5 152/8 158/19
174/22 175/14
**2023-CA-1002-NC [1]**
1/4
**2023-CA-1280-NC [1]**
1/11
**2024 [26]** 1/2 2/7
95/18 118/8 144/4
144/11 144/21 145/7
145/9 146/4 146/13
146/19 146/20 147/8
147/16 147/25
148/12 148/17
149/21 151/24 152/9
153/23 154/15 210/5
210/12 232/15
**2100 [1]** 3/11
**217 [1]** 37/15
**21st [1]** 210/5
**22 [2]** 1/2 2/7
**2299 [1]** 3/11
**23 [1]** 109/21
**23-CA-1002 [1]** 6/6
**23-CA-1280 [1]** 6/7
**232 [1]** 2/9
**2500 [1]** 3/16
**25th [2]** 181/10
181/15
**26 [1]** 59/16
**27 [1]** 182/17
**27th [1]** 182/3
**28 [1]** 146/4
**28th [1]** 120/8
**29 [3]** 174/22 175/14
176/2
**2900 [1]** 4/16
**2:00 [1]** 165/20
**2:50 p.m [1]** 201/20
**2nd [9]** 19/10 19/13
178/22 178/24 179/1
181/17 195/25 196/3

**2**

**2nd... [1]** 196/5

**3**

**30 [3]** 59/16 153/1 183/1
**305 [1]** 3/17
**30th [2]** 120/8 232/15
**31 [1]** 179/24
**312 [1]** 4/12
**32301 [1]** 3/7
**329-4852 [1]** 3/7
**331-4129 [1]** 4/5
**33131-5340 [1]** 3/12
**33301-2299 [1]** 3/11
**33301-4442 [1]** 4/5
**33602-5810 [1]** 4/17
**34205-7734 [1]** 5/4
**34237 [1]** 2/6
**353 [1]** 150/8
**362 [2]** 156/8 156/12
**39 [3]** 93/3 94/14 122/8
**3:03 [1]** 201/21
**3:40 [1]** 2/8
**3:40 p.m [1]** 231/13

**4**

**40 [2]** 197/24 200/12
**40 percent [6]** 52/15 55/12 55/21 60/24 60/24 61/1
**4000 [1]** 3/21
**4129 [1]** 4/5
**423-8522 [1]** 3/17
**4442 [1]** 4/5
**46.021 [1]** 223/12
**462-9500 [1]** 3/12
**467 [1]** 26/13
**4700 [1]** 4/11
**4852 [1]** 3/7
**4th [11]** 22/15 22/19 23/1 23/7 23/16 23/20 48/17 180/19 181/21 182/1 196/6

**5**

**50 [2]** 12/3 113/7
**50 percent [8]** 36/15 42/25 43/9 43/11 43/21 46/9 65/21 157/5
**500 [1]** 3/20
**52 [1]** 12/4
**531 [1]** 211/2
**5340 [1]** 3/16
**56 [1]** 12/4
**57 [1]** 12/4
**57.105 [1]** 26/13
**5810 [1]** 4/17
**5A [3]** 216/4 216/6 216/14
**5th [1]** 48/17

**6**

**60 [1]** 164/19
**60606 [1]** 4/12
**607.0750 [1]** 33/25
**607.0831 [2]** 31/15

**38**/15
**607.0854 [2]** 214/8 219/19
**607.1201 [2]** 30/17 47/21
**656 [1]** 210/4
**664 [1]** 150/8
**6th [10]** 18/23 20/9 20/21 23/17 24/7 24/13 48/12 48/19 48/20 48/20

**7**

**7-day [1]** 75/6
**704-7700 [1]** 4/12
**7100 [1]** 4/17
**716 [1]** 57/6
**720 [1]** 3/6
**726.102 [1]** 30/4
**730 [2]** 50/18 56/19
**748-0100 [1]** 5/4
**761 [1]** 69/8
**763 [1]** 9/15
**764 [1]** 69/9
**765 [1]** 57/13
**766 [1]** 219/21
**7700 [1]** 4/12
**7734 [1]** 5/4
**780 [3]** 155/17 166/11 166/21
**787 [1]** 57/14
**788 [1]** 9/16
**789 [1]** 69/10
**799-4000 [1]** 3/21

**8**

**802 [1]** 5/3
**813 [1]** 4/17
**820 [3]** 24/25 25/8 48/10
**821 [2]** 49/8 57/10
**823 [1]** 57/13
**827 [1]** 71/14
**828 [1]** 71/15
**832 [3]** 143/9 155/5 155/19
**834 [1]** 202/14
**840 [1]** 179/11
**841 [1]** 197/12
**843 [1]** 71/19
**850 [2]** 3/7 202/1
**851 [2]** 143/12 166/22
**852 [1]** 71/23
**8522 [1]** 3/17
**853 [1]** 143/12
**854 [2]** 202/18 220/12
**855 [1]** 179/12
**856 [2]** 71/20 71/23
**857 [2]** 24/25 25/9
**858 [2]** 71/15 92/13
**86.081 [1]** 204/7
**8:30 [1]** 2/8

**9**

**941 [1]** 5/4
**9500 [1]** 3/12
**954 [2]** 3/12 4/5
**99 [1]** 12/4
**9th [4]** 19/15 19/22

**22**/14 24/1

**A**

**a.m [4]** 2/8 70/20 70/21 115/21
**AAS [2]** 232/4 232/19
**abetting [6]** 35/19 37/19 52/24 53/13 53/24 54/1
**abide [1]** 106/3
**ability [2]** 144/23 145/15
**able [29]** 6/16 8/3 12/22 18/9 24/7 24/10 26/23 43/19 85/11 105/9 116/1 125/2 127/23 128/17 141/1 151/11 152/1 154/12 154/16 157/14 163/7 178/6 182/18 186/8 197/16 198/13 200/9 221/10 221/11
**absence [3]** 127/13 138/9 208/15
**absent [3]** 64/3 211/22 225/1
**absolute [3]** 30/6 137/15 163/11
**absolutely [8]** 48/1 76/3 106/11 107/6 121/23 122/21 125/14 151/15
**abundance [1]** 210/15
**abuse [10]** 25/24 26/1 28/20 28/21 28/23 29/4 29/7 41/15 41/21 229/1
**abused [1]** 161/19
**acceded [1]** 156/11
**access [2]** 60/8 196/15
**accessing [1]** 37/3
**accomplish [1]** 141/24
**accomplished [1]** 141/25
**according [1]** 194/4
**accordingly [5]** 32/13 86/5 88/24 110/16 113/20
**account [3]** 144/12 146/14 191/10
**accountant [2]** 145/4 147/22
**accountant/client [1]** 145/4
**accounted [1]** 33/10
**accounting [5]** 144/12 146/15 146/16 149/25 150/19
**accrue [2]** 64/14 209/15
**accrued [1]** 52/13
**accurate [2]** 122/2 151/25
**acknowledged [5]** 109/23 124/20 130/24 131/2 211/13
**acknowledging [1]**

**66**/5
**acknowledgment [1]** 66/9
**aclement [1]** 4/18
**acronym [1]** 231/2
**act [9]** 29/5 29/17 38/25 44/2 51/22 56/14 63/16 85/4 196/8
**action [24]** 26/3 26/9 26/14 26/15 28/19 28/25 29/4 31/14 31/22 32/2 32/6 32/12 39/14 39/18 40/18 40/19 48/1 51/4 53/14 85/24 210/8 222/22 232/13 232/14
**actions [8]** 32/7 43/13 45/4 45/18 58/11 59/4 204/8 218/21
**active [1]** 100/4
**activities [4]** 59/4 59/10 60/4 60/5
**activity [1]** 206/9
**actor [1]** 45/22
**actual [8]** 105/21 107/14 112/6 114/3 146/19 161/14 163/4 196/4
**actually [36]** 6/20 8/23 12/3 28/14 70/1 71/19 72/2 83/9 98/22 104/5 124/20 124/21 125/11 128/16 130/24 136/17 141/17 144/3 144/16 148/18 152/14 163/8 164/16 173/20 174/1 178/18 180/14 184/17 193/22 195/16 198/4 201/10 207/20 213/24 219/23 223/9 229/18 100/9 161/21 162/24 228/10
**addition [3]** 46/13 92/23 94/17
**additional [3]** 149/8 198/14 220/10
**address [23]** 23/6 35/18 38/6 40/8 54/25 56/5 79/4 86/8 88/17 91/1 92/10 100/17 104/1 104/8 107/12 109/16 121/3 130/7 170/22 187/14 211/8 212/1 224/9
**addressed [11]** 34/8 76/2 84/7 84/18 85/22 88/18 112/12 205/22 212/4 223/8 224/17
**addressing [9]** 25/8 57/22 73/18 102/22 130/9 150/3 191/14 203/5 224/5
**adequate [2]** 41/14

**41**/21
**adequately [1]** 46/18
**adjectives [1]** 14/22
**adjudged [1]** 219/15
**adjust [1]** 118/10
**adjusted [2]** 78/21 113/6
**admissible [1]** 172/23
**Admission [2]** 174/17 176/19
**Admissions [1]** 174/13
**admit [2]** 174/20 175/25
**admits [1]** 183/1
**admitted [2]** 155/16 166/12
**admonition [1]** 14/21
**ado [1]** 151/22
**adopt [1]** 49/16
**adopted [1]** 11/13
**advance [7]** 41/6 41/8 71/13 74/6 215/9 221/1 226/21
**advancement [22]** 213/19 215/3 217/13 218/4 218/8 218/16 218/18 219/1 219/6 220/3 220/6 220/8 220/19 221/13 221/24 222/6 222/19 222/20 222/25 223/2 223/7 223/23
**advancing [1]** 221/7
**advantage [1]** 117/17
**advise [1]** 8/21
**advisement [2]** 56/18 224/3
**advocating [2]** 83/9 113/9
**AEO [6]** 157/22 159/7 159/11 160/14 161/2 163/17
**affect [4]** 76/7 77/24 78/2 114/5
**affected [2]** 76/5 78/5
**affidavit [1]** 173/1
**affiliated [1]** 100/12
**affirmative [5]** 14/3 23/3 24/12 51/4 142/9
**afford [2]** 215/7 221/5
**afforded [2]** 227/20 227/20
**afranklin [1]** 14/14
**afternoon [1]** 90/25
**agent [1]** 37/8
**aggregate [1]** 96/16
**aggressively [1]** 93/23
**ago [9]** 50/3 59/6 105/10 123/13 123/20 180/10 183/12 199/21 216/22
**agree [23]** 20/6 27/1 27/16 80/5 80/6 82/10 85/19 86/16 86/17 103/20 110/20 120/1 121/20 157/21 160/2 196/18

**A**

agree... **[7]** 198/14
204/6 204/23 205/11
205/22 207/10
212/25

agreed **[11]** 64/15
156/13 158/9 180/7
193/20 194/8 194/22
195/2 206/18 206/19
212/10

agreeing **[3]** 68/10
80/2 159/2

agreement **[63]** 28/8
55/18 58/2 60/19
60/22 64/16 64/18
64/24 64/25 66/4
66/4 66/7 66/23
66/25 73/4 73/13
107/23 110/10
110/20 110/22
110/23 111/2 121/17
125/12 125/19
125/20 125/20
126/16 126/17
126/18 126/19
126/23 126/24 127/2
127/10 129/4 129/6
129/8 130/25 131/4
133/20 133/20
135/12 135/15
135/17 161/18
162/11 175/2 175/15
175/21 176/4 176/5
202/6 203/11 203/15
205/5 207/3 207/9
216/2 216/16 216/17
216/21 216/23

agreements **[3]** 217/24
219/8 222/7

agrees **[3]** 27/5 27/17
71/2

ahead **[5]** 8/17 20/14
48/10 118/24 224/18

aiding **[6]** 35/19 37/19
52/24 53/12 53/24
53/25

AKERMAN **[4]** 4/4 7/1
7/16 25/7

akerman.com **[2]** 4/6
4/6

al **[2]** 57/12 143/11

alerts **[1]** 93/24

ALEXIS **[42]** 1/7 5/1
5/6 6/13 9/13 9/24
10/2 10/11 10/17
10/22 11/7 11/20
12/10 12/24 15/15
17/25 20/22 21/11
21/14 21/24 23/8
57/20 66/5 69/8
73/24 77/1 77/24
86/22 88/9 90/9
115/1 119/11 124/18
127/3 133/8 139/2
157/12 161/6 175/18
197/17 200/20 230/1

Alexis' **[5]** 19/15
19/21 21/12 197/11
197/17

ALHADEFF **[2]** 3/5
3/9

align **[2]** 144/18
145/11

aligned **[1]** 213/24

alive **[1]** 127/5

allegation **[7]** 60/2
63/7 65/3 65/22
65/25 67/3 146/15

allegations **[19]** 12/17
12/21 37/11 39/8
44/24 45/14 63/6
67/7 100/19 144/18
145/11 149/23
214/21 215/19 217/5
217/14 220/17 222/1
223/18

allege **[13]** 13/6 28/21
44/9 44/9 53/5 62/15
64/5 65/8 65/13
144/9 167/12 167/13
214/14

alleged **[14]** 12/8 14/1
29/7 34/13 37/7
45/15 45/18 60/18
67/6 67/7 67/9 96/5
215/20 218/9

allegedly **[4]** 18/16
57/25 58/5 99/1

alleges **[19]** 34/18
35/15 35/20 35/21
58/10 58/14 59/7
59/11 59/13 59/16
59/21 60/16 60/16
60/18 62/1 62/20
62/24 63/13 65/14

alleging **[1]** 15/15

allow **[3]** 89/6 156/21
176/6

allowed **[4]** 42/10
162/11 176/10
177/16

allows **[2]** 43/7 176/7

alls **[1]** 77/7

alluded **[1]** 165/1

alluding **[1]** 102/9

allure **[1]** 81/12

almost **[7]** 93/25
95/24 121/2 135/21
153/20 162/22
197/16

alone **[2]** 54/16 94/21

along **[3]** 102/16
107/25 166/2

already **[29]** 8/20
13/11 13/14 19/8
19/11 21/6 25/14
26/10 34/13 34/17
42/17 76/9 80/4
80/22 80/25 92/17
133/15 137/4 137/5
156/7 156/11 156/13
158/9 180/1 184/6
193/11 202/8 226/23
227/12

also **[38]** 5/6 5/8 7/10
7/16 7/16 10/3 11/3
11/13 12/14 19/5
19/14 42/21 44/24

54/8 54/10 56/19
58/16 63/3 66/16
95/15 114/23 120/13
130/21 134/2 135/2
141/18 150/15
150/18 151/19
156/15 156/18
183/14 187/16 188/3
188/4 202/22 210/24
216/1

alter **[1]** 144/9

alteration **[2]** 109/19
148/11

alterations **[2]** 147/25
148/7

altered **[5]** 109/15
144/4 145/10 146/23
147/17

alternative **[8]** 67/16
79/21 80/12 80/13
106/15 106/21 118/5
207/9

alternatives **[1]** 83/9

although **[1]** 29/11

always **[1]** 225/8

ambiguous **[9]** 169/10
170/3 170/4 170/7
170/14 170/14
170/21 175/5 175/8

ambitious **[1]** 97/11

amenable **[1]** 9/2

amend **[6]** 22/8 71/22
90/17 92/14 190/11
203/17

amended **[30]** 10/2
10/14 50/1 50/5
50/10 51/8 67/12
69/13 69/16 71/12
71/13 143/9 143/10
143/22 144/19
144/20 145/22
154/25 155/14
155/18 157/20
158/11 170/9 178/8
178/9 179/2 188/7
211/13 214/2 214/11

amendment **[1]**
203/18

among **[2]** 62/16
162/6

amongst **[2]** 114/21
116/6

amorphous **[1]** 14/17

amount **[11]** 13/8
17/7 30/11 119/19
188/1 188/23 188/24
189/7 189/8 212/24
212/25

amounts **[2]** 40/15
208/3

ample **[1]** 93/15

analogous **[1]** 213/11

analyses **[3]** 97/9
103/4 112/3

analysis **[13]** 46/6
73/6 80/21 80/23
89/1 95/13 96/17
97/16 103/5 103/8
112/23 119/18

222/22

analyze **[1]** 81/10

analyzing **[2]** 95/17
95/17

ancillary **[1]** 113/2

ANDREW **[3]** 4/10
6/21 143/20

animate **[1]** 90/19

ANITRA **[3]** 4/15 6/22
70/24

another **[16]** 28/14
36/15 50/7 90/1 93/8
95/18 111/13 117/12
131/1 131/2 139/12
141/18 158/22
162/10 214/16
227/11

answer **[33]** 14/9
17/21 18/23 23/2
23/19 23/23 24/12
48/12 48/22 68/15
76/11 97/16 98/22
99/22 104/19 110/14
140/23 167/11
169/15 170/9 171/5
176/9 176/11 176/13
176/14 176/17
176/22 187/18
188/11 191/7 192/7
200/19 230/7

answered **[2]** 95/4
175/11

answers **[2]** 142/3
195/3

anybody **[4]** 6/3 88/3
226/11 229/5

anymore **[4]** 122/7
127/6 143/17 183/8

anyone **[8]** 6/2 7/19
60/4 115/8 133/1
133/2 201/14 210/9

anyone's **[1]** 48/13

anything **[46]** 6/4
13/17 16/20 16/22
24/14 43/12 56/8
65/23 66/10 66/12
94/6 105/14 105/18
105/21 106/6 108/4
109/18 109/23 115/8
124/7 133/1 142/13
146/4 146/21 147/15
152/12 153/9 154/8
161/20 163/9 173/4
179/3 182/21 187/5
187/13 189/12
190/25 192/13
195/12 196/21 201/1
206/18 207/11
215/15 228/9 230/18

anyway **[2]** 34/12
153/9

anyways **[1]** 55/10

anywhere **[1]** 189/25

apart **[4]** 35/6 101/19
101/19 102/1

apologize **[7]** 7/7
50/17 56/22 57/7
122/19 125/6 226/3

apparently **[3]** 133/24

182/10 184/4

appear **[2]** 36/23
228/14

appearances **[2]** 2/20
90/2

appears **[4]** 60/21
129/4 143/8 220/15

apple **[1]** 26/21

applicable **[3]** 61/16
64/8 64/8

applied **[2]** 36/19 37/5

applies **[5]** 13/25
14/23 36/25 37/6
204/7

apply **[3]** 16/11 64/23
176/18

applying **[1]** 64/10

Appoint **[1]** 201/23

appointed **[1]** 121/21

appointment **[1]**
109/13

appreciate **[10]** 48/21
75/3 116/13 117/6
158/16 197/1 202/9
226/19 230/23 231/7

appreciation **[1]** 77/19

appreciative **[1]**
116/14

approach **[3]** 97/5
101/5 132/22

appropriate **[19]** 31/9
37/21 81/2 85/20
99/9 103/7 120/3
158/1 159/3 186/16
187/8 210/18 211/3
211/22 217/4 220/13
220/20 229/14
229/16

appropriately **[2]**
11/18 68/4

approval **[3]** 30/20
47/25 116/18

approve **[1]** 123/24

Arango **[1]** 211/10

argue **[9]** 26/19 60/9
64/12 71/5 78/15
78/24 112/9 160/7
190/9

argued **[2]** 50/2 50/11

argues **[2]** 36/24 37/2

arguing **[2]** 91/19
91/19

argument **[14]** 9/1
11/13 11/15 31/7
40/3 41/25 86/15
91/10 91/20 98/1
111/6 155/24 177/23
177/24

arguments **[6]** 25/15
33/21 49/16 51/14
72/9 79/19

arising **[5]** 60/18 64/6
64/20 64/20 216/11

arms **[2]** 61/20 97/25

arms-length **[1]** 61/20

around **[11]** 8/8 22/6
37/11 64/17 85/22
97/25 136/21 165/24
184/1 224/19 231/5

**A**

**Articles [2]** 30/18 47/23

**articulate [3]** 14/3 112/24 161/11

**articulated [3]** 10/14 25/14 123/10

**aside [6]** 8/5 86/12 99/23 101/20 204/17 207/8

**ask [20]** 46/18 67/11 67/16 69/11 79/1 92/16 98/22 108/13 108/25 119/6 133/14 139/13 142/16 147/3 147/24 158/7 183/18 185/21 188/7 223/7

**asked [6]** 18/22 84/20 97/15 112/4 185/6 199/1

**asking [24]** 38/4 101/7 111/15 125/8 126/12 145/18 167/4 172/7 172/16 172/16 172/18 172/19 175/25 180/16 181/15 183/21 185/9 193/23 196/1 209/5 209/7 213/16 214/1 228/1

**asks [2]** 92/7 145/22

**aspect [2]** 114/11 120/16

**aspects [1]** 227/13

**assault [1]** 132/6

**assert [8]** 25/10 26/8 31/14 32/16 34/6 35/4 35/12 146/17

**asserted [1]** 39/9

**asserting [2]** 39/13 176/7

**assertion [2]** 32/1 144/15

**assertions [1]** 81/20

**asserts [2]** 25/25 29/17

**assess [1]** 208/5

**asset [10]** 30/8 42/3 42/16 43/25 44/11 46/10 46/12 55/23 58/16 96/13

**asset.' [1]** 30/8

**assets [24]** 29/19 29/22 30/2 30/21 33/11 34/15 34/19 40/24 42/13 42/24 43/2 43/7 43/13 43/15 43/20 44/5 44/13 44/19 48/4 58/17 66/6 99/3 111/3 217/18

**assigned [3]** 74/11 74/19 81/17

**assist [2]** 157/15 205/20

**assistant [1]** 202/4

**associate [1]** 165/19

**associated [3]** 137/11 191/3 201/4

**assume [5]** 14/22 21/6 98/1 162/24 226/11

**assumes [2]** 221/16 221/17

**assuming [4]** 17/10 73/6 73/9 216/22

**assumption [1]** 221/19

**assurance [1]** 151/4

**assuring [1]** 45/24

**attached [5]** 41/17 157/20 206/13 207/18 207/19

**attempt [4]** 35/4 50/5 50/22 169/16

**attempted [2]** 156/18 158/5

**attend [1]** 71/6

**attention [4]** 25/21 42/20 70/22 135/1

**attenuated [1]** 10/13

**attorney [20]** 3/4 3/9 3/15 3/19 4/3 4/3 4/9 4/9 4/10 4/10 4/15 5/2 145/5 149/18 161/21 162/24 163/2 164/5 232/10 232/12

**attorney's [1]** 210/11

**attorney/client [1]** 145/5

**attorneys [4]** 116/5 149/24 156/13 163/12

**attorneys' [3]** 156/6 157/3 159/7

**audience [1]** 33/14

**audio [2]** 46/24 169/17

**audit [3]** 150/16 150/23 150/25

**audited [1]** 150/20

**audits [1]** 151/13

**August [10]** 66/24 107/4 117/9 119/5 134/3 156/4 174/22 175/14 176/2 216/7

**August 29 [3]** 174/22 175/14 176/2

**August 7 [1]** 156/4

**authority [6]** 32/17 72/14 203/4 204/6 204/10 204/12

**Authorization [1]** 201/24

**authorize [3]** 32/12 47/17 220/6

**authorized [5]** 30/15 30/16 34/22 220/7 232/6

**availability [1]** 134/8

**available [7]** 92/20 117/1 120/13 137/24 138/2 173/25 227/8

**Avenue [1]** 3/6

**avoid [4]** 121/24 225/5 225/9 225/10

**avoids [1]** 81/14

**award [8]** 210/23 210/25 211/4 218/18

219/22 221/16 222/24 222/25

**awarded [5]** 203/7 206/2 208/16 208/25 210/18

**awards [2]** 78/20 219/13

**aware [16]** 8/20 59/3 59/5 59/11 59/20 59/22 59/23 59/24 60/1 64/21 146/23 186/6 192/12 204/12 206/22 228/20

**away [8]** 61/5 72/3 73/22 85/14 87/11 95/1 203/16 203/22

**B**

**back [68]** 7/4 18/2 24/3 34/9 38/10 39/24 43/14 50/19 56/19 57/7 65/4 70/19 81/16 88/7 89/25 90/24 92/8 96/6 96/8 98/24 102/9 105/4 114/10 115/12 115/25 116/4 118/11 122/9 122/16 123/9 123/11 127/9 128/22 129/4 130/2 132/11 133/21 134/2 135/12 139/7 142/21 150/4 150/13 151/11 151/18 152/1 154/16 162/1 169/23 170/9 174/2 185/4 185/11 187/4 187/21 189/22 193/16 195/19 198/21 200/4 200/23 206/16 207/1 215/12 215/16 223/20 224/24 228/23

**background [1]** 213/5

**backwards [1]** 152/9

**BACON [2]** 4/11 4/16

**bad [5]** 39/1 166/20 217/8 220/17 223/18

**badly [1]** 116/21

**balance [1]** 137/2

**ball's [1]** 92/8

**ballpark [1]** 90/12

**bank [1]** 191/10

**bar [1]** 220/18

**bare [1]** 144/10

**barred [4]** 60/10 65/1 65/5 219/25

**bars [1]** 53/11

**based [22]** 15/25 16/7 26/1 26/9 29/3 69/24 78/4 78/14 96/11 112/6 114/7 119/14 119/21 139/6 141/2 149/23 151/5 153/5 188/6 200/18 205/7 214/21

**bases [2]** 58/11 58/20

**basic [1]** 151/23

**basically [8]** 46/9 60/25 66/5 71/17

81/19 136/25 184/15 216/10

**basis [18]** 11/17 11/21 18/20 26/17 26/18 35/5 55/20 61/23 66/13 72/16 81/22 82/14 83/19 100/5 102/14 142/17 210/22 214/18

**Bateman [1]** 211/9

**Bates [9]** 18/2 175/2 189/17 189/18 189/21 189/22 193/16 193/17 194/8

**battalion [1]** 104/18

**battalions [1]** 102/17

**BC [1]** 36/11

**be,' [1]** 84/17

**bear [2]** 110/21 201/4

**bears [1]** 47/15

**became [1]** 202/22

**become [3]** 62/15 63/1 111/18

**becomes [4]** 152/19 153/4 154/13 201/8

**began [1]** 64/14

**begin [5]** 38/9 64/13 64/25 152/15 203/1

**beginning [2]** 64/19 111/4

**behalf [20]** 1/17 3/2 3/14 4/1 4/8 5/1 6/12 6/24 7/2 7/8 7/10 7/16 25/7 62/7 79/12 98/15 143/20 156/13 158/22 173/21

**behest [1]** 63/2

**behind [3]** 130/2 196/17 198/8

**belabor [1]** 122/11

**belatedly [1]** 108/22

**believe [71]** 20/16 26/23 28/4 37/21 38/20 39/2 39/16 39/17 40/13 41/14 41/20 42/18 43/24 44/16 45/3 45/14 45/15 45/22 46/3 46/17 54/17 54/24 56/2 56/3 57/6 68/20 84/3 84/4 95/3 97/2 126/21 126/22 143/14 145/20 145/22 145/23 146/6 146/22 147/2 147/10 147/13 147/24 150/24 154/3 161/1 161/5 162/15 162/16 164/10 164/15 165/6 165/8 168/15 171/1 178/2 178/25 180/12 181/23 181/25 181/25 183/3 184/18 185/10 186/10 190/14 192/14 195/6 202/4 211/1 212/6 225/22

**believes [3]** 144/14

174/7 212/5

**bell [1]** 165/4

**beneficiary [1]** 9/25

**benefit [6]** 10/11 10/17 11/6 14/16 43/19 55/24

**benefited [1]** 17/15

**benefits [2]** 45/25 222/12

**Bentley [5]** 136/13 140/25 141/6 141/18 141/19

**beside [2]** 183/4 183/10

**besides [1]** 90/20

**best [7]** 19/10 24/11 25/15 75/17 116/17 134/17 197/23

**bet [1]** 116/25

**better [7]** 51/10 132/21 136/21 140/25 146/24 161/20 229/18

**beyond [1]** 107/14

**bifurcate [1]** 132/2

**bifurcation [2]** 89/6 90/20

**big [4]** 10/3 129/9 134/25 200/1

**bigger [1]** 52/9

**bills [1]** 15/20

**binary [3]** 73/12 83/4 111/9

**binder [3]** 199/19 216/5 216/15

**Biscayne [1]** 3/16

**bit [12]** 16/18 52/25 72/9 74/25 96/20 104/22 115/11 132/22 134/18 158/16 223/8 229/18

**bite [2]** 26/21 146/2

**bite-size [1]** 146/2

**BLALOCK [1]** 5/3

**blalockwalters.com [1]** 5/5

**blanket [1]** 100/19

**bleed [1]** 108/6

**bleeding [2]** 107/21 116/21

**blocked [1]** 21/7

**Blvd [2]** 3/16 4/4

**BMW [2]** 13/7 189/20

**boilerplate [3]** 176/25 177/8 195/20

**book [1]** 198/18

**books [8]** 84/10 127/13 127/14 137/6 146/13 146/13 153/23 154/4

**bore [2]** 169/20 198/20

**born [1]** 35/25

**borrow [1]** 215/4

**bottom [2]** 114/2 158/2

**bought [4]** 15/24 191/23 191/23 191/23

**B**

**Boulevard [2]** 2/6 3/10
**Bradenton [1]** 5/4
**brand [1]** 157/1
**brand-new [1]** 157/1
**breach [18]** 32/16 33/9 33/19 34/19 35/12 44/17 45/3 45/17 47/10 47/15 53/15 53/16 53/22 60/17 60/18 113/4 135/7 214/15
**breached [1]** 217/22
**breaches [1]** 111/23
**break [12]** 69/6 70/19 70/20 102/10 115/21 142/21 143/4 146/2 195/22 201/14 201/16 201/20
**bridge [1]** 102/6
**BRIDGET [3]** 3/4 6/23 7/8
**brief [7]** 9/21 31/7 33/14 46/20 49/14 51/17 67/4
**briefing [1]** 51/20
**briefly [9]** 46/21 88/20 92/16 93/18 120/20 133/4 133/16 140/18 150/15
**briefs [1]** 64/1
**bring [7]** 32/17 47/10 49/20 51/7 56/13 56/14 163/21
**bringing [1]** 201/4
**brings [2]** 206/4 229/20
**broad [3]** 172/1 172/3 216/9
**broader [1]** 228/20
**brother [2]** 62/17 101/13
**brought [22]** 42/20 44/4 49/21 50/23 50/25 50/25 51/8 51/11 52/17 57/18 75/12 78/6 78/7 106/13 123/14 123/14 173/21 213/22 226/21 227/8 227/10 229/8
**Brown [1]** 28/9
**bsmitha [1]** 3/8
**building [2]** 99/3 99/3
**built [1]** 43/1
**bumped [1]** 148/18
**bunch [2]** 96/23 223/19
**bundled [3]** 205/17 207/23 208/18
**burden [8]** 107/18 169/20 206/6 206/12 206/12 207/17 208/9 220/10
**burdened [1]** 227/6
**burdensome [4]** 172/2 172/4 173/1 173/23
**business [13]** 24/13

58/5 61/21 63/5 63/8 85/2 85/8 86/3 100/21 101/1 101/12 102/13 179/18
**buyout [1]** 72/2
**buzz [1]** 169/16
**BVI [1]** 128/5
**bylaws [1]** 43/5

