# EXHIBIT 21

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,

<div align="center">Plaintiffs,</div>

v.                                                      Case No. 2023-CA-1002-NC

JANICE LOGAN, individually, as Trustee of the James
Logan Family Trust, dated February 10, 2021, and as
Personal Representative of the ESTATE OF
JAMES LOGAN, JUSTIN PETERSON, and
ALEXIS LOGAN,

<div align="center">Defendants.</div>

_____/

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021,

<div align="center">Counterclaim Plaintiff,</div>

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC.,
SMART COMMUNICATIONS HOLDING, LLC, and
HLFIP HOLDING, LLC,

<div align="center">Counterclaim Defendants.</div>

_____/

JANICE LOGAN, as Trustee of the James Logan          (CONSOLIDATED)
Family Trust, dated February 10, 2021, and derivatively
on behalf of Smart Communications Holding, Inc.,

<div align="center">Plaintiff,</div>                  Case No.: 2023-CA-1280-NC

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., nominal
defendant, SMART COMMUNICATIONS HOLDING,
LLC, HLFIP HOLDING, LLC,
LOCO FLORIDA LLC, and SMART
COMMUNICATIONS YACHT HOLDING, LLC,

<div align="center">Defendants.</div>

_____/

## JANICE LOGAN'S NOTICE OF TAKING IN-PERSON,
## <u>VIDEOTAPED DEPOSITION OF JONATHAN LOGAN</u>

**PLEASE TAKE NOTICE** that pursuant to Rule 1.310 of the Florida Rules of Civil Procedure, counsel for the Janice Logan will take the following in-person, videotaped deposition upon oral examination before a court reporter or Notary Public in and for the State of Florida, or some other officer duly authorized by law to take depositions.

|  |  |
|---|---|
| **DEPONENT:** | **Jonathan Logan** |
| **DATE/TIME:** | **December 17, 2024** |
|  | **9:00 a.m. (EST)** |
| **LOCATION:** | **Akerman LLP** |
|  | **401 E. Jackson Street, Suite 1700** |
|  | **Tampa, FL 33602** |

The deposition is being taken for the purpose of discovery, for use at a hearing or trial, or all of the foregoing, and for such other purposes as are permitted under the Florida Rules of Civil Procedure and other applicable law. The oral examination will continue as needed on dates and times to hopefully be agreed upon by the parties and their counsel.

Pursuant to Rule 1.310(b)(4) the deposition will be videotaped. Janice will furnish the videographer's details closer to the date of the deposition.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been filed and served on all counsel of record via the Florida Court's e-filing portal, on November 1, 2024.

Dated:  November 1, 2024                    Respectfully submitted,

/s/   *David E. Schoenfeld*
Anitra R. Clement
Florida Bar No. 100354
**SHOOK, HARDY & BACON L.L.P.**
100 N. Tampa St., Ste. 2900
Tampa, FL 33602
Telephone: (813) 202-7100
aclement@shb.com

David E. Schoenfeld (FL PHV # 1047561)
Peter F. O'Neill (FL PHV # 1043125)
Andrew L. Franklin (FL PHV # 1035737)
Kailin Liu (FL PHV # 1051416)
**SHOOK, HARDY & BACON L.L.P.**
111 S. Wacker Dr., Ste. 4700
Chicago, IL 60606
Telephone: (312) 704-7700
dschoenfeld@shb.com
pfoneill@shb.com
afranklin@shb.com
kliu@shb.com

John D. Garretson (FL PHV #1057004)
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, MO 64108
Telephone:  (816) 474-6550
jgarretson@shb.com

***Counsel for Janice Logan, individually, as Trustee of the James Logan Family Trust, dated February 10, 2021, and as Personal Representative of the Estate of James Logan***

# EXHIBIT 22

**IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA**

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,

     Plaintiffs,

v.              Case No. 2023-CA-1002-NC

JANICE LOGAN, individually, as Trustee of
the James Logan Family Trust, dated
February 10, 2021, and as Personal
Representative of the ESTATE OF
JAMES LOGAN, JUSTIN PETERSON, and
ALEXIS LOGAN,

     Defendants.  /
_____

JANICE LOGAN, as Trustee of the James
Logan Family Trust, dated February 10,
2021,

     Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING,
INC.,
SMART COMMUNICATIONS HOLDING, LLC,
and HLFIP HOLDING, LLC,

     Counterclaim Defendants.
_____/

JANICE LOGAN, as Trustee of the James   (CONSOLIDATED)
Logan Family Trust, dated February 10,
2021, and derivatively on behalf of Smart
Communications Holding, Inc.,

     Plaintiff,      Case No.: 2023-CA-1280-NC

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC.,
nominal defendant, SMART
COMMUNICATIONS HOLDING, LLC, HLFIP
HOLDING, LLC,
LOCO FLORIDA LLC, and SMART
COMMUNICATIONS YACHT HOLDING, LLC,

     Defendants.
_____/

**NOTICE OF TAKING DEPOSITION OF
SMART COMMUNICATIONS HOLDING, INC.
<u>PURSUANT TO RULE 1.310(b)(6)</u>**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORDS:**

PLEASE TAKE NOTICE that pursuant to Rule 1.310(b)(6) of the Florida Rules of Civil Procedure, counsel for Janice Logan will take the following deposition upon oral examination before a court reporter or Notary Public in and for the State of Florida, or some other officer duly authorized by law to take depositions.

| | |
|---|---|
| **DEPONENT:** | **Smart Communications Holding, Inc.** |
| **DATE/TIME:** | |
| **LOCATION:** | **To be agreed upon by counsel for the parties** |

The deposition is being taken for the purpose of discovery, for use at a hearing or trial, or all of the foregoing, and for such other purposes as are permitted under the Florida Rules of Civil Procedure and other applicable law. The oral examination will continue as needed on dates and times to be mutually agreed upon by the parties and their counsel.

**PLEASE TAKE FURTHER NOTICE** that, in connection with the taking of the deposition, the deponent shall be designated to testify on its behalf about the topics listed in **Exhibit 1**.

Pursuant to Rule 1.310(b)(4) of the Florida Rules of Civil Procedure, this deposition will be audio-visually recorded by a videographer to be identified prior to the deposition.

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Florida Court's e-filing portal on November 14, 2024.

Dated:  November 14, 2024          Respectfully submitted,

/s/   *Peter F. O'Neill*
Anitra R. Clement
Florida Bar No. 100354
**SHOOK, HARDY & BACON L.L.P.**
100 N. Tampa St., Ste. 2900
Tampa, FL 33602
Telephone: (813) 202-7100
aclement@shb.com

David E. Schoenfeld (FL PHV # 1047561)
Peter F. O'Neill (FL PHV # 1043125)
Andrew L. Franklin (FL PHV # 1035737)
**SHOOK, HARDY & BACON L.L.P.**
111 S. Wacker Dr., Ste. 4700
Chicago, IL 60606
Telephone: (312) 704-7700
dschoenfeld@shb.com
pfoneill@shb.com
afranklin@shb.com

John D. Garretson (FL PHV #1057004)
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, MO 64108
Telephone:  (816) 474-6550
jgarretson@shb.com

***Counsel for Janice Logan, individually, as Trustee of the
James Logan Family Trust, dated February 10, 2021,
as Personal Representative of the Estate of James Logan,
derivatively on behalf of Smart Communications Holding, Inc.***

## **EXHIBIT 1**

### I.    **Definitions**

1.    "You," or "your" or "SmartComm" refers to Defendants Smart Communications Holding, Inc., Smart Communications Holding, LLC, and any of their subsidiaries and affiliates, and all of their respective agents, directors, officers, employees, and all other persons acting or purporting to act on their behalf. This definition should not be interpreted to call for attorney-client communications.

2.    "HLFIP" refers to Defendant HLFIP Holding, LLC, its predecessor HLFIP Holding, Inc., and any of their subsidiaries and affiliates, and all of their respective agents, directors, officers, employees, and all other persons acting or purporting to act on their behalf. This definition should not be interpreted to call for attorney-client communications.

3.    "Marcum Report" refers to the October 4, 2023 "US Transfer Pricing Documentation Study: HLFIP Holding, Inc.," which was produced at Plaintiffs0001687-1788.

4.    "Royalty Fee" refers to the defined term in paragraph 5.1 of the Exclusive Intercompany Intellectual Property License, which was produced at SMART_B&R 000532-542. The Royalty Fee is defined as "Licensee [SmartComm]

shall pay to Licensor [HLFIP] a royalty of 40 percent (40%) of the Net Sales of products and services sold by Licensee to any third party."

5.      "Termination of Oral License Memorandum" refers to the document entitled "Termination of Exclusive Oral License Memorandum" produced at SMART_B&R 000531.

6.      "Exclusive Intercompany Intellectual Property License Agreement" refers to the document entitled "Exclusive Intercompany Intellectual Property License Agreement" produced at SMART_B&R 000532-542.

7.      "Funded" means provided, directly or indirectly, any material support for, including, but not limited to, any financial, logistical, legal, technical, or personnel resources of any kind.

## II.     Fla. R. Civ. P. 1.310(b)(6) Topics

1.      SmartComm's  preservation of the following original SmartComm documents and underlying data and supporting material, between September 2022 and the present:

      a.      SmartComm's general ledgers;

      b.      SmartComm's balance sheets;

      c.      SmartComm's income statements;

      d.      SmartComm's Profit & Loss statements;

      e.      SmartComm's unaudited financial statements;

      f.      SmartComm's audited financial statements; and

      g.      SmartComm's books and records produced in this litigation since September 2022.

2.      All versions of SmartComm's books and records produced in this litigation since September 2022. This topic includes, but is not limited to,

      a.      the number of versions of each book/record produced;

      b.      the date those versions were created;

      c.      whether and to what extent each version was modified; and,

      d.      the person(s) involved in any of the foregoing modification.

3.      The identities of all individuals who accessed SmartComm's books and records since September 2022.

4.      The identity of accounting professionals and/or attorneys who advised SmartComm on accounting and/or tax-related issues since September 2022.

5.      The alleged accounting and GAAP compliance issues ascribed to James Logan in your First Amended Complaint, which is the purported basis for the recent (within the last 24 months) alterations of SmartComm's financials.

6.      SmartComm's communications with Mike Shreve about the accounting and GAAP compliance issues in relation to Mike Shreve's unqualified audits of SmartComm's Audited Financial Statements from 2015 to 2022.

7.      The recording of the purported IP liability stemming from the Exclusive Intercompany Intellectual Property License Agreement in SmartComm's books and records.

8.      All official actions of SmartComm's Board of Directors since October 16, 2022.

9.      SmartComm's revenue, capital expenditures, assets, liabilities, liquidity, contracts, bids, and accounts from October 16, 2022 to the present.

10.     SmartComm's April 2022 Internal Financial Presentation.

11.     UBS and Truist's 2022 Strategic Alternatives Discussion Materials presentations for SmartComm, including (without limit) the context, purpose, research, production, background, and strategy related thereto. This topic further includes all communications between SmartComm and UBS or Truist regarding those presentations.

12.     SmartComm's knowledge of Decedent James Logan's alleged purchases and transfers in SmartComm's First Amended Complaint ¶¶ 47–60 (DIN 734), including, but not limited to, the date SmartComm became aware of those purchases and transfers.

13.     SmartComm's investigation of Decedent James Logan's alleged purchases and transfers in its First Amended Complaint ¶¶ 47–60 (DIN 734).

14.     SmartComm's search for documents responsive to Janice Logan's discovery requests to it in this Consolidated Action.

15.     The development, negotiation, and execution of the intellectual property license discussed in, inter alia, ¶ 41 of the First Amended Complaint (DIN 734).

16.     SmartComm's knowledge of the "tax issue" referenced in ¶ 42 of the First Amended Complaint (DIN 734).

17.     The "assets" Jon received as a shareholder, officer, and/or employee of SmartComm, as referenced in ¶ 46 of the First Amended Complaint (DIN 734),

including, but not limited to, the cost of each such asset at the time it was purchased and whether SmartComm is still in possession of it.

18.    All intellectual property HLFIP alleges it owns, including, but not limited to, patents, trademarks, trade secrets, and know-how, including the validity and value thereof.

19.    HLFIP's conception, reduction to practice, assignment, and ownership of the intellectual property identified in response to Topic 20.

20.    The persons or entities that funded the conception, reduction to practice, development, prosecution, and ownership of the intellectual property identified in response to Topic 20.

21.    The persons or entities that funded or participated in the Patent-Related Proceedings.

22.    The factual basis for HLFIP's and/or Smart Comm's statements in the pleadings filed in the Patent-Related Proceedings.

23.    Any valuation(s) of the intellectual property licensed under the alleged Oral License described in Jon/Smart Comm's First Amended Complaint, including the results of the valuation, the identity of the individual or entity performing the valuation, and the information provided to that individual or entity.

24.    Any valuation(s) of any intellectual property listed in the Exclusive Intercompany Intellectual Property License Agreement produced at SMART_B&R 000532-542, including the results of the valuation, the identity of the individual

or entity performing the valuation, and the information provided to that individual or entity.

25.     Your understanding and/or allegation of SmartComm's use, including the extent thereof, of any intellectual property licensed under the Oral License and the Exclusive Intercompany Intellectual Property License Agreement, including the basis for that understanding.

26.     SmartComm's licensing of intellectual property from persons and entities besides HLFIP, including, but not limited to, from Justin Scott and from Lattice.

27.     The Termination of Oral License Memorandum, and (without limit) its purpose, terms, drafting, strategy, negotiation, context, and execution.

28.     The Exclusive Intercompany Intellectual Property License Agreement, and (without limit) its purpose, terms, drafting, strategy, negotiation, context, and execution.

29.     The Royalty Fee in the Exclusive Intercompany Intellectual Property License Agreement, including who negotiated the Royalty Fee, how the Royalty Fee was decided, the relative value of each licensed piece of intellectual property under the Royalty Fee, and any payments received under the Exclusive Intercompany Intellectual Property License Agreement.

30.     Any royalties in the Oral License, including who negotiated the royalties, how any royalty rate or royalties were decided, the relative value of each licensed piece of intellectual property under the Oral License, and what

amount of royalties were paid, if any, to HLFIP and the source of any such royalty payments.

31.     HLFIP's attempt to enforce any provision of the Exclusive Intercompany Intellectual Property License Agreement, and Your response to the same.

32.     Your response to the Letter Extending Limited License and Notice re Nonpayment of Royalties for License Agreement from Jon Logan on behalf of HLFIP to Smart Communications Holding, Inc., including a detailed explanation of the basis for Your response.

33.     Any employment agreements You have with Jon Logan, Justin Scott, and your form or standard employment agreement.

**IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT**
**IN AND FOR SARASOTA COUNTY, FLORIDA**

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,

        Plaintiffs,

v.

                                      Case No. 2023-CA-1002-NC

JANICE LOGAN, individually, as Trustee of
the James Logan Family Trust, dated
February 10, 2021, and as Personal
Representative of the ESTATE OF
JAMES LOGAN, JUSTIN PETERSON, and
ALEXIS LOGAN,

        Defendants.
_____/

JANICE LOGAN, as Trustee of the James
Logan Family Trust, dated February 10,
2021,

        Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC.,
SMART COMMUNICATIONS HOLDING, LLC,
and HLFIP HOLDING, LLC,

        Counterclaim Defendants.
_____/

                                       (CONSOLIDATED)

JANICE LOGAN, as Trustee of the James
Logan Family Trust, dated February 10,
2021, and derivatively on behalf of Smart
Communications Holding, Inc.,

        Plaintiff,

                                       Case No.: 2023-CA-1280-NC

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC.,
nominal defendant, SMART
COMMUNICATIONS HOLDING, LLC, HLFIP
HOLDING, LLC,
LOCO FLORIDA LLC, and SMART
COMMUNICATIONS YACHT HOLDING, LLC,

        Defendants.
_____/

**NOTICE OF TAKING DEPOSITION OF HLFIP HOLDING, LLC**
**PURSUANT TO RULE 1.310(b)(6) WITH**
**RULE 1.310(b)(5) REQUESTS FOR PRODUCTION**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that pursuant to Rule 1.310(b)(6) of the Florida Rules of Civil Procedure, counsel for Janice Logan will take the following deposition upon oral examination before a court reporter or Notary Public in and for the State of Florida, or some other officer duly authorized by law to take depositions.

| | |
|---|---|
| **DEPONENT:** | **HLFIP Holding, LLC** |
| **DATE/TIME:** | |
| **LOCATION:** | **To be agreed upon by counsel for the parties** |

The deposition is being taken for the purpose of discovery, for use at a hearing or trial, or all of the foregoing, and for such other purposes as are permitted under the Florida Rules of Civil Procedure and other applicable law. The oral examination will continue as needed on dates and times to be mutually agreed upon by the parties and their counsel.

**PLEASE TAKE FURTHER NOTICE** that, in connection with the taking of the deposition, the deponent shall be designated to testify on its behalf about the topics listed in **Exhibit 1**.

Pursuant to Rule 1.310(b)(4) of the Florida Rules of Civil Procedure, this deposition will be audio-visually recorded by a videographer to be identified prior to the deposition.

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Florida Court's e-filing portal on November 14, 2024.

Dated:  November 14, 2024          Respectfully submitted,

/s/   *Peter F. O'Neill*
Anitra R. Clement
Florida Bar No. 100354
**SHOOK, HARDY & BACON L.L.P.**
100 N. Tampa St., Ste. 2900
Tampa, FL 33602
Telephone: (813) 202-7100
aclement@shb.com

David E. Schoenfeld (FL PHV # 1047561)
Peter F. O'Neill (FL PHV # 1043125)
Andrew L. Franklin (FL PHV # 1035737)
**SHOOK, HARDY & BACON L.L.P.**
111 S. Wacker Dr., Ste. 4700
Chicago, IL 60606
Telephone: (312) 704-7700
dschoenfeld@shb.com
pfoneill@shb.com
afranklin@shb.com

John D. Garretson (FL PHV #1057004)
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, MO 64108
Telephone:  (816) 474-6550
jgarretson@shb.com

***Counsel for Janice Logan, individually, as Trustee of the
James Logan Family Trust, dated February 10, 2021,
as Personal Representative of the Estate of James Logan,
derivatively on behalf of Smart Communications Holding, Inc.***

## **EXHIBIT 1**

### I.    **Definitions**

1.    "You," or "your" or "HLFIP" refers to Defendant HLFIP Holding, LLC, its predecessor HLFIP Holding, Inc., and any of their subsidiaries and affiliates, and all of their respective agents, directors, officers, employees, and all other persons acting or purporting to act on their behalf. This definition should not be interpreted to call for attorney-client communications.

2.    "SmartComm" refers to Defendants Smart Communications Holding, Inc., Smart Communications Holding, LLC, and any of their subsidiaries and affiliates, and all of their respective agents, directors, officers, employees, and all other persons acting or purporting to act on their behalf. This definition should not be interpreted to call for attorney-client communications.

3.    "Marcum Report" refers to the October 4, 2023 "US Transfer Pricing Documentation Study: HLFIP Holding, Inc.," which was produced at Plaintiffs0001687-1788.

4.    "Termination of Oral License Memorandum" refers to the document entitled "Termination of Exclusive Oral License Memorandum" produced at SMART_B&R 000531.

5.    "Exclusive Intercompany Intellectual Property License Agreement" refers to the document entitled "Exclusive Intercompany Intellectual Property License Agreement" produced at SMART_B&R 000532-542.

6.    "Royalty Fee" refers to the defined term in paragraph 5.1 of the Exclusive Intercompany Intellectual Property License Agreement, which was

produced at SMART_B&R 000532-542. The Royalty Fee is defined as "Licensee [SmartComm] shall pay to Licensor [HLFIP] a royalty of 40 percent (40%) of the Net Sales of products and services sold by Licensee to any third party."

7.    "Document" should be construed as broadly as permissible under the Florida Rules of Civil Procedure and Florida Rules of Evidence. "Document" encompasses all of the following:  any medium by which information is recorded, stored, communicated, or utilized, including, but not limited to, any and all documentary, written, printed, computer printed or generated, typewritten or graphic material of any kind or character. The term includes, without limitation, audio tapes, video tapes, still or moving pictures, computer disks, CD-ROMS, microfilm, microfiche, x rays, notes, letters, memoranda, contracts, invoices, receipts, checks, estimates, statements, bills, photographs, or any other piece of paper whatsoever. The term "document" should be deemed to include a request for any document which relates to the principal document or the subject matter of the principal document, *e.g.* (a) any material which was used or referred to in the preparation of the principal document; (b) all attachments to the document; (c) any document referred to in the principal document; and (d) all additions, deletions, substitutions, amendments, or modifications to the original of the principal document. All requests for documents should be interpreted to include requests for any metadata associated with such documents.

8.    "Communication" means the transmittal of information by any means (including through electronic means—including, but not limited to, text messages, emails, messenger applications (such as WhatsApp or via social media

messaging), and fax). All requests for communications should be interpreted to include requests for any metadata associated with such communications.

9.    "Valuation" is defined to mean any third-party's assessment of an entity's value (including, but not limited to, past, present, potential, or projected future value) of any kind and for any purpose.

10.    Any words or phrases not defined should be given their ordinary usage. If the ordinary usage is unclear, please refer to the definition for the word or phrase in the Merriam-Webster online dictionary.

11.    "Patent-Related Proceedings" is defined to mean any of the following: *HLFIP Holdings, Inc. d/b/a Smart Communications IP Holdings v. Rutherford County, Tennessee et al*, Case No. 3-19-cv-00714 (MDTN); *HLFIP Holdings, Inc. d/b/a Smart Communications IP Holdings v. York County, Pennsylvania et al*, Case No. 1-20-cv-00186 (MDPA); *HLFIP Holdings, Inc. d/b/a Smart Communications IP Holdings v. Wisconsin Department of Corrections et al*, Case No. 3-22-cv-00227 (WD WI); *HLFIP Holding Inc. v York County, PA*, 22-1940 (CAFC); *HLFIP Holding Inc. v. Rutherford County, TN*, 23-1379 (CAFC).

12.    "Funded" means provided, directly or indirectly, any material support for, including, but not limited to, any financial, logistical, legal, technical, or personnel resources of any kind.

13.    Business terms should be accorded their typical business usage. If you have any questions about business terms herein, please promptly seek to clarify them with the propounding party.

## II.   Fla. R. Civ. P. 1.310(b)(6) Topics

1.    HLFIP Holding, Inc.'s incorporation in 2015, its management and operations from 2015 to 2023, and its conversion from HLFIP Holding, Inc. (a Florida corporation) to HLFIP Holding, LLC (a Delaware LLC) in 2023.

2.    All intellectual property HLFIP alleges it owns, including, but not limited to, patents, trademarks, trade secrets, and know-how, including the validity and value thereof.

3.    HLFIP's conception, reduction to practice, assignment, and ownership of the intellectual property identified in response to Topic 2.

4.    The persons or entities that funded the conception, reduction to practice, development, prosecution, and ownership of the intellectual property identified in response to Topic 2.

5.    The persons or entities that funded or participated in the Patent-Related Proceedings.

6.    The factual basis for HLFIP's and/or SmartComm's statements in the pleadings filed in the Patent-Related Proceedings.

7.    Any valuation(s) of the intellectual property licensed under the alleged Oral License described in Jon/SmartComm's First Amended Complaint, including the results of the valuation, the identity of the individual or entity performing the valuation, and the information provided to that individual or entity.

8.    Any valuation(s) of any intellectual property listed in the Exclusive Intercompany Intellectual Property License Agreement produced at SMART_B&R

000532-542, including the results of the valuation, the identity of the individual or entity performing the valuation, and the information provided to that individual or entity.

9.    Your understanding and/or allegation of SmartComm's use, including the extent thereof, of any intellectual property licensed under the Oral License and the Exclusive Intercompany Intellectual Property License Agreement, including the basis for that understanding.

10.    All agreements, licenses, covenants not to sue, offers to purchase, sell, or license, and negotiations relating to any of HLFIP's intellectual property.

11.    Any royalties for any third-party's use of HLFIP's intellectual property, including the amounts, dates, and rates of any such royalties.

12.    HLFIP's accounting practices, capitalization, internal management, internal controls, actions of the board, officers or members, financial documents, tax documents, and financial management from 2015 to the present.

13.    The Termination of Oral License Memorandum, and (without limit) its purpose, terms, drafting, strategy, negotiation, context, and execution.

14.    The Exclusive Intercompany Intellectual Property License Agreement, and (without limit) its purpose, terms, drafting, strategy, negotiation, context, and execution.

15.    The Royalty Fee in the Exclusive Intercompany Intellectual Property License Agreement, including who negotiated the Royalty Fee, how the Royalty Fee was decided, the relative value of each licensed piece of intellectual property

under the Royalty Fee, and any payments received under the Exclusive Intercompany Intellectual Property License Agreement.

16.    Any royalties in the Oral License, including who negotiated the royalties, how any royalty rate or royalties were decided, the relative value of each licensed piece of intellectual property under the Oral License, and what amount of royalties were paid, if any, to HLFIP and the source of any such royalty payments.

17.    HLFIP's attempt to enforce any provision of the Exclusive Intercompany Intellectual Property License Agreement.

18.    The Letter Extending Limited License and Notice re Nonpayment of Royalties for License Agreement from Jon Logan on behalf of HLFIP to Smart Communications Holding, Inc., including the contents, author, recipient, date, purpose, and result of the same.

19.    A detailed description of the know-how listed in the Exclusive Intercompany Intellectual Property License Agreement, including when and by whom it was conceived, when it was transferred to SmartComm, and how it was transferred to SmartComm.

20.    HLFIP's role in the modification and/or alteration of SmartComm's financial records since this Consolidated Action was filed, including communications with SmartComm, possession of edited or revised versions of SmartComm documents, or instructions from SmartComm regarding such modification and/or alteration.

21.     Each and every valuation of HLFIP or any of its individual assets that has been performed, the results of the valuation, the identity of the individual or entity performing the valuation, and the information provided to that individual or entity.

22.     The Marcum Report, and (without limit) its commissioning, drafting, strategy, research, context, production, receipt, purpose, meaning, and use. This topic includes (without limit) HLFIP's participation in providing information to Marcum, communications with Marcum, the scope and content of information provided, and participation in the drafting and revision of the report itself.

23.     All distributions, dividends, payments or transfers HLFIP has made to Jonathan Logan or any third-party entity Jonathan Logan holds an interest in.

24.     HLFIP's past and present operations, including members, shareholders, officers, employees, agents, offices, assets, and expenditures.

25.     All attorneys who represented HLFIP in connection with any negotiation or legal proceeding involving HLFIP's intellectual property, and the date any such attorney(s) was engaged and the date their representation ended, and the nature of their work on HLFIP's behalf (e.g., hired to represent HLFIP in the enforcement of  X Patent or Y trademark).  To be clear, this topic does not seek the disclosure of privileged information.

# EXHIBIT 23

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,

                Plaintiffs,

v.

JANICE LOGAN, individually, as Trustee of
the James Logan Family Trust, dated
February 10, 2021, and as Personal
Representative of the ESTATE OF
JAMES LOGAN, JUSTIN PETERSON, and
ALEXIS LOGAN,

                Defendants.

Case No. 2023-CA-1002-NC

_____/

JANICE LOGAN, as Trustee of the James
Logan Family Trust, dated February 10,
2021,

                Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC.,
SMART COMMUNICATIONS HOLDING, LLC,
and HLFIP HOLDING, LLC,

                Counterclaim Defendants.

_____/

JANICE LOGAN, as Trustee of the James
Logan Family Trust, dated February 10,
2021, and derivatively on behalf of Smart
Communications Holding, Inc.,

                Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., nominal
defendant, SMART COMMUNICATIONS
HOLDING, LLC, HLFIP HOLDING, LLC,
LOCO FLORIDA LLC, and SMART
COMMUNICATIONS YACHT HOLDING, LLC,

                Defendants.

(CONSOLIDATED)

Case No.: 2023-CA-1280-NC

_____/

## JANICE LOGAN'S SUBPOENA *DUCES TECUM* FOR DEPOSITION OF
## NON-PARTY MARCUM LLP CORPORATE REPRESENTATIVE VIA ZOOM

TO:    Marcum LLP Corporate Representative
       c/o Daniel Dowell, Office Managing Partner
       Marcum LLP
       201 East Kennedy Boulevard, Suite 1500
       Tampa, FL 33602


       YOU ARE HEREBY COMMANDED to appear via Zoom before a person authorized by law to take depositions on December 16, 2024, at 9:00 am (EST)[1] for the taking of your deposition in this action. You must attend using the Zoom platform (a link to which will be forthcoming).

       There are no fees for attending this deposition via the Zoom Platform.

       **You should be prepared to discuss at that time and place the topics set forth in the attached Exhibit 1.**

       **You should produce to the attorney listed on this subpoena electronic copies of the items listed in Exhibit 2 at least 7 days before the deposition.**

       **See attached Exhibits 1 and 2.**


       **IF YOU FAIL TO APPEAR, YOU MAY BE IN CONTEMPT OF COURT.**


You are subpoenaed by the attorney whose name appears on this Subpoena and unless excused from this Subpoena by the attorney or the Court, you shall respond to this Subpoena as directed.

---

[1]    Counsel for Janice is willing to be accommodating on the date and time of the deposition.

Dated:  November 14, 2024          Respectfully submitted,

By:   _/s/_  *Peter F. O'Neill*_____
      Peter F. O'Neill (FL PHV # 1043125)

      Anitra R. Clement
      Florida Bar No. 100354
      **SHOOK, HARDY & BACON L.L.P.**
      100 N. Tampa St., Ste. 2900
      Tampa, FL 33602
      Telephone: (813) 202-7100
      aclement@shb.com

      David E. Schoenfeld (FL PHV # 1047561)
      Peter F. O'Neill (FL PHV # 1043125)
      Andrew L. Franklin (FL PHV # 1035737)
      Kailin Liu (FL PHV # 1051416)
      **SHOOK, HARDY & BACON L.L.P.**
      111 S. Wacker Dr., Ste. 4700
      Chicago, IL 60606
      Telephone: (312) 704-7700
      dschoenfeld@shb.com
      pfoneill@shb.com
      afranklin@shb.com
      kliu@shb.com

      John D. Garretson (FL PHV #1057004)
      **SHOOK, HARDY & BACON L.L.P.**
      2555 Grand Boulevard
      Kansas City, MO 64108
      Telephone:  (816) 474-6550
      jgarretson@shb.com

      ***Counsel for Janice Logan, individually,
      as Trustee of the James Logan Family
      Trust, dated February 10, 2021, as
      Personal Representative of the Estate of
      James Logan, and derivatively on behalf
      of Smart Communications Holding, Inc.***

# EXHIBIT 1

**EXHIBIT 1**

**I.    Corporate Representative Topics**

1.    The "US Transfer Pricing Documentation Study" of HLFIP Holding, Inc.[2] dated October 4, 2023 (hereinafter, "Marcum Report" or "Report"), attached as Exhibit 3 to this subpoena, including but not limited to all information solicited, searched for, accessed, reviewed and/or considered in connection with the Report, as well as the timing, purpose, preparation, and dissemination of the Report.

2.    The conclusions of the Marcum Report, as well as the bases therefor, including but not limited to the methodologies employed in the Report as well as methodologies considered but not ultimately employed.

3.     Marcum's understanding of HLFIP's intellectual property holdings, the development and implementation thereof, as well as the practice, use, and enforcement of those intellectual property holdings.

4.    All communications with HLFIP Holding, Inc., Smart Communications Holding, Inc./LLC (and its subsidiaries), Jonathan Logan, entities associated with Jonathan Logan, and governmental and/or tax authorities in connection with the Marcum Report.

---

[2]    HLFIP Holding, Inc. was converted to a Delaware LLC ("HLFIP Holding, LLC") on August 29, 2023. References herein to "HLFIP Holding, Inc." or "HLFIP" should be considered inclusive of HLFIP Holding, LLC, which HLFIP itself has stipulated is the same entity for purposes of issues in this Consolidated Action. DIN 709.

5.     Compensation paid, promised, and/or otherwise provided to Marcum LLP, including but not limited to items of value provided to individual person(s) associated with Marcum LLP, in connection with the Marcum Report.

6.     The relationship between Marcum LLP and Jonathan Logan, and/or entities associated with Jonathan Logan.

7.     All engagements entered into between Marcum LLP and Jonathan Logan, and/or entities associated with Jonathan Logan.

8.     Any information obtained or conclusions reached during preparation of the Marcum Report that were not ultimately included in the Report.

9.     The identity, experience, background and qualifications of all person(s) involved in preparing and/or reviewing the Marcum Report.

10.     Marcum LLP's quality control policies, procedures and monitoring protocols applicable to the Marcum Report, including but not limited to review and audit procedures.

11.     The documents requested to be produced pursuant to this subpoena, including but not limited to their content, creation, alteration, their maintenance in Marcum LLP's files, their custodians, and associated metadata.

12.     Marcum LLP's document retention and preservation policies, including retention and preservation of associated metadata.

# EXHIBIT 2

**EXHIBIT 2**

## I.    Definitions.

"Document" means any written, typed, recorded, or graphic matter, however produced, of any type or description, whether sent or received, including both sides of originals, known identical copies, and drafts, and including, without limitation, papers, books, letters, correspondence, telegrams, bulletins, notices, announcements, instructions, charts, manuals, accountants' working papers, transcripts, minutes, agendas, reports, electronic mail (e-mail), electronically stored information (ESI) and recordings of telephone or other conversations, of interviews, of conferences, or of other meetings, affidavits, statements, summaries, opinions, seconds, report studies, analyses, evaluations, contracts, agreements, journals, statistical records, desk calendars, appointment books, diaries, lists, tabulations, sound recordings, computer printouts, data processing input and output, microfilms, and other records kept by electronic, photographic or mechanical means, and things similar to any of the above. As specified above, "document" includes all electronically stored information ("ESI") (including any metadata associated with such ESI). Said documents originally and/or currently may be in any format, in any form, in any location, and in any data format that can directly, or through manipulation, lead to the reconstruction of a printed, unedited copy of the original information. "Manipulation" includes, but is not limited to, the direct production or repair, recovery, recreation, retrieval, restoration, and/or translation of all documents (such as, but not limited to, ESI) that may exist, whether intact, corrupted,

altered, deleted, or in whatever form or format, whether archived or in persons' e-mail mailboxes as sent/received mail copies, or in anyplace whatsoever.

## II.    Documents Requested.

1.    All documents solicited, searched for, accessed, reviewed and/or considered in connection with the "US Transfer Pricing Documentation Study" of HLFIP Holding, Inc.[3] dated October 4, 2023 (hereinafter, "Marcum Report" or "Report"), attached as Exhibit 3 to this subpoena.

2.    All documents consisting of, relating to, or reflecting communications with Jonathan Logan and/or entities associated with Jonathan Logan (individually a "JL entity", and collectively "JL entities"), including but not limited to HLFIP Holding, Inc./LLC, Smart Communications Holding, Inc./LLC, the defendant entities identified in the caption of this subpoena for Case No. 2023-CA-1280-NC, and the "SmartCom group" of companies identified in Section 1.1 of the Marcum Report.

3.    All documents consisting of, relating to, or reflecting work performed for Jonathan Logan or any JL entity.

4.    All studies, reports, accounting analyses, valuations, and tax-related documents provided to Jonathan Logan, to any JL entity, and/or to any governmental authority with respect to Jonathan Logan or any JL entity.

5.    All invoices sent to Jonathan Logan or any JL entity.

---

[3]    HLFIP Holding, Inc. was converted to a Delaware LLC ("HLFIP Holding, LLC") on August 29, 2023. References herein to "HLFIP Holding, Inc." or "HLFIP" should be considered inclusive of HLFIP Holding, LLC, which HLFIP itself has stipulated is the same entity for purposes of issues in this Consolidated Action. DIN 709.

6.    All documents reflecting payments or other remuneration received from Jonathan Logan or any JL entity.

7.    All drafts of the Marcum Report, including but not limited to any drafts circulated for internal review at Marcum LLP, and any drafts provided to Jonathan Logan or a JL entity.

8.    All documents reflecting any decision not to include certain materials, information or conclusions in the Marcum Report.

9.    All documents consisting of, relating to, or reflecting the "discussions with management, marketing literature, and publicly available information" and the "financial information and descriptive analysis" identified in Section 1.1 of the Marcum Report.

10.    All documents consisting of, relating to, or reflecting the "communications with key personnel regarding the operation of the entities", "company financial records", and "financial and other information provided by HLFIP and SmartCom" identified in Section 1.2 of the Marcum Report.

11.    All documents consisting of, relating to, or reflecting the purported licenses of "HLFIP IP" referenced in Sections 1.3, 1.4, 1.5 and 6.1 of the Marcum Report, including all documents supporting the statement that "[f]or FY 2022, HLFIP charged a royalty rate of 40.00% of net sales to SmartCom Holding."

12.    All documents consisting of, relating to, or reflecting the following step purportedly performed by Marcum, according to Section 3.1 of the Marcum Report: "Gathered facts, reviewed HLFIP documents, concluded interviews with

HLFIP personnel and SmartCom Collier's personnel, and completed a functional analysis".

13.    All tax returns prepared for Jonathan Logan, and for any JL entity, from 2015 to the present.

14.    All documents consisting of, relating to, or reflecting any update to or re-evaluation of the analysis in the Marcum Report, as referenced in Section 2 of the Report.

15.    All documents consisting of, relating to or reflecting "the questions and information requests of Marcum" referenced in Section 2 of the Marcum Report.

16.    All documents concerning the conclusion in Section 4.6 of the Marcum Report that the SmartCom group's "main competitors are Securus Technologies and ViaPath Technologies."

17.    All documents concerning the purported tangible assets of the SmartCom group as of December 31, 2022, as referenced in Section 6.3.1 of the Marcum Report.

18.    All documents concerning the purported intangible assets of HLFIP as referenced in Section 6.3.2 of the Marcum Report, including but not limited to any valuation thereof.

19.    All documents concerning any relationship between the intangible assets of HLFIP referenced in Section 6.3.2 of the Marcum Report and the products/services offered by the SmartCom group, including but not limited to any assessment of patent claim coverage.

20.    All documents consisting of, relating to, or reflecting the materials specified in Section 8.5 of the Marcum Report, including but not limited to "historical data of the comparables, Forms 10-K, budgets, invoices, interview notes, third party agreements, strategic plans, manuals, specifications, or other descriptions of functions performed."

21.    All documents consisting of, relating to, or reflecting the "independent agreements" referenced in Section 8.8 of the Marcum Report.

22.    All documents concerning Marcum LLP's selection of the "CUT method" as the "best method" for assessing the Covered Transaction, as referenced in Section 8.8 of the Marcum Report.

23.    All documents consisting of, relating to or reflecting Marcum LLP's "Comparable Agreement Search and Evaluation," referenced in Section 10.1 of the Marcum Report.

24.    All documents consisting of, relating to or reflecting the purported "Comparable Agreements" referenced in Section 10.2 and 10.3, and in Appendix I.2, of the Marcum Report.

25.    All documents consisting of, relating to, or reflecting the agreements referenced in Appendix I.1 of the Marcum Report, entitled "Rejection Matrix."

26.    All documents concerning Marcum LLP's identification of the industry to be analyzed for FY 2022 regarding HLFIP, as referenced in Appendix II of the Marcum Report.

# CONFIDENTIAL EXHIBIT 3



**US Transfer Pricing Documentation Study**

# HLFIP Holding, Inc.

**For Fiscal Year Ended December 31, 2022**

## MARCUM
### ACCOUNTANTS ▲ ADVISORS

**October 4, 2023**

marcumllp.com

HLFIP Holding, Inc.                                                                    Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

## Table of Contents

Table of Contents ........................................................................................................................... 2

Acronym List.................................................................................................................................. 3

1.  Executive Summary ............................................................................................................... 5

2.  Scope of the Analysis ........................................................................................................... 9

3.  Report Summary .................................................................................................................. 11

4.  Corporate Overview ............................................................................................................. 12

5.  Industry Analysis – Correctional Facilities in the US ......................................................... 16

6.  Functional Analysis, Risk Analysis and Assets Owned Analysis........................................ 17

7.  Corporate Structure ............................................................................................................. 22

8.  Best Method Selection ......................................................................................................... 23

9.  Methods Not Selected.......................................................................................................... 34

10. Economic Analysis: Licensing of Technology and Trademarks ......................................... 35

CONFIDENTIAL                                                    Plaintiffs0001688

HLFIP Holding, Inc.                                                    Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

## Acronym List

The following is a list of acronyms used in this report:

| Acronym | Description |
|---|---|
| CEO | Chief Executive Officer |
| Covered Transaction | Intercompany transaction under analysis |
| CP | Cost Plus Method |
| CPM | Comparable Profits Method |
| CSP | Cost of Services Plus Method |
| CUP | Comparable Uncontrolled Price Method |
| CUSP | Comparable Uncontrolled Services Price Method |
| CUT | Comparable Uncontrolled Transaction |
| FY 2022 | For the fiscal year ended December 31, 2022 |
| GSM | Gross Services Margin Method |
| HLFIP | HLFIP Holding, Inc. |
| HLFIP IP | Proprietary technology, patents, trademarks, and know-how owned by HLFIP |
| IP | Intellectual Property |
| IQR | Interquartile range |
| IRC | Internal Revenue Code |
| IRS | Internal Revenue Service |
| IT | Information Technology |
| ITS | Information Technology System |
| Mr. Logan | Jonathan D. Logan |
| Marcum | Marcum LLP |
| PP&E | Property, plant, and equipment |
| PSM | Profit Split Method |
| R&D | Research and development |
| RPM | Resale Price Method |
| SCM | Service Cost Method |
| SmartCom | The overall SmartCom group |
| SmartCom group | Smart Communications Holding, Inc., Smart Communications Collier, Inc., Smart Communications Pasco, Inc., and Smart Communications US, Inc. |

3

HLFIP Holding, Inc.                                                                                          Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

| Acronym | Description |
| --- | --- |
| SmartCom Collier | Smart Communications Collier, Inc. |
| SmartCom Holding | Smart Communications Holding, Inc. |
| SmartCom Pasco | Smart Communications Pasco, Inc. |
| SmartCom US | Smart Communications US, Inc. |
| Treas Regs | Section 1.482 of the US Regulations |
| US | United States |

4

                                          Plaintiffs0001690

HLFIP Holding, Inc.                                                                                      Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

# 1.    Executive Summary

## 1.1.    Purpose of Analysis

HLFIP Holding, Inc. ("HLFIP") has engaged Marcum LLP ("Marcum") to evaluate the arm's-length nature of its primary intercompany transaction for the fiscal year ended December 31, 2022 ("FY 2022"). In this report, Marcum relied on financial information and descriptive analysis provided by HLFIP and Smart Communications Holding, Inc. ("SmartCom Holding") and its wholly owned subsidiaries (collectively, "SmartCom" or the "SmartCom group") as well as research conducted at Marcum and resources available in available databases.

Marcum based its understanding of the functions performed, risks assumed, and resources employed by various entities on discussions with management, marketing literature, and publicly available information. Marcum performed this analysis from a United States ("US") perspective and based it upon Section 482 of the Internal Revenue Code ("IRC") and the Section 1.482 of the US Regulations ("Treas Regs") thereunder.

Marcum conducted a functional analysis to identify and characterize the relevant intercompany transactions and the entities involved in those transactions. Based on the functional analysis, it was possible to identify the functions performed, resources employed, and risks assumed by each entity in connection with the intercompany transaction under review.

As part of this analysis, a review of the general economics of the industry in which HLFIP and SmartCom operate was also conducted. Based on the functional and industry analysis, it was possible to characterize the intercompany transaction between HLFIP and the SmartCom group of companies, which includes SmartCom Holding as the parent company and its wholly owned subsidiaries, namely, Smart Communications Collier, Inc. ("SmartCom Collier"), Smart Communications Pasco, Inc. ("SmartCom Pasco"), and Smart Communications US, Inc. ("SmartCom US"). Finally, this combined process allowed for the identification of the best method as defined in the Treas Regs to test the arm's-length results of the intercompany transaction.

5

HLFIP Holding, Inc.                                                                                              Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

**Table 1: Summary of Affiliated Parties**

| Legal Name of Entity | Address | Country of Incorporation | Abbreviation1 | Abbreviation2 |
|---|---|---|---|---|
| HLFIP Holding, Inc. | 10491 72nd St., Seminole, FL 33777 | United States | HLFIP | |
| Smart Communications Holding, Inc. | 10491 72nd St., Seminole, FL 33777 | United States | SmartCom Holding | SmartCom group |
| Smart Communications Collier, Inc. | 10491 72nd St., Seminole, FL 33777 | United States | SmartCom Collier | |
| Smart Communications Pasco, Inc. | 10491 72nd St., Seminole, FL 33777 | United States | SmartCom Pasco | |
| Smart Communications US, Inc. | 10491 72nd St., Seminole, FL 33777 | United States | SmartCom US | |

## 1.2. Overview of Analysis and Approach

Our conclusions in this study are based on information pertaining to FY 2022 gathered during the data collection process. Marcum conducted a functional analysis to identify and characterize the relevant intercompany transactions covered by this analysis and the entities involved in those transactions. In conducting the functional analysis, Marcum communicated with key personnel regarding the operations of the entities and reviewed company financial records. Marcum's analysis and conclusions are based on financial and other information provided by HLFIP and SmartCom, as well as information obtained from publicly available sources.

Based on the functional analysis, it was possible to identify the functions performed, resources employed, and risks assumed by each entity in connection with the intercompany transactions under review.

## 1.3. Summary of Facts

SmartCom is a leading provider of specialized inmate communication technologies. HLFIP is the owner of intellectual property, including proprietary technology, patents, trademarks, and know-how (collectively, "HLFIP IP"), that provides easy-to-use communication systems to connect incarcerated individuals with family and friends, that eliminates contraband in postal mail at correctional facilities, and that improves the lives and safety of incarcerated individuals and correctional facility staff. HLFIP provides SmartCom Holding an exclusive license of HLFIP IP for distribution to and use at correctional facilities across the US.

6

HLFIP Holding, Inc.                                                                                   Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

For FY 2022, HLFIP licensed HLFIP IP to SmartCom Holding, which then sublicensed it to SmartCom Collier for distribution to and use at correctional facilities across the US[1]. This intercompany transaction, referred to as the "Covered Transaction," is summarized in **Table 2**.

### 1.4.    Summary of Covered Transaction

**Table 2: Summary of Covered Transaction**

| Transaction | Transfer Pricing Policy | Method Selected | Benchmark Range | | Actual Results |
|---|---|---|---|---|---|
| The licensing of HLFIP IP from HLFIP to SmartCom Holding, which then sublicenses it to SmartCom Collier for distribution to correctional facilities across the US | Royalty rate = 40% of net sales | CUT | Royalty Rate | UQ[2] 50.00% | 40.00% |
| | | | | M[3] 24.00% | |
| | | | | LQ[4] 18.00% | |

### 1.5.    Method Applied and Results

The Treas Regs require that transfer prices within a controlled group must be consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction, under the same circumstances.

Marcum examined the methods described in the Treas Regs and selected the best method to test the Covered Transaction. The following is a summary of the selected method for the licensing of intellectual property ("IP").

The Comparable Uncontrolled Transaction ("CUT") Method was selected as the best method based on the facts surrounding the intercompany transaction relating to the licensing of IP. In this intercompany transaction, HLFIP is the licensor and SmartCom Holding is the exclusive licensee. Independent agreements with similar characteristics were reliably identified. The royalty rate charged by HLFIP to SmartCom Holding was compared to those of independent agreements, effectively measuring the arm's-length nature of this intercompany transaction under analysis. We were able to identify uncontrolled transactions which we believe have a high degree of comparability with the Covered Transaction under Treas. Reg. Section 1.482-4(c)(2). We did not identify significant differences between the selected CUT's and Covered Transaction to warrant an adjustment of the arm's length price.

---

[1] SmartCom Holding also sublicenses the HLFIP IP to its other subsidiaries within the SmartCom group; however, we did not analyze these entities separately because the intercompany transaction amounts were not significant for FY 2022.
[2] Upper Quartile
[3] Median
[4] Lower Quartile

7

An arm's length range was constructed using the royalty rates indicated in the 10 comparable third-party patent/trademark licensing agreements. The interquartile range ("IQR") of licensing rates ranged from 18.00% to 50.00%, with a median of 24.00%.

For FY 2022, HLFIP charged a royalty rate of 40.00% of net sales to SmartCom Holding. This result falls within the IQR of licensing rates charged by uncontrolled taxpayers. This indicates that HLFIP is transacting with SmartCom Holding in a manner which is considered to be consistent with the arm's length standard from a US transfer pricing perspective.

8

HLFIP Holding, Inc.                                                                                    Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

To the extent that the research for this report was conducted using publicly available databases, Marcum has relied on the accuracy of the information contained in those databases and has not undertaken any work to verify this data or to test the validity of the search engines employed by the databases.

This report supersedes and replaces any and all prior written or oral advice (including, without limitation, electronic communications) related to this report and all such prior communications, if any, should not be relied upon for any purpose whatsoever.

This report is based upon the assumption that HLFIP has made a reasonably thorough search for relevant information in response to the questions and information requests of Marcum.

10

HLFIP Holding, Inc.                                                    Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

## 3.    Report Summary

This study was conducted in accordance with Section 1.482 of the Treas Regs and the IRC. To complete this analysis, we (i) worked with HLFIP's personnel to perform a functional analysis of itself, (ii) completed an economic analysis of the relevant intercompany transaction, and (iii) applied the arm's-length standard of Treas Regs Section 1.482.

### 3.1.    Marcum's Approach

In preparing this report, Marcum performed the following steps:

- Gathered facts, reviewed relevant HLFIP documents, conducted interviews with HLFIP's personnel and SmartCom Collier's personnel, and completed a functional analysis;

- Reviewed the legal, regulatory, and economic issues that confront HLFIP, and how such issues affect the pricing of goods and services in the industry;

- Performed a financial analysis of HLFIP and assessed the appropriateness of various transfer pricing methods for the evaluated transactions;

- Identified, evaluated, and analyzed third party comparable transactions as required in the methods applied; and

- Provided a report which summarizes the results of Marcum's functional, industry, financial, and economic analyses.

### 3.2.    Report Contents

Subsequent to the "Executive Summary", "Scope of the Analysis" and "Report Summary", this report contains all of the required Principal Documents as defined in Treas Regs §1.6662-6(d)(2)(iii)(B)(10).

11

HLFIP Holding, Inc.                                                                                  Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

## 4.    Corporate Overview

### 4.1.    Profile

SmartCom is a leading provider of specialized inmate communication technologies. Jonathan D. Logan ("Mr. Logan") is the inventor of several patents and proprietary technologies aimed at eliminating contraband in postal mail at correctional facilities, improving the safety of inmates and correctional facility staff, improving correctional facility and inmate surveillance, and improving communication systems to be used by inmates and their friends and families. HLFIP is the owner of HLFIP IP (which includes the patents and proprietary technologies invented by Mr. Logan) and it exclusively licenses the HLFIP IP to SmartCom Holding, which then sublicenses it to SmartCom Collier for distribution in the US market.

### 4.2.    HLFIP

HLFIP is sole owner of the IP. Mr. Logan is the sole member of HLFIP.

### 4.3.    SmartCom

SmartCom Holding is the holding company of the SmartCom group's wholly owned subsidiaries. It was established in 2014 and currently services approximately 150 correctional facilities in more than 25 states nationwide. SmartCom Holding's wholly owned subsidiary, SmartCom Collier, operates the bank account on behalf of the SmartCom group as well as payroll. As of December 31, 2022, SmartCom Collier had 107 employees. SmartCom's website can be found at smartcommunications.us/; smartjailmail.com/; and mailguardtracker.com/.

### 4.4.    Technology

Mr. Logan invented several technologies related to communication systems between inmates and the public and between inmates and their counsel, surveillance in correctional facilities, and improving inmates' lives in correctional facilities. Mr. Logan assigned his rights to his inventions to HLFIP.

#### 4.4.1. MailGuard

MailGuard is a patented system, technology, and process owned by HLFIP. It essentially eliminates contraband such as drugs and weapons from being introduced in jails and prisons through the postal mail. The system uses a central processing facility in which all inmate mail is received, digitized, and reviewed by correctional personnel. The system administrators log into a database various information about the postal mail sender, inmate recipient, mail contents, and institution into a format that is stored in the cloud and is easily accessible and searchable. Correctional staff and police may also access the associated information for investigative purposes.

#### 4.4.2. MailGuardLegal

MailGuardLegal is a patented system, technology, and process owned by HLFIP. It essentially eliminates contraband from being introduced in jails and prisons through legal postal mail. The system provides a legal

12

                                                    Plaintiffs0001698

HLFIP Holding, Inc.                                                                                 Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

mail scanning station to be used by correctional institution staff at the facility for opening, inspecting, and copying inmate legal without violating an inmate's right to privacy for such mail. The legal mail is scanned / copied by the staff member in the presence of the inmate and then the original letter is either shredded or placed into the inmate's personal property in secure storage. The scanned mail may then be made available to the intended inmate through an inmate-only-accessible platform and/or printed at the scanning station to ensure the elimination of contraband.

### 4.4.3. MailGuard Digital

MailGuard Digital is a method and system used to verify a privacy status of a sender and generate privacy status identifiers to be used at a correctional facility in order to maintain privacy in certain inmate postal mail, such as privileged / legal postal mail or medical mail. As mail sent to inmates is processed, the system's privacy status identifiers provide an indication that the mail is private so that appropriate measures can be taken to maintain privacy status.

### 4.4.4. MailGuardTracker

MailGuardTracker is a method and system for tracking physical and digital communication that are sent to inmates. MailGuardTracker enables a significant reduction in contraband and/or prohibited communications that are sent to inmates and provides transparency in the communication delivery process such that a sender is appraised as to the current status of a particular communication as it is processed by various systems and sub-systems within a correctional facility.

### 4.4.5. SmartWatch

SmartWatch is a device and system providing inmate surveillance and tracking. The SmartWatch is a wearable device that provides insight related to an inmate's location and biometrics offering both live and historical data.

### 4.4.6. SmartEcosystem

SmartEcosystem is a software platform that provides correctional facilities a single location where all of the other HLFIP technologies can be accessed. The SmartEcosystem dashboard allows facility staff to efficiently manage all of the correctional facility administrative services as well as provides access to new technology as it becomes available.

### 4.4.7. SmartEd

SmartED is a mobile and software application that provides incarcerated individuals with educational courses and training materials via a tablet or a kiosk.

### 4.4.8. SmartEntertainment

SmartEntertainment is a mobile and software application that provides incarcerated individuals with entertainment services, mainly in the form of video, music, and game options.

13

                                              Plaintiffs0001699

### 4.4.9. SmartLaw

SmartLaw is a software program that provides inmates with access to legal materials such as case law, treatises, legal forms, and other books in the legal field.

### 4.4.10. SmartLink

SmartLink is a surveillance software that allows correctional facility staff to track and monitor inmate communications, requests, grievances, and other interactions in the facility. The SmartLink program assists correctional facility staff to compile inmate data in a manner that helps to identify inappropriate communications, abuse of privileges, or a failure on behalf of facility staff to respond to inmate needs.

### 4.4.11. SmartReentry

SmartReentry is a mobile and software program that provides incarcerated individuals with educational and wellness-based courses and training materials to assist in the transition from incarceration to the public as a means of reducing the recidivism rate.

### 4.4.12. SmartRequest

The SmartRequest application provides incarcerated individuals with a platform to electronically submit their requests or grievances to correctional facility staff. The SmartRequest system also helps to ensure that inmate requests are tracked throughout their pendency through completion, kept on an inmates file, and ultimately provides a record of the correctional facility's responsiveness to the inmate population.

### 4.4.13. SmartTablet

SmartTablet is a portable device that incarcerated individuals are given access to so that they can view the SmartEd, SmartEntertainment, SmartVisit, MailGuard, SmartRequest, SmartReentry, and SmartLaw applications.

### 4.4.14. SmartVisit

SmartVisit allows inmates to visit with family and friends virtually on either a SmartTablet or kiosk. The SmartVisit application facilitates remote or on-site video visitation.

## 4.5.    Major Customers

The group's major customers are prisons, jails, and detention centers throughout the US.

## 4.6.    Major Competitors

The group's main competitors are Securus Technologies and ViaPath Technologies.

14

HLFIP Holding, Inc.                                                                                      Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

## 4.7.    Employee Headcount

Below is an employee headcount summary for SmartCom Collier as of December 31, 2022, broken down by department.

| Department | Headcount |
|---|---|
| Accounting | 2 |
| Administrative | 8 |
| Call Center | 30 |
| Client Services | 3 |
| Engineering/Development | 11 |
| Field Services | 7 |
| Information Technology ("IT") | 7 |
| Information Technology System ("ITS") | 3 |
| Mail Processing Clerks | 13 |
| Sales | 19 |
| Warehouse | 4 |
| **Total** | **107** |

15

Plaintiffs0001701

HLFIP Holding, Inc.                                                                                          Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

## 5.    Industry Analysis – Correctional Facilities in the US[5]

Please refer to **Appendix II** for this report.

---

[5] IBISWorld Industry Report. Prepared by Alex Petridis. March 2023.

16

## 6.    Functional Analysis, Risk Analysis and Assets Owned Analysis

### 6.1.    Intercompany Transaction

The Treas Regs specify that in determining the degree of comparability between controlled and uncontrolled transactions or controlled and uncontrolled taxpayers, functions and risks, contractual terms, economic conditions, and property or services are some of the factors that must be considered. Functions that are economically significant are identified in a particular taxpayer's business. Economically significant functions typically include research and development, product design and engineering, manufacturing, production and process engineering, product fabrication, extraction, and assembly, purchasing and materials management, marketing and distribution, transportation and warehousing, and managerial and administrative services.

The following is a summary of the Covered Transaction relevant in this report:

**Table 3: Intercompany Transaction Amounts**

| Intercompany Transaction | Type of Transaction | Amount (USD) |
|---|---|---|
| The licensing of HLFIP IP from HLFIP to SmartCom Holding, which then sublicenses it to SmartCom Collier for distribution to correctional facilities across the US | Intangible Transaction | $17,874,784 |

The Company is in the process of ratifying a Patent & Trademark licensing agreement between HLFIP and SmartCom Holding for the Covered Transaction.

The functional analysis section contains a description of the functions performed, risks borne, and assets owned by HLFIP. The use of a functional analysis in determining the comparability of transactions and selecting the best method of analysis is explicitly discussed in the Treas Regs:

> "Determining the degree of comparability between controlled and uncontrolled transactions requires a comparison of the functions performed, and associated resources employed, by the taxpayers in each transaction. This comparison is based on a functional analysis that identifies and compares the economically significant activities undertaken, or to be undertaken, by the taxpayers in both controlled and uncontrolled transactions. A functional analysis should also include consideration of the resources employed, or to be employed, in conjunction with the activities undertaken, including consideration of the type of assets used, such as plant and equipment, or the use of valuable intangibles. A functional analysis is not a pricing method and does not itself determine the arm's-length result for the controlled transaction under review..." [6]

Accordingly, the functions performed, risks borne, and assets used by HLFIP were reviewed. This discussion primarily addresses the organization and the functional responsibilities of the relevant entities as they pertain to the Covered Transaction evaluated in this report.

---

[6] Treas Regs §1.482-1(d)(3)(i)

17

HLFIP Holding, Inc.                                                                                     Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

Below is a summary of the functional analysis that was conducted for the Covered Transaction.

**Table 4: Functional Analysis Summary**

| Functions | HLFIP | SmartCom Collier |
|---|---|---|
| Research & development ("R&D") | X | X |
| Product design and upgrade | X | X |
| Sales and business development | | X |
| Managerial and administrative | X | X |

| Functions | Description |
|---|---|
| Research & development ("R&D") | Mr. Logan is the only inventor of patented and proprietary technologies, and he has assigned those proprietary technologies and their associated trademarks to HLFIP. Mr. Logan formulates his ideas in writing, assigns them to HLFIP, and then he approaches SmartCom Collier employees to explain his ideas. Afterwards, SmartCom Collier employees start working on the implementation of the ideas into commercial product offerings. SmartCom Collier develops and updates the software that captures HLFIP IP and then is sold in the US market. |
| Product design and upgrade | The R&D employees at SmartCom Collier receive writings and instructions from HLFIP to implement in the commercial products. A third party develops hardware for the SmartWatch. Charging stations are also produced by third parties. SmartCom Collier assumes the third-party costs. |
| Sales and business development | Sales and business development are primarily the responsibility of SmartCom Collier's sales team. |
| Managerial and administrative | Each entity is responsible for its own managerial and administrative functions. |

## 6.2.    Risks

| Risks | HLFIP | SmartCom Collier |
|---|---|---|
| Market risk | X | X |
| Infringement risk | X | |
| Credit risk | | X |
| Operational risk | | X |

18

HLFIP Holding, Inc.
FY 2022 – US Transfer Pricing Documentation Study

Marcum LLP

| Risks | Description |
|---|---|
| Market risk | Changes in local economic, market, and regulatory conditions can adversely affect the availability of projects requiring SmartCom's expertise. As the operational entity of the SmartCom group, SmartCom Collier bears the market risk. In the event of client loss (or loss of contracts with the government), SmartCom Collier would still need to cover its operational expenses. HLFIP bears limited market risk. |
| Infringement risk | As patent owner, HLFIP is responsible for pursuing infringements. |
| Credit risk | SmartCom Collier bears the credit risk as it contracts with the government agency in charge of the jail. However, the credit risk is low. |
| Operational risk | As the operating entity, SmartCom Collier bears the operational risk. |

### 6.3.    Assets Employed

#### 6.3.1. Tangible Assets

**Table 5** summarizes the tangible assets of the SmartCom group at cost as of December 31, 2022. HLFIP does not own any tangible assets.

**Table 5: Tangible Assets**

| Description | SmartCom US | SmartCom Pasco | SmartCom Collier |
|---|---|---|---|
| Kiosks/Computer System | $152,052 | $148,243 | $2,687,307 |
| Computer Software | | | $2,987,876 |
| Vehicles | | | $2,682,697 |
| Display System | | | $21,280 |
| Demo Build | | | $22,500 |
| Furniture & Fixtures | | $7,350 | $156,342 |
| Buildings | | | $5,071,155 |
| Leasehold Improvements | | $3,250 | $352,500 |
| Mail Service Equipment | | | $414,217 |
| Equipment | | | $185,252 |
| Total | $152,052 | $158,843 | $14,581,127 |

19

Plaintiffs0001705

HLFIP Holding, Inc.                                                                                    Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

### 6.3.2. Intangible Assets

**Table 6**, **Table 7**, and **Table 8** summarize the intangible assets that are owned by HLFIP and that are subject to the Covered Transaction.

**Table 6: Intangible Assets – Patents**

| No. | Patent Name | Patent No. | Filing Date |
|-----|-------------|------------|-------------|
| 1. | CORRECTIONAL POSTAL MAIL CONTRABAND ELIMINATION SYSTEM | 11457013 | 05/10/2019 |
| 2. | CORRECTIONAL INSTITUTION LEGAL POSTAL MAIL PROCESSING SYSTEM AND METHOD | 10659630 | 02/26/2019 |
| 3. | SYSTEMS AND METHODS FOR PROCESSING REQUESTS TO SEND PRIVATE POSTAL MAIL TO AN INMATE | 11201974 | 08/27/2020 |
| 4. | CORRECTIONAL INSTITUTION LEGAL POSTAL MAIL PROCESSING SYSTEM AND METHOD | 11637940 | 05/18/2020 |
| 5. | COMMUNICATION TRACKING SYSTEM FOR CORRECTIONAL FACILITIES | 10862891 | 08/01/2019 |
| 6. | CORRECTIONAL POSTAL MAIL CONTRABAND ELIMINATION SYSTEM | 10291617 | 05/12/2016 |

**Table 7: Intangible Assets - Patent Applications**

| No. | Patent Application Name | Application No. | Filing Date |
|-----|-------------------------|-----------------|-------------|
| 1. | COMMUNICATION TRACKING SYSTEM FOR CORRECTIONAL FACILITIES | 17/114326 | 12/07/2020 |
| 2. | SMART WEARABLE DEVICE FOR TRACKING AND MONITORING INDIVIDUALS IN A CORRECTIONAL FACILITY | 17/580462 | 01/20/2022 |
| 3. | STATIONARY EXERCISE BIKE FOR USE IN A CORRECTIONAL FACILITY | 17/194190 | 03/05/2021 |
| 4. | SYSTEMS AND METHODS FOR PROCESSING REQUESTS TO SEND PRIVATE POSTAL MAIL TO AN INMATE | 17/549349 | 12/13/2021 |
| 5. | CORRECTIONAL POSTAL MAIL CONTRABAND ELIMINATION SYSTEM | 17/363499 | 06/30/2021 |

20

HLFIP Holding, Inc.                                                                                      Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

**Table 8: Intangible Assets – Trademarks**

| No. | Trademark Name |
|-----|----------------|
| 1. | Smart Ecosystem |
| 2. | SmartEd |
| 3. | SmartEntertainment |
| 4. | SmartLaw |
| 5. | SmartLink |
| 6. | SmartReentry |
| 7. | SmartRequest |
| 8. | SmartTablet |
| 9. | SmartVisit |
| 10. | SmartWatch |
| 11. | SmartSummit |
| 12. | MailGuard |
| 13. | MailGuardLegal |
| 14. | MailGuardConnect |
| 15. | MailGuardTracker |
| 16. | MailGuardDigital |

## 6.4.    Characterization of Entity

Based on the "Functional Analysis" above, HLFIP can be characterized as an entrepreneur as the title owner of the HLFIP IP. SmartCom Collier can be characterized as a distributor of the HLFIP IP licensed from HLFIP to be used in correctional facilities across the US.

21

                                                          Plaintiffs0001707

HLFIP Holding, Inc.                                                                                          Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

## 7.    Corporate Structure

The regulations require a description of the taxpayer's organizational structure covering all affiliates whose transactions may be relevant under Treas Regs.

**Figure 1** below provides an abridged organizational chart of the affiliates, with the entities analyzed in this report shaded in blue. Mr. Logan owns 100 percent of HLFIP and 50 percent of SmartCom Holding; SmartCom Holding owns 100 percent of SmartCom Collier.

**Figure 1: HLFIP and SmartCom's Abridged Organization Chart as of FY 2022**



22

CONFIDENTIAL

HLFIP Holding, Inc.                                                                   Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

## 8.    Best Method Selection

### 8.1.    Overview of US Transfer Pricing Guidelines

The US tax law on transfer pricing is contained in Section 482 of the IRC and the regulations thereunder. The US statute reflects the international standard requiring taxpayers who are controlled by the same interests to deal with each other at arm's-length.

The statute was amplified by regulations promulgated in 1968. These regulations provided guidance and set forth the methods that should be employed when establishing an arm's-length price for the rendition of services, the transfer of tangible goods, the license of intangible property, and related party loans. In January 1992, the IRS issued proposed regulations under Section 482 that would have substantially modified the 1968 regulations. In response to many negative comments received by the IRS, these proposed regulations were withdrawn and substantially revised temporary and proposed regulations were issued on January 21, 1993. Final regulations under Section 482 were issued in July 1994, effective for taxable years beginning after October 6, 1994. However, taxpayers may elect to apply these regulations to any open taxable year.

### 8.2.    Arm's-Length Standard

In order to make a proper determination of taxable income of a controlled taxpayer, the standard to be applied in every case is that of a taxpayer dealing at arm's-length with an uncontrolled taxpayer.[7] A controlled transaction is deemed to be conducted at arm's-length if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances.[8]

The nature of all transactions must be evaluated in light of a method selected under the best method rule (discussed below) in order to ensure that the arm's-length standard is met.[9]

To determine whether a tangible, intangible, or service transaction has been conducted at arm's-length, the regulations provide a number of different testing methodologies. These methodologies generally fall into two broad categories. The first are transactional methods and include the Comparable Uncontrolled Price Method ("CUP"), the Comparable Uncontrolled Transaction Method ("CUT"), the Resale Price Method ("RPM"), Cost of Services Plus Method ("CSP"), Gross Services Margin Method ("GSM"), Comparable Uncontrolled Services Price Method ("CUSP"), and the Cost Plus Method ("CP"). When one of these methodologies is employed, the arm's-length character of a controlled transaction under review is established by comparing the unit price, gross margin, or royalty realized in connection with the controlled transaction to the same financial measure associated with an uncontrolled transaction that is comparable to the controlled transaction.

Although transactional methodologies are typically the most reliable measures of an arm's-length price, they are often not used due to the scarcity of comparable uncontrolled transactions. Since the identification of one

---

[7] Treas Regs §1.482-1(b)
[8] Treas Regs §1.482-1(b)
[9] Treas Regs §1.482-1(b)

23

HLFIP Holding, Inc.                                                        Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

or more uncontrolled transactions is difficult, the regulations offer an alternative profit-based approach to determine whether controlled transactions have been conducted at arm's-length.

The second are profitability methods and include the Comparable Profits Method ("CPM") and the PSM. In general, when a profit-based methodology is employed, the profitability of one of the parties to a controlled transaction is compared to the profitability of other similar, unrelated legal entities that have not engaged in related party transfers. If the profitability of the legal entity involved in the controlled transaction is similar to that of the unrelated legal entities, then the conclusion can be made that the controlled transaction was conducted at arm's-length. If not, then this can be an indicator that the controlled transaction was priced incorrectly.

To determine whether a controlled transaction has been conducted at arm's-length, it is necessary to carefully compare the controlled transaction or the controlled taxpayer to comparable uncontrolled transactions or taxpayers. When making this comparison, the regulations require that you take into account the following factors:

- Property or services transferred in the transaction;
- Economic conditions that affect the prices that would be charged or paid;
- Contractual terms;
- Functions performed; and
- Significant risks undertaken.

Uncontrolled transactions or taxpayers that are not exactly the same can still be used as comparables if material differences (those that would affect the price) can be adjusted for. The regulations provide that as the degree of comparability between the controlled transactions or taxpayer increases, so will the reliability of the analysis.

Multiple testing methodologies might be employed to test the arm's-length character of the controlled transactions being analyzed in this transfer pricing study. The regulations state that taxpayers should use the methodology that provides the most reliable measure of an arm's-length result under the facts and circumstances. As mentioned above, this concept is known as the Best Method rule.

### 8.3.    Best Method Analysis[10]

Often more than one testing method is applicable to a particular controlled transaction. To establish which method should be applied to the transaction, the regulations employ the Best Method rule. The best method is defined as the method that provides the most reliable measure of an arm's-length result under the facts and circumstances of the controlled transaction under review. There is no strict priority of methods. An arm's-length result may be determined without disproving other applicable methods. However, if another method is subsequently shown to provide a more reliable result, this other method must be used.

Pursuant to the penalty regulations, there will be no penalty if the taxpayer reasonably concludes that the method employed is the best method.

---

[10] Treas Regs §1.482-1(c)(1)

24

This document will first provide background information on the transfer pricing regulatory environment and then will discuss the best method and the justification for its selection.

### 8.3.1. Methodology

As noted above, the regulations provide specific methods that can be used to evaluate whether transactions between or among members of the controlled group satisfy the arm's-length standard. The regulations state that the following methods can be used to test tangible transactions: (1) CUP, (2) RPM, (3) CP, (4) CPM, (5) Profit Split Method ("PSM"), and (6) unspecified methods. For intangible transactions, the regulations specify the following methods: (1) CUT, (2) CPM, (3) PSM, (4) unspecified methods. For service transactions, the regulations specify the following methods (1) SCM, (2) CUSP, (3) GSM, (4) CSP, (5) CPM, (6) PSM, and (7) unspecified methods. Each method will be described in detail below.

### 8.3.1.1. Comparable Uncontrolled Price ("CUP") Method [11]

When employing the CUP methodology, the unit price charged for the tangible property transferred in a controlled transaction is compared to the unit price charged for the same (or very similar) tangible property transferred in a comparable uncontrolled transaction. The CUP method is the most reliable measure of an arm's-length price where there are no material differences that would affect the price between the controlled and uncontrolled transactions, or where there are only minor differences for which adjustments can be made.

The regulations state that when applying the CUP method to a transaction, the basic comparability factors outlined in Treas Regs Section 1.482-1(d)(3) must be adhered to (i.e., property transferred, functions performed, contractual terms, economic conditions, and risks assumed). However, the regulations emphasize that product similarity is the most important factor to be taken into account. In addition, because even minor differences in the contractual terms or economic conditions could materially affect the price charged in uncontrolled transactions, comparability under the CUP method depends on close similarity with respect to these factors as well.

### 8.3.1.2. Resale Price Method ("RPM") [12]

The RPM determines whether the amount paid between a manufacturer and distributor in a controlled transaction is the arm's-length price by comparing the gross profit margin realized by the distributor (in connection with the controlled transaction) to the gross margin realized by it or a similar distributor in a comparable uncontrolled transaction.

Since a distributor's gross profit provides compensation for the resale functions that it performs in relation to the products under review, comparability under the RPM is particularly dependent on the similarity of functions performed, the risks assumed, and the contractual terms of the controlled and comparable uncontrolled transactions (or adjustments must be made to account for the effects of any such differences). However, all of the comparability factors listed in the regulations must still be considered.

### 8.3.1.3. Cost Plus ("CP") Method [13]

The CP Method determines whether the amount charged between a manufacturer and distributor in a controlled transaction is the arm's-length price by comparing the gross profit margin realized by the

---

[11] Treas Regs §1.482-3(b)
[12] Treas Regs §1.482-3(c)
[13] Treas Regs §1.482-3(d)

25

manufacturer in connection with the controlled transaction to the gross profit margins realized by similar uncontrolled manufacturers when they transfer similar property to similar uncontrolled distributors. Since a manufacturer's gross profit provides compensation for the production functions that it performs in relation to the products under review, comparability under the CP Method is particularly dependent on the similarity of functions performed, the risks assumed, and the contractual terms of the controlled and comparable uncontrolled transactions (or adjustments must be made to account for the effects of any such differences). However, all of the comparability factors listed in regulations must still be considered.

### 8.3.1.4. Comparable Profits Method ("CPM")[14]

The CPM can be used to test prices paid for tangible property, intangible property, and as compensation paid for related party services. Unlike transactional methods, the CPM does not compare the controlled transaction to a comparable uncontrolled transaction. Instead, the profitability of a controlled taxpayer or one of its business units is compared to the profitability of comparable uncontrolled taxpayers. The controlled transaction participant whose profitability is being evaluated is known as the "tested party."

In most cases, the tested party will be the least complex of the controlled taxpayers and the party whose profit attributable to the controlled transactions can be verified using the most reliable data requiring the fewest adjustments and for which reliable data regarding uncontrolled comparables can be located. Where the profitability of the tested party falls within the arm's-length range established by the profitability of the comparable uncontrolled taxpayers, all of the tested party's controlled transactions are deemed to be at arm's-length.

Since the CPM does not take into account the actual controlled transactions undertaken by the tested party, the product specific data necessary to apply the transactional based methods is not required. Instead, the financial data associated with the tested party's controlled transactions are used. To determine profitability for the tested party and comparable uncontrolled taxpayers, the regulations explicitly include three PLIs that can be used. Where the tested party is concerned, the PLI employed should be applied solely to the financial data that corresponds to the controlled transactions under review.

While all the comparability factors listed in the regulations must still be considered, comparability under the CPM is particularly dependent on resources employed and risks assumed. It is also important to consider the functions performed by the tested party and the comparable uncontrolled taxpayers.

### 8.3.1.5. Profit Split Method ("PSM")[15]

The PSM evaluates whether the allocation of the combined profit or loss attributable to one or more controlled transactions is at arm's-length by reference to the relative value of each controlled taxpayer's contribution. The combined operating profit must be derived from the most narrowly identifiable business activity of the controlled taxpayers for which data is available that includes the controlled transactions. The relative value of each related entity's contribution to the success of the venture must be determined in a manner that reflects the functions performed, the risks assumed, and the resources employed by each partner.

Two profit split methods are allowed by the regulations: (1) the comparable profit split, and (2) the residual profit split. The comparable profit split is derived from the combined operating profit of uncontrolled taxpayers

---

[14] Treas Regs §1.482-5
[15] Treas Regs §1.482-6

HLFIP Holding, Inc.                                                                                      Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

whose transactions and activities are similar to those of the controlled taxpayers in the relevant business activity.

Under this method, each uncontrolled taxpayer's percentage of the combined operating profit or loss is used to allocate the combined operating profit or loss of the relevant business activity.

The residual profit split allocates the combined operating profit of the taxpayers involved in the controlled transactions under review using a two-step process. First, operating income is allocated to each party to provide a market return for its routine business contributions. The market returns should be determined by reference to the returns achieved by uncontrolled taxpayers engaged in similar activities. Second, the residual profit (i.e., the profit attributable to the valuable intangible property owned by the group) should be allocated based on the relative value of their contributions of intangible property to the relevant business activity that was not accounted for as a routine contribution.

### 8.3.1.6. Comparable Uncontrolled Transaction ("CUT") Method [16]

The CUT method determines whether the amount charged in a controlled transfer of intangible property is the arm's-length price by comparing this controlled transaction to a very similar uncontrolled transaction involving a transfer of comparable intangible property under comparable circumstances.

When determining the comparability between the controlled and comparable uncontrolled transactions, the basic comparability factors listed in the regulations must be considered.

However, the regulations emphasize that the controlled and uncontrolled transactions should involve the same or comparable intangible property. The regulations further provide that when determining comparability, the intangible property in both the controlled and uncontrolled transactions must: (1) be used in connection with similar products or processes within the same general industry or market; and (2) have a similar profit potential. In addition, the economic conditions and the contractual terms surrounding the controlled and uncontrolled transactions should be very similar (or adjustments should be made to account for any material differences).

### 8.3.1.7. Service Cost Method ("SCM") [17]

The SCM evaluates whether the amount charged for specified covered or low-margin covered services is arm's-length by reference to the total services costs with no mark-up. The specified covered services are those that may be included as support services common among taxpayers across industry sectors and generally do not involve a significant comparable markup on total services costs. Low margin covered services are controlled services transactions for which the median comparable markup on total services costs is less than or equal to 7%. For these purposes, the median comparable markup on total services costs means the excess of the arm's-length price of the controlled services transaction determined under the Section 482 Regulations using the interquartile range described in §1.482-1(e)(2)(iii)(C) and making necessary adjustments, over total services costs, expressed as a percentage of total services costs.

Services not eligible for the application of the SCM (i.e., cannot be charged at cost) include the following categories or transactions: manufacturing; production; extraction, exploration or processing of natural resources; construction; reselling, distribution, acting as a sales or purchasing agent, or acting under a

---

[16] Treas Regs §1.482-4(c)
[17] Treas Regs §1.482-9(b)

27

Plaintiffs0001713

commission or other similar arrangement; research, development, or experimentation; engineering or scientific; financial transactions, including guarantees; and insurance or reinsurance.[18]

In addition, application of the SCM must be considered in view of the "business judgment rule." The taxpayer must therefore reasonably conclude in its business judgment that the service does not contribute significantly to key competitive advantages, core capabilities, or fundamental risks of success or failure in one or more trades or the businesses of the renderer, recipient or both.[19] The taxpayer must also keep adequate books and records that would permit for verification of total services costs incurred.

### 8.3.1.8. Comparable Uncontrolled Services Price ("CUSP") Method[20]

The CUSP method uses service transactions between unrelated parties to determine arm's-length consideration for services transacted between related parties. This method evaluates whether the amount charged in a controlled transaction is arm's-length by reference to the amount charged in a comparable uncontrolled transaction. In making this evaluation, it is important that prospective CUSP method comparables involve substantially the same services as the controlled transaction. If there are material differences for which reliable adjustments cannot be made, this method ordinarily will not provide a reliable measure of an arm's-length result.

### 8.3.1.9. Gross Services Margin ("GSM") Method[21]

The GSM method determines the arm's-length consideration amount charged to a related company by reference to the gross profit margin realized by the related company in a transaction with an unrelated company. This method ordinarily is used in cases where a related company performs services or functions in connection with an unrelated transaction between a related company and an unrelated company. As such, this method is used where a related company renders services (agent services) to another related company in connection with a transaction between that other company and an unrelated company. Furthermore, this method is also used in cases where a related taxpayer contracts to provide services to an unrelated company and another related company actually performs a portion of the services provided.

### 8.3.1.10.    Cost of Services Plus ("CSP") Method [22]

The CSP method determines the arm's-length consideration that the related company should earn in an intercompany service transaction based on the gross services profit markup realized in comparable unrelated transactions. The CSP method is ordinarily used in cases where the controlled service renderer provides the same or similar services to both related and unrelated parties. The reliability of profit measures based on gross services profit may be adversely affected by factors that have less effect on prices. For- example, gross services profit may be affected by a variety of other factors, including cost structures or efficiency-related factors (for example, differences in the level of experience of the employees performing the service in the related and unrelated transactions). Accordingly, if material differences in these factors are identified based on objective evidence, the reliability of the analysis may be affected.

---

[18] Treas Regs §1.482-9(b)(3)(ii)
[19] Treas Regs §1.482-9(b)(2)
[20] Treas Regs §1.482-9(c)
[21] Treas Regs §1.482-9(d)
[22] Treas Regs §1.482-9(e)

28

Plaintiffs0001714

## 8.4.    Penalty Regulations

The final Section 6662 regulations stipulate that penalties can be asserted when IRS adjustments to taxpayers' returns are warranted, and that these penalties can be avoided through contemporaneous documentation of a reasonable cause and good faith effort to establish appropriate transfer pricing policies. The regulations define two types of penalties, the substantial valuation misstatement and the gross valuation misstatement.

A substantial valuation misstatement occurs when the IRS makes a transfer pricing adjustment and either (1) the original transfer price is 200 percent or more or 50 percent or less of the amount determined under Section 482 to be the correct price or (2) the net Section 482 adjustment[23] is greater than the lesser of $5 million or 10% of gross receipts. A substantial valuation misstatement results in a penalty of 20 percent of the underpayment of tax attributable to the misstatement.

A gross valuation misstatement will result in a 40% penalty. A gross valuation misstatement occurs when the IRS makes an adjustment and either (1) the original transfer price is 400% or more or 25% or less of the amount determined under Section 482 to be the correct price or (2) the net Section 482 adjustment is greater than the lesser of $20 million or 20% of gross receipts.

These misstatement penalties can be avoided if taxpayers demonstrate that they acted reasonably and in good faith in their intercompany transactions. Specifically, the reasonable cause and good faith standard requires "fact and circumstance" analysis in which the taxpayer demonstrates an effort to accurately determine tax liability. A taxpayer can also establish reasonable cause and good faith by meeting the documentation requirements relating to net Section 482 adjustments.

## 8.5.    Documentation Requirements

The following is a list of documents specified under Section 1.6662-6(d)(2)(iii)(A-C). At the time the tax return is filed, taxpayers must have in existence the principal documents numbers 1 through 8 and background documents, and must provide this documentation to IRS within 30 days of a request for it.

1.   Overview of taxpayer's business, including an analysis of the economic and legal factors affecting pricing;

2.   Description of the taxpayer's organizational structure, including all related entities with transactions which are potentially covered under Section 482;

3.   Copies of any documents explicitly required under Section 482, such as agreements or pricing arrangements;

4.   Description of the method selected and an explanation of why that method was selected;

5.   Description of the alternative methods that were considered and an explanation of why they were not selected;

---

[23] The term net Section 482 adjustment is defined as the sum of all increases in the taxable income of a taxpayer for a taxable year resulting from allocations under Section 482 (determined without regard to any amount carried to such taxable year from another taxable year) less any decreases in taxable income attributable to collateral adjustments as described in Section 1.482-1(g).

29

HLFIP Holding, Inc.                                                                    Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

6. Description of the controlled transactions and any internal data used to analyze the controlled transactions;

7. Description of the comparables that were used, how comparability was evaluated, and any adjustments that were made;

8. Explanation of the economic analysis relied upon in developing the method;

9. Description or summary of any relevant data obtained after the end of tax year and before filing the tax return; and

10. General index of the principal and background documents and a description of the record keeping system used for cataloging and accessing those documents.

Background documents support the principal documentation. These documents may be necessary to establish that the taxpayer's method was selected and applied in the way that provided the most accurate measure of an arm's length result. Background documents may include: historical data of the comparables, Forms 10-K, budgets, invoices, interview notes, third party agreements, strategic plans, manuals, specifications, or other descriptions of functions performed.

## 8.6.    Application of the Best Method Rule

Often more than one testing methodology is applied to a particular controlled transaction. To establish which method should be used to perform an arm's length analysis for the transaction, the Internal Revenue Code Section 482 regulations employ the Best Method Rule. The best method is defined as the method that provides the most reliable measure of an arm's length result under the facts and circumstances of the controlled transaction under review. There is no hierarchy for choosing methods. Furthermore, an arm's length result may be determined without disproving other applicable methods. However, if another method is subsequently shown to provide a more reliable result, this other method must be employed. Pursuant to the penalty regulations, a penalty will not be assessed if the taxpayer reasonably concludes that the method employed is the best method.

Factors to be considered include:

- The degree of comparability between the controlled transaction (or taxpayers) and any uncontrolled transactions or comparables. Treas Regs Section 1.482-1(d)(3) discusses in detail the specific factors that must be considered (e.g., Functional Analysis, Contractual Terms, Risk, Economic Conditions, and Property or Services).

- The completeness and accuracy of the underlying data used in the analysis, the reliability of the assumptions used in connection with the method, and the sensitivity of the results to deficiencies in the data used or the assumptions made (depending on the methodology employed).

- In certain circumstances, one should also consider whether the results of an analysis using a particular method are consistent with the results of an analysis using another method. If two or more methods produce inconsistent results, a third method may be used as a tie-breaker.

The Best Method Rule requires the taxpayer to select the methodology that provides the most reliable measure of an arm's-length result under the facts and circumstances under review. Since the regulations do not present a hierarchy of methods when performing a transfer pricing analysis, it is necessary to evaluate all available testing methodologies. The penalty regulations require the taxpayer to document the testing

30

                                                          Plaintiffs0001716

HLFIP Holding, Inc.                                                                 Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

methodology which is chosen to be the "best method." The penalty regulations also require taxpayers to discuss each alternative methodology that was not considered and provide an explanation for why it was not selected.

Below is a description of the best methodologies for the controlled transactions under review in this report. This decision is based upon the documentation and economic analysis outlined in this report.

## 8.7.    Overview of the US Transfer Pricing Regulations for Services

In the United States, intercompany transactions for the provision of services are addressed by the Section 482 Regulations, including the "Services Regulations" issued July 31, 2009[24]. The Services Regulations replace temporary services regulations ("Temporary Regulations"), which were issued July 31, 2006[25]. The final Services Regulations are applicable to tax years beginning after July 31, 2009. The Temporary Regulations were generally effective for taxable years starting after December 31, 2006, and replaced transfer pricing rules for intercompany services that had been in place since 1968[26]. The final Services Regulations provide specified methods for the provision of intercompany services, including a new cost safe harbor for certain services that are not considered "Core Services" to the controlled group, as further described below[27].

The overriding principle of the US transfer pricing regulations is to place transactions between related parties on par with transactions between unrelated parties. As previously discussed, the standard to be applied in determining the "true taxable income" derived from related party transactions is the arm's length standard. The Services Regulations provide that an arm's length charge should be made for a controlled services transaction, which is defined as an activity undertaken by a controlled entity (or entities) that results in a benefit to one or more other controlled entities[28].

### 8.7.1. Benefit Rule

In considering the provision of intercompany services, the Services Regulations impose a specific benefit rule[29]. An activity provides a benefit if the activity directly results in a reasonably identifiable increment of economic or commercial value that enhances the recipient's commercial position or that may reasonably be anticipated to do so.[30] In general terms, the benefit test states that benefits must be obtained by the receiver in order for a charge to be levied. The Services Regulations state:

---

[24] The Treasury Department and the IRS issued final section 482 regulations regarding the treatment of intercompany service transactions and the allocation of income from intangibles on July 31, 2009. The final regulations, principally Treas. Reg. §1.482-9, replace temporary regulations issued on July 31, 2006. While the final services regulations incorporate some minor modifications in response to comments received regarding the temporary regulations, the preamble to the final regulations notes that the changes are in the nature of clarifications that do not fundamentally alter the policies reflected in the 2006 temporary regulations.
[25] Treas. Reg. §1.482-9T.
[26] Former Treas. Reg. §1.482-2(b).
[27] Treas. Reg. §1.482-9(b)(5).
[28] Treas. Reg. §1.482-9(l)(1).
[29] The preamble to the Temporary Regulations states that the specific benefit rule was intended to be consistent with the OECD Guidelines by focusing on the value to the recipient. This benefit rule applies even if the services received are occasional or intermittent. 71 Fed. Reg. 44466, 44473 (Aug. 4, 2006).
[30] Treas. Reg. §1.482-9(l)(3)(i).

31

HLFIP Holding, Inc.                                                                                                Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

*"An activity is considered to provide a benefit to the recipient if the activity directly results in an economic or commercial value that enhances the recipient's commercial position, or that may reasonably be anticipated to do so. An activity is generally considered to confer a benefit if, taking into account the facts and circumstances, an uncontrolled taxpayer in circumstances comparable to those of the recipient would be willing to pay an uncontrolled party to perform the same or similar activity on either a fixed or contingent-payment basis, or if the recipient otherwise would have performed for itself the same activity or a similar activity."*

An activity is not considered to provide a benefit to the recipient if, at the time the activity is performed, the present or reasonably anticipated benefit from that activity is so indirect or remote that the recipient would not be willing to pay an uncontrolled party to perform a similar activity, and would not be willing to perform such activity for itself for this purpose[31]. There is no benefit for activities that duplicate services already being performed by the recipient unless they provide additional benefit to the recipient[32].

Similarly, there is no benefit conferred for shareholder activities[33]. There is no benefit to a related party if the sole effect of the activity is: (i) to protect the renderer's capital investment in the recipient or in other members of the controlled group; and/or (ii) to facilitate compliance with the renderer's reporting, legal or regulatory requirements. However, day-to-day management of a related party is not a shareholder activity.

Where a controlled taxpayer obtains a benefit due to passive association (i.e., by account of its status of being a member of the controlled group), no benefit is deemed to be conferred under the Services Regulations and, therefore, no compensation is permitted[34].

### 8.7.2. Total Services Cost

Total services costs are relevant for the application of the methods permissible under the Services Regulations (the SCM, the CUSP method, the GSM method, the CSP method, the CPM, the PSM, and unspecified methods)[35]. These methods are described later in this section.

Total services costs include all costs (including stock-based compensation) that can be identified directly with the act of providing services, and all other costs reasonably allocable to the services including:

- direct costs that are specifically identified with a particular service; and

- indirect costs that are not specifically identified with a particular service, but which relate to direct costs[36].

Total services costs exclude interest expense and income taxes.

---

[31] Treas. Reg. §1.482-9(l)(3)(ii).
[32] Treas. Reg. §1.482-9(l)(3)(iii).
[33] Treas. Reg. §1.482-9(l)(3)(iv).
[34] Treas. Reg. §1.482-9(l)(3)(v).
[35] Treas. Reg. §1.482-9(a).
[36] Treas. Reg. §1.482-9(j).

32

HLFIP Holding, Inc.                                                                                    Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

### 8.7.3. Allocation of Costs

Where a method makes reference to costs, costs are to be allocated according to any reasonable method of allocation and apportionment of costs[37]. Allocation of costs based on a generalized or non-specific benefit is not permissible.[38]

US GAAP is not necessarily controlling. Allocations used for non-tax, business purposes (e.g., segment report on public financial statements or management reporting) may be considered reliable but also not controlling[39]. Consideration should be given to all bases and factors, for example: total services costs, total costs for relevant activity, assets, sales, compensation, space utilized, and time spent[40].

### 8.8.    Method Applied

The CUT method was selected as the best method based on the facts surrounding the Covered Transaction where HLFIP is the licensor, SmartCom Holding is the exclusive licensee, and SmartCom Collier is the sublicensee. Independent agreements with similar characteristics were reliably identified. The royalty rate charged by HLFIP to SmartCom Holding was compared to those of the independent agreements, effectively measuring the arm's-length nature of the Covered Transaction.

**Table 9: Method Selected Summary**

| Intercompany Transaction | Type of Transaction | Method Selected | Licensor | Licensee | Sublicensee |
|---|---|---|---|---|---|
| The licensing of HLFIP IP from HLFIP to SmartCom Holding, which then sublicenses it to SmartCom Collier for distribution to correctional facilities across the US | Intangible Transaction | CUT | HLFIP | SmartCom Holding | SmartCom Collier |

---

[37] Treas. Reg. §1.482-9(k)(2)(ii).
[38] Treas. Reg. §1.482-9(k)(1).
[39] Treas. Reg. §1.482-9(k)(2)(ii).
[40] Treas. Reg. §1.482-9(k)(2)(i).

33

## 9.    Methods Not Selected

### 9.1.    Methods Not Selected Discussion

Methods used to test the Covered Transaction will not be discussed in this section. The methods not used amongst those provided by the regulations to test intangible transactions are further discussed below.

#### 9.1.1. Intangible Transactions

**Table 10** summarizes the reasons of rejection of other transfer pricing methods available for intangible transactions.

**Table 10: Intangible Transaction - Non-Selected Methods Summary**

| Method | Reason of Rejection |
|---|---|
| CPM | The CPM method was not used in this intercompany transaction because it does not evaluate whether the amount charged in a controlled intangible transaction is at arm's length by reference to the amount charged in a comparable uncontrolled transaction. Instead, it evaluates an amount charged as arm's length based on objective measures of profitability derived from uncontrolled taxpayers engaging in similar business activities. When the CUT is reliable, as it is for the license of technology, patents, trademarks, and know-how from HLFIP to SmartCom Holding, it is generally considered the best method. |
| PSM | The PSM method calculates the profit (total and residual) from the controlled transactions and splits those profits based on the contribution of each entity and is therefore consistent with what would have occurred at arm's length. The contribution of each entity is determined by performing a functional analysis and valued, if possible, by reference to reliable external market data. The PSM is applied when both related parties own valuable and non-routine intangible assets. The PSM was not selected as the best method for this analysis. |
| Unspecified Method | Not applicable. |

34

HLFIP Holding, Inc.                                                                                      Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

## 10.    Economic Analysis: Licensing of Technology and Trademarks

The application of a CUT herein establishes an arm's length percentage of royalty charged by HLFIP for licensing its intellectual property to SmartCom Holding, which then sublicenses it to SmartCom Collier. This section details the search, identification, and evaluation of agreements that are potentially comparable to the license agreement between HLFIP and SmartCom Holding.

### 10.1.    Comparable Agreement Search and Evaluation

Marcum conducted a search for comparable uncontrolled agreements similar to the Covered Transaction. Marcum searched for agreements using the IntangibleSpring database[41]. IntangibleSpring provides financial and market data for active and inactive businesses and financial institutions, as well as comprehensive repository of intangibles data, including royalty rates, intercompany agreements, and independent party transaction structures. Such data include descriptions of business segments, industry indices, patent assignments, trademarks, and merger & acquisition deals and rumors.

**Table 11** summarizes the search criteria used to find comparable agreements to the Covered Transaction based on the comparability factors identified as relevant, including type of agreement, industry, period, region, royalty base among others.

**Table 11: Search Criteria**

| No. | General Criteria | | Search Result |
|-----|------------------|--------------------------------------------|---------------|
| 1. | Type of IP | Distribution, Software | 1,959 |
| 2. | Industry of IP | Software, Software as a Service ("SaaS") | 775 |
| 3. | Rights | Distribute, Install, Maintain, Support | 2,839 |
| 4. | Normalized Base | Net Profit, Net Sales | More than 6,000 |
| 5. | Exclude | Related Parties | More than 6,000 |
| 6. | Exclude | Expired Agreements | More than 6,000 |
| | Boolean search | 1 and 2 and 3 and 4 and 5 | |
| | | **Total** | **107** |

After applying this search criteria, 107 potential comparable agreements remained. Based on a detailed review of the remaining agreements, Marcum rejected 97 agreements. A final set of 10 agreements were identified.

---

[41] Version August 2023

35

HLFIP Holding, Inc.                                                                                    Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

**Table 12: Summary of Rejection Reasons for Agreements**

| Review Rejections | Agreement Count |
|---|---|
| Duplicated agreement | 2 |
| Insufficient information | 3 |
| Significant different type of contract | 73 |
| Significantly different activities | 9 |
| Significantly different products | 10 |
| **Total Rejected** | **97** |

See **Appendix I.1.** for a detailed listing of potential comparable agreements that were rejected and their corresponding rejection reasons.

### 10.2. Final Set of Comparable Agreements

Below are the 10 uncontrolled agreements that have been deemed comparable after review. The data associated with these agreements was used to construct an arm's-length range. See **Appendix I.2** for descriptions of each comparable uncontrolled agreement.

**Table 13: Comparable Agreements**

| No. | Unique Code | Comparable Agreement Licensor | Comparable Agreement Licensee |
|---|---|---|---|
| 1. | 62046 | Artera Group, Inc. | FairPoint Communications, Inc. |
| 2. | 68075 | Autopack, GmbH | GiveMePower, Inc. |
| 3. | 92851 | Boswell International Technologies Ltd | ESL Pro Systems Inc |
| 4. | 94859 | Intuit, Inc. | Retail Technologies International, Inc. |
| 5. | 77698 | McAfee.com Corp | Network Associates K.K. |
| 6. | 96144 | Merit Audio Visual | Siboney Corporation |
| 7. | 43165 | Nectar Foundation | Siboney Learning Group |
| 8. | 99016 | PTN Media | NeoHand, Inc. |
| 9. | 80371 | Synthonics, Incorporated | MedScape, LLC |
| 10. | 92769 | Virtual Reality Laboratories, Inc | A.I. Soft, Inc |

36

                                                    Plaintiffs0001722

HLFIP Holding, Inc.                                                                                       Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

## 10.3.   Results

Following the rejections from the analysis, 10 agreements were considered to be specifically comparable to the agreement between HLFIP and SmartCom Holding. All royalty rates reported on each of the 10 selected comparable agreements are taken as individual datapoints. **Table 14** displays the results of our economic analysis.

**Table 14: Comparable Agreements – Royalty Rate – IRS Methodology**

| No. | Unique Code | Royalty Rate #1 | Royalty Rate #2 | Royalty Rate #3 | Royalty Rate #4 | Royalty Rate #5 | Royalty Rate #6 |
|---|---|---|---|---|---|---|---|
| 1. | 62046 | 50.00% | 60.00% | | | | |
| 2. | 68075 | 25.00% | 30.00% | 40.00% | 50.00% | | |
| 3. | 92851 | 5.00% | | | | | |
| 4. | 94859 | 75.00% | | | | | |
| 5. | 77698 | 50.00% | | | | | |
| 6. | 96144 | 12.00% | 15.00% | | | | |
| 7. | 43165 | 15.00% | 20.00% | | | | |
| 8. | 99016 | 50.00% | | | | | |
| 9. | 80371 | 3.00% | | | | | |
| 10. | 92769 | 18.00% | 19.00% | 20.00% | 22.00% | 24.00% | 26.00% |
| **Arm's Length Range** | | | | | | | |
| Maximum | | | 75.00% | | | | |
| Upper Quartile | | | 50.00% | | | | |
| Median | | | 24.00% | | | | |
| Lower Quartile | | | 18.00% | | | | |
| Minimum | | | 3.00% | | | | |

The interquartile range of royalty rate percentages over net sales ranged from 18.00% to 50.00%, with a median of 24.00%.

## 10.4.   Conclusion

We identified 10 agreements comparable to the exclusive intellectual property license agreement between HLFIP and SmartCom Holding. For FY 2022, HLFIP charged SmartCom Holding a royalty of 40.00% of net sales, which falls within the interquartile range. This indicates that the royalty rate applied during FY 2022 is consistent with the arm's-length standard from a US transfer pricing perspective.

37

HLFIP Holding, Inc.                                                                Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

## Table of Contents for Appendices

Table of Contents for Appendices ........................................................................................... 1
Appendix I. Rejection Matrix ................................................................................................... 2
Appendix II. Industry Analysis ............................................................................................... 12

CONFIDENTIAL                                    Plaintiffs0001724

HLFIP Holding, Inc.                                                                                    Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

## Appendix I. Rejection Matrix

### I.1.    Rejection Matrix

The tables below document the results of the rejection process. There was a total of 97 rejections applied to potential comparable agreements.

| No. | Contract ID | Synopsis | Rejection Reason |
|-----|-------------|----------|------------------|
| 1. | 11422 | Technology used in the entertainment market distributed over the internet that includes pay-per-view, ad insertion, and subscription fee based pre-recorded video entertainment and sports content, such as sports shows, sporting events, sports shorts, full-length movies and TV shows, movie trailers, music videos, and documentaries. | Significant Different Products - Content for media |
| 2. | 11786 | Software that issues or authenticates a digital certificate or permit. | Significant Different Type of contract - Royalty not only a % of sales. |
| 3. | 14172 | Rich internet application software that offers a secure program consolidation solution that integrates applications (such as SAP, PeopleSoft and Siemens PL) and legacy software within an organization to seamlessly connect all existing programs into a single user interface. | Significant Different Type of contract - Royalty not only a % of sales. |
| 4. | 14510 | Stand-alone application program in the field of engineering design quality. | Significant Different Type of contract - Royalty not only a % of sales. |
| 5. | 15352 | Software designed to help data warehousing analysts, business users and partners reduce the overall cost of deploying decision support applications by more quickly and productively transforming operational data into actionable business information. | Significant Different Type of contract - Royalty not only a % of sales. |
| 6. | 15831 | Billing and revenue software suite used for telecommunications companies and ISP. | Significant Different Activities - Use and Install of software |
| 7. | 15939 | Plate and event recognition system to governmental law enforcement agencies. | Significant Different Type of contract - Royalty not only a % of sales. |
| 8. | 16671 | Manuals, works, and documentations which explain the operation of and provides support for applications used in secondary schools and two and four-year undergraduate institutions. | Significant Different Type of contract - Royalty not only a % of sales. |

Appendices-2

HLFIP Holding, Inc.
FY 2022 – US Transfer Pricing Documentation Study

Marcum LLP

| No. | Contract ID | Synopsis | Rejection Reason |
|---|---|---|---|
| 9. | 16998 | 3D real-time visualizer software. | Significant Different Type of contract - Royalty not only a % of sales. |
| 10. | 18182 | Software used for the provision of telephone answering services. | Significant Different Type of contract - Royalty not only a % of sales. |
| 11. | 20522 | Architecture facilitator and libraries. | Significant Different Type of contract - Royalty not only a % of sales. |
| 12. | 21516 | Software applications that enable subscribers and operators to play interactive television games based on a fixed odds betting service, and blackjack and poker games. | Significant Different products - Applications for distribution of games |
| 13. | 22306 | Services as a senior software engineer for the company that creates computer software products. | Significant Different Type of contract - Employment Contract |
| 14. | 23216 | Software that enables users to create multimedia Internet postcards for all occasions, send through regular email. | Significant Different Type of contract - Expired agreement |
| 15. | 27245 | Electronic business applications, analytic applications and industry-specific applications products for end users. | Significant Different Type of contract - Royalty not only a % of sales. |
| 16. | 28144 | Software related to e-business infrastructure monitoring and configuration console that is used to simplify web services. | Significant Different Type of contract - Royalty not only a % of sales. |
| 17. | 28358 | Products specializing in test and simulation applications for electronic funds transfer systems. | Significant Different Type of contract - Royalty not only a % of sales. |
| 18. | 28991 | Object code used for the software system in an integrated security and facilities management system. | Significant Different Type of contract - Royalty not only a % of sales. |
| 19. | 31654 | Computer program used for the IBM PC Windows. | Significant Different Type of contract - Royalty not only a % of sales. |
| 20. | 31882 | Encryption software and technical support services via resellers to end users. | Significant Different Type of contract - Royalty not only a % of sales. |

Appendices-3

Plaintiffs0001726

HLFIP Holding, Inc.                                                                    Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

| No. | Contract ID | Synopsis | Rejection Reason |
|-----|-------------|----------|------------------|
| 21. | 33293 | Software used for enterprise integration, data interoperability and application development. | Significant Different Type of contract - Royalty not only a % of sales. |
| 22. | 34043 | Query objects, demos and trials for internal use and end users. | Significant Different Type of contract - Expired agreement |
| 23. | 34217 | 3D landscape generation programs. | Duplicate |
| 24. | 35154 | Program that upgrades the computer without adding any hardware. | Significant Different Activities - Manufacturing activities |
| 25. | 35395 | Limited use version of a embedded client and workgroup server. | Significant Different Type of contract - Royalty not only a % of sales. |
| 26. | 36370 | Search engine and a database of telephone directory information. | Significant Different Type of contract - Expired agreement |
| 27. | 37721 | Hard drive accelerator software for Windows system. | Significant Different Type of contract - Royalty not only a % of sales. |
| 28. | 39465 | Software that provides secure connectivity across public or private networks including the Internet, wireless and cellular network. | Significant Different Type of contract - Royalty not only a % of sales. |
| 29. | 39595 | Management methods program used for Vista and Vistapro. | Significant Different Type of contract - Expired agreement |
| 30. | 43841 | Real-time artificial intelligence system. | Insufficient Information |
| 31. | 44689 | Electronic business applications, analytic applications and industry-specific applications. | Significant Different Type of contract - Royalty not only a % of sales. |
| 32. | 46383 | Software that is used to process weather data for flight route planning and air traffic management business. | Significant Different Activities - Use of software for getting data of flight routes |
| 33. | 47349 | Application used for detection system in the transportation industry. | Significant Different Activities - Manufacturing activities |

Appendices-4

HLFIP Holding, Inc.                                                                 Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

| No. | Contract ID | Synopsis | Rejection Reason |
|---|---|---|---|
| 34. | 48930 | Computer software, customer service management software and customer relationship management software. | Significant Different Type of contract - Both parties are licensing its software |
| 35. | 49871 | Product that provides organizations with production-ready, scalable and affordable software for building, deploying and managing applications built on the Java 2, enterprise edition platform. | Insufficient Information |
| 36. | 52544 | Software used in digital video recorder, data storage, and backup software. | Significant Different Type of contract - Royalty not only a % of sales. |
| 37. | 53152 | PDF transformation programs and compound document publishing features. | Significant Different Type of contract - Royalty not only a % of sales. |
| 38. | 54725 | Computer program used for the IBM PC Windows platform. | Duplicate |
| 39. | 55070 | Applications used on IBM, IBM compatible, NECs PC-98 series, NEC compatible, and Fujitsu FM-Towns series personal computers. | Significant Different Type of contract - Royalty not only a % of sales. |
| 40. | 55594 | Two session CD wherein the first session is made up of CD-A files and the second session is made of up of compressed WMA files embedded into a versatile multimedia user interface. | Significant Different Type of contract - Royalty not only a % of sales. |
| 41. | 55613 | System related to technology and software that delivers site-selected audio programming, broadcast advertising and on-wall billboard advertising. | Significant Different Type of contract - Royalty not only a % of sales. |
| 42. | 56373 | General-purpose user interface component for interacting with large hierarchies containing thousands of nodes. | Significant Different Type of contract - Royalty not only a % of sales. |
| 43. | 57296 | Software that provides a technical foundation for application programs, such as accounting, inventory, bill-of-material maintenance, and process definition programs. | Significant Different Activities - Provision of Services |
| 44. | 60710 | Software used for data mining and discovering relational patterns from databases in source code form, and to compile the same into object code form as part of the Smart Access System together with documentations and derivative works for end users. | Significant Different Type of contract - Royalty not only a % of sales. |

Appendices-5

CONFIDENTIAL                                                      Plaintiffs0001728

HLFIP Holding, Inc.                                                                                          Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

| No. | Contract ID | Synopsis | Rejection Reason |
|---|---|---|---|
| 45. | 61167 | PDF transformation program and compound document publishing features. | Significant Different Type of contract - Royalty not only a % of sales. |
| 46. | 61209 | Software that allows a stream of fax data from a server or a fax to be directed through a device that routes such data through an Internet. | Insufficient Information |
| 47. | 61734 | Data management computer program that runs on a mainframe supporting remote terminals, PC's and workstations. | Significant Different Type of contract - Asset Purchase |
| 48. | 62685 | Media player software, including wireless platform enterprise server and wagering gaming systems. | Significant Different Type of contract - Royalty not only a % of sales. |
| 49. | 66445 | Software that is used to create an organizational chart. | Significant Different Type of contract - Royalty not only a % of sales. |
| 50. | 67772 | Computer applications that incorporate for the creation of custom graphs for scientific and engineering applications. | Significant Different Type of contract - Royalty not only a % of sales. |
| 51. | 70496 | Geographic databases, digital maps, software applications, dynamic spatial data, and related materials. | Significant Different Activities - Manufacturing activities |
| 52. | 70884 | Software used for online videoconferencing, video telephony, security, and compression and transmission of electronic files. | Significant Different Type of contract - Royalty not only a % of sales. |
| 53. | 71368 | Intelligent voice interactive technology used for the speech recognition. | Significant Different Type of contract - Royalty not only a % of sales. |
| 54. | 71574 | Software programs. | Significant Different Type of contract - Asset Purchase |
| 55. | 72081 | Entertainment programming to residential subscribers of digital cable television service on a video-on-demand basis. | Significant Different products - TV Programs |
| 56. | 72402 | Online application services providers that allow end users to use the software on a one task at a time or a subscription basis with no access to the underlying application. | Significant Different Type of contract - Royalty not only a % of sales. |

Appendices-6

HLFIP Holding, Inc.                                                                    Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

| No. | Contract ID | Synopsis | Rejection Reason |
|-----|-------------|----------|------------------|
| 57. | 72601 | Software used for the video communication. | Significant Different Type of contract - Expired agreement |
| 58. | 72845 | English language versions of the medical educational application. | Significant Different Type of contract - Royalty not only a % of sales. |
| 59. | 73630 | Electronic business, analytic applications and industry-specific software applications. | Significant Different Activities - Manufacturing activities |
| 60. | 73958 | Incorporate software that provides interpreter for the PostScript language and library that implements graphic capabilities into Print Manager Family product for Xerox printers. | Significant Different Type of contract - Royalty not only a % of sales. |
| 61. | 77431 | Software used for storing, managing, viewing and navigating content on a CD. | Significant Different Type of contract - Royalty not only a % of sales. |
| 62. | 77732 | Software used for the operation of casino. | Significant Different Type of Contract - Option of buy after reaching a total amount of royalty paid. |
| 63. | 78005 | Internet database reporting software. | Significant Different Type of contract - Royalty not only a % of sales. |
| 64. | 78415 | Business that designs, engineers, writes, manufactures, and distributes low level computer software, including the BIOS, keyboard controller / embedded controller, embedded and application-level power management, system setup, VGA BIOS, and ACPI software in source and object code formats. | Significant Different Type of contract - Asset Purchase |
| 65. | 78597 | Applications related to training centers. | Significant Different Type of contract - Royalty not only a % of sales. |
| 66. | 79562 | Software used for the operation of an internet site that displays market price quotations, news, and information for analysis, and that initiates and transmits trading orders. | Significant Different Type of contract - Royalty not only a % of sales. |
| 67. | 80487 | Delivery management software products. | Significant Different Type of contract - Royalty not only a % of sales. |

CONFIDENTIAL                                                              Plaintiffs0001730

HLFIP Holding, Inc                                                                        Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

| No. | Contract ID | Synopsis | Rejection Reason |
|---|---|---|---|
| 68. | 80895 | Application for use in messaging, EDI, message broker, mapping and intelligent messaging software. | Significant Different Type of contract - Royalty not only a % of sales. |
| 69. | 84514 | Software used to build B2B databases. | Significant Different Type of contract - Royalty not only a % of sales. |
| 70. | 86083 | PaperData application software used to barcode reader. | Significant Different Type of contract - Royalty not only a % of sales. |
| 71. | 86526 | Desktop planetarium computer program. | Significant Different Type of contract - Royalty not only a % of sales. |
| 72. | 87871 | Supply chain, transportation and logistics management software. | Significant Different Type of contract - Asset Purchase |
| 73. | 88373 | Computerized reservation system with inventory management and booking capability. | Significant Different Type of contract - Royalty not only a % of sales. |
| 74. | 88462 | Helpdesk and customer support application, end user trouble ticketing system, add-on to helpdesk application to enhance support functions in helpdesk application and add-on to helpdesk application to add enterprise functionality to helpdesk application. | Significant Different Type of contract - Royalty not only a % of sales. |
| 75. | 89748 | Applications and devices for caching and indexing Internet and multimedia files on special servers at schools, homes and businesses, for educational purposes. | Significant Different Type of contract - Royalty not only a % of sales. |
| 76. | 91816 | Computer software related to knowledge engineering. | Significant Different Activities - Manufacturing activities |
| 77. | 92428 | Application used to train and certify personnel to perform testing and assessment of enterprise vulnerabilities. | Significant Different Type of contract - Royalty not only a % of sales. |
| 78. | 92923 | Software that performs inventory management and related accounting functions. | Significant Different Type of contract - Expired agreement |

CONFIDENTIAL                                                        Plaintiffs0001731

HLFIP Holding, Inc.                                                           Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

| No. | Contract ID | Synopsis | Rejection Reason |
|-----|-------------|----------|------------------|
| 79. | 93163 | Software used for the encryption, e-commerce, and creating protected trialware versions of software. | Significant Different Type of contract - Royalty not only a % of sales. |
| 80. | 95262 | Software that stores and retrieves text data as well as provide full text retrieval to augment the core ObjectStore. | Significant Different Type of contract - Distribution without value added. |
| 81. | 96187 | Digital data file in a conventionally printed document and then recovers that file from the document's digitized print image using conventional document scanners. | Significant Different Type of contract - Royalty not only a % of sales. |
| 82. | 96843 | Organizational charting software. | Significant Different Type of contract - Royalty not only a % of sales. |
| 83. | 98653 | Ultra-thin client database access middleware extender, and the source code. | Significant Different Type of contract - Royalty not only a % of sales. |
| 84. | 99999 | Network and platform technology used for creating, managing and coordinating e-commerce channels and transactions. | Significant Different products - Ecommerce platforms for distribution |
| 85. | 21703 | Video and audio subscription programming to mobile and wireless devices and related bundled products. | Significant Different products - Content for mobile |
| 86. | 56081 | Products that include streamlined toolset for writing applications and integrated suite of development tools for building Internet Transaction Processing applications. | Significant Different Type of contract - Royalty not only a % of sales. |
| 87. | 73681 | Animated and live-action TV series, the video library of master tapes and website for child education, health, fitness, edutainment, and safety, including launch of a subscription-based online internet community for kids, books, activity books, retail kiosks, and merchandise. | Significant Different Products - Use of trademarks, domain names or copyrigths for manufacture, distribute and sale of products |
| 88. | 80794 | Web-based electronic platform that facilitates the aggregation of demand for high-ticket capital equipment and selected commodities. | Significant Different Activities - Use and maintane of a technology. |
| 89. | 78218 | Individualized television distributed directly to home subscribers. | Significant Different products - TV Content |

Appendices-9

HLFIP Holding, Inc.                                                                                    Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

| No. | Contract ID | Synopsis | Rejection Reason |
|-----|-------------|----------|------------------|
| 90. | 48353 | Mobile device platforms that display news, business, science and entertainment headlines and sports, financial and weather content. | Significant Different products - Mobile content |
| 91. | 33409 | Video content, film and visuals via all electronic, digital and mobile platforms, and video and sound content as ringtones, true tones, wallpapers and video tones on mobile platforms, and to record, dub and synchronize content in timed relation with visual images. | Significant Different products - Video Content |
| 92. | 27999 | Digital and physical products sold through a network of partners and ecommerce platform. | Significant Different products - Ecommerce platforms for distribution |
| 93. | 69516 | Server intelligent software programs. | Significant Different Type of contract - Royalty not only a % of sales. |
| 94. | 47339 | Video games. | Significant Different Type of Contract - Includes a discount of royalty because of shares |
| 95. | 53964 | Downloadable survival game | Significant Different Type of contract - Royalty not only a % of sales. |
| 96. | 80984 | Downloadable survival game. | Significant Different Type of contract - Royalty not only a % of sales. |
| 97. | 10620 | Downloadable survival game. | Significant Different Type of contract - Royalty not only a % of sales. |

Appendices-10

Plaintiffs0001733

HLFIP Holding, Inc.                                                                                          Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

### I.2.    Final Set of Comparable Agreements

| No. | Contract ID | Licensor | Licensee | Synopsis |
|-----|-------------|----------|----------|----------|
| 1. | 62046 | Artera Group, Inc. | FairPoint Communications, Inc. | Internet infrastructure technology used as single-PC residential or as business subscriber products. |
| 2. | 68075 | Autopack, GmbH | GiveMePower, Inc. | Computer-aided design applications for use on handheld computers. |
| 3. | 92851 | Boswell International Technologies Ltd | ESL Pro Systems Inc | Language learning computer programs. |
| 4. | 94859 | Intuit, Inc. | Retail Technologies International, Inc. | Tools used to manage inventory at a single site. |
| 5. | 77698 | McAfee.com Corp | Network Associates K.K. | License the Products from McAfee.com in order to sub-license the Products in Japan to OEMs for the sole purpose of producing OEM Products for distribution to End Users and Resellers. |
| 6. | 96144 | Merit Audio Visual | Siboney Corporation | Educational software for schools. |
| 7. | 43165 | Nectar Foundation | SIBONEY LEARNING GROUP | Educational software programs that contain math activities for children. |
| 8. | 99016 | PTN Media | NeoHand, Inc. | Fitness guide software. |
| 9. | 80371 | Synthonics, Incorporated | MedScape, LLC | Products related to photogrammetry applications used in the diagnosis, treatment planning and image management by orthodontists, dentists, oral surgeons and cosmetic surgeons. |
| 10. | 92769 | Virtual Reality Laboratories, Inc | A.I. Soft, Inc | Visual three-dimensional images, animation and computer training software. |

CONFIDENTIAL                                                    Plaintiffs0001734

HLFIP Holding, Inc.                                                                                           Marcum LLP
FY 2022 – US Transfer Pricing Documentation Study

## Appendix II. Industry Analysis

The following pages in the appendix provide the industry analysis for FY 2022 regarding HLFIP.

Appendices-12



**IBIS**World

WHERE KNOWLEDGE IS POWER

INDUSTRY REPORT 56121

# Correctional Facilities in the US

On lockdown: A paradigm shift in government policy will likely contribute to sustained industry decline

Alex Petridis  |  March 2023

IBISWorld.com                    1-800-330-3772                    info@IBISWorld.com

CONFIDENTIAL                                          Plaintiffs0001736

# Contents

ABOUT THIS INDUSTRY................................... 4

Industry Definition.................................................4
Major Players......................................................4
Main Activities.....................................................4
Supply Chain.......................................................5

INDUSTRY AT A GLANCE.............................. 6

Executive Summary.............................................. 8

INDUSTRY PERFORMANCE.......................... 9

Key External Drivers.............................................9
Current Performance...........................................10

INDUSTRY OUTLOOK.................................. 12

Outlook.............................................................12
Industry Life Cycle..............................................14

PRODUCTS & MARKETS............................. 15

Supply Chain.....................................................15
Products & Services............................................15
Demand Determinants.........................................16
Major Markets....................................................17

GEOGRAPHIC BREAKDOWN....................... 19

Key Insights......................................................19
Business Locations............................................. 22

COMPETITIVE LANDSCAPE.......................... 23

Market Share Concentration................................. 23
Key Success Factors...........................................23
Cost Structure Benchmarks................................. 24
Basis of Competition........................................... 27
Barriers to Entry................................................ 28
Industry Globalization......................................... 28

MAJOR COMPANIES..................................... 30

Market Share Overview....................................... 30
Related Companies.............................................30
Corecivic, Inc....................................................31
The Geo Group, Inc............................................33
Management & Training Corp................................35
George S. Hall Inc..............................................37
Colliers International Group Inc.............................39

OPERATING CONDITIONS........................... 41

Capital Intensity.................................................41
Technology & Systems.........................................42
Revenue Volatility...............................................43
Regulation & Policy.............................................43
Industry Assistance.............................................44

KEY STATISTICS.......................................... 45

Industry Data.....................................................45
Annual Change...................................................45
Key Ratios.........................................................45
Industry Financial Statement................................46

ADDITIONAL RESOURCES...........................48

Additional Resources.......................................... 48
Industry Jargon.................................................. 48
Glossary........................................................... 48

CALL PREPARATION QUESTIONS.............. 50

Role Specific Questions....................................... 50
External Impacts Questions.................................. 51
Internal Issues Questions.....................................52

IBISWorld.com

CONFIDENTIAL

Plaintiffs0001737

March 2023

## About IBISWorld

IBISWorld specializes in industry research with coverage on thousands of global industries. Our comprehensive data and in-depth analysis help businesses of all types gain quick and actionable insights on industries around the world. Busy professionals can spend less time researching and preparing for meetings, and more time focused on making strategic business decisions that benefit you, your company and your clients. We offer research on industries in the US, Canada, Australia, New Zealand, Germany, the UK, Ireland, China and Mexico, as well as industries that are truly global in nature.

CONFIDENTIAL                                                      Plaintiffs0001738

## About This Industry

| | |
|---|---|
| **Industry Definition** | The Correctional Facilities industry consists of operators that own or manage correctional facilities and halfway houses. Services provided by industry enterprises include private janitorial, maintenance, trash disposal, guard and security, mail routing reception, laundry and other services that support operations in correctional facilities. The industry does not include facility support services for other types of establishments, such as military bases and other government facilities. |

**Major Players**

Corecivic

Geo

Management & Training

George

Colliers International

**Main Activities**

**The primary activities of this industry are:**

Ownership and/or management of community correctional facilities

Ownership and/or management of minimum security prisons

Ownership and/or management of medium security prisons

Ownership and/or management of maximum security prisons

**The major products and services in this industry are:**

Community correctional facilities

Minimum security

Medium security

Maximum security

CONFIDENTIAL

Plaintiffs0001739

Correctional Facilities in the US

March 2023

## Supply Chain

| Key External Drivers | | | |
|---|---|---|---|
| Incarceration rate | Government consumption and investment | Crime rate | Outsourcing for the Correctional Facilities industry |

| 2nd Tier Suppliers | 1st Tier Suppliers | Correctional Facilities in the US | 1st Tier Buyers |
|---|---|---|---|
| Educational Services in the US | Real Estate Investment Trusts in the US | | Consumers in the US |
| Primary Care Doctors in the US | Municipal Building Construction in the US | | Public Administration in the US |
| Dentists in the US | Commercial Leasing in the US | | |
| Psychologists, Social Workers & Marriage Counselors in the US | | | |
| Job Training & Career Counseling in the US | | | |
| Food Service Contractors in the US | | | |

### SIMILAR INDUSTRIES

| Security Services in the US | Security Alarm Services in the US | Residential Intellectual Disability Facilities in the US | Food Service Contractors in the US |
|---|---|---|---|
|  Competition |  Competition |  Complementors | Complementors |

### RELATED INTERNATIONAL INDUSTRIES

| Correctional and Detention Services in Australia | Correctional and Detention Services in New Zealand | Security Services in Canada |
|---|---|---|

IBISWorld.com

CONFIDENTIAL

Plaintiffs0001740

# Industry at a Glance

## Key Statistics



**$10.3bn**
Revenue

| Annual Growth 2018–2023 | Annual Growth 2023–2028 | Annual Growth 2018–2028 |
|---|---|---|
| -0.6% | -2.6% | |

**$1.0bn**
Profit

| Annual Growth 2018–2023 | Annual Growth 2018–2023 |
|---|---|
| -0.4% | |

**9.7%**
Profit Margin

| Annual Growth 2018–2023 | Annual Growth 2018–2023 |
|---|---|
| 0.1pp | |

**311**
Businesses

| Annual Growth 2018–2023 | Annual Growth 2023–2028 | Annual Growth 2018–2028 |
|---|---|---|
| -8.9% | -3.2% | |

**39,260**
Employment

| Annual Growth 2018–2023 | Annual Growth 2023–2028 | Annual Growth 2018–2028 |
|---|---|---|
| -8.7% | -3.1% | |

**$3.8bn**
Wages

| Annual Growth 2018–2023 | Annual Growth 2023–2028 | Annual Growth 2018–2028 |
|---|---|---|
| -0.2% | -3.0% | |

## Key External Drivers

% = 2018–23 Annual Growth

**1.6%**
Government consumption and investment

**-10.5%**
Incarceration rate

**-3.8%**
Crime rate

**N/A**
Outsourcing for the Correctional Facilities industry

## Industry Structure

**POSITIVE IMPACT**

| Capital Intensity Low | Technology Change Low |
|---|---|
| Barriers to Entry High / Steady | Industry Globalization Low / Steady |

**MIXED IMPACT**

| Life Cycle Mature | Revenue Volatility Medium |
|---|---|
| Concentration Medium | Competition Medium / Increasing |

**NEGATIVE IMPACT**

| Industry Assistance Low / Decreasing | Regulation & Policy Heavy / Increasing |
|---|---|

## Key Trends

- The pandemic has increased scrutiny by exposing shortfalls among many facilities
- The Federal Bureau of Prisons has made continued use of private correctional facilities, bolstering industry revenue
- Rampant industry exit has precipitated declines in employment
- State and local governments have experienced heightened pressure on the use of private prisons
- State and federal governments will likely continue seeking alternatives to the increasing cost of incarceration
- Many smaller-scale operators will be forced to exit the industry or seek acquisition
- The pandemic is expected increase operational costs as facilities must implement quarantine systems

IBISWorld.com

CONFIDENTIAL

Plaintiffs0001741

Correctional Facilities in the US

March 2023

## Products & Services Segmentation



24.2%

Community correctional facilities

18.8%

Minimum security

50.1%

Medium security

6.9%

Maximum security

Correctional Facilities
Source: IBISWorld

## Major Players



● 18.9% Corecivic
● 15.1% Geo
● 12.4% Management & Training
● 0.3% George
● 0.0% Colliers International
● 53.3% Other

Correctional Facilities
Source: IBISWorld

## SWOT

**S** STRENGTHS

High & Steady Barriers to Entry
Low Imports
High Profit vs. Sector Average
Low Customer Class Concentration
Low Product/Service Concentration
Low Capital Requirements

**W** WEAKNESSES

Low & Decreasing Level of Assistance

**O** OPPORTUNITIES

High Revenue Growth (2005-2023)
High Revenue Growth (2023-2028)
Government consumption and investment

**T** THREATS

Low Revenue Growth (2018-2023)
Low Outlier Growth
Low Performance Drivers
Incarceration rate

IBISWorld.com

CONFIDENTIAL

Plaintiffs0001742

**Executive Summary** **On lockdown: A paradigm shift in government policy will likely contribute to sustained industry decline**

The Correctional Facilities industry owns, manages, and leases prisons, community correctional facilities and juvenile detention centers on behalf of government agencies. Industry demand is uniquely separate from the broader economic climate, in which revenue growth is primarily influenced by crime and incarceration rates. Public opinion and its effect on government policy regarding the privatization of prisons directly affects industry demand and participation. Industry revenue is declining at an annualized 0.6% to an estimated $10.3 billion, including a fall of 0.3% in 2023 as profit reaches 9.7%.

Decreasing national crime and incarceration rates have been the primary contributing factors influencing revenue. Declining incarceration rates have arisen from a conscious effort by the US government to reduce prison overcrowding. Revenue increases have been generally fueled by increased investment and demand in 2018 and 2019, during which ICE and other federal agencies heavily relied on private prisons. Since private correctional facilities charge fixed, per-diem rates based on occupancy, a reduction in the inmate population not only lowers demand for industry services but also increases fixed costs. To mitigate these costs, many companies have restructured as real estate investment trusts, to receive unique tax benefits and bolster profit. The pandemic caused a swell in operational expenses as facilities were forced to implement quarantine systems to reduce infection risk among inmates.

Aside from crime and incarceration, public opinion and policy regarding for-profit prison systems directly influence revenue and many industry enterprises have been the subject of controversy in recent years. Reports of inadequate medical care, excessive use of solitary confinement and unsanitary conditions have led to facility closures. The current administration's Private Prison Executive Order prevents the US Department of Justice (DOJ) from renewing private prison contracts for BOP and the USMS. This represents a paradigm shift in government policy and has contributed to revenue declines since 2021. Industry revenue is slated to decrease an annualized 2.6% to an estimated $9.1 billion in 2028.

CONFIDENTIAL                                                        Plaintiffs0001743

Correctional Facilities in the US

March 2023

# Industry Performance



Key External Drivers 2015–2028

Revenue — Incarceration rate — Government consumption and investment

Correctional Facilities
Source: IBISWorld

**Key External Drivers**

### Incarceration rate

The incarceration rate largely determines demand for Correctional Facilities industry services. As the number of people in prison increases, prisons become overcrowded and markets are more likely to employ industry services. The incarceration rate is expected to continue its decline in 2023, posing a potential threat to the industry's core services.

### Government consumption and investment

Private correctional facilities earn revenue from contracts with federal and state governments. Changes in government consumption and investment level affect demand for industry services. Government consumption and investment is expected to marginally increase in 2023, representing a potential opportunity for the industry.

### Crime rate

Increases in criminal activity generally result in more arrests and greater occupancy levels at correctional facilities, supporting demand for correctional facilities. The crime rate is forecast to continue its historical downward trend in 2023.

### Outsourcing for the Correctional Facilities industry

The goal of privatization is to improve the efficiency of an organization by transferring it from government ownership to the private sector. Outsourcing for the Correctional Facilities industry is anticipated to decline in 2023.

IBISWorld.com

CONFIDENTIAL

Plaintiffs0001744

Correctional Facilities in the US                                                                   March 2023



Correctional Facilities
Source: IBISWorld

**Current
Performance**

**Correctional Facilities in the US revenue is set to decline at an annualized rate of 0.6% to an estimated $10.3 billion, including an expected fall of 0.3% in 2023 as profit reaches 9.7%.**

**Historical trends continue to drag industry performance downward**
- Historical declines in crime and incarceration rates have contributed to waning demand for correctional facilities.
- Incarceration rates have dramatically fallen as of late due to a conscious effort by the federal government to reduce the prison population and policy favoring rehabilitation.

**Federal regulations nix private-public partnerships**
- In January 2021, the Biden administration issued an order preventing the US Department of Justice (DOJ) from renewing private prison contracts upon expiration.
- Major companies in the industry such as CoreCivic Inc. (CoreCivic) and the GEO Group Inc. (GEO Group), have unrenewed voided contracts with BOP and the USMS. While these contracts' expiration timetable remains variable, many federal prisons have already been closed, hindering revenue.
- Geo Group has three contracted facilities with the USMS that are all set to close; the facilities combined represent 6.0% of company revenue. Enterprises in the industry have been entering contracts with more state and local facilities to recoup the anticipated revenue losses.

**Pandemic-related disruptions significantly hinder industry performance**
- The pandemic led to correctional facilities experiencing major disruptions in operational costs, inmate populations and public backlash. Social distancing guidelines have forced many companies to reduce inmate and staff numbers in facilities.
- The pandemic has increased industry scrutiny by exposing shortfalls among many facilities in terms of living conditions, employment, and the overall handling of pandemic protocols.
- Major industry player GEO Group, received a class action lawsuit in July 2020, alleging investor misleading regarding pandemic responses in a Kansas halfway house run by the company.
- CoreCivic. has been embroiled in its own controversy recently, as the enterprise is accused of placing profit over safety and failing to police its guards concerning the death of two inmates.
- Regarding public opinion, the Correctional Facilities industry has long been controversial, as many oppose the idea of profiteering from the incarceration of individuals.

**Consolidation activity gives way to profit growth**
- Acquiring other facilities and buying government facilities has put companies in a better position to take on

CONFIDENTIAL                                                        Plaintiffs0001745

risks and assume long-term government contracts that bring them larger portions of the prison population.

- Since the industry is highly concentrated, new entrants are largely prevented by the competitive advantage these larger companies pose in securing contracts.

- As public opinion influences policy toward reducing private prison numbers, new entrants are limited in the geographic markets to compete.

- Rampant industry exit has precipitated employment declines as consolidations effects trickle into the total labor force.

## Historical Performance Data

| Year | Revenue ($m) | IVA ($m) | Establishments (Units) | Enterprises (Units) | Employment (People) | Exports ($m) | Imports ($m) | Wages ($m) | Domestic Demand ($m) | Incarceration rate (People) |
|------|------|------|------|------|------|------|------|------|------|------|
| 2014 | 8,147 | 4,319 | 1,559 | 480 | 62,883 | N/A | N/A | 3,358 | N/A | 491 |
| 2015 | 8,710 | 4,677 | 1,605 | 436 | 60,118 | N/A | N/A | 3,628 | N/A | 476 |
| 2016 | 8,915 | 4,754 | 1,544 | 431 | 53,193 | N/A | N/A | 3,615 | N/A | 467 |
| 2017 | 9,528 | 5,164 | 1,424 | 455 | 59,592 | N/A | N/A | 3,970 | N/A | 458 |
| 2018 | 10,641 | 5,159 | 1,417 | 495 | 61,841 | N/A | N/A | 3,870 | N/A | 448 |
| 2019 | 11,178 | 5,568 | 1,345 | 356 | 49,077 | N/A | N/A | 4,166 | N/A | 436 |
| 2020 | 11,284 | 5,657 | 1,298 | 343 | 43,715 | N/A | N/A | 4,254 | N/A | 366 |
| 2021 | 10,894 | 5,440 | 1,261 | 332 | 41,965 | N/A | N/A | 4,088 | N/A | 333 |
| 2022 | 10,341 | 5,166 | 1,213 | 319 | 39,941 | N/A | N/A | 3,889 | N/A | 297 |
| 2023 | 10,310 | 5,116 | 1,183 | 311 | 39,260 | N/A | N/A | 3,834 | N/A | 258 |

CONFIDENTIAL                                                   Plaintiffs0001746

# Industry Outlook

**Outlook**

**Correctional Facilities in the US revenue is slated to decrease an annualized 2.6% to an estimated $9.1 billion in 2028, with profit reaching 9.9%.**

**Industry Outlook**
2023–2028



Correctional Facilities
Source: IBISWorld

**Shifting public sentiment against private prisons is amplified**

- Increased scrutiny from the public regarding for-profit incarceration facilities will continue to shift government policy away from outsourcing to the private sector.

- State and local governments continue to experience heightened tension on the use of private prisons, a trend that has been amplified by mounting political pressure.

- This shift in policy will come amid continued steady declines in crime and incarceration rates, sapping demand away from correction facilities.

**New executive order continues to adversely affect private correctional facilities**

- In January 2021, an executive order was issued for the US Department of Justice not to renew contracts with private incarceration facilities upon expiration.

- The largest industry enterprises have already had contracts expire for many BOP and USMS facilities and have more to expire soon.

- While the executive order does not include private operation of facilities contracted by ICE, even these facilities have recently been scaled back and will continue to reduce capacity in line with broader public sentiment.

**State and local facilities come under fire**

- Both major industry enterprises, The GEO Group Inc. and CoreCivic Inc., have been involved in ongoing negligence-related lawsuits, citing mismanagement in providing a safe workplace and implementing infection-reducing protocol.

- Recurring controversy and legal action have accelerated the divestment of private facilities among federal agencies and will serve as examples for state and local organizations to follow suit.

- In 2020, California enacted legislation targeting public-private prison partnerships, aiming to phase out many industry facilities, if more states embrace this trend, industry revenue will be stymied.

- Major competitors have hedged against trending closures by increasing investment in various service lines, like reentry facilities and electronic monitoring systems.

**Alternative detention methods grow in popularity to combat overcrowded prisons**

- State and federal governments will continue seeking alternatives to the ever-increasing incarceration cost for nonviolent offenders who need treatment, education, and rehabilitation.

- Two recent pieces of legislation, Title 42, and the Migrant Protection Protocols, aim at limiting the number of detainees in ICE facilities, citing the negligence at these facilities, and permitting refugees to seek asylum.

- Fewer people will be committed to labor-intensive detention systems. Community-based reentry programs along with substance abuse and behavioral health programs becoming more popular alternative to costly correctional facilities.

CONFIDENTIAL                                                                        Plaintiffs0001747

- Many states have embraced policies aimed at curtailing their prison populations through reduced sentences for some nonviolent drug offenders and reformed mandatory minimum sentencing laws.

## Performance Outlook Data

| Year | Revenue ($m) | IVA ($m) | Establishments (Units) | Enterprises (Units) | Employment (People) | Exports ($m) | Imports ($m) | Wages ($m) | Domestic Demand ($m) | Incarceration rate (People) |
|------|------|------|------|------|------|------|------|------|------|------|
| 2023 | 10,310 | 5,116 | 1,183 | 311 | 39,260 | N/A | N/A | 3,834 | N/A | 258 |
| 2024 | 10,073 | 4,988 | 1,146 | 301 | 38,176 | N/A | N/A | 3,731 | N/A | 216 |
| 2025 | 9,799 | 4,836 | 1,112 | 291 | 36,883 | N/A | N/A | 3,610 | N/A | 169 |
| 2026 | 9,567 | 4,705 | 1,079 | 282 | 35,630 | N/A | N/A | 3,495 | N/A | 143 |
| 2027 | 9,330 | 4,578 | 1,048 | 274 | 34,582 | N/A | N/A | 3,395 | N/A | 119 |
| 2028 | 9,059 | 4,442 | 1,017 | 265 | 33,547 | N/A | N/A | 3,294 | N/A | 98.3 |
| 2029 | 8,828 | 4,325 | 988 | 258 | 32,633 | N/A | N/A | 3,205 | N/A | 98.3 |

CONFIDENTIAL                                                                    Plaintiffs0001748

Correctional Facilities in the US                                                                March 2023

**Industry Life Cycle**    **The life cycle stage of this industry is ☉ Mature**

LIFE CYCLE REASONS

**The industry is growing on par with US GDP**

**There is some public resistance to privatization of correctional and detention facilities**

**Public opposition to privately run prisons has risen**



Indicative Industry Life Cycle

Correctional Facilities
Source: IBISWorld

### Contribution to GDP

As the government pursues more progressive sentencing laws and public opposition to privately run prisons rises, growth has been challenging and has led to the industry lagging behind overall GDP growth.

### Market Saturation

Companies generate revenue through government contracts as a highly regulated and often controversial industry. Competition for these contracts is intense and prevents many, smaller-scale companies from entering the industry and capturing any significant portion of total revenue.

### Innovation

The Correctional Facilities industry is subject to slow technological innovation. Some advances have been made in the use of technology in recent years, mainly involving facilities' design, operation, security and education.

### Consolidation

In 2011, GEO Group Inc. acquired Behavioral Interventions Inc., a company specializing in developing and supervising electrical monitoring devices for parolees and pre-trial individuals. This case illustrates the consolidation strategy employed by major competing enterprises to hedge against political risk.

### Technology and Systems

Technological change influences the industry most via improvements to security capabilities and education offerings for detainees, with distance learning boosting the number of programs offered to inmates.

CONFIDENTIAL                                                                    Plaintiffs0001749

# Products & Markets

**Supply Chain**

| Key Buying Industries | Key Selling Industries |
|---|---|
| **1st Tier** | **1st Tier** |
| Consumers in the US | Real Estate Investment Trusts in the US |
| Public Administration in the US | Municipal Building Construction in the US |
| | Commercial Leasing in the US |
| | **2nd Tier** |
| | Educational Services in the US |
| | Primary Care Doctors in the US |
| | Dentists in the US |
| | Psychologists, Social Workers & Marriage Counselors in the US |
| | Job Training & Career Counseling in the US |
| | Food Service Contractors in the US |

**Products & Services**

Products and Services Segmentation



| Segment | Share |
|---|---|
| Community correctional facilities | 24.2% |
| Minimum security | 16.8% |
| Medium security | 50.1% |
| Maximum security | 6.9% |

2023 INDUSTRY REVENUE

## $10.3bn

Correctional Facilities
Source: IBISWorld

**Community correctional facilities grow in-line with public sentiment favoring rehabilitation**

- According to the BOP, community facilities have fewer restrictions than typical correction facilities and generally staff are not permitted to use force to restrain residents of halfway homes.

- Contracts for community correctional facilities stipulate that the facility must provide therapy, job placement and other assistive services.

- As private prison contracts have decreased, industry enterprises have expanded services to run community correctional facilities, increasing this segment's contribution to total revenue.

- As public opinion increases focus on rehabilitation and therapy for inmates, community correctional facilities will generate a more significant share of total revenue.

**Minimum security prison fall prey to the popularity of community facilities**

- According to the BOP, minimum security facilities generally have dormitory housing, a relatively low staff-to-inmate ratio and limited or no perimeter fencing.

- Many contracts stipulate that minimum-security prisons should be work- and program-oriented, with a strong emphasis on rehabilitation services.

- Inmates in these facilities may be permitted off-site on work release and can participate in prerelease transition programs with either community volunteers or family sponsors.

- This segment's share of industry revenue has decreased, with an increased focus on the rehabilitation and reentry of low-level offenders being offset by more stringent and constraining regulations.

**The termination of private partnerships among BOP and USMS prisons has taken a toll on medium security facilities**

- Medium security facilities account for the largest share of industry revenue, and tend to have strengthened perimeters, often double fences with electronic detection systems, tall concrete walls, and cell type housing.
- Due to the overcrowding in federal and state prisons in recent years, many medium security prisons now have dormitory style sleeping quarters.
- These facilities have a higher staff-to-inmate ratio than minimum security facilities, with inmates not permitted to leave the premises for work or prerelease programs.
- This segment's revenue share has been hindered recently due to the closure of USMS prisons, which predominantly tend to be medium security facilities.

**Maximum security prisons wane in popularity as public sentiment shifts**
- Maximum security facilities are reserved for high-level offenders. According to the BOP, inmates in maximum security facilities are housed in multiple or single-occupant cells with sliding doors that lock at night.
- Prisoners are rarely let out of cells, sometimes for only one hour per day. These facilities have the highest staff-to-inmate ratio and provide the least amount of vocational training of any other facilities.
- This segment's share of industry revenue has declined at a CAGR of 2.2% from 2018 to 2023, due to increased public scrutiny and shifting emphasis toward rehabilitating and reentry low-level offenders.

**Demand Determinants**

## Demand for correctional facilities is primarily determined by the propensity of localities, states, and federal agencies to outsource prison operations to the private sector.

The health of the government's correctional service budget determines whether it will use correctional facilities. While tight budgets may encourage the government to outsource, therefore helping the industry, prolonged budget shortfalls will inevitably lead to fewer contracts and reduced industry revenue.

### Incarceration

Another major driver in demand for the industry is the incarceration rate. As the number of individuals placed into correctional facilities increases, demand for correctional facilities inevitably grows. The prison population is affected by changes in sentencing policies of individual governments and alternative programs used by the courts, including parole and community service, in lieu of imprisonment. The US prison system has been increasingly overcrowded in recent years due to minimum sentencing laws that keep individuals in prison for long periods. This overcrowding has helped the industry grow, as state governments are required (sometimes by court of law) to create additional prison facilities to house excess prisoners. For example, the US Supreme Court ordered the state of California to fix its long-running prison overcrowding problem.

### Recidivism

The change in the prisoner recidivism rate (rate of relapses back to crime) also influences the industry. Prisons will remain saturated if the recidivism rate increases and industry demand grows. In recent years, there has been public outcry over concerns that private prisons do not provide adequate education and job training services to reduce relapse back to crime. The two most prominent industry enterprises, CoreCivic Inc. and the GEO Group, have been accused of having insufficient assistance programs in owned facilities. Government legislation enforcing a minimum standard of rehabilitation services in private prisons may affect this driver in the future.

### Public opinion

In recent years, public opinion has also affected industry revenue in the general discourse of crime, imprisonment, and rehabilitation. Increasingly, public opinion regarding mass incarceration and the nature of for-profit correctional facilities has influenced policy negatively and positively. For instance, California passed a bill in October 2019, banning for-profit prisons and providing a time-line for private facility closures that will occur. The state of Washington has already followed in California's footsteps enacting similar legislation, as a result, ripple effects of this bill could negatively affect industry revenue if more states join in banning industry facilities. Conversely, public opinion regarding illegal immigration has provided a unique growth opportunity for companies as major enterprises have increasingly been contracted by the US Immigration and Customs Enforcement agency (ICE). As public opinion sways on the issue of effective and humane incarceration, industry demand is subject to change.

The most recent and substantial effect of public opinion has been manifested in the executive order from the current administration for the US Department of Justice not to renew private correctional facility contracts. This request will prevent the US Bureau of Prisons (BOP) and US Marshal Service (USMS) from continuing relationships with private correctional facilities. In 2018 these organizations accounted for more than 30.0% of industry revenue, the immediate results will negatively affect revenue growth prospects, with both the USMS and BOP market segments shrinking. This tectonic shift in federal policy will incentivize state and local governments to follow suit, contributing

CONFIDENTIAL                                                            Plaintiffs0001751

more than 50.0% of total revenue.

## Major Markets



Major Market Segmentation

| | |
|---|---|
| State and local departments | 62.6% |
| Immigration and Customs Enforcement | 16.2% |
| US Marshals Service | 14.0% |
| Federal Bureau of Prisons | 7.2% |

2023 INDUSTRY REVENUE

## $10.3bn

Correctional Facilities
Source: IBISWorld

### ICE facilities benefited from previous administration's policy

- Under the purview of the Department of Homeland Security, ICE is responsible for protecting the nation by enforcing criminal and civil laws governing border control, customs, trade, and immigration.

- The federal government's recent crackdown on migrant border crossings under the previous Trump administration resulted in a substantial boom in the number of immigrants in ICE's custody.

- The current administration has implemented policy to limit detainees in ICE facilities, precisely Title 42 and the Migrant Protection Protocols.

- Major enterprises experience legal pressure from ICE detainees, pressuring their involvement with this market.

### USMS market depleted by new executive order

- The USMS' primary responsibilities are protecting the federal judiciary, apprehending federal criminals, selling assets seized from illegal activities and housing and transporting federal detainees.

- As the USMS does not own or operate any of its prisons, it relies solely on federal, state, and private facilities to house inmates in its care.

- The USMS as a market has been declining and this trend has been accelerated by the 2021 legislation, barring contract renewals. Since 2021, major player Geo Group Inc., has already closed 3 USMS facilities.

- The USMS industry revenue share has declined at a CAGR of 8.5% from 2018 to 2023.

### Demand from the BOP sapped by new administrations policy against private-federal partnerships

- The BOP was founded to provide "progressive and humane" rehabilitation services to federal inmates. The BOP oversees the custody and care of over 180,000 federal prisoners in 122 facilities.

- In 2017 (latest data available) an estimated 11.0% of BOP housed inmates were confined in privately managed facilities.

- Severe overcrowding and general acceptance of the privatization has led to the agency frequently partnering with private companies such as The Geo Group and Management and Training Corporation.

- Revenue from this segment has fallen in recent years as the total federal prison population declined and this pattern will continue as the effects of the new executive order on contract renewals rears its head.

### Local markets at risk of succumbing to shifts in public sentiment against private prisons

- State and local departments of corrections account for the most significant share of industry revenue.

- States with the highest portion of inmates housed in private facilities are New Mexico, Montana, Oklahoma and Hawaii.

- According to the Bureau of Justice Statistics, eight states that previously contracted these facilities no longer outsource to the private sector.

- States like as California and Washington have begun to enact legislation aimed at phasing out public-private partnerships, hindering this segment's growth.

CONFIDENTIAL

Plaintiffs0001752

**Exports in this industry are** ⊘ **Low** and **Steady**

**Imports in this industry are** ⊘ **Low** and **Steady**

Due to the service nature of the Correctional Facilities industry, there is no international trade for the industry. While many of the larger enterprises in this industry have a global reach, there is no international trade.

CONFIDENTIAL

Plaintiffs0001753

Correctional Facilities in the US                                                                    March 2023

# Geographic Breakdown

**Key Insights**

| California | Virginia | Kansas | Connecticut | North Dakota | Texas |
|---|---|---|---|---|---|
| 67 Est. | $1.0bn | 17.3% | -10.4% | $220.5k | 3,790 |
| Most Establishments | Highest Revenue | Fastest Growth | Slowest Growth | Highest Average Wage | Most Employees |

## Establishment Concentration in the United States



Correctional Facilities in the US
Source: IBISWorld

**State Data for Correctional Facilities in the US (2023)**

| State | Establishments | Establishments Growth Rate (2018-2023) | Revenue | Revenue Growth Rate (2018-2023) | Employment | Employment Growth Rate (2018-2023) | Wages | Wages Growth Rate (2018-2023) |
|---|---|---|---|---|---|---|---|---|
| Alabama | 9 | 2.38% | $201.8m | 6.23% | 937 | -1.76% | $70.0m | 5.24% |

CONFIDENTIAL                                                                          Plaintiffs0001754

## State Data for Correctional Facilities in the US (2023)

| State | Establishments | Establishments Growth Rate (2018-2023) | Revenue | Revenue Growth Rate (2018-2023) | Employment | Employment Growth Rate (2018-2023) | Wages | Wages Growth Rate (2018-2023) |
|-------|---------------|-----------------------------------------|---------|----------------------------------|------------|------------------------------------|-------|-------------------------------|
| Alaska | 7 | 0.00% | $405.4m | 5.40% | 1,172 | -4.70% | $142.3m | 4.66% |
| Arizona | 15 | 1.39% | $301.8m | 3.84% | 934 | -7.72% | $108.0m | 3.51% |
| Arkansas | 4 | 5.92% | $29.4m | 12.27% | 167 | -1.27% | $10.9m | 12.68% |
| California | 67 | -0.30% | $699.4m | 0.30% | 2,736 | -7.74% | $246.0m | -0.36% |
| Colorado | 24 | 3.71% | $532.4m | 0.85% | 1,630 | -9.04% | $189.0m | 0.36% |
| Connecticut | 7 | -4.90% | $29.6m | -10.42% | 73 | -22.79% | $10.9m | -10.22% |
| Delaware | 3 | 0.00% | $14.1m | 1.55% | 127 | -2.21% | $5.1m | 1.41% |
| Florida | 42 | 0.00% | $896.0m | 6.82% | 3,045 | -5.80% | $317.5m | 6.28% |
| Georgia | 33 | 0.62% | $333.9m | -2.08% | 1,275 | -14.35% | $121.8m | -2.01% |
| Hawaii | 4 | 0.00% | $87.8m | 12.81% | 236 | -1.46% | $31.6m | 12.60% |
| Idaho | 3 | 0.00% | $16.9m | 4.46% | 207 | 7.68% | $6.1m | 4.27% |
| Illinois | 28 | 0.00% | $277.0m | -0.50% | 710 | -16.79% | $98.9m | -0.86% |
| Indiana | 9 | 0.00% | $147.7m | 5.82% | 867 | -0.39% | $52.1m | 5.18% |
| Iowa | 4 | 0.00% | $31.2m | 4.80% | 259 | 1.88% | $11.1m | 4.40% |
| Kansas | 9 | 5.16% | $117.4m | 17.28% | 687 | 9.47% | $42.6m | 17.25% |
| Kentucky | 8 | 0.00% | $129.5m | 10.19% | 1,319 | 7.66% | $47.6m | 10.42% |
| Louisiana | 12 | 1.76% | $187.4m | 3.91% | 699 | -5.81% | $67.1m | 3.59% |
| Maine | 3 | 8.45% | $10.8m | -0.18% | 77 | -9.09% | $4.3m | 1.61% |
| Maryland | 38 | -0.52% | $398.0m | -5.21% | 1,651 | -10.19% | $141.1m | -5.69% |
| Massachusetts | 15 | 0.00% | $173.6m | 6.11% | 1,696 | 7.76% | $62.6m | 5.92% |
| Michigan | 28 | 4.01% | $328.7m | 5.74% | 2,231 | 1.48% | $118.4m | 5.54% |
| Minnesota | 10 | 2.13% | $36.9m | 1.79% | 298 | 1.62% | $13.6m | 2.02% |
| Mississippi | 3 | 0.00% | $63.7m | -3.02% | 423 | -10.56% | $22.5m | -3.61% |
| Missouri | 12 | 0.00% | $73.2m | 3.96% | 576 | 1.45% | $26.1m | 3.53% |
| Montana | 1 | 0.00% | $22.0m | 6.16% | 167 | 2.04% | $7.8m | 5.69% |
| Nebraska | 4 | 0.00% | $42.1m | 12.80% | 223 | 6.73% | $14.9m | 12.11% |
| Nevada | 4 | 0.00% | $57.5m | 5.71% | 236 | -2.66% | $20.5m | 5.29% |
| New Hampshire | 3 | 0.00% | $12.6m | -8.43% | 179 | -2.96% | $4.3m | -9.48% |
| New Jersey | 21 | 0.00% | $259.3m | 1.28% | 1,381 | -2.30% | $92.3m | 0.85% |
| New Mexico | 5 | 0.00% | $94.5m | 1.31% | 484 | -5.81% | $33.3m | 0.68% |
| New York | 47 | 0.87% | $270.4m | -0.51% | 1,090 | -7.30% | $97.9m | -0.60% |

CONFIDENTIAL                                                      Plaintiffs0001755

Correctional Facilities in the US                                          March 2023

## State Data for Correctional Facilities in the US (2023)

| State | Establishments | Establishments Growth Rate (2018-2023) | Revenue | Revenue Growth Rate (2018-2023) | Employment | Employment Growth Rate (2018-2023) | Wages | Wages Growth Rate (2018-2023) |
|---|---|---|---|---|---|---|---|---|
| North Carolina | 24 | 0.86% | $222.1m | 4.28% | 1,972 | 1.48% | $78.9m | 3.80% |
| North Dakota | 1 | 0.00% | $13.6m | 4.50% | 22 | -14.80% | $4.9m | 4.08% |
| Ohio | 20 | 0.00% | $354.8m | 3.71% | 1,747 | -2.53% | $125.9m | 3.21% |
| Oklahoma | 11 | 1.92% | $141.2m | 2.71% | 576 | -8.13% | $50.6m | 2.41% |
| Oregon | 5 | 0.00% | $27.2m | 2.98% | 263 | 2.19% | $9.7m | 2.52% |
| Pennsylvania | 27 | -0.73% | $367.6m | -0.20% | 1,297 | -13.38% | $131.9m | -0.48% |
| Rhode Island | 3 | 0.00% | $17.3m | -2.64% | 115 | -0.51% | $6.4m | -2.34% |
| South Carolina | 8 | -2.33% | $68.8m | -5.27% | 452 | -9.97% | $25.3m | -5.06% |
| South Dakota | 2 | 14.87% | $11.3m | 16.22% | 39 | -9.71% | $4.0m | 15.65% |
| Tennessee | 13 | 0.00% | $601.6m | 13.38% | 1,877 | 0.19% | $204.3m | 11.84% |
| Texas | 59 | 0.69% | $946.0m | 2.28% | 3,790 | -7.21% | $333.0m | 1.62% |
| Utah | 5 | 4.56% | $20.6m | 3.96% | 141 | 1.33% | $7.5m | 3.84% |
| Vermont | 2 | 14.87% | $6.5m | -0.80% | 35 | -9.61% | $2.6m | 0.98% |
| Virginia | 27 | -1.42% | $1.0bn | 8.15% | 2,741 | -3.18% | $361.3m | 7.56% |
| Washington | 10 | 0.00% | $119.0m | 0.28% | 954 | 6.36% | $129.3m | 24.82% |
| West Virginia | 4 | 5.92% | $48.8m | 12.88% | 150 | -10.14% | $17.6m | 12.72% |
| Wisconsin | 6 | -3.04% | $136.9m | 10.97% | 741 | 5.69% | $48.6m | 10.43% |
| Wyoming | 1 | 0.00% | $11.7m | 6.53% | 98 | 8.90% | $4.2m | 6.18% |

CONFIDENTIAL                                          Plaintiffs0001756

**Business Locations**

**The Southeast is home to the two most prominent companies in the industry**

- The Southeast has traditionally been welcoming to industry enterprises and account for the largest total of industry establishments.

- CoreCivic Inc. and the GEO Group Inc., the industry's two largest enterprises, were founded in the Southeast and are currently headquartered in the region.

- Given the industry's long history in the Southeast, private correctional facilities experience widespread acceptance among policymakers and the public.

- According to the Prison Policy Initiative, the South has historically incarcerated more people than the rest of the country.

**The Southwest region has taken advantage of its proximity to the US-Mexico border**

- Industry enterprises are attracted to the Southwest due to its proximity to the US-Mexico border. ICE increasingly rely on private facilities to house the growing population of people detained border crossing.

- Texas is home to the largest concentration of companies in the region. According to ICE, the number of undocumented migrants entering the country through the Rio Grande Valley, has increased since 2018.

- The most prominent industry player, CoreCivic Inc., has expanded the capacity of its South Texas Family Residential Center, used to house undocumented women and children as they await due process in the courts.

**Mid-Atlantic and West regions supply ample demand for correctional facilities due to their large populations**

- Due to necessity, industry enterprises concentrate establishments in areas with large populations, such as New York and California.

- While 27 states permit the private operation of correctional facilities, the remaining 23 prohibit use, citing issues with overcrowding, prisoner treatment and rehabilitation and ethical issues.

- Western states like California and Washington have begun to legally bar public-private prison partnerships, decreasing the concentration of establishments in the region.

- It is important to note that some states that do not permit private prisons do permit private community correctional facilities.

Distribution of Establishments vs Population



Correctional Facilities
Source: IBISWorld

CONFIDENTIAL                      Plaintiffs0001757

# Competitive Landscape

**Market Share Concentration**

Market Share Concentration



Correctional Facilities
Source: IBISWorld

**Concentration in this industry is ○ Medium**

**High regulation and competition for government contracts prevents new entrants from penetrating the market**

- The three largest enterprises, CoreCivic Inc., the GEO Group Inc. and Management & Training Corporation, account for nearly half of all industry revenue, indicative of moderate market concentration.
- Companies generate revenue through government contracts, with intense competition preventing smaller-scale enterprises from entering the industry and capturing any significant portion of revenue.
- The strict regulatory environment requires correctional facility managers to obtain proper accreditation and regularly meet quality standards to sustain operations.

**Major companies have begun to diversify their offerings to hedge against political risk**

- Market share concentration has decreased significantly. The three largest companies captured over half of the total revenue in 2018. Mounting political pressure has forced enterprises to diversify business segments.
- CoreCivic has significantly invested in reentry institutions, shying away from full-scale correctional facility management.
- In 2011, GEO Group Inc. acquired Behavioral Interventions Inc., a company specializing in developing and supervising electrical monitoring devices for parolees and pre-trial individuals.
- The executive order released in January 2021, will contribute to further market fragmentation as revenue streams from the BOP and USMS become unavailable, leading companies to divest from the industry.

**Key Success Factors**

IBISWorld identifies over 200 Key Success Factors for a business. The most important for this industry are:

**Ability to compete on tender:**
Government agencies responsible for correctional and detention facilities generally procure goods and services through requests for proposals.

**Carrying out all necessary maintenance to keep facilities in good condition:**
Industry participants are generally subject to standards and guidelines for operating and maintaining their facilities. The American Correctional Association (ACA) has established these standards.

**Provision of appropriate facilities:**
Industry participants provide a range of essential services, from correctional and detention services to mental health services. It is necessary to provide appropriate facilities according to the type of services required.

**Understand government policies and their implications:**
It is paramount that industry enterprises stay cognizant of ongoing government policy discussions, at both the federal and state level. Many industry participants also lobby the government to support their political agenda.

**Must comply with government regulations:**
Industry participants must comply with a variety of federal, state and local legislation administered by several government agencies.

IBISWorld.com

CONFIDENTIAL

Plaintiffs0001758

Correctional Facilities in the US                                                    March 2023

## Cost Structure Benchmarks



Cost Structure 2023

## Profit

### Profitability outpaces increased purchases

- As a service industry, profit levels are primarily influenced by wage expenses. Correctional facilities require expansive and diverse collections of employees to operate properly.

- Company-specific profit is dictated by an enterprise's ability to manage these expenses effectively.

- Overall, industry profit, measured as earnings before interest and taxes, is estimated to account for 9.7% of revenue in 2023.



Profit as a Share of Revenue 2018-2023

Correctional Facilities
Source: IBISWorld

## Wages

### Minimum wage increases translate to higher expenses for the industry

- Wage costs constitute the single largest expense category for the industry and accounted for an estimated 37.2% of average revenue in 2023.

- The industry is highly labor-intensive since facilities require high staff-to-inmate ratios to function and comply with applicable regulations properly.

- Guards in minimum to maximum security prisons are paid substantially higher wages than workers in community correctional facilities due to the required accreditation and training to serve as guards.

- As minimum wage requirements have been raised, industry wage expenses have increased from an estimated 36.4% in 2018.



Wages as a Share of Revenue 2018-2023

Correctional Facilities
Source: IBISWorld

CONFIDENTIAL                                                          Plaintiffs0001759

### Purchases

**Pandemic pressures purchase costs**

- Purchase costs are a significant expense for the Correctional Facilities industry and account for an estimated 26.8% of average revenue in 2023.

- While purchase costs can vary based on company size and scale, all correctional facility establishments require food, medical and general maintenance supplies to operate appropriately.

- Heightened focus on sanitation and healthcare resulting from the pandemic has pressured industry purchase expenses significantly.

- Major industry enterprises, such as The GEO Group Inc. and CoreCivic Inc., have noted heightened purchase expenses related to medical supplies, personal protective equipment, and sanitary products.

Purchases as a Share of Revenue 2018-2023



Correctional Facilities
Source: IBISWorld

### Marketing

Marketing and advertising expenses for industry enterprises are low, accounting for just 1.5% of average industry revenue in 2023.

Marketing as a Share of Revenue 2018-2023



Correctional Facilities
Source: IBISWorld

### Depreciation

Depreciation accounts for an estimated 2.8% of industry revenue in 2023.

Depreciation as a Share of Revenue 2018-2023



Correctional Facilities
Source: IBISWorld

CONFIDENTIAL                                                                      Plaintiffs0001760

Correctional Facilities in the US                                                            March 2023

### Rent

Rent expenses encompass costs associated with ownership of facilities and relative properties, accounting for an estimated 1.8% of average industry revenue in 2023.

**Rent as a Share of Revenue 2018-2023**



Correctional Facilities
Source: IBISWorld

**Rent Breakdown (% of Total Rent in 2023)**



Breakdown of Rent as a Share of Revenue

● Machinery and equipment   ● Land, Building and Structure   ● Other

Correctional Facilities
Source: IBISWorld

### Utilities

Utility expenses represent costs associated with electricity, water, fuel and other utilities required to run day-to-day operations, the combination of these expenses accounts for an estimated 0.3% of average industry revenue in 2023.

**Utilities as a Share of Revenue 2018-2023**



Correctional Facilities
Source: IBISWorld

IBISWorld.com

CONFIDENTIAL                                         Plaintiffs0001761

### Other Costs

**Liability and legal action force industry enterprises to incur high costs**

- Other costs compose an estimated 19.9% of industry revenue and include administrative expenses, professional fees, inmate medical costs and legal insurance fees.

- These expenses vary between facilities depending on the type of services provided and the inmates housed.

- Large industry enterprises incur hefty legal insurance fees through various third-party legal claims.

- Industry enterprises obtain liability insurance for all operations and maintain insurance to cover property and casualty risks, workers' compensation and directors' and officers' liability.

**Industry companies frequently lobby for favorable legislation**

- Companies often spend large amounts of money on lobbying and political donations. Both CoreCivic and GEO Group, have Political Action Committees (PACs) that funnel funds to political campaigns.

- According to OpenSecrets.org, GEO's PAC contributed $2.8 million in the 2020 election cycle, while CoreCivic's PAC contributed $389,545.



Other Costs as a Share of Revenue 2018-2023

Year
Correctional Facilities
Source: IBISWorld

Other Breakdown (% of Total Other in 2023)



Breakdown of Other as a Share of Revenue

- Taxes
- Research and Development
- Telecommunications
- Repair and Maintenance
- Professional Services
- Other
- IT services and related spend
- Temporary employees

Correctional Facilities
Source: IBISWorld

**Basis of Competition**

Competition in this industry is ⊝ Medium and the trend is Increasing

### The Correctional Facilities industry experiences a medium level of competition.

The market is characterized by a few large enterprises that account for most federal and state government contracts for private incarceration facilities. Smaller companies more frequently compete for contracts to run community correctional facilities rather than incarceration facilities. Community facilities are subject to less federal and state regulation and have lower operating costs, making it easier for smaller companies to operate such facilities. Increased demand for correctional facilities in recent years has enabled new companies to enter the market despite the high barriers to entry, increasing competition for the industry. As community correctional facilities continue to grow as a market segment, even large enterprises have begun to raise investment into this market, this may prove threatening to smaller companies.

#### INTERNAL COMPETITION

### Competition between companies involve bed availability, price, quality and range of services, experience, and reputation.

Independent accreditation by various oversight and regulatory organizations is designed to ensure a facility adheres to nationally accepted quality standards, facility design, management and maintenance. Accreditation organizations

IBISWorld.com

CONFIDENTIAL                                                    Plaintiffs0001762

set national benchmarks for services, programs, and operations essential to maintaining safe and high-quality correctional management. These include administrative and fiscal controls, staff training and development, physical environment, safety and emergency procedures.

**EXTERNAL COMPETITION**

## Private enterprises experience external competition from government-operated correctional facilities.

Competition is based on relative costs and potential savings of government-operated versus privately owned facilities. Some states have legislation that require private companies to provide a minimum level of saving for the state to gain operation and management contracts. While some other states have imposed legislation barring public-private prison partnerships. Some enterprises are structured as a Real Estate Investment Trust (REIT) and may compete with developers and real estate companies to acquire government-leased assets. United States government tenants are viewed as desirable by landlords due to a strong credit profile. Companies may compete with well-capitalized investors that want to acquire government-leased properties. This competition could inflate prices for properties and hinder industry enterprises' ability to diversify and expand.

**Barriers to Entry**

Barriers to Entry in this industry are ⊘ **High** and the trend is **Steady**

**Legal**

The Correctional Facilities industry is subject to high barriers to entry as a direct result of the stringent federal and state regulations that industry facilities must abide by. To compete for government contracts, correctional facilities must have accreditation from a national accreditation program, such as the American Correctional Association (ACA).

**Start-Up Costs**

The process of gaining accreditation from the ACA often requires enterprises to make significant investments in facilities to meet quality standards. New entrants to the market often experience substantial upfront capital costs to own and operate facilities outright.

**Differentiation**

The sheer size of most government contracts also raises barriers to entry. As most government contracts to the industry are for managing several hundred inmates, if not thousands, smaller facilities have a difficult time competing with larger established enterprises.

**Labor Intensity**

The industry is highly labor-intensive since facilities require high staff-to-inmate ratios to properly function and comply with applicable regulations. Wage costs are kept low for the industry relative to the number of workers by paying low average wages to industry employees across the board.

| Barriers to Entry Checklist | |
| --- | --- |
| Competition | Medium ⊘ |
| Concentration | Medium ⊘ |
| Life Cycle Stage | Mature ⊘ |
| Technology Change | Low ⊘ |
| Regulation & Policy | Heavy △ |
| Industry Assistance | Low △ |

**Industry Globalization**

Globalization in this industry is ⊘ **Low** and the trend is **Steady**

Due to the service nature of the Correctional Facilities industry, there is no international trade for the industry, keeping globalization for the industry low and steady. There is a small degree of global presence among more prominent enterprises. The second-largest industry player, GEO Group, operates 4 correctional facilities throughout Australia and South Africa accounting for 6,525 beds total. According to a 2019 report from the Sentencing Project, a nonprofit research group, the US has the highest number of private prisons of any other country, with private prisons housing 8.0% of the 1.5 million people in federal and state prisons nationwide. If the privatization trend for prisons extends to the global market, companies will likely expand the number of their overseas operations. Nonetheless, globalization for the industry has not changed significantly.

CONFIDENTIAL                                                    Plaintiffs0001763

CONFIDENTIAL                                              Plaintiffs0001764

# Major Companies

**Market Share Overview**

### Breakdown of Industry Market Share (2022)



Source: IBISWorld, Correctional Facilities

**Related Companies**

| Competitors | Company Type | Employee Segment | Revenue ($m) | Market Share (%) | Profit ($m) |
|---|---|---|---|---|---|
| Corecivic | Incumbent | 500+ Employees | 1,878.9 ▲ | 18.93 ▼ | 245.5 ▲ |
| Geo | Golden Goose | 500+ Employees | 1,498.0 ▲ | 15.09 ▼ | 188.0 ▼ |
| Management & Training | Rising Star | 500+ Employees | 1,232.2 ▲ | 12.41 ▲ | 235.3 ▲ |
| George | Laggard | 500+ Employees | 25.9 ▼ | 0.26 ▼ | 2.1 ▼ |
| Colliers International | Laggard | 500+ Employees | 4.3 ▼ | 0.04 ▼ | 0.8 ▼ |

CONFIDENTIAL                                                                    Plaintiffs0001765

Companies with 5.0% industry market share are displayed in the PDF version of this report. You can view insights for all companies associated with this industry on my.ibisworld.com

## Corecivic, Inc.

## Company Overview

**Description**

Corecivic is a public company headquartered in Tennessee with an estimated 10,348 employees. In the US, the company has a notable market share in at least one industry: Correctional Facilities, where they account for an estimated 18.9% of total industry revenue.

| | |
|---|---|
| COMPANY TYPE | Public Company |
| TOTAL COMPANY REVENUE | $1.9bn |
| EMPLOYEES | 10,348 |

**Analyst Insights**

**Company is the largest private owner of real estate used by government agencies in the United States**
According to its latest 10K report, CoreCivic is the largest private owner of real estate used by government agencies in the United States. As of December 31, 2021, the company owned, or controlled via a long-term lease, approximately 15.1 million square feet of real estate, all used directly or indirectly by government agencies, which it believes makes the company the largest private owner of real estate used by government agencies in the U.S. CoreCivic's complementary set of business assets provide critical infrastructure and services under contracts with federal, state, and local government agencies that generally have credit ratings of single-A or better, which also contributes to its steady, predictable cash flows.

COVID  Structural

**Corecivic dominates the industry**
Through the company's CoreCivic Safety segment, it is the nation's largest private prison owner and one of the largest prison operators in the United States, which provides the company with significant credibility with current and prospective clients. According to company estimates, CoreCivic owns, or controls via a long-term lease, nearly 56.0% of all privately owned prison beds in the United States and manage nearly 38.0% of all privately managed prison beds in the United States.

COVID  Structural

**Company provides a 2022 outlook**
While reporting its results for the fourth quarter of 2021, CoreCivic Inc (CoreCivic) issued an outlook for the full year 2022. The company said its guidance reflects a "continuation of occupancy restrictions placed on our bed capacity by many of our government partners as a result of the ongoing COVID-19 (coronavirus) pandemic, which could result in enhanced earnings when relieved."

COVID

CONFIDENTIAL                                                          Plaintiffs0001766

  

Case 8:24-bk-07106-RCT  Doc 45-3  Filed 12/17/24  Page 120 of 290

---

Correctional Facilities in the US                                    March 2023

**Corecivic, Inc.**

## Company Overview

**Industry Market Share, Revenue and Profit**

### Market Share

**18.93%** Strong        **-1.8%** ▼

Current Year        Annual Growth
(2022)              (2018–22)



Change in Market Share

Year

Correctional Facilities
Source: IBISWorld

### Industry Revenue

**$1.9bn** Strong        **0.6%** ▲

Current Year        Annual Growth
(2022)              (2018–22)



Change in Industry Revenue

Year

Correctional Facilities
Source: IBISWorld

### Profit Margin

**13.07%** Moderate        **-0.5%** ▼

Current Year        Annual Growth
(2022)              (2018–22)



Change in Profit Margin

Year

Correctional Facilities
Source: IBISWorld

32                                                  IBISWorld.com

CONFIDENTIAL                                       Plaintiffs0001767

## The Geo Group, Inc.

## Company Overview

**Description**

Geo is a public company headquartered in Florida with an estimated 22,000 employees. In the US, the company has a notable market share in at least one industry: Correctional Facilities, where they account for an estimated 15.1% of total industry revenue.

| | |
|---|---|
| COMPANY TYPE | Public Company |
| TOTAL COMPANY REVENUE | $1.5bn |
| EMPLOYEES | 22,000 |

**Analyst Insights**

**Geo Group Inc. to close a correctional facility in Michigan**
Announced in May of 2022, the North Lake Correctional Facility in Baldwin, MI, a facility that is a joint venture between Geo Group and the Federal Bureau of Prisons (FBP), will be closed on September 30th due to the FBP choosing not to renew their contract with Geo Group as part of a broader policy shift enacted by the President which aims to halt the renewal of federal contracts with private, for-profit prisons. Overall, this represents a broader challenge for the Geo Group and the Correctional Facilities industry in the US.

Discontinued Activity

**Geo Group Inc. gets extension to continue operating in San Diego**
While originally set to close on March 31, 2022 as a part of the President's broader policy shift away from federally contracted, for-profit prisons, the Western Regional Detention Facility in San Diego, owned by the Geo Group Inc. has been granted a 90-day extension to continue operating. Amid controversy surrounding the fate of this facility, Geo Group Inc. is exploring numerous options to keep the facility operating.

Structural

**The GEO Group adjusts its structure, becoming a taxable C corporation**
According to the Commercial Observer, The GEO Group Inc. will become a taxable C corporation moving forward and will stop paying dividends. As of January 1st, 2022, the corporation will not be managed a real estate investment trust (REIT), leading to shares falling more than 7% after this announcement was made. According to NASDAQ, the move is expected to give GEO Group more flexibility to ramp up cash flow to help reduce debt. Moving in the future, GEO Group expects to pay a higher annual corporate tax rate.

New Activity  Structural

CONFIDENTIAL                                                                                    Plaintiffs0001768

Correctional Facilities in the US                                                 March 2023

**The Geo Group, Inc.**

## Company Overview

| Industry Market Share, Revenue and Profit | |
|---|---|

### Market Share

**15.09%** Moderate          **-1.8%** ▼

Current Year              Annual Growth
(2022)                    (2018–22)




Change in Market Share

### Industry Revenue

**$1.5bn** Moderate          **0.1%** ▲

Current Year              Annual Growth
(2022)                    (2018–22)



Change in Industry Revenue

### Profit Margin

**12.55%** Weak          **1.2%** ▲

Current Year              Annual Growth
(2022)                    (2018–22)




Change in Profit Margin

34                                                                IBISWorld.com

## Management & Training Corp.

### Company Overview

**Description**

Management & Training is a private company with an estimated 8,000 employees. In the US, the company has a notable market share in at least one industry: Correctional Facilities, where they account for an estimated 12.4% of total industry revenue and are considered a Rising Star because they display lower market share, but displaying stronger profit and revenue growth than some of their peers.

| COMPANY TYPE | Private Company |
|---|---|
| TOTAL COMPANY REVENUE | $1.2bn |
| EMPLOYEES | 8,000 |

**Analyst Insights**

**MTC concerned regarding the Biden Administration's phase out of private prisons**

Management & Training Corporation (MTC) has expressed concerns following a decision by the Biden Administration's intentions to deemphasize the government's reliance on private prisons through an executive order. As part of the new executive order, the Department of Justice will no longer renew any contracts with private prisons. As MTC serves as a contractor for the management of private prisons, these decisions would have material negative effects on the company.

New Activity

**MTC expands its global presence into Morocco**

In September 2020, MTC announced that it will participate in a new training project in Morocco, expanding the company's global presence. As part of a contract granted to the company, MTC will provide technical support for a new training center set to be located in Morocco. The company cited this new project will be funded by both Morocco and the US government with the intention to help develop labor skills among adults.

New Activity

CONFIDENTIAL                                                                  Plaintiffs0001770

**Management & Training Corp.**

Company Overview

**Industry Market Share, Revenue and Profit**

**Estimated Industry Market Share**

**12.41%** Moderate

Current Year
(2022)



**Estimated Industry Revenue**

**$1.2bn** Moderate

Current Year
(2022)



**Estimated Profit Margin**

**19.1%** Strong

Current Year
(2022)



IBISWorld.com

CONFIDENTIAL                                      Plaintiffs0001771

## George S. Hall Inc.

## Company Overview

**Description**

George is a private company with an estimated 4,500 employees. In the US, the company has a notable market share in at least one industry: Correctional Facilities, where they account for an estimated 0.3% of total industry revenue.

| COMPANY TYPE | Private Company |
| --- | --- |
| TOTAL COMPANY REVENUE | $25.9m |
| EMPLOYEES | 4,500 |

**Financial Performance**

### George S. Hall Inc. - financial performance *

| Year | Revenue $m | Growth % change | Operating Income $m | Growth % change |
| --- | --- | --- | --- | --- |
| 2017 | 21.8 | 13.5 | 1.8 | 12.5 |
| 2018 | 25 | 14.7 | 2.1 | 16.7 |
| 2019 | 27.6 | 10.4 | 2.3 | 9.5 |
| 2020 | 25.7 | -6.9 | 2.1 | -8.7 |
| 2021 | 26.1 | 1.6 | 2.1 | 0 |
| 2022 | 25.9 | -0.8 | 2.1 | 0 |

Source: IBISWorld
Note: * Estimates

CONFIDENTIAL

Plaintiffs0001772

**George S. Hall Inc.**

## Company Overview

**Industry Market Share, Revenue and Profit**

### Estimated Industry Market Share

**0.26%** Weak

Current Year
(2022)



### Estimated Industry Revenue

**$25.9m** Weak

Current Year
(2022)



### Estimated Profit Margin

**8.2%** Weak

Current Year
(2022)



CONFIDENTIAL

Plaintiffs0001773

## Colliers International Group Inc.

## Company Overview

**Description**    Colliers International is a public company headquartered in Ontario with an estimated 17,000 employees. In the US, the company has a notable market share in at least two industries: Real Estate Sales & Brokerage, Correctional Facilities and Correctional Facilities. Their largest market share is in the Real Estate Sales & Brokerage industry, where they account for an estimated 1.5% of total industry revenue and are considered a Disruptor because they display lower to medium market share that's rising rapidly, but weaker profits compared to some of their peers.

| COMPANY TYPE | Public Company |
|---|---|
| TOTAL COMPANY REVENUE | $4.3m |
| EMPLOYEES | 17,000 |

**Other Industries**    Real Estate Sales & Brokerage in the US

**Financial Performance**

### Colliers International Group Inc. - financial performance *

| Year | Revenue $m | Growth % change | Operating Income $m | Growth % change |
|---|---|---|---|---|
| 2017 | 2.2 | 120 | 0.4 | 100 |
| 2018 | 2.5 | 13.6 | 0.5 | 25 |
| 2019 | 7.1 | 184 | 1.3 | 160 |
| 2020 | 9.1 | 28.2 | 1.7 | 30.8 |
| 2021 | 5.3 | -41.8 | 1 | -41.2 |
| 2022 | 4.3 | -18.9 | 0.8 | -20 |

Source: IBISWorld
Note: * Estimates

CONFIDENTIAL                                             Plaintiffs0001774

Correctional Facilities in the US                                                March 2023

**Colliers International Group Inc.**

## Company Overview

**Industry Market Share, Revenue and Profit**

**Market Share**

**0.04%** Weak       **0.0%** ▲

Current Year       Annual Growth
(2022)             (2018–22)



**Industry Revenue**

**$4.3m** Weak       **14.7%** ▲

Current Year       Annual Growth
(2022)             (2018–22)



**Profit Margin**

**18.75%** Moderate       **0.0%** ▲

Current Year       Annual Growth
(2022)             (2018–22)



40                                                                IBISWorld.com

Correctional Facilities in the US                                                  March 2023

# Operating Conditions

## Costs of Growth: Targeting Capital vs. Labor



Correctional Facilities in the US
Source: IBISWorld

| Capital Intensity | **The level of capital intensity is** ⊘ **Low** |
|---|---|

The Correctional Facilities industry is characterized by a low-to-moderate level of capital intensity, measured by the capital-to-wage ratio. In 2023, for every $1.00 allocated toward employee compensation and benefits, the average operator is estimated to spend $0.07 on capital expenditures. As a service-oriented industry, correctional facilities are highly labor-intensive and require a diverse population of professionals to operate appropriately. Since industry facilities house inmates full-time, required services range from medical professionals, general maintenance staff, education, and counseling professionals hired security, information technology support staff, and various administrators. Companies invest in the necessary training required to work in such a unique environment, increasing overall labor costs. Enterprises allocate more revenue toward wage expenses than investing in complex machinery or equipment.

Initial capital outlays are still significant for companies and represent a barrier to entry. Aside from staffing, a facility must be equipped with the size, scale, and sanitary environment to house inmates. Capital intensity for correctional facilities is typically higher compared with other service professions, since industry activities are performed in owned or leased locations. The degree of capital requirements can vary depending on a company's size and scale. For instance, major companies, such as GEO Group Inc., incur higher capital expenses by constructing new facilities or expanding and modernizing owned buildings. The industry's market share concentration also contributes to comparatively higher capital intensity.

While capital intensity has remained consistent, the pandemic has affected the dynamic within the industry. Many correctional facilities have received scrutiny regarding sanitation and available space in compliance with social distancing requirements. Major company CoreCivic Inc. (CoreCivic), has received various lawsuits since the outset of the pandemic, under claims of both



## Capital Intensity Ratios

Correctional Facilities
Source: IBISWorld

CONFIDENTIAL                                                              Plaintiffs0001776

prisoner and staff neglect regarding sanitation. These suits claim the company failed to implement proper sanitation protocols and outright ignored coronavirus cases in certain facilities. CoreCivic and the industry is expected to allocate more revenue toward sanitation and medical equipment, while modernizing many existing structures. As macroeconomic conditions improve, capital intensity in the industry is expected to remain steady.

**Technology & Systems**

Potential Disruptive Innovation: Factors Driving Threat of Change

| | Level | Factor | Disruptive Effect | Description |
|---|---|---|---|---|
| ⊖ | Medium | Rate of Innovation | Potential | A ranked measure for the number of patents assigning to an industry. A faster rate of new patent additions to the industry increases the likelihood of a disruptive innovation occurring. |
| ⚠ | Very High | Innovation Concentration | Very Likely | A measure for the mix of patent classes assigned to the industry. A greater concentration of patents in one area increases the likelihood of technological disruption of incumbent operators. |
| ⊘ | Very Low | Ease of Entry | Very Unlikely | A qualitative measure of barriers to entry. Fewer barriers to entry increases the likelihood that new entrants can disrupt incumbents by putting new technologies to use. |
| ⊘ | Very Low | Rate of Entry | Very Unlikely | Annualized growth in the number of enterprises in the industry, ranked against all other industries. A greater intensity of companies entering an industry increases the pool of potential disruptors. |
| ⚠ | Very High | Market Concentration | Very Likely | A ranked measure of the largest core market for the industry. Concentrated core markets present a low-end market or new market entry point for disruptive technologies to capture market share. |

The industry is adding new patent technologies at a rate in line with the average across all industries, which suggests a stable addition of technology. However, the concentration of technologies is high. This creates the potential for innovation outside the focus of industry leaders to gain traction.

There are both significant barriers to entry and a low rate of new entrants in this industry. This combination of factors dampens the threat of innovative players disrupting the industry structure.

The major markets for this industry are highly concentrated, which implies that the market has a focus on key customer segments. This presents an opportunity for strategic entrance into lower-end markets or unserved markets for innovations to take on a disruptive trajectory.

## The Correctional Facilities industry has experienced marginal technology and systems disruption.

Although technology has advanced rapidly, it has yet to disrupt the industry directly despite some minor security improvements. Enterprises operate legacy business models with a high barrier to entry. It is tough to innovate in the sector, deterring new entrants. With industry enterprises using a business model that has experienced no disruption, the market structure is likely to remain unchanged.

**The level of technology change is** ⊘ **Low**

Plaintiffs0001777

## The Correctional Facilities industry is subject to slow technological innovation.

Some advances have been made in the use of technology in recent years, mainly involving facilities' design, operation, security, and education. Improvement in technology has enabled some industry participants to reduce the number of officers required to provide security at a facility. Educational programs offered to inmates have improved due to increased computerized learning using online-based distance learning. In-house educational programs were generally restricted to the most common types of education, including basic education and high school diplomas. The use of distance learning has boosted the number of programs offered to inmates.

**Revenue Volatility**

**The level of volatility is** ⊙ **Medium**

Volatility vs. Growth



Correctional Facilities
Source: IBISWorld

**Historical downward trend in crime and incarceration rate shows no sign of slowing**
- The industry has exhibited a moderate level of revenue volatility. Industry demand is influenced by the national prison population, making it uniquely insulated from the broader economic climate.
- Factors like crime rate and incarceration have been steadily declining since 2008, emblematic of the industry's moderate level of volatility.
- Revenue can vary between companies in different locations since local and state governments represent the largest industry market segment.
- Revenue may dip as local and state government budgets are constrained and funding for social services are diminished.

**Government policy exerts significant influence over the industry, as the federal administration looks to reduce prison populations**
- Government policy represents a major influencing factor for industry demand. Private correctional facilities generate revenue directly from state, local and federal government contracts.
- Changes in the judicial system, such as sentencing practices, also influence industry revenue. Policies dealing with sentencing laws and non-violent drug offenders strongly affect demand for correctional facilities.
- Before the pandemic, detention centers contracted under the Immigration and Customs Enforcement Agency (ICE) have contributed to industry revenue growth.
- In January 2021, a new executive order mandated that the BOP and USMS terminate contracts with private incarceration facilities, hindering industry enterprises revenue earning potential.

**Regulation & Policy**

**The level of regulation is** △ **Heavy and the trend is Increasing**

**American Correctional Association Regulations**

CONFIDENTIAL    Plaintiffs0001778

To receive contracts from the federal government companies must be accredited by a national accreditation program; some state governments have similar requirements. The American Correctional Association (ACA) is the nation's most extensive accreditation program. To obtain ACA accreditation, companies must perform self-evaluations and have a standards compliance audit by ACA consultants. Most industry enterprises obtain accreditation from the ACA or a similar organization. Some states require private prisons to show a minimum level of savings compared with public prisons to obtain a government contract. For example, the state of Texas requires that private prisons demonstrate a 10.0% savings to the state to obtain a contract.

**Pandemic-related Regulations**

While the Correctional Facilities industry is highly regulated, the disruptive effects of the coronavirus pandemic have added to the complexity of prison policy. To reduce infection risk among incarceration facilities, private and public institutions have tried reducing prison populations. According to the Associated Press and The Marshall Project, national prison populations declined an estimated 8.0% between March and June 2020, as more than 100,000 inmates were released. A more significant portion of these reductions also occurred due to the lack of sentencing as courts remained closed from the virus. More than 40 states received failing grades from the American Civil Liberties Union on handling the pandemic in prisons. As health and safety restrictions have been eased, prisons are still scrutinized for their population's treatment. Many measures implemented in response to the coronavirus pandemic have persisted.

**New Executive Order**

In January 2021, the current executive administration released an order calling for a reform to the incarceration system in the United States. The decree stipulates a requirement for the Attorney General to not renew US Department of Justice (DOJ) contracts with private incarceration facilities, as is consistent with applicable laws. The adoption of this order will stymie revenue growth potential. According to major player GEO Group Inc., several major contracts with the Federal Bureau of Prisons (BOP) and US Marshal Service have expired in 2022, with more set to become void in 2023. With this order in effect, the likelihood of renewal for these contracts is highly uncertain. This order does not apply to private contracts for ICE facilities, but increasing political pressure may expand the list of included facilities. Some states like California and Washington have enacted their own legislation barring public-private prison partnerships.

| Industry Assistance | **The level of industry assistance is** △ **Low and the trend is Decreasing** |
| --- | --- |

*Public*

**Federal Government Subsidies**

Correctional Facilities companies are subject to a low degree of government assistance. The detention bed mandate, passed in 2009, requires a minimum of 34,000 people to reside in federal immigration detention centers, assuring a minimum level of enforcement from US Immigration and Customs Enforcement (ICE). The two largest industry enterprises, Correctional Corporation of America, and GEO Group, control an estimated 43.0% of federal government contracts, 20.0% of which are ICE holding facilities; GEO Group benefits from this detention quota. Companies may also benefit from stipulations in government contracts that guarantee funding levels even in the event of a reduction in the inmate population. The current administration has approved more than $888 million in direct funding payments to Core Civic, the GEO Group and their subsidiaries through federal government contracts.

**Coronavirus Aid, Relief and Economic Security Act**

While the Correctional Facilities industry is uniquely separate from the broader economic climate, the coronavirus pandemic has disrupted industry operation. Thus, in March 2020, the current executive administration passed the Coronavirus Aid, Relief and Economic Security (CARES) Act, providing more than $2.0 trillion in stimulus funds across virtually all sectors of the economy. For private correctional facilities in particular, the CARES Act provides more than $100.0 million in emergency funds for federal prison systems along with $850.0 million for law enforcement, the department of corrections and other criminal justice agencies. These funds will be largely used to mitigate heightened costs associated with increased sanitation protocols. The act expands the Bureau of Prisons' home confinement law, in which prison populations can be reduced by releasing low-level offenders for monitoring in a residential area.

**Real Estate Investment Trusts**

Many companies have converted their corporate structure in recent years to become real estate investment trusts (REITs). REITs are designed for companies whose main revenue source is real estate holdings. Although enterprises in the Correctional Facilities industry operate prisons as their primary form of business, the prison facilities themselves constitute real estate, enabling them to file as REITs. Companies that have created taxable REIT subsidiaries are subject to several unique tax advantages, including not being subject to income tax. As of 2019, the two largest industry enterprises, CoreCivic Inc. and the Geo Group Inc., have converted their corporate structure to file as REITs.

CONFIDENTIAL                                                                        Plaintiffs0001779

Correctional Facilities in the US                                                                          March 2023

# Key Statistics

## Industry Data

| Year | Revenue ($m) | IVA ($m) | Establishments (Units) | Enterprises (Units) | Employment (People) | Exports ($m) | Imports ($m) | Wages ($m) | Domestic Demand ($m) | Incarceration rate (People) |
|------|------|------|------|------|------|------|------|------|------|------|
| 2014 | 8,147 | 4,319 | 1,559 | 480 | 62,883 | N/A | N/A | 3,358 | N/A | 491 |
| 2015 | 8,710 | 4,677 | 1,605 | 436 | 60,118 | N/A | N/A | 3,628 | N/A | 476 |
| 2016 | 8,915 | 4,754 | 1,544 | 431 | 53,193 | N/A | N/A | 3,615 | N/A | 467 |
| 2017 | 9,528 | 5,164 | 1,424 | 455 | 59,592 | N/A | N/A | 3,970 | N/A | 458 |
| 2018 | 10,641 | 5,159 | 1,417 | 495 | 61,841 | N/A | N/A | 3,870 | N/A | 448 |
| 2019 | 11,178 | 5,568 | 1,345 | 356 | 49,077 | N/A | N/A | 4,166 | N/A | 436 |
| 2020 | 11,284 | 5,657 | 1,298 | 343 | 43,715 | N/A | N/A | 4,254 | N/A | 366 |
| 2021 | 10,894 | 5,440 | 1,261 | 332 | 41,965 | N/A | N/A | 4,088 | N/A | 333 |
| 2022 | 10,341 | 5,166 | 1,213 | 319 | 39,941 | N/A | N/A | 3,889 | N/A | 297 |
| 2023 | 10,310 | 5,116 | 1,183 | 311 | 39,260 | N/A | N/A | 3,834 | N/A | 258 |
| 2024 | 10,073 | 4,988 | 1,146 | 301 | 38,176 | N/A | N/A | 3,731 | N/A | 216 |
| 2025 | 9,799 | 4,838 | 1,112 | 291 | 36,883 | N/A | N/A | 3,610 | N/A | 169 |
| 2026 | 9,567 | 4,705 | 1,079 | 282 | 35,630 | N/A | N/A | 3,495 | N/A | 143 |
| 2027 | 9,330 | 4,578 | 1,048 | 274 | 34,582 | N/A | N/A | 3,395 | N/A | 119 |
| 2028 | 9,059 | 4,442 | 1,017 | 265 | 33,547 | N/A | N/A | 3,294 | N/A | 98.3 |

## Annual Change

| Year | Revenue (%) | IVA (%) | Establishments (%) | Enterprises (%) | Employment (%) | Exports (%) | Imports (%) | Wages (%) | Domestic Demand (%) | Incarceration rate (%) |
|------|------|------|------|------|------|------|------|------|------|------|
| 2014 | 3.89 | -6.49 | 0.12 | -11.0 | -15.7 | N/A | N/A | -6.65 | N/A | -1.67 |
| 2015 | 6.91 | 8.29 | 2.95 | -9.17 | -4.40 | N/A | N/A | 8.04 | N/A | -3.00 |
| 2016 | 2.34 | 1.63 | -3.81 | -1.15 | -11.5 | N/A | N/A | -0.36 | N/A | -1.92 |
| 2017 | 6.88 | 8.63 | -7.78 | 5.56 | 12.0 | N/A | N/A | 9.81 | N/A | -1.89 |
| 2018 | 11.7 | -0.11 | -0.50 | 8.79 | 3.77 | N/A | N/A | -2.54 | N/A | -2.17 |
| 2019 | 5.04 | 7.92 | -5.09 | -28.1 | -20.7 | N/A | N/A | 7.64 | N/A | -2.82 |
| 2020 | 0.94 | 1.60 | -3.50 | -3.66 | -10.9 | N/A | N/A | 2.11 | N/A | -16.1 |
| 2021 | -3.46 | -3.84 | -2.86 | -3.21 | -4.01 | N/A | N/A | -3.90 | N/A | -8.92 |
| 2022 | -5.08 | -5.03 | -3.81 | -3.92 | -4.83 | N/A | N/A | -4.88 | N/A | -10.7 |
| 2023 | -0.31 | -0.99 | -2.48 | -2.51 | -1.71 | N/A | N/A | -1.43 | N/A | -13.1 |
| 2024 | -2.31 | -2.50 | -3.13 | -3.22 | -2.77 | N/A | N/A | -2.67 | N/A | -16.5 |
| 2025 | -2.72 | -3.01 | -2.97 | -3.33 | -3.39 | N/A | N/A | -3.26 | N/A | -21.5 |
| 2026 | -2.38 | -2.75 | -2.97 | -3.10 | -3.40 | N/A | N/A | -3.20 | N/A | -15.5 |
| 2027 | -2.48 | -2.70 | -2.88 | -2.84 | -2.95 | N/A | N/A | -2.85 | N/A | -16.7 |
| 2028 | -2.91 | -2.97 | -2.96 | -3.29 | -3.00 | N/A | N/A | -2.98 | N/A | -17.5 |

## Key Ratios

| Year | IVA/Revenue (%) | Imports/ Demand (%) | Exports/ Revenue (%) | Revenue per Employee ($'000) | Wages/ Revenue (%) | Employees per estab. (Units) | Average Wage ($) |
|------|------|------|------|------|------|------|------|
| 2014 | 53.0 | N/A | N/A | 130 | 41.2 | 40.3 | 53,399 |
| 2015 | 53.7 | N/A | N/A | 145 | 41.7 | 37.5 | 60,346 |
| 2016 | 53.3 | N/A | N/A | 168 | 40.6 | 34.5 | 67,964 |
| 2017 | 54.2 | N/A | N/A | 160 | 41.7 | 41.8 | 66,623 |
| 2018 | 48.5 | N/A | N/A | 172 | 36.4 | 43.6 | 62,573 |
| 2019 | 49.8 | N/A | N/A | 228 | 37.3 | 36.5 | 84,877 |
| 2020 | 50.1 | N/A | N/A | 258 | 37.7 | 33.7 | 97,303 |
| 2021 | 49.9 | N/A | N/A | 260 | 37.5 | 33.3 | 97,417 |
| 2022 | 50.0 | N/A | N/A | 259 | 37.6 | 32.9 | 97,366 |
| 2023 | 49.6 | N/A | N/A | 263 | 37.2 | 33.2 | 97,644 |
| 2024 | 49.5 | N/A | N/A | 264 | 37.0 | 33.3 | 97,737 |
| 2025 | 49.4 | N/A | N/A | 266 | 36.8 | 33.2 | 97,874 |
| 2026 | 49.2 | N/A | N/A | 269 | 36.5 | 33.0 | 98,080 |
| 2027 | 49.1 | N/A | N/A | 270 | 36.4 | 33.0 | 98,175 |
| 2028 | 49.0 | N/A | N/A | 270 | 36.4 | 33.0 | 98,194 |

Figures are inflation adjusted to 2023

CONFIDENTIAL                                                                          Plaintiffs0001780

Correctional Facilities in the US

March 2023

## Industry Financial Statement

| Industry Multiples | 2018 | 2019 | 2020 | 2021 | 3-Year | 5-Year | 10-Year |
|---|---|---|---|---|---|---|---|
| EBIT/Revenue | 6.6 | 7.1 | 6.0 | 6.4 | 6.5 | 6.7 | 9.5 |
| EBITDA/Revenue | 10.0 | 10.4 | 9.2 | 9.9 | 9.8 | 10.3 | 14.5 |
| Leverage Ratio | 2.8 | 3.0 | 4.1 | 4.2 | 3.7 | 3.3 | 2.5 |

| Industry Tax Structure | 2018 | 2019 | 2020 | 2021 | 3-Year | 5-Year | 10-Year |
|---|---|---|---|---|---|---|---|
| Taxes Paid/Revenue | 3.2 | 3.3 | 3.0 | 3.5 | 3.2 | 3.3 | 3.3 |

| Income Statement | 2018 | 2019 | 2020 | 2021 | 3-Year | 5-Year | 10-Year |
|---|---|---|---|---|---|---|---|
| Total Revenue | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Business receipts | 87.2 | 89.2 | N/A | N/A | 89.2 | 87.5 | 86.5 |
| Cost of goods | 38.6 | 37.4 | 38.6 | 37.4 | 37.8 | 38.1 | 35.4 |
| Gross Profit | 61.4 | 62.6 | 61.4 | 62.6 | 62.2 | 61.9 | 64.6 |

### Expenses

| | 2018 | 2019 | 2020 | 2021 | 3-Year | 5-Year | 10-Year |
|---|---|---|---|---|---|---|---|
| Salaries and wages | 13.5 | 15.0 | 14.0 | 14.7 | 14.6 | 14.4 | 15.4 |
| Advertising | 2.0 | 2.1 | 2.2 | 2.2 | 2.2 | 2.2 | 2.6 |
| Depreciation | 2.8 | 2.9 | 2.9 | 3.3 | 3.1 | 3.1 | 2.8 |
| Depletion | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.3 |
| Amortization | 0.4 | 0.3 | 0.2 | 0.2 | 0.2 | 0.3 | 2.0 |
| Rent paid | 2.6 | 2.6 | 2.6 | 2.7 | 2.6 | 2.6 | 3.0 |
| Repairs | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.2 | 0.6 |
| Bad debts | 62.7 | 78.4 | 86.2 | 90.1 | 84.9 | 69.8 | 36.4 |
| Employee benefit programs | 7.0 | 7.2 | 7.3 | 7.4 | 7.3 | 7.1 | 5.2 |
| Compensation of officers | 20.1 | 20.2 | 20.3 | 20.4 | 20.3 | 20.1 | 14.3 |
| Taxes paid | 3.2 | 3.3 | 3.0 | 3.5 | 3.2 | 3.3 | 3.3 |
| Interest Income | 0.8 | 0.5 | 0.3 | 0.2 | 0.3 | 0.7 | 1.7 |

### Other Income

| | 2018 | 2019 | 2020 | 2021 | 3-Year | 5-Year | 10-Year |
|---|---|---|---|---|---|---|---|
| Royalties | 0.6 | 0.3 | 0.2 | 0.1 | 0.2 | 0.5 | 1.2 |
| Rent Income | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.2 |
| Net Income | 2.6 | 3.1 | 2.2 | 2.1 | 2.5 | 2.6 | 2.8 |

| Balance Sheet | 2018 | 2019 | 2020 | 2021 | 3-Year | 5-Year | 10-Year |
|---|---|---|---|---|---|---|---|

### Assets

| | 2018 | 2019 | 2020 | 2021 | 3-Year | 5-Year | 10-Year |
|---|---|---|---|---|---|---|---|
| Cash and Equivalents | 8.3 | 8.3 | 8.4 | 8.6 | 8.4 | 8.4 | 9.3 |
| Notes and accounts receivable | 18.0 | 18.3 | 18.6 | 18.9 | 18.6 | 18.3 | 16.3 |
| Allowance for bad debts | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.6 |
| Inventories | 18.3 | 19.7 | 20.6 | 21.3 | 20.5 | 19.1 | 12.6 |
| Other current assets | 6.5 | 6.3 | 6.1 | 6.0 | 6.1 | 6.3 | 6.4 |
| Other investments | 12.3 | 11.3 | 10.7 | 10.3 | 10.8 | 11.8 | 19.9 |
| Property, Plant and Equipment | 48.6 | 52.6 | 55.9 | 58.6 | 55.7 | 52.0 | 48.5 |
| Accumulated depreciation | 32.6 | 35.8 | 38.3 | 40.5 | 38.2 | 35.3 | 30.5 |
| Intangible assets (Amortizable) | 19.6 | 19.1 | 18.3 | 18.0 | 18.5 | 19.1 | 19.3 |
| Accumulated amortization | 4.0 | 3.9 | 3.8 | 3.8 | 3.8 | 3.9 | 4.8 |
| Other assets | 7.6 | 7.4 | 7.2 | 7.1 | 7.2 | 7.4 | 8.6 |
| Total assets | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Accounts payable | 12.3 | 12.7 | 13.1 | 13.4 | 13.1 | 12.6 | 10.1 |

### Liabilities and Net Worth

| | 2018 | 2019 | 2020 | 2021 | 3-Year | 5-Year | 10-Year |
|---|---|---|---|---|---|---|---|
| Mort, notes, and bonds under 1 yr | 13.4 | 13.9 | 14.3 | 14.5 | 14.2 | 13.7 | 10.7 |
| Other current liabilities | 11.3 | 10.7 | 10.2 | 10.0 | 10.3 | 10.9 | 11.5 |
| Loans from shareholders | 5.7 | 6.2 | 6.5 | 6.8 | 6.5 | 6.1 | 5.0 |
| Mort, notes, bonds, 1 yr or more | 44.8 | 45.5 | 45.7 | 46.1 | 45.8 | 45.3 | 44.9 |
| Other liabilities | 13.1 | 12.9 | 12.6 | 12.4 | 12.6 | 12.9 | 14.2 |
| Total liabilities | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Capital stock | 2.6 | 2.4 | 2.3 | 2.3 | 2.3 | 2.6 | 6.6 |
| Additional paid-in capital | 12.7 | 11.8 | 11.1 | 10.7 | 11.2 | 12.2 | 25.4 |
| Retained earnings, appropriated | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 |
| Retained earnings-unappropriated | 28.6 | 29.2 | 29.5 | 29.9 | 29.5 | 29.1 | 32.6 |
| Cost of treasury stock | 17.1 | 17.0 | 16.7 | 16.6 | 16.8 | 17.0 | 22.8 |
| Net worth | 17.7 | 16.4 | 15.6 | 15.0 | 15.7 | 17.0 | 24.6 |

IBISWorld.com

CONFIDENTIAL

Plaintiffs0001781

Correctional Facilities in the US                                                        March 2023

## Liquidity Ratios

| Liquidity Ratios | 2018 | 2019 | 2020 | 2021 | 3-Year | 5-Year | 10-Year |
|---|---|---|---|---|---|---|---|
| Current Ratio | 1.4 | 1.5 | 1.5 | 1.5 | 1.5 | 1.4 | 1.5 |
| Quick Ratio | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 1.1 |
| Sales/Receivables | 19.7 | 17.8 | 14.2 | 12.8 | 14.9 | 16.9 | 31.9 |
| Days' Receivables | 18.5 | 20.5 | 25.7 | 28.5 | 24.9 | 22.3 | 18.8 |
| Days' Inventory | 48.7 | 59.3 | 73.8 | 85.7 | 72.9 | 62.1 | 40.4 |
| Inventory Turnover | 7.5 | 6.2 | 4.9 | 4.3 | 5.1 | 6.3 | 21.6 |
| Payables Turnover | 11.1 | 9.5 | 7.8 | 6.8 | 8.0 | 9.4 | 17.1 |
| Days' Payables | 32.8 | 38.3 | 46.9 | 53.9 | 46.4 | 40.7 | 32.7 |
| Sales/Working Capital | 39.2 | 33.5 | 45.4 | 14.3 | 31.1 | 33.5 | 72.9 |

## Coverage Ratios

| Coverage Ratios | 2018 | 2019 | 2020 | 2021 | 3-Year | 5-Year | 10-Year |
|---|---|---|---|---|---|---|---|
| Interest Coverage | 387.3 | 380.7 | 396.6 | 400.6 | 392.6 | 389.9 | 370.9 |
| Debt Service Coverage Ratio | 2.4 | 3.2 | 1.2 | 0.8 | 1.7 | 2.0 | 2.5 |

## Leverage Ratios

| Leverage Ratios | 2018 | 2019 | 2020 | 2021 | 3-Year | 5-Year | 10-Year |
|---|---|---|---|---|---|---|---|
| Fixed Assets/Net Worth | 6.3 | 7.2 | 7.9 | 8.5 | 7.9 | 7.0 | 5.1 |
| Debt/Net Worth | 5.7 | 6.1 | 6.4 | 6.7 | 6.4 | 6.0 | 4.8 |
| Tangible Net Worth | 0.2 | 0.2 | 0.2 | 0.1 | 0.2 | 0.2 | 0.2 |

## Operating Ratios

| Operating Ratios | 2018 | 2019 | 2020 | 2021 | 3-Year | 5-Year | 10-Year |
|---|---|---|---|---|---|---|---|
| Return on Net Worth, % | 132.4 | 141.3 | 101.8 | 103.6 | 115.6 | 121.7 | 127.5 |
| Return on Assets, % | 23.4 | 23.2 | 15.9 | 15.5 | 18.2 | 20.8 | 31.6 |
| Sales/Total Assets | 3.5 | 3.2 | 2.6 | 2.4 | 2.8 | 3.1 | 3.3 |
| EBITDA/Revenue | 10.0 | 10.4 | 9.2 | 9.9 | 9.8 | 10.3 | 14.5 |
| EBIT/Revenue | 6.6 | 7.1 | 6.0 | 6.4 | 6.5 | 6.7 | 9.5 |

## Cash Flow & Debt Service Ratios (% of sales)

| Cash Flow & Debt Service Ratios (% of sales) | 2018 | 2019 | 2020 | 2021 | 3-Year | 5-Year | 10-Year |
|---|---|---|---|---|---|---|---|
| Cash from Trading | 60.4 | 61.9 | 60.1 | 62.2 | 61.4 | 61.0 | 64.2 |
| Cash after Operations | 21.9 | 21.8 | 21.0 | 22.1 | 21.6 | 21.5 | 28.7 |
| Net Cash after Operations | 18.7 | 18.8 | 18.1 | 19.3 | 18.7 | 18.3 | 26.5 |
| Debt Service P&I Coverage | 2.6 | 2.4 | 2.1 | 2.0 | 2.2 | 2.3 | 2.9 |
| Interest Coverage (Operating Cash) | 22.3 | 22.7 | 21.8 | 23.4 | 22.7 | 22.0 | 16.3 |

Source: IRS SOI Tax Stats; US Census Bureau; IBISWorld

CONFIDENTIAL                                                                  Plaintiffs0001782

# Additional Resources

**Additional Resources**

Bureau of Justice Statistics
http://www.bjs.gov

US Department of Justice
http://www.usdoj.gov

American Correctional Association
http://www.aca.org

American Civil Liberties Union
http://www.aclu.org

**Industry Jargon**

**JAIL**
A local facility where a person is physically confined while awaiting trial, sentencing or transfer, or while serving a sentence of less than one year.

**PAROLE**
Court-ordered community supervision of a convicted offender following a period of incarceration.

**PRISON**
A state or federal facility where a person is physically confined and usually deprived of personal freedoms while serving a sentence of one or more years.

**PROBATION**
Court-ordered community supervision of a convicted offender, often in lieu of or after incarceration.

**Glossary**

**BARRIERS TO ENTRY**
High barriers to entry mean that new companies struggle to enter an industry, while low barriers mean it is easy for new companies to enter an industry.

**CAPITAL INTENSITY**
Compares the amount of money spent on capital (plant, machinery and equipment) with that spent on labor. IBISWorld uses the ratio of depreciation to wages as a proxy for capital intensity. High capital intensity is more than $0.333 of capital to $1 of labor; medium is $0.125 to $0.333 of capital to $1 of labor; low is less than $0.125 of capital for every $1 of labor.

**CONSTANT PRICES**
The dollar figures in the Key Statistics table, including forecasts, are adjusted for inflation using the current year (i.e. year published) as the base year. This removes the impact of changes in the purchasing power of the dollar, leaving only the "real" growth or decline in industry metrics. The inflation adjustments in IBISWorld's reports are made using the US Bureau of Economic Analysis' implicit GDP price deflator.

**DOMESTIC DEMAND**
Spending on industry goods and services within the United States, regardless of their country of origin. It is derived by adding imports to industry revenue, and then subtracting exports.

**EMPLOYMENT**
The number of permanent, part-time, temporary and seasonal employees, working proprietors, partners, managers and executives within the industry.

**ENTERPRISE**
A division that is separately managed and keeps management accounts. Each enterprise consists of one or more establishments that are under common ownership or control.

**ESTABLISHMENT**
The smallest type of accounting unit within an enterprise, an establishment is a single physical location where business is conducted or where services or industrial operations are performed. Multiple establishments under common control make up an enterprise.

**EXPORTS**
Total value of industry goods and services sold by US companies to customers abroad.

**IMPORTS**
Total value of industry goods and services brought in from foreign countries to be sold in the United States.

CONFIDENTIAL                                                    Plaintiffs0001783

**INDUSTRY CONCENTRATION**

An indicator of the dominance of the top four players in an industry. Concentration is considered high if the top players account for more than 70% of industry revenue. Medium is 40% to 70% of industry revenue. Low is less than 40%.

**INDUSTRY REVENUE**

The total sales of industry goods and services (exclusive of excise and sales tax); subsidies on production; all other operating income from outside the firm (such as commission income, repair and service income, and rent, leasing and hiring income); and capital work done by rental or lease. Receipts from interest royalties, dividends and the sale of fixed tangible assets are excluded.

**INDUSTRY VALUE ADDED (IVA)**

The market value of goods and services produced by the industry minus the cost of goods and services used in production. IVA is also described as the industry's contribution to GDP, or profit plus wages and depreciation.

**INTERNATIONAL TRADE**

The level of international trade is determined by ratios of exports to revenue and imports to domestic demand. For exports/revenue: low is less than 5%, medium is 5% to 20%, and high is more than 20%. Imports/domestic demand: low is less than 5%, medium is 5% to 35%, and high is more than 35%.

**LIFE CYCLE**

All industries go through periods of growth, maturity and decline. IBISWorld determines an industry's life cycle by considering its growth rate (measured by IVA) compared with GDP; the growth rate of the number of establishments; the amount of change the industry's products are undergoing; the rate of technological change; and the level of customer acceptance of industry products and services.

**NONEMPLOYING ESTABLISHMENT**

Businesses with no paid employment or payroll, also known as nonemployers. These are mostly set up by self-employed individuals.

**PROFIT**

IBISWorld uses earnings before interest and tax (EBIT) as an indicator of a company's profitability. It is calculated as revenue minus expenses, excluding interest and tax.

**REGIONS**

West | CA, NV, OR, WA, HI, AK
Great Lakes | OH, IN, IL, WI, MI
Mid-Atlantic | NY, NJ, PA, DE, MD
New England | ME, NH, VT, MA, CT, RI
Plains | MN, IA, MO, KS, NE, SD, ND
Rocky Mountains | CO, UT, WY, ID, MT
Southeast | VA, WV, KY, TN, AR, LA, MS, AL, GA, FL, SC, NC
Southwest | OK, TX, NM, AZ

**VOLATILITY**

The level of volatility is determined by averaging the absolute change in revenue in each of the past five years. Volatility levels: very high is more than ±20%; high volatility is ±10% to ±20%; moderate volatility is ±3% to ±10%; and low volatility is less than ±3%.

**WAGES**

The gross total wages and salaries of all employees in the industry.

CONFIDENTIAL    Plaintiffs0001784

# Call Preparation Questions

**Role Specific Questions**

**Sales & Marketing**

How much does your company expend on marketing?

Marketing expenses constitute a small share of revenue, accounting for typically between 1.0% and 2.0 % of total revenue in a given year.

Marketing efforts should be focused on securing government contracts and garnering local support.

How can your company ensure contract renewals with federal, state and local governments?

Maintaining positive relationships with contracted federal and state entities can ensure contract renewals.

Maintaining these relationships through administration changes is crucial for sustaining business.

**Strategy & Operations**

Has your company expanded your market share through strategic acquisitions?

Pursuing strategic acquisitions can help a company grow organically with reduced capital expenditure and can strengthen relationships in new state and local environments.

Strategic acquisitions can help penetrate previously untapped geographic markets, while enhancing the benefits of economies of scale.

Has your company considered expanding abroad?

The GEO Group, one of the largest private prison operators, has expanded into a number of countries including the United Kingdom, South Africa, Australia and Canada.

However, compliance with local laws requires significant investment in legal advice and is paramount in avoiding controversy.

**Technology**

Has your company invested in new technology?

Investing in the latest technology can help streamline operations, thereby increasing efficiency and reducing operating expenses.

Software systems associated with security and inmate tracking can help reduce labor expenses.

Is your company investing in new tracking technology?

Cutting-edge Global Positioning Satellite (GPS) tracking devices can help reduce costs associated with monitoring individuals.

**Compliance**

How has tax reform impacted investors in your company?

As a direct result of tax reform signed into law in 2017, individual investors in US private prisons will now see an estimated 25.0% reduction in taxes, with the investment tax for real estate investment trusts (REITs) reduced from 39.6% to 29.6%.

How have recent changes to immigration policy impacted revenue?

A shift in immigration policy under the previous administration has been lucrative for private prison operators, which receive about half of their total revenue from federal government contracts, including the Immigration and Customs Enforcement (ICE).

**Finance**

How can your company benefit financially by restructuring as a real estate investment trust?

Real estate investment trusts (REITs) are commonplace in the private prison business. Restructuring your business as a REIT can provide substantial tax savings, as REITs are not subject to income tax.

How do your company's profit margins compare to the industry average?

Industry average profit margins range from 5.0-9.0% of revenue for a typical operator, depending on the size of the

company and the type of facilities managed.

Company-specific profit above or below industry average figures typically implies pricing power or weakness.

**External Impacts Questions**

**Impact: Crime rate**

How closely does your company monitor trends in sentencing? How do these trends affect your performance?

Increases in criminal activity generally result in more arrests and greater occupancy levels at correctional facilities, supporting demand for industry services.

**Impact: Incarceration rate**

Do you regularly monitor the incarceration rate? Is there a direct correlation between the incarceration rate and demand for your facilities?

Demand for industry services is largely determined by the incarceration rate. As the number of people in prison increases, prisons become overcrowded and federal and state governments become more likely to employ industry services.

**Impact: Government consumption and investment**

What government contracts does your company own? Are appropriations made on a timely basis? How do you handle public resistance to privatization?

Private correctional facilities earn all of their revenue from contracts with federal and state governments. Therefore, changes in the level of government consumption and investment affect demand for industry services.

Privatization of prisons remains an area of public debate, especially in regard to immigration policy.

Changing executive administration can greatly affect government policy on the topic.

CONFIDENTIAL                                              Plaintiffs0001786

**Internal Issues Questions**

**Issue: Carrying out all necessary maintenance to keep facilities in good condition**

How much do you spend on routine maintenance? What tasks do you outsource? How do you ensure that your maintenance is adequate and cost-effective?

Industry participants are generally subject to standards and guidelines for operating and maintaining their facilities. The American Correctional Association (ACA) has established these standards.

**Issue: Must comply with government regulations**

Do you monitor changes in government regulations? Have you had any issues with regulations in the past? How has your company adapted to coronavirus-related guidelines?

Industry participants must comply with a variety of federal, state and local legislation administered by several government agencies.

Social distancing, capacity limits, heightened sanitation procedures and other pandemic-related measures have significantly affected correctional facility operation.

**Issue: Ability to attract local support/patronage**

How loyal is your local support? How do you deal with public opposition to your facilities?

Industry participants may experience community opposition to facility location. By attempting to conduct business in communities that support the establishment of industry facilities, they may be able to acquire land on more favorable terms.

Recent infection outbreaks in prisons have been a main area of focus for industry opponents.

CONFIDENTIAL                                                          Plaintiffs0001787



# IBISWorld helps you find the industry information you need – fast.

With our trusted research covering thousands of global industries, you'll get a quick and intelligent overview of any industry so you can get up to speed in minutes. In every report, you'll find actionable insights, comprehensive data and in-depth analysis to help you make smarter, faster business decisions. If you're not yet a member of IBISWorld, contact us at 1-800-330-3772 or info@ibisworld.com to learn more.

DISCLAIMER
This product has been supplied by IBISWorld Inc. ('IBISWorld') solely for use by its authorized licenses strictly in accordance with their license agreements with IBISWorld. IBISWorld makes no representation to any other person with regard to the completeness or accuracy of the data or information contained herein, and it accepts no responsibility and disclaims all liability (save for liability which cannot be lawfully disclaimed) for loss or damage whatsoever suffered or incurred by any other person resulting from the use of, or reliance upon, the data or information contained herein. Copyright in this publication is owned by IBISWorld Inc. The publication is sold on the basis that the purchaser agrees not to copy the material contained within it for other than the purchasers own purposes. In the event that the purchaser uses or quotes from the material in this publication – in papers, reports, or opinions prepared for any other person – it is agreed that it will be sourced to: IBISWorld Inc.

Copyright 2023 IBISWorld Inc.

Plaintiffs0001788

# EXHIBIT 24

Filing # 211593503 E-Filed 11/22/2024 04:43:19 PM

# IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
# IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,

            Plaintiffs,

v.

JANICE LOGAN, individually, as Trustee of the James
Logan Family Trust, dated February 10, 2021, and as
Personal Representative of the ESTATE OF
JAMES LOGAN, JUSTIN PETERSON, and
ALEXIS LOGAN,

            Defendants.

_____/

Case No. 2023-CA-1002-NC

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021,

            Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., SMART
COMMUNICATIONS HOLDING, LLC, and
HLFIP HOLDING, LLC,

            Counterclaim Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021, and derivatively
on behalf of Smart Communications Holding, Inc.,

            Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., nominal
defendant, SMART COMMUNICATIONS HOLDING,
LLC, HLFIP HOLDING, LLC,
LOCO FLORIDA LLC, and SMART
COMMUNICATIONS YACHT HOLDING, LLC,

            Defendants.

_____/

(CONSOLIDATED)

Case No.: 2023-CA-1280-NC

1

## AGREED ORDER APPOINTING COMMISSIONER
## AND AUTHORIZING OUT OF STATE DEPOSITION

Upon consideration of Janice Logan's Unopposed Motion to Appoint Commissioner and Authorize Out of State Deposition (DIN 850) ("Motion") pursuant to Florida Rules of Civil Procedure 1, 300(a), 1.410, and Florida Statute Section 92.251, having considered the Motion, and being advised that all other parties in the Consolidated Action are unopposed to the Motion, and otherwise being fully advised in the premises, this Court ORDERS:

1.      Eller Reporting, Inc. is appointed commissioner for the purposes of administering oaths, stenographically recording the deposition of Mike Shreve, and video recording the deposition of Mike Shreve.

2.      Janice Logan is authorized to serve a subpoena in Muskegon, County, Michigan to compel the witness's testimony.

3.      The subpoena must be served, and the deposition must be taken, under the law of the target state, Michigan Compiled Laws § 600.2201 *et seq.*

DONE AND ORDERED in Chambers, Sarasota County, Florida.

e-Signed 11/22/2024 4:43 PM 2023 CA 001002 NC
Hon. Hunter W. Carroll
Circuit Court Judge

Copies to:  All Counsel of Record

| 14th<br>MUSKEGON | **STATE OF MICHIGAN**<br>**JUDICIAL CIRCUIT**<br>**COUNTY** | **SUBPOENA FOR OUT-OF-STATE CASE** | 24-15<br>HON KENNETH S HOOPES |
|---|---|---|---|

| Court address | Court telephone no. |
|---|---|
| 990 Terrace Street, Muskegon, Michigan 49442 | 231-724-6251 |

This subpoena is issued for the following out-of-state case under MCL 600.2201 *et seq.*

| Case name Jonathan Logan and Smart Communications Holding, Inc. v. Janice Logan, individually, as Trustee of the James Logan Family Trust dated February 10, 2021 and as Personal Representative of the Estate of James Logan; Justin Peterson; and Alexis Logan | | |
|---|---|---|
| Name of state/territory where case is filed<br>Sarasota, Florida | Name of court<br>Circuit Court of the Twelfth Judicial Circuit in and for Sarasota County, Florida | Case number<br>2023-CA-1002-NC and<br>2023-CA-1280-NC (Consolidated) |

**Note:** Attach a separate sheet containing the names, addresses, and telephone numbers of all attorneys of record and any parties not represented by an attorney.

| Person requesting subpoena<br>Peter F. O'Neill | | | |
|---|---|---|---|
| Address<br>Shook, Hardy & Bacon L.L.P., 111 South Wacker Drive, Suite 4700 | | | |
| City<br>Chicago, | State<br>Illinois | Zip<br>60606 | Telephone no.<br>(312) 704-7710 |

In the Name of the People of the State of Michigan. TO:

Mike Shreve, M.L. Shreve CPA, P.C.
7781 N. Easy Street, Whitehall, Michigan 49461
(231) 894-5559

**YOU ARE ORDERED TO COMPLY WITH THE ATTACHED OUT-OF-STATE SUBPOENA:**

☑ 1. Appear personally at the time and place stated below for the purposes stated in that subpoena:

> Date:     December 19, 2024

> Time:     9:00 am (EST)

> Location:  Via Zoom - link to be provided by court reporter

☑ 2. Produce/Permit inspection or copying of the items stated in that subpoena.

☐ 3. Permit inspection of the premises identified in that subpoena.

**THE TERMS OF THE OUT-OF-STATE SUBPOENA ARE INCORPORATED IN THIS ORDER BY REFERENCE. FAILURE TO OBEY THE COMMANDS OF THE SUBPOENA MAY SUBJECT YOU TO PENALTY FOR CONTEMPT OF COURT.**

*Christina S. Jarvis*                    11/25/2024
_____     12:25 PM
Circuit court clerk signature and date

                                   CHRISTINA S. JARVIS
                                   COUNTY CLERK SPECIALIST

Distribute form to:
Return
Person subject to subpoena
Requesting person's file

**Subpoena for Out-Of-State Case**   (3/23)                                       Case No. _____24-15_____

<div align="center">

**PROOF OF SERVICE**

</div>

**TO PROCESS SERVER:** You must serve the subpoena and provide proof of service to the person requesting the subpoena. If you are unable to complete service, you must return this original and all copies to the person requesting the subpoena.

<div align="center">

**CERTIFICATE OF SERVICE / NONSERVICE**

</div>

☐ I served     ☐ personally     ☐ by registered or certified mail, return receipt requested, and delivery restricted to the addressee (copy of return receipt attached)     a copy of the subpoena for out-of-state case, together with any required fees and the attachments listed below, on:

☐ I have attempted to serve a copy of the subpoena for out-of-state case, together with any required fees and the attachments listed below, and have been unable to complete service on:

| Name | Date and time of service |
|---|---|
| Place or address of service | |
| Attachments (if any) | |

I declare under the penalties of perjury that this certificate of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled | Fee $ | | Signature |
|---|---|---|---|---|
| Incorrect address fee $ | Miles traveled | Fee $ | TOTAL FEE $ | Name (type or print) |

<div align="center">

**ACKNOWLEDGMENT OF SERVICE**

</div>

I acknowledge that I have received service of a copy of the subpoena for out-of-state case, together with any required

fees and _____ on _____ .
                     Attachments (if any)                              Date and time

_____ on behalf of _____
Signature

_____
Name (type or print)

MCR 2.105, MCR 2.107, MCR 2.305(A), MCR 2.506(G)

## COUNSEL OF RECORD LIST

*Counsel for Janice Logan, individually, as Trustee of the James Logan Family Trust dated February 10, 2021, as Personal Representative of the Estate of James Logan, and derivatively on behalf of Smart Communications Holding, Inc.*

Anitra R. Clement
Florida Bar No. 100354
**SHOOK, HARDY & BACON L.L.P.**
100 N. Tampa St., Ste. 2900
Tampa, FL 33602
Telephone: (813) 202-7100
aclement@shb.com

David E. Schoenfeld (FL PHV # 1047561)
Peter F. O'Neill (FL PHV # 1043125)
Andrew L. Franklin (FL PHV # 1035737)
Kailin Liu (FL PHV # 1051416)
**SHOOK, HARDY & BACON L.L.P.**
111 S. Wacker Dr., Ste. 4700
Chicago, IL 60606
Telephone: (312) 704-7700
dschoenfeld@shb.com
pfoneill@shb.com
afranklin@shb.com
kliu@shb.com

John D. Garretson (FL PHV #1057004)
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, MO 64108
Telephone:  (816) 474-6550
jgarretson@shb.com

| | |
|---|---|
| ***Counsel for Jonathan D. Logan; Smart Communications Holding, Inc.; Smart Communications Holding LLC; Loco Florida LLC, Smart Communications Yacht Holding, LLC*** | Michael J. Harwin<br>**Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.**<br>200 East Las Olas Boulevard<br>Suite 2100<br>Fort Lauderdale, FL 33301<br>Tel:  (954) 462-9500<br>mharwin@stearnsweaver.com<br>mhernandez@stearnsweaver.com<br><br>Glenn Burhans, Jr.<br>Christopher R. Clark<br>Bridget K. Smitha<br>**Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.**<br>106 East College Avenue, Suite 700<br>Tallahassee, FL 32301<br>Tel: (850) 580-7200<br>gburhans@stearnsweaver.com<br>bsmitha@stearnsweaver.com<br>cacosta@stearnsweaver.com<br>crclark@stearnsweaver.com<br>lrussell@stearnsweaver.com |
| ***Counsel for Jonathan D. Logan; Smart Communications Holding, Inc.; Smart Communications Holding, LLC; Loco Florida LLC*** | Mark Bernet<br>**Akerman LLP**<br>401 E. Jackson Street, Suite 1700<br>Tampa, FL 33602-5250<br>Tel:  (813) 223-7333<br>Mark.bernet@akerman.com<br>Caren.deruiter@akerman.com<br><br>Jason S. Oletsky<br>Dustin B. Hillsley<br>Max C. Rudolf<br>**Akerman LLP**<br>201 East Las Olas Boulevard<br>Suite 1800<br>Fort Lauderdale, FL 33301<br>Tel:  (954) 463-2700<br>Jason.oletsky@akerman.com<br>Jill.parnes@akerman.com<br>Dustin.hillsley@akerman.com<br>Max.rudolf@akerman.com<br>Deborah.karlson@akerman.com |

| | |
|---|---|
| ***Counsel for HLFIP Holding, LLC*** | Christopher G. Oprison |
| | Tal Aburos |
| | Jody A. Stafford |
| | **DLA Piper LLP (US)** |
| | 200 South Biscayne Boulevard |
| | Suite 2500 |
| | Miami, Florida 33131-5341 |
| | Tel:  (305) 423-8522 |
| | chris.oprison@dlapiper.com |
| | tal.aburos@dlapiper.com |
| | jody.stafford@dlapiper.com |
| | chris.baker2@dlapiper.com |
| | Sheila.hall@dlapiper.com |
| | |
| | Steve Dixon |
| | **DLA Piper LLP (US)** |
| | 500 Eighth Street, NW |
| | Washington, DC 20004 |
| | Tel:  (202) 799-4000 |
| | steve.dixon@dlapiper.com |
| | |
| ***Counsel for Alexis Logan and Justin Peterson*** | Charles F. Johnson |
| | **Blalock Walters, P.A.** |
| | 802 11th St. West |
| | Bradenton, FL 34205 |
| | Tel: (941) 748-0100 |
| | cjohnson@blalockwalters.com |
| | eservice@blalockwalters.com |

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,

          Plaintiffs,

v.

JANICE LOGAN, individually, as Trustee of
the James Logan Family Trust, dated
February 10, 2021, and as Personal
Representative of the ESTATE OF
JAMES LOGAN, JUSTIN PETERSON, and
ALEXIS LOGAN,

          Defendants.
_____/

JANICE LOGAN, as Trustee of the James
Logan Family Trust, dated February 10,
2021,

          Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., SMART
COMMUNICATIONS HOLDING, LLC, and
HLFIP HOLDING, LLC,

          Counterclaim Defendants.
_____/

JANICE LOGAN, as Trustee of the James
Logan Family Trust, dated February 10,
2021, and derivatively on behalf of Smart
Communications Holding, Inc.,

          Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., nominal
defendant, SMART COMMUNICATIONS
HOLDING, LLC, HLFIP HOLDING, LLC,
LOCO FLORIDA LLC, and SMART
COMMUNICATIONS YACHT HOLDING, LLC,

          Defendants.
_____/

Case No. 2023-CA-1002-NC

(CONSOLIDATED)

Case No.: 2023-CA-1280-NC

## SUBPOENA DUCES TECUM FOR ZOOM DEPOSITION

TO:    **Mike Shreve**
       M.L. Shreve CPA, P.C.
       7781 N. Easy Street
       Whitehall, Michigan 49461
       231-894-5559

**YOU ARE COMMANDED** to appear via Zoom (link to be provided closer to deposition) before a person authorized by law to take depositions, on December 19, 2024,[1] at 9:00 AM Eastern Time for the taking of your deposition in this action, and to have with you at that time and place the items listed below that are in your possession, custody, or control pertaining to the above captioned action.

ITEMS TO BE PRODUCED:  <u>SEE ATTACHED EXHIBIT 1</u>.

These items will be inspected and copied at that time.  You will not be required to surrender the original items.

**<u>IN LIEU OF BRINGING PHYSICAL COPIES OF THE REQUESTED ITEMS, COPIES OF THE RECORDS MAY BE EMAILED TO PFONEILL@SHB.COM OR MAILED ON OR BEFORE THE ABOVE REFERENCED DATE TO ELLER REPORTING, INC. ATTN: PETER F. O'NEILL, SHOOK, HARDY & BACON, L.L.P., 625 KENMOOR AVE SE, SUITE 301, GRAND RAPIDS, MI 49546. HOWEVER, IF YOU ARE PRODUCING DOCUMENTS AND COMMUNICATIONS ON THE DAY OF YOUR DEPOSITION, BRING ELECTRONIC COPIES FOR THOSE PRESENT.</u>**

You may condition the preparation of the reproduction of the above items upon payment in advance **<u>not to exceed $200.00</u>** of the reasonable cost of preparation by sending an invoice for your costs to Shook, Hardy & Bacon L.L.P. <u>If prepayment arrangements need to be made, or if you require payment in the amount exceeding $100.00, immediately contact</u> Peter F. O'Neill at (312) 704-7710. You have the right to object to the production pursuant to this subpoena at any time before production by giving written notice to the attorney whose name appears on this subpoena.

If you fail to:

a)    appear as specified; or
b)    furnish copies of the records instead of appearing as provided above; or
c)    object to this subpoena,

---

[1]    This date was chosen preliminarily. Janice is willing to reschedule the deposition *duces tecum* pending party availability within a reasonable window.

**YOU MAY BE IN CONTEMPT OF COURT.**  You are subpoenaed by the attorney whose name appears on this Subpoena and unless excused from this Subpoena by that attorney or the Court, you shall respond to the subpoena as directed.

Dated:  November 25, 2024

Respectfully submitted,

By:  /s/   *Peter F. O'Neill*
Peter F. O'Neill (FL PHV # 1043125)

David E. Schoenfeld (FL PHV # 1047561)
Peter F. O'Neill (FL PHV # 1043125)
Andrew L. Franklin (FL PHV # 1035737)
Kailin Liu (FL PHV # 1051416)
**SHOOK, HARDY & BACON L.L.P.**
111 S. Wacker Dr., Ste. 4700
Chicago, IL 60606
Telephone: (312) 704-7700
dschoenfeld@shb.com
pfoneill@shb.com
afranklin@shb.com
kliu@shb.com

Anitra R. Clement
Florida Bar No. 100354
**SHOOK, HARDY & BACON L.L.P.**
100 N. Tampa St., Ste. 2900
Tampa, FL 33602
Telephone: (813) 202-7100
aclement@shb.com

John D. Garretson
(FL PHV #1057004)
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, MO 64108
Telephone:  (816) 474-6550
jgarretson@shb.com

***Counsel for Janice Logan, individually, as Trustee of the James Logan Family Trust, dated February 10, 2021, as Personal Representative of the Estate of James Logan and derivatively on behalf of Smart Communications Holding, Inc.***

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Peter F. O'Neill at 100 North Tampa Street, Suite 2900, Tampa, Florida 33602 whose phone number is 813-202-7100, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711.**

**EXHIBIT 1**

**Definitions**

1.    "Document" should be construed as broadly as permissible under the Florida Rules of Civil Procedure and Florida Rules of Evidence. "Document" encompasses all of the following:  any medium by which information is recorded, stored, communicated, or utilized, including, but not limited to, any and all documentary, written, printed, computer printed or generated, typewritten or graphic material of any kind or character. The term includes, without limitation, audio tapes, video tapes, still or moving pictures, computer disks, CD-ROMS, microfilm, microfiche, x rays, notes, letters, memoranda, contracts, invoices, receipts, checks, estimates, statements, bills, photographs, or any other piece of paper whatsoever. The term "document" should be deemed to include a request for any document which relates to the principal document or the subject matter of the principal document, e.g. (a) any material which was used or referred to in the preparation of the principal document; (b) all attachments to the document; (c) any document referred to in the principal document; and (d) all additions, deletions, substitutions, amendments, or modifications to the original of the principal document. All requests for documents should be interpreted to include requests for any metadata associated with such documents.

2.    The term "Communication" means (whether oral, written, electronic, face-to-face, or otherwise) any disclosure, transfer or exchange of information, or attempt thereof, including but not limited to all electronic mail, text messages, WhatsApp    messages,    messaging    application    correspondence,    letters,

statements, inquiries, discussions, conversations, negotiations, agreements, understandings, memos, meetings, appointments, meeting or appointment invites (e.g. in Zoom) whether or not accepted, telephone conversations, recordings, or Internet postings. The term "Communication" does not include attorney-client privileged communications.

3.    "SmartComm" means Smart Communications Holding, Inc. and includes subsidiary entities Smart Communications Holding, LLC, Smart Communications Collier, Inc., Smart Communications West, Inc., Smart Communications Pasco, Inc., and Smart Communications US, Inc.; and, related entities Smart Communications Yacht Holding, LLC and Loco Florida LLC.

4.    "HLFIP" means HLFIP Holding, LLC, its predecessor HLFIP Holding, Inc., and any of their subsidiaries and affiliates, and all of their respective agents, directors, officers, employees, and all other persons acting or purporting to act on their behalf. This definition should not be interpreted to call for attorney-client communications.

### **Requests**

Please produce the following Documents and Communications in your possession, custody, or control for the time period between January 1, 2015—present unless otherwise specified:

1.    Your entire file related to or associated with SmartComm (as defined above).

2.    Your entire file related to or associated with HLFIP (as defined above).

3.      Any and all of SmartComm's (as defined above) books, records, ledgers, invoices, receipts, statements, and transactions, including but not limited to, those maintained in an accounting application software.

4.      Any and all receipts, invoices, and/or transaction records relating to SmartComm (as defined above) assets, whether owned jointly or individually, including, but not limited to, cars, houses, condominiums, yachts, and debts.

5.      Any and all records of shareholder distributions issued by SmartComm (as defined above).

6.      All information and communications relating to SmartComm's (as defined above) transactions, accounts, statements, advice, or compliance.

7.      Any and all information and communications relating to the corporate records of SmartComm (as defined above), such as annual meeting notices and minutes; documentation of membership interest transfers and withdrawals; shareholder lists and records; corporate resolutions, consents, agreements, and similar documents; and communications about the foregoing.

8.      Any and all loan applications or account applications made by SmartComm (as defined above).

9.      Any and all documents related to a purported intellectual property license agreement between SmartComm and HLFIP from 2015 to the present.

10.      Any and all communications related to a purported intellectual property license agreement between SmartComm and HLFIP from 2015 to the present, including but not limited to communications with Jonathan D. Logan

6

about "Note I" to SmartComm's 2022 Audited Financial Statements, *attached hereto as* Confidential Exhibit A for reference.

# Confidential
# Exhibit A

**Smart Communications Holding, Inc.**

**Consolidated Audited Financial Statements**

**December 31, 2022**

Prepared by:

**M. L. Shreve  CPA, P.C.**
**7781  N. Easy Street**
**Whitehall, Michigan  49461**
**231.894.5559**

CONFIDENTIAL
SMART_B&R 000302

**Smart Communications Holding, Inc.**
Table of Contents
December 31, 2022

|  | Page No. |
|---|---|
| **Independent Auditor's Report** | 1 - 2 |
| **Financial Statements** |  |
| Consolidated Balance Sheet | 3 |
| Consolidated Income Statement | 4 - 6 |
| Consolidated Statement of Retained Earnings | 7 |
| Consolidated Statement of Cash Flows | 8 |
| Consolidated Notes to Financial Statements | 9 - 13 |

PRIVATE AND CONFIDENTIAL



### 𝔐 𝔏 𝔖

**M.L. Shreve CPA, P.C.**
7781 N. Easy Street
Whitehall, Michigan 49461
231.894.5559 (phone)
231.893.2097 (fax)
www.mlshrevecpa.com
mlshrevecpa@frontier.com (email)

October 25, 2023

**Independent Auditor's Report**

To the Board of Directors
Smart Communications Holding, Inc.
Seminole, Florida 33777

*Opinion*

We have audited the consolidated financial statements of Smart Communications Holding, Inc., which comprise the consolidated balance sheet as of December 31, 2022, and the related consolidated statements of income, retained earnings, and cash flows for the year then ended, and the related notes to the consolidated financial statements.

In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the financial position of Smart Communications Holding, Inc. as of December 31, 2022, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

*Basis for Opinion*

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Financial Statements section or our report. We are required to be independent of Smart Communications Holding, Inc. and to meet our other ethical responsibilities, in accordance with the relevant ethical requirements relating to our audit. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

*Responsibilities of Management for the Consolidated Financial Statements*

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the consolidated financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about Smart Communications Holding, Inc.'s ability to continue as a going concern within one year after the date that the consolidated financial statements are available to be issued.

*1*

CONFIDENTIAL
SMART_B&R 000304

***Auditor's Responsibilities for the Audit of the Consolidated Financial Statements***

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with generally accepted auditing standards will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the consolidated financial statements.

In performing an audit in accordance with generally accepted auditing standards, we:

Exercise professional judgment and maintain professional skepticism throughout the audit.

Identify and assess the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements.

Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances but not for the purpose of expressing an opinion on the effectiveness of Smart Communications Holding, Inc.'s internal control. Accordingly, no such opinion is expressed.

Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the consolidated financial statements.

Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about Smart Communications Holding, Inc.'s ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control-related matters that we identified during the audit.

*M. L. A Shreve CPA P.C.*

**M. L. Shreve CPA, P.C.**
Whitehall, Michigan 49461

2

CONFIDENTIAL
SMART_B&R 000305

**Smart Communications Holding, Inc.**
*Consolidated Balance Sheet*
**December 31, 2022**

## ASSETS

| | | | |
|---|---|---:|---:|
| **Current Assets** | | | |
| Cash and Cash Equivalents | $ | 865,720 | |
| Accounts Receivable - Trade | | 462,259 | |
| Federal Corporate Income Tax Receivable | | 1,375,000 | |
| Florida Corporate Income Tax Receivable | | 459,114 | |
| Technology Grant Advance | | 37,539 | |
| Prepaid Expenses | | 723,934 | |
| Inventory | | 690,704 | |
| **Total Current Assets** | | $ | 4,614,270 |
| **Fixed Assets** | | | |
| Buildings | | 5,071,155 | |
| Kiosk Computer System | | 2,987,602 | |
| Computer Software | | 2,987,876 | |
| Leasehold Improvements | | 355,751 | |
| Vehicles | | 2,682,697 | |
| Display System & Demo Build | | 43,780 | |
| Equipment | | 599,469 | |
| Furniture | | 163,692 | |
| | | 14,892,022 | |
| Less: Accumulated Depreciation | | (7,158,755) | |
| Property & Equipment, Net | | | 7,733,267 |
| **Other Assets** | | | |
| Shareholder Loans | | 2,914,086 | |
| Affiliated Entities Receivable | | | |
| Smart Communications Yacht Holding LLC | | 5,505,639 | |
| Mailguard Federal Inc | | 1,746,369 | |
| Loco Florida LLC | | 1,358,011 | |
| HLFIP | | 169,685 | |
| **Total Other Assets** | | | 11,693,790 |
| **TOTAL ASSETS** | | $ | 24,041,327 |

## LIABILITIES AND EQUITY

| | | | |
|---|---|---:|---:|
| **LIABILITIES** | | | |
| **Current Liabilities** | | | |
| Accounts Payable | $ | 1,277,645 | |
| Accrued Credit Cards | | 182,611 | |
| Accrued Commissions | | 971,993 | |
| Accrued Facility Tech Grant | | 142,998 | |
| Accrued Expenses | | 201,592 | |
| Current Portion - Long Term Debt | | 589,405 | |
| **Total Current Liabilities** | | $ | 3,366,244 |
| **Long Term Liabilities** | | | |
| Lattice Technology License | | 665,000 | |
| Note Payable - HLFIP | | 52,848,813 | |
| Interest Payable - HLFIP | | 5,592,170 | |
| Notes Payable - Vehicles | | 59,714 | |
| Less Current Portion | | (589,405) | |
| **Total Long Term Debt** | | | 58,576,292 |
| **Total Liabilities** | | | 61,942,536 |
| **EQUITY** | | | |
| Common Stock | | 448,988 | |
| Paid In Capital | | 392,151 | |
| Retained Earnings | | (38,742,328) | |
| **Total Equity** | | | (37,901,209) |
| **TOTAL LIABILITIES AND EQUITY** | | $ | 24,041,327 |

*See Notes to Consolidated Financial Statements.*

3

CONFIDENTIAL
SMART_B&R 000306

**Smart Communications Holding, Inc.**
*Consolidated Statement of Income*
**For the year ended December 31, 2022**

| | | | |
|---|---|---:|---:|
| **Revenue** | | | |
| Mail Services Income | $ | | 4,512,000 |
| Messaging Sales | | | 25,801,718 |
| Telephone Call Sales | | | 9,982,532 |
| Telephone Service Fees | | | 4,388,973 |
| Trust Account Funding Fees | | | 37,076 |
| Miscellaneous Income | | | 93,375 |
| | | | 44,815,675 |
| Less Reurns and Allowances | | | (35,341) |
| | | | 44,780,334 |
| **Total Cost of Sales** | | | (25,540,158) |
| **Gross Profit** | | | 19,240,176 |
| | | | |
| **Total Operating Expenses** | | | (32,041,827) |
| | | | |
| **Income /Loss from Operations** | | | (12,801,651) |
| | | | |
| **Other Income and (Expense)** | | | |
| Interest Expense | $ | (461,010) | |
| Penalties and Late Fees | | (22,137) | |
| | | | (483,147) |
| **Net Other Income and (Expense)** | | | (483,147) |
| | | | |
| **Net Income (Loss) for the Year** | $ | | (13,284,798) |

*See Notes to Consolidated Financial Statements*            *4*

CONFIDENTIAL
SMART_B&R 000307

**Smart Communications Holding, Inc.**
*Consolidated Statement of Income - Cost of Sales*
**For the year ended December 31, 2022**

| | | | |
|---|---|---|---|
| **Cost of Sales** | | | |
| Beginning Inventory | $ | | $ 1,894,859 |
| Computer and Tablet Purchases | 3,716,300 | | |
| Software Purchases | 171,080 | | |
| Technology Grant & Services - Facilities | 214,397 | | |
| Equipment Design | 70,000 | | |
| Watch | 144,714 | | |
| Voice Over IP | 224,730 | | |
| Freight and Shipping | 548,212 | | |
| Telecommunications Taxes Expense | 629,686 | | |
| Contractor Services | 1,605,422 | | |
| Facililtes Commissions Expense | 11,322,286 | | |
| Salesperson Commissions | 164,193 | | |
| Sublicense Royalty Fees Expense | 23,496 | | |
| Data Sorage & Server Hosting | 167,343 | | |
| Labor - Telephone CC Sales | 616,321 | | |
| Labor - Installations | 258,964 | | |
| Labor - Mail Processing | 466,778 | | |
| Labor - Repairs & Maintenance | 601,662 | | |
| Internet Services | 478,554 | | |
| Merchant Card Fees | 1,625,594 | | |
| Travel | 1,204,257 | | |
| Meals | 82,014 | | |
| | | 24,336,003 | |
| | | 26,230,862 | |
| **Less Ending Inventory** | | (690,704) | |
| **Cost of Sales** | | **25,540,158** | |

PRIVATE AND CONFIDENTIAL

*See Notes to Consolidated Financial Statements*        5

CONFIDENTIAL
SMART_B&R 000308

**Smart Communications Holding, Inc.**
*Consolidated Statement of Income - Operating Expenses*
**For the year ended December 31, 2022**

| Description | | Amount |
|---|---|---|
| Advertising and Promotions | $ | 187,879 |
| Bank Service Fees | | 6,804 |
| Depreciation Expense | | 1,636,576 |
| Health Insurance | | 369,967 |
| Workman Compensation Insurance | | 22,601 |
| Business Insurance Expense | | 331,853 |
| Outside Services | | 9,744 |
| Dues and Subscriptions | | 98,821 |
| Computer Expenses | | 162,968 |
| Professional Fees | | 110,937 |
| Regulatory and Registration Fees | | 587,094 |
| Legal Fees | | 2,562,058 |
| IP License Fees | | 17,874,783 |
| Officer Compensation | | 160,385 |
| Wages and Salaries | | 4,814,980 |
| Payroll Taxes Expense | | 568,542 |
| Payroll Service Fees | | 79,354 |
| Property Taxes | | 71,658 |
| Repairs and Maintenance | | 472,332 |
| Rent Expense | | 793,547 |
| Telephone Expense | | 50,197 |
| Contract Labor Expense | | 293,580 |
| Website Design and Maintenance | | 89,318 |
| Client Welfare Expense | | 142,976 |
| Recruitment Fees | | 131,372 |
| Professional Education | | 8,316 |
| Licenses and Permits | | 162 |
| Charitable Contributions | | 19,340 |
| Employee Welfare Expense | | 7,708 |
| Meals and Entertainment | | 144,538 |
| Office Expense | | 160,302 |
| Utilities | | 50,197 |
| Postage and Shipping | | 18,982 |
| Other Expenses | | 1,958 |
| **Total Operating Expenses** | | **32,041,827** |

*See Notes to Consolidated Financial Statements*                    6

CONFIDENTIAL
SMART_B&R 000309

**Smart Communications Holding, Inc.**
*Consolidated Statement of Retained Earnings*
**For the year ended December 31, 2022**

| | | |
|---|---|---:|
| Retained Earnings - Beginning of Year | $ | 15,211,356 |
| Effect on Retained Earnings for Prior Years' IP License Fee Liability and Interest | | (40,668,886) |
| Net Income for the Year | | (13,284,798) |
| Retained Earnings - End of Year | $ | (38,742,328) |

*See Notes to Consolidated Financial Statements.*                    7

CONFIDENTIAL
SMART_B&R 000310

**Smart Communications Holding, Inc.**
**Consolidated Statement of Cash Flows**
**For the year ended December 31, 2022**

| | | |
|---|---|---:|
| **Cash Flows from (Provided to) Operating Activities** | | |
| Net Income (Loss) form Operations | $ | (13,284,798) |
| Adjustments to reconcile increase in net assets | | |
| to net cash provided by (used in) operating activities: | | |
| Depreciation | | 1,636,576 |
| | | (11,648,222) |
| (Increase) Decrease in operating assets: | | |
| Accounts Receivable | | (223,173) |
| Corporate Taxes Receivable | | (1,624,177) |
| Employee Advances Receivable | | 7,149 |
| Other Receivables | | (9,364,949) |
| Prepaid Expenses | | (49,434) |
| Prepaid Corporate Taxes | | (345,697) |
| Inventory | | 1,203,684 |
| Deferred Taxes | | 90,269 |
| Increase (Decrease) in operating liabilities: | | |
| Accounts Payable | | (53,465) |
| Accrued Credit Cards Payable | | 79,693 |
| Accrued Expenses | | 278,863 |
| Accrued Federal Income Taxes | | (20,153) |
| Accrued Payroll and Withholdings | | 72,115 |
| Current Portion of Long Term Debt | | 235,595 |
| **Net Cash Flows from (Provided to) Operating Activities** | | (21,361,902) |
| | | |
| **Cash Flows From ( Provided to) Investing Activities** | | |
| Purchase of Fixed Assets - net | | (1,237,874) |
| **Net Cash Flows From (Provided to) Provided to Investing Activities** | | (1,237,874) |
| **Cash Flows From (Provided to) Financing Activities** | | |
| Note Payable - IP License Fee | | (58,440,984) |
| Payments on Notes Payable | | 18,060,844 |
| **Net Cash Flows from (Provided to) Financing Activities** | | 18,060,844 |
| | | |
| **Net Increase (Decrease) in Cash From Operating Activities** | | (4,538,932) |
| | | |
| Cash and Cash Equivalents at Beginning of Year | | 5,404,652 |
| | | |
| **Cash and Cash Equivalents at End of Year** | $ | 865,720 |

Interest Expense for the year was in the amount of $ 461,010.
Taxes Paid for the year was in the amount of $ 1,813,961.

*See Notes to Consolidated Financial Statements*                    8

CONFIDENTIAL
SMART_B&R 000311

**Smart Communications Holding, Inc.**
**Notes to Consolidated Financial Statements**
**For the year ended December 31, 2022**
===============================================================================
**Note A – Significant Accounting Policies**

*Basis of Consolidation*
The consolidated financial statements include the financial statements of Smart Communications, U.S, Inc.; Smart Communications, Pasco, Inc.; and Smart Communications, Collier, Inc. Smart Communications Holding, Inc, owns 100 % of these companies. All transactions between Smart Communications Holding, Inc. and subsidiaries have been eliminated in the consolidated financial statements.

*Concentration of Credit Risk*
The Company normally maintains sufficient cash to meet its anticipated working capital needs. Cash in deposit accounts may, at times, exceed the Federal Deposit Insurance Corporation (FDIC) insured limit in the amount of $ 250,000. However, The Company has not experienced any losses in such accounts and therefore believes it is not exposed to any significant credit risk in these accounts.

*Cash and Cash Equivalents*
For purposes of the statement of cash flows, the Company considers all highly liquid investments, generally those assets readily convertible to known amounts of cash with a maturity of three months or less, to be cash equivalents.

*Accounts Receivable*
Accounts Receivable are customer obligations due under normal trade conditions that have been received after the year end but attributable to the current year. The Company considers these accounts receivable to be fully collectible; accordingly, no allowance for doubtful accounts is required. If amounts become uncollectible, they are charged to operations when that determination is made.

*Inventory*
Inventory consists of tablets, kiosks, and various computer parts and accessories, and is stated at the lower of cost or market using the first-in, first-out method.

*Property and Equipment*
Property and equipment is stated at cost less accumulated depreciation. Provisions for depreciation of assets are computed using the straight-line at rates which are intended to amortize the cost of such assets over their useful lives which range from 5 to 40 years. Leasehold Improvements are amortized over the service lives of the improvements, generally 40 years.

*Revenue Recognition*
Revenues are generally recognized when realized or realizable, and when earned (generally when goods are transferred or services rendered), no matter when payment is received. The Company recognizes revenue from messaging services at the point of sale, net of sales taxes (if any). Service contract revenue is recognized when the service is performed.

The Company adopted FASB ASC 606, *Revenues from Contracts with Customers*, which amended the existing standards for revenue recognition. The adoption of this new revenue standard does not have a significant impact on the amount and timing of revenue recognized in the Company's financial statements. Based on the Company's evaluation process and review of its contracts with customers, the timing and amount of revenue recognized previously is consistent with how revenue is recognized under the new standard. No changes were required to reported revenues as a result of the adoption of FASB ASC 606.

*9*

CONFIDENTIAL
SMART_B&R 000312

**Smart Communications Holding, Inc.**
**Notes to Consolidated Financial Statements**
**For the year ended December 31, 2022**
========================================================================

## Note A – Significant Accounting Policies (continued)

*Use of Estimates*
These financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America. Management is required to make certain estimates and assumptions that affect amounts reported in the financial statements. Actual results may differ from these estimates.

*Advertising Costs*
Advertising costs are charged to operations when incurred. For the year ended December 31, 2022, advertising expense amounted to $ 187,879.

## Note B – Property and Equipment

Property and equipment are stated at cost. All property and equipment and leasehold improvements are depreciated on the straight-line method. Repairs and maintenance of property and equipment are charged to operations, and major improvements are capitalized. Upon retirement, sale or other disposition of assets, the costs and accumulated depreciation are eliminated from the accounts, and any resulting gain or loss is included in operations.

For the year ended December 31, 2022, property and equipment consists of the following:

| Description | Cost | 2022 Depreciation | 12.31.2022 Accumulated Depreciation | Net Book Value |
|---|---|---|---|---|
| Kiosk Computer System | $ 2,987,602 | $ 313,349 | $ 2,690,779 | $ 296,823 |
| Computer Software | 2,987,876 | 589,406 | 2,370,375 | 617,501 |
| Vehicles | 2,682,697 | 512,738 | 1,354,744 | 1,327,953 |
| Display System | 21,280 | 4,256 | 17,277 | 4,003 |
| Demo Build | 22,500 | 1,400 | 20,283 | 2,217 |
| Furniture and Fixtures | 163,692 | 24,972 | 114,552 | 49,140 |
| Buildings | 5,071,155 | 95,780 | 244,189 | 4,826,966 |
| Leasehold Improvements | 355,751 | 9,037 | 26,860 | 328,891 |
| Mail Service Equipment | 414,217 | 59,174 | 241,627 | 172,590 |
| Equipment | 185,252 | 26,464 | 78,069 | 107,183 |
| | $ 14,892,022 | $ 1,636,576 | $ 7,158,755 | $ 7,733,267 |

All property is depreciated using the straight-line method. Furniture and fixtures, computer software, demos, kiosks, and vehicles are depreciated over 5 years. Buildings and leasehold improvements are depreciated over 39 years, and machinery and equipment are depreciated over 7 years. Assets commence depreciation as of the first full month of usage.

*10*

CONFIDENTIAL
SMART_B&R 000313

**Smart Communications Holding, Inc.**
**Notes to Consolidated Financial Statements**
**For the year ended December 31, 2022**
=====================================================================

### Note D – Loans To Shareholder

At December 31, 2022, a 50 % shareholder owed the Company loans in the amount of $ 2,914,086. No interest has been accrued on the loans.

### Note E – Affiliated Entities

As of December 31, 2022, the Company has accounts receivable from the following affiliated entities:

| Description | | Amount |
|---|---|---|
| Smart Communications Yacht Holding LLC | $ | 5,505,639 |
| Mailguard Federal, Inc. | | 1,746,369 |
| LOCO Florida, LLC | | 1,358,011 |
| HLFIP | | 169,685 |
| | $ | 8,779,704 |

### Note F – Subsequent Events

Management has evaluated subsequent events through October 25, 2023, the date financial statements were available to be issued. No events occurred or are pending through this date which would have a material effect on the financial statements or require disclosure in the financial statements, except as noted in Footnote Disclosure Note I

### Note G – Long Term Debt

On May 19, 2020, the Company purchased three Ford Trucks at a total financing cost of $ 93,319.44. Payments on this loan commenced as of July 3, 2020 in the amount of $ 622.02 per truck, including interest at the annual rate of 7.2900%, payable monthly for 60 months for each truck. Final payment on this loan is due on June 3, 2025. As of December 31, 2022, the principal balance on the vehicle loan is in the amount of $ 59,713.92. Interest expense on this loan for the year ended December 31, 2022 is in the amount of $ 2,988.00

As of January 1, 2019, The Company entered into a Technology License Agreement with LATTICE Incorporated. The Agreement is a Licensing Agreement with LATTICE Software wherein Smart Communications Holding, Inc. pays LATTICE a license fee, in the amount of $ 2,850,000.00 payable in monthly installments of $ 47,500.00 for sixty (60) consecutive months beginning on February 1, 2019. Upon payment in full of the License fee, Smart Communications Holding, Inc. shall pay LATTICE an annual royalty payment of $ 100.00 each year (the "Royalty Fee"). The Royalty Fee shall be due on or before December 31, of each year beginning in 2025 and shall continue until the Licensing Agreement is terminated.

As of December 31, 2022, the Company owed the balance due to LATTICE on the Licensing Agreement is in the amount of $ 665,000.

*11*

CONFIDENTIAL
SMART_B&R 000314

**Smart Communications Holding, Inc.**
**Notes to Consolidated Financial Statements**
**For the year ended December 31, 2022**
====================================================================

**Note H – Income Taxes**

Income taxes are provided for the tax effects of transactions reported in the financial statements and consist of taxes currently due. The Company is required to recognize, measure, classify and disclose in the consolidated financial statements uncertain tax positions taken or expected to be taken in the Company's tax returns. Management has determined that the Company does not have any uncertain tax positions and associated unrecognized benefits that materially impact the consolidated financial statements or related disclosures. Since tax matters are subject to some degree of uncertainty, there can be no assurance that the Company's tax returns will not be challenged by the taxing authorities and that the Company will not be subject to additional tax, penalties, and interest as a result of such challenge. Penalties and interest assessed by income taxing authorities would be included in operating expenses.

The Company is taxed as a C Corporation under the Internal Revenue Code. For the year ended December 31, 2022, the Company incurred a net operating loss in the amount of $ 12,710,042, a carryover of disallowed business interest expense, and charitable contributions in the amount of $ 19,340.

**NOTE I – Intellectual Property License**

Smart Communications Holding, Inc. provides specialized prison inmate communication technologies. A related entity, HLFIP Holding, Inc. is the owner of proprietary intellectual property, patents, trademarks, and other know how that provides the specialized communications systems (collectively known as "HLFIP IP") which connect prison inmates, correctional facility administration, courts, attorneys, and families. As such, the HLFIP IP improves the lives and safety of the incarcerated inmates, correctional facility staff, and others involved in the delivery of those specialized communications services, as well as the elimination of contraband in postal mail at correctional facilities.

HLFIP Holding, Inc. provides Smart Communications Holding, Inc. an exclusive license of its HLFIP IP for distribution and use at correctional facilities across the United States of America. During and for the year ended December 31, 2022, Smart Communications Holding, Inc. sublicensed the HLFIP IP to Smart Communications Collier, Inc. (a ubsidiary company) for distribution and use at those correctional facilities. HLFIP is the licensor and Smart Communications, Holding, Inc. is the exclusive licensee of HLFIP IP, for which a royalty rate is charged by HLFIP to the Company. The royalty rate of 40 % of net sales was charged for the HLFIP IP. The royalty rate was determined by measurement of and comparison to independent   agreements, using the method known as the Comparable Uncontrolled Transaction ("CUT"), which was selected as the best method under Internal Revenue Code Section 482 and its Treasury Regulations Section 1.482-4(c)(2). Accordingly, Smart Communications Holding, Inc. (via its subsidiary, Smart Communications Collier, Inc.) reported an IP license expense, in the amount of $ 17,874,784 for the year ended December 31, 2022. Additionally, the Company reported interest in the amount of $ 446, 870, calculated at the rate of 5 % for one-half of the year, 2022.

The Company has also reflected the prior years' use of the HLFIP IP license for the years of  2015 – 2021 as a long-term liability in the amount of $ 52,848,813, and accrued interest of $ 5,592,170. Retained earnings has been adjusted to reflect effects of this inclusion for prior year use of the HLFIP license.

*12*

CONFIDENTIAL
SMART_B&R 000315

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,

                Plaintiffs,

v.                                                                    Case No. 2023-CA-1002-NC

JANICE LOGAN, individually, as Trustee of the James
Logan Family Trust, dated February 10, 2021, and as
Personal Representative of the ESTATE OF
JAMES LOGAN, JUSTIN PETERSON, and
ALEXIS LOGAN,

                Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021,

                Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., SMART
COMMUNICATIONS HOLDING, LLC, and
HLFIP HOLDING, LLC,

                Counterclaim Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan        (CONSOLIDATED)
Family Trust, dated February 10, 2021, and derivatively
on behalf of Smart Communications Holding, Inc.,

                Plaintiff,                  Case No.: 2023-CA-1280-NC

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., nominal
defendant, SMART COMMUNICATIONS HOLDING,
LLC, HLFIP HOLDING, LLC,
LOCO FLORIDA LLC, and SMART
COMMUNICATIONS YACHT HOLDING, LLC,

                Defendants.

_____/

## AGREED ORDER APPOINTING COMMISSIONER
## AND AUTHORIZING OUT OF STATE DEPOSITION

Upon consideration of Janice Logan's Unopposed Motion to Appoint Commissioner and Authorize Out of State Deposition (DIN 850) ("Motion") pursuant to Florida Rules of Civil Procedure 1, 300(a), 1.410, and Florida Statute Section 92.251, having considered the Motion, and being advised that all other parties in the Consolidated Action are unopposed to the Motion, and otherwise being fully advised in the premises, this Court ORDERS:

1.    Eller Reporting, Inc. is appointed commissioner for the purposes of administering oaths, stenographically recording the deposition of Mike Shreve, and video recording the deposition of Mike Shreve.

2.    Janice Logan is authorized to serve a subpoena in Muskegon, County, Michigan to compel the witness's testimony.

3.    The subpoena must be served, and the deposition must be taken, under the law of the target state, Michigan Compiled Laws § 600.2201 *et seq.*

DONE AND ORDERED in Chambers, Sarasota County, Florida.

e-Signed 11/22/2024 4:43 PM 2023 CA 001002 NC
Hon. Hunter W. Carroll
Circuit Court Judge

Copies to:  All Counsel of Record

# EXHIBIT 25

# IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.

              Plaintiffs,

v.

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust, dated February 10, 2021;
JUSTIN PETERSON, ALEXIS LOGAN, and
UNNAMED CURATOR of the Estate of Jim Logan,

              Defendants      /

Case No. 2023-CA-1002-NC

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021,

              Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., SMART
COMMUNICATIONS HOLDING, LLC, HLFIP
HOLDING, INC, AND HLFIP HOLDING, LLC,

              Counterclaim Defendants   /

(CONSOLIDATED)

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021, and
derivatively on behalf of Smart Communications
Holding, Inc.,

              Plaintiff,

Case No.: 2023-CA-1280-NC

        v.

JONATHAN D. LOGAN,
SMART COMMUNICATIONS HOLDING, INC.,
nominal defendant, SMART COMMUNICATIONS
HOLDING, LLC, HLFIP HOLDING, INC., HLFIP
HOLDING, LLC, LOCO FLORIDA LLC, and
SMART COMMUNICATIONS YACHT HOLDING,
LLC,

              Defendants

                            /

**SMART PARTIES' OPPOSED MOTION FOR EXTENSION OF TIME
TO RESPOND TO THE TRUST'S SECOND AMENDED VERIFIED
COMPLAINT AND THE TRUST'S COUNTERCLAIMS**

JONATHAN LOGAN ("Jon"), LOCO FLORIDA, LLC, and SMART COMMUNICATIONS YACHT HOLDING, LLC (together with Jon, the "Smart Parties"), by and through undersigned counsel, and pursuant to the applicable Florida Rules of Civil Procedure, hereby file this Opposed Motion for Extension of Time to Respond to the Second Amended Verified Complaint [DIN 680] and Counterclaims [DIN 775] filed by JANICE LOGAN, as Trustee of the James Logan Family Trust, dated February 10, 2021 (the "Trust"), which responses are currently due on Friday, December 6, 2024, and in support thereof state as follows:

1.      The Trust filed its Second Amended Verified Complaint ("SAC"), dated May 29, 2024 [DIN 680], against Smart Communications Holding, Inc. and Smart Communications Holding, LLC (the "Debtors"), the Smart Parties and HLFIP Holding, LLC ("HLFIP").

2.      On October 2, 2024, the Trust filed its Counterclaims [DIN 775] against Debtors, Jon, and HLFIP.

3.      The Debtors, Smart Parties and HLFIP, as applicable, moved to dismiss the Trust's SAC and Counterclaims. Those motions were heard by the Court at a hearing on November 22, 2024.

4.      The Court denied the respective motions to dismiss, and ordered that responses to the SAC and Counterclaims be filed no later than 4 p.m. on Friday, December 6, 2024. [*See* DIN 859, 867, 881].

5.      On November 30, 2024, the Debtors each filed voluntary petitions under Chapter 11 of Title XI of the United States Code, and thereafter filed a Notice of Suggestion of Bankruptcy [DIN 887] in these consolidated cases.

6.     The bankruptcy cases are styled *In re: Smart Communications Holding, Inc.*, Case No. 8:24-bk-07106-RCT and *In re: Smart Communications Holding, LLC*, Case No. 8:24-bk-07108-RCT, both filed in the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court"). *See id.*

7.     Pursuant to 11 U.S.C. § 362, upon the filing of a chapter 11 petition, an injunction is placed into effect which stays, among other things: (i) the commencement or continuation of a judicial proceeding against either of the Debtors; (ii) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the bankruptcy case; (iii) any act to obtain possession of property of the estate; and (iv) any act to create, perfect, or enforce any lien against property of the estate. *See* 11 U.S.C. § 362(a)(3). Section 362(a)(6) of the Bankruptcy Code also prohibits any act to assess a claim against a debtor that arose pre-petition.

8.     Importantly, the person against whom relief is named or sought is not dispositive concerning whether the automatic stay applies. *See Purvis v. Blitz, U.S.A., Inc.*, 2012 WL 645884, at *2-3 (M.D. Ga. Feb. 28, 2012) (imposition of the automatic stay may be appropriate even though debtor not named as a defendant). The reasoning behind this is set forth in greater detail, for example, in *In re Kaiser Aluminum Corp., Inc.*, 315 B.R. 655 (D. Del. 2004), where the court found:

> the protection of the automatic stay extends to any action or proceeding against an interest of the debtor. *The scope of this protection is not determined solely by whom a party chose to name in the proceeding, but rather, by who is the party with a real interest in the litigation*. [T]he automatic stay provision applies to suits against non-debtor defendants who are related to the debtor and *to suits the resolution of which may have a significant impact on the debtor*….

*In re Kaiser Aluminum Corp., Inc.*, 315 B.R. at 658 (emphasis added) (internal citations omitted). Post-petition, the parties in this proceeding cannot adjudicate any issue or claim which

impacts Debtors' estate; and, for obvious reasons, that reaches all claims asserted against the Smart Parties in this proceeding.

9.    Nonetheless, on December 4, 2024, in violation of the automatic stay, the Trust filed what it titled a Response to Notice of Suggestion of Bankruptcy and Request to Retain Trial Dates ("Response to Notice") [DIN 892], stating that the "proceedings against Jon and HLFIP are *not* stayed" (even though all such claims concern the Debtors) and requested "this Court retain its January trial date to try, at minimum, the narrow 'license/royalty' issue[,]" which matter clearly concerns the Debtors' estate. The Smart Parties understand that the Debtors will be filing an appropriate motion to enforce the automatic stay in the Bankruptcy Court.

10.    The Trust's contrary position in its Response to Notice suggests (and the Trust's counsel today confirmed) that the Trust believes answers by the Smart Parties and HLFIP would be due today, thus necessitating the instant motion (out of an abundance of caution) and the forthcoming motion to enforce stay to be filed in the Bankruptcy Court.

11.    On Friday, December 6, 2024, at approximately 10:38 a.m., counsel for the Smart Parties sent an email to counsel for the Trust requesting, out of an abundance of caution, an agreement to extend the answer dates for the Smart Parties until such time as the Bankruptcy Court rules on the enforcement and scope of the automatic stay. HLFIP joined that request. In response, counsel for the Trust indicated that they will not agree to extend answer dates until that time.[1]

12.    Accordingly, though the Smart Parties are subject to the automatic stay, out of an abundance of caution and in light of the dispute over the same, the Smart Parties seek an extension

---

[1] Counsel for the Trust, instead, offered to extend deadlines by one-week, and only if the Smart Parties agreed to file answers at that time, inconsistent with the automatic stay.

of their answer dates until such time as the Bankruptcy Court rules on the enforcement and confirms the scope of the automatic stay.

      13.    This request is made in good faith and not for the purpose of undue delay.

      14.    The Smart Parties have met and conferred with counsel for the Trust in good faith in an attempt to resolve these issues, but have been unable to do so.

      WHEREFORE, the Smart Parties respectfully request the Court enter an Order extending the deadline for them to file answers to the Trust's Second Amended Verified Complaint [DIN 680] and the Counterclaims [DIN 775] until such time that the Bankruptcy Court adjudicates the application and scope of the automatic stay, and for whatever further relief this Court deems necessary and proper.

Dated: December 6, 2024

**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
Highpoint Center
106 East College Avenue - Suite 700
Tallahassee, FL 32301
Telephone: (850) 580-7200
gburhans@stearnsweaver.com

By: *s/ Glenn Burhans, Jr.*
Glenn Burhans, Jr.
Florida Bar No. 605867

-and-

**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
200 East Las Olas Boulevard, Suite 2100
Fort Lauderdale, Florida 33301
Telephone: (954) 462-9500

**AKERMAN LLP**
401 E. Jackson Street, Suite 1700
Tampa, FL 33602-5250
Office: (813) 23-7333
Fax: (813)218-5495
mark.bernet@akerman.com
caren.deruiter@akerman.com

By:*/s/ Mark J. Bernet*
Mark J. Bernet, Esq.
Florida Bar No. 606359

-and-

**AKERMAN LLP**
201 East Las Olas Boulevard
Suite 1800
Fort Lauderdale, FL 33301
Telephone: (954) 463-2700
Fax: (954) 463-2224

mharwin@stearnsweaver.com
mhernandez@stearnsweaver.com

By: */s/Michael J. Harwin*
Michael J. Harwin
Florida Bar No.: 1018578

Jason S. Oletsky, Esq.
Florida Bar No. 9301
jason.oletskey@akerman.com
jill.parnes@akerman.com
Dustin B. Hillsley, Esq.
Florida Bar No. 1018589
dustin.hillsley@akerman.com
deborah.karlson@akerman.com
Max C. Rudolf, Esq.
Florida Bar No. 98766
max.rudolf@akerman.com
deborah.karlson@akerman.com

*Counselors for Jonathan Logan, Loco Florida, LLC, and Smart Communications Yacht Holding, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on December 6, 2024, a true and correct copy of the foregoing was electronically filed via the Florida Court's E-Filing Portal, which will provide copies to all parties and counsel of record.

/s/*Mark Bernet*_____
Mark Bernet, Esq.

# EXHIBIT 26

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.

     Plaintiffs,

v.

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust, dated February 10, 2021;
JUSTIN PETERSON, ALEXIS LOGAN, and
UNNAMED CURATOR of the Estate of Jim Logan,

     Defendants    /

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021,

     Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., SMART
COMMUNICATIONS HOLDING, LLC, HLFIP
HOLDING, INC, AND HLFIP HOLDING, LLC,

     Counterclaim Defendants  /

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021, and
derivatively on behalf of Smart Communications
Holding, Inc.,

     Plaintiff,

   v.

JONATHAN D. LOGAN,
SMART COMMUNICATIONS HOLDING, INC.,
nominal defendant, SMART COMMUNICATIONS
HOLDING, LLC, HLFIP HOLDING, INC., HLFIP
HOLDING, LLC, LOCO FLORIDA LLC, and
SMART COMMUNICATIONS YACHT HOLDING,
LLC,

     Defendants

           /

Case No. 2023-CA-1002-NC

(CONSOLIDATED)

Case No.: 2023-CA-1280-NC

**HLFIP'S OPPOSED MOTION FOR EXTENSION OF TIME
TO RESPOND TO THE TRUST'S SECOND AMENDED VERIFIED
COMPLAINT AND THE TRUST'S COUNTERCLAIMS**

HLFIP Holding, LLC ( "HLFIP"), by and through undersigned counsel, and pursuant to the applicable Florida Rules of Civil Procedure, hereby file this Opposed Motion for Extension of Time to Respond to the Second Amended Verified Complaint [DIN 680] and Counterclaims [DIN 775] filed by Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021 (the "Trust"), which responses are currently due on Friday, December 6, 2024, and in support thereof state as follows:

1.      The Trust filed its Second Amended Verified Complaint ("Second Amended Complaint"), dated May 29, 2024 [DIN 680], against Smart Communications Holding, Inc. and Smart Communications Holding, LLC (collectively "SmartComm" or the "Debtors"), Jonathan Logan ("Jon"), Loco Florida, LLC ("Loco"), Smart Communications Yacht Holding LLC ("Yacht"), and HLFIP.

2.      On October 2, 2024, the Trust filed its Counterclaims [DIN 775] against the Debtors, Jon and HLFIP.

3.      The Debtors, Jon, Loco, Yacht, and HLFIP, as applicable, moved to dismiss the Trust's SAC and Counterclaims. Those motions were heard by the Court at a hearing on November 22, 2024.

4.      The Court denied the respective motions to dismiss, and ordered that responses to the Second Amended Complaint and Counterclaims be filed no later than 4 p.m. on Friday, December 6, 2024. [*See* DIN 859, 867, 881].

5.      On November 30, 2024, the Debtors each filed voluntary petitions under Chapter 11 of Title XI of the United States Code, and thereafter filed a Notice of Suggestion of Bankruptcy [DIN 887] in these consolidated cases.

6.      The bankruptcy cases are styled *In re: Smart Communications Holding, Inc.*, Case No. 8:24-bk-07106-RCT and *In re: Smart Communications Holding, LLC*, Case No. 8:24-bk-07108-RCT, both filed in the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court"). *See id.*

7.      Pursuant to 11 U.S.C. § 362, upon the filing of a chapter 11 petition, an injunction is placed into effect which stays, among other things: (i) the commencement or continuation of a judicial proceeding against either of the Debtors; (ii) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the bankruptcy case; (iii) any act to obtain possession of property of the estate; and (iv) any act to create, perfect, or enforce any lien against property of the estate. *See* 11 U.S.C. § 362(a)(3). Section 362(a)(6) of the Bankruptcy Code also prohibits any act to assess a claim against a debtor that arose pre-petition.

8.      Importantly, the person against whom relief is named or sought is not dispositive concerning whether the automatic stay applies. *See Purvis v. Blitz, U.S.A., Inc.*, 2012 U.S. Dist. LEXIS 25343 at *3 (M.D. Ga. February 28, 2012) (imposition of the automatic stay may be appropriate even though debtor not named as a defendant). The reasoning behind this is set forth in greater detail, for example, in *In re Kaiser Aluminum Corp., Inc.*, 315 B.R. 655 (D. Del. 2004), where the court found:

> the protection of the automatic stay extends to any action or proceeding against an interest of the debtor. *The scope of this protection is not determined solely by whom a party chose to name in the proceeding, but rather, by who is the party with a real interest in the litigation.* [T]he automatic stay provision applies to suits against non-debtor defendants who are related to the debtor and *to*

> *suits the resolution of which may have a significant impact on the debtor….*

*In re Kaiser Aluminum Corp., Inc*., 315 B.R. at 658 (emphasis added) (internal citations omitted).

9.      The Court has stated that Phase II, Part 1 of this action concerns the "license/royalty" issue—i.e., "(1) whether HLFIP owns some or all the intellectual property that SmartComm uses to provides services to correctional facilities across the country and (2) the royalty that HLFIP is owned for the intellectual property that it owns and licenses to SmartComm." [DIN 870.]   Phase II, Part 2 will address the remaining issues, including the valuation of SmartComm. [DIN 870.] It is evident that Part 1 and Part 2 cannot be litigated without SmartComm and that both Parts have a significant impact on SmartComm and its debt to HLFIP that is before the Bankruptcy Court.

10.      Nonetheless, on December 4, 2024, in violation of the automatic stay and before the Debtors have even filed a proposed bankruptcy plan, the Trust filed what it titled a Response to Notice of Suggestion of Bankruptcy and Request to Retain Trial Dates ("Response to Notice") [DIN 892], stating that the "proceedings against Jon and HLFIP are *not* stayed" (even though all such claims concern the Debtors) and requested "this Court retain its January trial date to try, at minimum, the narrow 'license/royalty' issue[,]" which matter (as shown above) clearly concerns the Debtors' estate. HLFIP understands that the Debtors will be filing an appropriate motion to enforce the automatic stay in the Bankruptcy Court.

11.      The Trust's contrary position in its Response to Notice suggests (and the Trust's counsel today confirmed) that the Trust believes answers by Jon, Loco, Yacht, and HLFIP would be due today, thus necessitating the instant motion (out of an abundance of caution) and the forthcoming motion to enforce stay to be filed in the Bankruptcy Court.

12.     On Friday, December 6, 2024, at approximately 10:38 a.m., counsel for Jon, Loco, and Yacht sent an email to counsel for the Trust requesting, out of an abundance of caution, an agreement to extend the answer dates for Jon, Loco, and Yacht until such time as the Bankruptcy Court rules on the enforcement and scope of the automatic stay. HLFIP joined that request. In response, counsel for the Trust indicated that they will not agree to extend answer dates until that time.[1]

13.     Accordingly, though HLFIP is subject to the automatic stay, out of an abundance of caution and in light of the dispute over the same, HLFIP seeks an extension of the Answer Deadline until such time as the Bankruptcy Court rules on the enforcement and confirms the scope of the automatic stay.

14.     This request is made in good faith and not for the purpose of undue delay.

15.     HLFIP has met and conferred with counsel for the Trust in good faith in an attempt to resolve these issues, but have been unable to do so.

WHEREFORE, HLFIP respectfully requests that the Court  enter an Order extending the Answer Deadline to Trust's Second Amended Verified Complaint [DIN 680] and the Counterclaims [DIN 775] until such time that the Bankruptcy Court adjudicates the application and scope of the automatic stay, and for whatever further relief this Court deems necessary and proper.

---

[1] Counsel for the Trust, instead, offered to extend deadlines by one-week, inconsistent with the automatic stay.

Date: December 6, 2024                     Respectfully submitted,
                                           */s/ Christopher G. Oprison*
                                           Christopher G. Oprison (FBN 122080)
                                           Email:  chris.oprison@dlapiper.com
                                           **DLA PIPER LLP (US)**
                                           200 South Biscayne Boulevard
                                           Suite 2500
                                           Miami, Florida 33131
                                           Telephone:  (305) 423-8522
                                           Facsimile:  (305) 657-6366

                                           *Attorney for Defendant HLFIP*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 6, 2024, a true and correct copy of the foregoing document was served via the Court's electronic portal to all entitled parties and counsel of record appearing on the Court's service list at the time of service.

                                           */s/ Christopher G. Oprison*
                                           Christopher G. Oprison

# EXHIBIT 27

# IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA
### CIVIL DIVISION

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021,

                Plaintiff,

          v.

JONATHAN D. LOGAN and SMART
COMMUNICATIONS HOLDING, INC., nominal
defendant,

                Defendants.

)
)
)
)
)  No.
)
)
)
)
)
)

## VERIFIED COMPLAINT

Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021 ("Janice"), files this complaint against Defendants Jonathan D. Logan ("Jon") and Smart Communications Holding, Inc., nominal defendant ("Smart Communications" or "the company").

## INTRODUCTION

1.    Smart Communications is a family-owned business, controlled by a son out to take advantage of his mother.  Now, following his father's death, Jon is trying to use a fraudulent "shareholder agreement" to force his mother to sell that same 50% stake to him on unfair terms.

2.    Janice, on behalf of the Trust (defined below), asks this Court to declare this purported "shareholders agreement" invalid and to prevent Jon from further misusing company assets for his personal benefit.

## THE PARTIES

3.      Plaintiff Janice Logan is a resident of Sarasota County, Florida, Trustee of the James Logan Family Trust, dated February 10, 2021 ("the Trust"), and 50% shareholder of Smart Communications.

4.      The Trust is administered in Sarasota County, Florida.

5.      Nominal defendant Smart Communications is a Florida corporation, with its principal office in Pinellas County, Florida at 10491 72nd Street, Seminole, Florida 33777.

6.      Jonathan D. Logan is Janice's son, 50% shareholder of Smart Communications, the current sole Director and sole Operating Officer of Smart Communications, and is a resident of Pinellas County, Florida.

## JURISDICTION AND VENUE

7.      Venue in Sarasota County is proper because Janice is a resident of Sarasota County, the Trust is administered in Sarasota County, and the Trust's injuries as a shareholder and directly accrued pursuant to Florida Statutes Section 47.051 in Sarasota County.

8.      In addition, Defendants Jon and Smart Communications filed a related suit in Sarasota County, Case No. 2023 CA 001002 NC, improperly bringing Declaratory Judgment Actions to construe a purported agreement in the Probate Division.

9.      The Amount in Controversy exceeds $50,000.00.

## FACTUAL BACKGROUND

I.      **The Genesis of Smart Communications**

10.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████████



13.    ███████████████    Jon conceived of the technology underlying Smart Communications. Though his initial idea, Jon's father, James Logan ("James"), and sister, Alexis Logan ("Alexis"), were instrumental in the development of Smart Communications.

14.    James was a 50% owner of Smart Communications, and contributed significantly to its growth and success—both financially and strategically.

## II.    The Formation of Smart Communications Holding, Inc.

15.    Smart Communications is a national provider of communications-related products and services to correctional facilities.

16.    Smart Communications Holding, Inc. was incorporated on December 29, 2014. *See* Ex. 4, Smart Communications Holding, Inc.'s Articles of Incorporation.

17.    The Articles of Incorporation provide for 10,000 shares of single-class stock, of which Jon owns 50% and James owned 50%. *See* Ex. 4.

18.    There are no other Smart Communications shareholders.

---

[1] █████████████████████████████████████████████████████

**III.    Jon's Waste of Corporate Assets**

19.    Smart Communications has come to control a substantial market-share in the prison technology and communications space.

20.    In abuse of his fiduciary duties, Jon has treated the company's resources as a personal piggy-bank, and grossly wasted corporate assets.

21.    Among other misconduct, Jon purchased the following assets with Smart Communications funds for his personal use:

      a.    A $10 million 100' Riva Corsaro yacht named "Convict";

      b.    A $1 million 45' Nor-Tech boat named "Dirty Amy";

      c.    A $250,000 Rolls-Royce;

      d.    A $300,000 Lamborghini with the license plate "Inmate";

      e.    A $350,000 Ferrari; and,

      f.    A $1.5 million condo in Miami.

22.    Jon also regularly amasses enormous corporate credit card bills on personal expenses like vacations and luxury meals:

      a.    $9,438 on an Airbnb ski lodge in Breckenridge, Colorado;

      b.    International plane tickets to Colombia for an annual "guys trip";

      c.    $2,848 on a fishing charter; and,

      d.    $1,624 for a sushi dinner.

23.    ███████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████

24. ███████████████████████████████████████

████████████████████████████████████████████

██████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

25. ███████████████████████████████████████

████████████████████████████████████████████

**IV.    Jon Threatens His Parents and Tries to Steal Their Shares**

26.    Not satisfied with the lavish lifestyle he was extracting from the company, Jon

decided that he was entitled to his father's shares.

5

27.

28.



## V.    Shareholder Agreement Negotiations

31.    Since 2021, James had been trying to persuade Jon to sign a Shareholders' Agreement that would govern the disposition of their Smart Communications shares.

32.    Jon consistently refused to sign.

33.    On September 12, 2022, Thomas Sims, Janice and James' trust and estate attorney, emailed a draft Shareholders' Agreement to Jon. In this email, he mentioned that he had drafted it a while ago, and that it was James' wish that prior to his upcoming medical procedure Jon execute it. *See* Ex. 7, Sept. 12, 2022, email from Jon Logan to James Logan (Sims email at bottom).

34.     Jon forwarded the email to James an hour later, and said: "This agreement is ridiculously too complicated I don't even understand it. I'm not stupid or bad with contracts and I can't understand this. I want it more simple and direct. All these terms and names that need their own paragraphs of definition is ridiculous." *See* Ex. 7.

35.     He also, in keeping with his egocentric narrative, disputed some of the material terms of the Agreement: "I do not agree to be a 50/50 partner with you." *See* Ex. 7.

36.     He warned his father "Don't test me"; "I really hope you fix yourself because you will be dead soon"; and, "I have zero patience left for you and I am not one to fuck with on what I created with sheer willpower and brains. If you, or Janice or Alexis try and take anymore from me, I am prepared to do things the normal human could never fathom." *See* Ex. 7.

37.     Jon ended the email by saying, "Have that attorney draft a simple strait [sic] forward agreement with the buyout I listed." *See* Ex. 7.

38.     James responded to Jon's email in an email dated September 18, 2022. *See* Ex. 5.

39.     James explained that "The 'Shareholders Agreement' sent to you is the very same as was delivered to you over a year ago. You have had ample time to review or hire an attorney to modify. It is a mutual agreement (same terms for both of us) sent to you for your protection in the event my surgery goes poorly tomorrow." *See* Ex. 5.

40.     Jon never did sign the draft shareholder agreement.

**VI.    James Dies and the Trust Receives His Shares**

41.     James Logan executed a Last Will and Testament and a Revocable Trust on February 10, 2021. *See* Ex. 8, James Logan Last Will and Testament; *see* Ex. 9, James Logan Family Trust, dated Feb. 10, 2021.

42.     The Trust names Janice as Trustee and primary beneficiary of the Trust with full power of appointment over the assets of the Trust at her death. *See* Ex. 9.

43.    On September 16, 2022, James executed a Stock Power that transferred his shares in Smart Communications to the Trust. *See* Ex. 10, Stock Power Certificate.

44.    On September 16, 2022, James also assigned his membership interests (50% ownership) in Loco Florida, LLC, and Smart Communications Yacht Holdings, LLC to the Trust. *See* Ex. 11, Assignment of Member Interest Loco Florida; Ex. 12, Assignment of Membership Interest Yacht Holdings.

45.    Loco Florida, Inc. owns Smart Communications' $2.1 million building headquarters, to which Smart Communications owes rent.

46.    James died on October 16, 2022.

47.    In her individual capacity as a beneficiary of the Trust, and as a result of Jon's behavior, Janice has executed her most recent Last Will and Testament that exercises the testamentary power of appointment granted her by James under the terms of the Trust (subparagraph 5.3(b)1.) in favor of separate subtrusts created under a newly-executed revocable trust agreement solely for the benefit of Alexis or her descendants. Such exercise eliminates Jon's beneficial interest in the Trust.

48.    As a result, the Trust owns half of Smart Communications' issued shares.

## VII.    In December 2022, Jon Worked with His Lawyer to Draft a Stock Purchase Agreement

49.    After his father's death, Jon became the sole Director of Smart Communications, in addition to being the sole Operating Officer.

50.    Jon decided he wanted to purchase the Trust's shares, and he directed his personal attorneys, Hill, Ward, Henderson, to draft a Stock Purchase Agreement.

51.    Separately, he threatened Janice that if she did not sell the Trust's shares he would sabotage the company by refusing to sign agreements and contracts on the company's behalf.

8

52. On December 22, 2022, clearly under the impression that Jon had never executed the Shareholders' Agreement, Mark M. Wall of Hill, Ward, Henderson, "On behalf of Jon," emailed a draft Stock Purchase Agreement to Thomas Sims. *See* Ex. 13, Dec. 22, 2022, email from Mark M. Wall to Thomas D. Sims.

53. A Stock Purchase Agreement would have been redundant had a Shareholders' Agreement been executed and in effect as of December 2022.

54. And, if a Shareholders' Agreement had been in effect, the Stock Purchase Agreement would have referenced it, and explained (at the very least) what, if anything, the Stock Purchase Agreement changed about the Shareholders' Agreement.

55. Yet, "On behalf of Jon," Hill, Ward, Henderson drafted a meticulous, 12-page single spaced Stock Purchase Agreement.

56. The draft Stock Purchase Agreement has the watermark "HWH DRAFT 12/22/2022 *For discussion purposes only*." *See* Ex. 14, Draft Stock Purchase Agreement.

57. The draft Stock Purchase Agreement contains a "Note to Draft" Footnote, which three times refers to the Shareholders' Agreement—that Jon now says was fully executed on September 23, 2022—as the "unsigned Shareholders' Agreement." *See* Ex. 14, p. 2 n.2.

58. Jon's own lawyer, Mark M. Wall, who is representing him in the improperly filed related suit in the Probate Division, was clearly under the impression as of December 22, 2022, that the Shareholders' Agreement was unsigned.

59. At a December 2022 meeting between Jon, Mark Wall, Thomas Sims, and Janice, Jon was repeatedly asked whether he regretted not signing the Shareholders' Agreement and he said that he wished he would have signed it.

## VIII.    Janice Sends the Management Concern Letter to Jon

60.    On January 20, 2023, counsel for the Trust sent Jon's attorneys a letter detailing Janice's concerns about Jon's management of Smart Communications' ("Management Concern Letter") and demanding, among other things, (a) a full accounting of Jon's use of corporate assets and (b) that Janice be involved in company management going forward. *See* Ex. 15, Management Concern Letter.

61.    The Trust and Jon entered into a Standstill and Document Exchange Agreement in an attempt (at least by the Trust) to resolve this dispute short of litigation.

### A.    Jon "Discovers" A Fully Executed Shareholder Agreement

62.    While discussions regarding the Trust's concerns of corporate mismanagement were ongoing, Jon miraculously "discovered" a copy of a fully-executed Shareholders' Agreement. He claimed that on February 2, 2023, his housekeeper found a copy of the executed Shareholder Agreement, dated September 23, 2022, in the kitchen counter mail rack. He said he thought the original would be in James' files.

63.    The Purported Shareholders' Agreement would require that Shareholders sell their shares back to the corporation upon death. *See* Ex. 16, Purported Shareholders' Agreement.

64.    The Purported Shareholders' Agreement also has a more favorable appraisal term for Jon than the draft Stock Purchase Agreement did. Under the Purported Shareholders' Agreement, Smart Communications would choose a single appraiser to value the shares, whose decision would be binding. The Stock Purchase Agreement, on the other hand, provided for each party to designate a Qualified Appraiser, and for further challenge if there were a value discrepancy after both appraisals. *Cf.* Ex. 14, (C)(2)-(3); *and* Ex. 16, §§ 4.3, 5.3(b).

65.    On February 24, 2023, Jon's counsel attempted to invoke the unilateral valuation provided for in the Purported Shareholders' Agreement, and name an appraiser.

10

66.    The Trust objected on February 25, 2023.

67.    Jon and Smart Communications then improperly filed a lawsuit in the Probate Division of this Court, alleging breach of contract of the Purported Shareholders' Agreement and asking the Probate Division to use its equitable powers to force the Trust to sell to Smart Communications under the guise of breach of trust and trust administration.

68.    Jon, however, is not a qualified beneficiary of the Trust and thus has no standing to bring the trust/probate claims he asserted.

69.    His suit also seeks specific performance of the Purported Shareholders' Agreement, which is properly brought in the Civil Division, not probate court.

## THE TRUST'S DIRECT AND DERIVATIVE STANDING

70.    The Trust brings the below claims both directly and derivatively as a 50% shareholder of Smart Communications.

71.    The Trust has been injured directly pursuant to Florida Statutes Section 607.0750 to the extent that Jon has fraudulently attempted to subject it to the Purported Shareholders' Agreement, and to the extent that Jon has made distributions to himself in which the Trust did not share.

72.    The Trust has been injured derivatively pursuant to Florida Statutes Section 607.0742 to the extent Jon's breaches of fiduciary duty, corporate waste, and mismanagement have impacted the value of Smart Communications' shares.

73.    The Trust sent the Management Concern Letter to Jon's counsel demanding certain actions be taken on January 20, 2023. *See* Ex. 15.

74.    Between January 20, 2023, and February 26, 2023, the Trust and Jon executed a standstill agreement, and attempted to resolve the Trust's concerns outside of court.

75.     On February 27, 2023, the day the standstill agreement expired, Jon and Smart Communications filed suit against the Trust in the related lawsuit improperly brought in the Probate Division for the enforcement of the Purported Shareholders' Agreement.

76.     Further, Jon is the sole Director of the Board and only other Smart Communications shareholder. The Trust can surmise from Jon and Smart Communications' aggressive action that its demands will not be met, and there is the potential for irreparable injury to the corporation and continuing corporate waste in the interim. Jon's background and behavior dictate legal intervention to avoid erratic or destructive action, and to ensure the preservation of Smart Communications.

77.     There is no other arbiter or venue in which or from which the Trust can properly seek relief.

### Count I: Declaratory Judgment
**(Declaration Concerning the Validity of the Purported Shareholder Agreement)**

78.     Plaintiff incorporates the foregoing paragraphs of this complaint as though fully set forth herein.

79.     Pursuant to Florida Statutes Chapter 86, Plaintiff seeks declaratory relief construing the validity of the Purported Shareholders' Agreement.

80.     Plaintiff contends that Defendant Jon fraudulently executed the Purported Shareholders' Agreement well after September 23, 2022, in order to force Janice's sale of the Trust's shares back to Jon and Smart Communications, and to obtain the benefits of a unilateral appraisal of Smart Communications' share price.

81.     There is a bona fide, actual, present need to determine the validity of the Purported Shareholders' Agreement—namely, to determine whether the Trust must sell its shares to Jon and Smart Communications and how those shares will be valued upon sale.

82.     The validity of the Purported Shareholders' Agreement is an ascertainable fact or set of facts.

83.     Janice and the Trust's control over her right to and property in the 5,000 Smart Communications shares is dependent upon the validity of the Purported Shareholders' Agreement.

84.     Jon has an adverse and antagonistic interest in the Purported Shareholders' Agreement being found valid and enforceable.

85.     Jon is properly served and in front of this Court's Civil Division for adjudication of this question.

WHEREFORE, Plaintiff Janice Logan as Trustee of the James Logan Family Trust, dated February 10, 2021, demands judgment in her favor and against Defendants Jonathan D. Logan and Smart Communications Holding, Inc. declaring:

1.     The Purported Shareholders' Agreement is invalid and unenforceable.

2.     Therefore, the disposition of the Trust's Smart Communications shares is unconstrained by the Purported Shareholders' Agreement.

3.     Such other and further declarations as this Court deems just and proper.

### Count II: Breach of Fiduciary Duties
**(The Trust against Jonathan Logan and Smart Communications)**

86.     Plaintiff incorporates the foregoing paragraphs of this complaint as though fully set forth herein.

87.     Jon, as CEO and sole Director of Smart Communications, has fiduciary duties to both the shareholders and Smart Communications to act with care and loyalty in the management of Smart Communications.

88.     Jon breached those fiduciary duties by, among other things:

a.      Fraudulently claiming the Purported Shareholders' Agreement is a valid agreement in order to force Janice to sell to him and to gain favorable sale and appraisal terms;

b.      Perpetrating corporate waste via luxury asset purchases for Jon's personal use;

c.      Abusing the corporate credit card for personal expenses;

d.      Failing to make 50/50 distributions to shareholders;

e.      Compensating himself excessively; and,

f.      Threatening to harm Smart Communications, and therefore the value of the shares, if Janice and the Trust do not comply with his wishes.

89.     Upon information and belief, additional breaches will become evident upon an accounting of Smart Communications' books and records, and the conduct of further discovery.

90.     As a direct and proximate result of Jon's breaches as CEO, sole Director, President, Vice President, Secretary, and Treasurer of Smart Communications, the Trust has not received distributions due it, and the Trust's shares have lost value or have been the subject of efforts to devalue them. Additionally, the Trust has had to defend an improperly brought suit in the Probate Division of this Court and take personal protective precautions as a result of Jon's criminal background and threats.

WHEREFORE, Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, demands judgment in her favor and against Defendants Jonathan D. Logan and Smart Communications Holding, Inc., including:

1.      Compensatory damages;

2.      Punitive damages pursuant to Florida Statutes Section 768.72 because

Plaintiff has pled a reasonable basis for the inference of intentional

misconduct or gross negligence by Jon and Smart Communications;

3.      A full accounting of Smart Communications' and its subsidiaries'

corporate books and records by a third-party forensic accounting firm;

4.      Appointment of Janice, as trustee of the Trust, as a board member, in

addition to the appointment of a third, neutral director such that the board

will not be susceptible to deadlock;

5.      Attorneys' fees and expenses pursuant to Florida Statutes Section

607.0746; and,

6.      Such other and further relief as this Court deems just and proper.

**<u>Count III: 607.0748 Action to Appoint a Custodian</u>**
**(The Trust against Jonathan Logan and Smart Communications)**

91.     Plaintiff incorporates the foregoing paragraphs of this complaint as though fully set

forth herein.

92.     Pursuant to Florida Statutes Section 607.0748, the Trust asks this Court to appoint

a temporary custodian to oversee Smart Communications during the pendency of this litigation.

93.     As alleged above, given that Jon is the sole Director and Officer of Smart

Communications, the Trust's 50% ownership does not allow meaningful participation in the

decisions of Smart Communications since James Logan's death.

94.     In light of this, the Trust is hamstrung by the decisions of an erratic and vindictive

person who has shown a penchant for waste, violence, harassment, and intimidation.

95.    To preserve Smart Communications from continuing waste and mismanagement, and prevent retribution via share devaluation and major corporate expenditures for Jon's personal benefit, the Trust believes a temporary custodianship is in order.

96.    An impartial custodian will be able to exercise oversight and control to ensure that Smart Communications' value is maintained, and that there is an accountability mechanism for Jon's decisions.

WHEREFORE, Plaintiff Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, demands judgment in her favor and against Defendants Jonathan D. Logan and Smart Communications Holding, Inc., including:

1.    Appointment of a temporary custodian during the pendency of this litigation to oversee Smart Communications operations; and,

2.    Such other and further relief as this Court deems just and proper.

Dated:  March 10, 2023                Respectfully submitted,

**JANICE LOGAN, AS TRUSTEE OF THE JAMES LOGAN FAMILIY TRUST DATED FEBRUARY 10, 2021**

By:    _/s/ Anitra R. Clement_
One of Her Attorneys

Anitra R. Clement
Florida Bar Number 100354
SHOOK, HARDY & BACON L.L.P.
100 North Tampa Street, Suite 2900
Tampa, FL  33602-5810
Tel:  (813) 202-7100
aclement@shb.com

*Attorneys for Plaintiff*

16

## **VERIFICATION**

Under penalties of perjury, I declare that I have read the foregoing VERIFIED COMPLAINT and that the facts stated in it are true, or, where indicated, are stated to the best of my knowledge and belief.

Dated: March _10_, 2023

_Janice Logan_

Janice Logan
Trustee of the James Logan Family Trust,
dated February 10, 2021

# EXHIBIT 28

# IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,

        Plaintiffs,

v.

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust, dated February 10, 2021;
and ALEXIS LOGAN,

        Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan         Case No.: 2023-CA-1002-NC
Family Trust, dated February 10, 2021,

        Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., SMART
COMMUNICATIONS HOLDING, LLC, HLFIP
HOLDING, INC., and HLFIP HOLDING, LLC,

        Counterclaim Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan Family     (CONSOLIDATED)
Trust, dated February 10, 2021, and derivatively on
Behalf of Smart Communications Holding, Inc.,

        Plaintiff,              Case No.: 2023-CA-1280-NC

v.

JONATHAN D. LOGAN,
SMART COMMUNICATIONS HOLDING, INC.,
nominal defendant, SMART COMMUNICATIONS
HOLDING, LLC, HLFIP HOLDING, INC., HLFIP
HOLDING, LLC, LOCO FLORIDA LLC, and
SMART COMMUNICATIONS YACHT
HOLDING, LLC,

        Defendants.

_____/

## NOTICE OF SUGGESTION OF BANKRUPTCY

**PLEASE TAKE NOTICE** that Smart Communications Holding, Inc. and Smart Communications Holding, LLC (collectively, the "Smart Entities" or "Debtors") each filed voluntary petitions under chapter 11 of Title XI of the United States Code on November 30, 2024, both attached as **Exhibit 1** and **Exhibit 2**, respectively. The bankruptcy cases are styled *In re: Smart Communications Holding, Inc.*, Case No. 8:24-bk-07106-RCT and *In re:  Smart Communications Holding, LLC*, Case No. 8:24-bk-07108-RCT, both filed in the United States Bankruptcy Court for the Middle District of Florida.

**PLEASE TAKE FURTHER NOTICE** that pursuant to 11 U.S.C. § 362, upon the filing of a chapter 11 petition, an injunction is placed into effect which stays, among other things: (i) the commencement or continuation of a judicial proceeding against either of the Debtors; (ii) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the bankruptcy case; (iii) any act to obtain possession of property of the estate; and (iv) any act to create, perfect, or enforce any lien against property of the estate. Accordingly, any further action against the Smart Entities, including but not limited to, all claims asserted in this action against the Smart Entities, including those asserted in the Second Amended Complaint [DIN 680] filed on May 29, 2024, and the Counterclaim [DIN 775] filed on October 2, 2024 (collectively, "Claims Asserted"), are hereby stayed pursuant to 11 U.S.C. § 362.

**PLEASE TAKE FURTHER NOTICE** that standing to pursue the Claims Asserted against the Smart Entities in this action are hereby automatically transferred to the Debtors' bankruptcy estates  upon the filing of the aforementioned chapter 11 petitions pursuant to Title XI of the United States Code. Therefore, the Claims Asserted are property of the Debtors' bankruptcy estates and the Trust no longer retains standing to pursue any of the Claims Asserted against any of the Defendants pursuant to Title XI of the United States Code.

Dated:  December 2, 2024                    Respectfully submitted,

**AKERMAN LLP**
401 E. Jackson Street, Suite 1700
Tampa, FL 33602-5250
Office: (813) 23-7333
Fax: (813)218-5495
mark.bernet@akerman.com
caren.deruiter@akerman.com

By:/s/ *Mark J. Bernet*____
    Mark J. Bernet, Esq.
    Florida Bar No. 606359

-and-

Jason S. Oletsky, Esq.
Florida Bar No. 9301
jason.oletskey@akerman.com
jill.parnes@akerman.com
Dustin B. Hillsley, Esq.
Florida Bar No. 1018589
dustin.hillsley@akerman.com
deborah.karlson@akerman.com
Max C. Rudolf, Esq.
Florida Bar No. 98766
max.rudolf@akerman.com
deborah.karlson@akerman.com

**AKERMAN LLP**
201 East Las Olas Boulevard
Suite 1800
Fort Lauderdale, FL 33301
Telephone: (954) 463-2700
Fax: (954) 463-2224

Counsel for Jonathan D. Logan, Smart
Communications Holdings, Inc., Smart
Communications Holding, LLC, Loco Florida,
LLC and Smart Communications Yacht Holding,
LLC

## CERTIFICATE OF SERVICE

I certify that the foregoing document has been furnished to the attorneys listed below on December 2, 2024, through the Court's e-filing portal pursuant to Florida Rule of Judicial Administration 2.516(b)(1):

Anitra R. Clement
Florida Bar No. 100354
**SHOOK, HARDY & BACON L.L.P.**
100 N. Tampa Street, Suite 2900
Tampa, FL 33602
Telephone: (813) 202-7100
aclement@shb.com

David E. Schoenfeld (FL PHV # 1047561)
Peter F. O'Neill (FL PHV # 1043125)
Andrew L. Franklin (FL PHV # 1035737)
Kailin Liu (FL PHV # 1051416)
**SHOOK, HARDY & BACON L.L.P.**
111 S. Wacker Drive, Suite 4700
Chicago, IL 60606
Telephone: (312) 704-7700
dschoenfeld@shb.com
pfoneill@shb.com
afranklin@shb.com
kliu@shb.com

*Counsel for Janice Logan, Alexis Logan, and Justin Peterson*


Christopher G. Oprison (FBN 122080)
Email:  chris.oprison@dlapiper.com
**DLA PIPER LLP (US)**
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
Telephone:  (305) 423-8522
Facsimile:  (305) 657-6366

*Counsel for Defendant HLFIP*


/s/*Mark J. Bernet*
Mark J. Bernet, Esq.

Exhibit "1"

**Fill in this information to identify your case:**

United States Bankruptcy Court for the:

MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION

Case number *(if known)* _____ Chapter __11__

☐ Check if this an amended filing

## Official Form 201
# Voluntary Petition for Non-Individuals Filing for Bankruptcy
06/24

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | | |
|---|---|---|
| 1. | **Debtor's name** | **Smart Communications Holding, Inc.** |
| 2. | **All other names debtor used in the last 8 years** <br> Include any assumed names, trade names and *doing business as* names | |
| 3. | **Debtor's federal Employer Identification Number** (EIN) | 47-2886302 |

4. **Debtor's address**

| Principal place of business | Mailing address, if different from principal place of business |
|---|---|
| **10491 72nd St.** <br> **Seminole, FL 33777** <br> Number, Street, City, State & ZIP Code | P.O. Box, Number, Street, City, State & ZIP Code |
| **Pinellas** <br> County | **Location of principal assets, if different from principal place of business** <br><br> Number, Street, City, State & ZIP Code |

5. **Debtor's website** (URL) _____

6. **Type of debtor**

■ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other. Specify: _____

| Debtor | Smart Communications Holding, Inc. | Case number (if known) | |
|---|---|---|---|
| | Name | | |

**7. Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

■ None of the above

B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See
http://www.uscourts.gov/four-digit-national-association-naics-codes.

\_\_\_\_\_

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

☐ Chapter 7

☐ Chapter 9

■ Chapter 11. *Check **all** that apply*:

■ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725 (amount subject to adjustment on 4/01/25 and every 3 years after that).

■ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

■ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and it chooses to proceed under Subchapter V of Chapter 11.

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**
If more than 2 cases, attach a separate list.

■ No.

☐ Yes.

| | District | _____ | When | _____ | Case number | _____ |
|---|---|---|---|---|---|---|
| | District | _____ | When | _____ | Case number | _____ |

Debtor **Smart Communications Holding, Inc.**      Case number (*if known*) _____
   Name

| | |
|---|---|
| **10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?** | ☐ No<br>■ Yes. |

List all cases. If more than 1, attach a separate list

| | | | |
|---|---|---|---|
| Debtor | **Smart Communications Holding, LLC** | Relationship | **Affiliate** |
| District | **Middle District of Florida** | When _____ | Case number, if known _____ |

| | |
|---|---|
| **11. Why is the case filed in *this district*?** | *Check all that apply:*<br><br>■ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.<br><br>☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district. |

| | |
|---|---|
| **12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?** | ■ No<br>☐ Yes.    Answer below for each property that needs immediate attention. Attach additional sheets if needed.<br><br>**Why does the property need immediate attention?** (*Check all that apply.*)<br><br>☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.<br>    What is the hazard? _____<br><br>☐ It needs to be physically secured or protected from the weather.<br><br>☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).<br>☐ Other _____<br><br>**Where is the property?** _____<br>     Number, Street, City, State & ZIP Code<br><br>**Is the property insured?**<br>☐ No<br>☐ Yes.   Insurance agency _____<br>        Contact name _____<br>        Phone _____ |

**■ Statistical and administrative information**

| | |
|---|---|
| **13. Debtor's estimation of available funds** | *Check one:*<br><br>■ Funds will be available for distribution to unsecured creditors.<br><br>☐ After any administrative expenses are paid, no funds will be available to unsecured creditors. |

| | | |
|---|---|---|
| **14. Estimated number of creditors** | ■ 1-49<br>☐ 50-99<br>☐ 100-199<br>☐ 200-999 | ☐ 1,000-5,000<br>☐ 5001-10,000<br>☐ 10,001-25,000 | ☐ 25,001-50,000<br>☐ 50,001-100,000<br>☐ More than100,000 |

| | | |
|---|---|---|
| **15. Estimated Assets** | ☐ $0 - $50,000<br>☐ $50,001 - $100,000<br>☐ $100,001 - $500,000<br>☐ $500,001 - $1 million | ☐ $1,000,001 - $10 million<br>■ $10,000,001 - $50 million<br>☐ $50,000,001 - $100 million<br>☐ $100,000,001 - $500 million | ☐ $500,000,001 - $1 billion<br>☐ $1,000,000,001 - $10 billion<br>☐ $10,000,000,001 - $50 billion<br>☐ More than $50 billion |

| Debtor | **Smart Communications Holding, Inc.** | Case number (*if known*) |
|--------|----------------------------------------|--------------------------|
|        | Name                                   |                          |

**16. Estimated liabilities**

☐ $0 - $50,000
☐ $50,001 - $100,000
☐ $100,001 - $500,000
☐ $500,001 - $1 million

☐ $1,000,001 - $10 million
☐ $10,000,001 - $50  million
■ $50,000,001 - $100 million
☐ $100,000,001 - $500 million

☐ $500,000,001 - $1 billion
☐ $1,000,000,001 - $10 billion
☐ $10,000,000,001 - $50 billion
☐ More than $50 billion

Debtor    __Smart Communications Holding, Inc.__                    Case number (*if known*) _____
            Name

■    **Request for Relief, Declaration, and Signatures**

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or
          imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature
    of authorized
    representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    11-28-2024
                MM / DD / YYYY

X _____          **Jonathan D. Logan**
    Signature of authorized representative of debtor          Printed name

Title    **President**

**18. Signature of attorney**

X    **/s/ Daniel R. Fogarty**                    Date    **11.29.2024**
    Signature of attorney for debtor                        MM / DD / YYYY

    **Daniel R. Fogarty**
    Printed name

    **Stichter, Riedel, Blain & Postler, P.A.**
    Firm name

    **110 E. Madison St.**
    **Suite 200**
    **Tampa, FL 33602**
    Number, Street, City, State & ZIP Code

    Contact phone    **(813) 229-0144**        Email address    **dfogarty@srbp.com**

    **0017532 FL**
    Bar number and State

Assets America, Inc.
800 5th Ave #101
Seattle, WA 98104

CDW Direct LLC
200 N Milwaukee Ave,
Vernon Hills, IL 60061

Cents LLC
6801 Holabird Ave.
Dundalk, MD 21222

Florida Custom Mold, Inc
1806 Gunn Hwy,
Odessa, FL 33556

GGC Brennan Industrial, LLC
Attn: Michael W. Brennan
9450 W. Bryn Mawr, #750
Rosemont, IL 60018

HLFIP Holding, LLC
Two Ballpark Center
800 Battery Ave. SE, #100
Atlanta, GA 30339

I.D. Tel
55 Canal S.
Staten Island, NY 10304

Janice Logan, as Trustee
of the James Logan Family Trust
c/o David E. Schoenfeld, Esq.
100 N. Tampa St., #2900
Tampa, FL 33602

Janice Logan, individually
c/o David E. Schoenfeld, Esq.
100 N. Tampa St., #2900
Tampa, FL 33602

Jonathan D. Logan
10491 72nd St.
Seminole, FL 33777

Lattice Incorporated
7150 N. Park Dr., #500
Pennsauken, NJ 08109

Loco Florida, LLC

10491 72nd St.
Seminole, FL 33777

McNees Wallace & Nurick LLC
100 Pine Street
Harrisburg, PA 17101

Melvin W. Engelke, III
c/o Dean Kent, Esq.
101 E. Kennedy Blvd., #2700
Tampa, FL 33602-5150

Mt. View Business Plaza, LLC
P.O. Box 821048
Vancouver, WA 98682

Priority1
401 W. Capitol Ave.
Little Rock, AR 72201

ShenZhen Meridian Technology Co. Ltd.
Room 2809, West Building, Qui Shi Bldg.
Zhu Zi Ling, Fu Tian District
Shenzhen, CHINA 51804

Swank Motion Pictures, Inc.
10795 Watson Road,
St. Louis, MO 63127

Timothy Szuhaj, Esq.
1635 Market St 7th Floor
Philadelphia, PA 19103

Versa Technology, Inc.
5224 Bell Ct.
Chino, CA 91710

Westfield Insurance
One Park Circle
P.O. Box 5001
Westfield Center, OH 44251

Wintel Corp.
2741 NW 82nd Ave
Doral, FL 33122

xByte Technologies
4614 19th St Ct E.
Bradenton, FL 34203

Exhibit "2"

| Fill in this information to identify your case: |
|---|

United States Bankruptcy Court for the:

MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION

Case number *(if known)* _____ Chapter __11__

☐ Check if this an amended filing

## Official Form 201
# Voluntary Petition for Non-Individuals Filing for Bankruptcy     06/24

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.**

| 1. | **Debtor's name** | **Smart Communications Holding, LLC** | |
|---|---|---|---|

| 2. | **All other names debtor used in the last 8 years** <br> Include any assumed names, trade names and *doing business as* names | | |
|---|---|---|---|

| 3. | **Debtor's federal Employer Identification Number** (EIN) | **93-3238948** | |
|---|---|---|---|

| 4. | **Debtor's address** | **Principal place of business** | **Mailing address, if different from principal place of business** |
|---|---|---|---|
| | | **10491 72nd St.** <br> **Seminole, FL 33777** <br> Number, Street, City, State & ZIP Code | _____ <br> P.O. Box, Number, Street, City, State & ZIP Code |
| | | **Pinellas** <br> County | **Location of principal assets, if different from principal place of business** <br> _____ <br> Number, Street, City, State & ZIP Code |

| 5. | **Debtor's website** (URL) | _____ |
|---|---|---|

| 6. | **Type of debtor** | ■ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP)) |
|---|---|---|
| | | ☐ Partnership (excluding LLP) |
| | | ☐ Other. Specify: _____ |

| Debtor | Smart Communications Holding, LLC | Case number (if known) |
|---|---|---|
| | Name | |

**7.** **Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

■ None of the above

B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See
http://www.uscourts.gov/four-digit-national-association-naics-codes.

_____

**8.** **Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

☐ Chapter 7

☐ Chapter 9

■ Chapter 11. *Check **all** that apply*:

■ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725 (amount subject to adjustment on 4/01/25 and every 3 years after that).

■ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

■ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and it chooses to proceed under Subchapter V of Chapter 11.

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9.** **Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**
If more than 2 cases, attach a separate list.

■ No.

☐ Yes.

| District | _____ | When | _____ | Case number | _____ |
| District | _____ | When | _____ | Case number | _____ |

| Debtor | **Smart Communications Holding, LLC** | Case number (*if known*) | |
| | Name | | |

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

☐ No

■ Yes.

| List all cases. If more than 1, attach a separate list | Debtor | **Smart Communications Holding, Inc.** | Relationship | **Affiliate** |
| | District | **Middle District of Florida** | When | Case number, if known |

**11. Why is the case filed in *this district*?**

Check all that apply:

■ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

■ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other

**Where is the property?** _____

Number, Street, City, State & ZIP Code

**Is the property insured?**

☐ No

☐ Yes. Insurance agency _____

Contact name _____

Phone _____

---

**■ Statistical and administrative information**

**13. Debtor's estimation of available funds**

Check one:

■ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available to unsecured creditors.

**14. Estimated number of creditors**

| | | |
| --- | --- | --- |
| ■ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than100,000 |
| ☐ 200-999 | | |

**15. Estimated Assets**

| | | |
| --- | --- | --- |
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ■ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

| Debtor | **Smart Communications Holding, LLC** | Case number (*if known*) |
|---|---|---|
| | Name | |

**16.  Estimated liabilities**

- ☐ $0 - $50,000
- ☐ $50,001 - $100,000
- ☐ $100,001 - $500,000
- ☐ $500,001 - $1 million

- ☐ $1,000,001 - $10 million
- ☐ $10,000,001 - $50  million
- ■ $50,000,001 - $100 million
- ☐ $100,000,001 - $500 million

- ☐ $500,000,001 - $1 billion
- ☐ $1,000,000,001 - $10 billion
- ☐ $10,000,000,001 - $50 billion
- ☐ More than $50 billion

Debtor  **Smart Communications Holding, LLC**        Case number (*if known*) _____
    Name

▮   Request for Relief, Declaration, and Signatures

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   11-28-2024
              MM / DD / YYYY

X _____     **Jonathan D. Logan**
   Signature of authorized representative of debtor     Printed name

Title   **Manager**

**18. Signature of attorney**

X   **/s/ Daniel R. Fogarty**        Date   **11.29.2024**
   Signature of attorney for debtor              MM / DD / YYYY

**Daniel R. Fogarty**
Printed name

**Stichter, Riedel, Blain & Postler, P.A.**
Firm name

**110 E. Madison St.**
**Suite 200**
**Tampa, FL 33602**
Number, Street, City, State & ZIP Code

Contact phone   **(813) 229-0144**     Email address   **dfogarty@srbp.com**

**0017532 FL**
Bar number and State

HLFIP Holding, LLC
Two Ballpark Center
800 Battery Ave. SE, #100
Atlanta, GA 30339

Janice Logan, as Trustee
of the James Logan Family Trust
c/o David E. Schoenfeld, Esq.
100 N. Tampa St., #2900
Tampa, FL 33602

Janice Logan, individually
c/o David E. Schoenfeld, Esq.
100 N. Tampa St., #2900
Tampa, FL 33602

Smart Communications Holding, Inc.
10491 72nd St.
Seminole, FL 33777

# EXHIBIT 29

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

SMART COMMUNICATIONS
HOLDING, INC.,

      Plaintiff,

v.                              Case No. 8:20-cv-1469-WFJ-TGW

CORRECT SOLUTIONS, LLC a/k/a
Correct Solutions Group, LLC,

      Defendant.

_____/

## ORDER

The Court held a bench trial from August 19-23, 2024, in this matter. The claims remaining after summary judgment rulings were addressed at trial. The Court enters the following findings of fact, conclusions of law, and judgment.

## Findings of Fact

This case involved Correct Solutions, LLC ("Correct") as contractor and Smart Communications Holdings, Inc. ("Smart") as a sub-contractor. The relevant business was providing computer tablets and kiosks to county sheriffs for use by jail inmates. Three counties were involved in this case. [1]

---

[1] Smart's Fourth Amended Complaint is at Dkt. 93. The summary judgment rulings are at Dkt. 234. Smart's claims related to Sebastian County that remained after summary judgment were

**1. Smart was Non-compliant:** Smart did not provide contract-compliant jail-grade tablets. The contractual obligation at issue required Smart to provide custom "ruggedized and correctional-grade" tablets for usage by jail inmates within the jail environment. The tablets provided to customers Sebastian County and Bowie County by Smart were first-generation tablets, that Smart had never provided in any jail setting before. They were ordered from the Chinese manufacturer to fulfill the subject contracts here. They had not been beta-tested or used anywhere. Dkt. 381-2 at 13, pp. 42–45; at 24, p. 88. They had two black covers or shells, held together with approximately ten visible hex screws. The overwhelming evidence was that these tablets were noncompliant and not jail-worthy by any reasonable

---

several. The first was breach of contract, related to exclusive rights to supply the County that ended up with a competitor, Tech Friends. Smart's other clams were breach of implied good faith/fair dealing covenant, and common law unfair competition. These counts also asserted a claim based upon Tech Friends replacing Smart as supplier at Sebastian. The implied covenant breach also asserted that Correct solicited Sebastian to non-renew the underlying contract in order to eject Smart from serving Sebastian. Correct's counterclaims related to Sebastian, Dkt. 105, were breach of contract for failure to supply the promised goods; breach of the implied covenant of good faith/fair dealing; tortious interference; and common law unfair competition. As part of these latter two tort counterclaims Correct also sued a Smart-related party, Smart Communications Collier, Inc. ("Smart Collier").

Smart's claims related to Washington County that survived summary judgment mirrored the three it asserted concerning Sebastian. In essence, it claimed Correct breached the Master Service Agreement by causing Smart to be removed from that county jail or not delivering exclusivity in Washington County, and by terminating under paragraph 6 when the contract term had to be coterminous with Correct's relationship with the County.

Smart's claims as to Bowie County were in a similar vein. Smart complained of improper notice to cure, improper termination, and the tortious insertion of the competitor Tech Friends who took over Smart's job at this County in derogation of Smart's contractual exclusivity.

measure.  It appears the Chinese company that provided the second generation tablets to Smart went out of business.  Dkt. 355 at 23, 28.  The tablets had multiple flaws and were easily abused and misused by the inmates in various ways, some of which were dangerous.  By any examination of this record, they were not rugged. To anyone familiar with a jail environment they were not fit for use inside a jail.

Smart notes that the tablets provided to Washington County were second generation and improved.  Notwithstanding this, the credible evidence is that they suffered similar, material flaws and were likewise non-compliant and not suitable for a jail environment.  Dkt. 381-24 at 5–6, pp. 288–93; Dkt. 346-104; Dkt. 363 at 119–20; Dkt. 345-9.

This failure in product was exacerbated by a Smart's failure to provide the appropriate number of tablets to the customers for use, and very poor customer service.  The failure of these Smart tablets is evidenced throughout this record, and is almost uncontested by any competent evidence.  The tablets (first generation) had "pigtail" plugs for recharging that could be broken or abused.  The tablets could be disassembled due to the exposed screws.  They were credibly described as almost toy-like, as from a Wal-Mart.  Dkt. 381-24 at 6, pp. 290–92; Dkt. 381-1 at 7, pp. 19–20; Dkt. 381-18 at 7, pp. 18–19.  Inmates could fairly easily make shanks out of them, or other tools like tattoo guns or cigarette lighters.  Relatively soon after placement these faults became very evident, and were exacerbated by first

3

lackadaisical and then abysmal customer service from Smart.  The Court need not

expand upon this abundant competent evidence of Smart's noncompliance here.

Those interested in this sad proof further may consult the references, *supra*, and the

margin.[2]

The main defender of the Smart products was Jon Logan, Smart's principal.

The Court did not find this witness to be accurate or worthy of credit—the Court

makes an adverse credibility finding.  His testimony about the tablets was

contradicted by multiple credible witnesses.  He stated the customers who

complained extensively were lying, and they were all engaged in a "sham" or a

multi-faceted anti-Smart conspiracy.  Or they were "idiots," Dkt. 381-9 at 78, or

stupid.  *Id*.  A great weight of evidence contradicted this witness.  Mr. Logan's

testimony as to the tablets and relevant history was greatly outweighed by contrary

evidence, and was materially contradicted by six or more credible witnesses.

It is not surprising that the customers showed nearly uniform criticism of

Smart.  Its products were poor and some presented a danger in the jail

environment.  The customers were often "shorted" in number, and were poorly

---

[2] Dkts. 345-1–9; Dkts. 346-44–53; Dkts. 346-81–90; Dkt. 346-104; Dkts. 346-115–117; Dkt. 346-124; Dkt. 346-143; Dkt. 346-148; Dkt. 346-186; Dkt. 381-1 at 9–10, pp. 27–31; at 13–16, pp. 44–56; at 21–23, pp. 75–84; at 26, p. 94; at 27–29, pp. 100–07; Dkt. 381-6 at 35, pp. 131–32; Dkt. 381-7 at 22, pp. 78–82; Dkt. 381-9 at 77–78, pp. 293–96; Dkt. 381-15 at 65, pp. 250–52; Dkt. 381-16 at 5, pp. 8–9; at 9–11, pp. 25–30; Dkt. 381-17 at 15–20, pp. 50–72, at 21–25, pp. 77–91; at 26, p. 97; Dkt. 381-23 at 43–44, pp. 165–66; at 47, p. 178; at 51 pp. 194–95; at 55, p. 213; at 60–61, pp. 231–33; Dkt. 381-24 at 5–6, pp. 287–93; at 25–27, pp. 368–74.

4

serviced.  Smart's principal in turn showed disdain for the customers, *see supra*, including an overnight, unannounced stark and sudden exit from Washington County, leaving the jail "high and dry."  Dkt. 345-9; Dkt. 345-11; Dkt. 381-23 at 52, p.198.  Only a small amount of exhibits and testimony (vastly outweighed) support Smart's position as to these tablets.

## Conclusions of Law

1.      The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a).  *See* Dkt. 1 at 2–11.

2.      The parties waived consequential damages in Section 7 of the Master Services Agreement ("MSA"), Dkt. 93-2.  *See* Dkts. 265 at 2–5; 266 at 2–8.  This controlling contract was written from a Smart template without help from lawyers. Section 7 states that "neither Party shall have any liability for indirect, incidental, consequential, exemplary or special damages of any kind, including damages arising from lost profits, lost saving, lost income, loss of use or other benefit . . . ." Dkt. 93-2 at 3 (emphasis added).  And this limitation applies "[n]otwithstanding anything to the contrary in this Agreement or Schedules."

"Consequential damages" are those that stem from losses incurred by the non-breaching party in its dealing, often with a third party.  *HCA Health Servs. of Fla., Inc. v. Cyberknife Ctr. of Treasure Coast, LLC*, 204 So. 3d 469 (Fla. 4th DCA

2016).  "What makes a loss consequential is that it stems from relationships with third parties, while still reasonably foreseeable at the time of contracting." *Keystone Airpark Auth. v. Pipeline Contractors, Inc.*, 266 So. 3d 1219, 1223 (Fla. 1st DCA 2019); *see also Nview Health, Inc. v. Sheehan*, No. 8:21-cv-385-VMC-TGW, 2022 WL 16923585, at *21–22 (M.D. Fla. Nov. 14, 2022) (applying Delaware law).  Here "any kind" of consequential damages including lost profits are disclaimed by Section 7.  Smart's claimed damages are, entirely, lost profits for sales from third parties (jail inmates or families), not parties to the MSA or its schedules.  *See* Dkt. 355 at 48–49; Dkt. 381-8 at 21, pp. 76–77; Dkt. 354 at 30–31. Those claims (all of Smart's asserted damages) are barred by Section 7.

3.      Likewise, the approximately $4800.00 in damages sought by Correct due to the reduction in phone rates incurred in the new, subsequent Sebastian contract are barred by Section 7.  All of these come from lost profits from sales to third persons, *i.e.*, jail inmates or families.  Thus Correct's breach of contract counterclaim as to Sebastian County fails due to this provision of the MSA.

Beyond the contractual disclaimer, this set of Correct damages related to a reduction in phone rates at Sebastian County also fails substantially.  The phone rate reduction at Sebastian was not proven at trial by a preponderance of evidence to have been proximately caused by a Smart breach or by any tort committed by Smart or Smart Collier.  *See*, *e.g.*, J139 at Dkt. 346-139 (Correct discusses

6

proposed rate reduction in the new contract as "olive branch" to sheriff). There was no proof Smart caused this rate reduction proximately, and in any event the reduction was not a foreseeable consequence of any breach by Smart in failing to provide compliant product.

4.      Like the Sebastian rate reduction, all of Correct's counterclaims for tortious interference or unfair competition (Amended Counterclaim Counts V and VI), are not proven at trial. The two Smart defendants and Correct were not fiduciaries. There were no non-competes. They were free to compete ferociously. And in much of the factual scenario related to these claims, Smart was not a stranger to the contract and relationships—Smart was free to assert its interests forcefully. No credible proof exists that competition by the Smart defendants with Correct was tortious or unfair and damaged Correct.

Smart or Smart Collier was free to take ownership of the key supplier Lattice, and could tell its Lattice employees like Bruce Johnson what to work on. Johnson had a brief hiatus in working for Correct when Smart or Smart Collier told him to cease. There was no competent proof that this brief hiatus damaged Correct. One lawsuit brought by the Smart interests in this affair was settled and the other went nowhere, with no claims asserted here for costs or actual damages from either lawsuit.

As to the salary Correct paid Bruce Johnson, he provided value to Correct both when Correct was paying Lattice for his services and thereafter when Correct hired him outright. Correct would not have paid and then hired Johnson if the cost of doing so exceeded the benefit to Correct. His value is not accounted for in Correct's counterclaim.

5.      The "Term" provision of the MSA was in dispute here. *See* ¶ 6, Dkt. 93-2. The Court must read plain English text to define the term:

> 6. Term. This Agreement shall commence on the "Effective Date" and shall be co-terminous with Customer's [Correct's] Agreement with [jail] Facility as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

A party to a contract is a signator, or person bound to its terms. The MSA contains a signature line for "the Parties" and it is signed by Correct and Smart only. Dkt. 93-2 at 7. The MSA identifies the two parties. The MSA uses the word "party" or "parties" 46 times. It means "party." But for two times only, in paragraph 6 above Smart states "party" means something else. Smart claims it means Correct and county sheriffs who run jails. In other words, Smart states that its relationship as a subcontractor of Correct must continue as long as Correct has a

contract with a jail, and the jail is what a "party" means for ¶ 6 but not 42 other times in the MSA.

This is an improper reading of contract. "Party" means "party" throughout and does not change meaning. "Courts must strive to read a contract in a way that gives effect to all of the contract's provisions." *Retreat at Port of the Islands, LLC v. Port of the Islands Resort Hotel Condo. Ass'n, Inc.*, 181 So. 3d 531, 533 (Fla. 2d DCA 2015). These very sophisticated parties made a bargain and set their terms, including an integration agreement. Dkt. 93-2 at 6. Paragraph 6 is plain and not ambiguous. *See CitiMortgage, Inc. v. Turner*, 172 So. 3d 502, 504 (Fla. 1st DCA 2015). This meant that either party could properly terminate by giving notice under paragraph 6, above.

This plain reading of paragraph 6, that "party" means the signatories Smart and Correct, is shared by Smart's own drafting witness who provided the contract templates. Dkt. 381-2 at 32–35, pp. 119–33. *See also* Dkt. 363 at 32–35 (90-day nonrenewal notice for Smart and Correct was important to Correct during drafting).

6.      Beyond the contractual disclaimer of Smart's asserted damages, the Court previously found as a matter of fact that Smart did not provide conforming goods. The essence of the contract was to provide customized, "ruggedized" correction

grade product.  This Smart did not do.  The evidence of this is fairly overwhelming.  This has been proven both by contractor Smart's inability to prove its contract performance in its case-in-chief and by Correct's proof as part of its affirmative defense.  Dkt. 96 at 38.  Smart's contract claims thus fail for this reason.  *See 777 Partners, LLC v. Pagnanelli*, No. 20-20172-civ-Martinez, 2023 WL 11965485, at *23 (S.D. Fla. July 17, 2023), citing cases.  Smart's breach of contract discharged Correct from contract liability.  *Id*.

7.      Because the underlying breach of contract claims by both parties fail, the claims for implied covenant of good faith/fair dealing cannot survive.  *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1152 (11th Cir. 2005); *Progressive American Ins. Co. v. Rural/Metro Corp. of Fla.*, 994 So. 2d 1202, 1207 (Fla. 5th DCA 2008); *Insurance Concepts and Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001).

Both parties are successful here in that each defeated every claim against it.  Smart shall take nothing by its claims in the Fourth Amended Complaint.  Correct shall take nothing by its Fourth Amended Counterclaims.  Each party shall go hence without day.  The Clerk will enter judgment in favor of Smart on all Correct's counterclaims, and in favor of Smart Collier on counterclaims V and VI.  The Clerk will enter judgment in favor of Correct on Smart's Fourth Amended Complaint.  The Clerk will then close this case.

**DONE AND ORDERED** at Tampa, Florida, on December 13, 2024.

_(signature)_

WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE

**COPIES FURNISHED TO:**
Counsel of record

# EXHIBIT 30

RECORDED IN OFFICIAL RECORDS
INSTRUMENT 2024029761    26 PG(S)
2/7/2024 4:24 PM
KAREN E. RUSHING
CLERK OF THE CIRCUIT COURT
SARASOTA COUNTY, FLORIDA
CIVIL COURTS        Receipt # 3140431

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.

Plaintiffs,

v.                                                              Case No. 2023-CA-1002-NC

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust; and ALEXIS LOGAN,

Defendants.
_____/     (CONSOLIDATED)

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021, and directly
and derivatively on behalf of Smart Communications
Holding, Inc., and derivatively on behalf of Loco
Florida, LLC,                                                   Case No.: 2023-CA-1280-NC

Plaintiff,                          **Jury Demanded:**
                                                                **Counts II, III, IV, and V**
v.

JONATHAN LOGAN,
SMART COMMUNICATIONS HOLDING, INC.,
nominal defendant, LOCO FLORIDA, LLC,
nominal defendant, and SMART
COMMUNICATIONS HOLDING, LLC,

Defendants.            /
_____

### PHASE I[1] DECLARATORY JUDGMENT

THIS CAUSE having come before the Court for a three-day bench trial from January 29,

2024, to January 31, 2024, on Count II of Plaintiffs Jonathan D. Logan's ("Jon") and Smart

Communications Holding, Inc.'s ("Smart Communications") Complaint (DIN 2) seeking a

declaration that a certain purported Shareholders' Agreement attached to the Complaint as Exhibit

---

[1] The consolidated action was bifurcated by agreement (DIN 241) of the Parties in order to try the Declaratory Judgments actions, which are referred to as "Phase I," before the remaining counts of the Parties' respective operative pleadings.

D was valid and enforceable, and on Count I of the Amended Verified Complaint (DIN 271) of Defendant Janice Logan, individually and as Trustee of the James Logan Family Trust, dated February 10, 2021, ("Janice") seeking a declaration that the purported Shareholders' Agreement is invalid and unenforceable, and having reviewed the file, heard testimony of fact and expert witnesses, and received documentary and physical evidence, and being fully advised in the premises, the Court **ADJUDGES**:

1. The Court has jurisdiction over the Parties and subject matter of Phase I pursuant to Fla. Stat. § 86.011, *et seq.* Jon is a resident of Pinellas County, Florida, Smart Communications is incorporated in the state of Florida and has its headquarters in Pinellas County, Florida. Janice is a resident of Sarasota County, Florida, and the James Logan Family Trust, dated February 10, 2021, is administered in Sarasota County, Florida.

2. The Court's January 31, 2024, oral findings of fact and conclusions of law, explained in open court before a court reporter, a transcript of which is attached hereto as **EXHIBIT A**, are incorporated into this judgment and entered.

Based on those findings and conclusions, the Court **DECLARES**:

I. That the purported September 23, 2022, Shareholders' Agreement attached to Plaintiffs' Complaint as Exhibit D is invalid and unenforceable, and that there is no shareholders' agreement in effect between the two 50% shareholders of Smart Communications Holding, Inc.'s stock, (1) Jonathan D. Logan and (2) Janice Logan, as sole Trustee of the James Logan Family Trust, dated February 10, 2021.

**DONE AND ORDERED** in Chambers in Sarasota County, Florida on this _6_ day of

February, 2024.

_____
Hon. Hunter Carroll, Circuit Court Judge

## Certificate of Service

On February ___, 2024, the Court caused the foregoing document to be served via the Clerk

of Court's case management system, which served the following individuals via email (where

indicated). On the same date, the Court also served a copy of the foregoing document via First

Class U.S. Mail on the individuals who do not have an email address on file with the Clerk of

Court.

CRAIG STEPHEN BARNETT
200 EAST LAS OLAS BLVD
SUITE 2100
FORT LAUDERDALE, FL 33301

MICHAEL J. HARWIN
200 EAST LAS OLAS BLVD
SUITE 2100
FORT LAUDERDALE, FL 33301

CHRISTOPHER R. CLARK
106 EAST COLLEGE AVE
SUITE 700
TALLAHASSEE, FLORIDA 32301

CHARLES FRANKLIN JOHNSON III
802 11TH ST W
BRADENTON, FL 34205

ANITRA RAIFORD CLEMENT
100 N TAMPA ST
SUITE 2900
TAMPA, FL 33602

DAVID E. SCHOENFELD
111 S. WACKER DR
SUITE 4700
CHICAGO, IL 60606

PETER F. O'NEILL
111 S. WACKER DR.
SUITE 4700
CHICAGO, IL 60606

ANDREW L. FRANKLIN
111 S. WACKER DR.
SUITE 4700
CHICAGO, IL 60606

KAILIN LIU
111 S. WACKER DR.
SUITE 4700
CHICAGO, IL 60606

# Exhibit A

```
 1   IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT IN
     AND FOR SARASOTA COUNTY, FLORIDA
 2
     JONATHAN LOGAN and SMART
 3   COMMUNICATIONS HOLDING, INC.,

 4             Plaintiffs,
     vs.                        Case No.:  2023-CA-1002-NC
 5
     JANICE LOGAN, individually and
 6   as Trustee of the James Logan
     Family Trust, and ALEXIS LOGAN,
 7   individually,

 8   _____Defendants._____/      (CONSOLIDATED)

 9   JANICE LOGAN, as Trustee of the
     James Logan Family Trust dated
10   February 10, 2021, and directly
     and derivatively on behalf of
11   Smart Communications Holdings,
     Inc., and derivatively on behalf
12   of Loco Florida, LLC,

13             Plaintiff,

14   vs.                        Case No:   2023-CA-1280-NC

15   JONATHAN LOGAN, SMART
     COMMUNICATIONS HOLDING, INC.,
16   nominal defendant, and LOCO
     FLORIDA, LLC, nominal defendant,
17
     _____Defendants._____/
18

19             IN-PERSON TRIAL, PHASE ONE

20        BEFORE THE HONORABLE HUNTER W. CARROLL

21                  held at the
          Judge Lynn N. Silvertooth Judicial Center
22         2002 Ringling Boulevard, Courtroom 6C
                  Sarasota, Florida
23   Wednesday, January 31, 2024, 8:47 a.m. to 3:56 p.m.

24        VOLUME III, Pages 569 through 740

25           Stenographically reported by:
          Linda R. Wolfe, RPR, RMR, FCRR, FPR-C
```

1  following commenced at 3:08 p.m.)

2  R-U-L-I-N-G

3  THE COURT:  This is Case 2023-CA-1002-NC

4  together with 2023-CA-1280.  We had Phase One of

5  the trial focusing on declaratory judgment actions

6  which was tried January 29th, 30th and 31st.

7  A predecessor judge entered a temporary

8  injunction in this case which, after that judge's

9  disqualification, got expanded ultimately by

10  agreement of parties after some discussions with

11  the Court.

12  But today is -- and the last three days has

13  been focusing in on whether there is a

14  Shareholders' Agreement; and, if so, what is it.

15  And in coming to this ruling, let me first

16  identify who several of the players are.  We have

17  Smart Communications Holding, Inc., I'll call it

18  either "Smart" or "Smart Communications", and it

19  provides telecommunication services for jail and

20  prison inmates.  And although it was not the focus

21  of this Phase One trial, just by the sheer number

22  of lawyers here, it really suggests that the entity

23  is quite successful.

24  We have Jonathan Logan, who is the incumbent

25  president, director, and 50 percent shareholder of

```
1    Smart Communications.
2         We have Janice Logan, both in her individual
3    capacity and as trustee of the James Logan Family
4    Trust dated February 19th, 2021.  And James Logan,
5    of course, was her late husband.
6         The Trustee currently owns 50 percent of Smart
7    Communications' shares.  So Jon, and Janice as
8    trustee, each are 50 percent.  And I'm using
9    everyone's first name not because I'm trying to be
10   offensive but to help be clear as to who we are
11   talking about.
12        Also a party is Alexis Logan, who is the
13   sister of Jon.  She is the daughter of Janice.  And
14   if I didn't say it, Jon also is the son of Janice.
15        The evidence makes clear that Jon Logan and
16   Alexis Logan do not get along, at all.
17        And Jon's relationship with his mother,
18   Janice, is only slightly better.
19        Alexis and her mom, Janice, get along well.
20        Alexis is an attorney, and I'll comment on it
21   a little bit later.  She also, for a period of
22   time, was the 100 percent shareholder of Smart
23   Communications in a legal title type of situation.
24        There are other folks that we're going to be
25   talking about primarily.  First is James or Jim
```

1    Logan.

2         Jim is Janice's late husband.  He was the

3    father of Jon and Alexis.

4         And Jim died October 16th, 2022.

5         Attorney Mark Wall, who is an attorney at Hill

6    Ward Henderson, has represented Jon Logan.

7         Tom Sims, who is an attorney at the Johnson

8    Pope firm, has represented Jim and Janice Logan

9    relating to -- and I'm going to say their estate

10   plan.  I know when I say "estate plan," I'm just

11   using that generically, not just referring to wills

12   but the more global planning aspect, trusts and all

13   sorts of various agreements.

14        And I know probate lawyers get upset when I

15   say estate lawyers and I reference trusts.  But I'm

16   using "estate lawyer" here and just "estate

17   planning" in just a very generic sense.

18        We have -- Another person we are going to talk

19   about is Lisa Eddy, who is Smart Communications'

20   Vice President of Operations.  She's been with

21   Smart for approximately five years in various

22   roles, and her current salary is $230,000 a year.

23        We have Scott Holte, who is Smart

24   Communications' Chief Strategy Officer, and he has

25   also been with Smart for approximately five years.

1    And his current salary is $150,000.

2         Gloria Burgess, who is Jon Logan's housekeeper

3    who tends to Jon Logan's house every Tuesday,

4    almost without fail.

5         I did reference earlier that Jon Logan is the

6    incumbent president, director, and 50 percent

7    shareholder of Smart Communications, and he is the

8    person that's been driving the company.  And his

9    dad was with him along for that ride and, over

10   time, providing various different services.  Dad

11   tended to focus on the legal-financial-banking type

12   of services.  Jon Logan was vision and IP type of

13   involvement.

14        The core group of Smart Communications is Jon

15   Logan, Lisa Eddy, and Scott Holte.

16        And that core group can be -- that core group

17   meets at least once a week.  I mean, the evidence

18   indicated that Jon's talking to Lisa, the chief of

19   operations -- sorry, the Vice President of

20   Operations, you know, on a daily basis, but that --

21   those three are the core group that run Smart

22   Communications.  And I don't have it quickly, but I

23   want to say the evidence was there was, like, 14

24   departments and more than 100 employees.  Again,

25   another testament that Smart Communications is a

1    successful business.

2        And I've got -- I think that's basically the

3    players I'm going to talk about.  There are others

4    that I might mention along the way.

5        Now, I'm not going to focus in on how Smart

6    Communications was formed because it's not really

7    relevant.  As with most start-ups, corporate

8    formalities usually come a little bit later after

9    concept and a lot of sweat and tears and time, and

10   sometimes capital.

11       But it became -- from the general beginning,

12   there was a 50/50 split between son and dad.

13       Now, I know that due to various unspecified

14   issues that we didn't explore -- and, again, it

15   doesn't really matter, really -- Alexis held

16   100 percent of stock in her name.  But the reality

17   is, Jim and Jon treated each other as if they were

18   50/50.  Smart Communications' lawyers, accountants

19   treated them as 50/50, although they would include

20   Alexis.  And when we get to it, we'll talk about

21   the 2017, because she was still the legal owner of

22   the stock.

23       But for whatever reason, I never picked up on

24   what Mr. Schoenfeld was trying to explain to me,

25   but I don't think it really matters because I find

1   as fact that, from at least an equitable

2   standpoint, dad and son were 50/50.

3         We heard a lot about dad's alcoholism, and

4   certainly it's a pernicious disease, and I've seen

5   many families -- in this case, unfortunately -- I

6   see a lot of affects of alcoholism.  But be that as

7   it may, Jim would have periods of sobriety and then

8   some periods that were the opposite.

9         And as time has progressed, the waxing and

10  waning, it appears that dad's alcoholism was

11  getting the better of him.

12        And I think as it came through from Jon's

13  testimony, but more particularly in some of the

14  e-mails, Jon was growing frustrated with alcoholic

15  portion of dad.

16        And, Jon, I will just say this:  Nothing I'm

17  going to say changes your love for your dad.  But

18  I'm talking about your business here.  I'm not

19  talking about your love for your dad.  And so,

20  please --

21        JON LOGAN:  Understood, Your Honor.

22        THE COURT:  And I honor that -- and even in

23  some of those difficult e-mails, you know, you

24  acknowledged your love for your dad.  And so I'm

25  not talking about that.

1    But there was some growing resentment about

2    Jim's role and ownership.  And I do agree with what

3    Mr. Johnson was saying, that that concern wasn't

4    necessarily that dad was a 50 percent owner, but it

5    was the longer term:  What does that mean when

6    dad's no longer with us?

7    Now, over the years, there were efforts to

8    agree to a Shareholders' Agreement.  Now, Jon

9    suggests that there always has been one and it's

10    been modified slightly.  With exception of and

11    putting the 2002 (sic) purported Shareholders'

12    Agreement to the side, there are no written

13    agreements that contain signatures.  And we'll talk

14    about 2017, whether that is or is not a written

15    agreement later on.

16    I want to talk for a moment about Exhibit 101.

17    Exhibit 101 is the -- what Jon Logan testified to

18    is the Shareholders' Agreement that's in effect

19    that both he and his dad signed on or about

20    September 23rd, 2022.  It is thirteen single-spaced

21    pages and pretty small font, as you all saw me with

22    the magnifying glass looking.  And that thirteen

23    pages is exclusive of the signature page.

24    The import for our discussion today at

25    Section 4.3, the agreement contains a mandatory

1   buyback-on-death provision of any deceased

2   shareholder's shares.  And Section 5.3(b), as in

3   "bravo," sets the fair market value, but that is

4   determined by a company appraisal to set the

5   purchase price.

6       And the reality is, given that Jon Logan is

7   the incumbent director, if this is the agreement,

8   that puts Jon in basic total control over the

9   valuation process.

10      Now, I'll also pause here.  The Court isn't in

11  a position to determine whether a deal is a good

12  deal or a bad deal from some person's perspective,

13  and it's not the Court's role ever to write or

14  rewrite a contract to make it more fair for one

15  party or the other.

16      I reference the fact of 5.3(b) to help explain

17  the dynamic that brings us here today.

18      Now, there are three questioned signatures.

19  Two are on page 14 of the Shareholders' Agreement

20  from 2022 -- the purported Shareholders' Agreement,

21  and both of those allegedly contain Jim's

22  signature.

23      And then the third disputed signature is on a

24  separate document, but it's also in Exhibit 101,

25  which is entitled the Written Action of the Board

1    of Directors.

2        Janice and Alexis dispute that Jim signed this

3    agreement.  And we certainly have competing

4    experts.

5        The Jim -- sorry.  The Janice and Alexis'

6    expert was of the opinion:  Very highly probable

7    that this was not signed by Jim.

8        And we have the expert for Jon Logan who

9    contained a pretty high -- it was probable that dad

10   did sign.

11       And so I've got two experts that are not

12   exactly polar opposites, but pretty close to being

13   polar opposites of each other.

14       I do want to reference Exhibit 200.

15   Exhibit 200 is an e-mail chain that starts with

16   Attorney Mr. Sims.  And it is to Jon and Jim Logan.

17       And let me just back up.  The Alexis ownership

18   of the stock, her ownership terminated

19   approximately 2018.  I don't have the specific date

20   written down.  I'm sure it's on a document here.  I

21   just didn't go back to write it down.  At that

22   point, the shares went to Jon, individually, and

23   Jim, individually.

24       And prior to Jim's surgery in September, he

25   conveyed the Smart Communications' stock into the

1    Revocable Trust, and that's how Janice, as the

2    trustee, now is the owner of that stock.

3         Okay.  So going back to Exhibit 200.  This is

4    an e-mail.  It originated from Mr. Sims to Jon and

5    copying Jim.  And it, again, is conveying a

6    Shareholders' Agreement.  And the date on this is

7    September 12th, 2022.

8         Now, the text of that e-mail includes

9    statements that this is for Jon's review and

10    comment.  It reminds Jon that his dad's going to be

11    undergoing a medical procedure in the near future.

12    It contemplates that, quote, "once finalized", end

13    quote, it could be signed by son and dad, quote,

14    "in order to put it into place."

15         And I use those quotes to indicate that the

16    sending of the document itself was not a technical

17    offer.  But even if it were, that same day, still

18    in Exhibit 200, Jon rejects the Shareholders'

19    Agreement.

20         He writes, quote, "It's ridiculously too

21    complicated," end quote.

22         Quote, "I don't even understand it," end

23    quote.

24         Quote, "I want it much more simple and

25    direct," end quote.

1    Quote, "All these terms and names that need

2  their own paragraph of definition is ridiculous,"

3  end quote.

4    Now, critically, also in that e-mail, Jon

5  writes to his dad -- or Jon writes to -- yeah -- to

6  his dad, quote, "I do not agree to be a 50/50

7  partner with you," end quote.

8    Now, Jon's explanation is this was written as

9  part of his normal modus operandi to shock his dad

10  back into sobriety.

11    And, you know, I don't really have any

12  statement one way or the other, other than there's

13  not an acceptance of the offer to the extent that

14  you would construe the sending of Exhibit 200 to be

15  an offer, which I do not.

16    But it also is -- it indicates that there's no

17  reference to any existing shareholders.

18    Now, dad has two different types of responses.

19  The first response is at Exhibit 210, which is more

20  on the business side of the response.  And it talks

21  about the share transfer agreement, and that's the

22  share transfer agreement that took Alexis

23  100 percent back to Jon and Jim 50/50.  And so dad

24  is reminding Jon about the 50/50 nature.

25    Then there is Exhibit 211 and 213, and this is

1    a September 18th e-mail, slash, letter, that was

2    sent on October 3rd, 2022.  And I know that there

3    is questions lodged by Jon as far as its proper

4    admissibility.  But it's clear that there's a

5    videotape of Jim signing something, which is this

6    response.  And this is the response on the more

7    personal side.

8        What I highlight at this point is in

9    Exhibit 213, a reply that Jon wrote to his dad on

10   October 3rd, 2022.

11       Quote, "If you want to start a war with me,

12   then we will have a war like you have never seen.

13   I have never made a death threat.  Don't try and

14   put words into my mouth and document that like it

15   is fact.  I am not stupid.  I know what you are

16   attempting to do here.  You are unfit as a business

17   partner, unfit as a father, unfit as a husband, and

18   unfit as an adult.  You can't even dress yourself.

19   You want to make this get nasty.  We can make it

20   get real nasty.  I didn't deserve this.  But I will

21   not let someone, including my own family, take

22   advantage of me anymore," end quote.

23       Now, again, Jon, I go back to I know you

24   testified that this is part of the shock that

25   you're trying to bring dad back into sobriety, but

1    I do note that nowhere in here is there an

2    assertion that there's an existing Shareholders'

3    Agreement.

4         And this was done on October 3rd, and the

5    testimony is that there previously was a signed

6    agreement that Jon left at his own house in

7    Tierra Verde, Pinellas County, Florida, for his dad

8    to come over, dad signed it, left Jon a copy and

9    took the original.

10        Now, the purported original has never been

11   found.  And as we indicated, dad dies on

12   October 16th, 2022.

13        Jon Logan's conduct over the next few months

14   suggests that there was no 2022 signed

15   Shareholders' Agreement.

16        Exhibit 217 -- and I know, again, that there

17   was a dispute over the admissibility of this

18   document -- suggests that Jon was not -- now

19   willing to sign it.

20        But even if I took that 217 away, my finding

21   doesn't change that there was no signed settlement

22   agreement -- I'm sorry -- no signed Shareholders'

23   Agreement in September or at any time in 2022.

24        What, to me, is really telling is the lead-up

25   to the December 8th meeting with Mr. Sims,

1    Mr. Wall, where Mr. Wall seeks from Smart

2    Communications' accountants and attorneys and Jim's

3    attorneys any information or if there is any signed

4    agreements regarding the business.  There's no

5    indication in those communications, "Hey, we know

6    that there is one, we're just trying to track it

7    down."

8         And in the December 8th meeting, while I

9    understand Jon contends that he referenced a signed

10   agreement, the attorneys for the parties don't

11   recall that.

12        There was a statement that Janice made to Jon,

13   "Why didn't you sign it?"  And Jon saying, "I wish

14   I had."

15        Now, I also know that there is an allegation

16   that Janice said something to the effect of that

17   she knows that there is a signed agreement or she

18   had seen a signed agreement, and the Court credits

19   Janice's testimony on that that it was in reference

20   to some prior iteration, not the 2022.

21        I have no doubt that Gloria Burgess found a

22   document, but the circumstances in how that

23   document was found are suspicious to the Court.

24        I also understand that Ms. Eddy and Mr. Holte

25   testified that Jim said something to the effect of

1    "I've signed the stockholders' agreement" or "You

2    don't need to worry about it because That's been

3    taken care of," and those are statements in the

4    fall 2022 time period.

5         I do know that both of them are interested in

6    the outcome of this proceeding from a financial

7    standpoint, and I have difficulty understanding how

8    individuals who talk daily or weekly as part of the

9    core group of Smart Communications would not

10   earlier disclose the existence of that comment or

11   those comments that Jim allegedly made when,

12   indisputably, they knew that one of the prime

13   issues of this lawsuit -- or these lawsuits, I

14   should say, involve whether there is a settlement

15   or -- a Shareholders' Agreement -- why I say

16   settlement agreement, I don't know -- why there's a

17   Shareholders' Agreement.

18        So all of that goes to me saying that I find

19   as fact that the Exhibit 101 was not signed by Jim

20   Logan.   Jim Logan never assented to that document.

21        That there is no 2022 stockholder's agreement.

22        Now, let me also talk, because I said at the

23   beginning that there was references over time that

24   there were various different shareholder

25   agreements.   And without a doubt, there were a lot

1    of evidence of discussions and drafts of various

2    iterations, and I will say they are different in a

3    material respect.  One provision that is different

4    than the 2022 has to do with how the company gets

5    evaluated.

6         And under those other prior agreements, it was

7    more of a -- and depending on which version, but

8    they were more typical that you would see one side

9    picks an appraiser, the other side picks the

10   appraiser, and then if there is a dispute, then

11   they pick a third.

12        I -- I -- I know that most of those

13   Shareholder Agreement requests were being driven by

14   dad and that he was willing to enter into some type

15   of agreement.

16        The 2017 is probably the closest that the

17   evidence supports of a Shareholders' Agreement, but

18   the Court will ultimately find that there was no

19   2017 Shareholders' Agreement.

20        If you look at the discussions contained

21   within the e-mails that were discussing various

22   drafts, there is never a situation where Jon says

23   "I accept" or Jim says "I accept" or using words to

24   that effect.

25        At that time, Alexis was involved and, in

1    fact, some of the e-mails reference that there was

2    either disagreement or a difference of opinion as

3    to what various provisions meant.  And what those

4    e-mails from 2017 -- they talk about a global, Hey,

5    we need to move in this direction type of plan,

6    these are some steps we need to take.  One step is

7    getting the stock out of Alexis' name.  And the

8    next step is to have a Shareholders' Agreement.

9    But the parties never agreed on the business terms.

10        And I understand that parties can agree to

11   business terms but have other terms that are left

12   open that doesn't defeat the existence of an

13   enforceable agreement.

14        Here the parties never came to either an oral

15   or written agreement as to the core business terms

16   for a Shareholders' Agreement.  Certainly, one of

17   the terms that existed or that both sides may have

18   wanted was the existence of a mandatory buyback.

19   But that's not the only term.

20        The various drafts that different lawyers from

21   different firms sent around were much more

22   comprehensive than just a buyback.  And so it's

23   just like a situation where parties are negotiating

24   over ten points; they come to an agreement on

25   three, but not on the other seven.  You don't have

1    an agreement unless the parties then say, "Okay, we

2    agree to those three and they are going to be

3    controlling."  There was not anything like that

4    here.

5        I understand Jon testified that at each of

6    these yearly meetings or whenever a new version of

7    whatever year they were talking about at the time's

8    Shareholders' Agreement, that the parties agreed

9    orally with each other and then decided, since it

10   wasn't a big deal, to physically memorialize it in

11   writing.

12       I find that that -- that Jon Logan failed to

13   meet his burden that there was an existence of

14   either an oral or written Shareholders' Agreement

15   at any time, including the 2017, '18, and I think

16   it was 2020 or the various different iterations.

17       So, ultimately, that means I'm declaring that

18   there is no Shareholders' Agreement that is in

19   effect between the two 50 percent shareholder --

20   50 percent shareholders of Smart Communications'

21   stock.

22       So I'm going to pause there.  Are there any

23   questions or clarifications I need to make?  And

24   I'm going to start with Jon's lawyers first.

25       MR. BARNETT:  No, Your Honor.

1          THE COURT: Going to Janice's lawyers.

2          MR. SCHOENFELD: No, Your Honor.

3          THE COURT: Okay. Going to Alexis' lawyers.

4          MR. JOHNSON: No, Your Honor.

5          THE COURT: Now, who on this side of the room

6     is going to take the first draft of coming up with

7     this partial judgment?

8          MR. SCHOENFELD: Your Honor, we'd be happy to

9     do so.

10         THE COURT: I want a specific person. Is

11    it --

12         MR. SCHOENFELD: It's not going to be

13    Mr. O'Neill because he is leaving on parental

14    leave, and I've forbidden him to do any more work

15    on this case until it is done. So it will be

16    Mr. Franklin and myself.

17         THE COURT: Okay. Obviously, before anything

18    gets submitted, it needs to go to all the attorneys

19    for their review and approval.

20         What I normally do in these types of

21    situations, if you can get a copy of my ruling, and

22    I'm fine if you want to just electronically staple

23    it and then come up with the partial judgment, just

24    implementing it, that's fine, too.

25         Now, let's talk about -- and that completes my

1    ruling.

2         So I'm now going to shift about what's next.

3    I mean, obviously the lawyers here know, you know,

4    I was a business litigator for many years before I

5    even got on the bench.  I mean, we all know the

6    three primary things that are going to happen.

7    There could be others.

8         Parties are either going to agree on a

9    Shareholders' Agreement governing their relations,

10   there's going to be a buyout, or there's going to

11   be a deadlock.  There could be others, but those

12   are the three typical that I see in these types of

13   situations.

14        I want to be clear that the injunction is

15   still in effect.  And let's not move assets.

16        What is going on next week with the hearing

17   time, and how do we want to proceed?  Do we need to

18   go back to mediation in, let's say, 30 or 60 days?

19        Did you all get the financial information that

20   we talked about when we had the contempt hearings

21   that were ultimately resolved by agreement?

22        MR. O'NEILL:  So, Your Honor -- So to answer

23   Your Honor, I think your first question was, as for

24   next week, what is, I believe, is up on Monday, am

25   I correct?

# EXHIBIT 31

**SUPERIOR COURT**
OF THE
**STATE OF DELAWARE**

VIVIAN L. MEDINILLA
JUDGE

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 10400
WILMINGTON, DE 19801-3733
TELEPHONE (302) 255-0626

March 20, 2024

Richard Rollo, Esquire
Travis S. Hunter, Esquire
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, Delaware 19801

Shaun Michael Kelly, Esquire
Lauren P. DeLuca, Esquire
Connolly Gallagher LLP
1202 North Market Street
Wilmington, DE 19801

**Re:** ***Jonathan D. Logan v. Loco Florida, LLC et al.,***
***C.A. No. N23C-10-208 VLM CCLD***

Dear Counsel,

This is the Court's ruling on the Intervenor's Motion to Dismiss or Stay.

Having considered the parties' full briefing and for the reasons set forth below, the

Intervenor's Motion to Stay is **GRANTED** in favor of the Florida Action.

## I.    BACKGROUND[1]

---

[1] The facts are drawn from the Complaint, and the documents it incorporates by reference.   The Court also refers to the allegations from public filings in the pending Florida litigation between the parties, *Jonathan D. Logan et al. v. Janice Logan et al.*, 2023-CA-1002-NC (Fl. Cir. Ct.) and *Janice Logan v. Jonathan Logan et al.*, 2023-CA-1280-NC (Fl. Cir. Ct.)   (consolidated into the 1002 Action).   DRE 202(d)(1)(C) permits judicial notice of "the records of the court in which the action is pending and of any other court of this State or federal court sitting in or for this State…." The Court may take judicial notice of court filings "for certain limited purposes, such as to understand the nature and grounds for rulings" made by the court in which the documents were filed." *In re Rural Metro Corp. S'holders Litig.*, 2013 WL 6634009, at *9 (Del. Ch. Dec. 17, 2013).   It may not, however, take judicial notice of such filings for the truth of their contents.   *Id.*

On October 23, 2023, Plaintiff Jonathan D. Logan initiated this action by filing a Complaint against Defendants Loco Florida, LLC ("Loco") and Smart Communications Yacht Holding, LLC ("Yacht"), seeking declarations that he is the sole member and manager of Loco and Yacht, and that both were validly converted into Delaware entities.[2]

Loco and Yacht were allegedly formed as Florida limited liability companies in 2020 and March 2022, respectively.[3]   Loco owns assets that include a warehouse in Seminole, Florida, which was purchased for approximately $1.1 million.[4]   Yacht owns assets that include a 100' Riva Cosaro, which was purchased for approximately $10 million.[5]

In 2021, Jonathan's father, James Logan, formed the James Logan Family Trust (the "Trust").[6]   He and his wife, Janice Logan, the Intervenor in this action, were the Co-Trustees.[7]   In September 2022, James purportedly transferred his member interests in Loco and Yacht to the Trust.[8]   James died nearly one month later.[9]

---

[2] Complaint for Declaratory Judgment ("Compl.").
[3] *Id*. ¶¶ 1, 2.
[4] *Id*. ¶ 1.
[5] *Id.* ¶ 4.
[6] *Id*.
[7] *Id*.
[8] *Id*. ¶¶ 4, 11. The Court utilizes the parties' first names for ease of reference only.
[9] *Id.*

## A. The Florida Action

On February 27, 2023, Jonathan and Smart Communications Holding, Inc. ("SCH") filed a complaint in the Circuit Court of the 12th Judicial Circuit in Sarasota County, Florida Probate Division (Florida Court) against Janice and Janice's daughter, asserting claims for breach of trust and seeking declarations relating to the capacity in which claims may be pursued, and the effect of SCH's purported shareholders' agreement.[10]    Shortly thereafter, Janice filed her original complaint on behalf of the Trust, and directly and derivatively on behalf of SCH and Loco in the Florida Court against Jonathan, SCH, and Loco.[11]    She amended that complaint in August 2023,[12] to include allegations that are particularly alarming.[13]

The amended complaint in Florida consists of five counts.  Count I seeks declarations concerning the validity of the purported shareholders' agreement of

---

[10] *Id.* ¶ 4, n.1; Intervenor's Opening Brief in Support of Her Motion to Dismiss or Stay (the "Motion"), Ex. 4. (*Jonathan D. Logan, et al. v. Janice Logan, et al.*, 2023-CA-1002-NC (Fl. Cir. Ct.)).

[11] *See* Motion, Ex. 10.

[12] *Id.*, Ex. 5A.

[13] *See, e.g., id.* "Jon was convicted of Felony Aggravated Stalking in 2008 for harassing and intimidating a business associate and the associate's wife with whom Jon worked on a car dealership venture" (¶ 17); "Jon held James and Janice at gunpoint, hit his father's face, and demanded that James transfer his shares to Jon.  He also smacked the phone out of his mother's hand when she tried to call 911" (¶ 32); "he vandalized his mother's car" (¶ 33); "On Saturday, August 14, 2021 at 11:24 AM, Jon sent an email to his parents from his Smart Communications email address, threatening to 'Burn your [expletive] house down'" (¶ 34); "He warned his father 'Don't test me'; 'I really hope you fix yourself because you will be dead soon'; and, 'I have zero patience left for you and I am not one to [expletive] with on what I created with sheer willpower and brains. If you, or Janice or Alexis try and take anymore from me, I am prepared to do things the normal human could never fathom'" (¶ 40).

3

SCH; Count II is a claim for director liability; Counts III and V are direct and derivative claims for breach of fiduciary duty; and Count IV seeks to appoint a temporary custodian of SCH. Count III further relates to Yacht's assets, which Janice alleges Jonathan improperly purchased with SCH's funds.[14] The Court consolidated these actions (together, the "Florida Action").

On July 20, 2023, the Florida Court considered Janice's motion for a temporary injunction, seeking, in part, an order finding that Janice had a substantial likelihood of success on the merits of her claims.[15] The Florida Court granted that motion.[16] After that ruling, Jonathan submitted articles of conversion to the Secretary of State of the State of Florida, converting Yacht and Loco into Delaware entities.[17] Jonathan then moved to dismiss counts II-V of Janice's amended complaint,[18] which the Florida Court denied.[19]

Because of the conversions and Jonathan's creation of a new Delaware entity (*i.e.*, Smart Communications Holding, LLC ("SCH LLC")), Janice again sought relief from the Florida Court and filed a motion for contempt of the temporary

---

[14] Motion at II.A.    The Motion omitted page numbers, so the Court refers to the section headings.
[15] *Id.*, Ex. 10.
[16] *Id.*, Ex. 6.
[17] Compl. ¶ 23; *id.*, Ex. C.
[18] Motion, Ex. 8.
[19] *Id*. Ex. 9.

injunction order and a request to appoint a temporary custodian.[20]    After the

hearing, the parties, including SCH LLC, agreed to additional injunctive relief.[21]

On January 31, 2024, the Florida Court, in Phase 1 of its proceedings,

concluded a three-day trial to resolve Count II, declaring SCH's shareholders'

agreement invalid and unenforceable.[22]    The Florida Court also found that Janice

owned 50% of the shares of SCH.[23]    The Florida Court is expected to address the

remaining counts in Phase II after the parties attend mediation.[24]

**B. This Action**

On October 23, 2023, during the pendency of the Florida Action and

approximately one week after the Florida Court denied his Motion to Dismiss

therein, Jonathan filed his Complaint in this Court.    Specifically, he seeks

declarations under 10 *Del. C.* § 6501, and 6 *Del. C.* § 18-110[25] that he is the sole

---

[20]  Motion Section IV; *id.*, Ex. 15.

[21]  Intervenor's Rely Brief in Support of Her Motion to Dismiss or Stay ("Reply"), Ex. 2.

[22]  Reply, Ex. 4 at 2.

[23]  *Id.*

[24]  Reply at 3.

[25]  Jonathan invokes 6 *Del C.* § 18-110, but that statute confers jurisdiction to the Court of Chancery, not this Court.  *See* 6 *Del. C.* § 18-110 ("(a) Upon application of any member or manager, the Court of Chancery may hear and determine the validity of any admission, election, appointment, removal or resignation of a manager of a limited liability company, and the right of any person to become or continue to be a manager of a limited liability company, and, in case the right to serve as a manager is claimed by more than 1 person, may determine the person or persons entitled to serve as managers; and to that end make such order or decree in any such case as may be just and proper, with power to enforce the production of any books, papers and records of the limited liability company relating to the issue.").

member and manager of Loco and Yacht, and that Loco and Yacht were validly converted to Delaware limited liability companies.   The Complaint's only reference to the ongoing Florida litigation described above was confined to a single-sentence footnote.[26]   Jonathan's subsequently filed Motion for Summary Judgment on November 16, 2023, provided few additional details.[27]

In response, Janice filed an unopposed motion to intervene, as well as her Intervenor's Motion to Dismiss or Stay (the "Motion").[28]   The parties submitted competing schedules on whether to first resolve the Motion for Summary Judgment or this Motion.   The Court held a status conference on December 19, 2023, granted the Motion to Intervene, and determined this Motion would be considered first due to the potential forum-related issues presented at first blush.[29]   With full briefing submitted, this matter is ripe for decision.

## II.   DISCUSSION

Under *McWane*'s three-factor test, the Court may dismiss or stay in favor of a previously filed action if there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, and involving the same parties and

---

[26] Compl. ¶ 4, n.1. ("There is pending probate litigation in Florida between Jon and the Trust, but it does not involve the declarations requested here.   Jon will promptly provide the Trust a copy of this complaint.").

[27] Plaintiff Jonathan Logan's Motion for Summary Judgment (D.I. 2).

[28] D.I. 9; D.I. 10.

[29] D.I. 13.

6

the same issues.[30]   "[I]t is preferable to merely stay the later-filed action because it is impossible to predict with certainty the course of earlier-filed litigation in another jurisdiction."[31]   The authority to grant a stay is "incident to the inherent power of a court to exercise its discretion to control the disposition of actions on its docket in order to promote economies of time and effort for the court, litigants, and counsel."[32]

## A.    The Delaware Action is Stayed under *McWane*

Jonathan filed his complaint in the Florida Action in February 2023 and Janice filed her amended complaint in August 2023.   This action commenced in October 2023.   Thus, the Florida Action is the prior-filed action.

The Florida Court has already proven its ability to provide prompt and complete justice.   It has held several evidentiary hearings, entered injunctive relief, and heard predicate Florida-related governance issues that implicate Loco and Yacht, which prior to their conversions, were Florida entities.   It has also considered and added, to a status quo order, the Delaware entity (SCH LLC), which was formed during the Florida litigation.

The Florida Action involves functionally the same parties and issues

---

[30] *LG Electronics, Inc. v. InterDigital Commc'ns, Inc.*, 114 A.3d 1246, 1252 (Del. 2015) (citing *McWane Cast Iron Pipe Corp. v. McDowell–Wellman Eng'g Co.,* 263 A.2d 281, 283 (Del. 1970).
[31] *Schnell v. Porta Sys. Corp.*, 1994 WL 148276, at *6 (Del. Ch. Apr. 12, 1994*); EnVen Energy Corp. v. Dunwoody*, 2020 WL 2770609, at *5 (Del. Ch. May 28, 2020).
[32] *Joseph v. Shell Oil Co.,* 498 A.2d 1117, 1123 (Del. Ch. 1985).

presented before this Court.   "Consistent with the *McWane* doctrine generally, the 'same parties, same issues' analysis focuses on substance over form."[33]   The Court looks for "substantial or functional identity" between the competing action.[34] Whether two cases raise the same issues is based on whether the claims "are closely related and arise out of the same common nucleus of operative facts."[35]

Here, Loco is a party to both actions.   And although Yacht is not a party to the Florida Action, SCH, which is a party, allegedly purchased and maintains Yacht's assets.   Thus, the 100' Riva Cosaro, Yacht's primary asset, may also be subject to relief from the claims of fiduciary duty and waste brought in the Florida Action.   Accordingly, substantial or functional identity exists between the competing actions.   Furthermore, the issues in both proceedings also arise from a common nucleus of operative facts, that is, Jonathan and Janice's rights in SCH and their related entities, including Loco and Yacht, as well as Jonathan's actions with respect to those entities.

Jonathan's opposition is unpersuasive.   He argues that the Delaware Action only seeks narrow declarations regarding membership status in Loco and Yacht, and

---

[33] *Zurich Am. Ins. Co. v. Sterigenics U.S., LLC*, 2024 WL 324094, at *6 (Del. Super. Ct. Jan. 26, 2024) (citation omitted).

[34] *Id*.

[35] *EnVen Energy Corp.*, 2020 WL 2770609, at *5 (citing *EuroCapital Advisors, LLC v. Colburn*, 2008 WL 401352, at *2 (Del. Ch. Feb. 14, 2008) (quoting *Dura Pharms., Inc. v. Scandipharm, Inc.*, 713 A.2d 925, 930 (Del. Ch. 1998))).

on that basis, the propriety of their conversions into Delaware entities.   But in the Florida Action, Janice has brought derivative claims against Loco, and may only do so if she is a member thereof.   The analysis and interpretation of Florida law as to Loco will similarly apply to Yacht.   Thus, Janice's claims in the Florida action closely relate to the declarations sought in this action.   Lastly, the resolution of the claims regarding the actions taken by Jonathan at SCH may moot the requested declarations as to Yacht.[36]

For these reasons, the Delaware Action is stayed under *McWane*.

### B.    Inherent Discretion to Control Court Docket Weighs in Favor of a Stay

Aside from this Court's consideration of the *McWane* factors, Jonathan's litigation conduct raises a host of jurisdictional concerns.   Although Jonathan argues that he merely seeks declarations regarding questions of Delaware internal affairs, any jurisdictional analysis requires consideration of the actions he took after the Florida Action was well underway.   Further, Jonathan's contention that his Complaint presents narrow issues of Delaware governance is further belied by the fact that he asks this Court to interpret Florida law.   Yet, the only basis that allows him to seek relief here is dependent upon the purported conversion of Florida

---

[36] *See* Reply at 5.

9

entities, the validity of which may be *void ab initio* if Janice—who has already shown a substantial likelihood of success—prevails on her claims in the Florida Action.

Given the alarming nature of the allegations in the Florida Action against Jonathan, the Court is loath to insert itself in a dispute that has involved significant motions practice, evidentiary hearings, and injunctive relief.[37]  The parties' more than year-long dispute in the Florida Court also implicates claims of fiduciary duty and director liability—issues beyond the subject matter jurisdiction of this Court. Namely, one claim in the Florida is a derivative claim on behalf of Loco, and others are direct and derivative breach of fiduciary duty claims against Jonathan regarding Yacht's assets.[38]  Seeking declaratory relief at this stage is, therefore, premature and presents the risk of inconsistent rulings between the two actions.[39]  Principles of comity and judicial efficiency weigh in favor of a stay pending the Florida Action.[40]

---

[37] In seeking summary judgment, this Court would have appreciated more transparency from Plaintiff's filings regarding the course of proceedings in the Florida Action.

[38] Motion at II.

[39] *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.,* 263 A.2d 281, 283 (Del. 1970) (The Court should avoid "the wasteful duplication of time, effort, and expense that occurs when judges, lawyers, parties, and witnesses are simultaneously engaged in the adjudication of the same cause of action in two courts," as well as "the possibility of inconsistent and conflicting rulings and judgments and an unseemly race by each party to trial and judgment in the forum of its choice.").

[40] *Park G.P., Inc. v. CCSB Fin. Corp.,* 2020 WL 7706962, at *2 (Del. Ch. Dec. 29, 2020) (Citation omitted).

10

### III.    CONCLUSION

For the foregoing reasons, whether under *McWane* or this Court's inherent discretion to control its docket, Intervenor's Motion to Stay is **GRANTED**, and this action is **STAYED** in favor of the Florida Action.

**IT IS SO ORDERED.**

Sincerely,
/s/ Vivian L. Medinilla
Vivian L. Medinilla
Judge

11

# EXHIBIT 32

| | |
|---|---|
| DISTRICT COURT, DENVER COUNTY, COLORADO<br>Court Address: 1437 Bannock Street<br>                Denver, Colorado 80202 | DATE FILED<br>December 3, 2024 4:34 PM<br>FILING ID: 6A6061FE33E2D<br>CASE NUMBER: 2024CV33720 |
| **Plaintiff**: SMART COMMUNICATIONS HOLDING, INC.,<br><br>v.<br><br>**Defendant:** CITY AND COUNTY OF DENVER, DEPARTMENT OF GENERAL SERVICES, PURCHASING DIVISION. | ▲ COURT USE ONLY ▲ |
| *Attorney for Plaintiff*<br><br>Name:        Shaun C. Kennedy, No. 46548<br>                Shannon N. Calhoun, No. 58175<br>Address:    HOLLAND & HART LLP<br>                555 17th Street, Suite 3200<br>                Denver, Colorado 80202-3921<br>Phone No.:  (303) 295-8000<br>Fax No:      (303) 295-8261<br>E-Mail:      SCKennedy@hollandhart.com<br>                SNCalhoun@hollandhart.com | Case No.<br><br>Div: |
| **COMPLAINT** | |

For its Complaint, Plaintiff Smart Communications Holding, Inc. ("Smart"), by and through undersigned counsel of Holland & Hart LLP, hereby alleges as follows:

## NATURE OF THE ACTION

1.        This is a Colorado Rule of Civil Procedure ("C.R.C.P.") 106(a)(4) appeal action against the Defendant, City and County of Denver, acting through the Department of General Services, Purchasing Division (the "City" or "Denver").

2.        This appeal action challenges the City's arbitrary and capricious decision to withdraw a Notice of Award, issued "in the best interest of the City and County of Denver" under full and open procurement, without a rational basis.

3.        The City's withdrawal decision cites a purported failure to reach a mutual agreement on the terms of a contract.  However, the City altogether failed to conduct meaningful, good faith negotiations with Smart  And when pressed, the City admitted there was actually no term Smart did not agree to.  Rather, the withdrawal decision appears to have been solution in search of a problem.  The City entered negotiations with a separate vendor under the terms of the

1

Solicitation (defined below), despite selecting Smart as the apparent awardee and acknowledging its offer was in the best interest of the City.

4.      The City's irrational decision not only violates the terms of its own Solicitation, but also the basic tenant in public procurements to treat prospective offerors fairly.  In addition, the City's failure to conduct reasonable negotiations after selecting Smart as the apparent awardee was irrational.

5.      For these reasons, Smart seeks an order from the Court overturning the City's unlawful actions pursuant to C.R.C.P. 106(a)(4), and respectfully asks that the Court grant Smart the declaratory and injunctive relief sought in this Complaint.

<u>**PARTIES**</u>

6.      Plaintiff Smart Communications Holding, Inc., a leading provider of telecommunications services and technologies in the corrections space, is a Florida corporation with its principal place of business located at 10491 72nd Street, Seminole, Florida 33777.

7.      Defendant City and County of Denver, acting through the Department of General Services, Purchasing Division, is a governmental entity established by the Charter of the City and County of Denver, with a principal place of business located at 201 W. Colfax Avenue, Denver, Colorado 80202.

<u>**JURISDICTION AND VENUE**</u>

8.      This Court has subject matter jurisdiction pursuant to Colo. Const. art. VI, § 9(1), C.R.C.P. 106(a)(4), the Colorado Declaratory Judgment Act, §§ 13-51-101, *et seq*.; and C.R.C.P. 57;

9.      This Court has personal jurisdiction over Defendant, who resides and has its principal place of business located in the City and County of Denver.

10.     Venue is proper in this Court pursuant to C.R.C.P. 98 because Defendant resides in this judicial district.

<u>**GENERAL FACTUAL ALLEGATIONS**</u>

A.      <u>**The Solicitation**</u>

11.     On or about October 12, 2023, the City published Request for Proposal No. 29440, entitled "Telecommunication, Video, and Programmatic Services for Persons Experiencing Incarceration with the Denver Sheriff's Department" (the "Solicitation").  The Solicitation refers to the "Denver Sheriff's Department" as "DSD."  A true and correct copy of the Solicitation is appended hereto as <u>Exhibit A</u>.

12.     The Solicitation included a "Scope of Work" describing the services to be acquired by Denver.  It states the purpose of the procurement is to obtain "multi-purpose" telephone and video visitation solutions for DSD operated Correctional Facilities.

2

13.     These services include: (a) hardware including telephones, kiosks, tablets, servers, switches, all necessary WiFi infrastructure, and the external service provider that will provide internet connection; (b) video and telephone visitation software; (c) educational materials and career services; (d) voice biometrics; (e) investigative platform; (f) fraud management; (g) digital mail solutions; (h) Jail Management System (JMS) and commissary system integrations; (i) reporting and business intelligence capability; (j) access and security configurability; and (k) compliance, technology, and compatibility standards.

14.     The Solicitation required the selected vendor to provide an end-to-end solution, including installation of all hardware and software, as well as ongoing maintenance and support.

15.     The Solicitation stated that "the effective period of the contract resulting from this [Solicitation] shall be from the date of City signature for five consecutive years."

16.     The City announced its intent to utilize a comparative evaluation criteria to select an awardee.  It states that "[o]ne award will be made on an 'all or none' basis."

17.     The evaluation criteria set forth in the Solicitation required the City to consider the following factors: (a) pricing; (b) response to "Vendor Questions and Requirements"; (c) the vendor's responses to the "Required Traceability Matrix" and the "Integration Requirement Matrix"; (d) other required submittals; (e) whether the vendor is qualified, responsible and responsive; and (f) the vendor's response to the City's proposed Sample Contract provisions.  It further advised that "[n]o weighting or relative importance of criteria is intended or implied" by the above-referenced evaluation factors.

## B.    Smart Proposal Submission and Notice of Award

18.     On January 2, 2024, Smart tendered its proposal to the City.  The proposal complied in all material aspects with the requirements of the Solicitation.

19.     Smart's proposal leveraged its long-standing expertise and experience providing telephone and video services in correctional facilities for other governmental customers across the country.  Smart also proposed competitively advantageous pricing as required by Section C.4 of the Solicitation.

20.     Recognizing the technical and pricing advantages of Smart's proposal, on April 8, 2024, Denver transmitted a "Notice of Apparent Successful Proposer" letter to Smart (the "Award Letter").  A true and correct copy of the Award Letter is appended hereto as Exhibit B.

21.     The Notice of Award stated that Smart's proposal was "fair, equitable, and in the best interest of the City and County of Denver, Colorado."  It further advised that the "proposal is hereby declared to be acceptable at the bid price contained therein, **SUBJECT TO** the approval of the agreement in accordance with the Charter of the City and County of Denver."

22.     The Notice of Award further requested that Smart submit to the City certain "Certificates of Insurance."  Smart complied with this request by transmitting the requested certificates to the City.

3

**C.    Post-Award Exchanges Between the City and Smart**

23.    During the period of July through August 2024, Smart and the City engaged in a review of the Scope of Work for the contract.  The City provided Smart with a final version of the Scope of Work on August 1, 2024, and submitted the same to the City Council for approval. Upon information and belief, the City Council rejected the Scope of Work proposed by the City.

24.    In September 2024, Smart participated in several transition activities with the City and DSD in anticipation of commencing the contract awarded under the Solicitation.  To be clear, Smart participated in the transition activities prior to the City's ratification of the contract, at the City's request, to accelerate the timing for its readiness to assume the contractual activities.

25.    For example, Smart flew its technical staff to Denver to participate in an on-site in a walk-through of the relevant DSD-operated Detention Center facilities.  In addition, Smart engaged in further communications (both by email and over the telephone) with Denver regarding the services it described in its proposal.

26.    Over the course of the following months, through October 2024, the parties continued to review and revise the Scope of Work.  Notably, the City revised the Scope of Work to largely adopt the method of performance set forth in Smart's proposal.  At no time did the City express that Smart's suggested input for the Scope of Work was unacceptable.

**D.    The City's Decision to Pursue Negotiations With Another Vendor**

27.    While Smart pursued negotiations in good faith with the City to finalize the Scope of Work and a resulting Contract, the City began surreptitiously pursuing other opportunities.

28.    As an example, in October 2014, Smart and the City engaged in discussions regarding the potential impact of regulations recently adopted by the Federal Communications Commission ("FCC").

29.    Specifically, on July 18, 2024, the FCC adopted regulations pursuant to the Martha Wright-Reed Fair and Just Compensation Act.  The regulations established new maximum charges for telephone and video calling services in prisons and jails applicable to the services being acquired by the City under the Solicitation.  The FCC notably adopted these regulations *after* Smart submitted its proposal in response to the Solicitation.

30.    On October 22, 2024, a representatives from DSD—not the City's purchasing division—requested information from Smart regarding whether the FCC regulations would impact the company's proposed pricing model.  Smart responded indicating that the FCC regulations would impact the pricing structure, but would importantly result in a "*cost reduction*" under the resulting contract.  Put differently, Smart specifically assured DSD that any change resulting from FCC's regulations would not result in a cost increase.  A true and correct copy of the email exchange between Smart and DSD is appended hereto as Exhibit C.

31.    Nevertheless, on or about October 23, 2024, the City abruptly decided to pursue a new contract with the second-ranked vendor, Securus Technologies ("Securus").  To conceal

their plan, a City supervisor made clear that DSD begin preparations for awarding a contract to Securus "*without contacting Securus*."

32.     The City made this decision while purportedly continuing to engage in negotiations with Smart. Smart was unaware the City was planning to withdraw the Award Letter and continued to engage in good faith negotiations and discussions with the City.

33.     Nearly a week passed before DSD sent a letter to the City's Chief Procurement Officer requesting that the City "discontinue negotiations with Smart Communications" (the "Withdrawal Letter"). A true and correct copy of the Withdrawal Letter is appended hereto as Exhibit D.

34.     In the Withdrawal Letter, DSD erroneously claimed that "after months of negotiations, . . . Smart asked for a different arrangement to be enacted which included *increased costs* to the people in their custody and their families." This claim is plainly contradicted by Smart's prior assurance by email that compliance with the FCC regulations would result in a "cost reduction" from its initially proposed pricing structure. *See* Exh. C.

35.     The Withdrawal Letter also unfairly criticized Smart for apparently not foreseeing the passage of the FCC regulations *after* it submitted its proposal in response to the Solicitation. It claimed that the FCC regulations "have been in the works for nearly a decade" and that "Smart officials knew when they submitted their pricing proposals that these regulations were potentially forthcoming."

36.     Finally, the Withdrawal Letter speciously concludes that Smart's compliance with new FCC regulations presented a "change" and was a "disservice to operating in good faith and . . . an indicator of behavior to come from Smart."

37.     DSD requested approval to begin negotiations with Securus. The Withdrawal Letter explains that Securus is DSD's "current contractor," and that the parties should be able to "come to a fair and reasonable cost model while also having the benefit of no disruption to [DSD's] current service."

38.     In summary, DSD used new federal regulations imposed by FCC as a pretext to circumvent the competitive bidding process and award a contract under the Solicitation to its preferred vendor, whose proposal did not receive the highest evaluated score, the incumbent Securus.

## E.     The City's Revocation Decision

39.     Unexpectedly, and without warning, on November 6, 2024, the City transmitted a "Revocation of Intent to Award" letter to Smart (the "Award Revocation"). A true and correct copy of the Award Revocation is appended hereto as Exhibit E.

40.     The City transmitted the Award Revocation nearly *two weeks* after it already made the decision to begin negotiating a new contract with Securus.

41.     The Award Revocation states, in pertinent part:

5

The City and County of Denver (City) would like to thank Smart
Communications for participating in the process for the above reference
[*sic*] solicitation.  On April 8, 2024, the City sent Smart Communications
an Intent to Award letter and contract negotiations were initiated.

However, the City and Smart Communications have not been able to come
to mutually agreeable terms during these negotiations.  At this time, the
City is revoking its Intent to Award to Smart Communications.  We
appreciate the time and effort put forth by your company during this time.
All communications for this contract negotiation will stop and will be held
confidential.

42.     Notably, however, the City never actually engaged Smart in meaningful
negotiations regarding a contract under the Solicitation.  Quite to the contrary, Smart diligently
worked with the City to transition activities at its own cost to assist the City in promptly
commencing contract performance.  This included providing assistance in revising the Scope of
Work to ensure it described the services acquired by the City pursuant to the Solicitation.
Furthermore, Smart sought to comply with the newly passed FCC regulations and assured the
City that it would result in a "cost decrease."

43.     There were no material issues for which the City and Smart disagreed or that
justified the City's issuance of the Award Revocation.

44.     At no time did Smart affirmatively, by implication, or otherwise, state that it
intended to withdraw any aspect of its proposal submitted to the City, or make any material
adjustment to the manner in which it proposed to perform the contract.

## <u>COUNT I</u>
### (For Judicial Review Pursuant to C.R.C.P. 106(a)(4))

45.     Plaintiff incorporates the previous paragraphs as if fully set forth herein.

46.     Defendant is a governmental body that exercised judicial or quasi-judicial
functions in issuing the Award Revocation.  Defendant conducted a public procurement for
goods and services in accordance with State and municipal law, which included decision-making
authority that adversely affected the protected interest of Plaintiff.

47.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered
damages and has no plain, speedy, or adequate remedy otherwise provided by law.

48.     Defendant exceeded its jurisdiction and abused its discretion.  By issuing the
Award Revocation without engaging Plaintiff in good faith negotiations to finalize a contract
pursuant to the Solicitation, Defendant's actions were arbitrary and capricious.

49.     Plaintiff respectfully requests that the Court sustain this appeal brought pursuant
to C.R.C.P. 106(a)(4).

6

## COUNT II
### (Declaratory Judgment Pursuant to the Colorado Declaratory Judgment Act, §§ 13-51-101, *et seq*. and C.R.C.P. 56)

50.     Plaintiff incorporates the previous paragraphs as if fully set forth herein.

51.     Plaintiff is an entity whose rights, status, or other legal relations were affected by Defendant's abuse of discretion in issuing the Award Revocation.

52.     A declaratory judgment or decree would terminate the uncertainty or controversy giving rise to these proceedings.

53.     Plaintiff respectfully requests a declaratory judgment that Defendant wrongly issued the Award Revocation without a rational basis.

54.     Plaintiff respectfully requests a declaratory judgment that Defendant wrongly issued the Award Revocation in contravention of the terms of the Solicitation.

55.     Plaintiff respectfully requests a declaratory judgment that Defendant wrongly issued the Award Revocation in violation of Colorado law.

## COUNT III
### (Permanent Injunction of Defendant's *Ultra Vires* Actions)

56.     Plaintiff incorporates the previous paragraphs as if fully set forth herein.

57.     As an administrative body under the City and County of Denver, Defendant is authorized to solicit, procure, and award contracts to third-parties in accordance with State and municipal law.

58.     For the reasons set forth herein, Defendant's issuance of the Award Revocation exceeded its authority under State and municipal procurement law.  Therefore, Defendant's actions were *ultra vires* and unlawful.

59.     Defendant's unlawful action of issuing the Award Revocation threatens to cause Plaintiff irreparable harm for which there is no adequate remedy of law.  Defendant will not be harmed by a permanent injunction enjoining their *ultra vires* application of State and municipal procurement law.

60.     Plaintiff respectfully requests that this Court enter judgment and permanently enjoin Defendant from their *ultra vires* application of State and municipal procurement law when it issued the Award Revocation.

## **PRAYER FOR RELIEF**

WHEREFORE, Smart requests that this Court enter judgment in its favor and award the following relief:

1.      Judgment in Plaintiff's favor against Defendant.

2.      Preliminary and permanent injunctive relief in favor of Plaintiff and against Defendant.

3.      An order vacating the Award Revocation and remanding the matter to Defendant with the direction to commence good faith negotiations of a contract resulting from the Solicitation.

4.      An award of all attorney fees and cost.

5.      Any and all other relief that this Court deems just and proper.


Dated: December 3, 2024                    **HOLLAND & HART** LLP

                                           */s/  Shaun C. Kennedy*
                                           Shaun C. Kennedy
                                           Shannon N. Calhoun

                                           **Attorneys for Plaintiff, Smart Communications
                                           Holding, Inc.**

Plaintiff's Address:
10491 72nd Street
Seminole, Florida 33777

# EXHIBIT 33

# IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
# IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,

        Plaintiffs,

v.

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust, dated February 10, 2021;
and ALEXIS LOGAN,

        Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan       Case No.: 2023-CA-1002-NC
Family Trust, dated February 10, 2021,

        Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., SMART
COMMUNICATIONS HOLDING, LLC, HLFIP
HOLDING, INC., and HLFIP HOLDING, LLC,

        Counterclaim Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan Family     (CONSOLIDATED)
Trust, dated February 10, 2021, and derivatively on
Behalf of Smart Communications Holding, Inc.,

        Plaintiff,                   Case No.: 2023-CA-1280-NC

v.

JONATHAN D. LOGAN,
SMART COMMUNICATIONS HOLDING, INC.,
nominal defendant, SMART COMMUNICATIONS
HOLDING, LLC, HLFIP HOLDING, INC., HLFIP
HOLDING, LLC, LOCO FLORIDA LLC, and
SMART COMMUNICATIONS YACHT
HOLDING, LLC,

        Defendants

_____/

## NOTICE OF APPEARANCE

76705078;1

Mark Bernet, Esq., Jason S. Oletsky, Esq., Dustin B. Hillsley, Esq., and Max C. Rudolf, Esq. of the law firm Akerman LLP, hereby enter their appearance as co-counsel on behalf of Jonathan D. Logan, Smart Communications Holding, Inc., Smart Communications Holding, LLC, and Loco Florida LLC, and request that copies of all pleadings, notices, orders, and other documents filed or served in this matter be served on them via the Florida e-filing ePortal, email, or at the address listed below, as appropriate.

Dated:  June 7, 2024              Respectfully submitted,

**AKERMAN LLP**
401 E. Jackson Street, Suite 1700
Tampa, FL 33602-5250
Office: (813) 23-7333
Fax: (813)218-5495

By:___/s/ *Mark Bernet*_____
**Mark Bernet**
Florida Bar No. 606359
Email: mark.bernet@akerman.com
Secondary Email: caren.deruiter@akerman.com

-and-

**Jason S. Oletsky**
Florida Bar No. 9301
Email: jason.oletskey@akerman.com
Secondary Email: jill.parnes@akerman.com
**Dustin Hillsley**
Florida Bar No. 1018589
Email: dustin.hillsley@akerman.com
Secondary Email: deborah.karlson@akerman.com
**Max C. Rudolf**
Florida Bar No. 98766
Email: max.rudolf@akerman.com
Secondary Email: deborah.karlson@akerman.com

- 2 -

76705078;1

201 East Las Olas Boulevard
Suite 1800
Ft. Lauderdale, FL 33301
Telephone: (954) 463-2700
Fax: (954) 463-2224

***Counsel for Jonathan D. Logan, Smart Communications
Holding, Inc., Smart Communications Holding, LLC, and
Loco Florida LLC***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on June 7,

2024 via electronic mail through the Florida Court's E-Portal to:

Anitra R. Clement
Florida Bar No. 100354
**SHOOK, HARDY & BACON L.L.P.**
100 N. Tampa Street, Suite 2900
Tampa, FL 33602
Telephone: (813) 202-7100
aclement@shb.com

David E. Schoenfeld (FL PHV # 1047561)
Peter F. O'Neill (FL PHV # 1043125)
Andrew L. Franklin (FL PHV # 1035737)
Kailin Liu (FL PHV # 1051416)
**SHOOK, HARDY & BACON L.L.P.**
111 S. Wacker Drive, Suite 4700
Chicago, IL 60606
Telephone: (312) 704-7700
dschoenfeld@shb.com
pfoneill@shb.com
afranklin@shb.com
kliu@shb.com

/s/*Dustin B. Hillsley*
Dustin B. Hillsley, Esq.

76705078;1