UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
Tampa Division
www.flmb.uscourts.gov

In re:

SMART COMMUNICATIONS
HOLDING, INC.,

and

SMART COMMUNICATIONS
HOLDING, LLC.,

Debtors.

_____/

Chapter 11, Subchapter V
Case No. 8:24-bk-07106-RCT

*Jointly Administered with*
Case No. 8:24-bk-07108-RCT

## DEBTORS' JOINT PLAN OF REORGANIZATION

This Plan of Reorganization (the "**Plan**") in these above styled bankruptcy cases under subchapter V of chapter 11 (the "**Chapter 11 Cases**") of the Bankruptcy Code (the "**Code**" or "**Title 11**") proposes to pay creditors of Smart Communications Holding, Inc. ("**Smart Comm FL**") and Smart Communications Holding, LLC ("**Smart Comm DE**") (collectively, the "**Debtors**"). As described herein, the Plan shall be funded by the Debtors and by: (i) HLFIP Holding, LLC; (ii) Jonathan Logan; (iii) Smart Communications Yacht Holdings, LLC; and (iv) Loco Florida, LLC (collectively, the "**Plan Funders**").

To creditors: Your rights may be affected by this Plan. Your claim may be reduced, modified, or eliminated. You may wish to consult an attorney about your rights and your treatment under the Plan.

## PLAN

### A. Brief History of the Debtors' Business Operations

Smart Comm FL is a Florida corporation formed in December of 2014. Smart Comm FL is the parent company and sole member of Smart Comm DE. Jonathan Logan ("**Jon Logan**") is the founder of the Smart Communications business (which was started in 2009), and is the sole officer and sole director of Smart Comm FL.

Smart Comm DE is a Delaware limited liability company formed in August of 2023. Smart Comm DE was established to be an intermediate holding company, and was set up to receive a transfer of transferrable assets from Smart Comm FL in exchange for the equity interests in Smart Comm DE issued to Smart Comm FL pursuant to a Transfer Agreement between Smart Comm DE and Smart Comm FL. Smart Comm DE is wholly-owned by Smart Comm FL as its sole member. Jon Logan is the sole manager of Smart Comm DE.

The Smart Communications corporate group, comprising the Debtors and certain non-debtor subsidiaries,[1] is a top technology supplier to corrections facilities across the country. Smart Communications provides its customers with comprehensive inmate communications systems including telephone, video visitation, electronic messaging, streaming media platforms, and other services that are fully integrated through a single web-based dashboard, providing a single location for authorized staff to access all system administration, monitoring, reporting, data sharing and investigation tools. Smart Communications' client footprint has grown organically for 13 years, from a single account to more than 120 facilities throughout 29 states. Smart Communications' client footprint continues to grow, and the Debtors are focused on that trajectory.

The Debtors' primary material asset is an exclusive license (the "**Exclusive License**") of various intellectual property and technology the Debtors have with HLFIP Holding, LLC ("**HLFIP**"), a Delaware limited liability company owned by Jon Logan.  A true and correct copy of the License is attached hereto as **Composite Exhibit "A."**  As described more fully in the Case Management Summary (Doc. No. 12) (the "**Case Management Summary**"), in 2015 Jon Logan, James Logan, and Alexis Logan agreed that Jon Logan would exclusively own and control any new intellectual property that he created from that day forward (the "**IP**"). Since 2015, Jon Logan assigned and continues to assign the rights to his intellectual property to HLFIP, and HLFIP has exclusively licensed and continues to exclusively license that intellectual property to Smart Communications through a license that is subject to a royalty-based fee, initially through an oral license that remained in place until August 2023, when it was reduced to writing. The license provided Smart Communications with an uninterrupted and exclusive license to the Intellectual Property.

The Debtors currently use the intellectual property and technology subject to the License in the operations of their business and the business of various wholly owned affiliates. Without the IP and the Exclusive License, the Debtors could not continue as a going concern. Under the exclusive license agreement, HLFIP is owed a royalty fee of 40 percent of Smart's net sales, which accrued fees are in excess of $67 million for the last three years alone. HLFIP made a demand for the Debtors to pay royalties by the end of 2024 or the license would be terminated. The Debtors lack available cash and cash equivalents to provide for a prompt cure of the existing unpaid obligations under the License.  The Debtors' Plan seeks to restructure the obligations owed under the Exclusive License and make certain material modifications to the terms of the Exclusive License to allow the Debtors to continue utilizing the intellectual property and technology for the five-year period the Debtors will be funding payments to all holders of allowed claims pursuant to this Plan.

The Debtors have been mired in state-court litigation (the "**State Court Litigation**") for the last two years since the untimely passing of James Logan, Jon Logan's father and business partner, in October 2022.  Prior to his passing, James transferred his 50% interest in Smart Comm FL to the James Logan Family Trust, dated February 10, 2021 (the "**Trust**"). Soon after James Logan's passing, and following her assumption in the role of Trustee of the Trust, Janice Logan (James Logan's window and Jon Logan's estranged mother) weaponized the Trust's interest in Smart Comm FL in an attempt to extract grotesque sums of money from the business.  The state

---

[1] The non-debtor subsidiaries are Smart Communications Collier, Inc. ("**Smart Collier**"), Smart Communications Pasco, Inc., and Smart Communications US, Inc.

court litigation includes claims by Debtors, both direct and derivative, claims against the Debtors, and claims regarding property of the estates. Among other claims discussed in the Case Management Summary, the Trust sought a dissolution of Smart Comm FL, resulting in Smart Comm FL's election to purchase the Trust's shares under the provisions of § 607.1436 of the Florida Statutes. The ultimate outcome of that litigation is that the Trust has a claim for the value of the Trust's shares in Smart Comm FL, which will be treated in Plan.

**B.      Liquidation Analysis/Best Interests of Creditors Test Satisfied**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The liquidation analysis attached to this Plan as **Exhibit B** demonstrates that the Plan meets this requirement.  As shown in the liquidation analysis, the liquidation value of the assets is approximately $6,789,199 (the "**Liquidation Value**"), and the creditors of Debtors will receive substantially in excess of the Liquidation Value in the proposed Plan.

**C.      Feasibility / Ability to Fund Plan**

The Debtors have provided financial projections attached as **Exhibit C** to analyze their ability to meet the obligations under the Plan.  The Debtors believe that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors due to the Restructuring Agreement (described herein) incorporated into the Plan by and between the Debtors, Jonathan Logan, and HLFIP, which will receive 100% of the equity of the Reorganized Debtors (the primary "Plan Funder").  The Debtors, Jon Logan, and certain of the Debtors affiliates along with the Plan Funder shall provide Debtors with sufficient funding and other consideration necessary to make all distributions under the Plan.  The guaranteed payments due on the Effective Date permit immediate reorganization and restructuring of debt obligations, to provide a fresh start without the existing operational constraints of debt service.

**D.      License Restructuring Agreement**

The Plan Funder asserts that it holds right, title, and interest to certain intellectual property and technology that the Debtors currently license in the operation of the Debtors and the Debtors' affiliates pursuant to the License.  Plan Funder has filed a claim asserting that the Debtors owe Plan Funder in excess of $67,000,000 for unpaid pre-petition license fees pursuant to the License (the "**Plan Funder Cure Claim**").  A true and correct copy of the Plan Funder Cure Claim is attached as **Exhibit D.**  In addition to the Plan Funder Claim, the Debtors are obligated to fund 40% of their gross revenue to Plan Funder for going forward license fees (the "**Plan Funder License Fees**").  The Debtors and the Plan Funder have reached an agreement to modify the License to fully resolve the Plan Funder Cure Claim and restructure the Plan Funder License Fees pursuant to the following terms:

(1) Satisfaction of Plan Funder Cure Claim

The Debtors shall satisfy the Plan Funder Cure Claim by providing the Plan Funder with: (i)  100% of the equity interest in the Reorganized Debtors; (ii) an allowed general unsecured claim

with treatment in Class 4 equal to 75% of the Plan Funder Cure Claim; and (iii) a general release of all claims that the Debtors can assert against the Plan Funder.

(2) Plan Funder License Fees

The Debtors and Reorganized Debtors shall be obligated to pay Plan Funder 40% of the Debtors' net operating revenues.  The License Fees shall be calculated on a quarterly basis and shall be due on or before the 15th day subsequent to the end of the preceding quarter.

(3) License Term

The License shall be extended for a term that will expire on the 30th day subsequent to the fifth (5) anniversary of the Effective Date.  The License shall be renewable upon terms acceptable to the Plan Funder and Reorganized Debtors communicated in writing prior to the expiration of the license term.

(4) License Termination

The Plan Funder shall be authorized to terminate the License solely upon the Reorganized Debtors uncured default of the obligations owed to Plan Funder pursuant to the Plan.

(5) Plan Funder Carveout

The Plan Funder shall carveout from the Plan Funder License Fees actually paid to the Plan Funder by the Reorganized Debtors:

(i) all sums necessary for the Debtors to fund all allowed administrative claims asserted against the Debtors prior to the Effective Date in an aggregate sum not to exceed $3,000,000;

(ii) all sums necessary for the Debtors to fund the treatment proposed by the Debtors for Class 3 and Class 4 Claimants in an aggregate sum not to exceed $10,000,000.

For the avoidance of doubt, in the event Class 3 accepts the Debtors' proposed treatment, the Debtors shall deduct any payment made to holders of Class 3 Claims from the $10,000,000 the Debtors propose to pay all holders of allowed general unsecured claims against the Debtors' estates.

## E.    Plan Length and Funding

The Plan will be primarily funded through the Plan Funder Carveout detailed herein and from the following assets contributed to the Debtors by various non-debtors:

(i) Assets titled in Jonathan Logan's individual capacity.  Jonathan Logan shall contribute the net proceeds realized from the sale of the following property: (1) Rolls Royce, (2) Ferrari, (3) Condominium located in Miami, Florida (465 Brickell Ave, Unit 4101, Miami, Florida 33131), and (4) a Nor-tech fishing boat.  In addition, Mr. Logan shall contribute the net proceeds realized

from all claims Mr. Logan is currently asserting against various non-debtor parties in the State Court Litigation. Finally, Mr. Logan will release the Debtors' estates from all claims Mr. Logan can assert against the Debtors, contribute his entire equity in the Debtors to facilitate the funding of the Plan, and will provide a limited guaranty of up to $500,000 of obligations the Reorganized Debtors are committed to funding to holders of allowed general unsecured claims.

(ii) Smart Communications Yacht Holdings, LLC Assets. Smart Communications Yacht Holdings, LLC is a title owner to a marine vessel, specifically a 2020 Riva Cosoro currently docked at Epic Marina, 270 Biscayne Blvd., Miami, FL 33131 (the "Vessel"). Smart Communications Yacht Holdings, LLC shall sell the Vessel on or before the second anniversary of the Effective Date and contribute the net proceeds realized from the sale of the Vessel after payoff of all liens and closing costs to fund the Plan.

(iii) Loco Florida LLC is the Debtors' landlord on a certain office building located at 10491 72nd Street, Seminole, FL 33777. Loco Florida, LLC shall waive its existing cure claim for all accrued past-due rent in the estimated amount of $1,000,000 and shall charge the Debtors a fixed monthly rent payment for the duration of the Plan in the amount of $40,000 per month.

The Plan, and the Debtors' financial projections, provides that unsecured creditors will receive amount that substantially exceeds the Debtors' projected disposable income, as defined by section 1191(d) of the Code, in the 5-year period of the Plan. Specifically, the Debtors project that the Plan Funder Carveout will be sufficient to fund an aggregate $10,000,000 to holders of allowed unsecured claims. The Reorganized Debtors shall distribute the payments to holders of allowed unsecured claims by making $500,000 payments on a quarterly basis commencing ninety days subsequent to the Effective Date and terminating on the fifth anniversary after the Effective Date.

F.    **Treatment of Claims and Equity Interests**

1.    <u>Summary</u>.

This Plan provides for:    _1_ class of secured claims
_0_ classes of priority claims
_3_ classes of non-priority unsecured claims
_1_ class of equity security holders

2.    <u>Secured Claims</u>.

Allowed Secured Claims are claims secured by property of the Debtors' bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code. If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim.

With respect to the Allowed Secured Claims, the Plan provides that:

[ _X_ ] the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtors or transferred to another

entity, to the extent of the allowed amount of such claims; and that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estate's interest in such property;

| Secured Claim | Class | Allowed Amount | Proposed Treatment of Allowed Claims | Voting Rights | Projected Plan Recovery |
|---|---|---|---|---|---|
| None known | 1 | 0 | Retain lien and paid pursuant to contractual terms. | Unimpaired/Not entitled to Vote. | 100% |

3.   Priority Claims.  There are no anticipated holders of any allowed claims entitled to priority under section 507(a) of the Code (except administrative expense claims under section 507(a)(2) and priority tax claims under section 507(a)(8)).

