UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11, Subchapter V |
| SMART COMMUNICATIONS HOLDING, INC., | Case No. 8:24-bk-7106-RCT |
| SMART COMMUNICATIONS HOLDING, LLC, | Case No. 8:24-bk-7108-RCT |
| Debtors.                                                            / | *Jointly Administered under*<br>*Case No. 8:24-bk-7106-RCT* |

## DEBTORS' OBJECTION TO
## CREDITOR JANICE LOGAN'S MOTION TO DISMISS CASES

Smart Communications Holding, Inc. ("**Smart Comm FL**") and Smart Communications Holding, LLC ("**Smart Comm DE**" and collectively, the "**Debtors**"), object to the Motion to Dismiss Cases (Doc. No. 45) (the "**Motion to Dismiss**") filed by Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021 (the "**Trust**"), and in support thereof, state as follows:

## Introduction

1.  The Motion to Dismiss asks the Court to dismiss the Debtors' cases for cause because the Trust alleges that the cases were filed in bad faith or without corporate authority. The Court should hear the Motion to Dismiss in connection with confirmation of the Debtors' Plan. At that hearing, it will be clear that the Motion to Dismiss is flawed both legally and factually. These cases were filed with valid corporate authority. And, the Court is the right place to resolve the issues. As the Court has already observed, "[t]his is a mess. And I think everybody who has spoken that says that this would be a good place to resolve it is correct." Dec. 19, 2024 Hr'g Tr. 67: 6-8.

The Debtors have filed the Plan (as described below) to resolve this mess in a fair and equitable way, and the determinations of those issues should be made by the Court as part of confirmation.

2. The Debtors filed their Joint Plan of Reorganization (Doc. No. 46 ) (the "**Plan**"), and the Plan is set for confirmation on March 6, 2025 (the "**Confirmation Hearing**").  In essence, the Plan proposes to pay projected disposable income over five years, including the value of non-core business assets that are the subject of dispute in the state court litigation but are nonetheless contributed under the Plan (such as a yacht, a fishing boat, cars, and houses). That income will be paid as the Court determines what claims are allowed or allowable, but the income is not affected by the amount of the claims (if anything, it may be reduced if the Debtors' past or future income tax liabilities increase). The Debtors' projections filed in support of the Plan are intended to easily reflect what value there is to distribute under the Plan, and do so independent of the economic analysis for what is owed based upon the use of intellectual property owned by HLFIP Holdings, LLC ("**HLFIP**").

3. The Plan meets the fair and equitable requirement in § 1191(c) because (1) it meets the requirements of § 1129(b)(2)(A), (2) it provides for the distribution of cash to unsecured creditors *in excess of* Debtors' projected disposable income over five years, and (3) there is a reasonable likelihood that the Debtors will be able to make all of the plan payments and the Plan provides appropriate remedies if payments are not made. And this is true independent of the ultimate ruling on HLFIP's various claims. The Plan resolves or provides a mechanism to address the resolution of the claims by the Trust and by HLFIP, and does so in the context of the Debtors' actual projected revenues, rather than outdated investment banking pitch materials.

4. Because the Debtors have filed a plan that is confirmable and would preserve jobs and value for employees, customers, vendors, counter-parties, and third-party creditors, as well as

paying the Trust consistent with the requirements in the Bankruptcy Code, this case was filed for a valid and proper purpose and in good faith. The Trust's contentions to the contrary ignore the factual realities of the Debtors' financial circumstances, the Plan, and the actual procedural posture in the state court litigation.

## Argument

A. The Trust's scorched earth litigation has put the Debtors in financial distress that worsens as the litigation continues.

5. The Debtors' schedules reflect actual as well as contingent, unliquidated, and affiliate and insider debt that if left unaddressed will result in certain and substantial financial distress. Even excluding the claims of insiders, on the Petition Date the Debtors had scheduled claims of $1.3 million. The Debtors have non-insider claims that are contingent, unliquidated, and disputed but that are asserted to be well in excess of $1 million. And, the Debtors' short-term budgeted operating expenses, which exclude obligations to insiders or insider debt, are $6.2 million on $6 million in projected revenue.

