IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11, Subchapter V |
| Smart Communications Holding, Inc. | Case No. 8:24-bk-07106 |
| Smart Communications Holding, LLC | Case No. 8:24-bk-07108 |
| Debtors. | *Jointly Administered under* 8:24-bk-07106 |

_____/

**CREDITOR JANICE LOGAN'S**
**REPLY TO DEBTORS' OBJECTION TO MOTION TO DISMISS CASES**

Creditor Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021 ("Janice"), hereby replies to the Debtors' Objection to the Motion to Dismiss (Doc No. 45) (the "Objection"). In support thereof, she states as follows:

1.      There are three reasons why the Objection should be overruled.

2.      First, in an about-face, the Debtors have now switched from pointing to the bogus HLFIP debt as the reason for the bankruptcy filing to now pointing to the "scorched earth" litigation in Sarasota County state court (the "Sarasota Court"). However, the Objection complains about litigation costs that are entirely the doing of Jonathan Logan ("Jon"), to wit:

a.      All of the pending litigation involving Janice is premised upon Jon's efforts to advocate for the self-dealing IP Liability so that Jon can argue for a lower value for Janice's stock interest;

b.      Jon spent a year forcing the Debtors to litigate a fraudulent shareholders agreement (Phase 1 trial). *See* Exhibit 1, Sarasota County Phase 1 Declaratory Judgment Order, at 724 (transcript pagination) (Court makes factual finding that shareholders'

agreement that Jon held out to be signed by the deceased previous co-owner of SmartComm was not signed by the deceased co-owner);

c.     Jon went so far as to create a Delaware entity so that he could run to Delaware court in an attempt to obtain more favorable rulings than in the Sarasota Court. The Delaware court declined to entertain such blatant forum shopping and, in granting Janice's motion to stay a declaratory-judgment action that Jon had filed in Delaware, criticized Jon's counsel for their lack of candor on the Sarasota Court proceedings. *See* Exhibit 2, Delaware Order Granting Janice's Motion to Stay, at 10 n.37 ("[T]his Court would have appreciated more transparency from Plaintiff's filings regarding the course of proceedings in the Florida Action");

d.     Jon has not made any settlement proposals to Janice since he commenced the state court litigation against her in February 2023, nor has he even responded to Janice's several proposals;

e.     In the current phase of the litigation (Phase 2), Jon filed a statutory election to purchase Janice's shares in lieu of litigating derivative claims, *see* Exhibit 3, SmartComm's Purchase Election, but made no proposal of a purchase price during the statutory negotiation window. Instead, Jon opted to litigate the value of Janice's share; and

f.     Jon has been paying his own attorneys' fees and those of purported creditor HLFIP – whose interests would be adverse to those of the Debtors but for the fact that Jon controls both entities – with the Debtors' money.

3.     Accordingly, any argument that the Debtors needed to file bankruptcy because of "scorched earth" litigation by Janice is disingenuous and only underscores the fact that they want this Court to resolve a two-party dispute that should be resolved in the

Sarasota Court. Jon seeks reorganization of the purported Debtors because he wants this Court—rather than the Sarasota Court that has already rejected one agreement he forged—to endorse a $67 million liability ("IP Liability") from the Debtors to himself (via HLFIP). The Debtors filed their petitions days after the Sarasota Court denied their request to delay a February trial that will decide whether the IP Liability is valid.  Such conduct reeks of bad faith and should not be countenanced by this Court.

4.      Second, Jon brings the Debtors to this Court without any *bona fide* need for reorganization, but instead to avoid the efficient adjudication and resolution of a two-sided dispute *that Jon and the Debtors initiated* in the Sarasota Court.  Without the IP Liability, these Debtors are solvent and profitable.  Indeed, after eliminating insider claims and the critical vendor that was paid, the remaining claims are less than $500,000.00 and there are serious questions as to whether such claims are asserted by creditors of the Debtors or Smart Communications Collier, the wholly-owned subsidiary to which all of the profit flows from customers.  The Debtors are meeting their financial obligations and apparently have enough money to spend $60,000 on unauthorized expenses for the Yacht.  The only potential financial issues for these Debtors are based on the following self-inflicted wounds: (1) the litigation costs discussed above; (2) the bogus insider debt of HLFIP; and (3) some type of tax liability that allegedly may result if the HLFIP debt is eliminated—because apparently the Debtors have been taking deductions based on this phantom debt. These self-inflicted wounds do not warrant dragging the creditors into a needless bankruptcy case.

5.      The Debtors fail in their attempt to distinguish the holding in *In re LTL Management, LLC*, 64 F. 4th 84 (3d Cir. 2023).  There, the Third Circuit makes clear that bankruptcy is not to be abused by companies that are only potentially in financial distress based

on some "attenuated possibility." *Id.* at 448-49.  In their attempt to distinguish *LTL,* the only argument that the Debtors can make is that the requirement to pay the IP Liability is a real possibility rather than an "attenuated possibility."  Such an argument ignores the fact that the Debtors have never paid the IP Liability during the ten years it has purportedly existed, and an injunction currently forbids the payment.

6.     Third, the cases should be dismissed because there was no corporate authority to file them.  The Debtors contend that the requirements in Fla. Stat. § 607.1202 do not apply because they filed Chapter 11 (as opposed to a Chapter 7) bankruptcy petitions. That distinction is immaterial. By its terms, § 607.1202(1) requires shareholder approval if a "corporation [] sell[s], lease[s], exchange[s], or otherwise dispose[s] of all, or substantially all, of its property (with or without good will), otherwise than in the usual and regular course of business." Regardless of whether a debtor files a Chapter 11 or Chapter 7 petition, the filing of the petition both creates a bankruptcy estate and pours "all legal or equitable interests of the debtor" into that estate. 11 U.S.C § 541(a)(1). Therefore, the effect of the bankruptcy petition is a transfer of all of the debtor's assets into the bankruptcy estate. Section 607.1202 applies and SmartComm was required to—but did not—obtain shareholder approval before filing its bankruptcy petition.

7.     SmartComm cites several cases in an attempt to establish that shareholder approval is not required for a company to petition for Chapter 11 bankruptcy, but those cases are not persuasive. The only case it cites applying Florida law, *In re Nica Holdings, Inc*., 810 F.3d 781 (11th Cir. 2015), did not reach the issue of whether shareholder approval was required for a bankruptcy petition because, in that case, the petitioner did not even meet the minimum requirement of director authorization. The other cases do not apply Florida law at all. *See, e.g., In re Teacorp, Inc*., 2007 Bankr. LEXIS 1658, 2007 WL 1404424 at *3 (Bankr. S.D. Tex. Feb. 7,

2007) (applying Texas law and quoted in *In re ComScape Telecommunications, Inc*., 423 B.R. 816, 831 (S.D. Ohio Feb. 11, 2010); *In re Arkco Prop., Inc*., 207 B.R. 624, 628 (Bankr. E.D. Ark. Mar. 31, 1997) (applying Arkansas law); *In re N2N Commerce, Inc*., 405 B.R. 34, 41–42 (Bankr. D. Mass. May 1, 2009) (applying Delaware law).

