UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | |
| | Chapter 11, Subchapter V |
| SMART COMMUNICATIONS HOLDING, INC., | Case No. 8:24-bk-7106-RCT |
| SMART COMMUNICATIONS HOLDING, LLC, | Case No. 8:24-bk-7108-RCT |
| Debtors. | *Jointly Administered under* |
| _____/ | *Case No. 8:24-bk-7106-RCT* |

### CREDITOR JANICE LOGAN'S EMERGENCY MOTION
### TO REMOVE THE DEBTORS AS DEBTORS-IN-POSSESSION

Creditor, JANICE LOGAN, as Trustee of the James Logan Family Trust, dated February 10, 2021 ("Janice"), by and through her undersigned counsel and pursuant to 11 U.S.C. § 1185(a), hereby moves this Court for an order removing Debtors SMART COMMUNICATIONS HOLDING, INC., and SMART COMMUNICATIONS HOLDING, LLC. ("SmartComm DE") (collectively, the "Debtors" or "SmartComm")) as debtors-in-possession, as follows:

### SUMMARY

Ruling from the bench at the conclusion of a trial held in the 12th Judicial Circuit (Sarasota) on February 10-12, 2025, Judge Hunter Carroll declared invalid and unenforceable the entire "IP liability" asserted by HLFIP Holding, LLC ("HLFIP") as a claim in this matter. During the trial, Jonathan Logan ("Jon") testified that he (exerting his sole control of SmartComm *and* sole ownership of HLFIP) would direct HLFIP to "pull the physical plug" on SmartComm's use of certain technology if the Court invalidated the IP liability, warning that action "is not going to be good for Smart Communications."

Jon's threat is not idle bluster. He has been threatening to pull SmartComm's IP assets and start a new company since January 2023. Indeed, the now-invalidated IP liability was an attempt to

do precisely that by stripping SmartComm of all value and transferring it to HLFIP. Jon's mother, Janice, testified at trial, "[Jon] said, if you don't accept [Jon's price for Janice's shares], I'm going to pull the patents and I'm going to start a new company. And, by golly, that's what he's done." The only change in Jon's posture is that now, after having failed to destroy SmartComm financially, he also threatens "physical" damage.

Because the Debtors (at Jon's direction), have grossly mismanaged the estate, engaged in self-dealing, created an incurable conflict of interest interfering with their ability to fulfill their fiduciary duties (which Judge Carroll expressly noted in his ruling), and threatened physical damage to its assets, sufficient "cause" exists requiring their removal as debtors-in-possession.

The transcript of Judge Carroll's Oral Ruling is attached hereto as **Exhibit A**.[1]

## BACKGROUND AND RELEVANT FACTS

1.      Since the Debtors' co-founder, co-director, and co-owner James Logan ("Jim") died in October 2022, Jon has exerted sole control of the Debtors, including SmartComm DE (formed in the midst of the Sarasota Action), HLFIP, and their myriad waves of attorneys. Janice, the beneficial heir to her late husband's 50% stake in SmartComm, simply seeks the fair value of her husband's legacy. Jon and SmartComm elected to invoke Florida's statutory procedure to purchase Janice's shares. *See* Fla. Stat. § 607.1436 Election to Purchase Shares (filed June 20, 2024), *Jonathan Logan and Smart Commc'n Holding, Inc. v. Janice Logan, et al.* ("Sarasota Action"), No. 2023-CA-1002 & 2023-CA-1280 (consolidated into 1002).[2] Jon, however, refuses to pay his

---

[1]      Judge Carroll stated at the end of his oral ruling that he would issue an order incorporating the transcribed oral ruling. Janice will submit that order to this Court when issued.

[2]      This Court can take judicial notice of filings in other courts. *Progressive Mountain Ins. Co. v. Middlebrooks*, 805 F. App'x 731, 733 (11th Cir. 2020) ("We can reasonably take judicial notice of these state court filings as public records."); *see also* Fed. R. Evid. 201. Janice hereby requests that the Court take judicial notice of all exhibits herein that were filed or entered in the Sarasota Action, the Delaware Action, and any other state or federal courts of the United States, including

widowed 71-year-old mother the fair value of those shares because he thinks she does not deserve it—regardless of what his father intended.

2.      Blind to the rights intrinsic to Janice's shares, Jon has endangered SmartComm and wasted millions in company money on attorneys' fees by repeatedly attempting to cheat Janice of the shares' value. First, he forged a shareholders' agreement and sued his mother in the Sarasota Court to enforce it. *See* Emergency Mot. for Relief from Automatic Stay, ECF No. 26, ¶¶ 10–24. After that court set a trial date on the validity of his forgery, Jon attempted to move SmartComm's assets and the litigation to Delaware. *Id*. After the Delaware *and* Sarasota courts rejected that ploy and the latter invalidated the forged shareholder agreement and set a trial on the validity of the self-dealing, backdated IP Liability, Jon placed the otherwise solvent and profitable companies in bankruptcy. *Id*. Now Jon seeks here what he failed to obtain in Sarasota or Delaware: this Court's imprimatur on his value-stripping scheme.

3.      The liability that has now been declared invalid (the "IP Liability") stemmed from a 40% net sales royalty rate in the August 29, 2023 Exclusive Intercompany Intellectual Property License Agreement that Jon created and executed on behalf of both SmartComm and HLFIP while the Sarasota Action was pending and then backdated to 2015 in SmartComm's financial statements. Jon admits he signed the agreement for both SmartComm and HLFIP, and no one negotiated the 40% license on SmartComm's behalf.

4.      Forty percent significantly exceeds SmartComm's entire profit margin. Jon thus effectively signed SmartComm's entire value away to himself (via HLFIP) as IP "royalties"—just

---

the Middle District of Florida. Janice does not request that the Court take judicial notice of disputed facts. Janice requests only that the Court take judicial notice of the fact of filings, the existence of certain allegations within those filings, and the content of orders and rulings issued by courts of competent jurisdiction.

a month after the Sarasota Court issued a temporary injunction based, in part, on a finding the Janice was substantially likely to prevail on her claim that Jon forged a purported shareholder agreement.

5.      After Jon "negotiated" the IP Liability with himself and signed for both the Licensor and Licensee, he wrote himself a demand letter: "HLFIP made a demand for the Debtors to pay the outstanding amounts by the end of 2024 or the license would be terminated." *See* Mot. to Enforce Stay, ECF No. 19, at ¶ 4; *see also* Emergency Mot. for Relief, ECF No. 26, ¶ 22 & Ex. 14.

6.      Both here and in the Sarasota Action, Jon caused SmartComm to defend a liability that would gut its value for his sole benefit. *See* Mot. to Enforce Stay, ECF No. 19, at ¶¶ 4, 6 ("Under the exclusive license agreement, HLFIP is owed a royalty fee of 40 percent of Smart's net sales, which accrued fees are in excess of $80 million and growing. … First, those [Sarasota Action] claims and issues include the assumption and cure terms for the Exclusive License, under § 365 and the treatment of those claim under the Debtors' plan.").

7.      Judge Carroll's Oral Ruling addressed this issue directly,

> The fact that Smart Communications is even here today advocating for something that saddles the company to make it legally insolvent is mystifying to me, but right now because Jon Logan was the incumbent management and has continuedon as the incumbent management, he has saddled the company with those debts. I will go ahead and invalidate that transaction.

Ex. A, at p. 30. He wasted large sums of money trying to benefit personally at the Debtors' expense. Jon's loss now *relieves* the Debtors of a sham burden.

8.      The Sarasota Court also made the following finding of fact when invalidating the HLFIP debt:

> This agreement, and it's consistent with what the Court has seen and

> that I've kind of gone through the timeline, is Jon Logan here has spite and animus towards his mother and his sister, and that's what's driving decisions, not business judgment, not what's good for the company, not what's good for the 120 families that are, or their employees and whose family are at jeopardy because of the bankruptcy filing, but spite and animus.

Ex. A, p. 30.

9.    The Sarasota Court heard three days of testimony from HLFIP, SmartComm, and Janice from February 10-12, 2025. At the close of trial Judge Carroll issued his findings and rulings from the bench. He held invalid and unenforceable the entirety of the purported IP agreement. He also chose a valuation date for SmartComm's election to purchase Janice's shares of August 28, 2025—the day before the effective date of the Purported IP Agreement as well as a number of other surreptitious corporate conversions and asset transfers. *See* Ex. A.

10.    During his trial testimony, Jon threatened to harm SmartComm as follows:

> A.    …. I control HLFIP's technology. So I mean, if essentially the direction is Janice through the Court is going to take over HLFIP's technology, I will have no choice but to protect HLFIP and take my technology elsewhere.
>
> Q. Even as a director and chief executive of Smart Communications, you'd do that?
>
> A. Well, at that point, you will have taken over my business management to run Smart Communications if you're doing that. So I have no choice. (2/11/25 rough Tr. at 72:20–73:4.)
>
> ***
>
> A. Well, Mr. Schoenfeld, in my opinion, if it doesn't pay its bills, there's going to be zero revenue SmartComm has because HLFIP is going to have to pull the physical plug on the technology that it owns and has the right to control and SmartComm is refusing under Janice's direction to pay for this technology. That's a you know attain able position. HLFIP owes debt to the IRS and SmartComm owes money to HLFIP. And if that is not going to be upheld, there been there is going to have to be adjustment for arrangement and that is not going to be good for Smart Communications. (2/11/25 Tr. at 103:21–104:6.)

Part 1, Phase 2 Sarasota Action Trial Day 2 Tr. is attached hereto as **Exhibit B**.[3]

11.    Janice has filed a Motion to Dismiss because of the bad faith filing, and this Motion is set alongside confirmation for March 10, 2025. The arguments in the Motion to Dismiss are incorporated herein by reference.

12.    The Schedules reflect significant intercompany receivables, including over $5 million owed by Smart Communications Yacht Holdings, LLC ("SCYH"), which owns a yacht that was paid for by the Debtors, which Jon has used primarily for his personal benefit.  Jon claims to be sole owner and managing member of SCYH, even though Janice holds her late husband's 50% interest in the company.

13.    Further, the Schedules reflect that there are amounts owed by Loco Florida LLC, which Jon also claims to be sole owner and managing member of even though Janice holds her late husband's 50% interest in the company.

14.    And, the Schedules reflect that there are amounts owed by HLFIP Holding, LLC, of which Jon is the sole owner and manager.

15.    Janice filed a claim for at least $110 million.

## ARGUMENT AND CITATION OF AUTHORITY

16.     Janice, as a creditor, requests an order removing the Debtors as debtors in possession pursuant to 11 U.S.C. § 1185, which provides:

> On request of a party in interest, and after notice and a hearing, the court shall order that the debtor shall not be a debtor in possession for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor, either before or after the date of commencement of the case, or for failure to perform the obligations of the debtor under a plan confirmed under this subchapter,

---

[3]    Janice will file the final upon receipt.

11 U.S.C. § 1185(a).[4] "The statutory use of the word 'including,' of course, is 'not limiting.'" *In re ComedyMX, LLC*, 647 B.R. 457, 464 (Bankr. D. Del. 2022).

17.    While "the court has discretion to determine whether cause exists to remove a subchapter V debtor in possession…if the court determines cause exists, removal is mandatory." *In re Neosho Concrete Products Co*., 20-30314, 2021 WL 1821444, at *8 (Bankr. W.D. Mo. May 6, 2021) (citations omitted).[5] Examples of debtor conduct warranting removal of the debtor in possession for cause include:

a.    "[W]here the debtor in possession has a conflict of interest in properly investigating and pursuing potential fraudulent transfers and other claims of the estate." *In re No Rust Rebar, Inc*., 641 B.R. 412, 423 (Bankr. S.D. Fla. 2022) (citing *In re Picacho Hills Utility Co., Inc*., 518 B.R. 75, 82 (Bankr. D.N.M. 2014));

b.    Where there is evidence of self-dealing and incurring debt for the principal's benefit resulting in an incurable conflict of interest. *In re Duling Sons, Inc*., 650 BR 578, 581 (Bankr. D. S. D. 2023);

c.    Where the evidence demonstrates a lack of sound business judgment based on patterns "of intermingling funds and of expedient transfers, and the absence of proper

---

[4]    Further, 11 U.S.C. § 1183(b)(5) provides if the Debtors cease to be debtors in possession, the Subchapter V Trustee shall "perform the duties specified in section 704(a)(8) and paragraphs (1), (2), and (6) of section 1106(a) of this title, including operating the business of the debtor." 11 U.S.C. § 1183(b)(5). Upon removal, Janice requests appointment of The United States Trustee.

[5]    The Court in *In re Neosho Concrete Products Co* also formulated a five factor list of things to consider when the court is asked to remove the debtor in possession in a subchapter V case: (1) Materiality of any debtor in possession misconduct; (2) The debtor in possession's evenhandedness or lack thereof in dealing with insiders and affiliated entities in relation to other creditors; (3) Existence of pre-petition avoidable preferences or fraudulent conveyances; (4) whether any conflicts of interest on the part of the debtor in possession are interfering with its ability to fulfill its fiduciary duties; and (5) Self-dealing or squandering of assets. *Id.* at *8

record keeping…" *In re Rivermeadows Assoc.*, Ltd., 185 B.R. 615, 619 (Bankr. D. Wyo. 1995); and

    d.    "[W]hen a trustee is needed immediately to preserve assets of the estate and to curb improper conduct of the debtor." *In re Pinnacle Foods of California LLC*, 24-11015-B-11, 2024 WL 3873478, at *3 (Bankr. E.D. Cal. Aug. 15, 2024).

18.    Because the Debtors engaged in self-dealing, and created an incurable conflict of interest interfering with their ability to fulfill their fiduciary duties, sufficient "cause" exists requiring their removal as debtors-in-possession.

<strong>Gross Mismanagement</strong>

19.    Section 1184 makes plain that debtors in possession in a subchapter V case are required to "perform [the] function and duties...of a trustee serving in a case under this chapter." In addition to fiduciary duties imposed by state law, "it is implicit in the term 'trustee,' which is drawn from the common law of trusts, that these duties include managing the debtor's business as a fiduciary to the estate and its stakeholders." *In re ComedyMX, LLC*, 647 B.R. 457, 465 (Bankr. D. Del. 2022); *see also In re G–I Holdings, Inc.,* 385 F.3d 313, 319 (3d Cir.2004) (a debtor-in-possession owes a fiduciary duty to its creditors).

20.    The Debtors' failure to fulfill their fiduciary duties to creditors amounts to gross mismanagement of the estate warranting their removal as debtors in possession.

<strong>Fiduciary Duty/Conflict of Interests</strong>

21.    Removal of Debtors as debtors-in-possession is further required due to the incurable conflict of interest arising from the Debtors' (through Jon) significant self-dealing and breach of their fiduciary duty.

22.    Section 1184 makes plain that debtors in possession in a subchapter V case are

required to "perform [the] function and duties...of a trustee serving in a case under this chapter." In addition to fiduciary duties imposed by state law, "it is implicit in the term 'trustee,' which is drawn from the common law of trusts, that these duties include managing the debtor's business as a fiduciary to the estate and its stakeholders." *In re ComedyMX, LLC*, 647 B.R. 457, 465 (Bankr. D. Del. 2022); *see also In re G–I Holdings, Inc.,* 385 F.3d 313, 319 (3d Cir.2004) (a debtor-in-possession owes a fiduciary duty to its creditors).

23.     The removal of a debtor as debtor-in-possession is required where a conflict of interest interferes with its ability to fulfill its fiduciary duties. *In re Pinnacle Foods of California LLC*, 24-11015-B-11, 2024 WL 3873478, at *3 (Bankr. E.D. Cal. Aug. 15, 2024); *see also In re ComedyMX, LLC*, 647 B.R. at 465 (A "demonstration that [the debtor] is unable to conduct itself as an appropriate fiduciary for the bankruptcy estate is also 'cause' to dispossess the debtor under § 1185.").

24.     An incurable conflict of interest arises where "where the debtor in possession has a conflict of interest in properly investigating and pursuing potential fraudulent transfers and other claims of the estate." *In re No Rust Rebar, Inc*., 641 B.R. 412, 423 (Bankr. S.D. Fla. 2022) (citing *In re Picacho Hills Utility Co., Inc*., 518 B.R. 75, 82 (Bankr. D.N.M. 2014)); *see also In re Duling Sons, Inc.,* 650 B.R. 578, 581 (Bankr. D.S.D. 2023).

25.     In filing these petitions, Jon fulfilled a threat that Janice recounted in her early papers nearly two years ago: "88. Jon breached those fiduciary duties by, among other things … Threatening to harm Smart Communications, and therefore the value of the shares, if Janice and the Trust do not comply with his wishes." *See* Janice's Verified Complaint (filed March 10, 2023), Sarasota Action, 2023-CA-1002, DIN 177.

26.     An incurable conflict of interest mandating removal also arises where there is

evidence of self-dealing, inappropriate relations between corporate parents and subsidiaries, or incurring debt for the principal's benefit. *In re Duling Sons, Inc*., 650 BR at 581; *see also In re Fed. Roofing Co.,* 205 B.R. 638, 642–43 (Bankr. N.D. Ala. 1996) (a debtor's practice of maintaining ongoing financial transactions with insider cited as a breach of debtor in possession's fiduciary duty); *see also In re Ashley River Consulting, LLC,* 14-13406 (MG), 2015 WL 1540941, at *9 (Bankr. S.D.N.Y. Mar. 31, 2015) (noting that an appointment of a trustee is warranted for "conflicts of interest, including inappropriate relations between corporate parents and the subsidiaries; misuse of assets and funds; inadequate record keeping and reporting; various instances of conduct found to establish fraud or dishonesty; and lack of credibility and creditor confidence.") (citation omitted).

27.    Removal of the Debtors as debtors-in-possession is required due to their incurable conflict of interest. Furthermore, substitution of the trustee is imminently needed to curb Jon's improper conduct.

28.    In the present case, the following undisputed facts are grounds for appointment of a trustee:

    a. Jon was on both sides of the transaction between the Debtors and HLFIP that resulted in an alleged liability of $67 million owed by the Debtors to HLFIP—an amount that would have rendered the Debtors insolvent;

    b. The transaction with HLFIP effectively transferred all of the Debtors' net profit to HLFIP;

    c. Jon is now using that sham liability as currency for HLFIP to become the owner of the Debtors under the Plan;

    d. Jon did not schedule the sham liability (one which would inure to his sole benefit)

as disputed;

e.  Jon will undoubtedly not pursue the significant debt owed by SCYH and Loco to the Debtors;

f.  Jon is having the Debtors pay (directly or indirectly) for his and HLFIP's attorneys' fees in the state court lawsuits.  At last count, Jon has had seven different law firms represent him in the multi-year litigation that he initiated against Janice—not including bankruptcy counsel and HLFIP's IP counsel who is paid by SmartComm.

g.  Jon has repeatedly threatened to destroy the Debtors if it is determined that the HLFIP debt is not owed.  It has now been determined that the HLFIP is not owed. Jon needs to be removed immediately.

## <u>CONCLUSION</u>

Because the Debtors have grossly mismanaged the estate, engaged in self-dealing, and created an incurable conflict of interest interfering with their ability to fulfill their fiduciary duties, and threatened specific further deliberate harm to the Debtors because he did not get his way in court, sufficient "cause" exists requiring their removal as debtors-in-possession. Accordingly, pursuant to 11 U.S.C. § 1185, Janice requests an order removing the Debtors as debtors-in-possession.

Dated   February 14, 2025

/s/ Edward J. Peterson
Edward J. Peterson (FBN 014612)
Johnson Pope Bokor Ruppel & Burns, LLP
400 N. Ashley Drive, Suite 3100
Tampa, Florida 33602
Telephone: (813) 225-2500
Email: edwardp@jpfirm.com
Attorneys for Janice Logan

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Objection to Debtors'

Motion For Authority To Advance Payments To Smart Communications Yacht Holding, LLC, has

been furnished on February 14, 2025, by the Court's CM/ECF system to all parties receiving

electronic noticing as follows:

- **John A Anthony**    janthony@anthonyandpartners.com, efilings@anthonyandpartners.com; cfosdick@anthonyandpartners.com
- **Kimberly A. Bald**    kab@harlleebald.com
- **Eyal Berger**    eyal.berger@akerman.com, jeanette.martinezgoldberg@akerman.com
- **Kathleen L DiSanto**    disanto.trustee@bushross.com, kdisanto@bushross.com; bankruptcy.eservice@bushross.com; kdisanto@ecf.courtdrive.com; ecf.alert+disanto@titlexi.com
- **John L Dicks**    john.dicks@akerman.com, judy.mcarthur@akerman.com
- **Teresa Marie Dorr**    teresa.dorr@usdoj.gov, lizette.montanez@usdoj.gov
- **Daniel R Fogarty**    dfogarty.ecf@srbp.com, srbpecf@srbp.com
- **Donald R Kirk**    dkirk@carltonfields.com, kathompson@carltonfields.com
- **John W Landkammer**    jlandkammer@anthonyandpartners.com, efilings@anthonyandpartners.com, crodriguez@anthonyandpartners.com
- **James Emery Lynch**    jel@harlleebald.com
- **Megan Wilson Murray**    mmurray@underwoodmurray.com, dstrand@underwoodmurray.com; mmurray@ecf.courtdrive.com; euzonwanne@underwoodmurray.com; admin@underwoodmurray.com
- **Edward J. Peterson**    edwardp@jpfirm.com, andrenaw@jpfirm.com; JillC@jpfirm.com; melanief@jpfirm.com; AngelinaL@jpfirm.com
- **David Edward Schoenfeld**    docket@shb.com, docket@shb.com
- **United States Trustee - TPA**    USTPRegion21.TP.ECF@USDOJ.GOV
- **W. L. West**    cwest@roedelparsons.com

/s/ Edward J. Peterson
Edward J. Peterson

**In the Matter Of:**

Jonathan Logan v Janice Logan

---

**Trial**

*February 12, 2025*

---



1341 Moreland Ave, SE
Suite 2000
Atlanta, GA 30316
855.478.7376

Exhibit "A"

```
 1   IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT IN
     AND FOR SARASOTA COUNTY, FLORIDA
 2
             WEDNESDAY, FEBRUARY 12, 2025 JUDGE'S RULING
 3
     JONATHAN LOGAN and SMART
 4   COMMUNICATIONS HOLDING, INC.,

 5           Plaintiffs,
     vs.                        Case No.:  2023-CA-1002-NC
 6
     JANICE LOGAN, individually and
 7   as Trustee of the James Logan
     Family Trust, dated February 10,
 8   2021; and ALEXIS LOGAN,

 9           Defendants.        /    (CONSOLIDATED)
     JANICE LOGAN, as Trustee of the
10   James Logan Family Trust dated
     February 10, 2021,
11
             Counterclaim Plaintiff,
12   vs.                        Case No.:  2023-CA-1280-NC

13   JONATHAN D. LOGAN, SMART
     COMMUNICATIONS HOLDING, INC.,
14   SMART COMMUNICATIONS HOLDING,
     LLC, HLFIP HOLDING, INC., and
15   HLFIP HOLDING, LLC,

16   _____ Counterclaim Defendants./
     JANICE LOGAN, as Trustee of the
17   James Logan Family Trust dated
     February 10, 2021, and
18   derivatively on behalf of
     Smart Communications Holdings,
19   Inc.,

20           Plaintiff,
     vs.
21   JONATHAN D. LOGAN, SMART
     COMMUNICATIONS HOLDING, INC.,
22   nominal defendant, SMART
     COMMUNICATIONS HOLDING, LLC,
23   HLFIP HOLDING, LLC, HLFIP HOLDING
     LLC, LOCO FLORIDA LLC and SMART
24   COMMUNICATIONS YACHT HOLDING, LLC,
             Defendants.
25
```



1

OFFICIAL TRANSCRIPT OF PROCEEDINGS
2                    JUDGE'S RULING

3    BEFORE THE HONORABLE HUNTER W. CARROLL
          held via Zoom and at the
4    Judge Lynn N. Silvertooth Judicial Center
         2002 Ringling Boulevard, 6-C
5          Sarasota, Florida  34237

6         Wednesday, February 12, 2025

7           6:04 p.m. to 7:06 a.m.

8            Pages 1 through 37

9

10

11

12

13

14        Stenographically reported by:

15             Linda R. Wolfe
         Registered Professional Reporter
16           Registered Merit Reporter
         Federal Certified Realtime Reporter
17   Florida Professional Reporter-Certified

18

19

20

21

22

23

24

25



```
 1  (All participants appeared live.)

 2  APPEARANCES:
    On behalf of HLFIP Holding, LLC:
 3          CHRISTOPHER G. OPRISON, Attorney at Law
            TAL ABUROS, Attorney at Law
 4          KATIE MIESNER, Attorney at Law
            DLA PIPER, LLP (US)
 5          200 S. Biscayne Blvd., Suite 2500
            Miami, FL  33131-5340
 6          (305)423-8522
            chris.oprison@dlapiper.com
 7          erin.berhan@dlapiper.com
            katie.miesner@us.dlapiper.com
 8
            STEVE DIXON, Attorney at Law
 9          JAMES (SEAMUS) BRESNAHAN, Attorney at Law
            DLA PIPER, LLP (US)
10          500 Eighth Street, NW
            Washington, DC  20004
11          (202)799-4000
            steve.dixon@dlapiper.com
12          seamus.bresnahan@dlapiper.come

13  On behalf of Jonathan D. Logan; Smart Communications
    Holding, Inc.; Smart Communications Holding LLC; and
14  Loco Florida, LLC:

15          DUSTIN B. HILLSLEY, Attorney at Law
            MAX RUDOLF, Attorney at Law
16          MICHELLE HOGAN, Attorney at Law
            AKERMAN, LLP
17          201 E. Las Olas Blvd., Suite 1800
            Ft. Lauderdale, FL  33301-4442
18          (954)331-4129
            dustin.hillsley@akerman.com
19

20

21

22

23

24

25
```



```
 1   On behalf of Janice Logan:

 2           DAVID SCHOENFELD, Attorney at Law
             PETER O'NEILL, Attorney at Law
 3           ANDREW FRANKLIN, Attorney at Law
             KAILIN LIU, Attorney at Law
 4           SHOOK, HARDY & BACON L.L.P.
             111 S. Wacker Dr., Ste. 4700
 5           Chicago, IL  60606
             (312)704-7700
 6           dschoenfeld@shb.com
             pfoneill@shb.com
 7           afranklin@shb.com

 8           JOHN D. GARRETSON, Attorney at Law
             SHOOK, HARDY & BACON L.L.P.
 9           2555 Grand Boulevard
             Kansas City, MO  64108
10           (816)474-6550
             jgarretson@shb.com
11
             ANITRA CLEMENT, Attorney at Law
12           SHOOK, HARDY & BACON L.L.P.
             Tampa, FL
13           (813)202-7110
             aclement@shb.com
14
     On behalf of Alexis Logan and Justin Peterson:
15
             CHARLES F. JOHNSON, III
16           Attorney at Law
             BLALOCK WALTERS, P.A.
17           802 11th Street West
             Bradenton, FL  34205-7734
18           (941)748-0100
             cjohnson@blalockwalters.com
19
     ALSO PRESENT:           Jonathan Logan
20                           Janice Logan
                             Alexis Logan
21                           Dr. Louis Berneman
                             Justin Peterson
22                           Michael Barfield,
                              Observer/Press/Paralegal
23                           Claudia Lora, Akerman Paralegal
                             Chezelle McDade, DLA Piper
24                              Paralegal
                             Justin Watkins-TrialQuest Tech
25                           Marlin Galvis-Trial Tech
```

```
 1              JUDGE HUNTER CARROLL'S RULING

 2       THE COURT:  Court has before it Part 1 of

 3   Phase II in case number 2023-CA-1002.

 4       I'm going to ask that the court reporter type

 5   up my ruling, not the whole trial but my ruling,

 6   and make sure I get a copy because my intent will

 7   be to enter an order with just the core findings

 8   and I'm going to attach my transcript as the

 9   factual findings.

10       First thing I'm going to do is go through some

11   individuals; identify them.  Then go through a

12   timeline.  And then come back and make some factual

13   findings that kind of fill in that timeline, and

14   that address this case.

15       Now, certainly, I am here in this phase of the

16   trial as authorized by the Bankruptcy Court and the

17   Court does not anticipate and will not exceed the

18   bounds of the limited stay relief provided by the

19   Bankruptcy Court.

20       Starting with individuals.  We have James

21   Logan, also known as Jim Logan, and many times will

22   be referred to as Dad.  And he passed on

23   October 16, 2022.

24       Mr. James Logan was married to Janice Logan,

25   his wife, and they had two children, Jon Logan, and
```



 1   Alexis Logan.

 2        Jon Logan and Alexis Logan are Brother and

 3   Sister.

 4        I don't think it goes without saying that

 5   there is family discord within the Logan family:

 6   And, principally, there's problems between

 7   Jon Logan and Alexis Logan, and Jon Logan and

 8   Janice Logan.  I guess even under Jon Logan's

 9   statements that the difficulty he has with his mom

10   is actually a little bit less than the difficulty

11   he has with his Sister.

12        We also have Lisa Eddy who is the Vice

13   President of Operations of Smart Communications.  I

14   think, technically, she's employed by Smart

15   Communications Collier.

16        We have Mike Shreve, who is the long-time

17   accountant for Smart Communications as well as

18   HLFIP.

19        We have Noreen Gunning, who now is the

20   Director of Accounting and Finance for Smart

21   Communications, a position she took on after James

22   Logan's passing.  Prior to that, she was the

23   accountant internally for Smart Communications and

24   she also provides services to HLFIP.

25        We have Justin Scott, who originally was an



 1   independent contractor that was retained to assist

 2   with the original idea; and then, ultimately,

 3   became an employee.

 4        We have a group called Marcum LLP, although

 5   they have been subsequently purchased, and my notes

 6   aren't as clear, but I think it's like CBIZ or

 7   something like that which is a new name, but I'm

 8   just going to refer to that group as "Marcum,"

 9   because that's how all the documents are titled.

10        The specific engagement that we are here on,

11   the supervisor of that engagement is Ms. Voralia.

12   And I apologize for not being able to pronounce her

13   first name.

14        The primary person who was under Ms. Voralia

15   but the person who did the bulk of the work is

16   Ms. Naidu.

17        The client contact for this Marcum study was

18   Katrina Quicker, who is an attorney for HLFIP.

19        And there's Katie Vance who is in

20   Ms. Quicker's office.

21        Our timeline, generally, starts in 2008

22   although the animus and the difficulties between

23   the various members of the Logan family appear to

24   predate this time.  I don't know the source, but

25   doesn't matter for my purposes other than there is



 1    this difficulty within the Logan family.

 2         And for purposes of our hearing and trial for

 3    the last three days, our timeline generally starts

 4    in 2008 when Jon Logan did a very brief stint in a

 5    county jail in Michigan, and when he was there, he

 6    came up with an idea about communication with

 7    family members.

 8         And his grandmother kind of helped encourage

 9    him along the lines.  There was some correspondence

10    back and forth between grandmom and Jon Logan.  We

11    see that at Exhibit 700.

12         And when I reference to exhibits, sometimes

13    there's multiple versions of the same exhibit.  I

14    don't think I have all of the same references, but

15    if I've got it once, that's good enough, at least

16    in my view.

17         And so Jon Logan has this idea and,

18    ultimately, creates a business plan, which is

19    Exhibit 821, in April of 2009.

20         And he, being Jon Logan, also in consultation

21    with his dad, James Logan, "Hey, let's do something

22    with this plan."

23         And, ultimately, there was the finding on

24    Craigslist of Justin Scott.  And he enters into an

25    Independent Contractor Agreement between, at that



 1   time it was Justin Scott and Asset Recovery and

 2   Marketing, and that's December 7, 2009, and that's

 3   Exhibit 409.  And also in Exhibit 409 is an

 4   amendment to that agreement where there's an

 5   ovation and now Smart Communications, U.S., Inc. is

 6   included.  And that was the original product, if

 7   you will.  I think it was referred to as JailMail

 8   here.

 9       And over time there was an expansion of ideas.

10   And Jon Logan had an idea -- this is in 2015, early

11   2015 -- for what ultimately became the MailGuard.

12   And Jon Logan discussed this new idea, April 25th

13   2015, Exhibit 898.

14       And he then goes to his Dad and his Sister.

15       And at this time -- and I probably should have

16   introduced the names of the companies.

17       We have Smart Communications Holding, Inc., a

18   Florida entity.

19       My notes -- I don't know where they are with

20   all the pictures.  Here it is.

21       And we have this Florida entity.  At the time,

22   there were two 50/50 shareholders.  Well,

23   technically, the legal shareholder was

24   Alexis Logan, but the -- She was holding the shares

25   50 percent for her father, James Logan; 50 percent



 1   for her brother.

 2       Her brother was on probation and there was a

 3   need for Alexis Logan to hold legal title even

 4   though equitable title was with Jon.  And then Dad

 5   had some IRS problems himself, and so there was a

 6   need for Alexis Logan to hold legal title, but Dad

 7   was the equitable title of 50 percent of Smart

 8   Communications Holding, the Florida corporation.

 9       So going back to our timeline, Jon Logan has

10   this idea which ultimately becomes the MailGuard

11   system, and from his perspective, he wants to

12   protect this new idea.  I think "new idea" was

13   certainly referenced in the Exhibit 898, the

14   April 25th e-mail.

15       And then there was five days later on

16   April 30th, 2015, an e-mail that went out from

17   Jon Logan to his Sister -- actually, went to his

18   Dad and then Dad sent it to Alexis, the Sister,

19   Alexis Logan.

20       Dad signs the April 30th, 2015 e-mail as does

21   Alexis.  Alexis Logan annotates it, referencing

22   "For new technology/patent/new IP only."  And we'll

23   come back and talk about the significance of that

24   later on.

25       And it's clear that after the family members



1    signed on May 5th, 2015, Jon Logan goes to Justin

2    Scott with eight rudimentary schematics; that's

3    Exhibit 898.  With attachments, I think it's 893,

4    '97.

5        And following up on this, James Logan, who at

6    the time is also President of HLFIP, files

7    paperwork with the U.S. PTO -- I think that's U.S.

8    Patent and Trademark Office -- paperwork for the,

9    quote, "correctional postal mail contraband

10   elimination system," which is the reference that

11   was used in the e-mail that is from April 30th,

12   2015, which is Exhibit 711.

13       Now, I guess, technically, Dad signed this one

14   day early because May 12th, 2015 is when HLFIP was

15   established with the Florida Secretary of State.

16   That's exhibits 352 and 713.

17       Obviously, Alexis Logan knew about this

18   because Exhibit 930 shows that Alexis Logan was the

19   one who actually filed the paperwork with the

20   Secretary of State of Florida.

21       Now, let me just pause, and I probably should

22   have mentioned this earlier.  Alexis Logan, of

23   course, being the Sister and she held legal title,

24   but the testimony also indicates that because she

25   was the legal title holder, she personally had to



1    guarantee certain obligations of Smart

2    Communications.  So she had skin in the game, if

3    you will.

4        Going back to our timeline, the concept that

5    ultimately would become MailGuard was being

6    developed, and there is -- without question there

7    is references over the next few years to HLFIP

8    licensing to Smart Communications' various IP.

9        And there's various filings that say that.

10   There's definitely references throughout the years

11   post-2015 when this MailGuard concept was created

12   by Jon Logan.

13       We get to approximately late 2018,

14   September 4th, 2018, and by -- I don't want to say

15   luck because certainly the ground work had already

16   been laid -- but there was some difficulty with 25

17   employees in The Commonwealth of Pennsylvania

18   having to go to the emergency room due to drug

19   overdoses by handling inmate mail.  And that caused

20   the Governor of The Commonwealth of Pennsylvania to

21   declare an emergency, which allowed the Department

22   of Corrections in Pennsylvania to have an emergency

23   contract that was very favorable to Smart

24   Communications.

25       And, at this point, Smart Communications



1    starts to round the corner on getting new jails and

2    prisons to go to its suite of offerings.  And so

3    Smart Communications continues to expand.

4        There's the buyout of Justin Scott on

5    March 30th, 2020.  That's Exhibit 410.

6        We know that in February 10, 2021, James Logan

7    creates a Family Trust.  And, subsequently, he

8    transfers his 50 percent interest in Smart

9    Communications Holdings, the Florida entity, into

10   the Trust.

11       By that time, Alexis Logan had already

12   tendered back legal title of the 50/50 shares to

13   James Logan and Jon Logan.

14       March 11, 2020, Noreen Gunning is hired by

15   Smart Communications Collier, which is the entity

16   that handles the employees, at a salary of $80,000.

17       And in -- looks like -- April 8th, 2022,

18   Alexis Logan e-mails her dad, Jim Logan, with

19   talking points.  And it appears -- although there

20   was very little testimony, but from some of the

21   documentary evidence, there was some contemplation

22   of potentially talking to, like, Truist Bank or

23   some other banks, maybe about a merger or

24   acquisition.  It's very infancy discussions, but

25   they're going to create some paperwork which



1    implicates our story.  So I make a note of that.

2        But, certainly, Alexis Logan was helping Dad

3    with talking points that ultimately would be going

4    to these M & A entities.

5        Everything, however, is not exactly rosy.  On

6    April 25th of 2022, the Middle District of

7    Pennsylvania invalidates the '617 patent, which is

8    one of the three patents undergirding MailGuard.

9    Ultimately, the DC Court of Appeals affirmed that

10   decision, and that is Exhibit 364.

11       A couple months later, October 7, 2022,

12   another district court -- this is the Middle

13   District of Tennessee -- invalidates the '617

14   patent.  That's the same one that was invalidated

15   by the Middle District of Pennsylvania court.

16       A few days later on October 16th, 2022,

17   Jim Logan passes.

18       And we know next month in November of 2022,

19   Noreen Gunning is promoted to the Director of

20   Accounting and Finance, now with a salary of

21   $170,000.  Direct reports to Jon Logan.

22       I'm not going to rehash the trial relative to

23   the Shareholders' Agreement, but I do think we do

24   need to comment that in late 2022, early 2023,

25   there's some difficult conversations between



1    Jon Logan and Janice Logan.

2         Apparently, Jon Logan offered $20 million and

3    if she didn't -- "she" being Janice Logan -- didn't

4    take it for the 50 percent, he was going to pull

5    the patents and start a new company.  According to

6    Janice, he -- "he" being Jon Logan -- was using

7    vulgar language.  I think, ultimately, it just was

8    a difficult conversation.

9         From Janice Logan's perspective, she had some

10   sort of discussion draft from Truist Merger and

11   Acquisitions, which is Exhibit 335, where the

12   thought process of a potential value -- not that

13   that is the value.  I'm not saying that at all.

14   And certainly would never assume a piece of paper

15   on a possible, 'Hey, let's talk about mergers and

16   acquisitions' is anywhere close to reality.  But at

17   least that was a concept that was out there.

18        We also know at this time on January 5th,

19   2023, President Biden signs Public Law 117338,

20   which is known as the Martha Wright-Reed Just and

21   Reasonable Communication Act of 2022.

22        Because there appeared to have been some

23   difficult conversations in late 2022, early 2023,

24   between Janice Logan and Jon Logan, Janice Logan

25   makes her first demand upon Jon Logan -- that's



1   January 20th, 2023; that's at Exhibit 260 -- where

2   Janice is alleging mismanagement by Jon Logan, and

3   also makes a demand for records.

4        February 27th, 2023, Jon Logan responds by

5   filing a lawsuit -- Exhibit 430 is that exhibit --

6   where Jon Logan and Smart Communications Holding,

7   Inc. sues Janice Logan, individually, and as

8   trustee.

9        Paragraph 21 references the 2021 audited

10  financial statements showing shareholder equity of

11  approximately 15 million as of December 31st, 2021.

12       Now, in the time after Dad dies, Jon did

13  start -- Jon Logan did start a $100,000 salary draw

14  for mom, Janice Logan.

15       On May 10th, 2023 that was cut off.  That's at

16  Exhibit 303.  A few weeks later on May 23, 2023,

17  Noreen Gunning cancels the generator project.

18  That's at Exhibit 301.

19       We know on June 13, 2023 at Exhibit 432,

20  Jon Logan causes Smart Communications Holding, Inc.

21  to sue Janice Logan for replevin of the Cadillac

22  Escalade.

23       Janice Logan makes another demand for books

24  and records on June 23rd, 2024 -- that's Exhibit

25  365 -- because the prior demand for records under



```
 1   Florida law had not been complied with.
 2        In response, Jon Logan, a few days later on
 3   June 29, 2023, sends a 30-day notice for
 4   Janice Logan to vacate the home that she's living
 5   in, which, of course, is in the name of Smart
 6   Communications.  And that's at Exhibit 302.
 7        With respect to the records, on July 1st,
 8   2023, Jon Logan only provides a partial response
 9   for records and, basically, takes the position that
10   due to the Shareholders' Agreement that there is no
11   authority for the demand.  That's at Exhibit 366.
12        A predecessor judge, Judge Williams, conducted
13   a temporary injunction and entered a temporary
14   injunction.  We all know that it has since been
15   invalidated by the Second District, but at the time
16   starting on July 25th, 2023, that went into effect.
17   That's Exhibit 584, Exhibit 2, also at Exhibit 589.
18        July 26, 2023, Mike Shreve prepares
19   consolidated financials.  Now, these are prior to
20   the August 29th, 2023 transaction that shows
21   long-term liabilities for Smart Communications
22   Holdings of Florida of approximately $3.6 million,
23   but no long-term liability associated with any
24   purported royalty or any sort of ongoing current
25   obligation for ongoing payments.
```



1        We know on August 9th, 2023 is the date that

2   Marcum's engagement letter is signed by

3   Katrina Quicker on behalf of HLFIP, and that is the

4   date that Marcum begins the transactional pricing

5   study.

6        April 18th, 2023 is the date that the DC

7   Circuit Court of Appeals affirmed the invalidity of

8   the '617 patent, and that's at Exhibit 364.

9        The Transfer Pricing Study, as I indicated,

10  begun on August 9th, 2023, but was functionally and

11  substantially completed prior to August 29th, 2023,

12  a span of less than three weeks.

13       August 29th, 2023 is a substantial date in the

14  life of Smart Communications Holdings.  There is a

15  lot of corporate activity that occurs.  I don't

16  really need to get into a lot of the details of it.

17       From Jon Logan's perspective it's all revenue

18  neutral and it was designed to clean up the

19  accounting records that he contends Dad was

20  somewhat asleep at the switch having occurred.

21       There is, however, no evidence that Jon Logan

22  consulted with the other shareholder.  Now, at the

23  time Jon Logan was the only officer or director and

24  I should have backed up.

25       When James Logan was alive, James Logan was an



 1    officer and a director and a shareholder of Smart

 2    Communications until such time as he put his shares

 3    into Trust and he was an officer and director and

 4    the trustee, himself, owned the shares.

 5         Jon Logan also was an officer, director,

 6    shareholder of Smart Communications Holdings, Inc.,

 7    the Florida entity.

 8         After Dad dies, Jon Logan does not invite Mom

 9    to become a director.  Does not invite Mom to

10    become an officer.  And at no time did

11    Janice Logan, either individually or as trustee,

12    ever become an officer or director of Smart

13    Communications Holding, Inc.

14         We know on August 29th, 2023 a lot of the

15    assets of Smart Communications Holding, Inc. were

16    assigned to various entities, which -- and I have

17    not gone into it, doesn't need to -- which

18    Jon Logan contends all are subsidiaries of Smart

19    Communications.

20         What we also have on that date is the HLFIP

21    Holding, Inc. a Florida corporation, converts to

22    HLFIP Holding, LLC, a Delaware limited liability

23    company, at DIN -- or sorry, not DIN -- at

24    Exhibit 345.

25         We have Smart Communications Holding, LLC, a



```
 1   Delaware liability company, is formed and it

 2   becomes a subsidiary of Smart Communications

 3   Holding, Inc., a Florida corporation.

 4       And August 29th 2023 is when the Delaware

 5   entity starts operating.

 6       That is the date, August 29th, 2023 -- and

 7   this is Exhibits 306, same again at 771 -- that

 8   Jon Logan signs the Exclusive Intercompany

 9   Intellectual Property License Agreement with an

10   effective date of August 29th, 2023.

11       Again, at no point prior to signing this did

12   Jon Logan or anyone else at Smart Communications or

13   HLFIP reach out and discuss this, talk to

14   Janice Logan, ask for assent or otherwise let her

15   know this was happening.

16       And, in fact, we know this also because a

17   couple of days later, on August 31st, 2023,

18   Janice Logan is still talking about the records

19   demand, and this is Exhibit 367, which, of course,

20   that demand doesn't reference the new entities

21   because she doesn't know about 'em.

22       The final U.S. Transfer Pricing Documentation

23   Study is not complete until October of 2023.

24       And in October 2023 -- on October 23rd,

25   Jon Logan, individually, up in Delaware sued Loco
```



1   Florida, LLC.  That's the entity that owns title to

2   the building that Smart Communications operates out

3   of.  And also sued Smart Communications Yacht

4   Holdings, LLC; that's the entity that holds the

5   yacht that Jon Logan has.

6       And that suit was filed in Delaware and,

7   again, no reference or knowledge to Janice Logan or

8   Smart Communications.

9       I will note that Loco Florida, LLC, a Delaware

10  entity, there previously was a Florida entity --

11  that's another August 29th, 2023 transfer -- just

12  like the Smart Communications Yacht Holdings, LLC,

13  previously was a Florida entity.

14      We also know on October 25th, 2023 audited

15  financials of Smart Communications, the Florida

16  corporation, are published -- this is

17  Exhibit 379 -- which for the first time shows a

18  long-term liability of HLFIP -- or a long-term

19  liability to HLFIP of 52.8 million under a note

20  payable with, at that time, 5.6 million approximate

21  of accrued interest.

22      And we will come back and talk about that

23  note.  But let me finish out the timeline.

24      About a month later, on December 6, 2023, me,

25  as the current-assigned judge, holds a hearing in



1    the case, and that led to an agreement amongst the

2    parties that precluded the payment of any licensing

3    fee, royalty fee, and also no payments outside the

4    ordinary course.  That was Exhibit 435.

5        And then the Court entered an Order on that

6    October -- sorry -- on December 15th, 2023.

7        We then come into 2024.  And we have the trial

8    on Phase I where the Court found no Shareholders'

9    Agreement.  And that Final Judgment was entered on

10   February 7, 2024.

11       After the Court confirmed Janice Logan as

12   trustee's ownership of 50 percent of shares, she

13   demanded a meeting.  That is Exhibit 443.  That's

14   on March 15, 2024.

15       And, certainly, none of the requests that

16   Janice Logan, as Trustee, as 50 percent shareholder

17   of Smart Communications, Inc., was agreed to by the

18   other 50 percent shareholder.

19       On March 20th, 2024, the Delaware court stayed

20   the Delaware action that had been filed on

21   October 23rd in favor of this Florida action.

22       A couple of weeks later, on March 15, 2024,

23   Jon Logan, on behalf of HLFIP, demands payment of

24   the royalties from Smart Communications in full by

25   December 31, 2024 or he'll terminate the purported

1    license.

2        He also indicates that there was a material

3    term of the agreement, is Jon Logan's exclusive

4    control over Smart Communications.  And that's

5    Exhibit 357.

6        The Court, of course, pauses and questions how

7    that could have been done after Jon Logan had

8    agreed not to do anything outside the ordinary

9    course in December of 2023, but, be that as it may,

10    Jon Logan did it.

11        On May 29, 2024, Janice Logan files for

12    judicial dissolution.  That's Exhibit 437.

13        And, in response, what we have, just days

14    later, is Jon Logan going to Noreen Gunning and at

15    Smart Communications where Jon Logan requested that

16    Noreen Gunning reclassify the Rolls Royce, the

17    Ferrari Spider, the Miami condo, all that had been

18    considered shareholders' loans to Jon Logan and

19    have them -- have Smart Communications assume

20    ownership as well as recognizing rent relating to

21    Loco Florida and for Smart Communications, for the

22    office building.

23        Jon Logan, also at that time, raises his

24    salary in June of 2024 from $120,000 a year to

25    $1.2 million a year, again, without any contact



1    with, approval of, discussion, assent from

2    Janice Logan as trustee, the other 50 percent

3    shareholder.

4         Now, certainly, Jon Logan indicated that upon

5    the filing in November -- of bankruptcy of

6    November 2024, he discontinued his salary, but,

7    certainly, that's approximately $600,000 that

8    Jon Logan took from Smart Communications out of

9    salary.  Certainly, that was a transaction that was

10   outside the ordinary course, even though he had

11   previously agreed not to do things outside the

12   ordinary course.

13        June 20, 2024, Jon Logan causes Smart

14   Communications to elect to purchase Janice Logan,

15   as Trustee, shares.

16        July 22, 2024, the proposed rules under the

17   Martha Wright-Reed Act were proposed by the FCC,

18   with the final regulations coming out on

19   September 20, 2024 with effective date of

20   November 19, 2024.

21        And we all know about the bankruptcy at this

22   point in time.

23        So that is the overarching timeline.  And I

24   always like doing timelines because it helps me, in

25   my mind, figure out how things happened, why things



 1    happened, and, certainly, I use that in conjunction

 2    with the documentary evidence, the testimony, the

 3    credibility determinations.

 4         There are only a couple of core issues that

 5    the Court can decide in today's proceeding.

 6         One is the date of valuation of the company;

 7    and then the other is reference to the royalty

 8    issue.

 9         Now, as framed, the parties are basically

10    asserting two different things.

11         The Judge's right side of the room, the Smart

12    Communications and HLFIP side, talk about that

13    there is an agreement in 2015, and the context and

14    the explanation is that Jon Logan is the inventor

15    of all future intellectual property that is ever

16    used by Smart Communications, and he has assigned

17    that to HLFIP.

18         And that Jon Logan testified that during his

19    father's life, that he and his father agreed that

20    there would be a license -- or the agreement was

21    that there would be a license for Smart

22    Communications and its subsidiaries to be able to

23    use the HLFIP intellectual property and that there

24    would be a true-up later in time and it would

25    either be an agreement true-up or that they would



1    retain an appraiser.

2        There was no further details provided by

3    Jon Logan relative to that agreement and,

4    certainly, there is scant documentary evidence that

5    seem to memorialize that transaction.

6        The other issue is the August 2023 agreement

7    that Jon Logan signed on behalf of HLFIP as well as

8    on behalf of Smart Communications Holdings, Inc.

9    that indicated that there was a 40 percent royalty

10    rate and then using that 40 percent royalty rate on

11    an ongoing forward basis, and then to

12    retrospectively look and show that on the books of

13    Smart Communications all the way back to 2015, even

14    though it previously had not existed on the books.

15        The transaction is, by definition, under

16    Florida law Section 607.0832, a Directors Conflict

17    of Interest Transaction.  Jon Logan, individually,

18    and through HLFIP had a material financial interest

19    in that transaction.

20        There are instances, and the statute talks to

21    us, about how a transaction such as this can be

22    approved, and then who holds the burden of proof.

23        In this particular case, because there was no

24    assent by the other shareholder, there is no other

25    director, there was no attempt for any sort of



1    discussion with his Mother, Jon Logan and Smart

2    Communications now is left with the burden to prove

3    the validity of the fairness in this proceeding.

4        Jon Logan, Smart Communications, and HLFIP

5    assert that they can show the fairness through the

6    Marcum Transfer Pricing Study.

7        The Transfer Pricing Study is a study that

8    seeks to comply with 26 U.S.C. 482.  The purpose of

9    a Transfer Pricing Study is to provide a taxpayer

10   protection from the IRS from having to pay

11   penalties if the taxpayer has a Transfer Pricing

12   Study in its file prior to filing a tax filing that

13   would have an intercompany transaction.

14       This Transfer Pricing Study does not prevent

15   the Internal Revenue Service from disagreeing with

16   the Transfer Pricing Study, coming up with a

17   different one, or saying that it's just wrong.

18       What it does is if the Transfer Pricing Study

19   is in the file and it's provided to the IRS within

20   30 days after the request, it eliminates the IRS's

21   ability, under the Treasury regulations, from

22   assessing a penalty.  That's its point.

23       And the concept of the Transfer Pricing Study

24   is you have a intercompany transaction and its

25   concept is to, supposed to come up with what would



1   an arm's length transaction be.  And that is why

2   Mr. Jon Logan and his side are saying, 'Well, that

3   shows that this transaction is fair.'

4        The Court cannot agree.

5        The Court is going to find that the Transfer

6   Pricing Study and that -- I'm going to find several

7   things.

8        One, that the Judge's left side -- so the

9   Janice Logan as Trustee, plus Alexis Logan -- have

10  demonstrated, and Jon Logan, Smart Communications,

11  and HLFIP have failed to demonstrate, that this

12  transaction was remotely fair to Smart

13  Communications Holding.  That's actually a pretty

14  easy decision.  It's not close by any stretch of

15  imagination.

16       We know that when Marcum was hired, Marcum

17  expressly told Jon Logan and HLFIP several things.

18       One, that this is a Transfer Pricing Study.

19  It is not a fairness opinion and it cannot be used

20  and should not be used as one.  It is not a proxy

21  for one.  Those are my words.  "Proxy" is my word.

22  That's not what was testified to.

23       But both Ms. Voralia and Ms. Naidu testified

24  that they had a specific conversation with

25  Jon Logan as well as Katrina Quicker that this



```
 1   should not be used in litigation, they knew

 2   litigation was there, and that its purpose was to

 3   provide the taxpayer protection.  And that's it.

 4       And within the less than three weeks that

 5   Marcum worked on this Transfer Pricing Study, they

 6   did not do anything to independently verify any of

 7   the information that was provided to it by anyone

 8   on the Jon Logan side of the equation.

 9       They did nothing to independently verify the

10   assertions of ownership of intellectual property.

11   They just accepted everything at face value.

12       Smart Communications and HLFIP's own expert,

13   Mr. Schuette, criticized Marcum's selection of

14   eight of the ten comparables that were selected,

15   and they were selected after Marcum had

16   commissioned a group out of Argentina to do some

17   research on comparables and they came back with

18   comparables that are more than two decades old,

19   which perhaps might be okay for IRS purposes, but

20   has nothing to do with the validity and fairness of

21   the transaction.

22       The Court will find as fact that the

23   August 29, 2023 exclusive intercompany intellectual

24   company license is voidable and, therefore,

25   ineffective because it violate -- that that
```



1   agreement never was fair to the company, "the

2   company" being Smart Communications.

3        This agreement, and it's consistent with what

4   the Court has seen and that I've kind of gone

5   through the timeline, is Jon Logan here has spite

6   and animus towards his mother and his sister, and

7   that's what's driving decisions, not business

8   judgment, not what's good for the company, not

9   what's good for the 120 families that are, or their

10  employees and whose family are at jeopardy because

11  of the bankruptcy filing, but spite and animus.

12       I also find that the purported, long-term note

13  payable for the historic 2015 forward until the

14  August 29, 2023 is also invalid for the same

15  reason.

16       The fact that Smart Communications is even

17  here today advocating for something that saddles

18  the company to make it legally insolvent is

19  mystifying to me, but right now because Jon Logan

20  was the incumbent management and has continued on

21  as the incumbent management, he has saddled the

22  company with those debts.  I will go ahead and

23  invalidate that transaction.

24       Now, we need to also talk about March of 2015.

25  And I want to be clear that I'm only going to talk



 1    limited about whatever agreement, if any, there

 2    was.  I find, as fact, that the alleged agreement

 3    articulated by Jon Logan is not credible.

 4        I find, as fact, there was no such agreement

 5    under the terms that Jon Logan has testified to

 6    this Court.

 7        Certainly, the Court finds that there was

 8    instances where Jim Logan signed things on behalf

 9    of HLFIP, but there was no agreement in 2015 for a

10    true-up relative to the royalty.

11        Now, I agree with Mr. Johnson that I am not

12    here to determine who owns the IP.

13        It seems that everyone agrees that the

14    MailGuard concept was Jon Logan's.  There's

15    evidence on both sides of the equation about what

16    was done with that and whether Smart Communications

17    contributed financially or idea-wise or employees

18    on a going-forward basis.  That's an open question,

19    and I think it's a valuation question.

20        If I'm the one that ever -- if the state court

21    is the one ever doing valuation, I would expect to

22    see discussions about the ownership of it.  If the

23    Bankruptcy Court does it -- and I am totally fine

24    if the Bankruptcy Court wants to take and go

25    forward -- I don't care.  I get paid regardless.



 1        But I want to be clear:  I am not making any

 2   findings, one way or the other, about the ownership

 3   other than to say that the proffered agreement by

 4   Jon Logan here in court is not credible and I find

 5   as fact it did not and does not exist.

 6        That takes us to the question of when I should

 7   evaluate if the state court is the entity that is

 8   going to be doing the valuation.  This actually is

 9   a more difficult question in the Court's mind than

10   the invalidity of the August 2023 transaction.

11        On the one hand, there is a significant

12   history of Jon Logan trying to keep Mom from

13   getting any information and taking actions that

14   cause the company financial difficulty; for

15   instance, you know, increasing his salary

16   substantially, taking $600,000 approximately out of

17   the company right before you declare bankruptcy,

18   approximately six months after you do that, that

19   kind of suggests that it was planned.  Putting on

20   notes on to your financial statements that make the

21   company insolvent indicate this, and is symptomatic

22   of this spite that Jon Logan has towards Mom.

23        So that suggests an earlier-in-time valuation.

24        The Court's also cognizant that the Martha

25   Wright-Reed Act may be impacting the business of

 1   Smart Communications which I think would be a

 2   special circumstance.

 3        Where I come out on this is at a date that

 4   neither side has articulated, but I think is the

 5   one that I feel most comfortable and I find under

 6   the facts of this case, under the family dynamic in

 7   this case, under what was known or knowable as of

 8   the date that I'm going to determine, because

 9   certainly we know the Martha Wright-Reed Act was

10   signed by President Biden in January of 2023, I'm

11   going to conclude that the date that we're going to

12   value the company is August 28th, 2023, which is

13   the day prior to all of the corporate changes

14   occurred.

15        At that date, the Martha Wright-Reed was known

16   or knowable, storm clouds were on the horizon.

17        It also reflects an earlier-in-time date than

18   when the judicial dissolution was filed, but it's

19   clear that by that date -- and, actually, by

20   earlier than that date, there was a deadlock, and

21   Jon Logan was doing what he could to prevent

22   Janice Logan from any access to the company in

23   taking steps to make Smart Communications Holding a

24   lot less valuable so that what he ultimately would

25   have to pay out to Mom on the valuation was less.



1        So I'm going to choose April 28th -- sorry --
2   August 28th, 2023.
3        So, again, I'm going to want this all typed up
4   and sent to me.  I will enter a very short order
5   with just the core findings and staple this.
6        I'm going to start on the Judge's right if
7   there are any points or clarifications.
8        Mr. Hillsley.
9        MR. HILLSLEY:  No, Your Honor.
10       THE COURT:  Mr. Oprison.
11       MR. OPRISON:  No, Your Honor.
12       THE COURT:  Going to Judge's left.
13  Mr. Schoenfeld.
14       MR. SCHOENFELD:  No, Your Honor.
15       THE COURT:  Mr. Johnson.
16       MR. JOHNSON:  No, Your Honor.
17       THE COURT:  Thank you very much.  I will see
18  you all next week and's.
19       MR. DIXON:  Sorry, Your Honor, earlier in your
20  discussion you mentioned something about the
21  handwritten note at the bottom of the 2015 license
22  and its effect.
23       THE COURT:  Oh, thank you.  My apologies.  Let
24  me continue.
25       The note in Alexis Logan's comment



```
 1   specifically reference what became MailGuard.  And
 2   I think when you look at that, the timing of that
 3   e-mail plus the Dad signing the HLFIP paperwork
 4   with the Patent and Trademark Office just a few
 5   days later, that goes to the MailGuard.
 6       I cannot find that that note means every
 7   single future invention is 100 percent exclusively
 8   Jon's.  But I don't need to get into who owns all
 9   of these products, because I think that's a
10   valuation issue.
11       I expressly don't think I have authority from
12   the Bankruptcy Court to get there, and I am not
13   going there other than to say:  I see there's
14   evidence; it's conflicting evidence on both sides.
15       Okay.  Anything else?
16       MR. HILLSLEY:  Your Honor, should we deal with
17   the confidentiality issue?
18       THE COURT REPORTER:  I'm sorry.  Could you say
19   that again?  I had this on.
20       THE COURT:  Did you give the Clerk the exhibit
21   numbers?
22       MR. HILLSLEY:  We have been preparing them
23   including getting the recitation, so.
24       THE COURT:  I need to give that to the Clerk
25   to give her the direction to keep those
```



```
 1  confidential because the other ones will not be

 2  confidential.  So do you have that list yet?

 3       MS. LIU:  We can write it down on one piece of

 4  paper, Your Honor.

 5       THE COURT:  She needs that very soon because

 6  she's going to want to go home very soon.

 7       MS. LIU:  I understand, Your Honor.  We'll be

 8  quick.

 9       THE COURT:  Anything else?

10       MR. HILLSLEY:  No, Your Honor.

11       THE COURT:  Best of luck to everybody and I

12  will see everybody next week.

13       (Trial concluded at 7:06 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25
```

1               JUDGE'S RULING CERTIFICATE

2    STATE OF FLORIDA   )

3    COUNTY OF SARASOTA)

4         I, Linda R. Wolfe, AAS, RPR, RMR, FCRR, FPR-C,

5    Certified Stenographic Court Reporter, certify that

6    I was authorized to and did stenographically report

7    the foregoing Judge's Ruling; and that the

8    transcript is a true record of the Ruling.

9         I further certify that I am not a relative,

10   employee, attorney, or counsel of any of the

11   parties, nor am I a relative or employee of any of

12   the parties' attorney or counsel connected with the

13   action, nor am I financially interested in the

14   action.

15        Dated this 14th day of February, 2025.

16

17

18   _____

19   LINDA R. WOLFE, AAS, RPR, RMR, FCRR, FPR-C
     Certified Stenographic Court Reporter
20   Registered Professional Reporter
     Registered Merit Reporter
21   Federal Certified Realtime Reporter
     Florida Professional Reporter

22

23

24

25



Jonathan Logan v Janice Logan

**$**

**$1.2** 23:25

**$100,000** 16:13

**$120,000** 23:24

**$170,000** 14:21

**$20** 15:2

**$3.6** 17:22

**$600,000** 24:7 32:16

**$80,000** 13:16

**1**

**1** 2:8 5:2

**10** 13:6

**100** 35:7

**10th** 16:15

**11** 13:14

**117338** 15:19

**11th** 4:17

**12** 2:6

**120** 30:9

**12th** 11:14

**13** 16:19

**15** 16:11 22:14,22

**15th** 22:6

**16** 5:23

**16th** 14:16

**1800** 3:17

**18th** 18:6

**19** 24:20

**1st** 17:7

**2**

**2** 17:17

**20** 24:13,19

**200** 3:5

**20004** 3:10

**2008** 7:21 8:4

**2009** 8:19 9:2

**201** 3:17

**2015** 9:10,11,13 10:16,
20 11:1,12,14 25:13
26:13 30:13,24 31:9
34:21

**2018** 12:13,14

**202 799-4000** 3:11

**2020** 13:5,14

**2021** 13:6 16:9,11

**2022** 5:23 13:17 14:6,
11,16,18,24 15:21,23

**2023** 14:24 15:19,23
16:1,4,15,16,19 17:3,8,
16,18,20 18:1,6,10,11,
13 19:14 20:4,6,10,17,
23,24 21:11,14,24 22:6
23:9 26:6 29:23 30:14
32:10 33:10,12 34:2

**2023-CA-1002** 5:3

**2024** 16:24 22:7,10,14,
19,22,25 23:11,24 24:6,
13,16,19,20

**2025** 2:6

**20th** 16:1 22:19

**21** 16:9

**22** 24:16

**23** 16:16

**23rd** 16:24 20:24 22:21

**25** 12:16

**2500** 3:5

**2555** 4:9

**25th** 9:12 10:14 14:6
17:16 21:14

**26** 17:18 27:8

**260** 16:1

**27th** 16:4

**28th** 33:12 34:1,2

**29** 17:3 23:11 29:23
30:14

**29th** 17:20 18:11,13
19:14 20:4,6,10 21:11

**3**

**30** 27:20

**30-day** 17:3

**301** 16:18

**302** 17:6

**303** 16:16

**305 423-8522** 3:6

**306** 20:7

**30th** 10:16,20 11:11
13:5

**31** 22:25

**312 704-7700** 4:5

**31st** 16:11 20:17

**33131-5340** 3:5

**33301-4442** 3:17

**335** 15:11

**34205-7734** 4:17

**34237** 2:5

**345** 19:24

**352** 11:16

**357** 23:5

**364** 14:10 18:8

**365** 16:25

**366** 17:11

**367** 20:19

**37** 2:8

**379** 21:17

**4**

**40** 26:9,10

**409** 9:3

**410** 13:5

**430** 16:5

**432** 16:19

**435** 22:4

**437** 23:12

**443** 22:13

**4700** 4:4

**482** 27:8

**4th** 12:14

**5**

**5.6** 21:20

**50** 9:25 10:7 13:8 15:4
22:12,16,18 24:2

**50/50** 9:22 13:12

**500** 3:10

**52.8** 21:19

**584** 17:17

**589** 17:17

**5th** 11:1 15:18

**6**

**6** 21:24

**6-C** 2:4

**60606** 4:5

**607.0832** 26:16

**617** 14:7,13 18:8

**64108** 4:9

**6:04** 2:7

**7**

**7** 9:2 14:11 22:10

**700** 8:11

**711** 11:12

**713** 11:16

**771** 20:7

**7:06** 2:7

**8**

**802** 4:17

**813 202-7110** 4:13

**816 474-6550** 4:10

**821** 8:19

**893** 11:3

**898** 9:13 10:13 11:3

**8th** 13:17

---

**9**

**930** 11:18

**941 748-0100** 4:18

**954 331-4129** 3:18

**97** 11:4

**9th** 18:1,10

---

**A**

**a.m.** 2:7

**ability** 27:21

**ABUROS** 3:3

**accepted** 29:11

**access** 33:22

**accountant** 6:17,23

**accounting** 6:20 14:20 18:19

**accrued** 21:21

**aclement@shb.com** 4:13

**acquisition** 13:24

**Acquisitions** 15:11

**acquisitions'** 15:16

**Act** 15:21 24:17 32:25 33:9

**action** 22:20,21

**actions** 32:13

**activity** 18:15

**address** 5:14

**advocating** 30:17

**affirmed** 14:9 18:7

**afranklin@shb.com** 4:7

**agree** 28:4 31:11

**agreed** 22:17 23:8 24:11 25:19

**agreement** 8:25 9:4 14:23 17:10 20:9 22:1,9 23:3 25:13,20,25 26:3,6 30:1,3 31:1,2,4,9 32:3

**agrees** 31:13

**ahead** 30:22

**Akerman** 3:16 4:23

**Alexis** 4:14,20 6:1,2,7 9:24 10:3,6,18,19,21 11:17,18,22 13:11,18 14:2 28:9 34:25

**alive** 18:25

**alleged** 31:2

**alleging** 16:2

**allowed** 12:21

**amendment** 9:4

**and's** 34:18

**ANDREW** 4:3

**animus** 7:22 30:6,11

**ANITRA** 4:11

**annotates** 10:21

**anticipate** 5:17

**apologies** 34:23

**apologize** 7:12

**Apparently** 15:2

**Appeals** 14:9 18:7

**APPEARANCES** 3:2

**appeared** 3:1 15:22

**appears** 13:19

**appraiser** 26:1

**approval** 24:1

**approved** 26:22

**approximate** 21:20

**approximately** 12:13 16:11 17:22 24:7 32:16,

18

**April** 8:19 9:12 10:14, 16,20 11:11 13:17 14:6 18:6 34:1

**Argentina** 29:16

**arm's** 28:1

**articulated** 31:3 33:4

**asleep** 18:20

**assent** 20:14 24:1 26:24

**assert** 27:5

**asserting** 25:10

**assertions** 29:10

**assessing** 27:22

**Asset** 9:1

**assets** 19:15

**assigned** 19:16 25:16

**assist** 7:1

**assume** 15:14 23:19

**attach** 5:8

**attachments** 11:3

**attempt** 26:25

**attorney** 3:3,4,8,9,15, 16 4:2,3,8,11,16 7:18

**audited** 16:9 21:14

**August** 17:20 18:1,10, 11,13 19:14 20:4,6,10, 17 21:11 26:6 29:23 30:14 32:10 33:12 34:2

**authority** 17:11 35:11

**authorized** 5:16

---

**B**

**back** 5:12 8:10 10:9,23 12:4 13:12 21:22 26:13 29:17

**backed** 18:24

**BACON** 4:4,8,12

**Bank** 13:22

**bankruptcy** 5:16,19

24:5,21 30:11 31:23,24 32:17 35:12

**banks** 13:23

**Barfield** 4:22

**basically** 17:9 25:9

**basis** 26:11 31:18

**begins** 18:4

**begun** 18:10

**behalf** 3:2,13 4:1,14 18:3 22:23 26:7,8 31:8

**Berneman** 4:21

**Biden** 15:19 33:10

**Biscayne** 3:5

**bit** 6:10

**BLALOCK** 4:16

**Blvd** 3:5,17

**books** 16:23 26:12,14

**bottom** 34:21

**Boulevard** 2:4 4:9

**bounds** 5:18

**Bradenton** 4:17

**BRESNAHAN** 3:9

**brother** 6:2 10:1,2

**building** 21:2 23:22

**bulk** 7:15

**burden** 26:22 27:2

**business** 8:18 30:7 32:25

**buyout** 13:4

---

**C**

**Cadillac** 16:21

**called** 7:4

**cancels** 16:17

**care** 31:25

**CARROLL** 2:3

**CARROLL'S** 5:1

**case** 5:3,14 22:1 26:23



33:6,7

**caused** 12:19

**CBIZ** 7:6

**Center** 2:4

**Certified** 2:16

**CHARLES** 4:15

**Chezelle** 4:23

**Chicago** 4:5

**children** 5:25

**choose** 34:1

**chris.oprison@
dlapiper.com** 3:6

**CHRISTOPHER** 3:3

**Circuit** 18:7

**circumstance** 33:2

**City** 4:9

**cjohnson@
blalockwalters.com**
4:18

**clarifications** 34:7

**Claudia** 4:23

**clean** 18:18

**clear** 7:6 10:25 30:25
32:1 33:19

**CLEMENT** 4:11

**Clerk** 35:20,24

**client** 7:17

**close** 15:16 28:14

**clouds** 33:16

**cognizant** 32:24

**Collier** 6:15 13:15

**comfortable** 33:5

**comment** 14:24 34:25

**commissioned** 29:16

**Commonwealth**
12:17,20

**communication** 8:6
15:21

**Communications**

3:13 6:13,15,17,21,23
9:5,17 10:8 12:2,24,25
13:3,9,15 16:6,20 17:6,
21 18:14 19:2,6,13,15,
19,25 20:2,12 21:2,3,8,
12,15 22:17,24 23:4,15,
19,21 24:8,14 25:12,16,
22 26:8,13 27:2,4
28:10,13 29:12 30:2,16
31:16 33:1,23

**Communications'**
12:8

**companies** 9:16

**company** 15:5 19:23
20:1 25:6 29:24 30:1,2,
8,18,22 32:14,17,21
33:12,22

**comparables** 29:14,
17,18

**complete** 20:23

**completed** 18:11

**complied** 17:1

**comply** 27:8

**concept** 12:4,11 15:17
27:23,25 31:14

**conclude** 33:11

**condo** 23:17

**conducted** 17:12

**confidentiality** 35:17

**confirmed** 22:11

**Conflict** 26:16

**conflicting** 35:14

**conjunction** 25:1

**considered** 23:18

**consistent** 30:3

**consolidated** 17:19

**consultation** 8:20

**consulted** 18:22

**contact** 7:17 23:25

**contemplation** 13:21

**contends** 18:19 19:18

**context** 25:13

**continue** 34:24

**continued** 30:20

**continues** 13:3

**contraband** 11:9

**contract** 12:23

**contractor** 7:1 8:25

**contributed** 31:17

**control** 23:4

**conversation** 15:8
28:24

**conversations** 14:25
15:23

**converts** 19:21

**copy** 5:6

**core** 5:7 25:4 34:5

**corner** 13:1

**corporate** 18:15 33:13

**corporation** 10:8
19:21 20:3 21:16

**correctional** 11:9

**Corrections** 12:22

**correspondence** 8:9

**county** 8:5

**couple** 14:11 20:17
22:22 25:4

**court** 5:2,4,16,17,19
14:9,12,15 18:7 22:5,8,
11,19 23:6 25:5 28:4,5
29:22 30:4 31:6,7,20,
23,24 32:4,7 34:10,12,
15,17,23 35:12,18,20,
24

**Court's** 32:9,24

**Craigslist** 8:24

**create** 13:25

**created** 12:11

**creates** 8:18 13:7

**credibility** 25:3

**credible** 31:3 32:4

**criticized** 29:13

**current** 17:24

**current-assigned**
21:25

**cut** 16:15

---

**D**

**dad** 5:22 8:21 9:14
10:4,6,18,20 11:13
13:18 14:2 16:12 18:19
19:8 35:3

**date** 18:1,4,6,13 19:20
20:6,10 24:19 25:6
33:3,8,11,15,17,19,20

**DAVID** 4:2

**day** 11:14 33:13

**days** 8:3 10:15 14:16
17:2 20:17 23:13 27:20
35:5

**DC** 3:10 14:9 18:6

**deadlock** 33:20

**deal** 35:16

**debts** 30:22

**decades** 29:18

**December** 9:2 16:11
21:24 22:6,25 23:9

**decide** 25:5

**decision** 14:10 28:14

**decisions** 30:7

**declare** 12:21 32:17

**definition** 26:15

**Delaware** 19:22 20:1,4,
25 21:6,9 22:19,20

**demand** 15:25 16:3,23,
25 17:11 20:19,20

**demanded** 22:13

**demands** 22:23

**demonstrate** 28:11

**demonstrated** 28:10

**Department** 12:21

**designed** 18:18



Jonathan Logan v Janice Logan

**details** 18:16 26:2

**determinations** 25:3

**determine** 31:12 33:8

**developed** 12:6

**dies** 16:12 19:8

**difficult** 14:25 15:8,23 32:9

**difficulties** 7:22

**difficulty** 6:9,10 8:1 12:16 32:14

**DIN** 19:23

**Direct** 14:21

**direction** 35:25

**director** 6:20 14:19 18:23 19:1,3,5,9,12 26:25

**Directors** 26:16

**disagreeing** 27:15

**discontinued** 24:6

**discord** 6:5

**discuss** 20:13

**discussed** 9:12

**discussion** 15:10 24:1 27:1 34:20

**discussions** 13:24 31:22

**dissolution** 23:12 33:18

**district** 14:6,12,13,15 17:15

**DIXON** 3:8 34:19

**DLA** 3:4,9 4:23

**documentary** 13:21 25:2 26:4

**Documentation** 20:22

**documents** 7:9

**draft** 15:10

**draw** 16:13

**driving** 30:7

**drug** 12:18

**dschoenfeld@shb. com** 4:6

**due** 12:18 17:10

**DUSTIN** 3:15

**dustin.hillsley@ akerman.com** 3:18

**dynamic** 33:6

---

**E**

---

**e-mail** 10:14,16,20 11:11 35:3

**e-mails** 13:18

**earlier** 11:22 33:20 34:19

**earlier-in-time** 32:23 33:17

**early** 9:10 11:14 14:24 15:23

**easy** 28:14

**Eddy** 6:12

**effect** 17:16 34:22

**effective** 20:10 24:19

**Eighth** 3:10

**elect** 24:14

**eliminates** 27:20

**elimination** 11:10

**em** 20:21

**emergency** 12:18,21, 22

**employed** 6:14

**employee** 7:3

**employees** 12:17 13:16 30:10 31:17

**encourage** 8:8

**engagement** 7:10,11 18:2

**enter** 5:7 34:4

**entered** 17:13 22:5,9

**enters** 8:24

**entities** 14:4 19:16 20:20

**entity** 9:18,21 13:9,15 19:7 20:5 21:1,4,10,13 32:7

**equation** 29:8 31:15

**equitable** 10:4,7

**equity** 16:10

**erin.berhan@ dlapiper.com** 3:7

**Escalade** 16:22

**established** 11:15

**evaluate** 32:7

**evidence** 13:21 18:21 25:2 26:4 31:15 35:14

**exceed** 5:17

**exclusive** 20:8 23:3 29:23

**exclusively** 35:7

**exhibit** 8:11,13,19 9:3, 13 10:13 11:3,12,18 13:5 14:10 15:11 16:1, 5,16,18,19,24 17:6,11, 17 18:8 19:24 20:19 21:17 22:4,13 23:5,12 35:20

**exhibits** 8:12 11:16 20:7

**exist** 32:5

**existed** 26:14

**expand** 13:3

**expansion** 9:9

**expect** 31:21

**expert** 29:12

**explanation** 25:14

**expressly** 28:17 35:11

---

**F**

---

**face** 29:11

**fact** 20:16 29:22 30:16 31:2,4 32:5

**facts** 33:6

**factual** 5:9,12

**failed** 28:11

**fair** 28:12 30:1

**fair.'** 28:3

**fairness** 27:3,5 28:19 29:20

**families** 30:9

**family** 6:5 7:23 8:1,7 10:25 13:7 30:10 33:6

**father** 9:25 25:19

**father's** 25:19

**favor** 22:21

**favorable** 12:23

**FCC** 24:17

**February** 2:6 13:6 16:4 22:10

**Federal** 2:16

**fee** 22:3

**feel** 33:5

**Ferrari** 23:17

**figure** 24:25

**file** 27:12,19

**filed** 11:19 21:6 22:20 33:18

**files** 11:6 23:11

**filing** 16:5 24:5 27:12 30:11

**filings** 12:9

**fill** 5:13

**final** 20:22 22:9 24:18

**Finance** 6:20 14:20

**financial** 16:10 26:18 32:14,20

**financially** 31:17

**financials** 17:19 21:15

**find** 28:5,6 29:22 30:12 31:2,4 32:4 33:5 35:6

**finding** 8:23

Jonathan Logan v Janice Logan

**findings** 5:7,9,13 32:2 34:5

**finds** 31:7

**fine** 31:23

**finish** 21:23

**FL** 3:5,17 4:12,17

**Florida** 2:5,17 3:14 9:18,21 10:8 11:15,20 13:9 17:1,22 19:7,21 20:3 21:1,9,10,13,15 22:21 23:21 26:16

**formed** 20:1

**forward** 26:11 30:13 31:25

**found** 22:8

**framed** 25:9

**FRANKLIN** 4:3

**Ft** 3:17

**full** 22:24

**functionally** 18:10

**future** 25:15 35:7

---

**G**

**Galvis-trial** 4:25

**game** 12:2

**GARRETSON** 4:8

**generally** 7:21 8:3

**generator** 16:17

**give** 35:20,24,25

**going-forward** 31:18

**good** 8:15 30:8,9

**Governor** 12:20

**Grand** 4:9

**grandmom** 8:10

**grandmother** 8:8

**ground** 12:15

**group** 7:4,8 29:16

**guarantee** 12:1

**guess** 6:8 11:13

---

**Gunning** 6:19 13:14 14:19 16:17 23:14,16

---

**H**

**hand** 32:11

**handles** 13:16

**handling** 12:19

**handwritten** 34:21

**happened** 24:25 25:1

**happening** 20:15

**HARDY** 4:4,8,12

**he'll** 22:25

**hearing** 8:2 21:25

**held** 2:3 11:23

**helped** 8:8

**helping** 14:2

**helps** 24:24

**Hey** 8:21 15:15

**Hillsley** 3:15 34:8,9 35:16,22

**hired** 13:14 28:16

**historic** 30:13

**history** 32:12

**HLFIP** 3:2 6:18,24 7:18 11:6,14 12:7 18:3 19:20,22 20:13 21:18, 19 22:23 25:12,17,23 26:7,18 27:4 28:11,17 31:9 35:3

**HLFIP's** 29:12

**HOGAN** 3:16

**hold** 10:3,6

**holder** 11:25

**holding** 3:2,13 9:17,24 10:8 16:6,20 19:13,15, 21,22,25 20:3 28:13 33:23

**Holdings** 13:9 17:22 18:14 19:6 21:4,12 26:8

**holds** 21:4,25 26:22

---

**home** 17:4

**Honor** 34:9,11,14,16,19 35:16

**HONORABLE** 2:3

**horizon** 33:16

**HUNTER** 2:3 5:1

---

**I**

**idea** 7:2 8:6,17 9:10,12 10:10,12

**idea-wise** 31:17

**ideas** 9:9

**identify** 5:11

**II** 5:3

**III** 4:15

**IL** 4:5

**imagination** 28:15

**impacting** 32:25

**implicates** 14:1

**included** 9:6

**including** 35:23

**increasing** 32:15

**incumbent** 30:20,21

**independent** 7:1 8:25

**independently** 29:6,9

**individually** 16:7 19:11 20:25 26:17

**individuals** 5:11,20

**ineffective** 29:25

**infancy** 13:24

**information** 29:7 32:13

**injunction** 17:13,14

**inmate** 12:19

**insolvent** 30:18 32:21

**instance** 32:15

**instances** 26:20 31:8

**intellectual** 20:9 25:15, 23 29:10,23

---

**intent** 5:6

**intercompany** 20:8 27:13,24 29:23

**interest** 13:8 21:21 26:17,18

**Internal** 27:15

**internally** 6:23

**introduced** 9:16

**invalid** 30:14

**invalidate** 30:23

**invalidated** 14:14 17:15

**invalidates** 14:7,13

**invalidity** 18:7 32:10

**invention** 35:7

**inventor** 25:14

**invite** 19:8,9

**IP** 10:22 12:8 31:12

**IRS** 10:5 27:10,19 29:19

**IRS's** 27:20

**issue** 25:8 26:6 35:10, 17

**issues** 25:4

---

**J**

**jail** 8:5

**Jailmail** 9:7

**jails** 13:1

**James** 3:9 5:20,24 6:21 8:21 9:25 11:5 13:6,13 18:25

**Janice** 4:1,20 5:24 6:8 15:1,3,6,9,24 16:2,7,14, 21,23 17:4 19:11 20:14, 18 21:7 22:11,16 23:11 24:2,14 28:9 33:22

**January** 15:18 16:1 33:10

**jeopardy** 30:10

**jgarretson@shb.com** 4:10



**Jim** 5:21 13:18 14:17 31:8

**JOHN** 4:8

**Johnson** 4:15 31:11 34:15,16

**Jon** 5:25 6:2,7,8 8:4,10, 17,20 9:10,12 10:4,9,17 11:1 12:12 13:13 14:21 15:1,2,6,24,25 16:2,4,6, 12,13,20 17:2,8 18:17, 21,23 19:5,8,18 20:8, 12,25 21:5 22:23 23:3, 7,10,14,15,18,23 24:4, 8,13 25:14,18 26:3,7,17 27:1,4 28:2,10,17,25 29:8 30:5,19 31:3,5,14 32:4,12,22 33:21

**Jon's** 35:8

**Jonathan** 3:13 4:19

**judge** 2:4 5:1 17:12 21:25

**Judge's** 2:2 25:11 28:8 34:6,12

**judgment** 22:9 30:8

**judicial** 2:4 23:12 33:18

**July** 17:7,16,18 24:16

**June** 16:19,24 17:3 23:24 24:13

**Justin** 4:14,21,24 6:25 8:24 9:1 11:1 13:4

**K**

**KAILIN** 4:3

**Kansas** 4:9

**Katie** 3:4 7:19

**katie.miesner@us. dlapiper.com** 3:7

**Katrina** 7:18 18:3 28:25

**kind** 5:13 8:8 30:4 32:19

**knew** 11:17 29:1

**knowable** 33:7,16

**knowledge** 21:7

**L**

**L.L.P.** 4:4,8,12

**laid** 12:16

**language** 15:7

**Las** 3:17

**late** 12:13 14:24 15:23

**Lauderdale** 3:17

**law** 3:3,4,8,9,15,16 4:2, 3,8,11,16 15:19 17:1 26:16

**lawsuit** 16:5

**led** 22:1

**left** 27:2 28:8 34:12

**legal** 9:23 10:3,6 11:23, 25 13:12

**legally** 30:18

**length** 28:1

**letter** 18:2

**liabilities** 17:21

**liability** 17:23 19:22 20:1 21:18,19

**license** 20:9 23:1 25:20,21 29:24 34:21

**licensing** 12:8 22:2

**life** 18:14 25:19

**limited** 5:18 19:22 31:1

**Linda** 2:15

**lines** 8:9

**Lisa** 6:12

**litigation** 29:1,2

**LIU** 4:3

**live** 3:1

**living** 17:4

**LLC** 3:2,13,14 19:22,25 21:1,4,9,12

**LLP** 3:4,9,16 7:4

**loans** 23:18

**Loco** 3:14 20:25 21:9

23:21

**Logan** 3:13 4:1,14,19, 20 5:21,24,25 6:1,2,5,7, 8 7:23 8:1,4,10,17,20, 21 9:10,12,24,25 10:3, 6,9,17,19,21 11:1,5,17, 18,22 12:12 13:6,11,13, 18 14:2,17,21 15:1,2,3, 6,24,25 16:2,4,6,7,13, 14,20,21,23 17:2,4,8 18:21,23,25 19:5,8,11, 18 20:8,12,14,18,25 21:5,7 22:11,16,23 23:7,10,11,14,15,18,23 24:2,4,8,13,14 25:14,18 26:3,7,17 27:1,4 28:2,9, 10,17,25 29:8 30:5,19 31:3,5,8 32:4,12,22 33:21,22

**Logan's** 6:8,22 15:9 18:17 23:3 31:14 34:25

**long-term** 17:21,23 21:18 30:12

**long-time** 6:16

**Lora** 4:23

**lot** 18:15,16 19:14 33:24

**Louis** 4:21

**luck** 12:15

**Lynn** 2:4

**M**

**mail** 11:9 12:19

**Mailguard** 9:11 10:10 12:5,11 14:8 31:14 35:1,5

**make** 5:6,12 14:1 30:18 32:20 33:23

**makes** 15:25 16:3,23

**making** 32:1

**management** 30:20,21

**March** 13:5,14 22:14, 19,22 30:24

**Marcum** 7:4,8,17 18:4 27:6 28:16 29:5,15

**Marcum's** 18:2 29:13

**Marketing** 9:2

**Marlin** 4:25

**married** 5:24

**Martha** 15:20 24:17 32:24 33:9,15

**material** 23:2 26:18

**matter** 7:25

**MAX** 3:15

**Mcdade** 4:23

**means** 35:6

**meeting** 22:13

**members** 7:23 8:7 10:25

**memorialize** 26:5

**mentioned** 11:22 34:20

**merger** 13:23 15:10

**mergers** 15:15

**Merit** 2:16

**Miami** 3:5 23:17

**Michael** 4:22

**MICHELLE** 3:16

**Michigan** 8:5

**Middle** 14:6,12,15

**MIESNER** 3:4

**Mike** 6:16 17:18

**million** 15:2 16:11 17:22 21:19,20 23:25

**mind** 24:25 32:9

**mismanagement** 16:2

**MO** 4:9

**mom** 6:9 16:14 19:8,9 32:12,22 33:25

**month** 14:18 21:24

**months** 14:11 32:18

**mother** 27:1 30:6

**multiple** 8:13

**mystifying** 30:19



## N

Naidu 7:16 28:23

names 9:16

neutral 18:18

Noreen 6:19 13:14 14:19 16:17 23:14,16

note 14:1 21:9,19,23 30:12 34:21,25 35:6

notes 7:5 9:19 32:20

notice 17:3

November 14:18 24:5, 6,20

number 5:3

numbers 35:21

NW 3:10

## O

O'NEILL 4:2

obligation 17:25

obligations 12:1

Observer/press/ paralegal 4:22

occurred 18:20 33:14

occurs 18:15

October 5:23 14:11,16 20:23,24 21:14 22:6,21

offered 15:2

offerings 13:2

office 7:20 11:8 23:22 35:4

officer 18:23 19:1,3,5, 10,12

OFFICIAL 2:1

Olas 3:17

ongoing 17:24,25 26:11

open 31:18

operates 21:2

operating 20:5

Operations 6:13

opinion 28:19

Oprison 3:3 34:10,11

order 5:7 22:5 34:4

ordinary 22:4 23:8 24:10,12

original 7:2 9:6

originally 6:25

ovation 9:5

overarching 24:23

overdoses 12:19

owned 19:4

ownership 22:12 23:20 29:10 31:22 32:2

owns 21:1 31:12 35:8

## P

P.A. 4:16

p.m. 2:7

Pages 2:8

paid 31:25

paper 15:14

paperwork 11:7,8,19 13:25 35:3

Paragraph 16:9

Paralegal 4:23,24

Part 5:2

partial 17:8

participants 3:1

parties 22:2 25:9

passed 5:22

passes 14:17

passing 6:22

patent 11:8 14:7,14 18:8 35:4

patents 14:8 15:5

pause 11:21

pauses 23:6

pay 27:10 33:25

payable 21:20 30:13

payment 22:2,23

payments 17:25 22:3

penalties 27:11

penalty 27:22

Pennsylvania 12:17, 20,22 14:7,15

percent 9:25 10:7 13:8 15:4 22:12,16,18 24:2 26:9,10 35:7

person 7:14,15

personally 11:25

perspective 10:11 15:9 18:17

PETER 4:2

Peterson 4:14,21

pfoneill@shb.com 4:6

phase 5:3,15 22:8

pictures 9:20

piece 15:14

Piper 3:4,9 4:23

plan 8:18,22

planned 32:19

point 12:25 20:11 24:22 27:22

points 13:19 14:3 34:7

position 6:21 17:9

post-2015 12:11

postal 11:9

potential 15:12

potentially 13:22

precluded 22:2

predate 7:24

predecessor 17:12

prepares 17:18

preparing 35:22

PRESENT 4:19

President 6:13 11:6 15:19 33:10

pretty 28:13

prevent 27:14 33:21

previously 21:10,13 24:11 26:14

pricing 18:4,9 20:22 27:6,7,9,11,14,16,18,23 28:6,18 29:5

primary 7:14

principally 6:6

prior 6:22 16:25 17:19 18:11 20:11 27:12 33:13

prisons 13:2

probation 10:2

problems 6:6 10:5

proceeding 25:5 27:3

PROCEEDINGS 2:1

process 15:12

product 9:6

products 35:9

Professional 2:15,17

proffered 32:3

project 16:17

promoted 14:19

pronounce 7:12

proof 26:22

property 20:9 25:15,23 29:10

proposed 24:16,17

protect 10:12

protection 27:10 29:3

prove 27:2

provide 27:9 29:3

provided 5:18 26:2 27:19 29:7

proxy 28:20,21



**PTO** 11:7

**Public** 15:19

**published** 21:16

**pull** 15:4

**purchase** 24:14

**purchased** 7:5

**purported** 17:24 22:25
30:12

**purpose** 27:8 29:2

**purposes** 7:25 8:2
29:19

**put** 19:2

**Putting** 32:19

**Q**

**question** 12:6 31:18,19
32:6,9

**questions** 23:6

**Quicker** 7:18 18:3
28:25

**Quicker's** 7:20

**quote** 11:9

**R**

**raises** 23:23

**rate** 26:10

**reach** 20:13

**reality** 15:16

**Realtime** 2:16

**reason** 30:15

**Reasonable** 15:21

**recitation** 35:23

**reclassify** 23:16

**recognizing** 23:20

**records** 16:3,24,25
17:7,9 18:19 20:18

**Recovery** 9:1

**refer** 7:8

**reference** 8:12 11:10
20:20 21:7 25:7 35:1

**referenced** 10:13

**references** 8:14 12:7,
10 16:9

**referencing** 10:21

**referred** 5:22 9:7

**reflects** 33:17

**Registered** 2:15,16

**regulations** 24:18
27:21

**rehash** 14:22

**relating** 23:20

**relative** 14:22 26:3
31:10

**relief** 5:18

**remotely** 28:12

**rent** 23:20

**replevin** 16:21

**reported** 2:14

**reporter** 2:15,16 5:4
35:18

**Reporter-certified**
2:17

**reports** 14:21

**request** 27:20

**requested** 23:15

**requests** 22:15

**research** 29:17

**respect** 17:7

**responds** 16:4

**response** 17:2,8 23:13

**retain** 26:1

**retained** 7:1

**retrospectively** 26:12

**revenue** 18:17 27:15

**Ringling** 2:4

**Rolls** 23:16

**room** 12:18 25:11

**rosy** 14:5

**round** 13:1

**royalties** 22:24

**royalty** 17:24 22:3 25:7
26:9,10 31:10

**Royce** 23:16

**rudimentary** 11:2

**RUDOLF** 3:15

**rules** 24:16

**ruling** 2:2 5:1,5

**S**

**saddled** 30:21

**saddles** 30:17

**salary** 13:16 14:20
16:13 23:24 24:6,9
32:15

**Sarasota** 2:5

**scant** 26:4

**schematics** 11:2

**Schoenfeld** 4:2 34:13,
14

**Schuette** 29:13

**Scott** 6:25 8:24 9:1
11:2 13:4

**SEAMUS** 3:9

**seamus.bresnahan@
dlapiper.come** 3:12

**Secretary** 11:15,20

**Section** 26:16

**seeks** 27:8

**selected** 29:14,15

**selection** 29:13

**sends** 17:3

**September** 12:14
24:19

**Service** 27:15

**services** 6:24

**shareholder** 9:23
16:10 18:22 19:1,6

22:16,18 24:3 26:24

**shareholders** 9:22

**shareholders'** 14:23
17:10 22:8 23:18

**shares** 9:24 13:12 19:2,
4 22:12 24:15

**SHOOK** 4:4,8,12

**short** 34:4

**show** 26:12 27:5

**showing** 16:10

**shows** 11:18 17:20
21:17 28:3

**Shreve** 6:16 17:18

**side** 25:11,12 28:2,8
29:8 33:4

**sides** 31:15 35:14

**signed** 11:1,13 18:2
26:7 31:8 33:10

**significance** 10:23

**significant** 32:11

**signing** 20:11 35:3

**signs** 10:20 15:19 20:8

**Silvertooth** 2:4

**single** 35:7

**sister** 6:3,11 9:14
10:17,18 11:23 30:6

**skin** 12:2

**Smart** 3:13 6:13,14,17,
20,23 9:5,17 10:7 12:1,
8,23,25 13:3,8,15 16:6,
20 17:5,21 18:14 19:1,
6,12,15,18,25 20:2,12
21:2,3,8,12,15 22:17,24
23:4,15,19,21 24:8,13
25:11,16,21 26:8,13
27:1,4 28:10,12 29:12
30:2,16 31:16 33:1,23

**sort** 15:10 17:24 26:25

**source** 7:24

**span** 18:12

**special** 33:2

**specific** 7:10 28:24



**specifically** 35:1

**Spider** 23:17

**spite** 30:5,11 32:22

**staple** 34:5

**start** 15:5 16:13 34:6

**starting** 5:20 17:16

**starts** 7:21 8:3 13:1 20:5

**state** 11:15,20 31:20 32:7

**statements** 6:9 16:10 32:20

**statute** 26:20

**stay** 5:18

**stayed** 22:19

**Ste** 4:4

**Stenographically** 2:14

**steps** 33:23

**STEVE** 3:8

**steve.dixon@ dlapiper.com** 3:11

**stint** 8:4

**storm** 33:16

**story** 14:1

**Street** 3:10 4:17

**stretch** 28:14

**study** 7:17 18:5,9 20:23 27:6,7,9,12,14,16,18,23 28:6,18 29:5

**subsequently** 7:5 13:7

**subsidiaries** 19:18 25:22

**subsidiary** 20:2

**substantial** 18:13

**substantially** 18:11 32:16

**sue** 16:21

**sued** 20:25 21:3

**sues** 16:7

**suggests** 32:19,23

**suit** 21:6

**suite** 3:5,17 13:2

**supervisor** 7:11

**supposed** 27:25

**switch** 18:20

**symptomatic** 32:21

**system** 10:11 11:10

---

**T**

**takes** 17:9 32:6

**taking** 32:13,16 33:23

**TAL** 3:3

**talk** 10:23 15:15 20:13 21:22 25:12 30:24,25

**talking** 13:19,22 14:3 20:18

**talks** 26:20

**Tampa** 4:12

**tax** 27:12

**taxpayer** 27:9,11 29:3

**Tech** 4:24,25

**technically** 6:14 9:23 11:13

**technology/patent/ new** 10:22

**temporary** 17:13

**ten** 29:14

**tendered** 13:12

**Tennessee** 14:13

**term** 23:3

**terminate** 22:25

**terms** 31:5

**testified** 25:18 28:22, 23 31:5

**testimony** 11:24 13:20 25:2

**thing** 5:10

**things** 24:11,25 25:10 28:7,17 31:8

**thought** 15:12

**time** 7:24 9:1,9,15,21 11:6 13:11 15:18 16:12 17:15 18:23 19:2,10 21:17,20 23:23 24:22 25:24

**timeline** 5:12,13 7:21 8:3 10:9 12:4 21:23 24:23 30:5

**timelines** 24:24

**times** 5:21

**timing** 35:2

**title** 10:3,4,6,7 11:23,25 13:12 21:1

**titled** 7:9

**today** 30:17

**today's** 25:5

**told** 28:17

**totally** 31:23

**Trademark** 11:8 35:4

**transaction** 17:20 24:9 26:5,15,17,19,21 27:13, 24 28:1,3,12 29:21 30:23 32:10

**transactional** 18:4

**transcript** 2:1 5:8

**transfer** 18:9 20:22 21:11 27:6,7,9,11,14, 16,18,23 28:5,18 29:5

**transfers** 13:8

**Treasury** 27:21

**trial** 5:5,16 8:2 14:22 22:7

**true-up** 25:24,25 31:10

**Truist** 13:22 15:10

**Trust** 13:7,10 19:3

**trustee** 16:8 19:4,11 22:16 24:2,15 28:9

**trustee's** 22:12

**type** 5:4

**typed** 34:3

---

**U**

**U.S.** 9:5 11:7 20:22

**U.S.C.** 27:8

**ultimately** 7:2 8:18,23 9:11 10:10 12:5 14:3,9 15:7 33:24

**undergirding** 14:8

---

**V**

**vacate** 17:4

**validity** 27:3 29:20

**valuable** 33:24

**valuation** 25:6 31:19, 21 32:8,23 33:25 35:10

**Vance** 7:19

**verify** 29:6,9

**versions** 8:13

**Vice** 6:12

**view** 8:16

**violate** 29:25

**voidable** 29:24

**Voralia** 7:11,14 28:23

**vulgar** 15:7

---

**W**

**Wacker** 4:4

**WALTERS** 4:16

**Washington** 3:10

**Watkins-trialquest** 4:24

**Wednesday** 2:6

**week** 34:18

**weeks** 16:16 18:12 22:22 29:4

**West** 4:17

**wife** 5:25

Jonathan Logan v Janice Logan

**Williams**  17:12

**Wolfe**  2:15

**word**  28:21

**words**  28:21

**work**  7:15 12:15

**worked**  29:5

**Wright-reed**  15:20
  24:17 32:25 33:9,15

**wrong**  27:17

---

Y

---

**yacht**  21:3,5,12

**year**  23:24,25

**years**  12:7,10

---

Z

---

**Zoom**  2:3



```
 1   ROUGH Tuesday, February 11, 2025
 2                  P-R-O-C-E-E-D-I-N-G-S
 3           THE COURT:  Okay.  Welcome, everybody.  Today
 4        is Tuesday.  This is Case Number 2023-CA-1002-NC.
 5           Mr. Hillsley, make your appearance for all
 6        folks on your side.
 7           MR. HILLSLEY:  Yes, Your Honor.
 8        Dustin Hillsley on behalf of Smart Communications
 9        and Jonathan Logan.  With me today are my
10        colleagues, Max Rudolf, as well as -- Michelle
11        Hogan isn't yet in the courtroom, but she'll be
12        joining us today.  And our paralegal, Claudia Lora.
13        Also present in the courtroom is my client,
14        Jonathan Logan, and David Gann.
15           Your Honor, would you like me to also
16        introduce the folks from HLFIP?
17           THE COURT:  No.  Mr. Oprison can do that.
18           MR. OPRISON:  Good morning, Your Honor.  Chris
19        Oprison from DLA Piper for HLFIP.  We also have got
20        Steve Dixon in the courtroom, Chezelle McDade, Erin
21        Berhan, and then we will have Tal Aburos and Katie
22        Miesner.  We also have Seamus Bresnahan down at the
23        other end of the table, Your Honor.
24           THE COURT:  Okay.  Mr. Schoenfeld.
25           MR. SCHOENFELD:  Good morning, Your Honor.
```

Exhibit "B"

1     David Schoenfeld for Janice Logan as trustee.  With

2     me in the courtroom are Kailin Liu, Andrew

3     Franklin, Peter O'Neill, John Garretson.  And

4     Ms. Logan is also present in the courtroom.  Also

5     and Anitra Clement.  I'm sorry.  I've traded you to

6     Chuck.

7          THE COURT:  Mr. Johnson.

8          MR. JOHNSON:  Charles Johnson on behalf of

9     Alexis Logan and Justin Peterson.  Ms. Logan should

10    be here with Mr. Peterson in just a few moments,

11    Your Honor.

12         THE COURT:  I received a number of filings

13    overnight.  I think I need to talk briefly about

14    two of them.  First, I got a filing from

15    Mr. Barfield about, I guess the public docket is

16    showing a whole bunch of stuff as confidential, and

17    he is challenging that.  Am I correct,

18    Mr. Barfield?  You might need to come to a lectern

19    for Miss Wolfe.

20         MR. BARNETT:  Good morning, Your Honor.

21    Michael Barfield, pro se in this, for the purposes

22    of the motion.

23         Yes, it is a challenge to the access to the

24    docket, which has a number of filings, I think

25    about three or four dozen that are deemed

1     confidential.  And for the reasons that I set out

2     in the amended motion, I think it's important that

3     the Court address that because the public has no

4     ability to see or understand what's going on in

5     this case because of the number of confidential

6     filings that exist.

7          THE COURT:  Okay.  Let me ask you this:

8     Because what I see is not what the public sees.

9     And so I am looking at your motion and then trying

10    to briefly look at the public docket.  I think I

11    understand.

12         What I'm thinking about is setting your motion

13    for Thursday at -- depending on how much time you

14    think it's going to need, probably anywhere between

15    12:30 and 1 o'clock start time.

16         And in the interim, what I'm hoping is that

17    you can identify the notice of confidential

18    information and what the Clerk is deeming to be

19    confidential.  I don't know -- I know the Clerk's

20    general counsel just took another job, so I don't

21    know if she has a new general counsel yet, but you

22    might want to loop in the Clerk to be here as well.

23         How much time do you think you would need?

24    And getting that -- that score sheet might be

25    helpful to me.

1          MR. BARFIELD:  Your Honor, I could do that.  I

2     have been in communication with the Clerk's office.

3     They are generally on top of this.  As you said,

4     they have had a transition.  I understand at least

5     one of the recently filed documents the Clerk

6     determined was not confidential.  I think that will

7     be the case for many of the others listed in the

8     motion.

9          But Thursday is fine.  I don't want to hold up

10     the proceedings any further than that.  It can

11     wait.  I'm not writing the article tomorrow.

12          THE COURT:  Right.  Normally the process is if

13     the Clerk deems something not to be confidential,

14     then the Clerk notified me.  I don't think I have

15     been notified at all about any of the issues in

16     what you're bringing up in your motion.  So perhaps

17     your calls over there might start a wave of these

18     types of notifications to me.

19          MR. BARFIELD:  Okay.  The only one that I know

20     is one that was issued last week.  So it may not

21     have come in to --

22          THE COURT:  I don't think I've seen it yet.

23     So how much -- I mean, because I'm only going to be

24     able to give a limited amount of time on Thursday.

25     Would you rather me try to find a bigger block next

1      week, or do you want a smaller block on Tuesday --

2      or on Thursday?  I apologize.

3           MR. BARFIELD:  I only need about fifteen

4      minutes, Your Honor.

5           THE COURT:  Well, the other side --

6           MR. BARFIELD:  The burden will be on them.  So

7      I don't know how much time they need.

8           THE COURT:  Well, let me ask you this:  If I

9      can get Ms. Scibak looking for some bigger block of

10     time next week, is that acceptable?

11          MR. BARFIELD:  Yes.

12          THE COURT:  Okay.  I will do that.  And I will

13     get back on this issue later on this morning once I

14     am told what she can find, and then we'll see from

15     everybody what's doable.

16          MR. BARFIELD:  Thank you.  Appreciate it.

17          THE COURT:  The other issue that I think we

18     absolutely needed to talk briefly about is, I

19     guess, Mr. Hillsley, your filing about a show of

20     cause related to Janice Logan's public filings in

21     the bankruptcy matter that you contend contain

22     information that is subject to the confidential

23     order.

24          MR. HILLSLEY:  Yes, sir.  May I be heard?

25          THE COURT:  Well, I'm just -- in my mind, I'm

1     not stopping this proceeding to have a hearing on

2     that.

3          MR. HILLSLEY:  No problem.

4          THE COURT:  I'm just thinking, what are you

5     envisioning as far as a proceeding?  I'll probably

6     ask for a response.  And I'm wondering if we should

7     marry this to Mr. Barfield's challenge to --

8          MR. HILLSLEY:  If Your Honor has had an

9     opportunity to review the motion, which you may not

10    have, Your Honor --

11         THE COURT:  Just -- I've quickly scanned.  I

12    have not thought about it.

13         MR. HILLSLEY:  Let me address that, because I

14    think you will understand the exigency and waiting

15    next week is not going to be okay for, frankly,

16    anybody in this courtroom that is appearing here as

17    a party.  May I address that issue?

18         THE COURT:  Sure.

19         MR. HILLSLEY:  Your Honor, I'm not going to

20    beat around the bush.  This is an actual true, blue

21    emergency.  As we noted to Your Honor yesterday,

22    Janice Logan filed a claim in bankruptcy for

23    $110 million.  Shook Hardy's firm has also appeared

24    on her behalf in the bankruptcy.

25         What we did not know until after the trial was

1        that numerous attached confidential documents

2        were -- sorry -- numerous confidential documents

3        were attached to that filing, produced pursuant to

4        the Protective Order in this case and plainly

5        designated and previously, frankly, filed in this

6        case by Janice Logan under seal.

7             I'm hesitant to describe in open court with

8        any specificity, but I will give Your Honor enough

9        information so that you can appreciate the

10       exigency.

11            These documents give the road map of future

12       technology for SmartComm and for HLFIP that are not

13       yet on the market.  This showed -- these documents

14       show the vision of growth strategy features and

15       functionalities that will allow competitors to copy

16       HLFIP tech and beat SmartComm and HLFIP to the

17       market.

18            They attached the entire general ledger, which

19       includes every transaction, every partner,

20       customer, vendor, contractor and employee, how

21       every dollar is spent by this company.  These are

22       obviously well-established trade secret information

23       without even getting to the compromise that has

24       been done to the technology.

25            THE COURT:  Let me -- are you making some sort

1    of emergency filing in the Bankruptcy Court?

2         MR. HILLSLEY:  We have done that as well, Your

3    Honor.  We are doing everything.

4         THE COURT:  Because I can't tell the

5    Bankruptcy Court what to put on their docket and

6    what not.

7         MR. HILLSLEY:  Let me get to the request to

8    Your Honor.  The request is that you direct the

9    party who is in front of you, Janice Logan, to do

10   everything possible to get that off of that docket

11   because this -- Your Honor, to really emphasize the

12   point, competitors of SmartComm have appeared in

13   that bankruptcy, received by e-service these

14   documents, and they may be looking at them right

15   now.

16        We need to do everything we can to pull this

17   back.  This is a valuation case.  This company just

18   got a heck of a lot less valuable.

19        THE COURT:  Your fastest relief is an order

20   from the bankruptcy judge.  What I can do is give

21   you time on that Thursday, either 12:30 or

22   1 o'clock.  But I'm only going to have a little bit

23   of time.

24        So I understand the exigency.  If you want

25   something faster, then I can contact the Chief

1      Judge and see if I can get a senior judge in here

2      to handle the issue, and you're going to just have

3      to peel off some of your numbers that are here to

4      go to whatever courtroom when I can get a judge to

5      physically hear it.

6           MR. HILLSLEY:  So if we're going to get into

7      the actual trade secrets and technology, I have to

8      preface that that has to be done confidentially.  I

9      cannot create a further record of what the contents

10     of these documents are publicly.  The way to the

11     story --

12          THE COURT:  There is going to be a huge

13     quagmire, and I understand it would be better if

14     I'm the one doing it, but I can't give you until

15     Thursday, and it's going to be a short period of

16     time.

17          That's why your best bet right this second is

18     in the Bankruptcy Court.  If you're telling me it

19     can't wait until Thursday, I will contact the Chief

20     Judge.  I don't know who my duty judge is right

21     this second, but I'll figure something out.  But

22     it's going to require a good amount of examination

23     on this.

24          So --

25          MR. HILLSLEY:  Your Honor, I think we have to

1      do everything we can.  I'm trying to say this

2      ^confident, Your Honor.  I have to get these

3      documents out of the public.

4           THE COURT:  Well, let me hear from

5      Janice Logan's side.

6           MR. OPRISON:  May we be heard after that, Your

7      Honor?

8           THE COURT:  Sure.

9           MS. LIU:  Good morning, Your Honor.  Smart's

10      bankruptcy counsel alerted our bankruptcy counsel

11      of this issue at 10 p.m. last night.  We learned of

12      it around 6 or 7 this morning.  We took immediate

13      action to figure out which document was at issue,

14      and we've already directed our bankruptcy counsel

15      to take action to file it under seal as

16      appropriate.  As of about 40 minutes ago, he was

17      coordinating with SmartComm's bankruptcy counsel to

18      get that done.

19           THE COURT:  Okay.  So has this side of the

20      room told this side of the room what are the

21      specific document or documents that are allegedly

22      publicly filed that need to be sealed?

23           MS. LIU:  I do not believe they identified

24      them by exhibit number in the bankruptcy filing.

25      We have told our bankruptcy counsel which one we

1      think it is, and he, as of the last e-mail I saw 40

2      minutes ago, is getting the phone numbers of

3      SmartComm's bankruptcy counsel to figure out a

4      complete and correct solution.

5          THE COURT:  Okay.  Mr. Oprison, did you want

6      to say something?

7          MR. OPRISON:  Yeah.  Thank you, Your Honor.  I

8      just want to make sure we clear something -- first

9      of all, they can't distance themselves from this.

10      The only way the bankruptcy counsel got it is

11      through this team over here.  These are

12      documents --

13          THE COURT:  Mr. Oprison, right this second,

14      I'm more concerned about getting documents sealed

15      that need to be sealed.

16          MR. OPRISON:  There's multiple documents.

17          THE COURT:  We can deal with sanctions and

18      contempt at a later time, but let's get the

19      documents sealed.  That's why I asked Ms. Liu if

20      there was any sort of discussion about this DIN

21      number -- these pages need to be sealed.  Has

22      anybody on this side of the room told this side of

23      the room, this is the roster of documents that need

24      to be sealed?

25          MR. OPRISON:  Did you send a -- we -- they

1          sent -- last night when we got the filing, we sent

2          this side -- I believe Smart's counsel sent this

3          side a notice that they had filed things in the

4          bankruptcy action improperly and documents that had

5          been marked confidential in this case that they

6          should -- now, they knew about it last night at

7          10:00 p.m.  All of these documents should have been

8          clawed back as a matter of course, and then they

9          can just release what's not confidential.

10              But the problem is, they got it out there and

11         then we're trying to play catch-up.  They knew

12         about it at 10o'clock last night.  The same counsel

13         is the bankruptcy counsel, Your Honor, from the

14         same firm.  So they knew, and now I guess the

15         question is, why should we now have to jump through

16         hoops to pull everything back?

17              THE COURT:  Well, your side's trying to say

18         documents that are going to ruin the company are

19         publicly available.  Tell us what they are, and

20         allow that side to go to the bankruptcy and say,

21         let's try to get these documents sealed.  To me,

22         that's the absolute fastest way.  I don't know what

23         Judge Colton is going to do or not do.

24              MR. OPRISON:  We sent -- we when I say the

25         collective "we," Smart's counsel sent notice last

1    night and has not heard back from bankruptcy

2    counsel.

3        MR. HILLSLEY:  Your Honor, there are 1300

4    pages, and throughout all of it are confidential

5    documents with headers, with confidential exhibits,

6    slip sheets.  We're talking about a massive task.

7    That's why -- and they are filled with incredibly

8    sensitive information.  So there's no way.  I was

9    working on this all day.  And so, Your Honor --

10       THE COURT:  I will tell you --

11       MR. HILLSLEY:  We just need it out.

12       THE COURT:  Mr. Hillsley, I have had to direct

13   the Clerk to seal documents before.  The Clerk

14   needs, you know, this docket entry, these pages.

15   They need a list.  I'm telling you, they're going

16   to need a list as to what is being claimed.  So

17   someone has to create that list.

18       Now, I hear you saying it should be SmartComm,

19   and I'm not saying that they shouldn't be trying to

20   create their own list.

21       MR. HILLSLEY:  Your Honor, did you mean

22   Janice Logan's --

23       THE COURT:  I'm sorry.  I'm sorry.

24   Janice Logan's counsel.  I'm -- I'm going to

25   judge's left here, which is where Janice Logan's

1        side is.  And you're on judge's right.  But I'm not

2        saying that they shouldn't also try to create their

3        own list.  It sounds like they started that, but

4        if -- someone needs to tell the bankruptcy judge

5        and then the Clerk in bankruptcy what specific

6        documents have to be marked as not publicly

7        available.

8            MR. HILLSLEY:  Your Honor, I'll step out of

9        the room right now and make sure that's being done

10       on our side.  I''ll make the call to the bankruptcy

11       counsel, make sure we're doing that.  I'm hoping

12       that Janice Logan's side appreciates the situation

13       we're in and will also make the effort so that

14       we're both racing to get this done.

15           THE COURT:  Is there any objection to efforts

16       to try to get documents that are purportedly trade

17       secret and confidential and all these other

18       designations temporarily sealed at the bankruptcy

19       level until such time as a more structured

20       proceeding can be had?

21           MS. LIU:  No objection, Your Honor.

22           THE COURT:  Okay.  I'm going to be -- in about

23       7 minutes, going to be doing this other hearing.

24       So in a moment, I'll let you all go and make those

25       telephone calls.

1          Is there anything else -- if that is

2    happening, do you still want me to try to find a

3    judge to handle some sort of emergency hearing --

4    if it's blocked on the bankruptcy, it would seem

5    like we would have a little bit more time.

6          MR. HILLSLEY:  Your Honor, I agree.  Given the

7    consent from the other side, I think that the

8    sanction aspect of this can wait.  The part that

9    was emergency, obviously, was getting it out of the

10   public domain.  It appears that everyone has agreed

11   that we need to make every effort to make that

12   happen.  So let's deal with the sanctions at a

13   later date.

14         THE COURT:  Okay.  Let's see here.

15

16         (An off-the-record discussion was had.)

17         THE COURT:  I have apparently a half day

18   starting at 1:30 next Wednesday.  Mr. Barfield, I'm

19   talking to you, too.  So I can give the collective

20   between these two issues next -- next Wednesday at

21   1:30.  You know, if people want to be here in

22   person, that's great.  I will let people be here by

23   Zoom as well, if that is more convenient to make

24   this happen.  So, Mr. Barfield, are you able to

25   make next Wednesday at 1:30 work?

1           MR. BARFIELD:  I am, Your Honor, but I was

2     just informed this morning that there may be other

3     counsel from other media organizations.  I'll let

4     them know and --

5           THE COURT:  Okay.  Well, let me see from this

6     room if next Wednesday -- it might end up being an

7     evidentiary hearing.  So if you want to be here in

8     person, that's probably a little bit better.  But

9     if you needed to be by Zoom, we'll make that work

10    as well.  So --

11          MR. HILLSLEY:  Your Honor, I will be in

12    Canada, but I will appear by Zoom, if that's

13    acceptable.

14          THE COURT:  That's fine.

15          MR. OPRISON:  I'll be here, Your Honor.  I'm

16    not sure if in person or Zoom, but I will be here.

17          THE COURT:  Haven't you got a house here now?

18          MR. OPRISON:  I should.

19          THE COURT:  Okay.

20          MR. SCHOENFELD:  That time is fine for us.

21          THE COURT:  Mr. Johnson is nodding his head,

22    so -- and so what I'm going to do is I'm going to

23    notice it for both Mr. Barfield's issue and then

24    this other issue that we were just talking about,

25    and we'll probably have to deal with Mr. Barfield's

1    issue first.

2         (An off-the-record discussion was had.)

3         THE COURT:  And I'm going to go ahead and want

4    the -- Janice Logan's side to file a response as to

5    the -- Smart Communications' motion to show cause.

6         Are there any other preparatory stuff that we

7    need to deal with, or you just want to break now to

8    call?

9         MR. HILLSLEY:  Anything else?  Nothing

10   further, Your Honor.

11        THE COURT:  Anything from this side of the

12   room?

13        MR. SCHOENFELD:  Nothing here.

14        THE COURT:  Okay.  We'll be in recess until I

15   can finish this other hearing.  If anyone needs to

16   step outside to make telephone calls, please do so

17   now.

18        (A break was taken at 8:27 a.m. and the

19   following commenced at 8:37 a.m.)

20        THE COURT:  We are back in the Logan v. Logan

21   matter.  So it sounds like we've addressed all of

22   the preparatory stuff.  So we need to bring

23   Mr. Logan -- Mr. Jon Logan back to the stand.

24   Since we have been overnight, let's go ahead and

25   readminister the oath to him.

1           THE COURT REPORTER:  Would you raise your

2      right hand, please?

3           (The witness complied.)

4           THE CLERK:  Do you solemnly swear or affirm

5      that the testimony you are about to give will be

6      the truth, the whole truth, and nothing but the

7      truth?

8           THE WITNESS:  Yes, ma'am.

9           THE CLERK:  Thank you.

10  Thereupon,

11                JONATHAN DEMETRIUS LOGAN

12  the Witness, after first being duly sworn to tell the

13  truth, the whole truth, and nothing but the truth,

14  testified as follows:

15           THE COURT:  Mr. Hillsley.

16           MR. HILLSLEY:  Your Honor, we've completed our

17      direct exam.  Pass the witness.

18           THE COURT:  Okay.  Mr. Schoenfeld.

19                CROSS EXAMINATION.

20  BY MR. SCHOENFELD:

21      Q.   Good morning, sir.

22      A.   Morning.

23      Q.   Prior to his death in October 2022, your

24  father Jim Logan was a 50 percent shareholder of Smart

25  Communications, correct?

1    A.   Yes.  But then he transferred before his death

2    to the Trust, so technically the Trust was.

3    Q.   That was immediately before.  But within

4    several weeks of his death, right?

5    A.   Yes.  He, I believe -- he didn't tell me that

6    he transferred the stock to the Trust.  I learned about

7    it after.  But I think that was -- that was done -- I

8    saw the e-mail my sister sent to the attorney requesting

9    the stock be transferred to the Trust, and that was

10   about a month before he passed.

11   Q.   In any event, while he was a 50 percent

12   shareholder, your father was also director of Smart

13   Communications, correct?

14   A.   Yes.

15   Q.   And he was the chief financial officer of the

16   company, correct?

17   A.   Yes.

18   Q.   He was principally responsible for accounting

19   and corporate structure?

20   A.   He was.

21   Q.   He had access to the company's books and

22   records, correct?

23   A.   He did.

24   Q.   He had access to its accounting records?

25   A.   He did.

1     Q.   He had access to its tax filings?

2     A.   I assume he did.

3     Q.   He had input into major decisions that

4  affected the company, correct?

5     A.   I can tell you that the only thing I had was a

6  debit card, and every major financial transaction from

7  2009 till October 2022 was done by my father.

8     Q.   So it would be fair to say as a 50 percent

9  shareholder, he had essentially complete visibility into

10  the company's finances and any decisions that could

11  affect those finances?

12     A.   My dad was the one that orchestrated the

13  structure of the entities and the acquisition of assets

14  and payments to people, and he ran all of the finances.

15     Q.   Now, following Jim's death, you mentioned

16  yesterday you had some discussions with your mother

17  about the purchase of the Trust's shares, correct?

18     A.   That I had discussions with my mother about --

19  yes.

20     Q.   And those discussions ended in January 2023,

21  correct?

22     A.   Yeah.  It would have been somewhere around

23  that time frame.

24     Q.   And then you said you received a letter from

25  my firm, correct?

1      A.   Yes.  My mother hung up on me, and then I

2   didn't hear from her, and I reached out to her through

3   texts, said I would like to talk to her about this.  And

4   she never responded.  And then, like, a week later, I

5   got the letter from your firm.

6           MR. SCHOENFELD:  Would you display

7      Exhibit 260, please.

8   BY MR. SCHOENFELD:

9      Q.   Is this the letter you just described?

10      A.   Is that the full extent of the letter?

11      Q.   The full letter is available.  You could

12   either look at it in the binder or you can look at it

13   here if we spoke, but your choice.

14      A.   If you're going to ask me anything about it,

15   I'd like to see what it is.

16      Q.   I will point you to any language I'm going to

17   ask you about.  Let's look at the first paragraph.

18           There, Mr. Miller, the author of this letter,

19   wrote in the second sentence that he writes regarding

20   the share's 50 percent ownership stake; correct?

21      A.   Yes.  That's what he says.

22      Q.   And he writes that the Trust is very concerned

23   about your management of the company, waste of corporate

24   assets, and threats to injure the company; correct?

25      A.   When was this dated?

1      Q.   January 20, 2023, at the top.

2      A.   Okay.  So this would have been just over,

3  like, sixty days from my dad passing.  All of the

4  management of assets was Jim, not Jon.  So this letter

5  is just ridiculous.

6      Q.   I'm not asking you about the veracity of what

7  Mr. Miller wrote.  I'm asking about what you learned

8  from this letter.

9      A.   I learned that it was false statements about

10  Jon's management of Smart Communications, waste of

11  corporate assets and threats to injure my own company,

12  that this is just a false statement on its face.

13      Q.   Going to the details of that discussion,

14  first, I would like you to look at the last two

15  sentences of this paragraph.

16          Now, there Mr. Miller directs that all

17  communications with Janice, whether from your lawyers or

18  from you, should be directed to our firm, and that

19  Janice did not want to communicate with you directly,

20  right?

21      A.   That's what the letter says, is that Janice

22  will not communicate with me about buying the stock,

23  yes.

24      Q.   Well, that's not what it says, is it, sir?  It

25  says Janice doesn't want to communicate directly with

1  you, right?

2      A.   Yeah.  It's saying that I cannot communicate

3  with my mother globally, so about anything.

4      Q.   The word is "directly," isn't it?

5      A.   I don't know -- "to be clear" -- directly.

6  Communicate directly with her.

7      Q.   There is nothing in this letter that says you

8  couldn't communicate with Janice through your lawyers;

9  right?

10      A.   Well, I believe the letter says to direct

11  communications to your firm, which I had my attorneys

12  direct communications to your firm.  I followed this

13  direction.

14      Q.   Okay.  You had a way to communicate to Janice,

15  even after you received this letter, right?

16      A.   I suppose our firms can always communicate.

17      Q.   I'd like you to turn to the next page, please.

18  Now, in the last paragraph carrying over to the next

19  page, there's a series of bullet points.  Do you see

20  that?

21      A.   I'm sorry.  I'm reading through.

22           THE COURT:  And, Mr. Logan, there's a binder,

23      if you would rather have the complete document.

24           THE WITNESS:  Right here?

25           THE COURT:  Yeah.  It's down on the floor in

1       binder one of six.

2              THE WITNESS:  Okay.  Thank you.

3              THE COURT:  If you would prefer to look at it

4       that way.  It's up to you.

5              THE WITNESS:  So far, this is fine.  But thank

6       you.

7       A.    Okay.  I've read the bullet points.

8  BY MR. SCHOENFELD:

9       Q.    Now, the paragraph leading into the -- two

10  sentences leading into those bullet points say that the

11  situation Mr. Miller described was back to your

12  management of your company needs to be resolved

13  promptly.  And then he writes, "The Trust demands that

14  Jon take the following steps immediately," right?

15      A.    That's what the document says.

16      Q.    And the first of those steps is to preserve

17  e-mail accounts associated with Jim and Jon Logan.  Did

18  you do that, preserve all those e-mail accounts?

19      A.    I believe all of our e-mail accounts are

20  automatically forever preserved unless intentionally

21  removed, and that would have to be done by our Google

22  account administrator, which I am not.

23      Q.    The next item is a demand to provide complete,

24  direct access to all Smart Communications entities'

25  e-mail accounts, books and records, including the

1    company's accounting software application, right?

2         A.    That's what the bullet says.

3         Q.    You didn't provide that information, did you?

4         A.    No, I would not ever provide that information

5    to Janice.  I would follow the law of what she's

6    entitled to, for the exact reason that we had this

7    morning.

8         Q.    Now, the next bullet point demands that you

9    agree in writing that any corporate dividends or

10   distributions will be made on a 50/50 basis between the

11   Trust and Jon, correct?

12        A.    This is what the bullet point says.  I

13   obviously will defer to counsel on what to do with this

14   document, but --

15        Q.    You didn't provide any dividends in any form

16   to Janice, ever, right?

17        A.    I'm glad you brought it up.  There's been no

18   dividends to me since my father has passed, or to

19   Janice, to no one.

20        Q.    Go to the next page, please.  At the top, the

21   list of bullet points representing the Trust's demands

22   in this letter continue.  And the next one is a demand

23   to convene a shareholder meeting to appoint Janice as

24   director of Smart Communications Holding and director of

25   all other Smart Communications entities.  Do you see

1  that?

2      A.   Yes, I see what the document says.

3      Q.   Now, you didn't convene a shareholder meeting

4  in response to this letter, right?

5      A.   I don't believe so.  I'd have to defer to

6  counsel.  I was obviously inexperienced in how any of

7  this would work, and I had to find an attorney to deal

8  with this, I would say, threatening, harassment, demand.

9  And I would defer to counsel on what happened next.

10     Q.   Well, I'm asking what you know about what

11  happened next.  And the answer to my question is, you

12  did not convene a shareholder meeting in response to

13  this demand, right?

14     A.   Well, I know that there was a shareholder

15  meeting at one point.  I don't remember the exact date,

16  but, no, look, I can tell you that I -- when I got what

17  her attorneys have coined the Shook shakedown letter, we

18  did not roll over and comply with these untenable

19  demands.

20     Q.   The shareholder meeting you just described

21  took place more than a year later, right?

22     A.   I wouldn't know the date.  You can -- that

23  sounds fine.

24     Q.   And you've never agreed to appoint Janice as

25  director of Smart Communications Holdings, right?

1          A.    As I testified yesterday, I think -- I know,

2    and I think what she just did yesterday by exposing all

3    of the company's secrets on both companies to our direct

4    competitors, e-mailing them directly, this is the exact

5    reason why I would not have Janice have any control.

6    Because her intent is not for the company.  Her intent

7    to is extract money from the company, not to build the

8    company.

9          Q.    You've never appointed Janice director of any

10   Smart Communications entities; right?

11         A.    No, she's never been a director.

12         Q.    The next bullet point demands that you convene

13   a meeting of the Board of Directors of Smart

14   Communications Holding to appoint Janice as vice

15   president.  Do you see that?

16         A.    Yeah, I see the bullet point.

17         Q.    As the holder of 50 percent of the stock in

18   Smart Communications, Jim Logan had been an officer of

19   the company.  You just told me that, right?

20         A.    Yes.  Jim Logan worked for the company for

21   fifteen years.

22         Q.    And you never appointed Janice an officer of

23   the company, correct?

24         A.    Correct.  Janice has never been an officer of

25   any company.

1      Q.   Now, the next bullet point demands that you

2  add Janice as a signatory to all Smart Communications

3  bank accounts with her authority necessary for any

4  payments by the corporation over $50,000; correct?

5      A.   That's what the bullet point says.

6      Q.   And you've never given Janice that kind of

7  say-so with respect to any payments by Smart

8  Communications, right?

9      A.   No.  From what I've learned, there's a proven

10  history of Janice taking large sums of cash, including

11  $150,000 for a diamond ring, out of Smart

12  Communications.  I would never give her access to

13  control a bank account for Smart Communications.

14      Q.   And on the subject of large expenditures of

15  cash, the next bullet point says you should sell the

16  yachts, the 100-foot Riva Corsaro and the 40-foot Center

17  Console Nor-Tech with 50 percent of proceeds --

18           THE COURT:  Mr. Schoenfeld, I can read.  I've

19       read this before.  Let's get to the issues in the

20       case.

21  BY MR. SCHOENFELD:

22      Q.   You didn't sell either of the yachts, right?

23      A.   One's a boat, one's a yacht.  No.  These are

24  all purchases by Jim that were supposed to be towards my

25  compensation instead of me actually getting paid.

1          THE COURT:  So you have not sold the boat or

2      the yacht.  Is that --

3          THE WITNESS:  That's correct.  They are

4      actually both for sale, but they are not sold.

5  BY MR. SCHOENFELD:

6      Q.   When did you put them up for sale?

7      A.   I've been trying to sell the Nor-tech for a

8  year.  The yacht's been up for sale for a couple of

9  weeks.

10  BY MR. SCHOENFELD:

11     Q.   So after the filing of the bankruptcy?

12     A.   Yes.  Well, on the yacht.  The Nor-Tech,

13  obviously, before.

14     Q.   Now, in response to this letter, you sued your

15  mother in this court, correct?

16     A.   Yes.

17          MR. SCHOENFELD:  Would you display 460,

18      please.  430.  My apologies.

19  BY MR. SCHOENFELD:

20     Q.   Sir, I'll represent to you in the interest of

21  time that this is the agreement -- or the Complaint that

22  you filed on February 27, 2023.  Unless you think it's

23  not.

24     A.   Obviously, I haven't looked at it, but I take

25  your word for it.

1     Q.   Have you turn to page 4 of this Complaint.

2  And in paragraph 21, you alleged, "According to the 2021

3  audited financial statements of Smart Communications,

4  the shareholder equity was approximately $15 million as

5  of December 31, 2021."

6          Was that a correct statement when you made it?

7     A.   I think the financial statements speak for

8  themselves.

9     Q.   That's not what I asked.  Is that a correct

10 statement?

11    A.   According to the 2021 audited financial

12 statements -- I would have to refer to what the

13 statements of -- the audited financial statements say.

14    Q.   So you don't recall as you sit here today?

15    A.   No.  I didn't actually really review our

16 financials until after my dad passed.

17    Q.   He had passed at this time.  It had been three

18 months.  And you were filing a Complaint in court.  Did

19 you check to be sure that this was a correct statement?

20    A.   No, I wouldn't actually know how to review and

21 check for accuracy audited financials.  I'm not an

22 accountant.

23    Q.   And you didn't say anything here about a

24 longterm obligation from Smart Communications to pay

25 anything to HLFIP that could affect the shareholder

1   equity of the company; correct?

2       A.   No.  I think at the time, we didn't realize

3   that that needed to be accounted for and what that would

4   actually look like.

5       Q.   Now, if you turn to page 12, I'll have page 12

6   displayed, in what your lawyers call a "wherefore

7   clause," second paragraph of this page, with the number

8   2, you sought a declaration that "Janice has no standing

9   to pursue the claims of the decedent's estate because

10  she had not been appointed as personal representative of

11  the estate."  Right?

12      A.   That's what number 2 says.

13      Q.   And that included claims including the demand

14  for $6.7 million in proceeds of the sale of yachts, real

15  estate, cars; correct?

16      A.   I'm sorry.  Could you repeat the question.

17      Q.   Those claims included the $6.7 million in

18  proceeds that Mr. Miller's letter had demanded that you

19  pay over after selling yachts and boats and real estate

20  and exotic automobiles, right?

21      A.   Well, I guess just if you're referring to the

22  yacht, I mean, the yacht owes 5.7 million.  So selling

23  the yacht is not going to throw up cash for Smart

24  Communications.  It's going to pay off the note that it

25  owes.  But this was what -- it says what number 2 says.

1    I don't know the legal standings on how that works.  I'd
2    have to defer counsel.
3         Q.    On paragraph 57, you contended that the
4    Shareholder Agreement was in effect; correct?
5         A.    Yes.
6         Q.    This was a Shareholder Agreement that was the
7    subject of a Phase I trial that we held about a year
8    ago, correct?
9         A.    Yes.
10        Q.    And you contended there that because of that
11   Shareholder Agreement, the Trust was obligated to sell
12   its ownership interest in Smart Communications to the
13   company, correct?
14        A.    Yes.
15        Q.    So according to this Complaint, Janice
16   couldn't sell it to anyone else, right?
17        A.    I guess that would be a legal conclusion.  I
18   don't know.  I would have to defer to someone who knows.
19        Q.    Go to paragraph 58, please.
20             There you write that you also contend that
21   Janice had failed to comply with one of the provisions
22   of that agreement, quote, "such that the Trust cannot
23   exercise any control over the ownership interest in
24   Smart Communications," right?
25        A.    That's what number 58 says, yes.

1       Q.   And she was only entitled to receive payment

2   of the fair market value of her interest, right?

3       A.   That's what the Shareholder Agreement said.

4       Q.   And you brought this action to enforce that

5   restriction on her ability to exercise any control of

6   the ownership interests in Smart Communications, right?

7       A.   Yes.

8       Q.   Now, since you filed this Complaint, you

9   changed the citizenship of Loco Florida from a Florida

10  to a Delaware LLC; correct?

11      A.   Correct.  There was a period where we changed

12  all entities to a Delaware LLC, for numerous reasons and

13  discussed before.

14      Q.   And the period somewhat overstates the length

15  of time during which that occurred.  It was all pretty

16  much on August 29th, 2023, right?

17      A.   Yes.  Counsel is working on converting all

18  entities that I'm associated with and have ownership in,

19  and Smart Communications and -- yeah, to Delaware.

20      Q.   Now, you don't have to tell me what

21  communications you had with counsel, but who were they?

22      A.   There is a Delaware firm, I believe Rich Rollo

23  is an attorney I recall, I believe he was with the firm.

24      Q.   Is that Richards Layton firm?

25      A.   That sounds familiar.  I didn't have a whole

1  lot of interaction with them.  It's been a while.  But

2  yes.

3      Q.   You also changed the citizenship of Smart

4  Communications Yacht Holding from Florida to Delaware at

5  the same time, correct?

6      A.   Yes.  All entities was part of a corporate

7  restructuring cleanup organization.

8      Q.   We looked at a demonstrative yesterday, right?

9      A.   Yes.

10      Q.   Loco wasn't on the demonstrative, right?

11      A.   No.  Loco is not associated with Smart

12  Communications from an ownership standpoint.

13      Q.   And Yacht was not on that demonstrative

14  either, right?

15      A.   No.  Yacht is owned by me personally.  It's

16  not associated with Smart Communications from a stock or

17  ownership standpoint.

18      Q.   You filed a lawsuit in Delaware concerning the

19  redomestication of Loco and Yacht, correct?

20      A.   Yes.

21          MR. SCHOENFELD:  Could we display 354, please.

22  BY MR. SCHOENFELD:

23      Q.   Is this the lawsuit you filed?

24      A.   I assume it is.  I haven't seen it in, it

25  seems like, ages, but...

1    Q.   And this was filed on October 23, 2023?

2    A.   Yes.  It looks like that.

3    Q.   And you are the Plaintiff here, correct?

4    A.   Yes.

5    Q.   Only you, right?

6    A.   Me, yeah, that's what it says, yes.

7    Q.   And Loco Florida, LLC and Smart Communications

8    Yacht Holding, Inc. [sic] are the Defendants, right?

9    A.   I guess.  I don't really know how this works,

10   but, yeah, that's what it says.

11   Q.   I would like you to turn to page 3, please.

12       Now, in paragraph 10, you allege before his

13   death, your father James claimed to be a member and

14   manager of Loco and Yacht, correct?

15   A.   That's because I saw the e-mail where my

16   sister e-mailed my dad's attorney and said he wants to

17   transfer his ownership interest, which I, frankly,

18   wasn't aware of any ownership interest, especially in

19   Yacht, but there's also no records that show he had

20   ownership interest in either entity.

21   Q.   And you alleged that in paragraph 11, correct?

22   A.   Yeah.  That's what the records show, that

23   there are no actual ownership interests of James in the

24   records of those companies --

25   Q.   If you turn --

1      A.   -- even though he set them up.

2      Q.   Would you turn to paragraph 23, please.

3           Now, there, you allege the conversion of the

4  companies from Florida to Delaware, correct?

5      A.   I'm sorry.  You said "allege"?

6      Q.   Allege, yes.  That you had converted them from

7  Florida LLCs to Delaware LLCs, right?

8      A.   Yes, we did.

9      Q.   And you did that on August 29th, 2023, right?

10     A.   Yes.  All entities were done on the same day,

11  kind of -- like I say, it was a reorganization of

12  everything.

13     Q.   Turn to page -- or paragraph 25, please.  Now,

14  there, you allege the Trust claims the right to inspect

15  books and records as a purported member of Loco and

16  Yacht, right?

17     A.   Correct.

18     Q.   And was that true?

19     A.   Was what true?

20     Q.   That the Trust claimed the right to inspect

21  books and records as a purported member of Loco and

22  Yacht?

23     A.   Yes, and the Trust is not a member of Loco or

24  Yacht.

25     Q.   You brought this lawsuit to prevent the Trust

1  from having access to the books and records of Loco and

2  Yacht, right?

3      A.   Yes, we brought the lawsuit to enforce the

4  rights that the Trust is not a member, and that's just a

5  fact.

6      Q.   And to declare yourself the sole member and

7  manager of both companies, right?

8      A.   Yeah.  Because I believe I am.

9      Q.   Now, you created new operating agreements for

10 both companies, right?

11     A.   I believe so.  It was done with counsel, but

12 yeah.

13          Well, I don't know that I would say they're

14 new operating agreements.  There were no operating

15 agreements.  So I believe operating agreements needed to

16 be made, is my understanding.

17     Q.   There were no operating agreements for the

18 Delaware companies that you converted, these Florida

19 companies into, right?

20          THE COURT:  I'm sorry.  I didn't understand

21     the question.

22          MR. SCHOENFELD:  That's a fair -- I'll

23     withdraw it.

24 BY MR. SCHOENFELD:

25     Q.   When you say there were no operating

1    agreements, that's because the Florida -- I'm sorry --

2    the companies recently converted to Delaware LLCs and

3    there were no operating agreements for the new

4    companies, right?

5         A.   No.  And to help clarify, this is exactly the

6    problem.  My dad did not have any operating agreements

7    for any corporation.  It was a total mess.  And I

8    finally had professionals involved.  And, like, hey, you

9    got to clean this up.  You got to get organized.  And

10   you got to get these things in line.  And so I relied on

11   counsel to do so.

12        Q.   Would you turn to -- we'll turn to Exhibit H

13   of this Complaint.  And that is at page 55 of this

14   exhibit.

15             Sir, this is the Limited Liability Company

16   Agreement of Loco Florida, LLC, correct?

17        A.   That's what it says.  I'm not sure I've even

18   ever reviewed it.

19        Q.   Let's turn to, if you will, the last page of

20   this exhibit, which is --

21             MR. SCHOENFELD:  I don't know if I have the

22        number -- the last page.

23             THE COURT:  Page 61.

24             MR. SCHOENFELD:  There it is.

25

1  BY MR. SCHOENFELD:

2      Q.   Sir, that is your signature on the last page

3  of this agreement, right?

4      A.   Yes.

5      Q.   I'd like you to turn to the second page of

6  this agreement.  In paragraph 8, you are identified as

7  the sole member of Loco Florida, LLC, correct?

8      A.   Yes.

9      Q.   And on the next page of the agreement,

10  paragraph 12, the agreement provides the companies'

11  profits and losses shall be allocated solely to the

12  Member, and that's you, right?

13      A.   Yes.  I'm the only member of Loco and Yacht.

14  It's just a fact of law.  So the losses or the profits,

15  both -- cuts both ways -- are my responsibilities.

16      Q.   That would have been a fact of law if the

17  Court had ruled in your favor in Delaware on the

18  Complaint you just looked at, right?

19          MR. HILLSLEY:  Objection.  Calls for a legal

20      conclusion.

21          THE COURT:  Sustained.

22      A.   Well --

23          THE COURT:  You don't have to answer it.

24  BY MR. SCHOENFELD:

25      Q.   Paragraph 13 provides that distribution shall

1  be made to the member at the times and in the aggregate

2  amounts determined by the member.  And that's you,

3  right?

4       A.   Yes.  I'm the only member, which there has

5  been no distributions from either corporation.

6       Q.   Now, you didn't get Janice's consent to make

7  either of these changes to Loco or Yacht, correct?

8       A.   Janice has never been a member of Loco or

9  Yacht.  I wouldn't need her consent for anything.

10      Q.   You used Smart Communications funds to pay for

11 this lawsuit, right?

12      A.   To pay for what lawsuit?

13      Q.   This lawsuit, the Delaware lawsuit.

14      A.   I'm not sure about that.  I'd have to actually

15 get with counsel.  Because I paid numerous legal fees

16 related to HLFIP and other corporations out of my own

17 funds.  It's been quite difficult.

18      Q.   And you didn't -- and you had Smart

19 Communications pay the Richards Layton firm to do these

20 documents, converting the companies, right?

21      A.   That's what I just testified.  I wouldn't be

22 able to tell you one way or the other.  I'd have to

23 actually check records, because I have paid numerous

24 legal fees to numerous different firms on numerous

25 issues over these past two years now.

1    Q.   And you didn't get Janice's consent to any of
2  the changes or to this lawsuit, right?
3    A.   I'm sorry.  I don't understand the question.
4    Q.   You didn't get Janice's consent to any of
5  these changes to the Loco and Yacht citizenship or the
6  lawsuit that you filed, right?
7    A.   No.  She was never part of either company.
8    Q.   Now, you also at the same time created a new
9  Smart Communications Holding, LLC entity in Delaware,
10  correct?
11    A.   Yes.
12        MR. SCHOENFELD:  Let me see Exhibit 342,
13    please.
14  BY MR. SCHOENFELD:
15    Q.   So this is the Certificate of Formation of
16  Smart Communications Holding, LLC, a Delaware limited
17  liability company that you signed on October 29, 2023;
18  right?
19    A.   Yes.  And -- yeah.
20        THE COURT:  Did you say October or August?
21        MR. SCHOENFELD:  I'm sorry.  I meant to say
22    August 29, 2023.
23  BY MR. SCHOENFELD:
24    Q.   And that's the date of this agreement, right,
25  sir?

1          A.    Yes.   That's what the agreement says.

2          Q.    And you began making customer contracts for

3     Smart Communications -- Strike that.  Let me start

4     again.

5               You began making customer contracts for Smart

6     Communications services and products in the name of this

7     Delaware LLC after you formed it; right?

8          A.    Yes.   That is part of the global plan was to

9     bring an organization to Smart Communications because

10    contracts were scattered amongst about six different

11    corporations that were all subsidiaries, and there was

12    no organization and it was difficult for accounting,

13    difficult for tax purposes.  And everything now is in

14    one clean entity that is owned by Smart Communications.

15         Q.    And you didn't get Janice's consent for that

16    process, right?

17         A.    No.   From my understanding from counsel, that

18    was not required.

19         Q.    You didn't even tell Janice about these

20    changes, right?

21         A.    I wasn't -- I -- like I say, I don't speak to

22    Janice.  I'm not allowed to speak to Janice.

23         Q.    You didn't direct anyone to communicate to

24    Janice that you were doing all this, even through our

25    firm, right?

1        A.   I -- I don't know what was communicated to

2   your firm through my firm.

3        Q.   You didn't tell anyone to communicate to

4   Janice that you were undertaking these changes to the

5   corporate structure, right?

6        A.   I rely on counsel.  I don't really tell them

7   how to do what they do.

8        Q.   Now, you also at the same time transferred all

9   of the assets of Smart Communications, Inc., a Florida

10  corporation, to Smart Communications Holding, LLC, a

11  Delaware limited liability company, right?

12       A.   Yes.  As I just stated, all assets -- because

13  some were held by Smart Communications Holding, Inc.,

14  some were held by Collier, some were held by Smart

15  Communications West, some were held by Smart

16  Communications DeSoto, Smart Communications Lee, Smart

17  Communications U.S.

18            It was truly a mess, and so we consolidated

19  everything into a new entity, operating entity, and that

20  is owned specifically by Smart Communications that is

21  owned between Janice and I.

22       Q.   Now, on the same day, August 29, 2023, you

23  adopted new bylaws governing Smart Communications

24  Holding, Inc., the Florida corporation, right?

25       A.   I'll be honest.  I don't really know what

1  bylaws are.  You have to show it to me.

2         MR. SCHOENFELD:  Would you display

3     Exhibit 344, please.

4  BY MR. SCHOENFELD:

5     Q.   Sir, this is a Consent of the Sole Director of

6  Smart Communications Holding, Inc.  Did you sign this on

7  the third page?

8     A.   Can I see it?  Yes.  That's the same

9  electronic signature as -- I guess I want to point out

10 same electronic signature that's been on all these same

11 documents.

12    Q.   You're not suggesting that somebody signed

13 these documents without your authority, right?

14    A.   No.  I'm not.  I'm suggesting that this is all

15 kind of a rubber-stamped process of what my counsel had

16 provided for me to sign.

17    Q.   You understood the changes you were making to

18 the structure of the company, right?

19    A.   On a broad level, I think I understand.  I'm

20 certainly not an expert on corporate structure.  I have

21 zero experience in it, and that's why I relied on

22 experts to help me organize, frankly, the disaster and

23 the mess that my father left me in.

24    Q.   And you approved all the changes that were

25 made, correct?

1      A.    Yes.

2      Q.    Now, we go back to the first page of this

3   document.  It refers to the bylaws in the form to be

4   attached hereto -- in the form attached hereto as

5   Exhibit A.  Those were adopted by this consent.  And

6   we'll look at those in a moment.  But just below that,

7   you appointed yourself to the offices of president,

8   chief executive officer, treasurer and secretary, right?

9      A.    Yes.  I was the only director and, frankly,

10  the only person that really has experience in running

11  the company.

12     Q.    And in addition to adopting bylaws and

13  appointing yourself to all of the offices of the

14  company, you also had the company direct its entry into

15  a limited liability company agreement with Smart

16  Communications Delaware, the LLC, correct?

17     A.    I'm sorry.  Can you repeat that?

18     Q.    This resolution also included the company,

19  that's the Florida corporations, entry into a limited

20  liability agreement of Smart Communications Delaware,

21  the Delaware LLC, correct?

22     A.    Yeah.  I mean, I guess that's what the

23  document says.  I don't really know what that means.

24     Q.    We'll look at that in a moment as well.  But

25  before we do, the third paragraph directs the company to

1    execute and deliver the transfer agreement and to cause

2    the company to perform the obligations thereunder.

3    That's the transfer of all assets from Smart Holding

4    Florida to Smart Holding Delaware, correct?

5         A.    Yes.  This is, again, the same operation of

6    bringing all the assets into one entity that SmartComm

7    Florida owns and controls.  Essentially the same thing

8    that was already done.  It's just it was scattered among

9    six different corporations and now it's in one

10   corporation that SmartComm Holding totally owns.

11   SmartComm Florida, sorry.

12        Q.    Now, if we could go to Exhibit A, these are

13   the bylaws adopted by the consent that we just looked

14   at.  And I'd like you to turn, if you would, to

15   paragraph 2.2.  And this is on page 8 of the exhibit.

16        Now, there you set the number of directors of

17   Smart Communications Holding, Inc., the Florida

18   corporation, to be fixed at one director; right?

19        A.    This says -- yes, unless the Board of

20   Directors, by resolution, fixes a different number.  I

21   guess this may be something where you had to say what --

22   what the number is.  I don't know.  This is not my area.

23        Q.    And that one director was you, right?

24        A.    I am the only director of SmartComm, yes.

25        Q.    And you didn't get Janice's consent to make

1   yourself the sole director of the Florida corporation,

2   right?

3        A.    I was the sole director of Florida corporation

4   when my dad passed.  That wasn't something Janice

5   consented to or I had to -- it just was a fact of law.

6        Q.    And you didn't get Janice's consent to set the

7   number of directors of one, correct?

8        A.    The number of directors was one upon my dad's

9   passing.

10           THE COURT:  I'm sorry.  I thought dad was a

11       director.  So there were two directors, is that

12       correct, before he died?

13           THE WITNESS:  Correct.  It was my father and I

14       as both directors.  And when he died, I was the

15       sole director.

16   BY MR. SCHOENFELD:

17       Q.    And then you changed the bylaws to make that

18   one of the bylaws, that there be a sole director, right?

19       A.    No, sir.  There were no bylaws.  And this goes

20   back to the problem.  I didn't change bylaws.  We had to

21   actually put things in place that my father had never

22   taken the time, I guess, to organize our companies and

23   put things in place.

24       Q.    What you put in place in this agreement was it

25   would be one director instead of the two, as there had

1  been during your father's life, right?

2      A.   Well, during my father's life, he was a

3  director, and I was a director.  And when he passed, I

4  am the sole director.  And I don't know what the days,

5  maybe August of '23.  So at some point, we had to put, I

6  guess, terms in place for the corporation.

7      Q.   If we turn to Exhibit B in this document, this

8  is the Limited Liability Company Agreement of the

9  Delaware LLC which you created pursuant to the consent

10  that we looked at a moment ago.

11          I would like you to look here.  You appointed

12  yourself the manager of this document, right -- I'm

13  sorry -- this company?

14      A.   The manager of Smart Communications?

15      Q.   LLC Delaware, right.

16      A.   I believe somebody had to be.

17      Q.   And so you made yourself that manager,

18  correct?

19      A.   I believe I would be the only one that was in

20  a position to be a manager of this company, yes.

21      Q.   Let's look at page 18, section 14 of this

22  agreement.  And this paragraph A identifies the power of

23  the managers.  That's the sole and exclusive power

24  without the vote or consent of the member or any other

25  party bound by this agreement, right?

1       A.   I don't know.  It's a large paragraph, but if
2   you want to point to a certain part that --
3       Q.   It's about the ninth line down, beginning in
4   the middle.
5       A.   What is it I'm looking for?
6       Q.   "The manager shall have the sole and exclusive
7   power and authority, without the vote or consent of the
8   member" -- let me strike that and start again.
9            "The manager shall have the sole and exclusive
10  power and authority, without the vote or consent of the
11  member or any other party bound by this Agreement," to
12  do a number of things, right?
13      A.   Well, I believe that's what a manager does.
14      Q.   Right.  And that's the power you gave yourself
15  in this agreement, right?
16      A.   I'm the sole director of SmartComm, so I
17  believe that power would be inherently true.
18      Q.   And the power you gave yourself included the
19  power to effect a merger or consolidation of the company
20  with or into any other entity, right?
21      A.   Okay.  I don't really know what that means.
22      Q.   You gave yourself the power to amend and/or
23  restate this agreement, right?
24      A.   So you're saying this -- the manager has the
25  ability to make its -- that the manager's own agreement

 1   with itself?  I guess I'm confused by all this, but,

 2   yeah, the document speaks for itself, so...

 3       Q.   You gave yourself the power to effect the

 4   division transaction involving the company --

 5           THE COURT:  Mr. Schoenfeld, I've been allowing

 6       you to read to me various provisions, but if we

 7       have any hope of finishing --

 8           MR. SCHOENFELD:  Understood.

 9           THE COURT:  And I will say, in other cases, I

10       also say please don't read things to me.  I can

11       read it faster than what your question is.

12           MR. SCHOENFELD:  Understood.

13           THE COURT:  The Court is snickering because he

14       knows I do that all the time.  So it's not just

15       you.

16           MR. SCHOENFELD:  I understand.  I appreciate

17       that.

18   BY MR. SCHOENFELD:

19       Q.   Sir, you also included in this agreement a

20   paragraph exculpating, indemnifying, advancing fees, and

21   waiving fiduciary duties to the company?

22       A.   I don't know.  Is that in this page we're

23   looking at?

24       Q.   Paragraph 17, right -- section 17.

25       A.   So we are not on that section?

1      Q.   Right.

2      A.   Okay.  I'm not sure.

3      Q.   You understood this to protect you against

4  claims for the management of this company from pretty

5  much anybody, right?

6      A.   Again, this isn't really my wheelhouse.  But I

7  believe we do indemnification on a lot of our own

8  agreements and contracts.  So, to me, this doesn't

9  seem -- I know you may be trying to make this out to be

10  a -- I don't know -- I guess some plot to do something,

11  but to me it seems like a normal term for SmartComm.

12  All of our clients, we have to indemnify.  This doesn't

13  raise a flag for me.

14      Q.   Have you submitted an indemnification claim in

15  the bankruptcy?

16      A.   I'm not sure.

17      Q.   Now, you also raised your own salary from

18  12,000 to $1.2 million a year in either the end of May

19  or June of 2024, correct?

20      A.   I'm glad you brought that up because it just

21  points out the gross unfairness going on here, because I

22  worked 8 years for my own company without a single

23  paycheck.  The last -- since 2018, I've been getting

24  $120,000 a year, which is about 30th down on our pay

25  scale from our other employees out of 100.

1          When I had to turn in my assets that I

2    volunteered to turn in that are in my name that was

3    supposedly compensation for me over the years, including

4    the boat and cars you keep discussing, I said, okay.

5    But I'm not a slave to SmartComm.  And I'm working my

6    tail off for this company for 16 years, and I need to be

7    paid what would be a reasonable salary for someone in my

8    position, and it's actually below market rate for

9    someone in my position still at 1.2.  And you know what?

10   I volunteered I don't even get any salary.  So since

11   November, I haven't been paid a dollar from Smart

12   Communications, and yet I work every day for it.

13          THE COURT:  My realtime stopped.

14          So I think the question was, at some point,

15       you raised your salary from 120,000 to 1.2.  So did

16       you do that?  And, if so, when did you do that?

17          THE WITNESS:  Yes.  I did that, I think, maybe

18       in June, starting June, somewhere around there, of

19       2024.

20          THE COURT:  Of '24.

21          THE WITNESS:  And it ended in November of

22       2024, and I have no salary now again.

23   BY MR. SCHOENFELD:

24       Q.   And you did not get Janice's consent to

25   increase your salary tenfold, right?

1      A.    Every employee we have had has had a massive

2  salary increase over the past three years, and I've

3  never asked for anyone's consent.  And I wouldn't ask

4  for my own.

5      Q.    Now, we'll spend more time discussing this in

6  a moment, but on August 29, 2023, you signed the

7  intellectual property license agreement, correct?

8      A.    Yeah.  I'm sorry.  I wasn't -- can you repeat

9  the question.

10     Q.    Certainly.  On October -- I'm sorry,

11 August 29th, 2023, you signed the intellectual property

12 license agreement that's at issue in this hearing,

13 right?

14     A.    That was the date on the document.  I think it

15 was signed after and maybe dated previously.  But I'd

16 have to defer to counsel.  I don't recall specifically.

17     Q.    And you signed that on behalf of Smart

18 Communications, right?

19     A.    Yes.

20     Q.    And that agreement obligated Smart

21 Communications to pay 40 percent of its net sales to

22 HLFIP, right?

23     A.    Yes.

24     Q.    And you contend that it covered the period of

25 2015 and into the future, right?

1          A.    Since we entered the transaction for the oral

2    license for HLFIP to exclusively allow SmartComm to use

3    all of my technology, that agreement has been place.

4          Q.    You didn't get Janice's consent to burden the

5    company with that obligation, right?

6          A.    No.   That obligation started under Jim 10

7    years ago, and everybody's been operating under it and

8    very happy and proud about it until Jim passed, and now

9    they're attempting to extort money from the company.

10         Q.    Janice demanded a shareholder meeting on

11   March 15th, 2024, right?

12         A.    I'm not exact on the dates, but, yes, there

13   was a shareholder meeting somewhere around that time.

14               MR. SCHOENFELD:   Display 443, please.

15   BY MR. SCHOENFELD:

16         Q.    Now, did you see this at the time?

17         A.    What is this?   Is this Janice's demand for --

18   yeah.   I may have seen it.   I don't recall specifically.

19         Q.    In any event, you were aware that Janice

20   demanded the annual election of the directors of the

21   corporation, correct?

22         A.    Yes.

23         Q.    And you refused that demand, right?

24         A.    I -- no.   What was the question?

25         Q.    You refused to -- let me strike that and ask

1  it differently.

2         You refused to vote for Janice to be a

3  director, right?

4     A.   I was going to say, your first question is not

5  accurate, right?  She requested a vote, right, for an

6  election, which I granted the request for the vote.  And

7  I chose my right to not vote for Janice to be a

8  director.  And I'm very glad, because this company needs

9  protection from her.  And I don't want to keep throwing

10  my mother under the bus, but it's really being driven by

11  my sister.

12     Q.   So you remain the sole director because there

13  was no new election of directors, right?

14     A.   Yes.  I am the sole director of Smart

15  Communications.

16     Q.   Now, Janice also requested a resolution -- the

17  company adopt a resolution unwinding the note payable to

18  HLFIP for the IP liability, right?

19     A.   I remember that that was brought up.  I

20  don't -- I don't recall what -- I don't think there was

21  a vote on that.

22     Q.   You refused that demand, right?

23     A.   Refused what demand?

24     Q.   To unwind the long-term note payable stemming

25  from the August 29, 2023 intellectual property agreement

1   to HLFIP.

2       A.   Well, I think as it says in the transcript

3   or -- or the document here, it says the following

4   transactions, the ultra virus transactions.  I can't

5   unwind a transaction that started in 2015.  And,

6   frankly, if we were to unwind that transaction, that

7   would be the worst possible thing Janice could do for

8   herself or your legal team could do for yourself,

9   because that would immediately end Smart Communications.

10  They would literally have no products to provide to

11  their customers.  None.

12      Q.   Janice also demanded that you unwind the

13  purported transfer agreement between Smart

14  Communications Holding, Inc. and Smart Communications

15  Holding, LLC, conveying all the corporation's assets to

16  the Delaware LLC, right?

17      A.   That's what the document says.  I think we've

18  went over that issue numerous times now.

19      Q.   And you refused that, too, right?

20      A.   Correct.  I believe that that was the right

21  process, to reorganize SmartComm for the benefit of

22  actually Janice.

23      Q.   And Janice demanded that you unwind the

24  purported adoption of bylaws of the corporation that we

25  looked at a moment ago, right?

1          A.    Whatever the document says, it says.

2          Q.    And you refused that request as well, right?

3          A.    I'm not sure -- when you say I refused it, I

4    don't recall that.  I believe there was just a vote for

5    the shareholder, and I don't think anything else was

6    voted on.  So when you say I refused it, I'm not sure I

7    follow that.

8          Q.    You certainly didn't agree to it, right?

9          A.    Well, no, I did not -- I did not unwind

10   transactions that started 10 years ago.  I did not

11   transfer assets back to all the different entities.  It

12   makes it a mess.  Yeah, I don't know what the other

13   issue was.  Everything is still in Delaware owned by

14   SmartComm Florida.

15         Q.    Since this litigation began with the filing

16   here from ^plaintiff on February 27, 2023, you have

17   employed at least eight law firms in this matter, right?

18         A.    I don't know.  I have had some, I would say,

19   not so good representation when we first started.  And I

20   think I've needed to get some specialized people in

21   here.  And when you say eight, are you referring to me

22   personally or SmartComm or HLFIP?  I guess I don't know.

23   I'm not really counting.

24         Q.    You've engaged the Hill Ward Henderson firm?

25         A.    Yes.  They were my -- when I was attempting to

1  work this out with my mother and work through the

2  whole -- my dad's will and Trust, I engaged, I guess, a

3  probate firm.  I didn't really -- I've never dealt with

4  that.

5       Q.   And you employed the Griesing law firm?

6            MR. OPRISON:  I'm going to object to this and

7       all these --

8            THE COURT:  Sustained.

9  BY MR. SCHOENFELD:

10       Q.   How much have you paid these eight law firms?

11            MR. OPRISON:  Objection to that.

12            THE COURT:  Sustained.

13  BY MR. SCHOENFELD:

14       Q.   You didn't get Janice's consent to pay any of

15  these law firms, right?

16            MR. OPRISON:  Objection, Your Honor.  And

17       instruction --

18            THE COURT:  Well, he can answer that question

19       and then we can move on.

20       A.   No, I did not get the Trust's permission to

21  pay attorneys.

22  BY MR. SCHOENFELD:

23       Q.   Now, you testified in your deposition that the

24  effect of the Martha Wright-Reed Act on the Smart

25  Communications' profitability began in November of 2024,

1  right?

2       A.   Yes.  The act went into effect November 19th,

3  I believe, of 2024, the first step of the act.

4       Q.   So would it be fair to say that its effect on

5  the company's profitability is still to be determined?

6       A.   I would say that the final effect would take

7  some time to -- to obviously materialize, but the effect

8  that went into effect on the 19th of November was

9  instant and instantly noticeable.  We're missing half a

10  million dollars a month in our most profitable segment

11  of revenue.  It's just pure money that we kept.  We are

12  just missing half a million a month, which you guys can

13  all do the math.

14       Q.   Now, you can't predict, for example, how lower

15  rates might increase demand, offsetting the impact of

16  the lower rates, right?

17       A.   Offset demand?  Maybe you can explain that.

18       Q.   If the act requires lower rates, that lower

19  cost might drive an increase in demand, right?

20       A.   No.  I think that us providers in this

21  industry have found the sweet spot of what gets the most

22  revenue because -- look, at the end of the day, when

23  people are in prison for three years, they can only call

24  their mom so many times before there's nothing left to

25  talk about.  And if you make the phones free, it doesn't

1   necessarily increase the amount of calls, and that's

2   actually been proven, because we do have some accounts

3   that have free phone calls.

4         So, look, I think the providers in this space

5   obviously know what they're doing, including Smart

6   Communications, on their pricing and know what's best

7   for their own company.  And this act has cut those

8   prices, in some instances, to 30 percent.  We're having

9   a 70 percent reduction in pricing and an elimination of

10  two of our other main revenue sources.  So it is

11  completely gutting the business model of providers in

12  our space.

13      Q.   And you're basing that on about two months of

14  experience with this?

15      A.   I guess I'm perplexed by the question.

16      Q.   You said it began to have an effect in

17  November of 2024, right?

18      A.   The elimination of deposit fees and ancillary

19  fees went into effect November 19 of 2024.  The

20  different rate caps on the different services will be

21  rolled out depending on the size of the facility and

22  depending on the dates of your contract signings.  And

23  so it's kind of a schedule rollout starting to happen.

24      Q.   So it's both a short time and it's not even

25  fully in effect, right?

1      A.   Can you repeat that question?

2      Q.   So you have had both a short experience since

3  any of this went into effect, right?

4      A.   Well, like I said, we eliminated fees, which

5  was a half a million dollars a month.  That's instant.

6  That's just a math equation.  That's what that is.  And

7  that doesn't account for the two-cent recovery fee that

8  we were charging every minute on some of these phone

9  calls.  And that does not account for the rate caps that

10  will now go into effect on a rolling basis.  Those are

11  yet to be determined how -- how far-reaching that damage

12  will be to the company.

13      Q.   You have no education or training in

14  engineering, right?

15      A.   Education and training in engineering?  No, I

16  just have experience.

17      Q.   You have no education or training in coding,

18  right?

19      A.   In what?

20      Q.   Software coding.

21      A.   Oh, no.  I've never wrote software.

22      Q.   You've never designed software?

23      A.   No.  I have 16 years of designing software.  I

24  most certainly have designed software.

25      Q.   You describe what you like software to do to

1  people who know how to code it, and then they code it,
2  right?
3      A.   Well, that would be considered designing.
4      Q.   You have no training or education in
5  industrial design, right?
6      A.   No, I just have experience.  I don't have
7  formal training.  I just have 16 years of experience in
8  designing and actually manufacturing and prototyping
9  hardware and software.
10      Q.   You have a team of engineers to write code for
11  your -- for Smart Communications' products, right?
12          THE COURT:  I'm sorry.  What does this have to
13      do with the issues that we're here to try?
14          MR. SCHOENFELD:  Well, relatively little, but
15      in response to examination yesterday.  I will try
16      to move through this quickly, but, yeah, I think
17      there was an effort yesterday to spend a good deal
18      of time --
19          THE COURT:  And perhaps I should have been
20      more aggressive in keeping us on track to what
21      we're actually here to do.
22          MR. SCHOENFELD:  I will try to do that myself,
23      Your Honor.
24          THE COURT:  And just to let you know, in about
25      15 minutes, we're going to have to take a break.

1      So, are you going to be able to finish your

2      cross-examination in 15?

3           MR. SCHOENFELD:  I don't think it will be done

4      in 15 minutes.

5           THE COURT:  Let's keep going.

6  BY MR. SCHOENFELD:

7      Q.   So you talked yesterday about the MailGuard

8  patent, right?

9      A.   Some, yes.

10      Q.   And that is part of the intellectual property

11  that you licensed from HLFIP to Smart Communications,

12  right?

13      A.   Well, the MailGuard patent is a relatively

14  small part of the IP portfolio that HLFIP licenses to

15  Smart.  I know you're focusing on it, but it's actually

16  a relatively small piece of the whole pie.

17      Q.   Now, that patent was invalidated by the

18  Federal District Court for the Middle District of

19  Tennessee in 2022, right?

20      A.   No, not accurate.  There are three patents

21  covering what is known as the MailGuard system.  One out

22  of three has been invalidated.  But MailGuard is a

23  patented system.  It still has two valid patents that

24  cover that technology.  In fact, they are more direct

25  and better patents than the original provisional '617

 1   that actually got invalidated recently.

 2       Q.   Now, in 2018, a competitor began implementing

 3   a new application that essentially was Smart

 4   Communications' MailGuard product, right?

 5       A.   I guess I need you to be more specific about

 6   that.

 7       Q.   Let's look at Exhibit 362.

 8            THE COURT:  360 what?

 9            MR. SCHOENFELD:  362.

10   BY MR. SCHOENFELD:

11       Q.   Sir, this is the decision of the Federal

12   District Court for the Middle District of Tennessee in

13   the HLFIP versus Rutherford County case, right?

14       A.   Yes.  That's what it says.

15            MR. OPRISON:  Your Honor, I would object to

16       this line of questioning on relevance grounds.

17            MR. SCHOENFELD:  Judge, the relevance of this

18       is that the intellectual property that is at issue

19       in the agreement has, in significant measure, been

20       invalidated, and the witness has testified -- and

21       I'll elicit this -- that it hasn't made an impact

22       on the company's sales.

23            THE COURT:  Was the invalidation before or

24       after the August 29, 2023?

25            MR. SCHOENFELD:  It was before.  In fact, in

1       one of the two Complaints here -- two decisions

2       here, one of them was upheld by the federal circuit

3       into which all appeals go 11 days prior to the

4       intellectual property.

5            THE COURT:  Well, Mr. Oprison, anything

6       further you would like to say?

7            MR. OPRISON:  I think as Your Honor said

8       yesterday, this goes to value.  I think that's what

9       we're concerned about.  It really doesn't have

10      anything to do with why we're here today, Your

11      Honor.

12           THE COURT:  I'm going to allow the examination

13      relative to patents, but this is not going to be a

14      we're going to go into every single litigation,

15      every single one.  Make your points, and then let's

16      move on.

17  BY MR. SCHOENFELD:

18      Q.   If you look at the third page of this

19  document, the Court writes that Rutherford County

20  implemented a new application by a competitor of yours

21  that was essentially Smart Communications MailGuard;

22  right?

23      A.   Yes.  VendEngine engaged with us in using our

24  MailGuard system, and we revealed how it worked, and

25  they attempted to copy.

1          Q.   And you sued under the -- what's referred to

2    as the '617 patent, correct?

3          A.   Correct.

4          Q.   And the Court ruled that that patent is

5    invalid because it was not directed to patent-eligible

6    subject matter under section 101, right?

7          A.   I don't know what all the terms and

8    definitions mean and what that really equates to, but I

9    know there are two valid patents that cover the

10   MailGuard system that we would actually eagerly like to

11   enforce, but we need to get out of this litigation

12   before the company could afford to enforce its own IP.

13         Q.   You didn't sue on those other patents you sued

14   on the 617, right?

15         A.   I'm not sure if the other patents were issued

16   when we filed suit.  I would have to check.  I'm not

17   sure.

18         Q.   The Court bases the decision on the finding

19   that you had not allege there are any new techniques

20   used in the MailGuard patent, right?

21         A.   I don't follow the question.

22         Q.   It's up here on the screen from page 7 of the

23   opinion.  "Plaintiff also does not allege that there are

24   new techniques used?

25              MR. HILLSLEY:  Your Honor I'm going to lodge

1        an objection.  It calls for a legal conclusion.

2             THE COURT:  Sustained.  I don't think this

3        document is in evidence.

4             MR. SCHOENFELD:  I think that's right.  There

5        was an objection on relevance.  So I would move its

6        submission now.

7             MR. OPRISON:  Objection on relevance.

8             THE COURT:  I'm going to over rule the

9        relevant.  I'll accept into evidence 362.

10             (Exhibit 362 was admitted into evidence.)

11   BY MR. SCHOENFELD:

12        Q.   Sir also in the district the United States

13   district for the Middle District of  in Pennsylvania

14   ruled in a case that HLFIP brought, right?

15        A.   I'm not sure you would have to point it out.

16             MR. SCHOENFELD:  Display 363, please.

17   BY MR. SCHOENFELD:

18        Q.   Do you recall seeing this opinion when this

19   came out?

20        A.   I don't see what I guess what's your question.

21        Q.   Do you recall seeing this opinion that was

22   should issued?

23        A.   Yeah I recall I reviewed there I'm sure.

24        Q.   And this decision also invalidated the one 617

25   MailGuard patent, right?

1       A.    Right.  Which is is specifically why we

2   recreated the two other patents that cover this

3   technology because there was more specifics in them so

4   that it would defeat the claim of all the scanning

5   papers, nothing new.

6            There is a lot of technique and there's a lot

7   of features and functions in the MailGuard system that

8   wasn't actually captured in the '617 patents which is

9   why we were able to get other patent applications to

10  cover a broader scope of features and make it obviously

11  enforceable and valid which is why the patent office

12  issued two of them.

13           MR. SCHOENFELD:  Your Honor, I move admission

14       of this exhibit as well.

15           THE COURT:  Anything other than relevance?

16           MR. OPRISON:  No, sir.

17           THE COURT:  Court overrules the relevance and

18       receives 363.

19           (Exhibit 363 was admitted into evidence.)

20  BY MR. SCHOENFELD:

21       Q.    Now, this decision was upheld by the federal

22  circuit, United States Court of Appeals for the federal

23  circuit, right?

24       A.    Yes, I believe that's true.

25           MR. SCHOENFELD:  And can we display

1          Exhibit 364, please.

2    BY MR. SCHOENFELD:

3          Q.   Did you see this decision from the federal

4    Court of Appeals for the federal circuit?

5          A.   I believe I have.

6          Q.   And you're aware that this was issued on

7    August 18, 2023, right?

8          A.   If that's what it says.  I'm not sure of the

9    date but --

10         Q.   And 11 days after this you entered into the

11   intellectual property license agreement, right?

12         A.   Okay.  That's what it says, yes.

13         Q.   Did you take the invalidation of the MailGuard

14   patent into account in determining what royalty rate you

15   were going to impose on Smart Communications?

16              MR. OPRISON:  Objection Your Honor.  This is

17         going outside the scope of this trial we talked

18         about royalty rate.

19              THE COURT:  No.  This goes into the extent and

20         validity of the royalty agreement so I'm going to

21         over rule.  You can answer.

22         A.   Can you ask your question again?

23   BY MR. SCHOENFELD:

24         Q.   Did you take into account in choosing the

25   40 percent royalty rate that you imposed on Smart

1    Communications 11 days after this opinion that this

2    opinion had invalidated the principal MailGuard patent?

3        A.    Well, it didn't invalidate the principal

4    MailGuard patent.  There's still two other more complex,

5    better principal patents that cover this technology, and

6    yes, I obviously considered it but again the MailGuard

7    system is still a double patented system.  It has still

8    had tremendous success in the market and growing success

9    in the market and it has had zero downturn on Smart

10   Communications because the original patent that was --

11   and more I would say, broad and not complex and much

12   more likely to be invalidated was invalidated.  That was

13   kind of expected which is why we sharp penned the pencil

14   and got more accurate patents to cover it.  So I

15   certainly considered it and I, again, MailGuard has

16   generated the exact same amount of money with

17   Pennsylvania Department of Corrections for example,

18   while it was patents pending, the same amount of money

19   while it was patented and still today the same amount of

20   money after this one patent has been invalidated,

21   because the value still continues with MailGuard.

22       Q.    The invalidation of the patent covering

23   MailGuard didn't effect the value of mail -- is that

24   what you --

25       A.    No, because there are still two patent

1   covering MailGuard and the commercial value of MailGuard
2   continues to rise?
3          MR. SCHOENFELD:  Your Honor I move admission
4      of 364.
5          THE COURT:  Anything other than relevance.
6          MR. OPRISON:  No, sir.
7          THE COURT:  Court overrules and will receive
8      364.  Are you changing subjects at this point.
9          MR. SCHOENFELD:  Yes.
10         THE COURT:  Because we have been here for two
11     hours so I need to give everybody a break.  Let's
12     try to keep it to ten minutes folks.  Ten minutes
13     (a break was taken at 9:58 a.m. and the following
14     commenced at 10:09 a.m. (.
15         THE COURT:  We're back -- we're still in cross
16     examination.  How much longer.
17         MR. SCHOENFELD:  I'm hoping half an hour.
18         THE COURT:  Let's go.
19  BY MR. SCHOENFELD:
20     Q.   Sir, you testified earlier that the
21  invalidation of intellectual property agreement, license
22  agreement you made would be the worst thing that
23  happened to Smart Communications, right?
24     A.   Yes.  That if -- is your question that in
25  Smart Communications were to stop it's agreement with

1    HLFIP and not be able to use HLFIP's technology?  Would

2    it be the worse thing for Smart Communications?  Is that

3    your question?

4         Q.   Yes.

5         A.   One thousand percent.  There would literally

6    be no technology that SmartComm would even have to offer

7    its clients.  The only thing SmartComm had prior to

8    HLFIP's agreement in 2015, was a simple two way e-mail

9    system through a kiosk and a simple request of grievance

10   system.  And that was it.  And now there's a whole suite

11   of enough hardware, a whole suite of new technology and

12   services, including education.  Entertainment.  All

13   these things the other judgments doesn't want to go into

14   T I'm happy to go into T explore.  Shock everyone how

15   much is actually there.  This is not just a patents.

16        Q.   So are you suggesting that HLFIP would sue

17   Smart Communications to prevent it from using any of

18   Smart Communications products and services?

19        A.   Like I said, I have to get with counsel to see

20   what the next steps would be but, you know, I mean, I

21   control HLFIP's technology.  So I mean, if essentially

22   the direction is Janice through the Court is going to

23   take over HLFIP's technology, I will have no choice but

24   to protect HLFIP and take my technology elsewhere.

25        Q.   Even as a director and chief executive of

1   Smart Communications, you'd do that?

2        A.   Well, at that point, you will have taken over

3   my business management to run Smart Communications if

4   you're doing that.  So I have no choice.

5        Q.   Now, when you made the oral agreement with

6   your father about a true-up, you didn't agree on an

7   amount, right?

8        A.   We agreed on a process.

9        Q.   But not an amount, right?

10       A.   We agreed on a process to come to the amount.

11       Q.   And Smart Communications has never made any

12   payments, right?

13       A.   No.  There's been, like I say, hundreds at

14   this point, millions of dollars made by Smart

15   Communications on this technology and they have never

16   paid a single dollar nor any of it.

17       Q.   You didn't record any royalty on Smart

18   Communications books and records prior to 2023, right?

19       A.   Correct.  Jim and I had deferred payments and

20   through this process, it came to my attention that this

21   was actually really a transfer pricing issue and that

22   needed to be accounted for.

23       Q.   There's no reference to a royalty agreement

24   between yourself and yourself in any e-mail, right?

25       A.   No.  That's inaccurate.  There is tons of

1 | evidence of an agreement.  You're calling it a royalty
2 | agreement, but this agreement is clearly throughout
3 | everything, including e-mails, including contracts.
4 | Including RFP responses.  Including litigation,
5 | including under oath testimony.  It was clearly an
6 | agreement.  Was the amount at the time stated?  No.  But
7 | there was a process.
8 | Q.   And in all of those writings that you've
9 | mentioned, there was never even a reference to a royalty
10 | whether it was a true-up or a specific amount, right.  I
11 | have had conversations with Jim, yes.
12 | Q.   And HLFIP didn't report any royalty income
13 | from Smart Communications prior to 2023, right?
14 | A.   No.  Through this process, again, it was
15 | identified both companies need to be required to report
16 | what the economic substance of the transaction actually
17 | is.
18 | MR. SCHOENFELD:  Could we days play 304,
19 | please?
20 | BY MR. SCHOENFELD:
21 | Q.   Sir, this is the e-mail that your counsel
22 | asked you about yesterday.  There's no reference in this
23 | e-mail between yourself, Jon and Alexis, to a license,
24 | right?
25 | A.   Our license was oral as we discussed, and as

1  everyone including, Jim, Janice Alexis, SmartComm has

2  acknowledged for many years there has been an oral

3  license.  This document specifically really addresses my

4  ownership and my continued ownership and the fact that I

5  will control the technology and I will allow Smart

6  Communications to use it.

7       Q.   And this document doesn't refer to a royalty

8  at all, right?

9       A.   No.  The royalty was from the oral agreement

10  my father and I will.

11       Q.   Now, this e-mail refers to a postal mail

12  contraband elimination system, right?

13       A.   Is this the full extent of the e-mail because

14  which e-mail are we referring to because Alexis had it

15  in the contract.

16       Q.   I'm asking about this e-mail?

17       A.   Can we scroll to the bottom.  Is this signed

18  by anyone.

19       Q.   Scroll down?

20       A.   Now, that I see this.  What was your question,

21  again.

22       Q.   The e-mail that you sent refers to the postal

23  mail contraband elimination system, right?

24       A.   Well that's one of the things it refers to but

25  there's other things including at the bottom.

1        Q.    That's the technology?

2              MR. HILLSLEY:  Objection Your Honor.  I ask

3        that he finish his answer.

4              THE COURT:  Go ahead and finish your answer.

5        A.    At the bottom you will see, can you please

6    scroll down, fentanyl for new technology/patent/and new

7    IP.

8              MR. SCHOENFELD:  Postal mail re limb nation

9        refers to MailGuard.

10       A.    Postal mail elimination refers to MailGuard.

11       Q.    And that phrase does not describe electronic

12   messaging, right?

13       A.    That phrase does not describe electronic

14   messaging?  Right.  No.  It was clearly established that

15   our agreement between Jim, Jon, Alexis, and SmartComm

16   was about new technology going forward.  Not the

17   existing and that was the clarification Alexis wanted to

18   add before she would sign it which is that the

19   clarification is it would be for new IP going forward

20   from that date forward.

21       Q.    And the phrase postal mail contraband

22   elimination system is now reached to an inmate, inmate

23   database, right.  I'm confused what.

24       Q.    Does not refer to an inmate database, right?

25       A.    What doesn't?

1      Q.   The phrase "postal mail contraband elimination

2  system"?

3      A.   Does it refer to an inmate database?

4      Q.   Yes.

5      A.   Yes.  See where it says system.  For it to be

6  a system it would have to have a database of information

7  to be an operative system.

8      Q.   The phrase "postal mail elimination system"

9  doesn't describe the Smart entertainment system, right?

10     A.   No.  That IP didn't exist at that time.

11     Q.   And it doesn't describe the SmartEcosystem,

12  correct?

13     A.   No that IP didn't exist at that time.

14     Q.   It doesn't describe Smart visit?

15     A.   No.  These are all new technologies that you

16  you're running through that I developed through HLFIP.

17     Q.   And these are all through Justin Scott did the

18  code?

19     A.   Not at all.  Justin Scott does not write code

20  for our video visitation.  He is a code writer that

21  rights in ColdFusion.  Our video visitation platforms

22  operate on Android operating devices.  He can't write

23  the code for those devices.

24          So Justin Scott's contribution was the

25  original outline I hired him to do in 2009, which was a

two way e-mail system, and the information is sitting
encrypted at rest and that is his skill set.  So live
communication, text, voice, video, entertainment,
streaming, those live kind of technologies is not
something Justin Scott has the ability to do and that's
not something he has done.  That is all new technology
that HLFIP's created without Justin Scott ever doing any
coding regarding that.

     Q.   Was that code created by people working for
Smart Communications?

     A.   It's code created -- some of it, by people
that I hired at Smart Communications, and people that I
direct to build code.  In fact, we have about a two year
backlog of new innovation that I have instructed them to
write and I have a ton of people that work under me
writing code to develop technology that your client just
released to my competitors.

     Q.   And all of that is paid for my Smart
Communications, right?

     A.   No so -- no.  That's just factually not true
because HLFIP as you will look at the books and records
owes Smart Communications for professional services,
right?  And so that's HLFIP bearing the burden of the
cost for the development that his developers have used.
So that's just factually false and this is just a

1   narrative you're trying to push.

2       Q.   All that's on paper?  All the money comes from

3   Smart Communications, right?

4       A.   Well, because Smart Communications hasn't paid

5   HLFIP a single dollar yet.  HLFIP can't pay Smart

6   Communications for its time developing my products.

7   It's documented.  It's been registered.  SmartComm has

8   issued that with its taxes.  It's no secret here.

9   Jim Logan did that.

10       Q.   Katrina Quicker wrote the 2023 intellectual

11   property license agreement, right?

12       A.   I'm not sure.  I would assume, maybe.

13       Q.   To the best of your knowledge that's who wrote

14   it, right?

15       A.   Possibly.  It wasn't me.

16       Q.   And Katrina Quicker represented HLFIP, right?

17       A.   Yes.

18       Q.   No one from Smart Communications made any

19   changes to the agreement, right?

20       A.   I may have looked at it.  I would have to --

21   offered some changes, I don't recall.

22       Q.   As you sit here today, you can't identify any

23   changes you made in the agreement on behalf of Smart

24   Communications, right?

25       A.   I guess off the top of my head I don't know

 1   the specific of the agreement.

 2        Q.   Now, Ms. Quicker engaged Marcum to do the

 3   study we've talked about, right?

 4        A.   Yes.  She engaged Marcum to do a Transfer

 5   Pricing Study.

 6        Q.   And she did that on behalf of HLFIP; right.

 7   Yes.  She did.

 8        Q.   You didn't obtain a similar study to protect

 9   Smart Communications' interests with respect to the

10   intellectual property license agreement we're

11   contemplating?

12        A.   The Transfer Pricing Study does exactly that

13   as it takes the two companies.  So this is really a

14   study for both companies and it collects information

15   from both companies because they're obviously related

16   companies IE on both sides this week obviously discussed

17   numerous times and there that was the purpose of the

18   Transfer Pricing Study was to perform that exact

19   function which is a unique function.

20             And that's what was done.

21        THE COURT:  Sir, hold on a second.  I'm going

22        to let you complete your answer on questions but at

23        least answer the question that was asked.  The

24        question was "did you hire somebody for Smart

25        Communications to do a Transfer Pricing Study on

1        behalf of Smart Communications."

2        A.   I guess I don't technically know how you look

3   at it if it's SmartComm or HLFIP.  I know Katrina was

4   engaged by HLFIP, but I believe the study was done on

5   behalf of both companies.  So I don't really know how

6   to -- I'd have to defer to your true answer.  I'm not

7   sure.

8   BY MR. SCHOENFELD:

9        Q.   Did you rely on the Marcum study?

10       A.   Yes.  I relied on the Marcum study.

11       Q.   To decide what royalty rate to include in the

12  2023 intellectual property agreement, right?

13       A.   Yes.

14       Q.   And to decide what rate you would utilize from

15  2015 forward under the oral agreement you say you had

16  with Jim?

17       A.   Yeah.  So they had looked at -- Marcum the

18  study I believe was performed looking at the 2022 year.

19  So looking in the past.  And, yeah, that's what the

20  contract reflects was the findings of the study.

21       Q.   And you didn't tell Janice you were having the

22  study made so she would have the opportunity to have one

23  made for Smart Communications, right?

24       A.   No.  I again, I don't -- Janice's never been

25  involved in any of the business decisions or any

1  agreements Smart Communications in fifteen years has

2  entered and I still wouldn't involve her in any

3  decisions or anything like that.

4      Q.   It you didn't direct anyone at Smart

5  Communications to engage a consultant or expert of any

6  kind to perform a study to protect Smart Communications'

7  interests?

8          MR. HILLSLEY:  Objection Your Honor.  Asked

9      and answered.

10         THE COURT:  Overruled.  He can answer.

11     A.   So I believe the study was done on behalf of

12  both companies because the data was collected from both

13  companies.  People were, I believe, interviewed at both

14  companies.  And the study was performed for both

15  companies.

16  BY MR. SCHOENFELD:

17     Q.   So the answer to my question is you did not

18  instruct anyone at Smart Communications to obtain a

19  study to protect Smart Communications' interests in the

20  intellectual licensed transaction?

21     A.   Your question is did I hire another company to

22  do the same study between the two companies?  I did not.

23  I relied on one study between the two companies.

24     Q.   You've never received any communication from

25  the IRS raising any question about the royalty or lack

1    of royalty agreement between HLFIP and Smart

2    Communications; right?

3              MR. OPRISON:  I'm going to object and

4         relevance ground.

5              THE COURT:  Overruled.

6         A.   I haven't been involved with our taxes in the

7    past so I can't really speak to what either entity has

8    received or communicated.

9              I was just informed that for best practices

10   and to protect the companies from fees and penalties,

11   this was a requirement.

12   BY MR. SCHOENFELD:

13        Q.   So to the best of your knowledge, the IRS has

14   Nevada raised this issue with respect to HLFIP and Smart

15   Communications, right?

16        A.   I've never communicated with the IRS.  I just

17   know that that's, obviously, the laws and I intend to

18   follow the laws.

19        Q.   Smart Communications reports its tax

20   obligations as a corporation, right?

21        A.   Smart Communications -- yes, I believe so.

22        Q.   And at least as of the end of 2023 and all

23   years prior to that, so did HLFIP, right?

24        A.   I would assume.  Like I say, I wasn't really

25   involved in the taxes before my father passed.

1          MR. SCHOENFELD:  Can we display Exhibit 400,

2      please.

3  BY MR. SCHOENFELD:

4      Q.   Sir, if we could scroll down a bit.  Is this

5  your signature on this document?

6      A.   Yes.  That's all signature.

7      Q.   And this is an E-File Authorization for

8  Corporations, right?

9      A.   Yeah.

10      Q.   And the name of the corporation is

11  HLFIP Holding, Inc., right?

12      A.   Yes.

13      Q.   And this is for the calendar year '23, right

14  up there at the top where it says E-File Authorization

15  for Corporations?

16      A.   Yes.

17      Q.   I'd like you to turn to the fifth page of this

18  exhibit.

19      Q.   If you go down this the federal tax summary

20  and the margin tax rate for HLFIP Holding, Inc. for 2023

21  was 21 percent, right?

22      A.   Yeah -- yes, that's what it says.

23      Q.   So this was not a submission of a pass through

24  entity; right?

25      A.   I don't know what that means, to be honest.

1          MR. SCHOENFELD:  Now, could we display

2      Exhibit 308, please.

3   BY MR. SCHOENFELD:

4      Q.   Sir, this is the Marcum study which we

5   referred several times today.  You relied on this study

6   to set the royalty rate that you ended up including in

7   the IP license agreement, correct?

8      A.   Yeah.  I hired Marcum and they gave me a

9   range.  I think before the study was even complete we

10  already knew what the range was.

11     Q.   If you turn to page 37 of this report.  If you

12  look at the, is this the range you refer to?

13     A.   Yes.  The 15 [sic] to 08 percent -- or I mean

14  50 to 18 percent, I'm sorry.

15     Q.   Now, that is, we say, that's the range Marcum

16  gave you, what do you mean?

17     A.   That was the range that they set.  They said

18  between 50 to 18 percent is the adequate range.  And

19  that anything in that range would be acceptable.

20         MR. SCHOENFELD:  Your Honor I've just been

21      reminded this is not in evidence.  I move it into

22      evidence.

23         THE COURT:  I thought 308 was in evidence.

24         MR. JOHNSON:  My notation it's for a limited

25      purpose.

1          THE COURT:  For a limited purpose.

2          MR. SCHOENFELD:  So I believe Mr. Schoenfeld

3      has to clear that up.

4          THE COURT:  Mr. on.

5          MR. OPRISON:  Your Honor that may have been a

6      mistake.  I think we stipulate the to the 308.

7          THE COURT:  So the Court will receive 308 for

8      all purposes.

9          (Exhibit 308 was admitted into evidence.)

10  BY MR. SCHOENFELD:

11      Q.   Now, this is the range that Marcum provided to

12  you, right?

13      A.   I mean, I believe I've seen a screenshot here

14  but I believe I remember 18 to 50 percent was a range to

15  choose within.

16      Q.   And Marcum recommended the median, 24 percent,

17  right?

18      A.   I don't necessarily recall that, but I

19  remember between 18 to 50 percent, and I chose 40.

20      Q.   You didn't chose 3 percent, right?

21      A.   That wasn't within the acceptable range.

22      Q.   It it was one of the options, one of the

23  results that Marcum found, right?

24      A.   That I think they acknowledged was not an

25  acceptable range.

1        Q.   For tax purposes, right?

2        A.   Well, that is the -- what the study protects

3   you against is --

4        Q.   That was -- go ahead?

5        A.   -- the study, I believe, protects you against

6   to follow the IRS.

7        Q.   So that was your purpose in obtaining this

8   study, right?

9        A.   The purpose in obtaining the study was this

10  was an accounting that needed to be done, it needed to

11  be Trudy up before we got in trouble with the IRS and

12  it's also something that needed to be done because in

13  order to evaluate Smart Communications' shares, Smart

14  Communications need to account and true-up for the use

15  of HLFIP's technology that is driving all of the revenue

16  SmartComm makes.

17       Q.   Now, the 40 percent royalty -- take this

18  down -- 40 percent you chose rendered insolvent, right?

19       A.   No.  Smart Communications insolvent has never

20  paid a single dollar on this royalty to HLFIP.  Smart

21  Communications has bills it can't pay.  And it's never

22  paid HLFIP.

23       Q.   Now, who is Mike Shreve?

24       A.   Mike Shreve is an accountant, an older guy up

25  in Michigan.  My dad's been using him for accounting.

1   He's been my dad's personal account at that point for

2   like some 40 years.  So he's been doing SmartComm's

3   books and record for a long time.  And so I --, you

4   know, obviously new in this little a frightened when my

5   dad passed just wanted to stick with somebody who I

6   think is familiar and I would trust.

7        Q.   Mike Shreve prepared two different sets of

8   financial statements for Smart Communications in 2022,

9   right?

10        A.   I'm not sure.

11        Q.   He prepared one in July, on July 26, 2023?

12        A.   I'm not sure, honestly.

13        MR. SCHOENFELD:  Look at Exhibit 483, please.

14   BY MR. SCHOENFELD:

15        Q.   Sir, this is a response to a request for

16   proposal from the Vermont Department of Corrections,

17   right?

18        A.   It's what the cover letter says.

19        Q.   And Smart Communications submitted this to the

20   Department of Corrections in April of 2024, right?

21        A.   I don't know.  I'd have to look at the dates.

22        Q.   It's on the next page, please.  This is a

23   letter -- cover letter from yourself dated April 30,

24   2024.  Do you see that?

25        A.   I see it.  Obviously I haven't seen the full

1    cover letter but I see that that's the subject here.

2         Q.    Now, if we go to the next page, that's your

3    signature at the bottom of this page, right?

4         A.    Yeah.  It's basically this is a template that

5    every IRP has our cover letter and that's just my

6    electronic signature that goes on every single one of

7    these RFPs.

8              MR. OPRISON:  I'm going to object to this line

9         of question.  I think we covered this yesterday and

10        I was told this area is irrelevant.  I'm going to

11        object to relevance grounds on Mr. Schoenfeld RFP.

12             MR. SCHOENFELD:  Your Honor on this one in

13        particular, I'm going to ask Mr. Logan to look at

14        Mr. Shreve's July 26, 2023 statement of the

15        company's financials as of that date.

16             THE COURT:  I'm going to overly because I

17        recall judges right side of the room yesterday did

18        look at some financial statements from this time

19        frame.  Let's try to do this as quickly as

20        possible.

21             MR. SCHOENFELD:  Yep.

22    BY MR. SCHOENFELD:

23        Q.    So if we could turn to page 134 of this

24    exhibit.  So this is Mr. Shreve's cover letter and

25    that's dated July 26, 2023, correct?

1      A.    Mike Shreve's July 26, 2023, yes.

2      Q.    And that's prior to the date of the

3   intellectual property license agreement, correct?

4      A.    I guess slightly prior, yes.  Wasn't it in

5   August?  I can't remember.  Sorry.

6           THE COURT:  I'm sorry where do you see the

7        date on this.

8           MR. SCHOENFELD:  At the bottom of

9        Mr. Shreve's.

10          THE COURT:  There it is.

11  BY MR. SCHOENFELD:

12     Q.    Now, I'd like you to look at the next page in

13  the bottom half of this page, it describes -- identifies

14  the company's liabilities.  Describes total liabilities

15  of a little bit over 3.5 million, right?

16     A.    Yes.

17     Q.    And total equity a little bit over -- well,

18  18.8 million, right?

19     A.    Yeah.  This is showing the 2022 consolidated

20  balance sheet of SmartComm.  Not the 2023 or '4 balance

21  sheet.

22     Q.    Right.  And this balance sheet does not

23  identify the HLFIP intellectual property liability in

24  any way, right?

25     A.    I think we already reviewed that the 2022

1    consolidated balance sheets -- I don't recall exactly

2    when the -- I believe in 2022 the -- at some point,

3    balance sheets were reflecting the IP debt when we got

4    the number for the three and applied that and updated

5    financials.

6        Q.    Turn to the next page, please.  Now, this is

7    the consolidate the income statement and at the bottom

8    it shows net income of positive $3.6 million, right?

9        A.    Yes.  For 2022.  But this is the unaudited

10   financials, correct?

11       Q.    This is the version prior to the intellectual

12   property agreement.  Let me turn to Exhibit 379.

13       A.    Mr. Schoenfeld, let me just so I understand

14   clarify, when you say this is the financials prior to,

15   you mean these are the financials intellectual

16   financials that were not audit yet in '22 which the

17   audit reflect the IP.

18       Q.    Sir, my job is to ask the question?

19       A.    Sorry.  I'm confused.  This is not my

20   wheelhouse.  I apologize.

21       Q.    So I'd like -- this is -- let me ask you to

22   turn to the third page of this exhibit.  Now, this is

23   Mr. Shreve's auditor's report for 2022, again, same year

24   we were just looking at.  But this one is dated

25   October 25, 2023, right?

1        A.    Yes.

2        Q.    I'd like you to turn to the page 5 of this

3   exhibit.   Look at the liability section.   That's the

4   bottom.   This one does reflect the note payable to

5   HLFIP, right?

6        A.    Yes.   This is the correctly audited financial

7   statement that reflect the debts that are owed.

8        Q.    And shows a note payable to $52.8 million,

9   right?

10       A.    Correct.   That reflects the use of the IP

11   since 2015, I believe.

12       Q.    And interests due on that note payable of

13   almost 5.6 million?

14       A.    Yes.   That's what it says.

15       Q.    And now the total equity reported for the

16   company is a negative 37.9 million, right?

17       A.    That's the record financials speak for

18   themselves.

19       Q.    That's what it says, right?

20       A.    That's what it says, yes.

21       Q.    Turn to the next page, please.

22             And at the bottom of this page, the inclusion

23   of the HLFIP obligation result in a net loss on an

24   annual basis to the company in 2022 of 13.2 million,

25   right?

1        A.    Yes.   That's what the number shows.

2        Q.    So the March statement do not include HLFIP.

3   The October version of the statement included the HLFIP

4   obligation, right?

5        A.    Yeah.   I think we just went over it, yeah.

6        Q.    And that changes had annual income from 2022

7   from a profit of 3.6 million to a loss of 13.2 million,

8   right?

9        A.    Yes.

10        Q.    And the change to the shareholder equity from

11   a positive 18 million to a negative 37 million, right?

12        A.    Yes.

13              MR. SCHOENFELD:   Display 448, please.

14   BY MR. SCHOENFELD:

15        Q.    Before we look at 448 just to sick tell back,

16   you cemented Vermont response to Vermont department of

17   directions request for proposal on April 30th of 2024,

18   right?

19        A.    I believe something like that, whatever it

20   says, yes.

21        Q.    So that was about eight months after the

22   intellectual property agreement was entered, right?

23        A.    Yeah.   Yes.

24        Q.    And it was six months after Mr. Shreve issued

25   his October 25, 2023 restate the financial statements,

1  right?

2          A.   It may have been.

3          Q.   And yet Smart Communications included its

4   prior July financial statements that did not reflect the

5   HLFIP obligation in that April 2024 submission, right.

6   Yeah.  So there's a team of six people that work on the

7   RFPs and they pull from template and these templates are

8   basically filled out by this team and they didn't -- I

9   probably have the updated financials.  Again, the RFP

10  marketing team is not really in connection with

11  obviously our financial tax accountant.  So they just

12  have files that they pull and when they're required to

13  enter those files they enter the files.

14         Q.   Now, changing the company's financials of

15  almost $58 million is kind of a big deal, right?

16         A.   Yeah.  It's a big deal.

17              And it's -- allows Smart Communications to pay

18  its bills and not sell equity for 10 years and grow and

19  explode and, like, most start-ups that have to sell

20  equity to raise money, Smart Communications was able to

21  avoid all of that because HLFIP didn't charge the

22  royalties and deferred them.  And so that's a big deal

23  and it's generated hundreds of millions of dollars for

24  SmartComm.  Hundreds.

25         Q.   And, yet, you didn't instruct your RFP

1   response team to included what you contend to be the

2   correct financial statements for at least eight months

3   after the IP agreement was entered, right?

4        A.   Well, I don't tell them what to include in

5   these RFPs I usually review the cover letter and I

6   review our financial proposal.  Those are separate

7   sections of these RFPs and they are usually hundreds of

8   pages long and they are check boxes that they fill

9   boilerplate information that must be submitted and I

10  don't know when though got the updated financials, but

11  when they did, I know that updated financials have been

12  used and utilized and we went over that as well.

13       Q.   Sir,?

14            THE COURT:  I'm sorry.  What was the exhibit

15       number of the April 2024 document submission that

16       you were referring to.

17            MR. SCHOENFELD:  483.

18            THE COURT:  483?  Okay.  Thank you.

19  BY MR. SCHOENFELD:

20       Q.   Sir, Exhibit 448 --

21            THE COURT:  I'm sorry.  This is the one that

22       includes -- or this one doesn't include.  Okay.

23            MR. SCHOENFELD:  That's correct.

24            THE COURT:  My apologies.

25

1  BY MR. SCHOENFELD:

2      Q.    Sir, Exhibit 448 is a summary of assets and

3  liabilities that you filed in the Smart Communications

4  bankruptcy proceeding, right?

5      A.    Again, I'm not sure.  I may have -- I don't

6  know what this document is.

7      Q.    Could you scroll up to the top, please?  So

8  debtor named Smart Communications Holding, Inc.  Okay.

9  Yes.

10     Q.    If we go to page 24 of this document and

11  that's a declaration understand penalty of perjury for

12  non individual debtors, right?

13     A.    Yes.

14     Q.    And you say you examined the information and

15  have a reasonable belief that the information is true

16  and correct, right?

17     A.    I believe so.  I don't know what information

18  you're referring to.

19     Q.    We'll get to that in a moment.  At the bottom

20  of this page you signed it?

21     A.    Yes.  That's my signature.

22     Q.    Go back to the first page, please.

23     Q.    So this summary shows 40.7 million in assets

24  for Smart Communications, right?

25     A.    That's what it shows.

1        Q.    And it shows total liabilities of $70,024,000,

2   right?

3        A.    Yes.

4        Q.    I'd like you to turn to page 20 of this

5   exhibit.

6        Q.    Sir at the bottom of page 20, there is a total

7   of liabilities owed by Smart Communications.  It's the

8   same 70 million, $24,000 we looked at earlier, right?

9        A.    Yes.

10       Q.    Turn back to page 17 of this exhibit.  Now,

11  there in section 3.10 you identify HLFIP as a creditor,

12  right?

13       A.    Yes.

14       Q.    And the basis for that creditor's claims

15  royalty amount owed for IP license agreement, right?

16       A.    Yes.

17       Q.    And the amount is $67.9 million, right?

18       A.    Yes.  I think the claim may have been also

19  adjust an app added to.  I'm not sure how this works.

20  But I believe it's been adjusted to include if it's not

21  a royalty amount, then it's unjust enrichment.  So there

22  is a claim there with numerous.

23       Q.    In fact if Noreen Gunning your accountant

24  testified that the total amount of the claim now is over

25  one hundred million dollars, you wouldn't disagree with

1   that, right?

2           MR. OPRISON:  Objection.  Assumes facts not in

3       evidence Your Honor.

4           MR. SCHOENFELD:  We'll tie it up.

5           THE COURT:  Promising me it's going to come

6       in?  Yeah.  I'll overrule.

7       A.    What was your question.

8   BY MR. SCHOENFELD:

9       Q.    If Noreen Gunning, your accountant, your

10  bookkeeper, testified that the amount of this liability

11  is now over one hundred million dollars, you wouldn't

12  disagree with her, right?

13      A.    I wouldn't know the exact number.  We'd have

14  to -- but, no, I wouldn't disagree with it.  I think

15  it's owed.

16      Q.    And even at the time you submitted this the

17  $67.9 million represented almost 97 percent of the total

18  liabilities owed by Smart Communications as you reported

19  them on this bankruptcy filing, right?

20          MR. HILLSLEY:  Objection Your Honor.  Lack of

21      foundation.

22          THE COURT:  Overruled.

23      A.    So I think what this shows is there's still

24  two million dollars worth of debt that SmartComm

25  couldn't pay outside of HLFIP and also we have a legal

1  burn of about a HLFIP million dollars a month in this

2  case that SmartComm could not sustain.  And that's why

3  SmartComm's filed bankruptcy.

4  BY MR. SCHOENFELD:

5      Q.   So you contend it's the money spent on this

6  litigation and not the money with HLFIP liability that

7  necessitated filing for bankruptcy?

8      A.   I'm telling you that the HLFIP liability has

9  never paid a dollar and these companies have three

10  million dollars worth of debt that it can't pay.  I can

11  tell you that the day we filed bankruptcy, our account

12  was overdrawn and I got to come up with a half million

13  dollars every fourteen days at minimum to pay employees.

14  That doesn't count commissions that go to the jail.

15  Millions of dollars.  That couldn't count vendors we

16  have to pay to install.  It adds up to over six million

17  dollars.  In fact I think just January $6.2 million in

18  operating costs on only six million dollars in revenue

19  and it doesn't include the legal fees of half a million

20  dollars a month to try and defend this company from

21  being liquidated by the Trust.

22      Q.   And you didn't take any of that into account

23  in deciding to impose a 40 percent royalty on all of

24  Smart Communications' net sales, did you?

25      A.   Actually, I did.  I actually -- first off,

1  relied on a expert, and second of all, Smart

2  Communications has operated unlike most growing

3  companies -- they have operated in a profit where most

4  growing companies, in fact, 99 percent of growing

5  companies are massively in debt.  That doesn't mean they

6  don't have value, right?  Some of the most valuable

7  companies in the world are massively in debt.  Look at

8  Amazon for instance, it's a debt but it's massively

9  valuable.  Facebook for a long time was in debt.  All

10  these things can be debt and still be valuable.

11  SmartComm was no different, but it actually deferred its

12  debt to now and it's not unjustified.

13      Q.   You testified that Smart Communications

14  employs about 120, right?

15      A.   Yes.

16      Q.   So you've also testified that means about 120

17  families are depending on Smart Communications for their

18  livelihood; right?

19      A.   They are, which is why it was so egregious

20  what happened this morning.

21      Q.   And, nevertheless, you decided to settle the

22  company you work for with 40 percent debt that's now in

23  your tell a hundred million dollars, right?

24      A.   Well, what that would mean is if HLFIP's debt

25  is a hundred million dollars a day, for instance, let's

1    just take that, it's a simple math areas of expertise

2    Jigs then Smart Communications has done what

3    2,320,000,000 in revenue on technology that it didn't

4    own in licenses and didn't pay I dollar for.  SmartComm

5    has collected over 220 million and never paid anyone a

6    dollar for revenue that -- the technology that drives

7    that revenue and makes that money for them?  That's

8    outrageous.

9         Q.   You testified that in fact in order to deal

10   with the Smart -- HLFIP debt, Smart Communications will

11   have to borrow money, right?

12        A.   That's how most companies -- in fact if you

13   look at my two biggest competitors that are considered

14   billion dollar companies, they are over nine hundred

15   million in debt each of them.

16        Q.   You testified you may need to sell equity,

17   right?

18        A.   That's why SmartComm and the Trust, for

19   example, that's why I, Jon and Janice as trustee of the

20   Trust, still owns Smart Communications collectively

21   100 percent, 50/50 in each.  Because it deferred these

22   payments.  If it were to have to pay these things at the

23   beginning, like most companies would if it was not a

24   related company, then they would have had to sell

25   equity.  And I can tell you, I'll good enough you a

1 | specific.  Great white flooding based here in Sarasota

2 | Greg Norman, he offered 20 percent of the company and

3 | 20 percent on half of the money to borrow money.  That's

4 | why we defer payments for HLFIP (check).

5 |     Q.   You testified that Smart Communications may

6 | need to change its business operations and reduce its

7 | costs so it can pay its bills, right?

8 |     A.   Can you repeat that.

9 |     Q.   You've testified that Smart Communications may

10 | need to change its business operations and reduce its

11 | costs so it can pay its bills, including the HLFIP

12 | liability, right?

13 |     A.   For sure.  What would actually happen is

14 | instead of SmartComm becoming an exploding, growing

15 | company, it would need to actually scale back and pay

16 | its bills instead of paying contractors to install

17 | new -- new jails.  It would have to account for its

18 | debts that it's not accounted for and operate like most

19 | businesses that can't afford to just go and open up a

20 | new location every single week that costs them a million

21 | dollars like SmartComm has done for the past decade.

22 | That's why SmartComm is bringing in all this revenue

23 | because it got to use technology for free, it got to

24 | install in new facilities without ever paying its bills,

25 | and now that its time to pay its bills, the Trust, by

1  the way, this has never been disputed before, but now

2  the Trust because they got ownership is trying to say

3  this this bill's unjust.  What's unjust is that it was

4  allowed to use this technology and make hundreds of

5  millions of dollars and never pay a dollar to the person

6  that provided the technology.

7      Q.   And reduction in costs that you just

8  described, that would not benefit the employees in the

9  company, some of them would lose their jobs, right?

10      A.   Most of it's contractors, I can tell you.

11  Most of our costs right now is contractors, which has

12  also gone up about threefold in the past three years,

13  and so look, they are scaling back, I can tell you we

14  wouldn't have to have such a big, payroll to support

15  three million customers, SmartComm would have to reduce

16  its operations to account for the bills that it owns

17  like every other business.

18      Q.   To pay the 40 percent obligation that you

19  imposed on Smart Communications in August of 2023,

20  right?

21      A.   Well, Mr. Schoenfeld, in my opinion, if it

22  doesn't pay its bills, there's going to be zero revenue

23  SmartComm has because HLFIP is going to have to pull the

24  physical plug on the technology that it owns and has the

25  right to control and SmartComm is refusing under

1    Janice's direction to pay for this technology.  That's a

2    you know attain able position.  HLFIP owes debt to the

3    IRS and SmartComm owes money to HLFIP.  And if that is

4    not going to be upheld, there been there is going to

5    have to be adjustment for arrangement and that is not

6    going to be good for Smart Communications.

7         Q.   I'm going to try to wrap this up quickly if I

8    can.  Sir, we looked at the response to the Vermont

9    request for proposal.  And you agree with me that that

10   proposal which was submitted in April of 2024 included

11   the pre intellectual property agreement financials done

12   by Mr. Shreve; is that a fair statement of our

13   discussion?

14        A.   I think you said Vermont in --

15        Q.   Yes?

16        A.   In when April?  April 20 --

17        Q.   April of 2024?

18        A.   It was like April 23 of 2024, something like

19   that.

20        Q.   April 30?

21        A.   April 30.  Okay.  So almost May of 2024.  And

22   then I I believe I saw yesterday Philadelphia Department

23   of Corrections in July had updated financials.  So sixty

24   days later there's updated financials or not even.

25        Q.   And I could show you these if necessary, but

1  let me ask it this way, do you recall from your

2  deposition I showed you several other responses to RFPs

3  that Smart Communications submitted in 2024.

4      A.   Yeah.  I think you're getting to the point of

5  that the updated financials weren't submitted until they

6  were splitted.  I mean, that's obvious.  The updated

7  financial is got updated to the RFP and they started

8  using them.  I don't know when or who directed that but,

9  you know,.

10     Q.   That was true of a proposal submitted by Smart

11  Communications on February 14, 2024 to the Clay County,

12  Florida, Sheriff's Office, right.

13     A.   It would be my assumption.  Just an assumption

14  that anything before the updated financials went out was

15  the unupdated financials prior.  So if we're going to

16  start from Philadelphia in the beginning of July with

17  updated financials and work our way back wards I would

18  assume all the functions would be unupdated financials

19  because they got updated after that.

20     Q.   So it's your testimony that until July of

21  2024, you submitted the July 2023 versions of

22  Mr. Shreve's financials that did not include the HLFIP

23  liability to your customers?

24     A.   Again, that's a lot to follow with the

25  balancing of dates but I will tell you that the RFP team

 1   submits the records that they have and use and when they

 2   the old ones they submitted the old ones.  When they

 3   submitted the new updated records.  They submitted the

 4   new updated records.  I don't dispute what the records

 5   say.  They show what they show.

 6          MR. SCHOENFELD:  Those are all my questions.

 7       Thank you, sir.

 8              THE COURT:  Mr. Johnson.

 9          MR. JOHNSON:  You don't want to take a break.

10       Can I take a break and cross out the vast majority

11       of questions because it's been covered?

12              THE COURT:  Yes.

13

14                    CROSS EXAMINATION

15   BY MR. JOHNSON:

16       Q.   A little unorthodox, judge can I ask one

17   question of you?

18              THE COURT:  Sure.  I observe the right of

19       whether I'm going to answer this.  I'm.

20          MR. SCHOENFELD:  I'm clear on who you this

21       works but there were a lot of financial statements

22       shown and I think you saw the numbers, the HLFIP

23       liability results in the liability being greater

24       than the assets.  Do I need to go through that

25       again or do you get it.

1          THE COURT:  No.

2          MR. JOHNSON:  I don't need to go through it

3     again.

4          THE COURT:  And what I'm taking from

5     Mr. Logan's testimony just before is the RFP team

6     was in the first part of 2024 was using the I'll

7     just call it the old financial statements, and it

8     looks like the Philadelphia -- is it Philadelphia.

9          THE WITNESS:  Yes.

10         THE COURT:  Philadelphia department of prisons

11    responds to the RFP on July 2, 2024 is probably

12    when the new financials were incorporated into the

13    RFP team.  Now, maybe there's one or two that are

14    different but that was generally what I took from

15    Mr. Logan's testimony.  I don't need the financials

16    yet again.

17         MR. JOHNSON:  That's why I asked, judge.

18         THE COURT:  Yeah.

19         Cross examination.

20         MR. JOHNSON:  I think I'm ready to proceed.

21         THE COURT:  Go for it.

22    BY MR. JOHNSON:

23    Q.   Mr. Logan as I say the earlier I cross the out

24    about ninety percent of what I was going to ask.  I'm

25    going to jump around a little bit if you don't

1    understand the context, will you let me know?

2        A.   Yes, sir.

3        Q.   Do you recall the license agreement, the

4    August 29 document it's Exhibit 771 if we need it?

5        A.   Ask your question and we'll see if we need it.

6        Q.   My memory of the documents is it says it's

7    effective on August 29th, 2023.

8        A.   Okay.  I would probably tend to agree.

9        Q.   Do you see where it says effective date on the

10   first page, first paragraph?

11       A.   Yes.

12       Q.   And I believe also above the signature line

13   you'll find -- when you zoom in it says "have caused

14   this agreement to be executed as of the August 29,

15   2023".  And I believe you were testifying with

16   Mr. Schoenfeld and you said you -- it was signed

17   sometime.  Would you tell us when this document was

18   actually signed?

19       A.   From memory not really.  I believe it was

20   signed perhaps later on.  I think we were waiting on

21   some things from Marcum to plug into this from my memory

22   but I'm not 100 percent sure.  I have to defer to

23   counsel exactly what the timelines took place there.

24       Q.   I'm asking you about when your pen touched the

25   paper.  So do you think your pen touched the paper on

1    this document before or after the Marcum Report?

2         A.   Before or after the Marcum Report?  The Marcum

3    Report came out, I think, after I signed because I had

4    discussed with Marcum and they gave me basically the

5    pertinent information of what the report was going to

6    have in it.  And we needed to have this in place as soon

7    as possible.  So that was, I think, my kind of frankly,

8    vague recollection of how it all played out but we were

9    waiting for information from Marcum to plug into our

10   agreement.

11        Q.   If I understood the sequence, Ms. Quicker

12   engaged Marcum on or about August 9.  You had a

13   discussion, a functional analysis meeting, you may

14   recall, mid August, does that sound right?

15        A.   I'm terrible with dates as you can probably

16   tell now, but I don't -- I don't know.

17        Q.   Approximately how long before the Marcum

18   Report came out did you sign this document?

19        A.   I don't think it would have been long.

20        Q.   Changing topics, Mr. Logan.  Before I leave

21   that topic, sorry, based on your discussion with Marcum,

22   you were confident were you going to use the 40 percent

23   before even though the final report hadn't been issued,

24   right?

25        A.   Yeah.  They had given me the range and they

1  said they're finalizing the report, and of course,

2  typical I think they took a lot longer to actually pump

3  out the finished product.

4      Q.   Sir, related question to one that was

5  requested earlier, Ms. Quicker was representing HLFIP

6  with respect to the August 29 license agreement, right?

7      A.   License agreement.  Yes.

8      Q.   Who -- was there a lawyer representing Smart

9  Communications with respect to the August 29th, 2023

10  agreement?

11     A.   We have in-house counsel at Smart

12  Communications, but as far as -- yeah, so that's all I

13  know.  I mean, we always have representation.  Smart

14  Communications always has representation.  We have

15  inhouse counsel.

16     Q.   My question was different.  My question was

17  did Smart Communications have counsel with respect to

18  the August 29, 2023 agreement?

19     A.   Independent of in-house counsel?  I don't -- I

20  guess I don't recall.  We had -- we had counsel in this

21  case but I don't remember if they were involved much in

22  the agreement or not.

23     Q.   Apt in-house counsel you're referring to is

24  David Gann who is sitting eye I'll let you judge -- a

25  how from in HLFIP's counsel right now?

1      A.    Yes.

2      Q.    The range that Marcum gave you or the

3  interquartile range, by the way a new word I had to

4  learn for this process, was from 18 to 50, right?

5      A.    Correct.

6      Q.    If you had selected 18, can we agree that

7  would have reduced the liability burden on Smart

8  Communications?

9      A.    I think you could.  I think you could adjust

10  it to 18.  I mean, it's just a math equation at that

11  point.

12      Q.    And it's not an insubstantial change, right?

13  In other words, you were here during the opening and

14  trust me, I did the math on my phone before the opening,

15  277 percent is the differential between 18 and 44

16  [sic] -- excuse me -- between 18 and 40.  It's not like

17  3 or 5 percent, it's 277 percent greater.  How did you

18  make the decision?

19          MR. OPRISON:  Well, I'm going to object to the

20      question as compound, complex.  Going into areas it

21      shouldn't go into.  There's a bunch of different.

22          THE COURT:  I think you're going to have to

23      break it up into more bite-size pieces.

24          MR. JOHNSON:  Sorry about that.

25

1  BY MR. JOHNSON:

2      Q.   How did you pick 40 rather than 18?

3      A.   That's a good question.  Valid.  And I get

4  from not being involved in this industry why you would

5  say oh, geez that seems like a lot.  But let me give you

6  some real world examples.  Keith commissary, the biggest

7  company in the industry has a very similar agreement

8  with the competitor of ours they do 18 to 20.

9          MR. JOHNSON:  I don't want to be I apologize

10         for interrupting the witness.  I don't know if he

11         is allowed to give expert testimony at this point.

12         MR. OPRISON:  Your Honor, it's not expert

13         testimony.

14         MR. JOHNSON:  And it's calling for hearsay,

15         which he is about to blurt out, I think.

16         MR. OPRISON:  He asked a question.  He asked

17         how to come up with this.  He is asked comparables

18         for corporate force that's perfectly appropriate.

19         He left the door open.  Appropriate to allow

20         questions.

21         THE COURT:  Were you going to say anything

22         else?

23         MR. HILLSLEY:  Same.

24         THE COURT:  Normally, I would agree,

25         Ms. Quicker is not sitting here.  And my concern is

1      this witness is going to articulate something that

2      Ms. Quicker, herself, would have an objection to.

3      That's my concern right this second.  I have no

4      problem with him answering it.  But I don't know

5      how he answers that without violating what

6      Ms. Quicker has been advocating for the last

7      several weeks to prevent any investigation into

8      those statements.

9          MR. OPRISON:  Understood Your Honor.  What I

10     heard Mr. Logan testifying about was his own

11     experience and his knowledge of the industry so

12     assuming that doesn't involve information he's got

13     from Ms. Quicker, I would expect he can answer that

14     but if it's not cross-pollinated with it then I

15     think we are comfortable it's not going to be

16     objection later.

17         THE COURT:  The problem is Ms. Quicker seemed

18     to take a very expansive view of what was hers, and

19     she's not sitting here.  And so now I'm left in the

20     position of having to protect Ms. Quicker

21     privilege.

22         MR. OPRISON:  Your Honor, I think what he's

23     answering is based on his own knowledge and based

24     on information that he has independent of anything

25     Ms. Quicker may have done.  So he is asking how he

1          came up with this number, I think he can testify

2          about that.

3                THE COURT:  He was just about ready to talk

4          about an agreement and a structure of a competitor,

5          and Ms. Quicker was taking the position that she

6          had all these royalty agreements that were her

7          intellectual property and were her attorney/client

8          privilege documents that were given to Marcum so

9          they could create this percentage.

10                So now you're putting him in the position of

11          answering and articulating that exact thing which

12          Ms. Quicker said we couldn't go into.

13                MR. OPRISON:  Right.  I understood Your Honor.

14          I think the difference is between the

15          communications and information he received and

16          facts themselves that he may be able to testify to

17          that are not privileged.

18                MR. HILLSLEY:  Your Honor I just add I think

19          we can just clear this up by asking the witness if

20          he got the information from Marcum or Ms. Quicker.

21          If the answer is no and he got it from other

22          sources we may identify the sources and justify

23          them.

24                THE COURT:  I'm telling you my concern so

25          Ms. Quicker is not here and I don't want this

1      witness to inadvertently say something that, you

2      know, even though HLFIP hired Ms. Quicker, and

3      HLFIP seems to own the privilege, Ms. Quicker has

4      taken a different view.  So.

5          MR. OPRISON:  Appreciate that.

6          THE COURT:  I think I've identified this

7      particular issue for weeks on end.  So here we are.

8      So Mr. Johnson, do you.

9          MR. JOHNSON:  I can withdraw the question if

10     that will.

11         THE COURT:  I think once you withdraw the

12     question ask something else.  And then if we can

13     get to the answer without invading Ms. Quicker's

14     privilege, then --

15 BY MR. JOHNSON:

16     Q.   Let me go back to a more foundational

17 question, which we identified there was only one lawyer

18 who was involved in the negotiating the document, right?

19 I didn't understand Mr. Gann was actually involved in

20 negotiating the document.

21     A.   And I'm not sure that he was.

22     Q.   Okay.  Now, beside Jon Logan and

23 Katrina Quicker, were there any other people involved in

24 the preparation of the license agreement?

25     A.   I mean, I think there was -- I guess the

1  agreement itself, yeah, I'm not sure.  I'd have to defer

2  to counsel.  I didn't make the agreement myself.  I saw

3  it but that's really all I know.

4      Q.   Moving on, Mr. Logan, I'm not sure anybody

5  said it.  Do you know the difference between an accrual

6  on a tax basis taxpayer?

7      A.   You're definitely pushing my edge of knowledge

8  here, but I think I understand.  Accrual is something

9  that is addding up, but not dealt with I think.

10      Q.   In other words, the transaction in this case,

11  the liability to HLFIP started accruing in 2015

12  according to your testimony; right?

13      A.   It did.

14      Q.   But that liability even though Smart

15  Communications and HLFIP are accrual basis taxpayers, it

16  didn't show up -- the liability did not show up on Smart

17  Communications' financial statements and the asset did

18  not show up on HLFIP's financial statement, right?  Not

19  until you reconciled things?

20      A.   Correct.  My father was in charge of corporate

21  structure and accounting and as we obviously are clearly

22  seeing -- I love my dad, but he was failing this company

23  in massive ways and our taxes were a mess.  The

24  accounting that we were having was a mess.  And that,

25  obviously has been a big issue for this case and a lot

1  of fixing of the books.

2      A.   I know we're twisting that into something

3  else.  Yeah this was something that hadn't been done

4  before and needed to be done and properly put these

5  companies in their proper positions.

6      Q.   Who are you here representing today?

7      A.   I guess you'll have to -- I wear numerous

8  hats.

9      Q.   I was going to try the hat thing.  You're

10 obviously here representing yourself, right?

11     A.   Yes.

12     Q.   Are you representing Smart Communications

13 today?

14     A.   Yes.

15     Q.   Are you representing the two Smart

16 Communications entities, correct, meaning Smart -- Smart

17 Communications Holding, Inc. a Florida entity and Smart

18 Communications Holding, LLC a Delaware entity.  You're

19 here on behalf of bolt of those entities, right?

20     A.   Well I would also be here on behalf of all the

21 subsidiaries.  Essentially there is SmartComm Inc.

22 Florida and everything below it is owned by it.

23     Q.   But in terms of the parties to this lawsuit,

24 meaning HLFIP Holding, Inc. a Florida company and -- I

25 misspoke.

1          Smart Communications Holding, Inc. a Florida

2    company and Smart Communications Holding, LLC, a

3    Delaware company, you're here on behalf of both those

4    entities today, right?

5          A.    Well, I have interest in both entities, yes.

6          Q.    And you're also here on behalf of HLFIP Inc.

7    that inverted into a Delaware entity, HLFIP Holding,

8    LLC, right?

9          A.    Again, I'm not good at this, but I don't think

10   that's accurate.  I think HLFIP, Inc. is no longer and

11   it's just HLFIP, LLC I think.

12         Q.    I think what happened is it convert and the

13   Florida entity goes away.  So fair enough Mr. Logan?

14         A.    Okay.

15         Q.    By the way, yesterday you testified about the

16   discussions after your father passed and you talked

17   about some settlement discussions and how you wanted

18   those to go forward, do you recall that?

19         A.    Yes.

20         Q.    And at some point I think you suggested that

21   you were going to get three sort of appraiser types and

22   try to solve this; do you recall that?

23         A.    Yes.

24         Q.    Tell me about that.

25         A.    So this would date back to when I was just

1  trying to resolve this dispute with my mother and we

2  could not locate the Shareholder Agreement at the time,

3  and she didn't feel comfortable having one appraiser

4  appraise the company.  So I said, okay.  What would you

5  like?  How's two?  And then that wasn't good enough.  So

6  how's three.  She said that was good enough and then she

7  talked to Alexis and my mother responded to me that Jon,

8  I cannot sign any document until you tell me exactly how

9  much you're going to pay me.  And I said, well that is

10  the point of hiring these people is I don't know and you

11  have to have an independent person.  And she said unless

12  you're going to guarantee me a number I'm not going to

13  sign anything.  And that was the last pretty much I've

14  heard from her.

15      Q.    And was it your intention with the proposal

16  for the three valuators to bring some measure of

17  independence meaning you get one I get one you pick one,

18  how are you --

19      A.    It was really just to comfort my mother.  I

20  trusted people that are experts at doing what they do,

21  would do an accurate job and fairly reflect what's

22  there.  And if you need three people to get the comfort

23  to do the same job, I guess some people have different

24  levels of comfort.

25      Q.    Did you contemplate a similar methodology with

1  respect to the selection of the license fee?  In other

2  words let try to make sure this is fair to Janice.

3  Let's go get three numbers just to see what it looks

4  like.  Did you think about doing that?

5      A.   No.  From my understanding.  That's kind of

6  opposite of how transfer pricing works.

7           Transfer pricing actually looks at both

8  companies at the same time.  That is the core purpose of

9  transfer pricing is to assess both companies and to

10  assess the conduct and economic relevance of the

11  transaction that's happening between the two companies.

12           So it's not like SmartComm could hire one and

13  HLFIP could hire one and then we compare, essentially

14  you just be having multiple people repeat the exact same

15  process.

16      Q.   I'm not trying to argue with you, Mr. Logan,

17  but I think you've described your experience and you've

18  never done a Transfer Pricing Study, right?

19      A.   I think everybody in the room except for maybe

20  a couple experts here have -- have probably never even

21  heard of it.

22      Q.   You made your statement, I understand, but

23  bear for me to understand that if I want to know how you

24  do a Transfer Pricing Study and what should be done, we

25  should defer to somebody other than you in this room?

1       A.   Yeah.  I defer to the experts.  That's what I

2  did.

3       Q.   You mentioned the stock and Alexis holding it

4  for you yesterday.  Alexis was holding -- Alexis Logan

5  was holding 50 percent of the stock for you and

6  50 percent for your father, right?

7       A.   Correct.

8       Q.   And yesterday you gave a pretty expansive

9  description of what you did for the company.  What did

10  Jim Logan do for his 50 percent?

11      A.   Jim Logan, his role, had changed through

12  throughout pretty much the whole period of the company.

13  At the beginning he was a little more involved when the

14  company was very small with a couple of account.  He

15  helped acquire some of those accounts.

16          Once, you know, I was able to basically become

17  the face of my own company, his role, really, kind of

18  remained just the finances and corporate structure and

19  taxes and the back end we used to call it the back end

20  of the house that I really didn't even want to deal with

21  even if I could, and that was his role and over the

22  years, I can tell you, obviously, he declined a lot and

23  there were many period where he was just not -- not

24  involved with anything, anything.  Not even getting out

25  of bed, and so we put some people in place, he put some

1  people in place to kind of start fulfilling his role

2  with the accounting and those functions.  And that was

3  pretty much how it went at the time of my dad's passing.

4       Q.   You mentioned that you were on some pretty

5  hard times when you started this company, right?

6       A.   Yes.

7       Q.   Didn't have any money and didn't have a way

8  to -- I don't remember -- didn't have a way to feed

9  yourself or something but you gave a pretty grim

10  picture, right?

11      A.   It was a definitely difficult time.  I had a

12  car dealership business I had in Michigan and, yeah, got

13  into it with another car dealer down the street and

14  ended up leading to some jail time and I was trying to

15  restart my life.

16      Q.   I wasn't intend to go try to bring that up,

17  Mr. Logan.

18           Your father carried you in the beginning,

19  didn't he?

20      A.   Carried me?

21      Q.   Your father had been an entrepreneur with

22  multiple business.  He was a serial entrepreneur, wasn't

23  he?

24      A.   Yeah.  My dad was great.

25      Q.   It and in the beginning, you had no experience

1   and he had 30-plus years, something like that?

2        A.   I -- I I think you're mischaracterizing.

3   Would I certainly say I had no experience.  At that

4   point I had two businesses myself.  Actually three.

5        So it wouldn't say no, I was also a payroll

6   athlete and I raised motorcycles all across the world

7   and I was sponsored by very large corporations and had

8   contract dealings.  So I certainly had some experience.

9   I also had a successful car deal hip, but no, I never

10  wept to college.  I was home schooled my last year of

11  high school so I could travel and race full-time.  My

12  experience has just been through life.

13       Q.   Did you take out any of the early loans for

14  the company?

15       A.   What loans are you reefing to?

16       Q.   Start with englewood bank?

17       A.   Englewood bank, Smart Communications took out

18  loans.

19       Q.   Did you guarantee those loans?

20       A.   No.  The stock was not in my name at the time.

21       Q.   Whose stock name was the stock in?  To

22  guarantee the lope?

23       A.   I said no the stock wasn't in my name so I

24  couldn't guarantee the loan.

25       Q.   Did your father guarantee the loan?

1          A.   I don't know because I think he at the time --

2    I don't know actually.

3          Q.   Did your sister guarantee the loan?

4          A.   She was a stockholder so she had to as she was

5    on the credit card, so she had the credit cards were in

6    her name, the bank accounts were in her name, the stock

7    was in her name.

8               THE COURT:  I'm sorry the question is did your

9          sister guarantee the loans?

10              THE WITNESS:  Yes.

11              THE COURT:  Okay.

12   BY MR. JOHNSON:

13         Q.   She also pledged some of her personal property

14   for those loans?

15         A.   Not that I'm aware of.

16         Q.   Turning to the Marcum study for just a second,

17   Mr. Logan, did you rely on the advice that Jignasha

18   Voralia gave you?

19         A.   I'm not sure I remember the name, but I relied

20   on the experts I heard at Marcum.

21         Q.   Did you rely on the advice that Melina Naidu

22   gave you?

23         A.   Again, I don't remember specific names at

24   Marcum.  I remember I had a conversation with someone at

25   Marcum.  I don't honestly remember.  And -- but I do

1  think they had a unique name.  I do remember that about

2  them.  But I couldn't tell you what, who.

3          And I relied on the report.

4      Q.   Did someone at Marcum, maybe Melina Naidu,

5  tell you that a Transfer Pricing Study is really for IRS

6  purposes and it should not be used in litigation?

7      A.   I don't remember specifically hearing that,

8  no.

9          MR. JOHNSON:  May I consult with

10     Mr. Schoenfeld for a second, Judge?

11         THE COURT:  Sure.

12         MR. JOHNSON:  No further questions.

13         THE COURT:  Mr. Oprison, any follow-up.

14         MR. OPRISON:  Five minutes.  Can I go up.

15         THE COURT:  Yes, I'd like to finish this

16     witness before we go to lunch.

17                    RECROSS EXAMINATION

18  BY MR. OPRISON:

19     Q.   Mr. Logan, you've been running a bills for

20  fifteen years.  In your view is it good business

21  practice to wait for the IRS to come to you regarding an

22  audit before you come into tax compliance?

23     A.   Obviously not.

24     Q.   You have time in your schedule running

25  companies to look at hundreds of pages of RFP responses?

1      A.   No.  That's not something I could do all the

2 time.

3      Q.   Counsel asked you about RFPs and unaudited

4 financials.  The ones that you submitted that did not

5 reflect the HLFIP note or the interest, was it your

6 intent to try to mislead those entities that were

7 receiving the RFP responses?

8      A.   Obviously I know that's what the angel is but

9 that's not the intent.

10      Q.   Did all RFP requests or requests for proposal

11 seek audited financials?

12      A.   No.  In fact maybe some of the issue was we

13 would try and give as little information about the

14 financials as possible, that was what the team was

15 always instructed to do.  Some didn't require financials

16 at all.  Some required just interim financials, and some

17 required physically audited, complete financials.

18      Q.   In any event, regardless of which financials

19 were submitted, audited or unaudited, to this date Smart

20 as never paid anything on that liability, has it?

21      A.   Not one dollar.

22      Q    (By Mr. Oprison) I don't have anything

23 further, thank you?

24           THE COURT:  Mr. Hillsley.

25           MR. HILLSLEY:  Thank you, Your Honor.  Recross

1    examination.

2  BY MR. HILLSLEY:

3    Q.   Mr. Logan you were asked about Jim Logan's

4  responsibilities before his death and you testified he

5  did finances, corporate structure and taxes.  Do you

6  recall that?

7    A.   Yes.

8    Q.   You were asked whether those were

9  responsibilities as a 50 Percent shareholder.  Do you

10  recall that, too?

11    A.   Yes.

12    Q.   Was Jim a director of SmartComm before his

13  death?

14    A.   Yes.

15    Q.   Was he an officer?

16    A.   Yes.

17    Q.   Was he an employee?

18    A.   Yes.

19    Q.   Would you say it's fair to compare Jim's

20  access and responsibilities before his death and to

21  Janice's responsibilities today?

22    A.   No.  No comparison.

23    Q.   Let's clear up the record on Smart Yacht and

24  Loco Florida as to the relevance in this case.  If

25  either of those entities ever been owned by Smart

1    Communications Holding, Inc., a Florida entity?

2         A.    No.   Jim specifically set them up completely

3    individual to myself.

4         Q.    And Smart Communications Holding, Inc. is the

5    entity of the Trust as a 50 percent interest in it?

6         A.    Correct.

7         Q.    So Smart, Yacht, and Loco Florida aren't and

8    have never been owned by the entity that this valuation

9    case is about; is that your testimony?

10        A.    That's correct.

11        Q.    Let's turn to the MWRA, do you remember how

12   you could asked to project the expect of the price caps

13   when you were crossed?

14        A.    Yes.

15        Q.    How long have you been running a company in

16   trying to maintain profitability in this industry?

17        A.    Fifteen years.

18        Q.    Do you remember hearing Mr. Schoenfeld ask you

19   if a $67 million claim by HLFIP represented 98 percent

20   of the claims in the bankruptcy?

21        A.    I think he said 97, yes.

22        Q.    How much was Janice Logan's claim in the

23   bankruptcy filed yesterday?

24        A.    110 million of half of Smart Communications.

25        Q.    Are there claims without specific amounts

1   attached to them in the bankruptcy?

2        A.   Yes.   There's numerous claims from creditors

3   that have no specific amounts yet.

4        Q.   Did Mr. Schoenfeld's 97 percent calculation

5   address those claims?

6        A.   No.   Those were not included in the

7   calculation.

8             MR. HILLSLEY:  Nothing further, Your Honor.

9             THE COURT:  Mr. Schoenfeld?

10            MR. SCHOENFELD:  Nothing Your Honor.

11            THE COURT:  Mr. Johnson.

12            MR. JOHNSON:  Nothing.

13            THE COURT:  Okay.  Let's have a seat.  We are

14        at 1135, have we heard what's occurred in the

15        bankruptcy court relative to the potential sealing

16        of the documents that were discussed this morning.

17            MR. O'NEILL:  Yes, Your Honor probably 30

18        minutes ago I received a draft in the order in my I

19        know box.  I responded to bankruptcy counsel for

20        the other side copied our bankruptcy counsel as

21        well let them know they have our authority and sign

22        off to submit that order.

23            I believe the order if I'm correct sealed

24        everything that was attached as a preliminary

25        matter while the parties could then address any

1      disc agreements or dispute but we figured that was

2      the safest given the presentation this morning.

3          THE COURT:  So I guess the question is do I

4      need to find a judge to do anything today or if, Or

5      if a proposed order is being submitted to judge

6      Colton because I can't see the bankruptcy filings.

7      That would seem like that's the best you could ever

8      get from me for purposes of today or judge in state

9      court.

10          MR. HILLSLEY:  Your Honor, we agree.  The only

11     thing we could document publish today was a

12     direction for assistance in getting this done.  We

13     have obtained that assistance.  I think at this

14     point we'll address the rest of this next week.

15     And we don't need anything further today from Your

16     Honor.

17          THE COURT:  Okay.  Instead at starting a

18     witness right this second.  Why don't we go to

19     lunch right this second and then come back one hour

20     from now.  I know yesterday we only wanted to do an

21     hour as opposed to an hour and 15.  Are you still

22     okay with that.

23          MR. OPRISON:  Yes, sir.

24          MR. SCHOENFELD:  Yes, sir.

25          THE COURT:  So 12:35 we'll be in recess.

1          (A break was taken at 11:36 a.m. and the

2      following commenced at 12:38 p.m.)

3          THE COURT:  Please be seated everybody.  We

4      are back from lunch.  Do we or have we heard

5      relative to whether Judge Colton entered the order

6      or not.

7          MR. O'NEILL:  I have not seen anything come

8      through, Your Honor.  Actually -- I have not seen

9      anything come through, Your Honor, at this point.

10         THE COURT:  Did anyone call Judge Colton's

11     office and just give the judicial assistant or a

12     staff attorney ahead up.

13         MR. O'NEILL:  Did not.  We're happy to do

14     that, Your Honor.

15         THE COURT:  I think it might help in the world

16     of letting them know that this is there.

17         MR. O'NEILL:  Sure.

18         THE COURT:  So we finished with, Jon Logan.

19     So, Mr. Oprison.  Call your next witness.

20         MR. OPRISON:  We call Janice.  We are calling

21     her out of our case that we would like to do our

22     full case with her so it includes the cross

23     examination.

24         THE COURT:  That's fine.

25         THE COURT:  My recollection is the the calling

1          to call folks.

2                  MR. OPRISON:  Right.

3                  THE CLERK:  Do you solemnly swear or affirm

4          that the testimony you are about to give will be

5          the truth, the whole truth and nothing but the

6          truth?

7                  THE WITNESS:  Yes.

8                  THE CLERK:  Thank you.

9    Thereupon,

10                          JANICE LOGAN

11   the Witness, after first being duly sworn to tell the

12   truth, the whole truth, and nothing but the truth,

13   testified as follows:

14                      DIRECT EXAMINATION

15   BY MR. OPRISON:

16       Q.   Good afternoon, Chris Oprison from DLA Piper

17   for HLFIP.

18       A.   Good afternoon.

19       Q.   You are the trustee of the James Logan family

20   trust?

21       A.   Yes.

22       Q.   And that was created before Jim Logan's death?

23       A.   Yes.

24       Q.   Was that dated in about February 10, 2021?

25       A.   The Trust originally was, yes.

1      Q.    You're the beneficiary of that Trust?

2      A.    Yes.

3      Q.    And Alexis Logan, your daughter, is a

4  contingent beneficiary of the Trust?

5      A.    Yes.

6      Q.    Now, Jon Logan was a contingent beneficiary of

7  the Trust?

8      A.    Correct.

9      Q.    You removed him though, right?

10      A.    Yes.

11      Q.    So if you were to pass, we're not hoping that

12  is the case here man?

13      A.    Oh, you mean die.

14      Q.    No I do not?

15      A.    I thought you meant pass.

16      Q.    But yes, your daughter Alexis would be the

17  sole beneficiary?

18      A.    Yes.

19      Q.    You've asserted claims against HLFIP in this

20  action, correct?

21      A.    Yes.

22      Q.    And HLFIP is owned by Jon, your son?

23      A.    Yes.

24      Q.    You understand he's the sole member of HLFIP

25  hold will?

1       A.   Yes.

2       Q.   You understand that HLFIP was created to hold

3  Jon's intellectual property?

4       A.   Yes.

5       Q.   And you understand that HLFIP arrest leases IP

6  or licenses IP, I should say, to SmartComm?

7       A.   I know that SmartComm uses the IP.  I don't

8  know anything about a license.

9       Q.   Well, can we -- can we agree that the IP that

10  SmartComm use is is IP owned by or held by HLFIP?

11      A.   Yes.

12      Q.   You understand that there's an exclusive

13  arrangement between HLFIP and SmartComm, you understand

14  that?

15      A.   I have heard that in court, yes.

16      Q.   Well you haven't just heard it, you've pleaded

17  it in your Complaint, right?

18      A.   Yes.

19      Q.   And that arrangement, that exclusive

20  arrangement between HLFIP and SmartComm involves HLFIP

21  leasing or licensing its intangible property to

22  SmartComm, do you understand that?

23      A.   No, I don't understand that.  I just know that

24  the IP is used by SmartComm.  I don't know anything

25  about a license or a royalty or leasing.

1      Q.   Okay.  We'll come back to that point.  But you
2  do understand that HLFIP leases its intangible property
3  to SmartComm?
4      A.   No, I don't know that.  I just stated that I
5  don't know that they lease it to SmartComm.
6      Q.   You said that in your second Amended Verified
7  Complaint, didn't you?
8      A.   I don't recall saying that in my verified
9  Complaint.  I don't have it in front of me.
10          MR. OPRISON:  Justin, can you call it up.
11      Paragraph 59?
12  BY MR. OPRISON:
13      Q.   Do you recall filing a second Amended Verified
14  Complaint in this case?
15      A.   Yes.
16      Q.   And do you recall before you filed that that
17  you reviewed the allegations in that Complaint?
18      A.   I did.
19      Q.   Do you know what a verification on a Complaint
20  means?
21      A.   Yes.
22          MR. OPRISON:  Could you turn to paragraph 59,
23      Justin.
24  BY MR. OPRISON:
25      Q.   And do you understand that you swore under

1  oath as to all facts in this Complaint?

2       A.   I see that it seas leases.  Uh-huh.  Yes, I

3  understand that I swore that, so I guess I have to stand

4  by what is written, yes.

5       Q.   Well do you -- do you take issue with that

6  statement now?

7       A.   I don't know that there's a lease.  I don't --

8  there's nothing in writing that I've seen.  So perhaps

9  this was incorrectly stated.

10      Q.   Well, when you signed this Complaint, you

11  verified to it?

12      A.   Yes I did.

13      Q.   Were the facts correct at the time you did

14  that?  Was that your understanding?

15      A.   I guess maybe I overlooked the word "leases."

16      Q.   Was that the only time lease was used in your

17  Complaint?

18      A.   I don't recall.

19      Q.   Do you dispute that HLFIP's only client is

20  SmartComm?

21      A.   No.

22      Q.   You don't dispute that?

23      A.   Do I not dispute that.

24      Q.   So there's an exclusivity relationship between

25  HLFIP and SmartComm?

1       A.   Yes.

2            MR. JOHNSON:  Objection to form.

3            THE COURT:  Overruled.

4   BY MR. OPRISON:

5       Q.   You understand that Jon conceived of the

6   technology underlying Smart Communications?

7       A.   Yes.

8       Q.   Jon is the brains behind the IP, true?

9       A.   It was his idea.  It was produced by other

10  people with his guidance, but certainly they had the

11  knowledge to do a product.

12      Q.   But you don't -- you don't dispute that Jon

13  conceived of and created the technology?

14      A.   I do not.

15      Q.   Would you agree with me that SmartComm and

16  HLFIP have had a license for a number of years?

17      A.   I don't really know what they have had.

18      Q.   Do you believe -- or do you dispute the

19  existence of a license between HLFIP and SmartComm?

20      A.   I don't know of any.

21      Q.   Well, didn't you plead that in your second

22  Amended Verified Complaint?

23      A.   Perhaps.

24      Q.   Why don't we pull it up and see if it

25  refreshes your recollection.

1          MR. OPRISON:  Paragraph 110, Justin.

2   BY MR. OPRISON:

3          Q.   Do you see where it says on the third line

4   "there is ample evidence from that time that SmartComm

5   and HLFIP had a royalty-free license, which is ongoing"?

6          A.   Yes, I see that.  If you want to call it a

7   license, an agreement, whatever you want to call it.  I

8   know there is some kind of agreement between SmartComm

9   and HLFIP.

10         Q.   From 2015 through 2022, right?

11         A.   Yes.

12         Q.   Have you ever spoken with your husband, Jim,

13  before he passed about the existence of this license?

14         A.   No.

15         Q.   Merely because you didn't have a conversation

16  with him about it, that doesn't mean that the license

17  didn't exist, does it?

18         A.   No.

19         Q.   And, in fact, you're aware that Jim has

20  testified in other cases and confirmed that there is, in

21  fact, a license agreement between?

22         A.   I did see that in the Engle pee case (check

23  check).

24         Q.   You don't doubt when Mr. Logan, your husband

25  Jim, testified in that case that he was testifying

1  truthfully that in fact there was a license agreement

2  between HLFIP and SmartComm?

3          MR. O'NEILL:  Your Honor, I object on the

4      basis of hearsay as to Jim's statements in the

5      deposition.

6          THE COURT:  She can answer it.  I'll overrule

7      it.

8      A.   Repeat please.

9          MR. OPRISON:  Can you (read back).

10     A.   Yes, Jim was a truthful person.

11     Q.   So when he said there was a license agreement

12 between HLFIP and SmartComm, he was telling the truth?

13         MR. O'NEILL:  Your Honor I object to the

14     extent that that testifies from the testimony from

15     that deposition.

16         THE COURT:  Sustained.

17     A.   Please repeat that.

18         MR. OPRISON:  He sustained the objection so

19     I'm going to move on to another question.

20         THE WITNESS:  Okay.

21 BY MR. OPRISON:

22     Q.   Do you have an understanding that HLFIP -- I'm

23 sorry.  Strike that.

24         Do you have an understanding that SmartComm

25 held itself out to the general public as a exclusive

1   licensee of IP from HLFIP?

2        A.   Yes, I've seen literature to that.

3        Q.   Have you seen any of the contracts that

4   SmartComm has entered into with correctional facilities

5   where it holds itself out as an exclusive licensee?

6        A.   No, I've never seen any contracts.

7        Q.   Do you dispute that SmartComm held itself out

8   as an exclusive licensee of IP that was owned by HLFIP?

9        A.   I don't doubt that.  We used the product.

10            MR. OPRISON:  Your Honor, with respect to

11        Mr. Logan, Jim Logan's deposition testimony, we

12        have deposition transcripts and designations that

13        we'll read into the record at that time.

14            THE COURT:  That's fine.

15            MR. OPRISON:  Yeah.

16   BY MR. OPRISON:

17        Q.   Did you ever know of an agreement that Jim

18   signed acknowledging that your son, Jon, owned all the

19   intellectual property?

20        A.   No.

21            MR. O'NEILL:  Objection to the extent that it

22        mischaracterizes the testimony.

23            THE COURT:  Sustained.

24   BY MR. OPRISON:

25        Q.   Were you aware of any agreement that Jim

1   signed acknowledging that Jon owned intellectual

2   property that Smart would be using?

3        A.   No.

4        Q.   He never talked to you about this agreement?

5        A.   There wasn't a formal agreement.  It was just

6   something that SmartComm used.

7             MR. OPRISON:  Could you put up 708, Justin?

8   BY MR. OPRISON:

9        Q.   Have you ever seen this document before?  This

10  is 708 that's been admitted into evidence?

11       A.   No.

12       Q.   Never seen this document?

13       A.   I have not.

14       Q.   Do you recognize that signature?

15       A.   That could be Jim's.

16       Q.   Could be Jim?

17       A.   It could be, yes.  But then Jim's signature

18  has been forged before.  So.

19       Q.   Do you see the name at the bottom of that

20  e-mail, Jim Logan to Alexis?

21       A.   Correct.

22       Q.   You understand that Alexis also signed this

23  same agreement?

24            MR. O'NEILL:  Objection Your Honor.  She just

25            testified that she's never seen this document

1    before.

2         THE COURT:  Sustained.

3         MR. OPRISON:  I'm asking if she has an

4    understanding or otherwise whether you have seen

5    this agreement or not.

6         THE COURT:  You can rephrase but I'm

7    sustaining the objection.

8    BY MR. OPRISON:

9    Q.   Are you aware that Alexis -- have you heard

10   are you aware through other Marines that Alexis also

11   signed this agreement?

12   A.   No.  Wasn't aware Jim signed it either.  I

13   don't think his signature looks like, though.  Why is it

14   angled up like that.

15   BY MR. OPRISON:

16   Q.   Ma'am I didn't sign it but there is no dispute

17   up to this point that Jim as a matter of fact signed

18   this agreement?

19        MR. O'NEILL:  Objection Your Honor.  Misstates

20   evidence.

21        THE COURT:  Mr. Oprison is not giving

22   testimony.  So I don't consider what he just said

23   testimony.

24   BY MR. OPRISON:

25   Q.   But fair to say your husband, you didn't know

1   about this because Jim didn't talk to you about this

2   agreement?

3        A.   That's correct.  I don't know about it.

4        Q.   You've actually never provided any services to

5   SmartComm have you?

6        A.   That is untrue.

7        Q.   Have you ever -- have you ever worked in any

8   capacity for SmartComm?

9        A.   Without pay, I worked for Jim.  He asked me to

10  write checks.  Take things to the printer.

11       Q.   You didn't have a title with SmartComm did

12  you?

13       A.   No.

14       Q.   You never shared as a director?

15       A.   Never.

16       Q.   You never shared as an officer?

17       A.   No.

18       Q.   And you didn't have any defined roles more

19  SmartComm?

20       A.   Correct.  I was just helping my husband.

21       Q.   Do you believe that the HLFIP IP that is used

22  by SmartComm is virtually worthless?

23       A.   I think it's diminished because of the court

24  that said it was not a valid patent.

25       Q.   You mean when the patent as to 617, the one

1   patent that had been invalidated?

2        A.   Correct.

3        Q.   You understand there's other patents?

4        A.   I understand there's babies, yes.

5        Q.   You understand there other patents than the

6   other two effective with MailGuard whose technology?

7        A.   I don't know how many there are.  I know

8   there's more than one.

9        Q.   So only one out of all those patents that

10  you're aware of that's been invalidated?

11       A.   That I'm aware of.

12       Q.   But it's still your view, then that the the,

13  that the IP, that HLFIP licenses to SmartComm is

14  virtually worthless?

15       A.   I said it's diminished.

16       Q.   What do you mean by diminished?

17       A.   It's worthless.

18       Q.   But not worthless?

19       A.   No I would not say it's worthless.

20       Q.   Why do you think it's worthless?

21       A.   Because the main patent was invalidated.

22       Q.   From MailGuard?

23       A.   Correct.

24       Q.   You understand there's other technology that

25  has been developed and licensed out to SmartComm that

1  SmartComm uses for its contract?

2       A.   I just don't know because nobody tells me.

3       Q.   So there could be a lot, you just don't know?

4       A.   That's correct.

5       Q.   Before preparing your second Amended Verified

6  Complaint, did you speak to Alexis low your daughter?

7       A.   Speak with her all the time.

8       Q.   Did she tell you what to put into that -- tell

9  you what to put into that Complaint?

10      A.   Everything, my legal team developed it.

11      Q.   So your lawyers developed it, gave it to you

12  to sign?

13      A.   Yes.

14      Q.   But you don't have any independent knowledge

15  one way or the other?

16      A.   Of what?

17      Q.   Of any of the facts in that Complaint.

18      A.   Oh, I believe I do, yes.

19      Q.   Did you make any edits to the Amended

20  Complaint before you signed it?

21      A.   No, no.

22      Q.   So you just took whatever your attorneys put

23  in front of you and you signed it?

24      A.   I read it and signed it.

25      Q.   And then signed it.

1          MR. OPRISON:  Can I confer Your Honor real

2     quick?

3          THE COURT:  You may.

4  BY MR. OPRISON:

5     Q.   You did file a $110 million claim yesterday

6  against -- in the bankruptcy court, correct?

7     A.   I did.

8     Q.   And that's your valuation of half of what

9  SmartComm's --

10    A.   No it says at least 110 million.

11    Q.   And you understand that the entirety of what

12 SmartComm does is use HLFIP's IP, right?

13         MR. JOHNSON:  Objection to form.

14         THE COURT:  Sustained.

15 BY MR. OPRISON:

16    Q.   You understand that SmartComm uses HLFIP's IP,

17 nobody else's IP in carrying out its contracts?

18    A.   Correct.

19    Q.   It so that it has value, whatever value that

20 is?

21    A.   Uh-huh.

22    Q.   Derived from the contracts it has using

23 HLFIP's IP?

24    A.   Yes it contribute some value.

25    Q.   And you believe you're entitled to

1  $110 million out of the company?

2      A.   At least.

3           MR. OPRISON:  Thank you, Your Honor.

4           THE COURT:  Mr. Hillsley.

5           MR. HILLSLEY:  Yes, Your Honor.

6           Cross examination.

7  BY MR. HILLSLEY:

8      Q.   Good afternoon, Ms. Logan?

9      A.   Hello.

10     Q.   To make a clear record given the presence of

11  your daughter Alexis Logan, I'm going to call you Janice

12  is that all right?

13     A.   That's fine.

14          THE COURT:  How you about Janice Logan.

15          MR. HILLSLEY:  I can do that Your Honor.

16          THE COURT:  Thank you.

17  BY MR. HILLSLEY:

18     Q.   What what date are you asking the Court to use

19  for valuation.

20     A.   February 27, 2023.

21     Q.   That's about two years ago, isn't it?

22     A.   Almost.

23     Q.   You've argued in this case that date is

24  appropriate to value the trust interests in SmartComm,

25  correct?

1  A. Yes.

2  Q. And you believe that is the case, at least in

3 part because you've been oppressed by Jon and SmartComm,

4 is that right?

5  A. Correct.

6  Q. Specifically you selected February 27, 2023 on

7 the grounds that that was the date that Jon sued you in

8 this court, is that correct?

9  A. Yes.

10  Q. Let's talk a little bit about what's happened

11 over the last two years.  You've argued in this case

12 that Jon and SmartComm have oppressed you, I think you

13 just testified to that, right?

14  A. Yes.

15  Q. Until the bankruptcy filing SmartComm's paying

16 you $100,000 a year, correct?

17  A. Yes.  But he -- he did fire me in June of 2023

18 or even before, and then he fired me again in October of

19 2024.

20  Q. From the date -- are you aware that there was

21 an injunction been placed it that required SmartComm to

22 pay you $100,000 a year?

23  A. Yes.

24  Q. And then you received $100,000 up until the

25 bankruptcy was filed, correct?

1        A.    Correct.

2        Q.    You received health benefits as well?

3        A.    Yes.

4        Q.    You live in a house owned by Smart

5   Communications, don't you?

6        A.    Yes.

7        Q.    It and that house is a 700 square foot manages

8   on a 20-acre estate, fair?

9        A.    It's a house on 20 acres, correct.

10       Q.    Are you saying you don't think a 7,000 square

11   foot house?

12       A.    It is a 7,000 square foot house.  I I don't

13   recognize it as a manages.  It's a house.

14       Q.    Let's put up Smart Communications

15   demonstrative number 2.

16             Janice Logan, is this where you live?

17       A.    That is home sweet home.

18       Q.    You don't pay represent or a mortgage to live

19   in this house, do you?

20       A.    No.

21       Q.    Smart Communications pace for the costs

22   associated with maintaining this manages -- sorry,

23   house -- and estate doesn't it?

24       A.    Not at this time.

25       Q.    It did up until the bankruptcy, correct?

1    A.   Yes.

2    Q.   And that included power washing,?

3    A.   Oh, of the fences, yes.

4    Q.   The new generator?

5    A.   Yes.

6    Q.   Landscaping?

7    A.   Yes.

8    Q.   Did the cost amount to at least several

9  $100,000?

10    A.   I wouldn't know.

11    Q.   Do you have a reason to believe that that

12  wouldn't be the case?

13    A.   I think that's a little high but out --

14    Q.   Over $100,000 is that fair?

15    A.   Correct.

16    Q.   You have possession of a Smart Communications'

17  owned car as well correct?

18    A.   Yes.

19    Q.   And that's a Cadillac escalated?

20    A.   2021.

21    Q.   And you've declined to give the Escalade back

22  to Jon for company use, correct?

23    A.   That's correct.  I own half of it.

24    Q.   Half of the company, correct?

25    A.   Half of the company which owns the vehicle.

1      Q.   You don't drive that vehicle, do you?

2      A.   Yes.

3      Q.   Your testimony is that you do?

4      A.   Yes.

5      Q.   Let's put up Exhibit 563.  Janice -- sorry

6  Janice Logan do you remember giving a deposition on

7  July 14, 2023 in this case, that would be your first

8  deposition?

9      A.   Yes.

10      Q.   Does this look like a transcript from that

11  deposition?

12      A.   Perhaps, yes.

13      Q.   We can look at the date, do you see July 14,

14  2023?

15      A.   Yes.  And I see my name, yes.

16      Q.   So would you agree that this is a transcript

17  from that deposition?

18      A.   Yes.

19      Q.   Let's go to page 26, line 1?

20          MR. JOHNSON:  Objection.  Improper

21      impeachment.  The question is do you drive.

22          MR. HILLSLEY:  I haven't gotten to the

23      impeachment yet.

24          MR. JOHNSON:  Doesn't matter.  It's a didn't

25      drive in a year and a halving I'm not sure how you

1    impeach.

2         THE COURT:  I don't know what is going to say

3    but if his question did not limit it until the time

4    period before July 14, 2023, I agree with you on

5    that.

6  BY MR. HILLSLEY:

7    Q.    Let's go to foundation, Ms. Logan.  Did you

8  drive the Cadillac before July 14, 2023?

9    A.    Yes.

10   Q.    All right.  I'm reading from page 26 line 1,

11  question what car do you drive?  Answer:  Why do you

12  need to know that.  Question I am asking the questions.

13  Mr. O'Neill, you can go ahead and answer.  The witness I

14  drive a GMC Yukon.

15        By my Negovan, question and what year is that?

16   A.    2023 question:  Hock so who drives the

17  Cadillac answer:  No one.

18        Did I read that correctly?

19   A.    You did.

20   Q.    Suffice sum up, you received a hundred

21  thousand dollars a year, you get to live in a 7,000

22  square foot house in a 20-acre estate rent free and

23  least some expenses paid for and with a company-paid

24  car, would you say that summarizes the testimony you

25  just gave me?

1          MR. O'NEILL:  Objection to form to the extent

2      it mischaracterizes her testimony, Your Honor.

3          THE COURT:  She can answer.

4   A.   Would you repeat that question, please?

5          MR. HILLSLEY:  Could you read it back?

6          THE COURT REPORTER:  "Suffice sum up, you

7      received a hundred thousand dollars a year, you get

8      to live in a 7,000 square foot house in a 20-acre

9      estate rent free and least some expenses paid for

10      and with a company paid car, would you say that

11      summarizes the testimony you just gave me?"

12   A.   Yes.

13   BY MR. HILLSLEY:

14   Q.   And you provide no services to the company in

15   exchange for that, correct?

16   A.   That's incorrect.

17   Q.   You testified that that's Incorrect because

18   you take care of the house you live in rent free?

19   A.   Yes.

20   Q.   Would you acknowledge at least that most

21   people don't get paid $100,000 a year to take care of

22   their own house?

23   A.   I wouldn't know what other people get paid.

24   Q.   I'm sorry could you repeat that?

25   A.   I wouldn't know what other people get paid for

1    that job.  I don't know.

2         Q.   And when you say you take care of the house,

3    you're not doing manual labor, are you?

4         A.   Yes.

5         Q.   Do you hire other people?

6         A.   I do hire other people to help me but yes.

7         Q.   And in fact, SmartComm pace for some of those

8    services do they not?

9         A.   They did.

10        Q.   And that included in install a new generator,

11   correct?

12        A.   That's correct.

13        Q.   So all of these benefits you receive from

14   SmartComm and the only work you do is taking care of the

15   house that oppression to you?

16        A.   I didn't say it was oppression.

17        Q.   So your testimony is that is not oppression?

18        A.   That is not oppression.

19        Q.   You told me a couple weeks ago in your

20   deposition that the only thing you know of that Jon has

21   done wrong with his performance leading Smart

22   Communications is not sharing enough information with

23   you, do you remember that?

24        A.   Yes.

25        Q.   The type of information you think Jon Logan

1    should be providing you includes Smart Communications'

2    financial information, would you say that's true?

3         A.    Correct.

4         Q.    Are you aware that Smart Communications has

5    produced a host of its financial information in this

6    case?

7         A.    Yes.

8         Q.    In fact on your behalf your counsel filed

9    publicly the entire general ledger of the company in the

10   bankruptcy case, were you aware of that?

11        A.    Would you repeat that?

12        Q.    On your behalf your counsel filed publicly the

13   entire general ledger of the company in the bankruptcy

14   case, are you a bear of that will?

15             MR. O'NEILL:  Your Honor, I would like to

16             correct the record on that just for the record that

17             that question implies intent and intent is going to

18             be relevant to Your Honor's hearing next week and

19             so I don't want there to be any intention by

20             Ms. Logan or counsel as to the bankruptcy filing.

21             MR. HILLSLEY:  Your Honor I think she can

22             answer the question.

23             THE COURT:  I'm going to sustain that

24             objection.  You may continue.

25

1  BY MR. HILLSLEY:

2      Q.   Ms. Logan, did you review your claim that was

3  filed yesterday in the bankruptcy case before it was

4  filed.

5      A.   Yes.

6      Q.   Did you review the whole thing?

7      A.   Yes.  Well it didn't include all the detailed

8  financial stuff you're referring to, I think.

9      Q.   Is it your testimony that you didn't review

10  the exhibits?

11     A.   I don't know that three were attached to what

12  I signed.

13     Q.   Do you recall reviewing the exhibits?

14         MR. JOHNSON:  Judge I'm going to object.

15         THE COURT:  I'm going to.

16         MR. JOHNSON:  You said the hearing for next

17     week she's not prepped for.

18         THE COURT:  I'm going to sustain.

19  BY MR. HILLSLEY:

20     Q.   Despite the many requests for financial

21  information from SmartComm, which have led to documents

22  you testified have been produced in this case, you have

23  not reviewed any financial information of SmartComm's

24  have you.

25     A.   If it was provided to me, I did.

1        Q.   As of January 21, 2025, would you agree with

2   me that you had not read any of the financials of

3   SmartComm?

4             MR. O'NEILL:  Objection Your Honor to the

5        extent, I guess counsel might clarify what he means

6        by "financials."

7             THE COURT:  You're going start impeaching her.

8             MR. HILLSLEY:  Nods head.

9             THE COURT:  Was the underlying question

10       specific names or was it just financials?

11            MR. HILLSLEY:  Financial statements, Your

12       Honor.

13            THE COURT:  Overruled.

14   BY MR. HILLSLEY:

15       Q.   Let's put up Exhibit 500.  Do you recognize

16   this as your deposition transcript from January 21,

17   2025?

18       A.   Yes.

19       Q.   It let's go to page 68, line 10.  Question:

20   Having reviewed those documents.  Sorry let me ask a

21   foundational question.  Have you personally reviewed the

22   financial statements from Smart Communications?  Answer:

23   I have not.

24            Were you asked that question and did you give

25   that answer?

1        A.    Yes, I gave that answer.

2        Q.    So let's talk about the why.  You've never

3   been involved in Smart Communications' business

4   operations, have you?

5        A.    No.

6        Q.    And to be clear what you are confirming to the

7   Court is that before February 27, 2023, that's the date

8   of the Complaint was filed by Jon Logan in this case you

9   claim to be the date that's used for valuation, you were

10  not involved in any operational or business decisions at

11  SmartComm, correct?

12       A.    Yes, that's correct.

13       Q.    And that's because you've never had the

14  authority to make decisions on SmartComm's behalf,

15  correct?

16       A.    Correct.

17       Q.    In fact, even before Jim Logan died, you've

18  never even went into the office -- offices of SmartComm,

19  did you?

20       A.    I had been there a couple times.

21       Q.    Let's go to page 53, line 14.

22             Question:  How often did you go into the

23  office while Jim Logan was alive, the office of Smart

24  Communications?  Answer:  I did not "were you asked that

25  question and did you give that answer?

1          A.    I did.

2          Q.    You've never been an officer or director of

3     the company, correct?

4          A.    That's correct.

5          Q.    And you don't believe you are qualified to

6     lead Smart Communications, correct?

7          A.    I am not qualified but I certainly could hire

8     someone who was.

9          Q.    You agree you are not personally qualified?

10         A.    I agree.

11         Q.    You've never personally been a shareholder of

12    the company, correct?

13         A.    Not personally.

14         Q.    And let me go back, you just testified that

15    you could hire someone.  Have you ever interviewed

16    anyone to be a leader of Smart Communications?

17         A.    No.

18         Q.    You testified earlier that after your husband

19    passed, the Trust became -- well, actually, let me amend

20    that.  Strike that.

21              You testified earlier that after your husband

22    passed, you became the trustee of the Trust which owns a

23    50 percent -- 50 percent of Smart Communications,

24    correct?

25         A.    Yeah.

1    Q.   And you control that Trust?

2    A.   I do.

3    Q.   Are you aware that over the last few years

4  your lawyers tried very hard to make you a director of

5  the company on behalf of the Trust?

6    A.   Yes, I'd like to be a director.

7    Q.   You even requested a shareholder meeting to

8  accomplish that, didn't you?

9    A.   I did.

10   Q.   And that meeting resulted in a deadlock

11 because you voted to be a director and Jon voted against

12 it, right?

13   A.   Yes.

14   Q.   Now, you just said you would like that very

15 much to be a director, right?

16   A.   Yes.

17   Q.   The truth is is that you never wanted to be a

18 director, did you?

19   A.   I don't know why you would say that.  I've

20 requested to be a director since day one.

21        MR. HILLSLEY:  Let's put up Exhibit 500 back

22      up.  That's the deposition transcript that we were

23      just looking at.  Would like to go to page 52, line

24      23.

25

1   BY MR. HILLSLEY:

2       Q.   "Question:  Ms. Logan, would you agree that

3   given your lack of work experience and lack of

4   experience in the company and industry, you're not

5   qualified to run Smart Communications?

6           "Mr. O'Neill:  Objection to the form.  You're

7   boarding on argumentative.  You can go ahead and answer.

8           "THE WITNESS:  I agree.  I would not want to."

9           Were you asked that question and given.

10          MR. O'NEILL:  Your Honor, I object to improper

11      impeachment.  I believe the question was:  You

12      never wanted to be a director.

13          THE WITNESS:  No.

14          MR. HILLSLEY:  Your Honor, I submit that's a

15      distinction without a difference.

16          THE COURT:  Well, I'm going to sustain.

17          THE WITNESS:  I can't --

18          THE COURT:  I want to remind our collective

19      group while why we are here.  So this has to either

20      go to the issue of the royalty matter or the date

21      of valuation.  I've been letting this go on but --

22          MR. HILLSLEY:  Your Honor Ms. Logan has argued

23      in her papers both in November and again in

24      connection with this hearing that she was used from

25      the company, fundamental prerequisite she was

1      involved in the company if the first place.  And

2      now we have testimony that she never even wanted to

3      be.  She wasn't and she didn't want to be.  This is

4      fundamental to our case on this ouster issue.

5           THE COURT:  Remember at the ends of the day,

6      there's a judicial dissolution allegation and a

7      valuation of the company for the shareholder.

8      Shareholder being the trustee.

9           MR. HILLSLEY:  Your Honor, their theory is

10     that you should look back two years because she

11     could have run this company better than Jon Logan

12     and the evidence that she neither was ever in

13     charge of it and didn't want to goes to

14     establishing that that's not a valid reason to look

15     back in two years.

16          THE COURT:  Go ahead and do what you need to

17     do.

18  BY MR. HILLSLEY:

19     Q.   Ms. Logan, you are not aware of anyone at

20  Smart Communications other than Jon Logan that has the

21  experience and ability to manage the Smart

22  Communications' companies are you?

23     A.   I don't know any of the other employees.

24     Q.   So you aren't aware of anyone right now?

25     A.   No, I'm not.

1          Q.   If Jon Logan resigned from Smart
2     Communications and no longer managed the portfolio
3     companies, that would have an immediate negative impact
4     on the company; wouldn't it?
5          A.   Would you repeat that?
6          Q.   If Jon Logan resigned from Smart
7     Communications tomorrow and no longer managed the
8     company, that would have an immediate negative impact on
9     those companies, correct?
10         A.   No.  Someone else could be hired to do his
11    job.
12         Q.   You just testified earlier that you haven't
13    interviewed anyone for that role?
14         A.   I didn't say interview but someone could be
15    hired to do his job.
16         Q.   No one is lined up right now, right?
17         A.   No.  I have not contacted anyone.
18         Q.   Jonathan Logan came up with the ideas that
19    SmartComm uses, you testified to that earlier correct?
20         A.   Yes.
21         Q.   So there is no one else at Smart
22    Communications who can come up with the ideas for
23    technology for SmartComm like Jonathan Logan has done,
24    correct?
25         A.   Why do I need more ideas.  We've got some

1  pretty good once out there right now.

2      Q.    Because you have Jonathan Logan, correct.  We

3  have the patents or IP information at Smart.

4      Q.    What?

5      A.    We have IP information that Smart was using.

6      Q.    My question is a little bit different.  I

7  asked that's because you have Jonathan Logan providing

8  these ideas to SmartComm, correct?

9      A.    No, they are provided through HLFIP.

10     Q.    Which Jonathan Logan owns?

11     A.    Correct.

12     Q.    Do you know if there is anything that would

13  prevent Jonathan Logan from starting a new company that

14  provided the same services as Smart Communications?

15     A.    I wouldn't know.

16         MR. JOHNSON:  Calls for a legal conclusion,

17     judge.

18         THE COURT:  Sustained.

19  BY MR. HILLSLEY:

20     Q.    Jonathan Logan goes to trade shows on the like

21  for Smart Communications, correct?

22     A.    Yes.

23     Q.    Have you ever been to a trade show on behalf

24  of SmartComm?

25     A.    No.

1      Q.   Do you have any sales experience?

2      A.   No.

3      Q.   To your understanding, Jon is involved in

4  obtaining customers for SmartComm, correct?

5      A.   Yes.

6      Q.   Jon assists in obtaining all of SmartComm's

7  customers, would you say that's fair?

8      A.   No.  We have a sales team.

9      Q.   Do you know if Jon oversees that team?

10      A.   I don't know who oversees it.

11      Q.   Does Jon assist -- sorry does Jonathan Logan

12  assist in procuring all of Smart Communications existing

13  vendor agreements?

14      A.   I don't know.

15      Q.   Are you aware of anyone at Smart

16  Communications with at least as much experience as

17  Jon Logan in operating Smart Communications' entities?

18      A.   Other than Jim, I would say no.

19      Q.   And unfortunately Jim has passed, correct?

20      A.   Yes.

21      Q.   Would you agree that the litigation between

22  HLFIP, Jon Logan, and the Trust has had a negative

23  impact on the value of SmartComm?

24          MR. O'NEILL:  Objection, Your Honor.  We are

25          specifically here not to talk about valuation.

1          MR. HILLSLEY:  I can rephrase, Your Honor.

2          THE COURT:  Sustained.

3    BY MR. HILLSLEY:

4          Q.   Would you agree that the litigation between

5    HLFIP, Jon Logan, and the Trust has cost Smart

6    Communications a lot of money?

7          A.   In legal fees.

8          Q.   That's a yes as to legal fees, correct?

9          A.   Yes that's a yes but keep in mind that I pay

10   50 percent of their legal fees as 50 percent owner of

11   the company.

12         Q.   Are you aware that your attorneys have argued

13   you were oppressed by Jon Logan in part because he

14   stopped you from selling the Trust shares to a third

15   party?

16         A.   Repeat that, please.

17         Q.   Are you aware that your attorneys have argued

18   that you were oppressed by Jon Logan because he stopped

19   you from sell the Trust shares to a third party?

20         A.   Yes, I'm aware of that.

21         Q.   How long do you think it would take you to

22   sell the SmartComm business if it was put up for sale?

23         A.   Well it would require restructuring it and as

24   of now, my shares are worth not very much.

25         Q.   So it would take a while?

1       A.   I don't know how long it would take.  That
2  would be a professional question.
3       Q.   You've never tried to sell your shares to a
4  third party?
5       A.   No.
6       Q.   Does Smart Communications have any
7  competitors?
8       A.   Yes.
9       Q.   You testified you never solicited a third
10 party; that means you never solicited to have one of
11 Smart Communications' competitors acquire your interest
12 in the company, correct?
13      A.   That's correct.  I don't know where that
14 question's coming from.  I have not had contact with any
15 of our competitors.  Ever.
16      Q.   And you have not even consulted with anyone
17 about the possibility of selling the Trust shares to the
18 third party is that he is your testimony correct?
19           MR. O'NEILL:  Objection.  Asked and answered,
20      Your Honor.
21           THE COURT:  Sustained.
22           MR. HILLSLEY:  A moment to consult, Your
23      Honor.  Two more questions.
24 BY MR. HILLSLEY:
25      Q.   Ms. Logan, did you sell a Corvette that Smart

1  Communications bought for Jim Logan?

2       A.   I sold a Corvette that was in Jim Logan's

3  name, yes.

4       Q.   Did you understand that that was purchased

5  using Smart Communications money?

6            MR. JOHNSON:  Judge, this is part of the case

7       of pleadings that you're not --

8            THE COURT:  Sustained.

9            MR. HILLSLEY:  Thank you, Your Honor.

10                     CROSS EXAMINATION

11  BY MR. O'NEILL:

12       Q.   Good afternoon, Ms. Logan?

13       A.   Hello.

14       Q.   Going to ask you to introduce yourselves but

15  we're way past that now.

16       A.   Uh-huh.

17       Q.   I want to talk, Ms. Logan, about -- I'm going

18  to try to be quick here but I'm going to talk briefly

19  about Jim, his role at the company before he passed in

20  October of 2022.

21            Was Jim a director of Smart Communications

22  Holding, Inc.?

23       A.   Yes.

24       Q.   And he was also an officer, right?

25       A.   Yes.

1      Q.    And to your knowledge did he have access to

2    the company's books and records?

3      A.    Yes.

4      Q.    And also the company's tax returns?

5      A.    Yes.

6      Q.    To your knowledge did Jim receive a salary?

7      A.    Yes.

8      Q.    Did Jon ever CUT Jim's salary payments?

9      A.    No.

10     Q.    To your knowledge did Jim receive health care

11   benefits from the company?

12     A.    Yes.

13     Q.    Did Jon ever terminate those health care

14   benefits?

15     A.    No.

16     Q.    You and Jim lived together in the Ranch Club

17   Boulevard house that we saw a little bit earlier right?

18     A.    Yes.

19     Q.    And I think it was mentioned earlier that

20   house was purchased by Smart Communications?

21     A.    Yes.

22     Q.    Before Jim died, had Jon ever tried to evict

23   Jim from the house?

24     A.    No.

25     Q.    And did Jim drive cars that were purchased by

1   the company over the years?

2        A.   Yes.

3        Q.   Did Jon ever try to repossess those cares from

4   Jim?

5             MR. HILLSLEY:  Objection Your Honor this is

6             along series of legal questions.

7             THE COURT:  I'm going to overly it.  Let's

8             just get this done.

9   BY MR. O'NEILL:

10       Q.   His low, after Jim passed away in October of

11  2022, did you ever conversations with Jon about the

12  company purchasing your 50 percent ownership interest at

13  that time?

14       A.   Yes.

15       Q.   And I want to focus specifically about a

16  conversation that I believe Mr. Logan referred to

17  yesterday in January of 2023.

18       A.   Yes.

19       Q.   Do you recall?

20       A.   Oh, definitely recall.

21       Q.   I know you were hear yesterday in Mr. Logan

22  testified about the conversations.  Can you tell us to

23  your knowledge what was actually discussed?

24       A.   He was trying to tell me why will the

25  20 million was acceptable or should be acceptable to me.

1   And I said I think we've got valuations from UBS and

2   Truist that indicated it's worth anywhere from

3   200 million to 550 million.  Why would I accept

4   20 million?  And he got real ugly with me and used

5   language that I don't use.  He was yelling at me and so

6   I just hung up on him.

7             Oh, let me back up.  He said, "If you don't

8   accept the 20 million, I'm going to pull the patents and

9   I'm going to start a new company."  And, by golly,

10  that's what he's done.

11       Q.   And what was your understanding at the time he

12  did you have any understanding of what he meant by I'm

13  going to start a new company?

14       A.   No.

15       Q.   And at the time did you have any understanding

16  of what he meant by pull the patents?

17       A.   No.

18       Q.   After that conversation, we've -- you've been

19  in the court so you've seen the letter that our firm

20  sent to Jon, right?

21       A.   Nods head.

22       Q.   Nan that letter I'll represent to you that and

23  it's in evidence that in there there was a books and

24  records request, do you remember that?

25       A.   Yes.

1      Q.   Why was it important for you at that time to

2  have access to the company's books and records?

3      A.   Because I needed to know where this company

4  was and to know what kind of decisions were being made.

5      Q.   Did Jon respond to the letter at all before

6  filing the lawsuit?

7      A.   I think he sent me a text message as to why

8  the 20 million should be -- he said it's going to take

9  him 42 years to pay it off or something, I don't know.

10  I had already asked you guys to accepted a letter saying

11  please don't contact Janice, and I want no contact with

12  Jon.  When he speaks with me, he's vulgar.

13      Q.   And you're aware of the Complaint that

14  ultimately was filed in February of 2023.  We've been

15  through there so I'm in the going to go through it all.

16  Are you generally aware that it involve the Shareholder

17  Agreement and whether you were bound by that agreement?

18      A.   Yeah he was trying to make my honor a

19  Shareholder Agreement that I don't believe had been

20  executed properly.

21      Q.   So I want to shift gears and talk about what

22  happened after the lawsuit was filed.

23           You mentioned, I believe, on your direct but

24  also cross examination that Smart Communications CUT off

25  your salary payments at some point?

1      A.    It did.

2      Q.    And when was that?

3      A.    I think in June.

4      Q.    Would that have been June of 2023?

5      A.    Yeah.  June of '23.

6      Q.    And then did you also have your health care

7  benefits cut off?

8      A.    Yes.

9      Q.    We talked a little bit earlier about your

10  home.  Did Jon take any action with respect to your home

11  after this lawsuit was filed?

12      A.    Yes, he sent me a 30 day eviction notice.

13      Q.    Did he take any action with respect to the

14  company car at the house?

15      A.    He put a replevin on the Escalade.

16      Q.    Did he consult you about the eviction before

17  he had filed the Complaint relating to the house?

18      A.    No.

19      Q.    Did he consult you at all about the replevin

20  action before he had filed that?

21      A.    No.

22      Q.    Since this lawsuit was filed, you've not been

23  allowed to be a director; is that right?

24      A.    Right.

25          MR. HILLSLEY:  Your Honor, I'm going to renew

1      my objection about leading the witness.  It seems

2      to me the --

3           MR. O'NEILL:  I can clean it up, Your Honor if

4      you would like.

5           THE COURT:  I mean, does anyone think that the

6      answers are going to be different?

7           MR. HILLSLEY:  I think they may be, Your

8      Honor.

9           THE COURT:  Okay.  Ask non-leading questions

10      and if it takes us longer, it takes us longer.

11           MR. O'NEILL:  I'll be quick, Your Honor.

12  BY MR. O'NEILL:

13      Q.   Ms. Logan, since this lawsuit was filed, have

14  you been allowed to be a director of Smart

15  Communications?

16      A.   No.

17      Q.   Since this lawsuit was filed, have you been

18  allowed to be an officer of Smart Communications?

19      A.   No.

20           MR. HILLSLEY:  Your Honor, I got -- this is

21      still leading questions.

22           THE COURT:  Okay.  Is there any doubt in

23      anyone's mind that Jon Logan did not allow Janice

24      to be the officer or director?  I mean, is that an

25      issue in this case?

1              MR. HILLSLEY:  I don't think we even need to

2         ask those questions, Your Honor.  They are leading

3         questions this entire examination.

4              THE COURT:  I agree that a lot of questions

5         that have been asked of this witness have nothing

6         to do with the issues that we're trying here today.

7         But since Mr. Oprison and you asked a lot of those

8         questions that don't -- aren't designed, I feel

9         like I need to give the same latitude I gave the

10        two of you.  I just want to get through this

11        because, frankly, most of this isn't going to

12        address the issues we have here.  That's why I want

13        to get through it.  But since you want us to not

14        ask leading questions, Mr. O'Neill, please ask a

15        non-leading question.

16             MR. O'NEILL:  I do need to get these two

17        questions out because I think I was interrupted a

18        the some point.  I'm not toward Your Honor in any

19        way so I apologize.

20   BY MR. O'NEILL:

21        Q.   Ms. Logan, has Jon offered you an offer to

22   serve position in Smart Communications since this

23   lawsuit was filed?

24        A.   No.

25        Q.   Same question but for a director position?

1          A.    No.

2          Q.    Do you recall when Jon first produced the

3     books and records in this case?

4          A.    I think in November of 2023.

5          Q.    So I want to talk about what happened when you

6     received those books and records.  While the Shareholder

7     Agreement issue was being litigated, did Jon take any

8     action with respect to the patents?

9          A.    Well, in August of '23, he moved his patents

10    from a Florida corporation to a Delaware LLC.

11         Q.    So are you talking about kind of a series of

12    conversions we've been hearing about over the last

13    couple of days?

14         A.    Correct.  Same old stuff.

15         Q.    And have you seen the IP license agreement

16    that we've been talking about over the course of the

17    last day or so?

18         A.    Have I seen it in person?

19         Q.    Well, have you seen just a couple of it,

20    generally?

21         A.    No, I don't believe I've seen the actual

22    written document.

23         Q.    So can we go to Exhibit 306, please.

24               So Ms. Logan, do you see the date of this?

25         A.    The yeah.

1          Q.   This is the license agreement we have been

2     referring to from August 2023?

3          A.   Yes.

4          Q.   And so have you seen that at least in the

5     course of this trial?

6          A.   Yes.

7          Q.   Okay.  Did Jon Logan seek your consent before

8     signing this agreement?

9          A.   No.

10         Q.   If we go to the last page, the signature page

11    I'm sorry.  And then zoom in on the signature thank you.

12         Ms. Logan, do you see that it appears Jon had

13    signed for both HLFIP Holding, LLC and Smart

14    Communications Holding, LLC?

15         A.   I see that.

16         Q.   Was this the first time that you had heard of

17    Smart Communications Holding, LLC, the Delaware entity?

18         A.   Yes.

19         MR. HILLSLEY:  Your Honor, I just like to have

20         a standing objection to leading questions and I

21         won't bother Your Honor further.  They have

22         continued uninterrupted.

23         MR. O'NEILL:  Your Honor, if I may be heard.

24         The question:  "Was this the first time you had

25         heard of that entity" is not a leading question.

1          THE COURT:  I agree it's not a leading

2      question and I generally don't give standing

3      objections.

4  BY MR. O'NEILL:

5      Q.  Ms. Logan, was this the first time you had

6  heard.

7          Excuse me.  Let me take a step back.

8          Was -- when you received the license agreement

9  here in November of 2023, was that the first time you

10  had heard of Smart Communications Holding, LLC?

11      A.  Yes.

12      Q.  It to your knowledge, who created that entity?

13      A.  Jon Logan.

14      Q.  And did he tell you he was creating that

15  entity?

16      A.  No.

17      Q.  Did Jon Logan ever tell you that he was hiring

18  a company called Marcum?

19      A.  No.

20      Q.  Did Jon Logan ever tell you that he had hired

21  a law firm called Quicker Law with respect to a license

22  agreement?

23      A.  No.

24      Q.  Did Jon ever consult you about a royalty

25  allegedly owed by Smart Communications to HLFIP?

1        A.   No.

2        Q.   Before that 2023IP agreement we were just

3   looking at, did you have any knowledge of a royalty owed

4   by Smart Communications to HLFIP?

5        A.   No.

6        Q.   Before that 2023IP agreement, did you have any

7   knowledge of an oral license between Smart

8   Communications and HLFIP?

9        A.   No.

10       Q.   Before this 2023 IP agreement did you have any

11   knowledge of a written license between Smart

12   Communications and HLFIP?

13       A.   No.

14       Q.   To your knowledge before August 2023, was

15   there ever an agreement obligating Smart Communications

16   to pay HLFIP a 40 percent royalty?

17       A.   No.

18       Q.   Had Jon asked your permission before signing

19   that agreement, would you have given him that

20   permission?

21       A.   No.

22       Q.   To your knowledge, did Jon execute any other

23   agreements around the same time as the IP agreement?

24       A.   Yes.

25       Q.   We referred to it yesterday, was that the

1  asset transfer agreement?

2       A.   Yes.

3       Q.   Did Jon consult you about the as set transfer

4  agreement before signing it?

5       A.   No.

6       Q.   Had he asked you permission to transfer the

7  assets, would you have given him that permission?

8       A.   No.

9       Q.   You heard Jon testify a little bit earlier

10  about the conversion of Loco and Yacht to Delaware LLC,

11  do you remember that?

12       A.   Yes.

13       Q.   My question is simply did he consult you

14  before those conversions?

15       A.   No.

16       Q.   Do you recall Mr. Logan testifying about the

17  Delaware lawsuit?

18       A.   Say that again, please?

19       Q.   Sorry.  Do you recall Mr. Logan testifying

20  earlier about the Delaware lawsuit --

21       A.   Yes.

22       Q.   -- involving Loco and Yacht?

23       A.   Yes.

24       Q.   Did Jon tell you about that lawsuit before he

25  filed it?

 1       A.   No.

 2       Q.   Ms. Logan, earlier just a few more questions

 3  here.  Do you recall Jon, Mr. Schoenfeld, my colleague

 4  had asked Mr. Logan about some bylaws that were adopted

 5  for Smart Communications Holding, Inc.?

 6       A.   Yes.

 7       Q.   Did you -- did Jon consult you about those

 8  bylaws at all before they went into effect?

 9       A.   No.

10       Q.   And did Jon consult you about -- well, strike

11  that.

12            Did Jon discuss with you whether Smart

13  Communications should file for PWRUPT?

14       A.   No.

15       Q.   Had Jon consult you had for your thoughts

16  would you have agreed to file?

17       A.   No.

18            THE COURT:  Mr. Johnson.

19  BY MR. JOHNSON:

20       Q.   Ms. Logan, what if any training do you have as

21  an intellectual property lawyer?

22       A.   None.

23       Q.   What if any ability do you have to identify

24  the legal requirements for when something qualifies as

25  IP or intellectual property?

1           A.   I have none.

2           Q.   What, if any, ability do you have to describe

3    the contribution of Justin Scott versus Jim Logan versus

4    Jon Logan versus others in the product development at

5    Smart Communications?

6           A.   You will have to say that again, please.

7           Q.   Sure.  What, if any, ability do you have to

8    describe the contribution of Justin Scott, versus

9    Jim Logan, versus Jon Logan, versus somebody else at

10   Smart Communications in product development?

11          A.   I think they all had hand in it in a different

12   way.

13          Q.   But you weren't there day-to-day so you really

14   can't tell correct?

15          A.   That's correct.

16               MR. JOHNSON:  No further questions.

17               THE COURT:  Mr. Oprison.

18               MR. OPRISON:  I don't have anything sir.

19               THE COURT:  Mr. Hillsley.

20               MR. HILLSLEY:  Just four questions, Your

21          Honor.

22               Recross examination.

23   BY MR. HILLSLEY:

24          Q.   Ms. Logan, you testified earlier that

25   Jon Logan pulled the patent and started a new company,

1  do you remember that?

2       A.   Say that again.

3       Q.   You testified earlier that Jon Logan pulled

4  the patent and started a new company, do you remember

5  that?

6       A.   He threatened to do that, yes.

7       Q.   So it's not your testimony that he has done

8  that?

9       A.   I don't know if he started a new company at

10 this point.  I don't know.

11          MR. HILLSLEY:  Thank you.

12          MR. O'NEILL:  Couple follow-ups.

13          Recross examination.

14 BY MR. O'NEILL:

15      Q.   Before August 29, 2023, had you ever heard of

16 the entity Smart Communications Holding, LLC?

17      A.   No.

18      Q.   So is that company created after your

19 discussion with Jon in January of 2023?

20      A.   Yes.

21          MR. O'NEILL:  Nothing further, Your Honor.

22          THE COURT:  Mr. Johnson?

23          MR. JOHNSON:  No questions.

24          THE COURT:  Ma'am, you can go ahead and have a

25      seat.

1          Mr. Oprison?

2          MR. OPRISON:  Is.

3          MR. HILLSLEY:  Your Honor, our next witness is

4     Noreen Gunning.  Do you mind if we take five

5     minutes to get her?

6          THE COURT:  Is she Mr. Oprison's witness.

7          MR. OPRISON:  Smart's.

8          THE COURT:  So has HLFIP rested its case in

9     chief?

10          MR. OPRISON:  No, we have not Your Honor.  We

11     have an expert witness who is going to come on but

12     we're going to alternate because it makes sense for

13     Smart to bring Ms. Gunning in.

14          THE COURT:  Okay.  And so this is a tiny

15     sequence issue.

16          MR. OPRISON:  It is, yes, sir.

17          THE COURT:  So let's take five minutes and try

18     to keep it to five minutes.

19          MR. HILLSLEY:  Thank you, Your Honor.

20          (A break was taken at 1:40 p.m. and the

21     following commenced at 1:47 p.m.)

22          THE BAILIFF:  All rise.

23          THE COURT:  Please be seated everybody.  So

24     Mr. Hillsley you're calling the next witness so

25     call your next witness.

1          MR. RUDOLF:  Your Honor, we call Noreen

2     Gunning.

3          THE CLERK:  Do you solemnly swear or affirm

4     that the testimony you are about to give will be

5     the truth, the whole truth and nothing but the

6     truth?

7          THE WITNESS:  I do.

8          THE CLERK:  Thank you.

9  Thereupon,

10                    NOREEN GUNNING

11  the Witness, after first being duly sworn to tell the

12  truth, the whole truth, and nothing but the truth,

13  testified as follows:

14          THE COURT:  Mr. Rudolf.

15          MR. RUDOLF:  Yes, sir.

16                  DIRECT EXAMINATION

17  BY MR. RUDOLF:

18     Q.   Hi.

19     A.   Hi.

20     Q.   Good afternoon, Ms. Gunning.  Will you

21  introduce yourself to the Court?

22     A.   My name is Noreen Gunning and I'm the

23  accountant at Smart Communications.

24     Q.   And what is your title there?

25     A.   I'm the director of accounting and finance.

1       Q.    When did you join Smart Communications?

2       A.    In March of 2022.

3       Q.    What was your title when you started?

4       A.    The accountant.

5       Q.    So that different than your title now?

6       A.    It is.

7       Q.    Had a raise higher title?

8       A.    Yes, I took on more responsibility over the

9  past couple years.

10      Q.    And what services do you provide SmartComm in

11 the role of it's director of accounting and finance?

12      A.    I do bookkeeping accounting.  I prepare

13 consolidated financial records reports.  I prepare

14 operating reports.  I'm the treasurer.  I assist in

15 state compliance in regulations, I also am the business

16 manager so I would purchase the business insurance for

17 the company and other roles that I'm asked to step into

18 and account with.

19      Q.    Sound busy.  Are you a licensed CPA in

20 Florida?

21      A.    I am.

22      Q.    And now if it's okay with you, I'm going to

23 refer to Smart Communications Holding Inc., the Florida

24 parent corporation as SmartComm Florida.  And I'll refer

25 to the wholly-owned subsidiary, Smart Communications,

1   LLC the Delaware limited liability company as SmartComm

2   Delaware does that make sense?

3        A.   Okay.

4        Q.   Now, in your answers to any of my questions

5   require to you specify which SmartComm entity you're

6   talking about, please let us know.  Otherwise, if you

7   answer, to SmartComm, we'll assume that you talk about

8   Smart Communications Holding, Inc., SmartComm Florida,

9   is that fair?

10       A.   That's fair.

11       Q.   Who do you report to directly at SmartComm?

12       A.   Jon Logan.

13       Q.   And do you also provide services for

14   HLFIP Holding, LLC?

15       A.   I do.

16       Q.   And what services do you provide for them?

17       A.   I do the bookkeeping for the company as well

18   as I provide information to the tax accountant for tax

19   returns.

20       Q.   And would that being Mr. Mike Shreve?

21       A.   It is.

22       Q.   And now as a an initial matter can you tell us

23   whether SmartComm Florida is an operational entity.  It

24   is not.  It is a holding company.

25       Q.   And how is or what -- what company within that

1   SmartComm family is the operational entity?

2       A.   Smart Communications Collier incorporated is

3   the primary operating company.

4       Q.   And how is SmartComm Collier related to

5   SmartComm Florida in the corporate structure, if you

6   know?

7       A.   It's a wholly-owned subsidiary of the holding

8   company of SmartComm Florida.  So there is SmartComm --

9   Smart Communications Collier, Smart Communications U.S.

10  Incorporated, Smart Communications Pasco, Incorporated

11  are three wholly-owned subsidiaries that consolidate up

12  to SmartComm, Florida, the holding company.

13      Q.   And how do these companies prepare their

14  financial statements?

15      A.   We use the gap accrual base accounting and

16  then we take, it gets consolidated together and rolled

17  up into the holding company.

18      Q.   Now, I would like to talk some about SmartComm

19  Florida and its financial, the financial health.  Did

20  you prepare a chart to help you testify today about the

21  subject?

22      A.   I did.

23      Q.   And is it a fair and accurate depiction of the

24  testimony you would give today.  It is,.

25      Q.   Would a I am member aid the Court in your

1  testimony?

2      A.   I think so yesterday.

3          MR. RUDOLF:  Justin put up SmartComm

4      demonstrative 4.  This was previously sent to all

5      parties here.  I have a paper copy if you would

6      like.  May I approach?

7          THE COURT:  What Mr. Oprison is saying --

8          MR. RUDOLF:  Ms. Gunning, can you please tell

9      us what you're looking at.

10         THE COURT:  Mr. Oprison, I'm trained to watch

11     the entire room.

12         MR. RUDOLF:  I'm sorry Your Honor I'm not

13     getting in Q.

14         THE COURT:  No, no, I was trying to help you

15     along.

16         MR. RUDOLF:  Sorry for the technical

17     difficulties.  I think we're on a roll now.

18  BY MR. RUDOLF:

19     Q.   Ms. Gunning, would you tell us what we're

20  looking at?

21     A.   Yeah, this is summarized income statement that

22  I prepared out of the audited financials for 2022 and

23  2023.

24     Q.   And those are the audited financials of

25  SmartComm Florida?

1       A.   Yes.

2       Q.   Okay.  So can you tell us in these audited

3  financials that you prepared, I see operating expenses

4  without IP P and interest.  What does that mean:

5  Without IP P and interest?

6       A.   I eliminated the intellectual property fee and

7  the interests associated on the intellectual property

8  fee in order to review the financials as if that was not

9  part of the company.

10      Q.   Okay.  So in fiscal year 2023, SmartComm

11 Florida net loss of $524,482 even without taking in

12 consideration the IP license fee and interest?

13           MS. LIU:

14           MS. CLEMENT:  Operation.

15           THE COURT:  Sustained.

16           MR. RUDOLF:  Your Honor if I may.  He other

17      side has put this as issue by repeatedly stating

18      that the IP lies and the fee has somehow bankrupted

19      the company and is unfair to the royalty agreement

20      as well understand the Florida Statutes.  So.

21           THE COURT:  How much are you going to be

22      digging into these financial statements?

23           MR. RUDOLF:  I can try to be brief here.  I

24      will move along.

25           THE COURT:  Okay.  Go ahead.  Ask a few

1    questions but --

2         MR. RUDOLF:  All right.

3    BY MR. RUDOLF:

4         Q.   How does SmartComm Florida account for its

5    expenses?

6         A.   We record expenses as either a cost to consult

7    which is cost in this demonstration or as an operating

8    expense.  The.

9         Q.   Okay.  And what is SmartComm Florida's largest

10   cost to get sold?

11        A.   A facility commissions expense.

12        Q.   All right.  What's the next largest expense in

13   that cost currently old?

14        A.   Hardwear purchases.

15        Q.   Could you tell us a little about about those,

16   please?

17        A.   The company purchases hardware in order to

18   install in our customers sites once we sign a contract.

19   Included tablets for these by the inmates.  It includes

20   charging stations where the tablet's charged.  Kiosks

21   that are placed in either booking or other areas of the

22   facility, or friends and family to come up and order

23   come sorry account.  We also have legal carts that are

24   integrated and put together in are rolled around the

25   facilities so that inmates can pull up and read their

 1  legal mail privately.

 2       Q.   And just briefly, for those types of expenses,

 3  does SmartComm get to pass those along to the facilities

 4  in the customers or do they bear those expenses?

 5       A.   They bear the expenses.  They don't pass it

 6  on.

 7       Q.   And can you tell us how has SmartComm's

 8  hardware expenses as a percentage of its reef knew

 9  decreased over time?

10       A.   They've dramatically increased over the past

11  two years.  There has been requirements on behalf of our

12  customers to provide a one to one radio, one tablet for

13  each inmate whereas in prior years we were able to

14  supply one tablet for five to six inmates to share and

15  right now it's increased.  So the number of tablets

16  we're purchasing is going up.

17       Q.   Now let's move ahead and talk about the

18  operating expenses.  Can you kind of generally tell us

19  what do the operating expenses entail?

20       A.   They're expenses that companies bear that

21  support the company operations and support cost of goods

22  sold.  They are not directly related to the services

23  provided facilities.  It would be overhead expenses or

24  expenses that provide the company to operate.

25       Q.   Are legal fees a part of that?

1        A.    Yes.

2        Q.    And do you know as the accountant of SmartComm

3    Florida what the legal fees expenses in 2023 totaled?

4        A.    About three million dollars.

5        Q.    All right.  So absent the legal fees in 2023,

6    SmartComm Florida would have been profitable?

7        A.    Theoretically, yeah.  If you add it back in.

8        Q.    Do you know what SmartComm Florida's legal

9    fees amounted for fiscal year 2024?

10       A.    About four million dollars.

11       Q.    And in looking at 2022, SmartComm Florida

12   reported an operating profit for the IP licensing fees

13   of $5 million.  What did SmartComm Florida do with that

14   influx of cash, if you know?

15       A.    So that was over a years time and during the

16   year, the cash was used to invest in large properties

17   that would sit on the balance sheet as a fixed as set.

18       Q.    And what are some of these large properties?

19       A.    So there is a home in Sarasota, and there's

20   also an investment in a vessel, a yacht.

21       Q.    And that home in Sarasota, is that the home

22   that Jim Logan lived in before his passing and

23   Janice Logan currently live in?

24       A.    Correct.

25       Q.    So on a cash basis, how did SmartComm Florida

1   and fiscal year 2022?

2       A.   It had less than a million dollar in the bank

3   account.

4       Q.   All right.  And as a CPA in your role as a CPA

5   for SmartComm what minimum cash balance do you believe

6   SmartComm should have at any given time to support its

7   operations?

8       A.   Anywhere between three to four million dollars

9   in its current state.

10      Q.   Do you know whether SmartComm Florida is

11  operating income and again without taking into

12  consideration the IP licensing feel or royalty fee or

13  interest has improved in fiscal year 2024?

14      A.   No.  It has not.

15      Q.   And what is SmartComm Florida's operating

16  income or losses before the IP fee and interest for

17  2024?

18      A.   It's a loss of $1.4 million preliminarily on

19  our books.

20      Q.   Okay.  Now, I would like to talk to you about

21  what has been alleged of these 2023 transfers and

22  distributions in this case.

23          Are you aware of the formation of an entity

24  SmartComm Delaware?

25      A.   I am.

1    Q.   And what is your understanding of SmartComm

2  Delaware?

3    A.   That that's another wholly-owned subsidiary of

4  SmartComm Florida.

5    Q.   And as a CPA, what chiropractor of the

6  formation of SmartComm Delaware have on SmartComm's

7  Florida's financial health?

8    A.   It hasn't impacted it at all.

9    Q.   And why is that?

10   A.   Because we prepare financials at the operating

11 level so that's Collier U.S. and Pasco that has

12 consolidate and role up into the SmartComm Florida

13 holding incorporated entity.

14   Q.   So does SmartComm Delaware, does that register

15 on its books or anything or is it just ignored for

16 account iting purposes?

17   A.   For my purposes I ignore it.

18   Q.   Has SmartComm Delaware had any direct income

19 revenue or expense of any sort of costs with the

20 business itself?

21   A.   No.

22   Q.   Does SmartComm Delaware have a bank account in

23 its own name?

24   A.   No.

25   Q.   And I'd also like to ask about the booking of

1    the IP licensing fees and associated interest.  Has

2    there been any payments made from SmartComm Florida to

3    HLFIP in connection with the IP license fees or

4    interests?

5         A.   No.

6         Q.   Have there been any payments to SmartComm

7    HLFIP or any other person related to the IP license fees

8    and interests?

9         A.   No.

10        MR. RUDOLF:  You can take that down, Justin.

11   BY MR. RUDOLF:

12        Q.   Now, I would like to focus on the 2024

13   accounting adjustments that are discussed in this case

14   by the other side a little bit.

15             THE COURT:  Just so when we are talking when

16        we are talking about 2024 adjustments, are we

17        talking about adjustments occurred in 2024 to the

18        2023 financials or are we talking about something

19        else?

20             MR. RUDOLF:  So there are some allegations

21        that they --

22             THE COURT:  No, I need you to clarify with the

23        witness so I understand what we are talking about.

24             MR. RUDOLF:  Okay.  The adjustments in 2024

25        that I'm talking about are to the 2022 financials.

1          THE COURT:  The witness.

2          MR. RUDOLF:  Yes, Your Honor.  Thank you.

3   BY MR. RUDOLF:

4      Q.   So I would like to talk about 2024 adjustments

5   that were made to the financials for the year 2024.

6   There have been some allegations in this case that there

7   were ongoing corrections of existing financials and

8   creations of new ones in 2024.  Specifically with

9   respect to the financials as of May 28, 2024 and I would

10  like to ask about those.  So in 2024 is it true that you

11  made certain changes to how assets were classified?

12     A.   I was asked to reclassify some costs out of

13  shareholder letter loan and into fixed as set.

14     Q.   Okay.

15     A.   And there was also a reclassification out of

16  shareholder loan for rent expense as well.

17     Q.   Did you assist in preparing image to help me

18  testify about this subject?

19     A.   I did.

20     Q.   Is it fair and accurate depiction that will

21  give today.  It is.

22     Q.   And would it aid the Court in giving your

23  testimony?

24     A.   I think, so, yes.

25          MR. RUDOLF:  Justin demonstrative number 5.

1          THE COURT:  Do I get a copy.

2          MR. RUDOLF:  Yes, Your Honor.

3     BY MR. RUDOLF:

4          Q.   In looking at this image could you tell if

5     these are the assets reclassified?

6          A.   Yes, they are.

7          Q.   Let's talk about the one on top, it's the

8     Rolls-Royce Wraith, when was this purchased?

9          A.   August 2nd, 2018.

10         Q.   All right.  And how was it originally

11    classified on the financials?

12         A.   As a shareholder loan to Jon.

13         Q.   And how did you reclassify it?

14         A.   We reclassified it to a fixed asset vehicle on

15    the balance sheet.

16         Q.   Where in SmartComm Florida's financials can we

17    find the information reflecting this reclassification?

18         A.   It was done as a journal entry.  So it's in

19    journal entries as well as the general ledger.  So

20    journal entries make up the general ledger.

21         Q.   And it would be in both the journal entries as

22    well as the general ledger, is that correct?

23         A.   Correct.

24         Q.   And how would you go about finding this entry

25    in those ledgers?

1       A.   I mean, you could search for a keyword.  Maybe

2   "Rolls" or "Wraith".

3       Q.   Okay.

4       A.   If I put the description in correctly, which I

5   typically do, of what's going on.

6       Q.   Let's talk about the next one down, the

7   Ferrari Spider.  When was this asset purchased?

8       A.   June 14, 2022.

9       Q.   And do you recall were you the one who made

10  the transaction for the purchase of this car?

11      A.   I assisted in the transaction.

12      Q.   And who asked you to make the payment for the

13  Ferrari to purchase it?

14      A.   To James Logan.

15      Q.   And in whose name was it purchased?

16      A.   Jon Logan.

17      Q.   And who asked you to do that?

18      A.   James Logan.

19      Q.   And here, how was it originally classified in

20  the financials?

21      A.   It was classified as a shareholder loan to

22  Jon.

23      Q.   And why did you book it as a shareholder loan?

24      A.   Because it's an asset that was going to be

25  used for personal use in his name, and so it's assumed

1   that he would reimburse the company for that.

2       Q.   Had a similar assets been treated the same

3   way?

4       A.   Yes.

5       Q.   On financials?

6       A.   Yes.

7       Q.   And were you the individual who entered those

8   prior assets like that?

9       A.   From the point I started, yes, and prior to me

10  Jim or the prior accountant would have booked them that

11  way because I followed the same procedures that were

12  done before me.

13      Q.   And where in SmartComm Florida's financials

14  can we find this information about the reclassification?

15      A.   Same place in the general ledger or a journal

16  entry.

17      Q.   And you would search for that the same way?

18      A.   Nods head.  I would, yeah.

19      Q.   I would like to speak about the third entry

20  down.

21           Can you tell us what is this entry?

22      A.   It's an entry that would reclassify the fixed

23  asset that is the condo in Miami that was purchased that

24  was originally booked as a shareholder loan to Jon, and

25  we reclassified that on to the fixed assets in the

building section of the balance sheet for SmartComm.

Q.   Is that because SmartComm assumed ownership of the Miami condo?

A.   Yes.

Q.   And so you had to account to that under the gap standard?

A.   Correct (check).

Q.   And where would we find re class facial on SmartComm financials?

A.   Same place in the general ledger or journal entry I would have made.

Q.   If you look up there in the last row on the right-hand column we have the add journal entries rows 54230 to 247; does sound about right?

A.   What you're reading is for the building.  It's 54201 to 229 for the condominium.

Q.   Now, I would like to ask about the last entry, the fourth one down, this would be the Loco Florida, LLC office building, can you tell us what was the change that was made here?

A.   Yep.  We reclassified and we booked rent expense for the office building that SmartComm Collier uses for its operations.

Q.   It and why did you use that figure, $40,000 a month in rent?

1      A.   We had heard that that was an amount that was

2   being requested by Janice to book as rent expense for

3   that property.

4      Q.   And is this adjustment reflected in

5   SmartComm's financials?

6      A.   It is.

7      Q.   And where would that?

8      A.   It would be in the general ledger, journal

9   entries.

10     Q    (By The Court) I'm sorry.  Did all of these

11  adjustments occur on May 28, 2024?

12     A.   No, I did them on 1, 1, 2024.  So January 1,

13  2024.

14  BY MR. RUDOLF:

15     Q.   Is that the effective date?

16     A.   Effective date.

17          THE COURT:  What date did you actually do it?

18     A.   Maybe in June.

19          THE COURT:  All right.  Well, this

20          demonstrative references a May 28 date.  I don't

21          know if that has anything to do with this.  And

22          it's on the top one of the Rolls-Royce.

23          MR. RUDOLF:  Your Honor I believe it's more

24          appropriate for an attorney to answer that question

25          because here we had that statutory cutoff date so

1       that was just the financials that SmartComm has

2       produced in this litigation up until May 28, 2024

3       so that's why there is that date on the ledger.

4               THE COURT:  I want to know the date she

5       actually did it.

6               MR. RUDOLF:  Okay.

7       A.    I have to look again.  In my recollection it's

8   probably in June of 2024, I think, but it could have

9   been at a later time.

10              THE COURT:  Where would we look to actually

11      determine this?

12              THE WITNESS:  I'd have to look, I guess, in

13      the accounting records.

14              THE COURT:  The general ledger?  What records.

15              THE WITNESS:  Probably the audit trail of the

16      accounting records.

17              THE COURT:  Thank you.

18  BY MR. RUDOLF:

19              THE WITNESS:  They could be somewhere else,

20      too, maybe in my notes at the office of what

21      transpired.

22  BY MR. RUDOLF:

23      Q.    And just to put a bow on it, for entering

24  these accounting adjustments, what was the effective

25  date the adjustment took place?

1        A.    It was January 1, 2024.

2        Q.    Is so if you made these adjustments later in

3    June, is that abnormal or out of the ordinary course of

4    business to adjust something effective at a earlier

5    date?

6        A.    You can do prior period adjustments and as a

7    private company,, you know, you're tree free to do that

8    but you're not recording on a public basis.

9        Q.    Do you close out SmartComm's financials at

10   month end?

11       A.    We -- there's always desire to, but, you know,

12   again, in a private company, you can have situations

13   come up where you have to reopen the months, the prior

14   months so it's called the management principal.  You

15   want to be able to match the revenue and expense.  So

16   that typically can -- can happen.

17       Q.    And for these adjustments that were made that

18   we just discussed here, if I'm understanding this

19   correctly, does this reflect the movement of an asset

20   such as the Miami condo on to SmartComm Florida's

21   financials, books, as an asset of the company?

22       A.    Yes.

23       Q.    So before that asset was not on SmartComm's

24   books as an asset?

25       A.    As an asset, no but as a shareholder loan

1    which lives in the same section of the balance sheet.

2         Q.   Okay.  And what other adjustments -- let's use

3    the Miami condo as an example.  As part of that did you

4    have to make any other adjustments in connection with re

5    class indicating that asset?

6         A.   There were probably property taxes and

7    insurance costs associated with that condo that were

8    then booked into the operating expenses of the company.

9         Q.   And the same for the Ferrari Spider were there

10   other adjustments?

11        A.   That would have been accumulated depreciation

12   would have been recognized depreciation.

13        Q.   So now that the Ferrari Spider is an as set

14   and I believe it says fixed as set vehicle, do you

15   account for the depreciation of that asset and

16   SmartComm's books going forward?

17        A.   I do.

18        Q.   And so would that also be then taken out of

19   SmartComm's over all revenue for tax purposes strike

20   that let me go another way.  Are there tax benefits

21   recognizing depression going forward on that asset?

22        A.   There is a monthly depreciate expense in the

23   operating expense section of the income statement.

24        Q.   Okay.  Thank you.

25             Now, I would like to discuss whether there had

1  been any shareholder distributions which has come up in

2  this case.  So since February 2023, has SmartComm

3  Florida made any shareholder distributions that you're

4  aware of?

5      A.   No.

6      Q.   Has any Smart communications entity?

7      A.   No.

8      Q.   How would you be sure?

9      A.   I would be the person processing the

10  distribution as the primary account at that point in the

11  company.

12      Q.   And has SmartComm Florida made any shareholder

13  distribution since you started?

14      A.   No.

15      Q.   And that would be since March of 2022?

16      A.   Correct.

17      Q.   I would now like to show you what has

18  previously been marked SmartComm of 591.  Previously

19  admitted into evidence.

20          MS. CLEMENT:  Your Honor I don't know if 519

21      has been admitted into evidence.

22          MR. RUDOLF:  We note that it was.  Happy to be

23      corrected.

24          THE COURT:  I'll look.  Clerk's also looking,

25      too.  My notes say that 591 not in evidence.

1          MR. JOHNSON:  Right.

2          MR. RUDOLF:  It is Mr. Johnson or it is not.

3          MS. CLEMENT:  It's not.

4          MR. JOHNSON:  I concur with the judge.

5          THE CLERK:  Not in evidence.

6          THE COURT:  I concur with the Clerk who says

7      it's not in evidence.

8          MR. RUDOLF:  If you don't mind me asking what

9      was the objection?

10          MS. CLEMENT:  The objection is just relevance.

11          THE COURT:  Let's -- I'll overrule it but

12      again we seem to be meandering far afield from why

13      we're here.

14          MR. RUDOLF:  Yes, Your Honor.  But there have

15      been allegations for the valuation date that sorted

16      transactions.

17          THE COURT:  That is why I'm allowing you to do

18      it.

19          MR. RUDOLF:  Thank you, Your Honor.

20 BY MR. RUDOLF:

21      Q.   Ms. Gunning, can you tell us what this

22 document is?

23      A.   Yeah this is a list of any -- any cost

24 associated with the company that was booked as a

25 shareholder loan.

1          MR. RUDOLF:  Just tip zoom into the top
2      left-hand corner of the page.
3  BY MR. RUDOLF:
4      Q.   So these are the shareholder loan history from
5  December 31, 2017 to February 9, 2023?
6      A.   That's correct.
7      Q.   And are you the person who prepared this
8  document?
9      A.   I did.
10     Q    (By Mr. Rudolf) Justin please zoom in the top
11  right-hand corner.
12  BY MR. RUDOLF:
13     Q.   Now, are these the summaries of the over all
14  shaver holder loans for each of these individuals,
15  Jim Logan, Jon Logan, Janice Logan during this time
16  period?
17     A.   Yes.  What I could decipher out of the general
18  ledger, yeah.
19     Q.   And the number for Jim Logan roughly $724,000,
20  is that correct there?  Is that what he had during that
21  time span?
22     A.   During that time span it is under indicated by
23  the -- there was a -- there was a shareholder loan that
24  once I started console dating the U.S. entities, Smart
25  Communications, U.S., Inc. there was a 3 $100,000

1    shareholder loan that was in the general ledger of that

2    wholly-owned subsidiary that's not included in this.

3    This is mostly, there is Collier.

4         Q.   So with that inclusion it would be over a

5    million dollars?

6         A.   Yes.

7              MR. RUDOLF:  Justin, could you please go to

8         page 2, about four rows down.  And blow that up

9         over to the right, please.

10   BY MR. RUDOLF:

11        Q.   I'd like you to look, turn to the entry for

12   229,000.  Can you tell us what that is?

13        A.   That was the purchase of the Rolls-Royce.

14        Q.   And that is reflected in Jon Logan shareholder

15   loan column?

16        A.   It is.

17             MR. RUDOLF:  And for the purposes of saving

18        time, I would like to quickly direct Justin to

19        page, I believe it's my 9, towards the middle.

20        Page 9 go down, please.

21   BY MR. RUDOLF:

22        Q.   There that $349,000 entry.  Can you tell us

23   what that entry is?

24        A.   That was for the purchase of the Ferrari

25   Spider.

1        Q.   Are those the Rolls-Royce and Ferrari Spider

2    that we just discussed on the prior demonstrative?

3        A.   It is.

4        Q.   And those were the two assets that were the

5    subject to the adjustment you made in 2024?

6        A.   It is.

7             MR. RUDOLF:  Please scroll to the right,

8        please.

9    BY MR. RUDOLF:

10       Q.   So here during that time frame, that $349,000

11   purchase shows up for Jon Logan as a shareholder loan?

12       A.   Yes.

13       Q.   Now, when you reclassify these assets from

14   shareholder loans to Mr. Jon Logan to fixed assets

15   taking ownership on to SmartComm Florida's books, does

16   that mean that you remove these from Jon Logan's over

17   all shareholder loan amount?

18       A.   I did.

19       Q.   What would that add up to if you remove those

20   two?

21       A.   Like the two add up to about $580,000, to

22   34950.

23       Q.   Please to the top right on page 1 again.  Ms.

24   Gunning can you tell us what those two assets added up

25   to?

1      A.    Approximately $580,000.

2      Q.    So if we subtract that from Jon Logan's over

3  all shareholder total as of February 9, 2023 would that

4  mean that the company would owe Jon Logan over $40,000?

5      A.    Mathematically yes.

6      Q.    It and how is that possible?

7      A.    Because if they were transferred back to the

8  company, then the company is now in ownership of those

9  two assets.

10      Q.    How is it possible that the company would owe

11  Mr. Logan money then?

12      A.    Oh, he -- there was a time that he was asked

13  to deposit $330,000 into the company as a loan to the

14  company.

15      Q.    Is that reflected on this document?

16      A.    It is.

17           MR. RUDOLF:  Justin, please bottom page 3.

18      Down please.  Page 3.  There okay.

19  BY MR. RUDOLF:

20      Q.    The 3 $100,000 is that you're referring to?

21      A.    It is it was in the 2021 if you go to the left

22  it would show the date.

23      Q.    All right.  Thank you Ms. Gunning.  That's all

24  the questions I have for you?

25           THE COURT:  Mr. Oprison?

1          MR. OPRISON:  We have no questions, Your

2     Honor.

3          Cross examination.

4          THE COURT:  Miss Raiford.

5  BY MS. CLEMENT:

6     Q.   Good afternoon, Ms. Gunning.  My name is

7  Anitra Clement?

8          THE COURT:  I apologize Ms. Clement.

9     Q.   Of representing Janice Logan.

10          So you work for Smart Communications Collier

11  Inc.?

12     A.   I do.

13     Q.   In fact, Smart Communications Collier Inc.

14  employs all Smart Communications employees?

15     A.   It does.

16     Q.   It and you started working for Smart

17  Communications on March 11, 2022?

18     A.   That's correct.

19     Q.   And I think I heard you say earlier that you

20  are a certified public accountant?

21     A.   I am.

22     Q.   Your first role with Smart Communications was

23  being its accountant?

24     A.   That's correct.

25     Q.   I think earlier you said you were the

1  accountant?

2      A.   One and only.

3      Q.   Your salary when you started was $8,000 a

4  year?

5      A.   That's correct.

6      Q.   And then you received a promotion after

7  Jim Logan's death in November of 2024?

8      A.   2022.

9      A.   That's correct.

10      Q.   Today you're the director of accounting and

11  finance?

12      A.   That's correct.

13      Q.   You have one direct report?

14      A.   Carla Colbert is her name.  Yes, I do.  One.

15      Q.   In your role as director of accounting and

16  finance, you now make $170,000 a year?

17      A.   I do.

18      Q.   Do you report directly to Jon Logan?

19      A.   I do.

20      Q.   And Jon Logan is the only person that you

21  report to at work?

22      A.   Correct.  I mean there's dotted lines around

23  but yes he is my direct supervisor.

24      Q.   When you joined the company, Smart

25  Communications maintained an employment hands book?

1        A.    It does.

2        Q.    And the hands book did not include any

3   provisions about intellectual property?

4        A.    There might have been a section I just didn't

5   focus on it at the time.  The handbook's gone through a

6   couple revisions so I couldn't tell you exactly what

7   date.

8        Q.    Did you take a deposition in this case?

9        A.    I did.

10        Q.    Was that deposition on January 27th of 2025?

11        A.    It was.

12        Q.    Where you swore to tell the truth during your

13   deposition?

14        A.    I was.

15             MS. CLEMENT:  Your Honor, may I approach or

16        have the bailiff approach?

17             THE COURT:  To give to the witness.

18             MS. CLEMENT:  Yes, please.

19             THE COURT:  That's fine.

20             MR. RUDOLF:  Could we be aware of what was

21        handed to the witness?

22             MS. CLEMENT:  For the record, I just handed a

23        copy of Ms. Gunning's deposition in this case to

24        the witness through the bailiff.

25             MR. RUDOLF:  Thank you.

1  BY MS. CLEMENT:

2      Q.   Ms. Gunning, please turn to page 52 and I'm

3  going to start at line 3 and let me know when you have

4  it?

5      A.   I'm there.

6      Q.   Question:  And did the company have a HR

7  handbook when you joined?  Answer:  Yes.  Question:  And

8  did the handbook include any provisions talking about

9  developments or additions to intellectual property?

10  Answer:  No.

11          Did I read that correctly?

12     A.   You read it correctly.

13     Q.   Okay.  Thank you, Ms. Gunning.

14          I'd like to talk about Jim Logan, and you can

15  put your deposition to the side.

16          Jim Logan was a director and officer of Smart

17  Communications?

18     A.   Yes.  Yes.

19     Q.   And Jim Logan had access to the books and

20  records of Smart Communications?

21     A.   Yes.

22     Q.   Jim Logan had access to all of Smart

23  Communications' consistenting records?

24     A.   He did.

25     Q.   And Jim Logan had access to all of Smart

1   Communications tax filings.

2        A.    He did.

3        Q.    And Jon Logan also had access to the books,

4   accounting and tax records, too?

5        A.    He would.

6        Q.    Since this lawsuit began in February of 2023,

7   Janice Logan has not been offered a director position.

8        A.    That's correct.

9        Q.    And since this lawsuit began, Janice Logan has

10  not been offered an officer position.

11       A.    As far as I know.

12       Q.    Since this lawsuit began, if Janice Logan came

13  to you requesting financial information about Smart

14  Communications, you are not able to provide it to her.

15       A.    That's correct.

16       Q.    You are given a direction by Jon Logan to CUT

17  off Janice Logan's salary?

18       A.    It would be true at some point, yeah.

19       Q.    Now, let's talk about HLFIP.  You've never

20  been employed by HLFIP.

21       A.    That's correct.

22       Q.    HLFIP has one employee.

23       A.    Yes.

24       Q.    And that one employee is Jon Logan.

25       A.    Yes.

1      Q.   You have handled the bookkeeping for HLFIP

2  since April 2022?

3      A.   That's correct.

4      Q.   You have provided HLFIP's information to

5  Mike Shreve a tax accountant to prepare HLFIP's tax

6  returns.

7      A.   Yes.

8      Q.   It outside of bookkeeping, you have not

9  performed any services for HLFIP.

10      A.   That's correct.

11      Q.   In March of 2022 when you joined Smart

12  Communications, Smart Communications Collier was paying

13  for the lawsuits involving HLFIP's intellectual

14  property.

15      A.   That's correct.

16      Q.   Today, HLFIP's legal fees are being paid for

17  by Smart Communications through an intercompany

18  transfer.

19      A.   That's correct.

20      Q.   And HLFIP has not paid Smart Communications

21  back for these lawsuit-related expenses?

22          MR. RUDOLF:  I'm going to object to this as

23          irrelevant, Your Honor.  We had this issue before

24          with the other questions.

25          THE COURT:  After all Florida what came out in

1          direct, I think what's good for the goose is good

2          for the gander.  So overruled.

3          A.   Can you repeat that?

4     BY MS. CLEMENT:

5          Q.   Sure.  HLFIP has not paid Smart Communications

6     back for the lawsuit-related expenses?

7          A.   That's correct.

8          Q.   And HLFIP has not paid Smart Communications

9     back for its Marcum engagement.

10         A.   That's correct.

11         Q.   Now, I'd like to talk about the alleged

12    license between Smart Communications and HLFIP.

13              Prior to this pending lawsuit, which began in

14    February of 2023, you have not heard of an intellectual

15    property license agreement between Smart Communications

16    and HLFIP?

17         A.   I had not heard of an agreement, no.  I knew

18    there was a patent.

19         Q.   Prior to the lawsuit you were not aware of a

20    written IP agreement between Smart Communications and

21    HLFIP?

22         A.   Correct.

23         Q.   You also were not aware of an oral agreement

24    between Smart Communications and HLFIP.

25         A.   Correct.  I was not privy to any of that.

1        Q.   I'm sorry.  Could you please repeat that?

2        A.   I wouldn't have been privy to any of that

3   conversation.

4        Q.   Prior to this lawsuit?

5             THE COURT:  Hold on a second.  Let me finish

6        my notes here.

7             Okay.  You can continue.

8   BY MS. CLEMENT:

9        Q.   Prior to this lawsuit, you have never heard of

10  a 40 percent royalty associated with Smart

11  Communications use of HLFIP's intellectual property.

12       A.   That's correct.

13       Q.   From March 2022 through February 2023, HLFIP

14  never asked Smart Communications to make a royalty

15  payment to HLFIP.

16       A.   That's correct.

17       Q.   And at the time of your deposition in this

18  case, which was January 27 of 2025, you have never seen

19  any written intellectual property license between Smart

20  Communications and HLFIP.

21       A.   That's correct.

22       Q.   You first learned about the alleged 40 percent

23  royalty after this lawsuit was filed.

24       A.   Correct.

25       Q.   And you heard about the 40 percent royalty

1  directly from Jon Logan.

2      A.   That's correct.

3      Q.   It you later had a conversation with

4  Mike Shreve about the 40 percent royalty, too.

5      A.   I did.

6      Q.   As it relates to Marcum, you have not had any

7  conversations with Marcum about the 40 percent royalty.

8      A.   No.

9      Q.   You have not had any conversations with Marcum

10 about the work Marcum was doing on behalf of Smart

11 Communications?

12     A.   No.

13     Q.   And you have not had any conversations with

14 Marcum about the work Marcum was doing on behalf of

15 HLFIP?

16     A.   No.

17     Q.   And, likewise, you have not had any

18 conversations with Quicker Law about the work it was

19 doing for Smart Communications or HLFIP.

20     A.   No.

21     Q.   Now, let's talk about Smart Communications'

22 general ledger.  Ms. Gunning, you and your direct report

23 with the only employees at Smart Communications that can

24 make changes to the general ledger?

25     A.   That's correct.

1     Q.    The books and records now show a liability

2  from Smart Communications to HLFIP.

3     A.    Yes.

4     Q.    And this liability was recorded in 2023 at the

5  direction of Jon Logan.

6     A.    That's correct.

7     Q.    And the liability was recorded around the time

8  that the exclusive intercompany intellectual property

9  license agreement was executed.

10     A.    That's correct.

11     Q.    This liability represents an alleged overdue

12  royalty from 2015 until August of 2023 plus interest.

13     A.    Yes.

14     Q.    It represents 40 percent net sales going

15  forward?

16     A.    40 percent, yes.

17     Q.    It and the interests is at five percent per

18  year?

19     A.    Yes.

20     Q.    And the interests rate was set as a result of

21  the Marcum Study?

22     A.    Yes.

23     Q.    Earlier I heard some questions and answers

24  about shareholder loans.  Has Jon Logan ever repaid a

25  shareholder loan, to your knowledge?

1        A.    To my knowledge, just the $300,000 that was

2   deposited into the company in 2021.

3        Q.    So outside of 2021, where he provided a loan

4   to the company, he has not repaid a shareholder loan?

5        A.    No.

6        Q.    Earlier you mentioned that someone asked you

7   to reclassify assets in 2024.  Who asked you to

8   reclassify assets?

9        A.    We worked with Jon on that as well as, you

10  know, the -- the -- maybe some attorneys as well.

11       Q.    When you say "Jon" you mean Jon Logan?

12       A.    I do.

13       Q.    Are you aware that Jon Logan filed a claim in

14  bankruptcy court to recover the classified assets?

15       A.    I am aware of the bankruptcy petitions is.

16  Not exactly everything that's inside of them.

17       Q.    Were you aware that he filed a claim today in

18  the bankruptcy court?

19       A.    No.

20       Q.    I want to take a look at the liability and the

21  general ledger.  Let's put up Exhibit 393.  This has

22  been admitted into evidence.

23       Q.    I see it's already up to the GL October 2023

24  tap.  We are going to look at row 24305.  This is where

25  we see what is due to HLFIP according to the general

1  ledger.

2         The first listing of the alleged liability is

3  from January 31 of 2023 and we see that at row 24306?

4         THE COURT:  Can you hold on one second until I

5      get there.

6         MS. CLEMENT:  Yes, I can hold on.

7         THE COURT:  Okay.  It's not in here.

8         MS. CLEMENT:  It's not in there?

9         THE COURT:  No there is just a sheet saying

10     it's electronic, which is fine.

11        MS. CLEMENT:  I'll get that fixed Your Honor.

12        THE COURT:  So 393 is in evidence.

13        MS. CLEMENT:  Yes, Your Honor.

14        THE COURT:  Okay.

15  BY MS. CLEMENT:

16     Q.   So the first entry that is allegedly due to

17  HLFIP we see that in row 24305, I believe.

18     A.   Can you scroll out that a little bit?

19     Q.   Okay so 24305 it was due to HLFIP and the

20  first listing is on the next row 24306, that's from

21  January 31 of 2023.  Do you see that Ms. Gunning?

22     A.   I do.

23     Q.   It and then it continues monthly until

24  October 31 of 2023 at row 24315?

25     A.   Uh-huh.

1      Q.   Do you see that Ms. Gunning?

2      A.   I do.

3      Q.   The total liability as of October 31 of 2023

4   is over 71 million.  Do you see that?

5      A.   I do.

6      Q.   In column M of 24316?

7      A.   Yeah.

8      Q.   We discussed the interest earlier the interest

9   is reflected at rows 24317 all the way to rows 24328 of

10  tab GL on October 2023, is that correct?

11     A.   I see that.

12     Q.   When the liability was placed in the books and

13  records, it caused a loss of Smart Communications' over

14  all profitability.

15     A.   It is.

16     Q.   Now, the liability of Smart Communications

17  currently exceed its assets?

18     A.   They do.

19     Q.   And this was caused by the implementation of

20  the IP fee.

21     A.   It's -- it's one of the causes of that, yes.

22     Q.   Ms. Gunning, since you already have your

23  deposition testimony right in front of you, do you mind

24  opening it up again and let's turn to page 75.  Line 13.

25  And let me know when you have it.

1          A.    I'm there.

2          Q.    Question:  What event occurred which caused

3     the liabilities of SmartComm to exceed its assets?

4                Answer:  The implementation of the IP fee,

5     period.

6                Did I read that correctly?

7          A.    Yes, I did.

8          Q.    You can close your deposition transcript.

9                As of your deposition on January 27, 2025, if

10    you pulled the books and records, the total liability

11    amount would be at least $100 million?

12         A.    Yeah.  As of 12/31/24.  I would have to add up

13    these numbers but yeah.

14         Q.    It but it would be at least $100 million?

15         A.    At 12/31/24; yeah.

16         Q.    So it would be more sitting here today?

17         A.    Through January, yes.

18         Q.    A $100,000,000 liability to HLFIP concerns you

19    as the company's bookkeeper.  It would, yeah.  It

20    concerns.  It would concern any bookkeeper.

21         Q.    You worry about the long-term health of the

22    company.

23         A.    I do.  There's currently no call to pay any of

24    that, but it would -- you know, it's not easy to present

25    a financial statement that has that on it.

1          Q.    Was that a yes?

2          A.    Repeat the question.

3          Q.    You worry about the long-term health of the

4    company.

5          A.    Yes.

6          Q.    Would that IP liability Smart Communications

7    would not be insolvent.

8          A.    Untrue.  I mean it varies.  It could vary

9    month to month.  There are times where current

10   liabilities, which are above the IP fee, are higher than

11   the current Assets in the company.  So current

12   liabilities consist of accounts payable and current

13   assets consist of liquid assets, cash, per se, so there

14   are times, I mean it varies by month depending on what

15   our payables are in the normal course of business that's

16   outside of the IP fee.

17         Q.    Okay.  Well let's open up the deposition

18   transcript that's right in front of you that you took

19   this deposition, and let's turn to page 76 line 22 and

20   let me know when you have it?

21         A.    I'm there.

22         Q.    Can we agree that without the IP fee or the IP

23   liability that SmartComm would not be insolvent.

24               Answer:  Yes.  I could agree with that.

25               Did I read that correctly?

1          A.    You did.

2          Q.    Thank you Ms. Gunning.  Those are all my

3     questions.

4               THE COURT:  Mr. Johnson cross examination.

5               MR. JOHNSON:  Ms. Gunning, my name's Charles

6          Johnson and I represent Alexis Logan.

7               I'm looking at the demonstrative document that

8          you handed out and with respect to the Miami condo

9          it says, quote, SmartComm assumed ownership of the

10         Miami condo.

11              Right?

12         A.    Yes.

13         Q.    Tell me what assumed ownership means?

14         A.    Jon's intent to is transfer the ownership of

15    the company.

16         Q.    Sorry I wasn't paying close enough attention?

17         A.    So the intent was for Jon to turn over

18    ownership of the condominium to Smart Communications.

19         Q.    But to be clear, according to the records in

20    Dade County, Jon Logan still owns the Brickell condo as

21    I stand here at this podium correct?

22         A.    That's correct.

23         Q.    He is thinking about transferring it back but

24    hasn't done it.  So assumed ownership of the condo still

25    means Jon Logan has it?

1      A.   Yes.  Technically.

2      Q.   For the assets that are listed in the

3  demonstrative aid, the Rolls-Royce and Ferrari, has

4  SmartComm put those in safekeeping somewhere?

5      A.   I believe they are in storage.

6      Q.   Not being funny.  Does that mean in

7  Jon Logan's garage?

8      A.   I don't know.

9      Q.   Do you have any reason to believe those items

10  are anywhere other than Jon Logan's garage?

11      A.   They could be in a storage facility because I

12  believe Jon Logan's garage was damaged in a hurricane.

13      Q.   Changing topics, Ms. Gunning.  The judge asked

14  a question about the timing of certain items.  What

15  program do you use to do your accounting is QuickBooks

16  or something common?

17      A.   QuickBooks.

18      Q.   And does QuickBooks have an audit trail

19  function that would allow you to identify that date with

20  precision when these transactions were accomplished?

21      A.   It could, yeah.  There may be another way to

22  find it as well if I look in my records as my office but

23  yes that would do that.

24      Q.   On your list of items, you don't reference the

25  Nor-Tech boat, but the Nor-Tech boat is part of the

1    bankruptcy claim filed by Jon Logan, do you know why?

2        A.   That boat was purchased before I was at the

3    company and it's always been listed as an asset of the

4    company.

5            THE COURT:  I'm sorry this the yacht or the

6            smaller one.

7        A.   It's a 45-foot boat.  In Nor-Tech Mercury.

8    BY MR. JOHNSON:

9        Q.   And I think Ms. Clement asked you a little bit

10   about it.  Are you aware that Jon Logan filed a claim

11   yesterday that mirrors your numbers for the Rolls-Royce

12   and Ferrari Spider and the condo exactly and that

13   Jon Logan's claiming those amounts need to be given to

14   him as a priority claim for his services?

15       A.   I was not involved in filing any claim for

16   that.

17           MR. JOHNSON:  No other questions, judge.

18           THE COURT:  Mr. Rudolf.

19           MR. RUDOLF:  Brief redirect, Your Honor.

20       Redirect examination.

21   BY MR. RUDOLF:

22       Q.   Ms. Gunning, you were just asked about whether

23   you worry about the long-term health of Smart

24   Communications?

25       A.   That's correct.

 1      Q.   Can you do me a favor, can you describe Smart
 2   Communications Florida's cash flow situation for us.
 3      A.   Currently we are on a maybe day by day basis.
 4   A week by week basis.  A check by check basis.
 5      Q.   And why is that?
 6      A.   Because our payables for the past
 7   installations for the our recent customers run on are in
 8   excess of what our daily cash would be.
 9      Q.   It as we sit here today, could you make next
10   payroll with what you currently have in cash?
11      A.   No.
12      Q.   So in the near -- Strike that.
13           Let me back up.
14           Do any of those considering the cash flow
15   situation have anything to do with the HLFIP Debt or
16   interest debt?
17      A.   It does not.
18      Q.   Are it there any payments being maid on HLFIP
19   license fee royalty debt?
20      A.   There is not.
21      Q.   So in the near term, are you more concerned
22   about the HLFIP debt on SmartComm's books or your
23   day-to-day cash flow?
24      A.   Day-to-day cash flow issues.  First thing I
25   look at in the morning.

1          Q.   You also were just asked about insolvency and

2     you were quoted from your deposition.

3               Do you recall how counsel for Janice Logan or

4     it might have been Mr. Johnson defines insolvency for

5     you when you were answering that question?

6               MS. CLEMENT:  Objection Your Honor.  There was

7          no -- there is no definition of insolvency by me.

8               THE COURT:  Sustained.

9     BY MR. RUDOLF:

10         Q.   Ms. Logan, I'm sorry.  Ms. Gunning, if you

11    would open up your deposition please.

12         A.   Yep.

13         Q.   Page 74, line 2.

14              MR. JOHNSON:  Is he impeachment the witness.

15              THE COURT:  I suspect this is a rule of

16         completeness I'm assuming.

17              MR. RUDOLF:  Yes, Your Honor.

18              THE COURT:  I don't have the deposition but

19         that's what I was taking it for.

20    BY MR. RUDOLF:

21         Q.   Question:  How do you define the term

22    insolvency?  Give the answer please?

23         A.   A company would not have the resources to pay

24    its bills or obligations.

25         Q.   Question, the classic definition of insolvency

1   is liabilities exceeding assets; correct?

2       A.   Correct.

3       Q.   So is that definition that I just read to you

4   liabilities exceeding assets, the definition you were

5   using when you were answering that earlier question

6   previously quoted?

7       A.   Well, I mean, in a technical sense, this is an

8   IRS definition, liabilities exceeding assets can happen

9   but you can still pay your bills.

10      Q.   Not exactly what I was asking.

11           I was asking when she previously quoted from

12  your deposition about can we agree that without the IP

13  fee or the IP liability that SmartComm would be

14  insolvent, it was based off of that definition of

15  insolvency of liabilities exceeding assets is that

16  right?

17      A.   That's correct.

18      Q.   And as a CPA and as a CPA of Smart

19  Communications, how would you define I know Sol develop

20  is I.  That the company would not have the resources to

21  pay its -- its -- its bills.

22      Q.   Does a SmartComm debt have any bearing on the

23  insolvency?

24      A.   No.

25           MR. RUDOLF:  Thank you Ms. Gunning.

1          THE COURT:  Mr. Oprison.

2          MR. OPRISON:  Nothing, sir.

3          THE COURT:  Ms. Clement?

4          MS. CLEMENT:  No redirect or no recross.

5          MR. JOHNSON:  Nothing Your Honor.

6          THE COURT:  Now, I probably should have

7    stopped at the time.  I don't know if this is

8    anything, there was some discussion about this is

9    right after the discussion of the legal fees of

10   normally within I think Mr. Rudolf's questions, and

11   there was discussion about the home and the yacht,

12   but I missed Mr. Rudolf these were your questions.

13   I missed whatever couple questions you asked.  So I

14   should have stopped you right then and there but I

15   didn't.  I I did put a note so I'll give you a

16   chaps to go back to help me if I missed something.

17        MR. RUDOLF:  Your Honor, I believe this was

18   the discussion of the cost of goods sold is that

19   correct the operating expenses.

20        THE COURT:  I think you were talking about the

21   audited financials and there was legal fees of

22   $4 million and fiscal year '24, but it immediately

23   followed the discussion on cost of goods sold so

24   perhaps you were still talking about cost of goods

25   sold.  I want to let you know, I didn't --

1          MR. RUDOLF:  I believe DEMPE strife number

2     four for the audited 2023 total I asked about legal

3     fees that make up the operating expenses there.

4          THE COURT:  This one.

5          MR. RUDOLF:  Correct yes and I believe she

6     testified we have a $3 million of operating

7     expenses for fiscal year 2023 and then I asked her

8     for fiscal year 2024, what the legal fees amounted

9     to.  And I don't want to misstate Ms. Gunning, you

10    remind us what were to your knowledge Smart

11    Communications legal fees for fiscal year 2024.

12         THE WITNESS:  It was four.  Four million

13    dollars.  And that's preliminary.  I don't know if

14    I have all the billions.

15         THE COURT:  Then you had a question about the

16    home and the yacht.

17         THE WITNESS:  Because of the $5 million that

18    the prior years net income resulted in.

19         MR. RUDOLF:  Yes.

20         THE COURT:  Can you just explain to me the

21    issue issue so and then we'll let the lawyers ask

22    follow-up questions.

23         THE WITNESS:  So in 2022, the company ended

24    the year with net income of $5 million and he was

25    asking me what the company did with the $5 million

1    that was errands during the year and I was

2    explaining that during that year of 2022, there

3    were large purchases made that would have used up

4    the capital of the working capital that was earned

5    off of that five million dollar income.

6         THE COURT:  Oh, so the five million dollars

7    were to buy the yacht in the home.

8         THE WITNESS:  Yes.

9         MR. RUDOLF:  Who made the decision to buy

10   those assets.

11   A.   At the time Jim Logan.

12        MR. RUDOLF:  Jon Logan's father.

13        THE WITNESS:  Yes.

14        THE COURT:  And which home are we talking

15   about.

16        THE WITNESS:  It's in Sarasota.

17        MR. RUDOLF:  Who lives in that home currently.

18        THE WITNESS:  Janice Logan.

19        THE COURT:  Mr. Oprison, any follow-up

20   questions based on that issue?

21        MS. CLEMENT:  No, Your Honor.

22        THE COURT:  She's got to --

23        MR. JOHNSON:  Your Honor, excuse me.

24   BY MR. JOHNSON:

25   Q.   I'm told that the Sarasota house wasn't bought

1  in 2022.  So let me.

2       A.   It was.  I mean it was leased before that time

3  per month but officially the contract was in June of

4  2022, I believe.

5            THE COURT:  Go for it.

6  BY MR. JOHNSON:

7       Q.   In other words, do you understand that that's

8  when the closing occurred, when they actually took title

9  to the Sarasota home?

10      A.   That's correct.

11      Q.   I'll check it.

12           MR. JOHNSON:  Thank you very much, Your Honor.

13      A.   Please do.  Yes.

14           THE COURT:  Ms. Clement?

15           MS. CLEMENT:  No further questions.

16           THE COURT:  Mr. Rudolf, anything further.

17           MR. RUDOLF:  Nothing further Your Honor.

18           THE COURT:  Mr. Oprison.

19           MR. OPRISON:  Nothing further Your Honor.

20           THE COURT:  May this witness be excused.

21           MR. RUDOLF:  Yes, Your Honor.

22           MR. OPRISON:  Yes.

23           THE COURT:  You're excused.  Thank you.

24           THE WITNESS:  Thank you.

25           THE CLERK:  Are we admitting the 591 of Smart

1        Communications?  They just addressed is it with the

2        witness.

3              THE COURT:  591 in the general ledger.

4              THE CLERK:  I believe so yes.

5              THE COURT:  Attorneys.  The Clerk is asking me

6        about the status of 591 which I understand is the

7        general ledger.  Do we need this to be introduced?

8              MR. RUDOLF:  No, Your Honor.  No.

9              THE CLERK:  Thank you.

10             THE COURT:  So it's not introduced at this

11       time.

12             THE CLERK:  Okay.  Thank you.  Sorry.

13             THE COURT:  Madam Clerk, have you ID it.

14             THE CLERK:  No do you wants plea to ID it.

15             THE COURT:  Here's the issue if she ID's it it

16       becomes property of the court.

17             THE COURT:  And given everything that you all

18       were talking about the bankruptcy, do you want 591

19       ID'd or not?

20             MR. RUDOLF:  The answer is no, Your Honor.

21             THE CLERK:  Okay.

22             THE COURT:  I don't see any objection from any

23       of the attorneys so we'll go with no do not ID591.

24             THE CLERK:  Thank you.

25             THE COURT:  Who's our next witness going to be

1    and is it short or.

2        MR. RUDOLF:  Your Honor that would be our

3    expert Robert Sly and maybe 20 minutes 2530.

4        THE COURT:  We are going to take one more

5    break before the end of the day do you want to take

6    it now or do you want to start with Mr. Sly.

7        MR. RUDOLF:  Take a quick five minutes break.

8        THE COURT:  Let's take ten minutes.  Ten

9    minutes.

10       (A break was taken at 2:52 p.m. and the follow

11   commenced at 3:04 p.m.)

12       THE COURT:  Before we call the consultant,

13   talk to me about what witnesses we have --

14   everybody can be seated.  I apologize.

15       What witnesses do we have left and how we are

16   doing on time?

17       MR. DIXON:  Your Honor, Mr. Dixon for HLFIP.

18   Mr. O'Neill who is coming up to join plea and I

19   have had some discussions about how the sequencing

20   is going to look for the rest of the afternoon and

21   for tomorrow.

22       So right now Smart parties will be calling Rob

23   Sly, consultant.  After him comes Mr. Schuette the

24   expert for HLFIP on the transfer pricing issues.

25   We have had a slight hiccup, not really a hiccup,

1    Ms. Voralia was deposed last Thursday.  We didn't

2    get -- we did not get the video until Sunday.

3    There's been a few things going on since then.  So

4    we -- but the party have worked diligently to come

5    up with designations.  We have now exchanged those

6    designations.  We are in the process of preparing

7    the video.  That won't be ready to play this

8    afternoon, but it will be ready to play first thing

9    notice morning.  So what we discussed with the

10   Janice side is that Mr. Sly and Mr. Schuette finish

11   this afternoon, then they will begin their case in

12   chief by reading in some deposition testimony that

13   they have to do so that we use up the rest of the

14   court's time today, most usefully, and then we will

15   pick up in the morning by playing Ms. Voralia's

16   video, which is also part of their case.  And

17   then -- and then we, I believe then the Smart

18   parties, Jon HLFIP Smart will then rest their case.

19   Leaving the rest of the day tomorrow for their

20   witnesses.  So I'll let Mr. O'Neill pick up.  As

21   for the remaining.

22        MR. O'NEILL:  As for remaining this is going

23   to sound a lot a number of these witnesses are

24   short read in testimony or stipulation, for

25   example, that would take two minutes to read.  So

1       we would need -- so they have Mr. Sly, Mr.

2       Schuette, Ms. Voralia, and then we would have Lisa

3       Eddy by short stipulation, Mike Shreve by very

4       short read in testimony and candidly we might end

5       up cutting that so need to evaluate that tonight.

6            Justin Scott by video deposition, currently

7       with the designations that are in there, my

8       understanding is that the run time is about two

9       hours.  The goal is, obviously, to CUT that down.

10      So tonight we'll be working on that, Your Honor.

11           And then we've, again, a very short read in of

12      Ms. Naidu who is one of the Marcum witnesses, that

13      will be very very short ten minutes at most and the

14      so the real sort of substance of tomorrow is going

15      to come with I believe Justin Scott and I believe

16      their experts Mr. Berneman and Mr. White but again

17      we are going to be efficient with our time.  We

18      understand that we want to get this done, so I just

19      want to -- that's the plan for Your Honor.  I might

20      be missing somebody.

21           THE COURT:  Well, I didn't know if

22      Alexis Logan is getting called.

23           MR. O'NEILL:  Yes she might be getting called

24      we don't know at this juncture.

25           THE COURT:  Anything else, Mr. Johnson.

1              MR. JOHNSON:  No, Your Honor.

2              MR. DIXON:  I have a minor amendment I'm being

3         told we're reading in apportion of a Jim Logan

4         deposition.  At some point during our affirmative

5         case.  So I believe we're prepared to do that if

6         Mr. Sly and Mr. Schuette finish.

7              THE COURT:  I say let's go.

8              MR. DIXON:  Thank you, Your Honor.

9              THE COURT:  Call your next witness.

10             MR. RUDOLF:  Your Honor Smart parties call

11        Robert Sly.

12             THE CLERK:  Do you solemnly swear or affirm

13        that the testimony you are about to give will be

14        the truth, the whole truth and nothing but the

15        truth?

16             THE WITNESS:  Yeah.

17             THE CLERK:  Thank you.

18   Thereupon,

19                      Witness name

20   the Witness, after first being duly sworn to tell the

21   truth, the whole truth, and nothing but the truth,

22   testified as follows:

23                   DIRECT EXAMINATION

24   BY Attorney's name     :

25

1  BY MR. RUDOLF:

2      Q.    Good afternoon Mr. Sly, would you please inter

3  Tuesday yourself to the court?

4      A.    My name is Robert Scott Sly junior from and

5  what is your current occupation.

6      A.    I'm a director of valuations at litigation

7  support.

8      Q.    And where is that at?

9      A.    I work for business valuation Inc. in

10  Jacksonville, Florida.

11      Q.    And what is that entail?

12      A.    It entails a lot of valuation work.  Entails

13  overseeing some staff.  I do valuations from initial

14  client interview, building the model developing the

15  report, mostly analysis.

16      Q.    And what is the highest level of education you

17  have and where did you receive it?

18      A.    I have a master of business administration

19  from BYU.

20      Q.    Do you have any other certifications?

21      A.    I am accredited senior appraiser with the

22  American society of appraisers.

23      Q.    And do you have any specialties?

24      A.    I specialize in business valuations and

25  damages calculations, financial analysis.

1          MR. RUDOLF:  Your Honor as a matter of

2      efficiency, I can stop here with Mr. Sly's

3      credentials.  I don't believe there is any socks to

4      his qual tags is as an expert.  I would like to

5      proffer him as an expert in business valuations.

6          THE COURT:  I don't think we have to do that

7      anymore.

8          MR. RUDOLF:  Then we will save sometime.

9          THE COURT:  There you go.

10  BY MR. RUDOLF:

11      Q.   Mr. Sly, for the record, when I'm asking

12  questions, I will refer to Smart Communications Holding,

13  Inc. as SmartComm Florida.  Is that okay?

14      A.   Sure.

15      Q.   All right.  And what services were you engaged

16  to perform on behalf of SmartComm Florida in this case?

17      A.   Well, I was asked to discuss the valuations

18  process with and testify with a specific focus on the

19  adjusting entries or the fact that normalization

20  normalizing the assets, liabilities, revenues, expenses

21  of a company is very standard in any valuation.  And

22  it's my opinion that -- I haven't seen anything in this

23  trial that would or read or come across anything that,

24  in the documents I've reviewed that would indicate that

25  any of -- any valuation date would be any better than

1  other one or harder to do with with respect to valuation

2  adjustments.

3      Q.    Could you please he will us a standard

4  valuations process.  Sure.  Welling the standard

5  valuations process involves the income approach, the

6  market approach, and a cost approach to valuation.  But

7  key to arriving at a valuation, is the gathering

8  analysis and adjustment of historical financial

9  statements.

10     Q.    Okay.  In your experience when I'm taking

11  business valuation, how often do you have to consider

12  and make adjustment to a company's financials?

13     A.    Boy, I've probably done over 1200 business

14  valuations.  I would say 95 percent of them are closely

15  held entities.  I would say all of them to some extent

16  or the other required some type of normalization

17  adjustment.

18     Q.    In this case here, you've been in the present

19  in the courtroom since the beginning of this trial is

20  that correct?

21     A.    Yes.

22     Q.    Do you know that there's some allegations here

23  about certain transactions in 2023 adjustments made to

24  financials in 2024.  With that in mind, could you please

25  tell us how you go about looking at certain insider

1   transactions or other types of transactions as part of

2   the normalization of a company's financials for business

3   valuation?

4        A.   Sure.  So any time I'm doing a business

5   valuation, we want to -- what we're trying to do

6   ultimately is calculate the true economic earning power

7   of the operations.  And so to do that, we need to carve

8   out personal expenses that are rolling through.

9   Obviously mostly held entities have prerogative to throw

10  some expenses in there that may be personal in nature or

11  assets that are personal in nature.  So do a detailed

12  review of the financial statements often refer to the

13  general ledger or the journal.  The journal entries to

14  look at the, any assets or liabilities or expenses or

15  income that may be nonoperating extraordinary or

16  nonrecurring.

17       Q.   Am I understanding correctly one of the main

18  goals of the normalization process is to identify and

19  exclude nonoperational-type of transaction while valuing

20  a business; is that right?

21       A.   Yes.  Yes.  And nonrecurring assets or

22  liabilities or expenses.

23       Q.   Okay.  Now, you heard the other is side, I

24  believe in opening statements, indicate that an earlier

25  valuation date to be selected in this case because it

1   would require fewer adjustments or that and I quote "the

2   earliest date is the most efficient" do you agree for

3   your purposes?

4         A.   I -- I disagree.  I'm not aware of any case or

5   valuation I've done where the valuation date was

6   dependent upon the number of adjusting entries.  It

7   adjusting entries is what we do -- what I do all the

8   time in every valuation.  It's considered -- in fact,

9   ASA standard indicate that you must make adjusting

10  entries where warranted.  As I said previously, I

11  haven't come across anything in this case that would

12  indicate that an earlier date would be harder to do than

13  a later date.

14        Q.   How many valuations have you formed in your

15  career?

16        A.   I'm assuming 1200.  I do about 50 a year.

17  I've been doing it for 24 years, so about 1200.

18        Q.   So identifying insider, not operational or

19  extraordinary transactions is something that you do all

20  the time?

21        A.   Yes, it's part of the standard valuations

22  process.

23        Q.   And do you, as a business valuations expert,

24  is this something a normal business valuation would do

25  in your shoes?

1      A.    Absolutely.  They should have, if they're

2  worth their salt.  I would imagine anybody on the side

3  would have the same skills and same ability to make any

4  adjustments that are warranted.

5      Q.    And now you heard during opening statements

6  yesterday Mr. Johnson argued that in your role as a

7  valuations expert, undertaking a valuation of SmartComm

8  Florida, you would have to rely on individual at

9  SmartComm that I believe referred to as the inner

10  circle.  Do you recall that?

11      A.    Yes.

12      Q.    And then I believe Mr. Justin poles the the

13  Court whether a normalization process that relies on

14  cooperation of company insiders could result in affair

15  valuation.  Do you agree with that?

16      A.    I disagree.  I'm not an MAI anyway, so but --

17      Q.    Why do you disagree with that?

18      A.    Well, I -- it's just not true.  I don't -- I

19  don't -- I understand the self interests when there's --

20  when we're doing valuation.  We'll obviously talk toll

21  owners.  We'll talk to insiders, talk to management, but

22  we don't just run with those numbers.  We'll look at how

23  they compare to other companies.  In this case, for

24  example, if there is a Ferrari or a Rolls-Royce sitting

25  on the books and they tell me it's an operating a set or

 1   used in the operations of the company, a lot of it's

 2   just common sense.  And just my experience in

 3   identifying where to look for these assets or

 4   liabilities or expenses that are rolling through.

 5       Q.   All right.  So let's go with that hypothetical

 6   of if a correctional communication company had a

 7   Ferrari, purchased a Ferrari that the CEO drove, and

 8   that CEO told you that that was an operating entity,

 9   would you take that as gospel?  Would you view it as an

10   operating entity?

11       A.   No the at all.  It would not be.  I wouldn't

12   consider it as an operating as set unless it was taking

13   clients around every single day or something.

14       Q.   And what about that same hypothetical company,

15   if it purchased a 7,000 square foot manages for relative

16   of the owner to live in, would that house contains no

17   company offices, no company business is conducted there,

18   would you consider that an operational asset?

19       A.   Not at all.

20            MR. SCHOENFELD:  I object.  This is getting

21       into valuation.

22            THE COURT:  Sustained.

23   BY MR. RUDOLF:

24       Q.   All right.  Can you he is please explain to

25   the Court how would you go about treating nonoperational

1  assets?

2      A.   Well, for example, let's take the Rolls-Royce.

3  So we would remove the Rolls-Royce from the balance

4  sheet.  What we want to do is establish a clean basis

5  for our forecast generally because generally ninety

6  percent of the valuations I do end up using an income

7  approach.  So we'll carve out the Rolls-Royce.  We

8  remove it from the balance sheet.  We remove any impact

9  of depreciation from the balance sheet related to that

10 asset.  We'll remove any maintenance fees or car

11 payments or any other expenses from the P & L.

12     Q.   And there was some discussion about the legal

13 fees incurred in this case harming the value of Smart

14 Communications.  Would that be something that you would

15 also adjust for when valuing the company or this

16 company?

17     A.   Exactly.

18     Q.   How would you do that?

19     A.   Well, I would obviously talk to company

20 manage -- I would look at their ratios.  I would look

21 at, you know, if it's used for if it's a extraordinary

22 item obviously wouldn't consider it in the future of the

23 company.  We're interested in the economic -- the true

24 economic earning power of the company.  I want to look

25 at the company as if I came in and bought the company.

1   I wouldn't have incurred those legal expenses so I carve

2   those out.

3        Q.   And now, I also would like to talk to you

4   about the impact of regulatory changes or changes in the

5   law on a company.  Is it industry standard or practice

6   to consider and make normalizing adjustments to

7   historical or future or past financial statements when

8   there has been a regulatory change?

9        A.   Well, I wouldn't go back and make historical

10  adjustments if there's a -- if there is a regulatory

11  change but I would consider that in my forecast, in the

12  forecast for the operations, obviously.

13       Q.   And what are some of the adjustments of the

14  forecast of financial statements that are typically

15  made?

16       A.   With respect to a regulatory change.

17       Q.   Yes.  Yes?

18       A.   Well, I would -- depends on the regulatory

19  change.  If it's going to enhance revenue, I would

20  inspect to see more revenue growth over time.  If it's

21  going to impair the revenue, I would inspect to see a

22  lower revenue forecast, but again, if there is a

23  regulatory provision out there, and there's a lot of

24  uncertainty n if the business valuation word uncertainty

25  equals risk Morris equals lower value.  There is waste

1  to account on will uncertainty with the discount rate or

2  the forecast.

3      Q.   And if the interest of time, I'm not going to

4  throw up any demonstrative but you were leer and you saw

5  the demonstrative with the assets for reclassification

6  in 2024?

7      A.   Yes.

8      Q.   Were you able to identify those adjustments or

9  the financials that you reviewed in this case?

10     A.   Yes.  I was able to see those on the balance

11 sheets and also the general ledger and the journal

12 entries.

13     Q.   Okay.  And reviewing journal entries, general

14 ledgers, is that Something expert in business valuations

15 would do in a normal process?

16     A.   Yeah.  That's part of our tool kit.

17         MR. RUDOLF:  Justin, would like to pull up the

18     expert of Janice Logan pretrial brief.  Page 41.

19 BY MR. RUDOLF:

20     Q.   I would like to read you something, Mr. Sly,

21 starting at the top.  In addition Jon's efforts to

22 transfer assets and divert revenue from SmartComm and

23 excellencing in August of 2023, apt ongoing correction

24 of existing financials and creation of new once, further

25 undermine this Court's ability to fulfill it's statutory

1    responsibility to determine the fair value of the

2    company as of any date since February 27, 2023.

3              Do you agree with that statement?

4         A.   Not at all.  It wouldn't impair me from being

5    able to come up with affair value and make affair

6    adjustment of value as of the date after that.

7              MR. RUDOLF:  Thank you, Mr. Sly that's all for

8         me.

9              THE COURT:  Mr. Oprison.

10             MR. OPRISON:  Nothing Your Honor.

11             THE COURT:  Mr. Schoenfeld?  Cross

12        examination.

13   BY MR. SCHOENFELD:

14        Q.   I would like you to look at the language you

15   were looking just a moment ago with respect to

16   corrections.  Your testimony that you could perform a

17   valuation notwithstanding of the exist financials and

18   the creations of new ones assumes that you could

19   determine the accuracy of those corrections and

20   understand the reason why they were made, right?

21        A.   Understanding the -- that's part of -- we

22   would want to understand why certain -- any time I do a

23   valuation, I'll ask dig into the financials look at the

24   assets and liabilities, if there's questions we have

25   about them or flag 'em, same with the revenues and

1  expenses.

2      Q.   And if you can't be certain you have a

3  credible explanation for the reason changes were made,

4  you can't accurately value that change, right?

5      A.   I don't need to know the reason why they were

6  made, necessarily, to make the adjustment.  Just the

7  fact that a Ferrari sitting on the books, I don't care

8  how it got there.  There's a Ferrari sitting on the

9  books.

10      Q.   You get an explanation from management of why

11  changes were made, right?

12      A.   That's one data point.

13      Q.   And if that's not a credible explanation, that

14  undermines your ability to properly value a company,

15  right?

16      A.   And any time you get a garbage answer, you're

17  going to get garbage out.

18      Q.   You agree that the choice of a valuation date

19  in this case is a legal matter for the Court to

20  determine, right?

21      A.   Yes.  It's a legal matter.

22      Q.   And you have not developed an opinion as to

23  any specific adjustments for normalization that would be

24  required if the Court were to choose a February 27, 2023

25  as the appropriate valuation date, right?

1       A.   I'm sure any valuation date that's chosen in

2   this matter would require adjustments.

3       Q.   But you haven't identified any specific

4   adjustments that would be needed as of now, right?

5       A.   I haven't identified.  Well, I've -- I've --

6   well I know one of the issues in this case is the IP

7   issue.  So if that's -- and I understand that's -- like

8   somebody going on bankruptcy regarding that as well, but

9   depending which way the courts go or is decision is made

10  we can clue include that or not include that.

11      Q.   Now, you could adjust for that or anything

12  else you've seen in this case if the Court were to pick

13  a February 27, 2023 valuation, right?

14      A.   I could do any date after that date.  Any date

15  and reliable conclusion of value.

16           MR. SCHOENFELD:  Those are all the questions I

17      have.

18           THE COURT:  Mr. Johnson.

19           Cross examination.

20  BY MR. JOHNSON:

21      Q.   Just briefly, Mr. Sly.

22           When Jim Logan was alive, there were two

23  shareholders, right?

24      A.   I -- well, I understand that he transferred

25  50 percent to a Trust.

1      Q.   Fair enough?

2      A.   I don't know if that's -- face to face?

3      A.   Yeah.

4      Q.   When you have an entity with multiple

5   shareholder, pick my law firm, six shareholders, what

6   does that tell you about the normalization to do?

7      A.   What does that tell me about the

8   normalization?  I'm not sure what you're getting at.

9      Q.   My five partners don't want me taking

10  vacations and putting it on company credit card, right?

11     A.   Yeah.

12     Q.   So in other words when you have multiple

13  shareholders, you've got internal check and balance,

14  right?

15     A.   Yeah.  There would be some fiduciary dear

16  obligation there, I would assume.  But, you know, but,

17  again, that's why people pay less for minority interest

18  because -- you know, 50 percent or lower is

19  technically -- go ahead.

20     Q.   No better than trying to interrupt the witness

21  before they finish.  So I stop?

22     A.   I was going to say any time you take a

23  minority position, there's risk that a controlling

24  shareholder may implement certain things.

25     Q.   I wasn't getting to minority discounts, I'm

1  just suggesting when you have multiple owners, you have

2  an internal system of check and balances to keep an eye

3  on what you were referring to as non operating type

4  expenses, right?

5      A.   They may -- there may be some allowed.  Some

6  non operating expenses allowed.

7      Q.   All other things being equal, if you're a sole

8  proprietor, is it easier to put non operating expenses

9  on the books?

10     A.   Absolutely.

11         MR. JOHNSON:  No further questions.

12         THE COURT:  Before I go to redirect and

13     recross, there's a question I'm going to ask it and

14     I'll give you all a chance to follow up.

15         Mr. Sly, what should I consider to determine

16     whether I should exercise my discretion to use a

17     date other than the statutory identified date?

18         THE WITNESS:  -- can't -- I mean, something

19     more -- I mean, I don't -- something more current

20     you know, as current as you can get.  But if it's

21     not the statutory date just because it's more

22     current information.  So I -- I'm not sure.

23         THE COURT:  Thank you.  Mr. Rudolf.

24         MR. RUDOLF:  Nothing further Your Honor.

25         THE COURT:  Mr. Oprison.

1          MR. OPRISON:  Nothing, sir.

2          THE COURT:  Mr. Schoenfeld recross

3     examination.

4 BY MR. SCHOENFELD:

5     Q.   Sir if events have occurred since one act

6 possible date that have affected the company's value,

7 there's not a benefit in ignoring those events, right?

8     A.   Repeat the question.

9     Q.   Your -- your -- your -- your answer to the

10 judge was you prefer eye recent date over a date further

11 in the past.  Other things being equal, right?

12    A.   Sure.

13    Q.   But if events have occurred which have

14 diminished the value of the company without the ability

15 of one of the shareholders to -- to prevent that, and

16 caused by the actions of the other shareholder, there

17 wouldn't be any advantage in a more current date rather

18 than a date prior to those events, right?

19    A.   Well, it's always easier to do a more

20 contemporary valuation than it is an old valuation, but

21 it's still -- I mean, with our ability to make

22 adjustments, it's really doesn't matter what the date

23 is, frankly, or from a valuation perspective.

24         MR. SCHOENFELD:  Thanks.

25         THE COURT:  Mr. Johnson.

CROSS EXAMINATION.

BY MR. JOHNSON:

Q.   Mr. Sly, do I understand you're I know different about the valuation date?

A.   Well, my point is obviously it's a legal matter but from a valuations perspective, my ability to come up with a Lee liable indication of value, it doesn't matter.

Q.   Let me talk to you about the valuation that has more than one puzzle piece, if you will.  In this case, there's some discussion about valuing the stock and the people who hired you are advocating for a date potentially in 2025, right?

A.   That's what I heard.  I think something to March 2025 so recently.

Q.   You watched Ms. Gunning testify that the profit of the company has gone from $5 million in 2022 to $1.6 million in 2023 to negative now in 2024, right?

MR. RUDOLF:  Object this outside of the scope of the prior testimony.  Prior questions.

THE COURT:  Help me out because I'm about ready to sustain it Mr. Johnson.

MR. JOHNSON:  I'll tell you where I'm going.

MR. RUDOLF:  And that mischaracterizes the testimony.

1          MR. JOHNSON:  Well, the problem we've got

2     here, you'll here it now and in closing argument,

3     what you're going to do a WIP saw Janice Logan

4     because you're being asked to value the company in

5     2025, but now we are going to get an IP number from

6     2023.  That's fundamentally unfair, because the

7     valuation done by Marcum took into account the

8     profitability at that time and now we are going to

9     try to get a valuation based on the fact the March

10     that right read act in 2025 so it's a lose lose

11     prop six for Janice Logan.  Low valuation on her

12     shares and Jon get the high valuation on the IP.

13     That's a bad deal for us.

14          THE COURT:  I thought you were going with the

15     valuation date that is after when I would rule.  I

16     thought that was the question you were going.

17          MR. JOHNSON:  No not at all.

18          THE COURT:  I'll sustain the objection but is

19     there another question?

20          MR. JOHNSON:  I'll do my best, Judge.

21  BY MR. JOHNSON:

22     Q.   I think my question was, do you understand

23  you're being asked potentially value the company as of

24  2025?

25     A.   I haven't been asked that specifically.  But I

1   understand it's a possibility.

2       Q.   If the Judge set the valuation date in 2025 or

3   after the Martha Reed-Wright Act you could do that?

4       A.   Exactly.

5       Q.   And if you did that you would be taking into

6   account the then current profitability of the company in

7   terms of doing your income an analysis, right?

8       A.   Yeah, that would be one data point, but, yeah,

9   the value of a company is present value of the future

10  cash flows, but back in 2023 it's my understanding that

11  the Martha Reed-Wright Act was still out there, too, and

12  there was a lot of uncertainty with respect to what was

13  going on there and that in my mind would increase the

14  risk of the company.

15      Q.   But at that point the risk of the Martha

16  Reed-Wright Act was unknown, in other words it had been

17  proposed by Congressperson Duckworth in 2021, the

18  initial rule -- initial adoption was in 2022 --

19          MR. RUDOLF:  Your Honor, I object.  This is a

20       convoluted question.  It's outside the scope.  He

21       is raising new issues.  We're gonig to object to

22       this as improper.

23          THE COURT:  I'm tending to agree with

24       Mr. Oprison.

25          MR. JOHNSON:  I'll move on.  If you're not

1    going to let me finish this line, I get it.  I

2    think I already probably told the Court where I'm

3    going with it.

4  BY MR. JOHNSON:

5    Q.   Can we agree with doing a valuation it would

6  be better to value the pieces of the business at the

7  same time?

8    A.   Well, the pieces of the business are the

9  business.

10    Q.   In this case, you understand that there's a

11  Marcum study -- I don't further characterize it -- and

12  the effective date of that study is 2022 based on the

13  year 2022, is that a known fact to you?

14    A.   I'm not sure exactly when it was done.  I'm

15  vaguely a square there was a Marcum study.  Yeah there

16  is a Marcum Study, I don't remember the date.

17    Q.   It and the Marcum Study which was completed on

18  October 4th of 2023 post signatures a $17 million

19  liability for the company for the calendar year 2022,

20  does it?

21    A.   To Marcum study post signatures a liability of

22  17 million.

23    Q.   Yes, sir?

24    MR. RUDOLF:  Outside the scope of direct

25    redirect, cross redirect.

1          THE COURT:  I'll sustain.  Any further

2      questions Mr. Rudolf.

3          MR. RUDOLF:  No, Your Honor.

4          THE COURT:  Mr. Oprison.

5          MR. OPRISON:  No, Your Honor.

6          THE COURT:  Mr. Schoenfeld.

7          MR. SCHOENFELD:  No.

8          THE COURT:  Okay.  You're excused sir.

9          THE WITNESS:  Thank you.

10          THE COURT:  Next witness, please.

11          MR. DIXON:  Your Honor HLFIP calls Mark

12      Schuette to the stand.

13          THE COURT REPORTER:  Do you solemnly swear or

14      affirm that the testimony you are about to give

15      will be the truth, the whole truth and nothing but

16      the truth?

17          THE WITNESS:  I do.

18          THE COURT REPORTER:  Thank you.

19  Thereupon,

20                      Witness name

21  the Witness, after first being duly sworn to tell the

22  truth, the whole truth, and nothing but the truth,

23  testified as follows:

24                  DIRECT EXAMINATION

25  BY Attorney's name    :

1

2          A.   I do (.

3               THE COURT:  Mr. Dixon.

4               MR. DIXON:  Thank you.

5     BY MR. DIXON:

6          Q.   Mr. Schuette could you state your flame and

7     title for the record?

8          A.   Mark Schuette, I lead the global transfer

9     pricing practice for BDO.

10         Q.   And what's BDO?

11         A.   BDO is a public accounting firm that offers

12    audit tax and consulting services.

13         Q.   And which of throws areas does your work fall

14    into?

15         A.   Transfer pricing would fall in the tax

16    business line.

17         Q.   Could you just briefly describe your

18    education?

19         A.   Sure, I have an undergraduate degree?

20    Accounting Loyola University of Maryland and also a MBA

21    with a concentration in finance Loyola university of

22    Maryland.

23         Q.   Do you have any payroll certifications?

24         A.   CPA I'm a member of the CPA of public

25    accountants.

1          Q.   Did you explain what your work involves at BDO

2     and transfer pricing space?

3          A.   Sure.  So as a global leader, I work with

4     transfer pricing specialists in 85 countries around the

5     world.  And that -- that involves calls that I would get

6     from practice leaders about transfer pricing studies

7     that they are involved with, clients where they may need

8     to work with other countries and so I'm either advising

9     them or connecting them with other specialists across

10    the network.

11         Q.   What are some of the other things that you do

12    in your role at B D O?

13         A.   Sure.  I also lead our U.S. transfer pricing

14    practice.  And so in that role I work on transfer

15    pricing studies, I would say probably 25 percent of my

16    time is involved with working on U.S. transfer pricing

17    studies.

18         Q.   And if you were to sort of look back across

19    your career, has that number diminished or increased?

20         A.   Yeah, it's diminished.  So I think early in my

21    career it was probably 90 to 100 percent of my work was

22    related to transfer pricing studies.  Now, there's a --

23    As a leader, I'm not doing that all the time.

24         Q.   And over the course of your career how many

25    transfer pricing studies have you prepared?

1     A.    So over 30 years, hundreds of transfer pricing

2   studies.

3          MR. DIXON:  I don't have to move to qualify

4       him as an expert?  Okay.

5   BY MR. DIXON:

6     Q.    What is transfer pricing?

7     A.    Sure.  So transfer pricing involves

8   transactions between related parties and what you're

9   doing in transfer pricing exercise is trying to arrive

10  at a price that is similar between those related

11  parties, that third parties would have gone to if they

12  entered into that same transaction.

13    Q.    And what kinds of transactions do you have to

14  analyze in doing transfer pricing analysis?

15    A.    So it's one of the first things we ask about

16  when we come in and talk to a client.  And that is, what

17  are the intercompany transactions?

18         So they may be transactions of goods, so

19  products that are sold between two related parties.  It

20  could include services.  So management services that are

21  performed between the parties.  It could be intercompany

22  loans.  But very much it's intellectual property that's

23  developed by one party and used by another.

24    Q.    And why do you say that's very much

25  intellectual property?

1          A.    Because intellectual is definitely the hardest

2     of those types of transactions to value.  And that's

3     because when related parties are developing intellectual

4     that's the crown jewel of that company.  And so they are

5     not typically going to license that out to a third

6     party.

7               So you're left with trying to compare that to

8     other third -- agreements between third parties and not

9     between the entity and another third party because they

10    just -- they wouldn't license that out.  That's the case

11    with HLFIP.  I think that you heard yesterday where that

12    is the driver of business and there is no example that

13    we found where the company licenses that out to a third

14    party.

15         Q.    I think you talked a little bit about transfer

16    pricing studies.  Could you explain at a high level what

17    you're referring to with the Transfer Pricing Study?

18         A.    Sure.  The U.S. has some guidance as far as

19    producing what's called a Transfer Pricing Study.  And

20    that includes a functional analysis.  So looking at the

21    functions, the assets and is risks that are taken on by

22    both of the related parties, it includes what's called a

23    best is method analysis.  So looking at the methods that

24    are available to value or to price that transaction in

25    determining which one of those are most reliability or

1    the best method.  That's basically what the exercise is.

2         Q.    And so why do clients come to you and ask for

3    transfer pricing studies?

4         A.    A number of reasons.  So typically it starts

5    with there are some U.S. penalties that attacks pair

6    doesn't have a Transfer Pricing Study and is then

7    audited by the IRS they can face penalties of 20 to

8    40 percent of additional tax due if they don't have a

9    Transfer Pricing Study.  And that Transfer Pricing Study

10   has to be filed contemporaneous with that tax return.

11   So you can't wait until the IRS shows up and then say,

12   okay, yeah, I'm going to put my Transfer Pricing Study

13   together real quick and give that to you as the auditor.

14   It's too late at that point.

15        Q.    You said it has to be filed.  Is that what you

16   do with the Transfer Pricing Study once it's prepared

17   for a particular tax year is you file with the IRS?

18        A.    It has to be completed before the tax return

19   is filed.  So there's the penalty aspect.  There's also

20   the aspect of if you have a Transfer Pricing Study and

21   you get audited by the IRS, it's more than likely that

22   they are not going drag there out into along audit

23   because you already have a document that supports what a

24   reasonable transfer fries is.  I have clients where the

25   IRS comes in and they do not do the Transfer Pricing

1  Study and the audit has gone on for literally five

2  years.  And so they ended up spending a lot more money

3  that it would have cost them if they had put that

4  Transfer Pricing Study in.

5          THE COURT:  I'm sorry.  You use the word filed

6      does that mean the Transfer Pricing Study is

7      tendered to the IRS.

8          THE WITNESS:  The Transfer Pricing Study is

9      not filed with the tax return.  It must be done

10      contemporaneous with that tax return filing, but

11      the taxpayer would hold on to that analysis and

12      when questioned under audit they would provide it.

13  BY MR. DIXON:

14      Q.   Do you know generally what the time period

15  between the time period IRS asks for that documentation

16  and when the taxpayer has to proffer it to the IRS?

17      A.   It varies but it could be five, seven years.

18      Q.   And what about from the time that the IRS asks

19  for it to the time the taxpayer has to provide it?

20      A.   Oh, I'm sorry.  Yes.  So from the time they

21  ask for it the taxpayer only has thirty days.  So beyond

22  just the contemporaneous issue, it's not really possible

23  to put a Transfer Pricing Study together in 30 days.

24      Q.   And when you said the five to seven years, I

25  understood you are saying from the time that it's

1  prepared contemporaneous with the return to when the IRS

2  would begin an audit and actually ask for the Transfer

3  Pricing Study, that could be five to seven years?

4      A.   I think that's an accurate estimate from what

5  I have seen.

6      Q.   When you prepare transfer pricing

7  documentation like this, what is the relevant pricing

8  standard that you apply?

9      A.   Right, so the U.S. rules and, actually, the

10 rules outside the U.S. talks about an arm's-length

11 standard.  And what that is to what I said earlier, you

12 have transactions between related parties, and you're

13 trying to put those transactions on an arm's-length

14 basis or the basis that what they would have looked like

15 if two third parties had entered into that same

16 transaction.

17     Q.   And based on your experience and understanding

18 in transfer pricing, why is that the standard that's

19 applied here in this tax context?

20     A.   You're trying to come to a fair price between

21 two related parties that really can set that I because

22 they are related they can set that price whatever they

23 want.  And so coming to what two third parties would

24 agree to in a similar transaction is putting that on an

25 arm's-length basis.

1        Q.   In your experience have you prepared transfer

2   pricing studies where the entities involved are both

3   domestic or U.S. entities?

4        A.   I have.

5        Q.   Have you ever advised clients to commission a

6   Transfer Pricing Study where both the entities are

7   domestic entities?

8        A.   I have.  And it's for those reasons that I

9   mentioned earlier the benefits of having that study in

10  place in case you get audited, the potential for

11  penalties, all of that would be reasons for putting that

12  in place.

13       Q.   Where do you begin when you're engaging in

14  transfer pricing analysis under the arm's-length

15  standard that you just described?

16       A.   So a new client, we come on the scene.  We're

17  going to ask them about what are the intercompany the

18  related-party transactions that you're already aware of

19  between these two parties.  A list of those

20  transactions.  Go ahead.

21       Q.   And how do you figure out what the

22  transactions are between related parties?

23       A.   Yeah.  I was going to say we don't stop there.

24  So that's really a listing of what the company is aware

25  of the transactions.  Very often when we get in and we

1   start talking to the company and reviewing their

2   documents, we realize -- and this is even for very large

3   sophisticated companies -- we realize that they

4   overlooked a transaction.  That they actually have a

5   transaction between related parties that they have not

6   recognized.  And very often, again, because intellectual

7   property is difficult to realize.  It's not as simple as

8   a good that you see actually physically moving from one

9   entity to another.

10          It may be that an entity has some know how and

11   the other entity is using that.  And that's not obvious

12   to the company that might not be on their list of trans

13   is actions that they identify.

14      Q.   Can you elaborate know how.  What's an example

15   of something that a big sophisticated company might miss

16   in finding a related-party transaction?

17      A.   Yeah.  A trademark would be a great example.

18   One I know at this time owns a trademark and the other

19   entity is using the trademark.  They are saying oh,

20   we're related we can use that.  We don't have to pay

21   something extra for that.

22          And so we would come in and say, no there's

23   value to that trademark.  The other party is using that.

24   So there need to be some type of royalty for that use of

25   that trademark.

1          Q.   And so now having sort of identified the

2     transactions, how do you analyze the economics of those

3     transactions under the arm's-length standard?

4          A.   Yeah.  So as I said earlier, our task is to

5     take this related-party transaction and identify what

6     this would look like if you had two third parties that

7     were entering into the same transaction.

8               So you're looking at, really, the economics of

9     that transaction.  So what as I said functions asset and

10    risks are taken on by each of the parties.  And then

11    you're trying to look at "Are there any comparables,

12    publiclyavailable comparables?"  In this case,

13    intellectual property would be comparable agreements

14    that are out there publicly available or available to a

15    company that would help us establish what is a

16    comparable between two third parties that would

17    establish what an arm's-length range would be.

18         Q.   We've been talking about relate the party, how

19    do you determine whether party to a transaction are

20    related parties?

21         A.   Yeah.  So the U.S. rules talk about control,

22    and it's a facts and circumstances test.  But basically,

23    does one of the related parties have control to the

24    point where they can set that pricing?

25         Q.   And what's your opinion about whether HLFIP

1   and SmartComm are related parties for purpose of this

2   kind of analysis?

3        A.   Yeah.  Pretty straightforward.  I mean, common

4   ownership, I think we heard testimony that the price was

5   set between the relate the parties.  So, yeah.  Clearly

6   a related party situation.

7        Q.   And so we've heard testimony that the price

8   was set and I think here we're talking about the

9   management decision on the 40 percent rate; correct?

10       A.   Uh-huh, yes.

11       Q.   To what extent -- do you have client who come

12  to you for transfer pricing advice where they already

13  management has already selected a rate?

14       A.   Yeah.  There's a double different scenarios we

15  see when we come into a client.  So they may not have

16  established a rate yet and are just coming to video and

17  asking we need your help and determine what an

18  arrangements length range is and set a price within that

19  range.

20            Other times they've already established that

21  rate is and come to us saying we need objective analysis

22  so we can see a range and determine whether our price

23  that we have established falls within that range.  We

24  need documentation.  We have done our best to put a

25  reasonable rate but we don't have any support around

1  that.

2      Q.   And so as between those scenarios report

3  client has -- management has already selected a rate and

4  management has not yet selected a rate, how does your

5  arm's-length analysis change between the two?

6      A.   It's not going to change either way.  We are

7  going to do the same analysis whether the company is

8  deciding had on a rate or asked.

9      Q.   Does the fact that a company selected a rate

10  ever influence I don't remember attempt to come up with

11  an arm's-length range that meets that already selected

12  rate?

13     A.   No it's not a predetermined range.

14     Q.   Have you ever had any instances where the

15  client has already has selected a rate, you do a

16  transfer pricing analysis and you go back to the client

17  and say, you're outside what we think the range is?

18     A.   Sure.  Yes.  I mean, we will present to the

19  client here is the interquartile range based on the

20  third party comparables that we've identified and there

21  are cases where they've already set that rate and

22  they're outside the range.

23     Q.   Just want to ask about one question.  This is

24  just I'm putting this up on the screen for to you read.

25  This is property.  This is a sentence or part of a

1  sentence from Janice low's brief in this case.  You've

2  reviewed that brief and you understand that there's

3  quite a bit of -- quite a few allegations about the fact

4  that no royalty rate had been expressly agreed to before

5  August 29, 2023.  How if at all would that influence a

6  transfer pricing analysis on whether a royalty rate

7  should have been paid for purposes of transfer pricing

8  pricing.

9        MR. GARRETSON:  Your Honor I object this is

10        outside of his Expert Report.  Maybe Mr. Dixon list

11        Expert Report was served only 10 days ago and was

12        deposed last Tuesday.

13        MR. DIXON:  This is Janice Logan's trial

14        brief.  And she makes a lot of noise about the fact

15        that there are -- there is -- there was no

16        expressly agreed royalty rate before August of

17        2023.  And what Mr. Schuette is going to explain is

18        that the tax law requires you to impose impute a

19        royalty rate regardless of whether it was written

20        down or not.

21        THE COURT:  Is that concept in his Expert

22        Report?

23        MR. DIXON:  Yes.

24        THE COURT:  Okay.  Then overruled.  I'm taking

25        Mr. Dixon's word that it's in the report.

1          MR. GARRETSON:  I asked you show me where.

2     This report was titled a rebuttal of Dr. Berneman

3     and Dr. White who are our experts and the specific

4     opinions that they expressed.  And I don't -- I am

5     not aware of a specific reference to this concept

6     here in the Expert Report.

7          THE COURT:  Well, I mean, the concept is --

8     well I'm going to assume Mr. Dixon if you saying

9     it's in the report then we'll go with it.

10         MR. DIXON:  Your Honor the Janice parties have

11    put at issue the notion that the absence of an

12    expressly stated royalty rate is somehow indicative

13    of whether HLFIP is owed anything.  What Mr.

14    Schuette has already explained is that the tax law

15    doesn't care whether there has been a royalty rate

16    written down at any point.  In fact it doesn't care

17    if the parties ever write it down.  It's still a

18    legal requirement to impute a royalty.  And what he

19    said here -- we can move on from this but what he

20    said here is it doesn't matter whether the royalty

21    rate is expressed or not.  Mr. Garretson, can

22    examine Mr. Schuette.

23         MR. GARRETSON:  We have a hearing where

24    Mr. Dixon is testifying instead of the witness,

25    Your Honor.

1          THE COURT:  Well, I kind of assumed based on

2      what he told me yesterday Mr. Garretson, Mr. Dixon

3      that that was in fact the state of the law relative

4      to this issue, so since you're --

5          MR. DIXON:  We can move on.

6          THE COURT:  -- you are not a witness here, why

7      don't you have him testify and we'll move on, how

8      about that?

9          MR. DIXON:  Very good.  I'll move on, Your

10     Honor.

11  BY MR. DIXON:

12     Q.   Mr. Schuette, what did you do -- you analyzed

13  the relate party transaction here between HLFIP and

14  SmartComm, correct?

15     A.   I did.

16     Q.   And what did you do in analyzing that

17  related-party transaction?

18     A.   Yeah.  So as I said before with any other

19  client.  We started with what is the transaction, right.

20  Let's identify the transaction.  And so at part of that

21  myself and my team met with Jon Logan for about two or

22  three hours.  Went through a lot of what you heard

23  yesterday, the history of the company, how this HLFIP

24  operate in the relation to SmartComm, how is SmartComm

25  using the IP that HLFIP owns.  We looked at deposition

1   testimony.  We looked at other documents.  Just to

2   understand the transaction itself.  So that was really

3   the start of the engagement.

4       Q.   And do you remember -- did you ask Mr. Logan

5   about any other facts that he might have that would

6   assist in that kind of analysis?

7       A.   Yeah.  So I mentioned we look at publicly

8   available third-party agreements before we do that we'll

9   typically look for are there any buttons called internal

10  agreements.  So those would be agreements between the

11  related parties and a third party internal because it's

12  with the actual company that you're looking at, right?

13  Or are there any agreements within the industry that

14  that company would have access to because it's in that

15  industry.

16       So we talk through with Jon Logan that that

17  would be something we would want to review as a

18  potential comparable.

19       Q.   And what, if anything, did you have a chance

20  to receive in that regard?

21       A.   Yeah.  Four agreement were identified that

22  were what we would call internal agreements.

23       Q.   And are -- could you maybe explain one or two

24  of them.

25       A.   I can, yeah.  So there was an agreement

1   between Tech Friends and I believe it's Correct

2   Solutions, and my understanding is these are not

3   companies that are affiliated with either SmartComm or

4   HLFIP, but the company had access to that agreement.

5   And it involve Tech Friends licensing IP to the licensee

6   and the licensee using that IP to generate revenue.  It

7   was particularly of interest to us because the revenue

8   that the licensee was generating, was very similar to

9   the types of revenue that SmartComm was operating.  And

10  that the royalty was charged on that revenue stream

11  because they were using this IP.

12      Q.    And I believe you've already heard some

13  testimony about Justin Scott and his agreement, is that

14  right?

15      A.    That's right.  So we also looked at the

16  Justin Scott agreement.

17      Q.    And in doing your analysis in this case, did

18  you review the Marcum study?

19      A.    We did.  And when I say we, it's my team and

20  I, right.  We looked at the Marcum agreement.

21      Q.    Would you have read the Marcum study?

22      A.    I read the Marcum study, yes.

23      Q.    So I want to just ask at a high level, is

24  there a difference between the kind of analysis that you

25  or other transfer pricing experts would do for purposes

1  of litigation like this and the kind of analysis that's

2  done for purposes of transfer pricing documentation?

3      A.   I would say yes.  So and I think the reality

4  with that is when you're brought in to do a Transfer

5  Pricing Study, there's a certain scope and there's a

6  certain budget that you have to work to, right.  And so

7  when I look at the Marcum Report, for example, it was

8  probably -- I don't know what the cost was -- but it was

9  probably a budget that allowed them to do a city that

10  could be put forth to the IRS but it was not the level

11  of detail and rigor that you would see from a litigation

12  exercise where you're going to be questioned on every

13  comparable and why you accepted that in and in your

14  opinion, was it reasonable for Mr. Logan, for purposes

15  of reporting his transfer pricing liabilities to rely on

16  the Marcum study to provide an arm's length range for

17  transfer pricing.

18          MR. JOHNSON:  Objection Your Honor this is not

19      comfort and would I ask Mr. Dixon to point to page

20      and line on this.  I don't think he has been asked

21      to offer an opinion on that.

22          MR. DIXON:  I'm fairly confident that the

23      report at least -- at least says that the Mr.

24      Schuette's opinion was that there was a good faith

25      effort to comply with transfer pricing regulations

1        in the Marcum study.

2             MR. JOHNSON:  That's a very different

3        question.  It's still not in the report that was a

4        very statement there from what the question was

5        asked.

6             THE COURT:  Mr. Dixon, if he is going beyond

7        the report, then I'm going to sustain the

8        objection.  So I think at this point you're going

9        to have to show the report to me.

10            MR. DIXON:  I might come back to that, Your

11       Honor.

12            THE COURT:  Okay.

13  BY MR. DIXON:

14       Q.   After you reviewed the Marcum Report and you

15  interviewed Jon and looked at internal comes, what else

16  did you do in your analysis?

17       A.   Yes.  I have to look at internal comes,

18  reviewing the Marcum Report.  I did a separate,

19  independent analysis to look for additional third-party

20  agreements that would be considered come.

21       Q.   And let's talk about that independent analysis

22  and I want to put up -- this is from your report it's a

23  matrix, right?

24       A.   It is.

25       Q.   Could you describe maybe by walking through

1  the matrix what you did in this analysis?

2      A.   Sure.  So you'll see the third line there

3  external ktMine with 20 there.  Let me back up how we

4  got to that 20.

5          KtMine is a database of publicly-available

6  license agreements.  It's used by valuation experts,

7  licensing advisers.  It's used in transfer pricing, the

8  IRS uses it, many taxing authorities use it.  It's a

9  very kind of established source for these types of

10  agreements.

11         So my team and I went into the external ktMine

12  database, searched for these agreements on some

13  criteria, so, first, looked at some industries that

14  ktMine has identified, including telecommunications,

15  business services, industries that would be similar to

16  this industry.

17         We then look for some key words around IP.  So

18  trademark, software, patent, things that we found that

19  were part of the HLFIP portfolio of intellectual

20  property.

21         Lastly keyword related to the industry.

22  Prison, inmate, communication.  And so through that we

23  gathered the large group of potentially comparable

24  agreements.

25      Q.   And can I just ask there, was that an exercise

1  of sort of casting nets out to find potential

2  comparables?

3      A.    Exactly.  So you're casting this net trying to

4  find comparables.

5            And then use some filters to narrow that set

6  down.

7            So we looked at net sales.  So the royalty

8  that's paid by SmartComm is on net sales.

9            We looked at related party.  When I say

10  related party, ktMine has gone in and identified

11  agreements that they have concluded are related parties.

12  Okay.  That narrows the set down.

13            Then we looked at just some names of some

14  types of agreements that really aren't license

15  agreements.  Like Asset Purchase Agreement, a joint

16  R & D agreement where two parties are agreeing to join

17  R & D.

18            So that initial search and then kale it down

19  got us to 360 agreements.

20            I looked at the synopsis, ktMine provides a

21  synopsis for the 360 agreements to determine whether

22  those should be further detailed reviewed.

23            If we could tell from the synopsis, I went and

24  looked at the actual agreement, high level, to see if

25  there is anything in there that would eliminate them.

1          So that's how I got down to the 20 ktMine

2     agreements.

3          Once I was at 20, and that's what you see here

4     reasons for rejecting agreements, really, across all

5     three sets of agreements, the internal comparables, the

6     Marcum agreements, and the 20 ktMine agreements, I

7     applied what's called comparability criteria that are

8     listed in the U.S. transfer pricing rules.

9          So for example, if the screen hadn't picked up

10    that these were related parties but through reading the

11    agreement or looking at the company's 10K or its website

12    it became clear that these two parties are related.

13    They maybe they both had the same officers in two

14    companies where they shared the same address.  Evidence

15    that they were related parties.  So we limited on that

16    basis.

17         Different geographic market.  So if the

18    territory that the licensee was allowed to sell into,

19    did not include North America, those were rejected.

20         And collateral transactions, there would be a

21    transaction that was in the agreement in addition to the

22    royalty.  And so it may be difficult to tell whether

23    that transaction was impacted royalty rate because they

24    were in the same agreement.

25         Q.   It and I think the last line here suggests or

1   at least lists the number of comparable agreements that

2   your analysis resulted in?

3        A.    Right.  So a total of 34 agreements that were

4   detailed reviewed.  And that got us we rejected 29.

5   Which got down to five.

6        Q.    Okay.  Can we look at those five transactions

7   from your report?

8        A.    Sure.  Uh-huh.

9        Q.    And maybe it would help if we called out each

10  one and start with the first one and explain your

11  analysis on that particular?

12       A.    Sure I'll briefly summarize these.  As I said

13  the Tech Friends agreement because same industry, same

14  hype very similar list of services that generated

15  revenue that the 50 percent is applied to.  This was a

16  very comparable agreement.  And so that was included in

17  the set.

18            And then there are two Marcum agreements.

19  Both of the licensee were Siboney.  These are in the

20  education industry and I felt that because they were

21  selling into the education market, the school market,

22  that's typically county owned.  So similar in that

23  respect to the industry that we are looking at

24  (SIBONEY).

25       Q.    Could I maybe see four and five as well?  And

1  these are both labeled external ktMine, what does that

2  mean?

3       A.   Right.  So these last three agreements come

4  out of the ktMine search.  I should point out, there was

5  one accepted agreement that overlapped.  So it was in

6  the Marcum study but also came out of our ktMine search.

7  And that's the Nectar Siboney agreement.

8            The last two the Artera agreement was -- if

9  you can go over to the right, yeah, it was within the

10 communications industry.  Similar IP.  And then the last

11 agreement was in the audio vis you'all program.  Some

12 similarities there with the service properties of Smart

13 Communications.

14      Q.   If we could look at the results of your --

15 sorry.  This is your table of internal comparables.

16           I wanted to show you the result.  I'm hoping

17 to pull up the results table from?

18           THE COURT:  Is that Table 7?

19           MR. DIXON:  I can tell you in one second.  It

20      is Table 6 from page 37, I believe.

21           THE COURT:  We were just looking at Table 6.

22           MR. DIXON:  Then it must be Table 7, Your

23      Honor.

24           THE COURT:  Page 38.

25           MR. DIXON:  Page 38.  So we'll put a pin in

1          that so we can pull it up.

2    BY MR. DIXON:

3          Q.   You were asked, I believe to review Dr.

4    Berneman's report, correct?

5          A.   Correct.

6          Q.   And did you do that?

7          A.   I did.

8          Q.   And I believe that Dr. Berneman also offers a

9    set of comparables.

10              I don't seem to have.  There we go.

11              Dr. Berneman offers a set of comparables.  Do

12   you recognize this table from Dr. Berneman's report?

13         A.   I do.

14         Q.   And could you compare your approach that you

15   just described with the royalty staff the approach that

16   you understood Dr. Berneman to understand take in

17   arriving these three comparable agreements?

18         A.   Yeah.  Just walking through the steps of the

19   search, it was done very differently and relied heavily

20   on what we call screens or filters.  And so there was a

21   large number of companies and then through filters, that

22   got down to somewhere over about 300 intentionally

23   comparable agreements.  And then one of the last filters

24   was what date that agreement had on it.  And that

25   narrowed this group down to about 25.

1          And so we went from over 300 to 25.  So as I

2    understand the Court, Dr. Berneman only really

3    potentially looked at 25 agreements in his set.

4        Q.    And then I believe these are the three that he

5    concluded on as comparables?

6        A.    Correct.

7        Q.    And what is your opinion about the first of

8    these three?

9        A.    Let me just say on the three overall, I think

10   if Dr. Berneman had consistently followed his own

11   elimination criteria, I believe all three should have

12   been rejected as comparables.  And we can go through

13   what that is.

14       Q.    So why is that the case for the first one.  I

15   think it's called Demand Pooling is the licensor?

16       A.    Right.  So on this particular agreement, as I

17   said, myself and my team read the agreement and then

18   went out and did additional research.

19          If you pull up the company's AK which is the

20   financial statement for the quarter, the date of that AK

21   as well as the date of this agreement are the same.  And

22   then there's a section with the AK which says this

23   license agreement and there's a exhibit to the AK which

24   has this license agreement is between related parties

25   and so on that basis, I would conclude it's a related

1   party agreement and shouldn't be included in the

2   acceptance of that.

3       Q.   Did you understand Dr. Berneman to be

4   excluding relate the party agreements when he applied

5   those filters?

6       A.   That's when I said not consistently that if we

7   went to Dr. Berneman's rejection list, you would see

8   agreements in there that were of the 25 that were

9   reviewed and eliminated because it was determined that

10  they were related party.

11      Q.   And what about the second of Dr. Berneman's

12  accepted agreements here?

13      A.   Yeah.  Maybe I'll speak to the second and the

14  third because I think it's the same issue.

15           This goes back to collateral transactions.

16  This was in the actual agreement.  This was something I

17  found in additional research.  So if you go into the

18  agreement, the licensee in addition to paying the five

19  percent royalty is giving the licensor a million shares

20  of its stock and so this is a perfect example of what a

21  collateral transaction is.  And so because the licensee

22  is paying the royalty but also paying in stock, you

23  can't tell whether the fact that this licensee is paying

24  in stock as part of the lie sent fee impacts reduce the

25  royalty, the question is would that licensor have

1    required more in royalty if they weren't also getting

2    the stock.  So that's a prefer example of collateral

3    transaction which raise any question is five percent

4    really the apples to apples rate.  And you can't tell.

5    And that's why it -- it should have been in my view

6    eliminated.  And there are cases in Dr. Berneman's list

7    of rejected agreements where he lists collateral

8    transactions.  It's something that he was aware of in

9    applying but not in this case.

10       Q.   And in reviewing Dr. Berneman's report, he

11   offers several opinions about whether you would see some

12   of the terms in the written agreement that was puts in

13   place in August 2023 between HLFIP and Smart and other

14   agreements between unrelated parties and I believe one

15   of the things he points to is the fact that Jon Logan

16   signed for both SmartComm and HLFIP.  How does that

17   influence the analysis under the arm's-length standard

18   in transfer pricing?

19       A.   Really not at all.  It kind of misses the

20   point of relate the party agreements that they are

21   related.  And so it's not unusual to see common control,

22   common ownership same signature within one of these

23   agreements.

24       Q.   I believe you also read Dr. White's report in

25   this case; correct?

1     A.   I did.

2     Q.   And do you recall him opining about the three

3 accepted agreements here in Dr. Berneman's study?

4     A.   Yeah.  I think Dr. White was brought in

5 reviewing Dr. Berneman analysis as a transfer pricing

6 expert.  And he in his report reviews these three

7 agreements and agrees that these are the please similar

8 particularly was the word that was used in the report to

9 the HLFIP transaction.

10     Q.   And what's your opinion about that application

11 of 482 to these three transactions.  My guess is that

12 Dr. White doesn't do transfer pricing studies a lot and

13 probably not familiar with some of the rejection

14 criteria because that was missed and that was not

15 pointed out that these may not be comparable.

16     Q.   I want to look at some over language from

17 Dr. White's report and ask you to offer an opinion on

18 it.  Maybe if we could just zoom into the highlighted

19 section there.

20     A.   Yeah.

21     Q.   Thank you.

22          And so here Dr. White's offering an opinion

23 about whether or not there would be a documentation

24 study between two related domestic business entities in

25 the U.S. both subject to U.S. taxes; what is your

1  reaction to that statement?

2      A.    Yeah.  I've seen those transactions and seeing

3  clients do transfer pricing studies around two domestic

4  transactions.  So I don't know how much Dr. White works

5  in day-to-day transfer pricing studies but that's

6  something that I have seen over my 30 years.

7      Q.    And then if we could zoom back out.  I want to

8  look at the last sentence in that paragraph that against

9  furthermore.

10         He says "furthermore, I'm unaware of recent

11  circumstances why there would be a domestic study.  Are

12  you aware of any reasons why there would be a study

13  between -- a Transfer Pricing Study for a transaction

14  between two domestic parties?

15     A.    Yeah, it's a significant transaction as I said

16  earlier.  If the related parties have not documented

17  that and the IRS were to come in and look at this

18  transaction, they could face penalties, they could face

19  adjustments and costly audits.

20         I guess the other example just from what I

21  have seen, if one of the parties has net operating

22  losses and they basically would be collecting, right,

23  that revenue for a license, that would offset that net

24  operating loss, or NOL, and so that would be a reason to

25  make sure that the transaction is priced arm's length

1    how third parties would've treated it.

2           MR. DIXON:  Do we have the table that I

3       referred to earlier that shows the results of Mr.

4       Schuette's --

5           MR. O'NEILL:  Your Honor, while we take a

6       minute, I was informed that the bankruptcy court

7       did enter the order and the seal of the records at

8       2:00 p.m. this afternoon.

9           THE COURT:  Thank you.

10          MR. DIXON:  Thank you.

11          THE WITNESS:  Should be the last table under

12      report.

13   BY MR. DIXON:

14       Q.   Mr. Schuette, this table reflects your --

15   reflects the range of the -- it says number of

16   observations five in the last line, do you see that?

17       A.   Yes.

18       Q.   And are those the five observations that we

19   looked at earlier?

20       A.   Yes.  Those happen huh to be because it's 5,

21   that's the 5 observations, correct.

22       Q.   And so what conclusions did you draw about the

23   relative breadth and range under the arm's-length

24   standard in this transaction?

25       A.   Right.  So the range of 13.5 to 50 (fix) was

1    the full range.  The U.S. transfer pricing pricing

2    regulations suggest that you do a interquartile range.

3    An interquartile range is basically just removing the

4    upper and the lower bounds of the range and it's done

5    routinely by the IRS and transfer pricing practitioners,

6    what the rules say is that -- if you have a set of five

7    what is called a in transfer pricing in exact, right, so

8    not transactions between what I talked about before --

9    between in this case SmartComm and a third party where

10   it's internal transaction, these are in exact, not

11   exactly like the transaction that you're looking at.

12            That reliability can be increased by doing

13   this.  So when you do that calculation, the range is

14   narrowed from 18 and a half to 50 with a median of 21.3.

15       Q.   And I just want to go back to one more

16   statement.  Again, we're just on Dr. White's report

17   here.

18            And I want to ask you about one other

19   statement in Dr. White's report.  So here he says -- I'm

20   going to summarize because the Court doesn't want me to

21   read it which I understand.  It says from a functionally

22   and operationally the August 2023 license had no change

23   in how the parties conducted business or offered

24   services?

25            MR. GARRETSON:  I object to this.  I don't

1          believe this is in his Expert Report either.  May

2          have been in Dr. White's Expert Report but wasn't

3          being responsibility had to by Dr. Shut.

4               MR. DIXON:  Mr. Schuette offered a rebuttal

5          report to Dr. White's report.

6               MR. GARRETSON:  Yes but you said there was

7          from Mr. White's report and you focused his

8          criticisms and certain fine things with direct

9          respect to Dr. White.

10               MR. O'NEILL:  Your Honor, I'm -- rather than

11          put Your Honor through the trouble I'm going to

12          withdraw.  Let him testify.  Not the part about

13          highlighted about the substance and we are fine to

14          have his testimony.  I'll sit down.

15               MR. DIXON:  Thank you.

16     BY MR. DIXON:

17          Q.   Mr. Schuette, what's your opinion about the

18     insertion that that appears here?

19          A.   Yeah.  If I understand the statement, I

20     believe it's saying that nothing has changed over the

21     period of time from everything that I have looked at and

22     I've seen, what hasn't changed is that HLFIP has owned

23     this IP from the point where there was an oral agreement

24     and there was a license agreement.  But whether there

25     was a oral or written agreement, you have a transaction,

1  that doesn't change throughout.  So I would agree with

2  the statement.

3       Q.    So the highlighted sentence you agree with?

4       A.    I do.

5             MR. DIXON:  Nothing further.

6             THE COURT:  Mr. Hillsley?

7             MR. HILLSLEY:  No questions, Your Honor.

8             Cross examination.

9             MR. GARRETSON:  Thank you, Your Honor, John

10      Garretson for Janice Logan, good afternoon

11      Dr. Shut.  I believe we met for the first time at

12      your deposition last Tuesday is that right.

13      A.    It's Mr. Schuette yes good afternoon.

14      Q.    Good afternoon.

15            So that Table 7 that we saw just a moment ago

16  that counsel was essentially able to bring up do you

17  recall that with your could you know collusion is?

18      A.    Yes.

19      Q.    Now, those conclusions are remarkably similar

20  to what the Marcum Report concluded in terms of an upper

21  quartile and a lower quarter file range isn't that true?

22      A.    They are close to the Marcum range, yes.

23      Q.    And you developed your opinions in this case,

24  rebuttal opinions, to Dr. Berneman and Dr. White after

25  you received their expert reports on January 8 of 2025,

1   isn't that right?

2        A.    Repeat the question.

3        Q.    So I developed your opinions, you did your

4   independent analysis, after January 8 of 2025, right?

5        A.    Actually, we began that work before then?  So

6   you concluded -- your Expert Report was dated January 31

7   of 2025.

8        A.    Correct.

9        Q.    And it's titled rebuttal of Dr. Berneman and

10  Dr. White?

11       A.    Correct.

12       Q.    And then you went through an analysis of why

13  you believe Dr. Berneman and Dr. White are incorrect

14  about their conclusions, right?

15       A.    Correct.

16       Q.    And then after rejecting a number of

17  agreements, you decided that it was rightness for you to

18  do your own independent analysis,?

19       A.    That analysis had started before I saw the

20  Berneman and White reports.

21       Q.    You were retained about three or four months

22  ago isn't that right?

23       A.    In the fall of 2024.

24       Q.    And you were retained by counsel with

25  DLA Piper, correct?

1          A.    Correct.

2          Q.    And you were retained on behalf of

3    HLFIP Holding, LLC, right?

4          A.    Correct.

5          Q.    Not SmartComm, right?

6          A.    I was retained by counsel, from HLFIP.

7          Q.    Might question is that was specific to HLFIP,

8    to your knowledge were you not retained by SmartComm,

9    right?

10         A.    I was not retained by SmartComm, correct.

11         Q.    Now, Mr. Logan, you said you do recognize

12   Mr. Logan sitting here in the courtroom, Jonathan Logan?

13         A.    I do is Mr.

14         Q.    It is Mr. Logan someone you spoke to for

15   purposes generating your opinions in the report?

16         A.    Yes, as I said earlier.

17         Q.    And in fact, Mr. Logan and his counsel were

18   the only two people you talked to in connection with

19   their opinions, correct?

20         A.    That's correct.

21         Q.    And your analysis assumed everything that

22   Mr. Logan told you was true, isn't that right?

23         A.    I don't think that's accurate.  So we -- as I

24   said, we spent two or three hours with Mr. Logan.  I

25   also reviewed a lot of deposition testimony.  And looked

1  at a lot of documents.  So it was not solely relying on

2  that two to three hours that we spent with Jon Logan.

3       Q.   So it was talking with Jon Logan and his

4  counsel?

5       A.   Right.

6       Q.   And looking at a bunch of documents correct.

7  And you took those documents on your face and didn't do

8  any additional research beyond that, true?

9       A.   I reviewed the documents.  I didn't do any

10  research beyond reviewing those documents to verify that

11  any of that was false.

12       Q.   And to that specific point, you recall your

13  Expert Report that you submitted in this case?

14       A.   I do.

15       Q.   And you studied it thoroughly for purposes of

16  your testimony today?

17       A.   Correct.

18       Q.   And you recall that you mentioned that no

19  independent verification was sought to corroborate this

20  information, and that's an accurate statement wasn't it?

21       A.   That's consistent, yes, with what I said.

22       Q.   Let's talk about the Marcum Report, you

23  mentioned it during your direct testimony.

24            In analyzing the Marcum opinion, you only

25  reviewed the Marcum Report itself, right?

1      A.   I reviewed the Marcum Report and I also

2  reviewed the ten agreements that Marcum accepted as

3  comparables.  I reviewed those agreements.

4      Q.   Okay.  So the Marcum Report and the

5  agreements.  But you didn't review any Marcum documents

6  beyond that, right?

7      A.   No.

8      Q.   You reviewed no internal e-mail communications

9  involving Marcum employees, right?

10      A.   I did not.

11      Q.   Now, Marcum used a date base, a particular

12  date base called intangible springs for its analysis,

13  right?

14      A.   Correct.

15      Q.   And you would never use what this

16  IntangibleSpring date base doing a transfer pricing

17  analysis, right?

18      A.   I have never used it.

19      Q.   You mentioned ten agreements used in the

20  Marcum Report.  In your analysis, you rejected eight out

21  of those ten agreements as not being suitable for

22  purposes of what you were doing, correct?

23      A.   I rejected them but after doing a thorough

24  analysis of the -- as I said, for all three categories

25  of documents which included the ten Marcum agreements, I

1  did a thorough analysis of the agreement as well as

2  looked at other information, 10K's websites to evaluate

3  those ten market agreements were the comparable.

4      Q.    And the result of those were you rejected 8 of

5  them as not being comparable, right?

6      A.    That's correct.

7      Q.    Now, there was some discussion of

8  interquartile range earlier.  Do you recall that?

9      A.    Yes.

10     Q.    And you agree you can't calculate an

11 interquartile range using only two agreements, right?

12     A.    I never seen an interquartile range calculated

13 on two agreements, correct.

14     Q.    Let's talk about a little bit about your own

15 analysis.

16         You formed -- I think we've talked about that.

17 You formed your opinions, your rebuttal opinions relate

18 to Dr. Berneman and Dr. Write.  And you take particular

19 issue with Dr. Berneman and how he did his analysis?

20         THE COURT REPORTER:  You're nodding your head,

21     sir.

22     A.    Yes.

23 BY MR. GARRETSON:

24     Q.    You never personally negotiated a license

25 agreement?

1        A.    I looked at thousands of third-party

2   agreements.  I've never personally negotiated a I

3   license agreement, no.

4        Q.    And you have no specific certification in

5   intellectual property law, do you?

6        A.    No.

7        Q.    Do you recall a discussion of search filters

8   you said Dr. Berneman and you did a very different

9   approach and Dr. Berneman had a bunch of search filters,

10  right?

11       A.    Correct.

12       Q.    And now you yourself, sir, when you did your

13  analysis you had a bunch of search filters too, didn't

14  you?

15       A.    We did.  Well, let me correct that.  So there

16  were three basically criteria to build up the group of

17  comparable -- potentially comparable agreements and then

18  there were, I believe, three filters that were used to

19  narrow that down to 360 agreements.

20       Q.    You got to 360 treatments and then each of

21  those agreements has a -- had a short synopsis in the

22  ktMine's date base that you discussed correct?

23       A.    That's correct.  KtMine provides you with a

24  synopsis which has the licensee licensor, the grant and

25  some other information.

1        Q.   And in order to get to the 20 potentially

2   comparable agreements that you reviewed for purposes of

3   your opinion, you rejected 340 out of those 360

4   agreements just by reading the snort synopsis that was

5   provided by ktMine, right?

6        A.   It was reading the synopsis as well as -- I

7   wasn't able to conclude whether that was a comparable or

8   not looking at the actual agreement.

9        Q.   I want to return for a moment to your

10  analysis.  I believe that you stated you reviewed the

11  August 29, 2023 license agreement that's been marked and

12  admitted as an exhibit as 771, right?

13       A.   Correct.  I reviewed it.

14       Q.   And you looked at the types of corporate

15  entities involved.  I mean by that domestic entities you

16  decided that they are both U.S. corporate entities?

17       A.   Separate U.S. entities, correct.

18       Q.   And I believe you stated on direct that it's

19  your contention, you've seen numerous transfer pricing

20  studies where the related parties are both domestic

21  entities that are subject to U.S. taxes, right?

22       A.   Can you receipt Pete that.

23       Q.   When you were stalking to Mr. Dixon you said

24  it was not unusual to see a Transfer Pricing Study done

25  for two domestic companies?

1      A.    I think I said I've seen those he, those -- I

2  have seen those transfer pricing studies done for

3  domestic entities.

4      Q.    And you identified a couple reasons why

5  related domestic parties might commission a Transfer

6  Pricing Study, do you recall that?

7      A.    I recall that from MRI report, yes.

8      Q.    And then one of whether and you discussed it

9  with Mr. Dixon whether one of the entities has net

10  operating losses that would be off sit by related party

11  the profits or has a different tax profile than the

12  other U.S. related entity.  That's what you said in your

13  Expert Report right?

14      A.    I believe so.

15      Q.    But you did not do any analysis to determine

16  whether one of the entities in the transaction here had

17  net operating losses that would be offset by relate the

18  party profits, did you?

19      A.    I was not asked to look at that, know.

20      Q.    And you didn't look at whether the tax rates

21  of Smart and HLFIP were the same rate either, correct?

22      A.    I did not look at that either.

23      Q.    Let's talk about the Marcum Report for a bit

24  again.  I believe you testified on direct about the best

25  method analysis that was done?

1          A.   Correct.

2          Q.   And you, yourself, did not do a best method

3     analysis, did you?

4          A.   Way not asked to prepare a Transfer Pricing

5     Study, so, no, I did not perform a best method analysis.

6               THE COURT:  I'm sorry.

7               THE WITNESS:  Why yes.

8               THE COURT:  You did not do a Transfer Pricing

9          Study?

10              THE WITNESS:  No.

11              THE COURT:  Okay.

12              THE WITNESS:  Do you need clarification on

13         that?

14              THE COURT:  I'm wondering how Table 7 has

15         conclusions that almost look like the Marcum, if he

16         didn't do a Transfer Pricing Study.

17              THE WITNESS:  You want me to answer that?

18              THE COURT:  I mean that's in my mind.  I don't

19         know if the parties want to ask that question.

20              MR. DIXON:  HLFIP is happy to have him answer

21         that question.

22              MR. GARRETSON:  I believe that the Court's

23         asking you a question, you should answer it, sir.

24         A.   Correct.  Yeah.  So what I did was I performed

25    a CUT analysis.  So comparable uncontrolled transaction

1    analysis which is what I was talking about earlier.

2    Going out and identifying comparable agreements between

3    third parties that are similar to -- that the HLFIP

4    transaction.

5            And so that is the method that is in the regs

6    noted as the most reliable of the methods and so that is

7    the method that I applied in my independent analysis.

8        Q.   The most reliable in the regs potentially if

9    there is a particular set of circumstances that relates

10   to the two companies in question, isn't that true?

11       A.   Yes.

12       Q.   And in fact is it most reliable when only one

13   company holds all of the intangible assets at issue in

14   the relate the party transaction?

15       A.   I don't think that's a stipulation for not

16   using the CUT method.

17       Q.   But in terms of the most reliable method --

18   you yourself started with the assumption that the CUT

19   method was what you needed to do, right?

20       A.   I started -- yes, I was asked to do a CUT

21   analysis, yes.

22       Q.   All right.  You mention in your Expert Report

23   that the IP involved in this case involved several

24   industry first technologies, do you recall that?

25       A.   I do.

1          Q.   It you didn't do any independent verification

2   of whether that was accurate, did you?

3          A.   As I said earlier, I spoke with Jon Logan, we

4   looked at marketing materials.  So that's how I reached

5   that conclusion on the type of IP.

6          Q.   And when we talked last week after you've done

7   your Expert Report during your deposition, you were

8   aware at that point that HLFIP had been involved in

9   patent litigation generally speaking, right?

10         A.   Generally speaking, yes.

11         Q.   But you weren't familiar with the outcome of

12  that litigation, were you?

13         A.   At the time you took my deposition, I was not,

14  correct.

15         Q.   All right.  And so for purposes of generating

16  the opinions that you reached here and that you put in

17  your Expert Report and that we talked about last week,

18  you did not consider the fact that the federal circuit

19  invalidated this 617 patent before the license agreement

20  in this case was executed, did you?

21         A.   I looked at the pool of IP.  Yeah, I did not

22  specifically focus on one invalidated patent, correct.

23         Q.   You didn't know that it had been invalidated,

24  right.

25         A.   At that time, correct.

1          Q.   Now, let's talk about the trademarks that are

2    allegedly owned by HLFIP.  You didn't do any analysis to

3    determine what the trademarks owned by HLFIP were

4    actually being used by SmartComm, did you?

5          A.   Again, other than talking with Jon Logan and

6    looking at marketing materials that were SmartComm had

7    produced that were using those trademarks in the

8    publications, no, I didn't verify beyond that.

9          Q.   It you didn't do any analysis to determine

10   whether the patents that HLFIP is saying it owns

11   actually cover the products that are sold by SmartComm?

12         A.   Again, other than the three hours we spent

13   with Jon Logan and looking at a list of patents, no, I

14   didn't do any additional verification.

15         Q.   It and you're also assuming that the revenue

16   from SmartComm's products and services is all

17   attributable to the intellectual property, right?

18         A.   Yeah.  And I think you heard that in the

19   testimony yesterday that around MailGuard that MailGuard

20   is offered at no charge, but it leads to lots of other

21   service revenue on multiple contracts.  So, yes, under

22   that basis, I was assuming that it would be applied to

23   all of that revenue, not just specific revenue line

24   items.

25         Q.   And you made that assumption before you heard

1   any of the testimony yesterday and today, didn't you?

2       A.   I heard that same as I said a lot of what was

3   testified to by Jon Logan yesterday is what we heard

4   when we met with him for three hours.

5       Q.   And you would agree that based on your

6   understanding that research and development team at

7   SmartComm and Justin Scott were the ones who ended up

8   developing Mr. Logan's ideas into commercial products,

9   right?

10      A.   It's that team that developed the IP at

11  Jon Logan's direction, correct.

12      Q.   Let's talk about the Justin Scott agreement

13  for a little bit.  Are you familiar with that agreement?

14      A.   I am.

15      Q.   All right.  You did a thorough review of that

16  agreement for purposes of your Expert Report?

17      A.   I did.

18      Q.   And you agreed that the Justin Scott agreement

19  should be considered, right?

20      A.   I do.

21      Q.   And the Marcum study did not consider it?

22      A.   It did not.

23      Q.   And you agree that the Marcum study should

24  have considered it?

25      A.   Yes.

1      Q.    Now, the Justin Scott agreement provide for a
2  license of similar intellectual property within the same
3  industry, doesn't it?

4      A.    It does.

5      Q.    But you discarded because the royalty rate
6  applies to gross revenue, not net sales like in the IP
7  transaction at issue here right?

8      A.    I think what I said in my report it was it
9  provide an indication of that a royalty is appropriate.
10 But it's a different agreement from the agreements that
11 were accepted.

12     Q.    Well, shall we take you to your Expert Report?
13 Do you need to refresh what you said in your Expert
14 Report?

15     A.    I believe one of the criteria that I used was
16 the fact that it was not a net sales agreement, which
17 was also applied consistently to some other agreements
18 that were gross sales agreements and so because it was
19 not able to determine what that net sales royalty would
20 have been, that was the reason for rejecting it as a
21 comparable in a set of agreements.

22     Q.    So, okay, one is gross revenues and the other
23 is net revenues, right?

24     A.    Right.

25     Q.    You made no attempt yourself to determine what

1  the difference was between gross and net revenues for

2  SmartComm, did you?

3       A.   I did not.

4       Q.   And you would agree that the Justin Scott

5  independent contractor agreement by itself does not

6  support a 40 percent royalty, does it?

7       A.   It is lower than the 40 percent royalty, yes.

8       Q.   Let's talk about the agreements that you used,

9  that you talked about with Mr. Dixon.

10      A.   Okay.

11      Q.   Now, we talked about the fact that you did, in

12  fact, use some search filters and selection criteria in

13  order to come out with some agreements of with this

14  ktMine correct?

15      A.   Correct.

16      Q.   And one of those selection criteria you used

17 whether it was a software agreement, right?

18      A.   That was one of the key words I think that was

19 used to gather agreements that could be potentially

20 comparable, yes.

21      Q.   Okay.  And to be clear you've never worked for

22 a software company, right?

23      A.   I've done projects in the software -- I had

24 transfer pricing clients that I have worked for in the

25 software industry.  I personally have not worked for a

1  software company, no.

2      Q.   And you've never made a business decision for

3  a software company have you?

4      A.   Again I've recommended.  I've given my

5  recommendations on transfer pricing guidance to software

6  companies as part of engagements with them, but I have

7  not made a decision as an employee of a software

8  company, no.

9      Q.   Now, for all the agreements of those five

10  agreements that you ultimately find comparables we are

11  going to touch on very briefly here in just a moment,

12  your review was essentially limited to those agreements

13  and no other external elements about those agreements,

14  right?

15      A.   No, I think as I said earlier, I reviewed the

16  agreement in detail and then also went out and looked at

17  companies, 10K and websites and other information to

18  determine whether it should be considered a comparable.

19      Q.   So this agreement has been marked but I'm not

20  going to get into details.  I want to direct your

21  attention to the Tech Friends license agreement that you

22  discussed on direct with Mr. Dixon.  Do you have that in

23  mind?

24      A.   Let me put my glasses down.

25      Q.   Do you need, you say you have your glasses on,

1    let me ask you a question, you're familiar with that

2    agreement?

3         A.   I am it just cage um on the screen if you're

4    not going to put it up I won't need these.

5         Q.   If we need to go there we'll go there.  This

6    will be very short.  This agreement was provided to you

7    by Mr. Logan here, right?

8         A.   Correct.

9         Q.   And you didn't look at whether the agreement

10   between Tech Friends and Correct Solutions was the

11   result of a threat of litigation, did you?

12        A.   There was some talk about.  I did not look at

13   that as a reason to eliminate that agreement.

14        Q.   And you weren't aware of any patents or

15   trademarks being licensed in that agreement, were you?

16        A.   I don't believe those word are used in the

17   actual agreement.

18        Q.   Well, and you weren't aware any patents and

19   trademarks being licensed in that agreement, right?

20        A.   Again, I didn't see those words used in the

21   agreement.  So yes, I was not aware of any patents.  I'm

22   sorry what did you say patents or --

23        Q.   Patents or trademarks being licensed in that

24   agreement.

25        A.   Yeah.  I'm certain patents were not mentioned

1    there.  I'm not certain about trademarks.

2         Q.    And this was a non-exclusive license wasn't

3    it, this Tech Friends license?

4         A.    Correct.

5         Q.    Let's talk about the Merit Audio Visual

6    agreement.  That is in evidence as Exhibit 317.

7              MR. GARRETSON:  Why don't we have that up on

8         the screen.  First page, please.  Now, if you can

9         blow-up the first paragraph at the top.

10   BY MR. GARRETSON:

11        Q.    The title of there is software distribution

12   and license agreement, do you see that?

13        A.    I do.

14        Q.    And the date of the agreement is sometime in

15   1996.  There is a blank there but to your understanding

16   this is done in 1996, right.  That would be my

17   understanding, yes.

18        Q.    And you're not aware of any patents or

19   trademarks being licensed under this agreement either

20   are you?

21        A.    Yeah.  I don't believe the words patents or

22   trademarks appear in this agreement.

23        Q.    And there agreement relates to MS-DOS software

24   right?

25        A.    Yeah.

1      Q.   And you don't have any idea whether this

2  agreement was still in effect in 2023 when the license

3  agreement at issue here was signed, do you?

4      A.   No.   When I look at comparable agreements, I

5  see the effective date, but you can't tell whether that

6  agreement -- how long that agreement has been in effect.

7  That's not part of the analysis that I would normally

8  do.

9      Q.   And from your standpoint, the date is

10  essentially irrelevant in the agreement as long as it

11  satisfies symptom other selects criteria that you have

12  chosen?

13      A.   I think as I said in my report, date in this

14  particular industry is not as critical.   Some other

15  industries that I have worked in like pharma, biotech,

16  where the technology is rapidly changing, I think dates

17  of comparable agreements are much more important.

18          In this industry, I think as you heard from

19  some of the Jon Logan testimony yesterday, the

20  technology is severely lagging behind what's out in the

21  market.   So some extent using older agreements may be

22  more relevant in comparing this IP to third-party

23  agreements.

24      Q.   Let's talk about the Nectar Foundation

25  agreement.   We can bring this up this is Exhibit 309 in

1    evidence in the first page.  This is also a Software

2    License Agreement, right?

3         A.   Correct.

4         Q.   And it's dated May 8, 1998 is that right?

5         A.   That's the date.

6         Q.   So that is it 25 years before the at issue

7    license agreement in this case, right?

8         A.   I think the math is correct.

9         Q.   Now, you don't know if a Nectar Foundation is

10   nonprofit, do you?

11        A.   You asked me this in my deposition.  I went

12   back and had my team do some research.  While I found

13   out foundation sounds like a non for profit entity, I

14   was not able to find any evidence that it is a non for

15   profit so I don't know.

16        Q.   And you critical size -- one of the criticisms

17   you have of Dr. Berneman is that he has had at least

18   some experience, partial experience among many other

19   things that he has done with nonprofit, is that right?

20        A.   I think I put it out that that's been his

21   experience, heavy part of his experience, yes.

22        Q.   Dr. Berneman will get to testify about what

23   his experience actually is?

24        A.   Okay.

25        Q.   But that was a criticism of yours correct?

1          A.    I think what I said.

2               MR. DIXON:  Objection I think that

3          mischaracterizes his report.

4               MR. GARRETSON:  I'll move on Your Honor.

5          That's fine.

6               THE COURT:  Just so everyone's we're at 4:45.

7          I think we need to wrap up no later than 51515.

8               MR. GARRETSON:  I will be done at least the

9          first part.

10    BY MR. GARRETSON:

11         Q.    At the time that I deposed you and the time

12    you did the Expert Report you had not investigated

13    whether the Nectar foundation was a nonprofit?

14         A.    I don't think that's accurate.  I will done

15    some additional analysis to see if there was any reason

16    to eliminate this as a comparable and that didn't come

17    up in my analysis (fix) prior to my deposition and as I

18    said, I, my team have gone in and researched this and it

19    didn't come after.

20         Q.    My question at the time of your opinion and

21    your deposition, didn't know if it was a nonprofit?

22         A.    Based on all the research that I had done.

23    No, I was not aware -- there was no evidence that it was

24    a not for profit.

25         Q     (By Mr. Garretson) Your Honor I would like to

1   talk briefly about a document that is not on the exhibit
2   list that was at one of the agreements that Mr. Schuette
3   had, the one of his five agreements in the Expert
4   Report.
5           THE COURT:  Let him first.  Let's see if we
6       have an issue.
7           MR. DIXON:  Yeah.  I have no objection to
8       Mr. Garretson asking questions about one of the
9       comparable agreements that Mr. Schuette.
10          MR. GARRETSON:  And we have it electronically.
11          THE COURT:  Well let's identify this for the
12      Clerk.  What's the next number on.
13          MR. GARRETSON:  494.  We can give a
14      provisional mark on the exhibit on our list.
15          THE COURT:  Is there any objection to 494
16      coming in.
17          MR. DIXON:  I have no objection.
18          THE COURT:  Are you moving it in.
19          MR. GARRETSON:  I'll move it in.
20          THE COURT:  494 is received.
21          (Exhibit 494 was admitted into evidence.)
22          THE COURT:  Does the Clerk have a copy.
23      Kaisha?
24          MR. GARRETSON:  We will be able to pull it up
25      on the screen.

1           THE WITNESS:  Could I get a hard copy.

2           MR. GARRETSON:  I'm happy.

3           THE COURT:  Give limb at hard copy.  May I

4      approach instead of the bailiff.

5           THE COURT:  Yes.

6  BY MR. GARRETSON:

7      Q.   All right Mr. Schuette, you've been handed

8  what's been marked as Exhibit 494.  You have that in

9  front of you?

10     A.   I do.

11     Q.   All right.  And do you recognize this

12 document?

13     A.   Yes.

14     Q.   It's one of the five, I believe it's one of

15 the five agreements that I accepted as comparable?

16          MR. GARRETSON:  All right why don't we bring

17     up the first page of this document please.

18 BY MR. GARRETSON:

19     Q.   Now, this is titled distribution and marketing

20 agreement, right?

21     A.   Yes.

22     Q.   And this is another agreement -- Strike that.

23          Withdrawn.

24          This is another agreement that is dated more

25 than 20 years ago, right?

 1       A.    No.  2023 would be -- oh, yes, more than.

 2       Q.    April 21, 2003.

 3             I would like to talk with you about an

 4  article, this is a royalty issue, I should step back a

 5  bit (fix year) this is one of the two agreements that

 6  you rely on that has what you characterize is a

 7  50 percent royalty rate, isn't that right?

 8       A.    It does.

 9       Q.    And I want to talk with you about something

10  that was not in your Expert Report and that we discussed

11  at your deposition.

12             There is an article 3.2 of this agreement that

13  refers to a 20 percent finders commission.  Do you

14  recall that?

15       A.    Let me just get to 3.2, please.

16       Q.    Sure.

17       A.    Yes, I see it.

18       Q.    And so what's going on here set the stage a

19  little bit.  There is a 50 percent royalty, unit

20  royalty, on sales going one way, right?  And that's what

21  you rely on?

22       A.    50 percent -- let's use the name.  50 percent

23  paid to the licensor Artera.

24       Q.    Okay.  And then going the other way is a

25  finder commission equal to 20 percent of Artera's

1   revenues on the license of such unit and then it goes on

2   net of certain things.  Do you recall that?

3        A.   20 percent commission paid on the same net

4   sales.

5        Q.   Yeah?

6        A.   But paid to the licensee.

7        Q.   Paid to the licensee?

8        A.   Yes.

9        Q.   So you did no research -- well let's step

10  back.

11            You don't refer to this finders commission in

12  this 20 percent payment at all in your Expert Report, do

13  you?

14       A.   I don't believe so, no.

15       Q.   And you didn't research -- do any research to

16  determine whether or not that 20 percent commission was

17  ever paid, did you?

18       A.   No.

19       Q.   And you did no analysis into what impact the

20  20 percent commission would have on the 50 percent

21  royalty rate specified in this agreement, right?

22       A.   Yeah.  If I could expound on that.

23            You can't tell how many of these 50 percent

24  commissions also have a 20 percent -- I'm sorry --

25  50 percent royalties have a 20 mothers commission going

1  to the licensee.

2          If I was able to do that and know that on

3  every transaction the same net sales that royalties were

4  paid to the licensor, there was a 20 percent commission,

5  then you would have a range of 30 to 50 percent of net

6  royalties, right, 50 percent royalty less the 20 percent

7  commission.  So if you took the average of those, this

8  would be a 40 percent agreement.

9          I did not do that adjustment because I

10  couldn't tell how many of these agreements included the

11  20 percent commission.

12     Q.  Unless there were zero commissions paid on

13  anything it wasn't 50 was it.  It wasn't but that's

14  possible so I don't know.

15     Q.  What you close to do is put 50 down and call

16  it a day, right?

17     A.  I would not -- I would say this is very

18  different from a collateral transaction where it is

19  bringing into question that transaction and its impact

20  on the royalty.  You can tell fairly clearly here that

21  if it is a situation where that 20 percent commission is

22  it made, it's going to be a net 30 percent royalty.

23     Q.  And that's not what's in your Expert Report,

24  though, is it?

25     A.  That is not in the report because I was not

1    able to tell how many of these agreements had a

2    20 percent commission.

3        Q.    So we talked earlier about the fact that this

4    agreement was executed in April of 2003, do you recall

5    that?

6        A.    Yes.

7        Q.    And if you look at article 7 of this

8    agreement, if we scroll down and pull out article 7, and

9    this says the term of this agreement shall again on the

10   effective date, and unless extended or earlier

11   terminated by the written agreement of party pursuant to

12   article 8 below, shall expire one year thereafter.

13          Or in 2004, right is this?

14       A.    That's what I read, yes.

15       Q.    And you don't know whether this agreement was

16   ever renewed, do you?

17       A.    I can't tell from this agreement, no.

18       Q.    And you don't know whether this purported

19   50 percent royalty was ever in existence for more than

20   twelve months discounted by what the finders commission

21   was?

22       A.    Can't tell after the parties went in and re

23   upped the license, no.

24       Q.    All right.  Last agreement.  This?

25          MR. GARRETSON:  This is a document, Your Honor

1          that was produced in native form and also not on

2          the exhibit list but was testified to by the

3          witness during Direct Examination.

4               THE COURT:  Is there any objection to this

5          one.

6               MR. DIXON:  No objection.  This appears to be

7          one of the agreements that Mr. Schuette.

8               THE COURT:  What number.

9               MR. GARRETSON:  This is 495, Your Honor and

10         foundation with the witness.

11              THE COURT:  Doesn't sound like there is ooh

12         objection.

13              MR. GARRETSON:  Just put it in.

14              THE COURT:  495 is received.

15              (Exhibit 495 admitted into evidence.)

16    BY MR. GARRETSON:

17         Q.   All right.  Mr. Schuette, do you have

18    Exhibit 495 in front of you?

19         A.   I do.

20         Q.   Now, the title of this document, if we could

21    bring it up on the screen, please, again is a Software

22    License and Marketing Agreement, right?

23         A.   I see that.

24         Q.   And the effective date of it below is

25    March 25th, 2002, do you see that?

1       A.   I do.

2       Q.   And when you scroll through this document,

3  when you reviewed this document thoroughly for purposes

4  of your Expert Report, right?

5       A.   Yes.

6       Q.   And if you scroll through the document, there

7  are a number of provisions that are intentionally

8  omitted, do you see that look at for example, 1.9 -- or

9  actually 1.2 if we could scroll through it --

10  intentionally omitted there is a number of other.  You

11  see that, right?

12       A.   I do.

13       Q.   And if you go to section 6 entitled royalties,

14  if we could go to second and maybe go back up to section

15  6 and it's on page 1 --

16            THE COURT:  I'm there.

17            MR. GARRETSON:  Okay.

18  BY MR. GARRETSON:

19       Q.   Under 6.1 on royalties, the very first

20  provision is intentionally omitted.  Do you see that?

21       A.   I do.

22       Q.   You have no idea what was in that provision,

23  do you?

24       A.   Well, I think when you asked me this in my

25  deposition, you referred to it as redacted and then

1    quickly corrected yourself.  It's not a redacted

2    agreement.  We see these types of agreements all the

3    time, and my understanding it's a standard agreement.

4    And the licensor has intentionally omitted sections that

5    don't relate to this agreement with that licensee.

6        Q.   So my question was, you don't know what's in

7    Section 6.1 request respect to royalties, do you?

8        A.   I don't know what the licensor has

9    intentionally omitted and what was in the original

10   template, no.

11           I do know there's a royalty section that has a

12   royalty rate.

13       Q.   Now, and let's talk about that.  This license

14   is not just limited to a particular territory, is it?

15       A.   It includes North America which was one of our

16   criteria but it's not limited to North America, no.

17       Q.   Fact I apologize I didn't mean to speak over

18   you?

19       A.   I was done.

20       Q.   In fact it's the whole world, isn't it?

21       A.   That's the territory listed in the agreement,

22   yes.

23       Q.   And so you didn't exclude from your list --

24   your comparable agreements, agreements that could

25   include the entire world with all the different

1  products, laws markets, regulations all that, as long as

2  it includes North America it's in that was your

3  criteria?

4      A.   Yes.  And that's fairly typical of doing a

5  study.  As long as the territory that you're looking at

6  for the HLFIP agreement is in that set he, that's

7  typically how it's done.  I believe Dr. Berneman had the

8  same criteria.

9      Q.   To be clear?

10      A.   Yes.

11      Q.   The business that we are looking at here today

12  is an U.S. domestic business, right?

13      A.   Correct.

14      Q.   And this agreement relates to the Super Duper

15  Music Looper?

16      A.   It does.

17      Q.   And that's an entertainment product?

18      A.   It is, yes.

19      Q.   I'm not going to waist everybody's time going

20  through it now.  Late in the day.  That was the

21  similarity that you saw between that and SmartComm's

22  products?

23      A.   I think you heard yesterday there are some

24  entertainment service features of the SmartComm product,

25  yes.

1          Q.   And you did not assess the product potential
2     for this agreement for the licensor, did you?
3          A.   I did not.
4          Q.   And in fact you did not assess the profit
5     potential of any of the licenses that you found to be
6     acceptable, did you?
7          A.   I did not but I would mention that the Tech
8     Friends agreement, because it's in the same industry, I
9     would conclude that the profit potential should be
10    similar.
11         Q.   But you didn't specifically assess the
12    economic circumstances of either party to that
13    agreement, did you?
14         A.   I did not do an analysis of the profit
15    potential, no.
16         Q.   Now, let's -- let's wrap up, shall we.
17              You did not assess -- let me step back.
18              You're familiar with the term pivot --
19         A.   Yes.
20         Q.   -- support, incoming taxes, depreciation,
21    amortization?
22         A.   I am.
23         Q.   All right.  You did not assess what the EBIDTA
24    was for the either of the parties in this case, did you?
25         A.   I did not but I did not for a reason.

1       Q.   Sir, that's -- thank you.  You did not analyze

2  what the economic impact would be on either of the

3  parties to the IP transaction of applying a 40 percent

4  royalty, did you?

5       A.   It's because the earnings, the state that I

6  saw was not normalized.

7       Q.   It the answer to my question, sir, I would

8  appreciate an answer?

9       A.   The answer is no.  I did not.

10       Q.   And you did not review any documents relating

11  to the bankruptcy proceeding either for purposes of --

12       A.   Not to my recollection.

13       Q.   And you have been paid for your work in this

14  case, right?

15       A.   Yes.

16       Q.   How much have you been paid?

17       A.   175,000.

18            THE COURT:  I'm sorry?

19       A.   175,000.

20            MR. GARRETSON:  Your Honor at this point I

21       pass the witness.

22            THE COURT:  Mr. Johnson.

23            MR. JOHNSON:  No questions.

24            THE COURT:  Mr. Dixon.

25            MR. DIXON:  Very brief, Your Honor.

1              Cross examination

2  BY MR. DIXON:

3      Q.   First I want to ask you were at the end of the

4  examination there you were asked about why you didn't

5  assess the EBITDA of the earnings before interest taxes

6  depreciation and amortization.  Why didn't you do that

7  in this instance?

8      A.   Yeah.  Typically when you do as, as I refer to

9  before a CUT analysis and you come up with a range of

10  royalties, very often you will look at can the company

11  actually absorb that royalty he over a long period of

12  years.  And I believe Dr. Berneman in his report offered

13  up an EBITDA analysis before or after the royalty.  I

14  couldn't rely on that because the analysis has not been

15  normal lies dollars.  I think the last expert talked

16  about normalization.  So until you do that.  You can't

17  really reliably do that tax to where that royalty could

18  be absorbed.

19      Q.   I believe you were also asked a little bit

20  about whether you analyzed?

21              THE COURT:  I'm sorry.

22              THE COURT:  So did I understand you normal

23      will I if you had normalized financials, you would

24      have looked at the impact on both companies.

25              THE WITNESS:  Yeah.  That's atypical step to

1          take over a period of years.  Not typically just

2          folk discuss on one year.  But, yes, that is

3          something that you would typically do.

4              MR. DIXON:  And why would you look over a

5          period of years.

6      A.    Because the IP's being used over a period of

7  years.  So you have to look at that period and look at

8  the earnings over that period, the normalized earnings.

9      Q.    I think were you asked about whether you

10  analyzed HLFIP and Smart paid the same tax rate.  Is

11  that something that you would typically analyze in a

12  transfer pricing analysis?

13      A.    Not typically, no.

14      Q.    Why not?

15      A.    It doesn't really impact the answer., so.

16      Q.    I want to talk talk about the transfer pricing

17  regs I know it's late but the Court did ask a question

18  and I want to clarify one part.  I think you said that

19  you did not do a TP study but you did do a CUT analysis?

20      A.    Uh-huh.

21      Q.    And I'm aware that those terms have very

22  specific meanings.  So when you say that you did not do

23  a TP study, what is the pertinence of the treasury

24  regulations in that -- in you saying that?

25      A.    Yeah.  I think that probably has meaning to a

1   transfer pricing nerd like myself.  But when I say I

2   didn't do a Transfer Pricing Study, a Transfer Pricing

3   Study would require actually do a best method analysis

4   and conclude that the CUT was the best method.  I didn't

5   do that in this case.  We were asked to go in and apply

6   a CUT to determine are there a set of agreements that

7   are comparable.

8        Q.   And Marcum applied a CUT analysis, right?

9        A.   They did.

10       Q.   And.

11       Q.   It and I believe Dr. White owe piped that Dr.

12   Berneman's analysis, at least resembled or looked like a

13   482 CUT analysis?

14       A.   And I believe there was mention of a CUT in

15   that report, yes.

16       Q.   And so -- are there other requirements under

17   the regulations that have to be met in order to call a

18   particular study a Transfer Pricing Study or 6662

19   documentation?

20       A.    , you know, best method is one of the key ones

21   but I think also a functional analysis, we are looking

22   at the function, asset and risks of all the parties.

23       Q.   And so if HLFIP had gotten your rebuttal

24   report in this case, and the IRS came and said show me

25   your Transfer Pricing Study, could they have hand had

1  the rebuttal report to the IRS?

2       A.   No.

3       Q.   And I think you were also asked about whether

4  you analyzed the use of patents and trademarks in some

5  of the comparable agreements that you had looked at do

6  you remember that?

7       A.   Yes.

8       Q.   And I think you've also said that one of the

9  things you have to price in transfer pricing pricing are

10 intangibles, right?

11      A.   Correct.

12      Q.   For purposes of doing a transfer pricing

13 analysis, do you limit the analysis to patents and

14 trademarks?

15      A.   No in fact in search for agreements there were

16 certain words use trademarks patents no how so it wasn't

17 just similar.  It was really a full group that would

18 represent the pool intangibles that HLFIP owns.

19      Q.   It is there any relationship between the

20 search terms that you use in that regard and your

21 experience with the transfer pricing regulations?

22      A.   Yes.  The transfer pricing regulations talk

23 about intangibles pretty broad.  There are pretty famous

24 cases out there where the U.S. taxpayers have argued

25 that you only look at a specific intangible and the IRS

1  argued that no the definition of intangibles have

2  changed to be much broader.

3          MR. DIXON:  Nothing further Your Honor.

4          THE COURT:  Mr. Oprison.

5          MR. OPRISON:  He is on my team.

6          THE COURT:  Mr. Hillsley.

7          MR. HILLSLEY:  Nothing Your Honor.

8          THE COURT:  Mr. Garretson.

9          MR. GARRETSON:  Nothing Your Honor.

10         THE COURT:  Mr. Johnson.

11         MR. JOHNSON:  No questions.

12         THE COURT:  I think you said that you were

13     going to read in Jim Logan is it like a five minute

14     thing or is it longer?

15         MR. DIXON:  I have to defer to my team on

16     that.

17         MR. BRESNAHAN:  Ready to go.

18         MR. O'NEILL:  Your Honor we do have an

19     evidentiary issue with the reading in the

20     deposition given that its Jim Logan.  So I do think

21     that the propriety of reading that in will require

22     some argument.

23         THE COURT:  He was a shareholder and director,

24     right.

25         MR. O'NEILL:  My understanding and Ms. Liu

1           could probably take over because I don't want to

2           butcher Ms. Liu can give you the background.

3                MS. LIU:  If this is referring to HLFIP

4           Exhibit 805, which is Jim Logan's testimony on

5           November 11, 2022 in the Engelke case, he testified

6           there in his capacity as a HLFIP corporate

7           representative so we believe that's a big hearsay

8           problem.

9                THE COURT:  Is that true.  He was testifying

10          as a HLFIP.

11               MR. OPRISON:  He was a HLFIP.

12               THE COURT:  Was he designating and testifying

13          as a corporate representative of HLFIP?

14               MR. OPRISON:  He was, Your Honor.

15               THE COURT:  Then where is the hearsay

16          exception?

17               MR. OPRISON:  Well, Your Honor, we're a party

18          in this case, and -- by the way, we're a party in

19          this case, so certainly it's evidence that could

20          come in particularly if they had the opportunity to

21          cross examine him and Alexis Logan was there at the

22          time as the outside represent -- as a counsel for

23          Smart Communications as well.  So she was presents

24          at the deposition.

25               THE COURT:  Remind me who this litigation is

1     between?  Is this between her ex-boyfriend and --
2             MR. OPRISON:  It is.
3             THE COURT:  And HLFIP.
4             MR. OPRISON:  Correct.
5             THE COURT:  And this was the guy that was
6     10 percent owner of one of the subsidiaries.
7             MR. OPRISON:  That's correct.
8             THE COURT:  And when was this deposition
9     taken?
10            MR. BRESNAHAN:  November 2020.
11            THE COURT:  Ms. Liu.  I would like to.
12            MS. LIU:  I would like to clarify that
13    Alexis Logan was not at that deposition.  She was
14    not there in her capacity as party's attorney.
15            MR. JOHNSON:  She wasn't counsel of record.
16    She was appearing in effect as a representative of
17    the company.
18            THE COURT:  Representative of which company?
19            MS. ALEXIS LOGAN:  No no no.
20            MR. JOHNSON:  Just one moment.
21            MR. OPRISON:  Your Honor, Alexis has testified
22    that she was acted incapacity as general counsel to
23    Smart Communications through about 2020.  She was
24    present at that time.  She also has indicated that
25    she's represented both her mother and her father.

1      So I believe that would be in that capacity as

2      well.

3              THE COURT:  Can someone give me the hearsay

4      statute number or section that we're talking about?

5              MR. OPRISON:  Your Honor, she testified I

6      represented Jim personally in the Engelke case

7      which also sued Smart Communications U.S.

8              THE COURT:  Hold on a second.  Let me get to

9      the exception that HLFIP is going to contend

10     applies here.

11             MR. HILLSLEY:  Your Honor does it make sense

12     for the parties to prepare to address issuing in

13     the morning.

14             THE COURT:  No my hope is to be able to have a

15     ruling so by tomorrow you know what's going to

16     happen.  Let see if I can do it in the next couple

17     minutes.

18             THE COURT REPORTER:  Ms. Liu can you spell

19     that.

20             MS. LIU:  E-N-G-E-L-K-E.

21             THE COURT REPORTER:  Thank you.

22             THE COURT:  So what I'm hearing this is a

23     statement by HLFIP being offered by HLFIP.  So it

24     would not seem that it can come in as a statement

25     that is offered against a party because it's HLFIP

1       offering its own statement.

2            MR. OPRISON:  HLFIP offering its own

3       statement.  It was under oath initial of

4       trustworthiness he was there as a corporate

5       representative, Your Honor, now he is no longer

6       available.

7            THE COURT:  Well, help me out to identify the

8       exception to the hearsay that applies?

9            MR. HILLSLEY:  Your Honor, I'm concerned

10      about -- I wonder if this falls under rule 1.330 an

11      interplay with the evidentiary rule assets and

12      liabilities to the use of depositions at trial.

13           So I think that may be where the analysis

14      falls.  There is an evidentiary rule that ties into

15      this relate today hearsay and I'm trying to pull it

16      up, Your Honor.

17           MR. OPRISON:  Your Honor under 22 -- under sub

18      part 22 of the rule Your Honor former testimony

19      given by the declarant which testimony was given as

20      a witness at another hearing of the same or

21      different proceeding or in deposition taken in

22      compliance with law in the course of the same or

23      another proceeding if the party against whom the

24      testimony is now offered or in a civil proceeding

25      or action a predecessor in interest a person with a

1        similar interest had an opportunity and similar

2        motive to develop the testimony by direct Cross or

3        redirect examination.

4             THE COURT:  What was that case about?

5             MR. OPRISON:  The Engle key case Your Honor.

6             THE COURT:  Yes.

7             MR. OPRISON:  My understanding Engelke case

8        was a challenge of a former investor of HLFIP to

9        recover on some of the -- and the interests of --

10       I'm not Smart investor in Smart Communications

11       HLFIP was sued as a party in that case as well,

12       Your Honor.

13            He was there was a dispute and he was claiming

14       to have a 10 percent interest in both Smart and

15       HLFIP technology.

16            THE COURT:  So was Janice Logan or

17       Alexis Logan a party in that case?

18            MR. OPRISON:  James Logan, Jonathan Logan,

19       HLFIP, Smart, DeSoto, Smart west, Smart Collier,

20       all of subsidiaries for Smart Communications.

21            THE COURT:  Who on that side of the room --

22            MR. OPRISON:  No one on that side of the room

23       Your Honor ebbs exempt for Jim Logan was again

24       represented in his personal capacity by

25       Alexis Logan.

1          THE COURT:  Because if the party against whom

2     the testimony is now offered, had a similar

3     interest so where is the -- where is the party

4     against whom this is being used?

5          MR. OPRISON:  Well there wouldn't be anybody

6     on that side of the V now Your Honor but teller

7     alleging that the interest of Jim Logan now as the

8     member of or the who he transferred his interests

9     to in the entity his 50 percent shares went into

10    the Trust, that is now creating a situation where

11    they are saying his interests created an interest

12    in Ms. Logan so his interests have transferred in

13    the trust she represents the interests of the trust

14    of the trustee.  Step or two removed.

15         THE COURT:  In my gatekeeper function, what is

16    the testimony, if I allowed it, what's it going to

17    say.

18         MR. OPRISON:  The testimony will say he

19    admits, HLFIP owned the technology and licensed the

20    technology to Smart Communications.

21         MR. O'NEILL:  It has absolutely not what that

22    deposition transcript says and not no those words

23    and I'm not even conclusion.  There is a

24    significant foundational issues with deposition

25    testimony.

1          THE COURT:  Well, right this second, I do not

2     think it's qualifying as a statement adverse to a

3     party because this is a HLFIP statement because

4     Jim Logan was a -- was the HLFIP corporate

5     representative in this deposition, am I correct?

6          MR. OPRISON:  He was the testifying here as

7     the corporate representative.

8          THE COURT:  And so that doesn't work.  And the

9     former testimony doesn't work because there's not a

10     party against whom this is now being offered that

11     would either present or a predecessor in interest

12     that had a similar interest here.

13          MR. OPRISON:  Well our position is even though

14     Mr. Logan was there in his capacity as a corporate

15     representative of HLFIP, he testified to things

16     that are -- well he later became adverse in the

17     sense that his interests were transferred to the

18     Trust, the trust is now controlled by Ms. Logan,

19     and he did testify at that deposition on facts that

20     are now contrary to what they're alleging and the

21     Trust is now alleging.  He does say and I take

22     issue with what counsel says.

23          For example, your understanding is HLFIP and

24     Smart are parties to some sort of license

25     agreement.  I believe so yes.

1          MR. SCHOENFELD:  Your Honor, now he is just

2     reading into the record.

3          MR. OPRISON:  No I'm just.

4          THE COURT:  One at a time.  I asked my

5     gatekeeper function what I'm going to hear, so I

6     can see if this is even an issue or not.

7          MR. OPRISON:  Your Honor, yes.  Several

8     instances it says after that, and that license

9     agreement relates to certain intellectual property

10    that's my assumption.  And he says later says are

11    you aware of any agreement of any type between

12    HLFIP and Smart Communications Holding.  I believe

13    HLFIP licenses Smart Communications Holding to

14    utilize some of its intellectual property.

15         THE COURT:  Well --

16         MR. OPRISON:  And to the extent that they are

17    disputing that there was ever an agreement between

18    HLFIP and Smart --

19         THE COURT:  I hear what you're saying, it

20    seems more human to as to that issue but, two, I

21    don't see where you're qualifying under an

22    exception to the hearsay where the defendant is

23    available or here immaterial or declarant

24    unavailable immaterial.  I don't see where you got

25    an exception that allows this here say in.

1          MR. OPRISON:  Your Honor if you look at the

2     nature of the Engelke litigation, what underlied

3     that was a transaction that Ms. Logan, Alexis Logan

4     had, when she brought her boyfriend in to invest in

5     the company.  They had a dispute.  Came after the

6     company.  She actually was there representing

7     Jim Logan in his individual capacity, who was there

8     to acknowledge hold on Chuck you will have a

9     second.  There to acknowledge.

10          THE COURT:  Mr. Johnson.

11          MR. OPRISON:  I'm sorry.  We have gotten

12     familiar sharing space so much.  Mr. Johnson I

13     apologize.

14          Testifying to a very fact that she now takes

15     issue with that she disputes.  And that is -- that

16     is whether or not there was in fact a license in an

17     agreement over the IP.

18          THE COURT:  But to qualify a former testimony

19     with if Alexis Logan is not a party in that case,

20     if she was representing it sounds like HLFIP --

21          MR. OPRISON:  Not HLFIP, Jim Logan in his

22     individual capacity.

23          THE COURT:  -- that there is not a -- not a

24     reason to develop -- let me get the right words --

25     to develop testimony by direct cross as a

1    predecessor in interest.  So I don't see how this

2    comes in.  So I don't -- I don't think you can get

3    it in.

4        Okay.  Mr. Hillsley, did you phone a friend,

5    anything further?

6        MR. OPRISON:  I love my friend, Mr. Hillsley,

7    but I don't think that works but the point is Your

8    Honor that was our position that because of the

9    nature of the Jim Logan and the Trust it's interest

10   in the Trust later that is now adverse to our

11   client.  They are taking a position it's directly

12   adverse to this.  Your Honor if we can't read it in

13   we certainly will be able to use it for impeachment

14   if his low gets on stand tomorrow and testifies

15   that she was aware that testimony was coming out by

16   Jim Logan on behalf of HLFIP.

17       THE COURT:  Well I'm assuming you mean by

18   Alexis list.

19       THE COURT:  She's sitting right back there.

20   She's heard you.

21       MR. OPRISON:  I understand.

22       THE COURT:  Okay.  Sounds like we don't need

23   to read in Jim Logan.  We are now at 525.  Or 3523.

24   We need to wrap up for the day.

25       Let's talk 8:00 a.m. tomorrow or we need to

1      finish tomorrow.  We're going to finish tomorrow.

2      Let me be more declare I have to.

3            MR. OPRISON:  Should we a lot the last few

4      hours.  Do we need the if you will stop time a lot

5      two hours for closing total.

6            THE COURT:  Well, I feel like you need to a

7      lot two hours and you need to lot to half an hour.

8      If I real I'm not certain I'm going to rule

9      tomorrow or not.  So you need to figure out two and

10     a half hours and five o'clock.

11           MR. OPRISON:  And five is the time?

12           THE COURT:  Look if I say we're going to go to

13     six then you're going to take me to 7:30.

14           MR. OPRISON:  He is going to tackle us.

15           THE COURT:  Is that your fifth amendment you

16     don't have to answer.

17           THE COURT:  We're going to start at 8:00.  We

18     are going to work.  We need to finish tomorrow but

19     you all need to leave time for closings and you

20     need to leave time for me to rule if I'm going to

21     rule.  If I'm not going to rule, then you get the

22     call claw pack a little time but I think you need

23     to assume I'm going to rule.

24           Okay.  Anything else before we break?  We're

25     in recess.

1          (Proceedings adjourned at 5:23 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**BY MR. DIXON: [9]**
263/5 265/5 268/13
277/11 281/13 287/2
293/13 295/16 330/2
**BY MR. GARRETSON:**
**[7]** 301/23 314/10
317/10 319/6 319/18
324/16 325/18
**BY MR. HILLSLEY:**
**[14]** 127/2 147/7
147/17 152/6 153/13
155/25 156/19
157/14 160/25
162/18 164/19 166/3
167/24 182/23
**BY MR. JOHNSON:**
**[13]** 106/15 107/22
111/25 115/15
124/12 181/19 229/8
235/24 236/6 254/20
258/2 259/21 261/4
**BY MR. O'NEILL: [6]**
168/11 170/9 174/12
175/20 178/4 183/14
**BY MR. OPRISON: [15]**
125/18 132/15
135/12 135/24 137/4
138/2 139/21 140/16
140/24 141/8 142/8
142/15 142/24 146/4
146/15
**BY MR. RUDOLF: [23]**
185/17 189/18 191/3
196/11 197/3 198/3
202/14 203/18
203/22 207/20 208/3
208/12 209/10
209/21 210/9 211/19
229/21 231/9 231/20
242/1 243/10 248/23
251/19
**BY MR.**
**SCHOENFELD: [47]**
18/20 21/8 24/8
28/21 29/5 29/10
29/19 34/22 37/24
38/25 39/24 41/14
41/23 44/4 47/16
50/18 52/23 54/15
58/9 58/13 58/22
63/6 64/10 65/17
67/11 67/17 68/20
69/2 69/23 71/19
74/20 81/8 82/16
83/12 84/3 85/3
86/10 88/14 89/22
90/11 93/14 95/19
95/25 98/8 99/4
252/13 257/4
**BY MS. CLEMENT: [5]**
212/5 215/1 218/4
219/8 223/15
**MR. BARFIELD: [7]**
4/1 4/19 5/3 5/6
5/11 5/16 16/1
**MR. BARNETT: [1]**
2/20
**MR. BRESNAHAN: [2]**

334/17 336/10
**MR. DIXON: [30]**
238/17 241/2 241/8
262/11 263/4 265/3
275/13 275/23
276/10 277/5 277/9
280/22 281/10
286/19 286/22
286/25 293/2 293/10
295/4 295/15 296/5
305/20 317/2 318/7
318/17 324/6 329/25
331/4 334/3 334/15
**MR. GARRETSON: [22]**
275/9 276/1 276/23
294/25 295/6 296/9
305/22 314/7 317/4
317/8 318/10 318/13
318/19 318/24 319/2
319/16 323/25 324/9
324/13 325/17
329/20 334/9
**MR. HILLSLEY: [56]**
1/7 5/24 6/3 6/8
6/13 6/19 8/2 8/7
9/6 9/25 13/3 13/11
13/21 14/8 15/6
16/11 17/9 18/16
39/19 66/25 76/2
82/8 98/20 112/23
114/18 126/25 129/8
130/10 147/5 147/15
151/22 153/5 155/21
157/8 157/11 160/21
161/14 161/22 162/9
166/1 167/22 168/9
170/5 173/25 174/7
174/20 175/1 177/19
182/20 183/11 184/3
184/19 296/7 334/7
337/11 338/9
**MR. JOHNSON: [44]**
2/8 85/24 106/9
107/2 107/17 107/20
111/24 112/9 112/14
115/9 125/9 125/12
129/12 137/2 146/13
151/20 151/24
156/14 156/16
164/16 168/6 182/16
183/23 207/1 207/4
227/5 229/17 231/14
233/5 235/23 236/12
241/1 256/11 258/23
259/1 259/17 259/20
260/25 280/18 281/2
329/23 334/11
336/15 336/20
**MR. O'NEILL: [28]**
129/17 131/7 131/13
131/17 139/3 139/13
140/21 141/24
142/19 153/1 155/15
157/4 161/10 165/24
167/19 174/3 174/11
175/16 177/23
183/12 183/21
239/22 240/23 293/5
295/10 334/18

334/25 340/21
**MR. OPRISON: [85]**
1/18 10/6 11/7 11/16
11/25 12/24 16/15
16/18 58/6 58/11
58/16 64/15 65/7
67/7 68/16 69/16
71/6 83/3 86/5 89/8
98/2 111/19 112/12
112/16 113/9 113/22
114/13 115/5 125/14
130/23 131/20 132/2
135/10 135/22 138/1
139/9 139/18 140/10
140/15 141/7 142/3
146/1 147/3 182/18
184/2 184/7 184/10
184/16 212/1 233/2
236/19 236/22
252/10 257/1 262/5
334/5 335/11 335/14
335/17 336/2 336/4
336/7 336/21 337/5
338/2 338/17 339/5
339/7 339/18 339/22
340/5 340/18 341/6
341/13 342/3 342/7
342/16 343/1 343/11
343/21 344/6 344/21
345/3 345/11 345/14
**MR. RUDOLF: [57]**
185/1 185/15 189/3
189/8 189/12 189/16
190/16 190/23 191/2
196/10 196/20
196/24 197/2 197/25
198/2 202/23 203/6
206/22 207/2 207/8
207/14 207/19 208/1
209/7 209/17 210/7
211/17 214/20
214/25 217/22
229/19 231/17
232/25 233/17 234/1
234/5 234/19 235/9
235/12 235/17
236/17 236/21 237/8
237/20 238/2 238/7
241/10 243/1 243/8
251/17 252/7 256/24
258/19 258/24
260/19 261/24 262/3
**MR. SCHOENFELD:**
**[52]** 1/25 16/20 17/13
21/6 29/17 34/21
37/22 38/21 38/24
41/12 41/21 44/2
50/8 50/12 50/16
54/14 62/14 62/22
63/3 64/9 64/17
64/25 67/4 67/16
68/13 68/25 71/3
71/9 71/17 74/18
76/8 84/1 85/1 85/20
86/2 88/13 89/12
89/21 90/8 93/13
95/17 95/23 98/4
106/6 106/20 129/10
130/24 248/20

254/16 257/24 262/7
342/1
**MS. ALEXIS LOGAN:**
**[1]** 336/19
**MS. CLEMENT: [15]**
190/14 206/20 207/3
207/10 214/15
214/18 214/22 223/6
223/8 223/11 223/13
231/6 233/4 235/21
236/15
**MS. LIU: [7]** 10/9
10/23 14/21 190/13
335/3 336/12 337/20
**THE BAILIFF: [1]**
184/22
**THE CLERK: [8]** 207/5
236/25 237/4 237/9
237/12 237/14
237/21 237/24
**THE COURT**
**REPORTER: [4]** 153/6
301/20 337/18
337/21
**THE COURT: [348]**
**THE WITNESS: [33]**
23/24 24/2 24/5 29/3
47/13 52/17 52/21
107/9 124/10 139/20
161/13 161/17
203/12 203/15
203/19 234/12
234/17 234/23 235/8
235/13 235/16
235/18 236/24
256/18 262/9 268/8
293/11 305/7 305/10
305/12 305/17 319/1
330/25

**$**

**$1.2 [1]** 51/18
**$1.2 million [1]** 51/18
**$1.4 [1]** 194/18
**$1.4 million [1]**
194/18
**$1.6 [1]** 258/18
**$1.6 million [1]**
258/18
**$100 [2]** 225/11
225/14
**$100 million [2]**
225/11 225/14
**$100,000 [8]** 148/16
148/22 148/24 150/9
150/14 153/21
208/25 211/20
**$100,000,000 [1]**
225/18
**$110 [3]** 6/23 146/5
147/1
**$110 million [3]** 6/23
146/5 147/1
**$120,000 [1]** 51/24
**$15 [1]** 30/4
**$15 million [1]** 30/4
**$150,000 [1]** 28/11
**$17 [1]** 261/18
**$17 million [1]** 261/18

**$170,000 [1]** 213/16
**$24,000 [1]** 97/8
**$3 [1]** 234/6
**$3 million [1]** 234/6
**$3.6 [1]** 91/8
**$3.6 million [1]** 91/8
**$300,000 [1]** 222/1
**$330,000 [1]** 211/13
**$349,000 [2]** 209/22
210/10
**$4 [1]** 233/22
**$4 million [1]** 233/22
**$40,000 [2]** 201/24
211/4
**$5 [5]** 193/13 234/17
234/24 234/25
258/17
**$5 million [5]** 193/13
234/17 234/24
234/25 258/17
**$50,000 [1]** 28/4
**$52.8 [1]** 92/8
**$52.8 million [1]** 92/8
**$524,482 [1]** 190/11
**$58 [1]** 94/15
**$58 million [1]** 94/15
**$580,000 [2]** 210/21
211/1
**$6.2 [1]** 99/17
**$6.7 [2]** 31/14 31/17
**$6.7 million [2]** 31/14
31/17
**$67 [1]** 128/19
**$67 million [1]** 128/19
**$67.9 [2]** 97/17 98/17
**$67.9 million [2]**
97/17 98/17
**$70,024,000 [1]** 97/1
**$724,000 [1]** 208/19
**$8,000 [1]** 213/3

**,**

**'22 [1]** 91/16
**'23 [4]** 48/5 84/13
173/5 176/9
**'24 [2]** 52/20 233/22
**'4 [1]** 90/20
**'617 [3]** 63/25 66/2
68/8
**'617 patent [1]** 66/2
**'em [1]** 252/25

**0**

**08 percent [1]** 85/13

**1**

**1 o'clock [1]** 8/22
**1.2 [3]** 52/9 52/15
325/9
**1.330 [1]** 338/10
**1.9 [1]** 325/8
**10 [8]** 10/11 35/12
54/6 57/10 94/18
132/24 157/19
275/11
**10 percent [2]** 336/6
339/14
**100 [1]** 51/25
**100 percent [3]**

**1**

**100 percent... [3]** 101/21 108/22 264/21
**100-foot [1]** 28/16
**101 [1]** 66/6
**10:00 p.m [1]** 12/7
**10:09 a.m [1]** 71/14
**10K [2]** 284/11 312/17
**10K's [1]** 301/2
**10o'clock [1]** 12/12
**11 [7]** 1/1 35/21 65/3 69/10 70/1 212/17 335/5
**110 [1]** 138/1
**110 million [2]** 128/24 146/10
**1135 [1]** 129/14
**11:36 a.m [1]** 131/1
**12 [3]** 31/5 31/5 39/10
**12,000 [1]** 51/18
**12/31/24 [2]** 225/12 225/15
**120 [2]** 100/14 100/16
**120,000 [1]** 52/15
**1200 [3]** 244/13 246/16 246/17
**12:30 [2]** 3/15 8/21
**12:35 [1]** 130/25
**12:38 [1]** 131/2
**13 [2]** 39/25 224/24
**13.2 million [2]** 92/24 93/7
**13.5 [1]** 293/25
**1300 [1]** 13/3
**134 [1]** 89/23
**14 [8]** 48/21 105/11 151/7 151/13 152/4 152/8 158/21 199/8
**15 [5]** 62/25 63/2 63/4 85/13 130/21
**15th [1]** 54/11
**16 [3]** 52/6 61/23 62/7
**17 [3]** 50/24 50/24 97/10
**17 million [1]** 261/22
**175,000 [2]** 329/17 329/19
**18 [12]** 48/21 69/7 86/14 86/19 111/4 111/6 111/10 111/15 111/16 112/2 112/8 294/14
**18 million [1]** 93/11
**18 percent [2]** 85/14 85/18
**18.8 million [1]** 90/18
**19 [1]** 60/19
**1996 [2]** 314/15 314/16
**1998 [1]** 316/4
**19th [2]** 59/2 59/8
**1:30 [3]** 15/18 15/21 15/25
**1:40 p.m [1]** 184/20
**1:47 [1]** 184/21

**2**

**2,320,000,000 [1]** 101/3
**2.2 [1]** 46/15
**20 [15]** 22/1 97/4 97/6 104/16 112/8 238/3 267/7 282/3 282/4 284/1 284/3 284/6 303/1 319/25 321/25
**20 acres [1]** 149/9
**20 million [4]** 170/25 171/4 171/8 172/8
**20 percent [14]** 102/2 102/3 320/13 320/25 321/3 321/12 321/16 321/20 321/24 322/4 322/6 322/11 322/21 323/2
**20-acre [3]** 149/8 152/22 153/8
**200 million [1]** 171/3
**2002 [1]** 324/25
**2003 [2]** 320/2 323/4
**2004 [1]** 323/13
**2009 [2]** 20/7 77/25
**2015 [8]** 53/25 56/5 72/8 81/15 92/11 116/11 138/10 221/12
**2017 [1]** 208/5
**2018 [3]** 51/23 64/2 198/9
**2020 [2]** 336/10 336/23
**2021 [9]** 30/2 30/5 30/11 132/24 150/20 211/21 222/2 222/3 260/17
**2022 [37]** 18/23 20/7 63/19 81/18 88/8 90/19 90/25 91/2 91/9 91/23 92/24 93/6 138/10 168/20 170/11 186/2 189/22 193/11 194/1 196/25 199/8 206/15 212/17 213/8 217/2 217/11 219/13 234/23 235/2 236/1 236/4 258/17 260/18 261/12 261/13 261/19 335/5
**2023 [91]** 20/20 22/1 29/22 33/16 35/1 36/9 41/17 41/22 43/22 53/6 53/11 55/25 57/16 64/24 69/7 73/18 74/13 79/10 81/12 83/22 84/20 88/11 89/14 89/25 90/1 90/20 91/25 93/25 103/19 105/21 108/7 108/15 110/9 110/18 147/20 148/6 148/17 151/7 151/14 152/4 152/8 152/16 158/7 170/17 172/14 173/4 176/4 177/2 178/9 179/10

**179/14 183/15**
**183/19 189/23**
**190/10 193/3 193/5**
**194/21 196/18 206/2**
**208/5 211/3 216/6**
**218/14 219/13 221/4**
**221/12 222/23 223/3**
**223/21 223/24 224/3**
**224/10 234/2 234/7**
**244/23 251/23 252/2**
**253/24 254/13**
**258/18 259/6 260/10**
**261/18 275/5 275/17**
**290/13 294/22**
**303/11 315/2 320/1**
**2023-CA-1002-NC [1]** 1/4
**2023IP [2]** 179/2 179/6
**2024 [50]** 51/19 52/19 52/22 54/11 58/25 59/3 60/17 60/19 88/20 88/24 93/17 94/5 95/15 104/10 104/17 104/18 104/21 105/3 105/11 105/21 107/6 107/11 148/19 193/9 194/13 194/17 196/12 196/16 196/17 196/24 197/4 197/5 197/8 197/9 197/10 202/11 202/12 202/13 203/2 203/8 204/1 210/5 213/7 222/7 234/8 234/11 244/24 251/6 258/18 297/23
**2025 [15]** 1/1 157/1 157/17 214/10 219/18 225/9 258/13 258/15 259/5 259/10 259/24 260/2 296/25 297/4 297/7
**21 [4]** 30/2 157/1 157/16 320/2
**21 percent [1]** 84/21
**21.3 [1]** 294/14
**22 [3]** 226/19 338/17 338/18
**220 million [1]** 101/5
**229 [1]** 201/16
**229,000 [1]** 209/12
**23 [4]** 35/1 36/2 104/18 160/24
**24 [4]** 96/10 225/12 225/15 246/17
**24 percent [1]** 86/16
**24305 [3]** 222/24 223/17 223/19
**24306 [2]** 223/3 223/20
**24315 [1]** 223/24
**24316 [1]** 224/6
**24317 [1]** 224/9
**24328 [1]** 224/9
**247 [1]** 201/14
**25 [8]** 36/13 91/25 93/25 287/25 288/1

**288/3 289/8 316/6**
**25 percent [1]** 264/15
**2530 [1]** 238/3
**25th [1]** 324/25
**26 [6]** 88/11 89/14 89/25 90/1 151/19 152/10
**260 [1]** 21/7
**27 [10]** 29/22 57/16 147/20 148/6 158/7 219/18 225/9 252/2 253/24 254/13
**277 percent [2]** 111/15 111/17
**27th [1]** 214/10
**28 [4]** 197/9 202/11 202/20 203/2
**29 [14]** 41/17 41/22 43/22 53/6 55/25 64/24 108/4 108/14 110/6 110/18 183/15 275/5 285/4 303/11
**29th [5]** 33/16 36/9 53/11 108/7 110/9
**2:00 p.m [1]** 293/8
**2:52 p.m [1]** 238/10
**2nd [1]** 198/9

**3**

**3 percent [1]** 86/20
**3.10 [1]** 97/11
**3.2 [2]** 320/12 320/15
**3.5 million [1]** 90/15
**3.6 million [1]** 93/7
**30 [9]** 88/23 104/20 104/21 129/17 173/12 265/1 268/23 292/6 322/5
**30 percent [2]** 60/8 322/22
**30-plus [1]** 123/1
**300 [2]** 287/22 288/1
**304 [1]** 74/18
**306 [1]** 176/23
**308 [5]** 85/2 85/23 86/6 86/7 86/9
**309 [1]** 315/25
**30th [2]** 51/24 93/17
**31 [7]** 30/5 208/5 223/3 223/21 223/24 224/3 297/6
**317 [1]** 314/6
**34 [1]** 285/3
**340 [1]** 303/3
**342 [1]** 41/12
**344 [1]** 44/3
**34950 [1]** 210/22
**3523 [1]** 344/23
**354 [1]** 34/1
**360 [6]** 64/8 283/19 283/21 302/19 302/20 303/3
**362 [4]** 64/7 64/9 67/9 67/10
**363 [3]** 67/16 68/18 68/19
**364 [3]** 69/1 71/4 71/8
**37 [2]** 85/11 286/20

**37 million [1]** 93/11
**37.9 million [1]** 92/16
**379 [1]** 91/12
**38 [2]** 286/24 286/25
**393 [2]** 222/21 223/12
**3:04 p.m [1]** 238/11

**4**

**40 [6]** 10/16 11/1 86/19 88/2 111/16 112/2
**40 percent [22]** 53/21 69/25 87/17 87/18 99/23 100/22 103/18 109/22 179/16 219/10 219/22 219/25 220/4 220/7 221/14 221/16 267/8 273/9 311/6 311/7 322/8 329/3
**40-foot [1]** 28/16
**40.7 million [1]** 96/23
**400 [1]** 84/1
**41 [1]** 251/18
**42 [1]** 172/9
**430 [1]** 29/18
**44 [1]** 111/15
**443 [1]** 54/14
**448 [4]** 93/13 93/15 95/20 96/2
**45-foot [1]** 229/7
**460 [1]** 29/17
**482 [2]** 291/11 332/13
**483 [3]** 88/13 95/17 95/18
**494 [5]** 318/13 318/15 318/20 318/21 319/8
**495 [4]** 324/9 324/14 324/15 324/18
**4:45 [1]** 317/6
**4th [1]** 261/18

**5**

**5.6 million [1]** 92/13
**5.7 million [1]** 31/22
**50 [11]** 25/10 85/14 85/18 101/21 111/4 127/9 246/16 293/25 294/14 322/13 322/15
**50 percent [31]** 18/24 19/11 20/8 21/20 27/17 28/17 86/14 86/19 121/5 121/6 121/10 128/5 159/23 159/23 166/10 166/10 170/12 254/25 255/18 285/15 320/7 320/19 320/22 321/20 321/23 321/25 322/5 322/6 323/19 340/9
**50/50 [2]** 25/10 101/21
**500 [2]** 157/15 160/21
**51515 [1]** 317/7
**519 [1]** 206/20
**52 [2]** 160/23 215/2

**5**

**525 [1]** 344/23
**53 [1]** 158/21
**54201 [1]** 201/16
**54230 [1]** 201/14
**55 [1]** 38/13
**550 million [1]** 171/3
**563 [1]** 151/5
**57 [1]** 32/3
**58 [2]** 32/19 32/25
**59 [2]** 135/11 135/22
**591 [6]** 206/18 206/25
236/25 237/3 237/6
237/18
**5:23 p.m [1]** 346/1

**6**

**6.1 [2]** 325/19 326/7
**61 [1]** 38/23
**617 [4]** 66/14 67/24
143/25 307/19
**6662 [1]** 332/18
**68 [1]** 157/19

**7**

**7,000 [5]** 149/10
149/12 152/21 153/8
248/15
**70 million [1]** 97/8
**70 percent [1]** 60/9
**700 [1]** 149/7
**708 [2]** 141/7 141/10
**71 million [1]** 224/4
**74 [1]** 231/13
**75 [1]** 224/24
**76 [1]** 226/19
**771 [2]** 108/4 303/12
**7:30 [1]** 345/13

**8**

**805 [1]** 335/4
**85 [1]** 264/4
**8:00 [1]** 345/17
**8:00 a.m [1]** 344/25
**8:27 a.m [1]** 17/18
**8:37 [1]** 17/19

**9**

**90 [1]** 264/21
**95 percent [1]** 244/14
**97 [1]** 128/21
**97 percent [2]** 98/17
129/4
**98 percent [1]** 128/19
**99 percent [1]** 100/4
**9:58 a.m [1]** 71/13

**A**

**a.m [6]** 17/18 17/19
71/13 71/14 131/1
344/25
**ability [14]** 3/4 33/5
49/25 78/5 162/21
181/23 182/2 182/7
247/3 251/25 253/14
257/14 257/21 258/6
**able [25]** 4/24 15/24
40/22 63/1 68/9 72/1
94/20 104/2 114/16

121/16 192/13
204/15 216/14 251/8
251/10 252/5 296/16
303/7 310/19 316/14
318/24 322/2 323/1
337/14 344/13
**abnormal [1]** 204/3
**absence [1]** 276/11
**absent [1]** 193/5
**absolute [1]** 12/22
**absolutely [4]** 5/18
247/1 256/10 340/21
**absorb [1]** 330/11
**absorbed [1]** 330/18
**Aburos [1]** 1/21
**accept [3]** 67/9 171/3
171/8
**acceptable [8]** 5/10
16/13 85/19 86/21
86/25 170/25 170/25
328/6
**acceptance [1]** 289/2
**accepted [8]** 172/10
280/13 286/5 289/12
291/3 300/2 310/11
319/15
**access [16]** 2/23
19/21 19/24 20/1
24/24 28/12 37/1
127/20 169/1 172/2
215/19 215/22
215/25 216/3 278/14
279/4
**accomplish [1]** 160/8
**accomplished [1]**
228/20
**according [6]** 30/2
30/11 32/15 116/12
222/25 227/19
**account [25]** 24/22
28/13 61/7 61/9
69/14 69/24 87/14
88/1 99/11 99/22
102/17 103/16
121/14 186/18 191/4
191/23 194/3 195/16
195/22 201/5 205/15
206/10 251/1 259/7
260/6
**accountant [14]** 30/22
87/24 94/11 97/23
98/9 185/23 186/4
187/18 193/2 200/10
212/20 212/23 213/1
217/5
**accountants [1]**
263/25
**accounted [3]** 31/3
73/22 102/18
**accounting [23]** 19/18
19/24 25/1 42/12
87/10 87/25 116/21
116/24 122/2 185/25
186/11 186/12
188/15 196/13
203/13 203/16
203/24 213/10
213/15 216/4 228/15
263/11 263/20

**accounts [9]** 24/17
24/18 24/19 24/25
28/3 60/2 121/15
124/6 226/12
**accredited [1]** 242/21
**accrual [4]** 116/5
116/8 116/15 188/15
**accruing [1]** 116/11
**accumulated [1]**
205/11
**accuracy [2]** 30/21
252/19
**accurate [12]** 55/5
63/20 70/14 118/10
119/21 188/23
197/20 269/4 298/23
299/20 307/2 317/14
**accurately [1]** 253/4
**acknowledge [3]**
153/20 343/8 343/9
**acknowledged [2]**
75/2 86/24
**acknowledging [2]**
140/18 141/1
**acquire [2]** 121/15
167/11
**acquisition [1]** 20/13
**acre [3]** 149/8 152/22
153/8
**acres [1]** 149/9
**across [6]** 123/6
243/23 246/11 264/9
264/18 284/4
**act [10]** 58/24 59/2
59/3 59/18 60/7
257/5 259/10 260/3
260/11 260/16
**acted [1]** 336/22
**action [10]** 10/13
10/15 12/4 33/4
133/20 173/10
173/13 173/20 176/8
338/25
**actions [2]** 257/16
271/13
**actual [9]** 6/20 9/7
35/23 176/21 278/12
283/24 289/16 303/8
313/17
**actually [51]** 28/25
29/4 30/15 30/20
31/4 40/14 40/23
47/21 52/8 56/22
60/2 62/8 62/21
63/15 64/1 66/10
68/8 72/15 73/21
74/16 99/25 99/25
100/11 102/13
102/15 108/18 110/2
115/19 120/7 123/4
124/2 131/8 143/4
159/19 170/23
202/17 203/5 203/10
236/8 269/2 269/9
271/4 271/8 297/5
308/4 308/11 316/23
325/9 330/11 332/3
343/6
**add [8]** 28/2 76/18

114/18 193/7 201/13
210/19 210/21
225/12
**addding [1]** 116/9
**added [2]** 97/19
210/24
**addition [4]** 45/12
251/21 284/21
289/18
**additional [7]** 267/8
281/19 288/18
289/17 299/8 308/14
317/15
**additions [1]** 215/9
**address [9]** 3/3 6/13
6/17 129/5 129/25
130/14 175/12
284/14 337/12
**addressed [2]** 17/21
237/1
**addresses [1]** 75/3
**adds [1]** 99/16
**adequate [1]** 85/18
**adjourned [1]** 346/1
**adjust [5]** 97/19 111/9
204/4 249/15 254/11
**adjusted [1]** 97/20
**adjusting [4]** 243/19
246/6 246/7 246/9
**adjustment [10]** 104/5
202/4 203/25 210/5
244/8 244/12 244/17
252/6 253/6 322/9
**adjustments [26]**
196/13 196/16
196/17 196/24 197/4
202/11 203/24 204/2
204/6 204/17 205/2
205/4 205/10 244/2
244/23 246/1 247/4
250/6 250/10 250/13
251/8 253/23 254/2
254/4 257/22 292/19
**administration [1]**
242/18
**administrator [1]**
24/22
**admission [2]** 68/13
71/3
**admits [1]** 340/19
**admitted [10]** 67/10
68/19 86/9 141/10
206/19 206/21
222/22 303/12
318/21 324/15
**admitting [1]** 236/25
**adopt [1]** 55/17
**adopted [4]** 43/23
45/5 46/13 181/4
**adopting [1]** 45/12
**adoption [2]** 56/24
260/18
**advancing [1]** 50/20
**advantage [1]** 257/17
**adverse [4]** 341/2
341/16 344/10
344/12
**advice [3]** 124/17
124/21 273/12

**advised [1]** 270/5
**advisers [1]** 282/7
**advising [1]** 264/8
**advocating [2]** 113/6
258/12
**affair [3]** 247/14
252/5 252/5
**affect [2]** 20/11 30/25
**affected [2]** 20/4
257/6
**affiliated [1]** 279/3
**affirm [5]** 18/4 132/3
185/3 241/12 262/14
**affirmative [1]** 241/4
**afford [2]** 66/12
102/19
**afield [1]** 207/12
**afternoon [14]** 132/16
132/18 147/8 168/12
185/20 212/6 238/20
239/8 239/11 242/2
293/8 296/10 296/13
296/14
**ages [1]** 34/25
**aggregate [1]** 40/1
**aggressive [1]** 62/20
**ago [15]** 10/16 11/2
32/8 48/10 54/7
56/25 57/10 129/18
147/21 154/19
252/15 275/11
296/15 297/22
319/25
**agree [38]** 15/6 25/9
57/8 73/6 104/9
108/8 111/6 112/24
130/10 134/9 137/15
151/16 152/4 157/1
159/9 159/10 161/2
161/8 165/21 166/4
175/4 178/1 226/22
226/24 232/12 246/2
247/15 252/3 253/18
260/23 261/5 269/24
296/1 296/3 301/10
309/5 309/23 311/4
**agreed [8]** 15/10
26/24 73/8 73/10
181/16 275/4 275/16
309/18
**agreeing [1]** 283/16
**agreement [212]**
29/21 32/4 32/6
32/11 32/22 33/3
38/16 39/3 39/6 39/9
39/10 41/24 42/1
45/15 45/20 46/1
47/24 48/8 48/22
48/25 49/11 49/15
49/23 49/25 50/19
53/7 53/12 53/20
54/3 55/25 56/13
64/19 69/11 69/20
71/21 71/22 71/25
72/8 73/5 73/23 74/1
74/2 74/2 74/6 75/9
76/15 79/11 79/19
79/23 80/1 80/10
81/12 81/15 83/1

**A**

**agreement... [158]**
85/7 90/3 91/12
93/22 95/3 97/15
104/11 108/3 108/14
109/10 110/6 110/7
110/10 110/18
110/22 112/7 114/4
115/24 116/1 116/2
119/2 138/7 138/8
138/21 139/1 139/11
140/17 140/25 141/4
141/5 141/23 142/5
142/11 142/18 143/2
172/17 172/17
172/19 176/7 176/15
177/1 177/8 178/8
178/22 179/2 179/6
179/10 179/15
179/19 179/23 180/1
180/4 190/19 218/15
218/17 218/20
218/23 221/9 278/21
278/25 279/4 279/13
279/16 279/20
283/15 283/16
283/24 284/11
284/21 284/24
285/13 285/16 286/5
286/7 286/8 286/11
287/24 288/16
288/17 288/21
288/23 288/24 289/1
289/16 289/18
290/12 295/23
295/24 295/25 301/1
301/25 302/3 303/8
303/11 307/19
309/12 309/13
309/16 309/18 310/1
310/10 310/16 311/5
311/17 312/16
312/19 312/21 313/2
313/6 313/9 313/13
313/15 313/17
313/19 313/21
313/24 314/6 314/12
314/14 314/19
314/22 314/23 315/2
315/3 315/6 315/6
315/10 315/25 316/2
316/7 319/20 319/22
319/24 320/12
321/21 322/8 323/4
323/8 323/9 323/11
323/15 323/17
323/24 324/22 326/2
326/3 326/5 326/21
327/6 327/14 328/2
328/8 328/13 341/25
342/9 342/11 342/17
343/17
**agreement -- Strike [1]**
319/22
**agreements [98]** 37/9
37/14 37/15 37/15
37/17 38/1 38/3 38/6
51/8 82/1 114/6
130/1 165/13 179/23

266/8 272/13 278/8
278/10 278/10
278/13 278/22
281/20 282/6 282/10
282/12 282/24
283/11 283/14
283/15 283/19
283/21 284/2 284/4
284/5 284/6 284/6
285/1 285/3 285/18
286/3 287/17 287/23
288/3 289/4 289/8
289/12 290/7 290/14
290/20 290/23 291/3
291/7 297/17 300/2
300/3 300/5 300/19
300/21 300/25 301/3
301/11 301/13 302/2
302/17 302/19
302/21 303/2 303/4
306/2 310/10 310/17
310/18 310/21 311/8
311/13 311/19 312/9
312/10 312/12
312/13 315/4 315/17
315/21 315/23 318/2
318/3 318/9 319/15
320/5 322/10 323/1
324/7 326/2 326/24
326/24 332/6 333/5
333/15
**agrees [1]** 291/7
**ahead [13]** 17/3 17/24
76/4 87/4 131/12
152/13 161/7 162/16
183/24 190/25
192/17 255/19
270/20
**aid [3]** 188/25 197/22
228/3
**AK [4]** 288/19 288/20
288/22 288/23
**alerted [1]** 10/10
**Alexis [28]** 2/9 74/23
75/1 75/14 76/15
76/17 119/7 121/3
121/4 121/4 133/3
133/16 141/20
141/22 142/9 142/10
145/6 147/11 227/6
240/22 335/21
336/13 336/21
339/17 339/25 343/3
343/19 344/18
**Alexis Logan [12]** 2/9
121/4 133/3 147/11
227/6 240/22 335/21
336/13 339/17
339/25 343/3 343/19
**alive [2]** 158/23
254/22
**allegation [1]** 162/6
**allegations [6]** 135/17
196/20 197/6 207/15
244/22 275/3
**allege [7]** 35/12 36/3
36/5 36/6 36/14
66/19 66/23
**alleged [7]** 30/2 35/21

194/21 218/11
219/22 221/11 223/2
**allegedly [4]** 10/21
178/25 223/16 308/2
**alleging [3]** 340/7
341/20 341/21
**allocated [1]** 39/11
**allow [8]** 7/15 12/20
54/2 65/12 75/5
112/19 174/23
228/19
**allowed [11]** 42/22
103/4 112/11 173/23
174/14 174/18 256/5
256/6 280/9 284/18
340/16
**allowing [2]** 50/5
207/17
**allows [2]** 94/17
342/25
**almost [6]** 92/13
94/15 98/17 104/21
147/22 305/15
**along [5]** 170/6
189/15 190/24 192/3
267/22
**already [19]** 10/14
46/8 85/10 90/25
172/10 222/23
224/22 261/2 267/23
270/18 273/12
273/13 273/20 274/3
274/11 274/15
274/21 276/14
279/12
**also [80]** 1/13 1/15
1/19 1/22 2/4 2/4
6/23 14/2 14/13
19/12 32/20 34/3
35/19 41/8 43/8
45/14 45/18 50/10
50/19 51/17 55/16
56/12 66/23 67/12
67/24 87/12 97/18
98/25 100/16 103/12
108/12 117/20 118/6
123/5 123/9 124/13
141/22 142/10
168/24 169/4 172/24
173/6 186/15 187/13
191/23 193/20
195/25 197/15
205/18 206/24 216/3
218/23 231/1 239/16
249/15 250/3 251/11
263/20 264/13
267/19 279/15 286/6
287/8 289/22 290/1
290/24 298/25 300/1
308/15 310/17
312/16 316/1 321/24
324/1 330/19 332/21
333/3 333/8 336/24
337/7
**alternate [1]** 184/12
**always [7]** 23/16
110/13 110/14
126/15 204/11 229/3
257/19

**Amazon [1]** 100/8
**amend [2]** 49/22
159/19
**amended [6]** 3/2
135/6 135/13 137/22
145/5 145/19
**amendment [2]** 241/2
345/15
**America [4]** 284/19
326/15 326/16 327/2
**American [1]** 242/22
**among [2]** 46/8
316/18
**amongst [1]** 42/10
**amortization [2]**
328/21 330/6
**amount [20]** 4/24
9/22 60/1 70/16
70/18 70/19 73/7
73/9 73/10 74/6
74/10 97/15 97/17
97/21 97/24 98/10
150/8 202/1 210/17
225/11
**amounted [2]** 193/9
234/8
**amounts [4]** 40/2
128/25 129/3 229/13
**ample [1]** 138/4
**analysis [70]** 109/13
242/15 242/25 244/8
260/7 265/14 266/20
266/23 268/11
270/14 273/2 273/21
274/5 274/7 274/16
275/6 278/6 279/17
279/24 280/1 281/16
281/19 281/21 282/1
285/2 285/11 290/17
291/5 297/4 297/12
297/18 297/19
298/21 300/12
300/17 300/20
300/24 301/1 301/15
301/19 302/13
303/10 304/15
304/25 305/3 305/5
305/25 306/1 306/7
306/21 308/2 308/9
315/7 317/15 317/17
321/19 328/14 330/9
330/13 330/14
331/12 331/19 332/3
332/8 332/12 332/13
332/21 333/13
333/13 338/13
**analyze [4]** 265/14
272/2 329/1 331/11
**analyzed [4]** 277/12
330/20 331/10 333/4
**analyzing [2]** 277/16
299/24
**ancillary [1]** 60/18
**Andrew [1]** 2/2
**Android [1]** 77/22
**angel [1]** 126/8
**angled [1]** 142/14
**Anitra [2]** 2/5 212/7
**annual [3]** 54/20

92/24 93/6
**another [15]** 3/20
82/21 122/13 139/19
195/3 205/20 228/21
259/19 265/23 266/9
271/9 319/22 319/24
338/20 338/23
**answer [45]** 26/11
39/23 58/18 69/21
76/3 76/4 80/22
80/23 81/6 82/10
82/17 106/19 113/13
114/21 115/13 139/6
152/11 152/13
152/17 153/3 155/22
157/22 157/25 158/1
158/24 158/25 161/7
187/7 202/24 215/7
215/10 225/4 226/24
231/22 237/20
253/16 257/9 305/17
305/20 305/23 329/7
329/8 329/9 331/15
345/16
**answered [2]** 82/9
167/19
**answering [5]** 113/4
113/23 114/11 231/5
232/5
**answers [4]** 113/5
174/6 187/4 221/23
**anybody [6]** 6/16
11/22 51/5 116/4
247/2 340/5
**anymore [1]** 243/7
**anyone [17]** 17/15
32/16 42/23 43/3
75/18 82/4 82/18
101/5 131/10 159/16
162/19 162/24
163/13 163/17
165/15 167/16 174/5
**anyone's [2]** 53/3
174/23
**anything [47]** 15/1
17/9 17/11 21/14
23/3 30/23 30/25
40/9 57/5 65/5 65/10
68/15 71/5 82/3
85/19 105/14 112/21
113/24 119/13
121/24 121/24
126/20 126/22 130/4
130/15 131/7 131/9
134/8 134/24 164/12
182/18 195/15
202/21 230/15 233/8
236/16 240/25
243/22 243/23
246/11 254/11
276/13 278/19
283/25 322/13 344/5
345/24
**anyway [1]** 247/16
**anywhere [4]** 3/14
171/2 194/8 228/10
**apologies [2]** 29/18
95/24
**apologize [8]** 5/2

**A**

apologize... **[7]** 91/20
112/9 175/19 212/8
238/14 326/17
343/13
app **[1]** 97/19
apparently **[1]** 15/17
appeals **[3]** 65/3 68/22
69/4
appear **[2]** 16/12
314/22
appearance **[1]** 1/5
appeared **[2]** 6/23
8/12
appearing **[2]** 6/16
336/16
appears **[4]** 15/10
177/12 295/18 324/6
apples **[2]** 290/4
290/4
application **[4]** 25/1
64/3 65/20 291/10
applications **[1]** 68/9
applied **[9]** 91/4
269/19 284/7 285/15
289/4 306/7 308/22
310/17 332/8
applies **[3]** 310/6
337/10 338/8
apply **[2]** 269/8 332/5
applying **[2]** 290/9
329/3
appoint **[3]** 25/23
26/24 27/14
appointed **[5]** 27/9
27/22 31/10 45/7
48/11
appointing **[1]** 45/13
apportion **[1]** 241/3
appraise **[1]** 119/4
appraiser **[3]** 118/21
119/3 242/21
appraisers **[1]** 242/22
appreciate **[5]** 5/16
7/9 50/16 115/5
329/8
appreciates **[1]** 14/12
approach **[11]** 189/6
214/15 214/16 244/5
244/6 244/6 249/7
287/14 287/15 302/9
319/4
appropriate **[7]** 10/16
112/18 112/19
147/24 202/24
253/25 310/9
approved **[1]** 44/24
approximately **[3]**
30/4 109/17 211/1
April **[15]** 88/20 88/23
93/17 94/5 95/15
104/10 104/16
104/16 104/17
104/18 104/20
104/21 217/2 320/2
323/4
April 20 **[1]** 104/16
April 2022 **[1]** 217/2
April 2024 **[2]** 94/5

95/15
April 21 **[1]** 320/2
April 23 **[1]** 104/18
April 30 **[1]** 88/23
104/20 104/21
April 30th **[1]** 93/17
apt **[2]** 110/23 251/23
area **[2]** 46/22 89/10
areas **[4]** 101/1
111/20 191/21
263/13
argue **[1]** 120/16
argued **[8]** 147/23
148/11 161/22
166/12 166/17 247/6
333/24 334/1
argument **[2]** 259/2
334/22
argumentative **[1]**
161/7
arm's **[12]** 269/10
269/13 269/25
270/14 272/3 272/17
274/5 274/11 280/16
290/17 292/25
293/23
arm's-length **[10]**
269/10 269/13
269/25 270/14 272/3
272/17 274/5 274/11
290/17 293/23
around **[16]** 6/20
10/12 20/22 52/18
54/13 107/25 179/23
191/24 213/22 221/7
248/13 264/4 273/25
282/17 292/3 308/19
arrangement **[4]** 104/5
134/13 134/19
134/20
arrangements **[1]**
273/18
arrest **[1]** 134/5
arrive **[1]** 265/9
arriving **[2]** 244/7
287/17
Artera **[2]** 286/8
320/23
Artera's **[1]** 320/25
article **[6]** 4/11 320/4
320/12 323/7 323/8
323/12
articulate **[1]** 113/1
articulating **[1]**
114/11
ASA **[1]** 246/9
ask **[47]** 3/7 5/8 6/6
21/14 21/17 53/3
54/25 69/22 76/2
89/13 91/18 91/21
105/1 106/16 107/24
108/5 115/12 128/18
157/20 168/14 174/9
175/2 175/14 175/14
190/25 195/25
197/10 201/17
234/21 252/23
256/13 265/15 267/2
268/21 269/2 270/17

274/23 278/4 279/23
280/19 282/25
291/17 294/18
305/19 313/1 330/3
331/17
asked **[61]** 11/19 30/9
53/3 74/22 80/23
82/8 107/17 112/16
112/16 112/17 126/3
127/3 127/8 128/12
143/9 157/24 158/24
161/9 164/7 167/19
172/10 175/5 175/7
179/18 180/6 181/4
186/17 197/12
199/12 199/17
211/12 219/14 222/6
222/7 228/13 229/9
229/22 231/1 233/13
234/2 234/7 243/17
259/4 259/23 259/25
274/8 276/1 280/20
281/5 287/3 304/19
305/4 306/20 316/11
325/24 330/4 330/19
331/9 332/5 333/3
342/4
asking **[19]** 22/6 22/7
26/10 75/16 108/24
113/25 114/19 142/3
147/18 152/12 207/8
232/10 232/11
234/25 237/5 243/11
273/17 305/23 318/8
asks **[2]** 268/15
268/18
aspect **[3]** 15/8
267/19 267/20
asserted **[1]** 133/19
assess **[8]** 120/9
120/10 328/1 328/4
328/11 328/17
328/23 330/5
asset **[20]** 116/17
180/1 198/14 199/7
199/24 200/23
204/19 204/21
204/19 204/24
204/25 205/5 205/15
205/21 229/3 248/18
249/10 272/9 283/15
332/22
assets **[51]** 20/13
21/24 22/4 22/11
43/9 43/12 46/3 46/6
52/1 56/15 57/11
96/2 96/23 106/24
180/7 197/11 198/5
200/2 200/8 200/25
210/4 210/13 210/14
210/24 211/9 222/7
222/8 222/14 224/17
225/3 226/11 226/13
226/13 228/2 232/1
232/4 232/8 232/15
235/10 243/20
245/11 245/14
245/21 248/3 249/1
251/5 251/22 252/24

266/21 306/13
338/11
assist **[5]** 165/11
165/12 186/14
197/17 278/6
assistance **[2]** 130/12
130/13
assistant **[1]** 131/11
assisted **[1]** 199/11
assists **[1]** 165/6
associated **[10]** 24/17
33/18 34/11 34/16
149/22 190/7 196/1
205/7 207/24 219/10
assume **[9]** 20/2 34/24
79/12 83/24 105/18
187/7 255/16 276/8
345/23
assumed **[7]** 199/25
201/2 227/9 227/13
227/24 277/1 298/21
assumes **[2]** 98/2
252/18
assuming **[6]** 113/12
231/16 246/16
308/15 308/22
344/17
assumption **[5]** 105/13
105/13 306/18
308/25 342/10
athlete **[1]** 123/6
attached **[8]** 7/1 7/3
7/18 45/4 45/4 129/1
129/24 156/11
attacks **[1]** 267/5
attain **[1]** 104/2
attempt **[2]** 274/10
310/25
attempted **[1]** 65/25
attempting **[2]** 54/9
57/25
attention **[3]** 73/20
227/16 312/21
attorney **[8]** 19/8 26/7
33/23 35/16 114/7
131/12 202/24
336/14
Attorney's **[2]** 241/24
262/25
Attorney's name **[2]**
241/24 262/25
attorney/client **[1]**
114/7
attorneys **[9]** 23/11
26/17 58/21 145/22
166/12 166/17
222/10 237/5 237/23
attributable **[1]**
308/17
atypical **[1]** 330/25
audio **[2]** 286/11
314/5
audit **[10]** 91/16
91/17 125/22 203/15
228/18 263/12
267/22 268/1 268/12
269/2
audited **[16]** 30/3
30/11 30/13 30/21

92/6 126/11 126/17
126/19 189/22
189/24 190/2 233/21
234/2 267/7 267/21
270/10
auditor **[2]** 267/13
auditor's **[1]** 91/23
audits **[1]** 292/19
August **[33]** 33/16
36/9 41/20 41/22
43/22 48/5 53/6
53/11 55/25 64/24
69/7 90/5 103/19
108/4 108/7 108/14
109/12 109/14 110/6
110/9 110/18 176/9
177/2 179/14 183/15
198/9 221/12 251/23
275/5 275/16 290/13
294/22 303/11
August 18 **[1]** 69/7
August 2023 **[4]** 177/2
179/14 290/13
294/22
August 29 **[11]** 41/22
43/22 55/25 64/24
108/4 108/14 110/6
110/18 183/15 275/5
303/11
August 29th **[5]** 33/16
36/9 53/11 108/7
110/9
August 2nd **[1]** 198/9
August 9 **[1]** 109/12
author **[1]** 21/18
authorities **[1]** 282/8
authority **[6]** 28/3
44/13 49/7 49/10
129/21 158/14
Authorization **[2]** 84/7
84/14
automatically **[1]**
24/20
automobiles **[1]** 31/20
available **[10]** 12/19
14/7 21/11 266/24
272/14 272/14 278/8
282/5 338/6 342/23
average **[1]** 322/7
avoid **[1]** 94/21
aware **[47]** 35/18
54/19 69/6 124/15
138/19 140/25 142/9
142/10 142/12
144/10 144/11
148/20 155/4 155/10
160/3 162/19 162/24
165/15 166/12
166/17 166/20
172/13 172/16
194/23 206/4 214/20
218/19 218/23
222/13 222/15
222/17 229/10 246/4
270/18 270/24 276/5
290/8 292/12 307/8
313/14 313/18
313/21 314/18
317/23 331/21

**A**

**aware... [2]** 342/11 344/15

**away [2]** 118/13 170/10

**B**

**babies [1]** 144/4
**back [57]** 5/13 8/17 12/8 12/16 13/1 17/20 17/23 24/11 45/2 47/20 57/11 71/15 93/15 96/22 97/10 102/15 103/13 105/17 115/16 118/25 121/19 121/19 130/19 131/4 135/1 139/9 150/21 153/5 159/14 160/21 162/10 162/15 171/7 178/7 193/7 211/7 217/21 218/6 218/9 227/23 230/13 233/16 250/9 260/10 264/18 274/16 281/10 282/3 289/15 292/7 294/15 316/12 320/4 321/10 325/14 328/17 344/19
**background [1]** 335/2
**backlog [1]** 78/14
**bad [1]** 259/13
**bailiff [3]** 214/16 214/24 319/4
**balance [15]** 90/20 90/20 90/22 91/1 91/3 193/17 194/5 198/15 201/1 205/1 249/3 249/8 249/9 251/10 255/13
**balances [1]** 256/2
**balancing [1]** 105/25
**bank [7]** 28/3 28/13 123/16 123/17 124/6 194/2 195/22
**bankruptcy [55]** 5/21 6/22 6/24 8/1 8/5 8/13 8/20 9/18 10/10 10/10 10/14 10/17 10/24 10/25 11/3 11/10 12/4 12/13 12/20 13/1 14/4 14/5 14/10 14/18 15/4 29/11 51/15 96/4 98/19 99/3 99/7 99/11 128/20 128/23 129/1 129/15 129/19 129/20 130/6 146/6 148/15 148/25 149/25 155/10 155/13 155/20 156/3 222/14 222/15 222/18 229/1 237/18 254/8 293/6 329/11
**bankrupted [1]** 190/18
**Barfield [5]** 2/15 2/18 2/21 15/18 15/24
**Barfield's [3]** 6/7 16/23 16/25

**base [5]** 188/15 300/11 300/12 300/16 302/22
**based [13]** 102/1 109/21 113/23 113/23 232/14 235/20 259/9 261/12 269/17 274/19 277/1 309/5 317/22
**bases [1]** 66/18
**basically [9]** 89/4 94/8 109/4 121/16 267/1 272/22 292/22 294/3 302/16
**basing [1]** 60/13
**basis [19]** 25/10 61/10 92/24 97/14 116/6 116/15 139/4 193/25 204/8 230/3 230/4 230/4 249/4 269/14 269/14 269/25 284/16 288/25 308/22
**BDO [4]** 263/9 263/10 263/11 264/1
**bear [5]** 120/23 155/14 192/4 192/5 192/20
**bearing [2]** 78/23 232/22
**beat [2]** 6/20 7/16
**became [4]** 159/19 159/22 284/12 341/16
**become [1]** 121/16
**becomes [1]** 237/16
**becoming [1]** 102/14
**bed [1]** 121/25
**began [11]** 42/2 42/5 57/15 58/25 60/16 64/2 216/6 216/9 216/12 218/13 297/5
**begin [3]** 239/11 269/2 270/13
**beginning [7]** 49/3 101/23 105/16 121/13 122/18 122/25 244/19
**behalf [24]** 1/8 2/8 6/24 53/17 79/23 80/6 81/1 81/5 82/11 117/19 117/20 118/3 118/6 155/8 155/12 158/14 160/5 164/23 192/11 220/10 220/14 243/16 298/2 344/16
**behind [2]** 137/8 315/20
**belief [1]** 96/15
**believe [106]** 10/23 12/2 19/5 23/10 24/19 26/5 33/22 33/23 37/8 37/11 37/15 48/16 48/19 49/13 49/17 51/7 56/20 57/4 59/3 68/24 69/5 81/4 81/18 82/11 82/13

83/21 86/2 86/13 86/14 87/5 91/2 92/11 93/19 96/17 97/20 104/22 108/12 108/15 108/19 129/23 137/18 143/21 145/18 146/25 148/2 150/11 159/5 161/11 170/16 172/19 172/23 176/21 194/5 202/23 205/14 209/19 223/17 228/5 228/9 228/12 233/17 234/1 234/5 236/4 237/4 239/17 240/15 240/15 241/5 243/3 245/24 247/9 247/12 279/1 279/12 286/20 287/3 287/8 288/4 288/11 290/14 290/24 295/1 295/20 296/11 297/13 302/18 303/10 303/18 304/14 304/24 305/22 310/15 313/16 314/21 319/14 321/14 327/7 330/12 330/19 332/11 332/14 335/7 337/1 341/25 342/12
**beneficiary [4]** 133/1 133/4 133/6 133/17
**benefit [3]** 56/21 103/8 257/7
**benefits [7]** 149/2 154/13 169/11 169/14 173/7 205/20 270/9
**Berhan [1]** 1/21
**Berneman [21]** 240/16 276/2 287/8 287/11 287/16 288/2 288/10 289/3 291/5 296/24 297/9 297/13 297/20 301/18 301/19 302/8 302/9 316/17 316/22 327/7 330/12
**Berneman's [8]** 287/4 287/12 289/7 289/11 290/6 290/10 291/3 332/12
**beside [1]** 115/22
**best [16]** 9/17 60/6 79/13 83/9 83/13 130/7 259/20 266/23 267/1 273/24 304/24 305/2 305/5 332/3 332/4 332/20
**bet [1]** 9/17
**better [8]** 9/13 16/8 63/25 70/5 162/11 243/25 255/20 261/6
**beyond [6]** 268/21 281/6 299/8 299/10 300/6 308/8
**big [7]** 94/15 94/16 94/22 103/14 116/25

271/15 335/7
**bigger [2]** 4/25 5/9
**biggest [2]** 101/13 112/6
**bill's [1]** 103/3
**billion [1]** 101/14
**billions [1]** 234/14
**bills [13]** 87/21 94/18 102/7 102/11 102/16 102/24 102/25 103/16 103/22 125/19 231/24 232/9 232/21
**binder [3]** 21/12 23/22 24/1
**biotech [1]** 315/15
**bit [23]** 8/22 15/5 16/8 84/4 90/15 90/17 107/25 148/10 164/6 169/17 173/9 180/9 196/14 223/18 229/9 266/15 275/3 301/14 304/23 309/13 320/5 320/19 330/19
**bite [1]** 111/23
**bite-size [1]** 111/23
**blank [1]** 314/15
**block [3]** 4/25 5/1 5/9
**blocked [1]** 15/4
**blow [2]** 209/8 314/9
**blow-up [1]** 314/9
**blue [1]** 6/20
**blurt [1]** 112/15
**Board [2]** 27/13 46/19
**boarding [1]** 161/7
**boat [7]** 28/23 29/1 52/4 228/25 228/25 229/2 229/7
**boats [1]** 31/19
**boilerplate [1]** 95/9
**bolt [1]** 117/19
**book [4]** 199/23 202/2 213/25 214/2
**booked [5]** 200/10 200/24 201/21 205/8 207/24
**booking [2]** 191/21 195/25
**bookkeeper [3]** 98/10 225/19 225/20
**bookkeeping [4]** 186/12 187/17 217/1 217/8
**books [30]** 19/21 24/25 36/15 36/21 37/1 73/18 78/21 88/3 117/1 169/2 171/23 172/2 176/3 176/6 194/19 195/15 204/21 204/24 205/16 210/15 215/19 216/3 221/1 224/12 225/10 230/22 247/25 253/7 253/9 256/9
**borrow [2]** 101/11 102/3
**bother [1]** 177/21

**bottom [13]** 75/17 75/25 76/5 89/3 90/8 90/13 91/7 92/4 92/22 96/19 97/6 141/19 211/17
**bought [3]** 168/1 235/25 249/25
**Boulevard [1]** 169/17
**bound [3]** 48/25 49/11 172/17
**bounds [1]** 294/4
**bow [1]** 203/23
**box [1]** 179/9
**boxes [1]** 95/8
**Boy [1]** 244/13
**boyfriend [2]** 336/1 343/4
**brains [1]** 137/8
**breadth [1]** 293/23
**break [14]** 17/7 17/18 62/25 71/11 71/13 106/9 106/10 111/23 131/1 184/20 238/5 238/7 238/10 345/24
**Bresnahan [1]** 1/22
**Brickell [1]** 227/20
**brief [7]** 190/23 229/19 251/18 275/1 275/2 275/14 329/20
**briefly [10]** 2/13 3/10 5/18 168/18 192/2 254/21 263/17 285/12 312/11 318/1
**bring [9]** 17/22 42/9 119/16 122/16 184/13 296/16 315/25 319/16 324/21
**bringing [4]** 4/16 46/6 102/22 322/19
**broad [3]** 44/19 70/11 333/23
**broader [2]** 68/10 334/2
**brought [10]** 25/17 33/4 36/25 37/3 51/20 55/19 67/14 280/4 291/4 343/4
**budget [2]** 280/6 280/9
**build [3]** 27/7 78/13 302/16
**building [5]** 201/1 201/15 201/19 201/22 242/14
**bullet [12]** 23/19 24/7 24/10 25/2 25/8 25/12 25/21 27/12 27/16 28/1 28/5 28/15
**bunch [5]** 2/16 111/21 299/6 302/9 302/13
**burden [4]** 5/6 54/4 78/23 111/7
**burn [1]** 99/1
**bus [1]** 55/10
**bush [1]** 6/20
**business [42]** 60/11 73/3 81/25 102/6

**B**

**business... [38]**
102/10 103/17
122/12 122/22
125/20 158/3 158/10
166/22 186/15
186/16 195/20 204/4
226/15 242/9 242/18
242/24 243/5 244/11
244/13 245/2 245/4
245/20 246/23
246/24 248/17
250/24 251/14 261/6
261/8 261/9 263/16
266/12 282/15
291/24 294/23 312/2
327/11 327/12
**businesses [2]** 102/19
123/4
**busy [1]** 186/19
**butcher [1]** 335/2
**buttons [1]** 278/9
**buy [2]** 235/7 235/9
**buying [1]** 22/22
**bylaws [12]** 43/23
44/1 45/3 45/12
46/13 47/17 47/18
47/19 47/20 56/24
181/4 181/8
**BYU [1]** 242/19

**C**

**CA [1]** 1/4
**Cadillac [3]** 150/19
152/8 152/17
**cage [1]** 313/3
**calculate [2]** 245/6
301/10
**calculated [1]** 301/12
**calculation [3]** 129/4
129/7 294/13
**calculations [1]**
242/25
**calendar [2]** 84/13
261/19
**call [25]** 14/10 17/8
31/6 59/23 107/7
121/19 131/10
131/19 131/20 132/1
135/10 138/6 138/7
147/11 184/25 185/1
225/23 238/12 241/9
241/10 278/22
287/20 322/15
332/17 345/22
**called [13]** 178/18
178/21 204/14
240/22 240/23
266/19 266/22 278/9
284/7 285/9 288/15
294/7 300/12
**calling [6]** 74/1
112/14 131/20
131/25 184/24
238/22
**calls [11]** 4/17 14/25
17/16 39/19 60/1
60/3 61/9 67/1
164/16 262/11 264/5

**came [12]** 67/19
73/20 109/3 109/18
114/1 163/18 216/12
217/25 249/25 286/6
332/24 343/5
**Canada [1]** 16/12
**candidly [1]** 240/4
**capacity [8]** 143/8
335/6 336/14 337/1
339/24 341/14 343/7
343/22
**capital [2]** 235/4
235/4
**caps [3]** 60/20 61/9
128/12
**captured [1]** 68/8
**car [10]** 122/12
122/13 123/9 150/17
152/11 152/24
153/10 173/14
199/10 249/10
**card [3]** 20/6 124/5
255/10
**cards [1]** 124/5
**care [10]** 153/18
153/21 154/2 154/14
169/10 169/13 173/6
253/7 276/15 276/16
**career [4]** 246/15
264/19 264/21
264/24
**cares [1]** 170/3
**Carla [1]** 213/14
**carried [2]** 122/18
122/20
**carrying [2]** 23/18
146/17
**cars [3]** 31/15 52/4
169/25
**carts [1]** 191/23
**carve [3]** 245/7 249/7
250/1
**case [90]** 1/4 3/5 4/7
7/4 7/6 8/17 12/5
28/20 64/13 67/14
99/2 110/21 116/10
116/25 127/24 128/9
131/21 131/22
133/12 135/14
138/22 138/25
147/23 148/2 148/11
150/12 151/7 155/6
155/10 155/14 156/3
156/22 158/8 162/4
168/6 174/25 176/3
184/8 194/22 196/13
197/6 206/2 214/8
214/23 219/18
239/11 239/16
239/18 241/5 243/16
244/18 245/25 246/4
246/11 247/23
249/13 251/9 253/19
254/6 254/12 258/11
261/10 266/10
270/10 272/12 275/1
279/17 288/14 290/9
290/25 294/9 296/23
299/13 306/23

307/20 316/7 328/24
329/14 332/5 332/24
335/5 335/18 335/19
337/6 339/4 339/5
339/7 339/11 339/17
343/19
**cases [5]** 50/9 138/20
274/21 290/6 333/24
**cash [15]** 28/10 28/15
31/23 193/14 193/16
193/25 194/5 226/13
230/2 230/8 230/10
230/14 230/23
230/24 260/10
**casting [2]** 283/1
283/3
**catch [1]** 12/11
**catch-up [1]** 12/11
**categories [1]** 300/24
**cause [3]** 5/20 17/5
46/1
**caused [3]** 108/13
224/13 224/19 225/2
257/16
**causes [1]** 224/21
**cemented [1]** 93/16
**cent [1]** 61/7
**Center [1]** 28/16
**CEO [2]** 248/7 248/8
**certain [17]** 49/2
197/11 228/14
244/23 244/25
252/22 253/2 255/24
280/5 280/6 295/8
313/25 314/1 321/2
333/16 342/9 345/8
**certainly [11]** 44/20
53/10 57/8 61/24
70/15 123/3 123/8
137/10 159/7 335/19
344/13
**Certificate [1]** 41/15
**certification [1]** 302/4
**certifications [2]**
242/20 263/23
**certified [1]** 212/20
**challenge [3]** 2/23 6/7
339/8
**challenging [1]** 2/17
**chance [2]** 256/14
278/19
**change [15]** 47/20
93/10 102/6 102/10
111/12 201/19 250/8
250/11 250/16
250/19 253/4 274/5
274/6 294/22 296/1
**changed [8]** 33/9
33/11 34/3 47/17
121/11 295/20
295/22 334/2
**changes [17]** 40/7
41/2 41/5 42/20 43/4
44/17 44/24 79/19
79/21 79/23 93/6
197/11 220/24 250/4
250/4 253/3 253/11
**changing [5]** 71/8
94/14 109/20 228/13

315/16
**chaps [1]** 233/16
**characterize [2]**
261/11 320/6
**charge [4]** 94/21
116/20 162/13
308/20
**charged [2]** 191/20
**charging [2]** 61/8
191/20
**Charles [2]** 2/8 227/5
**chart [1]** 188/20
**check [14]** 30/19
30/21 40/23 66/16
95/8 102/4 138/22
138/23 201/7 230/4
230/4 236/11 255/13
256/2
**checks [1]** 143/10
**Chezelle [1]** 1/20
**chief [7]** 8/25 9/19
19/15 45/8 72/25
184/9 239/12
**chiropractor [1]** 195/5
**choice [4]** 21/13
72/23 73/4 253/18
**choose [2]** 86/15
253/24
**choosing [1]** 69/24
**chose [4]** 55/7 86/19
86/20 87/18
**chosen [2]** 254/1
315/12
**Chris [2]** 1/18 132/16
**Chuck [2]** 2/6 343/8
**circle [1]** 247/10
**circuit [5]** 65/2 68/22
68/23 69/4 307/18
**circumstances [4]**
272/22 292/11 306/9
328/12
**citizenship [3]** 33/9
34/3 41/5
**city [1]** 280/9
**civil [1]** 338/24
**claim [17]** 6/22 51/14
68/4 97/18 97/22
97/24 128/19 128/22
146/5 156/2 158/9
222/13 222/17 229/1
229/10 229/14
229/15
**claimed [3]** 13/16
35/13 36/20
**claiming [2]** 229/13
339/13
**claims [11]** 31/9
31/13 31/17 36/14
51/4 97/14 128/20
128/25 129/2 129/5
133/19
**clarification [3]** 76/17
76/19 305/12
**clarify [6]** 38/5 91/14
157/5 196/22 331/18
336/12
**class [2]** 201/8 205/5
**classic [1]** 231/25

**classified [5]** 197/11
198/11 199/19
199/21 222/14
**Claudia [1]** 1/12
**clause [1]** 31/7
**claw [1]** 345/22
**clawed [1]** 12/8
**Clay [1]** 105/11
**clean [4]** 38/9 42/14
174/3 249/4
**cleanup [1]** 34/7
**clear [12]** 11/8 23/5
86/3 106/20 114/19
127/23 147/10 158/6
227/19 284/12
311/21 327/9
**clearly [6]** 74/2 74/5
76/14 116/21 273/5
322/20
**Clement [6]** 2/5 212/7
212/8 229/9 233/3
236/14
**Clerk [21]** 3/18 3/22
4/5 4/13 4/14 13/13
13/13 14/5 18/4 18/9
132/3 132/8 185/3
185/8 207/6 237/5
237/13 241/12
241/17 318/12
318/22
**Clerk's [3]** 3/19 4/2
206/24
**client [15]** 1/13 78/16
114/7 136/19 242/14
265/16 270/16
273/11 273/15 274/3
274/15 274/16
274/19 277/19
344/11
**clients [9]** 51/12 72/7
248/13 264/7 267/2
267/24 270/5 292/3
311/24
**close [5]** 204/9 225/8
227/16 296/22
322/15
**closely [1]** 244/14
**closing [3]** 236/8
259/2 345/5
**closings [1]** 345/19
**Club [1]** 169/16
**clue [1]** 254/10
**code [11]** 62/1 62/1
62/10 77/18 77/19
77/20 77/23 78/9
78/11 78/13 78/16
**coding [3]** 61/17
61/20 78/8
**coined [1]** 26/17
**Colbert [1]** 213/14
**ColdFusion [1]** 77/21
**collateral [6]** 284/20
289/15 289/21 290/2
290/7 322/18
**colleague [1]** 181/3
**colleagues [1]** 1/10
**collected [2]** 82/12
101/5
**collecting [1]** 292/22

## C

**collective [3]** 12/25 15/19 161/18
**collectively [1]** 101/20
**collects [1]** 80/14
**college [1]** 123/10
**Collier [11]** 43/14 188/2 188/4 188/9 195/11 201/22 209/3 212/10 212/13 217/12 339/19
**collusion [1]** 296/17
**Colton [3]** 12/23 130/6 131/5
**Colton's [1]** 131/10
**column [3]** 201/13 209/15 224/6
**come [43]** 2/18 4/21 73/10 98/5 99/12 112/17 125/21 125/22 130/19 131/7 131/9 135/1 163/22 184/11 191/22 191/23 204/13 206/1 239/4 240/15 243/23 246/11 252/5 258/7 265/16 267/2 269/20 270/16 271/22 273/11 273/15 273/21 274/10 281/10 281/20 286/3 292/17 311/13 317/16 317/19 330/9 335/20 337/24
**comes [6]** 79/2 238/23 267/25 281/15 281/17 344/2
**comfort [4]** 119/19 119/22 119/24 280/19
**comfortable [2]** 113/15 119/3
**coming [6]** 167/14 238/18 269/23 273/16 318/16 344/15
**commenced [5]** 17/19 71/14 131/2 184/21 238/11
**commercial [2]** 71/1 309/8
**commissary [1]** 112/6
**commission [15]** 270/5 304/5 320/13 320/25 321/3 321/11 321/16 321/20 321/25 322/4 322/7 322/11 322/21 323/2 323/20
**commissions [4]** 99/14 191/11 321/24 322/12
**common [5]** 228/16 248/2 273/3 290/21 290/22
**communicate [10]** 22/19 22/22 22/25 23/2 23/6 23/8 23/14 23/16 42/23 43/3

**communicated [3]** 43/1 83/8 83/16
**communication [5]** 4/2 78/3 82/24 248/6 282/22
**communications [240]** 1/8 18/25 19/13 22/10 22/17 23/11 23/12 24/24 25/24 25/25 26/25 27/10 27/14 27/18 28/2 28/8 28/12 28/13 30/3 30/24 31/24 32/12 32/24 33/6 33/19 33/21 34/4 34/12 34/16 35/7 40/10 40/19 41/9 41/16 42/3 42/6 42/9 42/14 43/9 43/10 43/13 43/15 43/16 43/16 43/17 43/20 43/23 44/6 45/16 45/20 46/17 48/14 52/12 53/18 53/21 55/15 56/9 56/14 56/14 60/6 63/11 65/21 69/15 70/1 70/10 71/23 71/25 72/2 72/17 72/18 73/1 73/3 73/11 73/15 73/18 74/13 75/6 78/10 78/12 78/19 78/22 79/3 79/4 79/6 79/18 79/24 80/25 81/1 81/23 82/1 82/5 82/18 83/2 83/15 83/19 83/21 87/14 87/19 87/21 88/8 88/19 94/3 94/17 94/20 96/3 96/8 96/24 97/7 98/18 100/2 100/13 100/17 101/2 101/10 101/20 102/5 102/9 103/19 104/6 105/3 105/11 110/9 110/12 110/14 110/17 111/8 114/15 116/15 117/12 117/16 117/17 117/18 118/1 118/2 123/17 128/1 128/4 128/24 137/6 149/5 149/14 149/21 154/22 155/4 157/22 158/24 159/6 159/16 159/23 161/5 162/20 163/2 163/7 163/22 164/14 164/21 165/12 165/16 166/6 167/6 168/1 168/5 168/21 169/20 172/24 174/15 174/18 175/22 177/14 177/17 178/10 178/25 179/4 179/8 179/12 179/15 181/5 181/13 182/5 182/10 183/16

185/23 186/1 186/23 186/25 187/8 188/2 188/9 188/9 188/10 206/6 208/25 212/10 212/13 212/14 212/17 212/22 213/25 215/17 215/20 216/1 216/14 217/12 217/12 217/17 217/20 218/5 218/8 218/12 218/15 218/20 218/24 219/11 219/14 219/20 220/11 220/19 220/23 221/2 224/16 226/6 227/18 229/24 230/2 232/19 234/11 237/1 243/12 249/14 286/10 286/13 300/8 335/23 336/23 337/7 339/10 339/20 340/20 342/12 342/13
**Communications -- Strike [1]** 42/3
**Communications' [19]** 17/5 58/25 62/11 64/4 80/9 82/6 82/19 87/13 99/24 116/17 150/16 155/1 158/3 162/22 165/17 167/11 215/23 220/21 224/13
**companies [52]** 27/3 35/24 36/4 37/7 37/10 37/18 37/19 38/2 38/4 40/20 47/22 74/15 80/13 80/14 80/15 80/16 81/5 82/12 82/13 82/14 82/15 82/22 82/23 83/10 99/9 100/3 100/4 100/5 100/7 101/12 101/14 101/23 117/5 120/8 120/9 120/11 125/25 162/22 163/3 163/9 188/13 192/20 247/23 271/3 279/3 284/14 287/21 303/25 306/10 312/6 312/17 330/24
**companies' [1]** 39/10
**company [193]** 7/21 8/17 12/18 19/16 20/4 21/23 21/24 22/11 24/12 27/6 27/7 27/8 27/19 27/20 27/23 27/25 31/1 32/13 38/15 41/7 41/17 43/11 44/18 45/11 45/14 45/14 45/15 45/18 45/25 46/2 48/8 48/13 48/20 49/19 50/4 50/21 51/4 51/22 52/6 54/5 54/9 55/8 55/17 60/7 61/12 66/12 82/21

92/16 92/24 99/20 100/22 101/24 102/2 102/15 103/9 112/7 116/22 117/24 118/2 118/3 119/4 121/9 121/12 121/14 121/17 122/5 123/14 128/15 147/1 150/22 150/24 150/25 152/23 153/10 153/14 155/9 155/13 159/3 159/12 160/5 161/4 161/25 162/1 162/7 162/11 163/4 163/8 164/13 166/11 167/12 168/19 169/11 170/1 170/12 171/9 171/13 172/3 173/14 178/18 182/25 183/4 183/9 183/18 186/17 187/1 187/17 187/24 187/25 188/3 188/8 188/12 188/17 190/9 190/19 191/17 192/21 192/24 200/1 204/7 204/12 204/21 205/8 206/11 207/24 211/4 211/8 211/8 211/10 211/13 211/14 213/24 215/6 222/2 222/4 225/22 226/4 226/11 227/15 229/3 229/4 231/23 232/20 234/23 234/25 243/21 247/14 248/1 248/6 248/14 248/17 248/17 249/15 249/16 249/19 249/23 249/24 249/25 249/25 250/5 252/2 253/14 255/10 257/14 258/17 259/4 259/23 260/6 260/9 260/14 261/19 266/4 266/13 270/24 271/1 271/12 271/15 272/15 274/7 274/9 277/23 278/12 278/14 279/4 306/13 311/22 312/1 312/3 312/8 330/10 336/17 336/18 343/5 343/6
**company's [18]** 19/21 20/10 25/1 27/3 59/5 64/22 89/15 90/14 94/14 169/2 169/4 172/2 225/19 244/12 245/2 257/6 284/11 288/19
**company-paid [1]** 152/23
**comparability [1]** 284/7
**comparable [29]** 272/13 272/16 278/18 280/13 282/23 285/1 285/16

287/17 287/23 291/15 301/3 301/5 302/17 302/17 303/2 303/7 305/25 306/2 310/21 311/20 312/18 315/4 315/17 317/16 318/9 319/15 326/24 332/7 333/5
**comparables [14]** 112/17 272/11 272/12 274/20 283/2 283/4 284/5 286/15 287/9 287/11 288/5 288/12 300/3 312/10
**compare [5]** 120/13 127/19 247/23 266/7 287/14
**comparing [1]** 315/22
**comparison [1]** 127/22
**compensation [2]** 28/25 52/3
**competitor [4]** 64/2 65/20 112/8 114/4
**competitors [8]** 7/15 8/12 27/4 78/17 101/13 167/7 167/11 167/15
**Complaint [24]** 29/21 30/1 30/18 32/15 33/8 38/13 39/18 134/17 135/7 135/9 135/14 135/17 135/19 136/1 136/10 136/17 137/22 145/6 145/9 145/17 145/20 158/8 172/13 173/17
**Complaints [1]** 65/1
**complete [7]** 11/4 20/9 23/23 24/23 80/22 85/9 126/17
**completed [3]** 18/16 261/17 267/18
**completely [2]** 60/11 128/2
**completeness [1]** 231/16
**complex [3]** 70/4 70/11 111/20
**compliance [3]** 125/22 186/15 338/22
**complied [1]** 18/3
**comply [3]** 26/18 32/21 280/25
**compound [1]** 111/20
**compromise [1]** 7/23
**conceived [2]** 137/5 137/13
**concentration [1]** 263/21
**concept [3]** 275/21 276/5 276/7
**concern [4]** 112/25 113/3 114/24 225/20
**concerned [5]** 11/14 21/22 65/9 230/21 338/9
**concerning [1]** 34/18
**concerns [2]** 225/18

**C**

**concerns...** **[1]** 225/20
**conclude** **[4]** 288/25
303/7 328/9 332/4
**concluded** **[4]** 283/11
288/5 296/20 297/6
**conclusion** **[7]** 32/17
39/20 67/1 164/16
254/15 307/5 340/23
**conclusions** **[4]**
293/22 296/19
297/14 305/15
**concur** **[2]** 207/4
207/6
**condo** **[10]** 200/23
201/3 204/20 205/3
205/7 227/8 227/10
227/20 227/24
229/12
**condominium** **[2]**
201/16 227/18
**conduct** **[1]** 120/10
**conducted** **[2]** 248/17
294/23
**confer** **[1]** 146/1
**confident** **[3]** 10/2
109/22 280/22
**confidential** **[15]** 2/16
3/1 3/5 3/17 3/19
4/6 4/13 5/22 7/1
7/2 12/5 12/9 13/4
13/5 14/17
**confidentially** **[1]** 9/8
**confirmed** **[1]** 138/20
**confirming** **[1]** 158/6
**confused** **[3]** 50/1
76/23 91/19
**Congressperson** **[1]**
260/17
**connecting** **[1]** 264/9
**connection** **[5]** 94/10
161/24 196/3 205/4
298/18
**consent** **[20]** 15/7
40/6 40/9 41/1 41/4
42/15 44/5 45/5
46/13 46/25 47/6
48/9 48/24 49/7
49/10 52/24 53/3
54/4 58/14 177/7
**consented** **[1]** 47/5
**consider** **[10]** 142/22
244/11 248/12
248/18 249/22 250/6
250/11 256/15
307/18 309/21
**consideration** **[2]**
190/12 194/12
**considered** **[9]** 62/3
70/6 70/15 101/13
246/8 281/20 309/19
309/24 312/18
**considering** **[1]**
230/14
**consist** **[2]** 226/12
226/13
**consistent** **[1]** 299/21
**consistenting** **[1]**
215/23

**consistently** **[3]**
288/10 289/6 310/17
**console** **[2]** 28/17
208/24
**consolidate** **[3]** 91/7
188/11 195/12
**consolidated** **[5]** 43/18
90/19 91/1 186/13
188/16
**consolidation** **[1]**
49/19
**consult** **[11]** 125/9
167/22 173/16
173/19 178/24 180/3
180/13 181/7 181/10
181/15 191/6
**consultant** **[3]** 82/5
238/12 238/23
**consulted** **[1]** 167/16
**consulting** **[1]** 263/12
**contact** **[5]** 8/25 9/19
167/14 172/11
172/11
**contacted** **[1]** 163/17
**contain** **[1]** 5/21
**contains** **[1]** 248/16
**contemplate** **[1]**
119/25
**contemplating** **[1]**
80/11
**contemporaneous** **[4]**
267/10 268/10
268/22 269/1
**contemporary** **[1]**
257/20
**contempt** **[1]** 11/18
**contend** **[6]** 5/21
32/20 53/24 95/1
99/5 337/9
**contended** **[2]** 32/3
32/10
**contention** **[1]** 303/19
**contents** **[1]** 9/9
**context** **[2]** 108/1
269/19
**contingent** **[2]** 133/4
133/6
**continue** **[3]** 25/22
155/24 219/7
**continued** **[2]** 75/4
177/22
**continues** **[3]** 70/21
71/2 223/23
**contraband** **[4]** 75/12
75/23 76/21 77/1
**contract** **[7]** 60/22
75/15 81/20 123/8
145/1 191/18 236/3
**contractor** **[2]** 7/20
311/5
**contractors** **[3]** 102/16
103/10 103/11
**contracts** **[10]** 42/2
42/5 42/10 51/8 74/3
140/3 140/6 146/17
146/22 308/21
**contrary** **[1]** 341/20
**contribute** **[1]** 146/24
**contribution** **[3]** 77/24

182/3 182/8
**control** **[11]** 27/5
28/13 32/23 33/5
72/21 75/5 103/25
160/1 272/21 272/23
290/21
**controlled** **[1]** 341/18
**controlling** **[1]** 255/23
**controls** **[1]** 46/7
**convene** **[4]** 25/23
26/3 26/12 27/12
**convenient** **[1]** 15/23
**conversation** **[6]**
124/24 138/15
170/16 171/18 219/3
220/3
**conversations** **[7]**
74/11 170/11 170/22
220/7 220/9 220/13
220/18
**conversion** **[2]** 36/3
180/10
**conversions** **[2]**
176/12 180/14
**convert** **[1]** 118/12
**converted** **[3]** 36/6
37/18 38/2
**converting** **[2]** 33/17
40/20
**conveying** **[1]** 56/15
**convoluted** **[1]** 260/20
**cooperation** **[1]**
247/14
**coordinating** **[1]** 10/17
**copied** **[1]** 129/20
**copy** **[8]** 7/15 65/25
189/5 198/1 214/23
318/22 319/1 319/3
**core** **[1]** 120/8
**corner** **[2]** 208/2
208/11
**corporate** **[20]** 19/19
21/23 22/11 25/9
34/6 43/5 44/20
112/18 116/20
121/18 127/5 188/5
303/14 303/16 335/6
335/13 338/4 341/4
341/7 341/14
**corporation** **[16]** 28/4
38/7 40/5 43/10
43/24 46/10 46/18
47/1 47/3 48/6 54/21
56/24 83/20 84/10
176/10 186/24
**corporation's** **[1]**
56/15
**corporations** **[7]** 40/16
42/11 45/19 46/9
84/8 84/15 123/7
**correct** **[216]** 2/17
11/4 18/25 19/13
19/16 19/22 20/4
20/17 20/21 20/25
21/20 21/24 25/11
27/23 27/24 28/4
29/3 29/15 30/6 30/9
30/19 31/1 31/15
32/4 32/8 32/13

33/10 33/11 34/5
34/19 35/3 35/14
35/21 36/4 36/17
38/16 39/7 40/7
41/10 44/25 45/16
45/21 46/4 47/7
47/12 47/13 48/18
51/19 53/7 54/21
56/20 66/2 66/3
73/19 77/12 85/7
89/25 90/3 91/10
92/10 95/2 95/23
96/16 111/5 116/20
117/16 121/7 128/6
128/10 129/23 133/8
133/20 136/13
141/21 143/3 143/20
144/2 144/23 145/4
146/6 146/18 147/25
148/5 148/8 148/16
148/25 149/1 149/9
149/25 150/15
150/17 150/22
150/23 150/24
153/15 154/11
154/12 155/3 155/16
158/11 158/12
158/15 158/16 159/3
159/4 159/6 159/12
159/24 163/9 163/19
163/24 164/2 164/8
164/11 164/21 165/4
165/19 166/8 167/12
167/13 167/18
176/14 182/14
182/15 193/24
198/22 198/23 201/7
206/16 208/6 208/20
212/18 212/24 213/5
213/9 213/12 213/22
216/8 216/15 216/21
217/3 217/10 217/15
217/19 218/7 218/10
218/22 218/25
219/12 219/16
219/21 219/24 220/2
220/25 221/6 221/10
224/10 227/21
227/22 229/25 232/1
232/2 232/17 233/19
234/5 236/10 244/20
273/9 277/14 279/1
287/4 287/5 288/6
290/25 293/21 297/8
297/11 297/15
297/25 298/1 298/4
298/20 298/19
298/20 299/6 299/17
300/14 300/22 301/6
301/13 302/11
302/15 302/22
302/23 303/13
303/17 304/21 305/1
305/24 307/14
307/22 307/25
309/11 311/14
311/15 313/8 313/10
314/4 316/3 316/8
316/25 327/13

333/11 336/4 336/7
341/5
**corrected** **[2]** 206/23
326/1
**correction** **[1]** 251/23
**correctional** **[2]** 140/4
248/6
**corrections** **[7]** 70/17
88/16 88/20 104/23
197/7 252/16 252/19
**correctly** **[9]** 92/6
152/18 199/4 204/19
215/11 215/12 225/6
226/25 245/17
**corroborate** **[1]**
299/19
**Corsaro** **[1]** 28/16
**Corvette** **[2]** 167/25
168/2
**cost** **[16]** 59/19 78/24
150/8 166/5 191/16
191/7 191/10 191/13
192/21 207/23
233/18 233/23
233/24 244/6 268/3
280/8
**costly** **[1]** 292/19
**costs** **[10]** 99/18
102/7 102/11 102/20
103/7 103/11 149/21
195/19 197/12 205/7
**counsel** **[58]** 3/20
3/21 10/10 10/10
10/14 10/17 10/25
11/3 11/10 12/2
12/12 12/13 12/25
13/2 13/24 14/11
16/3 25/13 26/6 26/9
32/2 33/17 33/21
37/11 38/11 40/15
42/17 43/6 44/15
53/16 72/19 74/21
108/23 110/11
110/15 110/17
110/19 110/20
110/23 110/25 116/2
126/3 129/19 129/20
155/8 155/12 155/20
157/5 231/3 296/16
297/24 298/6 298/17
299/4 335/22 336/15
336/22 341/22
**count** **[2]** 99/14 99/15
**counting** **[1]** 57/23
**countries** **[2]** 264/4
264/8
**county** **[5]** 64/13
65/19 105/11 227/20
285/22
**couple** **[13]** 29/8
120/20 121/14
154/19 158/20
176/13 176/19
183/12 186/9 214/6
233/13 304/4 337/10
**course** **[8]** 12/8 110/1
176/16 177/5 204/3
226/15 264/24
338/22

**C**

**court [49]** 3/3 7/7 8/1 8/5 9/18 18/1 29/15 30/18 39/17 50/13 63/18 64/12 65/19 66/4 66/18 68/17 68/22 69/4 71/7 72/22 86/7 129/15 130/9 134/15 143/23 146/6 147/18 148/8 158/7 171/19 185/21 188/25 197/22 222/14 222/18 237/16 242/3 247/13 248/25 253/19 253/24 254/12 261/2 262/13 262/18 288/2 293/6 294/20 331/17
**court's [3]** 239/14 251/25 305/22
**courtroom [9]** 1/11 1/13 1/20 2/2 2/4 6/16 9/4 244/19 298/12
**courts [1]** 254/9
**cover [13]** 63/24 66/9 68/2 68/10 70/5 70/14 88/18 88/23 89/1 89/5 89/24 95/5 308/11
**covered [3]** 53/24 89/9 106/11
**covering [3]** 63/21 70/22 71/1
**CPA [8]** 186/19 194/4 194/4 195/5 232/18 232/18 263/24 263/24
**create [5]** 9/9 13/17 13/20 14/2 114/9
**created [12]** 37/9 41/8 48/9 78/7 78/9 78/11 132/22 134/2 137/13 178/12 183/18 340/11
**creating [2]** 178/14 340/10
**creation [1]** 251/24
**creations [2]** 197/8 252/18
**credentials [1]** 243/3
**credible [2]** 253/3 253/13
**credit [3]** 124/5 124/5 255/10
**creditor [1]** 97/11
**creditor's [1]** 97/14
**creditors [1]** 129/2
**criteria [12]** 282/13 284/7 288/11 291/14 302/16 310/15 311/12 311/16 315/11 326/16 327/3 327/8
**critical [2]** 315/14 316/16
**criticism [1]** 316/25
**criticisms [2]** 295/8 316/16

**cross [23]** 18/19 63/2 71/15 106/10 106/14 107/19 107/23 113/14 131/22 147/6 168/10 172/24 212/3 227/4 252/11 254/19 258/1 261/25 296/8 330/1 335/21 339/2 343/25
**cross-examination [1]** 63/2
**cross-pollinated [1]** 113/14
**crossed [1]** 128/13
**crown [1]** 266/4
**current [1]** 194/9 226/9 226/11 226/11 226/12 242/5 256/19 256/20 256/22 257/17 260/6
**currently [8]** 191/13 193/23 224/17 225/23 230/3 230/10 235/17 240/6
**customer [3]** 7/20 42/2 42/5
**customers [9]** 56/11 103/15 105/23 165/4 165/7 191/18 192/4 192/12 230/7
**cut [17]** 60/7 169/8 172/24 173/7 216/16 240/9 305/25 306/16 306/18 306/20 330/9 331/19 332/4 332/6 332/8 332/13 332/14
**cutoff [1]** 202/25
**cuts [1]** 39/15
**cutting [1]** 240/5

**D**

**dad [9]** 20/12 22/3 30/16 38/6 47/4 47/10 88/5 116/22 122/24
**dad's [6]** 35/16 47/8 58/2 87/25 88/1 122/3
**Dade [1]** 227/20
**daily [1]** 230/8
**damage [1]** 61/11
**damaged [1]** 228/12
**damages [1]** 242/25
**data [3]** 82/12 253/12 260/8
**database [6]** 76/23 76/24 77/3 77/6 282/5 282/12
**date [78]** 15/13 26/15 26/22 41/24 53/14 69/9 76/20 89/15 90/2 90/7 108/9 118/25 126/19 147/18 147/23 148/7 148/20 151/13 158/7 158/9 161/20 176/24 202/15 202/16 202/17 202/20 202/25 203/3 203/4

203/25 204/5 207/15 211/22 214/7 228/19 243/25 245/25 246/2 246/5 246/12 246/13 252/2 252/6 253/18 253/25 254/1 254/14 254/14 254/14 256/17 256/17 256/21 257/6 257/10 257/10 257/17 257/18 257/22 258/4 258/12 259/15 260/2 261/12 261/16 287/24 288/20 288/21 300/11 300/12 300/16 302/22 314/14 315/5 315/9 315/13 316/5 323/10 324/24
**dated [9]** 21/25 53/15 88/23 89/25 91/24 132/24 297/6 316/4 319/24
**dates [6]** 54/12 60/22 88/21 105/25 109/15 315/16
**dating [1]** 208/24
**daughter [4]** 133/3 133/16 145/6 147/11
**David [1]** 1/14 2/1 110/24
**day [28]** 13/9 15/17 36/10 43/22 52/12 59/22 99/11 100/25 160/20 162/5 173/12 176/17 182/13 182/13 230/3 230/3 230/23 230/23 230/24 230/24 238/5 239/19 248/13 292/5 292/5 322/16 327/20 344/24
**days [6]** 22/3 48/4 65/3 69/10 70/1 74/18 99/13 104/24 176/13 268/21 268/23 275/11
**deadlock [1]** 160/10
**deal [13]** 11/17 15/12 16/25 17/7 26/7 62/17 94/15 94/16 94/22 101/9 121/20 123/9 259/13
**dealer [1]** 122/13
**dealership [1]** 122/12
**dealings [1]** 123/8
**dealt [2]** 58/3 116/9
**dear [1]** 255/15
**death [10]** 18/23 19/1 19/4 20/15 35/13 127/4 127/13 127/20 132/22 213/7
**debit [1]** 20/6
**debt [19]** 91/3 98/24 99/10 100/5 100/7 100/8 100/9 100/10 100/12 100/22 100/24 101/10 101/15 104/2 230/15

230/16 230/19 230/22 232/22
**debtor [1]** 96/8
**debtors [1]** 96/12
**debts [2]** 92/7 102/18
**decade [1]** 102/21
**decedent's [1]** 31/9
**December [2]** 30/5 208/5
**December 31 [2]** 30/5 208/5
**decide [2]** 81/11 81/14
**decided [3]** 100/21 297/17 303/16
**deciding [2]** 99/23 274/8
**decipher [1]** 208/17
**decision [11]** 64/11 66/18 67/24 68/21 69/3 111/18 235/9 254/9 273/9 312/2 312/7
**decisions [8]** 20/3 20/10 65/1 81/25 82/3 158/10 158/14 172/4
**declarant [2]** 338/19 342/23
**declaration [2]** 31/8 96/11
**declare [2]** 37/6 345/2
**declined [2]** 121/22 150/21
**decreased [1]** 192/9
**deemed [1]** 2/25
**deeming [1]** 3/18
**deems [1]** 4/13
**defeat [1]** 68/4
**defend [1]** 99/20
**defendant [1]** 342/22
**Defendants [1]** 35/8
**defer [13]** 25/13 26/5 26/9 32/2 32/18 53/16 81/6 102/4 108/22 116/1 120/25 121/1 334/15
**deferred [4]** 73/19 94/22 100/11 101/21
**define [2]** 231/21 232/19
**defined [1]** 143/18
**defines [1]** 231/4
**definitely [4]** 116/7 122/11 170/20 266/1
**definition [7]** 231/7 231/25 232/3 232/4 232/8 232/14 334/1
**definitions [1]** 66/8
**degree [1]** 263/19
**Delaware [40]** 33/10 33/12 33/19 33/22 34/4 34/18 36/4 36/7 37/18 38/2 39/17 40/13 41/9 41/16 42/7 43/11 45/16 45/20 45/21 46/4 48/9 48/15 56/16 57/13 117/18 118/3

118/7 176/10 177/17 180/10 180/17 180/20 187/1 187/2 194/24 195/2 195/6 195/14 195/18 195/22
**deliver [1]** 46/1
**demand [13]** 24/23 25/22 26/8 26/13 31/13 54/17 54/23 55/22 55/23 59/15 59/17 59/19 288/15
**demanded [5]** 31/18 54/10 54/20 56/12 56/23
**demands [6]** 24/13 25/8 25/21 26/19 27/12 28/1
**DEMETRIUS [1]** 18/11
**demonstration [1]** 191/7
**demonstrative [12]** 34/8 34/10 34/13 149/15 189/4 197/25 202/20 210/2 227/7 228/3 251/4 251/5
**DEMPE [1]** 234/1
**department [6]** 70/17 88/16 88/20 93/16 104/22 107/10
**dependent [1]** 246/6
**depending [6]** 3/13 60/21 60/22 100/17 226/14 254/9
**depends [1]** 250/18
**depiction [2]** 188/23 197/20
**deposed [3]** 239/1 275/12 317/11
**deposit [2]** 60/18 211/13
**deposited [1]** 222/2
**deposition [50]** 58/23 105/2 139/5 139/15 140/11 140/12 151/6 151/8 151/11 151/17 154/20 157/16 160/22 214/8 214/10 214/13 214/23 215/15 219/17 224/23 225/8 225/9 226/17 226/19 231/2 231/11 231/18 232/12 239/12 240/6 241/4 277/25 296/12 298/25 307/7 307/13 316/11 317/17 317/21 320/11 325/25 334/20 335/24 336/8 336/13 338/21 340/22 340/24 341/5 341/19
**depositions [1]** 338/12
**depreciate [1]** 205/22
**depreciation [6]** 205/11 205/12 205/15 249/9 328/20 330/6
**depression [1]** 205/21

**D**

Derived [1] 146/22
describe [12] 7/7
61/25 76/11 76/13
77/9 77/11 77/14
182/2 182/8 230/1
263/17 281/25
described [7] 21/9
24/11 26/20 103/8
120/17 270/15
287/15
describes [2] 90/13
90/14
description [2] 121/9
199/4
design [1] 62/5
designated [1] 7/5
designating [1] 335/12
designations [5] 14/18
140/12 239/5 239/6
240/7
designed [3] 61/22
61/24 175/8
designing [3] 61/23
62/3 62/8
desire [1] 204/11
DeSoto [2] 43/16
339/19
Despite [1] 156/20
detail [2] 280/11
312/16
detailed [4] 156/7
245/11 283/22 285/4
details [2] 22/13
312/20
determine [17] 203/11
252/1 252/19 253/20
256/15 272/19
273/17 273/22
283/21 304/15 308/3
308/9 310/19 310/25
312/18 321/16 332/6
determined [5] 4/6
40/2 59/5 61/11
289/9
determining [2] 69/14
266/25
develop [5] 78/16
232/19 339/2 343/24
343/25
developed [9] 77/16
144/25 145/10
145/11 253/22
265/23 296/23 297/3
309/10
developers [1] 78/24
developing [4] 79/6
242/14 266/3 309/8
development [4]
78/24 182/4 182/10
309/6
developments [1]
215/9
devices [2] 77/22
77/23
diamond [1] 28/11
die [1] 133/13
died [4] 47/12 47/14
158/17 169/22

difference [5] 114/14
116/5 161/15 279/24
311/1
different [28] 40/24
42/10 46/9 46/20
57/11 60/20 60/20
88/7 100/11 107/14
110/16 111/21 115/4
119/23 164/6 174/6
182/11 186/5 258/4
273/14 281/2 284/17
302/8 304/11 310/10
322/18 326/25
338/21
differential [1] 111/15
differently [2] 55/1
287/19
difficult [6] 40/17
42/12 42/13 122/11
271/7 284/22
difficulties [1] 189/17
dig [1] 252/23
digging [1] 190/22
diligently [1] 239/4
diminished [6] 143/23
144/15 144/16
257/14 264/19
264/20
DIN [1] 11/20
direct [33] 8/8 13/12
18/17 23/10 23/12
24/24 27/3 42/23
45/14 63/24 78/13
82/4 132/14 172/23
185/16 195/18
209/18 213/13
213/23 218/1 220/22
241/23 261/24
262/24 295/8 299/23
303/18 304/24
312/20 312/22 324/3
339/2 343/25
directed [4] 10/14
22/18 66/5 105/8
direction [7] 23/13
72/22 104/1 130/12
216/16 221/5 309/11
directions [1] 93/17
directly [11] 22/19
22/25 23/4 23/5 23/6
27/4 187/11 192/22
213/18 220/1 344/11
director [49] 19/12
25/24 25/24 26/25
27/9 27/11 44/5 45/9
46/18 46/23 46/24
47/1 47/3 47/11
47/15 47/18 47/25
48/3 48/3 48/4 49/16
55/3 55/8 55/12
55/14 72/25 127/12
143/14 159/2 160/4
160/6 160/11 160/15
160/18 160/20
161/12 168/21
173/23 174/14
174/24 175/25
185/25 186/11
213/10 213/15

215/16 216/7 242/6
334/23
directors [9] 27/13
46/16 46/20 47/7
47/8 47/11 47/14
54/20 55/13
directs [2] 22/16
45/25
disagree [6] 97/25
98/12 98/14 246/4
247/16 247/17
disaster [1] 44/22
disc [1] 130/1
discarded [1] 310/5
discount [1] 251/1
discounted [1] 323/20
discounts [1] 255/25
discretion [1] 256/16
discuss [4] 181/12
205/25 243/17 331/2
discussed [15] 33/13
74/25 80/16 109/4
129/16 170/23
196/13 204/18 210/2
224/8 239/9 302/22
304/8 312/22 320/10
discussing [2] 52/4
53/5
discussion [17] 11/20
15/16 17/2 22/13
104/13 109/13
109/21 183/19 233/8
233/9 233/11 233/18
233/23 249/12
258/11 301/7 302/7
discussions [6] 20/16
20/18 20/20 118/16
118/17 238/19
display [10] 21/6
29/17 34/21 44/2
54/14 67/16 68/25
84/1 85/1 93/13
displayed [1] 31/6
dispute [12] 106/4
119/1 130/11 136/19
136/22 136/23
137/12 137/18 140/7
142/16 339/13 343/5
disputed [1] 103/1
disputes [1] 343/15
disputing [1] 342/17
dissolution [1] 162/6
distance [1] 11/9
distinction [1] 161/15
distribution [5] 39/25
206/10 206/13
314/11 319/19
distributions [5]
25/10 40/5 194/22
206/1 206/3
district [7] 63/18
63/18 64/12 64/12
67/12 67/13 67/13
divert [1] 251/22
dividends [3] 25/9
25/15 25/18
division [1] 50/4
Dixon [14] 1/20
238/17 263/3 275/10

276/8 276/24 277/2
280/19 281/6 303/23
304/9 311/9 312/22
329/24
Dixon's [1] 275/25
DLA [3] 1/19 132/16
297/25
DLA Piper [3] 1/19
132/16 297/25
doable [1] 5/15
docket [6] 2/15 2/24
3/10 8/5 8/10 13/14
document [48] 10/13
10/21 23/23 24/15
25/14 26/2 45/3
45/23 48/7 48/12
50/2 53/14 56/3
56/17 57/1 65/19
67/3 75/3 75/7 84/5
95/15 96/6 96/10
108/4 108/17 109/1
109/18 115/18
115/20 119/8 130/11
141/9 141/12 141/25
176/22 207/22 208/8
211/15 227/7 267/23
318/1 319/12 319/17
323/25 324/20 325/2
325/3 325/6
documentation [6]
268/15 269/7 273/24
280/2 291/23 332/19
documented [2] 79/7
292/16
documents [41] 4/5
7/1 7/2 7/11 7/13
8/14 9/10 10/3 10/21
11/12 11/14 11/16
11/19 11/23 12/4
12/7 12/18 12/21
13/5 13/13 14/6
14/16 40/20 44/11
44/13 108/6 114/8
129/16 156/21
157/20 243/24 271/2
278/1 299/1 299/6
299/7 299/9 299/10
300/5 300/25 329/10
dollar [13] 7/21 52/11
73/16 79/5 87/20
99/9 101/4 101/6
101/14 103/5 126/21
194/2 235/5
dollars [27] 59/10
61/5 73/14 94/23
97/25 98/11 98/24
99/1 99/10 99/13
99/15 99/17 99/18
99/20 100/23 100/25
102/21 103/5 152/21
153/7 193/4 193/10
194/8 209/5 234/13
235/6 330/15
domain [1] 15/10
domestic [12] 270/3
270/7 291/24 292/3
292/11 292/14
303/15 303/20
303/25 304/3 304/5

327/12
done [58] 7/24 8/2
9/8 10/18 14/9 14/14
19/7 20/7 24/21
36/10 37/11 46/8
63/3 78/6 80/20 81/4
82/11 87/10 87/12
101/2 102/21 104/11
113/25 117/3 117/4
120/18 120/24
130/12 154/21
163/23 170/8 171/10
183/7 198/18 200/12
227/24 240/18
244/13 246/5 259/7
261/14 268/9 273/24
280/2 287/19 294/4
303/24 304/2 304/25
307/6 311/23 314/16
316/19 317/8 317/14
317/22 326/19 327/7
door [1] 112/19
DOS [1] 314/23
dotted [1] 213/22
double [2] 70/7
273/14
doubt [3] 138/24
140/9 174/22
downturn [1] 70/9
dozen [1] 2/25
Dr [27] 276/2 287/3
287/8 287/11 287/12
287/16 288/2 288/10
289/3 289/7 289/11
290/6 290/10 291/3
291/5 296/24 297/9
297/13 301/18
301/19 302/8 302/9
316/17 316/22 327/7
330/12 332/11
Dr. [19] 276/3 290/24
291/4 291/12 291/17
291/22 292/4 294/16
294/19 295/2 295/3
295/5 295/9 296/11
296/24 297/10
297/13 301/18
332/11
Dr. Shut [2] 295/3
296/11
Dr. White [9] 276/3
291/4 291/12 292/4
295/9 296/24 297/10
297/13 332/11
Dr. White's [7] 290/24
291/17 291/22
294/16 294/19 295/2
295/5
Dr. Write [1] 301/18
draft [1] 129/18
drag [1] 267/22
dramatically [1]
192/10
draw [1] 293/22
drive [8] 59/19 151/1
151/21 151/25 152/8
152/11 152/14
169/25
driven [1] 55/10

**D**

**driver [1]** 266/12
**drives [2]** 101/6
152/16
**driving [1]** 87/15
**drove [1]** 248/7
**Duckworth [1]** 260/17
**due [5]** 92/12 222/25
223/16 223/19 267/8
**duly [5]** 18/12 132/11
185/11 241/20
262/21
**Duper [1]** 327/14
**Dustin [1]** 1/8
**Dustin Hillsley [1]** 1/8
**duties [1]** 50/21
**duty [1]** 9/20

**E**

**E-File [2]** 84/7 84/14
**e-mail [19]** 11/1 19/8
24/17 24/18 24/19
24/25 35/15 72/8
73/24 74/21 74/23
75/11 75/13 75/14
75/16 75/22 78/1
141/20 300/8
**e-mailed [1]** 35/16
**e-mailing [1]** 27/4
**e-mails [1]** 74/3
**E-N-G-E-L-K-E [1]**
337/20
**e-service [1]** 8/13
**eagerly [1]** 66/10
**earlier [38]** 71/20
97/8 107/23 110/5
159/18 159/21
163/12 163/19
169/17 169/19 173/9
180/9 180/20 181/2
182/24 183/3 204/4
212/19 212/25
221/23 222/6 224/8
232/5 245/24 246/12
269/11 270/9 272/4
292/16 293/3 293/19
298/16 301/8 306/1
307/3 312/15 323/3
323/10
**earliest [1]** 246/2
**early [2]** 123/13
264/20
**earned [1]** 235/4
**earning [2]** 245/6
249/24
**earnings [4]** 329/5
330/5 331/8 331/8
**easier [2]** 256/8
257/19
**easy [1]** 225/24
**ebbs [1]** 339/23
**EBIDTA [1]** 328/23
**EBITDA [2]** 330/5
330/13
**economic [7]** 74/16
120/10 245/6 249/23
249/24 328/12 329/2
**economics [2]** 272/2
272/8

**Eddy [1]** 240/3
**edge [1]** 116/7
**edits [1]** 145/19
**education [9]** 61/13
61/15 61/17 62/4
72/12 242/16 263/18
285/20 285/21
**effect [19]** 32/4 49/19
50/3 58/24 59/2 59/4
59/6 59/7 59/8 60/16
60/19 60/25 61/3
61/10 70/23 181/8
315/2 315/6 336/16
**effective [11]** 108/7
108/9 144/6 202/15
202/16 203/24 204/4
261/12 315/5 323/10
324/24
**efficiency [1]** 243/2
**efficient [2]** 240/17
246/2
**effort [4]** 14/13 15/11
62/17 280/25
**efforts [2]** 14/15
251/21
**egregious [1]** 100/19
**eight [6]** 57/17 57/21
58/10 93/21 95/2
300/20
**either [27]** 8/21 21/12
28/22 34/14 35/20
40/5 40/7 41/7 51/18
83/7 127/25 142/12
161/19 191/6 191/21
264/8 274/6 279/3
295/1 304/21 304/22
314/19 328/12
328/24 329/2 329/11
341/11
**elaborate [1]** 271/14
**election [3]** 54/20
55/6 55/13
**electronic [6]** 44/9
44/10 76/11 76/13
89/6 223/10
**electronically [1]**
318/10
**elements [1]** 312/13
**elicit [1]** 64/21
**eligible [1]** 66/5
**eliminate [3]** 283/25
313/13 317/16
**eliminated [4]** 61/4
190/6 289/9 290/6
**elimination [9]** 60/9
60/18 75/12 75/23
76/10 76/22 77/1
77/8 288/11
**else [16]** 15/1 17/9
32/16 57/5 112/22
115/12 117/3 163/10
163/21 182/9 196/19
203/19 240/25
254/12 281/15
345/24
**else's [1]** 146/17
**elsewhere [1]** 72/24
**emergency [4]** 6/21
8/1 15/3 15/9

**emphasize [1]** 8/11
**employed [3]** 57/17
58/5 216/20
**employee [6]** 7/20
53/1 127/17 216/22
216/24 312/7
**employees [7]** 51/25
99/13 103/8 162/23
121/14 220/23 300/9
**employment [1]**
213/25
**employs [2]** 100/14
212/14
**encrypted [1]** 78/2
**end [14]** 1/23 16/6
51/18 56/9 59/22
83/22 115/7 121/19
121/19 204/10 238/5
240/4 249/6 330/3
**ended [7]** 20/20 52/21
85/6 122/14 234/23
268/2 309/7
**ends [1]** 162/5
**enforce [4]** 33/4 37/3
66/11 66/12
**enforceable [1]** 68/11
**engage [1]** 82/5
**engaged [8]** 57/24
58/2 65/23 80/2 80/4
81/4 109/12 243/15
**engagement [2]** 218/9
278/3
**engagements [1]**
312/6
**engaging [1]** 270/13
**Engelke [4]** 335/5
337/6 339/7 343/2
**engineering [2]** 61/14
61/15
**engineers [1]** 62/10
**Engle [2]** 138/22
339/5
**englewood [2]** 123/16
123/17
**enhance [1]** 250/19
**enough [9]** 7/8 72/11
101/25 118/13 119/5
119/6 154/22 227/16
255/1
**enrichment [1]** 97/21
**entail [2]** 192/19
242/11
**entails [2]** 242/12
242/12
**enter [3]** 94/13 94/13
293/7
**entered [10]** 54/1
69/10 82/2 93/22
95/3 131/5 140/4
200/7 265/12 269/15
**entering [2]** 203/23
272/7
**entertainment [5]**
72/12 77/9 78/3
327/17 327/24
**entire [6]** 7/18 155/9
155/13 175/3 189/11
326/25
**entirety [1]** 146/11

**entities [31]** 20/13
25/25 27/10 33/12
33/18 34/6 36/10
57/11 117/16 117/19
118/4 118/5 126/6
127/25 165/17
208/24 244/15 245/9
270/2 270/3 270/6
270/7 291/24 303/15
303/15 303/16
303/17 303/21 304/3
304/9 304/16
**entities' [1]** 24/24
**entitled [4]** 25/6 33/1
146/25 325/13
**entity [38]** 35/20 41/9
42/14 43/19 43/19
46/6 49/20 83/7
84/24 117/17 117/18
118/7 118/12 128/1
128/5 128/8 177/17
177/25 178/12
178/15 183/16 187/5
187/23 188/1 194/23
195/13 206/6 248/8
248/10 255/4 266/9
271/9 271/10 271/11
271/19 304/12
316/13 340/9
**entrepreneur [2]**
122/21 122/22
**entries [12]** 198/19
198/20 198/21
201/13 202/9 243/19
245/13 246/6 246/7
246/10 251/12
251/13
**entry [15]** 13/14
45/14 45/19 198/18
198/24 200/16
200/19 200/21
200/22 201/11
201/17 209/11
209/22 209/23
223/16
**envisioning [1]** 6/5
**equal [3]** 256/7
257/11 320/25
**equals [2]** 250/25
250/25
**equates [1]** 66/8
**equation [2]** 61/6
111/10
**equity [9]** 30/4 31/1
90/17 92/15 93/10
94/18 94/20 101/16
101/25
**Erin [1]** 1/20
**errands [1]** 235/1
**Escalade [2]** 150/21
173/15
**escalated [1]** 150/19
**especially [1]** 35/18
**essentially [10]** 20/9
46/7 64/3 65/21
72/21 117/21 120/13
296/16 312/12
315/10
**establish [3]** 249/4

272/15 272/17
**established [6]** 7/22
76/14 273/16 273/20
273/23 282/9
**establishing [1]**
162/14
**estate [8]** 31/9 31/11
31/15 31/19 149/8
149/23 152/22 153/9
**estimate [1]** 269/4
**evaluate [3]** 87/13
240/5 301/2
**even [33]** 7/23 23/15
36/1 38/17 42/19
42/24 52/10 60/24
72/6 72/25 74/9 85/9
98/16 104/24 109/23
115/2 116/14 120/20
121/20 121/21
121/24 148/18
158/17 158/18 160/7
162/2 167/16 175/1
190/11 271/2 340/23
341/13 342/6
**event [4]** 19/11 54/19
126/18 225/2
**events [4]** 257/5
257/7 257/13 257/18
**ever [35]** 25/4 25/16
38/18 78/7 102/24
127/25 130/7 138/12
140/17 141/9 143/7
143/7 159/15 162/12
164/23 167/15 169/8
169/13 169/22 170/3
170/11 178/17
178/20 178/24
179/15 183/15
221/24 270/5 274/10
274/14 276/17
321/17 323/16
323/19 342/17
**every [19]** 7/19 7/19
7/21 15/11 20/6
52/12 53/1 61/8
65/14 65/15 89/5
89/6 99/13 102/20
103/17 246/8 248/13
280/12 322/3
**everybody [7]** 1/3
5/15 71/11 120/19
131/3 184/23 238/14
**everybody's [2]** 54/7
327/19
**everyone [3]** 15/10
72/14 75/1
**everyone's [1]** 317/6
**everything [17]** 8/3
8/10 8/16 10/1 12/16
36/12 42/13 43/19
57/13 74/3 117/22
129/24 145/10
222/16 237/17
295/21 298/21
**evict [1]** 169/22
**eviction [2]** 173/12
173/16
**evidence [30]** 67/3
67/9 67/10 68/19

**E**

**evidence... [26]** 74/1
85/21 85/22 85/23
86/9 98/3 138/4
141/10 142/20
162/12 171/23
206/19 206/21
206/25 207/5 207/7
222/22 223/12
284/14 314/6 316/11
316/14 317/23
318/21 324/15
335/19
**evidentiary [4]** 16/7
334/19 338/11
338/14
**ex [1]** 336/1
**ex-boyfriend [1]** 136/1
**exact [11]** 25/6 26/15
27/4 54/12 70/16
80/18 98/13 114/11
120/14 294/7 294/10
**exactly [14]** 38/5
80/12 91/1 108/23
119/8 214/6 222/16
229/12 232/10
249/17 260/4 261/14
283/3 294/11
**exam [1]** 18/17
**examination [33]** 9/22
18/19 62/15 63/2
65/12 71/16 106/14
107/19 125/17 127/1
131/23 132/14 147/6
168/10 172/24 175/3
182/22 183/13
185/16 212/3 227/4
229/20 241/23
252/12 254/19 257/3
258/1 262/24 296/8
324/3 330/1 330/4
339/3
**examine [2]** 276/22
335/21
**examined [1]** 96/14
**example [17]** 59/14
70/17 101/19 205/3
239/25 247/24 249/2
266/12 271/14
271/17 280/7 284/9
289/20 290/2 292/20
325/8 341/23
**examples [1]** 112/6
**exceed [2]** 224/17
225/3
**exceeding [4]** 232/1
232/4 232/8 232/15
**excellencing [1]**
251/23
**except [1]** 120/19
**exception [5]** 335/16
337/9 338/8 342/22
342/25
**excess [1]** 230/8
**exchange [1]** 153/15
**exchanged [1]** 239/5
**exclude [2]** 245/19
326/23
**excluding [1]** 289/4

**exclusive [10]** 48/23
49/6 49/9 134/12
134/19 139/25 140/5
140/8 221/8 314/2
**exclusively [1]** 54/2
**exclusivity [1]** 136/24
**exculpating [1]** 50/20
**excuse [3]** 111/16
178/7 235/23
**excused [3]** 236/20
236/23 262/8
**execute [2]** 46/1
179/22
**executed [5]** 108/14
172/20 221/9 307/20
323/4
**executive [2]** 45/8
72/25
**exempt [1]** 339/23
**exercise [7]** 32/23
33/5 256/16 265/9
267/1 280/12 282/25
**exhibit [48]** 10/24
21/7 38/12 38/14
38/20 41/12 44/3
45/5 46/12 46/15
48/7 64/7 67/10
68/14 68/19 69/1
84/1 84/18 85/2 86/9
88/13 89/24 91/12
91/22 92/3 95/14
95/20 96/2 97/5
97/10 108/4 151/5
157/15 160/21
176/23 222/21
288/23 303/12 314/6
315/25 318/1 318/14
318/21 319/8 324/2
324/15 324/18 335/4
**Exhibit 260 [1]** 21/7
**Exhibit 306 [1]**
176/23
**Exhibit 308 [1]** 85/2
**Exhibit 309 [1]**
315/25
**Exhibit 317 [1]** 314/6
**Exhibit 342 [1]** 41/12
**Exhibit 344 [1]** 44/3
**Exhibit 362 [1]** 64/7
**Exhibit 364 [1]** 69/1
**Exhibit 379 [1]** 91/12
**Exhibit 400 [1]** 84/1
**Exhibit 448 [2]** 95/20
96/2
**Exhibit 483 [1]** 88/13
**Exhibit 494 [1]** 319/8
**Exhibit 495 [1]**
324/18
**Exhibit 500 [2]**
157/15 160/21
**Exhibit 563 [1]** 151/5
**Exhibit 805 [1]** 335/4
**exhibits [3]** 13/5
156/10 156/13
**exigency [3]** 6/14
7/10 8/24
**exist [5]** 3/6 77/10
77/13 138/17 252/17
**existence [3]** 137/19

138/13 323/19
**existing [4]** 76/17
165/12 197/7 251/24
**exotic [1]** 31/20
**expansive [2]** 113/18
121/8
**expect [2]** 113/13
128/12
**expected [1]** 70/13
**expenditures [1]**
28/14
**expense [10]** 191/8
191/11 191/12
195/19 197/16
201/22 202/2 204/15
205/22 205/23
**expenses [33]** 152/23
153/9 190/3 191/5
191/6 192/2 192/4
192/5 192/8 192/18
192/19 192/20
192/23 192/24 193/3
205/8 217/21 218/6
233/19 234/3 234/7
243/20 245/8 245/10
245/14 245/22 248/4
249/11 250/1 253/1
256/4 256/6 256/8
**experience [28]** 44/21
45/10 60/14 61/2
61/16 62/6 62/7
113/11 120/17
122/25 123/3 123/8
123/12 161/3 161/4
162/21 165/1 165/16
244/10 248/2 269/17
270/1 316/18 316/18
316/21 316/21
316/23 333/21
**expert [39]** 44/20
82/5 100/1 112/11
112/12 184/11 238/3
238/24 243/4 243/5
246/23 247/7 251/14
251/18 265/4 275/10
275/11 275/21 276/6
291/6 295/1 295/2
296/25 297/6 299/13
304/13 306/22 307/7
307/17 309/16
310/12 310/13
317/12 318/3 320/10
321/12 322/23 325/4
330/15
**expertise [1]** 101/1
**experts [9]** 44/22
119/20 120/20 121/11
124/20 240/16 276/3
279/25 282/6
**expire [1]** 323/12
**explain [8]** 59/17
234/20 248/24 264/1
266/16 275/17
278/23 285/10
**explained [1]** 276/14
**explaining [1]** 235/2
**explanation [3]** 253/3
253/10 253/13
**explode [1]** 94/19

**exploding [1]** 102/14
**explore [1]** 72/14
**exposing [1]** 27/2
**expound [1]** 321/22
**expressed [2]** 276/4
276/21
**expressly [3]** 275/4
275/16 276/12
**extended [1]** 323/10
**extent [11]** 21/10
69/19 75/13 139/14
140/21 153/1 157/5
244/15 273/11
315/21 342/16
**external [4]** 282/3
282/11 286/1 312/13
**extort [1]** 54/9
**extra [1]** 271/21
**extract [1]** 27/7
**extraordinary [3]**
245/15 246/19
249/21
**eye [3]** 110/24 256/2
257/10

**F**

**face [8]** 22/12 121/17
255/2 255/2 267/7
292/18 292/18 299/7
**Facebook [1]** 100/9
**facial [1]** 201/8
**facilities [5]** 102/24
140/4 191/25 192/3
192/23
**facility [4]** 60/21
191/11 191/22
228/11
**fact [47]** 37/5 39/14
39/16 47/5 63/24
64/25 75/4 78/13
97/23 99/17 100/4
101/9 101/12 126/12
138/19 138/21 139/1
142/17 154/7 155/8
158/17 212/13
243/19 246/8 253/7
259/9 261/13 274/9
275/3 275/14 276/16
277/3 289/23 290/15
298/17 306/12
307/18 310/16
311/11 311/12 323/3
326/17 326/20 328/4
333/15 343/14
343/16
**facts [8]** 98/2 114/16
136/1 136/13 145/17
272/22 278/5 341/19
**factually [2]** 78/20
78/25
**failed [1]** 32/21
**failing [1]** 116/22
**fair [19]** 20/8 33/2
37/22 59/4 104/12
118/13 120/2 127/19
142/25 149/8 150/14
165/7 187/9 187/10
188/23 197/20 252/1
255/1 269/20

**fairly [4]** 119/21
280/22 322/20 327/4
**faith [1]** 280/24
**fall [3]** 263/13 263/15
297/23
**falls [3]** 273/23
338/10 338/14
**false [4]** 22/9 22/12
78/25 299/11
**familiar [8]** 33/25
88/6 291/13 307/11
309/13 313/1 328/18
343/12
**families [1]** 100/17
**family [3]** 132/19
188/1 191/22
**famous [1]** 333/23
**far [7]** 6/5 24/5 61/11
110/12 207/12
216/11 266/18
**far-reaching [1]** 61/11
**faster [2]** 8/25 50/11
**fastest [2]** 8/19 12/21
**father [19]** 18/24
19/12 20/7 25/18
35/13 44/23 47/13
47/21 73/6 75/10
83/25 116/20 118/16
121/6 122/18 122/21
123/25 235/12
336/25
**father's [2]** 48/1 48/2
**favor [2]** 39/17 230/1
**features [4]** 7/14 68/7
68/10 327/24
**February [21]** 1/1
29/22 57/16 105/11
132/24 147/20 148/6
158/7 172/14 206/2
208/5 211/3 216/6
218/14 219/13 252/2
253/24 254/13
**February 10 [1]**
132/24
**February 11 [1]** 1/1
**February 14 [1]**
105/11
**February 2023 [2]**
206/2 219/13
**February 27 [8]** 29/22
57/16 147/20 148/6
158/7 252/2 253/24
254/13
**February 9 [2]** 208/5
211/3
**federal [9]** 63/18
64/11 65/2 68/21
68/22 69/3 69/4
84/19 307/18
**fee [16]** 61/7 120/1
190/6 190/8 190/12
190/18 194/12
194/16 224/20 225/4
226/10 226/16
226/22 230/19
232/13 289/24
**feed [1]** 122/8
**feel [4]** 119/3 175/8
194/12 345/6

# F

**fees [27]** 40/15 40/24 50/20 60/18 60/19 61/4 83/10 99/19 166/7 166/8 166/10 192/25 193/3 193/5 193/9 193/12 196/1 196/3 196/7 217/16 233/9 233/21 234/3 234/8 234/11 249/10 249/13
**felt [1]** 285/20
**fences [1]** 150/3
**fentanyl [1]** 76/6
**Ferrari [13]** 199/7 199/13 205/9 205/13 209/24 210/1 228/3 229/12 247/24 248/7 247/8 253/7 253/8
**fewer [1]** 246/1
**fiduciary [2]** 50/21 255/15
**fifteen [5]** 5/3 27/21 82/1 125/20 128/17
**fifth [2]** 84/17 345/15
**figure [6]** 9/21 10/13 11/3 201/24 270/21 345/9
**figured [1]** 130/1
**file [9]** 10/15 17/4 84/7 84/14 146/5 181/13 181/16 267/17 296/21
**filed [43]** 4/5 6/22 7/5 10/22 12/3 29/22 33/8 34/18 34/23 35/1 41/6 66/16 96/3 99/3 99/11 128/23 135/16 148/25 155/8 155/12 156/3 156/4 158/8 172/14 172/22 173/11 173/17 173/20 173/22 174/13 174/17 175/23 180/25 219/23 222/13 222/17 229/1 229/10 267/10 267/15 267/19 268/5 268/9
**files [3]** 94/12 94/13 94/13
**filing [17]** 2/14 5/19 7/3 8/1 10/24 12/1 29/11 30/18 57/15 98/19 99/7 135/13 148/15 155/20 172/6 229/15 268/10
**filings [7]** 2/12 2/24 3/6 5/20 20/1 130/6 216/1
**fill [1]** 95/8
**filled [2]** 13/7 94/8
**filters [10]** 283/5 287/20 287/21 287/23 289/5 302/7 302/9 302/13 302/18 311/12
**final [2]** 59/6 109/23
**finalizing [1]** 110/1

**finally [1]** 38/8
**finance [5]** 185/25 186/11 213/11 213/16 263/21
**finances [5]** 20/10 20/11 20/14 121/18 127/5
**financial [40]** 19/15 20/6 30/3 30/7 30/11 30/13 88/8 89/18 92/6 93/25 94/4 94/11 95/2 95/6 105/7 106/21 107/7 116/17 116/18 155/2 155/5 156/8 156/20 156/23 157/11 157/22 186/13 188/14 188/19 188/19 190/22 195/7 216/13 225/25 242/25 244/8 245/12 250/7 250/14 288/20
**financials [63]** 30/16 30/21 89/15 91/5 91/10 91/14 91/15 91/16 92/17 94/9 94/14 95/10 95/11 104/11 104/23 104/24 105/5 105/14 105/15 105/17 105/18 105/22 107/12 107/15 126/4 126/11 126/14 126/15 126/16 126/17 126/18 157/2 157/6 157/10 189/22 189/24 190/3 190/8 195/10 196/18 196/25 197/5 197/7 197/9 198/11 198/16 199/20 200/5 200/13 201/9 202/5 203/1 204/9 204/21 233/21 244/12 244/24 245/2 251/9 251/24 252/17 252/23 330/23
**find [14]** 4/25 5/14 15/2 26/7 108/13 130/4 198/17 200/14 201/8 228/22 283/1 283/4 312/10 316/14
**finder [1]** 320/25
**finders [3]** 320/13 321/11 323/20
**finding [3]** 66/18 198/24 271/16
**findings [1]** 81/20
**fine [13]** 4/9 16/14 16/20 24/5 26/23 131/24 140/14 147/13 214/19 223/10 295/8 295/13 317/5
**finish [13]** 17/15 63/11 76/3 76/4 125/15 219/5 239/10 241/6 255/21 261/1 345/1 345/1 345/18
**finished [2]** 110/3

131/18
**finishing [1]** 50/7
**fire [1]** 148/17
**fired [1]** 148/18
**firm [21]** 6/23 12/14 20/25 21/5 22/18 23/11 23/12 33/22 33/23 33/24 40/19 42/25 43/2 43/2 57/24 58/3 58/5 171/19 178/21 255/5 263/11
**firms [5]** 23/16 40/24 57/17 58/10 58/15
**first [49]** 2/14 11/8 17/1 18/12 21/17 22/14 24/16 45/2 55/4 57/19 59/3 96/22 99/25 107/6 108/10 108/10 132/11 151/7 162/1 176/2 177/16 177/24 178/5 178/9 185/11 212/22 219/22 223/2 223/16 223/20 230/24 239/8 241/20 262/21 265/15 282/13 285/10 288/7 288/14 296/11 306/24 314/8 314/9 316/1 317/9 318/5 319/17 325/19 330/3
**fiscal [8]** 190/10 193/9 194/1 194/13 233/22 234/7 234/8 234/11
**five [29]** 125/14 184/4 184/17 184/18 192/14 221/17 235/5 235/6 238/7 255/9 268/1 268/17 268/24 269/3 285/5 285/6 285/25 289/18 290/3 293/16 293/18 294/6 312/9 318/3 319/14 319/15 334/13 345/10 345/11
**fix [3]** 293/25 317/17 320/5
**fixed [9]** 46/18 193/17 197/13 198/14 200/22 200/25 205/14 210/14 223/11
**fixes [1]** 46/20
**fixing [1]** 117/1
**flag [2]** 51/13 252/25
**flame [1]** 263/6
**flooding [1]** 102/1
**floor [1]** 23/25
**Florida [60]** 33/9 33/9 34/4 35/7 36/4 36/7 37/18 38/1 38/16 39/7 43/9 43/24 45/19 46/4 46/7 46/11 46/17 47/1 47/3 57/14 105/12 117/17 117/22 117/24 118/1 118/13

127/24 128/1 128/7 176/10 186/20 186/23 186/24 187/8 187/23 188/5 188/8 188/12 188/19 189/25 190/11 190/20 191/4 193/3 193/6 193/11 193/13 193/25 194/10 195/4 195/12 196/2 201/18 206/3 206/12 217/25 242/10 243/13 243/16 247/8
**Florida's [9]** 191/9 193/8 194/15 195/7 198/16 200/13 204/20 210/15 230/2
**flow [4]** 230/2 230/14 230/23 230/24
**flows [1]** 260/10
**focus [5]** 170/15 196/12 214/5 243/18 307/22
**focused [1]** 295/7
**focusing [1]** 63/15
**folk [1]** 331/2
**folks [4]** 1/6 1/16 71/12 132/1
**follow [12]** 25/5 57/7 66/21 83/18 87/6 105/24 125/13 183/12 234/22 235/19 238/10 256/14
**follow-up [3]** 125/13 234/22 235/19
**follow-ups [1]** 183/12
**followed [4]** 23/12 200/11 233/23 288/10
**following [7]** 17/19 20/15 24/14 56/3 71/13 131/2 184/21
**follows [5]** 18/14 132/13 185/13 241/22 262/23
**foot [9]** 28/16 28/16 149/7 149/11 149/12 152/22 153/8 229/7 248/15
**force [1]** 112/18
**forecast [6]** 249/5 250/11 250/12 250/14 250/22 251/2
**forever [1]** 24/20
**forged [1]** 141/18
**form [8]** 25/15 45/3 45/4 137/2 146/13 153/1 161/6 324/1
**formal [2]** 62/7 141/5
**formation [3]** 41/15 194/23 195/6
**formed [4]** 42/7 246/14 301/16 301/17
**former [4]** 338/18 339/8 341/9 343/18
**forth [1]** 280/10
**forward [8]** 76/16

76/19 76/20 81/15 118/18 205/16 205/21 221/15
**found [7]** 59/21 86/23 266/13 282/18 289/17 316/12 328/5
**foundation [7]** 98/21 152/7 315/24 316/9 316/13 317/13 324/10
**foundational [3]** 115/16 157/21 340/24
**four [11]** 2/25 182/20 193/10 194/8 209/8 234/2 234/12 234/12 278/21 285/25 297/21
**fourteen [1]** 99/13
**fourth [2]** 201/18
**frame [3]** 20/23 89/19 210/10
**Franklin [1]** 2/3
**frankly [9]** 6/15 7/5 35/17 44/22 45/9 56/6 109/7 175/11 257/23
**free [8]** 59/25 60/3 102/23 138/5 152/22 153/9 153/18 204/7
**friend [2]** 344/4 344/6
**friends [8]** 191/22 279/1 279/5 285/13 312/21 313/10 314/3 328/8
**fries [1]** 267/24
**frightened [1]** 88/4
**front [7]** 8/9 135/9 145/23 224/23 226/18 319/9 324/18
**fulfill [1]** 251/25
**fulfilling [1]** 122/1
**full [8]** 21/10 21/11 75/13 88/25 123/11 131/22 294/1 333/17
**full-time [1]** 123/11
**fully [1]** 60/25
**function [6]** 80/19 80/19 228/19 332/22 340/15 342/5
**functional [3]** 109/13 266/20 332/21
**functionalities [1]** 7/15
**functionally [1]** 294/21
**functions [5]** 68/7 105/18 122/2 266/21 272/9
**fundamental [2]** 161/25 162/4
**fundamentally [1]** 259/6
**funds [2]** 40/10 40/17
**funny [1]** 228/6
**furthermore [2]** 292/9 292/10
**future [5]** 7/11 53/25 249/22 250/7 260/9

## G

**gander [1]** 218/2
**Gann [3]** 1/14 110/24 115/19
**gap [2]** 188/15 201/6
**garage [3]** 228/7 228/10 228/12
**garbage [2]** 253/16 253/17
**Garretson [6]** 2/3 276/21 277/2 296/10 318/8 334/8
**gatekeeper [2]** 340/15 342/5
**gather [1]** 311/19
**gathered [1]** 282/23
**gathering [1]** 244/7
**gave [17]** 49/14 49/18 49/22 50/3 85/8 85/16 109/4 111/2 121/8 122/9 124/18 124/22 145/11 152/25 153/11 158/1 175/9
**gears [1]** 172/21
**geez [1]** 112/5
**general [25]** 3/20 3/21 7/18 139/25 155/9 155/13 198/19 198/20 198/22 200/15 201/10 202/8 203/14 208/17 209/1 220/22 220/24 222/21 222/25 237/3 237/7 245/13 251/11 251/13 336/22
**generally [11]** 4/3 107/14 172/16 176/20 178/2 192/18 249/5 249/5 268/14 307/9 307/10
**generate [1]** 279/6
**generated [3]** 70/16 94/23 285/14
**generating [3]** 279/8 298/15 307/15
**generator [2]** 150/4 154/10
**geographic [1]** 284/17
**get [81]** 5/9 5/13 8/7 8/10 9/1 9/4 9/6 10/2 10/18 11/18 12/21 14/14 14/16 28/19 38/9 38/10 40/6 40/15 41/1 41/4 42/15 46/25 47/6 52/10 52/24 54/4 57/20 58/14 58/20 66/11 68/9 72/19 96/19 106/25 112/3 115/13 118/21 119/17 119/17 119/22 120/3 130/8 152/21 153/7 153/21 153/23 153/25 170/8 175/10 175/13 175/16 184/5 191/10 192/3 198/1 223/5 223/11 239/2 239/2

240/18 253/10 253/16 253/17 256/20 259/5 259/9 259/12 261/1 264/5 267/21 270/10 270/25 303/1 312/20 316/22 319/1 320/15 337/8 343/24 344/2 345/21
**gets [3]** 59/21 188/16 344/14
**getting [17]** 3/24 7/23 11/2 11/14 15/9 28/25 51/23 105/4 121/24 130/12 189/13 240/22 240/23 248/20 255/8 255/25 290/1
**give [33]** 4/24 7/8 7/11 8/20 9/14 15/19 18/5 28/12 71/11 112/5 112/11 126/13 131/11 132/4 150/21 157/24 158/25 175/9 178/2 185/4 188/24 197/21 214/17 231/22 233/15 241/13 256/14 262/14 267/13 318/13 319/3 335/2 337/3
**given [18]** 15/6 28/6 109/25 114/8 130/2 147/10 161/3 161/9 179/19 180/7 194/6 216/16 229/13 237/17 312/4 334/20 338/19 338/19
**giving [4]** 142/21 151/6 197/22 289/19
**GL [2]** 222/23 224/10
**glad [3]** 25/17 51/20 55/8
**glasses [2]** 312/24 312/25
**global [3]** 42/8 263/8 264/3
**globally [1]** 23/3
**GMC [1]** 152/14
**go [85]** 9/4 12/20 14/24 17/3 17/24 25/20 32/19 45/2 46/12 61/10 65/3 65/14 71/18 72/13 72/14 76/4 84/19 87/4 89/2 96/10 96/22 99/14 102/19 106/24 107/2 107/21 111/21 114/12 115/16 118/18 120/3 122/16 125/14 125/16 130/18 151/19 152/7 152/13 157/19 158/21 158/22 159/14 160/23 161/7 161/20 161/21 162/16 172/15 176/23 177/10 183/24

190/25 198/24 205/20 209/7 209/20 211/21 233/16 236/5 237/23 241/7 243/9 244/25 248/5 248/25 259/24 259/25 255/19 256/12 270/20 274/16 276/9 286/9 287/10 288/12 289/17 294/15 313/5 313/5 325/13 325/14 325/14 332/5 334/17 345/12
**goal [1]** 240/9
**goals [1]** 245/18
**goes [9]** 47/19 65/8 69/19 89/6 118/13 162/13 164/20 289/15 321/1
**going [171]** 3/4 3/14 4/23 6/15 6/19 8/22 9/2 9/6 9/12 9/15 9/22 12/18 12/23 13/15 13/24 14/22 14/23 16/22 16/22 17/3 21/14 21/16 22/13 31/23 31/24 51/21 55/4 58/6 62/25 63/1 63/5 65/12 65/13 65/14 66/25 67/8 69/15 69/17 69/20 72/22 76/16 76/19 80/21 83/3 89/8 89/10 89/13 89/16 98/5 103/22 103/23 104/4 104/4 104/6 104/7 105/15 106/19 107/24 107/25 109/5 109/22 111/19 111/20 111/22 112/21 113/1 113/15 117/9 118/21 119/9 119/12 119/12 139/19 147/11 152/2 155/17 155/23 156/14 156/15 156/18 157/7 161/16 168/14 168/17 168/18 170/7 171/8 171/9 171/13 172/8 172/15 173/25 174/6 175/11 184/11 184/12 186/22 190/21 192/16 199/5 199/24 205/16 205/21 215/3 217/22 221/14 222/24 237/25 238/4 238/20 239/3 239/22 240/14 240/17 250/19 250/21 251/3 253/17 254/8 255/22 256/13 258/23 259/3 259/5 259/8 259/14 259/16 260/13 261/1 261/3 266/5 267/12 267/22 270/17 270/23 274/6 274/7 275/17 276/8

280/12 281/6 281/7 281/8 294/20 295/11 306/2 312/11 312/20 313/4 320/18 320/20 320/24 321/25 322/22 327/19 327/19 334/13 337/9 337/15 340/16 342/5 345/1 345/8 345/12 345/13 345/14 345/17 345/18 345/20 345/21 345/23
**golly [1]** 171/9
**gone [7]** 103/12 214/5 258/17 265/11 268/1 283/10 317/18
**gonig [1]** 260/21
**good [31]** 1/18 1/25 2/20 9/22 10/9 18/21 57/19 62/17 101/25 104/6 112/3 118/9 119/5 119/6 125/20 132/16 132/18 147/8 164/1 168/12 185/20 212/6 218/1 218/1 242/2 271/8 277/9 280/24 296/10 296/13 296/14
**goods [5]** 192/21 233/18 233/23 233/24 265/18
**Google [1]** 24/21
**goose [1]** 218/1
**gospel [1]** 248/9
**got [43]** 1/19 2/14 8/18 11/10 12/1 12/10 16/17 21/5 26/16 38/9 38/9 38/10 64/1 70/14 87/11 91/3 95/10 99/12 102/23 102/23 103/2 105/7 105/19 113/12 114/20 114/21 122/12 163/25 171/1 171/4 174/20 235/22 253/8 255/13 259/1 282/4 283/19 284/1 285/4 285/5 287/22 302/20 342/24
**gotten [3]** 151/22 332/23 343/11
**governing [1]** 43/23
**grant [1]** 302/24
**granted [1]** 55/6
**great [4]** 15/22 102/1 122/24 271/17
**greater [2]** 106/23 111/17
**Greg [1]** 102/2
**Griesing [1]** 58/5
**grievance [1]** 72/9
**grim [1]** 122/9
**gross [5]** 51/21 310/6 310/18 310/22 311/1
**ground [1]** 83/4
**grounds [3]** 64/16 89/11 148/7

**group [5]** 161/19 282/23 287/25 302/16 333/17
**grow [1]** 94/18
**growing [5]** 70/8 100/2 100/4 100/4 102/14
**growth [2]** 7/14 250/20
**guarantee [7]** 119/12 123/19 123/22 123/24 123/25 124/2 124/9
**guess [32]** 2/15 5/19 12/14 31/21 32/17 35/9 44/9 45/22 46/21 47/22 48/6 50/1 51/10 57/22 58/2 60/15 64/5 67/20 79/25 81/2 90/4 110/20 115/25 117/7 119/23 130/3 136/3 136/15 157/5 203/12 291/11 292/20
**guidance [3]** 137/10 266/18 312/5
**Gunning [28]** 97/23 98/9 184/4 184/13 185/2 185/10 185/20 185/22 189/8 189/19 207/21 210/24 211/23 212/6 215/2 215/13 220/22 223/21 224/1 224/22 227/2 227/5 228/13 229/22 231/10 232/25 234/9 258/16
**Gunning's [1]** 214/23
**gutting [1]** 60/11
**guy [2]** 87/24 336/5
**guys [2]** 59/12 172/10

## H

**half [17]** 15/17 59/9 59/12 61/5 71/17 90/13 99/12 99/19 102/3 128/24 146/8 150/23 150/24 150/25 294/14 345/7 345/10
**halving [1]** 151/25
**hand [6]** 18/2 182/11 201/13 208/2 208/11 332/25
**handbook [2]** 215/7 215/8
**handbook's [1]** 214/5
**handed [4]** 214/21 214/22 227/8 319/7
**handle [2]** 9/2 15/3
**handled [1]** 217/1
**hands [2]** 213/25 214/2
**happen [8]** 15/12 15/24 60/23 102/13 204/16 232/8 293/20 337/16
**happened [8]** 26/9

**H**
**happened... [7]** 26/11
71/23 100/20 118/12
148/10 172/22 176/5
**happening [2]** 15/2
120/11
**happy [6]** 54/8 72/14
131/13 206/22
305/20 319/2
**harassment [1]** 26/8
**hard [4]** 122/5 160/4
319/1 319/3
**harder [2]** 244/1
246/12
**hardest [1]** 266/1
**hardware [4]** 62/9
72/11 191/17 192/8
**Hardwear [1]** 191/14
**Hardy's [1]** 6/23
**harming [1]** 249/13
**hat [1]** 117/9
**hats [1]** 117/8
**head [6]** 16/21 79/25
157/8 171/21 200/18
301/20
**headers [1]** 13/5
**health [9]** 149/2
169/10 169/13 173/6
188/19 195/7 225/21
226/3 229/23
**hear [7]** 9/5 10/4
13/18 21/2 170/21
342/5 342/19
**heard [41]** 5/24 10/6
13/1 113/10 119/14
120/21 124/20
129/14 131/4 134/15
134/16 142/9 177/16
177/23 177/25 178/6
178/10 180/9 183/15
202/1 212/19 218/14
218/17 219/9 219/25
221/23 245/23 247/5
258/14 266/11 273/4
273/7 277/22 279/12
308/18 308/25 309/2
309/3 315/18 327/23
344/20
**hearing [15]** 6/1
14/23 15/3 16/7
17/15 53/12 125/7
128/18 155/18
156/16 161/24
176/12 276/23
337/22 338/20
**hearsay [8]** 112/14
139/4 335/7 335/15
337/3 338/8 338/15
342/22
**heavily [1]** 287/19
**heavy [1]** 316/21
**heck [1]** 8/18
**held [10]** 32/7 43/13
43/14 43/14 43/15
134/10 139/25 140/7
244/15 245/9
**Hello [2]** 147/9
168/13
**help [13]** 38/5 44/22
131/15 154/6 188/20
189/14 197/17
233/16 258/21
272/15 273/17 285/9
338/7
**helped [1]** 121/15
**helpful [1]** 3/25
**helping [1]** 143/20
**Henderson [1]** 57/24
**hereto [2]** 45/4 45/4
**hesitant [1]** 7/7
**hey [1]** 38/8
**Hi [2]** 185/18 185/19
**hiccup [2]** 238/25
238/25
**high [6]** 123/11
150/13 259/12
266/16 279/23
283/24
**higher [2]** 186/7
226/10
**highest [1]** 242/16
**highlighted [3]** 291/18
295/13 296/3
**Hill [1]** 57/24
**Hillsley [13]** 1/5 1/8
5/19 13/12 18/15
126/24 147/4 182/19
184/24 296/6 334/6
344/4 344/6
**hip [1]** 123/9
**hire [8]** 80/24 82/21
120/12 120/13 154/5
154/6 159/7 159/15
**hired [8]** 77/25 78/12
85/8 115/2 163/10
163/15 178/20
258/12
**hiring [2]** 119/10
178/17
**historical [3]** 244/8
250/7 250/9
**history [3]** 28/10
208/4 277/23
**HLFIP [186]** 1/16
1/19 7/12 7/16 7/16
30/25 40/16 53/22
54/2 55/18 56/1
57/22 63/11 63/14
64/13 67/14 72/1
72/16 72/24 74/12
77/16 78/21 78/23
79/5 79/5 79/16 80/6
81/3 81/4 83/1 83/14
83/23 84/11 84/20
87/20 87/22 90/23
92/5 92/23 93/2 93/3
94/5 94/21 97/11
98/25 99/1 99/6 99/8
101/10 102/4 102/11
103/23 104/2 104/3
105/22 106/22 110/5
115/2 115/3 116/11
116/15 117/24 118/6
118/7 118/10 118/11
120/13 126/5 128/19
132/17 133/19
133/22 133/24 134/2
134/5 134/10 134/13
134/20 134/20 135/2
136/25 137/16
137/19 138/5 138/9
139/2 139/12 139/22
140/1 140/8 143/21
144/13 164/9 165/22
166/5 177/13 178/25
179/4 179/8 179/12
179/16 184/8 187/14
196/3 196/7 216/19
216/20 216/22 217/1
217/9 217/20 218/5
218/8 218/12 218/16
218/21 218/24
219/13 219/15
219/20 220/15
220/19 221/2 222/25
223/17 223/19
225/18 230/15
230/18 230/22
238/17 238/24
239/18 262/11
266/11 272/25
276/13 277/13
277/23 277/25 279/4
282/19 290/13
290/16 291/9 295/22
298/3 298/6 298/7
304/21 305/20 306/3
307/8 308/2 308/3
308/10 327/6 331/10
332/23 333/18 335/3
335/6 335/10 335/11
335/13 336/3 337/9
337/23 337/23
337/25 338/2 339/8
339/11 339/15
339/19 340/19 341/3
341/4 341/15 341/23
342/12 342/13
342/18 343/20
343/21 344/16
**HLFIP Holding [7]**
84/11 84/20 117/24
118/7 177/13 187/14
298/3
**HLFIP IP [1]** 143/21
**HLFIP's [18]** 72/1
72/8 72/21 72/23
78/7 87/15 100/24
110/25 116/18
136/19 146/12
146/16 146/23 217/4
217/5 217/13 217/16
219/11
**Hock [1]** 152/16
**Hogan [1]** 1/11
**hold [10]** 4/9 80/21
133/25 134/2 219/5
223/4 223/6 268/11
337/8 343/8
**holder [2]** 27/17
208/14
**holding [49]** 25/24
27/14 34/4 35/8 41/9
41/16 43/10 43/13
43/24 44/6 46/3 46/4
46/10 46/17 56/14
56/15 84/11 84/20
96/8 117/17 117/18
117/24 118/1 118/2
118/7 121/3 121/4
121/5 128/1 128/4
168/22 177/13
177/14 177/17
178/10 181/5 183/16
186/23 187/8 187/14
187/24 188/7 188/12
188/17 195/13
243/12 298/3 342/12
342/13
**Holdings [1]** 26/25
**holds [2]** 140/5
306/13
**home [14]** 123/10
149/17 149/17
173/10 173/10
193/19 193/21
193/21 233/11
234/16 235/7 235/14
235/17 236/9
**honest [2]** 43/25
84/25
**honestly [2]** 88/12
124/25
**honor [186]** 1/7 1/15
1/18 1/23 1/25 2/11
2/20 4/1 5/6 4/8
6/10 6/19 6/21 7/8
8/3 8/8 8/11 9/25
10/2 10/7 10/9 11/7
12/13 13/3 13/9
13/21 14/8 14/21
15/6 16/1 16/11
16/15 17/10 18/16
58/16 62/23 64/15
65/7 65/11 66/25
68/13 69/16 71/3
76/2 82/8 85/20 86/5
89/12 98/3 98/20
112/12 113/9 113/22
114/3 114/18
126/25 129/8 129/10
129/17 130/10
130/16 131/8 131/9
131/14 139/3 139/13
140/10 141/24
142/19 146/1 147/3
147/5 147/15 153/2
155/15 155/21 157/4
157/12 161/10
161/14 161/22 162/9
165/24 166/1 167/20
167/23 168/9 170/5
172/18 173/25 174/3
174/8 174/11 174/20
175/2 175/18 177/19
177/21 177/23
182/21 183/21 184/3
184/10 184/19 185/1
189/12 190/16 197/2
198/2 202/23 206/20
207/14 207/19 212/2
214/15 217/23
223/11 223/13
229/19 231/6 231/17
233/5 233/17 235/21
235/23 236/12
236/17 236/19
236/21 237/8 237/20
238/2 238/17 240/10
240/19 241/1 241/8
241/10 243/1 252/10
256/24 260/19 262/3
262/5 262/11 275/9
276/10 276/25
277/10 280/18
281/11 286/23 293/5
295/10 295/11 296/7
296/9 317/4 317/25
323/25 324/9 329/20
329/25 334/3 334/7
334/9 334/18 335/14
335/17 336/21 337/5
337/11 338/5 338/9
338/16 338/17
338/18 339/5 339/12
339/23 340/6 342/1
342/7 343/1 344/8
344/12
**Honor's [1]** 155/18
**hoops [1]** 12/16
**hope [2]** 50/7 337/14
**hoping [5]** 3/16 14/11
71/17 133/11 286/16
**host [1]** 155/5
**hour [5]** 71/17 130/19
130/21 130/21 345/7
**hours [11]** 71/11
240/9 277/22 298/24
299/2 308/12 309/4
345/4 345/5 345/7
345/10
**house [26]** 16/17
110/11 110/19
110/23 121/20 149/4
149/7 149/9 149/11
149/12 149/13
149/19 149/23
152/22 153/8 153/18
153/22 154/2 154/15
169/17 169/20
169/23 173/14
173/17 235/25
248/16
**HR [1]** 215/6
**huge [1]** 9/12
**huh [8]** 136/2 146/21
168/16 223/25
273/10 285/8 293/20
331/20
**human [1]** 342/20
**hundred [7]** 97/25
98/11 100/23 100/25
101/14 152/20 152/7
**hundreds [7]** 73/13
94/23 94/24 95/7
103/4 125/25 265/1
**hung [2]** 21/1 171/6
**hurricane [1]** 228/12
**husband [6]** 138/12
138/24 142/25
143/20 159/18
159/21
**hype [1]** 285/14
**hypothetical [2]** 248/5
248/14

**I**

**I'll [1]** 14/10
**ID [2]** 237/13 237/14
**ID'd [1]** 237/19
**ID's [1]** 237/15
**ID591 [1]** 237/23
**idea [3]** 137/9 315/1
325/22
**ideas [5]** 163/18
163/22 163/25 164/8
309/8
**identified [14]** 10/23
39/6 74/15 115/6
115/17 254/3 254/5
256/17 272/1 274/20
278/21 282/14
283/10 304/4
**identifies [2]** 48/22
90/13
**identify [14]** 3/17
79/22 90/23 97/11
114/22 181/23
228/19 245/18 251/8
271/13 272/5 277/20
318/11 338/7
**identifying [3]** 246/16
248/3 306/2
**IE [1]** 80/16
**ignore [1]** 195/17
**ignored [1]** 195/15
**ignoring [1]** 257/7
**image [2]** 197/17
198/4
**imagine [1]** 247/2
**immaterial [2]** 342/23
342/24
**immediate [3]** 10/12
163/3 163/8
**immediately [4]** 19/3
24/14 56/9 233/22
**impact [12]** 59/15
64/21 163/3 163/8
165/23 249/8 250/4
321/19 322/19 329/2
330/24 331/15
**impacted [2]** 195/8
284/23
**impacts [1]** 289/24
**impair [2]** 250/21
252/4
**impeach [1]** 152/1
**impeaching [1]** 157/7
**impeachment [5]**
151/21 151/23
161/11 231/14
344/13
**implement [1]** 255/24
**implementation [2]**
224/19 225/4
**implemented [1]**
65/20
**implementing [1]** 64/2
**implies [1]** 155/17
**important [3]** 3/2
172/1 315/17
**impose [3]** 69/15
99/23 275/18
**imposed [2]** 69/25
103/19

**improper [3]** 151/20
161/10 260/22
**improperly [1]** 12/4
**improved [1]** 194/13
**impute [2]** 275/18
276/18
**inaccurate [1]** 73/25
**inadvertently [1]**
115/1
**Inc [27]** 35/8 43/9
43/13 43/24 44/6
46/17 56/14 84/11
84/20 96/8 117/17
117/21 117/24 118/1
118/6 118/10 128/1
128/4 168/22 181/5
186/23 187/8 208/25
212/11 212/13 242/9
243/13
**incapacity [1]** 336/22
**include [15]** 81/11
93/2 95/4 95/22
97/20 99/19 105/22
156/7 214/2 215/8
254/10 254/10
265/20 284/19
326/25
**included [18]** 31/13
31/17 45/18 49/18
50/19 93/3 94/3 95/1
104/10 129/6 150/2
154/10 191/19 209/2
285/16 289/1 300/25
322/10
**includes [9]** 7/19
95/22 131/22 155/1
191/19 266/20
266/22 326/15 327/2
**including [16]** 24/25
28/10 31/13 52/3
60/5 72/12 74/3 74/3
74/4 74/4 74/5 75/1
75/25 85/6 102/11
282/14
**inclusion [2]** 92/22
209/4
**income [16]** 74/12
91/7 91/8 93/6
189/21 194/11
194/16 195/18
205/23 234/18
234/24 235/5 244/5
245/15 249/6 260/7
**incoming [1]** 328/20
**incorporated [5]**
107/12 188/2 188/10
188/10 195/13
**incorrect [3]** 153/16
153/17 297/13
**incorrectly [1]** 136/9
**increase [6]** 52/25
53/2 59/15 59/19
60/1 260/13
**increased [4]** 192/10
192/15 264/19
294/12
**incredibly [1]** 13/7
**incurred [2]** 249/13
250/1

**indemnification [2]**
51/7 51/14
**indemnify [1]** 51/12
**indemnifying [1]**
50/20
**independence [1]**
119/17
**independent [12]**
110/19 113/24
119/11 145/14
281/19 281/21 297/4
297/18 299/19 306/7
307/1 311/5
**indicate [4]** 243/24
245/24 246/9 246/12
**indicated [3]** 171/2
208/22 336/24
**indicating [1]** 205/5
**indication [2]** 258/7
310/9
**indicative [1]** 276/12
**individual [6]** 96/12
128/3 200/7 247/8
343/7 343/22
**individuals [1]** 208/14
**industrial [1]** 62/5
**industries [3]** 282/13
282/15 315/15
**industry [2]** 59/21
112/4 112/7 113/11
128/16 161/4 250/5
278/13 278/15
282/16 282/21
285/13 285/20
285/23 286/10
306/24 310/3 311/25
315/14 315/18 328/8
**inexperienced [1]**
26/6
**influence [3]** 274/10
275/5 290/17
**influx [1]** 193/14
**information [39]** 3/18
5/22 7/9 7/22 13/8
25/3 25/4 77/6 78/1
80/14 95/9 96/14
96/15 96/17 109/5
109/9 113/12 113/24
114/15 114/20
126/13 154/22
154/25 155/2 155/5
156/21 156/23 164/3
164/5 187/18 198/17
200/14 216/13 217/4
256/22 299/20 301/2
302/25 312/17
**informed [3]** 16/2
83/9 293/6
**inherently [1]** 49/17
**inhouse [1]** 110/15
**initial [6]** 187/22
242/13 260/18
260/18 283/18 338/3
**injunction [1]** 148/21
**injure [2]** 21/24 22/11
**inmate [6]** 76/22
76/22 76/24 77/3
192/13 282/22
**inmates [3]** 191/19

191/25 192/14
**inner [1]** 247/9
**innovation [1]** 78/14
**input [1]** 20/3
**insertion [1]** 295/18
**inside [1]** 222/16
**insider [2]** 244/25
246/18
**insiders [2]** 247/14
247/21
**insolvency [7]** 231/1
231/4 231/7 231/22
231/25 232/15
232/23
**insolvent [5]** 87/18
87/19 226/7 226/23
232/14
**inspect [4]** 36/14
36/20 250/20 250/21
**install [5]** 99/16
102/16 102/24
154/10 191/18
**installations [1]** 230/7
**instance [3]** 100/8
100/25 330/7
**instances [3]** 60/8
274/14 342/8
**instant [2]** 59/9 61/5
**instantly [1]** 59/9
**instead [7]** 28/25
47/25 102/14 102/16
130/17 276/24 319/4
**instruct [2]** 82/18
94/25
**instructed [2]** 78/14
126/15
**instruction [1]** 58/17
**insubstantial [1]**
111/12
**insurance [2]** 186/16
205/7
**intangible [5]** 134/21
135/2 300/12 306/13
333/25
**intangibles [4]** 333/10
333/18 333/23 334/1
**IntangibleSpring [1]**
300/16
**integrated [1]** 191/24
**intellectual [45]** 53/7
53/11 55/25 63/10
64/18 65/4 69/11
71/21 79/10 80/10
81/12 82/20 90/3
90/23 91/1 91/15
93/22 104/11 114/7
134/3 140/19 141/1
181/21 181/25 190/6
190/7 214/3 215/9
217/13 218/14
219/11 219/19 221/8
265/22 265/25 266/1
266/3 271/6 272/13
282/19 302/5 308/17
310/2 342/9 342/14
**intend [2]** 83/17
122/16
**intent [8]** 27/6 27/6
126/6 126/9 155/17

155/17 227/14
227/17
**intention [2]** 119/15
155/19
**intentionally [7]**
24/20 287/22 325/7
325/10 325/20 326/4
326/9
**inter [1]** 242/2
**interaction [1]** 34/1
**intercompany [5]**
217/17 221/8 265/17
265/21 270/17
**interest [36]** 29/20
32/12 32/23 33/2
35/17 35/18 35/20
118/5 126/5 128/5
167/11 170/12 190/4
190/5 190/12 194/13
194/16 196/1 221/12
224/8 224/8 230/16
251/3 255/17 279/7
330/5 338/25 339/1
339/14 340/3 340/7
340/11 341/11
341/12 344/1 344/9
**interested [1]** 249/23
**interests [19]** 33/6
35/23 80/9 82/7
82/19 92/12 147/24
190/7 196/4 196/8
221/17 221/20
247/19 339/9 340/8
340/11 340/12
340/13 341/17
**interim [2]** 3/16
126/16
**internal [11]** 255/13
256/2 278/9 278/11
278/22 281/15
281/17 284/5 286/15
294/10 300/8
**interplay [1]** 338/11
**interquartile [7]** 111/3
274/19 294/2 294/3
301/8 301/11 301/12
**interrupt [1]** 255/20
**interrupted [1]** 175/17
**interrupting [1]**
112/10
**interview [2]** 163/14
242/14
**interviewed [4]** 82/13
159/15 163/13
281/15
**introduce [3]** 1/16
168/14 185/21
**introduced [2]** 237/7
237/10
**invading [1]** 115/13
**invalid [1]** 66/5
**invalidate [1]** 70/3
**invalidated [15]** 63/17
63/22 64/1 64/20
67/24 70/2 70/12
70/12 70/20 144/1
144/10 144/21
307/19 307/22
307/23

**I**
invalidation [4] 64/23
69/13 70/22 71/21
inverted [1] 118/7
invest [2] 193/16
343/4
investigated [1]
317/12
investigation [1]
113/7
investment [1] 193/20
investor [2] 339/8
339/10
involve [4] 82/2
113/12 172/16 279/5
involved [23] 38/8
81/25 83/6 83/25
110/21 112/4 115/18
115/19 115/23
121/13 121/24 158/3
158/10 162/1 165/3
229/15 264/7 264/16
270/2 303/15 306/23
306/23 307/8
involves [5] 134/20
244/5 264/1 264/5
265/7
involving [4] 50/4
180/22 217/13 300/9
IP [72] 55/18 63/14
66/12 76/7 76/19
77/10 77/13 85/7
91/3 91/17 92/10
95/3 97/15 134/5
134/6 134/7 134/9
134/10 134/24 137/8
140/1 140/8 143/21
144/13 146/12
146/16 146/17
146/23 164/3 164/5
176/15 179/10
179/23 181/25 190/4
190/5 190/12 190/18
193/12 194/12
194/16 196/1 196/3
196/7 218/20 224/20
225/4 226/6 226/10
226/16 226/22
226/22 232/12
232/13 254/6 259/5
259/12 277/25 279/5
279/6 279/11 282/17
286/10 295/23
306/23 307/5 307/21
309/10 310/6 315/22
329/3 343/17
IP's [1] 331/6
IRP [1] 89/5
irrelevant [3] 89/10
217/23 315/10
IRS [26] 82/25 83/13
83/16 87/6 87/11
104/3 125/5 125/21
232/8 267/7 267/11
267/17 267/21
267/25 268/7 268/15
268/16 268/18 269/1
280/10 282/8 292/17
294/5 332/24 333/1

333/25
issue [47] 5/13 5/17
6/17 9/2 10/11 10/13
16/23 16/24 17/1
53/12 56/18 57/13
64/18 73/21 83/14
115/7 116/25 126/12
136/5 161/20 162/4
174/25 176/7 184/15
190/17 217/23
234/21 234/21
235/20 237/15 254/7
268/22 276/11 277/4
289/14 301/19
306/13 310/7 315/3
316/6 318/6 320/4
334/19 341/22 342/6
342/20 343/15
issued [8] 4/20 66/15
67/22 68/12 69/6
79/8 93/24 109/23
issues [12] 4/15 15/20
28/19 40/25 62/13
175/6 175/12 230/24
238/24 254/6 260/21
340/24
issuing [1] 337/12
item [2] 24/23 249/22
items [4] 228/9
228/14 228/24
308/24
iting [1] 195/16

**J**
Jacksonville [1]
242/10
jail [2] 99/14 122/14
jails [1] 102/17
James [6] 35/13
35/23 132/19 199/14
199/18 339/18
Janice [84] 2/1 5/20
6/22 7/6 8/9 10/5
13/22 13/24 13/25
14/12 17/4 22/17
22/19 22/21 22/25
23/8 23/14 25/5
25/16 25/19 25/23
26/24 27/5 27/9
27/14 27/22 27/24
28/2 28/6 28/10 31/8
32/15 32/21 40/8
42/19 42/22 42/22
42/24 43/4 43/21
47/4 54/10 54/19
55/2 55/7 55/16 56/7
56/12 56/22 56/23
72/22 75/1 81/21
101/19 120/2 128/22
131/20 132/10
147/11 147/14
149/16 151/5 151/6
172/11 174/23
193/23 202/2 208/15
212/9 216/7 216/9
216/12 216/17 231/3
235/18 239/10
251/18 259/3 259/11
275/1 275/13 276/10

296/10 339/16
Janice Logan [20] 2/1
6/22 7/6 8/9 147/14
149/16 151/6 193/23
208/15 212/9 216/7
216/9 216/12 231/3
235/18 251/18 259/3
259/11 296/10
339/16
Janice Logan's [10]
5/20 10/5 13/22
13/24 13/25 14/12
17/4 128/22 216/17
275/13
Janice's [13] 40/6
41/1 41/4 42/15
46/25 47/6 52/24
54/4 54/17 58/14
81/24 104/1 127/21
January [18] 20/20
22/1 99/17 157/1
157/16 170/17
183/19 202/12 204/1
214/10 219/18 223/3
223/21 225/9 225/17
296/25 297/4 297/6
January $6.2 million
[1] 99/17
January 1 [2] 202/12
204/1
January 20 [1] 22/1
January 2023 [1]
20/20
January 21 [2] 157/1
157/16
January 27 [2] 219/18
225/9
January 27th [1]
214/10
January 31 [3] 223/3
223/21 297/6
January 8 [2] 296/25
297/4
jewel [1] 266/4
Jignasha [1] 124/17
Jigs [1] 101/2
Jim [76] 18/24 22/4
24/17 27/18 27/20
28/24 54/6 54/8
73/19 74/11 75/1
76/15 79/9 81/16
121/10 121/11 127/3
127/12 128/2 132/22
138/12 138/19
138/25 139/10
140/11 140/17
140/25 141/16
141/20 142/12
142/17 143/1 143/9
158/17 158/23
165/18 165/19 168/1
168/2 168/19 168/21
169/6 169/10 169/16
169/22 169/23
169/25 170/4 170/10
182/3 182/9 193/22
200/10 208/15
208/19 213/7 215/14
215/16 215/19

215/22 215/25
235/11 241/3 254/22
334/13 334/20 335/4
337/6 339/23 340/7
341/4 343/7 343/21
344/9 344/16 344/23
Jim Logan [32] 18/24
27/18 27/20 79/9
121/10 121/11
141/20 158/17
158/23 168/1 182/3
182/9 193/22 208/15
208/19 215/14
215/16 215/19
215/22 235/11 241/3
254/22 334/13
334/20 339/23 340/7
341/4 343/7 343/21
344/9 344/16 344/23
Jim Logan's [5] 127/3
140/11 168/2 213/7
335/4
Jim's [6] 20/15
127/19 139/4 141/15
141/17 169/8
job [7] 3/20 91/18
119/21 119/23 154/1
163/11 163/15
jobs [1] 103/9
John [2] 2/3 296/9
Johnson [21] 2/7 2/8
16/21 106/8 115/8
129/11 181/18
183/22 207/2 227/4
227/6 231/4 240/25
247/6 254/18 257/25
258/22 329/22
334/10 343/10
343/12
join [3] 186/1 238/18
283/16
joined [3] 213/24
215/7 217/11
joining [1] 1/12
joint [1] 283/15
Jon [121] 17/23 22/4
24/14 24/17 25/11
74/23 76/15 101/19
115/22 119/7 131/18
133/6 133/22 137/5
137/8 137/12 140/18
141/1 148/3 148/7
148/12 150/22
154/20 154/25 158/8
160/11 162/11
162/20 163/1 163/6
165/3 165/6 165/9
165/11 165/17
165/22 166/5 166/13
166/18 169/8 169/13
169/22 170/3 170/11
171/20 172/5 172/12
173/10 174/23
175/21 176/2 176/7
177/7 177/12 178/13
178/17 178/20
178/24 179/18
179/22 180/3 180/9
180/24 181/3 181/7

181/10 181/12
181/15 182/4 182/9
182/25 183/3 183/19
187/12 198/12
199/16 199/22
200/24 208/15
209/14 210/11
210/14 210/16 211/2
211/4 213/18 213/20
216/3 216/16 216/24
220/1 221/5 221/24
222/9 222/11 222/11
222/13 227/17
227/20 227/25 228/7
228/10 228/12 229/1
229/10 229/13
235/12 239/18
259/12 277/21
278/16 281/15
290/15 299/2 299/3
307/3 308/5 308/13
309/3 309/11 315/19
Jon Logan [51] 24/17
115/22 154/25 158/8
162/11 162/20 163/1
163/6 165/17 165/22
166/5 166/13 166/18
174/23 177/7 178/13
178/17 178/20 182/4
182/9 182/25 183/3
187/12 199/16
208/15 209/14
210/11 211/4 213/18
213/20 216/3 216/16
216/24 220/1 221/5
221/24 222/13
227/20 227/25 229/1
229/10 277/21
278/16 290/15 299/2
299/3 307/3 308/5
308/13 309/3 315/19
Jon Logan's [8]
210/16 211/2 228/7
228/10 228/12
229/13 235/12
309/11
Jon's [4] 22/10 134/3
227/14 251/21
Jonathan [13] 1/9
1/14 18/11 163/18
163/23 164/2 164/7
164/10 164/13
164/20 165/11
298/12 339/18
journal [12] 198/18
198/19 198/20
198/21 200/15
201/10 201/13 202/8
245/13 245/13
251/1 251/13
judge [28] 8/20 9/1
9/1 9/4 9/20 9/20
12/23 14/4 15/3
64/17 106/16 107/17
110/24 125/10 130/4
130/5 130/8 131/5
131/10 156/14
164/17 168/6 207/4
228/13 229/17

**J**

**judge... [3]** 257/10 259/20 260/2

**judge's [2]** 13/25 14/1

**judges [1]** 89/17

**judgments [1]** 72/13

**judicial [2]** 131/11 162/6

**July [15]** 88/11 88/11 89/14 89/25 90/1 94/4 104/23 105/16 105/20 105/21 107/11 151/7 151/13 152/4 152/8

**July 14 [4]** 151/7 151/13 152/4 152/8

**July 2 [1]** 107/11

**July 26 [4]** 88/11 89/14 89/25 90/1

**jump [2]** 12/15 107/25

**juncture [1]** 240/24

**June [12]** 51/19 52/18 52/18 148/17 173/3 173/4 173/5 199/8 202/18 203/8 204/3 236/3

**June 14 [1]** 199/8

**junior [1]** 242/4

**just [166]** 2/10 3/20 5/25 6/4 6/11 8/17 9/2 11/8 12/9 13/11 16/2 16/24 17/7 21/9 22/2 22/5 22/12 26/20 27/2 27/19 31/21 37/4 39/14 39/18 40/21 43/12 45/6 46/8 46/13 47/5 50/14 51/20 57/4 59/11 59/12 61/6 61/16 62/6 62/7 62/24 72/15 78/16 78/20 78/25 78/25 83/9 83/16 85/20 88/5 89/5 91/13 91/24 93/5 93/15 94/11 99/17 101/1 102/19 103/7 105/13 107/5 107/7 111/10 114/3 114/18 114/19 118/11 118/25 119/19 120/3 120/14 121/18 121/23 123/12 124/16 126/16 131/11 134/16 134/23 135/4 141/5 141/24 142/22 143/20 145/2 145/3 145/22 148/13 152/25 153/11 155/16 157/10 159/14 160/14 160/23 163/12 170/8 171/6 175/10 176/19 177/19 179/2 181/2 182/20 192/2 195/15 196/15 203/1 203/23 204/18 207/10 208/1 210/2 214/4 214/22

222/1 223/9 229/22 231/1 232/3 234/20 237/1 240/18 247/18 247/22 248/2 248/2 252/15 253/6 254/21 256/1 256/21 263/17 266/10 268/22 270/15 273/16 274/23 274/24 278/1 279/23 282/25 283/13 286/21 287/15 287/18 288/9 291/18 292/20 294/3 294/15 294/16 296/15 303/4 308/23 312/11 313/3 317/6 320/15 324/13 326/14 331/1 333/17 336/20 342/1 342/3

**justify [1]** 114/22

**Justin [30]** 2/9 77/17 77/19 77/24 78/5 78/7 135/10 135/23 138/1 141/7 182/3 182/8 189/3 196/10 197/25 208/10 209/7 209/18 211/17 240/6 240/15 247/12 251/17 279/13 279/16 309/7 309/12 309/18 310/1 311/4

**Justin Scott [15]** 77/17 77/19 78/5 78/7 182/3 182/8 240/6 240/15 279/13 279/16 309/7 309/12 309/18 310/1 311/4

**K**

**Kailin [1]** 2/2

**Kaisha [1]** 318/23

**kale [1]** 283/18

**Katie [1]** 1/21

**Katrina [4]** 79/10 79/16 81/3 115/23

**Katrina Quicker [3]** 79/10 79/16 115/23

**keep [7]** 52/4 55/9 63/5 71/12 166/9 184/18 256/2

**keeping [1]** 62/20

**Keith [1]** 112/6

**kept [1]** 59/11

**key [5]** 244/7 282/17 311/18 332/20 339/5

**keyword [2]** 199/1 282/21

**kind [23]** 28/6 36/11 44/15 60/23 70/13 78/4 82/6 94/15 109/7 120/5 121/17 122/1 138/8 172/4 176/11 192/18 273/2 277/1 278/6 279/24 280/1 282/9 290/19

**kinds [1]** 265/13

**kiosk [1]** 72/9

**Kiosks [1]** 191/20

**kit [1]** 251/16

**knew [6]** 12/6 12/11 12/14 85/10 192/8 218/17

**know [177]** 3/19 3/19 3/21 4/19 5/7 6/25 9/20 12/22 13/14 15/21 16/4 23/5 26/10 26/14 26/22 27/1 30/20 32/1 32/18 35/9 37/13 38/21 43/1 43/25 45/23 46/22 48/4 49/1 49/21 50/22 51/9 51/10 52/9 57/12 57/18 57/22 60/5 60/6 62/1 62/24 63/15 66/7 66/9 72/20 79/25 81/2 81/3 81/5 83/17 84/25 88/4 88/21 95/10 95/11 96/6 96/17 98/13 104/2 105/8 105/9 108/1 109/16 110/13 112/10 113/4 115/2 116/3 116/5 117/2 119/10 120/23 121/16 124/1 124/2 126/8 129/19 129/21 130/20 131/16 134/7 134/8 134/23 134/24 135/4 135/15 135/19 136/7 137/17 137/20 138/8 140/17 142/25 143/3 144/7 144/7 145/2 145/3 150/10 152/2 152/12 153/23 153/25 154/1 154/20 156/11 160/19 162/23 164/12 164/15 165/9 165/10 165/14 167/1 167/13 170/21 172/3 172/4 172/9 183/9 183/10 187/6 188/6 193/2 193/8 193/14 194/10 202/21 203/4 204/7 204/11 206/20 215/3 216/11 222/10 224/25 225/24 226/20 228/8 229/1 232/19 233/7 233/25 234/13 240/21 240/24 244/22 249/21 253/5 254/6 255/2 255/16 255/18 256/20 258/3 268/14 271/10 271/14 271/18 280/8 292/4 296/17 304/19 305/19 307/23 316/9 316/15 317/21 322/2 322/14 323/15 323/18 326/6 326/8 326/11 331/17 332/20 337/15

**knowledge [21]** 79/13 83/13 113/11 113/23 116/7 137/11 145/14

169/1 169/6 169/10 170/23 178/12 179/3 179/7 179/11 179/14 179/22 221/25 222/1 234/10 298/8

**known [2]** 63/21 261/13

**knows [2]** 32/18 50/14

**ktMine [14]** 282/3 282/5 282/11 282/14 283/10 283/20 284/1 284/6 286/1 286/4 286/6 302/23 303/5 311/14

**ktMine's [1]** 302/22

**L**

**labeled [1]** 286/1

**labor [1]** 154/3

**lack [4]** 82/25 98/20 161/3 161/3

**lagging [1]** 315/20

**Landscaping [1]** 150/6

**language [4]** 21/16 171/5 252/14 291/16

**large [10]** 28/10 28/14 49/1 123/7 193/16 193/18 235/3 271/2 282/23 287/21

**largest [2]** 191/9 191/12

**last [39]** 4/20 10/11 11/1 12/1 12/6 12/12 12/25 22/14 23/18 38/19 38/22 39/2 51/23 113/6 119/13 123/10 148/11 160/3 176/12 176/17 177/10 201/12 201/17 239/1 275/12 284/25 286/3 286/8 286/10 287/23 292/8 293/1 293/16 296/12 307/6 307/17 323/24 330/15 345/3

**Lastly [1]** 282/21

**late [3]** 267/14 327/20 331/17

**later [16]** 5/13 11/18 15/13 21/4 26/21 104/24 108/20 113/16 203/9 204/2 220/3 246/13 317/7 341/16 342/10 344/10

**latitude [1]** 175/9

**law [18]** 25/5 39/14 39/16 47/5 57/17 58/5 58/10 58/15 178/21 178/21 220/18 250/5 255/5 275/18 276/14 277/3 302/5 338/22

**laws [3]** 83/17 83/18 327/1

**lawsuit [31]** 34/18 34/23 36/25 37/3 40/11 40/12 40/13

40/13 41/2 41/6 117/23 172/6 172/22 173/11 173/22 174/13 174/17 175/23 180/17 180/20 180/24 216/6 216/9 216/12 217/21 218/6 218/13 218/19 219/4 219/9 219/23

**lawsuit-related [2]** 217/21 218/6

**lawsuits [1]** 217/13

**lawyer [3]** 110/8 115/17 181/21

**lawyers [6]** 22/17 23/8 31/6 145/11 160/4 234/21

**Layton [2]** 33/24 40/19

**lead [3]** 159/6 263/8 264/13

**leader [3]** 159/16 264/3 264/23

**leaders [1]** 264/6

**leading [13]** 24/9 24/10 122/14 154/21 174/1 174/9 174/21 175/2 175/14 175/15 177/20 177/25 178/1

**leads [1]** 308/20

**learn [1]** 111/4

**learned [6]** 10/11 19/6 22/7 22/9 28/9 219/22

**lease [3]** 135/5 136/7 136/16

**leased [1]** 236/2

**leases [4]** 134/5 135/2 136/2 136/15

**leasing [2]** 134/21 134/25

**least [22]** 4/4 57/17 80/23 83/22 95/2 146/10 147/2 148/2 150/8 152/23 153/9 153/20 165/16 177/4 225/11 225/14 280/23 280/23 285/1 316/17 317/8 332/12

**leave [3]** 109/20 345/19 345/20

**Leaving [1]** 239/19

**lectern [1]** 2/18

**led [1]** 156/21

**ledger [21]** 7/18 155/9 155/13 198/19 198/20 198/22 200/15 201/10 202/8 203/3 203/14 208/18 209/1 220/22 220/24 222/21 223/1 237/3 237/7 245/13 251/11

**ledgers [2]** 198/25 251/14

**Lee [2]** 43/16 258/7

**leer [1]** 251/4

**left [9]** 13/25 44/23 59/24 112/19 113/19 208/2 211/21 238/15

**L**

**left... [1]** 266/7
**left-hand [1]** 208/2
**legal [34]** 32/1 32/17
39/19 40/15 40/24
56/8 67/1 98/25
99/19 145/10 164/16
166/7 166/8 166/10
170/6 181/24 191/23
192/1 192/25 193/3
193/5 193/8 217/16
233/9 233/21 234/2
234/8 234/11 249/12
250/1 253/19 253/21
258/5 276/18
**length [14]** 33/14
269/10 269/13
269/25 270/14 272/3
272/17 273/18 274/5
274/11 280/16
290/17 292/25
293/23
**less [4]** 8/18 194/2
255/17 322/6
**let [57]** 3/7 5/8 6/13
7/25 8/7 10/4 14/24
15/22 16/3 16/5
41/12 42/3 49/8
54/25 62/24 80/22
91/12 91/13 91/21
105/1 108/1 110/24
112/5 115/16 120/2
129/21 157/20
159/14 159/19 171/7
178/7 187/6 205/20
215/3 219/5 224/25
226/20 230/13
233/25 234/21 236/1
239/20 258/9 261/1
282/3 288/9 295/12
302/15 312/24 313/1
318/5 320/15 328/17
337/8 337/16 343/24
345/2
**letter [29]** 20/24 21/5
21/9 21/10 21/11
21/18 22/4 22/8
22/21 23/7 23/10
23/15 25/22 26/4
26/17 29/14 31/18
88/18 88/23 88/23
89/1 89/5 89/24 95/5
171/19 171/22 172/5
172/10 197/13
**letting [2]** 131/16
161/21
**level [8]** 14/19 44/19
195/11 242/16
266/16 279/23
280/10 283/24
**levels [1]** 119/24
**liabilities [20]** 90/14
90/14 96/3 97/1 97/7
98/18 225/3 226/10
226/12 232/1 232/4
232/8 232/15 243/20
245/14 245/22 248/4
252/24 280/15
338/12

**liability [38]** 38/15
41/17 43/11 45/15
45/20 48/8 55/18
90/23 92/3 98/10
99/6 99/8 102/12
105/23 106/23
106/23 111/7 116/11
116/14 116/16
126/20 187/1 221/1
221/4 221/7 221/11
222/20 223/2 224/3
224/12 224/16
225/10 225/18 226/6
226/23 232/13
261/19 261/21
**liable [1]** 258/7
**license [71]** 53/7
53/12 54/2 69/11
71/21 74/23 74/25
75/3 79/11 80/10
85/7 90/3 97/15
108/3 110/6 110/7
115/24 120/1 134/8
134/25 137/16
137/19 138/5 138/7
138/13 138/16
138/21 139/1 139/11
176/15 177/1 178/8
178/21 179/7 179/11
190/12 196/3 196/7
218/12 218/15
219/19 221/9 230/19
266/5 266/10 282/6
283/14 288/23
288/24 292/23
294/22 295/24
301/24 302/3 303/11
307/19 310/2 312/21
314/2 314/3 314/12
315/2 316/2 316/7
321/1 323/23 324/22
326/13 341/24 342/8
343/16
**licensed [9]** 63/11
82/20 144/25 186/19
313/15 313/19
313/23 314/19
340/19
**licensee [16]** 140/1
140/5 140/8 279/5
279/6 279/8 284/18
285/19 289/18
289/21 289/23
302/24 321/6 321/7
322/1 326/5
**licenses [7]** 63/14
101/4 134/6 144/13
266/13 328/5 342/13
**licensing [6]** 134/21
193/12 194/12 196/1
279/5 282/7
**licensor [9]** 288/15
289/19 289/25
302/24 320/23 322/4
326/4 326/8 328/2
**lie [1]** 289/24
**lies [2]** 190/18 330/15
**life [4]** 48/1 48/2
122/15 123/12

**like [109]** 1/15 14/3
15/5 17/21 21/3 21/4
21/15 22/3 22/14
23/17 31/4 34/25
35/2 35/11 36/11
38/8 39/5 42/21
46/14 48/11 51/11
61/4 61/25 65/6
66/10 72/19 73/13
82/3 83/24 84/17
88/2 90/12 91/21
92/2 93/19 94/19
97/4 101/23 102/18
102/21 103/17
104/18 104/18 107/8
111/16 112/5 119/5
120/4 120/12 123/1
125/15 130/7 131/21
142/13 142/14
151/10 155/15 160/6
160/14 160/23
163/23 164/20 174/4
175/9 177/19 188/18
189/6 194/20 195/25
196/12 197/4 197/10
200/8 200/19 201/17
205/25 206/17
209/11 209/18
210/21 215/14
218/11 243/4 250/3
251/17 251/20
252/14 254/7 269/7
269/14 272/6 280/1
283/15 294/11
305/15 310/6 315/15
316/13 317/25 320/3
324/11 332/1 332/12
334/13 336/11
336/12 343/20
344/22 345/6
**likely [2]** 70/12
267/21
**likewise [1]** 220/17
**limb [2]** 76/8 319/3
**limit [22]** 152/3 333/13
**limited [14]** 4/24
38/15 41/16 43/11
45/15 45/19 48/8
85/24 86/1 187/1
284/15 312/12
326/14 326/16
**line [22]** 38/10 49/3
64/16 89/8 108/12
138/3 151/19 152/10
157/19 158/21
160/23 215/3 224/24
226/19 231/13 261/1
263/16 280/20 282/2
284/25 293/16
308/23
**lined [1]** 163/16
**lines [1]** 213/22
**liquid [1]** 226/13
**liquidated [1]** 99/21
**Lisa [1]** 240/2
**list [20]** 13/15 13/16
13/17 13/20 14/3
25/21 207/23 228/24
270/19 271/12

275/10 285/14 289/7
290/6 308/13 318/2
318/14 324/2 326/23
344/18
**listed [5]** 4/7 228/2
229/3 284/8 326/21
**listing [3]** 223/2
223/20 270/24
**lists [2]** 285/1 290/7
**literally [3]** 56/10
72/5 268/1
**literature [1]** 140/2
**litigated [1]** 176/7
**litigation [17]** 57/15
65/14 66/11 74/4
99/6 125/6 165/21
166/4 203/2 242/6
280/1 280/11 307/9
307/12 313/11
335/25 343/2
**little [27]** 8/22 15/5
16/8 62/14 88/4
90/15 90/17 106/16
107/25 121/13
126/13 148/10
150/13 164/6 169/17
173/9 180/9 191/15
196/14 223/18 229/9
266/15 301/14
309/13 320/19
330/19 345/22
**Liu [6]** 2/2 11/19
334/25 335/2 336/11
337/18
**live [10]** 78/2 78/4
149/4 149/16 149/18
152/21 153/8 153/18
193/23 248/16
**lived [2]** 169/16
193/22
**livelihood [1]** 100/18
**lives [2]** 205/1 235/17
**LLC [30]** 33/10 33/12
35/7 38/16 39/7 41/9
41/16 42/7 43/10
45/16 45/21 48/9
48/15 56/15 56/16
117/18 118/2 118/8
118/11 176/10
177/13 177/14
177/17 178/10
180/10 183/16 187/1
187/14 201/18 298/3
**LLCs [3]** 36/7 36/7
38/2
**loan [21]** 123/24
123/25 124/3 197/13
197/16 198/12
199/21 199/23
200/24 204/25
207/25 208/4 208/23
209/1 209/15 210/11
210/17 211/13
221/25 222/3 222/4
**loans [10]** 123/13
123/15 123/18
123/19 124/9 124/14
208/14 210/14
221/24 265/22

**locate [1]** 119/2
**location [1]** 102/20
**Loco [21]** 33/9 34/10
34/11 34/19 35/7
35/14 36/15 36/21
36/23 37/1 38/16
39/7 39/13 40/7 40/8
41/5 127/24 128/7
180/10 180/22
201/18
**Loco Florida [3]** 33/9
127/24 128/7
**lodge [1]** 66/25
**Logan [196]** 1/9 1/14
2/1 2/4 2/9 2/9 6/22
7/6 8/9 17/20 17/20
17/23 17/23 18/11
18/24 23/22 24/17
27/18 27/20 79/9
89/13 107/23 109/20
113/10 115/22 116/4
118/13 120/16 121/4
121/10 121/11
122/17 124/17
125/19 127/3 131/18
132/10 132/19 133/3
133/6 138/24 140/11
141/20 147/8 147/11
147/14 149/16 151/6
152/7 154/25 155/20
156/2 158/8 158/17
158/23 161/2 161/22
162/11 162/19
162/20 163/1 163/6
163/18 163/23 164/2
164/7 164/10 164/13
164/20 165/11
165/17 165/22 166/5
166/13 166/18
167/17 168/1 168/12
168/17 170/16
170/21 174/13
174/23 175/21
176/24 177/7 177/12
178/5 178/13 178/17
178/20 180/16
180/19 181/2 181/4
181/20 182/3 182/4
182/9 182/9 182/24
182/25 183/3 187/12
193/22 193/23
199/14 199/16
199/18 208/15
208/15 208/15
208/19 209/14
210/11 210/14 211/4
211/11 212/9 213/18
213/20 215/14
215/16 215/19
215/22 215/25 216/3
216/7 216/9 216/12
216/16 216/24 220/1
221/5 221/24 222/11
222/13 227/6 227/20
227/25 229/1 229/10
231/3 231/10 235/11
235/18 240/22 241/3
251/18 254/22 259/3
259/11 277/21 278/4

**L**

**Logan... [42]** 278/16
280/14 290/15
296/10 298/11
298/12 298/12
298/14 298/17
298/22 298/24 299/2
299/3 307/3 308/5
308/13 309/3 313/7
315/19 334/13
334/20 335/21
336/13 339/16
339/17 339/18
339/18 339/23
339/25 340/7 340/12
341/4 341/14 341/18
343/3 343/3 343/7
343/19 343/21 344/9
344/16 344/23
**Logan's [27]** 5/20
10/5 13/22 13/24
13/25 14/12 17/4
107/5 107/15 127/3
128/22 132/22
140/11 168/2 210/16
211/2 213/7 216/17
228/7 228/10 228/12
229/13 235/12
275/13 309/8 309/11
335/4
**long [17]** 55/24 88/3
95/8 100/9 109/17
109/19 128/15
166/21 167/1 225/21
226/3 229/23 315/6
315/10 327/1 327/5
330/11
**long-term [4]** 55/24
225/21 226/3 229/23
**longer [9]** 71/16
110/2 118/10 163/2
163/7 174/10 174/10
334/14 338/5
**longterm [1]** 30/24
**look [83]** 3/10 21/12
21/12 21/17 22/14
24/3 26/16 31/4 45/6
45/24 48/11 48/21
59/22 60/4 64/7
65/18 78/21 81/2
85/12 88/13 88/21
89/13 89/18 90/12
92/3 93/15 100/7
101/13 103/13
125/25 151/10
151/13 162/10
162/14 201/12 203/7
203/10 203/12
206/24 209/11
222/20 222/24
228/22 230/25
238/20 245/14
247/22 248/3 249/20
249/20 249/24
252/14 252/23
264/18 272/6 272/11
278/7 278/9 280/7
281/17 281/19
282/17 285/6 286/14

291/16 292/8 292/17
304/19 304/20
304/22 305/15 313/9
313/12 315/4 323/7
325/8 330/10 331/4
331/7 331/7 333/25
343/1 345/12
**looked [35]** 29/24
34/8 39/18 46/13
48/10 56/25 79/20
81/17 97/8 104/8
269/14 277/25 278/1
279/15 279/20
281/15 282/13 283/7
283/9 283/13 283/20
283/24 288/3 293/19
295/21 298/25 301/2
302/1 303/14 307/4
307/21 312/16
330/24 332/12 333/5
**looking [33]** 3/9 5/9
8/14 49/5 50/23
81/18 81/19 91/24
160/23 179/3 189/9
189/20 193/11 198/4
206/24 227/7 244/25
252/15 266/20
266/23 272/8 278/12
284/11 285/23
286/21 294/11 299/6
303/8 308/6 308/13
327/5 327/11 332/21
**looks [5]** 35/2 107/8
120/3 120/7 142/13
**loop [1]** 3/22
**Looper [1]** 327/15
**lope [1]** 123/22
**Lora [1]** 1/12
**lose [3]** 103/9 259/10
259/10
**loss [6]** 92/23 93/7
190/11 194/18
224/13 292/24
**losses [6]** 39/11 39/14
194/16 292/22
304/10 304/17
**lot [31]** 8/18 34/1
51/7 68/6 68/6
105/24 106/21 110/2
112/5 116/25 121/22
145/3 166/6 175/4
175/7 239/23 242/12
248/1 250/23 260/12
268/2 275/14 277/22
291/12 298/25 299/1
309/2 345/3 345/4
345/7 345/7
**lots [1]** 308/20
**love [2]** 116/22 344/6
**low [4]** 145/6 170/10
259/11 344/14
**low's [1]** 275/1
**lower [10]** 59/14
59/16 59/18 59/18
250/22 250/25
255/18 294/4 296/21
311/7
**Loyola [2]** 263/20
263/21

**lunch [3]** 125/16
130/19 131/4

**M**

**ma'am [3]** 18/8
142/16 183/24
**Madam [1]** 237/13
**made [42]** 25/10 30/6
37/16 40/1 44/25
48/17 64/21 71/22
73/5 73/11 73/14
79/18 79/23 81/22
81/23 120/22 172/4
196/2 197/5 197/11
199/9 201/11 201/20
204/2 204/17 206/3
206/12 210/5 235/3
235/9 244/23 250/15
252/20 253/3 253/6
253/11 254/9 308/25
310/25 312/2 312/7
322/22
**MAI [1]** 247/16
**maid [1]** 230/18
**mail [28]** 11/1 19/8
24/17 24/18 24/19
24/25 35/15 70/23
72/8 73/24 74/21
74/23 75/11 75/11
75/13 75/14 75/16
75/22 75/23 76/8
76/10 76/21 77/1
77/8 78/1 141/20
192/1 300/8
**mailed [1]** 35/16
**MailGuard [26]** 63/7
63/13 63/21 63/22
64/4 65/21 65/24
66/10 66/20 67/25
68/7 69/13 70/2 70/4
70/6 70/15 70/21
70/23 71/1 71/1 76/9
76/10 144/6 144/22
308/19 308/19
**mailing [1]** 27/4
**mails [1]** 74/3
**main [3]** 60/10 144/21
245/17
**maintain [1]** 128/16
**maintained [1]** 213/25
**maintaining [1]**
149/22
**maintenance [1]**
249/10
**major [2]** 20/3 20/6
**majority [1]** 106/10
**make [49]** 1/5 11/8
14/9 14/10 14/11
14/13 14/24 15/11
15/11 15/23 15/25
16/9 17/16 40/6
46/25 47/17 49/25
51/9 59/25 65/15
68/10 103/4 111/18
116/2 120/2 145/19
147/10 158/14 160/4
172/18 187/2 198/20
199/12 205/4 213/16
219/14 220/24 230/9

234/3 244/12 246/9
247/3 250/6 250/9
252/5 253/6 257/21
292/25 337/11
**makes [5]** 57/12
87/16 101/7 184/12
275/14
**making [4]** 7/25 42/2
42/5 44/17
**man [1]** 133/12
**manage [2]** 162/21
249/20
**managed [2]** 163/2
163/7
**management [14]**
21/23 22/4 22/10
24/12 51/4 73/3
204/14 247/21
253/10 265/20 273/9
273/13 274/3 274/4
**manager [11]** 35/14
37/7 48/12 48/14
48/17 48/20 49/6
49/9 49/13 49/24
186/16
**manager's [1]** 49/25
**managers [1]** 48/23
**manages [4]** 149/7
149/13 149/22
248/15
**manual [1]** 154/3
**manufacturing [1]**
62/8
**many [13]** 4/7 59/24
75/2 121/23 144/7
156/20 246/14
264/24 282/8 316/18
321/23 322/10 323/1
**map [1]** 7/11
**March [10]** 54/11
93/2 186/2 206/15
212/17 217/11
219/13 258/15 259/9
324/25
**March 11 [1]** 212/17
**March 15th [1]** 54/11
**March 2022 [1]**
219/13
**March 2025 [1]**
258/15
**March 25th [1]**
324/25
**Marcum [74]** 80/2
80/4 81/9 81/10
81/17 85/4 85/8
85/15 86/11 86/16
86/23 108/21 109/1
109/2 109/2 109/4
109/9 109/12 109/17
109/21 111/2 114/8
114/20 124/16
124/20 124/24
124/25 125/4 178/18
218/9 220/6 220/7
220/9 220/10 220/14
220/14 221/21
240/12 259/7 261/11
261/15 261/16
261/17 261/21

279/18 279/20
279/21 279/22 280/7
280/16 281/1 281/14
281/18 284/6 285/18
286/6 296/20 296/22
299/22 299/24
299/25 300/1 300/2
300/4 300/5 300/9
300/11 300/20
300/25 304/23
305/15 309/21
309/23 332/8
**margin [1]** 84/20
**Marines [1]** 142/10
**mark [3]** 262/11
263/8 318/14
**marked [6]** 12/5 14/6
206/18 303/11
312/19 319/8
**market [12]** 7/13 7/17
33/2 52/8 70/8 70/9
244/6 284/17 285/21
285/21 301/3 315/21
**marketing [5]** 94/10
307/4 308/6 319/19
324/22
**markets [1]** 327/1
**marry [1]** 6/7
**Martha [4]** 58/24
260/3 260/11 260/15
**Maryland [2]** 263/20
263/22
**massive [3]** 13/6 53/1
116/23
**massively [3]** 100/5
100/7 100/8
**master [1]** 242/18
**match [1]** 204/15
**materialize [1]** 59/7
**materials [2]** 307/4
308/6
**math [6]** 59/13 61/6
101/1 111/10 111/14
316/8
**Mathematically [1]**
211/5
**matrix [2]** 281/23
282/1
**matter [18]** 5/21 12/8
17/21 57/17 66/6
129/25 142/17
151/24 161/20
187/22 243/1 253/19
253/21 254/2 257/22
258/6 258/8 276/20
**Max [1]** 1/10
**may [54]** 4/20 5/24
6/9 6/17 8/14 10/6
16/2 46/21 51/9
51/18 54/18 79/20
86/5 94/2 96/5 97/18
101/16 102/5 102/9
104/21 109/13
113/25 114/16
114/22 125/9 146/3
155/24 174/7 177/23
189/6 190/16 197/9
202/11 202/20 203/2
214/15 228/21

**M**

**may... [17]** 236/20
245/10 245/15
255/24 256/5 256/5
264/7 265/18 271/10
273/15 284/22
291/15 295/1 315/21
316/4 319/3 338/13
**May 28 [4]** 197/9
202/11 202/20 203/2
**May 8 [1]** 316/4
**maybe [25]** 48/5
52/17 53/15 59/17
79/12 107/13 120/19
125/4 126/12 136/15
199/1 202/18 203/20
222/10 230/3 238/3
275/10 278/23
281/25 284/13 285/9
285/25 289/13
291/18 325/14
**MBA [1]** 263/20
**McDade [1]** 1/20
**mean [46]** 4/23 13/21
31/22 45/22 66/8
72/20 72/21 85/13
85/16 86/13 91/15
100/5 100/24 105/6
110/13 111/10
115/25 133/13
138/16 143/25
144/16 174/5 174/24
190/4 199/1 210/16
211/4 213/22 222/11
226/8 226/14 228/6
232/7 236/2 256/18
256/19 257/21 268/6
273/3 274/18 276/7
286/2 303/15 305/18
326/17 344/17
**meandering [1]**
207/12
**meaning [4]** 117/16
117/24 119/17
331/25
**meanings [1]** 331/22
**means [9]** 45/23
49/21 84/25 100/16
135/20 157/5 167/10
227/13 227/25
**meant [4]** 41/21
133/15 171/12
171/16
**measure [2]** 64/19
119/16
**media [1]** 16/3
**median [2]** 86/16
294/14
**meeting [11]** 25/23
26/3 26/12 26/15
26/20 27/13 54/10
54/13 109/13 160/7
160/10
**meets [1]** 274/11
**Melina [2]** 124/21
125/4
**Melina Naidu [2]**
124/21 125/4
**member [20]** 35/13

36/15 36/21 36/23
37/4 37/6 39/7 39/12
39/13 40/1 40/2 40/4
40/8 48/24 49/8
49/11 133/24 188/25
263/24 340/8
**memory [3]** 108/6
108/19 108/21
**mention [3]** 306/22
328/7 332/14
**mentioned [13]** 20/15
74/9 121/3 122/4
169/19 172/23 222/6
270/9 278/7 299/18
299/23 300/19
313/25
**Mercury [1]** 229/7
**Merely [1]** 138/15
**merger [1]** 49/19
**Merit [1]** 314/5
**mess [6]** 38/7 43/18
44/23 57/12 116/23
116/24
**message [1]** 172/7
**messaging [2]** 76/12
76/14
**met [4]** 277/21
296/11 309/4 332/17
**method [13]** 266/23
267/1 304/25 305/2
305/5 306/5 306/7
306/16 306/17
306/19 332/3 332/4
332/20
**methodology [1]**
119/25
**methods [2]** 266/23
306/6
**Miami [6]** 200/23
201/3 204/20 205/3
227/8 227/10
**Michael [1]** 2/21
**Michelle [1]** 1/10
**Michigan [2]** 87/25
122/12
**mid [1]** 109/14
**middle [5]** 49/4 63/18
64/12 67/13 209/19
**Miesner [1]** 1/22
**might [20]** 2/18 3/22
3/24 4/17 16/6 59/15
59/19 131/15 157/5
214/4 231/4 240/4
240/19 240/23
271/12 271/15 278/5
281/10 298/7 304/5
**Mike [8]** 87/23 87/24
88/7 90/1 187/20
217/5 220/4 240/3
**Mike Shreve [6]** 87/23
87/24 88/7 217/5
220/4 240/3
**Mike Shreve's [1]** 90/1
**Miller [4]** 21/18 22/7
22/16 24/11
**Miller's [1]** 31/18
**million [75]** 6/23 30/4
31/14 31/17 31/22
51/18 59/10 59/12

61/5 90/15 90/18
91/8 92/8 92/13
92/16 92/24 93/7
93/7 93/11 93/11
94/15 96/23 97/8
97/17 97/25 98/11
98/17 98/24 99/1
99/10 99/12 99/16
99/17 99/18 99/19
100/23 100/25 101/5
101/15 102/20
103/15 128/19
128/24 146/5 146/10
147/1 170/25 171/3
171/3 171/4 171/8
172/8 193/4 193/10
193/13 194/2 194/8
194/18 209/5 224/4
225/11 225/14
233/22 234/6 234/12
234/7 234/24
234/25 235/5 235/6
258/17 258/18
261/18 261/22
289/19
**millions [4]** 73/14
94/23 99/15 103/5
**mind [10]** 5/25 166/9
174/23 184/4 207/8
224/23 244/24
260/13 305/18
312/23
**minimum [2]** 99/13
194/5
**minor [1]** 241/2
**minority [3]** 255/17
255/23 255/25
**minute [3]** 61/8 293/6
334/13
**minutes [20]** 5/4
10/16 11/2 14/23
62/25 63/4 71/12
71/12 125/14 129/18
184/5 184/17 184/18
238/3 238/7 238/8
238/9 239/25 240/13
337/17
**mirrors [1]** 229/11
**mischaracterizes [4]**
140/22 153/2 258/24
317/3
**mischaracterizing [1]**
123/2
**mislead [1]** 126/6
**miss [3]** 2/19 212/4
271/15
**Miss Wolfe [1]** 2/19
**missed [4]** 233/12
233/13 233/16
291/14
**misses [1]** 290/19
**missing [3]** 59/9
59/12 240/20
**misspoke [1]** 117/25
**misstate [1]** 234/9
**Misstates [1]** 142/19
**mistake [1]** 86/6
**model [2]** 60/11
242/14

**mom [1]** 59/24
**moment [13]** 14/24
45/6 45/24 48/10
53/6 56/25 96/19
167/22 252/15
296/15 303/9 312/11
336/20
**moments [1]** 2/10
**money [20]** 27/7 54/9
59/11 70/16 70/18
70/20 79/2 94/20
99/5 99/6 101/7
101/11 102/3 102/3
104/3 122/7 166/6
168/5 211/11 268/2
**month [12]** 19/10
59/10 59/12 61/5
99/1 99/20 201/25
204/10 226/9 226/9
226/14 236/3
**monthly [2]** 205/22
223/23
**months [9]** 30/18
60/13 93/21 93/24
95/2 204/13 204/14
297/21 323/20
**morning [17]** 1/18
1/25 2/20 5/13 10/9
10/12 16/2 18/21
18/22 25/7 100/20
129/16 130/2 230/25
239/9 239/15 337/13
**Morris [1]** 250/25
**mortgage [1]** 149/18
**mostly [3]** 209/3
242/15 245/9
**mother [11]** 20/16
20/18 21/1 23/3
29/15 55/10 58/1
119/1 119/7 119/19
336/25
**mothers [1]** 321/25
**motion [8]** 2/22 3/2
3/9 3/12 4/8 4/16
6/9 17/5
**motive [1]** 339/2
**motorcycles [1]** 123/6
**move [18]** 58/19
62/16 65/16 67/5
68/13 71/3 85/21
139/19 190/24
192/17 260/25 265/3
276/19 277/5 277/7
277/9 317/4 318/19
**moved [1]** 176/9
**movement [1]** 204/19
**moving [3]** 116/4
271/8 318/18
**Mr [33]** 2/10 21/18
22/7 22/16 31/18
131/19 152/13 161/6
233/12 236/16
238/23 239/10 240/11
241/6 256/23 262/2
263/6 275/17 276/13
276/22 277/12
280/23 293/3 293/14
295/4 295/17 296/13
298/13 318/2 318/9

319/7 324/7 324/17
**Mr. [163]** 1/5 1/17
1/24 2/7 2/15 2/18
5/19 6/7 11/5 11/13
13/12 15/18 15/24
16/21 16/23 16/25
17/23 17/23 18/15
18/18 23/22 24/11
28/18 50/5 65/5 86/2
86/4 89/11 89/13
89/14 89/24 90/9
91/13 91/23 93/24
103/21 104/12
105/22 106/8 107/5
107/15 107/23
108/16 109/20
113/10 115/8 115/19
116/4 118/13 120/16
122/17 124/17
125/10 125/13
125/19 126/24 127/3
128/18 129/4 129/9
129/11 138/24
140/11 142/21 147/4
170/16 170/21 175/7
175/14 180/16
180/19 181/3 181/4
181/18 182/17
182/19 183/22 184/1
184/6 184/24 185/14
187/20 189/7 189/10
207/2 210/14 211/11
211/25 227/4 229/18
231/4 233/1 233/10
235/19 236/18 238/6
238/17 238/18
239/10 239/20 240/1
240/16 240/16
240/25 241/6 242/2
243/2 243/11 247/6
247/12 251/20 252/7
252/9 252/11 254/18
254/21 256/15
256/25 257/2 257/25
258/3 258/22 260/24
262/4 262/6 263/3
275/10 275/25 276/8
276/21 276/24 277/2
277/2 278/4 280/14
280/19 281/6 295/7
296/6 298/11 298/12
298/14 298/17
298/22 298/24
303/23 304/9 309/8
311/9 312/22 313/7
318/8 329/22 329/24
334/4 334/6 334/8
334/10 341/14
343/10 343/12 344/4
344/6
**Mr. Barfield [4]** 2/15
2/18 15/18 15/24
**Mr. Barfield's [3]** 6/7
16/23 16/25
**Mr. Berneman [1]**
240/16
**Mr. Dixon [13]** 238/17
263/3 275/10 276/8
276/24 277/2 280/19

**M**

**Mr. Dixon... [6]** 281/6
303/23 304/9 311/9
312/22 329/24
**Mr. Dixon's [1]** 275/25
**Mr. Gann [1]** 115/19
**Mr. Garretson [4]**
276/21 277/2 318/8
334/8
**Mr. Hillsley [12]** 1/5
5/19 13/12 18/15
126/24 147/4 182/19
184/24 296/6 334/6
344/4 344/6
**Mr. Johnson [19]** 2/7
16/21 106/8 115/8
129/11 181/18
183/22 207/2 227/4
231/4 240/25 247/6
254/18 257/25
258/22 329/22
334/10 343/10
343/12
**Mr. Jon Logan [2]**
17/23 210/14
**Mr. Justin [1]** 247/12
**Mr. Logan [31]** 17/23
23/22 89/13 107/23
109/20 113/10 116/4
118/13 120/16
122/17 124/17
125/19 127/3 138/24
140/11 170/16
170/21 180/16
180/19 181/4 211/11
278/4 280/14 298/11
298/12 298/14
298/17 298/22
298/24 313/7 341/14
**Mr. Logan's [3]** 107/5
107/15 309/8
**Mr. Mike Shreve [1]**
187/20
**Mr. Miller [1]** 24/11
**Mr. O'Neill [3]** 175/14
238/18 239/20
**Mr. on [1]** 86/4
**Mr. Oprison [20]** 1/17
11/5 11/13 65/5
125/13 142/21 175/7
182/17 184/1 189/7
189/10 211/25 233/1
235/19 236/18 252/9
256/25 260/24 262/4
334/4
**Mr. Oprison's [1]**
184/6
**Mr. Rudolf [2]** 185/14
229/18
**Mr. Rudolf's [1]**
233/10
**Mr. Schoenfeld [16]**
1/24 18/18 28/18
50/5 86/2 89/11
91/13 103/21 108/16
125/10 128/18 129/9
181/3 252/11 257/2
262/6
**Mr. Schoenfeld's [1]**

129/4
**Mr. Shreve [2]** 93/24
104/12
**Mr. Shreve's [5]** 89/14
89/24 90/9 91/23
105/22
**Mr. Sly [11]** 238/6
239/10 240/1 241/6
242/2 243/11 251/20
252/7 254/21 256/15
258/3
**Mr. Sly's [1]** 243/2
**Mr. White [1]** 240/16
**Mr. White's [1]** 295/7
**MRI [1]** 304/7
**Ms [24]** 184/13
185/20 189/8 189/19
207/21 210/23
211/23 212/6 214/23
215/2 215/13 220/22
223/21 224/1 224/22
227/2 227/5 228/13
229/22 231/10
232/25 234/9 258/16
314/23
**MS-DOS [1]** 314/23
**Ms. [55]** 2/4 2/9 5/9
11/19 80/2 109/11
110/5 112/25 113/2
113/6 113/13 113/17
113/20 113/25 114/5
114/12 114/20
114/25 115/2 115/3
115/13 147/8 152/7
155/20 156/2 161/2
161/22 162/19
167/25 168/12
168/17 174/13
175/21 176/24
177/12 178/5 181/2
181/20 182/24 212/8
229/9 231/10 233/3
236/14 239/1 239/15
240/2 240/12 334/25
335/2 336/11 337/18
340/12 341/18 343/3
**Ms. Clement [4]** 212/8
229/9 233/3 236/14
**Ms. Liu [5]** 11/19
334/25 335/2 336/11
337/18
**Ms. Logan [24]** 2/4
2/9 147/8 152/7
155/20 156/2 161/2
161/22 162/19
167/25 168/12
168/17 174/13
175/21 176/24
177/12 178/5 181/2
181/20 182/24
231/10 340/12
341/18 343/3
**Ms. Naidu [1]** 240/12
**Ms. Quicker [16]** 80/2
109/11 110/5 112/25
113/2 113/6 113/13
113/17 113/20
113/25 114/5 114/12
114/20 114/25 115/2

115/3
**Ms. Quicker's [1]**
115/13
**Ms. Scibak [1]** 5/9
**Ms. Voralia [2]** 239/1
240/2
**Ms. Voralia's [1]**
239/15
**much [28]** 3/13 3/23
4/23 5/7 33/16 51/5
58/10 70/11 71/16
72/15 110/21 119/9
119/13 121/12 122/3
128/22 160/15
165/16 166/24
190/21 236/12
265/22 265/24 292/4
315/17 329/16 334/2
343/12
**multiple [7]** 11/16
120/14 122/22 255/4
255/12 256/1 308/21
**Music [1]** 327/15
**must [4]** 95/9 246/9
268/9 286/22
**MWRA [1]** 128/11

**N**

**Naidu [3]** 124/21
125/4 240/12
**name [26]** 42/6 52/2
84/10 123/20 123/21
123/23 124/6 124/6
124/7 124/19 125/1
141/19 151/15 168/3
185/22 195/23
199/15 199/25 212/6
213/14 241/19
241/24 242/4 262/20
262/25 320/22
**name's [1]** 227/5
**named [1]** 96/8
**names [3]** 124/23
157/10 283/13
**Nan [1]** 171/22
**narrative [1]** 79/1
**narrow [2]** 283/5
302/19
**narrowed [2]** 287/25
294/14
**narrows [1]** 283/12
**nation [1]** 76/8
**native [1]** 324/1
**nature [4]** 245/10
245/11 343/2 344/9
**NC [1]** 1/4
**near [2]** 230/12
230/21
**near -- Strike [1]**
230/12
**necessarily [3]** 60/1
86/18 253/6
**necessary [2]** 28/3
104/25
**necessitated [1]** 99/7
**Nectar [4]** 286/7
315/24 316/9 317/13
**need [71]** 2/13 2/18
3/14 3/23 5/3 5/7

8/16 10/22 11/15
11/21 11/23 13/11
13/15 13/16 15/11
17/7 17/22 40/9 52/6
64/5 66/11 71/11
74/15 87/14 101/16
102/6 102/10 102/15
106/24 107/2 107/15
108/4 108/5 119/22
130/4 130/15 152/12
162/16 163/25 175/1
175/9 175/16 196/22
229/13 237/7 240/1
240/5 245/7 253/5
264/7 271/24 273/17
273/21 273/24
305/12 310/13
312/25 313/4 313/5
317/7 344/22 344/24
344/25 345/4 345/6
345/7 345/9 345/18
345/19 345/20
345/22
**needed [14]** 5/18 16/9
31/3 37/15 57/20
73/22 87/10 87/10
87/12 109/6 117/4
172/3 254/4 306/19
**needs [5]** 13/14 14/4
17/15 24/12 55/8
**negative [6]** 92/16
93/11 163/3 163/8
165/22 258/18
**negotiated [2]** 301/24
302/2
**negotiating [2]** 115/18
115/20
**Negovan [1]** 152/15
**neither [1]** 162/12
**nerd [1]** 332/1
**net [25]** 52/21 91/8
92/23 99/24 190/11
221/14 234/18
234/24 283/3 283/7
283/8 292/21 292/23
304/9 304/17 310/6
310/16 310/19
310/23 311/1 321/2
321/3 322/3 322/5
322/22
**nets [1]** 283/1
**network [1]** 264/10
**Nevada [1]** 83/14
**never [62]** 21/4 26/24
27/9 27/11 27/22
27/24 28/6 28/12
40/8 41/7 47/21 53/3
58/3 61/21 61/22
73/11 73/15 74/9
81/24 82/24 83/16
87/19 87/21 99/9
101/5 103/1 103/5
120/18 120/20 123/9
126/20 128/8 140/6
141/4 141/12 141/25
143/4 143/14 143/15
143/16 158/2 158/13
158/18 159/2 159/11
160/17 161/12 162/2

167/3 167/9 167/10
216/19 219/9 219/14
219/18 300/15
300/18 301/12
301/24 302/2 311/21
312/2
**nevertheless [1]**
100/21
**new [43]** 3/21 37/9
37/14 38/3 41/8
43/19 43/23 55/13
64/3 65/20 66/19
66/24 68/5 72/11
76/6 76/6 76/16
76/19 77/15 78/6
78/14 88/4 102/17
102/17 102/20
102/24 106/3 106/4
107/12 111/3 150/4
154/10 164/13 171/9
171/13 182/25 183/4
183/9 197/8 251/24
252/18 260/21
270/16
**next [42]** 4/25 5/10
6/15 15/18 15/20
15/20 15/25 16/6
23/17 23/18 24/23
25/8 25/20 25/22
26/9 26/11 27/12
28/1 28/15 39/9
72/20 88/22 89/2
90/12 91/6 92/21
130/14 131/19
155/18 156/16 184/3
184/24 184/25
191/12 199/6 223/20
230/9 237/25 241/9
262/10 318/12
337/16
**night [5]** 10/11 12/1
12/6 12/12 13/1
**nine [1]** 101/14
**ninety [2]** 107/24
249/5
**ninth [1]** 49/3
**nobody [2]** 145/2
146/17
**nodding [2]** 16/21
301/20
**Nods [3]** 157/8 171/21
200/18
**noise [1]** 275/14
**NOL [1]** 292/24
**non [9]** 96/12 174/9
175/15 256/3 256/6
256/8 314/2 316/13
316/14
**non-exclusive [1]**
314/2
**non-leading [2]** 174/9
175/15
**none [3]** 56/11 181/22
182/1
**nonoperating [1]**
245/15
**nonoperational [2]**
245/19 248/25
**nonoperational-type
[1]** 245/19

**N**

**nonprofit [4]** 316/10 316/19 317/13 317/21
**nonrecurring [2]** 245/16 245/21
**Noreen [6]** 97/23 98/9 184/4 185/1 185/10 185/22
**normal [6]** 51/11 226/15 246/24 251/15 330/15 330/22
**normalization [9]** 243/19 244/16 245/2 245/18 247/13 253/23 255/6 255/8 330/16
**normalized [3]** 329/6 330/23 331/8
**normalizing [2]** 243/20 250/6
**normally [4]** 4/12 112/24 233/10 315/7
**Norman [1]** 102/2
**North [4]** 284/19 326/15 326/16 327/2
**notation [1]** 85/24
**note [9]** 31/24 55/17 55/24 92/4 92/8 92/12 126/5 206/22 233/15
**noted [2]** 6/21 306/6
**notes [3]** 203/20 206/25 219/6
**nothing [33]** 17/9 17/13 18/6 18/13 23/7 59/24 68/5 129/8 129/10 129/12 132/5 132/12 136/8 175/5 183/21 185/5 185/12 233/2 233/5 236/17 236/19 241/14 241/21 252/10 256/24 257/1 262/15 262/22 295/20 296/5 334/3 334/7 334/9
**notice [6]** 3/17 12/3 12/25 16/23 173/12 239/9
**noticeable [1]** 59/9
**notifications [1]** 4/18
**notified [2]** 4/14 4/15
**notion [1]** 276/11
**notwithstanding [1]** 252/17
**November [13]** 52/11 52/21 58/25 59/2 59/8 60/17 60/19 161/23 176/4 178/9 213/7 335/5 336/10
**November 11 [1]** 335/5
**November 19 [1]** 60/19
**November 19th [1]** 59/2
**November 2020 [1]** 336/10

**now [157]** 8/15 12/6 12/14 12/15 13/18 14/9 16/17 17/7 17/17 20/15 22/16 23/18 24/9 25/8 26/3 28/1 29/14 31/5 33/8 33/20 35/12 36/3 36/13 37/9 40/6 40/25 41/8 42/13 43/8 43/22 45/2 46/9 46/12 46/16 51/17 52/22 53/5 54/8 54/16 55/16 56/18 58/23 59/14 61/10 63/17 64/2 67/6 68/21 72/10 73/5 75/11 75/20 76/22 80/2 85/1 85/15 86/11 87/17 87/23 89/2 90/12 91/6 91/22 92/15 94/14 97/10 97/24 98/11 100/12 100/22 102/25 103/1 103/11 107/13 109/16 110/25 113/19 114/10 115/22 130/20 133/6 136/6 160/14 162/2 162/24 163/16 164/1 166/24 168/15 186/5 186/22 187/4 187/22 188/18 189/17 192/15 192/17 194/20 196/12 201/17 205/13 205/25 206/17 208/13 210/13 211/8 213/16 216/19 218/11 220/21 221/1 224/16 233/6 238/6 238/22 239/5 245/23 247/5 250/3 254/4 254/11 258/18 259/2 259/5 259/8 264/22 272/1 296/19 298/11 300/11 301/7 302/12 308/1 310/1 311/11 312/9 314/8 316/9 319/19 324/20 326/13 327/20 328/16 338/5 338/24 340/2 340/6 340/7 340/10 341/10 341/18 341/20 341/21 342/1 343/14 344/10 344/23
**number [43]** 1/4 2/12 2/24 3/5 10/24 11/21 31/7 31/12 31/25 32/25 38/22 46/16 46/20 46/22 47/7 47/8 49/12 91/4 93/1 95/15 98/13 114/1 119/12 137/16 149/15 192/15 197/25 208/19 234/1 239/23 246/6 259/5 264/19 267/4 285/1 287/21 293/15 297/16 318/12 324/8 325/7 325/10 337/4
**numbers [7]** 9/3 11/2 106/22 120/3 225/13 229/11 247/22
**numerous [13]** 7/1 7/2 33/12 40/15 40/23 40/24 40/24 56/18 80/17 97/22 117/7 129/2 303/19

**O**

**o'clock [3]** 3/15 8/22 345/10
**O'Neill [6]** 2/3 152/13 161/6 175/14 238/18 239/20
**oath [4]** 17/25 74/5 136/1 338/3
**object [17]** 58/6 64/15 83/3 89/8 89/11 111/19 139/3 139/13 156/14 161/10 217/22 248/20 258/19 260/19 260/21 275/9 294/25
**objection [46]** 14/15 14/21 39/19 58/11 58/16 67/1 67/5 67/7 69/16 76/2 82/8 98/2 98/20 113/2 113/16 137/2 139/18 140/21 141/24 142/7 142/19 146/13 151/20 153/1 155/24 157/4 161/6 165/24 167/19 170/5 174/1 177/20 207/9 207/10 231/6 237/22 259/18 280/18 281/8 317/2 318/7 318/15 318/17 324/4 324/6 324/12
**objections [1]** 178/3
**objective [1]** 273/21
**obligated [2]** 32/11 53/20
**obligating [1]** 179/15
**obligation [8]** 30/24 54/5 54/6 92/23 93/4 94/5 103/18 255/16
**obligations [3]** 46/2 83/20 231/24
**observations [3]** 293/16 293/18 293/21
**observe [1]** 106/18
**obtain [2]** 80/8 82/18
**obtained [1]** 130/13
**obtaining [4]** 87/7 87/9 165/4 165/6
**obvious [2]** 105/6 271/11
**obviously [29]** 7/22 15/9 25/13 26/6 29/13 29/24 59/7 60/5 68/10 70/6 80/15 80/16 83/17

**264/19 267/4 285/1**
**287/21 293/15**
**297/16 318/12 324/8**
**325/7 325/10 337/4**

**88/4 88/25 94/11 116/21 116/25 117/10 121/22 125/23 126/8 240/9 245/9 247/20 249/19 249/22 250/12 258/5**
**occupation [1]** 242/5
**occur [2]** 202/11
**occurred [7]** 33/15 129/14 196/17 225/2 236/8 257/5 257/13
**October [17]** 18/23 20/7 35/1 41/17 41/20 53/10 91/25 93/3 93/25 148/18 168/20 170/10 222/23 223/24 224/3 224/10 261/18
**October 2022 [2]** 18/23 20/7
**October 2023 [2]** 222/23 224/10
**October 23 [1]** 35/1
**October 25 [2]** 91/25 93/25
**October 29 [1]** 41/17
**October 31 [2]** 223/24 224/3
**October 4th [1]** 261/18
**offer [4]** 72/6 175/21 280/21 291/17
**offered [14]** 79/21 102/2 175/21 216/7 216/10 294/23 295/4 308/20 330/12 337/23 337/25 338/24 340/2 341/10
**offering [3]** 291/22 338/1 338/2
**offers [4]** 263/11 287/8 287/11 290/11
**office [11]** 4/2 68/11 105/12 131/11 158/18 158/23 158/23 201/19 201/22 203/20 228/22
**officer [13]** 19/15 27/18 27/22 27/24 45/8 127/15 143/16 159/2 168/24 174/18 174/24 215/16 216/10
**officers [1]** 284/13
**offices [4]** 45/7 45/13 158/18 248/17
**officially [1]** 236/3
**offset [3]** 59/17 292/23 304/17
**offsetting [1]** 59/15
**often [6]** 158/22 244/11 245/12 270/25 271/6 330/10
**oh [12]** 61/21 112/5 133/13 145/18 150/3 170/20 171/7 211/12 235/6 268/20 271/19 320/1

**okay [84]** 1/3 1/24 3/7 4/19 5/12 6/15 10/19 11/5 14/22 15/14 16/5 16/19 17/14 18/18 22/2 23/14 24/2 24/7 49/21 51/2 52/4 69/12 95/18 95/22 96/8 104/21 108/8 115/22 118/14 119/4 124/11 129/13 130/17 130/22 135/1 139/20 174/9 174/22 177/7 184/14 186/22 190/25 191/9 194/20 196/24 197/14 199/3 203/6 205/2 205/24 211/18 215/13 219/7 223/7 223/14 223/19 226/17 237/12 237/21 243/13 244/10 245/23 251/13 262/8 265/4 267/12 275/24 281/12 283/12 285/6 300/4 305/11 310/22 311/10 311/21 316/24 320/24 325/17 344/4 344/22 345/24
**old [6]** 106/2 106/2 107/7 176/14 191/13 257/20
**older [2]** 87/24 315/21
**omitted [5]** 325/8 325/10 325/20 326/4 326/9
**one [141]** 4/5 4/19 4/20 9/14 10/25 20/12 24/1 25/19 25/22 26/15 32/21 40/22 42/14 46/6 46/9 46/18 46/23 47/7 47/8 47/18 47/25 48/19 63/21 65/1 65/2 65/15 67/24 70/20 72/5 75/24 79/18 81/22 82/23 86/22 86/22 88/11 89/6 89/12 91/24 92/4 95/21 95/22 97/25 98/11 106/16 107/13 110/4 115/17 119/3 119/17 119/17 119/17 120/12 120/13 126/21 130/19 143/25 144/8 144/9 145/15 152/17 160/20 163/16 163/21 167/10 192/12 192/12 192/12 192/14 198/7 199/6 199/9 201/18 202/22 213/2 213/13 213/14 216/22 216/24 223/4 224/21

**O**

**one... [60]** 229/6
234/4 238/4 240/12
244/1 245/17 253/12
254/6 257/5 257/15
258/10 260/8 265/15
265/23 266/25 271/8
271/18 272/23
274/23 278/23
285/10 285/10 286/5
286/19 287/23
288/14 290/14
290/22 292/21
294/15 294/18 304/8
304/9 304/16 306/12
307/22 310/15
310/22 311/16
311/18 316/16 318/2
318/3 318/8 319/14
319/14 320/5 320/20
323/12 324/5 324/7
326/15 331/2 331/18
332/20 333/8 336/6
336/20 339/22 342/4
**one's [2]** 28/23 28/23
**ones [7]** 106/2 106/2
126/4 197/8 252/18
309/7 332/20
**ongoing [3]** 138/5
197/7 251/23
**ooh [1]** 324/11
**open [5]** 7/7 102/19
112/19 226/17
231/11
**opening [5]** 111/13
111/14 224/24
245/24 247/5
**operate [4]** 77/22
102/18 192/24
277/24
**operated [2]** 100/2
100/3
**operating [40]** 37/9
37/14 37/14 37/15
37/17 37/25 38/3
38/6 43/19 54/7
77/22 99/18 165/17
186/14 188/3 190/3
191/7 192/18 192/19
193/12 194/11
194/15 195/10 205/8
205/23 233/19 234/3
234/6 247/25 248/8
248/10 248/12 256/3
256/6 256/8 279/9
292/21 292/24
304/10 304/17
**operation [2]** 46/5
190/14
**operational [5]** 158/10
187/23 188/1 246/18
248/18
**operationally [1]**
294/22
**operations [10]** 102/6
102/10 103/16 158/4
192/21 194/7 201/23
245/7 248/1 250/12
**operative [1]** 77/7

**opining [1]** 291/2
**opinion [20]** 66/23
67/18 67/21 70/1
70/2 103/21 243/22
253/22 272/25
280/14 280/21
280/24 288/7 291/10
291/17 291/22
295/17 299/24 303/3
317/20
**opinions [10]** 276/4
290/11 296/23
296/24 297/3 298/15
298/19 301/17
301/17 307/16
**opportunity [4]** 6/9
81/22 335/20 339/1
**opposed [1]** 130/21
**opposite [1]** 120/6
**oppressed [4]** 148/3
148/12 166/13
166/18
**oppression [4]** 154/15
154/16 154/17
154/18
**Oprison [23]** 1/17
1/19 11/5 11/13 65/5
125/13 131/19
132/16 142/21 175/7
182/17 184/1 189/7
189/10 211/25 233/1
235/19 236/18 252/9
256/25 260/24 262/4
334/4
**Oprison's [1]** 184/6
**options [1]** 86/22
**oral [10]** 54/1 73/5
74/25 75/2 75/9
81/15 179/7 218/23
295/23 295/25
**orchestrated [1]** 20/12
**order [17]** 5/23 7/4
8/19 87/13 101/9
129/18 129/22
129/23 130/5 131/5
190/8 191/17 191/22
293/7 303/1 311/13
332/17
**ordinary [1]** 204/3
**organization [3]** 34/7
42/9 42/12
**organizations [1]** 16/3
**organize [2]** 44/22
47/22
**organized [1]** 38/9
**original [4]** 63/25
70/10 77/25 326/9
**originally [4]** 132/25
198/10 199/19
200/24
**others [2]** 4/7 182/4
**otherwise [2]** 142/4
187/6
**ours [1]** 112/8
**ouster [1]** 162/4
**outcome [1]** 307/11
**outline [1]** 77/25
**outrageous [1]** 101/8
**outside [14]** 17/16

69/17 98/25 217/8
222/3 226/16 258/19
260/20 261/24
269/10 274/17
274/22 275/10
335/22
**overall [1]** 288/9
**overdrawn [1]** 99/12
**overdue [1]** 221/11
**overhead [1]** 192/23
**overlapped [1]** 286/5
**overlooked [2]** 136/15
271/4
**overly [2]** 89/16 170/7
**overnight [2]** 2/13
17/24
**overrule [3]** 98/6
139/6 207/11
**overruled [7]** 82/10
83/5 98/22 137/3
157/13 218/2 275/24
**overrules [2]** 68/17
71/7
**overseeing [1]** 242/13
**oversees [2]** 165/9
165/10
**overstates [1]** 33/14
**owe [3]** 211/4 211/10
332/11
**owed [8]** 92/7 97/7
97/15 98/15 98/18
178/25 179/3 276/13
**owes [5]** 31/22 31/25
78/22 104/2 104/3
**owned [25]** 34/15
42/14 43/20 43/21
57/13 117/22 127/25
128/8 133/22 134/10
140/8 140/18 141/1
149/4 150/17 186/25
188/7 188/11 195/3
209/2 285/22 295/22
308/2 308/3 340/19
**owner [3]** 166/10
248/16 336/6
**owners [2]** 247/21
256/1
**ownership [25]** 21/20
32/12 32/23 33/6
33/18 34/12 34/17
35/17 35/18 35/20
35/23 75/4 75/4
103/2 170/12 201/2
210/15 211/8 227/9
227/13 227/14
227/18 227/24 273/4
290/22
**owns [13]** 46/7 46/10
101/20 103/16
103/24 150/25
159/22 164/10
227/20 271/18
277/25 308/10
333/18

**P**

**P-R-O-C-E-E-D-I-N-G-S
[1]** 1/2
**p.m [9]** 10/11 12/7

131/2 184/20 184/21
238/10 238/11 293/8
346/1
**pace [2]** 149/21 154/7
**pack [1]** 345/22
**page [70]** 23/17 23/19
25/20 30/1 31/5 31/5
31/7 35/11 36/13
38/13 38/19 38/22
38/23 39/2 39/5 39/9
44/7 45/2 46/15
48/21 50/22 65/18
66/22 84/17 85/11
88/22 89/2 89/3
89/23 90/12 90/13
91/6 91/22 92/2
92/21 92/22 96/10
96/20 96/22 97/4
97/6 97/10 108/10
151/19 152/10
157/19 158/21
160/23 177/10
177/10 208/2 209/8
209/19 209/20
210/23 211/17
211/18 215/2 224/24
226/19 231/13
251/18 280/19
286/20 286/24
286/25 314/8 316/1
319/17 325/15
**page 8 [1]** 46/15
**Page 9 [1]** 209/20
**pages [5]** 11/21 13/4
13/14 95/8 125/25
**paid [37]** 28/25 40/15
40/23 52/7 52/11
58/10 73/16 78/18
79/4 87/20 87/22
99/9 101/5 126/20
152/23 152/23 153/9
153/10 153/21
153/23 153/25
217/16 217/20 218/5
218/8 275/7 283/8
320/23 321/3 321/6
321/7 321/17 322/4
322/12 329/13
329/16 331/10
**pair [1]** 267/5
**paper [4]** 79/2 108/25
108/25 189/5
**papers [2]** 68/5
161/23
**paragraph [27]** 21/17
22/15 23/18 24/9
30/2 31/7 32/3 32/19
35/12 35/21 36/2
36/13 39/6 39/10
39/25 45/25 46/15
48/22 49/1 50/20
50/24 108/10 135/11
135/22 138/1 292/8
314/9
**paralegal [1]** 1/12
**parent [1]** 186/24
**part [31]** 15/8 34/6
41/7 42/8 49/2 63/10
63/14 107/6 148/3

166/13 168/6 190/9
192/25 205/3 228/25
239/16 245/1 246/21
251/16 252/21
274/25 277/20
282/19 289/24
295/12 312/6 315/7
316/21 317/9 331/18
338/18
**partial [1]** 316/18
**particular [11]** 89/13
115/7 267/17 285/11
288/16 300/11
301/18 306/9 315/14
326/14 332/18
**particularly [3]** 279/7
291/8 335/20
**parties [53]** 117/23
129/25 189/5 238/22
239/18 241/10 265/8
265/11 265/11
265/19 265/21 266/3
266/8 266/22 269/12
269/15 269/21
269/23 270/19
270/22 271/5 272/6
272/10 272/16
272/20 272/23 273/1
273/5 276/10 276/17
278/11 283/11
283/16 284/10
284/12 284/15
288/24 290/14
292/14 292/16
292/21 293/1 294/23
303/20 304/5 305/19
306/3 323/22 328/24
329/3 332/22 337/12
341/24
**partner [1]** 7/19
**partners [1]** 255/9
**party [52]** 6/17 8/9
48/25 49/11 166/15
166/19 167/4 167/10
167/18 239/4 265/23
266/6 266/9 266/14
270/18 271/16
271/23 272/5 272/18
272/19 273/6 274/20
277/13 277/17 278/8
278/11 281/19 283/9
283/10 289/1 289/4
289/10 290/20 294/9
302/1 304/10 304/18
306/14 315/22
323/11 328/12
335/17 335/18
337/25 338/23
339/11 339/17 340/1
340/3 341/3 341/10
343/19
**party's [1]** 336/14
**Pasco [2]** 188/10
195/11
**pass [7]** 18/17 84/23
133/11 133/15 192/3
192/5 329/21
**passed [16]** 19/10
25/18 30/16 30/17

**P**

**passed... [12]** 47/4
48/3 54/8 83/25 88/5
118/16 138/13
159/19 159/22
165/19 168/19
170/10

**passing [4]** 22/3 47/9
122/3 193/22

**past [12]** 40/25 53/2
81/19 83/7 102/21
103/12 168/15 186/9
192/10 230/6 250/7
257/11

**patent [29]** 63/8
63/13 63/17 66/2
66/4 66/5 66/20
67/25 68/9 68/11
69/14 70/2 70/4
70/10 70/20 70/22
70/25 76/6 143/24
143/25 144/1 144/21
182/25 183/4 218/18
282/18 307/9 307/19
307/22

**patent-eligible [1]**
66/5

**patented [3]** 63/23
70/7 70/19

**patents [34]** 63/20
63/23 63/25 65/13
66/9 66/13 66/15
68/2 68/8 70/5 70/14
70/18 72/15 144/3
144/5 144/9 164/3
171/8 171/16 176/8
176/9 308/10 308/13
313/14 313/18
313/21 313/22
313/23 313/25
314/18 314/21 333/4
333/13 333/16

**pay [40]** 30/24 31/19
31/24 40/10 40/12
40/19 51/24 53/21
58/14 58/21 79/5
87/21 94/7 98/25
99/10 99/13 99/16
101/4 101/22 102/7
102/11 102/15
102/25 103/5 103/18
103/22 104/1 119/9
143/9 148/22 149/18
166/9 172/9 179/16
225/23 231/23 232/9
232/21 255/17
271/20

**payable [6]** 55/17
55/24 92/4 92/8
92/12 226/12

**payables [2]** 226/15
230/6

**paycheck [1]** 51/23

**paying [9]** 102/16
102/24 148/15
217/12 227/16
289/18 289/22
289/22 289/23

**payment [4]** 33/1

199/12 219/15
321/12

**payments [13]** 20/14
28/4 28/7 73/12
73/19 101/22 102/4
169/8 172/25 196/2
196/6 230/18 249/11

**payroll [4]** 103/14
123/5 230/10 263/23

**pee [1]** 138/22

**peel [1]** 9/3

**pen [2]** 108/24 108/25
267/5 267/7 270/11
292/18

**penalty [2]** 96/11
267/19

**pencil [1]** 70/13

**pending [2]** 70/18
218/13

**penned [1]** 70/13

**Pennsylvania [2]**
67/13 70/17

**people [29]** 15/21
15/22 20/14 57/20
59/23 62/1 78/9
78/11 78/12 78/15
82/13 94/6 115/23
119/10 119/20
119/22 119/23
120/14 121/25 122/1
137/10 153/21
153/23 153/25 154/5
154/6 255/17 258/12
298/18

**per [3]** 221/17 226/13
236/3

**per se [1]** 226/13

**percent [97]** 18/24
19/11 20/8 21/20
27/17 28/17 53/21
60/8 60/9 69/25 72/5
84/21 85/13 85/14
85/18 86/14 86/16
86/19 86/20 87/17
87/18 98/17 99/23
100/4 100/22 101/21
102/2 102/3 103/18
107/24 108/22
109/22 111/15
111/17 111/17 121/5
121/6 121/10 127/9
128/5 128/19 129/4
159/23 159/23
166/10 166/10
170/12 179/16
219/10 219/22
219/25 220/4 220/7
221/14 221/16
221/17 244/14 249/6
254/25 255/18
264/15 264/21 267/8
273/9 285/15 289/19
290/3 311/6 311/7
320/7 320/13 320/19
320/22 320/22
320/25 321/3 321/12
321/16 321/20
321/20 321/23

321/24 321/25 322/4
322/5 322/6 322/6
322/8 322/11 322/21
322/22 323/2 323/19
329/3 336/6 339/14
340/9

**percentage [2]** 114/9
192/8

**perfect [1]** 289/20

**perfectly [1]** 112/18

**perform [6]** 46/2
80/18 82/6 243/16
252/16 305/5

**performance [1]**
154/21

**performed [5]** 81/18
82/14 217/9 265/21
305/24

**perhaps [7]** 4/16
62/19 108/20 136/8
137/23 151/12
233/24

**period [19]** 9/15
33/11 33/14 53/24
121/12 121/23 152/4
204/6 208/16 225/5
268/14 268/15
295/21 330/11 331/1
331/5 331/6 331/7
331/8

**perjury [1]** 96/11

**permission [5]** 58/20
179/18 179/20 180/6
180/7

**perplexed [1]** 60/15

**person [13]** 15/22
16/8 16/16 45/10
103/5 119/11 139/10
176/18 196/7 206/9
208/7 213/20 338/25

**personal [8]** 31/10
88/1 124/13 199/25
245/8 245/10 245/11
339/24

**personally [10]** 34/15
57/22 157/21 159/9
159/11 159/13
301/24 302/2 311/25
337/6

**perspective [2]** 257/23
258/6

**pertinence [1]** 331/23

**pertinent [1]** 109/5

**Pete [1]** 303/22

**Peter [1]** 2/3

**Peter O'Neill [1]** 2/3

**Peterson [2]** 2/9 2/10

**petitions [1]** 222/15

**pharma [1]** 315/15

**Phase [1]** 32/7

**Philadelphia [5]**
104/22 105/16 107/8
107/8 107/10

**phone [5]** 11/2 60/3
61/8 111/14 344/4

**phones [1]** 59/25

**phrase [5]** 76/11
76/13 76/21 77/1
77/8

**physical [1]** 103/24

**physically [3]** 9/5
126/17 271/8

**pick [6]** 112/2 119/17
239/15 239/20
254/12 255/5

**picked [1]** 284/9

**picture [1]** 122/10

**pie [1]** 63/16

**piece [2]** 63/16
258/10

**pieces [3]** 111/23
261/6 261/8

**pin [1]** 286/25

**piped [1]** 332/11

**Piper [3]** 1/19 132/16
297/25

**pivot [1]** 328/18

**place [17]** 26/21
47/21 47/23 47/24
48/6 54/3 108/23
109/6 121/25 122/1
162/1 200/15 201/10
203/25 270/10
270/12 290/13

**placed [3]** 148/21
191/21 224/12

**plainly [1]** 7/4

**plaintiff [3]** 35/3
57/16 66/23

**plan [2]** 42/8 240/19

**platforms [1]** 77/21

**play [4]** 12/11 74/18
239/7 239/8

**played [1]** 109/8

**playing [1]** 239/15

**plea [2]** 237/14
238/18

**plead [1]** 137/21

**pleaded [1]** 134/16

**pleadings [1]** 168/7

**please [67]** 17/16
18/2 21/7 23/17
25/20 29/18 32/19
34/21 35/11 36/2
36/13 41/13 44/3
50/10 54/14 67/16
69/1 74/19 76/5 84/2
85/2 88/13 88/22
91/6 92/21 93/13
96/7 96/22 131/3
139/8 139/17 153/4
166/16 172/11
175/14 176/23
180/18 182/6 184/23
187/6 189/8 191/16
208/10 209/7 209/9
209/20 210/7 210/8
210/23 211/17
211/18 214/18 215/2
219/1 231/11 231/22
236/13 242/2 244/3
244/24 248/24
262/10 291/7 314/8
319/17 320/15
324/21

**pledged [1]** 124/13

**plot [1]** 51/10

**plug [3]** 103/24

108/21 109/9

**plus [2]** 123/1 221/12

**podium [1]** 227/21

**point [53]** 8/12 21/16
25/8 25/12 26/15
27/12 27/16 28/1
28/5 28/15 44/9 48/5
49/2 52/14 67/15
71/8 73/2 73/14 88/1
91/2 105/4 111/11
112/11 118/20
119/10 123/4 130/14
131/9 135/1 142/17
172/25 175/18
183/10 200/9 206/10
216/18 241/4 253/12
258/5 260/8 260/15
267/14 272/24
276/16 280/19 281/8
286/4 290/20 295/23
299/12 307/8 329/20
344/7

**pointed [1]** 291/15

**points [7]** 23/19 24/7
24/10 25/21 51/21
65/15 290/15

**poles [1]** 247/12

**pollinated [1]** 113/14

**pool [2]** 307/21
333/18

**Pooling [1]** 288/15

**portfolio [3]** 63/14
163/2 282/19

**position [15]** 48/20
52/8 52/9 104/2
113/20 114/5 114/10
175/22 175/25 216/7
216/10 255/23
341/13 344/8 344/11

**positions [1]** 117/5

**positive [2]** 91/8
93/11

**possession [1]** 150/16

**possibility [2]** 167/17
260/1

**possible [10]** 8/10
56/7 89/20 109/7
126/14 211/6 211/10
257/6 268/22 322/14

**Possibly [1]** 79/15

**post [2]** 261/18
261/21

**postal [7]** 75/11 75/22
76/8 76/10 76/21
77/1 77/8

**potential [8]** 129/15
270/10 278/18 283/1
328/1 328/5 328/9
328/15

**potentially [8]** 258/13
259/23 282/23 288/3
302/17 303/1 306/8
311/19

**power [13]** 48/22
48/23 49/7 49/10
49/14 49/17 49/18
49/19 49/22 50/3
150/2 245/6 249/24

**practice [5]** 125/21

**P**

**practice... [4]** 250/5 263/9 264/6 264/14
**practices [1]** 83/9
**practitioners [1]** 294/5
**pre [1]** 104/11
**precision [1]** 228/20
**predecessor [3]** 338/25 341/11 344/1
**predetermined [1]** 274/13
**predict [1]** 59/14
**preface [1]** 9/8
**prefer [3]** 24/3 257/10 290/2
**preliminarily [1]** 194/18
**preliminary [2]** 129/24 234/13
**preparation [1]** 115/24
**preparatory [2]** 17/6 17/22
**prepare [9]** 186/12 186/13 188/13 188/20 195/10 217/5 269/6 305/4 337/12
**prepared [10]** 88/7 88/11 189/22 190/3 208/7 241/5 264/25 267/16 269/1 270/1
**preparing [3]** 145/5 197/17 239/6
**prepped [1]** 156/17
**prerequisite [1]** 161/25
**prerogative [1]** 245/9
**presence [1]** 147/10
**present [8]** 1/13 2/4 225/24 244/18 260/9 274/18 336/24 341/11
**presentation [1]** 130/2
**presents [1]** 335/23
**preserve [2]** 24/16 24/18
**preserved [1]** 24/20
**president [2]** 27/15 45/7
**pretrial [1]** 251/18
**pretty [12]** 33/15 51/4 119/13 121/8 121/12 122/3 122/4 122/9 164/1 273/3 333/23 333/23
**prevent [5]** 36/25 72/17 113/7 164/13 257/15
**previously [8]** 7/5 53/15 189/4 206/18 206/18 232/6 232/11 246/10
**price [10]** 128/12 265/10 266/24 269/20 269/22 273/4 273/7 273/18 273/22 333/9
**priced [1]** 292/25

**prices [1]** 60/8
**pricing [97]** 60/6 60/9 73/21 80/5 80/12 80/18 80/25 120/6 120/7 120/9 120/18 120/24 125/5 238/24 263/9 263/15 264/2 264/4 264/6 264/13 264/15 264/16 264/22 264/25 265/1 265/6 265/7 265/9 265/14 266/16 266/17 266/19 267/3 267/6 267/9 267/9 267/12 267/16 267/20 267/25 268/4 268/6 268/8 268/23 269/3 269/6 269/7 269/18 270/2 270/6 270/14 272/24 273/12 274/16 275/6 275/7 275/8 279/25 280/2 280/5 280/15 280/17 280/25 282/7 284/8 290/18 291/5 291/12 292/3 292/5 292/13 294/1 294/1 294/5 294/7 300/16 303/19 303/24 304/2 304/6 305/4 305/8 305/16 311/24 312/5 331/12 331/16 332/1 332/2 332/2 332/18 332/25 333/9 333/9 333/12 333/21 333/22
**primary [2]** 188/3 206/10
**principal [4]** 70/2 70/3 70/5 204/14
**principally [1]** 19/18
**printer [1]** 143/10
**prior [28]** 18/23 65/3 72/7 73/18 74/13 83/23 90/2 90/4 91/11 91/14 94/4 105/15 192/13 200/8 200/9 200/10 204/6 204/13 210/2 218/13 218/19 219/4 219/9 234/18 257/18 258/20 258/20 317/17
**priority [1]** 229/14
**prison [2]** 59/23 282/22
**prisons [1]** 107/10
**private [2]** 204/7 204/12
**privately [1]** 192/1
**privilege [4]** 113/21 114/8 115/3 115/14
**privileged [1]** 114/17
**privy [2]** 218/25 219/2
**pro [1]** 2/21
**probably [23]** 3/14 6/5 16/8 16/25 94/9 107/11 108/8 109/15

120/20 129/17 203/8 203/15 205/6 233/6 244/13 261/2 264/15 264/21 280/8 280/9 291/13 331/25 335/1
**probate [1]** 58/3
**problem [8]** 6/3 12/10 38/6 47/20 113/4 113/17 259/1 335/8
**procedures [1]** 200/11
**proceed [1]** 107/20
**proceeding [8]** 6/1 6/5 14/20 96/4 329/11 338/21 338/23 338/24
**proceedings [2]** 4/10 346/1
**proceeds [3]** 28/17 31/14 31/18
**process [19]** 4/12 42/16 44/15 56/21 73/8 73/10 73/20 74/7 74/14 111/4 120/15 239/6 243/18 244/4 244/5 245/18 246/22 247/13 251/15
**processing [1]** 206/9
**procuring [1]** 165/12
**produced [8]** 7/3 137/9 155/5 156/22 176/2 203/2 308/7 324/1
**producing [1]** 266/19
**product [9]** 64/4 110/3 137/11 140/9 182/4 182/10 327/17 327/24 328/1
**products [11]** 42/6 56/10 62/11 72/18 79/6 265/19 308/11 308/16 309/8 327/1 327/22
**professional [2]** 78/22 167/2
**professionals [1]** 38/8
**proffer [2]** 243/5 268/16
**profile [1]** 304/11
**profit [10]** 93/7 100/3 193/12 258/17 316/13 316/15 317/24 328/4 328/9 328/14
**profitability [6]** 58/25 59/5 128/16 224/14 259/8 260/6
**profitable [2]** 59/10 193/6
**profits [4]** 39/11 39/14 304/11 304/18
**program [2]** 228/15 286/11
**project [1]** 128/12
**projects [1]** 311/23
**Promising [1]** 98/5
**promotion [1]** 213/6
**promptly [1]** 24/13
**prop [1]** 259/11

**proper [1]** 117/5
**properly [3]** 117/4 172/20 253/14
**properties [3]** 193/16 193/18 286/12
**property [48]** 53/7 53/11 55/25 63/10 64/18 65/4 69/11 71/21 79/11 80/10 81/12 90/3 90/23 91/12 93/22 104/11 114/7 124/13 134/3 134/21 135/2 140/19 141/2 181/21 181/25 190/6 190/7 202/3 205/6 214/3 215/9 217/14 218/15 219/11 219/19 221/8 237/16 265/22 265/25 271/7 272/13 274/25 282/20 302/5 308/17 310/2 342/9 342/14
**proposal [8]** 88/16 93/17 95/6 104/9 104/10 105/10 119/15 126/10
**proposed [2]** 130/5 260/17
**proprietor [1]** 256/8
**propriety [1]** 334/21
**protect [7]** 51/3 72/24 80/8 82/6 82/19 83/10 113/20
**protection [1]** 55/9
**Protective [1]** 7/4
**protects [2]** 87/2 87/5
**prototyping [1]** 62/8
**proud [1]** 54/8
**proven [2]** 28/9 60/2
**provide [18]** 24/23 25/3 25/4 25/15 56/10 153/14 186/10 187/13 187/16 187/18 192/12 192/24 216/14 268/12 268/19 280/16 310/1 310/9
**provided [12]** 44/16 86/11 103/6 143/4 156/25 164/9 164/14 192/23 217/4 222/3 303/5 313/6
**providers [3]** 59/20 60/4 60/11
**provides [4]** 39/10 39/25 283/20 302/23
**providing [2]** 155/1 164/7
**provision [3]** 250/23 325/20 325/22
**provisional [2]** 63/25 318/14
**provisions [5]** 32/21 50/6 214/3 215/8 325/7
**public [12]** 2/15 3/3 3/8 3/10 5/20 10/3 15/10 129/25 204/8

212/20 263/11 263/24
**publications [1]** 308/8
**publicly [9]** 9/10 10/22 12/19 14/6 155/9 155/12 272/14 278/7 282/5
**publicly-available [1]** 282/5
**publiclyavailable [1]** 272/12
**publish [1]** 130/11
**pull [16]** 8/16 12/16 94/7 94/12 103/23 137/24 171/8 171/16 191/25 251/17 286/17 287/1 288/19 318/24 323/8 338/15
**pulled [3]** 182/25 183/3 225/10
**pump [1]** 110/2
**purchase [8]** 20/17 186/16 199/10 199/13 209/13 209/24 210/11 283/15
**purchased [10]** 168/4 169/20 169/25 198/8 199/7 199/15 200/23 229/2 248/7 248/15
**purchases [4]** 28/24 197/14 191/17 235/3
**purchasing [2]** 170/12 192/16
**pure [1]** 59/11
**purported [5]** 36/15 36/21 56/13 56/24 323/18
**purportedly [1]** 14/16
**purpose [7]** 80/17 85/25 86/1 87/7 87/9 120/8 273/1
**purposes [24]** 2/21 42/13 86/8 87/1 125/6 130/8 195/16 195/17 205/19 209/17 246/3 275/7 279/25 280/2 280/14 298/15 299/15 300/22 303/2 307/15 309/16 325/3 329/11 333/12
**pursuant [3]** 7/3 48/9 323/11
**pursue [1]** 31/9
**push [1]** 79/1
**pushing [1]** 116/7
**put [45]** 8/5 29/6 47/21 47/23 47/24 48/5 117/4 121/25 121/25 141/7 145/8 145/9 145/22 149/14 151/5 157/15 160/21 166/22 173/15 189/3 190/17 191/24 199/4 203/23 215/15 222/21 228/4 233/15 256/8 267/12 268/3 268/23 269/13

**P**

**put... [12]** 273/24 276/11 280/10 281/22 286/25 295/11 307/16 312/24 313/4 316/20 322/15 324/13
**puts [1]** 290/12
**putting [5]** 114/10 255/10 269/24 270/11 274/24
**puzzle [1]** 258/10
**PWRUPT [1]** 181/13

**Q**

**quagmire [1]** 9/13
**qual [1]** 243/4
**qualified [4]** 159/5 159/7 159/9 161/5
**qualifies [1]** 181/24
**qualify [2]** 265/3 343/18
**qualifying [2]** 341/2 342/21
**quarter [2]** 288/20 296/21
**quartile [1]** 296/21
**question [101]** 12/15 26/11 31/16 37/21 41/3 50/11 52/14 53/9 54/24 55/4 58/18 60/15 61/1 66/21 67/20 69/22 71/24 72/3 75/20 80/23 80/24 82/17 82/21 82/25 89/9 91/18 98/7 106/17 108/5 110/4 110/16 110/16 111/20 112/3 112/16 115/9 115/12 115/17 124/8 130/3 139/19 151/21 152/3 152/11 152/12 152/15 152/16 153/4 155/17 155/22 157/9 157/19 157/21 157/24 158/22 158/25 161/2 161/9 161/11 164/6 167/2 175/15 175/25 177/24 177/25 178/2 180/13 202/24 215/6 215/7 225/2 226/2 228/14 231/5 231/21 231/25 232/5 234/15 256/13 257/8 259/16 259/19 259/22 260/20 274/23 281/3 281/4 289/25 290/3 297/2 298/7 305/19 305/21 305/23 306/10 313/1 317/20 322/19 326/6 329/7 331/17
**question's [1]** 167/14
**questioned [2]** 268/12 280/12
**questioning [1]** 64/16
**questions [45]** 80/22

106/6 106/11 112/20 125/12 152/12 167/23 170/6 174/9 174/21 175/2 175/3 175/4 175/8 175/14 175/17 177/20 181/2 182/16 182/20 183/23 187/4 191/1 211/24 212/1 217/24 221/23 227/3 229/17 233/10 233/12 233/13 234/22 235/20 236/15 243/12 252/24 254/16 256/11 258/20 262/2 296/7 318/8 329/23 334/11
**quick [5]** 146/2 168/18 174/11 238/7 267/13
**QuickBooks [3]** 228/15 228/17 228/18
**Quicker [21]** 79/10 79/16 80/2 109/11 110/5 112/25 113/2 113/6 113/13 113/17 113/20 113/25 114/5 114/12 114/20 114/25 115/2 115/3 115/23 178/21 220/18
**Quicker Law [1]** 178/21
**Quicker's [1]** 115/13
**quickly [6]** 6/11 62/16 89/19 104/7 209/18 326/1
**quite [3]** 40/17 275/3 275/3
**quote [3]** 32/22 227/9 246/1
**quoted [3]** 231/2 232/6 232/11

**R**

**race [1]** 123/11
**racing [1]** 14/14
**radio [1]** 192/12
**Raiford [2]** 212/4
**raise [5]** 18/1 51/13 94/20 186/7 290/3
**raised [4]** 51/17 52/15 83/14 123/6
**raising [2]** 82/25 260/21
**ran [1]** 20/14
**Ranch [1]** 169/16
**range [40]** 85/9 85/10 85/12 85/15 85/17 85/18 85/19 86/11 86/14 86/21 86/25 109/25 111/2 111/3 272/17 273/18 273/19 273/22 273/23 274/11 274/13 274/17 274/19 274/22 280/16 293/15

293/23 293/25 294/1 294/2 294/3 294/4 294/13 296/21 296/22 301/8 301/11 301/12 322/5 330/9
**rapidly [1]** 315/16
**rate [39]** 52/8 60/20 61/9 69/14 69/18 69/25 81/11 81/14 84/20 85/6 221/20 251/1 273/9 273/13 273/16 273/21 273/25 274/3 274/4 274/8 274/9 274/12 274/15 274/21 275/4 275/6 275/16 275/19 276/12 276/15 276/21 284/23 290/4 304/21 310/5 320/7 321/21 326/12 331/10
**rates [4]** 59/15 59/16 59/18 304/20
**rather [5]** 4/25 23/23 112/2 257/17 295/10
**ratios [1]** 249/20
**re [4]** 76/8 201/8 205/4 323/22
**reached [4]** 21/2 76/22 307/4 307/16
**reaching [1]** 61/11
**reaction [1]** 292/1
**read [35]** 24/7 28/18 28/19 50/6 50/10 50/11 139/9 140/13 145/24 152/18 153/5 157/2 191/25 215/11 215/12 225/6 226/25 232/3 239/24 239/25 240/4 240/11 243/23 251/20 259/10 274/24 279/21 279/22 288/17 290/24 294/21 323/14 334/13 344/12 344/23
**reading [11]** 23/21 152/10 201/15 239/12 241/3 284/10 303/4 303/6 334/19 334/21 342/2
**readminister [1]** 17/25
**ready [6]** 107/20 114/3 239/7 239/8 258/22 334/17
**real [8]** 31/14 31/19 112/6 146/1 171/4 240/14 267/13 345/8
**reality [1]** 280/3
**realize [4]** 31/2 271/2 271/3 271/7
**really [44]** 8/11 30/15 35/9 43/6 43/25 45/10 45/23 49/21 51/6 55/10 57/23 58/3 65/9 66/8 73/21 75/3 80/13 81/5 83/7 83/24 94/10 108/19

116/3 119/19 121/17 121/20 125/5 137/17 182/13 238/25 257/22 268/22 269/21 270/24 272/8 278/2 283/14 284/4 288/2 290/4 290/19 330/17 331/15 333/17
**realtime [1]** 52/13
**reason [14]** 25/6 27/5 150/11 162/14 228/9 252/20 253/3 253/5 292/24 310/20 313/13 317/15 328/25 343/24
**reasonable [5]** 52/7 96/15 267/24 273/25 280/14
**reasons [8]** 3/1 33/12 267/4 270/8 270/11 284/4 292/12 304/4
**rebuttal [7]** 276/2 295/4 296/24 297/9 301/17 332/23 333/11
**recall [47]** 30/14 33/23 53/16 54/18 55/20 57/4 67/18 67/21 67/23 79/21 86/18 89/17 91/1 105/1 108/3 109/14 110/20 118/18 118/22 127/6 127/10 135/8 135/13 135/16 136/18 156/13 170/19 170/20 176/2 180/16 180/19 181/3 199/9 231/3 247/10 291/2 296/17 299/12 299/18 301/8 302/7 304/6 304/7 306/24 320/14 321/2 323/4
**receipt [1]** 303/22
**receive [8]** 33/1 71/7 86/7 154/13 169/6 169/10 242/17 278/20
**received [18]** 2/12 8/13 20/24 23/15 82/24 83/8 114/15 129/18 148/24 149/2 152/20 153/7 176/6 178/8 213/6 296/25 318/20 324/14
**receives [1]** 68/18
**receiving [1]** 126/7
**recent [3]** 230/7 257/10 292/10
**recently [4]** 4/5 38/2 64/1 258/15
**recess [3]** 17/14 130/25 345/25
**reclassification [4]** 197/15 198/17 200/14 251/5
**reclassified [4]** 198/5 198/14 200/25 201/21
**reclassify [6]** 197/12

198/13 200/22 210/13 222/7 222/8
**recognize [6]** 141/14 149/13 157/15 287/12 298/11 319/11
**recognized [2]** 205/12 271/6
**recognizing [1]** 205/21
**recollection [5]** 109/8 131/25 137/25 203/7 329/12
**recommendations [1]** 312/5
**recommended [2]** 86/16 312/4
**reconciled [1]** 116/19
**record [17]** 9/9 15/16 17/2 73/17 88/3 92/17 127/23 140/13 147/10 155/16 155/16 191/6 214/22 243/11 263/7 336/15 342/2
**recorded [2]** 221/4 221/7
**recording [1]** 204/8
**records [34]** 19/22 19/24 24/25 35/19 35/22 35/24 36/15 36/21 37/1 40/23 73/18 78/21 106/1 106/3 106/4 106/4 169/2 171/24 172/2 176/3 176/6 186/13 203/13 203/14 203/16 215/20 215/23 216/4 221/1 224/13 225/10 227/19 228/22 293/7
**recover [2]** 222/14 339/9
**recovery [1]** 61/7
**recreated [1]** 68/2
**recross [7]** 125/17 126/25 182/22 183/13 233/4 256/13 257/2
**redacted [2]** 325/25 326/1
**redirect [7]** 229/19 229/20 233/4 256/12 261/25 261/25 339/3
**redomestication [1]** 34/19
**reduce [4]** 102/6 102/10 103/15 289/24
**reduced [1]** 111/7
**reduction [2]** 60/9 103/7
**Reed [4]** 58/24 260/3 260/11 260/16
**Reed-Wright [3]** 260/3 260/11 260/16
**reef [1]** 192/8
**reefing [1]** 123/15
**refer [11]** 30/12 75/7

# R

**refer... [9]** 76/24 77/3 85/12 186/23 186/24 243/12 245/12 321/11 330/8
**reference [5]** 73/23 74/9 74/22 228/24 276/5
**references [1]** 202/20
**referred [7]** 66/1 85/5 170/16 179/25 247/9 293/3 325/25
**referring [12]** 31/21 57/21 75/14 95/16 96/18 110/23 156/8 177/2 211/20 256/3 266/17 335/3
**refers [7]** 45/3 75/11 75/22 75/24 76/9 76/10 320/13
**reflect [7]** 91/17 92/4 92/7 94/4 119/21 126/5 204/19
**reflected [4]** 202/4 209/14 211/15 224/9
**reflecting [2]** 91/3 198/17
**reflects [4]** 81/20 92/10 293/14 293/15
**refresh [1]** 310/13
**refreshes [1]** 137/25
**refused [9]** 54/23 54/25 55/2 55/22 55/23 56/19 57/2 57/3 57/6
**refusing [1]** 103/25
**regard [2]** 278/20 333/20
**regarding [4]** 21/19 78/8 125/21 254/8
**regardless [2]** 126/18 275/19
**register [1]** 195/14
**registered [1]** 79/7
**regs [3]** 306/5 306/8 331/17
**regulations [8]** 186/15 280/25 294/2 327/1 331/24 332/17 333/21 333/22
**regulatory [6]** 250/4 250/8 250/10 250/16 250/18 250/23
**reimburse [1]** 200/1
**rejected [8]** 284/19 285/4 288/12 290/7 300/20 300/23 301/4 303/3
**rejecting [3]** 284/4 297/16 310/20
**rejection [2]** 289/7 291/13
**relate [10]** 272/18 273/5 277/13 289/4 290/20 301/17 304/17 306/14 326/5 338/15
**related [49]** 5/20 40/16 80/15 101/24

110/4 188/4 192/22 196/7 217/21 218/6 249/9 264/22 265/8 265/10 265/19 266/3 266/22 269/12 269/21 269/22 270/18 270/22 271/5 271/16 271/20 272/5 272/20 272/23 273/1 273/6 277/17 278/11 282/21 283/9 283/10 283/11 284/10 284/12 284/15 288/24 288/25 289/10 290/21 291/24 292/16 303/20 304/5 304/10 304/12
**related-party [4]** 270/18 271/16 272/5 277/17
**relates [5]** 220/6 306/9 314/23 327/14 342/9
**relating [2]** 173/17 329/10
**relation [1]** 277/24
**relationship [2]** 136/24 333/19
**relative [6]** 65/13 129/15 131/5 248/15 277/3 293/23
**relatively [3]** 62/14 63/13 63/16
**release [1]** 12/9
**released [1]** 78/17
**relevance [12]** 64/16 64/17 67/5 67/7 68/15 68/17 71/5 83/4 89/11 120/10 127/24 207/10
**relevant [4]** 67/9 155/18 269/7 315/22
**reliability [2]** 266/25 294/12
**reliable [5]** 254/15 306/6 306/8 306/12 306/17
**reliably [1]** 330/17
**relied [9]** 38/10 44/21 81/10 82/23 85/5 100/1 124/19 125/3 287/19
**relief [1]** 8/19
**relies [1]** 247/13
**rely [9]** 43/6 81/9 124/17 124/21 247/8 280/15 320/6 320/21 330/14
**relying [1]** 299/1
**remain [1]** 55/12
**remained [1]** 121/18
**remaining [2]** 239/21 239/22
**remarkably [1]** 296/19
**remember [26]** 26/15 55/19 86/14 86/19 90/5 110/21 122/8 124/19 124/23

124/24 124/25 125/1 125/7 128/11 128/18 151/6 154/23 162/5 171/24 180/11 183/1 183/4 261/16 274/10 278/4 333/6
**remind [1]** 161/18 234/10 335/25
**reminded [1]** 85/21
**remove [6]** 210/16 210/19 249/3 249/8 249/8 249/10
**removed [3]** 24/21 133/9 340/14
**removing [1]** 294/3
**rendered [1]** 87/18
**renew [1]** 173/25
**renewed [1]** 323/16
**rent [7]** 152/22 153/9 153/18 197/16 201/21 201/25 202/2
**reopen [1]** 204/13
**reorganization [1]** 36/11
**reorganize [1]** 56/21
**repaid [2]** 221/24 222/4
**repeat [18]** 31/16 45/17 53/8 61/1 102/8 120/14 139/8 139/17 153/4 153/24 155/11 163/5 166/16 218/3 219/1 226/2 257/8 297/2
**repeatedly [1]** 190/17
**rephrase [2]** 142/6 166/1
**replevin [2]** 173/15 173/19
**report [82]** 74/12 74/15 85/11 91/23 109/1 109/2 109/3 109/5 109/18 109/23 110/1 125/3 187/11 213/13 213/18 213/21 220/22 242/15 274/2 275/10 275/11 275/22 275/25 276/2 276/6 276/9 280/7 280/23 281/3 281/7 281/9 281/14 281/18 281/22 285/7 287/4 287/12 290/10 290/24 291/6 291/8 291/17 293/12 294/16 294/19 295/1 295/2 295/5 295/5 295/7 296/20 297/6 298/15 299/13 299/22 299/25 300/11 300/4 300/20 304/7 304/13 304/23 306/22 307/7 307/17 309/16 310/8 310/12 310/14 315/13 317/3 317/12 318/4 320/10 321/12 322/23 322/25 325/4 330/12

332/15 332/24 333/1
**reported [3]** 92/15 98/18 193/12
**REPORTER [3]** 18/1 262/13 262/18
**reporting [1]** 280/15
**reports [5]** 83/19 186/13 186/14 296/25 297/20
**repossess [1]** 170/3
**represent [6]** 29/20 149/18 171/22 227/6 333/18 335/22
**representation [3]** 57/19 110/13 110/14
**representative [9]** 31/10 335/7 335/13 336/16 336/18 338/5 341/5 341/7 341/15
**represented [6]** 79/16 98/17 128/19 336/25 337/6 339/24
**representing [10]** 25/21 110/5 110/8 117/6 117/10 117/12 117/15 212/9 343/6 343/20
**represents [3]** 221/11 221/14 340/13
**request [10]** 8/7 8/8 55/6 57/2 72/9 88/15 93/17 104/9 171/24 326/7
**requested [6]** 55/5 55/16 110/5 160/7 160/20 202/2
**requesting [2]** 19/8 216/13
**requests [3]** 126/10 126/10 156/20
**require [8]** 9/22 126/15 166/23 187/5 246/1 254/2 332/3 334/21
**required [9]** 42/18 74/15 94/12 126/16 126/17 148/21 244/16 253/24 290/1
**requirement [2]** 83/11 276/18
**requirements [3]** 181/24 192/11 332/16
**requires [2]** 59/18 275/18
**research [10]** 288/18 289/17 299/8 299/10 309/6 316/12 317/22 321/9 321/15 321/15
**researched [1]** 317/18
**resembled [1]** 332/12
**resigned [2]** 163/1 163/6
**resolution [4]** 45/18 46/20 55/16 55/17
**resolve [1]** 119/1
**resolved [1]** 24/12
**resources [2]** 231/23 232/20

**respect [21]** 28/7 80/9 83/14 110/6 110/9 110/17 120/1 140/10 173/10 173/13 176/8 178/21 197/9 227/8 244/1 250/16 252/15 260/12 285/23 295/9 326/7
**respond [1]** 172/5
**responded [3]** 21/4 119/7 129/19
**responds [1]** 107/11
**response [10]** 6/6 17/4 26/4 26/12 29/14 62/15 88/15 93/16 95/1 104/8
**responses [4]** 74/4 105/2 125/25 126/7
**responsibilities [5]** 39/15 127/4 127/9 127/20 127/21
**responsibility [3]** 186/8 252/1 295/3
**responsible [1]** 19/18
**rest [6]** 78/2 130/14 238/20 239/13 239/18 239/19
**restart [1]** 122/15
**restate [2]** 49/23 93/25
**rested [1]** 184/8
**restriction [1]** 33/5
**restructuring [2]** 34/7 166/23
**result [6]** 92/23 221/20 247/14 286/16 301/4 313/11
**resulted [3]** 160/10 234/18 285/2
**results [5]** 86/23 106/23 286/14 286/17 293/3
**retained [6]** 297/21 297/24 298/2 298/6 298/8 298/10
**return [6]** 267/10 267/18 268/9 268/10 269/1 303/9
**returns [3]** 169/4 187/19 217/6
**revealed [1]** 65/24
**revenue [29]** 59/11 59/22 60/10 87/15 99/18 101/3 101/6 101/7 102/22 103/22 195/19 204/15 205/19 250/19 250/20 250/21 250/22 251/22 279/6 279/7 279/9 279/10 285/15 292/23 308/15 308/21 308/23 308/23 310/6 310/6
**revenues [6]** 243/20 252/25 310/22 310/23 311/1 321/1
**review [17]** 6/9 30/15 30/20 95/5 95/6 156/2 156/6 156/9

**R**

**review... [9]** 190/8 245/12 278/17 279/18 287/3 300/5 309/15 312/12 329/10

**reviewed [26]** 38/18 67/23 90/25 135/17 156/23 157/20 157/21 243/24 251/9 275/2 281/14 283/22 285/4 289/9 298/25 299/9 299/25 300/1 300/2 300/3 300/8 303/2 303/10 303/13 312/15 325/3

**reviewing [7]** 156/13 251/13 271/1 281/18 290/10 291/5 299/10

**reviews [1]** 291/6

**revisions [1]** 214/6

**RFP [12]** 74/4 89/11 94/9 94/25 105/7 105/25 107/5 107/11 107/13 125/25 126/7 126/10

**RFPs [6]** 89/7 94/7 95/5 95/7 105/2 126/3

**Rich [1]** 33/22

**Richards [2]** 33/24 40/19

**ridiculous [1]** 22/5

**right [400]**

**right-hand [2]** 201/13 208/11

**rightness [1]** 297/17

**rights [2]** 37/4 77/21

**rigor [1]** 280/11

**ring [1]** 28/11

**rise [2]** 71/2 184/22

**risk [4]** 250/25 255/23 260/14 260/15

**risks [3]** 266/21 272/10 332/22

**Riva [1]** 28/16

**road [1]** 7/11

**Rob [1]** 238/22

**Robert [3]** 238/3 241/11 242/4

**Robert Sly [2]** 238/3 241/11

**role [14]** 121/11 121/17 121/21 122/1 163/13 168/19 186/11 194/4 195/12 212/22 213/15 247/6 264/12 264/14

**roles [2]** 143/18 186/17

**roll [2]** 26/18 189/17

**rolled [3]** 60/21 188/16 191/24

**rolling [3]** 61/10 245/8 248/4

**Rollo [1]** 33/22

**rollout [1]** 60/23

**Rolls [11]** 198/8 199/2 202/22 209/13 210/1

228/3 229/11 247/24 249/2 249/3 249/7

**Rolls-Royce [10]** 198/8 202/22 209/13 210/1 228/3 229/11 247/24 249/2 249/3 249/7

**room [13]** 10/20 10/20 11/12 11/23 14/9 16/6 17/12 89/17 120/19 120/25 189/11 339/21 339/22

**roster [1]** 11/23

**ROUGH [1]** 1/1

**roughly [1]** 208/19

**routinely [1]** 294/5

**row [6]** 201/12 222/24 223/3 223/17 223/20 223/24

**rows [4]** 201/13 209/8 224/9 224/9

**royalties [8]** 94/22 321/25 322/3 322/6 321/25 322/3 322/6 323/15 325/19 326/7 330/10

**royalty [75]** 69/14 69/18 69/20 69/25 73/17 73/23 74/1 74/9 74/12 75/7 75/9 81/11 82/25 83/1 85/6 87/17 87/20 97/15 97/21 99/23 114/6 134/25 138/5 161/20 178/24 179/3 179/16 190/19 194/12 219/10 219/14 219/23 219/25 220/4 220/7 221/12 230/19 271/24 275/4 275/6 275/16 275/19 276/12 276/15 276/18 276/20 279/10 283/7 284/22 284/23 287/15 289/19 289/22 289/25 290/1 310/5 310/9 310/19 311/6 311/7 320/4 320/7 320/19 320/20 321/21 322/6 322/20 322/22 323/19 326/11 326/12 329/4 330/11 330/13 330/17

**royalty-free [1]** 138/5

**Royce [10]** 198/8 202/22 209/13 210/1 228/3 229/11 247/24 249/2 249/3 249/7

**rubber [1]** 44/15

**rubber-stamped [1]** 44/15

**Rudolf [7]** 1/10 185/14 229/18 233/12 236/16 256/23 262/2

**Rudolf's [1]** 233/10

**ruin [1]** 12/18

**rule [14]** 67/8 69/21 231/15 259/15 260/18 338/10 338/11 338/14 338/18 345/8 345/20 345/21 345/21 345/23

**ruled [3]** 39/17 66/4 67/14

**rules [5]** 269/9 269/10 272/21 284/8 294/6

**ruling [1]** 337/15

**run [6]** 73/3 161/5 162/11 230/7 240/8 247/22

**running [5]** 45/10 77/16 125/19 125/24 128/15

**Rutherford [2]** 64/13 65/19

**S**

**safekeeping [1]** 228/4

**safest [1]** 130/2

**said [69]** 4/3 20/24 21/3 33/3 35/16 36/5 52/4 60/16 61/4 65/7 72/19 85/17 104/14 108/16 110/1 114/12 116/5 119/4 119/6 119/9 119/11 123/23 128/21 135/6 139/11 142/22 143/24 144/15 156/16 160/14 171/1 171/7 172/8 212/25 246/10 267/15 268/24 269/11 272/4 272/9 276/19 276/20 277/18 285/12 288/17 289/6 292/15 295/6 298/11 298/16 298/24 299/21 300/24 302/8 303/23 304/1 304/12 307/3 309/2 310/8 310/13 312/15 315/13 317/1 317/18 331/18 332/24 333/8 334/12

**salary [12]** 51/17 52/7 52/10 52/15 52/22 52/25 53/2 169/6 169/8 172/25 213/3 216/17

**sale [5]** 29/4 29/6 29/8 31/14 166/22

**sales [15]** 53/21 64/22 99/24 165/1 165/8 221/14 283/7 283/8 310/6 310/16 310/18 310/19 320/20 321/4 322/3

**salt [1]** 247/2

**sanction [1]** 15/8

**sanctions [2]** 11/17 15/12

**Sarasota [6]** 102/1 193/19 193/21

235/16 235/25 236/9

**satisfies [1]** 315/11

**save [1]** 243/8

**saving [1]** 209/17

**saw [13]** 11/1 19/8 35/15 104/22 106/22 116/2 169/17 251/4 259/3 296/15 297/19 327/21 329/6

**say [88]** 10/1 11/6 12/17 12/20 12/24 20/8 24/10 26/8 28/7 30/13 30/23 36/11 37/13 37/25 41/20 41/21 42/21 46/21 50/9 50/10 55/4 57/3 57/6 57/18 57/21 59/4 59/6 65/6 70/11 73/13 81/15 83/24 85/15 91/14 96/14 103/2 106/5 107/23 112/5 112/21 115/11 123/3 123/5 127/19 134/6 142/25 144/19 152/2 152/24 153/10 154/2 154/16 155/2 160/19 163/14 165/7 165/18 180/18 182/6 183/2 206/25 212/19 222/11 241/7 244/14 244/15 255/22 264/15 265/24 267/11 270/23 271/22 274/17 279/19 280/3 283/9 288/9 294/6 312/25 313/22 322/17 331/22 332/1 340/17 340/18 341/21 342/25 345/12

**say-so [1]** 28/7

**saying [19]** 13/18 13/19 14/2 23/2 49/24 135/8 149/10 172/10 189/7 223/9 268/25 271/19 273/21 276/8 295/20 308/10 331/24 340/11 342/19

**says [58]** 21/21 22/21 22/24 22/25 23/7 23/10 24/15 25/2 25/12 26/2 28/5 28/15 31/12 31/25 31/25 32/25 35/6 35/10 38/17 42/1 56/3 56/17 57/1 57/1 64/14 69/8 69/12 77/5 84/14 84/22 88/18 92/14 92/19 92/20 93/20 108/6 108/9 108/13 138/3 146/10 205/14 207/6 227/9 280/23 288/22 292/10 293/15 294/19 294/21 323/9 340/22 341/22 342/8 342/10 342/10

**scale [2]** 51/25 102/15

**scaling [1]** 103/13

**scanned [1]** 6/11

**scanning [1]** 68/4

**scattered [2]** 42/10 46/8

**scenarios [2]** 273/14 274/2

**scene [1]** 270/16

**schedule [2]** 60/23 125/24

**Schoenfeld [17]** 1/24 2/1 18/18 28/18 50/5 86/2 89/11 91/13 103/21 108/16 125/10 128/18 129/9 181/3 252/11 257/2 262/6

**Schoenfeld's [1]** 129/4

**school [2]** 123/11 285/21

**schooled [1]** 123/10

**Schuette [20]** 238/23 239/10 240/2 241/6 262/12 263/6 263/8 275/17 276/14 276/22 277/12 293/14 295/4 295/17 296/13 318/2 318/9 319/7 324/7 324/17

**Schuette's [2]** 280/24 293/4

**Scibak [1]** 5/9

**scope [6]** 68/10 69/17 258/19 260/20 261/24 280/5

**score [1]** 3/24

**Scott [16]** 77/17 77/19 78/5 78/7 182/3 182/8 240/6 240/15 242/4 279/13 279/16 309/7 309/12 309/18 310/1 311/4

**Scott's [1]** 77/24

**screen [7]** 66/22 274/24 284/9 313/3 314/8 318/25 324/21

**screens [1]** 287/20

**screenshot [1]** 86/13

**scroll [11]** 75/17 75/19 76/6 84/4 96/7 210/7 223/18 323/8 325/2 325/6 325/9

**se [2]** 2/21 226/13

**seal [4]** 7/6 10/15 13/13 293/7

**sealed [9]** 10/22 11/14 11/15 11/19 11/21 11/24 12/21 14/18 129/23

**sealing [1]** 129/15

**Seamus [1]** 1/22

**search [12]** 199/1 200/17 283/18 286/4 286/6 287/19 302/7 302/9 302/13 311/12 333/15 333/20

**searched [1]** 282/12

**seas [1]** 136/2

**S**

**seat [2]** 129/13
183/25
**seated [3]** 131/3
184/23 238/14
**second [26]** 9/17 9/21
11/13 21/19 31/7
39/5 80/21 100/1
113/3 124/16 125/10
130/18 130/19 135/6
135/13 137/21 145/5
219/5 223/4 286/19
289/11 289/13
325/14 337/8 341/1
343/9
**secret [3]** 7/22 14/17
79/8
**secretary [1]** 45/8
**secrets [2]** 9/7 27/3
**section [17]** 48/21
50/24 50/25 66/6
92/3 97/11 201/1
205/1 205/23 214/4
288/22 291/19
325/13 325/14 326/7
326/11 337/4
**sections [2]** 95/7
326/4
**see [83]** 3/4 3/8 5/14
9/1 15/14 16/5 21/15
23/19 25/25 26/2
27/15 27/16 41/12
44/8 54/16 67/20
69/3 72/19 75/20
76/5 77/5 88/24
88/25 89/1 90/6
108/5 108/9 120/3
130/6 136/2 137/24
138/3 138/6 138/22
141/19 151/13
151/15 176/24
177/12 177/15 190/3
222/23 222/25 223/3
223/17 223/21 224/1
224/4 224/11 237/22
250/20 250/21
251/10 271/8 273/15
273/22 280/11 282/2
283/24 284/3 285/25
289/7 290/11 290/21
293/16 303/24
313/20 314/12 315/5
317/15 318/5 320/17
324/23 324/25 325/8
325/11 325/20 326/2
337/16 342/6 342/21
342/24 344/1
**seeing [4]** 67/18
67/21 116/22 292/2
**seek [2]** 126/11 177/7
**seem [6]** 15/4 51/9
130/7 207/12 287/10
337/24
**seemed [1]** 113/17
**seems [6]** 34/25 51/11
112/5 115/3 174/1
342/20
**seen [33]** 4/22 34/24
54/18 86/13 88/25

131/7 131/8 136/8
140/2 140/3 140/6
141/9 141/12 141/25
142/4 171/19 176/15
176/18 176/19
176/21 177/4 219/18
243/22 254/12 269/5
292/2 292/6 292/21
295/22 301/12
303/19 304/1 304/2
**sees [1]** 3/8
**segment [1]** 59/10
**selected [9]** 111/6
148/6 245/25 273/13
274/3 274/4 274/9
274/11 274/15
**selection [3]** 120/1
311/12 311/16
**selects [1]** 315/11
**self [1]** 247/19
**sell [14]** 28/15 28/22
29/7 32/11 32/16
94/18 94/19 101/16
101/24 166/19
166/22 167/3 167/25
284/18
**selling [5]** 31/19
31/22 166/14 167/17
285/21
**send [1]** 11/25
**senior [2]** 9/1 242/21
**sense [6]** 184/12
187/2 232/7 248/2
337/11 341/17
**sensitive [1]** 13/8
**sent [12]** 12/1 12/1
12/2 12/24 12/25
19/8 75/22 171/20
172/7 173/12 189/4
289/24
**sentence [5]** 21/19
274/25 275/1 292/8
296/3
**sentences [2]** 22/15
24/10
**separate [3]** 95/6
281/18 303/17
**sequence [2]** 109/11
184/15
**sequencing [1]** 238/19
**serial [1]** 122/22
**series [3]** 23/19 170/6
176/11
**serve [1]** 175/22
**served [1]** 275/11
**service [4]** 8/13
286/12 308/21
327/24
**services [23]** 42/6
60/20 72/12 72/18
78/22 143/4 153/14
154/8 164/14 186/10
187/13 187/16
192/22 217/9 229/14
243/15 263/12
265/20 265/20
282/15 285/14
294/24 308/16
**set [36]** 3/1 36/1

46/16 47/6 78/2 85/6
85/17 128/2 180/3
193/17 197/13
205/13 205/14
221/20 247/25
248/12 260/2 269/21
269/22 272/24 273/5
273/8 273/18 274/21
283/5 283/12 285/17
287/9 287/11 288/3
294/6 306/9 310/21
320/18 327/6 332/6
**sets [2]** 88/7 284/5
**setting [1]** 3/12
**settle [1]** 100/21
**settlement [1]** 118/17
**seven [3]** 268/17
268/24 269/3
**several [8]** 19/4 85/5
105/2 113/17 150/8
290/11 306/23 342/7
**severely [1]** 315/20
**shakedown [1]** 26/17
**shall [8]** 39/11 39/25
49/6 49/9 310/12
323/9 323/12 328/16
**share [1]** 192/14
**share's [1]** 21/20
**shared [3]** 143/14
143/16 284/14
**shareholder [53]**
18/24 19/12 20/9
25/23 26/3 26/12
26/14 26/20 30/4
30/25 32/4 32/6
32/11 33/3 54/10
54/13 57/5 93/10
119/2 127/9 159/11
160/7 162/7 162/8
172/16 172/19 176/6
197/13 197/16
198/12 199/21
199/23 200/24
204/25 206/1 206/3
206/12 207/25 208/4
208/23 209/1 209/14
210/11 210/14
210/17 211/3 221/24
221/25 222/4 255/5
255/24 257/16
334/23
**shareholders [4]**
254/23 255/5 255/13
257/15
**shares [10]** 20/17
87/13 166/14 166/19
166/24 167/3 167/17
259/12 289/19 340/9
**sharing [2]** 154/22
343/12
**sharp [1]** 70/13
**shaver [1]** 208/14
**sheet [12]** 3/24 90/20
90/21 90/22 193/17
198/15 201/1 205/1
223/9 249/4 249/8
249/9
**sheets [4]** 13/6 91/1
91/3 251/11

**Sheriff's [1]** 105/12
**shift [1]** 172/21
**Shock [1]** 72/14
**shoes [1]** 246/25
**Shook [2]** 6/23 26/17
**short [11]** 9/15 60/24
61/2 238/1 239/24
240/3 240/4 240/11
240/13 302/21 313/6
**show [20]** 5/19 7/14
17/5 35/19 35/22
44/1 104/25 106/5
106/5 116/16 116/16
116/18 164/23
206/17 211/22 221/1
276/1 281/9 286/16
332/24
**showed [2]** 7/13 105/2
**showing [2]** 2/16
90/19
**shown [1]** 106/22
**shows [11]** 91/8 92/8
93/1 96/23 96/25
97/1 98/23 164/20
210/11 267/11 293/3
**Shreve [9]** 87/23
87/24 88/7 93/24
104/12 187/20 217/5
220/4 240/3
**Shreve's [6]** 89/14
89/24 90/1 90/9
91/23 105/22
**Shut [2]** 295/3 296/11
**Siboney [3]** 285/19
285/24 286/7
**sic [3]** 35/8 85/13
111/16
**sick [1]** 93/15
**side [27]** 1/6 5/5 10/5
10/19 10/20 11/22
11/22 12/2 12/3
12/20 14/1 14/10
14/12 15/7 17/4
17/11 89/17 129/20
190/17 196/14
215/15 239/10
245/23 247/2 339/21
339/22 340/6
**side's [1]** 12/17
**sides [1]** 80/16
**sign [10]** 44/6 44/16
76/18 109/18 119/8
119/13 129/21
142/16 145/12
191/18
**signatory [1]** 28/2
**signature [15]** 39/2
44/9 44/10 84/5 84/6
89/3 89/6 96/21
108/12 141/14
141/17 142/13
177/10 177/11
290/22
**signatures [2]** 261/18
261/21
**signed [27]** 41/17
44/12 53/6 53/11
53/15 53/17 75/17
96/20 108/16 108/18

108/20 109/3 136/10
140/18 141/1 141/22
142/11 142/12
142/17 145/20
145/23 145/24
145/25 156/12
177/13 290/16 315/3
**significant [3]** 64/19
292/15 340/24
**signing [3]** 177/8
179/18 180/4
**signings [1]** 60/22
**similar [21]** 80/8
112/7 119/25 200/2
265/10 269/24 279/8
282/15 285/14
285/22 286/10 291/7
296/19 306/3 310/2
328/10 333/17 339/1
339/1 340/2 341/12
**similarities [1]** 286/12
**similarity [1]** 327/21
**simple [4]** 72/8 72/9
101/1 271/7
**simply [1]** 180/13
**since [29]** 17/24
25/18 33/8 51/23
52/10 54/1 57/15
61/2 92/11 160/20
173/22 174/13
174/17 175/7 175/13
175/22 206/2 206/13
206/15 216/6 216/9
216/12 217/2 224/22
239/3 244/19 252/2
257/5 277/4
**single [9]** 51/22 65/14
65/15 73/16 79/5
87/20 89/6 102/20
248/13
**sir [44]** 5/24 18/21
22/24 29/20 38/15
39/2 41/25 44/5
47/19 50/19 64/11
67/12 68/16 71/6
71/20 74/21 80/21
84/4 85/4 88/15
91/18 95/13 95/20
96/2 97/6 104/8
106/7 108/2 110/4
130/23 130/24
182/18 184/16
185/15 233/2 257/1
257/5 261/23 262/8
301/21 302/12
305/23 329/1 329/7
**sister [5]** 19/8 35/16
55/11 124/3 124/9
**sit [6]** 30/14 79/22
193/17 230/9 295/14
304/10
**sites [1]** 191/18
**sitting [10]** 78/1
110/24 112/25
113/19 225/16
247/24 253/7 253/8
298/12 344/19
**situation [7]** 14/12
24/11 230/2 230/15

**S**

**situation... [3]** 273/6
322/21 340/10
**situations [1]** 204/12
**six [11]** 24/1 42/10
46/9 93/24 94/6
99/16 99/18 192/14
255/5 259/11 345/13
**sixty [2]** 22/3 104/23
**size [3]** 60/21 111/23
316/16
**skill [1]** 78/2
**skills [1]** 247/3
**slave [1]** 52/5
**slight [1]** 238/25
**slightly [1]** 90/4
**slip [1]** 13/6
**Sly [15]** 238/3 238/6
238/23 239/10 240/1
241/6 241/11 242/2
242/4 243/11 251/20
252/7 254/21 256/15
258/3
**Sly's [1]** 243/2
**small [3]** 63/14 63/16
121/14
**smaller [2]** 5/1 229/6
**Smart [280]** 1/8 17/5
18/24 19/12 22/10
24/24 25/24 25/25
26/25 27/10 27/13
27/18 28/2 28/7
28/11 28/13 30/3
30/24 31/23 32/12
32/24 33/6 33/19
34/3 34/11 34/16
35/7 40/10 40/18
41/9 41/16 42/3 42/5
42/9 42/14 43/9
43/10 43/13 43/14
43/15 43/16 43/16
43/20 43/23 44/6
45/15 45/20 46/3
46/4 46/17 48/14
52/11 53/17 53/20
55/14 56/9 56/13
56/14 58/24 60/5
62/11 63/11 63/15
64/3 65/21 69/15
69/25 70/9 71/23
71/25 72/2 72/17
72/18 73/1 73/3
73/11 73/14 73/17
74/13 75/5 77/9
77/14 78/10 78/12
78/18 78/22 79/3
79/4 79/5 79/18
79/23 80/9 80/24
81/1 81/23 82/1 82/4
82/6 82/18 82/19
83/1 83/14 83/19
83/21 87/13 87/13
87/19 87/20 88/8
88/19 94/3 94/17
94/20 96/3 96/8
96/24 97/7 98/18
99/24 100/1 100/13
100/17 101/2 101/10
101/10 101/20 102/5
102/9 103/19 104/6
105/3 105/10 110/8
110/11 110/13
110/17 111/7 116/14
116/16 117/12
117/15 117/16
117/16 117/17 118/1
118/2 123/17 126/19
127/23 127/25 128/4
128/7 128/24 137/6
141/2 149/4 149/14
149/21 150/16
154/21 155/1 155/4
157/22 158/3 158/23
159/6 159/16 159/23
161/5 162/20 162/21
163/1 163/6 163/21
164/3 164/5 164/14
164/21 165/12
165/15 165/17 166/5
167/6 167/11 167/25
168/5 168/21 169/20
172/24 174/14
174/18 175/22
177/13 177/17
178/10 178/25 179/4
179/7 179/11 179/15
181/5 181/12 182/5
182/10 183/16
184/13 185/23 186/1
186/23 186/25 187/8
188/2 188/9 188/9
188/10 206/6 208/24
212/10 212/13
212/14 212/16
212/22 213/24
215/16 215/20
215/22 215/25
216/13 217/11
217/12 217/17
217/20 218/5 218/8
218/12 218/15
218/20 218/24
219/10 219/14
219/19 220/10
220/19 220/21
220/23 221/2 224/13
224/16 226/6 227/18
229/23 230/1 232/18
234/10 236/25
238/22 239/17
239/18 241/10
243/12 249/13
286/12 290/13
304/21 331/10
335/23 336/23 337/7
339/10 339/10
339/14 339/19
339/19 339/19
339/20 340/20
341/24 342/12
342/13 342/18
**Smart Yacht [1]**
127/23
**Smart's [4]** 10/9 12/2
12/25 184/7
**SmartComm [169]**
7/12 7/16 8/12 13/18
46/6 46/10 46/11
46/24 49/16 51/11
52/5 54/2 56/21
57/14 57/22 72/6
72/7 75/1 76/15 79/7
81/3 87/16 90/20
94/24 98/24 99/2
100/11 101/4 101/18
102/14 102/21
102/22 103/15
103/23 103/25 104/3
117/21 120/12
127/12 134/6 134/7
134/10 134/13
134/20 134/22
134/24 135/3 135/5
136/20 136/25
137/15 137/19 138/4
138/8 139/2 139/12
139/24 140/4 140/7
141/6 143/5 143/8
143/11 143/19
143/22 144/13
144/25 145/1 146/12
146/16 147/24 148/3
148/12 148/21 154/7
154/14 156/21 157/3
158/11 158/18
163/19 163/23 164/8
164/24 165/4 165/23
166/22 186/10
186/24 187/1 187/5
187/7 187/8 187/11
187/23 188/1 188/4
188/5 188/8 188/8
188/12 188/18 189/3
189/25 190/10 191/4
191/9 192/3 193/2
193/6 193/8 193/11
193/13 193/25 194/5
194/6 194/10 194/15
194/24 195/1 195/4
195/6 195/12 195/14
195/18 195/22 196/2
196/6 198/16 200/13
201/1 201/2 201/9
201/22 203/1 204/20
206/2 206/12 206/18
210/15 225/3 226/23
227/9 228/4 232/13
232/22 243/13
243/16 247/7 247/9
251/22 273/1 277/14
277/24 277/24 279/3
279/9 283/8 290/16
294/9 298/5 298/8
298/10 308/4 308/6
308/11 309/7 311/2
327/24
**SmartComm's [19]**
10/17 11/3 88/2 99/3
146/9 148/15 156/23
158/14 165/6 192/7
195/6 202/5 204/9
204/23 205/16
205/19 230/22
308/16 327/21
**SmartEcosystem [1]**
77/11
**snickering [1]** 50/13
**snort [1]** 303/4
**society [1]** 242/22
**socks [1]** 243/3
**software [21]** 25/1
61/20 61/21 61/22
61/23 61/24 61/25
62/9 282/18 311/17
311/22 311/23
311/25 312/1 312/3
312/5 312/7 314/11
314/23 316/1 324/21
**SoI [1]** 232/19
**sold [10]** 29/1 29/4
168/2 191/10 192/22
233/18 233/23
233/25 265/19
308/11
**sole [17]** 37/6 39/7
44/5 47/1 47/3 47/15
47/18 48/4 48/23
49/6 49/9 49/16
55/12 55/14 133/17
133/24 256/7
**solely [2]** 39/11 299/1
**solemnly [5]** 18/4
132/3 185/3 241/12
262/13
**solicited [2]** 167/9
167/10
**solution [1]** 11/4
**Solutions [2]** 279/2
313/10
**solve [1]** 118/22
**somebody [8]** 44/12
48/16 80/24 88/5
120/25 182/9 240/20
254/8
**somehow [2]** 190/18
276/12
**someone [14]** 13/17
14/4 32/18 52/7 52/9
124/24 125/4 159/8
159/15 163/10
163/14 222/6 298/14
337/3
**something [47]** 4/13
8/25 9/21 11/6 11/8
46/21 47/4 51/10
78/5 78/6 87/12
93/19 104/18 113/1
115/1 115/12 116/8
117/2 117/3 122/9
123/1 126/1 141/6
172/9 181/24 196/18
204/4 228/16 233/16
246/19 246/24
248/13 249/14
251/14 251/20
256/18 256/19
258/14 271/15
271/21 278/17
289/16 290/8 292/6
320/9 331/3 331/11
**sometime [3]** 108/17
243/8 314/14
**somewhat [1]** 33/14
**somewhere [6]** 20/22
52/18 54/13 203/19
228/4 287/22
**son [2]** 133/22 140/18
**soon [1]** 109/6
**sophisticated [2]**
271/3 271/15
**sorry [53]** 2/5 7/2
13/23 13/23 23/21
31/16 36/5 37/20
38/1 41/3 41/21
45/17 46/11 47/10
48/13 53/8 53/10
62/12 85/14 90/5
90/6 91/19 95/14
95/21 109/21 111/24
124/8 139/23 149/22
151/5 153/24 157/20
165/11 177/11
180/19 189/12
189/16 191/23
202/10 219/1 227/16
229/5 231/10 237/12
268/5 268/20 286/15
305/6 313/22 321/24
329/18 330/21
343/11
**sort [10]** 7/25 11/20
15/3 118/21 195/19
240/14 264/18 272/1
283/1 341/24
**sorted [1]** 207/15
**sought [2]** 31/8
299/19
**sound [5]** 109/14
186/19 201/14
239/23 324/11
**sounds [7]** 14/3 17/21
26/23 33/25 316/13
343/20 344/22
**source [1]** 282/9
**sources [3]** 60/10
114/22 114/22
**space [4]** 60/4 60/12
264/2 343/12
**span [2]** 208/21
208/22
**speak [10]** 30/7 42/21
42/22 83/7 92/17
145/6 145/7 200/19
289/13 326/17
**speaking [2]** 307/9
307/10
**speaks [2]** 50/2
172/12
**specialists [2]** 264/4
264/9
**specialize [1]** 242/24
**specialized [1]** 57/20
**specialties [1]** 242/23
**specific [21]** 10/21
14/5 64/5 74/10 80/1
102/1 124/23 128/25
129/3 157/10 243/18
253/23 254/3 276/3
276/5 298/7 299/12
302/4 308/23 331/22
333/25
**specifically [14]** 43/20
53/16 54/18 68/1
75/3 125/7 128/2
148/6 165/25 170/15

**S**

**specifically... [4]** 197/8 259/25 307/22 328/11
**specificity [1]** 7/8
**specifics [1]** 68/3
**specified [1]** 321/21
**specify [1]** 187/5
**spell [1]** 337/18
**spend [2]** 53/5 62/17
**spending [1]** 268/2
**spent [5]** 7/21 99/5 298/24 299/2 308/12
**Spider [6]** 199/7 205/9 205/13 209/25 210/1 229/12
**splitted [1]** 105/6
**spoke [3]** 21/13 298/14 307/3
**spoken [1]** 138/12
**sponsored [1]** 123/7
**spot [1]** 59/21
**springs [1]** 300/12
**square [7]** 149/7 149/10 149/12 152/22 153/8 248/15 261/15
**staff [3]** 131/12 242/13 287/15
**stage [1]** 320/18
**stake [1]** 21/20
**stalking [1]** 303/23
**stamped [1]** 44/15
**stand [5]** 17/23 136/3 227/21 262/12 344/14
**standard [15]** 201/6 243/21 244/3 244/4 246/9 246/21 250/5 269/8 269/11 269/18 270/15 272/3 290/17 293/24 326/3
**standing [3]** 31/8 177/20 178/2
**standings [1]** 32/1
**standpoint [3]** 34/12 34/17 315/9
**start [17]** 3/15 4/17 42/3 49/8 94/19 105/16 122/1 123/16 157/7 171/9 171/13 215/3 238/6 271/1 278/3 285/10 345/17
**start-ups [1]** 94/19
**started [21]** 14/3 54/6 56/5 57/10 57/19 105/7 116/11 122/5 182/25 183/4 183/9 186/3 200/9 206/13 208/24 212/16 213/3 277/19 297/19 306/18 306/20
**starting [6]** 15/18 52/18 60/23 130/17 164/13 251/21
**starts [1]** 267/4
**state [6]** 130/8 186/15 194/9 263/6 277/3 329/5

**stated [7]** 43/12 74/6 135/4 136/9 276/12 303/10 303/18
**statement [31]** 22/12 30/6 30/10 30/19 89/14 91/7 92/7 93/2 93/3 104/12 116/18 120/22 136/6 189/21 205/23 225/25 252/3 281/4 288/20 292/1 294/16 294/19 295/19 296/2 299/20 337/23 337/24 338/1 338/3 341/2 341/3
**statements [26]** 22/9 30/3 30/7 30/12 30/13 30/13 88/8 89/18 93/25 94/4 95/2 106/21 107/7 113/8 116/17 139/4 157/11 157/22 188/14 190/22 244/9 245/12 245/24 247/5 250/7 250/14
**States [2]** 67/12 68/22
**stating [1]** 190/17
**stations [1]** 191/20
**status [1]** 237/6
**statute [1]** 337/4
**Statutes [1]** 190/20
**statutory [4]** 202/25 251/25 256/17 256/21
**stemming [1]** 55/24
**step [10]** 14/8 17/16 59/3 178/7 186/17 320/4 321/9 328/17 330/25 340/14
**steps [4]** 24/14 24/16 72/20 287/18
**Steve [1]** 1/20
**stick [1]** 88/5
**still [28]** 15/2 52/9 57/13 59/5 63/23 70/4 70/7 70/7 70/19 70/21 70/25 71/15 82/2 98/23 100/10 101/20 130/21 144/12 174/21 227/20 227/24 232/9 233/24 257/21 260/11 276/17 281/3 315/2
**stipulate [1]** 86/6
**stipulation [3]** 239/24 240/3 306/15
**stock [17]** 19/6 19/9 22/22 27/17 34/16 121/3 121/5 123/20 123/21 123/21 123/23 124/6 258/11 289/20 289/22 289/24 290/2
**stockholder [1]** 124/4
**stop [5]** 71/25 243/2 255/21 270/23 345/4
**stopped [5]** 52/13 166/14 166/18 233/7

233/14
**stopping [1]** 6/1
**storage [2]** 228/5 228/11
**story [1]** 9/11
**straightforward [1]** 273/3
**strategy [1]** 7/14
**stream [1]** 279/10
**streaming [1]** 78/4
**street [1]** 122/13
**strife [1]** 234/1
**strike [9]** 42/3 49/8 54/25 139/23 159/20 181/10 205/19 230/12 319/22
**structure [10]** 19/19 20/13 43/5 44/18 44/20 114/4 116/21 121/18 127/5 188/5
**structured [1]** 14/19
**studied [1]** 299/15
**studies [14]** 264/6 264/15 264/17 264/22 264/25 265/2 266/16 267/3 270/2 291/12 292/3 292/5 303/20 304/2
**study [80]** 80/3 80/5 80/8 80/12 80/14 80/18 80/25 81/4 81/9 81/10 81/18 81/20 81/22 82/6 82/11 82/14 82/19 82/22 82/23 85/4 85/5 85/9 87/2 87/5 87/8 87/9 120/18 120/24 124/16 125/5 221/21 261/11 261/12 261/15 261/16 261/17 261/21 266/17 266/19 267/6 267/9 267/17 267/12 267/16 267/20 268/1 268/4 268/6 268/8 268/23 269/3 270/6 270/9 279/18 279/21 279/22 280/5 280/16 281/1 286/6 291/3 291/24 292/11 292/12 292/13 303/24 304/6 305/5 305/9 305/16 309/21 309/23 327/5 331/19 331/23 332/2 332/3 332/18 332/18 332/25
**stuff [5]** 2/16 17/6 17/22 156/8 176/14
**sub [1]** 338/17
**subject [10]** 5/22 28/14 32/7 66/6 89/1 188/21 197/18 210/5 291/25 303/21
**subjects [1]** 71/8
**submission [4]** 67/6 84/23 94/5 95/15
**submit [2]** 129/22

161/14
**submits [1]** 106/1
**submitted [16]** 51/14 88/19 95/9 98/16 104/10 105/3 105/5 105/10 105/21 106/2 106/3 106/23 126/4 126/19 130/5 299/13
**subsidiaries [5]** 42/11 117/21 188/11 336/6 339/20
**subsidiary [4]** 186/25 188/7 195/3 209/2
**substance [3]** 74/16 240/14 295/13
**subtract [1]** 211/2
**success [2]** 70/8 70/8
**successful [1]** 123/9
**sue [2]** 66/13 72/16
**sued [6]** 29/14 66/1 66/13 148/7 337/7 339/11
**Suffice [2]** 152/20 153/6
**suggest [1]** 294/2
**suggested [1]** 118/20
**suggesting [4]** 44/12 44/14 72/16 256/1
**suggests [1]** 284/25
**suit [1]** 66/16
**suitable [1]** 300/21
**suite [2]** 72/10 72/11
**sum [2]** 152/20 153/6
**summaries [1]** 286/13
**summarize [2]** 285/12 294/20
**summarized [1]** 189/21
**summarizes [2]** 152/24 153/11
**summary [3]** 84/19 96/2 96/23
**sums [1]** 28/10
**Sunday [1]** 239/2
**Super [1]** 327/14
**supervisor [1]** 213/23
**supply [1]** 192/14
**support [8]** 103/14 192/21 192/21 194/6 242/7 273/25 311/6 328/20
**supports [1]** 267/23
**suppose [1]** 23/16
**supposed [1]** 28/24
**supposedly [1]** 52/3
**sure [57]** 6/18 10/8 11/8 14/9 14/11 16/16 30/19 38/17 40/14 51/2 51/16 57/3 57/6 66/15 66/17 67/15 67/23 69/8 79/12 81/7 88/10 88/12 96/5 97/19 102/13 106/18 108/22 115/21 116/1 116/4 120/2 124/19 125/11 131/17 151/25 182/7 206/8 218/5 243/14 244/4

245/4 254/1 255/8 256/22 257/12 261/14 263/19 264/3 264/13 265/7 266/18 274/18 282/2 285/8 285/12 292/25 320/16
**suspect [1]** 231/15
**sustain [8]** 99/2 155/23 156/18 161/16 258/22 259/18 262/1 281/7
**sustained [16]** 39/21 58/8 58/12 67/2 139/16 139/18 140/23 142/2 146/14 164/18 166/2 167/21 168/8 190/15 231/8 248/22
**sustaining [1]** 142/7
**swear [5]** 18/4 132/3 185/3 241/12 262/13
**sweet [2]** 59/21 149/17
**swore [3]** 135/25 136/3 214/12
**sworn [5]** 18/12 132/11 185/11 241/20 262/21
**symptom [1]** 315/11
**synopsis [7]** 283/20 283/21 283/23 302/21 302/24 303/4 303/6
**system [20]** 63/21 63/23 65/24 66/10 68/7 70/7 70/7 72/9 72/10 75/12 75/23 76/22 77/2 77/5 77/6 77/7 77/8 77/9 78/1 256/2

**T**

**tab [1]** 224/10
**table [13]** 1/23 286/15 286/17 286/18 286/20 286/21 286/22 287/12 293/2 293/11 293/14 296/15 305/14
**tablet [2]** 192/12 192/14
**tablet's [1]** 191/20
**tablets [2]** 191/19 192/15
**tackle [1]** 345/14
**tags [1]** 243/4
**tail [1]** 52/6
**take [52]** 10/15 24/14 29/24 59/6 62/25 69/13 69/24 72/23 72/24 87/17 99/22 101/1 106/9 106/10 113/18 123/13 136/5 143/10 153/18 153/21 154/2 166/21 166/25 167/1 172/8 173/10 173/13 176/7 178/7 184/4 184/17

**T**

**take... [21]** 188/16
196/10 214/8 222/20
238/4 238/5 238/7
238/8 239/25 248/9
249/2 255/22 272/5
287/16 293/5 301/18
310/12 331/1 335/1
341/21 345/13
**taken [13]** 17/18
47/22 71/13 73/2
115/4 131/1 184/20
205/18 238/10
266/21 272/10 336/9
338/21
**takes [4]** 80/13
174/10 174/10
343/14
**taking [14]** 28/10
107/4 114/5 154/14
190/11 194/11
210/15 231/19
244/10 248/12 255/9
260/5 275/24 344/11
**Tal [1]** 1/21
**talk [52]** 2/13 5/18
21/3 59/25 114/3
143/1 148/10 158/2
165/25 168/17
168/18 172/21 176/5
187/7 188/18 192/17
194/20 197/4 198/7
199/6 215/14 216/19
218/11 220/21
238/13 247/20
247/21 247/21
249/19 250/3 258/9
265/16 272/21
278/16 281/21
299/22 301/14
304/23 308/1 309/12
311/8 313/12 314/5
315/24 318/1 320/3
320/9 326/13 331/16
331/16 333/22
344/25
**talked [17]** 63/7
69/17 80/3 118/16
119/7 141/4 173/9
266/15 294/8 298/18
301/16 307/6 307/17
311/9 311/11 323/3
330/15
**talking [24]** 13/6
15/19 16/24 176/11
176/16 187/6 196/15
196/16 196/17
196/18 196/23
196/25 215/8 233/20
233/24 235/14
237/18 271/1 272/18
273/8 299/3 306/1
308/5 337/4
**talks [1]** 269/10
**tap [1]** 222/24
**task [2]** 13/6 272/4
**tax [33]** 20/1 42/13
83/19 84/19 84/20
87/1 94/11 116/6

125/22 169/4 187/18
187/18 205/19
205/20 216/1 216/4
217/5 217/5 263/12
263/15 267/8 267/10
267/17 267/18 268/9
268/10 269/19
275/18 276/14
304/11 304/20
330/17 331/10
**taxes [11]** 79/8 83/6
83/25 116/23 121/19
127/5 265/6 291/25
303/21 328/20 330/5
**taxing [1]** 282/8
**taxpayer [5]** 116/6
268/11 268/16
268/19 268/21
**taxpayers [2]** 116/15
333/24
**team [24]** 11/11 56/8
62/10 94/6 94/8
94/10 95/1 105/25
107/5 107/13 126/14
145/10 165/8 165/9
277/21 279/19
282/11 288/17 309/6
309/10 316/12
317/18 334/5 334/15
**tech [14]** 7/16 28/17
29/7 29/12 228/25
228/25 229/7 279/1
279/5 285/13 312/21
313/10 314/3 328/7
**technical [2]** 189/16
232/7
**technically [4]** 19/2
81/2 228/1 255/19
**technique [1]** 68/6
**techniques [2]** 66/19
66/24
**technologies [3]** 77/15
78/4 306/24
**technology [38]** 7/12
7/24 9/7 54/3 63/24
68/3 70/5 72/1 72/6
72/11 72/21 72/23
72/24 73/15 75/5
76/1 76/6 76/16 78/6
78/16 87/15 101/3
101/6 102/23 103/4
103/6 103/24 104/1
137/6 137/13 144/6
144/24 163/23
315/16 315/20
339/15 340/19
340/20
**technology/patent/an
d [1]** 76/6
**telecommunications
[1]** 282/14
**telephone [2]** 14/25
17/16
**tell [76]** 8/4 12/19
13/10 14/4 18/12
19/5 20/5 26/16
33/20 40/22 42/19
43/3 43/6 81/21
93/15 95/4 99/11

100/23 101/25
103/10 103/13
105/25 108/17
109/16 118/24 119/8
121/22 125/2 125/5
132/11 145/8 145/8
152/22 170/24
178/14 178/17
178/20 180/24
182/14 185/11
187/22 189/8 189/19
190/2 191/15 192/7
192/18 198/4 200/21
201/19 207/21
209/12 209/22
210/24 214/6 214/12
227/13 241/20
244/25 247/25 255/6
255/7 258/23 262/21
283/23 284/22
286/19 289/23 290/4
315/5 321/23 322/10
322/20 323/1 323/17
323/22
**teller [1]** 340/6
**telling [5]** 9/18 13/15
99/8 114/24 139/12
**tells [1]** 145/2
**template [3]** 89/4
94/7 326/10
**templates [1]** 94/7
**temporarily [1]** 14/18
**ten [10]** 71/12 71/12
238/8 238/8 240/13
300/2 300/19 300/21
300/25 301/3
**tend [1]** 108/8
**tendered [1]** 268/7
**tending [1]** 260/23
**tenfold [1]** 52/25
**Tennessee [2]** 63/19
64/12
**term [9]** 51/11 55/24
225/21 226/3 229/23
230/21 231/21 323/9
328/18
**terminate [1]** 169/13
**terminated [1]** 323/11
**terms [9]** 48/6 66/7
117/23 260/7 290/12
296/20 306/17
331/21 333/20
**terrible [1]** 109/15
**territory [4]** 284/18
326/14 326/21 327/5
**test [1]** 272/22
**testified [43]** 18/14
27/1 40/21 58/23
64/20 71/20 97/24
98/10 100/13 100/16
101/9 101/16 102/5
102/9 118/15 127/4
132/13 138/20
138/25 141/25
148/13 153/17
156/22 159/14
159/18 159/21
163/12 163/19 167/9
170/22 182/24 183/3

185/13 234/6 241/22
262/23 304/24 309/3
324/2 335/5 336/21
337/5 341/15
**testifies [2]** 139/14
344/14
**testify [11]** 114/1
114/16 180/9 188/20
197/18 243/18
258/16 277/7 295/12
316/22 341/19
**testifying [10]** 108/15
113/10 138/25
180/16 180/19
276/24 335/9 335/12
341/6 343/14
**testimony [61]** 18/5
74/5 105/20 107/5
107/15 112/11
112/13 116/12 128/9
132/4 139/14 140/11
140/22 142/22
142/23 151/3 152/24
153/2 153/11 154/17
156/9 162/2 167/18
183/7 185/4 188/24
189/1 197/23 224/23
239/12 239/24 240/4
241/13 252/16
258/20 258/25
262/14 273/4 273/7
278/1 279/13 295/14
298/25 299/16
299/23 308/19 309/1
315/19 335/4 338/18
338/19 338/24 339/2
340/2 340/16 340/18
340/25 341/9 343/18
343/25 344/15
**text [2]** 78/3 172/7
**texts [1]** 21/3
**thank [46]** 5/16 11/7
18/9 24/2 24/5 95/18
106/7 126/23 126/25
132/8 147/3 147/16
168/9 177/11 183/11
184/19 185/8 197/2
203/17 205/24
207/19 211/23
214/25 215/13 227/2
232/25 236/12
236/23 236/24 237/9
237/12 237/24 241/8
241/17 252/7 256/23
262/9 262/18 263/4
291/21 293/9 293/10
295/15 296/9 329/1
337/21
**Thanks [1]** 257/24
**Theoretically [1]**
193/7
**theory [1]** 162/9
**thereafter [1]** 323/12
**thereunder [1]** 46/2
**Thereupon [5]** 18/10
132/9 185/9 241/18
262/19
**thing [14]** 20/5 46/7
56/7 71/22 72/2 72/7

114/11 117/9 130/11
154/20 156/6 230/24
239/8 334/14
**things [27]** 12/3
38/10 47/21 47/23
49/12 50/10 72/13
75/24 75/25 100/10
101/22 108/21
116/19 143/10 239/3
255/24 256/7 257/11
264/11 265/15
282/18 290/15 295/8
316/19 321/2 333/9
341/15
**think [168]** 2/13 2/24
3/2 3/10 3/14 3/23
4/6 4/14 4/22 5/17
6/14 9/25 11/1 15/7
19/7 27/1 27/2 29/22
30/7 31/2 44/19
52/14 52/17 53/14
55/20 56/2 56/17
57/5 57/20 59/20
60/4 62/16 63/3 65/7
65/8 67/2 67/4 85/9
86/6 86/24 88/6 89/9
90/25 93/5 97/18
98/14 98/23 99/17
104/14 105/4 106/22
107/20 108/20
108/25 109/3 109/7
109/19 110/2 111/9
111/9 111/22 112/15
113/15 113/22 114/1
114/14 114/18 115/6
115/11 115/25 116/8
116/9 118/9 118/10
118/11 118/12
118/20 120/4 120/17
120/19 123/2 124/1
125/1 128/21 130/13
131/15 142/13
143/23 144/20
148/12 149/10
150/13 154/25
155/21 156/8 166/21
169/19 171/1 172/7
173/3 174/5 174/7
175/1 175/17 176/4
182/11 189/2 189/17
197/24 203/8 212/19
212/25 218/1 229/9
233/10 233/20 243/6
258/14 259/22 261/2
264/20 266/11
266/15 269/4 273/4
273/8 274/17 280/3
280/20 281/8 284/25
288/9 288/15 289/14
291/4 298/23 301/16
304/1 306/15 308/18
310/8 311/18 312/15
315/13 315/16
315/18 316/8 316/20
317/1 317/2 317/7
317/14 325/24
327/23 330/15 331/9
331/18 331/25
332/21 333/3 333/8

**T**

**think... [7]** 334/12
334/20 338/13 341/2
344/2 344/7 345/22

**thinking [3]** 3/12 6/4
227/23

**third [32]** 44/7 45/25
65/18 91/22 138/3
166/14 166/19 167/4
167/9 167/18 200/19
265/11 266/5 266/8
266/8 266/9 266/13
269/15 269/23 272/6
272/16 274/20 278/8
278/11 281/19 282/2
289/14 293/1 294/9
302/1 306/3 315/22

**third-party [4]** 278/8
281/19 302/1 315/22

**thirty [1]** 268/21

**thorough [3]** 300/23
301/1 309/15

**thoroughly [2]** 299/15
325/3

**though [9]** 36/1 95/10
109/23 115/2 116/14
133/9 142/13 322/24
341/13

**thought [6]** 6/12
47/10 85/23 133/15
259/14 259/16

**thoughts [1]** 181/15

**thousand [3]** 72/5
152/21 153/7

**thousands [1]** 302/1

**threat [1]** 313/11

**threatened [1]** 183/6

**threatening [1]** 26/8

**threats [2]** 21/24
22/11

**three [39]** 2/25 30/17
53/2 59/23 63/20
63/22 91/4 99/9
103/12 103/15
118/21 119/6 119/16
119/22 120/3 123/4
156/11 188/11 193/4
194/8 277/22 284/5
286/3 287/17 288/4
288/8 288/9 288/11
291/2 291/6 291/11
297/21 298/24 299/2
300/24 302/16
302/18 308/12 309/4

**threefold [1]** 103/12

**throughout [4]** 13/4
74/2 121/12 296/11

**throw [3]** 31/23 245/9
251/4

**throwing [1]** 55/9

**throws [1]** 263/13

**Thursday [8]** 3/13 4/9
4/24 5/2 8/21 9/15
9/19 239/1

**tie [1]** 98/4

**ties [1]** 338/14

**till [1]** 20/7

**time [121]** 3/13 3/15
3/23 4/24 5/7 5/10

8/21 8/23 9/16 11/18
14/19 15/5 16/20
20/23 29/21 30/17
31/2 33/15 34/5 41/8
43/8 47/22 50/14
53/5 54/13 54/16
59/7 60/24 62/18
74/6 77/10 77/13
79/6 88/3 89/18
98/16 100/9 102/25
119/2 120/8 122/3
122/11 122/14
123/11 123/20 124/1
125/24 126/2 136/13
136/16 138/4 140/13
145/7 149/24 152/3
170/13 171/11
171/15 172/1 177/16
177/24 178/5 178/9
179/23 192/9 193/15
194/6 203/9 208/15
208/21 208/22
209/18 210/10
211/12 214/5 219/17
221/7 233/7 235/11
236/2 237/11 238/16
239/14 240/8 240/17
245/4 246/8 246/20
250/20 251/3 252/22
253/16 255/22 259/8
261/7 264/16 264/23
268/14 268/15
268/18 268/19
268/20 268/25
271/18 295/21
296/11 307/13
307/25 317/11
317/11 317/20 326/3
327/19 335/22
336/24 342/4 345/4
345/11 345/19
345/20 345/22

**timelines [1]** 108/23

**times [10]** 40/1 56/18
59/24 80/17 85/5
122/5 158/20 226/9
226/14 273/20

**timing [1]** 228/14

**tiny [1]** 184/14

**tip [1]** 208/1

**title [9]** 143/11
185/24 186/3 186/5
186/7 236/8 263/7
314/11 324/20

**titled [3]** 276/2 297/9
319/19

**today [30]** 1/3 1/9
1/12 30/14 65/10
70/19 79/22 85/5
117/6 117/13 118/4
127/21 130/4 130/8
130/11 130/15 175/6
188/20 188/24
197/21 213/10
217/16 222/17
225/16 230/9 239/14
299/16 309/1 327/11
338/15

**together [5]** 169/16

188/16 191/24
267/13 268/23

**told [13]** 5/14 10/20
10/25 11/22 27/19
89/10 154/19 235/25
241/3 248/8 261/2
277/2 298/22

**toll [1]** 247/20

**tomorrow [12]** 4/11
163/7 238/21 239/19
240/14 337/15
344/14 344/25 345/1
345/1 345/9 345/18

**ton [1]** 78/15

**tonight [2]** 240/5
240/10

**tons [1]** 73/25

**took [16]** 3/20 10/12
26/21 107/14 108/23
110/2 123/17 145/22
186/8 203/25 226/18
236/8 259/7 299/7
307/13 322/7

**tool [1]** 251/16

**top [13]** 4/3 22/1
25/20 79/25 84/14
96/7 198/7 202/22
208/1 208/10 210/23
251/21 314/9

**topic [1]** 109/21

**topics [2]** 109/20
228/13

**total [14]** 38/7 90/14
90/17 92/15 97/1
97/6 97/24 98/17
211/3 224/3 225/10
234/2 285/3 345/5

**totaled [1]** 193/3

**totally [1]** 46/10

**touch [1]** 312/11

**touched [2]** 108/24
108/25

**toward [1]** 175/18

**towards [2]** 28/24
209/19

**TP [2]** 331/19 331/23

**track [1]** 62/20

**trade [5]** 7/22 9/7
14/16 164/20 164/23

**traded [1]** 2/5

**trademark [6]** 271/17
271/18 271/19
271/23 271/25
282/18

**trademarks [12]** 308/1
308/3 308/7 313/15
313/19 313/23 314/1
314/19 314/22 333/4
333/14 333/16

**trail [2]** 203/15
228/18

**trained [1]** 189/10

**training [6]** 61/13
61/15 61/17 62/4
62/7 181/20

**trans [1]** 271/12

**transaction [52]** 7/19
20/6 50/4 54/1 56/5
56/6 74/16 82/20

116/10 120/11
199/10 199/11
245/19 265/12
266/24 269/16
269/24 271/4 271/5
271/16 272/5 272/7
272/9 272/19 277/13
277/17 277/19
277/20 278/2 284/21
284/23 289/21 290/3
291/9 292/13 292/15
292/18 292/25
293/24 294/10
294/11 295/25
304/16 305/25 306/4
306/14 310/7 322/3
322/18 322/19 329/3
343/3

**transactions [30]** 56/4
56/4 57/10 207/16
228/20 244/23 245/1
245/1 246/19 265/8
265/13 265/17
265/18 266/2 269/12
269/13 270/18
270/20 270/22
270/25 272/2 272/3
284/20 285/6 289/15
290/8 291/11 292/2
292/4 294/8

**transcript [8]** 56/2
151/10 151/16
157/16 160/22 225/8
226/18 340/22

**transcripts [1]** 140/12

**transfer [102]** 35/17
46/1 46/3 56/13
57/11 73/21 80/4
80/12 80/18 80/25
120/6 120/7 120/9
120/18 120/24 125/5
180/1 180/3 180/6
217/18 227/14
238/24 251/22 263/8
263/15 264/2 264/4
264/6 264/13 264/14
264/16 264/22
264/25 265/1 265/6
265/7 265/9 265/14
266/15 266/17
266/19 267/3 267/6
267/9 267/9 267/12
267/16 267/20
267/24 267/25 268/4
268/6 268/8 268/23
269/2 269/6 269/18
270/1 270/6 270/14
273/12 274/16 275/6
275/7 279/25 280/2
280/4 280/15 280/17
280/25 282/7 284/8
290/18 291/5 291/12
292/3 292/5 292/13
294/1 294/5 294/7
300/16 303/19
303/24 304/2 304/5
305/4 305/8 305/16
311/24 312/5 331/12
331/16 332/1 332/2

332/2 332/18 332/25
333/9 333/12 333/21
333/22

**transferred [9]** 19/1
19/6 19/9 43/8 211/7
254/24 340/8 340/12
341/17

**transferring [1]**
227/23

**transfers [1]** 194/21

**transition [1]** 4/4

**transpired [1]** 203/21

**travel [1]** 123/11

**treasurer [2]** 45/8
186/14

**treasury [1]** 331/23

**treated [2]** 200/2
293/1

**treating [1]** 248/25

**treatments [1]** 302/20

**tree [1]** 204/7

**tremendous [1]** 70/8

**trial [8]** 6/25 32/7
69/17 177/5 243/23
244/19 275/13
338/12

**tried [3]** 160/4 167/3
169/22

**trouble [2]** 87/11
295/11

**Trudy [1]** 87/11

**true [24]** 6/20 36/18
36/19 49/17 68/24
73/6 74/10 78/20
81/6 87/14 96/15
105/10 137/8 155/2
197/10 216/18 245/6
247/18 249/23
296/21 298/22 299/8
306/10 335/9

**true-up [3]** 73/6 74/10
87/14

**Truist [1]** 171/2

**truly [1]** 43/18

**trust [47]** 19/2 19/2
19/6 19/9 21/22
24/13 25/11 32/11
32/22 36/14 36/20
36/23 36/25 37/4
58/2 88/6 99/21
101/18 101/20
102/25 103/2 111/14
128/5 132/20 132/25
133/1 133/4 133/7
147/24 159/19
159/22 160/1 160/5
165/22 166/5 166/14
166/19 167/17
254/25 340/10
340/13 340/13
341/18 341/18
341/21 344/9 344/10

**Trust's [3]** 20/17
25/21 58/20

**trusted [1]** 119/20

**trustee [6]** 2/1 101/19
132/19 159/22 162/8
340/14

**trustworthiness [1]**

**T**

trustworthiness... [1]
338/4

truth [33]  18/6 18/6
18/7 18/13 18/13
18/13 132/5 132/5
132/6 132/12 132/12
132/12 139/12
160/17 185/5 185/5
185/6 185/12 185/12
185/12 214/12
241/14 241/14
241/15 241/21
241/21 241/21
262/15 262/15
262/16 262/22
262/22 262/22

truthful [1]  139/10

truthfully [1]  139/1

try [23]  4/25 12/21
14/2 14/16 15/2
62/13 62/15 62/22
71/12 89/19 99/20
104/7 117/9 118/22
120/2 122/16 126/6
126/13 168/18 170/3
184/17 190/23 259/9

trying [26]  3/9 10/1
12/11 12/17 13/19
29/7 51/9 79/1 103/2
119/1 120/16 122/14
128/16 170/24
172/18 175/6 189/14
245/5 255/20 265/9
266/7 269/13 269/20
272/11 283/3 338/15

Tuesday [6]  1/1 1/4
5/1 242/3 275/12
296/12

turn [32]  23/17 30/1
31/5 35/11 35/25
36/2 36/13 38/12
38/12 38/19 39/5
46/14 48/7 52/1 52/2
84/17 85/11 89/23
91/6 91/12 91/22
92/2 92/21 97/4
97/10 128/11 135/22
209/11 215/2 224/24
226/19 227/17

Turning [1]  124/16

twelve [1]  323/20

twisting [1]  117/2

two [81]  2/14 15/20
22/14 24/9 40/25
47/11 47/25 60/10
60/13 61/7 63/23
65/1 65/1 66/9 68/2
68/12 70/4 70/25
71/10 72/8 78/1
78/13 80/13 82/22
82/23 88/7 98/24
101/13 107/13
117/15 119/5 120/11
123/4 144/6 147/21
148/11 162/10
162/15 167/23
175/10 175/16
192/11 210/4 210/20

**U**

210/21 210/24 211/9
239/25 240/8 254/22
265/19 269/15
269/21 269/23
270/19 272/6 272/16
274/5 277/21 278/23
283/16 284/12
284/13 285/18 286/8
291/24 292/3 292/14
298/18 298/24 299/2
301/11 301/13
303/25 306/10 320/5
340/14 342/20 345/5
345/7 345/9

two-cent [1]  61/7

type [7]  154/25
244/16 245/19 256/3
271/24 307/5 342/11

types [10]  4/18
118/21 192/2 245/1
266/2 279/9 282/9
283/14 303/14 326/2

typical [2]  110/2
327/4

typically [13]  199/5
204/16 250/14 266/5
267/4 278/9 285/22
327/7 330/8 331/1
331/3 331/11 331/13

**U.S** [24]  43/17 188/9
195/11 208/24
208/25 264/13
264/16 266/18 267/5
269/9 269/10 270/3
272/21 284/8 291/25
291/25 294/1 303/16
303/17 303/21
304/12 327/12
333/24 337/7

UBS [1]  171/1

ugly [1]  171/4

Uh [7]  136/2 146/21
168/16 223/25
273/10 285/8 331/20

Uh-huh [7]  136/2
146/16 168/16
223/25 273/10 285/8
331/20

ultimately [3]  172/14
245/6 312/10

ultra [1]  56/4

um [1]  313/3

unaudited [3]  91/9
126/3 126/19

unavailable [1]  342/24

unaware [1]  292/10

uncertainty [4]
250/24 250/24 251/1
260/12

uncontrolled [1]
305/25

undergraduate [1]
263/19

underlied [1]  343/2

underlying [2]  137/6
157/9

undermine [1]  251/25

undermines [1]
253/14

understand [59]  3/4
3/11 4/4 6/14 8/24
9/13 37/20 41/3
44/19 50/16 91/13
96/11 108/1 115/19
116/8 120/22 120/23
133/24 134/2 134/5
134/12 134/13
134/22 134/23 135/2
135/25 136/3 137/5
141/22 144/3 144/4
144/5 144/24 146/11
146/16 168/4 190/20
196/23 236/7 237/6
240/18 247/19
252/20 252/22 254/7
254/24 258/3 259/22
260/1 261/10 275/2
278/2 287/16 288/2
289/3 294/21 295/19
330/22 344/21

understanding [26]
37/16 42/17 120/5
136/14 139/22
139/24 142/4 165/3
171/11 171/12
171/15 195/1 204/18
240/8 245/17 252/21
260/10 269/17 279/2
309/6 314/15 314/17
326/3 334/25 339/7
341/23

understood [9]  44/17
50/8 50/12 51/3
109/11 113/9 114/13
268/25 287/16

undertaking [2]  43/4
247/7

unfair [2]  190/19
259/6

unfairness [1]  51/21

unfortunately [1]
165/19

uninterrupted [1]
177/22

unique [2]  80/19
125/1

unit [2]  320/19 321/1

United [2]  67/12
68/22

university [2]  263/20
263/21

unjust [3]  97/21
103/3 103/3

unjustified [1]  100/12

unknown [1]  260/16

unless [7]  24/20
29/22 46/19 119/11
248/12 322/12
323/10

unlike [1]  100/2

unorthodox [1]
106/16

unrelated [1]  290/14

untenable [1]  26/18

untrue [2]  143/6
226/8

unupdated [2]  105/15
105/18

unusual [2]  290/21
303/24

unwind [6]  55/24 56/5
56/6 56/12 56/23
57/9

unwinding [1]  55/17

updated [14]  91/4
94/9 95/10 95/11
104/23 104/24 105/5
105/6 105/7 105/14
105/17 105/19 106/3
106/4

upheld [3]  65/2 68/21
104/4

upon [2]  47/8 246/6

upped [1]  323/23

upper [2]  294/4
296/20

ups [2]  94/19 183/12

us [36]  1/12 12/19
16/20 59/20 62/20
65/23 108/17 170/22
174/10 174/10
175/13 187/6 187/22
189/9 189/19 190/2
191/15 192/7 192/18
200/21 201/19
207/21 209/12
209/22 210/24 230/2
234/10 244/3 244/25
259/13 272/15
273/21 279/7 283/19
285/4 345/14

use [35]  54/2 72/1
75/6 87/14 92/10
102/23 103/4 106/1
109/22 134/10
146/12 147/18
150/22 171/5 188/15
199/25 201/24 205/2
219/11 228/15
239/13 256/16 268/5
271/20 271/24 282/8
283/5 300/15 311/12
320/22 333/4 333/16
333/20 338/12
344/13

used [37]  40/10 66/20
66/24 78/24 95/12
121/19 125/6 134/24
136/16 140/9 141/6
143/21 158/9 161/24
171/4 193/16 199/25
235/3 248/1 249/21
265/23 282/6 282/7
291/8 300/11 300/18
300/19 302/18 308/4
310/15 311/8 311/16
311/19 313/16
313/20 331/6 340/4

usefully [1]  239/14

uses [6]  134/7 145/1
146/16 163/19
201/23 282/8

using [21]  65/23
72/17 87/25 105/8
107/6 141/2 146/22

**V**

164/5 168/5 232/5
249/6 271/11 271/19
271/23 277/25 279/6
279/11 301/11
306/16 308/7 315/21

usually [2]  95/5 95/7

utilize [2]  81/14
342/14

utilized [1]  95/12

**V**

vacations [1]  255/10

vague [1]  109/8

vaguely [1]  261/15

valid [6]  63/23 66/9
68/11 112/3 143/24
162/14

validity [1]  69/20

valuable [4]  8/18
100/6 100/9 100/10

valuation [48]  8/17
128/8 146/8 147/19
158/9 161/21 162/7
165/25 207/15 242/9
242/12 243/21
243/25 244/1 244/6
244/7 244/11 245/3
245/5 245/25 246/5
246/5 246/8 246/24
247/7 247/15 247/20
248/21 250/24
252/17 252/23
253/18 253/25 254/1
254/13 257/20
257/20 257/23 258/4
258/9 259/7 259/9
259/11 259/12
259/15 260/2 261/5
282/6

valuations [16]  171/1
242/6 242/13 242/24
243/5 243/17 244/4
244/5 244/14 246/14
246/21 246/23 247/7
249/6 251/14 258/6

valuators [1]  119/16

value [30]  33/2 65/8
70/21 70/23 71/1
100/6 146/19 146/19
146/24 147/24
165/23 249/13
250/25 252/1 252/5
252/6 253/4 253/14
254/15 257/6 257/14
258/7 259/4 259/23
260/9 260/9 261/6
266/2 266/24 271/23

valuing [3]  245/19
249/15 258/11

varies [3]  226/8
226/14 268/17

various [1]  50/6

vary [1]  226/8

vast [1]  106/10

vehicle [4]  150/25
151/1 198/14 205/14

VendEngine [1]  65/23

vendor [2]  7/20
165/13

**V**

**vendors [1]** 99/15
**veracity [1]** 22/6
**verification [4]** 135/19
299/19 307/1 308/14
**verified [6]** 135/6
135/8 135/13 136/11
137/22 145/5
**verify [2]** 299/10
308/8
**Vermont [5]** 88/16
93/16 93/16 104/8
104/14
**version [2]** 91/11 93/3
**versions [1]** 105/21
**versus [7]** 64/13
182/3 182/3 182/4
182/8 182/9 182/9
**vessel [1]** 193/20
**vice [1]** 27/14
**video [8]** 77/20 77/21
78/3 239/2 239/7
239/16 240/6 273/16
**view [6]** 113/18 115/4
125/20 144/12 248/9
290/5
**violating [1]** 113/5
**virtually [2]** 143/22
144/14
**virus [1]** 56/4
**vis [1]** 286/11
**visibility [1]** 20/9
**vision [1]** 7/14
**visit [1]** 77/14
**visitation [2]** 77/20
77/21
**Visual [1]** 314/5
**voice [1]** 78/3
**volunteered [2]** 52/2
52/10
**Voralia [3]** 124/18
239/1 240/2
**Voralia's [1]** 239/15
**vote [9]** 48/24 49/7
49/10 55/2 55/5 55/6
55/7 55/21 57/4
**voted [3]** 57/6 160/11
160/11
**vulgar [1]** 172/12

**W**

**waist [1]** 327/19
**wait [5]** 4/11 9/19
15/8 125/21 267/11
**waiting [3]** 6/14
108/20 109/9
**waiving [1]** 50/21
**walking [2]** 281/25
287/18
**want [71]** 3/22 4/9
5/1 8/24 11/5 11/8
15/2 15/21 16/7 17/3
17/7 22/19 22/25
44/9 49/2 55/9 72/13
106/9 112/9 114/25
120/23 121/20 138/6
138/7 155/19 161/8
161/18 162/3 162/13
168/17 170/15

172/11 172/21
175/10 175/12
175/13 176/5 203/4
204/15 222/20
233/25 234/9 237/18
238/5 238/6 240/18
240/19 245/5 249/4
249/24 252/22 255/9
269/23 274/23
278/17 279/23
281/22 291/16 292/7
294/15 294/18
294/20 303/9 305/17
305/19 312/20 320/9
330/3 331/16 331/18
335/1
**wanted [8]** 76/17 88/5
118/17 130/20
160/17 161/12 162/2
286/16
**wants [2]** 35/16
237/14
**Ward [1]** 57/24
**wards [1]** 105/17
**warranted [2]** 246/10
247/4
**washing [1]** 150/2
**waste [3]** 21/23 22/10
250/25
**watch [1]** 189/10
**watched [1]** 258/16
**wave [1]** 4/17
**way [33]** 9/10 11/10
12/22 13/8 23/14
24/4 40/22 72/8 78/1
90/24 103/1 105/1
105/17 111/3 118/15
122/7 122/8 145/15
168/15 175/19
182/12 200/3 200/11
200/17 205/20 224/9
228/21 254/9 274/6
305/4 320/20 320/24
335/18
**ways [2]** 39/15 116/23
**wear [1]** 117/7
**website [1]** 284/11
**websites [2]** 301/2
312/17
**Wednesday [4]** 15/18
15/20 15/25 16/6
**week [14]** 4/20 5/1
5/10 6/15 21/4 80/16
102/20 130/14
155/18 156/17 230/4
230/4 307/6 307/17
**weeks [5]** 19/4 29/9
113/7 115/7 154/19
**Welcome [1]** 1/3
**well [113]** 1/10 3/22
5/5 5/8 5/25 7/22
8/2 10/4 12/17 15/23
16/5 16/10 22/24
23/10 26/10 26/14
29/12 31/21 37/13
39/22 45/24 48/2
49/13 56/2 57/2 57/9
58/18 61/4 62/3
62/14 63/13 65/5

68/14 70/3 73/2
75/24 79/4 87/2
90/17 95/4 95/12
100/24 103/21
111/19 117/20 118/5
119/9 129/21 134/9
134/16 136/5 136/10
137/21 149/2 150/17
156/7 159/19 161/16
166/23 176/9 176/19
181/10 187/17
190/20 197/16
198/19 198/22
202/19 222/9 222/10
226/17 228/22 232/7
240/21 243/17
247/18 249/2 249/19
250/9 250/18 254/5
254/6 254/8 254/24
257/19 258/5 259/1
261/8 276/7 276/8
277/1 285/25 288/21
301/1 302/15 303/6
310/12 313/18
318/11 321/9 325/24
335/17 335/23 337/2
338/7 339/11 340/5
341/1 341/13 341/16
342/15 344/17 345/6
**well-established [1]**
7/22
**Welling [1]** 244/4
**went [22]** 56/18 59/2
59/8 60/19 61/3 93/5
95/12 105/14 122/3
158/18 181/8 277/22
282/11 283/23 288/1
288/18 289/7 297/12
312/16 316/11
323/22 340/9
**wept [1]** 123/10
**west [2]** 43/15 339/19
**whatever [8]** 9/4 57/1
93/19 138/7 145/22
146/19 233/13
269/22
**wheelhouse [2]** 51/6
91/20
**whereas [1]** 192/13
**wherefore [1]** 31/6
**whether [49]** 22/17
74/10 106/19 127/8
131/5 142/4 172/17
181/12 187/23
194/10 205/25
229/22 247/13
256/16 272/19
272/25 273/22 274/7
275/6 275/19 276/13
276/15 276/20
283/21 284/22
289/23 290/11
291/23 295/24 303/7
304/8 304/9 304/16
304/20 307/2 308/10
311/17 312/18 313/9
315/1 315/5 317/13
321/16 323/15
323/18 330/20 331/9

333/3 343/16
**white [12]** 102/1
240/16 276/3 291/4
291/12 292/4 295/9
296/24 297/10
297/13 297/20
332/11
**White's [8]** 290/24
291/17 291/22
294/16 294/19 295/2
295/5 295/7
**whole [19]** 2/16 18/6
18/13 33/25 58/2
63/16 72/10 72/11
121/12 132/5 132/12
156/6 185/5 185/12
241/14 241/21
262/15 262/22
326/20
**wholly [5]** 186/25
188/7 188/11 195/3
209/2
**wholly-owned [5]**
186/25 188/7 188/11
195/3 209/2
**whose [3]** 123/21
144/6 199/15
**will [77]** 1/21 4/6 5/6
5/12 5/12 6/14 7/8
7/15 9/19 13/10
14/13 15/22 16/11
16/12 16/16 18/5
21/16 22/22 25/10
25/13 38/19 50/9
58/2 60/20 61/10
61/12 62/15 62/22
63/3 71/7 72/23 73/2
75/5 75/5 75/10 76/5
78/21 86/7 101/10
105/25 108/1 115/10
132/4 133/25 155/14
170/24 182/6 185/4
185/20 190/24
197/20 238/22 239/8
239/11 239/14
239/18 240/13
241/13 243/8 243/12
244/3 251/1 258/10
262/15 274/18 313/6
316/22 317/8 317/14
318/24 330/10
330/23 334/21
340/18 343/8 344/13
345/4
**WIP [1]** 259/3
**withdraw [4]** 37/23
115/9 115/11 295/12
**Withdrawn [1]** 319/23
**within [11]** 19/3
86/15 86/21 187/25
233/10 273/18
273/23 278/13 286/9
290/22 310/2
**without [20]** 7/23
44/13 48/24 49/7
49/10 51/22 78/7
102/24 113/5 115/13
128/25 143/9 161/15
190/4 190/5 190/11

194/11 226/22
232/12 257/14
**witness [49]** 18/3
18/8 18/12 18/17
64/20 112/10 113/1
114/19 115/1 125/16
130/18 131/19 132/7
132/11 152/13 161/8
174/1 175/5 184/3
184/6 184/11 184/24
184/25 185/7 185/11
196/23 197/1 214/17
214/21 214/24
231/14 236/20 237/2
237/25 241/9 241/16
241/19 241/20
255/20 262/10
262/17 262/20
262/21 276/24 277/6
324/3 324/10 329/21
338/20
**Witness name [2]**
241/19 262/20
**witnesses [5]** 238/13
238/15 239/20
239/23 240/12
**Wolfe [1]** 2/19
**wonder [1]** 338/10
**wondering [2]** 6/6
305/14
**word [9]** 23/4 29/25
111/3 136/15 250/24
268/5 275/25 291/8
313/16
**words [13]** 111/13
116/10 120/2 236/7
255/12 260/16
282/17 311/18
313/20 314/21
333/16 340/22
343/24
**work [31]** 15/25 16/9
26/7 52/12 58/1 58/1
78/15 94/6 100/22
105/17 154/14 161/3
212/10 213/21
220/10 220/14
220/18 242/9 242/12
263/13 264/1 264/3
264/8 264/14 264/21
280/6 297/5 329/13
341/8 341/9 345/18
**worked [11]** 27/20
51/22 65/24 143/7
143/9 222/9 239/4
311/21 311/24
311/25 315/15
**working [8]** 13/9
33/17 52/5 78/9
212/16 235/4 240/10
264/16
**works [7]** 32/1 35/9
97/19 106/21 120/6
292/4 344/7
**world [7]** 100/7 112/6
123/6 131/15 264/5
326/20 326/25
**worry [3]** 225/21
226/3 229/23

**W**

**worse [1]** 72/2
**worst [2]** 56/7 71/22
**worth [5]** 98/24 99/10
166/24 171/2 247/2
**worthless [6]** 143/22
144/14 144/17
144/18 144/19
144/20
**would've [1]** 293/1
**Wraith [2]** 198/8
199/2
**wrap [4]** 104/7 317/7
328/16 344/24
**Wright [4]** 58/24
260/3 260/11 260/16
**Wright-Reed [1]** 58/24
**write [8]** 32/20 62/10
77/19 77/22 78/15
143/10 276/17
301/18
**writer [1]** 77/20
**writes [4]** 21/19 21/22
24/13 65/19
**writing [4]** 4/11 25/9
78/16 136/8
**writings [1]** 74/8
**written [10]** 136/4
176/22 179/11
218/20 219/19
275/19 276/16
290/12 295/25
323/11
**wrong [1]** 154/21
**wrote [5]** 21/19 22/7
61/21 79/10 79/13

**Y**

**yacht [30]** 28/23 29/2
29/12 31/22 31/22
31/23 34/4 34/13
34/15 34/19 35/8
35/14 35/19 36/16
36/22 36/24 37/2
39/13 40/7 40/9 41/5
127/23 128/7 180/10
180/22 193/20 229/5
233/11 234/16 235/7
**yacht's [1]** 29/8
**yachts [4]** 28/16
28/22 31/14 31/19
**yeah [99]** 11/7 20/22
23/2 23/25 27/16
33/19 35/6 35/10
35/22 37/8 37/12
41/19 45/22 50/2
53/8 54/18 57/12
62/16 67/23 81/17
81/19 84/9 84/22
85/8 89/4 90/19 93/5
93/5 93/23 94/6
94/16 98/6 105/4
107/18 109/25
110/12 116/1 117/3
121/1 122/12 122/24
140/15 159/25
172/18 173/5 176/25
189/21 193/7 200/18
207/23 208/18

216/18 224/7 225/12
225/13 225/15
225/19 228/21
241/16 251/16 255/3
255/11 255/15 260/8
260/8 261/15 264/20
267/12 270/23
271/17 272/4 272/21
273/3 273/5 273/14
277/18 278/7 278/21
278/25 286/9 287/18
289/13 291/4 291/20
292/2 292/15 295/19
305/24 307/21
308/18 313/25
314/21 314/25 318/7
321/5 321/22 330/8
330/25 331/25
**year [40]** 26/21 29/8
32/7 51/18 51/24
78/13 81/18 84/13
91/23 123/10 148/16
148/22 151/25
152/15 152/21 153/7
153/21 190/10 193/9
193/16 194/1 194/13
197/5 213/4 213/16
221/18 233/22 234/7
234/8 234/11 234/24
235/1 235/2 246/16
261/13 261/19
267/17 320/5 323/12
331/2
**years [47]** 27/21
40/25 51/22 52/3
52/6 53/2 54/7 57/10
59/23 61/23 62/7
75/2 82/1 83/23 88/2
94/18 103/12 121/22
123/1 125/20 128/17
137/16 147/21
148/11 160/3 162/10
162/15 170/1 172/9
186/9 192/11 192/13
193/15 234/18
246/17 265/1 268/2
268/17 268/24 269/3
292/6 316/6 319/25
330/12 331/1 331/5
331/7
**yelling [1]** 171/5
**Yep [3]** 89/21 201/21
231/12
**yes [352]**
**yesterday [34]** 6/21
20/16 27/1 27/2 34/8
62/15 62/17 63/7
65/8 74/22 89/9
89/17 104/22 118/15
121/4 121/8 128/23
130/20 146/5 156/3
170/17 170/21
179/25 189/2 229/11
247/6 266/11 277/2
277/23 308/19 309/1
309/3 315/19 327/23
**yet [15]** 1/11 3/21
4/22 7/13 52/12
61/11 79/5 91/16

94/3 94/25 107/16
129/3 151/23 273/16
274/4
**you'all [1]** 286/11
**Yukon [1]** 152/14

**Z**

**zero [4]** 44/21 70/9
103/22 322/12
**zoom [10]** 15/23 16/9
16/12 16/16 108/13
177/11 208/1 208/10
291/18 292/7