UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

SMART COMMUNICATIONS HOLDING, INC.,          Chapter 11, Subchapter V

SMART COMMUNICATIONS HOLDING, LLC,           Case No. 8:24-bk-7106
                                             Case No. 8:24-bk-7108-RCT

    Debtors.

_____/                   *Jointly Administered under*
                                             *Case No. 8:24-bk-7106-RCT*

**CREDITOR JANICE LOGAN'S REPLY TO DEBTORS' AND HLFIP HOLDING, LLC'S**
**<u>RESPONSES TO ORDERS TO SHOW CAUSE</u>**

Creditor Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021 ("Janice") replies to Debtors Smart Communications Holding, Inc. and Smart Communications Holding, LLC's ("Debtors" or "SmartComm") and HLFIP Holding, LLC's ("HLFIP") Responses to the Court's Order to Show Cause Why These Administratively Consolidated Cases Should not be Dismissed (Doc. No. 191) as follows:

**Introduction**

Unsurprisingly, Jon Logan—in his irreconcilably conflicted capacities as Debtors' sole management and HLFIP's sole owner—opposes dismissal so that he can continue to manipulate the reorganization process to dispossess Janice of her shares and obtain sole ownership of Reorganized Debtors for a pittance. The purpose of the Plan of Reorganization remains transparent—to litigate the shareholder dispute with Janice by continuing to falsely claim that HLFIP is owed over $67 million it can use as currency to acquire the Debtors for Jon's sole benefit. Tellingly, no other creditors or participants in the bankruptcy oppose dismissal. Jon alone seeks to exploit the reorganization process to oust the Sarasota Court's jurisdiction over dissolution and

share valuation issues assigned to that court by the Florida Legislature. He does so not because the Sarasota Court cannot efficiently and fairly decide this shareholder dispute, but *because it can and will do so*. Ultimately, Debtors and HLFIP's responses simply underscore the wisdom of dismissing these jointly administered cases.[1]

### Legal Standard

Congress granted this Court significant authority in managing its own cases:

> (a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105 (emphasis added).

Part of the Court's gatekeeping function is ensuring petitioners' good faith. "'Good faith' implies an honest intent and genuine desire on the part of the petitioner to use the statutory process to effect a plan of reorganization and not merely as a device to serve some sinister or unworthy purpose." *In re Metro. Realty Corp.*, 433 F.2d 676, 678 (5th Cir. 1970). "As soon as the lack of good faith affirmatively appeared, the district court acted properly in dismissing the petition even though the plan stage had not been reached." *Id*. at 679.

In the Eleventh Circuit, bad faith "may constitute cause for dismissal of a petition." *In re Nat. Land Corp.*, 825 F.2d 296, 297 (11th Cir. 1987). "An intent to abuse the judicial process and the purposes of the reorganization provisions may constitute a lack of good faith." *In re Bal Harbour Club, Inc.*, 316 F.3d 1192, 1194 (11th Cir. 2003). This Court has "broad discretion to

---

[1]    Janice incorporates here by reference her Motion to Dismiss (Doc. No. 45) and her Reply in Support thereof (Doc. No. 97).

evaluate the totality of the circumstances in each case and to determine whether those circumstances indicate a petition was filed in bad faith." *In re Schroeder*, 2021 WL 5749836, *14 (Bankr. M.D. Fla. 2021).

Dismissal of a petition on bad faith grounds is reviewed for abuse of discretion. *See In re Piazza*, 719 F.3d 1253, 1271 (11th Cir. 2013). "An abuse of discretion occurs when a court applies the wrong principle of law or makes clearly erroneous findings of fact." *Id.*; *see also In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 379 (8th Cir. 2000) ("Whether a bankruptcy case has been filed in bad faith is a question of fact, and a dismissal will only be reversed if the court abused its broad discretion.").

## Argument

Jon-HLFIP and Jon-SmartComm argue that the cases should not be dismissed because of short-term liquidity issues stemming from expensive litigation that they initiated and proliferated on bad faith grounds.

### I.    HLFIP

HLFIP's response asks this Court to re-litigate a matter that was fully and finally adjudicated, after extensive discovery, by the Sarasota Court in a three-day bench trial: the validity and extent of the IP agreement. In the Sarasota Court's Order issued a week ago Monday, that Court found,

1.  The Exclusive Intercompany Intellectual Property License Agreement, dated August 29, 2023, is invalid and of no legal force or effect.

2.  The long-term liability recognized by Smart Communications Holdings, Inc. in favor of HLFIP Holding, LLC purporting to impose a historic 40% royalty and as described in Note I to the Smart Communications Holdings, Inc. Consolidated Audited Financial Statements (as of December 31, 2022) is invalid and of no legal force or effect. This includes both the accrual of that liability and the accrual of the associated interest expense.

Ex. 1, Feb. 17, 2025 Order on Part 1, Phase 2 Trial.[2]

To save money, Jon-HLFIP asks this Court to not credit the Sarasota Court's careful work in adjudicating this issue and instead to "provide[] a forum that could permit HLFIP and the Debtors to put a new license in place that would permit the Debtors to maintain an exclusive license … and provide a mechanism for determining and satisfying the HLFIP liabilities described above." *See* HLFIP's Response, Doc. No. 208.

HLFIP also indicates concern that the Debtors will seek to recover approximately $1.3 million in liabilities HLFIP owes to SmartComm. *Id*. at ¶ 6. Yet, Jon-SmartComm under penalty of perjury in SmartComm's schedules did not indicate the purported HLFIP liability was subject to any offset. *See* Doc. No. 65, Claim 3.10 (also failing to indicate under penalty of perjury that the liability was contingent, unliquidated, or *disputed*).

This is perhaps why the Sarasota Court observed in its Oral Ruling,

> The fact that Smart Communications is even here today advocating for something that saddles the company to make it legally insolvent is mystifying to me, but right now because Jon Logan was the incumbent management and has continued on as the incumbent management, he has saddled the company with those debts. I will go ahead and invalidate that transaction.

Ex. 1, at Attached Oral Ruling p. 30.

In any event, it is not clear why HLFIP's financial statements and tax filings should have any bearing on this Court's determination. Jon-HLFIP chose to surreptitiously execute the now-invalidated Executed License Agreement, impose the now-invalidated long-term note payable on Debtors, and tried to bolster those liabilities by filing with the IRS tax returns reflecting the related

---

[2]    This Court can take judicial notice of filings in other courts. *Progressive Mountain Ins. Co. v. Middlebrooks*, 805 F. App'x 731, 733 (11th Cir. 2020) ("We can reasonably take judicial notice of these state court filings as public records."); see also Fed. R. Evid. 201.

enormous income and liability. He did so in the midst of litigation without consulting the other 50% shareholder of SmartComm or the Court, and the Sarasota Court has now found that transaction was unfair to Debtors and therefore invalid under Fla. Stat. § 607.0832. Jon Logan, not the Debtors, is solely responsible for those actions and their consequences.

## II.    DEBTORS

### A.  Debtors' Petitions are Bad Faith Filings to Avoid Unfavorable Rulings in a Shareholder Dispute.

SmartComm petitioned for reorganization five days after the Sarasota Court set the IP "license/royalty" and the election to purchase valuation date for trial. Doc. No. 45, ¶ 14. The petitions were and remain a transparent bid to find a more favorable forum to resolve a shareholder dispute that Jon and SmartComm initiated two years ago. Ex. 2, Jon and SmartComm's Complaint (February 27, 2023). SmartComm's contention that Janice is no longer a 50% shareholder because of SmartComm's election to purchase finds no support in law. Fla. Stat. § 607.1436 is clear on its face that Janice's rights as a shareholder do not lapse until a purchase order has been entered. Fla. Stat. § 607.1436(6) ("Upon entry of an order under subsection (5) [Purchase Order], … the petitioning shareholder shall no longer have any rights or status as a shareholder of the corporation, except the right to receive the amounts awarded by the order of the court, which shall be enforceable in the same manner as any other judgment."). No purchase order has been entered.

There is abundant support for the dismissal of cases where petitioners seek to misuse Chapter 11 to resolve a shareholder dispute. *See e.g., In re Argus Group 1700, Inc.*, 206 B.R. 737, 754 (Bankr. E.D. Penn. 1996) (dismissing case where Debtors' financial condition did not necessitate the filing but rather the impetus for filing was the Debtors' desire to remove the litigation involving a partnership dispute); *In re Laurel Highlands Foundation, Inc.*, 473 B.R. 641, 657-658 (Bankr. W.D. Penn. 2012) (dismissing case because the filing was a litigation tactic

involving a dispute solely between shareholders); *In re Cedar Shore Resort, Inc.*, 235 F. 3d 375, 379-80 (8th Cir. 2000).

The cases cited by the Debtors do not change the result. In those cases, the debtors either had real liquidity issues or the courts appointed a chapter 11 trustee in lieu of dismissal. By contrast, in this case, without the HLFIP liability, as set forth in the projections attached to the Amended Plan, these Debtors do not have liquidity issues and have no need to be in bankruptcy other than their desire to litigate the shareholder dispute. Moreover, the operating entity, Smart Communications Collier, Inc., through which all of Debtors' money flows, notably *did not* petition for reorganization despite the alleged liquidity problems.

Indeed, even after Janice obtained relief from stay to continue to Part 1 of Phase 2 Trial, the Debtors attempted to use the automatic stay to *prevent trial on the invalidation of their principal debt*. *See* Ex. 3, Jon, SmartComm, and HLFIP's Expedited Motion for Clarification. That Motion was denied because the Sarasota Court thought its Order and this Court's comments were both clear. Ex. 4, Order Denying Expedited Motion for Clarification.

If Debtors' intent was not clear prior to the Sarasota Court's Part 1 of Phase 2 Trial, one need look no further than the Amended Plan filed after final resolution of Part 1 of Phase 2 for a lucid picture of SmartComm's aims in this Court. On February 12, 2025, the Sarasota Court (which had been assigned to the case for 15 months at the time of trial) provided a thorough timeline of Jon's actions, including noting that Jon had increased his salary from $120,000/year to $1.2 million/year in violation of a stipulated injunction in effect in the Sarasota Court. Ex. 1, at Attached Oral Ruling pp. 23–24. Upon an extensive recitation of its findings of fact, it concluded,

> This agreement, and it's consistent with what the Court has seen and that I've kind of gone through the timeline, is Jon Logan here has spite and animus towards his mother and his sister, and that's what's driving decisions, not business judgment, not what's good for the

company, not what's good for the 120 families that are, or their
employees and whose family are at jeopardy because of the
bankruptcy filing, but spite and animus.

*** 

[T]here is a significant history of Jon Logan trying to keep Mom
from getting any information and taking actions that cause the
company financial difficulty; for instance, you know, increasing his
salary substantially, taking $600,000 approximately out of the
company right before you declare bankruptcy, approximately six
months after you do that, that kind of suggests that it was planned.
Putting on notes on to your financial statements that make the
company insolvent indicate this, and is symptomatic of this spite
that Jon Logan has towards Mom.

Ex. 1, at Attached Oral Ruling pp. 30, 35.

Nevertheless, only six days after the Sarasota Court made those findings with Jon and his

phalanx of attorneys present in the Courtroom, officers of the Court on Jon's behalf under Jon's

signature, submitted here an Amended Joint Plan that continued to describe a $67 million liability

owed to HLFIP (which is the currency for Jon to gain control of the Debtors under the Amended

Plan) and continued to allege Jon should be compensated in the amount of $1.2 million/year

following plan confirmation, disregarding an existing agreed injunction in state court. Doc. No.

183. Jon looks to this Court not just to evade future decision on the valuation process *he elected*,

but to roll back decisions already made by the Sarasota Court.

**B. SmartComm's Remaining Liabilities Are Primarily Insider Debts and Attorneys'
Fees Stemming from Jon's Litigation Tactics.**

The "short term liquidity crisis" that SmartComm articulates in its brief is the result of Jon

Logan's vexatious and scorched-earth litigation strategy. He began two years ago by forging, and

proffering as valid, a Shareholder Agreement that the Sarasota Court ultimately found was never

signed, and was never valid. While forcing Janice to litigate that for a year, Jon sued Janice in two

other state court proceedings, and a separate Delaware proceeding. He then paid countless

attorneys and professionals to help him develop and implement an asset-diversion scheme,

whereby he (among other things): (1) created SmartComm DE, and, without Janice's consent, executed a document purporting to transfer all the assets from SmartComm FL to SmartComm DE; and (2) executed the now-invalid IP royalty transactions saddling SmartComm with over $100 million in liabilities owed to Jon. He then used the liabilities created by the IP transactions—along with other financial maneuvers recently criticized by the Sarasota Court, including raising his own salary to $1.2 million—to file for bankruptcy. Now he cites this wasteful expense to justify continuing these duplicative cases.

### C. Debtors' Provide Only Attorney Argument and Exhibits that Refer to Paid and Unclaimed Non-Insider Debts in Support of Remaining in Bankruptcy.

SmartComm's and HLFIP's responses to the Court's Order to Show Cause present *no competent evidence* in support of their doomsday-level assertions. Perhaps this is because Jon Logan is trying to avoid having yet another tribunal find him to be untrustworthy. Regardless, one would think the factual assertions in SmartComm and HLFIP's briefs would be supported by a declaration, or at least something more than attorney argument and creative financials. Not even SmartComm's in-house CPA—who also inexplicably works as the bookkeeper for HLFIP—would attest to the veracity of the many questionable statements in the briefs at issue. The failure to present competent evidence should be dispositive, particularly when compared to the multiple judicial findings that Jon lacks credibility, including in this very District[3] and the most recent

---

[3] The main defender of the Smart products was Jon Logan, Smart's principal. The Court did not find this witness to be accurate or worthy of credit—the Court makes an adverse credibility finding. His testimony about the tablets was contradicted by multiple credible witnesses. He stated the customers who complained extensively were lying, and they were all engaged in a "sham" or a multi-faceted anti-Smart conspiracy. Or they were "idiots," Dkt. 381-9 at 78, or stupid. Id. A great weight of evidence contradicted this witness. Mr. Logan's testimony as to the tablets and relevant history was greatly outweighed by contrary evidence, and was materially contradicted by six or more credible witnesses.

finding that Jon intentionally altered the financial condition of Debtors to harm Janice.  *See, e.g.*, *In re EHT US1, Inc.*, 630 B.R. 410, 428–29 (Bankr. D. Del. 2021) (quoting *Tamecki v. Frank (In re Tamecki)*, 229 F.3d 205, 208 (3d Cir. 2000)) ("[O]nce a debtor's good faith is appropriately put at issue, it is the burden of the debtor *to produce evidence* of good faith.") (emphasis added).

### Conclusion

WHEREFORE Creditor Janice Logan respectfully asserts that Debtors and HLFIP Holding, LLC's Responses to the Order to Show Cause fail to provide sufficient reasons to avoid dismissal of the jointly administered cases.

Dated:  February 25, 2025

/s/  *Edward J. Peterson*
Edward J. Peterson
Johnson Pope Bokor Ruppel & Burns, LLP
400 N. Ashley Drive, Suite 3100
Tampa, Florida 33602
Telephone:  (813) 225-2500
Email:  edwardp@jpfirm.com

**Attorney for Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021**

-AND-

David E. Schoenfeld (*pro hac vice*)
Illinois Bar No. 6197020
Email:  dschoenfeld@shb.com
Shook, Hardy & Bacon L.L.P.
111 South Wacker Drive, Suite 4700
Chicago, Illinois 60606
Telephone:  (312) 704-7700
**Attorney for Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021**

---

Findings of Fact and Conclusions of Law, Smart Commc'n Holdings, Inc. v. Correct Solutions, Inc., et al., No. 8:20-cv-01469-WFJ-TGW, ECF No. 387 (M.D. Fla. Dec. 13, 2024), attached hereto as Exhibit 5.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via the Court's CM/ECF service to those parties receiving such service in the ordinary course of business on this 25th day of February 2025.

_/s/ *Edward J. Peterson*_
Edward J. Peterson

# Exhibit 1

IN THE TWELFTH JUDICIAL CIRCUIT COURT
IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
JANICE LOGAN,
     Plaintiff,

v.

                            CASE NO.  2023 CA 001002 NC
                                 DIVISION C CIRCUIT

JANICE LOGAN,
JANICE LOGAN AS TRUSTEE OF
THE JAMES LOGAN FAMILY
TRUST DATED FEBRUARY 19 2021,
ALEXIS LOGAN,
JONATHAN D LOGAN,
SMART COMMUNICATIONS
HOLDING INC,
LOCO FLORIDA LLC,
SMART COMMUNICATIONS
HOLDING INC,
HLFIP HOLDING LLC,
     Defendant.

_____

## ORDER WITH THE COURT'S FINDINGS
## FROM PART 1 OF PHASE 2 TRIAL

The Court conducted Part 1 of Phase 2 Trial on February 10, 2025 – February 12, 2025. The Court made findings and conclusions in open court at the conclusion of trial. Those are attached to this Order. The Court indicated it would release this Order with its core findings and attach the oral ruling. The core findings are:

1.     Jon Logan is the 100% owner of HLFIP Holding, Inc., which he caused to be converted to HLFIP Holding, LLC on August 29, 2023.

2.     Jon Logan is a 50% shareholder of Smart Communications Holding, Inc. The other 50% shareholder is his mother, Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021. Previously, James Logan—Janice Logan's late husband and Jon Logan's father—owned these shares. Shortly before his death on October 16, 2022, James Logan transferred his shares of Smart Communications Holding, Inc. into the James Logan Family Trust.

3.     Jon Logan was, and is, an officer and director of Smart Communications Holding, Inc. During his life, James Logan was also an officer and director of Smart Communications

Holding, Inc. Janice Logan has never been an officer or director of Smart Communications Holding, Inc. Prior to James Logan's death, Jon Logan and James Logan were the only two members of the board of directors of Smart Communications Holding, Inc. After James Logan's death, Jon Logan has been its only director. Janice Logan requested to become a director of Smart Communications Holding, Inc.; Jon Logan denied that request.

4.    The Court makes no findings as to the ownership of the intellectual property, as that is a valuation issue and beyond the scope of Part 1 of Phase 2 Trial and outside the Bankruptcy Court's limited relief from stay. (Parenthetically, it appeared everyone agreed that Jon Logan through HLFIP owned the original MailGuard concept.)

5.    With respect to the royalty issue, Jon Logan testified that he and his father (James Logan) agreed that Smart Communications could use HLFIP's intellectual property and that there would be a future true-up or appraisal of valuation for payment to HLFIP. There is no documentary evidence memorializing a future true-up or appraisal of valuation for payment to HLFIP agreement. And Smart Communications' senior, non-family member employees such as Lisa Eddy (Vice President of Operations) and Noreen Gunning (Director of Accounting and Finance), knew nothing of this alleged future true-up or appraisal of valuation for payment to HLFIP agreement. Mike Shreve, Smart Communications' long-term external auditor, knew nothing of it, either.

6.    The Court finds Jon Logan's testimony concerning a true-up or valuation for payment to HLFIP is not credible. The Court finds as fact there was no such agreement between Jon Logan and James Logan for a future true-up or valuation for payment to HLFIP by Smart Communications.

7.    August 29, 2023, is the date Jon Logan caused substantial corporate creation of, and reconfiguration to, subsidiaries of Smart Communications Holding, Inc. as well as related entities. Jon Logan unilaterally caused the entirety of the corporate restructuring to occur; there was no attempted discussion with, or request for assent by, Janice Logan.

8.    On August 29, 2023, Jon Logan caused the creation of Smart Communications Holding, LLC, which is a 100% owned subsidiary of Smart Communications Holding, Inc. On that date, Jon Logan caused most of the assets of Smart Communications Holding, Inc. to be assigned to Smart Communications Holding, LLC. Jon Logan did not attempt to discuss these transactions with Janice Logan or otherwise receive her consent.

9.    On August 29, 2023, Jon Logan also caused multiple transactions to occur with respect to the imposition of a purported 40% royalty to be paid by Smart Communications to HLFIP, both prospectively and retrospectively. On that day, Jon Logan signed the purported Exclusive Intercompany Intellectual Property License Agreement on behalf of both Smart Communications Holdings, LLC, on the one hand, and HLFIP Holdings, LLC, on the other hand. He also caused Smart Communications Holding, Inc. to reflect within its Consolidated Audited Financial Statements released in October 2023 for year-end December 31, 2022, an alleged long-term liability in favor of HLFIP for the prior use of HLFIP intellectual property. This is described in Footnote I to those consolidated financial statements. Those statements now reflect

a Note Payable to HLFIP. For the years 2015-2021, this is expressed as an expense then valued at $52.8M with accrued interest of $5.6M. For 2022, the accrual added $17.9M to the expense and $0.4M of accrued interest. The Court collectively will refer to the actions of signing the Exclusive Intercompany Intellectual Property License Agreement and causing Smart Communications Holding, Inc. to recognize a long-term liability in favor of HLFIP as the "Purported Royalty Transactions." Jon Logan did not attempt to discuss these Purported Royalty Transactions with Janice Logan or otherwise receive her consent.

10.     These Purported Royalty Transactions are "director's conflict of interest transactions" within the meaning of section 607.0832, Florida Statutes. Jon Logan and his wholly owned HLFIP Holding, LLC entity have a direct or indirect "material financial interest or other material interest" in these Purported Royalty Transactions within the meaning of section 607.0832.

11.     Jon Logan, Smart Communications Holdings, Inc, and HLFIP Holding, LLC failed to prove that these Purported Royalty Transactions were fair to Smart Communications Holdings, Inc. Separately, Janice Logan, individually and as Trustee of the James Logan Family Trust dated February 19, 2021, proved that these Purported Royalty Transactions were not fair to Smart Communications Holdings, Inc.

12.     In the light of Janice Logan's filing seeking the judicial dissolution of Smart Communications Holding, Inc. and the entity's election to purchase the Trustee's shares, section 605.0706(4), Florida Statutes, establishes the valuation date but permits "such other date as the court deems appropriate under the circumstances." Here, the Court deems it appropriate under these unique facts to establish the valuation date as August 28, 2023, the day before Jon Logan caused massive structural changes and other transactions.

13.     In the Court's oral ruling, the Court neglected to affirmatively state that the Court credited the testimony of Dr. Berneman. The Court corrects that omission now.

IT IS ORDERED:

1.     The Exclusive Intercompany Intellectual Property License Agreement, dated August 29, 2023, is invalid and of no legal force or effect.

2.     The long-term liability recognized by Smart Communications Holdings, Inc. in favor of HLFIP Holding, LLC purporting to impose a historic 40% royalty and as described in Note I to the Smart Communications Holdings, Inc. Consolidated Audited Financial Statements (as of December 31, 2022) is invalid and of no legal force or effect. This includes both the accrual of that liability and the accrual of the associated interest expense.

3.     The Court will value Smart Communications Holdings, Inc. as of August 28, 2023, for purposes of the company's election to purchase the shares owned by Janice Logan, as Trustee of the James Logan Family Trust, dated February 10, 2021.

DONE AND ORDERED in Sarasota, Sarasota County, Florida, on February 17, 2025.

e-Signed 2/17/2025 8:24 AM 2023 CA 001002 NC

**HUNTER W CARROLL**
Circuit Judge

## SERVICE CERTIFICATE

On February 17, 2025, the Court caused the foregoing document to be served via the Clerk of Court's case management system, which served the following individuals via email (where indicated). On the same date, the Court also served a copy of the foregoing document via First Class U.S. Mail on the individuals who do not have an email address on file with the Clerk of Court.

CRAIG STEPHEN BARNETT
200 EAST LAS OLAS BLVD
SUITE 2100
FORT LAUDERDALE, FL  33301

BRETT ALAN GEER
PO BOX 47212
SAINT PETERSBURG, FL  33743

MARK MATTHEW WALL
101 EAST KENNEDY BLVD
SUITE 3700
TAMPA, FL  33602

CHARLES FRANKLIN JOHNSON III
802 11TH ST W
BRADENTON, FL  34205

DAVID A WALLACE ESQ
783 S ORANGE AVE STE 300
SARASOTA, FL  34236

CHELSEA KOFF
200 EAST LAS OLAS BLVD
SUITE 2100

FORT LAUDERDALE, FL  33301

BRETT ALAN GEER
PO BOX 47212
SAINT PETERSBURG, FL  33743

JOSEPH H III VARNER
777 S. HARBOUR ISLAND PLACE, #800
TAMPA, FL  33602

MARK JAMES BERNET
AKERMAN SENTERFITT PA
401 EAST JACKSON STREETSUITE 1700
TAMPA, FL  33602

JASON SAMUEL OLETSKY
401 E JACKSON ST STE 1700
TAMPA, FL  33602

M MARIE WILSON ESQ
2357 S TAMIAMI TRAIL #3 PMB #122
VENICE, FL  34293

JONATHAN T TORTORICI
4301 WEST BOY SCOUT BLVD STE 300
TAMPA, FL  33607

JAROD A BRAZEL
101 E. KENNEDY BLVD., SUITE 3700
TAMPA, FL  33602

JULIE NEGOVAN
6750 N ANDREWS AVE STE 200
FORT LAUDERDALE, FL  33309

REGINALD KEITH PETERSEN
6750 N ANDREWS AVE STE 200
FORT LAUDERDALE, FL  33309

SARAH O'ROURKE
100 N TAMPA STREET STE 2900
SUITE 2900
TAMPA, FL  33602

ANDREW L FRANKLIN
111 S. WACKER DR.

