UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11, Subchapter V |
| SMART COMMUNICATIONS HOLDING, INC., | Case No. 8:24-bk-7106-RCT |
| SMART COMMUNICATIONS HOLDING, LLC, | Case No. 8:24-bk-7108-RCT |
| Debtors. | *Jointly Administered under* |
| _____/ | *Case No. 8:24-bk-7106-RCT* |

## DEBTORS' MOTION FOR RECONSIDERATION OF DISMISSAL

Smart Communications Holding, Inc. ("**Smart Comm FL**") and Smart Communications Holding, LLC ("**Smart Comm DE**" and collectively with Smart Comm FL the "**Debtors**"), move for the entry of an order reconsidering the dismissal without prejudice of these cases as stated on the record at a hearing on February 26, 2025, and in support, state as follows.

## I.    INTRODUCTION

1.    At the hearing on the Court's Order to Show Cause, the Court expressed concerns on two areas of the Debtors' plan: (i) magnitude of insider claims by equity; and (ii) affiliate transactions contemplated by Plan. Those concerns are squarely addressed by amendments reflected in the Debtors' proposed Second Amended Plan (the "**Amended Plan**") attached to this Motion, which satisfy and extinguish all insider claims and provide multiple independent oversight as to the affiliated transactions in the Amended Plan.  The material provisions are summarized as follows:

•    Appointment of an independent director for consideration and approval of all transactions by the Debtors and any affiliates as contemplated in the Amended Plan with the Subchapter V Trustee.

- Creation of a new license agreement between HLFIP and the Debtors using a heavily discounted proposed 5% of gross revenue license fee that adopts the lowest comparable license fee that the Trust has previously argued is a reasonable fee.

- Satisfaction of all of the Trust's equity redemption claims and interests by: (i) conveying to the Trust the Ranch Mansion[1] holding a liquidation value of $2.5MM; (ii) providing the Trust 49% of the equity in the Reorganized Smart Comm FL; and (iii) providing the Trust and Janice Logan a general release from the Debtors.

- Satisfaction of all of Jonathan Logan's claims and interests by providing Mr. Logan with a general release from the Debtors.[2]

- Satisfaction of all of HLFIP's claims by: (i) providing HLFIP 51% interest in Reorganized Smart Comm FL; (ii) a new license agreement for a 5% license fee of gross revenue generated by the Reorganized Debtors for the duration of the Amended Plan; and (iii) a general release of all claims the Debtors can assert against HLFIP or HLFIP's assets.

- Satisfaction of all Loco Florida's claims by: (i) providing a general release to Loco Florida; and (ii) a below market lease of the office space used by the Debtors for the duration of the Amended Plan in the amount of $40,000 per month.

- With the exception of the Ranch Mansion conveyed to the Trust, liquidation of all non-core assets to fund the Reorganized Debtors obligations under the Amended Plan.

---

[1] 7000 Square Foot estate on a 20 acre lot located at 1660 Ranch Club Blvd., Sarasota, Florida.

[2] Mr. Logan will also be conveying all non-core assets in his possession or control to the Reorganized Debtors to fund all obligations under the Amended Plan and will separately guarantee up to $500,000 of the Reorganized Debtors' obligations under the Amended Plan.

2

2.      Because the Court's concerns have been fully addressed by the Debtors, subject to full review by the Court at the confirmation hearing, manifest injustice would result from the premature dismissal of these cases and dismissal should therefore be reconsidered.

3.      Reconsideration is also separately required because the stated grounds for dismissal were legally and factually erroneous. Specifically, the Court's stated reasoning for dismissal of these cases was predicated on the following erroneous legal conclusions: (i) that the Court lacked the power and authority to approve a transaction by and between the Debtors and HLFIP, the Debtors' affiliate; (ii) that shareholder approval (or a resolution of any existing shareholder disputes) is required to confirm Debtors' Plan or any transaction between the Debtors and HLFIP; and (iii) that the Court lacks the power to expand the Subchapter V Trustee's powers to recommend an appropriate license fee for the Debtors to continue using intellectual property owned by HLFIP.[3]

4.      First, notwithstanding the Court's concerns, it indeed has the authority to approve affiliate transactions without any requisite approval by holders of equity, and the Subchapter V Trustee's role contemplates involvement in validating and approving those transactions. Here, the Debtors' amended plan (Doc. No. 183) (the "**First Amended Plan**") contemplated, not a specific royalty rate of 35% as the Court indicated it understood at the hearing, but a rate to be determined in part by the Subchapter V Trustee's recommendation in an amount "not to exceed 35%." Indeed, it is without dispute that Florida law separately authorizes affiliate transactions either by: (i) confirming that the terms are fair and reasonable; or (ii) obtaining the review and approval from a

---

[3] The Court was also factually incorrect in citing to certain of the provisions of the Debtor's Plan in support of the dismissal ruling, including: (i) that the Plan required a 35% license fee to HLFIP; and (ii) that insider claims of Jonathan Logan, Loco Florida, LLC, and HLFIP were receiving distributions under the Plan on account of their pre-petition claims. On the contrary, the Plan expressly provides that a reasonable license fee would be negotiated by the Subchapter V Trustee and HLFIP and that fee would be in an amount "not to exceed 35%" which reflects the exact language requested by the Subchapter V Trustee. Similarly, the Debtors' Plan provides for all the pre-petition claims of Jonathan Logan, HLFIP, and Loco Florida, LLC to be released in favor of the Debtors in order to allow the Debtors the ability to fund a 100% Plan to holders of allowed claims.

3

non-conflicted and disinterested independent director.  Because the Court can approve an affiliate transaction, and because the Subchapter V Trustee can both report on and even negotiate the transaction, the Court erred in dismissing the case on that basis.

5.    Second, the Bankruptcy Code specifically provides for adjustments to creditor claims and interests of equity holders even without the approval of some or all of a debtor's equity holders. Because these are not corporate governance issues, but instead go to the heart of a Bankruptcy Court's powers and purposes, a debtor's right to use those powers consistent with the Bankruptcy Code, even without consent, cannot be a basis to dismiss a case. While a court can deny confirmation of a plan, the Court cannot as a matter of law dismiss a case solely because it includes an aspect of a shareholder dispute where the debtors are otherwise in need of bankruptcy relief because of their present and undisputed near-term financial distress.

## II.    STANDARD FOR RECONSIDERATION

6.    Fed. R. Civ. P. 59(e) and Fed. R. Civ. P. 60(b) govern motions for reconsideration. *See Jordan v. Defense Financing and Accounting Serv.,* 8:15–cv–391–T–36TBM, 2017 WL 6383968, *1 (M.D. Fla. July 18, 2017). Motions for reconsideration filed within 28 days of the Court's judgment are governed by Rule 59(e), while motions for reconsideration governed by Rule 60(b) must be filed within a "reasonable time." *Id*. (citing Fed. R. Civ. P. 59(e) and Fed. R. Civ. P. 60)(b)). "Motions for reconsideration, whether considered under Rule 54(b), Rule 59(b), or Rule 60(b), are generally all evaluated under the same standard.*" Grasso v. Electrolux Home Products, Inc.*, CV 15-20774-CIV, 2016 WL 2625746, at *1 (S.D. Fla. Mar. 24, 2016) (Scola, J.)(citations omitted). "In addressing a motion to reconsider a prior decision, two opposing policies must be balanced: on the one hand, the desirability of finality, and on the other, the public interest in reaching the right result. Motions for reconsideration under Rule 59(e) are appropriate where there

is newly discovered evidence, or a need to correct a manifest error of law or fact. *Jordan*, 2017 WL 6383968, at *1 (citing *Hood v. Perdue*, 300 Fed.Appx. 699, 700 (11th Cir. 2008)). Rule 60(b) of the Federal Rules of Civil Procedure allows a court to reconsider an order on the grounds of mistake, fraud, inadvertence, misconduct, newly discovered evidence, or if the judgment is void. Fed. R. Civ. P. 60(b). *Holland v. J. Chavarria & J. Bassillo*, No. 2:23-cv-398-JLB-KCD, 2024 U.S. Dist. LEXIS 49926, *1 (M.D. Fla. Feb. 28, 2024)

7.      Motions for reconsideration are treated as motions to alter or amend a judgment under Rule 59(e) of the Federal Rules of Civil Procedure. *Wright v. Preferred Research, Inc*., 891 F.2d 886, 889 (11th Cir. 1990) ("Rule 59 applies to motions for reconsideration of matters encompassed in a decision on the merits of a dispute."). Like the adjudication of a motion under Rule 60(b), adjudication of a motion for reconsideration under Rule 59 should be driven by the interests of justice. *See*, *e.g.*, *Horowitch v. Diamond Aircraft Industries, Inc*., No. 6:06-cv-1703-Orl-19KRS, 2009 WL 1537896, at *3 (M.D. Fla. June 2, 2009) (citing *Burger King Corp. v. Ashland Equities*, Inc., 181 F.Supp.2d 1366, 1369 (S.D. Fla. 2002)).

8.      On a motion for reconsideration or rehearing, a party "must demonstrate why the court should reconsider its prior decision and set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision." *Socialist Workers Party v. Leahy*, 957 F. Supp. 1262, 1263 (S.D. Fla. 1997). A district court has power pursuant to Rule 60(b) to vacate or set aside a judgment or other order "whenever such action is appropriate to accomplish justice." *Griffin v. Swim-Tech Corp*., 722 F.2d 677, 680 (11th Cir. 1984). Rule 60 should be "liberally construed in order to do substantial justice." *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 401 (5th Cir. Jan. 1981). In *Seven Elves*, the court explained, "what is meant by this general statement is that, although the desideratum of finality is an important goal, the justice-function of the courts

demands that it must yield, in appropriate circumstances, to the equities of the particular case in

order the judgement might reflect the true merits of the case." *James v. Jacksonville Bulk Mail Ctr.*,

No. 3:06-cv-1120-J-33JRK, 2008 U.S. Dist. LEXIS 134501, *5 (M.D. Fla. Mar. 11, 2008) (quoting

*Id.*).

9.      "[A] party seeking reconsideration must demonstrate (i) that controlling law has

changed; (ii) newly discovered evidence would merit a different result; or (iii) reconsideration is

necessary to correct a clear error of law or fact or to prevent a manifest injustice." *In re*

*Fundamental Long Term Care, Inc.*, 493 B.R. 620, 624 (M.D. Fla. 2013). Here, reconsideration is

necessary to correct a clear error and to prevent a manifest injustice.

## III.    <u>REASONS FOR RECONSIDERATION</u>

### A.    <u>The Court erred in concluding that it does not have the ability to approve a related-party license agreement.</u>

10.     First, the Court should reconsider dismissal because the Court has the authority to

approve transactions between a debtor and an affiliate, and the Subchapter V trustee's role

contemplates involvement in validating and approving those transactions. Once in a chapter 11,

although general corporate law continues to be relevant, debtors as debtors-in-possession are

governed by the Bankruptcy Code. *E.g.*, *In re Schepps Food Stores, Inc.*, 160 B.R. 792, 799 (Bankr.

S.D. Tex. 1993) ("[W]hile state law standards continue to apply to post-petition fiduciary

obligations, the rights and remedies of aggrieved shareholders and creditors during the post-

petition/pre-confirmation period are regulated by the Bankruptcy Code which controls state law

pursuant to the Supremacy Clause of the United States Constitution.")

11.     Under § 363, the debtor can enter into transactions outside the ordinary course of

business with court approval. The standard for the approval varies based on the type of transaction.

So, for example, a sale of substantially all assets presents a different set of considerations than a

motion to approve a debtor's entry into a new lease. And an insider transaction can be approved

by the bankruptcy court, but is subject to higher standard of scrutiny in evaluating the fairness of

the transaction. *E.g.*, *In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 771 (Bankr. S.D.N.Y. 2020)

(approving insider DIP financing facility under the entire fairness doctrine). But, each of those

would be subject to court approval and consideration of the debtor's decision-making process and

outcome, and subject to objections by creditors and parties in interest.

12.     Here, the First Amended Plan provided as follows: "As a compromise, the Debtors

and Reorganized Debtors shall be obligated to pay Plan Funder a percentage of the Debtors' gross

revenues **not to exceed** 35% generated from the Reorganized Debtors operation subsequent to the

Effective Date **in a specific amount to be recommended by the Subchapter V Trustee** on behalf

of the Debtors' estates and accepted by HLFIP (the "License Fees")." (emphasis added). In

addition, the payment of the royalty rate, whatever rate determined, was only to be paid after all

other plan funding requirements were met. As discussed further below, the Amended Plan further

improves on the treatment and satisfies any standard for approval of the license agreement, both

factually and legally.

13.     The approval of a new license agreement between the Debtors and HLFIP is no

different than any other new related-party transaction entered into by a debtor during a bankruptcy

case. While it is true that such a license is a related-party transaction, it only means the transaction

is subject to a different standard than if it was not. The same is true of a sale of substantially all

assets to an insider, which courts are regularly called on to consider and approve. But it is a

transaction that the Court has both the power and indeed the exclusive jurisdiction to consider and

approve. And, critically, the requirements of Sections 363 and 1123 do not include shareholder

consent for such actions taken by a corporation.  There is nothing in the record that purports to require shareholder consent for this type of transaction.

14.     Moreover, the Court's conclusion that the subchapter V trustee is always limited to an advisory role, as opposed to taking a larger operational role, is incorrect. Certainly, the subchapter V Trustee's role here could include at least submitting a report on the fairness of a new royalty agreement, which could be based on and include input from all parties in interest. Then, with that information, the Court could approve the new agreement under § 363.

15.     But alternatively, § 1183(b)(5) states that the subchapter V trustee shall, "if the debtor ceases to be a debtor in possession ... be authorized to operate the business of the debtor." For example, in a recent analogous case, *In re Micron Devices, LLC*,[4] Judge Isicoff removed the debtor-in-possession due to debtor's manager having a conflict of interest arising from being an employee of an affiliate of the debtor owned and controlled by one of debtor's equity holders.[5] Judge Isicoff expanded the powers of a Subchapter V trustee subsequent[6] to the debtor filing a plan of reorganization specifically to address management's conflict of interest in resolving a dispute over the ownership of certain intellectual property. The Subchapter V trustee took over operations of the debtor and ultimately negotiated and obtained bankruptcy court approval of a settlement agreement[7] related to the disputed intellectual property over the objections of certain of debtor's equity.

