ORDERED.

**Dated:  March 06, 2025**

_Roberta A. Colton_
Roberta A. Colton
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:
SMART COMMUNICATIONS                        Chapter 11, Subchapter V
HOLDING, INC.,                              Case No. 8:24-bk-07106-RCT

and

SMART COMMUNICATIONS
HOLDING, LLC.,                              Jointly Administered with
                                           Case No. 8:24-bk-07108-RCT

        Debtors.
_____/

## ORDER DISMISSING JOINTLY ADMINISTERED CASES WITHOUT PREJUDICE

These jointly administrated cases were considered at a hearing on February 26, 2025, on the Court's Order to Show Cause Why These Jointly Administered Cases Should Not be Dismissed.  (Doc. 191).  Three responses were filed (Docs. 208, 209, 216), and the Court heard argument from all parties that wanted to be heard at the hearing and considered the documents proffered by Debtors.  For the reasons stated on the record at the hearing, and those set forth below, the Court finds that these jointly administered cases should be dismissed, without prejudice.

Debtors Smart Communications Holding, Inc. ("Smart-INC") and Smart Communications Holding, LLC ("Smart-LLC") are effectively owned 50% by Jon Logan and 50% by his mother

Janice Logan, as Trustee of the James Logan Family Trust ("Janice Logan").[1]   Since 2023, Jon and Janice Logan have been involved in protracted litigation in the Circuit Court of Sarasota.[2]   Although Janice Logan attempted to become a director of Smart-INC on her husband's death, Jon Logan apparently denied the request. As a result, Jon Logan acts as the sole director of Smart-INC and by extension, he controls Smart-LLC.

In the State Court litigation, Jon Logan seeks to have Smart-INC pay Janice Logan for her stock, so that he can control 100% of both Debtors.  This process is brought under Florida Statute § 607.1430(1)(b) and § 607.1436 and involves a valuation of the companies to determine the amount of the payout due to Janice Logan for her shares.  In his effort to reduce the value of Debtors, and in turn the amount payable to Janice Logan, Jon Logan argues that Debtors (presumably Smart-INC but maybe Smart-LLC) owe HLFIP Holding, LLC ("HLFIP") more than $67 million.   HLFIP is wholly owned by Jon Logan.

Preliminary rulings were not going well for Jon Logan in State Court, so he filed these bankruptcy cases, which stayed the litigation.  Because the overwhelming debt is allegedly owed to "insiders," Debtors elected to file under Subchapter V of the Bankruptcy Code, which is a speedy process designed for small businesses with debt less than $3,024,725.

After the bankruptcy cases were filed, Jon Logan filed a claim against Smart-INC for approximately $67 million on behalf of HLFIP.[3]  No written agreement is attached to the proof of claim other than what appears to be two emails from Jon Logan to himself.  Jon Logan then filed

---

[1] Smart-INC is the lead case, and it includes information on non-debtor subsidiaries in its operating reports. Smart-LLC does not purport to have any business operations. (Docs. 91, 199).  According to its bankruptcy schedules, Smart-LLC is the 100% owner of Smart Communications Collier, Inc., Smart Communications Pasco, Inc., and Smart Communications US, Inc. (Case No. 8:24-bk-7108-RCT, Doc. 16).  Smart-INC owns 100% of Smart-LLC. (Case No. 8:24-bk-7108-RCT, Doc. 3).

[2] *Logan v. Logan*, Case No. 2023 CA 001002 NC (12th Jud. Circuit, Sarasota County, FL).

[3] POC 2-2.

a contingent claim for himself against Smart-INC for $2,990,462.22 if he has to return the Rolls Royce, Ferrari, and 45' fishing boat he claims was compensation from Smart-INC.[4] And finally, Jon Logan filed a claim for $916,500 against Smart-INC on behalf of another company that he wholly owns, Loco Florida, Inc., for "rent."[5] No lease is attached to Loco Florida's proof of claim. The *only* proof of claim filed against Smart-LLC is by Janice Logan for $110 million for her ownership interest.[6]

Shortly after the bankruptcy cases were filed, Janice Logan moved to lift the stay to continue the proceedings in State Court.[7] Janice Logan also filed a motion to dismiss these cases on grounds that they amount to a two-party dispute between warring shareholders, and, if the $67 million insider claim of HLFIP is disregarded, Debtors are solvent.[8] This Court ultimately modified the automatic stay to permit the State Court to try and decide the issue of HLFIP's claim and to determine the appropriate date to value Debtors for purposes of buying Janice Logan's stock.[9] The trial on these specific issues took place in State Court on February 10-12, 2025.

