UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11, Subchapter V |
| SMART COMMUNICATIONS HOLDING, INC., | |
| and | Case No. 8:24-bk-7106-RCT |
| SMART COMMUNICATIONS HOLDING, LLC., | Case No. 8:24-bk-7108-RCT |
| | *Jointly Administered under* |
| Debtors. | *Case No. 8:24-bk-7106-RCT* |

## RESPONSE TO THE TRUST'S OBJECTION TO AKERMAN LLP's
## FIRST INTERIM AND FINAL APPLICATION FOR ALLOWANCE AND PAYMENT

Eyal Berger, Esq., Dustin Hillsley, Esq., and the law firm of Akerman LLP ("**Akerman**" or "**Applicant**"), as special litigation and transactional counsel to Smart Communications Holdings, Inc. ("**SmartComm FL**") and Smart Communications Holding, LLC ("**SmartComm DE**" and, collectively, the "**Debtors**") respond to the Objection to Akerman LLP's First Interim and Final Application for Allowance and Payment (Doc. No. 228) ("**Janice's Fee Objection**") filed on March 11, 2025, by creditor Janice Logan ("**Janice**"), as Trustee of the James Logan Family Trust, dated February 10, 2021(the "**Trust**"), which objection was in response to Akerman LLP's First and Final Application for Allowance and Payment (Doc. No. 212) ("**Akerman's Fee Application**" or "**Application**"), and in support thereof, state as follows:

## INTRODUCTION

It is axiomatic and without dispute that the value of the results obtained by Applicant on behalf of the Debtors' estates far exceeds the fees and costs sought by Applicant in this Application. Applicant's efforts resulted in, *inter alia*: (i) the disallowance of a $1MM proof of claim; (ii) the disallowance of proofs of interest that Janice values at $22MM; (iii) a favorable finding that the

Debtors have at least one valid license for the use of their affiliate's intellectual property; (iv) a more favorable valuation date for liquidating Debtors' equity redemption obligations than that requested by Janice; and (v) the denial of various frivolous motions interposed by Melvin Engelke against the Debtors and broad discovery sought by Mr. Engelke in connection therewith.  In addition to the results obtained, Applicant's fees and costs are demonstrably reasonable given that: (i) Applicant operated under substantial time constraints in achieving the aforementioned results in less than ninety (90) days from the Petition Date; (ii) Applicant provided substantial discounts of Applicant's regular hourly rates and courtesy discounts of numerous time entries associated with assisting general bankruptcy counsel; and (iii) Applicant's rates are lower than the rates charged by Janice's own counsel.

With the exception of Janice, no party has interposed a single objection to the Application, including the Office of the United States Trustee, the Subchapter V Trustee, and the largest non-insider creditor of the Debtors' estates.  Notably, Janice's Fee Objection is facially defective in its broad and unsupported allegations, which fail to comply with the Court's mandates requiring specific objections to specific fees and specific costs.  This confirms that Janice's Fee Objection is nothing more than a litigation tactic to further oppress and harass the Debtors and Applicant, even where a super-majority of the time incurred by Applicant was a direct result of Janice's litigation tactics.  Moreover, Janice's Fee Objection belatedly raises nonexistent conflicts that Janice failed to prosecute at the time of Applicant's retention or at any point in the State Court Action.  Because the Applicant's fees and costs represent reasonable compensation for necessary services on behalf of the Debtors' estates, the Court should overrule Janice's Objection and allow Applicant 100% of the fees and costs sought in the Application.

**ARGUMENT**

**I.    Applicant's Services Were Likely To, And Did, Benefit Debtors' Estates.**

Contrary to Janice's Fee Objection, Applicant's services were not only likely to benefit Debtors, but *did* benefit Debtors in this Court and in the Sarasota Action.[1] A debtor's attempt to reorganize does not have to be successful is order to recover debtor's attorneys' fees:

> [C]ounsel who undertake to represent debtors cannot be required to predict the ultimate outcome of a Chapter 11 reorganization. Indeed, whether they are to be compensated cannot be based upon the success of the reorganization. Such a test would require the debtor's counsel to also be debtor's guarantors. It would impose an impossible burden upon lawyers. Because some risk of failure is inherent in every Chapter 11 case, such a rule would preclude the filing of many potentially-successful reorganizations.

*In re Garrison Liquors, Inc.*, 108 B.R. 561, 564 (Bankr. D. Md. 1989); *In re James Contracting Grp., Inc.*, 120 B.R. 868 (Bankr. N.D. Ohio 1990) (overruling objections to Chapter 11 debtor's attorney's fee request even though reorganization was unsuccessful). Instead, the services need only have been "reasonable" at the time they were rendered.

A court may not determine "reasonableness" through hindsight. The test does not depend on results; rather, it is an objective one and considers "what services a reasonable lawyer or legal firm would have performed in the same circumstances." *In re Ames Dep't Store, Inc.*, 76 F.3d 66, 72 (2d Cir. 1996) (citing *In re Taxman Clothing Co.*, 49 F.3d 310, 315 (7th Cir. 1995) (Posner, C.J.)). Debtors' legal positions advanced in state court as to the validity of the 2015 license with HLFIP Holding, LLC ("**HLFIP**") (which has now been upheld on a motion for reconsideration post-dismissal) and the valuation date of the Trust's shares, if Debtors' prevailed, would obtain significant value to Debtors' estates. Debtors did in fact prevail on certain of the issues adjudicated, which benefited the estate. *See* Akerman Fee Application at 7-11.

---

[1] Capitalized Terms will have the same meaning ascribed to them in Akerman's Fee Application.

**a. Applicant's Services in the Sarasota Action Benefited Debtors' Estate**

In the Sarasota Action, Applicant was responsible for handling two main issues: (1) whether there was a valid license between Debtors and HLFIP for Debtors' use of HLFIP's intellectual property in its business; and (2) the appropriate valuation date, pursuant to Fla. Stat. § 607.1436(4), of Debtors' redeemed equity in its proceedings for Debtors' election to purchase the Trust's shares in Debtors. Applicant largely (and ultimately) prevailed, in part, on both issues to the benefit of Debtors' estate.