**C**

**C.E.O [2]** 58/13 62/21
**C.F.O [1]** 144/13
**CA [4]** 1/4 1/11 6/6 6/7
**calculation [2]** 98/16 114/17
**calendar [5]** 75/13 153/11 153/16 153/19 181/19
**calendars [1]** 140/5
**call [5]** 110/9 125/21 128/18 132/2 135/8
**called [2]** 42/12 51/3
**calling [2]** 71/11 135/7
**calls [2]** 151/3 220/25
**came [7]** 10/9 85/22 102/9 111/8 123/20 159/4 191/6
**candid [1]** 41/19
**candidly [1]** 204/2
**capability [1]** 76/8
**capacities [1]** 6/20
**capacity [7]** 35/10 35/10 58/12 59/7 218/22 225/16 225/17
**capped [3]** 85/7 85/11 86/8
**car [7]** 10/20 14/19 45/11 188/20 189/5 189/10 199/8
**card [11]** 12/11 14/12 15/20 15/21 15/25 16/16 16/19 16/21 16/24 17/11 17/13
**cards [3]** 15/15 15/17 17/14
**care [2]** 45/3 220/25
**carefully [1]** 87/9
**CARROLL [3]** 2/4 92/3 207/10
**cars [2]** 188/2 190/15
**carve [2]** 39/16 93/1
**carve-outs [1]** 39/16
**case [148]** 1/4 1/11 9/25 11/12 23/10 26/9 26/11 26/19 27/8 28/11 30/13 30/25 31/16 34/9 35/9 35/22 36/4 36/8 36/11 36/13 36/16 37/13 37/16 40/22 40/22 40/25 41/13 45/2 50/6 50/23 54/10 58/24 59/1 59/2 59/9 59/15 61/19 62/13 63/3 71/13 72/1 73/19

74/10 74/18 74/20 74/21 78/13 85/20 87/23 89/3 89/6 92/4 92/21 92/22 93/3 93/19 93/22 94/2 94/5 100/1 100/4 100/25 102/23 106/1 107/16 107/25 108/4 108/14 108/15 108/25 109/11 110/2 110/4 110/12 114/12 117/17 118/12 119/2 121/7 121/13 121/14 122/1 122/6 122/7 122/8 122/21 123/15 127/24 131/2 131/10 134/10 134/23 134/24 135/19 136/13 136/22 138/11 140/3 141/18 148/15 149/17 150/7 155/2 157/4 158/20 159/17 159/18 161/24 162/5 164/5 172/14 172/21 174/5 176/7 182/15 183/11 184/6 196/17 199/3 199/5 199/6 199/9 199/15 199/25 201/7 204/22 206/9 209/16 209/19 209/21 211/7 211/16 217/3 219/2 219/20 219/24 221/12 221/20 222/4 222/25 225/7 227/13 227/21 227/25 228/3 229/4 229/10 229/25
**cases [16]** 6/6 12/19 31/23 36/5 63/4 63/4 74/12 93/23 94/11 118/14 135/3 135/4 136/16 140/6 159/9 211/10
**cash [3]** 107/21 108/7 169/18
**catch [2]** 128/1 128/2
**catch-up [2]** 128/1 128/2
**categories [1]** 156/20
**category [4]** 161/13 177/16 208/12 208/20
**catheterized [1]** 151/16
**caucus [1]** 116/6
**cause [11]** 26/11 31/14 32/1 32/6 32/7 32/11 39/18 40/16 53/14 93/15 99/20
**caused [1]** 122/21
**causes [1]** 31/22
**causing [1]** 47/3
**caution [1]** 210/16
**Center [1]** 2/5
**certain [12]** 32/5 43/1 51/23 66/6 79/25 96/4 145/2 172/10 180/8 180/14 193/25 228/21

**certainly [22]** 26/17 44/9 44/16 45/3 52/7 66/11 72/6 77/1 87/14 96/15 104/7 125/24 129/19 132/18 137/18 139/18 140/19 154/1 154/5 154/22 208/11 216/24
**CERTIFICATE [1]** 232/1
**certification [1]** 164/13
**Certified [5]** 2/18 2/19 232/5 232/19 232/21
**certify [2]** 232/5 232/9
**cetera [3]** 42/23 43/5 222/5
**challenge [7]** 159/12 159/13 160/10 160/13 161/10 161/10 163/17
**challenged [1]** 98/23
**challenging [3]** 146/3 146/11 163/18
**chance [8]** 49/2 49/6 89/24 104/17 114/20 116/6 140/13 145/10
**change [4]** 20/24 79/25 89/9 163/3
**changed [5]** 146/14 148/13 150/4 189/12 210/20
**changes [6]** 109/18 144/17 144/24 145/4 145/16 154/13
**changing [5]** 22/5 84/18 110/2 110/7 142/3
**characterizations [1]** 100/19
**characterize [2]** 110/11 124/13
**characterized [1]** 92/17
**charge [2]** 58/14 85/11
**charged [2]** 15/18 16/20
**charges [2]** 15/22 16/15
**charging [1]** 85/12
**CHARLES [2]** 5/2 6/12
**check [1]** 144/15
**checking [1]** 74/8
**checkmarking [1]** 96/14
**checks [1]** 169/19
**Chevy [1]** 189/15
**Chicago [1]** 4/12
**chicanery [2]** 148/14 150/21
**chime [2]** 24/18 86/19
**choice [8]** 73/12 80/7 81/4 83/4 105/23 118/1 122/4 221/6
**choices [1]** 79/15

**choose [1]** 226/13
**chooses [1]** 93/9
**chose [1]** 174/8
**chris.oprison [1]** 3/17
**CHRISTOPHER [1]** 3/15
**circuit [4]** 1/1 1/1 55/19 140/9
**circulate [1]** 141/7
**circulated [1]** 91/3
**circumstance [6]** 84/22 84/24 111/6 174/10 227/7 228/19
**circumstances [12]** 31/19 38/21 39/5 83/20 83/22 86/1 103/13 106/20 205/3 218/23 223/23 223/24
**circumvent [1]** 131/18
**cite [6]** 27/8 36/12 37/15 63/3 63/3 204/22
**cited [7]** 27/10 30/13 31/16 31/23 175/2 211/9 222/4
**cites [3]** 36/4 211/16 219/2
**citing [1]** 149/16
**civil [2]** 52/24 63/18
**cjohnson [1]** 5/5
**claim [78]** 10/2 10/4 10/13 14/12 14/19 26/1 26/6 26/18 26/20 28/20 28/20 29/2 29/4 29/11 29/13 29/16 29/17 29/17 29/20 29/22 31/9 31/13 32/16 32/17 32/19 32/19 33/20 33/24 34/4 34/5 34/6 34/11 34/17 34/23 35/5 35/13 35/16 35/24 36/3 41/15 41/21 47/8 47/14 51/4 51/22 53/24 55/2 56/4 56/14 63/16 63/23 64/2 64/2 69/14 70/2 70/4 78/19 78/22 79/6 88/15 88/15 88/17 88/24 89/15 89/15 89/16 89/17 89/19 89/20 90/6 96/9 100/5 113/5 113/8 220/21 220/22 223/15 223/21
**claimed [2]** 17/5 18/11
**claiming [2]** 19/19 69/14
**claims [100]** 11/18 27/13 32/22 33/1 33/9 33/22 34/1 34/7 34/10 34/12 34/14 35/19 37/19 46/18 47/10 47/12 47/15 47/19 51/7 51/12

**C**

**claims... [80]** 56/12
58/11 58/21 58/23
59/12 59/24 60/10
61/6 61/8 61/8 61/24
64/6 64/7 64/11
64/20 73/21 73/23
73/24 76/15 76/16
76/17 76/18 76/19
76/20 76/24 76/25
77/7 77/20 77/24
78/2 78/6 78/6 78/11
78/15 78/21 79/3
86/22 86/25 88/8
93/2 93/3 94/14 95/1
111/21 111/22
111/23 111/24
111/25 112/1 112/11
112/20 112/22 113/2
113/12 113/19 114/8
114/24 119/15
119/20 122/8 172/13
203/12 209/4 213/8
213/10 213/16
213/22 214/1 214/10
214/19 215/20
216/10 217/17 218/5
218/9 218/21 219/25
220/25 223/9 223/13
**clarification [6]** 17/24
18/21 139/11 140/20
141/16 141/20
**clarify [5]** 148/11
200/6 200/13 213/14
225/13
**clarifying [1]** 169/25
**clarity [1]** 20/3
**classified [1]** 150/2
**clause [2]** 69/23
199/16
**clawed [1]** 96/6
**cleaned [2]** 144/12
180/3
**clear [26]** 20/3 27/2
35/23 36/20 40/16
46/12 62/6 72/9 87/5
87/19 109/10 128/20
149/1 149/3 158/3
167/6 178/15 179/22
209/18 211/7 211/12
213/6 219/10 224/4
228/13 228/24
**clearer [2]** 154/1
154/6
**clearly [2]** 39/3 167/6
**CLEMENT [3]** 4/15
6/22 70/24
**client [19]** 50/23
50/25 51/7 51/12
52/1 52/17 52/20
56/15 131/16 145/4
145/5 158/23 160/19
162/20 163/4 169/14
174/6 199/24 201/3
**client's [3]** 127/24
173/7 200/22
**clients [4]** 94/4 163/6
186/16 227/5
**close [9]** 7/5 24/13

26/14 136/8 154/4
154/5 169/7 179/18
214/10
**closed [6]** 7/4 62/18
62/22 142/5 142/8
153/24
**closely [1]** 84/9
**closely-held [1]** 84/9
**co [1]** 123/16
**co-counsel [1]** 123/16
**coalescing [1]** 137/15
**code [1]** 18/14
**cognizant [2]** 108/11
118/19
**colleague [2]** 165/19
225/23
**colleagues [1]** 68/22
**collect [1]** 124/22
**College [1]** 3/6
**columns [1]** 197/23
**combined [1]** 149/18
**come [24]** 39/23
49/10 87/11 89/25
90/23 91/7 104/19
111/11 111/15 114/8
114/10 115/12
116/10 118/11 123/4
127/21 128/1 129/25
132/10 139/7 142/21
151/7 184/16 201/3
**comes [13]** 12/19
122/16 132/4 132/23
136/20 154/18
154/25 178/24
185/24 187/4 227/14
228/4 228/23
**comfort [3]** 142/21
201/14 201/16
**comfortable [2]**
154/10 177/23
**coming [7]** 19/6 64/17
81/18 81/19 112/19
121/19 231/5
**Comm [37]** 42/9
42/12 42/14 42/14
43/9 43/11 43/12
120/1 121/11 121/24
143/24 144/3 144/8
144/10 144/18
144/20 144/25 145/9
145/15 145/21
145/25 146/24
155/14 174/25 185/2
203/17 205/12
207/20 208/13 215/8
215/14 215/18
215/24 215/25 216/2
216/13 226/4
**Comm's [7]** 46/5
145/11 147/22 203/5
204/17 214/2 217/7
**commenced [4]** 70/21
115/22 143/5 201/21
**commencing [1]**
26/11
**comment [2]** 220/12
228/7
**comments [4]** 92/6
196/10 196/25

230/14
**Commissioner [1]**
201/24
**commit [5]** 63/13
63/24 180/8 180/13
185/3
**commitment [1]**
193/21
**committed [1]** 39/1
**common [1]** 60/17
**communication [2]**
10/5 224/24
**communications [45]**
1/3 1/12 1/13 1/17
1/21 1/22 1/24 3/2
3/2 3/3 4/1 4/1 5/9
11/4 11/6 15/16
15/17 16/16 16/21
16/23 24/23 24/24
43/4 43/21 43/25
44/1 57/12 58/4
58/13 59/18 59/19
60/23 61/3 62/2 62/4
62/23 65/19 71/16
151/1 152/4 169/23
175/19 175/20 179/9
191/5
**Communications' [5]**
12/11 14/14 14/15
46/15 197/10
**companies [6]** 35/23
36/14 36/16 64/22
86/10 107/4
**company [52]** 10/24
16/13 29/23 43/16
43/16 43/17 43/18
46/10 58/15 58/17
59/4 60/1 61/1 61/3
62/8 63/2 77/13
77/16 78/17 84/10
84/11 84/17 85/25
86/2 86/9 86/9 88/10
103/6 105/16 111/15
113/23 129/1 153/12
157/14 159/17
173/20 213/8 214/14
215/21 217/12
217/18 218/14 220/9
220/10 220/22 221/2
221/7 221/10 222/12
222/13 223/19 228/8
**company's [1]** 160/1
**compare [2]** 152/11
230/4
**compel [13]** 11/11
106/4 143/10 143/22
155/14 155/16
157/21 166/11
179/10 179/20
197/11 199/13
199/15
**compensated [4]**
65/15 65/17 65/24
67/1
**competent [1]** 126/6
**competing [1]** 37/8
**competitors [3]**
159/19 159/19
159/20

**complaining [1]** 58/21
**complaint [36]** 12/13
13/11 13/14 14/7
15/23 18/6 22/8 41/1
41/17 49/20 49/22
50/1 50/2 50/10 51/1
51/3 51/9 51/24
52/16 52/25 53/1
57/18 57/24 59/7
59/14 65/13 66/2
67/12 69/13 69/16
144/19 203/13
203/18 203/20 214/2
214/11
**complaints [1]** 108/20
**complete [12]** 46/8
46/16 84/11 89/2
97/8 97/16 153/25
179/10 187/3 197/11
228/21 229/12
**completed [2]** 228/17
230/10
**completely [3]** 77/25
78/1 107/24
**complex [1]** 98/18
**complicated [3]** 99/7
130/9 139/20
**component [3]** 79/4
115/3 224/5
**compromise [1]**
157/19
**computing [1]** 106/12
**concealed [2]** 42/22
60/7
**concealment [2]** 60/3
60/3
**conceive [3]** 77/22
77/23 109/9
**concept [2]** 80/25
122/3 219/14
**conceptual [1]** 55/3
**conceptually [1]** 72/7
**concern [17]** 8/11
24/8 116/19 117/14
131/16 134/3 134/14
141/21 147/20 151/1
154/11 164/24
164/25 182/10
195/18 215/8 218/21
**concerned [9]** 109/5
116/22 118/21 136/7
159/6 181/10 195/10
195/23 196/19
**concerns [4]** 107/12
119/3 134/16 169/14
**concession [1]** 69/25
**conclude [4]** 205/2
210/8 217/7 217/11
**concluded [6]** 209/20
210/14 219/12
224/23 225/14
231/13
**concluding [1]** 209/19
**conclusion [8]** 33/7
33/12 204/20 204/25
209/22 219/24
221/16 222/5
**conclusions [1]**
113/19

**conclusory [1]** 67/6
**concrete [1]** 100/21
**conditional [5]** 30/6
180/24 192/16
192/21 196/10
**conduct [10]** 39/5
58/10 58/20 85/18
93/21 139/13 213/18
214/7 215/1 216/11
**conducts [1]** 59/18
**confer [5]** 90/11
142/16 156/18
189/11 193/12
**conference [3]** 94/3
94/6 123/12
**confers [2]** 195/20
195/21
**confidence [2]** 61/10
61/22
**confident [1]** 113/13
**confidential [9]** 61/9
62/12 63/12 156/14
156/21 157/22
160/16 161/2 164/9
**confidentiality [16]**
156/6 156/8 156/11
156/12 156/17
156/22 157/1 157/1
158/8 158/10 158/11
161/2 161/18
161/19 164/6 165/9
**confirmed [1]** 218/6
**conflating [1]** 35/9
**conflict [3]** 44/18
62/6 120/6
**conflicts [5]** 117/3
117/4 117/5 121/5
126/2
**confused [2]** 166/19
166/20
**congratulations [2]**
140/17 166/3
**Congress [1]** 85/5
**conjunctive [1]** 69/22
**connected [2]** 197/25
232/12
**connection [7]** 29/18
34/17 212/7 218/4
218/9 219/18 229/3
**Connolly [1]** 31/15
**consequence [2]** 60/9
134/9
**consider [4]** 40/12
43/8 80/13 220/4
**consideration [3]** 66/8
119/6 217/14
**considered [1]** 40/15
**considering [2]** 82/21
217/2
**consistent [2]** 141/21
219/19
**consolidated [2]** 1/8
6/6
**conspiracy [15]** 35/18
35/24 36/2 36/10
36/19 37/6 37/18
45/23 52/24 53/11
53/12 54/15 63/13
63/18 63/24

## C

**conspire [3]** 36/1 36/7 54/1
**conspired [3]** 35/22 37/9 54/11
**constantly [1]** 149/7
**constitute [2]** 44/2 52/8
**constituting [1]** 29/5
**construction [2]** 136/12 136/16
**constructive [1]** 60/16
**consuming [1]** 135/23
**contain [2]** 152/5 187/24
**contained [1]** 190/6
**contemplated [1]** 75/8
**contemplates [1]** 81/25
**contemplating [1]** 92/24
**contemplation [1]** 75/25
**contend [3]** 75/14 175/7 210/9
**contention [1]** 145/6
**contest [1]** 101/22
**contestant [1]** 116/11
**contested [1]** 207/14
**contesting [1]** 205/17
**context [7]** 64/2 65/11 67/5 67/9 83/5 204/11 227/13
**contingent [1]** 12/21
**continuance [3]** 93/14 94/9 99/20
**continue [21]** 39/22 71/18 71/22 92/14 92/18 93/7 105/4 107/8 107/14 107/16 107/17 108/7 109/13 123/10 154/12 157/17 204/4 207/15 224/22 228/24 230/11
**continuing [1]** 137/10
**contract [6]** 53/15 65/4 110/10 124/14 124/19 135/8
**contracts [4]** 46/14 46/15 48/5 111/4
**contrary [1]** 31/24
**control [9]** 43/19 44/14 44/15 44/20 62/19 174/22 176/2 183/13 183/14
**controlled [2]** 36/14 184/6
**controlling [2]** 39/11 43/7
**conversation [1]** 141/5
**conversion [1]** 29/25
**convert [1]** 42/9
**conveyed [1]** 145/1
**convince [1]** 91/15
**cool [1]** 165/23
**copies [1]** 149/4
**Copperweld [1]** 36/5

**copy [2]** 183/24 186/1
**core [3]** 56/1 73/19 137/8
**corner [2]** 64/17 184/2
**corners [2]** 27/5 131/17
**corporate [15]** 31/21 33/24 34/7 36/18 44/23 44/25 54/15 61/13 131/1 159/25 160/4 214/23 214/25 226/7 228/8
**corporation [5]** 30/25 34/3 37/7 53/4 220/7
**corporation's [1]** 30/21
**corporations [2]** 30/22 111/3
**correct [30]** 12/7 28/6 54/3 57/5 69/19 69/20 90/9 90/10 106/24 145/19 145/21 145/25 147/9 147/13 151/15 152/3 152/17 152/18 166/13 179/12 181/22 185/8 194/2 197/13 201/25 205/14 206/21 212/14 213/25 225/23
**corrected [2]** 151/18 222/16
**corrections [1]** 151/18
**correctly [3]** 12/6 79/15 213/23
**Corvette [2]** 189/16 189/18
**cost [7]** 103/17 201/4 206/10 207/23 212/17 212/22 224/4
**costs [48]** 108/6 167/17 169/6 187/5 191/3 191/6 191/9 191/12 191/18 202/13 203/2 203/3 203/6 203/22 204/6 204/7 204/13 204/15 204/18 205/14 205/16 205/18 206/1 206/2 206/5 206/7 206/14 206/18 207/4 207/10 207/14 207/22 208/4 208/9 208/10 208/13 208/24 209/25 210/11 210/17 210/23 210/25 211/4 211/19 212/9 212/13 218/4 221/22
**counsel [36]** 5/9 6/14 8/2 8/21 27/21 28/3 46/23 47/5 47/16 80/22 81/20 90/12 93/19 95/25 120/15 120/21 120/25 123/16 126/6 139/19 139/22 157/15

197/17 197/23 210/21 211/18 219/20 221/5 221/15 221/23 222/10 224/24 227/2 227/4 232/10 232/12
**counsel's [2]** 47/19 82/3
**count [20]** 13/11 25/20 25/23 29/14 29/15 31/11 33/20 38/10 39/25 41/22 44/3 44/4 47/14 51/21 57/18 60/16 61/25 63/13 64/4 139/6
**counterclaim [7]** 1/10 1/15 25/25 35/2 37/1 49/18 51/3
**counterclaims [6]** 39/9 39/15 49/9 50/24 52/22 54/18
**counts [23]** 11/14 25/10 25/13 25/24 35/18 45/20 46/22 51/21 57/21 57/23 58/6 60/15 63/10 64/5 65/8 67/17 69/21 203/14 203/16 214/12 214/14 214/20 214/21
**COUNTY [2]** 1/1 232/3
**couple [14]** 14/6 25/19 38/14 53/1 68/18 94/16 120/22 123/20 140/20 198/5 198/6 201/15 215/23 227/16
**course [10]** 25/13 60/4 86/3 100/13 149/22 163/23 176/21 199/12 214/22 220/7
**court [111]** 1/1 8/20 8/22 9/23 10/1 26/12 26/23 26/24 27/8 27/11 27/12 28/12 28/15 30/5 30/9 34/25 36/17 40/12 41/18 48/9 60/13 67/11 67/16 70/1 70/5 75/9 76/3 78/20 79/2 80/7 82/6 85/23 86/4 86/6 87/1 87/15 91/10 91/13 92/7 92/9 92/18 99/7 101/25 105/3 105/6 106/25 107/7 107/10 107/11 107/23 108/10 108/11 108/13 109/2 110/25 111/19 112/4 112/9 113/6 113/10 113/14 113/18 113/25 115/17 117/3 119/15 120/18 121/2 121/7 130/6 133/12 141/1 141/23 147/5 149/17 152/20

154/15 156/7 157/12 157/13 162/23 167/4 168/15 180/16 193/23 196/1 199/4 204/25 205/2 205/5 205/21 208/23 211/5 212/9 218/18 219/3 219/5 219/9 220/5 220/8 220/11 223/22 225/1 226/21 228/15 229/11 229/23 230/8 232/5 232/19
**court's [20]** 9/2 14/21 25/14 25/20 41/16 75/3 75/16 76/11 78/4 82/9 106/3 107/17 112/18 116/14 116/18 137/23 153/5 163/23 204/13 219/23
**court-ordered [1]** 223/22
**courtroom [7]** 6/8 6/21 7/20 7/25 24/17 33/15 168/18
**courts [4]** 30/10 32/12 36/1 85/21
**cover [2]** 203/2 229/13
**covered [2]** 156/16 217/21
**covers [1]** 216/10
**COVID [3]** 85/22 86/2 86/4
**CPA [1]** 97/1
**crap [1]** 102/7
**create [6]** 18/17 32/11 95/19 139/8 139/9 148/18
**created [2]** 60/22 66/6
**creates [2]** 31/21 32/6
**creating [1]** 149/21
**creation [2]** 66/23 111/2
**creativity [1]** 116/15
**credible [2]** 157/7 160/10
**credit [18]** 12/11 14/12 15/15 15/17 15/20 15/21 15/25 16/16 16/19 16/21 16/24 17/11 17/13 17/14 98/14 112/13 113/20 205/6
**creditor [1]** 52/12
**creditors [1]** 159/23
**Creek [2]** 217/3 219/20
**critical [3]** 88/17 90/18 119/23
**cross [4]** 51/4 109/12 125/24 205/8
**cross-claim [1]** 51/4
**cross-moved [1]** 109/12
**crude [1]** 77/4
**crux [1]** 55/19
**crystal [1]** 109/10

**crystalize [1]** 52/8
**crystalized [1]** 52/11
**culpability [1]** 63/20
**current [5]** 75/19 79/6 116/17 119/14 119/21
**currently [6]** 21/3 40/24 69/14 93/10 120/2 141/25
**currently-set [2]** 120/2 141/25
**custodian [5]** 42/19 109/13 110/3 110/5 119/3
**custody [3]** 174/21 176/1 183/13
**cut [1]** 95/8
**cutting [1]** 131/17

## D

**D-I-N [1]** 9/10
**damages [7]** 29/1 57/25 69/15 69/18 70/2 70/4 162/20
**Danese [1]** 62/10
**dare [2]** 138/4 138/6
**data [7]** 97/17 144/15 145/14 146/8 149/12 153/25 185/24
**date [97]** 13/7 13/15 13/21 17/5 17/10 17/16 18/25 23/24 67/2 72/11 72/12 72/13 72/18 72/20 72/20 75/10 75/15 77/13 79/14 79/17 79/18 79/24 80/1 80/8 80/12 80/13 81/1 81/6 81/14 81/25 82/5 82/12 82/18 82/18 82/20 83/12 83/15 84/2 84/19 84/25 85/19 85/20 86/7 86/14 87/16 87/16 91/11 91/17 91/22 92/23 95/18 98/2 98/6 98/13 99/16 102/11 103/7 103/11 103/14 103/17 104/8 105/2 105/3 105/6 105/20 106/21 107/9 111/9 114/15 116/23 118/2 118/8 118/8 120/3 124/7 126/22 128/21 129/1 132/19 132/20 132/23 135/6 140/21 145/7 146/9 147/5 147/7 147/8 152/5 152/21 153/9 154/15 175/14 180/8 180/14 193/21 193/25
**dated [4]** 1/6 1/9 1/16 232/15
**dates [19]** 20/25 22/6 72/19 73/17 75/11 76/4 87/13 87/18 98/25 106/12 106/15 111/12 126/2 126/3

**D**

**dates... [5]** 126/4
137/20 139/5 139/20
208/3

**DAVID [3]** 4/9 5/9
6/19

**Davis [1]** 37/15

**day [39]** 8/5 8/6
20/20 21/24 46/1
58/15 58/15 59/19
59/19 62/22 62/22
72/24 75/6 81/24
94/1 136/5 142/23
148/24 149/7 178/11
182/12 200/3 224/23
224/23 224/25
225/12 227/3 227/24
228/1 228/15 228/18
228/22 228/23
228/25 228/25
229/15 229/20
230/12 232/15

**days [13]** 23/4 23/17
38/14 55/17 93/11
108/18 131/13 153/1
164/19 198/6 199/13
199/21 225/1

**DC [1]** 3/20

**DCA [11]** 27/8 31/15
34/9 37/16 49/3 74/8
74/12 136/22 140/14
205/12 217/3

**de [1]** 77/8

**deadline [6]** 17/21
142/3 148/19 179/1
180/17 209/15

**deadlines [2]** 139/8
139/9

**deal [9]** 31/24 68/9
69/5 77/16 90/3 93/9
94/25 228/4 230/13

**dealing [6]** 89/16
132/24 155/4 199/6
214/22 222/1

**deals [1]** 37/14

**dealt [2]** 68/5 119/4

**death [3]** 58/1 188/22
189/7

**debit [1]** 112/13

**debtor [3]** 52/1 52/9
52/11

**decedent [5]** 14/14
184/19 188/22 189/6
191/5

**decedent's [3]** 188/2
188/22 189/7

**December [31]** 18/23
19/10 19/12 19/13
19/14 19/15 22/19
23/7 24/13 48/12
48/17 48/22 68/15
94/16 96/23 147/23
154/7 178/22 178/24
179/1 180/19 181/8
181/13 181/17 195/4
195/10 195/25 196/3
196/5 196/6 224/22

**December 11th [1]**
195/10

**December 17th [1]**
224/22

**December 1st [1]**
181/13

**December 2nd [8]**
19/10 19/13 178/22
178/24 179/1 195/25
196/3 196/5

**December 4 [1]** 181/8

**December 4th [3]**
22/19 23/7 180/19

**December 6 [5]** 19/12
19/14 48/22 68/15
195/4

**December 6th [3]**
18/23 24/13 48/12

**December 9th [1]**
19/15

**decide [7]** 79/16 81/8
83/6 91/11 91/21
96/11 112/10

**decided [2]** 78/8 78/9

**decides [1]** 211/5

**decision [7]** 81/21
90/19 91/24 101/12
102/14 109/2 220/9

**declaratory [4]** 26/3
26/14 204/8 210/7

**declined [1]** 121/15

**decreased [1]** 112/21

**deduct [1]** 113/20

**Deem [1]** 166/12

**defeat [1]** 55/3

**defend [4]** 206/8
214/3 221/25 223/11

**defendant [9]** 1/22
28/22 28/23 29/1
36/13 55/2 56/4
62/13 63/21

**defendants [6]** 1/8
1/15 1/24 55/22
64/12 69/16

**defense [4]** 60/11
214/4 215/8 216/19

**defenses [8]** 14/4 23/3
24/13 58/8 58/9
58/24 142/9 172/13

**defer [5]** 49/23 77/21
88/25 120/15 154/19

**define [3]** 170/8
170/10 170/11

**defined [2]** 30/5
174/24

**defining [3]** 32/10
175/3 177/4

**definite [15]** 9/14
11/23 12/17 13/5
13/18 17/4 17/18
17/21 19/1 22/18
22/25 24/8 87/1
133/7 133/11

**definition [2]** 171/1
174/25

**Delaware [26]** 26/4
28/19 29/4 29/20
29/24 30/9 34/16
34/19 35/21 36/8
40/18 42/3 42/9
42/12 42/14 43/6

43/16 43/17 44/1
44/5 46/5 46/7 46/13
48/5 48/7 111/2

**Delaware's [1]** 216/2

**delay [7]** 109/4
121/10 131/8 131/8
133/25 134/9 209/1

**delayed [2]** 16/7
16/12

**delaying [1]** 108/24

**deletion [3]** 164/10
164/11 164/12

**delicto [4]** 58/7 60/11
67/14 68/7

**delineated [1]** 117/25

**delta [3]** 101/9 101/11
104/1

**demonstrably [1]**
83/24

**denial [2]** 12/18 22/25

**denied [11]** 11/21
34/14 46/19 177/11
201/3 201/6 201/12
209/22 212/3 212/4
223/1

**denies [1]** 121/10

**deny [8]** 11/22 12/22
12/25 17/2 48/10
175/12 176/3 177/9

**denying [5]** 11/17
26/12 68/12 70/3
177/6

**depart [4]** 82/11
83/16 86/6 219/3

**departed [1]** 83/19

**departing [2]** 82/4
101/13

**departs [1]** 86/4

**departure [1]** 84/23

**dependent [2]** 62/16
62/17

**depending [2]** 132/4
221/17

**deponents [1]** 230/4

**depose [4]** 126/4
154/12 154/16
208/17

**deposed [4]** 133/9
133/15 226/23
226/25

**deposition [41]** 19/11
19/15 19/18 19/21
20/8 20/10 20/15
20/21 21/16 22/14
23/23 23/24 68/16
133/8 180/19 181/6
181/7 181/12 181/17
181/21 182/11 184/1
184/14 184/20 196/6
201/25 208/7 224/21
225/1 225/11 225/14
225/22 227/9 227/11
227/22 229/10
229/12 230/2 230/8
230/9 230/10

**deposition's [1]** 97/6

**depositions [29]** 19/6
19/9 20/25 21/1
21/18 22/18 48/17

68/21 95/12 95/21
96/22 96/24 97/19
124/2 124/2 124/6
125/23 125/24
129/20 141/22
141/25 147/21 148/1
148/2 154/12 224/12
225/20 228/17 229/4

**depositions' [1]** 48/13

**derivative [3]** 34/5
34/8 34/10

**derivatively [3]** 1/17
34/13 47/11

**describe [1]** 92/16

**described [2]** 39/6
122/21

**describes [2]** 38/21
66/3

**descriptions [1]** 208/4

**designate [2]** 160/11
160/15

**designated [4]** 226/7
226/8 226/10 228/7

**designating [1]** 160/13

**designation [4]**
159/11 161/2 163/17
163/20

**designations [1]**
156/24

**desk [1]** 100/17

**desperately [1]** 157/25

**despite [1]** 137/22

**destitute [1]** 221/22

**detail [2]** 14/8 43/2

**determination [7]**
72/4 80/15 82/7
82/14 101/25 103/6
219/10

**determine [6]** 71/12
72/18 124/12 163/24
211/14 219/24

**determining [3]** 99/9
128/21 221/1

**detracts [1]** 151/23

**detriment [1]** 46/2

**developing [1]** 160/21

**died [1]** 223/14

**difference [2]** 34/4
152/10

**different [30]** 33/22
37/8 64/10 81/25
87/12 87/13 99/8
111/11 111/12
111/16 111/17 114/8
124/24 136/14
139/21 155/9 155/12
169/21 170/1 170/8
170/23 170/24
185/23 190/12
190/15 190/16 200/5
203/19 215/1 230/1

**differently [2]** 49/24
203/25

**difficult [2]** 18/4 68/8

**difficulty [3]** 6/3 73/1
130/8

**dig [1]** 209/3

**dilatory [3]** 80/24
93/20 93/21

**diligence [1]** 231/8

**diminution [1]** 48/4

**DIN [40]** 9/10 9/12
9/15 9/16 24/25
24/25 25/8 25/9
26/13 48/10 49/8
50/13 50/18 56/19
57/1 57/3 57/10
57/13 69/8 69/9
71/14 71/15 71/19
71/23 92/13 143/9
155/5 155/9 155/15
156/8 156/12 166/11
166/21 166/22
179/11 179/12 202/1
202/14 210/4 211/2