4.   Unsecured Claims.  General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.  The following chart identifies the Plan's proposed treatment of the general unsecured claims against the Debtors.  All holders of general unsecured claims allowed under § 502 of the Code shall receive their *pro rata* share of the distributions from the Debtor, as guaranteed by the Plan Funder.

| Unsecured Claim | Class | Allowed Amount | Proposed Treatment of Allowed Claims | Voting Rights | Projected Plan Recovery |
|---|---|---|---|---|---|
| HLFIP | 2 | Estimated amount: $67,000,000 | The Plan Funder shall receive 100% of the equity in the Reorganized Debtors, and allowed general unsecured claim in the amount of $50,250,000 that shall receive the treatment afforded all holders of Allowed Class 4 Claims, and general releases from the Debtors in full satisfaction of the Plan Funder Claim as detailed in the License Restructuring Agreement. | Impaired/Entitled to Vote. | 23.2% |

| Unsecured Claim | Class | Allowed Amount | Proposed Treatment of Allowed Claims | Voting Rights | Projected Plan Recovery |
|---|---|---|---|---|---|
| All non-debtor parties to the State Court Litigation, including Janice Logan in her individual capacity and as Trustee of the Trust. Class 3 shall exclude all Plan Funders. | 3 | Estimated amount: $0 | Class 3 Claimants accepting the Plan shall receive $4,000,000 paid over 20 quarterly installments commencing on the 105th day subsequent to the Effective Date and terminating on the 5th anniversary of the Effective Date. Class 3 Claimants shall consensually release all of the Released Parties identified in the Plan of all claims that Class 3 Claimants could have asserted against any of the Released Parties prior to the Plan's Effective Date. Class 3 Claimants that reject the Plan shall receive on account of any ultimately allowed general unsecured claims against the Debtors at their election: (i) up to $50,000 of any Allowed Class 3 Claim funded on the 105th day subsequent to the Effective Date; or (ii) their pro rate share of $10,000,000 paid over 20 quarterly installments commencing on the 105th day subsequent to the Effective Date and terminating on the fifth anniversary of the Effective Date. | Impaired/Entitled to Vote. | 100% |

| Unsecured Claims | Class | Allowed Amount | Proposed Plan Treatment | Voting Rights | Projected Plan Recovery |
|---|---|---|---|---|---|
| All other holders of General Unsecured Claims | 4 | Estimated amount: $52,500,000. | Class 4 Claimants accepting the Plan shall receive the lesser of: (i) 100% of their Allowed Class 4 Claim; and (ii) $50,000, funded by the Reorganized Debtors on or before 105th day subsequent to the Effective Date. Class 4 Claimants rejecting the Plan shall receive on account | Impaired/Entitled to Vote. | 23%-100% |

| | | of any Allowed Class 4 Claim their pro rata share of $10,000,000 paid over 20 quarterly installments by the Reorganized Debtors commencing on the 105th day subsequent to the Effective Date and terminating on the fifth anniversary of the Effective Date. | | |

5.    Equity interest holder.  The equity interest of the Equity Holders will be cancelled and all assets of the Debtors will vest with the Reorganized Debtors.  Equity of the Reorganized Debtors will be issued pursuant to the License Restructuring Agreement to the Plan Funder.

| Class | Description | Proposed Plan Treatment | Voting Rights | Projected Plan Recovery |
|---|---|---|---|---|
| 5 | Equity interest holder. | The equity interest of the current equity interest holder will be cancelled. | Deemed to reject | $0 |

6.    Unclassified claims.  Under section 1123(a)(1), administrative expense claims and priority tax claims are not in classes.

a.    Administrative expense claims.  Each holder of an administrative expense claim allowed under section 503 of the Code will be paid in full on the Effective Date of this Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor, or as provided in the Plan.

Below are the anticipated administrative expense claims and their treatment:

| Claim | Allowed Amount | Proposed Treatment of Allowed Claims |
|---|---|---|
| Subchapter V Trustee Fees | $35,000 estimated | Cash equal to the allowed amount of such claim on the Effective Date of the Plan |
| Stichter Riedel and Akerman LLP – Debtors' attorneys' fees and costs | $1,200,000 estimated | Cash equal to the allowed amount of such claim on the Effective Date of the Plan or as consented to by the holder of the Administrative Claim. |
| Accountants | $300,000 | Cash equal to the allowed amount of such claim on the Effective Date of the Plan |

b.  <u>Priority tax claims</u>.  Each holder of a priority tax claim will be paid:

(    ) regular installment payments in cash either
( X ) of a total value, as of the effective date of the Plan, equal to the allowed amount of such claim, or
(    ) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303,

and in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan (other than cash payments made to a class of creditors under section 1122(b)).

## G.    Allowance and Disallowance of Claims

1.    <u>Disputed claim</u>.  A disputed claim is a claim that has not been allowed or disallowed by a final non-appealable order, and as to which either:

(i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or

(ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

2.    <u>Delay of distribution on a disputed claim</u>.  No distribution will be made on account of a disputed claim unless such claim is allowed by a final non-appealable order.

3.    <u>Settlement of disputed claims</u>.  The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

## H.    Executory Contracts and Unexpired Leases

Within 14 days of the Confirmation Hearing, Debtors will file a list of executory contracts and unexpired leases that the Debtors will reject.  Any executory contract of unexpired lease that is not formally rejected by the Debtors shall be assumed.  Assumption means that the Debtors have elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any.  Any counterparty or lessee that has a scheduled or filed claim that Debtors propose to cure shall not be treated in their respective class but shall receive cure payments as specified under a further supplement to the Plan.

Except for executory contracts that have been assumed before the Effective Date or under this section of the Plan, or that are the subject of a pending motion to assume, or that the Debtors have expressly rejected prior to the Effective Date, the Debtors will be conclusively deemed to have assumed all executory contracts and unexpired leases as of the Effective Date.

9

If you object to the assumption, and if applicable the assignment, of your unexpired lease or executory contract under the Plan, the proposed cure of any defaults, the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.  If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.  The deadline for filing a Proof of Claim based on a claim arising from the rejection of a lease or contract is 30 days after the date of the order confirming this Plan, or within 30 days of the rejection of the contract or lease, whichever is earlier.  Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

## I.    Post-Confirmation Management and Employment/Retention of Insiders

The Reorganized Debtors' post-confirmation management will include Jonathan Logan and below is his proposed compensation for services provided to the Reorganized Debtors as Chief Executive Officer.

| Individual | Role/Compensation |
|---|---|
| Jonathan Logan | Chief Executive Officer / $1,200,000 per year |

The appointment to, or continuance in, such office of Mr. Logan, is consistent with the interests of creditors and equity security holders and with public policy.  In particular, the retention of Mr. Logan is key to the Reorganized Debtors maintaining their business relationships, because he has customer and vendor relationships and operational knowledge, which is vital to the success of the Reorganized Debtors.  The Reorganized Debtors could not likely sustain their projected operations without Mr. Logan.

## J.    Distributions Under the Plan

1.    All distributions under the Plan shall be made by the Reorganized Debtors, whether the Plan is confirmed pursuant to Section 1191(a) or (b) of the Bankruptcy Code.  The Reorganized Debtors shall file with the Court as a supplement to the Plan and provide notice to all creditors at or before confirmation, a list of all the creditors who will be receiving payments under the Plan, the total amount to be paid to each creditor under the Plan (inclusive of all allowed interest and fees) and the payment terms and schedule for each creditor under the Plan.  The following additional provision shall govern distributions under the Plan:

a.    All payments under the Plan will be made by the Reorganized Debtors to the holder of each allowed claim at the address of such holder as listed on the Schedules, or if different, the Proof of Claim, unless the Reorganized Debtors have been notified in writing of a change of address.

b.    Any payment required to be made under the Plan on a day other than a business day shall be made on the next succeeding business day.

c.      De minimis Distributions less than five hundred dollars ($500.00) shall not be made, and shall become unclaimed funds, which shall vest in the Reorganized Debtors.

d.      Claimants shall not be permitted to amend or otherwise modify any claim after the later of the claims bar date or the confirmation date without leave of the Bankruptcy Court.  Any amendment to a claim filed after the confirmation date shall be deemed disallowed in full and expunged without any action by Debtors unless the claimholder has obtained prior Court authorization for the filing of such amendment.  The Debtors shall have no obligation to recognize any transfer of any claim after distributions have started.

e.      Unless expressly provided in the Plan, or confirmation order, post-petition interest and fees shall not accrue on or after the Petition Date on account of any claim.

f.      Unclaimed distributions shall be administered pursuant to section 347 of the Bankruptcy Code. Should the holder of an allowed claim fail to negotiate a payment from the Reorganized Debtors within 90 days of the date the check was issued, the Reorganized Debtors shall provide the holder with written notice of the requirement that the holder of an allowed claim must negotiate the payment within 180 days of the date the check was issued. Should the holder thereafter fail to negotiate the payment within 180 days, then upon the expiration of the deadline set forth in section 1143, the Reorganized Debtors may exercise their remedies under section 347(b) of the Bankruptcy Code.

## K.      Subchapter V Trustee

1.      <u>Service of Trustee</u>.  The service of the trustee appointed under Subchapter V of Chapter 11 (the "**Subchapter V Trustee**") shall terminate in accordance with section 1183(c) of Title 11.  In a consensual case, such service shall terminate when the Plan has been substantially consummated.  In a nonconsensual case, the Subchapter V Trustee shall continue to monitor the Reorganized Debtors' compliance with the Plan.  If the Reorganized Debtors fail to timely make any plan payment to creditors, the Subchapter V Trustee may file and serve a notice of delinquency upon the Reorganized Debtors and the Reorganized Debtors' attorney.  The Reorganized Debtors shall have 45 days from the date of the notice of delinquency to make all payments due under the Plan, including any payments that become due within the 45-day period.  If the Reorganized Debtors are seeking to cure the delinquency in a modified plan, the Reorganized Debtors must file a motion to modify the confirmed plan within 45 days of the notice of delinquency.  If the Reorganized Debtors are not current with plan payments on the 45th day after the date of the notice of delinquency or has not filed a motion to modify within that time period, the Trustee may file and serve a report of non-compliance and may thereafter seek the dismissal or conversion of the cases to Chapter 7.

2.      <u>Compensation</u>.  Under section 330 of the Bankruptcy Code, the Subchapter V Trustee shall be compensated for services and reimbursed for expenses.  However, the method of payment of the Subchapter V Trustee compensation depends on the provision under which the Plan is confirmed and the method of disbursement to creditors under the Plan:

a.      The Subchapter V Trustee's total compensation is estimated to be $25,000 through confirmation.  The Subchapter V Trustee will apply to the Court for an award of compensation through the application process that is used by professionals. The Subchapter V Trustee will file a final fee application for compensation to be heard with the other final fee applications in the case.

b.      If the Plan is confirmed on a consensual basis under section 1191(a) of Title 11, the service of the Subchapter V Trustee terminates with substantial consummation of the Plan under section 1183(c)(1). The Subchapter V Trustee's allowed compensation, as with other administrative expenses, is payable on the Effective Date of the Plan, unless the Subchapter V Trustee agrees to different treatment.

c.      If the Plan is confirmed on a non-consensual basis under section 1191(b) of Title 11, then the Subchapter V Trustee will remain in place throughout the life of the Plan, and the Subchapter V Trustee may be entitled to additional compensation for services provided after confirmation.  The fee for the Subchapter V Trustee to monitor the plan payments made by Debtors shall be $1000 on a semi-annual basis.  As such, the Subchapter V Trustee may file additional or supplemental fee applications throughout the life of the Plan.  Upon approval of the Subchapter V Trustee's fee applications in a non-consensual case, as long as all professional administrative claims are similarly treated in the Plan, the Debtors shall pay all fee amounts due to the Subchapter V Trustee on the Effective Date of the Plan, over the remaining life of the Plan, or forthwith.

## L.      Additional Provisions

1.      <u>Definitions and rules of construction</u>.  The definition and rules of construction set forth in sections 101 and 102 of the Code shall apply when terms are defined or construed in the Code are used in this Plan.

2.      <u>Effective Date</u>.  The Effective Date of this Plan is the first business day following the date that is 14 days after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on that date, the Effective Date will be the first business day after the date on which the stay expires or is otherwise terminated.

3.      <u>Severability</u>.  If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

4.      <u>Binding effect</u>. The rights and obligations of any entity named or referred to in this Plan will be binding upon them, and will inure to the benefit of the successors or assigns of such entity.

5.      <u>Captions</u>.  The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

6.      <u>Corporate Governance</u>. The issuance of non-voting securities will be prohibited in the charter of Reorganized Debtors to the extent required to comply with §1123(a)(6) of the Code.

7.      Default Remedies. If the Debtors do not make the payments provided for under the Plan as and when due, the Debtors will be in default under the Plan ("**Default**").  After the occurrence of a Default, any creditor may send written notice to the Debtors, with a copy to Debtors' attorney and the Subchapter V Trustee, that the Debtors are in Default under the Plan ("**Default Notice**").  For payments to general unsecured creditors, the Debtors will be entitled to a 45-day grace period after the transmission of the Default Notice ("**Grace Period**") to cure the default.  If the Debtors have not cured the Default within the Grace Period, the creditor is entitled to commence a lawsuit to liquidate its claim in the Circuit Court of Hillsborough County, Florida.  For payments to secured creditors, secured creditors will be entitled to exercise any and all in rem rights against their collateral except that Debtors shall be entitled to a 15-day grace period after transmission of the Default Notice.  This provision survives the confirmation of the Plan, and creditors are entitled to enforce this provision post-confirmation.  The bankruptcy court with jurisdiction over this Plan retains jurisdiction to enforce this provision of the Plan.

8.      Vesting of Assets.  Pursuant to section 1141(c), as of the Effective Date, all property of the Debtors' estate will vest in the Reorganized Debtors, free and clear of any and all liens, debts, obligations, claims, liabilities, and all other interests of every kind and nature, except for the Plan Obligations and as otherwise provided under the Plan.