6. The Debtors' ability to operate does not exist in a vacuum, and the litigation expenses of the Sarasota state court action continuing unabated, with seemingly no realistic end in sight, make that more than "an attenuated possibility." On the Petition Date, the only certainty was that those expenses would be enormous, and the Debtors had no choice other than to incur them.

7. Even after the filing, those expenses continue to mount, exponentially and unfortunately. There are a significant number of depositions scheduled in the next nine days in connection with the limited scope stay relief granted by this Court. Based on the Trust's excessive discovery demands and litigation tactics, the Debtors and their professionals anticipate being forced to spend well over an additional $1 million litigating issues that will have at best marginal impact on the Debtors' long-term future disposable income, and, at most, determine to whom an

indeterminate amount might be paid. The result is that the Debtors will have less money available to pay creditors because of the additional administrative expenses incurred—and those expenses have to be paid before creditors or shareholders receive anything.

B.  These Cases were filed in good faith to accomplish a fair and equitable reorganization.

8. These cases were filed in an effort to install a rational and orderly process in light of the size of the fund in dispute. And the cases were filed before the litigation costs ballooned even more (as they now have) and to stop the bleeding. The timing of the filing of these cases is directly related to the purposes of the Debtors' reorganization, and that purpose is underscored by the continued deterioration of the Debtors' financial circumstances due to the litigation.

9. The authority cited by the Trust supports the Debtors' position here. For example, the Trust cites the Third Circuit's two decisions (one reported, one unreported) in *In re LTL Management LLC*.[1] In the *LTL Management* cases, the Johnson & Johnson mass-tort talc case, the corporate structure for the debtor included a funding agreement from a non-debtor Johnson & Johnson entity (not the spun-off entity holding only liabilities). "The evidence before the Bankruptcy Court showed that the funding agreement, 'an ATM disguised as a contract,' promised amounts 'exceed[ing] any reasonable projections available on the record before us' of LTL's future talc liability." *LTL*, 64 F.4th at 109. And there was no evidence of other kinds of financial distress. *Id.* Having failed once, the solvent parent revised its "ATM" downward, but with still enough to show there was approximately $9 billion available in excess of the "worst-case estimate." 2024 WL 3540467 at *3.

10. The court described, on the second filing, what financial distress is necessary for a good faith filing based on the law in their circuit, and why LTL Management still could not show

---

[1] *In re LTL Management LLC*, 64 F. 4th 84 (3d Cir. 2023); *In re LTL Management LLC*, No. 23-2971, 2024 WL 3540467 (3d Cir. July 25, 2024).

4900-6664-5007, v. 3

it. First, "many 'kinds of problems ... justify Chapter 11 relief'" and those might include "difficulties with employees, customers and vendors wary of the firm's credit risk, challenges in the capital markets, liquidity problems, and cutbacks in spending and investment that impair the firm's value." *Id.* at *3. Second, LTL's assets exceeded its liabilities on any analysis, and any modest liquidity issues were not the debtor's issues, but at a non-debtor parent level. *Id.* at _. Here, if the combination of the amount owed for using HLFIP's IP in the past and in the future is more than the Debtors' projected disposable income, the Debtors are not only insolvent but can't operate going forward. This is not an attenuated possibility.

11. Similarly distinguishable, in *Dixie Broadcasting*, the debtor owned a unique asset (an FCC license for an FM radio station) that the debtor had agreed to sell to the buyer, but wanted to cancel the sale contract because it decided the sale price was too low. The company was not in financial distress. And even the principal testified that the filing was "a diversionary tactic" to get out of the contract so they could sell it for more.

12. The Trust cites other cases where the debtor had no hope of reorganization, a number of which were single asset real estate cases filed on the eve of foreclosure sales without an exit strategy. The simple fact is that none of the cases cited have comparable facts here: an operating company (with hundreds of installations in dozens of states) saddled with costly litigation that has had and continues to have the consequence of sucking all the liquidity from the company and with the very real possibility of leaving it without the ability to operate.