## <u>CONCLUSION</u>

WHEREFORE, Creditor Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021, respectfully requests that this Court dismiss Debtors' bankruptcy cases pursuant to 11 U.S.C. § 1112(b), and grant such further relief as it deems just and appropriate.

Dated:  January 27, 2024.      */s/  Edward J. Peterson*
Edward J. Peterson
Johnson Pope Bokor Ruppel & Burns, LLP
400 N. Ashley Drive, Suite 3100
Tampa, Florida 33602
Telephone:  (813) 225-2500
Email:  edwardp@jpfirm.com

***Attorney for Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021***

-AND-

David E. Schoenfeld (*pro hac vice*)
Illinois Bar No. 6197020
Email:  dschoenfeld@shb.com
Shook, Hardy & Bacon L.L.P.
111 South Wacker Drive, Suite 4700
Chicago, Illinois 60606
Telephone:  (312) 704-7700

***Attorney for Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021***

## PROOF OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via the Court's CM/ECF service to those parties receiving such service in the ordinary course of business on this 27th day of January 2025.

_/s/  Edward J. Peterson_
Edward J. Peterson

EXHIBIT 1

RECORDED IN OFFICIAL RECORDS
INSTRUMENT # 2024016761    26 PG(S)
2/7/2024 4:24 PM
KAREN E. RUSHING
CLERK OF THE CIRCUIT COURT
SARASOTA COUNTY, FLORIDA
CIVIL COURTS        Receipt # 3140431

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.

                Plaintiffs,

v.                                                              Case No. 2023-CA-1002-NC

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust; and ALEXIS LOGAN,

                Defendants.        /        (CONSOLIDATED)

_____

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021, and directly
and derivatively on behalf of Smart Communications
Holding, Inc., and derivatively on behalf of Loco
Florida, LLC,                                                 Case No.: 2023-CA-1280-NC

                Plaintiff,

v.                                                              **Jury Demanded:**
                                                                **Counts II, III, IV, and V**
JONATHAN LOGAN,
SMART COMMUNICATIONS HOLDING, INC.,
nominal defendant, LOCO FLORIDA, LLC,
nominal defendant, and SMART
COMMUNICATIONS HOLDING, LLC,

                Defendants.        /

_____

### PHASE I[1] DECLARATORY JUDGMENT

THIS CAUSE having come before the Court for a three-day bench trial from January 29,

2024, to January 31, 2024, on Count II of Plaintiffs Jonathan D. Logan's ("Jon") and Smart

Communications Holding, Inc.'s ("Smart Communications") Complaint (DIN 2) seeking a

declaration that a certain purported Shareholders' Agreement attached to the Complaint as Exhibit

---

[1] The consolidated action was bifurcated by agreement (DIN 241) of the Parties in order to try the Declaratory Judgments actions, which are referred to as "Phase I," before the remaining counts of the Parties' respective operative pleadings.

D was valid and enforceable, and on Count I of the Amended Verified Complaint (DIN 271) of Defendant Janice Logan, individually and as Trustee of the James Logan Family Trust, dated February 10, 2021, ("Janice") seeking a declaration that the purported Shareholders' Agreement is invalid and unenforceable, and having reviewed the file, heard testimony of fact and expert witnesses, and received documentary and physical evidence, and being fully advised in the premises, the Court **ADJUDGES**:

1.     The Court has jurisdiction over the Parties and subject matter of Phase I pursuant to Fla. Stat. § 86.011, *et seq.* Jon is a resident of Pinellas County, Florida, Smart Communications is incorporated in the state of Florida and has its headquarters in Pinellas County, Florida. Janice is a resident of Sarasota County, Florida, and the James Logan Family Trust, dated February 10, 2021, is administered in Sarasota County, Florida.

2.     The Court's January 31, 2024, oral findings of fact and conclusions of law, explained in open court before a court reporter, a transcript of which is attached hereto as **EXHIBIT A**, are incorporated into this judgment and entered.

Based on those findings and conclusions, the Court **DECLARES**:

I.     That the purported September 23, 2022, Shareholders' Agreement attached to Plaintiffs' Complaint as Exhibit D is invalid and unenforceable, and that there is no shareholders' agreement in effect between the two 50% shareholders of Smart Communications Holding, Inc.'s stock, (1) Jonathan D. Logan and (2) Janice Logan, as sole Trustee of the James Logan Family Trust, dated February 10, 2021.

**DONE AND ORDERED** in Chambers in Sarasota County, Florida on this _6th_ day of February, 2024.

_____

Hon. Hunter Carroll, Circuit Court Judge

### Certificate of Service

On February ___, 2024, the Court caused the foregoing document to be served via the Clerk of Court's case management system, which served the following individuals via email (where indicated). On the same date, the Court also served a copy of the foregoing document via First Class U.S. Mail on the individuals who do not have an email address on file with the Clerk of Court.

CRAIG STEPHEN BARNETT
200 EAST LAS OLAS BLVD
SUITE 2100
FORT LAUDERDALE, FL 33301

MICHAEL J. HARWIN
200 EAST LAS OLAS BLVD
SUITE 2100
FORT LAUDERDALE, FL 33301

CHRISTOPHER R. CLARK
106 EAST COLLEGE AVE
SUITE 700
TALLAHASSEE, FLORIDA 32301

CHARLES FRANKLIN JOHNSON III
802 11TH ST W
BRADENTON, FL 34205

ANITRA RAIFORD CLEMENT
100 N TAMPA ST
SUITE 2900
TAMPA, FL 33602

DAVID E. SCHOENFELD
111 S. WACKER DR
SUITE 4700
CHICAGO, IL 60606

PETER F. O'NEILL
111 S. WACKER DR.
SUITE 4700
CHICAGO, IL 60606

ANDREW L. FRANKLIN
111 S. WACKER DR.
SUITE 4700
CHICAGO, IL 60606

KAILIN LIU
111 S. WACKER DR.
SUITE 4700
CHICAGO, IL 60606

# Exhibit A

1   IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT IN
    AND FOR SARASOTA COUNTY, FLORIDA
2
    JONATHAN LOGAN and SMART
3   COMMUNICATIONS HOLDING, INC.,

4                   Plaintiffs,
                                        Case No.:  2023-CA-1002-NC
5   vs.

6   JANICE LOGAN, individually and
    as Trustee of the James Logan
7   Family Trust, and ALEXIS LOGAN,
    individually,

8   _____Defendants._____/     (CONSOLIDATED)

9   JANICE LOGAN, as Trustee of the
    James Logan Family Trust dated
10  February 10, 2021, and directly
    and derivatively on behalf of
11  Smart Communications Holdings,
    Inc., and derivatively on behalf
12  of Loco Florida, LLC,

13                  Plaintiff,

14  vs.                                 Case No:   2023-CA-1280-NC

15  JONATHAN LOGAN, SMART
    COMMUNICATIONS HOLDING, INC.,
16  nominal defendant, and LOCO
    FLORIDA, LLC, nominal defendant,
17
    _____Defendants._____/
18

19              IN-PERSON TRIAL, PHASE ONE

20          BEFORE THE HONORABLE HUNTER W. CARROLL

21                   held at the
          Judge Lynn N. Silvertooth Judicial Center
22         2002 Ringling Boulevard, Courtroom 6C
                     Sarasota, Florida
23     Wednesday, January 31, 2024, 8:47 a.m. to 3:56 p.m.