Filed 02/17/2025 08:24 AM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL

STE. 4700
CHICAGO, IL  60606

DAVID E SCHOENFELD
111 SOUTH WACKER DRIVE
SUITE 4700
CHICAGO, IL  60606

ANITRA F RAIFORD
2555 GRAND BLVD
KANSAS CITY, MO  64108

JESSICA LEONA MAZZEO
6750 N ANDREWS AVE
STE. 200
FORT LAUDERDALE, FL  33309

PETER F O'NEILL
2555 GRAND BOULEVARD
KANSAS CITY, MO  64108

MICHAEL J HARWIN
200 EAST LAS OLAS BOULEVARD
SUITE 2100
FORT LAUDERDALE, FL  33301

CHRISTOPHER ROY CLARK
106 EAST COLLEGE AVENUE
SUITE 700
TALLAHASSEE, FL  32301

GLENN T BURHANS JR
106 EAST COLLEGE AVENUE
SUITE 700
TALLAHASSEE, FL  32301

MAX CORY RUDOLF
350 EAST LAS OLAS BLVD.
SUITE 1600
FT. LAUDERDALE, FL  33301

DUSTIN BRYAN HILLSLEY
AKERMAN LLP
201 EAST LAST OLAS BOULEVARD, SUITE 1800
FORT LAUDERDALE, FL  33301

CHRISTOPHER GEORGE OPRISON
DLA PIPER LLP (US)
200 SOUTH BISCAYNE BOULEVARD - SUITE 2500
MIAMI, FL  33131

BRIDGET K SMITHA
106 EAST COLLEGE AVENUE
SUITE 700
TALLAHASSEE, FL  32301

TAL ABUROS
200 SOUTH BISCAYNE BOULEVARD
SUITE 2500
MIAMI, FL  33131

KATRINA MARIE QUICKER
900 CIRCLE 75 PARKWAY
SUITE 100
ATLANTA, GA  30339

MICHELLE HOGAN
15952 SW 16 ST
PEMBROKE PINES, FL  33027

ERIN BERHAN
200 SOUTH BISCAYNE BLVD
SUITE 2500 / 25TH FLOOR
MIAMI, FL  33131

MICHAEL BARFIELD
1668 Oak Street, #1
Sarasota, FL 34236
michael@denovolawfl.com

**Filed 02/17/2025 08:24 AM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL**

# Exhibit 1

1   IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT IN
    AND FOR SARASOTA COUNTY, FLORIDA
2
          WEDNESDAY, FEBRUARY 12, 2025 JUDGE'S RULING
3
    JONATHAN LOGAN and SMART
4   COMMUNICATIONS HOLDING, INC.,

5             Plaintiffs,
    vs.                           Case No.:  2023-CA-1002-NC
6
    JANICE LOGAN, individually and
7   as Trustee of the James Logan
    Family Trust, dated February 10,
8   2021; and ALEXIS LOGAN,

9             Defendants.          /    (CONSOLIDATED)
    JANICE LOGAN, as Trustee of the
10  James Logan Family Trust dated
    February 10, 2021,
11
              Counterclaim Plaintiff,
12  vs.                           Case No.:  2023-CA-1280-NC

13  JONATHAN D. LOGAN, SMART
    COMMUNICATIONS HOLDING, INC.,
14  SMART COMMUNICATIONS HOLDING,
    LLC, HLFIP HOLDING, INC., and
15  HLFIP HOLDING, LLC,

16            Counterclaim Defendants./
    JANICE LOGAN, as Trustee of the
17  James Logan Family Trust dated
    February 10, 2021, and
18  derivatively on behalf of
    Smart Communications Holdings,
19  Inc.,

20            Plaintiff,
    vs.
21  JONATHAN D. LOGAN, SMART
    COMMUNICATIONS HOLDING, INC.,
22  nominal defendant, SMART
    COMMUNICATIONS HOLDING, LLC,
23  HLFIP HOLDING, LLC, HLFIP HOLDING
    LLC, LOCO FLORIDA LLC and SMART
24  COMMUNICATIONS YACHT HOLDING, LLC,
              Defendants.
25

1

2

OFFICIAL TRANSCRIPT OF PROCEEDINGS
JUDGE'S RULING

3

BEFORE THE HONORABLE HUNTER W. CARROLL
held via Zoom and at the

4

Judge Lynn N. Silvertooth Judicial Center
2002 Ringling Boulevard, 6-C

5

Sarasota, Florida  34237

6

Wednesday, February 12, 2025

7

6:04 p.m. to 7:06 a.m.

8

Pages 1 through 37

9

10

11

12

13

14

Stenographically reported by:

15

Linda R. Wolfe
Registered Professional Reporter

16

Registered Merit Reporter
Federal Certified Realtime Reporter

17

Florida Professional Reporter-Certified

18

19

20

21

22

23

24

25

1   (All participants appeared live.)

2   APPEARANCES:
     On behalf of HLFIP Holding, LLC:

3           CHRISTOPHER G. OPRISON, Attorney at Law
          TAL ABUROS, Attorney at Law

4           KATIE MIESNER, Attorney at Law
          DLA PIPER, LLP (US)

5           200 S. Biscayne Blvd., Suite 2500
          Miami, FL  33131-5340

6           (305)423-8522
          chris.oprison@dlapiper.com

7           erin.berhan@dlapiper.com
          katie.miesner@us.dlapiper.com

8

9           STEVE DIXON, Attorney at Law
          JAMES (SEAMUS) BRESNAHAN, Attorney at Law

10           DLA PIPER, LLP (US)
          500 Eighth Street, NW

11           Washington, DC  20004
          (202)799-4000

12           steve.dixon@dlapiper.com
          seamus.bresnahan@dlapiper.come

13   On behalf of Jonathan D. Logan; Smart Communications
     Holding, Inc.; Smart Communications Holding LLC; and

14   Loco Florida, LLC:

15           DUSTIN B. HILLSLEY, Attorney at Law
          MAX RUDOLF, Attorney at Law

16           MICHELLE HOGAN, Attorney at Law
          AKERMAN, LLP

17           201 E. Las Olas Blvd., Suite 1800
          Ft. Lauderdale, FL  33301-4442

18           (954)331-4129
          dustin.hillsley@akerman.com

19

20

21

22

23

24

25

```
 1   On behalf of Janice Logan:

 2          DAVID SCHOENFELD, Attorney at Law
            PETER O'NEILL, Attorney at Law
 3          ANDREW FRANKLIN, Attorney at Law
            KAILIN LIU, Attorney at Law
 4          SHOOK, HARDY & BACON L.L.P.
            111 S. Wacker Dr., Ste. 4700
 5          Chicago, IL  60606
            (312)704-7700
 6          dschoenfeld@shb.com
            pfoneill@shb.com
 7          afranklin@shb.com

 8          JOHN D. GARRETSON, Attorney at Law
            SHOOK, HARDY & BACON L.L.P.
 9          2555 Grand Boulevard
            Kansas City, MO  64108
10          (816)474-6550
            jgarretson@shb.com
11
            ANITRA CLEMENT, Attorney at Law
12          SHOOK, HARDY & BACON L.L.P.
            Tampa, FL
13          (813)202-7110
            aclement@shb.com
14
     On behalf of Alexis Logan and Justin Peterson:
15
            CHARLES F. JOHNSON, III
16          Attorney at Law
            BLALOCK WALTERS, P.A.
17          802 11th Street West
            Bradenton, FL  34205-7734
18          (941)748-0100
            cjohnson@blalockwalters.com
19
     ALSO PRESENT:          Jonathan Logan
20                          Janice Logan
                            Alexis Logan
21                          Dr. Louis Berneman
                            Justin Peterson
22                          Michael Barfield,
                              Observer/Press/Paralegal
23                          Claudia Lora, Akerman Paralegal
                            Chezelle McDade, DLA Piper
24                            Paralegal
                            Justin Watkins-TrialQuest Tech
25                          Marlin Galvis-Trial Tech
```

1              JUDGE HUNTER CARROLL'S RULING

2          THE COURT:  Court has before it Part 1 of

3     Phase II in case number 2023-CA-1002.

4          I'm going to ask that the court reporter type

5     up my ruling, not the whole trial but my ruling,

6     and make sure I get a copy because my intent will

7     be to enter an order with just the core findings

8     and I'm going to attach my transcript as the

9     factual findings.

10         First thing I'm going to do is go through some

11     individuals; identify them.  Then go through a

12     timeline.  And then come back and make some factual

13     findings that kind of fill in that timeline, and

14     that address this case.

15         Now, certainly, I am here in this phase of the

16     trial as authorized by the Bankruptcy Court and the

17     Court does not anticipate and will not exceed the

18     bounds of the limited stay relief provided by the

19     Bankruptcy Court.

20         Starting with individuals.  We have James

21     Logan, also known as Jim Logan, and many times will

22     be referred to as Dad.  And he passed on

23     October 16, 2022.

24         Mr. James Logan was married to Janice Logan,

25     his wife, and they had two children, Jon Logan, and

1       Alexis Logan.

2            Jon Logan and Alexis Logan are Brother and

3       Sister.

4            I don't think it goes without saying that

5       there is family discord within the Logan family:

6       And, principally, there's problems between

7       Jon Logan and Alexis Logan, and Jon Logan and

8       Janice Logan.  I guess even under Jon Logan's

9       statements that the difficulty he has with his mom

10      is actually a little bit less than the difficulty

11      he has with his Sister.

12           We also have Lisa Eddy who is the Vice

13      President of Operations of Smart Communications.  I

14      think, technically, she's employed by Smart

15      Communications Collier.

16           We have Mike Shreve, who is the long-time

17      accountant for Smart Communications as well as

18      HLFIP.

19           We have Noreen Gunning, who now is the

20      Director of Accounting and Finance for Smart

21      Communications, a position she took on after James

22      Logan's passing.  Prior to that, she was the

23      accountant internally for Smart Communications and

24      she also provides services to HLFIP.

25           We have Justin Scott, who originally was an

1      independent contractor that was retained to assist

2      with the original idea; and then, ultimately,

3      became an employee.

4          We have a group called Marcum LLP, although

5      they have been subsequently purchased, and my notes

6      aren't as clear, but I think it's like CBIZ or

7      something like that which is a new name, but I'm

8      just going to refer to that group as "Marcum,"

9      because that's how all the documents are titled.

10         The specific engagement that we are here on,

11     the supervisor of that engagement is Ms. Voralia.

12     And I apologize for not being able to pronounce her

13     first name.

14         The primary person who was under Ms. Voralia

15     but the person who did the bulk of the work is

16     Ms. Naidu.

17         The client contact for this Marcum study was

18     Katrina Quicker, who is an attorney for HLFIP.

19         And there's Katie Vance who is in

20     Ms. Quicker's office.

21         Our timeline, generally, starts in 2008

22     although the animus and the difficulties between

23     the various members of the Logan family appear to

24     predate this time.  I don't know the source, but

25     doesn't matter for my purposes other than there is

1    this difficulty within the Logan family.

2        And for purposes of our hearing and trial for

3    the last three days, our timeline generally starts

4    in 2008 when Jon Logan did a very brief stint in a

5    county jail in Michigan, and when he was there, he

6    came up with an idea about communication with

7    family members.

8        And his grandmother kind of helped encourage

9    him along the lines.  There was some correspondence

10   back and forth between grandmom and Jon Logan.  We

11   see that at Exhibit 700.

12       And when I reference to exhibits, sometimes

13   there's multiple versions of the same exhibit.  I

14   don't think I have all of the same references, but

15   if I've got it once, that's good enough, at least

16   in my view.

17       And so Jon Logan has this idea and,

18   ultimately, creates a business plan, which is

19   Exhibit 821, in April of 2009.

20       And he, being Jon Logan, also in consultation

21   with his dad, James Logan, "Hey, let's do something

22   with this plan."

23       And, ultimately, there was the finding on

24   Craigslist of Justin Scott.  And he enters into an

25   Independent Contractor Agreement between, at that

1    time it was Justin Scott and Asset Recovery and

2    Marketing, and that's December 7, 2009, and that's

3    Exhibit 409.  And also in Exhibit 409 is an

4    amendment to that agreement where there's an

5    ovation and now Smart Communications, U.S., Inc. is

6    included.  And that was the original product, if

7    you will.  I think it was referred to as JailMail

8    here.

9         And over time there was an expansion of ideas.

10   And Jon Logan had an idea -- this is in 2015, early

11   2015 -- for what ultimately became the MailGuard.

12   And Jon Logan discussed this new idea, April 25th

13   2015, Exhibit 898.

14        And he then goes to his Dad and his Sister.

15        And at this time -- and I probably should have

16   introduced the names of the companies.

17        We have Smart Communications Holding, Inc., a

18   Florida entity.

19        My notes -- I don't know where they are with

20   all the pictures.  Here it is.

21        And we have this Florida entity.  At the time,

22   there were two 50/50 shareholders.  Well,

23   technically, the legal shareholder was

24   Alexis Logan, but the -- She was holding the shares

25   50 percent for her father, James Logan; 50 percent

1     for her brother.

2          Her brother was on probation and there was a

3     need for Alexis Logan to hold legal title even

4     though equitable title was with Jon.  And then Dad

5     had some IRS problems himself, and so there was a

6     need for Alexis Logan to hold legal title, but Dad

7     was the equitable title of 50 percent of Smart

8     Communications Holding, the Florida corporation.

9          So going back to our timeline, Jon Logan has

10    this idea which ultimately becomes the MailGuard

11    system, and from his perspective, he wants to

12    protect this new idea.  I think "new idea" was

13    certainly referenced in the Exhibit 898, the

14    April 25th e-mail.

15         And then there was five days later on

16    April 30th, 2015, an e-mail that went out from

17    Jon Logan to his Sister -- actually, went to his

18    Dad and then Dad sent it to Alexis, the Sister,

19    Alexis Logan.

20         Dad signs the April 30th, 2015 e-mail as does

21    Alexis.  Alexis Logan annotates it, referencing

22    "For new technology/patent/new IP only."  And we'll

23    come back and talk about the significance of that

24    later on.

25         And it's clear that after the family members

1     signed on May 5th, 2015, Jon Logan goes to Justin

2     Scott with eight rudimentary schematics; that's

3     Exhibit 898.  With attachments, I think it's 893,

4     '97.

5         And following up on this, James Logan, who at

6     the time is also President of HLFIP, files

7     paperwork with the U.S. PTO -- I think that's U.S.

8     Patent and Trademark Office -- paperwork for the,

9     quote, "correctional postal mail contraband

10    elimination system," which is the reference that

11    was used in the e-mail that is from April 30th,

12    2015, which is Exhibit 711.

13        Now, I guess, technically, Dad signed this one

14    day early because May 12th, 2015 is when HLFIP was

15    established with the Florida Secretary of State.

16    That's exhibits 352 and 713.

17        Obviously, Alexis Logan knew about this

18    because Exhibit 930 shows that Alexis Logan was the

19    one who actually filed the paperwork with the

20    Secretary of State of Florida.

21        Now, let me just pause, and I probably should

22    have mentioned this earlier.  Alexis Logan, of

23    course, being the Sister and she held legal title,

24    but the testimony also indicates that because she

25    was the legal title holder, she personally had to

1          guarantee certain obligations of Smart

2          Communications.  So she had skin in the game, if

3          you will.

4               Going back to our timeline, the concept that

5          ultimately would become MailGuard was being

6          developed, and there is -- without question there

7          is references over the next few years to HLFIP

8          licensing to Smart Communications' various IP.

9               And there's various filings that say that.

10         There's definitely references throughout the years

11         post-2015 when this MailGuard concept was created

12         by Jon Logan.

13              We get to approximately late 2018,

14         September 4th, 2018, and by -- I don't want to say

15         luck because certainly the ground work had already

16         been laid -- but there was some difficulty with 25

17         employees in The Commonwealth of Pennsylvania

18         having to go to the emergency room due to drug

19         overdoses by handling inmate mail.  And that caused

20         the Governor of The Commonwealth of Pennsylvania to

21         declare an emergency, which allowed the Department

22         of Corrections in Pennsylvania to have an emergency

23         contract that was very favorable to Smart

24         Communications.

25              And, at this point, Smart Communications

1          starts to round the corner on getting new jails and

2          prisons to go to its suite of offerings.  And so

3          Smart Communications continues to expand.

4              There's the buyout of Justin Scott on

5          March 30th, 2020.  That's Exhibit 410.

6              We know that in February 10, 2021, James Logan

7          creates a Family Trust.  And, subsequently, he

8          transfers his 50 percent interest in Smart

9          Communications Holdings, the Florida entity, into

10         the Trust.

11             By that time, Alexis Logan had already

12         tendered back legal title of the 50/50 shares to

13         James Logan and Jon Logan.

14             March 11, 2020, Noreen Gunning is hired by

15         Smart Communications Collier, which is the entity

16         that handles the employees, at a salary of $80,000.

17             And in -- looks like -- April 8th, 2022,

18         Alexis Logan e-mails her dad, Jim Logan, with

19         talking points.  And it appears -- although there

20         was very little testimony, but from some of the

21         documentary evidence, there was some contemplation

22         of potentially talking to, like, Truist Bank or

23         some other banks, maybe about a merger or

24         acquisition.  It's very infancy discussions, but

25         they're going to create some paperwork which

1        implicates our story.  So I make a note of that.

2            But, certainly, Alexis Logan was helping Dad

3        with talking points that ultimately would be going

4        to these M & A entities.

5            Everything, however, is not exactly rosy.  On

6        April 25th of 2022, the Middle District of

7        Pennsylvania invalidates the '617 patent, which is

8        one of the three patents undergirding MailGuard.

9        Ultimately, the DC Court of Appeals affirmed that

10       decision, and that is Exhibit 364.

11           A couple months later, October 7, 2022,

12       another district court -- this is the Middle

13       District of Tennessee -- invalidates the '617

14       patent.  That's the same one that was invalidated

15       by the Middle District of Pennsylvania court.

16           A few days later on October 16th, 2022,

17       Jim Logan passes.

18           And we know next month in November of 2022,

19       Noreen Gunning is promoted to the Director of

20       Accounting and Finance, now with a salary of

21       $170,000.  Direct reports to Jon Logan.

22           I'm not going to rehash the trial relative to

23       the Shareholders' Agreement, but I do think we do

24       need to comment that in late 2022, early 2023,

25       there's some difficult conversations between

1   Jon Logan and Janice Logan.

2   Apparently, Jon Logan offered $20 million and

3   if she didn't -- "she" being Janice Logan -- didn't

4   take it for the 50 percent, he was going to pull

5   the patents and start a new company.  According to

6   Janice, he -- "he" being Jon Logan -- was using

7   vulgar language.  I think, ultimately, it just was

8   a difficult conversation.

9   From Janice Logan's perspective, she had some

10  sort of discussion draft from Truist Merger and

11  Acquisitions, which is Exhibit 335, where the

12  thought process of a potential value -- not that

13  that is the value.  I'm not saying that at all.

14  And certainly would never assume a piece of paper

15  on a possible, 'Hey, let's talk about mergers and

16  acquisitions' is anywhere close to reality.  But at

17  least that was a concept that was out there.

18  We also know at this time on January 5th,

19  2023, President Biden signs Public Law 117338,

20  which is known as the Martha Wright-Reed Just and

21  Reasonable Communication Act of 2022.

22  Because there appeared to have been some

23  difficult conversations in late 2022, early 2023,

24  between Janice Logan and Jon Logan, Janice Logan

25  makes her first demand upon Jon Logan -- that's

1    January 20th, 2023; that's at Exhibit 260 -- where

2    Janice is alleging mismanagement by Jon Logan, and

3    also makes a demand for records.

4         February 27th, 2023, Jon Logan responds by

5    filing a lawsuit -- Exhibit 430 is that exhibit --

6    where Jon Logan and Smart Communications Holding,

7    Inc. sues Janice Logan, individually, and as

8    trustee.

9         Paragraph 21 references the 2021 audited

10   financial statements showing shareholder equity of

11   approximately 15 million as of December 31st, 2021.

12        Now, in the time after Dad dies, Jon did

13   start -- Jon Logan did start a $100,000 salary draw

14   for mom, Janice Logan.

15        On May 10th, 2023 that was cut off.  That's at

16   Exhibit 303.  A few weeks later on May 23, 2023,

17   Noreen Gunning cancels the generator project.

18   That's at Exhibit 301.

19        We know on June 13, 2023 at Exhibit 432,

20   Jon Logan causes Smart Communications Holding, Inc.

21   to sue Janice Logan for replevin of the Cadillac

22   Escalade.

23        Janice Logan makes another demand for books

24   and records on June 23rd, 2024 -- that's Exhibit

25   365 -- because the prior demand for records under

1    Florida law had not been complied with.

2         In response, Jon Logan, a few days later on

3    June 29, 2023, sends a 30-day notice for

4    Janice Logan to vacate the home that she's living

5    in, which, of course, is in the name of Smart

6    Communications.  And that's at Exhibit 302.

7         With respect to the records, on July 1st,

8    2023, Jon Logan only provides a partial response

9    for records and, basically, takes the position that

10   due to the Shareholders' Agreement that there is no

11   authority for the demand.  That's at Exhibit 366.

12        A predecessor judge, Judge Williams, conducted

13   a temporary injunction and entered a temporary

14   injunction.  We all know that it has since been

15   invalidated by the Second District, but at the time

16   starting on July 25th, 2023, that went into effect.

17   That's Exhibit 584, Exhibit 2, also at Exhibit 589.

18        July 26, 2023, Mike Shreve prepares

19   consolidated financials.  Now, these are prior to

20   the August 29th, 2023 transaction that shows

21   long-term liabilities for Smart Communications

22   Holdings of Florida of approximately $3.6 million,

23   but no long-term liability associated with any

24   purported royalty or any sort of ongoing current

25   obligation for ongoing payments.

1          We know on August 9th, 2023 is the date that

2     Marcum's engagement letter is signed by

3     Katrina Quicker on behalf of HLFIP, and that is the

4     date that Marcum begins the transactional pricing

5     study.

6          April 18th, 2023 is the date that the DC

7     Circuit Court of Appeals affirmed the invalidity of

8     the '617 patent, and that's at Exhibit 364.

9          The Transfer Pricing Study, as I indicated,

10    begun on August 9th, 2023, but was functionally and

11    substantially completed prior to August 29th, 2023,

12    a span of less than three weeks.

13         August 29th, 2023 is a substantial date in the

14    life of Smart Communications Holdings.  There is a

15    lot of corporate activity that occurs.  I don't

16    really need to get into a lot of the details of it.

17         From Jon Logan's perspective it's all revenue

18    neutral and it was designed to clean up the

19    accounting records that he contends Dad was

20    somewhat asleep at the switch having occurred.

21         There is, however, no evidence that Jon Logan

22    consulted with the other shareholder.  Now, at the

23    time Jon Logan was the only officer or director and

24    I should have backed up.

25         When James Logan was alive, James Logan was an

1    officer and a director and a shareholder of Smart

2    Communications until such time as he put his shares

3    into Trust and he was an officer and director and

4    the trustee, himself, owned the shares.

5         Jon Logan also was an officer, director,

6    shareholder of Smart Communications Holdings, Inc.,

7    the Florida entity.

8         After Dad dies, Jon Logan does not invite Mom

9    to become a director.  Does not invite Mom to

10   become an officer.  And at no time did

11   Janice Logan, either individually or as trustee,

12   ever become an officer or director of Smart

13   Communications Holding, Inc.

14        We know on August 29th, 2023 a lot of the

15   assets of Smart Communications Holding, Inc. were

16   assigned to various entities, which -- and I have

17   not gone into it, doesn't need to -- which

18   Jon Logan contends all are subsidiaries of Smart

19   Communications.

20        What we also have on that date is the HLFIP

21   Holding, Inc. a Florida corporation, converts to

22   HLFIP Holding, LLC, a Delaware limited liability

23   company, at DIN -- or sorry, not DIN -- at

24   Exhibit 345.

25        We have Smart Communications Holding, LLC, a

1      Delaware liability company, is formed and it

2      becomes a subsidiary of Smart Communications

3      Holding, Inc., a Florida corporation.

4           And August 29th 2023 is when the Delaware

5      entity starts operating.