---

[4] *In re Micron Devices, LLC*, No. 20-23359-LMI, 2021 WL 2021468, at *2 (Bankr. S.D. Fla. May 20, 2021) (describing orders entered in the case removing debtor-in-possession and expanding trustee's powers).

[5] *Id.* at D.E. 217, Pages 73-75.

[6] The Debtor filed their Plan on March 4, 2021 and the debtor was removed from possession on March 8, 2021.  *Id.* at D.E. Nos. 196 and 206.

[7] *Id.* at D.E. Nos. 234 and 393.

16.     Here, the Court appears to have concluded that it could not allow the Subchapter V

Trustee to fulfill a similar role, including the role that the subchapter V Trustee agreed to take on

under the First Amended Plan. As is clear from the *Micron Devices* case, the Court has the

authority to expand the subchapter V trustee's role as needed to encompass at least a limited aspect

of the debtor's business operations, much less advising and assisting in validating the fairness of

a related-party, affiliate transaction.  For cause, under § 1183(b)(2), the court can instruct the

Subchapter V Trustee to perform the duties specified in § 1106(a)(3), (4), and (7). That is exactly

what the Debtors proposed to the Subchapter V Trustee, and exactly what she agreed to undertake.

And the Court has the authority to order it. A conclusion that the Court lacks that authority and

therefore must dismiss the case is in error, and results in a manifest injustice to the Debtors' ability

to reorganize.

17.     Bankruptcy Courts routinely approve plans where a debtor converts debt into new

equity and where the debtor purchases some or all of the existing equity using assets of the debtor's

estate.  Indeed, 11 U.S.C. Section 1123(a)(5)(j) expressly provides:

> (a)Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall:
>     (5)provide adequate means for the plan's implementation, such as—
>         (J) issuance of securities of the debtor, or of any entity referred to in
>     subparagraph (B) or (C) of this paragraph, for cash, for property, for existing
>     securities, or in exchange for claims or interests, **or for any other**
>     **appropriate purpose**;

(emphasis added).

18.     As this Court is aware, in the *BPI Sports* case Judge Grossman confirmed a pre-

negotiated plan that satisfied all of the debtor's debts to its critical vendor in exchange for the

critical vendor receiving all of the equity in the reorganized debtor without obtaining the express

approval of all of debtor's existing equity.  *See generally, In re BPI Sports LLC*, October 20, 2023,

Case No. 23-17463-SMG (Bankr. S.D. Fla. October 20, 2023) (Plan D.E. 44, Plan Supplement

D.E. 109, and Confirmation Order D.E. 121). Here, the Debtors' proposal to acquire some of the Trust's equity as a means of implementing a 100% Plan is entirely authorized under the Bankruptcy Code and will serve the proper purpose of resolving numerous disputes that may otherwise take many months or perhaps years of costly litigation.

### B. The Court erred in concluding that this case is a corporate governance issue.

19.    The second error made by the Court is to conclude that the Debtors here are seeking to involve the Court in a corporate governance issue, and that the Court cannot rule on the relief requested by the Debtors without the consent of the Trust.

20.    The clear and undisputed facts of this case are that Jonathan Logan is the sole officer and director of Smart Comm FL, a corporation, and the sole manager of Smart Comm DE, a limited liability company (wholly owned by Smart Comm FL). The Trust itself admits that it is a creditor on account of the statue of the Sarasota Action on the petition date, and it has filed all of its pleadings under the title "creditor." There is no corporate agreement or document that requires shareholder consent for the filing of this case or the transactions contemplated by the Plan. After all, the Plan simply accomplishes the relief postured in the Sarasota Action by redeeming the Trust's shares based on the value of the Debtors' available cash flow. Nothing in Sections 1123, 1129, 1189, or 1191 require shareholder approval under these circumstances.

### C. Finally, the Court should reconsider dismissal to prevent manifest injustice.

21.    The unrebutted evidence proffered at the Hearing showed the Debtors' precarious financial circumstances, including the Debtors' significant liquidity issues, mounting payables, and the substantial risks that because of the uncertain status of the Debtors' ability to use the intellectual property there is considerable exposure to customer liabilities and the risks of cancellation. Understanding the Court's concerns, the Debtors addressed those issues in the First Amended Plan. But, to clarify, the Debtors attach the proposed Amended Plan executed by the

Debtors and all plan funders. With respect to the royalty rate issue, the Amended Plan further addresses the concerns by satisfying the requirements of § 363 in three different ways. First, the Amended Plan provides for the payment of 100% of the allowed claims of unsecured creditors, separate and apparat from those insider claims that are resolved in the Amended Plan, all while preserving equity of the Trust. Second, the Amended Plan provides for a process that facially meets the requirements of the Florida Statutes for related-party transactions by adopting the appointment of an independent director to consider the both the royalty amount, as well as any other future related party transactions during the life of the Amended Plan. The Amended Plan continues the involvement of the Subchapter V Trustee as a specific estate fiduciary, and the ultimate compromise is subject to approval by the Court on notice and an opportunity to object to all creditors and parties in interest, further buttressing the due process and procedural fairness of the decisions related to the royalty rate. Third, by proposing a compromise reduced rate of 5%, the Amended Plan is substantively fair by choosing, subject to the approval of the independent fiduciaries and the Court, a rate that is both clearly reasonable and at the lowest point in the rates identified by experts in the underlying litigation, including by the Trust. The Amended Plan provides the further material modified terms outlined above, all of which combine to address and resolve the two areas of the Debtors' plan identified by the Court.

22.     Based on the Court's power and authority to confirm the Amended Plan coupled with the unrebutted financial distress necessitating bankruptcy protection, premature dismissal of these cases is manifestly unjust, and the Court should give the Debtors the opportunity to confirm the Amended Plan, a further amended plan, or any other consensual plan negotiated by and among the parties.

## IV.    CONCLUSION

23.    For the reasons stated above, the Court should reconsider dismissal of these cases, reinstate the hearing on confirmation of the Debtors' plan, as amended through the Amended Plan, and as may be further amended to address additional concerns of the Court, the Subchapter V Trustee, or other parties.

**WHEREFORE**, the Debtors request that this Court enter an order reconsidering dismissal,[8] and grant such other relief that is just and proper.

Dated: March 2, 2025.

/s/ Daniel R. Fogarty
Daniel R. Fogarty (FBN 0017532)
Stichter Riedel Blain & Postler, P.A.
110 East Madison Street, Suite 200
Tampa, Florida   33602
Telephone: (813) 229-0144
Email:  dfogarty@srbp.com
Attorneys for Debtors

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the **DEBTORS' MOTION FOR RECONSIDERATION OF DISMISSAL** has been furnished on March 2, 2025, by the Court's electronic notice system to all parties receiving CM/ECF electronic noticing.

/s/ Daniel R. Fogarty
Daniel R. Fogarty

---

[8] To the extent that the Court views this Motion as solely directed to the Court's oral ruling and premature, the Debtors ask the Court to treat this Motion as a post-hearing brief and consider the relief requested in that posture.

4908-8004-2786, v. 4

**Proposed Second Amended Plan – Clean**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
Tampa Division
www.flmb.uscourts.gov

In re:

SMART COMMUNICATIONS
HOLDING, INC.,

  and

SMART COMMUNICATIONS
HOLDING, LLC.,

     Debtors.

_____/

Chapter 11, Subchapter V
Case No. 8:24-bk-07106-RCT

*Jointly Administered with*
Case No. 8:24-bk-07108-RCT


## DEBTORS' PROPOSED SECOND AMENDED JOINT PLAN OF REORGANIZATION

This Second Amended Plan of Reorganization (the "**Plan**") in these above styled bankruptcy cases under subchapter V of chapter 11 (the "**Chapter 11 Cases**") of the Bankruptcy Code (the "**Code**" or "**Title 11**") proposes to pay creditors of Smart Communications Holding, Inc. and Smart Communications Holding, LLC (collectively, the "**Debtors**"). As described herein, the Plan shall be funded by the Debtors and by: (i) HLFIP Holding, LLC; (ii) Jonathan Logan; (iii) Smart Communications Yacht Holdings, LLC; and (iv) Loco Florida, LLC (collectively, the "**Plan Funders**").

**Importantly, the Plan fully satisfies and releases all colorable non-barred[1] claims asserted against the Debtors' estates by Debtors' insiders and affiliates and while facilitating the 100% payment to holders of allowed claims. Furthermore, the Plan is confirmable without the need to adjudicate any valuation disputes as the Debtors and the Plan Funders have adopted as a compromise solely to allow for the expedited confirmation of the Plan the valuations Janice Logan has attributed to the Debtors and the lowest proposed license fee her expert identified.**

To creditors: Your rights may be affected by this Plan and you may wish to consult an attorney about your rights and your treatment under the Plan.

---

[1] Melvin Engelke's Claim No. 14-1 and Proofs of Interest remain collectively time barred and will receive no treatment under the Plan.

## PLAN

### A.    Brief History of the Debtors' Business Operations

Smart Comm FL is a Florida corporation formed in December of 2014. Smart Comm FL is the parent company and sole member of Smart Comm DE. Jonathan Logan ("**Jon Logan**") is the founder of the Smart Communications business (which was started in 2009), and is the sole officer and sole director of Smart Comm FL.

Smart Comm DE is a Delaware limited liability company formed in August of 2023. Smart Comm DE was established to be an intermediate holding company, and was set up to receive a transfer of transferrable assets from Smart Comm FL in exchange for the equity interests in Smart Comm DE issued to Smart Comm FL pursuant to a Transfer Agreement between Smart Comm DE and Smart Comm FL. Smart Comm DE is wholly-owned by Smart Comm FL as its sole member. Jon Logan is the sole manager of Smart Comm DE.

The Smart Communications corporate group, comprising the Debtors and certain non-debtor subsidiaries,[2] is a top technology supplier to corrections facilities across the country. Smart Communications provides its customers with access to unique patented and patent pending comprehensive inmate communications systems and custom proprietary hardware solutions it licenses from HLFIP, including telephone, video visitation, electronic messaging, streaming media platforms, and other services that are fully integrated through a single web-based dashboard, providing a single location for authorized staff to access all system administration, monitoring, reporting, data sharing and investigation tools. Smart Communications' client footprint has grown organically for 13 years, from a single account to more than 120 facilities throughout 29 states. Smart Communications' client footprint continues to grow, and the Debtors are focused on that trajectory.

The Debtors' primary material asset is an exclusive license (the "**Exclusive License**") of various intellectual property and technologies the Debtors have licensed since 2015 from  HLFIP Holding, LLC ("**HLFIP**"), a Delaware limited liability company owned by Jon Logan.  A true and correct copy of the License is attached hereto as **Composite Exhibit "A."**  As described more fully in the Case Management Summary (Doc. No. 12) (the "**Case Management Summary**"), in 2015 Jon Logan, James Logan, and Alexis Logan agreed that Jon Logan would exclusively own and control any new intellectual property that he created from that day forward (the "**IP**").  Since 2015, Jon Logan assigned and continues to assign the rights to his intellectual property to HLFIP, and HLFIP has exclusively licensed and continues to exclusively license that intellectual property to Smart Communications through a license that is subject to a royalty-based fee, initially through an oral license that remained in place until August 2023, when it was reduced to writing (the "**2023 Written License**"). The license provided Smart Communications with  uninterrupted use and an exclusive license to the Intellectual Property.

The Debtors currently use the intellectual property and technology subject to the Exclusive License in the operations of their business and the business of various wholly owned affiliates.

---

[2] The non-debtor subsidiaries are Smart Communications Collier, Inc. ("**Smart Collier**"), Smart Communications Pasco, Inc., and Smart Communications US, Inc.

Without the IP and the Exclusive License, the Debtors could not continue as a going concern and would not have been able to generate significant gross revenues both prior to and subsequent to the commencement of these bankruptcy cases . Under the Exclusive License agreement, HLFIP is owed a royalty fee of Smart's net sales, which HLFIP alleges has accrued in the aggregate amount exceeding $67 million for the last three years alone of Debtors' use. HLFIP made a demand for the Debtors to pay royalties by the end of 2024 or the Exclusive License would be terminated. The Debtors lack available cash and cash equivalents to provide for a prompt cure of the existing unpaid obligations to HLFIP. The Debtors' Plan seeks to restructure the obligations owed to HLFIP by negotiating a new exclusive license agreement with HLFIP that will make certain material modifications to the terms of the prior 2023 Written License to allow the Debtors to continue utilizing the intellectual property and technology for the five-year period the Debtors will be funding payments to all holders of allowed claims pursuant to this Plan.

The Debtors have been mired in state-court litigation (the "**State Court Litigation**") for the last two years since the untimely passing of James Logan, Jon Logan's father and business partner, in October 2022. Just 30 days prior to his passing, James transferred his 50% interest in Smart Comm FL to the James Logan Family Trust, dated February 10, 2021 (the "**Trust**"). Soon after James Logan's passing, and following her assumption in the role of Trustee of the Trust, Janice Logan (James Logan's window and Jon Logan's estranged mother) never having any previous involvement in the Debtors, now weaponized the Trust's new found interest in Smart Comm FL in an attempt to extract grotesque sums of money from the business and compel the Debtors to fully fund her occupation and possession of luxury real estate owned by the Debtors that is not currently used in Debtors' operations. The State Court Litigation includes claims by Debtors, both direct and derivative, claims against the Debtors, and claims regarding property of the estates. Among other claims discussed in the Case Management Summary, the Trust sought a dissolution of Smart Comm FL, resulting in Smart Comm FL's election to purchase the Trust's shares under the provisions of § 607.1436 of the Florida Statutes. The ultimate outcome of that litigation is that the Trust has a claim for the value of the Trust's shares in Smart Comm FL, which will be treated in Plan. Recently, the State Court adjudicated that the Exclusive License was not valid under applicable Florida law thereby creating substantial uncertainty as to the Debtors continued rights to use HLFIP's IP. HLFIP and the Debtors are currently in the process of appealing the State Court's ruling because the State Court, *inter alia*: (i) committed various legal errors in reaching its adjudication; (ii) certain of the State Court's findings went beyond the scope of the automatic stay and are therefore void; and (iii) the State Court lacks subject matter jurisdiction to consider or adjudicate federal question issues, for example, related to the validity of patents and trademarks owned by HLFIP.