Meanwhile, Jon Logan continued to operate Debtors in bankruptcy. Although operations were mostly smooth, Smart-INC reported a payment of approximately $60,000 for the maintenance of a boat that is not owned by either Debtor, but rather by a non-debtor entity, Smart Communications Yacht Holdings, LLC. The payment was made without approval of this Court.[10] Smart-INC also reported paying at least two prepetition unsecured creditors—Swank Motion

---

[4] POC 12-1.
[5] POC 13-1.
[6] Janice Logan also filed a proof of claim against Smart-INC for the same amount.
[7] Doc. 26.
[8] Doc. 45.
[9] Doc. 83.
[10] Doc. 95, p. 4. In fairness, the payments were likely made by Smart Communications Collier, Inc., a non-debtor operating subsidiary of Smart-LLC and authorization may or may not have been required, as discussed below.

Pictures ($292,729.91[11]) and a credit card with Truist Bank—without approval of this Court. As a result of these unauthorized payments, as well as authorized critical vendor payments, the remaining proofs of claim filed by unsecured creditors (who are not insiders or attorneys) are CDW ($36,572 for invoices[12]) and Correct Solutions ($1.15 million for unliquidated litigation costs and attorney's fees[13]). Debtors have no secured creditors.

Before Debtors even filed schedules of assets and liabilities, Debtors filed a Chapter 11 joint plan that essentially seeks to cancel Janice Logan's stock and issue all of Debtors' new stock to HLFIP.[14] In addition, the plan allows a $50,250,000 claim in favor of HLFIP and obligates Debtors to pay HLFIP 40% of gross revenues going forward. This Court scheduled a trial to consider confirmation of Debtors' plan for March 10, 2025.[15]

On February 17, 2025, the Sarasota Circuit Court issued an order on the matters heard pursuant to this Court's order lifting the stay. The State Court found as follows:

> The long-term liability recognized by Smart Communications Holdings, Inc. in favor of HLFIP Holding, LLC purporting to impose a historic 40% royalty and as described in Note I to the Smart Communications Holdings, Inc. Consolidated Audited Financial Statements (as of December 31, 2022) is invalid and of no legal force or effect. This includes both the accrual of that liability and the accrual of the associated interest expense.[16]

In response to the State Court's order, HLFIP did not withdraw or reduce its $67 million

---

[11] Docs. 92, 198.

[12] Smart-INC reported two checks to CDW on January 3, 2025, for $57,657.87 and $75.00, so it is possible that even this claim has been paid. (Doc. 198 at p. 8).

[13] Smart-INC's bankruptcy schedules are not much help. (Doc. 65). In addition to the proofs of claim, eight trade creditors are listed as having undisputed unsecured claims, but it is difficult to determine if they have received payments on account of their pre-petition claims. If any were paid, they were paid by the operating company, Smart Communications Collier, Inc., a non-debtor. The Court did approve payment of critical vendor ShenZhen Meridian Technology Co. Ltd.'s prepetition claim of $748,000. (Doc. 65, p. 19; Doc. 140).

[14] Doc. 46.

[15] Doc. 104.

[16] Doc. 175, p. 6.

proof of claim. And, to date, Smart-INC, with an obvious conflict of interest, has not objected to HLFIP's claim. Instead, Debtors amended the plan,[17] under which HLFIP would still receive 100% of Debtors' equity and a royalty of up to 35% of Debtors' gross revenues, "in a specific amount to be recommended by the Subchapter V Trustee on behalf of the Debtors' estates and accepted by HLFIP."[18]

At a hearing on February 20, 2025, at which all parties discussed the implications of the State Court ruling, this Court stated its intent to issue an Order to Show Cause why the cases should not be dismissed and offered all parties an opportunity to respond.[19] Debtors and HLFIP respond that the cases should not be dismissed; Janice Logan responds that the cases should be dismissed.[20]

After hearing all sides, this Court is of the view that the cases should be dismissed.