For the first issue, Debtors undoubtedly had and still have an interest in protecting and preserving Debtors' access to and ability to use the intellectual property owned by HLFIP and licensed to Debtors for use in their business. At the February 2025 trial, Janice admitted under oath that Debtors' business has derived great benefits from the use of HLFIP's intellectual property. The precise value of the intellectual property license to Debtors is still in dispute, but no one disputes that Debtors reap *some* non-zero value from the intellectual property license being in place; in fact, the evidence established that Debtors could not function without the license. Janice has long acknowledged this. In fact, in her Emergency Motion to Remove the Debtors as Debtors-in-Possession (Doc. No. 168), which she subsequently withdrew, Janice argued that if Jon "'pull[ed] the physical plug' on SmartComm's use of certain technology" owned by HLFIP, that "is not going to be good for Smart Communications." So, the idea that Debtors should argue against the validity of such a license – as Janice would apparently now have Debtors do – is directly at odds with Debtors' interests, and would materially harm Debtors' estates if successful.

At the conclusion of the February 2025 trial, it appeared that the Court failed to find the existence of an intellectual property license dating back to 2015 as agreed to between Jon Logan, on behalf of HLFIP, and Jim Logan, Jon's father and then SmartComm officer and director, on behalf of SmartComm (*i.e.,* Debtors). Applicant and Debtors believed that such a finding was

directly at odds with the evidence put forth during the February 2025 trial, and filed a Motion for Reconsideration on this and other points. *See* Mot. for Reconsideration [DIN 1265]. On April 2, 2025 (after this case had been dismissed), the Sarasota Court entered an order granting the motion, in part. The Sarasota Court noted that, due to the Court's oversight, the Court neglected to "expressly state that Jon Logan and his Dad (Jim Logan) in 2015 agreed that Smart Communications could use HLFIP's intellectual property." *See* Apr. 2, 2025, Order at 2 [DIN 1284], a true and correct copy of which is attached as ***Exhibit 1***.

Critically, the Order explicitly provides: "The Court clarifies that Jon Logan and Jim Logan orally agreed that Smart Communications could use HLFIP's intellectual property." *Id.* Thus, Applicant and Debtors ultimately prevailed on the single-most important issue in the Sarasota Action's February 2025 trial, and Applicant protected and preserved Debtors' access to and ability to use the intellectual property owned by HLFIP under the parties' license agreement.[2] This is undoubtedly to Debtors' estate's benefit because without a license agreement, Debtors' business and its compliance under existing contracts would be called into question.[3]

Applicant and Debtors also obtained a positive ruling to Debtors' benefit in connection with the second issue in the February trial: the appropriate valuation date. Janice and the Trust argued in favor of a February 27, 2023, valuation date, presumably because Janice believes such

---

[2] If the Sarasota Court's initial order and findings were more clear on this point – *i.e.* that a valid license agreement between Debtors and HLFIP existed and exists – it is possible that this Bankruptcy Proceeding would not have been dismissed. While the exact terms of the license are still in dispute, under the Sarasota Court's ruling, Debtors owe some non-zero amount of money to HLFIP in the form of royalties for use of its intellectual property under their license agreement.

[3] As the Debtors have explained before, in their government contracts, they are required to identify themselves as the "exclusive licensee" of HLFIP's technology; so, if the license were not upheld, that could have created contract risk with its 150 facility partners, all of whom use HLFIP technology. While the scope of the license and the appropriate royalty owed under it are still at issue and will be decided in the next phase of the case, Debtors' business operations are secured in the near term due, in part, to Applicant's advocacy.

a date provides her with the greatest chance to obtain an artificially inflated valuation for the Trust's shares by avoiding the import of recent regulatory changes in the inmate communication industry. As an initial matter, and as discussed in more detail below, this perfectly encapsulates why there is and was no conflict in Applicant representing both Jon and Debtors in the Sarasota Action: Janice and the Trust have an interest in advocating for the greatest valuation of Debtors' shares in connection with the election to purchase the Trust's shares proceeding, while Debtors (and, indirectly, Jon) have an interest in advocating for the lowest valuation of Debtors' shares in that proceeding, so that Debtors will have to pay as little as possible to the Trust in exchange for its shares. The less Debtors have to pay to the Trust for its shares, the more money it retains for ongoing operations—thus, the greater the benefit to Debtors and Debtors' estate. Conversely, the higher the valuation of the Trust's shares, the less money available to Debtors and Debtors' estate. This is a simple, indisputable fact Janice ignores.

With this in mind, it was to Debtors' benefit to obtain a valuation date that properly took into consideration the most impactful and important recent development in Debtors' industry: the passage of the Martha Wright-Reed Act ("**MWRA**") and the promulgation of regulations by the Federal Communications Commission. The MWRA was signed into law in January 2023, and its ultimate impact was largely speculative by February 2023, though the industry feared the worst. At trial, Applicant successfully opposed Janice's requested February 27, 2023, valuation date, and the Court ultimately chose August 28, 2023, as the valuation date (a date in between those proposed by Janice and Debtors). However, and most significantly, based upon Applicant's arguments and evidence put forward at trial, the Sarasota Court's order after the February 2025 trial specifically found that as of August 28, 2023 (its selected valuation date), "the Martha Wright-Reed was known or knowable, storm clouds were on the horizon." *See* Feb. 17, 2025 Order, Ex. 1 at 33:15-16 [DIN

1189]. In other words, the Sarasota Court explicitly held that the effects of the MWRA on Debtors' business, and thus on its valuation, can and should be taken into account by the valuation experts. This ruling, obtained by Applicant, inures directly to Debtors' benefit because it results in a more accurate valuation of Debtors' shares due to the negative impact of the MWRA on its business—a consideration Janice tried to avoid by arguing for her earlier proposed valuation date that was intended to ignore these realities.