**dinner [1]** 101/4

**DINs [1]** 143/11

**direct [11]** 17/4 33/25
34/4 34/6 35/4 35/16
81/3 81/9 83/6 105/7
183/15

**directed [1]** 44/24

**direction [1]** 95/15

**directly [2]** 47/10
171/18

**director [15]** 32/18
38/15 38/22 39/4
39/10 39/18 58/13
128/13 202/23
214/13 214/17 218/7
218/13 218/20
219/15

**directors [5]** 31/13
31/18 31/21 32/5
222/21

**disagree [7]** 40/12
91/22 111/20 123/15
162/21 163/15
163/16

**disagreement [2]**
212/16 220/15

**disappear [1]** 223/14

**disclose [3]** 44/7
121/5 162/17

**disclosed [1]** 44/19

**disclosing [1]** 55/10

**disclosure [1]** 133/7

**discover [1]** 145/15

**discovered [1]** 149/25

**discovery [63]** 12/14
13/2 16/8 16/12
37/22 89/2 90/25
93/25 94/3 94/17
94/19 95/11 95/20
96/21 105/12 123/21
124/11 125/15
125/18 126/7 126/10
127/7 128/17 129/15
129/18 130/5 130/15
132/1 132/3 132/6
132/13 133/19
134/19 135/22 137/4
137/5 137/7 142/19
142/22 143/7 143/10
143/25 144/16
144/21 144/23 145/3
145/8 146/18 150/9
172/23 179/11

**D**

**discovery... [12]**
179/19 179/22
191/21 192/1 195/14
195/25 197/11 199/5
199/9 200/25 201/1
205/4
**discreet [3]** 38/7
132/7 143/23
**discretion [1]** 204/13
**discussed [15]** 43/24
45/19 52/23 53/10
53/17 54/4 76/21
84/3 90/19 107/3
120/4 139/7 142/4
180/2 227/12
**discussing [3]** 92/25
105/2 105/20
**discussion [6]** 71/25
73/18 87/22 93/17
104/13 104/18
**discussions [1]** 117/25
**dismiss [30]** 9/14
11/17 11/20 12/15
13/4 24/25 25/13
26/24 34/14 48/10
49/5 49/9 49/17
49/18 50/2 50/5 50/6
50/8 50/9 54/17
57/12 57/17 58/6
67/12 67/17 68/3
68/6 68/9 68/12 73/2
**dismissal [4]** 29/21
31/8 37/21 58/25
**dismissed [10]** 11/12
26/20 29/11 32/20
34/11 34/24 37/19
60/12 63/11 64/4
**dismissing [1]** 29/12
**disparity [2]** 213/7
213/12
**dispatch [1]** 196/8
**disposal [1]** 30/7
**dispose [2]** 27/13 43/7
**disposed [1]** 203/12
**disposition [2]** 164/13
164/21
**dispositive [1]** 97/19
**dispute [12]** 36/23
46/3 46/5 59/13
62/16 78/24 128/22
144/3 208/13 208/16
216/1 217/21
**disputed [3]** 40/25
207/21 211/15
**disputes [1]** 124/18
**dissolution [3]** 72/2
75/21 107/19
**distinct [1]** 37/9
**distributed [1]** 10/6
**distribution [2]**
164/14 217/19
**distributions [2]** 10/8
214/25
**District [2]** 26/25
36/17
**District's [1]** 140/19
**dividing [1]** 134/10
**divorce [1]** 101/1

**divorced [1]** 96/17
**DIXON [1]** 3/19
**DJ [2]** 26/12 26/15
**DLA [3]** 3/15 3/19 7/1
**dlapiper.com [2]** 3/17
3/21
**doable [3]** 97/11
111/10 182/5
**docket [7]** 9/11 74/6
89/7 93/24 138/21
138/22 197/12
**doctored [1]** 109/14
**doctrine [5]** 36/2
36/20 37/6 53/11
54/14
**document [21]** 58/1
66/21 106/1 108/3
127/7 145/18 148/22
149/4 150/10 152/19
153/4 155/1 156/3
168/8 168/23 193/2
193/8 194/5 194/10
205/7 205/8
**documentary [1]**
66/22
**documentation [2]**
208/10 208/23
**documented [3]** 60/21
65/5 129/5
**documents [84]** 15/25
16/4 16/6 17/25 24/4
60/21 94/5 95/12
123/22 126/8 130/19
149/10 149/14
152/15 157/7 157/16
158/8 158/12 160/11
160/24 161/15 164/8
164/9 164/23 165/3
165/16 174/21
175/13 176/1 177/9
178/12 180/6 180/8
180/9 180/13 180/15
180/18 180/18 181/3
181/5 182/4 183/2
183/3 183/7 183/9
183/12 183/15
183/18 184/8 184/9
184/14 184/16
184/18 184/22
185/11 187/21
187/23 187/24
189/17 190/1 190/5
191/20 192/11
192/25 193/14 194/3
194/7 194/9 194/21
194/24 195/9 196/4
196/5 196/13 196/15
196/16 197/19
197/21 197/25 198/2
198/8 198/9 200/12
218/16
**dodge [1]** 85/18
**dollar [1]** 88/15
**dollars [1]** 189/12
**domestic [1]** 30/22
**domesticated [2]** 97/1
97/3
**dominant [2]** 62/17
62/24

**done [40]** 19/1 80/16
80/21 86/23 95/21
95/21 96/19 96/21
97/8 97/13 99/14
99/17 102/25 103/20
108/19 117/17
117/20 120/4 123/7
123/8 124/15 125/13
128/16 129/21
129/22 130/13
134/19 144/17
158/18 159/8 159/22
160/2 160/4 160/6
165/14 200/3 219/13
225/9 225/10 227/24
**door [1]** 14/11
**doubt [1]** 217/19
**dozen [1]** 94/19
**Dr [1]** 4/11
**Dr. [3]** 205/19 207/24
208/18
**Dr. Mohammed [2]**
205/19 207/24
**Dr. Mohammed's [1]**
208/18
**draft [5]** 22/21 139/4
142/16 154/17
201/10
**drafting [1]** 68/25
**drain [1]** 122/22
**draining [2]** 116/21
122/3
**draw [2]** 25/20 204/25
**drawings [3]** 160/17
163/24 164/1
**drive [1]** 24/19
**driven [1]** 116/19
**dschoenfeld [1]** 4/13
**due [6]** 33/14 137/25
156/4 183/4 195/25
210/12
**duplicative [1]** 225/10
**DUSTIN [3]** 4/3 7/9
25/6
**dustin.hillsley [1]** 4/6
**duties [6]** 31/21 45/6
60/17 61/7 63/12
217/22
**duty [22]** 32/16 33/9
33/19 34/20 35/13
44/17 45/3 45/17
47/10 47/15 53/16
53/19 60/18 62/3
62/5 111/23 183/12
183/16 214/13
214/15 214/18
214/18

**E**

**e-mail [4]** 66/1 66/3
133/21 199/20
**earlier [15]** 34/21
60/20 68/4 72/13
76/21 85/19 102/9
116/20 133/6 152/23
152/24 156/10 210/1
222/16 223/8
**early [4]** 89/24 165/25
186/9 195/4

**earth [1]** 122/6
**easier [2]** 75/1 82/23
**East [2]** 3/6 3/10
**easy [3]** 123/23
207/25 208/2
**economic [1]** 169/20
**effect [7]** 78/18 85/5
96/15 101/21 112/17
112/21 142/7
**effective [1]** 136/24
**effectively [8]** 26/10
61/4 79/22 92/9
100/5 101/14 102/16
127/23
**effectuate [1]** 101/12
**efficient [2]** 156/23
203/23
**effort [5]** 115/4
160/20 161/25
173/16 176/25
**efforts [2]** 131/25
132/13
**eight [2]** 158/20
200/21
**Eighth [1]** 3/20
**either [26]** 52/2 61/9
64/18 65/2 65/6
66/13 72/16 73/12
79/16 80/8 80/15
82/18 82/22 87/16
98/24 137/1 137/20
158/7 173/18 180/25
194/19 206/8 212/4
212/25 216/11 226/6
**either/or [1]** 82/22
**elected [2]** 121/25
220/11
**election [1]** 81/24
**electronic [3]** 185/24
186/21 201/5
**elegant [1]** 110/17
**elements [4]** 28/22
52/18 56/11 63/14
**eliminate [1]** 160/3
**else [29]** 22/4 24/9
24/14 56/6 60/4
65/23 74/21 101/15
103/15 108/13 115/8
127/8 133/1 142/13
145/24 147/15
165/22 179/3 182/21
183/14 187/13
190/25 195/12 206/1
227/4 227/21 227/23
227/25 230/19
**employee [3]** 45/7
232/10 232/11
**employee.' [1]** 45/8
**employment [5]** 35/1
35/8 35/14 44/23
45/1
**enable [1]** 116/16
**encapsulated [1]**
79/15
**end [24]** 8/6 30/12
46/1 63/1 75/7
100/11 108/15 110/3
114/13 128/19 136/4
154/6 164/11 178/13

203/24 204/24
209/15 210/14
210/18 211/3 211/6
211/6 215/12 222/22
**endeavor [1]** 138/8
**ended [1]** 15/12
**ends [1]** 98/12
**enforce [4]** 171/10
171/17 171/22
172/10
**enforcing [1]** 45/11
**engage [6]** 84/8 84/12
85/6 93/16 121/1
172/17
**engaged [1]** 94/3
**engaging [1]** 44/25
**engineer [1]** 202/23
**enhance [1]** 63/23
**enjoying [1]** 216/25
**enough [3]** 9/5 133/15
208/5
**enriched [1]** 12/9
12/25 13/2
**enrichment [8]** 16/22
16/25 63/14 63/15
63/17 63/19 63/24
96/10
**ensure [3]** 109/14
110/6 156/22
**ensuring [2]** 131/15
143/25
**enter [5]** 54/15 64/16
70/3 207/8 212/10
**entered [4]** 55/18
156/8 175/20 209/8
**entering [1]** 229/9
**enterprise [1]** 84/9
**enters [1]** 113/11
**entire [14]** 34/3 46/10
61/1 61/13 61/23
65/18 65/18 67/12
71/13 106/10 117/17
117/20
**entirely [6]** 42/11
118/19 156/5 200/4
203/19 216/23
**entirety [1]** 17/2
**entities [12]** 25/11
30/23 36/17 39/11
39/12 79/12 143/24
167/17 168/3 169/5
226/6 226/9
**entitled [13]** 55/14
94/10 144/14 145/8
161/5 162/9 162/15
162/16 163/22
163/23 164/2 217/9
218/10
**entitlement [3]** 212/8
212/13 212/23
**entity [22]** 42/9 42/12
42/22 42/24 43/3
43/4 43/6 44/13
44/14 46/4 46/6 46/7
46/13 48/7 53/6
129/7 158/22 167/16
168/3 169/5 169/18
169/20
**entries [1]** 197/24

**E**

**envisioning [1]** 79/10
**equipment [2]** 205/20
207/23
**equipped [1]** 90/13
**equitable [6]** 58/7
60/11 67/14 204/9
204/11 204/19
**equitably [1]** 58/21
**equity [2]** 160/20
222/9
**equivalent [2]** 55/15
55/17
**error [1]** 87/3
**errors [3]** 77/18
144/13 146/16
**ESI [2]** 200/25 208/17
**ESI-type [1]** 200/25
**especially [5]** 8/15
144/17 145/9 217/23
228/2
**essentially [4]** 58/2
76/21 193/4 221/2
**establish [3]** 40/23
66/16 83/25
**estate [24]** 57/19
57/21 57/25 67/14
76/24 78/2 78/11
78/16 93/2 184/19
213/22 214/3 214/3
214/6 217/1 217/8
218/5 219/2 220/23
221/4 221/9 221/11
222/21 223/10
**estimate [1]** 93/4
**estopped [1]** 58/21
**estoppel [3]** 58/7
60/11 67/15
**et [5]** 42/23 43/5
57/12 143/11 222/5
**et al [2]** 57/12 143/11
**evaluating [1]** 223/21
**eve [1]** 181/14
**even [33]** 12/18 13/25
31/12 37/10 40/14
65/23 66/9 67/9
68/11 72/17 84/6
93/1 94/15 98/9
105/10 106/12
107/17 109/9 113/22
121/13 153/8 155/3
156/3 156/7 180/14
184/10 186/21
208/22 211/13
215/18 219/3 220/25
222/23
**event [3]** 50/21 65/2
162/12
**events [1]** 61/14
**ever [6]** 58/18 66/24
107/3 109/23 109/23
158/20
**every [12]** 13/12
93/25 111/12 148/24
149/7 150/19 162/22
171/10 172/20
188/20 189/5 227/25
**everybody [22]** 22/3
24/21 27/15 68/17

69/11 70/6 87/17
88/2 115/13 115/23
121/18 137/19 141/7
142/10 142/11
142/24 162/14
196/17 216/7 227/21
227/22 227/25
**everybody's [1]** 123/1
**everyone [9]** 9/7 27/5
27/17 71/2 87/25
138/10 196/7 227/4
231/11
**everyone's [3]** 188/9
230/14 231/7
**everything [32]** 8/13
8/15 23/13 24/9 43/5
49/13 54/25 56/6
74/5 74/21 94/23
100/7 105/24 108/11
108/13 115/24
133/23 134/15
134/22 141/24 154/5
159/22 160/3 160/4
160/6 160/14 163/16
192/10 200/4 203/24
205/25 225/9
**everywhere [1]** 168/20
**evict [1]** 45/10
**evidence [13]** 66/23
75/9 80/2 91/15 92/2
92/3 92/5 106/22
107/2 172/23 173/23
227/8 228/4
**evidentiary [26]** 72/16
75/17 80/9 80/16
81/8 81/22 82/13
86/17 91/16 104/8
120/1 131/5 139/14
203/6 205/11 205/14
205/23 206/2 208/24
211/7 211/14 211/23
211/25 212/7 212/16
213/1
**exact [2]** 58/20
187/17
**exactly [2]** 114/3
132/24
**example [6]** 12/10
68/7 85/21 100/21
179/23 214/14
**examples [3]** 14/6
211/11 211/23
**Excel [1]** 197/23
**except [3]** 17/2 23/13
227/7
**exception [2]** 36/25
37/5
**exceptional [5]** 83/19
83/22 84/21 84/23
111/5
**excessive [1]** 12/20
**exclude [2]** 99/10
171/16
**excluded [1]** 114/16
**excluding [1]** 96/13
**exclusive [3]** 157/5
175/1 175/22
**exclusively [1]** 175/22
**excuse [2]** 10/17

205/21
**executed [3]** 55/9
216/7 216/16
**executive [1]** 58/12
**exercising [1]** 45/2
**exerted [1]** 62/19
**exhaustive [1]** 211/24
**exhibit [9]** 66/2
150/24 151/19
157/21 168/16 216/4
216/6 216/14 216/17
**Exhibit 10 [1]** 150/24
**Exhibit 15 [1]** 157/22
**Exhibit 5A [3]** 216/4
216/6 216/14
**Exhibit 8 [2]** 151/19
216/17
**exist [5]** 32/2 150/11
150/14 177/9 213/12
**existence [3]** 64/2
150/6 150/12
**existing [8]** 134/16
136/1 158/8 161/12
161/17 161/19 164/6
165/8
**exists [4]** 124/20
129/9 150/10 188/12
**expect [3]** 84/3
119/15 230/10
**expectations [1]**
135/4
**expecting [1]** 56/21
**expeditious [1]**
139/22
**expenses [6]** 12/12
15/18 15/19 205/18
219/17 222/15
**expensive [2]** 122/24
204/2
**expert [21]** 61/18
81/9 84/4 88/25
97/15 97/18 98/22
99/12 103/4 103/5
103/7 111/10 117/22
120/6 124/4 124/6
128/4 132/24 140/3
205/19 208/19
**expert's [1]** 147/11
**expertise [1]** 61/15
**experts [38]** 75/10
76/4 76/9 80/11
80/20 82/23 84/8
85/15 95/10 97/8
103/8 103/11 105/11
105/22 105/24 106/7
106/8 106/15 108/22
110/15 111/15
111/19 112/3 112/8
112/16 113/16 114/2
114/6 118/4 118/5
119/18 121/19 124/4
136/6 139/16 144/1
152/25 163/13
**experts' [2]** 96/12
114/5
**expired [2]** 209/14
209/14
**explain [4]** 83/1 158/5
177/11 213/15

**explained [1]** 12/9
**explaining [1]** 177/6
**explains [1]** 151/19
**explanation [1]**
177/10
**express [1]** 48/1
**expressly [10]** 12/8
27/11 34/22 47/22
59/6 75/8 165/10
175/21 176/4 214/12
**extension [5]** 100/6
209/11 209/12
209/17 210/15
**extent [10]** 40/3
58/18 59/23 65/20
154/14 157/23
171/15 187/1 188/5
210/9
**extraneous [2]** 67/5
91/12
**extraordinary [1]**
103/13
**extremely [1]** 213/11
**eyes [7]** 156/6 157/3
159/7 161/21 162/24
163/2 164/5

**F**

**face [2]** 134/9 167/6
**facing [1]** 165/3
**fact [32]** 11/1 16/17
43/15 49/19 53/13
58/25 59/8 59/21
68/8 75/6 80/14
81/20 86/2 86/8
95/11 95/20 96/20
113/10 123/18
127/16 137/22
151/13 156/9 160/8
172/9 195/17 211/16
215/7 215/17 217/16
219/14 221/20
**fact-intensive [1]** 68/8
**factor [1]** 101/24
**facts [12]** 44/10 52/22
80/10 106/22 110/2
203/19 215/5 220/14
223/23 223/24
228/19 229/6
**factual [9]** 12/21 39/8
45/14 82/14 103/16
204/20 205/3 214/21
217/21
**fail [1]** 47/12
**failed [2]** 61/6 192/24
**fails [3]** 26/17 29/2
63/14
**failure [1]** 64/6
**fair [19]** 10/19 14/18
51/10 75/14 78/5
78/20 108/8 108/8
112/6 112/18 113/21
123/2 134/19 211/14
213/19 215/3 216/25
217/2 218/22
**fairly [2]** 100/6
131/12
**fairness [1]** 19/20
**faith [7]** 39/1 55/25

56/2 196/2 199/12
220/17 223/18
**falls [1]** 51/15
**false [2]** 83/24 121/23
**familiar [2]** 51/20
219/14
**families [1]** 165/23
**family [11]** 1/6 1/9
1/16 62/11 62/14
62/18 100/25 101/1
101/3 198/2 231/1
**fan [1]** 130/3
**far [5]** 102/1 120/18
134/8 137/4 144/6
**fashion [1]** 90/13
**fast [3]** 187/7 187/8
187/9
**faster [2]** 185/25
187/9
**father [2]** 10/5 10/10
**fathom [1]** 133/19
**favor [2]** 216/24
219/1
**FCC [2]** 85/6 86/8
**FCRR [2]** 232/4
232/19
**feasibility [1]** 120/16
**feasible [1]** 109/3
**February [26]** 1/6 1/9
1/16 15/24 75/7
75/19 81/2 84/2 89/7
92/19 94/13 95/17
102/25 106/17 107/6
107/15 108/15
109/11 110/4 116/24
117/20 120/10
120/12 136/6 139/14
210/5
**February 14th [1]**
136/6
**February 1st [1]** 15/24
**February 2023 [3]**
81/2 84/2 95/17
**February 21st [1]**
210/5
**federal [4]** 2/18 55/19
229/23 232/21
**fee [5]** 107/2 107/3
174/23 174/24
175/18
**feedback [1]** 47/3
**feel [9]** 8/14 9/4 13/8
83/5 92/10 114/11
114/23 121/2 157/25
**feels [1]** 157/23
**fees [12]** 167/17
169/6 208/7 208/17
208/17 208/17
208/18 209/25
210/11 218/4 221/1
221/22
**felt [1]** 159/2
**fiduciary [23]** 32/16
33/9 33/19 34/19
35/12 44/17 45/5
45/17 47/10 47/15
53/16 53/18 53/19
53/22 60/17 61/9
61/22 62/3 62/5

**F**

**fiduciary... [4]** 63/12
111/22 111/23
214/15
**field [2]** 11/23 102/13
**fifteen [1]** 70/12
**Fifth [1]** 27/11
**fight [3]** 130/1 192/14
228/22
**fighting [2]** 107/22
108/5
**figment [1]** 110/10
**figure [11]** 62/18
89/17 89/19 89/20
115/5 119/19 129/15
130/22 141/6 168/11
168/13
**figured [1]** 140/15
**figures [4]** 119/16
119/20 200/20
200/21
**file [7]** 26/24 27/12
28/12 28/15 40/13
69/17 172/9
**filed [15]** 10/2 40/20
69/13 85/23 105/10
108/21 161/24 168/1
171/10 171/17
171/21 173/18 174/1
199/12 210/5
**files [5]** 106/10
108/23 109/7 198/7
198/12
**filing [10]** 29/3 29/3
40/21 41/7 81/14
81/15 93/24 162/22
185/5 208/7
**filings [2]** 41/3 41/10
**final [9]** 118/12
137/15 164/13
164/14 164/21
200/19 209/19 215/2
217/2
**finalize [2]** 154/4
158/10
**finally [7]** 35/17
157/18 195/22
195/22 208/12
213/18 217/20
**finance [1]** 222/2
**financial [7]** 103/12
103/12 109/22
145/14 200/23
215/25 220/10
**financially [1]** 232/13
**financials [19]** 96/18
99/8 109/20 144/4
144/5 144/7 144/11
144/22 144/22 145/9
146/19 147/25
148/13 148/15
148/17 149/21
151/24 152/1 155/2
**find [10]** 79/24 79/25
126/1 126/4 132/8
132/12 160/22
165/21 183/2 212/13
**finder [1]** 127/16
**finding [4]** 40/15

**findings [4]** 78/4
80/14 103/16 113/18
**fine [9]** 8/7 20/3
70/16 71/3 71/9
114/22 164/6 168/7
193/15
**finish [3]** 135/23
139/25 142/23
**finished [1]** 230/7
**firm [2]** 25/7 193/21
**first [61]** 9/13 10/1
13/20 19/23 20/2
26/5 33/24 38/4
42/20 46/22 50/22
55/23 64/15 65/5
67/12 69/13 69/16
71/25 75/6 81/14
81/17 88/22 90/1
93/14 97/8 102/11
106/13 108/3 108/16
116/10 117/22 118/3
119/10 120/6 120/10
123/12 125/22
139/12 139/14 143/8
143/22 143/24
144/19 156/3 165/24
167/8 167/10 167/15
184/22 199/21
199/22 203/9 214/2
214/11 215/7 216/15
217/3 220/6 220/21
220/25 226/17
**first-party [2]** 220/21
220/25
**fiscal [3]** 153/12
153/17 153/19
**fish [1]** 193/13
**five [6]** 57/22 111/16
142/20 174/20
201/16 201/17
**five-minute [2]** 142/20
201/16
**FL [6]** 3/7 3/11 3/16
4/5 4/17 5/4
**flatly [1]** 188/12
**flawed [1]** 61/25
**flexibility [1]** 116/15
**flexible [1]** 212/6
**flip [1]** 40/6
**floated [1]** 107/17
**floor [4]** 166/25
179/16 197/14
202/24
**FLORIDA [49]** 1/1
1/23 2/6 2/19 3/3
4/2 29/10 29/16
29/19 29/23 30/1
30/4 30/14 31/14
33/25 34/16 34/22
34/24 35/21 36/7
37/16 42/9 42/14
43/5 43/9 43/11
43/12 43/16 43/18
43/22 44/1 46/10
46/15 48/2 48/6
54/14 54/14 59/2
61/19 63/18 64/1
64/3 211/7 211/12

**218/17 220/24**
223/12 232/2 232/21
**Florida's [1]** 34/18
**flowing [1]** 158/12
**fluff [1]** 229/21
**focus [10]** 33/23
34/25 42/3 55/1
55/21 94/24 104/3
131/22 131/25 135/1
**focused [2]** 103/25
177/5
**focusing [1]** 132/9
**folded [1]** 95/2
**folks [10]** 6/10 6/15
7/20 8/3 72/23 73/8
75/1 115/15 126/4
143/12
**folks' [1]** 71/17
**follow [1]** 27/25
**followed [1]** 28/16
**following [9]** 33/6
70/21 96/2 97/18
115/22 143/5 178/21
195/4 201/21
**foot [1]** 97/12
**force [1]** 43/12
**forecasts [1]** 85/10
**foreclosure [1]** 28/11
**foregoing [3]** 179/25
191/8 232/7
**foreign [1]** 30/22
**foresee [1]** 135/22
**forever [2]** 16/9 186/1
**forget [4]** 53/13
117/11 183/21
215/12
**forgot [1]** 178/19
**forgotten [1]** 178/18
**form [5]** 90/13 183/4
185/19 186/1 186/14
**formally [3]** 6/4 142/5
142/12
**format [2]** 183/8
200/5
**formation [1]** 16/13
**forms [1]** 186/16
**Fort [1]** 3/11
**forth [8]** 12/13 95/13
112/8 121/21 122/9
195/19 198/22
227/10
**fortunately [1]** 32/14
**forward [17]** 6/15
18/20 52/14 80/25
86/7 86/11 88/12
92/22 93/10 94/8
102/14 104/10 106/5
137/21 142/17
198/23 227/8
**found [2]** 107/23
113/6
**founder [1]** 62/21
**four [14]** 16/10 27/5
64/9 64/11 74/9
74/17 118/7 123/12
136/12 141/2 190/12
203/2 203/6 213/13
**four-week [4]** 74/9
74/17 136/12 141/2

**four-year [2]** 16/10
64/9
**fourth [5]** 27/10
37/16 72/11 182/11
222/9
**FPR [2]** 232/4 232/19
**FPR-C [2]** 232/4
232/19
**fraction [1]** 85/12
**frame [9]** 9/23 11/1
13/23 18/14 23/13
65/10 66/16 66/20
67/8
**framed [1]** 52/16
**FRANKLIN [25]** 4/10
6/21 137/22 138/1
143/15 143/20
152/17 154/8 154/21
158/17 159/14
165/11 166/22
166/25 168/17
170/17 174/14 178/4
178/23 180/23 182/2
186/4 190/3 194/14
195/1
**frankly [10]** 76/8
78/11 80/18 86/10
88/25 100/16 130/6
132/17 135/20
209/16
**fraud [8]** 60/16 151/5
151/8 151/9 204/20
205/1 205/8 222/1
**frauds [2]** 65/1 65/7
**fraudulent [13]** 29/16
29/18 30/12 44/2
51/22 52/11 52/21
55/11 56/14 60/2
65/8 66/14 66/14
**fraudulently [1]** 55/5
**fray [1]** 51/15
**freestanding [1]** 53/6
**Friday [7]** 2/7 20/9
22/1 23/17 178/14
178/16 182/12
**friend [1]** 123/15
**frivolous [1]** 26/15
**front [5]** 41/8 79/2
159/9 162/22 170/12
**fruits [1]** 217/1
**Ft [1]** 4/5
**FUFTA [4]** 29/15 30/1
34/17 47/14
**full [7]** 58/9 108/24
132/5 132/6 168/9
174/16 187/3
**full-on [1]** 132/6
**fully [5]** 94/11 119/13
131/19 154/4 154/4
**fully-fully [1]** 154/4
**function [1]** 78/13
**fund [1]** 210/22
**fundamental [7]** 47/6
80/14 83/21 89/4
98/19 125/18 130/7
**fundamentally [6]**
82/10 83/24 85/8
100/1 101/18 101/21
**funded [13]** 167/12

**167/17 168/3 169/6**
169/10 169/13
169/16 169/21
169/25 170/3 170/20
171/1 213/10
**funding [1]** 122/12
**funds [8]** 10/15 14/14
14/15 191/6 191/11
191/13 192/18 221/7
**fungible [1]** 169/18
**furthering [1]** 128/4
**Furthermore [1]**
157/11
**future [3]** 69/18 168/6
176/14
**FYI [1]** 49/5

**G**

**gain [1]** 140/19
**Gann [1]** 5/9
**gave [3]** 148/14
177/10 211/23
**general [10]** 12/18
38/18 39/23 40/2
65/23 68/2 193/9
216/8 216/18 216/19
**generally [2]** 12/19
12/25
**generates [1]** 84/4
**generically [1]** 17/14
**genesis [1]** 110/21
**Georgia [1]** 140/5
**get [96]** 8/12 8/15
8/16 12/15 13/12
13/13 17/23 18/4
21/10 21/24 33/1
41/23 43/13 45/21
50/12 70/22 74/25
75/23 85/19 85/23
87/14 88/16 89/1
97/12 99/13 99/16
100/6 106/4 108/3
111/6 112/5 113/23
114/21 114/23
115/24 117/10
117/17 117/20
121/22 123/2 123/23
125/15 125/18 126/7
128/4 129/16 129/20
130/22 131/19 132/6
132/15 134/7 134/19
138/11 139/24 142/5
142/7 142/9 142/12
143/13 146/18 151/7
158/11 161/13
161/15 165/15
165/18 165/20
165/25 169/16 178/7
182/16 183/23
184/13 185/24
186/15 190/19
193/22 195/22
196/17 196/19
196/21 198/7 198/13
200/9 200/15 204/2
217/13 223/7 224/15
226/13 227/24 229/5
229/23 230/25 231/9
**gets [5]** 32/23 98/14

**G**

**gets... [3]** 113/6 214/3 227/6
**getting [16]** 6/17 23/15 129/18 131/14 135/19 137/19 138/3 143/16 148/24 148/25 151/10 155/21 166/18 184/21 187/7 195/16
**Giat [1]** 211/16
**gift [1]** 189/16
**gifted [1]** 189/20
**give [23]** 8/17 9/23 24/16 44/10 45/16 61/21 62/11 68/22 72/23 75/13 104/17 108/13 114/20 115/12 132/19 149/5 149/10 150/13 151/4 161/20 182/12 198/5 198/6
**given [17]** 21/9 26/19 58/19 59/25 69/11 165/1 165/1 169/14 174/10 182/7 185/1 190/6 194/23 218/11 218/12 227/15 228/2
**gives [2]** 32/5 204/12
**giving [1]** 61/7
**go [81]** 6/9 6/15 7/4 15/23 17/16 20/14 38/10 39/7 45/24 48/10 50/19 54/23 56/19 57/7 57/11 71/7 72/3 73/22 74/13 74/14 79/24 84/13 85/9 86/7 86/14 89/23 90/21 90/23 95/1 98/24 103/17 104/12 104/21 104/21 105/15 106/2 106/5 109/11 110/4 115/9 118/24 121/7 122/9 122/25 123/9 127/21 127/23 130/20 131/22 132/18 136/17 137/21 141/1 148/4 148/5 149/13 150/13 151/9 151/11 160/13 165/17 170/8 173/16 174/2 183/17 184/8 187/22 188/19 193/13 195/19 200/4 201/13 201/15 207/1 213/3 222/17 224/18 224/19
**goes [5]** 92/22 96/9 120/11 152/20 221/18
**going [186]** 6/8 8/14 8/17 9/4 9/5 13/13 17/1 17/2 17/3 17/10 17/18 18/7 18/8 18/9 18/20 18/20 19/9 22/18 23/2 24/2 24/3 24/6 24/18 32/25