9.      Discharge.

a.      Consensual Plan.  If the Debtors' Plan is confirmed under section 1191(a), then pursuant to section 1141(d) of the Bankruptcy Code, the distributions, rights, and treatment that are provided in the Plan shall, effective as of the Effective Date, be in complete satisfaction, discharge, and release of claims, interests, and causes of action against Debtors of any nature whatsoever, including any interest accrued on claims from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and interests in, the Debtors' or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such claims and interests, including demands, liabilities, and causes of action that arose before the Effective Date, and any liability to the extent such claims or causes of action accrued before Effective Date.  On the confirmation date of this Plan, the Debtors as they exist post-Effective Date (the "Reorganized Debtor") will be discharged from any debt that arose before confirmation of this Plan, subject to the occurrence of the Effective Date, to the extent specified in section 1141(d)(1)(A) of the Code, except that the Debtors will not be discharged of any debt: (i) imposed by this Plan; (ii) of a kind specified in section 1141(d)(6)(A) if a timely complaint was filed in accordance with Rule 4007(c) of the Federal Rules of Bankruptcy Procedure; or (iii) of a kind specified in section 1141(d)(6)(B).

b.      Non-Consensual Plan. If the Plan is confirmed under section 1191(b) of this title, confirmation of the Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due within the first 5 years of this Plan, or as otherwise provided in § 1192 of the Code.

10.      **Releases.        On the Effective Date of this Plan, without the need for execution or delivery of any additional documentation or orders of the Bankruptcy Court,**

and in exchange for valuable consideration of and under this Plan, HLFIP Holding, LLC, Jonathan Logan, Smart Communications Yacht Holdings, LLC, Loco Florida LLC, and any of their agents, representatives, professionals, attorneys, employees, officers, directors, managers, members, or equity holders (collectively, the "Released Parties") will be fully and finally released and forever discharged from any and all claims, actions, causes of action, liabilities, obligations, rights, suits, accounts, covenants, contracts, controversies, agreements, promises, damages, judgments, debts, encumbrances, liens, remedies, and demands, of every kind and nature whatsoever, in law or in equity, that the Debtors have asserted or could assert against any of the Released Parties prior to the Effective Date (collectively, "Released Claims").    The Released Claims shall expressly exclude any obligations by the Released Parties pursuant to the Plan.    The Released Parties shall expressly exclude Janice Logan, Alexis Logan,  and the James Logan Family Trust, dated February 10, 2021, James Logan, the James Logan probate estate, and Justin Peterson.

11.    <u>Exculpation.</u>  Except as specifically provided in the Plan, neither the Debtors, nor their employees, representatives, members, advisors, attorneys, accountants, financial advisors, or agents, or any of such parties' successors or assigns, shall have or incur, and are hereby released from, any claim, obligation, cause of action or liability to one another or to any holder of a claim or interest, or any other party in interest, or any of their respective officers, directors, shareholders, members, employees, representatives, advisors, attorneys, accountants, financial advisors, agents, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the negotiation and pursuit of confirmation of this Plan, the consummation of this Plan, or the administration of this Plan, or the property to be distributed under the Plan, except for their gross negligence, willful misconduct, or actual fraud, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities (if any) under this Plan.

12.    <u>Discharge Injunction.</u>  Except as otherwise specifically provided in the Plan or the Confirmation Order, all entities and persons, and any successor, assigns or representatives of such entities and persons, who have held, hold, or may hold claims, rights, causes of action, liabilities, equity interests, or any other interests based on any act or omission, transaction, or other activity of any kind or nature related to the Debtors, Debtors in Possession, or the Chapter 11 Cases that occurred prior to the Effective Date ("Enjoined Claim"), regardless of the filing, lack of filing, allowance or disallowance of such claim or interest, and regardless of whether such entity or person has voted to accept the Plan, shall be precluded and permanently enjoined on and after the Effective Date from:

 (a) the commencement or continuation in any manner of any claim, action or other proceeding of any kind with respect to any Enjoined Claim, against (i) any assets of the Debtors, (ii) any assets re-vested in the Reorganized Debtors, (iii) the Debtors or Reorganized Debtors;

(b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree or order with respect to any Enjoined Claim, against (i) any assets of the Debtors, (ii) any assets re-vested in the Reorganized Debtors, (iii) the Debtor or Reorganized Debtors;

**(c) the creation, perfection, or enforcement of any encumbrance or lien of any kind with respect to any Enjoined Claim, against (i) any assets of the Debtors, (ii) any assets re-vested in the Reorganized Debtors, (iii) the Debtors or Reorganized Debtors; and**

13.   <u>Request for "Cram Down" of Non-Accepting Classes</u>.  The Debtors request that the Court confirm the Plan notwithstanding the failure of classes to vote to accept the Plan. Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in a manner prescribed by section 1191 of the Code.  A Plan that binds nonaccepting classes is commonly referred to as a "cram down" Plan.  The Code allows the Plan to bind non-accepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the requirements of sections 1129(a)(8), 1129 (a)(10), or 1129 (a)(15) of the Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan under the standard of section 1191(c) of the Code. **Creditors and Equity Interest Holders concerned with how the cram down provisions will affect your claim or equity interest should seek independent counsel, as the variations on this general rule are numerous and complex.**  The Debtors are not required to file a motion or other pleading to seek and obtain cram down of a Plan. As a result, the Debtors will seek the Court's confirmation of this Plan in accordance with the cram down provisions of the Bankruptcy Code by *ore tenus* motion at the date and time of the confirmation hearing without further notice to creditors or other parties in interest.

14.   <u>Retention of Jurisdiction</u>.  Until the case is closed, the Court shall retain jurisdiction to insure that the purpose and intent of the Plan are carried out.  The Court shall retain jurisdiction to hear and determine the following:

a.      the classification of the claim of any creditor and the re-examination of claims which have been allowed for purposes of voting and the determination of such objections as may be filed against creditor's claims;

b.      the determination of all questions and disputes regarding title to the assets of the estate and the determination of all causes of action, controversies, disputes or conflicts whether or not subject to action pending as of the date of confirmation between the Debtors and any other party included but not limited to any rights of parties in interest to recover assets pursuant to the provisions of Title 11 of the United States Code;

c.      the correction of any defect, the curing of any omission or the reconciliation of any inconsistency in the Plan or the Order of Confirmation as may be necessary to carry out the purposes and intent of the Plan;

d.      the modification of this Plan after confirmation pursuant to the Bankruptcy Rules and Title 11 of the United States Code;

e.      the enforcement and interpretation of the terms and conditions of this Plan, including but not limited to questions relating to the scope of the releases and the enforcement of the releases, and the entry of an Order necessary to interpret and enforce the releases;

f.    the entry of an Order including injunctions necessary to enforce the title rights and powers of parties in interest and to impose such limitations, restrictions, terms and conditions of such title rights and powers as this Court may deem necessary; and

g.    the entry of an order concluding and terminating this case.

Respectfully submitted and executed on December 17, 2024,

SMART COMMUNICATIONS
HOLDING, INC.

By: _____

SMART COMMUNICATIONS
HOLDING, LLC.,

By: _____

HLFIP HOLDING, LLC

By: _____

SMART COMMUNICATIONS
YACHT HOLDINGS, LLC

By: _____

LOCO FLORIDA, LLC

By: _____

_____
JONATHAN LOGAN

Dated:  December 17, 2024

/s/ *Daniel R. Fogarty*

Daniel R. Fogarty
Florida Bar 0017532
Stichter, Riedel, Blain & Postler, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone: (813) 229 0144
Email:  dfogarty@srbp.com
Attorneys For Debtors

# EXHIBIT A

# MEMORANDUM

**To:**    Smart Communications Holding, Inc.

**From:** HLFIP Holding, LLC (formerly HLFIP Holding, Inc.)

**CC:**    File

**Date:**  August 29, 2023

**Re:**    Termination of Exclusive Oral License Agreement Between HLFIP Holding, Inc. and
Smart Communications Holding, Inc.

---

This memorandum shall serve as a memorialization that the exclusive oral license (the "License
Agreement") granted to Smart Communications Holding, Inc. ("Smart Comm") by HLFIP
Holding, Inc. ("HLFIP") for use of any and all intellectual property owned by HLFIP is
terminated effective as of August 29, 2023.

Notwithstanding, any of Smart Comm's existing contracts utilizing HLFIP's intellectual property
("Legacy Contracts") that are affected by this termination of the License Agreement will be
permitted to continue to use HLFIP's intellectual property until the Legacy Contracts naturally
terminate or expire, or the obligations therein to Smart Comm otherwise cease, but the Legacy
Contracts may not be extended, renewed, renegotiated, or otherwise expanded in a manner that
goes beyond the scope of the existing terms as of August, 29, 2023.

Additionally, given the current status of outstanding requests for proposals and participation in
bidding efforts, Smart Comm may continue to market and offer the licensed intellectual property
up to March 31, 2024 (the "Transitory Period"). At the end of the Transitory Period, unless
otherwise extended, Smart Comm must cease any and all marketing or offers for sale or use of
the licensed intellectual property.

This termination does not release Smart Comm from its obligation to pay any ongoing amounts
due pursuant to the License Agreement through the completion and related to the performance of
all Legacy Contracts.

Accordingly, any and all rights Smart Comm had to utilize HLFIP's intellectual property covered
under the License Agreement is terminated, other than the specific, limited exceptions noted
above.

CONFIDENTIAL LICENSE AGREEMENT

# EXCLUSIVE INTERCOMPANY
# INTELLECTUAL PROPERTY LICENSE AGREEMENT

This Exclusive Intercompany Intellectual Property License Agreement ("**Agreement**"), effective as of August 29, 2023 (the "**Effective Date**"), is by and between HLFIP Holding, LLC, a Delaware limited liability company ("**Licensor**") and Smart Communications Holding, LLC, a Delaware limited liability company ("**Licensee**") (collectively, the "**Parties**," or each, individually, a "**Party**").

WHEREAS, Licensor is the sole owner of all right, title, and interest in certain intellectual property, including proprietary technology, patents, patent applications, registered and common law names, trademarks, service marks, logos, federal trademark registrations, and know-how (including those items set forth on **Schedule 1**, which may be supplemented or amended from time to time) aimed at inmate communications technology and services, including to eliminate contraband in postal mail at correctional facilities, improve the safety of inmates and correctional facilities, improve correctional facility and inmate surveillance, and improve communication systems to be used by inmates and their friends and families (collectively, the "**Licensed Intellectual Property**");

WHEREAS, Licensee desires to distribute and sell inmate communication systems and services to correctional facilities in the United States (the "**Business**");

WHEREAS, Licensee specifically acknowledges that Licensor has valuable goodwill associated with its names, trademarks, service marks, and logos used as trademarks in connection with inmate communication systems and services;

WHEREAS, Licensee wishes to license the Licensed Intellectual Property to facilitate Licensee's conduct of the Business;

WHEREAS, Licensor is willing to grant to Licensee an exclusive license to use the Licensed Intellectual Property on the terms set forth herein;

WHEREAS, the parties desire to allocate rights to the intellectual property developed by, or acquired by either of them for inmate communication systems and services developed under this Agreement in accordance with the terms and conditions set forth herein; and

WHEREAS, Licensor and Licensee are commonly controlled.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.   License.

    1.1   License Grant. Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee during the Term (as defined below) an exclusive, non-transferable,

## CONFIDENTIAL LICENSE AGREEMENT

non-sublicensable license to make, have made, use, import, export, sell, and offer for sale the Licensed Intellectual Property in connection with the conduct of the Business in the United States and in accordance with standards, specifications, and/or instructions approved by Licensor, from time to time.

1.2     Ownership. Licensee acknowledges and agrees that Licensor shall retain all right, title, and interest in and to the Licensed Intellectual Property and all rights relating thereto; that the license and rights granted in this Agreement will not be construed to confer any rights upon Licensee by implication, estoppel, or otherwise as to any technology not identified in **Schedule 1**; that all use and goodwill symbolized by and connected with the use of the Licensed Intellectual Property by Licensee shall inure solely to the benefit of Licensor; and that Licensee acquires no ownership right in or to the Licensed Intellectual Property as a result of this Agreement.

1.3     Prosecution and Maintenance. Licensor has the sole right, in its discretion and at its Licensee's expense, to file, prosecute, and maintain all applications, registrations, and patents relating to the Licensed Intellectual Property. Licensee shall provide, at the request of Licensor and at Licensee's expense, all necessary assistance with such filing, maintenance, and prosecution.

1.4     Recordation of License. Licensor shall make all necessary filings to record this Agreement in the United States Patent and Trademark Office and in the corresponding offices or agencies where it may be required under applicable law, including as a prerequisite to enforcement of the Licensed Intellectual Property or enforceability of this Agreement in the courts, and any recordation fees and related costs and expenses will be at Licensee's expense.

1.5     Assignments and Sublicensing. The license hereby granted is and shall be personal to the Licensee, and unless Licensor consents in writing, shall not be assignable by any act of Licensee or by operation of law. Furthermore, the license and rights granted hereunder may not be sublicensed, conveyed, assigned, or otherwise transferred by Licensee to any third party. Any purported sublicense, conveyance, assignment, or transfer will be void and of no force and effect.

1.6     Prior Exclusive License Agreement. Licensee acknowledges that Licensor previously exclusively licensed the Licensed Intellectual Property to another party, and that under that pre-existing license agreement, the prior licensee executed contracts that extend beyond the Effective Date of this Agreement. Licensee hereby acknowledges that despite Licensor's exclusive license grants to Licensee under this Agreement, Licensor has also agreed to allow the prior licensee to continue to use the Licensed Intellectual Property beyond this Agreement's Effective Date, until the prior contracts naturally expire. Licensee hereby consents to this limited period of overlap of the Licensed Intellectual Property license grants.

1.7     Reservation of Rights. Licensor hereby reserves all rights not expressly granted to Licensee under this Agreement.