13. In contrast, the Plan provides a framework for resolving all of the issues more efficiently and globally, preserving the Debtors' going-concern status, and preserving the rights of creditors within the confines of the economic realities of the operations and in accordance with bankruptcy law. The Plan creates a framework where the actual issues litigated in state court

become largely irrelevant to the core issues facing the parties. Indeed, the state court's rulings on the limited stay relief matters potentially have only marginal effects on the Plan. A summary demonstrating why that is the case is included as **Exhibit A** to this Objection.

14.     The timing of these cases was necessary to contain litigation costs, stave off liquidity problems, and preserve value. The state court was not near to a resolution of the various issues when these cases were filed, and the fact that the Trust wanted to take 10 depositions with respect to a narrow subset of issues shows what the litigation could sprawl into. The Debtors need a path to continue to operate, their customers need clarity as to their counter-party, and the Debtors need management focused on the business and willing to work. These cases accomplish that.

C. These Cases are Subchapter V cases, but they are not two party disputes.

15.     The Trust also contends that this case presents a two-party dispute, citing *In re Nw. Place Ltd.*, 108 BR 809 (N.D. Ga. 1988). That case involved a two party dispute over a single real estate asset, where only the debtor would benefit from overturning a consent-order that directed a pre-petition sale transaction. As the bankruptcy court stated, "It is quite apparent to the Court that the *only* thing the debtor wants to reorganize is its relationship with the Coopers by converting them back to equity holders." *Id.* at 812.

16.     Here, the Debtors are seeking to use the provisions of the Bankruptcy Code to preserve their substantial operations for the benefit of their customers, vendors, and creditors, and reorganize regardless of the outcome in the state court litigation. The Debtors' creditors include the Trust, HLFIP, over $1 million in liquidated unsecured debt on the Petition Date, and much more in asserted, unliquidated, or contingent debt. The only litigation advantage is to eliminate (or at least significantly reduce) the substantial legal and professional fees incurred from wasteful scorched-earth litigation over issues that do not need to be resolved based on the Debtors' financial

realities, and instead focus the collective efforts of the Debtors and all interested parties on the reorganization process.

17. Even if the Trust's theory of the case were correct, this is a three-party dispute among the Trust, the Debtors, and HLFIP. And the Trust's effort to paint this as a simple case of just avoiding HLFIP's claim is nonsense. This reality is starkly apparent from the Trust's argument in the Motion to Dismiss, where it states that "Freeing SmartComm of a fraudulent $90 million debt would maintain both the net income and assets to pay its creditors without reorganization." Motion to Dismiss at 14. That statement is simply misguided. For example, freedom from certain debt doesn't create additional net income or new assets or avoid other debt. It doesn't pay for increased tax liabilities created as a consequence. It doesn't address the economic realities of the actual ownership and use of the intellectual property, which has to be paid for somehow. It doesn't address the other issue in the litigation (the buyout claim). And, it doesn't repay the heavy price of professional fees spent litigating to obtain that freedom. It also ignores that freedom from that debt could result in additional tax liability for the Debtors, given the Debtors' prior tax positions on that debt.

D. <u>Jon, as the sole director and manager, had corporate authority to file these chapter 11 reorganization cases.</u>

18. The other argument the Trust makes in its Motion to Dismiss is that, because Janice (presumably solely in her capacity as trustee of the Trust) may still have a temporary equity interest in Smart Comm FL pending completion of the Buyout litigation,[2] and shareholders of Florida corporations are entitled to vote before a Florida corporation can file a bankruptcy case, the cases were filed without proper corporate authority. Because that argument fails as a matter of law, and the Motion to Dismiss on that basis should be readily denied.

---

[2] The Motion to Dismiss was filed by "Creditor" Janice Logan, not "Shareholder" Janice Logan.

7

19. It is undisputed that Jon is the sole director of Smart Comm FL, a Florida corporation. As such, the case was filed with proper corporate authority.