24          VOLUME III, Pages 569 through 740

25             Stenographically reported by:
            Linda R. Wolfe, RPR, RMR, FCRR, FPR-C

1    following commenced at 3:08 p.m.)

2                    R-U-L-I-N-G

3        THE COURT:  This is Case 2023-CA-1002-NC

4    together with 2023-CA-1280.  We had Phase One of

5    the trial focusing on declaratory judgment actions

6    which was tried January 29th, 30th and 31st.

7        A predecessor judge entered a temporary

8    injunction in this case which, after that judge's

9    disqualification, got expanded ultimately by

10   agreement of parties after some discussions with

11   the Court.

12       But today is -- and the last three days has

13   been focusing in on whether there is a

14   Shareholders' Agreement; and, if so, what is it.

15       And in coming to this ruling, let me first

16   identify who several of the players are.  We have

17   Smart Communications Holding, Inc., I'll call it

18   either "Smart" or "Smart Communications", and it

19   provides telecommunication services for jail and

20   prison inmates.  And although it was not the focus

21   of this Phase One trial, just by the sheer number

22   of lawyers here, it really suggests that the entity

23   is quite successful.

24       We have Jonathan Logan, who is the incumbent

25   president, director, and 50 percent shareholder of

1    Smart Communications.

2         We have Janice Logan, both in her individual

3    capacity and as trustee of the James Logan Family

4    Trust dated February 19th, 2021.  And James Logan,

5    of course, was her late husband.

6         The Trustee currently owns 50 percent of Smart

7    Communications' shares.  So Jon, and Janice as

8    trustee, each are 50 percent.  And I'm using

9    everyone's first name not because I'm trying to be

10   offensive but to help be clear as to who we are

11   talking about.

12        Also a party is Alexis Logan, who is the

13   sister of Jon.  She is the daughter of Janice.  And

14   if I didn't say it, Jon also is the son of Janice.

15        The evidence makes clear that Jon Logan and

16   Alexis Logan do not get along, at all.

17        And Jon's relationship with his mother,

18   Janice, is only slightly better.

19        Alexis and her mom, Janice, get along well.

20        Alexis is an attorney, and I'll comment on it

21   a little bit later.  She also, for a period of

22   time, was the 100 percent shareholder of Smart

23   Communications in a legal title type of situation.

24        There are other folks that we're going to be

25   talking about primarily.  First is James or Jim

1    Logan.

2        Jim is Janice's late husband.  He was the

3    father of Jon and Alexis.

4        And Jim died October 16th, 2022.

5        Attorney Mark Wall, who is an attorney at Hill

6    Ward Henderson, has represented Jon Logan.

7        Tom Sims, who is an attorney at the Johnson

8    Pope firm, has represented Jim and Janice Logan

9    relating to -- and I'm going to say their estate

10   plan.  I know when I say "estate plan," I'm just

11   using that generically, not just referring to wills

12   but the more global planning aspect, trusts and all

13   sorts of various agreements.

14       And I know probate lawyers get upset when I

15   say estate lawyers and I reference trusts.  But I'm

16   using "estate lawyer" here and just "estate

17   planning" in just a very generic sense.

18       We have -- Another person we are going to talk

19   about is Lisa Eddy, who is Smart Communications'

20   Vice President of Operations.  She's been with

21   Smart for approximately five years in various

22   roles, and her current salary is $230,000 a year.

23       We have Scott Holte, who is Smart

24   Communications' Chief Strategy Officer, and he has

25   also been with Smart for approximately five years.

1    And his current salary is $150,000.

2        Gloria Burgess, who is Jon Logan's housekeeper

3    who tends to Jon Logan's house every Tuesday,

4    almost without fail.

5        I did reference earlier that Jon Logan is the

6    incumbent president, director, and 50 percent

7    shareholder of Smart Communications, and he is the

8    person that's been driving the company.  And his

9    dad was with him along for that ride and, over

10    time, providing various different services.  Dad

11    tended to focus on the legal-financial-banking type

12    of services.  Jon Logan was vision and IP type of

13    involvement.

14        The core group of Smart Communications is Jon

15    Logan, Lisa Eddy, and Scott Holte.

16        And that core group can be -- that core group

17    meets at least once a week.  I mean, the evidence

18    indicated that Jon's talking to Lisa, the chief of

19    operations -- sorry, the Vice President of

20    Operations, you know, on a daily basis, but that --

21    those three are the core group that run Smart

22    Communications.  And I don't have it quickly, but I

23    want to say the evidence was there was, like, 14

24    departments and more than 100 employees.  Again,

25    another testament that Smart Communications is a

1    successful business.

2         And I've got -- I think that's basically the

3    players I'm going to talk about.  There are others

4    that I might mention along the way.

5         Now, I'm not going to focus in on how Smart

6    Communications was formed because it's not really

7    relevant.  As with most start-ups, corporate

8    formalities usually come a little bit later after

9    concept and a lot of sweat and tears and time, and

10   sometimes capital.

11        But it became -- from the general beginning,

12   there was a 50/50 split between son and dad.

13        Now, I know that due to various unspecified

14   issues that we didn't explore -- and, again, it

15   doesn't really matter, really -- Alexis held

16   100 percent of stock in her name.  But the reality

17   is, Jim and Jon treated each other as if they were

18   50/50.  Smart Communications' lawyers, accountants

19   treated them as 50/50, although they would include

20   Alexis.  And when we get to it, we'll talk about

21   the 2017, because she was still the legal owner of

22   the stock.

23        But for whatever reason, I never picked up on

24   what Mr. Schoenfeld was trying to explain to me,

25   but I don't think it really matters because I find

1    as fact that, from at least an equitable

2    standpoint, dad and son were 50/50.

3        We heard a lot about dad's alcoholism, and

4    certainly it's a pernicious disease, and I've seen

5    many families -- in this case, unfortunately -- I

6    see a lot of affects of alcoholism.  But be that as

7    it may, Jim would have periods of sobriety and then

8    some periods that were the opposite.

9        And as time has progressed, the waxing and

10   waning, it appears that dad's alcoholism was

11   getting the better of him.

12       And I think as it came through from Jon's

13   testimony, but more particularly in some of the

14   e-mails, Jon was growing frustrated with alcoholic

15   portion of dad.

16       And, Jon, I will just say this:  Nothing I'm

17   going to say changes your love for your dad.  But

18   I'm talking about your business here.  I'm not

19   talking about your love for your dad.  And so,

20   please --

21       JON LOGAN:  Understood, Your Honor.

22       THE COURT:  And I honor that -- and even in

23   some of those difficult e-mails, you know, you

24   acknowledged your love for your dad.  And so I'm

25   not talking about that.