6           That is the date, August 29th, 2023 -- and

7      this is Exhibits 306, same again at 771 -- that

8      Jon Logan signs the Exclusive Intercompany

9      Intellectual Property License Agreement with an

10     effective date of August 29th, 2023.

11          Again, at no point prior to signing this did

12     Jon Logan or anyone else at Smart Communications or

13     HLFIP reach out and discuss this, talk to

14     Janice Logan, ask for assent or otherwise let her

15     know this was happening.

16          And, in fact, we know this also because a

17     couple of days later, on August 31st, 2023,

18     Janice Logan is still talking about the records

19     demand, and this is Exhibit 367, which, of course,

20     that demand doesn't reference the new entities

21     because she doesn't know about 'em.

22          The final U.S. Transfer Pricing Documentation

23     Study is not complete until October of 2023.

24          And in October 2023 -- on October 23rd,

25     Jon Logan, individually, up in Delaware sued Loco

1      Florida, LLC.  That's the entity that owns title to

2      the building that Smart Communications operates out

3      of.  And also sued Smart Communications Yacht

4      Holdings, LLC; that's the entity that holds the

5      yacht that Jon Logan has.

6           And that suit was filed in Delaware and,

7      again, no reference or knowledge to Janice Logan or

8      Smart Communications.

9           I will note that Loco Florida, LLC, a Delaware

10     entity, there previously was a Florida entity --

11     that's another August 29th, 2023 transfer -- just

12     like the Smart Communications Yacht Holdings, LLC,

13     previously was a Florida entity.

14          We also know on October 25th, 2023 audited

15     financials of Smart Communications, the Florida

16     corporation, are published -- this is

17     Exhibit 379 -- which for the first time shows a

18     long-term liability of HLFIP -- or a long-term

19     liability to HLFIP of 52.8 million under a note

20     payable with, at that time, 5.6 million approximate

21     of accrued interest.

22          And we will come back and talk about that

23     note.  But let me finish out the timeline.

24          About a month later, on December 6, 2023, me,

25     as the current-assigned judge, holds a hearing in

1    the case, and that led to an agreement amongst the

2    parties that precluded the payment of any licensing

3    fee, royalty fee, and also no payments outside the

4    ordinary course.  That was Exhibit 435.

5         And then the Court entered an Order on that

6    October -- sorry -- on December 15th, 2023.

7         We then come into 2024.  And we have the trial

8    on Phase I where the Court found no Shareholders'

9    Agreement.  And that Final Judgment was entered on

10    February 7, 2024.

11         After the Court confirmed Janice Logan as

12    trustee's ownership of 50 percent of shares, she

13    demanded a meeting.  That is Exhibit 443.  That's

14    on March 15, 2024.

15         And, certainly, none of the requests that

16    Janice Logan, as Trustee, as 50 percent shareholder

17    of Smart Communications, Inc., was agreed to by the

18    other 50 percent shareholder.

19         On March 20th, 2024, the Delaware court stayed

20    the Delaware action that had been filed on

21    October 23rd in favor of this Florida action.

22         A couple of weeks later, on March 15, 2024,

23    Jon Logan, on behalf of HLFIP, demands payment of

24    the royalties from Smart Communications in full by

25    December 31, 2024 or he'll terminate the purported

1    license.

2         He also indicates that there was a material

3    term of the agreement, is Jon Logan's exclusive

4    control over Smart Communications.  And that's

5    Exhibit 357.

6         The Court, of course, pauses and questions how

7    that could have been done after Jon Logan had

8    agreed not to do anything outside the ordinary

9    course in December of 2023, but, be that as it may,

10   Jon Logan did it.

11        On May 29, 2024, Janice Logan files for

12   judicial dissolution.  That's Exhibit 437.

13        And, in response, what we have, just days

14   later, is Jon Logan going to Noreen Gunning and at

15   Smart Communications where Jon Logan requested that

16   Noreen Gunning reclassify the Rolls Royce, the

17   Ferrari Spider, the Miami condo, all that had been

18   considered shareholders' loans to Jon Logan and

19   have them -- have Smart Communications assume

20   ownership as well as recognizing rent relating to

21   Loco Florida and for Smart Communications, for the

22   office building.

23        Jon Logan, also at that time, raises his

24   salary in June of 2024 from $120,000 a year to

25   $1.2 million a year, again, without any contact

1        with, approval of, discussion, assent from

2        Janice Logan as trustee, the other 50 percent

3        shareholder.

4            Now, certainly, Jon Logan indicated that upon

5        the filing in November -- of bankruptcy of

6        November 2024, he discontinued his salary, but,

7        certainly, that's approximately $600,000 that

8        Jon Logan took from Smart Communications out of

9        salary.  Certainly, that was a transaction that was

10       outside the ordinary course, even though he had

11       previously agreed not to do things outside the

12       ordinary course.

13           June 20, 2024, Jon Logan causes Smart

14       Communications to elect to purchase Janice Logan,

15       as Trustee, shares.

16           July 22, 2024, the proposed rules under the

17       Martha Wright-Reed Act were proposed by the FCC,

18       with the final regulations coming out on

19       September 20, 2024 with effective date of

20       November 19, 2024.

21           And we all know about the bankruptcy at this

22       point in time.

23           So that is the overarching timeline.  And I

24       always like doing timelines because it helps me, in

25       my mind, figure out how things happened, why things

1    happened, and, certainly, I use that in conjunction

2    with the documentary evidence, the testimony, the

3    credibility determinations.

4         There are only a couple of core issues that

5    the Court can decide in today's proceeding.

6         One is the date of valuation of the company;

7    and then the other is reference to the royalty

8    issue.

9         Now, as framed, the parties are basically

10   asserting two different things.

11        The Judge's right side of the room, the Smart

12   Communications and HLFIP side, talk about that

13   there is an agreement in 2015, and the context and

14   the explanation is that Jon Logan is the inventor

15   of all future intellectual property that is ever

16   used by Smart Communications, and he has assigned

17   that to HLFIP.

18        And that Jon Logan testified that during his

19   father's life, that he and his father agreed that

20   there would be a license -- or the agreement was

21   that there would be a license for Smart

22   Communications and its subsidiaries to be able to

23   use the HLFIP intellectual property and that there

24   would be a true-up later in time and it would

25   either be an agreement true-up or that they would

1     retain an appraiser.

2         There was no further details provided by

3     Jon Logan relative to that agreement and,

4     certainly, there is scant documentary evidence that

5     seem to memorialize that transaction.

6         The other issue is the August 2023 agreement

7     that Jon Logan signed on behalf of HLFIP as well as

8     on behalf of Smart Communications Holdings, Inc.

9     that indicated that there was a 40 percent royalty

10    rate and then using that 40 percent royalty rate on

11    an ongoing forward basis, and then to

12    retrospectively look and show that on the books of

13    Smart Communications all the way back to 2015, even

14    though it previously had not existed on the books.

15        The transaction is, by definition, under

16    Florida law Section 607.0832, a Directors Conflict

17    of Interest Transaction. Jon Logan, individually,

18    and through HLFIP had a material financial interest

19    in that transaction.

20        There are instances, and the statute talks to

21    us, about how a transaction such as this can be

22    approved, and then who holds the burden of proof.

23        In this particular case, because there was no

24    assent by the other shareholder, there is no other

25    director, there was no attempt for any sort of

1     discussion with his Mother, Jon Logan and Smart

2     Communications now is left with the burden to prove

3     the validity of the fairness in this proceeding.

4          Jon Logan, Smart Communications, and HLFIP

5     assert that they can show the fairness through the

6     Marcum Transfer Pricing Study.

7          The Transfer Pricing Study is a study that

8     seeks to comply with 26 U.S.C. 482.  The purpose of

9     a Transfer Pricing Study is to provide a taxpayer

10    protection from the IRS from having to pay

11    penalties if the taxpayer has a Transfer Pricing

12    Study in its file prior to filing a tax filing that

13    would have an intercompany transaction.

14         This Transfer Pricing Study does not prevent

15    the Internal Revenue Service from disagreeing with

16    the Transfer Pricing Study, coming up with a

17    different one, or saying that it's just wrong.

18         What it does is if the Transfer Pricing Study

19    is in the file and it's provided to the IRS within

20    30 days after the request, it eliminates the IRS's

21    ability, under the Treasury regulations, from

22    assessing a penalty.  That's its point.

23         And the concept of the Transfer Pricing Study

24    is you have a intercompany transaction and its

25    concept is to, supposed to come up with what would

1      an arm's length transaction be.  And that is why

2      Mr. Jon Logan and his side are saying, 'Well, that

3      shows that this transaction is fair.'

4           The Court cannot agree.

5           The Court is going to find that the Transfer

6      Pricing Study and that -- I'm going to find several

7      things.

8           One, that the Judge's left side -- so the

9      Janice Logan as Trustee, plus Alexis Logan -- have

10     demonstrated, and Jon Logan, Smart Communications,

11     and HLFIP have failed to demonstrate, that this

12     transaction was remotely fair to Smart

13     Communications Holding.  That's actually a pretty

14     easy decision.  It's not close by any stretch of

15     imagination.

16          We know that when Marcum was hired, Marcum

17     expressly told Jon Logan and HLFIP several things.

18          One, that this is a Transfer Pricing Study.

19     It is not a fairness opinion and it cannot be used

20     and should not be used as one.  It is not a proxy

21     for one.  Those are my words.  "Proxy" is my word.

22     That's not what was testified to.

23          But both Ms. Voralia and Ms. Naidu testified

24     that they had a specific conversation with

25     Jon Logan as well as Katrina Quicker that this

1      should not be used in litigation, they knew

2      litigation was there, and that its purpose was to

3      provide the taxpayer protection.  And that's it.

4          And within the less than three weeks that

5      Marcum worked on this Transfer Pricing Study, they

6      did not do anything to independently verify any of

7      the information that was provided to it by anyone

8      on the Jon Logan side of the equation.

9          They did nothing to independently verify the

10     assertions of ownership of intellectual property.

11     They just accepted everything at face value.

12         Smart Communications and HLFIP's own expert,

13     Mr. Schuette, criticized Marcum's selection of

14     eight of the ten comparables that were selected,

15     and they were selected after Marcum had

16     commissioned a group out of Argentina to do some

17     research on comparables and they came back with

18     comparables that are more than two decades old,

19     which perhaps might be okay for IRS purposes, but

20     has nothing to do with the validity and fairness of

21     the transaction.

22         The Court will find as fact that the

23     August 29, 2023 exclusive intercompany intellectual

24     company license is voidable and, therefore,

25     ineffective because it violate -- that that

1    agreement never was fair to the company, "the

2    company" being Smart Communications.

3         This agreement, and it's consistent with what

4    the Court has seen and that I've kind of gone

5    through the timeline, is Jon Logan here has spite

6    and animus towards his mother and his sister, and

7    that's what's driving decisions, not business

8    judgment, not what's good for the company, not

9    what's good for the 120 families that are, or their

10   employees and whose family are at jeopardy because

11   of the bankruptcy filing, but spite and animus.

12        I also find that the purported, long-term note

13   payable for the historic 2015 forward until the

14   August 29, 2023 is also invalid for the same

15   reason.

16        The fact that Smart Communications is even

17   here today advocating for something that saddles

18   the company to make it legally insolvent is

19   mystifying to me, but right now because Jon Logan

20   was the incumbent management and has continued on

21   as the incumbent management, he has saddled the

22   company with those debts.  I will go ahead and

23   invalidate that transaction.

24        Now, we need to also talk about March of 2015.

25   And I want to be clear that I'm only going to talk

1          limited about whatever agreement, if any, there

2          was.  I find, as fact, that the alleged agreement

3          articulated by Jon Logan is not credible.

4               I find, as fact, there was no such agreement

5          under the terms that Jon Logan has testified to

6          this Court.

7               Certainly, the Court finds that there was

8          instances where Jim Logan signed things on behalf

9          of HLFIP, but there was no agreement in 2015 for a

10         true-up relative to the royalty.

11              Now, I agree with Mr. Johnson that I am not

12         here to determine who owns the IP.

13              It seems that everyone agrees that the

14         MailGuard concept was Jon Logan's.  There's

15         evidence on both sides of the equation about what

16         was done with that and whether Smart Communications

17         contributed financially or idea-wise or employees

18         on a going-forward basis.  That's an open question,

19         and I think it's a valuation question.

20              If I'm the one that ever -- if the state court

21         is the one ever doing valuation, I would expect to

22         see discussions about the ownership of it.  If the

23         Bankruptcy Court does it -- and I am totally fine

24         if the Bankruptcy Court wants to take and go

25         forward -- I don't care.  I get paid regardless.

1          But I want to be clear:  I am not making any

2     findings, one way or the other, about the ownership

3     other than to say that the proffered agreement by

4     Jon Logan here in court is not credible and I find

5     as fact it did not and does not exist.

6          That takes us to the question of when I should

7     evaluate if the state court is the entity that is

8     going to be doing the valuation.  This actually is

9     a more difficult question in the Court's mind than

10    the invalidity of the August 2023 transaction.

11         On the one hand, there is a significant

12    history of Jon Logan trying to keep Mom from

13    getting any information and taking actions that

14    cause the company financial difficulty; for

15    instance, you know, increasing his salary

16    substantially, taking $600,000 approximately out of

17    the company right before you declare bankruptcy,

18    approximately six months after you do that, that

19    kind of suggests that it was planned.  Putting on

20    notes on to your financial statements that make the

21    company insolvent indicate this, and is symptomatic

22    of this spite that Jon Logan has towards Mom.

23         So that suggests an earlier-in-time valuation.

24         The Court's also cognizant that the Martha

25    Wright-Reed Act may be impacting the business of

1      Smart Communications which I think would be a

2      special circumstance.

3          Where I come out on this is at a date that

4      neither side has articulated, but I think is the

5      one that I feel most comfortable and I find under

6      the facts of this case, under the family dynamic in

7      this case, under what was known or knowable as of

8      the date that I'm going to determine, because

9      certainly we know the Martha Wright-Reed Act was

10     signed by President Biden in January of 2023, I'm

11     going to conclude that the date that we're going to

12     value the company is August 28th, 2023, which is

13     the day prior to all of the corporate changes

14     occurred.

15         At that date, the Martha Wright-Reed was known

16     or knowable, storm clouds were on the horizon.

17         It also reflects an earlier-in-time date than

18     when the judicial dissolution was filed, but it's

19     clear that by that date -- and, actually, by

20     earlier than that date, there was a deadlock, and

21     Jon Logan was doing what he could to prevent

22     Janice Logan from any access to the company in

23     taking steps to make Smart Communications Holding a

24     lot less valuable so that what he ultimately would

25     have to pay out to Mom on the valuation was less.

1          So I'm going to choose April 28th -- sorry --
2     August 28th, 2023.
3          So, again, I'm going to want this all typed up
4     and sent to me.  I will enter a very short order
5     with just the core findings and staple this.
6          I'm going to start on the Judge's right if
7     there are any points or clarifications.
8          Mr. Hillsley.
9          MR. HILLSLEY:  No, Your Honor.
10         THE COURT:  Mr. Oprison.
11         MR. OPRISON:  No, Your Honor.
12         THE COURT:  Going to Judge's left.
13    Mr. Schoenfeld.
14         MR. SCHOENFELD:  No, Your Honor.
15         THE COURT:  Mr. Johnson.
16         MR. JOHNSON:  No, Your Honor.
17         THE COURT:  Thank you very much.  I will see
18    you all next week and's.
19         MR. DIXON:  Sorry, Your Honor, earlier in your
20    discussion you mentioned something about the
21    handwritten note at the bottom of the 2015 license
22    and its effect.
23         THE COURT:  Oh, thank you.  My apologies.  Let
24    me continue.
25         The note in Alexis Logan's comment

1     specifically reference what became MailGuard.  And

2     I think when you look at that, the timing of that

3     e-mail plus the Dad signing the HLFIP paperwork

4     with the Patent and Trademark Office just a few

5     days later, that goes to the MailGuard.

6          I cannot find that that note means every

7     single future invention is 100 percent exclusively

8     Jon's.  But I don't need to get into who owns all

9     of these products, because I think that's a

10    valuation issue.

11         I expressly don't think I have authority from

12    the Bankruptcy Court to get there, and I am not

13    going there other than to say:  I see there's

14    evidence; it's conflicting evidence on both sides.

15         Okay.  Anything else?

16         MR. HILLSLEY:  Your Honor, should we deal with

17    the confidentiality issue?

18         THE COURT REPORTER:  I'm sorry.  Could you say

19    that again?  I had this on.

20         THE COURT:  Did you give the Clerk the exhibit

21    numbers?

22         MR. HILLSLEY:  We have been preparing them

23    including getting the recitation, so.

24         THE COURT:  I need to give that to the Clerk

25    to give her the direction to keep those

1    confidential because the other ones will not be

2    confidential.  So do you have that list yet?

3         MS. LIU:  We can write it down on one piece of

4    paper, Your Honor.

5         THE COURT:  She needs that very soon because

6    she's going to want to go home very soon.

7         MS. LIU:  I understand, Your Honor.  We'll be

8    quick.

9         THE COURT:  Anything else?

10        MR. HILLSLEY:  No, Your Honor.

11        THE COURT:  Best of luck to everybody and I

12   will see everybody next week.