Ultimately, the Debtors and HLFIP assert that the validity and extent of the pre-petition 2023 Written License is a red herring that has no material impact on the confirmation of the Plan. Specifically, the Plan provides for the issuance of a new exclusive license expressly subject to the the independent review of the United States Trustee, the Subchapter V Trustee appointed to this Case, an independent director, and all creditors of the Debtors' estates, and ultimately the approval of the Bankruptcy Court. Thus, the only issue relevant to the adjudication of the Debtors' Plan is the value HLFIP is providing to the Debtors in the context of HLFIP's proposed plan funding in exchange for the equity HLFIP is obtaining in the Reorganized Debtors. Finally, the Plan provides for the payment of all allowed non-insider general unsecured claims in full and maintains the

Debtors as going concern entities for the benefit of over 150 employees and millions of Debtors' existing customers.

## B.     Liquidation Analysis/Best Interests of Creditors Test Satisfied

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a liquidation under chapter 7 of the Bankruptcy Code. The liquidation analysis attached to this Plan as **Exhibit B** demonstrates that the Plan meets this requirement because all non-insider holders of allowed claims will be paid in full under the Plan and all holders of impaired equity will receive on account of their impaired interest property of a value that far exceeds what they would retain on account of retaining the impaired interest if the debtor was liquidated under chapter 7. As shown in the liquidation analysis, the liquidation value of the assets is approximately $6,789,199 (the "**Liquidation Value**"), and the impaired creditors and interest holders of Debtors will receive substantially in excess of the Liquidation Value in the proposed Plan.

## C.     Feasibility / Ability to Fund Plan

The Debtors have provided financial projections attached as **Exhibit C** to analyze their ability to meet the obligations under the Plan. The Debtors believe that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors due to the License Restructuring Agreement (described herein) incorporated into the Plan by and between the Debtors, the Subchapter V Trustee, Jonathan Logan, and HLFIP, which will receive 51% of the equity of the Reorganized Debtors. The Debtors, Jon Logan, and certain of the Debtors affiliates along with HLFIP shall provide Debtors with sufficient funding and other consideration necessary to make all distributions under the Plan. The guaranteed payments due on the Effective Date permit immediate reorganization and restructuring of debt obligations, to provide a fresh start without the existing operational constraints of debt service and the uncertainty for the Debtors' continued business operations without a valid exclusive license to use HLFIP's intellectual property.

## D.     License Restructuring Agreement

HLFIP asserts that it holds right, title, and interest to certain intellectual property and technology (including 8 issued patents and numerous pending patents) that the Debtors currently use in the operation of the Debtors and the Debtors' affiliates pursuant to the prior Exclusive License. HLFIP has filed a claim asserting that the Debtors owe HLFIP in excess of $67,000,000 (a fraction of the gross revenue the Debtors have generated over their entire historical use of the IP) for fees associated with the Debtors' use of HLFIP's intellectual property under several different legal theories that need not be adjudicated as a result of the compromises proposed herein (the "**HLFIP Cure Claim**"). A true and correct copy of the HLFIP Cure Claim is attached as **Exhibit D.** In addition to the HLFIP Cure Claim, the Debtors are obligated to fund additional post-petition fees for the Debtors continued use of HLFIP's intellectual property (the "**HLFIP License Fees**"). The Debtors and HLFIP have reached an agreement, subject to the independent examination, recommendation, and ultimate approval of the Subchapter V Trustee, to fully resolve the HLFIP Cure Claim and restructure the HLFIP License Fees pursuant to the following terms:

(1) HLFIP Issuance of Exclusive License to Reorganized Debtors

HLFIP shall issue the Debtors an exclusive license to use all intellectual property currently titled with HLFIP and any new intellectual property developed by HLFIP subsequent to the Effective Date and for the duration of this Plan (the "**HLFIP Exclusive License**").

(2) Satisfaction of HLFIP Cure Claim

In exchange for the issuance of the HLFIP Exclusive License, the satisfaction and release of the HLFIP Cure Claim, and HLFIP's funding of the HLFIP Carve-out, HLFIP shall receive the following consideration under the Plan: (i) 51% of the equity interest in the Reorganized Debtors;; (ii) a general release of all claims that the Debtors can assert against HLFIP; and (iii) an injunction against the Debtors, the Debtors' creditors, and any parties alleging an interest in the Debtors from asserting any claims on behalf of the Debtors against HLFIP for the duration of the Plan conditioned upon the Debtors and HLFIP fully complying with all obligations owed to all parties pursuant to the Plan and the HLFIP Exclusive License.

(3) HLFIP License Fees

As a compromise to allow for the payment of all allowed claims in full, the Debtors and Reorganized Debtors shall be obligated to pay HLFIP a highly discounted[3] license fee equal to 5% of the Reorganized Debtors' gross revenues  from the Reorganized Debtors operation subsequent to the Effective Date  (the "**License Fees**").  License Fees shall be calculated on a quarterly basis and shall be due on or before the 15th day subsequent to the end of the preceding quarter.

(4) License Term

The HLFIP Exclusive License shall be effective as of the Petition Date and be extended for a term that will expire on the 30th day subsequent to the earlier of: (i) completion of all payments required under the Plan; or (ii) fifth (5) anniversary of the Effective Date.  The HLFIP Exclusive License shall be renewable upon terms acceptable to HLFIP and Reorganized Debtors communicated in writing prior to the expiration of the license term.

(5) License Termination

HLFIP shall be authorized to terminate the HLFIP Exclusive License solely upon the Reorganized Debtors uncured default of the obligations owed to HLFIP pursuant to the Plan. HLFIP shall provide the Reorganized Debtors and the Subchapter V Trustee and all creditors holding allowed claims against the Debtors with notice of any default as to any obligations owed by the Reorganized Debtors to HLFIP under the Plan and provide the Debtors with twenty-eight days to cure any default (the "**Cure Deadline**").  The Reorganized Debtors, the Subchapter V

---

[3] HLFIP asserts that the market rate for the use of its intellectual property is exponentially higher than the negotiated discount rate included in this Plan.  HLFIP has consented to adopt the lowest rate cited by the Trust's own expert in the State Court Litigation in order to expedite confirmation by mooting out certain factual disputes previously raised by the Trust.  In addition, the Debtors will still seek the independent review and approval of the proposed 5% rate by the Subchapter V Trustee and an independent director as part of the confirmation of this Plan.

Trustee, or any holder of an allowed claim against the Debtors shall have the right to challenge any improper default notice by filing an objection to same with the Bankruptcy Court prior to the expiration of the Cure Deadline.

(6) HLFIP Carveout

HLFIP shall carveout from the License Fees actually paid to HLFIP by the Reorganized Debtors an amount not to exceed the aggregate of $10,000,000 to be used by the Reorganized Debtors as follows:

(i) all sums necessary for the Reorganized Debtors to fund all allowed administrative claims asserted against the Debtors prior to the Effective Date to be paid at $100,000 per month commencing on the 91st day after the Effective Day and terminating on the fifth anniversary of the Effective Day;

(ii) all sums necessary for the Reorganized Debtors to fund the treatment proposed by the Debtors for Class 4 Claimants in an aggregate sum not to exceed the sum of $10,000,000 minus any funding to satisfy allowed administrative expense claims to be paid at $300,000 per quarter commencing on the 91st day after the Effective Day and terminating on fifth anniversary of the Effective Day.

E.    **Plan Length and Funding**

The Plan will be primarily funded through the HLFIP Carveout over a period not to exceed five years detailed herein and from the following assets contributed to the Debtors by various non-debtors:

(i) Assets titled in Jonathan Logan's individual capacity.  Jonathan Logan shall contribute the net proceeds realized from the sale of the following property: (1) Rolls Royce, (2) Ferrari, (3) Condominium located in Miami, Florida (465 Brickell Ave, Unit 4101, Miami, Florida 33131), and (4) a Nor-tech fishing boat.  Finally, Mr. Logan will release the Debtors' estates from all claims Mr. Logan can assert against the Debtors (including Claim No. 12-1 in the amount of $2,990,462.22), contribute his entire equity in the Debtors to facilitate the funding of the Plan, and will provide a limited guaranty of up to $500,000 of obligations the Reorganized Debtors are committed to funding to non-insider holders of allowed general unsecured claims.

(ii) Smart Communications Yacht Holdings, LLC Assets.   Smart Communications Yacht Holdings, LLC is a title owner to a marine vessel, specifically a 2020 Riva Cosoro currently docked at Epic Marina, 270 Biscayne Blvd., Miami, FL 33131 (the "**Vessel**").  Smart Communications Yacht Holdings, LLC shall sell the Vessel on or before the second anniversary of the Effective Date and contribute the net proceeds realized from the sale of the Vessel after payoff of all liens and closing costs to fund the Plan.

(iii) Loco Florida LLC is the Debtors' landlord on a certain office building located at 10491 72nd Street, Seminole, FL 33777.  Loco Florida, LLC shall waive its existing cure claim for all accrued past-due rent accruing prior to the Effective Date: (1) in the pre-petition amount of

$916,500.00 (as reflected in Claim No. 13-1); and (2) $160,000 for post-petition rent.  Moreover, Loco Florida, LLC shall charge the Reorganized Debtors a reduced fixed monthly rent payment for the duration of the Plan in the amount of $40,000 per month pursuant to a five-year written commercial lease to be executed by the Reorganized Debtors and Loco Florida, LLC incorporating these materials terms.

The Plan, and the Debtors' financial projections, collectively provide that unsecured creditors shall be fully satisfied on account of their projected allowed claims or will receive an amount that substantially exceeds the Debtors' projected disposable income, as defined by section 1191(d) of the Code, in the 5-year period of the Plan.  Specifically, the Debtors project that the Plan Funder Carveout will be sufficient to fund an aggregate $10,000,000 to holders of allowed unsecured claims.   The Reorganized Debtors shall distribute the payments to holders of allowed unsecured claims by making $500,000 payments on a quarterly basis commencing ninety days subsequent to the Effective Date and terminating on the earlier of: (i) satisfaction of all allowed claims; or (ii) fifth anniversary after the Effective Date.

## F.      Corporate Structure of the Reorganized Debtors

Debtor Smart Communications Holdings, Inc. shall vest all of its assets into Reorganized Debtor Smart Communications Holdings, Inc. which shall be organized as a Florida corporation Debtor Smart Communications Holdings, LLC shall vest all of its assets into Reorganized Debtor Smart Communications Holdings, LLC which shall be organized as a Delaware limited liability company with Reorganized Debtor Smart Communications Holdings, Inc. as its sole member and Jonathan Logan as its manager.  **For the duration of the Plan, both of the Reorganized Debtors shall have an independent director that shall be tasked with analyzing, reviewing, and approving or denying any proposed transactions between the Reorganized Debtors and any Affiliate as such term is defined by 11 U.S.C. Section 101.**

## G.      Treatment of Claims and Equity Interests

1.      <u>Summary</u>.

This Plan provides for:      __1__  class of secured claims
                                        __1__  classes of priority claims
                                        __3__  classes of non-priority unsecured claims
                                        __1__  class of equity security holders

2.      <u>Secured Claims</u>.

Allowed Secured Claims are claims secured by property of the Debtors' bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code.  If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim.

With respect to the Allowed Secured Claims, the Plan provides that:

[ X ] the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtors or transferred to another entity, to the extent of the allowed amount of such claims; and that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estate's interest in such property;

| Secured Claim | Class | Allowed Amount | Proposed Treatment of Allowed Claims | Voting Rights | Projected Plan Recovery |
|---|---|---|---|---|---|
| None known | 1 | 0 | Retain lien and paid pursuant to contractual terms. | Unimpaired/Not entitled to Vote. | 100% |

3.    Priority Claims.  The Reorganized Debtors shall pay holders of allowed priority claims their allowed claims *pari passu* from the $100,000 monthly HLFIP Carve-out until the allowed priority claims are paid in full.  The Debtors project that the allowed priority claims shall be between $3,000,000 and $4,000,000.

4.    Unsecured Claims.  General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.  The following chart identifies the Plan's proposed treatment of the general unsecured claims against the Debtors.  All holders of general unsecured claims allowed under § 502 of the Code shall receive their *pro rata* share of the distributions from the Debtor, as guaranteed by the Plan Funder.

| Unsecured Claim | Class | Allowed Amount | Proposed Treatment of Allowed Claims | Voting Rights | Projected Plan Recovery |
|---|---|---|---|---|---|
| HLFIP | 2 | Estimated amount: $67,000,000 | HLFIP shall receive 51% of the equity in the Reorganized Debtors in full satisfaction of any allowed claims HLFIP can assert against the Debtors that accrue prior to the Effective Date of the Plan. | Impaired/Entitled to Vote. | 0% |

| Unsecured Claim | Class | Allowed Amount | Proposed Treatment of Allowed Claims | Voting Rights | Projected Plan Recovery |
|---|---|---|---|---|---|
| Janice Logan in her individual capacity and as Trustee of the Trust. Class 3 | 3 | Estimated amount: $0 | Class 3 Claimants shall receive 49% of the equity in the Reorganized Debtors and the Debtors' right, title, and interest in the real property | Impaired/Entitled to Vote. | 100% |

80209024;7

| | | | | | |
|---|---|---|---|---|---|
| shall exclude all Plan Funders and exclude any claims asserted by the Trust that are not based upon the Trust's equity in either of the Debtors. | | | currently possessed and occupied by Janice Logan in full satisfaction of any Allowed Class 3 Claim | | |

| Unsecured Claims | Class | Allowed Amount | Proposed Plan Treatment | Voting Rights | Projected Plan Recovery |
|---|---|---|---|---|---|
| All other holders of General Unsecured Claims | 4 | Estimated amount: $1,500,000. | Class 4 Claimants accepting the Plan shall receive at their election: (a) the lesser of: (i) 100% of their Allowed Class 4 Claim; and (ii) $50,000, funded by the Reorganized Debtors on or before the 105th day subsequent to the Effective Date; or (b) their pro rata share of the HLFIP Carve-out paid over 20 quarterly installments by the Reorganized Debtors commencing on the 91st day subsequent to the Effective Date and terminating on the fifth anniversary of the Effective Date. | Impaired/Entitled to Vote. | 100% |

5.    Equity interest holder.  The equity interest of the Equity Holders will be cancelled and all assets of the Debtors will vest with the Reorganized Debtors.  Equity in the amount of 51% of the Reorganized Debtor Smart Communications Holding, Inc. will be issued to HLFIP pursuant to the License Restructuring Agreement.  The remaining equity of Reorganized Debtor Smart Communications Holding, Inc.  in the amount of 49% shall be issued to the Trust in full satisfaction of all Allowed Class 3 Claims and all Allowed Interests against the Debtors.  Reorganized Debtor Smart Communications Holding, Inc.  shall be the sole member of Reorganized Debtor Smart Communications Holding, LLC.  The Reorganized Debtors shall be expressly prohibited from making any dividend distributions to holders of equity until all payments owed to holders of priority claims and holders of allowed claims in Classes 1 and 4 are completed.

| Class | Description | Proposed Plan Treatment | Voting Rights | Projected Plan Recovery |
|---|---|---|---|---|
| 5 | Equity interest holder. | The equity interest of the current equity interest holder will be cancelled and re-issued to HLFIP and the Trust as detailed herein. | Deemed to reject | $0 |

6.      Unclassified claims.  Under section 1123(a)(1), administrative expense claims and priority tax claims are not in classes.

a.      Administrative expense claims.  Each holder of an administrative expense claim allowed under section 503 of the Code will be paid in full on the Effective Date of this Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor, or as provided in the Plan.