First, it is not seriously disputed that Debtors filed bankruptcy as a litigation tactic to avoid adverse rulings in State Court. This is not always evidence of bad faith, particularly if the litigation is with a creditor and one creditor is likely to advance ahead of other creditors. Here, however, Debtors filed bankruptcy as a litigation tactic to avoid State Court rulings implicating the relationship between two shareholders and insider transactions that clearly involve conflicts of interest.

Second, the obvious conflicts of interest that permeated Jon Logan's operation of Debtors prepetition, permeate in these Subchapter V cases. Smart-INC cannot be expected to fairly object to the claims of HLFIP, Jon Logan, or Loco Florida. Objecting to claims is also not the principal role of a Subchapter V trustee, whose primary goal is to facilitate a consensual reorganization and

---

[17] Doc. 183.
[18] Doc. 183, p. 4. The liquidation analysis presented with the amended plan references Smart Collier, but it does not reference any other entities that Debtors own. (Doc. 183, p. 33).
[19] Doc. 191.
[20] Docs. 208, 209, 216.

report to the Court. There are many things that a Subchapter V trustee can do to facilitate a small business reorganization, and the Court certainly may expand the powers of a Subchapter V trustee, even to the point of assuming control of business operations. But*, absent shareholder consent*, the use of a Subchapter V trustee to effectively serve as an independent director (to review and negotiate insider transactions), seems to conflict with state corporate law and with a Subchapter V trustee's duties to the Court and all parties to a Subchapter V case. But Debtors want even more— they want the Subchapter V Trustee for Smart-INC and Smart-LLC to effectively address a director/conflict arrangement for the use of the intellectual property by the operating non-debtor subsidiaries. Ironically, Debtors filed a persuasive paper outlining why the Subchapter V Trustee should not assume Debtors' operations.[21]

Third, Debtors seeks to use Subchapter V to effectively cram down a "settlement" of the shareholder litigation with Janice Logan. The amended plan is a somewhat better settlement proposal than the original plan, and the Court is not saying that the proposal is bad, just that it is unacceptable to Janice Logan and thus not really a settlement. This seems an improper use of Subchapter V where the State Court has already considered many of the contested issues and has already determined that the asserted (40%) arrangement with HLFIP is invalid. It makes sense for the State Court to continue its work and determine whether any arrangement is appropriate for purposes of determining Janice Logan's claim. Moreover, if Janice Logan's stock is purchased under Florida Statute § 607.1436, then the issues and the inherent conflicts may be moot.

As discussed at the Order to Show Cause hearing, if this was a regular Chapter 11 case, the Court could conceivably appoint an independent Chapter 11 trustee to operate Debtors.[22] Also,

---

[21] Doc. 186.

[22] *See, e.g., In re Sirius Systems, Inc.,* 112 B.R. 50 (Bankr. D.N.H. 1990) (warring shareholders agreed to the appointment of a Chapter 11 trustee).

in a regular Chapter 11 case, the appointment of a Chapter 11 trustee terminates a debtor's exclusive right to file a Chapter 11 plan.[23]  Creditors could evaluate alternative plans proposed by each of the 50% shareholders or even file their own plan.  A regular Chapter 11 case offers far more disclosure and a fairer process when two 50% owners disagree about the need for bankruptcy protection.  But Debtors made the tactical decision to file two small business Subchapter V cases, where Debtors will always have the exclusive right to file a plan of reorganization, and the Court is precluded from appointing a Chapter 11 trustee.[24]  Debtors also made the tactical decision not to file bankruptcy for the operating subsidiaries (mainly, Smart Communications Collier, Inc.).

The Court has expressed many times from the bench that, notwithstanding the fact that the Bankruptcy Code intends to leave state corporate laws largely untouched, consensual arrangements can be approved, and the Court encouraged the parties (Jon Logan and Janice Logan) to work together.  As explained by one court:

> This does not mean that a bankruptcy court should automatically abstain from approving *consensual* resolutions to governance disputes that avoid the time and expense of litigation or the need to appoint a chapter 11 trustee. Bankruptcy courts should not, however, take sides in corporate governance disputes. . . .[25]

No such consent or cooperation exists in these cases.  Indeed, the two 50% shareholders expressly disagree about the need for bankruptcy in the first instance, there are no secured creditors, and the few prepetition unsecured creditors have already been paid or are bit players in the main event between the shareholders.