Furthermore, in addition to largely prevailing on the two main issues for Debtors during the February 2025 trial, Applicant also successfully fought for and protected Debtors' *trade secrets* from publication by a local reporter that was present during the trial. At the conclusion of the February 2025 trial, the Sarasota Court entered a number of orders that would have released to the public a multitude of Debtors' trade secrets and confidential proprietary business information. *See* DINs 1185, 1186, 1187. On February 14, 2025, the Sarasota Court set for hearing a number of issues pertaining to Debtors' confidential information, including a filing deadline of February 18, 2025, to move for the continued confidentiality of Debtors' information across hundreds of different documents. Applicant successfully moved for a writ of prohibition with the Florida Second District Court of Appeal staying the Sarasota Court's orders and the February 19, 2025, hearing, which provided Applicant and the Debtors an opportunity to undertake an appropriate review of the various docket entries and trial exhibits, and thus take any necessary actions to protect Debtors' confidential information. This work and the obtained result was certainly to Debtors' benefit because the release of its confidential and trade secret information to the public and its competitors would have an immense adverse effect on Debtors' business. This was not only to Debtors' estate's benefit, but also (indirectly) to Janice's benefit.[4]

---

[4] Notably, Janice and her counsel showed a reckless disregard for these trade secrets when they

For all of the above reasons, and those Applicant will put forward at the upcoming hearing on Akerman's Fee Application, the work performed by Applicant greatly benefited Debtors' estate and, therefore, this Court should approve the Fee Application and reject Janice's Fee Objection.

**b. Applicant's Services in this Bankruptcy Proceeding Benefited Debtors' Estate**

Further, Applicant's services in this Court were likely to and did benefit the estate. For example, Melvin W. Engelke, III ("**Engelke**") has claimed, for the past decade, a supposed 10% ownership interest in various Smart Communications entities and the "Smart Jail Mail concept." Because of the Applicant's efforts, the Court entered the following orders: denying Engelke's motion to appoint trustee (Doc. Nos. 153, 188); granting Debtors' emergency motion for protective order declaring that Debtors were not required to respond to the discovery requests or deposition notices of Melvin W. Engelke, III (Doc. Nos. 153, 189); granting motion to strike Melvin W. Engelke, III's objection to confirmation and notice of filing of proof of interest (Doc. Nos. 153, 203); sustaining objection to Claim No. 3 of Melvin W. Engelke (Doc. Nos. 153, 221); and granting Debtors' motion for entry of order enforcing the stay as to confidential information in state court filings (Doc. No. 220).

Janice's proofs of interest (though highly flawed and grossly overstated) estimated the Debtors to be worth $220 million (Doc. Nos. 155, 156). As a result, defeating Mr. Engelke's 10% interest claims, according to Janice's estimates, benefitted the estate by $22 million. Likewise, Janice herself and Debtors' estate were the beneficiaries of Debtors' defeat of Engelke's discovery motions. Engelke served Debtors with burdensome discovery requests consisting of requests for 74 separate categories of documents, 31 requests for admission, and 18 interrogatories, some of

---

filed them in this Court, which required Applicant to take swift protective action.

which contained multiple parts. Engaging in discovery with Mr. Engelke no doubt would have caused all parties to incur unnecessary legal fees.

Separately, the Court's order dismissing the case noted that Jon Logan filed affiliate proofs of claim against SmartComm FL on behalf of HLFIP, himself, and Loco Florida, Inc. (Doc. No. 225 at pp. 2-3). But the Applicant only filed these affiliate proofs of claim to identify the consideration the affiliates were providing under the Plan. After all, those claims were always being released under the Plan.[5]

## II.    Janice Grossly Misrepresented to this Court the Amount of Legal Work and Attorney's Fees  Her Stay Relief Would Entail, and Then Directly Caused Debtors to Incur These Fees by Refusing Debtors' Reasonable Requests to Avoid Unnecessary Fees in the Sarasota Action.

In Janice's Fee Objection, Janice misconstrues events, holdings, and the proceedings in both this Court and the Sarasota Action, and ignores her role in causing the amount of fees the Debtors were forced to incur. The most egregious part of Janice's Fee Objection is her taking issue with the amount of Akerman's legal fees when a super majority of those fees were directly caused by Janice, her counsel, and their litigation tactics in the Sarasota Action.

To be clear, Debtors repeatedly warned this Court that Janice's requested stay relief would require substantial legal work and result in Debtors incurring significant legal fees. *See* Dec. 19, 2024 Hearing Tr. at 42:20-43:5, 44:21-24, 45:9-19, 48:9-15 (Doc. No. 68); *see also* Debtors' Obj. to Creditor Janice Logan's Mot. to Dismiss Cases at 3-4 (Doc. No. 90) ("Based on the Trust's excessive discovery demands and litigation tactics, the Debtors and their professionals anticipate being forced to spend well over an additional $1 million litigating issues that will have at best

---

[5] It is axiomatic that Applicant's results speak for themselves as no other party has interposed a single objection to the fees and costs requested by Applicant in the Application, including the Office of the United States Trustee and the Subchapter V Trustee (both with fiduciary duties to separately review the Application).

marginal impact on the Debtors' long-term future disposable income, and, at most, determine to whom an indeterminate amount might be paid. The result is that the Debtors will have less money available to pay creditors because of the additional administrative expenses incurred—and those expenses have to be paid before creditors or shareholders receive anything.").

However, at the December 19, 2024, hearing on Janice's Emergency Motion for Relief from Automatic Stay (Doc. No. 26), Janice falsely represented to this Court that this case was already "teed up" and "on the eve of a trial" when the bankruptcy petitions were filed (Dec. 19, 2024 Hearing Tr. at 37:22-23) (Doc. No. 68); and that this Court was, back in December, already "intimately familiar with the [IP] issues" (*id.* 38:8-9) because we had been "litigating [them] for a year and [a] half" (*id.* 36:24-25).