33/1 37/25 39/7 40/7 40/20 41/2 41/9 42/3 43/2 48/10 48/16 52/14 56/17 57/9 59/20 65/4 68/15 68/18 69/5 71/5 73/5 73/11 73/21 73/22 73/23 74/3 74/15 74/20 76/13 77/4 77/12 79/4 80/3 82/18 85/11 86/1 86/6 86/11 88/5 88/7 88/9 88/12 88/12 89/18 92/4 95/1 97/6 101/3 102/14 103/17 107/12 107/14 108/9 110/4 114/11 114/24 115/6 117/1 119/5 120/22 121/1 121/4 123/15 123/21 123/23 124/6 125/1 126/1 126/3 127/15 127/20 127/25 128/22 128/25 129/24 130/1 131/5 131/7 131/17 131/23 133/10 133/12 136/6 137/7 137/9 137/24 138/8 138/24 139/3 139/20 140/5 142/17 143/13 145/1 146/8 149/19 150/21 151/1 151/2 152/8 152/11 152/14 154/19 160/15 162/19 162/20 162/25 163/13 165/7 165/10 165/23 170/3 172/24 173/6 176/10 177/12 177/14 178/6 178/12 180/2 180/14 180/20 180/23 181/12 181/13 182/11 182/18 184/5 184/11 184/15 184/22 185/11 186/8 187/10 190/18 193/22 193/24 194/12 194/21 195/24 196/19 198/20 198/23 199/25 200/7 200/23 202/22 203/1 212/13 213/7 213/13 213/14 213/15 215/11 215/13 215/14 224/2 227/16 229/15 230/2 230/7 230/25
**going-forward [3]** 18/20 102/14 142/17
**gone [7]** 42/17 110/1 138/24 165/19 174/6 179/8 192/9
**good [20]** 6/18 47/19 49/11 49/12 55/25 56/2 73/21 76/10 93/15 99/20 115/20 196/2 199/12 201/9 202/10 224/13

224/14 224/15 224/19 230/17
**goofied [1]** 148/14
**goofied-up [1]** 148/14
**got [45]** 7/3 14/7 17/9 27/15 56/24 69/7 71/11 72/14 74/3 88/16 97/18 98/12 107/11 110/14 123/25 125/2 126/2 127/6 127/7 129/17 129/18 129/20 131/10 132/22 134/5 135/21 138/20 138/20 141/12 143/19 147/3 154/21 165/21 165/22 168/20 168/21 169/1 170/12 176/15 181/11 196/8 196/12 200/7 200/17 202/5
**Gotcha [1]** 83/15
**gotten [2]** 126/9 223/19
**governance [1]** 218/16
**gradation [1]** 73/15
**grant [3]** 93/15 202/11 229/22
**granted [3]** 49/23 54/18 200/16
**grapple [1]** 131/6
**grasp [1]** 153/14
**greater [1]** 58/18
**greedy [1]** 186/20
**ground [4]** 41/15 58/9 108/5 229/13
**grounds [3]** 32/20 58/7 67/14
**group [8]** 1/2 7/23 71/10 71/11 142/19 168/7 193/9 222/5
**growing [2]** 148/22 150/5
**grown [1]** 61/12
**guardrails [1]** 131/23
**guess [15]** 82/15 88/5 92/8 94/6 98/19 111/8 114/2 119/24 120/24 126/12 134/14 147/14 147/20 194/1 195/2
**guidance [1]** 204/12
**guidelines [4]** 204/14 204/14 206/6 206/11
**Gunning [2]** 48/18 147/22

**H**

**H-I-L-L-S-L-E-Y [1]** 7/12
**H-L [1]** 230/24
**half [3]** 94/19 115/13 214/12
**hand [2]** 130/2 213/9
**handed [2]** 198/18 199/19
**handing [1]** 9/12
**handle [3]** 77/7 77/14 211/22

**handling [3]** 10/8 86/22 120/17
**hands [1]** 125/3
**handwriting [1]** 205/18
**hang [1]** 167/24
**happen [12]** 22/16 57/3 65/25 73/20 76/13 89/11 94/12 121/4 124/11 144/17 195/24 227/18
**happened [11]** 41/13 41/19 42/8 84/16 98/11 101/7 122/23 148/16 148/22 193/4 209/20
**happening [1]** 141/3
**happens [3]** 131/24 147/19 148/2
**happy [14]** 25/18 81/7 82/2 82/5 86/14 89/10 91/12 116/8 165/24 169/15 182/6 190/11 231/1 231/11
**hard [3]** 37/10 68/18 183/3
**HARDY [2]** 4/11 4/16
**harm [3]** 44/12 157/9 162/19
**harmed [1]** 85/3
**harmful [1]** 85/1
**harming [1]** 45/5
**HARWIN [4]** 3/9 7/22 57/5 116/11
**hash [1]** 229/17
**hate [1]** 140/8
**head [3]** 11/25 37/10 114/18
**hear [17]** 6/16 8/3 19/4 21/19 75/1 75/9 79/8 80/10 80/21 87/7 111/5 116/1 117/1 134/11 140/3 150/16 209/2
**heard [19]** 7/21 11/18 46/23 47/4 47/16 95/25 97/4 123/6 134/10 141/23 152/24 152/25 157/12 157/13 161/16 185/4 188/9 194/1 211/18
**hearing [44]** 6/3 14/21 56/21 68/23 75/13 75/17 75/23 80/9 80/16 81/8 82/13 82/17 82/9 86/17 87/11 91/16 104/9 117/10 120/1 132/19 135/1 139/14 148/11 149/18 152/16 203/6 205/11 205/15 205/23 206/3 207/13 208/24 211/8 211/23 211/25 212/7 212/16 212/18 213/1 216/14 226/19 231/13 231/16 232/7
**hearings [1]** 211/14

**hearken [1]** 134/2
**heavily [1]** 221/13
**heightened [3]** 161/1 161/5 164/2
**heightens [1]** 117/14
**held [7]** 2/5 62/24 75/7 75/24 84/9 111/1 171/12
**help [13]** 72/8 102/16 107/13 125/17 125/17 134/25 139/9 152/3 158/9 167/4 168/22 172/25 196/25
**helped [1]** 199/7
**helpful [1]** 115/5
**helping [1]** 115/5
**helps [3]** 8/2 104/1 177/10
**Hemsley [1]** 7/11
**hence [2]** 61/2 61/4
**Hey [3]** 98/11 173/2 207/9
**HH [1]** 30/13
**hidden [1]** 151/7
**hiding [1]** 152/12
**high [1]** 151/4
**higher [1]** 84/5
**highlight [1]** 49/15
**highlights [2]** 67/25 68/2
**highly [5]** 156/20 157/22 160/16 160/16 160/17
**highly-confidential [1]** 157/22
**Hillsby [1]** 25/1
**HILLSLEY [32]** 4/3 6/25 7/9 7/12 7/13 25/2 25/3 25/3 25/6 39/24 45/18 46/20 52/23 53/10 79/12 87/10 88/7 91/6 91/19 92/9 104/21 105/8 109/16 111/20 112/5 119/8 123/16 138/12 145/24 209/7 218/1 226/15
**Hillsley's [3]** 40/3 91/10 212/14
**hinge [1]** 214/13
**hired [1]** 103/8
**historic [1]** 98/3
**historical [1]** 130/20
**historically [1]** 85/13
**histrionics [2]** 93/17 120/23
**hit [3]** 67/24 137/2 213/13
**HLFIP [80]** 1/13 1/14 1/23 1/23 3/14 7/2 35/22 36/11 46/4 49/9 50/3 50/9 51/15 52/4 53/3 53/9 54/4 54/12 55/1 55/12 56/2 56/4 60/23 61/4 64/7 71/8 71/21 104/6 105/24 105/25 108/3 120/15 123/18

**H**

**HLFIP... [47]** 128/9
129/6 130/12 130/17
131/2 143/12 143/23
154/24 155/1 155/8
155/15 155/17
155/25 156/2 156/10
156/16 157/6 157/8
157/9 157/23 158/2
158/7 158/12 158/19
158/20 159/4 159/5
162/2 165/10 165/12
166/12 166/20 167/5
167/6 167/9 167/11
167/14 171/7 171/13
171/17 171/20
172/17 173/21
173/25 174/25 175/4
226/5

**HLFIP's [4]** 60/18
128/3 133/19 160/22
**hold [7]** 39/4 54/21
61/17 91/13 92/6
112/22 139/3
**holding [18]** 1/3 1/12
1/13 1/13 1/14 1/21
1/22 1/23 1/23 1/24
3/2 3/2 3/3 3/14 4/1
4/1 54/6 149/5
**Holdings [6]** 1/17
24/24 36/11 49/9
141/9 175/20
**Holdings' [1]** 71/21
**Holdings/Loco [1]**
24/24
**holds [2]** 162/2
223/10
**holiday [2]** 23/11
182/8
**holidays [2]** 97/5
231/11
**Home [1]** 150/8
**homework [1]** 115/10
**Honor [293]**
**Honor's [7]** 27/20
33/10 40/14 42/20
92/19 96/2 164/25
**HONORABLE [1]** 2/4
**hope [5]** 138/9 140/23
166/5 185/1 228/18
**hopeful [4]** 50/4
196/10 196/12
196/25
**hopefully [2]** 101/8
196/11
**hoping [5]** 70/24 71/7
134/7 134/11 184/2
**horn [1]** 231/5
**hosed [1]** 215/11
**host [6]** 79/19 89/10
96/21 211/11 220/5
222/24
**hotel [1]** 86/1
**hour [4]** 9/6 115/12
123/7 227/22
**hour-long [1]** 9/6
**hours [1]** 229/23
**house [2]** 5/9 222/14
**how/show [1]** 124/24

**however [9]** 18/5
25/19 65/2 90/15
93/8 107/8 110/11
132/2 165/6
**huge [1]** 80/18
**huh [4]** 117/13
185/16 186/2 190/17
**hump [1]** 123/24
**hundred [2]** 88/14
94/20
**hundreds [5]** 18/1
18/5 77/11 88/14
197/20
**HUNTER [1]** 2/4
**husband [1]** 10/3
**hyperbole [1]** 114/24
**hypothetical [1]** 97/22

**I**

**i.e [3]** 29/3 167/17
169/6
**idea [8]** 41/9 89/14
90/7 140/4 176/22
197/25 215/23
223/21
**identical [2]** 174/17
185/1
**Identification [2]** 9/11
197/12
**identified [3]** 13/7
13/8 37/20
**identifies [1]** 170/10
**identify [14]** 14/5
17/4 151/11 167/16
169/5 171/9 172/8
172/19 173/3 188/20
189/5 191/3 192/24
194/8
**identifying [1]** 191/12
**identity [2]** 17/10
160/4
**ignoring [1]** 47/20
**II [4]** 29/15 41/22
47/14 51/21
**III [5]** 5/2 31/11
38/11 44/3 46/22
**IL [1]** 4/12
**illegal [1]** 28/22
**illustrate [1]** 211/25
**imagination [2]** 52/18
110/11
**immediately [1]** 19/8
**immunity [1]** 32/5
**impact [17]** 48/13
49/5 73/6 77/12
80/12 80/18 81/10
85/16 86/11 88/10
95/24 96/1 103/12
111/14 113/3 119/17
136/23
**impacted [1]** 85/12
**impacts [4]** 77/15
101/22 135/16
135/17
**impasse [1]** 101/7
**impediment [1]** 86/24
**imperative [1]** 13/21
**important [8]** 30/14
30/23 40/19 42/7

42/21 88/15 180/4
201/8
**importantly [1]**
180/11
**impose [2]** 59/2 60/23
**imposes [3]** 31/20
59/14 59/15
**imposing [1]** 220/9
**improper [6]** 28/5
28/23 31/24 31/25
215/21 223/20
**improperly [1]** 99/24
**impropriety [1]** 55/9
**inability [1]** 222/2
**INC [7]** 1/3 1/12 1/13
1/18 1/21 3/2 4/1
**incident [1]** 161/17
**inclined [4]** 11/22
82/11 82/15 82/16
**include [5]** 17/7 38/23
63/15 99/9 187/11
188/1 222/7
**included [3]** 56/24
57/2 165/13
**includes [2]** 97/1
183/16
**including [9]** 17/5
33/5 65/10 80/10
96/13 114/16 121/18
188/23 189/7
**inconsistent [2]** 53/1
171/24
**Incorporation [2]**
30/18 47/23
**incorrectly [1]** 150/1
**increased [1]** 112/21
**incurred [1]** 219/17
**indemnification [34]**
201/22 202/13 204/3
213/18 213/21 214/8
215/2 216/9 216/20
216/24 217/9 217/13
218/3 218/9 218/15
218/18 219/1 219/6
219/11 219/13
219/16 219/16
219/22 220/2 220/19
220/24 221/8 222/19
222/20 222/24 223/1
223/7 223/14 223/22
**indemnified [4]** 213/8
215/25 217/17 220/1
**indemnifies [1]** 216/3
**indemnifying [2]**
215/18 215/24
**indemnity [2]** 213/2
213/6
**independent [2]** 77/25
84/11
**indicate [1]** 184/25
**indicated [9]** 47/22
144/25 146/9 181/4
181/5 184/7 184/24
194/17 221/4
**indicates [1]** 192/13
**indirect [1]** 30/6
**indirectly [2]** 30/2
48/6
**indispensable [1]**

137/23
**individual [7]** 35/10
54/9 67/18 208/4
209/4 215/1 225/22
**individually [3]** 1/5
35/11 54/13
**inducement [2]** 65/8
66/15
**inducements [1]**
66/17
**industry [1]** 85/2
**inference [3]** 44/10
45/16 172/9
**infinite [1]** 114/7
**information [36]**
18/19 23/5 23/7
23/16 88/11 90/14
94/8 95/19 106/5
106/9 130/20 133/11
133/13 144/8 147/9
147/17 149/8 151/10
152/6 153/14 156/21
160/18 173/24 187/2
187/22 187/23
187/25 188/5 188/8
189/25 190/7 190/10
198/15 200/17
217/15 230/3
**informative [1]**
104/24
**inherently [1]** 34/7
**inhouse [1]** 147/22
**initial [4]** 79/13
198/25 199/11
199/14
**initially [2]** 9/24
105/3
**initiated [1]** 122/1
**injunction [9]** 49/4
75/22 98/3 100/10
100/11 100/18
107/20 122/13
122/16
**injury [1]** 34/2
**inn [1]** 39/15
**innocent [2]** 122/9
123/18
**inputs [3]** 95/11
95/14 99/14
**inquire [1]** 144/23
**inquiries [1]** 130/14
**inquiry [1]** 68/8
**insane [1]** 24/19
**insisted [1]** 110/23
**insistence [1]** 134/15
**insisting [1]** 157/2
**insofar [1]** 215/20
**instance [1]** 37/7
**instead [7]** 19/25 22/5
36/24 69/15 106/7
175/6 187/21
**instituted [2]** 121/13
121/14
**instructed [1]** 87/1
**instructive [1]** 36/12
**instrumental [1]**
157/17
**insurance [1]** 45/10
**intellectual [8]** 42/2

55/20 155/3 171/12
171/14 171/18 175/1
175/23
**intelligently [1]**
185/13
**intend [2]** 142/2
181/6
**intensive [1]** 68/8
**intention [1]** 157/9
**intentional [1]** 38/14
**intercompany [1]**
175/1
**interest [9]** 30/8
35/14 43/9 46/8
46/16 53/20 62/7
124/21 128/4
**interested [2]** 187/7
232/13
**interests [4]** 30/24
35/6 37/8 127/24
**interfere [2]** 68/15
68/21
**interference [2]** 46/24
169/17
**interim [1]** 165/1
**internal [2]** 130/14
130/17
**internally [2]** 104/13
104/18
**interrelatedness [1]**
198/9
**interrogatories [5]**
167/5 167/8 167/9
171/5 187/17
**interrogatory [17]**
167/15 167/19
167/25 168/2 168/5
169/8 171/21 171/22
174/12 187/25 188/3
188/18 189/1 189/2
190/21 191/2 191/25
**interrupt [1]** 80/6
**interrupting [1]** 226/3
**interruption [1]** 33/14
**Intracorporate [4]**
36/2 36/19 37/5
53/11
**introduced [1]** 7/20
**introducing [1]** 6/10
**invalid [2]** 107/24
111/1
**invalidated [1]** 55/19
**invalidity [1]** 76/6
**inventor [1]** 175/24
**investigation [1]**
130/14
**invited [3]** 63/1
156/19 158/4
**inviting [1]** 56/13
**invoices [5]** 148/25
206/13 207/19
207/22 208/15
**involuntary' [1]** 30/7
**involve [2]** 63/4 75/25
**involved [13]** 35/24
48/16 63/1 113/17
123/19 128/25
133/14 136/11 139/2
173/2 173/8 173/18

**I**

**involved... [1]** 228/19
**involves [1]** 109/4
**involving [3]** 88/9
101/1 143/6
**IP [63]** 54/6 54/7
55/11 55/17 58/4
60/19 61/2 61/17
62/4 64/6 65/16
65/17 65/20 66/6
73/3 73/4 73/11
73/18 76/6 102/12
103/8 103/23 104/6
106/24 109/22
114/15 116/23 118/1
118/6 118/6 118/7
120/16 123/25
124/22 124/24 125/8
133/13 157/24
157/25 158/23
158/23 159/5 160/2
160/6 160/8 160/9
160/18 161/3 161/4
162/3 162/4 162/7
162/12 162/13
163/25 165/4 171/19
172/10 172/21
173/17 174/8 217/23
231/1
**IP's [1]** 118/7
**IP-related [2]** 160/18
217/23
**irrespective [1]**
172/20
**IRS [6]** 183/16 183/17
184/8 185/6 185/21
186/5
**ish [1]** 135/12
**issue [80]** 21/23 23/6
24/22 28/5 28/18
31/7 31/8 34/23
34/25 42/6 52/9
65/19 72/10 72/17
72/24 76/18 77/17
79/14 81/10 90/2
90/20 94/10 94/15
94/16 101/22 102/1
102/11 102/12
106/16 107/5 108/17
113/11 115/1 119/23
120/19 120/21
125/16 127/16
127/20 128/18
128/24 129/2 129/3
133/25 135/6 139/17
140/16 143/23
146/12 147/18 148/4
149/20 149/22
150/16 154/9 154/18
154/24 156/25 167/8
170/18 176/20 180/6
181/4 184/10 184/16
187/19 187/20
191/13 194/18
195/10 196/11
196/23 197/18
198/10 207/7 207/8
211/5 211/19 211/21
225/15

**issued [3]** 11/16
15/16 109/20
**issues [58]** 29/6 31/9
37/22 44/18 49/16
74/24 75/5 75/8
83/20 86/12 87/3
91/1 92/9 95/22
101/21 102/22 103/9
114/15 117/18 119/4
128/24 129/10
129/11 129/14 130/4
130/7 130/9 131/5
131/11 131/22
131/25 132/1 132/3
132/7 132/10 132/11
132/16 134/25
135/20 135/22
135/24 135/25 136/1
137/1 137/8 139/21
142/10 142/22 143/6
149/19 149/23
152/14 197/17
200/19 209/3 210/7
211/9 225/7
**item [3]** 188/23 189/8
224/11
**items [2]** 24/8 231/10
**iterations [2]** 112/16
152/2
**IV [4]** 33/20 38/11
44/4 46/22

**J**

**James [8]** 1/6 1/9
1/16 10/4 144/13
146/15 175/18 218/5
**JANICE [117]** 1/5 1/8
1/15 4/8 5/6 6/19
25/10 26/8 28/2
32/15 35/20 36/4
36/23 37/3 39/13
40/21 41/2 41/3 41/3
41/4 42/10 42/15
42/22 43/18 44/7
44/12 44/19 45/2
46/1 46/9 47/5 47/6
47/9 47/9 47/17
48/18 53/17 55/10
57/11 57/18 57/22
61/5 67/13 71/12
75/23 76/19 76/25
78/20 81/13 83/23
84/15 94/23 98/2
98/6 99/23 105/14
105/15 107/18
110/24 111/24
116/21 122/4 122/12
122/22 134/9 143/9
143/20 144/5 144/6
144/14 145/8 156/18
157/12 161/6 166/11
167/16 175/6 177/22
179/10 179/18 188/1
189/20 190/2 191/9
191/17 192/12
192/17 192/24 194/3
194/7 194/20 202/12
202/16 203/13 204/3
204/15 207/17 208/8

208/25 209/16
209/24 210/6 210/8
211/13 212/11 213/9
213/15 213/20
213/25 214/5 215/7
217/11 217/20 218/3
223/10 223/17
223/19
**Janice's [18]** 26/13
28/4 42/15 43/9 55/2
69/7 78/5 111/22
120/21 144/20 145/3
156/15 156/25 167/9
181/6 181/7 185/1
210/17
**January [38]** 13/21
75/7 75/19 85/5 89/7
92/19 94/12 102/25
104/3 106/17 110/22
114/12 114/12
114/13 116/17
116/24 117/20 120/8
123/8 123/8 124/8
125/9 128/18 128/19
132/4 132/8 135/5
136/20 137/1 137/9
139/12 140/2 140/7
140/24 147/4 147/19
148/3 154/6
**January 2023 [1]** 85/5
**January 28th [1]**
120/8
**January/February [3]**
89/7 92/19 102/25
**Jim [33]** 10/9 10/21
17/14 57/25 58/18
60/4 61/6 61/8 61/11
61/13 61/15 62/1
62/20 63/1 63/7
63/11 65/14 65/22
66/5 93/2 127/3
130/21 189/16 205/6
213/17 214/12
215/20 216/7 217/7
217/22 218/24 223/6
223/9
**Jim's [11]** 57/19
57/25 62/6 67/7
76/24 78/11 213/22
214/3 214/6 217/1
223/13
**job [1]** 131/15
**JOHNSON [15]** 5/2
6/9 6/12 6/16 8/25
15/11 20/5 22/24
24/6 77/21 86/19
88/6 133/3 138/18
231/5
**Johnson's [4]** 21/19
74/4 136/11 141/21
**Joinders [1]** 57/13
**joined [1]** 10/3
**joining [1]** 143/17
**Jon [108]** 7/22 8/21
24/23 25/7 25/11
26/11 35/21 36/3
37/2 39/10 40/23
41/18 42/8 43/6 44/6
44/25 45/22 45/23

47/5 53/4 53/4 53/7
53/7 53/8 54/3 54/11
55/7 57/12 58/2 58/9
59/3 59/6 59/15 60/5
60/22 61/4 61/6
61/11 61/12 62/2
62/4 62/10 62/20
62/20 63/8 63/11
64/15 64/17 64/21
65/15 65/17 65/20
65/23 65/24 66/5
66/24 67/1 71/16
71/19 79/12 84/14
104/25 107/21
110/10 110/22
111/22 117/21
124/21 127/4 128/8
129/8 130/18 144/2
144/8 144/18 145/11
147/23 151/8 153/15
156/9 158/9 158/21
162/3 175/18 175/21
175/24 185/2 189/16
203/17 213/7 214/1
215/18 215/24 216/3
216/7 216/25 217/6
217/16 224/21 226/8
226/22 227/3 227/6
227/15 227/17 230/2
230/5 230/20
**Jon's [8]** 48/1 59/9
62/3 62/7 63/2 66/1
66/8 205/6
**JONATHAN [6]** 1/2
1/12 1/21 3/2 4/1
5/8
**judge [18]** 2/5 14/10
23/18 28/14 40/20
41/9 41/10 41/12
49/3 90/1 113/18
133/4 139/3 140/10
202/22 207/9 220/4
230/16
**judgment [26]** 11/19
13/3 18/10 25/16
26/3 26/14 41/8 68/5
76/22 78/9 97/20
109/4 112/14 112/18
112/19 113/11
113/12 113/21 114/3
203/12 203/22 204/8
209/8 209/19 210/7
212/10
**judicial [9]** 1/1 2/5
26/2 27/13 28/11
28/15 71/15 72/2
140/9
**July [10]** 74/10 74/15
92/20 97/11 117/2
131/10 136/23 137/2
137/12 159/4
**jumbled [1]** 197/22
**juncture [1]** 104/9
**jurisdiction [1]** 11/2
**jury [2]** 79/3 79/7
**just [179]** 6/8 8/2
8/10 9/11 9/23 11/24
15/19 17/14 18/2
19/24 20/2 22/6

24/16 25/22 27/23
28/15 32/7 37/13
40/2 40/6 40/16 41/6
41/23 43/10 44/23
45/20 46/22 47/4
47/16 49/15 49/19
50/2 51/13 54/6
54/13 56/9 62/13
67/24 69/15 70/2
70/10 71/7 71/24
72/5 72/6 72/15
72/23 73/2 74/24
74/24 77/9 77/11
77/19 78/1 80/2
88/15 88/18 91/5
94/24 95/1 95/5 95/5
97/13 97/17 97/20
97/24 98/11 98/15
99/15 101/7 102/1
102/6 103/18 104/15
105/8 106/10 108/9
112/5 112/25 113/6
113/23 117/14
118/13 119/19 122/2
122/22 123/14
123/14 123/19
123/24 124/23 126/5
128/15 128/20
129/23 129/25 130/7
131/9 132/18 137/20
138/9 139/10 139/13
139/15 145/20
145/20 145/22 146/1
147/18 148/8 148/10
149/13 150/25 151/8
153/7 154/11 155/16
157/18 158/15
158/17 158/21
160/22 161/4 166/7
166/18 167/20
167/21 167/24
167/25 168/22
169/24 172/18
176/21 176/23
178/15 182/7 182/16
185/24 186/13
186/15 187/18
188/12 190/12
191/21 193/13
193/15 193/23
194/11 194/21 196/1
196/3 196/12 196/19
196/19 197/24
198/12 198/24 199/2
200/6 201/7 202/19
206/10 206/15
208/21 211/11
212/23 219/20
223/25 225/12
225/25 228/1 228/13
228/24 229/5 229/14
231/1
**justification [2]**
144/11 156/5
**justify [1]** 108/24
**Justin [25]** 5/7 6/13
6/25 9/13 10/12
10/18 10/22 11/7

**J**

**Justin... [17]** 14/16
17/15 20/22 21/24
23/8 57/20 73/24
77/1 77/24 86/23
88/9 90/8 93/1 115/1
119/11 200/20 230/1
**Justin's [1]** 69/9

**K**

**KAILIN [3]** 4/10 6/22
202/16
**keep [10]** 9/21 25/22
90/24 101/8 101/10
121/2 136/14 137/6
143/25 148/11
**keeps [1]** 13/15
**KELLOGG [1]** 3/4
**kept [1]** 190/2
**key [4]** 25/19 40/7
40/9 55/19
**kicks [1]** 219/16
**kind [35]** 11/24 41/23
64/19 71/25 84/5
88/11 97/24 102/8
114/21 114/23
115/10 135/2 135/3
137/2 139/5 141/6
142/11 146/1 147/18
148/20 148/23
149/14 149/18
150/21 151/22 153/2
161/20 167/24
168/24 187/19 196/8
196/9 197/22 214/24
226/13
**kinds [1]** 39/4
**kliu [1]** 4/14
**knife [1]** 127/19
**know [138]** 7/18 7/21
8/5 11/7 11/25 13/24
13/25 15/21 15/22
16/17 18/14 18/15
18/16 19/18 20/24
21/1 21/23 24/17
27/2 28/10 32/21
32/24 38/13 40/21
42/7 43/3 46/5 48/19
53/18 54/7 55/16
71/5 72/12 72/14
72/15 72/23 73/8
73/10 74/3 74/15
74/17 75/12 75/24
76/12 76/12 77/3
77/9 80/4 80/10
81/16 81/24 82/23
83/12 85/15 86/24
87/23 88/1 88/11
88/14 89/14 89/14
89/16 89/17 93/21
94/22 97/4 97/5
97/12 98/5 98/10
99/6 99/19 101/2
102/22 106/14 109/1
111/9 112/15 113/5
113/18 114/4 118/1
118/13 119/1 120/12
120/18 123/18
124/12 124/23

125/10 127/20
130/12 130/12
131/13 132/24 134/8
136/7 136/18 137/11
137/19 138/7 140/7
140/12 141/14 142/6
147/12 152/25 153/8
153/16 153/20
153/22 154/11
160/17 162/2 163/25
164/1 164/16 167/23
168/7 170/18 174/1
177/8 177/12 184/19
187/8 196/12 203/10
207/7 207/11 215/24
216/1 226/12 226/17
226/19 228/7 228/9
228/25 229/25
**know-how [1]** 163/25
**know-how/show-how
[1]** 160/17
**knowing [3]** 18/12
55/6 68/17
**knowledge [8]** 55/8
58/10 58/22 79/5
119/14 119/22
157/13 192/10
**knowledgeable [1]**
225/6
**known [1]** 98/8
**knows [4]** 15/18
142/10 142/11 144/6

**L**

**L.L.P [2]** 4/11 4/16
**labor [1]** 165/20
**lack [2]** 65/9 115/2
**laid [1]** 115/10
**lamenting [1]** 105/8
**landing [1]** 83/17
**lane [1]** 133/5
**language [4]** 39/2
170/23 206/11 215/4
**largely [1]** 116/19
**larger [1]** 114/4
**Las [2]** 3/10 4/4
**last [34]** 8/8 14/21
21/12 23/6 45/21
50/11 53/17 54/4
71/4 71/8 91/3 94/20
110/22 123/6 137/16
137/16 138/12 141/1
141/15 141/20
142/22 160/21
166/15 179/18
181/11 189/23
195/13 195/17
197/19 197/20 199/3
200/16 202/6 206/4
**last-minute [1]** 142/22
**Lastly [1]** 152/7
**late [1]** 189/23
**later [13]** 92/7 98/11
113/3 113/10 113/14
119/6 126/24 132/11
132/20 137/11
184/16 195/16 204/3
**latest [1]** 105/1
**Lauderdale [2]** 3/11

4/5
**laughable [1]** 16/18
**law [42]** 3/4 3/9 3/15
3/19 4/3 4/3 4/9 4/9
4/10 4/10 4/15 5/2
26/7 26/10 26/19
29/2 29/10 29/25
35/22 36/4 47/13
47/20 48/2 52/19
59/2 59/15 60/17
61/19 63/18 64/1
64/3 85/21 100/25
150/8 176/7 183/11
184/6 211/7 219/2
220/15 222/4 223/16
**lawsuit [2]** 41/7
45/12 81/15 171/10
172/10 172/17
172/20 173/19 174/9
205/7 213/7 217/16
**lawsuits [15]** 167/18
167/25 168/3 169/7
171/17 171/21 172/5
172/16 172/18 173/3
173/7 173/17 173/19
173/21 174/1
**lawyers [5]** 102/18
102/19 104/19 139/6
196/14
**laying [1]** 139/5
**lead [3]** 20/10 172/23
174/4
**least [12]** 8/6 44/14
44/20 52/21 53/22
83/5 93/5 105/16
129/10 130/4 176/3
213/11
**leave [5]** 32/14
159/11 163/20 197/5
229/24
**leaves [1]** 28/18
**lectern [6]** 8/2 74/25
91/8 166/19 167/24
179/9
**led [1]** 100/24
**left [4]** 6/9 10/23
11/6 116/4
**legal [11]** 31/8 32/1
32/20 34/23 44/12
53/6 203/4 204/5
204/20 204/25 207/7
**Legislature [1]** 30/5
**legitimate [1]** 121/5
**legitimately [1]** 195/1
**length [2]** 61/20
217/22
**less [1]** 168/18
**let [49]** 9/5 11/15
11/24 24/17 38/10
40/6 41/23 45/21
54/21 69/11 70/10
79/1 79/8 87/25
88/20 89/24 90/22
97/22 101/16 104/6
104/12 104/13
104/21 109/16
112/24 114/10
115/24 118/13
120/17 120/20