2.     Use of Licensed Intellectual Property.

2

## CONFIDENTIAL LICENSE AGREEMENT

2.1    Notices. Licensee shall ensure that all use of Licensed Intellectual Property hereunder is accompanied by or marked with the appropriate proprietary rights notices, symbols, and legends as may be reasonably necessary under applicable law to maintain the Licensed Intellectual Property and Licensor's proprietary rights therein and in such order and manner as may be reasonably specified by Licensor. Without limiting the foregoing, Licensee shall comply with the patent marking provisions of 35 U.S.C. § 287(a) by marking all Licensed Products/patented products covered by any Licensed Intellectual Property with the word "patent" or the abbreviation "pat." and either the relevant patent numbers or a web address that is freely accessible to the public and that lists the relevant patent numbers.

2.2    Modifications. As between the Parties, Licensor owns any improvement, enhancement, or other modification of or derivative work based on any of the Licensed Intellectual Property made by or on behalf of Licensee or Licensor (each, a "**Modification**"). Licensee shall immediately notify Licensor of any Modification made by or on behalf of Licensee (each, a "**Licensee Modification**"). Licensee hereby assigns to Licensor all of its right, title, and interest in and to all Licensee Modifications, including all rights to apply for any patents, trademarks, or other intellectual property registrations with respect to such Licensee Modifications and all enforcement rights and remedies for past, present, and future infringement thereof and all rights to collect royalties and damages therefor. All patent applications and trademark applications filed by Licensor with respect to any such Licensee Modification and all patents or trademark registrations issuing therefrom shall automatically be included in the Licensed Intellectual Property and subject to the license granted to Licensee under Section 1.1. At the request of Licensor, Licensee shall promptly execute and deliver such documents as may be necessary or desirable to effect and perfect the foregoing assignment of rights.

2.3    Quality. Licensee acknowledges and is familiar with the high standards and reputation for quality symbolized by the trademarks, service marks, and logos included in the Licensed Intellectual Property as of the Effective Date ("**Licensed Marks**"). Licensee agrees to conduct the Business and use the Licensed Marks in a manner at least consistent with such quality standards and reputation. Licensee shall comply with Licensor's guidelines and specifications regarding the style, appearance, and usage of the Licensed Marks. Licensor may exercise quality control over all uses of the Licensed Marks under this Agreement to maintain the validity of the Licensed Marks and protect the goodwill associated therewith. If Licensor determines that the quality and nature of the goods and services with which the Licensed Marks are used by Licensee do not meet the standards and requirements set forth by Licensor, Licensee agrees to meet or exceed the standards and requirements set forth by Licensor within thirty (30) days of receiving written notification of a failure to meet the standards and requirements for the quality and nature of the goods with which the Licensed Marks are used. Approval of any use by Licensee of the Licensed Marks, once given by Licensor, will continue in effect, without need for future approval, so long as Licensee's use of the Licensed Marks in connection with the goods and services of the Business continues to be substantially consistent with such previously approved use.

3.    Improvements.

3.1    Ownership of Improvements. Each Party shall advise the other of any technical improvements, modifications, or enhancements relating to the Licensed Intellectual Property

3

## CONFIDENTIAL LICENSE AGREEMENT

created from time to time and useful to effectively operate the Licensed Intellectual Property (collectively referred to as "**Improvements**"). Any and all such Improvements shall be the property of Licensor. All Improvements made by Licensor shall be included in the license grant of Section 1.1. All Improvements made by Licensee shall be the property of Licensor and shall be licensed to Licensee for its use. Improvements that are made jointly by the parties shall be owned by Licensor. Each Party agrees to execute any and all documents requested by the other to perfect rights to jointly made Improvements.

4.    Actions by Third Parties.

4.1    Infringement Actions. Licensee shall promptly notify Licensor in writing of any actual, suspected, or threatened infringement, misappropriation, or other violation of any Licensed Intellectual Property by any third party of which it becomes aware. Licensor has the sole right, in its discretion, and at Licensee's expense, to (a) bring any action or proceeding with respect to any such infringement; (b) defend any declaratory judgment action concerning any Licensed Intellectual Property; and (c) control the conduct of any such action or proceeding (including any settlement thereof). Licensee shall provide Licensor with all assistance that Licensor may reasonably request, at Licensee's expense, in connection with any such action or proceeding. Licensor and Licensee will evenly split any monetary recovery resulting from any such action or proceeding (including any settlement thereof) for each's own account, subject to reimbursement of Licensee's costs, fees or expenses incurred in such action.

4.2    Other Actions by a Third Party. Each Party shall promptly notify the other in the event of any legal or administrative action by any third party involving the Licensed Intellectual Property of which it becomes aware, including any opposition, cancellation, or revocation proceeding. Licensor shall have the right, but not the obligation, to defend against any such action involving the Licensed Intellectual Property, and any such defense shall be at Licensee's expense. If Licensor fails to defend against any such action, then Licensee shall have the right to defend such action, in its own name, and any such defense shall be at Licensee's expense.

5.    Payment.

5.1    Royalty. On or before the last business day of each calendar year during the term of this Agreement, Licensee shall pay to Licensor a royalty of 40 percent (40%) of the Net Sales of products and services sold by Licensee to any third party ("**Royalty Fee**"). "**Net Sales**" means, for any period of determination, the aggregate amount invoiced by Licensee to a third party for Business in the United States, less any credits, refunds, customary and usual trade discounts, rebates, discounts, charge-backs, and sales taxes, excluding net income tax. The amounts of any deductions shall be determined from books and records maintained in accordance with International Financial Reporting Standards, consistently applied.

5.2    Maintenance of Books and Records; Record Inspection and Audit. Licensee shall keep complete and accurate books and records as reasonably necessary for the calculation the Royalty Fee payable under Section 5.1. Licensee further agrees it shall make these records available for inspection, from time to time, by Licensor, or a third party retained by Licensor, at Licensee's site and at Licensee's cost. Any audit and/or inspection shall be conducted during

## CONFIDENTIAL LICENSE AGREEMENT

regular business hours at Licensee's facilities upon at least seven (7) days prior written notice. Such examination shall be conducted in such a manner as to not unduly interfere with Licensee's business. If the audit reveals an underpayment of Royalty Fee by Licensee under this Agreement, Licensee shall pay to Licensor the full amount of any underpayment revealed by the audit, plus interest at the per annum prime rate in effect at the Chase Manhattan Bank, N.A., New York, New York, on the due date.

6.    <u>Confidentiality</u>. Each Party acknowledges that in connection with this Agreement it will gain access to certain confidential and proprietary information of the other Party (collectively, **"Confidential Information"**). Without limiting the foregoing, for purposes of this Agreement, all trade secrets and confidential information included in the Licensed Intellectual Property, including unpublished patent applications, will be deemed Confidential Information of Licensor. Each Party shall maintain the Confidential Information in strict confidence and not disclose any Confidential Information to any other person, except to its employees who (a) have a need to know such Confidential Information for such Party to exercise its rights or perform its obligations hereunder; and (b) are bound by written nondisclosure agreements. Each Party shall use reasonable care, at least as protective as the efforts it uses with respect to its own confidential information, to safeguard the Confidential Information from use or disclosure other than as permitted hereby.

7.    <u>Indemnification</u>. Licensee shall indemnify, defend, and hold harmless Licensor, its Affiliates, officers, directors, employees, agents and representatives against all losses, liabilities, claims, damages, actions, fines, penalties, expenses or costs (including court costs and reasonable attorneys' fees) arising out of or in connection with any third-party claim, suit, action, or proceeding relating to any breach of this Agreement by Licensee and use by Licensee of any Licensed Intellectual Property under this Agreement.

8.    <u>Term and Termination</u>. This Agreement begins on the Effective Date and will remain in force until terminated (**"Term"**). Licensor may terminate this Agreement at any time without cause, and without incurring any additional obligation, liability, or penalty. Licensee may terminate this Agreement at any time with prior written notice to Licensor.

9.    <u>General Provisions</u>.

9.1    <u>Amendments</u>. No amendment to this Agreement will be effective unless it is in writing and signed by both Parties.

9.2    <u>No Third-Party Beneficiaries</u>. This Agreement solely benefits the Parties and their respective permitted successors and assigns and nothing in this Agreement, express or implied, confers on any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

9.3    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement.

9.4    <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability will not affect

## CONFIDENTIAL LICENSE AGREEMENT

any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

9.5    Governing Law. This Agreement, including all exhibits, schedules, attachments, and appendices attached to this Agreement and thereto, and all matters arising out of or relating to this Agreement, are governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Delaware.

9.6    Waiver. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power, or privilege arising from this Agreement will operate or be construed as a waiver thereof, nor will any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

9.7    Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified):

If to Licensor:
> HLFIP Holding, LLC
> 10491 72nd Street
> Seminole, Florida 33777
> Email: jon.logan787@gmail.com
> Attention: Jon Logan

If to Licensee:
> Smart Communications Holding, LLC
> 10491 72nd Street
> Seminole, Florida 33777
> Email: legal@smartcommunications.us
> Attention: Legal Dept.

9.8    Entire Agreement. This Agreement, including and together with any related exhibits, schedules, attachments, and appendices, constitutes the sole and entire agreement of Licensor and Licensee with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, regarding such subject matter.

[SIGNATURE PAGE FOLLOWS]

## CONFIDENTIAL LICENSE AGREEMENT

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the August 29, 2023, by their respective officers thereunto duly authorized.

HLFIP Holding, LLC

By_____

Name: Jon Logan

Title: President




Smart Communications Holding, LLC

By_____

Name: Jon Logan

Title: CEO

## CONFIDENTIAL LICENSE AGREEMENT

## SCHEDULE 1: LICENSED INTELLECTUAL PROPERTY

| PATENTS | | | | |
|---|---|---|---|---|
| Assignee | Country | Title | Publication No. | Patent No. |
| HLFIP Holding, LLC | USA | CORRECTIONAL POSTAL MAIL CONTRABAND ELIMINATION SYSTEM | 2020/0128014 A1 | 11457013 |
| HLFIP Holding, LLC | USA | CORRECTIONAL POSTAL MAIL CONTRABAND ELIMINATION SYSTEM | 2016/0337360 A1 | 10291617 |
| HLFIP Holding, LLC | USA | CORRECTIONAL INSTITUTION LEGAL POSTAL MAIL PROCESSING SYSTEM AND METHOD | 2020/0280645 A1 | 11637940 |
| HLFIP Holding, LLC | USA | CORRECTIONAL INSTITUTION LEGAL POSTAL MAIL PROCESSING SYSTEM AND METHOD | 2019/0268488 A1 | 10659630 |
| HLFIP Holding, LLC | USA | COMMUNICATION TRACKING SYSTEM FOR CORRECTIONAL FACILITIES | 2019/0386996 A1 | 10862891 |
| HLFIP Holding, LLC | USA | SYSTEMS AND METHODS FOR PROCESSING REQUESTS TO SEND PRIVATE POSTAL MAIL TO AN INMATE | 2020/0396347 A1 | 11201974 |

8

CONFIDENTIAL LICENSE AGREEMENT

| PATENT APPLICATIONS | | | | | |
|---|---|---|---|---|---|
| Assignee | Country | Title | Application No. | Filing Date | Publication No. |
| HLFIP Holding, LLC | USA | CORRECTIONAL POSTAL MAIL CONTRABAND ELIMINATION SYSTEM | 17/363499 | 06/30/2021 | 2022/0060475 A1 |
| HLFIP Holding, LLC | USA | COMMUNICATION TRACKING SYSTEM FOR CORRECTIONAL FACILITIES | 17/114326 | 12/7/2020 | 2021/0194878 A1 |
| HLFIP Holding, LLC | USA | SYSTEMS AND METHODS FOR PROCESSING REQUESTS TO SEND PRIVATE POSTAL MAIL TO AN INMATE | 17/549349 | 12/13/2021 | 2022/0103701 A1 |
| HLFIP Holding, LLC | USA | SMART WEARABLE DEVICE FOR TRACKING AND MONITORING INDIVIDUALS IN A CORRECTIONAL FACILITY | 17/580462 | 1/20/2022 | 2022/0225947 A1 |
| HLFIP Holding, LLC | USA | STATIONARY EXERCISE BIKE FOR USE IN A CORRECTIONAL FACILITY | 17/194190 | 3/5/2021 | 2021/0275863 A1 |

## CONFIDENTIAL LICENSE AGREEMENT

| TRADEMARKS | | | |
|---|---|---|---|
| Owner | Country | Trademark | Reg. No. |
| HLFIP Holding, LLC | USA | MAILGUARD | 5,135,773 |
| HLFIP Holding, LLC | USA | MAILGUARD POSTAL MAIL ELIMINATION LOGO | 5,135,772 |
| HLFIP Holding, LLC | USA | MAILGUARD CONNECT | |
| HLFIP Holding, LLC | USA | MAILGUARD DIGITAL | |
| HLFIP Holding, LLC | USA | MAILGUARD TRACKER | |
| HLFIP Holding, LLC | USA | MAILGUARDLEGAL | |
| HLFIP Holding, LLC | USA | SMARTECOSYSTEM | |
| HLFIP Holding, LLC | USA | SMARTED | |
| HLFIP Holding, LLC | USA | SMARTENTERTAINMENT | |
| HLFIP Holding, LLC | USA | SMARTLAW | |
| HLFIP Holding, LLC | USA | SMARTLINK | |
| HLFIP Holding, LLC | USA | SMARTREENTRY | |
| HLFIP Holding, LLC | USA | SMARTREQUEST | |
| HLFIP Holding, LLC | USA | SMARTSUMMIT | |
| HLFIP Holding, LLC | USA | SMARTTABLET | |
| HLFIP Holding, LLC | USA | SMARTVISIT | |
| HLFIP Holding, LLC | USA | SMARTWATCH | |