20. "The Bankruptcy Code itself does not establish the requisites for the initiation of a voluntary corporate bankruptcy case, the validity…must be determined with reference to the laws of the state in which the corporation was chartered." *Winter v. Bel-Aire Invs., Inc.*, 97 B.R. 88, 89-90 (Bankr. M.D. Fla. 1989). *See, e.g., In re DeLuca*, 194 B.R. 79, 87 n. 12 (Bankr. E.D. Va. 1986) (noting the court would be able to dismiss a bankruptcy filing based on an action that violated applicable state law); *In re Quarter Moon Livestock Co. Inc.*, 116 B.R. 775, 778 (Bankr. D. Idaho 1990) ("the authority to file a bankruptcy petition must be found in the instruments of the corporation and applicable state law"). *See also* David B. Stratton, News at 11: Special Purpose Entities and the Authority to File Bankruptcy, Vol. 23, No. 2, Am. Bankr. Inst. J. 36, 43-44 (March 2004) (collecting cases ruling that the provisions of applicable state law and organizational documents of an entity may be enforced when determining whether an entity has authorization to file).

21. Turning to Florida corporate law, per Fla. Stat. § 607.0801, "[a]ll corporate powers shall be exercised by or under the authority of the board of directors of the corporation, and the business and affairs of the corporation shall be managed by or under the direction of, and subject to the oversight of, its board of directors, subject to any limitation set forth in the articles of incorporation or in an agreement authorized under s. 607.0732." Here, Smart Comm FL's operative documents include no such limitation, and the Trust has not pointed to any. Smart Comm FL's bylaws do not contain any requirement of shareholder approval for a bankruptcy filing. And, there is no shareholder or other agreement containing any such requirement.

22. "Florida courts have long held that the authority to file a bankruptcy petition rests with a corporation's board of directors." *In re Nica Holdings, Inc.*, 810 F.3d 781, 790 (11th Cir. 2015) (citations omitted); *In re Arkco Prop., Inc.*, 207 B.R. 624, 628 (Bankr. E.D. Ark. Mar. 31, 1997); *In re N2N Commerce, Inc.*, 405 B.R. 34, 41–42 (Bankr. D. Mass. May 1, 2009) (applying Delaware law); *In re ComScape Telecommunications, Inc.*, 423 B.R. 816, 831 (S.D. Ohio Feb. 11, 2010) ("[I]t is beyond cavil that modern American corporations invoke the protection of the bankruptcy laws without obtaining shareholder votes. Rather, it is generally true that the board of directors has the authority to commence a bankruptcy case on behalf of a corporation." (internal quotations and citation omitted)).

23. Although it is true that under limited circumstances, Florida corporate boards must obtain shareholder approval in order to act, those limited circumstances are not applicable here. Fla. Stat. s. 607.1202 provides, for example, that a corporation may "dispose of all, or substantially all, of its property (with or without good will), otherwise than in the usual and regular course of business" only if "the board of directors proposes and its shareholders approve the proposed transaction." Id. § 607.1202(1) (emphasis added).

24. The Trust cites to *In re Zebranek & Doughten P.A.*, No. 01-04461-6B7, 2001 WL 1825793 (Bankr. M.D. Fla. July 31, 2001) (Briskman, J.) to apply the shareholder approval requirement to a bankruptcy petition, a twenty year old unreported decision not cited by any other case. In *Zebranek*, the Debtor had two shareholders, and four directors (each shareholder and their respective wives). One shareholder and his wife authorized a chapter 7 filing by the corporation, and did not allow the other two directors to vote on whether to authorize the filing.