1           But there was some growing resentment about

2      Jim's role and ownership.  And I do agree with what

3      Mr. Johnson was saying, that that concern wasn't

4      necessarily that dad was a 50 percent owner, but it

5      was the longer term:  What does that mean when

6      dad's no longer with us?

7           Now, over the years, there were efforts to

8      agree to a Shareholders' Agreement.  Now, Jon

9      suggests that there always has been one and it's

10     been modified slightly.  With exception of and

11     putting the 2002 (sic) purported Shareholders'

12     Agreement to the side, there are no written

13     agreements that contain signatures.  And we'll talk

14     about 2017, whether that is or is not a written

15     agreement later on.

16          I want to talk for a moment about Exhibit 101.

17     Exhibit 101 is the -- what Jon Logan testified to

18     is the Shareholders' Agreement that's in effect

19     that both he and his dad signed on or about

20     September 23rd, 2022.  It is thirteen single-spaced

21     pages and pretty small font, as you all saw me with

22     the magnifying glass looking.  And that thirteen

23     pages is exclusive of the signature page.

24          The import for our discussion today at

25     Section 4.3, the agreement contains a mandatory

1    buyback-on-death provision of any deceased

2    shareholder's shares.  And Section 5.3(b), as in

3    "bravo," sets the fair market value, but that is

4    determined by a company appraisal to set the

5    purchase price.

6          And the reality is, given that Jon Logan is

7    the incumbent director, if this is the agreement,

8    that puts Jon in basic total control over the

9    valuation process.

10         Now, I'll also pause here.  The Court isn't in

11   a position to determine whether a deal is a good

12   deal or a bad deal from some person's perspective,

13   and it's not the Court's role ever to write or

14   rewrite a contract to make it more fair for one

15   party or the other.

16         I reference the fact of 5.3(b) to help explain

17   the dynamic that brings us here today.

18         Now, there are three questioned signatures.

19   Two are on page 14 of the Shareholders' Agreement

20   from 2022 -- the purported Shareholders' Agreement,

21   and both of those allegedly contain Jim's

22   signature.

23         And then the third disputed signature is on a

24   separate document, but it's also in Exhibit 101,

25   which is entitled the Written Action of the Board

1    of Directors.

2        Janice and Alexis dispute that Jim signed this

3    agreement.  And we certainly have competing

4    experts.

5        The Jim -- sorry.  The Janice and Alexis'

6    expert was of the opinion:  Very highly probable

7    that this was not signed by Jim.

8        And we have the expert for Jon Logan who

9    contained a pretty high -- it was probable that dad

10   did sign.

11       And so I've got two experts that are not

12   exactly polar opposites, but pretty close to being

13   polar opposites of each other.

14       I do want to reference Exhibit 200.

15   Exhibit 200 is an e-mail chain that starts with

16   Attorney Mr. Sims.  And it is to Jon and Jim Logan.

17       And let me just back up.  The Alexis ownership

18   of the stock, her ownership terminated

19   approximately 2018.  I don't have the specific date

20   written down.  I'm sure it's on a document here.  I

21   just didn't go back to write it down.  At that

22   point, the shares went to Jon, individually, and

23   Jim, individually.

24       And prior to Jim's surgery in September, he

25   conveyed the Smart Communications' stock into the

1    Revocable Trust, and that's how Janice, as the

2    trustee, now is the owner of that stock.

3         Okay.  So going back to Exhibit 200.  This is

4    an e-mail.  It originated from Mr. Sims to Jon and

5    copying Jim.  And it, again, is conveying a

6    Shareholders' Agreement.  And the date on this is

7    September 12th, 2022.

8         Now, the text of that e-mail includes

9    statements that this is for Jon's review and

10   comment.  It reminds Jon that his dad's going to be

11   undergoing a medical procedure in the near future.

12   It contemplates that, quote, "once finalized", end

13   quote, it could be signed by son and dad, quote,

14   "in order to put it into place."

15        And I use those quotes to indicate that the

16   sending of the document itself was not a technical

17   offer.  But even if it were, that same day, still

18   in Exhibit 200, Jon rejects the Shareholders'

19   Agreement.

20        He writes, quote, "It's ridiculously too

21   complicated," end quote.

22        Quote, "I don't even understand it," end

23   quote.

24        Quote, "I want it much more simple and

25   direct," end quote.

1          Quote, "All these terms and names that need

2     their own paragraph of definition is ridiculous,"

3     end quote.

4          Now, critically, also in that e-mail, Jon

5     writes to his dad -- or Jon writes to -- yeah -- to

6     his dad, quote, "I do not agree to be a 50/50

7     partner with you," end quote.

8          Now, Jon's explanation is this was written as

9     part of his normal modus operandi to shock his dad

10    back into sobriety.

11         And, you know, I don't really have any

12    statement one way or the other, other than there's

13    not an acceptance of the offer to the extent that

14    you would construe the sending of Exhibit 200 to be

15    an offer, which I do not.

16         But it also is -- it indicates that there's no

17    reference to any existing shareholders.

18         Now, dad has two different types of responses.

19    The first response is at Exhibit 210, which is more

20    on the business side of the response.  And it talks

21    about the share transfer agreement, and that's the

22    share transfer agreement that took Alexis

23    100 percent back to Jon and Jim 50/50.  And so dad

24    is reminding Jon about the 50/50 nature.

25         Then there is Exhibit 211 and 213, and this is

1    a September 18th e-mail, slash, letter, that was

2    sent on October 3rd, 2022. And I know that there

3    is questions lodged by Jon as far as its proper

4    admissibility. But it's clear that there's a

5    videotape of Jim signing something, which is this

6    response. And this is the response on the more

7    personal side.

8        What I highlight at this point is in

9    Exhibit 213, a reply that Jon wrote to his dad on

10   October 3rd, 2022.

11       Quote, "If you want to start a war with me,

12   then we will have a war like you have never seen.

13   I have never made a death threat. Don't try and

14   put words into my mouth and document that like it

15   is fact. I am not stupid. I know what you are

16   attempting to do here. You are unfit as a business

17   partner, unfit as a father, unfit as a husband, and

18   unfit as an adult. You can't even dress yourself.

19   You want to make this get nasty. We can make it

20   get real nasty. I didn't deserve this. But I will

21   not let someone, including my own family, take

22   advantage of me anymore," end quote.

23       Now, again, Jon, I go back to I know you

24   testified that this is part of the shock that

25   you're trying to bring dad back into sobriety, but

1    I do note that nowhere in here is there an

2    assertion that there's an existing Shareholders'

3    Agreement.

4        And this was done on October 3rd, and the

5    testimony is that there previously was a signed

6    agreement that Jon left at his own house in

7    Tierra Verde, Pinellas County, Florida, for his dad

8    to come over, dad signed it, left Jon a copy and

9    took the original.

10        Now, the purported original has never been

11    found.  And as we indicated, dad dies on

12    October 16th, 2022.

13        Jon Logan's conduct over the next few months

14    suggests that there was no 2022 signed

15    Shareholders' Agreement.

16        Exhibit 217 -- and I know, again, that there

17    was a dispute over the admissibility of this

18    document -- suggests that Jon was not -- now

19    willing to sign it.