13        (Trial concluded at 7:06 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    JUDGE'S RULING CERTIFICATE
 2      STATE OF FLORIDA  )
 3      COUNTY OF SARASOTA)
 4           I, Linda R. Wolfe, AAS, RPR, RMR, FCRR, FPR-C,
 5      Certified Stenographic Court Reporter, certify that
 6      I was authorized to and did stenographically report
 7      the foregoing Judge's Ruling; and that the
 8      transcript is a true record of the Ruling.
 9           I further certify that I am not a relative,
10      employee, attorney, or counsel of any of the
11      parties, nor am I a relative or employee of any of
12      the parties' attorney or counsel connected with the
13      action, nor am I financially interested in the
14      action.
15           Dated this 14th day of February, 2025.
16
17
18      _____
19      LINDA R. WOLFE, AAS, RPR, RMR, FCRR, FPR-C
        Certified Stenographic Court Reporter
20      Registered Professional Reporter
        Registered Merit Reporter
21      Federal Certified Realtime Reporter
        Florida Professional Reporter
22
23
24
25
```

# Exhibit 2

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA
PROBATE DIVISION

JONATHAN LOGAN and
SMART COMMUNICATIONS HOLDING, INC.,

      Plaintiffs,

v.                                      Case No:

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust dated February 10, 2021
and ALEXIS LOGAN, individually,

      Defendants.

_____/

## COMPLAINT

      Plaintiffs, Jonathan Logan and Smart Communications Holding, Inc., by and through their

respective undersigned counsel, hereby sue Defendants, Janice Logan, individually and as Trustee

of the James Logan Family Trust dated February 10, 2021 and Alexis Logan, individually, and in

support thereof state as follows:

### The Parties

      1.      Plaintiff, Jonathan Logan ("Jonathan"), is a resident of Pinellas County, Florida.

He is the natural son of James Logan and Janice Logan.

      2.      Plaintiff, Smart Communications Holding, LLC ("Smart Communications") is a

Florida limited liability company with its principal place of business in Pinellas County, Florida.

Smart Communications is a national provider of inmate communication services and contracts

with various correctional facilities.

      3.      Defendant, Janice Logan ("Janice") is a resident of Sarasota County, Florida.

      4.      Defendant, Alexis Logan ("Alexis") is a resident of Sarasota County, Florida. She

is the natural daughter of James Logan and Janice Logan, and the sister of Jonathan Logan.

5.     James Logan was a resident of and domiciled in Sarasota County, Florida at the time of his death on October 16, 2022. He was married to Janice at the time of his death. James Logan shall hereinafter be referred to as the "Decedent."

## Decedent's Estate Plan

6.     Decedent executed what purports to be a Last Will and Testament (the "Will") on February 10, 2021, a copy of which is attached hereto as **Exhibit "A."**  On the same date, Decedent executed what purports to be the James Logan Family Trust (the "Trust"), a copy of which is attached hereto as **Exhibit "B."**

7.     The Will is a pour-over will, devising all of Decedent's assets (with the exception of some tangible personal property) to the Trust, after all expenses and debts of Decedent's estate have been paid.

8.     The Will nominates Janice as Personal Representative of the Decedent's estate, and the Trust designates Janice and the Decedent as Co-Trustees during the Decedent's life, and provides that Janice becomes the sole Trustee upon Decedent's death.

9.     The Decedent was the beneficiary of the Trust during his life. The Trust provides that upon Decedent's death, the beneficiaries are Janice, Jonathan, and Alexis, although the Trust provides that the Trust estate shall be held for the primary benefit of Janice.

## Venue and Standing for Probate and Trust Administration Purposes

10.     Venue in this action is proper because any probate estate of the Decedent would be opened in Sarasota County, Florida pursuant to Florida Statutes Section 733.101 and because Janice and Alexis are residents of Sarasota County, Florida.

11.     Additionally, the principal place of administration of the Trust is Sarasota County, Florida pursuant to Florida Statutes Section 736.0108. As such, venue is proper in Sarasota County pursuant to Florida Statutes Section 736.0204.

12.     Venue in Sarasota County is also proper pursuant to Florida Statutes Section 736.0202 because Janice, Jonathan and Alexis are beneficiaries of the Trust.

13.     Jonathan qualifies as a beneficiary of any probate estate to be opened for the Decedent given the interrelationship between the Will and the Trust. As such, Jonathan has standing to bring claims related to his father's estate and he will be entitled to notice of probate administration.

14.     The Trust provides that, to the extent Janice does not devise all of the Trust assets in her Will, the remaining assets, upon her death, will be devised equally among trusts for Alexis and Jonathan. As a result, Jonathan is a qualified beneficiary of the Trust under Florida Statutes because he would be a permissible distributee under the Trust if Janice's interest under the Trust terminates. *See* Florida Statutes Section 736.0103(19)(b).

15.     In addition to being a qualified beneficiary of the Trust and a beneficiary of the to-be-opened probate estate, Jonathan is an "interested person" with standing and rights under the Probate Code (Chapter 733) and the Trust Code (Chapter 736).  In particular, Florida Statutes Section 731.201(23) defines an interested person as "any person who may reasonably be expected to be affected by the outcome of the particular proceeding involved."

16.     Jonathan will be "affected by the outcome" of the probate and Trust administration of the Decedent in various ways given his status as a beneficiary of any probate estate and his status as a beneficiary under the Trust, and the fact that he is the only other owner of Smart Communications.

3

17.     Smart Communications also qualifies as an "interested person" because it is reasonably expected to be affected by the outcome of this proceeding insofar as the position taken by Janice as Trustee is depriving Smart Communications of its purchase rights under the Shareholders' Agreement, referenced below.

**Jonathan's and the Decedent's Co-Ownership of the Corporations**

18.     Prior to execution of the Trust, Decedent and Jonathan were each 50% shareholders in the following Florida corporations and limited liability companies:

i.      Smart Communications Holdings, Inc. (a Plaintiff in this action)

ii.     Smart Communications Lee, Inc.

iii.    Smart Communications Desoto, Inc.

iv.     Mailguard, Inc.

v.      Mailguard Federal, Inc.

vi.     Smart Communications Yacht Holdings, LLC

viii.   Loco Florida, LLC

19.     Decedent was the sole shareholder of a Florida entity known as Inmate Information Services, Inc.

20.     Plaintiff, Smart Communications, owns 100% of the shares of Smart Communications US, Inc., Smart Communications Pasco, Inc. and Smart Communications Collier, Inc.

21.     According to the 2021 Audited Financial Statements of Smart Communications, the shareholder equity was approximately $15 million as of December 31, 2021.

22.     Smart Communications Yacht Holdings, LLC owns assets consisting of a 100' Riva Cosaro purchased for approximately $10 million in 2022 and a 48' center console Nortech purchased for approximately $1 million.

4

23.     Loco Florida, Inc. has assets consisting of a warehouse space located in Seminole,
Florida purchased for approximately $1.1 million in 2019.

**The Smart Communications Shareholder Agreement**

24.     Jonathan and his father, the Decedent, were each 50% shareholders in the Plaintiff,
Smart Communications, prior to Decedent's purported transfer of his ownership interest in Smart
Communications to the Trust. Jonathan and the Decedent were the only directors of the company.
Jonathan was and remains the sole operating officer of Smart Communications and he conducts
its day-to-day operations, although the Decedent largely handled the financial aspects of Smart
Communications when he was alive.

25.     Shortly before the Decedent's death, Decedent transferred his ownership interest in
Smart Communications to the Trust pursuant to the Stock Power dated September 16, 2022, a copy
of which is attached hereto as **Exhibit "C."[1]**

26.     As of September 23, 2022, Decedent and Jonathan executed a Shareholder
Agreement for Smart Communications (the "Shareholders' Agreement"), a copy of which is
attached hereto as **Exhibit "D."** Given the Decedent's transfer of his interest in Smart
Communications to the Trust pursuant to the September 16, 2022 Stock Power, as of Decedent's
date of death, the parties to the Shareholders' Agreement are Jonathan and the Trust, with each
designated as having a 50% ownership interest.

27.     Section 4.3 of the Shareholders' Agreement provides for "Mandatory Purchase
upon Death of a Shareholder."  It states, in relevant part:

> Upon the death of a Shareholder or, in the case of a Shareholder that
> is a Trust, the death of the Key Designee (in each case referred to
> herein, along with the personal representative of a deceased

---

[1] The Decedent also transferred his interests in various other companies to the Trust on September 16, 2022, such as for Smart Communications Yacht Holding, LLC, and Loco Florida, LLC. presumably as part of his end-of-life planning.

5

individual Shareholder as the "Decedent Shareholder"), the Corporation shall purchase and the Decedent Shareholder shall sell, all of the Decedent Shareholder's Stock, at the price determined in accordance with the provisions of Article Five and in accordance with the terms of Article Six.[2]

### Janice's Repudiation of the Shareholders' Agreement

28.    The Decedent's intentions with respect to his estate plan and the funding of the Trust with the ownership interest in Smart Communications are clear: he intended to provide liquidity for Janice (and the other beneficiaries) through the mandatory sale and purchase requirement in Section 4.3 of the Shareholders' Agreement. This would allow the Trust to receive the fair market value of the ownership interest in Smart Communications, a potentially significant amount.

29.    Decedent intended for Jonathan to then become the sole shareholder of Smart Communications.  This is important because he would not have to account to Janice as Trustee of the Trust, because Janice had no knowledge of or prior dealings with respect to the company.

30.    Simply put, the Decedent's estate plan, of which the Shareholder's Agreement is a part, would financially provide for his surviving spouse and ensure that his son would become the sole shareholder in Smart Communications.

31.    Unfortunately, Janice is attempting to thwart the structure of the estate plan and the clear requirements of Section 4.3 of the Shareholders' Agreement out of her own perceived self-interest and self-aggrandizement.

32.    Janice is refusing to recognize the Shareholders' Agreement as valid and she is thereby refusing to adhere to the buy/sell requirement in Section 4.3 thereof. As a result, the

---

[2] Section 1.3(c) defines "Key Designee" as the Decedent, with respect to the Trust.

valuation process set forth in Article Five of the Shareholders' Agreement is being frustrated and cannot occur because of her refusal to abide by the Shareholders' Agreement.

33.     On information and belief, Janice believes that she will leverage the negotiating position of the Trust if the Trust is not contractually obligated to sell its interest for fair market value. Janice believes that if the Trust can continue to hold onto and remain a passive 50% ownership of Smart Communications, the company and/or Jonathan will be forced to pay her a sum of money well in excess of what a valuation process under the Shareholders' Agreement would garner for the Trust. It is believed that Janice would intend to have the Trust assert various demands as a 50% owner of Smart Communications until such time as the company or Jonathan would relent and pay the Trust a premium for its interest. Meanwhile, the Trust's interest in Smart Communications is far and away its most valuable asset and Janice's position and strategy actually serve to deprive the Trust of the necessary capital and liquidity (that the Decedent wanted the Trust to have) and that are necessary to financially backstop the Decedent's probate estate and pay his creditors.

34.     On information and belief, the Decedent has creditors that cannot be paid without the Trust selling its interest in Smart Communications pursuant to the terms of the Shareholders' Agreement. It does not appear as if Janice has opened any probate estate for the Decedent, despite her being nominated as the Personal Representative. Certainly, Jonathan has not been provided with any Notice of Administration, and it does not appear as if any estate has been opened for the Decedent by a search of public records in Sarasota County. Nevertheless, just to name an example of the Decedent's debts, he was individually named as a party defendant to a pending lawsuit. It is anticipated that the extent of the Decedent's creditors will be made known when a probate estate is eventually opened.

### Janice as Trustee does not Possess "Permitted Transferee" Status
### <u>Under the Shareholders' Agreement</u>

35.     Section 1.3(c) of the Shareholders' Agreement defines "Key Designee" as "James Logan," with respect to the Trust.

36.     Section 2.3(b) of the Shareholders' Agreement states that a change of Key Designee shall constitute a transfer, which is subject to the restrictions of the Shareholders' Agreement.

37.     Section 2.3 (b) of the Shareholder Agreement only allows "Permitted Transfers" of the stock to "Permitted Transferees," who must (i) execute and deliver to the non-transferring Shareholders a counterpart of the Shareholder Agreement agreeing to be bound by its terms and (ii) receive advice of Corporation's counsel to the effect that such transfer does not contravene or otherwise conflict with terms and conditions of the Agreement and (iii) if the Transfer is to a trust, the Trustee and all current beneficiaries thereof agree in writing to no amendment of such trust instrument and no assignment of beneficial interest in such trust will be made with an advance written opinion of Corporation's counsel to the effect that such amendment or assignment does not contravene and is not otherwise in conflict with the terms or conditions of the Agreement.

38.     Defendant, Janice, as Trustee, has failed to comply with any of these requirements. As such, she has not become a Permitted Transferee.  Section 2.3(e) specifically states, "Any attempted transfer to a Permitted Transferee without satisfying all of the applicable requirements of this Section 2.3, including but not limited to, obtaining the required approval shall be void *ab initio* and of no force and effect."

39.     Since Janice, as Trustee, has not complied with the requirements of Section 2.3, she is not a Permitted Transferee and therefore, is not authorized to control the Stock.

### Janice's Misguided Demands for Millions of Dollars to be Paid to the Trust
### Without Regard to the Creditors of a Probate Estate

40.     On January 20, 2023, Janice made a demand on Jonathan through counsel that she retained in Chicago in her capacity as Trustee of the Trust. Janice had no participation in Smart Communications or understanding as to how the company was operated or any agreements between Jonathan and the Decedent. Nevertheless, she had her attorney demand that Jonathan pay up to $6.7 million to the Trust within 60 days on the rationale that various watercraft, automobiles, and real estate that were being *used* by Jonathan were in effect distributions to him worth $6.7 million, and that the Decedent should have received equal distributions from Smart Communications and the operative companies. Janice is fundamentally mistaken about the nature of the assets insofar as they continued to be titled in the name of the companies and she was not privy to the express arrangement between Jonathan and the Decedent.[3] Nevertheless, Janice has either fundamentally confused the fiduciary capacities in which she has been designated, or she has attempted to make a multi-million-dollar money grab at the level of the Trust to benefit her as beneficiary and at the expense of creditors of the necessary probate estate.

41.     Any distributions owed to the Decedent prior to September 16, 2022, as are addressed in the January 20, 2023 demand, were claims or assets personal to the Decedent and would belong exclusively to the Decedent's probate estate. Janice has no standing or capacity to make such demands as Trustee of the Trust. Even if the demand for the $6.7 million had merit, only the Personal Representative of the Decedent's probate estate would have standing to pursue

---

[3] To further illustrate the point, Janice is herself a beneficiary of corporate-owned assets that she lives in and uses. For example, the Decedent and Janice lived in a home in Sarasota County that is titled in the name of Smart Communications. Janice continues to reside there. Janice's personal automobile is also owned by one of the companies. The Decedent (and Janice) also took hundreds of thousands of cash distributions from Smart Communications prior to the Decedent's passing, for which Jonathan did not receive "equal distributions."

the claims. Sections 5.1 and 5.2 of the Will provide that the Decedent's residuary estate is devised to the Trust "<u>after</u> the payment of debts and taxes" of the estate (emphasis supplied).

42.     In other words, even if Janice's demand for the $6.7 million had merit, she has demanded it in the wrong capacity as any such claims would belong to the to-be-opened probate estate, and not to the Trust. Any "equivalent distributions" owed to the Decedent would have been personal to him <u>prior</u> to his funding the Trust with his ownership interest in Smart Communications. Additionally, Janice's demand for the $6.7 million be paid to the Trust is wrongful as to the probate estate and creditors of the Decedent, demonstrating that Janice is not understanding her fiduciary roles, despite her nomination in the Will as Personal Representative.

43.     All conditions precedent have occurred or have otherwise been waived.

<u><strong>COUNT I</strong></u>
<strong>(Declaration over Capacity in which Claims may be Pursued)</strong>

44.     This is an action for declaratory and supplemental relief by Plaintiffs, Jonathan and Smart Communications, against Defendants, Janice, individually and as Trustee of the Trust, and Alexis, as beneficiary of the Trust, pursuant to Florida Statutes Section 736.0201 and Florida Statutes Chapter 86.

45.     Plaintiffs reallege the allegations in paragraphs 1 through 43 above as if fully incorporated herein.

46.     Plaintiffs contend that the claims represented by the demand for $6.7 million by Janice, as Trustee, through her attorney's letter of January 20, 2023, can <u>only</u> be brought by a duly appointed Personal Representative of the Decedent's estate because they represent claims personal to the Decedent and pre-date the Decedent's September 16, 2022 Stock Power to the Trust, to the extent the claims have any merit (which is denied). Plaintiffs contend that Janice, as Trustee, has

no standing to pursue those claims, and she would only have standing to do so if and when she is appointed as Personal Representative.

47.     Defendants are believed to contend that the demand for $6.7 million was properly brought by Janice as Trustee, and that she has standing to pursue those claims.

48.     Pursuant to Florida Statutes Section 736.0201(2), a court "may intervene in the administration of a trust to the extent a court's jurisdiction is invoked by an interested person as is provided by law." Section 736.0201(8) allows the Court to "instruct trustees" and Section 736.0201(f) authorizes the Court to provide a declaration of rights.

49.     As a result of the foregoing, there exists a bona fide, actual, present practical need for a declaration by the Court as to whether claims relating to the $6.7 million demanded in Janice's January 20, 2023 letter belong to the Decedent's to-be-opened estate or to the Trust.

50.     The requested declaration deals with a present, ascertained, or ascertainable state of facts or present controversy as to a state of facts. As alleged herein, there is a present controversy between Plaintiffs and Janice.

51.     The rights of the parties are dependent upon the facts alleged herein and the law applicable to these facts.

52.     Plaintiffs and Janice have an actual, present, adverse, and antagonistic interest in the subject matter as alleged herein, in both fact and law.

53.     The antagonistic and adverse interests alleged herein are all before the Court by proper process and the relief sought is not merely the giving of legal advice by the courts or the answer to questions propounded from curiosity. The parties are presently in need of the declaration described above.

11

54.     Defendant, Alexis, is named as a proper and necessary party to this proceeding by virtue of her interest as beneficiary under the Will and the Trust.

WHEREFORE, Plaintiffs, Jonathan Logan and Smart Communications Holding, Inc., demand judgment in their favor and against Defendants, Janice Logan, individually and as the Trustee of the Trust and Alexis Logan as beneficiary of the Trust, declaring:

1.      Any claims of allegedly improper distributions to Jonathan occurring proper to September 16, 2022 are claims of the to-be-opened estate of the Decedent;

2.      Janice has no standing to pursue the claims of the Decedent's estate because she has not been appointed as Personal Representative of the estate;

3.      No improper distributions were made to Jonathan prior to September 16, 2022; and

4.      Such other and further declarations as this Court deems just and proper.

## COUNT II
### (Declaration Concerning Effect of Shareholders' Agreement)

55.     This is an action for declaratory and supplemental relief by Plaintiffs, Jonathan and Smart Communications, against Defendants, Janice, individually and as Trustee of the Trust, and Alexis, as beneficiary of the Trust, pursuant to Florida Statutes Section 736.0201 and Florida Statutes Chapter 86.

56.     Plaintiffs reallege the allegations in paragraphs 1 through 43 above as if fully incorporated herein.

57.     Plaintiffs contend that the Shareholders' Agreement is in effect and that the Trust is obligated to sell its ownership interest in Smart Communications to the company pursuant to Section 4.3 of the Shareholders' Agreement.

58.     Plaintiffs also contend that Janice, as Trustee, has failed to comply with the "Permitted Transferee" provisions in Section 2.3(b) of the Shareholders' Agreement such that the

Trust cannot exercise any control over the ownership interests in Smart Communications and only has the right to receive payment of fair market value for its interest pursuant to Articles Five and Six.

59.     Defendants contend that the Shareholders' Agreement is not valid and that there is no obligation for the Trust to sell its interest to the company therein.

60.     Defendants are also believed to contend that Janice, as Trustee, enjoys "Permitted Transferee" status under the Shareholders' Agreement and can exercise ownership rights in Smart Communications in the event that the Shareholders' Agreement is effective.''

61.     Janice has not complied with the requirements of Section 2.3(b) of the Shareholder Agreement.

62.     Janice is not a "Permitted Transferee" under the Shareholder Agreement.

63.     Janice had refused to recognize the Shareholder Agreement as valid and enforceable.

64.     Janice has refused to participate in the mandatory sale provisions of the Shareholder Agreement.

65.     Pursuant to Florida Statutes Section 736.0201(2), a court "may intervene in the administration of a trust to the extent a court's jurisdiction is invoked by an interested person as is provided by law." Section 736.0201(8) allows the Court to "instruct trustees" and Section 736.0201(f) authorizes the Court to provide a declaration of rights.

66.     As a result of the foregoing, there exists a bona fide, actual, present practical need for a declaration by the Court as to whether the Shareholders' Agreement is in effect and the Trust must sell its interest in Smart Communications to the company and whether the Trust enjoys "Permitted Transferee" status under the Shareholders' Agreement.

67.     The requested declaration deals with a present, ascertained, or ascertainable state of facts or present controversy as to a state of facts. As alleged herein, there is a present controversy between Plaintiffs and Defendants.

68.     The rights of the parties are dependent upon the facts alleged herein and the law applicable to these facts.

69.     Plaintiffs and Defendants have an actual, present, adverse, and antagonistic interest in the subject matter as alleged herein, in both fact and law.

70.     The antagonistic and adverse interests alleged herein are all before the Court by proper process and the relief sought is not merely the giving of legal advice by the courts or the answer to questions propounded from curiosity. The parties are presently in need of the declaration described above.

71.     Defendant, Alexis, is named as a proper and necessary party to this proceeding by virtue of her interest as beneficiary under the Will and the Trust.

72.     Jonathan and Smart Communications have retained the services of the undersigned counsel and are obligated to pay them a reasonable fee for their professional services. They are entitled to recover their attorneys' fees from the Trust pursuant to Florida Statutes Sections 736.1005.

WHEREFORE, Plaintiffs, Jonathan Logan and Smart Communications Holding, Inc., demand judgment in their favor and against Defendants, Janice Logan, individually and as the Trustee of the Trust and Alexis Logan as beneficiary of the Trust, declaring:

1.     The Shareholders' Agreement is valid and enforceable against the Trust;

2.     Janice, as Trustee of the Trust, is required to comply with the "Permitted Transferee" provisions of Section 2.3 of the Shareholders' Agreement;

3. The Trust is required to comply with the mandatory sale provisions of the Shareholders' Agreement, and instructing her to do so;

4. This Court retains jurisdiction over these matters to implement transfer of the Stock to Smart Communications Holding, Inc. in the event of further dispute;

5. Plaintiffs are entitled to their attorneys' fees, and awarding such fees to Plaintiffs; and

6. Such other and further declarations as this Court deems just and proper.

**COUNT III**
**(Breach of Trust)**

73. This is an action by Plaintiff, Jonathan, against Defendant, Janice, individually and as Trustee of the Trust, for breach of trust involving an amount in controversy in excess of $50,000, exclusive of interest, costs and attorneys' fees.

74. Plaintiff realleges his allegations in paragraphs 1 through 43 above as if fully set forth herein.

75. Defendant, Janice, as Trustee, has committed a breach of trust by refusing to honor the Shareholders' Agreement to sell the Trust's interest in Smart Communications to the company for fair market value and thereby fund the Trust for the benefit of all beneficiaries.

76. As a result of the foregoing, Janice has committed a serious breach of trust. Plaintiff, Jonathan, demands the following remedies under Florida Statutes, Section 736.1001:

a. Compelling Janice to perform her duties and to convey the Trust's ownership interest in Smart Communications pursuant to Section 4.3 of the Shareholders' Agreement;

b. Ordering Janice to account to Jonathan; and

c. Reducing or denying compensation to Janice, as Trustee.

15

77.     Jonathan has retained the services of the undersigned counsel and is obligated to pay them a reasonable fee for their professional services. Jonathan is entitled to recover his attorneys' fees from the Trust pursuant to Florida Statutes Sections 736.1004 and 736.1005.

WHEREFORE, Plaintiff, Jonathan Logan, demands judgment against Defendant, Janice Logan, as Trustee of the Trust, in accordance with the foregoing, to include an award of Jonathan's reasonable attorneys' fees and costs incurred in this action, in addition to such other relief as the Court considers just.

<table>
<tr><td>

*/s/ Mark M. Wall*
Mark M. Wall
Florida Bar Certified, Business Litigation
Florida Bar No. 58483
mark.wall@hwhlaw.com
ashley.jecevicus@hwhlaw.com
RELitMMW@hwhlaw.com
Jarod A. Brazel
Florida Bar No. 1017722
jarod.brazel@hwhlaw.com
Hill, Ward & Henderson, P.A.
101 East Kennedy Blvd., Suite 3700
Tampa, Florida 33602
Telephone: (813) 221-3900
Fax: (813) 221-2900
*Attorneys for Plaintiff, Jonathan Logan*

</td><td>

*/s/ Julie Negovan*
Julie Negovan
Florida Bar No. 121450
jnegovan@griesinglaw.com
Griesing Mazzeo Law, LLC
6750 N. Andrews Ave., Ste. 200
Fort Lauderdale, FL 33309
Telephone (215) 431-9295
*Attorneys for Jonathan*
*Logan and Smart Communications*
*Holding, Inc.*

</td></tr>
</table>

# Exhibit 3

# IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,
                Plaintiffs,

v.

JANICE LOGAN, individually and as Trustee of the
James Logan Family Trust, dated February 10, 2021;
and ALEXIS LOGAN,
                Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan        Case No.: 2023-CA-1002-NC
Family Trust, dated February 10, 2021,
                Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., SMART
COMMUNICATIONS HOLDING, LLC, HLFIP
HOLDING, INC., and HLFIP HOLDING, LLC,
                Counterclaim Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan Family      (CONSOLIDATED)
Trust, dated February 10, 2021, and derivatively on
Behalf of Smart Communications Holding, Inc.,
                Plaintiff,           Case No.: 2023-CA-1280-NC

v.

JONATHAN D. LOGAN,
SMART COMMUNICATIONS HOLDING, INC.,
nominal defendant, SMART COMMUNICATIONS
HOLDING, LLC, HLFIP HOLDING, LLC, LOCO
FLORIDA LLC, and SMART COMMUNICATIONS
YACHT HOLDING, LLC,
                Defendants.

_____/

## EXPEDITED MOTION FOR CLARIFICATION OF ORDER
## BIFURCATING PHASE 2 OF TRIAL

Defendants Jonathan D. Logan, Smart Communications Holding, Inc., Smart

Communications Holding, LLC, and HLFIP Holding, LLC ("HLFIP") (collectively, the

"Movants") hereby move the Court to clarify the scope of its Order Bifurcating Phase 2 Trial (the "Order," DIN 870). Movants bring this motion because the Order describes the scope of Part 1 of Phase 2 of this case (which was set for the three-week trial period beginning on January 27, 2025) in terms that appear to be significantly broader than what was discussed in and what the Court described in the hearing on November 22, 2024. Because the Bankruptcy Court lifted the automatic stay on "a very limited basis" in order to allow this Court to address "issues dealing with the validity and extent of the IP agreement and the date on which the valuation should be determined," clarification is now required.

If the parties were to proceed on the broader issue, which was arguably not contemplated by the Bankruptcy Court's order, that would require more discovery (especially expert discovery) and would be prejudicial to the Movants. Accordingly, the Movants respectfully request the Court clarify that the Order does not retract the Court's prior statement from the November 22 hearing that it is was "not asking for a valuation of the IP in [the] January [trial period]."

On November 30, 2024, Smart Communications Holding, Inc. and Smart Communications Holding, LLC (the "Debtors") each filed voluntary petitions under Chapter 11 of the bankruptcy code. *See* DIN 887. In a hearing on December 19, 2024, the Bankruptcy Court lifted the stay for the limited purpose of allowing this Court to decide the two issues this Court set for hearing as Part 1 of Phase 2 of this case.

Although the Court circumscribed one version of what that second issue involves in its hearing on November 22, its subsequent Order describes something much broader—something that the Court expressly ruled out during the November 22 hearing. This motion discusses that second issue using the term that the Court coined, which is the "license/royalty" issue.

2

Before the Court's hearing on November 22, HLFIP filed both a motion to dismiss (DIN 821) and a motion for continuance (DIN 852). In the former, HLFIP explained that the issues that the Court must decide in Phase II are "far more nuanced than Janice's aggressive trial schedule suggests" and include, "[a]mong other things," decisions about "(1) whether HLFIP owns some or all of the intellectual property that SmartComm uses to provide[] services to correctional facilities across the country and (2) the royalty that HLFIP is owed for the intellectual property that it owns and licenses to SmartComm." DIN 821 at 5. In the latter, HLFIP opposed the then current trial schedule because addressing those issues would require "the testimony of HLFIP's expert," "depositions of Janice's apparent valuation experts," and, ideally, the exchange of "both expert and rebuttal reports." DIN 852 at 5. In short, HLFIP opposed a trial on IP valuation in January/February 2025.

At the November 22 hearing, this Court acknowledged HLFIP's concerns and stated that the license/royalty issue tried in January/February 2025 would involve something much narrower than the IP valuation. The Court stated that the issue it would try would "be a binary choice" in that "either there was the agreement or there wasn't." Trans. 73:8-15.[1] The Court insisted that the parties could prepare for and that it could decide the issue of "was there a license or wasn't there a license." Trans. 103:23-24; *see also* Trans. 135:5-13 (stating that the license issue to be tried in January was "whether or not there was that agreement back in … 2015-ish").

The Court's logic for pressing forward with that "binary" issue in the trial session in January/February 2025 was that there was little or no discovery needed to address that issue: "What discovery has to happen to determine -- I don't know if you want to characterize it as a

---

[1] For the Court's convenience, attached as Exhibit A are excerpts from the November 22 hearing transcript.

license, a royalty, a contract? I mean, what really has to be done?" Trans. 124:11-15.[2] The Court later asked: "What else is there to do relative to whether or not back in, was it 2015, there was an oral agreement … maybe some notations in the books and records or the absence of notation in the books and records?" Trans. 127:8-14.

Moreover, in the November 22 hearing, this Court expressly *ruled out* the possibility of deciding the IP valuation issue. In arguing against trying the IP valuation issue in January/February 2025, HLFIP's counsel explained to this Court that there is an entire portfolio of IP involved in the case and that valuing that portfolio would require more time and discovery, including expert reports and expert depositions. Trans. 124:16-125:4. This Court dismissed those concerns, stating that it was not going to hear evidence on the proper royalty rate in January but sought to resolve the narrower "binary" issue on whether a license exists at all:

> I'm not asking for a valuation of the IP in January. What I was wondering is why can't we resolve whether there's, you know -- whether that transaction actually occurred or whether there was or was not a royalty agreement, and to me that seems like something that could be done probably next week if we absolutely had to. It doesn't seem like it requires that much discovery to get to that one issue. Help me … understand what specific discovery we have to get to the fundamental question of whether there was an agreement, a royalty agreement, a license agreement, whatever you want to call it.

Trans. 125:8-21.[3] The Court thus posed an existential question ("was there a license or wasn't there a license," as the Court stated elsewhere) and not an IP valuation question. As for the IP

---

[2] Janice has requested *seven* depositions in the month of January, inconsistent with the Court's (and the Movants') understanding of what was required to proceed in January/February and the Bankruptcy Court's limited lifting of the automatic stay.

[3] By requesting seven depositions, Janice either disagrees with the Court that this issue involves minimal discovery or has something in mind for the license/royalty issue that is markedly different from what the Court had in mind during the November 22 hearing. Janice's intent is unclear. For instance, in the November 22 hearing, Janice's counsel said that they wanted to depose "Noreen Gunning, Smart Comm's inhouse accountant" on "questions about the 2024 financials" but conceded that this was "probably just

valuation question, the Court said that "the existing trial period probably isn't the best trial period to do that because I do think there is a little bit more discovery that has to get done for it to be a fair trial." Trans. 134:14-22.

On her part, Janice appears to agree that the Court is not going to try the "valuation of the IP in January." Her counsel argued in the November 22 hearing that he could not "fathom" that HLFIP could possibly need discovery on the license/royalty issue, stating that "this is their agreement" and "[i]t's one agreement." Trans. 133:18-22. If Janice's counsel thought that the Court intended to decide the IP valuation (and therefore the proper arm's-length royalty rate), he would have presumably reminded the Court about Janice's need to get a report from Jon's expert and would have acknowledged the need to provide a report from Janice's expert. Janice's counsel has already emailed about the seven depositions they intend to schedule in January. Those depositions are all for fact witnesses. She did not list HLFIP's valuation expert, nor has she offered up the expert that she appears to have retained on that issue.

When the Court framed the license/royalty issue in its Order, however, the Court used language from HLFIP's motion to dismiss—language that HLFIP used in arguing *against* trying the broader IP valuation issue in January/February 2025. The Court's Order of November 25 states that the license/royalty issue involves "'(1) whether HLFIP owns some or all of the intellectual property that SmartComm uses to provide[] services to correctional facilities across the country and (2) the royalty that HLFIP is owed for the intellectual property that it owns and licenses to SmartComm.'" Order at 2. This is precisely the issue that HLFIP argued could not be tried in January/February 2025 and the issue that the Court and the parties agreed (at the November 22 hearing) would *not* be heard in January/February 2025. When HLFIP argued that it

---

valuation" discovery. Trans. 147:20-148:8. Janice has nevertheless asked to depose Ms. Gunning for Part 1 of Phase 2, inconsistent with her statements to this Court and the limited lifting of the stay.

could not practicably be prepared for a hearing on that expansive valuation issue in January/February 2025 (because it involves a vast set of IP, trade secrets, and the like and required significant expert discovery), this Court assured HLFIP that it did not intend to try the "valuation of the IP in January." Trans. 125:8-21.

Finally, since the November 22 hearing, the Debtors commenced a Chapter 11 bankruptcy case and immediately filed a plan of reorganization (the "Bankruptcy Plan") that provides a restructuring remedy addressing the Debtors' liabilities asserted by HLFIP, Janice, and numerous non-insider creditors of the Debtors (none of which creditors are parties to this case). *See* Bankruptcy Plan attached as Exhibit B. Specifically, the Bankruptcy Plan seeks to restructure the Debtors by, *inter alia*, funding up to $10,000,000 over a period of five years to holders of allowed claims against the Debtors. The Debtors will be funding that amount by selling, *inter alia*, assets that are the subject of several of the claims in this case, including cars and boats. Given that the Bankruptcy Plan, which the Debtors seek to confirm on an expedited track, presents core issues under the bankruptcy code that only the Bankruptcy Court can adjudicate and for which only the Bankruptcy Court can bind all parties (and all creditors) to the relief requested, logic dictates that the valuation issues under the HLFIP license must be adjudicated in the bankruptcy case. It makes no sense for the parties to adjudicate the same issues twice in two different courts.

Accordingly, the Movants hereby move this Court to clarify that its Order of November 25 does not retract the Court's prior statement that it is not going to try the "valuation of the IP in January."

6

## Certificate of Conferral

I certify that before filing this motion, we discussed the relief requested in this motion by email on January 2, 2025, with the opposing party and the opposing party disagrees that the Court's Order is unclear about the scope of Part 1 of Phase 2.

Dated: January 2, 2025

**DLA PIPER LLP (US)**
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131
Office:  (305) 423-8522
Fax:  (305) 657-6366
chris.oprison@dlapiper.com

By: /s/ *Chris Oprison*
Christopher G. Oprison, Esq.
Florida Bar No. 122080

*Attorney for Defendant HLFIP*

**AKERMAN LLP**
401 E. Jackson Street, Suite 1700
Tampa, FL 33602-5250
Office: (813) 23-7333
Fax: (813)218-5495
mark.bernet@akerman.com
caren.deruiter@akerman.com

By:/s/ *Mark J. Bernet*
Mark J. Bernet, Esq.
Florida Bar No. 606359

-and-

**AKERMAN LLP**
201 East Las Olas Boulevard
Suite 1800
Fort Lauderdale, FL 33301
Telephone: (954) 463-2700
Fax: (954) 463-2224

Jason S. Oletsky, Esq.
Florida Bar No. 9301
jason.oletskey@akerman.com
jill.parnes@akerman.com
Dustin B. Hillsley, Esq.
Florida Bar No. 1018589
dustin.hillsley@akerman.com
deborah.karlson@akerman.com
Max C. Rudolf, Esq.
Florida Bar No. 98766
max.rudolf@akerman.com
deborah.karlson@akerman.com

*Attorneys for Jonathan D. Logan, Smart Communications Holding, Inc., and Smart Communications Holding, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 2, 2025, a true and correct copy of the foregoing document was served via the Court's electronic portal to all entitled parties and counsel of record appearing on the Court's service list at the time of service.

*/s/ Christopher G. Oprison*

Christopher G. Oprison

Exhibit 4

# IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,

                Plaintiffs,

v.

                Case No. 2023-CA-1002-NC

JANICE LOGAN, individually, as Trustee of the James
Logan Family Trust, dated February 10, 2021, and as
Personal Representative of the ESTATE OF
JAMES LOGAN, JUSTIN PETERSON, and
ALEXIS LOGAN,

                Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021,

                Counterclaim Plaintiff,

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC.,
SMART COMMUNICATIONS HOLDING, LLC, and
HLFIP HOLDING, LLC,

                Counterclaim Defendants.

_____/

JANICE LOGAN, as Trustee of the James Logan
Family Trust, dated February 10, 2021, and derivatively
on behalf of Smart Communications Holding, Inc.,

                Plaintiff,

(CONSOLIDATED)

Case No.: 2023-CA-1280-NC

v.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC., nominal
defendant, SMART COMMUNICATIONS HOLDING,
LLC, HLFIP HOLDING, LLC,
LOCO FLORIDA LLC, and SMART
COMMUNICATIONS YACHT HOLDING, LLC,

                Defendants.

_____/

## ORDER DENYING EXPEDITED MOTION FOR CLARIFICATION

1

This cause came before the Court on Jonathan Logan, Smart Communications Holding, Inc., Smart Communications Holding, LLC, and HLFIP Holding, LLC's Expedited Motion for Clarification of Order Bifurcating Phase 2 of Trial, [DIN 903] (the "Motion"), and Janice Logan's Response in Opposition thereto [DIN 909], and the Court having heard argument of counsel, having reviewed the court file and being otherwise fully advised, it is Ordered and Adjudged as follows:

1.      The Motion is DENIED for the reasons stated on the record during the hearing on the Motion on January 10, 2025, a copy of which transcript is attached hereto as Exhibit 1 and incorporated as part of this Order (see esepcially pages 28-31);

2.      In making this Order this Court recognizes "the bankruptcy court's limitation of stay on this issue to be the validity and extent of the IP agreement" (1/10/2025 Hrg. Tr. 30:5–8) in its Order Granting In Part Creditor Janice Logan's Emergency Motion For Relief From Automatic Stay And Request For Comfort Order As To Claims Against Non-Debtors in *In re SmartComm*, Middle District of Florida, 8:24-BK-07106 (Jointly Administered with 8:24-BK-07108). *See* DINs 908 (Full 12/19 Transcript), 928 (Entered Limited Relief from Stay Order).

DONE AND ORDERED in Sarasota County, Florida.

e-Signed 1/15/2025 7:35 AM 2023 CA 001002 NC

Honorable Hunter W. Carroll
Circuit Judge

# EXHIBIT 1

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT IN AND FOR SARASOTA COUNTY, FLORIDA
DIN 903 - EXPEDITED MOTION FOR CLARIFICATION OF ORDER BIFURCATING PHASE 2 TRIAL, AND CASE MANAGEMENT
FRIDAY, JANUARY 10, 2025

JONATHAN LOGAN and SMART
COMMUNICATIONS HOLDING, INC.,

               Plaintiffs,

vs.                          Case No.:  2023-CA-1002-NC

JANICE LOGAN, individually and
as Trustee of the James Logan
Family Trust, dated February 10,
2021; and ALEXIS LOGAN,

             Defendants.          /    (CONSOLIDATED)

JANICE LOGAN, as Trustee of the
James Logan Family Trust dated
February 10, 2021,

          Counterclaim Plaintiff,

vs.                          Case No.:  2023-CA-1280-NC

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC.,
SMART COMMUNICATIONS HOLDING,
LLC, HLFIP HOLDING, INC., and
HLFIP HOLDING, LLC,

        Counterclaim Defendants./

JANICE LOGAN, as Trustee of the
James Logan Family Trust dated
February 10, 2021, and
derivatively on behalf of
Smart Communications Holdings,
Inc.,

              Plaintiff,

vs.

JONATHAN D. LOGAN, SMART
COMMUNICATIONS HOLDING, INC.,
nominal defendant, SMART
COMMUNICATIONS HOLDING, LLC,
HLFIP HOLDING, LLC, HLFIP HOLDING
LLC, LOCO FLORIDA LLC and SMART
COMMUNICATIONS YACHT HOLDING, LLC,
        Defendants.

1

2

3

4          OFFICIAL TRANSCRIPT OF PROCEEDINGS

5        BEFORE THE HONORABLE HUNTER W. CARROLL

6              held via Zoom and at the
        Judge Lynn N. Silvertooth Judicial Center
7           2002 Ringling Boulevard, 6-C
              Sarasota, Florida  34237
8
             Friday, January 10, 2025
9
              9:02 a.m. to 9:37 a.m.
10
                Pages 1 through 32
11

12

13

14

15

16

17        Stenographically reported via Zoom by:

18                Linda R. Wolfe
          Registered Professional Reporter
19            Registered Merit Reporter
         Federal Certified Realtime Reporter
20       Florida Professional Reporter-Certified

21

22

23

24

25