Below are the anticipated administrative expense claims and their treatment:

| Claim | Allowed Amount | Proposed Treatment of Allowed Claims |
|---|---|---|
| Subchapter V Trustee Fees | $100,000 estimated | Cash equal to the allowed amount of such claim on the Effective Date of the Plan or as consented to by the holder of the Administrative Claim. |
| Stichter Riedel and Akerman LLP – Debtors' attorneys' fees and costs | $1,700,000 estimated | Cash equal to the allowed amount of such claim on the Effective Date of the Plan or as consented to by the holder of the Administrative Claim. |
| Accountants | $300,000 | Cash equal to the allowed amount of such claim on the Effective Date of the Plan or as consented to by the holder of the Administrative Claim |

b.      Priority tax claims.  Each holder of a priority tax claim will be paid:

(     ) regular installment payments in cash either
(  ) of a total value, as of the effective date of the Plan, equal to the allowed amount of such claim, or
(  X  ) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303,

and in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan (other than cash payments made to a class of creditors under section 1122(b)).

### H.    Allowance and Disallowance of Claims

1.    <u>Disputed claim</u>.  A disputed claim is a claim that has not been allowed or disallowed by a final non-appealable order, and as to which either:

> (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or

> (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

2.    <u>Delay of distribution on a disputed claim</u>.  No distribution will be made on account of a disputed claim unless such claim is allowed by a final non-appealable order.

3.    <u>Settlement of disputed claims</u>.  The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

4.    <u>Subordination of Class 3 Claims</u>. The disputed Class 3 Claim arises, by operation of law, from Florida's "Election to Purchase" statute, § 607.1436(8), Fla. Stat. As such, it is appropriate to classify the Class 3 Claim as a particular kind of general unsecured creditor, rather than a holder of equity. In *Universal Towers Investimentos E Participacoes, LTDA v. Constrazza International, Inc. (In re Universal Towers Construction, Inc.)*, for example, the Plan relegated the claims of a former shareholder – whose shares were to be repurchased under the statute – to Class 3B, after payment of all other general unsecured creditors in Class 3A, and the Court held that it "does not implicate Chapter 11's recognized policy of equitable distribution among and satisfaction of the Debtor's creditors. And because the Plan pays all the Debtor's other creditors before paying [the former shareholder], the specific risk mitigated by § 510(b) – that a shareholder will try to obtain a distribution with higher priority as a creditor, to the creditors' disadvantage – is not present here." 641 B.R. 691, 704-5 (M.D. Fla. 2022). As for treatment of the Class 3 Claim, Florida's "Election to Purchase" statute provides that the amount paid to the former shareholder cannot render the corporation insolvent,[4] and the case law confirms that such payments can be made over time where the finances of the corporation so require. *See Cox Enterprises, Inc. v. News-Journal Corp.*, 794 F.3d 1259 (11th Cir. 2015). Given the alignment of the statute and "feasibility" requirements of the Bankruptcy Code – *i.e.* that the reorganized debtor should not be rendered insolvent through Confirmation of its Plan – the Debtor's proposal to satisfy the Class 3 Claim by conveying Debtors' interests in the certain real property in the current possession of Janice Logan and providing 49% of the equity in the Reorganized Debtor Smart Comm satisfies the mandates of both *Universal Towers and Cox Enterprises*.

---

[4] Specifically: "[a]ny payment by the corporation pursuant to an order… is subject to the provisions of s. 607.06401." § 607.1436(8), Fla. Stat. And § 607.06401 provides that a repurchase cannot be made if, after giving it effect: "(a) The corporation would not be able to pay its debts as they become due in the usual course of the corporation's activities and affairs; or (b)   The corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved and wound up at the time of the distribution, to satisfy the preferential rights upon dissolution and winding up of shareholders whose preferential rights are superior to those receiving the distribution." § 607.06401(3), Fla. Stat.

## I.      Executory Contracts and Unexpired Leases

Within 14 days of the Confirmation Hearing, Debtors will file a list of executory contracts and unexpired leases that the Debtors will reject.  Any executory contract of unexpired lease that is not formally rejected by the Debtors shall be assumed.  Assumption means that the Debtors have elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any.  Any counterparty or lessee that has a scheduled or filed claim that Debtors propose to cure shall not be treated in their respective class but shall receive cure payments as specified under a further supplement to the Plan.

Except for executory contracts that have been assumed before the Effective Date or under this section of the Plan, or that are the subject of a pending motion to assume, or that the Debtors have expressly rejected prior to the Effective Date, the Debtors will be conclusively deemed to have assumed all executory contracts and unexpired leases as of the Effective Date.

If you object to the assumption, and if applicable the assignment, of your unexpired lease or executory contract under the Plan, the proposed cure of any defaults, the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.  If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.  The deadline for filing a Proof of Claim based on a claim arising from the rejection of a lease or contract is 30 days after the date of the order confirming this Plan, or within 30 days of the rejection of the contract or lease, whichever is earlier.  Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

## J.      Post-Confirmation Management and Employment/Retention of Insiders

The Reorganized Debtors' post-confirmation management will include Jonathan Logan and below is his proposed compensation for services provided to the Reorganized Debtors as Chief Executive Officer.

| Individual | Role/Compensation |
|---|---|
| Jonathan Logan | Chief Executive Officer and Director / $1,200,000 per year |
| To be Appointed | Independent Director for Affiliated Transactions/$12,000 per year. |

The appointment to, or continuance in, such office of Mr. Logan, is consistent with the interests of creditors and equity security holders and with public policy.  In particular, the retention of Mr. Logan is key to the Reorganized Debtors maintaining their business relationships, because he has customer and vendor relationships and operational knowledge, which is vital to the success of the Reorganized Debtors.  The Reorganized Debtors could not  sustain their projected operations without Mr. Logan.  Attached to the Plan as **Exhibit "E"** is Mr. Logan's curriculum vita and a market study conducted by the Debtors evidencing the market rate for CEO compensation for

similarly situated businesses.  For the duration of the Plan, any post-Effective Date transactions by and between the Reorganized Debtors and any of the Reorganized Debtors' insiders or affiliates (an "**Affiliate Transaction**") shall be separately examined and approved in writing by both the Subchapter V Trustee, an independent director to be appointed by Mr. Logan for the Reorganized Debtors prior to the Effective Date solely to review, advise, and ultimately approve or deny any Affiliate Transaction (the "**Independent Approval**").  In the event an Affiliate Transaction does not obtain Independent Approval, , the Reorganized Debtors shall be authorized to seek Bankruptcy Court approval of an Affiliate Transaction pursuant to the requirements of 11 U.S.C. Section 363(b) and any applicable Florida law by filing a motion with the Bankruptcy Court and providing all interested parties at least twenty-one days' notice of any hearing to approve the Affiliate Transaction.

## K.    Distributions Under the Plan

1.    All distributions under the Plan shall be made by the Reorganized Debtors, whether the Plan is confirmed pursuant to Section 1191(a) or (b) of the Bankruptcy Code.  The Reorganized Debtors shall file with the Court as a supplement to the Plan and provide notice to all creditors at or before confirmation, a list of all the creditors who will be receiving payments under the Plan, the total amount to be paid to each creditor under the Plan (inclusive of all allowed interest and fees) and the payment terms and schedule for each creditor under the Plan.  The following additional provision shall govern distributions under the Plan:

a.    All payments under the Plan will be made by the Reorganized Debtors to the holder of each allowed claim at the address of such holder as listed on the Schedules, or if different, the Proof of Claim, unless the Reorganized Debtors have been notified in writing of a change of address.

b.    Any payment required to be made under the Plan on a day other than a business day shall be made on the next succeeding business day.

c.    De minimis Distributions less than five hundred dollars ($500.00) shall not be made, and shall become unclaimed funds, which shall vest in the Reorganized Debtors.

d.    Claimants shall not be permitted to amend or otherwise modify any claim after the later of the claims bar date or the confirmation date without leave of the Bankruptcy Court.  Any amendment to a claim filed after the confirmation date shall be deemed disallowed in full and expunged without any action by Debtors unless the claimholder has obtained prior Court authorization for the filing of such amendment.  The Debtors shall have no obligation to recognize any transfer of any claim after distributions have started.

e.    Unless expressly provided in the Plan, or confirmation order, post-petition interest and fees shall not accrue on or after the Petition Date on account of any claim.

f.    Unclaimed distributions shall be administered pursuant to section 347 of the Bankruptcy Code. Should the holder of an allowed claim fail to negotiate a payment from the Reorganized Debtors within 90 days of the date the check was issued, the Reorganized

Debtors shall provide the holder with written notice of the requirement that the holder of an allowed claim must negotiate the payment within 180 days of the date the check was issued. Should the holder thereafter fail to negotiate the payment within 180 days, then upon the expiration of the deadline set forth in section 1143, the Reorganized Debtors may exercise their remedies under section 347(b) of the Bankruptcy Code.

**L.    Subchapter V Trustee**

1.    <u>Service of Trustee</u>.  The service of the trustee appointed under Subchapter V of Chapter 11 (the "**Subchapter V Trustee**") shall terminate in accordance with section 1183(c) of Title 11.  In a consensual case, such service shall terminate when the Plan has been substantially consummated.  In a nonconsensual case, the Subchapter V Trustee shall continue to monitor the Reorganized Debtors' compliance with the Plan.  If the Reorganized Debtors fail to timely make any plan payment to creditors, the Subchapter V Trustee may file and serve a notice of delinquency upon the Reorganized Debtors and the Reorganized Debtors' attorney.  The Reorganized Debtors shall have 45 days from the date of the notice of delinquency to make all payments due under the Plan, including any payments that become due within the 45-day period.  If the Reorganized Debtors are seeking to cure the delinquency in a modified plan, the Reorganized Debtors must file a motion to modify the confirmed plan within 45 days of the notice of delinquency.  If the Reorganized Debtors are not current with plan payments on the 45th day after the date of the notice of delinquency or has not filed a motion to modify within that time period, the Trustee may file and serve a report of non-compliance and may thereafter seek the dismissal or conversion of the cases to Chapter 7.

2.    <u>Compensation</u>.  Under section 330 of the Bankruptcy Code, the Subchapter V Trustee shall be compensated for services and reimbursed for expenses.  However, the method of payment of the Subchapter V Trustee compensation depends on the provision under which the Plan is confirmed and the method of disbursement to creditors under the Plan:

a.    The Subchapter V Trustee's total compensation is estimated to be $100,000 through confirmation.  The Subchapter V Trustee will apply to the Court for an award of compensation through the application process that is used by professionals. The Subchapter V Trustee will file a final fee application for compensation to be heard with the other final fee applications in the case.

b.    If the Plan is confirmed on a consensual basis under section 1191(a) of Title 11, the service of the Subchapter V Trustee terminates with substantial consummation of the Plan under section 1183(c)(1). The Subchapter V Trustee's allowed compensation, as with other administrative expenses, is payable on the Effective Date of the Plan, unless the Subchapter V Trustee agrees to different treatment.

c.    If the Plan is confirmed on a non-consensual basis under section 1191(b) of Title 11, then the Subchapter V Trustee will remain in place throughout the life of the Plan, and the Subchapter V Trustee may be entitled to additional compensation for services provided after confirmation.  The fee for the Subchapter V Trustee to monitor the plan payments made by the Reorganized Debtors shall remain calculated based upon 11 USC Sections 326 and 330 and the Reorganized Debtors shall fund the Subchapter V Trustee

supplemental retainers in the amount of $1000 on a semi-annual basis. As such, the Subchapter V Trustee may file additional or supplemental fee applications throughout the life of the Plan. Upon approval of the Subchapter V Trustee's fee applications in a non-consensual case, as long as all professional administrative claims are similarly treated in the Plan, the Debtors shall pay all fee amounts due to the Subchapter V Trustee on the Effective Date of the Plan, over the remaining life of the Plan, or forthwith.

**M.    Additional Provisions**

1.    <u>Definitions and rules of construction</u>. The definition and rules of construction set forth in sections 101 and 102 of the Code shall apply when terms are defined or construed in the Code are used in this Plan.

2.    <u>Effective Date</u>. The Effective Date of this Plan is the first business day following the date that is 14 days after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on that date, the Effective Date will be the first business day after the date on which the stay expires or is otherwise terminated.

3.    <u>Severability</u>. If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

4.    <u>Binding effect</u>. The rights and obligations of any entity named or referred to in this Plan will be binding upon them, and will inure to the benefit of the successors or assigns of such entity.

5.    <u>Captions</u>. The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

6.    <u>Corporate Governance</u>. The issuance of non-voting securities will be prohibited in the charter of Reorganized Debtors to the extent required to comply with §1123(a)(6) of the Code.