As a last-ditch effort to establish that Debtors' Subchapter V cases are more than a shareholder dispute, Debtors filed a mountain of documents and now argue that there are

---

[23] 11 U.S.C. § 1121(c)(1).
[24] *See generally In re ComedyMX, LLC*, 647 B.R. 457 (Bankr. D. Del. 2022).
[25] *In re Ampal-American Israel Corp.*, 2013 WL 1400346, at *5 (Bankr. S.D.N.Y. April 5, 2013 ).

difficulties making payroll and paying outstanding payables during the bankruptcy case. Debtors'

documents, however, are unclear at best. This is because Debtors' complex corporate structure

operates through several non-debtor affiliates that pay or do not pay expenses, presumably at the

direction of Jon Logan. Significant non-debtors include Smart Communications Collier, Inc.

("Smart Collier"), Smart Communications Pasco, Inc., and Smart Communications US, Inc. As

explained by Debtors:

> As part of Smart Communications' corporate cash management
> system and overall corporate structure, Smart Collier is the account
> holder on the operating account, manages and pays payroll for the
> employees employed by Smart Collier and who provide services to
> the clients and customers, and it performs other functions as the
> operating entity….As their name implies, the Debtors act primarily
> as holding companies ([Smart-INC] is the parent company and sole
> member of [Smart-LLC], which in turn is the owner of the non-
> debtor subsidiaries). In addition to holding the interests in the
> operating subsidiaries, the Debtors, either directly or through the
> operating subsidiaries as a designee or assignee, are parties to
> various agreements with clients and customers. However, those
> services are generally provided directly by the operating
> subsidiaries, and primarily by Smart Collier.[26]

Although Debtors and its subsidiaries file consolidated tax returns, that does not collapse

the underlying separate corporate entities. Debtors' main operating entity, presumably Smart

Collier, is technically not in bankruptcy, arguably not subject to the automatic stay, and not subject

to this Court's jurisdiction, except with respect to reports required to value Smart-LLC's interest

in this subsidiary. Smart Collier also, presumably, is not itself in need of bankruptcy protection

since it did not file its own bankruptcy petition and does not seem to be a party to the State Court

ligation.

Debtors' cash management system and corporate structure is not unusual for complex

businesses or necessarily improper. It just cautions that the payables data cannot be taken at face

---

[26] Doc. 17, ¶ 5-6.

value when the operating entities are not in bankruptcy. The Court has little confidence that the alleged claims in the documents submitted in response to the Order to Show Cause are direct claims against Debtors (both represented to the Court to be holding companies) or whether they are claims against non-debtor operating subsidiaries. Indeed, most of the documents filed by Debtors in response to the Order to Show Cause relate to Smart Collier, a non-debtor.

Debtors' Subchapter V cases were filed to stop the State Court shareholder litigation with Janice Logan and to impose a non-consensual settlement of the shareholder litigation. Janice Logan now has filed a claim against both Debtors for $110 million.[27]  At this time, the Court has no opinion about which shareholder should prevail in the shareholder dispute. But, because the amount of Janice Logan's claims has been pending in State Court for some time, and the State Court has already heard many days of testimony, issued numerous rulings, and has managed the massive litigation in phases, even if this Court were inclined to not dismiss these Subchapter V cases, this Court would likely permit the State Court to complete its work and liquidate Janice Logan's claims (and would probably not confirm any plan until that work was completed). In the meantime, any non-insider creditors are well protected under the Florida Statutes at issue in the State Court ligation.[28]

It is therefore **ORDERED**:

1. These jointly consolidated cases are dismissed, without prejudice.

---

[27] POC 11-1.

[28] Florida Statute § 607.1436(8) states that any payments by a corporation under this statute for a shareholder's stock are subject to Florida Statute § 607.060401(3) ("No distribution may be made if, after giving it effect: (a) The corporation would not be able to pay its debts as they become due in the usual course of the corporation's activities and affairs; or (b) The corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved and wound up at the time of the distribution, to satisfy the preferential rights upon dissolution and winding up of shareholders whose preferential rights are superior to those receiving the distribution."). *See generally Cox Enterprises, Inc. v. Pension Ben. Guar. Corp.*, 666 F.3d 697, 702 (11th Cir. 2012).

2.  The Court will reserve jurisdiction to consider any fee applications on file or filed within 30 days after the entry of this order.

3.  The Subchapter V Trustee is directed to submit any reports necessary to wind up the case, after which she shall be discharged from further duties in this case.

Clerk's Office to serve.