As should now be readily apparent, Janice misled this Court with these representations. The fact is that preparing for the February 2025 trial in the Sarasota Action entailed extensive discovery and motion practice.[6] Even worse, Debtors repeatedly tried to keep fees to a minimum during the State Court Proceedings, such as by offering to enter into reasonable stipulations in lieu of costly depositions—including depositions sought by Janice for the sole purpose of authenticating documents—but were repeatedly rebuffed by Janice and her counsel.

Janice noticed ten (10) separate depositions that Applicant had to prepare for, attend, and in most cases, defend. These included: (1) prepare for and defend deposition of Jonathan Logan (noticed in his individual capacity, as corporate representative of Debtors, and as corporate representative of HLFIP on over fifty topics); (2) prepare for and defend deposition of Noreen Gunning (Debtors' in-house accountant); (3) prepare for and defend deposition of Michael Shreve

---

[6] Indeed, Applicant assisted the Debtors in opposing Janice's Motion for Relief from Stay precisely to avoid the Debtors' estates from incurring substantial litigation expenses for issues in which resolution of same might not assist in the contemplated reorganization of the Debtors.

(Debtors' outside accountant); (4) prepare for and defend deposition of Justin Scott; (5) prepare for and defend deposition of Robert Sly (Debtors' expert witness testifying as to the appropriate valuation date); (6) prepare for and attend deposition of Mark Schuette (HLFIP's expert witness); (7) prepare for and attend deposition of Jigrasha Voralia (Marcum employee); (8) prepare for and attend deposition of Lisa Miller (Marcum employee); (9) prepare for and attend deposition of Melina Naidu (Marcum employee); and (10) Lisa Eddy (Debtors' Chief Operations Officer). In the case of Lisa Eddy, Janice finally agreed to forgo Ms. Eddy's deposition after Applicant moved for a Protective Order due to the unnecessary amount of discovery relevant to the February trial, arguing that Debtors were willing to enter into reasonable stipulations rather than engage in time-consuming depositions, and Janice Logan reluctantly agreed to enter into stipulations for Ms. Eddy. Applicant made the same offer on behalf of Debtors for a number of the other witnesses, but Janice refused those offers, against the recommendation of the State Court.

Debtors also noticed four depositions: (1) Janice Logan; (2) Alexis Logan; (3) Dr. Berneman (Janice's first expert witness); and (4) Dr. Alan White (Janice's second expert witness). In total, thirteen (13) depositions were taken during January and February 2025 in the lead up to the February trial. In addition, Applicant had to review tens of thousands of pages of documents that Janice insisted be produced, in late made discovery requests, in advance of the February 2025 trial.

Between the limited lifting of the stay and the conclusion of the Sarasota Action's February trial, Debtors also had to engage in extensive motion practice in the Sarasota Action to protect the interests of the Debtors and Debtors' estates, as well as in an attempt to limit the amount of discovery and resources expended in the Sarasota Action. These included seven different motions that were aimed at limiting the scope of the evidence Janice sought to unnecessarily elicit at trial,

plus a response to Janice's motion to compel. *See* Akerman Fee Application at 9 (Doc. No. 212). Applicant also had to attend and argue matters at five separate hearings in the Sarasota Action during January and February 2025. *See id.* at 9-10.

It was Janice herself that acted contrary to the interests of the estates, not Debtors. As a matter of law, her conduct bars her from opposing Akerman's Fee Application. *See In re LBH Associates Limited Partnership*, 109 B.R. 157, 158 (Bankr. D. Md. 1989) (creditor whose conduct materially increased debtor's counsel fees was estopped from objecting to size of fees due to unclean hands); *In re Fraidin*, 401 B.R. 725, 731 (Bankr. D. Md. 2008) ("It ill behooves the debtor to complain about the time and expense to which the trustee has been put in this case when it was the consistently obstructive conduct of the debtor that caused the long delays in the administration of this case to a conclusion with the attendant costs."); *In re Macco Properties, Inc.*, 540 B.R. 793, 889 (Bankr. W.D. Okl. 2015) (refusing to permit set-off where objecting party caused the increase in fees). Simply put, Janice should not be permitted to object to the generation of fees that *she* caused when the Trust multiplied the breadth of the dispute in seeking stay relief and then pursuing the state court Proceedings in a scorched-earth manner. Thus, Janice's Objection should be overruled and Akerman's Fee Application granted.

**III.    Janice's Objection is Legally Defective.**

The Trust's Fee Objection is also legally defective. First, it relies on a purported conflict in Applicant's joint representation of Jonathan Logan and the Debtors; but, no conflict exists because the interests of Applicant's clients are fully aligned. Second, even if there were a conflict, any objection to that purported conflict has been waived. Third, the Trust fails to object to specific time entries as required; instead, the Trust contends that Applicant's billing on whole is "shocking" and "mystifying." Not only are such generic objections legally deficient, in this case they are unwarranted.

a. **No Conflict Existed In Akerman's Representation.**

Janice's Fee Objection must be denied because there was no conflict in the first place. Here, the Debtors' and Mr. Logan's interests were and are fully-aligned with each other—both in the proceedings before this Court and in the proceedings that occurred in state court at this Court's direction. Janice seems to argue that the mere fact that Debtors are pursuing positions in litigation at odds with the Trust's interests as a 50% shareholder makes Debtors' conduct (and Applicant's) *per se* improper. Janice clearly has an interest to argue for the highest possible valuation of SmartComm FL, and thus the highest possible valuation of the Trust's shares, in order to obtain the highest possible payout for her 50% shares from the Debtors. Similarly, Debtors have an interest in putting forth evidence that would have the practical effect of decreasing the value of its shares so that any judgment entered under Fla. Stat. § 607.1436, which judgment would direct Debtors to make a payment to the Trust, is as small as possible. This is not unusual or remarkable. Any corporation when faced with a claim seeking its dissolution and then electing to purchase the complaining shareholder's shares has the exact same interest: to advocate for the lowest value of those shares as possible in connection with the election to repurchase shares. Janice's arguments, taken to the logical conclusion, would preclude an adversarial process in *every* election to purchase shares proceeding. That is not the law.