145/17 146/1 147/3
154/17 161/25 166/7
185/12 188/19 194/1
197/8 202/19 206/15
206/16 207/1 207/4
207/6 209/2 225/23
226/12
**letter [1]** 157/20
**letters [2]** 198/21
230/25
**letting [1]** 104/20
**level [7]** 14/8 32/5
39/6 55/3 63/20
63/21 151/4
**Lexus [1]** 191/4
**liabilities [2]** 60/19
99/4
**liability [6]** 31/13
31/18 38/15 38/23
39/18 96/14
**liable [3]** 39/4 52/20
219/15
**liberty [1]** 69/1
**license [16]** 66/11
73/13 103/23 103/24
107/1 110/9 124/13
125/4 125/20 127/11
129/7 130/25 131/3
175/2 175/15 176/5
**licensee [1]** 157/6
**licensing [3]** 55/18
135/7 162/10
**light [3]** 41/15 107/19
217/15
**like [70]** 6/4 8/14 9/4
11/8 13/8 14/5 18/1
18/18 22/17 25/22
26/5 27/14 29/9 33/9
33/19 40/4 49/3
56/22 70/1 71/1
72/19 74/2 74/6 82/7
82/21 83/5 84/12
85/21 86/1 89/13
93/21 95/6 102/2
114/23 121/2 125/13
125/15 130/4 134/23
137/6 140/6 141/4
151/5 151/8 152/13
152/21 153/8 153/10
153/21 158/1 165/23
166/10 173/1 173/4
173/5 183/22 183/22
185/17 185/20 187/2
188/14 190/18
193/15 196/4 197/25
200/19 207/11 208/7
225/13 228/24
**likely [3]** 87/2 174/4
225/11
**likely-to-lead-to [1]**
174/4
**limit [3]** 209/24 229/9
229/12
**limitation [1]** 13/25
**limitations [5]** 16/7
64/9 64/13 64/23
65/6
**limited [4]** 38/24
163/10 219/17

223/25
**limiting [1]** 177/4
**Linda [3]** 2/17 232/4
232/19
**line [6]** 7/4 98/21
114/2 139/25 158/2
205/8
**Liquidation [1]** 30/13
**list [8]** 18/8 18/11
18/12 50/8 91/2
140/13 143/8 166/10
**listed [3]** 167/18
168/4 169/8
**listen [2]** 71/8 87/9
**literally [4]** 12/22
93/13 94/4 96/7
**litigated [1]** 93/23
**litigation [14]** 29/9
116/20 122/24
136/13 136/16
148/19 149/22 157/8
157/10 204/4 210/22
212/12 221/3 222/2
**little [14]** 16/18 52/25
72/9 74/25 104/22
115/11 132/22
134/18 136/8 158/16
194/22 202/19 223/8
229/18
**LIU [9]** 4/10 6/22
202/16 202/24
207/15 212/22 213/3
223/4 224/3
**live [9]** 2/16 3/4 3/15
4/3 4/3 4/9 5/2 5/6
232/7
**living [2]** 87/23
222/15
**LLC [16]** 1/13 1/14
1/22 1/23 1/23 1/23
1/24 3/2 3/3 3/3 3/3
3/14 4/1 4/2 36/15
128/11 216/2
**LLP [3]** 3/15 3/19 4/4
**load [2]** 198/7 198/12
**LOCO [5]** 1/23 3/2
4/2 24/24 40/23
**LOGAN [96]** 1/2 1/5
1/6 1/7 1/8 1/9 1/12
1/15 1/16 1/21 3/2
4/1 4/8 5/1 5/6 5/6
5/8 6/13 6/19 6/20
9/13 9/24 10/4 10/9
10/11 10/17 10/17
10/21 10/22 11/7
17/14 19/25 20/1
20/22 21/11 21/13
21/14 21/24 24/23
25/11 26/7 26/8 35/3
35/9 35/11 35/15
35/20 36/3 48/18
54/3 54/3 57/12
71/16 90/9 98/6
107/18 119/11
122/12 124/18 128/8
129/8 133/8 139/2
143/21 144/5 144/13
146/15 147/23
153/15 158/21

**L**

**LOGAN... [26]** 175/18
175/18 175/19
175/21 191/9 191/17
192/17 194/4 194/8
200/20 202/16
209/16 212/11 218/7
218/24 219/2 221/4
222/10 225/6 226/8
226/22 227/3 229/25
230/2 230/5 231/1
**Logan's [25]** 19/10
19/21 20/8 21/15
28/3 35/1 35/7 57/11
71/12 71/19 93/2
94/18 110/10 122/4
122/22 143/10
153/15 162/4 166/11
179/10 202/12
209/24 218/5 224/21
230/20
**long [13]** 9/6 18/15
65/3 93/20 97/15
105/1 146/7 146/7
183/24 197/21
214/23 214/25 230/6
**long-running [1]** 65/3
**long-standing [2]**
214/23 214/25
**long-winded [1]** 230/6
**longer [2]** 33/13
115/11
**look [31]** 12/3 26/24
27/12 28/5 51/17
52/25 56/19 57/8
60/6 65/2 76/4 76/4
84/13 85/23 104/2
104/2 114/1 125/2
128/5 150/24 151/2
151/11 161/16
180/15 180/17
181/18 187/23
199/15 214/10 217/6
217/10
**lookback [1]** 16/10
**looked [3]** 133/24
140/6 149/24
**looking [7]** 17/11 27/4
114/6 115/14 128/23
164/16 200/1
**looks [7]** 49/3 56/22
84/11 86/4 93/21
96/8 166/10
**loose [1]** 10/7
**lose [1]** 165/7
**loses [2]** 33/6 38/22
**loss [1]** 140/19
**lost [3]** 31/20 112/12
165/5
**lot [20]** 20/10 33/21
33/22 87/23 95/6
103/24 123/6 130/5
130/6 130/13 131/10
140/8 152/13 160/19
165/22 168/18 200/7
204/1 215/19 229/21
**lots [2]** 101/2 168/21
**loud [1]** 6/4
**lunch [11]** 89/23

90/22 90/23 104/12
114/9 115/4 115/20
115/21 115/25 116/5
116/25
**luxury [1]** 195/18
**Lynn [1]** 2/5

**M**

**ma'am [1]** 87/8
**Madam [1]** 115/17
**made [21]** 25/15
28/22 46/11 55/24
58/2 64/24 65/11
65/12 66/20 67/10
98/4 98/14 109/16
122/5 144/13 146/15
149/17 169/22 177/3
198/4 205/17
**magnitude [3]** 86/25
115/2 115/3
**mail [4]** 66/1 66/3
133/21 199/20
**main [1]** 94/9
**majority [1]** 41/12
**make [61]** 9/5 9/7
11/15 14/12 14/15
22/6 22/16 27/21
40/16 48/12 48/19
48/20 48/20 51/13
70/10 72/8 80/14
81/5 81/21 82/6
82/14 82/22 84/10
87/25 88/23 91/5
91/23 98/17 99/10
101/12 102/13 103/5
103/16 112/25
113/18 116/17
118/18 119/21
120/13 121/8 128/17
129/25 130/21
137/24 138/16
138/17 139/23
140/10 144/18
145/17 150/25
155/24 160/11
165/10 179/22
196/23 205/2 211/12
221/19 224/4 228/24
**makes [9]** 13/21 28/1
31/6 49/21 75/22
86/15 106/11 199/16
219/10
**making [13]** 47/19
85/6 89/20 101/8
101/10 104/3 119/17
134/24 135/4 165/12
176/25 177/5 208/19
**malfeasance [2]**
204/21 205/9
**malicious [8]** 25/23
25/25 26/6 26/8
26/18 29/13 39/1
40/11
**man [1]** 61/12
**manage [1]** 227/23
**management [5]** 94/2
94/5 105/16 149/17
216/12
**managing [2]** 53/8

53/8
**Manatee [2]** 74/10
136/22
**Mancinelli [1]** 37/14
**mandatory [2]** 218/15
222/18
**manipulation [2]**
109/7 109/7
**mantel [1]** 223/10
**many [13]** 18/5 35/23
54/6 58/22 58/22
130/17 131/13
134/20 136/16 172/5
173/10 173/24
180/12
**March [4]** 136/2 136/5
136/8 210/12
**March 8 [1]** 210/12
**markedly [1]** 229/25
**married [2]** 138/3
143/16
**Martha [1]** 85/4
**massive [2]** 85/16
86/11
**massively [1]** 85/10
**masters [1]** 51/24
**material [8]** 77/12
88/10 89/18 96/15
101/24 105/22
111/14 164/23
**materiality [1]** 88/24
**materially [1]** 77/15
**materials [1]** 153/2
**matter [24]** 13/2 13/2
13/15 19/20 26/7
29/2 29/25 47/12
51/2 52/19 68/2
79/13 80/24 99/6
117/12 145/12
151/10 156/3 156/9
173/6 176/21 203/21
222/9 226/20
**MAX [4]** 4/3 6/25
7/10 7/14
**max.rudolf [1]** 4/6
**may [39]** 8/20 8/20
10/7 16/9 16/14
31/20 33/16 69/17
75/16 91/11 92/21
93/24 95/18 99/4
109/9 113/2 116/16
116/24 117/19 119/2
129/23 132/1 133/16
136/10 136/19 137/2
137/12 137/21 138/2
138/21 140/21
141/14 146/4 151/21
159/20 175/13
186/24 198/16
225/21
**May 2024 [1]** 95/18
**May 28 [1]** 146/4
**maybe [26]** 21/25
56/12 72/17 73/14
73/25 77/18 82/25
89/23 90/22 101/10
102/13 105/13
117/19 119/24 125/5
125/6 127/12 131/17

132/20 141/5 142/20
147/7 147/14 152/24
153/16 195/4
**mean [50]** 14/3 19/19
23/13 24/7 27/16
43/18 73/19 80/4
80/6 81/23 85/25
86/24 87/22 88/13
89/12 96/7 96/8 97/4
100/24 101/14
102/15 124/15
124/18 126/6 127/15
127/17 127/18 129/9
130/17 138/23 140/1
146/7 147/11 148/7
163/2 172/22 173/9
173/22 181/4 181/12
182/7 184/12 184/15
192/15 194/17 195/8
199/4 199/4 225/17
230/13
**Meaning [1]** 72/16
**means [9]** 158/23
162/14 169/25
169/25 183/14 217/6
220/2 221/2 221/6
**meant [4]** 44/8 77/5
211/24 211/24
**mechanism [1]** 39/3
**Med [1]** 150/8
**mediation [2]** 101/6
210/14
**mediator [1]** 208/17
**meet [6]** 142/16
156/18 189/11
193/12 195/19
195/21
**meets [2]** 39/16 64/17
**member [11]** 33/14
36/15 43/4 43/17
53/8 53/9 53/9 54/9
128/10 128/12
156/10
**members [3]** 36/20
101/1 101/3
**memorialized [1]**
175/15
**mentally [1]** 74/9
**mention [1]** 199/16
**mentioned [4]** 59/6
60/20 108/16 156/10
**mere [1]** 62/13
**merely [2]** 31/17 53/3
**merge [3]** 76/21 78/8
113/12
**merger [1]** 112/1
**Merit [2]** 2/18 232/20
**meritless [1]** 195/20
**met [4]** 206/12
206/12 207/17 208/8
**metadata [3]** 198/1
198/7 199/17
**method [1]** 199/17
**methodologies [1]**
10/8
**mharwin [1]** 3/12
**Miami [1]** 3/16
**mic [2]** 19/4 87/7
**MICHAEL [2]** 3/9 7/22

**Michigan [1]** 97/2
**microphone [4]** 8/1
8/1 46/24 169/17
**microphones [1]** 47/1
**Microsoft [1]** 36/5
**mid [2]** 109/11 110/4
**mid-February [2]**
109/11 110/4
**might [25]** 8/18 48/19
52/6 66/17 75/8
75/25 76/7 77/16
82/22 114/8 132/21
140/3 140/4 140/13
141/1 145/7 147/6
147/8 153/8 158/21
167/21 186/21
186/22 202/4 210/9
**Mike [2]** 97/2 201/25
**Mike Shreve [2]** 97/2
201/25
**militate [1]** 106/20
**MILLER [2]** 3/5 3/9
**million [4]** 52/13
55/13 57/24 109/25
**millions [2]** 77/10
77/10
**mind [11]** 72/7 72/22
74/9 74/16 97/24
100/24 108/22
110/21 129/9 187/6
210/10
**mine [2]** 9/17 9/21
**minimis [1]** 77/8
**minimum [5]** 99/13
114/14 114/17
129/12 130/10
**Minkoff [1]** 211/10
**minor [1]** 199/23
**minus [2]** 207/22
207/23
**minute [5]** 70/18
142/20 142/21
142/22 201/16
**minutes [4]** 70/12
70/13 70/14 201/17
**misconduct [5]** 38/24
84/6 100/15 100/20
220/18
**misheard [1]** 105/13
**misrepresentation [1]**
66/14
**Miss [4]** 22/13 22/13
53/16 161/6
**missed [1]** 56/22
**missing [4]** 78/1
183/1 183/6 184/7
**misspeak [1]** 173/15
**misstatement [1]**
65/14
**misstating [1]** 28/6
**mistake [1]** 151/17
**mistaken [2]** 42/1
202/5
**mistreat [1]** 159/15
**misunderstood [1]**
103/19
**misuse [7]** 29/5 32/17
159/16 161/6 162/18
163/8 165/6

**M**

**misusing [1]** 157/10
**model [1]** 220/13
**models [1]** 147/12
**Mohammed [2]**
205/19 207/24
**Mohammed's [1]**
208/18
**mold [1]** 102/2
**mom [1]** 101/13
**moment [6]** 17/20
49/1 59/6 68/22
107/13 158/10
**momentarily [1]**
187/18
**moments [1]** 79/9
**Monday [5]** 20/11
178/21 181/20 182/9
182/14
**money [24]** 10/21
10/22 11/6 12/12
17/15 44/13 52/5
96/8 100/1 100/2
108/2 169/19 191/18
191/22 204/3 210/22
215/9 215/10 215/16
215/21 217/11
221/15 221/18
223/19
**money' [1]** 103/18
**moneys [5]** 10/5 10/9
10/11 55/5 221/11
**month [11]** 50/3
50/11 53/18 54/5
94/20 97/16 99/13
129/20 136/7 153/22
178/20
**months [13]** 97/9
105/10 106/9 123/13
123/20 134/20
135/21 148/16 154/3
158/19 158/20
180/10 195/16
**months' [1]** 93/8
**monumental [1]** 80/17
**moot [2]** 70/3 179/20
**Moreover [1]** 204/23
**Morgan [1]** 136/13
**morning [7]** 6/18
49/11 49/12 68/4
74/14 165/20 202/5
**motion [105]** 9/14
11/10 11/17 11/20
12/15 13/3 13/4 13/4
17/2 24/14 24/24
26/13 26/24 27/20
28/8 29/8 34/14
42/19 46/19 48/9
48/11 49/9 49/17
49/18 49/23 50/2
50/8 50/9 54/17
56/25 57/4 57/11
57/17 68/3 68/6 68/9
68/12 69/8 69/9 71/4
71/5 71/8 71/12
71/14 71/17 71/21
74/4 74/5 75/12
78/10 83/2 90/16
92/14 93/14 100/17

123/10 143/9 143/10
143/22 144/20
144/25 145/22
154/25 155/8 155/14
155/16 155/18
157/21 166/9 166/11
167/2 179/4 179/10
179/20 182/22 185/5
187/14 197/3 197/7
197/10 199/13
199/15 201/23
202/12 203/1 204/16
206/1 209/21 209/25
210/2 210/3 210/11
210/25 211/13
211/20 212/3 212/12
223/1 224/6 224/12
225/3 226/18 229/8
229/17 229/22
**Motion's [1]** 209/10
**motions [22]** 1/2 8/16
8/23 8/24 9/1 49/5
56/20 69/6 69/7 70/3
71/11 73/2 93/25
97/19 106/4 109/12
126/10 131/7 142/19
155/12 224/8 224/16
**motives [2]** 28/24
67/7
**movant's [1]** 222/1
**movants [2]** 221/21
221/23
**move [21]** 25/13
28/17 44/13 49/1
49/8 50/4 58/6 68/10
71/10 81/2 93/10
94/8 104/10 139/2
143/6 145/13 166/8
179/4 203/3 203/21
213/2
**moved [3]** 29/22 50/6
109/12
**moving [8]** 29/15
31/11 41/22 80/25
101/2 144/1 204/5
214/8
**Mr [55]** 7/1 10/19
13/6 14/13 17/12
20/15 21/4 23/5 38/1
38/3 39/24 40/3
46/20 49/10 52/23
53/10 54/19 54/25
56/8 57/5 87/10 88/7
91/6 91/10 91/19
104/20 105/8 109/16
111/20 112/5 116/1
117/11 123/4 123/16
138/12 138/15
141/17 145/24
154/22 156/9 156/19
157/2 158/14 165/14
167/23 171/25
175/10 178/6 182/8
195/1 208/18 212/14
226/15 228/6 230/20
**Mr. [69]** 6/9 6/16
7/18 8/25 11/14
15/11 19/25 20/5
21/19 22/24 24/6

25/1 25/2 40/4 45/18
48/22 54/3 57/15
74/4 74/5 77/21
79/12 86/19 87/10
87/17 88/6 92/9
104/20 116/9 117/21
119/8 133/3 136/11
137/16 137/22 138/1
138/18 140/25 141/6
141/18 141/19
141/21 143/15
152/17 153/15 154/8
154/21 158/17
159/14 165/11
166/22 166/25
168/17 170/17
174/14 178/4 178/23
180/23 182/2 186/4
190/3 194/14 202/7
209/7 218/1 224/18
225/6 229/25 231/5
**Mr. Bentley [4]**
140/25 141/6 141/18
141/19
**Mr. Franklin [21]**
137/22 138/1 143/15
152/17 154/8 154/21
158/17 159/14
165/11 166/22
166/25 168/17
170/17 174/14 178/4
178/23 180/23 182/2
186/4 190/3 194/14
**Mr. Hillsby [1]** 25/1
**Mr. Hillsley [7]** 25/2
45/18 79/12 92/9
119/8 209/7 218/1
**Mr. Johnson [13]** 6/9
6/16 8/25 15/11 20/5
22/24 24/6 77/21
86/19 88/6 133/3
138/18 231/5
**Mr. Johnson's [4]**
21/19 74/4 136/11
141/21
**Mr. Logan [5]** 19/25
54/3 153/15 225/6
229/25
**Mr. O'Neill [3]** 40/4
48/22 202/7
**Mr. Oprison [1]** 7/18
**Mr. Schoenfeld [8]**
11/14 57/15 87/10
87/17 104/20 116/9
137/16 224/18
**Mr. Schoenfeld's [1]**
74/5
**Mr. Sly [1]** 117/21
**Ms [34]** 6/20 15/10
20/7 20/19 20/21
21/12 22/22 67/20
69/3 94/18 124/18
133/8 139/1 148/9
152/17 166/19 179/8
179/15 182/18
184/24 185/4 187/10
197/2 198/22 199/1
199/12 199/20
201/10 202/24

207/15 212/22 213/3
223/4 224/3
**Ms. [16]** 10/17 19/10
20/1 26/7 35/1 35/3
35/7 35/9 35/11
35/15 35/20 209/16
218/7 219/2 221/4
222/10
**Ms. Logan [13]** 10/17
20/1 26/7 35/3 35/9
35/11 35/15 35/20
209/16 218/7 219/2
221/4 222/10
**Ms. Logan's [3]** 19/10
35/1 35/7
**much [20]** 13/21 43/2
51/13 54/25 62/13
67/22 70/13 74/21
75/22 100/2 103/18
125/15 128/25 134/8
140/25 151/22 173/4
185/25 190/2 228/20
**muddle [1]** 138/9
**multiple [5]** 112/3
112/15 195/19
195/21 198/4
**music [1]** 88/2
**must [5]** 28/21 45/14
96/19 164/22 210/14
**muted [1]** 213/3
**mutual [3]** 216/7
216/18 216/18

**N**

**name [2]** 20/2 21/12
**namely [2]** 145/4
179/20
**names [2]** 19/24
208/3
**narrow [6]** 31/9 37/22
102/12 132/8 132/12
135/25
**narrowly [1]** 37/5
**narrows [2]** 101/9
102/23
**Nationstar [1]** 28/10
**natural [1]** 35/25
**natural-born [1]** 35/25
**nature [6]** 17/17
21/10 38/12 38/15
41/11 43/14
**NC [2]** 1/4 1/11
**nearly [1]** 222/6
**necessarily [6]** 21/21
32/6 43/8 83/4
123/17 169/19
**necessary [5]** 137/8
153/5 157/4 157/23
206/8
**necessity [8]** 205/13
205/15 205/25
206/24 207/18
207/21 208/5 225/5
**need [96]** 18/19 19/3
19/18 22/15 23/12
23/14 40/4 43/8
67/22 68/1 71/6
71/24 81/9 81/9
82/13 82/20 87/6

87/11 88/11 89/21
90/4 90/5 92/1 92/10
93/4 93/16 94/8 94/9
95/10 95/15 95/18
96/5 96/25 101/8
103/5 103/7 103/11
103/16 105/14
105/18 105/21
105/23 105/25 106/6
107/13 108/12 110/3
119/3 121/3 124/9
125/23 129/10
129/14 129/14
129/15 129/24
130/20 130/21 132/1
133/19 133/23 136/7
139/1 139/8 139/15
147/6 147/8 147/12
153/1 156/5 157/25
161/1 163/11 164/4
168/8 184/8 186/15
190/10 192/16 193/6
193/24 194/25 196/4
196/14 196/15
200/25 201/14 209/4
209/18 211/25
219/23 224/8 227/23
229/5 229/19 230/13
**needed [2]** 49/14
117/24
**needs [18]** 80/9 80/21
83/5 97/3 97/3 97/7
98/18 104/9 108/10
130/8 158/3 188/12
192/21 196/8 196/17
204/3 215/15 219/9
**negotiate [1]** 62/7
**negotiating [1]** 62/3
**negotiations [1]** 62/9
**neither [2]** 12/24
31/20
**net [1]** 112/21
**neutralize [1]** 162/6
**never [6]** 44/18 60/20
130/3 184/7 185/4
229/3
**nevertheless [2]**
137/25 208/9
**new [12]** 10/4 42/11
94/14 94/19 94/20
112/23 142/6 156/6
157/1 158/10 161/13
226/20
**next [40]** 19/7 24/21
24/23 28/18 28/19
34/15 49/2 68/18
92/20 101/4 109/10
116/10 117/2 117/10
125/14 129/3 141/3
153/5 154/19 165/25
166/8 166/8 166/10
174/14 177/20
178/13 178/13
178/18 179/4 179/13
182/24 186/9 192/23
194/25 197/7 197/10
205/14 225/7 230/12
230/17
**night [11]** 8/8 91/3

**N**

**night... [9]** 179/18
181/11 189/23
195/17 197/19
197/20 200/16 202/6
216/6
**nine [3]** 155/22
200/21 212/17
**nobody [3]** 30/19
183/8 210/10
**nominal [1]** 1/22
**non [3]** 171/11 171/18
208/18
**non-bundled [1]**
208/18
**non-patent [2]** 171/11
171/18
**none [9]** 35/15 36/15
61/11 67/5 67/5
68/23 80/19 84/16
108/23
**nonetheless [1]** 36/19
**nonpayment [1]** 64/21
**nonspecific [1]** 15/1
**noon [3]** 182/3 182/17
190/24
**Noreen [2]** 48/18
147/21
**normal [3]** 24/17
168/17 208/6
**normalization [3]**
84/8 96/6 96/18
**normalize [1]** 112/7
**Notably [1]** 31/6
**notation [1]** 127/13
**notations [1]** 127/12
**note [8]** 20/9 42/21
44/24 45/21 70/10
134/12 137/21 212/9
**noted [5]** 31/15 33/4
120/5 220/12 221/12
**notes [3]** 41/23 45/21
166/7
**nothing [13]** 26/20
66/19 85/17 151/22
158/24 162/8 173/5
179/5 199/24 228/10
230/19 231/3 231/6
**notice [9]** 27/13
28/11 28/15 69/16
71/15 75/14 125/24
125/25 209/19
**noticed [6]** 96/25
124/3 126/3 224/22
226/18 226/21
**notified [1]** 41/4
**notify [3]** 41/2 41/2
42/16
**noting [2]** 154/11
219/21
**notion [2]** 86/22
105/11
**NOVEMBER [13]** 1/2
2/7 134/4 157/19
157/20 181/10
181/15 182/17
198/24 199/2 199/11
199/13 232/15
**November 1 [1]**
157/20
**November 13th [1]**
198/24
**November 15th [1]**
199/13
**November 25th [2]**
181/10 181/15
**November 27 [1]**
182/17
**now [102]** 12/15
14/18 20/12 20/25
21/12 23/2 23/14
28/3 29/7 32/22
38/14 43/3 46/13
50/14 50/24 51/7
51/11 53/7 57/11
58/22 58/24 59/11
64/5 64/12 65/13
69/5 69/11 72/19
73/1 75/12 76/25
81/20 82/17 82/25
83/25 84/20 87/15
88/8 90/1 90/23
93/12 99/16 99/23
99/25 107/22 111/15
112/1 115/10 116/4
117/21 118/14
122/14 123/7 128/3
128/20 130/13
131/21 131/24 132/6
136/2 136/11 141/3
141/18 142/12
142/19 143/18 144/6
144/14 147/13
148/16 148/18
152/12 160/10
161/21 165/14
165/14 166/14
168/11 170/13
172/15 172/25
176/13 178/5 178/7
179/8 193/3 193/24
199/22 203/3 203/8
207/8 208/25 211/5
211/18 212/14 213/6
214/20 221/14 222/4
222/15 225/16
230/12
**nowhere [1]** 60/21
**Nu [1]** 150/8
**number [38]** 9/11
9/12 44/9 45/15 57/1
57/3 73/21 98/8 98/9
114/7 124/24 145/18
152/19 155/20
155/20 167/25 168/2
168/12 169/4 171/23
173/11 174/12
174/17 175/3 177/21
177/25 179/24 183/1
190/19 190/21 191/2
193/8 196/16 197/12
198/19 198/21
199/20 222/11
**numbers [6]** 18/2 77/5
189/21 189/23
193/16 194/8
**NW [1]** 3/20

**O**

**O'NEILL [8]** 4/9 6/21
38/1 38/3 40/4 48/22
54/19 202/7
**oath [1]** 131/3
**obey [1]** 184/5
**object [2]** 205/24
206/23
**objected [3]** 46/10
46/11 205/12
**objection [29]** 8/9
27/19 104/24 121/16
138/13 138/19 146/3
146/11 169/9 170/13
170/15 171/3 171/8
171/25 174/17 175/8
176/8 176/9 176/12
176/16 176/19
176/22 177/13
177/15 180/25
188/10 192/16
192/21 205/17
**objections [14]** 123/11
170/5 174/11 176/11
177/1 177/3 177/8
177/11 179/25
180/24 188/6 191/8
195/21 196/11
**objects [2]** 46/12
175/4
**obligated [1]** 221/23
**obligation [10]** 52/5
52/6 52/7 55/13
59/25 66/25 109/24
110/1 150/10 200/23
**obligations [6]** 59/3
59/14 59/15 59/19
66/17 148/17
**observed [1]** 137/23
**obviated [2]** 118/21
118/25
**obvious [1]** 40/10
**obviously [23]** 27/7
40/10 42/17 44/5
46/2 49/4 49/16
51/19 64/7 72/11
81/23 95/15 97/23
119/13 119/16
120/11 120/13
132/15 192/15
220/11 227/14 229/8
229/11
**occur [3]** 32/25
126/20 142/6
**occurred [10]** 14/2
18/16 41/7 66/18
99/1 125/11 137/5
194/5 198/24 205/1
**occurs [1]** 136/3
**October [5]** 50/3
109/21 117/12 134/4
158/18
**October 18th [1]** 50/3
**offense [1]** 102/19
**offensive [1]** 19/24
**offered [3]** 9/20
156/15 157/19
**officer [11]** 39/11
58/12 59/17 62/2

128/13 214/13
214/17 218/7 218/12
218/20 219/15
**officers [2]** 214/24
222/21
**offset [4]** 78/12 78/16
78/24 96/3
**often [1]** 58/24
**Oh [7]** 16/11 23/24
113/4 141/12 181/19
192/4 197/6
**okay [66]** 7/19 21/8
21/14 22/17 24/6
24/12 33/18 45/7
47/4 49/8 50/20 57/7
67/23 68/13 70/10
71/3 71/9 79/8 83/13
90/21 92/8 96/9
96/11 99/2 114/9
115/17 115/23 116/1
118/17 127/6 128/12
128/15 138/25 139/4
140/12 146/1 155/23
155/24 156/1 166/21
167/22 168/10
168/19 170/16
170/19 171/2 171/6
177/18 179/15
182/24 186/12
186/18 187/10
192/23 193/15
193/23 194/14 197/2
197/14 202/17
207/15 212/24 224/2
224/17 228/12 231/7
**Olas [2]** 3/10 4/4
**omission [1]** 38/25
**one [132]** 8/24 8/25
10/20 14/18 15/20
16/18 17/22 21/24
21/25 22/1 22/20
23/20 28/19 30/22
32/12 32/22 32/25
34/15 35/25 36/14
36/21 43/17 44/20
45/25 46/1 48/16
49/2 53/3 54/6 55/8
56/17 56/22 64/18
74/7 74/7 81/5 82/18
83/20 91/5 96/1 96/1
100/12 100/18
100/20 122/5 124/23
125/16 129/2 130/2
133/9 133/20 139/3
139/10 140/20 143/8
143/15 147/18
149/20 150/2 151/21
153/3 153/21 154/18
155/15 157/13 162/2
162/10 166/10
166/15 166/23
167/21 171/8 173/3
174/14 177/20 179/3
183/22 183/23
183/25 185/24
186/14 187/7 187/9
187/9 192/20 192/23
192/25 193/11
193/14 193/18 194/4

194/21 194/25 195/9
195/13 196/16 197/5
197/10 198/12
198/20 198/24 200/1
202/13 203/2 203/2
203/10 203/12
203/22 204/1 204/18
204/24 206/1 206/17
207/13 210/11 210/7
210/13 212/9 212/17
212/22 213/13
215/17 218/19 224/2
224/4 224/11 226/12
226/24 227/7 228/1
228/15 229/19
**one's [3]** 31/12 127/6
166/16
**onerous [1]** 137/9
**ones [5]** 11/8 12/5
52/12 91/2 121/25
**ongoing [2]** 26/3 35/7
**oops [1]** 218/12
**open [9]** 14/8 14/11
15/12 69/25 70/5
140/25 149/17
168/21 169/1
**open-ended [1]** 15/12
**operating [3]** 59/17
219/7 222/7
**operation [1]** 216/13
**operations [3]** 58/15
160/1 160/2
**operator [1]** 62/22
**opining [1]** 163/13
**opinion [2]** 112/16
128/6
**opinions [3]** 27/10
114/7 118/11
**opportunity [8]** 51/6
90/16 94/11 117/19
132/10 137/16
138/12 187/3
**opposed [4]** 21/22
68/5 152/23 200/21
**opposing [1]** 83/2
**opposition [7]** 27/19
28/2 31/7 66/1 93/17
207/20 211/20
**oppress [1]** 229/5
**OPRISON [20]** 3/15
7/1 7/18 49/10 54/25
56/8 123/4 138/15
141/17 156/9 156/20
157/2 158/14 165/14
167/23 172/1 175/10
178/6 182/8 228/6
**Oprison's [1]** 117/11
**option [2]** 79/21
132/18
**options [2]** 83/3
87/12
**oral [11]** 64/18 64/25
65/4 126/17 126/18
126/23 127/1 127/9
127/11 175/15 176/3
**order [83]** 8/7 8/7
8/12 11/17 18/22
22/20 22/22 22/24
26/12 27/20 33/8

(18) night... - order

**O**

**order...** **[72]** 40/14
41/16 48/23 51/20
52/10 56/24 57/9
68/25 70/3 71/22
80/14 90/17 92/14
96/2 123/24 127/25
139/1 142/4 142/16
144/12 154/17
154/21 156/6 156/8
156/12 156/14
156/17 156/22
156/22 157/2 158/7
158/8 158/10 158/11
158/22 158/25
160/25 161/13
161/19 164/6 165/9
165/11 165/13 166/8
178/5 182/19 187/11
197/3 201/10 202/4
209/11 209/12
209/23 209/23 210/3
210/4 212/23 215/13
224/4 224/7 224/13
224/16 224/19 225/1
225/3 228/15 229/11
229/17 229/23 230/8
230/9 230/18
**ordered [1]** 223/22
**orders [4]** 131/21
159/8 224/14 231/9
**ordinarily [1]** 95/7
**ordinary [1]** 100/13
**organized [1]** 197/8
**original [2]** 203/13
203/19
**Originally [1]** 22/11
**Orlinsky [1]** 34/8
**others [7]** 63/6 76/6
129/11 169/13
171/16 211/11 230/3
**otherwise [9]** 10/23
30/19 43/20 46/14
47/22 112/12 121/6
199/18 215/8
**ours [1]** 164/16
**ourselves [1]** 120/13
**ouster [2]** 83/23
86/15
**outcome [5]** 33/8
78/21 109/2 123/2
170/24
**outline [1]** 137/3
**outlining [2]** 25/17
39/10
**outs [1]** 39/16
**outset [1]** 38/6
**outside [6]** 27/5 86/4
97/1 100/13 157/8
162/14
**outstanding [1]**
179/23
**overarching [1]** 209/3
**overcome [1]** 108/1
**overlapping [1]**
214/21
**overly [2]** 172/1 172/3
**overriding [1]** 220/8
**overrule [4]** 170/4