CONFIDENTIAL LICENSE AGREEMENT

| LICENSED KNOW HOW | |
|---|---|
| Owner | Technology |
| HLFIP Holding, LLC | MAILGUARD |
| HLFIP Holding, LLC | MAILGUARD DIGITAL |
| HLFIP Holding, LLC | MAILGUARD TRACKER |
| HLFIP Holding, LLC | MAILGUARDLEGAL |
| HLFIP Holding, LLC | SMARTECOSYSTEM |
| HLFIP Holding, LLC | SMARTED |
| HLFIP Holding, LLC | SMARTENTERTAINMENT |
| HLFIP Holding, LLC | SMARTLAW |
| HLFIP Holding, LLC | SMARTLINK |
| HLFIP Holding, LLC | SMARTREENTRY |
| HLFIP Holding, LLC | SMARTREQUEST |
| HLFIP Holding, LLC | SMARTTABLET |
| HLFIP Holding, LLC | SMARTVISIT |
| HLFIP Holding, LLC | SMARTWATCH |

# EXHIBIT B

**In re Smart Communications Holding, Inc. et al.**
**Liquidation Analysis**

*This Liquidation Analysis was formulated based on information considered as of November 30, 2024. This Liquidation Analysis is intended to quantify estimated recoveries that could be expected by creditors holding claims against the Debtors if the Plan were not confirmed and the Debtors' assets were instead liquidated by a chapter 7 trustee. The column headed "Estimated Liquidation Value" represents the Debtors' estimate of the value that could be obtained, net of sales or other expenses, in a chapter 7 liquidation where a chapter 7 trustee has the duty to convert the assets of the estates to cash as quickly as possible under 11 U.S.C. § 704(a)(1).*

| | Estimated Liquidation Value | Note # |
|---|---:|:---:|
| **Estimated Liquidation Value - Assets** | | |
| Cash on Hand - Debtors | 33,000 | 1 |
| Smart Collier Cash on Hand, net of liquidation expenses of Smart Collier | 100,000 | 2 |
| Accounts Receivable - trade | 220,000 | 3 |
| Prepaid Expenses | 990,631 | 4 |
| Inventory | - | 5 |
| Office Furniture, Fixtures, Equipment | 10,000 | 6 |
| Customer and facility contracts | - | 7 |
| Intellectual Property owned by the Debtors | - | 8 |
| Exclusive License with HLFIP | | 9 |
| Non-Core Business Assets - Debtors-owned | | |
|     Vehicles Titled in Debtors' names | 200,000 | 10 |
|     Ranch Mansion | 2,500,000 | 11 |
|     Tierra Verde House | 1,400,000 | 12 |
| Litigation Claims | | 13 |
|     Litigation Expenses attributable to litigation claims | (500,000) | |
|     Litigation Claims against Janice Logan, Alexis Logan, Estate of James Logan, etc. | - | |
|     Vehicles titled to and in possession of Janice Logan, Alexis Logan, others | - | |
|     Vehicles titled to and in possession of Jon Logan | 240,000 | |
|     Miami condo titled to Jon Logan | 880,000 | |
|     Smart Communications Yacht Holding (vessel) | 960,000 | |
|     Nor-Tech boat | 440,000 | |
|     Loco Florida, LLC, including rent offset | 100,000 | |
|     Other Litigation Clams | Unknown | |
| **Total Proceeds From Assets** | **7,573,631** | |
| | | |
| **Secured Claims** | | |
| None - secured claims of Smart Collier addressed in Smart Collier entry | - | |
| **Total Amount of Secured Claims** | **-** | |
| | | |
| **Estimated Ch. 7 Priority and Administrative Expenses** | | |
| Chapter 7 Trustee Fees Pursuant to 11 U.S.C. § 326 | 384,432 | 14 |
| Chapter 7 Trustee's General Counsel (Estimated) | 100,000 | |
| Other Chapter 7 Administrative Expense Claims | 50,000 | |
| Chapter 11 Administrative Expense Claims | 250,000 | |
| **Total Amount of Ch. 7 Priority and Administrative Expenses** | **784,432** | |
| | | |
| **Proceeds Available for All Unsecured Claims in Chapter 7** | **6,789,199** | |

## ASSUMPTIONS IN THE PREPARATION OF THE LIQUIDATION ANALYSIS IN CONNECTION WITH DEBTORS' PLAN

1.  This Liquidation Analysis was prepared in accordance with the requirements of §§ 1129 and 1191 of the Bankruptcy Code to establish that the Plan is in the best interest of each holder of a claim or interest.

2.  The Liquidation Analysis is based upon certain estimates and assumptions that, although developed and considered reasonable by the Debtors, are inherently subject to significant economic factors, market conditions, uncertainties, and contingencies beyond the control of the Debtors. The Liquidation Analysis is also based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if the Debtors were in fact to undergo such liquidation and actual results could vary materially and adversely from those contained herein. The liquidation and reorganization values represent the Debtors' best estimate of those values based on available information.

3.  This analysis assumes the conversion of the current Chapter 11 cases to Chapter 7 cases with the liquidation of the Debtors' assets by a Chapter 7 Trustee within a significantly abbreviated timeframe. One or more Chapter 7 Trustees would be appointed by the Bankruptcy Court to administer the estates. The Chapter 7 Trustee is independent and would be entitled to make all of his or her own decisions regarding the liquidation of the estates' assets, the hiring of professionals, the pursuit of claims or litigation and the payment of or objection to claims. The distribution of any ultimate dividend would be made in accordance with the priorities established by the Bankruptcy Code. The Chapter 7 Trustee would be compensated in accordance with the Bankruptcy Code.

4.  The Liquidation Analysis assumes the liquidation of Smart Collier, a wholly-owned subsidiary of the Debtors, and the net assets from the liquidation distributed by a Chapter 7 Trustee. The Liquidation Analysis assumes that the administration of the Debtors together from a liquidation perspective for convenience purposes only, rather than assuming that Holdings LLC is liquidated and then net funds up-streamed to Holdings, Inc., or on any other basis.

5.  The Liquidation Analysis uses the Debtors' unaudited financial information, and other figures estimated by the Debtors' management and professionals.

6.  There can be no assurances made that all of the Debtors' assets will be completely liquidated during the shortened liquidation period in a Chapter 7.

7.  This Liquidation Analysis is the Debtors' best estimate of the net value of assets available to distribution to their creditors after deducting the value of secured and administrative claims. To the extent the Debtors' estates re comprised of assets that had no value or nominal value as set forth in the Debtors' bankruptcy schedules, those assets were excluded from this analysis.

8.  This Liquidation Analysis is without prejudice to the Debtors' ability to object to the characterization, amount, secured status or classification of any claim or asset. The Debtors reserves all rights and objections to any filed or scheduled claim, and any application or motion

seeking an administrative expense claim.  Reference to any filed or scheduled claim or any pleading seeking a claim shall not constitute a waiver of any kind.

## NOTES TO LIQUIDATION ANALYSIS

1.      Cash in Debtor's bank accounts as of the Petition Date. The Debtors' cash assets include a Certificate of Deposit in place for utilities and other services in California, and may be offset in a liquidation. The Debtor's Cash balance will change prior to the Confirmation Hearing.

2.      The estimated amount of cash in Smart Collier bank accounts, plus vehicle sales net of secured debt, and less any expected payables and other winddown costs of Smart Collier.

3.      The face amount of the accounts receivable as of the Petition Date.  The related party accounts receivable are presumed to be uncollectible or otherwise recoverable as part of the "Litigation Claims" line item. Due to the nature of the trade accounts receivable, the Debtors estimate that the forced liquidation of these assets, account for setoff and other defenses, would result in a Chapter 7 trustee receiving 20% of the scheduled value.

4.      The amount of the Prepaid Expenses on the Debtors' consolidated balance sheet as of the Petition Date. It is estimated that prepaid contract expenses, facility commissions, and landlord security deposit(s) or rent prepayments are not recoverable in a liquidation. The amount listed is the book amount of prepaid federal and state income taxes.

5.      The inventory carried on the Debtors' consolidated balance sheet includes both inventory held for installation at customers' facilities, and items already installed at customers' facilities. The inventory held for installation is managed on a "just in time" basis, and therefore varies depending on ordering history and status, and installation progress. The inventory, sourced through an overseas sole-source supplier, largely consists of tablets and related equipment installed in correction facilities and used by inmates, is engraved, branded, customized, and generally operable only as a part of the customized installation, and what remaining tablet inventory remains on hand has little to no resale value to third parties. The inventory installed and in place generally has no material resale value.

6.      The forced liquidation value of the office furniture, fixtures, and equipment as of the Petition Date, in the Debtors' various office locations, based on the age and condition of the items.

7.      Because the Debtors' customer and facility contracts are personal and generally non-assignable by their terms, and given the truncated times for liquidation under a chapter 7, the contracts are presumed to have little to no value in a liquidation.

8.      The value of the Debtors' intellectual property rights, separate and apart from any intellectual property owned by HLFIP and licensed to the Debtors subject to a royalty fee. The Debtors' access to intellectual property and other similar rights are only through the license with HLFIP, and therefore the value of any intellectual property rights outside of that license is expected to have no value in a liquidation.

9.      The value of the license held by the Debtors to use the intellectual property owned by HLFIP, subject to a royalty fee. The license is non-assignable by its terms, and terminable at the election of HLFIP. In a liquidation, a chapter 7 trustee would need to assume the non-transferable license, cure any defaults and arrearages, provide adequate assurance of future

performance, and be able to assume and assign the license notwithstanding the provisions of § 365(c). Given the expected litigation costs and risks, the license is therefore presumed to have little to no value in a liquidation.

10.     The value of the vehicles titled in the Debtors' name. The vehicles include a 2020 Lamborghini Huracan used by Jonathan Logan, a 2021 Cadillac Escalade used by Janice Logan, and other vehicles used by company employees in their activities on behalf of the Debtors. Vehicles owned by Smart Collier are included under the net liquidation value of Smart Collier.

11.     The value of the Ranch Mansion (a 7,000 sq. ft. house on a 20 acre lot located at 1660 Ranch Club Blvd, Sarasota, Florida) owned by Smart Comm FL, assuming a liquidation value is achieved in the sale of the property, and net of costs of sale.

12.     The value of the property located at 788 Columbus Dr., Tierra Verde, Florida) owned by Smart Comm FL. Due to the damaging impact from recent hurricanes, the value has been significantly reduced, and would be further reduced in a liquidation sale context.

13.     The entries under "Litigation Claims" comprise the various claims or causes of action belonging to the Debtors' estate, some of which are being pursued by the Debtors directly, some of which are being pursued by the Trust on a derivative basis, and some of which are not yet being pursued. The Liquidation Analysis generally estimates that the Litigation Claims would ultimately recover the liquidation value of the assets transferred, whether through an avoidance claim or other theory, and would be further reduced by the expenses of the litigation necessary to pursue the litigation and achieve a monetary recovery, and would be subject to a litigation discount for risks associated with litigation and collection under a liquidation scenario of 20%. Additionally, the Litigation Claims against Janice Logan, individually or as trustee, Alexis Logan, the Estate of James Logan are estimated at a zero recovery for purposes of the Liquidation Analysis, including, but not limited to, based on collection risks and are presumed for purpose of this analysis to be subject to a setoff against any recovery on account of any claims against the estates.

14.     Administrative claims include estimated Chapter 11 fees and costs of the Debtors' bankruptcy counsel (Stichter, Riedel, Blain & Postler, P.A.), special counsel (Akerman) and the Subchapter V Trustee, net of any unused retainer(s), assuming that confirmation of the Plan is denied and the case converted to chapter 7. The administrative expense claims will fluctuate prior to confirmation but are estimated at $250,000, and are subject to change prior to the Confirmation Hearing. In addition, in the event of a conversion of the case to Chapter 7, the Chapter 7 Trustee would be entitled to compensation pursuant to 11 U.S.C. §326 computed as follows:

        25% of first $5,000 ($1,250 Maximum)
+       10% of Next $45,000 ($4,500 Maximum)
+        5% of Next $950,000 ($47,500 Maximum)
+        3% of Balance

To the extent that funds are available, any disbursements would be based on the calculations above.