25. In finding a lack of authority to file based on the vote of only two *directors*, the court was clearly focused on the actions of the directors, not the shareholders. *Id.* at *2 ("Authority

4900-6664-5007, v. 3

to file a voluntary bankruptcy petition on behalf of a corporation requires approval of the corporation's board of directors.… The debtor did not [sic] have authority from the board of directors, since the authorization given on May 8, 2001 did not meet the requirements of Section 607.0824 for board action.") While the Court asserted that § 607.1202 applies "to a voluntary petition <u>under Chapter VII</u> of the Bankruptcy Code, since the filing of a petition pursuant to Chapter VII results in a transfer of a corporate debtor's assets to a trustee in bankruptcy," *id.* at *2 (emphasis added and citing *In re Am. Int'l Indus., Inc.*, 10 B.R. 695, 696 (Bankr. S.D. Fla. 1981)),[3] that conclusion is dicta because the court's ruling on lack of authority was addressed solely to the directors, not the shareholders. Moreover, the court's conclusion that § 607.1202 applies could make sense, but only for Chapter 7, which by definition involves the disposition by liquidation of the debtor's assets. As noted by the *Zebranek* court, Chapter 7 results in control over a corporate debtor's assets passing to a trustee in bankruptcy, which could be considered a disposition of all of a corporation's assets under § 607.122. *But see*, *Royal Indem. Co. v. Am. Bond & Mortg. Co.*, 289 U.S. 165, 171 (1933) ("[t]he petition in a voluntary or involuntary proceeding is a pleading. The entry of an adjudication vests title in the trustee, and this is the act of the court, not of the petitioner.").

26.     Chapter 11 is fundamentally different: the debtor remains a "debtor in possession" and manages its assets while developing a plan. Particularly in a case where no sale is contemplated, such as these cases, there is no transfer, no disposition, and no third party trustee appointed. Once in a chapter 11, although general corporate law continues to be relevant, parties,

---

[3] *American International*, cited in *Zebranek*, involved an officer authorizing a corporate filing without board approval, not a board authorizing a filing without shareholder approval. *In re Am. Int'l Indus., Inc.*, 10 B.R. 695, 697 (Bankr. S.D. Fla. 1981) ("it appears that the president of a Florida corporation could not, in good faith, presume to have the power to file a voluntary petition in bankruptcy, unless he had a specific resolution of the board of directors authorizing the action.").

10

including the Debtor, are governed by the Bankruptcy Code. *E.g.*, *In re Schepps Food Stores, Inc.*, 160 B.R. 792, 799 (Bankr. S.D. Tex. 1993) ("[W]hile state law standards continue to apply to post-petition fiduciary obligations, the rights and remedies of aggrieved shareholders and creditors during the post-petition/pre-confirmation period are regulated by the Bankruptcy Code which controls state law pursuant to the Supremacy Clause of the United States Constitution.") Chapter 11, and Subchapter V in particular, do not contemplate the disposal of all of the corporation assets, and so Fla. Stat. s. 607.1202 (and the requirement for shareholder approval) is not implicated. Once the filing is made with proper authority (as here), the Bankruptcy Code controls.

27. The case of *In re Quarter Moon Livestock Co., Inc.*, 116 B.R. 775 (Bankr. D. Idaho 1990) is particularly illustrative here. In *Quarter Moon*, the debtor was owned 50/50 by two families, and a deadlock arose after the death of one of the family heads. A director was elected by one of the families, and made the decision to file a chapter 7 proceeding for the debtor, a solvent company. The other family moved to dismiss for bad faith. The court considered and rejected an argument that the director lacked authority, finding that the director was properly acting as a director, and that the board was vested with the authority to file. The court found that any protections applicable to a sale outside of bankruptcy did not prevent the filing, and in any event could be maintained in the bankruptcy case through rights under the Bankruptcy Code.

28. The authority to file for a Florida corporation lies in the hands of the directors. Florida law requires a valid resolution of a corporation's board of directors (not shareholders) before a bankruptcy filing is authorized under Chapter 11. *See Winter v. Bel-Aire Invs., Inc.*, 97 B.R. 88, 89 (Bankr. M.D. Fla. 1989) (dismissing Chapter 11 filing made by president of corporation and holding a valid resolution of a corporation's board is required based on the corporation's articles of incorporation); *Matter of Brandon Farmer's Market, Inc.*, 34 B.R. 148

(Bankr. M.D. Fla. 1983) (dismissing Chapter 11 petition filed by officer). Because Jon was the sole director, he had authority to authorize the filing (which he exercised), and no vote or permission from shareholders was required.