20        But even if I took that 217 away, my finding

21    doesn't change that there was no signed settlement

22    agreement -- I'm sorry -- no signed Shareholders'

23    Agreement in September or at any time in 2022.

24        What, to me, is really telling is the lead-up

25    to the December 8th meeting with Mr. Sims,

1    Mr. Wall, where Mr. Wall seeks from Smart

2    Communications' accountants and attorneys and Jim's

3    attorneys any information or if there is any signed

4    agreements regarding the business.  There's no

5    indication in those communications, "Hey, we know

6    that there is one, we're just trying to track it

7    down."

8         And in the December 8th meeting, while I

9    understand Jon contends that he referenced a signed

10   agreement, the attorneys for the parties don't

11   recall that.

12        There was a statement that Janice made to Jon,

13   "Why didn't you sign it?"  And Jon saying, "I wish

14   I had."

15        Now, I also know that there is an allegation

16   that Janice said something to the effect of that

17   she knows that there is a signed agreement or she

18   had seen a signed agreement, and the Court credits

19   Janice's testimony on that that it was in reference

20   to some prior iteration, not the 2022.

21        I have no doubt that Gloria Burgess found a

22   document, but the circumstances in how that

23   document was found are suspicious to the Court.

24        I also understand that Ms. Eddy and Mr. Holte

25   testified that Jim said something to the effect of

1   "I've signed the stockholders' agreement" or "You
2   don't need to worry about it because That's been
3   taken care of," and those are statements in the
4   fall 2022 time period.
5       I do know that both of them are interested in
6   the outcome of this proceeding from a financial
7   standpoint, and I have difficulty understanding how
8   individuals who talk daily or weekly as part of the
9   core group of Smart Communications would not
10  earlier disclose the existence of that comment or
11  those comments that Jim allegedly made when,
12  indisputably, they knew that one of the prime
13  issues of this lawsuit -- or these lawsuits, I
14  should say, involve whether there is a settlement
15  or -- a Shareholders' Agreement -- why I say
16  settlement agreement, I don't know -- why there's a
17  Shareholders' Agreement.
18      So all of that goes to me saying that I find
19  as fact that the Exhibit 101 was not signed by Jim
20  Logan.  Jim Logan never assented to that document.
21      That there is no 2022 stockholder's agreement.
22      Now, let me also talk, because I said at the
23  beginning that there was references over time that
24  there were various different shareholder
25  agreements.  And without a doubt, there were a lot

1    of evidence of discussions and drafts of various

2    iterations, and I will say they are different in a

3    material respect.  One provision that is different

4    than the 2022 has to do with how the company gets

5    evaluated.

6        And under those other prior agreements, it was

7    more of a -- and depending on which version, but

8    they were more typical that you would see one side

9    picks an appraiser, the other side picks the

10   appraiser, and then if there is a dispute, then

11   they pick a third.

12       I -- I -- I know that most of those

13   Shareholder Agreement requests were being driven by

14   dad and that he was willing to enter into some type

15   of agreement.

16       The 2017 is probably the closest that the

17   evidence supports of a Shareholders' Agreement, but

18   the Court will ultimately find that there was no

19   2017 Shareholders' Agreement.

20       If you look at the discussions contained

21   within the e-mails that were discussing various

22   drafts, there is never a situation where Jon says

23   "I accept" or Jim says "I accept" or using words to

24   that effect.

25       At that time, Alexis was involved and, in

1    fact, some of the e-mails reference that there was

2    either disagreement or a difference of opinion as

3    to what various provisions meant.  And what those

4    e-mails from 2017 -- they talk about a global, Hey,

5    we need to move in this direction type of plan,

6    these are some steps we need to take.  One step is

7    getting the stock out of Alexis' name.  And the

8    next step is to have a Shareholders' Agreement.

9    But the parties never agreed on the business terms.

10    And I understand that parties can agree to

11    business terms but have other terms that are left

12    open that doesn't defeat the existence of an

13    enforceable agreement.

14    Here the parties never came to either an oral

15    or written agreement as to the core business terms

16    for a Shareholders' Agreement.  Certainly, one of

17    the terms that existed or that both sides may have

18    wanted was the existence of a mandatory buyback.

19    But that's not the only term.

20    The various drafts that different lawyers from

21    different firms sent around were much more

22    comprehensive than just a buyback.  And so it's

23    just like a situation where parties are negotiating

24    over ten points; they come to an agreement on

25    three, but not on the other seven.  You don't have

1    an agreement unless the parties then say, "Okay, we

2    agree to those three and they are going to be

3    controlling."  There was not anything like that

4    here.

5        I understand Jon testified that at each of

6    these yearly meetings or whenever a new version of

7    whatever year they were talking about at the time's

8    Shareholders' Agreement, that the parties agreed

9    orally with each other and then decided, since it

10   wasn't a big deal, to physically memorialize it in

11   writing.

12       I find that that -- that Jon Logan failed to

13   meet his burden that there was an existence of

14   either an oral or written Shareholders' Agreement

15   at any time, including the 2017, '18, and I think

16   it was 2020 or the various different iterations.

17       So, ultimately, that means I'm declaring that

18   there is no Shareholders' Agreement that is in

19   effect between the two 50 percent shareholder --

20   50 percent shareholders of Smart Communications'

21   stock.

22       So I'm going to pause there.  Are there any

23   questions or clarifications I need to make?  And

24   I'm going to start with Jon's lawyers first.

25       MR. BARNETT:  No, Your Honor.

1          THE COURT:  Going to Janice's lawyers.

2          MR. SCHOENFELD:  No, Your Honor.

3          THE COURT:  Okay.  Going to Alexis' lawyers.

4          MR. JOHNSON:  No, Your Honor.

5          THE COURT:  Now, who on this side of the room

6     is going to take the first draft of coming up with

7     this partial judgment?

8          MR. SCHOENFELD:  Your Honor, we'd be happy to

9     do so.

10          THE COURT:  I want a specific person.  Is

11     it --

12          MR. SCHOENFELD:  It's not going to be

13     Mr. O'Neill because he is leaving on parental

14     leave, and I've forbidden him to do any more work

15     on this case until it is done.  So it will be

16     Mr. Franklin and myself.

17          THE COURT:  Okay.  Obviously, before anything

18     gets submitted, it needs to go to all the attorneys

19     for their review and approval.

20          What I normally do in these types of

21     situations, if you can get a copy of my ruling, and

22     I'm fine if you want to just electronically staple

23     it and then come up with the partial judgment, just

24     implementing it, that's fine, too.

25          Now, let's talk about -- and that completes my

1   ruling.

2        So I'm now going to shift about what's next.

3   I mean, obviously the lawyers here know, you know,

4   I was a business litigator for many years before I

5   even got on the bench.  I mean, we all know the

6   three primary things that are going to happen.