```
 1   (All appearances attended via Zoom.)

 2   APPEARANCES:

 3   On behalf of HLFIP Holding, LLC:

 4           CHRISTOPHER G. OPRISON, Attorney at Law
             TAL ABUROS, Attorney at Law
 5           ERIN BERHAN, Attorney at Law
             ROBERT WALTON, Attorney at Law
 6           DLA PIPER, LLP (US)
             200 S. Biscayne Blvd., Suite 2500
 7           Miami, FL  33131-5340
             (305)423-8522
 8           chris.oprison@dlapiper.com

 9           STEVE DIXON, Attorney at Law
             JAMES "SEAMUS" F. BRESNAHAN, II,
10            Attorney at Law
             DLA PIPER, LLP (US)
11           500 Eighth Street, NW
             Washington, DC  20004
12           (202)799-4000
             steve.dixon@dlapiper.com
13           james.bresnahan@dlapiper.com

14

15   On behalf of Jonathan D. Logan; Smart Communications
     Holding, Inc.; Smart Communications Holding LLC; and
16   Loco Florida, LLC:

17           DUSTIN B. HILLSLEY, Attorney at Law
             EYAL BERGER, Attorney at Law
18           AKERMAN, LLP
             201 E. Las Olas Blvd., Suite 1800
19           Ft. Lauderdale, FL  33301-4442
             (954)331-4129
20           dustin.hillsley@akerman.com
             eyal.berger@akerman.com
21