7.    <u>Default Remedies</u>. If the Debtors do not make the payments provided for under the Plan as and when due, the Debtors will be in default under the Plan ("**Default**"). After the occurrence of a Default, any creditor may send written notice to the Debtors, with a copy to Debtors' attorney and the Subchapter V Trustee, that the Debtors are in Default under the Plan ("**Default Notice**"). For payments to general unsecured creditors, the Debtors will be entitled to a 45-day grace period after the transmission of the Default Notice ("**Grace Period**") to cure the default. If the Debtors have not cured the Default within the Grace Period, the creditor is entitled to commence a lawsuit to liquidate its claim in the Circuit Court of Hillsborough County, Florida. For payments to secured creditors, secured creditors will be entitled to exercise any and all in rem rights against their collateral except that Debtors shall be entitled to a 15-day grace period after transmission of the Default Notice. This provision survives the confirmation of the Plan, and creditors are entitled to enforce this provision post-confirmation. The bankruptcy court with jurisdiction over this Plan retains jurisdiction to enforce this provision of the Plan.

8.    <u>Vesting of Assets</u>. Pursuant to section 1141(c), as of the Effective Date, all property of the Debtors' estate will vest in the Reorganized Debtors, free and clear of any and all liens,

debts, obligations, claims, liabilities, and all other interests of every kind and nature, except for the Plan Obligations and as otherwise provided under the Plan.

9.    Discharge.

a.    Consensual Plan.  If the Debtors' Plan is confirmed under section 1191(a), then pursuant to section 1141(d) of the Bankruptcy Code, the distributions, rights, and treatment that are provided in the Plan shall, effective as of the Effective Date, be in complete satisfaction, discharge, and release of claims, interests, and causes of action against Debtors of any nature whatsoever, including any interest accrued on claims from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and interests in, the Debtors' or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such claims and interests, including demands, liabilities, and causes of action that arose before the Effective Date, and any liability to the extent such claims or causes of action accrued before Effective Date.  On the confirmation date of this Plan, the Debtors as they exist post-Effective Date (the "Reorganized Debtor") will be discharged from any debt that arose before confirmation of this Plan, subject to the occurrence of the Effective Date, to the extent specified in section 1141(d)(1)(A) of the Code, except that the Debtors will not be discharged of any debt: (i) imposed by this Plan; (ii) of a kind specified in section 1141(d)(6)(A) if a timely complaint was filed in accordance with Rule 4007(c) of the Federal Rules of Bankruptcy Procedure; or (iii) of a kind specified in section 1141(d)(6)(B).

b.    Non-Consensual Plan. If the Plan is confirmed under section 1191(b) of this title, confirmation of the Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due within the first 5 years of this Plan, or as otherwise provided in § 1192 of the Code.

10.    **Releases.        On the Effective Date of this Plan, without the need for execution or delivery of any additional documentation or orders of the Bankruptcy Court, and in exchange for valuable consideration of and under this Plan, HLFIP Holding, LLC, Jonathan Logan, Smart Communications Yacht Holdings, LLC, Loco Florida LLC, the James Logan Family Trust, dated February 10, 2021, Janice Logan, and any of their agents, representatives, professionals, attorneys, employees, officers, directors, managers, members, or equity holders (collectively, the "Released Parties") will be fully and finally released and forever discharged from any and all claims, actions, causes of action, liabilities, obligations, rights, suits, accounts, covenants, contracts, controversies, agreements, promises, damages, judgments, debts, encumbrances, liens, remedies, and demands, of every kind and nature whatsoever, in law or in equity, that the Debtors have asserted or could assert against any of the Released Parties prior to the Effective Date (collectively, "Released Claims").  The Released Claims shall expressly exclude any obligations by the Released Parties pursuant to the Plan.  For the avoidance of doubt, the Released Claims shall expressly release any claims by the Debtors related to an interest in intellectual property legally titled in the name of HLFIP prior to the Effective Date of the Plan.**

11.     **Exculpation.**  **Except as specifically provided in the Plan, neither the Debtors, nor their employees, representatives, members, advisors, attorneys, accountants, financial advisors, or agents, or any of such parties' successors or assigns, shall have or incur, and are hereby released from, any claim, obligation, cause of action or liability to one another or to any holder of a claim or interest, or any other party in interest, or any of their respective officers, directors, shareholders, members, employees, representatives, advisors, attorneys, accountants, financial advisors, agents, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the negotiation and pursuit of confirmation of this Plan, the consummation of this Plan, or the administration of this Plan, or the property to be distributed under the Plan, except for their gross negligence, willful misconduct, or actual fraud, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities (if any) under this Plan.**

12.     **Discharge Injunction.**  **Except as otherwise specifically provided in the Plan or the Confirmation Order, all entities and persons, and any successor, assigns or representatives of such entities and persons, who have held, hold, or may hold claims, rights, causes of action, liabilities, equity interests, or any other interests based on any act or omission, transaction, or other activity of any kind or nature related to the Debtors, Debtors in Possession, or the Chapter 11 Cases that occurred prior to the Effective Date ("Enjoined Claim"), regardless of the filing, lack of filing, allowance or disallowance of such claim or interest, and regardless of whether such entity or person has voted to accept the Plan, shall be precluded and permanently enjoined on and after the Effective Date from:**

 **(a) the commencement or continuation in any manner of any claim, action or other proceeding of any kind with respect to any Enjoined Claim, against (i) any assets of the Debtors, (ii) any assets re-vested in the Reorganized Debtors, (iii) the Debtors or Reorganized Debtors;**

**(b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree or order with respect to any Enjoined Claim, against (i) any assets of the Debtors, (ii) any assets re-vested in the Reorganized Debtors, (iii) the Debtor or Reorganized Debtors;**

**(c) the creation, perfection, or enforcement of any encumbrance or lien of any kind with respect to any Enjoined Claim, against (i) any assets of the Debtors, (ii) any assets re-vested in the Reorganized Debtors, (iii) the Debtors or Reorganized Debtors; and**

13.     Request for "Cram Down" of Non-Accepting Classes.  The Debtors request that the Court confirm the Plan notwithstanding the failure of classes to vote to accept the Plan. Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in a manner prescribed by section  1191 of the Code.  A Plan that binds nonaccepting classes is commonly referred to as a "cram down" Plan.  The Code allows the Plan to bind non-accepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the requirements of sections 1129(a)(8), 1129 (a)(10), or 1129 (a)(15) of the Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan under the standard of section 1191(c) of the

Code. **Creditors and Equity Interest Holders concerned with how the cram down provisions will affect your claim or equity interest should seek independent counsel, as the variations on this general rule are numerous and complex.** The Debtors are not required to file a motion or other pleading to seek and obtain cram down of a Plan. As a result, the Debtors will seek the Court's confirmation of this Plan in accordance with the cram down provisions of the Bankruptcy Code by *ore tenus* motion at the date and time of the confirmation hearing without further notice to creditors or other parties in interest.

       14.   <u>Retention of Jurisdiction</u>. Until the case is closed, the Court shall retain jurisdiction to insure that the purpose and intent of the Plan are carried out. The Court shall retain jurisdiction to hear and determine the following:

       a.     the classification of the claim of any creditor and the re-examination of claims which have been allowed for purposes of voting and the determination of such objections as may be filed against creditor's claims;

       b.     the determination of all questions and disputes regarding title to the assets of the estate and the determination of all causes of action, controversies, disputes or conflicts whether or not subject to action pending as of the date of confirmation between the Debtors and any other party included but not limited to any rights of parties in interest to recover assets pursuant to the provisions of Title 11 of the United States Code;

       c.     the correction of any defect, the curing of any omission or the reconciliation of any inconsistency in the Plan or the Order of Confirmation as may be necessary to carry out the purposes and intent of the Plan;

       d.     the modification of this Plan after confirmation pursuant to the Bankruptcy Rules and Title 11 of the United States Code;

       e.     the enforcement and interpretation of the terms and conditions of this Plan, including but not limited to questions relating to the scope of the releases and the enforcement of the releases, and the entry of an Order necessary to interpret and enforce the releases;

       f.     the entry of an Order including injunctions necessary to enforce the title rights and powers of parties in interest and to impose such limitations, restrictions, terms and conditions of such title rights and powers as this Court may deem necessary; and

       g.     the entry of an order concluding and terminating this case.

Respectfully submitted and executed on March __, 2025,

**SMART COMMUNICATIONS
HOLDING, INC.**

By:_____

**SMART COMMUNICATIONS
HOLDING, LLC.,**


By:_____


**HLFIP HOLDING, LLC**



By:_____

**SMART COMMUNICATIONS
YACHT HOLDINGS, LLC**


By:_____


**LOCO FLORIDA, LLC**


By:_____



_____
**JONATHAN LOGAN**

**<u>Proposed Second Amended Plan - Redline</u>**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
Tampa Division
www.flmb.uscourts.gov

In re:

SMART COMMUNICATIONS
HOLDING, INC.,

  and

SMART COMMUNICATIONS
HOLDING, LLC.,

    Debtors.

_____/

Chapter 11, Subchapter V
Case No. 8:24-bk-07106-RCT

*Jointly Administered with*
Case No. 8:24-bk-07108-RCT

## DEBTORS' PROPOSED SECOND AMENDED JOINT PLAN OF REORGANIZATION

This Second Amended Plan of Reorganization (the "**Plan**") in these above styled bankruptcy cases under subchapter V of chapter 11 (the "**Chapter 11 Cases**") of the Bankruptcy Code (the "**Code**" or "**Title 11**") proposes to pay creditors of Smart Communications Holding, Inc. and Smart Communications Holding, LLC (collectively, the "**Debtors**").  As described herein, the Plan shall be funded by the Debtors and by: (i)  HLFIP Holding, LLC; (ii) Jonathan Logan; (iii) Smart Communications Yacht Holdings, LLC; and (iv) Loco Florida, LLC (collectively, the "**Plan Funders**").

**Importantly, the Plan fully satisfies and releases all colorable non-barred[1] claims asserted against the Debtors' estates by Debtors' insiders and affiliates and while facilitating the 100% payment to holders of allowed claims.  Furthermore, the Plan is confirmable without the need to adjudicate any valuation disputes as the Debtors and the Plan Funders have adopted as a compromise solely to allow for the expedited confirmation of the Plan the valuations Janice Logan has attributed to the Debtors and the lowest proposed license fee her expert identified.**

To creditors:  Your rights may be affected by this Plan. ~~Y      laim   ay b         liminated.  Y~~  and you may wish to consult an attorney about your rights and your treatment under the Plan.

---

[1] Melvin Engelke's Claim No. 14-1 and Proofs of Interest remain collectively time barred and will receive no treatment under the Plan.

80037913;9
80209024;7

<u>PLAN</u>

**A.      Brief History of the Debtors' Business Operations**

Smart Comm FL is a Florida corporation formed in December of 2014. Smart Comm FL is the parent company and sole member of Smart Comm DE. Jonathan Logan ("**Jon Logan**") is the founder of the Smart Communications business (which was started in 2009), and is the sole officer and sole director of Smart Comm FL.

Smart Comm DE is a Delaware limited liability company formed in August of 2023. Smart Comm DE was established to be an intermediate holding company, and was set up to receive a transfer of transferrable assets from Smart Comm FL in exchange for the equity interests in Smart Comm DE issued to Smart Comm FL pursuant to a Transfer Agreement between Smart Comm DE and Smart Comm FL. Smart Comm DE is wholly-owned by Smart Comm FL as its sole member. Jon Logan is the sole manager of Smart Comm DE.

The Smart Communications corporate group, comprising the Debtors and certain non-debtor subsidiaries,[12] is a top technology supplier to corrections facilities across the country. Smart Communications provides its customers with access to unique patented and patent pending comprehensive inmate communications systems and custom proprietary hardware solutions it licenses from HLFIP, including telephone, video visitation, electronic messaging, streaming media platforms, and other services that are fully integrated through a single web-based dashboard, providing a single location for authorized staff to access all system administration, monitoring, reporting, data sharing and investigation tools. Smart Communications' client footprint has grown organically for 13 years, from a single account to more than 120 facilities throughout 29 states. Smart Communications' client footprint continues to grow, and the Debtors are focused on that trajectory.

The Debtors' primary material asset is an exclusive license (the "**Exclusive License**") of various intellectual property and technologies the Debtors have licensed since 2015 from  HLFIP Holding, LLC ("**HLFIP**"), a Delaware limited liability company owned by Jon Logan.  A true and correct copy of the License is attached hereto as **Composite Exhibit "A."**  As described more fully in the Case Management Summary (Doc. No. 12) (the "**Case Management Summary**"), in 2015 Jon Logan, James Logan, and Alexis Logan agreed that Jon Logan would exclusively own and control any new intellectual property that he created from that day forward (the "**IP**").  Since 2015, Jon Logan assigned and continues to assign the rights to his intellectual property to HLFIP, and HLFIP has exclusively licensed and continues to exclusively license that intellectual property to Smart Communications through a license that is subject to a royalty-based fee, initially through an oral license that remained in place until August 2023, when it was reduced to writing (the "2023 Written License"). The license provided Smart Communications with  uninterrupted use and an exclusive license to the Intellectual Property.

---

[12] The non-debtor subsidiaries are Smart Communications Collier, Inc. ("**Smart Collier**"), Smart Communications Pasco, Inc., and Smart Communications US, Inc.

The Debtors currently use the intellectual property and technology subject to the Exclusive License in the operations of their business and the business of various wholly owned affiliates. Without the IP and the Exclusive License, the Debtors could not continue as a going concern and would not have been able to generate significant gross revenues both prior to and subsequent to the commencement of these bankruptcy cases . Under the ~~exclusive license~~Exclusive License agreement, HLFIP is owed a royalty fee  of Smart's net sales, which HLFIP alleges has accrued in the aggregate amount exceeding  $67 million for the last three years alone of Debtors' use. HLFIP made a demand for the Debtors to pay royalties by the end of 2024 or the Exclusive License  would be terminated. The Debtors lack available cash and cash equivalents to provide for a prompt cure of the existing unpaid obligations ~~under the Exclusive Li       to HLFIP~~.  The Debtors' Plan seeks to restructure the obligations owed ~~under the Exclusive License  nd~~to HLFIP by negotiating a new exclusive license agreement with HLFIP that will make certain material modifications to the terms of the ~~Exclusive~~prior 2023 Written License to allow the Debtors to continue utilizing the intellectual property and technology for the five-year period the Debtors will be funding payments to all holders of allowed claims pursuant to this Plan.