First, Debtors and Jon Logan clearly have the same interest as to the proper valuation date for Janice's stock as mentioned above. *See supra* Section I(a). The later the valuation date was determined to be, the easier it will be to take the negative impacts of the MWRA into consideration during the valuation analysis. This would lower the Trust's shares' valuation, resulting in less money that would need to be paid to the Trust from the estate, and thus less money that is taken out of the company. Janice can point to no evidence that Debtors and Jon ever took conflicting positions on this argument, because it does not exist. Rather, Janice argues in favor of her preferred

outcome—a higher valuation of Debtors' shares, which would result in a higher payment to her for the Trust's shares. This is the heart of the conflict, one that is between Debtors and Jon, on one side, and Janice and the Trust, on the other side. And if Janice's proffered position were adopted, it would flip this conflict on its head and require Debtors to advocate in favor of a higher judgment against them, to their detriment.

Second, Debtors' and Jon's interests are aligned with respect to the validity of the license agreement between Debtors and HLFIP. As Debtors have previously explained, SmartComm provides its customers with comprehensive inmate communications systems including telephone, video visitation, electronic messaging, streaming media platforms, and other services that are fully integrated through a single web-based dashboard, providing a single location for authorized staff to access all system administration, monitoring, reporting, data sharing and investigation tools. (Doc. No. 12). Since 2015, Jon assigned and continues to assign the rights to his intellectual property to HLFIP, and HLFIP has exclusively licensed and continues to exclusively license that intellectual property to Debtors through a license that is subject to a royalty-based fee. (*Id.*). The litigation concerned the validity of the license between Debtors and HLFIP for Debtors' use of HLFIP's intellectual property.

The February 2025 trial in the Sarasota Action did not concern the *value* of the license, but simply its validity. Both Debtors and HLFIP have a vested and aligned interest in upholding the license between them. Debtors have contracts with dozens of correctional facilities to provide services that necessarily use the intellectual property owned by HLFIP. Debtors want to uphold the validity of the license because without it, those contracts could be in default; and it would essentially have no services to provide without the use of the technology. HLFIP, on the other hand, agreed to roll up the license fee into a new exclusive five year license agreement as part of

the Confirmation Plan. And as mentioned above, Applicant was ultimately successful during the February 2025 trial in preserving Debtors' ability to continue to use the licensed technology.

To avoid addressing whether Debtors benefit from the use of HLFIP's intellectual property—a proposition Janice admitted to during trial—Janice instead focuses on the amount of the past-due royalty liability on Debtors' books. Thus, Janice argues that there was a conflict in representing both Debtors and Jon as the other 50% shareholder in connection with HLFIP's asserted past-due Intellectual Property liability amount under the license. However, the amount of that liability was *not* at issue in the Sarasota Action's February trial. Moreover, Debtors, Jon, and HLFIP all took the position at trial that any payment to HLFIP was to be deferred until sale (at which time a third party would pay for HLFIP's interest), pursuant to the 2015 agreement.

Even if the IP liability as asserted by HLFIP was at issue during the February trial, a finding of a large past-due debt to HLFIP for use of its IP since 2015 would not be against Debtors' interests *in the context of this election to purchase shares proceeding*. Of course, saddling Debtors with a $80 million plus liability that would require *immediate* payment would be against Debtors' interest, as well as SmartComm's ability to continue as a going concern, but that was not at issue and never was—and no party argued for such a position. In the context of Debtors' election to purchase the Trust's shares, a finding of a larger IP liability to HLFIP would have the practical effect of offsetting the value of SmartComm FL under a market valuation approach, and thus decreasing the amount the Debtors would have to pay the Trust for its 50% shares. Therefore, that position would fully align the interests of Debtors, HLFIP, and Jon in the context of their litigation with Janice and the Trust.

There simply has never been a conflict between the interests of Debtors and those of HLFIP and Jon in this litigation. Indeed, recognizing the realities of the adversarial posture of this case

and the alignment of interests, the Sarasota Court ordered Debtors to share trial time with HLFIP, describing the case as "a family feud." *See* Feb. 4, 2025 Hr'g Tr. at 59:11-18 ("THE COURT: Let me be – I see this as a family feud. Maybe I shouldn't but it is. You've got Jon on one side, and Mom and Sister on the other side. So, to me, Jon, Peterson [sic] and all his entities get half the time. Janice Logan and – and her daughter get the other half of the time. Pretty – I don't think it needs to be more complex than that."). Janice's Objection that cherry picks certain time entries where Debtors' counsel strategized or spoke with counsel for HLFIP is thus unconvincing, because all parties' interests were aligned. *See Platinum Properties Inv'r Network, Inc. v. Sells*, No. 18-61907-CIV, 2019 WL 1670893 (S.D. Fla. Apr. 17, 2019) (denying motion for disqualification where defendants' interests were closely aligned); *Hill Nissan, Inc. v. Jenkins Nissan, Inc.*, No. 8:11-CV-2757-T-35EAJ, 2012 WL 13106336 (M.D. Fla. Feb. 9, 2012) (denying motion to disqualify defendants' counsel from representing corporate defendant and individually named officers because both had unified positions with respect to the claims asserted against them); *Rahal v. Mussel Beach Rest. Inc.*, No. 17-CV-80442, 2017 WL 11454443 (S.D. Fla. Nov. 29, 2017) (same).

Additionally, it should be noted that Akerman was retained as special counsel under 11 U.S.C. § 327(e), which permits the trustee, with the court's approval, to employ for a specified special purpose counsel "that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed." In this case, Akerman sought and was granted its status as special counsel due to its ongoing representation of Debtors in the Sarasota Action pre-petition, and Akerman's representation of Debtors in that action was fully disclosed to and known by Janice, the Court, and all other interested parties at that time.