171/4 172/24 176/10
**overruled [1]** 175/9
**overruling [2]** 170/15
174/11
**oversee [2]** 59/3
59/10
**owe [2]** 63/11 119/10
**owed [5]** 52/13 52/14
53/19 61/6 62/2
**owing [1]** 50/7
**owned [14]** 29/24
30/11 30/25 31/1
31/3 36/7 36/13
36/16 42/6 47/24
48/6 53/7 188/21
189/6
**owner [5]** 42/25 43/11
53/9 54/4 162/3
**owners [1]** 36/21
**ownership [6]** 40/24
124/21 128/23
132/20 175/23
216/12
**owns [5]** 30/2 48/5
158/23 159/5 175/22

**P**

**P-R-O-C-E-E-D-I-N-G-S**
**[1]** 5/10
**P.A [3]** 3/5 3/10 5/3
**p.m [7]** 2/8 115/22
143/4 143/5 201/20
201/21 231/13
**pace [1]** 94/18
**page [5]** 139/23
155/19 155/22
186/14 188/19
**page 9 [1]** 155/22
**pages [9]** 2/9 18/1
18/5 18/5 152/8
152/9 194/20 197/21
200/8
**paid [20]** 52/6 98/12
99/24 100/3 167/17
169/6 169/21 170/1
191/4 191/9 191/11
191/12 191/15
191/17 191/22
192/12 192/17 199/7
222/13 222/14
**paper [6]** 9/21 70/5
142/12 183/4 183/8
186/1
**papers [13]** 9/1 25/17
36/12 36/24 37/20
40/8 43/24 54/25
56/7 120/5 168/20
175/5 211/10
**paragraph [5]** 14/10
14/13 35/2 37/1
199/21
**paragraphs [10]** 12/3
12/8 14/11 15/11
15/12 15/12 15/14
17/3 23/14 59/16
**parallel [1]** 217/17
**parallels [1]** 215/19
**paren [2]** 169/6 169/7
**parent [3]** 29/23 36/6

47/24
**pari [4]** 58/7 60/10
67/14 68/7
**Parker [1]** 211/9
**part [17]** 25/19 28/25
30/23 40/8 62/6 62/7
63/20 66/8 81/12
94/7 96/6 99/18
130/11 137/23
165/10 180/4 216/15
**partial [1]** 44/14
**participated [1]** 58/16
**participating [1]**
58/19
**participation [1]**
58/23
**particular [10]** 8/13
13/18 38/5 40/1
55/12 61/15 75/23
107/16 153/21
154/18
**particularity [1]** 65/9
**particularly [5]** 27/13
44/17 61/25 107/19
227/15
**parties [34]** 6/24 7/9
7/17 8/22 25/8 25/12
25/12 27/1 33/4
69/13 74/17 81/3
85/18 92/13 92/24
93/19 94/2 94/10
101/19 102/1 104/1
104/25 107/7 123/18
127/1 144/1 156/23
159/1 161/14 196/14
206/20 207/3 212/10
232/11
**parties' [3]** 213/23
215/5 232/12
**parting [1]** 30/7
**parts [1]** 101/2
**party [13]** 96/24
117/21 121/20 122/9
151/7 164/22 212/11
214/6 218/20 218/24
220/21 220/22
220/25
**pass [1]** 166/2
**passed [2]** 85/4
153/23
**past [7]** 52/13 107/8
109/11 110/4 151/13
198/5 198/6
**patent [7]** 54/6
124/23 161/3 161/4
171/11 171/18
171/22
**patents [5]** 160/6
161/3 172/10 172/21
174/7
**path [2]** 88/17 95/6
**pattern [1]** 109/10
**Pause [1]** 24/20
**pay [10]** 64/6 191/6
199/7 215/11 215/14
215/15 221/5 221/15
221/18 221/22
**paying [4]** 64/25
102/17 102/20 221/2

**payment [7]** 52/5
58/4 62/3 64/19
66/12 67/2 129/7
**payments [4]** 84/15
98/4 98/14 169/21
**PDF [1]** 199/2
**PDFs [3]** 197/20
198/13 199/3
**peculiar [5]** 215/5
215/7 215/17 215/17
220/14
**pedal [1]** 97/12
**peers [1]** 85/3
**pencil [1]** 126/13
**pending [5]** 126/10
148/2 208/24 210/25
221/25
**people [7]** 9/5 80/19
96/25 127/5 130/17
163/11 196/12
**people's [2]** 19/23
20/2
**per [2]** 78/3 219/18
**percent [19]** 36/15
42/25 43/9 43/11
43/21 46/9 52/15
55/12 55/21 60/24
60/24 61/1 65/21
86/16 86/17 113/7
128/9 151/15 157/5
**perfectly [1]** 227/14
**perhaps [5]** 26/23
78/5 100/23 132/8
163/12
**period [29]** 20/7
65/18 74/10 92/19
92/20 93/8 98/5
109/3 110/12 114/13
118/15 120/12 120/11
128/18 134/16
134/17 136/2 136/3
136/4 136/8 136/19
136/20 136/23 137/9
140/2 140/7 140/24
147/4 147/19
**permissible [1]** 186/23
**permission [3]** 42/15
42/23 69/17
**permit [2]** 218/17
224/25
**permitted [7]** 27/12
34/24 48/1 85/6
203/9 220/24 221/9
**person [13]** 21/15
35/25 35/25 36/3
36/22 55/23 58/14
102/18 214/4 223/16
223/16 225/6 226/11
**personal [15]** 12/12
15/18 15/19 31/18
36/24 37/2 38/23
45/23 58/17 191/10
191/18 192/18
215/21 225/17
225/18
**personally [2]** 57/19
67/13
**persuaded [1]** 182/12
**pertain [1]** 184/18

**perverted [1]** 28/23
**PETER [2]** 4/9 6/21
**Peterson [23]** 5/7
6/13 9/14 10/12
10/18 10/20 10/22
11/7 12/24 13/6
14/13 17/12 17/15
20/15 20/22 21/4
21/24 23/5 57/20
77/1 90/9 93/1
119/11
**Peterson's [2]** 11/20
191/4
**pfoneill [1]** 4/13
**phase [41]** 96/2
100/11 117/10 153/6
154/19 157/13
192/25 193/1 193/11
193/14 193/18
193/19 194/4 194/6
194/10 194/21 195/9
202/13 202/13 203/1
203/10 203/12
203/22 203/24
203/25 204/18
204/24 206/1 206/17
210/1 210/7 210/18
211/3 211/6 212/5
212/9 212/22 215/13
224/4 225/8 226/25
**physically [1]** 185/15
**pick [1]** 116/4
**picking [1]** 121/18
**picture [7]** 10/3
148/23 149/2 149/3
153/25 154/2 154/6
**piece [2]** 182/24
213/6
**piecemealing [1]**
130/3
**pieces [4]** 103/21
134/23 136/15 146/2
**piecing [1]** 99/8
**pin [3]** 37/15 52/4
53/14
**PIPER [3]** 3/15 3/19
7/1
**place [7]** 61/14
100/11 100/14
137/20 158/25 159/1
160/20
**places [1]** 53/5
**plain [1]** 13/9
**Plaintiff [6]** 1/10 1/19
11/4 28/21 29/1
136/14
**plaintiffs [4]** 1/4
31/23 55/4 62/15
**plan [1]** 142/1
**planned [1]** 108/17
**plausible [1]** 100/4
**play [3]** 72/20 124/25
128/1
**player [1]** 199/23
**playing [2]** 102/12
128/1
**plead [3]** 50/6 50/22
108/9
**pleaded [3]** 52/22

**P**

**pleaded... [2]** 53/23 54/2
**pleading [5]** 10/15 11/1 29/21 45/13 214/11
**pleadings [14]** 31/25 73/11 79/7 105/8 105/9 108/21 142/5 142/8 213/10 217/5 217/7 217/10 219/21 223/25
**please [6]** 115/23 166/2 188/16 198/3 198/5 198/6
**pled [2]** 214/2 223/9
**plenary [1]** 132/6
**plenty [1]** 8/15
**plus [1]** 57/13
**podium [1]** 14/23
**point [65]** 11/3 12/14 13/23 15/2 17/24 28/8 30/2 33/18 36/4 39/19 40/19 42/5 44/20 45/6 47/7 49/19 50/12 51/11 56/5 59/21 63/25 82/22 91/5 93/4 93/13 95/10 97/7 101/11 109/16 109/17 109/25 111/18 114/4 121/9 121/23 122/12 122/20 139/10 139/15 141/15 141/20 153/25 156/19 157/11 157/18 158/6 167/15 169/22 171/14 171/20 183/4 183/10 188/3 195/13 203/5 205/10 206/4 213/24 213/25 214/6 215/2 217/2 221/12 221/20 223/6
**pointed [1]** 109/17
**points [9]** 25/20 38/7 40/7 40/9 90/18 133/12 134/12 140/20 215/23
**portion [8]** 29/13 35/18 73/3 96/12 99/21 104/6 122/1 139/14
**posing [1]** 58/3
**position [34]** 16/5 16/15 28/3 28/4 28/6 39/10 39/12 40/14 61/10 62/24 83/11 84/25 88/8 106/14 123/9 147/4 171/23 177/14 183/7 188/9 190/5 207/5 209/17 210/6 210/10 210/13 210/17 210/20 212/2 213/17 214/7 214/17 227/17 227/18
**positioned [1]** 49/25
**positions [2]** 25/18

165/2
**possession [5]** 11/5 174/21 176/1 183/13 185/4
**possessor [1]** 162/3
**possibility [2]** 118/19 145/7
**possible [7]** 82/19 83/8 116/17 120/10 184/2 186/3 187/1
**possibly [1]** 73/14
**post [1]** 81/15
**post-lawsuit [1]** 81/15
**pot [1]** 221/18
**potential [4]** 96/3 117/4 117/5 171/19
**potentially [4]** 32/23 130/23 133/13 152/20
**practical [3]** 99/6 147/15 203/21
**practice [3]** 29/8 214/23 214/25
**practiced [1]** 131/7
**practices [2]** 98/4 157/14
**practicing [1]** 171/16
**prayer [1]** 31/25
**precedent [1]** 205/12
**preceding [1]** 168/4
**precipitating [1]** 206/9
**precise [1]** 168/12
**precisely [1]** 142/10
**preclude [1]** 58/25
**predators [4]** 159/21 159/21 159/24 159/25
**predicate [2]** 124/9 124/17
**prefer [1]** 182/15
**preferable [1]** 178/21
**preference [1]** 132/15 133/8
**prejudice [6]** 99/21 100/5 201/7 201/12 209/22 212/4
**prejudiced [2]** 144/2 146/18
**prejudicial [1]** 167/14
**preliminary [2]** 72/5 75/3
**premature [3]** 211/22 219/11 222/23
**prematurely [2]** 148/21 210/23
**preparation [1]** 144/2
**prepare [3]** 20/8 106/8 107/7
**prepared [15]** 8/22 8/24 8/25 75/18 75/18 81/10 87/17 88/22 100/7 106/1 106/21 131/19 134/1 137/21 181/16
**preparing [9]** 19/5 19/16 74/9 75/11 137/11 147/12 157/15 189/24

208/19
**prescribed [1]** 223/16
**presence [2]** 13/20 216/22
**present [13]** 5/6 5/8 8/23 8/24 61/11 83/2 94/11 99/7 100/7 106/21 111/19 112/8 139/24
**presentation [3]** 9/7 47/21 82/3
**presentations [2]** 9/6 9/6
**presented [2]** 119/25 183/11
**presenting [1]** 127/16
**presently [1]** 93/2
**president [1]** 62/21
**press [1]** 149/13
**presumably [3]** 79/16 95/16 113/7
**presume [1]** 78/15
**presumptive [3]** 79/17 80/8 146/5
**pretrial [1]** 72/17
**pretty [7]** 54/25 74/21 77/4 131/25 167/2 209/18 216/9
**prevailing [1]** 212/11
**prevent [4]** 137/10 145/2 163/6 163/7
**preventing [5]** 37/3 161/14 163/4
**previous [3]** 152/11 194/9 217/17
**previously [6]** 105/5 113/6 145/1 194/7 194/24 195/9
**price [3]** 108/8 190/2 190/7
**prices [1]** 85/7
**primary [4]** 41/25 99/4 99/5 156/25
**Prime [1]** 68/7
**principal [1]** 108/25
**principally [1]** 36/13
**Print [1]** 149/13
**printed [1]** 149/4
**prior [25]** 19/18 40/14 56/21 58/1 66/23 67/2 68/3 107/4 109/22 110/22 131/4 146/21 146/23 147/1 150/14 150/21 152/2 160/25 174/22 184/14 185/5 190/8 194/3 198/11 228/17
**priority [3]** 22/6 74/20 196/16
**privilege [3]** 29/10 145/4 145/5
**privileges [1]** 145/2
**Pro [1]** 168/6
**probable [2]** 26/11 40/16
**probably [23]** 21/10 30/14 32/4 50/16 71/24 73/23 74/25 89/17 90/6 93/16

100/23 111/10 124/9 125/13 130/6 131/12 134/17 135/20 148/8 153/1 153/16 173/24 229/22
**probative [1]** 171/19
**problem [12]** 22/7 43/10 102/24 117/19 126/1 135/5 135/19 149/14 149/15 161/12 176/13 184/3
**procedural [1]** 205/10
**procedurally [2]** 49/20 51/13
**procedure [1]** 41/8
**proceed [8]** 8/10 32/8 33/16 83/7 89/6 115/6 120/8 225/2
**proceeding [11]** 8/9 26/2 26/5 33/7 41/20 94/18 137/18 218/20 218/25 219/11 219/18
**proceedings [5]** 2/3 26/2 33/5 41/11 232/8
**process [24]** 25/24 26/1 28/20 28/21 28/23 29/4 29/5 29/8 33/12 41/15 41/21 73/16 74/7 84/8 84/12 84/18 96/7 96/17 96/18 109/19 149/20 161/9 163/18 186/5
**processes [1]** 159/12
**produce [26]** 108/3 112/15 114/7 146/10 148/17 150/6 150/11 152/15 153/9 158/7 160/23 160/24 178/12 180/5 180/7 180/18 181/5 182/4 183/12 183/15 183/16 189/1 196/3 196/13 196/13 196/20
**produced [33]** 15/25 18/3 20/20 24/4 94/4 105/25 108/4 123/22 144/5 149/2 150/12 151/24 151/25 152/7 153/10 155/1 156/2 165/16 179/19 181/10 192/11 192/25 193/11 193/14 194/4 194/7 194/9 194/20 194/24 195/8 197/18 200/7 200/10
**produces [1]** 157/8
**producing [1]** 180/9
**product [1]** 148/20
**production [17]** 144/22 165/15 165/17 179/22 181/3 193/10 196/2 198/12 198/19 198/23 198/25 199/2 199/3

199/11 199/14 199/17 199/24
**productions [2]** 156/24 198/11
**products [1]** 85/9
**Professional [4]** 2/17 2/19 232/20 232/21
**proffer [1]** 80/3
**profit [3]** 60/25 60/25 61/1
**profited [1]** 65/20
**progress [1]** 71/25
**prohibits [1]** 100/12
**promise [3]** 66/10 184/5 184/10
**promised [2]** 65/15 65/22
**promises [1]** 135/3
**pronunciation [1]** 202/1
**proper [12]** 13/4 32/17 38/12 55/2 55/22 56/4 177/17 203/3 213/15 214/9 217/6 217/10
**properly [1]** 100/7
**property [8]** 42/2 55/20 155/3 171/12 171/14 171/18 175/1 175/23
**proportional [1]** 172/13
**proportionally [1]** 199/8
**proposal [8]** 8/6 22/10 117/16 118/20 119/7 120/20 138/14 139/11
**proposals [1]** 121/18
**proposed [4]** 75/6 87/16 98/25 139/24
**proposition [5]** 36/6 61/20 62/11 150/9 211/17
**propounded [3]** 126/9 180/10 185/1
**proprietary [1]** 160/16
**prosecute [1]** 206/8
**prosecuting [1]** 205/7
**prosecution [7]** 25/23 26/1 26/6 26/8 26/18 29/13 40/11
**protect [10]** 63/8 127/24 145/2 157/24 160/9 160/23 161/2 161/7 174/9 174/9
**protectable [1]** 125/3
**protected [2]** 29/9 158/4
**protecting [2]** 54/5 159/6
**protection [8]** 31/19 157/25 161/5 162/16 164/3 165/3 165/5 165/7
**protections [4]** 32/11 123/25 156/16 160/5
**protective [9]** 123/24 158/22 158/25 159/8

**P**

**protective... [5]**
160/25 225/3 229/17
229/22 230/9
**protects [2]** 100/14
174/7
**prove [1]** 84/7
**proven [1]** 220/18
**proves [3]** 36/4
150/20 221/8
**provide [19]** 30/19
55/15 55/16 67/4
128/5 139/16 156/20
185/21 188/7 193/24
193/24 198/14 199/8
200/14 218/15
218/25 222/18
222/20 227/3
**provided [2]** 13/10
140/9
**provides [5]** 33/25
39/3 43/6 55/22
190/9
**providing [1]** 222/12
**provision [14]** 156/7
157/3 157/22 159/7
160/12 164/5 164/7
164/11 216/2 216/8
216/19 217/1 219/7
222/8
**provisions [2]** 165/13
222/6
**public [1]** 165/3
**public-facing [1]**
165/3
**publicly [1]** 155/3
**publicly-registered [1]**
155/3
**pull [1]** 143/13 185/12
**pulling [1]** 96/7
**punitive [4]** 69/14
69/18 70/2 70/4
**punt [1]** 147/18
**purchase [3]** 33/8
121/12 121/25
**purchased [3]** 10/21
188/21 189/6
**purchases [1]** 14/15
**purely [1]** 31/8
**purported [7]** 29/17
42/13 64/14 156/4
157/5 203/11 205/4
**purports [2]** 31/13
34/6
**purpose [8]** 28/24
39/1 44/11 44/12
45/5 54/5 55/4
150/25
**purposes [1]** 37/9
45/22 58/18
**pursuant [1]** 122/13
**pursue [2]** 105/9
174/9
**pursued [1]** 223/15
**pursuit [1]** 108/7
**push [3]** 142/1 182/8
194/25
**pushed [2]** 107/25
148/21

**put [18]** 15/20 16/16
16/18 23/22 74/16
74/18 75/12 81/8
97/12 99/23 104/14
110/3 135/24 135/25
159/1 159/7 200/24
201/6
**putting [5]** 69/15
86/11 101/20 160/20
207/8

**Q**

**question [26]** 27/4
32/24 35/3 38/12
76/11 84/21 89/5
95/4 98/19 98/21
99/2 103/10 106/19
107/1 107/1 113/17
114/25 119/25
125/19 133/14
151/23 153/21
155/20 155/20
186/11 216/23
**questioning [1]**
225/10
**questions [11]** 38/6
38/8 58/25 60/13
76/1 103/3 124/17
124/17 147/25
170/23 211/15
**quick [6]** 91/5 131/13
166/17 167/2 186/2
205/10
**QuickBooks [4]**
148/23 149/1 149/6
149/12
**quicker [1]** 183/22
**quickest [1]** 184/2
**quickly [1]** 187/1
**quite [4]** 51/19 96/20
204/2 225/11
**quote [21]** 30/10
30/12 30/18 31/17
36/8 41/17 62/17
62/18 62/18 62/21
62/22 62/25 63/1
83/23 134/15 175/17
175/17 210/6 210/14
210/15 221/21
**quote/unquote [1]**
83/23
**quoted [1]** 47/20
**quotidian [1]** 208/6
**quoting [2]** 24/3
206/10

**R**

**raise [5]** 38/7 58/25
215/8 225/4 229/2
**raised [5]** 40/7 116/20
123/11 149/23 229/3
**raises [1]** 171/7
**raising [1]** 228/16
**ramp [1]** 129/21
**ranges [2]** 189/19
193/18
**Ransom [1]** 222/4
**rare [1]** 37/7
**rarely [1]** 37/4

**rated [1]** 100/22
**rather [10]** 10/7
10/12 62/20 64/14
102/20 157/24 182/8
189/20 217/14
223/15
**raw [5]** 144/15 144/21
145/14 149/12
153/25
**reach [1]** 96/19
**read [16]** 12/19 28/18
32/8 49/2 49/6 51/19
69/12 168/15 169/2
174/16 187/17
188/15 189/3 208/1
208/2 216/9
**readily [1]** 173/25
**reading [1]** 213/23
**ready [9]** 24/21
106/17 106/18 121/7
123/1 131/14 132/7
160/23 165/17
**reaffirmed [1]** 105/6
**real [2]** 84/1 91/5
**realistic [1]** 93/3
**reality [1]** 121/11
**realize [1]** 202/21
**realized [1]** 151/17
**really [32]** 13/16
23/12 23/14 33/1
44/15 46/4 47/15
51/2 55/3 65/13
75/13 75/22 80/17
83/1 83/3 85/24 86/1
89/21 90/4 92/1
98/18 114/13 124/15
129/21 131/17
161/16 168/22
173/10 173/24 174/5
198/10 200/1
**realm [1]** 77/18
**Realtime [2]** 2/18
232/21
**reason [22]** 7/4 29/10
34/11 37/18 43/23
45/8 58/8 84/1 84/24
101/20 107/6 121/8
121/14 133/25
159/10 161/20
162/10 199/19 209/1
209/21 227/15
228/16
**reasonable [8]** 20/7
81/4 151/4 213/19
215/3 216/25 217/3
218/23
**reasonableness [7]**
205/13 205/15
205/25 206/23
207/18 207/21 208/5
**reasonably [4]** 20/8
55/15 55/16 206/8
**reasons [22]** 10/16
37/20 43/23 46/17
52/23 53/10 53/17
54/16 67/11 67/18
74/8 82/4 89/10 94/9
144/24 145/3 145/13
145/15 203/8 219/9

**220/5 222/25
reassert [1]** 177/13
**recall [3]** 10/7 227/15
229/9
**recalling [1]** 82/24
**receipt [2]** 148/24
153/1
**receive [3]** 8/6 23/5
162/9
**received [10]** 10/5
12/12 13/7 17/25
65/21 86/25 144/7
146/14 187/16
222/11
**receiving [3]** 23/23
45/7 164/22
**recent [2]** 84/25
194/6
**recently [2]** 74/19
200/8
**recess [2]** 115/19
231/12
**recipient [1]** 55/12
**recipients [1]** 55/6
**recklessness [1]** 38/25
**recognize [3]** 29/12
30/10 92/21
**recognized [3]** 36/17
175/21 176/4
**recollecting [1]**
200/24
**recollection [1]**
185/23
**recommended [1]**
22/12
**record [12]** 24/20
37/13 40/17 70/25
71/2 71/4 108/12
109/23 131/3 146/16
188/17 232/8
**records [18]** 11/5
16/23 20/20 105/14
108/23 109/8 109/14
109/18 110/7 127/13
127/14 133/24
146/13 146/14
146/23 147/1 150/19
215/25
**recover [4]** 43/13
55/5 221/10 221/11
**recovering [1]** 206/7
**redo [1]** 7/6
**redone [1]** 188/13
**Reed [1]** 85/4
**refer [5]** 18/2 25/12
104/25 175/6 223/20
**reference [7]** 9/24
10/20 27/19 69/21
174/23 175/4 175/7
**referenced [5]** 12/5
37/4 41/18 219/20
222/10
**references [1]** 69/22
**referencing [3]** 27/9
37/14 70/4
**referred [4]** 109/21
150/7 193/16 204/16
**referring [2]** 9/10
15/11

**refers [5]** 36/1 187/21
189/17 189/18
189/21
**reflect [2]** 84/10
85/24
**refused [1]** 167/11
**refusing [1]** 149/10
**regard [3]** 13/9 68/3
220/16
**regarding [3]** 14/12
14/19 42/1
**regardless [5]** 35/23
77/13
**registered [5]** 2/17
2/18 155/3 232/20
232/20
**regulations [1]** 85/7
**reimburse [1]** 221/15
**relate [1]** 214/22
**related [17]** 17/12
17/13 40/22 81/16
124/7 133/13 160/18
167/18 169/7 192/6
200/13 200/14 212/9
213/21 217/23
217/23 225/7
**relatedness [1]** 198/2
**relates [3]** 15/3
172/20 212/8
**relating [1]** 129/5
146/3 209/25
**relationship [9]** 61/9
61/10 61/21 61/22
61/23 62/11 62/12
62/14 62/25
**relative [10]** 13/17
87/3 114/15 115/3
127/8 140/2 155/25
200/19 232/9 232/11
**release [3]** 216/8
216/18 216/19
**relevance [4]** 151/23
171/8 171/23 174/3
**relevant [8]** 152/20
172/11 172/12
172/21 172/22 174/5
203/4 223/24
**relief [5]** 32/15
213/14 213/16
213/20 214/1
**relies [3]** 62/10 66/1
67/6
**rely [5]** 25/18 126/5
145/1 146/8 217/4
**remain [3]** 22/18
73/23 196/12
**remaining [2]** 182/4
197/18
**remains [3]** 122/16
141/23 179/22
**remanded [1]** 122/19
**remember [2]** 12/6
14/20 231/2
**remind [1]** 138/1
207/4
**remove [2]** 180/24
192/16
**removed [2]** 122/14
192/22

**R**

rendered [1] 222/14
rental [2] 205/20
207/23
reopen [1] 148/2
rep [3] 131/1 226/7
228/8
repay [2] 221/5
221/24
repeatedly [4] 47/17
109/6 156/15 158/4
repertoire [1] 74/22
rephrase [2] 171/3
207/6
replicate [1] 162/19
reply [1] 223/4
report [5] 96/12 124/4
128/5 208/19 232/6
reported [1] 2/16
reporter [13] 2/17
2/18 2/18 2/19
115/17 205/20
205/21 232/5 232/19
232/20 232/20
232/21 232/21
Reporter-Certified [1]
2/19
reports [2] 95/19
97/18
represent [4] 63/23
119/15 121/4 157/15
representation [14]
27/22 66/20 66/22
66/25 67/8 88/23
89/8 119/10 119/17
119/21 120/24
122/14 151/25
210/21
representations [2]
67/10 99/11
represented [2] 62/8
83/21
represents [1] 99/13
reproduce [1] 200/4
reps [1] 226/7
request [40] 71/14
90/15 94/23 120/9
145/14 145/18
152/19 153/4 164/22
168/8 168/23 169/4
174/13 174/16
175/12 175/12
176/19 179/21
185/10 186/24
187/18 188/20 189/1
191/3 191/25 193/3
193/8 193/10 194/5
194/10 196/1 198/4
198/19 200/2 201/1
208/22 209/13
209/17 222/3 223/22
requested [10] 84/1
92/18 145/24 181/9
187/6 187/25 210/3
213/14 213/20 227/4
requesting [1] 227/19
requests [12] 94/20
96/21 144/21 169/24
180/10 185/2 192/3

193/1 193/19 195/14
195/25 218/3
require [9] 47/24 61/8
63/20 103/4 112/22
164/8 171/5 176/11
225/12
required [10] 13/9
30/20 52/1 63/12
65/9 68/16 110/24
206/24 211/8 211/15
requirement [1] 219/4
requires [7] 12/16
29/5 35/24 63/17
63/18 114/2 125/15
requiring [4] 34/1
64/19 167/4 187/6
requisite [2] 63/15
65/9
reserved [2] 212/24
231/10
reserving [2] 9/2
119/13
reset [1] 120/7
resistance [1] 108/1
resisted [1] 105/3
resit [1] 184/15
resolution [1] 108/10
resolve [4] 125/10
129/10 129/14
216/23
resolved [2] 112/1
138/11
resources [2] 122/4
122/22
respect [25] 10/19
14/13 15/10 24/14
33/21 38/20 40/11
40/18 44/4 44/19
44/22 45/17 45/20
58/3 62/1 72/10
122/10 126/7 133/18
153/3 171/4 174/12
179/3 182/21 216/12
respectful [1] 230/13
respectfully [8] 11/19
144/21 145/14
146/17 175/7 200/2
208/1 208/22
respectively [1] 181/9
respond [7] 9/3 15/2
16/14 74/13 120/20
167/5 171/20
response [71] 9/16
11/1 12/6 13/17
13/24 24/25 25/8
28/2 31/23 39/19
39/23 40/2 46/20
57/14 69/10 69/12
71/15 71/20 71/23
91/6 91/9 105/7
109/12 133/2 134/7
134/7 134/13 143/11
166/22 167/13
167/19 168/4 168/9
168/24 169/8 170/10
171/22 177/15 178/7
178/8 178/9 178/23
179/2 179/10 179/12
179/23 180/12

180/21 180/25
180/25 182/4 182/25
185/18 187/4 187/21
188/3 188/7 189/14
189/15 190/23 191/2
193/10 194/18
196/20 200/15
202/17 204/17
213/23 215/5 226/24
227/2
responses [8] 145/23
156/4 179/19 179/21
187/16 190/13
195/16 197/11
responsibility [3] 59/8
59/10 59/20
responsible [1] 214/4
responsive [12] 149/9
180/6 180/7 180/9
180/13 185/10 190/6
192/25 193/18
194/10 196/4 196/5
rest [5] 11/10 40/7
56/6 119/2 206/4
restore [1] 164/23
restrictions [1] 163/3
result [2] 28/25 55/11
resulted [2] 109/18
210/4
retain [1] 175/22
retained [5] 124/5
188/2 188/24 189/9
190/1
retaliate [1] 39/12
retaliated [1] 47/6
retaliation [2] 45/1
47/8
return [6] 164/8
164/11 164/22
183/24 184/5 222/13
returns [1] 155/2
revenue [1] 86/9
revenues [1] 85/9
reversed [5] 49/3
99/24 100/10 122/19
222/16
review [4] 50/20
153/2 181/16 201/8
reviewed [1] 189/22
revise [1] 182/3
revised [3] 147/17
190/19 190/23
revisit [2] 132/3
153/4
RFA [2] 177/21
177/25
RFAs [1] 167/5
RFP [6] 145/23 156/3
179/23 183/1 192/2
192/8
right [65] 6/9 11/25
12/15 21/5 23/14
32/22 47/7 47/20
50/14 72/8 73/13
74/22 76/3 77/8
80/19 81/20 82/17
83/25 84/23 86/3
87/15 88/8 89/9 90/1
95/9 100/2 101/24