4

# EXHIBIT C

**Smart Communications Consolidated**
**Five Year Projections**

| | Year 1 2025 | Year 2 2026 | Year 3 2027 | Year 4 2028 | Year 5 2029 |
|---|---|---|---|---|---|
| **Operational Revenues** | $69,983,187 | $72,082,683 | $74,245,163 | $76,472,518 | $78,766,694 |
| | | | | | |
| **Plan Funding Revenue** | $5,310,000 | $3,000,000 | $0 | $0 | $0 |
| | | | | | |
| Contractor Services/Contractors | $4,050,000 | $4,171,500 | $4,296,645 | $4,425,544 | $4,558,311 |
| Data Storage/Server Hosting | $496,920 | $511,828 | $527,182 | $542,998 | $559,288 |
| Facility Commissions to Customers | $18,180,000 | $18,725,400 | $19,287,162 | $19,865,777 | $20,461,750 |
| Freight and Shipping Costs | $999,900 | $1,029,897 | $1,060,794 | $1,092,618 | $1,125,396 |
| Internet Service at Customer Facilities | $1,212,000 | $1,248,360 | $1,285,811 | $1,324,385 | $1,364,117 |
| Travel Expenses - Technicians Traveling for Customer Maintenance | $2,121,000 | $2,184,630 | $2,250,169 | $2,317,674 | $2,387,204 |
| Merchant Account Fees including Chargebacks and Fees | $1,454,400 | $1,498,032 | $1,542,973 | $1,589,262 | $1,636,940 |
| Tablet / Inmate Software | $3,030,000 | $3,120,900 | $3,214,527 | $3,310,963 | $3,410,292 |
| Hardware Purchases-ShenZhen & Estone | $4,114,000 | $4,237,420 | $4,364,543 | $4,495,479 | $4,630,343 |
| Hardware Purchases-Other Suppliers | $7,630,978 | $7,859,908 | $8,095,705 | $8,338,576 | $8,588,733 |
| Telecommunication Taxes | $3,600,000 | $3,708,000 | $3,819,240 | $3,933,817 | $4,051,832 |
| Voice over IP - Bandwidth | $787,800 | $811,434 | $835,777 | $860,850 | $886,676 |
| Other - Customer Tech Grants - Software Etc | $181,800 | $187,254 | $192,872 | $198,658 | $204,618 |
| **Cost of Sales** | $47,858,798 | $49,294,562 | $50,773,399 | $52,296,601 | $53,865,499 |
| | | | | | |
| **Operating Expenses:** | | | | | |
| Officer's Compensation | $900,000 | $1,200,000 | $1,200,000 | $1,200,000 | $1,200,000 |
| Salaries | $10,926,697 | $11,254,498 | $11,592,133 | $11,939,897 | $12,298,094 |
| Repairs and Maintenance | $551,197 | $556,709 | $562,276 | $567,899 | $573,578 |
| Rents- Office Space | $221,887 | $228,543 | $235,400 | $242,462 | $249,735 |
| Rents-Loco Florida (Corporate Office)* | $480,000 | $480,000 | $480,000 | $480,000 | $480,000 |
| Operations and Maintenance - Vessel* | $1,200,000 | $0 | $0 | $0 | $0 |
| Taxes and Licenses and Permits | $186,119 | $187,980 | $189,860 | $191,758 | $193,676 |
| Charitable Contributions | $21,476 | $21,690 | $21,907 | $22,126 | $22,348 |
| Advertising | $329,287 | $332,580 | $335,906 | $339,265 | $342,658 |
| Auto and Truck | $171,802 | $173,520 | $175,255 | $177,008 | $178,778 |
| Bank Charges | $7,159 | $7,230 | $7,303 | $7,376 | $7,450 |
| Client Welfare Expense | $150,326 | $151,830 | $153,348 | $154,881 | $156,430 |
| Computer Expenses | $164,643 | $166,290 | $167,952 | $169,632 | $171,328 |
| Contract Labor | $336,445 | $339,810 | $343,208 | $346,640 | $350,106 |
| Employee Welfare Expense | $7,159 | $7,230 | $7,303 | $7,376 | $7,450 |
| Insurance - Including Auto, Liability plus Employee Health Ins and WC | $1,407,891 | $1,450,127 | $1,493,631 | $1,538,440 | $1,584,593 |
| Legal and Professional - restructuring/bankruptcy | $1,200,000 | | | | |
| Legal and Professional - Subchapter V - Trustee | $35,000 | $0 | $0 | $0 | $0 |
| Legal and Professional - ordinary course, compliance, regulatory | $900,000 | $1,700,000 | $1,700,000 | $1,700,000 | $1,700,000 |
| Meals and Entertainment | $186,119 | $187,980 | $189,860 | $191,758 | $193,676 |
| Office Expense | $128,852 | $130,140 | $131,442 | $132,756 | $134,084 |
| Outside Services | $7,159 | $7,230 | $7,303 | $7,376 | $7,450 |
| Payroll Service Fees | $161,558 | $166,404 | $171,396 | $176,538 | $181,834 |
| Inmate Education Expense (NALI) | $186,119 | $187,980 | $189,860 | $191,758 | $193,676 |
| Recruitment Expense | $114,535 | $115,680 | $116,837 | $118,006 | $119,186 |
| Subscriptions | $171,802 | $173,520 | $175,255 | $177,008 | $178,778 |
| Telephone | $116,803 | $120,307 | $123,916 | $127,634 | $131,463 |
| Utilities | $80,302 | $82,711 | $85,192 | $87,748 | $90,380 |
| Website Design and Maintenance | $128,852 | $130,140 | $131,442 | $132,756 | $134,084 |
| Penalties | $28,634 | $28,920 | $29,209 | $29,501 | $29,796 |
| Postage and Shipping | $21,476 | $21,690 | $21,907 | $22,126 | $22,348 |
| Payroll Taxes | $904,742 | $952,769 | $978,598 | $1,005,202 | $1,032,604 |
| Uniforms | $730 | $752 | $775 | $798 | $822 |
| Operational Reserve | $1,750,000 | $1,850,000 | $1,950,000 | $2,050,000 | $2,150,000 |
| | | | | | |
| | $23,184,769 | $22,414,264 | $22,968,474 | $23,535,726 | $24,116,404 |
| | | | | | |
| Total Budgeted Net Income/(Loss) before IP License Fee | $4,249,620 | $3,373,857 | $503,290 | $640,191 | $784,791 |
| | | | | | |
| IP License Fee | $27,993,275 | $28,833,073 | $29,698,065 | $30,589,007 | $31,506,677 |
| IP License Cure | $3,000,000 | $3,000,000 | $1,000,000 | $1,000,000 | $1,000,000 |
| Total Operating Expenses | $30,993,275 | $31,833,073 | $30,698,065 | $31,589,007 | $32,506,677 |
| | | | | | |
| Total Budgeted Net Income/(Loss) including the IP License Fee | ($26,743,655) | ($28,459,216) | ($30,194,776) | ($30,948,816) | ($31,721,887) |

* Affiliated Entity

# EXHIBIT D

**Fill in this information to identify the case:**

Debtor 1    Smart Communications Holding, Inc.

Debtor 2    Smart Communications Holding, LLC
(Spouse, if filing)

United States Bankruptcy Court for the:   Middle    District of   Florida
                                                          (State)

Case number   8:24-bk-7106-RCT (jointly administered with 8:24-bk-7108-RCT)

## Official Form 410

# Proof of Claim

                                                        12/24

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309)** that you received.

| Part 1: | Identify the Claim |
| --- | --- |

| | |
| --- | --- |
| 1. **Who is the current creditor?** | HLFIP Holding, LLC |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor    HLFIP Holding, Inc. |

| | |
| --- | --- |
| 2. **Has this claim been acquired from someone else?** | ☒ No |
| | ☐ Yes.  From whom? _____ |

| 3. **Where should notices and payments to the creditor be sent?** | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| --- | --- | --- |
| Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Donald R. Kirk | |
| | Name | Name |
| | 4221 W. Boy Scout Blvd., Ste. 1000 | |
| | Number     Street | Number     Street |
| | Tampa, Florida 33607-5780 | |
| | City        State        ZIP Code | City        State        ZIP Code |
| | Contact phone   813-229-4334 | Contact phone _____ |
| | Contact email   dkirk@carltonfields.com | Contact email _____ |
| | Uniform claim identifier (if you use one): | |
| | ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ | |

| | |
| --- | --- |
| 4. **Does this claim amend one already filed?** | ☒ No |
| | ☐ Yes. Claim number on court claims registry (if known) _____      Filed on _____ |
| |                                                               MM   /   DD   / YYYY |

| | |
| --- | --- |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☒ No |
| | ☐ Yes.  Who made the earlier filing? _____ |

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☒ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**    $_____$67,904,478.66_____    **Does this amount include interest or other charges?**

☒ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Unpaid royalties.  See attached statement.

**9. Is all or part of the claim secured?**

☒ No

☐ Yes.  The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☒ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☒ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☒ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  12/17/2024
                  MM / DD / YYYY

*/s/ Jonathan D. Logan*
Signature

Print the name of the person who is completing and signing this claim:

| Name | Jonathan | D. | Logan |
|---|---|---|---|
| | First name | Middle name | Last name |

Title  President

Company  HLFIP Holding, LLC
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address  10491 72nd Street
         Number    Street

Seminole                          FL        33777
City                              State     ZIP Code

Contact phone  Please contact counsel        Email    Please contact counsel

HLFIP Holding, LLC Proof of Claim Statement
*In re Smart Communication Holding, Inc. & In re Smart Communication Holding, LLC*
U.S. Bankruptcy Cout for the Middle District of Florida
Case No. 8:24-bk-7106-RCT (jointly administered with 8:24-bk-7108-RCT)

**Claim Overview**

HLFIP possesses an unsecured claim against the Debtor in an amount of at least $67,904,479 in connection with the Debtor's use of HLFIP Intellectual Property (as defined below). The basis of the claim is set forth below. HLFIP reserves the right to amend, supplement, or modify this claim for any reason.

HLFIP owns the valuable intangibles and intellectual property that drive the business and revenue generation of Smart Communications Holding, Inc. and Smart Communications Holding, LLC (collectively, the "Debtor").[1] HLFIP has provided those assets for the Debtor's exclusive use since 2015 under an exclusive oral license that HLFIP and the Debtor reduced to writing in August 2023 (the "Exclusive License"). But HLFIP has never been paid those royalties due under the Exclusive License. This claim is based on the Debtor's obligations due under the Exclusive License, including the arm's-length royalties that accrued prepetition and that continue to accrue.

There is no dispute that HLFIP has exclusively licensed its intangible assets and intellectual property to the Debtor since 2015. The only dispute is the amount of royalties that Debtor owes to HLFIP for that uninterrupted and exclusive use of HLFIP's assets.

HLFIP maintains that the Debtor owes the royalties that HLFIP could have charged the Debtor if the parties were unrelated. This arm's-length amount reflects the underlying economics of the license and is what the tax law requires HLFIP to report as income. In fact, that arm's-length amount is what HLFIP reported as income in its 2022 and 2023 tax years (based on a transfer-pricing study that benchmarked that royalty rate by looking to comparable software and services license agreements between unrelated parties). As far as HLFIP's claim is concerned, the *only* issue before the Court is the proper arm's-length royalty amount.

Janice Logan, as Trustee of the James Logan Family Trust, asserts that the Debtor owes HLFIP no royalties and confusingly refers to the issue as one about "the validity of" what she refers to as the "IP Liability." Doc. 26 at 2. This is confusing because Janice has repeatedly conceded that there is a valid license between HLFIP and the Debtor; she takes issue only with the amount of royalty due under that license. Janice has made only two arguments for the zero-royalty outcome, neither of which is based in economics and both of which are incompatible with the basic concept of ownership. Moreover, that zero-royalty outcome is simply not possible under the tax law, which requires the prices in related party transactions (like the licensing transaction between HLFIP and the Debtor) to comply with the arm's-length standard.

---

[1] HLFIP is not suggesting that Smart Communications Holding, Inc. and Smart Communications Holding, LLC are the same entity or that their corporate forms should be disregarded. Using the singular Debtor is merely a stylistic choice to improve readability.

1

HLFIP Holding, LLC Proof of Claim Statement
*In re Smart Communication Holding, Inc. & In re Smart Communication Holding, LLC*
U.S. Bankruptcy Cout for the Middle District of Florida
Case No. 8:24-bk-7106-RCT (jointly administered with 8:24-bk-7108-RCT)

## License Background

Jonathan Logan ("Jon") conceived of the idea for Smart Communications in 2008. After doing so, Jon invited his father, James Logan ("Jim"), to be his partner as a co-owner and to help Jon manage Smart Communications. Smart Communications was founded in 2009. In connection with its formation in 2009, Alexis Logan ("Alexis," Jon's sister and Jim's daughter) agreed to temporarily hold the Smart Communications stock in trust for Jon and Jim.

From its inception, Jon has been the Debtor's chief executive and currently is CEO and President. Jon is the visionary who developed and owns the intangible assets and intellectual property that have propelled the Debtor's business. Jim also held executive titles. Until his untimely passing in October 2022, Jim oversaw the Debtor's finance, tax, and compliance functions, and was responsible for its corporate structure.

In or around 2014, Jon and Jim asked Alexis to relinquish the Smart Communications stock that she held in trust. She refused and a prolonged dispute followed. From 2014 through 2018, Jon and Jim tried to get Alexis to honor her agreement but to no avail. In fact, Alexis tried to leverage the stock that she held in trust to extract an ownership interest in the Debtor.

Alexis's refusal revealed that the Logan family's involvement in the Debtor's business put Jon's interests in the Debtor and in his own inventions at risk. Jon therefore took affirmative steps to protect himself. In April 2015, Jon drafted a written contract that memorialized the understanding he had with Jim, the Debtor, and Alexis that Jon (and Jon alone) owned the intellectual property that the Debtor had been using exclusively in its business. (*See* Exhibit A.) Jim (on behalf of himself and the Debtor) and Alexis countersigned that contract. (*See* Exhibits B and C.) In signing the contract, Alexis clarified the parties' shared understanding that the contract was "for all new IP from that date forward." ("IP Contract," *see* Exhibit C.)

The IP Contract (1) provided that Jon would retain half of the value of intellectual property that he had already invented, conceived of, created, produced, authored, amended, designed, and developed and that had already been implemented at Smart Communications (which value he realized through his 50% ownership of Smart Communications) and (2) clarified that Jon would own (and thus control) any and all future intellectual property that he invented, conceived of, created, produced, authored, amended, designed, and developed (the "Intellectual Property"). With Jim's full knowledge and participation, Jon formed a holding company—which he named "Happy Logan Family IP," or HLFIP, as a tongue-in-cheek acknowledgement of the family strife that led to its formation—and assigned his Intellectual Property to that holding company.