## Conclusion

29. Once it has all of the facts of the Debtors' circumstances, and can consider the Debtors' Plan in context, the Court should conclude that the Debtors' cases were filed in good faith, consistent with the purposes of the Bankruptcy Code, and with proper corporate authority.

WHEREFORE, the Debtors respectfully request that this Court enter an order denying the Motion to Dismiss, and providing such other and further relief as is just.

                                                        */s/ Daniel R. Fogarty*
                                                        Daniel R. Fogarty (FBN 0017532)
                                                        Stichter Riedel Blain & Postler, P.A.
                                                        110 East Madison Street, Suite 200
                                                        Tampa, Florida   33602
                                                        Telephone: (813) 229-0144
                                                        Email:  dfogarty@srbp.com
                                                        Attorneys for Debtors

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Debtors' Objection to Creditor Janice Logan's Motion to Dismiss Cases has been furnished on January 21, 2025, by the Court's CM/ECF electronic mail system to all parties receiving electronic service.

                                                        */s/Daniel R. Fogarty*
                                                        Daniel R. Fogarty

# EXHIBIT A

## STATE COURT OUTCOMES EFFECT ON PROPOSED PLAN OF REORGANIZATION

| DISPUTED ISSUE | STATE COURT ADJUDICATION | EFFECT ON DEBTORS' ESTATES | EFFECT ON PLAN | BASIS FOR EFFECT ON PLAN |
|---|---|---|---|---|
| **Validity/Extent of License** | HLFIP HAS VALID LICENSE | HLFIP has a right to seek termination of Debtors' use of the license and Debtors would be required to negotiate future license fees for use of HLFIP's intellectual property. | NONE | Plan contemplates license is valid and enforceable and can be fully implemented without liquidating the amounts owed under the license pursuant to the terms proposed by the Debtors and HLFIP in the Plan because HLFIP is subordinating any license fees to the carve-out detailed in the Plan. |
| | HLFIP LICENSE IS INVALIDATED OR NARROWED IN SCOPE | HLFIP will assert alternative claims against the Debtors' estates for unjust enrichment, contribution, and indemnification related to Debtors' prior use of HLFIP's intellectual property and HLFIP's tax burden related to same. Additionally, depending on the resolution of these alternative claims, Debtors' estates may incur separate income tax liability arising from negating significant expense deductions previously taken by the Debtors on pre-petition tax returns arising from the accrued license fees owed to HLFIP. The Debtors will still owe similar liabilities to potentially different parties under different theories of recovery. | NONE | Plan contemplates the execution of a new exclusive license for five years that is subject to court approval and that expressly carves out for the benefit of all creditors of the Debtors' estates the Debtors' projected disposable income during the five years. The ability to obtain a new license will still require the conversion of any prior fees and subordination of future license fees to be converted into equity in the Reorganized Debtors. Moreover, any offset in amounts owed to HLFIP would be negated by additional income taxes that would be owed from negating Debtors' prior deductions. |

| DISPUTED ISSUE | STATE COURT ADJUDICATION | EFFECT ON DEBTORS' ESTATES | EFFECT ON PLAN | BASIS FOR EFFECT ON PLAN |
|---|---|---|---|---|
| **Valuation Date of Trust's Equity in the Debtors** | Date requested by the Trust | According to the Trust, may result in the potential for a higher valuation of the Trust's equity and increase an allowed general unsecured claim in favor of the Trust against the Debtors' estates. | NONE | The Plan is a pot plan for all creditors holding allowed unsecured claims that reject the Debtors' proposed treatment. Thus, the Plan can be fully implemented even if a substantial general unsecured claim is ultimately allowed in favor of the Trust. |
| | Date requested by the Debtors | May result in the potential for a lower valuation of the Trust's equity and decrease or entirely disallow any general unsecured claim in favor of the Trust against the Debtors' estates. | NONE | The distributions under the proposed Plan would simply be redistributed in a different allocation in the event the Trust's claims were disallowed or significantly reduced against the Debtors. |

4900-6664-5007, v. 3