7   There could be others.

8        Parties are either going to agree on a

9   Shareholders' Agreement governing their relations,

10  there's going to be a buyout, or there's going to

11  be a deadlock.  There could be others, but those

12  are the three typical that I see in these types of

13  situations.

14       I want to be clear that the injunction is

15  still in effect.  And let's not move assets.

16       What is going on next week with the hearing

17  time, and how do we want to proceed?  Do we need to

18  go back to mediation in, let's say, 30 or 60 days?

19       Did you all get the financial information that

20  we talked about when we had the contempt hearings

21  that were ultimately resolved by agreement?

22       MR. O'NEILL:  So, Your Honor -- So to answer

23  Your Honor, I think your first question was, as for

24  next week, what is, I believe, is up on Monday, am

25  I correct?

EXHIBIT 2

**SUPERIOR COURT**
OF THE
**STATE OF DELAWARE**

VIVIAN L. MEDINILLA
JUDGE

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 10400
WILMINGTON, DE 19801-3733
TELEPHONE (302) 255-0626

March 20, 2024

Richard Rollo, Esquire
Travis S. Hunter, Esquire
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, Delaware 19801

Shaun Michael Kelly, Esquire
Lauren P. DeLuca, Esquire
Connolly Gallagher LLP
1202 North Market Street
Wilmington, DE 19801

**Re:** *Jonathan D. Logan v. Loco Florida, LLC et al.,*
<u>*C.A. No. N23C-10-208 VLM CCLD*</u>

Dear Counsel,

This is the Court's ruling on the Intervenor's Motion to Dismiss or Stay.

Having considered the parties' full briefing and for the reasons set forth below, the

Intervenor's Motion to Stay is **GRANTED** in favor of the Florida Action.

## I.   BACKGROUND[1]

---

[1] The facts are drawn from the Complaint, and the documents it incorporates by reference.   The Court also refers to the allegations from public filings in the pending Florida litigation between the parties, *Jonathan D. Logan et al. v. Janice Logan et al.*, 2023-CA-1002-NC (Fl. Cir. Ct.) and *Janice Logan v. Jonathan Logan et al.*, 2023-CA-1280-NC (Fl. Cir. Ct.)   (consolidated into the 1002 Action).   DRE 202(d)(1)(C) permits judicial notice of "the records of the court in which the action is pending and of any other court of this State or federal court sitting in or for this State…."   The Court may take judicial notice of court filings "for certain limited purposes, such as to understand the nature and grounds for rulings" made by the court in which the documents were filed." *In re Rural Metro Corp. S'holders Litig.,* 2013 WL 6634009, at *9 (Del. Ch. Dec. 17, 2013).   It may not, however, take judicial notice of such filings for the truth of their contents. *Id.*

On October 23, 2023, Plaintiff Jonathan D. Logan initiated this action by filing a Complaint against Defendants Loco Florida, LLC ("Loco") and Smart Communications Yacht Holding, LLC ("Yacht"), seeking declarations that he is the sole member and manager of Loco and Yacht, and that both were validly converted into Delaware entities.[2]

Loco and Yacht were allegedly formed as Florida limited liability companies in 2020 and March 2022, respectively.[3]   Loco owns assets that include a warehouse in Seminole, Florida, which was purchased for approximately $1.1 million.[4]   Yacht owns assets that include a 100' Riva Cosaro, which was purchased for approximately $10 million.[5]

In 2021, Jonathan's father, James Logan, formed the James Logan Family Trust (the "Trust").[6]   He and his wife, Janice Logan, the Intervenor in this action, were the Co-Trustees.[7]   In September 2022, James purportedly transferred his member interests in Loco and Yacht to the Trust.[8]   James died nearly one month later.[9]

---

[2] Complaint for Declaratory Judgment ("Compl.").

[3] *Id*. ¶¶ 1, 2.

[4] *Id*. ¶ 1.

[5] *Id.* ¶ 4.

[6] *Id*.

[7] *Id*.

[8] *Id*. ¶¶ 4, 11. The Court utilizes the parties' first names for ease of reference only.

[9] *Id.*

2

## A. The Florida Action

On February 27, 2023, Jonathan and Smart Communications Holding, Inc. ("SCH") filed a complaint in the Circuit Court of the 12ᵗʰ Judicial Circuit in Sarasota County, Florida Probate Division (Florida Court) against Janice and Janice's daughter, asserting claims for breach of trust and seeking declarations relating to the capacity in which claims may be pursued, and the effect of SCH's purported shareholders' agreement.[10]  Shortly thereafter, Janice filed her original complaint on behalf of the Trust, and directly and derivatively on behalf of SCH and Loco in the Florida Court against Jonathan, SCH, and Loco.[11]  She amended that complaint in August 2023,[12] to include allegations that are particularly alarming.[13]

The amended complaint in Florida consists of five counts.  Count I seeks declarations concerning the validity of the purported shareholders' agreement of

---

[10] *Id.* ¶ 4, n.1; Intervenor's Opening Brief in Support of Her Motion to Dismiss or Stay (the "Motion"), Ex. 4. (*Jonathan D. Logan, et al. v. Janice Logan, et al.*, 2023-CA-1002-NC (Fl. Cir. Ct.)).

[11] *See* Motion, Ex. 10.

[12] *Id.*, Ex. 5A.

[13] *See, e.g., id.* "Jon was convicted of Felony Aggravated Stalking in 2008 for harassing and intimidating a business associate and the associate's wife with whom Jon worked on a car dealership venture" (¶ 17); "Jon held James and Janice at gunpoint, hit his father's face, and demanded that James transfer his shares to Jon.  He also smacked the phone out of his mother's hand when she tried to call 911" (¶ 32); "he vandalized his mother's car" (¶ 33); "On Saturday, August 14, 2021 at 11:24 AM, Jon sent an email to his parents from his Smart Communications email address, threatening to 'Burn your [expletive] house down'" (¶ 34); "He warned his father 'Don't test me'; 'I really hope you fix yourself because you will be dead soon'; and, 'I have zero patience left for you and I am not one to [expletive] with on what I created with sheer willpower and brains. If you, or Janice or Alexis try and take anymore from me, I am prepared to do things the normal human could never fathom'" (¶ 40).

3

SCH; Count II is a claim for director liability; Counts III and V are direct and derivative claims for breach of fiduciary duty; and Count IV seeks to appoint a temporary custodian of SCH.   Count III further relates to Yacht's assets, which Janice alleges Jonathan improperly purchased with SCH's funds.[14]   The Court consolidated these actions (together, the "Florida Action").

On July 20, 2023, the Florida Court considered Janice's motion for a temporary injunction, seeking, in part, an order finding that Janice had a substantial likelihood of success on the merits of her claims.[15]   The Florida Court granted that motion.[16]   After that ruling, Jonathan submitted articles of conversion to the Secretary of State of the State of Florida, converting Yacht and Loco into Delaware entities.[17]   Jonathan then moved to dismiss counts II-V of Janice's amended complaint,[18] which the Florida Court denied.[19]

Because of the conversions and Jonathan's creation of a new Delaware entity (*i.e.*, Smart Communications Holding, LLC ("SCH LLC")), Janice again sought relief from the Florida Court and filed a motion for contempt of the temporary

---

[14] Motion at II.A.    The Motion omitted page numbers, so the Court refers to the section headings.
[15] *Id.*, Ex. 10.
[16] *Id.*, Ex. 6.
[17] Compl. ¶ 23; *id.*, Ex. C.
[18] Motion, Ex. 8.
[19] *Id.* Ex. 9.