22

23

24

25
```

1   On behalf of Janice Logan:

2           DAVID SCHOENFELD, Attorney at Law
            ANDREW L. FRANKLIN, Attorney at Law
3           SHOOK, HARDY & BACON L.L.P.
            111 S. Wacker Dr., Ste. 4700
4           Chicago, IL  60606
            (312)704-7700
5           dschoenfeld@shb.com
            afranklin@shb.com
6
    On behalf of Alexis Logan and Justin Peterson:
7
            CHARLES F. JOHNSON, III
8           Attorney at Law
            BLALOCK WALTERS, P.A.
9           802 11th Street West
            Bradenton, FL  34205-7734
10          (941)748-0100
            cjohnson@blalockwalters.com
11
    ALSO PRESENT:  Jonathan Logan
12                 Janice Logan
                   Alexis Logan
13                 David Gann, Smart inhouse counsel

14

15

16

17

18

19

20

21

22

23

24

25

1              P-R-O-C-E-E-D-I-N-G-S

2          THE COURT:  This is case number

3     2023-CA-1002-NC, Jonathan Logan, et al., versus

4     Smart Communications, Janice Logan, et al.

5          Starting with -- let's do it this way.  I'm

6     going to go through my Zoom tiles and, hopefully,

7     the Clerk has it the same order I do.

8          So, Mr. Johnson, make your appearance, please.

9     You're on mute.

10         MR. JOHNSON:  Charles Johnson on behalf of

11    Alexis Logan and Justin Peterson.

12         THE COURT:  And I see Alexis Logan is here.

13    And I don't think I see Justin Peterson.

14         Okay.  Mr. Andrew Franklin.

15         MR. FRANKLIN:  Yes, Your Honor.  I'm here on

16    behalf of Janice Logan with my colleague David

17    Schoenfeld.

18         MR. SCHOENFELD:  Janice Logan is also present

19    on Zoom.

20         THE COURT:  Chris Oprison.

21         MR. OPRISON:  Good morning, Your Honor.  Chris

22    Oprison from DLA Piper for HLFIP.  I'm joined here

23    by my partner Steve Dixon, who is actually one of

24    my partners that was just admitted yesterday on pro

25    hac.  He'll be doing the argument today as well as

 1        Tal Aburos from our office.

 2              THE COURT:  Thank you.

 3              I got Mr. Schoenfeld.

 4              Jon Logan is present.

 5              Erin Berhan?

 6              MR. OPRISON:  I'm sorry, Your Honor.  Erin, as

 7        well, is from our office.  One of our new

 8        associate.  She's on this case.

 9              THE COURT: Okay.  Thank you.

10              And Ms. Aburos was introduced.

11              Dustin Hillsley?

12              MR. HILLSLEY:  Yes, Your Honor.  Dustin

13        Hillsley from Akerman on behalf of Jon Logan and

14        the Smart Communication parties.

15              Joined with me today is my partner, Eyal

16        Berger, who is special transactional counsel to the

17        debtors in the bankruptcy.

18              THE COURT:  And then I see a J-I-M-L-O name on

19        the Zoom tile, but now it's not connecting.

20              MR. SCHOENFELD:  That is Ms. Logan, Your

21        Honor.

22              THE COURT:  Okay.  Thanks.

23              I see something:  RW46671?

24              MR. WALTON:  Hi.  Robert Walton with DLA

25        Piper.

1          THE COURT:  I need your camera on.  I require

2      the attorneys to have their cameras on at all time.

3          MR. WALTON:  Okay.  I'll turn it on, but it

4      may not work.

5          THE COURT:  Look, if you're going to be an

6      attorney appearing in front of me, you need to have

7      a working camera and you need to be dressed for

8      court.  That's just Basic 101.

9          Okay.  Mr. Overall is a public observer.

10         Mr. Gann, I need your camera on.

11         MR. WALTON:  Your Honor, I'll drop off the

12     call then.

13         THE COURT:  Thank you.

14         Mr. David Gann?

15         MR. GANN:  Sorry.  I'm having a little

16     technical difficulties.

17         THE COURT:  Everybody needs to be dressed for

18     court.  That's just -- I don't want to spend time

19     on it.

20         Now, there is somebody here by telephone, last

21     four digits 9491.

22         MR. OPRISON:  Your Honor, that's Seamus

23     Bresnahan who you also admitted yesterday by pro

24     hac.  He's calling in on the phone.  And Seamus --

25         THE COURT:  No.  I need lawyers by video and

1        people need to be dressed for court.

2             Everybody needs a camera and to be dressed for

3        court that's an attorney.

4             And, Mr. Gann, you're wearing a coat and tie?

5             Folks, look, I don't understand the idea that

6        you wouldn't -- if you're going to be here for a

7        court case, assume that you're here in person, and

8        would you walk into court the way -- without being

9        dressed for court?

10            So is Mr. Gann participating in this hearing?

11       Because, I mean, we have got many, many lawyers for

12       each person here, except for, I guess I only have

13       one for --

14            MR. HILLSLEY:  Your Honor, Dustin Hillsley

15       from Akerman.

16            David Gann is inhouse counsel for Smart.  He

17       is not speaking today.

18            THE COURT:  Folks, again, everyone needs to be

19       dressed.  So next time, please, Mr. Gann, be

20       dressed for court.

21            Now, we are here on DIN 903.  That's Docket

22       Identification Number or DIN 903, which is the

23       Expedited Motion for Clarification.

24            I have reviewed the parties' submissions.  I

25       did read Judge Colton's -- or the transcript from

1          the hearing in front of her.

2              I must confess, my bankruptcy speak is a

3          little bit rusty.  It's been a long time since I've

4          been in the bankruptcy court, but my takeaway from

5          what Judge Colton said is that the state court can

6          have the January trial as outlined in the trial

7          order that was done for part one of Phase Two.

8              I don't think we have authority for the part

9          two of Phase Two, which we were talking about

10         possibly trying to do in May, but that's going to

11         be up to the bankruptcy court.

12             So am I understanding where we are correctly?

13             MR. SCHOENFELD:  That is our view too, Your

14         Honor.

15             MR. DIXON:  Yes, Your Honor.

16             THE COURT REPORTER:  I'm sorry.  Who said

17         "Yes, Your Honor"?  The last one?

18             MR. DIXON:  This is Steve Dixon on behalf of

19         HLFIP.

20             THE COURT:  Well, let's hear the Expedited

21         Motion for Clarification, and who is going to be

22         making this argument?

23             MR. DIXON:  Thank you, Your Honor.  This is

24         Steve Dixon on behalf of HLFIP Holding, LLC.  And

25         thank you for taking the time to hear this motion

1        today.

2              As HLFIP understands it, the entire reason the

3        Court split the trial for Phase Two into two parts

4        was the Court decided on November 22nd that it

5        would be impractical and perhaps prejudicial to try

6        the IP valuation issue in January.

7              HLFIP argued in that hearing that the

8        valuation issue was complex.  There are various

9        intangibles at issue, including patents, trademarks

10       and other proprietary technologies and knowhow all

11       of which require time to value.

12             And HLFIP argued this valuation issue, the

13       issue of the right arm's length royalty rate

14       warranted more discovery time, especially expert

15       discovery, exchange of expert reports, rebuttal

16       reports, and expert depositions.

17             As we understood it, the Court decided during

18       that hearing that it would not hear the issue of IP

19       valuation in January.  The Court specifically

20       stated it was not asking for valuation of the IP

21       and that it needed -- that it wasn't the best trial

22       period to do the IP valuation issue in terms of

23       creating the conditions for a fair trial.

24             But, as we understand, the Court did not want

25       to defer the entire trial for just that issue.  In

1        fact, it decided to bifurcate Phase Two so that it

2        could decide issues in service of the Court's plan

3        to keep making rulings and narrow the delta between

4        the parties to facilitate this business divorce.

5             The licensed royalty issue that the Court

6        contemplated in that hearing was a narrow issue

7        that required -- that necessarily required less

8        discovery, and the Court called that narrow issue

9        the licensed royalty issue and called it a binary

10       choice, and it specifically chose that because it

11       would require not much discovery at all.  In fact.

12       The Court said something along the lines of there

13       wasn't much to do in deciding whether in 2015 there

14       was an oral agreement and determining whether that

15       transaction occurred with something that could be

16       done probably next week.

17            What the other side's trying to do now is

18       forcibly unbifurcate the trial and address this

19       core IP valuation issue at this hearing in January.

20       They have already submitted 133 pages of expert

21       reports on IP valuation, all of which necessitate

22       expert discovery by both HLFIP and Smart.

23            One of those reports actually implies that the

24       royalty rate issue properly belongs in the

25       bankruptcy court because it argues that the right

1    royalty rate standard should consider Smart's

2    solvency, the very issue that the bankruptcy court

3    is discharged with deciding and handling.

4          Moreover, they have asked for seven

5    depositions, several of which go far beyond what's

6    needed for the binary issue that the Court

7    described, including additional Smart personnel who

8    are not involved in putting the license in place.

9          In addition, they're subpoenaing a deposition

10   from the accountants who did the TP study, the

11   transfer pricing study, Marcum.  That study is only

12   relevant to the IP valuation if it's relevant at

13   all.  In fact, HLFIP would proffer a separate

14   expert at trial if it were trying the IP valuation

15   issue before this Court.

16         None of this comports with what the Court --

17   with the Court's intent to carve out an issue that

18   could be done next week.

19         It also upends what Janice's counsel

20   represents to this Court back in November that

21   HLFIP did not need discovery because the binary

22   issue that the Court described involves just one

23   agreement that's, quote/unquote, their agreement.

24   For that matter, it also contradicts what Janice's

25   counsel represented to the bankruptcy court about

1       part one of Phase Two.  They told Judge Colton that

2       the issue of IP valuation is ready to go in early

3       February and that this Court is intimately familiar

4       with the IP valuation issues.  But the Court

5       bifurcated Phase Two to push those IP valuation

6       issues into the future and give more time for

7       discovery.

8           Now, in terms of the issues that the Court,

9       this Court, expressly described in the

10      November 22nd hearing, the binary issue of whether

11      there is a license, HLFIP believes that's an

12      important issue to be decided and one that

13      materially advances the Court's wish of diminishing

14      the delta between the parties.

15          If the Court finds, as we believe it will,

16      that there's a license between HLFIP and Smart

17      beginning in 2015 that has to bring the parties

18      closer together.  That's because if there is a

19      license, it means that HLFIP owns IP and valuable

20      intangibles, and HLFIP allows Smart Communications

21      to use those intangibles pursuant to some sort of

22      related party transaction.

23          If there is a related party transaction, then

24      we know that Smart owes a royalty to HLFIP.  Why?

25      Well, the tax law gives the IRS power to allocate

1      income between related parties who transact with

2      each other in order to clearly reflect income.

3           So if there is a license, we know that HLFIP

4      and Smart transact with each other, and the context

5      of related party licenses like this one, the

6      relevant Treasury regulations look to who is the

7      owner of the intangible property, whether

8      intellectual property --

9           THE COURT:  Mr. Dixon, let me ask you this.

10          MR. DIXON:  Yes.

11          THE COURT:  If I needed to clarify, why

12     wouldn't I just say, as Judge Colton did, it's the

13     validity and extent of the IP agreement?  I'm not

14     getting into valuations at all, but the validity

15     and the extent.

16          MR. DIXON:  Your Honor --

17          THE COURT:  Would that -- Would that solve

18     your concern that you express in the motion?

19          MR. DIXON:  Yes, it would, Your Honor.

20          If the question is whether or not there is a

21     license between HLFIP and Smart beginning in 2015,

22     we believe that that significantly reduces the

23     discovery burden in January.  We believe that as

24     the Court contemplated back in November that this

25     would require the testimony of only a handful of

1      witnesses, probably Mr. Logan and Janice Logan and

2      Alexis Logan, and it would greatly reduce the

3      expert discovery burden, in particular.  It would

4      eliminate the need for expert depositions and

5      testimony on the valuation of the IP and the

6      royalty rate.

7           THE COURT:  Well, I mean, the bankruptcy court

8      indicated -- at least what I understand, and maybe

9      I'm wrong, so correct me if I'm wrong -- that the

10     stay from bankruptcy is to address, among other --

11     the other issue, the validity and the extent of the

12     IP agreement.

13          So, I mean, whether I set it greater than

14     that, it wouldn't matter because I have to abide by

15     the bankruptcy stay; right?

16          MR. DIXON:  I agree, Your Honor.  And that's

17     precisely why we've brought this motion and why

18     this week's expert reports that the other side has

19     disclosed made this hearing all the more necessary,

20     because we do not want to try a valuation issue in

21     January because we think that requires far more

22     discovery.

23          But we are ready, as Your Honor contemplated

24     back in November and began preparations for a

25     hearing on the IP agreements, the license in

1        between HLFIP and Smart, and in particular whether

2        or not there was a license beginning in 2015.

3              THE COURT:  Anyone else that wants to speak in

4        favor before I go to the other side?

5              Who is going to speak in opposition?

6              MR. SCHOENFELD:  I will, Your Honor.  Thank

7        you.

8              There is no need to do an IP valuation of

9        HLFIP's IP now or probably ever.

10             But what's really going on here, Judge, is

11       they're trying to beg the question that the Florida

12       Legislature directs this Court to undertake in the

13       instance of what we have here, a conflicted

14       director transaction.

15             Section 607.083(2) spells out exactly what's

16       required in that circumstance in order to determine

17       the validity of these agreements, and that is not

18       the IP valuation.  No one's going to have to value

19       an individual or collective aggregate components of

20       what Mr. Dixon refers to, quite generally and quite

21       vaguely, as the IP, and no one's going to have to

22       establish what he describes very vaguely as IP

23       value or valuation.

24             What's at issue is not that but, rather,

25       fairness.  And that's defined in the statute and

1       we've quoted that in our brief in terms of what's

2       required.  It will jive as the conflicted director;

3       there is no real dispute about that.  He's plainly

4       a conflicted director, who did this transaction

5       without the shareholders' approval.  So it plainly

6       brings it within the ambit of the statute, and also

7       under the statute puts the burden on Jon to

8       establish fairness.

9          And they have, as we noted in our brief, going

10      on and on at length about what it is that they

11      claim will -- should suffice to make this a fair

12      transaction.

13         They claim that they were compelled by

14      Treasury regulations to undertake a transfer

15      pricing analysis that focused on the fairness of

16      the transaction relative to other comparable

17      transactions, and then they claimed that they

18      obtained such an order or such a valuation.  Now

19      they base their 40 percent royalty rate on that

20      figure.

21         So what they're saying to you now, Judge, is

22      you can't question that.  You can't undertake the

23      analysis directed by the Legislature in the

24      conflicted director transaction statute.  You can't

25      question -- you can't question the fairness of this

1        transaction.

2              And all of this was pleaded in the -- long

3        before the hearing we held, the hearing the Court

4        held on November 22nd.  It was all before this

5        Court.  It was all before Judge Colton.  And nobody

6        identified, you know, this statute as somebody that

7        the Court couldn't pursue.  It's only now that they

8        bring this up.

9              THE COURT:  Hold on one second.

10             Bev, feel free to come set up for your

11       hearing, whatever you need to do, but you're free

12       to do move around if you need to.

13             Okay.  Mr. Schoenfeld.

14             MR. SCHOENFELD:  So, first, that notion that

15       the bankruptcy court imposed any restriction on

16       this is absolutely unsupported.

17             The Court plainly said she read everything,

18       and that included both the transcript of the

19       November 22nd hearing, the pleadings were before

20       her, the Court's order bifurcating the case and

21       identifying what would be tried.

22             THE COURT:  Let me see if I can rearticulate

23       what I think I understood from your briefing and

24       then what you're saying.

25             MR. SCHOENFELD:  Sure.  Sure.

1          THE COURT:  Make sure I'm on the same page.

2          You're saying you're not seeking to value the

3     IP itself if there were an agreement.  What you're

4     saying is part of the determination of whether

5     there is a valid IP agreement has to do with the

6     arm's length nature of the transaction and you're

7     suggesting that Mr. Jon Logan violated those

8     regulations, whether it's the Treasury regulations

9     or that would become relevant under the statute,

10    and that is the reason that you have the expert and

11    it goes to that factor which goes to the question

12    of whether there is a valid IP agreement.

13         MR. SCHOENFELD:  I would state it a little bit

14    differently, Your Honor.

15         THE COURT:  How would you --

16         MR. SCHOENFELD:  Right.

17         THE COURT:  Where am I wrong?

18         MR. SCHOENFELD:  What we're saying is that --

19    so the statute requires Jon to demonstrate the

20    fairness of the agreement, and the fairness is

21    defined in the statute as establishing that the

22    transaction as a whole is beneficial to the

23    corporation and its shareholders; that's Janice.

24    And then it states a couple of factors that the

25    Court, it's appropriate for the Court to take into

1    account.

2    Our point is that Jon cannot do that, and the

3    things that he's pleaded to as purportedly

4    justifying and purportedly establishing the

5    fairness of the agreement, are wrong.  It will

6    disprove what they're saying.

7    The first of those is that this is -- a

8    royalty is compelled by -- they're compelled to

9    charge a royalty.

10    Bear in mind, these companies went eight years

11    without any royalty payment, and then suddenly in

12    2023, after the Shareholder Agreement gambit

13    failed, Jon suddenly did this agreement, and sought

14    to justify it by claiming that the Treasury

15    regulations required an arm's length transfer

16    pricing analysis and that they obtained one.

17    THE COURT:  How does that 2023 action speak to

18    whether there was an agreement back in 2015?

19    MR. SCHOENFELD:  That, it doesn't do.  That

20    agreement's invalid on its -- that agreement is

21    invalid because it's a completely undocumented,

22    unproven agreement.

23    But what they did in -- what Jon purported to

24    do in 2023 was to create an agreement, a new

25    agreement, between the companies he controls, so

1       it's a conflicted director agreement, and then

2       retrospectively apply that, the rate that they

3       approved then, back to 2015.  And that transaction,

4       if it even existed, would also be a conflicted

5       director transaction.  So all of this fails on that

6       ground.

7              Your Honor is right.  The portion from 2015 to

8       2023 fails on a completely independent ground and

9       that is that it's an agreement that never existed.

10      There is no evidence of it whatsoever, particularly

11      on the royalty point, which is what matters here.

12             It's not enough to say there's a license, but

13      here Mr. Dixon, he's making the very argument that

14      I'm describing.  He is making it right now today in

15      this courtroom.  And arguing that this Court can't

16      inquire into the validity of that argument because

17      it's, quote, IP valuation.  And that's not --

18      that's not correct.

19             The Court is not going to have to value the

20      HLFIP, intellectual property.  What the Court will

21      do is look at the analysis that they undertook to

22      justify this transaction because that's what the

23      statute requires.  And if they can't -- if the

24      analysis that it took doesn't justify, doesn't

25      establish the fairness of the transaction, then the

1    statute invalidates it.  So that's the validity

2    question.

3        And what they're saying is, Judge, you can't

4    look at what the Legislature has directed the Court

5    to look at, you have to take our word for it.  So

6    Mr. Dixon is, you know, quite, you know, anxious to

7    tell the Court why this is fair, but they don't

8    want any evidentiary investigation into that

9    argument.

10        They want that to be off limits here.  And you

11   just can't do that under the statute.  The statute

12   turns on these fairness determinations.

13        But to be crystal clear again, they do not

14   require a valuation of the IP.  Whatever -- HLFIP's

15   IP is not even at issue as a part of the valuation

16   case.  It's a separate company.

17        The valuation issue in this case is Smart

18   Communications.  It's not HLFIP.

19        So this whole idea that HLFIP is in here

20   complaining that they shouldn't be required to, you

21   know, have a trial now on the value of their IP is

22   a red herring.  There is no reason why this court

23   would ever have to value HLFIP's IP, per se.

24        The question is the fairness of the

25   transaction that supposedly created this royalty

 1          obligation.  And that's not based on the value of

 2          the IP.  It's based on how Jon did this; what, you

 3          know, he based the royalty on; whether that's

 4          consummate with comparable transactions.  And

 5          that's what our experts are looking at, whether or

 6          not they, you know, the IRS regulations really

 7          required this.  Our position is they did not.

 8              I'm just being -- I'll just address that real

 9          briefly.

10              The whole notion that these -- that the

11          transfer pricing regulations apply here is wrong.

12          Those regulations apply to, for example, generally

13          foreign subsidiaries of the company that's

14          producing something overseas and using intellectual

15          property to make sure that where the subsidiary and

16          the parent have different tax rates, that the

17          parent is paying, or the licensor is paying a fair,

18          proper tax rate.

19              That's not the case here.  These two companies

20          have the same tax rate.  They're co-located.  It's

21          not a foreign subsidiary situation.  So this

22          doesn't even apply; okay?  And we'll brief that and

23          our experts will explain why that is.

24              And we'll also look at the Marcum study, which

25          is what they say is the basis of the 40 percent

1    royalty, and show the Court, among other things, an

2    e-mail, an internal e-mail at Marcum saying HLFIP

3    chose the rate, and then Marcum created the,

4    basically, adjusted its study to support that rate.

5    And that that rate is completely out of line with

6    any reasonable comparables.

7         So this is why they don't want to try this

8    issue.  They want the Court to take it as gospel,

9    as decided, and out of bounds.

10        And there's no reason why that --

11        THE COURT:  Mr. Schoenfeld, I need you to wrap