The Debtors have been mired in state-court litigation (the "**State Court Litigation**") for the last two years since the untimely passing of James Logan, Jon Logan's father and business partner, in October 2022.  Just 30 days prior to his passing, James transferred his 50% interest in Smart Comm FL to the James Logan Family Trust, dated February 10, 2021 (the "**Trust**"). Soon after James Logan's passing, and following her assumption in the role of Trustee of the Trust, Janice Logan (James Logan's window and Jon Logan's estranged mother) never having any previous involvement in the Debtors, now weaponized the Trust's new found interest in Smart Comm FL in an attempt to extract grotesque sums of money from the business and compel the Debtors to fully fund her occupation and possession of luxury real estate owned by the Debtors that is not currently used in Debtors' operations.  The State Court Litigation includes claims by Debtors, both direct and derivative, claims against the Debtors, and claims regarding property of the estates. Among other claims discussed in the Case Management Summary, the Trust sought a dissolution of Smart Comm FL, resulting in Smart Comm FL's election to purchase the Trust's shares under the provisions of § 607.1436 of the Florida Statutes. The ultimate outcome of that litigation is that the Trust has a claim for the value of the Trust's shares in Smart Comm FL, which will be treated in Plan.  Recently, the State Court adjudicated that the Exclusive License was not valid under applicable Florida law thereby creating substantial uncertainty as to the Debtors continued rights to use HLFIP's IP.  HLFIP and the Debtors are currently in the process of appealing the State Court's ruling  because the State Court, *inter alia*: (i) committed various legal errors in reaching its adjudication; (ii) certain of the State Court's findings went beyond the scope of the automatic stay and are therefore void; and (iii) the State Court lacks subject matter jurisdiction to consider or adjudicate federal question issues, for example, related to the validity of patents and trademarks owned by HLFIP.

Ultimately, the Debtors and HLFIP assert that the validity and extent of the pre-petition ~~Exclusive~~2023 Written License  is a red herring that has no material impact on the confirmation of the Plan.  Specifically, the Plan provides for the issuance of a new exclusive license expressly subject to the the independent review of the United States Trustee, the Subchapter V Trustee appointed to this Case, an independent director, and all creditors of the Debtors' ~~estate~~estates, and ultimately the approval of the Bankruptcy Court.  Thus, the only issue relevant to the

- 3 -

adjudication of the Debtors' Plan is the value HLFIP is providing to the Debtors in the context of HLFIP's proposed ~~Plan F~~ plan funding in exchange for the equity HLFIP is obtaining in the Reorganized Debtors. Finally, the Plan provides for the payment of all allowed non-insider general unsecured claims in full and maintains the Debtors as going concern entities for the benefit of over 150 employees and millions of Debtors' existing customers.

**B.    Liquidation Analysis/Best Interests of Creditors Test Satisfied**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The liquidation analysis attached to this Plan as **Exhibit B** demonstrates that the Plan meets this requirement because all non-insider holders of allowed claims will be paid in full under the Plan and all holders of impaired equity will receive on account of their impaired interest property of a value that far exceeds what they would retain on account of retaining the impaired interest if the debtor was liquidated chapter 7.  As shown in the liquidation analysis, the liquidation value of the assets is approximately $6,789,199 (the "**Liquidation Value**"), and the impaired creditors and interest holders of Debtors will receive substantially in excess of the Liquidation Value in the proposed Plan.

**C.    Feasibility / Ability to Fund Plan**

The Debtors have provided financial projections attached as **Exhibit C** to analyze their ability to meet the obligations under the Plan.  The Debtors believe that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors due to the License Restructuring Agreement (described herein) incorporated into the Plan by and between the Debtors, the Subchapter V Trustee, Jonathan Logan, and HLFIP, which will receive ~~100~~51% of the equity of the Reorganized Debtors ~~the p~~ "**Plan Funder**". The Debtors, Jon Logan, and certain of the Debtors affiliates along with ~~the Plan Funder~~HLFIP shall provide Debtors with sufficient funding and other consideration necessary to make all distributions under the Plan.  The guaranteed payments due on the Effective Date permit immediate reorganization and restructuring of debt obligations, to provide a fresh start without the existing operational constraints of debt service and the uncertainty for the Debtors' continued business operations without a valid exclusive license to use HLFIP's intellectual property.

**D.    License Restructuring Agreement**

~~The Plan Funder~~HLFIP asserts that it holds right, title, and interest to certain intellectual property and technology (including 8 issued patents and ~~20~~numerous pending patents) that the Debtors currently use in the operation of the Debtors and the Debtors' affiliates pursuant to the prior Exclusive License.  ~~Plan Funder~~HLFIP has filed a claim asserting that the Debtors owe ~~Plan Funder~~HLFIP in excess of $67,000,000 (a fraction of the gross revenue the Debtors have generated over their entire historical use of the IP) for fees associated with the Debtors' use of ~~Plan Funder's~~HLFIP's intellectual property ~~the "Plan Funder~~under several different legal theories that need not be adjudicated as a result of the compromises proposed herein  (the "**HLFIP Cure Claim**").  A true and correct copy of the ~~Plan Funder~~HLFIP Cure Claim is attached as **Exhibit D.**  In addition to the ~~Plan Funder~~HLFIP Cure Claim, the Debtors are

obligated to fund additional post-petition fees for the Debtors continued use of ~~Plan Funder's~~HLFIP's intellectual property (the "~~Plan Funder~~**HLFIP** License Fees").  The Debtors and ~~the Plan Funder~~HLFIP have reached an agreement, subject to the independent examination, recommendation, and ultimate approval of the Subchapter V Trustee,  to fully resolve the ~~Plan Funder~~HLFIP Cure Claim and restructure the ~~Plan Funder~~HLFIP License Fees pursuant to the following terms:

(1) HLFIP Issuance of Exclusive License to Reorganized Debtors

HLFIP shall issue the Debtors an exclusive license to use all intellectual property currently titled with HLFIP and any new intellectual property developed by HLFIP subsequent to the Effective Date and for the duration of this Plan (the "**HLFIP Exclusive License**").

(~~1~~2) Satisfaction of ~~Plan Funder~~HLFIP Cure Claim

~~The Debtors   hall        the Plan Funder C     Claim by p        ~~In exchange for the issuance of the HLFIP Exclusive License, the satisfaction and release of the HLFIP Cure Claim, and HLFIP's funding of the HLFIP Carve-out, HLFIP shall receive the following consideration under the Plan ~~Funder with~~: (i)  ~~100~~51% of the equity interest in the Reorganized Debtors;; (ii) a general release of all claims that the Debtors can assert against ~~the Plan Funder~~HLFIP; and (iii) an injunction against the Debtors, the Debtors' creditors, and any parties alleging an interest in the Debtors from asserting any claims on behalf of the Debtors against HLFIP for the duration of the Plan conditioned upon the Debtors and HLFIP fully complying with all obligations owed to all parties pursuant to the Plan and the HLFIP Exclusive License.

(~~2~~3) ~~Plan Funder~~HLFIP License Fees

As a compromise to allow for the payment of all allowed claims in full, the Debtors and Reorganized Debtors shall be obligated to pay ~~Plan Funder    p           f the~~ HLFIP a highly discounted[3] license fee equal to 5%  of the Reorganized Debtors' gross revenues ~~not t   xceed 35% generated~~ from the Reorganized Debtors operation subsequent to the Effective Date ~~in         mount t  b  ecommended by the S         V Trustee     behalf  f the Debtors' estates  nd         by HLFIP~~ (the "**License Fees**").  ~~The p          License F  hall b  filed with the B         Court prior t  ny h    t  onfirm the Plan.~~  License Fees shall be calculated on a quarterly basis and shall be due on or before the 15th day subsequent to the end of the preceding quarter.

(~~3~~4) License Term

The ~~Plan~~HLFIP Exclusive License shall be effective as of the Petition Date and be extended for a term that will expire on the 30th day subsequent to the earlier of: (i) completion of all payments required under the Plan; or (ii) fifth (5) anniversary of the Effective Date.  The

---

[3] HLFIP asserts that the market rate for the use of its intellectual property is exponentially higher than the negotiated discount rate included in this Plan.  HLFIP has consented to adopt the lowest rate cited by the Trust's own expert in the State Court Litigation in order to expedite confirmation by mooting out certain factual disputes previously raised by the Trust.  In addition, the Debtors will still seek the independent review and approval of the proposed 5% rate by the Subchapter V Trustee and an independent director as part of the confirmation of this Plan.

~~Plan~~HLFIP Exclusive License shall be renewable upon terms acceptable to ~~the Plan Funder~~HLFIP and Reorganized Debtors communicated in writing prior to the expiration of the license term.

(~~4~~5) License Termination

~~The Plan Funder~~HLFIP shall be authorized to terminate the ~~Plan~~HLFIP Exclusive License solely upon the Reorganized Debtors uncured default of the obligations owed to ~~Plan Funder~~HLFIP pursuant to the Plan. ~~The Plan Funder~~HLFIP shall provide the Reorganized Debtors and the Subchapter V Trustee and all creditors holding allowed claims against the Debtors with notice of any default as to any obligations owed by the Reorganized Debtors to ~~the Plan Funder~~HLFIP under the Plan and provide the Debtors with ~~fourteen~~twenty-eight days to cure any default (the "**Cure Deadline**"). The Reorganized Debtors~~—~~, the Subchapter V Trustee, or any holder of an allowed claim against the Debtors shall have the right to challenge any improper default notice by filing an objection to same with the Bankruptcy Court prior to the expiration of the Cure Deadline.

(~~5~~6) ~~Plan Funder~~HLFIP Carveout

~~The Plan Funder~~HLFIP shall carveout from the ~~Plan Funder~~ License Fees actually paid to ~~the Plan Funder~~HLFIP by the Reorganized Debtors an amount not to exceed the aggregate of $10,000,000 to be used by the Reorganized Debtors as follows:

(i) all sums necessary for the Reorganized Debtors to fund all allowed administrative claims asserted against the Debtors prior to the Effective Date to be paid at $100,000 per month commencing on the 91st day after the Effective Day and terminating on the fifth anniversary of the Effective Day;

(ii) all sums necessary for the Reorganized Debtors to fund the treatment proposed by the Debtors for Class ~~3 nd Class~~ 4 Claimants in an aggregate sum not to exceed the sum of $10,000,000 minus any funding to satisfy allowed administrative expense claims to be paid at $300,000 per quarter commencing on the 91st day after the Effective Day and terminating on fifth anniversary of the Effective Day.

~~For the  voidance of        in the event Class 3        the Debtors' the Debtors  hall deduct  ny payment    ade t  holders  f Class 3 Claims f      the $ the Debtors propose t  pay  ll holders  f  llowed general  nsecured  laims        the Debtors' estates.~~

**E.    Plan Length and Funding**

The Plan will be primarily funded through the ~~Plan Funder~~HLFIP Carveout over a period not to exceed five years detailed herein and from the following assets contributed to the Debtors by various non-debtors:

(i) Assets titled in Jonathan Logan's individual capacity. Jonathan Logan shall contribute the net proceeds realized from the sale of the following property: (1) Rolls Royce, (2) Ferrari, (3)

Condominium located in Miami, Florida (465 Brickell Ave, Unit 4101, Miami, Florida 33131), and (4) a Nor-tech fishing boat. ~~In from ll laims M Logan i                              arious  on-debtor parties i  the State Court L~~ Finally, Mr. Logan will release the Debtors' estates from all claims Mr. Logan can assert against the Debtors (including Claim No. 12-1 in the amount of $2,990,462.22), contribute his entire equity in the Debtors to facilitate the funding of the Plan, and will provide a limited guaranty of up to $500,000 of obligations the Reorganized Debtors are committed to funding to non-insider holders of allowed general unsecured claims.

(ii) Smart Communications Yacht Holdings, LLC Assets.  Smart Communications Yacht Holdings, LLC is a title owner to a marine vessel, specifically a 2020 Riva Cosoro currently docked at Epic Marina, 270 Biscayne Blvd., Miami, FL 33131 (the "**Vessel**").  Smart Communications Yacht Holdings, LLC shall sell the Vessel on or before the second anniversary of the Effective Date and contribute the net proceeds realized from the sale of the Vessel after payoff of all liens and closing costs to fund the Plan.

(iii) Loco Florida LLC is the Debtors' landlord on a certain office building located at 10491 72nd Street, Seminole, FL 33777.  Loco Florida, LLC shall waive its existing cure claim for all accrued past-due rent accruing prior to the Effective Date: (1) in the ~~estimated  mount  f                      $          nd~~ pre-petition amount of $916,500.00 (as reflected in Claim No. 13-1); and (2) $160,000 for post-petition rent.  Moreover, Loco Florida, LLC shall charge the Reorganized Debtors a reduced fixed monthly rent payment for the duration of the Plan in the amount of $40,000 per month pursuant to a five-year written commercial lease to be executed by the Reorganized Debtors and Loco Florida, LLC incorporating these materials terms.

The Plan, and the Debtors' financial projections, collectively provide that unsecured creditors shall be fully satisfied on account of their projected allowed claims or will receive an amount that substantially exceeds the Debtors' projected disposable income, as defined by section 1191(d) of the Code, in the 5-year period of the Plan.  Specifically, the Debtors project that the Plan Funder Carveout will be sufficient to fund an aggregate $10,000,000 to holders of allowed unsecured claims.   The Reorganized Debtors shall distribute the payments to holders of allowed unsecured claims by making $500,000 payments on a quarterly basis commencing ninety days subsequent to the Effective Date and terminating on the earlier of: (i) satisfaction of all allowed claims; or (ii) fifth anniversary after the Effective Date.