The bottom line is that the shareholder dispute, which exists because of Janice's wrongdoings, has cost Debtors a small fortune. If there is anyone that has worked against the interests of the estate, it is Janice herself. Bankruptcy and reorganization of the debt was a clear way to quickly and economically eliminate the overhang of significant litigation and resolve the issue of the companies' outstanding debt. It is indisputable that HLFIP owns the technology that Debtors use to service their contracts with correctional facilities, and that Debtors have not paid HLFIP any money for the use of that technology. It is also indisputable that if Debtors are going to continue to operate, they need to do so using the technology that HLFIP owns. As a result, it is in Debtors' best interest to resolve the issue of the license that exists between Debtors and HLFIP, and clearly delineate the obligations to HLFIP going forward. The bankruptcy provided a way to not only resolve the shareholder issue and cut off other third-party creditor debt, but it also provided Debtors a way to resolve the issue of its outstanding obligations to HLFIP. It is clear the actions that Debtors' counsel took in the Sarasota Action and in this Bankruptcy Action were ones that a reasonable attorney would have taken for the benefit of the estate. Thus, Janice's Objection should be denied.

**b. The Trust Waived Its Objection To The Purported Conflict**

Even if there were "clear conflicts of interest" in Applicant representing Jon and the Debtors as Janice contends, *see* Fee Objection (Doc. No. 228) at 2, this argument has been waived.

On December 10, 2024, Applicant filed its application for approval of employment as special litigation and transactional counsel to Debtors effective to November 30, 2024 ("**Akerman's Appointment Application**") (Doc. No. 32). Applicant sought to represent the Debtors "as special litigation counsel as to adjudication of any contested matters relating or concerning issues raised by any non-debtor party in the state court litigation described herein and as transactional counsel in these jointly administered Chapter 11 cases." *Id.* at 2. At that time,

Applicant was already counsel of record for Jon and the Debtors in the state court litigation. *Id.* at 3. Akerman's Appointment Application also made clear that Applicant intended "to apply to the Court for allowance of compensation for professional services rendered and reimbursement of charges and disbursements[.]" *Id.* at 4.

On December 23, 2024, the Trust filed an objection to Akerman's Appointment Application ("**Trust's Appointment Objection**") (Doc. No. 63). The Trust argued that the application "should be denied because Akerman has an irreconcilable conflict here as a result of representing Jonathan Logan ('Jon')—who purports to be SmartComm's largest creditor [via his control of HLFIP Holding LLC]—individually in the state court lawsuit in Sarasota County." *Id.* at 1.[7] The Trust further stated that Debtors and Jon "have divergent interests in this bankruptcy" (*id.*); that "[i]t is not in SmartComm's best interest to be subject to a disputed $90 million liability, which in fact is its only substantial liability in these bankruptcies" (note the Trust would thereafter file a $110 million claim in these bankruptcies (Proof of Interest (Doc. No. 156)) (Trust's Appointment Objection (Doc. No. 63) at 2); and that it is in "Jon's best interests for HLFIP (*i.e.*, himself) to receive $90 million from SmartComm" (*id.* at 2). The Trust further noted that in the state court litigation SmartComm has long acknowledged "the validity of the IP Liability" and that "it owes and owed HLFIP a royalty fee in connection with the use of HLFIP IP before 2023." *Id.* at 3. These arguments (which the Trust raised in connection with Akerman's appointment) are the

---

[7] It bears noting that Applicant had been representing Jon and Debtors in the state court litigation since June 7, 2024. By December 23, 2024, when the Trust filed its objection to Akerman's appointment, the Trust had also sought and obtained leave from this Court to continue to litigate (and, in fact, go to trial) on valuation issues in state court in approximately one month's time. Accordingly, the import of the Trust's objection is clear; it sought to achieve an improper tactical advantage over Jon and the Debtors by disqualifying their counsel right before a grueling and expedited trial process. The Trust's belated objection was an effective end-run around the disqualification process in state court, which process the Trust had already waived.

*same* arguments the Trust makes now—that Akerman represented Jon's interests, and not the Debtors, and that the Debtors and Jon/HLFIP were and are not aligned. Trust's Fee Objection (Doc No. 228) at 2.

Yet, one week after the Trust's Appointment Objection was filed, on December 31, 2024, the Trust voluntarily waived the objection by filing a Notice of Withdrawal of the Trust's Appointment Objection to Akerman's Appointment Application (Doc. No. 72). *See In re Estate of Douglas*, 622 So. 2d 1146, 1146-47 (Fla. 2d DCA 1993) (holding that withdrawing a previous objection made in the case estopped the party from asserting the objection later). Applicant expects the Trust will argue it did not waive the objection because the Trust stated the objection was withdrawn "without prejudice" in the notice. That argument fails for the simple reason that the Trust never re-filed an objection to Akerman's Appointment Application. It had ample opportunity to do so. The Court did not enter an order approving Akerman's Appointment Application until January 31, 2025 (Doc. 20. 114), exactly one month after the Trust withdrew its objection.

When the Court entered its order, the Court accepted that Akerman "holds no undisclosed interest adverse to the estates in the matters upon which they are engaged" and that "their employment is necessary and would be in the best interest of the estates[.]" *Id.* That is consistent with Section 327(a) of the U.S. Bankruptcy Code, which provides that only lawyers "that do not hold or represent an interest adverse to the estate, and that are disinterested persons" may be employed to assist the estate fiduciary in carrying out his or her duties under the Code.

The Trust had multiple opportunities to challenge these determinations; it waived its opportunity to do so. Indeed, after the order was entered, the Trust did not file a motion for reconsideration or otherwise indicate to the Court that it intended to, but had not, renewed its objection to Akerman's representation of Debtors. For certain, the time for the Trust to object to

Akerman's representation is <u>not</u> months later, after Akerman's professionals have spent over 2,000 hours on their clients' behalf. *See* Akerman's Fee Application (Doc. No. 212) at 21.