102/22 103/22 112/4
114/18 118/14
122/18 126/14
127/11 130/13
131/15 131/16 141/4
142/2 142/11 142/15
146/17 148/1 152/16
153/7 161/21 170/13
172/18 181/11
185/22 192/19
194/23 201/2 203/22
209/8 209/11 209/24
213/6 219/5 220/21
221/17 223/15 225/2
225/23
rights [8] 9/2 32/10
39/13 45/2 45/11
62/4 119/14 223/13
Ringling [1] 2/6
ripe [1] 154/13
rise [7] 39/17 44/10
45/16 61/7 61/21
62/12 63/21
rises [1] 39/5
risk [1] 157/7
RMR [2] 232/4 232/19
road [1] 222/17
roadblocks [1] 129/16
Rob [2] 120/7 139/11
Rog [2] 171/6 190/23
role [4] 59/25 61/13
105/15 144/13
rolled [1] 140/4
rolls [1] 136/9
room [4] 72/12 72/21
79/9 224/19
Rosalyne [4] 141/9
141/10 141/11
141/12
roughly [1] 55/13
rounding [2] 77/18
87/2
royalties [7] 52/14
52/14 64/6 64/14
124/22 162/9 162/11
royalty [30] 44/18
52/5 55/13 55/21
58/3 60/19 60/24
61/2 64/16 66/12
67/2 101/22 102/2
102/4 107/2 107/3
109/24 110/9 124/13
125/4 125/12 125/20
129/8 135/7 174/23
174/24 175/17
175/18 176/5 176/5
RPR [2] 232/4 232/19
rubber [1] 151/14
RUDOLF [5] 4/3 6/25
7/10 7/14 7/15
rule [15] 12/16 13/10
65/10 71/6 85/6
91/17 110/8 147/7
154/15 203/9 209/18
209/25 210/11
211/12 212/5
rule-making [1] 85/6
ruled [7] 30/10 32/13
110/25 122/15

136/22 174/3 217/4
rules [4] 61/16 142/7
147/5 220/13
ruling [16] 50/4 56/21
96/11 97/23 112/6
132/11 136/3 136/9
137/16 153/5 154/19
164/25 170/12
176/20 196/23
203/15
rulings [5] 72/6 101/8
101/10 106/3 108/21
run [1] 154/22
rung [1] 165/5
running [5] 64/13
64/22 65/3 84/11
149/15
rushing [1] 93/7

**S**

safely [1] 95/23
said [48] 14/18 19/14
21/2 41/1 49/7 55/1
74/14 81/3 89/4
106/12 108/11
108/17 109/17
109/23 131/21 133/2
137/7 140/6 141/1
160/12 161/24
162/22 166/22
167/16 169/15
169/18 169/24
175/12 177/2 181/21
183/12 183/17
188/20 191/15
191/17 191/23
192/17 193/11
193/12 193/12
193/15 193/23 198/3
200/13 210/6 221/15
226/22 229/19
said' [1] 104/15
sake [2] 98/1 131/8
salary [3] 45/8 45/9
222/13
sale [5] 188/2 188/24
189/9 190/2 190/8
sales [1] 190/6
sampling [1] 151/2
sanctions [3] 26/16
27/20 40/14
SARASOTA [3] 1/1
2/6 232/3
sat [2] 44/6 184/3
satisfied [1] 96/22
satisfy [2] 52/17
56/11
save [1] 11/10
saw [1] 111/1
say [64] 12/10 13/20
15/24 19/12 38/18
48/15 49/14 49/22
66/10 66/11 68/23
74/13 78/23 88/8
93/18 94/6 95/23
96/13 106/7 110/13
113/4 114/12 115/9
115/12 123/22
123/23 125/2 127/19

**S**

**say... [36]** 130/16
133/1 133/21 135/25
136/3 138/20 140/8
149/13 151/8 151/9
151/14 154/14
155/11 157/18
159/19 159/21
162/25 174/19 175/5
177/9 178/11 178/12
182/3 183/5 187/8
192/12 193/13
193/23 194/1 196/14
197/19 207/25
214/16 226/17
229/14 230/1
**saying [33]** 16/11
16/20 16/24 19/25
27/23 52/12 54/11
106/8 121/19 129/23
131/9 136/25 148/24
149/10 156/1 158/17
159/23 162/7 162/8
162/13 163/10
172/12 173/9 176/2
176/8 185/14 185/22
187/22 202/8 204/18
219/23 224/24 230/6
**says [36]** 14/14 14/19
27/16 27/25 32/7
53/1 53/3 66/3 66/19
79/23 85/23 92/4
119/1 129/8 150/23
150/25 151/3 151/6
159/14 168/14
174/20 179/24 180/5
183/6 187/22 188/4
191/3 191/11 196/20
199/22 200/11
207/10 209/23
211/20 211/20
221/20
**scale [1]** 200/1
**scales [1]** 199/25
**scenario [1]** 56/3
**scenarios [2]** 111/17
118/6
**schedule [5]** 75/20
90/17 116/18 133/6
196/9
**scheduled [12]** 19/11
20/16 21/3 68/21
75/24 106/9 141/22
147/21 147/23 181/7
224/21 228/1
**schedules [2]** 21/1
230/14
**scheduling [2]** 117/18
142/17
**SCHOENFELD [10]**
4/9 6/19 11/14 57/15
87/10 87/17 104/20
116/9 137/16 224/18
**Schoenfeld's [1]** 74/5
**scope [1]** 132/9
**scorched [1]** 122/5
**screens [1]** 168/18
**se [1]** 78/3
**search [1]** 180/5

**seated [2]** 6/14
115/23
**second [41]** 11/25
24/16 26/21 26/25
27/8 27/16 27/24
27/25 31/15 49/3
50/1 50/5 50/10 51/8
54/21 72/8 74/8
74/12 74/22 114/19
117/7 120/12 122/15
136/22 140/14
140/18 152/16 153/7
194/10 195/24
198/24 201/2 205/11
206/15 207/2 215/17
220/21 222/17 224/5
224/25 229/15
**second-phase [1]**
194/10
**Secondly [1]** 139/18
**section [8]** 26/13
26/17 30/4 30/17
47/21 164/15 216/18
220/12
**see [25]** 6/3 24/18
38/8 49/6 68/9 77/14
78/14 80/1 90/12
91/16 93/24 97/13
99/15 109/5 112/24
132/5 132/23 147/18
163/11 163/23
163/23 164/4 189/24
225/5 229/21
**seeing [5]** 130/8
161/14 161/22 163/4
163/6
**seek [4]** 40/23 69/17
69/17 225/3
**seeking [7]** 26/15
72/13 105/1 105/4
200/15 213/21 218/8
**seeks [2]** 57/17 57/24
**seem [10]** 14/9 19/17
19/20 70/1 89/13
95/5 98/8 124/8
125/14 184/12
**seems [12]** 72/19 95/6
103/24 114/14
125/13 130/4 134/24
152/13 171/23
173/25 196/7 204/17
**seen [2]** 73/10 109/6
**segued [1]** 199/10
**selected [1]** 221/5
**selection [1]** 116/22
**self [2]** 213/10 222/1
**self-dealing [1]** 222/1
**self-funded [1]** 213/10
**sell [2]** 110/24 121/15
**send [3]** 181/13
185/25 186/16
**sense [12]** 28/1 40/13
49/21 51/13 86/15
87/25 88/16 89/2
93/6 106/11 134/25
209/13
**sensible [2]** 104/5
104/7
**sensitive [2]** 25/14

160/17
**sensitivity [1]** 186/25
**sent [5]** 8/8 15/19
101/6 197/23 200/11
**separate [17]** 35/6
36/18 37/9 45/22
46/4 46/6 53/6 56/25
57/1 78/22 78/22
80/15 128/24 154/24
155/16 184/20 224/6
**separately [1]** 86/23
**September [5]** 117/9
134/3 195/15 195/15
216/16
**September 10th [1]**
195/15
**sequence [1]** 48/14
**serious [2]** 107/9
119/6
**served [4]** 55/20
94/18 159/4 195/14
**services [3]** 216/12
222/13 222/14
**servicing [1]** 131/15
**set [18]** 8/5 12/13
42/11 54/4 90/17
92/23 105/3 110/13
118/14 120/2 133/6
136/12 141/25
148/12 149/6 158/15
167/10 195/24
**sets [3]** 42/22 72/11
94/19
**setting [6]** 109/3
117/23 118/4 118/12
139/19 140/21
**settings [1]** 117/2
**settle [1]** 140/4
**settling [1]** 136/14
**setup [1]** 53/4
**seven [8]** 23/16 89/20
93/11 108/18 158/19
200/21 227/22
229/23
**seven-figure [1]** 89/20
**seven-hour [1]** 227/22
**sever [1]** 212/11
**several [11]** 38/21
60/14 63/3 64/10
74/12 156/19 169/13
169/22 197/19
197/20 216/21
**severe [1]** 107/18
**sham [1]** 53/3
**share [2]** 91/12
216/15
**shareholder [19]** 33/6
33/13 34/2 35/4
35/13 39/14 43/21
45/5 45/12 46/9
47/11 63/4 65/21
121/17 128/9 157/5
217/19 217/20
218/11
**shareholders [6]** 30/20
35/7 47/25 63/5
110/23 214/24
**Shareholders' [4]**
107/23 203/11

203/15 205/4
**shares [13]** 30/24
33/8 37/4 78/5 78/18
78/18 78/21 100/3
108/8 121/12 121/15
121/25 215/14
**sharing [1]** 75/3
**sharp [1]** 217/21
**sharpen [1]** 126/12
**shb.com [5]** 4/13 4/13
4/14 4/14 4/18
**sheet [1]** 88/2
**sheets [1]** 201/13
**shenanigans [1]** 121/1
**shield [1]** 38/22
**shields [1]** 31/18
**shift [1]** 61/2
**SHOOK [2]** 4/11 4/16
**short [4]** 9/12 13/9
100/6 140/13
**short-handing [1]**
9/12
**shortened [1]** 19/8
**shorter [1]** 95/6
**shortly [1]** 210/5
**shot [1]** 108/14
**show [14]** 51/23
51/25 52/2 52/19
53/15 54/7 54/7
87/17 124/24 152/2
160/17 163/22
220/19 229/15
**show-how/know-how**
**[1]** 54/7
**showing [1]** 207/17
**showmanship [1]**
120/23
**shown [1]** 99/20
**shows [1]** 216/6
**Shreve [2]** 97/2
201/25
**shrinks [1]** 101/11
**shy [1]** 208/21
**siblings [1]** 62/16
**sic [3]** 164/14 181/12
181/17
**side [23]** 10/2 72/12
72/21 75/14 77/23
78/14 79/9 81/13
83/9 84/24 94/18
95/25 100/14 101/17
115/1 119/1 120/25
121/10 126/8 129/19
146/8 169/23 230/21
**side's [1]** 117/1
**sides [5]** 44/6 55/7
77/6 103/8 221/3
**sign [2]** 186/16 205/6
**signed [3]** 111/4
156/11 158/21
**significant [3]** 85/2
85/6 94/3
**significantly [1]**
101/23
**Silvertooth [1]** 2/5
**similar [2]** 30/9 34/12
**similarly [4]** 36/10
122/3 217/9 223/12
**simple [7]** 25/22

61/20 99/3 100/24
101/20 110/17
119/12
**simpler [1]** 31/12
**simply [7]** 10/25
14/11 61/19 112/19
113/17 174/8 180/16
**since [16]** 8/16 47/2
64/7 71/8 94/2 94/5
98/13 101/6 131/10
144/17 168/12
188/22 189/7 195/3
196/8 225/4
**single [11]** 13/12 94/1
100/20 105/25
150/19 155/1 156/2
225/12 227/3 228/18
228/22
**singular [1]** 34/2
**sir [7]** 33/17 49/10
83/11 116/1 123/4
143/1 178/10
**sister [1]** 101/13
**sit [2]** 118/13 225/13
**sits [1]** 227/21
**SITTERSON [2]** 3/5
3/10
**sitting [3]** 199/6
211/1 211/2
**situation [2]** 27/14
218/17
**six [12]** 25/10 25/13
89/17 89/19 94/14
111/16 119/16
119/20 183/2 183/6
183/9 200/20
**six-figure [2]** 89/17
89/19
**size [1]** 146/2
**slash [2]** 12/20 137/12
**slew [1]** 189/17
**slot [1]** 136/18
**Sly [3]** 117/21 120/7
139/11
**SMART [157]** 1/2
1/12 1/13 1/17 1/21
1/22 1/23 3/2 3/2
3/3 4/1 4/1 5/9 6/24
7/9 7/17 7/22 7/23
10/5 11/3 11/4 11/6
12/11 14/14 14/15
15/15 15/16 16/16
16/21 16/23 24/23
24/24 25/7 25/11
25/12 25/12 29/19
29/19 29/22 29/23
29/23 30/1 34/15
34/16 34/18 34/19
35/21 35/21 36/6
36/8 42/3 42/9 42/12
42/13 42/14 43/4
43/9 43/11 43/12
43/21 43/25 44/1
46/5 46/15 47/5 48/4
48/5 48/6 51/23 53/7
53/8 54/9 54/12
57/12 58/4 58/13
57/19 59/18 60/23
61/3 62/2 62/4 62/2

**S**

**SMART... [74]** 65/19
71/16 79/12 83/23
84/5 84/6 85/3 85/17
92/13 96/8 96/16
97/2 98/14 99/4
99/25 102/3 102/4
105/24 120/1 121/11
121/24 122/12
122/20 122/21 129/7
143/11 143/12
143/23 143/24 144/3
144/8 144/10 144/18
144/20 144/25 145/9
145/11 145/15
145/21 145/25
146/24 147/22 151/1
152/4 155/14 174/25
175/19 175/19 179/9
185/2 191/5 197/10
203/5 203/17 204/17
205/12 206/19
207/20 208/13
210/24 213/23 214/2
215/4 215/8 215/14
215/18 215/23
215/25 216/1 216/13
217/7 218/8 222/18
226/4
**Smart's [2]** 49/16
149/25
**smarter [1]** 87/24
**Smith [1]** 154/22
**SMITHA [26]** 3/4 6/23
7/8 15/4 15/5 15/7
15/8 15/10 20/19
22/22 67/20 69/3
148/9 152/18 166/19
179/8 179/15 182/18
184/24 185/4 187/10
197/2 198/22 199/1
199/12 201/10
**Smitha's [1]** 199/20
**smuggle [1]** 51/12
**So.2d [2]** 150/8
219/21
**So.3rd [1]** 37/15
**software [1]** 149/6
**sold [5]** 188/22
188/23 189/7 189/8
189/21
**sole [12]** 43/4 45/4
53/9 53/9 54/3 54/9
58/12 59/17 62/21
128/10 128/12
156/10
**solely [3]** 46/1 217/4
217/10
**solution [2]** 110/18
139/24
**solve [2]** 20/23
196/11
**solvent [1]** 30/11
**somebody [6]** 21/16
125/1 145/24 159/15
165/22 183/14
**somehow [4]** 148/13
150/20 151/14
161/18

**someone [2]** 92/2
229/20
**something [17]** 27/3
38/13 78/1 87/18
101/15 103/14
125/13 138/20 141/3
150/5 150/11 150/13
170/1 173/2 185/20
186/22 200/3
**sometime [1]** 16/12
**somewhat [2]** 139/20
214/10
**son [1]** 101/13
**soon [1]** 231/9
**sorry [35]** 7/3 7/6
15/6 26/7 35/20 38/2
50/7 63/17 74/4 77/1
80/5 88/5 115/14
118/23 136/5 136/5
137/5 138/5 155/4
155/11 155/20
155/21 164/17
166/18 167/20
181/24 188/19
188/25 191/15
191/16 193/2 193/6
197/9 218/12 221/10
**sort [20]** 18/8 18/12
32/18 73/15 80/10
120/24 124/8 131/6
148/14 152/10
160/18 173/22
176/17 184/4 200/24
204/19 204/21
212/16 223/4 226/20
**sought [2]** 41/6
210/15
**sound [7]** 57/21 57/22
77/4 137/17 153/10
190/18 202/23
**sounds [8]** 22/17
82/21 153/8 153/20
185/17 200/19 201/9
202/10
**speak [22]** 6/4 12/1
16/9 27/21 81/7
81/11 82/2 88/20
90/16 101/17 104/12
110/3 120/17 139/22
146/24 147/11
153/13 180/20
184/22 185/12 209/5
225/15
**speaking [3]** 6/17
47/2 78/13
**special [1]** 227/5
**specially [2]** 74/11
74/19
**specific [25]** 14/4
14/19 20/1 30/3 54/5
57/23 59/2 60/14
65/14 67/8 67/8
72/11 84/20 110/19
113/19 125/17
152/18 156/20 177/5
177/24 196/23
196/23 205/13
205/16 223/6
**specifically [23]** 13/6

14/6 18/18 27/24
30/15 36/25 38/17
55/21 90/8 90/16
120/7 148/19 149/24
150/23 151/3 151/5
158/3 165/12 205/12
205/24 206/23
208/16 211/8
**specifications [1]**
164/2
**specifics [1]** 13/12
**specifies [1]** 31/19
**specs [2]** 160/18
163/25
**spectrum [1]** 82/20
**speed [1]** 8/18
**spend [1]** 108/2
**spent [5]** 10/11 17/15
107/22 140/8 160/19
**splitting [1]** 134/23
**spoken [1]** 120/18
**spots [1]** 83/17
**spreadsheet [9]**
197/23 200/11
206/13 207/19
207/22 207/25 208/2
208/11 208/23
**spurious [1]** 108/5
**staff [1]** 8/22
**stage [3]** 11/19 29/21
45/13
**stake [3]** 36/24 37/2
45/23
**stamp [1]** 151/14
**stand [2]** 36/5 61/24
**standard [4]** 203/4
204/8 204/23 206/25
**standing [8]** 35/12
47/9 47/13 53/20
106/7 113/13 214/23
214/25
**standpoint [1]** 77/8
**stands [2]** 150/8
231/2
**start [21]** 6/10 9/19
21/25 25/22 27/4
38/4 68/12 74/24
81/23 93/12 99/16
116/7 119/11 119/24
120/9 126/15 129/18
147/12 203/8 213/5
213/20
**started [4]** 10/24
80/22 115/24 186/4
**starting [2]** 6/8 94/12
**state [7]** 27/11 28/20
41/20 96/25 106/25
201/24 232/2
**stated [12]** 26/12
30/19 34/21 40/11
46/18 47/17 67/1
67/18 68/3 206/6
222/2 223/8
**statement [24]** 9/15
11/24 12/17 12/24
13/5 13/9 13/18 17/4
17/19 17/21 19/1
22/19 22/25 24/9
31/25 65/24 66/9

70/5 87/1 133/7
133/11 149/16
192/19 194/6
**statements [7]** 14/24
17/11 17/13 65/11
87/10 100/20 120/22
**states [2]** 47/22
180/11
**stating [1]** 34/9
**status [2]** 33/6 123/12
**statute [41]** 13/25
16/7 30/9 31/14
31/17 31/20 32/3
32/9 34/22 34/24
38/16 38/21 39/3
39/6 39/17 52/2
52/20 54/14 55/4
56/10 59/14 64/9
64/12 64/22 65/1
65/6 65/6 69/22
72/11 79/23 81/23
81/25 204/9 218/11
218/25 219/4 219/6
219/10 219/17
222/19 223/12
**statute's [1]** 56/10
**statutes [9]** 30/3 30/4
30/14 30/16 33/25
59/1 59/25 64/10
218/17
**statutory [18]** 72/20
81/1 81/6 82/4 82/12
83/12 83/15 86/7
86/14 87/16 91/11
91/21 103/14 146/4
147/5 152/21 203/4
204/5
**stay [3]** 85/14 133/5
197/8
**Ste [1]** 4/11
**STEARNS [5]** 3/5 3/9
6/24 7/8 7/23
**stearnsweaver.com [2]**
3/8 3/12
**Steigman [1]** 62/10
**stem [1]** 213/17
**stems [1]** 203/18
**Stenographic [2]**
232/5 232/19
**stenographically [2]**
2/16 232/6
**step [4]** 98/21 162/1
165/22 205/14
**steps [3]** 119/1 124/9
227/16
**STEVE [1]** 3/19
**steve.dixon [1]** 3/21
**stick [4]** 79/18 80/8
81/6 86/14
**sticking [2]** 103/14
147/5
**still [24]** 30/1 39/25
48/4 48/6 54/19
56/20 94/15 96/21
100/10 108/2 108/5
118/14 119/2 127/5
134/11 140/9 142/7
143/18 162/25 168/8
184/23 197/6 202/1

229/13
**Stingray [1]** 189/18
**stipulate [1]** 156/15
**stole [1]** 63/7
**stood [3]** 106/13
108/16 116/9
**stop [4]** 110/6 122/25
206/15 219/5
**story [1]** 39/14
**straightforward [2]**
122/6 167/3
**strategic [1]** 105/23
**strategy [1]** 108/6
**strawman [1]** 82/5
**street [4]** 3/20 4/16
5/3 130/1
**strike [4]** 69/6 69/7
69/8 69/9
**strongly [1]** 26/23
**structure [1]** 88/12
**structured [1]** 114/3
**structures [1]** 36/18
**struggling [1]** 38/14
**stuck [1]** 221/7
**stuff [2]** 193/11 217/8
**sub [4]** 31/1 31/3
36/8 47/24
**subject [14]** 60/14
61/15 64/8 66/13
125/4 160/25 176/8
177/2 177/11 179/24
184/11 188/4 188/11
191/7
**subject-to-and-without**
**-waiving [1]** 188/11
**submission [1]** 186/22
**submit [10]** 8/25
11/19 12/18 60/9
86/13 102/24 185/20
202/7 208/11 209/24
**submitted [4]** 25/17
186/15 202/4 216/5
**subs [1]** 36/16
**subsequent [4]** 55/25
56/1 140/22 225/1
**subset [1]** 213/11
**subsidiary [4]** 29/24
30/11 31/4 42/6
**substance [1]** 195/23
**substantially [1]**
230/3
**substantiate [1]** 144/8
**successfully [1]**
221/25
**succinctly [1]** 131/25
**suddenly [2]** 109/21
109/25
**sued [2]** 13/22 159/4
**suffered [3]** 29/1 34/2
34/3
**suffers [1]** 46/2
**sufficient [8]** 17/18
26/16 99/15 165/9
180/19 181/16
190/10 219/22
**sufficiently [1]** 63/23
**suggest [6]** 14/9
76/13 88/13 141/23
170/24 173/23

**S**

**suggesting [5]** 21/9
56/12 72/21 113/1
129/22
**suggestion [9]** 21/20
104/5 104/7 116/16
118/18 120/25 121/8
121/9 150/18
**suggests [3]** 98/2
148/12 219/3
**suing [1]** 220/23
**Suite [5]** 3/6 3/11
3/16 4/4 4/16
**suited [1]** 29/20
**sum [1]** 57/24
**summary [7]** 11/19
13/3 18/10 25/16
41/8 68/5 97/20
**summer [1]** 92/24
**superior [1]** 61/13
**supplemental [10]**
170/9 179/19 179/21
182/25 187/16
187/20 191/7 216/4
216/6 216/14
**support [6]** 59/11
61/19 63/16 98/4
204/22 222/5
**supporting [4]** 61/7
63/25 64/1 64/3
**suppose [3]** 77/22
113/25 118/7
**supposed [5]** 10/6
15/23 32/8 168/24
217/12
**sure [23]** 8/12 21/25
22/9 33/3 38/19
51/18 56/23 68/1
91/7 112/25 121/16
129/25 130/21 131/6
139/23 145/17
150/17 151/1 153/23
165/12 169/3 189/4
224/4
**surgical [1]** 127/19
**surprise [1]** 199/4
**surprised [1]** 226/20
**surprises [3]** 24/3
24/5 88/3
**surrounding [1]** 205/3
**survive [1]** 33/12
**suspect [6]** 73/5 80/4
98/2 102/19 173/14
176/20
**suspicious [2]** 205/5
205/8
**sweat [1]** 160/19
**sworn [2]** 192/19
205/6
**synthesize [1]** 87/22

**T**

**Tab [2]** 198/19 199/20
**table [7]** 6/14 8/2
18/17 121/1 158/16
206/17 220/3
**Tabs [1]** 198/21
**tackle [1]** 26/5
**tailor [1]** 156/22

**take [40]** 27/12 43/13
45/4 45/10 56/17
69/1 69/6 70/12
70/18 74/20 84/9
95/10 97/15 114/9
115/11 117/15
117/17 120/21 126/7
127/19 130/5 131/13
142/7 142/20 159/11
163/20 166/7 173/3
174/13 191/21
194/21 200/23
201/16 201/17
210/20 211/5 211/19
211/21 214/10 224/2
**takeaway [1]** 172/8
**taken [12]** 28/3 28/14
45/14 70/20 115/21
124/2 125/23 143/4
165/2 201/20 215/21
218/21
**takes [10]** 57/9 84/24
99/13 142/18 170/17
171/6 177/20 183/24
186/1 202/12
**taking [10]** 16/6
20/25 21/11 21/15
21/17 46/14 51/6
98/11 227/17 227/18
**talk [15]** 17/6 17/20
19/3 38/17 42/1
68/14 70/25 87/6
89/24 114/10 114/20
141/19 183/19
184/21 221/14
**talked [2]** 44/3 97/19
**talking [25]** 14/7
15/13 16/2 32/21
73/2 74/24 77/10
77/11 85/15 87/3
90/24 95/22 108/18
116/7 119/5 128/21
128/23 134/20
134/21 146/20
147/16 163/14 172/5
173/10 225/16
**Tallahassee [1]** 3/7
**Tampa [2]** 4/16 4/17
**tangentially [1]** 192/5
**target [2]** 129/15
132/13
**targeted [1]** 103/25
**task [1]** 99/5
**tax [17]** 60/19 61/16
81/16 155/2 183/2
183/3 183/7 183/9
183/23 184/7 184/9
184/13 184/16
184/18 185/7 185/11
185/19
**tax-related [1]** 81/16
**taxable [1]** 206/5
**taxation [5]** 204/6
204/7 204/13 204/15
208/9
**taxes [1]** 183/8
**taxing [2]** 190/19
204/18
**taxpayer [1]** 183/20

**tea [1]** 28/18
**team [1]** 137/24
**teams [1]** 114/21
**tease [1]** 89/21
**tech [1]** 160/18
**technically [2]** 142/8
148/20
**technological [1]**
164/1
**technology [2]** 54/8
124/25
**tell [14]** 18/18 40/21
41/10 42/15 50/14
80/19 99/12 101/18
103/11 126/15
141/13 155/19
168/14 193/17
**telling [6]** 6/4 61/2
62/25 72/7 113/13
162/14
**tells [4]** 92/2 173/2
186/22 223/12
**temporary [6]** 42/19
75/21 98/3 100/10
122/13 122/16
**ten [8]** 70/12 70/14
70/16 70/18 111/16
111/17 142/21
214/11
**ten-minute [2]** 70/18
142/21
**tend [1]** 151/6
**tends [1]** 220/19
**tens [2]** 94/4 152/7
**term [3]** 158/1 174/24
175/17
**terminated [1]** 45/9
**terminating [1]** 45/11
**termination [2]** 35/1
44/22
**terminology [1]**
183/22
**terms [13]** 31/17 32/4
33/10 39/9 51/14
51/15 52/4 110/24
129/8 131/11 131/14
137/19 159/2
**terrific [1]** 8/19
**testified [3]** 130/22
130/24 131/1
**testifier [1]** 226/8
**testimony [5]** 130/23
139/16 205/6 208/20
217/18
**Thank [59]** 7/24
18/21 25/5 28/13
31/5 37/24 39/21
48/8 48/24 56/16
57/16 67/19 67/20
71/9 75/2 79/11
92/12 104/16 115/7
115/18 116/3 116/12
119/8 119/9 123/3
123/5 140/11 142/14
143/2 143/3 158/13
166/6 177/19 179/6
179/7 179/17 187/13
197/1 197/4 197/15
201/11 201/18

202/20 202/25
207/16 212/21 213/4
217/25 218/2 223/3
224/1 224/20 226/16
228/5 228/12 230/16
230/22 231/4 231/11
**Thanks [1]** 178/19
**Thanksgiving [8]** 19/7
22/7 101/4 141/4
178/15 181/19 182/7
182/13
**that,' [1]** 92/4
**theft [2]** 63/4 63/5
**theory [2]** 10/4 32/1
**thereafter [2]** 22/2
92/20
**therefore [5]** 16/22
53/23 58/19 64/3
217/8
**thereto [1]** 148/1
**thing [21]** 20/4 26/22
38/16 52/3 73/11
76/14 98/10 109/6
117/20 150/6 151/21
160/19 162/2 163/1
188/21 189/5 189/10
193/17 195/23 215/1
229/16
**things [39]** 8/18
43/14 51/23 53/2
59/11 59/22 59/24
60/6 71/1 74/6 76/8
79/25 112/7 114/18
127/21 129/24 130/4
131/18 132/14 142/1
144/16 150/1 150/2
151/5 151/6 153/10
160/15 161/24 162/6
165/23 168/21
172/17 189/24
190/16 203/2 205/22
208/7 213/13 218/19
**think [145]** 9/17
12/23 17/9 17/16
18/1 18/22 20/19
21/10 22/14 23/6
24/9 27/18 31/12
33/4 37/22 38/16
40/10 40/18 41/25
42/6 42/21 51/10
51/14 51/17 52/18
52/19 68/23 69/12
71/24 73/1 73/11
73/21 73/22 73/24
76/1 78/25 79/14
80/7 81/1 81/4 81/5
81/5 81/12 81/21
81/22 82/8 82/16
83/20 86/23 87/2
87/11 90/6 90/19
91/23 92/1 92/17
93/6 93/16 95/23
96/9 97/11 97/13
98/18 99/19 101/3
101/5 102/8 102/17
102/21 103/20 104/4
104/7 104/9 106/16
107/5 107/13 108/16
108/19 108/20

109/20 111/10 112/4
114/1 114/17 115/1
115/4 117/16 117/24
118/3 120/4 120/11
123/17 127/17
128/24 130/11
131/11 132/21
134/18 134/20
134/21 134/24
135/12 135/18 136/4
136/6 137/6 137/7
137/14 138/10
139/19 139/21
141/23 142/11
142/18 146/11 148/8
149/16 152/7 153/15
153/18 154/10
154/17 157/6 167/2
170/2 176/7 176/19
181/4 182/13 185/19
186/13 186/15 187/5
194/18 194/23
200/25 207/2 207/13
212/17 212/17 225/2
228/25 229/14
229/16 230/4
**thinking [2]** 76/9 83/1
**thinks [2]** 94/7 109/2
**third [11]** 34/9 34/25
50/5 50/22 96/24
121/20 151/7 205/10
220/22 226/23 228/3
**third-party [2]** 96/24
220/22
**thou [1]** 185/12
**though [8]** 40/4 55/1
105/19 156/3 156/7
166/17 180/11
215/18
**thought [10]** 73/16
74/7 75/4 105/12
136/18 143/16 155/8
203/23 204/1 225/4
**thoughts [9]** 8/17
72/5 74/2 74/23 75/4
91/6 91/9 194/16
229/7
**thousand [3]** 88/14
88/14 189/12
**thousands [5]** 77/11
94/5 152/8 197/21
200/7
**three [18]** 28/21
33/23 36/14 63/10
105/7 111/16 138/21
138/22 138/24
190/14 190/15
190/16 203/5 210/13
213/16 214/6 218/19
218/22
**three-week [2]** 138/21
138/22
**threw [1]** 132/14
**through 232 [1]** 2/9
**throughout [2]** 65/17
65/18
**throw [1]** 97/22
**thrown [1]** 77/6
**thumbs [1]** 6/17

**T**

Thursday [2] 22/1
178/14
tied [2] 79/7 130/2
ties [1] 133/21
TIFF [4] 198/7 198/12
199/17 200/14
TIFF-load [1] 198/12
TIFFs [1] 199/22
till [1] 178/20
tilt [1] 199/25
time [74] 8/15 8/17
9/5 10/16 14/13 18/4
20/7 20/10 50/23
61/13 64/16 65/5
65/10 66/16 66/19
67/8 70/13 70/19
72/25 76/23 82/9
88/19 91/13 93/20
97/21 98/5 99/15
100/6 106/10 108/12
111/12 113/15
117/10 117/15 130/5
130/6 132/16 132/20
132/22 133/9 135/23
136/20 140/8 148/24
150/13 152/2 153/22
159/1 167/21 173/4
180/19 181/16
183/24 186/25 187/4
194/22 195/19
199/22 206/9 211/4
212/2 215/15 220/3
222/17 227/9 227/24
228/10 229/1 229/2
229/9 229/12 229/21
230/23 231/8
timeframe [1] 16/2
timeframes [1] 139/7
timeline [2] 147/11
193/21
timely [4] 209/10
209/13 209/13
212/12
times [3] 105/7
156/19 198/4
timing [8] 17/20
18/22 48/13 68/14
68/17 92/10 140/2
141/6
tip [1] 168/6
Title [1] 216/15
today [33] 6/21 9/10
50/12 57/10 79/16
81/11 81/21 82/7
82/13 88/22 89/22
90/3 90/5 90/19
91/11 91/17 91/22
91/24 95/16 97/20
120/19 133/6 134/11
142/4 152/24 165/21
189/24 217/22
222/16 224/9 227/13
230/23 231/8
together [5] 37/10
41/23 76/20 121/19
197/22
told [12] 11/8 26/25
27/24 39/15 40/20