## The HLFIP-Smart Communications License

With this ownership clarification in place beginning in 2015, HLFIP and Smart Communications operated under an oral license that gave Smart Communications an exclusive right to use the Intellectual Property. That exclusive oral license agreement did not state a royalty rate. As the sole owner of HLFIP, Jon decided that HLFIP would defer charging royalties to the Debtor in the

HLFIP Holding, LLC Proof of Claim Statement
*In re Smart Communication Holding, Inc. & In re Smart Communication Holding, LLC*
U.S. Bankruptcy Cout for the Middle District of Florida
Case No. 8:24-bk-7106-RCT (jointly administered with 8:24-bk-7108-RCT)

early years of the exclusive license in order to improve the Debtor's cash position and facilitate its growth. HLFIP continued operating as the owner of the Intellectual Property from 2015 forward—for example, HLFIP filed patent applications in its name, pursued litigation to enforce patents, and continued to develop innovations that it licensed to the Debtor.

Under the Exclusive License, the Debtor's business grew. With the patents, trademarks, proprietary technologies, know-how, products, designs, and services (and enhancements thereto) that Jon devised and assigned to HLFIP, the Exclusive License transformed Smart Communications from the provider of a relatively simple kiosk-based inmate email system to an industry-leading provider of integrated correctional facility communication, safety, investigative, and automation technologies and services that reshaped how correctional facilities operated. Current Smart Communications offerings include but are not limited to the following products and technologies, all of which are owned and exclusively licensed by HLFIP:

- **HLFIP's SmartEcosystem™**, the proprietary dashboard agency-management software platform and system from which SmartComm customers can access the suite of products and services that HLFIP licenses to the Debtor.

- **MailGuard® Postal Mail Elimination System ("MailGuard®"),** a technological advancement that Jon Logan created, designed, developed, invented and patented and that HLFIP owns. MailGuard® increases the safety of correctional facilities by (among other things) scanning postal mail to inmates' personal accounts on the SmartEcosystem™, thereby essentially eliminating the risk of contraband entering correctional facilities through physical mail.

- **SmartTablet™**, the first tablet system built specifically for correctional facilities. Inmates and personnel at correctional facilities use SmartTablets™ to access the SmartEcosystem™ and its entire suite of products and services, including MailGuard® and MailGuardLegal™. SmartTablet™ offers inmates educational opportunities (SmartEd™), tools for reentry (SmartReentry™), free access to law libraries (SmartLaw™), and access to approved entertainment options (SmartEntertainment™). Through SmartEcosystem™, SmartTablet™ enables inmates to maintain regular contact with friends and family in several ways through HLFIP's proprietary applications for phone calls, remote and onsite video visits, and text message services (SmartVisit™).

- **SmartRequest™**, HLFIP's proprietary communication technology and service that allows inmates to send digital grievances, medical applications, and other approved communications to correctional facility staff.

- **MailGuardLegal™** is an industry first built on HLFIP's proprietary and patented system. In general, legal mail must be opened in the presence of the receiving inmate and may not be viewed or copied by the correctional facility. It is common, however, for drug-laced and substance-laced mail to be disguised as "legal mail" so drugs and other contraband can be smuggled into correctional facilities. MailGuardLegal™ eliminates drugs and contraband from entering

HLFIP Holding, LLC Proof of Claim Statement
*In re Smart Communication Holding, Inc. & In re Smart Communication Holding, LLC*
U.S. Bankruptcy Cout for the Middle District of Florida
Case No. 8:24-bk-7106-RCT (jointly administered with 8:24-bk-7108-RCT)

correctional facilities through purported legal mail. MailGuardLegal™ is a hardware and software solution that sends an encrypted scan of a legal mail to a secure account that only the receiving inmate can access through SmartEcosystem™ on SmartTablet™. After the inmate verifies the scan with a digital signature, MailGuardLegal™ hardware shreds the legal mail in the presence of the inmate, thereby maintaining the confidentiality of the privileged legal mail and eliminating the possibility of contraband and drugs entering the correction facility through the original paper copies of legal mail.

- **Digital MailGuardLegal™** gives inmates and their vetted attorneys the ability to send and receive privileged communications more easily and efficiently with the secure electronic transmission of case files and other privileged documents.

- **SmartWatch™** improves inmate safety and health with inmate tracking services and health biometrics monitoring capabilities. SmartWatch™ also provides access to SmartEcosytem™ so inmates can use the wearable device to make and receive phone calls, conduct video visitation, view their postal mail through MailGuard, view legal mail through MailGuardLegal™, send and receive text messages, and use SmartRequest™ to communicate with correctional facility staff and medical providers.

In 2023, a tax-compliance issue arose that affected both HLFIP and the Debtor. Although the Debtor realized and recognized all the revenue from its operations, the Exclusive License between HLFIP and the Debtor drove those revenues. And the tax law (by operation of 26 U.S.C. § 482 and 26 C.F.R. § 1.482-1(b)) requires HLFIP and the Debtor to price the Exclusive License under the arm's-length standard. The law provides that "[a] controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's length result)."[2]

To address that tax compliance issue, HLFIP retained an outside accounting firm to document the arm's-length royalty rate for the Exclusive License. That documentation supported a royalty rate of 40% of net sales. On August 29, 2023, to conform the Exclusive License with the tax reporting of HLFIP and the Debtor, HLFIP terminated the exclusive oral license and executed a written license with the Debtor that provided the Debtor with an uninterrupted and exclusive license of the Intellectual Property in exchange for a royalty of 40% of net sales.

### There is No Dispute about the Validity of the *License*; Only the Royalty *Rate* Is in Dispute

HLFIP understands that the only opposition to its claim for royalties comes from Janice Logan. Jim transferred his 50% interest in Debtor to the Trust before his death. Janice Logan, Jim's surviving spouse and the sole Trustee of that Trust since Jim's passing, has endeavored (through scorched-earth state-court litigation) to extract the highest possible price from the Debtor for the Trust's shares, even at the cost of endangering the Debtor's business.

---

[2] Treas. Reg. § 1.482-1(b)

HLFIP Holding, LLC Proof of Claim Statement
*In re Smart Communication Holding, Inc. & In re Smart Communication Holding, LLC*
U.S. Bankruptcy Cout for the Middle District of Florida
Case No. 8:24-bk-7106-RCT (jointly administered with 8:24-bk-7108-RCT)

Janice has misleadingly characterized the Trust's dispute about what the Debtor owes to HLFIP as a dispute about the "validity" of the "IP Liability." Doc. 26 at 2. But there is really no dispute about the "validity" of anything. Janice has repeatedly admitted that HLFIP indeed owns the IP and that the Debtor licenses the IP from HLFIP. In fact, when the Sarasota Court suggested that it could decide the issue of "was there a license or wasn't there a license," Janice's counsel corrected the Sarasota Court and stated that "the question is not [whether there was] a license" but that "the question is a royalty fee." (*See* Exhibit D, Trans. 103:23-25, 106:23-107:4.)

Therefore, what Janice really means when she contests the "validity" of the license is that she disputes whether the Debtor owes HLFIP the 40% documented in the August 2023 written license agreement. But here, Janice posits a false dichotomy. Her argument appears to be that either (1) the royalty rate under the oral license is 0% and the August 2023 written license does not effectively change that rate to 40% or (2) the effective royalty rate is 40% *solely because* of the August 2023 written license. Option (1) is incorrect because the royalty rate under the oral license was never stated at 0% or any other rate. And Option (2) is incorrect insofar as the 40% rate stems not from the August 2023 written license but rather from the actual economics of the Exclusive License as reflected by the proper arm's-length charge under that License.

HLFIP presumes that Janice will nevertheless ask this Court to find that the effective royalty rate under the Exclusive License is 0%. Janice has advanced two arguments in support of her zero-royalty position. Neither has any merit.

Janice's first argument is that because HLFIP did not charge royalties in the early years of the Exclusive License, it is permanently precluded from doing so. This argument is without merit because it robs HLFIP of its Intellectual Property (and defeats the only reason that HLFIP exists, which is to protect Jon's interest in the Intellectual Property). After all, if the Debtor were to have a royalty-free, exclusive, and perpetual license to use the intangible assets and intellectual property, then the Debtor—and not HLFIP—would own that property.

When Janice alleges that HLFIP cannot charge the Debtor a royalty because there is a "complete absence of contemporaneous support for *any* royalty before 2023" (Doc. 26 at 7), her argument necessarily implies that because the oral exclusive license did not state a royalty rate, HLFIP unwittingly transferred its assets to the Debtor (because, according to Janice, the Debtor is entitled to exclusive, perpetual, and royalty-free use of those assets).

Janice's second argument is that because one of HLFIP's patents was invalidated in litigation (a patent that HLFIP has since cured with the US Patent and Trademark Office), none of HLFIP's Intellectual Property can command any royalties. The Intellectual Property includes much more than any single patent; it includes other unrelated patents, pending patent applications, registered and common law trademarks, proprietary technologies, know-how, products, designs, and services, among other things. Moreover, patentability or protectability does not determine whether the Intellectual Property warrants royalties. And there is no transitive property of patent invalidity—HLFIP has several patents and the invalidity of one of them (even if it is one that Janice labels as the "flagship patent"; *see* Doc. 26 at 7) does not make the others invalid. For that

5

HLFIP Holding, LLC Proof of Claim Statement
*In re Smart Communication Holding, Inc. & In re Smart Communication Holding, LLC*
U.S. Bankruptcy Cout for the Middle District of Florida
Case No. 8:24-bk-7106-RCT (jointly administered with 8:24-bk-7108-RCT)

matter, the one invalidated patent indicates *nothing* about the value of the other intangible assets (which include far more than patents, as explained above).

Janice's second argument is economic nonsense. She alleges that her 50% interest in the Debtor is worth at least a "minimum mid-eight figure" amount. Janice appears to base this figure on what she misleadingly describes as the "UBS and Truist valuations *of SmartComm* greater than $200 million." Doc. 26 at 4. That figure, which was based on speculative growth projections about the Debtor's revenues and not the Debtor's actual financial information, necessarily conflates the Debtor's purported value with the value associated with the intellectual property and intangible assets that the Debtor licenses *from HLFIP*. The "valuations" she references did *not* partition the value of the Debtor's revenue between the revenue attributable to the Debtor and its operations from the value of the Intellectual Property that the Debtor exclusively licenses from HLFIP. If Janice insists that her interest in the Debtor is worth at least a "minimum mid-eight figure" amount, then she should be able to explain how the Debtor is worth that much when the intellectual property and intangible assets that the Debtor uses in its business are worth so little.

**HLFIP's Claim is for an Arm's-Length Royalty Rate**

HLFIP is entitled to its arm's-length royalty under the Exclusive License for the Intellectual Property that Smart Communications has relied on since 2015 and continues to rely on today. Comparable licensing transactions between unrelated parties indicate that the arm's length royalty to which HLFIP is entitled is at least 40% of Smart Communications net sales—*i.e.*, the rate explicitly stated in the August 2023 written license. As of the November 2024 petition date, that 40% royalty rate means that from January 2022 forward, Smart Communications owes HLFIP $67,904,479 of past due royalties (excluding interest). HLFIP does not waive any rights to seek amounts that may have accrued prior to January 2022 and expressly reserves the right to amend, supplement or otherwise revise this claim as to those or any other amounts which may be due under the Exclusive License or otherwise.

6

Exhibit A

Message

| | |
|---|---|
| **From**: | Jon [jon.logan@smartjailmail.com] |
| on behalf of | Jon <jon.logan@smartjailmail.com> [jon.logan@smartjailmail.com] |
| **Sent**: | 4/30/2015 3:26:19 PM |
| **To**: | Jim Logan [jim.logan@smartjailmail.com] |
| **Subject**: | Contract |

Agreement between Jim Logan - president of smart communications us, and smart communications holding, between Jon Logan creator and owner of intellectual property known as (postal mail contraband elimination system).

This contract confirms Jonathan D Logan is the creator and owner of intellectual property and system business model soon to be patented for postal mail elimination system. This intellectual property is solely created and owned by Jonathan Logan (inventor) and this contract acknowledges that Jonathan Logan exclusively owns and will retain exclusive ownership of this service invention to correctional facilities and smart communications us and smart communications holding and Jim Logan, Alexis logan, or any employee, share holder or agent of smart communications us or of Jim Logan and Alexis Logan acknowledges they do not own this service invention and they can not use this postal mail contraband elimination service or system model, unless direct written permission is given by the owner of this intellectual property (Jonathan d Logan) to use this service, model, business plan, or technology.

This agreement encompasses a non disclosure agreement and the technology and system disclosed by Jonathan Logan to Jim Logan, Alexis Logan and smart communications us and smart communications holding can not be used or disclosed in any way shape or form unless written permission is given by Jonathan Logan.

Date and sign. Alexis sign and Janice as a witness to you.

Thank you!

Jon,
Smartjailmail.com

Exhibit B

Mail

COMPOSE

Inbox (1,524)
Starred
Important
Sent Mail
Drafts (78)
Follow up
Misc
Priority
More

Contract    Inbox    x

More

1 of 3,691

Jon
to me                                                           3:26 PM (18 minutes ago)

Agreement between Jim Logan – president of smart communications us, and smart communications holding, between Jon
Logan creator and owner of intellectual property known as (postal mail contraband elimination system).

This contract confirms Jonathan D Logan is the creator and owner of intellectual property and system business model soon to
be patented for postal mail elimination system. This intellectual property is solely created and owned by Jonathan Logan
(inventor) and this contract acknowledges that Jonathan Logan exclusively owns and will retain exclusive ownership of this
service invention to correctional facilities and smart communications us and smart communications holding and Jim Logan,
Alexis logan, or any employee, share holder or agent of smart communications us or of Jim Logan and Alexis Logan
acknowledges they do not own this service invention and they can not use this postal mail contraband elimination service or
system model, unless direct written permission is given by the owner of this intellectual property (Jonathan d Logan) to use this
service, model, business plan, or technology.