4

injunction order and a request to appoint a temporary custodian.[20]    After the hearing, the parties, including SCH LLC, agreed to additional injunctive relief.[21]

On January 31, 2024, the Florida Court, in Phase 1 of its proceedings, concluded a three-day trial to resolve Count II, declaring SCH's shareholders' agreement invalid and unenforceable.[22]    The Florida Court also found that Janice owned 50% of the shares of SCH.[23]    The Florida Court is expected to address the remaining counts in Phase II after the parties attend mediation.[24]

### B. This Action

On October 23, 2023, during the pendency of the Florida Action and approximately one week after the Florida Court denied his Motion to Dismiss therein, Jonathan filed his Complaint in this Court.    Specifically, he seeks declarations under 10 *Del. C.* § 6501, and 6 *Del. C.* § 18-110[25] that he is the sole

---

[20]  Motion Section IV; *id.*, Ex. 15.

[21]  Intervenor's Rely Brief in Support of Her Motion to Dismiss or Stay ("Reply"), Ex. 2.

[22]  Reply, Ex. 4 at 2.

[23]  *Id.*

[24]  Reply at 3.

[25]  Jonathan invokes 6 *Del C.* § 18-110, but that statute confers jurisdiction to the Court of Chancery, not this Court.  *See* 6 *Del. C.* § 18-110 ("(a) Upon application of any member or manager, the Court of Chancery may hear and determine the validity of any admission, election, appointment, removal or resignation of a manager of a limited liability company, and the right of any person to become or continue to be a manager of a limited liability company, and, in case the right to serve as a manager is claimed by more than 1 person, may determine the person or persons entitled to serve as managers; and to that end make such order or decree in any such case as may be just and proper, with power to enforce the production of any books, papers and records of the limited liability company relating to the issue.").

member and manager of Loco and Yacht, and that Loco and Yacht were validly converted to Delaware limited liability companies.   The Complaint's only reference to the ongoing Florida litigation described above was confined to a single-sentence footnote.[26]   Jonathan's subsequently filed Motion for Summary Judgment on November 16, 2023, provided few additional details.[27]

In response, Janice filed an unopposed motion to intervene, as well as her Intervenor's Motion to Dismiss or Stay (the "Motion").[28]   The parties submitted competing schedules on whether to first resolve the Motion for Summary Judgment or this Motion.   The Court held a status conference on December 19, 2023, granted the Motion to Intervene, and determined this Motion would be considered first due to the potential forum-related issues presented at first blush.[29]   With full briefing submitted, this matter is ripe for decision.

## II.   DISCUSSION

Under *McWane*'s three-factor test, the Court may dismiss or stay in favor of a previously filed action if there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, and involving the same parties and

---

[26] Compl. ¶ 4, n.1. ("There is pending probate litigation in Florida between Jon and the Trust, but it does not involve the declarations requested here.   Jon will promptly provide the Trust a copy of this complaint.").

[27] Plaintiff Jonathan Logan's Motion for Summary Judgment (D.I. 2).

[28] D.I. 9; D.I. 10.

[29] D.I. 13.

6

the same issues.[30]   "[I]t is preferable to merely stay the later-filed action because it is impossible to predict with certainty the course of earlier-filed litigation in another jurisdiction."[31]   The authority to grant a stay is "incident to the inherent power of a court to exercise its discretion to control the disposition of actions on its docket in order to promote economies of time and effort for the court, litigants, and counsel."[32]

### A.    The Delaware Action is Stayed under *McWane*

Jonathan filed his complaint in the Florida Action in February 2023 and Janice filed her amended complaint in August 2023.   This action commenced in October 2023.   Thus, the Florida Action is the prior-filed action.

The Florida Court has already proven its ability to provide prompt and complete justice.   It has held several evidentiary hearings, entered injunctive relief, and heard predicate Florida-related governance issues that implicate Loco and Yacht, which prior to their conversions, were Florida entities.   It has also considered and added, to a status quo order, the Delaware entity (SCH LLC), which was formed during the Florida litigation.

The Florida Action involves functionally the same parties and issues

---

[30] *LG Electronics, Inc. v. InterDigital Commc'ns, Inc.*, 114 A.3d 1246, 1252 (Del. 2015) (citing *McWane Cast Iron Pipe Corp. v. McDowell–Wellman Eng'g Co.,* 263 A.2d 281, 283 (Del. 1970).
[31] *Schnell v. Porta Sys. Corp.*, 1994 WL 148276, at *6 (Del. Ch. Apr. 12, 1994*); EnVen Energy Corp. v. Dunwoody*, 2020 WL 2770609, at *5 (Del. Ch. May 28, 2020).
[32] *Joseph v. Shell Oil Co.,* 498 A.2d 1117, 1123 (Del. Ch. 1985).

presented before this Court.   "Consistent with the *McWane* doctrine generally, the 'same parties, same issues' analysis focuses on substance over form."[33]   The Court looks for "substantial or functional identity" between the competing action.[34] Whether two cases raise the same issues is based on whether the claims "are closely related and arise out of the same common nucleus of operative facts."[35]

Here, Loco is a party to both actions.   And although Yacht is not a party to the Florida Action, SCH, which is a party, allegedly purchased and maintains Yacht's assets.   Thus, the 100' Riva Cosaro, Yacht's primary asset, may also be subject to relief from the claims of fiduciary duty and waste brought in the Florida Action.   Accordingly, substantial or functional identity exists between the competing actions.   Furthermore, the issues in both proceedings also arise from a common nucleus of operative facts, that is, Jonathan and Janice's rights in SCH and their related entities, including Loco and Yacht, as well as Jonathan's actions with respect to those entities.

Jonathan's opposition is unpersuasive.   He argues that the Delaware Action only seeks narrow declarations regarding membership status in Loco and Yacht, and

---

[33]  *Zurich Am. Ins. Co. v. Sterigenics U.S., LLC*, 2024 WL 324094, at *6 (Del. Super. Ct. Jan. 26, 2024) (citation omitted).

[34]  *Id.*

[35]  *EnVen Energy Corp.*, 2020 WL 2770609, at *5 (citing *EuroCapital Advisors, LLC v. Colburn*, 2008 WL 401352, at *2 (Del. Ch. Feb. 14, 2008) (quoting *Dura Pharms., Inc. v. Scandipharm, Inc.*, 713 A.2d 925, 930 (Del. Ch. 1998))).

on that basis, the propriety of their conversions into Delaware entities.   But in the Florida Action, Janice has brought derivative claims against Loco, and may only do so if she is a member thereof.   The analysis and interpretation of Florida law as to Loco will similarly apply to Yacht.   Thus, Janice's claims in the Florida action closely relate to the declarations sought in this action.   Lastly, the resolution of the claims regarding the actions taken by Jonathan at SCH may moot the requested declarations as to Yacht.[36]

For these reasons, the Delaware Action is stayed under *McWane*.