12   up your argument because I have to get back to Mr.

13   Dixon to hear his response, and we're running out

14   of time.

15        MR. SCHOENFELD:  Short point:  There's no

16   prejudice here.

17        The experts that they've just told us they're

18   going to submit has been available.  They disclosed

19   them some time ago on a different topic, I suppose,

20   but they have an expert.  They have the Marcum

21   report.  They did the transaction.  This is not a

22   difficult thing for them to try.  So there's no

23   prejudice in this.  And this is something that

24   they've pleaded all along.

25        So in order to try the validity, these issues

1          have to be addressed because that's what the

2          Florida Legislature directed.

3               THE COURT:  Anyone else in opposition to the

4          Motion for Clarification?

5               Mr. Dixon, I'll let you respond to

6          Mr. Schoenfeld.

7               MR. DIXON:  Thank you, Your Honor.

8               MR. HILLSLEY:  Your Honor, sorry, if I may.

9          Mr. Hillsley on behalf of Smart.

10              If I could speak for just a moment.

11              THE COURT:  Okay.  Is this in response to

12         Mr. Schoenfeld?

13              MR. HILLSLEY:  It is, Your Honor.

14              So I think what Mr. Schoenfeld has done is

15         blurred two separate issues.

16              Your Honor can certainly rule on the validity

17         of a 2015 license agreement, which didn't include a

18         reference, a specific royalty rate without

19         determining the royalty issue.

20              And I'd further emphasize that by stating that

21         the IP valuation issue isn't up for hearing in

22         January, that's a misleading statement, because the

23         point of the IP valuation is to determine what the

24         reasonable royalty would be, and that,

25         fundamentally, is the issue that we believe Your

1    Honor ruled was to be addressed in a subsequent

2    hearing.

3         With that, I'll defer to Mr. Dixon.

4         THE COURT:  Mr. Dixon.

5         MR. DIXON:  Thank you.

6         I mean, first of all, Your Honor, the

7    statement that we -- that HLFIP or Smart takes a

8    position that the Court cannot hear the issue of

9    the IP valuation is incorrect.  We very much expect

10   that the Court would hear the issue or issues

11   related to the IP valuation; we just think that

12   it's an issue that requires more discovery and

13   time.  That was the discussion in the November 22nd

14   hearing.  So that's incorrect.

15        Moreover, what's really happening here is that

16   they are trying to smuggle a valuation issue in

17   under the guise of a validity determination.

18        The standard under the Florida Statute is

19   whether or not the royalty under the license is

20   comparable to what might have been obtainable in an

21   arm's length transaction.  That's the same standard

22   as the transfer pricing regulations.

23        We believe that's the core issue in the case

24   is what is the fair transaction between these

25   parties.  It's just that the Court told us that we

1        would not be doing IP valuations.  That is --

2        Fairness is an IP valuation issue.

3            If the IP -- depending on what the IP is

4        worth, that determines the fair royalty rate.  The

5        royalty rate is just a different numerical

6        expression of the IP value.

7            So for them to say "You can try the issue of

8        validity and fairness but you don't need to

9        determine the IP valuation," that's simply

10       incorrect.  The IP value is the primary determinant

11       of whether the royalty rate is fair.

12           As for whether the transaction can even

13       happen, they appear to be making an argument that

14       just simply cuts too broad.  The Florida Statute

15       contemplates that, in fact, there can be director

16       transactions when it meets the arm's length

17       standard, and in this case we're arguing that it

18       does meet the arm's length standard.

19           We are not relying solely on the Marcum

20       valuation.  We would present experts, but, again,

21       we think that requires a more robust and

22       comprehensive discovery process, one that hadn't

23       been done to date and one that shouldn't be jammed

24       into the next three weeks.

25           Also, if I may, Your Honor, it is true that

1        the transfer pricing regulations look to the rates

2        that are the difference between the rates that

3        parties pay.  In this instance, Smart

4        Communications is a corporation, a C corporation

5        and pays C corporation rates.

6            HLFIP is a pass-through entity, an LLC, which

7        means that Jon is directly taxed on it.  That is a

8        distinct rate.  Obviously, the top marginal rates

9        change as between those parties, but this is

10       absolutely a transfer pricing issue.  Transfer

11       pricing applies not only between foreign and

12       domestic entities, it can apply among domestic

13       entities.

14           MR. SCHOENFELD:  Your Honor, very briefly.

15           THE COURT:  Fifteen seconds.

16           MR. SCHOENFELD:  None of this is new.  These

17       folks have known these issues.  They have put these

18       issues in the case, and this is the same Complaint

19       we heard in November.  It's lending it

20       self-inflicted wounds in terms of their inability

21       to try -- purported inability to try this.

22           THE COURT:  Well, when I saw the motion, I

23       went back and looked at my prior order.

24           When I first read the motion, I didn't think I

25       needed to enter a clarification and I -- having now

1    heard the arguments, I continue to be along the

2    same lines.  I don't think I need to enter a

3    clarification.

4        I am not, not, not, not in any way, shape, or

5    form going to determine how much, if there is a

6    royalty, what would that royalty is.

7        And I like how Judge Colton said it probably

8    much more articulately than I did:  The validity

9    and the extent of the IP agreement, that is

10   precisely the extent that we will go because that's

11   the precise extent that the bankruptcy court

12   allowed.

13       I believe then, and I believe now, to

14   determine the validity of the existence of an

15   agreement, you do have to consider the statutory

16   factors that the Legislature laid out.  So I don't

17   think that comes as a surprise to me or the

18   parties.

19       So at the end of the day, I'm not granting

20   clarification.

21       I am recognizing the limits of the stay relief

22   that the bankruptcy court provided.  And I am going

23   to do my level best to not step over any line

24   because I do not want to do anything that would

25   make Judge Colton upset at me.  So that's my

1    ruling.

2        So, Mr. Schoenfeld, what I would like is a

3    very brief order that says that for the reasons

4    stated in open court:  I'm denying the Expedited

5    Motion for Clarification; that the Court recognizes

6    the bankruptcy court's limitation of stay on this

7    issue to be the validity and extent of the IP

8    agreement.

9        And then, obviously, the bankruptcy court

10    allowed -- and I don't have the transcript in front

11    of me -- the other issue to be addressed as well.

12        MR. SCHOENFELD:  The valuation date.

13        THE COURT:  Yeah.  I don't think there's been

14    any concern about that.  So, obviously, we're still

15    going to hear that.

16        MR. SCHOENFELD:  Very well, Your Honor.

17        MR. HILLSLEY:  Agreed, Your Honor.

18        THE COURT:  And, again, you know, I'm -- I'll

19    say this:  I am -- I am happy to do whatever the

20    bankruptcy court wants me to do so long as it's

21    framed by the pleadings here in state court.

22        But I'm fine if the bankruptcy court wants to

23    keep all of this up in bankruptcy court as well.

24    I've got enough cases to deal with, so it's -- I'm

25    not looking to run the bankruptcy court in any way,

1        shape, or form.
2              Thank you all very much.
3              (Proceedings concluded at 9:37 a.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    HEARING CERTIFICATE

2      STATE OF FLORIDA  )

3      COUNTY OF SARASOTA)

4          I, Linda R. Wolfe, AAS, RPR, RMR, FCRR, FPR-C,

5      Certified Stenographic Court Reporter, certify that

6      I was authorized to and did stenographically report

7      the foregoing hearing; and that the transcript is a

8      true record of the proceedings.

9          I further certify that I am not a relative,

10     employee, attorney, or counsel of any of the

11     parties, nor am I a relative or employee of any of

12     the parties' attorney or counsel connected with the

13     action, nor am I financially interested in the

14     action.

15         Dated this 13th day of January, 2025.

16

17

18     _____
       LINDA R. WOLFE, AAS, RPR, RMR, FCRR, FPR-C
19     Certified Stenographic Court Reporter

20

21

22

23

24

25

**MR. DIXON: [9]** 9/15
9/18 9/23 14/10
14/16 14/19 15/16
25/7 26/5
**MR. FRANKLIN: [1]**
5/15
**MR. GANN: [1]** 7/15
**MR. HILLSLEY: [5]**
6/12 8/14 25/8 25/13
30/17
**MR. JOHNSON: [1]**
5/10
**MR. OPRISON: [3]**
5/21 6/6 7/22
**MR. SCHOENFELD:**
**[15]** 5/18 6/20 9/13
16/6 18/14 18/25
19/13 19/16 19/18
20/19 24/15 28/14
28/16 30/12 30/16
**MR. WALTON: [3]** 6/24
7/3 7/11
**THE COURT**
**REPORTER: [1]** 9/16
**THE COURT: [33]**

**0**

**0100 [1]** 4/10

**1**

**10 [5]** 1/3 1/7 1/10
1/17 2/8
**101 [1]** 7/8
**111 [1]** 4/3
**11th [1]** 4/9
**133 [1]** 11/20
**13th [1]** 32/15
**1800 [1]** 3/18

**2**

**200 [1]** 3/6
**20004 [1]** 3/11
**2002 [1]** 2/7
**201 [1]** 3/18
**2015 [8]** 11/13 13/17
14/21 16/2 20/18
21/3 21/7 25/17
**202 [1]** 3/12
**2021 [3]** 1/8 1/10
1/17
**2023 [4]** 20/12 20/17
20/24 21/8
**2023-CA-1002-NC [2]**
1/5 5/3
**2023-CA-1280-NC [1]**
1/12
**2025 [3]** 1/3 2/8
32/15
**22nd [5]** 10/4 13/10
18/4 18/19 26/13
**2500 [1]** 3/6

**3**

**305 [1]** 3/7
**312 [1]** 4/4
**32 [1]** 2/10
**331-4129 [1]** 3/19
**33131-5340 [1]** 3/7

**33301-4442 [1]** 3/19
**34205-7734 [1]** 4/9
**34237 [1]** 2/7

**4**

**40 percent [2]** 17/19
23/25
**4000 [1]** 3/12
**4129 [1]** 3/19
**423-8522 [1]** 3/7
**4442 [1]** 3/19
**4700 [1]** 4/3

**5**

**500 [1]** 3/11
**5340 [1]** 3/7

**6**

**6-C [1]** 2/7
**60606 [1]** 4/4
**607.083 [1]** 16/15

**7**

**704-7700 [1]** 4/4
**748-0100 [1]** 4/10
**7700 [1]** 4/4
**7734 [1]** 4/9
**799-4000 [1]** 3/12

**8**

**802 [1]** 4/9
**8522 [1]** 3/7

**9**

**903 [3]** 1/2 8/21 8/22
**941 [1]** 4/10
**9491 [1]** 7/21
**954 [1]** 3/19
**9:02 [1]** 2/9
**9:37 [1]** 2/9
**9:37 a.m [1]** 31/3

**A**

**a.m [3]** 2/9 2/9 31/3
**AAS [2]** 32/4 32/18
**abide [1]** 15/14
**absolutely [2]** 18/16
28/10
**ABUROS [3]** 3/4 6/1
6/10
**account [1]** 20/1
**accountants [1]** 12/10
**action [3]** 20/17
32/13 32/14
**actually [2]** 5/23
11/23
**addition [1]** 12/9
**additional [1]** 12/7
**address [3]** 11/18
15/10 23/8
**addressed [2]** 25/1
26/1 30/11
**adjusted [1]** 24/4
**admitted [2]** 5/24
7/23
**advances [1]** 13/13
**afranklin [1]** 4/5
**aggregate [1]** 16/19
**ago [1]** 24/19

**agree [1]** 15/16
**Agreed [1]** 30/17
**agreement [23]** 11/14
12/23 12/23 14/13
15/12 19/3 19/5
19/12 19/20 20/5
20/12 20/13 20/18
20/20 20/22 20/24
20/25 21/1 21/9
25/17 29/9 29/15
30/8
**agreement's [1]** 20/20
**agreements [2]** 15/25
16/17
**AKERMAN [3]** 3/18
6/13 8/15
**akerman.com [2]** 3/20
3/20
**al [2]** 5/3 5/4
**ALEXIS [6]** 1/8 4/6
4/12 5/11 5/12 15/2
**allocate [1]** 13/25
**allowed [2]** 29/12
30/10
**allows [1]** 13/20
**along [3]** 11/12 24/24
29/1
**already [1]** 11/20
**also [9]** 4/11 5/18
7/23 12/19 12/24
17/6 21/4 23/24
27/25
**ambit [1]** 17/6
**among [3]** 15/10 24/1
28/12
**analysis [5]** 17/15
17/23 20/16 21/21
21/24
**ANDREW [2]** 4/2 5/14
**anxious [1]** 22/6
**Anyone [2]** 16/3 25/3
**anything [1]** 29/24
**appear [1]** 27/13
**appearance [1]** 5/8
**appearances [2]** 3/1
3/2
**appearing [1]** 7/6
**applies [1]** 28/11
**apply [5]** 21/2 23/11
23/12 23/22 28/12
**appropriate [1]** 19/25
**approval [1]** 17/5
**approved [1]** 21/3
**argued [2]** 10/7 10/12
**argues [1]** 11/25
**arguing [2]** 21/15
27/17
**argument [7]** 5/25
9/22 21/13 21/16
22/9 24/12 27/16
**arguments [1]** 29/1
**arm's [6]** 10/13 19/6
20/15 26/21 27/16
27/18
**around [1]** 18/12
**articulately [1]** 29/8
**ask [1]** 14/9
**asked [1]** 12/4
**asking [1]** 10/20

**associate [1]** 6/8
**assume [1]** 8/7
**attended [1]** 3/1
**attorney [15]** 3/4 3/4
3/5 3/5 3/9 3/10
3/17 3/17 4/2 4/2
4/8 7/6 8/3 32/10
32/12
**attorneys [1]** 7/2
**authority [1]** 9/8
**authorized [1]** 32/6
**available [1]** 24/18

**B**

**back [7]** 12/20 14/24
15/24 20/18 21/3
24/12 28/23
**BACON [1]** 4/3
**bankruptcy [19]** 6/17
9/2 9/4 9/11 11/25
12/2 12/25 15/7
15/10 15/15 18/15
29/11 29/22 30/6
30/9 30/20 30/22
30/23 30/25
**base [1]** 17/19
**based [3]** 23/1 23/2
23/3
**Basic [1]** 7/8
**basically [1]** 24/4
**basis [1]** 23/25
**Bear [1]** 20/10
**become [1]** 19/9
**beg [1]** 16/11
**began [1]** 15/24
**beginning [3]** 13/17
14/21 16/2
**behalf [11]** 1/18 3/3
3/15 4/1 4/6 5/10
5/16 6/13 9/18 9/24
25/9
**believe [7]** 13/15
14/22 14/23 25/25
26/23 29/13 29/13
**believes [1]** 13/11
**belongs [1]** 11/24
**beneficial [1]** 16/16
**BERGER [2]** 3/17 6/16
**BERHAN [2]** 3/5 6/5
**best [2]** 10/21 29/23
**Bev [1]** 18/10
**beyond [1]** 12/5
**bifurcate [1]** 11/1
**bifurcated [1]** 13/5
**bifurcating [1]** 1/2
18/20
**binary [4]** 11/9 12/6
12/21 13/10
**Biscayne [1]** 3/6
**bit [2]** 9/3 19/13
**BLALOCK [1]** 4/8
**blalockwalters.com [1]**
4/10
**blurred [1]** 25/15
**Blvd [2]** 3/6 3/18
**Boulevard [1]** 2/7
**bounds [1]** 24/9
**Bradenton [1]** 4/9
**BRESNAHAN [2]** 3/9

**7/23
brief [4]** 17/1 17/9
23/22 30/3
**briefing [1]** 18/23
**briefly [2]** 23/9 28/14
**bring [2]** 13/17 18/8
**brings [1]** 17/6
**broad [1]** 27/14
**brought [1]** 15/17
**burden [3]** 14/23 15/3
17/7
**business [1]** 11/4

**C**

**CA [3]** 1/5 1/12 5/3
**call [1]** 7/12
**called [2]** 11/8 11/9
**calling [1]** 7/24
**camera [4]** 7/1 7/7
7/10 8/2
**cameras [1]** 7/2
**CARROLL [1]** 2/5
**carve [1]** 12/17
**case [13]** 1/2 1/5 1/12
5/2 6/8 8/7 18/20
22/16 22/17 23/19
26/23 27/17 28/1
**cases [1]** 30/24
**Center [1]** 2/6
**certainly [1]** 25/16
**CERTIFICATE [1]** 32/1
**Certified [4]** 2/19
2/20 32/5 32/19
**certify [2]** 32/5 32/9
**change [1]** 28/9
**charge [1]** 20/9
**CHARLES [2]** 4/7 5/10
**Chicago [1]** 4/4
**choice [1]** 11/10
**chose [2]** 11/10 24/3
**Chris [2]** 5/20 5/21
**chris.oprison [1]** 3/8
**CHRISTOPHER [1]** 3/4
**CIRCUIT [2]** 1/1 1/1
**circumstance [1]**
16/16
**cjohnson [1]** 4/10
**claim [2]** 17/11 17/13
**claimed [1]** 17/17
**claiming [1]** 20/14
**clarification [8]** 1/2
8/23 9/21 25/4 28/25
29/3 29/20 30/5
**clarify [1]** 14/11
**clear [1]** 22/13
**clearly [1]** 14/2
**Clerk [1]** 5/7
**closer [1]** 13/18
**co [1]** 23/20
**co-located [1]** 23/20
**coat [1]** 8/4
**colleague [1]** 5/16
**collective [1]** 16/19
**Colton [6]** 9/5 13/1
14/12 18/5 29/7
29/25
**Colton's [1]** 8/25
**come [1]** 18/10
**comes [1]** 29/17

**C**

Communication [1] 6/14
COMMUNICATIONS [13] 1/4 1/13 1/14 1/18 1/22 1/23 1/25 3/15 3/15 5/4 13/20 22/18 28/4
companies [3] 20/10 20/25 23/19
company [2] 22/16 23/13
comparable [3] 17/16 23/4 26/20
comparables [1] 24/6
compelled [3] 17/13 20/8 20/8
complaining [1] 22/20
Complaint [1] 28/18
completely [3] 20/21 21/8 24/5
complex [1] 10/8
components [1] 16/19
comports [2] 12/16
comprehensive [1] 27/22
concern [2] 14/18 30/14
concluded [1] 31/3
conditions [1] 10/23
confess [1] 9/2
conflicted [6] 16/13 17/2 17/4 17/24 21/1 21/4
connected [1] 32/12
connecting [1] 6/19
consider [2] 12/1 29/15
CONSOLIDATED [1] 1/9
consummate [1] 23/4
contemplated [3] 11/6 14/24 15/23
contemplates [1] 27/15
context [1] 14/4
continue [1] 29/1
contradicts [1] 12/24
controls [1] 20/25
core [2] 11/19 26/23
corporation [4] 19/23 28/4 28/4 28/5
correct [2] 15/9 21/18
correctly [1] 9/12
counsel [7] 4/13 6/16 8/16 12/19 12/25 32/10 32/12
Counterclaim [2] 1/11 1/16
COUNTY [2] 1/1 32/3
couple [1] 19/24
court [66]
court's [5] 11/2 12/17 13/13 18/20 30/6
courtroom [1] 21/15
create [1] 20/24
created [2] 22/25 24/3
creating [1] 10/23

crystal [1] 22/13
cuts [1] 27/14

**D**

date [2] 27/23 30/12
dated [4] 1/7 1/10 1/17 32/15
DAVID [5] 4/2 4/13 5/16 7/14 8/16
day [2] 29/19 32/15
DC [1] 3/11
deal [1] 30/24
debtors [1] 6/17
decide [1] 11/2
decided [5] 10/4 10/17 11/1 13/12 24/9
deciding [2] 11/13 12/3
defendant [1] 1/23
Defendants [3] 1/9 1/16 1/25
defer [2] 10/25 26/3
defined [2] 16/25 19/21
delta [2] 11/3 13/14
demonstrate [1] 19/19
denying [1] 30/4
depending [1] 27/3
deposition [1] 12/9
depositions [3] 10/16 12/5 15/4
derivatively [1] 1/18
described [3] 12/7 12/22 13/9
describes [1] 16/22
describing [1] 21/14
determinant [1] 27/10
determination [2] 19/4 26/17
determinations [1] 22/12
determine [5] 16/16 25/23 27/9 29/5 29/14
determines [1] 27/4
determining [2] 11/14 25/19
difference [1] 28/2
different [3] 23/16 24/19 27/5
differently [1] 19/14
difficult [1] 24/22
difficulties [1] 7/16
digits [1] 7/21
diminishing [1] 13/13
DIN [3] 1/2 8/21 8/22
directed [3] 17/23 22/4 25/2
directly [1] 28/7
director [7] 16/14 17/2 17/4 17/24 21/1 21/5 27/15
directs [1] 16/12
discharged [1] 12/3
disclosed [2] 15/19 24/18
discovery [12] 10/14 10/15 11/8 11/11

11/22 12/21 13/7 14/23 15/3 15/22 26/12 27/22
discussion [1] 26/13
disprove [1] 20/6
dispute [1] 17/3
distinct [1] 28/8
divorce [1] 11/4
DIXON [12] 3/9 5/23 9/18 9/24 14/9 16/20 21/13 22/6 24/13 25/5 26/3 26/4
DLA [4] 3/6 3/10 5/22 6/24
dlapiper.com [3] 3/8 3/12 3/13
Docket [1] 8/21
domestic [2] 28/12 28/12
done [5] 9/7 11/16 12/18 25/14 27/23
Dr [1] 4/3
dressed [7] 7/7 7/17 8/1 8/2 8/9 8/19 8/20
drop [1] 7/11
dschoenfeld [1] 4/5
DUSTIN [4] 3/17 6/11 6/12 8/14
dustin.hillsley [1] 3/20

**E**

e-mail [2] 24/2 24/2
early [1] 13/2
eight [1] 20/10
Eighth [1] 3/11
eliminate [1] 15/4
else [2] 16/3 25/3
emphasize [1] 25/20
employee [2] 32/10 32/11
end [1] 29/19
enough [2] 21/12 30/24
enter [2] 28/25 29/2
entire [2] 10/2 10/25
entities [2] 28/12 28/13
entity [1] 28/6
ERIN [3] 3/5 6/5 6/6
especially [1] 10/14
establish [3] 16/22 17/8 21/25
establishing [2] 19/21 20/4
et [2] 5/3 5/4
et al [2] 5/3 5/4
even [4] 21/4 22/15 23/22 27/12
ever [2] 16/9 22/23
Everybody [2] 7/17 8/2
everyone [1] 8/18
everything [1] 18/17
evidence [1] 21/10
evidentiary [1] 22/8
exactly [1] 16/15
example [1] 23/12

except [1] 8/12
exchange [1] 10/15
existed [2] 21/4 21/9
existence [1] 29/14
expect [1] 26/9
EXPEDITED [4] 1/2 8/23 9/20 30/4
expert [11] 10/14 10/15 10/16 11/20 11/22 12/14 15/3 15/4 15/18 19/10 24/20
experts [4] 23/5 23/23 24/17 27/20
explain [1] 23/23
express [1] 14/18
expression [1] 27/6
expressly [1] 13/9
extent [7] 14/13 14/15 15/11 29/9 29/10 29/11 30/7
EYAL [2] 3/17 6/15
eyal.berger [1] 3/20

**F**

facilitate [1] 11/4
fact [4] 11/1 11/11 12/13 27/15
factor [1] 19/11
factors [2] 19/24 29/16
failed [1] 20/13
fails [2] 21/5 21/8
fair [7] 10/23 17/11 22/7 23/17 26/24 27/4 27/11
fairness [12] 16/25 17/8 17/15 17/25 19/20 19/20 20/5 21/25 22/12 22/24 27/2 27/8
familiar [1] 13/3
Family [3] 1/7 1/10 1/17
far [2] 12/5 15/21
favor [1] 16/4
FCRR [2] 32/4 32/18
February [4] 1/7 1/10 1/17 13/3
Federal [1] 2/19
feel [1] 18/10
Fifteen [1] 28/15
figure [1] 17/20
financially [1] 32/13
finds [1] 13/15
fine [1] 30/22
first [4] 18/14 20/7 26/6 28/24
FL [3] 3/7 3/19 4/9
FLORIDA [10] 1/1 1/24 2/7 2/20 3/16 16/11 25/2 26/18 27/14 32/2
focused [1] 17/15
folks [3] 8/5 8/18 28/17
forcibly [1] 11/18
foregoing [1] 32/7
foreign [3] 23/13

23/21 28/11
form [2] 29/5 31/1
four [1] 7/21
FPR [2] 32/4 32/18
FPR-C [2] 32/4 32/18
framed [1] 30/21
FRANKLIN [2] 4/2 5/14
free [2] 18/10 18/11
FRIDAY [2] 1/3 2/8
front [3] 7/6 9/1 30/10
Ft [1] 3/19
fundamentally [1] 25/25
future [1] 13/6

**G**

gambit [1] 20/12
Gann [7] 4/13 7/10 7/14 8/4 8/10 8/16 8/19
generally [2] 16/20 23/12
get [1] 24/12
getting [1] 14/14
give [1] 13/6
gives [1] 13/25
go [5] 5/6 12/5 13/2 16/4 29/10
goes [2] 19/11 19/11
going [15] 5/6 7/5 8/6 9/10 9/21 16/5 16/10 16/18 16/21 17/9 21/19 24/18 29/5 29/22 30/15
Good [1] 5/21
gospel [2] 24/8
got [3] 6/3 8/11 30/24
granting [1] 29/19
greater [1] 15/13
greatly [1] 15/2
ground [2] 21/6 21/8
guess [1] 8/12
guise [1] 26/17

**H**

hac [2] 5/25 7/24
handful [1] 14/25
handling [1] 12/3
happen [1] 27/13
happening [1] 26/15
happy [1] 30/19
HARDY [1] 4/3
hear [7] 9/20 9/25 10/18 24/13 26/8 26/10 30/15
heard [2] 28/19 29/1
hearing [18] 8/10 9/1 10/7 10/18 11/6 11/19 13/10 15/19 15/25 18/3 18/3 18/11 18/19 25/21 26/2 26/14 31/4 32/7
held [3] 2/6 18/3 18/4
herring [1] 22/22
Hi [1] 6/24
HILLSLEY [5] 3/17 6/11 6/13 8/14 25/9

**H**

**HLFIP [28]** 1/14 1/15 1/24 1/24 3/3 5/22 9/19 9/24 10/2 10/7 10/12 11/22 12/13 12/21 13/11 13/16 13/19 13/20 13/24 14/3 14/21 16/1 21/20 22/18 22/19 24/2 26/7 28/6
**HLFIP's [3]** 16/9 22/14 22/23
**Hold [1]** 18/9
**HOLDING [14]** 1/4 1/13 1/14 1/14 1/15 1/22 1/23 1/24 1/24 1/25 3/3 3/15 3/15 9/24
**Holdings [1]** 1/18
**Honor [29]** 5/15 5/21 6/6 6/12 6/21 7/11 7/22 8/14 9/14 9/15 9/17 9/23 14/16 14/19 15/16 15/23 16/6 19/14 21/7 25/7 25/8 25/13 25/16 26/1 26/6 27/25 28/14 30/16 30/17
**HONORABLE [1]** 2/5
**hopefully [1]** 5/6
**HUNTER [1]** 2/5

**I**

**idea [2]** 8/5 22/19
**Identification [1]** 8/22
**identified [1]** 18/6
**identifying [1]** 18/21
**II [1]** 3/9
**III [1]** 4/7
**IL [1]** 4/4
**implies [1]** 11/23
**important [1]** 13/12
**imposed [1]** 18/15
**impractical [1]** 10/5
**inability [2]** 28/20 28/21
**INC [6]** 1/4 1/13 1/14 1/19 1/22 3/15
**include [1]** 25/17
**included [1]** 18/18
**including [2]** 10/9 12/7
**income [2]** 14/1 14/2
**incorrect [3]** 26/9 26/14 27/10
**independent [1]** 21/8
**indicated [1]** 15/8
**individual [1]** 16/19
**individually [1]** 1/6
**inflicted [1]** 29/10
**inhouse [2]** 4/13 8/16
**inquire [1]** 21/16
**instance [2]** 16/13 28/3
**intangible [1]** 14/7
**intangibles [3]** 10/9 13/20 13/21
**intellectual [3]** 14/8 21/20 23/14

**intent [1]** 12/17
**interested [1]** 32/13
**internal [1]** 24/2
**intimately [1]** 13/3
**introduced [1]** 6/10
**invalid [2]** 20/20 20/21
**invalidates [1]** 22/1
**investigation [1]** 22/8
**involved [1]** 12/8
**involves [1]** 12/22
**IP [43]**
**IRS [2]** 13/25 23/6
**issue [41]**
**issues [9]** 11/2 13/4 13/6 13/8 24/25 25/15 26/10 28/17 28/18

**J**

**J-I-M-L-O [1]** 6/18
**James [4]** 1/7 1/10 1/17 3/9
**james.bresnahan [1]** 3/13
**jammed [1]** 27/23
**JANICE [10]** 1/6 1/9 1/16 4/1 4/12 5/4 5/16 5/18 15/1 19/23 **Janice's [2]** 12/19 12/24
**JANUARY [10]** 1/3 2/8 9/6 10/6 10/19 11/19 14/23 15/21 25/22 32/15
**jive [1]** 17/2
**JOHNSON [3]** 4/7 5/8 5/10
**joined [2]** 5/22 6/15
**Jon [10]** 6/4 6/13 17/7 19/7 19/19 20/2 20/13 20/23 23/2 28/7
**JONATHAN [6]** 1/3 1/13 1/22 3/15 4/11 5/3
**Judge [11]** 2/6 8/25 9/5 13/11 14/12 16/10 17/21 18/5 22/3 29/7 29/25
**JUDICIAL [2]** 1/1 2/6
**just [15]** 5/24 7/8 7/18 10/25 12/22 14/12 22/11 23/8 23/8 24/17 25/10 26/11 26/25 27/5 27/14
**justify [3]** 20/14 21/22 21/24
**justifying [1]** 20/4
**Justin [3]** 4/6 5/11 5/13

**K**

**keep [2]** 11/3 30/23
**know [9]** 13/24 14/3 18/6 22/6 22/6 22/21 23/3 23/6 30/18
**knowhow [1]** 10/10

**known [1]** 28/17

**L**

**L.L.P [1]** 4/3
**laid [1]** 29/16
**Las [1]** 3/18
**last [2]** 7/20 9/17
**Lauderdale [1]** 3/19
**law [12]** 3/4 3/4 3/5 3/5 3/9 3/10 3/17 3/17 4/2 4/2 4/4 4/8 13/25
**lawyers [2]** 7/25 8/11
**least [1]** 15/8
**Legislature [5]** 16/12 17/23 22/4 25/2 29/16
**lending [1]** 28/19
**length [7]** 10/13 17/10 19/6 20/15 26/21 27/16 27/18
**less [1]** 11/7
**let [3]** 14/9 18/22 25/5
**level [11]** 29/23
**license [11]** 12/8 13/11 13/16 13/19 14/3 14/21 15/25 16/2 21/12 25/17 26/19
**licensed [2]** 11/5 11/9
**licenses [1]** 14/5
**licensor [1]** 23/17
**like [3]** 14/5 29/7 30/2
**limitation [1]** 30/6
**limits [2]** 22/10 29/21
**Linda [3]** 2/18 32/4 32/18
**line [2]** 24/5 29/23
**lines [2]** 11/12 29/2
**little [3]** 7/15 9/3 19/13
**LLC [12]** 1/14 1/15 1/23 1/24 1/24 1/24 1/25 3/3 3/15 3/16 9/24 28/6
**LLP [3]** 3/6 3/10 3/18
**located [1]** 23/20
**LOCO [2]** 1/24 3/16
**LOGAN [29]** 1/3 1/6 1/7 1/8 1/9 1/10 1/13 1/16 1/17 1/22 3/15 4/1 4/6 4/11 4/12 4/12 4/25 5/4 5/11 5/12 5/16 5/18 6/4 6/13 6/20 16/1 15/1 15/22 19/7 30/20
**look [8]** 7/5 8/5 14/6 21/21 22/4 22/5 23/24 28/1
**looked [1]** 28/23
**looking [2]** 23/5 30/25
**Lynn [1]** 2/6

**M**

**made [1]** 15/19

**mail [2]** 24/2 24/2
**make [5]** 5/8 17/11 19/1 23/15 29/25
**making [5]** 9/22 11/3 21/13 21/14 27/13
**MANAGEMENT [1]** 1/2
**many [2]** 8/11 8/11
**Marcum [6]** 12/11 23/24 24/2 24/3 24/20 27/19
**marginal [1]** 28/8
**materially [1]** 13/13
**matter [2]** 12/24 15/14
**matters [1]** 21/11
**may [4]** 7/4 9/10 25/8 27/25
**maybe [1]** 15/8
**mean [4]** 8/11 15/7 15/13 26/6
**means [2]** 13/19 28/7
**meet [1]** 27/18
**meets [1]** 27/16
**Merit [1]** 2/19
**Miami [1]** 3/7
**might [1]** 26/20
**mind [1]** 20/10
**misleading [1]** 25/22
**moment [1]** 26/15
**Moreover [2]** 12/4 26/15
**morning [1]** 5/21
**motion [10]** 1/2 8/23 9/21 9/25 14/18 15/17 25/4 28/22 28/24 30/5
**move [1]** 18/12
**Mr [10]** 7/14 16/20 19/7 21/13 22/6 24/12 25/5 25/9 26/3 26/4
**Mr. [16]** 5/8 5/14 6/3 7/9 7/10 8/4 8/10 8/19 14/9 15/1 18/13 24/11 25/6 25/12 25/14 30/2
**Mr. Andrew [1]** 5/14
**Mr. Dixon [1]** 14/9
**Mr. Gann [4]** 7/10 8/4 8/10 8/19
**Mr. Johnson [1]** 5/8
**Mr. Logan [1]** 15/1
**Mr. Overall [1]** 7/9
**Mr. Schoenfeld [7]** 6/3 18/13 24/11 25/6 25/12 25/14 30/2
**Ms [2]** 6/10 6/20
**much [6]** 11/11 11/13 26/9 29/5 29/8 31/2
**must [1]** 9/2
**mute [1]** 5/9

**N**

**name [1]** 6/18
**narrow [3]** 11/3 11/6 11/8
**nature [1]** 19/6
**NC [3]** 1/5 1/12 5/3
**necessarily [1]** 11/7

**necessary [1]** 15/19
**necessitate [1]** 11/1
**need [14]** 7/1 7/6 7/7 7/10 7/25 8/1 12/21 15/4 16/8 18/11 18/12 24/11 27/8 29/2
**needed [4]** 10/21 12/6 14/11 28/25
**needs [3]** 7/17 8/2 8/18
**never [1]** 21/9
**new [3]** 6/7 20/24 28/16
**next [4]** 8/19 11/16 12/18 27/24
**nobody [1]** 18/5
**nominal [1]** 1/23
**None [2]** 12/16 28/16
**noted [1]** 17/9
**notion [2]** 18/14 23/10
**November [9]** 10/4 12/20 13/10 14/24 15/24 18/4 18/19 26/13 28/19
**November 22nd [5]** 10/4 13/10 18/4 18/19 26/13
**now [13]** 6/19 7/20 8/21 11/17 13/8 16/9 17/18 17/21 18/7 21/14 22/21 28/25 29/13
**number [2]** 5/2 8/22
**numerical [1]** 27/5
**NW [1]** 3/11

**O**

**obligation [1]** 23/1
**observer [1]** 7/9
**obtainable [1]** 26/20
**obtained [2]** 17/18 20/16
**obviously [1]** 28/8 30/9 30/14
**occurred [1]** 11/15
**office [2]** 6/1 6/7
**OFFICIAL [1]** 2/4
**okay [8]** 5/14 6/9 6/22 7/3 7/9 18/13 23/22 25/11
**Olas [1]** 3/18
**one [14]** 5/23 6/7 8/9 9/4 9/7 9/17 11/23 12/22 13/1 13/12 14/5 18/9 20/16 27/22 27/23
**one's [2]** 16/18 16/21
**open [1]** 30/4
**opposition [2]** 16/5 25/3
**OPRISON [3]** 3/4 5/20 5/22
**oral [1]** 11/14
**order [10]** 1/2 5/7 9/7 14/2 16/16 17/18 18/20 24/25 28/23 30/3

**O**

outlined [1] 9/6