**F.      Corporate Structure of the Reorganized Debtors**

Debtor Smart Communications Holdings, Inc. shall vest all of its assets into Reorganized Debtor Smart Communications Holdings, Inc. which shall be organized as a Florida corporation Debtor Smart Communications Holdings, LLC shall vest all of its assets into Reorganized Debtor Smart Communications Holdings, LLC which shall be organized as a Delaware limited liability company with Reorganized Debtor Smart Communications Holdings, Inc. as its sole member and Jonathan Logan as its manager.  **For the duration of the Plan, both of the Reorganized Debtors shall have an independent director that shall be tasked with analyzing, reviewing, and approving or denying any proposed transactions between the Reorganized Debtors and any Affiliate as such term is defined by 11 U.S.C. Section 101.**

**G.      ~~F.~~ Treatment of Claims and Equity Interests**

  1.      <u>Summary</u>.

This Plan provides for:      _1_ class of secured claims
                                          _~~0~~1_ classes of priority claims

                                          _3_ classes of non-priority unsecured claims
                                          _1_ class of equity security holders

  2.      <u>Secured Claims</u>.

Allowed Secured Claims are claims secured by property of the Debtors' bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code.  If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim.

With respect to the Allowed Secured Claims, the Plan provides that:

[ _X_ ] the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtors or transferred to another entity, to the extent of the allowed amount of such claims; and that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estate's interest in such property;

| Secured Claim | Class | Allowed Amount | Proposed Treatment of Allowed Claims | Voting Rights | Projected Plan Recovery |
|---|---|---|---|---|---|
| None known | 1 | 0 | Retain lien and paid pursuant to contractual terms. | Unimpaired/Not entitled to Vote. | 100% |

3.    <u>Priority Claims</u>.  ~~There~~ The Reorganized Debtors shall pay holders of ~~any~~allowed priority claims their allowed claims ~~entitled t p         nder ection    f the Code          dministrative  xpense  laims  nder  ection 5          nd p~~ ~~*pari passu*~~ from the $100,000 monthly HLFIP Carve-out until the allowed priority claims are paid in full.  The Debtors project that the allowed priority claims shall be between $3,000,000 and $4,000,000.

4.    <u>Unsecured Claims</u>.  General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.  The following chart identifies the Plan's proposed treatment of the general unsecured claims against the Debtors.  All holders of general unsecured claims allowed under § 502 of the Code shall receive their *pro rata* share of the distributions from the Debtor, as guaranteed by the Plan Funder.

| Unsecured Claim | Class | Allowed Amount | Proposed Treatment of Allowed Claims | Voting Rights | Projected Plan Recovery |
|---|---|---|---|---|---|
| HLFIP | 2 | Estimated amount: $67,000,000 | ~~The Plan Funder~~HLFIP shall receive ~~100~~51% of the equity in the Reorganized Debtors in full satisfaction of any allowed claims ~~the Plan Funder~~HLFIP can assert against the Debtors that accrue prior to the Effective Date of the Plan. | Impaired/Entitled to Vote. | 0% |

| Unsecured Claim | Class | Allowed Amount | Proposed Treatment of Allowed Claims | Voting Rights | Projected Plan Recovery |
|---|---|---|---|---|---|
| ~~All non-debtor~~ ~~State Court~~ Janice Logan in her individual capacity and as Trustee of the Trust. Class 3 shall exclude all Plan Funders and exclude any claims asserted by the Trust that are not based upon the Trust's equity in | 3 | Estimated amount: $0 | Class 3 Claimants ~~the Plan~~ shall receive ~~either at their  lection:~~ 49% of the equity in the Reorganized Debtors and the Debtors' right, title, and interest in the real property currently possessed and occupied by Janice Logan~~:~~ ~~20  q          installments          the 91ˢᵗ day          t the Effective Date    $4,000,000  paid          the 91st day          t the Effective Date  nd t          the 5th          f the~~ | Impaired/Entitled to Vote. | 100% |

| | |
|---|---|
| either of the Debtors. | ~~Effective Date, Class 3 Claimants hall release ll f the Released Parties identified i the Plan of ll laims that Class 3 Claimants ould h asserted ny f the Released Parties prior t the Plan's Effective Date. Class 3 shall eceive ny f the Plan Funder Carve-out that remains fter the atisfaction of ll llowed dministrative claims, Class 1 Claims, nd Class 4 laims t b funded follow the initial payment hall b funded Effective D ll funded i q installments the 91st day fter the econd f the Effective date nd t the fifth f the Effective Date.~~ <u>in full satisfaction of any Allowed Class 3 Claim</u> |

| Unsecured Claims | Class | Allowed Amount | Proposed Plan Treatment | Voting Rights | Projected Plan Recovery |
|---|---|---|---|---|---|
| All other holders of General Unsecured Claims | 4 | Estimated amount: $~~2,000,000~~ <u>1,500,000</u>. | Class 4 Claimants accepting the Plan shall receive <u>–at</u> their election: (a) the lesser of: (i) 100% of their Allowed Class 4 Claim; and (ii) $50,000, funded by the Reorganized Debtors on or before <u>the</u> 105th day subsequent to the Effective Date; or (b) their pro rata share of the ~~Plan Funder~~<u>HLFIP</u> Carve-out paid over 20 quarterly installments by the Reorganized Debtors commencing on the 91st day subsequent to the Effective Date and terminating on the fifth anniversary of the Effective Date. | Impaired/Entitled to Vote. | 100% |

5.    Equity interest holder.  The equity interest of the Equity Holders will be cancelled and all assets of the Debtors will vest with the Reorganized Debtors.  Equity in the amount of ~~100~~51% of the Reorganized ~~Debtors~~Debtor Smart Communications Holding, Inc. will be issued to HLFIP pursuant to the License Restructuring Agreement ~~– the Plan Funder~~.  The remaining equity of Reorganized Debtor Smart Communications Holding, Inc.  in the amount of 49% shall be issued to the Trust in full satisfaction of all Allowed Class 3 Claims and all Allowed Interests against the Debtors.  Reorganized Debtor Smart Communications Holding, Inc.  shall be the sole member of Reorganized Debtor Smart Communications Holding, LLC.  The Reorganized Debtors shall be expressly prohibited from making any dividend distributions to holders of equity until all payments owed to holders of ~~————————~~priority claims and holders of allowed claims in Classes 1~~—~~ and 4 are completed.

| Class | Description | Proposed Plan Treatment | Voting Rights | Projected Plan Recovery |
|-------|-------------|-------------------------|---------------|-------------------------|
| 5 | Equity interest holder. | The equity interest of the current equity interest holder will be cancelled and re-issued to HLFIP and the Trust as detailed herein. | Deemed to reject | $0 |

6.    Unclassified claims.  Under section 1123(a)(1), administrative expense claims and priority tax claims are not in classes.

a.    Administrative expense claims.  Each holder of an administrative expense claim allowed under section 503 of the Code will be paid in full on the Effective Date of this Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor, or as provided in the Plan.

Below are the anticipated administrative expense claims and their treatment:

| Claim | Allowed Amount | Proposed Treatment of Allowed Claims |
|-------|----------------|--------------------------------------|
| Subchapter V Trustee Fees | $100,000 estimated | Cash equal to the allowed amount of such claim on the Effective Date of the Plan or as consented to by the holder of the Administrative Claim. |
| Stichter Riedel and Akerman LLP – Debtors' attorneys' fees and costs | $~~2,100,000~~1,700,000 estimated | Cash equal to the allowed amount of such claim on the Effective Date of the Plan or as consented to by the holder of the Administrative Claim. |
| Accountants | $300,000 | Cash equal to the allowed amount of such claim on the Effective Date of the Plan or as consented to by the holder of the Administrative Claim |

b.    <u>Priority tax claims</u>.  Each holder of a priority tax claim will be paid:

(     ) regular installment payments in cash either

( ~~X~~ ) of a total value, as of the effective date of the Plan, equal to the allowed amount of such claim, or

(   <u>X</u>   ) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303,

and in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan (other than cash payments made to a class of creditors under section 1122(b)).

## <u>H.</u>    ~~G.~~Allowance and Disallowance of Claims

1.    <u>Disputed claim</u>.  A disputed claim is a claim that has not been allowed or disallowed by a final non-appealable order, and as to which either:

(i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or

(ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

2.    <u>Delay of distribution on a disputed claim</u>.  No distribution will be made on account of a disputed claim unless such claim is allowed by a final non-appealable order.

3.    <u>Settlement of disputed claims</u>.  The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

4.    <u>Subordination of Class 3 Claims.</u> The disputed Class 3 Claim arises, by operation of law, from Florida's "Election to Purchase" statute, § 607.1436(8), Fla. Stat. As such, it is appropriate to classify the Class 3 Claim as a particular kind of general unsecured creditor, rather than a holder of equity. In *Universal Towers Investimentos E Participacoes, LTDA v. Constrazza International, Inc. (In re Universal Towers Construction, Inc.)*, for example, the Plan relegated the claims of a former shareholder – whose shares were to be repurchased under the statute – to Class 3B, after payment of all other general unsecured creditors in Class 3A, and the Court held that it "does not implicate Chapter 11's recognized policy of equitable distribution among and satisfaction of the Debtor's creditors. And because the Plan pays all the Debtor's other creditors before paying [the former shareholder], the specific risk mitigated by § 510(b) – that a shareholder will try to obtain a distribution with higher priority as a creditor, to the creditors' disadvantage – is not present here." 641 B.R. 691, 704-5 (M.D. Fla. 2022). As for treatment of the Class 3 Claim, Florida's "Election to Purchase" statute provides that the amount paid to the former shareholder cannot render the corporation insolvent,[24] and the case law confirms that such

---

[24] Specifically: "[a]ny payment by the corporation pursuant to an order… is subject to the provisions of s. 607.06401." § 607.1436(8), Fla. Stat. And § 607.06401 provides that a repurchase cannot be made if, after giving it effect: "(a) The corporation

payments can be made over time where the finances of the corporation so require. *See Cox Enterprises, Inc. v. News-Journal Corp.*, 794 F.3d 1259 (11th Cir. 2015). Given the alignment of the statute and "feasibility" requirements of the Bankruptcy Code – *i.e.* that the reorganized debtor should not be rendered insolvent through Confirmation of its Plan – the Debtor's proposal to satisfy the Class 3 Claim by ~~pay      ll          p        d          i      t  the Class 3 Creditor i  the          iable~~ conveying Debtors' interests in the certain real property in the current possession of Janice Logan and providing 49% of the equity in the Reorganized Debtor Smart Comm satisfies the mandates of both *Universal Towers and Cox Enterprises*.

## I.    ~~H.~~ Executory Contracts and Unexpired Leases

Within 14 days of the Confirmation Hearing, Debtors will file a list of executory contracts and unexpired leases that the Debtors will reject.  Any executory contract of unexpired lease that is not formally rejected by the Debtors shall be assumed.  Assumption means that the Debtors have elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any.  Any counterparty or lessee that has a scheduled or filed claim that Debtors propose to cure shall not be treated in their respective class but shall receive cure payments as specified under a further supplement to the Plan.

Except for executory contracts that have been assumed before the Effective Date or under this section of the Plan, or that are the subject of a pending motion to assume, or that the Debtors have expressly rejected prior to the Effective Date, the Debtors will be conclusively deemed to have assumed all executory contracts and unexpired leases as of the Effective Date.

If you object to the assumption, and if applicable the assignment, of your unexpired lease or executory contract under the Plan, the proposed cure of any defaults, the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.  If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.  The deadline for filing a Proof of Claim based on a claim arising from the rejection of a lease or contract is 30 days after the date of the order confirming this Plan, or within 30 days of the rejection of the contract or lease, whichever is earlier.  Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

---

607.1436(8), Fla. Stat. And § 607.06401 provides that a repurchase cannot be made if, after giving it effect: "(a) The corporation would not be able to pay its debts as they become due in the usual course of the corporation's activities and affairs; or (b)   The corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved and wound up at the time of the distribution, to satisfy the preferential rights upon dissolution and winding up of shareholders whose preferential rights are superior to those receiving the distribution." § 607.06401(3), Fla. Stat.

**J.**    ~~I.~~Post-Confirmation Management and Employment/Retention of Insiders

The Reorganized Debtors' post-confirmation management will include Jonathan Logan and below is his proposed compensation for services provided to the Reorganized Debtors as Chief Executive Officer.

| Individual | Role/Compensation |
|---|---|
| Jonathan Logan | Chief Executive Officer and Director / $1,200,000 per year |
| To be Appointed | Independent Director for Affiliated Transactions/$12,000 per year. |

The appointment to, or continuance in, such office of Mr. Logan, is consistent with the interests of creditors and equity security holders and with public policy. In particular, the retention of Mr. Logan is key to the Reorganized Debtors maintaining their business relationships, because he has customer and vendor relationships and operational knowledge, which is vital to the success of the Reorganized Debtors. The Reorganized Debtors could not —— sustain their projected operations without Mr. Logan. Attached to the Plan as **Exhibit "E"** is Mr. Logan's curriculum vita and a market study conducted by the Debtors evidencing the market rate for CEO compensation for similarly situated businesses. For the duration of the Plan, any post-Effective Date transactions by and between the Reorganized Debtors and any of the Reorganized Debtors' insiders or affiliates (an "**Affiliate Transaction**") shall be separately examined and approved in writing by both the Subchapter V Trustee, an independent director to be appointed by Mr. Logan for the Reorganized Debtors prior to the Effective Date solely to review, advise, and ultimately approve or deny any Affiliate Transaction (the "**Independent Approval**"). In the event ~~the            V Trustee does not approve of~~ an Affiliate Transaction does not obtain Independent Approval, , the Reorganized Debtors shall be authorized to seek Bankruptcy Court approval of an Affiliate Transaction pursuant to the requirements of 11 U.S.C. Section 363(b) and any applicable Florida law by filing a motion with the Bankruptcy Court and providing all interested parties at least twenty-one days' notice of any hearing to approve the Affiliate Transaction.