The Court should also know that Jon and the Debtors have had joint representation in the State Court Proceedings for *years*, and the Trust has *never* sought to disqualify *any* of their counsel on the basis of this purported conflict of interest; this includes Griesing Mazzeo Law, LLC (appearing March 13, 2023); Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A. (appearing November 13, 2023); The Geer Law Firm, L.C. (appearing November 15, 2023); and Akerman LLP (appearing June 7, 2024). This too constitutes a waiver: "The law is clear that a litigant can waive the right to seek disqualification of an opponent's attorney by a delay in seeking to enforce the right." *L.E.B. v. D.D.C.*, 304 So. 3d 54, 57 (Fla. 2d DCA 2020) (waiving right to move to disqualify by waiting for over a year after the start of the proceedings to make motion); *In re Jet 1 Center, Inc.*, 310 B.R. 649, 654 (Bankr. M.D. Fla. 2004) (denying motion to disqualify counsel where adverse party knew about the conflict "for a considerable amount of time"); *Med. & Chiropractic Clinic, Inc. v. Oppenheim*, No. 8:16-CV-1477-T-36CPT, 2018 WL 4561783, *7 (M.D. Fla. Aug. 10, 2018) (delay in filing motion to disqualify based on purported conflict of interest "operates as a waiver"); *Zayas-Bazan v. Marcelin*, 40 So. 3d 870, 872-73 (Fla. 3d DCA 2010) (right to seek disqualification was waived where moving party waited more than two years after the lawsuit was filed to assert a conflict of interest). The Trust never sought to disqualify any of Jon's and the Debtors' counsel in the State Court Proceedings—and it still has not.

The Trust waived its conflict-based objection to Akerman's Fee Application.

**c.   Janice's Objection Fails To Conform To Requirements For Fee Application Objections.**

Instead of substantively confronting the time entries and tasks performed by Akerman, Janice's objection makes a blanket assertion that the total amount of fees in Akerman's Application

is "shocking." (Doc. 228 at p. 3). That is patently inadequate. "The amount requested by a fee application cannot be considered unreasonable simply because one party feels it is excessive." *In re Blackwood Assocs., L.P.*, 165 B.R. 108, 111-12 (Bankr. E.D.N.Y. 1994). "Objectors have the responsibility to challenge [the] information [presented in a fee application] and to produce evidence controverting that produced by the applicant . . . ][A] gestalt reaction that there was too much time spent . . . isn't good enough.'" *Hunt's Health Care*, 161 B.R. 971, 981-82 (Bankr. N.D. Ind. 1993) (quoting *Steinlauf v. Continental Ill. Corp. (In re Continental Ill. Sec. Litig.)*, 962 F.2d 566, 570 (7th Cir. 1992)). It is also inconsistent with Janice's counsel's own fee applications. *See, e.g., Sprint Commc'ns Amended Mot. for an Award of Att. Fees*, No. 18-cv-60788, 2024 WL 4491392, Doc. No. 405-1 (S.D. Fla. July 11, 2024).[8]

The party opposing the fee application has the burden of explaining what therein is unreasonable. Absent such evidence, the opposition fails. *See Norman v. Housing Auth. Of City of Montgomery*, 836 F.2d 1292, 1301 (11th Cir. 1988) ("Generalized statements that the time spent was reasonable or unreasonable of course are not particularly helpful and not entitled to much weight"); *In re Investors Lending Grp., LLC*, No. 11-br-41963, 2013 WL 3380995, at *3 (Bankr. S.D. G.A. July 8, 2013) ("For the court to consider objections to fee and expense requests, the objections must be as reasonably detailed as the fee and expense requests themselves."); *Hunt's Health Care*, 161 B.R. 971, 971 (Bankr. N.D. Ind. 1993) ("just as the district court . . . could not properly reduce fees for 'inarticulate and unsubstantiated dissatisfaction with the lawyers' efforts

---

[8] This motion for an award of attorneys' fees was submitted jointly by Janice's primary counsel in the Sarasota Action, Shook, Hardy & Bacon, L.L.P. ("**SHB**"), in a recent case in the Southern District of Florida, in which SHB argued hourly rates as high as $1,100/hr were reasonable. *See Sprint Commc'ns, LLC v. Calabrese*, No. 18-CV-60788, 2025 WL 713048, at *7 (S.D. Fla. Feb. 20, 2025), *rep. and rec. adopted*, No. 18-60788-CIV, 2025 WL 708130 (S.D. Fla. Mar. 5, 2025) (ultimately awarding more than $2.7 million in attorneys' fees).

to economize' . . . this court should not heed a creditor's unexplained dissatisfaction"). It is not the Court's role to "supply such evidence or the detail required to support the objectant's overly general pleading." *In re Blackwood Assocs., L.P.*, 165 B.R. 108, 112 (Bankr. E.D.N.Y. 1994). And that is all Janice's Objection is—an overly generalized pleading that urges this Court to blanketly deny Akerman's Application.

Additionally, although Janice's Fee Objection does not specifically object to Applicant's hourly rates as unreasonable, and therefore such objection has been waived, Applicant notes that it provided Debtors with a substantial hourly rate discount in connection with its representation in both the Sarasota Action and in its role as special counsel in this proceeding. *See* Akerman Fee App. at 4 n.2 (Doc. No. 212). Moreover, Applicant's services were provided under immense time constraints caused by Janice's misrepresentations to both courts, including the completion of 13 depositions and additional discovery while preparing for trial within a 6-week span, that absolutely obstructed the Applicant's attorneys working on the Sarasota Action from being able to take on additional separate engagements. Janice's position that Jon should be forced to pay for the attorneys' fees that Debtor incurred is actually an argument that Applicant should not be paid at all for its work. As this Court is aware, Jon has not taken a salary since November 2024, and he had planned to contribute his other assets to Debtors as part of the Confirmation Plans. Janice knows that Jon does not have the ability to pay Applicant's fees himself, and her Objection is nothing more than blatant gamesmanship seeking to obtain an unfair advantage in the parties' ongoing dispute by depriving Debtors of competent counsel.[9]

---

[9] This is not Janice's only attempt to deprive Debtors of their chosen legal counsel. In the Sarasota Action, Janice filed an Amended Mot. to Appoint a Custodian in which she seeks an order granting her hand-picked custodian with the power to approve any future payments of attorneys' fees and to engage a new law firm that reports to the custodian rather than Jon for all future litigation decisions and strategies in the parties' dispute. *See* Janice's Emergency Mot. to Appoint a

Janice's objection is woefully deficient and lacks any detail necessary to challenge the information presented in Akerman's Fee Application. Janice's conclusory statement that Akerman's total fees are too high for the work performed do not provide any evidence from which this Court can conclude that Akerman's Fee Application is improper or unreasonable. Thus, Janice's Objection is improper and should be dismissed.