81/15 112/25 117/21
154/3 184/6 194/11
228/14
ton [3] 40/4 85/22
204/10
took [12] 20/21 28/11
45/9 45/9 56/1 61/14
195/21 209/16 210/6
210/10 210/13
214/24
top [1] 43/1
topic [1] 143/25
tort [2] 63/19 63/22
total [4] 88/23 93/3
119/19 119/19
totaling [1] 94/19
totally [1] 108/4
touch [1] 150/15
touched [1] 34/16
tough [1] 196/22
toward [1] 44/25
track [1] 173/17
tracking [2] 41/3
173/7
transaction [17] 13/13
17/5 17/17 18/15
18/16 42/2 44/6 44/8
44/8 55/8 55/9 76/6
106/24 109/22
116/23 125/11
205/19
transaction' [2]
110/13 110/14
transactions [18]
10/24 14/1 17/5
17/17 18/1 18/6
19/19 45/24 55/11
61/16 81/15 96/5
98/24 99/1 99/10
100/12 100/13 109/8
transcript [5] 2/3
183/23 185/7 229/20
232/7
transcripts [2] 126/5
208/7
transfer [35] 29/17
29/19 30/1 30/10
30/12 30/15 30/16
30/21 34/15 34/18
34/21 42/4 42/13
42/16 43/25 44/2
44/5 44/11 46/11
46/12 47/18 47/23
51/22 51/25 52/4
52/8 52/10 52/11
52/21 55/6 55/24
56/14 111/3 190/8
216/16
transferee [5] 55/23
55/25 56/1 56/2 56/3
transferees [1] 55/22
transferred [1] 55/5
transfers [4] 29/18
42/24 61/17 84/14
travel [1] 205/18
treatment [3] 227/5
227/20 228/2
trends [1] 85/2
trial [106] 10/1 13/15

13/16 13/20 18/9
31/10 37/23 71/13
71/18 71/22 71/22
72/17 74/10 74/10
74/17 75/6 75/24
76/13 80/16 87/14
89/7 89/13 90/17
92/11 92/14 92/15
92/18 92/19 92/20
92/23 92/25 93/7
93/8 96/2 97/10
97/21 99/16 104/3
105/1 105/2 105/5
105/6 106/8 107/7
107/8 108/24 109/3
110/12 114/13
116/18 117/2 117/12
117/22 117/24 118/4
118/12 118/14
118/15 120/2 120/7
120/11 123/1 123/10
127/21 128/18
129/22 129/25
131/20 132/4 132/7
134/16 134/17
134/20 135/19 136/1
136/2 136/2 136/4
136/8 136/12 136/17
136/19 136/20
136/23 137/9 139/12
140/2 140/7 140/21
140/24 141/2 141/2
141/9 141/13 142/6
144/2 147/4 147/19
153/6 154/20 196/9
204/24 205/21 210/6
215/13 225/8
trial-setting [1] 109/3
trials [1] 139/9
tried [19] 41/7 45/10
45/10 72/1 76/15
76/20 76/23 76/25
77/2 88/1 88/1
102/11 106/17 107/5
113/14 113/15
159/25 168/7 197/22
trifurcate [1] 132/2
true [12] 45/15 73/10
106/23 109/19
111/25 145/9 146/19
158/17 203/17
204/24 211/19 232/8
trust [25] 1/6 1/9
1/16 9/25 25/10
29/22 31/6 31/13
32/15 33/6 34/6
34/18 35/5 35/6
35/11 35/14 47/5
47/9 61/10 61/22
76/19 95/25 100/2
121/12 121/15
trusted [1] 159/15
trustee [6] 1/6 1/8
1/15 35/11 57/19
67/13
trustee's [1] 221/25
try [38] 7/25 19/10
20/2 46/25 52/3
54/23 67/4 72/24

73/17 74/3 74/5
87/17 94/23 109/9
113/3 116/22 118/3
118/11 119/1 120/22
121/1 127/24 128/17
129/15 133/4 134/15
136/25 141/22
141/24 159/16 160/3
160/5 160/7 161/25
162/18 162/19 170/7
212/19
trying [37] 14/20
19/24 19/25 20/1
40/23 49/22 51/12
70/22 87/9 87/25
88/13 88/16 97/24
108/2 108/14 114/11
121/10 121/11
121/24 128/3 128/4
131/8 131/18 131/19
132/19 135/5 160/9
160/22 161/7 162/5
162/6 168/11 168/13
178/15 199/8 229/1
229/5
Tuesday [1] 216/6
tune [1] 114/22
Turkey [2] 217/3
219/20
turn [5] 24/18 33/19
54/21 60/14 202/19
turning [2] 47/1
119/23
turns [2] 18/10 166/5
TV [1] 202/23
TWELFTH [2] 1/1
140/9
twenty [3] 94/14
185/11 185/11
Twenty-six [1] 94/14
twenty-twenty [1]
185/11
twice [3] 105/7
133/15 226/23
two [78] 8/23 23/13
26/1 27/10 58/6
61/12 69/7 69/21
72/19 72/23 72/23
87/18 93/5 96/2 97/9
101/9 102/22 105/16
107/21 111/11
111/11 117/2 118/5
127/5 128/24 129/9
129/11 129/13 130/4
130/7 130/9 132/7
132/17 135/18
135/19 135/20
135/21 135/24
135/25 136/1 136/2
136/7 137/1 137/8
138/21 139/9 141/2
149/18 155/10
155/12 155/12
171/24 180/10
183/11 184/3 185/12
185/23 186/14 193/1
193/19 195/15
199/13 199/21
202/13 203/3 203/8

203/24 203/25
205/22 210/19 211/3
211/6 212/5 213/14
213/25 214/23
215/13 218/21
two-page [1] 186/14
two-week [2] 136/2
141/2
twofold [1] 155/7
type [1] 200/25
types [2] 25/15 211/9
typically [2] 176/24
177/7

**U**

U.S [1] 175/19
Uh [4] 117/13 185/16
186/2 190/17
Uh-huh [4] 117/13
185/16 186/2 190/17
ulterior [1] 28/24
ultimate [2] 112/19
201/2
ultimately [7] 18/7
33/11 37/23 74/15
112/17 184/13 221/8
unable [4] 10/25 15/2
221/22 221/24
unaltered [2] 144/7
144/22
unavailable [1] 117/22
unaware [1] 60/5
unclear [4] 125/6
125/7 167/12 172/15
uncontrovertible [1]
36/9
underlying [4] 53/14
53/21 53/22 63/16
undermine [5] 159/16
160/1 160/5 161/25
162/18
undermines [1] 222/2
understand [32] 10/23
22/9 24/5 42/7 45/6
51/18 72/8 75/16
81/18 84/14 89/12
91/21 111/7 112/25
115/2 118/16 121/16
125/17 131/12
145/17 146/9 152/4
164/24 172/25 174/3
184/9 198/1 198/8
200/9 200/10 200/12
214/9
understanding [14]
13/22 18/4 42/5
69/12 69/19 87/12
87/19 90/5 98/23
135/2 146/12 149/11
152/22 174/4
understood [14] 28/17
40/5 40/5 48/24
87/15 91/25 117/8
117/13 135/10
135/14 137/13 167/7
181/1 205/16
undertaken [1] 206/10
undertaking [1] 222/7
undisputed [1] 208/20

**U**

**unduly [3]** 172/1
172/3 173/23
**unfavorable [1]**
110/24
**unfolded [1]** 203/25
**uniform [3]** 29/16
204/14 206/6
**uniformed [1]** 204/14
**unilaterally [1]** 229/14
**unique [1]** 85/25
**uniquely [1]** 29/20
**unity [2]** 46/8 46/16
**universal [1]** 223/23
**unjust [8]** 16/21
16/24 63/13 63/15
63/17 63/19 63/24
96/10
**unjustly [3]** 12/9
12/25 13/1
**unknown [1]** 59/12
**unless [18]** 8/8 27/1
27/5 27/17 30/18
47/22 56/11 60/13
71/2 78/1 91/14 92/2
92/7 94/7 145/21
200/22 201/3 230/8
**unnecessary [2]** 14/22
208/14
**unopposed [3]** 201/23
202/2 210/3
**unquote [1]** 83/23
**unreasonable [2]**
208/14 222/11
**unspecified [4]** 10/15
10/16 10/16 157/24
**unsubstantiated [1]**
144/10
**unsupported [1]**
208/14
**unwieldly [1]** 13/14
**unworkable [1]** 111/18
**upcoming [1]** 147/21
**updated [1]** 149/7
**updating [1]** 148/25
**upon [1]** 164/22
**urgent [1]** 75/22
**us [60]** 3/15 3/19
15/19 16/1 18/3 24/4
24/19 28/8 49/21
51/22 57/9 70/7
70/15 70/17 72/23
80/19 107/18 108/13
115/5 116/16 119/25
121/2 126/12 127/6
128/17 128/22
131/21 132/5 132/20
132/21 136/9 139/3
139/24 142/18
143/17 156/21
157/15 157/17 158/5
158/9 167/4 170/7
171/6 172/7 172/19
174/13 175/25
177/20 183/19
184/10 193/16 198/6
198/6 198/14 202/12
206/4 206/19 223/13
226/12 231/3

**use [17]** 12/20 20/2
65/20 91/21 95/13
98/9 116/17 117/19
120/3 135/6 147/16
163/7 170/25 174/24
175/17 215/22
217/18
**used [15]** 10/16 12/10
12/12 14/15 39/10
39/12 58/5 58/5 82/1
145/8 171/15 174/25
175/6 188/21 189/6
**uses [1]** 69/22
**using [5]** 18/20 19/23
32/4 81/13 157/7
**utilization [1]** 58/17

**V**

**vague [9]** 12/18
169/10 170/3 170/4
170/7 170/13 170/14
175/4 175/8
**Valentine's [1]** 136/5
**valid [8]** 44/12 96/9
110/13 110/14 118/6
118/7 124/20 227/15
**validity [5]** 76/5
106/23 116/23 118/1
203/11
**valuable [1]** 171/15
**valuation [112]** 32/23
32/25 33/2 33/7
33/11 72/10 72/13
72/22 72/25 73/3
73/6 73/9 73/17
73/25 75/10 75/15
76/3 76/5 76/16
76/18 76/18 76/22
77/5 77/13 77/15
77/17 77/25 78/3
78/9 78/10 78/23
79/2 79/13 79/17
79/17 80/1 80/8
80/18 82/4 82/12
84/2 84/5 84/19
84/25 87/13 88/10
88/18 91/17 92/25
94/22 94/24 94/25
95/2 95/24 98/2 98/7
98/13 98/25 104/8
105/12 105/18
105/20 106/12
107/14 108/15 109/4
111/9 111/14 111/24
112/2 112/6 112/14
112/16 112/23 113/1
113/3 113/5 113/20
114/15 114/24
114/25 115/3 116/23
118/2 118/8 118/8
118/11 119/18 120/3
120/5 121/19 122/7
124/7 124/8 125/8
128/21 129/1 132/19
132/23 135/1 135/6
135/9 135/16 135/17
145/7 148/5 148/6
148/8 152/4 152/21
154/15 221/17

**valuations [3]** 72/24
111/11 111/16
**value [54]** 37/3 48/4
55/15 55/17 56/1
61/3 65/21 71/12
72/4 78/3 78/4 78/5
78/16 78/17 78/18
78/19 78/20 84/17
85/16 85/25 86/2
86/5 86/11 88/23
90/6 96/16 96/19
100/22 101/21
101/23 102/3 102/4
103/6 103/12 105/21
108/8 108/14 110/15
112/6 112/18 113/21
113/23 125/3 160/7
162/6 162/7 162/17
163/13 171/19 174/8
188/21 189/5 189/10
211/14
**valued [1]** 119/16
**variants [1]** 185/23
**various [4]** 63/9 95/11
99/10 136/14
**vast [1]** 41/12
**vastly [1]** 102/23
**Vastrick [1]** 208/18
**vehicle [1]** 32/18
**vendor [3]** 199/5
201/5 208/3
**vernacular [1]** 87/2
**versus [3]** 28/9 38/17
98/11
**vests [1]** 124/21
**VI [2]** 35/18 45/20
**via [4]** 5/6 5/8 8/1
207/18
**video [2]** 71/7 71/7
**view [16]** 25/14 75/16
76/17 82/3 84/22
89/5 101/17 101/18
102/2 127/18 134/14
136/21 140/25 157/3
201/2 208/8
**viewing [2]** 117/18
157/16
**violation [2]** 52/10
100/17
**virtue [1]** 43/10
**volume [1]** 54/22
**voluntary [1]** 30/7
**vs [4]** 1/4 1/11 1/20
62/10

**W**

**Wacker [1]** 4/11
**wait [3]** 117/7 153/21
182/13
**waiting [2]** 74/12
184/4
**waiver [1]** 119/13
**waiving [6]** 176/9
177/3 179/24 188/4
188/11 191/8
**walk [3]** 82/5 89/10
90/4
**WALTERS [1]** 5/3
**want [88]** 8/12 18/8

18/8 18/11 18/14
18/17 18/18 23/17
23/18 25/20 33/22
34/25 38/4 38/7 40/8
40/16 49/15 49/19
55/1 56/5 65/2 67/24
70/13 75/9 83/14
85/14 85/15 86/19
87/5 87/14 87/19
88/3 89/1 89/13 91/5
98/20 102/17 104/14
104/17 106/24 107/9
107/10 107/10 110/9
110/11 114/20
122/11 122/25
124/12 125/21
127/23 129/19
129/25 131/23
131/24 132/2 132/18
134/2 135/8 135/24
135/25 137/20 142/5
142/7 142/9 147/16
147/24 148/10
158/15 159/12
160/13 161/13
165/11 167/24 169/2
173/15 186/2 186/19
186/25 192/20
199/22 200/6 203/2
210/21 221/14
226/14 228/6 228/22
**wanted [7]** 38/8 38/18
134/12 150/15
150/16 161/9 187/18
**wanting [1]** 98/6
**wants [6]** 74/23 115/8
116/7 208/10 208/23
225/15
**warrant [1]** 26/16
**warranted [1]** 86/18
**warranting [1]** 84/22
**Washington [1]** 3/20
**waste [4]** 33/24 34/7
44/23 44/25
**wasted [1]** 229/21
**wasting [1]** 229/1
**way [52]** 8/9 8/10
20/4 32/17 41/4 43/6
43/20 46/7 53/22
54/2 56/10 61/18
67/1 73/16 77/23
82/12 85/9 93/10
96/1 96/3 96/4 97/10
97/14 101/5 102/2
106/25 114/1 123/2
123/23 129/16
130/22 131/16 132/8
132/12 132/21
137/17 149/11 152/8
152/9 157/9 160/23
163/8 170/8 170/10
170/11 182/16
191/20 199/1 214/16
225/2 226/12 230/6
**ways [3]** 43/8 63/9
80/17
**WBDH [1]** 36/11
**WBDH-BC [1]** 36/11
**WEAVER [5]** 3/5 3/9

6/24 7/8 7/23
**website [1]** 71/6
**wedding [4]** 191/4
191/9 191/18 199/7
**Wednesday [9]** 22/15
178/16 181/19 182/3
182/16 182/17
190/24 194/25 195/5
**week [31]** 19/6 19/7
19/8 23/20 74/9
74/17 101/4 117/22
118/3 118/10 118/12
120/6 120/10 120/12
125/14 136/2 136/12
138/21 138/22
139/12 141/1 141/2
141/2 141/3 165/25
178/7 178/13 178/13
178/19 186/9 195/4
**weekend [1]** 23/11
**weeks [12]** 13/15
68/19 93/5 94/16
128/6 135/21 138/24
153/11 183/11 184/3
198/5 210/13
**weigh [4]** 68/22 86/21
103/9 104/6
**weighs [2]** 216/24
221/13
**WEISSLER [2]** 3/5 3/9
**welcome [2]** 201/19
202/21
**well [88]** 8/4 8/18 9/8
11/10 12/11 14/23
17/8 19/15 19/17
20/12 22/13 22/13
47/16 49/17 51/5
51/22 57/8 59/15
60/25 62/20 64/21
76/7 77/3 79/1 79/8
79/23 83/8 83/11
84/23 87/21 90/21
91/14 94/20 98/24
99/25 103/10 104/11
110/8 113/25 115/7
115/16 116/4 117/9
118/22 119/24
120/14 122/15
124/16 125/22
126/11 126/18
127/17 129/13
130/11 130/18
132/25 134/6 150/16
152/9 152/13 154/14
159/17 161/11
162/13 163/5 166/5
169/23 170/2 170/6
172/7 172/15 173/5
173/20 174/2 176/20
176/24 182/10
184/12 184/17
184/21 186/23 188/8
192/7 196/7 207/1
209/2 216/3 229/7
**well-being [1]** 159/17
**went [8]** 43/15 85/5
149/24 150/4 151/18
166/19 189/22
203/16

**W**

**West [1]** 5/3
**whatever [17]** 18/10 23/17 38/17 39/22 59/23 65/19 98/12 101/9 109/1 109/2 125/20 128/13 135/8 148/2 185/9 187/4 195/2
**whatnot [1]** 93/25
**whatsoever [1]** 37/12
**Where'd [1]** 201/13
**whereas [1]** 109/22
**wherefore [2]** 69/23 199/16
**whether [42]** 10/23 10/25 18/9 21/23 46/5 51/2 55/1 88/8 88/16 89/2 99/9 103/13 105/20 110/8 111/21 114/16 124/18 124/19 125/10 125/10 125/11 125/19 127/8 129/3 129/5 135/11 136/21 136/23 152/14 163/24 170/17 171/16 172/20 173/20 174/5 174/6 206/7 207/7 217/22 219/24 221/1 228/23
**whole [4]** 34/4 107/16 139/15 208/12
**wholly [9]** 29/24 30/11 31/1 31/3 36/7 36/16 42/6 47/24 208/20
**wholly-owned [8]** 29/24 30/11 31/1 31/3 36/7 36/16 42/6 47/24
**will [86]** 9/21 19/16 24/5 25/11 28/17 37/22 38/1 60/14 72/3 73/4 78/3 78/8 80/11 80/12 81/13 82/8 84/8 86/10 93/18 94/8 96/15 101/16 101/17 101/21 104/5 104/25 106/4 107/4 107/11 109/1 109/5 112/8 112/12 113/18 119/20 120/15 121/6 132/24 134/25 136/21 136/23 136/23 137/1 138/20 139/2 139/4 140/1 140/24 142/6 142/15 142/15 153/1 153/22 153/23 153/24 154/1 154/14 154/16 154/23 157/17 165/6 166/4 166/6 171/4 174/1 175/22 180/5 181/2 193/16 193/17 195/6 196/3 196/11 196/20 196/25 212/9

212/24 212/25 221/15 221/18 225/8 225/9 225/12 225/13 228/24 231/9
**willful [1]** 38/24
**Williams [1]** 49/4
**willing [4]** 116/25 139/18 184/25 200/22
**winded [1]** 230/6
**Windmill [2]** 221/12 221/20
**wired [1]** 169/19
**wish [1]** 133/1
**wished [1]** 41/18
**wishes [1]** 201/3
**withdrawing [1]** 177/23
**withdrawn [1]** 178/1
**withheld [2]** 41/11 188/6
**within [6]** 16/7 76/7 77/17 114/16 157/10 164/19
**without [40]** 9/1 32/15 42/14 42/23 43/2 55/10 72/15 80/2 84/18 91/15 91/16 92/3 101/25 105/12 118/4 119/13 120/23 170/6 173/22 176/8 176/11 177/2 177/13 179/24 188/4 188/11 191/8 191/19 192/9 196/22 201/7 201/12 206/2 209/22 212/4 214/16 214/18 222/12 228/15 229/24
**witness [1]** 227/25
**Wolfe [3]** 2/17 232/4 232/19
**wondering [6]** 72/22 89/5 125/9 128/16 153/3 225/25
**word [10]** 66/12 167/12 169/10 169/13 169/15 169/16 170/2 170/20 175/6 191/21
**wording [1]** 168/12
**words [6]** 11/5 13/24 23/7 77/12 133/10 200/1
**work [39]** 18/12 22/3 22/7 22/21 22/22 23/20 48/20 48/20 68/18 70/6 70/14 74/16 103/2 105/19 105/19 106/15 107/10 107/11 109/1 114/4 114/6 115/13 115/15 118/5 137/10 137/18 138/17 138/17 139/18 140/10 142/23 148/20 158/5 176/23 178/24 195/6 197/16 212/15 212/19

**working [9]** 68/17 76/9 80/22 80/25 124/5 137/3 137/6 140/21 143/18
**works [3]** 22/3 70/7 149/12
**world [3]** 147/17 148/11 162/15
**worlds [2]** 101/19 101/19
**worry [1]** 98/10
**worth [7]** 48/3 82/8 162/8 183/2 183/7 183/9 210/24
**worthless [2]** 162/12 162/13
**Wow [1]** 194/14
**wrap [3]** 35/17 37/10 97/24
**wrapped [7]** 32/23 33/1 73/25 113/23 114/25 166/14 217/15
**write [4]** 50/16 56/10 168/8 168/13
**writing [3]** 69/25 126/20 175/16
**written [10]** 14/23 56/10 64/16 126/16 126/19 126/24 127/7 131/4 164/22 175/20
**wrong [13]** 32/4 33/15 57/6 63/19 63/22 74/1 116/24 145/25 152/17 152/18 188/12 194/2 225/24
**wrongdoing [1]** 205/1
**wrongful [3]** 29/3 63/16 223/20
**wrote [1]** 169/19

**Y**

**YACHT [7]** 1/24 3/3 24/24 40/23 56/24 57/4 71/17
**Yeah [14]** 15/9 21/21 45/8 50/19 68/11 83/13 83/13 102/5 103/20 134/6 141/13 164/20 168/6 191/22
**year [19]** 14/1 16/10 64/9 99/25 100/4 107/22 110/22 122/13 150/19 153/12 153/12 153/17 153/19 153/19 154/6 159/5 199/3 211/1 222/11
**year-end [1]** 154/6
**years [10]** 58/22 64/11 105/10 105/17 107/22 121/12 123/19 160/21 212/17 216/21
**years' [3]** 183/2 183/7 183/9
**yes [53]** 7/14 9/21 12/1 13/19 18/24 23/9 25/4 33/17

67/21 67/23 69/4 70/9 87/8 88/4 115/18 116/2 122/24 122/25 130/13 133/17 140/23 141/8 142/25 143/1 143/19 155/6 155/13 166/24 167/1 171/7 171/13 174/15 177/22 178/10 179/14 182/6 182/20 182/23 187/12 187/15 190/4 191/1 191/19 192/2 193/7 194/13 194/15 195/13 196/24 198/17 202/3 223/5 225/18
**yesterday [5]** 8/7 11/16 18/23 56/24 142/4
**yet [13]** 37/9 37/11 50/4 55/9 73/10 74/14 77/7 77/19 96/22 106/1 155/1 185/6 228/8
**your-alls [1]** 77/7

**Z**

**zero [1]** 162/7
**zoom [19]** 3/9 3/19 4/9 4/10 4/10 4/15 5/8 6/3 6/16 6/22 7/19 8/3 19/4 70/23 75/1 102/19 115/15 115/15 208/2

# EXHIBIT 32

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART COMMUNI-
CATIONS HOLDING, INC.

      Plaintiffs,

v.                 Case No. 2023-CA-1002-NC

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust, dated February 10, 2021;
and ALEXIS LOGAN,

      Defendants.    /
_____

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021,

      Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART COMMUNICA-
TIONS HOLDING, INC., SMART COMMUNICA-
TIONS HOLDING, LLC, HLFIP HOLDING, INC,
and HLFIP HOLDING, LLC,

      Counterclaim Defendants.  /
_____

JANICE LOGAN, as Trustee of the James Logan    (CONSOLIDATED)
Family Trust, dated February 10, 2021, and deriva-
tively on behalf of Smart Communications Holding,
Inc.,
                  Case No.: 2023-CA-1280-NC

      Plaintiff,

    v.

JONATHAN D. LOGAN,
SMART COMMUNICATIONS HOLDING, INC.,
nominal defendant, SMART COMMUNICATIONS
HOLDING, LLC, HLFIP HOLDING, LLC, LOCO
FLORIDA LLC, and SMART COMMUNICA-
TIONS YACHT HOLDING, LLC,

      Defendants.     /
_____

## DEFENDANT HLFIP HOLDING, LLC'S AMENDED RESPONSES AND OBJECTIONS
## TO JANICE LOGAN'S FIRST REQUESTS FOR ADMISSION

Defendant HLFIP Holdings, LLC ("HLFIP"), by and through undersigned counsel and pursuant to Fla. R. Civ. P. 1.370, hereby responds and objects to Plaintiff Janice Logan's, as Trustee of the James Logan Family Trust, dated February 10, 2021 ("Janice" or "Plaintiff") First Set of Requests for Admission to HLFIP Holdings, LLC, served on July 24, 2024, as follows:

## <u>GENERAL OBJECTIONS</u>

1.      HLFIP objects to any Definition or Instruction that imposes requirements upon HLFIP or seeks to require HLFIP to provide information or assume an obligation beyond those imposed by law or set forth in the Florida Rules of Civil Procedure.

2.      HLFIP objects to the Requests to the extent they seek information for a time period beyond that placed at issue by the claims in the operative pleadings or allowed by applicable statute (e.g., Fla. Stat. § 607.1436(4)). Unless otherwise noted, HLFIP will provide information and documents for the time period placed at issue by the Parties' claims, as limited by applicable laws or the Court.

3.      HLFIP objects to the Requests to the extent they call for information protected by the attorney-client privilege or work product doctrine, or any other applicable privilege, rule, statute, or law. To the extent that any such information is inadvertently provided, it shall not be deemed a waiver of any applicable privilege, immunity, or protection.

4.      HLFIP expressly conditions its Response to each and every Request upon completion of further discovery and reserves the right to amend and/or supplement any Response as discovery of additional information may from time to time require.

5.      HLFIP objects to the Requests to the extent they are overbroad, unduly burdensome and/or seek to impose upon HLFIP an undue expense or burden that properly should be borne by Plaintiff.

6.      HLFIP objects to the Requests to the extent they seek or encompass information that (a) is not relevant to the issues in the above-captioned case or (b) is not reasonably calculated to lead to the discovery of admissible evidence. HLFIP does not concede the relevance of any information provided in response to the Requests and expressly reserves the right to object to the introduction into evidence of any responses on relevance or any other grounds.

7.      HLFIP reserves the right to rely, at trial or in any other proceeding in this action or any other action, upon information in addition to that identified and/or provided in response to the Requests.

8.      Nothing contained herein shall be deemed to constitute an assent to the terms or definitions used in the Requests. The adoption and/or use by HLFIP of any term that Plaintiff defines in the Requests is for convenience only and is not intended as a waiver of any objection stated herein, nor shall it be deemed an admission in any respect.

9.       HLFIP reserves the right to challenge the competency, relevance, materiality, and admissibility of, or to object on any ground to the use of, information set forth in the Responses to the Requests.

10.     HLFIP objects to the Requests to the extent they seek information that Plaintiff already has in her possession, custody, or control.

11.     HLFIP objects to the Requests to the extent they assume the existence of facts that do not exist and the occurrence of events that did not occur. Any Response of HLFIP to an individual Request is not intended to be, and shall not be construed as, an admission that any factual predicate stated in the Request is accurate.

12.     Each of the foregoing "General Objections" is hereby incorporated into each of the Responses provided below.

3

## RESPONSES TO REQUESTS FOR ADMISSION

**1.      Admit that HLFIP holds U.S. Patent No. 10,291,617.**

**Response to RFA No. 1**: Admitted.

**2.      Admit that U.S. Patent No. 10,291,617 was not issued until May 14, 2019.**

**Response to RFA No. 2**: Admitted.

**3.      Admit that the claims of U.S. Patent No. 10,291,617 are invalid under 35 U.S.C. Section 101, for essentially the reasons articulated in *HLFIP Holding, Inc. d/b/a Smart Communications IP Holdings v. York Cnty., PA, et al.*, 600 F. Supp. 3d 526 (Case No. 1:20-cv-00186, ECF 135) (M.D. Pa. April 25, 2022) *aff'd sub nom. HLFIP Holding, Inc. v. York Cnty., PA*, 2022-1940, 2023 WL 5316529 (Fed. Cir. Aug. 18, 2023).**

**Response to RFA No. 3**: Denied.

**4.      Admit that HLFIP has never received any intellectual property license royalty payments from SmartComm.**

**Response to RFA No. 4**: HLFIP objects to this Request on the grounds that the terms "payment" and "received" are vague and ambiguous. HLFIP further objects to this Request because HLFIP reported income from SmartComm royalty payments on its 2022 Federal income tax return, pursuant to 26 U.S.C. § 482 (which permits the IRS to "allocate gross income" among "businesses … owned or controlled directly or indirectly by the same interests" as "necessary … clearly to reflect the income of any of such . . . businesses") and Treas. Reg. § 1.482-1 (which explains that section 482 "places a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer" and provides that "[i]n determining the true taxable income of a controlled taxpayer, the standard to be applied in every case is that of a taxpayer

dealing at arm's length with an uncontrolled taxpayer"). Subject to and without waiving the foregoing general and specific objections, HLFIP denies this Request.

5.     **Admit that there are no documents in your custody, possession, or control from prior to August 29, 2023, that reference the Royalty Fee.**

**Response to RFA No. 5**: HLFIP denies this Request because while there may be no documents from before August 29, 2023, that use the term "royalty" or "royalty fee," in 2015, James Logan, Jon Logan, Alexis Logan, Smart Communications US, and Smart Communications Holding entered into a written agreement that expressly recognized that "Jonathan Logan exclusively owns and will retain exclusive ownership" of the intellectual property for which Jon was the "inventor." Jon's ownership of the intellectual property that Jon invented or developed necessarily entitles him to reap the economic benefits of that intellectual property. Therefore, that 2015 agreement necessarily implies that SmartComm owed and owes royalties to Jon Logan (via what is now his wholly owned entity, HLFIP).

6.      **Admit that there are no documents in your custody, possession, or control from prior to August 29, 2023, that reference a 40% net sales intellectual property royalty license from SmartComm to HLFIP.**

**Response to RFA No. 6**: HLFIP denies this Request because while there may be no documents from before August 29, 2023, that use the term "royalty" or "royalty fee," in 2015, James Logan, Jon Logan, Alexis Logan, Smart Communications US, and Smart Communications Holding entered into a written agreement that expressly recognized that "Jonathan Logan exclusively owns and will retain exclusive ownership" of the intellectual property for which Jon was the "inventor." Jon's ownership of the intellectual property that Jon invented or developed necessarily entitles him to reap the economic benefits of that intellectual property. Therefore, that 2015 agreement necessarily implies that SmartComm owed and owes royalties to Jon Logan (via what is now his wholly owned entity, HLFIP).

Date: December 2, 2024                    Respectfully submitted,

*/s/ Christopher G. Oprison*
Christopher G. Oprison (FBN 122080)
Email:  chris.oprison@dlapiper.com
**DLA PIPER LLP (US)**
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131
Telephone:  (305) 423-8522
Facsimile:  (305) 657-6366

*Attorney for Defendant HLFIP*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on December 2, 2024, a true and correct copy of the foregoing document was served via email to all entitled parties and counsel of record appearing on the Court's service list at the time of service, and on December 2, 2024, a true and correct copy of the foregoing document was served via the Court's electronic portal to all entitled parties and counsel of record appearing on the Court's service list at the time of service.

*/s/ Christopher G. Oprison*
Christopher G. Oprison