This agreement encompasses a non disclosure agreement and the technology and system disclosed by Jonathan Logan to
Jim Logan, Alexis Logan and smart communications us and smart communications holding can not be used or disclosed in any
way shape or form unless written permission is given by Jonathan Logan.

Date and sign.  Alexis sign and Janice as a witness to you.

Thank you!

Jim Logan <jim.logan@smartjailmail.com>                      3:42 PM (2 minutes ago)
to Alexis

https://mail.google.com/mail/u/0/                                        4/30/2015

Exhibit C

---------- Forwarded message ----------
From: **Jon** <jon.logan@smartjailmail.com>
Date: Thu, Apr 30, 2015 at 3:26 PM
Subject: Contract
To: Jim Logan <jim.logan@smartjailmail.com>

Agreement between Jim Logan - president of smart communications us, and smart communications holding, between Jon Logan creator and owner of intellectual property known as (postal mail contraband elimination system).

This contract confirms Jonathan D Logan is the creator and owner of intellectual property and system business model soon to be patented for postal mail elimination system. This intellectual property is solely created and owned by Jonathan Logan (inventor) and this contract acknowledges that Jonathan Logan exclusively owns and will retain exclusive ownership of this service invention to correctional facilities and smart communications us and smart communications holding and Jim Logan, Alexis logan, or any employee, share holder or agent of smart communications us or of Jim Logan and Alexis Logan acknowledges they do not own this service invention and they can not use this postal mail contraband elimination service or system model, unless direct written permission is given by the owner of this intellectual property (Jonathan d Logan) to use this service, model, business plan, or technology.

This agreement encompasses a non disclosure agreement and the technology and system disclosed by Jonathan Logan to Jim Logan, Alexis Logan and smart communications us and smart communications holding can not be used or disclosed in any way shape or form unless written permission is given by Jonathan Logan.

Date and sign.  Alexis sign and Janice as a witness to you.

Thank you!

Jon,
Smartjailmail.com

X Alexis Logan, Dated May 18, 2015

* Jon new technology/Patent/new IP only

- Alexis Logan

```
1  IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT IN
   AND FOR SARASOTA COUNTY, FLORIDA
2        GROUP 1, 2, 3, & 4 MOTIONS ON NOVEMBER 22, 2024
   JONATHAN LOGAN and SMART
3  COMMUNICATIONS HOLDING, INC.,

4            Plaintiffs,
   vs.                          Case No.:  2023-CA-1002-NC
5
   JANICE LOGAN, individually and
6  as Trustee of the James Logan
   Family Trust, dated February 10,
7  2021; and ALEXIS LOGAN,

8  _____Defendants._____/   (CONSOLIDATED)
   JANICE LOGAN, as Trustee of the
9  James Logan Family Trust dated
   February 10, 2021,
10
            Counterclaim Plaintiff,
11 vs.                          Case No.:  2023-CA-1280-NC

12 JONATHAN D. LOGAN, SMART
   COMMUNICATIONS HOLDING, INC.,
13 SMART COMMUNICATIONS HOLDING,
   LLC, HLFIP HOLDING, INC., and
14 HLFIP HOLDING, LLC,

15 _____Counterclaim Defendants./
   JANICE LOGAN, as Trustee of the
16 James Logan Family Trust dated
   February 10, 2021, and
17 derivatively on behalf of
   Smart Communications Holdings,
18 Inc.,

19            Plaintiff,

20 vs.

21 JONATHAN D. LOGAN, SMART
   COMMUNICATIONS HOLDING, INC.,
22 nominal defendant, SMART
   COMMUNICATIONS HOLDING, LLC,
23 HLFIP HOLDING, LLC, HLFIP HOLDING
   LLC, LOCO FLORIDA LLC and SMART
24 COMMUNICATIONS YACHT HOLDING, LLC,
            Defendants.
25
```

1

2

3                    TRANSCRIPT OF PROCEEDINGS

4        BEFORE THE HONORABLE HUNTER W. CARROLL

5                         held at the
             Judge Lynn N. Silvertooth Judicial Center
6                 2002 Ringling Boulevard, 2-A
                    Sarasota, Florida  34237
7
                   Friday, November 22, 2024
8
                     8:30 a.m. to 3:40 p.m.
9
                     Pages 1 through 232
10

11

12

13

14

15

16         Stenographically reported live by:

17                     Linda R. Wolfe
               Registered Professional Reporter
18                 Registered Merit Reporter
              Federal Certified Realtime Reporter
19         Florida Professional Reporter-Certified

20

21

22

23

24

25

1    APPEARANCES:

2    On behalf of Jonathan D. Logan; Smart Communications
     Holding, Inc.; Smart Communications Holding LLC; Loco
3    Florida, LLC; and Smart Communications Yacht Holding,
     LLC:

4
              BRIDGET KELLOGG SMITHA, Attorney at Law (Live)
5             STEARNS WEAVER MILLER WEISSLER ALHADEFF &
                SITTERSON, P.A.
6             106 East College Avenue
              Suite 720
7             Tallahassee, FL  32301
              (850)329-4852
8             bsmitha@stearnsweaver.com

9             MICHAEL J. HARWIN, Attorney at Law (Zoom)
              STEARNS WEAVER MILLER WEISSLER ALHADEFF &
10              SITTERSON, P.A.
              200 East Las Olas Boulevard
11            Suite 2100
              Fort Lauderdale, FL  33301-2299
12            (954)462-9500
              mharwin@stearnsweaver.com
13

14   On behalf of HLFIP Holding, LLC:

15            CHRISTOPHER G. OPRISON, Attorney at Law (Live)
              DLA PIPER, LLP (US)
16            200 S. Biscayne Blvd., Suite 2500
              Miami, FL  33131-5340
17            (305)423-8522
              chris.oprison@dlapiper.com
18

19            STEVE DIXON, Attorney at Law (Zoom)
              DLA PIPER, LLP (US)
20            500 Eighth Street, NW
              Washington, DC  20004
21            (202)799-4000
              steve.dixon@dlapiper.com
22

23

24

25

1  | On behalf of Jonathan D. Logan; Smart Communications
2  | Holding, Inc.; Smart Communications Holding LLC; and
   | Loco Florida, LLC:

3  |          DUSTIN B. HILLSLEY, Attorney at Law (Live)
   |          MAX C. RUDOLF, Attorney at Law (Live)
4  |          AKERMAN, LLP
   |          201 E. Las Olas Blvd., Suite 1800
5  |          Ft. Lauderdale, FL  33301-4442
   |          (954)331-4129
6  |          dustin.hillsley@akerman.com
   |          max.rudolf@akerman.com
7  |

8  | On behalf of Janice Logan:

9  |          DAVID SCHOENFELD, Attorney at Law (Live)
   |          PETER F. O'NEILL, Attorney at Law (Zoom)
10 |          ANDREW L. FRANKLIN, Attorney at Law (Zoom)
   |          KAILIN LIU, Attorney at Law (Zoom)
11 |          SHOOK, HARDY & BACON L.L.P.
   |          111 S. Wacker Dr., Ste. 4700
12 |          Chicago, IL  60606
   |          (312)704-7700
13 |          dschoenfeld@shb.com
   |          pfoneill@shb.com
14 |          afranklin@shb.com
   |          kliu@shb.com
15 |
   |          ANITRA R. CLEMENT, Attorney at Law (Zoom)
16 |          SHOOK, HARDY & BACON L.L.P.
   |          100 N. Tampa Street, Suite 2900
17 |          Tampa, FL  33602-5810
   |          (813)202-7100
18 |          aclement@shb.com

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1 | On behalf of Alexis Logan:

2 |           CHARLES F. JOHNSON, III (Live)
           Attorney at Law
3 |           BLALOCK WALTERS, P.A.
           802 11th Street West
4 |           Bradenton, FL  34205-7734
           (941)748-0100
5 |           cjohnson@blalockwalters.com

6 | ALSO PRESENT VIA LIVE:   Janice Logan
                          Alexis Logan
7 |                          Justin Peterson

8 |
  | ALSO PRESENT VIA ZOOM:   Jonathan Logan
9 |                          David Gann, Smart Communications
                           In-House Counsel
10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1                    P-R-O-C-E-E-D-I-N-G-S

2          THE COURT:  Is there anyone that is having

3     difficulty hearing me on Zoom?  I don't see anybody

4     formally telling me to speak loud or anything like

5     that.

6          This is consolidated cases 23-CA-1002,

7     23-CA-1280.

8          Starting in the courtroom, and I'm just going

9     to go from my left to right.  So, Mr. Johnson, why

10    don't you start introducing yourself and the folks

11    with you.

12         MR. JOHNSON:  Charles Johnson on behalf of

13    Alexis Logan and Justin Peterson, both whom are

14    seated at counsel table.

15         THE COURT:  And before we go forward, folks on

16    Zoom, were you able to hear Mr. Johnson where he

17    was speaking from?  I'm getting thumbs up.

18         MR. SCHOENFELD:  Good morning, Your Honor.

19    David Schoenfeld for Janice Logan in all her

20    capacities.  Actually, Ms. Logan is with me in the

21    courtroom today.  Peter O'Neill, Andrew Franklin,

22    Anitra Clement and Kailin Liu are with me on Zoom.

23         MS. SMITHA:  Your Honor, Bridget Smitha with

24    Stearns Weaver on behalf of the Smart parties.  I

25    have with me here Justin Hillsley and Max Rudolf

1          THE COURT:  Why not?

2          MR. HILLSLEY:  Because that's where the work

3     is.  And that's what both of those questions

4     require the expert analyses.

5          We need the expert analysis to make the

6     determination on the value of the company and what

7     is the appropriate date.  We need the expert

8     analysis -- both sides have hired experts on IP, so

9     to weigh in on those issues.

10         THE COURT:  Well, but if the question is what

11    is the date, I don't need the experts to tell me

12    the financial value or the financial impact.  It's

13    the extraordinary circumstances as to whether we're

14    sticking with the statutory date or doing something

15    else.

16         I don't need to make factual findings, do I,

17    as to 'If I go with this date, it's going to cost

18    this much money'?  It's just --

19         MR. HILLSLEY:  I misunderstood, Your Honor.

20    Yeah, I agree with you.  I think that can be done

21    before the other pieces.

22         THE COURT:  Right.  So do that.

23         And then the IP is -- was there a license or

24    wasn't there a license?  And that seems to be a lot

25    more targeted and focused.  And if that -- if that

1   helps address the delta between the parties the

2   most, then why don't we look at or can we look at

3   making that the focus of the January trial?

4        MR. HILLSLEY:  So, Your Honor, I think that's

5   actually -- that's a sensible suggestion.  I will

6   let HLFIP weigh in on the IP portion, but I

7   certainly think it's a sensible suggestion that we

8   address the valuation date at an evidentiary

9   hearing at that juncture because I think that needs

10  to move forward.

11       THE COURT:  Well, why don't we do this?  I'll

12  let you all speak.  And then we'll go to lunch.

13  And let you all have further discussion internally,

14  because I don't want you to put yourself into a,

15  'Well, you just said'.

16       MR. HILLSLEY:  Thank you, Your Honor.

17       THE COURT:  I want to give you a chance to

18  have some discussion internally with your battalion

19  of lawyers to come up with an answer.

20       But, Mr. Schoenfeld, I have been letting Mr.

21  Hillsley go for a while.  So why don't I let you go

22  for a little bit here.

23       MR. SCHOENFELD:  Your Honor, it's been very

24  informative to me, too, so no objection.

25       What I will refer to as the "Jon parties" have

1    document in this case.  And, yet, we're prepared to

2    go.

3        We'll abide by the Court's rulings on the

4    motions to compel.  We will get with the

5    information that we can and we'll go forward.

6        They don't need anything.  And if their

7    experts say -- instead of standing up here and

8    saying their experts can't prepare for a trial

9    that's been scheduled for months on information

10   that's been in their files the entire time, it just

11   makes absolutely no sense.

12       Even the computing valuation dates, as I said

13   when I first stood up here, we brought this up so

14   that they would know what our position was and so

15   that the experts could work to alternative dates.

16   And if that's the issue that we think should be

17   tried in January or February, then we'll be ready

18   for that, they can be ready for it, too.

19       The question here is what are the

20   circumstances that would militate for an

21   alternative date, then we'll be prepared to present

22   evidence on those facts.

23       The same would be true on the validity of the

24   IP, the transaction.  And I don't want to correct

25   the Court, but I would state it this way.  The

1    question is not a license.  The question is a

2    royalty fee.  And that is -- there is no evidence

3    that any royalty fee was ever discussed between the

4    companies prior to August of 2023.  But that will

5    be the issue, and I think that that can be tried in

6    February.  And there's absolutely no reason why the

7    Court -- the parties can't prepare for that trial.

8         To continue the trial, however, past that

9    date -- and we have serious -- I want -- I don't

10    want to -- we want to work with the Court and we

11    will work with the Court, but we've got some

12    concerns that I'm going to have to address in a

13    moment that we need some help with, we think, if

14    we're going to continue the actual valuation beyond

15    February.

16         But to continue the whole case in particular,

17    and even to continue, as the Court's floated with

18    us, would be a severe burden on Janice Logan,

19    particularly in light of the dissolution of the

20    injunction.

21         Jon has been bleeding her of cash for two

22    years now.  She's spent a year fighting off a

23    Shareholders' Agreement that the Court found to be

24    completely invalid.

25         She's pushed this case along and been -- and