### B.    Inherent Discretion to Control Court Docket Weighs in Favor of a Stay

Aside from this Court's consideration of the *McWane* factors, Jonathan's litigation conduct raises a host of jurisdictional concerns.   Although Jonathan argues that he merely seeks declarations regarding questions of Delaware internal affairs, any jurisdictional analysis requires consideration of the actions he took after the Florida Action was well underway.   Further, Jonathan's contention that his Complaint presents narrow issues of Delaware governance is further belied by the fact that he asks this Court to interpret Florida law.   Yet, the only basis that allows him to seek relief here is dependent upon the purported conversion of Florida

---

[36] *See* Reply at 5.

entities, the validity of which may be *void ab initio* if Janice—who has already shown a substantial likelihood of success—prevails on her claims in the Florida Action.

Given the alarming nature of the allegations in the Florida Action against Jonathan, the Court is loath to insert itself in a dispute that has involved significant motions practice, evidentiary hearings, and injunctive relief.[37]   The parties' more than year-long dispute in the Florida Court also implicates claims of fiduciary duty and director liability—issues beyond the subject matter jurisdiction of this Court. Namely, one claim in the Florida is a derivative claim on behalf of Loco, and others are direct and derivative breach of fiduciary duty claims against Jonathan regarding Yacht's assets.[38]   Seeking declaratory relief at this stage is, therefore, premature and presents the risk of inconsistent rulings between the two actions.[39]   Principles of comity and judicial efficiency weigh in favor of a stay pending the Florida Action.[40]

---

[37] In seeking summary judgment, this Court would have appreciated more transparency from Plaintiff's filings regarding the course of proceedings in the Florida Action.

[38] Motion at II.

[39] *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.,* 263 A.2d 281, 283 (Del. 1970) (The Court should avoid "the wasteful duplication of time, effort, and expense that occurs when judges, lawyers, parties, and witnesses are simultaneously engaged in the adjudication of the same cause of action in two courts," as well as "the possibility of inconsistent and conflicting rulings and judgments and an unseemly race by each party to trial and judgment in the forum of its choice.").

[40] *Park G.P., Inc. v. CCSB Fin. Corp.,* 2020 WL 7706962, at *2 (Del. Ch. Dec. 29, 2020) (Citation omitted).

### III.    CONCLUSION

For the foregoing reasons, whether under *McWane* or this Court's inherent discretion to control its docket, Intervenor's Motion to Stay is **GRANTED**, and this action is **STAYED** in favor of the Florida Action.

**IT IS SO ORDERED.**

<div style="margin-left: 50%;">

Sincerely,
/s/ Vivian L. Medinilla
Vivian L. Medinilla
Judge

</div>

11

EXHIBIT 3

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,

        Plaintiffs,

v.

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust, dated February 10, 2021;
and ALEXIS LOGAN,

        Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan        Case No.: 2023-CA-1002-NC
Family Trust, dated February 10, 2021,

        Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., SMART
COMMUNICATIONS HOLDING, LLC, HLFIP
HOLDING, INC., and HLFIP HOLDING, LLC,

        Counterclaim Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan Family        (CONSOLIDATED)
Trust, dated February 10, 2021, and derivatively on
Behalf of Smart Communications Holding, Inc.,

        Plaintiff,        Case No.: 2023-CA-1280-NC

v.

JONATHAN D. LOGAN,
SMART COMMUNICATIONS HOLDING, INC.,
nominal defendant, SMART COMMUNICATIONS
HOLDING, LLC, HLFIP HOLDING, INC., HLFIP
HOLDING, LLC, LOCO FLORIDA LLC, and
SMART COMMUNICATIONS YACHT
HOLDING, LLC,

        Defendants

_____/

## SMART COMMUNICATIONS HOLDING, INC.'S ELECTION TO PURCHASE
## PURSUANT TO FLORIDA STATUTE § 607.1436

Smart Communications Holding, Inc. ("Smart Communications" or the "Company"), pursuant to § 607.1436, Fla. Stat., elects to purchase all shares of the Company owned by the James Logan Family Trust, dated February 10, 2021, at fair value.

Smart Communications reserves all rights available to it under § 607.1436, or otherwise, including its right to deny, contest and/or object to the allegations raised in the Second Amended Complaint dated May 29, 2024.

Dated:  June 20, 2024

**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
Highpoint Center
106 East College Avenue - Suite 700
Tallahassee, FL 32301
Telephone: (850) 580-7200
gburhans@stearnsweaver.com

By: *s/ Glenn Burhans, Jr.*
Glenn Burhans, Jr.
Florida Bar No. 605867

-and-

**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
200 East Las Olas Boulevard, Suite 2100
Fort Lauderdale, Florida 33301
Telephone:  (954) 462-9500
mharwin@stearnsweaver.com
mhernandez@stearnsweaver.com

By: */s/Michael J. Harwin*
Michael J. Harwin
Florida Bar No.: 1018578

**AKERMAN LLP**
401 E. Jackson Street, Suite 1700
Tampa, FL 33602-5250
Office: (813) 23-7333
Fax: (813)218-5495
mark.bernet@akerman.com
caren.deruiter@akerman.com

By:*/s/ Mark J. Bernet*
Mark J. Bernet, Esq.
Florida Bar No. 606359

-and-

**AKERMAN LLP**
201 East Las Olas Boulevard
Suite 1800
Fort Lauderdale, FL 33301
Telephone: (954) 463-2700
Fax: (954) 463-2224

Jason S. Oletsky, Esq.
Florida Bar No. 9301
jason.oletskey@akerman.com
jill.parnes@akerman.com
Dustin B. Hillsley, Esq.
Florida Bar No. 1018589
dustin.hillsley@akerman.com
deborah.karlson@akerman.com
Max C. Rudolf, Esq.
Florida Bar No. 98766
max.rudolf@akerman.com
deborah.karlson@akerman.com

*Counsel for Smart Communications Holding, Inc.*

76886216;1

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on June 20,

2024, via electronic mail through the Florida Court's E-Portal to:

Anitra R. Clement
Florida Bar No. 100354
**SHOOK, HARDY & BACON L.L.P.**
100 N. Tampa Street, Suite 2900
Tampa, FL 33602
Telephone: (813) 202-7100
aclement@shb.com

David E. Schoenfeld (FL PHV # 1047561)
Peter F. O'Neill (FL PHV # 1043125)
Andrew L. Franklin (FL PHV # 1035737)
Kailin Liu (FL PHV # 1051416)
**SHOOK, HARDY & BACON L.L.P.**
111 S. Wacker Drive, Suite 4700
Chicago, IL 60606
Telephone: (312) 704-7700
dschoenfeld@shb.com
pfoneill@shb.com
afranklin@shb.com
kliu@shb.com

/s/*Mark Bernet*
Mark Bernet, Esq.

76886216;1