Overall [1] 7/9
overseas [1] 23/14
owes [1] 13/24
owner [1] 14/7
owns [1] 13/19

**P**

P-R-O-C-E-E-D-I-N-G-S
[1] 4/14
P.A [1] 4/8
page [1] 19/1
pages [2] 2/10 11/20
parent [2] 23/16
23/17
part [5] 9/7 9/8 13/1
19/4 22/15
participating [1] 8/10
particular [2] 15/3
16/1
particularly [1] 21/10
parties [10] 6/14 11/4
13/14 13/17 14/1
26/25 28/3 28/9
29/18 32/11
parties' [2] 8/24 32/12
partner [2] 5/23 6/15
partners [1] 5/24
parts [1] 10/3
party [3] 13/22 13/23
14/5
pass [1] 28/6
pass-through [1] 28/6
patents [1] 10/9
pay [1] 28/3
paying [2] 23/17
23/17
payment [1] 20/11
pays [1] 28/5
people [1] 8/1
per [1] 22/23
percent [2] 17/19
23/25
perhaps [1] 10/5
period [1] 10/22
person [2] 8/7 8/12
personnel [1] 12/7
Peterson [3] 4/6 5/11
5/13
PHASE [7] 1/2 9/7
9/9 10/3 11/1 13/1
13/5
phone [1] 7/24
PIPER [4] 3/6 3/10
5/22 6/25
place [1] 12/8
plainly [3] 17/3 17/5
18/17
Plaintiff [2] 1/11 1/20
Plaintiffs [1] 1/5
plan [1] 1/2
pleaded [3] 18/2 20/3
24/24
pleadings [2] 18/19
30/21
please [2] 5/8 8/19
point [4] 20/2 21/11
24/15 25/23

portion [1] 21/7
position [2] 23/7 26/8
possibly [1] 9/10
power [1] 13/25
precise [1] 29/11
precisely [2] 15/17
29/10
prejudice [2] 24/16
24/23
prejudicial [1] 10/5
preparations [1] 15/24
present [4] 4/11 5/18
6/4 27/20
pricing [8] 12/11
17/15 20/16 23/11
26/22 28/1 28/10
28/11
primary [1] 27/10
prior [1] 28/23
pro [2] 5/24 7/23
probably [4] 11/16
15/1 16/9 29/7
proceedings [3] 2/4
31/3 32/8
process [1] 27/22
producing [1] 23/14
Professional [2] 2/18
2/20
proffer [1] 12/13
proper [1] 23/18
properly [1] 11/24
property [4] 14/7 14/8
21/20 23/15
proprietary [1] 10/10
provided [1] 29/22
public [1] 7/9
purported [2] 20/23
28/21
purportedly [2] 20/3
20/4
pursuant [1] 13/21
pursue [1] 18/7
push [1] 13/5
put [1] 28/17
puts [1] 17/7
putting [1] 12/8

**Q**

question [8] 14/20
16/11 17/22 17/25
17/25 19/11 22/2
22/24
quite [3] 16/20 16/20
22/6
quote [2] 12/23 21/17
quote/unquote [1]
12/23
quoted [1] 17/1

**R**

rate [16] 10/13 11/24
12/1 15/6 17/19 21/2
23/18 23/20 24/3
24/4 24/5 25/18 27/4
27/5 27/11 28/8
rates [5] 23/16 28/1
28/2 28/5 28/8
rather [1] 16/24
read [3] 8/25 18/17

28/24
ready [2] 13/2 15/23
real [2] 17/3 23/8
really [3] 16/10 23/6
26/15
Realtime [1] 2/19
rearticulate [1] 18/22
reason [4] 10/2 19/10
22/22 24/10
reasonable [2] 24/6
25/24
reasons [1] 30/3
rebuttal [1] 10/15
recognizes [1] 30/5
recognizing [1] 29/21
record [1] 32/8
red [1] 22/22
reduce [1] 15/2
reduces [1] 14/22
reference [1] 25/18
refers [1] 16/20
reflect [1] 14/2
Registered [2] 2/18
2/19
regulations [10] 14/6
17/14 19/8 19/8
20/15 23/6 23/11
23/12 26/22 28/1
related [3] 13/22
13/23 14/1 14/5
26/11
relative [3] 17/16
32/9 32/11
relevant [4] 12/12
12/12 14/6 19/9
relief [1] 29/21
relying [1] 27/19
report [2] 24/21 32/6
reported [1] 2/17
Reporter [6] 2/18
2/19 2/19 2/20 32/5
32/19
Reporter-Certified [1]
2/20
reports [5] 10/15
10/16 11/21 11/23
15/18
represented [1] 12/25
represents [1] 12/20
require [5] 7/1 10/11
11/11 14/25 22/14
required [7] 11/7 11/7
16/16 17/2 20/15
22/20 23/7
requires [5] 15/21
19/19 21/23 26/12
27/21
respond [1] 25/5
response [2] 24/13
25/11
restriction [1] 18/15
retrospectively [1]
21/2
reviewed [1] 8/24
right [6] 10/13 11/25
15/15 19/16 21/7
21/14
Ringling [1] 2/7
RMR [2] 32/4 32/18

ROBERT [2] 3/5 6/24
robust [1] 27/21
royalty [24] 10/13
11/5 11/9 11/24 12/1
13/24 15/6 17/19
20/8 20/9 20/11
21/11 22/25 23/3
24/1 25/18 25/19
25/24 26/19 27/4
27/5 27/11 29/6 29/6
RPR [2] 32/4 32/18
rule [1] 25/16
ruled [1] 26/1
ruling [1] 30/1
rulings [1] 11/3
run [1] 30/25
running [1] 24/13
rusty [1] 9/3
RW46671 [1] 6/23

**S**

said [5] 9/5 9/16
11/12 18/17 29/7
SARASOTA [3] 1/1
2/7 32/3
saw [1] 28/22
say [5] 14/12 21/12
23/25 27/7 30/19
saying [8] 17/21
18/24 19/2 19/4
19/18 20/6 22/3 24/2
says [1] 30/3
SCHOENFELD [9] 4/2
5/17 6/3 18/13 24/11
25/6 25/12 25/14
30/2
se [1] 22/23
SEAMUS [3] 3/9 7/22
7/24
second [1] 18/9
seconds [1] 28/15
Section [1] 16/15
see [5] 5/12 5/13 6/18
6/23 18/22
seeking [1] 19/2
self [1] 28/20
self-inflicted [1] 28/20
separate [3] 12/13
22/16 25/15
service [1] 11/2
set [2] 15/13 18/10
seven [1] 12/4
several [1] 12/5
shape [2] 29/4 31/1
Shareholder [1] 20/12
shareholders [1] 19/23
shareholders' [1] 17/5
shb.com [2] 4/5 4/5
SHOOK [1] 4/3
Short [1] 24/15
show [1] 24/1
side [2] 15/18 16/4
side's [1] 11/17
significantly [1] 14/22
Silvertooth [1] 2/6
simply [2] 27/9 27/14
since [1] 9/3
situation [1] 23/21
SMART [25] 1/3 1/13

1/14 1/18 1/22 1/23
1/24 3/15 3/15 4/13
5/4 6/14 8/16 11/22
12/7 13/16 13/20
13/24 14/4 14/21
16/1 22/17 25/9 26/7
28/3
Smart's [1] 12/1
smuggle [1] 27/6
solely [1] 27/19
solve [1] 14/17
solvency [1] 12/2
somebody [2] 7/20
18/6
something [5] 6/23
11/12 11/12 15/13 23/14
24/23
sorry [4] 6/6 7/15
9/16 25/8
sort [1] 13/21
sought [1] 20/13
speak [5] 9/2 16/3
16/5 20/17 25/10
speaking [1] 8/17
special [1] 6/16
specific [1] 25/18
specifically [2] 10/19
11/10
spells [1] 16/15
spend [1] 7/18
split [1] 10/3
standard [5] 12/1
26/18 26/21 27/17
27/18
Starting [1] 5/5
state [4] 9/5 19/13
30/21 32/2
stated [2] 10/20 30/14
statement [2] 25/22
26/7
states [1] 19/24
stating [1] 25/20
statute [14] 16/25
17/6 17/7 17/24 18/6
19/9 19/19 19/21
21/23 22/1 22/11
22/11 26/18 27/14
statutory [1] 29/15
stay [4] 15/10 15/15
29/21 30/6
Ste [1] 4/3
Stenographic [2] 32/5
32/19
stenographically [2]
2/17 32/6
step [1] 29/23
STEVE [4] 3/9 5/23
9/18 9/24
steve.dixon [1] 3/12
still [1] 30/14
Street [2] 3/11 4/9
study [5] 12/10 12/11
12/11 23/24 24/24
submissions [1] 8/24
submit [1] 24/18
submitted [1] 11/20
subpoenaing [1] 12/9
subsequent [1] 26/1
subsidiaries [1] 23/13

**S**

**subsidiary [2]** 23/15 23/21
**suddenly [2]** 20/11 20/13
**suffice [1]** 17/11
**suggesting [1]** 19/7
**Suite [2]** 3/6 3/18
**support [1]** 24/4
**suppose [1]** 24/19
**supposedly [1]** 22/25
**sure [4]** 18/25 18/25 19/1 23/15
**surprise [1]** 29/17

**T**

**take [3]** 19/25 22/5 24/8
**takeaway [1]** 9/4
**takes [1]** 26/7
**taking [1]** 9/25
**TAL [2]** 3/4 6/1
**talking [1]** 9/9
**tax [4]** 13/25 23/16 23/18 23/20
**taxed [1]** 28/7
**technical [1]** 7/16
**technologies [1]** 10/10
**telephone [1]** 7/20
**tell [1]** 22/7
**terms [4]** 10/22 13/8 17/1 28/20
**testimony [2]** 14/25 15/5
**thank [9]** 6/2 6/9 7/13 9/23 9/25 16/6 25/7 26/5 31/2
**Thanks [1]** 6/22
**thing [1]** 24/22
**things [2]** 20/3 24/1
**think [11]** 5/13 9/8 15/21 18/23 25/14 26/11 27/21 28/24 29/2 29/17 30/13
**three [1]** 27/24
**through 32 [1]** 2/10
**tie [1]** 8/4
**tile [1]** 6/19
**tiles [1]** 5/6
**time [11]** 7/2 7/18 8/19 9/3 9/25 10/11 10/14 13/6 24/14 24/19 26/13
**today [5]** 5/25 6/15 8/17 10/1 21/14
**together [1]** 13/18
**told [3]** 13/1 24/17 26/25
**took [1]** 21/24
**top [1]** 28/8
**topic [1]** 24/19
**TP [1]** 12/10
**trademarks [1]** 10/9
**transact [2]** 14/1 14/4
**transaction [20]** 11/15 13/22 13/23 16/14 17/4 17/12 17/16 17/24 18/1 19/6 19/22 21/3 21/5

21/22 21/25 22/25 24/21 26/21 26/24 27/12
**transactional [1]** 6/16
**transactions [3]** 17/17 23/4 27/16
**transcript [5]** 2/4 8/25 18/18 30/10 32/7
**transfer [8]** 12/11 17/14 20/6 23/11 26/22 28/1 28/10 28/10
**Treasury [4]** 14/6 17/14 19/8 20/14
**trial [10]** 1/2 9/6 9/6 10/3 10/21 10/23 10/25 11/18 12/14 22/21
**tried [1]** 18/21
**true [2]** 27/25 32/8
**Trust [3]** 1/7 1/10 1/17
**Trustee [3]** 1/7 1/9 1/16
**try [8]** 10/5 15/20 24/7 24/22 24/25 27/7 28/21 28/21
**trying [5]** 9/10 11/17 12/14 16/11 26/16
**turn [1]** 7/3
**turns [1]** 22/12
**TWELFTH [1]** 1/1
**two [10]** 9/7 9/9 9/9 10/3 10/3 11/1 13/1 13/5 23/19 25/15

**U**

**unbifurcate [1]** 11/18
**understand [3]** 8/5 10/24 15/8
**understanding [1]** 9/12
**understands [1]** 10/2
**understood [2]** 10/17 18/23
**undertake [3]** 16/12 17/14 17/22
**undertook [1]** 21/21
**undocumented [1]** 20/21
**unproven [1]** 20/22
**unquote [1]** 12/23
**unsupported [1]** 18/16
**upends [1]** 12/19
**upset [1]** 29/25
**us [4]** 3/6 3/10 24/17 26/25
**use [1]** 13/21
**using [1]** 23/14

**V**

**vaguely [2]** 16/21 16/22
**valid [2]** 19/5 19/12
**validity [13]** 14/13 14/14 15/11 16/17 21/16 22/1 24/25 25/16 26/17 27/8

29/8 29/14 30/7
**valuable [1]** 13/19
**valuation [32]** 10/6 10/8 10/12 10/19 10/20 10/22 11/19 11/21 12/12 12/14 13/2 13/4 13/5 15/5 15/20 16/8 16/18 16/23 17/18 21/17 22/14 22/15 22/17 25/21 25/23 26/9 26/11 26/16 27/2 27/9 27/20 30/12
**valuations [2]** 14/14 27/1
**value [10]** 10/11 16/18 16/23 19/2 21/19 22/21 22/23 23/1 27/6 27/10
**various [1]** 10/8
**versus [1]** 5/3
**via [3]** 2/6 2/17 3/1
**video [1]** 7/25
**view [1]** 9/13
**violated [1]** 19/7
**vs [3]** 1/5 1/12 1/21

**W**

**Wacker [1]** 4/3
**walk [1]** 8/8
**WALTERS [1]** 4/8
**WALTON [2]** 3/5 6/24
**want [8]** 7/18 10/24 15/20 22/8 22/10 24/7 24/8 29/24
**wants [3]** 16/3 30/20 30/22
**warranted [1]** 10/14
**Washington [1]** 3/11
**way [4]** 5/5 8/8 29/4 30/25
**wearing [1]** 8/4
**week [2]** 11/16 12/18
**week's [1]** 15/18
**weeks [1]** 27/24
**well [9]** 5/25 6/7 9/20 13/25 15/7 28/22 30/11 30/16 30/23
**went [2]** 20/10 28/23
**West [1]** 4/9
**whatever [3]** 18/11 22/14 30/19
**whatsoever [1]** 21/10
**whether [16]** 11/13 11/14 13/10 14/7 14/20 15/13 16/1 19/4 19/8 19/12 20/18 23/3 23/5 26/19 27/11 27/12
**whole [3]** 19/22 22/19 23/10
**will [8]** 13/15 16/6 17/2 17/11 20/5 21/20 23/23 29/10
**wish [1]** 13/13
**within [1]** 17/6
**without [4]** 8/8 17/5 20/11 25/18
**witnesses [1]** 15/1

**Wolfe [3]** 2/18 32/4 32/18
**word [1]** 22/5
**work [1]** 7/4
**working [1]** 7/7
**worth [1]** 27/4
**wounds [1]** 28/20
**wrap [1]** 24/11
**wrong [5]** 15/9 15/9 19/17 20/5 23/11

**Y**

**YACHT [1]** 1/25
**Yeah [1]** 30/13
**years [1]** 20/10
**Yes [6]** 5/15 6/12 9/15 9/17 14/10 14/19
**yesterday [2]** 5/24 7/23

**Z**

**Zoom [6]** 2/6 2/17 3/1 5/6 5/19 6/19

# EXHIBIT 5

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

SMART COMMUNICATIONS
HOLDING, INC.,

     Plaintiff,

v.                                                   Case No. 8:20-cv-1469-WFJ-TGW

CORRECT SOLUTIONS, LLC a/k/a
Correct Solutions Group, LLC,

     Defendant.

_____/

## <u>ORDER</u>

The Court held a bench trial from August 19-23, 2024, in this matter.  The

claims remaining after summary judgment rulings were addressed at trial.  The

Court enters the following findings of fact, conclusions of law, and judgment.

## Findings of Fact

This case involved Correct Solutions, LLC ("Correct") as contractor and

Smart Communications Holdings, Inc. ("Smart") as a sub-contractor.  The relevant

business was providing computer tablets and kiosks to county sheriffs for use by

jail inmates.  Three counties were involved in this case. [1]

---

[1] Smart's Fourth Amended Complaint is at Dkt. 93.  The summary judgment rulings are at Dkt.
234.  Smart's claims related to Sebastian County that remained after summary judgment were

**1. Smart was Non-compliant:** Smart did not provide contract-compliant jail-grade tablets. The contractual obligation at issue required Smart to provide custom "ruggedized and correctional-grade" tablets for usage by jail inmates within the jail environment. The tablets provided to customers Sebastian County and Bowie County by Smart were first-generation tablets, that Smart had never provided in any jail setting before. They were ordered from the Chinese manufacturer to fulfill the subject contracts here. They had not been beta-tested or used anywhere. Dkt. 381-2 at 13, pp. 42–45; at 24, p. 88. They had two black covers or shells, held together with approximately ten visible hex screws. The overwhelming evidence was that these tablets were noncompliant and not jail-worthy by any reasonable

---

several. The first was breach of contract, related to exclusive rights to supply the County that ended up with a competitor, Tech Friends. Smart's other clams were breach of implied good faith/fair dealing covenant, and common law unfair competition. These counts also asserted a claim based upon Tech Friends replacing Smart as supplier at Sebastian. The implied covenant breach also asserted that Correct solicited Sebastian to non-renew the underlying contract in order to eject Smart from serving Sebastian. Correct's counterclaims related to Sebastian, Dkt. 105, were breach of contract for failure to supply the promised goods; breach of the implied covenant of good faith/fair dealing; tortious interference; and common law unfair competition. As part of these latter two tort counterclaims Correct also sued a Smart-related party, Smart Communications Collier, Inc. ("Smart Collier").

Smart's claims related to Washington County that survived summary judgment mirrored the three it asserted concerning Sebastian. In essence, it claimed Correct breached the Master Service Agreement by causing Smart to be removed from that county jail or not delivering exclusivity in Washington County, and by terminating under paragraph 6 when the contract term had to be coterminous with Correct's relationship with the County.

Smart's claims as to Bowie County were in a similar vein. Smart complained of improper notice to cure, improper termination, and the tortious insertion of the competitor Tech Friends who took over Smart's job at this County in derogation of Smart's contractual exclusivity.

measure.  It appears the Chinese company that provided the second generation
tablets to Smart went out of business.  Dkt. 355 at 23, 28.  The tablets had multiple
flaws and were easily abused and misused by the inmates in various ways, some of
which were dangerous.  By any examination of this record, they were not rugged.
To anyone familiar with a jail environment they were not fit for use inside a jail.

Smart notes that the tablets provided to Washington County were second
generation and improved.  Notwithstanding this, the credible evidence is that they
suffered similar, material flaws and were likewise non-compliant and not suitable
for a jail environment.  Dkt. 381-24 at 5–6, pp. 288–93; Dkt. 346-104; Dkt. 363 at
119–20; Dkt. 345-9.

This failure in product was exacerbated by a Smart's failure to provide the
appropriate number of tablets to the customers for use, and very poor customer
service.  The failure of these Smart tablets is evidenced throughout this record, and
is almost uncontested by any competent evidence.  The tablets (first generation)
had "pigtail" plugs for recharging that could be broken or abused.  The tablets
could be disassembled due to the exposed screws.  They were credibly described as
almost toy-like, as from a Wal-Mart.  Dkt. 381-24 at 6, pp. 290–92; Dkt. 381-1 at
7, pp. 19–20; Dkt. 381-18 at 7, pp. 18–19.  Inmates could fairly easily make shanks
out of them, or other tools like tattoo guns or cigarette lighters.  Relatively soon
after placement these faults became very evident, and were exacerbated by first

lackadaisical and then abysmal customer service from Smart.  The Court need not expand upon this abundant competent evidence of Smart's noncompliance here. Those interested in this sad proof further may consult the references, *supra*, and the margin.[2]

    The main defender of the Smart products was Jon Logan, Smart's principal. The Court did not find this witness to be accurate or worthy of credit—the Court makes an adverse credibility finding.  His testimony about the tablets was contradicted by multiple credible witnesses.  He stated the customers who complained extensively were lying, and they were all engaged in a "sham" or a multi-faceted anti-Smart conspiracy.  Or they were "idiots," Dkt. 381-9 at 78, or stupid.  *Id*.  A great weight of evidence contradicted this witness.  Mr. Logan's testimony as to the tablets and relevant history was greatly outweighed by contrary evidence, and was materially contradicted by six or more credible witnesses.

    It is not surprising that the customers showed nearly uniform criticism of Smart.  Its products were poor and some presented a danger in the jail environment.  The customers were often "shorted" in number, and were poorly

---

[2] Dkts. 345-1–9; Dkts. 346-44–53; Dkts. 346-81–90; Dkt. 346-104; Dkts. 346-115–117; Dkt. 346-124; Dkt. 346-143; Dkt. 346-148; Dkt. 346-186; Dkt. 381-1 at 9–10, pp. 27–31; at 13–16, pp. 44–56; at 21–23, pp. 75–84; at 26, p. 94; at 27–29, pp. 100–07; Dkt. 381-6 at 35, pp. 131–32; Dkt. 381-7 at 22, pp. 78–82; Dkt. 381-9 at 77–78, pp. 293–96; Dkt. 381-15 at 65, pp. 250–52; Dkt. 381-16 at 5, pp. 8–9; at 9–11, pp. 25–30; Dkt. 381-17 at 15–20, pp. 50–72, at 21–25, pp. 77–91; at 26, p. 97; Dkt. 381-23 at 43–44, pp. 165–66; at 47, p. 178; at 51 pp. 194–95; at 55, p. 213; at 60–61, pp. 231–33; Dkt. 381-24 at 5–6, pp. 287–93; at 25–27, pp. 368–74.

serviced.  Smart's principal in turn showed disdain for the customers, *see supra*, including an overnight, unannounced stark and sudden exit from Washington County, leaving the jail "high and dry."  Dkt. 345-9; Dkt. 345-11; Dkt. 381-23 at 52, p.198.  Only a small amount of exhibits and testimony (vastly outweighed) support Smart's position as to these tablets.

## Conclusions of Law

1.      The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a).  *See* Dkt. 1 at 2–11.

2.      The parties waived consequential damages in Section 7 of the Master Services Agreement ("MSA"), Dkt. 93-2.  *See* Dkts. 265 at 2–5; 266 at 2–8.  This controlling contract was written from a Smart template without help from lawyers.  Section 7 states that "neither Party shall have any liability for indirect, incidental, consequential, exemplary or special damages of any kind, including damages arising from lost profits, lost saving, lost income, loss of use or other benefit . . . ."  Dkt. 93-2 at 3 (emphasis added).  And this limitation applies "[n]otwithstanding anything to the contrary in this Agreement or Schedules."

"Consequential damages" are those that stem from losses incurred by the non-breaching party in its dealing, often with a third party.  *HCA Health Servs. of Fla., Inc. v. Cyberknife Ctr. of Treasure Coast, LLC*, 204 So. 3d 469 (Fla. 4th DCA

2016). "What makes a loss consequential is that it stems from relationships with third parties, while still reasonably foreseeable at the time of contracting." *Keystone Airpark Auth. v. Pipeline Contractors, Inc.*, 266 So. 3d 1219, 1223 (Fla. 1st DCA 2019); *see also Nview Health, Inc. v. Sheehan*, No. 8:21-cv-385-VMC-TGW, 2022 WL 16923585, at *21–22 (M.D. Fla. Nov. 14, 2022) (applying Delaware law). Here "any kind" of consequential damages including lost profits are disclaimed by Section 7. Smart's claimed damages are, entirely, lost profits for sales from third parties (jail inmates or families), not parties to the MSA or its schedules. *See* Dkt. 355 at 48–49; Dkt. 381-8 at 21, pp. 76–77; Dkt. 354 at 30–31. Those claims (all of Smart's asserted damages) are barred by Section 7.

3.      Likewise, the approximately $4800.00 in damages sought by Correct due to the reduction in phone rates incurred in the new, subsequent Sebastian contract are barred by Section 7. All of these come from lost profits from sales to third persons, *i.e.*, jail inmates or families. Thus Correct's breach of contract counterclaim as to Sebastian County fails due to this provision of the MSA.

Beyond the contractual disclaimer, this set of Correct damages related to a reduction in phone rates at Sebastian County also fails substantially. The phone rate reduction at Sebastian was not proven at trial by a preponderance of evidence to have been proximately caused by a Smart breach or by any tort committed by Smart or Smart Collier. *See*, *e.g.*, J139 at Dkt. 346-139 (Correct discusses

proposed rate reduction in the new contract as "olive branch" to sheriff). There was no proof Smart caused this rate reduction proximately, and in any event the reduction was not a foreseeable consequence of any breach by Smart in failing to provide compliant product.

4.      Like the Sebastian rate reduction, all of Correct's counterclaims for tortious interference or unfair competition (Amended Counterclaim Counts V and VI), are not proven at trial. The two Smart defendants and Correct were not fiduciaries. There were no non-competes. They were free to compete ferociously. And in much of the factual scenario related to these claims, Smart was not a stranger to the contract and relationships—Smart was free to assert its interests forcefully. No credible proof exists that competition by the Smart defendants with Correct was tortious or unfair and damaged Correct.

Smart or Smart Collier was free to take ownership of the key supplier Lattice, and could tell its Lattice employees like Bruce Johnson what to work on. Johnson had a brief hiatus in working for Correct when Smart or Smart Collier told him to cease. There was no competent proof that this brief hiatus damaged Correct. One lawsuit brought by the Smart interests in this affair was settled and the other went nowhere, with no claims asserted here for costs or actual damages from either lawsuit.

As to the salary Correct paid Bruce Johnson, he provided value to Correct both when Correct was paying Lattice for his services and thereafter when Correct hired him outright. Correct would not have paid and then hired Johnson if the cost of doing so exceeded the benefit to Correct. His value is not accounted for in Correct's counterclaim.

5. The "Term" provision of the MSA was in dispute here. *See* ¶ 6, Dkt. 93-2. The Court must read plain English text to define the term:

> 6. Term. This Agreement shall commence on the "Effective Date" and shall be co-terminous with Customer's [Correct's] Agreement with [jail] Facility as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

A party to a contract is a signator, or person bound to its terms. The MSA contains a signature line for "the Parties" and it is signed by Correct and Smart only. Dkt. 93-2 at 7. The MSA identifies the two parties. The MSA uses the word "party" or "parties" 46 times. It means "party." But for two times only, in paragraph 6 above Smart states "party" means something else. Smart claims it means Correct and county sheriffs who run jails. In other words, Smart states that its relationship as a subcontractor of Correct must continue as long as Correct has a

contract with a jail, and the jail is what a "party" means for ¶ 6 but not 42 other times in the MSA.

This is an improper reading of contract. "Party" means "party" throughout and does not change meaning. "Courts must strive to read a contract in a way that gives effect to all of the contract's provisions." *Retreat at Port of the Islands, LLC v. Port of the Islands Resort Hotel Condo. Ass'n, Inc.*, 181 So. 3d 531, 533 (Fla. 2d DCA 2015). These very sophisticated parties made a bargain and set their terms, including an integration agreement. Dkt. 93-2 at 6. Paragraph 6 is plain and not ambiguous. *See CitiMortgage, Inc. v. Turner*, 172 So. 3d 502, 504 (Fla. 1st DCA 2015). This meant that either party could properly terminate by giving notice under paragraph 6, above.

This plain reading of paragraph 6, that "party" means the signatories Smart and Correct, is shared by Smart's own drafting witness who provided the contract templates. Dkt. 381-2 at 32–35, pp. 119–33. *See also* Dkt. 363 at 32–35 (90-day nonrenewal notice for Smart and Correct was important to Correct during drafting).

6.      Beyond the contractual disclaimer of Smart's asserted damages, the Court previously found as a matter of fact that Smart did not provide conforming goods. The essence of the contract was to provide customized, "ruggedized" correction

grade product.  This Smart did not do.  The evidence of this is fairly

overwhelming.  This has been proven both by contractor Smart's inability to prove

its contract performance in its case-in-chief and by Correct's proof as part of its

affirmative defense.  Dkt. 96 at 38.  Smart's contract claims thus fail for this

reason.  *See 777 Partners, LLC v. Pagnanelli*, No. 20-20172-civ-Martinez, 2023

WL 11965485, at *23 (S.D. Fla. July 17, 2023), citing cases.  Smart's breach of

contract discharged Correct from contract liability.  *Id*.

7.      Because the underlying breach of contract claims by both parties fail, the

claims for implied covenant of good faith/fair dealing cannot survive.  *Centurion*

*Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1152 (11th Cir. 2005);

*Progressive American Ins. Co. v. Rural/Metro Corp. of Fla.*, 994 So. 2d 1202, 1207

(Fla. 5th DCA 2008); *Insurance Concepts and Design, Inc. v. Healthplan Servs.,*

*Inc.*, 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001).

Both parties are successful here in that each defeated every claim against it.

Smart shall take nothing by its claims in the Fourth Amended Complaint.  Correct

shall take nothing by its Fourth Amended Counterclaims.  Each party shall go

hence without day.  The Clerk will enter judgment in favor of Smart on all

Correct's counterclaims, and in favor of Smart Collier on counterclaims V and VI.

The Clerk will enter judgment in favor of Correct on Smart's Fourth Amended

Complaint.  The Clerk will then close this case.

**DONE AND ORDERED** at Tampa, Florida, on December 13, 2024.

_____
WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE

**COPIES FURNISHED TO:**
Counsel of record