**K.**    ~~J.~~Distributions Under the Plan

1.    All distributions under the Plan shall be made by the Reorganized Debtors, whether the Plan is confirmed pursuant to Section 1191(a) or (b) of the Bankruptcy Code. The Reorganized Debtors shall file with the Court as a supplement to the Plan and provide notice to all creditors at or before confirmation, a list of all the creditors who will be receiving payments under the Plan, the total amount to be paid to each creditor under the Plan (inclusive of all allowed interest and fees) and the payment terms and schedule for each creditor under the Plan. The following additional provision shall govern distributions under the Plan:

a.    All payments under the Plan will be made by the Reorganized Debtors to the holder of each allowed claim at the address of such holder as listed on the Schedules, or if different, the Proof of Claim, unless the Reorganized Debtors have been notified in writing of a change of address.

b.      Any payment required to be made under the Plan on a day other than a business day shall be made on the next succeeding business day.

c.      De minimis Distributions less than five hundred dollars ($500.00) shall not be made, and shall become unclaimed funds, which shall vest in the Reorganized Debtors.

d.      Claimants shall not be permitted to amend or otherwise modify any claim after the later of the claims bar date or the confirmation date without leave of the Bankruptcy Court.  Any amendment to a claim filed after the confirmation date shall be deemed disallowed in full and expunged without any action by Debtors unless the claimholder has obtained prior Court authorization for the filing of such amendment. The Debtors shall have no obligation to recognize any transfer of any claim after distributions have started.

e.      Unless expressly provided in the Plan, or confirmation order, post-petition interest and fees shall not accrue on or after the Petition Date on account of any claim.

f.      Unclaimed distributions shall be administered pursuant to section 347 of the Bankruptcy Code. Should the holder of an allowed claim fail to negotiate a payment from the Reorganized Debtors within 90 days of the date the check was issued, the Reorganized Debtors shall provide the holder with written notice of the requirement that the holder of an allowed claim must negotiate the payment within 180 days of the date the check was issued. Should the holder thereafter fail to negotiate the payment within 180 days, then upon the expiration of the deadline set forth in section 1143, the Reorganized Debtors may exercise their remedies under section 347(b) of the Bankruptcy Code.

**L.**      **K.** **Subchapter V Trustee**

1.      _Service of Trustee_.  The service of the trustee appointed under Subchapter V of Chapter 11 (the "**Subchapter V Trustee**") shall terminate in accordance with section 1183(c) of Title 11.  In a consensual case, such service shall terminate when the Plan has been substantially consummated.  In a nonconsensual case, the Subchapter V Trustee shall continue to monitor the Reorganized Debtors' compliance with the Plan.  If the Reorganized Debtors fail to timely make any plan payment to creditors, the Subchapter V Trustee may file and serve a notice of delinquency upon the Reorganized Debtors and the Reorganized Debtors' attorney.  The Reorganized Debtors shall have 45 days from the date of the notice of delinquency to make all payments due under the Plan, including any payments that become due within the 45-day period. If the Reorganized Debtors are seeking to cure the delinquency in a modified plan, the Reorganized Debtors must file a motion to modify the confirmed plan within 45 days of the notice of delinquency.  If the Reorganized Debtors are not current with plan payments on the 45th day after the date of the notice of delinquency or has not filed a motion to modify within that time period, the Trustee may file and serve a report of non-compliance and may thereafter seek the dismissal or conversion of the cases to Chapter 7.

2.      Compensation.  Under section 330 of the Bankruptcy Code, the Subchapter V Trustee shall be compensated for services and reimbursed for expenses.  However, the method of payment of the Subchapter V Trustee compensation depends on the provision under which the Plan is confirmed and the method of disbursement to creditors under the Plan:

a.      The Subchapter V Trustee's total compensation is estimated to be $100,000 through confirmation.  The Subchapter V Trustee will apply to the Court for an award of compensation through the application process that is used by professionals. The Subchapter V Trustee will file a final fee application for compensation to be heard with the other final fee applications in the case.

b.      If the Plan is confirmed on a consensual basis under section 1191(a) of Title 11, the service of the Subchapter V Trustee terminates with substantial consummation of the Plan under section 1183(c)(1). The Subchapter V Trustee's allowed compensation, as with other administrative expenses, is payable on the Effective Date of the Plan, unless the Subchapter V Trustee agrees to different treatment.

c.      If the Plan is confirmed on a non-consensual basis under section 1191(b) of Title 11, then the Subchapter V Trustee will remain in place throughout the life of the Plan, and the Subchapter V Trustee may be entitled to additional compensation for services provided after confirmation.  The fee for the Subchapter V Trustee to monitor the plan payments made by the Reorganized Debtors shall remain calculated based upon 11 USC Sections 326 and 330 and the Reorganized Debtors shall fund the Subchapter V Trustee supplemental retainers in the amount of  $1000 on a semi-annual basis.  As such, the Subchapter V Trustee may file additional or supplemental fee applications throughout the life of the Plan.  Upon approval of the Subchapter V Trustee's fee applications in a non-consensual case, as long as all professional administrative claims are similarly treated in the Plan, the Debtors shall pay all fee amounts due to the Subchapter V Trustee on the Effective Date of the Plan, over the remaining life of the Plan, or forthwith.

## M.      ~~L.~~ Additional Provisions

1.      Definitions and rules of construction.  The definition and rules of construction set forth in sections 101 and 102 of the Code shall apply when terms are defined or construed in the Code are used in this Plan.

2.      Effective Date.  The Effective Date of this Plan is the first business day following the date that is 14 days after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on that date, the Effective Date will be the first business day after the date on which the stay expires or is otherwise terminated.

3.      Severability.  If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

4.    Binding effect. The rights and obligations of any entity named or referred to in this Plan will be binding upon them, and will inure to the benefit of the successors or assigns of such entity.

5.    Captions.  The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

6.    Corporate Governance. The issuance of non-voting securities will be prohibited in the charter of Reorganized Debtors to the extent required to comply with §1123(a)(6) of the Code.

7.    Default Remedies. If the Debtors do not make the payments provided for under the Plan as and when due, the Debtors will be in default under the Plan ("**Default**").  After the occurrence of a Default, any creditor may send written notice to the Debtors, with a copy to Debtors' attorney and the Subchapter V Trustee, that the Debtors are in Default under the Plan ("**Default Notice**").  For payments to general unsecured creditors, the Debtors will be entitled to a 45-day grace period after the transmission of the Default Notice ("**Grace Period**") to cure the default.  If the Debtors have not cured the Default within the Grace Period, the creditor is entitled to commence a lawsuit to liquidate its claim in the Circuit Court of Hillsborough County, Florida.  For payments to secured creditors, secured creditors will be entitled to exercise any and all in rem rights against their collateral except that Debtors shall be entitled to a 15-day grace period after transmission of the Default Notice.  This provision survives the confirmation of the Plan, and creditors are entitled to enforce this provision post-confirmation.  The bankruptcy court with jurisdiction over this Plan retains jurisdiction to enforce this provision of the Plan.

8.    Vesting of Assets.  Pursuant to section 1141(c), as of the Effective Date, all property of the Debtors' estate will vest in the Reorganized Debtors, free and clear of any and all liens, debts, obligations, claims, liabilities, and all other interests of every kind and nature, except for the Plan Obligations and as otherwise provided under the Plan.

9.    Discharge.

a.    Consensual Plan.  If the Debtors' Plan is confirmed under section 1191(a), then pursuant to section 1141(d) of the Bankruptcy Code, the distributions, rights, and treatment that are provided in the Plan shall, effective as of the Effective Date, be in complete satisfaction, discharge, and release of claims, interests, and causes of action against Debtors of any nature whatsoever, including any interest accrued on claims from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and interests in, the Debtors' or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such claims and interests, including demands, liabilities, and causes of action that arose before the Effective Date, and any liability to the extent such claims or causes of action accrued before Effective Date.  On the confirmation date of this Plan, the Debtors as they exist post-Effective Date (the "Reorganized Debtor") will be discharged from any debt that arose before confirmation of this Plan, subject to the occurrence of the Effective Date, to the extent specified in section 1141(d)(1)(A) of the Code, except that the Debtors will not be discharged of any

debt: (i) imposed by this Plan; (ii) of a kind specified in section 1141(d)(6)(A) if a timely complaint was filed in accordance with Rule 4007(c) of the Federal Rules of Bankruptcy Procedure; or (iii) of a kind specified in section 1141(d)(6)(B).

b.    Non-Consensual Plan. If the Plan is confirmed under section 1191(b) of this title, confirmation of the Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due within the first 5 years of this Plan, or as otherwise provided in § 1192 of the Code.

10.    **Releases.**    **On the Effective Date of this Plan, without the need for execution or delivery of any additional documentation or orders of the Bankruptcy Court, and in exchange for valuable consideration of and under this Plan, HLFIP Holding, LLC, Jonathan Logan, Smart Communications Yacht Holdings, LLC, Loco Florida LLC, the James Logan Family Trust, dated February 10, 2021, Janice Logan, and any of their agents, representatives, professionals, attorneys, employees, officers, directors, managers, members, or equity holders (collectively, the "Released Parties") will be fully and finally released and forever discharged from any and all claims, actions, causes of action, liabilities, obligations, rights, suits, accounts, covenants, contracts, controversies, agreements, promises, damages, judgments, debts, encumbrances, liens, remedies, and demands, of every kind and nature whatsoever, in law or in equity, that the Debtors have asserted or could assert against any of the Released Parties prior to the Effective Date (collectively, "Released Claims").    The Released Claims shall expressly exclude any obligations by the Released Parties pursuant to the Plan.    The~~For the avoidance of doubt, the~~ Released ~~Parties~~Claims shall expressly ~~exclude Janice Logan, Alexis Logan,   nd the James Logan F      T     dated F     1 2     J     Logan, the J     Logan     and Justin Peterson.~~release any claims by the Debtors related to an interest in intellectual property legally titled in the name of HLFIP prior to the Effective Date of the Plan.**

11.    **Exculpation.    Except as specifically provided in the Plan, neither the Debtors, nor their employees, representatives, members advisors, attorneys, accountants, financial advisors, or agents, or any of such parties' successors or assigns, shall have or incur, and are hereby released from, any claim, obligation, cause of action or liability to one another or to any holder of a claim or interest, or any other party in interest, or any of their respective officers, directors, shareholders, members, employees, representatives, advisors, attorneys, accountants, financial advisors, agents, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the negotiation and pursuit of confirmation of this Plan, the consummation of this Plan, or the administration of this Plan, or the property to be distributed under the Plan, except for their gross negligence, willful misconduct, or actual fraud, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities (if any) under this Plan.**

12.    **Discharge Injunction.    Except as otherwise specifically provided in the Plan or the Confirmation Order, all entities and persons, and any successor, assigns or representatives of such entities and persons, who have held, hold, or may hold claims, rights, causes of action, liabilities, equity interests, or any other interests based on any act**

**or omission, transaction, or other activity of any kind or nature related to the Debtors, Debtors in Possession, or the Chapter 11 Cases that occurred prior to the Effective Date ("Enjoined Claim"), regardless of the filing, lack of filing, allowance or disallowance of such claim or interest, and regardless of whether such entity or person has voted to accept the Plan, shall be precluded and permanently enjoined on and after the Effective Date from:**

**(a) the commencement or continuation in any manner of any claim, action or other proceeding of any kind with respect to any Enjoined Claim, against (i) any assets of the Debtors, (ii) any assets re-vested in the Reorganized Debtors, (iii) the Debtors or Reorganized Debtors;**

**(b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree or order with respect to any Enjoined Claim, against (i) any assets of the Debtors, (ii) any assets re-vested in the Reorganized Debtors, (iii) the Debtor or Reorganized Debtors;**

**(c) the creation, perfection, or enforcement of any encumbrance or lien of any kind with respect to any Enjoined Claim, against (i) any assets of the Debtors, (ii) any assets re-vested in the Reorganized Debtors, (iii) the Debtors or Reorganized Debtors; and**

13.    <u>Request for "Cram Down" of Non-Accepting Classes</u>.  The Debtors request that the Court confirm the Plan notwithstanding the failure of classes to vote to accept the Plan. Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in a manner prescribed by section  1191 of the Code.  A Plan that binds nonaccepting classes is commonly referred to as a "cram down" Plan.  The Code allows the Plan to bind non-accepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the requirements of sections 1129(a)(8), 1129 (a)(10), or 1129 (a)(15) of the Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan under the standard of section 1191(c) of the Code. **Creditors and Equity Interest Holders concerned with how the cram down provisions will affect your claim or equity interest should seek independent counsel, as the variations on this general rule are numerous and complex.**  The Debtors are not required to file a motion or other pleading to seek and obtain cram down of a Plan. As a result, the Debtors will seek the Court's confirmation of this Plan in accordance with the cram down provisions of the Bankruptcy Code by *ore tenus* motion at the date and time of the confirmation hearing without further notice to creditors or other parties in interest.

14.    <u>Retention of Jurisdiction</u>.    Until the case is closed, the Court shall retain jurisdiction to insure that the purpose and intent of the Plan are carried out.  The Court shall retain jurisdiction to hear and determine the following:

a.    the classification of the claim of any creditor and the re-examination of claims which have been allowed for purposes of voting and the determination of such objections as may be filed against creditor's claims;

b.      the determination of all questions and disputes regarding title to the assets of the estate and the determination of all causes of action, controversies, disputes or conflicts whether or not subject to action pending as of the date of confirmation between the Debtors and any other party included but not limited to any rights of parties in interest to recover assets pursuant to the provisions of Title 11 of the United States Code;

c.      the correction of any defect, the curing of any omission or the reconciliation of any inconsistency in the Plan or the Order of Confirmation as may be necessary to carry out the purposes and intent of the Plan;

d.      the modification of this Plan after confirmation pursuant to the Bankruptcy Rules and Title 11 of the United States Code;

e.      the enforcement and interpretation of the terms and conditions of this Plan, including but not limited to questions relating to the scope of the releases and the enforcement of the releases, and the entry of an Order necessary to interpret and enforce the releases;

f.      the entry of an Order including injunctions necessary to enforce the title rights and powers of parties in interest and to impose such limitations, restrictions, terms and conditions of such title rights and powers as this Court may deem necessary; and

g.      the entry of an order concluding and terminating this case.

Respectfully submitted and executed on ~~18~~March__, 2025,

**SMART COMMUNICATIONS HOLDING, INC.**


By:_____


 **SMART COMMUNICATIONS HOLDING, LLC.,**


By:_____


**HLFIP HOLDING, LLC**


By:_____


**SMART COMMUNICATIONS YACHT HOLDINGS, LLC**

By:_____


**LOCO FLORIDA, LLC**


By:_____


_____
**JONATHAN LOGAN**