## IV.    Conclusion

For the foregoing reasons, Debtors respectfully ask this Court to overrule Janice's Objection to Akerman's Application and grant the Application.

**WHEREFORE**, the Debtors, Smart Communications Holding, Inc. and Smart Communications holding, LLC, request that this Court overrule Janice's Objection and enter an order granting Akerman LLP's First Interim and Final Application for Allowance and Payment, and grant such other relief that is just and proper.

Dated: April 11, 2025                    Respectfully submitted,

By:  */s/ Eyal Berger*
Eyal Berger, Esq.
Florida Bar Number:  0011069
Email: eyal.berger@akerman.com
Dustin Hillsley, Esq.
Florida Bar Number:  101858
Email: dustin.hillsley@akerman.com
**AKERMAN LLP**
201 East Las Olas Blvd., Suite 1800
Fort Lauderdale, FL  33301
Tel: (954) 463-2700 /Fax: (954) 463-2224

*Special Litigation & Transactional Counsel to Debtors*

---

Custodian, at 22, Feb. 27, 2025 (DIN 1225).

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished on March __, 2025 by the Court's CM/ECF electronic mail system as listed in the attached service list.

/s/ Eyal Berger

## SERVICE LIST

**8:24-bk-07106-RCT Notice will be electronically mailed to:**

John A Anthony on behalf of Creditor Melvin Engelke
janthony@anthonyandpartners.com, efilings@anthonyandpartners.com;cfosdick@anthonyandpartners.com

Kimberly A. Bald on behalf of Creditor Correct Solutions, LLC
kab@harlleebald.com

Eyal Berger on behalf of Debtor Smart Communications Holding, Inc.
eyal.berger@akerman.com, jeanette.martinezgoldberg@akerman.com

Eyal Berger on behalf of Interested Party Smart Communications Holding, LLC
eyal.berger@akerman.com, jeanette.martinezgoldberg@akerman.com

Kathleen L DiSanto
disanto.trustee@bushross.com,
kdisanto@bushross.com;bankruptcy.eservice@bushross.com;kdisanto@ecf.courtdrive.com;ecf.alert+disanto@titlexi.com

Kathleen L DiSanto on behalf of Trustee Kathleen L DiSanto
disanto.trustee@bushross.com,
kdisanto@bushross.com;bankruptcy.eservice@bushross.com;kdisanto@ecf.courtdrive.com;ecf.alert+disanto@titlexi.com

John L Dicks, II on behalf of Debtor Smart Communications Holding, Inc.
john.dicks@akerman.com, judy.mcarthur@akerman.com

John L Dicks, II on behalf of Interested Party Smart Communications Holding, LLC
john.dicks@akerman.com, judy.mcarthur@akerman.com

Teresa Marie Dorr on behalf of U.S. Trustee United States Trustee - TPA
teresa.dorr@usdoj.gov, lizette.montanez@usdoj.gov

Daniel R Fogarty on behalf of Attorney Stichter, Riedel, Blain & Postler, P.A.
dfogarty.ecf@srbp.com, srbpecf@srbp.com

Daniel R Fogarty on behalf of Debtor Smart Communications Holding, Inc.
dfogarty.ecf@srbp.com, srbpecf@srbp.com

Daniel R Fogarty on behalf of Debtor Smart Communications Holding, LLC
dfogarty.ecf@srbp.com, srbpecf@srbp.com

Daniel R Fogarty on behalf of Interested Party Smart Communications Holding, LLC
dfogarty.ecf@srbp.com, srbpecf@srbp.com

Donald R Kirk on behalf of Creditor HLFIP Holding, LLC
[dkirk@carltonfields.com](mailto:dkirk@carltonfields.com), [kathompson@carltonfields.com](mailto:kathompson@carltonfields.com)

John W Landkammer on behalf of Creditor Melvin Engelke
[jlandkammer@anthonyandpartners.com](mailto:jlandkammer@anthonyandpartners.com), [efilings@anthonyandpartners.com,crodriguez@anthonyandpartners.com](mailto:efilings@anthonyandpartners.com)

James Emery Lynch on behalf of Creditor Correct Solutions, LLC
[jel@harlleebald.com](mailto:jel@harlleebald.com)

Megan Wilson Murray on behalf of Interested Party Swank Motion Pictures, Inc.
[mmurray@underwoodmurray.com](mailto:mmurray@underwoodmurray.com),
[dstrand@underwoodmurray.com;mmurray@ecf.courtdrive.com;euzonwanne@underwoodmurray.com;admin@underwoodmurray.com](mailto:dstrand@underwoodmurray.com)

Edward J. Peterson, III on behalf of Creditor Janice Logan
[edwardp@jpfirm.com](mailto:edwardp@jpfirm.com), [andrenaw@jpfirm.com;JillC@jpfirm.com;melanief@jpfirm.com;AngelinaL@jpfirm.com](mailto:andrenaw@jpfirm.com)

David Edward Schoenfeld on behalf of Creditor Janice Logan
[docket@shb.com](mailto:docket@shb.com), [docket@shb.com](mailto:docket@shb.com)

United States Trustee - TPA
[USTPRegion21.TP.ECF@USDOJ.GOV](mailto:USTPRegion21.TP.ECF@USDOJ.GOV)

W. L. West on behalf of Creditor Correct Solutions, LLC
[cwest@roedelparsons.com](mailto:cwest@roedelparsons.com)

W. L. West on behalf of Interested Party Mark Turner
[cwest@roedelparsons.com](mailto:cwest@roedelparsons.com)

W. L. West on behalf of Interested Party Rick Ferguson
[cwest@roedelparsons.com](mailto:cwest@roedelparsons.com)